Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff Elon Musk*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELON MUSK, an individual,<br><br>Plaintiff,<br><br>v.<br><br>SAMUEL ALTMAN, an individual, GREGORY BROCKMAN, an individual, OPENAI, INC., a Delaware corporation, OPENAI, L.P., a Delaware limited partnership, OPENAI, L.L.C., a Delaware limited liability company, OPENAI GP, L.L.C., a Delaware limited liability company, OPENAI OPCO, LLC, a Delaware limited liability company, OPENAI GLOBAL, LLC, a Delaware limited liability company, OAI CORPORATION, LLC, a Delaware limited liability company, OPENAI HOLDINGS, LLC, a Delaware limited liability company, | Case No. 3:24-cv-04722<br><br>**COMPLAINT FOR:**<br><br>1. **PROMISSORY FRAUD**<br>2. **CONSTRUCTIVE FRAUD**<br>3. **AIDING AND ABETTING FRAUD**<br>4. **VIOLATIONS OF FEDERAL CIVIL RICO, 18 U.S.C. § 1962(C)**<br>5. **CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO, 18 U.S.C. § 1962(D)**<br>6. **BREACH OF EXPRESS CONTRACT**<br>7. **BREACH OF IMPLIED-IN-FACT CONTRACT**<br>8. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |

OPENAI INVESTMENT LLC, a
Delaware limited liability company,
OPENAI STARTUP FUND
MANAGEMENT, LLC, a Delaware
limited liability company, OPENAI
STARTUP FUND GP I, L.L.C., a
limited liability company, OPENAI
STARTUP FUND I, L.P. a
Delaware limited partnership,
OPENAI STARTUP FUND SPV
GP I, L.L.C., a Delaware limited
liability company, OPENAI
STARTUP FUND SPV GP II,
L.L.C., a Delaware limited liability
company, OPENAI STARTUP
FUND SPV GP III, L.L.C., a
Delaware limited liability company,
OPENAI STARTUP FUND SPV
GP IV, L.L.C., a Delaware limited
liability company, OPENAI
STARTUP FUND SPV I, L.P., a
Delaware limited partnership,
OPENAI STARTUP FUND SPV II,
L.P., a Delaware limited
partnership, OPENAI STARTUP
FUND SPV III, L.P., a Delaware
limited partnership, OPENAI
STARTUP FUND SPV IV, L.P., a
Delaware limited partnership,
AESTAS MANAGEMENT
COMPANY, LLC, a Delaware
limited liability company, AESTAS,
LLC, a Delaware limited liability
company, and DOES 1-10,

Defendants.

9. **BREACH OF QUASI-CONTRACT/UNJUST ENRICHMENT**

10. **FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)**

11. **UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE §§ 17200 *et seq.***

12. **FALSE ADVERTISING UNDER CAL. BUS. & PROF. CODE §§ 17500 *et seq.***

13. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

14. **TORTIOUS INTERFERENCE WITH CONTRACT**

15. **DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiff Elon Musk ("Musk" or "Plaintiff"), for his complaint against defendants Samuel Altman ("Altman"), Gregory Brockman ("Brockman"), OpenAI, Inc., OpenAI, L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Investment LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas, LLC[1] (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      Elon Musk's case against Sam Altman and OpenAI is a textbook tale of altruism versus greed. Altman, in concert with other Defendants, intentionally courted and deceived Musk, preying on Musk's humanitarian concern about the existential dangers posed by artificial intelligence ("AI"). Altman and his long-time associate Brockman assiduously manipulated Musk into co-founding their spurious non-profit venture, OpenAI, Inc., by promising that it would chart a safer, more open course than profit-driven tech giants. The idea Altman sold Musk was that a non-profit, funded and backed by Musk, would attract world-class scientists, conduct leading AI research and development, and, as a meaningful counterweight to Google's DeepMind in the race for Artificial General Intelligence ("AGI"), decentralize its technology by making it open source. Altman assured Musk that the non-profit structure guaranteed neutrality and a focus on safety and openness for the benefit of

---

[1] This Complaint hereinafter uses "OpenAI" to refer to the non-profit (OpenAI, Inc.) and all entity Defendants, collectively.

humanity, not shareholder value. But as it turns out, this was all hot-air philanthropy—the hook for Altman's long con.

2.      After Musk lent his name to the venture, invested significant time, tens of millions of dollars in seed capital, and recruited top AI scientists for OpenAI, Inc., Musk and the non-profit's namesake objective were betrayed by Altman and his accomplices. The perfidy and deceit are of Shakespearean proportions.

3.      Once OpenAI, Inc.'s technology approached transformative AGI, Altman flipped the narrative and proceeded to cash in. In partnership with Microsoft, Altman established an opaque web of *for-profit* OpenAI affiliates, engaged in rampant self-dealing, seized OpenAI, Inc.'s Board, and systematically drained the non-profit of its valuable technology and personnel. The resulting OpenAI network, in which Altman and Microsoft hold significant interests, was recently valued at a staggering $100 billion.

4.      The world has gotten wise to Defendants' scheme. Not only are there several pending lawsuits against OpenAI, Inc. over its unlawful practices, but Defendants are also under investigation by multiple federal agencies, including the Securities and Exchange Commission and the Federal Trade Commission, and are the subject of numerous consumer advocacy complaints to the California Attorney General. A recent spate of OpenAI executives and insiders have blown the whistle on Altman, exposing his unscrupulous maneuvering and self-dealing. Indeed, just this June it was reported that Altman, foregoing any further humanitarian pretense, proposed to OpenAI's stakeholders that it be converted to an entirely *for-profit* enterprise, shielding Defendants from public oversight and the mandatory financial disclosures of a non-profit.

5.      As a result of their unlawful actions, Defendants have been unjustly enriched to the tune of billions of dollars in value, while Musk, who co-founded their *de-facto* for-profit start-up, has been conned along with the public, whom

its vital technology was supposed to benefit. Musk brings this remedial action to divest Defendants of their ill-gotten gains.

## **PARTIES**

6.     Plaintiff Elon Musk is an individual, citizen, and resident of Texas.

7.     Plaintiff is informed and believes and thereon alleges that Defendant Samuel Altman is a resident of San Francisco, California.

8.     Plaintiff is informed and believes and thereon alleges that Defendant Gregory Brockman is a resident of San Francisco, California.

9.     OpenAI, Inc. is a registered non-profit organization incorporated under the laws of Delaware on December 8, 2015. OpenAI, Inc. is registered as an out-of-state corporation with the California Secretary of State and has its principal place of business at 3180 18th Street, San Francisco, CA 94110.

10.     OpenAI, L.P. is a limited partnership formed under the laws of Delaware on September 19, 2018, originally as SummerSafe, L.P. On information and belief, on January 23, 2023 OpenAI, L.P. was converted to OpenAI OpCo, LLC. OpenAI, L.P. is registered as an out-of-state limited partnership with the California Secretary of State and has its principal place of business at 3180 18th Street, San Francisco, CA 94110.

11.     OpenAI, L.L.C. is a limited liability company formed in Delaware on September 17, 2020. OpenAI, L.L.C. maintains its principal place of business in California.

12.     OpenAI GP, L.L.C. is a limited liability company formed in Delaware on September 19, 2018. OpenAI GP, L.L.C is registered as an out-of-state limited liability company registered with the California Secretary of State and has its principal place of business at 3180 18th Street, San Francisco, CA 94110.

13.     OpenAI OpCo, LLC is a limited liability company formed in Delaware on September 19, 2018 as OpenAI, L.P, but was later converted on

COMPLAINT

January 23, 2023 to OpenAI OpCo, LLC. OpenAI OpCo, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

14.   OpenAI Global, LLC is a limited liability company formed in Delaware on December 28, 2022. OpenAI Global, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

15.   OAI Corporation, LLC is a limited liability company formed in Delaware. OAI Corporation, LLC maintains its principal place of business in California.

16.   OpenAI Holdings, LLC is a limited liability company formed in Delaware on March 17, 2023. OpenAI Holdings, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

17.   OpenAI Investment LLC is a limited liability company formed in Delaware on February 6, 2023. Plaintiff is informed and believes and thereon alleges that OpenAI Investment LLC also maintains its principal place of business in San Francisco, California.

18.   OpenAI Startup Fund Management, LLC is a limited liability company formed in Delaware on July 16, 2021. OpenAI Startup Fund Management, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 3180 18th Street, San Francisco, CA 94110.

19.   OpenAI Startup Fund GP I, L.L.C. is a limited liability company formed in Delaware on July 28, 2021. OpenAI Startup Fund GP I, L.L.C. is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 3180 18th Street, San

COMPLAINT

Francisco, CA 94110.

20.     OpenAI Startup Fund I, L.P. is a limited partnership formed in Delaware on July 28, 2021. OpenAI Startup Fund I, L.P. is registered as an out-of-state limited partnership with the California Secretary of State and has its principal place of business at 3180 18th Street, San Francisco, CA 94110.

21.     OpenAI Startup Fund SPV GP I, L.L.C. is a limited liability company formed in Delaware on December 5, 2023. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV GP I, L.L.C. maintains its principal place of business in San Francisco, California.

22.     OpenAI Startup Fund SPV GP II, L.L.C. is a limited liability company formed in Delaware on April 4, 2024. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV GP II, L.L.C. maintains its principal place of business in San Francisco, California.

23.     OpenAI Startup Fund SPV GP III, L.L.C. is a limited liability company formed in Delaware on April 4, 2024. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV GP III, L.L.C. maintains its principal place of business in San Francisco, California.

24.     OpenAI Startup Fund SPV GP IV, L.L.C. is a limited liability company formed in Delaware on May 9, 2024. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV GP IV, L.L.C. maintains its principal place of business in San Francisco, California.

25.     OpenAI Startup Fund SPV I, L.P. is a limited partnership formed in Delaware on December 5, 2023. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV I, L.P. maintains its principal place of business in San Francisco, California.

26.     OpenAI Startup Fund SPV II, L.P. is a limited partnership formed in Delaware on April 4, 2024. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV II, L.P. maintains its principal place of

business in San Francisco, California.

27.    OpenAI Startup Fund SPV III, L.P. is a limited partnership formed in Delaware on April 4, 2024. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV III, L.P. maintains its principal place of business in San Francisco, California.

28.    OpenAI Startup Fund SPV IV, L.P. is a limited partnership formed in Delaware on May 9, 2024. Plaintiff is informed and believes and thereon alleges that OpenAI Startup Fund SPV IV, L.P. maintains its principal place of business in San Francisco, California.

29.    Aestas Management Company, LLC, is a Delaware limited liability company formed in Delaware on February 10, 2023. Aestas Management Company, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

30.    Aestas, LLC is a limited liability company formed in Delaware on September 19, 2018. Aestas, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

31.    Plaintiff is informed and believes and based thereon alleges that the fictitiously named defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions, and circumstances alleged herein. The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiff, and Plaintiff will amend this Complaint to assert the true names and capacities of such fictitiously named defendants when they have been ascertained. For convenience, each reference herein to the named Defendants shall also refer to the Doe defendants and each of them.

**JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

32.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this is a civil case arising under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965, Lanham Act, 15 U.S.C. § 1121, and Declaratory Judgment Act, 18 U.S.C. § 2201, and has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 because all claims herein form part of the same case or controversy under Article III of the United States Constitution. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the matter in controversy well exceeds $75,000 in value and is between citizens of different states.

33.     Plaintiff is informed and believes and thereon alleges that jurisdiction over Samuel Altman is proper because he is domiciled in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

34.     Plaintiff is informed and believes and thereon alleges that jurisdiction over Gregory Brockman is proper because he is domiciled in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

35.     Jurisdiction over OpenAI, Inc. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

36.     Jurisdiction over OpenAI, L.P. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

37.     Jurisdiction over OpenAI, L.L.C. is proper because it has its

principal place of business in the State of California, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

38.     Jurisdiction over OpenAI GP, L.L.C. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

39.     Jurisdiction over OpenAI OpCo, LLC is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

40.     Jurisdiction over OpenAI Global, LLC is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

41.     Jurisdiction over OAI Corporation, LLC is proper because it has its principal place of business in the State of California, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

42.     Jurisdiction over OpenAI Holdings, LLC is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

43.     Jurisdiction over OpenAI Investment LLC is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

44.     Jurisdiction over OpenAI Startup Fund Management, LLC is proper

because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

45.     Jurisdiction over OpenAI Startup Fund GP I, L.L.C. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

46.     Jurisdiction over OpenAI Startup Fund I, L.P. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

47.     Jurisdiction over OpenAI Startup Fund SPV GP I, L.L.C. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

48.     Jurisdiction over OpenAI Startup Fund SPV GP II, L.L.C. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

49.     Jurisdiction over OpenAI Startup Fund SPV GP III, L.L.C. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

50.     Jurisdiction over OpenAI Startup Fund SPV GP IV, L.L.C. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

51.     Jurisdiction over OpenAI Startup Fund SPV I, L.P. is proper

COMPLAINT

because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

52.    Jurisdiction over OpenAI Startup Fund SPV II, L.P. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

53.    Jurisdiction over OpenAI Startup Fund SPV III, L.P. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

54.    Jurisdiction over OpenAI Startup Fund SPV IV, L.P. is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

55.    Jurisdiction over Aestas Management Company, LLC is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

56.    Jurisdiction over Aestas, LLC is proper because it has its principal place of business in the State of California and in this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

57.    Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the State of California and at least one of the Defendants is a resident of this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

COMPLAINT

58.     This action is properly assigned to the San Francisco Division of this District under Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, and a substantial part of the property that is the subject of the action is situated, in San Francisco County, which is served by the San Francisco Division.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.     *The Dangers of Artificial Intelligence*

59.     Over the course of the 20th century, the United States gradually shifted from a primarily labor-based economy to a knowledge-based one, with economic value increasingly generated primarily by human intelligence. As the century progressed, another paradigm shift was already underway: value creation through artificial intelligence ("AI").

60.     Starting in the late 2000s and early 2010s, an algorithm called "deep learning" was developed, the hallmark of which was that it no longer needed to be designed with significant knowledge of the task at hand because it could essentially "learn" from examples and program itself. As deep learning algorithms became increasingly sophisticated, some of the world's leading AI researchers set their sights on Artificial General Intelligence ("AGI"). The basic concept of AGI is a general-purpose AI system—a machine having intelligence for a wide variety of tasks like a human.

61.     Musk has long been concerned by the grave threat these advanced systems pose to humanity, which he has repeatedly warned is likely the greatest existential threat we face today. These dangers include, without limitation (or exaggeration), completely replacing the human workforce, supercharging the spread of disinformation, malicious human impersonation, and the manipulation of political and military systems, ultimately leading to the extinction of humanity. Musk's concerns are shared by other leading figures before him like Stephen Hawking and Bill Joy who chillingly warned that with AGI, "the future

doesn't need us."

62.    Musk has publicly called for a variety of measures to address the dangers of AGI, from voluntary moratoria to regulation, but his calls largely fell on deaf ears.

63.    Where some like Musk see AGI as an existential threat, others like Google—and as it would turn out, Defendants—see it as a source of even greater profit and power.

64.    At the end of 2013, Musk learned that Google was planning to acquire DeepMind, which at the time was one of the most advanced AI companies in the industry. Musk, who is well-known for his opposition to closed technology—e.g., Musk's rocket company SpaceX holds almost no patents and his electric vehicle company Tesla makes its patents open and available for public use—was deeply troubled by this development and believed that in the hands of a giant private company like Google, AGI would pose a particularly acute and noxious danger to humanity. To prevent this, Musk tried to stop the sale, but was ultimately unsuccessful.

65.    In 2014, Google acquired DeepMind and with its team, was immediately catapulted to the front of the race for AGI.

66.    Following Google's acquisition, Musk began hosting a series of dinner discussions on ways to counter Google and promote AI safety. He even reached out to President Barack Obama in 2015 to discuss the issue, but regulation never came.

67.    Musk continued to advocate for safe AI practices and in 2015, he thought he found someone who understood his concerns: Sam Altman.

**B.**    ***Altman Induces Musk to Back OpenAI, Inc.***

68.    From the start, Altman courted Musk by presenting himself as sharing Musk's well-known concerns over the threat posed by AI/AGI. Altman, an experienced tech player, feigned altruism to convince Musk into giving him

free start-up capital and recruiting top AI scientists to develop technological

assets from which Defendants would stand to make billions.

69.     Altman began by testing the waters. In early March 2015, he

approached Musk to help draft an open letter to the U.S. Government

emphasizing the need for regulation to ensure the safe creation of AI. Musk

agreed, and the two began preparing the open letter and approaching Musk's

influential contacts in the technology and AI sectors about signing the letter,

which was published on October 28, 2015.

70.     Sensing opportunity, Altman suggested to Musk on May 25, 2015

that they endeavor to beat Google in the race to develop AGI. He wrote that he'd

"[b]een thinking a lot about whether it's possible to stop humanity from

developing AI. I think the answer is almost definitely not. If it's going to happen,

it seems like it would be good for someone other than Google to do it first."

Altman proposed they start an AI "Manhattan Project" and, to win Musk's

backing, offered to "structure it so that the tech belongs to the world via some

sort of nonprofit but the people working on it get startup-like compensation if it

works. Obviously we'd comply with/aggressively support all regulation." Still

noncommittal, Musk merely responded: "Probably worth a conversation."

71.     To convince Musk of his sincerity, Altman promised that he too

would have skin in the game and would make meaningful financial contributions

to the non-profit. It has since been revealed, however, that Altman grossly

inflated and misrepresented his actual contributions, which pale in comparison

to what he had promised.

72.     A month later on June 24, 2015, Altman tried again, this time

wooing Musk with a detailed proposal for a new AI lab: "The mission would be

to create the first general AI [AGI] and use it for individual empowerment—ie

[*sic*], the distributed version of the future that seems the safest. More generally,

safety should be a first-class requirement." "The technology would be owned by

COMPLAINT

the foundation and used 'for the good of the world[.]'" This time Musk agreed.

73. Soon thereafter, Altman recruited Stripe's CTO Gregory Brockman who helped him seal the deal.

74. Altman's plan worked. In November 2015, Musk agreed to commit funding and help recruit the top scientists necessary to make Altman's project a success provided that—as Altman and Brockman had repeatedly promised—OpenAI, Inc. would be a non-profit devoted to developing AI/AGI for the benefit of humanity and would accomplish this mission by (i) distributing its research and technology openly, preventing its concentration, and (ii) focusing on safety, not profits. Indeed, to celebrate what he was led to believe was their mission, Musk named the endeavor—"OpenAI."

75. Altman moved fast. Just a month later on December 8, 2015, a Certificate of Incorporation for OpenAI, Inc. was filed with the Delaware Secretary of State, which reaffirmed Altman and Brockman's promises to Musk:

> This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue law. **The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person. . . . The property of this corporation is irrevocably dedicated to the[se] purposes . . . and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person** (emphasis added).

76. OpenAI, Inc. was publicly announced on December 11, 2015 and leveraged Musk's name by making him co-chair of its Board of Directors ("Board") alongside Altman, with Brockman as the CTO. The promotional

announcement published on OpenAI's website further touted: "OpenAI is a non-profit artificial intelligence research company [whose] goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact."

77.    Around this same time, Altman and Brockman also began to broadly advertise their new endeavor, specifically promoting its humanitarian purpose on their respective social media accounts, which reach many millions of followers.

### C.    *Musk's Crucial Contributions to OpenAI, Inc.*

78.    In an email to Altman and Brockman on the day of OpenAI, Inc.'s public announcement, Musk stated: "Our most important consideration is recruitment of the best people," and pledged that helping in this effort would be his "absolute top priority 24/7[.]" He wrote: "We are outmanned and outgunned by a ridiculous margin by organizations you know well, but we have right on our side and that counts for a lot. I like the odds."

79.    As Altman had devised, Musk proved to be a driving force as the co-founder of OpenAI, Inc. He contributed the majority of its funding in its first several years, provided valuable advice and guidance on research directions, and most importantly, recruited some of the world's leading scientists and engineers to work at the non-profit. In fact, recruiting for OpenAI, Inc. was a Herculean task in the face of relentless counter-recruiting by Google/DeepMind, which offered lavish compensation packages to squelch the new venture. But Musk persevered and proved instrumental in securing key talent including Chief Scientist Dr. Ilya Sutskever ("Sutskever"), whom he hired away from Google, as well as top research scientists Tim Salimans, Filip Wolski, and others.

80.    Just as Altman planned, Musk used his connections, credibility, and clout to launch the venture. The mere fact OpenAI, Inc. was an "Elon Musk"-

sponsored initiative and that Musk served as co-chair was key to its successful recruiting efforts.

81.     Musk also brought the capital to give OpenAI, Inc. a fighting chance. In late February 2016, he emailed Altman and Brockman: "Whatever it takes to bring on ace talent is fin[e] by me. Deepmind is causing me extreme mental stress. If they win, it will be really bad news with their one mind to rule the world philosophy."

82.     In fact, Musk was OpenAI, Inc.'s largest financial backer. In 2016, Musk contributed over $15 million and contributed another nearly $20 million in 2017. He leased OpenAI, Inc.'s office space in the Pioneer Building in San Francisco, paid its monthly overhead expenses, and even though he stepped down from the Board on February 21, 2018, he nevertheless continued to make regular contributions to OpenAI, Inc. until September 14, 2020. All told, Musk contributed more than $44 million to OpenAI, Inc. in its first five critical years. It is fair to say that without Musk's involvement, backing, and substantial supportive efforts, there would have been no OpenAI, Inc.

**D.     _Defendants Seek to Convert OpenAI, Inc. For Profit_**

83.     In 2017-2018, Altman and Brockman moved to recast the non-profit as a moneymaking endeavor to bring in shareholders, sell equity, and raise capital. Brockman and others suggested the move to Musk, who briefly toyed with the idea of using Tesla as OpenAI, Inc.'s "cash cow" to solve the non-profit's cash-flow concerns while keeping it in good hands and maintaining its mission.

84.     After some back and forth, Musk wrote to Altman and Brockman: "Either go do something on your own or continue with OpenAI as a non-profit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding to a start-up. Discussions are over."

85.     Altman tried to play the whole thing off, reassuring Musk: "[I]
remain enthusiastic about the non-profit structure!" with Brockman soon
following suit. But we now know that was a lie. Indeed, Altman wanted to
convert the non-profit to a for-profit entity all along, but was only interested in
doing so with Altman at the helm and in a way that most profited him.

      **E.**     ***Microsoft's Involvement***

86.     Even early on, Microsoft, which was working on developing its
own AI, was keen to exploit OpenAI, Inc. But as the non-profit had no
shareholders and Microsoft could not simply purchase influence, it sought to
obtain leverage in other ways by, for example, enticing OpenAI, Inc. to use and
become inextricably dependent on Microsoft's cloud computing system.

87.     In September 2016 Microsoft offered to sell "compute" to OpenAI,
Inc. at a steep discount (calling the difference in market price a "donation") if
the non-profit would agree to publicly promote Microsoft's products. Musk
rejected the "donation" and marketing ploy, writing to Altman: "This actually
made me feel nauseous. It sucks and is exactly what I would expect from them."
The deal eventually went through, but without marketing gimmicks and at a
more fulsome price.

88.     While Musk expressed a liking for Microsoft's CEO Satya Nadella
("Nadella"), the values of the company and OpenAI, Inc. did not align. Whereas
Musk was concerned that AI posed an existential danger to humankind and the
technology should be decentralized and open, Nadella and Microsoft's co-
founder Bill Gates minimized Musk's concerns as "panic" and too far off in the
future.

89.     Musk wrote: "History unequivocally illustrates that a powerful
technology is a double-edged sword . . . The recent example of Microsoft's AI

/ / /

/ / /

chatbot[2] shows how quickly it can turn incredibly negative. The wise course of action is to approach the advent of AI with caution and ensure that its power is widely distributed and not controlled by any one company or person. That is why we created OpenAI."

90.     Over the course of the next few years and continuing to today, Microsoft methodically entrenched itself further into OpenAI, Inc., gaining increasing leverage over the non-profit, its technology, and employees in lockstep with Defendants.

**F.     *Defendants Craft Their Path to Profit***

91.     After Musk rebuffed Altman's proposal to transform OpenAI, Inc. into a for-profit venture in 2017, Defendants continued to pursue their ambitions, but pivoted to a shrewder and methodical plan.

92.     The first step was to quietly craft a profitmaking apparatus that would allow Defendants to do indirectly what Musk had expressly denied them. Altman was appointed the non-profit's CEO in 2019. At his urging and with his assistance, on information and belief, Defendants began forming numerous for-profit entities, in which Altman held generous stakes, and weaving them into an increasingly labyrinthian OpenAI corporate web for the purpose of profiting from OpenAI, Inc.'s assets.

93.     On information and belief, Defendants' OpenAI web proceeded as follows: On March 11, 2019, Altman announced a new for-profit entity, OpenAI, L.P., which was established as, what Defendants call a "capped-profit company," where investors can make a profit capped at a certain multiple of their investment (e.g., 100x investment). On January 23, 2023, OpenAI, L.P. was converted to OpenAI OpCo, LLC.

---

[2] Referring to the incident where Microsoft's chatbot began posting inflammatory and offensive tweets through its Twitter account, causing Microsoft to shut the service down just 16 hours after its launch.

94.     On September 17, 2020, OpenAI, L.L.C. was formed in Delaware. OpenAI, L.L.C.'s sole member is OpenAI OpCo, LLC.

95.     On December 28, 2022, OpenAI Global, LLC was formed in Delaware. On information and belief, OpenAI Global, LLC, like OpenAI, L.P., is a "capped" for-profit entity. OpenAI Global, LLC has two members: Microsoft and OAI Corporation, LLC.

96.     On March 17, 2023, OAI Corporation, LLC, was formed in Delaware as a limited liability company. The sole owner of OAI Corporation, LLC is OpenAI Holdings, LLC.

97.     On March 17, 2023, OpenAI Holdings, LLC was formed in Delaware, and has multiple members including Aestas, LLC and various individuals.

98.     On information and belief, OpenAI OpCo, LLC and OpenAI Global, LLC are managed by OpenAI GP, L.L.C., which on September 19, 2018 was registered as a limited liability company in Delaware.

99.     On February 10, 2023, Aestas Management Company, LLC was formed as a limited liability company in Delaware and is managed by OpenAI GP, L.L.C.

100.    On information and belief, the other entities—OpenAI Investment LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.—are also interwoven into Defendants' corporate web for the purpose of profiting from the non-profit's assets.[3] Many of

---

[3] OpenAI, L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Investment LLC, OpenAI

these entities were only recently registered and indeed, more OpenAI entities are popping up every month as part of Defendants' shell game.

101. As with many things, the issue here is one of degree. While there is little concern caused by using a for-profit entity to help fundraise for a non-profit, it is quite another thing to launch a dense fleet of dozens of for-profit entities to facilitate veiled and unchecked profiteering, rife with conflicts including those of Altman, the non-profit's CEO and Board member, and Brockman, its CTO, as Defendants have done.

102. The complex profiteering arm of OpenAI—in which, on information and belief, Microsoft and Altman are significant shareholders, and Musk is not—while publicly cloaked as a mere fundraising apparatus, is in reality, the foundation for Defendants' scheme to control and cash in on OpenAI, Inc.'s technology.

103. When Defendants launched OpenAI, L.P. (now OpenAI OpCo, LLC), they drained the non-profit OpenAI, Inc. of most of its staff and transferred them over to the new company, which also now houses much of OpenAI's research and development. Altman and Brockman too are now employees of the private, for-profit OpenAI OpCo, LLC, which conveniently shields them from the public oversight and financial disclosures non-profits like OpenAI, Inc. must make.

104. With their web in place, Defendants' next step was to lock down the non-profit's technology. Obviously, the public would not pay for something that was open and free, so as detailed below, Defendants began withholding OpenAI,

---

Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas, LLC are collectively referred to hereinafter as the "OpenAI For-Profit Entities."

Inc.'s scientific research and hoarding its technology.

105.   From there, on information and belief, they hollowed out the non-profit and fed its assets to the OpenAI For-Profit Entities, from which they stood to make a bundle. Just *follow the money*. The non-profit's 2022 IRS tax return[4] showed just $44,485.00 in revenue, but one year later, OpenAI overall reportedly generated *hundreds of millions of dollars*.

106.   In addition, Altman, with the assistance and/or cooperation of Brockman and the OpenAI For-Profit Entities, began to self-deal with impunity.

107.   It has been reported that Altman deliberately withheld key information and lied about his personal holdings and investments both in and outside of OpenAI in an effort to keep the then-independent Board from discovering his glaring conflicts of interest.

108.   For example, a June 3, 2024 Wall Street Journal article[5] reported that Altman induced OpenAI to partner with Reddit in a deal wherein OpenAI would pay to bring Reddit's content to OpenAI, Inc.'s ChatGPT. On information and belief, Altman and/or entities he controls own a whopping 7.6% of Reddit, making him one of the company's largest outside shareholders. After the deal was announced, Reddit's stock shot up 10%, boosting Altman's stake by $69 million.

109.   On information and belief, Altman, in seeking further business with the non-profit, claimed to be an independent board member of the venture fund, OpenAI Startup Fund, while intentionally withholding from the non-profit's Board that he, in fact, *owned* the OpenAI Startup Fund and stood to personally profit from it. Further still, on information and belief, Altman caused OpenAI to

_____

[4] 2022 was the last year Defendants made such documents readily available to the public.

[5] Jin, Dotan & Hagey, *The Opaque Investment Empire Making OpenAI's Sam Altman Rich*, Wall Street Journal (June 3, 2024), https://www.wsj.com/tech/ai/openai-sam-altman-investments-004fc785?mod=hp_lead_pos1.

COMPLAINT

sign a $51 million AI chip deal with Rain AI, a company in which he also held a significant interest. On information and belief, Altman and former Apple chief design officer, Jony Ive, have also reportedly launched their own AI device company, which plans to exploit OpenAI's technology to compete with Apple and build the "iPhone of AI." And currently, on information and belief, OpenAI is hammering out a deal with Helion Energy (in which Altman owns a massive stake) for OpenAI to buy vast quantities of electricity to power its data centers.

110.   On information and belief, Altman, Brockman, and the OpenAI For-Profit Entities have been and will continue to be enriched by their respective stake in OpenAI's for-profit machine and Altman alone stands to make billions from the humble non-profit Musk co-founded.

111.   Defendants' scheme has now become clear: lure Musk with phony philanthropy; exploit his money, stature, and contacts to secure world-class AI scientists to develop leading technology; then feed the non-profit's lucrative assets into an opaque profit engine and proceed to cash in.

## G.   *Defendants Renege in 2023*

112.   In its early years, OpenAI, Inc.'s research and development were performed in the open, providing the public with free access to designs, models, and code.

113.   For example, in June 2018 when OpenAI, Inc. researchers discovered that an algorithm called "Transformers" could perform natural language tasks without any explicit training, entire communities from open-source, grass-roots groups to commercial endeavors sprung up to enhance and extend OpenAI, Inc.'s models—the intended benefit of making the non-profit's research open source.

114.   In 2019, OpenAI, Inc. released the full, open version of a second-generation Generative Pre-Trained Transformer ("GPT"), GPT-2 with the stated hope that it would "be useful to developers of future powerful models." It also

released a detailed report describing the new model and acknowledged some of the many benefits of openly releasing such models to the public.

115.   In 2020, OpenAI, Inc. announced a third version of its model, GPT-3 and again, published a research paper detailing its complete implementation for others to build on.

116.   OpenAI, Inc.'s initial findings, while technologically interesting, had little commercial value and were openly published by Altman. But having reached the threshold of AGI, which under the founding agreement Defendants were to develop for the benefit of humanity rather than profit, Altman about-faced and began locking down the technology for personal gain.

117.   For example, on March 14, 2023, OpenAI, Inc. released its most advanced model to date, GPT-4, which many including Microsoft celebrated as "a form of general intelligence." Microsoft's scientists stated that, given GPT-4's advanced capabilities, "we believe [it] could reasonably be viewed as an early (yet still incomplete) version of an artificial general intelligence (AGI) system." Defendants, however, publicly released no report or code, preventing the public from building on the non-profit's AI advancements as Musk had been promised.

118.   Reuters has reported that OpenAI is also developing a secret algorithm called Q*, and that several OpenAI staff members wrote a letter warning about its potential power. It appears Q* may be an even clearer and more striking example of AGI developed by OpenAI.

119.   On information and belief, Altman caused the non-profit to exclusively license its technology to Microsoft, the world's largest for-profit corporation,[6] contrary to Altman and the non-profit's black-letter commitments—e.g., OpenAI, Inc.'s Certificate of Incorporation: "no part of the net income or assets of this corporation shall ever inure to the benefit of . . . any

---

[6] As of August 2024, Microsoft is worth a reported $3.11 trillion.

COMPLAINT

private person"; and Charter: "We commit to . . . avoid enabling uses of AI or AGI that . . . unduly concentrate power."

120.   The Microsoft license includes all OpenAI, Inc.'s "pre-AGI"[7] technologies, and tasks the Board with determining when "AGI" has been attained. To date, the Board has made no such finding, thus giving Microsoft unfettered access to OpenAI's suite of technology. With full access to the non-profit's research and employees, many of whom, on information and belief, now work for the for-profit OpenAI enterprise or Microsoft, it is a short walk to develop a "complete" AGI system based on the non-profit's research and technology.

121.   Defendants have kept GPT-4, and subsequent models including without limitation, GPT-4T and GPT-4o (released May 2024), entirely closed. On information and belief, the internal details of GPT-4, GPT-4T, and GPT-4o are known only to OpenAI and its partner Microsoft. The reason for the secrecy is obvious: Defendants and Microsoft stand to make a fortune selling this technology to the public, which would not be possible if the non-profit made its research and technology freely available, as Altman had repeatedly promised Musk.

### H.   *Defendants Seize then Neuter OpenAI, Inc.'s Board*

122.   In a series of extraordinary developments, Microsoft and Altman leveraged their positions to force a majority of OpenAI, Inc.'s Board to resign on November 22, 2023, and replaced them with underqualified and compliant allies handpicked by Altman and blessed by Microsoft.

123.   The Board had consisted of Dr. Sutskever, Brockman, Altman, plus Helen Toner ("Toner"), Adam D'Angelo ("D'Angelo"), and Tasha McCauley

---

[7] OpenAI's website defines AGI as "a highly autonomous system that outperforms humans at most economically valuable work" and states such technology "is excluded from IP licenses and other commercial terms with Microsoft, which only apply to pre-AGI technology."

("McCauley"). In addition to serving on the Board, Toner is a researcher and advisor for the Center for the Governance of AI ("GovAI") and the Director of Strategy at Georgetown's Center for Security and Emerging Technology. McCauley is a Senior Management Scientist at RAND Corporation, a non-profit which specializes in public policy decision making. Like Toner, McCauley is also an advisor for GovAI.

124.   The choice to include on OpenAI, Inc.'s Board multiple academics and public policy experts with deep AI policy experience, most of whom had no financial stake in OpenAI, was deliberate. This composition of financially disinterested Board members with strong records of public service ensured that the Board would put the non-profit's principals of openness and safety before financial success.

125.   On November 17, 2023, OpenAI, Inc.'s Board dismissed Altman as CEO and from the Board, announcing he was fired following "a deliberative review process by the board, which concluded that he was not consistently candid in his communications with the board, hindering its ability to exercise its responsibilities. The board no longer has confidence in his ability to continue leading OpenAI." Brockman was also dismissed from the Board, but not as OpenAI, Inc.'s CTO.

126.   It has been reported that indeed the Board fired Altman because he had deliberately misrepresented what was happening at OpenAI, Inc. and explicitly lied to the Board to obstruct its ability to carry out its oversight duties. The Board was likewise concerned by the numerous side hustles and conflicts of interest Altman had and his purposeful withholding of information necessary for the Board to evaluate the scope and extent of his self-dealing and myriad conflicts.

127.   News reports further suggest Altman's firing was due in part to OpenAI, Inc.'s breakthrough in realizing AGI and Altman's prioritizing profit

over safety and the non-profit's founding principles. After Altman was fired, his close associate Brockman chose to immediately leave with him.

128.   On information and belief, when Microsoft's CEO Nadella learned of Altman's firing, he was furious. Reportedly, as a 49% shareholder in OpenAI's for-profit arm(s), Nadella felt Microsoft should have been consulted before the decision was made. However, at this time, aside from Altman and Brockman, OpenAI, Inc.'s Board, on information and belief, had no ties to Microsoft. Rather, Altman was the primary liaison between Microsoft and OpenAI, Inc. and with him gone, Microsoft's continued exclusive access to the non-profit's valuable technology was in jeopardy.

129.   Microsoft's response was swift. Nadella invited Altman and Brockman to lead a new Microsoft AI research lab, unbound by the constraints of OpenAI, Inc.'s humanitarian mission and the three actively solicited OpenAI, Inc.'s employees to leave OpenAI to join Microsoft's new lab.

130.   Microsoft was confident that, through its substantial ownership in OpenAI's for-profit arm, it could completely sequester OpenAI, Inc.'s research and technology should the non-profit cease to exist. Indeed, during an interview shortly after Altman's firing, Nadella stated:

> We [now] have all the IP rights and all the capability. If OpenAI disappeared tomorrow, I don't want any customer of ours to be worried about it quite honestly, because we have all of the rights to continue the innovation. Not just to serve the product, but we can go and just do what we were doing in partnership ourselves. We have the people, we have the compute, we have the data, we have everything.

131.   Despite Microsoft's bold statements, it apparently still wanted its man Altman on the inside as OpenAI, Inc.'s CEO. In the days following his firing, OpenAI, Inc.'s Board faced mounting pressure from Microsoft to reinstate Altman. Nadella even bragged about Microsoft's influence over the

non-profit: "We are in there. We are below them, above them, around them."

132.   Microsoft indeed had leverage. On information and belief, at the time of Altman's ouster, Microsoft had only paid a fraction of a $13 billion investment commitment it had made to OpenAI. And if Microsoft were to withhold its cloud computing system on which OpenAI, Inc. was reliant, the non-profit would be effectively incapacitated.

133.   The pressure on the Board from Altman, Brockman, and Microsoft continued until November 21, 2023, when Altman was reinstated as CEO just days after his dismissal, and Brockman as CTO. Upon his return, Altman took the opportunity to clean house and purge those who ousted him, demanding the resignation of Toner, McCauley, and Dr. Sutskever from the Board. Notably, D'Angelo—the sole board member to remain after Altman's reinstatement—is a tech CEO and entrepreneur.

134.   On information and belief, Altman then handpicked a new Board that lacked the technical expertise and substantial background in AI governance, which the previous Board had by design. The new members were reportedly "big fans of Altman."

135.   Microsoft too obtained an influential observer seat on the Board from which it could keep a close eye on its non-profit golden goose. Though just recently, on July 9, 2024, Microsoft relinquished its seat amid scrutiny and pressure from antitrust agencies in the U.S. and Europe suspicious of its all-too-cozy relationship with OpenAI.[8]

136.   With the reinstatement of Altman and the restructuring of the Board, OpenAI, Inc.'s once carefully crafted non-profit structure is now compromised by a fully profit-driven CEO (Altman) and CTO (Brockman), a

---

[8] Orru & Laursen, *Microsoft Quits OpenAI's Board Amid Antitrust Scrutiny*, Wall Street Journal (July 10, 2024), https://www.wsj.com/tech/ai/microsoft-withdraws-from-openais-board-amid-antitrust-scrutiny-aab6ff1e?reflink=desktopwebshare_permalink.

compliant Board with inferior technical expertise and almost no AI-governance

experience, and a trillion-dollar pro-profit partner (Microsoft).

137.    The loss of the Board's technical expertise in AI, neutrality, and

commitment to OpenAI, Inc.'s non-profit purposes are particularly

compromising as it is the Board that determines whether OpenAI has attained

AGI, which, as detailed above, OpenAI, Inc. had previously excluded from its

license to Microsoft. Given Microsoft and the OpenAI profit machine's

enormous financial interest in keeping the technology closed to the public,

OpenAI, Inc.'s newly captured, conflicted, and compliant Board will have every

reason to delay ever making a finding that OpenAI, Inc. has attained AGI.

OpenAI's for-profit apparatus may now operate fully unchecked.

I.    *__OpenAI Today__*

138.    Defendants' unbridled power and profit focus have led to a recent

flurry of safety and legal concerns and forceful pushback against OpenAI and

Altman for abandoning their non-profit mission.

139.    Along with pending civil litigation from media outlets like *The New

York Times*, *Raw Story*, and *The Intercept* concerning OpenAI's illegal use of

their media content to train GPT models, the takeover of the Board and

Microsoft's increasingly close relationship with OpenAI have sparked numerous

ongoing investigations by the Securities and Exchange Commission, U.S.

Federal Trade Commission, and various U.K. and E.U. regulators. On July 22

and August 1, 2024, the U.S. Senate sent Altman demand letters seeking

documents and questioning OpenAI's commercial practices, commitment to

safety, and its attempts to muzzle employee-whistleblowers.[9]

/ / /

---

[9] Letter from Sens. King, Lujan, Schatz, Warner & Welch to Samuel Altman, CEO of OpenAI
(July 22, 2024), https://www.schatz.senate.gov/imo/media/doc/letter_to_openai.pdf; Letter
from Sen. Grassley to Samuel Altman, CEO of OpenAI (August 1, 2024),
https://www.washingtonpost.com/documents/8bf076a6-663b-4552-be52-079b79274f9c.pdf.

COMPLAINT

140.   Further, in a series of letters dated January 9,[10] March 5,[11] and June 6, 2024[12] to the California Attorney General, the prominent consumer advocacy organization Public Citizen detailed numerous issues concerning Altman's self-dealing and the troublesome power OpenAI's for-profit arm is wielding over the non-profit, urging the AG to investigate OpenAI, Inc.'s section 501(c)(3) status.

141.   In addition, on information and belief, OpenAI is hemorrhaging employees and executives on a continual basis. In large part, the resignations appear to be in protest to Altman and OpenAI's increasingly unfettered and conflicted pursuit of profits at the expense of safety.

142.   For instance, in May 2024, Chief Scientist Dr. Sutskever and OpenAI, Inc. executive Jan Leike resigned. The two had been the leaders of OpenAI, Inc.'s "Superalignment" team tasked with managing the risk that its technology "could lead to the disempowerment of humanity or even human extinction."[13] Leike stated he could no longer work at the company because he was concerned that safety and societal impact "have taken a backseat to shiny products."[14]

143.   Other employees, including Daniel Kokotajlo resigned because they "lost trust in OpenAI leadership and their ability to responsibly handle AGI." In

---

[10] Letter from Public Citizen to California Attorney General on OpenAI's Nonprofit Status (Jan. 9, 2024), https://www.citizen.org/article/letter-to-california-attorney-general-on-openais-nonprofit-status/.

[11] Follow Up Letter from Public Citizen to California Attorney General on OpenAI's Nonprofit Status (Mar. 5, 2024), https://www.citizen.org/article/second-letter-california-attorney-general-openai-nonprofit-status-musk-lawsuit/.

[12] June 2024 Follow Up Letter from Public Citizen to California Attorney General Regarding OpenAI's Nonprofit Status (June 6, 2024), https://www.citizen.org/article/june-2024-california-ag-openai-nonprofit-status-letter/.

[13] https://www.openai.com/index/introducing-superalignment/.

[14] https://www.x.com/janleike/status/1791498174659715494.

COMPLAINT

an interview with Vox on May 18, 2024,[15] Kokotajlo stated: "I joined with substantial hope that OpenAI would rise to the occasion and behave more responsibly as they got closer to achieving AGI. It slowly became clear to many of us that this would not happen." That same article reported numerous other departures: "at least seven people [] tried to push OpenAI to greater safety from within, but ultimately lost so much faith in its charismatic leader [Altman] that their position became untenable."

144.   Carroll Wainwright, a former alignment researcher for OpenAI, also resigned in May 2024 because "I worry that the board will not be able to effectively control the for-profit subsidiary, and I worry that the for-profit subsidiary will not be able to effectively prioritize the mission when the incentive to maximize profits is so strong."[16]

145.   The world is finally seeing through Altman's long con.

146.   A June 15, 2024 article in *Cointelegraph* entitled "OpenAI Reportedly Considering Shift to For-profit as CEO Stacks Board" details how Altman "told shareholders he was considering the [for-profit] move sometime during the week of June 10. If realized, the pivot would ostensibly result in OpenAI's nonprofit board losing control of the company."[17] Altman is now fast-tracking his plan to turn the non-profit Musk co-founded into the for-profit business Altman had always envisaged.

147.   Altman set the bait and hooked Musk with sham altruism then flipped the script as the non-profit's technology approached AGI and profits

[15] Samuel, *"I lost trust": Why the OpenAI team in charge of safeguarding humanity imploded*, Vox (May 18, 2024), https://www.vox.com/future-perfect/2024/5/17/24158403/openai-resignations-ai-safety-ilya-sutskever-jan-leike-artificial-intelligence.

[16] https://www.x.com/clwainwright?ref_src=twsrc%5Etfw%7Ctwcamp%5Etwee.

[17] Greene, *OpenAI reportedly considering shift to for-profit as CEO stacks board*, Cointelegraph (June 15, 2024), https://www.cointelegraph.com/news/open-ai-artificial-intelligence-for-profit.

neared, mobilizing Defendants to turn OpenAI, Inc. into their personal piggy bank and OpenAI into a moneymaking bonanza, worth billions.

### COUNT I: PROMISSORY FRAUD

#### (Against Altman, Brockman, and OpenAI, Inc.)

148.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 147 inclusive, as though fully set forth herein.

149.    Beginning in 2015, Altman and his collaborator Brockman preyed on Musk's well-known concerns about the existential harms posed by AI/AGI, and convinced him to fund and back what they falsely claimed would be a "non-profit" devoted to the safe and open development of AI to be "distributed . . . for the good of the world."

150.    On May 25, 2015, in correspondence by email, Altman proposed to Musk they start an AI lab and "structure it so that the tech belongs to the world via some sort of nonprofit[,]" and further represented: "Obviously we'd comply with/aggressively support regulation."

151.    On June 24, 2015, Altman corresponded with Musk by email and represented: "The mission would be to create the first general AI and use it for individual empowerment—ie [*sic*], the distributed version of the future that seems the safest. More generally, safety should be a first-class requirement." "The technology would be owned by the foundation and used 'for the good of the world[.]'"

152.    Based on Defendants' express promises, representations, and reassurances that the venture would be a non-profit devoted to the open-source development of AI for the benefit of humanity, Musk agreed to fund and back the endeavor.

153.    Between 2015 and 2020, Altman and Brockman reaffirmed these material promises and representations to Musk on numerous occasions, intentionally inducing Musk to regularly contribute his valuable resources to

OpenAI, Inc.

154.   On December 11, 2015, OpenAI, Inc. made the following public announcement on its website, which Altman had previously emailed to Musk on December 8, 2015 for his review:

> OpenAI is a non-profit artificial intelligence research company [whose] goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact. . . . We believe AI should be . . . as broadly and evenly distributed as possible. . . . As a non-profit, our aim is to build value for everyone rather than shareholders . . . and our patents (if any) will be shared with the world.

155.   On December 11, 2015 (the same date as OpenAI, Inc.'s announcement), Musk emailed Altman and Brockman stating: "Our most important consideration is recruitment of the best people," and pledged this would be his "absolute top priority 24/7[.]" Musk immediately contacted and recruited one of the top scientists in the AI field, Dr. Ilya Sutskever.

156.   The false promises, representations, and assurances Altman and Brockman made to Musk were enshrined, among other places, in OpenAI, Inc.'s December 2015 Certificate of Incorporation: "[OpenAI's] technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person," and "no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person."

157.   In reliance on Defendants' promises, representations, and assurances Musk thereafter contributed more than $15 million to the project and paid much of its overhead expenses in pricey San Francisco.

158.   On March 14, 2017, with Brockman copied, Musk was emailed a

draft online post for his review, promising: "We will share our research and techniques unless there is evidence that doing so would harm humanity." The post explained "openness [is] desirable" because it helps to: "Ensure that AI progress benefits everyone, rather than primarily benefiting whoever controls the technology." That same year, Musk contributed another $20 million to OpenAI, Inc. and helped recruit additional top scientists for the endeavor.

159.   On April 2, 2018, Altman emailed Musk a draft OpenAI, Inc. Charter to review, which was later published on its website, representing: "We commit to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all, and to avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power. Our primary fiduciary duty is to humanity." And in 2018, Musk contributed millions of dollars more.

160.   Even in marketing the creation of OpenAI, L.P., on March 11, 2019, Defendants represented: "The General Partner's duty to this mission and the principles advanced in the OpenAI Inc. Charter take precedence over any obligation to generate a profit." Altman emailed a draft of this announcement to Musk on March, 6, 2019 promising: "We've designed OpenAI LP to put our overall mission—ensuring the creation and adoption of safe and beneficial AGI—over generating returns for investors." Musk continued contributing to the non-profit OpenAI, Inc. based on these representations.

161.   Altman and Brockman knew or could have reasonably foreseen that their express promises, representations, and assurances would be relied upon by Musk. Indeed, they obviously intended Musk to rely on such statements and in good faith, Musk reasonably did rely on them to his detriment. Based thereon, he contributed tens of millions of dollars of seed money to OpenAI, Inc. and, importantly, invested his time, reputation, and connections to recruit world-class AI scientists and engineers for the project.

162.   Altman and Brockman knew their representations and promises

COMPLAINT

were false when made; they had no intention of performing them and failed to perform them. In reality, Altman and Brockman wished to launch a competitor to Google, who was so far ahead of all other AI companies that a small for-profit start-up had zero chance of success without an angle. To Altman and Brockman, "non-profit" and "open source" were simply philanthropic hooks, altruistic buzzwords to attract wealthy, connected donors like Musk and talented scientists like Dr. Sutskever to back and participate in their endeavor.

163.   Brockman essentially admitted as much. He wrote: "I hope for us to enter the field as a neutral group looking to collaborate widely and shift the dialog towards being about humanity winning rather than any particular group or company. (*I think that's the best way to bootstrap ourselves into being a leading research institution.*)" (emphasis added).

164.   Once they got Musk's backing and a talented team of scientists in place, Defendants' objective was to develop valuable AI/AGI and from there, convert the non-profit to a for-profit enterprise and cash in—essentially turning Musk's contributions into free start-up capital and their years of section 501(c)(3) tax benefits into a free government subsidy.

165.   Indeed, in 2017 Altman and Brockman guardedly approached Musk about converting the non-profit to a for-profit enterprise, but Musk refused and demanded further assurances from Altman and Brockman that they honor their promises and the non-profit's mission or get out. In response, Altman reassured Musk: "[I] remain enthusiastic about the non-profit structure!" with Brockman following suit. Musk thereafter continued to contribute millions of dollars to the project in good faith reliance on Altman and Brockman's representations and further assurances.

166.   Defendants, still committed to their scheme, became even more cunning and deceptive. They sequestered OpenAI, Inc.'s technology and orchestrated an increasingly opaque corporate web in which they were major

1    stakeholders, thus enabling them to covertly self-deal for enormous future

2    profits.

3        167.   On information and belief, Altman took full advantage of his

4    position of trust within OpenAI, Inc., causing it to make deals worth tens of

5    millions of dollars with side companies he owned or had major stakes in. On

6    information and belief, in just a single deal between OpenAI, Inc. and Reddit, in

7    which Altman is one of the largest shareholders, he scored a $69 million

8    windfall. On information and belief, Altman further induced Microsoft to buy

9    electricity from a power company he owned, and in turn, when Microsoft

10   wanted an exclusive license to OpenAI, Inc.'s technology (itself, defying the

11   non-profit's mission and principles), Altman was happy to oblige.

12       168.   Defendants also had no intention to "comply with/aggressively

13   support regulation." We now know such representations were false and

14   intentionally misleading when made, as exposed in an open letter published by

15   OpenAI employees on June 4, 2024, which criticized the company for having

16   "strong financial incentives to avoid effective oversight," maintaining "only

17   weak obligations to share [safety] information with governments, and none with

18   civil society," and enforcing "broad confidentiality agreements block[ing] us

19   from voicing our concerns."[18]

20       169.   In recent months, Altman has abandoned all pretense, displaying his

21   true colors. With Musk out of the picture and OpenAI, Inc.'s Board stacked with

22   compliant allies, Defendants are actively working to convert OpenAI, Inc. into

23   an entirely *for-profit* business.

24       170.   Defendants intentionally concealed their fraudulent conduct, which

25   prevented Musk from discovering their scheme, notwithstanding his exercise of

26   due diligence.

27   _____

28   [18] Open Letter From AI Researchers: A Right to Warn about Advanced Artificial Intelligence
(June 4, 2024), https://righttowarn.ai/.

171.   As a direct and proximate result of Altman, Brockman, and OpenAI, Inc.'s conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from the wrongful acquisition of Musk's contributions to OpenAI, Inc., including prejudgment interest. Musk is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

172.   As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged hereinabove, Musk has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, but which vastly exceeds $75,000, and for which restitution and/or non-restitutionary disgorgement is appropriate. Such should include the imposition of a constructive trust; a declaration by this Court that Defendants are jointly and severally the constructive trustee(s) for the benefit of Musk; and an order that Defendants convey to Musk all of the profits, assets, property, and ill-gotten gains received or to be received by Defendants, which are traceable to Musk's wrongfully acquired financial and other contributions to OpenAI, Inc.

173.   Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Musk substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Musk is both imminent and irreparable, and the amount of damage sustained by Musk will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Musk is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such

further tortious conduct.

174. Defendants' wrongful conduct constitutes oppression, fraud, and/or malice under Cal. Civ. Code § 3294, entitling Musk to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

## COUNT II: CONSTRUCTIVE FRAUD

### (Against Altman, Brockman, and OpenAI, Inc.)

175. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 174 inclusive, as though fully set forth herein.

176. As a charity and as persons soliciting contributions on behalf of a charity, OpenAI, Inc., Altman, and Brockman are in a fiduciary relationship with, and each owe a fiduciary duty to Musk, from whom charitable contributions were solicited, including under Cal. Bus. & Prof. Code § 17510.8.

177. As fiduciaries, Altman, Brockman, and OpenAI, Inc. owe Musk a duty to use his contributions for the declared charitable purposes for which they were sought, and are liable for constructive fraud for any advantages they gained by misleading Musk with their repeated promises, representations, and reassurances, regardless of whether they intended to deceive him.

178. Altman and Brockman solicited and obtained contributions from Musk by making repeated and material promises, representations, and reassurances to him that they would develop AI for the benefit of humanity, would predominantly open source their technology, avoid concentrating it, and would not operate for the profit of any person or company, as evidenced in, without limitation, the emails, corporate filings, and online advertisements alleged above.

179. Defendants knew or could have reasonably foreseen that their promises, representations, and reassurances would be relied upon by and were material to Musk.

180.   Defendants misled Musk by providing him with information that was inaccurate and/or incomplete and/or by failing to disclose to Musk Altman and Brockman's true commercial intentions, which were known to them.

181.   In 2023-2024, Defendants began keeping OpenAI, Inc.'s technology—including GPT-4, GPT-4T, GPT-4o—secret and closed, and concentrated it in the hands of Microsoft for private profit—all in knowing violation of their promises and representations to Musk.

182.   Altman and Brockman also engaged in unfettered self-dealing as alleged hereinabove. On information and belief, after developing the non-profit's valuable technology with Musk's contributions, they, with the assistance and/or cooperation of the OpenAI For-Profit Entities, manipulated and leveraged the non-profit's assets for their own personal gain and profit. Undeterred, Defendants are presently working to collapse the non-profit into an entirely for-profit enterprise, further defying their promises, representations, and reassurances to Musk.

183.   Defendants intentionally concealed their fraudulent conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

184.   As a direct and proximate result of Altman, Brockman, and OpenAI, Inc.'s conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from the wrongful acquisition of Musk's contributions to OpenAI, Inc., including prejudgment interest. Musk is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

185.   As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged hereinabove, Musk has been damaged, and

Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, but which vastly exceeds $75,000, and for which restitution and/or non-restitutionary disgorgement is appropriate. Such should include the imposition of a constructive trust; a declaration by this Court that Defendants are jointly and severally the constructive trustee(s) for the benefit of Musk; and an order that Defendants convey to Musk all of the profits, assets, property, and ill-gotten gains received or to be received by Defendants, which are traceable to Musk's wrongfully acquired financial and other contributions to OpenAI, Inc.

186.   Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Musk substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Musk is both imminent and irreparable, and the amount of damage sustained by Musk will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Musk is therefore entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further tortious conduct.

187.   Defendants' wrongful conduct constitutes oppression, fraud, and/or malice under Cal. Civ. Code § 3294, entitling Musk to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

## COUNT III: AIDING AND ABETTING FRAUD

### (Against the OpenAI For-Profit Entities)

188.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 187 inclusive, as though fully set forth herein.

189.   Altman and Brockman participated in a scheme to defraud Musk of

his valuable contributions and backing to enrich themselves, as alleged hereinabove.

190.   The OpenAI For-Profit Entities had actual knowledge that Altman and Brockman were engaging in such fraud, because Altman and Brockman formed the OpenAI For-Profit Entities for that very purpose, and on information and belief, have at all relevant times been officers, agents, employees, and/or owners whose knowledge and intent is imputed to the OpenAI For-Profit Entities.

191.   The OpenAI For-Profit Entities knowingly gave substantial assistance, encouragement, and/or actively participated in Altman and Brockman's fraud by willfully draining the non-profit's most valuable assets into their for-profit apparatus. On information and belief, the OpenAI For-Profit Entities currently employ much of the non-profit's former staff, including Altman and Brockman, house its research and intellectual property, have facilitated rampant self-dealing, as alleged herein, and have been greatly enriched as a result.

192.   Defendants intentionally concealed their fraudulent conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

193.   As a direct and proximate result of the OpenAI For-Profit Entities' conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from the wrongful acquisition of Musk's contributions to OpenAI, Inc., including prejudgment interest. Musk is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

194.   As a direct and proximate result of Defendants' wrongful conduct,

acts, and omissions alleged hereinabove, Musk has been damaged, and
Defendants have been and will continue to be unjustly enriched, in an amount
that shall be assessed at trial, but which vastly exceeds $75,000, and for which
restitution and/or non-restitutionary disgorgement is appropriate. Such should
include the imposition of a constructive trust; a declaration by this Court that
Defendants are jointly and severally the constructive trustee(s) for the benefit of
Musk; and an order that Defendants convey to Musk all of the profits, assets,
property, and ill-gotten gains received or to be received by Defendants, which
are traceable to Musk's wrongfully acquired financial and other contributions to
OpenAI, Inc.

195.   Defendants' wrongful conduct, acts, and omissions have
proximately caused and will continue to cause Musk substantial injury and
damage, much of which cannot be reasonably or adequately measured or
compensated in money damages. The harm this wrongful conduct will cause to
Musk is both imminent and irreparable, and the amount of damage sustained by
Musk will be difficult to ascertain if such wrongful conduct is allowed to
continue without restraint. Musk is entitled to an injunction during the pendency
of this action, and permanently enjoining Defendants, their officers, agents, and
employees, and all persons acting in concert with them, from engaging in such
further tortious conduct.

196.   Defendants' wrongful conduct constitutes oppression, fraud, and/or
malice under Cal. Civ. Code § 3294, entitling Musk to an award of punitive
damages appropriate to punish or set an example of Defendants in an amount to
be determined at trial.

## COUNT IV: VIOLATIONS OF FEDERAL CIVIL RICO,
## 18 U.S.C. § 1962(c)

### (Against Altman, Brockman, and the OpenAI For-Profit Entities)

197.   Plaintiff re-alleges and incorporates by reference paragraphs 1

through 196 inclusive, as though fully set forth herein.

198.    The federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, provides a private right of action for plaintiffs to recover against defendants who harm them by conducting an enterprise through a pattern of racketeering activity, as well as defendants who conspire to do so.

### A.    *Wire Fraud Predicate Offenses*

199.    Defendants knowingly participated in a scheme to exploit Musk and others by fraudulently inducing him to make significant financial and other contributions to develop valuable AI/AGI for ostensibly charitable purposes, which Defendants exploited to enrich themselves, as alleged hereinabove.

200.    In furtherance of their scheme, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343. The specific wirings in furtherance of the scheme to defraud Musk include, but are not limited to the following:

  a.  On May 25, 2015, in correspondence by email, Altman proposed to Musk that they start an AI lab and "structure it so that the tech belongs to the world via some sort of nonprofit[,]" and further represented: "Obviously we'd comply with/aggressively support regulation."

  b.  On June 24, 2015, Altman corresponded with Musk by email and represented: "The mission would be to create the first general AI and use it for individual empowerment—ie [*sic*], the distributed version of the future that seems the safest. More generally, safety should be a first-class requirement." "The technology would be owned by the foundation and used 'for the good of the world[.]'"

  c.  On November 22, 2015, Brockman sent Musk further email

COMPLAINT

correspondence representing: "I hope for us to enter the field as a neutral group looking to collaborate widely and shift the dialog towards being about humanity winning rather than any particular group or company. (I think that's the best way to bootstrap ourselves into being a leading research institution.)."

d.  On December 8, 2015, Altman sent Musk via email the following announcement for his review:

> OpenAI is a non-profit artificial intelligence research company [whose] goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact. . . . We believe AI should be . . . as broadly and evenly distributed as possible. . . . As a non-profit, our aim is to build value for everyone rather than shareholders . . . and our patents (if any) will be shared with the world.

e.  On March 14, 2017, Musk was emailed (with Brockman copied) a draft online post for his review, promising: "We will share our research and techniques unless there is evidence that doing so would harm humanity." The post stated "openness [is] desirable" because it helps to: "Ensure that AI progress benefits everyone, rather than primarily benefiting whoever controls the technology."

f.  On September 21, 2017, after Musk rebuffed Altman's efforts to turn OpenAI, Inc. into a for-profit company, Altman wrote to Musk via email reassuring him: "[I] remain enthusiastic about the non-profit structure!"

g.  On April 2, 2018, Altman emailed Musk a draft OpenAI, Inc. Charter to review, which it later published on its website, stating: "We commit to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all, and to avoid enabling uses

of AI or AGI that harm humanity or unduly concentrate power. Our primary fiduciary duty is to humanity."

    h. On March 11, 2019, in marketing the creation of OpenAI, L.P., Defendants represented: "The General Partner's duty to this mission and the principles advanced in the OpenAI Inc. Charter take precedence over any obligation to generate a profit." On March 6, 2019, Altman emailed Musk a draft of this announcement, promising: "We've designed OpenAI LP to put our overall mission—ensuring the creation and adoption of safe and beneficial AGI—over generating returns for investors."

201.  Defendants intended Musk to rely on their express promises, representations, and assurances and in good faith, Musk reasonably did rely on them to his detriment. Based thereon, Musk caused to be wired tens of millions of dollars of seed money to OpenAI, Inc. as follows:

| Date | Amount |
| --- | --- |
| 5/27/2016 | $500,000.00[19] |
| 6/8/2016 | $5,000,000.00 |
| 8/26/2016 | $4,500,000.00 |
| 10/3/2016 | $142,000.00 |
| 10/25/2016 | $142,000.00 |
| 11/21/2016 | $750,000.00 |
| 11/23/2016 | $142,000.00 |
| 12/7/2016 | $4,250,000.00 |
| 1/1/2017 | $1,140,000.00 |

---

[19] On information and belief, Musk's initial $10 million in donations to OpenAI, Inc. in 2016 were first wired to Altman's "YC Org.," and then wired to OpenAI, Inc. once OpenAI, Inc. obtained its section 501(c)(3) status.

| Date | Amount |
|------|--------|
| 1/1/2017 | $700,000.00 |
| 1/1/2017 | $16,028,500.00 |
| 1/5/2017 | $142,000.00 |
| 1/27/2017 | $142,000.00 |
| 7/18/2017 | $175,000.00 |
| 8/14/2017 | $175,000.00 |
| 9/15/2017 | $175,000.00 |
| 9/29/2017 | $85,000.00 |
| 10/16/2017 | $235,000.00 |
| 11/14/2017 | $235,000.00 |
| 12/14/2017 | $235,000.00 |
| 1/18/2018 | $290,000.00 |
| 2/20/2018 | $390,000.00 |
| 3/14/2018 | $290,000.00 |
| 4/16/2018 | $290,000.00 |
| 5/15/2018 | $290,000.00 |
| 6/14/2018 | $290,000.00 |
| 7/16/2018 | $290,000.00 |
| 8/14/2018 | $290,000.00 |
| 9/18/2018 | $290,000.00 |
| 10/17/2018 | $290,000.00 |
| 11/14/2018 | $290,000.00 |
| 12/17/2018 | $290,000.00 |
| 1/16/2019 | $290,000.00 |
| 2/14/2019 | $290,000.00 |
| 3/22/2019 | $290,000.00 |

COMPLAINT

| Date | Amount |
|------|--------|
| 4/16/2019 | $290,000.00 |
| 5/14/2019 | $290,000.00 |
| 6/14/2019 | $290,000.00 |
| 7/17/2019 | $290,000.00 |
| 8/14/2019 | $290,000.00 |
| 9/16/2019 | $290,000.00 |
| 10/17/2019 | $290,000.00 |
| 11/15/2019 | $290,000.00 |
| 12/17/2019 | $290,000.00 |
| 1/14/2020 | $290,000.00 |
| 2/14/2020 | $290,000.00 |
| 3/16/2020 | $290,000.00 |
| 4/13/2020 | $290,000.00 |
| 5/13/2020 | $290,000.00 |
| 6/15/2020 | $290,000.00 |
| 7/14/2020 | $290,000.00 |
| 8/17/2020 | $290,000.00 |
| 9/14/2020 | $290,000.00 |
| **Total** | $44,563,500.00 |

202.   During this period, Musk further invested his time, reputation, and connections to recruit top AI scientists and engineers for the OpenAI project, which included the transmission of emails and cellular telephonic communications.

203.   In addition, Defendants in their marketing, advertisements, and promotions made knowingly false and/or misleading representations to defraud the public and induce the false belief that OpenAI, Inc. would be a non-profit

whose charitable mission is to develop safe and open-source AI/AGI technology for the public good, not private gain. And these public pronouncements further served to reassure Musk.

204.   From December 11, 2015 to today, OpenAI's website represented:

- "OpenAI is a non-profit artificial intelligence research company [whose] goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact."

- "We believe AI should be an extension of individual human will and, in the spirit of liberty, as broadly and evenly distributed as possible."

- "Because of AI's surprising history, it's hard to predict when human-level AI might come within reach. When it does, it'll be important to have a leading research institution which can prioritize a good outcome for all over its own self-interest."

- "As a non-profit, our aim is to build value for everyone rather than shareholders."

- "Our primary fiduciary duty is to humanity. We anticipate needing to marshal substantial resources to fulfill our mission, but will always diligently act to minimize conflicts of interest among our employees and stakeholders that could compromise broad benefit."

- "Researchers will be strongly encouraged to publish their work, whether as papers, blog posts, or code, and our patents (if any) will be shared with the world."

- "Our mission is to ensure that [AGI] benefits all humanity, primarily by attempting to build safe AGI and share the benefits with the world."

205.   Defendants knew or could have reasonably foreseen that their promises and representations would be relied upon by Musk and other

contributors to OpenAI, Inc.

206.   Altman, Brockman, and the OpenAI For-Profit Entities each knew of, and participated in, numerous acts of wire fraud. Defendants knowingly and repeatedly accepted contributions from Musk and the public in order to develop AGI with no intention of honoring their promises and representations once AGI was in reach. As alleged hereinabove, GPT-4, GPT-4T, and GPT-4o are all closed source and shrouded in secrecy for Defendants and Microsoft's gain.

207.   It was reasonably foreseeable that interstate wire communications would be used in connection with Defendants' scheme. In addition to the fraudulent wire transmissions described above, Defendants relied on wires to receive the financial contributions of Musk and, on information and belief, other contributors, and to invest these funds in their fraudulent scheme. On information and belief, Defendants received many or all of these funds through an online wire, deposited such funds into Defendants' accounts through an online wire, and relied on email or other forms of electronic communication to exchange information about their receipt and usage of these misappropriated funds and contributions.

208.   Altman and Brockman used Musk's contributions to fund and support OpenAI, Inc.'s research and development and on information and belief, to launch dozens of for-profit shell entities (the OpenAI For-Profit Entities). The OpenAI For-Profit Entities furthered Defendants' scheme by harboring and exploiting OpenAI, Inc.'s valuable AI/AGI technology and helping to facilitate and conceal Defendants' profiteering and self-dealing.

209.   This private, complex profitmaking arm of OpenAI, in which on information and belief, Microsoft and Altman are significant shareholders, is publicly cloaked as a mere fundraising apparatus, but in reality, is the foundation of Defendants' scheme to control, co-opt, and cash in on OpenAI, Inc.'s valuable technology developed with Musk's significant contributions.

210.    When Altman and Brockman launched OpenAI, L.P. (now OpenAI OpCo, LLC), they transferred most of the non-profit's staff over to the new company, which also now houses and operates much of OpenAI's technological research and development. Defendants' reshuffling of OpenAI, Inc.'s assets served to conveniently shield them and their scheme from public scrutiny and to evade the financial disclosures non-profits like OpenAI, Inc. must make. Each of these predicate acts by Altman and/or Brockman were committed within the scope of their employment, officership, and/or directorship position(s) at, or their agency relationship with, the OpenAI For-Profit Entities.

211.    In addition, Altman, with the assistance and/or cooperation of Brockman and/or the OpenAI For-Profit Entities, brazenly engaged in self-dealing.

212.    For instance, it was recently reported that Altman induced OpenAI to partner with Reddit in a deal to bring Reddit's content to OpenAI's ChatGPT. On information and belief, Altman and/or entities he controls own 7.6% of Reddit and, after the OpenAI deal was announced, Reddit's stock went up 10%, boosting Altman's stake by $69 million.

213.    Further, on information and belief, Altman caused OpenAI to sign a $51 million AI chip deal with Rain AI, a company in which he also held a significant interest. On information and belief, Altman and Jony Ive, formerly of Apple, have also reportedly launched their own AI device company, which plans to exploit OpenAI's technology to compete with the iPhone. And, on information and belief, Altman is currently causing OpenAI, Inc. to work out a deal with Altman's Helion Energy for OpenAI, Inc. to buy large amounts of electricity to power its data centers.

214.    Defendants have also caused OpenAI, Inc. to exclusively license and/or furnish its now-closed technology to Microsoft, in partnership with Defendants, including its recent GPT-4, GPT-4T, and GPT-4o models for

Defendants and Microsoft's private gain, in contravention of the repeated representations to Musk and other contributors that its technology would be predominantly open source for the benefit of the public and humanity.

215.   Defendants knew their representations and promises alleged hereinabove were false when made and they had no intention of performing such promises and failed to perform them. Once they convinced Musk to back OpenAI, Inc., Defendants' aim was to develop valuable AI/AGI and exploit it for their own enrichment. Defendants intentionally concealed their fraudulent conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence. Musk would not have contributed to OpenAI, Inc. if he knew of Defendants' true intentions and scheme.

216.   Altman and Brockman directly and indirectly committed or aided and abetted these numerous predicate acts of wire fraud in furtherance of their scheme. The predicate acts by the OpenAI For-Profit Entities were committed by Altman, Brockman, and/or representatives of such entities acting through, or on behalf of and for the benefit of those entities. Each of these Defendants voluntarily and intentionally committed and/or aided and abetted the commission of the predicate acts to effectuate and/or further their illicit scheme.

### B.   *Pattern of Racketeering Activity*

217.   Defendants committed multiple predicate acts of wire fraud which are indictable under the provisions of the U.S. code enumerated in 18 U.S.C. § 1961(1)(B). Defendants did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

218.   Altman, Brockman, and/or the OpenAI For-Profit Entities committed, or conspired with or aided and abetted other Defendants in committing, at least two predicate acts of wire fraud constituting a continuous course of conduct spanning a period from at least March 2015 to the present.

The temporal duration and the number of predicate acts are so extensive as to constitute a pattern of racketeering activity with, at minimum, closed-ended continuity, though on information and belief, such conduct is continuing—e.g., Defendants are continuously forming new for-profit entities and continuing to promote their false non-profit mission—and there exists a specific threat it will persist indefinitely, constituting a pattern of racketeering activity that is open-ended.

219.   In order to implement their scheme, Defendants used the interstate wires to defraud Musk, as alleged herein. Such acts not only shared a common or related result, participants, and victims, but also shared a common method of commission. Defendants' acts of racketeering were all committed for the purpose of defrauding Musk and others of valuable financial and other contributions in furtherance of a scheme to develop valuable AI/AGI technology to be wrongfully exploited for Defendants' self-enrichment.

220.   On information and belief, the public, including without limitation, consumers, donors to OpenAI, Inc., and other contributors such as its leading AI scientists and engineers who were induced by Defendants' fake humanitarian mission, were also victimized by their fraudulent scheme. Defendants' fraudulent wire communications concerning OpenAI, Inc.'s non-profit mission to develop predominantly open-source AI/AGI technology and conduct research to be shared with the public for the benefit of humanity, have caused these individuals and/or groups to fund, support, back, and/or otherwise contribute to OpenAI, Inc. in the false belief that they were doing so to help further the non-profit's humanitarian purpose.

221.   On information and belief, Altman, Brockman, and the OpenAI For-Profit Entities' racketeering yielded financial and other contributions from Musk and others, which were, in turn, used to develop valuable AI/AGI technology that Altman along with other Defendants leveraged and exploited to

attract the powerful tech giant Microsoft and gain undue influence, which they used to acquire and/or maintain significant control over OpenAI, Inc. and its operations.

222.   To illustrate, on November 17, 2023, OpenAI, Inc.'s Board dismissed Altman as CEO and from the Board because, on information and belief, he had lied to the Board to obstruct its oversight of him, and because the Board was concerned by Altman's numerous conflicts of interest and instances of self-dealing.

223.   Prior to his dismissal, Altman had aligned himself with Microsoft and orchestrated deals causing OpenAI, Inc. to become inextricably dependent on Microsoft—e.g., on information and belief, Microsoft had paid only a fraction of its reported $13 billion commitment to OpenAI, and OpenAI, Inc. needed Microsoft's cloud computing system to continue to operate and function. On information and belief, when Microsoft learned of Altman's dismissal, it and Altman made a concerted and coordinated effort to use their influence and leverage to threaten and pressure OpenAI, Inc.'s Board to have Altman quickly reinstated.

224.   On November 21, 2023, Altman was reinstalled as CEO just days after his dismissal. Upon his return, Altman purged the Board members who had dismissed him and handpicked new compliant Board members, effectively taking over OpenAI, Inc. in furtherance of Defendants' scheme.

225.   Microsoft too obtained an influential observer seat on the Board, permitting it to exercise internal pressure and further influence over OpenAI, Inc.'s operations. Recently, on July 9, 2024, Microsoft relinquished its seat amid scrutiny from antitrust agencies in the U.S. and Europe investigating its close relationship with OpenAI.

226.   On information and belief, Defendants' illicit activities have placed them under investigation by multiple federal agencies including the Securities

and Exchange Commission and the Federal Trade Commission, U.K. and E.U.
regulators, and as of July 22 and August 1, 2024, the U.S. Senate. Defendants
are also the subject of numerous consumer advocacy complaints to the
California Attorney General, which have encouraged the AG to investigate
Defendants' wrongful exploitation of OpenAI, Inc. for personal gain.

### C.   *Violation of Section 1962(c)*

227.   Altman, Brockman, and the OpenAI For-Profit Entities are
"persons" within the definition of 18 U.S.C. § 1961(3), and at all relevant times
were employed by and/or associated with OpenAI, Inc.

228.   OpenAI, Inc. is an "enterprise" as defined by 18 U.S.C. § 1961(4)
(the "Enterprise"), and engaged in, and its activities affected, interstate and
foreign commerce. At all relevant times, OpenAI, Inc. had an existence separate
and distinct from the pattern of racketeering in which Altman, Brockman, and
the OpenAI For-Profit Entities engaged.

229.   Altman, Brockman, and the OpenAI For-Profit Entities wrongfully
conducted or participated, directly or indirectly, in the conduct of the
Enterprise's affairs through a pattern of racketeering activity.

230.   Altman, Brockman, and the OpenAI For-Profit Entities infiltrated
the Enterprise. Altman and Brockman are OpenAI, Inc.'s CEO and CTO
respectively, and at various times have sat, and Altman currently sits, on its
Board. The OpenAI For-Profit Entities, which on information and belief are
largely owned, operated, and/or controlled by Altman and Microsoft, have now
so thoroughly infiltrated the non-profit and are so intertwined with OpenAI, Inc.
so as to effectively participate in, manage, control, and/or operate the Enterprise
with impunity.

231.   Altman, Brockman, and the OpenAI For-Profit Entities'
racketeering acts were committed in furtherance of a common fraudulent scheme
to wrongfully exploit the financial and other contributions of Musk and others to

OpenAI, Inc. to develop valuable AI/AGI technology and assets, which Altman, Brockman, and the OpenAI For-Profit Entities then illicitly leveraged to enrich themselves.

232.   Altman induced Musk to contribute his money and resources to the Enterprise in the belief he was supporting an open-source, not-for-profit AI/AGI research foundation for the benefit of mankind, when, in fact, he was unwittingly providing capital, support, and/or services to a coordinated, covert profiteering scheme for Defendants' private gain.

233.   Based on Altman and Brockman's fraudulent misrepresentations, Musk contributed approximately $44,811,795.00[20] of seed capital to OpenAI, Inc. and invested his time, reputation, and connections to recruit premier AI scientists and engineers for the project.

234.   Defendants then furthered the scheme by using these contributions to develop valuable AI technology, which, once it approached marketable AGI, they kept closed source and exclusively licensed and/or furnished to Microsoft for Defendants' private gain.

235.   On information and belief, Altman and Brockman furthered the scheme by launching the OpenAI For-Profit Entities and transferring much of OpenAI, Inc.'s staff over to them. On information and belief, the OpenAI For-Profit Entities also now operate most of the non-profit's research and development, from which Altman, Brockman, and the OpenAI For-Profit Entities stand to make a veritable fortune.

236.   In addition, on information and belief, Altman along with other Defendants have engaged in unbridled self-dealing under cover of the "non-profit." On information and belief, the OpenAI For-Profit Entities facilitated and/or aided and abetted Defendants' conflicted dealings and furthered the

---

[20] In addition to the wired contributions tabled above, Musk donated Model 3 Teslas to OpenAI, Inc., valued at $248,295.00.

scheme by accepting receipt of OpenAI, Inc.'s misappropriated assets and staff, and helping to conceal Defendants' fraudulent conduct.

237.   On information and belief, Altman, Brockman, and the OpenAI For-Profit Entities have been and will continue to be enriched by their exploitation of OpenAI, Inc.'s assets, made possible by Musk's fraudulently obtained funding and contributions.

238.   The unlawful actions of Altman, Brockman, and the OpenAI For-Profit Entities directly, illegally, and proximately caused and continue to cause injuries to Musk in his business and property. In furtherance of their scheme and through fraudulent acts, Defendants caused Musk to make financial and other contributions to OpenAI, Inc., to which they were not entitled. But for Defendants' knowing misrepresentations, Musk would not have made such contributions and it was reasonably foreseeable to Defendants that their scheme would harm Musk.

239.   Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Musk is hereby entitled to recover three times the damages he sustained, reasonable attorneys' fees, and costs of litigation, as well as any other relief as authorized by statute.

## COUNT V: CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO, 18 U.S.C. § 1962(d)

### (Against Altman, Brockman, and the OpenAI For-Profit Entities)

240.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 239 inclusive, as though fully set forth herein.

241.   Altman, Brockman, and the OpenAI For-Profit Entities have undertaken the fraudulent acts described in Count IV above as part of a common scheme. Defendants willfully, knowingly, and unlawfully conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Defendants intentionally

concealed their fraudulent conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

242.   Altman, Brockman, and the OpenAI For-Profit Entities were aware of the illegal activity. Altman, as OpenAI, Inc.'s co-founder, CEO, and Board member, and Brockman as its CTO and prior Board member, knew that they had made false and/or misleading representations to Musk and other contributors that OpenAI, Inc. would be a non-profit devoted to the open-source development of AI for the benefit of humanity, and that Musk's financial or other contributions were supposed to be used solely to further such charitable purpose. On information and belief, Altman and Brockman have at all relevant times been officers, agents, employees, and/or owners whose knowledge and intent is imputed to the OpenAI For-Profit Entities. The OpenAI For-Profit Entities knew of and agreed to facilitate the operation of the Enterprise and/or Defendants' scheme.

243.   Altman and Brockman directed and caused the OpenAI For-Profit Entities to engage in the racketeering activity alleged hereinabove.

244.   Each Defendant understood that he or it was committing numerous RICO predicate acts and participating in a racketeering scheme, evidenced among other things, by his or its overt acts and involvement in repeatedly promulgating false and/or misleading representations via wire transmissions, including email correspondence, online transmittal, and social media posts, and receiving financial and other contributions, including wired funds, based on those fraudulent communications. In addition, on information and belief, the OpenAI For-Profit Entities understood they were facilitating and/or aiding and abetting Altman's self-dealing and furthering the scheme by helping to conceal Defendants' fraudulent conduct.

245.   The participation and agreement of Altman, Brockman, and each of the OpenAI For-Profit Entities was necessary to the scheme. Defendants knew

their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme, and agreed and conspired to conduct and participate in the affairs of the Enterprise through a consistent and continual pattern of racketeering activity. Further evidence of the agreement among Altman, Brockman, and the OpenAI For-Profit Entities is peculiarly within the knowledge and control of Defendants.

246.   As a direct and proximate result of Defendants' conspiracy and violations of 18 U.S.C. § 1962(d), Musk has been injured in his business and property, as alleged herein, and is entitled to treble damages, attorneys' fees, and costs of suit.

## COUNT VI: BREACH OF EXPRESS CONTRACT
### (Against Altman and OpenAI, Inc.)

247.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 246 inclusive, as though fully set forth herein.

248.   In a series of express written correspondence in 2015, Altman and Musk entered into a valid, enforceable, and binding agreement to co-found a non-profit entity (OpenAI, Inc.) to develop leading AI/AGI technology. Per their founding agreement, which under Altman's leadership was ratified and/or adopted by OpenAI, Inc., Musk was to contribute capital, provide integral advice, and use his stature and track record to recruit leading scientific talent, attracting further contributions to OpenAI, Inc. In exchange, and as consideration for Musk's contributions, Altman promised that OpenAI, Inc. (i) would be a non-profit and develop AI/AGI for the benefit of humanity, not personal profits, and (ii) to that end, would make OpenAI, Inc.'s technology largely open source, subject only to genuine safety considerations, and to not conceal nor concentrate its technology for proprietary commercial reasons.

249.   Musk fulfilled all of his obligations and has performed and/or complied with all terms and conditions of the agreement that he was required to

perform and/or comply with, except those which were waived and/or excused, or the non-performance of which was justified, and is in no matter or respect in breach of said agreement. From OpenAI, Inc.'s founding in 2015 through September 2020, Musk contributed more than $44 million to OpenAI, Inc., provided key advice on research to be conducted, played an integral role in recruiting world-class talent to OpenAI, Inc. like its Chief Scientist Dr. Sutskever, and due to his participation and stature, attracted financial contributions by others to the non-profit.

250.    In 2023, on information and belief, Altman and OpenAI, Inc. breached their agreement with Musk by, among other things:

    a.  Failing to publicly disclose the non-profit's research and development, including details on GPT-4, GPT-4T, and GPT-4o's architecture, hardware, training method, and training computation;

    b.  Licensing and/or furnishing OpenAI, Inc.'s GPT-4 and related technology exclusively to Microsoft, and by concentrating it in this single giant for-profit corporation;

    c.  Permitting Microsoft, a publicly traded for-profit business, to occupy a seat on OpenAI, Inc.'s Board of Directors and exert undue influence and control over OpenAI's activities;

    d.  Closing off OpenAI, Inc.'s technology for profit and erecting a "paywall" excluding the public from open usage of GPT-4 and related technology to advance Defendants and Microsoft's own private commercial interests;

    e.  Self-dealing and manipulating the non-profit's assets to enrich themselves by, for example causing OpenAI, Inc. to excessively patronize businesses in which Altman owns a significant interest, for his personal enrichment; and

    f.  Currently working to convert the non-profit into a fully for-profit

1    commercial entity.

2    251.   Defendants' obligations to perform were not waived nor were their

3    breaches and/or failures to perform justified and/or excused. Defendants

4    intentionally concealed their wrongful conduct, which prevented Musk from

5    discovering their scheme, notwithstanding his exercise of due diligence.

6    252.   As a direct and proximate result of Altman and OpenAI, Inc.'s

7    conduct, acts, and omissions alleged hereinabove, Defendants have deprived

8    Musk of the benefit of the parties' agreement and have caused Musk to suffer

9    damages, including but not limited to the financial contributions he made to

10   OpenAI, Inc., the loss of the time and resources he expended to direct research

11   and recruit talent and damage to his reputation, in an amount to be adjudicated

12   and determined at trial, but which vastly exceeds $75,000, plus prejudgment

13   interest.

14   253.   Musk has no adequate remedy at law for many of the injuries he

15   suffered as a result of Defendants' breaches and failures, and such injuries

16   cannot reasonably, adequately, or precisely be measured or compensated in

17   damages. Accordingly, Musk also seeks and is entitled to specific performance

18   of Defendants' contractual obligations.

19   **COUNT VII: BREACH OF IMPLIED-IN-FACT CONTRACT**

20   **(In the alternative to Count VI)**

21   **(Against Altman and OpenAI, Inc.)**

22   254.   Plaintiff re-alleges and incorporates by reference paragraphs 1

23   through 253 inclusive, as though fully set forth herein.

24   255.   The relationship, surrounding circumstances, and intentional course

25   of conduct between Musk on the one hand, and Altman and OpenAI, Inc. on the

26   other resulted in a valid, enforceable, and binding implied-in-fact contract.

27   256.   Altman proposed that he and Musk co-found an AI research non-

28   profit which Altman promised would make its findings open for the good of all

and would avoid concentrating its technology for the profit of any person or company. Musk assented and in turn agreed to use his time, name, reputation, and extensive connections to recruit premier talent, and make significant financial contributions to help launch the non-profit.

257.   From there, Altman individually and/or on behalf of OpenAI, Inc. proceeded and continued to reaffirm both publicly and to Musk directly that OpenAI, Inc. would be open and not for-profit. Such reaffirmations by Defendants were made, without limitation, in OpenAI, Inc.'s Certificate of Incorporation, the non-profit's Charter (circulated to Musk), numerous OpenAI online announcements, and countless communications to Musk from 2015 to 2020, as alleged in detail hereinabove.

258.   The conduct of Musk on the one hand, and Altman and OpenAI, Inc. on the other was intentional, and each knew or had reason to know that the other party(ies) would interpret their conduct as an agreement.

259.   Musk fulfilled any and all obligations and has performed and/or complied with any and all terms and conditions of the agreement that he was required to perform and/or comply with, except those which were waived and/or excused, or the non-performance of which was justified, and is in no matter or respect in breach of said agreement. During OpenAI, Inc.'s critical first five years, Musk used his power and connections to bring in the workforce necessary to launch the non-profit and contributed considerable funding each year, totaling approximately $44,811,795.00 from 2016 to 2020.

260.   Initially, Altman and OpenAI, Inc. performed their obligations, and publicly disclosed the non-profit's findings and research supporting its preliminary GPT models.

261.   In 2023, however, Altman and OpenAI, Inc. breached their implied-in-fact contract by, without limitation, failing to publicly disclose the non-profit's research, closing off the non-profit's technology for private profit,

excluding the public from open usage, self-dealing and exploiting the non-profit's assets to enrich themselves, and as recently as June 2024, working to convert the non-profit to a fully for-profit entity.

262.   Defendants' obligations to perform were not waived nor were their breaches and/or failures to perform justified and/or excused. Defendants intentionally concealed their wrongful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

263.   As a direct and proximate result of Altman and OpenAI, Inc.'s conduct, acts, and omissions alleged hereinabove, Defendants have deprived Musk of the benefit of the parties' agreement and have caused Musk to suffer damages, including but not limited to the loss of the time and resources he expended to direct research and recruit talent, the financial contributions he made to OpenAI, and damage to his reputation, in an amount to be adjudicated and determined at trial, but which vastly exceeds $75,000, plus prejudgment interest.

264.   Musk has no adequate remedy at law for many of the injuries he suffered as a result of Defendants' breaches and failures, and such injuries cannot reasonably, adequately, or precisely be measured or compensated in damages. Thus, Musk also seeks and is entitled to specific performance of Defendants' contractual obligations.

## COUNT VIII: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Altman and OpenAI, Inc.)

265.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 264 inclusive, as though fully set forth herein.

266.   Implied in every agreement is a covenant of good faith and fair dealing that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the agreement.

267.   Musk entered into a valid, binding, and enforceable agreement with Altman and OpenAI, Inc. with the purpose of developing AI/AGI technology to be openly shared with the public for the benefit of all, and not for private profiteering.

268.   Musk fulfilled any and all obligations and has performed and/or complied with any and all terms and conditions of the agreement with Altman and OpenAI, Inc. that he was required to perform and/or comply with, except those which were waived and/or excused, or the non-performance of which was justified, and is in no matter or respect in breach of said agreement. Musk paid over $44 million to OpenAI, Inc. and invested substantial time and resources, including using his valuable track record and notoriety to recruit leading scientific talent and attract further financial contributions to the non-profit.

269.   Altman and OpenAI, Inc. did not act fairly and in good faith by fraudulently inducing Musk to make significant contributions, failing to disclose material information to him, closing off the non-profit's technology for personal monetary gain, and engaging in brazen self-dealing and other profiteering as alleged hereinabove. Defendants thereby breached the implied covenant of good faith and fair dealing and consciously and deliberately frustrated the agreed-upon purpose and mission of the non-profit, wrongfully depriving Musk of the benefits of the parties' agreement.

270.   Defendants' obligations to perform were not waived nor were their breaches and/or failures to perform justified and/or excused.

271.   As a direct and proximate result of Altman and OpenAI, Inc.'s conduct, acts, and omissions alleged hereinabove, Defendants have deprived Musk of the benefit of the parties' agreement and have caused Musk to suffer damages, including but not limited to the financial contributions he made to OpenAI, Inc., the loss of the time and resources he expended to direct research and recruit talent, and damage to his reputation, in an amount to be adjudicated

COMPLAINT

and determined at trial, but which vastly exceeds $75,000, plus prejudgment interest.

272.   Musk has no adequate remedy at law for many of the injuries he suffered as a result of Defendants' breaches and failures, and such injuries cannot reasonably, adequately, or precisely be measured or compensated in damages. Musk therefore also seeks and is entitled to specific performance of Defendants' contractual obligations.

## COUNT IX: BREACH OF QUASI-CONTRACT/UNJUST ENRICHMENT

### (In the alternative to Counts VI, VII, and VIII)

### (Against All Defendants)

273.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 272 inclusive, as though fully set forth herein.

274.   In the absence of an enforceable agreement, Defendants have still been unjustly enriched at Musk's expense as a result of their improper exploitation for personal profit of OpenAI, Inc.'s resources, intellectual property, and assets.

275.   Musk contributed considerable money and resources to launch and sustain OpenAI, Inc., which was done on the condition that the endeavor would be and remain a non-profit devoted to openly sharing its technology with the public and avoid concentrating its power in the hands of the few.

276.   Defendants knowingly and repeatedly accepted Musk's contributions in order to develop AGI, with no intention of honoring those conditions once AGI was in reach. Case in point: GPT-4, GPT-4T, and GPT-4o are all closed source and shrouded in secrecy, while Defendants actively work to transform the non-profit into a thoroughly commercial business.

277.   Defendants intentionally concealed their wrongful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

278.   It would be unjust and inequitable to allow Defendants to retain the substantial benefits that were obtained as a direct and proximate result of their wrongful conduct including, without limitation, their solicitation of capital and other valuable resources from Musk under the false pretense and repeated promises that such would be used for charitable purposes, and while misrepresenting to Musk and the public that OpenAI, Inc. was developing AI/AGI for the public's benefit and not for private gain.

279.   As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged hereinabove, Musk has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, but which vastly exceeds $75,000, and for which restitution and/or non-restitutionary disgorgement is appropriate. Such should include the imposition of a constructive trust; a declaration by this Court that Defendants are jointly and severally the constructive trustee(s) for the benefit of Musk; and an order that Defendants convey to Musk all of the profits, assets, property, and ill-gotten gains received or to be received by Defendants, which are traceable to Musk's wrongfully acquired financial and other contributions to OpenAI, Inc.

## COUNT X: FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(B)

### (Against Altman, Brockman, and OpenAI, Inc.)

280.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 279 inclusive, as though fully set forth herein.

281.   Altman and Brockman induced an unwitting Musk to co-found their spurious non-profit, OpenAI, Inc. They then exploited Musk's stature and reputation to elicit public trust and support for the non-profit, recruit top AI scientists and engineers, and solicit financial contributions from third parties through knowingly false marketing and promotion of the non-profit, harming

COMPLAINT

Musk's business interests and reputation.

282.   Musk is well-known for his commitment to open technology—e.g., Tesla and SpaceX generally do not hold and/or do not enforce patents for their technology, which is free for the public to use.

283.   Altman and Brockman, in their individual capacities and on behalf of OpenAI, Inc., harnessed Musk's business reputation by among other things, making Musk co-chair of the Board, using his track record to recruit top talent, and promoting his name and involvement on OpenAI, Inc.'s website and other marketing of OpenAI, Inc.

284.   Defendants in their marketing, advertisements, and promotions made knowingly false and/or misleading representations to the public that OpenAI, Inc. would be a non-profit whose mission is to develop safe and open-source AI/AGI technology for the public good, not private gain.

285.   Commencing on December 11, 2015 and continuing to today, OpenAI, Inc.'s website represented that "OpenAI's co-chairs are Sam Altman and Elon Musk" and that:

- "OpenAI is a non-profit artificial intelligence research company [whose] goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact."

- "We believe AI should be an extension of individual human will and, in the spirit of liberty, as broadly and evenly distributed as possible."

- "Because of AI's surprising history, it's hard to predict when human-level AI might come within reach. When it does, it'll be important to have a leading research institution which can prioritize a good outcome for all over its own self-interest."

- "As a non-profit, our aim is to build value for everyone rather than shareholders."

- "Our primary fiduciary duty is to humanity. We anticipate needing to marshal substantial resources to fulfill our mission, but will always diligently act to minimize conflicts of interest among our employees and stakeholders that could compromise broad benefit."

- "Researchers will be strongly encouraged to publish their work, whether as papers, blog posts, or code, and our patents (if any) will be shared with the world."

- "Our mission is to ensure that [AGI] benefits all humanity, primarily by attempting to build safe AGI and share the benefits with the world."

286.   OpenAI, Inc.'s Charter, posted on its website, claims: "We commit to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all, and to avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power. Our primary fiduciary duty is to humanity."

287.   Even in marketing OpenAI, L.P., on March 11, 2019, Defendants claimed: "The General Partner's duty to this mission and the principles advanced in the OpenAI Inc. Charter take precedence over any obligation to generate a profit." OpenAI, Inc.'s website stated: "We've designed OpenAI LP [*sic*] to put our overall mission—ensuring the creation and adoption of safe and beneficial AGI—ahead of generating returns for investors. . . . Regardless of how the world evolves, we are committed—legally and personally—to our mission."

288.   Altman and Brockman made these material, false, and misleading representations of fact about the nature, characteristics, and qualities of Defendants' products and services in commercial advertising or promotion in interstate commerce, namely, OpenAI, Inc.'s website, online marketing, online blog posts, and Defendants' social media.

289.   These false and misleading statements have deceived and/or are

likely to deceive a substantial segment of the public.

290. Defendants' false and misleading claims are material because they are likely to induce the relevant public to make financial and/or other contributions, including the rendering of services (like the top scientists they recruited) to OpenAI, Inc. in the belief they are supporting an open-source, not-for-profit AI/AGI research foundation, when in fact, they are providing capital, support, and/or services to what is covertly a thoroughly commercial enterprise.

291. Defendants' conduct constitutes false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

292. Defendants' deceptive conduct and false and misleading claims have injured and will continue to injure Musk's valuable business reputation and commercial interests. Defendants intentionally concealed their wrongful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

293. As a prominent and well-respected tech figure, Musk's name and reputation served to attract top-tier AI scientists and engineers to OpenAI, Inc. Indeed, it was Musk's reputation and track record which served to recruit OpenAI, Inc.'s prominent Chief Scientist, Dr. Sutskever away from Google. But as alleged hereinabove, numerous key executives at OpenAI, Inc., including Dr. Sutskever, are now resigning from the supposed non-profit due to Defendants' conflicted pursuit of profits over safety.

294. Defendants' misrepresentations, by affiliation, have harmed, and will continue to harm Musk's professional standing and commercial interests particularly in the AI/tech industry, eroding his ability to recruit leading AI scientists and engineers, as he had done for Defendants. Such harm is particularly acute in the field of AI, where the recruitment of a very limited pool of top scientists and engineers is fiercely competitive and pivotal to success.

COMPLAINT

295.   As a direct and proximate result of Altman, Brockman, and OpenAI, Inc.'s conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from their wrongful conduct, including prejudgment interest. Musk is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

296.   As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged hereinabove, Musk has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, and for which restitution and/or non-restitutionary disgorgement is appropriate. Such should include the imposition of a constructive trust; a declaration by this Court that Defendants are jointly and severally the constructive trustee(s) for the benefit of Musk; and an order that Defendants convey to Musk all of the profits, assets, property, and ill-gotten gains received or to be received by Defendants, which are traceable to Musk's wrongfully acquired financial and other contributions to OpenAI, Inc.

297.   Unless enjoined by this Court pursuant to 15 U.S.C. § 1116, Defendants will continue to mislead the public and cause harm to Musk. Musk is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further acts.

298.   Defendants' false and misleading claims are deliberate, willful, fraudulent, and without extenuating circumstances. Defendants' conduct is thus an "exceptional case" within the meaning of section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). Musk is therefore entitled to recover three times the amount of his actual damages and his attorneys' fees and costs incurred in this action.

## COUNT XI: UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *et seq.*

### (Against All Defendants)

299.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 298 inclusive, as though fully set forth herein.

300.   Defendants engaged in unfair competition and other unlawful and/or fraudulent business practices by soliciting contributions from Musk and others under the false pretense that such funds would be used for the non-profit purposes articulated in OpenAI, Inc.'s Certificate of Incorporation, Charter, website, online marketing, blog posts, emails, and other communications.

301.   By founding OpenAI, Inc. as a non-profit, Defendants were able to solicit significant "donations," including from Musk, to purportedly develop AI/AGI, which was to be made largely open source for the public benefit and good of humanity—not closed and proprietary for profit.

302.   Defendants actively deceived Musk and the public by effectively using these "donations" as free start-up capital to develop valuable technology which they have concealed for their own personal gain, as described herein. Such conduct has deceived, and will likely continue to deceive, the public, and is unethical, immoral, substantially injurious to consumers, and violates public policy.

303.   But for Defendants' false, misleading, and unlawful practices, Musk would not have made his significant contributions to OpenAI, Inc. Defendants intentionally concealed their wrongful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

304.   As a direct and proximate result of Defendants' conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of

them, arising from the wrongfully obtained contributions Musk made to OpenAI, Inc., which amount vastly exceeds $75,000, including prejudgment interest.

305.    Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Musk substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Musk is both imminent and irreparable, and the amount of damage sustained by Musk will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Musk has no adequate remedy at law with respect to Defendants' ongoing unlawful conduct.

306.    Pursuant to Cal. Bus. & Prof. Code § 17203, Musk is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further acts of unfair competition.

## COUNT XII: FALSE ADVERTISING UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17500 *et seq.*

### (Against Altman, Brockman, and OpenAI, Inc.)

307.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 306 inclusive, as though fully set forth herein.

308.    As described above, Altman and Brockman, in their individual capacities and on behalf of OpenAI, Inc., have made materially false and/or misleading representations of fact in commercial advertisements about the nature, characteristics, and qualities of Defendants' products and services, including that OpenAI, Inc.'s AI/AGI research and technology would be largely open source for the benefit of humanity, and would not be concentrated or used for private commercial gain.

309.    Defendants knew and/or should have known their

communications—via OpenAI, Inc.'s website, online marketing, online blog posts, and social media—were materially false and/or misleading when they were made.

310. Defendants intended to use and did use the contributions from Musk and others to fund the research and development of AI/AGI technology which Defendants have kept secret from the public and have concentrated in Microsoft and the OpenAI For-Profit Entities to enhance commercial profits and personal gain.

311. Musk reasonably relied on these statements as he continued to fund OpenAI, Inc., believing his contributions were going toward the AI research and development project, as advertised and promoted by Defendants. Defendants' conduct deceived Musk and is likely to deceive a substantial segment of the public.

312. Defendants intentionally concealed their wrongful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

313. As a direct and proximate result of Altman, Brockman, and OpenAI, Inc.'s conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from the wrongfully obtained contributions Musk made to OpenAI, Inc., which amount vastly exceeds $75,000, including prejudgment interest.

314. Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Musk substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Musk is both imminent and irreparable, and the amount of damage sustained by

Musk will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Musk has no adequate remedy at law with respect to Defendants' ongoing unlawful conduct.

315.  Pursuant to Cal. Bus. & Prof. Code § 17203, Musk is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further acts of false advertising.

## COUNT XIII: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against the OpenAI For-Profit Entities)

316.  Plaintiff re-alleges and incorporates by reference paragraphs 1 through 315 inclusive, as though fully set forth herein.

317.  As a charity and persons soliciting contributions on behalf of a charity, OpenAI, Inc., Altman, and Brockman each owe a fiduciary duty to Musk, from whom charitable contributions were actively solicited, including under Cal. Bus. & Prof. Code § 17510.8.

318.  Altman, Brockman, and OpenAI, Inc. solicited and obtained contributions from Musk by making repeated and material promises, representations, and reassurances to him that they would develop AI for the benefit of humanity, would predominantly open source their technology, avoid concentrating it, and would not operate for the profit of any person or company, as evidenced in, without limitation, the emails, corporate filings, and online pronouncements alleged above.

319.  On information and belief, Altman, Brockman, and OpenAI, Inc. breached their fiduciary duties to Musk by:

    a.  Keeping secret the non-profit's research and development, including details on GPT-4, GPT-4T, and GPT-4o's architecture, hardware, training method, and training computation;

COMPLAINT

b.  Exploiting Musk's contributions, and the technological assets
funded by those contributions, in a thoroughly for-profit enterprise;

c.  Licensing and/or furnishing OpenAI, Inc.'s GPT-4 and related
technology exclusively to Microsoft, concentrating it in this single
giant for-profit corporation;

d.  Permitting Microsoft, a publicly traded business, to occupy a seat
on OpenAI, Inc.'s Board of Directors and otherwise to exert undue
influence and control over OpenAI's activities;

e.  Closing off OpenAI, Inc.'s technology for profit and erecting a
"paywall" excluding the public from open usage of GPT-4 and
related technology to advance Defendants and Microsoft's own
commercial interests;

f.  Self-dealing and manipulating the non-profit's assets to enrich
themselves by, for example causing OpenAI, Inc. to excessively
patronize businesses in which Altman owns a significant interest,
for his personal enrichment; and

g.  Currently working to convert the non-profit into a fully for-profit
commercial entity.

320.  The OpenAI For-Profit Entities each had actual knowledge of the
fiduciary duties Altman, Brockman, and OpenAI, Inc. owed to Musk, because
Altman and Brockman were instrumental in their formation. The very purpose of
the OpenAI For-Profit Entities is to enable Altman and Brockman to operate for
non-charitable purposes and to circumvent the fiduciary duties they owe to the
donors. Further, on information and belief, Altman and Brockman have at all
relevant times been officers, agents, employees, and/or owners whose
knowledge and intent is imputed to the OpenAI For-Profit Entities.

321.  The OpenAI For-Profit Entities provided substantial assistance to
Altman and Brockman, aiding and abetting their respective breaches of fiduciary

duty by helping them exploit OpenAI, Inc.'s intellectual property and staff for Defendants' private gain, rather than advancing the non-profit's express charitable purposes.

322. Defendants willfully aided and abetted these breaches of fiduciary duty for Defendants' own benefit, and this was a substantial factor in causing harm to Musk.

323. On information and belief, Defendants have been greatly enriched by their resulting misappropriation of the non-profit's assets and their self-dealing in blatant derogation of the fiduciary duties Altman, Brockman, and OpenAI, Inc. owed and continue to owe Musk.

324. Defendants intentionally concealed their wrongful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

325. As a direct and proximate result of the OpenAI For-Profit Entities' conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from the wrongful acquisition of Musk's contributions to OpenAI, Inc., including prejudgment interest. Musk is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

326. As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged hereinabove, Musk has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, but which vastly exceeds $75,000, and for which restitution and/or non-restitutionary disgorgement is appropriate. Such should include the imposition of a constructive trust; a declaration by this Court that Defendants are jointly and severally the constructive trustee(s) for the benefit of

Musk; and an order that Defendants convey to Musk all of the profits, assets, property, and ill-gotten gains received or to be received by Defendants, which are traceable to Musk's wrongfully acquired financial and other contributions to OpenAI, Inc.

327.   Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Musk substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Musk is both imminent and irreparable, and the amount of damage sustained by Musk will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Musk is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further tortious conduct.

328.   Defendants' wrongful conduct constitutes oppression, fraud, and/or malice under Cal. Civ. Code § 3294, entitling Musk to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

## COUNT XIV: TORTIOUS INTERFERENCE WITH CONTRACT
### (Against the OpenAI For-Profit Entities)

329.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 328 inclusive, as though fully set forth herein.

330.   The OpenAI For-Profit Entities knew Musk had a valid contract with Altman and OpenAI, Inc. and that the agreement required OpenAI, Inc.'s technology to be predominantly open source for the benefit of humankind, not for commercial gain. Aside from the name "OpenAI"—an appellation ironically shared by almost all the OpenAI For-Profit Entities—these Defendants all had knowledge of the charitable purpose for which Musk co-founded the non-profit,

as, on information and belief, Altman and Brockman have at all relevant times been their officers, agents, employees, and/or owners whose knowledge and intent is imputed to them.

331.   On information and belief, the OpenAI For-Profit Entities intended to disrupt Altman and OpenAI, Inc.'s performance of their contract with Musk and/or knew that such disruption of their performance was certain or substantially certain to occur as a result of their conduct.

332.   The OpenAI For-Profit Entities induced OpenAI, Inc. to breach its agreement with Musk and engaged in independently wrongful conduct by siphoning the non-profit's most valuable assets into their for-profit apparatus. On information and belief, the OpenAI For-Profit Entities currently employ much of the non-profit's former staff, including Altman and Brockman, house its research and intellectual property, and have facilitated rampant self-dealing.

333.   On information and belief, Altman, a major stakeholder in OpenAI's for-profit apparatus, could have donated his money to the non-profit like Musk but instead, Altman put the majority of his investment in the moneymaking scheme made possible by the OpenAI For-Profit Entities.

334.   Defendants intentionally concealed their wrongful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.

335.   As a direct and proximate result of the OpenAI For-Profit Entities' conduct, acts, and omissions alleged hereinabove, Musk is entitled to recover the damages he sustained and will sustain, including any income, gains, compensation, profits, and advantages obtained, received, or to be received by Defendants, or any of them, arising from the wrongful acquisition of Musk's contributions to OpenAI, Inc., including prejudgment interest. Musk is entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

336.   As a direct and proximate result of Defendants' wrongful conduct, acts, and omissions alleged hereinabove, Musk has been damaged, and Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial, but which vastly exceeds $75,000, and for which restitution and/or non-restitutionary disgorgement is appropriate. Such should include the imposition of a constructive trust; a declaration by this Court that Defendants are jointly and severally the constructive trustee(s) for the benefit of Musk; and an order that Defendants convey to Musk all of the profits, assets, property, and ill-gotten gains received or to be received by Defendants, which are traceable to Musk's wrongfully acquired financial and other contributions to OpenAI, Inc.

337.   Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Musk substantial injury and damage, much of which cannot be reasonably or adequately measured or compensated in money damages. The harm this wrongful conduct will cause to Musk is both imminent and irreparable, and the amount of damage sustained by Musk will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint. Musk is entitled to an injunction during the pendency of this action, and permanently enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further tortious conduct.

338.   Defendants' wrongful conduct constitutes oppression, fraud, and/or malice under Cal. Civ. Code § 3294, entitling Musk to an award of punitive damages appropriate to punish or set an example of Defendants in an amount to be determined at trial.

/ / /

/ / /

/ / /

## COUNT XV: DECLARATORY RELIEF

### (Against All Defendants)

339.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 338 inclusive, as though fully set forth herein.

340.   By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Musk and Defendants as to whether OpenAI, Inc.'s exclusive license to Microsoft is valid. Alternatively, if the license is valid, an actual and justiciable controversy has arisen between Musk and Defendants as to whether GPT-4, GPT-4T, GPT-4o, and other OpenAI next generation large language models constitute AGI and are thus excluded from Microsoft's license.

341.   Musk contends and Defendants deny that the Microsoft license violates OpenAI, Inc.'s non-profit mission and breaches the agreement between Musk, Altman, and OpenAI, Inc.

342.   Musk therefore desires a judicial determination that OpenAI, Inc.'s license to Microsoft is null and void.

343.   Musk contends and Defendants deny that GPT-4, GPT-4T, GPT-4o, and other OpenAI next generation large language models constitute AGI and are thus outside the scope of OpenAI, Inc.'s license to Microsoft.

344.   Musk therefore desires a judicial determination that GPT-4, GPT-4T, GPT-4o, and other OpenAI next generation large language models constitute AGI and are outside the scope of the license to Microsoft, to the extent the license is deemed valid by this Court.

345.   A declaration of the Court is necessary and appropriate pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, so the parties may ascertain their rights with respect to the aforesaid agreement, the license, and OpenAI's AGI technology.

/ / /

COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Musk respectfully prays for judgment against Defendants as follows:

1.     For compensatory, consequential, and statutory damages, restitution, and non-restitutionary disgorgement, and any other relief that may be permitted by law or equity, according to proof in an amount to be determined at trial, together with interest thereon as provided by law;

2.     For a constructive trust on Defendants' ill-gotten gains, property, and assets traceable to Musk's significant contributions to OpenAI, Inc.;

3.     For an accounting of all gains, profits, and advantages Defendants have derived from their solicitation, receipt, use, and expenditure of Musk's contributions to OpenAI, Inc., including the intellectual property and derivative works funded by the same and from Defendants' use of the same for their benefit or the benefit any third party;

4.     For a judicial determination that OpenAI, Inc.'s license to Microsoft is null and void, or to the extent it is deemed valid, that GPT-4, GPT-4T, GPT-4o, and/or other OpenAI next generation large language models constitute Artificial General Intelligence (AGI) and are therefore outside the scope of OpenAI's license to Microsoft;

5.     For an order compelling specific performance of Defendants' contractual promises to Musk, as alleged herein;

6.     For a preliminary and permanent injunction enjoining Defendants from the unlawful, unfair, and unjust conduct alleged herein;

7.     For treble damages pursuant to 18 U.S.C. § 1964(c);

8.     For punitive and/or exemplary damages as provided by law;

9.     For costs of suit;

10.     For attorneys' fees pursuant to Cal. Civ. Proc. § 1021.5, 15 U.S.C. § 1117(a), 18 U.S.C. § 1964(c), and as otherwise permitted by law; and

11.    For such other and further relief as the Court deems just and appropriate.



DATED: August 5, 2024              Respectfully Submitted,

                                   TOBEROFF & ASSOCIATES, P.C.

                                   By: */s/ Marc Toberoff*
                                         Marc Toberoff

                                   *Attorneys for Plaintiff Elon Musk*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury for all issues triable to a jury.

DATED: August 5, 2024          Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

By: */s/ Marc Toberoff*
        Marc Toberoff

*Attorneys for Plaintiff Elon Musk*