Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs Elon Musk,*
*Shivon Zilis, and X.AI Corp.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to Hon. Yvonne Gonzalez Rogers |
| v. | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION** |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date:    January 7, 2025 |
| | Time:    2:00 p.m. |
| | Place:    Courtroom 1 (4th Fl.) |
| | 1301 Clay St. |
| | Oakland, CA 94612 |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 7, 2025, at 2:00 p.m., or as soon as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers at the United States District Court for the Northern District of California, Ronald V. Dellums Federal Building and United States Courthouse, Courtroom 1 (4th Floor), 1301 Clay Street, Oakland, California 94612, Plaintiffs Elon Musk ("Musk"), Shivon Zilis ("Zilis"), and X.AI Corp. ("xAI," and collectively, "Plaintiffs") will, and hereby do, move the Court for a preliminary injunction against defendants Samuel Altman ("Altman"), Gregory Brockman ("Brockman"), OpenAI, Inc., OpenAI, L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, Aestas, LLC,[1] Deannah Templeton ("Templeton"), Reid Hoffman ("Hoffman"), and Microsoft Corp. (collectively, "Defendants"), and involuntary plaintiff, joined as defendant, Rob Bonta, in his official capacity as the Attorney General of California ("Attorney General of California") pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rules 7-2 and 65-2.

As detailed in the Proposed Order submitted with this Motion, Plaintiffs seek an order enjoining Defendants, as well as their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with Defendants, during the pendency of this litigation, from: (1) directly or indirectly undertaking any action for the purpose of, or tending to have the effect of, making, enforcing, or furthering agreements not to invest in OpenAI's competitors, such as xAI; (2) directly or indirectly undertaking any action for the purpose of,

---

[1] This Motion uses "OpenAI" to refer collectively to the non-profit or charity (OpenAI, Inc.) and all other OpenAI entities (which include Aestas Management Company, LLC and Aestas, LLC); it further uses "For-Profit Entities" to refer collectively to all OpenAI entities except the non-profit, OpenAI, Inc.

or tending to have the effect of, interlocking directorates or benefitting from wrongfully obtained competitively sensitive information or coordination via the Microsoft-OpenAI board interlocks; (3) directly or indirectly undertaking any action for the purpose of, or tending to have the effect of, furthering the conversion of OpenAI, Inc. to a for-profit enterprise or transferring any material assets, including intellectual property owned, held, or controlled by OpenAI, Inc., its subsidiaries, or affiliates; and/or (4) directly or indirectly undertaking any action for the purpose of, or tending to have the effect of, causing OpenAI, Inc. to contract or do business with any entity in which any Defendant has a material financial interest.

This Motion is made on the grounds that: (1) Plaintiffs will be irreparably harmed if Defendants are not so enjoined; (2) Plaintiffs are likely to succeed on the merits of their claims or their claims raise serious questions going to the merits; (3) the balance of hardships weighs strongly in Plaintiffs' favor; and (4) the public interest supports the issuance of a preliminary injunction.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Plaintiffs' Verified First Amended Complaint ("FAC"), Dkt. No. 32, the declaration of Marc Toberoff, all matters of which the Court may take judicial notice, all other pleadings on file in this action, and any other written or oral argument or evidence that Plaintiffs may present to the Court.

DATED: November 29, 2024        Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

*/s/ Marc Toberoff*
Marc Toberoff

*Attorneys for Plaintiffs Elon Musk,*
*Shivon Zilis, and X.AI Corp.*

**ISSUES TO BE DECIDED**

Pursuant to Local Civil Rule 7-4(a)(3), Plaintiffs identify the following issues to be decided:

1.        Whether Musk and xAI are likely to succeed on their claim that OpenAI's "Fund No Competitors" edict to investors violates section 1 of the Sherman Act;

2.        Whether Musk and xAI are likely to succeed on their claim that OpenAI, Inc. and Microsoft had interlocking boards under Section 8 of the Clayton Act, 15 U.S.C. § 19, the result of which threatens continuing competitive injury;

3.        Whether Musk is likely to succeed on his claim that Altman, Brockman, and OpenAI, Inc. are in breach of the conditions governing Musk's donations, entitling him to enforce said terms under either California Corporation Code section 5142 or the common law as embodied in the California Probate Code;

4.        Whether Musk and Zilis are likely to succeed on their claim that Altman is engaged in prohibited self-dealing;

5.        Whether Plaintiffs face irreparable injury;

6.        Whether the balance of equities for issuing a prohibitory injunction favors Plaintiffs or Defendants, and to what degree;

7.        Whether the public interest favors a prohibitory injunction;

8.        Whether Plaintiffs' claims raise sufficiently serious questions that a prohibitory injunction, preserving the status quo, should issue even in the absence of a likelihood of success on the merits; and

9.        Whether prohibiting Defendants, as well as their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, from the following is an appropriate remedy:

a.        directly or indirectly undertaking any action for the purpose of, or tending to have the effect of, making, enforcing, or furthering OpenAI's agreements with investors not to invest in OpenAI's competitors, such as xAI;

b.      directly or indirectly undertaking any action for the purpose of, or tending to have the effect of, interlocking directorates or benefitting from wrongfully obtained competitively sensitive information or coordination via the Microsoft-OpenAI board interlocks;

c.      directly or indirectly undertaking any action for the purpose of, or tending to have the effect of, furthering the conversion of OpenAI, Inc. to a for-profit enterprise or transferring any material assets, including intellectual property owned, held, or controlled by OpenAI, Inc., its subsidiaries, or affiliates; and/or

d.      directly or indirectly undertaking any action for the purpose of, or tending to have the effect of, causing OpenAI, Inc. to contract or do business with any entity in which any Defendant has a material financial interest.

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

LEGAL STANDARD ..................................................................................................4

ARGUMENT ...............................................................................................................5

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS..................................5

     A.    Defendants' "Fund No Competitors" Edict Is a Per Se Violation of
          of Section 1 of the Sherman Act (Musk and xAI against OpenAI
          and Microsoft)...................................................................................5

          1.    The "Fund No Competitors" edict is per se unlawful .............................5

          2.    The "Fund No Competitors" edict has directly caused
               harm to Musk and xAI .................................................................8

          3.    The "Fund No Competitors" edict harms competition in
               a way the antitrust laws were intended to prevent .....................8

     B.    Defendants Have Repeatedly and Flagrantly Violated Section 8
          of the Clayton Act (Musk and xAI against OpenAI, Microsoft,
          Templeton, and Hoffman)...................................................................9

          1.    Microsoft and OpenAI were competitors at all relevant times ...............10

          2.    Microsoft and OpenAI satisfy Section 8's jurisdictional thresholds........10

          3.    Microsoft and Hoffman's simultaneous board service
               violated Section 8 .......................................................................10

          4.    An injunction to prevent the misuse of wrongfully obtained
               information and continued unlawful coordination is an
               appropriate remedy.....................................................................12

     C.    Defendants Have Caused OpenAI, Inc. to Breach Its Charitable Trust
          (Musk against Altman, Brockman, and OpenAI, Inc.)......................................15

          1.    Musk has clear standing to sue under multiple theories.........................15

           2.    OpenAI is plainly violating the terms of Musk's donations ...................16

          3.    A narrow injunction to prohibit OpenAI's ongoing conversion
               to a for-profit is an appropriate remedy ....................................17

D.  Altman Has Engaged in Rampant Self-Dealing (Musk and Zilis, derivatively as members of OpenAI, Inc., against Altman and the Attorney General of California) ............................................................. 17

  1.  Plaintiffs have standing to bring this claim ............................................. 18

  2.  Plaintiffs make a strong prima facie showing of self-dealing ................. 20

  3.  An injunction ordering Defendants to cease self-dealing is an appropriate remedy ................................................................................. 21

II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF ........................................................................... 22

III.  THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS' FAVOR .............................................................................................. 23

IV.  A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST ................. 24

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)....................................................................4

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010)..................................................................................6

*American Center for Education, Inc. v. Cavnar*,
  80 Cal. App. 3d 476 (1978)......................................................................15

*Autonomous Region of Narcotics Anonymous v. Narcotics Anonymous World Servs., Inc.*,
  77 Cal. App. 5th 950 (2022).....................................................................16

*Bader v. Anderson*,
  179 Cal. App. 4th 775 (2009)...................................................................20

*Burt v. Irvine Co.*,
  237 Cal. App. 2d 828 (1965).....................................................................17

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
  596 U.S. 107 (2022)................................................................................15

*Comet Techs. U.S.A. Inc. v. Beuerman*,
  No. CV 18-1441, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ........................23

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017)....................................................................23

*E. & J. Gallo Winery v. Andina Licores S.A.*,
  446 F.3d 984 (9th Cir. 2006)......................................................................5

*Epic Games, Inc. v. Apple Inc.*,
  493 F. Supp. 3d 817 (N.D. Cal. 2020)........................................................22

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
  343 F.3d 1000 (9th Cir. 2003)...................................................................24

*Grosset v. Wenaas*,
  42 Cal. 4th 1100 (2008)...........................................................................19

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016).......................................................23

*Holt v. Coll. of Osteopathic Physicians & Surgeons*,
  61 Cal. 2d 750 (1964).............................................................................16

CASE NO. 24-CV-04722-YGR
PLAINTIFFS' MOT. FOR PRELIM. INJ.

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Honey Bum, LLC v. Fashion Nova, Inc.,*
  63 F.4th 813 (9th Cir. 2023)............................................................................7

*In re Musical Instruments & Equip. Antitrust Litig.,*
  798 F.3d 1186 (9th Cir. 2015).........................................................................7

*Klor's Inc. v. Broadway-Hale Stores, Inc.,*
  359 U.S. 207 (1959)........................................................................................7

*L.B. Rsch. & Educ. Found. v. UCLA Found.,*
  130 Cal. App. 4th 171 (2005)................................................................... 15-17

*Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing, Co.,*
  472 U.S. 284 (1985)........................................................................................8

*NYNEX Corp. v. Discon, Inc.,*
  525 U.S. 128 (1998)..................................................................................... 6-7

*O'Donnell/Salvatori Inc. v. Microsoft Corp.,*
  No. CV 20-0882, 2020 WL 3962132 (W.D. Wash. July 13, 2020).....................23

*Obasi Inv. LTD v. Tibet Pharms., Inc.,*
  931 F.3d 179 (3d Cir. 2019)...........................................................................11

*Patton v. Sherwood,*
  152 Cal. App. 4th 339 (2007).........................................................................15

*PLS.Com, LLC v. Nat'l Ass'n of Realtors,*
  32 F.4th 824 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023) ..............*passim*

*Protectoseal Co. v. Barancik,*
  484 F.2d 585 (7th Cir. 1973).........................................................................14

*SCM Corp. v. F.T.C.,*
  565 F.2d 807 (2d Cir. 1977)....................................................................... 9-10

*S.E.C. v. Sunwest Mgmt., Inc.,*
  No. 6:09-CV-06056-AA (D. Or. 2009).............................................................22

*Square D Co. v. Schneider S.A.,*
  760 F. Supp. 362 (S.D.N.Y. 1991)............................................................ 10-11

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.,*
  803 F.3d 1084 (9th Cir. 2015).........................................................................8

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                                                    **Pages**

3
*TMX Funding, Inc. v. Impero Techs., Inc.,*
4
   No. CV 10-0202, 2010 WL 1028254 (N.D. Cal. 2010) .........................................................23

5
*TRW, Inc. v. F.T.C.,*
   647 F.2d 942 (9th Cir. 1981) ...................................................................................... *passim*
6

7
*Turner v. Victoria,*
   15 Cal. 5th 99 (2023).................................................................................................. 18-19
8

9
*United States v. Newmont Min. Corp.,*
   4 F.R.D. 504 (S.D.N.Y. 1964) ...........................................................................................13

10
*United States v. Sears, Roebuck & Co.,*
11
   111 F. Supp. 614 (S.D.N.Y. 1953) ....................................................................................11

12
*United States v. W. T. Grant Co.,*
   345 U.S. 629 (1953) .........................................................................................................13
13

14
*Walczak v. EPL Prolong, Inc.,*
   198 F.3d 725, 732 (9th Cir. 1999).....................................................................................23

15
*Western Directories, Inc. v. Golden Guide Directories, Inc.,*
16
   No. CV 09-1625, 2009 WL 1625945 (N.D. Cal. June 8, 2009)..........................................23

17
*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..............................................................................................................4
18

19
*Zunum Aero, Inc. v. Boeing Co.,*
   No. CV 21-0896, 2022 WL 2116678 (W.D. Wash. June 13, 2022) ....................................11

20

21
**Statutes, Rules and Regulations**

22
15 U.S.C.
23
   § 1 ................................................................................................................... *passim*
24
   § 19 ................................................................................................................. *passim*
25

26
California Business and Professions Code § 17510.8 ................................................................16

27

28

# TABLE OF AUTHORITIES

**Statutes, Rules and Regulations**                                                     **Pages**

California Corporations Code

    § 800 ...............................................................................................................19

    § 5047 ...............................................................................................................11

    § 5142 ........................................................................................................ 15-16

    § 5233 ........................................................................................................ *passim*

    § 5710 ........................................................................................................ 18-20

Federal Trade Commission, *Revised Jurisdictional Thresholds for Section 8 of the*
    *Clayton Act*, 89 Fed. Reg. 3926 (Jan. 22, 2024) ....................................................9

**Other Authorities**

Restatement of Charitable Nonprofit Organizations § 6.05 (Am. L. Inst. 2021)...............16, 18

Restatement (Third) of Trusts § 94(2) (Am. L. Inst. 2012).......................................16

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

It would be one thing if Microsoft were, once again, engaging in anticompetitive conduct, this time with OpenAI. It would be another if OpenAI, aided and abetted by Microsoft, were violating the terms of Musk's foundational contributions to the charity. But OpenAI and Microsoft together exploiting Musk's donations so they can build a for-profit monopoly, one now specifically targeting xAI, is just too much. Plaintiffs and the public need a pause. OpenAI's path from a non-profit to for-profit behemoth is replete with *per se* anticompetitive practices, flagrant breaches of its charitable mission, and rampant self-dealing. Allowing this course of conduct to continue until final disposition will seriously harm Plaintiffs and the public at large, whether as competitors, FAC ¶¶ 201, 227, 330-89, as donors and early members, *id.* ¶¶ 237-39, 416-83, as investors facing a complex and costly unwinding, *id.* ¶¶ 113, 124, 387(f), as consumers, *id.* ¶¶ 330-415, as taxpayers, *id.* ¶¶ 183, 312, 387(d)-(e), as citizens concerned about violations of California and federal law, *id.* ¶ 387(a)-(i), or simply as people, concerned about rushed, unsafe AI products, *id.* ¶¶ 186, 401.

These irreparable harms, some already evident and others imminent, will snowball absent judicial intervention to maintain the status quo. Microsoft, a self-proclaimed competitor of OpenAI, *id.* ¶ 225, should not be "in there," "below them," "above them," and "around them," *id.* ¶ 158. These two enterprises have, through a series of exclusive arrangements, interlocking directorates, and predatory practices, seized control of nearly 70% of the market for generative artificial intelligence products ("generative AI"), *id.* ¶ 216, a market with profound network effects, *id.* ¶ 208. Microsoft and OpenAI now seek to cement this dominance by cutting off competitors' access to investment capital (a group boycott), *id.* ¶¶ 201, 331(a), while continuing to benefit from years' worth of shared competitively sensitive information during generative AI's formative years, *id.* ¶¶ 168-69, 368-82. Whatever leeway OpenAI might have been due under antitrust law as a purported charity it chose to forego when it subordinated itself to Microsoft for profit. OpenAI must therefore play by the same rules as everyone else. It cannot lumber about the marketplace as a Frankenstein,

stitched together from whichever corporate forms serve the pecuniary interests of Microsoft and Altman at any given moment.

More fundamentally, the charity should never have been put in this position. Musk made absolutely clear that his donations—which established and sustained OpenAI, Inc. for years, *id.* ¶¶ 91-97—were conditioned on Altman and Brockman's firm commitment to operate as a non-profit, devoted to the public good, *id.* ¶ 103. But they, acting in concert with Microsoft, have violated practically every term of those commitments to Musk and the public. *Id.* ¶¶ 251, 321-25, 428-34, 471-77. An injunction to preserve what is left of OpenAI's non-profit character, free from self-dealing, is the only appropriate remedy. If not, the OpenAI promised to Musk and the public will be long gone by the time the Court reaches the merits.

## STATEMENT OF FACTS

Three critical inflection points chart OpenAI's transformation from a charitable enterprise into something different altogether. The first period begins in 2015, when Altman approached Musk with a detailed plan to form an AI charity. FAC ¶¶ 83-84. Altman made express, repeated promises that OpenAI would be and remain a non-profit dedicated to the development and broad distribution of open and safe AI for the public benefit, not concentrated for shareholder profit. *Id.* ¶¶ 83-90. To ensure safety remained the primary focus, Altman also promised that the technology developed by the non-profit would be owned by it. FAC Ex. 2 at 1. Based on these commitments, Musk agreed to co-found and fund OpenAI, lending his name and credibility to help attract the talented AI scientists necessary to make OpenAI a success. *Id.* ¶¶ 91-97.

These conditions were unequivocal. When Altman and Brockman later proposed converting OpenAI to a for-profit enterprise, Musk wrote to them on September 20, 2017: "Either go do something on your own or continue with OpenAI as a non-profit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding to a start-up. Discussions are over." *Id.* ¶ 103. Altman and Brockman responded with their firm commitment that OpenAI remain a non-profit, and based on their express representations, Musk donated no less than an additional

1    $10,275,000.00 in cash alone. *Id.* ¶¶ 104, 309.

2         The second dividing line marks Microsoft's evolution from partner to co-conspirator.

3    When OpenAI was a charity operating as a counterweight against Google, there was arguable

4    value in partnering with an established tech company, especially one positioned to provide

5    OpenAI with its most important raw material—compute. *Id.* ¶¶ 99, 159. Microsoft, which was

6    developing its own generative AI, was keen to harness OpenAI's potential. *Id.* ¶ 98. What

7    began as a flawed partnership—with exclusive arrangements giving Microsoft the sole right to

8    supply OpenAI with compute, *id.* ¶ 112—became increasingly problematic as Microsoft took

9    a massive stake in the For-Profit Entities that Altman had launched, *id.* ¶¶ 124-25, and to

10   which he and Microsoft siphoned the non-profit's staff and intellectual property, *id.* ¶¶ 129-32.

11   These problems were compounded by Microsoft securing an exclusive license to OpenAI's

12   technology, thereby becoming both its exclusive supplier and exclusive licensee. *Id.* ¶ 133.

13        Throughout this process, Altman engaged in rampant self-dealing, *id.* ¶¶ 136-45, and

14   in November 2023, when OpenAI, Inc.'s board of directors became aware of Altman's

15   numerous conflicts of interests and deceptions, they fired him, *id.*¶¶ 148-60. But Microsoft,

16   unwilling to let its insider ally be ousted, leveraged its position to force the board members

17   who fired Altman to reinstate him and resign; in the process, it obtained for itself an

18   influential non-voting director seat filled by Microsoft executive Deannah Templeton. *Id.* ¶¶

19   158-61, 168. This gave Microsoft—an admitted competitor to OpenAI, *id.* ¶ 225—open

20   access to all of OpenAI's proprietary information, *id.* ¶ 169. This was not OpenAI's first (or

21   last) interlocking directorate, as Reid Hoffman had been serving simultaneously on the boards

22   of OpenAI, Inc., Microsoft, and his own AI startup, Inflection AI. *Id.* ¶ 163 & n.8.

23        Microsoft's critical role in reinstating Altman and purging the non-profit's board

24   demonstrated Microsoft's effective control over OpenAI. *Id.* ¶¶ 159-72. Since then, OpenAI

25   and Microsoft have operated in lockstep, controlling nearly 70% of the generative AI market

26   while accelerating anticompetitive conduct. *Id.* ¶¶ 156-60, 202. They have transformed

27   OpenAI into everything Altman promised Musk it would never be—a closed-source, *id.* ¶¶

28   179-80, for-profit monopoly, *id.* ¶¶ 172, 194-99, 216, that rushes unsafe AI products to market

for private commercial gain, *id.* ¶¶ 184-93. Before Microsoft had demonstrated its manifest dominance over OpenAI, Musk had reason to hope that an independent OpenAI was still possible. But after Microsoft's open consolidation of control ("We have the people, we have the compute, we have the data, we have everything"), *id.* ¶ 157, Musk lost that hope.

In response, Musk launched xAI in 2023, organizing it as a public benefit corporation to effectuate his longstanding commitments to open-source AI. *Id.* ¶¶ 77 n.4, 78. But OpenAI's $157 billion valuation and market dominance were not enough for Altman and Microsoft. The third dividing line came in October 2024, during OpenAI's latest oversubscribed funding round. There, Altman and OpenAI, acting in concert with Microsoft, expressly conditioned their acceptance of any investment on the investor's agreement not to fund OpenAI's competitors, specifically naming xAI. *Id.* ¶¶ 185, 189, 201-02. This funding restriction was not limited to xAI; OpenAI and Microsoft also targeted other safety-focused AI startups, such as Safe Superintelligence, which former Chief Scientist and board member Dr. Ilya Sutskever launched after leaving OpenAI over concerns that it no longer prioritized safety. *Id.* ¶¶ 185, 189.[2] Simultaneously, Altman and OpenAI announced their plan to formally convert to a fully for-profit enterprise, sounding the final death knell for their repeated commitments to Musk, regulators, and the public. FAC ¶¶ 194-96.

## LEGAL STANDARD

To obtain preliminary relief, Plaintiffs must establish that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, under the Ninth Circuit's "sliding scale" approach, "serious questions going to the merits" combined with a balance of hardships that tips sharply toward the plaintiffs will support preliminary relief where there is a likelihood of irreparable injury and the injunction serves the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

---

[2] Declaration of Marc Toberoff dated November 29, 2024, Ex. 8 at 1; Ex. 9 at 2. Subsequent "Ex." citations are to this Toberoff Declaration, unless otherwise stated.

1  Plaintiffs satisfy either standard.

2  <u>**ARGUMENT**</u>

3  **I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

4       The record establishes that Plaintiffs have "a fair chance of success on the merits or

5  [present] questions serious enough to require litigation." *E. & J. Gallo Winery v. Andina*

6  *Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006). Plaintiffs confine their discussion in this

7  section to only those claims where the public record alone reveals Defendants' conduct to be

8  illegal, injunctive relief is available, and the public interest is manifest and urgent.

9       **A.    Defendants' "Fund No Competitors" Edict Is a *Per Se* Violation of Section**
10          **1 of the Sherman Act (Musk and xAI against OpenAI and Microsoft).**

11       Section 1 of the Sherman Act prohibits "[e]very contract, *combination* in the form of

12  trust or otherwise, or *conspiracy*, in restraint of trade or commerce." 15 U.S.C. § 1 (emphases

13  added). To demonstrate a likelihood of success on their claim under this provision, Musk and

14  xAI must show: "(1) unlawful conduct, (2) causing an injury to [them], (3) that flows from

15  that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were

16  intended to prevent." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir.

17  2022), *cert. denied*, 143 S. Ct. 567 (2023) (internal quotation marks omitted).

18       **1.    The "Fund No Competitors" edict is *per se* unlawful.**

19       As the FAC explains, during OpenAI's October 2024 funding round, where Microsoft

20  invested approximately $750 million, "OpenAI said to people: 'We'll give you allocation but

21  we want you to be involved in a meaningful way in the business so you can't commit to our

22  competitors.'" FAC ¶ 201. Other reputable media outlets have confirmed this account. Ex. 8 at

23  1; Ex. 9 at 2. Musk has further verified that at least one major investor in OpenAI's October

24  2024 funding round has subsequently declined to invest in xAI. *Id.* ¶ 227.

25       Either OpenAI and Microsoft have engaged in an unregulated merger, or they are

26  competitors, engaged in a "strategic partnership," *id.* ¶ 225, that told investors not to fund

27  ///

28  ///

their mutual competitors, *id.* ¶ 201.[3] This is plainly an unlawful group boycott under 15 U.S.C. § 1, which the Ninth Circuit recently described as:

> [A] concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, the hallmark of the 'group boycott' is the effort of competitors to barricade themselves from competition at their own level.

*PLS.Com*, 32 F.4th at 834 (internal quotation marks omitted); *see NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 135 (1998) (describing "a group boycott in the strongest sense" as a "group of competitors threaten[ing] to withhold business from third parties unless those third parties . . . help them injure their directly competing rivals").

OpenAI and Microsoft, by jointly participating in the latest funding round, have engaged in "concerted action" constituting a traditional horizontal group boycott. *Am. Needle*, 560 U.S. at 195. They are competitors of xAI at the same level, FAC ¶ 226, and venture capital and private equity are services for which all startup companies are consumers, *PLS.Com*, 32 F.4th at 832-33. This is especially true for generative AI, where the financial barriers to entry are measured in the billions rather than the millions available from traditional lenders. FAC ¶¶ 209, 222. OpenAI and Microsoft, through concerted action, "induc[ed] suppliers" of investment capital "not to sell to potential competitors," such as xAI.[4] It is no

---

[3] The "key" to section 1's application "is whether the alleged contract, combination . . . or conspiracy is concerted action—that is, whether it joins together separate decisionmakers. . . . such that the agreement deprives the marketplace of independent centers of decisionmaking." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (cleaned up). Either Microsoft and OpenAI are independent competitors (as Microsoft claims, FAC ¶ 225), in which case their "concerted action" triggers section 1, or "they are controlled by a single center of decisionmaking and they control a single aggregation of economic power"—an unregulated, patently anticompetitive merger, whether measured by the Herfindahl-Hirschman Index of market concentration or otherwise. *Am. Needle*, 560 U.S. at 194.

[4] Microsoft's participation was not limited to investing, FAC Ex. 25 at 3; it also necessarily participated in the funding round as OpenAI's "long-term partner[]" and the only "strategic

answer that OpenAI's competitors can still obtain funding from others. "[A] group of competitors coercing a competitor's suppliers to sell to that competitor only on 'unfavorable terms' constitutes a group boycott even if the competitors do not completely cut off the competitor's access to inputs it needs." *PLS.Com*, 32 F.4th at 835. OpenAI and Microsoft's conduct was unlawful, full stop. *Id.* at 833.

But even if one ignored Microsoft's elephantine presence in the room, OpenAI acting alone still violated the Sherman Act. While the term "group boycott" might suggest there must be an agreement between two or more competitors at the same level to exclude a third, a single firm with market power may engage in a "group" boycott. *Discon*, 525 U.S. at 135 (noting "*Klor's* [*Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959),] involved a threat made by a *single* powerful firm" but the threat was still actionable because "it also involved a horizontal agreement among those threatened . . . to hurt a competitor of the retailer who made the threat" (emphasis in original)). "We call this latter type—where one dominant firm pressures other firms at a different level of the supply chain—a hub-and-spoke group boycott." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023) (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015)).

OpenAI, a rival with market power, threatened horizontally competing suppliers (the investors) and obtained an agreement with and among them to hurt OpenAI's competitors by restricting access to capital. Not only is this obvious from the reporting, but all the "plus factors" courts consider to infer such an agreement are also present. "Where the conduct of an alleged co-conspirator is in its own economic self-interest *only if* the other alleged co-conspirators follow suit, there is strong circumstantial evidence of a conspiracy." *Id.* at 823 (emphasis in original)). It is not in the economic self-interest of any investor during the October 2024 funding round to refrain from investing in competitors like xAI unless *all* investors refrain. Otherwise, some investors could diversify their generative AI investments while others could not, placing them at a marked disadvantage. Additionally, by jointly

partner" identified in its S.E.C. disclosures, *id*. ¶ 225; Ex. 17 at 5, 22. Plaintiffs' aiding and abetting and conspiracy allegations in the FAC provide additional bases to attribute OpenAI's edict to both OpenAI and Microsoft.

1   participating in the same funding round, investors had both the opportunity to collude among

2   themselves and with top OpenAI executives, further supporting the inference of conspiracy.

3   *Id.*; *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1092 (9th Cir. 2015).

4         If OpenAI and Microsoft's group boycott is not determined to be a *per se* violation

5   under *Klor's* (as it should be), it would still constitute a modified *per se* violation under

6   *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing, Co.*, 472 U.S. 284 (1985).

7   In *PLS.Com*, the Ninth Circuit explained that the Supreme Court has "held that a group

8   boycott 'generally' falls into the *per se* category if 'the boycotting firms possess[] a dominant

9   position in the relevant market,' they 'cut off access to a supply, facility, or market necessary

10  to enable the boycotted firm to compete,' and the practice is 'not justified by plausible

11  arguments that [it was] intended to enhance overall efficiency and make markets more

12  competitive.'" 32 F.4th at 835 (quoting *Pac. Stationery & Printing*, 472 U.S. at 294). In this

13  case, OpenAI alone and OpenAI and Microsoft together "possess[] a dominant position in the

14  [generative AI] market," FAC ¶ 216, they "cut off access to" capital and investors, "a supply,

15  facility, or market necessary to enable the boycotted firm [xAI] to compete," *id.* ¶¶ 222, 226,

16  and such was "not justified by plausible arguments that [it was] intended to enhance overall

17  efficiency and make markets more competitive," *id.* ¶ 249.

### 2. The "Fund No Competitors" edict has directly caused harm to Musk and xAI.

20         Musk has verified that at least one major investor in OpenAI's October 2024 funding

21  round has subsequently declined to invest in xAI. FAC ¶ 227. It is obviously harmful to

22  deprive xAI of investors, particularly during this crucial and formative period of growth in the

23  generative AI market. *Id.* ¶¶ 208-15.

### 3. The "Fund No Competitors" edict harms competition in a way the antitrust laws were intended to prevent.

26         "[T]he Sherman Act prohibits group boycotts because they are designed to drive

27  existing competitors out of the market or to prevent new competitors from entering, thus

28  leaving consumers with fewer choices, higher prices, and lower-quality products. . . . [T]he

Supreme Court has long recognized that 'competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.'" *PLS.Com*, 32 F.4th at 840-41. Here, depriving xAI of capital and investment—especially in a market with a powerful first-mover advantage and strong network effects that raise additional competitive barriers, FAC ¶¶ 208-09—impairs its ability to compete. That in turn reduces consumer choice. Fewer options for consumers mean dominant players like OpenAI and Microsoft are under less competitive pressure and have less incentive to ensure the safety of their products. Reduced competition from safety-minded startups, like the ones OpenAI forbade investors from funding, creates and amplifies harmful downstream effects, undermine safety standards industry-wide, and harms consumers.

**B.      Defendants Have Repeatedly and Flagrantly Violated Section 8 of the Clayton Act (Musk and xAI against OpenAI, Microsoft, Templeton, and Hoffman).**

Section 8 of the Clayton Act categorically prohibits a "person" from serving as a director or officer of two or more corporations at the same time if the corporations are "by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws." 15 U.S.C. § 19(a)(1). This bright-line, *per se* prohibition serves "to nip in the bud incipient antitrust violations by removing the opportunity or temptation for such violations through interlocking directorates." *TRW, Inc. v. F.T.C.*, 647 F.2d 942, 946-47 (9th Cir. 1981). A violation occurs where: (1) the interlocked corporations are competitors; (2) each corporation has capital, surplus, and undivided profits exceeding $48,559,000; and (3) each corporation has competitive sales exceeding $4,855,900. 15 U.S.C. § 19(a)(1); FTC, *Revised Jurisdictional Thresholds for Section 8 of the Clayton Act*, 89 Fed. Reg. 3926 (Jan. 22, 2024).[5]

The definition of a "person" prohibited from serving as an interlocking director includes corporations like Microsoft, *TRW*, 647 F.2d at 948-49 (citing *SCM Corp. v. F.T.C.*,

---

[5] The safe-harbor provisions in 15 U.S.C. § 19(a)(2) do not apply, and, in any event, it is Defendants' burden to prove otherwise. FAC ¶ 379.

565 F.2d 807, 811 (2d Cir. 1977)), which is forbidden to "attempt[] to place on the Board of a competitor individuals who are agents of, and have an employment or business relationship with, such company." *Square D Co. v. Schneider S.A.*, 760 F. Supp. 362, 367 (S.D.N.Y. 1991). In the Ninth Circuit, "competitors" are defined by looking to "the degree of actual interchangeability of use between the products of alleged competitors," as well as "evidence concerning (1) the extent to which the industry and its customers recognize the products as separate or competing; (2) the extent to which production techniques for the products are similar; and (3) the extent to which the products can be said to have distinctive customers." *TRW*, 647 F.2d at 947. There is no *de minimus* exception. *Id.* at 948.

### 1.    Microsoft and OpenAI were competitors at all relevant times.

Microsoft admits that it and OpenAI are competitors. FAC ¶ 225. Further, it is clear that OpenAI's ChatGPT and Microsoft's Copilot compete against one another in the market for generative AI. The industry and customers recognize these products as competitors, *id.* ¶¶ 204-07, 226, their production techniques are effectively identical, and each has similar customers at the same price point, *id.* ¶ 224. The fact there might be slight differences among the products is irrelevant. *TRW*, 647 F.2d at 947 (expressly rejecting the need for "proof of high cross-elasticity of demand between competing products or low-friction interchangeability of use"). Microsoft and OpenAI are competitors for purposes of section 8.[6]

### 2.    Microsoft and OpenAI satisfy Section 8's jurisdictional thresholds.

During the relevant period, Microsoft and OpenAI had capital, surplus, and undivided profits exceeding $48,559,000, and their competitive sales exceeded $4,855,900. FAC ¶ 378.

### 3.    Microsoft and Hoffman's simultaneous board service violated Section 8.

There are at least two sets of interlocks in this case.[7] The first occurred when Hoffman,

---

[6] An agreement not to compete between OpenAI and Microsoft would obviously "constitute a violation of any of the antitrust laws." 15 U.S.C. § 19(a)(1)(B).

[7] During the relevant period, Hoffman also served as a general partner at Greylock Partners, which has numerous investments in competing AI startups, including ones overseen by Hoffman himself (such as Inflection AI, which Microsoft "acqui-hired" in March 2024). FAC

who has continuously served as a voting director of Microsoft since 2017, FAC ¶ 163, also served as a voting director of OpenAI, Inc. from March 2018 until March 2023, *id.* ¶¶ 163 n.8, 166. This clearly violated section 8.

The second interlock occurred when Microsoft, through its agent and employee Templeton, served on OpenAI, Inc.'s board as a non-voting director from November 2023 until July 2024. *Id.* ¶¶ 168, 371. While no case appears to address interlocks by non-voting directors, the legislative purpose of the Clayton Act's prohibition on interlocking directors—to proactively prevent the sharing of sensitive information among competitors—is plainly furthered by its application here. *See TRW*, 647 F.2d at 846-47; *Square D*, 760 F. Supp. at 366 ("The purposes of § 8 are to avoid the opportunity for the coordination of business decisions by competitors and to prevent the exchange of commercially sensitive information by competitors."), *id.*(calling section 8 "a prophylactic rule designed to avoid potential antitrust violations before they occur"); *United States v. Sears, Roebuck & Co.*, 111 F. Supp. 614, 616 (S.D.N.Y. 1953) ("[W]hat Congress intended by § 8 was to nip in the bud incipient violations of the antitrust laws by removing the opportunity or temptation to such violations through interlocking directorates. The legislation was essentially preventative.").

Here, a non-voting director like Microsoft (via Templeton) and a voting director have the same access to "commercially sensitive information," *see* FAC ¶¶ 169, 227, 331(o), and both can report back and forth, creating "the opportunity for the coordination of business decisions by competitors." *Square D*, 760 F. Supp. at 366. As a matter of federal law, a non-voting director should be considered a "director" as that term, left undefined by Congress, is used in section 8 of the Clayton Act.[8] *Compare* 15 U.S.C. § 19(a)(4) (providing a specific

¶¶ 163, 169, 214 & n.11, 375. Hoffman remains a general partner at Greylock, while also still serving on Inflection AI's vestigial board. FAC ¶¶ 163, 375; Ex. 5 at 1.

[8] Cases have held that non-voting directors are not "directors" when it comes to liability for action (or inaction) on behalf of a corporation. *Obasi Inv. LTD v. Tibet Pharms., Inc.*, 931 F.3d 179, 189 (3d Cir. 2019); *Zunum Aero, Inc. v. Boeing Co.*, No. CV 21-0896, 2022 WL 2116678 (W.D. Wash. June 13, 2022). That makes sense, given that non-voting directors lack the power formally to act for a company. *See* Cal. Corp. Code § 5047. The Clayton Act, however, is not about formal action or inaction by voting; it exists to prevent opportunities for collusion.

1  federal definition of "officer" in section 8).

2      Indeed, the very reason Microsoft obtained its board seat was to coordinate business

3  decisions with OpenAI. After the board fired Altman, Microsoft's CEO, Satya Nadella,

4  expressed frustration that Microsoft had not been consulted, and he vowed Microsoft would

5  be more involved moving forward to avoid further "surprises." In an interview four days after

6  Altman's firing, Nadella spoke on the matter:

> As a partner, I think it does mean that you deserve to be consulted on big
> decisions . . . So all I said [to OpenAI, Inc.'s board] is 'Hey, whatever it is that
> you're doing, just make sure that you don't compromise the mission of the
> organization in which we have invested and the people who are behind that that
> we bet on.' . . . One thing I'll be very, very clear on is we are never going to get
> back into a situation where we get surprised like this ever again . . . We'll
> definitely take care of all of the governance issues and anything else. And as I
> said, we have all the rights, so therefore we will make sure that we are very, very
> clear that the governance gets fixed in a way that we really have maturity and
> guarantee that we don't have surprises.

13  Ex. 2 at 3, 5, 7. Eight days later, Microsoft obtained its seat on OpenAI, Inc.'s board.

14  Tellingly, Microsoft withdrew from OpenAI, Inc.'s board in July 2024 amid intense antitrust

15  scrutiny from U.S. and European regulators. FAC ¶ 168.

16
17  **4.    An injunction to prevent the misuse of wrongfully obtained
        information and continued unlawful coordination is an
18         appropriate remedy.**

19      Plaintiffs and the highly concentrated generative AI market are being damaged by the

20  extensive amount of competitively sensitive information that (1) Microsoft wrongfully

21  obtained from its service on OpenAI's board via Templeton, and (2) Hoffman/Microsoft

22  wrongfully obtained from his simultaneous service on the boards of Microsoft and OpenAI.

23      This is not theoretical. "Hoffman became a key negotiating force between Microsoft

24  and the Altman-Brockman team, according to a person with knowledge of the matter." Ex. 3

25  at 5. And even after leaving OpenAI's board, Hoffman continues to reference his knowledge

26  of non-public OpenAI information. Ex. 20 at 00:00:44–00:00:48 & Ex. 21 at 1:21–22.

27  Templeton's current profile on Microsoft's website continues to advertise that "[u]nder her

28  leadership, the cross-functional team responsible for Microsoft's collaboration with OpenAI

has made remarkable strides in joint endeavors[.]" Ex. 16 at 2. Templeton and Hoffman both continue to hold leadership positions at Microsoft, FAC ¶¶ 163, 369-70, where they have direct responsibilities for AI and the Microsoft-OpenAI relationship. Ex. 3 at 5; Ex. 16 at 1-2. This gives them ample opportunity to continue exploiting their insider information and synchronize efforts to suppress promising generative AI startups.

That Templeton and Hoffman have left OpenAI's board is no defense. As the Supreme Court noted in its only section 8 case: "Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). "The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs." *Id.* (internal citations omitted); *see also United States v. Newmont Min. Corp.*, 34 F.R.D. 504, 505 (S.D.N.Y. 1964) ("It is plain that mere resignation of a directorship allegedly held in violation of § 8 of the Clayton Act does not render an action for violation of that section moot. The *Grant* case expressly so holds." (citing *W.T. Grant*, 345 U.S. at 629)). The Ninth Circuit is in accord. When companies' violations of section 8 are "blatant" or they have "demonstrated a tendency to run afoul of" it, then "[t]he decision to terminate the offensive conduct . . . before issuance of the complaint"—even "arguably before notice of the FTC's investigation"—is no impediment to equitable relief. *TRW*, 647 F.2d at 954. Defendants' "tendency to run afoul of" section 8 is apparent even today. OpenAI, Inc.'s current board chairman, Bret Taylor—whom Hoffman helped install, Ex. 3 at 3—just this year launched his own AI company, Sierra, which directly competes with OpenAI. Ex. 4 at 1-2.

Defendants knew what they were doing was wrong, as evidenced by Templeton and Hoffman's abrupt resignations under even informal pressure to do so. They have made no commitment to avoid future violations—certainly nothing like the sworn assurances in *TRW*, which were still held insufficient. *Id.* at 953. Indeed, Hoffman was reluctant to resign notwithstanding his manifestly illegal conduct, FAC ¶ 163 n.8, Ex. 1 at 1, and he continues to

///

///

demonstrate zero concern for doing that which he must know to be illegal.[9] OpenAI, Microsoft via Templeton, and Hoffman have "blatant[ly]" violated section 8, as well as "demonstrated a tendency to run afoul of" it.[10] An order enjoining Defendants from seeking or holding interlocking directorates in the field of generative AI is appropriate.

It is not, however, sufficient. The damage done by OpenAI, Microsoft, Templeton, and Hoffman is substantial. Generative AI is in a crucial developmental period, FAC ¶¶ 185-92, and Defendants have had direct access to the information, and an opportunity to coordinate the activities, of companies representing nearly 70% of the market during this critical phase. "The district court ha[s] power to do more than enjoin the specific [section 8] violation found[.]" *Protecteseal Co. v. Barancik*, 484 F.2d 585, 589 (7th Cir. 1973). In *Protecteseal*, the Seventh Circuit affirmed an order "enjoining [the defendant] from voting his shares for the election of directors." *Id.* Here, the remedy can be narrower. Microsoft and OpenAI can simply be forbidden from (1) using or benefiting from any competitively sensitive information Templeton and/or Hoffman acquired from OpenAI or Microsoft, and (2) continuing with any actions they coordinated during their interlocked periods, as neither was entitled to these unlawful advantages in the first place. Hoffman should be similarly enjoined from using the information he wrongfully acquired and continuing any plans he coordinated during his

---

[9] Hoffman's cavalier comments to media that he metaphorically switches "hats" in acting for one competitor or another while on the boards of both evince a plain indifference to the law. Ex. 18 at 00:22:40–00:23:43 & Ex. 19 at 1:19–2:24. Hoffman does not even adhere to his own self-imposed rules, such as not being "in the room" during negotiations between his interlocked boards, which in any event could not sanitize his conduct. *Compare* Ex. 18 at 00:23:14–00:23:43 & Ex. 19 at 2:14–24 (Hoffman stating he believes he should not sit in the room during meetings between interlocked competitors) *with* Ex. 22 at 00:55:46–00:56:02 & Ex. 23 at 1:6–10 (Hoffman admitting he "sometimes sit[s] in the room" during meetings between interlocked competitors).

[10] Because application of section 8 to partnerships is a complex and evolving area of law, Plaintiffs do not press a free-standing claim based on Hoffman's service as a general partner of Greylock under an indirect or "deputization" interlock theory as part of their request for a preliminary injunction. Nor do they press a claim based on Hoffman's continuing interlocking service on Inflection AI's vestigial board—despite the serious issues it raises, Ex. 6 at 2—as Microsoft's acqui-hire may make causation a complex inquiry. But Hoffman's continued insouciance towards competition rules is relevant for purposes of assessing the need for an injunction to prevent future harms.

1    repeated, flagrant interlocks.

2    **C.    Defendants Have Caused OpenAI, Inc. to Breach Its Charitable Trust**
3    **(Musk against Altman, Brockman, and OpenAI, Inc.).**

4        **1.    Musk has clear standing to sue under multiple theories.**

5        California's non-profit regulatory law, which applies to California charities such as

6    OpenAI, Inc.,[11] provides that "[a] person with a reversionary, contractual, or property interest

7    in the assets subject to [a] charitable trust" is entitled to "bring an action to enjoin, correct,

8    obtain damages for or to otherwise remedy a breach of a charitable trust." Cal. Corp. Code

9    § 5142(a). In *L.B. Rsch. & Educ. Found. v. UCLA Found.*, 130 Cal. App. 4th 171 (2005), "[a]

10    donor contributed $1 million to establish an endowed chair at the UCLA School of Medicine,

11    which UCLA accepted along with the conditions imposed by the donor." *Id.* at 175. The court

12    concluded, as the Court should here, that acceptance of the donation on the donor's conditions

13    created an enforceable contract subject to a condition subsequent. *Id.* at 180. UCLA's failure

14    to abide by the condition subsequent—to select a chair of cardiothoracic surgery engaged in

15    "basic science research activities that may have the potential for clinical applications," *id.* at

16    175—gave the donor standing to sue for breach of contract. *Id.* at 180. Here, no less than in

17    *L.B. Research*, Musk is a person with a contractual interest, subject to the conditions

18    subsequent that OpenAI, Inc. would be and remain a non-profit that owns the technology it

19    develops and furthers the transparent development of safe AI.

20        But the *L.B. Research* court went even further: "Had we concluded otherwise (and

21    found . . . that [the donor's] gift created a charitable trust), we would have reversed on the

22    ground that the Attorney General's power to enforce charitable trusts does not in this type of

23    ─────────────────

24    [11] Under *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115-17 (2022), the
Court should apply California's choice-of-law rules. California selects its own law, without
25    regard to the internal affairs doctrine, to regulate the activities of charities like OpenAI, Inc.
FAC ¶¶ 228-29; *American Center for Education, Inc. v. Cavnar*, 80 Cal. App. 3d 476, 487
26    (1978) ("Where a charity has been organized by California residents, is located in this state
and has all of its assets and most of its activity here, we believe that actions taken in
27    California concerning the administration of that charity should not escape the scrutiny of
California law merely because the founders chose to incorporate elsewhere."), *superseded by*
28    *statute on other grounds as stated in Patton v. Sherwood*, 152 Cal. App. 4th 339, 346 (2007).

case deprive the donor of standing to enforce the terms of the trust it created."[12] *Id.* "[T]here is the interest of donors who have directed that their contributions be used for certain charitable purposes." *Id.* at 181 (internal quotation marks omitted). As Justice Traynor explained in a widely cited opinion, a "person having a sufficient special interest," such as "donors who have directed that their contributions be used for certain charitable purposes," may "also bring an action for this purpose." *Holt*, 61 Cal. 2d at 754; *see Autonomous Region of Narcotics Anonymous v. Narcotics Anonymous World Servs., Inc.*, 77 Cal. App. 5th 950, 967 (2022) ("For more than half a century, *Holt* has been a beacon. The Restatement Third [of Trusts] described *Holt* as 'frequently quoted' and paid Justice Traynor the compliment of identifying him as its author."); *see also* Restatement of Charitable Nonprofit Organizations § 6.05 (Am. L. Inst. 2021) ("special interest" test). This form of donor standing arises from the common law as embodied in the Probate Code. *Holt*, 61 Cal. 2d at 753; *Autonomous Region of Narcotics Anonymous*, 77 Cal. App. 5th at 960, 965 (quoting Restatement (Third) of Trusts § 94(2) (Am. L. Inst. 2012)).

Whether Musk's cause of action to enforce the terms of his donations to OpenAI, Inc. arises from a contract subject to a condition subsequent, *see* Cal. Corp. Code § 5142(a)(4), or the common law and Probate Code, he clearly has standing to sue.

### 2.    OpenAI is plainly violating the terms of Musk's donations.

The grant from the foundation in *L.B. Research* is in no material way different from Musk's contributions to OpenAI, Inc. "Our tour of charitable trust law begins by defining a trust: a fiduciary relationship with respect to property that arises from a manifestation of intention to create that relationship and that subjects the person who holds title to the property to duties to deal with it for the benefit of charity." *Autonomous Region of Narcotics Anonymous*, 77 Cal. App. 5th at 959 (internal citations omitted).[13] "The term 'person' includes

---

[12] "Rules governing charitable trusts ordinarily apply to charitable corporations." *Holt v. Coll. of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 753, 756 (1964).

[13] The course of conduct between Altman and Musk gave rise to a fiduciary duty. Further Altman, Brockman, and after its formation, OpenAI, Inc., owed Musk a statutory fiduciary duty under Cal. Bus. & Prof. Code § 17510.8.

corporations," *id.*, and cash gifts, in addition to less fungible contributions, qualify as the "property" necessary for a trust, *L.B. Research*, 130 Cal. App. 4th at 175.

Here, Musk manifested an intent to serve a charitable purpose, i.e., that OpenAI, Inc. would be a non-profit devoted to the development of safe and largely open-source generative AI. FAC ¶¶ 86-90. He provided cash and other property to a charitable corporation. *Id.* ¶ 96. No later than September 20, 2017, when he wrote "continue with OpenAI as a non-profit [or] I will no longer fund OpenAI," *id.* ¶ 103, Musk manifested a clear intent that his contributions be managed according to his wishes. As a result, there is a charitable trust.

There can be no serious question that OpenAI's imminent conversion to a for-profit entity violates the terms of Musk's donations. And, according to Defendants, they have already transferred away and locked down nearly all "the foundation['s]" "technology," for private gain, *id.* ¶¶ 129-130, 177-80, while safety is now, at best, window dressing, *id.* ¶¶ 184-93, 396-401.

> ### 3. A narrow injunction to prohibit OpenAI's ongoing conversion to a for-profit is an appropriate remedy.

Defendants' violations of the terms of Musk's gifts are glaring. The only real question here is the proper remedy. For the moment, it is sufficient simply to stop OpenAI's ongoing efforts to convert to a for-profit or to achieve the same end by further transferring OpenAI's intellectual property. While a more detailed order reforming OpenAI's form and practices can come after discovery, preliminary relief to maintain the status quo is appropriate now and makes practical sense. Unwinding OpenAI after its imminent conversion to a fully for-profit enterprise would be grievously costly, complex, and burdensome for the Court, the parties, investors, and other stakeholders. A preliminary injunction staying this conversion curtails these issues, while preserving a just and proper remedy.

> ### D. Altman Has Engaged in Rampant Self-Dealing (Musk and Zilis, derivatively as members of OpenAI, Inc., against Altman and the Attorney General of California).

California law has long policed self-dealing by directors—and aggressively. *Burt v. Irvine Co.*, 237 Cal. App. 2d 828, 851 (1965) (applying "rigorous scrutiny"). Self-dealing in

the context of a charity is defined broadly. Subject to three limited exclusions, it is any "transaction to which the corporation is a party and in which one or more of its directors has a material financial interest and which does not meet the requirements of" a safe-harbor provision. Cal. Corp. Code § 5233(a).

### 1. Plaintiffs have standing to bring this claim.

Plaintiffs have joined the Attorney General of California as an indispensable party, satisfying the first standing requirement of section 5233(c) of the Corporations Code. So, they must only show that they also have standing to "assert[] the right in the name of the corporation pursuant to Section 5710." *Id.* § 5233(c)(1). Section 5710(b) in turn states:

> No action may be instituted or maintained in the right of any corporation by any member of such corporation unless both of the following conditions exist:
>
> (1) The plaintiff alleges in the complaint that plaintiff was a member at the time of the transaction or any part thereof of which plaintiff complains; and
>
> (2) The plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort[.]

Thus, a "plaintiff" like Musk or Zilis, FAC ¶¶ 228-35, may act derivatively if he or she "*was* a member at the time of the transaction or any part thereof." Cal. Corp. Code § 5233(b)(1) (emphasis added). The use of the past tense in combination with reference to "[t]he plaintiff" rather than "the member" in subparagraph (1) strengthens this conclusion; the Legislature would otherwise have written: "The member alleges in the complaint that it was a member at the time of the transaction[.]" The reference to "*any* member of such corporation," rather than "a current member of such corporation," in the prefatory language provides further support. And this result accords with the more fundamental character of members, who select directors and therefore retain a permanent interest in the events that transpire during their tenures, as well as the Restatement's definition of a private party with a "special interest" for purposes of standing in suits against charities. Rest. of Charitable Nonprofit Orgs. § 6.05.

Plaintiffs' construction is also in accord with the California Supreme Court's recent decision in *Turner v. Victoria* on derivative standing for non-profit directors—who, again, are less fundamental to a corporation than its members. 15 Cal. 5th 99 (2023). In the classic

derivative action on behalf of a for-profit company, the party asserting the corporation's rights must satisfy two requirements: (1) continuous standing throughout the entirety of the litigation; and (2) contemporaneous standing at the time of the complained-of transaction or any part thereof, though both requirements have equitable exceptions. *Grosset v. Wenaas*, 42 Cal. 4th 1100, 1119 (2008); *see* Cal. Corp. Code § 800(b)(1). *Turner* made clear that the continuity requirement for directors, at least after initiation of suit, does *not* apply to non-profit corporations. 15 Cal. 5th at 134.

But *Turner* went further because, "[i]ndeed, the Restatement goes further, allowing some *former* board members to bring a claim." *Id.* at 128 (internal quotation marks omitted) (emphasis in original). "Under the Restatement, among those that have standing 'to bring a derivative action on behalf of a charity' are . . . 'a former member of the board of the charity who is no longer a member for reasons related to that member's attempt to address the alleged harm to the charity.'" *Id.* at 128. Thus, in addition to the equitable exception applicable even to for-profit corporations, *Grosset*, 42 Cal. 4th at 1119, as well as the grammatical differences in section 5710 between derivative standing for directors and members, a non-profit corporation's former members have this third, common law path to standing under *Turner*.

Musk and Zilis satisfy all these tests. First, both satisfy the requirement for contemporaneous service without any need for an equitable exception. Musk served on the board when Altman and Brockman hatched the first part of their plan to form the For-Profit Entities, FAC ¶¶ 106-09, 231, and Zilis served on the board during the formation of additional For-Profit Entities, as well as the self-dealing with Stripe and Humane; discovery may reveal she was also serving when OpenAI contracted with Rain AI,[14] *id*. ¶¶ 135-45, 232. Second, both were members of OpenAI, Inc., *id*. ¶¶ 230-35, entitling them to broader standing than directors, because the statute confers standing on members in the past tense. But even if that construction of section 5710(b)(1) were rejected, Musk and Zilis would still be entitled to

---

[14] While neither Musk nor Zilis appears to have non-equitable standing to challenge the 2024 Reddit deal (at least until discovery reveals the past extent of Reddit negotiations), FAC ¶ 137, it nevertheless demonstrates the ongoing nature of Altman's misconduct, which supports Musk and Zilis's claim for equitable standing. *See* Cal. Corp. Code § 800(b)(1); *Turner*, 15 Cal. 5th at 132.

equitable standing, whether under *Grosset* or *Turner*. As persons with a special interest in OpenAI, Inc. through their early, foundational roles and visible associations, FAC ¶¶ 238-39, 459-60, they ended their service to avoid precisely the kinds of conflicts Altman has pursued and encouraged.

Finally, Musk has repeatedly broadcast his belief that OpenAI, Inc. is violating its charter commitments, Exs. 10-15, which prohibit self-dealing, while Zilis has communicated to OpenAI board members her concerns regarding product safety as well as Altman's Helion Energy transaction, *see* pp. 20-21 *infra*. They also "delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file." Cal. Corp. Code § 5710(b)(2). In any event, the present adverse domination of OpenAI, Inc.'s board, FAC ¶¶ 161-71, means demand would have been futile. *See Bader v. Anderson*, 179 Cal. App. 4th 775, 792 (2009) (holding "lack of independence may be demonstrated by specific facts showing that the director is beholden to an interested director or officer, or so under their influence that their discretion would be sterilized" (internal quotation marks omitted)).

### 2.    Plaintiffs make a strong *prima facie* showing of self-dealing.

Altman has engaged in, or is preparing to engage in, at least the following self-dealing transactions:

a.    Forming and operating the For-Profit Entities, in which he has material financial interests, each of which has a contractual relationship to OpenAI, Inc., FAC ¶ 455;

b.    Currently attempting to convert OpenAI to a for-profit structure, in which he expressly plans to endow himself with material financial interests, *id*. ¶ 145;

c.    In 2019, causing OpenAI to contract with Rain AI, a company in which he has a material financial interest, for $51 million worth of computer chips, *id*. ¶ 139;

d.    In 2020, obtaining a material financial interest in Humane, which contracted to use OpenAI's technology to power its devices, *id*. ¶ 140;

e.    Obtaining a material financial interest in Limitless, another hardware company, which contracted to use OpenAI's technology for its devices, *id*. ¶ 141;

f.    Causing OpenAI to prepare to contract with Helion Energy, in which he

has a material financial interest, to buy vast quantities of electricity to power data centers, *id*. ¶ 144;

g.   On or about March 14, 2023, selecting Stripe, a payment platform in which he has material financial interests, as OpenAI's payment processer, *id*. ¶ 456;

h.   Beginning no later than September 2023, coordinating to launch an OpenAI-powered device company with former Apple chief designer, Jony Ive, *id*. ¶ 143; and

i.   Causing OpenAI and Reddit to strike a deal in May 2024, whereby OpenAI pays for Reddit's content, causing the value of Altman's shares in Reddit to appreciate by hundreds of millions of dollars, *id*. ¶ 137.

None of these self-dealing transactions fall within the exclusions provided in Cal. Corp. Code § 5233(b). They are not "[a]n action of the board fixing the compensation of a director as a director or officer of the corporation." *Id*. § 5233(b)(1). They are not "part of a public or charitable program of" OpenAI that confers a benefit on Altman merely because "they are in the class of persons intended to be benefited by the public or charitable program." *Id.* § 5233(b)(2). They are not transactions "of which the interested director or directors have no actual knowledge," totaling less than "one hundred thousand dollars." *Id.* § 5233(b)(3). Plaintiffs' *prima facie* case of an egregious and ongoing pattern of self-dealing by Altman is indisputable.[15]

### 3.   An injunction ordering Defendants to cease self-dealing is an appropriate remedy.

As Plaintiffs are likely to succeed on their self-dealing claims, the question is the appropriate remedy. While the Court should unwind the already-consummated self-dealing transactions after discovery and trial, at present an injunction to stop further self-dealing— including, without limitation, the conversion of OpenAI to a for-profit organization and the acceptance of further funding by the For-Profit Entities, in which Defendants have material financial interests—is sufficient to preserve the status quo and prevent further harm. Cal. Corp. Code § 5233(h).

---

[15] The safe-harbor provisions in Cal. Corp. Code § 5233(d) do not apply, and, in any event, are Defendants' burden to prove. FAC ¶ 465.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF

Plaintiffs, consumers, investors, and the generative AI market will suffer irreparable harm if Defendants' conduct continues unabated. The potential harm to investors is particularly severe. Currently, OpenAI's investors are sophisticated commercial parties, relatively small in number. If Plaintiffs prevail at trial, unwinding these existing investments will already pose significant challenges. However, if OpenAI continues at its current pace to accept new investments, including from more numerous smaller investors, or proceeds with a public offering, the complexity of unwinding these transactions will increase exponentially. The sheer number of affected parties would make it virtually impossible to reverse the charity's conversion without causing widespread investor losses and market disruption.[16]

The harm to competition—and thus the harm to consumers and the generative AI market—from Microsoft and OpenAI's conduct is also irreparable. Their group boycott blocks xAI's access to essential investment capital. Without immediate intervention, xAI and other safety-focused AI startups will lose crucial financial support during a pivotal moment in the development of generative AI. Given the market's strong network and follow-on effects, "such a scenario would likely lead to nebulous, hard-to-quantify questions, such as, how successful [xAI] might have been, and . . . the collateral damage to the third-party developers," who would otherwise have been able to develop applications on xAI's platform given fair access to capital and investment. *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 848 (N.D. Cal. 2020) (internal quotation marks omitted). "In this regard, [xAI] could not otherwise be made whole even if victorious at trial." *Id.*

The irreparable harm will extend further, as Microsoft and Hoffman misuse competitively sensitive information obtained through their interlocking directorates. This has given Defendants an unfair advantage through years of anticompetitive coordination and the

---

[16] Unwinding the collapse of Sunwest Management, a $1.2 billion enterprise with just 1200 investors, took the District of Oregon nearly ten years, at a cost of $155 million in expenses, and many investors were never made whole. *See S.E.C. v. Sunwest Mgmt., Inc.*, No. 6:09-cv-06056-AA (D. Or. 2009).

sharing of proprietary information, which courts in this District regularly recognize as causing irreparable harm.[17]

OpenAI, Inc. itself faces additional irreparable harm from Altman's ongoing self-dealing. For example, OpenAI's decision to license content from Reddit has generated hundreds of millions in personal profit for Altman. Meanwhile, his refusal to license content from sources where he lacks personal financial interest, such as *The New York Times*, has resulted in multiple lawsuits, exposing OpenAI to significant financial and reputational harm.

OpenAI's rapid expenditure of massive amounts of capital, including the profligate spending on Altman's side deals, further amplifies these harms. FAC ¶ 222. The Ninth Circuit recognizes that self-dealing, like Altman's, risks putting diverted assets out of reach, thereby compounding the risk of irreparable injury to Plaintiffs. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 732 (9th Cir. 1999). At its current burn rate, OpenAI will likely lack sufficient funds to pay damages, resulting in substantial losses to Musk and investors. Immediate court intervention significantly reduces these risks as well.

## III.   THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS' FAVOR

In considering the balance of equities, a court evaluates the degree of harm to each party if the injunction is improperly granted or denied. The equities favor Plaintiffs because their requested relief seeks "no more than requir[ing] Defendant[s] to comply with federal and state . . . laws." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (internal quotation marks omitted) (alteration in original); *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) (affirming the "long-settled principle that harm caused by illegal conduct does not merit significant equitable protection"). Denying relief would allow Defendants to continue accumulating market power through unlawful

---

[17] Indeed, courts in this District "'*presume*[] . . . irreparable harm if [] proprietary information is misappropriated.'" *Comet Techs. U.S.A. Inc. v. Beuerman*, No. CV 18-1441, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (emphasis added) (quoting *W. Directories, Inc. v. Golden Guide Directories, Inc.*, No. CV 09-1625, 2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009)); *TMX Funding, Inc. v. Impero Techs., Inc.*, No. CV 10-0202, 2010 WL 1028254, at *8 (N.D. Cal. 2010) (same). While those cases involve trade secrets rather than competitively sensitive information, the two are effectively synonymous. *See O'Donnell/Salvatori Inc. v. Microsoft Corp.*, No. CV 20-0882, 2020 WL 3962132, at *3 (W.D. Wash. July 13, 2020).

1    means, causing potentially irreversible damage to the market's structure.

2         Maintaining OpenAI, Inc.'s charitable status pending final resolution and halting

3    further self-dealing transactions by Altman protect both the organization's founding mission

4    and the public interest in proper administration of charities. While Defendants may experience

5    some delay in their corporate restructuring, their private financial interests are substantially

6    outweighed by the public interest in preserving charitable assets.

7    **IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST**

8         "[T]he central purpose of the antitrust laws, state and federal, is to preserve

9    competition. It is competition . . . that these statutes recognize as vital to the public interest."

10   *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1010 (9th Cir. 2003) (internal quotation

11   marks omitted). Beyond the public's interest in competition, and in seeing the law obeyed

12   across all domains, there is also the obvious public interest in having a charity created for

13   public benefit behave like a charity, rather than a for-profit monopolist. The development of

14   generative AI technology presents profound implications for society, making preservation of

15   competitive markets in this sector uniquely important to the public interest.

16        The public also has a strong interest in ensuring that charitable assets are not diverted

17   for private gain. This interest is particularly acute here given the substantial tax benefits

18   OpenAI, Inc. received as a non-profit, the organization's repeated public commitments to

19   developing AI technology for the benefit of humanity, and the serious safety concerns raised

20   by former OpenAI employees regarding the organization's rush to market potentially

21   dangerous products in pursuit of profit.

22        These safety concerns are pressing. Droves of employees, almost all with safety

23   responsibilities, have left OpenAI and sounded the alarm about its prioritization of profit over

24   basic product safety. Ex. 7 at 1-8. Almost every single person from OpenAI's founding days

25   has left for these same reasons. FAC ¶¶ 185-92, 396-401. Never mind future, existential

26   dangers. *Today* OpenAI's platform is being used by cybercriminals, *id.* ¶ 75 & n.3, is capable

27   of manipulating users into committing dangerous or illegal acts, *id.*, and tends to fabricate

28   critical information such as medical records*, id.* ¶¶ 186, 401. OpenAI, with its fevered pursuit

1  of profit from defense contracting with combat divisions, *Id.* ¶¶ 75, 193, cannot genuinely
2  claim that safety remains a "first-class requirement," *Id.* ¶ 86.

3       The reality is, the public would benefit from OpenAI slowing down its frenetic pace in
4  pursuit of a transformational, existentially dangerous technology even if it were not, as here,
5  violating the law. In fact, that was precisely what Musk co-founded OpenAI to do: act
6  deliberately, with safety as the highest priority. OpenAI's illegal deviation from that mission
7  betrays not just Musk, but us all.

8  <u>**CONCLUSION**</u>

9       Beginning early this year—and certainly since their "Fund No Competitors" edict—
10  Altman, OpenAI, and Microsoft have shown they have no interest in running a charity. In the
11  words of the *Hkpcpekcn Vko gu*, they are "in full world-domination mode." FAC Ex. 25 at 2. No
12  objective observer can look at OpenAI today and say it bears any resemblance whatsoever to
13  what it promised to be. Enough is enough.

14       Plaintiffs respectfully request that the Court maintain the status quo and pause
15  Defendants' worsening behavior until final disposition.

16    DATED: November 29, 2024          Respectfully Submitted,

17                              TOBEROFF & ASSOCIATES, P.C.

18

19                         *'''''''lul'O cte 'Vqdgtqhh'*
                         Marc Toberoff''

20

21                         *'Cwqtpg{u'hqt 'Rnckpvkhhu'Grqp 'O wun'*
                       *Uj kxqp '\ kku 'cpf 'ZŒCKE qt r0*

22

23

24

25

26

27

28