1    JORDAN ETH (CA SBN 121617)
     JEth@mofo.com
2    DAVID J. WIENER (CA SBN 291659)
     DWiener@mofo.com
3    MORRISON & FOERSTER LLP
     425 Market Street
4    San Francisco, CA 94105
     Telephone:    (415) 268-7000
5    Facsimile:    (415) 268-7522

6    WILLIAM SAVITT (admitted *pro hac vice*)
     WDSavitt@wlrk.com
7    SARAH K. EDDY (admitted *pro hac vice*)
     SKEddy@wlrk.com
8    WACHTELL, LIPTON, ROSEN & KATZ
     51 West 52nd Street
9    New York, NY 10019
     Telephone:    (212) 403-1000
10   Facsimile:    (212) 403-2000

11   *Attorneys for Defendants Samuel Altman, Gregory Brockman,*
     *OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,*
12   *OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,*
     *OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,*
13   *OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,*
     *OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,*
14   *OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,*
     *OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,*
15   *OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,*
     *Aestas Management Company, LLC, and Aestas LLC*

16

17                     UNITED STATES DISTRICT COURT

18                   NORTHERN DISTRICT OF CALIFORNIA

19                          OAKLAND DIVISION

20
     ELON MUSK, et al.                    Case No. 4:24-cv-04722-YGR
21
                    Plaintiffs,           **OPENAI DEFENDANTS' OPPOSITION
22                                         TO PLAINTIFFS' MOTION FOR A
            v.                             PRELIMINARY INJUNCTION**
23
     SAMUEL ALTMAN, et al.,               Date:  January 14, 2025
24                                        Time:  2:00 p.m.
                    Defendants.           Courtroom:  1 – 4th Floor
25                                        Judge:  Hon. Yvonne Gonzalez Rogers
                                          Compl. Filed:  August 5, 2024
26

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether Plaintiffs Musk and xAI have satisfied their burden of establishing an entitlement to a preliminary injunction on their claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, where (a) Musk and xAI have no standing to bring this claim; (b) there is no evidence of an agreement or conspiracy to restrain trade; (c) there is no evidence of an unreasonable restraint of trade; and (d) Musk and xAI make no showing of irreparable harm.

2. Whether Plaintiffs Musk and xAI have satisfied their burden of establishing an entitlement to a preliminary injunction on their claim under Section 8 of the Clayton Act, 15 U.S.C. § 19, where (a) there are no current "interlocking directorates" between Microsoft and OpenAI; (b) Musk and xAI have no standing to bring this claim; (c) no alleged "interlocking directorships" violated Section 8; and (d) Musk and xAI make no showing of irreparable harm.

3. Whether Plaintiff Musk has satisfied his burden of establishing an entitlement to a preliminary injunction on his breach of charitable trust claim under Cal. Bus. & Prof. Code § 17510.8 where (a) as a former donor, he has no standing to bring this claim under Cal. Corp. Code § 5142(a); (b) he fails to make a showing that he attached any conditions to his donations, let alone that those conditions were breached; and (c) he makes no showing of irreparable harm.

4. Whether Plaintiffs Musk and Zilis have met their burden of establishing an entitlement to a preliminary injunction on their self-dealing claim under Cal. Corp. Code § 5233 where (a) they have no standing to bring this claim under Cal. Corp. Code § 5233(c); (b) they make no showing of self-dealing; and (c) they make no showing of irreparable harm.

5. Whether Plaintiffs' request for preliminary injunctive relief should be denied for the additional, independent reasons that the balance of equities and the public interest each weighs against issuing a preliminary injunction in this case.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.    OpenAI, Musk, and xAI ................................................................................ 2

    B.    Musk's state court suit .................................................................................. 4

    C.    This action ..................................................................................................... 4

    D.    This motion .................................................................................................... 5

ARGUMENT .................................................................................................................... 5

I.    MUSK AND XAI FAIL TO ESTABLISH AN ENTITLEMENT TO INJUNCTIVE
RELIEF ON THEIR SHERMAN ACT CLAIM ...................................................... 6

    A.    Musk and xAI have no standing to sue ....................................................... 7

    B.    Musk and xAI do not state a claim under Section 1 of the Sherman Act,
let alone establish a likelihood of success on the merits ......................... 9

    C.    Musk and xAI make no showing of irreparable harm ............................ 13

II.    MUSK AND XAI HAVE FAILED TO ESTABLISH AN ENTITLEMENT TO
INJUNCTIVE RELIEF ON THEIR CLAYTON ACT CLAIM ................................ 13

    A.    The request for a preliminary injunction is moot ................................... 13

    B.    Musk and xAI have no standing to sue ..................................................... 14

    C.    Musk and xAI do not state a claim under Section 8 of the Clayton Act,
let alone establish a likelihood of success on the merits ....................... 15

    D.    Musk and xAI make no showing of irreparable harm ............................ 17

III.    MUSK HAS FAILED TO ESTABLISH AN ENTITLEMENT TO INJUNCTIVE
RELIEF ON HIS CHARITABLE TRUST CLAIM ...................................................... 18

    A.    Musk has no standing to sue ...................................................................... 18

    B.    Musk does not state a claim for breach of charitable trust, let alone
establish a likelihood of success on the merits ....................................... 20

    C.    Musk makes no showing of irreparable harm ........................................ 20

IV.    MUSK AND ZILIS FAIL TO ESTABLISH AN ENTITLEMENT TO INJUNCTIVE
RELIEF ON THEIR SELF-DEALING CLAIM ........................................................... 21

    A.    Musk and Zilis have no standing to bring a claim on OpenAI's behalf ............... 21

B.  Musk and Zilis do not state a claim for self-dealing, let alone demonstrate a likelihood of success on the merits................................................. 23

C.  Musk and Zilis make no showing of irreparable harm........................................... 24

V.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION......................................................................................... 25

CONCLUSION............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Passage Media Corp.* v. *Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985) ......................................................................... 6, 13, 20

*Assurance Wireless USA, LP* v. *Reynolds*,
    100 F.4th 1024 (9th Cir. 2024) ............................................................................ 5-6

*Bader* v. *Anderson*,
    179 Cal. App. 4th 775 (2009) ............................................................................ 22-23

*Bearden* v. *Ballad Health*,
    967 F.3d 513 (6th Cir. 2020) ................................................................................ 14

*Bell Atl. Bus. Sys., Inc.* v. *Storage Tech. Corp.*,
    1994 WL 125173 (N.D. Cal. Mar. 31, 1994) ........................................................ 13

*Burton* v. *Stevedoring Servs. of Am.*,
    196 F.3d 1070 (9th Cir. 1999) ............................................................................. 17

*California* v. *Sutter Health Sys.*,
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) ............................................................... 25

*Charter Twp. of Clinton Police & Fire Ret. Sys.* v. *Martin*,
    219 Cal. App. 4th 924 (2013) .............................................................................. 23

*Citco USA, LLC* v. *RiverPay Inc.*,
    2022 WL 287563 (9th Cir. Jan. 31, 2022) ........................................................... 18

*City of Oakland* v. *Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021) ............................................................................... 7, 9

*Comet Techs. U.S.A. Inc. v. Beuerman*,
    2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ................................................. 17, 18

*Eagle* v. *Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ............................................................................... 7, 9

*Epic Games, Inc.* v. *Apple Inc.*,
    493 F. Supp. 3d 817 (N.D. Cal. 2020) .................................................................. 25

*Flaa* v. *Hollywood Foreign Press Ass'n*,
    55 F.4th 680 (9th Cir. 2022) ................................................................................ 8

*Gerlinger* v. *Amazon.com, Inc.*,
    526 F.3d 1253 (9th Cir. 2008) ............................................................................. 7

iv

*Greenspun* v. *Del E. Webb Corp.*,
   634 F.2d 1204 (9th Cir. 1980)............................................................................... 22

*Grosset* v. *Wenaas*,
   42 Cal. 4th 1100 (2008) ............................................................................... 21, 22

*Herb Reed Enters., LLC* v. *Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013)............................................................................... 6

*Holt* v. *Coll. of Osteopathic Physicians & Surgeons*,
   61 Cal. 2d 750 (1964) ............................................................................... 19

*Honey Bum, LLC* v. *Fashion Nova, Inc.*,
   63 F.4th 813 (9th Cir. 2023) ........................................................ 10, 11, 12 & n.2

*Horiike* v. *Humane Soc'y of the U.S.*,
   2016 WL 11744969 (C.D. Cal. June 20, 2016) ........................................... 19, 20

*In re Kunz*,
   489 F.3d 1072 (10th Cir. 2007)............................................................................... 16

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015)............................................................................... 10

*L.B. Research & Education Foundation* v. *UCLA Foundation*,
   130 Cal. App. 4th 171 (2005) ............................................................................... 19

*LVRC Holdings LLC* v. *Brekka*,
   581 F.3d 1127 (9th Cir. 2009)............................................................................... 16

*Norbert* v. *City & Cnty. of S.F.*,
   10 F.4th 918 (9th Cir. 2021) ............................................................................... 6

*Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*,
   472 U.S. 284 (1985)............................................................................... 12

*O'Hara* v. *Grand Lodge, Indep. Ord. of Good Templars of State of Cal.*,
   213 Cal. 131 (1931) ............................................................................... 18

*Paladin Assocs., Inc.* v. *Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003)............................................................................... 9, 11

*Perrin* v. *United States*,
   444 U.S. 37 (1979)............................................................................... 16

*Pinkert* v. *Schwab Charitable Fund*,
   2021 WL 2476869 (N.D. Cal. June 17, 2021) ................................................ 18, 20

*PLS.Com, LLC* v. *Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ............................................................................... 8

*Reading Int'l, Inc.* v. *Oaktree Cap. Mgmt. LLC*,
    2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ......................................................... 13, 14

*Robert F. Booth Tr.* v. *Crowley*,
    687 F.3d 314 (7th Cir. 2012) ......................................................................... 15 n.3

*Square D Co.* v. *Schneider S.A.*,
    760 F. Supp. 362 (S.D.N.Y. 1991) ........................................................... 14, 17 n.6

*Stanislaus Food Prods. Co.* v. *USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ................................................................................ 9

*Stormans, Inc.* v. *Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ............................................................................. 25

*Taylor* v. *Biglari*,
    971 F. Supp. 2d 847 (S.D. Ind. 2013) .................................................................. 24

*Titaness Light Shop, LLC* v. *Sunlight Supply, Inc.*,
    585 F. App'x 390 (9th Cir. 2014) .......................................................................... 6

*TRW, Inc.* v. *F.T.C.*,
    647 F.2d 942 (9th Cir. 1981) ......................................................................... 14, 15

*Turner* v. *Victoria*,
    15 Cal. 5th 99 (2023) ........................................................... 19 n.8, 21, 23

*Winter* v. *Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................... 5, 6

**Statutes & Rules**

11 U.S.C § 547 ........................................................................................................ 16

15 U.S.C. § 1 ................................................................................................... passim

15 U.S.C. § 19 ................................................................... 13, 15, 16 n.4, 16 n.5

89 Fed. Reg. 3926 (Jan. 22, 2024) ................................................................... 16 n.4

Cal. Bus. & Prof. Code § 17510.8 ......................................................................... 18

Cal. Code Corp. § 800 ..................................................................................... 21, 22

Cal. Corp. Code § 5142 ......................................................................................... 18

Cal. Corp. Code § 5233 ................................................................ 21, 22 n.9, 24

Cal. Corp. Code § 5710 ........................................................... 21, 22 & n.9, 23

Cal. Code Regs., tit. 11, §§ 1-2, 10 ................................................................ 19 n.8

vi

**PRELIMINARY STATEMENT**

Elon Musk moves this Court to deploy its equitable power to benefit his competitive position in the development of artificial general intelligence. The motion fails. Since early 2024, Musk has filed three vexatious complaints against OpenAI and its leadership, piling far-fetched legal claims on top of false allegations, but never seeking injunctive relief with the dispatch equity requires. Musk adduces no evidence to support this late-breaking request for equitable relief. He claims he will suffer irreparable harm absent judicial intervention, but provides no plausible account of how or why. Musk doesn't even have standing to sue. And the sweeping relief he seeks would debilitate OpenAI's business, board deliberations, and mission to create safe and beneficial AI—all to the advantage of Musk and his own AI company. The motion should be denied:

(1)    Invoking the Sherman Act, Musk seeks an injunction against a supposed agreement to boycott investment in xAI, Musk's competing AI business. No facts support the existence of this conspiracy. Musk asserts that he has "verified that at least one major investor in OpenAI's October 2024 funding round has subsequently declined to invest in xAI." Mot. at 8 (citing ¶ 227).[1] This "major investor" is not identified anywhere in Musk's submissions, and there is no evidence—or even an allegation—that the mystery investor's decision resulted from a boycott agreement involving OpenAI. That's no surprise, because no such agreement exists—as evidenced by the fact that xAI has just raised nearly $6 billion in record time.

(2)    Next, invoking the Clayton Act, Musk asserts that "interlocking directorates" between the boards of Microsoft and OpenAI present a competitive threat to him and his business. But the first "interlocking" director Musk identifies left OpenAI's board over a year ago, and before Microsoft and OpenAI had competed long enough for the Clayton Act's prohibition to kick in. The second individual Musk identifies, also no longer involved with OpenAI's board, was not even a director but a non-voting observer—who enjoyed no decision-making power and was excluded

---

[1] Citations of "Mot." are to Plaintiffs' Motion for Preliminary Injunction. Citations of "¶ __" are to Plaintiffs' First Amended Complaint in this action. Citations to the FAC are solely for the Court's convenience and should not be construed as an admission of any allegation or of its characterization. Citations of "Ex." are to exhibits of the Wiener Declaration; of "FAC Ex." are to exhibits of the First Amended Complaint; and of "PI Ex." are to exhibits of Plaintiffs' motion.

from confidential board sessions. Musk does not identify any harm to him or to xAI flowing from these arrangements.

(3)    Seizing on the breach-of-charitable-trust claim he has been pressing in one form or another since February 2024 and keeps reframing, Musk now claims that supposed "misuse" of his donations made years ago entitles him to stop OpenAI from reorganizing or transferring any assets. But Musk has no standing to pursue this claim, and his allegations of breach could not survive a motion to dismiss much less support the sweeping injunctive relief Musk seeks.

(4)    Finally, Musk, together with new plaintiff Shivon Zilis, purports to vindicate OpenAI's rights respecting supposed "self-dealing" by OpenAI CEO Sam Altman by seeking an injunction stopping the company from doing business with any entity in which any other Defendant has an interest. Neither Musk nor Zilis has standing to bring this claim, and their claims of self-dealing have no factual foundation. Like the rest of Musk's demands, and his litigation tactics against OpenAI to date, this is just another evidence-free effort to harass a competitor.

## BACKGROUND

### A.    OpenAI, Musk, and xAI

Altman, Greg Brockman, Ilya Sutskever, and Musk launched OpenAI in 2015 as a laboratory dedicated to researching and developing safe and beneficial artificial general intelligence ("AGI"). *See* ¶¶ 82-90, 93. OpenAI, Inc. was incorporated as a non-profit entity in Delaware in December 2015. ¶ 89. Musk made substantial donations to OpenAI, Inc. in 2016 and 2017, and alleges he made further donations until September 2020. ¶ 96.

OpenAI's managers and board recognized that enormous capital infusions—more than could be raised through donations—would be needed to develop AGI. The cost of computing power alone required massive amounts of capital. *See* ¶¶ 220-22. And the cost of retaining top talent with scarce technical skills was likewise extraordinarily high. *See* ¶¶ 91, 222.

In early 2018, a former OpenAI employee whom Musk had recruited to develop AI at Tesla informed Musk that "OpenAI [was] burning cash and that the [existing] funding model [could not] seriously compete with Google." FAC Ex. 16. The former employee proposed to Musk that "[a] for-profit pivot might create a more sustainable revenue stream over time and would . . . likely

bring in a lot of investment." *Id.* "The most promising option" for this for-profit transformation, in the employee's view, "would be for OpenAI to attach to Tesla as its cash cow." *Id.* Musk agreed. *Id*. In Musk's words, "Tesla [was] the only path that could even hope to hold a candle to Google." *Id*. But when Musk's bid to effectuate a "for-profit pivot" by "attach[ing]" OpenAI to Tesla failed, he stepped down as OpenAI's co-chair on February 21, 2018. ¶ 96.

To raise the funds it needed to pursue its mission, OpenAI launched a "capped-profit" subsidiary called OpenAI, L.P. in March 2019. ¶ 116. Musk, who was still involved in OpenAI at the time, was notified of this decision. FAC Ex. 19. As alleged by Musk, his only reaction was that OpenAI should clarify he had "no financial interest in the for-profit arm." *See* ¶ 115; FAC Ex. 20. In the ensuing years, OpenAI worked on building out the capped-profit corporate structure, ¶¶ 117-122, and entered commercial partnerships with Microsoft, including a license to certain of OpenAI's GPT products, ¶¶ 133-34, all without Musk complaining of misused donations.

In March 2023, Musk called for a six-month "moratorium" on development of advanced AI. Ex. 1. Days earlier, Musk had quietly created his own AI development company, X.AI Corp. ("xAI"). ¶¶ 9, 12; Ex. 2. Only in July 2023 did Musk publicly announce the creation of xAI. *See* Ex. 1. That company competes directly with OpenAI. ¶¶ 226-27.

Leveraging Musk's influence, and the "web of companies" under his control, xAI has become a major player in a highly competitive industry, raising capital at unprecedented speed and scale. *See* Ex. 3. In less than two years, "[t]he startup has raised at least $11 billion and increased its valuation to $50 billion in a new funding round [last] month, making it the second most valuable private AI developer behind OpenAI." *Id.* In that funding round, which closed in early December, xAI raised nearly $6 billion from 97 different investors. *See id.*; *see also* Exs. 4-5.

xAI has put its capital to quick use. At Musk's direction, xAI built in three months what is believed to be the world's largest supercomputer, dubbed "Colossus." Ex. 6. The project used 100,000 next-generation NVIDIA GPU chips, *see id.*, some of which Musk diverted from Tesla, *see* Ex. 7. Musk reportedly plans a "tenfold" expansion of "Colossus" to "incorporate more than 1 [million] graphics processing units . . . to leap ahead of rivals," including OpenAI. Ex. 6.

**B.    Musk's state court suit**

On February 29, 2024, Musk sued Altman, Brockman, OpenAI, Inc. and several affiliated entities in California Superior Court. *See* Ex. 8. In that action, Musk accused the named defendants of abandoning OpenAI's mission, and asserted that they violated a supposed "Founding Agreement" with Musk. *Id.* ¶ 125. Musk's original complaint did not claim fraud, assert any antitrust claim, or even acknowledge the existence of xAI. Musk maintained that any purported "motivation" he had to "compete with OpenAI" was irrelevant to the action. Ex. 9 at 2. Musk did not move for any preliminary injunctive relief.

Defendants promptly filed a demurrer. Musk, meanwhile, served broad discovery requests and sought the immediate depositions of non-party former OpenAI directors. The day before argument on the demurrer (and a few hours before an expected tentative ruling), Musk withdrew his lawsuit without explanation. *See* Ex. 10.

**C.    This action**

Two months later, on August 5, 2024, Musk filed this action. *See* Dkt. No. 1. His original complaint in this court repeated the factual narrative advanced in state court, but featured a longer list of legal theories. Where the state court complaint asserted five claims, led by the "Founding Agreement"-based contract claim, Musk's original federal complaint asserted 15 claims, leading with new counts of fraud and RICO. Touting the new complaint, Musk's new counsel told the press the old one "lacked teeth"—even though the factual allegations were largely unchanged. Ex. 11.

OpenAI moved to dismiss all 15 claims on October 8. *See* Dkt. No. 25. Rather than defend his pleading, Musk again abandoned it, filing instead an Amended Complaint ("FAC") with yet more claims—bringing the total to 26 and adding as defendants Microsoft, former OpenAI director Reid Hoffman, and Microsoft's Deannah Templeton, who for a period served as a non-voting observer on OpenAI's board. Musk also added the California Attorney General as an involuntary plaintiff (joined as a defendant). *See* Dkt. No. 32; ¶¶ 15-16, 38-39.

While Musk had previously denied his suit had anything to do with his plan to "compete with OpenAI," *see* Ex. 9 at 2, the FAC added xAI as a plaintiff to assert new antitrust claims premised on, among other things, (1) a purported agreement between Microsoft and OpenAI to

condition "the opportunity to invest in OpenAI" in its latest October 2024 funding round "on an agreement by investors not to deal with and/or invest in [its] competitors" (¶ 331(a)); and (2) alleged "interlocking directorates" between Microsoft and OpenAI (¶¶ 371, 375). The FAC also seeks to tie a claim for breach of charitable trust—a claim Musk has been advancing in some form since filing his state court complaint—to OpenAI's publicly-reported consideration of a corporate reorganization that would involve the creation of a new for-profit entity. *See* ¶¶ 194-99.

**D.    This motion**

On November 29, 2024, the parties agreed that Defendants' motions to dismiss would be heard no earlier than May 2025. Just hours later, Plaintiffs filed this motion largely on the basis of stale facts and false allegations, without conferring with defense counsel.

The motion seeks an order barring Defendants from: (1) pursuing or enforcing purported agreements in which OpenAI investors undertook "not to invest in OpenAI's competitors"; (2) engaging in future alleged interlocking directorates, or "benefitting" from "competitively sensitive information" that was purportedly "wrongfully obtained" or from alleged "coordination" arising from prior overlap between the OpenAI and Microsoft boards; (3) taking "any action" that would "tend[] to have the effect" of converting OpenAI, Inc. to a "for-profit enterprise" or "transferring any material assets" held or controlled by OpenAI, Inc.; and (4) "directly or indirectly" undertaking "any action" that would cause "OpenAI, Inc. to contract or do business with any entity in which any Defendant has a material financial interest." *See* Mot. at i-ii.

Musk offers no evidence to justify this extraordinary relief, instead relying solely on allegations in his own complaint—86 of which are made on "information and belief"—and a handful of press reports and podcast transcripts.

**ARGUMENT**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The moving party "must establish" through evidence, not merely allege: "[1] a likelihood of success on the merits, [2] that it will suffer irreparable harm in the absence of injunctive relief, [3] that the balance of the equities tips in its favor, and [4] that the public interest supports relief." *Assurance Wireless USA, L.P.* v. *Reynolds*,

100 F.4th 1024, 1031 (9th Cir. 2024). A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Norbert* v. *City & Cnty. of S.F.*, 10 F.4th 918, 927 (9th Cir. 2021).

Confirming this heavy burden, the Ninth Circuit's "sliding scale" approach requires not just "a merely plausible claim," *Reynolds*, 100 F.4th at 1031, but cognizable evidence "demonstrat[ing] that irreparable injury is *likely* in the absence of an injunction,'" *Herb Reed Enters., LLC* v. *Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (quoting *Winter*, 555 U.S. at 22). The movant must "proffer evidence sufficient to establish a likelihood of irreparable harm." *Id.* at 1251. "[C]onclusory or speculative allegations are not enough." *Titaness Light Shop, LLC* v. *Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) (vacating preliminary injunction "[b]ecause [movant] did not produce evidence establishing a likelihood of irreparable harm"); *Herb Reed*, 736 F.3d at 1250 (reversing entry of preliminary injunction "grounded in platitudes rather than evidence"); *Am. Passage Media Corp.* v. *Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing entry of preliminary injunction where supporting affidavits were "conclusory and without sufficient support in facts").

Plaintiffs' motion comes nowhere close to meeting this burden.

## I.   MUSK AND XAI FAIL TO ESTABLISH AN ENTITLEMENT TO INJUNCTIVE RELIEF ON THEIR SHERMAN ACT CLAIM

Plaintiffs first seek relief for an asserted violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. They contend that OpenAI engaged in a prohibited "group boycott" by requiring investors in its October 2024 funding round to forgo investment in OpenAI's competitors. *See* Mot. at 5-6. The only support for that claim is one allegation in the FAC—made on "information and belief" and relying on anonymously-sourced and inaccurate media accounts—that an unidentified person at OpenAI "said" to an unidentified group of prospective investors "[w]e'll give you allocation [in OpenAI] but we want you to be involved in a meaningful way in the business so you can't commit to our competitors." Mot. at 5 (quoting ¶ 201).

The claim has no likelihood of success for multiple independent reasons: Plaintiffs have no standing; even their unsupported allegations could not support their boycott claim; and those

allegations are in any event false. Contrary to Plaintiffs' claim, OpenAI did not bar participants in its October 2024 funding round from investing in other companies. *See* Wu Decl. ¶¶ 5-7. Instead, OpenAI investors who received competitively-sensitive OpenAI information agreed (as is customary) that they would relinquish their right to that information if they made non-passive investments in OpenAI competitors. *Id*.

### A. Musk and xAI have no standing to sue

To have Article III standing, an antitrust plaintiff must have suffered an "injury in fact that is concrete, particularized, and actual or imminent," *City of Oakland* v. *Oakland Raiders*, 20 F.4th 441, 452 (9th Cir. 2021), and that "bears a causal connection to the alleged antitrust violation," *Gerlinger* v. *Amazon.com Inc.*, 526 F.3d 1253, 1255-56 (9th Cir. 2008). Clearing this bar in the antitrust context requires, at minimum, a "substantial probability" that plaintiff suffered damages caused by the defendant's anticompetitive conduct, premised on a theory that is neither "counterintuitive" nor "highly attenuated." *Oakland Raiders*, 20 F.4th at 453.

To ensure antitrust litigants do not abuse the antitrust laws for competitive advantage, courts also insist that antitrust plaintiffs demonstrate "antitrust standing." *Id.* at 455. In assessing antitrust standing, courts consider "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; [and] (3) the speculative measure of the harm." *Id.* at 452. Damages are not "direct" for purposes of this inquiry unless there is a tight "chain of causation between the plaintiff's injury and the alleged restraint of trade." *Id*. at 458-60 (finding alleged harm from Section 1 violation was insufficiently direct where "there [was] no way of knowing [] what would have occurred" absent the alleged restraint (cleaned up)). Nor can "only speculative" damages support antitrust standing. *Id*. at 460; *see also Eagle* v. *Star-Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987).

Musk and xAI lack standing under these standards because they do not even allege, much less demonstrate, injury of any kind resulting from OpenAI's (nonexistent) boycott. According to Plaintiffs, "Musk has verified that at least one major investor in OpenAI's October 2024 funding round has subsequently declined to invest in xAI." Mot. at 8 (citing ¶ 227). Notably absent from this assertion is specification of the *reason* for this supposed declination. And though the assertion

cites the verified FAC as support, it misrepresents that document, which makes no mention of any "major investor." *See* ¶ 227. In all events, Plaintiffs' allegations do not show the requisite "concrete," "direct," "particularized," or non-speculative injury to xAI caused by any alleged anticompetitive conduct. Plaintiffs do not identify even one investor—"major" or otherwise—who has refused to invest in xAI, let alone one who refused as a result of this fictitious boycott.

Nor do Plaintiffs establish the amount of any purportedly lost investment, or any facts demonstrating how any supposed refusal to invest some unidentified sum harmed xAI. They offer no allegations (let alone the required evidence) that xAI has been unable to raise the funds it needs or plans to raise; that its business or growth prospects have been impaired; that it has been incapable of hiring talent; or that it cannot access sufficient computational resources. And while Plaintiffs argue that a boycott need not "completely cut off [a] competitor's access to inputs it needs" to be unlawful, Mot. at 7 (citing *PLS.Com, LLC* v. *Nat'l Ass'n of Realtors*, 32 F.4th 824, 835 (9th Cir. 2022)), conclusory assertions that an alleged boycott denied Plaintiffs access to "some kind of economic benefit" cannot satisfy Section 1, *Flaa* v. *Hollywood Foreign Press Ass'n*, 55 F.4th 680, 690 (9th Cir. 2022). What is required is evidence that Defendants meaningfully hindered Plaintiffs' "professional success." *See id.* at 694.

No such evidence exists. xAI is tapping the capital markets at unprecedented scale. Its latest funding round took place in November 2024—*after* the purported investor boycott—and raised nearly $6 billion. *See* Exs. 3-5. What's more, some of xAI's funding has come from investors who have also invested in OpenAI. *See* FAC Ex. 25. This latest round brings xAI's total capital raise in just over a year since its founding to at least $11 billion. *See* Ex. 3. On the strength of this massive fundraising, xAI has attained a $50 billion valuation in only 16 months—a threshold OpenAI took nine years to cross. *Id*. Meanwhile, xAI has been deploying its enormous resources to compete with OpenAI and others—building the world's largest supercomputer at record speed, securing a trove of highly coveted, advanced NVIDIA chips, and hiring top talent from DeepMind, OpenAI, and other leading AI companies. *See* Exs. 3, 6. Plaintiffs have enjoyed outsized success in raising capital during the period of the claimed "boycott," and have established no injury at all.

Moreover, even had Plaintiffs shown any injury, it would not be of the kind the antitrust

laws are designed to prevent. *See Eagle*, 812 F.2d at 540. Antitrust injury requires harm to "competition as a whole" in the allegedly "restrained market"—here, the market for investment capital. *Id*. Plaintiffs offer no evidence suggesting that OpenAI has constrained investment in generative AI (or even that it meaningfully could), as the industry has recently received billions in investment and commands the "heftiest slice of the venture funding pie." *See* Ex. 12.

Finally, Plaintiffs' alleged injury is too indirect and speculative to qualify for antitrust standing. Courts in this circuit will not entertain antitrust claims where "there [is] no way of knowing [] what would have occurred in a more competitive marketplace" but for the complained-of conduct and any hypothetical damage would be "exceedingly difficult to calculate." *Oakland Raiders*, 20 F.4th at 459-61. Nothing before the Court suggests that xAI could or would have raised even more capital, beyond its recent remarkable haul, but for OpenAI's market activity.

**B. Musk and xAI do not state a claim under Section 1 of the Sherman Act, let alone establish a likelihood of success on the merits**

The request for relief under the Sherman Act fails for the further reason that Plaintiffs have not demonstrated a likelihood of success on the merits. "To prove an illegal boycott under § 1 . . . [plaintiff] must show (1) an agreement, conspiracy, or combination among two or more entities and (2) that the agreement, conspiracy, or combination was unreasonable." *Paladin Assocs., Inc.* v. *Mont. Power Co.*, 328 F.3d 1145, 1153 (9th Cir. 2003). Plaintiffs establish neither element.

**1. Musk and xAI do not plausibly allege an "agreement" or "conspiracy," much less proffer any evidence of one**

A Section 1 claim requires proof of an "agreement" or "conspiracy" to "restrain trade," rooted in "evidence that tends to exclude the possibility that [] alleged conspirators acted independently." *Stanislaus Food Prods. Co.* v. *USS-POSCO Indus.*, 803 F.3d 1084, 1088-89 (9th Cir. 2015) (cleaned up). Plaintiffs fail to satisfy this most basic element of a Section 1 claim.

***No agreement with Microsoft***. Plaintiffs' primary Sherman Act contention is that Microsoft and OpenAI entered into an agreement to restrict OpenAI competitors' access to capital. Mot. at 6-7. This contention fails for want of proof. The FAC's lone boycott allegation (¶ 201) does not allege any such agreement, or even mention Microsoft. In fact, the FAC later alleges that "Microsoft is

spending billions investing in [] AI companies" *other* than OpenAI (¶ 225), facially contradicting this "group boycott" theory. *See* Mot. 5-6.

In a footnote, Plaintiffs suggest that Microsoft and OpenAI must have engaged in "concerted action" because they are allegedly "long-term" and "strategic" partners. *See* Mot. at 6 & n.4. But just because Microsoft is a significant investor in OpenAI and collaborates with OpenAI on research and development does not mean the two agreed to a boycott. What Plaintiffs must show is that OpenAI and Microsoft conspired to restrict access to competitors' capital. They have produced not a whisper of evidence showing that happened.

***No agreements with and among investors***. As a fallback, Plaintiffs contend that OpenAI secured agreements with its investors to restrict competitors' access to capital—a purported "hub-and-spoke group boycott." Mot. at 7. To prevail on this theory, Plaintiffs must demonstrate both the "spokes" and the "rim" of the wheel—that is, agreements between OpenAI and each investor and agreements among the investors to that same effect. *See Honey Bum, LLC* v. *Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015).

Plaintiffs have established neither the rim nor the spokes. As to the "spokes," the FAC alleges only that someone at OpenAI "said" at some unidentified time to some unidentified investors that they should not invest in competitors. ¶ 201. Even the (inaccurate) articles submitted by Plaintiffs report only that OpenAI made "requests" not to fund competitors that were "not legally binding." PI Ex. 8. This is not a plausible allegation of agreement, much less proof of one.

As to the "rim," the FAC is devoid of any allegation of agreement or concerted action between and among OpenAI's investors. The motion argues, citing nothing, that such an agreement must exist because "[i]t [would not be] in the economic self-interest of any investor during the October 2024 funding round to refrain from investing in competitors like xAI unless all investors refrain[ed]," as "[o]therwise, some investors could diversify their generative AI investments while others could not." Mot. at 7 (emphasis omitted). This purportedly amounts to "strong circumstantial evidence of a conspiracy." *Id*. But it is not "evidence" of anything—it is merely lawyer's argument. And the argument is defective on its face. There are many pro-competitive reasons OpenAI

10

investors would choose not to invest in competing AI firms. An investor might simply conclude that OpenAI is best-of-breed in the AI industry—for example, because it believed that OpenAI was more likely to be successful, or generate a higher return, or because it believed in OpenAI's management, or its vision, or its mission, or its products, or for countless other rational and pro-competitive reasons. *See Honey Bum*, 63 F.4th at 823. Moreover, Plaintiffs' own cited media sources recite that "[m]ost venture investors generally refrain from investing in direct competitors of their portfolio companies to avoid reputational risks." PI Ex. 8. And as the FAC recognizes, OpenAI invited investors to be "meaningfully" involved in the business, which implies access to competitively-sensitive information that OpenAI must and does avoid sharing with competitors. ¶ 201. Plaintiffs themselves identify antitrust concerns in the sharing of competitively-sensitive information with major investors and competitors. ¶ 380; Mot. at 12-14. In short, Plaintiffs offer no evidence—circumstantial or otherwise—that "tend[s] to exclude the possibility that [investors] acted independently." *Honey Bum*, 63 F.4th at 822. That is fatal.

### 2. Musk and xAI do not plausibly allege an "unreasonable" restraint of trade

To obtain an injunction, Musk and xAI must establish that OpenAI has engaged in an "unreasonable" restraint of trade. *See Paladin Assocs.*, 328 F.3d at 1153. An unlawful restraint can be established under the "rule of reason" or as a *per se* violation. *Id.* at 1154. Plaintiffs make no effort to show that the supposed "group boycott" violates the "rule of reason," claiming instead that it is illegal *per se*. That contention is unsupported and untenable.

A group boycott is *per se* unreasonable only where its "initiator had no purpose other than disadvantaging the target," such that the alleged restriction is "not justified" by plausible arguments that it is pro-competitive—*i.e.*, a "naked" boycott. *Honey Bum*, 63 F.4th at 820-21. Plaintiffs do not come close to making this showing. Even accepting the unsourced allegations of the FAC, potential pro-competitive justifications are apparent. *See infra* at 11. Among other things, it is beneficial to have a diversity of sophisticated and experienced venture capital firms "meaningful[ly]" (¶ 201) involved in a new business, as they can provide management and financial expertise. That involvement will be more productive if key investors have access to proprietary information that may be competitively sensitive, which could otherwise be misused to anti-competitive effect if the

11

investing firm is also "meaningfully" involved and invested in a competitor. Even imagining Plaintiffs' allegations as true—they are not, as set out immediately below—Plaintiffs have failed to negate pro-competitive reasons for OpenAI's alleged arrangements with investors.

There is also no credible suggestion that "modified" *per se* treatment could be warranted here on the theory that OpenAI has such a "dominant position" in the market that it can unilaterally shut off investment into generative AI. *See Honey Bum*, 63 F.4th at 821. Plaintiffs have made no showing that any purported boycott placed xAI at a "severe competitive disadvantage," as would be necessary to "justify *per se* invalidation" under a modified approach. *See Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*, 472 U.S. 284, 295 n.6 (1985); *see also Honey Bum*, 63 F.4th at 821 n.3.[2]

### 3.    The FAC's conclusory allegations are false

The request for Sherman Act relief fails for the further reason that it rests on false factual allegations. OpenAI did not enter into any agreements barring participants in its October 2024 funding round from investing in other companies. Declaration of Robert Wu ("Wu Decl.") ¶ 5. A minority of investors instead agreed to customary terms governing their access to confidential and competitively-sensitive information. To protect against the potential disclosure or misuse of this nonpublic information, the agreements gave OpenAI the option to terminate continuing access to confidential information should the investor obtain significant voting or governance rights in an OpenAI competitor. *Id.* at ¶ 6. Nothing in these agreements prevented OpenAI's investors from taking even significant, active stakes in competitors—the only consequence for doing so would be losing access to OpenAI's proprietary information. *Id.* at ¶ 7. As Plaintiffs no doubt know, these provisions are customary and are enshrined in the widely-used model "Investor Rights Agreement" maintained by the National Venture Capital Association. *See* Ex. 13 (§ 3.1 and definition of "Competitor"); Wu. Decl. ¶ 8.

---

[2] In any event, the Ninth Circuit's "modified per se rule [involves] threshold inquiries into market power and the harms and benefits of a restriction" that require "that the facts be developed as in a rule of reason case, or at least almost as fully." *Honey Bum*, 63 F.4th at 821 n.3 (cleaned up). Plaintiffs do not even attempt to marshal those facts here.

12

### C. Musk and xAI make no showing of irreparable harm

A final, and independently dispositive, reason Plaintiffs' Sherman Act claim cannot ground a preliminary injunction is that their speculation shows no threat of irreparable harm. There is no evidence that xAI has been, or will soon be, harmed from the supposed boycott, much less that xAI's very "existence" is at stake such that any hypothetical harm would be irremediable through money damages. *See Am. Passage Media Corp.*, 750 F.2d at 1473-74 (no preliminary injunction where no evidence that alleged restraints of trade "threatened [plaintiff's] existence," such that "any loss in revenue due to an antitrust violation [could not be] compensable in damages"); *accord Bell Atl. Bus. Sys., Inc.* v. *Storage Tech. Corp.*, 1994 WL 125173, at *2 (N.D. Cal. Mar. 31, 1994). Without irreparable harm, Plaintiffs cannot obtain the extraordinary relief they demand.

## II. MUSK AND XAI HAVE FAILED TO ESTABLISH AN ENTITLEMENT TO INJUNCTIVE RELIEF ON THEIR CLAYTON ACT CLAIM

Next, Plaintiffs claim that they are entitled to a preliminary injunction based on Section 8 of the Clayton Act, which provides in relevant part that "[n]o person shall, at the same time, serve as a director or officer in any two corporations" that are "by virtue of their business and location of operation, competitors." 15 U.S.C. § 19(a)(1). Plaintiffs allege that two purported "interlocks" violated Section 8: (1) Reid Hoffman's simultaneous service as a director on Microsoft's and OpenAI's boards from "March 2018 until March 2023" (Mot. at 10-11; *see also* ¶ 163 & n.8); and (2) Deannah Templeton's service as Microsoft's non-voting observer of OpenAI's board from late 2023 through July 2024 (Mot. at 11; *see also* ¶ 168; Wu Decl., Ex. A). The Section 8 claim fails on multiple independent grounds and cannot support injunctive relief.

### A. The request for a preliminary injunction is moot

Because neither Hoffman nor Templeton is currently affiliated with OpenAI's board in any capacity, there is no live "case or controversy" that permits injunctive relief. *Reading Int'l, Inc.* v. *Oaktree Cap. Mgmt. LLC*, 2007 WL 39301, at *17-18 (S.D.N.Y. Jan. 8, 2007) (where "the alleged interlocking directorate no longer exists," an "Article III court" may not "review a private Section 8 claim, and issue an injunction against possible conduct in the future"). Even if not legally moot, a Section 8 violation only warrants prospective relief if there "exists some cognizable danger of

recurrent violation, something more than the mere possibility which serves to keep the case alive." *TRW, Inc.* v. *F.T.C.*, 647 F.2d 942, 954 (9th Cir. 1981) (vacating cease-and-desist order where interlocking directors had already resigned).

Plaintiffs have made no credible showing that there is a "cognizable danger" of any future Section 8 violations. *See id.* To the contrary, Plaintiffs claim that both Hoffman and Templeton voluntarily stepped down precisely to avoid any prospective antitrust risk. *See* Mot. at 13; *see also* ¶¶ 163 & n.8, 168. Accepting that as true, it demonstrates good-faith compliance, not evidence of likely future violations. *See Reading Int'l*, 2007 WL 39301, at *17-18.

## B.    Musk and xAI have no standing to sue

Plaintiffs lack both Article III and antitrust standing to pursue a Section 8 claim. *See Bearden* v. *Ballad Health*, 967 F.3d 513, 517-18 (6th Cir. 2020) (affirming dismissal where plaintiffs challenging interlocking directorship failed to allege individualized injury). They assert that Hoffman and Templeton had access to unspecified "competitively sensitive information" and now seek relief to prevent Defendants from "benefiting" from that unidentified information, in light of the supposed "ample opportunity" to "exploit" it in unidentified ways "to suppress promising generative AI startups." Mot. 12-14. Missing from that already conclusory contention is any allegation, much less proof, that *xAI* or *Musk* has been or will be harmed in any specific and concrete way.

In any event, remedying alleged future use of information by a director *after* she has stepped down is not a cognizable "antitrust injury" under the statute. As Plaintiffs acknowledge, Section 8 is a "prophylactic rule" meant to "to nip [violations] in the bud." Mot. at 9, 11 (first quoting *Square D Co.* v. *Schneider S.A.*, 760 F. Supp. 362, 366 (S.D.N.Y. 1991), then quoting *TRW, Inc.*, 647 F.2d at 946-47). Because both Hoffman and Templeton stepped down from their respective roles months ago, any theoretical antitrust issue has been duly "nipped." Plaintiffs identify no case, and certainly

none by a private litigant, in which a court has applied Section 8 in the way they seek here.[3]

### C. Musk and xAI do not state a claim under Section 8 of the Clayton Act, let alone establish a likelihood of success on the merits

Mootness and standing aside, a third independent reason why Plaintiffs' Clayton Act claim cannot entitle them to injunctive relief is that they cannot show a violation.

#### 1. Hoffman's prior Board service did not violate Section 8

Section 8 can only bar service on multiple boards where the companies are "competitors." 15 U.S.C. § 19(a)(1)(B); *TRW, Inc.*, 647 F.2d at 948. Plaintiffs offer no evidence toward this showing; they have failed to demonstrate that Microsoft and OpenAI were "competitors" while Hoffman served on both boards.

Plaintiffs assert that "OpenAI's ChatGPT and Microsoft's Copilot compete against one another in the market for generative AI." Mot. at 10; ¶¶ 204-07, 225-26, 373-74. Even accepting that as true, it does not establish a Section 8 violation. Copilot—Microsoft's "flagship" "chatbot" that allegedly competes with ChatGPT in the generative AI market (¶ 207)—was broadly released in March 2023 and only offered as a paid service in January 2024. *See* Exs. 14-15; *see also* ¶ 224. Thus, on Plaintiffs' theory, Microsoft could at most have qualified as OpenAI's "competitor" during the final days or weeks of Hoffman's tenure in March 2023, when Copilot was released. Mot. at 10-11; ¶ 163 n.8. And Section 8 contains a safe harbor, affording directors whose service becomes unlawful—by virtue of a change in competitive landscape or otherwise—one year to terminate their overlapping service. *See* 15 U.S.C. § 19(b); *see also TRW, Inc.*, 647 F.2d at 949. Accordingly, Plaintiffs at best suggest that Hoffman's service on Microsoft's and OpenAI's boards could theoretically have amounted to a Section 8 violation at the earliest in March 2024—a full

---

[3] Private litigation under Section 8 is exceptionally rare, with enforcement left almost exclusively to "the [DOJ's] Antitrust Division or the FTC" in practice. *Robert F. Booth Tr.* v. *Crowley*, 687 F.3d 314, 319 (7th Cir. 2012). Those agencies generally resolve Section 8 issues "amicably" by "notif[ying] [] firm[s]" upon "conclud[ing] that directorships improperly overlap" and "giv[ing] [the firms] a chance to avoid litigation (or to convince the enforcers that the interlock is lawful)." *Id*.

year after he stepped down.[4]

### 2. Templeton's prior role as a board observer cannot trigger Section 8 liability

Nor does Templeton's prior role give rise to a Clayton Act concern. Section 8 bars concurrent service only by a "director or officer in any two corporations." 19 U.S.C. § 19(a)(1). Plaintiffs do not contend that Templeton was an OpenAI "officer."[5] And she was never a "director" of OpenAI either—only an "observer," with no vote and no voice in OpenAI board decisions. *See* Wu Decl., Ex. A.

It is a "fundamental canon of statutory construction" that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *LVRC Holdings LLC* v. *Brekka*, 581 F.3d 1127, 1132-33 (9th Cir. 2009) (quoting *Perrin* v. *United States*, 444 U.S. 37, 42 (1979)). "When the term 'director' is used in reference to a corporation"—as it is in Section 8— "the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance." *In re Kunz*, 489 F.3d 1072, 1077-78 (10th Cir. 2007) (interpreting the term "director" within the meaning of 11 U.S.C. § 547(b) of the Bankruptcy Code). Templeton was not a "member" of the "governing board" of OpenAI, and as a non-voting observer she had no role in "corporate governance" and no ability to act on behalf of OpenAI at all.

That "director" means someone who can "direct" the corporate affairs of the company—as is plain from the word itself—is further confirmed by the remainder of Section 8's text. The safe harbor provision of part (b) expressly contemplates that the "director" or "officer" covered by Section 8 will "act for such corporation," 19 U.S.C. § 19(b), which Templeton could not do.

---

[4] For related reasons, Hoffman's service could not have violated Section 8 because the provision includes a safe harbor where the "two corporations" lack "competitive sales"—defined as revenues of "products and services sold by one corporation in competition with the other . . . in that corporation's *last completed fiscal year*"—exceeding $4,855,900 or 2% of either corporation's "total sales." *See* 15 U.S.C. § 19(a)(2)(B)-(C) (emphasis added); *see* 89 Fed. Reg. 3926 (Jan. 22, 2024). The latest relevant "fiscal year" for purposes of analyzing Hoffman's tenure is 2022, when, according to Plaintiffs, OpenAI and Microsoft lacked any competing sales, let alone sales exceeding these thresholds—neither Copilot nor any paid version of ChatGPT, which was first offered as a subscription product in February 2023, had been released at that time. *See* Ex. 16.

[5] Nor do Plaintiffs proffer any evidence that Templeton was an "officer" of Microsoft within the meaning of Section 8, *see* 15 U.S.C. § 19(a)(4), an independent basis to deny their Section 8 claim.

16

Plaintiffs identify no contrary authority,[6] instead acknowledging that courts uniformly hold in other contexts that non-voting observers are not directors. *See* Mot. at 11 & n.8 (collecting cases). They nevertheless encourage the Court to ignore the statutory text, and the uniform law interpreting the term "director," to break new ground for misguided policy reasons, arguing this would serve the Clayton Act's "legislative purpose . . . to proactively prevent the sharing of sensitive information among competitors." *Id.* at 11. But where a statute's terms are clear, "[t]here is no need to look beyond the plain meaning in order to derive the 'purpose' of the statute," *Burton* v. *Stevedoring Servs. of Am.*, 196 F.3d 1070, 1072 (9th Cir. 1999) (cleaned up), much less throw over long-settled caselaw. And the alleged legislative "purpose" Plaintiffs assert—preventing sharing of sensitive information—was satisfied by the express terms of the agreement by which Templeton was made an observer. OpenAI secured the ability to exclude Templeton from attending portions of board meetings, and receiving materials, in which sensitive or confidential information was discussed. *See* Wu Decl. Ex. A.

**D. Musk and xAI make no showing of irreparable harm**

A final independent reason Plaintiffs have no entitlement to relief on their Clayton Act claim is that they make no showing of irreparable harm. They merely speculate that Hoffman and Templeton may have an "opportunity" to "exploit" some unidentified information (not even Musk's or xAI's information), for an unidentified improper purpose, and that doing so could inflict unidentified harms on "promising generative AI startups." Mot. at 13 n.17 (cleaned up). But plaintiffs do not identify any likely, specific, non-speculative, and immediately-threatened harm to *them*, as they must to obtain injunctive relief. And their invitation that the Court "presume irreparable harm" on the basis of purported "misappropriation" of proprietary information, *see* Mot. at 23 n.17 (cleaned up) (citing *Comet Techs. U.S.A. Inc. v. Beuerman*, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018)), does not cure the defect. There is no evidence of "misappropriation";

---

[6] Plaintiffs cite *Square D Co.* v. *Schneider S.A.*, 760 F. Supp. 362 (S.D.N.Y. 1991), for the proposition that Section 8 forbids the placement of competitor's "agents" on a corporation's board, which they suggest brings Templeton within the statute's ambit. *See* Mot. at 10. But *Square D* involved a corporation's attempt to "install" eleven such "agents" as "Directors" on its competitor's "Board"—not merely as observers on it. *Square D Co.*, 760 F. Supp. at 364, 367.

courts should not presume irreparable harm from misappropriation anyway, *see Citco USA, LLC* v. *RiverPay Inc.*, 2022 WL 287563, at *2 (9th Cir. Jan. 31, 2022); and still less should they do so when the information allegedly misappropriated belonged not to the plaintiff but to someone else, *compare Comet Techs.*, 2018 WL 1990226, at *1.

### III. MUSK HAS FAILED TO ESTABLISH AN ENTITLEMENT TO INJUNCTIVE RELIEF ON HIS CHARITABLE TRUST CLAIM

Musk next seeks an injunction on the claim he has been trying to press in various forms under Cal. Bus. & Prof. Code § 17510.8 since earlier this year.[7] Section 17510.8 provides that accepting "charitable contributions . . . establishes a charitable trust and a duty on the part of the charity" to use those donations "for the declared charitable purposes for which they are sought." *See* ¶¶ 416-26. Alleging breach of this duty, Musk—a one-time funder of OpenAI who abandoned the organization years ago—asks the Court to block OpenAI's contemplated restructuring on his behalf and prevent OpenAI from making asset transfers. Mot. ii, 17. But Musk lacks standing to assert a violation of Section 17510.8, and does not even plausibly allege a breach of any charitable trust, much less show a likelihood of success in establishing one. Musk's demand for a preliminary injunction that would interfere in OpenAI's governance and disrupt its board's consideration of a potential restructuring therefore lacks all grounding.

#### A. Musk has no standing to sue

"By statute, California limits the persons who can sue for mismanagement of a charitable corporation's assets, and a donor like [Musk] is not among them"—"[d]onors who 'parted with their interest in' and 'control over' their donated assets" generally have "no standing to complain." *Pinkert* v. *Schwab Charitable Fund*, 2021 WL 2476869, at *5 (N.D. Cal. June 17, 2021) (quoting *O'Hara* v. *Grand Lodge, Indep. Ord. of Good Templars of State of Cal*., 213 Cal.131, 139-40 (1931)), *aff'd*, 48 F.4th 1051 (9th Cir. 2022)).

Under California law, only a member, officer, or director of a non-profit, a party "with a reversionary, contractual, or property interest in" the entity's assets, or the Attorney General (or a relator) has standing to sue the non-profit for breach of trust. Cal. Corp. Code § 5142(a)(1)-(5);

---

[7] *See* Ex. 8 at ¶¶ 133-44; Dkt. No. 1 at Counts II, XI, and XIII.

*Horiike* v. *Humane Soc'y of the U.S.*, 2016 WL 11744969, at \*16-17 (C.D. Cal. June 20, 2016). Musk is none of those things: he is not a member, director, or officer of OpenAI, nor does he have authority to sue on the Attorney General's behalf as a "relator." *See* Mot. at 15-16.[8] And his attempt to claim standing on the basis of his alleged "reversionary," "contractual," or (otherwise sufficient) "special interest" in OpenAI's assets, *see id*. (quoting *Holt* v. *Coll. of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 754 (1964)), is foreclosed by settled law.

Musk relies heavily on *L.B. Research & Education Foundation* v. *UCLA Foundation*, 130 Cal. App. 4th 171 (2005), in which a donor established a medical school endowment subject to an express, written agreement that imposed conditions on the permissible uses of the funds. The agreement also specified contingencies for transferring the funds to other institutions in the event the school did not abide by those conditions. *Id*. at 175-76. The court found the donor had standing because that agreement was "a conditional contract" that demonstrated the donor's "intent" to create an "enforceable obligation" concerning the use of the gift and to cause the funds to "revert" to other donees if "not used for the designated purposes." *Id*. at 179 (cleaned up).

In dicta, the court further noted that it would have also found standing under charitable trust principles because—through the written instrument specifying that funds would "revert" if conditions were breached—the donor maintained a "reversionary interest" in those funds. *Id*. at 179-81 (emphasis omitted) (quoting *Holt*, 61 Cal. 2d at 753). Musk claims he should likewise be entitled to sue on this basis. But he identifies no similar condition on the use of his donations, nor any promise that the funds would revert to him (or someone else) if those supposed instructions were not followed. He points to an email from more than seven years ago, sent to Altman and Brockman in the midst of his effort to take control of OpenAI, in which he wrote: "Either go do

---

[8] All but conceding that Musk lacks standing, on December 6, his counsel—having already filed this motion—served Defendants with an application to the California Attorney General, asking Musk and Zilis to be granted "relator" status under Cal. Code Regs., tit. 11, §§ 1-2, 10. Ex. 17. Those regulations provide a framework for "person[s] desiring 'leave to sue' in the name of the people of the State of California under [a] law *requiring the prior permission therefor of the Attorney General*." *Turner* v. *Victoria*, 15 Cal. 5th 99, 129 (2023) (emphasis added) (quoting Cal. Code Regs., tit. 11, § 1); *see also id.* ("A relator is a party who is allowed to proceed in the name of the people or the attorney general when the power to sue otherwise resides wholly in that official" (citation omitted)). The California Attorney General has not yet addressed Plaintiffs' application.

something on your own or continue with OpenAI as a nonprofit. I will no longer fund OpenAI until you have made a firm commitment to stay." Mot. at 17; ¶ 103; FAC Ex. 13. Nothing in this email imposes or reflects a restriction on OpenAI's use of Musk's donations amounting to a contract right or a "reversionary interest" in OpenAI's assets. *See Pinkert*, 2021 WL 2476869, at *5-6 (no "reversionary interest" standing where charitable donations had "no restriction" on their use, nor were alleged to have been a "conditional donation"); *Horiike*, 2016 WL 11744969, at *16-17 (same). Nor could the email suggest that, by accepting Musk's donations, OpenAI undertook in perpetuity to never reconsider its corporate form or capital structure. *See* Mot. at 15. To the contrary, just months later, *Musk* reaffirmed his desire to pursue for "[a] for-profit pivot," with his company, Tesla, absorbing OpenAI and serving as its "cash cow." FAC Ex. 16.

**B. Musk does not state a claim for breach of charitable trust, let alone establish a likelihood of success on the merits**

Musk's charitable trust claim fails for the further reason that he has made no showing of breach. Musk declares that he "manifested a clear intent that his contributions be managed according to his wishes"—which purportedly included, among other things, that OpenAI open-source all of its technology, neither license it to, nor otherwise partner with, a for-profit company, and maintain its current organizational structure in perpetuity. Mot. at 17; *see* ¶¶ 254, 420. But Musk identifies no document, or even a conversation, in which Altman, Brockman, or OpenAI solicited his donations subject to these commitments, or in which they undertook to keep OpenAI's corporate structure unchanged forever. Quite the contrary; the evidence shows that *Musk* contemplated a conversion to a for-profit corporation early in OpenAI's history. *See supra* at 2-3.

**C. Musk makes no showing of irreparable harm**

Finally, Musk cannot show that he is likely to suffer irreparable harm absent the sweeping injunctive relief he seeks. *See* Mot. at 17, 22-23. Even had he standing to bring a claim for misuse of historical donations, money damages could remedy any supposed harm, *see* Cal. Jur. 3d Corporations § 613 (noting that the plaintiff can "obtain damages for . . . a breach of a charitable trust"), foreclosing the availability of equitable relief, *Am. Passage Media Corp*, 750 F.2d at 1473-74. The suggestion that any personal injury to Musk could be redressed only by enjoining OpenAI

20

from reorganizing or transferring any assets just exposes the true motive behind Musk's motion: to try to undermine a competitor.

## IV. MUSK AND ZILIS FAIL TO ESTABLISH AN ENTITLEMENT TO INJUNCTIVE RELIEF ON THEIR SELF-DEALING CLAIM

As a final basis for injunctive relief, Musk and Zilis rely on their putative derivative claim alleging that Altman has engaged in self-dealing under Cal. Corp. Code § 5233. *See* Mot. at 17-21. But Musk and Zilis lack standing to assert this claim and offer no proof that any self-dealing occurred or harmed OpenAI.

### A. Musk and Zilis have no standing to bring a claim on OpenAI's behalf

Only the following persons "may bring an action" under the provision Musk and Zilis invoke: (1) "The corporation, or a member asserting the right in the name of the corporation pursuant to Section 5710"; (2) "A director of the corporation"; (3) "An officer of the corporation"; [or] (4) "Any person granted relator status by the Attorney General." § 5233(c)(1)-(4). Musk and Zilis are none of these. They allege only that they are *former* members and directors of OpenAI. ¶¶ 231-32. That category is not one the statute recognizes. The California Supreme Court has expressly so held: "The director enforcement statutes clearly indicate they require an individual who brings a lawsuit *to be a director when that person institutes the action*." *Turner* v. *Victoria*, 15 Cal. 5th 99, 115 (2023) (emphasis added). The rule is important: it prohibits litigants with no direct corporate stake from usurping a corporation's claim to further their private interests.

Plaintiffs' attempted end-run around this unambiguous provision fails. They argue that Cal. Corp. Code § 5710(b)(1) expands standing to former members because it provides that a member-plaintiff must allege that she "*was* a member at the time of the transaction[.]" § 5710(b)(1) (emphasis added). But that requirement is *in addition* to the requirement of Section 5233(c)(1) that the plaintiff be "a member" when the suit is initiated, *i.e.*, requiring that the plaintiff must be "a member" at the time of suit (§ 5233(c)(1)) *and* at the time of the challenged transactions (§ 5710(b)(1)). The California Supreme Court's decision in *Grosset* v. *Wenaas*, 42 Cal. 4th 1100 (2008), confirms this reading. There, the court interpreted the analogous provisions of Cal. Corp. Code § 800, which governs shareholder derivative actions. Like Section 5710, Section 800 grants

derivative standing only to a plaintiff who alleges she "was a shareholder" at the time of the transaction complained of. Cal. Code Corp. § 800(b)(1). The court held that this also required shareholder status "at the time the action was filed." *See Grosset*, 42 Cal. 4th at 1107.[9]

Even if former members could sue under Section 5710(b)(1), they would still need to "allege[] in the complaint with particularity" their "efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort"—*i.e.* to make a "demand" on the board. Cal. Corp. Code § 5710(b)(2); *see also* Mot. at 20. Musk and Zilis made no cognizable demand. As to Musk, he relies solely on a scattershot of tweets containing vague complaints about OpenAI over the years, none of which were addressed to the board, and none of which called on the board to take any action at all. *See* PI Exs. 10-15. Zilis, meanwhile, says she spoke with some unidentified board members about "concerns regarding product safety" and "Altman's Helion Energy transaction," Mot. at 20, but does not specify when these conversations took place, with whom she spoke, what she asked anyone to do, or whether she believed the Helion transaction was in any way improper. *See* ¶ 462. This is not the stuff of which demands on a board are made. *See Greenspun* v. *Del E. Webb Corp.*, 634 F.2d 1204, 1209 (9th Cir. 1980) (under similar federal demand rule, meeting "only with [one director] and the [corporation's] general counsel . . . to apprise them of the wrongful acts alleged in [the] complaint" was inadequate).

Nor have Musk and Zilis alleged any "reason[] for not making such effort[s]," *i.e.*, to explain why a demand would have been "futile." *Bader* v. *Anderson*, 179 Cal. App. 4th 775, 782, 790 (2009). Citing the FAC, the Motion simply concludes that "the present adverse domination of OpenAI, Inc.'s board . . . means demand would have been futile." Mot. at 20. The FAC, in turn, does not even identify the present composition of the board, let alone allege facts suggesting a lack of board independence on a "director-by-director" basis. *Bader*, 179 Cal. App. 4th at 790 (court

---

[9] Plaintiffs' alternative suggestion that members should have broader standing than directors because "directors . . . are less fundamental to a corporation," Mot. at 18, is directly contrary to the statutory scheme in §§ 5233(c) and 5710. And it is meaningless here regardless because OpenAI's directors exclusively comprise its members. *See* FAC Ex. 21 (Art. II, Sec. 1). Moreover, no conceivable reading of § 5710(b) could confer standing on Musk, who resigned from OpenAI in February 2018 prior to any of the allegedly self-interested transactions of which he now complains. *See* ¶ 231; Mot. at 20-21.

"must be able to determine on a director-by-director basis whether or not each possesses independence or disinterest such that he or she may fairly evaluate the challenged transaction"). Like the motion, it merely asserts the conclusion, "on information and belief," that the board is "dominated by directors with interests conflicted and adverse to those of OpenAI, Inc." ¶ 170.[10] Section 5710 requires much more. *See Charter Twp. of Clinton Police & Fire Ret. Sys.* v. *Martin*, 219 Cal. App. 4th 924, 936 (2013) (reliance on "general, identical allegations as to each member of the Board" was "insufficient" for demand futility).

In a final attempt to show standing, Musk and Zilis invoke a purported "third, common law path to standing under *Turner*," Mot. at 19, referencing *Turner*'s discussion of section 6.02(b)(2)(B) of the Restatement of Charitable Nonprofit Organizations. The Restatement posits that "a former member of the board of [a] charity who is no longer a member for reasons related to that member's attempt to address the alleged harm to the charity" should have standing to bring a derivative action. *See* § 6.02(b)(2)(B). But as *Turner* explains, relying on an amicus brief from the Restatement's Reporter, that section is necessary because "it is typical for a member of the board who brings a derivative suit to lose her position on the board." *Turner*, 15 Cal. 5th at 128. That circumstance—retaliation against a member *after* she brings suit—is what *Turner* addresses, *id.* at 111, 120, and it has no relevance here.

### B. Musk and Zilis do not state a claim for self-dealing, let alone demonstrate a likelihood of success on the merits

Injunctive relief is inappropriate on Plaintiffs' derivative claim for another, independent reason: no evidence of self-dealing. To establish a likelihood of success on the merits of this claim, Musk and Zilis must adduce evidence that OpenAI was a party to a transaction in which Altman had "a material financial interest *and* which does not meet the requirements" of California

---

[10] The purportedly "conflicted" directors that Plaintiffs do not name include: (1) Larry Summers (former U.S. Treasury Secretary and President of Harvard); (2) Bret Taylor (former co-CEO of Salesforce, chairman of Twitter's board and CTO of Facebook); (3) Retired U.S. Army General Paul Nakasone (former head of the NSA); (4) Sue Desmond-Hellman (former CEO of the Bill and Melinda Gates Foundation); (5) Nicole Seligman (former Global General Counsel of Sony); (6) Fidji Simo (CEO and Chair of Instacart); and (7) Zico Kolter (Director of the Machine Learning Department at Carnegie Mellon University, whose research focuses on AI safety and alignment). *See* Exs. 18-20.

Corporations Code Section 5233(d). Cal. Corp. Code § 5233(a) (emphasis added). Section 5223(d) in turn provides, among other things, that the transaction is not one that the "corporation entered into . . . for its own benefit," that is "fair and reasonable," and that has been authorized by disinterested and informed directors. *Id.* § 5233(d)(2).

The FAC lists OpenAI transactions that allegedly involved entities in which Altman had an interest. But it pleads nothing—and Plaintiffs produce no evidence—that the transactions enriched Altman at the expense of OpenAI, that any of the transactions were unfair to the corporation, that disinterested and informed directors did not authorize them, or that they were on anything but market terms. Indeed, on the face of the FAC, the transactions appear to have *benefited* OpenAI—resulting in sales of OpenAI's products to third parties (*e.g.*, sales of OpenAI technology to Humane and Limitless, *see* ¶¶ 140-41), receipt by OpenAI of necessary products and services (*e.g.*, purchase or potential purchase of chips from Rain AI and electricity from Helion Energy, *see* ¶¶ 139, 144), or bringing content to OpenAI's products (*e.g.*, partnership with Reddit, *see* ¶ 137). Plaintiffs cannot establish a likelihood of success—or even a serious question—on the merits of this claim without producing evidence that the transactions were unauthorized, unfair, unreasonable, and undertaken for reasons other than OpenAI's benefit.

### C. Musk and Zilis make no showing of irreparable harm

The third independently dispositive reason the self-dealing claim cannot ground injunctive relief is that Musk and Zilis have demonstrated no threat of immediate irreparable injury to the company stemming from the transactions they identify. *See, e.g., Taylor* v. *Biglari*, 971 F. Supp. 2d 847, 854 (S.D. Ind. 2013). As noted above, the purported "self-dealing" transactions appear to have benefited OpenAI, *see* ¶¶ 137, 139-44, and there is nothing to suggest they were at other than market rates. The FAC's vague allusion to the threat of "financial and reputational" harms to OpenAI, Mot. at 23, are not backed up either. The only purported "reputational" harm identified is a copyright lawsuit by the *New York Times* that has already been brought, is being heavily contested, is in no way traceable to any purported "self-dealing," and would not be remedied by an injunction. *See id.* So if Plaintiffs had standing (they do not), and if they had any likelihood of success (they do not), their claim would still be entirely remediable in damages.

24

## V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION

For all the foregoing reasons, Plaintiffs come nowhere near satisfying the first two elements required for the extraordinary relief of a preliminary injunction. Their showing on the remaining factors—balance of equities and public interest—is at least as feeble.

On one side of the scale, Musk has been trying to wield the legal process for nearly a year to gain competitive advantage, based on claims that have no legal support and are grounded only in conclusions and conjecture. He has identified no harm to himself or xAI should the Court decline to issue the injunction he seeks—relief that he could have sought months or years ago if any of his purported concerns were legitimate. And the assortment of speculative harms to third parties he alleges do not weigh in the balance. *See Stormans, Inc.* v. *Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

On the other side of the scale, granting Musk's proposed injunction risks serious harm to OpenAI, an innovative pioneer in a rapidly evolving industry whose core mission is to develop safe and beneficial AGI, and to help others to do so.

Plaintiffs argue that the requested injunction is "uniquely important to the public interest" because it will "preserv[e] [] competitive markets in th[e] [generative AI] sector." Mot. at 24. The opposite is true. Musk has brought this motion to try to restrain the technological leader in the AI field he wants to dominate. His aim is not to level the playing field, but to tilt it in his favor. Courts rightly exercise "extreme caution" when "judicial intervention in a competitive situation [could] itself upset the balance of market force." *California* v. *Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1137 (N.D. Cal. 2001) (cleaned up); *see also Epic Games, Inc.* v. *Apple Inc.*, 493 F. Supp. 3d 817, 832 (N.D. Cal. 2020) ("[t]he [] legal landscape cautions against preliminarily finding[s]" with respect to allegations of competitive harm). Nowhere is that caution more warranted than here.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction in its entirety.

1   Date: December 13, 2024

                         MORRISON & FOERSTER LLP

2

                         */s/ Jordan Eth*

3                          JORDAN ETH (CA SBN 121617)
                         JEth@mofo.com

4                          DAVID J. WIENER (CA SBN 291659)
                         DWiener@mofo.com

5                          MORRISON & FOERSTER LLP
                         425 Market Street

6                          San Francisco, CA 94105
                         Telephone:  (415) 268-7000

7                          Facsimile:  (415) 268-7522

8                          WILLIAM SAVITT (admitted *pro hac vice*)
                         WDSavitt@wlrk.com

9                          SARAH K. EDDY (admitted *pro hac vice*)
                         SKEddy@wlrk.com

10                        WACHTELL, LIPTON, ROSEN & KATZ
                         51 West 52nd Street

11                        New York, NY 10019
                         Telephone:  (212) 403-1000

12                        Facsimile:  (212) 403-2000

13                        *Attorneys for Defendants Samuel Altman,*
                       *Gregory Brockman, OpenAI, Inc., OpenAI L.P.,*

14                        *OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI*
                       *OpCo, LLC, OpenAI Global, LLC, OAI*

15                        *Corporation, LLC, OpenAI Holdings, LLC,*
                       *OpenAI Startup Fund Management, LLC,*

16                        *OpenAI Startup Fund GP I, L.L.C., OpenAI*
                       *Startup Fund I, L.P., OpenAI Startup Fund SPV*

17                        *GP I, L.L.C., OpenAI Startup Fund SPV GP II,*
                       *L.L.C., OpenAI Startup Fund SPV GP III,*

18                        *L.L.C., OpenAI Startup Fund SPV GP IV,*
                       *L.L.C., OpenAI Startup Fund SPV I, L.P.,*

19                        *OpenAI Startup Fund SPV II, L.P., OpenAI*
                       *Startup Fund SPV III, L.P., OpenAI Startup*

20                        *Fund SPV IV, L.P., Aestas Management*
                       *Company, LLC, and Aestas LLC*

21

22

23

24

25

26

27

28

OPENAI DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
CASE NO. 4:24-cv-04722-YGR