EXHIBIT 13

This sample document is the work product of a national coalition of attorneys who specialize in venture capital financings, working under the auspices of the NVCA. This document is intended to serve as a starting point only, and should be tailored to meet your specific requirements. This document should not be construed as legal advice for any particular facts or circumstances. Note that this sample document presents an array of (often mutually exclusive) options with respect to particular deal provisions.

For convenience of review, the drafting committee has flagged new footnotes and footnotes that were substantively revised (excluding cleanup changes) in the October 2024 revision , as a redline will show as changes footnotes that merely moved making it harder to discern a "substantive" change.

*Preliminary Note*

*An Investors' Rights Agreement can cover many different subjects. The most common are information rights, registration rights, contractual "rights of first offer" or "preemptive" rights (i.e., the right to purchase securities in subsequent equity financings conducted by the Company), and various post-closing covenants of the Company.*

## [AMENDED AND RESTATED] INVESTORS' RIGHTS AGREEMENT

THIS [AMENDED AND RESTATED] INVESTORS' RIGHTS AGREEMENT (this "**Agreement**"), is made as of [_____], 20[__], by and among [_____], a Delaware corporation (the "**Company**"), [and] the Investors (as defined below) [and the Key Holders (as defined below)].

## RECITALS[1]

[**WHEREAS**, certain of the Investors (the "**Existing Investors**") hold shares of [Series [_]] Preferred Stock and/or shares of Common Stock issued upon conversion thereof and possess registration rights, information rights, rights of first offer, and other rights pursuant to that certain Investors' Rights Agreement dated as of [_____ __, 20__], by and among the Company and such Existing Investors (the "**Prior Agreement**");

**WHEREAS**, the undersigned Existing Investors are holders of a sufficient number of the securities of the Company as are required to amend the Prior Agreement, and desire to amend and restate the Prior Agreement in its entirety and to accept the rights created pursuant to this Agreement in lieu of the rights granted to them under the Prior Agreement; and]

**WHEREAS**, the Company and [certain of] the Investors are parties to that certain Series [_] Preferred Stock Purchase Agreement of even date herewith by and among the Company and such Investors (the "**Purchase Agreement**"), under which certain of the Company's and such Investors' obligations are conditioned upon the execution and delivery of this Agreement by the undersigned parties.

**NOW, THEREFORE**, the parties agree as follows:

1.    <u>Definitions</u>. For purposes of this Agreement:

1.1    "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or other investment fund now or hereafter existing that is controlled by one or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such Person.

---

[1]    ***New October 2024*** Recitals have been further simplified and conformed across documents; care should be taken to appropriately update to reflect the specific terms of the particular transaction.

Last Updated October 2024

1.2    "**Board of Directors**" means the board of directors of the Company.

1.3    "**Certificate of Incorporation**" means the Company's Amended and Restated Certificate of Incorporation, as amended and/or restated from time to time.

1.4    "**Common Stock**" means shares of the Company's common stock, par value [$0.____] per share.

1.5    ["**Competitor**" means a Person engaged, directly or indirectly (including through any partnership, limited liability company, corporation, joint venture or similar arrangement (whether now existing or formed hereafter)), in [*description of business*], but shall not include any financial investment firm or collective investment vehicle that, together with its Affiliates, holds less than [20]% of the outstanding equity of any Competitor and does not, nor do any of its Affiliates, have a right to designate any members of the board of directors of any Competitor. [Additionally, in no event shall [____] or its Affiliates be a Competitor hereunder.][2]]

1.6    "**Damages**" means any loss, damage, claim or liability (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act, or other federal or state law, insofar as such loss, damage, claim or liability (or any action in respect thereof) arises out of or is based upon: (i) any untrue statement or alleged untrue statement of a material fact contained in any registration statement of the Company, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto; (ii) an omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation promulgated under the Securities Act, the Exchange Act, or any state securities law.

1.7    "**Deemed Liquidation Event**" shall have the meaning ascribed to it in the Company's Amended and Restated Certificate of Incorporation, as in effect on the date of this Agreement and regardless of the date on which such event occurs.

1.8    "**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly), Common Stock, including options and warrants.

1.9    ["**Direct Listing**" means the initial listing of the Common Stock (or other equity securities of the Company) on the Nasdaq Stock Market, the New York Stock Exchange or another exchange or marketplace approved by the Board of Directors by means of an effective registration statement filed by the Company with the SEC, without a related underwritten offering of such Common Stock (or other equity securities).]

1.10    ["**DPA**" means Section 721 of the Defense Production Act, as amended, including all implementing regulations thereof.

1.11    "**DPA Triggering Rights**" means (i) "control" (as defined in the DPA); (ii) access to any "material non-public technical information" (as defined in the DPA) in the possession of the Company; (iii) membership or observer rights on the Board of Directors or equivalent governing body of the Company or the right to nominate an individual to a position on the Board of Directors or equivalent governing body of

---

[2]    ***New October 2024*** Most large venture funds (typically those that comprise Major Investors) will expect to be specifically carved out of the "Competitor" definition; caution should be taken with strategic investors that may in fact compete.

Last Updated October 2024

the Company; (iv) any involvement, other than through the voting of shares, in substantive decision-making of the Company regarding (x) the use, development, acquisition or release of any Company "critical technology" (as defined in the DPA); (y) the use, development, acquisition, safekeeping, or release of "sensitive personal data" (as defined in the DPA) of U.S. citizens maintained or collected by the Company, or (z) the management, operation, manufacture, or supply of "covered investment critical infrastructure" (as defined in the DPA).][3]

1.12    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

1.13    "**Excluded Registration**" means (i) a registration relating to the sale or grant of securities to employees of the Company or a subsidiary pursuant to a stock option, stock purchase, equity incentive or similar plan; (ii) a registration relating to an SEC Rule 145 transaction; (iii) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities; or (iv) a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered.

1.14    ["**FOIA Party**" means a Person that, in the [reasonable] determination of the Board of Directors, may be subject to, and thereby required to disclose non-public information furnished by or relating to the Company under, the Freedom of Information Act, 5 U.S.C. 552 ("**FOIA**"), any state public records access law, any state or other jurisdiction's laws similar in intent or effect to FOIA, or any other similar statutory or regulatory requirement.]

1.15    ["**Foreign Person**" means either (i) a Person or government that is a "foreign person" within the meaning of the DPA or (ii) a Person through whose investment a "foreign person" within the meaning of the DPA would obtain any DPA Triggering Rights.] [4]

1.16    "**Form S-1**" means such form under the Securities Act as in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC.

1.17    "**Form S-3**" means such form under the Securities Act as in effect on the date hereof or any registration form under the Securities Act subsequently adopted by the SEC that permits forward incorporation of substantial information by reference to other documents filed by the Company with the SEC.

1.18    "**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

1.19    "**Holder**" means any holder of Registrable Securities who is a party to this Agreement.

1.20    "**Immediate Family Member**" means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, life partner or similar statutorily-recognized domestic partner, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships of a natural person referred to herein.

1.21    "**Initiating Holders**" means, collectively, Holders who properly initiate a registration request under this Agreement.

---

[3]    To be included if needed for any of the CFIUS-related provisions below.

[4]    To be included if needed for any of the CFIUS-related provisions below.

1.22    "**Investors**" means the persons named on <u>Schedule A</u> hereto, each person to whom the rights of an Investor are assigned pursuant to <u>Section 6.1</u>, and each person who hereafter becomes a party to this Agreement pursuant to <u>Section 6.9</u>.

1.23    "**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act.

1.24    ["**Key Holders**" means the persons named on <u>Schedule B</u> hereto and each person to whom the rights of a Key Holder are assigned pursuant to <u>Section 6.1</u>.]

1.25    ["**Key Holder Registrable Securities**" means (i) the shares of Common Stock held by the Key Holders as of the date of this Agreement, and (ii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of such shares.]

1.26    "**Major Investor**" means any Investor that, individually or together with such Investor's Affiliates, holds at least [_____] shares of Registrable Securities (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof).

1.27    "**New Securities**" means, collectively, equity securities of the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities.

1.28    "**Person**" means any individual, corporation, partnership, trust, limited liability company, association, or other entity.

1.29    "**Preferred Stock**" means, collectively, shares of the Company's Series A Preferred Stock[ and Series [_] Preferred Stock].[5]

1.30    "**Registrable Securities**" means [(i)] the Common Stock issuable or issued upon conversion of the Preferred Stock[, excluding any Common Stock issued upon conversion of the Preferred Stock pursuant to the Special Mandatory Conversion (as defined in the Certificate of Incorporation)][6]; [(ii) any Common Stock, or any Common Stock issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, held by the Investors from time to time]; [(iii) the Key Holder Registrable Securities,[7] provided, however, that such Key Holder Registrable Securities shall not be deemed Registrable Securities and the Key Holders shall not be deemed Holders for the purposes of <u>Sections 2.1</u> (and any other applicable Section with respect to registrations under <u>Section 2.1</u>), <u>2.10</u>, [<u>3.1</u>, <u>3.2</u>, <u>4.1</u> and the first sentence of <u>6.6</u>;] and [(iv) any Common Stock issued as (or issuable upon the

---

[5]    Ordinarily, this should refer to each series of preferred stock; in some transactions, there may be certain series (such as a shadow preferred created in a Special Mandatory Conversion, see next footnote) that could be excluded for simplicity, if not entitled to all the same rights.

[6]    If the Company's Certificate of Incorporation contains a "pay-to-play" provision, consider whether shares issued upon a "Special Mandatory Conversion" pursuant thereto should lose their status as Registrable Securities. See Section 5A of Part B of Article Fourth of the Model Certificate of Incorporation.

[7]    Typically, Key Holders of common stock are not granted registration rights. In certain instances it may be appropriate to grant Key Holders (*e.g.*, founders, significant early-round angel investors) piggyback and/or S-3 registration rights, although often they will be subordinate to investors on underwriter cutbacks. If such rights are granted, provision must be made throughout this form to include such rights and provide for appropriate cutbacks and limitations and protection in the event of amendments and waivers.

Last Updated October 2024

conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares referenced [in clause[s] (i) [and (ii)]] above; excluding in all cases (other than the restrictions on transfer and legend requirements in Section 2.12), however, any Registrable Securities sold by a Person in a transaction in which the applicable rights under this Agreement are not assigned pursuant to Section 6.1, and excluding for purposes of Section 2 any shares for which registration rights have terminated pursuant to Section 2.13.[8]

1.31    "**Registrable Securities then outstanding**" means the number of shares determined by adding the number of shares of outstanding Common Stock that are Registrable Securities and the number of shares of Common Stock issuable (directly or indirectly) pursuant to then exercisable and/or convertible securities that are Registrable Securities.

1.32    "**Requisite Holders**" means (a) prior to the IPO, the Investors holding [a majority/at least [____]%] of the then outstanding shares of Preferred Stock (calculated together as a single class on an as-converted basis), and (b) following the IPO, the Investors holding [a majority/at least [____]%] of the then outstanding shares of Registrable Securities.

1.33    "**Restricted Securities**" means the securities of the Company required to be notated with the legend set forth in Section 2.12(b) hereof.

1.34    "**Sanctioned Party**" means any Person: (i) organized under the laws of, ordinarily resident in, or located in a country or territory that is the subject of comprehensive Sanctions ("**Restricted Countries**")[9]; (ii) 50% or more owned or controlled by the government of a Restricted Country; or (iii) (A) designated on a sanctioned parties list administered by the United States[, European Union, or United Kingdom], including, without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List, Foreign Sanctions Evaders List, [and ]Sectoral Sanctions Identification List[, the Consolidated List of Persons, Groups, and Entities Subject to EU Financial Sanctions, and the UK's Consolidated Sanctions List] (collectively, "**Designated Parties**"); or (B) 50% or more owned or, where relevant under applicable Sanctions, controlled, individually or in the aggregate, by one or more Designated Party, in each case only to the extent that dealings with such Person is are prohibited pursuant to applicable Sanctions[10].

1.35    "**Sanctions**" means applicable laws and regulations pertaining to trade and economic sanctions administered by the United States[, European Union, or United Kingdom][11] .[12]

1.36    "**SEC**" means the Securities and Exchange Commission.

1.37    "**SEC Rule 144**" means Rule 144 promulgated by the SEC under the Securities Act.

---

[8]    *Revised October 2024* Registrable Securities are defined in terms of common stock because preferred stock of venture-capital-backed companies is usually not sold or marketed at an IPO. The language "issued or issuable" should be present so that the definition works regardless of whether or not the preferred stock has yet been converted. Note that the effect of the transferability section is such that certain sizeable transfers of shares pursuant to available exemptions under the Securities Act will not remove the registration rights associated with those shares. Also consider the effect of the use of "Registrable Securities" on things like amendment provisions/voting thresholds.

[9]    *New October 2024* The current Restricted Countries can be found at: https://ofac.treasury.gov/sanctions-programs-and-country-information.

[10]    Model language is to account for the fact that some listed parties may not be fully prohibited, but rather subject to more targeted restrictions.

[11]    Include to the extent that these jurisdictions that are or may be relevant.

[12]    This model agreement provides flexibility to the Company to enable it to comply with any Sanctions.

Last Updated October 2024

1.38    "**SEC Rule 145**" means Rule 145 promulgated by the SEC under the Securities Act.

1.39    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.40    "**Selling Expenses**" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any Holder[, except for the fees and disbursements of the Selling Holder Counsel borne and paid by the Company as provided in Section 2.6].

1.41    "**Series A Preferred Stock**" means shares of the Company's Series A Preferred Stock, par value [$0.___] per share.[13]

2.    Registration Rights. The Company covenants and agrees as follows:

2.1    Demand Registration.

(a)    **Form S-1 Demand**. If at any time after [the earlier of (i) [[insert date][14] [three to five years after] [the date of this Agreement] or (ii)] 180 days[15] after the effective date of the registration statement for the IPO [or Direct Listing, as applicable], the Company receives a request from Holders of a majority of the Registrable Securities then outstanding that the Company file a Form S-1 registration statement with respect to Registrable Securities then outstanding having an anticipated aggregate offering price, net of Selling Expenses, would exceed $[20,000,000])], then the Company shall: (x) within ten days after the date such request is given, give notice thereof (the "**Demand Notice**") to all Holders other than the Initiating Holders; and (y) as soon as practicable, and in any event within 60 days after the date such request is given by the Initiating Holders, file a Form S-1 registration statement under the Securities Act covering all Registrable Securities that the Initiating Holders requested to be registered and any additional Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within 20 days of the date the Demand Notice is given, and in each case, subject to the limitations of Sections 2.1(c) and 2.3[; provided, however, that this right to request the filing of a Form S-1 registration statement shall in no event be made available to any Holder that is a Foreign Person].[16]

---

[13]    Add additional series as applicable as new defined terms.

[14]    As investors' counsel, to prevent inadvertent perpetual roll-forward, consider inserting a date certain that reflects the agreed upon time frame.

[15]    ***Revised October 2024*** The starting time period for initiating registration rights often has both an absolute time-based component and a "relative to IPO" time-based component; depending on the stage of the company and the timing of the expectations of the parties, the absolute time frame should be tailored (or perhaps eliminated). The first time period is designed to allow the investors to force the Company to go public if it has not already done so, although practically speaking this rarely, if ever, happens. The second time period is set around the expiration of any underwriter lock-ups after an IPO, which usually expire 180 days after the IPO. See Section 2.11.

[16]    Note that the ability of a foreign investor (within the meaning of the regulations of the Committee on Foreign Investment in the United States (CFIUS)) to trigger an IPO on demand may give rise to a CFIUS determination that that investor has "control" over the Company. The concept of "control" under the CFIUS regulations is very broad and subjective. It is defined as the power – direct or indirect and whether or not exercised – to "determine, direct, or decide important matters affecting" the Company. This same principle applies throughout the financing documents. Parties may therefore wish to confirm that no foreign investor will obtain this particular right; other rights that are likely to be of concern are indicated throughout this document, and in addition, highly conservative companies may wish to restrict foreign investors from obtaining any rights beyond the specific set of rights consistent with passivity outlined in the CFIUS regulations.

6

Last Updated October 2024

(b)    **Form S-3 Demand**. If at any time when it is eligible to use a Form S-3 registration statement, the Company receives a request from Holders of the Registrable Securities then outstanding that the Company file a Form S-3 registration statement with respect to outstanding Registrable Securities of such Holders having an anticipated aggregate offering price, net of Selling Expenses, of at least $5,000,000, then the Company shall (i) within ten days after the date such request is given, give a Demand Notice to all Holders other than the Initiating Holders; and (ii) as soon as practicable, and in any event within 45 days after the date such request is given by the Initiating Holders, file a Form S-3 registration statement under the Securities Act covering all Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within 20 days of the date the Demand Notice is given, and in each case, subject to the limitations of Sections 2.1(c) and 2.3.

(c)    Notwithstanding the foregoing obligations, if the Company furnishes to Holders requesting a registration pursuant to this Section 2.1 a certificate signed by the Company's chief executive officer stating that in the good faith judgment of the Board of Directors it would be materially detrimental to the Company for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (i) materially interfere with a significant acquisition, corporate reorganization, or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or Exchange Act, then the Company shall have the right to defer taking action with respect to such filing[, and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly,][for a period of not more than [30-120] days after the request of the Initiating Holders is given]; provided, however, that the Company may not invoke this right more than [once] in any 12-month period[17][; and provided further that the Company shall not register any securities for its own account or that of any other stockholder during such [30-120] day period other than [an Excluded Registration] [*Alternative*: pursuant to a registration relating to the sale or grant of securities to employees of the Company or a subsidiary pursuant to a stock option, stock purchase, equity incentive or similar plan; a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities; or a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered]].[18]

(d)    The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Section 2.1(a), (i) during the period that is 60 days before the Company's good faith estimate of the date of filing of, and ending on a date that is 180 days after the effective date of, a Company-initiated registration, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; (ii) after the Company has effected [one to two] registration[s] pursuant to Section 2.1(a); or (iii) if the Initiating Holders propose to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a

---

[17]    ***Revised October 2024*** It is common to limit use of the blackout provisions to either one longer time in any 12-month period or two shorter periods in any 12-month period. The second alternative provides greater flexibility to the Company and may also be better for the investors to provide instead for two 60-day periods in any 12-month period, which the Company can combine if necessary to achieve a total blackout of 120 days.

[18]    Note that the alternative carve-out provision from the limitation on the Company's right to register securities for its own account during a blackout period does not include a carve-out for a registration relating to a SEC Rule 145 transaction. From the investors' perspective, although it may be acceptable for the Company to delay a resale registration in the circumstances set forth in this provision, those circumstances should not entitle the Company to file, *e.g.*, a Form S-4 for a Rule 145 transaction, in priority to a registration requested by the Holders of Registrable Securities. However, from the Company's perspective, the inability to file the Form S-4 could be a hindrance to an acquisition.

Last Updated October 2024

request made pursuant to Section 2.1(b). The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Section 2.1(b), (i) during the period that is [30] days before the Company's good faith estimate of the date of filing of, and ending on a date that is [90] days after the effective date of, a Company-initiated registration, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; or (ii) if the Company has effected [two] registration[s] pursuant to Section 2.1(b) within the 12-month period immediately preceding the date of such request. A registration shall not be counted as "effected" for purposes of this Section 2.1(d) until such time as the applicable registration statement has been declared effective by the SEC, unless the Initiating Holders withdraw their request for such registration, elect not to pay the registration expenses therefor, and forfeit their right to one demand registration statement pursuant to Section 2.6, in which case such withdrawn registration statement shall be counted as "effected" for purposes of this Section 2.1(d); provided, that if such withdrawal is during a period the Company has deferred taking action pursuant to Section 2.1(c), then the Initiating Holders may withdraw their request for registration and such registration will not be counted as "effected" for purposes of this Section 2.1(d).

2.2    Company Registration. If the Company proposes to register (including for this purpose a registration effected by the Company for stockholders other than the Holders) any of its Common Stock under the Securities Act in connection with the public offering of such securities solely for cash (other than in an Excluded Registration or a registration pursuant to Section 2.1), the Company shall, at such time, promptly give each Holder notice of such registration. Upon the request of each Holder given within 20 days after such notice is given by the Company, the Company shall, subject to the provisions of Section 2.3, cause to be registered all of the Registrable Securities that each such Holder has requested to be included in such registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 before the effective date of such registration, whether or not any Holder has elected to include Registrable Securities in such registration. The expenses (other than Selling Expenses) of such withdrawn registration shall be borne by the Company in accordance with Section 2.6.

2.3    Underwriting Requirements.

(a)    If, pursuant to Section 2.1, the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 2.1, and the Company shall include such information in the Demand Notice. The underwriter(s) will be selected by the [Company][Board of Directors] and shall be reasonably acceptable to a majority in interest of the Initiating Holders. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in Section 2.4(e)) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting[; provided, however, that no Holder (or any of their assignees) shall be required to make any representations, warranties or indemnities except as they relate to such Holder's ownership of shares and authority to enter into the underwriting agreement and to such Holder's intended method of distribution, and the liability of such Holder shall be several and not joint, and limited to an amount equal to the net proceeds from the offering received by such Holder]. Notwithstanding any other provision of this Section 2.3, if the [managing] underwriter(s) advise(s) the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, then the Initiating Holders shall so advise all Holders of Registrable Securities that otherwise would be underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be allocated among such Holders of Registrable Securities, including the Initiating Holders, in proportion (as nearly as practicable) to the number of Registrable Securities owned by each Holder or in such other proportion as shall mutually be agreed to by all such selling Holders; provided, however, that the number of Registrable Securities held by

the Holders to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest 100 shares.

(b)    In connection with any offering involving an underwriting of shares of the Company's capital stock pursuant to Section 2.2, the Company shall not be required to include any of the Holders' Registrable Securities in such underwriting unless the Holders accept the terms of the underwriting as agreed upon between the Company and its underwriters, and then only in such quantity as the underwriters in their sole discretion determine will not jeopardize the success of the offering by the Company. If the total number of securities, including Registrable Securities, requested by stockholders to be included in such offering exceeds the number of securities to be sold (other than by the Company) that the underwriters in their reasonable discretion determine is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters and the Company in their sole discretion determine will not jeopardize the success of the offering. If the underwriters determine that less than all of the Registrable Securities requested to be registered can be included in such offering, then the Registrable Securities that are included in such offering shall be allocated among the selling Holders in proportion (as nearly as practicable to) the number of Registrable Securities owned by each selling Holder or in such other proportions as shall mutually be agreed to by all such selling Holders. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest 100 shares. Notwithstanding the foregoing, in no event shall (i) the number of Registrable Securities included in the offering be reduced unless all other securities (other than securities to be sold by the Company) are first entirely excluded from the offering, [or] (ii) the number of Registrable Securities included in the offering be reduced below [20-30]% of the total number of securities included in such offering, unless such offering is the IPO, in which case the selling Holders may be excluded further if the underwriters make the determination described above and no other stockholder's securities are included in such offering [or (iii) notwithstanding (ii) above, any Registrable Securities which are not Key Holder Registrable Securities be excluded from such underwriting unless all Key Holder Registrable Securities are first excluded from such offering].[19] For purposes of the provision in this Section 2.3(b) concerning apportionment, for any selling Holder that is a partnership, limited liability company, or corporation, the partners, members, retired partners, retired members, stockholders, and Affiliates of such Holder, or the estates and Immediate Family Members of any such partners, retired partners, members, and retired members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "selling Holder," and any pro rata reduction with respect to such "selling Holder" shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "selling Holder," as defined in this sentence.

(c)    For purposes of Section 2.1, a registration shall not be counted as "effected" if, as a result of an exercise of the underwriter's cutback provisions in Section 2.3(a), fewer than 50% of the total number of Registrable Securities that Holders have requested to be included in such registration statement are actually included.

---

[19]    This language is commonly referred to as the "underwriter cutback" section. In some offerings, an underwriter may determine it can successfully market only a certain number of securities and must therefore reduce the size of the overall registration. When this happens, the holders of Registrable Securities are generally entitled to include their shares before anybody else (consider whether later series may want priority over earlier series). If there is not enough room for these holders, the cutback should be pro rata based on shares held and not "shares requested to be included" (which only creates a race to request and an incentive to request all amounts held every time). Also, if Key Holders have been given registration rights, consider priority of cutback for such Key Holders.

Last Updated October 2024

2.4     <u>Obligations of the Company</u>. Whenever required under this <u>Section 2</u> to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:[20]

(a)     prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to 120 days or, if earlier, until the distribution contemplated in the registration statement has been completed; <u>provided</u>, <u>however</u>, that (i) such 120-day period shall be extended for a period of time equal to the period the Holder refrains, at the request of an underwriter of Common Stock (or other securities) of the Company, from selling any securities included in such registration, and (ii) in the case of any registration of Registrable Securities on Form S-3 that are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such 120-day period shall be extended for up to an additional 90 days, if necessary, to keep the registration statement effective until all such Registrable Securities are sold;

(b)     prepare and file with the SEC such amendments and supplements to such registration statement, and the prospectus used in connection with such registration statement, as may be necessary to comply with the Securities Act in order to enable the disposition of all securities covered by such registration statement;

(c)     furnish to the selling Holders such numbers of copies of a prospectus, including a preliminary prospectus, as required by the Securities Act, and such other documents as the Holders may reasonably request in order to facilitate their disposition of their Registrable Securities;

(d)     use its commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue-sky laws of such jurisdictions as shall be reasonably requested by the selling Holders; <u>provided</u> that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions,[21] unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(e)     in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the underwriter(s) of such offering;

(f)     use its commercially reasonable efforts to cause all such Registrable Securities covered by such registration statement to be listed on a national securities exchange or trading system and each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

(g)     provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(h)     promptly make available for inspection by the selling Holders, any [managing] underwriter(s) participating in any disposition pursuant to such registration statement, and any attorney or

---

[20]    This section simply lists the undertakings of the Company in the event of a registration. As a practical matter, this language will be superseded by any underwriting agreement as part of an underwritten offering.

[21]    This is generally viewed as a burdensome requirement for a Company, so it is often carved out of required registrations.

Last Updated October 2024

accountant or other agent retained by any such underwriter or selected by the selling Holders, all financial and other records, pertinent corporate documents, and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct appropriate due diligence in connection therewith;[22]

(i)     notify each selling Holder, promptly after the Company receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed; and

(j)     after such registration statement becomes effective, notify each selling Holder of any request by the SEC that the Company amend or supplement such registration statement or prospectus.

In addition, the Company shall ensure that, at all times after any registration statement covering a public offering of securities of the Company under the Securities Act shall have become effective, its insider trading policy shall provide that the Company's directors may implement a trading program under Rule 10b5-1 of the Exchange Act.

2.5     Furnish Information. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Section 2 with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as is reasonably required to effect the registration of such Holder's Registrable Securities.

2.6     Expenses of Registration. All expenses (other than Selling Expenses) incurred in connection with registrations, filings, or qualifications pursuant to Section 2, including all registration, filing, and qualification fees; printers' and accounting fees; fees and disbursements of counsel for the Company; and the reasonable fees and disbursements[, not to exceed $[50,000] [per registration],] of one counsel for the selling Holders selected by Holders of a majority of the Registrable Securities to be registered ("**Selling Holder Counsel**"), shall be borne and paid by the Company; provided, however, that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Section 2.1 if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case all selling Holders shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration), unless the Holders of a majority of the Registrable Securities agree to forfeit their right to one registration pursuant to Sections 2.1(a) or 2.1(b), as the case may be; provided further that if, at the time of such withdrawal, the Holders shall have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time of their request and have withdrawn the request with reasonable promptness after learning of such information then the Holders shall not be required to pay any of such expenses and shall not forfeit their right to one registration pursuant to Sections 2.1(a) or 2.1(b). All Selling Expenses relating to Registrable Securities registered pursuant to this Section 2 [(other than fees and disbursements of counsel to any Holder, other than the Selling Holder Counsel, which shall be borne solely by the Holder engaging such counsel)] shall be borne and paid by the Holders pro rata on the basis of the number of Registrable Securities registered on their behalf.

---

[22]     This inspection right is necessary to enable the selling Holders and underwriters to undertake their due diligence investigation in connection with the distribution. In facilitating the due diligence investigations, the Company must be sensitive to its obligations under Regulation FD under the Securities Act.

11

Last Updated October 2024

2.7 <u>Delay of Registration</u>. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this <u>Section 2</u>.

2.8 <u>Indemnification</u>.[23] If any Registrable Securities are included in a registration statement under this <u>Section 2</u> [or in connection with a Direct Listing, as applicable]:

(a) To the extent permitted by law, the Company will indemnify and hold harmless each selling Holder, and the partners, members, officers, directors, and stockholders of each such Holder; legal counsel and accountants for each such Holder; any underwriter (as defined in the Securities Act) for each such Holder; and each Person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Damages, and the Company will pay to each such Holder, underwriter, controlling Person, or other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; <u>provided</u>, <u>however</u>, that the indemnity agreement contained in this <u>Section 2.8(a)</u> shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable for any Damages to the extent that they arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of any such Holder, underwriter, controlling Person, or other aforementioned Person expressly for use in connection with such registration [except to the extent such information has been corrected in a subsequent writing [at least one business day] prior to the sale of Registrable Securities to the Person asserting the claim].

(b) To the extent permitted by law, each selling Holder, severally and not jointly, will indemnify and hold harmless the Company, and each of its directors, each of its officers who has signed the registration statement, each Person (if any), who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter (as defined in the Securities Act), any other Holder selling securities in such registration statement, and any controlling Person of any such underwriter or other Holder, against any Damages, in each case only to the extent that such Damages arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such selling Holder expressly for use in connection with such registration [and that has not been corrected in a subsequent writing [at least one business day] prior to the sale of Registrable Securities to the Person asserting the claim]; and each such selling Holder will pay to the Company and each other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; <u>provided</u>, <u>however</u>, that the indemnity agreement contained in this <u>Section 2.8(b)</u> shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; and <u>provided</u> <u>further</u> that in no event shall the aggregate amounts payable by any Holder by way of indemnity or contribution under <u>Sections 2.8(b)</u> and <u>2.8(d)</u> exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of fraud or willful misconduct by such Holder.

(c) Promptly after receipt by an indemnified party under this <u>Section 2.8</u> of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this <u>Section 2.8</u>, give the indemnifying party notice of the commencement

_____

[23]  ***Revised October 2024*** Note that as a practical matter underwriting agreements also provide for indemnification obligations.

thereof. The indemnifying party shall have the right to participate in such action and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party to which notice has been given, and to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such action. [The failure to give notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this Section 2.8, [only] to the extent that such failure materially prejudices the indemnifying party's ability to defend such action. The failure to give notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 2.8.]

(d)     To provide for just and equitable contribution to joint liability under the Securities Act in any case in which either: (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this Section 2.8 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case, notwithstanding the fact that this Section 2.8 provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any party hereto for which indemnification is provided under this Section 2.8, then, and in each such case, such parties will contribute to the aggregate losses, claims, damages, liabilities, or expenses to which they may be subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of each of the indemnifying party and the indemnified party in connection with the statements, omissions, or other actions that resulted in such loss, claim, damage, liability, or expense, as well as to reflect any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact, or the omission or alleged omission of a material fact, relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission; provided, however, that, in any such case (x) no Holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement, and (y) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation; and provided further that in no event shall a Holder's liability pursuant to this Section 2.8(d), when combined with the amounts paid or payable by such Holder pursuant to Section 2.8(b), exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of willful misconduct or fraud by such Holder.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control; provided, however, that any matter expressly provided for or addressed by the provisions of this Section 2.8 that is not expressly provided for or addressed by the underwriting agreement shall be controlled by the foregoing provisions.

(f)     Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and Holders under this Section 2.8 shall survive the completion of any offering of Registrable Securities in a registration under this

Last Updated October 2024

Section 2, and otherwise shall survive the termination of this Agreement or any provision(s) of this Agreement.

2.9     <u>Reports Under Exchange Act</u>. With a view to making available to the Holders the benefits of SEC Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company shall:

(a)     make and keep available adequate current public information, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the registration statement filed by the Company for the IPO[ or Direct Listing, as applicable];

(b)     use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements); and

(c)     furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) to the extent accurate, a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after 90 days after the effective date of the registration statement filed by the Company for the IPO[ or Direct Listing, as applicable]), the Securities Act, and the Exchange Act (at any time after the Company has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after the Company so qualifies); and (ii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Exchange Act) or pursuant to Form S-3 (at any time after the Company so qualifies to use such form).

2.10     <u>Limitations on Subsequent Registration Rights</u>. From and after the date of this Agreement, the Company shall not, without the prior written consent of the Requisite Holders, enter into any agreement with any holder or prospective holder of any securities of the Company that would (i) [provide to such holder or prospective holder the right to include securities in any registration on other than either a pro rata basis with respect to the Registrable Securities or on a subordinate basis after all Holders have had the opportunity to include in the registration and offering all shares of Registrable Securities that they wish to so include]/[allow such holder or prospective holder to include such securities in any registration unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such securities will not reduce the number of the Registrable Securities of the Holders that are included]; or (ii) allow such holder or prospective holder to initiate a demand for registration of any securities held by such holder or prospective holder; <u>provided</u> that this limitation shall not apply to Registrable Securities acquired by any additional Investor that becomes a party to this Agreement in accordance with <u>Section 6.9</u>.[24]

2.11     <u>"Market Stand-off" Agreement</u>.[25] Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final

---

[24]     Attention should be given to ensure that this provision does not provide any particular investor with a blocking right on future securities issuances beyond what is included in the Certificate of Incorporation.

[25]     This section sets forth the period during which the investors and other holders will be prohibited from selling their securities following the IPO and potentially other registrations. A lock-up agreement will typically be required by the underwriter and is usually set at 180 days for an IPO. However, Investors and the Company may want to consider staged releases from the lock-up (*e.g.*, tied to stock to stock price performance), in order to mitigate the impact of a 180-day cliff. Because the principal investors in the Company will almost certainly be required to provide a lock-up agreement, the greatest value of the lock-up provision may be to ensure a similar lock-up of shares held by

Last Updated October 2024

prospectus relating to the registration by the Company for its own behalf of shares of its Common Stock or any other equity securities under the Securities Act on a registration statement (other than an Excluded Registration) on Form S-1 [or Form S-3], and ending on the date specified by the Company and the managing underwriter (such period not to exceed 180 days in the case of the IPO [or 90 days in the case of any registration other than the IPO][26] [or, if the Company is not then an emerging growth company as defined in the applicable SEC regulations, such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports and (2) analyst recommendations and opinions, including, but not limited to, the restrictions contained in applicable FINRA rules, or any successor provisions or amendments thereto]), (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Common Stock held immediately before the effective date of the registration statement for such offering[27] or (ii) enter into any swap, hedging, or other transaction or arrangement that transfers, or is designed to transfer, to another, in whole or in part, any of the economic consequences of ownership, directly or indirectly, of such securities, whether or not any such transaction or arrangement described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Section 2.11 [shall apply only to the sale of any shares to an underwriter pursuant to an underwriting agreement [or to the establishment of a trading plan pursuant to Rule 10b5-1, provided that such plan does not permit transfers during the restricted period ], [or the transfer of any shares to any trust for the direct or indirect benefit of the Holder or one or more of the Holder's Immediate Family Members, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value,] and shall be applicable to the Holders only if all officers and directors of the Company are subject to the same restrictions and the Company uses commercially reasonable efforts to obtain a similar agreement from all stockholders individually owning more than [1-3]% of the Company's outstanding Common Stock (after giving effect to the conversion into Common Stock of all outstanding Preferred Stock). The underwriters in connection with such registration are intended third-party beneficiaries of this Section 2.11 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this Section 2.11. [Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Company stockholders that are subject to such agreements, based on the number of shares subject to such agreements[, except that, notwithstanding the foregoing, the

---

the smaller holders of Company stock. Note, if some investors are released from the lock-up and sell under Rule 144, it may help protect the Company and directors from potential Section 11 liability. See *Krim v. pcOrder.com, Inc.*, 402 F.3d 489 (5th Cir. 2005) (holding that investors lack standing to bring a Section 11 claim where they cannot show that the shares they acquired in the open market were in fact registered in the allegedly false or misleading registration statement); see also *Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023) (holding that open market buyers in a direct listing were required to show that their shares were registered in the allegedly false or misleading registration statement for purposes of Section 11 standing).

[26]    The bracketed language provides for additional lock-ups for registrations other than the IPO. Some investors may have issues with being locked-up for any registration other than the IPO, but others may prefer to have this provision in order to help ensure the success of any subsequent offering. A compromise position might be to say that with respect to any offering other than the IPO the Holders would be subject to a lock-up if requested by the managing underwriter and approved by Holders of [X]% of the Registrable Securities.

[27]    Investors will want to exempt any common stock acquired in the IPO or in the public market after the IPO from the lock-up provisions, so that they are not disadvantaged relative to other public market purchasers.

Last Updated October 2024

Company and the underwriters may, in their sole discretion, waive or terminate these restrictions with respect to up to [____] shares of the Common Stock].]²⁸

2.12    <u>Restrictions on Transfer</u>.²⁹The Preferred Stock and the Registrable Securities shall not be sold, pledged, or otherwise transferred, and the Company shall not recognize and shall issue stop-transfer instructions to its transfer agent with respect to any such sale, pledge, or transfer, except upon the conditions specified in this Agreement, which conditions are intended to ensure compliance with the provisions of the Securities Act and all other applicable U.S. laws and regulations. A transferring Holder will cause any proposed purchaser, pledgee, or transferee of the Preferred Stock and the Registrable Securities held by such Holder to agree to take and hold such securities subject to the provisions and upon the conditions specified in this Agreement. Notwithstanding the foregoing, the Company shall not require any transferee of shares pursuant to an effective registration statement or, following the IPO [or Direct Listing, as applicable], SEC Rule 144, in each case, to be bound by the terms of this <u>Section 2.12</u>.

(b)    Each certificate, instrument, or book entry representing (i) the Preferred Stock, (ii) the Registrable Securities, and (iii) any other securities issued in respect of the securities referenced in clauses (i) and (ii), upon any stock split, stock dividend, recapitalization, merger, consolidation, or similar event, shall (unless otherwise permitted by the provisions of <u>Section 2.12(c)</u>) be notated with a legend substantially in the following form:

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES MAY NOT BE SOLD, PLEDGED, OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR A VALID EXEMPTION FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.

THE SECURITIES REPRESENTED HEREBY MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

The Holders consent to the Company making a notation in its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer set forth in this <u>Section 2.12</u>.

(c)    The holder of such Restricted Securities, by acceptance of ownership thereof, agrees to comply in all respects with the provisions of this <u>Section 2</u>. Before any proposed sale, pledge, or transfer of any Restricted Securities, unless there is in effect a registration statement under the Securities Act covering the proposed transaction [or following the IPO [or Direct Listing, as applicable], the transfer is made pursuant to SEC Rule 144], the Holder thereof shall give notice to the Company of such Holder's intention to effect such sale, pledge, or transfer, <u>provided</u> that no such notice shall be required in connection

---

²⁸    ***Revised October 2024*** Sometimes *de minimis* thresholds are negotiated so that smaller employee stockholders in need of liquidity can be released without destroying all of the lock-ups and the offering. Note, however, that the IPO underwriters may object to small holders not being subject to lock-ups. Lawyers should be aware that even if this last bracketed sentence is included in this Agreement some underwriters will object to including similar language regarding discretionary waivers in the lock-up agreements they require in connection with an IPO. Investors having the benefit of the bracketed sentence can be reluctant to agree to a lock-up agreement less favorable, creating an issue that needs to be resolved to successfully complete the IPO.

²⁹    This Agreement does not prohibit the transfer of Registrable Securities to competitors (or Competitors). Some companies insist on providing for a flat prohibition on transfers to competitors; a less restrictive alternative would be to provide for a "right of first refusal" in favor of the Company, other investors, or Key Holders in the event of a proposed sale or transfer to a competitor.

if the intended sale, pledge or transfer complies with SEC Rule 144. Each such notice shall describe the manner and circumstances of the proposed sale, pledge, or transfer in sufficient detail and, if reasonably requested by the Company, shall be accompanied at such Holder's expense by either (i) a written opinion of legal counsel who shall, and whose legal opinion shall, be reasonably satisfactory to the Company, addressed to the Company, to the effect that the proposed transaction may be effected without registration under the Securities Act; (ii) a "no action" letter from the SEC to the effect that the proposed sale, pledge, or transfer of such Restricted Securities without registration will not result in a recommendation by the staff of the SEC that action be taken with respect thereto; or (iii) any other evidence reasonably satisfactory to counsel to the Company to the effect that the proposed sale, pledge, or transfer of the Restricted Securities may be effected without registration under the Securities Act, whereupon the Holder of such Restricted Securities shall be entitled to sell, pledge, or transfer such Restricted Securities in accordance with the terms of the notice given by the Holder to the Company. The Company will not require such a notice, legal opinion or "no action" letter (x) in any transaction in compliance with SEC Rule 144; or (y) in any transaction in which such Holder distributes Restricted Securities to an Affiliate of such Holder for no consideration; <u>provided</u> that with respect to transfers under the foregoing clause (y), each transferee agrees in writing to be subject to the terms of this <u>Section 2.12</u>. Each certificate, instrument, or book entry representing the Restricted Securities transferred as above provided shall be notated with, except if such transfer is made pursuant to SEC Rule 144, the appropriate restrictive legend set forth in <u>Section 2.12(b)</u>, except that such certificate, instrument, or book entry shall not be notated with such restrictive legend if, in the opinion of counsel for such Holder and the Company, such legend is not required in order to establish compliance with any provisions of the Securities Act and the Company will use commercially reasonable efforts to cause any such legend to be removed.

2.13    <u>Termination and Suspension of Registration Rights</u>.

(a)    The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to <u>Section 2.1</u> or <u>2.2</u> shall terminate, as to such Holder, upon [the earliest to occur of]:

(i)    [the closing of a Deemed Liquidation Event [in which (x) the consideration received by the Investors in such Deemed Liquidation Event is in the form of cash and/or publicly traded securities, or (y) if the Investors receive registration rights from the acquiring company or other successor to the Company reasonably comparable to those set forth in this <u>Section 2</u>]; [and]]

(ii)    [such time after consummation of an IPO [or Direct Listing, whichever is earlier], when the Holder (A) together with its "affiliates" (as determined under SEC Rule 144) holds less than 1% of the outstanding capital stock of the Company and (B) may immediately sell all of the Holder's Registrable Securities under SEC Rule 144 without volume limitation, or another similar exemption under the Securities Act is available for the sale of all of such Holder's shares without limitation, during a three-month period without registration]; [and]][36]

(iii)    the [third to fifth] anniversary of the IPO[ or Direct Listing, as applicable][, or such later date that is 180 days following the expiration of all deferrals of the Company's obligations pursuant to <u>Section 2</u> that remain in effect as of such anniversary].

(b)    The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to <u>Section 2.1</u> or <u>2.2</u> shall be suspended during any time as such Holder is a Sanctioned Party.

3.    <u>Information [and Observer] Rights</u>.

Last Updated October 2024

3.1    <u>Delivery of Financial Statements</u>.

(a)    The Company shall deliver to each Major Investor[30][, <u>provided</u> that such Major Investor is not a Competitor][31]:

(i)    as soon as practicable, but in any event within 180[32] days after the end of each fiscal year of the Company (A) a balance sheet as of the end of such year, (B) statements of income and of cash flows for such year[, and a comparison between (x) the actual amounts as of and for such fiscal year and (y) the comparable amounts for the prior year and as included in the Approved Annual Budget (as defined below) for such year, with an explanation of any material differences between such amounts and a schedule as to the sources and applications of funds for such year], and (C) a statement of stockholders' equity as of the end of such year, all such financial statements prepared in accordance with GAAP [and audited and certified by independent public accountants of [nationally][regionally] recognized standing selected by the Company];[33]

(ii)    as soon as practicable, but in any event within 45 days after the end of each quarter of each fiscal year of the Company, unaudited statements of income and cash flows for such fiscal quarter, and an unaudited balance sheet [and a statement of stockholders' equity] as of the end of such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements may (A) be subject to normal year-end audit adjustments; and (B) not contain all notes thereto that may be required in accordance with GAAP);

(iii)    as soon as practicable, but in any event within 45 days after the end of each quarter of each fiscal year of the Company, a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the Common Stock issuable upon conversion or exercise of any outstanding securities convertible or exercisable for Common Stock and the exchange ratio or exercise price applicable thereto, and the number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Major Investors to calculate their respective percentage equity ownership in the Company;

(iv)    [as soon as practicable, but in any event within 30 days after the end of each month, an unaudited income statement [and statement of cash flows] for such month, and an unaudited balance sheet [and statement of stockholders' equity] as of the end of such month, all prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments and (ii) not contain all notes thereto that may be required in accordance with GAAP);]

(v)    as soon as practicable, the Company's Approved Annual Budget.

---

[30]    ***Revised October 2024*** The share ownership minimum for receiving financial information is negotiable, but is often the same as the Major Investor threshold or, alternatively, set at the holdings of the smallest venture capital investor even if not a Major Investor. It should be set high enough to avoid burdensome disclosure requirements on the Company, but low enough to provide investors with information if they really need it.

[31]    ***New October 2024*** See <u>footnote 2</u>; if no Major Investor can be a Competitor, consider removing the bracketed language or lower-casing the "c".

[32]    If the financial statements will not be audited, consider a shorter time frame, *e.g.*, 120 days.

[33]    Consider the Company's stage of development, costs, and timing associated with audited financial statements as well as the use of nationally vs. regionally recognized accountants. Further, as a practical matter, "nationally recognized" accounting firms may not readily accept engagements by early stage companies.

(b)    The Company shall[, at least 30 days before the end of each fiscal year,]³⁴ prepare an annual budget and business plan for the next fiscal year, prepared on a monthly basis, including balance sheets, income statements, and statements of cash flow for such months (the "**Budget**"). The Company shall submit the Budget to the Board of Directors for approval and the Budget, as may be revised by the Board of Directors, shall be approved by the Board of Directors ("**Approved Annual Budget**").

(c)    If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

(d)    If reasonably requested by a Major Investor, the Company shall provide the information required by, or reasonably requested pursuant to, this Section 3.1 to such Major Investor by uploading the information to a portfolio management platform.

(e)    Notwithstanding anything else in this Section 3.1 to the contrary, the Company may cease providing the information set forth in this Section 3.1 during the period starting with the date [30-60] days before the Company's good-faith estimate of the date of filing of a registration statement if it reasonably concludes it must do so to comply with the SEC rules applicable to such registration statement and related offering; provided that the Company's covenants under this Section 3.1 shall be reinstated at such time as the Company is no longer actively employing its commercially reasonable efforts to cause such registration statement to become effective.

3.2    Inspection. The Company shall permit each Major Investor [(provided that the Board of Directors has not reasonably determined that such Major Investor is a Competitor)], at such Major Investor's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Major Investor in connection with monitoring or making decisions with respect to its investment in the Company; provided, however, that the Company shall not be obligated pursuant to this Section 3.2 to (a) create any new information or materials or (b) provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

3.3    [Observer Rights.³⁵ As long as [_____] owns not less than [_____] shares of Preferred Stock (as adjusted for stock splits, stock combinations, stock dividends and the like), the Company shall invite a representative of such Investor to attend all meetings of the Board of Directors in a nonvoting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to the Board of Directors [promptly following provision to the directors]; provided, however, that such representative shall agree to hold in confidence all information so provided; and provided further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting would be reasonably likely to adversely affect the attorney-client privilege between the Company

---

³⁴    ***New October 2024*** Frequently the budget is presented to the Board during the next fiscal year; consider adjusting the time frame to be more consistent with the Company's actual practice while still providing the good governance intended by this provision.

³⁵    ***New October 2024*** Sometimes the right to appoint an observer is contained in the management rights or side letter with an investor; care should be taken that the exceptions and terms across investors with similar rights are conformed or, if not, that deviations are intentional.

Last Updated October 2024

and its counsel, result in disclosure of trade secrets or highly confidential information, create a competitive harm or competitive disadvantage, or relates to subject matter in which the Investor may have a conflict of interest[, or if such Investor or its representative is a Competitor].][36] [37]

3.4    <u>Termination of Information [and Observer] Rights</u>. The covenants set forth in <u>Sections 3.1</u>[,][and] <u>3.2</u> [and <u>3.3</u>] shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO [or Direct Listing, as applicable];[38] (ii) with respect to any Investor that is or becomes a Sanctioned Party, for so long as such Investor is a Sanctioned Party; [or] (iii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, [or (iv) upon the closing of a Deemed Liquidation Event, whichever event occurs first; <u>provided</u>, that, with respect to clause (iv), the covenants set forth in <u>Section 3.1</u> shall only terminate if the consideration received by the Investors in such Deemed Liquidation Event is in the form of cash and/or publicly traded securities or if the Investors receive financial information from the acquiring company or other successor to the Company comparable to those set forth in <u>Section 3.1</u>].

3.5    <u>Confidentiality</u>. Each Investor agrees that such Investor will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor or make decisions with respect to its investment in the Company) any confidential information obtained from the Company (including notice of the Company's intention to file a registration statement), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this <u>Section 3.5</u> by such Investor), (b) is or has been independently developed or conceived by such Investor without use of the Company's confidential information, or (c) is or has been made known or disclosed to such Investor by a third party without a breach of any obligation of confidentiality such third party may have to the Company; <u>provided</u>, <u>however</u>, that an Investor may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent reasonably necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Registrable Securities from such Investor, if such prospective purchaser agrees to be bound by the provisions of this <u>Section 3.5</u>;[39] (iii) to any [existing or prospective][40] Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Investor in the ordinary course of business, <u>provided</u> that such Investor informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law, regulation, rule, court order or subpoena,

---

[36]    Note that inclusion of an observer right for a foreign investor is often inconsistent with a passive investment by that foreign investor within the meaning of the CFIUS regulations. Moreover, not only are observer rights "inconsistent with a passive investment," affording a foreign investor observer rights can trigger CFIUS jurisdiction even if CFIUS were to find that the investor did not control the Company (*i.e.*, observer rights are expressly identified as among the rights that can trigger CFIUS jurisdiction). This issue is frequently dealt with in a side letter providing that, notwithstanding anything to the contrary in the financing documents, the foreign investor will not get a board observer, among other rights.

[37]    ***Revised October 2024*** If the party with a right to an observer is a strategic (vs. traditional venture) investor, consider whether there are other appropriate limitations.

[38]    Because the Company will be a reporting company under the Exchange Act following any registered public offering, the Company will be required to limit information provided to Investors to the information filed with the SEC under the Exchange Act.

[39]    Consider including language to prohibit disclosure of confidential information to any competitor.

[40]    The bracketed language is a (pro-investor) provision intended to give Investors the ability to provide such information to prospective limited partners, members and other investors which may be important to an Investor, though note that companies may be uncomfortable extending the group which has access to their confidential information this far and may prefer to deal with this issue on a case by case basis.

Last Updated October 2024

_provided_ that such Investor promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

3.6    [Limitation on Foreign Person Investors. Notwithstanding the covenants set forth in Sections 3.1 and 3.2, the Company shall not provide any Investor that is a Foreign Person access to any "material non-public technical information" within the meaning of the DPA.][41]

3.7    [Waiver of Statutory Information Rights.

(a)    Each Investor hereby acknowledges and agrees that until the consummation of the [earlier of the ]IPO[ or Direct Listing, as applicable], such Investor shall hereby be deemed to have unconditionally and irrevocably, to the fullest extent permitted by law, on behalf of such Investor and all beneficial owners of the shares of Common Stock or Preferred Stock owned by such Investor (a "**Beneficial Owner**"), waived, and does hereby so waive, any rights such Investor or a Beneficial Owner might otherwise have had under Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law) to inspect for any proper purpose and to make copies and extracts from the Company's stock ledger, a list of its stockholders and its other books and records or the books and records of any subsidiary. This waiver applies only in such Investor's capacity as a stockholder and does not affect any other information and inspection rights such Investor may expressly have pursuant to Sections 3.1, 3.2, or 3.7(b) of this Agreement. Each Investor hereby further warrants and represents that such Investor has reviewed this waiver with its legal counsel, and that such Investor knowingly and voluntarily waives its rights as a stockholder otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law).

(b)    Within 15 days after request by any Investor that is not a Major Investor (but no more frequently than once per each quarter of each fiscal year of the Company), the Company shall deliver to such requesting Investor a statement showing the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the Common Stock issuable upon conversion or exercise of any outstanding securities convertible or exercisable for Common Stock and the exchange ratio or exercise price applicable thereto, and the number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the relevant Investors to calculate its respective percentage equity ownership in the Company.][42]

---

[41]    Inclusion of this limitation is appropriate in cases in which there is a foreign person investing into the Company but that investor intends to avoid obtaining any rights that might trigger CFIUS intervention. In such cases, depending on the nature of the U.S. business, the foreign investor may need to avoid obtaining access to any "material non-public technical information," which in turn may restrict certain types of information sharing contemplated under the sections addressing information and inspection rights, above. However, these limitations should not impact the foreign investor's ability to obtain financial information about the performance of the U.S. business. As a practical matter, as it may be unclear what constitutes "material nonpublic technical information," so it may be preferable in some cases to expressly provide that a foreign investor will be limited to receiving financial information regarding the performance of the Company.

[42]    The Company and the Investors may desire to have the Company's stockholders waive statutory rights to information about the Company as provided in Section 3.7(a). If including this provision, consider whether waivers should be obtained from stockholders who are not party to this agreement. Such a waiver would need to be included in a contract between the Company and the applicable stockholders (_e.g._, option documents, founder stock purchase agreements, etc.), and will not be effective when included in the Company's bylaws or charter. Section 3.7(b) has been added to address the need for smaller investors to need to understand their relative holdings despite the 220 waiver.

Last Updated October 2024

4.    Rights to Future Stock Issuances.

    4.1    Right of First Offer. Subject to the terms and conditions of this Section 4.1 and applicable securities laws, if the Company proposes to offer or sell any New Securities, the Company shall first offer such New Securities to each Major Investor.[43] A Major Investor shall be entitled to apportion the right of first offer hereby granted to it in such proportions as it deems appropriate, among (i) itself, (ii) its Affiliates and (iii) its beneficial interest holders, such as limited partners, members or any other Person having "beneficial ownership," as such term is defined in Rule 13d-3 promulgated under the Exchange Act, of such Major Investor ("**Investor Beneficial Owners**"); provided that each such Affiliate or Investor Beneficial Owner (x) is not a Competitor [or FOIA Party], unless such party's purchase of New Securities is otherwise consented to by the Board of Directors, and (y) enters into this Agreement and the [Amended and Restated] Voting Agreement of even date herewith among the Company, the Investors and the other parties named therein, as amended and/or restated from time to time (the "**Voting Agreement**"), as an "**Investor**" under each such agreement (provided that any Competitor [or FOIA Party] shall not be entitled to any rights as a Major Investor under Sections 3.1, 3.2 and 4.1 hereof) [and provided that the Company shall not be obligated to offer or sell any New Securities to any person or entity that is a Sanctioned Party].

        (a)    The Company shall give notice (the "**Offer Notice**") to each Major Investor, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.

        (b)    By notification to the Company within 20 days after the Offer Notice is given, each Major Investor may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that (x) the Common Stock then held by such Major Investor (including all shares of Common Stock then issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held by such Major Investor) bears to (y) the total Common Stock of the Company [then outstanding (assuming full conversion and/or exercise, as applicable, of all Preferred Stock and any other Derivative Securities then outstanding).[44] At the expiration of such 20 day period, the Company shall promptly notify each Major Investor that elects to purchase or acquire all the shares available to it (each, a "**Fully Exercising Investor**") of any other Major Investor's failure to do likewise. During the ten-day period commencing after the Company has given such notice, each Fully Exercising Investor may, by giving notice to the Company, elect to purchase or acquire, in addition to the number of shares specified above, up to that portion of the New Securities for which Major Investors were entitled to subscribe but that were not subscribed for by the Major Investors which is equal to the proportion that the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of Preferred Stock and any other Derivative Securities then held, by such Fully Exercising Investor bears to the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held, by all Fully Exercising

---

[43]    ***Revised October 2024*** Most often, this right is provided to only a few select investors (usually the Major Investors) to avoid unduly complicating subsequent financing rounds; revise appropriately if the terms of the transaction provide this right to all Investors (or some other subset of investors other than Major Investors).

[44]    ***Revised October 2024*** The definition of this pro rata participation concept can be subject to negotiation, this model uses the most common formulation. If it is intended that 100% of the New Securities be subject to the right of first offer such that, if fully exercised, the right of first offer would result in 100% of the New Securities being sold to the investors holding these rights, the following should replace the denominator in clause (y) of the above formulation: "(y) then held by all the Major Investors (including all shares of Common Stock issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held by all the Major Investors." In practice, the New Securities are often allocated by negotiation, with the specific pro rata right set forth here being waived, but the Investors' entitlement to these rights is considered a key term, and provides them with negotiating position in future financings.

Investors who wish to purchase such unsubscribed shares.[45] The closing of any sale pursuant to this <u>Section 4.1(b)</u> shall occur within the later of [90-120] days of the date that the Offer Notice is given and the date of initial sale of New Securities pursuant to <u>Section 4.1(c)</u>.

(c)     If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired as provided in <u>Section 4.1(b)</u>, the Company may, during the [90-120] day period following the expiration of the periods provided in <u>Section 4.1(b)</u>, offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons at a price no less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice. If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within [30] days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to the Major Investors in accordance with this <u>Section 4.1</u>.

(d)     The right of first offer in this <u>Section 4.1</u> shall not be applicable to[46] (i) Exempted Securities (as defined in the Certificate of Incorporation); [and] (ii) shares of Common Stock issued in the IPO[; and (iii) the issuance of shares of Preferred Stock pursuant to the Purchase Agreement].

(e)     [The right of first offer set forth in this <u>Section 4.1</u> shall terminate with respect to any Major Investor who fails to purchase, in any transaction subject to this <u>Section 4.1</u>, all of such Major Investor's pro rata amount of the New Securities allocated (or, if less than such Major Investor's pro rata amount is offered by the Company, such lesser amount so offered) to such Major Investor pursuant to this <u>Section 4.1</u>. Following any such termination, such Investor shall no longer be deemed a "**Major Investor**" for any purpose of this <u>Section 4.1</u>]

(f)     [Notwithstanding any provision hereof to the contrary, in lieu of complying with the provisions of this <u>Section 4.1</u>, the Company may elect to give notice to the Major Investors within 30 days after the issuance of New Securities. Such notice shall describe the type, price, and terms of the New Securities. Each Major Investor shall have 20 days from the date notice is given to elect to purchase up to the number of New Securities that would, if purchased by such Major Investor, maintain such Major Investor's percentage ownership position, calculated as set forth in <u>Section 4.1(b)</u> before giving effect to the issuance of such New Securities.][47]

4.2     <u>Termination</u>. The covenants set forth in <u>Section 4.1</u> shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO[ or Direct Listing, as applicable], or (ii) upon the closing of a Deemed Liquidation Event [in which the consideration received by the Investors in such Deemed Liquidation Event is in the form of cash and/or publicly traded securities, or if the Investors receive participation rights from the acquiring company or other successor to the Company reasonably

---

[45]     ***Revised October 2024*** This is commonly referred to as a, "over allotment" provision and allows investors to purchase shares not purchased by other investors entitled to purchase rights. While some companies may resist allowing investors increase their ownership percentage by purchasing shares left behind by other existing investors, this provision is the mainstream approach and rarely negotiated.

[46]     These provisions should generally be consistent with the carve-outs to antidilution protection contained in the Certificate of Incorporation. However, additional exclusions may be negotiated, and more Company flexibility may be afforded here than in the similar antidilution carve-outs in the Certificate of Incorporation since, as a practical matter, it may be appropriate for preemptive rights not to apply to certain issuances as to which it may still be appropriate to give effect to the resulting conversion price adjustment if not carved out from antidilution protection.

[47]     If this provision is included in the Agreement, careful attention should be paid to the denominator used in the calculation of the pro rata participation right. Note that this language will not work if <u>Section 4.1</u> has been set up to give investors a preemptive right to purchase all shares offered.

Last Updated October 2024

comparable to those set forth in this Section 4] whichever event occurs first [and, as to each Major Investor, in accordance with Section 4.1(e)].

5.    Additional Covenants. [48]

5.1    Insurance. The Company [shall obtain, within 90 days of the date hereof, from financially sound and reputable insurers, Directors and Officers liability insurance [and term "key person" insurance on [_____], each] in an amount [not less than $_____] and on terms and conditions approved by the Board of Directors and] will use commercially reasonable efforts to cause such insurance policies to be maintained until such time as the Board of Directors determines that such insurance should be discontinued. [The key person policy shall name the Company as loss payee]. No such policy shall be cancelable by the Company without prior approval by the Board of Directors. [Notwithstanding any other provision of this Section 5.1 to the contrary, during such time(s) as one or more directors elected by holders of one or more series of Preferred Stock is serving on the Board of Directors, the Company shall upon request from any such holder deliver to each such holder a certification that such a Directors and Officers liability insurance policy remains in effect.][49]

5.2    Employee Agreements. Unless otherwise approved by the Board of Directors, the Company (a) will cause each Person now or hereafter employed by it or by any subsidiary (or engaged by the Company or any subsidiary as a consultant/independent contractor) with access to confidential information and/or trade secrets to enter into a nondisclosure, proprietary rights assignment agreement[ and, to the extent legally permissible, non-competition and non-solicitation agreement]; [and] (b) shall not amend, modify, terminate, waive, or otherwise alter, in whole or in part, any of the above-referenced agreements or any restricted stock agreement between the Company and any employee[.][; and (c) shall not enter into or give effect to any severance plan, arrangement, agreement, or obligation that may result in payments by the Company of over $[200,000] to any individual].[50]

5.3    [Qualified Small Business Stock. The Company shall use commercially reasonable efforts to refrain from taking any action that could reasonably be expected to cause the shares of [[Series A] Preferred Stock [originally issued by the Company to the Investors]][51], as well as any shares into which such shares are converted, within the meaning of Section 1202(f) of the Internal Revenue Code (the "**Code**"), to fail to qualify as "qualified small business stock" as defined in Section 1202(c) of the Code; provided, however, that such requirement shall not be applicable if the Board of Directors determines, in its good-faith business judgment, that such qualification is inconsistent with the best interests of the Company. The Company shall submit to the Investors and to the Internal Revenue Service any reports that may be required under Section 1202(d)(1)(C) of the Code. In addition, within 20 business days after any Investor's written request therefor, the Company shall deliver to such Investor a checklist in substantially the same form as Annex 1. The Company shall use commercially reasonable efforts to ensure the accuracy of any such checklist, but in no event shall the Company be liable to the Investors or any other person for

---

[48] ***New October 2024*** A number of provisions that previously were in this Section 5 are now in the model Certificate of Incorporation.

[49]    Key person insurance does not necessarily make sense for every company. A benefit of key person insurance is that, if done correctly, the proceeds payable are not taxable income to the Company. Notice to and consent by the key person is typically required in order to obtain the favorable tax treatment; be sure such consent is obtained. Discuss with the Company's insurance broker.

[50] [50]    ***New October 2024*** This suite of covenants is intended to mirror good governance constructs, and not to indicate a shift in practice.

[51]    If this agreement is being implemented as an additional series of preferred is being issued, tailor the QSBS covenant to include only those series as to which it should reasonably apply.

Last Updated October 2024

any damages arising from any errors or inaccuracies in such report or checklist, unless made by the Company in a manner either grossly negligent or fraudulent.]

5.4     [Board Attendance Expenses. The Company shall reimburse the directors for all reasonable out-of-pocket travel expenses incurred (consistent with the Company's travel policy) in connection with attending meetings of the Board of Directors.]

5.5     Successor Indemnification. If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of members of the Board of Directors as in effect immediately before such transaction, whether such obligations are contained in the Company's Bylaws, the Certificate of Incorporation, or elsewhere, as the case may be.

5.6     [Expenses of Counsel and Transaction Assistance in [an IPO and] Sale of the Company.[52]

(a)     Expense Reimbursement. In the event of [an IPO or] a transaction that is a Sale of the Company (as defined in the Voting Agreement of even date herewith among the Investors, the Company and the other parties named therein) ([each,] a "**Reimbursed Transaction**"), the reasonable fees and disbursements[, not to exceed $[150,000] in the aggregate,] of one counsel for the Investors ("**Investor Counsel**"), solely in their capacities as stockholders, shall be borne and paid by the Company.

(b)     Sale of the Company. At the outset of considering a transaction, which if consummated would constitute a Sale of the Company, the Company shall obtain the ability to share with the Investor Counsel (and such counsel's clients) and shall share the confidential information (including, without limitation, the initial and all subsequent drafts of memoranda of understanding, letters of intent and other transaction documents and related noncompete, employment, consulting and other compensation agreements and plans) pertaining to and memorializing any of the transactions, which, individually or when aggregated with others, would constitute the Sale of the Company. The Company shall be obligated to share (and cause the Company's counsel and investment bankers to share) such materials when distributed to the Company's executives and/or any one or more of the other parties to such transaction(s).

(c)     [IPO. If in connection with the IPO the underwriters or the Company request the execution of additional agreements pursuant to Section 2.11, the Company shall share (and cause the Company's underwriters or their counsel to share) the form of such agreement with the Investor Counsel no less than [ten] days prior to the deadline for execution such agreement, and in any event, no later than [20] days prior to the first public filing of a registration statement in connection with the IPO. [The Company shall [be obligated][use commercially reasonable efforts] to provide [ten] days' advanced written notice to Investor Counsel of any deadlines for written information that may be required by the Company to be furnished or reviewed by or on behalf of any Holder to be used in connection with the IPO (*e.g.*, information relating to beneficial ownership, director biographies, and summaries of material contracts to which Holder is a party)].]

---

[52]     Investors at times find that their interests are not perfectly aligned with those of management when it comes to the Sale of a Company and/or that the matters of concern to them (*e.g.*, escrow provisions) are not necessarily important to management; providing for separate investor counsel ensures that someone is looking out for their interests at a crucial time. Reimbursement of one investor counsel can also encourage stockholders to coordinate their comments and increase transaction efficiency. In this Model Investors' Rights Agreement, reimbursement of legal expenses in connection with the IPO is also added as an option.

Last Updated October 2024

(d)    Joint Defense/Common Interest Agreement. In the event that Investor Counsel deems it appropriate, in its reasonable discretion, to enter into a joint defense/common interest agreement or other arrangement to enhance the ability of the parties to protect their communications and other reviewed materials under the attorney client privilege, the Company shall, and shall direct its counsel to, execute and deliver to Investor Counsel and its clients such an agreement in form and substance reasonably acceptable to Investor Counsel and the Company's counsel. In the event that one or more of the other party or parties to such transactions require the clients of Investor Counsel to enter into a confidentiality agreement and/or joint defense and/or common interest agreement in order to receive such information, then the Company shall share whatever information can be shared without entry into such agreement and shall, at the same time, in good faith work expeditiously to enable Investor Counsel and its clients to negotiate and enter into the appropriate agreement(s) without undue burden to the clients of Investor Counsel.]

5.7    [Indemnification Matters. The Company hereby acknowledges that one or more of the directors affiliated with one or more Investors ("**Investor Directors**") may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more of the Investors and certain of their Affiliates (collectively, the "**Investor Indemnitors**"). The Company hereby agrees (a) that it is the indemnitor of first resort (*i.e.*, its obligations to any such Investor Director are primary and any obligation of the Investor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Investor Director are secondary), (b) that it shall be required to advance the full amount of expenses incurred by such Investor Director and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement by or on behalf of any such Investor Director to the extent legally permitted and as required by the Certificate of Incorporation or Bylaws of the Company (or any agreement between the Company and such Investor Director), without regard to any rights such Investor Director may have against the Investor Indemnitors, and, (c) that it irrevocably waives, relinquishes and releases the Investor Indemnitors from any and all claims against the Investor Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Investor Indemnitors on behalf of any such Investor Director with respect to any claim for which such Investor Director has sought indemnification from the Company shall affect the foregoing and the Investor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Investor Director against the Company. The Investor Directors and the Investor Indemnitors are intended third-party beneficiaries of this <u>Section 5.7</u> and shall have the right, power and authority to enforce the provisions of this <u>Section 5.7</u> as though they were a party to this Agreement.][53]

5.8    Right to Conduct Activities. The Company hereby agrees and acknowledges that each Investor that is a venture capital fund or other investment fund (together with its Affiliates) (each, a "**Professional Investment Organization**") is a professional investment organization, and as such reviews the business plans and related proprietary information of many enterprises, some of which may compete directly or indirectly with the Company's business (as currently conducted or as currently propose to be conducted). Nothing in this Agreement shall preclude or in any way restrict the Professional Investment Organization from evaluating or purchasing securities, including publicly traded securities, of a particular enterprise, or investing or participating in any particular enterprise whether or not such enterprise has products or services that compete with those of the Company; and the Company hereby agrees that, to the extent permitted under applicable law, no Professional Investment Organization shall be liable to the Company for any claim arising out of, or based upon, (i) the investment by such Professional Investment

---

[53]    This provision, added in the wake of the Delaware Chancery Court's decision in *Levy v. HLI Operating Co.*, 924 A.2d 210 (Del.Ch. 2007), is designed to reinforce the priority of the Company's indemnification of an investor director and to ensure that the investing entity itself is in direct contractual privity with the Company with respect to such priority (in contrast to an indemnification agreement between the Company and the individual director themselves).

Last Updated October 2024

Organization in any entity competitive with the Company, or (ii) actions taken by any partner, officer, employee or other representative of such Professional Investment Organization to assist any such competitive company, whether or not such action was taken as a member of the board of directors of such competitive company or otherwise, and whether or not such action has a detrimental effect on the Company; <u>provided</u>, <u>however</u>, that the foregoing shall not contravene the confidentiality obligations in <u>Section 3.5</u> or otherwise in this Agreement or relieve any director or officer of the Company from any liability associated with such person's fiduciary duties to the Company.

      5.9    [<u>Anti-Harassment Policy</u>. The Company shall, within 60 days following the Closing (as defined in the Purchase Agreement), adopt and thereafter maintain in effect (i) a code of conduct governing appropriate workplace behavior; and (ii) an anti-harassment and discrimination policy prohibiting discrimination and harassment at the Company. Such code of conduct and policy shall be reviewed by the Board of Directors and its adoption shall require the approval of the Board of Directors.][54]

      5.10    [<u>Commitment to Diversity, Equity and Inclusion</u>. The Company shall [use commercially reasonable efforts to adopt within [90] days following the date hereof][ and thereafter] maintain written policies, processes and procedures applicable to the Board of Directors and the Company to promote diversity, equity, inclusion and responsible governance. The Company shall use commercially reasonable efforts to interview at least one person who self-identifies as a member of a currently underrepresented population (*e.g.,* race, gender, ethnicity, sexual orientation or disability) within the Company for each open executive-level employment position and each vacant independent director seat on the Board of Directors, if and when such a seat exists and to the extent permitted by the Voting Agreement.]

      5.11    [<u>FCPA</u>. The Company covenants that it shall not (and shall not permit any of its subsidiaries or Affiliates or any of its or their respective directors, officers, managers, employees, independent contractors, representatives or agents to) promise, authorize or make any payment to, or otherwise contribute any item of value to, directly or indirectly, to any third party, including any Non-U.S. Official (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), in each case, in violation of the FCPA, the U.K. Bribery Act, or any other applicable anti-bribery or anti-corruption law. The Company further covenants that it shall (and shall cause each of its subsidiaries and Affiliates to) cease all of its or their respective known activities, as well as remediate any known actions taken by the Company, its subsidiaries or Affiliates, or any of their respective directors, officers, managers, employees, independent contractors, representatives or agents in violation of the FCPA, the U.K. Bribery Act, or any other applicable anti-bribery or anti-corruption law. The Company further covenants that it shall (and shall cause each of its subsidiaries and Affiliates to) maintain commercially reasonable systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) to provide reasonable assurances regarding compliance with the FCPA, the U.K. Bribery Act, or any other applicable anti-bribery or anti-corruption law. Upon request by a [Major] Investor, the Company agrees to provide responsive information and/or certifications to such [Major] Investor concerning its compliance with applicable anti-corruption laws. The Company shall promptly notify each [Major] Investor if the Company becomes aware of any Enforcement Action (as defined in the Purchase Agreement). The Company shall, and shall cause any direct or indirect subsidiary or entity controlled by it, whether now in existence or formed in the future to make commercially reasonable efforts to comply with the FCPA. The Company shall use its commercially reasonable efforts to cause any direct or indirect subsidiary, whether now in existence or formed in the future, to comply in all material respects with all applicable laws.][55]

---

[54]    NVCA has available on its website model HR policies.

[55]    Because FCPA compliance can be costly and time-consuming, consideration should be given to when and how it may be best implemented at an early-stage company. If including this provision in an early-stage deal, consider making

Last Updated October 2024

5.12    [<u>Investment and Cash Management</u>. The Company shall, within [90] days following the date hereof, adopt an investment policy and cash management policy [prepared in consultation with the Company's tax counsel to ensure compliance with the Company's obligations under <u>Section 5.3</u>] [that shall be reviewed and recommended to the Board of Directors by the Company's Chief Financial Officer or highest-ranking accounting manager and reviewed and subject to approval by the Board of Directors on an [annual] basis] ("**Approved Cash Management Policy**").][56]

5.13    [<u>Cybersecurity</u>. The Company shall, within 180 days following the date of this Agreement, use commercially reasonable efforts to: (a) identify the Company's confidential business information, trade secrets, and any information about identified or identifiable natural persons maintained, disclosed, or otherwise processed by or on behalf of the Company (collectively, "**Protected Data**") and the Company's servers, laptops, desktops, cloud computing, containers, virtual environments, data centers, and/or other Company or vendor systems and applications that process Protected Data, or are used to provide, host or enable the Company's operations or services (collectively, "**Systems**"); (b) restrict access to Protected Data and Systems to those individuals or entities who have a need to access such Protected Data and Systems; (c) conduct a commercially reasonable risk assessment to evaluate the potential risks, vulnerabilities, and threats to Protected Data and Systems; (d) implement and maintain commercially reasonable physical, technical and administrative safeguards designed to protect the security, confidentiality, integrity and availability of all Protected Data and Systems, and (e) provide its applicable employees, agents, and contractors with privacy and security training as determined reasonably necessary by the Company.]

5.14    [<u>Real Property Holding Corporation</u>. Within a reasonable period following (and in any event within 20 days after receipt of) written request by an Investor, the Company shall provide such Investor with a written statement informing such Investor whether such Investor's interest in the Company constitutes a United States real property interest. The Company shall use commercially reasonable efforts to ensure its determination complies with the requirements of Treasury Regulation Section 1.897-2(h)(1) or any successor regulation, and the Company shall provide timely notice to the Internal Revenue Service, in accordance with and to the extent required by Treasury Regulation Section 1.897-2(h)(2) or any successor regulation, that such statement has been made. The Company's obligation to furnish such written statement shall continue notwithstanding the fact that a class of the Company's stock may be regularly traded on an established securities market or the fact that there is no Preferred Stock then outstanding; <u>provided</u>, such obligation shall terminate as to any particular Investor when the Investor no longer owns shares of Preferred Stock or any shares of Common Stock issued upon conversion of Preferred Stock.][57]

5.15    [<u>CFIUS and Foreign Person Limitations</u>.

(a)    Unless otherwise approved by the Board of Directors, the Company will not provide to any Foreign Person any DPA Triggering Rights. No Investor that is a Foreign Person shall be permitted to obtain any DPA Triggering Rights or a voting equity interest in the Company that exceeds

---

specific practical recommendations to the Company regarding measures that the Company should take to establish and maintain FCPA compliance.

[56]    Early-stage startups may find it burdensome to adopt a formal investment and cash management policy, and there is the potential for foot-faults, including related to QSBS status. <u>Section 5.4</u> generally requires the Company to use commercially reasonable efforts to cause shares to qualify as QSBS, which provides some protection against the risk that excess cash or portfolio securities would cause it to fail the QSBS active business requirement. Ultimately this is a tradeoff between investors' interest in QSBS certainty vs. the compliance burden on Company.

[57]    In order to comply with certain U.S. federal income and withholding tax obligations, Investors treated as partnerships for U.S. federal income tax purposes (including many venture capital funds) may need to determine whether their interests in portfolio companies constitute U.S. real property interests.

Last Updated October 2024

10%[58] of the Company's total voting securities pursuant to the Purchase Agreement, <u>Section 4</u> of this Agreement, or otherwise, including by way of any secondary transaction(s), without the approval of the Board of Directors.

---

[58]   If there is a foreign person investing into the Company but that investor intends to avoid obtaining any rights that might trigger CFIUS intervention. In such cases, depending on the nature of the U.S. business, the foreign investor may need to avoid obtaining "control," and in order to do so may need to stay below the CFIUS-designated passivity threshold of 10% of outstanding voting shares. Generally, addition of this limitation would be paired with the addition in <u>Section 3.6,</u> above. Note also that keeping below the 10% threshold is not a panacea, as ownership interests will have to be considered in the balancing test of control rights. In other words, a foreign investor may have 8% of a company's voting stock, but also have other rights that – when combined – constitute control. The list of rights that do not themselves constitute control are referenced in the CFIUS regulations. Limiting an investor's rights to those enumerated rights, and remaining at 10% or less, will in most cases qualify an investment as a "passive" investment not subject to CFIUS jurisdiction.

Last Updated October 2024

(b)    Each Investor covenants that it will notify the Company in advance of permitting any Foreign Person affiliated with Investor, whether affiliated as a limited partner or otherwise, to obtain through Investor any DPA Triggering Rights.][59, 60, 61]

5.16    [Subsidiary Governance.  The Company shall not permit any subsidiary of the Company to take any action without the approval of the Board of Directors of the Company to the extent approval of the Board of Directors of the Company would be required in the event such action was to be taken by the Company itself, including the requisite groups of directors whose approval would be required in the event such action was to be taken by the Company itself.][62]

---

[59]    Inclusion of some or all of this covenant may be appropriate if the Company and some or all of the Investors want to be sure that neither the Company nor any existing investor will sell to a party that may raise CFIUS concerns without advance notification. Because CFIUS has significant flexibility in determining who may be considered a "foreign person" under its regulations, and thus restricting sales to such persons may remove a large number of potential investors, inclusion of these provisions may reduce the marketability of the Company's shares. If the Company or Investors wish to provide the Company additional flexibility to address potential CFIUS requirements as they arise, further provisions could be added to this covenant, e.g.,: "Each Investor acknowledges and agrees that the Company is authorized, without the consent of any Person, including any Investor, to take any action as it determines, in its reasonable and good faith discretion, to be necessary or advisable to comply with the DPA and/or the laws, rules, regulations, directives, or special measures adopted or implemented by CFIUS pursuant to the DPA, which shall include (i) restricting access to facilities, information, and/or materials, including access to facilities, information, and/or materials that the Company may otherwise be required to provide pursuant to Section 3 and/or (ii) limiting or eliminating an Investor's right of first offer pursuant to Section 4." However, a grant of this kind of broad authority to the Company may have inadvertent side effects – e.g., may result in the Company having the right to remove the board seat or observer rights of any Investor who becomes foreign after making its initial investment (e.g., a fund that hires a foreign citizen general partner). Accordingly, parties should be confident that all sides are comfortable with the Company having broad powers to remove investors' rights before including this type of language.

[60]    In addition to concerns about future investors potentially triggering a CFIUS filing, investors may have concerns that the Company might enter into a more highly-controlled or sensitive line of business. If so, an additional covenant could be added to require the Company to notify some or all investors and/or take certain steps to isolate foreign parties. An example covenant follows. Alternative 1 addresses foreign investors who want to be notified as early as possible of the potential restrictions on their participation in future rounds of investment. Alternatives 2 and 3 cover U.S. investors and/or the Company if they want such a change in the Company's products to trigger a pre-existing plan to limit Investors' rights.

[5.16 Critical Technology Matters. If to the Company's knowledge (i) any pre-existing products or services provided by the Company are re-categorized by the U.S. government as a critical technology within the meaning of the DPA, or would reasonably be considered to constitute the design, fabrication, development, testing, production or manufacture of a critical technology after a re-categorization of selected technologies by the U.S. government, or (ii) after execution of the Purchase Agreement, the Company engages in any activity that could reasonably be considered to constitute the design, fabrication, development, testing, production or manufacture of a critical technology within the meaning of the DPA:

Alternative 1: the Company shall promptly notify the [Major] Investors [that are known to the Company to be Foreign Persons] of (i) such change in the categorization of its products, services, or technology or (ii) its engagement in the design, fabrication, development, testing, production or manufacture of a critical technology.

Alternative 2: the Company and the Foreign Person Investors shall promptly enter into a Side Letter[, the form of which is set forth in Exhibit X,] limiting the rights of those Investors to preempt the need for any potential future filing pursuant to the DPA.

Alternative 3: the Company shall exercise its rights pursuant to Section 5.15 above, to remove any pre-existing DPA Triggering Rights held by any Foreign Person Investor.]

[61]    If Company is non-US, consider additional covenants addressing PFIC and CFC tax matters.

[62]    *New October 2024* Depending upon the corporate structure, this may be an important consideration; consider also whether stockholder level approvals are also appropriate.

Last Updated October 2024

63

5.17    <u>Termination of Covenants</u>. The covenants set forth in this <u>Section 5</u>, except for <u>Section[s]</u> <u>5.5</u>[, <u>5.6(a)</u>, and <u>5.7</u>], shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO[ or Direct Listing, as applicable]; (ii) upon a Deemed Liquidation Event, whichever event occurs first; or (iii) with respect to any obligation to an Investor that is or becomes a Sanctioned Party, for so long as such Holder is a Sanctioned Party [; <u>provided</u>, that, with respect to clause (ii), the covenants set forth in <u>Section 5</u> shall only terminate if the consideration received by the Investors in such Deemed Liquidation Event is in the form of cash and/or publicly traded securities or if the acquiring company or other successor to the Company agrees to covenants comparable to those set forth in <u>Section 5</u>].[64]

6.    <u>Miscellaneous</u>.

6.1    <u>Successors and Assigns</u>. The rights under this Agreement may be assigned (but only with all related obligations) by a Holder to a transferee of Registrable Securities that (i) is an Affiliate of a Holder; (ii) is a Holder's Immediate Family Member or trust for the benefit of an individual Holder or one or more of such Holder's Immediate Family Members; or (iii) after such transfer, [holds at least [_____] shares of Registrable Securities (subject to appropriate adjustment for stock splits, stock dividends, combinations, and other recapitalizations)][together with its Affiliates, would be a Major Investor]; <u>provided</u>, <u>however</u>, that (x) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee and the Registrable Securities with respect to which such rights are being transferred; (y) such transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement, including the provisions of <u>Section 2.11</u>; and (z) such assignee is not a Sanctioned Party. For the purposes of determining the number of shares of Registrable Securities held by a transferee, the holdings of a transferee (1) that is an Affiliate or stockholder of a Holder; (2) who is a Holder's Immediate Family Member; or (3) that is a trust for the

---

[63]    ***New October 2024*** It is the consensus of the NVCA drafting committee that it should not be necessary to incorporate formal covenants related to providing information as may be necessary for the Company to comply with the Corporate Transparency Act ("CTA"). Nonetheless, should parties decide to formalize these obligations, the following covenant and associated definitions could be incorporated. The definitions would be slotted into Section 1 in alphabetical order, and the covenant would reside here in Section 5.

*Definitions*:

"**CTA**" means the Corporate Transparency Act, 31 U.S.C §5336, and all rules and regulations promulgated thereunder, as each may be amended or replaced from time to time.

"**FinCEN**" means the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury.

*Covenant*: CTA Compliance. (a) Each Investor will reasonably cooperate with the Company to make available information reasonably necessary (if any) to enable the Company to comply with its reporting obligations (if any) pursuant to the CTA. (b) To the extent permitted by the CTA and authorized by FinCEN, an Investor may provide the Company with the applicable "FinCEN identifier(s)" (as defined in the CTA) in satisfaction of the corresponding information required to be provided pursuant to the preceding sentence. Notwithstanding the foregoing or anything herein to the contrary (except the final proviso of this sentence), in no event shall any Investor be deemed in breach of this Section 5.[__] as a result of, nor be liable to any other party for any damages arising from, (x) any subsequently proven or identified error in the Investor's reasonable and good faith determination with respect to whether information is required to be provided to enable the Company to comply with its reporting obligations or (y) the Investor's failure to provide information, provided that this limitation shall be inapplicable if such Investor willfully fails to provide information reasonably determined in good faith by such Investor required to be provided or such Investor willfully provides false or fraudulent information to the Company.

[64]    Compare to Sections 3.4 and 4.2.

Last Updated October 2024

benefit of an individual Holder or such Holder's Immediate Family Member shall be aggregated together and with those of the transferring Holder; provided further that all transferees who would not qualify individually for assignment of rights shall, as a condition to the applicable transfer, establish a single attorney-in-fact for the purpose of exercising any rights, receiving notices, or taking any action under this Agreement. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

6.2    Governing Law.[65] This Agreement shall be governed by the internal law of the [State of Delaware],[66] without regard to conflict of law principles that would result in the application of any law other than the law of the [State of Delaware].

6.3    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.4    Titles and Subtitles. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5    Notices.

(a)    General. All notices and other communications given or made pursuant to this Agreement shall be in writing (including electronic mail as permitted in this Agreement) and shall be deemed effectively given upon the earlier of actual receipt or (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth on Schedule A [or Schedule B (as applicable)] hereto, or (as to the Company) to the address set forth on the signature page hereto, or in any case to such email address or address as subsequently modified by written notice given in accordance with this Section 6.5. If notice is given to the Company, a copy (which copy shall not constitute notice) shall be sent to [*Company counsel name and address*], and if notice is given to any Investor, a copy (which copy shall not constitute notice) shall also be given to ay "cc" address noted on Schedule A for such Investor.[67]

---

[65]    After choosing the applicable law, the parties should determine whether such law imposes any particular requirements, such as special legends or other notices, in order to make restrictions on transfer of shares effective.

[66]    Some practitioners may select Delaware law as it has historically been the richest source for corporation law precedent. Other practitioners will prefer to choose the (non-Delaware) jurisdiction in which they are admitted to practice, if for no other reason than not having to retain Delaware counsel in the event they are called upon to give an enforceability opinion.

[67]    The model agreement provides that any cc to Investor counsel be listed as set forth in Schedule A, since there is often more than one such counsel and this prevents one cc being replaced with another if different investors in later rounds use different counsel.

Last Updated October 2024

(b)    Consent to Electronic Notice. Each party to this Agreement consents to the delivery of any stockholder notice pursuant to the Delaware General Corporation Law (the "**DGCL**"), as amended or superseded from time to time, by electronic mail pursuant to Section 232 of the DGCL (or any successor thereto) at the electronic mail address set forth below such party's name on the Schedules hereto, as updated from time to time by notice to the Company, or as on the books of the Company. To the extent that any notice given by means of electronic mail is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted electronic notice shall be ineffective and deemed to not have been given. Each party to this Agreement agrees to promptly notify the Company of any change in such stockholder's electronic mail address, and that failure to do so shall not affect the foregoing.

6.6    Amendments and Waivers.[68]

(a)    Any term of this Agreement may be amended, modified or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and the [Requisite Holders]; provided that the Company may in its sole discretion waive compliance with Section 2.12(c) (and the Company's failure to object promptly in writing after notification of a proposed assignment allegedly in violation of Section 2.12(c) shall be deemed to be a waiver); and provided further that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. For the avoidance of doubt, Registrable Securities do not include any shares held by a person or entity that is a Sanctioned Party.

(b)    Notwithstanding in this Agreement to the contrary, (i) this Agreement may not be amended, modified or terminated and the observance of any term hereof may not be waived with respect to any Investor without the written consent of such Investor, unless such amendment, modification, termination, or waiver applies to all Investors in the same fashion [(it being agreed that a waiver of the provisions of Section 4 with respect to a particular transaction shall be deemed to apply to all Investors in the same fashion if such waiver does so by its terms, notwithstanding the fact that certain Investors may nonetheless, by agreement with the Company, purchase securities in such transaction[; provided, however, if, after giving effect to any waiver of Section 4.1 or any provision pertaining to Section 4.1 with respect to a particular transaction, a waiving Major Investor in fact purchases New Securities in such transaction (such Major Investor, a "**Participating Investor**"), the aforementioned waiver shall be deemed to apply to any Major Investor only if that Major Investor has been provided the opportunity to purchase a proportional number of the New Securities in such transaction based on the pro rata purchase right of each Major Investor set forth in Section 4.1, assuming a transaction size determined based upon the amount purchased by the Participating Investor that invested the largest percentage in such transaction])[69]], [provided further that the Company may in its sole discretion waive compliance with any provision of this Agreement if observance of the terms would cause the Company or any Investor to be in violation of applicable Sanctions,] [and] (ii) Sections 3.1, 3.2, and 4 and any other section of this Agreement applicable to the Major Investors (including this clause (b) of this Section 6.6(b)(ii)) may be amended, modified, terminated or waived with only (and only with) the written consent of the Company and the holders of [a majority] of the Registrable Securities then outstanding and held by the Major Investors[, and (iii) no provision that names a specific Investor by

---

[68]    The composition of the stockholder base should be reviewed carefully when setting amendment and waiver thresholds. In general, rights as to each investor group should be separately waivable by that group.

[69]    Note that this parenthetical allows all investors with pro rata rights to vote for a waiver of pro rata rights, including investors who participate in a financing for which such rights are waived. This allows flexibility in structuring future investment rounds, but could result in some investors losing pro rata rights in a round where other investors are participating, and the further included bracketed language allows those investors whose rights were waived a partial opportunity to participate.

Last Updated October 2024

name may be amended or waived with respect to, or terminated pursuant to this Section 6.6 relative to, such Investor without such Investor's written consent][70], [and (iv). this Agreement may not be amended, modified or terminated, and no provision hereof may be waived, in each case, in any way which would adversely affect the rights of the Key Holders hereunder in a manner disproportionate to any adverse effect such amendment, modification, termination or waiver would have on the rights of the Investors hereunder, without also the written consent of the holders of [a majority] of the Registrable Securities held by the Key Holders].

(c)     Further notwithstanding anything in this Agreement to the contrary, <u>Schedule A</u> hereto may be amended by the Company from time to time to add transferees of any Registrable Securities in compliance with the terms of this Agreement without the consent of the other parties; and Schedule A hereto may also be amended by the Company after the date of this Agreement without the consent of the other parties to add information regarding any additional Investor who becomes a party to this Agreement in accordance with Section 6.9.

(d)     The Company shall give prompt written notice of any amendment, modification or termination hereof or waiver hereunder to any party hereto whose rights and/or obligations were affected by such amendment, modification, termination, or waiver and that did not consent in writing to such amendment, modification, termination, or waiver; provided that the failure to provide such notice shall not invalidate any amendment, modification, termination or waiver in accordance with this <u>Section 6.6</u>.

(e)     Any amendment, modification, termination, or waiver effected in accordance with this Section 6.6 shall be binding on all parties hereto, regardless of whether any such party has consented thereto or received notice thereof.

(f)     No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

6.7     <u>Severability</u>. In case any provision contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

6.8     <u>Aggregation of Stock; Apportionment</u>.[71] All shares of Registrable Securities held or acquired by Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such Affiliates may apportion such rights as among themselves in any manner they deem appropriate.

6.9     <u>Additional Investors</u>. Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of Preferred Stock after the date hereof, [pursuant to the Purchase Agreement,][72] any purchaser of such shares of Preferred Stock may become a party to this Agreement by executing and delivering a counterpart signature page to this Agreement, and thereafter shall be deemed an

---

[70]   ***New October 2024*** To be tailored appropriately for specific rights of specific parties; for example, if an investor has an observer right, it is probable that the appliable section should not be terminated pursuant to this Section 6.6 without that Investor's consent.

[71]   See also <u>Section 6.1</u> for special aggregation rule applicable to transferees of Registrable Securities.

[72]   Without this limitation, the other limitations on subsequent registration rights are effectively moot; confirm and conform appropriately.

"Investor" for all purposes hereunder. No action or consent by the Investors shall be required for such joinder to this Agreement by such additional Investor, so long as such additional Investor has agreed in writing to be bound by all of the obligations as an "Investor" hereunder.

6.10    Entire Agreement. [Upon the effectiveness of this Agreement, the Prior Agreement shall be deemed amended and restated and superseded and replaced in its entirety by this Agreement, and shall be of no further force or effect.][73] This Agreement (including the Exhibits and Schedules hereto) together with the other Transaction Agreements (as defined in the Purchase Agreement)[74] constitute the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between or among any of the parties are expressly canceled.

6.11    Dispute Resolution.

[*Alternative 1*: Except as (i) otherwise provided in this Agreement, or (ii) any disputes, controversies, or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, any unresolved dispute, controversy, or claim arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be resolved by arbitration before a single arbitrator.  Such arbitrator shall be mutually agreed upon by the parties, and if no agreement can be reached within 30 days after names of potential arbitrators have been proposed by Judicial Arbitration and Mediation Services, Inc. ("**JAMS**"),[75] then JAMS shall choose one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement. The arbitration shall take place in [*location*], pursuant to the JAMS Comprehensive Arbitration Rules and Procedures [and in accordance with the Expedited Procedures in those Rules] [or pursuant to JAMS' Streamlined Arbitration Rules and Procedures]; provided, however, that there shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to the issues to be arbitrated, (b) depositions of all party witnesses, and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause. Depositions shall be conducted in accordance with the [*state*] Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings.  Judgment on the Award may be entered in any court having jurisdiction.

Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of [_____] or any court of the [State][Commonwealth] of [*state*] having subject matter jurisdiction.][76]

---

[73]    **_Revised October 2024_** The drafter should ensure that the relevant signatories to the current agreement have authority to amend the Prior Agreement under the terms of the Prior Agreement. If the Prior Agreement is terminated rather than amended and restated, you can use the following language instead: "the Prior Agreement shall terminate and be of no further force or effect and shall be superseded and replaced in its entirety by this Agreement." Note, however, that terminating the Prior Agreement will result in parties that were bound by the Prior Agreement and do not sign the new agreement **not** to be bound by the new agreement.

[74]    It may be appropriate to include if there are side letters or other agreements that cover similar aspects.

[75]    Some parties prefer to use the American Arbitration Association ("**AAA**") instead of JAMS.

[76]    Binding arbitration may be less expensive and more efficient than litigating disputes in court. Additionally, it may be more confidential. However, some parties dislike that the result cannot be appealed, and the arbitrator(s) is not bound to follow case law and precedent.

[*Alternative 2*:

The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of [*state*] and to the jurisdiction of the United States District Court for the District of [judicial district] for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of [*state*] or the United States District Court for the District of [*judicial district*], and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of [_____] or any court of the [State][Commonwealth] of [*state*] having subject matter jurisdiction.]

[WITH EITHER ALTERNATIVE][77]

[WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.][78]

---

[77]    If Alternative 1 (arbitration) is being used for dispute resolution, the jury trial waiver language should always be included. If Alternative 2 (court) is being used for dispute resolution, then this provision is optional.

[78]    If the parties select California state court as the forum for any dispute resolution, a jury trial waiver will likely be unenforceable. Instead, the parties can choose to submit to trial by judicial referee, a private person (typically a retired judge) the parties select. All California rules of court, procedure and evidence govern judicial reference proceedings and, unlike with arbitration, the decision may be appealed. Accordingly, if the parties select California state court, and would like to backstop the jury waiver, we recommend including the following provision as a next paragraph:

If the waiver of jury trial set forth in this section is not enforceable, then any claim or cause of action based upon or arising out of this Agreement, the other Transaction Agreements, the securities or the subject matter hereof or thereof shall be settled by judicial reference pursuant to California Code of Civil Procedure Section 638 *et seq.* before a referee sitting without a jury, such referee to be mutually acceptable to the parties. Each party will bear an equal share of the cost for the judicial referee. This paragraph shall not restrict a party from exercising remedies under the Uniform Commercial Code or from exercising pre-judgment remedies under applicable law.

Last Updated October 2024

6.12    <u>Costs of Enforcement</u>. [Each party will bear its own costs in respect of any disputes arising under this Agreement.] [The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.][79]

6.13    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or non-defaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

[*Signature Page Follows*]

---

[79]    Be consistent across agreements.

Last Updated October 2024

IN WITNESS WHEREOF, the parties have executed this [Amended and Restated] Investors' Rights Agreement as of the date first written above.[80]

COMPANY:                          [*Insert Company Name*]

 

By: _____
Name: _____
Title: _____
Address: _____

_____

Email: _____[81]

INVESTORS:                        [*Insert Investor Name*]

 

By: _____
Name: _____
Title: _____

[KEY HOLDERS:                     [*Insert Key Holder Name*]

 

Signature:_____ ]

---

[80] This model agreement provides a simplified/condensed form of signature page, which should be customized as appropriate.

[81] The notice provision provides that notice address for the Company on the signature page and for Investors on <u>Schedule A</u> – accordingly, the Company's notice address/email address need to be on the signature page and the Investors' addresses should only be included in <u>Schedule A</u>.

## **SCHEDULE A**

### **INVESTORS**

Investor Name
Address
Phone Number
Email
[Counsel cc, if any]

Investor Name
Address
Phone Number
Email
[Counsel cc, if any]

Investor Name
Address
Phone Number
Email
[Counsel cc, if any]

<u>**[SCHEDULE B**</u>

**KEY HOLDERS**

[Key Holder Name
Home Address

Home Email]

[Key Holder Name
Home Address
Home Email]

[Key Holder Name
Home Address
Home Email]

]

**Annex 1**

**Qualified Small Business Stock Checklist**

The stockholder(s) named below (the "**Stockholders**") have requested information to assist in their determination of whether the shares of stock of [*Company Name*], a [*State*] corporation (the "**Company**") described below may be entitled to certain tax benefits associated with qualified small business stock (**"QSBS"**) pursuant to Sections 1045 and 1202 of the Code.[82]

Table to be completed by requesting Stockholder

| Stockholder | Class / Type of Stock | Issue Date | Stock Certificate / Issuance Number | Number of Shares |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

Pursuant to <u>Section 5.3</u> of the [Amended and Restated] Investors' Rights Agreement dated [___], the Company hereby provides the following information (the "**Checklist**") with respect to such shares. In no event shall the Company be liable to the Stockholders or any other person for any damages arising from any errors or inaccuracies in this Checklist, unless made by the Company in a manner either grossly negligent or fraudulent. Whether any Stockholder is entitled to tax benefits with respect to the Company's stock must depend on the Stockholder's particular facts and circumstances. Each Stockholder should seek professional tax advice from its tax advisor.

Checklist to be completed by Company

|  | Select one. If neither Yes nor No is checked, check See Appendix and provide further information: | | |
|---|---|---|---|
|  | Yes | No | See Appendix |
| I. "Qualified Small Business" Requirement[83] | | | |
| On each Issue Date, the Company was a domestic C corporation.[84] | ☐ | ☐ | ☐ |

---

[82]    This Checklist is based on the Internal Revenue Code of 1986, as amended, (the "**Code**") and Treasury Regulations thereunder, as of October 2024. Except as otherwise specified, all section references herein are to the Code and all "Treas. Reg. §" references are to the Treasury regulations promulgated or proposed thereunder, respectively, by the U.S. Department of Treasury and the Internal Revenue Service (the "**IRS**"), both as in effect through October 2024.

[83]    Section 1202(c)(1)(A).

[84]    Sections 1202(d)(1) and 1202(c)(2)(A).

4

Checklist Last Updated October 2024

|  | Select one. If neither Yes nor No is checked, check See Appendix and provide further information: | | |
|---|---|---|---|
|  | Yes | No | See Appendix |
| At all times of the Company's existence after August 10, 1993 through the time immediately following the Issue Date, the Company's aggregate gross assets were $50 million or less.[85] <br> ⇨ Aggregate gross assets includes *cash and* the adjusted tax basis of the Company's other property.[86] <br> ⇨ All corporations in the same parent-subsidiary controlled group are treated as one corporation.[87] | ☐ | ☐ | ☐ |
| The Company will comply with any IRS reporting requirements with respect to Section 1202.[88] | ☐ | ☐ | ☐ |
| 2.    "Qualified Trade or Business" Requirement | | | |
| • The Company is engaged in a qualified trade or business. A "qualified trade or business" is any business *other than* (i) any trade or business involving the performance of services in the fields of health, law, engineering, architecture, accounting, actuarial science, performing arts, consulting, athletics, financial services, brokerage services, or any trade or business where the principal asset of such trade or business is the reputation or skill of one or more of its employees; (ii) any banking, insurance, financing, leasing, investing, or similar business; (iii) any farming business (including the business of raising or harvesting trees); (iv) certain natural resource production or extraction businesses; and (v) any business of operating a hotel, motel, restaurant, or similar business.[89] | ☐ | ☐ | ☐ |
| 3.    "Eligible Corporation" Requirement | | | |
| Is the Company an entity *other than* a DISC, a former DISC, a RIC, a REIT, a REMIC, or a cooperative?[90] | ☐ | ☐ | ☐ |
| 4.    "Active Business" Requirement[91] | | | |

---

[85]    Sections 1202(d)(1)(A) and (B).

[86]    Section 1202(d)(2)(A). For purposes of this calculation, the adjusted tax basis is treated as including the fair market value (rather than tax basis) of assets contributed to the Company, determined as of the date of contribution (Section 1202(d)(2)(B)).

[87]    Section 1202(d)(3). A parent-subsidiary controlled group consists of a chain of corporations connected through stock ownership with a common parent, with more than 50% of the stock of each subsidiary (by vote or value) held by another subsidiary or the parent (ignoring certain nonvoting stock that is limited and preferred as to dividends and treasury stock).

[88]    Section 1202(d)(1)(C). As of August 16, 2024, there are no such IRS requirements.

[89]    Section 1202(e)(3).

[90]    Section 1202(e)(4). Corporations with respect to which an election under former Section 936 was in effect (or corporations with such subsidiaries) and corporations that were FASITs also are not "eligible corporations."

[91]    Section 1202(c)(2)(A).

Checklist Last Updated October 2024

| | Select one. If neither Yes nor No is checked, check See Appendix and provide further information: | | |
|---|---|---|---|
| | Yes | No | See Appendix |
| For substantially all of the Stockholder's holding period, at least 80% of the value of the Company's assets were used in the conduct of one or more "qualified trades or businesses"?[92]<br>=>     For this purpose, any assets which are held (i) as part of the reasonably required working capital needs of a qualified trade or business of the Company, or (ii) for investment and are reasonably expected to be used within two years to finance research and experimentation in a qualified trade or business or increases in the working capital needs of a qualified trade or business shall be treated as used in the active conduct of a qualified trade or business. However, after the Company has been in existence for at least two years, no more than 50% of the Company's assets can qualify as used in the active conduct of a qualified trade or business by reason of this rule.[93] | ☐ | ☐ | ☐ |
| For substantially all of the Stockholder's holding period, no more than 10% of the value of the Company's assets (in excess of liabilities) consisted of "portfolio stock"?[94] | ☐ | ☐ | ☐ |
| For substantially all of the Stockholder's holding period, no more than 10% of the total value of the Company's assets consisted of real property not being used in the active conduct of a qualified business?[95] | ☐ | ☐ | ☐ |
| • *If the answer to the preceding bullets under this Item #4 are yes, disregard this bullet.* The Company is a "specialized small business investment company" licensed to operate under Section 301(d) of the Small Business Act of 1958?[96] | ☐ | ☐ | ☐ |

| 5.      Redemption Analysis |
|---|

---

[92]    Section 1202(e)(1). The term "qualified trade or business" means any trade or business *other than* the businesses described in item #2. Stock and debt in any subsidiary corporation (as defined in <u>footnote 94</u>) are disregarded and the parent is deemed to own its ratable share of the subsidiary's assets, and to conduct its ratable share of the subsidiary's activities (Section 1202(e)(5)(A)). Rights to computer software which produce active business computer software royalties (within the meaning of Section 543(d)(1)) are treated as an asset used in the active conduct of a trade or business (Section 1202(e)(8)).

[93]    Section 1202(e)(6).

[94]    Section 1202(e)(5)(B). "Portfolio stock" is stock or securities in corporations that are not subsidiaries of the Company. A corporation is considered a "subsidiary" if the parent owns more than 50% of the combined voting power of all classes of stock entitled to vote, or more than 50% of the value of all outstanding stock, of the corporation (Section 1202(e)(5)(C)).

[95]    Section 1202(e)(7). The ownership of, dealing in, or renting of real property is not treated as the active conduct of a qualified trade or business.

[96]    Section 1202(c)(2)(B).

Checklist Last Updated October 2024

| | | | |
|---|---|---|---|
| • The Company has not redeemed stock from the Stockholder or, to the Company's knowledge, any related party (within the meaning of Sections 267(b) or 707(b) of the Stockholder) at any time during the four-year period beginning on the date two years before the Issue Date of the stock in question, other than *de minimis* redemptions and certain disregarded redemptions?[97] | ☐ | ☐ | ☐ |
| • The Company has not redeemed stock during the two-year period beginning on the date one year before the Issue Date with an aggregate value (as of the time of the redemption) exceeding 5% of the aggregate value of all the Company's stock as of the beginning of such two-year period, other than *de minimis* redemptions and certain disregarded redemptions?[98] | ☐ | ☐ | ☐ |

IN WITNESS WHEREOF, the Company has provided this Checklist on [*Date checklist is being delivered*].

[Company Name]

By: _____

Name: _____

Title: _____

---

[97]    Section 1202(c)(3)(A). Redemptions exceed the *de minimis* exception only if the aggregate amount paid for the stock exceeds $10,000 **and** more than 2% of the stock held by the Stockholder and related parties, by value. Treas. Reg. § 1.1202-2(a)(2). Redemptions are disregarded if they are incident to the termination of services (where such redeemed stock was acquired by an employee or director in connection with the performance of services), death, disability or mental incapacity, or divorce. Treas. Reg. § 1.1202-2(d).

[98]    Section 1202(c)(3)(B). Redemptions exceed the *de minimis* exception only if the aggregate amount paid for the stock exceeds $10,000 **and** more than 2% of all outstanding stock of the Company, by value. Treas. Reg. § 1.1202-2(b)(2). Redemptions are disregarded if they are incident to the termination of services (where such redeemed stock was acquired by an employee or director in connection with the performance of services), death, disability or mental incapacity, or divorce. Treas. Reg. § 1.1202-2(d).

Checklist Last Updated October 2024

1