1

2

3

4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ELON MUSK, et al.,

                  Plaintiffs,

    v.

SAMUEL ALTMAN, et al.,

                  Defendants.

Case No. 4:24-cv-04722-YGR

**[PROPOSED] ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Date:  January 14, 2025
Time:  2:00 p.m.
Courtroom:  1 – 4th Floor
Judge:  Hon. Yvonne Gonzalez Rogers
Compl. Filed:  August 5, 2024

# [PROPOSED] ORDER

Plaintiffs Elon Musk, Shivon Zilis, and X.AI Corp. ("xAI" and collectively, "Plaintiffs") move for a preliminary injunction against Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, Aestas LLC, Microsoft, Deannah Templeton, and Reid Hoffman, (collectively, "Defendants"), as well as involuntary plaintiff, Rob Bonta, joined in his official capacity as the Attorney General of California (the "Motion").

Having considered all papers filed by the parties in connection with the Motion and the parties' arguments at the hearing on this matter, the Motion is DENIED.

# BACKGROUND

## A.    Factual Background

Altman, Brockman, Ilya Sutskever, and Musk launched OpenAI in 2015 as a laboratory dedicated to researching and developing safe and beneficial artificial general intelligence ("AGI"). *See* First Amended Complaint ("FAC") ¶¶ 82-90, 93. Musk made donations to OpenAI, Inc. in 2016 and 2017, and claims to have made further donations until September 2020. *See id.* ¶ 96. Musk created his own AI development company, X.AI Corp. ("xAI"), in March 2023. *Id.* ¶¶ 9, 12. In July 2023, Musk publicly announced xAI, which now competes directly with OpenAI. *Id.* ¶¶ 226-27. According to public reporting, xAI has become a major player in the highly competitive generative AI industry, raising capital at unprecedented speed and scale.

## B.    Procedural History

On February 29, 2024, Musk sued Altman, Brockman, OpenAI, Inc. and several affiliated entities in California Superior Court, accusing the named defendants of abandoning OpenAI's

mission and violating an alleged "Founding Agreement" with Musk. Wiener Decl., Ex 8. Defendants promptly filed a demurrer. The day before argument on the demurrer, Musk withdrew his lawsuit without explanation. *See id.*, Ex. 10.

Two months later, on August 5, 2024, Musk filed this action. *See* Dkt. No. 1. His original complaint in this court tracked the factual narrative advanced in state court, but featured a longer list of legal theories. OpenAI moved to dismiss all counts on October 8. *See* Dkt. No. 25. Rather than oppose the motion, Musk filed an amended complaint with yet more claims—bringing the total to 26 and adding as defendants Microsoft, former OpenAI director Reid Hoffman, and Microsoft's Deannah Templeton, who for a period served as a non-voting observer to OpenAI's Board. Musk added the California Attorney General as an involuntary plaintiff. *See* Dkt. No. 32. On November 29, 2024, Plaintiffs filed this motion. *See* Dkt. No. 46.

## ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The moving party "must establish" through evidence, not merely allege: "[1] a likelihood of success on the merits, [2] that it will suffer irreparable harm in the absence of injunctive relief, [3] that the balance of the equities tips in its favor, and [4] that the public interest supports relief." *Assurance Wireless USA, L.P.* v. *Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Norbert* v. *City & Cnty. of S.F.*, 10 F.4th 918, 927 (9th Cir. 2021). The Ninth Circuit's "sliding scale" approach requires not just "a merely plausible claim," *Reynolds*, 100 F.4th at 1031, but cognizable evidence "demonstrat[ing] that irreparable injury is *likely* in the absence of an injunction,'" *Herb Reed Enters., LLC* v. *Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).

Plaintiffs seek injunctive relief in connection with four claims: (1) Musk and xAI's claim under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1); (2) Musk and xAI's claim under Section 8 of the Clayton Antitrust Act (15 U.S.C. § 19(a)); (3) Musk's claim for breach of charitable trust (Cal. Bus. & Prof. Code § 17510.8); and (4) Musk and Zilis's derivative claim for self-dealing (Cal. Corp. Code § 5233(a)).

Plaintiffs fail to satisfy their burden of establishing an entitlement to preliminary injunctive relief on any of these claims.

## I. SHERMAN ACT CLAIM

Musk and xAI fail to establish entitlement to injunctive relief on the basis of an asserted violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. They contend that OpenAI engaged in a prohibited "group boycott" by conditioning prospective investors' participation in its October 2024 funding round on their forgoing investment in OpenAI's competitors. *See* Mot. at 5-6. This claim fails on multiple grounds.

### a. Standing

As a threshold matter, Musk and xAI fail to establish constitutional or antitrust standing. Article III standing requires an "injury in fact that is concrete, particularized, and actual or imminent," *City of Oakland* v. *Oakland Raiders*, 20 F.4th 441, 452 (9th Cir. 2021), and that "bears a causal connection to the alleged antitrust violation," *Gerlinger* v. *Amazon.com, Inc.*, 526 F.3d 1253, 1255-56 (9th Cir. 2008). Antitrust plaintiffs must also demonstrate "antitrust standing," which hinges on, among other facts, "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; [and] (3) the speculative measure of the harm." *Oakland Raiders*, 20 F.4th at 455.

Musk and xAI lack standing under these standards because they do not plausibly allege, much less demonstrate, any injury stemming from the purported boycott, the existence of which Defendants have credibly disputed. *See* Declaration of Robert Wu ("Wu Decl.") at ¶¶ 5-7. Plaintiffs assert in the Motion that "Musk has verified that at least one major investor in OpenAI's October 2024 funding round has subsequently declined to invest in xAI." Mot. at 8 (citing FAC ¶ 227). This assertion—which overstates the allegations of the Amended Complaint that are themselves vague—does not show any "concrete," "direct," "particularized," or non-speculative injury to Musk or xAI caused by any alleged anticompetitive conduct. Plaintiffs do not identify even one investor, "major" or otherwise, who has refused to invest in xAI, let alone one who refused as a result of this alleged boycott. Moreover, Plaintiffs' alleged injury is far too indirect and speculative to qualify for antitrust standing. *See Oakland Raiders*, 20 F.4th at 457-60.

### b. Likelihood of Success on the Merits

Musk and xAI do not state a claim under Section 1 of the Sherman Act, let alone establish a likelihood of success on its merits. "To prove an illegal boycott under § 1 . . . [plaintiff] must show (1) an agreement, conspiracy, or combination among two or more entities and (2) that the agreement, conspiracy, or combination was unreasonable." *Paladin Assocs., Inc.* v. *Mont. Power Co.*, 328 F.3d 1145, 1153 (9th Cir. 2003). Plaintiffs establish neither element.

A Section 1 claim requires proof of an "agreement" or "conspiracy" to "restrain trade," rooted in "evidence that tends to exclude the possibility that [] alleged conspirators acted independently." *Stanislaus Food Prods. Co.* v. *USS-POSCO Indus.*, 803 F.3d 1084, 1088-89 (9th Cir. 2015) (cleaned up). Plaintiffs' primary Sherman Act contention is that Microsoft and OpenAI entered into an agreement to restrict OpenAI competitors' access to capital. This contention fails for want of proof. The FAC's lone boycott allegation (¶ 201) does not allege any such agreement, or even mention Microsoft. And the Wu Declaration shows that there was no such agreement. *See* Wu Decl. at ¶¶ 5-7

Plaintiffs also contend that OpenAI secured agreements with investors to restrict competitors' access to capital—a purported "hub-and-spoke group boycott." Mot. at 7. To prevail on this theory, Plaintiffs must demonstrate both the "spokes" and the "rim" of the wheel—that is, agreements between OpenAI and each investor and agreements among the investors to that same effect. *See Honey Bum, LLC* v. *Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023). Plaintiffs have not plausibly alleged, much less demonstrated with evidence, any agreement between OpenAI and any investors to restrict capital, nor any agreements between and among the investors to the same effect. And the Wu Declaration again controverts Plaintiffs' pleading.

To obtain an injunction, Plaintiffs must also establish that OpenAI has engaged in an "unreasonable" restraint of trade. *See Paladin Assoc.*, 328 F.3d at 1153. An unlawful restraint can be established under the "rule of reason" or as a *per se* violation. *Id.* at 1154. Plaintiffs make no effort to show that the alleged "group boycott" violates the "rule of reason," claiming instead that it is illegal *per se*. A group boycott is *per se* unlawful only where its "initiator had no purpose other than disadvantaging the target," such that the alleged restriction is "not justified" by plausible

arguments that it is pro-competitive. *Honey Bum*, 63 F.4th at 820-21. Plaintiffs do not make this showing. Even accepting the unsourced allegations of the FAC, potential pro-competitive justifications are apparent. Among other things, it is beneficial to have a diversity of sophisticated and experienced venture capital firms "meaningfully" (FAC ¶ 201) involved in a new business, as they can provide management and financial expertise. That involvement will be more productive if key investors have access to proprietary information that may be competitively sensitive, which could otherwise be misused to anti-competitive effect if the investing firm is also "meaningfully" involved and invested in a competitor.

Plaintiffs have thus failed to establish a likelihood of success on the merits of their Section 1 claim.

### c. Irreparable Harm

Plaintiffs also fail to demonstrate any threat of "immediate" irreparable harm stemming from the alleged "boycott." There is no evidence to suggest that xAI has been, or will soon be, harmed, much less that its very "existence" is at stake such that any hypothetical harm would be irremediable through money damages. *Am. Passage Media Corp.* v. *Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473-74 (9th Cir. 1985).

## II.    CLAYTON ACT CLAIM

Plaintiffs next assert a violation of Section 8 of the Clayton Act, which provides in relevant part that "[n]o person shall, at the same time, serve as a director or officer in any two corporations" that are "by virtue of their business and location of operation, competitors." 15 U.S.C. § 19(a)(1). Plaintiffs allege that two purported "interlocks" violate Section 8: (1) Defendant Reid Hoffman's simultaneous service as a director on Microsoft's and OpenAI's boards from "March 2018 until March 2023" (Mot. at 10-11; FAC ¶¶ 163 & n.8); and (2) Defendant Deannah Templeton's service as Microsoft's non-voting observer of OpenAI's Board from late 2023 through July 2024 (Mot. at 11; FAC ¶ 168). Plaintiffs' Section 8 claim fails on multiple independent grounds and cannot support injunctive relief.

### a. Mootness and Standing

Because neither Hoffman nor Templeton is currently affiliated with OpenAI's Board in any capacity, there is no live "case[] or controvers[y]" that permits injunctive relief. *Reading Int'l, Inc.* v. *Oaktree Cap. Mgmt. LLC*, 2007 WL 39301, at *17-18 (S.D.N.Y. Jan. 8, 2007). Even if the claim is not moot as a matter of law, to warrant prospective relief, there must "exist[] some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive," *TRW, Inc.* v. *F.T.C.*, 647 F.2d 942, 954 (9th Cir. 1981), and Plaintiffs have made no credible showing that there is a "cognizable danger" of any future Section 8 violations.

Furthermore, Plaintiffs again lack Article III and antitrust standing to assert this claim. *See Bearden* v. *Ballad Health*, 967 F.3d 513, 517-18 (6th Cir. 2020). Plaintiffs claim that Hoffman and Templeton had access to unspecified "competitively sensitive information" and now seek prospective relief to prevent Defendants from "benefiting" from that unidentified information. Mot. at 13-14. Missing from that already conclusory contention is any allegation, much less proof, that xAI or Musk has been or will be harmed in any specific and concrete way.

### b. Likelihood of Success on the Merits

Plaintiffs' Section 8 claim separately cannot sustain their demand for injunctive relief because it is not likely to succeed on the merits. Neither Hoffman's service as an OpenAI director, nor Templeton's role as a board observer, can trigger Section 8 liability. The statute only bars service on multiple boards where the companies qualify as "competitors." 15 U.S.C. § 19(a)(1)(B). Plaintiffs have failed to show that Microsoft and OpenAI were "competitors" while Hoffman served on both boards. They assert that "OpenAI's ChatGPT and Microsoft's Copilot compete against one another in the market for generative AI." Mot. at 10; FAC ¶¶ 204-07, 225. Accepting that as true, it does not establish a Section 8 violation, as Copilot—Microsoft's "flagship" "chatbot" (FAC ¶ 207) was broadly released in March 2023. Thus, on Plaintiffs' theory, Microsoft could at most have qualified as OpenAI's "competitor" during the final days or weeks of Hoffman's tenure in March 2023, when Copilot was first released. Mot. at 10-11; FAC ¶ 163 n.8. And Section 8 contains a safe harbor affording any director whose service becomes unlawful—by virtue of a change in

competitive landscape or otherwise—one year to terminate their overlapping service. *See* 15 U.S.C. § 19(b); *see also TRW, Inc.*, 647 F.2d at 949.

As for Templeton, she was not a "director" of OpenAI, *see* 15 U.S.C. § 19(a)(1)—she was a non-voting "observer." "When the term 'director' is used in reference to a corporation"—as it is in Section 8—"the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance." *In re Kunz*, 489 F.3d 1072, 1077-78 (10th Cir. 2007). That "director" means someone who can "direct" the corporate affairs of the company is further confirmed by the remainder of Section 8's text. The safe harbor provision of part (b) expressly contemplates that the "director" or "officer" covered by Section 8 will "act for such corporation," 19 U.S.C. § 19(b), which Templeton could not do.

### c. Irreparable Harm

Plaintiffs also fail to establish a likelihood of immediately threatened irreparable harm on their Clayton Act claim. They speculate that Hoffman and Templeton may have an "opportunity" to "exploit" some unidentified information (not even Musk's or xAI's information), for some improper purpose, and that doing so could inflict unidentified harms on "promising generative AI startups." Mot. 13. But Plaintiffs do not identify any likely, specific, non-speculative, and immediately-threatened harm to *them*, as they must do to obtain injunctive relief.

## III.    CHARITABLE TRUST CLAIM

Musk seeks an injunction for breach of charitable trust under Cal. Bus. & Prof. Code § 17510.8, which provides that accepting "charitable contributions . . . establishes a charitable trust and a duty on the part of the charity" to use those donations "for the declared charitable purposes for which they are sought." This claim fails for lack of standing and plausible allegations of breach.

### a. Standing

Under California law, only a member, officer, or director of a non-profit, a party "with a reversionary, contractual, or property interest in" the entity's assets, or the Attorney General (or a relator) has standing to sue the non-profit for breach of trust. Cal. Corp. Code § 5142(a)(1)-(5); *Horiike* v. *Humane Soc'y of the U.S.*, 2016 WL 11744969, at *16-17 (C.D. Cal. June 20, 2016). Musk is none of those things: he is not a member, director, or officer of OpenAI, nor does he have

authority to sue on the Attorney General's behalf as a "relator." And his attempt to claim standing on the basis of his alleged "reversionary," "contractual," or (otherwise sufficient) "special interest" in OpenAI's assets, *see* Mot. at 15-16 (quoting *Holt* v. *Coll. of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 754 (1964)), fails as a matter of law.

Musk can identify no express, written condition on the use of his donations, nor any promise that the funds would revert to him (or someone else) if those supposed instructions were not followed. *See Pinkert* v. *Schwab Charitable Fund*, 2021 WL 2476869, at *5-6 (N.D. Cal. June 17, 2021) (no "reversionary interest" standing where charitable donations had "no restriction" on their use, nor were alleged to have been a "conditional donation"); *cf. L.B. Rsch. & Educ. Found.* v. *UCLA Found.*, 130 Cal. App. 4th 171, 179-81 (2005) (express, written agreement that imposed conditions on the permissible uses of donated funds entitled donor to sue either on the basis of a "conditional contract" or on the basis of a "reversionary interest" in the donated funds). He therefore lacks standing to assert this claim.

### b. Likelihood of Success on the Merits

Musk also has not shown likelihood of success in demonstrating a breach. He declares that he "manifested a clear intent that his contributions be managed according to his wishes"—which purportedly included, among other things, that OpenAI open-source all of its technology and neither license it, nor otherwise partner with, a for-profit company, and that OpenAI maintain its current organizational structure in perpetuity. Mot. at 17; *see* FAC ¶¶ 254, 420. But Musk identifies no document, or even a conversation, in which Altman, Brockman, or OpenAI solicited his donations subject to these commitments, or in which they undertook to keep OpenAI's corporate structure permanently unchanged.

### c. Irreparable Harm

Finally, Musk cannot show that he is likely to suffer irreparable harm absent injunctive relief on this claim. *See* Mot. at 17, 22-23. Even if he had standing to bring a claim for misuse of historical donations, money damages could remedy any supposed harm, *see* Cal. Jur. 3d Corporations § 613 (plaintiff can "obtain damages for . . . a breach of a charitable trust"), foreclosing the availability of equitable relief, *Am. Passage Media Corp.*, 750 F.2d at 1473-74.

## IV.    SELF-DEALING CLAIM

As a final basis for injunctive relief, Musk and Zilis rely on their putative derivative claim alleging that Altman has engaged in self-dealing under Cal. Corp. Code § 5233(a). *See* Mot. at 17-21. Plaintiffs lack standing to assert this claim and offer no proof that any self-dealing occurred.

### a.  Standing

Only the following "may bring an action" under the provision Musk and Zilis invoke: (1) "The corporation, or a member asserting the right in the name of the corporation pursuant to Section 5710"; (2) "A director of the corporation"; (3) "An officer of the corporation"; [or] (4) "Any person granted relator status by the Attorney General." § 5233(c)(1)-(4). Musk and Zilis are none of these. Their allegations establish only that they are *former* members and directors of OpenAI, FAC ¶¶ 231-32, and Section 5233 does not confer standing on former directors or members, Cal. Corp. Code § 5233(c)(1)-(2); *see also Turner* v. *Victoria*, 15 Cal. 5th 99, 115 (2023).

Plaintiffs' argument that Cal. Code Corp. § 5710(b)(1) expands standing to former members because it provides that a member-plaintiff must allege that she "was a member at the time of the transaction" fails. § 5710(b)(1). That requirement is in addition to the requirement of Section 5233(c)(1) that the plaintiff be "a member" when the suit is initiated, *i.e.*, requiring that the plaintiff be "a member" at the time of suit (§ 5233(c)(1)) and at the time of the challenged transactions (§ 5710(b)(1)).

Even if former members could sue under Section 5710(b)(1), they would still need to satisfy the requirements of Section 5710(b)(2), which requires the plaintiff to "allege[] in the complaint with particularity" their "efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort"—*i.e.* to make a "demand" on the board. Cal. Corp. Code § 5710(b)(2); *see also* Mot. at 20. Musk and Zilis do not satisfy this requirement, as they do not allege what efforts they made calling on the Board to take any action with respect to Altman's alleged self-dealing, nor do they allege "with particularity" any of their "reasons for not making such effort[s]," Cal. Code Corp. § 5710(b)(2).

### b. Likelihood of Success on the Merits

Injunctive relief is also inappropriate on Plaintiffs' derivative claim for the independent reason that Plaintiffs have made no showing of self-dealing. To establish a likelihood of success on the merits of this claim, Musk and Zilis must adduce facts demonstrating that the challenged transactions qualify as "self-dealing" per the statutory definition, requiring that "the corporation [be] a party" to a transaction "in which one or more of its directors ha[d] a material financial interest *and which* does not meet the requirements" of subsection (d). Cal. Corp. Code § 5233(a) (emphasis added). Section 5223(d) in turn requires, among other things, that the transaction is not one that the "corporation entered into . . . for its own benefit," that is "fair and reasonable," and that has been authorized by disinterested and informed directors. *Id.* § 5233(d)(2). Plaintiffs list OpenAI transactions that allegedly involved entities in which Altman had an interest. But Plaintiffs offer no evidence that the transactions enriched Altman at the expense of OpenAI, that any of the transactions were unfair to the corporation, that disinterested and informed directors did not authorize them, or that they were on anything but market terms. A preliminary injunction cannot issue on this basis.

### c. Irreparable Harm

To obtain injunctive relief, Musk and Zilis must also demonstrate some threat of immediate irreparable injury to the company itself stemming from the alleged "self-dealing" transactions. But the transactions Plaintiffs identify appear to have benefited OpenAI. *See* FAC ¶¶ 137, 139-44. And in any event, Plaintiffs provide no credible basis to believe that any possible harm could not be remedied by money damages.

## V.  BALANCE OF EQUITIES AND THE PUBLIC INTEREST

Plaintiffs' showing on the balance of equities and public interest is equally infirm. Plaintiffs have identified no harm to Musk or xAI should the Court decline to issue an injunction, and the assortment of speculative harms alleged to third parties do not weigh in the balance. *See Stormans, Inc.* v. *Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). Plaintiffs' delay in moving for an injunction likewise weighs against any credible claim of harm. OpenAI, meanwhile, risks serious harm to its business should an injunction issue.

While Plaintiffs argue that an injunction would serve the public interest by "preserv[ing] []
competitive markets," Mot. at 24, courts in this district rightly exercise "extreme caution" when
"judicial intervention in a competitive situation [could] itself upset the balance of market force,"
*California* v. *Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1137 (N.D. Cal. 2001) (cleaned up); *see
also Epic Games, Inc.* v. *Apple Inc.*, 493 F. Supp. 3d 817, 832 (N.D. Cal. 2020). The Court finds
no basis to intervene here.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is DENIED.

1  IT IS SO ORDERED this ___ day of _____, 202_

2

3

4

5                                        _____
                                         HONORABLE YVONNE GONZALEZ ROGERS
6                                        UNITED STATES DISTRICT COURT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28