1  RUSSELL P. COHEN (SBN 213105)
   Russ.cohen@dechert.com
2  HOWARD M. ULLMAN (SBN 206760)
   Howard.ullman@dechert.com
3  DECHERT LLP
   45 Fremont Street, 26th Floor
4  San Francisco, CA 94105
   Telephone: (415) 262-4500
5  Facsimile: (415) 262-45555

6  NISHA PATEL (SBN 281628)
   Nisha.patelgupta@dechert.com
7  DECHERT LLP
   633 West 5th Street, Suite 4900
8  Los Angeles, CA 90071
   Telephone: (213) 808-5700
9  Facsimile: (213) 808-5760

ANDREW J. LEVANDER (admitted *pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

JOHN (JAY) JURATA, JR. (admitted *pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

10 *Attorneys for Defendants Microsoft Corporation,*
   *Reid Hoffman, and Deannah Templeton*

11

12                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
13                         **OAKLAND DIVISION**

14

15  ELON MUSK et al.,                          Case No. 4:24-cv-04722-YGR

16          Plaintiffs,

17      v.                                     **DEFENDANTS MICROSOFT**
                                               **CORPORATION, REID HOFFMAN,**
                                               **AND DEANNAH TEMPLETON'S**
18  SAMUEL ALTMAN, et al.,                     **MEMORANDUM IN OPPOSITION**
                                               **TO PLAINTIFFS' MOTION FOR A**
                                               **PRELIMINARY INJUNCTION**
19          Defendants.

20                                             **Date:        January 14, 2025**
                                               **Time:        2:00 p.m.**
21                                             **Place:       Courtroom 1 (4th Floor)**
                                               **1301 Clay St.**
22                                             **Oakland, CA  94612**

23

24

25

26

27

28

---

## ISSUES TO BE DECIDED

Pursuant to Local Civil Rule 7-4(a)(3), Defendants Microsoft, Hoffman, and Templeton identify the following issues to be decided:

1.  Have Plaintiffs established a likelihood of success on the merits of the (a) Sherman Act Section 1 claim or (b) the Clayton Act Section 8 claim when there was no agreement not to invest (Sherman Act Section 1), there is no board interlock (Clayton Act Section 8), there is no antitrust injury, and Mr. Musk lacks antitrust standing?

2.  Are Plaintiffs likely to suffer irreparable harm in the absence of preliminary relief when they rely on speculative, unsupported assertions of harm?

3.  Do the balance of equities tip in Plaintiffs' favor and is a preliminary injunction in the public interest when the requested injunction would harm Microsoft's customers and the public by jeopardizing access to the software and services on which they rely?

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 4

    A.    GenAI Technology. ................................................................................... 4

    B.    Microsoft's R&D Collaboration with OpenAI Launches GenAI Innovation. ........ 5

    C.    As a Result of the R&D Collaboration, Microsoft Began Offering Software and Services that Incorporate Access to OpenAI's GenAI Models. ..................... 5

    D.    OpenAI Began Offering Software and Services Powered by GenAI, After Which Mr. Hoffman Resigned from the OpenAI Board. ................................ 6

    E.    Many Other Companies, Including Plaintiff X.AI, Also Began Creating GenAI Models and Offering Software and Services Incorporating Those Models. .................................................................................................... 7

    F.    Microsoft Had, For a Limited Time, an OpenAI Board Non-Voting Observer. .................................................................................................. 8

    G.    Microsoft Supports a Vibrant and Competitive GenAI Ecosystem. ....... 8

    H.    OpenAI's October 2024 Funding Round. ................................................ 9

    I.    GenAI Funding Continues to Be Widely Available to Other GenAI Startups, including X.AI. ........................................................................... 9

III.  LEGAL STANDARD ....................................................................................... 10

IV.   ARGUMENT ................................................................................................... 11

    A.    Plaintiffs' Have No Likelihood of Succeeding on their Antitrust Claims. ........... 11

        1.    Plaintiffs' Section 1 claim against Microsoft relating to an alleged "fund no competitors" arrangement is baseless. ..................... 11

            (a)    There is no agreement. ................................................. 11

            (b)    Plaintiffs cannot invoke the per se rule and do not even attempt to make any showing under the Rule of Reason. ............. 13

        2.    Plaintiffs have no likelihood of succeeding against Microsoft, Mr. Hoffman, or Ms. Templeton on a claim that any of them violated Clayton Act Section 8. ......................................................... 15

        3.    Plaintiffs have failed to establish antitrust injury, and Mr. Musk lacks antitrust standing. ...................................................... 18

            (a)    Plaintiffs have not established antitrust injury. ............. 18

            (b)    Mr. Musk lacks antitrust standing. ............................... 20

    B.    Plaintiffs' Remaining State Law Claims Do Not Involve Microsoft. .................. 21

    C.    Plaintiffs Cannot Show Irreparable Harm. ............................................ 21

    D.    The Balance of Equities Tips Sharply in Microsoft's Favor and an Injunction Would Harm the Public Interest. ......................................... 22

V.    CONCLUSION ................................................................................................ 24

- ii -

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)................................................................. 10

*American Passage Media Corp.* v. *Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985)................................................................. 21

*Associated General Contractors of Cal. v. California State Council of Carpenters*,
    459 U.S. 519 (1983) ................................................................. 20

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)................................................................. 19

*Bearden v. Ballad Health*,
    967 F.3d 513 (6th Cir 2020) ................................................................. 19

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................. 12

*Borg-Warner Corp. v. FTC*,
    746 F.2d 108 (2d Cir. 1984)................................................................. 18

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)................................................................. 18

*Colorado River Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985)................................................................. 3, 21, 22

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977)................................................................. 14

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    1990 WL 126500 (D. Ariz. July 25, 1990) ................................................................. 13

*Epic Games, Inc. v. Apple Inc.*,
    493 F. Supp. 3d 817 (N.D. Cal. 2020) ................................................................. 10, 15, 23

*FTC v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020)................................................................. 20

*Garcia* v. *Google*,
    786 F.3d 733 (9th Cir. 2015) (*en banc*) ................................................................. 10

*Goldie's Bookstore, Inc.* v. *Superior Court of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984)................................................................. 21, 22

- iii -

*Good Meat Project v. GOOD Meat, Inc.*,
716 F. Supp. 3d 783 (N.D. Cal. 2024) ................................................................... 21, 22

*Honey Bum, LLC v. Fashion Nova, Inc.*,
63 F.4th 813 (9th Cir. 2023) ................................................................................ 12, 13

*Kendall v. Visa USA, Inc.*,
518 F.3d 1042 (9th Cir. 2008) .............................................................................. 11, 12

*Klor's Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959) ................................................................................................ 14

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ................................................................................................ 13

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980) ............................................................................ 19, 21

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) .................................................................................. 10

*Munaf v. Geren*,
553 U.S. 674 (2008) ................................................................................................ 10

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ............................................................................. 14, 15

*Newman v. Universal Pictures*,
813 F.2d 1519 (9th Cir. 1987), *cert. denied*, 486 U.S. 1059 (1988) ...................... 19

*Northern Pac. R. Co. v. United States*,
356 U.S. 1 (1958) ................................................................................................... 13

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
472 U.S. 284 (1985) ................................................................................................ 15

*Nynex Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) ................................................................................................ 15

*Oakland Tribune, Inc. v. Chronicle Publ'g. Co., Inc.*,
762 F.2d 1374 (9th Cir. 1985) ............................................................................... 21

*Ohio v. American Express Co.*,
585 U.S. 529 (2018) ................................................................................................ 15

*Phototron Corp. v. Eastman Kodak Co.*,
842 F.2d 95 (5th Cir.), *cert. denied*, 486 U.S. 1023 (1988) .................................. 19

*PLS.Com, LLC v. National Ass'n of Realtors*,
32 F. 4th 824 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023) ....................... 14

*Ralph Rosenberg Court Reporters, Inc. v. Fazio*,
    811 F. Supp. 1432 (D. Haw. 1993) ............................................................ 22

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................................... 21

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ..................................................................................... 13

*Stanley* v. *Univ. of S. California*,
    13 F.3d 1313 (9th Cir. 1994) .................................................................... 10

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .................................................................. 23

*The Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) (*en banc*) ................................................. 13

*TRW, Inc. v. FTC*,
    647 F.2d 942 (9th Cir. 1981) .................................................................... 18

*United States v. Brewbaker*,
    87 F.4th 563 (4th Cir. 2023), *cert. denied*, 2024 WL 4743079 (Nov. 12, 2024) ............. 14

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953) .................................................................................. 18

*Vinci v. Waste Mgmt., Inc.*,
    80 F.3d 1372 (9th Cir. 1996), *cert. denied*, 520 U.S. 1119 (1997) ............................ 20

*Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*,
    No. 19-CV-01424-YGR, 2020 WL 95638 (N.D. Cal. Jan. 8, 2020) ...................... 22

*Winter* v. *Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................... 10, 17, 21

**Statutes**

15 U.S.C. § 19(a)(2)(B) ................................................................................ 16

15 U.S.C. § 19(a)(2)(C) ................................................................................ 16

15 U.S.C. § 19(a)(4) ..................................................................................... 16

15 U.S.C. § 19(b) ......................................................................................... 16

Clayton Act ............................................................................................ *passim*

Clayton Act § 8 ...................................................................................... *passim*

DEFENDANTS MICROSOFT CORPORATION, REID HOFFMAN, AND DEANNAH TEMPLETON'S MEM.
IN OPP. TO PLAINTIFFS' MOT. FOR A PRELIMINARY INJUNCTION          4:24-CV-04722-YGR

Clayton Act § 16, 15 U.S.C. § 26 ................................................................................. 18

Cal. Bus. and Prof. Code § 17200 ............................................................................... 18

Sherman Act ....................................................................................................... 2, 3, 11

Sherman Act § 1 ................................................................................................... *passim*

**Court Rules**

Fed. R. Evid. 801, 802 ................................................................................................. 13

1

## I.      **INTRODUCTION**

Microsoft is committed to an innovative, responsible, and competitive AI ecosystem that supports opportunities not only for Microsoft and OpenAI, but also for X.AI and other AI start-ups. The allegations at the heart of Plaintiffs' Motion for Preliminary Injunction ring hollow, and the PI Motion should be denied.

Along with other technology providers, Microsoft plays an important role in supporting today's growing AI ecosystem. It builds supercomputers needed to train generative AI ("GenAI") models like OpenAI's GPT-4. It develops leading GenAI applications like Copilot that empower people and organizations to achieve more. It supports dozens of GenAI developers like Meta, Mistral.AI, Cohere, and others by making their models available on its Azure cloud computing platform. And it provides developers with tools and other services that are essential for responsible, safe, and secure GenAI application development. Ensuring choice in GenAI models is critical for Microsoft's cloud computing business.

Microsoft's partnership with OpenAI has helped spur an entire industry. Large technology companies have responded with their own massive investments to create competing software and services, such as Gemini Agent (Google), LLaMa (Meta), and Bedrock (Amazon). And startups— including Anthropic, Mistral.AI, ***and Plaintiff X.AI***—have raised enormous amounts of investment capital to bring exciting new innovations to market, like Grok (X.AI). Since 2023, close to $50 billion has been invested in GenAI startups, with $10B in new investment capital raised just since October 2024. This swell of investment has led to leapfrogging advances in AI models and a constant stream of innovative new GenAI services, as well as a vibrant, ongoing debate about ensuring its trustworthy, safe, and ethical use.

Plaintiffs ignore this reality. They push the fallacy that OpenAI and Microsoft operate as one to make this thriving marketplace less competitive. But Microsoft and OpenAI are independent companies that each pursue their own strategies and compete vigorously with each other and many others. Their research and development ("R&D") partnership advances GenAI development: Microsoft provides investment capital and groundbreaking, highly customized supercomputers for OpenAI to train its GenAI models and, in return, OpenAI licenses its models as an input into

- 1 -

Microsoft's software and services. So, while Microsoft and OpenAI collaborate on R&D, they *compete* to commercialize those innovations. This type of collaboration by competitors—and competition by collaborators—is common because it benefits consumers. For instance, Tesla (led by Plaintiff Musk) partners with two of its primary competitors, General Motors and Ford, to build a common charging network throughout the United States to encourage electric vehicle adoption. Similarly, Microsoft's partnership with OpenAI has fueled innovation between them and others, launching one of the most promising waves of new technology in a generation.

Despite this, Plaintiffs bring their PI Motion under four claims in their First Amended Complaint ("FAC"). Two of those claims include Microsoft as a Defendant: (1) a Sherman Act Section 1 antitrust claim alleging an agreement between Microsoft and OpenAI not to fund OpenAI's competitors; and (2) a Clayton Act Section 8 claim based on purported anticompetitive Board interlocks (or overlaps), which is the only claim involving Defendants Hoffman and Templeton.[1] The extraordinary remedy Plaintiffs seek would harm countless innocent third-party customers of Microsoft and their customers. For this, the PI Motion rests solely on the threadbare allegations in the FAC and a single attorney declaration. Plaintiffs provide *no* witness declarations, *no* expert reports, and *no* admissible evidence. Based on the well-established four-part test for preliminary injunctive relief, their sweeping request should be denied.

*First*, Plaintiffs have not and cannot show they are likely to succeed on the merits because: (a) there is no agreement in violation of the Sherman Act; (b) there is no board interlock in violation of the Clayton Act; and (c) there is no antitrust injury, negating both claims. Additionally, Plaintiff Musk (the only individual plaintiff for the two claims against Microsoft) lacks the necessary antitrust standing because he is only an individual investor in and director of X.AI.

No agreement (Sherman Act). Plaintiffs offer zero evidence that Microsoft has entered any agreement with OpenAI, or anyone else, to limit investment in any competitors as part of participating in OpenAI's latest round of funding. This is not surprising since no such agreement

---

[1] Plaintiffs do not direct the two state law claims at Microsoft, Hoffman, or Templeton and cannot support any relief as to those defendants (though Microsoft, Hoffman, and Templeton join OpenAI's discussion of why those claims also do not support a preliminary injunction).

exists. Microsoft was never asked to prohibit, never agreed to prohibit, never itself tried to prohibit, and has no interest in prohibiting, investments in competitors of OpenAI. Without evidence of an agreement, Plaintiffs' Sherman Act claim fails. Further, any such (non-existent) agreement would require proof of anticompetitive effects under the Rule of Reason because it would not be the type of horizontal agreement that is *per se* unlawful. Plaintiffs have not come close to clearing this high bar.

No board interlock (Clayton Act). Plaintiffs' claim that Microsoft and OpenAI share interlocking board members is also demonstrably false. Mr. Hoffman and Ms. Templeton had roles with the OpenAI Board that were entirely appropriate, transparent, and consistent with Section 8's rules and exemptions. Mr. Hoffman, a Microsoft director who also was involved with OpenAI since its inception, stepped down from OpenAI's Board immediately after OpenAI began commercializing its groundbreaking ChatGPT chatbot. Ms. Templeton, who was neither a Microsoft director nor officer at the time, was merely a non-voting observer to OpenAI's Board for seven months. She stepped out of the only four Board meetings she attended when the topics turned to OpenAI's commercialization efforts. And when she resigned from that role, Microsoft relinquished its right to reappoint anyone else to that position. Because there is no current board interlock and no possibility of a future interlock, injunctive relief is inappropriate.

No antitrust injury (both claims). Further, Plaintiffs have not established antitrust injury. Plaintiffs have shown neither harm to themselves nor harm to competition. To the contrary, X.AI is thriving. Two months ago, X.AI finished building one of the largest supercomputers in the world—in just over 120 days. Last month, after the alleged agreement that is claimed to have limited investment opportunities, X.AI raised *$6 billion* in equity from 97 investors, bringing its current valuation to $50 billion. Plaintiffs cannot credibly claim harm. And Mr. Musk, as an individual, lacks antitrust standing.

**Second**, Plaintiffs have not shown a threat of irreparable injury. The Ninth Circuit is clear that "speculative injury does not constitute irreparable injury." *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir. 1985). But Plaintiffs' alleged injury for both claims is speculative. There are no concrete facts supporting their allegations that: (a) X.AI and other

- 3 -

unnamed safety-focused startups will lose funding at a pivotal moment, despite the massive sums currently being raised by X.AI and others; (b) OpenAI or Microsoft will obtain an "unfair advantage" through unspecified and unexplained information exchanges; (c) future investments in OpenAI would be difficult to unwind if it accepts additional investors; and (d) assets could be diverted. Additionally, Plaintiffs' Section 8 claim fails to demonstrate imminent harm because it could and should have been brought long ago.

*Third*, the balance of hardships and the public interest weigh heavily against Plaintiffs. The charitable trust claim, though not directed at Microsoft, seeks relief that would cause substantial harm to Microsoft's customers and the public. Microsoft incorporates access to OpenAI's models in its Azure OpenAI services and various consumer and business Microsoft Copilot offerings, including Microsoft 365 Copilot and GitHub Copilot. Any interruption to the technology Microsoft receives under its R&D collaboration with OpenAI would cause substantial disruptions to the millions of third-party developers, business customers, and consumers who rely on those services. Worse, because some of OpenAI's version updates address bugs, safety, or other critical features, Microsoft's customers—including the customers of its customers—could be exposed to security vulnerabilities and the risk of harmful content if unable to obtain future updates. Plaintiffs' exceedingly thin evidentiary showing cannot offset the substantial harm an injunction would cause to the many third parties not before the Court.

Plaintiffs' PI Motion ignores these and other market realities. It lacks merit, fails to meet the exacting standards for a preliminary injunction, and would impose significant harm on third parties. It should be denied.

## II.    STATEMENT OF FACTS

### A.    GenAI Technology.

GenAI is a branch of artificial intelligence that generates new content, *e.g.,* text, images, sound, and music, by inferring patterns from existing data and then using those patterns to produce original outputs. This technology includes language or other foundation models ("models"), which are built using advanced neural networks trained on vast amounts of data to generate human-like responses to natural language queries. Training these models requires immense computational

- 4 -

power, often relying on supercomputers or large-scale cloud computing resources to handle the extensive data processing involved. *See* Deannah Templeton Decl. ¶ 6.

### B. Microsoft's R&D Collaboration with OpenAI Launches GenAI Innovation.

OpenAI was an early mover in GenAI research. However, it lacked funding and the massive computing power necessary to pursue that research. In 2019, Microsoft and OpenAI embarked upon a strategic partnership whereby Microsoft provided funding to OpenAI and agreed to build massive, highly customized supercomputers for OpenAI to develop and train its models. In return, OpenAI agreed to share those models with Microsoft so that Microsoft could create software and services incorporating access to OpenAI's technology. *See* Templeton Decl. ¶ 7.

This collaboration launched a wave of innovation in GenAI R&D and resulted in OpenAI's creation of the GPT-3 model in 2020. In November 2022, OpenAI released ChatGPT, a chatbot based on an improved version of the GPT-3 model. OpenAI made ChatGPT available for free to the public, allowing users to interact with the model. In January 2023, Microsoft invested an additional $10 billion in OpenAI to continue their R&D effort. *See* Templeton Decl. ¶ 8.

### C. As a Result of the R&D Collaboration, Microsoft Began Offering Software and Services that Incorporate Access to OpenAI's GenAI Models.

Starting before the launch of ChatGPT, Microsoft began providing software and services incorporating access to OpenAI's GenAI technologies. These products initially incorporated access to OpenAI's licensed GPT-3 model and subsequently an enhanced GPT-4 model. For instance, in June 2022, Microsoft released GitHub Copilot, a GenAI-powered tool that helps developers write and edit software code with real-time suggestions. *See* Yina Arenas Decl. ¶ 10. In January 2023, Microsoft announced that it was making OpenAI's models available on Azure for use by third-party developers to build their own GenAI-powered software. *See id.* Through this Microsoft service called Azure OpenAI, a third-party developer can incorporate one of OpenAI's models into its own AI applications. Today, thousands of organizations subscribe to and use the Azure OpenAI service. *See id.* ¶ 16.

- 5 -

Since then, Microsoft's Copilot line of GenAI-powered services has expanded, and now includes services used by consumers and businesses for marketing, coding, business development, and information search purposes. *See id.* ¶ 11. This includes Microsoft 365 Copilot, which provides GenAI-powered functionality for its popular productivity apps and services and Copilot Studio, which helps build custom software agents. *See id.* Today, thousands of businesses—and their many employees—use Microsoft 365 Copilot. *See id.* ¶ 16.

> **D.    OpenAI Began Offering Software and Services Powered by GenAI, After Which Mr. Hoffman Resigned from the OpenAI Board.**

Microsoft was not alone in its commercialization efforts. OpenAI seized on the opportunity to provide software and services that also incorporated access to the technology resulting from the R&D collaboration. After its initial free version of ChatGPT, OpenAI launched its first subscription plan for ChatGPT in February 2023, which offered enhanced access and features for a monthly fee.[2] *See* https://openai.com/index/chatgpt-plus/. OpenAI also has released other GenAI offerings, including: (a) DALL-E, a model that generates images from text descriptions; (b) Whisper, an automatic speech recognition system that converts spoken language into text; and (c) advanced versions of the OpenAI API, a service that competes with Microsoft's Azure OpenAI by allowing third party developers to integrate models into their own AI applications. *See* https://openai.com/api/pricing/.

By commercializing their R&D, OpenAI and Microsoft transformed what started as a two-way vertical supply agreement into a competitor collaboration. Today, the companies compete by each offering their own GenAI-powered software and services to customers. At the same time, the companies collaborate, with Microsoft providing cutting-edge supercomputers and related infrastructure for OpenAI's R&D to create continued innovations in GenAI models in return for OpenAI licensing its models to Microsoft. *See* Templeton Decl. ¶ 9.

In March 2023, one month after OpenAI began selling ChatGPT, Defendant Reid Hoffman stepped down from OpenAI's Board. *See* Reid Hoffman Decl. ¶ 5. Mr. Hoffman, who co-founded

---

[2] OpenAI had earlier launched the OpenAI API for developers, but to much less fanfare than ChatGPT.

LinkedIn, had joined Microsoft's Board as an Independent Director in March 2017. *See* Hoffman Decl. ¶ 3. A year later, Mr. Hoffman, who was involved with OpenAI since the beginning, also joined the OpenAI Board in his individual capacity. *See id.* at ¶ 4. During the time he served on both boards, Mr. Hoffman had no role or responsibility at Microsoft relating to GenAI or any other operational issues. *See id.* at ¶ 3.

### E.    Many Other Companies, Including Plaintiff X.AI, Also Began Creating GenAI Models and Offering Software and Services Incorporating Those Models.

Microsoft and OpenAI not only compete with each other. Large companies such as Amazon, Google, Meta, and Oracle have made significant investments to create their own GenAI models, host models developed by others, and market software and services. For instance, in June 2023, Amazon announced a $100 million investment to build and deploy GenAI solutions in Amazon Web Services and has since reported significant boosts in revenue directly tied to these products. *See* Declaration of Howard Ullman Ex. G. Alphabet (Google) has similarly stated that the company's "A.I. infrastructure and generative AI solutions for cloud customers [in 2024] have already generated billions in revenues and are being used by more than 2 million developers." *See* Ullman Decl. Ex. I. To this same end, Meta is investing $10 billion in its largest data center to date, designed to process vast amounts of data to support AI workloads. *See id.* Ex. J. And Oracle now offers its enterprise customers a suite of GenAI services that integrate with essential business applications. *See id.* Ex M.

Big Tech is not alone in investing in GenAI. Newer startups, such as Anthropic and Mistral.AI, have also developed their own GenAI models, tools, and platform services. In fact, investment in GenAI startups this year is on track to exceed the 2023 total of $23 billion. *See* Ullman Decl. Ex. L. Plaintiff X.AI is one such entrant. Mr. Musk announced the launch of X.AI in July 2023. *See id.* Ex H. Four months later, X.AI unveiled "Grok," a GenAI agent integrated with the popular social media platform X. *See id.* And X.AI has grown at a remarkable pace since. For example, X.AI recently built its "Colossus" supercomputer, one of the largest in the world, in just over 120 days. "Colossus" is specifically designed for training language models and other advanced GenAI applications. *See id.* Ex K.

1

**F.      Microsoft Had, For a Limited Time, an OpenAI Board Non-Voting Observer.**

2      In November 2023, Sam Altman, the Chief Executive Officer at OpenAI, was fired and

3  reinstated days later. Mr. Hoffman played no role in Mr. Altman's reinstatement. *See* Hoffman

4  Decl. ¶ 7. After those series of events and given the importance of the ongoing R&D collaboration

5  to Microsoft's business, Microsoft and OpenAI agreed that Deannah Templeton would serve as a

6  non-voting observer to the OpenAI Board. *See* Templeton Decl. ¶ 11. At the time, Ms. Templeton

7  was neither a director nor an officer of Microsoft. *See id.* at ¶¶ 2-3.

8      During her seven-months as a non-voting board observer, Ms. Templeton served with

9  appropriate protections. She attended limited portions of only four OpenAI Board meetings. *See*

10 *id.* at ¶ 13. She did not attend a fifth meeting entirely—at OpenAI's request and to ensure, among

11 other things, that she did not receive any sensitive information regarding OpenAI's

12 commercialization efforts. *See id.* at ¶ 14. In July 2024, Ms. Templeton stepped down from her

13 observer role. *See id.* at ¶ 15. At the same time, Microsoft informed OpenAI that it was

14 relinquishing its right to have an OpenAI Board non-voting observer. *See id.*

15

**G.      Microsoft Supports a Vibrant and Competitive GenAI Ecosystem.**

16      Microsoft has historically supported a broad, competitive, and vibrant GenAI ecosystem.

17 In addition to its R&D collaboration with OpenAI and deployment of Microsoft software and

18 services incorporating access to OpenAI's models, Microsoft makes available a wide array of

19 GenAI models from different providers. *See* Arenas Decl. ¶ 5. On its Azure cloud computing

20 platform, Microsoft hosts models from OpenAI, Meta, Mistral.AI, Cohere, Microsoft, and others.

21 *See id*. In addition, Microsoft makes available a catalog of 1,800 other models, mostly from

22 Hugging Face—a platform with a wide variety of open GenAI models. *See id*. These models from

23 Microsoft, Meta, Cohere, Mistral.AI, and Hugging Face compete with OpenAI, providing a wide

24 array of choices to the many developers that use Azure AI to build their own GenAI applications,

25 products, and services. *See id*.; FAC ¶ 216. Microsoft further supports this vibrant AI ecosystem

26 by offering developers tools and services that can be used in developing applications with these

27 non-OpenAI models. *See* Arenas Decl. at ¶ 6.

28

DEFENDANTS MICROSOFT CORPORATION, REID HOFFMAN, AND DEANNAH TEMPLETON'S MEM.
IN OPP. TO PLAINTIFFS' MOT. FOR A PRELIMINARY INJUNCTION          4:24-CV-04722-YGR

In addition to supporting a competitive GenAI ecosystem, Microsoft is deeply committed to implementing robust security measures, ensuring data privacy, promoting transparency in GenAI operations, and providing tools for fairness and accountability. To this end, Microsoft's Azure AI platform offers tools and services to help developers ensure privacy, security, and safety in the GenAI applications they are developing. *See* Arenas Decl. ¶¶ 4.

**H.      OpenAI's October 2024 Funding Round.**

In October 2024, OpenAI completed its most recent funding round, raising $6.6 billion. *See* Ullman Decl. Ex. E. Microsoft was one of the participants in that funding round. *See id*. The investment round was intended to support OpenAI's ongoing R&D efforts, expand its GenAI capabilities, and accelerate the deployment of its technologies across various industries. *See id*. Ex. D.

In conjunction with that funding round, Microsoft was neither asked nor agreed to prohibit investments in OpenAI's competitors, and Microsoft never attempted to prohibit any such investments. *See* Michael Wetter Decl. ¶¶ 6-8. And because Microsoft is committed to a robust and competitive GenAI ecosystem, Microsoft has no interest in prohibiting investments in competitors to OpenAI. *See id.* at ¶ 9. Thus, even if Microsoft had been asked to make an exclusive investment—and it was not—it would not have agreed. *See id*.

**I.      GenAI Funding Continues to Be Widely Available to Other GenAI Startups, including X.AI.**

Today, the GenAI ecosystem is booming. There are numerous sources of capital, including for X.AI. Venture capital and private equity firms, sovereign wealth funds, family offices, and individual investors are increasingly investing in GenAI. Moreover, large technology developers like Google, Amazon, and Meta have their own substantial capital and do not need third-party resources. *See* Ullman Decl. Ex. F.

Indeed, the industry has continued to experience rapid growth in the two months since OpenAI's October 2024 funding round. In November 2024, shortly before filing its PI Motion, X.AI raised more than ***$6 billion*** in new capital from 97 investors. *See id*. Ex. A. Those investors included three of the largest venture capital and investment funds: Sequoia Capital, Andreesen

- 9 -

Horowitz, and the Qatar Investment Authority. *See id*. Ex. C. The investment round valued X.AI at $50 billion, more than doubling its earlier $24 billion valuation. *See id*. Ex. B. Remarkably, X.AI achieved this valuation after only 16 months, compared to the nine years it took OpenAI to reach that same milestone. *See id*. Ex. C. The investment pool was so saturated that X.AI limited the round to only investors who had previously backed X.AI. *See* Ullman Decl. Ex. B.

## III.   LEGAL STANDARD

A preliminary injunction is an extraordinary and drastic remedy rarely granted. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *see also Epic Games, Inc. v. Apple Inc*., 493 F. Supp. 3d 817, 826 (N.D. Cal. 2020) (similar).

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter* v. *Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Plaintiffs bear the burden of meeting all the *Winter* prongs. A strong showing on the merits factor can offset a weaker showing on the balance of hardships factor, or *vice versa*, so long as a plaintiff establishes all four factors. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). But if the plaintiff shows only "serious questions" as to the merits, he must show that the balance of hardships tips sharply in his favor. *See Epic*, 493 F. Supp. 3d at 832.

Prohibitory injunctions preserve the status quo by freezing the parties' positions until the court can hear the case on the merits, while mandatory injunctions require a party to alter the status quo and take action. *See Marlyn Nutraceuticals, Inc.* v. *Mucos Pharma GmbH & Co*., 571 F.3d 873, 878-79 (9th Cir. 2009). A mandatory injunction "goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored." *Id*. at 879; *see also Stanley* v. *Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994) (same). The burden to obtain a mandatory injunction is thus "doubly demanding." *Garcia* v. *Google*, 786 F.3d 733, 740 (9th Cir. 2015) (*en banc*). A court must deny a mandatory injunction unless "the law and facts *clearly favor*" the moving party. *Id.* (emphasis in original).

DEFENDANTS MICROSOFT CORPORATION, REID HOFFMAN, AND DEANNAH TEMPLETON'S MEM.
IN OPP. TO PLAINTIFFS' MOT. FOR A PRELIMINARY INJUNCTION          4:24-CV-04722-YGR

1    Plaintiffs' requested injunction is wide reaching and vague. To the extent they seek to

2    impose any affirmative duties on Microsoft that constitutes a change from the status quo ante,

3    Plaintiffs must satisfy the even higher standard applied to mandatory injunctions. Because they

4    cannot meet the prohibitory injunction standard, they certainly cannot meet that higher standard.

5    **IV.    ARGUMENT**

6       **A.    Plaintiffs' Have No Likelihood of Succeeding on their Antitrust Claims.**

7          **1.    Plaintiffs' Section 1 claim against Microsoft relating to an alleged
            "fund no competitors" arrangement is baseless.**

8

9    Microsoft never agreed to avoid funding OpenAI's competitors or agreed that other

10   investors would do so—full stop. Not as part of the latest round of OpenAI funding, nor at any

11   other time.

12   In the absence of any agreement, Plaintiffs have *no* likelihood of success on the claim

13   against Microsoft. That should end the analysis. But Plaintiffs' Sherman Act argument is also

14   simply wrong. For one, any such agreement between OpenAI and Microsoft would be vertical in

15   nature and thus not subject to the *per se* rule. And Plaintiffs have completely failed to establish

16   that they are likely to succeed under the Rule of Reason on a facially implausible theory, based on

17   undefined relevant markets and unsupported by any evidence. Contrary to the PI Motion's alleged

18   harm, there is ample evidence that investment capital continues to flow into X.AI and others in

19   the dynamic and fast-growing GenAI space.

20                **(a)    There is no agreement.**

21   Section 1 of the Sherman Act, 15 U.S.C. § 1, requires proof of a contract, combination, or

22   conspiracy in restraint of trade that injures competition. *See Kendall v. Visa USA, Inc.*, 518 F.3d

23   1042, 1047 (9th Cir. 2008). Plaintiffs argue in conclusory fashion that Microsoft and OpenAI have

24   agreed that Microsoft would not also invest in OpenAI's competitors. *See* PI Motion at 5-6. *But*

25   *there is no such agreement*. Neither the FAC nor the PI Motion contains any allegation of an

26   agreement involving Microsoft, let alone evidence.

27   And for good reason. The accompanying declaration of Michael Wetter, who was deeply

28   involved in Microsoft's participation in OpenAI's October 2024 funding round, makes clear that

- 11 -

Microsoft never agreed to any investment exclusivity with or with respect to OpenAI. *See* Wetter Decl. ¶ 10. Not only that, but Microsoft never even discussed the possibility of Microsoft's exclusivity with OpenAI or anyone else. *See id.* ¶ 6. Nor did Microsoft discuss or agree to other investors' exclusivity. *See id.* ¶¶ 7-8. And if it had been requested to do so, Microsoft would have declined. *See id.* ¶ 9. Which makes sense because Microsoft—a company that both provides developers access to GenAI models and uses GenAI models in its own services—has long supported a robust and diversified GenAI technology ecosystem. *See supra* at 8. Plaintiffs' suggestion of a GenAI investment exclusivity agreement is implausible if not fanciful.

Plaintiffs present no direct evidence of a purported agreement. *See Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023). The PI Motion relies on vague statements by unnamed sources in media reports that do not suggest any agreement. The first is a *Financial Times* article that states that at some point OpenAI requested that investors invest in OpenAI on an exclusive basis. *See* FAC ¶ 201. A *Reuters* report similarly describes an OpenAI request for investment exclusivity, noting that the request was "not legally binding." *See* Toberoff Decl. Ex. 8, at 2. A *Wall Street Journal* article is similar. *See* Toberoff Decl. Ex. 9. Similarly, the FAC merely claims that unnamed investors declined to invest in X.AI and does not allege any involvement by Microsoft. *See* FAC ¶ 227.

These articles and allegations fall far short of showing an actionable agreement. Even at the pleading stage, a plaintiff is obliged to provide more than mere labels, conclusions, and a formulaic recitation of the elements of a cause of action. *See Kendall*, 518 F.3d at 1046, citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]o allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies'…." *Kendall*, 518 F.3d at 1047 (citation omitted). But, here, seeking a preliminary injunction, Plaintiffs must meet a far higher standard. Plaintiffs' proffered articles are devoid of even the most basic detail—they do not indicate **who** purportedly agreed with **whom**, **when**, **where**, or **how**, and they do not specify the actual terms of any agreement. They rely for their purported conclusory information on unnamed sources. And they certainly do not establish or even suggest any agreement involving Microsoft.

- 12 -

The articles are also hearsay.[3] Although a trial court has discretion to give hearsay evidence some weight in ruling on a request for preliminary injunction when there is also other admissible evidence, *see The Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (*en banc*), here there is no other evidence, much less admissible evidence, of the purported agreement. Microsoft does not have the burden here, but its concrete and definitive counterevidence rebuts Plaintiffs' empty suggestions of some inchoate agreement and suffices to demonstrate that Plaintiffs are unlikely to succeed on their Section 1 claim.

Nor is there any indirect evidence of a conspiracy. *See Honey Bum*, 63 F.4th at 823. Plaintiffs' suggestion of parallel behavior (PI Motion at 7) falls far short of establishing an agreement. *See id.* at 822 (conscious parallelism insufficient); *Twombly*, 550 U.S. at 554 ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish" an agreement under Section 1) (citation omitted). And Plaintiffs' speculation about parallelism is inconsistent with the affirmative evidence that there was no agreement, as well as Microsoft's commitment to a diversified supply chain for GenAI technology. *See supra* at 8.

      **(b)**      **Plaintiffs cannot invoke the *per se* rule and do not even attempt to make any showing under the Rule of Reason.**

Under no circumstances is Plaintiffs' Section 1 claim subject to the *per se* rule. Most restraints are evaluated under the Rule of Reason. Only a small set of restraints that have "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit," are deemed unlawful *per se*. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). These include horizontal price fixing, division of markets, and certain horizontal group boycotts not at issue here (*see infra* at 14). *See Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958). Vertical agreements, in contrast, cannot be *per se* unlawful restraints. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887, 907 (2007) and *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977) (*per se* rule inapplicable to vertical restraints; *see also In re Musical*

---

[3] *See* Fed. R. Evid. 801, 802; *see also In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 1990 WL 126500 (D. Ariz. July 25, 1990) at *3 ("[N]ewspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted, i.e., in this instance the existence of a conspiracy.").

1   *Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) (certain horizontal

2   agreements, but not vertical restraints, are subject to the *per se* rule). Thus, challenges to alleged

3   exclusive dealing arrangements between firms at different levels of production are evaluated under

4   the Rule of Reason.

5           And a vertical restraint is precisely what Plaintiffs allege. As Plaintiffs themselves state,

6   "venture capital and private equity are services for which all startup companies are consumers."

7   PI Motion at 6:16-17. Plaintiffs posit and challenge a purported agreement by Microsoft, an

8   investor, to invest capital in OpenAI, a consumer of capital, on the condition that Microsoft not

9   invest in competitors of X.AI. The nonexistent agreement Plaintiffs allege describes a vertical

10  relationship between Microsoft and OpenAI that would be analyzed under the Rule of Reason.

11  The fact that Microsoft and OpenAI are alleged to compete in a separate product market (GenAI)

12  does not turn their vertical investment relationship into a horizontal one. *See United States v.*

13  *Brewbaker,* 87 F.4th 563, 575-77 (4th Cir. 2023) (*per se* rule inapplicable to agreement between

14  bidders where one was also a supplier), *cert. denied*, 2024 WL 4743079 (Nov. 12, 2024).

15          None of the cases cited in the PI Motion are to the contrary because there is no allegation,

16  let alone evidence, that Microsoft agreed with ***other horizontal investors*** to invest only in OpenAI.

17  (Indeed, the only evidence is entirely to the contrary.) In *Klor's Inc. v. Broadway-Hale Stores,*

18  *Inc.*, 359 U.S. 207 (1959), the defendants had a horizontal agreement that could support

19  application of the *per se* rule. Similarly, *PLS.Com, LLC v. National Ass'n of Realtors*, 32 F. 4th

20  824 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023), found that a group boycott could violate

21  the *per se* rule where there is "a concerted attempt by a group of competitors at one level [of the

22  market] to protect themselves from competition from non-group members who seek to compete

23  at that level." *Id*. at 834 (citation omitted). Finally, *In re Musical Instruments*, 798 F.3d 1186,

24  involved a "hub-and-spoke" conspiracy with (i) a hub (purchaser), (ii) spokes (competing

25  manufacturers or distributors that enter vertical agreements with the hub), and (iii) the rim of the

26

27

28

wheel, which consists of horizontal agreements among the spokes. *See id.* at 1192. But no similar horizontal allegation involving Microsoft exists here.[4]

Finally, Plaintiffs' PI Motion fails to argue let alone establish that they are likely to prevail under the Rule of Reason on their Section 1 claim. The Rule of Reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition. *See Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018). The first step of any such inquiry is proving that the challenged restraint has a substantial anticompetitive effect that harms consumers in a relevant antitrust market. *See id.* Given the market-intensive analysis required, preliminary injunctions are rarely granted in Rule of Reason cases. *See, e.g., Epic Games*, 493 F. Supp. 3d at 836 (discussing necessity to define relevant markets for a Rule of Reason claim and denying request for preliminary relief in part because "[t]he determination of a 'relevant market' is a highly factual question."). Here, neither Plaintiffs' FAC nor their PI Motion pleads—let alone supports with evidence—any relevant antitrust market for capital investments or the like. Nor have they shown any actual reduction in capital investment. *See infra* at 19. Plaintiffs' notion that the dynamic GenAI marketplace is at risk of a funding shortage is baseless and cannot support the extraordinary relief that they seek.

### 2. Plaintiffs have no likelihood of succeeding against Microsoft, Mr. Hoffman, or Ms. Templeton on a claim that any of them violated Clayton Act Section 8.

The PI Motion also does not show that Plaintiffs are likely to prevail on their Clayton Act Section 8 claim. Mr. Hoffman's and Ms. Templeton's past participations associated with the OpenAI Board were transparent, consistent with Section 8's rules, and entirely lawful. Plaintiffs' feigned concerns about unspecified information exchanges are unfounded. Further, the interlock issue is now moot.

---

[4] Other cases Plaintiffs cite declined to apply the *per se* rule. In *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998), the Supreme Court held that an agreement by a buyer to purchase from one supplier rather than another is not a *per se* unlawful boycott. Similarly, in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985), a cooperative buying agency comprising retailers (horizontal competitors) expelled a member, *see id.* at 285, but despite the horizontal aspect the Court declined to apply the *per se* rule because not all concerted refusals to deal are predominantly anticompetitive, *see id.* at 298. Absent such a horizontal aspect (and as in *Northwest Wholesale*, even sometimes where there is one), the *per se* rule does not apply.

Section 8 of the Clayton Act, 15 U.S.C. § 19, generally prohibits the same person from serving as a director or officer in any two competing corporations. The statute, however, has several important limitations or exceptions. First, for the statute to apply, the person must be an officer or a director of each company—and an "officer" is an "officer elected or chosen by the Board of Directors." 15 U.S.C. § 19(a)(4). Second, it does not apply if the competitive sales of either corporation are less than 2% of that corporation's total sales. *See* 15 U.S.C. § 19(a)(2)(B).[5] Third, even if the competitive sales do exceed that threshold, the statute provides a one-year grace period during which a director or officer can resign without being in violation. *See* 15 U.S.C. § 19(b).

As to Mr. Hoffman, there are at least two reasons why there was no violation of the statute. ***First***, Microsoft's first GenAI product (GitHub Copilot) was released in June 2022. *See* Arenas Decl. ¶ 10. Mr. Hoffman resigned from OpenAI's Board in March 2023. *See* Hoffman Decl. ¶ 5. He therefore resigned within the statute's one-year grace period. *See* Genevieve Klobuchar Decl. ¶¶ 4-7. ***Second***, Mr. Hoffman resigned well before Microsoft's sales of competitive products exceeded the 2% statutory threshold. Section 8's 2% threshold is measured against sales during the corporation's last completed fiscal year ("FY"). *See supra* n.5. As of the time Mr. Hoffman resigned from the Board, in March 2023, Microsoft's last completed FY ended in June 2022. GitHub Copilot did not start generating revenue, however, until the following FY. *See* Klobuchar Decl. ¶¶ 4, 7. Thus, the statute's 2% safe harbor applied.

As to Ms. Templeton, she was not a Microsoft director or officer at the relevant time (and only became an officer a few weeks ago). *See* Templeton Decl. ¶¶ 2-3. That fact alone excludes her from Section 8's application. *See* 15 U.S.C. § 19(a)(4). Plaintiffs try to evade this statutory requirement by claiming Ms. Templeton was Microsoft's "agent" on OpenAI's Board. There is no legal basis for Plaintiffs' agency theory. Although a handful of cases have suggested that a corporation could be a Section 8 "person" by appointing a natural person as a director to a competitor's board, no court in this Circuit has adopted this reasoning, no court has ever enjoined

---

[5] "Competitive sales" means the gross revenues for all products and services sold by one corporation in competition with the other, determined based on annual gross revenues for such products and services in that corporation's last completed fiscal year. *See* 15 U.S.C. § 19(a)(2)(C). The statute contains several other competitive sales safe harbors.

a board "agent," and the notion makes no sense. But even if it did, that cannot change the fact that ***Ms. Templeton never served as a director on OpenAI's board***. *See* OpenAI Brief at 16 (Ms. Templeton was an observer, not an OpenAI director). Ms. Templeton had no vote on the OpenAI Board, and Microsoft never asked her to act or refrain from acting at OpenAI. *See* PI Motion at 11:5; FAC ¶ 371; Templeton Decl. at ¶¶ 10, 16. That undisputed fact ends the inquiry.[6]

Plaintiffs concede that no case addresses interlocks by non-voting observers but argue that the policy of the Clayton Act is to prevent the exchange of competitive information. *See* PI Motion at 11. While the statute does serve certain prophylactic purposes, it also creates a bright-line rule that applies only to interlocks at the officer or director level. And the statutory safe harbors (the one-year grace period and the competitive sales thresholds) demonstrate that Congress wanted to avoid burdening businesses with interlock rules when there is at most a *de minimis* impact on competition.

At any rate, Plaintiffs do not allege any actual, specific information exchanges involving Mr. Hoffman or Ms. Templeton. This is not surprising, because there were none. *See* Templeton Decl. ¶¶ 11-14; Hoffman Decl. ¶ 7. During the seven months that Ms. Templeton was a board observer, she attended only four meetings and stepped out during all portions involving competitively sensitive information—at OpenAI's request. *See* Templeton Decl. ¶ 13. Ms. Templeton never received any of OpenAI's competitively sensitive information from the OpenAI Board meetings and thus could not share any such information. And Mr. Hoffman has not disclosed to anyone at Microsoft, or anyone else, non-public OpenAI information that he might have obtained before he left the OpenAI Board more than 18 months ago. Likewise, he never disclosed to OpenAI any non-public Microsoft information that he may have obtained from his role as a Microsoft director. *See* Hoffman Decl. ¶ 7. Moreover, information exchanges untethered to any claim cannot support injunctive relief. *See Winter*, 555 U.S. at 20 (plaintiff must show a

---

[6] The statutory safe harbors would also apply to Ms. Templeton. Microsoft's FY2023 sales of competitive products did not exceed the 2% statutory threshold. *See* Klobuchar Decl. ¶ 8. And, even if Microsoft's FY2024 sales of competitive products did exceed the threshold, Ms. Templeton resigned from the OpenAI Board in July 2024, which is within the statute's one-year grace period (which would run from the end of FY2024, *i.e.*, June 30, 2024).

likelihood of success on the merits). Because there was no predicate Section 8 violation, Plaintiffs cannot seek free-floating injunctive relief against unspecified information exchanges.[7]

Finally, as discussed above, Mr. Hoffman and Ms. Templeton are no longer associated with the OpenAI Board. There is no allegation or evidence that either Mr. Hoffman or Ms. Templeton intend to resume their prior respective roles. And Microsoft has relinquished any right to appoint an observer to the OpenAI Board. *See* Templeton Decl. ¶ 15. Plaintiffs have made no showing that there is a cognizable danger of a recurrent violation, which is what must be shown to secure injunctive relief. *See TRW, Inc. v. FTC*, 647 F.2d 942, 954 (9th Cir. 1981) (where director resigned, even though director frequently served on corporate boards in the past and his company had a variety of commercial interests, there was no "cognizable danger of a recurrent violation"; the mere potential existence of a future Section 8 violation does not justify prospective relief).[8]

### 3.    Plaintiffs have failed to establish antitrust injury, and Mr. Musk lacks antitrust standing.

In addition to being unable to establish the elements of their antitrust claims, Plaintiffs also cannot establish injury, let alone the requisite antitrust injury—and Mr. Musk also cannot establish antitrust standing.

### (a)    Plaintiffs have not established antitrust injury.

Plaintiff X.AI's vague and nebulous allegations of harm do not establish antitrust injury. Section 16 of the Clayton Act, 15 U.S.C. § 26, which authorizes private parties to obtain injunctive relief "against threatened loss or damage by a violation of the antitrust laws," requires such injury. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111-112 (1986) (refusing "to read the

---

[7] The cases cited on page 23 of Plaintiffs' PI Motion were not Clayton Act cases—they were trade secret cases and Cal. Bus. and Prof. Code § 17200 cases, and they restricted information sharing after finding a misappropriation. They are thus inapposite. Further, Plaintiffs did not move on their Section 17200 claim. But even if they had so moved, because there was no Clayton Act violation, there was no Section 17200 violation, either. And Plaintiffs never identify the supposedly shared information.

[8] *See also Borg-Warner Corp. v. FTC,* 746 F.2d 108, 110 (2d Cir. 1984) (FTC did not show a cognizable danger of recurrent violation three years after violations, which were neither flagrant nor longstanding, ceased); *see generally United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (to obtain injunctive relief under Section 8 against discontinued conduct, the moving party must show that relief is needed to prevent some cognizable danger of recurrent violation, not a mere possibility which serves to keep the case alive; affirming refusal to award injunctive relief).

Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred."); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980) ("The party seeking such relief must demonstrate 'a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.'") (citation omitted).

Because it is a prerequisite for any private relief, Plaintiffs must establish antitrust injury as part of the probability of success analysis to secure a preliminary injunction. *See, e.g., Phototron Corp. v. Eastman Kodak Co*., 842 F.2d 95, 98 (5th Cir.) (on preliminary injunction motion, court must decide merits issue of antitrust injury and standing), *cert. denied*, 486 U.S. 1023 (1988). And that is true even for *per se* offenses (which Plaintiffs' claims are not). *See Newman v. Universal Pictures*, 813 F.2d 1519, 1522–23 (9th Cir. 1987) (although the *per se* rule "relieves plaintiff of the burden of demonstrating an anticompetitive effect, which is assumed, it does not excuse a plaintiff from showing that his injury was caused by the anticompetitive acts."), *cert. denied*, 486 U.S. 1059 (1988). *See also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42 (1990) (rejecting a presumption of antitrust injury in *per se* cases and requiring a private plaintiff to prove antitrust injury in every case). The rule is the same for claims under Section 8 of the Clayton Act. *See generally Bearden v. Ballad Health*, 967 F.3d 513, 518 (6th Cir 2020) (Clayton Act's § 8 prohibition of certain interlocking directorates is not a freestanding provision that is exempt from antitrust law's usual injury and standing requirements).

Here, there is a complete absence of any evidence of harm, let alone antitrust injury (that is, injury to competition itself) from the alleged funding agreement or from the fact of the prior OpenAI Board participation. Although the PI Motion alleges in conclusory fashion that absent an injunction, GenAI startups will lose critical financial support, *see id*. at 22, Plaintiffs provide no facts to support this "tipping point" allegation. As discussed *supra* at 9, there is no plausible foreclosure of investment capital. X.AI just raised $6 billion from well-known institutional investors in December 2024 and did not accept any investors that did not participate in earlier fundraising rounds. *See supra* at 10. Other startups also have recently raised substantial capital,

- 19 -

and large companies such as Google, Amazon, and Meta do not require third-party capital. *See supra* at 7. Further, X.AI's recent and rapid construction of a large supercomputer (*see supra* at 7) clearly shows that X.AI itself is a vibrant competitor at no risk of insolvency.

The prior OpenAI Board participation is even further divorced from any alleged harm to competition. A board membership itself does not, and cannot, affect competition, even if it somehow facilitates other actions that could. Unlike the government, a private party must show antitrust injury and standing under Section 8 of the Clayton Act. *See supra* at 19. And as to the alleged information sharing, the PI Motion completely fails to specify what information was shared. Nor does it specify who allegedly used it or to what purpose or effect. Given these failures, the PI Motion unsurprisingly does not explain how the information sharing affected or affects competition itself.

Finally, the other alleged harms to X.AI, such as being offered disfavored "compute" terms by Microsoft (FAC ¶ 227), are similarly conclusory and fail to establish competitive harm. They are also entirely unrelated to the Section 1 and Section 8 claims that are the subject of the PI Motion. In short, the PI Motion fails to establish likely harm to competition.

### (b) Mr. Musk lacks antitrust standing.

Mr. Musk is not a proper party to bring this private antitrust action. Mr. Musk, as a natural person, does not and is not alleged to compete with Microsoft in any alleged product market and does not himself seek capital to provide GenAI products. Any alleged injury he has sustained under the antitrust laws is as an investor in X.AI, which is derivative of any alleged injury to X.AI.

As a result, he does not have standing to sue under the Sherman or Clayton Acts. Parties whose injuries are experienced in another market, even if flowing from that which makes the defendant's conduct unlawful, do not suffer antitrust injury. *See Associated General Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31, 539 (1983); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (noting that the prohibited conduct must be directed towards competitors and must be intended to injure competition); *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375 (9th Cir. 1996) (former shareholder of defunct waste disposal firm lacked

1    standing to sue for injuries to the firm; even a sole shareholder lacks antitrust standing), *cert.*

2    *denied*, 520 U.S. 1119 (1997).[9]

3    **B.    Plaintiffs' Remaining State Law Claims Do Not Involve Microsoft.**

4          Microsoft, Mr. Hoffman, and Ms. Templeton are not defendants in the two state law claims

5    (for alleged breach of charitable trust and self-dealing) that are the subject of Plaintiffs' PI Motion.

6    As a result, those claims cannot support any preliminary relief as to them. Nevertheless, Microsoft,

7    Mr. Hoffman, and Ms. Templeton join in OpenAI's arguments as to why those claims also do not

8    support Plaintiffs' request for a preliminary injunction.

9    **C.    Plaintiffs Cannot Show Irreparable Harm.**

10         For many of the same reasons that Plaintiffs have not shown any antitrust injury, they also

11   have not shown any imminent risk of irreparable injury.

12         A plaintiff must show that it "is likely to suffer irreparable harm in the absence of

13   preliminary relief." *Winter*, 555 U.S. at 20. *See also Sampson v. Murray*, 415 U.S. 61, 88 (1974)

14   (irreparable harm and inadequacy of legal remedies is basis of injunctive relief). "[D]ubious and

15   speculative" injury is not enough. *Colorado River Indian Tribes,* 776 F.2d at 849 ("We have long

16   since determined that speculative injury does not constitute irreparable injury."). Unless a plaintiff

17   is likely to go out of business, the harm is monetary only and cannot support preliminary relief.

18   *See Goldie's Bookstore, Inc.* v. *Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984)

19   (rejecting injury from loss of goodwill and "untold" customers).[10] Finally, when a plaintiff sits on

20   its hands and waits to seek preliminary relief, the plaintiff's claims are stale and do not support a

21   claim of irreparable injury. *See Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783,

22

23   ───────────────────
     [9] Although Ms. Zilis also moves for a preliminary injunction, she is not a party to the Section 1 or
24   Section 8 claims and so cannot seek relief for them. But she also lacks antitrust standing for the
     same reasons.
25   [10] *See also American Passage Media Corp.* v. *Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th
     Cir. 1985) ("Without a sufficient showing that these contracts threatened AP's existence, any loss
26   in revenue due to an antitrust violation is compensable in damages"); *Oakland Tribune, Inc.* v.
     *Chronicle Publ'g. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("No evidence shows that the
27   Tribune verges on bankruptcy"); *L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1202 ("Other than
     the threat of lost revenues, the plaintiff did not demonstrate any threat of harm that would have
28   supported a finding of irreparable injury").

804-05 (N.D. Cal. 2024) (16-month delay in filing motion indicates a lack of urgency and undercuts any finding of imminent harm).

Here, Plaintiffs provide no evidence of harm, let alone imminent irreparable harm, for their Sherman Act Section 1 claim. As discussed above, Plaintiffs only allege in a highly conclusory fashion that investment capital has been limited. But they provide no actual evidence, and the evidence, including as to X.AI itself, contradicts Plaintiffs' claims. Because X.AI is in no danger of imminently going out of business, the purported harm it seeks to avoid can be remedied by an award of monetary damages and no preliminary injunctive relief is required. *See Goldie's Bookstore* at 472.

Plaintiffs' Clayton Act Section 8 claim for preliminary relief fares no better. As an initial matter, it is barred because all the facts about the involvement Mr. Hoffman and Ms. Templeton had with the OpenAI Board were known many months, if not over a year ago. *See, e.g., Good Meat Project* at 804-05; *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc*., No. 19-CV-01424-YGR, 2020 WL 95638 (N.D. Cal. Jan. 8, 2020) at *1 (delay from May to November 2019 weighed against any finding of irreparable harm). Further, the PI Motion's conclusory allegations about vague information sharing do not even attempt to establish what information was used by whom or for what purpose or to what effect, let alone why any resulting harm would be imminent. This is the sort of quintessential conclusory speculation that does not amount to a showing of likely irreparable injury, especially when Plaintiffs have failed to show an injury to competition itself under the antitrust harm requirement. *See Colorado River*, 776 F.2d at 849; *Ralph Rosenberg Court Reporters, Inc. v. Fazio*, 811 F. Supp. 1432, 1443 (D. Haw. 1993) (conclusory allegations about lost customers and goodwill speculative and insufficient).

### D. The Balance of Equities Tips Sharply in Microsoft's Favor and an Injunction Would Harm the Public Interest.

As part of their PI Motion, Plaintiffs seek to enjoin the transfer to Microsoft of any OpenAI assets, including the intellectual property resulting from the companies' R&D collaboration. *See* PI Motion at ii. Because Microsoft incorporates access to OpenAI's models into software and services used by third parties, the harm to Microsoft and its many customers from a preliminary

- 22 -

injunction would be immediate and substantial. The balance of equities tips sharply in Defendants' favor.

Plaintiffs must establish that the balance of equities tips in their favor and that an injunction is in the public interest. *See Epic Games*, 493 F. Supp. 3d at 832. The public interest inquiry primarily addresses the impact on non-parties. "The plaintiffs bear the initial burden of showing that the injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Where the public benefits from novel and innovative business practices involving technology, courts should refrain from presuming them to be unreasonable absent an elaborate inquiry into the precise harm they may cause or the business reasons for their use. *See Epic Games*, 493 F. Supp. 3d at 833.

Again, the PI Motion makes only vague, hyperbolic, and unsupported allegations regarding these factors. In actuality, however, there would be substantial, immediate harm to Microsoft if Plaintiffs' requested injunction issues. Microsoft incorporates access to OpenAI's models in Microsoft's business in two main ways: (1) Microsoft Azure makes OpenAI's models available for developers through the Azure OpenAI service; and (2) Microsoft's various Copilot products incorporate access to OpenAI's models. *See* Arenas Decl. ¶ 9. Microsoft regularly receives version updates and new models from OpenAI, as frequently as each month. *See id*. ¶ 18. If the Court were to grant the requested injunction, Microsoft would no longer receive OpenAI updates or newer model generations and would have limited access to only outdated models, resulting in a severely degraded experience and associated safety problems for developers who rely upon Microsoft's Azure OpenAI service. *See id*. ¶¶ 21-22.

These harms also would extend to Microsoft's customers, their users, and the public at large. As described above, because GenAI technology is advancing so rapidly, developers will not use degraded or retired models. *See* Arenas Decl. ¶ 21. Businesses large and small that utilize Microsoft's Copilot products would also endure decreased functionality, as well as potential security vulnerabilities and risk of harmful content. *See id*. ¶ 26. This could be ruinous to many small businesses and would be a massive strain even on large businesses now forced to overhaul their IT services.

1

V.    **CONCLUSION**

2
        Competition in AI is flourishing. Microsoft, OpenAI, X.AI, Google, Meta, Amazon,

3
Oracle, Cohere, Mistral.AI, Hugging Face, and other well-funded startups are driving a

4
transformative wave of AI innovation. Against that backdrop, Plaintiffs' antitrust claims against

5
Microsoft make no sense. Their evidence-free motion cannot establish a likelihood of success on

6
their Sherman Act Section 1 Claim—there is ***no agreement***. And there is no basis to establish any

7
violation of the Clayton Act, let alone one requiring preliminary injunctive relief—there is ***no***

8
***board overlap***. The vague, overbroad and disruptive injunction they seek would significantly harm

9
the millions of developers, enterprises, small businesses, and consumer customers who rely on

10
Microsoft to provide safe, responsible, and powerful GenAI-powered services built using

11
OpenAI's language models. This PI Motion should be denied.

12

13
DATED:  December 13, 2024

Respectfully Submitted,

14
DECHERT LLP

15

16
By:    */s/ Russell P. Cohen*

17
        Russell P. Cohen (SBN 213105)
        Russ.cohen@dechert.com
        Howard M. Ullman (SBN 206760)

18
        Howard.ullman@dechert.com

19
        45 Fremont Street, 26th Floor
        San Francisco, CA 94105

20
        Telephone: (415) 262-4500
        Facsimile: (415) 262-45555

21

22
        Nisha Patel (SBN 281628)
        Nisha.patelgupta@dechert.com

23
        DECHERT LLP
        633 West 5th Street, Suite 4900

24
        Los Angeles, CA 90071
        Telephone: (213) 808-5700

25
        Facsimile: (213) 808-5760

26

27

28

DEFENDANTS MICROSOFT CORPORATION, REID HOFFMAN, AND DEANNAH TEMPLETON'S MEM.
IN OPP. TO PLAINTIFFS' MOT. FOR A PRELIMINARY INJUNCTION          4:24-CV-04722-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Andrew J. Levander (admitted *pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

John (Jay) Jurata, Jr. (admitted *pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

*Attorney for Defendants Microsoft Corporation, Reid Hoffman and Deannah Templeton*

- 25 -