1   Marc Toberoff (S.B. #188547)
2   *mtoberoff@toberoffandassociates.com*
    Jaymie Parkkinen (S.B. #318394)
3   *jparkkinen@toberoffandassociates.com*
    TOBEROFF & ASSOCIATES, P.C.
4   23823 Malibu Road, Suite 50-363
    Malibu, CA 90265
5   Telephone: (310) 246-3333
    Facsimile: (310) 246-3101
6
7   *Attorneys for Plaintiffs Elon Musk,*
    *Shivon Zilis, and X.AI Corp.*
8
                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
10
11   ELON MUSK, et al.,                    Case No. 4:24-cv-04722-YGR

12                    Plaintiffs,          Assigned to Hon. Yvonne Gonzalez
                                           Rogers
13          v.
                                           **PLAINTIFFS' CONSOLIDATED**
14   SAMUEL ALTMAN, et al.,                **REPLY IN SUPPORT OF THEIR**
                                           **MOTION FOR A PRELIMINARY**
15                    Defendants.          **INJUNCTION**
16
17                                         Date:      January 14, 2025
                                           Time:      2:00 p.m.
18                                         Place:     Courtroom 1 (4th Fl.)
                                                      1301 Clay St.
19                                                    Oakland, CA 94612
20
21
22
23
24
25
26
27
28

1

## **TABLE OF CONTENTS**

2   INTRODUCTION .................................................................................................................... 1

3   ARGUMENT ........................................................................................................................... 5

4   I.    THE COURT SHOULD ENJOIN FURTHER IMPLEMENTATION
          OF THE "FUND NO COMPETITORS" EDICT ..................................................... 5
5
          A.    Musk and xAI Are Likely To Show Statutory Standing ........................... 5
6
          B.    Musk and xAI are Likely To Succeed on the Merits
7               of Their Group Boycott Claim .................................................................. 6

8         C.    The Group Boycott Threatens Irreparable Injury ..................................... 9

9   II.   A PROHIBITORY INJUNCTION SHOULD ISSUE TO STOP THE HARMS
          FLOWING FROM THE MICROSOFT-OPENAI BOARD INTERLOCKS .................. 9
10
          A.    Binding Ninth Circuit Authority Establishes This Claim is Not Moot ................. 9
11
          B.    Musk and xAI Have Standing Because the Irreparable Harm
12              of the Board Interlocks Persists .............................................................. 10

13        C.    Defendants Have Not Carried Their Burden To Prove
                that Section 8's Safe-Harbor Defenses Apply ........................................ 12
14
          D.    Templeton's "Observer" Board Membership Likely Triggers Section 8 ............. 15
15
          E.    Injunctive Relief is Necessary To Stop Ongoing Harms
16              and Prevent Future Misconduct .............................................................. 17

17  III.  A PROHIBITORY INJUNCTION TO STOP OPENAI FROM ACTING AS A
          FOR-PROFIT ENTITY, WITHOUT AUTHIRIZATION, SHOULD ISSUE ............... 17
18
          A.    Musk is Likely To Prevail on Statutory Standing .................................. 17
19
          B.    Musk is Likely To Prevail on His Claim That OpenAI is
20              Violating the Terms of Its Charitable Trust ........................................... 18

21  IV.   A PROHIBITORY INJUNCTION SHOULD ISSUE TO STOP
          ALTMAN'S SELF-DEALING ............................................................................ 20
22
          A.    Musk and Zilis Are Likely To Prevail on Statutory Standing ................ 20
23
          B.    OpenAI Does Not Defend Altman's Conduct and Ignores
24              California's Regulatory Framework ........................................................ 21

25  V.    THE HARMS FROM DEFENDANTS' CONDUCT ARE IRREPARABLE ............... 22

26  VI.   THE BALANCE OF EQUITIES TIPS SHARLY IN PLAINTIFFS' FAVOR
          AND THE PUBLIC INTEREST FAVORS RELIEF ............................................. 23
27
28  CONCLUSION ...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Pages**

*Apple Inc. v. Samsung Elecs. Co.,*
    809 F.3d 633 (Fed. Cir. 2015) ......................................................................................... 22

*Autonomous Region of Narcotics Anonymous v. Narcotics Anonymous World Servs., Inc.,*
    77 Cal. App. 5th 950 (2022) ............................................................................................ 18

*Bader v. Anderson,*
    179 Cal. App. 4th 775 (2009) .......................................................................................... 21

*Bearden v. Ballad Health*,
    967 F.3d 513 (6th Cir. 2020) ........................................................................................ 9-10

*City of Oakland v. Oakland Raiders,*
    20 F.4th 441 (9th Cir. 2021) ......................................................................................... 5, 7

*Columbia Pictures Indus., Inc. v. Fung,*
    710 F.3d 1020 (9th Cir. 2013) ........................................................................................ 21

*E. & J. Gallo Winery v. Strategic Materials, Inc.,*
    No. CV 17-1709 EPG, 2020 WL 4018241 (E.D. Cal. July 16, 2020) ............................... 16

*Epic Games, Inc. v. Apple Inc.*,
    493 F. Supp. 3d 817 (N.D. Cal. 2020) ....................................................................... 9, 22

*Fed. Trade Comm'n v. Microsoft Corp.*,
    No. CV 23-2880 JSC, 2023 WL 5186252 (N.D. Cal. Aug. 11, 2023) ............................... 16

*Flaa v. Hollywood Foreign Press Ass'n,*
    55 F.4th 680 (9th Cir. 2022) ............................................................................................. 6

*Holt v. Coll. of Osteopathic Physicians & Surgeons*,
    61 Cal. 2d 750 (1964) ..................................................................................................... 18

*Honey Bum, LLC v. Fashion Nova, Inc.,*
    63 F.4th 813 (9th Cir. 2023) .............................................................................................. 7

*In re Napster, Inc. Copyright Litig.,*
    354 F. Supp. 2d 1113 (N.D. Cal. 2005) ............................................................................. 5

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    702 F. Supp. 3d 809 (N.D. Cal. 2023) ............................................................................. 13

*Jackpot Harvesting Co. v. Superior Ct.,*
    26 Cal. App. 5th 125 (2018) ........................................................................................... 21

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                                        **Pages**

*L.B. Rsch. & Educ. Found. v. UCLA Found.,*
    130 Cal. App. 4th 171 (2005).................................................................................................18

*Mission Wellness Pharmacy LLC v. Caremark LLC,*
    641 F. Supp. 3d 673 (D. Ariz. 2022).......................................................................................16

*O'Hara v. Grand Lodge Indep. Ord. of Good Templars of State of Cal.,*
    213 Cal. 131 (1931)..................................................................................................................17

*OpenAI, Inc. v. Open A.I., Inc.,*
    No. 24-1963, 2024 WL 4763687 (9th Cir. Nov. 13, 2024).....................................................23

*Pac. Home v. Los Angeles Cnty.,*
    41 Cal. 2d 844 (1953)..........................................................................................................18-19

*Paladin Assocs., Inc. v. Montana Power Co.,*
    328 F.3d 1145 (9th Cir. 2003)...................................................................................................8

*Patton v. Sherwood,*
    152 Cal. App. 4th 339 (2007)..................................................................................................18

*PLS.Com, LLC v. Nat'l Ass'n of Realtors,*
    32 F.4th 824 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023) .........................................6

*Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC,*
    No. CV 03-1895 PAC, 2007 WL 39301 (S.D.N.Y. Jan 8, 2007) ......................................9-10

*Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency,*
    581 F.3d 1169 (9th Cir. 2009)..................................................................................................10

*SCM Corp. v. F.T.C.,*
    565 F.2d 807 (2d Cir. 1977)....................................................................................................15

*SCM Corp. v. F.T.C.,*
    612 F.2d 707 (2d Cir. 1980)....................................................................................................10

*Square D Co. v. Schneider S.A.,*
    760 F. Supp. 362 (S.D.N.Y. 1991)......................................................................................15-16

*Talavera v. Glob. Payments, Inc.,*
    670 F. Supp. 3d 1074 (S.D. Cal. 2023) .................................................................................4-5

*Tawfilis v. Allergan, Inc.,*
    157 F. Supp. 3d 853 (C.D. Cal. 2015)......................................................................................5

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                              **Pages**

*TRW, Inc. v. F.T.C.,*
647 F.2d 942 (9th Cir. 1981) ........................................................................*passim*

*Turner v. Victoria,*
15 Cal. 5th 99 (2023) ...............................................................................4, 20-21

*United States v. Bestfoods,*
524 U.S. 51 (1998) .................................................................................................. 8

*United States v. Cleveland Tr. Co.,*
392 F. Supp. 699 (N.D. Ohio 1974), *aff'd*, 513 F.2d 633 (6th Cir. 1975) ............................. 15

*United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) ................................................................................ 14

*United States v. Sears, Roebuck & Co.,*
111 F. Supp. 614 (S.D.N.Y. 1953) ........................................................................ 13

*United States v. W. T. Grant Co.,*
345 U.S. 629 (1953) ............................................................................................... 17

**<u>Statutes, Rules and Regulations</u>**

15 U.S.C.

§ 1 ..................................................................................................*passim*

§ 19 ................................................................................................*passim*

California Corporations Code

§ 5142 .............................................................................................3, 18

§ 5233 ............................................................................................*passim*

§ 5710 .............................................................................................20-21

California Probate Code § 24 ............................................................................ 18

Federal Trade Commission, *Revised Jurisdictional Thresholds for Section 8 of the Clayton Act*, 89 Fed. Reg. 3926 (Jan. 22, 2024) .................................................... 12

**<u>Other Authorities</u>**

Restatement of Charitable Nonprofit Organizations § 6.05 (Am. L. Inst. 2021) ..................20-21

# INTRODUCTION

The moving papers and oppositions now frame for the Court three questions of fact and six legal issues for decision.

## *Defendants' Group Boycott*

The first question of fact is whether OpenAI issued the "Fund No Competitors" edict as part of its October 2024 funding round. As consistently reported in *The Wall Street Journal*, *Financial Times*, and *Reuters*, based on several sources with knowledge, it did. Defendants collectively produced two declarations from lower-level employees that speak past those news accounts; they refer only to investors' information rights in written documents and Microsoft's supposed non-involvement. Wu Decl.; Wetter Decl. But it has never been Plaintiffs' contention that the "Fund No Competitors" restriction was written into documents by lawyers who must surely know better. The news accounts reported that OpenAI issued the edict verbally. Plaintiffs' ongoing investigations, without the benefit of discovery, now show this is exactly what happened. Sam Altman told investors their allocation in OpenAI's oversubscribed funding round was contingent on not investing in competitors. *See* Musk Decl. ¶¶ 3-4; Birchall Decl. ¶¶ 3-5; Gracias Decl. ¶¶ 3-4; Baker Decl. ¶¶ 3-4. A declaration from Altman is conspicuously absent.

On this record, the Court should conclude that Plaintiffs will likely prove the existence of the Fund No Competitors edict after discovery. The first legal question, then, is whether the edict constitutes a group boycott. Plaintiffs will likely prove it does in two ways: (i) as a hub-and-spoke conspiracy, because all "plus factors" courts consider point to an agreement not just between OpenAI and its investors, but among the investors as well; and (ii) as a horizontal restraint by OpenAI and Microsoft, because OpenAI's conduct should be attributed to Microsoft as a matter of law given its effective control of OpenAI. *See infra* pp. 6-9.

## *Defendants' Interlocking Directorates*

The second factual dispute concerns the interlocking directorates. Defendants have now raised Section 8's safe-harbor defenses. The Court must therefore decide whether Defendants proved those defenses with evidence demonstrating that OpenAI and Microsoft had competitive sales of less than 2% of total sales during the look-back period. Defendants did not (and cannot)

1

CASE NO. 24-CV-04722-YGR
PLS.' REPLY ISO MOT. FOR PRELIM. INJ.

produce such evidence even though it would readily be within their control. The safe harbor's language requires consideration of "*all* products and services sold by one corporation in competition with the other" during fiscal year 2022 (the look-back period), not just those in the generative AI market in which Defendants compete with Plaintiffs today. 15 U.S.C. § 19(a)(2) (emphasis added). The evidence shows Microsoft and OpenAI have been competing to sell cloud-based AI products to developers since at least 2021, and that these revenues vastly exceed the 2% safe-harbor limit. *See infra* pp. 12-15.

The second legal question is whether Deannah Templeton's service on behalf of Microsoft as an "observer" member of OpenAI's board violated Section 8. Plaintiffs are likely to prove it did. Section 8 was not adopted to address directors' voting behavior, but rather to prevent opportunities for information sharing and coordination of business decisions just like this. *See infra* pp. 15-17. Moreover, Defendants present no legal argument to sanitize Hoffman's glaring conflicts, additional instances of which Plaintiffs continue to uncover.

### *Plaintiffs' Antitrust Injuries*

The third question of fact is whether these antitrust violations have injured Musk and xAI sufficiently to support antitrust standing. Plaintiffs will likely prove they have. The funding restriction operates to deprive not just xAI but all of OpenAI and Microsoft's competitors of fair access to the capital markets that are necessary to develop tremendously expensive AI technology. Musk Decl. ¶¶ 5-8. Only a small number of investors can provide this level of funding, and OpenAI's edict and the agreements it induced limit available investors even further. Birchall Decl. ¶¶ 3-4; Gracias Decl. ¶ 2; Baker Decl. ¶ 2. These injuries must be viewed in light of OpenAI and Microsoft's seizure of an almost 70% share in a market with pronounced network effects, first-mover advantages, and huge structural barriers to entry—all facts they do not dispute. Defendants' "collaboration" (appearing fifteen times in Microsoft's opposition) to "commercialize" (seven times) products OpenAI developed as a publicly subsidized charity, all to enrich themselves, and their efforts to starve competitors of funding have unlawfully cemented their monopoly power and undermined fair competition.

_Breach of the OpenAI Charitable Trust_

The next three legal issues concern Plaintiffs' state-law claims. OpenAI contends Musk has no standing to bring his breach of charitable trust claim because he has no express reversionary interest in his donations. But Musk has a _contractual_ basis for standing, which is sufficient under Cal. Corp. Code 5142(a)(4)'s disjunctive test. OpenAI's argument further fails to address that OpenAI's Certificate of Incorporation impressed a trust on Musk's donations as a matter of law, giving Musk an additional and independent path to standing as a settlor under common law. _See infra_ pp. 17-18. Musk will likely prevail on state-law standing.

The next legal issue is whether Musk is likely to show breach of the charitable trust resulting from his donations. Defendants do not contest, and in fact confirm, that they are now "commercializing" OpenAI's products for the benefit of private investors (including themselves) without due permission from regulators to operate as a for-profit entity; indeed, in OpenAI's last publicly available annual report, it disclosed the OpenAI charity received just $44,485 out of the $200 million taken in by the enterprise as a whole. FAC ¶ 131; Ex. 46 at 2.[1] As settlor of the OpenAI charitable trust, Musk is entitled to enjoin such misconduct.

_Altman's Self-Dealing_

OpenAI has been marked by years of Altman's unchecked self-dealing, instances of which Plaintiffs continue to uncover. Despite Altman's sworn testimony before the U.S. Senate in 2023 denying any ownership interest in OpenAI, it was reported just last week that indeed, he _did_ have equity in the company through his stakes in Y Combinator and a Sequoia Capital fund. Ex. 52 at 1-2. Defendants also do not meaningfully contest that OpenAI and Altman have failed to comply with California's extensive process for approving self-dealing transactions by directors of a non-profit, arguing only that it "appear[s]" OpenAI received some benefit. OAI Opp. at 24. That is not the standard. OpenAI ignores that self-dealing transactions must be consummated at market-rate or better, and that a self-dealing director has the burden to show adherence to the statutory procedures for ensuring the transaction meets that standard. _See_ Cal.

---

[1] Citations of "Mot." are to Plaintiffs' Motion for a Preliminary Injunction. Citations of "FAC" are to Plaintiffs' Verified First Amended Complaint. Citations of "OAI Opp." and "MSoft Opp." are to OpenAI Defendants and Microsoft Defendants' respective Oppositions. Citations of "Ex." are to the November 29 or December 27, 2024 Toberoff Declaration, unless otherwise stated.

Corp. Code § 5233(d)(2)(C)-(D); *infra* pp. 21-22. The only question, therefore, is whether Musk and Zilis have state-law standing. They are likely to show they do. OpenAI misreads the clear language of *Turner v. Victoria,* 15 Cal. 5th 99 (2023), which recognizes that standing in the non-profit context is distinct from that in commercial disputes; the contemporaneous board service requirement OpenAI discusses does not apply. *Id.* at 113-16, 125-28. As former members and directors of OpenAI who left precisely because of the kinds of misconduct they allege OpenAI and Altman are engaged in, Musk and Zilis have standing. *See infra* pp. 20-21.

### Plaintiffs' Irreparable Injuries

The final legal issue for the Court is whether Plaintiffs have shown irreparable injury. OpenAI and Microsoft repeatedly assert that damages provide Plaintiffs with an adequate remedy. But under these facts, damages will not suffice. Defendants nowhere address Plaintiffs' point that OpenAI, an entity losing $5 billion per year, soon to soar to $14 billion, FAC ¶ 222, will likely be unable to pay damages. Further, money cannot correct market distortions. After Plaintiffs filed this Motion, Microsoft's CEO touted its two-year head start with OpenAI, emphasizing the importance of time in the burgeoning generative AI market. Ex. 41 at 2-3. Every day since OpenAI imposed its October 2024 Fund No Competitors edict is a day that xAI and other AI startups lose the chance to compete on a level playing field. The harms continuing to flow from the board interlocks magnify these market distortions by enabling Microsoft and OpenAI to move in lockstep.

OpenAI also fails to explain how, if preliminary relief is not granted to preserve the status quo, its self-dealing and unlawful profiteering can later be unwound in a way that is practical and just to all concerned. Instead, OpenAI continues to *expand* the number of parties adversely affected absent preliminary relief; e.g., it just permitted SoftBank to buy $1.5 billion in OpenAI employee shares. Ex. 39 at 2. Because OpenAI has no interest in protecting the markets, investors, the public, or its own employees from the harm of a costly unwinding, the Court must act before the class at risk grows unmanageably large.

Woven throughout both oppositions is the suggestion that, despite Defendants' anticompetitive conduct, xAI is doing just fine. While it is true xAI has not shuttered its doors,

that is not the standard. Indeed, most of xAI's achievements that Defendants tout were in progress *before* the Fund No Competitors edict interfered with the capital markets. *E.g.*, OAI Opp. Ex. 6 at 2 (Colossus). After years of misleading Musk, regulators, and the public, OpenAI and Microsoft dramatically accelerated their efforts to eradicate fair competition during the October 2024 funding round. This suit does not seek an advantage but to open competition and enforce antitrust laws designed for precisely that purpose. The Motion is relatively modest—it asks simply to pause Defendants' escalating efforts to unlawfully tilt the market in their favor until regulators and this Court can reach final, considered, and fair decisions about their unprecedented business conduct. A prohibitory injunction should issue.

## **ARGUMENT**

### I.   THE COURT SHOULD ENJOIN FURTHER IMPLEMENTATION OF THE "FUND NO COMPETITORS" EDICT.

#### A.   Musk and xAI Are Likely To Show Statutory Standing.

OpenAI argues incorrectly that Musk and xAI lack Article III and antitrust standing. But "[b]ecause Article III standing imposes a lower bar than antitrust standing," and because Musk and xAI have antitrust standing, they necessarily "meet[] the requirements for Article III standing." *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 863 (C.D. Cal. 2015); *see City of Oakland v. Oakland Raiders,* 20 F.4th 441, 452-53 (9th Cir. 2021) (discussing lower showing required under Article III). Plaintiffs therefore address only statutory antitrust standing.

Defendants claim Plaintiffs lack statutory standing because they do not show a sufficient antitrust injury.[2] But Musk and xAI alleged concrete harms in their FAC, which because it was verified, operates as a declaration. FAC ¶ 227; *Talavera v. Glob. Payments, Inc.*, 670 F. Supp. 3d 1074 (S.D. Cal. 2023). And since the filing of the FAC, further evidence has come to light. OpenAI's edict explicitly created a belief among investors that they will lose the opportunity to participate in OpenAI's growth if they invest in OpenAI's competitors. Musk

---

[2] Microsoft also argues Musk lacks standing to bring the Sherman and Clayton Act claims in his personal capacity. But only xAI *or* Musk needs standing for the Court to issue the injunction, and in any event, given Musk's position as founder, CEO, and key investor in xAI, Musk has standing in his own right. *See In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1121 (N.D. Cal. 2005).

Decl. ¶ 4; Birchall Decl. ¶ 4; Gracias Decl. ¶ 3; Baker Decl. ¶¶ 3-4. For instance, at least one reputable venture capital investor who had invested in OpenAI did not invest in xAI because of OpenAI's investment restriction. Birchall Decl. ¶ 5. OpenAI's edict is thus shrinking the pool of available investors, just as intended. *Id*.

Competing in the generative AI marketplace is staggeringly expensive. Musk Decl. ¶ 6. Unlike OpenAI, which receives free or heavily discounted compute from Microsoft, xAI must develop its own. *Id*. To do so, xAI must undertake the extraordinarily capital-intensive and complex challenge of constructing its own technological infrastructure from scratch. *Id*. Additional expenses necessary to compete effectively include costs associated with training the AI models—a process that requires massive amounts of meticulously curated datasets, which are expensive to collect, clean, and process—and the recruitment of scientific, engineering, and other necessary talent, the costs of which can quickly become quite significant. *Id*. at ¶ 7. Given the extraordinary capital needed to bring generative AI to market, OpenAI's investment restriction harms competition industry-wide. Artificially limiting the pool of capital, as OpenAI has, is a concrete and particularized harm. The causal connection between Defendants' group boycott and the harm to Plaintiffs is straightforward and of the kind the antitrust laws seek to prevent. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 840-41 (9th Cir. 2022). As such, Musk and xAI have both Article III and statutory standing. While it is true that OpenAI has not yet succeeded in crippling xAI, that is no defense.[3] *Id*. at 835.

### B.    Musk and xAI Are Likely To Succeed on the Merits of Their Group Boycott Claim.

Defendants contend that Musk and xAI cannot show the "spokes" of a hub-and-spoke group boycott. But as declarations submitted with their reply show, Plaintiffs have discovered additional evidence of the Fund No Competitors edict since filing the FAC. Musk Decl. ¶¶ 3-5;

---

[3] OpenAI's argument that professional success negates a showing of harm misrepresents the discussion in *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 694 (9th Cir. 2022). In *Flaa*, the court discussed professional success for purposes of determining market power under a rule-of-reason analysis. *Id*. This is not a rule-of-reason case, and OpenAI has not contested xAI and Musk's showing of OpenAI's enormous market power. In any event, "professional success" in this context is measured by revenue and market share of generative AI, not the size of data centers or funding rounds.

Birchall Decl. ¶¶ 3-5; Gracias Decl. ¶¶ 3-4; Baker Decl. ¶¶ 3-4. OpenAI's purported contrary declaration merely speaks to the knowledge of a low-level employee who drafted documents but does not contest the existence of a verbal agreement to restrict funding OpenAI's competitors. Wu Decl. And while Microsoft (through another lower-level employee) disclaims any agreement by it to the restriction, absent is any statement that *OpenAI* did not impose one. Wetter Decl. Defendants' carefully drafted declarations simply do not rebut Plaintiffs' showing that OpenAI issued its Fund No Competitors edict.

Defendants argue Plaintiffs cannot show the "rim" of the group boycott without direct evidence the investors agreed among themselves to comply with OpenAI's edict. It is true and unsurprising that Plaintiffs have not yet been able to convince one of the twelve October 2024 investors, who collectively gave OpenAI $6.6 billion, to provide a declaration supporting an injunction against it. But all of the circumstantial "plus" factors courts consider to infer an agreement around the "rim" are present. Mot. at 7-8.

Defendants do not dispute that facts supporting these "plus" factors are present here, but simply dismiss one of them—the observation that "[i]t [would not be] in the economic self-interest of any investor during the October 2024 funding round to refrain from investing in competitors like xAI unless all investors refrain[ed]"—as "merely lawyer's argument." OAI Opp. at 10. But it is the Ninth Circuit's "argument" why an agreement around the "rim" should be inferred: "Where the conduct of an alleged co-conspirator is in its own economic self-interest *only if* the other alleged co-conspirators follow suit, there is strong circumstantial evidence of a conspiracy." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 823 (9th Cir. 2023) (emphasis in original) (citations omitted). It is also, in fact, Microsoft's argument, given that it admits that refraining "from investing in other AI companies…would be contrary to Microsoft's business interests." Wetter Decl. ¶ 9. In any event, Plaintiffs put forth evidence of the "rim" agreement and are likely to succeed on this point. Gracias Decl. ¶¶ 5-6.

Separate and apart from their hub-and-spoke theory, Plaintiffs have also alleged that OpenAI's conduct should be imputed to Microsoft given Microsoft's de facto control of OpenAI. Mot. at 6 & n.4. Imputation of OpenAI's Fund No Competitors edict to Microsoft then

satisfies the "two or more parties" requirement for a traditional horizontal group boycott. *See City of Oakland*, 20 F.4th at 454.

Defendants' response to this argument misunderstands it. Plaintiffs do not contend that they—again, without the benefit of discovery—have direct, irrefutable evidence that Microsoft encouraged or actively joined in OpenAI's group boycott as a matter of indisputable fact, though they have cause to believe discovery will change that. Plaintiffs' contention is that OpenAI's conduct should be imputed to Microsoft as a matter of law, because Microsoft is a dominant partner in everything OpenAI does by virtue of its exclusive right to supply OpenAI's compute, FAC ¶ 112, exclusive license to "all the rights" to OpenAI's intellectual property, *id.* at ¶ 161, and position "in [OpenAI]," "below them," "above them," and "around them," *id.* ¶ 158. It is all the more so after Microsoft successfully re-installed Altman as CEO, purged OpenAI's board in November 2023, and obtained a non-voting seat for itself, filled by Templeton. *Id.* ¶¶ 148-72. Microsoft was at least in the room as an investor while OpenAI, a company it dominates and whose CEO and board it installed, demanded investors agree not to invest in competitors. Given Microsoft's extensive influence over OpenAI and its failure to prevent its subordinate entity from violating the law, Microsoft's participation in the Fund No Competitors edict should be inferred as a matter of fact and deemed as a matter of law. *See United States v. Bestfoods*, 524 U.S. 51, 62-64 (1998).

Finally, OpenAI suggests that Plaintiffs must show its group boycott unreasonably restrains trade or lacks a pro-competitive justification. Neither is required when, as here, the unlawful conduct is a *per se* violation, because such "agreements or practices…are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1154 (9th Cir. 2003). Regardless, OpenAI offers no pro-*competitive* justifications for its conduct. Pro-competitive justifications expand consumer choice. *See id.* at 1155 (repeatedly emphasizing consumer choice). But the edict OpenAI issued to get investors "involved in a meaningful way in [OpenAI,]" FAC Ex 25 at 1, does not help *competition*; it helps OpenAI. OpenAI's other argument, that the edict protects its business information, is

1    betrayed by its own practices. OpenAI has permitted board interlocks exposing such

2    information to competitors for years, continuing to today, Mot. at 13. OpenAI's investment

3    restriction throttles its rivals' access to capital, reducing consumer choice.

4         **C.**     **The Group Boycott Threatens Irreparable Injury.**

5         The final defense Defendants offer for their group boycott is that, unless xAI's doors

6    shutter, it cannot obtain an injunction. Not so. None of the cases Defendants cite considered a

7    market, like that for generative AI, with strong network effects and significant first-mover

8    advantages, as are undisputed here. These dynamics mean that the relative market share xAI is

9    losing as a result of OpenAI's anticompetitive conduct cannot be regained in the future.

10   Microsoft's CEO recently acknowledged as much. Ex. 41 at 3 ("'I don't think they'll be ever

11   again, maybe, be a two-year lead like this,' Nadella said. 'I think it's unlikely that that type of

12   lead could be established with some foundation model, but we have that advantage, that was the

13   great advantage we've had with OpenAI.'"). If lead time is as important as Microsoft says, then

14   the time xAI has lost, deprived of competing in a fair market, can never be made up. That

15   means it will be impossible to quantify compensatory damages accurately because the parties

16   will never know what the market would have looked like absent Defendants' anticompetitive

17   conduct. *See Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 848 (N.D. Cal. 2020). And,

18   even if this harm could be remedied with damages (which it cannot), OpenAI is losing billions

19   of dollars today and expects that burn rate to skyrocket to $14 billion in the near term. FAC

20   ¶ 222. Without an injunction, Plaintiffs will lose their opportunity for meaningful relief.

21
22   **II.**     **A PROHIBITORY INJUNCTION SHOULD ISSUE TO STOP THE HARMS
FLOWING FROM THE MICROSOFT-OPENAI BOARD INTERLOCKS.**

23        **A.**     **Binding Ninth Circuit Authority Establishes This Claim Is Not Moot.**

24        OpenAI cites *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 2007 WL 39301

25   (S.D.N.Y. Jan 8, 2007), as the sole support for its claim that the resignations of Microsoft (via

26   Templeton) and Hoffman from OpenAI's board render their violations moot. But that citation

27   fails to address the Ninth Circuit's binding analysis on this exact topic:

28        Petitioners also argue that this case is moot. Four reasons are given. First, Shepard
     left his post as an A-M director before the complaint was issued and, in fact, had

decided not to stand for reelection before receiving notice of the FTC investigation. Second, A-M…is no longer a competitor of TRW in any sense of the word. Third, TRW and Shepard have both provided sworn assurances that they will avoid offensive directorships in the future. Finally, TRW now maintains sophisticated director review procedures to ensure compliance with section 8. We hold that this case is not moot….[C]ases indicate that the concern is with repeated violations of the same law, and not merely with repetition of the same offensive conduct here, another interlock between TRW and A-M involving Shepard. In addition, it is clear that promises to refrain from future violations, no matter how well meant, are not sufficient to establish mootness.

*TRW, Inc. v. FTC*, 647 F.2d 942, 953 (9th Cir. 1981).[4] Even when all those mootness factors

were present, *TRW* still held "this case is not moot." *Id.* And this case *lacks* those factors.

Defendants have provided no evidence showing Hoffman and Templeton stood down "before

receiving notice of [an] FTC investigation," but even if that were so, the other three factors

*TRW* considered and found unpersuasive are not present: OpenAI and Microsoft still compete;

neither Hoffman nor Templeton has submitted "sworn assurances that they will avoid offensive

directorships in the future," with Templeton merely stating she has no present intention to seek

an OpenAI board position and Hoffman saying nothing; and OpenAI's continuous interlocks,

*infra* p. 17, demonstrate that it has no procedures in place "to ensure compliance with section

8." *Id.* Mootness is OpenAI's burden to prove, and it has come nowhere close. *Rosemere*

*Neighborhood*, 581 F.3d at 1172-73.

### B.    Musk and xAI Have Standing Because the Irreparable Harm of the Board Interlocks Persists.

OpenAI argues that Musk and xAI lack Article III standing under *Bearden v. Ballad*

*Health*, 967 F.3d 513 (6th Cir. 2020), because Plaintiffs allegedly fail to establish an injury in

---

[4] *Reading* is distinguishable on its facts. It specifically contrasted its holding with *SCM Corp. v. FTC*, 612 F.2d 707 (2d Cir.1980), where the Second Circuit exercised jurisdiction, because "the company that the interlocking director worked for [in *SCM*] still had an interest in the Respondent company at the time the Second Circuit reviewed the case." *Reading*, 2007 WL 39301, at *18. Here, like in *SCM* and unlike in *Reading*, Microsoft still has a significant "interest" in OpenAI. Further, in *SCM*, "there was no evidence—other than Defendant's own promise that it would not repeat the offending conduct—that the company would not seek a similar interlock in the future." *Id*. Here, Defendants have proffered even less. Templeton merely stated she has no present "intention" to serve on OpenAI's board again, Templeton Decl. ¶ 15, while Hoffman said nothing. To the extent OpenAI relies on dicta in *Reading*, 2007 WL 39301 at *17-18, to suggest mootness is less strictly enforced in a petition for review of an FTC action than in Plaintiffs' civil suit, OpenAI is simply wrong. Any Article III court, no matter the action, loses jurisdiction once the issue becomes moot. *Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency*, 581 F.3d 1169, 1172-73 (9th Cir. 2009).

fact. "To establish an injury in fact, plaintiffs must show that they suffered an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 516. In *Bearden*, the Sixth Circuit held that a group of local residents lacked standing to sue two hospitals with interlocking directorates because their claim was not "'particularized' to them," but rather an "interest" of the "general public," and the only potential injury was an admittedly "extreme" scenario. *Id.* at 517.

xAI and Musk are not purporting to sue on behalf of the public, but as direct competitors of OpenAI/Microsoft, and the notion that Defendants are benefitting from shared information is not "extreme." In the case of Templeton, even accepting her declaration as true, she abstained only from those portions of OpenAI meetings that concerned "topics relating to Microsoft *outside the parties' collaboration*," Templeton Decl. ¶ 13 (emphasis added), and from discussions of "competitively sensitive details of [OpenAI's] commercialization of GenAI technology in its *first-party products and services*," *id.* ¶ 16 (emphasis added), i.e., those products sold directly to consumers. In other words, Templeton actively participated in OpenAI board meetings when it concerned OpenAI's partnership with Microsoft, which Microsoft's CEO admitted is the very reason it acquired an interlocking board position. Ex. 2 at 3 (Nadella: "As a partner…you deserve to be consulted on big decisions."). And though Templeton left the board in July 2024, the risk of harm from her direct interlock continues today. She is able to readily exploit her prior board access to non-public information while leading "the cross-functional team responsible for Microsoft's collaboration with OpenAI." Ex. 16 at 2. There is no way to calculate damages for the competitive injury this collusion inflicts on xAI, because there is no way to measure the immense competitive advantage it gives OpenAI/Microsoft or to know what the market would have looked like absent it.

As to Hoffman, his declaration offers no promise against rejoining OpenAI's board whatsoever. Indeed, contrary to his declaration about his conduct during the interlock period, Hoffman is on tape touting his involvement in Microsoft's AI strategy and technical operations, Ex. 27 at 2, even using his insider access at OpenAI to give Microsoft co-founder Bill Gates a preview of ChatGPT before its release, Ex. 25 at 2-3. Such coordination by competitors is

precisely the kind of concrete, particularized, and irreparable harm Section 8 was meant to prevent. *TRW*, 647 F.2d at 846-47; Musk Decl. ¶¶ 9-10.

### C. Defendants Have Not Carried Their Burden To Prove that Section 8's Safe-Harbor Defenses Apply.

A *prima facie* case under Section 8 requires a showing that:

(1) No person shall, at the same time, serve as a director or officer in any two corporations…that are—(A) engaged in whole or in part in commerce; and (B) by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws; if each of the corporations has capital, surplus, and undivided profits aggregating more than $[48,559,000].

15 U.S.C. § 19; 89 Fed. Reg. 3926 (Jan. 22, 2024). Hoffman and Templeton admit they were involved with OpenAI's board after Defendants released competing products, including ChatGPT and Copilot. OAI Opp. at 15. Plaintiffs showed, and Defendants do not dispute, that OpenAI and Microsoft were "engaged in whole or in part in commerce," that "elimination of competition by agreement between them would constitute a violation of any of the antitrust laws," and that either business had capital under the adjusted limit of $48,559,000. Plaintiffs have made a *prima facie* case.

But as Defendants note, Section 8 has two safe-harbor provisions. *First*, it exempts companies that, during the relevant look-back period, have competitive sales below certain thresholds.[5] 15 U.S.C. § 19(a)(2). *Second*, "[w]hen any person elected or chosen as a director or officer of any corporation subject to the provisions hereof *is eligible at the time of his election* or selection to act for such corporation," then the director receives a one-year grace period to resign after any event rendering the director ineligible. *Id.* § 19(b) (emphasis added).

Applying this rubric first to Hoffman's board service, his last election to Microsoft's board prior to resigning from OpenAI's board occurred in December 2022. Ex. 47 at 2, 6. If he were "eligible at the time of [that] election," he would receive a one-year grace period after any disqualifying event. He was not eligible, however, because Microsoft's and OpenAI's competitive sales exceeded the 2% safe-harbor limit in the immediately preceding fiscal year,

---

[5] Microsoft and OpenAI raise only the 2% threshold, rather the absolute-dollar figure or the 4% threshold. OAI Opp. at 16 n.4; MSoft Opp. at 16 & n.5. As safe-harbor provisions are a defendant's burden, Plaintiffs do not address the waived thresholds.

1    which closed June 30, 2022.

2         For purposes of the 2% safe harbor, a court must consider "*all* products and services

3    sold by one corporation in competition with the other." 15 U.S.C. § 19(a)(2) (emphasis added).

4    Only if either Microsoft's or OpenAI's "competitive sales" were below 2% of "total sales,"

5    defined as "the gross revenues for all products and services sold by one corporation over that

6    corporation's last completed fiscal year," would Hoffman have been eligible for election to

7    Microsoft's board in December 2022. *Id.* § (a)(2)(B).

8         Section 8's definition of competition is exceptionally broad. The Ninth Circuit's

9    observations apply as easily to generative AI as to 1970s-era electronic fund transfer systems:

> During the complaint period the marketplace for this type of equipment was in its
> infancy. Most of the technology was experimental or in a developing state…In a
> developing industry in which product variation is just beginning and customer
> needs are not yet standardized, it is unlikely that two companies will produce
> products nearly equivalent in their ability to satisfy the needs of a range of
> customers. Nonetheless, these companies compete. Their competition consists of
> the struggle to obtain the patronage of the same prospective customers,
> accompanied by representations of a willingness to modify their respective
> products. Competition also consists of efforts to make a sale, even if neither
> succeeds in persuading the buyer to purchase.

15   *TRW*, 647 F.2d at 947-48; *see United States v. Sears, Roebuck & Co.*, 111 F. Supp. 614, 615

16   (S.D.N.Y. 1953) (defining competition as encompassing a wide-ranging inventory). The Ninth

17   Circuit's test, ignored by Defendants, looks to "the degree of actual interchangeability of use

18   between the products of alleged competitors," and "evidence concerning (1) the extent to which

19   the industry and its customers recognize the products as separate or competing; (2) the extent to

20   which production techniques for the products are similar; and (3) the extent to which the

21   products can be said to have distinctive customers." *TRW*, 647 F.2d at 947.

22        OpenAI provides the Court with absolutely no information concerning the date of

23   Hoffman's last election to its board, product descriptions, or segmented revenues during the

24   look-back period and has therefore waived this defense. *See In re Soc. Media Adolescent*

25   *Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 837 (N.D. Cal. 2023). Microsoft

26   offers a declaration concerning the absence of direct revenues in 2022 from two AI products,

27   Klobuchar Decl. ¶¶ 4-5, but fails to provide information on "all products and services" for "the

28

same prospective customers" as those of OpenAI. *TRW*, 647 F.2d at 947.[6] Nevertheless, Plaintiffs rebut Defendants' affirmative defenses below.

At the close of Microsoft's last fiscal year prior to Hoffman's December 2022 election, its "Intelligent Cloud" business segment offered numerous cloud-based AI products and services to developers that competed directly with those of OpenAI. Ex. 31 at 4-5, 13-14, 24, 40, 43-44. Microsoft's June 30, 2022, 10-K shows its "Intelligent Cloud" segment included "Server Products and Cloud Services," featuring a "global network of datacenters for...AI," and "Enterprise Services," which included "Nuance conversational AI," acquired from AI software provider Nuance Communications for $18.8 billion in 2022. Ex. 31 at 13, 40. Microsoft also launched its generative AI program Copilot through GitHub in 2021.[7] Ex. Ex. 48 at 1.

In fact, Microsoft deployed OpenAI's GPT-3 model under the Azure OpenAI brand as early as November 2, 2021. Ex. 44 at 1. Microsoft's 2021 and 2022 10-Ks extol its "vision [] to compete and grow by building…services for an intelligent cloud…infused with artificial intelligence," Ex. 30 at 23; Ex. 31 at 24, and how it was "accelerating adoption of AI innovations from research to products…[to] help[] every developer be an AI developer," Exs. 30-31 at 5. With such representations to investors and regulators, Microsoft cannot now tell the Court it earned nothing from AI until 2023.

Microsoft's Intelligent Cloud AI business segment produced 38% of total revenues in fiscal year 2022, far in excess of the safe-harbor 2% limit. Ex. 31 at 43-44 (showing $75.25 billion in Intelligent Cloud revenue out of $198 billion in total). Based on publicly available information, selling developers a cloud-based AI interface was OpenAI's *only* source of

---

[6] Regardless, as Plaintiffs show, Hoffman was ineligible at his December 2022 election to Microsoft's board, which alone is sufficient to deny safe-harbor protection.

[7] While Microsoft submitted a declaration claiming it received no revenues from Copilot until 2023, it bases this conclusion only on revenues from Copilot subscriptions, rather than *all* revenue attributable to Copilot. Klobuchar Decl. ¶¶ 4-6 (switching between "revenue" and "direct revenue"). But Microsoft cannot escape the need to account for revenue attributable to the free Copilot functionality tied to GitHub's revenue-generating features, any more than it could escape antitrust liability for tying the "free" Internet Explorer to Windows. *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001). Since GitHub sold products and services with a tied AI product, its revenues must be included in Microsoft's "gross revenues for all products and services sold." 15 U.S.C. § 19(a)(2).

revenue in 2021-2022, meaning of necessity, it exceeded 2% of total revenues. Ex. 46 at 2.

Because Microsoft and OpenAI had sales across all competing services and products in excess of 2% by the close of the relevant fiscal year on June 30, 2022, Hoffman was not eligible to serve on Microsoft's board when elected in December 2022. Because he was not eligible to serve when elected, he cannot avail himself of 15 U.S.C. § 19(b)'s one-year grace period. The same analysis applies to Templeton, who joined OpenAI's board in December 2023. Templeton Decl. ¶ 10. According to Microsoft's June 30, 2023, 10-K, its Intelligent Cloud segment generated $87.9 billion in revenue (41%) out of a total of $211.9 billion, far exceeding the 2% limit. Ex. 32 at 44-45. Templeton was not eligible to serve on OpenAI's board when selected, making her ineligible for the one-year grace period. As such, Plaintiffs will likely show Hoffman and Templeton were interlocked directors in violation of Section 8.

### D.    Templeton's "Observer" Board Membership Likely Triggers Section 8.

Defendants attempt to defend Templeton's violation of Section 8 on two bases. *First*, they argue she was not an officer of Microsoft until recently, so there was no interlock. But neither Microsoft nor OpenAI disputes that she was Microsoft's agent or that it was "Microsoft's seat," not hers personally. Templeton Decl. Ex. A at 2 ("Microsoft shall be entitled to appoint a representative as a non-voting board observer (the 'Board Observer') to attend and participate in all meetings of the Board…"). And as OpenAI acknowledges in a footnote, the sole case to address this issue held that agents of a corporation cannot serve. OAI Opp. at 17 n.6 (citing *Square D Co. v. Schneider S.A.*, 760 F. Supp. 362 (S.D.N.Y. 1991)); *see also U.S. v. Cleveland Tr. Co.*, 392 F. Supp. 699, 711-12 (N.D. Ohio 1974), *aff'd*, 513 F.2d 633 (6th Cir. 1975) (endorsing "deputization theory" on case-by-case basis). Congress clearly sought to prohibit companies placing themselves on a competitor's board. *See SCM v. F.T.C.,* 565 F.2d, 807, 810-11 (2d Cir. 1977) (holding Section 8 applies to corporations and individual directors).

*Second*, Defendants argue that, because Templeton was merely a non-voting "observer," she does not qualify as a "director" under Section 8. This ignores both the statute's purpose and practical reality. As Defendants concede, Section 8 serves to prevent opportunities for collusion between competitors, and the entire point of Microsoft's observer was to give it "greater

transparency in [OpenAI's] governance[.]" Templeton Decl. Ex. A at 2.

That Templeton allegedly stepped out of a few board meetings for a moment and skipped one entirely does not eliminate the harm. She still had the opportunity to coordinate *actions*,[8] had access to competitively sensitive *technical* information, and had access to commercialization information concerning OpenAI and Microsoft's relationship. Templeton Decl. Ex. A at 2. Although no case comprehensively defines "competitively sensitive information" for purposes of the Clayton Act, the "compelling need" standard for sealing business-related documents in court proceedings is closely analogous, if not more demanding. This category encompasses: commercial data, customer information, supply chain details, business relationships, and sensitive financial metrics including costs, margins, and performance data, *E. & J. Gallo Winery v. Strategic Materials, Inc.*, No. 17-CV-01709-EPG, 2020 WL 4018241, at *10-11 (E.D. Cal. July 16, 2020); operational elements like procurement, technological capabilities, decision-making processes, and market share information, *Fed. Trade Comm'n v. Microsoft Corp.*, No. 23-CV-02880-JSC, 2023 WL 5186252, at *4-6 (N.D. Cal. Aug. 11, 2023); and proprietary information including unique business methods, processes, and technologies, *Mission Wellness Pharmacy LLC v. Caremark LLC*, 641 F. Supp. 3d 673, 677-78 (D. Ariz. 2022).

Templeton's declaration does not show she lacked access to such information at OpenAI or that she declined to coordinate business activities even in the purported absence of it. Congress enacted Section 8 to prevent exactly this kind of inter-board coordination because corporations cannot be relied on to self-police against anticompetitive conduct.[9] Plaintiffs will

---

[8] Both Microsoft and OpenAI focus solely on information sharing, but Section 8 is focused on all acts of collusion, including coordination of business decisions without such sharing. *Square D*, 760 F. Supp. at 366 (highlighting need to prevent "the opportunity for the coordination of business decisions by competitors"). Templeton did not have to share *information* with OpenAI to synchronize Microsoft's business decisions; opinions or proposals, without the underlying information, would suffice.

[9] Even if one assumed, contrary to Congress' judgment, that corporations could be trusted to self-police board interlocks, the self-policing provisions of the letter granting Microsoft its seat are manifestly inadequate. In addition to all the limitations noted *supra* pp. 11-12, it nowhere prohibits Templeton from sharing *Microsoft*'s competitively sensitive commercial information with OpenAI or otherwise coordinating business activities.

1    likely show Templeton's service on OpenAI's board violated Section 8.[10]

2    E.    **Injunctive Relief Is Necessary To Stop Ongoing Harms and Prevent Future Misconduct.**

3    Defendants argue that, because Hoffman and Templeton's direct interlocks appear to be

4    over, the Court should deny injunctive relief. That is not the standard. Both the Supreme Court

5    and the Ninth Circuit, along with other courts, have recognized the appropriateness of

6    injunctive relief even after interlocks have ended when the conduct was "blatant" or repeated.

7    *TRW,* 647 F.2d at 954; *see United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

8    The Hoffman/Templeton interlocks were blatant indeed. Templeton was the agent of

9    admitted competitor Microsoft, while Hoffman served simultaneously on the boards of at least

10   three AI competitors: Microsoft, OpenAI, and Inflection AI—the latter of which he co-founded

11   to capitalize on AI's emerging market. FAC ¶ 169. And Hoffman and Templeton are not the

12   only interlocked directors at OpenAI. Brett Taylor, like Hoffman, founded his own competing

13   AI company while serving as chairman of OpenAI's board. Mot. at 13. And, in addition to

14   Hoffman's indirect interlocks through Greylock, his roles at Entrepreneur First, Reinvent

15   Capital, and Village Global create an intricate network of indirect interlocks across multiple AI

16   companies. Exs. 11-16. OpenAI was and is plainly a hotbed of conflicted directors. Plaintiffs

17   are entitled to equitable relief. *TRW*, 647 F.2d at 954.

18
19   III.    **A PROHIBITORY INJUNCTION TO STOP OPENAI FROM ACTING AS A FOR-PROFIT ENTITY WITHOUT AUTHORIZATION SHOULD ISSUE.**

20   A.    **Musk Is Likely To Prevail on Statutory Standing.[11]**

21   OpenAI's standing argument is based on a district court's citation to a 1931 California

22   case, *O'Hara v. Grand Lodge Indep. Ord. of Good Templars of State of Cal.*, 213 Cal. 131

23

24   [10] OpenAI also advances the argument that because the safe-harbor provision in 15 U.S.C.
§ 19(b) refers to a director's "eligibility to act," Congress meant to exclude non-voting board

25   members. But this argument proves the opposite. Congress did not use the phrase "eligibility to
*vote*," but "eligibility to *act*," and even non-voting directors "act" for a corporation by, e.g.,

26   attending board meetings, offering advice, and working on committees. *See* Mot. at 11 n.8.

27   [11] OpenAI's baseless statement that Musk "[a]ll but conced[es]…[he] lacks standing" by his
application for relator status, a process underway since before filing the FAC, Ex. 49 at 1,

28   misunderstands the facts. Musk and Zilis seek relator status not because they lack standing, but
because they are well-qualified to represent the State of California's separate interests in
stopping OpenAI's misconduct, Ex. 45, a conclusion shared even by competitors, Ex. 50 at 3.

(1931). Though OpenAI neglects to mention it, California courts recognize that *O'Hara* has been superseded by statute on the precise question at issue. *Patton v. Sherwood*, 152 Cal. App. 4th 339, 346-47 (2007) ("Respondents cite older cases holding that settlors/trustors have no standing to bring an action to enforce a charitable trust [including *O'Hara*]. Those cases, however, predate the 1983 enactment of [Cal. Prob. Code] Section 24…"). *O'Hara* also long pre-dates Justice Traynor's influential opinion in *Holt v. Coll. of Osteopathic Physicians & Surgeons*, 61 Cal. 2d 750, 754 (1964), under which California courts have ruled the common law provides that "[a] suit for the enforcement of a charitable trust may be maintained…by a settlor." *Autonomous Region of Narcotics Anonymous v. Narcotics Anonymous World Servs., Inc.*, 77 Cal. App. 5th 950, 965 (2022). Musk is such a settlor.

OpenAI resists Musk's settlor standing by stressing that the contract or trust document in *L.B. Research & Education Foundation v. UCLA Foundation,* 130 Cal. App. 4th 171 (2005), was in writing. But the charitable trust in this case is supported by writings, Mot. at 17, and in any event, that is irrelevant. *Pac. Home v. Los Angeles Cnty.*, 41 Cal. 2d 844, 852 (1953) ("[A]ll the assets of a corporation organized solely for charitable purposes must be deemed to be impressed with a charitable trust by virtue of the express declaration of the corporation's purposes, [] notwithstanding the absence of any express declaration by those who contribute such assets"). *L.B. Research* made no distinction between trusts formed by writing and those arising from "a manifestation of an intention to create it." And any such distinction would have been foreclosed by *Pacific Home. L.B. Research,* 130 Cal. App. 4th at 177. Finally, OpenAI claims that Musk maintained no "reversionary interest" in his donations to OpenAI, but Plaintiffs' Motion never argued he did. Instead, Musk has standing from two independent sources: a contract subject to a condition subsequent, Cal. Corp. Code § 5142(a)(4), and clear authority under California's common law. Both support standing here.

### B.    Musk Is Likely To Prevail on His Claim That OpenAI Is Violating the Terms of Its Charitable Trust.

The record demonstrates OpenAI's clear departure from and breach of its foundational commitments. OpenAI has systematically abandoned its open-source principles, prioritized

commercial interests over safety, and actively pursued conversion to a for-profit structure in contravention of its charitable mission. FAC ¶¶ 173-201. Whether the trust was memorialized in writing, or established through OpenAI's "express declaration of the corporation's purposes," *Pac. Home*, 41 Cal. 2d at 852, one unwavering commitment appears in every source: *OpenAI's assets will not inure to private benefit*. FAC Ex. 21 at 4 (Certificate of Incorporation: "[N]o part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person."). Thus, OpenAI's documented, admitted, and accelerating efforts to "commercialize" its technology, Exs. 42-43; its diversion of intellectual property, staff, and revenues from the non-profit to for-profit entities controlled by Altman and Microsoft for their self-enrichment, FAC ¶¶ 128-47; and its present intention to operate as a fully for-profit company, all breach the trust.[12] OpenAI offers no explanation to reconcile its operations with the charitable commitments on which Musk relied, as no lawful reconciliation is possible.

OpenAI's breach extends beyond structural changes and unlawful profiteering. The organization has also abandoned its foundational commitment to safety and transparency. OpenAI's AGI Readiness Team, whose task was to ensure OpenAI was prepared to safely handle advanced AI technology, has been disbanded, and the organization quietly dropped provisions in its terms of use banning military applications. FAC ¶ 193. Numerous OpenAI founders, executives, scientists, and engineers have resigned in protest of the organization's repudiation of its founding mission by prioritizing profits over safety. *Id*. ¶ 185 (safety has "taken a backseat to shiny products"); Ex. 40 at 3.

Notwithstanding this conduct, OpenAI is still a non-profit organization, bound by a charitable trust, which made express commitments to donors, regulators, and the public. It has not received, and may never obtain, proper approvals from the California and Delaware

---

[12] Contrary to OpenAI's argument, Musk never assented to OpenAI's conversion to a fully for-profit entity. Musk Decl. ¶¶ 12-13. But even if he had, it would change nothing. As *Pacific Home* makes clear, the Certification of Incorporation controls, and all OpenAI's assets were dedicated to its charitable purpose "irrevocably." 41 Cal. at 852; FAC ¶ 89. Musk can no more consent to OpenAI enriching Altman and Microsoft than someone who donated a Picasso to MoMA could consent to it being sold to enrich a board member.

Attorneys General to effectuate its conversion to a fully for-profit company. Absent such approval, the Court should enjoin OpenAI from further violating its obligations and abandoning its mission as a safety-first charitable organization.

## IV.    A PROHIBITORY INJUNCTION SHOULD ISSUE TO STOP ALTMAN'S SELF-DEALING.

### A.    Musk and Zilis Are Likely To Prevail on Statutory Standing.

The California Supreme Court has held former non-profit board members have multiple legal avenues to establish standing. *First*, former directors who are no longer members have standing under common law principles. *Turner v. Victoria,* 15 Cal. 5th 99, 128 (2023). OpenAI omits *Turner*'s relevant language, claiming it addressed only directors who are forced out after filing suit, but as *Turner* emphasizes, "the Restatement 'goes further.'" *Id*. It allows "*former* board members to bring a claim," *id.* (emphasis in original), if they, like Musk and Zilis, are no longer members "for reasons related to that member's attempt to address the alleged harm to the charity." Restatement of Charitable Nonprofit Organizations § 6.02(b)(2)(B). *Turner* makes clear this is in addition to the standing it grants directors forced out after filing suit (emphasized by OpenAI). 15 Cal. 5th at 128. *Second*, *Turner* further supports Plaintiffs' standing in confirming that California Corporation Code § 5710(b)(1) should be read to enable former members like Musk and Zilis, who had contemporaneous knowledge of challenged conduct, to protect OpenAI.[13] *Id*. at 115. California law is clear: derivative standing works differently for charities than for commercial entities.

Here, Zilis served as a member of OpenAI from March 2019 until March 2023, during several of Altman's self-dealing transactions, as detailed in the FAC, *id*. ¶¶ 135-45, 232, 456-57, and raised concerns with the board about Altman's Helion Energy transaction and product safety. Zilis Decl. ¶ 5. Once it became evident it was futile to raise these concerns with a board

---

[13] OpenAI asserts that, because its Bylaws use "director" and "member" coterminously, the statutory standing analysis for directors and members is identical. But this simplistic view ignores the distinct language in Section 5710(b), applicable to former *members* like Musk and Zilis, which supports broader standing than that in Section 5233(c)(2), applicable only to former *directors*. *See* Mot. at 18. California law maintains discrete standards for these positions; OpenAI's chosen definitions do not bear on the proper statutory analysis.

controlled by Altman, she resigned. *Id.* ¶ 6. Musk served on OpenAI's board from its founding in 2015 to 2018, during which Altman concocted the For-Profit Entities scheme, a self-dealing transaction enabling Altman's subsequent self-dealing. FAC ¶¶ 106-09, 231. Musk resigned specifically to avoid the kinds of conflicts of interests that have plagued OpenAI since.

Defendants' argument that Plaintiffs were required to make more precise demands on the board ignores both the futility exception and the reality of OpenAI's governance. After Microsoft and Altman purged its independent directors who sought to address Altman's conflicts in November 2023, the board has been dominated by directors aligned with Altman. FAC ¶¶ 161-71. California courts have long recognized that demand is excused as futile where the board is not independent because a "director is 'beholden' to an interested director or officer, 'or so under their influence that their discretion would be sterilized," as well as where an interested director takes action without formal board approval, as Altman habitually does. *Bader v. Anderson*, 179 Cal. App. 4th 775, 790-93 (2009); Zilis Decl. ¶¶ 2-3. In any event, the demand requirement applies only to derivative standing under Section 5710(b)(2). *Turner* imposed no demand requirement for common-law standing under the Restatement. Even if it did, Musk and Zilis made repeated efforts to raise their concerns before litigation, including by providing OpenAI with the FAC prior to filing. FAC ¶ 240. Only after these efforts proved futile and Altman's misconduct escalated did Plaintiffs file suit.

### B.     OpenAI Does Not Defend Altman's Conduct and Ignores California's Regulatory Framework.

OpenAI does not contest the existence of Altman's self-dealing transactions, i.e., that OpenAI has entered into transactions with businesses in which Altman has material financial interests. Instead, it simply states that the transactions "appear" to have benefitted OpenAI. But that is not the standard. Altman and OpenAI have the burden to show OpenAI "entered into [each] transaction for its own benefit."[14] Cal. Corp. Code § 5233(d)(2)(A). They have the

---

[14] As noted, Mot. at 21 n.15, Defendants carry the burden of showing compliance with this safe-harbor process for approving a self-dealing transaction. *See, e.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) (holding DMCA safe harbors are affirmative defenses); *Jackpot Harvesting Co. v. Superior Ct.*, 26 Cal. App. 5th 125, 148-49

burden to show each "transaction was fair and reasonable as to the corporation at the time the corporation entered into the transaction," *id.* § 5233(d)(2)(B), to show these transactions were properly disclosed to and approved by independent directors, *id.* § 5233(d)(2)(C), to show that "[p]rior to authorizing or approving the transaction the board considered and in good faith determined after reasonable investigation under the circumstances that the corporation could not have obtained a more advantageous arrangement with reasonable effort under the circumstances," or that "the corporation in fact could not have obtained a more advantageous arrangement with reasonable effort under the circumstances," *id.* § 5233(d)(2)(D). OpenAI proves none of these elements, failing to satisfy its burden.

## V.   THE HARMS FROM DEFENDANTS' CONDUCT ARE IRREPARABLE.

Defendants claim that xAI's recent fundraising shows it is not harmed, but their argument fundamentally misunderstands the generative AI market. As detailed in the FAC, this market exhibits pronounced network effects and first-mover advantages. As a result, the advantages gained through anticompetitive conduct become increasingly difficult to quantify and dislodge over time. Courts have recognized that such market characteristics support a finding of irreparable injury. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 645 (Fed. Cir. 2015) ("Apple's downstream and network effect losses are very difficult to quantify.").

Moreover, this Court has held that the long-term competitive disadvantage from being forced to operate with unlawfully limited resources cannot be adequately remedied through damages. Mot. at 22 (citing *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817 (N.D. Cal. 2020)). While both oppositions cite this case, neither addresses its irreparable injury analysis.

If OpenAI further transfers its assets and Altman's self-dealing continues, unwinding such transactions will be extraordinarily complex and irreparably harmful to all involved.[15] This problem is compounding every month. Since Plaintiffs filed their Motion, OpenAI has permitted SoftBank to buy $1.5 billion in employee equity, adding numerous ordinary

---

(2018) (Labor Code safe-harbor is affirmative defense). Yet, OpenAI does not address the issue, despite all the evidence being within its control.

[15] Microsoft inadvertently highlights another aspect of this problem by emphasizing how deeply integrated OpenAI's technology is in Microsoft's products. MSoft Opp. at 22-23.

1  employees to those at risk in an unwinding. OpenAI's aggressive spending exposes investors

2  and employees to needless harm, and all but ensures Plaintiffs will be unable to recover.

3
4
**VI.    THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS' FAVOR, AND THE PUBLIC INTEREST FAVORS RELIEF.**

5       Microsoft argues that a preliminary injunction would harm its customers who rely on

6  OpenAI's technology, but its argument dramatically overstates the scope and impact of the

7  proposed injunction. The relief sought would simply maintain the status quo by preventing

8  OpenAI from further transferring or diverting its technology in violation of its charitable trust

9  obligations unless and until regulators duly approve such. It does not unwind existing contracts

10  or affect OpenAI's ability to provide routine software updates, security patches, or safety

11  improvements to existing users like Microsoft. In any event, if Microsoft has concerns over the

12  precise scope of the injunction, those can be managed by the parties and the Court.

13       Defendants attempt to characterize the requested injunction as mandatory rather than

14  prohibitory, but their reframing of the Motion to manufacture prejudice is unavailing. The relief

15  sought is purely prohibitory. It seeks to maintain the status quo by halting Defendants'

16  anticompetitive conduct, protecting OpenAI's current charitable status, and preventing further

17  unlawful self-dealing. As noted in *OpenAI, Inc. v. Open A.I., Inc.*, the distinction between

18  mandatory and prohibitory injunctions becomes "particularly 'artificial'" in cases like this

19  involving misconduct that gradually worsens. No. 24-1963, 2024 WL 4763687, at *1 (9th Cir.

20  Nov. 13, 2024). Here, Defendants' misconduct escalated gradually but reached a tipping point

21  in October 2024 when OpenAI imposed a group boycott and Altman announced plans to

22  convert OpenAI to fully for-profit. These actions crystallized the need for immediate relief.

23       The public interest also strongly favors preliminary relief. Defendants' claim that

24  enjoining anticompetitive conduct would somehow harm competition turns antitrust law on its

25  head. The Sherman and Clayton Acts were specifically designed to prevent exactly what we see

26  here: dominant market players leveraging their power to exclude rivals and concentrate control

27  of emerging markets. OpenAI's anticompetitive exploitation of its non-profit status threatens to

28  distort competition and establishes a concerning precedent in Silicon Valley by allowing

companies to strategically toggle between non-profit and for-profit structures while retaining the benefits of both. Permitting such conduct encourages companies to exploit the system by masquerading as non-profits until it is time to cash out, securing a competitive advantage over market participants who operate legitimately. Ex. 50 at 2; Ex. 51 at 4-5.

Moreover, the public interest extends beyond market competition. There is a profound societal stake in ensuring tax-subsidized charitable assets fulfill their intended public benefit and not be diverted for private gain. These principles take on particular urgency here, where charitable donations were explicitly dedicated to the safe development of what will be the most transformative technology the world has ever known.

## **CONCLUSION**

What Defendants' oppositions *fail* to dispute confirms the urgency of Plaintiffs' need for relief. Their oppositions do not contest that OpenAI, Inc. lacks regulatory authorization to operate as a for-profit startup, yet that is precisely what it is doing. Nor do they contest that Altman is engaged in unchecked self-dealing. Nor that Defendants have seized monopolistic power, controlling nearly 70% of the generative AI market. Nor that there is significant and growing concern among experts over the safety of OpenAI's products. If and when this troubling pattern of conduct stops, the Court and the parties can proceed in ordinary course. Until then, Defendants' unlawful conduct irreparably handicaps competitors, distorts the generative AI market, undermines consumer choice, and betrays the OpenAI charitable trust. At minimum, Plaintiffs have raised serious questions warranting injunctive relief pending final disposition. Plaintiffs submit that the requested prohibitory injunction should issue.


DATED: December 27, 2024              Respectfully Submitted,

                                      TOBEROFF & ASSOCIATES, P.C.

                                         */s/ Marc Toberoff*
                                         Marc Toberoff

                                      *Attorneys for Plaintiffs Elon Musk*
                                      *Shivon Zilis, and X.AI Corp.*

CASE NO. 24-CV-04722-YGR
                                      PLS.' REPLY ISO MOT. FOR PRELIM. INJ.