DOHA MEKKI
*Acting Assistant Attorney General*
JOHN W. ELIAS
*Deputy Assistant Attorneys General*
DAVID B. LAWRENCE
*Policy Director*
RYAN DANKS
*Director of Civil Enforcement*
MIRIAM R. VISHIO
*Deputy Director of Civil Enforcement*
BENJAMIN L. RUDOFSKY (NY Bar No. 5321005, DC Bar No. 1029844)
ALICE A. WANG
*Counsel to the Assistant Attorney General*
ERIC D. DUNN (CSBN 312513)
*Assistant Chief, Competition Policy and Advocacy Section*

U.S. Department of Justice, Antitrust Division
950 Pennsylvania Ave, N.W.
Washington, DC 20530
Telephone: (202) 808-4260
benjamin.rudofsky@usdoj.gov

Attorneys for the United States

ANISHA DASGUPTA
*General Counsel*
HENRY LIU
*Director, Bureau of Competition*
HANNAH GARDEN-MONHEIT
*Director of the Office of Policy Planning*
SHAOUL SUSSMAN
*Associate Director for Litigation, Bureau of Competition*
KATHERINE VAN DYCK
*Attorney-Advisor, Office of Policy Planning*

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Attorneys for the Federal Trade Commission

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 4:24-cv-04722-YGR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ELON MUSK, et al.

                    Plaintiffs,

          v.

SAMUEL ALTMAN, et al.,

                    Defendants.

Case No. 4:24-cv-04722-YGR

Hon. Yvonne Gonzalez Rogers

**STATEMENT OF INTEREST OF THE UNITED STATES AND FEDERAL TRADE COMMISSION**

Date:   January 14, 2025
Time:   2:00 p.m.
Place:  Courtroom 1 (4th Floor)
        1301 Clay St.
        Oakland, CA 94612

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................II

INTRODUCTION ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................ 2

ARGUMENT ............................................................................................. 3

    I.      Section 8's Bar on Interlocking Directorates.................................. 3

          A.     Statutory Background ........................................................ 3

          B.     Section 8 Claims Are Not Mooted by Simply Unwinding an Interlock ..... 4

          C.     Section 8 Bars Relationships that Create an Interlock Regardless of Form 6

    II.     Interlocking Directorates are an Unfair Method of Competition........................... 7

    III.    Group Boycotts Under Section 1 ....................................... 10

CONCLUSION............................................................................... 12

1

**TABLE OF AUTHORITIES**

2
**Cases**

3
*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010).................................. 10

4
*Am. Tobacco v. United States*, 328 U.S. 781 (1946) ............................................... 11

5
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) .................................... 11

6
*Blau v. Lehman*, 368 U.S. 403 (1962)..................................................................... 7

7
*California v. Fed. Power Comm'n,* 369 U.S. 482 (1962) ......................................... 7

8
*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ............. 1, 8, 9

9
*Cty. of Los Angeles v. Davis*, 440 U.S. 625 (1979).................................................. 5

10
*E.I. du Pont de Nemours & Co. v. FTC (Ethyl)*, 729 F.2d 128 (2d Cir. 1984) ........................ 1, 8

11
*Epic Games v. Apple,* 67 F.4th 946 (9th Cir. 2023)........................................... 8, 10

12
*Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 2:23-CV-01495-JHC, 2024 WL 4448815

13
   (W.D. Wash. Sept. 30, 2024) ................................................................... 8

14
*Fed. Trade Comm'n v. Motion Picture Advertising Service Co.*, 344 U.S. 392 (1953) ................. 8

15
*Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)........................ 8

16
*Fed. Trade Comm'n v. Texaco, Inc.*, 393 U.S. 223 (1968)........................................ 8

17
*Grand Union Co. v. FTC*, 300 F.2d 92 (2d Cir. 1962) ........................................... 9

18
*Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813 (9th Cir. 2023) ................... 10, 11

19
*Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) ......................... 11

20
*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998)........................................ 11

21
*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) .............................................. 10

22
*PLS.com v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022) ............................ 11

23
*Protectoseal Co. v. Barancik*, 484 F.2d 585 (7th Cir. 1973) ............................... 4, 5

24
*Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003) ....... 3, 4, 7

25
*Square D Co. v. Schneider S.A.*, 760 F. Supp. 362 (S.D.N.Y. 1991) ..................... 4, 5, 7

26
*Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911)........................ 10

27
*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) .................................. 11

28
*TRW, Inc. v. FTC*, 647 F.2d 942 (9th Cir. 1981) .................................... passim

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) ........................................................ 11

*United States v. Cleveland Tr. Co.*, 392 F. Supp. 699 (N.D. Ohio 1974), *aff'd*, 513 F.2d 633
    (6th Cir. 1975) .................................................................................................................... 7

*United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199 (1968) ........................ 5, 6

*United States v. Paramount Pictures*, 334 U.S. 131 (1948) .......................................................... 5

*United States v. Sears, Roebuck & Co*, 111 F. Supp. 614 (S.D.N.Y. 1953) ................................. 4

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ................................... 6

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953) ............................................................. 4, 5

*White v. R.M. Packer Co.*, 635 F.3d 571 (1st Cir. 2011) ........................................................... 11

**Statutes**

15 U.S.C § 45 ................................................................................................................................. 1

15 U.S.C. § 1 ..................................................................................................................... 1, 4, 10

15 U.S.C. § 19 ........................................................................................................................ 1, 3

15 U.S.C. § 2 ................................................................................................................................ 4

28 U.S.C. § 517 ............................................................................................................................ 1

Cal. Bus. & Prof. Code § 17200 ................................................................................................. 1

**Administrative Decisions**

*In re Kraftco Corp.*, 89 F.T.C. 46, 1977 WL 188540 (Jan. 11, 1977) ......................................... 9

*In re Perpetual Fed. Sav & Loan Assoc.*, 90 F.T.C. 608 (1977), *rem'd on other grounds*, No.
    78-1134 (4th Cir. 1978), *order withdrawn*, 94 F.T.C. 401 (1979) .......................................... 9

*United Auto Workers Advisory Opinion*, 97 F.T.C. 933 (May 1, 1981) ..................................... 6

**Other Authorities**

*In re EQT Corp.*, File No. 221-0212, Stmt. of Chair Lina M. Khan Joined by Comm'r
    Rebecca Kelly Slaughter and Comm'r Alvaro Bedoya (F.T.C. Aug. 16, 2023) ...................... 9

Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5
    of the Federal Trade Commission Act, File No. P221202 (F.T.C. Nov. 10, 2022) ................. 8

1

**INTRODUCTION**

2    The United States, through the U.S. Department of Justice, joined by the Federal Trade

3  Commission ("FTC"), respectfully submits this Statement of Interest pursuant to 28 U.S.C. §

4  517.  The Antitrust Division of the U.S. Department of Justice and the FTC (collectively, the

5  "Agencies") enforce the federal antitrust laws, including the prohibition against interlocking

6  directorates in Section 8 of the Clayton Act, 15 U.S.C. § 19,[1] and the prohibition against

7  contracts, combinations, and conspiracies in restraint of trade in Section 1 of the Sherman Act,

8  15 U.S.C. § 1. The Agencies therefore have a strong interest in their correct application.

9    The FTC is further charged by Congress with preventing unfair methods of competition

10  under Section 5 of the FTC Act, 15 U.S.C § 45.  Such unfair methods include "incipient

11  violations of [the Clayton Act], and conduct which, although not a violation of the letter of the

12  antitrust laws, is close to a violation or is contrary to their spirit."  *E.I. du Pont de Nemours &*

13  *Co. v. FTC (Ethyl)*, 729 F.2d 128, 136–37 (2d Cir. 1984).  California similarly prohibits unfair

14  competition, Cal. Bus. & Prof. Code § 17200, and federal and state courts look to Section 5 of

15  the FTC Act to interpret that statute's meaning. *See Cel-Tech Commc'ns, Inc. v. Los Angeles*

16  *Cellular Tel. Co.*, 20 Cal. 4th 163, 185–86 (1999) ("As the issue before us in this case arises out

17  of a claim of unfair competition . . . the relevant jurisprudence would be that arising under

18  section 5's prohibition against 'unfair methods of competition.'").  The FTC therefore has an

19  interest in the correct interpretation of California's Unfair Competition Law ("UCL"), Cal. Bus.

20  & Prof. Code § 17200.

21    The Agencies file this Statement of Interest in response to Plaintiffs' Motion for a

22  Preliminary Injunction, ECF No. 46, to address the proper standards for analyzing whether (1) a

23

24  _____

[1] The United States has successfully unwound or prevented interlocks involving at least two
dozen companies in the last few years.  *See*, *e.g.*, Dep't of Justice, *Tencent Removes Two*
25  *Directors from Epic Games and Relinquishes Its Right to Unilaterally Appoint Directors or*
*Observers in Response to Justice Department Scrutiny* (Dec. 18, 2024), https://www.justice.gov/
26  opa/pr/tencent-removes-two-directors-epic-games-and-relinquishes-its-right-unilaterally-appoint;
FTC, *FTC Acts to Prevent Interlocking Directorate Arrangement, Anticompetitive Information*
27  *Exchange in EQT, Quantum Energy Deal* (Aug. 16, 2022), https://www
ftc.gov/newsevents/news/press-releases/2023/08/ftc-acts-prevent-interlocking-directorate-
28  arrangement-anticompetitiveinformation-exchange-eqt.

STATEMENT OF INTEREST OF THE UNITED STATES

claim under Section 8 is moot and (2) a company violates Section 8 by appointing a natural person to serve on the board of a competing company.  This statement also explains how interlocking board member arrangements can undermine fair competition and therefore violate the FTC Act and, by extension, California's UCL.  Finally, this statement discusses the legal standard for when group boycotts can run afoul of Section 1.

The Agencies take no position on any other issue in this case, including the facts alleged by Plaintiffs.

### FACTUAL BACKGROUND

The First Amended Complaint, ECF No. 32, alleges that "Artificial General Intelligence," i.e., "a machine having intelligence for a wide variety of tasks like a human," poses certain risks.  Am. Compl. ¶¶ 4, 74-75.  To address these risks, Plaintiff Musk helped establish OpenAI in 2015.  Am. Compl. ¶ 88.  That same year, OpenAI incorporated as a "nonprofit corporation" committed to the "research, development and distribution of technology related to artificial intelligence."  Am. Compl. ¶ 89.

The First Amended Complaint further alleges that (1) defendant Reid Hoffman simultaneously served on OpenAI's and Microsoft's boards of directors from March 2017 to March 2023, and (2) defendant Deannah Templeton simultaneously served as Vice President of Partnerships and Operations in the Technology & Research division at Microsoft and as a non-voting member of OpenAI's board of directors from November 2023 until July 2024.  Am. Compl. ¶¶ 163, 371; *see also id.* ¶¶ 168, 331(m), 374.

Based on these allegations, and others, Plaintiffs bring 26 separate claims including breach of contract, fraud, false advertising, breach of fiduciary duty, and claims under the Racketeer Influenced and Corrupt Organizations Act.  Plaintiffs also allege Defendants violated the Sherman and Clayton Acts based in part on conduct affecting the market for "generative AI models and platforms."  Am. Compl. ¶ 204.

On November 29, 2024, Plaintiffs filed a Motion for a Preliminary Injunction seeking to enjoin Defendants from, among other things, "directly or indirectly undertaking any action for the purpose of or tending to have the effect of, interlocking directorates or benefitting from

wrongfully obtained competitively sensitive information or coordination via the Microsoft-OpenAI board interlocks." ECF No. 46 at i–ii. Defendants oppose the motion. *See* ECF Nos. 64, 65.

**ARGUMENT**

The Agencies offer their views on the proper application of Section 8 of the Clayton Act, Section 1 of the Sherman Act, and the UCL to the specific issues discussed below. The Agencies take no position on the ultimate disposition of the motion.

**I.     Section 8's Bar on Interlocking Directorates**

**A.     Statutory Background**

Section 8 of the Clayton Act provides that "[n]o person shall, at the same time, serve as a director or officer in any two corporations . . . that are . . . competitors such that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws." 15 U.S.C. § 19. Section 8 makes interlocking directorates, i.e., overlapping directors or officers among competing companies, per se unlawful. *TRW, Inc. v. FTC*, 647 F.2d 942, 948 (9th Cir. 1981). At the same time, this broad prohibition is subject to certain limitations and exceptions. *See, e.g.*, 15 U.S.C. § 19(a)(2), (b). For example, the companies must be engaged in interstate commerce and have "capital, surplus, and undivided profits aggregating more than" $48,559,000. *Id.* Section 8 also does not apply if competitive sales: (A) of either corporation are less than $4,855,900; (B) of either corporation are less than two percent of the corporation's total sales; or (C) of each corporation are less than four percent of the corporation's total sales. *Id.* at § 8(a)(2). Finally, Section 19(b) grants a one-year grace period to individuals who were eligible to serve at the time of election but a change in circumstances later created an illegal interlock.

The purpose of Section 8's prohibition on interlocking directorates is "to nip in the bud incipient antitrust violations by removing the opportunity or temptation for such violations." *TRW*, 647 F.2d at, 946–47. Put another way, Section 8 "prevent[s] restraints on competition before they materialize[] by outlawing a particular practice thought to facilitate such restraints." *Id.* at 948; *see also Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 330 (S.D.N.Y. 2003). For example, preventing interlocking directorates helps "avoid the opportunity

1  for the coordination of business decisions by competitors and . . . the exchange of commercially

2  sensitive information by competitors." *Square D Co. v. Schneider S.A.*, 760 F. Supp. 362, 366

3  (S.D.N.Y. 1991). Such conduct can facilitate unreasonable restraints of trade in violation of

4  Section 1 of the Sherman Act (15 U.S.C. § 1) or help a monopolist maintain and entrench its

5  power in violation of Section 2 of the Sherman Act (15 U.S.C. § 2). In this way, Section 8

6  supports and reinforces the federal antitrust laws more generally. *See United States v. Sears,*

7  *Roebuck & Co.*, 111 F. Supp. 614, 616 (S.D.N.Y. 1953) ("Section 8 was but one of a series of

8  measures which finally emerged as the Clayton Act, all intended to strengthen the Sherman

9  Act.").

10      Courts have consistently interpreted Section 8 in view of these "prophylactic and

11  remedial purposes." *Square D Co. v. Schneider S.A.*, 760 F. Supp. 362, 366 (S.D.N.Y. 1991).

12  For example, the Ninth Circuit has held that establishing a Section 8 violation does not require

13  "proof that the interlock has an actual anticompetitive effect." *TRW*, 647 F.2d at 946–47 (citing

14  *Protectoseal Co. v. Barancik*, 484 F.2d 585, 589 (7th Cir. 1973) (Stevens, J.)). "On the contrary,

15  the statute reflects a public interest in preventing directors from serving in positions which

16  involve either a potential conflict of interest or a potential frustration of competition."

17  *Protectoseal*, 484 F.2d at 589. Likewise, courts have refused to read the statute so rigidly that a

18  company can evade Section 8 liability through tactics that elevate form over substance, e.g., "by

19  calling its agents on the competitors' board something other than either officers or directors."

20  *Square*, 760 F. Supp. at 366; *Reading*, 317 F. Supp. 2d at 327–28 (rejecting reading of Section 8

21  that would "elevate form over substance" and render the statue "a formalism").

22      **B.    Section 8 Claims Are Not Mooted by Simply Unwinding an Interlock**

23      Defendants argue "there is no live 'case or controversy'" here because "neither Hoffman

24  nor Templeton is currently affiliated with OpenAI's board in any capacity." ECF No. 64 at 13.

25  But ending an interlocking directorate, e.g., by having a person resign from a corporate board, is

26  not sufficient, *on its own*, to moot a claim under Section 8 of the Clayton Act. *See United States*

27  *v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953); *TRW*, 647 F.2d at 953. In resolving this matter,

28  the Court should avoid holding otherwise.

1    "[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the

2    tribunal of power to hear and determine the case, i.e., does not make the case moot.'" *Cty. of Los*

3    *Angeles v. Davis*, 440 U.S. 625, 631 (1979).  Otherwise "[a] defendant [would be] free to return

4    to his old ways," and that, "together with a public interest in having the legality of the [disputed]

5    practices settled, militates against a mootness conclusion." *United States v. W. T. Grant Co.*, 345

6    U.S. 629, 632 (1953).  Thus, where a defendant voluntarily ceases illegal conduct, it still bears a

7    "heavy burden" to demonstrate it is "absolutely clear that the allegedly wrongful behavior could

8    not reasonably be expected to recur." *TRW*, 647 F.2d at 953 (quoting *United States v.*

9    *Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).  Additionally, the relevant

10    "concern is with repeated violations of the same law, and not merely with repetition of the same

11    offensive conduct." *Id*.

12        The issue of mootness in the context of Section 8 was addressed squarely by the Ninth

13    Circuit in *TRW*.  647 F.2d at 953.  There, the interlocking director (i) resigned his position at the

14    competing company, (ii) "decided not to stand for reelection," (iii) and "provided sworn

15    assurances that [he] would avoid offensive directorships in the future." *Id*.  The Ninth Circuit

16    still held the case was not moot. *Id*.  As the Ninth Circuit explained, mootness depends on the

17    risk that a defendant may violate Section 8 in the future, not simply whether it might resume the

18    specific interlock at issue. *Id*.  That risk may remain even after an interlock is unwound despite

19    "good faith . . . assurances of future compliance." *Id*.

20        Moreover, "a potential conflict of interest or a potential frustration of competition,"

21    *Protectoseal*, 484 F.2d at 589, may remain even after an interlock is resolved and even if one is

22    unlikely to recur.  For example, if companies use interlocking directors to exchange

23    competitively sensitive information, *see Square*, 760 F. Supp. at 367, they may frustrate

24    competition so long as the information remains sensitive and in their possession.  Thus, holding

25    that a company moots a potential claim under Section 8 by simply ending an interlock would be

26    contrary to the purpose of the statute and would significantly undermine enforcement of the

27    Clayton Act. *Cf. United States v. Paramount Pictures*, 334 U.S. 131, 171–72 (1948) ("[T]he

28    requirement that the defendants restore what they unlawfully obtained [through an unlawful

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 4:24-cv-04722-YGR                    5

1   antitrust conspiracy] is no more punishment than the familiar remedy of restitution."); *United*
2   *Auto Workers Advisory Opinion*, 97 F.T.C. 933 (May 1, 1981) ("The basic purposes of Section 8
3   are to avoid the opportunity for coordination of business decisions by competitors *and to prevent*
4   *the exchange of commercially sensitive information among competitors*.") (emphasis added).
5   Unwound interlocks are subject to the same mootness analysis as other abandoned per se conduct
6   such as market allocation or price fixing. *W. T. Grant Co.*, 345 U.S. at 632 (voluntary cessation
7   of Section 8 interlock does not deprive the tribunal of power to hear and determine the case);
8   *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) ("mere voluntary
9   cessation of allegedly illegal conduct does not moot a case" involving price-fixing under Section
10  1); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("It is the 'contract,
11  combination . . . or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes
12  down, whether the concerted activity be wholly nascent or abortive on the one hand, or
13  successful on the other.") (citation omitted).

14      Accordingly, if a plaintiff properly pleads a likelihood of recurrence *or* an ongoing harm
15  through the wrongful retention of competitively sensitive information obtained through the
16  alleged interlocks, Section 8 claims are not moot. *See TRW*, 647 F.2d at 953. Even in the face of
17  good faith assurances of future compliance with Section 8, a court may find that "the heavy
18  burden of proof regarding mootness has not been satisfied." *Id*.

19      **C.    Section 8 Bars Relationships that Create an Interlock Regardless of Form**

20      It is well-established that an individual or a company can violate Section 8 when it
21  "serve[s] as a director or officer" directly or indirectly, e.g., through an agent, deputy, or
22  representative. For example, in *TRW*, the Ninth Circuit held that "section 8 prohibits
23  corporations from choosing, and natural persons from serving as, directors in violation of section
24  8's substantive requirements." *Id*. at 949. Consistent with *TRW*, if a company chooses a natural
25  person to serve on a competitor's board as its agent, the company *and* the natural person violate
26  Section 8 unless an exception or safe harbor applies.[2] *Id*. "To hold otherwise would be to allow

27
28
─────────────────────
[2] Whether a person serves as the agent, deputy, or representative of another entity is a case-
specific inquiry. *See*, *e.g.*, *United States v. Cleveland Tr. Co.*, 392 F. Supp. 699, 711–12 (N.D.

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 4:24-cv-04722-YGR              6

corporations (and individuals) to evade antitrust liability simply by designating agents to serve their bidding on the boards of competing businesses." *Reading*, 317 F. Supp. 2d at 331; *see also California v. Fed. Power Comm'n,* 369 U.S. 482, 485 (1962) ("Immunity from the antitrust laws is not lightly implied."). Consequently, an individual cannot evade liability by serving as an "observer" on a competitor's board. Similarly, companies cannot evade liability by relying on an agent to serve on a competitor's board. In resolving this matter, the Court should avoid holding otherwise.

A board "observer" may be a "director" under 15 U.S.C. § 19 in certain circumstances. Specifically, a company or individual cannot use an indirect means to a prohibited end, such as by asking another person to serve as a board observer to obtain entry to a meeting that is otherwise off limits due to Section 8's ban on interlocks. Such misdirection would undermine Section 8's intent to impose a clear ban on direct involvement in the management of a competitor. Accordingly, the Court should determine whether Defendants violated Section 8 based on case-specific allegations without "exalt[ing] form over substance," *Square*, 760 F. Supp. at 366, or disturbing longstanding precedent holding that a company may violate Section 8 when it appoints an agent, deputy, or representative to serve on the board of a competitor, *see TRW*, 647 F.2d at 949; *see also Square*, 760 F. Supp. at 367 ("[A] cause of action under § 8 is stated where a company attempts to place on the Board of a competitor individuals who are agents of, and have an employment or business relationship with, such company."); *Reading*, 317 F. Supp. 2d at 331-32 (similar).

## II.    Interlocking Directorates Are an Unfair Method of Competition

Interlocking directorates are an unfair method of competition under federal antitrust law, including the FTC Act. Courts have looked to Section 5 of the FTC Act and its prohibition

---

Ohio 1974), *aff'd*, 513 F.2d 633 (6th Cir. 1975). In each case, however, the key question is whether "it can legitimately be said that it is [the defendant] as an entity . . . which 'serve[s] as a director' of [the competing company]." *Reading*, 317 F. Supp. 2d at 331–32; *see also Blau v. Lehman*, 368 U.S. 403, 410 (1962) ("Lehman Brothers would be a 'director' of Tide Water [for purposes of the Securities Exchange Act of 1934], if . . . Lehman actually functioned as a director through Thomas, who had been deputized by Lehman to perform a director's duties not for himself but for Lehman.").

against unfair methods of competition for guidance on how to interpret California's UCL.  *See*, *e.g.*, *Cel-Tech Commc'ns*, 20 Cal. 4th at 185 (citations omitted) ("'In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive.'"); *Epic Games v. Apple*, 67 F.4th 946, 1000–1002 (9th Cir. 2023) (discussing the relationship between state unfair competition claims and federal antitrust claims).  "The standard of 'unfairness' under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws, but also practices that the Commission determines are against public policy for other reasons." *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC, 2024 WL 4448815, at *13 (W.D. Wash. Sept. 30, 2024) (quoting *Fed. Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986)).  *See also* Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act, File No. P221202, at 1 (F.T.C. Nov. 10, 2022) ("Section 5 reaches beyond the Sherman and Clayton Acts to encompass various types of unfair conduct that tend to negatively affect competitive conditions.") (collecting cases).

The Supreme Court has stated that the FTC Act's prohibition on unfair methods of competition was "designed to supplement and bolster the Sherman Act and the Clayton Act . . . to stop in their incipiency acts and practices which, when full blown, would violate [the Sherman Act and the Clayton Act] . . . ."  *Fed. Trade Comm'n v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 394–95 (1953) (internal citations omitted); *see also Ethyl*, 729 F.2d at 136–37 (the FTC Act empowers the FTC "to bar incipient violations of those statutes, and conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit") (cleaned up); *Fed. Trade Comm'n v. Texaco, Inc.*, 393 U.S. 223, 225 (1968) (same).

The Supreme Court has likewise long recognized that the FTC "has broad powers to declare trade practices unfair."  *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 242 (1972) (quoting *Fed. Trade Comm'n v. Brown Shoe Co.*, 384 U.S. 316, 320–321 (1966)).  In 1977, the FTC concluded that certain interlocks cannot "escape liability through the allegedly porous wording of Section 8."  *In re Kraftco Corp.*, 89 F.T.C. 46, 1977 WL 188540, at *13 (Jan.

11, 1977); *see also In re Perpetual Fed. Sav & Loan Assoc.*, 90 F.T.C. 608, 653 (1977), *remanded on other grounds*, No. 78-1134 (4th Cir. 1978), *order withdrawn*, 94 F.T.C. 401 (1979) ("Congress enacted the Clayton Act and the Federal Trade Commission Act in response to the perceived shortcomings of the Sherman Act, as interpreted by the courts, in abating what were seen as unhealthy concentrations of economic and political power.  One of the practices which was singled out for particular concern was the interlocking directorate.  This concern was highlighted in Congressional reports.").  It pointed out that the statute's legislative history suggests that "Congress specifically contemplated the application of Section 5 to interlocking directorates."[3] *Id.*[4]

    In light of the foregoing, the Court may consider under the proscriptions of California's UCL whether the alleged conduct is contrary to Section 5 of the FTC Act, e.g., by facilitating the exchange of confidential, competitively significantly information between rivals.  *See Cel-Tech Commc'ns*, 20 Cal. 4th at 185–86 (looking to Section 5 jurisprudence to determine that "the word "unfair" in [the California UCL] means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws . . . ."); *Grand Union Co. v. FTC*, 300 F.2d 92 (2d Cir. 1962) (allowing an expansion of the Clayton Act from certain "technical confines" to realize a "basic policy" underlying the Act).  *Epic Games,* 67 F.4th at

---

[3] Indeed, the Senate Interstate Commerce Committee reported that it "was of the opinion that it would be better to put in a general provision condemning unfair competition than to attempt to define the numerous unfair practices, such as . . . interlocking directorates and holding companies intended to restrain substantial competition." *In re Kraftco Corp.*, 1977 WL 188540, at *13 (cleaned up); *see also Perpetual Fed. Sav. & Loan Assoc.*, 90 F.T.C. at 655 (discussing legislative history and finding it "clear that Congress contemplated interlocks among the practices comprehended by Section 5 of the FTC Act").

[4] More recently, the Commission observed, as part of a consent decree settling charges of interlocking directorates violating Section 8, that the appointment of a board observer or designee in a rival firm raises concerns that the two competing firms will "have access to one another's competitively significant, non-public information and could participate in, or have influence over, competitive decisionmaking at each firm."  *In re EQT Corp.*, File No. 221-0212, Stmt. of Chair Lina M. Khan Joined by Comm'r Rebecca Kelly Slaughter and Comm'r Alvaro Bedoya (F.T.C. Aug. 16, 2023).

1    1000 ("a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not

2    specifically proscribed by some other law'") (quoting *Cel-Tec Commc'ns*, 20 Cal. 4th at 180).

3    **III.    Group Boycotts Under Section 1**

4        Plaintiffs seek to enjoin an alleged "fund-no-competitors" edict, which they unify under a

5    group boycott theory of antitrust, in violation of Section 1 of the Sherman Act. The Agencies

6    take no position on the alleged facts but file this statement in order to clarify the proper legal

7    analysis for group boycotts.[5] Section 1 of the Sherman Act forbids "[e]very contract,

8    combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1.

9    A claim under Section 1 therefore requires two key elements: (1) "a contract, combination, or

10   conspiracy"—i.e., "concerted action"— (2) that "unreasonably restrains trade." *Am. Needle, Inc.*

11   *v. Nat'l Football League*, 560 U.S. 183, 186 (2010). Concerted action can be unreasonable in

12   one of two ways. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018). First, it may be

13   unreasonable per se, without any further inquiry into its competitive effects or justifications,

14   because of its inherently anticompetitive "nature and character." *Standard Oil Co. of New Jersey*

15   *v. United States*, 221 U.S. 1, 64 (1911). Typically, only horizontal restraints, i.e., concerted

16   action between actual or potential competitors, are per se unlawful. *Am. Express*, 585 U.S. at

17   541. Second, a restraint may be unreasonable under the "rule of reason," a "fact-specific

18   assessment" of challenged conduct's "effect on competition." *Id.* (internal quotation marks

19   omitted). Group boycotts involving competing firms can properly be analyzed under the per se

20   rule. *See Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 820–21 (9th Cir. 2023).

21       The litigants disagree about whether the alleged fund-no-competitors edict is horizontal

22   or vertical.[6] This distinction does not preclude application of Section 1. Without commenting

23

24   _____

     [5] The operative complaint and preliminary injunction motion raise questions about the

25   relationship between OpenAI and Microsoft, namely whether it constitutes a form of prohibited

     coordinated conduct under the Sherman Act or, alternatively, may be characterized as "an

26   unregulated merger." The characterization of the relationship between the entities for antitrust

     purposes is a factual inquiry on which the Agencies take no position at this time.

27

28   [6] To the extent Defendants dispute the existence of concerted action, i.e., a group boycott against

     OpenAI's rivals, the Court would err if it required Plaintiffs to establish the existence of a

1   on the facts as alleged, a group boycott can have a vertical aspect; and per se liability under

2   Section 1 can attach so long as there is also a horizontal element to the alleged conspiracy.  *See*

3   *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998) (surveying precedent and distinguishing

4   purely vertical agreement between supplier and customer from cases also involving a horizontal

5   agreement among competitors).  Indeed, "[t]he horizontal agreement can exist either among the

6   initiators of the boycott (as in *Fashion Originators*) or those pressured into joining (as in

7   *Klor's*)."  *Honey Bum*, 63 F.4th at 821.  Thus, a conspiracy among competing firms can be per se

8   unlawful even if it is organized by one of their customers, as is the case with some hub-and-

9   spoke conspiracies.  *E.g.*, *Klor's Inc. v. Broadway-Hale Stores, Inc*., 359 U.S. 207, 211 (1959);

10  *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936–38 (7th Cir. 2000); *United States v. Apple, Inc*.,

11  791 F.3d 290, 323 (2d Cir. 2015).  For example, in *Apple*, a price fixing conspiracy was

12  condemned as per se unlawful even though it was organized by a distributor (Apple) that did not

13  compete with the other co-conspirators (book publishers).  791 F.3d at 323 (2d Cir. 2015)

14  (anticompetitive "threat is just as significant when a vertical market participant organizes the

15  conspiracy").

16          Moreover, group boycotts are "not to be tolerated merely because the victim is just one

17  merchant whose business is so small that his destruction makes little difference to the economy."

18  *Klor's*, 359 U.S. at 213 ("Monopoly can as surely thrive by the elimination of such small

19  businessmen, one at a time, as it can by driving them out in large groups").  And the fact that

20  alternative resources may be secured by the boycotted firm beyond those supplied by the

21  boycotting group cannot serve as a defense.  *See PLS.com*, 32 F.4th at 835 ("[A] group of

22  competitors coercing a competitor's suppliers . . . constitutes a group boycott even if the

23  competitors do not completely cut off the competitor's access to inputs it needs."); *Klor's*, 359

24  ──────────────────

25  "formal agreement" between members of the alleged boycott.  *Am. Tobacco v. United States*, 328
    U.S. 781, 809 (1946).  A "tacit" agreement can also qualify.  *Bell Atlantic Corp. v. Twombly*, 550

26  U.S. 544, 553 (2007); *see White v. R.M. Packer Co.*, 635 F.3d 571, 576 (1st Cir. 2011) (A tacit
    agreement is "one in which only the conspirators' actions . . . indicate [its] existence.").  For

27  example, concerted action may be inferred if one firm invites others to participate in a boycott
    and then those firms engage in conduct showing acceptance.  *PLS.com v. Nat'l Ass'n of Realtors*,

28  32 F.4th 824, 843 (9th Cir. 2022) (citing *Interstate Cir. v. United States*, 306 U.S. 208, 227
    (1939)).

U.S. at 210 (rejecting the argument that there is no violation of Section 1 "unless the opportunities for customers to buy in a competitive market are reduced" because then "a group of powerful businessmen may act in concert to deprive a single merchant . . . of the goods he needs to compete effectively").

**CONCLUSION**

For the foregoing reasons, the court should decide Plaintiffs' Motion for a Preliminary Injunction, ECF No. 46, consistent with the legal principles above regarding Section 8, California's Unfair Competition Law, and group boycotts under Section 1.

Respectfully submitted,

ANISHA DASGUPTA
*General Counsel*

HANNAH GARDEN-MONHEIT
*Director, Office of Policy Planning*

HENRY LIU
*Director, Bureau of Competition*

SHAOUL SUSSMAN
*Associate Director, Bureau of Competition*

KATHERINE VAN DYCK
*Attorney-Advisor, Office of Policy Planning*

Attorneys for the Federal Trade Commission

DOHA MEKKI
*Acting Assistant Attorney General*

JOHN W. ELIAS
Deputy Assistant Attorney General

DAVID B. LAWRENCE
*Policy Director*

RYAN DANKS
*Director of Civil Enforcement*

MIRIAM R. VISHIO
*Deputy Director of Civil Enforcement*

BENJAMIN L. RUDOFSKY
ALICE A. WANG
*Counsels to the Assistant Attorney General*

ERIC D. DUNN (CSBN 312513)
*Assistant Chief, Competition Policy and Advocacy Section*

Dated: January 10, 2025

 /s/ *Benjamin L. Rudofsky*

Attorneys for the United States

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 4:24-cv-04722-YGR                    12