**RAINES FELDMAN LITTRELL LLP**
Miles J. Feldman (State Bar No. 173383)
   *mfeldman@raineslaw.com*
Tyler G. Whitmer (State Bar No. 248192)
   *twhitmer@raineslaw.com*
Laith D. Mosely (State Bar No. 250832)
   *lmosely@raineslaw.com*
Joshua C. Williams (State Bar No. 317148)
   *jwilliams@raineslaw.com*
1900 Avenue of the Stars, 19th Floor
Los Angeles, California 90067
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

*Attorneys for Amicus Curiae*
ENCODE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, *et al.*, | Case No.: 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to: Hon. Yvonne Gonzalez Rogers |
| v. | **BRIEF OF ENCODE AS AMICUS CURIAE IN SUPPORT OF THE PART OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SEEKING TO ENJOIN THE RESTRUCTURING OF OPENAI INTO A FOR-PROFIT ENTERPRISE** |
| SAMUEL ALTMAN, *et al.*, | |
| Defendants. | |

**INTEREST OF AMICUS CURIAE**

Encode is a youth-led organization advocating for safe and responsible artificial intelligence (AI). It is a network of over 1000 volunteers across 40 countries focused on ensuring the voices of younger generations are heard in critical conversations about how AI impacts society. Encode works on the issues of today, like deepfakes, children's safety online, and oversight of algorithmic weapons systems, while also preparing for emerging challenges, like the possibility of transformative AI.

Encode's work on various pieces of state and federal legislation, including co-sponsoring the landmark Safe and Secure Innovation for Frontier Models Act (SB 1047) in California, gives it insight into the governance challenges posed by the commercialization of advanced AI systems. The organization has helped shape AI policy to foster innovation while protecting the public, having contributed to the White House AI Bill of Rights[1] and President Biden's Executive Order on AI.[2] Encode is uniquely qualified as a voice representing the public interest in this case because Encode represents a movement of young people—the generation that will inherit the world shaped by the technology that OpenAI is building.

No counsel for any party authored this brief in whole or in part, and no person or entity, other than the amicus curiae or its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

**INTRODUCTION**

OpenAI[3] and its CEO, Sam Altman, claim to be developing society-transforming technology, and those claims should be taken seriously. OpenAI Inc.'s charitable mission is to develop and deploy that transformative technology in a way that is safe and beneficial to the public, and OpenAI's proposed restructuring into a for-profit enterprise would undermine that

---

[1] *Blueprint For An AI Bill of Rights*, THE WHITE HOUSE OFFICE OF SCIENCE AND TECHNOLOGY POLICY, https://www.whitehouse.gov/ostp/ai-bill-of-rights/.

[2] *Executive Order on the Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence*, THE WHITE HOUSE, October 30, 2023, https://www.whitehouse.gov/briefing-room/presidential-actions/2023/10/30/executive-order-on-the-safe-secure-and-trustworthy-development-and-use-of-artificial-intelligence/.

[3] References to OpenAI include OpenAI Inc. and its various direct and indirect subsidiaries.

commitment. If the world truly is at the cusp of a new age of artificial general intelligence (AGI), then the public has a profound interest in having that technology controlled by a public charity legally bound to prioritize safety and the public benefit rather than an organization focused on generating financial returns for a few privileged investors. Indeed, that is why OpenAI was created in the first place. Encode therefore files this brief in support of the part of Plaintiffs' motion for a preliminary injunction seeking to enjoin OpenAI's restructuring into a for-profit enterprise.

## ARGUMENT

### I. Ensuring the Safety of Advanced AI Systems is Critical to the Public Interest

"If . . . the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (citing *Sammartano v. First Judicial Dist. Court*, 303 F.3d 920, 931 (9th Cir. 2002)); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138-39 (9th Cir. 2011) (overruling district court decision denying request for preliminary injunction in part because "issuing the injunction is in the public interest"); *Softketeers, Inc. v. Regal West Corp.*, 788 F. App'x 468, 469 (9th Cir. 2019) (upholding district court decision granting preliminary injunction, noting that the district court "concluded that . . . the injunction was in the public interest").

"Mitigating the risk of extinction from AI should be a global priority alongside other societal-scale risks such as pandemics and nuclear war."[4] OpenAI's CEO Sam Altman joined a long list of luminaries, including recent winners of Nobel Prizes for their work on AI, in signing on to that statement recognizing that AI could pose an existential threat to humanity. While the public's interest in continuing to exist is clear, one need not agree that AI poses an existential risk to recognize the public interest in ensuring AI is developed and deployed so that it is safe and beneficial. The public already finds itself face-to-face with tangible, wide-

---

[4] *Statement on AI Risk*, CENTER FOR AI SAFETY, https://www.safe.ai/work/statement-on-ai-risk.

reaching challenges from AI like algorithmic bias, disinformation, democratic erosion, and labor displacement. Ensuring AI is safe and beneficial is a pressing, immediate concern.

Encode is not alone in its concern about AI safety. Public survey data shows that the American public is broadly concerned. A late-2023 Pew Research survey found that "52% of Americans are more concerned than excited about AI in daily life, compared with just 10% who say they are more excited than concerned."[5] A poll by the Artificial Intelligence Policy Institute led to similar results and also found that "86% of voters believe AI could accidentally cause a catastrophic event, and 70% agree that mitigating the risk of extinction from AI should be a global priority alongside other risks like pandemics and nuclear war."[6] The public interest in the safety of AI systems could not be clearer.

## II.  OpenAI's Restructuring into a For-Profit Would Undermine AI Safety

OpenAI understood the public's interest in AI safety at an early stage when few others recognized its importance. Because OpenAI knew its focus on safety could be undermined if it were required to maximize returns to investors, it embedded safety into its DNA by structuring itself as a nonprofit. In describing itself to its primary federal regulator, OpenAI states that its "mission is to build general-purpose artificial intelligence (AI) that safely benefits humanity, *unconstrained by a need to generate [a] financial return*."[7] When registering with the state of California, where it is headquartered, OpenAI stated that it "wants to help the world build safe AI technology and ensure that AI's benefits are as widely and

---

[5] Michelle Faverio and Alec Tyson, *What the Data Says About Americans' View of Artificial Intelligence*, PEW RESEARCH CENTER, November 21, 2023, https://www.pewresearch.org/short-reads/2023/11/21/what-the-data-says-about-americans-views-of-artificial-intelligence/.

[6] *Poll Shows Overwhelming Concern About Risks From AI as New Institute Launches to Understand Public Opinion and Advocate for Responsible AI Policies*, AIPI, https://theaipi.org/poll-shows-overwhelming-concern-about-risks-from-ai-as-new-institute-launches-to-understand-public-opinion-and-advocate-for-responsible-ai-policies/.

[7] OpenAI, *IRS Form 990, Return of Organization Exempt From Income Tax for OpenAI Inc.*, 2022 (emphasis added), https://apps.irs.gov/pub/epostcard/cor/810861541_202212_990_2024010322164832.pdf.

evenly distributed as possible."[8] OpenAI has proudly proclaimed that its "primary fiduciary duty is to humanity."[9] And OpenAI's public charter is clear that the mission comes before the organization, explaining that OpenAI "will attempt to directly build safe and beneficial AGI, but will also consider [its] mission fulfilled if [its] work aids others to achieve this outcome."[10]

OpenAI designed its current capped-profit subsidiary structure so as not to undermine these commitments. When OpenAI rolled out the unique structure, it reassured the world that its duty to the public remained, explaining that "the for-profit subsidiary is fully controlled by the OpenAI Nonprofit" and that "because the board is still the board of a Nonprofit, each director must perform their fiduciary duties in furtherance of its mission—safe AGI that is broadly beneficial."[11]

This is not just a self-serving public relations statement; it is the law of the state of Delaware, where OpenAI Inc. is incorporated. *Oberly v. Kirby*, 592 A.2d 445, 462 (Del. 1991) ("[B]ecause the Foundation was created for a limited charitable purpose rather than a generalized business purpose, those who control it have a special duty to advance its charitable goals and protect its assets."); *see also id.* at 472-73 ("Although principles of corporate law generally govern the activities of [a nonstock charitable] corporation, its fiduciaries have a special duty to advance its charitable goals and protect its assets."). The *Oberly* case "made clear that a nonprofit charitable corporation's board owes fiduciary duties to its *beneficiaries*"—in this case the "humanity" OpenAI has recognized stands to gain (or lose) so much from its transformative technology. *Gassis v. Corkery*, No. 8868-VCL, 2014 WL 2200319, at *14 (Del. Ch. May 28, 2014) (citing *Oberly*, 592 A.2d at 463) (emphasis in original).

---

[8] OpenAI, *Initial Registration Form – State of California Office of the Attorney General Registry of Charitable Trusts*, August 28, 2017, https://gwern.net/doc/reinforcement-learning/openai/2017-openai-bylaws.pdf.
[9] OpenAI, *OpenAI Charter*, https://openai.com/charter/.
[10] *Id*.
[11] OpenAI, *Our Structure*, https://openai.com/our-structure/.

OpenAI plans to transfer control of its operations to a Delaware public benefit corporation (PBC).[12] That would do more than shift control from one kind of "inc." to another, leaving the organization's mission in place. It would convert an organization bound by law to ensure the safety of advanced AI into one bound by law to "balance" its consideration of any public benefit against "the pecuniary interests of [its] stockholders." 8 Del. C. § 365(a). OpenAI's touted fiduciary duty to humanity would evaporate, as Delaware law is clear that the directors of a PBC owe no duty to the public at all. 8 Del. C. § 365(b).[13]

Transferring control of the development and deployment of OpenAI's technology to a for-profit entity would also undermine specific safety-focused commitments the nonprofit has made to the public. For example, OpenAI has emblazoned on its website the following commitment to the public it serves as a charity:

> We are committed to doing the research required to make AGI safe, and to driving the broad adoption of such research across the AI community. We are concerned about late-stage AGI development becoming a competitive race without time for adequate safety precautions. Therefore, if a value-aligned, safety-conscious project comes close to building AGI before we do, we commit to stop competing with and start assisting this project.[14]

This commitment reinforces OpenAI's existing charitable mission, but how could a for-profit company required to seek a return for investors legally "stop competing with and start assisting" another for-profit organization in the same competitive industry–even in the

---

[12] OpenAI, *Why OpenAI's Structure Must Evolve To Advance Our Mission*, December 26, 2024, https://openai.com/index/why-our-structure-must-evolve-to-advance-our-mission/.

[13] "A director of a public benefit corporation shall not, by virtue of the public benefit provisions or § 362(a) of this title, have any duty to any person on account of any interest of such person in the public benefit or public benefits identified in the certificate of incorporation or on account of any interest materially affected by the corporation's conduct . . .." 8 Del. C. § 365(b).

[14] OpenAI, *OpenAI Charter*, https://openai.com/charter/. Altman has similarly stated that "as we get towards a real superintelligence, as we get towards a system that is … more capable … than like any humans, … I think it's very reasonable to say we need to treat that with like caution and … a coordinated approach." The Wall Street Journal, *OpenAI CEO Sam Altman and CTO Mira Murati on the Future of AI and ChatGPT*, YOUTUBE, October 21, 2023, https://www.youtube.com/watch?v=byYlC2cagLw.

name of safety and the public interest? OpenAI has not explained how it would maintain this commitment if it were to transfer control to a for-profit enterprise.

The existing nonprofit-controlled structure provides at least one other safety-focused failsafe that transferring control to a for-profit entity would remove. In text messages recently revealed by OpenAI on its website, Altman wrote in October 2022 that "[w]e saw no alternative to a structure change given the amount of capital we needed and still to preserve a way to 'give the AGI to humanity' other than the capped profit thing, which also lets the board cancel all equity if needed for safety."[15] It goes without saying that it would be impossible for the nonprofit board to "cancel all equity if needed for safety" following the contemplated restructuring. And if Altman and his team saw no approach other than the existing nonprofit-controlled structure that would "preserve a way to 'give the AGI to humanity,'" one wonders who they plan to give it to if permitted to abandon that structure.

### III. Control Over Development and Deployment of AGI Is a Charitable Asset that Should Not Be Sold for Any Price

OpenAI Inc. currently controls all of the other entities in the OpenAI corporate family, including those entities directly engaged in developing safe and beneficial AGI per OpenAI's charitable mission. That control is itself a charitable asset of the nonprofit.

OpenAI touts the technology it is developing as capable of totally transforming society. It warns potential investors in the existing capped-profit subsidiary controlled by the nonprofit that "[i]t would be wise to view any investment in OpenAI Global, LLC in the spirit of a donation, with the understanding that it may be difficult to know what role money will play in a post-AGI world."[16] In other words, OpenAI believes its technology may so alter our society that money itself ceases to have value. And the company views this transformation as a one-time occurrence. As Altman notably put it, "AGI [is] going to get built exactly once."[17]

---

[15] OpenAI, *Elon Musk Wanted An Openai For-Profit*, December 13, 2024, https://openai.com/index/elon-musk-wanted-an-openai-for-profit/.
[16] OpenAI, *Our Structure*, https://openai.com/our-structure/.
[17] Steven Levy, *What OpenAI Really Wants*, WIRED, September 5, 2023, https://www.wired.com/story/what-openai-really-wants/.

Taking OpenAI at its word, what price could a for-profit enterprise possibly pay that would adequately compensate the nonprofit for controlling how such a singular transformation of society unfolds? It is priceless. The public interest would be harmed by a safety-focused, mission-constrained nonprofit relinquishing control over something so transformative at any price to a for-profit enterprise with no enforceable commitment to safety.

## CONCLUSION

A preliminary injunction preventing OpenAI's restructuring into a for-profit enterprise is in the public interest.

Dated: January 14, 2025                    Respectfully submitted,

                                           RAINES FELDMAN LITTRELL LLP


                                           By: _/s/ Tyler G. Whitmer_
                                                Miles J. Feldman
                                                Tyler G. Whitmer
                                                Laith D. Mosely
                                                Joshua C. Williams
                                                *Attorneys for Amicus Curiae*
                                                ENCODE

**PROOF OF SERVICE**

I am over the age of 18 and not a party to the within action; I am employed by Raines Feldman Littrell LLP and its business address is 1900 Avenue of the Stars, 19th Floor, Los Angeles, California 90067; amkawasi@raineslaw.com.

On January 14, 2025, I served the following document(s) described as **BRIEF OF ENCODE AS AMICUS CURIAE IN SUPPORT OF THE PART OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SEEKING TO ENJOIN THE RESTRUCTURING OF OPENAI INTO A FOR-PROFIT ENTERPRISE** by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

SEE ATTACHED SERVICE LIST

☒ **BY ELECTRONIC SERVICE:** Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification addresses listed in the attached service list.

☒ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed January 14, 2025, at Los Angeles, California.

/s/ Addy Mkawasi Welch
Addy Mkawasi Welch

## SERVICE LIST

| | |
|---|---|
| Marc Toberoff (SBN 188547)<br>Jaymie Parkkinen (SBN 318394)<br>**TOBEROFF & ASSOCIATES, P.C.**<br>23823 Malibu Road, Suite 50-363<br>Malibu, CA 90265<br>Telephone: (310) 246-3333<br>Facsimile: (310) 246-3101<br>MToberoff@toberoffandassociates.com<br>JParkkinen@toberoffandassociates.com | *Attorneys for Plaintiffs,*<br>ELON MUSK, SHIVON ZILIS, and X.AI CORP. |
| Jordan Eth (SBN 121617)<br>David J. Wiener (SBN 291659)<br>**MORRISON & FOERSTER LLP**<br>425 Market Street<br>San Francisco, CA 94105<br>Telephone: (415) 268-7000<br>Facsimile: (737) 910-0730<br>JEth@mofo.com<br>DWiener@mofo.com<br><br>William Savitt (Admitted *Pro Hac Vice*)<br>Sarah K. Eddy (Admitted *Pro Hac Vice*)<br>**WACHTELL, LIPTON, ROSEN & KATZ**<br>51 West 52nd Street<br>New York, NY 10019<br>Telephone: (212) 403-1000<br>Facsimile: (212) 403-2000<br>WDSavitt@wlrk.com<br>SKEddy@wlrk.com | *Attorneys for Defendants,*<br>SAMUEL ALTMAN, GREGORY BROCKMAN, OPENAI, INC., OPENAI L.P., OPENAI, L.L.C., OPENAI GP, L.L.C., OPENAI OPCO, LLC, OPENAI GLOBAL, LLC, OAI CORPORATION, LLC, OPENAI HOLDINGS, LLC, OPENAI STARTUP FUND MANAGEMENT, LLC, OPENAI STARTUP FUND GP I, L.L.C., OPENAI STARTUP FUND I, L.P., OPENAI STARTUP FUND SPV GP I, L.L.C., OPENAI STARTUP FUND SPV GP II, L.L.C., OPENAI STARTUP FUND SPV GP III, L.L.C., OPENAI STARTUP FUND SPV GP IV, L.L.C., OPENAI STARTUP FUND SPV I, L.P., OPENAI STARTUP FUND SPV II, L.P., OPENAI STARTUP FUND SPV III, L.P., OPENAI STARTUP FUND SPV IV, L.P., AESTAS MANAGEMENT COMPANY, LLC, and AESTAS LLC |
| Russell P. Cohen (SBN 213105)<br>Howard M. Ullman (SBN 206760)<br>**DECHERT LLP**<br>45 Fremont Street, 26th Floor<br>San Francisco, CA 94105<br>Telephone: (415) 262-4500<br>Facsimile: (415) 262-4555<br>russ.cohen@dechert.com<br>howard.ullman@dechert.com | *Attorneys for Defendants,*<br>MICROSOFT CORPORATION, REID HOFFMAN, and DEANNAH TEMPLETON |

| | |
|---|---|
| 1 | Nisha Patel (SBN 281628) |
| 2 | **DECHERT LLP** |
| | 633 West 5th Street, Suite 4900 |
| 3 | Los Angeles, CA 90071 |
| 4 | Telephone: (213) 808-5700 |
| | Facsimile: (213) 808-5760 |
| 5 | nisha.patelgupta@dechert.com |
| 6 | Andrew J. Levander (Admitted *Pro Hac Vice*) |
| 7 | **DECHERT LLP** |
| | Three Bryant Park |
| 8 | 1095 Avenue of the Americas |
| | New York, NY 10036 |
| 9 | Telephone: (212) 698-3500 |
| | Facsimile: (212) 698-3599 |
| 10 | andrew.levander@dechert.com |
| 11 | John (Jay) Jurata, Jr. (Admitted *Pro Hac Vice)* |
| 12 | **DECHERT LLP** |
| | 1900 K Street, N.W. |
| 13 | Washington, DC 20006 |
| 14 | Telephone: (202) 261-3300 |
| | Facsimile: (202) 261-3333 |
| 15 | jay.jurata@dechert.com |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |