JORDAN ETH (CA SBN 121617)
JEth@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:    (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman,*
*OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,*
*OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,*
*OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,*
*OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,*
*OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,*
*OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,*
*OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,*
*OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,*
*Aestas Management Company, LLC, and Aestas LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al. | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **OPENAI DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date:  May 28, 2025 |
| | Time:  10:00 a.m. |
| | Courtroom:  1 – 4th Floor |
| | Judge:  Hon. Yvonne Gonzalez Rogers |

# NOTICE OF MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL: Please take notice that on May 28, 2025 at 10:00 a.m., or at such other time as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers, in Courtroom 1 of the U.S. District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC (the "OpenAI Defendants") will, and hereby do, move the Court pursuant to Federal Rules of Civil Procedure 8, 9(b), 12(b)(6), and 23.1 for an order dismissing the first amended complaint of Plaintiffs Elon Musk, Shivon Zilis, and X.AI Corp., dated November 14, 2024.

The OpenAI Defendants' motion is based on this Notice of Motion and Motion to Dismiss, the accompanying Memorandum of Points and Authorities, the OpenAI Defendants' Request for Judicial Notice, the Declaration of David J. Wiener and exhibits attached thereto, and such other argument and materials as may be presented before the Court takes this matter under submission.

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Whether Musk's contract claims (Counts I, II, III and V) should be dismissed for failure to adequately allege the formation of an enforceable contract through mutual assent and bargained-for consideration, or the breach of any contractual terms.

2.     Whether Plaintiffs' fraud claims (Counts IV, VII, and VIII) should be dismissed (a) for failure to plead with particularity that any OpenAI Defendant made a cognizable promise to Musk, (b) for failure to plead with particularity the other elements of fraud, including falsity and fraudulent intent, and (c) as time-barred under the applicable three-year statute of limitations for fraud.

3.     Whether Plaintiffs' civil RICO claims (Counts XXV and XXVI) should be dismissed for failure to plead any underlying predicate act of wire fraud with particularity, and for the independent reasons that Plaintiffs have failed to adequately plead (a) conduct of an enterprise under 18 U.S.C. § 1962(c); (b) injury proximately caused by the investment of racketeering income under 18 U.S.C. § 1962(a); (c) injury proximately caused by control of OpenAI under 18 U.S.C. § 1962(b); or (d) a conspiracy to violate civil RICO under 18 U.S.C. § 1962(d).

4.     Whether Musk's claims for breach of charitable trust (Count XX), constructive fraud (Count VI), and aiding and abetting breach of fiduciary duty to Musk (Count XXI) should be dismissed for lack of standing and any well-pleaded allegation of breach.

5.     Whether Plaintiffs' putative derivative claims (Counts XXII-XXIV) should be dismissed for lack of standing and for failure to adequately plead breach of fiduciary duty or self-dealing.

6.     Whether Plaintiffs' false advertising claims (Counts XVIII and XIX) should be dismissed because Plaintiffs: (a) identify no commercial advertisement or statement made primarily out of economic motivation; and (b) fail to allege particularized facts to support these claims.

7.     Whether Plaintiffs' antitrust claims (Counts IX-XVI) should be dismissed for failure to plead (a) injury to competition, as necessary to establish antitrust standing; and (b) any well-pleaded antitrust violation.

8.     Whether Plaintiffs' accessary claims for tortious interference (Count V); aiding and

abetting fraud (Count VIII); and aiding and abetting breach of fiduciary duty to Musk (Count XXI) and to OpenAI (Count XXIV) fail for the independent reasons that (a) Plaintiffs have not adequately pleaded any OpenAI Defendant's substantial assistance in an underlying violation and (b) an agent cannot interfere in its principal's contract or abet its principal's fraud or fiduciary breach.

9.    Whether Plaintiffs' UCL claim (Count XVII) should be dismissed as an impermissible shotgun pleading, for lack of standing, and for failure to plead a violation.

1

**TABLE OF CONTENTS**

2    INTRODUCTION .................................................................................................................... 1

3    BACKGROUND ..................................................................................................................... 3

4    I.      OpenAI, Musk, and xAI .................................................................................... 3

5    II.     Musk's state court suit ...................................................................................... 3

6    III.    This action ......................................................................................................... 4

7    ARGUMENT .......................................................................................................................... 4

8    I.      MUSK'S ALLEGATIONS CANNOT SUPPORT ANY CONTRACT CLAIM. ............. 5

9            A.      Musk fails to plead breach of an express contract (Count I). ................ 5

10                   1.      Musk has not adequately alleged the existence of a contract .................... 5

11                   2.      Musk has not plausibly alleged breach. ...................................... 8

12           B.      Musk does not plead an implied contract (Count II). ............................ 8

13           C.      Musk does not plead an implied covenant claim (Count III). ............... 9

14   II.     PLAINTIFFS' ALLEGATIONS CANNOT SUPPORT ANY FRAUD CLAIM. ............. 9

15           A.      Musk does not plead fraud (Count VII). ............................................... 9

16           B.      Musk's unjust enrichment claim falls with his fraud claim (Count IV) .............. 11

17           C.      Musk and xAI do not plead a civil RICO violation (Counts XXV & XXVI) ....... 11

18                   1.      Plaintiffs do not allege predicate acts of wire fraud. ............................. 11

19                   2.      Plaintiffs' RICO claims also fail for independent reasons. .................... 12

20   III.    MUSK'S BREACH OF CHARITABLE TRUST CLAIM FAILS. ............................... 13

21           A.      Musk lacks standing to bring a breach of charitable trust claim (Count XX). ...... 13

22           B.      Musk fails to plead any breach of charitable trust. ............................ 14

23           C.      Musk's duplicative constructive fraud claim fails (Count VI). ........... 15

24   IV.     THE FALSE ADVERTISING CLAIMS (COUNTS XVIII & XIX) SHOULD BE
             DISMISSED. ........................................................................................................ 15
25
     V.      MUSK AND ZILIS'S DERIVATIVE CLAIMS SHOULD BE DISMISSED. ............... 16
26
             A.      Musk and Zilis lack standing to assert derivative claims. .................. 17
27
             B.      Musk and Zilis fail to state a claim for breach of fiduciary duty (Count
28                   XXII). ............................................................................................................ 19

iv

C.    Musk and Zilis do not adequately plead self-dealing (Count XXIII)................... 19

VI.    PLAINTIFFS FAIL TO PLEAD ANY ANTITRUST CLAIM (COUNTS IX-XVI). ..... 20

A.    All of the antitrust claims fail for lack of "antitrust standing."............................ 20

B.    Musk and xAI fail to state any claim based on a purported "investor boycott." ...................................................................................................... 23

C.    Musk and xAI fail to state any claim based on board interlocks. ........................ 25

1.    Plaintiffs lack Article III and antitrust standing to assert this claim. ........ 26

2.    Hoffman's prior board service did not violate Section 8. ........................ 26

3.    Templeton's prior role as an observer did not implicate Section 8........... 27

D.    Musk and xAI fail to state any claim based on an alleged exclusivity arrangement. .................................................................................................... 27

1.    The purported "exclusivity" arrangements fail to state a Section 1 claim.................................................................................................... 27

2.    The purported "exclusivity" arrangements fail to state a claim under Section 3 of the Clayton Act or Section 16727 of the Cartwright Act.......................................................................................... 29

E.    Musk and xAI fail to state any claim based on anticompetitive pricing. .............. 29

1.    Plaintiffs fail to state a predatory pricing claim under federal law. .......... 30

2.    Plaintiffs fail to state a claim under California's Unfair Practices Act. ................................................................................................... 31

F.    Musk and xAI fail to state a claim under Clayton Act Section 7. ........................ 32

G.    Musk and xAI fail to plead a Sherman Act § 2 claim. ........................................ 33

H.    None of Musk and xAI's other theories can support antitrust relief. ................... 33

VII.    PLAINTIFFS' ACCESSORY CLAIMS (COUNTS V, VIII, XXI & XXIV) FAIL. ....... 34

VIII.    PLAINTIFFS' UCL CLAIM (COUNT XVII) FAILS. .................................................... 35

CONCLUSION ..................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Sols., LLC* v. *Hughes Missile Sys. Co.*,
  141 F.3d 947 (9th Cir. 1998)................................................................................. 21

*Am. Emps. Grp., Inc.* v. *Emp. Dev. Dep't*,
  154 Cal. App. 4th 836 (2007) ................................................................................. 5

*Aniel* v. *PHH Mortg. Corp.*,
  2022 WL 2164702 (N.D. Cal. June 1, 2022) ....................................................... 11

*Apple Inc.* v. *Superior Ct.*,
  18 Cal. App. 5th 222 (2017) ................................................................................. 18

*Arcesium, LLC* v. *Advent Software, Inc.*,
  2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ...................................................... 21

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)................................................................................................ 4

*Baba* v. *Hewlett-Packard Co.*,
  2010 WL 2486353 (N.D. Cal. June 16, 2010) ..................................................... 35

*Bader* v. *Anderson*,
  179 Cal. App. 4th 775 (2009) ........................................................... 17, 18-19 & n.5

*Bearden* v. *Ballad Health*,
  967 F.3d 513 (6th Cir. 2020).................................................................................. 26

*Behnke* v. *State Farm Gen. Ins. Co.*,
  196 Cal. App. 4th. 1443 (2011) ........................................................................ 9, 10

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)................................................................................................ 4

*Berg & Berg Enterprises, LLC* v. *Boyle*,
  178 Cal. App. 4th 1020 (2009) ............................................................................. 19

*Berryman* v. *Merit Property Management*,
  152 Cal. App. 4th 1544 (2007) ............................................................................. 35

*Brantley* v. *NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012)......................................................................... 25, 28

*Burch* v. *Premier Homes, LLC*,
  199 Cal. App. 4th 730 (2011) ................................................................................. 6

*Campbell* v. *eBay, Inc.*,
  2013 WL 4764526 (N.D. Cal. Sept. 5, 2013) ...................................................... 35

vi

*Cargill, Inc.* v. *Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ........................................................................................ 22

*Cascade Health Sols.* v. *PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ........................................................................ 30

*Casey* v. *U.S. Bank Nat. Assn.*,
    127 Cal. App. 4th 1138 (2005) ..................................................................... 34

*Chagby* v. *Target Corp.*,
    358 F. App'x 805 (9th Cir. 2009) ................................................................. 12

*Charlotte's Web, Inc.* v. *AAXLL Supply Co. LLC*,
    2020 WL 6891876 (N.D. Cal. Nov. 24, 2020) ............................................ 16

*Charter Twp. of Clinton Police & Fire Ret. Sys.* v. *Martin*,
    219 Cal. App. 4th 924 (2013) ....................................................................... 18

*Cheeks* v. *Fort Myer Constr. Corp.*,
    216 F. Supp. 3d 146 (D.D.C. 2016) .................................................. 25-26 n.8

*Children's Health Def.* v. *Meta Platforms, Inc.*,
    112 F.4th 742 (9th Cir. 2024) ....................................................................... 15

*Cisco Sys., Inc.* v. *Dexon Comput., Inc.*,
    2022 WL 2222962 (N.D. Cal. June 21, 2022) ............................................ 15

*City of Oakland* v. *Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021) ................................................................... 20, 23

*Conboy* v. *Black Diamond Props., Inc.*,
    2010 WL 2944374 (M.D. Fla. July 23, 2010) ............................................. 17

*Copperweld Corp.* v. *Independence Tube Corp.*,
    467 U.S. 752 (1984) .............................................................................. 29, 33

*D'Augusta* v. *Am. Petroleum Inst.*,
    117 F.4th 1094 (9th Cir. 2024) ..................................................................... 24

*Davidson* v. *Sprout Foods, Inc.*,
    106 F.4th 842 (9th Cir. 2024) ....................................................................... 15

*DeHoog* v. *Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018) ........................................................................ 32

*Desoto* v. *Condon*,
    371 F. App'x 822 (9th Cir. 2010) ................................................................. 11

*Destfino* v. *Reiswig*,
    630 F.3d 952 (9th Cir. 2011) .................................................................... 4, 35

*Dreifort* v. *DJO Global Inc.*,
    2019 WL 5578240 (S.D. Cal. Oct. 28, 2019) ............................................. 35

*Drum* v. *San Fernando Valley Bar Ass'n*,
182 Cal. App. 4th 247 (2010) .................................................................. 35

*Durell* v. *Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010) ................................................................ 35

*Eagle* v. *Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987)................................................................... 21

*Eastman* v. *Quest Diagnostics Inc.*,
108 F. Supp. 3d 827 (N.D. Cal. 2015) .................................................... 31

*Eastman* v. *Quest Diagnostics Inc.*,
724 F. App'x 556 (9th Cir. 2018) ........................................................... 29

*Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .................................................................. 11

*Feitelson* v. *Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ....................................... 27, 28, 29

*Ferrari* v. *Mercedes-Benz USA, LLC*,
2016 WL 7188030 (N.D. Cal. Dec. 12, 2016) ....................................... 12

*Flaa* v. *Hollywood Foreign Press Assoc.*,
55 F.4th 680 (9th Cir. 2022) .......................................... 24, 25, 30 n.13, 33 & n.17

*FTC* v. *Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)................................................................... 28

*Gjovik* v. *Apple Inc.*,
2024 WL 2309100 (N.D. Cal. May 20, 2024) ........................................ 12

*Grosset* v. *Wenaas*,
42 Cal. 4th 1100 (2008) .......................................................................... 17

*Haskins* v. *Symantec Corp.*,
2013 WL 6234610 (N.D. Cal. Dec. 2, 2013) ................................... 6, 8-9

*Haskins* v. *Symantec Corp.*,
2014 WL 2450996 (N.D. Cal. June 2, 2024) .......................................... 8-9

*Hip Hop Beverage Corp.* v. *Monster Energy Co.*,
733 F. App'x 380 (9th Cir. 2018) .................................................... 20, 27

*Holt* v. *College of Osteopathic Physicians and Surgeons*,
61 Cal. 2d 750 (1964) ......................................................................... 13-14

*HomeLight, Inc.* v. *Shkipin*,
694 F. Supp. 3d 1242 (N.D. Cal. 2023) ............................................ 15, 16

*Honey Bum, LLC* v. *Fashion Nova, Inc.*,
63 F. 4th 813 (9th Cir. 2023) .......................................................... 24, 25

viii

*Horiike* v. *Humane Soc'y of the U.S.*,
2016 WL 11744969 (C.D. Cal. June 20, 2016) ........................................................ 13, 14-15

*Hsu* v. *OZ Optics, Ltd.*,
211 F.R.D. 615 (N.D. Cal. 2002) ............................................................................... 10

*In re Diadexus, Inc.*,
2019 WL 3412928 (N.D. Cal. July 29, 2019) ............................................................ 19

*In re DRAM Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ..................................................................... 20 n.6

*In re Kunz*,
489 F.3d 1072 (10th Cir. 2007).................................................................................. 27

*In re Massey Energy Co. Derivative & Class Action Litig.*,
160 A.3d 484 (Del. Ch. 2017)............................................................................... 18-19 n.5

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ................................................................................... 23

*In re Toyota Motor Corp.*,
785 F. Supp. 2d 883 (C.D. Cal. 2011) ...................................................................... 13

*In re Verisign, Inc. Derivative Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) .................................................................... 15

*Intel Corp.* v. *Seven Networks, LLC*,
562 F. Supp. 3d 454 (N.D. Cal. 2021) ...................................................................... 32

*Jack Russell Terrier Network of N. Ca.* v. *Am. Kennel Club, Inc.*,
407 F.3d 1027 (9th Cir. 2005)................................................................................... 29

*Jara* v. *Suprema Meats, Inc.*,
121 Cal. App. 4th 1238 (2004) ................................................................................. 8

*JMP Secs. LLP* v. *Altair Nanotech. Inc.*,
880 F. Supp. 2d 1029 (N.D. Cal. 2012) .................................................................... 9

*John Doe 1* v. *Abbott Lab'ys*,
571 F.3d 930 (9th Cir. 2009)..................................................................................... 30

*Kearns* v. *Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009).................................................................................... 35

*Kendall* v. *Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008).................................................................................... 30

*Klein* v. *Cook*,
2023 WL 3726500 (N.D. Cal. May 30, 2023) ........................................................... 18

*Kona Enters., Inc.* v. *Estate of Bishop*,
179 F.3d 767 (9th Cir. 1999)..................................................................................... 16

*L.B. Rsch. & Educ. Found.* v. *UCLA Found.*,
   130 Cal. App. 4th 171 (2005) ............................................................. 14

*Laborers' Local* v. *Intersil*,
   868 F. Supp. 2d 838 (N.D. Cal. 2012) ....................................... 18-19 n.5

*Langan* v. *United Servs. Auto. Ass'n*,
   69 F. Supp. 3d 965 (N.D. Cal. 2014) ................................................... 9

*Lantz Ret. Inv., LLC* v. *Glover*,
   2020 WL 528890 (E.D. Cal. Jan. 31, 2020)................................. 18-19 n.5

*Lee* v. *Interinsurance Exch.*,
   50 Cal. App. 4th 694 (1996) ............................................................ 19

*Lenhoff Enters., Inc.* v. *United Talent Agency, Inc.*,
   2015 WL 7008185 (C.D. Cal. Sept. 18, 2015)....................................... 33

*Lenhoff Enters., Inc.* v. *United Talent Agency, Inc.*,
   729 F. App'x 528 (9th Cir. 2018) ................................................ 33 n.17

*Little* v. *Pac. Seafood Proc., LLC*,
   2024 WL 2305603 (N.D. Cal. May 21, 2024) ....................................... 31

*Lloyd Design Corp.* v. *Mercedes-Benz of N.A., Inc.*,
   66 Cal. App. 4th 716 (1998) ........................................................ 29 n.11

*Louis* v. *Nailtiques Cosmetic Corp.*,
   423 F. App'x 711 (9th Cir. 2011) ....................................................... 10

*Marzec* v. *Cal. Pub. Emps. Ret. Sys*,
   236 Cal. App. 4th 889 (2015) ............................................................. 7

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................. 22, 31

*McCann* v. *Lucky Money, Inc.*,
   129 Cal. App. 1382 (2005)................................................................ 15

*Melrose Place Holdings* v. *Socotra Opportunity Fund, LLC*,
   2022 WL 3013226 (C.D. Cal. May 31, 2022) ....................................... 34

*Metro Servs. Grp.* v. *Travelers Cas. & Sur. Co. of Am.*,
   2021 WL 2633416 (N.D. Cal. June 25, 2021) ................................. 12-13

*Meyer* v. *One West Bank, F.S.B.*,
   91 F. Supp. 3d 1177 (C.D. Cal. 2015) ................................................ 11

*Mintz* v. *Blue Cross of Cal.*,
   172 Cal. App. 4th 1594 (2009) ........................................................ 34

*Name.Space, Inc.* v. *Internet Corp. for Assigned Names and Nos.*,
   795 F.3d 1124 (9th Cir. 2015)........................................................... 33

*Netafim Irrigation, Inc.* v. *Jain Irrigation, Inc.*,
   562 F. Supp. 3d 1073 (E.D. Cal. 2021)..................................................................... 22

*Netbula, LLC* v. *BindView Dev. Corp.*,
   516 F. Supp. 2d 1137 (N.D. Cal. 2007) ...................................................................... 7

*O'Hara* v. *Grand Lodge, Indep. Ord. of Good Templars of State of Cal.*,
   213 Cal.131 (1931) ..................................................................................................... 13

*Obasi Inv. LTD* v. *Tibet Pharms., Inc.*,
   931 F.3d 179 (3d Cir. 2019)........................................................................................ 27

*Omega Env't, Inc.* v. *Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997).............................................................................. 22, 29

*OpenAI, Inc.* v. *Open Artificial Intelligence, Inc. et al.*,
   No. 23-cv-03918-YGR (N.D. Cal. Sept. 25, 2024)..................................................... 15

*Orcilla* v. *Big Sur, Inc.*,
   244 Cal. App. 4th 982 (2016) ...................................................................................... 8

*Pac. Bay Recovery, Inc.* v. *Cal. Physicians' Servs., Inc.*,
   12 Cal. App. 5th 200 (2017) ........................................................................................ 5

*Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009).................................................................................................... 30

*Pac. Recov. Sols.* v. *United Behav. Health*,
   481 F. Supp. 3d 1011 (N.D. Cal. 2020) ............................................................... 20 n.6

*Pagtakhan-So* v. *Cueto*,
   2016 WL 617429 (E.D. Ky. Feb. 16, 2016)................................................................ 17

*Patt* v. *Antech Diag., Inc.*,
   2019 WL 6654078 (C.D. Cal. July 30, 2019) ...................................................... 29 n.11

*Patton* v. *Sherwood*,
   152 Cal. App. 4th 339 (2007) .................................................................................... 13

*Pinkert* v. *Schwab Charitable Fund*,
   2021 WL 2476869 (N.D. Cal. June 17, 2021) ............................................... 13, 14, 35

*Pool Water Pros.* v. *Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001)........................................................................ 20, 22, 23

*Prager University* v. *Google LLC*,
   951 F.3d 991 (9th Cir. 2020)...................................................................................... 16

*Quinn* v. *Anvil Corp.*,
   620 F.3d 1005 (9th Cir. 2010).................................................................................... 17

*Rales* v. *Blasband*,
   634 A.2d 927 (Del.1993) ............................................................................................ 18

*Rebel Oil Co.* v. *Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir.1995) ........................................................................... 30

*Renne* v. *Geary*,
    501 U.S. 312 (1991) ...................................................................................... 26

*Reudy* v. *Clear Channel Outdoors, Inc.*,
    693 F. Supp. 2d 1091 (N.D. Cal. 2010) ........................................................ 33

*Richardson* v. *Reliance Nat'l Indem. Co.*,
    2000 WL 284211 (N.D. Cal. Mar. 9, 2000) ..................................................... 9

*Sandy* v. *McClure*,
    676 F. Supp. 2d 866 (N.D. Cal. 2009) .......................................................... 10

*Sanford* v. *MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ........................................................................ 13

*Sargent Fletcher, Inc.* v. *Able Corp.*,
    110 Cal. App. 4th 1658 (2003) ..................................................................... 19

*Seva* v. *Shri Shirdi Sai Baba Sansthin L.A.*,
    2013 WL 1431673 (C.D. Cal. Apr. 9, 2013) ................................................. 11

*Sonoma Foods, Inc.* v. *Sonoma Cheese Factory, LLC*,
    634 F. Supp. 2d 1009 (N.D. Cal. 2007) ........................................................ 15

*Steel Co.* v. *Citizens for a Better Environment*,
    523 U.S. 83 (1998) ....................................................................................... 26

*Sybersound Records, Inc.* v. *UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ...................................................................... 31

*Tagoia* v. *Well Fargo Bank, N.A.*,
    2018 WL 3377967 (N.D. Cal. July 11, 2018) .................................................. 5

*Texaco Inc.* v. *Dagher*,
    547 U.S. 1 (2006) ......................................................................................... 25

*Turner* v. *Victoria*,
    15 Cal. 5th 99 (2023) ................................................................................... 17

*Universal Grading Serv.* v. *eBay, Inc.*,
    2011 WL 846060 (N.D. Cal. Mar. 8, 2011) .................................................... 21

*Valencia* v. *Sharp Elecs. Corp.*,
    561 Fed. App'x 591 (9th Cir. 2014) .............................................................. 10

*Verde Media Corp.* v. *Levi*,
    2015 WL 374934 (N.D. Cal. Jan. 28, 2015) ....................................... 6, 7, 10, 11

*Vess* v. *Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ........................................................................ 4

*Villains, Inc.* v. *Am. Econ. Ins. Co.*,
  870 F. Supp. 2d 792 (N.D. Cal. 2012) ................................................................................ 34

*Weddington Prods., Inc.* v. *Flick*,
  60 Cal. App. 4th 793 (1998) ................................................................................................. 7

*Westron* v. *Zoom Video Commc'ns, Inc.*,
  2023 WL 3149262 (N.D. Cal. Feb. 15, 2023) ....................................................................... 9

*Yari* v. *Producers Guild of Am., Inc.*,
  161 Cal. App. 4th 172 (2008) ............................................................................................... 8

*Yetter* v. *Ford Motor Co.*,
  428 F. Supp. 3d 210 (N.D. Cal. 2019) .............................................................................. 4, 9

*Zenith Ins. Co.* v. *O'Connor*,
  148 Cal. App. 4th 998 (2007) ............................................................................................... 8

*Zunum Aero, Inc.* v. *Boeing Co.*,
  2022 WL2116678 (W.D. Wash. June 13, 2022) ................................................................. 27

**Statutes and Rules**

16 C.F.R. § 802.1 .................................................................................................................... 32

15 U.S.C. § 1 ................................................................................................................... *passim*

15 U.S.C. § 2 ................................................................................................................... 29, 33

15 U.S.C. § 14 ................................................................................................................. 27, 29

15 U.S.C. § 18 ........................................................................................................................ 32

15 U.S.C. § 19 ................................................................................................................. 26, 27

15 U.S.C. § 1125 .................................................................................................................... 15

18 U.S.C. § 1962 ..................................................................................................... 11, 12, 13

Article III, U.S. Constitution ................................................................................................ 26

Bus. & Prof. Code §§ 17500 *et seq.* ..................................................................................... 15

Cal. Bus. & Prof. Code § 16727 ..................................................................................... 27, 29

Cal. Bus. & Prof. Code § 17043 *et seq.* ................................................................................ 31

Cal. Bus. & Prof. Code § 17045 ..................................................................................... 31 n.15

Cal Bus. & Prof. Code §§ 17200 *et seq.* ........................................................................ 34-35

Cal. Bus. & Prof. Code § 17510.8 ......................................................................................... 14

Cal. Civ. Code § 1565 .............................................................................................................. 6

Cal. Civ. Code § 1605 .............................................................................................................. 8

Cal. Civ. Code § 1620 ........................................................................................... 5

Cal. Civ. Code § 1621 ........................................................................................... 8

Cal. Civ. Proc. Code § 338(d) ............................................................................. 10

Cal. Corp. Code § 800(b) .................................................................................... 17

Cal. Corp. Code § 5142 ................................................................................ 13, 17

Cal. Corp. Code § 5233 .......................................................................... 17, 19, 20

Cal. Corp. Code § 5710(b) ............................................................................ 16, 17

Fed. R. Civ. P. 9(b) ....................................................................................... *passim*

Fed. R. Civ. P. 23.1 ...................................................................................... 16, 17

Rest. of Char. Nonprofit Orgs. § 6.02(b)(3) ....................................................... 18

**Other Authorities**

Antonio Pequeño IV,
  *X Introduces Free Version of Grok*, Forbes (Dec. 6, 2024) ........................... 31 n.14

Hayden Field,
  *OpenAI closes funding at $157 billion valuation, as Microsoft, Nvidia, SoftBank join round*, CNBC (Oct. 2, 2024). ................................................... 21 n.7

*Introducing Microsoft 365 Copilot - your copilot for work*,
  Microsoft (March 16, 2023) ........................................................................ 26 n.10

Phillip Areeda & Herbert Hovenkamp,
  *Antitrust Law* (2024) ......................................................................................... 32

*xAI raises $6B Series C*, xAI (Dec. 23, 2024),
  https://x.ai/blog/series-c ............................................................................. 21 n.7

**INTRODUCTION**

In this third complaint, Plaintiff Elon Musk continues his year-long campaign to harass OpenAI and its leadership through abusive litigation. Musk asserted claims, withdrew them, then reasserted them in a new forum, dressed up in new theories, advanced by new lawyers: he sued in state court, then in federal court; he disclaimed a competitive motive, then named his own company as an antitrust plaintiff; he asked the California Attorney General for permission to sue on the State's behalf, then named the California Attorney General as a party to these proceedings, he privately encouraged the Delaware Attorney General to investigate OpenAI, then attacked her when she appeared here.

The amended complaint before the Court is a 500-paragraph broadside asserting 26 state and federal claims against 26 named defendants. The complaint lurches from theory to theory, distorts its own exhibits, and trades from start to finish on fact-free and often ad hominem conclusions. Musk's pleading is a grudge in search of a lawsuit. And for all its 105 pages, it fails at its one job: to plead facts that state a claim.

Boiled all the way down, the complaint asks the Court to intervene in Plaintiffs' favor to improve their position in an intensely competitive industry. Musk partnered with Sam Altman, Greg Brockman, and others to found OpenAI in 2015 as a research lab dedicated to developing safe and beneficial artificial intelligence. Musk contributed time and money for a few years, then lost interest in 2018 when he was unable to seize personal control of the organization. In the years that followed, OpenAI thrived without Musk's participation, and without any complaint from Musk. But in 2023, Musk launched a competing AI business—xAI. He has been suing OpenAI ever since, to undermine a successful competitor and advance his own commercial interests.

Musk's underlying complaint is that his long-ago donations to OpenAI were misused because OpenAI shouldn't engage in any commercial activities. Never mind that Musk endorsed a "for-profit pivot" seven years ago to ensure OpenAI could raise the funds it needed, was told in early 2019 that OpenAI was creating a "capped profit" structure to attract investors and talent, and continued to donate after that structure was publicly announced.

Musk's stale and invented grievances should all be dismissed, with prejudice:

1.      Musk seeks to state express and implied contract claims (Counts I and II) on the basis of a corporate charter and a few emails widely separated in time and subject. These writings disclose neither offer, nor acceptance, nor mutual assent, nor bargained-for consideration. No case has found an enforceable promise on the basis of such communications. Musk's claims for breach of the implied covenant (Count III) and tortious interference (Count V) fall with his contract claims and for independent reasons.

2.      Without a contract, Musk tries a variety of fraud claims (Counts IV, VII, and VIII). The fraud allegations, however, do no more than echo the contract claims—alleged broken promises, made in communications indicating no promise at all. Musk's civil RICO claims (Counts XXV and XXVI), predicated on the same alleged fraud, fail for the same reasons and others.

3.      Musk's claim for breach of charitable trust fails for lack of standing and any plausible allegation of breach (Count XX). So too do Musk's tag-along claims for constructive fraud (Count VI) and aiding and abetting (Count XXI).

4.      Musk and his associate Shivon Zilis now seek to bring derivative claims on OpenAI's behalf (Counts XXII-XXIV), but they flunk the settled tests for derivative standing every which way. Musk and Zilis have not even tried to satisfy the statutory requirements to sue derivatively. They plead no facts to excuse that failure. Nor do they plead facts that state a claim.

5.      Musk's false advertising claims (Counts XVIII and XIX) fail for, among other things, want of an advertisement.

6.      Tipping his hand that his purpose is to leverage litigation for competitive reasons, Musk, now joined by his own competing company, xAI, conjures a litany of supposed antitrust violations under every imaginable state and federal theory (Counts IX-XVI). But Musk pleads no injury to xAI, much less any injury to competition as a whole, as he must to establish standing. His allegations instead confirm vigorous competition, resulting in lower prices, higher quality products, and greater innovation, all of which benefit consumers. And while it is littered with antitrust buzzwords—"conspiracy," "collusion," "monopoly"—the FAC is devoid of the well-pleaded facts needed to plead any antitrust violation.

7.      Plaintiffs' catch-all UCL claim (Count XVII) is the pinnacle of improper "everyone

did everything" pleading, re-alleging all of the purported misconduct described in the complaint, and more, against every defendant, without specifying which defendants violated what law, or how.

Musk's third attempt at pleading a cognizable legal theory against any of the OpenAI Defendants fails again in its entirety.

## BACKGROUND

### I.    OpenAI, Musk, and xAI[1]

Sam Altman, Greg Brockman, Ilya Sutskever, and Elon Musk launched OpenAI in 2015 as a laboratory dedicated to developing safe and beneficial artificial general intelligence ("AGI"). *See* ¶¶ 82-90, 93. OpenAI, Inc. was incorporated as a non-profit in Delaware. ¶ 89. Musk alleges he made donations to OpenAI from 2016 through September 2020. ¶ 96.

As OpenAI's research progressed, it recognized that significant capital infusions—more than could be raised through donations—would be needed to develop AGI. In early 2018, a former OpenAI employee, by then working for Musk at Tesla, informed Musk that OpenAI's existing "funding model [could not] seriously compete with Google." FAC, Ex. 16. The employee proposed "[a] for-profit pivot," in which OpenAI would "attach to Tesla as its cash cow." *Id.* Musk agreed: "Tesla [was] the only path that could even hope to hold a candle to Google." *Id.* When Musk's bid for a Tesla "for-profit pivot" failed, he left OpenAI in February 2018. ¶ 96.

To raise needed funds, OpenAI launched a "capped-profit" subsidiary (OpenAI, L.P.) in March 2019. ¶ 116. Musk was advised in advance (FAC Ex. 19), raised no objection, and continued to donate to OpenAI for more than a year. ¶ 96. Nor did Musk complain that his donations had been misused in the ensuing years when OpenAI built out the capped-profit structure, ¶¶ 117-22, and entered commercial partnerships with Microsoft, including a license to certain OpenAI "technology," ¶¶ 133-34.

### II.    Musk's state court suit

In 2023, Musk launched his own AI venture—X.AI Corp. (xAI)—which "competes directly" with OpenAI. ¶¶ 9, 226-27. The following year, Musk sued Altman, Brockman, and

---

[1] Solely for purposes of this motion, the OpenAI Defendants accept as true the facts alleged in the complaint and documents incorporated by reference therein. Citations of "¶" are to the FAC. Citations of "Ex." are to exhibits of the Wiener Declaration.

3

OpenAI, Inc. in California Superior Court. *See* Ex. A. Hours before argument on Defendants' demurrer and a tentative ruling, Musk withdrew his lawsuit without explanation. Ex. B.

### III.    This action

Two months later, Musk filed this action with new counsel, largely repeating the narrative from the state complaint, but adding new legal claims. *See* Dkt. 1. OpenAI moved to dismiss. Dkt. 25. Rather than defend his pleading, Musk filed an Amended Complaint ("FAC") that repackaged some claims, piled on others—for a total of 26—and added Microsoft, Reid Hoffman (a former OpenAI director), and Microsoft's Deannah Templeton (a former observer of OpenAI's board) as defendants. *See* Dkt. 32; ¶¶ 15-16, 38.

While Musk had never previously admitted his suit was designed to advance his own competing AI organization, *see* Ex. C at 2, the FAC added xAI as a plaintiff to assert antitrust claims premised on, among other things, (1) Microsoft and OpenAI's purported "restraint[s] of trade," grounded in a wide variety of theories (Count IX); (2) Microsoft and OpenAI's alleged creation of a joint monopoly (Count X); and (3) alleged "interlocking directorates" (Count XVI). The FAC also added as a plaintiff Musk's long-time associate Shivon Zilis to assert putative derivative claims (Counts XXII, XXIII, and XXIV).

### ARGUMENT

A complaint must contain "[f]actual allegations" that "raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). Conclusory allegations "do not suffice," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009), and even well-pleaded facts "merely consistent with a defendant's liability" "stop[] short of the line between possibility and plausibility of entitlement to relief," *id.* (cleaned up).

Where, as here, plaintiffs "allege a unified course of fraudulent conduct," they must also satisfy the heightened standards of Rule 9(b), *Vess* v. *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003), and plead "the who, what, when, where, and how of the misconduct charged," *Yetter* v. *Ford Motor Co.*, 428 F. Supp. 3d 210, 231 (N.D. Cal. 2019) (cleaned up).

"Shotgun pleading" and "'everyone did everything' allegations" are improper, *Destfino* v. *Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011), because such "kitchen sink" pleadings reflect a

1    "strategic attempt to misuse the judicial process," *Tagoia* v. *Wells Fargo Bank, N.A.*, 2018 WL

2    3377967, at *5 (N.D. Cal. July 11, 2018).[2]

## I.    MUSK'S ALLEGATIONS CANNOT SUPPORT ANY CONTRACT CLAIM.

In state court, Musk alleged a written "Founding Agreement" with a variety of OpenAI

entities *and* Altman *and* Brockman, purportedly memorialized in OpenAI, Inc.'s Certificate of

Incorporation ("COI") and a 2015 email. Ex. A at ¶¶ 123-27. Musk alleged no facts showing any

defendant promised him anything, nor any bargained-for consideration. Musk withdrew the claim.

As it evolved in his first complaint in this court, Dkt. 1 at ¶¶ 247-53, the "contract" now involved

different counterparties (Altman and OpenAI, Inc.) and was supposedly evidenced in some "written

correspondence in 2015" (*id.* ¶ 248). That theory was just as deficient. Musk again retreated.

Musk's third attempt fares no better. This time, Musk's "contract" with OpenAI, Inc. and

Altman is supposedly "evidenced" in an assortment of public filings and emails spanning years and

covering various topics, some of which involve the contract's alleged counterparties, some of which

don't. ¶ 251. Each of Musk's contract-based claims fails (Counts I, II, III, and V).

### A.    Musk fails to plead breach of an express contract (Count I).

#### 1.    Musk has not adequately alleged the existence of a contract.

The terms of an express contract must be "stated in words," from which the "vital elements"

of "mutual assent" and "consideration" must be apparent. *Pac. Bay Recovery, Inc.* v. *Cal.

Physicians' Servs., Inc.*, 12 Cal. App. 5th 200, 215 (2017) (citing Cal. Civ. Code § 1620). The

documents purportedly evidencing Musk's contract show neither.

***No mutual assent****. Mutual assent "is determined under an objective standard applied to the

outward manifestations or expressions of the parties." *Am. Emps. Grp., Inc.* v. *Emp. Dev. Dep't*,

154 Cal. App. 4th 836, 847 (2007). It requires a "meeting of the minds on all material points," *id.*

---

[2] The FAC's intentionally disorienting style is improper in itself. By way of example, the complaint incorporates all alleged conduct into each of its 26 counts; asserts 13 alleged contractual breaches (¶ 254) of 11 purported "terms" (¶ 251) as the partial basis for eight distinct claims (Counts I, II, III, VI, XX, XXI, XXII, and XXIV); and asserts 17 distinct "restraints of trade" (¶ 331) as the bases for three separate antitrust counts (Counts IX, X, and XI). Moreover, the FAC names 100 Does, along with 26 identifiable defendants—most of whom are barely mentioned, despite allegedly having committed RICO offenses, abetted fraud, and violated the UCL, among other things.

at 846-47, demonstrated by the parties' "outward conduct" showing a mutual "intent to be bound," *Burch* v. *Premier Homes, LLC*, 199 Cal. App. 4th 730, 746 (2011); *see also* Cal. Civ. Code § 1565.

Musk identifies no writing showing the parties' "mutual assent" to the terms he claims have been breached. He instead tries to conjure a contract from OpenAI's initial registration form and COI and a collection of emails on varied subjects separated in time by months and years (¶ 251): (1) an email exchange from June 2015 (before OpenAI, Inc., an alleged counterparty, even existed) in which Altman brainstorms a possible "AI lab," whose "mission would be to create the first general AI" (FAC, Ex. 2); (2) a December 2015 email proposing language for a press release (FAC, Ex. 4); (3) an April 2018 email in which Musk said a draft of OpenAI's online charter "[s]ound[ed] fine" (FAC, Ex. 17); (4) a March 2016 email in which Brockman (not an alleged counterparty) discussed why OpenAI might not publish its research (FAC, Ex. 8); (5) an amalgamation of two September 2017 emails, which Musk misleadingly alleges shows Altman's "firm commitment" to "continue with OpenAI as a nonprofit" (¶ 251(j); FAC, Ex. 13); (6) an April 2018 email in which Zilis (also not an alleged counterparty) purports to summarize Altman's thinking regarding fundraising (FAC, Ex. 18); and (7) a March 2019 email sending Musk a draft announcement of the formation of a "capped-profit company" (FAC, Ex. 19).

Never has such a mash-up of inconclusive, open-ended communications been found to create an enforceable agreement. This "cobble[d] together" correspondence is inadequate as a matter of law to constitute a contract. *See Haskins* v. *Symantec Corp.*, 2013 WL 6234610, at *10 (N.D. Cal. Dec. 2, 2013) (dismissal where plaintiff "attempt[ed] to cobble together" a contract from disparate sources); *see also Verde Media Corp.* v. *Levi*, 2015 WL 374934, at *7 (N.D. Cal. Jan. 28, 2015) (no contract from an "in-person discussion and a few short and vague instant messages").

This assortment of emails is incapable of demonstrating mutual assent. Musk claims that he assented to the supposed "contract" on two occasions: (1) writing "[a]gree on all" in response to Altman's brainstorming email in June 2015 (FAC, Ex. 2); and (2) responding "ok" more than two years later to a September 2017 email in which *Zilis* (not an alleged counterparty) purported to summarize *Brockman's and Sutskever's* (not alleged counterparties) thinking regarding OpenAI's structure and fundraising (FAC, Ex. 14). ¶ 252. Where everyone else assented is unpleaded. And

missing entirely are any pleaded facts showing anyone intended to be bound to the terms Musk alleges. Musk claims, for example, that his contract obligates OpenAI to "open source technology for the public benefit" and to "openly share its plans and capabilities along the way," except where "its technology can be 'dangerous,' . . . causing genuine 'safety and security concerns.'" ¶ 251(f) (citing FAC, Exs. 8, 17, 21). But nothing in the pleading indicates the parties assented to this supposed term—if anything, Musk's allegations show the opposite. *See* FAC, Ex. 21 (providing that OpenAI "will seek to open source technology for the public benefit *when applicable*" (emphasis added)); *id.*, Ex. 8 (Brockman states that "giving away [OpenAI's] research" "might not be the best approach" in the "longer-term"). And while OpenAI remains deeply committed to AI safety, nothing in the imagined "contract" indicates agreement to Musk's made-for-litigation vision of what that commitment requires (¶¶ 251(g), 254(h)).

Musk's own documents likewise undermine his claim that Altman "'made a firm commitment' to 'continue with OpenAI as a nonprofit.'" ¶ 251(j) (citing FAC, Ex. 13). The "evidence" Musk produces actually shows that Musk wanted a "firm commitment" from Altman "to stay" at OpenAI and that Altman (in response to a different email, in which Musk took some undisclosed "ultimatum" off the table) expressed "enthusias[m]" about OpenAI's "non-profit structure." FAC, Ex. 13, at 1, 5. No one agreed to anything, still less indicated an intent to be bound. Nothing in these documents constitutes an undertaking to maintain a particular corporate structure indefinitely, notwithstanding changing commercial circumstances. *See Marzec* v. *Cal. Pub. Emps. Ret. Sys.*, 236 Cal. App. 4th 889, 912 (2015) (contract claim dismissed where "language" of identified document "not reasonably susceptible to the meaning plaintiffs ascribe[d] to it").

Nor would Musk's alleged "terms" be "sufficiently definite . . . to constitute an enforceable contract." *Netbula, LLC* v. *BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007). Contract terms must be certain enough to "provide a basis for determining what obligations the parties have agreed to" and "make possible a determination of whether those agreed obligations have been breached." *Weddington Prods., Inc.* v. *Flick*, 60 Cal. App. 4th 793, 811-12 (1998); *Verde Media*, 2015 WL 374934, at *7. The ideas reflected in Musk's cited documents—*e.g.*, "[t]he goal of . . . 'ensur[ing] that AI's benefits are as widely and evenly distributed as possible' [and] avoiding

undue concentrations of power," ¶ 251(e) (cleaned up), and making "safety . . . a first-class requirement," ¶ 251(g)—are too abstract to constitute enforceable contractual terms.

*No bargained-for consideration*. "Consideration" requires the recipient of a promise to confer a "benefit" or suffer a "prejudice" as "an inducement to the promisor." Cal. Civ. Code § 1605. It is not enough to unilaterally "confer a benefit or suffer prejudice." *Orcilla* v. *Big Sur, Inc.*, 244 Cal. App. 4th 982, 1006 (2016). Instead, "consideration" must be "bargained for"—a *quid pro quo*. *Jara* v. *Suprema Meats, Inc.*, 121 Cal. App. 4th 1238, 1249 (2004).

On this element, Musk offers only the conclusory allegation that Altman and OpenAI agreed to his fictitious terms "in consideration for Musk's donations, leasing of OpenAI, Inc.'s office space, and payment of overhead, and [his] time, skill, advice, stature, and connections." ¶ 251. Musk does not plead that the parties engaged in bargaining of any kind—the documents he cites do not evidence any *quid* for the *quo*. That is an independent basis for dismissal.

### 2.     Musk has not plausibly alleged breach.

Musk has also failed to plausibly allege any breach of the imagined contract. Musk alleges that OpenAI has operated "for [] private gain" (¶ 254(b)), that certain of its assets have "inured" to private benefit (¶ 254(c)), that it failed to "ensure AI's benefits are widely distributed" (¶ 254(e)), and that it "rushed development of [] dangerous and unsafe technology" (¶ 254(g)). These conclusory allegations are untethered to the breach of any specific contractual terms.

### B.     Musk does not plead an implied contract (Count II).

An implied contract is an agreement, "the existence and terms of which are manifested by conduct" rather than words. Cal. Civ. Code § 1621. Labeling a claim as breach of an implied contract does not relieve the plaintiff of its obligation to plead mutual assent and consideration. *Yari* v. *Producers Guild of Am., Inc.*, 161 Cal. App. 4th 172, 182 (2008); *Zenith Ins. Co.* v. *O'Connor*, 148 Cal. App. 4th 998, 1010 (2007). The FAC pleads neither. *See* ¶¶ 254, 265.

Musk does not even identify the conduct claimed to create the implied contract, alleging only that it arose from the parties' "relationship, surrounding circumstances, and intentional course of conduct," ¶ 259, without identifying the "source of [the] claimed terms" or explaining "how those terms became part of the parties' legal agreement," *Haskins* v. *Symantec Corp.*, 2014 WL

2450996, at *4 (N.D. Cal. June 2, 2024) (cleaned up). That too is fatal, as is the failure to plead any breach. *See* supra at 5-8.

### C.    Musk does not plead an implied covenant claim (Count III).

Musk's claim for breach of the implied covenant of good faith fails in the absence of a well-pleaded contract. *See Langan* v. *United Servs. Auto. Ass'n.*, 69 F. Supp. 3d 965, 980 (N.D. Cal. 2014). The claim independently fails because its premise—that Defendants did not "observe a reasonable construction of the terms, understandings, and obligations of the parties" (¶ 273)—is identical to Musk's contract claim. *See Westron* v. *Zoom Video Commc'ns, Inc.*, 2023 WL 3149262, at *2 (N.D. Cal. Feb. 15, 2023) (dismissing "impermissibly duplicative" implied covenant claim).

## II.    PLAINTIFFS' ALLEGATIONS CANNOT SUPPORT ANY FRAUD CLAIM.

Musk attempts to repackage his contract claims as various types of fraud. *See* Counts IV, VII, VIII, XXV, XXVI. Rather than claim that defendants made and then broke enforceable promises, Musk says those same promises were made to him with no intention to fulfill them. ¶¶ 309-10. But a plaintiff cannot take a deficient "claim for breach of a commercial contract and recast [it] as [a] tort[]." *JMP Secs. LLP* v. *Altair Nanotech. Inc.*, 880 F. Supp. 2d 1029, 1043-44 (N.D. Cal. 2012). Each fraud claim should be dismissed for that reason and others below.

### A.    Musk does not plead fraud (Count VII).

Musk's initial complaint alleged "promissory fraud." Dkt No. 1, ¶¶ 149-74. He now labels that count simply as "fraud," but the claim remains one of promissory fraud—purportedly false "promises" by Altman and Brockman that OpenAI would remain a non-profit.

To plead promissory fraud, a plaintiff must allege "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e]." *Behnke* v. *State Farm Gen. Ins. Co.*, 196 Cal. App. 4th 1443, 1453 (2011). Musk must plead these elements with the particularity Rule 9(b) requires. *Richardson* v. *Reliance Nat'l Indem. Co.*, 2000 WL 284211, at *4 (N.D. Cal. Mar. 9, 2000); *Yetter*, 428 F. Supp. 3d at 219-20. The FAC comes nowhere close:

1.      Musk identifies no actionable "promise." He points to Altman's statement in 2017 that he "remain[ed] enthusiastic" about OpenAI's structure at the time and Zilis' second-hand report of that enthusiasm. ¶¶ 307-08. These subjective "expressions of opinion" are not actionable promises. *Louis* v. *Nailtiques Cosmetic Corp.*, 423 F. App'x 711, 713 (9th Cir. 2011).

2.      Musk does not explain what Altman "promised" through this statement (¶ 309), leaving the court unable to assess whether any alleged "promise" was breached. *Behnke*, 196 Cal. App. 4th at 1453. The FAC suggests Altman promised not to "convert the non-profit [OpenAI, Inc.] to a for-profit" (¶ 312), and appears to further suggest that Altman committed to keep the structure of the OpenAI enterprise unchanged in perpetuity (*see* ¶¶ 106-14). No such "promise" can plausibly be inferred from Altman's statement of "enthusiasm" in 2017—particularly given that, just a few months *after* Altman's email, Musk endorsed a "for-profit pivot" that would involve "attach[ing]" OpenAI to "Tesla as its cash cow." FAC, Ex. 16; ¶ 102. And Musk continued to donate to OpenAI for more than a year after being notified of OpenAI's launch of for-profit subsidiaries. ¶ 96.

3.      Musk has pled no facts—let alone with particularity—that Altman and Brockman made any "promise" with an intent "not to perform." *Behnke*, 196 Cal. App. 4th at 1453. Musk simply concludes that they "had no intention of performing" (¶ 310), a far cry from the "clear, specific, and unequivocal" allegations required to "differentiat[e] [a] false promise from a mere broken promise," *Valencia* v. *Sharp Elecs. Corp.*, 561 F. App'x 591, 593-94 (9th Cir. 2014); *see also Sandy* v. *McClure*, 676 F. Supp. 2d 866, 882 (N.D. Cal. 2009); *Hsu* v. *OZ Optics Ltd.*, 211 F.R.D. 615, 620 (N.D. Cal. 2002); *Verde Media*, 2015 WL 374934, at *9.

4.      The claim is barred by the three-year statute of limitations. *See* Cal. Civ. Proc. Code § 338(d). Musk expressly alleges that Altman's "promise" was breached in February 2018, when defendants devised a "structure for an equity fundraise . . . [to] convert to a for-profit structure." ¶ 106. Musk alleges he was personally notified of this plan, and that it was disclosed publicly, in March 2019 (¶ 114; FAC, Ex. 19)—meaning the claim was time-barred nearly three years ago.[3]

---

[3] The same is true of Musk's aiding and abetting fraud claim (Count VIII) and his duplicative unjust enrichment claim (Count IV).

**B.      Musk's unjust enrichment claim falls with his fraud claim (Count IV).**

Musk's unjust enrichment claim (Count IV) rests on the same premise as his fraud claim—the purported solicitation of donations through alleged "misrepresent[ations]." *See* ¶ 280. Because Musk has not adequately pleaded his fraud claim, his unjust enrichment claim fails as well. *See Verde Media*, 2015 WL 374934, at *8.

**C.      Musk and xAI do not plead a civil RICO violation (Counts XXV & XXVI).**

Musk—joined by xAI—tries to turbocharge his fraud allegations by reasserting them as civil RICO under 18 U.S.C. § 1962 (Count XXV). The claim comes in three flavors: (1) a § 1962(c) theory premised on Defendants allegedly "conduct[ing] . . . OpenAI, Inc.'s affairs through a pattern of racketeering" (¶¶ 507-14); (2) a § 1962(a) theory premised on their alleged "invest[ing]" of "income derived . . . from a pattern of racketeering activity" in OpenAI (¶¶ 515-19); and (3) a § 1962(b) theory premised on their alleged "control over OpenAI, Inc." "through a pattern of racketeering activity" (¶¶ 520-24). Plaintiffs also reassert these allegations as a RICO "conspiracy" under § 1962(d) (Count XXVI). Each theory is premised on an alleged pattern of "racketeering activity" comprised of predicate acts of "wire fraud" (¶¶ 486-506).

Plaintiffs' failure to plead wire fraud with particularity is fatal to their RICO claims, which also fail for independent reasons. *See, e.g.*, *Desoto* v. *Condon*, 371 F. App'x 822, 824 (9th Cir. 2010) (dismissing "vague and conclusory" wire fraud allegations); *Seva* v. *Shri Shirdi Sai Baba Sansthin L.A.*, 2013 WL 1431673, at *4 (C.D. Cal. Apr. 9, 2013) (dismissing RICO claims predicated on wire fraud relating to charitable donations).

**1.      Plaintiffs do not allege predicate acts of wire fraud.**

To establish a pattern of racketeering based on wire fraud, Plaintiffs must plead with particularity "(A) the formation of a scheme to defraud, (B) the use of the . . . wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Alleging a "scheme to defraud" requires Plaintiffs to identify material information that Defendants misrepresented or withheld, *see Meyer* v. *One W. Bank, F.S.B.*, 91 F. Supp. 3d 1177, 1184 (C.D. Cal. 2015), and to do so with heightened specificity under Rule 9(b), which is particularly "exacting in the [RICO] context," *Aniel* v. *PHH Mortg.*

*Corp.*, 2022 WL 2164702, at *6 (N.D. Cal. June 1, 2022).

Far from meeting these demanding standards, the RICO claims are a reheated serving of Musk's deficient contract and promissory fraud claims—that Altman and Brockman purportedly "exploit[ed] Musk and others . . . by inducing them with repeated misrepresentations to make significant . . . contributions" to OpenAI—only to "exploit[] [those donations] to enrich themselves." ¶ 486. Musk identifies no representation that was false when made, much less facts establishing an intent to defraud. *See supra* at 9-10. Without particularized allegations to support these accusations, Musk's wire fraud allegations collapse, and so, as a result, do his RICO claims.[4]

### 2.    Plaintiffs' RICO claims also fail for independent reasons.

***No "conduct of an enterprise."*** To state a § 1962(c) claim, Plaintiffs must allege "the existence of two *distinct* entities: (1) a person . . . and (2) an 'enterprise.'" *Ferrari* v. *Mercedes-Benz USA, LLC*, 2016 WL 7188030, at *2 (N.D. Cal. Dec. 12, 2016) (emphasis added). Plaintiffs identify the For-Profit Entities (¶ 509) among the "persons" participating in the alleged enterprise—here, OpenAI, Inc. (¶ 508). But the FAC alleges that "OpenAI, Inc. and the For-Profit Entities operate together as a unitary enterprise" (¶ 241), violating RICO's distinctiveness requirement. *See Ferrari*, 2016 WL 7188030, at *2; *Chagby* v. *Target Corp.*, 358 F. App'x 805, 808 (9th Cir. 2009). And the FAC contains no plausible allegation that Altman and Brockman "conduct[ed]" OpenAI's operations "*through* a pattern of racketeering activity," as the mob might corrupt a business. *See* 18 U.S.C. § 1962(c) (emphasis added).

***No investment-specific injury***. Pleading a violation of § 1962(a) requires particularized allegations showing "an injury" proximately caused by "the use or investment of racketeering income" that is "*distinct* from an injury caused by the predicate acts themselves." *Gjovik* v. *Apple Inc.*, 2024 WL 2309100, at *7 (N.D. Cal. May 20, 2024) (emphasis in original). To the extent the FAC attempts to plead a § 1962(a) injury at all, it appears to be that Defendants misused Musk's donations (¶¶ 516-18), a purported injury that overlaps entirely with the alleged harm from Defendants' supposed wire fraud (*i.e.*, the predicate acts). That is insufficient.

---

[4] Plaintiffs plead no facts (much less particularized facts) to support their conclusion that OpenAI's recent models are "shrouded in secrecy" and that donations were used "on information and belief, to attract massive investment by Microsoft" and to "launch the For-Profit Entities." ¶¶ 494-95.

12

*No "acquisition" or "control"-specific injury*. Section 1962(b) similarly requires allegations of "an injury . . . resulting from defendant's control or acquisition of the enterprise." *Metro Servs. Grp.* v. *Travelers Cas. & Sur. Co. of Am.*, 2021 WL 2633416, at *6 (N.D. Cal. June 25, 2021). The asserted injury must be "proximately caused" by that "acquisition or control." *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 921 (C.D. Cal. 2011). Plaintiffs allege that Defendants maintain "control over OpenAI, Inc." (¶ 521), but again plead no "injury" specifically caused by that "control," as opposed to Defendants' solicitation of Musk's "contributions" (¶ 526), which is the alleged harm flowing from the underlying predicate acts.

*No conspiracy claim*. Without a substantive RICO claim, Plaintiffs' conspiracy claim under § 1962(d) also fails. *See Sanford* v. *MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010).

## III.    MUSK'S BREACH OF CHARITABLE TRUST CLAIM FAILS.

### A.    Musk lacks standing to bring a breach of charitable trust claim (Count XX).

By statute, only a member, officer, or director of a non-profit, a party "with a reversionary, contractual, or property interest in" the entity's assets, or the Attorney General (or a relator) has standing to sue a non-profit for breach of trust. Cal. Corp. Code § 5142(a)(1)-(5); *Horiike* v. *Humane Soc'y of the U.S.*, 2016 WL 11744969, at *16-17 (C.D. Cal. June 20, 2016). This statutory scheme "limits the persons who can sue for mismanagement of a charitable corporation's assets, and a donor like [Musk] is not among them"—"[d]onors who 'parted with their interest in' and 'control over' their donated assets" generally have "no standing to complain." *Pinkert* v. *Schwab Charitable Fund*, 2021 WL 2476869, at *5 (N.D. Cal. June 17, 2021) (quoting *O'Hara* v. *Grand Lodge, Indep. Ord. of Good Templars of State of Cal*., 213 Cal. 131, 139-40 (1931)).

Musk claims standing: (1) as a "settlor of a charitable trust"; (2) through his "special interest" in OpenAI, Inc. based on his prior status as "a co-founder, early director, and critical donor"; and (3) as a consequence of his alleged contract with Altman and OpenAI, Inc. *See* ¶¶ 237-38, 419. None of these theories is availing.

*First*, "settlors" have standing only if they "retain [a] reversionary interest in the trust property." *Patton* v. *Sherwood*, 152 Cal. App. 4th 339, 342 (2007). Musk now admits he has no such interest. *See* Dkt. 73, at 18 (disclaiming "reversionary interest"). That is dispositive.

*Second*, Musk's lack of a reversionary interest also dooms his claim to "special interest" standing. That path applies only if the plaintiff has "some definite interest in the property" as "a trustee, or a *cestui*" or as a result of "*some reversionary interest* in the trust property." *Holt* v. *Coll. of Osteopathic Phys. & Surgeons*, 61 Cal. 2d 750, 753 (1964) (emphasis added). Musk is neither a "trustee" nor "*cestui*" (beneficiary) of OpenAI and has disclaimed any "reversionary interest."

*Finally*, Musk's alleged "contract" does not support his standing either. Musk has not even identified an enforceable contract (*see supra* at 5-8), much less a "conditional contract" governing the use of his donations and specifying that "failure to comply . . . would result in a forfeiture." *L.B. Rsch. & Educ. Found.* v. *UCLA Found.*, 130 Cal. App. 4th 171, 179-80 (2005).

### B.    Musk fails to plead any breach of charitable trust.

Nor has Musk made any showing of breach. Musk claims that "Defendants [] breached the terms of [his] donations"—which purportedly included that OpenAI open source all of its technology, neither license it to, nor otherwise partner with, a for-profit company, and maintain its current organizational structure forever. *See* ¶¶ 254, 420. Yet he pleads nothing to plausibly suggest OpenAI accepted his donations subject to these commitments; that OpenAI no longer remains devoted to the development of safe and beneficial AI; or that OpenAI, Inc.'s assets have inured to private benefit. *See supra* at 8. The FAC itself makes clear that OpenAI, Inc. received "commensurate" "value" in exchange for any asset transfer, after a "robust independent appraisal process" and approval by OpenAI's "independent directors." FAC, Ex. 22, at *2; *see id.*, Ex. 23. Musk also cannot plausibly allege that his donations were used for "purposes" other than for which they were "sought," Cal. Bus. & Prof. Code § 17510.8, *i.e.*, in support of OpenAI's mission of developing safe AI for the benefit of humanity.

Confirming that Musk's charitable trust claim is a sham, Musk's counsel recently sent a letter to the California and Delaware Attorneys General demanding that OpenAI, Inc.'s assets be auctioned off to "major investors in generative artificial intelligence," (Ex. D), directly contradicting the entire premise of Musk's claim here—that OpenAI's assets should never "inure[] to [private] benefit" (¶¶ 254, 420).

### C.    Musk's duplicative constructive fraud claim fails (Count VI).

Musk's constructive fraud claim (Count VI) is duplicative of his charitable trust claim. *See* ¶¶ 294-95. Musk cannot cure his lack of standing to assert breach of charitable trust simply by renaming the claim. *See Pinkert*, 2021 WL 2476869, at *6; *Horiike*, 2016 WL 11744969, at *17, *19. Even if he could, the claim fails—it is premised on the same alleged "material promises, representations, and reassurances" (¶ 296) as the rest of Musk's fraud claims, none of which is pleaded with the required particularity. *See In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1219 (N.D. Cal. 2007) (dismissing constructive fraud claim under Rule 9(b)); *Sonoma Foods, Inc.* v. *Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1021 (N.D. Cal. 2007) (same).

## IV.    THE FALSE ADVERTISING CLAIMS (COUNTS XVIII & XIX) SHOULD BE DISMISSED.

Musk and xAI assert two false advertising claims—under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count XVIII), and California's false advertising statute, Bus. & Prof. Code §§ 17500 *et seq.* (Count XIX). Both of these claims are subject to Rule 9(b). *See Davidson* v. *Sprout Foods, Inc.*, 106 F.4th 842, 852-53 (9th Cir. 2024); *Cisco Sys., Inc.* v. *Dexon Comput., Inc.*, 2022 WL 2222962, at *5 (N.D. Cal. June 21, 2022). Neither is pleaded with the requisite particularity.

*First*, Plaintiffs have not identified any "commercial advertisement" (under the Lanham Act), *HomeLight, Inc.* v. *Shkipin*, 694 F. Supp. 3d 1242, 1254 (N.D. Cal. 2023) (listing elements), or statement made for purposes of "dispos[ing] of real or personal property" (under § 17500), *McCann* v. *Lucky Money, Inc.*, 129 Cal. App. 1382, 1387-88 (2005) (listing elements). The FAC lists a number of statements purportedly made at some time on "OpenAI's website, online marketing, online blog posts, and Defendants' social media" concerning OpenAI's mission and its commitment to safety, ¶¶ 392-93, 410. But the FAC does not identify when these statements were made, or by whom, or which products, if any, they were meant to promote. Indeed, far from alleging advertisements for "goods[] [or] services" or statements made "primarily out of economic motivation," *Children's Health Def.* v. *Meta Platforms, Inc.*, 112 F.4th 742, 764-65 (9th Cir. 2024), the FAC does not even allege that the statements were made at a time when OpenAI even offered any commercial products. This Court recently held that several of these precise statements were

untethered to any "specific promotion of goods or services" and thus did not qualify as "actionable commercial speech." Order Granting in Part Motion to Dismiss, *OpenAI, Inc.* v. *Open Artificial Intelligence, Inc.*, No. 23-cv-03918-YGR, at *5 (N.D. Cal. Sept. 25, 2024), ECF No. 127.

*Second*, the "general, subjective" statements challenged—regarding OpenAI's "goal[s]" and "mission"—are not "quantifiabl[y]" "false statement[s] of fact." *Prager University* v. *Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020); *HomeLight*, 694 F. Supp. 3d at 1254, 1256.

*Third*, none of the challenged statements is adequately alleged to be false. Plaintiffs claim that the statements created the "false belief Defendants' AI products are safe, when in fact . . . they were not" (¶ 395)—a conclusion apparently informed by unsupported allegations that OpenAI's "safety testing" is deficient (¶¶ 397, 399), that safety personnel have "resigned" (¶ 400), and that an OpenAI product has sometimes "hallucinated" (¶ 401). But these allegations do not disprove that OpenAI employs "substantial safeguards," that OpenAI's "goal is to advance digital intelligence," or that OpenAI uses a "multi-tiered safety system." ¶¶ 393(a)-(f).

*Finally*, Plaintiffs lack standing to assert a Lanham Act claim because they have not alleged commercial injury to their business reputation or sales "proximately caused by the defendant's actions." *See Charlotte's Web, Inc.* v. *AAXLL Supply Co. LLC*, 2020 WL 6891876, at *1 (N.D. Cal. Nov. 24, 2020). Plaintiffs allege that xAI's products are "comparable" to OpenAI's and that OpenAI's statements have somehow "diverted" potential customers away from xAI. ¶ 402. This conclusory assertion falls short of the required showing that xAI's injury "flow[s] directly from the deception wrought by [OpenAI's] advertising," which "necessarily caused [customers]" not to use xAI's products. *HomeLight*, 694 F. Supp. 3d at 1254-55.

## V.    MUSK AND ZILIS'S DERIVATIVE CLAIMS SHOULD BE DISMISSED.

Musk and Zilis assert claims on behalf of OpenAI for breach of fiduciary duty against Altman and Brockman (Count XXII); and self-dealing against Altman, Brockman, and the California Attorney General as an involuntary plaintiff (Count XXIII). These claims belong to OpenAI, Inc. The law does not permit plaintiffs like Musk and Zilis to seize them without satisfying procedural safeguards, none of which are met here.

1    **A.    Musk and Zilis lack standing to assert derivative claims.**

2    Federal law (Rule 23.1)—not the California law Plaintiffs allege (Cal. Corp. Code

3    § 5710(b))—supplies the "procedural" rule governing derivative actions in federal court. *Kona*

4    *Enters., Inc.* v. *Est. of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999). Under Rule 23.1, derivative

5    standing is limited to "shareholders or members of a corporation" who "fairly and adequately

6    represent the interests of" the corporation's other shareholders or members. Fed. R. Civ. P. 23.1.

7    As interpreted by the courts, this requires putative derivative plaintiffs to be members or

8    shareholders at the time they file suit, and throughout the litigation. *See Quinn* v. *Anvil Corp.*, 620

9    F.3d 1005, 1012 (9th Cir. 2010); *Pagtakhan-So* v. *Cueto*, 2016 WL 617429, at *4-5 & n.6 (E.D.

10   Ky. Feb. 16, 2016) (former trustees of non-profit could not provide "fair[] and adequate[]

11   represent[ation]"); *Conboy* v. *Black Diamond Props., Inc.*, 2010 WL 2944374, at *7-8 (M.D. Fla.

12   July 23, 2010) (plaintiff who resigned membership was not a "shareholder[] or member[] . . . at the

13   time [of] fil[ing] [] suit" and thus lacked standing). Neither Musk nor Zilis satisfy this threshold

14   requirement—both are former members of OpenAI who resigned long ago.

15   The result is the same under California law. Section 5710(b) provides that a "member" of a

16   non-profit may sue derivatively. California case law makes clear that former members do not have

17   standing to sue derivatively. In *Turner* v. *Victoria*, the Supreme Court held that "[t]he director

18   enforcement statutes clearly indicate they require an individual who brings a lawsuit *to be a director*

19   *when that person institutes the action*." 15 Cal. 5th 99, 115, 124 (2023) (emphasis added)

20   (interpreting Cal. Corp. Code §§ 5142 and 5233). Similarly, in *Grosset* v. *Wenaas*, the California

21   Supreme Court held that would-be stockholder derivative plaintiffs must hold shares *at the time*

22   suit is filed. 42 Cal. 4th 1100, 1111, 1116 (2008) (interpreting Cal. Corp. Code § 800(b)). No

23   California case permits what Plaintiffs propose here: to sue on behalf of a company because they

24   *used* to be members, directors, stockholders, or stakeholders.

25   Even if Musk and Zilis were current members, they may not sue derivatively on OpenAI's

26   behalf without making a demand upon the board—they must "allege[] in the complaint with

27   particularity" their "efforts to secure from the board such action as plaintiff desires, or the reasons

28   for not making such effort." Cal. Corp. Code § 5710(b)(2). Proper demand requires a derivative

17

plaintiff to make an "earnest" effort to "exhaust[] all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity with his wishes." *Bader* v. *Anderson*, 179 Cal. App. 4th 775, 789 (2009). Failure to do so defeats standing. *Id.*

Musk and Zilis claim to have made a demand through "phone calls, in-person discussions, public statements via social media, and emails" in which they brought unspecified "concerns" to the board's attention. ¶¶ 446, 462. Plaintiffs also claim to have "given notice to the Board of the [FAC's asserted] violations . . . prior to filing" (¶¶ 448, 464)—by which they mean they emailed a copy of the FAC to OpenAI's litigation counsel two hours before it was filed. Musk and Zilis do not even identify what "concerns" they brought to the board's attention or whether they requested the board take any action at all. These purported "demands" are nowhere near the "particularized" allegations necessary to show Plaintiffs "exhausted all means" in trying to secure remedial action from OpenAI's board. *Bader*, 179 Cal. 4th at 789; *see also* Rest. of Char. Nonprofit Orgs. § 6.02(b)(3) (demand requires "written, formal demand upon the board of the charity to pursue suitable corrective measures . . . provid[ing] the charity sufficient time to respond").

At the same time they pretend to have made a demand, Musk and Zilis allege that demand would have been futile because "[t]he Board was adversely dominated during all relevant periods." ¶¶ 445, 447, 461. Having claimed to make demand, however, Musk and Zilis cannot also claim demand futility—a demand upon the board "concedes the independence and disinterestedness of a majority of the board to respond" to that demand as a matter of law. *See Rales* v. *Blasband*, 634 A.2d 927, 935 n.12 (Del. 1993); *see also Klein* v. *Cook*, 2023 WL 3726500, *7-8 (N.D. Cal. May 30, 2023) (citing *Rales*, 634 A.2d at 930).

Moreover, Musk and Zilis have pleaded nothing to show why demand would be futile. Remarkably, the FAC does not even identify OpenAI's current directors—the only ones who matter for purposes of the demand requirement, *see Apple Inc.* v. *Superior Ct.*, 18 Cal. App. 5th 222, 234 (2017)—much less explain how that distinguished group of independent directors was "dominated." The complaint thus pleads no facts at all that call into question the ability of OpenAI's board to consider a demand, let alone the "director-by-director" analysis required "to support demand futility." *Bader*, 179 Cal. App. 4th at 790. *See Charter Twp. of Clinton Police & Fire Ret.*

*Sys.* v. *Martin*, 219 Cal. App. 4th 924, 936 (2013).[5]

**B.    Musk and Zilis fail to state a claim for breach of fiduciary duty (Count XXII).**

In any event, Musk and Zilis fail to allege any breach of duty. The FAC does not even identify the alleged breaches—it asserts breach based on the "violations of law identified in paragraph 286(a)-(i)." ¶ 442. But there is no "paragraph 286(a)-(i)" in the FAC. Regardless, under the business judgment rule, "a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose." *Berg & Berg Enters., LLC* v. *Boyle*, 178 Cal. App. 4th 1020, 1045 (2009) (cleaned up). A plaintiff can rebut the presumption that directors acted in good faith only with specific allegations of "fraud, [or] bad faith," not "conclusory allegations of improper motives and conflict of interest." *Id.* at 1045-46 (cleaned up).

Musk and Zilis only offer the latter. They claim that Altman and Brockman "fail[ed] to act in good faith and/or fail[ed] to use [due] care," ¶ 442, but plead no facts supporting that conclusion. *See Lee* v. *Interinsurance Exch.*, 50 Cal. App. 4th 694, 714-15 (1996); *In re Diadexus, Inc.*, 2019 WL 3412928, at *4 (N.D. Cal. July 29, 2019).

**C.    Musk and Zilis do not adequately plead self-dealing (Count XXIII).**

Musk and Zilis's self-dealing claim is equally deficient. To plead a *prima facie* case of self-dealing under Cal. Corp. Code § 5233, plaintiffs must allege "a transaction to which the corporation is a party and in which one or more of its directors has a material financial interest *and which does not meet the requirements of . . . subdivision (d)*." Cal. Corp. Code § 5233(a) (emphasis added). Section 5223(d) in turn requires that the transaction not be one that the "corporation entered into . . . for its own benefit," that is "fair and reasonable," and that has been authorized by disinterested and informed directors. *Id.* § 5233(d)(2). The burden of alleging facts to negate § 5223(d), which is

---

[5] Because the FAC alleges that California law applies, the OpenAI Defendants have briefed California law on this motion. But the "internal affairs doctrine" suggests that the law of Delaware (OpenAI's state of incorporation) governs. *See Lantz Ret. Inv., LLC* v. *Glover*, 2020 WL 528890, at *9 (E.D. Cal. Jan. 31, 2020); *Laborers' Loc.* v. *Intersil*, 868 F. Supp. 2d 838, 844 (N.D. Cal. 2012). Dismissal is required regardless of the law applied: Delaware's law of member standing is at least as demanding as California's, requiring continuous membership "at the time of the alleged wrong" and throughout the litigation. *See In re Massey Energy Co. Derivative & Class Action Litig.*, 160 A.3d 484, 497-98 (Del. Ch. 2017). And California follows Delaware law regarding demand and demand futility. *See Bader*, 179 Cal. App. 4th at 790-92.

19

"embedded within the [statutory] definition" of self-dealing, falls on Plaintiffs, and they have not met it. *See Sargent Fletcher, Inc.* v. *Able Corp.*, 110 Cal. App. 4th 1658, 1669 (2003) (discrete issues "embedded within [a statutory] definition" are "part of [plaintiff's] prima facie case").

Musk and Zilis gloss over § 5233(d), asserting it is inapplicable because "the Board was adversely dominated" and, on "information and belief," neither "the formalities" contained in the provision nor its "substantive standards" were satisfied. ¶ 465. But they plead no facts in support of these bare assertions, nor any facts suggesting the challenged transactions (¶¶ 137, 139-44) (1) enriched Altman at the expense of OpenAI, (2) were unfair to OpenAI, (3) were not authorized by disinterested and informed directors, or (4) were on anything but market terms. To the contrary, Musk and Zilis identify transactions that appear to have *benefited* OpenAI—resulting in sales of OpenAI's products to third parties (*see* ¶¶ 140-41), receipt by OpenAI of necessary products and services (*see* ¶¶ 139, 144), or bringing content to OpenAI's products (*see* ¶ 137).

## VI.    PLAINTIFFS FAIL TO PLEAD ANY ANTITRUST CLAIM (COUNTS IX-XVI).

### A.    All of the antitrust claims fail for lack of "antitrust standing."

"Antitrust standing" requires "a private plaintiff [to] show" at the pleading stage "that it is a proper party to pursue [an antitrust] claim." *City of Oakland* v. *Oakland Raiders*, 20 F.4th 441, 448 (9th Cir. 2021).[6] This assessment considers "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; [and] (3) the speculative measure of the harm[.]" *Id.* at 455. To clear this threshold, antitrust plaintiffs must plausibly allege "injury to competition generally," not merely to their "position[s] as [] market competitor[s]," *Hip Hop Beverage Corp.* v. *Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018), typically taking the form of "harm" that "raise[s] the price of goods above their competitive level," or that "diminish[es] their quality," *Pool Water Pros.* v. *Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001). They must further plead a direct, non-speculative link between the challenged conduct and the alleged harm to competition. *Oakland Raiders*, 20 F.4th at 458-61.

---

[6] "Antitrust standing" is a prerequisite for any "private part[y]" asserting "violations of the federal antitrust laws." *Pac. Recov. Sols.* v. *United Behav. Health*, 481 F. Supp. 3d 1011, 1022 (N.D. Cal. 2020). California antitrust law makes comparable demands. *E.g.*, *In re DRAM Antitrust Litig.*, 536 F. Supp. 2d 1129, 1134-35 (N.D. Cal. 2008).

The FAC musters only two conclusory paragraphs of alleged harms from its blunderbuss of claimed antitrust violations. *See* ¶¶ 227, 246. Even assuming their truth, neither reflects the injury to competition necessary to support standing. To the contrary, the FAC affirmatively alleges that "competition in the marketplace for generative AI remains healthy." ¶ 9.

**Investors declining to fund xAI**. Plaintiffs allege that "investors [have] declin[ed] to invest in xAI" (¶ 227) as a result of a purported "investor boycott" (¶ 331(a)). But even imagining the fictional boycott happened, Plaintiffs plead nothing to suggest "competition as a whole" in the market for AI investment capital has been harmed, *see Eagle* v. *Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987), or that the purported "boycott" has disrupted the "allocative efficiency" of the capital markets writ large, *see Pool Water Pros.*, 258 F.3d at 1034. Plaintiffs make no allegations concerning the existence, nature, and size of the AI investment market, or how much capital has purportedly been cut off by the supposed boycott, or whether xAI (or any other AI company) has had trouble raising the funds it needs, or whether it has otherwise been hindered in its ability to compete. To the contrary, xAI has been raising capital at unprecedented rates in the months *since* OpenAI's alleged boycott, including from the *same* investors who participated in OpenAI's funding round.[7] The FAC's bare allegation of harm does not plausibly state injury even to xAI, much less harm to competition. *Adaptive Power Sols., LLC* v. *Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (no "antitrust injury" where alleged harm to competition was "counter-intuitive").

**Inability to license OpenAI's technology**. Plaintiffs claim injury from xAI's purported inability to license OpenAI's "technology," supposedly because of Microsoft's "exclusive" license. ¶ 227. But "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing," and so "a refusal to deal by itself cannot establish an antitrust injury." *Universal Grading Serv.* v. *eBay, Inc.*, 2011 WL 846060, at *9 (N.D. Cal. Mar. 8, 2011); *see also Arcesium, LLC* v. *Advent Software, Inc.*, 2021 WL 1225446, at *6 (S.D.N.Y. Mar. 31,

---

[7] *See xAI raises $6B Series C*, xAI (Dec. 23, 2024), https://x.ai/blog/series-c; *see also* Hayden Field, *OpenAI closes funding at $157 billion valuation, as Microsoft, Nvidia, SoftBank join round*, CNBC (Oct. 2, 2024), https://www.cnbc.com/2024/10/02/openai-raises-at-157-billion-valuation-microsoft-nvidia-join-round.html.

2021) (no antitrust injury from defendant's "refusal" to license copyrighted software, as "a private business [may] decide on its own with whom it will deal" (cleaned up)). The FAC pleads nothing more—not (1) what "technology" is covered by the alleged license or the license's terms; (2) whether xAI has sought to license the unidentified "technology" (or even wants to); or (3) how OpenAI's purported unwillingness to turn over its technology to xAI has hindered xAI's ability to compete or disrupted competition in the genAI industry as a whole.

*Investment in compute.* Plaintiffs next claim injury based on OpenAI's ability to acquire "compute" on supposedly more favorable terms, requiring Plaintiffs to invest in their "own [compute] infrastructure." ¶ 227. That is not an injury remediable by antitrust law—"allegation[s] that [competitors] have had to invest significant resources to compete" do not demonstrate "harm to consumers." *Netafim Irrigation, Inc.* v. *Jain Irrigation, Inc.*, 562 F. Supp. 3d 1073, 1089 (E.D. Cal. 2021); *see also Pool Water Prods.*, 258 F.3d at 1036 ("[R]educed profits from lower prices and decreased market share is not the type of harm [private antitrust suits were] meant to protect against."). OpenAI's alleged acquisition of "compute" on favorable terms does not entitle xAI to the same deal. *See Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) ("[A] defendant, having succeeded in legitimately controlling the best, most efficient and cheapest source of supply, does not have to share the fruits of its superior acumen and industry." (citation omitted)). And again, Plaintiffs do not allege that they have sought compute from Microsoft on comparable terms or that their "invest[ment]" in compute infrastructure has resulted in harm. To the contrary, new investment in compute by well-resourced investors like Musk is pro-competitive and pro-consumer, increasing supply of a critical input and ultimately lowering prices. *See Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U.S. 104, 495 (1986) ("[L]oss or damage due merely to increased competition does not constitute [antitrust] injury.").

*Lower prices for xAI products.* Plaintiffs claim that they have been harmed by "lower prices for their generative AI products" (¶ 246) and appear to suggest that this is a result of OpenAI selling its products below cost. ¶ 331(e). The FAC again offers no facts, only unsupported conclusions— it omits which xAI "products" are being sold at what price, or why that unidentified "lower" price on unidentified "products" is harming xAI, much less competition or consumers. Indeed, "cutting

22

prices in order to increase business often is the very essence of competition." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). xAI itself prices its Grok product 30% below others in the market, including ChatGPT. *See infra* 30-31. And because lower prices *benefit* consumers, antitrust law is generally "concerned with acts that . . . *raise* the price of goods above their competitive level or diminish their quality." *Pool Water Pros.*, 258 F.3d at 1034 (cleaned up).

*Other asserted injuries*. Plaintiffs' other claimed injuries equally fail to justify their standing to sue. xAI contends it has had "difficulty recruiting" skilled workers because OpenAI is allegedly offering "lavish compensation." ¶¶ 200, 227, 331(n). The FAC again pleads no relevant details suggesting harm to competition—how much OpenAI is offering, to whom, and how much xAI, or any of the many other AI companies, is offering in the same circumstances. And the FAC again pleads only *pro*-competitive benefits, rather than antitrust injury—vigorous competition for talent, leading to better compensation.

The FAC finally alleges that xAI has been harmed by Microsoft and OpenAI's supposed sharing of "sensitive information." ¶¶ 227, 331(o). The FAC pleads no facts here either, and offers no explanation for how any purported information sharing has harmed competition.

Because none of the FAC's alleged harms indicates an injury to competition in any relevant market, Plaintiffs have failed to plead antitrust standing. Plaintiffs' asserted harms imply vigorous competition, as they suggest *lower* prices for, and *more* investment in, generative AI. *See* ¶¶ 222-27. Even if these alleged injuries were cognizable, none shows the direct and non-speculative causal relationship with OpenAI's purported misconduct necessary to ground standing. *Oakland Raiders*, 20 F.4th at 459-61. Plaintiffs' antitrust claims all fail on this basis alone.

Each of Plaintiffs' antitrust theories also fails to state a claim:

**B.    Musk and xAI fail to state any claim based on a purported "investor boycott."**

Plaintiffs contend that OpenAI violated Sherman Act, Section 1 (Count IX) by engaging in a prohibited "group boycott." ¶ 331(a). The premise of this claim is that OpenAI required investors in its October 2024 funding round to forgo investment in OpenAI's competitors. *Id*. The FAC offers a single allegation in support of this theory, stating that "OpenAI said" to prospective investors "[w]e'll give you allocation but we want you to be involved in a meaningful way in the business so

you can't commit to our competitors." ¶ 201. Taken as true, that allegation does not satisfy either element of a Section 1 claim: (1) an "agreement" that (2) "unreasonably restrain[s] trade." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).

***No agreement****.* The FAC pleads no facts suggesting OpenAI reached an "agreement" with anyone to boycott investment in its competitors. Plaintiffs allege only that someone at OpenAI "said" at some unidentified time to some unidentified people that they should not invest in competitors. ¶ 201. No agreement is, or could be, alleged.

***No unreasonable restraint****.* Plaintiffs' claim independently fails on Section 1's second prong. Plaintiffs may allege a restraint is "unreasonable" "in two [] ways": that it is (1) "unreasonable *per se*"; or (2) unreasonable under the "rule of reason." *Flaa* v. *Hollywood Foreign Press Assoc.*, 55 F.4th 680, 688 (9th Cir. 2022). Neither is plausibly pleaded here.

No *"per se"* treatment. An alleged group boycott is only subject to "*per se*" treatment in the presence of a "horizontal agreement," either among the "initiators of the boycott . . . or those pressured into joining." *Honey Bum, LLC* v. *Fashion Nova, Inc.*, 63 F. 4th 813, 821 (9th Cir. 2023). The latter type is called a "hub-and-spoke group boycott." *Id.* As Plaintiffs plead no agreement whatsoever to boycott investment in OpenAI's competitors, they necessarily plead no "horizontal agreement" that could justify *per se* treatment. The FAC vaguely gestures at an alleged conspiracy between OpenAI and Microsoft to constrain investment in their competitors. ¶ 331(a). Assuming Microsoft qualifies as OpenAI's horizontal competitor for these purposes, the FAC does not allege the existence of any agreement between them. Its lone allegation regarding a "boycott" (¶ 201) does not even mention Microsoft. And the FAC itself alleges that "Microsoft is spending billions investing in [] AI companies" *other* than OpenAI (¶ 225), facially contradicting Microsoft's participation in any such "boycott."

Notably, Plaintiffs have abandoned any argument that Microsoft expressly agreed to this purported boycott, now contending that "OpenAI's conduct should be imputed to Microsoft . . . because Microsoft is a dominant partner in everything OpenAI does." Dkt. 73 at 8. Imputing an agreement in this way would have no grounding in law, nor in well-pleaded fact, and would nullify § 1's element of an "agreement," on which courts have imposed rigorous pleading standards.

*E.g.*, *D'Augusta* v. *Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) (pleading an agreement requires alleging "who, did what, to whom (or with whom), where, and when").

Having failed to plead an agreement with Microsoft, Plaintiffs also do not plausibly allege the existence of a hub-and-spoke group boycott. To supply the "horizontal" feature necessary to justify *per se* treatment on this basis, the alleged boycott would need both agreements between OpenAI and each investor (vertical "spokes") and agreements among the investors to that same effect (a horizontal "rim"). *See Honey Bum*, 63 F.4th at 821. Plaintiffs allege neither. The FAC contains no allegation of agreement among OpenAI's investors. Nor could any such agreement be inferred from circumstantial evidence, on which the FAC is silent.

*Per se* treatment is unavailable for the further reason that it only applies to "naked" boycotts with "no purpose other than disadvantaging the target" that are "not justified" by pro-competitive rationales, which are readily apparent here. *Id.* at 820-21; *see also* Dkt. 64 at 11-12.

<u>No allegations under the "rule of reason."</u> Having pleaded this claim solely as a *per se* violation, s*ee* ¶ 331, Plaintiffs have abandoned any theory under the "rule of reason." *See Texaco Inc.* v. *Dagher*, 547 U.S. 1, 7 & n.2 (2006) (analyzing a purported restraint only as an alleged *per se* violation where plaintiffs "ha[d] not put forth a rule of reason claim"); *Honey Bum*, 63 F.4th at 821-22 (claim "assert[ing] only . . . *per se* group boycott" "rises and falls" on that theory).

Nor do the FAC's allegations come close to pleading a violation under the rule of reason—a searching inquiry requiring detailed factual allegations that the defendant's conduct was "intended to harm or restrain trade" and "actually injure[d] competition," *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (cleaned up), based on factors including "market power and market structure." *Flaa*, 55 F.4th at 693. Plaintiffs offer none of these well-pleaded allegations. Indeed, far from pleading injury to competition, Plaintiffs haven't even pled that xAI's own capital raising has been remotely impeded, nor that OpenAI has attained, or abused, market power in any relevant market. *Id.* at 694-95 (plaintiffs failed to allege defendant's "market power . . . to exclude competition" given their "professional success" notwithstanding alleged boycott); *see supra* at 21.

**C.    Musk and xAI fail to state any claim based on board interlocks.**

Plaintiffs next claim that alleged interlocking directorates between Microsoft and OpenAI's

boards violated § 8 of the Clayton Act (Count XVI).[8] The FAC challenges two purported "interlocks": (1) Hoffman's service as a director on Microsoft's and OpenAI's boards from March 2018 until March 2023 (see ¶ 163 & n.8); and (2) Templeton's service as Microsoft's non-voting observer of OpenAI's board from late 2023 through July 2024 (see ¶ 168). See ¶¶ 368-82.[9]

### 1.    Plaintiffs lack Article III and antitrust standing to assert this claim.

Hoffman and Templeton both resigned from their respective positions long before Plaintiffs commenced (or even threatened) a § 8 claim. At no time since has there been any alleged "board interlock." There is thus no "case or controversy" on which Plaintiffs' can ground Article III standing. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 109 (1998); Renne v. Geary, 501 U.S. 312, 320-21 (1991). And because the FAC is devoid of any allegation that Musk or xAI has suffered individualized antitrust injury from these purported interlocks, they lack antitrust standing, too. See Bearden v. Ballad Health, 967 F.3d 513, 517-18 (6th Cir. 2020).

### 2.    Hoffman's prior board service did not violate Section 8.

Plaintiffs also fail to state a prima facie § 8 violation. Only interlocks involving "competitors" implicate § 8. 15 U.S.C. § 19(a)(1)(B). But the FAC does not plausibly allege Microsoft and OpenAI were competitors during Hoffman's tenure. The FAC pleads competitive overlap solely on the basis of "Microsoft's Copilot compet[ition] against OpenAI's ChatGPT." ¶ 373; see also ¶¶ 374, 204-07, 225-26. But it omits even the date on which Copilot was released, and without that information, the FAC does not plead any competition between Microsoft and OpenAI during the relevant time.[10]

---

[8] Plaintiffs include the purported "interlock[s]" among their catalog of alleged violations of § 1, but provide no substantive allegations in support of that theory. ¶ 331(m). And an interlock that is permissible under § 8 would not separately violate § 1. Cf. Cheeks v. Fort Myer Constr. Corp., 216 F. Supp. 3d 146, 153, 164 & n.10 (D.D.C. 2016).

[9] The FAC also references Hoffman's involvement at the investment firm, Greylock, but does not explain how Greylock (a venture capital fund) could qualify as a "competitor" based merely on an alleged investment in an AI startup. See ¶ 163.

[10] Copilot was broadly released in March 2023. See Introducing Microsoft 365 Copilot – your copilot for work, Microsoft (March 16, 2023), https://blogs.microsoft.com/blog/2023/03/16/introducing-microsoft-365-copilot-your-copilot-for-work/. Thus, on Plaintiffs' theory, Microsoft could at most have qualified as OpenAI's "competitor" only at the very end of Hoffman's tenure

3.    **Templeton's prior role as an observer did not implicate Section 8.**

Section 8 applies only to a "director or officer" of competing corporations—a person eligible to "act for such corporation[s] in such capacit[ies]." *See* 15 U.S.C. § 19(a)(1), (b). "When the term 'director' is used in reference to a corporation"—as it is in § 8—"the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance." *In re Kunz*, 489 F.3d 1072, 1077-78 (10th Cir. 2007). Courts have uniformly found in other contexts that board "observers" do not qualify as "directors." *See Obasi Inv. LTD* v. *Tibet Pharms., Inc.*, 931 F.3d 179, 189-91 (3d Cir. 2019); *Zunum Aero, Inc.* v. *Boeing Co.*, 2022 WL2116678, at \*16-17 (W.D. Wash. June 13, 2022).

Templeton—who Plaintiffs repeatedly and falsely label a "director" (¶ 168)—was not a "member" of the "governing board" of OpenAI. She was a non-voting observer with none of the rights and (fiduciary or other) duties conferred upon board members. Without the capability to "act for [the] corporation," she did not qualify as a "director" under the statute. 15 U.S.C. § 19(b).

D.    **Musk and xAI fail to state any claim based on an alleged exclusivity arrangement.**

Plaintiffs challenge a variety of supposed "exclusive" arrangements between OpenAI and Microsoft: (1) OpenAI's purported exclusive sale or license of its "goods, commodities, assets, and/or services to Microsoft"; (2) OpenAI's supposed "transfer[]" of "employees and [] intellectual property to the For-Profit Entities"; and (3) OpenAI's alleged exclusive purchase of "its compute from Microsoft." ¶ 331(b)-(d). These "exclusive" arrangements are first challenged under § 1 of the Sherman Act (Count IX) and separately under § 3 of the Clayton Act, 15 U.S.C. § 14, and § 16727 of California's Cartwright Act (Counts XIII & XIV). As with the FAC's other antitrust claims, each of these rests on conclusory allegations, is incoherent, and fails to state a claim.

1.    **The purported "exclusivity" arrangements fail to state a Section 1 claim.**

Plaintiffs contend that the purported exclusivity arrangements are *per se* illegal. ¶ 331. That is wrong. "Because there are well-recognized economic benefits to exclusive dealing arrangements,

---

(¶ 163 n.8). And § 8 affords directors whose service becomes unlawful one year to unwind the interlock without incurring liability. *See* 15 U.S.C. § 19(b).

27

such arrangements are not per se violations of § 1" and must be "analyzed under the rule of reason." *Feitelson* v. *Google Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015) (cleaned up). To survive dismissal, Plaintiffs must "plead that the arrangement foreclosed competition in a substantial share of the line of commerce affected," *Hip Hop Beverage Corp.*, 733 F. App'x at 381 (affirming dismissal), which courts have generally quantified as "40% to 50% of the relevant market," *Feitelson*, 80 F. Supp. 3d at 1030. Plaintiffs come nowhere close to alleging this threshold is met.

**Purported OpenAI license to Microsoft**. Plaintiffs allege, "on information and belief," that OpenAI has exclusively licensed "pre-AGI technologies" to Microsoft. ¶¶ 133-34. But Plaintiffs do not allege what these "technologies" are, or on what terms they are purportedly licensed, or how these purported licenses, of unspecified duration, foreclosed competition at all—much less how they foreclosed a "substantial share" of the relevant market. Without identifying the particular technology licensed, there is no way for the Court to determine which "relevant market" these "technologies" compete in, or how any supposed exclusive license, of unidentified terms, would injure competition in that market. Pleading "injury to competition" requires more than a "bare" "recit[ation] [of] legal conclusion[s]"—"allegations of supporting factual detail" are required. *Brantley*, 675 F.3d at 1198 (cleaned up). The FAC pleads none.

That failure is all the more stark here, because OpenAI had no legal obligation to license its technology to xAI or anyone else. "The Sherman Act does not restrict the long recognized right" of a company to "freely [] exercise its own independent discretion as to parties with whom it will deal." *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (cleaned up). xAI remains free to contract with other market participants, or to develop its own AI technology, as it has.

**Compute**. Plaintiffs' "compute" theory is equally far-fetched. Plaintiffs allege that OpenAI has agreed to obtain its compute exclusively from Microsoft. ¶ 331(d). Missing is any allegation as to why xAI should care—there is no allegation that xAI sells "compute," and thus no allegation that it has suffered harm as a result of OpenAI's purported exclusive agreement. Nor do Plaintiffs allege that OpenAI's contract has foreclosed any portion of the compute market—let alone a "substantial share" of it. xAI is free to purchase compute from Microsoft—alleged to have only 24% of the market (¶ 217)—or from any of the other suppliers comprising the remaining 76%, or

28

self-supply compute, such as by building its own datacenters (as it already has).

***Licenses to For-Profit Entities***. Plaintiffs' final theory—that OpenAI, Inc. (the non-profit entity) transferred its "employees" and "intellectual property" to for-profit entities in the same corporate family (¶ 331(c))—is foreclosed by black-letter law: entities alleged to operate within a "unitary enterprise" (¶ 241) are "legally incapable of 'conspiring' for the purposes of § 1." *Jack Russell Terrier Network of N. Ca.* v. *Am. Kennel Club, Inc.*, 407 F.3d 1027, 1033 (9th Cir. 2005); *see also Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (related corporate entities with "unity of interest" cannot form a § 1 conspiracy). Any allegation of harm to competition from these purported transfers is also lacking.

### 2.    The purported "exclusivity" arrangements fail to state a claim under Section 3 of the Clayton Act or Section 16727 of the Cartwright Act.

Plaintiffs' tag-along claims under § 3 of the Clayton Act, 15 U.S.C. § 14 (Count XIII), and California's Cartwright Act, Cal. Bus. & Prof. Code § 16727 (Count XIV) are premised on the same exclusivity allegations and fail for the same reasons.[11] *See* ¶¶ 352-57. Plaintiffs cannot plead an exclusive dealing claim under these provisions without factual allegations that the arrangement is likely to injure competition by "foreclos[ing] competition in a substantial share" of an affected market. *See Eastman* v. *Quest Diagnostics Inc.*, 724 F. App'x 556, 558 (9th Cir. 2018); *Omega*, 127 F.3d at 1162. The claims also fail because both statutes apply only to arrangements respecting "commodities," which has been "strictly construed" to include "only tangible products." *Feitelson*, 80 F. Supp. 3d at 1033. Neither compute nor genAI products qualify.

### E.    Musk and xAI fail to state any claim based on anticompetitive pricing.

Plaintiffs challenge OpenAI's pricing of its "generative AI products," including ChatGPT. ¶¶ 331(e), (h).[12] Having alleged throughout their complaint that "OpenAI's technology" should not be kept behind a "paywall" of any kind (*e.g.*, ¶ 254(k)), Plaintiffs assert for purposes of this claim

---

[11] The Clayton and Cartwright Acts are analyzed together using the same standards. *See Lloyd Design Corp.* v. *Mercedes-Benz of N.A., Inc.*, 66 Cal. App. 4th 716, 721 (1998); *Patt* v. *Antech Diag., Inc.*, 2019 WL 6654078, at *5 (C.D. Cal. July 30, 2019).

[12] Plaintiffs assert similar challenges to Microsoft's pricing of its "compute," and "generative AI products." *See* ¶¶ 331(f), (g), (i). Plaintiffs incorporate and join Microsoft's motion to dismiss insofar as it argues that those challenges do not state a claim.

29

that consumers should actually pay *more* than $20 a month for OpenAI's "ChatGPT Plus" plan. ¶¶ 221-24. That allegation fails to state a claim under federal or state antitrust law.

### 1.    Plaintiffs fail to state a predatory pricing claim under federal law.

Plaintiffs appear to allege predatory pricing under both § 1 and § 2 of the Sherman Act. *See* ¶¶ 331(e), (h); 335.[13] To the extent they contend that pricing ChatGPT Plus too low violates § 1, the claim fails at the threshold: the FAC contains no plausible allegations that OpenAI and Microsoft conspired to underprice their respective AI chatbots. Instead, the FAC at best alleges parallel conduct—that ChatGPT Plus, Microsoft's Copilot, and other products like Google's Gemini, cost about $20 a month (¶ 224)—which is insufficient to plead a § 1 agreement. *See Kendall* v. *Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice" (quoting *Twombly*, 550 U.S. at 556)).

Plaintiffs must also plausibly allege that (1) "the prices complained of are below an appropriate measure of its rival's costs"; and (2) "there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices" by later raising prices. *John Doe 1* v. *Abbott Lab'ys*, 571 F.3d 930, 934 (9th Cir. 2009) (quoting *Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*, 555 U.S. 438, 451 (2009)). The FAC does neither.

With respect to the first element, the relevant cost is the product's "marginal or average variable cost." *Cascade Health Sols.* v. *PeaceHealth*, 515 F.3d 883, 909-10 (9th Cir. 2008). "Marginal cost is the cost that a firm incurs in the production of one additional unit of output." *Rebel Oil Co.* v. *Atlantic Richfield Co.*, 51 F.3d 1421, 1431 & n.1 (9th Cir.1995). "Average variable cost" is similar—looking to costs that change with an increase in output. *Cascade Health*, 515 F.3d at 896, 909-10. The FAC does not allege the marginal or variable cost of obtaining new subscriptions for ChatGPT Plus. Plaintiffs' conclusory assertion that it is "obvious" OpenAI's products are priced below cost (¶ 222) cannot state a claim.

Plaintiffs likewise fail to plead any "dangerous probability" that OpenAI could later recoup

---

[13] The FAC asserts that the "same conduct" forming the predicate for Plaintiffs' § 1 claim—including their below-cost pricing theories—amounted to monopolization in violation of Section 2. *See* ¶ 335. In these circumstances, the conduct may be analyzed under "each section simultaneously." *Flaa*, 55 F.4th at 688.

its "investment" by raising prices. The FAC does not even plead that OpenAI intends to raise prices, or that it could without drawing a response from the many existing competitors in the market. Indeed, xAI makes premium access available to its own AI chatbot—Grok—for $14 per month, undercutting ChatGPT's (and Copilot's and Gemini's) price by 30%, despite xAI's allegation that it has *higher* costs for compute—the "single most important raw material" in AI development. *See* ¶¶ 112, 246.[14] This sort of vigorous price competition should be encouraged. As the Supreme Court has cautioned, "mistaken inferences" condemning price cuts are "especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594.

### 2.    Plaintiffs fail to state a claim under California's Unfair Practices Act.

Plaintiffs likewise fail to plead any of the facts necessary to support their claim under the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17043 (Count XII). "To plead a UPA claim, the plaintiff must allege defendant's sales price, its cost in the product and its cost of doing business." *Eastman* v. *Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 838 (N.D. Cal. 2015) (cleaned up) (dismissal). The FAC does not meet these requirements—it alleges generically that OpenAI prices its "generative AI . . . at less than the cost thereof" (¶ 345), but identifies the "sales price" for only one of those products—ChatGPT Plus (¶ 224). And the FAC does not allege OpenAI's "cost in the product" for ChatGPT Plus, or any other OpenAI "generative AI product"—alleging only the conclusion that "creating generative AI is a hugely expensive undertaking" (¶ 222). That is insufficient. *See Little* v. *Pac. Seafood Proc., LLC*, 2024 WL 2305603, at *4 (N.D. Cal. May 21, 2024) ("To plead a section 17043 claim, [plaintiffs] must allege, in other than conclusory terms, the defendant's sales price, costs in the product, and cost of doing business."). Nor do Plaintiffs plausibly allege that OpenAI priced its products with the "specific purpose of injuring [] competition." *Sybersound Records, Inc.* v. *UAV Corp.*, 517 F.3d 1137, 1154 (9th Cir. 2008).[15]

---

[14] Antonio Pequeño IV, *X Introduces Free Version of Grok—With These Limits*, Forbes (Dec. 6, 2024), https://www.forbes.com/sites/antoniopequenoiv/2024/12/06/x-introduces-free-version-of-grok-with-these-limits/.

[15] Plaintiffs' tack-on claim that OpenAI offered "secret discounts" to Microsoft in violation of Cal. Bus. & Prof. Code § 17045 (¶ 350) is wholly conclusory. Plaintiffs do not allege what discounts were offered, when, for what, or on what terms.

1  **F.    Musk and xAI fail to state a claim under Clayton Act Section 7.**

2       Plaintiffs next challenge several "acquisitions" as violations of § 7 of the Clayton Act

3  (Count XV): (1) OpenAI's "acqui[sition]" of "the compute of Microsoft" (¶ 362); (2) OpenAI's

4  and the For-Profit Entities' acquisition of each other's "stock" and "assets" (¶¶ 363-64); and

5  (3) Microsoft's acquisition of the "stock" and "intellectual property of OpenAI" (¶ 361).[16]

6       Plaintiffs fail to allege that any of these alleged transactions "substantially [] lessen[ed]

7  competition" in violation of the statute. *See* 15 U.S.C. § 18. To state a § 7 claim, Plaintiffs must

8  allege "facts" showing "that an acquisition creates an appreciable danger or a reasonable probability

9  of anticompetitive effects in the relevant market." *DeHoog* v. *Anheuser-Busch InBev SA/NV*, 899

10 F.3d 758, 763 (9th Cir. 2018) (cleaned up). The FAC asserts that Microsoft has licensed OpenAI's

11 "technology" (¶ 133), that Microsoft holds a "significant stake" in the OpenAI enterprise (¶ 125),

12 and that OpenAI purchases compute from Microsoft (¶ 112). But it is silent as to how these alleged

13 transactions caused "anticompetitive effects" in the form of "supracompetitive pricing" or

14 "restricted output"—indeed, the FAC alleges that OpenAI's conduct has *reduced* prices. *See Intel*

15 *Corp.* v. *Seven Networks, LLC*, 562 F. Supp. 3d 454, 464 (N.D. Cal. 2021). Nor do Plaintiffs explain

16 how these alleged transactions "lessen[ed]" competition, in light of the FAC's allegation that

17 Microsoft and OpenAI "compete" against one another. *See* ¶¶ 373-74.

18      This claim fails for the additional reason that several of the challenged transactions do not

19 even qualify as "acquisition[s]" under § 7. *See* 15 U.S.C. § 18. Plaintiffs allege that OpenAI has

20 contracted with Microsoft for the "supply" of "compute" (¶ 112). But that does not amount to

21 "acquir[ing] . . . the assets of Microsoft" under any plausible read of § 7 (¶ 362). *See* Phillip Areeda

22 & Herbert Hovenkamp, *Antitrust Law* ¶ 1202c (2024) (purchases "in the ordinary course of

23 business are outside § 7 concern"); *id.* ¶ 1202g ("[T]he principle that ordinary contracting is not an

24 asset acquisition would seem generally applicable."); *see also* 16 C.F.R. § 802.1 ("[A]cquisitions

25 of goods transferred in the ordinary course of business are exempt from the notification

26 ───────────────

27 [16] Plaintiffs reassert this challenge to Microsoft's investments in OpenAI as a purported "de facto merger" in violation of § 1. *See* ¶ 331(k), (l). But Clayton Act § 7, rather than Sherman Act § 1,

28 governs the "acquisition by one corporation of stock" or "assets" of another and provides the correct framework for assessing Microsoft's purported acquisition of OpenAI's equity or assets.

requirements of the [Clayton] Act."). And the FAC lacks any allegations concerning the terms, duration, or scope of Microsoft's alleged license of OpenAI's "technology" (¶¶ 133-34) that could suggest the license operates as the functional equivalent of an "acquisition." *See supra* at 27-28.

Finally, Plaintiffs' challenge to the alleged transfer of assets or shares among the For-Profit Entities and OpenAI, Inc. (¶¶ 363-64) does not implicate § 7 under settled law. *See Copperweld*, 467 U.S. at 777 ("intra-enterprise" conduct not subject to "§ 7 of the Clayton Act").

### G.    Musk and xAI fail to plead a Sherman Act § 2 claim.

Plaintiffs' monopolization claim, 15 U.S.C. § 2 (Count X), is duplicative of their § 1 claim and fails alongside it. The § 2 claim—which requires Plaintiffs to plead (a) possession of monopoly power; (b) willful acquisition of that power; and (c) antitrust injury, *Name.Space, Inc.* v. *Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1131 (9th Cir. 2015)—is premised on identical conduct to their § 1 claim. *See* ¶ 335. Because "the conduct in question is not anticompetitive under § 1," the Court "need not separately analyze [it] under § 2." *Flaa*, 55 F.4th at 688.[17]

Plaintiffs' monopolization claim fails anyway. The FAC contends that "OpenAI and Microsoft" are together "monopoliz[ing] [] the market for generative AI." ¶ 335. But "a claim under § 2 requires the power to be in one entity rather than shared among multiple entities," as the "Ninth Circuit does not recognize a 'shared monopoly' or 'joint monopoly' theory." *Lenhoff Enters., Inc.* v. *United Talent Agency, Inc.*, 2015 WL 7008185, at *3-4 (C.D. Cal. Sept. 18, 2015); *see also Reudy* v. *Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010) ("Section 2 . . . does not punish behavior aimed at creating or maintaining oligopolies."). Even setting that threshold defect aside, the FAC alleges none of the facts regarding market definition, market power, and abuse of dominance necessary to plead that OpenAI (or Microsoft) has monopolized the dynamic and rapidly evolving generative AI industry.

### H.    None of Musk and xAI's other theories can support antitrust relief.

Exemplifying their "kitchen sink" approach, Plaintiffs assert a variety of even-more outlandish theories, without attempting to explain their basis in antitrust law. These include OpenAI

---

[17] Plaintiffs Cartwright Act claim (Count XI) fails for the same reason—the alleged conduct (¶¶ 338-39) is duplicative of Plaintiffs' Sherman Act, Section 1 claim. *See Flaa*, 55 F.4th at 688; *Lenhoff Enters., Inc.* v. *United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir. 2018).

allegedly: (1) "[a]busing [its] non-profit structure to obtain" some unspecified competitive advantage; (2) "[o]ffering vastly inflated compensation" to employees which "exce[eds] legitimate business needs" in Plaintiffs' estimation; and (3) "violat[ing] [the] terms of the Contract with Musk." *See* ¶¶ 331(j), (n), (p). The OpenAI Defendants are aware of no authority suggesting purported mismanagement of a non-profit, alleged overpayment of a company's employees, or an alleged breach of contract could state an antitrust claim. Nor does the FAC offer a shred of factual support suggesting any of this alleged conduct was anticompetitive, or, indeed, occurred.

## VII.    PLAINTIFFS' ACCESSORY CLAIMS (COUNTS V, VIII, XXI & XXIV) FAIL.

Plaintiffs also assert several claims against the so-called "For-Profit Entities" for tortious interference (Count V); aiding and abetting fraud (Count VIII); and aiding and abetting breach of fiduciary duty to Musk (Count XXI) and to OpenAI (Count XXIV). Each claim fails in the absence of well-pleaded claims for breach of contract, fraud, or breach of duty. *See supra* at 5-19.

These claims also fail for the reasons stated in Microsoft's motion to dismiss and because the For-Profit Entities are alleged to be agents of Altman's purported fraud. S*ee* ¶¶ 113, 322. A party's agent may neither "interfer[e] with its principal's contract," nor aid and abet its principal's fraud or fiduciary breach. *See Mintz* v. *Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1604, 1607 (2009); *Villains, Inc.* v. *Am. Econ. Ins. Co.*, 870 F. Supp. 2d 792, 795-96 (N.D. Cal. 2012). The claims are also time-barred to the extent predicated on Musk's fraud allegations. *See supra* at 10.

Finally, the claims fail as to the For-Profit Entities because the FAC contains no allegation that these entities "knowingly gave substantial assistance" in the purported tortious interference, fraud, or breach of fiduciary duty, alleging merely that they existed. *See Casey* v. *U.S. Bank Nat. Ass'n*, 127 Cal. App. 4th 1138, 1146 (2005). Instead, Plaintiffs rely on improper group pleading in accusing these *20* entities of together "assist[ing] or encourag[ing]" the supposed misconduct (*e.g.*, ¶ 325). *See Melrose Place Holdings* v. *Socotra Opportunity Fund, LLC*, 2022 WL 3013226, at *4-5 (C.D. Cal. May 31, 2022) (dismissing "impermissible shotgun pleading" that "allege[d] misconduct [among defendants] without differentiation"). Plaintiffs do not attempt to identify allegedly wrongful conduct on an entity-by-entity basis. Nor could they—many of these entities did not even exist at the time of the alleged conduct.

## VIII.  PLAINTIFFS' UCL CLAIM (COUNT XVII) FAILS.

Plaintiffs' claim under California's Unfair Competition Law, Cal Bus. & Prof. Code §§ 17200 *et seq.* (Count XVII) is the pinnacle of "shotgun pleading" and should be dismissed on that basis alone. *See Dreifort* v. *DJO Global Inc.*, 2019 WL 5578240, at *7 (S.D. Cal. Oct. 28, 2019); *Baba* v. *Hewlett-Packard Co.*, 2010 WL 2486353, at *6 (N.D. Cal. June 16, 2010). The claim quite literally alleges "everyone did everything," *Destfino,* 630 F.3d at 958, naming *26* identifiable defendants and *100* "John Does," while throwing the spaghetti and the kitchen sink at all of them—supposed tax violations (13 state and federal statutes); merger notification issues (for a non-existent merger); employment law claims; copyright infringement; trademark infringement, and many others (¶¶ 384-87)—all without any attempt to cogently differentiate who did what, when, or why, let alone how any of this could run afoul of any recognized legal prohibition.

The indiscriminate pleading is all the more egregious because Plaintiffs do not even have standing. Their attempt to reassert breach of charitable trust (¶ 384) has no grounding in law. *See Pinkert*, 2021 WL 2476869, at *6 (plaintiff's "lack[] [of] standing" to bring claims for breach of charitable trust "dispos[ed] of [his] UCL claim too"); *Berryman* v. *Merit Property Management*, 152 Cal. App. 4th 1544, 1555 (2007) (plaintiff cannot "bootstrap" a claim it lacks standing to pursue into a UCL claim). And Plaintiffs cannot plausibly allege "injury in fact *and* a loss of money or property caused by" their grab-bag of other theories. *Durell* v. *Sharp Healthcare*, 183 Cal. App. 4th 1350, 1359 (2010); *Drum* v. *San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 252 (2010).

Equally fatal, Plaintiffs do not bother to specify which prong of the UCL they intend to assert, relying instead on an improper "and/or" formulation (¶ 387). *See Campbell* v. *eBay, Inc.*, 2013 WL 4764526, at *5 (N.D. Cal. Sept. 5, 2013). And Plaintiffs' "laundry list of state and federal" statutory violations are improperly alleged as pure conclusions of law. *Berryman*, 152 Cal. App. 4th at 1554; *see also Kearns* v. *Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). Finally, to the extent it is predicated on the FAC's other defective claims (¶ 387(a)), the UCL claims fails for all of the reasons above. *See Baba*, 2010 WL 2486353, at *6.

### CONCLUSION

The Court should grant the motion to dismiss without leave to amend.

1    Date: January 31, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORRISON & FOERSTER LLP

*/s/ Jordan Eth*

JORDAN ETH (CA SBN 121617)
JEth@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:    (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC*