UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING OPENAI DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| v. | |
| SAMUEL ALTMAN, et al., | Date:   May 28, 2025 |
| Defendants. | Time:  10:00 a.m.<br>Courtroom:  1 – 4th Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |

1

**[PROPOSED] ORDER**

2      Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI,

3 L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,

4 OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I,

5 L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup

6 Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP

7 IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup

8 Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and

9 Aestas LLC (the "OpenAI Defendants"), have moved the Court, pursuant to Federal Rules of Civil

10 Procedure 8, 9(b), 12(b)(6), and 23.1 to dismiss the first amended complaint filed by Plaintiffs Elon

11 Musk, Shivon Zilis, and X.AI Corp. on November 14, 2024 (ECF No. 32, "Compl.").

12      Having considered all the papers filed by the parties in connection with the OpenAI

13 Defendants' motion, the parties' arguments at the hearing on this matter, and other matters of which

14 the Court may properly take judicial notice, the OpenAI Defendants' motion is GRANTED, and

15 the complaint is DISMISSED WITH PREJUDICE in its entirety.

16                                          **BACKGROUND**

17      **A.      Factual Background**

18      Altman, Brockman, Ilya Sutskever, and Musk launched OpenAI in 2015 as a laboratory

19 dedicated to researching and developing safe and beneficial artificial general intelligence ("AGI").

20 *See* Compl. ¶¶ 82-90, 93. Musk alleges he made donations to OpenAI, Inc. from 2016 until

21 September 2020. *See id.* ¶ 96. Musk created his own AI development company, X.AI Corp.

22 ("xAI"), in March 2023. *Id*. ¶¶ 9, 12. In July 2023, Musk publicly announced xAI, which now

23 competes directly with OpenAI. *Id.* ¶¶ 226-27.

24      **B.      Procedural History**

25      On February 29, 2024, Musk sued Altman, Brockman, OpenAI, Inc. and several affiliated

26 entities in California Superior Court, accusing the named defendants of abandoning OpenAI's

27 mission and violating an alleged "Founding Agreement" with Musk. Wiener Decl., Ex A. After

28

briefing on Defendants' demurrer, Musk withdrew his lawsuit before any ruling. *Id.*, Ex. B.

On August 5, 2024, Musk filed this action. *See* Dkt. No. 1. The complaint tracked the factual narrative advanced in state court, but featured a longer list of legal theories. OpenAI moved to dismiss all counts on October 8, 2024. *See* Dkt. No. 25. Musk did not oppose the motion, and instead filed an amended complaint ("FAC") with additional claims—bringing the total to 26 and adding as defendants Microsoft, former OpenAI director Reid Hoffman, and Microsoft's Deannah Templeton, who for a period served as a non-voting observer of OpenAI's board. Musk added the California Attorney General as an involuntary plaintiff. *See* Dkt. No. 32. Defendants moved to dismiss all claims in the FAC on January 31, 2025.

## ANALYSIS

To state a claim, a complaint must contain "[f]actual allegations" that "raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). Claims sounding in fraud must also satisfy Rule 9(b). The plaintiff must plead "the who, what, when, where, and how of the misconduct charged," "what [was] false or misleading about a [challenged] statement, and why it [was] false." *Yetter* v. *Ford Motor Co.*, 428 F. Supp. 3d 210, 231 (N.D. Cal. 2019) (cleaned up). Where, as here, "a unified course of fraudulent conduct" is alleged, any claim grounded in that purported misconduct "must satisfy . . . Rule 9(b)," whether or not expressly pleaded as fraud. *Vess* v. *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04, 1106 (9th Cir. 2003).

All of Plaintiffs' claims are due to be dismissed under these standards.

## I.   CONTRACT CLAIMS

### A.   Breach of express contract

The FAC fails to state a claim for breach of express contract (Count I). The terms of an express contract must be "stated in words," from which the "vital elements" of "mutual assent" and "consideration" must be apparent. *Pac. Bay Recovery, Inc.* v. *Cal. Physicians' Servs., Inc.*, 12 Cal. App. 5th 200, 215 (2017) (citing Cal. Civ. Code § 1620). The documents purportedly evidencing Musk's contract—consisting of an assortment of public filings and emails spanning years and

covering various topics (Compl. ¶ 251)—show neither.

Mutual assent requires a "meeting of the minds on all material points," *Am. Emps. Grp., Inc.* v. *Emp. Dev. Dep't*, 154 Cal. App. 4th 836, 846-47 (2007), demonstrated by the parties' "outward conduct" showing a mutual "intent to be bound," *Burch* v. *Premier Homes, LLC*, 199 Cal. App. 4th 730, 746 (2011); *see also* Cal. Civ. Code § 1565. None of the assortment of writings identified by Musk show the parties' "mutual assent" to the terms he claims have been breached. The "cobble[d] together" correspondence is inadequate as a matter of law to constitute a contract. *See Haskins* v. *Symantec Corp.*, 2013 WL 6234610, at *10 (N.D. Cal. Dec. 2, 2013). Nor does Musk plead facts demonstrating that anyone intended to be bound by the purported terms he alleges. Compl. ¶¶ 251-54. And none of Musk's alleged terms is "sufficiently definite . . . to constitute an enforceable contract" in any event. *Netbula, LLC* v. *BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007).

Musk likewise fails to plausibly allege any bargained-for consideration. "Consideration" requires the recipient of a promise to confer a "benefit" or suffer a "prejudice" as "an inducement to the promisor." Cal. Civ. Code § 1605. It is not enough to unilaterally "confer a benefit or suffer prejudice." *Orcilla* v. *Big Sur, Inc.*, 244 Cal. App. 4th 982, 1006 (2016). Instead, "consideration" must be "bargained for"—a *quid pro quo*. *Jara* v. *Suprema Meats, Inc.*, 121 Cal. App. 4th 1238, 1249 (2004). The FAC's conclusory allegations do not show that the parties engaged in bargaining of any kind.

Finally, even if the FAC adequately pleaded the existence of a contract, Musk has not plausibly alleged any breach—the FAC's conclusory allegations are untethered to the breach of any specific contractual terms.

## B.    Breach of implied contract

Musk's claim for breach of implied contract (Count II) fails for the same reasons. *Zenith Ins. Co.* v. *O'Connor*, 148 Cal. App. 4th 998, 1010 (2007) ("[a]n implied contract in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it," requiring the same showing of mutual assent and bargained-for consideration (cleaned up)). Musk does not plausibly allege conduct evincing mutual assent or bargained-for consideration or

even identify with specificity the conduct that allegedly gave rise to his implied contract, *see Haskins* v. *Symantec Corp.*, 2014 WL 2450996, at *4 (N.D. Cal. June 2, 2024), nor does the FAC plausibly allege any breach.

### C.    Implied covenant

Musk's implied covenant claim (Count III) likewise fails because it is predicated on the existence of an enforceable contract, and none has been pleaded. It fails for the additional reason that it is "based on the same conduct as [Musk's] breach of implied contract" claim and is thus "impermissibly duplicative." *Westron* v. *Zoom Video Commc'ns, Inc.*, 2023 WL 3149262, at *2 (N.D. Cal. Feb. 15, 2023).

### II.    FRAUD CLAIMS

Musk seeks to repackage his breach of contract claims as various claims of fraud. Rather than assert that Defendants made and then broke enforceable promises, Musk says those same promises were made to him with no present intention to fulfill them and therefore constituted fraud. *See* Compl. ¶¶ 309-10. But a failed contract claim cannot be repurposed in this manner. *See, e.g.*, *JMP Secs. LLP* v. *Altair Nanotech. Inc.*, 880 F. Supp. 2d 1029, 1043-44 (N.D. Cal. 2012) (dismissing fraud claim where plaintiff attempted to take "allegations underpinning a straightforward claim for breach of a commercial contract and recast them as [a] tort[]").

### A.    Fraud and unjust enrichment

Musk's fraud (Count VII) and duplicative unjust enrichment (Count IV) claims fail because he does not identify any promise made to him by any Defendant, or any facts suggesting that any such promise was made with fraudulent intent, let alone plead these facts with the particularity required under Rule 9(b). *See Behnke* v. *State Farm Gen. Ins. Co.*, 196 Cal. App. 4th 1443, 1453, 1459 (2011); *Valencia* v. *Sharp Elecs. Corp.*, 561 F. App'x 591, 593-94 (9th Cir. 2014).

These claims are also time-barred under the three-year limitations period for fraud claims. *See* Cal. Civ. Proc. Code § 338(d). Musk alleges that Altman's "promise" was breached in February 2018, when Defendants devised a "structure for an equity fundraise . . . [to] convert to a for-profit structure." Compl. ¶ 106. Musk alleges he was personally notified of this plan, and that it was disclosed publicly, in March 2019 (*id.* ¶ 114; *id.*, Ex. 19), more than three years before he filed suit

in 2024.

**B.    RICO**

Musk and xAI's civil RICO claims under 18 U.S.C. § 1962 (Counts XXV and XXVI) must likewise be dismissed. The FAC attempts to plead a pattern of racketeering activity based on wire fraud, requiring Musk and xAI to plead with particularity: "(A) the formation of a scheme to defraud, (B) the use of the . . . wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). But Musk and xAI identify no particular representation by any Defendant that was false when made, nor do they allege facts establishing an intent to defraud. Musk and xAI therefore do not adequately allege any cognizable predicate acts.

Each of the RICO theories fails for additional reasons.

First, to state a claim under § 1962(c), Plaintiffs must allege "the existence of two distinct entities: (1) a person . . . and (2) an 'enterprise.'" *Ferrari* v. *Mercedes-Benz USA, LLC*, 2016 WL 7188030, at *2 (N.D. Cal. Dec. 12, 2016). Musk and xAI identify the For-Profit Entities (Compl. ¶ 509) among the "persons" participating in the alleged enterprise—here, OpenAI, Inc. (*id.* ¶ 508)—violating RICO's distinctiveness requirement. *See Ferrari*, 2016 WL 7188030, at *2; *Chagby* v. *Target Corp.*, 358 F. App'x 805, 808 (9th Cir. 2009). Nor do Musk and xAI plausibly allege that Altman and Brockman "conduct[ed]" OpenAI's operations "through a pattern of racketeering," as is required to state a claim under § 1962(c). *See* § 1962(c).

Second, Musk and xAI fail to identify "an injury" proximately caused by "the use or investment of racketeering income" that is "*distinct* from an injury caused by the predicate acts themselves," defeating their § 1962(a) theory. *Gjovik* v. *Apple Inc.*, 2024 WL 2309100, at *7 (N.D. Cal. May 20, 2024) (emphasis in original).

Finally, their claim under § 1962(b) fares no better, as Musk and xAI plead no "injury," *Metro Servs. Grp.* v. *Travelers Cas. & Sur. Co. of Am.*, 2021 WL 2633416, at *6 (N.D. Cal. June 25, 2021), that is "proximately caused" by Defendants' alleged "acquisition or control" of the enterprise, *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 921 (C.D. Cal. 2011).

These deficiencies also necessarily require dismissal of Plaintiffs' claim for RICO

conspiracy (Count XXVI). *See Sanford* v. *MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010).

## III.    CHARITABLE TRUST CLAIMS

### A.    Breach of charitable trust

Musk lacks standing to assert his charitable trust claim (Count XX) because he is a donor with no "reversionary, contractual, or property interest in" the assets of OpenAI, Inc., nor is he an officer or director of OpenAI, Inc. Cal. Corp. Code § 5142(a)(1)-(4); *see also Pinkert* v. *Schwab Charitable Fund*, 2021 WL 2476869, at \*5-6 (N.D. Cal. June 17, 2021) (listing classes of plaintiffs with standing to assert breach of charitable trust under California law and noting that "a donor . . . is not among them"). His admission that he lacks a "reversionary interest" in OpenAI, Inc.'s assets, *see* ECF No. 73, at 18, is fatal to his claim of standing as a "settlor" of a charitable trust, *see Patton* v. *Sherwood*, 152 Cal. App. 4th 339, 342 (2007), and to his asserted "special interest" standing, *see Holt* v. *Coll. of Osteopathic Phys. & Surgeons*, 61 Cal. 2d 750, 753 (1964). Nor does Musk's alleged contract with Altman and OpenAI, Inc. support his standing—he has failed to identify an enforceable contract, let alone a "conditional contract" governing the use of his donations and specifying that "failure to comply . . . would result in a forfeiture," *L.B. Rsch. & Educ. Found.* v. *UCLA Found.*, 130 Cal. App. 4th 171, 179-80 (2005).

Musk also fails to adequately allege that the supposed terms of his donations (Compl. ¶¶ 254, 420) were breached. None of his allegations plausibly suggest OpenAI accepted his donations subject to the commitments he now claims.

### B.    Constructive fraud

Musk's constructive fraud claim (Count VI) is duplicative of his charitable trust claim and is dismissed for the same reasons. Musk cannot cure his lack of standing to assert breach of charitable trust simply by renaming the claim. *See Pinkert*, 2021 WL 2476869, at \*6. And the claim fails for lack of particularized allegations of fraud in any event. *See In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1219 (N.D. Cal. 2007) (dismissing constructive fraud claim under Rule 9(b)).

## IV.    FALSE ADVERTISING CLAIMS

The complaint fails to state a false advertising claim under the Lanham Act, 15 U.S.C.

§ 1125(a)(1)(B) (Count XVIII), or California's false advertising statute, Bus. & Prof. Code §§ 17500 *et seq.* (Count XIX).

First, Plaintiffs have not identified any "commercial advertisement" (under the Lanham Act), *HomeLight, Inc.* v. *Shkipin*, 694 F. Supp. 3d 1242, 1254 (N.D. Cal. 2023), or statement made for purposes of "dispos[ing] of real or personal property" (under § 17500), *McCann* v. *Lucky Money, Inc.*, 129 Cal. App. 1382, 1387-88 (2005). None of the alleged statements concerning OpenAI's mission and its commitment to safety, Compl. ¶¶ 392-93, are advertisements for "goods[] [or] services" or statements made "primarily out of economic motivation," *Children's Health Def.* v. *Meta Platforms, Inc.*, 112 F.4th 742, 764-65 (9th Cir. 2024); *see also* Order Granting in Part Motion to Dismiss, *OpenAI, Inc.* v. *Open Artificial Intelligence, Inc.*, No. 23-cv-03918-YGR, at *5 (N.D. Cal. Sept. 25, 2024), ECF No. 127.

Second, Plaintiffs have not challenged "quantifiabl[y]" false statements of fact. *Prager University* v. *Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020).

Third, Plaintiffs fail to adequately allege that any of the challenged statements were false. Plaintiffs assert that these statements created the "false belief Defendants' AI products are safe, when in fact . . . they were not" (Compl. ¶ 395)—but none of the FAC's allegations disprove that OpenAI employs "substantial safeguards," that OpenAI's "goal is to advance digital intelligence," or that OpenAI uses a "multi-tiered safety system," *id.* ¶¶ 393(a)-(f).

Fourth, Plaintiffs have not adequately pleaded commercial injury, depriving them of standing to assert their Lanham Act claim. Plaintiffs fail to explain how any alleged injury was "proximately caused by the defendant's actions." *See Charlotte's Web, Inc.* v. *AAXLL Supply Co. LLC*, 2020 WL 6891876, at *1 (N.D. Cal. Nov. 24, 2020).

## V.    DERIVATIVE CLAIMS

Musk and Zilis assert claims on behalf of OpenAI for breach of fiduciary duty against Altman and Brockman (Count XXII); and self-dealing, against Altman, Brockman, and the California Attorney General as an involuntary plaintiff (Count XXIII). Neither of these claims is adequately pleaded.

## A.    Standing

Federal law (Rule 23.1)—not the California law Plaintiffs allege (Cal. Corp. Code § 5710(b))—supplies the "procedural" rule governing derivative actions in federal court. *Kona Enters., Inc.* v. *Est. of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999). Under Rule 23.1, standing is limited to "shareholders or members of a corporation" who "fairly and adequately represent the interests of" the corporation's other shareholders or members. Fed. R. Civ. P. 23.1. As interpreted by the courts, this requires putative derivative plaintiffs to be members or shareholders at the time they file suit, and throughout the litigation. *See Quinn* v. *Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010); *Pagtakhan-So* v. *Cueto*, 2016 WL 617429, at *4-5 & n.6 (E.D. Ky. Feb. 16, 2016) (former trustees of non-profit could not provide "fair[] and adequate[] represent[ation]"); *Conboy* v. *Black Diamond Props., Inc.*, 2010 WL 2944374, at *7-8 (M.D. Fla. July 23, 2010) (plaintiff who resigned membership was not a "shareholder[] or member[] . . . at the time [of] fil[ing] [] suit" and thus lacked standing). Neither Musk nor Zilis is currently a "member" of OpenAI: they are former members who resigned from OpenAI long ago. They therefore lack standing to sue.

Even if California law applied, the result would be the same. Cal. Corp. Code § 5710(b) provides that a "member" of a non-profit may sue derivatively. California law does not grant former members derivative standing. *See Turner* v. *Victoria*, 15 Cal. 5th 99, 115, 124 (2023) ("[t]he director enforcement statutes clearly indicate they require an individual who brings a lawsuit to be a director when that person institutes the action"); *Grosset* v. *Wenaas*, 42 Cal. 4th 1100, 1111 (2008) (interpreting Cal. Corp. Code § 800(b) to require would-be stockholder derivative plaintiffs to hold shares at the time suit is filed).

Nor have Musk and Zilis adequately alleged demand or demand futility, as required under Cal. Corp. Code § 5710(b)(2). Their alleged "phone calls, in-person discussions, public statements via social media, and emails" (Compl. ¶¶ 446, 462), and their purported "notice to the Board" two hours before filing this complaint (*id.* ¶¶ 448, 464), fall short of the "particularized" allegations necessary to show they "exhausted all [] means" to secure remedial action from OpenAI's board, *Bader* v. *Anderson*, 179 Cal. App. 4th 775, 789 (2009). And by alleging they made a demand (albeit a deficient one), Musk and Zilis cannot claim that their purported demand was futile: they have

"concede[d] the independence and disinterestedness of a majority of the board to respond." *See Rales* v. *Blasband*, 634 A.2d 927, 935 n.12 (Del. 1993). Their allegations of demand futility are deficient in any event, as the complaint fails to undertake the "director-by-director" analysis required "to support demand futility." *Bader*, 179 Cal. App. 4th at 790.

In any event, as set forth below, Musk and Zilis fail to adequately plead any breach of duty.

## B. Breach of fiduciary duty

Musk and Zilis's breach of fiduciary duty claim (Count XXII) is barred by the business judgment rule, *see Berg & Berg Enters., LLC* v. *Boyle*, 178 Cal. App. 4th 1020, 1045 (2009) (cleaned up), as their allegations of bad faith and lack of due care are purely conclusory, *see* Compl. ¶ 442; *Lee* v. *Interinsurance Exch.*, 50 Cal. App. 4th 694, 714-15 (1996) ("conclusory allegations" that board "acted for improper motives and as a result of a conflict of interest" are insufficient to rebut the business judgment rule).

## C. Self-dealing

Musk and Zilis have not adequately pleaded a claim for self-dealing (Count XXIII) under Cal. Corp. Code § 5233, which requires them to allege "a transaction to which the corporation is a party and in which one or more of its directors has a material financial interest and which does not meet the requirements of . . . subdivision (d)." Cal. Corp. Code § 5233(a); *see also Sargent Fletcher, Inc.* v. *Able Corp.*, 110 Cal. App. 4th 1658, 1669 (2003) (discrete issues "embedded within [a statutory] definition" are "part of [plaintiff's] prima facie case"). Section 5223(d) in turn requires that the transaction not be one that the "corporation entered into . . . for its own benefit," that is "fair and reasonable," and that has been authorized by disinterested and informed directors. Cal. Corp. Code § 5233(d)(2). Musk and Zilis have not alleged sufficient facts to negate § 5233(d). *See* Compl. ¶¶ 137, 139-44, 465.

## VI. ANTITRUST CLAIMS

### A. Standing

To state a claim under federal or California antitrust law, Plaintiffs must satisfy the requirements of "antitrust standing." *See Pac. Recov. Sols.* v. *United Behav. Health*, 481 F. Supp. 3d 1011, 1022 (N.D. Cal. 2020); *In re DRAM Antitrust Litig.*, 536 F. Supp. 2d 1129, 1134-35 (N.D.

9

Cal. 2008). This assessment considers "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; [and] (3) the speculative measure of the harm[.]" *City of Oakland* v. *Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021). The first element requires Plaintiffs to plausibly allege "injury to competition generally," not merely to their "position[s] as [] market competitor[s]," *Hip Hop Beverage Corp.* v. *Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018), and the latter two require them to plead a direct, non-speculative link between the challenged conduct and the alleged harm to competition, *Oakland Raiders*, 20 F.4th at 458-61.

Plaintiffs' allegations of harm are insufficient under this standard. First, their allegation that "investors [have] declin[ed] to invest in xAI" (Compl. ¶ 227) as a result of a purported "group boycott" (*id.* ¶ 331(a)) does not suggest that "competition" for AI investment capital has been harmed, *see Eagle* v. *Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987), or that the purported "boycott" has disrupted the "allocative efficiency" of the capital markets writ large, *Pool Water Pros.* v. *Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001). Second, Plaintiffs' alleged inability to license OpenAI's "technology" as a result of Microsoft's purported "exclusive" license thereto (Compl. ¶ 227) does not constitute a cognizable antitrust injury, as OpenAI was under no obligation to grant such a license. *See Universal Grading Serv.* v. *eBay, Inc.*, 2011 WL 846060, at *9 (N.D. Cal. Mar. 8, 2011). Third, Plaintiffs claim that OpenAI's alleged ability to acquire "compute" on more favorable terms has required them to invest in their "own [compute] infrastructure" (Compl.¶ 227)—but "allegation[s] that [competitors] have had to invest significant resources to compete" do not demonstrate "harm to consumers," *Netafim Irrigation, Inc.* v. *Jain Irrigation, Inc.*, 562 F. Supp. 3d 1073, 1089 (E.D. Cal. 2021); *see also Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U.S. 104, 495 (1986). Fourth, Plaintiffs' allegation of harm resulting from "lower prices for their generative AI products" (Compl. ¶ 246) is antithetical to the antitrust laws, as "cutting prices in order to increase business often is the very essence of competition," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). Finally, their other allegations of harm— consisting of xAI's purported "difficulty recruiting" skilled workers due to OpenAI's "lavish compensation" (Compl. ¶¶ 200, 227, 331(n)) and its claimed harm stemming from Microsoft and

OpenAI's alleged sharing of "sensitive information" (*id.* ¶¶ 227, 331(o))—are conclusory and fail to demonstrate Plaintiffs' antitrust standing.

As set forth below, Plaintiffs also fail to plausibly allege violations of the antitrust laws under any of their various theories.

### B.     Investor boycott

Plaintiffs argue that OpenAI engaged in a prohibited "group boycott" under Section 1 of the Sherman Act (Count IX) by allegedly requiring investors in its October 2024 funding round to forgo investment in competitors (Compl. ¶ 331(a)). Their single conclusory allegation in support of this claim (*id.* ¶ 201) fails to satisfy either element of a Section 1 claim: (1) an "agreement" that (2) "unreasonably restrain[s] trade." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). Plaintiffs plead no facts suggesting OpenAI reached an "agreement" with anyone to boycott investment in its competitors. Nor have they plausibly alleged a restraint that is unreasonable "*per se*" or under the "rule of reason." *Flaa* v. *Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022).

An alleged group boycott is only subject to "*per se*" treatment in the presence of a "horizontal agreement," either among the "initiators of the boycott . . . or those pressured into joining"—the latter of which constitutes a "hub-and-spoke boycott." *Honey Bum, LLC* v. *Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023). As to the former, Plaintiffs fail to allege the existence of any agreement between OpenAI and Microsoft, and their suggestion that "OpenAI's conduct should be imputed to Microsoft" for purposes of this claim, ECF No. 73, at 8, has no grounding in law, *see D'Augusta* v. *Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024). Nor have Plaintiffs adequately alleged agreements between OpenAI and each investor (vertical "spokes") and agreements among the investors to that same effect (a horizontal "rim"), as required to plead the existence of a hub-and-spoke boycott. *See Honey Bum*, 63 F.4th at 821.

By pleading this claim solely as a *per se* violation (Compl. ¶ 331), Plaintiffs have abandoned any theory under the "rule of reason." *See Texaco Inc.* v. *Dagher*, 547 U.S. 1, 7 & n.2 (2006). Even if they had not, Plaintiffs fail to offer sufficient allegations (1) that Defendants' conduct was "intended to harm or restrain trade" and "actually injure[d] competition," *Brantley* v. *NBC*

*Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (cleaned up), or (2) concerning "market power and market structure," *Flaa*, 55 F.4th at 693.

## C.    Board interlocks

Plaintiffs next claim that alleged interlocking directorates between Microsoft and OpenAI's boards violated § 8 of the Clayton Act (Count XVI). Specifically, they challenge two purported "interlocks": (1) Hoffman's service as a director on Microsoft's and OpenAI's boards from March 2018 until March 2023 (Compl. ¶ 163 & n.8); and (2) Templeton's service as Microsoft's non-voting observer of OpenAI's board from late 2023 through July 2024 (*id.* ¶ 168). *Id.* ¶¶ 368-82.

Plaintiffs lack standing to assert this claim: Hoffman's and Templeton's departure from the board long before Plaintiffs commenced a § 8 claim means there is no "case or controversy" on which to ground Article III standing, *Steel Co.* v. *Citizens for a Better Environment*, 523 U.S. 83, 109 (1998), and Plaintiffs allege no individualized antitrust injury from these purported interlocks that could give rise to antitrust standing, *see Bearden* v. *Ballad Health*, 967 F.3d 513, 517-18 (6th Cir. 2020).

Plaintiffs also fail to state a § 8 violation. They do not plausibly allege that Microsoft and OpenAI were competitors during Hoffman's tenure, as is necessary to implicate § 8. *See* 15 U.S.C. § 19(a)(1)(B). Nor does Templeton's prior service as an "observer" implicate § 8, which applies only to "director[s] or officer[s]" of competing corporations—a person eligible to "act for such corporation[s] in such capacit[ies]." *See id.* § 19(a)(1), (b). "When the term 'director' is used in reference to a corporation"—as it is in § 8—"the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance." *In re Kunz*, 489 F.3d 1072, 1077-78 (10th Cir. 2007). Templeton was not a "member" of the "governing board" of OpenAI, *id.*, nor did she have the capability to "act for [the] corporation," 15 U.S.C. § 19(b). She therefore did not qualify as a "director" under the statute. *Id.*

## D.    Exclusivity arrangements

Plaintiffs challenge a variety of alleged "exclusive" arrangements between OpenAI and Microsoft: (1) OpenAI's purported exclusive sale or license of its "goods, commodities, assets, and/or services to Microsoft"; (2) OpenAI's supposed "transfer[]" of "employees and [] intellectual

property to the For Profit Entities"; and (3) OpenAI's alleged exclusive purchase of "its compute from Microsoft." Compl. ¶¶ 331(b)-(d). These "exclusive" arrangements are first challenged under § 1 of the Sherman Act (Count IX) and separately under § 3 of the Clayton Act, 15 U.S.C. § 14, and § 16727 of California's Cartwright Act (Counts XIII & XIV). None of these theories states a claim.

**Sherman Act**. Claimed exclusivity arrangements are analyzed under the rule of reason. *Feitelson* v. *Google Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015). Plaintiffs must "plead that the arrangement foreclosed competition in a substantial share of the line of commerce affected," *Hip Hop Beverage Corp.*, 733 F. App'x at 381, which courts have generally quantified as "40% to 50% of the relevant market," *Feitelson*, 80 F. Supp. 3d at 1030. Plaintiffs have failed to make this showing.

First, Plaintiffs allege that OpenAI has exclusively licensed "pre-AGI technologies" to Microsoft (Compl. ¶¶ 133-34), but they do not explain what these "technologies" are, or on what terms they are purportedly licensed, or how these purported licenses, of unspecified duration, foreclosed a "substantial share" of the relevant market. These omissions are especially stark here because OpenAI had no legal obligation to license its technology to xAI or anyone else. *See FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("[T]he Sherman Act does not restrict the long recognized right of a [company to] freely exercise [its] own independent discretion as to parties with whom [it] will deal." (cleaned up)).

Second, Plaintiffs' allegation that OpenAI has agreed to obtain its compute exclusively from Microsoft (Compl. ¶ 331(d)) is deficient for multiple reasons. Plaintiffs do not allege that they have suffered harm as a result of this purported exclusive arrangement. Nor do Plaintiffs allege that OpenAI's contract has foreclosed any portion of the compute market. xAI is free to purchase compute from Microsoft—alleged to have only 24% of the market (*id.* ¶ 217)—or from any of the other suppliers comprising the remaining 76%.

Third, Plaintiffs' final theory—that OpenAI, Inc. (the non-profit entity) transferred its "employees" and "intellectual property" to for-profit entities in the same corporate family (*id.* ¶ 331(c))—is foreclosed by settled law: entities alleged to operate within a "unitary enterprise" (*id.*

¶ 241) are "legally incapable of 'conspiring' for the purposes of § 1." *Jack Russell Terrier Network of N. Ca.* v. *Am. Kennel Club, Inc.*, 407 F.3d 1027, 1033 (9th Cir. 2005).

**Clayton Act, § 3 & Cartwright Act, § 16727.** Plaintiffs' tag-along claims under § 3 of the Clayton Act, 15 U.S.C. § 14 (Count XIII), and California's Cartwright Act, Cal. Bus. & Prof. Code § 16727 (Count XIV), are premised on the same exclusivity allegations and fail for the same reasons. *See Lloyd Design Corp.* v. *Mercedes-Benz of N.A., Inc.*, 66 Cal. App. 4th 716, 721 (1998). They also fail for independent reasons: Plaintiffs do not adequately allege that the challenged arrangements have injured competition by "foreclos[ing] competition in a substantial share" of an affected market, *Eastman* v. *Quest Diagnostics Inc.*, 724 F. App'x 556, 558 (9th Cir. 2018), or that the arrangements involve "commodities," a term that has been "strictly construed" to include "only tangible products," *Feitelson*, 80 F. Supp. 3d at 1033.

### E.    Predatory pricing

**Sherman Act.** Plaintiffs appear to allege that OpenAI's pricing of its "generative AI products," including ChatGPT, is unlawful under both § 1 and § 2 of the Sherman Act. *See* Compl. ¶¶ 331(e), (h); 335.[1] But Plaintiffs do not plead any Section 1 agreement, as they do not plausibly allege that OpenAI and Microsoft conspired to underprice their respective AI chatbots. Instead, Plaintiffs at most allege parallel conduct—that ChatGPT, Microsoft's Copilot, and other products like Google's Gemini, cost $20 a month (*id.* ¶ 224)—which is insufficient. *See Kendall* v. *Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

Plaintiffs also fail to plausibly allege that (1) "the prices complained of are below an appropriate measure of its rival's costs" and (2) "there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices" by later raising prices. *John Doe 1* v. *Abbott Lab'ys*, 571 F.3d 930, 934 (9th Cir. 2009) (cleaned up). They do not allege the "marginal or average variable cost" of obtaining new subscriptions for ChatGPT, as required to meet the first element. *Cascade Health Sols.* v. *PeaceHealth*, 515 F.3d 883, 909-10 (9th Cir. 2008).

---

[1] The FAC asserts that the "same conduct" forming the predicate for Plaintiffs' § 1 claim—including their below-cost pricing theories—amounted to monopolization in violation of § 2. *See* Compl. ¶ 335. In these circumstances, the conduct may be analyzed under both sections together. *Flaa*, 55 F.4th at 688.

Nor do Plaintiffs plead any "dangerous probability" that OpenAI intends to later raise prices, or could without drawing a response from its many competitors.

*California's Unfair Practices Act*. Plaintiffs likewise fail to plead any of the facts necessary to support their claim under the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17043 *et seq.* (Count XII). "To plead a UPA claim, the plaintiff must allege defendant's sales price, its cost in the product and its cost of doing business." *Eastman* v. *Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 838 (N.D. Cal. 2015). Plaintiffs fail to do so. They assert that OpenAI prices its "generative AI . . . at less than the cost thereof" (Compl. ¶ 345), but they identify the "sales price" for only ChatGPT Plus (*id.* ¶ 224) and otherwise do not allege OpenAI's "cost in the product" for ChatGPT Plus or any other product. That is insufficient. *See Little* v. *Pac. Seafood Proc., LLC*, 2024 WL 2305603, at *4 (N.D. Cal. May 21, 2024) ("To plead a section 17043 claim, [plaintiffs] must allege, in other than conclusionary terms, the defendant's sales price, costs in the product, and cost of doing business.").

## F.    Section 7 of the Clayton Act

Plaintiffs next challenge several purported "acquisitions" as violations of § 7 of the Clayton Act (Count XV): (1) OpenAI's alleged "acqui[sition]" of "the compute of Microsoft" (Compl. ¶ 362); (2) OpenAI's and the For-Profit Entities' alleged acquisition of each other's "stock" and "assets" (*id.* ¶¶ 363-64); and (3) Microsoft's alleged acquisition of the "stock" and "intellectual property of OpenAI" (*id.* ¶ 361). To state a § 7 claim, Plaintiffs must allege "facts" showing "that an acquisition creates an appreciable danger or a reasonable probability of anticompetitive effects in the relevant market." *DeHoog* v. *Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (cleaned up). Plaintiffs have not done so. Their allegations suggest that OpenAI's conduct has *reduced* prices—not that the alleged transactions have resulted in "supracompetitive pricing" or "restricted output." *See Intel Corp.* v. *Seven Networks, LLC*, 562 F. Supp. 3d 454, 464 (N.D. Cal. 2021). Nor have they explained how these alleged transactions "lessen[ed] competition" for genAI products. *See* 15 U.S.C. § 18.

Moreover, several of the challenged transactions do not qualify as "acquisition[s]" under § 7. *See id.* Plaintiffs allege that OpenAI has contracted with Microsoft for the "supply" of

"compute" (Compl. ¶ 112). But that does not amount to "acquir[ing] . . . the assets of Microsoft." *See* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1202c (2024) (purchases "in the ordinary course of business are outside § 7 concern"). And Plaintiffs do not offer allegations concerning the terms, duration, or scope of Microsoft's alleged license of OpenAI's "technology" (Compl. ¶¶ 133-34) that could suggest the license operates as the functional equivalent of an "acquisition."

Finally, Plaintiffs' challenge to the alleged transfer of assets or shares among the For-Profit Entities and OpenAI, Inc. (*id.* ¶¶ 363-64) does not implicate § 7 under settled law. *See Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 777 (1984) ("intra-enterprise" conduct not subject to "§ 7 of the Clayton Act").

### G.    Section 2 of the Sherman Act

Plaintiffs' monopolization claim, 15 U.S.C. § 2 (Count X), is duplicative of their § 1 claim and fails alongside it. *See Flaa*, 55 F.4th at 688.[2] Even if it were not, Plaintiffs' monopolization claim fails on the merits. To state a claim under § 2, Plaintiffs must plead (a) possession of monopoly power; (b) willful acquisition of that power; and (c) antitrust injury. *Name.Space, Inc.* v. *Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 (9th Cir. 2015). Plaintiffs allege that "OpenAI and Microsoft" are together "monopoliz[ing] [] the market for generative AI" (Compl. ¶ 335), but the "Ninth Circuit does not recognize a 'shared monopoly' or 'joint monopoly' theory," *Lenhoff Enters., Inc.* v. *United Talent Agency, Inc.*, 2015 WL 7008185, at *3-4 (C.D. Cal. Sept. 18, 2015). And Plaintiffs fail to provide sufficient facts regarding market definition, market power, and abuse of dominance to plead a § 2 claim in any event.

### H.    Miscellaneous antitrust theories

Finally, Plaintiffs assert a variety of additional antitrust theories, including: OpenAI (1) allegedly "[a]busing [its] non-profit structure to obtain" an unidentified competitive advantage; (2) "[o]ffering vastly inflated compensation" to employees, which allegedly "exce[eds] legitimate

---

[2] Plaintiffs' Cartwright Act claim (Count XI) fails for the same reason—the alleged conduct (Compl. ¶¶ 338-39) is duplicative of Plaintiffs' Sherman Act claim. *See Flaa*, 55 F.4th at 688; *Lenhoff Enters., Inc.* v. *United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir. 2018).

16

business needs"; and (3) allegedly "violat[ing] [the] terms of the Contract with Musk." *See* Compl. ¶¶ 331(j), (n), (p). These theories all fail, as Plaintiffs do not explain their basis in antitrust law or provide sufficient allegations in support of them.

## VII.    ACCESSORY CLAIMS

Plaintiffs assert several claims against the For-Profit Entities for tortious interference (Count V); aiding and abetting fraud (Count VIII); and aiding and abetting breach of fiduciary duty to Musk (Count XXI), and to OpenAI (Count XXIV). Plaintiffs' failure to adequately allege an underlying breach defeats each of these claims. These claims also fail because, as Altman's alleged agents (Compl. ¶¶ 113, 322), the For-Profit Entities cannot be held liable for tortiously interfering with his contract or aiding and abetting his alleged fraud or fiduciary breach, *see Mintz* v. *Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1604, 1607 (2009); *Villains, Inc.* v. *Am. Econ. Ins. Co.*, 870 F. Supp. 2d 792, 795-96 (N.D. Cal. 2012). Even if they could, Plaintiffs do not allege that these entities "knowingly gave substantial assistance" in the purported tortious interference, fraud, or breach of fiduciary duty, alleging merely that they existed. *Casey* v. *U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1146 (2005). That is insufficient.

## VIII.    UCL CLAIM

Plaintiffs' claim under California's Unfair Competition Law, Cal Bus. & Prof. Code §§ 17200 *et seq.* (Count XVII) is improperly pleaded, alleging a litany of supposed statutory violations against all Defendants (Compl. ¶¶ 384-87) without explaining how these statutes were violated, who violated them, and when they were violated. The claim is subject to dismissal on this basis alone. *See Baba* v. *Hewlett-Packard Co.*, 2010 WL 2486353, at *6 (N.D. Cal. June 16, 2010). It fails for additional reasons in any event. Plaintiffs lack standing to reframe their breach of charitable trust claim as a UCL violation, *see Pinkert*, 2021 WL 2476869, at *6, and they allege no "injury in fact [or] loss of money or property" stemming from their other theories, *see Durell* v. *Sharp Healthcare*, 183 Cal. App. 4th 1350, 1359 (2010). Plaintiffs also fail to specify which prong of the UCL—(1) unlawful, (2) unfair, or (3) fraudulent—they intend to assert, *see Campbell* v. *eBay, Inc.*, 2013 WL 4764526, at *5 (N.D. Cal. Sept. 5, 2013), and their "laundry list of state and federal" statutory violations are pure conclusions of law, *Berryman* v. *Merit Prop. Mgmt.*, 152 Cal.

17

App. 4th 1544, 1554 (2007). Finally, this count fails to the extent it is predicated on the FAC's other defective claims (Compl. ¶ 387(a)). *See Baba*, 2010 WL 2486353, at *6.

## CONCLUSION

For the foregoing reasons, the OpenAI Defendants' Motion to Dismiss is GRANTED, and the first amended complaint of Plaintiffs Elon Musk, Shivon Zilis, and X.AI Corp. is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED this ___ day of _____, 202_

_____
HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE