UNITED STATES DISTRICT COURT     *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| Elon Musk, et al. | ) | **Motion for Preliminary** |
| | ) | **Injunction** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. C 24-04722 YGR |
| | ) | |
| Samuel Altman, et al., | ) | Pages 1 - 107 |
| | ) | |
| Defendants. | ) | Oakland, California |
| _____ | ) | Tuesday, February 4, 2025 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          Toberoff & Associates, P.C.
                         23823 Malibu Road, Suite 50-363
                         Malibu, California  90265
                  BY:    MARC TOBEROFF,
                         JAYMIE PARKKINEN, ATTORNEYS AT LAW


For Defendants          Morrison & Foerster
Altman, Brockman,       425 Market Street
OpenAI and Aestas:      San Francisco, California  94105-2482
                  BY:    JORDAN ETH, ATTORNEY AT LAW

                         Wachtell, Lipton, Rosen & Katz
                         51 West 52nd Street
                         New York, New York  10019
                  BY:    SARAH K. EDDY,
                         WILLIAM SAVITT, ATTORNEYS AT LAW

             (Appearances continued next page)

Reported remotely via Zoom:  Raynee H. Mercado, CSR No. 8258


     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
1                    A P P E A R A N C E S  (CONT'D.)

2

3     For Defendants          Dechert LLP
      Microsoft, Hoffman,     45 Fremont Street, 26th Floor
4     and Templeton:          San Francisco, California  94105
                         BY:  RUSSELL P. COHEN,
5                             NISHA PATEL, ATTORNEYS AT LAW

6

7

8                              —o0o—

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Tuesday, February 4, 2025                      10:01 A.M.
 2                    P R O C E E D I N G S
 3             (Reported remotely via Zoom Webinar)
 4                          --o0o--
 5
 6        THE CLERK:  Good morning, everyone.  These
 7   proceedings are being court-reported by this court.  Any other
 8   recording of this proceeding, either by video, audio,
 9   including screenshots or other copying of the hearing is
10   strictly prohibited.
11        Your Honor, now calling the civil matter 24-CV-4722-YGR,
12   Musk versus Altman, et al.
13        Parties, please step forward, state your appearances for
14   the record starting with the plaintiff.
15        Lecterns, please.
16        MR. TOBEROFF:  Good morning.  Marc Toberoff for the
17   plaintiffs, Elon Musk, xAI, and Shivon Zilis.
18        THE COURT:  Okay.  And who's here with you, sir?
19        MR. TOBEROFF:  I'm here with my colleague Jaymie
20   Parkkinen.
21        THE COURT:  How do you spell that last name?
22        MR. TOBEROFF:  P-a-r-k-k-i-n-e-n.
23        THE COURT:  And everyone up here is praying for the
24   best for those of you in Southern California.  I know that's
25   why we had to postpone the hearing.  I've got family and
```

```
 1    friends down there myself, so I know it's a difficult
 2    circumstance.
 3            MR. TOBEROFF:  Thank you, Your Honor.  Appreciate
 4    your kind words.
 5            THE COURT:  On the defense?
 6            MR. ETH:  Morning, Your Honor.  Jordan Eth for the
 7    OpenAI defendants.
 8            THE COURT:  Okay.  I don't have you on -- oh,
 9    it's E-t-h.
10            MR. ETH:  E-t-h, yes, Your Honor.
11            THE COURT:  Okay.
12        MS. EDDY:  Good morning, Your Honor.  Sarah Eddy for
13    the OpenAI defendants.
14        MR. SAVITT:  Your Honor, good morning.  William
15    Savitt for the same defendants.
16            THE COURT:  Okay.
17        MR. COHEN:  Good morning, Your Honor.  Russell Cohen
18    on behalf of Microsoft, Reid Hoffman, and Deannah Templeton.
19    And with me at counsel table is Nisha Patel.
20            THE COURT:  With an "N" or an "M"?
21            MR. COHEN:  "N" as in "Nancy."
22            THE COURT:  Okay.
23        Anybody else?
24        I see one more person at that table.
25            MS. EDDY:  We have at counsel table with us Ioannis
```

```
 1    Drivas, D-r-i-v-a-s.
 2              THE COURT:  Okay.  Who's going to be doing the
 3    arguing on the defense side?
 4              MS. EDDY:  Your Honor, I will be conducting part of
 5    the argument.  Mr. Savitt as well for the OpenAI defendants.
 6              THE COURT:  Okay.  Tell me what you're doing.
 7              MS. EDDY:  I will be handling the two antitrust
 8    claims, and Mr. Savitt had been handling the state law claims.
 9              THE COURT:  Okay.
10              MR. COHEN:  And on behalf of the Microsoft defendants
11    including Mr. Hoffman and Templeton, I will be handling the
12    argument today.
13              THE COURT:  Okay.  Everybody take a mic.
14         Let's see.  In terms of starting off, well, we'll start
15    with the state law claims first, so I think, Mr. Savitt, that
16    would be you.  I want people at microphones, please.
17         That means you, too.  Mr. Cohen, at a microphone.
18         All right.  So we'll talk primarily today about the
19    pending motion for preliminary injunction.  You -- everyone
20    should understand that these motions are rarely granted.  It
21    is extraordinary leave.  Extraordinary relief.
22         I'd like to know when everybody's planning to be ready for
23    trial.  We'll start with the plaintiff.  When are you planning
24    to be ready for trial, sir?
25              MR. TOBEROFF:  We would be ready for trial this year.
```

| | |
|---|---|
| 1 | **THE COURT:**  By the end of the year? |
| 2 | **MR. TOBEROFF:**  Well, what's -- actually -- |
| 3 | **THE COURT:**  Yeah, I'd like a month.  When do you |
| 4 | think you'll be ready for trial? |
| 5 | **MR. TOBEROFF:**  June of next year. |
| 6 | **THE COURT:**  Do you anticipate motions for summary |
| 7 | judgment? |
| 8 | **MR. TOBEROFF:**  Yes, we do, Your Honor. |
| 9 | **THE COURT:**  How much discovery do you need?  When |
| 10 | would you be prepared to have discovery close in this case? |
| 11 | **MR. TOBEROFF:**  February? |
| 12 | **THE COURT:**  February of 2026, correct? |
| 13 | **MR. TOBEROFF:**  Correct. |
| 14 | **THE COURT:**  And is that expert and fact or just fact? |
| 15 | **MR. TOBEROFF:**  Fact. |
| 16 | **THE COURT:**  Do you anticipate experts? |
| 17 | **MR. TOBEROFF:**  Yes, Your Honor. |
| 18 | **THE COURT:**  Do you already have experts in your |
| 19 | antitrust case that you're consulting with? |
| 20 | **MR. TOBEROFF:**  No, Your Honor. |
| 21 | **THE COURT:**  How long do you anticipate expert |
| 22 | discovery to take? |
| 23 | **MR. TOBEROFF:**  Thirty to 45 days. |
| 24 | **THE COURT:**  How many experts do you anticipate? |
| 25 | **MR. TOBEROFF:**  I can't tell you that at this -- at |

```
 1   this time.
 2          THE COURT:  Well, you brought an antitrust claim.
 3          MR. TOBEROFF:  I understand.
 4          THE COURT:  So how many -- how many --
 5               (Simultaneous colloquy.)
 6          MR. TOBEROFF:  Let's say two.
 7          THE COURT:  Okay.  So what kind?  An economist, I
 8   would expect.
 9          MR. TOBEROFF:  Yes.
10          THE COURT:  And what else?
11          MR. TOBEROFF:  An expert with respect to the AI
12   industry.
13          THE COURT:  Now, you have a whole bunch of state law
14   claims.  Do you not anticipate damages experts for those?
15          MR. TOBEROFF:  I do.  So --
16          THE COURT:  So would it be the same economist for
17   your antitrust or separate?
18          MR. TOBEROFF:  It could be the same, or it may be
19   separate.
20          THE COURT:  Okay.
21          MR. TOBEROFF:  So we'll say -- to be on the safe
22   side, I'd say three to four experts.
23          THE COURT:  And you would be prepared to have expert
24   reports disclosed in February of 2026 and then receive
25   rebuttals and do depositions all within 45 days?
```

```
 1              MR. TOBEROFF:  Maybe that's too optimistic.

 2              THE COURT:  Sounds optimistic.

 3              MR. TOBEROFF:  Sixty days to -- 60 to 90 days, we'll

 4      say.

 5              THE COURT:  How many antitrust cases have you tried?

 6              MR. TOBEROFF:  This is my first, Your Honor.

 7              THE COURT:  Do you have anyone on your team who has

 8      done an antitrust case?

 9              MR. TOBEROFF:  Not that I could -- can identify at

10      the moment.

11              THE COURT:  Okay.

12         So when you say discovery closing in February, are you

13      talking about February 1st or February 28th?

14              MR. TOBEROFF:  The end of February.

15              THE COURT:  All right.

16         So end of February.  Let's say March, April, and May for

17      expert discovery.

18         Are you still sure you're ready to go to trial in June?

19              MR. TOBEROFF:  To be honest, Your Honor, I didn't

20      come here with the schedule in mind.

21              THE COURT:  Well, I always start --

22              MR. TOBEROFF:  Perhaps --

23              THE COURT:  I always start it this way.  And the

24      reason I start it this way is because you're asking for a

25      preliminary injunction, which in my mind means that you should
```

 1    have sorted through virtually all of these pieces because I

 2    don't grant injunctions, which are extraordinary, without

 3    knowing what the end game is.  The last time I issued one was

 4    in *Epic Games vs. Apple*.  It was partial, and we went to trial

 5    in eight months.  It was extraordinary.

 6        So expert discovery -- I mean, you're not going to be

 7    ready to go to trial until the end of 2026, it seems to me,

 8    'cause you still have motions for summary judgment, which

 9    means that you probably have to have expert discovery closed.

10    Then we have to have briefing on summary judgment.  And I need

11    to have time to resolve your motion.

12            **MR. TOBEROFF:**  Understood.

13            **THE COURT:**  Do you see where I'm going with this?

14            **MR. TOBEROFF:**  Yes, I do, Your Honor.

15        I think it's safer to say the end of 2026.  I think you're

16    correct.

17        At the same time, given that we are moving for preliminary

18    injunction, I -- the -- the time period -- I'd like to move at

19    a fairly quick pace, if possible.

20            **THE COURT:**  Well, I would expect that you would, and

21    that's why I'm asking these questions.

22            **MR. TOBEROFF:**  I appreciate that, Your Honor.

23            **THE COURT:**  On the motions to dismiss, I've already

24    taken -- I've spent a lot of time with this complaint.  I can

25    tell you right now it will be granted in part and denied in

```
 1    part.  Something is going to trial in this case.

 2        So there are a couple of things that I want you all to

 3    remember before we get into the nitty-gritty of the current

 4    motion.  One is that the standard is plausibility.  It is not

 5    certainty.  It is absolutely plausible that there was an oral

 6    contract.

 7        It is plausible that lots of these state law claims have a

 8    sufficient basis.  Some of the statutory claims, not so sure

 9    about.  The antitrust, not so sure about.

10        But the state law claims, you should not be pushing hard

11    on these things.  It's common law.  There are podcasts

12    between -- you know, talking about Altman and Musk's various

13    discussions about what they thought.  I don't know what the --

14    what happened, but I certainly am not throwing something out

15    on a motion to dismiss when it is plausible that what Mr. Musk

16    is saying is true.

17        We'll find out.  They'll sit on the stand.  They'll

18    present it to a jury.  A jury will decide who's right.  So

19    something's going to trial.

20        When do you think you'd be ready to go for trial if you're

21    still in this case?

22        MR. COHEN:  Your Honor, if the antitrust claims

23    remain in the case, then, as you know, antitrust discovery

24    takes considerable time, typically 12 to 18 months.  Antitrust

25    expert discovery can take 3 or 4 months.  And there will be
```

1    complex summary judgment motions.

2        So depending on how the Court rules on the motion to

3    dismiss and whether these claims include antitrust and -- as

4    Your Honor appreciates from looking at the motion to dismiss,

5    it's not simply claims relating to exclusive agreements.  But

6    there's also below-cost pricing claims and all manner of other

7    claims.

8        So depending on what we're talking about, I would

9    anticipate 12 to 18 months for discovery, 3 to 4 months for

10   summary judgment following that, and extensive expert

11   testimony.

12                    (Off-the-record discussion.)

13        THE COURT:  If you do it a few times, she's

14   incredibly terrific court reporter, she'll remember.  But you

15   have to do it a few times.

16        So you're saying, then, 2027?

17        MR. COHEN:  I think that's more realistic, Your

18   Honor.

19        THE COURT:  All right.

20        Mr. Savitt.

21        MR. SAVITT:  Your Honor, thank you.  William Savitt.

22        I -- generally speaking, I think I agree with Mr. Cohen.

23   It -- the antitrust claims, assuming they survive a motion to

24   dismiss, will be complex and will require the steps that he's

25   outlined, trial by the end of next year seems possible.  It

1    might be more realistic to think early in 2027.

2       We -- having -- fully appreciating Your Honor's comments

3    respecting the motion to dismiss, some of this might be --

4    affected by the outcome of motion to dismiss and the extent to

5    which the various claims are adjudicated and which ones

6    survive and how.

7            **THE COURT:**  If the antitrust claims do not survive,

8    when do you think you'd be ready for trial?

9            **MR. SAVITT:**  If all the antitrust claims fall away,

10   it becomes a simpler case.  And while I do think there will be

11   expert practice in that instance, we -- I should think that

12   the case could readily be brought to trial by the end of 2026,

13   and maybe not even at the very end, assuming that -- I don't

14   know my -- my friend's plans for summary judgment and summary

15   judgment briefing, but it seems to me that makes it a 2026

16   event, Your Honor, at any rate.

17           **THE COURT:**  All right.

18      All right.  Let's start with irreparable harm.

19      It is a stretch to claim irreparable harm in this case.

20   Mr. Toberoff.  I am -- billionaires versus billionaires.

21           **MR. TOBEROFF:**  Your Honor, the focus here is not Elon

22   Musk's net worth.  It's on the AI industry.  It's a nascent

23   industry, and anticompetitive conduct in a nascent industry

24   is --

25           **THE COURT:**  It's not only nascent, it is fluctuating

```
 1   by the day.

 2           MR. TOBEROFF:  Correct, Your Honor.

 3           THE COURT:  And so for me to say as a matter of law

 4   that something -- that you should be granted leave in this

 5   kind of environment is a stretch.

 6           MR. TOBEROFF:  Your Honor, I don't believe it's a

 7   stretch.  We've had --

 8       First of all, the evidence we presented on a motion --

 9   this motion for preliminary injunction where the evidentiary

10   standards are more relax than at trial, where we have --

11           THE COURT:  The -- you understand that the -- that

12   the -- it may be relaxed, but the -- the hurdle -- we don't

13   even call it a hurdle.  Maybe we call it a high jump -- is

14   significant.

15       It is not a low standard.  There must be certainty.

16           MR. TOBEROFF:  Your Honor, I think the evidence is

17   clear when you have reputable news outlets, like The

18   Wall Street Journal, Financial Times, Reuters, all speaking to

19   a verbal mandate from Sam Altman that if they want to invest

20   in the -- in their October 2024 funding round and get an

21   allocation, which was vastly oversubscribed, they would need

22   to commit to not fund competitors, not just Musk's xAI but

23   Safe Superintelligent [sic] started by their former chief

24   scientist.  Another --

25           THE COURT:  How much -- how much is xAI -- haven't
```

1    they raised -- how many billions at this point after the

2    alleged mandate?

3              **MR. TOBEROFF:**  I don't have the exact number, Your

4    Honor.  I think --

5              **THE COURT:**  Does anybody --

6              **MR. TOBEROFF:**  -- seven billion.

7              **MR. COHEN:**  It's 11 billion, Your Honor.

8              **THE COURT:**  Eleven billion?

9              **MR. TOBEROFF:**  Yeah.

10             **THE COURT:**  Look, someone can say it's a mandate.

11   That doesn't mean anybody thinks it's a mandate, especially

12   when your client's raised $11 billion.  How is that -- how is

13   that any --

14       Again, we'll find out what happens.  But how can I say as

15   a matter of law there is a -- there is likelihood of restraint

16   on trade when your client has raised $11 billion?

17       Answer that question.

18             **MR. TOBEROFF:**  I will.

19       Because he -- it takes billions of dollars to start up in

20   this industry.  XAI has to build its own infrastructure from

21   scratch.  They're not being handed Compute by Microsoft at

22   less than it costs to produce it.  They have to produce it

23   themselves.

24             **THE COURT:**  Well, the Chinese seem to think that it's

25   not that expensive.

1          **MR. TOBEROFF:**  Well, it's expensive here in the

2     United States.  And -- and that's --

3                    (Simultaneous colloquy.)

4          **MR. TOBEROFF:**  That's why these companies require

5     billions of dollars.  OpenAI projects that its annual burn

6     rate is at $14 billion a year.  And right now it's at

7     $5 billion.  So you're talking about a massive need for

8     amounts of money.

9          **THE COURT:**  You can be right as of today, but, like I

10    said, the industry's changing on a daily basis.

11         **MR. TOBEROFF:**  We're talking about the damages

12    today --

13         **THE COURT:**  We're talking about irreparable harm.

14         **MR. TOBEROFF:**  Okay.

15       So when you take an industry like this where -- which

16    costs billions of dollars to start up, and there are only a

17    handful of high-value investors that can invest at these

18    levels, it's a small community.  And you --

19       For example, in their last funding round --

20         **THE COURT:**  But yet, you don't have a single

21    declaration from a single person who said -- who supports your

22    client's claim.  Despite all of the influence that Mr. Musk

23    has, he's not able to get a single person to say that they

24    viewed the statement as a mandate.  Correct?  Am I -- so --

25    right?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1        Remind me if I -- if I got the record wrong, but that's my
2   memory of the record.  Am I right?
3             MR. TOBEROFF:  Your --
4             THE COURT:  Am I right?
5             MR. TOBEROFF:  Your Honor, if I may address that
6   point?
7             THE COURT:  I want to know, am I right about the
8   record, yes or no?
9             MR. COHEN:  Your Honor, I can tell you exactly what
10  was said in the Birchall declaration, which was the reply
11  declaration from somebody at xAI.  And I would say that is
12  the -- the high point of the evidence that is on the record.
13       And in that declaration, what Mr. Birchall says is that "a
14  reputable venture capital investor and an investor in OpenAI
15  informed me that they would not invest in xAI because of
16  Altman's funding restriction," so that's in the Birchall
17  declaration, 75 -- Docket 75-32 at paragraph 5.
18            MR. TOBEROFF:  And Mr. Birchall was participated
19  [sic] and coordinating xAI's last funding round.  But the
20  effect of this "Fund No Competitors" edict, which both the
21  Department of Justice and the Federal Trade Commission stated
22  alleges a per se violation in Section 1 of the Sherman Act, is
23  not just in the latest funding round.
24       And the -- the damage is obvious.  If you have a limited
25  pool of high-value investors consisting of the likes of
```

1    sovereign funds, et cetera, and you limit that further, not

2    just in this funding round of OpenAI but in next funding

3    rounds because the -- in the next funding round where OpenAI

4    has now valued itself at 340 billion, although it's a charity

5    where a tiny trickle goes to the charity.  It all goes to the

6    for-profit enterprise.

7        When you look at that, it's a cumulative effect in a

8    nascent industry where OpenAI already with 70 percent of the

9    market in conjunction with Microsoft is seeking to strangle

10    their competitors in -- in the crib.

11        The standard is not that they have to put a competitive

12    [sic] out of business.  Most of the achievements of xAI that

13    are touted by defendants were done before this -- this "Fund

14    No Competitors" edict.

15        This is a serious violation of the Sherman Act.  It's

16    clear that Microsoft, because of its dominant position over

17    OpenAI, or as its CEO Nadella said, "We're above them, we're

18    below them.  We're there.  We're around them."

19        It worked in conjunction when it's -- when -- with regard

20    to this "Fund No Competitors" edict.

21        It -- it doesn't take imagination to understand that by

22    strangling or diminishing the number of high-value investors

23    that can invest in competing companies --

24            THE COURT:  Has --

25            MR. TOBEROFF:  -- that is anticompetitive.

```
 1              THE COURT:  Is there evidence that he has withdrawn
 2    that edict?
 3              MR. TOBEROFF:  None, Your Honor.
 4              THE COURT:  All right.
 5         Ms. Eddy, maybe you need to stand up.
 6              MS. EDDY:  Happily, Your Honor.
 7         There is -- there is no evidence establishing even the
 8    vertical agreement.
 9              THE COURT:  He -- there is evidence as was reported
10    that he issued this statement.  Correct?
11              MS. EDDY:  Your Honor, there were un- --
12              THE COURT:  Yes or no?
13              MS. EDDY:  There are -- there are unsourced news
14    articles saying that OpenAI had this condition imposed.
15              THE COURT:  Okay.
16         And has he -- has he -- has he stated that he never did
17    that, never said that?  Has he -- what has he done, if
18    anything.
19              MS. EDDY:  He has, Your Honor.  He gave an interview
20    to DealBook in which he denied this.  And we have put the
21    evidence in the record, is that the only agreement that
22    existed here was an information -- a customary information
23    rights agreement, pursuant to which some investors agreed that
24    in the event -- some investors in OpenAI agreed that in the
25    event they became nonpassive investors with -- or with
```

```
 1        governance rights in other competitors, they would cease

 2        getting certain confidential information from OpenAI.

 3            That is the agreement that's established by the evidence,

 4        by the Wu declaration.  There are -- the only evidence even of

 5        this edict that is provided by plaintiffs is the -- the

 6        virtual declaration, that line that Mr. Cohen read, and it's

 7        actually not even that line.  That just refers to a funding

 8        restriction, which is a vague statement.  It's not clear if

 9        it's referring to the information rights agreement or to this

10        supposed edict.

11            The other line in Mr. Birchall's declaration says that an

12        unidentified investor told Mr. Birchall that Sam Altman

13        imposed this condition.

14            There's no evidence that -- we don't know who that

15        investor was.  It's untested.  It's untestable.  We -- we

16        think Your Honor should not rely on that secondhand hearsay.

17            But even if you were, Your Honor, there is no evidence

18        that that edict was an agreement.

19            And -- and I want to just note because this is something

20        that happened after our -- our papers went in, xAI announced

21        on its website -- and this is at our motion to dismiss page 21

22        and note 7, that two investors, Nvidia and MGX, had invested

23        in xAI after the October 2024 funding round for OpenAI.  And

24        these are two investors who are publicly reported as having

25        invested in the October round for OpenAI as well.
```

1    So there is just no evidence that -- of any boycott or

2    anything that -- that supports that this edict was issued,

3    much less that it was an agreement with anyone.

4         **THE COURT:**  All right.  A response on that second

5    point, the lack of an agreement as opposed to what you might

6    have is -- a unilateral statement.

7         **MR. TOBEROFF:**  First of -- if I may, I just want --

8    would like to address --

9         **THE COURT:**  No, answer my question first.

10        **MR. TOBEROFF:**  Okay.

11        **THE COURT:**  Make a note, and then you can go back to

12   yours.

13                 (Simultaneous colloquy.)

14        **THE COURT:**  That's the way it works.

15        **MR. TOBEROFF:**  -- is a horizontal restraint in trade

16   by virtue of the relationship between OpenAI and Microsoft.

17   Microsoft has such a dominant position.  Those are competitors

18   in the AI industry --

19        **THE COURT:**  You didn't answer my question.

20        **MR. TOBEROFF:**  I'm attempting to, Your Honor.

21        **THE COURT:**  Oh, so you're claiming that the agreement

22   has nothing to do with the edict.  The agreement is between

23   Microsoft and OpenAI?

24        **MR. TOBEROFF:**  No.  I'm saying that the agreement is

25   attributable to Microsoft and OpenAI, and together, that

```
 1    constitutes a horizontal restraint of trade under Section 1 of
 2    the Sherman Act.
 3              THE COURT:  And okay.
 4         MR. TOBEROFF:  Now, as to the other comment --
 5              THE COURT:  But you don't actually -- you're assuming
 6    the agreement.
 7              MR. TOBEROFF:  It's hard not to Your Honor, when --
 8              THE COURT:  Just to be clear, I don't have evidence
 9    in the record of an agreement.  You're assuming the agreement
10    based upon the statement that you say exists that was sent out
11    to third parties.
12         Is that right?  Do I understand your theory?
13              MR. TOBEROFF:  Yes.  By virtue -- I'm assuming the
14    agreement and the participation of Microsoft by virtue that it
15    invested $700 million in that round and its dominant position
16    in the relationship with OpenAI such that after its CEO was
17    furious when -- when Sam Altman was fired by the only neutral
18    board that's existed there, at that point, within four days,
19    due to the dominant position of Microsoft, he was reinstated
20    and the board was purged.
21         In the SEC filings of Microsoft, OpenAI is listed as his
22    only strategic partner, and they've been long-time partners.
23    They participated in the October round to the tune of 75 --
24    750 million, as I have said.  And it's impossible to imagine
25    that they -- this wasn't coordinated with them.  It can be
```

```
1     inferred as a matter of fact and as a matter of law.
2         That creates a horizontal restraint of trade in violation
3     of Section 1.
4         I'd like to address the question of the existence of the
5     edict.  Conspicuous in the absent [sic] is any declaration by
6     Sam Altman.
7         Where's the declaration from Sam Altman say, I didn't
8     issue this edict?  Instead, they talk past and are
9     unresponsive by referring to written documents --
10            THE COURT:  Okay.  Fair point.
11        Where is it?  Why don't I have it?
12            MS. EDDY:  Your Honor, there's no declaration from
13    Sam Altman because there was no need for one.  There's no --
14            THE COURT:  But if I asked you for it, could you file
15    it this week?
16            MS. EDDY:  I'm sure, Your Honor, we could go back and
17    do that, but -- but I would --
18            THE COURT:  All right.  File it this week.
19        Next.
20            MR. TOBEROFF:  There is also a violation of the
21    Sherman Act and horizontality by vir- -- under a hub and
22    spokes theory that we described to you.
23        All of the plus factors that a Court looks to infer an
24    agreement here would be an agreement among the investors of
25    what they call an agreement around the rim in the hub and
```

1    spoke theory, such as it's in the economic interest of each

2    investor to comply with this mandate because those investors

3    who do not are at a competitive advantage -- disadvantage.

4        Generally, investors in a nascent industry like to

5    diversify their investment so if one complies with the edict,

6    and others don't, they are at a competitive disadvantage and,

7    obviously --

8        **THE COURT:**  Yeah, but there's issues of -- once you

9    get to the rule of reason, there isn't going to be an

10   injunction.

11       **MR. TOBEROFF:**  I --

12       **THE COURT:**  You -- I mean, there are so many

13   different competitive reasons for why people do things or they

14   don't do things.  But I am not going to find at this juncture,

15   right, because if I grant this, it gives you a leg up.  It

16   changes the playing field.  So I would not do it unless I'm

17   pretty certain.  And right now, I'm not.

18       **MR. TOBEROFF:**  Your Honor, as articulated by the DOJ

19   and the FTC in their statement of interest, this is not a rule

20   of reason case.

21       **THE COURT:**  I agree.  But that's what you're arguing.

22   Once you start arguing about competitive advantages and

23   competitive reasons, you've moved away from per se into the

24   rule of reason.

25       **MR. TOBEROFF:**  That goes to the irreparable harm,

1    Your Honor, not to the antitrust violation.  That's why I

2    mentioned it.

3              **MS. EDDY:**  Your Honor, may I respond on --

4              **THE COURT:**  You may.

5              **MS. EDDY:**  -- horizontal agreement point.

6        Two things, the -- wholly apart from the absence of a

7    vertical agreement, there is no established horizontal

8    agreement.  The theory that there's evidence demonstrating an

9    agreement with Microsoft between OpenAI and Microsoft is --

10   rests entirely on an imputation theory, and there is no law to

11   support that.

12       The cases that -- that Mr. Toberoff has cited, *American*

13   *Needle* and *Best Food*, do not support that proposition even

14   remotely.  *American Needle* is -- is just saying that people

15   who are independent decision-makers coming into a joint

16   venture are not immune from Section 1 liability.  But it

17   doesn't -- it doesn't dispense with the agreement requirement.

18       And *Best Food* is just a case about veil-piercing in -- in

19   the environmental context, so there is no agreement with

20   Microsoft.

21                    (Pause in the proceedings.)

22             **MS. EDDY:**  And then as to the supposed hub and spoke

23   conspiracy, the horizontal agreement among investors, there is

24   nothing to establish that here.  There is not even parallel

25   conduct.  We come back to the one statement from Jared

```
1    Birchall that one investor allegedly told him that they were

2    not going to invest in xAI because of the funding restriction

3    undefined.

4        There's no -- no parallel conduct here.  As noted, there

5    are investors who are invested in both xAI and OpenAI,

6    including in the funding rounds that were of recent vintage,

7    so there's no parallel conduct.  And there is zero plus

8    factors here.

9        The -- the theory that -- that it would somehow be

10    irrational --

11        I'm sorry, Your Honor.  I'll pause for a moment.

12                    (Pause in the proceedings.)

13            THE COURT:  Okay.  Continue.

14            MS. EDDY:  Thank you, Your Honor.

15        I just -- the two plus factors that are cited by -- by

16    plaintiffs here, one is that it would supposedly be

17    economically irrational for investors to invest only in

18    OpenAI -- even if that were happening -- invest only in OpenAI

19    and not in competitors.  That's -- there's no support for

20    that.

21        There are plenty of reasons, as there were in the Honey

22    Bum case for investors to be selecting one -- one investment

23    vehicle rather than the other.

24        And the other plus factors cited is supposed opportunity

25    for communication, but that's -- that's not a plus factor on
```

1    its own.  And *Honey Bum* talks about this.  There has to be

2    some evidence of atypical communication, something to suggest

3    that even if you had parallel conduct here, it was the product

4    of concerted action rather than independent decision-making,

5    and we don't have anything like that here.

6          **THE COURT:**  All right.  A response.

7          **MR. TOBEROFF:**  Firstly, with respect to Microsoft, no

8    one would believe given their relationship with OpenAI that

9    Microsoft was not complicit in this "Fund No Competitors"

10   edict.

11         Together, they have 70 percent of the marketplace, and

12   they're further trying to cement that monopoly.  Nobody --

13   it's not credible.  That's why I believe it can be implied

14   that there's a horizontal agreement with Microsoft given their

15   relationship and the dominant position Microsoft has in that

16   relationship and the track record Microsoft has for

17   anticompetitive conduct.

18         **THE COURT:**  I don't know -- track record you're

19   talking about specifically, but I was looking for a response

20   on the two plus factors.

21         **MR. TOBEROFF:**  On the two plus factors, there was --

22   the case law allows a court to infer an agreement around the

23   rim.

24         **THE COURT:**  What case are you talking about in

25   particular?

1          MR. TOBEROFF:  I don't have a citation for you.

2          THE COURT:  Okay.  What are -- so -- so --

3          MR. TOBEROFF:  But I would -- I would be happy to

4     file a supplemental brief, if you'd like, on that issue.

5          THE COURT:  Well, is it in your papers?

6          MR. TOBEROFF:  I believe -- yes, it is.

7          THE COURT:  Okay.  Well, take a look at your papers,

8     tell me what you're referring to because, frequently, I would

9     expect that that inference that you're talking about does not

10    refer to this procedural posture.

11         MR. TOBEROFF:  You talking about on a motion for

12    preliminary injunction.

13         THE COURT:  Correct, as opposed to a motion to

14    dismiss.

15         MR. TOBEROFF:  Your Honor, Microsoft itself in this

16    case --

17         THE COURT:  So do you not want to take a look at your

18    papers and tell me --

19         MR. TOBEROFF:  If I can go back to our --

20         THE COURT:  Go ahead.

21         MR. TOBEROFF:  -- desk.  Thank you.

22         MR. COHEN:  Your Honor, and I would appreciate an

23    opportunity to address the claims regarding Microsoft and the

24    absence of any agreement with Microsoft.

25         THE COURT:  All right.  Well, give him a minute to

1    look.
2                    (Pause in the proceedings.)
3           **THE COURT:**  So come back, you can bring your computer
4    up with you.
5        Go ahead.
6           **MR. TOBEROFF:**  Thank you, Your Honor, for allowing me
7    to do that.
8        I believe it's the *Honey* -- the *Honey Bum LLC* case, Ninth
9    Circuit 2023 --
10          **THE COURT:**  And remind me the procedural posture.
11          **MR. TOBEROFF:**  I don't have the procedural posture of
12   that case, Your Honor.
13          **THE COURT:**  Ms. Eddy, you talked about that case.  Do
14   you know the procedural posture?
15          **MS. EDDY:**  I do, Your Honor.  Just a moment, please.
16       This was an appeal from the grant of summary judgment to
17   the defendant.  And --
18          **THE COURT:**  Okay.
19          **MS. EDDY:**  -- there was a discussion of plus factors
20   in that case.  Our position is those -- that discussion
21   indisputably favors defendants here, not -- not plaintiffs.
22          **THE COURT:**  Well, I mean, again, on a motion for
23   summary judgment what we're looking for is are there material
24   disputes of fact.  And if there are material disputes of fact,
25   then as a matter of law, a judge cannot find in favor of one

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    side or the other; it has to go to the jury.

2        That's why procedural posture matters.  So here, given the

3    hurdle, that doesn't help you.  But go ahead.

4        There was two plus factors.  What else do you want to say

5    in that regard?

6            MR. TOBEROFF:  The other -- the -- I was going to say

7    that Microsoft admits in its papers that it would be not --

8    not be in the economic interest of an investor not to

9    diversify their investments.  So they admit the first plus

10    factor.

11        And the second plus factor is that there was an

12    opportunity for coordination and agreement among the

13    investors.  There are only 12 high-value investors in a small

14    community, so both the opportunity and the incentive for an

15    agreement by the investors existed.

16            THE COURT:  All right.  A response.

17            MR. COHEN:  Thank you, Your Honor.

18        First off, the evidence that Microsoft put in in

19    opposition makes clear there was no agreement whatsoever with

20    Microsoft.  Mr. Wetter's declaration.  Mr. Wetter was the

21    person who was deeply involved in negotiating the investment

22    with OpenAI, made clear that he did not ask, they did not ask,

23    and he's not aware of anyone else asking for such an

24    agreement.  That's the evidence.

25        In terms of the newspaper articles that plaintiffs refer

1    to, they don't even mention Microsoft, nor do the reply

2    declarations that plaintiffs put in.

3        What I hear from Mr. Toberoff now is that rather it's

4    about the collaboration between Microsoft and OpenAI, and the

5    Court should effectively view them as one.  And there's

6    certainly no evidence and legal support to do that.

7        I believe what he's asking is that you pierce the

8    corporate veil and effectively treat OpenAI as a -- an

9    appendage of Microsoft, that it's not a separate organization,

10   that it's not separately incorporated, that it doesn't have

11   separate books.

12       There is no basis for doing anything like that on this

13   record.

14           THE COURT:  Well, since you used that term, and

15   before I forget, I would encourage plaintiffs in their

16   response to the motions to dismiss to go back to and look at

17   their complaint and dismiss claims, where appropriate,

18   especially claims that Mr. Musk is asserting allegedly on his

19   own behalf as opposed to those being brought by OpenAI because

20   the natural consequence of what you are doing is saying that

21   Musk is the -- is -- not OpenAI, but xAI -- is the alter ego

22   of xAI.  Your complaint makes no distinctions between the two.

23       There are two paragraphs where Musk identifies -- I mean,

24   frankly, it's quite dangerous for your client the way you've

25   outlined this complaint.  He gets sued all the time.  And for

```
1    you to say that they are one and the same in this complaint,

2    which is a natural consequence of the arguments, is quite

3    dangerous.

4        I don't think that they're probably -- they probably are

5    the same.  Are they?

6            MR. TOBEROFF:  No, they're not, Your Honor.

7            THE COURT:  Then you should not be bringing the kind

8    of claims that you are on behalf of both of them.

9            MR. TOBEROFF:  I understand your point.  I'll look --

10   go back in the complaint and look at it with that regard -- in

11   that regard.

12           THE COURT:  He obviously as an individual has claims

13   that he wants to bring this was his money that he was

14   investing that he claimed or thought it was a nonprofit.  But

15   to collapse them as one for antitrust claims purposes is to

16   say that he's the alter ego in a verified complaint.

17       Does he really want to be viewed as the alter ego of xAI?

18           MR. TOBEROFF:  I take your point, Your Honor.

19           MR. COHEN:  Your Honor, if I may briefly address the

20   plus factors.  The plaintiffs have alleged or said in argument

21   that Microsoft admitted that investors want to diversify.

22   That is not at all what Microsoft said.

23       What Microsoft explained is that its business model,

24   Microsoft's business model, is do make available Generative AI

25   models from the lots of different providers.  It is a platform
```

1    provider.  It provides services to customers who are able to

2    access those models via Microsoft.

3        And so it is in Microsoft's interest, which further makes

4    any such agreement implausible, to have a wide variety of

5    successful Generative AI companies.

6        As the Court already noted, there are lots of reasons why

7    individuals may choose to focus on one company rather than

8    many, so we don't think there's any basis to see any plus

9    factors here.

10            MR. TOBEROFF:  Your -- Your Honor --

11            THE COURT:  Are they competitors or are they

12    collaborators?

13            MR. COHEN:  They --

14            THE COURT:  And the reason that I ask is that in

15    Microsoft's form 10K, they identify OpenAI as a competitor.

16    And yet, they've got two people sitting on that board for a

17    period of time.

18            MR. COHEN:  Yes, for a period of time when there was

19    no material competition between the two firms.

20        Now, the case is they are competitors, and they're also

21    collaborators, as we explained in the brief.  This is not

22    uncommon.  We see it with Tesla and General Motors and Ford,

23    who are collaborating to improve the electrification of the

24    electric vehicle industry.

25        So this is a competitor collaboration where Microsoft

1    provided capital and the kinds of customized computing power

2    and super computers that OpenAI needed to develop its models.

3    OpenAI develops the models.  And then Microsoft sells those

4    models to its customers, along with the services that

5    Microsoft provides.

6        OpenAI is also competing in the marketplace in selling its

7    own products.  So there is a collaboration on the development

8    of models.  And there is competition and -- in marketing the

9    services relating to those models.

10              **MR. TOBEROFF:**  Your Honor may I address this point?

11              **THE COURT:**  You may.

12              **MR. TOBEROFF:**  Microsoft and OpenAI -- first,

13    Microsoft is the exclusive supplier of OpenAI's most precious

14    resource, which is Compute, which it -- which it supplies at

15    less than it costs to produce.

16        It at the same time is OpenAI's exclusive licensee of

17    technology -- the charity's technology that has been

18    transferred to for-profit entities in which Microsoft holds a

19    significant stake.  The two are inextricably intertwined.

20        Their competition in the AI industry isn't just the --

21    the -- OpenAI's ChatGPT and Microsoft's Copilot, which is

22    Generative AI.  It goes back to 2021 with significant revenues

23    from AI-based -- cloud-based -- excuse me -- cloud-based AI

24    products and services in which, although it was not our burden

25    on the interlocking directorate's claim to show, we show that

1    it far exceeds the 2 percent safe harbor defense claimed by

2    defendants.

3              **MS. EDDY:**  Your Honor, may I address that point, the

4    point about the alleged competition?

5              **THE COURT:**  You may.

6              **MS. EDDY:**  The -- the complaint in this case alleges

7    only -- and this is paragraph 374 of -- of the complaint, that

8    the rel- -- the competition that's alleged here is between the

9    chat bots.  It's between Co- -- the Copilot on the Microsoft

10   side and ChatGPT.

11       That is the basis upon which plaintiffs have alleged that

12   Reid Hoffman's service on -- on the two boards violated

13   Section 8.

14       And that -- the undisputed evidence -- the evidence in the

15   record is that any competition between those two products did

16   not begin until approximately February or March of 2023, and

17   there was a grace period of a year after that under the

18   statute for Mr. Hoffman to -- to step down, and he did so.  He

19   stepped down March 2023.

20             **THE COURT:**  So why did he equivocate on the

21   declarations that they would not -- I mean, you're trying to

22   moot it, but I have significant concerns with Microsoft having

23   put two members or two people on the board, whether or not

24   they were voting.  They're still information-sharing.  And the

25   point of the section is to nip in the bud, as the Court said,

```
 1    nip in the bud incipient antitrust violations by removing the
 2    opportunity or temptation for such violations through
 3    interlocking directorates.
 4             MS. EDDY:  That's right, Your Honor.  It's a
 5    prophylactic rule.
 6             THE COURT:  Right.
 7             MS. EDDY:  And has formal application, and it did not
 8    apply here.  When Reid Hoffman was sitting on the board,
 9    Microsoft and OpenAI were not competing.  So that -- that --
10    that ends sort of the inquiry under -- under the statute.
11         And with respect to Ms. Templeton, she was not a director
12    or an officer of OpenAI.  And she was not an officer or
13    director of Microsoft --
14             THE COURT:  -- still getting information and passing
15    it along.
16             MS. EDDY:  Well, the -- the uncontroverted evidence
17    in -- before Your Honor in the -- in the affidavits that have
18    been submitted is that she was not --
19             THE COURT:  So you think.
20             MS. EDDY:  -- privity to --
21             THE COURT:  You want me to believe that she was
22    sitting there listening to all the discussions and not telling
23    anybody?
24         What would the point be for her to sit there and listen to
25    everybody if not to communicate what she was listening?  There
```

1    would be no point for her to be there, which is why she

2    actually should not be there.

3         **MS. EDDY:**  Your Honor, I -- I -- I understand Your

4    Honor's concern.  But there was no competitively sensitive

5    information that was shared with Ms. Templeton.

6         **THE COURT:**  So information was shared; it just wasn't

7    competitively --

8       Is that what you're saying?

9         **MS. EDDY:**  Well, there is information shared between

10   these companies as part of their collaboration which as -- as

11   not just regulators but the Ninth Circuit has -- has

12   recognized in the *Paladin* case is appropriate.  That's not an

13   antitrust violation.  And there is no evidence here that

14   Ms. Templeton or Mr. Hoffman shared any -- any compet- --

15   competitively secret or sensitive information between these

16   two companies at a time when they were competitors or ever.

17        **MR. COHEN:**  Your Honor, if I may?

18        **THE COURT:**  No.

19        **MR. TOBEROFF:**  Your Honor, Reid Hoffman was on the

20   board of both companies for five years --

21        **THE COURT:**  What she is saying --

22        **MR. TOBEROFF:**  -- notwithstanding.

23        **THE COURT:**  -- at the time, they were not

24   competitors.  So your evidence that at the time they were

25   competitors, what is it?

1          **MR. TOBEROFF:**  We provided reams of documents showing

2     they're -- both company's involvement in cloud-based AI

3     products and services to -- even though it wasn't our burden

4     on their safe harbor defense, we showed that they been

5     competitors.

6          The focus is not just -- and the complaint is not just

7     limited.  The fact we point out ChatGPT and Copilot doesn't

8     mean that when we're broadly speaking about the two being

9     competitors, we're limited to those two products.

10         They're focusing on those two products and saying that

11    they were no longer on the board when those two products were

12    generating revenues.

13         Reid Hoffman was on the board there for five years, as

14    I've said.  He claimed in a declaration that he was not

15    involved in the AI products even though he's on the board of

16    OpenAI.

17         And there's a recent news report that before ChatGPT was

18    even released, he showed Microsoft's founder, Bill Gates, a

19    prototype of it in his home while claiming in his declaration

20    that he's not involved with AI.  He has his own AI company,

21    Inflection AI, which has since, because it couldn't compete,

22    was absorbed by Microsoft.

23         The -- the interlocking directorate's claim is bulletproof

24    and --

25              **THE COURT:**  It's not -- it's strong.  It is your

```
 1    stronger claim.  In terms of it being bulletproof, there is
 2    this issue.  It concerns me, but there is an issue about --
 3    that the statute, if you look at the plain language of the
 4    statute, it's specific to officers and directors.  And
 5    Ms. Templeton was neither.
 6        Now, I think there's a -- well, I have my own thoughts on
 7    that, but that certainly isn't bulletproof from your vantage
 8    point.
 9        MR. TOBEROFF:  The -- the response to that is as --
10    as the FTC and the DOJ agreed -- and they are by sure the
11    larger authorities on our antitrust law than any counsel here
12    today -- they both agreed that is irrelevant.
13        As you pointed out, Your Honor, the focus is on access to
14    competitively sensitive information.  And, of course, having a
15    seat on the board, you have that access.
16        Reid had that access hands down for five -- Reid Hoffman
17    had that access hands down for five years.  Deannah Templeton
18    was specifically put on the board after Sam Altman was fired
19    so that Microsoft can look over the board's shoulder and make
20    sure something like that never happened again and so they
21    could be involved in their competitor's governance.
22        After she left, she has been in charge of Microsoft's
23    cross-functional team for looking after the -- and
24    coordinating the relationship between OpenAI and Microsoft.
25        And, of course -- so the focus is on access to
```

```
 1    competitively sensitive information, not voting power.  And
 2    Reid Hoffman had that voting power in any event.
 3              THE COURT:  Like I said, it's your stronger claim.
 4         MR. COHEN:  Your Honor, may I address the arguments
 5    relating to Ms. Templeton and Mr. Hoffman?
 6              THE COURT:  You may.
 7         MR. COHEN:  Thank you.
 8       First, with respect to Ms. Templeton, it is clear that
 9    when she was appointed as a board observer.  There was a
10    requirement that she be excused and not receive competitively
11    sensitive information.  She had independent counsel advising
12    her on that.
13              THE COURT:  But the way, whose burden is this?  Whose
14    burden --
15         MR. COHEN:  In terms of the safe harbor, Your Honor?
16              THE COURT:  Yes.
17         MR. COHEN:  There are no cases in the record on this,
18    but I think it's fair to say that in advancing a safe
19    harbor -- that the party advancing it ought to put forward the
20    evidence.  I think we have here.  But as to --
21              THE COURT:  Do I have that in the record, that there
22    was a directive that she leave?
23         MR. COHEN:  There was a directive that was in the
24    appointment letter, which I believe is Exhibit A to her
25    declaration, which is Docket 65-15.
```

1    And -- and she also testified to the fact that she left.

2    And four of the meetings --

3          THE COURT:  Let me ask you this, what prejudice is

4    there for me to say -- to grant that portion of the request.

5    Neither of them have any business being on that board.

6          MR. COHEN:  Well --

7          THE COURT:  Period.  So what prejudice is there?

8          MR. COHEN:  So first of all, they're not on the

9    board, but --

10          THE COURT:  I know, but -- so that they do not go

11    back to the board, so I don't have to deal with this again.

12          MR. COHEN:  Well, in terms of going back, as

13    Ms. Templeton also explained in her declaration, when she came

14    off the board, when she resigned, Microsoft relinquished its

15    right to put anybody back on the board, so that's not an

16    issue.

17          But in terms of prejudice, I mean, Your Honor, under

18    *Winter*, you have to find that there is likelihood of success

19    under each of these claims, or at least a serious issue.  And

20    we can talk about that as well.

21          And there is no violation of Section 8, certainly not with

22    Ms. Templeton, who wasn't a director or officer, and not with

23    Mr. Hoffman, who came off the board almost two years ago when

24    they weren't competing in any material way.

25          THE COURT:  *TRW* makes pretty clear that I need to

1     look at competition much more broadly than you'd like me to.

2     So it's not just about the product.  It's about competition.

3          **MR. COHEN:**  Well, I -- I'd like to respond to that.

4          In terms of the complaint and in terms of the motion, as

5     Ms. Eddy mentioned, the plaintiffs have focused on Generative

6     AI, and -- and that is the appropriate focus here, Your Honor.

7          In reply, in response to the evidence from Microsoft, it

8     definitively showed that its Generative AI products, which are

9     the, quote, competitive sales under the Clayton Act are --

10    were zero in fiscal year 2022 and less than 2 percent of total

11    sales in fiscal year 2023.

12         What plaintiffs did in response is said, "Well, this is

13    about cloud computing," and cloud computing is a big Microsoft

14    business, so, of course, it's more than 2 percent.  But -- but

15    that is made up on reply.

16         There -- there is no competition in cloud computing

17    between Microsoft and OpenAI.  There -- there is no question

18    it's an important business for Microsoft.  And as Your Honor

19    may appreciate, cloud computing simply means moving the

20    servers from businesses where they were on premises up to the

21    cloud.  Microsoft does a lot of that.  OpenAI does none of

22    that.

23         And in -- in the reply brief, what the plaintiffs do is

24    they have a sentence that says, OpenAI offers cloud-based

25    access to Generative AI.  That doesn't mean they're in the

1    cloud business.  They aren't in the cloud business.  They're

2    in the Generative AI model development business and services

3    business, and that is the sphere of competition.

4        And as the Microsoft evidence makes clear, that was less

5    than 2 percent in fiscal year 2023 at the time that

6    Mr. Hoffman came off so he was well within the safe harbor.

7            **MR. TOBEROFF:**  Your Honor, if I may?

8            **THE COURT:**  You didn't respond to my question about

9    what harm is it, to make sure that I don't have to deal with

10   this again to grant that portion of the motion.

11       If you have no intent to put anyone back on, then it's

12   resolved.

13           **MR. COHEN:**  Your Honor, there's prejudice in a couple

14   of ways.  One relates to work that Ms. Templeton does as part

15   of her job.  As she explained, she is the person that is

16   responsible for the OpenAI relationship at Microsoft among

17   others.

18       And so enjoining Ms. Templeton from some kind of vague or

19   non-script action relating to information doesn't make any

20   sense, would interfere with her duties and --

21           **THE COURT:**  How --

22               (Simultaneous colloquy.)

23           **THE COURT:**  -- enjoining her not to attend any board

24   meetings.

25           **MR. COHEN:**  Well, she has no ability to attend any

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1   board meetings.
 2              THE COURT:  Well, currently.
 3              MR. COHEN:  Well --
 4              THE COURT:  Currently.
 5              MR. COHEN:  Yes.  That right was relinquished by
 6   Microsoft, so there is no right to attend those board
 7   meetings.
 8              THE COURT:  Currently.
 9              MR. COHEN:  There's no indication that OpenAI would
10   welcome her to those board meetings, but --
11              THE COURT:  They can always change their mind.
12   That's the problem.
13              MR. COHEN:  Your Honor, what the cases say, both TRW
14   and the U.S. v. Grant case is that there has to be some
15   dangerous cognizable danger of recurrence, I think is the
16   language it uses, and not a mere possibility.
17        At most, Your Honor, you are talking about a mere
18   possibility and not cognizable danger of recurrence.
19        I think there's another important argument that we haven't
20   made yet, which has to do with whether xAI has any kind of
21   antitrust standing to bring this claim at all, because there
22   is no evidence in the record that xAI is in any way injured
23   from an overlap.
24        There -- there's cases that we cite in our brief, the
25   Bearden case, Bearden v. Ballad Health.  It is a Sixth Circuit
```

```
1    case, Your Honor, but it is very instructive on this issue.
2    That is a case in which there was a private Section 8 claim
3    brought, and the Court held that the plaintiffs in that case
4    did not have standing to bring it because they could not show
5    the injury that was necessary.
6        TRW and US v. Grant, as you know, Your Honor, are
7    government enforcement actions, which have a very different
8    standard for establishing whether the -- whether the
9    plaintiff, the government in that case, can bring those
10   claims.
11            MS. EDDY:  Your Honor, may I --
12            MR. TOBEROFF:  Your Honor --
13            MS. EDDY:  -- add a point on that as well?
14            THE COURT:  All right.  Go ahead.  And then I'll go
15   to you.
16            MS. EDDY:  I think it's -- it's not just a matter of
17   antitrust standing, but also Article III standing, and this
18   is -- this is a point that was fleshed out in -- in the
19   briefing concerning DOJ and FTC's statement of interest in
20   this matter.
21        Mr. Musk and xAI did not have initial standing at the
22   beginning of the case because by the time they brought suit,
23   both of these alleged interlocs are already ended.  And the
24   plaintiffs and the regulators have pointed to the voluntary
25   cessation doctrine to -- to say, well, the fact that the
```

1   interlocs ended doesn't necessarily mean that -- the case is

2   moot --

3           **THE COURT:**  Correct.

4           **MS. EDDY:**  -- but it does if the inter- -- the

5   alleged interlocs ended before the suit by a private

6   plaintiff --

7           **THE COURT:**  Yeah, but the problem that you have with

8   that, that temporal component to the statute, which I think

9   courts imply all the time, is that they only acted after

10  government action.

11      That is, you don't have to get a complaint to be -- to

12  move.  There were government actors who expressed concern, and

13  it was only because of that pressure, or one could -- easily

14  assume that it was because of that pressure that they decided

15  to leave the board.

16      So the cases that you cite, the temporal distinction

17  between when the action happened and when the claim was

18  brought was substantially more than exists here.  So that does

19  not persuade.

20          **MS. EDDY:**  Well, Your Honor, I guess for -- for the

21  *WT Grant* case, it -- the -- so for the *WT Grant* case, that was

22  a government action.  It's not a private -- private suit.  The

23  interloc -- that -- that issue is not raised.

24      What we are talking about is the standing that a private

25  plaintiff has and in *WT Grant*, actually I think the -- the

1    cessation happened after the action was brought by the

2    government.

3        *TRW* is the case where the cessation happened before.  But,

4    again, that was a regulatory enforcement action.

5        The *Renne* case and, you know, *Steel Co.*, those cases make

6    very clear from the Supreme Court that you cannot have

7    Article III standing on the part of a private plaintiff when

8    the complained-of conduct ceased before the action began.

9        That -- that is our point and -- that's what we have here

10   so you don't even reach the question of whether -- whether the

11   standard for seeking an injunction has been met, the

12   cognizable danger --

13        **THE COURT:**  Response on standing.

14        **MR. TOBEROFF:**  Your Honor, defendants claim that this

15   issue is moot because they resigned under FTC pressure has

16   been totally debunked by the FTC itself and the DOJ in their

17   statement of interest briefing.

18        It's not moot.  And the -- as you point out the whole

19   purpose of Section 8 is to nip anticompetitive conduct in the

20   bud.  It has to do with the exposure to competitively

21   sensitive information at a very high level.

22        They have the burden on their safe harbor defenses, and

23   they did not supply the Court with sufficient evidence.  First

24   of all, there's no declaration -- in order to -- to figure out

25   the look-back period, the Court needs a declaration as to when

```
 1      Reid Hoffman and Deannah Templeton were last elected to the
 2      OpenAI board.  That's how you compute -- that's how you --
 3              THE COURT:  -- was never elected to the board.
 4              MR. TOBEROFF:  Placed --
 5              THE COURT:  That --
 6              MR. TOBEROFF:  Placed on the board.  Which makes it
 7      even worse.
 8              THE COURT:  Well, in your --
 9              MR. TOBEROFF:  I -- I understand.
10              THE COURT:  -- double-edged sword for you.
11              MR. TOBEROFF:  I understand, Your Honor.
12      They didn't supply that basic evidence.  And then they
13      didn't supply the data as to their competing products and
14      services.
15      You're not -- you don't look -- competition in products
16      and services is broadly defined specifically due to the
17      remedial purposes of Section 8 of the Clayton Act.
18      And we're not talking about them both using the cloud.
19      We're talking about cloud-based AI products and services.  And
20      we show in our papers that both OpenAI and Microsoft have been
21      competing in that sector since 2021, and although they've --
22      failed to meet their burden by providing --
23              THE COURT:  But that -- but that -- where in your
24      complaint do you complain about the cloud computing?  What --
25      where does the phrase cloud computing show up in your
```

1    complaint?

2          MR. TOBEROFF:  It's not cloud computing, Your Honor.

3    It's cloud-based AI products and services.  It's not just

4    cloud computing in general.  That's how they phrased it, but

5    that's not what it is.

6        And -- and I would ask that Your Honor when she reviews

7    this point look at our detailed evidence on this point,

8    because what -- they fail to meet their burden.  We shouldn't

9    even have to be providing that data, but we did.  Since it's

10   their burden, they waived their -- their 2 percent safe harbor

11   defense.

12         MS. EDDY:  Your Honor, may we have one last response

13   to that?

14         THE COURT:  You may.

15         MS. EDDY:  This is a bait-and-switch.  Plaintiffs,

16   not just in their complaint -- and if you look at their

17   paragraphs 204 to 207, which describe the competition --

18         THE COURT:  Hold on.

19              (Pause in the proceedings.)

20         THE COURT:  Okay.  Do you want me at 204?  I'm there.

21         MS. EDDY:  So these -- the relevant market they say

22   is -- is that of Generative AI models and platforms.  That's

23   what they identify as the relevant market.

24        And then if you look at paragraph 374, says that Hoffman

25   served on OpenAI's board --

1    **THE COURT:**  Okay.  Let me get there.

2    **MS. EDDY:**  Oh, sorry.

3    (Pause in the proceedings.)

4    **MS. EDDY:**  In the competition there, they are

5    competitors.  It's defined as Microsoft's Copilot against

6    OpenAI's ChatGPT.

7    There's nothing in the complaint that blows open the

8    allegations of competition in the way that it's blown open in

9    the reply brief.  It's just sandbagging.

10    **THE COURT:**  I understand the argument.

11    The word "cloud" only shows up twice in the complaint and

12    certainly never been in the paragraphs regarding competition.

13    **MR. TOBEROFF:**  Your -- Your Honor, we're not limited

14    by the complaint in terms of addressing their affirmative

15    defenses, which they bring up in their opposition.

16    **THE COURT:**  Well --

17    **MR. TOBEROFF:**  We can address it in reply, as we did.

18    We're not constrained by the complaint to predict their

19    affirmative defense and affirmatively plead facts debunking

20    their affirmative defenses.  We can do that in our reply, as

21    we did.

22    Your Honor, the --

23    **THE COURT:**  Your claim is based on -- your

24    affirmative claims are based on what you've pled in your

25    complaint.  That's it.

1          **MR. TOBEROFF:**  I understand, Your Honor.

2      Our complaint is -- there -- there are many statements in

3  the complaint incorporated by reference referring to OpenAI

4  and Microsoft as competitors.  That doesn't mean --

5          **THE COURT:**  But --

6          **MR. TOBEROFF:**  -- we have to --

7          **THE COURT:**  -- not with respect to this issue.  I

8  just told you, the word "cloud" comes up twice in a complaint

9  that is 102 pages long.

10          **MR. TOBEROFF:**  Yes, Your Honor.  But as I've said,

11  they raised this in -- in -- they raised this --

12          **THE COURT:**  No, I understand.  I understand the

13  perspective.

14          **MR. TOBEROFF:**  Okay.

15          **THE COURT:**  But understand that you've brought a

16  claim.  And you've got to be able to prove your claim based

17  upon the allegations in your complaint.  And that is not

18  something that you argued.  So when I review it, I review it

19  in that context.

20          **MR. TOBEROFF:**  If I may, Your Honor, I don't believe

21  that in our complaint we need to debunk the arguments that

22  they make in their opposition.

23          **THE COURT:**  Well -- all right.  Let's move on.

24          **MR. TOBEROFF:**  And -- and, Your Honor, they have not

25  provided the evidence to satisfy their burden.  The

1    interlocking directorates --

2            **THE COURT:**  You've said that now three times.  I

3    heard it the first.

4            **MR. TOBEROFF:**  The interlocking --

5            **THE COURT:**  Let's move on --

6            **MR. TOBEROFF:**  Okay.

7            **THE COURT:**  -- to a for profit.

8            **MS. EDDY:**  I'll cede the podium.

9            **THE COURT:**  The third restatement of trust says that

10   a settler of a charitable trust has a special interest in the

11   performance of the trust charitable purposes.

12       Why isn't that enough you never address it in your brief?

13           **MR. SAVITT:**  Your Honor, the -- the question when and

14   who can sue in respect of a charitable trust is governed by

15   statute in California.  It's section 5142(a).

16       Section 5142(a) substantially endorses the rule of law set

17   out in the *Holt* case from 1964.  In that case, the

18   Supreme Court was faced with the question, "well, is the only

19   one who can sue to enforce a charitable trust the

20   attorney general?"

21       Over an annoyed dissent, Justice Traynor held that that's

22   not quite right.  The boundaries for who can bring a lawsuit

23   to enforce a charitable trust need to be very narrowly

24   circumscribed but just the attorney general was too

25   circumscribed.  For a variety of policy reasons that Justice

Traynor set out, and he announced a rule of law that limited

standing in precisely this context to the attorney general, to

officers, directors, and members, to beneficiaries, and to

persons with a reversionary interest.

That rule is the same rule that is -- that is enshrined in

5142(a), and it was the law Justice Traynor believed before

this.  It certainly is the law now.  And since then, it has

been reaffirmed.

In the *Pinkert* case in this court, the Court held donors

who parted with their interest in and control over their

donated assets generally have no standing to complain.

The *Patton* case on which Mr. Toberoff relies, it says this

in these words, "it is well established that the settler of a

charitable trust who retains no reversionary interest in the

trust property lacks standing to bring an action."

And I suppose accordingly, my answer to your question,

Your Honor, is that the restatement third, to the extent that

is its express command, is not the law of California.  The law

of California is different.  And it limits special interest

standing to those with reversionary interest -- precisely the

interest that plaintiffs here have expressly disclaimed in

their -- in their moving papers.

        **THE COURT:**  A response.

        **MR. TOBEROFF:**  Your Honor, the California Court of

Appeals in a 2022 case *Narcotics Anonymous* said exactly what

1    you've said, and I quote, a suit for the enforcement of a

2    charitable trust may be maintained by a settler.

3        Justice Traynor in *Holt* said and, I quote, persons having

4    a sufficient special interest such as, quote, donors who have

5    directed that their contributions be used for certain

6    charitable purposes may bring an action for breach of

7    charitable trust.

8        The statutory -- there's a common law basis adopted by the

9    restatement, adopted by the California Court of Appeals,

10   adopted by the California Supreme Court, the statutory basis

11   in addition has a disjunctive test.  It refers not simply to a

12   reversionary interest but to a contractual interest.

13       And in *LB Research*, a 2005 California appellate court --

14   appeals court -- appeal court case, they found that a donor

15   who makes donations in that case to establish a -- a chair at

16   UCLA medicine, has a -- by virtue of that donation and the

17   commitment of the charity, established a contract subject to a

18   condition subsequent.

19           **THE COURT:**  Can you remind me, Mr. Toberoff, the

20   total amount of money that Mr. Musk put into OpenAI?

21           **MR. TOBEROFF:**  Approximately 45 million.

22           **THE COURT:**  And --

23           **MR. TOBEROFF:**  And he --

24           **THE COURT:**  And why is it that he would not get

25   anything -- he didn't get a written contract after giving

1    45 million?

2         **MR. TOBEROFF:**  He -- he -- because it was a

3    relationship built on trust.  He was very close at the time to

4    Sam Altman.  He was essentially a cofounder of this charity.

5    He named it OpenAI due to the mutual intention that its

6    technology, when safe to do so, would be open-sourced so this

7    very powerful technology was not in the hands -- concentrated

8    in the hands of a giant corporation.  And --

9                   (Simultaneous colloquy.)

10        **THE COURT:**  -- 45 million blank check without

11   anything in writing is interesting.

12        **MR. TOBEROFF:**  Your Honor, I wouldn't say "without

13   anything in writing."  There are multiple exchanges and emails

14   and representations.

15        **THE COURT:**  Yeah, but do you understand my point,

16   right?  $45 million and no specific writing regarding the

17   terms and conditions upon which that money was to be spent.

18        **MR. TOBEROFF:**  I --

19        **THE COURT:**  -- one document that I could look at that

20   says, "yes, Mr. Musk, you're right" or "no, you're not."

21   There is not a single document.

22        **MR. TOBEROFF:**  Your Honor --

23        **THE COURT:**  It is a compilation of everything.

24        **MR. TOBEROFF:**  Your Honor, on September 20th, 2-7

25   [sic] we have an email dated September 20th, 2017.  And in

```
1    response to Sam Altman and Greg Brockman's push to turn OpenAI

2    into a -- convert OpenAI into a for-profit structure, Musk

3    unequivocally states that, if your intention is to do so, I'm

4    out.  I'm not -- I'm paraphrasing.

5              THE COURT:  And didn't he also --

6                   (Simultaneous colloquy.)

7              THE COURT:  But didn't he also say in an email that

8    Tesla was the only path that could compete with Google?

9         He said the only path that it could even hope to hold a

10   candle to Google -- isn't that suggesting that he was thinking

11   of Tesla run this, a for-profit corporation?

12             MR. TOBEROFF:  When they -- when they came to the

13   conclusion that in order develop AI, they needed a lot more

14   money, him offering, based on the suggestion of -- of someone

15   who worked for him that perhaps Tesla could fund it, that's

16   still a company under his control.  That's not taking --

17   OpenAI was created as a -- as a antidote to Google's

18   acquisition of Deep Mind.

19        And the fact that -- that -- that he toyed with that idea

20   and then didn't move forward on it, you still have an

21   unequivocal agreement when they want to bring in third-party

22   investors, it -- to his mind, Tesla is not a third-party

23   investor.

24        When they want to bring in third-party investors and

25   convert to a non-profit [sic], and he unequivocally says
```

1    "either you remain a non-profit or I'm out," and then they

2    affirm to him that they were just kidding, that they're going

3    to remain a nonprofit and he proceeds to put in another

4    10 million, that creates a contract.

5        There is no --

6            THE COURT:  I know the argument.  It just -- it's a

7    lot of money to do on a handshake.

8            MR. TOBEROFF:  There's no requirement --

9            THE COURT:  I understand there's no requirement --

10   I'm just telling -- I'm just stating the obvious.  45 million

11   on a handshake and what do you end up with?  You end up in --

12   in a court.  So --

13       All right.  Let's keep going.

14           MR. SAVITT:  Your Honor, if I might just reply

15   briefly on -- on two of the points that Mr. Toberoff has made?

16           THE COURT:  You can respond on the Court of Appeal

17   case that he referenced.

18           MR. SAVITT:  Thank you.  I'd be glad to do that.

19       The -- the *LB Research* case on which plaintiff --

20   plaintiffs rely couldn't be clearer, that the only ground for

21   relief in that case was because there was a reversionary

22   interest.

23       The *Horiike* case that we've cited in our papers says a

24   donor without a reversionary interest lacks standing to sue a

25   charitable trust.

1          As for the court of appeal case that Mr. Toberoff invokes,

2    that was a case that rejected standing every which way.  The

3    quotation that plaintiff seeks to put in Justice Traynor's

4    mouth was actually an outtake from a document that didn't even

5    exist at the time the *Holt* case was written.

6          The fact is that every case that even plaintiffs site,

7    *Holt*, *LB*, they all turn, of course, importantly on the idea

8    that there is a reversionary interest, which has here been

9    disclaimed.

10          **THE COURT:**  *LB Research* uses a disjunctive, and one

11    of the questions that it focuses on for purposes of the issue

12    is whether the donor intended to impose an enforceable

13    obligation on the donees to devote it to specific purposes.

14    That is disjunctive from the other approach, which is the one

15    you focus on, which is a reversionary interest.

16          So I can ignore the reversionary interest, and there's

17    still a test that is more consistent with plaintiff's view.

18          **MR. SAVITT:**  Your Honor, I -- the *LB Research* case

19    was an attempt -- a successful attempt to cohere the body of

20    case law and enshrined now in statute.

21          **THE COURT:**  Let's just stop for a minute.

22          **MR. SAVITT:**  Yes.

23          **THE COURT:**  You understand there's disjunctive,

24    right?

25          **MR. SAVITT:**  I do.

1    **THE COURT:**  Have you read their -- I'm sure you have.

2    You're a smart guy.  You read the quote, right?

3    **MR. SAVITT:**  I -- I've read -- yes.

4    **THE COURT:**  At pages 177 to 178?

5    **MR. SAVITT:**  Yes.

6    **THE COURT:**  There is a two-part test.  Part one or

7    part two.  I understand part one doesn't apply.  There is no

8    reversionary interest.  But part two still exists.

9    **MR. SAVITT:**  Part -- part two is -- in the section of

10   that opinion that is -- it's the section related to the

11   alter -- not the alternative holding, the -- the dictum, what

12   would have happened were there no contract.

13       The Court is referencing the law of the state of

14   California and -- and respectfully, Your Honor, it's -- it's

15   interpreting 5142(a) necessarily because that is the law and

16   5142(a) is -- is express that it's limited to reversionary

17   interest, other than -- than those with -- with the statutory

18   standing.

19   **THE COURT:**  All right.

20   **MR. TOBEROFF:**  Your Honor, that --

21           (Simultaneous colloquy.)

22   **MR. TOBEROFF:**  That's actually incorrect.  The test

23   in 5142(a) is stated -- it's a disjunctive test --

24   **THE COURT:**  Okay.  I understand your argument.

25           (Simultaneous colloquy.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **THE COURT:**  I'll go back and look at that one.

2      All right.  Moving on.

3      Raynee, how are you doing?

4          **THE OFFICIAL CERTIFIED STENOGRAPHIC REPORTER:**  I'm

5  fine, Your Honor.  Thank you.

6          **THE COURT:**  Plaintiffs lump all of your irreparable

7  harm arguments.  You don't make any distinctions between the

8  various claims.  You just say it's all the same.

9      Is there any distinction relative to this claim in

10 particular?

11         **MR. TOBEROFF:**  The self-dealing claim?

12         **THE COURT:**  Conversion is what we're on.

13         **MR. TOBEROFF:**  Okay.

14     The -- the harm in the conversion -- is --

15         **THE COURT:**  Irreparable harm.

16         **MR. TOBEROFF:**  The irreparable harm exists on

17 multiple levels.  You -- when you take in money based on --

18 subsidized by the public, based on claims that that money will

19 be used in the public interest, and then you use that money

20 instead for private gain, betraying the public trust, the --

21 there is a distortion -- you're at a competitive advantage,

22 which leads to a market distortion.

23     The market distortion, as Your Honor pointed out in *Epic*

24 *Games* is -- cannot be remedied by damages.  And in this

25 particular -- with this particular technology --

 1          **THE COURT:**  This case is nothing like *Epic Games*.

 2   And the injunction that I issued -- well, which injunction are

 3   you talking about?  The preliminary injunction that I issued

 4   looks nothing like this case.  It does not help you.  I lived

 5   that case.

 6          **MR. TOBEROFF:**  I understand.  But the point from that

 7   case that I'm borrowing is the point that you will never know

 8   what the market would have looked like, and this is not

 9   something --

10          **THE COURT:**  I don't -- I don't think that -- I don't

11   think that -- you should move on because the injunction that

12   was issued -- the preliminary injunction, not the final

13   injunction -- but the preliminary injunction that was issued

14   had nothing to do with what you're talking about.  So you

15   should try a different argument.

16          **MR. TOBEROFF:**  Okay.

17      Well, Your Honor, in this case, you have a situation with

18   Microsoft and OpenAI with already close to 70 percent of

19   Generative AI market.

20          **THE COURT:**  Okay.  Can you focus on the claim about

21   converting to a for-profit company?  Can you focus on that

22   claim?

23          **MR. TOBEROFF:**  Yes.

24      You --

25          **THE COURT:**  Or is it all the same?  Because it

 1    sounds -- where you're going, it sounds like it's all the

 2    same.

 3            **MR. TOBEROFF:**  They're interrelated.

 4            **THE COURT:**  So it is the same.

 5            **MR. TOBEROFF:**  They combound [phonetic] -- they

 6    compound each other.

 7            **THE COURT:**  Okay.  There is no irreparable harm

 8    specific to this claim; it's at all same.

 9            **MR. TOBEROFF:**  It's -- it's similar.  The irreparable

10    harm is similar.  You can -- you -- a company taking in

11    publicly subsidized funds as a charity and then diverting the

12    technology developed with those funds for a for-profit

13    company -- they've been acting as a for-profit now for quite

14    some time, it appears, without any regulatory approval.

15        Even if they get that approval, which at this point, is

16    very unclear, that does not sanitize the years of acting as a

17    for-profit.

18            **THE COURT:**  So there's no --

19            **MR. TOBEROFF:**  The evidence shows --

20            **THE COURT:**  So there's no remedy to your client.

21            **MR. TOBEROFF:**  There is not -- there -- damages do

22    not suffice in a situation like that when you're dealing with

23    an industry in its nascent form and there's a market

24    distortion by their anticompetitive conduct, including the --

25    the advantage of taking money as a charity and diverting that

```
 1    money and diverting the technology established for that money,

 2    which is fairly outrageous, breaching --

 3         THE COURT:  So when was the last time that Mr. Musk

 4    made a payment?  When was his final payment?  Can you remind

 5    me, please.

 6         MR. TOBEROFF:  I believe it was in -- prior to

 7    February 2018.

 8         THE COURT:  So from February of 2018 to now, seven

 9    years later, how does that play into your argument?  It

10    seems -- I don't understand your argument given that seven

11    years has lapsed.

12         MR. TOBEROFF:  Well, they haven't been doing what

13    they're doing now seven years ago.  In fact, after he withdrew

14    from -- from the board of OpenAI, he continued to communicate

15    and be supportive of them.  It wasn't till I believe that

16    the -- the members of the board fired Altman and he was

17    reinstated by Microsoft in four -- in four days when Microsoft

18    demonstrated its dominant position with OpenAI, that he wanted

19    nothing further to do with them, which happened later.

20         THE COURT:  All right.  Is that all you have to say

21    on the topic?

22         MR. TOBEROFF:  No, Your Honor.

23      I think the -- I just want to make sure that -- that the

24    damage theory is under -- the irreparable harm theory is -- is

25    conveyed and understood here.
```

```
1          It first has to be taken in the context of their dominant
2    position -- already dominant position in the market.  Then you
3    add to that flagrant anticompetitive conduct such as the "Fund
4    No Competitors" edict for which there's significant evidence.
5    And by the way, it's not just one declaration from Birchall.
6    There are four declarations, including declarations from one
7    fund -- $25 billion fund -- from the CEO of that fund, and
8    from another fund, from the former head of Fidelity's tech
9    investment fund who now has another Altreides [phonetic],
10   Gavin Baker, all saying that that edict was common knowledge.
11   That --
12        You add to that the fact that you're dealing with a
13   technology that has pronounced network effects and in
14   addition --
15             THE COURT:  Okay.  None of that has anything to do
16   with a conversion of a nonprofit to a for-profit.
17             MR. TOBEROFF:  I was addressing the harm from that
18   conversion.
19             THE COURT:  So every claim that you are asking for an
20   injunction on requires a separate and independent finding of
21   irreparable harm.
22        Do you understand that fundamental principle?
23             MR. TOBEROFF:  Yes, Your Honor.
24             THE COURT:  Okay.  I thought you did.
25        What I said to you earlier was that it appeared to me that
```

1    you have collapsed irreparable harm for all of your various

2    requests as to one generic notion of irreparable harm.  And

3    that's fine.

4       I asked whether there was anything specific to this claim.

5    That was my question.

6              MR. TOBEROFF:  The competitive advantage --

7              THE COURT:  Of being a for-profit as being a

8    nonprofit?

9              MR. TOBEROFF:  -- of being able to raise tax --

10   publicly tax-subsidized money to develop technology, and then

11   transferring technology to an opaque web of for-profit

12   entities and benefiting from that when competitors are

13   supposed to compete on a level playing field.

14             THE COURT:  Okay.

15             MR. TOBEROFF:  That's not a level playing field.

16             THE COURT:  So what I hear you saying is that people

17   shouldn't be able to take a tax deduction from a nonprofit who

18   then can convert that money for for-profit enterprises.

19      Is that --

20             MR. TOBEROFF:  Yes, while other people have to do it

21   legitimately.

22             THE COURT:  Okay.  Now I understand.

23      Response.

24             MR. SAVITT:  Your Honor -- Thank you, Your Honor.

25      In respect of the question of irreparable harm for the

```
 1     claim sounding in breach of charitable trust, the baseline

 2     facts are that a plaintiff can obtain damages for a breach of

 3     a charitable trust.  The case law says that.  The treatise say

 4     that.  Section 5142(a) says that.

 5          THE COURT:  Why should OpenAI be able to obtain funds

 6     in a nonprofit context and then convert those funds for use in

 7     a for-profit context?

 8          MR. SAVITT:  Your Honor, reason it should be able --

 9     without wanting -- I apologize, Your Honor.

10        I don't want to characterize what any potential

11     restructuring might be, but the -- the reason a restructuring

12     to include for-profit entities should be permitted and has

13     been permitted in a variety of the circumstances, is because

14     such an endeavor is necessary to facilitate the mission of the

15     not-for-profit as best as its directors believe that it could.

16        And that's what's happened here.  And it's happened

17     elsewhere.  And it's also what Mr. Musk proposed in connection

18     with his desire to make OpenAI tied to Tesla as a cash cow.

19        This is not a unique circumstance.  It's not -- it's not

20     tremendously commonplace, but the not-for-profit has the

21     right, if it's consistent with its mission, to undertake -- to

22     engage in commercial activities to create the commercial

23     backdrop that will allow it to facilitate its objective.

24        And I also want to be very clear on this --

25          THE COURT:  -- continue to raise funds -- maybe I'm
```

 1    just wrong.  I mean, maybe I don't understand.

 2        Are people getting a tax deduction for contributing to

 3    OpenAI?

 4        Did Mr. Musk get a tax deduction for giving 45 million to

 5    OpenAI?

 6            **MR. TOBEROFF:**  I'm sure he did, Your Honor.

 7            **MR. SAVITT:**  Your Honor, that is the point I wanted

 8    to -- to just make sure I clarified.

 9        People who give to the not-for-profit receive a tax

10    deduction.  Investors don't receive a tax deduction.  It's not

11    as though all of the people putting money into the for-profit

12    arm are getting any of these funds in an unfair way.  They're

13    commercial investors.

14        It's only the -- donations to the not-for-profit that are

15    subject to the unfair advantage about which my adversary

16    complains.  And there isn't any sense in which those investors

17    are getting an unfair advantage the -- and the commercial

18    investors are investing just as they would in -- in any

19    commercial or for-profit undertaking.

20            **THE COURT:**  So I think he has sued how many OpenAI

21    companies?  I didn't count them.  But it looks like at least a

22    dozen maybe?  I can count them, but -- 12, 14?  Maybe more?

23            **MR. SAVITT:**  Yes, Your Honor, there are a bunch.

24            **THE COURT:**  Why is it that those entities can't do

25    their fund-raising and OpenAI for the pendency of this case

1    remain a not for profit?  What -- what's the difference?

2        You've got -- well, it looks like 20.

3            **MR. SAVITT:**  I think that's the number that have been

4    sued.  It's something like that --

5            **THE COURT:**  Yeah, 20 entities.  Why can't the -- the

6    circumstance be placed in a pause for this case to, you know,

7    resolve and the other 19 entities do all the fund raising they

8    want?  But OpenAI remain a nonprofit pending resolution of

9    this case.

10           **MR. SAVITT:**  Well, I should say, Your Honor,

11   OpenAI -- even in the contemplated restructuring will remain a

12   not-for-profit.  But that's not the real answer to Your

13   Honor's question, I don't think.

14       The reason that an order impairing the ability of OpenAI

15   to consider restructuring would be problematic even though the

16   entities that are raising funds commercially could continue to

17   do so, is that it has been -- at least as a concern of the

18   board of directors of OpenAI -- and I want to say a word about

19   them if I have the opportunity -- is concerned.  And if the

20   restructuring is proposed, will have reached the conclusion

21   that the ability of those entities to raise the funds

22   necessary to compete with, for example, Mr. Musk's

23   organization, would have to do so in a restructured

24   environment where the not-for-profit would have different

25   roles and responsibilities relative to the investors.

1      That is to say -- that's a lot of words.  Here's a few

2  words.  The restructuring is being proposed because it's the

3  only way for the not-for-profit to continue to facilitate its

4  mission.

5      And it's not for nothing that a competitor here is trying

6  to use a claim under the charitable trust doctrine to

7  essentially undermine the ability of a promising competitor to

8  compete with it.  Never has that been the office of this body

9  of law, and there's certainly no showing that --

10         THE COURT:  Well, there's --

11         MR. SAVITT:  -- damages won't do.

12         THE COURT:  There's a significant amount of evidence

13  that Musk, who is the primary contributor to the -- to OpenAI

14  in its infancy, that it was intended to be a nonprofit.  And

15  intended to be open, which is now obviously changed.

16      But in the interim, I don't know -- I don't understand how

17  competition is impacted at all given that you've got

18  approximately 20 other entities who could do -- continue to do

19  what they're doing while this one entity is in litigation

20  about its status?

21         MR. SAVITT:  All of those entities are under the

22  not-for-profit umbrella.  They are controlled by the

23  not-for-profit and they are therefore subject to the

24  not-for-profit.

25      And I think, Your Honor, it -- it would be wrong to

1    conclude that those entities would be able to compete in this

2    marketplace for both innovation and capital in the same way

3    that a public benefit corporation would be able to, a

4    corporation such as Mr. Musk has, because the constraints of

5    the governance arrangement here are meaningful to investors is

6    to the point that the OpenAI board of directors is considering

7    whether it can actually continue to maintain its mission in a

8    competitive way with all of them essentially operating in a

9    nonprofit environment, which they all are, because they are

10    underneath a not-for-profit controlling holding company.

11              **MR. TOBEROFF:**  Your Honor, if I may address these

12    points?

13              **THE COURT:**  Okay.

14              **MR. TOBEROFF:**  The charity -- a charity is allowed to

15    engage in for-profit activity but must, as they've admitted,

16    control the company's engaging in that activity.  And the

17    money is supposed to go back -- fall back to the charity.

18         Here, we have the 2022 tax return that's part of the

19    record where they showed 200 million in revenues to the

20    for-profit enterprise, and 44,000, I believe, 400 -- $485

21    going to the charity.

22         The 2023 annual report for OpenAI that was just

23    published -- that's why it's not in the record -- shows a

24    billion six going to the for-profit enterprise, and 5 million

25    going to the charity.

1    That's not how this is supposed to work.

2    In addition, the charity's certificate of incorporation

3    states that the property -- and I quote, the property of this

4    corporation is irrevocably dedicated to charitable purposes.

5    No part of the net income or asset of this corporation shall

6    ever inure to the benefit of any director, officer, or member

7    thereof, or to the benefit of any private person.

8    They proceeded to violate that, violate their charter,

9    violate their representations to Musk, the public, and to

10   regulators, and transferred their technology and their leading

11   employees all to the nonprofit enterprise and all without

12   regulatory approval.

13   **THE COURT:**  All right.  Hold on just a moment.

14   (Off-the-record discussion.)

15   **THE COURT:**  All right. let's go ahead and take a

16   15-minute break.

17   (Recess taken at 11:44 A.M.; proceedings resumed at 12:01

18   P.M.)

19   **THE COURT:**  All right.  We're back on the record.

20   The record will reflect the parties are present.

21   Raynee, can we do a test?

22   Great.  Thank you.

23   Okay.

24   We'll go ahead and move to self-dealing, California

25   Corporations Code Section 5233.

1    Again, here, the words of the statute specifically

2    indicate that in order to bring the action, you need to be a

3    member of the corporation.

4    Is not that a ground for -- well, he's not a member of the

5    corporation.

6    **MR. TOBEROFF:**  Yes, Your Honor.

7    **THE COURT:**  Neither -- neither of them are.

8    **MR. TOBEROFF:**  The -- 5710(b)(1) specifically uses

9    the past tense and says "plaintiff" meaning an action has

10   commenced, alleges in the complaint that plaintiff was a

11   member at the time of the transaction or any part thereof.

12   And we have done so for Musk and Zilis.

13   The fact it uses the past tense is significant because

14   under 5033 (c)(2), which applies to directors, not former

15   members, they don't use the past tense.

16   **THE COURT:**  Response?

17   **MR. SAVITT:**  The one thing that I think we think

18   emerges clearly, Your Honor, from the standing case law is

19   that you may not institute a lawsuit at such time as you are

20   no longer a member or director.

21   There is no case at all ever holding that you cannot

22   institute -- that you can institute a -- a claim on the

23   corporation's behalf after you have ceased to have that

24   relationship.

25   And so --

1          **THE COURT:**  I mean, it is a derivative claim by

2    definition.

3          **MR. TOBEROFF:**  Correct, Your Honor.

4          **MR. SAVITT:**  And -- and on that point, Your Honor,

5    it's a derivative claim, and it would be passing strange [sic]

6    and it's just lawless to have a circumstance where someone is

7    no longer affiliated with the corporation to bring that claim.

8          The law is crystal clear.  And the law is even clearer in

9    respect to the other requirements for standing in a derivative

10   action that demand has to be made upon the board, which it was

11   not here.  And it needs to be pleaded with particularity, why

12   demand would have been futile, which it absolutely has not

13   been here.

14         And there is talk in the papers about this board being

15   controlled by Sam Altman.  There is not a word pleaded to

16   suggest that.  It's an important point to consider throughout

17   this motion, Your Honor, because the people who will be making

18   the decisions about the matters in dispute, they are

19   independent directors.  You're talking about a former

20   Secretary of the Treasury, the former CEO of Sales Force, the

21   former global general counsel of Sony, a former four-star

22   general.

23         These are -- these are the people who the statute and the

24   state and the corporation has confided decision-making

25   authority.  And that goes, among other things, for the

1    question whether to bring a self-dealing claim.  And there

2    hasn't even been a whisper of an effort made, and that is

3    disqualifying without more.

4          **THE COURT:**  A response.

5          **MR. TOBEROFF:**  Your Honor, first of all, these are

6    the people who have --

7          **THE COURT:**  No, I meant a response on demand

8    futility.  It's explicitly required.  I can't ignore it.  But

9    you have.

10         **MR. TOBEROFF:**  We have not, Your Honor.  It's -- the

11    statute requires that it be alleged, and it was alleged that

12    demand was made and that it was otherwise futile.

13      In addition, we have the declaration of Shivon Zilis, who

14    stated that she objected to the Helion Energy transaction

15    and -- and stated to the board that there was not sufficient

16    due diligence to move forward with that transaction to

17    establish that it was in the best interests of the charity.

18    And realized that her complaints were being -- were -- fell on

19    deaf ears, and that after that experience, in addition to her

20    experience complaining about the lack of safety standards,

21    it's been reported and -- and -- and Zilis states this as well

22    that the board didn't know about the release of ChatGPT until

23    they read about it on Twitter.

24         **THE COURT:**  Could you point me to your best paragraph

25    in the complaint that identifies that on which you rely with

```
 1    respect to demand futility because the statute or the -- or
 2    the law requires that I assess whether it's done with
 3    sufficient particularity.
 4        What are you relying on?
 5        MR. TOBEROFF:  I'd have to pull the complaint, Your
 6    Honor.
 7        THE COURT:  All right.
 8                 (Pause in the proceedings.)
 9        THE COURT:  While he's finding that, the statute
10    indicates that you need to be a member at the time or a member
11    at the time of the complained-of transaction.  He was a member
12    at the time of the complained-of transaction, at least for
13    part of it.
14        Why isn't that enough?
15        MR. SAVITT:  The -- the reason we say, Your Honor,
16    it's not enough is because the -- that requirement -- that
17    condition allows one to -- and the case law says this, and
18    we've cited it, it allows you to file suit if you're a member
19    but you don't have to maintain standing throughout.  And
20    that's the lesson of the *Turner* case, which -- which
21    Mr. Toberoff invoked that we think actually rather powerfully
22    supports our position.
23        And what we -- the -- the preliminary portion of 5233 says
24    that an action maybe brought only by a member and director.
25    And that has been interpreted in the cases adjacent to this
```

1    issue, including the *Grosset* case, including the *Turner* case,

2    to establish that while you may not -- it's an open question

3    whether you have to maintain your position at the company.

4        But there is no case ever allowing derivative standing to

5    be brought -- a derivative action to be brought by a plaintiff

6    who had ceased his or her engagement with the company.  Ever.

7    Not a case.

8        And I should add that the plaintiffs here, they allow that

9    past -- for purposes of this motion, Your Honor, past

10    transactions are remedial in damages.  They concede that point

11    on page 21 of their opening brief.

12        So as to the -- everything that's happened in the past,

13    there can't be an injunction.  And as to everything that

14    happened in the future, well, they obviously don't have

15    standing because they aren't part of the organization anymore,

16    so there's no conceivable for an injunction to issue in

17    respect to the self-dealing claims.

18            **THE COURT:**  Okay.  Response.

19        **MR. TOBEROFF:**  Your Honor, to answer your question,

20    the complaint at paragraph 236, 461, and 463.

21            **THE COURT:**  Hold on.  You said 236?

22        **MR. TOBEROFF:**  461, and 463 alleges that the board

23    was adversely dominated, and the composition of the adversely

24    dominated board is detailed in paragraph 162 to -72.

25        Also the fact that the board have -- has allowed nine

1    documented instances of self-dealing by Sam Altman speaks to

2    the adverse domination as well as the purging of the board

3    within four days after Altman was fired and the re- -- and

4    the -- the enstatement [sic] of Altman allies on the board

5    alleged in the complaint -- all alleged in the complaint.

6         MR. SAVITT:  Your Honor, might I respond to that?

7         MR. TOBEROFF:  There's sufficient -- Zilis states in

8    her declaration with particularity how she objected to

9    OpenAI's prioritizing profits over safety as -- was a mass

10   exodus, multiple whistleblowers, part of the safety alignment

11   teams, she objected to that.

12      Musk has been quite to -- vociferous in terms of his

13   objections on social media and --

14        THE COURT:  A response to the statement that there

15   has never been a case asserting this particular claim where a

16   plaintiff's membership ceased.

17        MR. TOBEROFF:  There's not a lot of case law on this

18   particular provision, Your Honor.  In *Turner*, the --

19        THE COURT:  Is that -- okay.  There may be just

20   limited case law.  But is that right, that there's never been

21   a case?

22      Is what he told me accurate or not?

23        MR. TOBEROFF:  I believe it's inaccurate to the

24   extent in *Turner vs. Victoria*, the California Supreme Court, a

25   2023 case, recognized standing of former directors who left

1    the nonprofit's board for reasons related to the claims --

2            **THE COURT:**  And --

3            **MR. TOBEROFF:**  -- would apply here.

4            **THE COURT:**  After they left, did they file suit?

5            **MR. TOBEROFF:**  I don't have the -- the time line on

6    the top of my head.

7            **THE COURT:**  Back to my issue on the temporal

8    component.  Does anybody know?

9            **MR. SAVITT:**  It was essentially contemporaneously,

10   Your Honor.  That, I do know.  And that was the point of the

11   *Turner* decision, that in that case because the conduct that

12   gave rise to the action also resulted in the departure, it was

13   an appropriate exercise of -- of derivative standing.

14           **THE COURT:**  All right.  And I think in *Turner*, it was

15   pretty clear that the Court was dealing with a whistleblower

16   and that there was a claim of retaliation, which distinguishes

17   it from the -- six- to eight-year gap we have here.

18       When did -- when did Tellis [phonetic] -- do I know when

19   Tellis -- when her relationship ceased?

20           **MR. TOBEROFF:**  Zilis was on the board, I believe,

21   from 2018 to 2023.

22           **THE COURT:**  Okay.  Is that in the complaint?

23           **MR. TOBEROFF:**  Yes.

24           **THE COURT:**  She doesn't claim retaliation, does she,

25   in the complaint?

```
 1          MR. TOBEROFF:  She has not claimed retaliation, and

 2     the statute which seems to allow former members to sue

 3     derivatively for self-dealing, if a transaction occurred or

 4     even a part of the transaction occurred when they were

 5     members.

 6          The -- we believe the statutory language is clear in -- if

 7     it's -- in its use of the past tense.

 8          THE COURT:  You know, the word "clear" to me never

 9     persuades because if things were clear -- plain?  I don't

10     know.  I just don't think that's a very good word.

11          MR. TOBEROFF:  I -- it says plaintiff was a member in

12     the past tense.

13          THE COURT:  Okay.

14          MR. TOBEROFF:  And -- and both of them were.

15          THE COURT:  Everybody -- everybody argues "clear,"

16     and, rarely, is it.  That's the reason I'm saying that.

17                    (Simultaneous colloquy.)

18          MR. TOBEROFF:  I see -- I see the --

19          THE COURT:  -- take it with a grain of salt.

20          MR. TOBEROFF:  I actually -- I -- 100 percent

21     agreement.

22          THE COURT:  Any time a lawyer tells me "clear," I go

23     back 'cause I figure there's a lot of mud.

24          But we'll check.

25          MR. TOBEROFF:  What's --
```

```
1              THE COURT:  Not a problem.

2              MR. TOBEROFF:  -- noteworthy here, they don't even

3    attempt to refute the flagrant self-dealing here.  They say it

4    may have benefited the corporation.

5         There are procedures in place in California when you enter

6    into a transaction that -- an interested director transaction.

7              THE COURT:  What is the remedy here?

8              MR. TOBEROFF:  The remedy is like our other --

9              THE COURT:  What's the statutory remedy?

10             MR. TOBEROFF:  For -- for self-dealing?

11             THE COURT:  Yeah.

12             MR. TOBEROFF:  I believe the statutory remedy is you

13   can unwind the self-dealing, which we haven't asked for.  We

14   haven't asked for a mandatory injunction.  We're asking solely

15   compliance with the law, that they don't engage in further

16   self-dealing.

17        The thing -- I understand your point --

18             THE COURT:  But that's -- that's of particular

19   concern as well, because injunctions need to be specific.

20        Injunctions need to be -- things that I can look at and

21   figure out whether -- if I issue such a -- such an order that

22   I can -- that I can assess conduct against the specificity of

23   the order.

24        So if I told all of -- you know, if I told you, you have

25   to follow the law, well, that's not a good injunction because
```

```
 1     it's not specific enough.
 2              MR. TOBEROFF:  It can --
 3              THE COURT:  If I told you, you can't self-deal,
 4     that's not sufficient because it's not specific enough.
 5              MR. TOBEROFF:  The definition, Your Honor of,
 6     "self-dealing" here in this context is a -- a -- the charity
 7     entering into a contract in which a director or member,
 8     officer, has a material financial interest.
 9        That can be quite -- that's -- that's plain.  But it's
10     also sufficiently specific.
11        There's been numerous documented accounts of self-dealing.
12              THE COURT:  But as I look at your request for
13     injunctive relief, that's not what you state.  If I look at
14     your language -- your proposed language would have me
15     effectively running this business.
16              MR. TOBEROFF:  To -- are you speaking about the
17     self-dealing claim?
18              THE COURT:  I'm dealing -- I'm looking at your
19     proposed language for an injunction from which this flows.
20              MR. TOBEROFF:  Your Honor, the Court can fashion an
21     appropriate injunction here on each of these claims.
22              THE COURT:  So you want me to do your job now.
23              MR. TOBEROFF:  Not -- not do our job.  We --
24              THE COURT:  Well, then, look at your language and
25     tell me --
```

```
 1                    (Pause in the proceedings.)

 2            MR. TOBEROFF:  The self-dealing claim, Your Honor,

 3    would be an injunction prohibiting OpenAI from entering into

 4    any transaction where any current OpenAI board member,

 5    director or officer --

 6            THE COURT:  Okay.

 7            MR. TOBEROFF:  -- with an entity.

 8            THE COURT:  This is all new.  You understand that

 9    that's actually not in your motion.

10            MR. TOBEROFF:  I believe it's in -- I believe it's --

11            THE COURT:  I'm -- I'm looking at the language from

12    your motion.  And that's not there.

13            MR. TOBEROFF:  I believe it's inherent in our motion

14    that the Court can file an order.

15            THE COURT:  Motions for preliminary injunction are

16    not very conducive for inherent arguments.

17            MR. TOBEROFF:  I'm reading -- let me find the

18    provision in our proposed order.

19            THE COURT:  I took this from your motion at

20    Docket 46.

21            MR. TOBEROFF:  Okay.  In fact, this is stated in

22    paragraph four of our proposed order, Docket 46, defendants

23    are hereby enjoined and restrained from directly or indirectly

24    undertaking any action for the purpose of tending to have the

25    effect of or causing OpenAI, Inc. to contract or to do
```

1    business with any entity in which any defendant has a material

2    financial interest.

3       **THE COURT:**  That's pretty broad.

4       **MR. TOBEROFF:**  We can narrow it, Your Honor, to any

5    director, officer, or member of OpenAI, Inc.

6      I think it's fairly --

7       **THE COURT:**  The thing is -- well, your complaint is

8    with Altman.  I don't have any evidence about all the officers

9    and directors violating this provision.  You want me to

10    enjoin, right?  You just said that you want me to enjoin any

11    officer, director, or member of OpenAI, Inc.

12      But you've not given me evidence -- at best, you've only

13    given me evidence relative to Altman.

14      How am I supposed to -- how do I -- how do I justify an

15    injunction when you've given me no evidence?

16       **MR. TOBEROFF:**  Because these nine -- at least nine

17    instances, and we suspect there's more than what we know of,

18    of blatant self-dealing were carried forward and never stopped

19    by the board of OpenAI.

20       **THE COURT:**  Well, doesn't that, then, just limit it

21    to at most Altman?

22       **MR. TOBEROFF:**  No, because you're dealing with the

23    other directors of the board that inherently approved these

24    self-dealing transactions.

25       **THE COURT:**  Do you even have the names of the board

1  members in your complaint?

2          **MR. TOBEROFF:**  They've -- they've changed.  We

3  have -- we have --

4          **THE COURT:**  Do you have any names of board members in

5  your complaint?

6          **MR. TOBEROFF:**  We have -- I don't believe we've

7  listed all the board members.

8          **THE COURT:**  So how am I supposed to identify them?

9          **MR. TOBEROFF:**  They've identified their board members

10  in their papers.

11          **THE COURT:**  This is your motion.

12          **MR. TOBEROFF:**  I understand, Your Honor.

13      I -- I don't -- I don't -- you know, I understand that a

14  preliminary injunction is not often granted.  But here, what

15  we've asked for in the form of an -- enjoining them to obey

16  the law when they have admitted that they've engaged -- that

17  Altman has engaged in these self-dealing transactions.

18          **THE COURT:**  Okay.  Could you -- somebody respond to

19  the admissions.

20          **MR. SAVITT:**  Yeah.  Thank you, Your Honor.

21      I -- there has been nothing even remotely like an

22  admission there will be no admission and, in fact, there's

23  been no evidence been adduced here to indicate that the

24  elements of 5233(d) have not been respected here and there

25  won't be.

1    And -- and I wanted to -- zero in on a point that you were

2    just discussing with -- with Mr. Toberoff.  He cited to the

3    court paragraphs 162 to 172 to justify his identification of

4    the -- of the board and why it was conflicted.

5    As the Court's pointed out -- and this is a remarkable

6    thing -- the names of the directors aren't even in the

7    complaint, still less any allegation why this isn't a matter

8    for them.  And it is an issue, Your Honor.  We'd suggest that

9    it cuts across the motion.

10    The -- the plaintiffs want to pretend that the directors

11    aren't there, that these independent directors of substance

12    aren't there.  They are the ones who are supposed to run the

13    company.  They are the ones who are running the company.  And

14    they haven't even named them, let alone give a single

15    allegation that with respect to self-dealing or any of the

16    other matters before the Court, respecting, for example,

17    the -- the charitable trust claim with the potential

18    restructuring, that they aren't doing their job.

19    There are stakeholders in the world here.  There are

20    attorneys general to whom they answer.

21    But the -- the company's run by the directors.  And there

22    isn't a thing pleaded here, let alone established by evidence

23    to suggest that that authority ought to be handed over to a

24    competitor.

25    **MR. TOBEROFF:**  Your Honor, we name -- the focus of

1    the self-dealing, it's true, has been Sam Altman.

2             THE COURT:  Yeah.

3             MR. TOBEROFF:  But those self-dealing -- the board

4    never stopped the self-dealing transactions.  And we're not

5    talking about one or two things --

6                 (Simultaneous colloquy.)

7             THE COURT:  Didn't the board members change?

8             MR. TOBEROFF:  There've been different board

9    compositions.

10            THE COURT:  That is, until Sam Altman was removed,

11   the board members were all -- had backgrounds -- and I

12   actually don't even remember if this is in the complaint.

13   This is from news report.

14      I thought that all of the members of the board had had

15   nonprofit backgrounds, right?  They came from nonprofit

16   entities?

17            MR. TOBEROFF:  I -- I believe some of them came from

18   nonprofit entities, but the relevant point was that they had

19   experience in AI governance and AI safety.

20            THE COURT:  I'm not -- but -- but that group is not

21   the same group that currently exists, correct?

22            MR. TOBEROFF:  That's part of the problem, Your

23   Honor.

24            THE COURT:  Great.  So now I have a new group.  And

25   yet, I don't know anything about the new group.  I don't

```
1     know -- there -- well --
2              MR. TOBEROFF:  With -- with a history of self-dealing
3     transactions --
4              THE COURT:  But -- but if there's a long history, it
5     would have been under the group --
6                        (Simultaneous colloquy.)
7              THE COURT:  -- that was the nonprofit set of
8     directors, right?
9              MR. TOBEROFF:  I understand, Your Honor.
10        But asking -- enjoining with this -- with this history of
11    multiple self-dealing transactions --
12             THE COURT:  But the history --
13             MR. TOBEROFF:  I see the point, Your Honor.
14             THE COURT:  -- is that if you're -- if you're
15    claiming that it is a history, then you're going back to the
16    group of nonprofit board -- and I don't want to say
17    "nonprofit" 'cause you're right, they had significant AI
18    background.
19        But you're going back to a separate and distinct group of
20    board of directors, who, by the way, were operating even when
21    Musk was there, right?  Those --
22             MR. TOBEROFF:  I don't believe that's --
23             THE COURT:  -- for a long time.
24             MR. TOBEROFF:  I don't believe that's the case with
25    respect to these self-dealing transactions.  These
```

1    self-dealing transactions were more -- are more recent and

2    happened after Altman and Microsoft purged the board and got

3    rid of those people.

4          THE COURT:  It's -- then it's not a history.  Then

5    it's a recent.

6          MR. TOBEROFF:  It's more recent, correct.

7       The -- the Reddit deal in which Altman's -- Altman's one

8    of the largest stakeholders in Reddit.  He entered into a

9    contract with OpenAI, Inc. and Reddit for Reddit's content

10   while ignoring the content of *New York Times*, *Chicago Tribune*,

11   *The Daily News*, who have a massive lawsuit exposing the

12   charity to massive damages.

13      And in the Reddit deal, it's been reported that his

14   personal stock went up by over 200 million after the

15   announcement of that deal.  That was a 220 -- the 2024

16   transaction.

17      I believe most of the listed self-dealing transactions

18   happened far more recently.

19          THE COURT:  Okay.  So there --

20          MR. TOBEROFF:  Under the current board composition.

21          THE COURT:  So then not a history but a recent set of

22   activity.

23          MR. TOBEROFF:  I think the -- the -- my emphasis

24   would be better put on the fact that they're repeated multiple

25   instances of blatant self-dealing.

```
1          We have the limitless transaction, the transaction with
2    Humane, the transaction with Stripe.
3          THE COURT:  I'm looking -- looking at your complaint.
4       And there's one page, paragraphs 139 to 144, so less than
5    a page, that addresses these topics; is that right?
6       That's what I'm looking at?  Paragraphs 139 to 144?
7          MR. TOBEROFF:  -- turning to those, Your Honor.
8                  (Pause in the proceedings.)
9          MR. TOBEROFF:  Yes, Your Honor.  That's where those
10   specific transactions are listed in the complaint.
11         THE COURT:  All right.
12      And do you -- attached to your complaint anything to
13   support these 20 lines of text.
14         MR. TOBEROFF:  Multiple news reports from reputable
15   journals exposing this -- this self-dealing.
16         THE COURT:  Because none of these paragraphs
17   reference any attachments.  And all of them say "on
18   information and belief."
19         MR. TOBEROFF:  We provided those -- we provided those
20   attachments, Your Honor.
21         THE COURT:  Okay.
22         MR. TOBEROFF:  It's part of the record.
23         THE COURT:  So pretty significant request for one
24   page in a complaint, but I'll look at it.
25         MR. TOBEROFF:  I believe.
```

```
1              THE COURT:  You understand I can't take your word for

2    it.

3              MR. TOBEROFF:  I understand that, Your Honor.

4              THE COURT:  All right.

5              MR. TOBEROFF:  But I believe this self-dealing has

6    been number of -- of clear investigative reports.  And more --

7    more to the point, Your Honor, they have not denied the

8    self-dealing.  They have --

9              THE COURT:  We --

10                  (Simultaneous colloquy.)

11             MR. TOBEROFF:  -- opposition.

12             THE COURT:  We haven't gotten there yet.  We're

13   still -- we haven't even finished briefing on motions to

14   dismiss.

15             MR. TOBEROFF:  No, but in their opposition, they do

16   not deny the self-dealing.  They say, well, it may have

17   benefited the corporation.  That's not the test.  Nor did they

18   make any attempt to go through the procedures --

19             THE COURT:  And why isn't money damages sufficient?

20   Why isn't money damages sufficient?  Don't -- wouldn't you

21   want money damages?

22        Wouldn't you want the money damages to go back to the

23   nonprofit or for -- whoever?  Why -- I don't understand why

24   money's not enough.

25             MR. TOBEROFF:  Money's not enough on a number of
```

1    levels, Your Honor.  Specifically, they keep taking in more

2    and more money.  By the time you reach the merits, you

3    won't -- we won't be able to unwind any of these transactions.

4        **THE COURT:**  Well, maybe I have to have an evidentiary

5    hearing, then.

6        All right.  Let's keep going.

7        **MR. TOBEROFF:**  Your Honor, if I may, on the

8    conversion point, because of the computer issues, I -- I would

9    like to be able to finish the point I was making.

10       On the conversion point, we have a situation -- well, up

11   until now, have they -- has they've just stated, the charity

12   has control over the for-profit enterprise.

13       And what they're proposing to do after transferring the

14   technology that was developed with charitable donations to

15   for-profit enterprise and then transferring all of their top

16   scientists and engineers to the for-profit enterprise, they

17   now -- the most important part of this conversion is they want

18   to swap the charity's majority control over the for-profit

19   enterprise for a minority interest -- a minority interest.

20   And that's what's really at play here.

21       First, they raise money based on proclamations and

22   promises to Musk, regulators, and the public that they're

23   doing this for the benefit of mankind, that in no event will

24   their assets be used for private gain.  And then they

25   produce -- proceed to do the exact opposite.  And now after

1    doing that --

2         **THE COURT:**  Well, I don't understand -- I mean, those

3    are grand proclamations, but I need specificity.  And I say

4    that because I think there certainly was a point in time when

5    that was the case, that they were raising money for the

6    benefit of humanity.

7      It's clearly not the case now.  And it hasn't been for a

8    while.  And everybody who's investing knows it.  So I don't

9    understand -- you've collapsed a lot into some generic

10    statements.  So I don't -- so it's either meaningless or you

11    need to be more specific, one of the two.

12         **MR. TOBEROFF:**  As to -- as to which point, Your

13    Honor?

14         **THE COURT:**  Your --

15         **MR. TOBEROFF:**  Specific -- it's specific that in

16    2019 --

17         **THE COURT:**  Are you suggesting that today, investors

18    in OpenAI don't know that they're investing in a for-profit

19    venture?

20         **MR. TOBEROFF:**  No, they -- they do know, but --

21         **THE COURT:**  That's my point.

22         **MR. TOBEROFF:**  But the problem is -- and the problem

23    with the proposed conversion is they're going to take the

24    charities -- what board member of a charity would vote to swap

25    a majority interest in a for-profit enterprise, which they

1    themselves now value at $340 billion, for a minority interest?

2        That's what's going on here.  First, they raise money in

3    the charity.  They develop technology.  They transfer it to

4    this opaque -- opaque web of for-profit LLCs.  They enter into

5    an agreement with Microsoft for private gain.  Microsoft has

6    private gain.

7        Sam Altman lied to the senate when he said he had no

8    interest and it's since been revealed that he had an interest

9    through Y Combinator and through a Sequoia capital fund in the

10   for-profit enterprise.  And he certainly will have a major

11   equity stake after the conversion.

12       This is, for lack of a better word, a shell game.  And

13   it's outrageous.  And this is not a common occurrence

14   converting a $340 billion charity -- or at their last

15   valuation $157 billion charity to a for-profit corporation.

16       And this has been going on now incrementally.  And it's

17   reached the breaking point where something has to be done.

18   And all we're asking the Court to do is to preserve the status

19   quo, because, otherwise, if you find in our favor, it will be

20   impossible to unwind these transactions.  If they keep taking

21   in more and more money involving more and more investors --

22           THE COURT:  Well.

23           MR. TOBEROFF:  -- who won't be able to get their

24   money back.

25           THE COURT:  So are you concerned with past investors

1    or future investors?

2        **MR. TOBEROFF:**  I'm concerned about the -- if the

3    status quo is not.

4        **THE COURT:**  Well, I should just say -- well, go

5    ahead.  Finish what you were going to say.

6        **MR. TOBEROFF:**  I'm concerned about the fact that as

7    they raise more and more money -- and they're already on their

8    next funding round, more and more people are going to be

9    infected [sic] by this, and --

10       **THE COURT:**  Yeah, but people who are investing know

11   what's happening.  So I don't understand -- I can -- it gives

12   me concern that you've got a charity, frankly, that is worth

13   340 -- $357 billion, according to your statement.  That in and

14   of itself is mind-boggling, that a charity has that much

15   value.

16       The notion that people don't know what's happening who are

17   investing is not credible.  They know exactly what's going on.

18       The fact that Musk wants to compete with them throws yet

19   another level into this, especially given that he's, you know,

20   running the government right now, so who knows.

21       There are a lot of moving parts.  And -- and I was not

22   being -- I have to work through some of your stuff because

23   it's not as specific as it needs to be.

24       But I don't think you've given me a record to justify the

25   kind of leave you are requesting.  Now, that doesn't

```
 1      necessarily mean that you're not -- there isn't a good reason
 2      to get some relief.  But you haven't really given it to me.
 3      And it's not my job to do your job.
 4          And it's not my job to somehow stop competition.  And
 5      things are very murky still in terms of what's going on
 6      between Musk and his X.AI, whether they're one or separate
 7      entities, yet to be seen, and OpenAI and Microsoft on the
 8      other hand.
 9          This country values competition.
10          MR. TOBEROFF:  Exactly, Your Honor.  And what we're
11      asking for here --
12          THE COURT:  You're asking me to get -- to get
13      involved in the playing field.
14          MR. TOBEROFF:  To --
15          THE COURT:  And my job -- nope.  My job is to make
16      sure that judges are not -- or at least this particular judge
17      is not making a playing field unlevel.
18          So --
19          MR. TOBEROFF:  I --
20          THE COURT:  There's still a lot for me to un- --
21      unravel here.
22          MR. TOBEROFF:  If I may, Your Honor.
23          What we're asking here -- of course, X.AI is a competitor
24      of OpenAI.  We're asking that it be able, like other AI
25      competitors Anthropic, Safe Superintelligence, other
```

1    safety-minded AI companies, be allowed to compete on a

2    leveling playing field.

3            **THE COURT:**  I don't have any complaints from them.

4            **MR. TOBEROFF:**  I --

5            **THE COURT:**  There are lots of other AI companies,

6    none of whom are filing similar suits.

7            **MR. TOBEROFF:**  That's -- that's still -- it's still

8    the --

9            **THE COURT:**  It's still what?

10           **MR. TOBEROFF:**  It still holds that Musk should have

11   the ability to compete on a laying -- on a level playing

12   field.

13       And there's another aspect of this, that they can hardly

14   complain that the balance of equities don't ship -- ship --

15   tip sharply against them when basically the subject of this

16   preliminary injunction would be that they obey the law and

17   there -- at this early stage without the benefit of discovery,

18   I think we have put forward a plethora -- plethora of

19   evidence.  Numerous accounts --

20           **THE COURT:**  Do you know that the Ninth Circuit -- you

21   must know.  The Ninth Circuit won't -- won't affirm an

22   injunction that is not specific.  I cannot just say, "go obey

23   the law."  It -- there are so many cases that are contrary to

24   that notion that you just argued.

25           **MR. TOBEROFF:**  I'm not suggesting that -- I'm talking

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   about the net effect of the injunction.  I'm not suggesting

2   that that would be the wording of the injunction.

3            **THE COURT:**  All right.  Good to know.

4            **MR. TOBEROFF:**  And -- an injunction could also be

5   fashioned with defendants' participation at a certain point.

6        They've -- they've made claims that this will damage

7   certain aspects of their business.  They can participate in

8   helping the Court to fashion that injunction.

9            **THE COURT:**  Hmm.

10           **MR. TOBEROFF:**  But something, in our view, should be

11  done to preserve the status quo as they take in more and more

12  investors, even if those investors are investing under known

13  conditions.

14       What if they go public?  And you're now talking all the

15  people that would be affected if we prevail on the merits?

16  There's no ability -- and also as far as not -- not only when

17  you look at unwinding the -- these transactions, that goes to

18  irreparable harm.  But also the fact that they -- when you

19  have a projected burn rate of $14 billion a year, how could

20  they even pay the damages at that point?

21           **THE COURT:**  Well, okay.

22       Anything else you want to say?

23           **MR. TOBEROFF:**  No, Your Honor.

24           **THE COURT:**  All right.  You each get five minutes so

25  we can wrap this up.  And then you'll get the rebuttal; it's

1    your motion.

2            **MR. COHEN:**  Thank you, Your Honor.

3            **THE COURT:**  You're on the clock.

4            **MR. COHEN:**  An injunction is an extraordinary and

5    drastic remedy, and the moving party has to satisfy all of the

6    *Winter* factors.

7        And we submit that plaintiffs can satisfy none of them

8    here.  There's no evidence of an agreement.  There's no

9    evidence of an agreement with Microsoft.  And any such

10   agreement that they describe here is not horizontal.  It is

11   not per se.

12       And so, therefore, there's no likelihood of success, let

13   alone a serious question on the Section 1 claim.

14       As to the Section 8 claim, there is no present overlap.

15   And there is no dangerous likelihood of recurrence of that

16   overlap.  And at the time there was an overlap, it was

17   entirely consistent with the law.

18       There is no basis to issue an injunction prospectively to

19   ensure that the law is abided by going forward where there was

20   no violation in the first place.

21       *Winter* says there has to be likelihood of success, and,

22   here, there was none.

23       Finally, an injunction of the type that Mr. Toberoff has

24   described threatens significant harm to Microsoft's customers

25   and its customers' customers.  As explained in the Arenas

1    declaration, the OpenAI models are accessed through Microsoft

2    services and are accessed through the Copilot services, which

3    are used by thousands of developers and millions of customers.

4        And if OpenAI is somehow unable to continue to develop its

5    models or to transfer those models and to update those models,

6    that is going to have a significant effect on the customers

7    and the customers of the customers.

8        It's also going to have a dangerous effect because many of

9    those updates provide safety and security updates for the

10    customers of those services.

11        The premise that is at the core of plaintiffs' case is

12    misguided.  There is tremendous competition among firms like

13    Google and Meta and Oracle and Microsoft and among startups

14    like X.AI and Anthropic and Cohere and Mistral.

15        There is competition between Microsoft and OpenAI.  And as

16    a result of all of this competition, we see, as Your Honor

17    noted, a dynamic emerging wave of Generative AI technology, so

18    we're at the very beginning.  We're at the very beginning of

19    this wave of technology.

20        We're also at the very beginning of the case, Your Honor.

21    And we would submit that on this record, there is simply no

22    basis to award any injunction and that plaintiffs haven't

23    satisfied any of the *Winter*' factors.

24        Thank you.

25            **MR. SAVITT:**  Thank you, Your Honor.

1         OpenAI Inc. is a not-for-profit corporation, chartered

2    under Delaware law, doing substantial business in California,

3    in substantial dialogue with the attorneys general of those

4    two states and it's -- it's a not-for-profit organization.

5         It's -- it's mission remains to facilitate the development

6    of safe artificial intelligence whose benefits can be broadly

7    distributed.

8         That not-for-profit corporation is governed by a board of

9    directors, a board of directors as to whom plaintiffs here

10   could not manage even a single non-sanctionable allegation as

11   to undermine their independence or competence.  Those are the

12   persons to whom plenary authority to organize the affairs of

13   this corporation are -- are confided.

14        Mr. Toberoff asked, well, why would they -- these

15   directors consider a restructuring transaction.  And I should

16   say Mr. Toberoff talked about a proposed transaction, just so

17   there's no confusion on the point, what's happening is there's

18   a consideration of a -- of a potential restructuring.  There

19   isn't -- there isn't a proposal.  There isn't a proposal to be

20   had or rejected or accepted.

21        But why would they do it?  Here's why.  The not-for-profit

22   is small and its growth is constrained --

23             **THE COURT:**  I don't understand that.  If they're --

24   what did he say?

25             **MR. SAVITT:**  All that money.

1        **THE COURT:** -- hundreds of billions of dollars, how

2   can you say it's small?

3        **MR. SAVITT:** And I appreciate, Your Honor, the

4   opportunity to clarify that 'cause it's an important point.

5        The reason it's small is this: Those billions of dollars

6   have been generated -- and they only could have been generated

7   importantly through the for-profit -- the capped for-profit

8   subsidiaries of OpenAI, Inc.

9        **THE COURT:** The what?

10       **MR. SAVITT:** They are capped for-profit subsidiaries.

11  And the "capped" is important because they -- the investors

12  have a certain claim on the proceeds of those investments.

13  And only after what -- what the bankers call the waterfall

14  is -- are funds distributed to the not-for-profit, and that

15  waterfall takes a long time. So -- and that's why

16  Mr. Toberoff was speaking about the relatively small income to

17  the not-for-profit in the -- in the tax return. That's

18  actually not a -- in our judgment, it's a point -- it makes

19  our point, not -- not the contrary.

20       The not-for-profit is deeply restrained because of the

21  structure that has necessarily been put in place to generate

22  the value to make ChatGPT possible.

23       And one of the objectives --

24       **THE COURT:** What do you mean that it is deeply

25  constrained?

1          **MR. SAVITT:**  It's deeply -- the not-for-profit is

2    resource constrained because the benefits that have been

3    created by the -- the capped for-profit subsidiaries have not

4    flowed in a meaningful way to the not-for-profit.  It's in a

5    structure that is very constraining for the nonprofit itself,

6    OpenAI, Inc.

7          And I wanted to -- to recommend for the Court's attention

8    the -- the blog post that was attached to the Delaware

9    Attorney General's submission dated the 27th of December.  And

10   it essentially sets this out.  The restructuring that's being

11   contemplated would create the largest not-for-profit in

12   history, dedicated to safe and beneficial open -- artificial

13   intelligence.

14         It would also liberate the for-profit entities to be

15   competitive with others in the market who are not constrained

16   by the not-for-profit structure.

17         That is to say, it librates both parts of the equation and

18   ensures that they work together under a common mission.

19   That's why they would do it, because these directors would

20   have determined that it's the best way, if not the only way,

21   to facilitate the mission of OpenAI.  That's why they would do

22   it.

23         And, ultimately, it's their decision to make.  There are

24   others who certainly will have standing to object if

25   objections are to be had.  We don't think these plaintiffs do.

1    But what's clear at any rate to echo some of the points of

2    the colloquy Your Honor's had with -- with others here at the

3    podium, an injunction can't issue unless there's a --

4    convincing demonstration that it is in order, and it is

5    specific in its terms.

6    And we submit, Your Honor, the plaintiffs -- they haven't

7    established any harm they're going to suffer absent an --

8    objection.  They claimed on access to capital.  They're

9    raising billions.  They're claiming about the capped

10    subsidiary but never complained about it ever until Mr. Musk

11    decided he wanted to compete.  He says that OpenAI should have

12    no commercial interests; yet he proposes now to send it to

13    auction so he can buy it.

14    He asks for sweeping release to straight-jacket a

15    competitor and yet he has everything in the marketplace to

16    compete that he needs.

17    And more, on the other side of the scale, the requested

18    injunction is designed to -- let's make no mistake -- and if

19    granted, would risk serious harm to OpenAI in the marketplace.

20    That's why this is -- motion's being brought on.

21    It would sideline a leading innovator in the space.  It

22    would usurp the role of the board.  It would usurp the role of

23    the attorneys general, all at a time, as the Court's heard and

24    I think appreciates, at a time of intense early-stage

25    competition.

1        And while Mr. Musk and others may have a different vision

2   of what OpenAI's mission requires, what it entails, the

3   company's reputable board of directors continues to work

4   towards that, subject to the regulatory environment in which

5   it operates, and that objective is to safely distribute

6   artificial intelligence in a way that benefits society

7   broadly.

8        And the injunction -- any injunction if issued here, would

9   I think you can be sure weaponizing as a means of suggesting

10  that OpenAI is operating in a way that is inappropriate.

11  There has been no showing of standing on the merits of

12  irreparable harm that would justify that, and if -- to the

13  extent there are claims that survive a motion to dismiss, Your

14  Honor will be pleased to -- to try them to whoever the finder

15  of fact and -- and legal arbiter is because there is not a

16  claim here that will sustain evidence or the light of day.

17            **THE COURT:**  Your response.

18            **MR. TOBEROFF:**  Your Honor, this Court has broad

19  discretion with respect to a motion for preliminary

20  injunction.  There -- we have documented massive misconduct on

21  the part of Sam Altman and OpenAI, serial self-dealing which a

22  board, which we believe is controlled by Altman and the

23  dominant position of Microsoft, never objected to.

24       This has raised the concern of the FTC who have launched

25  investigations into OpenAI.  There have been senate hearings.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    The FTC and the DOJ, and I should say the Biden FTC and DOJ

2    filed a unprecedented statement of the interest supporting the

3    antitrust claims, which I understand is fairly unprecedented.

4         **THE COURT:**  When will we know if -- if the current

5    administration is going to take a different view or not?

6         **MR. TOBEROFF:**  I have no idea on that point.

7         The -- just looking at their cap for-profit structure, we

8    show in our briefing -- I'm not certain, but I believe it's

9    also maybe in the complaint -- that at the current --

10   Microsoft's interest at a hundred times comes to a trillion

11   four -- $1.4 trillion before the charity sees any money.

12        They have used this -- abused the charitable form, and the

13   public has an interest that a charity behaves like a charity.

14   This is unprecedented, and I submit outrageous.

15        And given the Court's broad discretion, I believe some

16   action must be taken to preserve the status quo and ensure in

17   the interim that they comply with the law.

18        **THE COURT:**  Why isn't it -- you know, we didn't

19   discuss this today.  If the FTC is investigating and the DOJ

20   is investigating and the Delaware AG is investigating, why

21   isn't that sufficient, as all of those entities have much more

22   resources than one federal judge?

23        **MR. TOBEROFF:**  We don't believe -- first of all, we

24   don't believe that -- first of all, the Delaware AG is

25   involved just by the happenstance of them happening to

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    register in Delaware.  And we don't believe that -- we've seen

2    no sign of Delaware AG investigating.

3        They've said that in their amicus, essentially saying to

4    the Court, don't delve into this area.  We've got this.  But

5    we don't --

6        **THE COURT:**  Because don't those entities really

7    represent the public?  Mr. Musk represents Mr. Musk and X.AI.

8    He doesn't represent the public.

9        I -- I have three government agencies that, in fact, do

10   represent the public.

11       **MR. TOBEROFF:**  I understand, Your Honor.

12       But I don't believe the two are mutually exclusive.  I

13   believe Musk and X.AI have the right to bring these claims and

14   do their part in doing something about this travesty.

15       In terms of --

16       **THE COURT:**  Does the -- does the FTC have injunctive

17   power?  Does the DOJ have injunctive investigative power?

18       **MR. TOBEROFF:**  I can't tell you -- I don't know the

19   answer to that question.

20       **THE COURT:**  Okay.

21       **MR. TOBEROFF:**  There is the -- this idea that they

22   will create the largest charity in history by converting a

23   majority control of their for-profit enterprise into some

24   self-determined minority interest where they're on both sides

25   of the negotiating table, Sam Altman has a fiduciary duty to

1    the charity, as does Brockman, and yet, this -- these

2    self-interest -- these for-profit entities are themselves a

3    self-dealing transaction because there are separate companies

4    in which they would have a massive equity interest.

5        It's been reported that that equity interest for Brockman

6    is approximately 7 percent and for Mr. Altman, 10 percent.

7        That it's the conversion itself is by itself a

8    self-dealing transaction.

9        They are essentially going to try and sanitize their

10   behavior where they've developed pivotal technological assets

11   using publicly subsidized funds in the form of donations,

12   completely violating their promises to Musk, regulators, and

13   the public, and commercializing -- the moment that including

14   their commitment to open-sourcing that technology, and the

15   moment became commercially viable, they along with Microsoft

16   shut it down.  It's no longer open source.

17       We're dealing with an opaque -- opaque web of for-profit

18   entities.  And I can't find a better way the describe it, but

19   just to say that it just stinks.  And something needs to be

20   done about it, and that's the purpose of this lawsuit.

21            **THE COURT:**  Okay.

22       Thank you.  I'll take it under submission.

23            **MR. TOBEROFF:**  Thank you, Your Honor.

24            **MR. ETH:**  Thank you, Your Honor.

25            **MR. SAVITT:**  Thank you, Your Honor.

1          (Proceedings were concluded at 1:00 P.M.)

2                          --o0o--

3

4

5                  **CERTIFICATE OF REPORTER**

6

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9    I further certify that I am neither counsel for, related to,

10   nor employed by any of the parties to the action in which this

11   hearing was taken, and further that I am not financially nor

12   otherwise interested in the outcome of the action.

13

14   _____

15          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

16                  Wednesday, February 5, 2025

17

18

19

20

21

22

23

24

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*