1

2

3

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

4

5

6

7

8

9

| | |
|---|---|
| **ELON MUSK, ET AL.**, | **Case No.: 4:24-CV-4722-YGR** |
| Plaintiffs, | **ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| **OPENAI, INC., ET AL.**, | Re: Dkt. Nos. 46, 118. |
| Defendants. | |

10

11

12

13

14

Plaintiffs Elon Musk, Shivon Zilis, and X.AI Corp. ("xAI") collectively move for a preliminary injunction barring defendants from engaging in various business activities, which plaintiffs claim violate federal antitrust and state law. The relief requested is extraordinary and rarely granted as it seeks the ultimate relief of the case on an expedited basis, with a cursory record, and without the benefit of a trial.

15

16

17

18

19

20

Having carefully considered the papers submitted and the pleadings in this action, including oral argument, and for the reasons set forth below, the Court hereby **FINDS** that plaintiffs have failed to meet their burden of proof for the extraordinary relief requested and **DENIES** the motion. That said, the Court is prepared to offer an expedited schedule on the core claims driving this litigation, while staying the balance.  Such an approach would be more efficient and address the issues which are allegedly more urgent in terms of public, not private, considerations.

21

**I.    BACKGROUND**

22

23

24

25

26

Elon Musk (individually and on derivatively behalf of OpenAI, Inc. ("OpenAI")); Shivon Zilis (derivatively on behalf of Open AI); and xAI assert twenty-six claims against Samuel Altman, Gregory Brockman, OpenAI, twenty entities owned and controlled by OpenAI, Microsoft Corporation ("Microsoft"), Deannah Templeton, Reid Hoffman, and California Attorney General Rob Bonta.[1]

27

28

_____

[1] Plaintiff Musk filed a complaint on August 5, 2024, and the operative First Amended Complaint ("FAC") on November 14, 2024. The FAC added Zilis and xAI as plaintiffs, and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs allege in the FAC as follows:

2    Altman, OpenAI's co-founder and chief executive officer ("CEO"), and Brockman,

3  OpenAI's co-founder and former chief technology officer, took advantage of Musk's altruism in

4  order to lure him into funding the venture. While pretending to share Musk's concern about the

5  trajectory of the artificial intelligence ("AI") industry, Altman and Brockman solicited millions in

6  donations from Musk to build OpenAI on the promise that the organization would put people over

7  profit and serve as a counterweight to the other dominant players in the AI space. With full

8  knowledge that Musk's money was contingent upon using his money charitably, defendants set

9  about building a for-profit behemoth contrary to their original promises. (*See generally*, FAC ¶¶ 82-

10  124.)

11    Defendants' secretive venture included an effort by Microsoft to "exploit" OpenAI. (*Id.*

12  ¶ 98.) As part of this, Altman established a vast network of for-profit entities in which both he and

13  Microsoft hold significant ownership stakes. Further, OpenAI and Microsoft have several

14  contractual arrangements, including, for example, Microsoft's agreement to supply raw materials to

15  OpenAI and OpenAI's granting Microsoft an exclusive license to its technology. (*Id.* ¶¶ 99, 112,

16  133.) Defendants have ensured OpenAI's board is full of directors fully aligned with Altman and

17  Brockman's interests, such that independent directors constitute only a minority of the board. (*See*

18  *id.,* ¶¶ 161-67.)  In this regard, Microsoft "obtained an influential non-voting director seat on the

19  Board from which it could keep a close eye on its non-profit golden goose." (*Id.* ¶ 168.)  Defendant

20  Deannah Templeton occupied this seat until Microsoft voluntarily relinquished that observer spot in

21  July 2024 after antitrust regulators began to investigate the arrangement.

22    Musk was a member of OpenAI from its inception through his resignation in February

23  2018. (*Id.* ¶ 231.) Zilis is a former employee who was a member from March 2019 until her

24  resignation in March 2023. (*Id.* ¶ 232.)

25                                          ***

26

27

28  Microsoft, Templeton, Hoffman, and Bonta as defendants. It also lists Bonta as a defendant because
he has not yet responded to plaintiffs' efforts to join him as a plaintiff.

1    In its motion for a preliminary injunction, plaintiffs note that in March 2023, Musk started

2    xAI, a public benefit corporation, in order to "effectuate his longstanding commitments to open-

3    source AI." (Dkt. No. 46, Plaintiffs' Motion for a Preliminary Injunction ("Mtn.") at 4.)   Plaintiffs

4    contend that OpenAI has grown significantly and become a leader in the AI industry and they

5    request that the Court issue an order:

> [E]njoining Defendants, as well as their officers, agents, servants,
> employees, attorneys, and all other persons in active concert or
> participation with Defendants, during the pendency of this litigation,
> from:
>
> (1) directly or indirectly undertaking any action for the purpose of, or
>     tending to have the effect of, making, enforcing, or furthering
>     agreements not to invest in OpenAI's competitors, such as xAI;
>
> (2) directly or indirectly undertaking any action for the purpose of, or
>     tending to have the effect of, interlocking directorates or
>     benefitting from wrongfully obtained competitively sensitive
>     information or coordination via the Microsoft-OpenAI board
>     interlocks;
>
> (3) directly or indirectly undertaking any action for the purpose of, or
>     tending to have the effect of, furthering the conversion of OpenAI,
>     Inc. to a for-profit enterprise or transferring any material assets,
>     including intellectual property owned, held, or controlled by
>     OpenAI, Inc., its subsidiaries, or affiliates; and/or
>
> (4) directly or indirectly undertaking any action for the purpose of, or
>     tending to have the effect of, causing OpenAI, Inc. to contract or
>     do business with any entity in which any Defendant has a material
>     financial interest.

(*Id.* at i-ii.)

## II.    LEGAL STANDARD

The United States Supreme Court has consistently held that a "preliminary injunction is an

extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

24 (2008).  A plaintiff seeking a preliminary injunction must establish that the plaintiff is both

likely to succeed on the merits, and likely to suffer irreparable harm in the absence of preliminary

relief, and further that the balance of equities tips in plaintiff's favor, and that an injunction is in the

United States District Court
Northern District of California

1   public interest. *Id.* at 20. Alternatively, a preliminary injunction may issue where "serious questions

2   going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor" if the

3   plaintiff "also shows that there is a likelihood of irreparable injury and that the injunction is in the

4   public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This is

5   the Ninth Circuit's "sliding scale" approach, in which "the elements of a preliminary injunction test

6   are balanced, so that a stronger showing of one element may offset a weaker showing of another."

7   *Id.* at 1131. In all cases, at an "irreducible minimum," the party seeking an injunction "must

8   demonstrate a fair chance of success on the merits, or questions serious enough to require

9   litigation." *Pimental v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012) (quoting *Guzman v.*

10  *Shewry*, 552 F.3d 941, 948 (9th Cir. 2009)).

11  **III.    ANALYSIS**

12          Based on the foregoing, the Court begins with evaluating the merits of the subset of claims

13  upon which the motion is brought.

14          **A.    Injunction Request No. 1: Violation of Section 1 of the Sherman Act**

15          Plaintiffs Musk and xAI argue that an injunction is warranted because defendants Microsoft

16  and OpenAI have violated the Sherman Act.  The claim is based on the alleged issuance of a so-

17  called "fund no competitors" edict issued by OpenAI and Microsoft allegedly commanding OpenAI

18  investors to avoid investing in any competitor.

19          Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or

20  otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

21  foreign nations, is declared to be illegal." 15 U.S.C. § 1. To bring such a claim, plaintiffs must first

22  demonstrate Article III injury and statutory standing. To do so, plaintiffs "must allege (1) unlawful

23  conduct, (2) causing an injury to [themselves], (3) that flows from that which makes the conduct

24  unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *PLS.Com, LLC v.*

25  *Nat'l. Assoc. of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022). With regard to the first prong, the

26  Supreme Court has interpreted Section 1 to prohibit only *un*reasonable restraints on trade. To

27  determine reasonableness, two approaches are used:

28                  Some practices are so harmful to competition and so rarely prove
                    justified that the antitrust laws do not require proof that an agreement

4

of that kind is, in fact, anticompetitive in the particular circumstances. These practices are *per se* violations of the Sherman Act, and [courts] presume that they are anticompetitive without inquiry into the particular market context in which [they] are found.

*Id.* (internal cites omitted). Others are analyzed under the so-called "rule of reason," which require a highly "fact-specific assessment of market power and market structure . . . to assess the restraint's actual effect on competition." *Id.* at 834 (internal cites omitted). Plaintiffs here allege that the edict constitutes a Sherman Act violation under either analysis.[2]

In terms of a *per se* violation, the Ninth Circuit in *PLS* described the group boycott as follows:

The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, the hallmark of the "group boycott" is the effort of competitors to "barricade themselves from competition at their own level."

*Id.* At a minimum, a horizontal agreement is needed to find a group boycott, but case law speaks of two distinct types: a prototypical group boycott occurs where an agreement exists among the instigators of the boycott. *Honey Bum,* 63 F.4th at 821. By contrast, a so-called "hub and spoke group boycott" occurs "where one dominant firm pressures other firms at a different level of the supply chain" to boycott." *Id.* Importantly, because horizontal agreement must be shown in order to

---

[2] Plaintiffs primarily argue they have shown a *per se* violation, but argue that if the Court disagrees, they have also shown a modified *per se* violation, which is analyzed under the rule of reason and defined as a boycott "where some or all of the following characteristics are met: (1) the defendant's restriction cut[s] off access to a supply, facility, or market necessary to enable the boycotted firm to compete; (2) the defendant possesse[s] a dominant position in the relevant market; and (3) the defendant's restriction is not justified by plausible arguments that [it is] intended to enhance overall efficiency and make markets more competitive." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023) (internal cites omitted). Merely stating the rule is insufficient. Plaintiffs have woefully failed to present an evidentiary record to support all of the elements required to make this finding, even in preliminary form.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    invoke the protections of the *per se* violation analysis, "plaintiffs can successfully invoke the *per se*

2    rule in a hub-and-spoke conspiracy only if they prove horizontal agreements among the spokes." *Id*.

3          Here, defendants first argue, and the Court agrees, that Musk himself has no Article III or

4    antitrust standing to make this request. Musk himself is not xAI, nor has he presented any evidence

5    of harm flowing from an antitrust injury. In fact, the natural extension of this litigation-based

6    argument would be to suggest that Musk is the alter ego of xAI. At oral argument, plaintiffs'

7    counsel confirmed the intention was not to argue that Musk is an alter-ego of xAI. The Court thus

8    proceeds with its analysis by focusing solely on xAI as the moving party.[3]

9          xAI claims it has provided evidence of both a classic and hub and spoke boycott by

10   submitting three news articles from the *Financial Times*, *Reuters*, and *Wall Street Journal*

11   describing an OpenAI request that its funders not contribute to any competitors. (*See* Dkt. No. 32-

12   36, FAC, Ex. 25; *see* Dkt. No. 46-9, Mtn., Ex. 8; Dkt. No. 46-10, Mtn., Ex. 9.)[4] Newspaper articles

13   are classic hearsay and, in a court of law, cannot be relied upon for the truth of statements made

14   therein. While technically a court may consider hearsay evidence while ruling on a motion for a

15   preliminary injunction, *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984),

16   the Court here affords the articles little weight.  Under the totality of the circumstances, these

17   articles do little to satisfy the evidentiary burden of proof on this element. Despite Musk's

_____

18   [3] Because the Court finds Musk lacks standing to bring this claim, the Court grants the
19   pending motion on this issue. Further briefing on this topic is not necessary.

20   [4] The Court notes that xAI submitted declarations along with their reply which they claim
     are relevant. Evidence in support of a motion must be submitted with the motion in order to allow
21   the opposing party to respond.  Evidence submitted in reply is properly disregarded as the Court
     does here. Most of this late-proffered evidence refers to "common knowledge" among OpenAI
22   investors throughout OpenAI's funding round, thus belying any argument that the evidence could
     not have been timely submitted.
23
     In any event, for the small number of evidentiary items plaintiffs attest they only learned
24   after filing the instant motion, the declarations submitted do not compel a different result.  They
     either merely describe the customary investment atmosphere, which may or may not, be reasonable
25   or, constitute hearsay.  (*See* Dkt. No. 73-31, ¶ 3; Dkt. No. 73-33, ¶ 3 (one states that "it was
     common knowledge in and among this close-knit investment community that OpenAI . . . imposed
26   as a condition to any investment allocation that investors agree not to fund OpenAI's competitors")
     and Dkt. No. 73-32, ¶¶ 3, 5 (one from xAI's chief financial officer stating that one "renowned
27   institutional investor" informed him of the edict, while another "reputable venture capital investor
     and an investor in OpenAI, informed [him] that they would not invest in xAI because of it.).)
28

United States District Court
Northern District of California

1  influence, xAI admitted that it could not provide a single declaration from an investor to confirm its

2  theory.

3       Further, as defendants rightly note, xAI has not actually alleged, or provided evidence of, an

4  actual agreement between Microsoft and OpenAI to collude.  That Microsoft is a major investor in

5  OpenAI does not, by itself, support such a finding.

6       Even if the Court afforded a measure of reliability to the articles, xAI fails again to rebut

7  defendants' argument that there are several possible pro-competitive justifications for preferring

8  investors who give only to OpenAI:

9

10
> . . . it is beneficial to have a diversity of sophisticated and experienced
> venture capital firms meaningful[ly] involved in a new business, as
> they can provide management and financial expertise. That
> involvement will be more productive if key investors have access to
> proprietary information that may be competitively sensitive, which
> could otherwise be misused to anti-competitive effect if the investing
> firm is also meaningfully involved and invested in a competitor.

11

12

13

14  (Dkt. No. 64, OpenAI Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction

15  ("OpenAI Oppo.") at 11-12.) The Court takes no position on the ultimate issue of fact, only noting

16  that, at this juncture, who is to succeed on the merits is debatable.

17       Finally, upon xAI's urging at oral argument, OpenAI submitted a declaration from Altman

18  himself, denying the allegations. Far from an edict, Altman and OpenAI portray the reported

19  request as an offer: investors were told that their continued access to certain confidential

20  information belonging to OpenAI was contingent upon their agreement not to invest in any

21  competitor. In his declaration, Altman stated:

22

23
> I understand that Plaintiffs claim that I told investors in the October
> 2024 funding round that their ability to invest in OpenAI was
> contingent on forgoing investment in OpenAI's competitors, including
> xAI. That claim is false. I did not tell any investor in the October 2024
> funding round that their ability to invest in OpenAI was subject to that
> condition, nor to my knowledge did anyone else at OpenAI. Instead,
> certain investors who were to be granted access to OpenAI's
> confidential information on an ongoing basis were informed that
> OpenAI would need to terminate their rights to that information if they
> made non-passive investments in OpenAI's competitors. That
> restriction is necessary to protect against the misuse of OpenAI's

24

25

26

27

28

competitively-sensitive information, and I understand it is industry standard for that reason.

(Dkt. No. 107 at ¶¶ 4-8.)

Thus, in terms of the four *Winter* factors, the Court finds that plaintiffs have failed to show that they are likely to succeed on the merits on their antitrust allegations.  First, plaintiffs have provided no direct evidence of a horizontal agreement to boycott. As to a classic boycott, that Microsoft and OpenAI have a close business relationship cannot by itself impute the one's behavior to the other. Plaintiffs provide no admissible evidence that the two entities agreed to foment any such boycott.  Even the news articles make only passing reference to Microsoft as an investor in OpenAI without any indication of an agreement. Further, plaintiffs offer no admissible evidence from the investors themselves nor any rebuttal to the possible business justification.  Based on the lack of any substantive evidentiary showing, the motion fails to justify the imposition of extraordinary relief.

Second, xAI fails to show irreparable harm.  xAI's proffer of a single reference via declaration to one investor's decision is insufficient.  Nor did xAI deny OpenAI's argument that it has demonstrated remarkable fundraising success by raising over $11 billion, including from some of OpenAI's investors.  Even if any edict did exist, the evidentiary record does not demonstrate irreparable injury.[5]

The request for injunction number one on this ground is **DENIED**.

### B.       Injunction Request No. 2: Interlocking Directorates

Next, plaintiffs allege a violation of Section 8 of the Clayton Act and seek an injunction barring any interlocking directorates on the Microsoft and OpenAI boards as well as barring either corporation from benefiting from improper information sharing.

---

[5] xAI's argument to the contrary does not persuade. It claims that the Court should consider that the generative AI market is different, "with strong network effects and significant first-mover advantages" such that the dynamics of this market result in irreparable harm. (*Id.*) Again, xAI fails to comprehend its evidentiary burden. The only evidence submitted to support this argument is a statement from Microsoft's CEO stating that since the AI industry is nascent, OpenAI enjoyed a "two-year lead" in which to become a dominant player. (*See* Dkt. No. 73-19.) The sole statement cited cannot, without more, support the sweeping arguments about irreparable harm in the industry as plaintiffs suggest especially given the contrary proffer of xAI's own success.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Here, plaintiffs complain about (i) Reid Hoffman's service on the OpenAI board from

2    March 2018 to March 2023 having also served on Microsoft's board since 2017 and (ii) Deannah

3    Templeton's non-voting observer status on OpenAI's board from November 2023 to July 2024

4    having been a longtime Microsoft employee. Section 8, 15 U.S.C. § 19(a), provides:

> No person shall, at the same time, serve as a director or officer in any two corporations (other than banks, banking associations, and trust companies) that are--
>
>    (A) engaged in whole or in part in commerce; and
>
>    (B) by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws; . . . .

10   The statute applies to corporations with capital, surplus, and undivided profits aggregating more

11   than $48,559,000 and to corporations with competitive sales exceeding $4,855,900.[6]

12   As described above, before addressing the merits, the standing to assert the claim must exist

13   as a threshold inquiry. Here, the first question to address is whether there is a live case or

14   controversy given that both Hoffman and Templeton resigned before the instant motion was filed,

15   the former a year and a half before the motion and the latter four months before the motion.

16   With respect to this issue, plaintiffs rely on longstanding doctrine that "voluntary cessation

17   of allegedly illegal conduct does not . . . make [a] case moot." *United States v. W.T. Grant Co.*, 345

18   U.S. 629, 632 (1953). *W.T. Grant* involved a civil action brought to stop allegedly interlocking

19   directorates. Immediately after the filing of the complaint, the director at issue resigned and moved

20   to dismiss the case as moot. Given the public interest in antitrust enforcement, and because a

21   "defendant is free to return to his old ways" after voluntary cessation, the Supreme Court held the

22   case was still suitable for adjudication unless the "defendant [could] demonstrate that there is no

23   reasonable expectation that the wrong will be repeated." *Id.* at 632-33 (internal cites omitted).

24   Plaintiffs further cite *TRW, Inc. v. Federal Trade Commission*, which held similarly. 647

25   F.2d 942 (9th Cir. 1981). There, a defendant who was alleged to be violating the prohibition on

26   interlocking directorates made a similar claim that his resignation mooted the action. The Federal

27

28   [6] The Department of Commerce adjusts these thresholds annually. These amounts reflect the current and relevant thresholds for the purpose of determining a statutory violation. Two safe harbors apply. *See* 15 U.S.C. § 19(a)(2).

United States District Court
Northern District of California

9

1    Trade Commission filed a complaint following the director's resignation, and the Ninth Circuit,

2    relying on *W.T. Grant*, rejected defendant's mootness argument. *See id.* at 953.

3          The Court finds plaintiffs' cases to be distinguishable. First, with respect to *W.T. Grant,* the

4    Supreme Court clarified its outer bounds in the subsequent case of *Steel Co. v. Citizens for a Better*

5    *Env't.*, 523 U.S. 83 (1998):

6          The United States, as *amicus curiae,* argues that the injunctive relief
does constitute remediation because there is a presumption of future
7          injury when the defendant has voluntarily ceased its illegal activity in
response to litigation, even if that occurs before a complaint is filed. .
8          . . This makes a sword out of a shield. The presumption the
Government refers to has been applied to refute the assertion of
9          mootness by a defendant who, when sued in a complaint that alleges
present or threatened injury, ceases the complained-of activity.
10         See, *e.g., United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct.
894, 897, 97 L.Ed. 1303 (1953). **It is an immense and unacceptable**
11         **stretch to call the presumption into service as a substitute for the**
**allegation of present or threatened injury upon which initial**
12         **standing must be based**. . . . To accept the Government's view would
be to overrule our clear precedent requiring that the allegations of
13         future injury be particular and concrete. . . . Past exposure to illegal
conduct does not in itself show a present case or controversy regarding
14         injunctive relief . . . if unaccompanied by any continuing, present
adverse effects.
15

16

17

18   *Id.* at 109 (cleaned up) (emphasis supplied). Thus, while *T.W. Grant* may support the continuation

19   of a court's jurisdiction to hear a case that was properly filed, it may not provide standing at the

20   outset of a case where none exists. In other words, the voluntary cessation doctrine applies only in

21   situations where a plaintiff demonstrates standing at the outset.

22         Shortly after *Steel Co.*, the Supreme Court opined further on the distinction between

23   standing and mootness.
          The Court of Appeals justified its mootness disposition by reference
24         to *Steel Co.,* which held that citizen plaintiffs lack standing to seek
civil penalties for wholly past violations. In relying on *Steel Co.,* the
25         Court of Appeals confused mootness with standing. The confusion is
understandable, given this Court's repeated statements that the doctrine
26         of mootness can be described as the doctrine of standing set in a time
frame . . . . Careful reflection on the long-recognized exceptions to
27         mootness, however, reveals that the description of mootness as
standing set in a time frame is not comprehensive. As just noted, a
28

United States District Court
Northern District of California

> defendant claiming that its voluntary compliance moots a case bears
> the formidable burden of showing that it is absolutely clear the
> allegedly wrongful behavior could not reasonably be expected to recur.
> . . . **By contrast, in a lawsuit brought to force compliance, it is the
> plaintiff's burden to establish standing by demonstrating that, if
> unchecked by the litigation, the defendant's allegedly wrongful
> behavior will likely occur or continue, and that the threatened
> injury [is] certainly impending**.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-90 (2000)

(cleaned up) (emphasis supplied).

Thus, because plaintiffs cannot show that an injury existed at the time the complaint was filed, the argument that the voluntary cessation does not moot plaintiffs' claim is irrelevant. There was no claim to moot. By the time plaintiffs filed the FAC[7], four months had passed since the most recent alleged interlock had ended. This sets this case apart from *W.T. Grant*, which involved cessation after the filing of a complaint. It would also be impossible for this Court to accept plaintiffs' standing arguments based on *TRW* without running afoul of later Supreme Court precedent, as explained above.

Plaintiffs urge that there is imminent threat the interlocks will resume, but present no evidence to support the assertion. Plaintiffs submit news articles and interviews with Hoffman in which he suggests he was unhappy about resigning from the OpenAI board. Without more, the Court cannot say that Hoffman's dissatisfaction with the situation gives rise to a colorable threat of a future interlock. Additionally, plaintiffs argue that the resignation only occurred in the context of suspicion from antitrust regulators, yet no concrete evidence of such suspicion is presented. The Court cannot issue an injunction that rests solely on plaintiffs' unsupported allegations.

In sum, because plaintiffs lack standing to bring this claim, the second request for injunctive relief is **DENIED**.[8]

---

[7] The initial complaint was filed within a month of Templeton's resignation, but makes no mention of the Section 8 claim. Only the FAC adds Templeton and Hoffman as defendants and alleges an interlock violation.

[8] Because the Court finds plaintiffs without standing to bring this claim, the Court **GRANTS** the pending motion to dismiss Count XVI of the FAC. Further briefing on this topic is not necessary.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

**C.    Injunction Request No. 3: Breach of Charitable Trust**

2      Musk asks this Court for an injunction preventing Altman, Brockman, or OpenAI from

3  taking steps towards converting the organization into a for-profit entity. With respect to this claim,

4  the parties dispute whether Musk's undisputed $44+ million donations created an enforceable

5  contract or a charitable trust.

6      California law holds that "[c]ourts favor the construction of a gift as a trust over a

7  conditional gift . . . ." *L.B. Rsch. & Educ. Found. V. UCLA Found.*, 130 Cal. App. 4th 171, 178

8  (2005). Where "the donor clearly manifests an intention to make a conditional gift, that intention

9  will be honored. The gift will be construed as one of a fee simple subject to a condition subsequent

10 if . . . it is expressly provided in the instrument that the transferee shall forfeit it or that the

11 transferer or his heir or a third person may enter for breach of the condition." *Id.* (internal cites

12 omitted).

13      To support his claim, Musk submits emails that he claims evidence an intent to make the

14 donation contingent on OpenAI remaining a non-profit:

15
16 • A June 24, 2015 email exchange in which Altman informs Musk of his plans for OpenAI,
   including making it a nonprofit "for the good of the world," to which Musk responds:
   "Agree on all." (Dkt. No. 32-2.)

17
18 • A December 2015 email from Musk to several OpenAI founders in which he states:
   "Congratulations on a great beginning! We are outmanned and outgunned by a ridiculous
   margin by organizations you know well, but we have right on our side and that counts for a
19   lot. I like the odds." (Dkt. No. 32-7.)

20
   • A February 22, 2016 email from Musk to Altman in which he says: "Either we get the best
21   people in the world or we will get whipped by Deepmind. Whatever it takes to bring on ace
     talent is fine by me. Deepmind is causing me extreme mental stress. If they win, it will be
22   really bad news with their one mind to rule the world philosophy."[9] (Dkt. No. 32-8.)

23
   • A March 2016 email from Brockman to Musk, describing the altruistic aims of the
24   organization to which Musk responds: "Sounds good." (Dkt. No. 32-9.)

25 • An April 2016 email from Musk stating: "History unequivocally illustrates that a powerful
26   technology is a double-edged sword. It would be foolish to assume that AI, arguably the
     most powerful of all technologies, only has a single edge. The recent example of Microsoft's
27   AI chatbot shows how quickly it can turn incredibly negative. The wise course of action is

28
   ───────────────
   [9] DeepMind is an AI company acquired by Google in 2014.

12

to approach the advent of AI with caution and ensure that its power is widely distributed and not controlled by any one company or person. That is why we created OpenAI." (Dkt. No. 32-10.)

- An August 2017 email from Zilis to Musk describing Altman and Brockman's proposed corporate structure for OpenAI, to which Musk responds: "This is very annoying. Please encourage them to go start a company. I've had enough." (Dkt. No. 32-13.)

- A September 2017 email exchange between Musk and Altman, in which Musk expressed annoyance with the ostensible moves towards a profit motive, saying: "Guys, I've had enough. This is the final straw. Either go do something on your own or continue with OpenAI as a nonprofit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding for you to create a startup. Discussions are over." Altman responds: "I remain enthusiastic about the non-profit structure!" (Dkt. No. 32-14.)

- Various posts on the Musk-owned social media website X (formerly Twitter), from 2023 and 2024 expressing anger at OpenAI's betrayal of its original non-profit motivations. (Dkt. Nos. 46-10 – 46-15.)

Other than these emails, no contract or gifting document with terms and conditions exists. On this basis, defendants dispute the allegations.

Whether Musk's emails and social media posts constitute a writing sufficient to constitute an actual contract or charitable trust between the parties is debatable. On the one hand, the email exchanges convey early communications regarding altruistic motives of OpenAI's early days and even include reassurances about those motives from Altman and Brockman when they perceived Musk as upset. The Court therefore disagrees with defendants' framing that there is no evidence that "Altman, Brockman, or OpenAI solicited his donations subject to these commitments." (OpenAI Oppo. at 20.) At the same time, though highly suggestive, the emails do not by themselves necessarily demonstrate a *likelihood* of success. There is, for example, defendants' counter-evidence implying that Musk himself considered the possibility of being the one to turn OpenAI into a for-profit. (Dkt. No. 32-17; FAC, Ex. 16.) On balance, the Court finds the emails are insufficient for purposes of the high burden required for a preliminary injunction[10] and the question of likelihood of success on the merits to be a toss-up.

_____

[10] On February 13, 2025, the OpenAI defendants filed a request to introduce a letter of intent that Musk, through counsel, sent to the board of OpenAI on February 10, 2025, the week

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Because of this, the remaining *Winter* factors are derivative of, and dependent on, the first.

2    *If a trust was indeed created*, then preventing or remedying breach would be in the public interest.

3    For this inquiry, the Court looks to OpenAI's certificates of incorporation in both Delaware

4    and California, which lay out the charitable purposes behind the corporation. The documents state

5    that OpenAI was "organized *exclusively* for charitable and/or educational purpose" and "*not*

6    organized for the *private gain* of any person." (*See,* e.g., Dkt. No. 32-22 at 5 (emphasis supplied).)

7    Going further, they state that "[t]he specific purpose of this corporation is to provide funding for

8    research, development and distribution of technology related to artificial intelligence. The resulting

9    technology will benefit the public and the corporation will seek to open source technology for the

10   public benefit when applicable." (*Id.*) The Court takes plaintiffs' point that to the extent a transfer

11   to a for-profit structure risks any of these endeavors, the public would benefit from an injunction.

12   Next, and similarly, *if a trust was created*, the balance of equities would certainly tip

13   towards plaintiffs in the context of a breach. As Altman and Brockman made foundational

14   commitments foreswearing any intent to use OpenAI as a vehicle to enrich themselves, the Court

15   finds no *in*equity in an injunction that seeks to preserve the status quo of OpenAI's corporate form

16   as long as the process proceeds in an expedited manner.

17   The third element is likewise similar.  Plaintiffs attest that the irreparable harm in this

18   instance flows from the abuse of donor funds and tax deductions. Plaintiffs first described the harm

19   as being the "competitive advantage . . . of being able to raise . . . publicly tax-subsidized money to

20   develop technology, and then transferring the technology to an opaque web of for-profit entities and

21   benefiting from that when competitors are supposed to compete on a level playing field." (Dkt. No.

22   109 at 64:6-13.) When the Court paraphrased and asked if it was accurate to say the claim of

23   _____

24   after the hearing on this motion. In that letter, Musk offers, "[o]n behalf of a consortium of buyers,"
     "to acquire all assets . . . of OpenAI" for $97,375,000,000. (Dkt. No. 118-1.) Defendants argue this

25   offer is inconsistent with Musk's claims of breach of charitable trust or the notion that no transfers
     or changes should be allowed, with apparently, the exception of Musk. (Dkt. No. 118 at 1.) In

26   opposition, plaintiffs assert the letter of intent is "entirely irrelevant" to their injunction request.
     (Dkt. No. 119 at 1.)  Given plaintiff's failure to meet its burden, the Court need not consider this

27   additional interaction between the parties although it does undermine the claim of irreparable harm.

28   The motion to file additional evidence at Dkt. No. 118 is **GRANTED** but moot.

14

irreparable harm is "that people shouldn't be able to take a tax deduction from a nonprofit who then

can convert that money for for-profit enterprises," plaintiffs agreed. (*Id.* at 64:16-21.) The Court

agrees that significant and irreparable harm is incurred when the public's money is used to fund a

non-profit's conversion into a for-profit.

Because the threshold question of whether a charitable trust was created remains a toss-up,

Musk has not demonstrated likelihood of success on the merits sufficient to obtain an injunction.

The request for an injunction barring any steps towards OpenAI's conversion to a for-profit entity

is **DENIED**.[11]  That said, given the other considerations outlined, the Court finds that the case would

benefit from an expedited trial on the claim.

### D.    Injunction Request No. 4: Self-Dealing

Fourth, Musk and Zilis, both derivatively on behalf of OpenAI, bring a claim under

California Corporation Code Section 5233 for engaging in self-dealing.

Section 5233 defines a self-dealing transaction as one "to which the corporation is a party

and in which one or more of its directors has a material financial interest and which does not meet

the requirements" of three safe harbor provisions. Subsection (c) enumerates those who have

standing to bring a suit to remedy self-dealing transactions, namely:

> The Attorney General or, if the Attorney General is joined as an indispensable party, any of the following may bring an action in the superior court of the proper county for the remedies specified in subdivision (h):
>
> (1) The corporation, or a member asserting the right in the name of the corporation pursuant to Section 5710.
> (2) A director of the corporation.
> (3) An officer of the corporation.
> (4) Any person granted relator status by the Attorney General.

---

[11] Defendants also challenge plaintiffs' standing. As Musk has not been directly affiliated with OpenAI for several years, any standing must come from an interest in OpenAI's assets. California Corporations Code Section 5142(a).  The Court is aware of the distinction between Restatement (Second) of Trusts § 391 and Restatement (Third) of Trusts § 94 and cmt. g, plus the California state authorities following the Restatement (Third).  Thus, for purposes of this motion, the Court finds plaintiffs' standing sufficient as a settlor given the modern trend in that direction. The motion to dismiss on this issue is **DENIED.**  Further briefing on this topic is not necessary.

United States District Court
Northern District of California

1    Cal. Corp. Code. § 5233(c).

2         Here, neither Musk nor Zilis is a director (subsection (c)(2)) or officer (subsection (c)(3))

3 and neither has been granted relator status by the Attorney General (subsection (c)(4)).[12] Thus, in

4 order to "bring" an action, plaintiffs must qualify under subsection (c)(1), *i.e.* "be a member

5 asserting rights under Section 5710."   Despite expending considerable paper explaining why the

6 requirements of Section 5710 are met, Musk and Zilis are not currently members of OpenAI.  That

7 Musk and Zilis may have been members at one point is insufficient as a matter of law.  Neither

8 Zilis nor Musk have standing to seek relief under the statute.

9         The fourth request for an injunction is therefore **DENIED.**[13]

10 **IV.    CONCLUSION**

11         For the reasons stated above, plaintiffs' motion is **DENIED.**

12         That said, given the public interest at stake and potential for harm if a conversion contrary

13 to law occurred, the Court is prepared to expedite trial to the fall of 2025 solely on that claim and

14 potentially the interrelated contract-based claims. However, the Court would require all ancillary

15 claims to be stayed.  As discussed at the hearing, it is unlikely the full case will be ready for trial

16 until 2027 or 2028.  The parties shall meet and confer on the issue and file a joint statement not

17 exceeding eight (8) pages by March 14, 2025.  The Court sets a case management conference on

18 March 21, 2025 at 8:00 a.m. in the United States District Court, Oakland, California, Courtroom

19 One.

20         This terminates Docket Nos. 46, 118.

21         **IT IS SO ORDERED**.

22 Date: March 4, 2025

                              **YVONNE GONZALEZ ROGERS**

23                          **UNITED STATES DISTRICT COURT JUDGE**

24

25

       [12] Musk and Zilis have asked the Attorney General to grant them relator status, but as of yet

26 the Attorney General has not responded.

27

       [13] Because the Court finds plaintiffs without standing to bring this claim, the Court **GRANTS**

28 the pending motion to dismiss Count XXIII of the FAC. Further briefing on this topic is not
necessary.

United States District Court
Northern District of California