Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs Elon Musk,*
*Shivon Zilis, and X.AI Corp.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to Hon. Yvonne Gonzalez Rogers |
| v. | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS MICROSOFT, DEANNAH TEMPLETON, AND REID HOFFMAN** |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date:     May 28, 2025 |
| | Time:     10:00 a.m. |
| | Place:    Courtroom 1 (4th Fl.) |
| | 1301 Clay St. |
| | Oakland, CA 94612 |

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiffs' claims under Section 1 of the Sherman Act (Count IX) and Section 16720 of the Cartwright Act (Count XI) are adequately pled by the First Amended Complaint's detailed and plausible allegations of (i) *per se* unlawful group boycotts targeting potential xAI investors, (ii) Microsoft-OpenAI's coordinated below-cost pricing strategies, (iii) anticompetitive joint conduct, and (iv) substantial market power, given Microsoft-OpenAI's 69% market share.

2. Whether Plaintiffs' claim under Section 2 of the Sherman Act (Count X) sufficiently alleges (i) Microsoft-OpenAI's joint monopolization with an approximately 69% market share, (ii) exclusionary conduct through Microsoft's agreement to be OpenAI's exclusive provider of compute resources and OpenAI's exclusive license of its technology to Microsoft, (iii) predatory pricing as to Microsoft's provision of compute to OpenAI at below-cost and OpenAI's below-cost products, (iv) group boycott restricting xAI's access to capital markets, and (v) Microsoft-OpenAI's de facto merger, substantially lessening competition.

3. Whether Plaintiffs' Unfair Practices Act claim (Count XII) adequately alleges (i) Microsoft's provision of compute to OpenAI at "far less than it costs to produce" with specific cost factors identified, and (ii) Microsoft's implementation of this strategy "for the purpose of injuring competitors or destroying competition."

4. Whether Plaintiffs' claim under Section 3 of the Clayton Act (Count XIII) adequately pleads (i) Microsoft's compute services and OpenAI's models involving "tens of thousands of computer processors" in physical data centers constitute tangible "goods" or "commodities," and (ii) the substantial restriction of competition through Microsoft's agreement to be OpenAI's exclusive provider of compute and OpenAI's agreement to exclusively provide Microsoft with its advanced AI models.

5. Whether Plaintiffs' claim under Section 16727 of the Cartwright Act (Count XIV) properly alleges substantial foreclosure of competition through exclusive arrangements causing harm to the generative AI market.

6.      Whether Plaintiffs' claim under Section 7 of the Clayton Act (Count XV) sufficiently alleges (i) Microsoft's acquisition of significant equity in the For-Profit Entities, (ii) Microsoft's exclusive technology license from OpenAI, effectively transferring control to the exclusion of third- party competitors, and (iii) Microsoft's escalating influence and control over OpenAI's operations and governance constituting a "de facto merger."

7.      Whether Plaintiffs' claim under Section 8 of the Clayton Act (Count XVI) adequately alleges interlocking directorates that harmed competition through the "exclusive exchange between OpenAI and Microsoft of competitively sensitive information," supporting damages.

8.      Whether Plaintiffs' antitrust claims (Counts IX-XVI) adequately allege antitrust injury through (i) restriction of capital markets via Defendants' group boycott, (ii) discriminatory compute pricing terms, (iii) anticompetitive hiring practices, and (iv) exclusive licensing arrangements that directly harm xAI's competitive position.

9.      Whether Plaintiffs' claim under California's Unfair Competition Law (Count XVII) properly alleges (i) unlawful business practices, including violations of tax, antitrust, and other laws, (ii) unfair business practices in the exploitation of charitable assets for private gain, (iii) fraudulent practices including Microsoft's deliberate deception regarding its relationship with Sam Altman and OpenAI, and (iv) whether Plaintiffs' fraud-based UCL claims satisfy Fed. R. Civ. P. 9(b) by detailed allegations of Microsoft's knowing participation in a fraudulent scheme.

10.     Whether Musk's quasi-contract/unjust enrichment claim (Count IV) adequately alleges (i) Microsoft's receipt of benefits derived from misappropriated charitable assets, (ii) Microsoft's deliberate exploitation for its private gain of technology developed with Musk's charitable contributions, and (iii) the inequity of allowing Microsoft to retain benefits from this wrongful conduct.

11.     Whether Musk's tortious interference claim (Count V) properly alleges (i) a valid agreement between Musk and OpenAI, Inc./Sam Altman, (ii) Microsoft's knowledge of it from its extensive due diligence, (iii) Microsoft's intentional disruption through exclusive arrangements and

orchestration of the For-Profit Entities contrary to the terms of such agreement, and (iv) resulting damage to Musk from the abandonment of OpenAI's charitable mission and commitments.

12.    Whether Plaintiffs' aiding and abetting claims (Counts VIII, XXI, XXIV) sufficiently allege (i) Microsoft's knowledge of underlying wrongful conduct through its close relationship with Altman/OpenAI, (ii) Microsoft's substantial assistance through exclusive agreements, orchestration, participation and substantial equity in the For-Profit Entities which looted the charity's assets, and (iii) Microsoft's intent to facilitate the scheme, demonstrated by its active role in reinstating Altman and purging OpenAI Inc.'s board.

13.    Whether Count VIII satisfies Rule 9(b) with detailed allegations specifying (i) Microsoft's role in the fraudulent scheme, (ii) its knowledge derived from extensive due diligence, and (iii) Microsoft's substantial assistance in the conversion of OpenAI Inc.'s charitable assets for its private commercial gain.

14.    Whether Plaintiffs' RICO claims (Counts XXV-XXVI) adequately allege (i) Microsoft's participation in the wire fraud scheme with co-schemers Sam Altman and Greg Brockman, (ii) Microsoft's infiltration and direction of the enterprise's governance and affairs by exploiting its leverage as OpenAI's exclusive provider of compute (its most critical resource) and key investor, and (iii) Microsoft's knowledge of and agreement to participate in the RICO conspiracy.

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

LEGAL STANDARD............................................................................................................4

ARGUMENT .........................................................................................................................4

I.    XAI HAS PLED PLAUSIBLE ANTITRUST CLAIMS. ..........................................4

    A.    The FAC States Plausible *Per Se* and Rule-of-Reason Violations of § 1 of the
        Sherman Act and § 16720 of the Cartwright Act (Counts IX and XI)......................4

        1.    *The FAC Plausibly Alleges a* Per Se *Violation.*................................................4

        2.    *The FAC Pleads a Plausible Rule-of-Reason Violation.* ....................................6

        3.    *The FAC Plausibly Alleges Predatory Pricing and Inflated
            Compensation Agreements.* ...............................................................................8

        4.    *The FAC's Other Allegations Support § 1 Liability.* .........................................9

    B.    The FAC States a Plausible Claim Under § 2 of the Sherman Act (Count X)...........10

    C.    The FAC Plausibly Alleges Antitrust Injury.............................................................13

    D.    The FAC States a Plausible Claim Under the Unfair Practices Act (Count XII).......13

    E.    The FAC States Plausible Claims Under § 3 of the Clayton Act and
        § 16727 of the Cartwright Act (Counts XIII and XIV)............................................14

    F.    The FAC States a Plausible Claim Under § 7 of the Clayton Act (Count XV). .........15

    G.    The FAC States a Plausible Claim Under § 8 of the Clayton Act (Count XVI).........16

II.    PLAINTIFFS PLEAD A PLAUSIBLE UCL CLAIM UNDER § 17200
    (COUNT XVII)........................................................................................................16

III.    THE FAC PLEADS A PLAUSIBLE QUASI-CONTRACT CLAIM (COUNT IV)..........17

IV.    THE FAC PLAUSIBLY PLEADS TORTIOUS INTERFERENCE (COUNT V). ............18

V.    THE FAC PLEADS PLAUSIBLE AIDING AND ABETTING CLAIMS
    (COUNTS VIII, XXI, XXIV)..................................................................................19

VI.    THE FAC PLEADS PLAUSIBLE RICO CLAIMS (COUNT XXV-XXVI). ...................20

    A.    The FAC Plausibly Alleges Predicate Acts of Wire Fraud.......................................20

B.    The FAC Alleges Microsoft's Conduct in the Enterprise. .........................................22

C.    The FAC Plausibly Alleges a RICO Conspiracy Under § 1962(d)............................23

CONCLUSION.................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ........................................................................................... 11

*Anderson News, LLC v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ................................................................................ 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................. 4, 7, 14

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ............................................................................. 18

*Bardin v. DaimlerChrysler Corp.*,
   136 Cal. App. 4th 1255 (2006) .......................................................................... 16

*Bay Guardian Co. v. New Times Media LLC*,
   187 Cal. App. 4th 438 (2010) ............................................................................ 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 4

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ............................................................................................ 8

*Brown Shoe Co. v. United States*, 3
   70 U.S. 294 (1962) ............................................................................................ 15

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ............................................................................................ 7

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ................................................................................. 16, 17

*Copeland v. Energizer Holdings, Inc.*,
   716 F. Supp. 3d 749 (N.D. Cal. 2024) ................................................................ 6

*Corazon v. Aurora Loan Servs.*,
   No. 11-CV-0542 SC, 2011 WL 1740099 (N.D. Cal. May 5, 2011) ..................... 21

*Corbello v. DeVito*,
   777 F.3d 1058 (9th Cir. 2015) ........................................................................... 15

*DeSoto Cab Co. v. Uber Techs., Inc.*,
   No. 16-CV-6385 JSW, 2018 WL 10247483 (N.D. Cal. Sept. 24, 2018) ............. 21

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct.*,
  114 Cal. App. 4th 309 (2003) ............................................................................... 14

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
  55 Cal. App. 5th 381 (2020) ..................................................................................... 4

*H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989) ................................................................................ 11

*Hale v. Sharp Healthcare*,
  183 Cal. App. 4th 1373 (2010) .............................................................................. 16

*Holt v. Coll. of Osteopathic Phys. & Surgeons*,
  61 Cal. 2d 750 (1964) ............................................................................................. 20

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000) .................................................................................. 23

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
  627 F.2d 919 (9th Cir. 1980) .................................................................................. 11

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ................................................................... 10, 11, 12

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) .................................................................. 23

*In re Data Gen. Corp. Antitrust Litig.*,
  490 F. Supp. 1089 (N.D. Cal. 1980) ..................................................................... 14

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
  630 F. Supp. 3d 968 (N.D. Ill. 2022) ....................................................................... 9

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
  395 F. Supp. 3d 464 (W.D. Pa. 2019) ...................................................................... 9

*In re Volkswagen "Clean Diesel" Mktg.*,
  MDL No. 2672 CRB, 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ............... 20, 22

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ................................................................................ 19

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) .................................................................................. 4

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) .................................................................................................. 6

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011) ............................................................................................ 20

*L.B. Rsch. & Educ. Found. v. UCLA Found.*,
  130 Cal. App. 4th 171 (2005) ............................................................................................... 20

*LD v. United Behav. Health*,
  No. 20-CV-2254 YGR, 2021 WL 930624 (N.D. Cal. Mar. 11, 2021) ................................... 20

*Lectrodryer v. Seoul Bank*,
  77 Cal. App. 4th 723 (2000) ................................................................................................. 18

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ................................................................................................................. 7

*Lueras v. BAC Home Loans Serv'g, LP*,
  221 Cal. App. 4th 49 (2013) ................................................................................................. 17

*Morrison v. Viacom, Inc.*,
  66 Cal. App. 4th 534 (1998) ................................................................................................. 14

*Natomas Gardens Inv. Grp. v. Sinadinos*,
  710 F. Supp. 2d 1008 (E.D. Cal. 2010) ................................................................................ 23

*NCAA v. Alston*,
  594 U.S. 69 (2021) ................................................................................................................... 7

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ................................................................................................ 8

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) ................................................................................................................. 5

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ................................................................................................................. 6

*Omega Envtl. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ........................................................................................... 7, 14

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
  50 Cal. 3d 1118 (1990) ......................................................................................................... 18

*Pac. Steel Grp. v. Com. Metals Co.*,
  600 F. Supp. 3d 1056 (N.D. Cal. 2022) ................................................................................ 11

*Paladin Assocs. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .............................................................................................. 11

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ......................................................................................... 5, 6, 12

*Prakashpalan v. Engstrom, Lipscomb & Lack*,
  223 Cal. App. 4th 1105 (2014) ....................................................................................... 17, 18

ix

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
  No. 12-CV-2102 JST, 2013 WL 3936394 (C.D. Cal. July 30, 2013) .................................. 14

*Reading, Int'l, Inc. v. Oaktree Cap. Mgmt.*,
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) ....................................................................... 16

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...................................................................................... 11

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993).................................................................................................... 22

*Russo v. Fed. Med. Servs.*,
  744 F. Supp. 3d 914 (N.D. Cal. 2024) ....................................................................... 21

*SC Innovations, Inc. v. Uber Techs., Inc.*,
  434 F. Supp. 3d 782 (N.D. Cal. 2020) ....................................................................... 12

*Shwarz v. United States*,
  234 F.3d 428 (9th Cir. 2000) ........................................................................................ 4

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys*,
  778 F.3d 775 (9th Cir. 2015) ...................................................................................... 15

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ...................................................................................... 19

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ........................................................................................ 6

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ...................................................................................... 7

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ....................................................................................... 12

*United States v. Gen. Motors Corp.*,
  384 U.S. 127 (1966)...................................................................................................... 8

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc) ............................................................... 6, 12

*United States v. Stapleton*,
  293 F.3d 1111 (9th Cir. 2002) .................................................................................... 20

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) .................................................................................... 21

*Voyager Indem. Ins. Co. v. Goldsmith*,
  733 F. Supp. 3d 905 (C.D. Cal. 2024) ....................................................................... 18

*Walter v. Drayson*,
   538 F.3d 1244 (9th Cir. 2008) ........................................................................................... 22


**Statutes**

15 U.S.C.

   § 1 ................................................................................................................................ 4, 9, 10

   § 2 .................................................................................................................................. 10, 11

   § 14 ...................................................................................................................................... 14

   § 18 ...................................................................................................................................... 15

   § 19 ...................................................................................................................................... 16

17 U.S.C. § 101 .......................................................................................................................... 15

18 U.S.C. § 1962 ................................................................................................................. 20, 23

California Business and Professions Code

   § 16720 .................................................................................................................................. 4

   § 17024 ................................................................................................................................ 13

   § 17043 ................................................................................................................................ 13

   § 17200 ................................................................................................................................ 16

   § 17204 ................................................................................................................................ 17


**Rules**

Federal Rule of Civil Procedure 9 ............................................................................... 9, 19, 21

Federal Rule of Civil Procedure 12 .................................................................................. 4, 18

**<u>INTRODUCTION</u>**

This case presents a disturbing transformation. What began as a non-profit co-founded by Elon Musk to develop AI for humanity's benefit has, through coordinated deception, become an enormous revenue engine for Microsoft and its co-Defendants. The First Amended Complaint ("FAC") details how Microsoft knowingly participated in this betrayal of the public's trust—not as a passive investor but as an active architect and participant in the looting of OpenAI.

When Musk contributed over $44 million to establish a charitable foundation committed to developing safe and open AI, and named it "OpenAI," he did so based on explicit promises that it would remain a charity "unconstrained by a need to generate financial return." Microsoft systematically helped dismantle these commitments. The exclusive agreements Microsoft extracted, the pressure it applied when OpenAI's independent board members sought to preserve its charitable mission by firing Sam Altman, and its ongoing efforts to entrench a "de facto merger" all reflect a deliberate strategy to exploit charitable assets.

The Motion to Dismiss of Microsoft, Reid Hoffman, and Deannah Templeton (collectively, "Microsoft") recasts this narrative, portraying each as an innocent bystander who merely partnered with an already-commercialized OpenAI. This revisionist account, designed to exculpate them from aiding and abetting liability, does not withstand scrutiny. Microsoft's CEO boasted about its total control of OpenAI, and a sophisticated corporation like Microsoft, investing billions, necessarily understood OpenAI's foundational commitments that it helped violate.

The antitrust claims rest on similarly solid foundations. Microsoft and OpenAI together command approximately 69% of the generative AI market, and their joint conduct—from exclusive licensing and preferential pricing arrangements, to predatory hiring practices, to investor exclusivity requirements targeting competitors—reflects a classic pattern of anticompetitive market strangulation, not healthy competition.

At its core, this case asks whether a corporation may knowingly participate in the conversion of charitable assets for its private gain without legal consequence. The question answers itself. The Court should reject Microsoft's effort to escape accountability.

**STATEMENT OF FACTS**

The FAC recounts the brazen scheme to defraud Musk and convert a charitable non-profit into a for-profit juggernaut benefiting Microsoft and its co-Defendants. We begin with OpenAI's founding, when Sam Altman approached Musk with a proposal to co-found a non-profit, research foundation dedicated to developing AI for the benefit of humanity. FAC ¶¶ 82-90.[1] Musk agreed to back this venture, contributing over $44 million, his name, expertise, time, and connections to recruit top scientific talent, based on express promises that OpenAI would remain a true non-profit committed to open sourcing its technological advancements for the public's benefit. ¶¶ 91-97.

Microsoft entered the picture in September 2016, and began selling compute to OpenAI at below-market rates and proposed using OpenAI as a marketing tool to which Musk objected. ¶ 99.

By 2017-2018, Altman and Brockman began pressing Musk to convert OpenAI to a for-profit. ¶¶ 102-03. Musk ultimately rejected this, stating unequivocally: "Either go do something on your own or continue with OpenAI as a non-profit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding to a start-up." ¶ 103. In response, Altman reassured Musk that he remained "enthusiastic about the non-profit structure!" as did Brockman. ¶ 104.

This assurance was a lie. Shortly thereafter, Altman and Brockman began secretly working with Microsoft to form a labyrinthine for-profit structure (the "For-Profit Entities") designed to loot OpenAI, Inc. of its intellectual property and employees for private gain, with almost no revenue going to the charity. ¶¶ 105-09, 113-27. Microsoft entered into agreements with OpenAI giving Microsoft exclusive rights to supply OpenAI's most vital resource—compute—in exchange for exclusive rights to its technology and a massive stake in the For-Profit Entities. ¶ 112.

Microsoft's efforts culminated in its acquiring effective control over OpenAI through its financial and compute leverage. ¶¶ 98, 147, 159. When OpenAI's board exercised independence by firing Altman in November 2023, Microsoft demonstrated its power, by immediately hiring Altman and threatening to poach OpenAI's employees. ¶¶ 148, 151-56. Microsoft's pressure campaign succeeded, Altman was reinstated in just four days and those board members who ousted him were

---

[1] Citations of "¶" or "Ex." are hereinafter to the FAC, unless otherwise stated.

removed. ¶¶ 160-61. Microsoft's CEO Satya Nadella bragged about its control: "We are in there. We are below them, above them, around them." ¶ 158.

Microsoft further enhanced its control through board interlocks. Defendant Hoffman simultaneously served on the boards of Microsoft and OpenAI from March 2018 until March 2023. ¶¶ 163-64, 167, 374. And following Altman's firing and reinstatement, and the purging of OpenAI's board, Microsoft secured a seat for itself as a non-voting member via Defendant Templeton (a Microsoft executive and advisor to its Chief Technology Officer), who served from November 2023 until July 2024. ¶¶ 168, 371.

Microsoft used its control over OpenAI to engage in anticompetitive conduct targeting xAI and other competitors. ¶¶ 200-01, 331. Microsoft controls 24% of the market for computing resources, a critical input for AI. ¶ 217. Microsoft's SEC filings lists OpenAI as its sole "strategic partner," ¶ 216, and together they control approximately 69% of the generative AI market. ¶ 225. Microsoft and OpenAI secured and maintained their market dominance through abuse of OpenAI's charitable form, overpaying and hoarding scientific talent, and below-cost pricing of generative AI products and computing resources. ¶¶ 200, 221-24, 331. Microsoft charges OpenAI for compute far less than it costs to produce, while OpenAI sells its generative AI products to Microsoft and the public at prices well below their cost. ¶¶ 221-23. More recently, at OpenAI's October 2024 oversubscribed funding round, Microsoft encouraged and benefited from its proxy Altman informing investors that to participate now and in future rounds, they must commit to not funding OpenAI's competitors, like xAI (the "Fund No Competitors Edict"). ¶ 201.

These actions have directly harmed xAI, which competes with OpenAI-Microsoft in the generative AI market. ¶ 226. xAI has been harmed by, among other things, restriction of high-level capital investors (a limited resource) who declined to invest in xAI because of the Fund No Competitors Edict, Microsoft and OpenAI's exchange of competitively sensitive information, xAI's inability to license OpenAI technology given Microsoft's exclusive license, or to obtain compute from Microsoft on favorable terms, and xAI's difficulty recruiting AI scientists. ¶¶ 201, 227, 246.

Musk has also been harmed by Microsoft's conduct. He contributed over $44 million to OpenAI, Inc. based on promises that it would remain a non-profit dedicated to developing AI for

the public's benefit. ¶¶ 91-97. Microsoft helped Altman convert the charity into a private, profit-driven goliath dominated by Microsoft—all without any regulatory approval. As a result, Musk's charitable contributions were effectively stolen and used to benefit Microsoft and its co-Defendants.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pled factual allegations as true and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must also draw all reasonable inferences in favor of the plaintiff. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A claim has facial plausibility when its allegations, accepted as true, allow the court to draw reasonable inferences that defendant is liable for alleged misconduct. *Iqbal*, 556 U.S. at 678. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (internal quotation marks omitted).

## ARGUMENT

### I.    XAI HAS PLED PLAUSIBLE ANTITRUST CLAIMS.[2]

#### A.    The FAC States Plausible *Per Se* and Rule-of-Reason Violations of § 1 of the Sherman Act and § 16720 of the Cartwright Act (Counts IX and XI).[3]

##### 1.    *The FAC Plausibly Alleges a* Per Se *Violation*.

In evaluating a motion to dismiss antitrust claims, courts are careful not to impose heightened pleading standards beyond those already established in *Twombly* and *Iqbal*, requiring only that the plaintiff plead enough facts to suggest that discovery will reveal evidence of the necessary elements. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). To establish a *per se* violation, xAI must allege: "(1) unlawful conduct, (2) causing an injury to [it], (3)

---

[2] Given the Court's ruling that Musk lacks standing to bring antitrust claims individually, Dkt. 121 at 6 n.3, Plaintiffs voluntarily dismiss so much of the FAC as makes him a party to antitrust claims.

[3] As "federal cases interpreting the Sherman Act are applicable to claims arising under the Cartwright Act," Plaintiffs discuss federal cases on the understanding this analysis applies *mutatis mutandis* to their Section 16720 claim. *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 5th 381, 400 (2020).

that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (internal quotation marks omitted). Microsoft's participation in an unlawful group boycott, either by explicit agreement with Altman or as part of a hub-and-spoke conspiracy, constitutes a *per se* violation of Section 1. The Ninth Circuit recently described a group boycott as follows:

> [A] concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors,…or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, the hallmark of the 'group boycott' is the effort of competitors to barricade themselves from competition at their own level.

*Id.*; *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).

Here, the FAC alleges that Defendants, including Microsoft, engaged in unlawful conduct by "conditioning the opportunity to invest in OpenAI on an agreement by investors not to deal with and/or invest in the competitors of Microsoft and OpenAI in generative AI," ¶ 331(a), and that "during OpenAI's latest funding round in early October 2024, on information and belief, Altman, in concert with and at the urging of other Defendants, conditioned investors' ability to participate in the heavily oversubscribed offering on their agreeing not to invest in OpenAI's competitors, specifically calling out xAI," ¶ 201. The FAC further quotes the *Financial Times'* reporting on this conduct: "OpenAI has asked investors to avoid backing rival start-ups such as Anthropic and Elon Musk's xAI, as it secures $6.6bn in new funding and seeks to shut out challengers to its early lead in generative artificial intelligence." *Id*. & Ex. 25 at 1.

Microsoft's argument that this claim does not include the "who, what, when, where, and how" of the agreement, ignores the FAC's specific allegations. The FAC identifies the "who" (Altman, in concert with and at the urging of other Defendants, including Microsoft), ¶¶ 201, 331(a), the "what" (conditioning investment in OpenAI on agreeing not to invest in competitors, like xAI), ¶ 331(a), the "when" (during OpenAI's funding round in early October 2024), ¶ 201, the "how" (by making participation in OpenAI's oversubscribed funding round contingent on agreeing

not to invest in competitors), *id.*, and the "where" (at the investment meetings where these funding negotiations took place), *id*. At the pleading stage, this level of detail is sufficient, particularly given that the details of these agreements are in Defendants' and its investors' exclusive possession and must be revealed through discovery. *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 763 (N.D. Cal. 2024) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact *to raise a reasonable expectation that discovery will reveal evidence* of illegal agreement.") (emphasis added, internal quotation marks omitted). Multiple news articles based on sources with knowledge, ¶ 201, may not suffice for extraordinary preliminary injunctive relief, but the FAC's allegations concerning OpenAI's conduct and Microsoft's intimate involvement in all aspects of OpenAI's activities render it *plausible* that there was an agreement. *See* ¶¶ 147, 154-61. This factual question merits discovery.

Microsoft incorrectly characterizes the agreement as vertical, arguing it and OpenAI are at different levels and not competitors, contrary to its admission that its Copilot chatbot is a "competitor" of OpenAI's ChatGPT. ¶ 225. Defendants collectively control 69% of the generative AI market, and collaborated specifically to block investment in competing ventures such as xAI, at the same level. ¶¶ 201, 216, 226. This is a horizontal restraint, not vertical, as it involves direct competitors jointly acting to deprive rivals (xAI) of essential capital funding, whether through a direct horizontal agreement, *PLS.Com*, 32 F.4th at 834-35, or a hub-and-spoke conspiracy under *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000); Statement of Interest of the United States and FTC, Dkt. 87 at 10-11 (explaining vertical elements do not defeat *per se* claim).

### 2.    *The FAC Pleads a Plausible Rule-of-Reason Violation*.

To state a claim for a rule-of-reason violation of Section 1, a plaintiff must plead conduct that has "a substantial anticompetitive effect that harms consumers" in a "relevant market" by defendants with the market power to cause such harm. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018). xAI pleads a rule-of-reason violation not based merely on Defendants' exclusive agreements, though that suffices to state a claim, *United States v. Microsoft Corp.*, 253 F.3d 34, 68-71 (D.C. Cir. 2001) (en banc), but the totality of their conduct. The proper rule-of-reason analysis

requires the Court to broadly evaluate *all* alleged anticompetitive restraints. "The whole point of the rule of reason is to furnish 'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." *NCAA v. Alston*, 594 U.S. 69, 97 (2021) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999) and citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) ("'[T]he factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited[.]'").

At the motion to dismiss stage, xAI's factual allegations are accepted as true. *See Iqbal*, 556 U.S. at 678. Microsoft's argument that the FAC's allegation that OpenAI sells directly to consumers is contradictory mischaracterizes the nature of the OpenAI-Microsoft exclusivity pled. Microsoft is the exclusive licensee of OpenAI's technology for incorporation into third-party products, while OpenAI may use its technology in its *own* products. ¶¶133, 227, 246. OpenAI's exclusive arrangement with Microsoft restricts OpenAI from licensing its technology to other third parties, including xAI. There is no contradiction, as Microsoft itself acknowledges. Mot. n.5.

Microsoft's factual argument regarding the absence of foreclosed competition for compute overlooks the FAC's allegations. Plaintiffs allege that Microsoft controls 24% of the global compute market, ¶ 217, and leveraged its significant market share to secure an exclusive arrangement with OpenAI, through which Microsoft gained control over OpenAI, ¶¶ 112, 147-72. The FAC further alleges that this exclusive relationship has harmed xAI by foreclosing access to Microsoft's compute on favorable terms comparable to those afforded OpenAI. ¶¶ 227, 246.

Microsoft's reliance on *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), ignores the market-specific nature of the analysis, and the FAC's allegations. While *Omega* found insufficient foreclosure, it involved a market with abundant competitive alternatives. *Id*. at 1163. Here, the generative AI market faces severe compute constraints, forcing xAI to construct its own compute infrastructure at extraordinary expense. ¶¶ 220, 227, 246. Regardless, a 24% market share supports foreclosure. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298 & n.5 (9th Cir. 1982) (recognizing a 24% market share supports liability).

Microsoft's challenge to the FAC's product market definition is also meritless. For antitrust

purposes, product market is defined to "encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The FAC explicitly defines the market as "generative AI models and platforms." ¶ 204. Its definition includes precise qualifying characteristics: technology that can "process natural language inputs and generate human-like outputs across multiple domains, while being adaptable to specific applications and providing a platform for independent developers to generate specialized models." ¶ 206. This is sufficiently specific and plausible to withstand dismissal at this preliminary stage.[4]

### 3.    *The FAC Plausibly Alleges Predatory Pricing and Inflated Compensation Agreements*.

A predatory pricing claim requires two elements: (1) the predatory price was below the predator's cost of production and (2) the predator had "a dangerous probability of recouping its investment in below-cost prices." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223-24 (1993). The FAC alleges: "Microsoft charges OpenAI far less than it costs to produce [compute]," ¶ 221; "OpenAI charges Microsoft and the public considerably less for its generative AI products than they cost to produce," ¶ 222; "Microsoft also charges the public considerably less for its generative AI than it costs to produce," ¶ 223; and "OpenAI is on track to lose $5 billion this year and losses are expected to soar to $14 billion per year by 2026," ¶ 222. This sufficiently pleads below-cost pricing. *See Brooke Grp.*, 509 U.S. at 222-24.

Microsoft's criticism that agreement on specific prices is not alleged misapprehends antitrust law. An agreement need not set specific prices to violate Section 1. *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966) (finding a Section 1 violation even though defendants did not agree on specific prices). The agreement alleged in the FAC—to price below cost to exclude competitors—is sufficient to state a claim under Section 1. *Id.*; ¶ 331(e)-(g).

Microsoft's argument that the FAC alleges no agreement, only parallel conduct, ignores its extensive allegations regarding Microsoft and OpenAI's extraordinary relationship. Microsoft

---

[4] Microsoft's contention that the distinction between "models and platforms" renders the market definition ambiguous mis-prioritizes technical precision over market realities. The FAC deliberately encompasses foundational models and their distribution platforms within a single relevant market, accurately reflecting how tech markets function, where competitive value derives from both the core technology (model) and delivery mechanisms to end users (platform). ¶¶ 205-06.

identifies OpenAI as its only "strategic partner," ¶ 225, wherein Microsoft exclusively provides OpenAI with compute at below-cost, while OpenAI exclusively provides Microsoft with AI technology at below-cost. ¶¶ 221-23. Microsoft's effective control over OpenAI, is evidenced, e.g., by Microsoft's decisive role in reinstating Altman and purging OpenAI's board. ¶¶ 147-72. These allegations transcend mere parallel conduct, revealing a coordinated strategy to price below cost to exclude competitors from the market, in violation of Section 1. *See Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (finding allegations of parallel conduct, and circumstantial evidence of coordination, satisfied Section 1 pleading requirements).

The FAC further alleges that Microsoft and OpenAI agreed to offer "vastly inflated compensation to hire AI-industry talent in excess of legitimate business needs to prevent competitors from hiring such personnel." ¶ 331(n). Microsoft's assertion that the FAC is insufficiently detailed ignores critical context and is incorrect. Given allegations of Microsoft and OpenAI's exclusive relationship, ¶¶ 147-72, and combined 69% control of the generative AI market, ¶ 216, the claim that they conspired to inflate compensation to block competitors from accessing essential talent is both plausible and well-supported by the FAC.

Microsoft's assertion that paying employees well is "procompetitive" mischaracterizes the FAC, which alleges they inflated compensation to choke competitors' access to necessary skilled labor, ¶ 331(n)—a brazenly anticompetitive agreement. *Cf. In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 988 (N.D. Ill. 2022) (holding agreement not to solicit employees a *per se* violation of Section 1); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 481 (W.D. Pa. 2019) (same).

### 4.   *The FAC's Other Allegations Support § 1 Liability.*

Microsoft's sundry Section 1 arguments fail for several reasons, but primarily because they disregard the compounding effect of *all* its anticompetitive conduct, as alleged in the FAC.

*First*, the FAC alleges that Microsoft's actions—exploiting OpenAI's non-profit status, ¶¶ 128, 331(j), strategic acquisition of substantial equity in the For-Profit Entities, ¶¶ 125, 147, 361, and interlocking directorates, ¶¶ 331(m), 373-74—directly impact the AI market, causing competitive injury, ¶¶ 227, 246. The FAC explains these coordinated actions undermined

competition by allowing Microsoft-OpenAI to systematically acquire, entrench, and weaponize market dominance. ¶¶ 113-45, 331. OpenAI abused its charitable form and mission to secure financing and technical talent necessary to develop leading technology, while working closely with Microsoft to convert this competitive advantage via an opaque web of For-Profit Entities into a market-dominating behemoth. ¶¶ 113, 310-11.

*Second*, the FAC explicitly alleges that Microsoft and OpenAI exchanged "confidential information and trade secrets, including intellectual property, customer lists, and pricing information, for the purpose of fixing prices and/or otherwise substantially lessening competition." ¶ 331(o). Such allegations satisfy pleading requirements, particularly where the precise content of these exchanges remains within Defendants' exclusive control until revealed in discovery.

*Third*, Microsoft's dismissive characterization of OpenAI's broken promises to Musk as irrelevant ignores the profound competitive consequences of this misconduct. The FAC alleges that Microsoft and OpenAI abused the taxpayer subsidies and regulatory forbearance afforded charities, and systematically abandoned the charity's foundational commitments to develop and open source its AI advancements for the public benefit, pivoting to a closed, mercenary structure designed to maximize their private gain. ¶¶ 14-47, 129-34, 178, 180. This strategic shift harms competition by preventing others from building upon OpenAI's technology, forces competitors to duplicate costly research, prevents consumer-benefitting interoperability, and raises market-wide barriers to entry. In essence, it weaponizes the innovations OpenAI developed under false promises of philanthropy and openness, directly enabling Microsoft and OpenAI to dominate the market.

**B.** **The FAC States a Plausible Claim Under § 2 of the Sherman Act (Count X).**

"To prevail on a § 2 monopoly claim," Plaintiffs are "required to prove that [Defendants]: (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power," and antitrust injury. *Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir. 1997). "To prevail on a § 2 attempt claim," Plaintiffs are "required to establish: (1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving monopoly power, and (4) causal antitrust injury." *Id.* (internal quotation markets omitted). Conspiracy to monopolize

requires specific intent, a "combination or conspiracy," and an "overt act" in furtherance thereof. *Paladin Assocs. v. Mont. Power Co*., 328 F.3d 1145, 1158 (9th Cir. 2003).

The FAC sufficiently alleges a joint monopolization scheme between Microsoft and OpenAI. ¶¶ 335-36. Microsoft's arguments are predicated on its erroneous belief that joint efforts to monopolize are not actionable. As the Supreme Court recognizes, Section 2 liability extends to joint action. *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) ("Monopoly power may be equally harmful whether it is the product of joint action or individual action."). A conspiracy to monopolize *necessarily* requires joint conduct. The only relevant case Microsoft cites does not contradict this clear, recent statement of the rule. In *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), the Ninth Circuit addressed oligopoly *pricing*—not market share, and even then, it held only that "oligopoly pricing standing *alone* does not prove that [a company] has market power." *Id.* (emphasis added). To the extent Microsoft's older, out-of-circuit case, *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005 (2d Cir. 1989), is inconsistent with the Supreme Court's ruling, it carries no weight in this Circuit.

Given the FAC's extensive allegations of coordinated conduct and the "de facto merger" between Microsoft and OpenAI, the Court should consider their combined market power and exclusionary conduct. ¶¶ 148-72, 241-42.[5] Indeed, they are so intertwined that Microsoft's CEO boasted: "We are in there. We are below them, above them, around them." ¶ 158. Even if joint monopolization claims were not actionable (they are), the FAC alleges a unitary enterprise, with OpenAI and Microsoft working hand-in-glove to wrongfully amass monopoly power.

*First,* the FAC explicitly alleges that together, Microsoft-OpenAI control "approximately 69% of the" AI market, ¶ 216, readily surpassing the threshold. *Eastman Kodak*, 125 F.3d at 1206 ("Courts generally require a 65% market share to establish a prima facie case of market power."); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir. 1980) (65% market share suffices); *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1073 (N.D. Cal. 2022) (same).

---

[5] While Microsoft attempts to paint OpenAI and Microsoft as competing at different market levels—and in some respects they do—the FAC makes clear that Microsoft and OpenAI are direct, horizontal competitors in the market for generative AI models and platforms, ¶¶ 226, 241-42, 331(k), a fact they conceded during preliminary injunction proceedings. Dkt. 65 at 6.

*Second,* the FAC details several forms of exclusionary conduct supporting a Section 2 claim:

1.    *Exclusive Computing Resources*: The FAC alleges Microsoft has leveraged its position as the exclusive provider of compute—"OpenAI's single most important raw material," ¶ 112—to exercise control over OpenAI and exclude competition. This strategic chokehold is precisely the type of exclusionary behavior Section 2 is designed to prevent. *Eastman Kodak*, 125 F.3d at 1208-09. While Microsoft points to the supposed availability of other compute suppliers, it ignores that by an agreement, alleged to have been wrongfully extracted, Microsoft is OpenAI's *exclusive* compute provider. ¶ 112. Even if labeled a partnership or investment, Microsoft's exclusive agreements that restrict competitors from key services, funding, and technology violate antitrust law. *Microsoft*, 253 F.3d at 70.

2.    *Predatory Pricing*: The FAC alleges that Microsoft prices its AI products and compute well below cost, for the deliberate "purpose of injuring competitors or destroying competition." ¶¶ 222-24, 346. Microsoft reportedly has a right to receive 100 times its original investment—approximately $1.4 trillion in profits—subject to 20% annual increases beginning in 2025. ¶ 196. There is thus a dangerous probability that Microsoft will recoup its investment once competitors are eliminated, otherwise Microsoft would not have invested another $750 million in October 2024. *See* FAC Ex. 25. This showing of below-cost pricing more than suffices on a motion to dismiss. *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 792 (N.D. Cal. 2020).

3.    *Investor Exclusivity*: The FAC alleges that Microsoft and OpenAI have conditioned investments in OpenAI on investors agreeing not to invest in competitors, like xAI. ¶ 201. This wrongful conduct directly restricts competitors' access to essential capital markets, constituting textbook exclusionary behavior prohibited under Section 2. *PLS.Com*, 32 F.4th at 833-35.

4.    *De Facto Merger*: The FAC details how Microsoft's acquisition of increasing control over OpenAI constitutes a de facto merger, substantially lessening competition. ¶ 331(k). Microsoft's dominance is starkly illustrated by its CEO's public boasts. ¶¶ 157-58. Even if, contrary to fact, none of the above conduct rose to the level of a violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, that would not be dispositive of this Section 2 claim. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 197 (3d Cir. 2005) ("[A] finding in favor of the

defendant under Section 1 of the Sherman Act and Section 3 of the Clayton Act, did not preclude

the application of evidence of exclusive dealing to support the Section 2 claim." (cleaned up)).

### C.    The FAC Plausibly Alleges Antitrust Injury.

The FAC details how xAI has suffered direct and concrete competitive harm stemming from

Microsoft's exclusionary conduct: investors have explicitly declined funding xAI due to OpenAI-

Microsoft's exclusionary Fund No Competitors Edict; xAI faces discriminatory pricing for essential

compute, on dramatically inferior terms; xAI experiences difficulty recruiting essential scientific

personnel because of the Microsoft-OpenAI's anticompetitive hiring practices; and Microsoft's

exclusive license of OpenAI's closed-source technology deliberately blocks competitors like xAI

from benefitting from it and catching up to OpenAI's substantial first-mover lead. ¶¶ 227, 246.

### D.    The FAC States a Plausible Claim Under the Unfair Practices Act (Count XII).

The UPA explicitly prohibits below-cost pricing when done for the purpose of injuring

competitors or competition. Cal. Bus. & Prof. Code § 17043; *Bay Guardian Co. v. New Times

Media LLC*, 187 Cal. App. 4th 438, 456 (2010) (proof of recoupment not required); Bus. & Prof.

Code § 17024 (UPA applies to services and intangibles). Plaintiffs adequately alleged Microsoft's

below-cost pricing strategy. The FAC alleges Microsoft charges OpenAI "far less than it costs to

produce" compute, citing specific costs for personnel, processors, real estate, and energy. ¶¶ 218-21.

With a 24% market share, and as OpenAI's exclusive provider, Microsoft supplies artificially low-

priced computing resources while OpenAI spends disproportionately little despite enormous

consumption. ¶¶ 217-19. Microsoft implemented this strategy "for the purpose of injuring

competitors or destroying competition." ¶ 344. Microsoft argues an unsupported, unreasonably

specific pleading standard. Plaintiffs need not provide granular details about Microsoft's expenses

before discovery, especially when the relevant cost and pricing data is exclusively in its control.

Defendants' contention that Plaintiffs failed to plead a "secret rebate/allowance" under

Section 17045 fails. The FAC alleges Microsoft provides "special services or privileges not

extended to all purchasers" of compute. ¶ 348. It details the secretive nature of these arrangements:

the opaque corporate structure of the OpenAI-Microsoft For-Profit Entities ¶¶ 5, 124, 146,

undisclosed terms of exclusive licensing agreements, ¶ 348, and concealed financial arrangements

1    shielding preferential pricing from scrutiny, *id*. These allegations collectively establish requisite

2    "secre[cy]" under Section 17045.

3         E.    **The FAC States Plausible Claims Under § 3 of the Clayton Act**
            **and § 16727 of the Cartwright Act (Counts XIII and XIV).**

4

5         Section 3 of the Clayton Act prohibits exclusive dealing that has a "tendency to foreclose

6    existing competitors or new entrants from competition in the covered portion of the relevant market

7    during the term of the agreement." *Omega*, 127 F.3d at 1162 (internal quotation marks omitted).[6]

8         Contrary to Microsoft's argument, neither OpenAI's exclusive provision to Microsoft of its

9    advanced AI models, ¶¶ 133-34, nor Microsoft's provision of compute to OpenAI, ¶ 112, can be

10   characterized as a mere "intangible." The FAC alleges that Microsoft's compute offerings involve

11   "tens of thousands of computer processors" housed in physical data centers requiring "significant

12   real estate and energy[.]" ¶¶ 218, 220. The hosting of OpenAI's models on these physical assets—

13   tangible goods and machinery—are likewise different from a mere "license." Unlike the pure

14   software license in *Pro Search Plus, LLC v. VFM Leonardo, Inc.,* 2013 WL 3936394, at *5 (C.D.

15   Cal. July 30, 2013), Microsoft's compute and OpenAI's models involve an extensive combination

16   of hardware, infrastructure, goods, machinery, and services that extend well beyond simple software

17   licensing. The Clayton Act's definitions of "goods," "machinery," and "commodities" demand an

18   appropriately expansive interpretation reflecting today's technology-driven economy and

19   contemporary commercial realities. *Cf. In re Data Gen. Corp. Antitrust Litig*., 490 F. Supp. 1089,

20   1124 (N.D. Cal. 1980) (finding genuine issues of material fact as to tying software and computer

21   processor sales). While the substantial physical infrastructure underlying generative AI compute

22   may defy simple categorization and require further factual development, at this preliminary stage,

23   all allegations must be viewed most favorably to Plaintiffs, *Iqbal*, 556 U.S. at 678, and thus, the

24   FAC's characterization of compute as a qualifying "good" controls.

25   _____

26   [6] Microsoft's argument that Plaintiffs' Section 16727 claim fails if their Clayton Act Section 3
     claim fails ignores California's distinct antitrust framework. The Cartwright Act requires
27   substantially lower market foreclosure—just 20% may suffice, *Fisherman's Wharf Bay Cruise
     Corp. v. Super. Ct.*, 114 Cal. App. 4th 309, 336-37 (2003)*,* while Section 16727 applies more
28   broadly to goods and services. *See, e.g., Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541-42
     (1998). Independent analysis of Plaintiffs' Section 16727 claim is thus required.

**F.      The FAC States a Plausible Claim Under § 7 of the Clayton Act (Count XV).**

Section 7 of the Clayton Act prohibits acquisitions where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The FAC alleges that Microsoft has acquired OpenAI equity, assets, and control in a manner that substantially lessens competition in the generative AI market. ¶ 361. Plaintiffs allege in detail Microsoft's substantial investments in OpenAI, ¶¶ 112, 147-48, 159, its acquisition of significant equity in the For-Profit Entities, ¶ 361, its escalating influence and control over OpenAI's operations, ¶¶ 147-72, and how Microsoft leveraged this control to steer OpenAI's decisions in ways that advance Microsoft's interests while undermining market competition, ¶¶ 156-61.

Microsoft's contention that its exclusive technology license and compute agreement fall outside Section 7 "asset" acquisitions incorrectly restricts the statute, which, as the Supreme Court has made clear, was expanded specifically to address efforts to evade review by structuring mergers as asset, rather than stock, acquisitions. *Brown Shoe Co. v. United States*, 370 U.S. 294, 316 (1962) ("no doubt that Congress…[wished] to include within the coverage of the Act the acquisition of assets no less than the acquisition of stock."). The practical difference between an exclusive IP license and assignment is paper-thin. *See, e.g.*, *Corbello v. DeVito*, 777 F.3d 1058, 1062 (9th Cir. 2015) ("Copyright law considers both exclusive licenses and assignments to be 'transfer[s] of copyright ownership.'") (quoting 17 U.S.C. § 101)). Microsoft's exclusive license of OpenAI's technology effectively transfers control to the exclusion of competitors, posing an "appreciable danger" of anticompetitive effects. *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys*, 778 F.3d 775, 783 (9th Cir. 2015). In any event, Microsoft's argument ignores its acquisition of significant *equity* in the For-Profit Entities, which is unambiguously an asset and is specifically alleged to substantially lessen competition. ¶¶ 2, 125, 145, 147, 361.

The FAC alleges Microsoft's acquisitions, including its massive stake in the For-Profit Entities, enabled by its "exclusive right to supply OpenAI's single most important raw material," ¶ 112, gave it "effective control over OpenAI—a de facto merger," ¶ 147, allowing it to coordinate anti-competitive strategies like the Fund No Competitors Edict, ¶ 201 & Ex. 25, and "exchanges of employees, information, and intellectual property," ¶ 331(k), harming competition, ¶¶ 214, 216,

331, 336. Microsoft asks the Court to privilege form over substance, focusing on technical transaction structures rather than anticompetitive effects, contrary to the principle that antitrust analysis should examine economic realities rather than formalistic distinctions. *See, e.g.*, *Reading*, *Int'l, Inc. v. Oaktree Cap. Mgmt.*, 317 F. Supp. 2d 301, 327-28 (S.D.N.Y. 2003) (rejecting reading of antitrust statute "elevate[s] form over substance").

### G.    The FAC States a Plausible Claim Under § 8 of the Clayton Act (Count XVI).

Section 8 of the Clayton Act prohibits a "person" from simultaneously serving as a director or officer of competing corporations. 15 U.S.C. § 19. The FAC alleges that both Deannah Templeton and Reid Hoffman served in capacities that violated this prohibition. ¶¶ 369-75. xAI acknowledges the Court dismissed as moot portions of this claim seeking *prospective* relief based on Templeton and Hoffman's resignations and indicated further briefing is not required. Dkt. 121 at 11 n.8. xAI maintains—with strong support from the United States and FTC—that the prospective Section 8 claim is not moot. Dkt. 87 at 4-6. xAI emphasizes that, even if the claims are currently moot, that does not eliminate its claim for damages resulting from the interlocks. Contrary to OpenAI's assertion, xAI pled injury, ¶¶ 227, 246, 380, from the unlawful interlock.

## II.    PLAINTIFFS PLEAD A PLAUSIBLE UCL CLAIM UNDER § 17200 (COUNT XVII).

The FAC alleges Microsoft violated the unlawful, unfair, and fraudulent business practices prongs of the UCL causing direct harm to Plaintiffs. Cal. Bus. & Prof. Code § 17200.

*Unlawful Business Practices*: To plead a claim under the unlawful prong of Section 17200, a plaintiff must allege that the defendant violated some other law, whether state, federal, or local. *See Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1383 (2010). The FAC details Microsoft's violations of numerous federal and state laws. ¶¶ 147, 227, 246, 331, 387 & Ex. 24.

*Unfair Business Practices*: "[A]n unfair business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1268 (2006) (internal quotation marks omitted). Microsoft's conduct constitutes textbook unfairness under the UCL, threatening competition through antitrust violations. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). The FAC alleges Microsoft knowingly

capitalized on misappropriated charitable assets, ¶¶ 129-35, and participated in exclusionary

arrangements, ¶¶ 112, 133, 331(b)-(d), to secure monopolistic dominance in the AI market, ¶¶ 336,

340, epitomizing unfair business practices. *Cel-Tech.*, 20 Cal. 4th at 187.

*Fraudulent Business Practices*: The fraudulent prong requires "only a showing that

members of the public are likely to be deceived" by a fraudulent practice. *See Lueras v. BAC Home

Loans Serv'g, LP*, 221 Cal. App. 4th 49, 81 (2013). The FAC alleges Microsoft engaged in

fraudulent business practices by maintaining "a public appearance of separate entities" while

"Microsoft is now OpenAI, and OpenAI, Microsoft." ¶ 147. This deception extends to regulatory

filings where Microsoft listed OpenAI as both "competitor" and "strategic partner." ¶ 225.

Microsoft publicly portrays its profit structure with OpenAI as having a "100 times investment"

cap. ¶ 196. But this limit "is subject to increase 20% annually beginning in 2025," ¶¶ 196-98,

allowing Microsoft to falsely claim a limited financial interest while securing an effectively

unlimited one. ¶¶ 197-98 (explaining how its supposed profit caps are effectively unlimited).

Collectively, this deceptive facade enabled Microsoft to exploit OpenAI's charitable assets and

idealistic safety-conscious AI personnel who believed they served the public interest, while their

innovations lined Microsoft's pockets, ¶¶ 134, 185-92, misleading consumers, including as to

product safety, and disguising Microsoft's control and overriding profit motive, ¶¶ 157-58, 169,

172, 393-401.

Finally, Plaintiffs' standing rests on concrete, particularized injuries directly resulting from

Microsoft's UCL violations. Under Cal. Bus. & Prof. Code § 17204, a UCL claim requires "injury

in fact and [loss of] money or property." Here, Musk suffered quantifiable financial harm when his

donations and the charity's technology were converted for Microsoft's gain. ¶¶ 389, 489. xAI

suffered competitive harm, including increased development costs, restricted access to compute and

essential capital, and restricted market opportunities due to Microsoft's exclusive arrangements with

OpenAI. ¶¶ 227, 246. These injuries directly trace to Microsoft's violations of all three UCL prongs.

**III.     THE FAC PLEADS A PLAUSIBLE QUASI-CONTRACT CLAIM (COUNT IV).**

Quasi-contract/unjust enrichment applies when no contract exists. *Prakashpalan v.

Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1132 (2014). Its elements are receipt of a

benefit by the defendant from the plaintiff, which would be inequitable to retain. *Id.*; *Lectrodryer v. Seoul Bank*, 77 Cal. App. 4th 723, 726 (2000). A simple, "straightforward statement" of the claim will do. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (allegations that defendant "had 'entic[ed]' plaintiffs to purchase their products through 'false and misleading' labeling, and that [defendant] was 'unjustly enriched' as a result," are sufficient). The FAC establishes Microsoft's deliberate exploitation of charitable assets developed under false pretenses. ¶¶ 277-83. Microsoft strategically positioned itself with OpenAI to harvest technology developed with Musk's misappropriated donations, by the like-minded scientists he recruited. ¶¶ 93, 98-99, 112, 129-35, 146-47.

Microsoft's claim that it committed "no bad act" ignores allegations that it intentionally participated in a scheme to loot charitable assets for private commercial gain. ¶¶ 280-81. Microsoft actively engineered the transfer of valuable charitable assets to the For-Profit Entities in which it secured substantial equity. ¶¶ 133, 147, 178. The timing of Microsoft's involvement after Musk's resources had established OpenAI's technological foundation, ¶¶ 82-96, 99, evidences its strategy to capture OpenAI's value it knew had been fraudulently obtained. ¶¶ 280-83.

## IV.    THE FAC PLAUSIBLY PLEADS TORTIOUS INTERFERENCE (COUNT V).

The FAC alleges: (1) a valid contract between Musk and OpenAI/Altman, ¶¶ 251-52; (2) Microsoft's knowledge thereof, ¶ 285; (3) Microsoft's intentional acts designed to disrupt its performance, ¶¶ 288-89; (4) actual breach, ¶ 254; and (5) resulting damage, ¶¶ 256-57. *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (reciting elements).

Microsoft's arguments fail on multiple grounds. *First*, the formation of a contract is a factual question not properly resolved on a motion to dismiss. *Voyager Indem. Ins. Co. v. Goldsmith*, 733 F. Supp. 3d 905, 919 (C.D. Cal. 2024) (denying Rule 12(b)(6) motion as to contract formation). The FAC details specific terms, consideration, and mutual assent between Musk and OpenAI/Altman. ¶¶ 251-52. *Second*, Microsoft's due diligence before investing billions in OpenAI would have revealed its founding agreement with Musk. ¶ 285. *Third*, the FAC alleges Microsoft's intentional acts to disrupt that agreement by leveraging its position as OpenAI's exclusive compute supplier to induce OpenAI's breach of its promises to maintain its charitable mission and open source its

technology. ¶ 288. Microsoft's pressure campaign achieved its intended outcome—OpenAI abandoned its contractual obligations. ¶¶ 112, 133, 147, 178-80. The breach deprived Musk of the precise benefit he bargained for—a charitable organization advancing open source, safe AI for the public's benefit, not private commercial advantage. ¶¶ 112, 133, 173-80, 288-89.

## V. THE FAC PLEADS PLAUSIBLE AIDING AND ABETTING CLAIMS (COUNTS VIII, XXI, XXIV).

The FAC pleads each element of Microsoft's liability for aiding and abetting both fraud (Count VIII) and breach of fiduciary duty (Counts XXI and XXIV), alleging Microsoft: (1) knew of underlying wrongful conduct, ¶¶ 322-23, 431-32, 474-75; (2) substantially assisted such conduct, ¶¶ 325, 434, 477; (3) with the intent to facilitate the wrongdoing, ¶¶ 287, 431-35, 474-77.

The FAC satisfies Fed. R. Civ. P. 9(b)'s particularity requirement by detailing Microsoft's role in the fraudulent scheme. *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (plaintiff must "identify the role of each defendant in the alleged fraudulent scheme"). Microsoft's argument that it did not make the misrepresentations to Musk is immaterial, as it knowingly profited from them and actively concealed the scheme. ¶¶ 322-23; *Swartz*, 476 F.3d at 764 ("no absolute requirement that…complaint must identify false statements made by each and every defendant").

Rule 9(b) is satisfied when the complaint identifies circumstances constituting fraud so a defendant can prepare an adequate answer. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The FAC provides ample notice of Microsoft's misconduct with specific details about its knowledge. ¶¶ 285, 323, 432. This knowledge derived from Microsoft's close relationship with Altman and due diligence before investing billions, revealed the conditions under which Musk co-founded and contributed to the charity and Altman/Brockman's fiduciary breaches. ¶ 323. The FAC describes Microsoft's substantial assistance through exclusive agreements and the strategic transfer of OpenAI's technology and staff to the For-Profit Entities, deliberately violating OpenAI's charitable promises, ¶¶ 130-33, 325, 434, 477, enabling investments for equity, ¶¶ 147-48, 159, leveraging its position to reinstate Altman and purge the charity's board after it fired him, ¶¶ 154-61, 325—all supporting Microsoft's pivotal role in the scheme, ¶¶ 323, 432, 475.

Musk has standing to pursue these claims as a substantial donor with a special interest in the

charitable trust. ¶¶ 237-38; *see Holt v. Coll. of Osteopathic Phys. & Surgeons*, 61 Cal. 2d 750, 753 (1964) (acknowledging donors' special interest standing); *L.B. Rsch. & Educ. Found. v. UCLA Found.*, 130 Cal. App. 4th 171, 180 (2005) (recognizing donor standing in similar context). Musk has suffered concrete injury from Microsoft's conduct, which aided and abetted Altman and Brockman's violations of their commitments to Musk and the charity. ¶¶ 251-52. The FAC specifically alleges direct, particularized harm to Musk resulting from Microsoft's participation in the scheme, including the nullification of Musk's substantial charitable contributions and reputational damage. ¶¶ 256, 273, 281, 326. *See Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 323 (2011) (economic injury suffices for standing).

## VI.    THE FAC PLEADS PLAUSIBLE RICO CLAIMS (COUNT XXV-XXVI).

Microsoft challenges Musk's RICO claims on only three discrete grounds, addressed in turn.

### A.    The FAC Plausibly Alleges Predicate Acts of Wire Fraud.

To establish RICO violations under 18 U.S.C. § 1962(a)-(c), a plaintiff must plead a pattern of racketeering activity (known as 'predicate acts'). The Ninth Circuit has recognized that mail or wire fraud can be established under a "co-schemer" theory of liability. *See United States v. Stapleton,* 293 F.3d 1111, 1117 (9th Cir. 2002). "[A] defendant may be held liable for mail or wire fraud if (1) the defendant was a knowing participant in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) a co-schemer committed acts of mail or wire fraud during the defendant's participation in the scheme, and those acts were within the scope of the scheme." *In re Volkswagen "Clean Diesel" Mktg.,* 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30, 2017) (citing *Stapleton*, 293 F.3d at 1117-18). "So long as these requirements are met, a defendant need not make any fraudulent representations itself…." *LD v. United Behav. Health*, No. 20-CV-2254 (YGR), 2021 WL 930624, at *6 (N.D. Cal. Mar. 11, 2021) (citing *In re Volkswagen*, 2017 WL 4890594, at *12).

*First*, Microsoft's role in the wire fraud scheme involved helping Defendants misappropriate, conceal, and monetize OpenAI's technology developed with Musk's charitable contributions. ¶¶ 325, 496-98. Microsoft's "group pleading" protests ring hollow given how the FAC meticulously details Microsoft's specific participation in the misconduct, and regardless,

group pleading would be permissible here. *DeSoto Cab Co. v. Uber Techs., Inc.*, 2018 WL 10247483, at *15 (N.D. Cal. Sept. 24, 2018) ("so-called 'group pleading' is not fatal as long as the complaint gives defendants fair notice"); *Russo v. Fed. Med. Servs.*, 744 F. Supp. 3d 914, 922 (N.D. Cal. 2024) ("Collective allegations can be sufficient, however, if the claims involve actors engaged in the same or similar conduct."); *cf. Corazon v. Aurora Loan Servs.,* 2011 WL 1740099, at *4 (N.D. Cal. May 5, 2011) (group pleading improper where plaintiff listed *over fifty* defendants and referred only to "defendants" in almost all allegations).

The FAC alleges *Microsoft's* knowing participation: "Microsoft...[was] aware of...[Altman/ Brockman's] unlawful conduct," ¶ 496, Microsoft "had actual knowledge" of the fraud as its "$13.75 billion" investment due diligence would have required review of "OpenAI, Inc.'s Certificate of Incorporation and regulatory filing," ¶ 323, and knowledge of "the charitable purpose for which Musk co-founded the non-profit," ¶ 285. Microsoft CEO Nadella's statement confirms its close involvement: "We are in there. We are below them, above them, around them." ¶ 158.

*Second*, under Rule 9(b), intent need only be alleged generally, as the Ninth Circuit does not require "absolute particularity or a recital of the evidence." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). Given Microsoft's knowledge of OpenAI's founding promises to Musk and emphatic charitable mission, the FAC's allegations detailing Microsoft's contravening actions demonstrate its fraudulent intent: Microsoft provided "substantial assistance ...to loot OpenAI, Inc. of its intellectual property and employees, drafting and executing exclusive licensing and other contracts contrary to the purposes of OpenAI, Inc." ¶ 325. Microsoft participated in "the For-Profit Entities' reshuffling of OpenAI, Inc.'s assets…[which] served to conveniently shield [Defendants] and their scheme from public scrutiny and to evade the financial disclosures non-profits like OpenAI, Inc. must make." ¶ 498. Microsoft's extraordinary response to its co-schemer Altman's ouster further shows intent. When OpenAI's board fired Altman, Microsoft's CEO "was furious," ¶ 154, and immediately orchestrated a pressure campaign, hiring Altman and Brockman, and "actively solicited OpenAI's employees to leave," ¶ 156. Microsoft leveraged its position as "OpenAI's exclusive compute supplier and primary current funder," ¶ 288 "to threaten and pressure OpenAI, Inc.'s Board to have Altman quickly reinstated," ¶ 523. Upon

Altman's return, Microsoft "demanded the resignation" of opposing board members and "purged those who ousted Altman," replacing them with "big fans of Altman," ¶¶ 161, 167, 524.

*Third*, Microsoft's participation in the wire fraud scheme alongside co-schemers Altman and Brockman is sufficient for liability regardless of whether Microsoft made misrepresentations. *See In re Volkswagen*, 2017 WL 4890594, at *12 ("each member of the scheme does not need to make a separate misrepresentation"), ¶¶ 502-04. The FAC alleges "Microsoft…aided and abetted the continuation of [Altman/Brockman's] unlawful conduct by…providing capital, corporate structure(s), and advice and encouragement to exploit OpenAI, Inc. and its assets for Defendants' enrichment[.]" ¶ 496. This scheme centered on "the For-Profit Entities…the foundation of Defendants' scheme to control, co-opt, and cash in on OpenAI, Inc.'s valuable technology." ¶ 497. Defendants, including "Microsoft, relied on wires to invest [Musk's] funds in furtherance of their fraudulent scheme[.]" ¶ 492. Microsoft "invested $13.75 billion" in this corporate web, ¶ 323, and "Microsoft…further participated by siphoning off and exploiting OpenAI, Inc.'s" assets "and by facilitating and concealing Defendants' profiteering," ¶ 496. Moreover, "Microsoft owns a significant stake in…the entity to which OpenAI, Inc.'s proprietary intellectual property was diverted," ¶ 125, and played a key role in the conversion of OpenAI into a for-profit giant, without any regulatory approval, from which Microsoft stands to make hundreds of billions. ¶¶ 196-98.

### B.    The FAC Alleges Microsoft's Conduct in the Enterprise.

Microsoft incorrectly asserts that Musk failed to allege its participation in the "operation or management" of the RICO enterprise. But to satisfy this requirement, a plaintiff need only allege that the defendant had "some part in directing [the enterprise's] affairs." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (citation and internal quotation marks omitted). "An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it…." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993). The FAC details Microsoft's central role in directing the enterprise's affairs, including: (1) making OpenAI "inextricably dependent on Microsoft's cloud computing system," ¶¶ 98-99; (2) leveraging its position as "OpenAI's exclusive compute supplier and primary current funder," ¶ 288; (3) forcefully intervening when OpenAI's board fired Altman to reinstate him, ¶¶ 156-59; (4) forcing the resignation of independent OpenAI

board members who fired Altman, ¶¶ 160-61; and (5) securing a non-voting board seat to "keep a close eye on its non-profit golden goose," ¶ 168. Additionally, Hoffman, simultaneously on Microsoft's and OpenAI's boards for five years until March 2023, ¶¶ 163-66, 374-76, served as Microsoft's agent in directing the enterprise's affairs, ¶ 375. Thus, Microsoft's CEO could claim as to the OpenAI enterprise to be "below them, above them, [and] around them." ¶ 158.

Given all of the above, Microsoft's claim of merely participating in its own affairs fails on its face. The FAC establishes much more than a casual association; it demonstrates Microsoft's concerted infiltration and participation in directing and controlling the OpenAI enterprise's affairs.

**C.    The FAC Plausibly Alleges a RICO Conspiracy Under § 1962(d).**

To establish a RICO conspiracy claim, a plaintiff must allege that the defendant was "aware of the essential nature and scope of the enterprise and intended to participate in it." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). The FAC addresses this by detailing Defendants' knowledge of and agreement to engage in the fraudulent scheme. ¶¶ 82-86, 98-99, 124-27, 133-34, 147-48, 304-15. Having properly alleged violations of § 1962(a)-(c), the FAC establishes a viable claim for RICO conspiracy under § 1962(d). The FAC describes how Defendants agreed to participate in a scheme involving wire fraud, each with a particular role. ¶¶ 494-502, 532-36. Altman and Brockman made fraudulent representations to secure Musk's contributions, ¶¶ 82-90, 304-15; the For-Profit Entities exploited OpenAI, Inc.'s fraudulently obtained assets, ¶¶ 113-32, 241-42; and Microsoft supplied funding and essential resources for the operation in exchange for major equity and exclusive access to OpenAI's technology, ¶¶ 98-99, 112, 133-34, 147-61. The FAC's allegations that all Defendants knowingly consented to participate in the scheme are sufficient to state a claim under § 1962(d). ¶¶ 486-506, 532-37; *see In re Chrysler-Dodge-Jeep Ecodiesel Mktg.*, 295 F. Supp. 3d 927, 984 (N.D. Cal. 2018); *Natomas Gardens Inv. Grp. v. Sinadinos*, 710 F. Supp. 2d 1008, 1022-23 (E.D. Cal. 2010).

**CONCLUSION**

For the foregoing reasons, Microsoft's motion should be denied except as to Musk's individual antitrust claims and Count XXIV.

1

DATED: March 24, 2025

Respectfully Submitted,

2

TOBEROFF & ASSOCIATES, P.C.

3

   */s/ Marc Toberoff*

4

Marc Toberoff

5

*Attorneys for Plaintiffs Elon Musk, Shivon Zilis, and X.AI Corp.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24