1  Marc Toberoff (S.B. #188547)
2  *mtoberoff@toberoffandassociates.com*
   Jaymie Parkkinen (S.B. #318394)
3  *jparkkinen@toberoffandassociates.com*
   TOBEROFF & ASSOCIATES, P.C.
4  23823 Malibu Road, Suite 50-363
   Malibu, CA 90265
5  Telephone: (310) 246-3333
   Facsimile: (310) 246-3101
6
7  *Attorneys for Plaintiffs Elon Musk,*
   *Shivon Zilis, and X.AI Corp.*
8
                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
10
11 ELON MUSK, et al.,                         Case No. 4:24-cv-04722-YGR

12              Plaintiffs,                    Assigned to Hon. Yvonne Gonzalez Rogers

13      v.                                     **PLAINTIFFS' OPPOSITION TO**
                                               **OPENAI DEFENDANTS' MOTION TO**
14 SAMUEL ALTMAN, et al.,                      **DISMISS**

15              Defendants.                    Date:    May 28, 2025
16                                             Time:    10:00 a.m.
                                               Place:   Courtroom 1 (4th Fl.)
17                                                      1301 Clay St.
                                                       Oakland, CA 94612
18
19
20
21
22
23
24
25
26
27
28

**STATEMENT OF ISSUES TO BE DECIDED**

1.　　Whether Plaintiff Elon Musk's contract claims (Counts I, II, III, and V) should be sustained based on well-pled allegations in the First Amended Complaint of (i) an enforceable agreement with specific terms conveyed in communications that collectively memorialize the agreement, (ii) mutual assent evidenced by direct statements including "Agree on all," (iii) adequate consideration, including Musk's over $44 million in contributions plus other valuable support, and (iv) breach due to Defendants' systematic conversion of the OpenAI, Inc. non-profit to a for-profit enterprise.

2.　　Whether Musk's quasi-contract/unjust enrichment claim (Count IV) adequately alleges (i) Defendants' receipt of benefits derived from misappropriated charitable assets, (ii) their deliberate exploitation for private gain of technology developed with Musk's charitable contributions contrary to the charity's explicit mission, and (iii) the inequity of allowing Defendants to retain benefits from this wrongful conduct.

3.　　Whether Plaintiffs' fraud claims (Counts VII and VIII) satisfy Fed. R. Civ. P. 9(b) by (i) specific allegations regarding false representations about OpenAI's non-profit form, mission, and charitable purpose, (ii) particularized and plausible pleading of fraudulent intent, and as demonstrated by contemporaneous for-profit conversion plans, and (iii) timely filing under the discovery rule, as Defendants' scheme was deliberately concealed and only recently revealed.

4.　　Whether Plaintiffs' civil RICO claims (Counts XXV and XXVI) adequately plead (i) predicate acts of wire fraud with the required specificity regarding who, what, when, where, and how, (ii) distinctiveness between RICO "persons" (Sam Altman and Greg Brockman) and the "enterprise" (OpenAI, Inc.), (iii) investment-specific injury under § 1962(a), (iv) control-specific injury under § 1962(b), and (v) a conspiracy among all Defendants.

5.　　Whether Musk has standing to bring claims for breach of charitable trust (Count XX), constructive fraud (Count VI), and aiding and abetting breach of fiduciary duty (Count XXI) given (i) the Court's previous ruling confirming standing for breach of charitable trust, and (ii) Defendants' breach of confidential/fiduciary relationships with Musk individually.

6.      Whether Plaintiffs' derivative claims (Counts XXII-XXIV) should be sustained based on (i) Musk and Shivon Zilis' standing as former members of OpenAI during the alleged misconduct, (ii) satisfaction of the demand requirement through specific allegations of demands made and demand futility due to adverse board domination, and (iii) factually detailed allegations of breach of fiduciary duty and self-dealing.

7.      Whether Plaintiffs' false advertising claims (Counts XVIII and XIX) properly allege (i) commercial statements about the safety of OpenAI's products designed to drive consumer adoption, (ii) falsity through evidence of OpenAI sidelining safety to rush products to market, and (iii) direct harm to xAI from the resulting diversion of customers, and to Musk from OpenAI's fraudulent solicitation of his charitable contributions.

8.      Whether Plaintiffs' claim under Section 1 of the Sherman Act (Count IX) and Section 16720 of the Cartwright Act (Count XI) properly allege (i) *per se* unlawful group boycotts targeting investment in xAI, (ii) Microsoft-OpenAI's below-cost pricing strategies; (iii) anticompetitive joint conduct, and (iv) substantial market power, given Microsoft-OpenAI's 69% market share.

9.      Whether Plaintiffs' claim under Section 2 of the Sherman Act (Count X) sufficiently alleges (i) Microsoft-OpenAI's joint monopolization with an approximately 69% market share, (ii) exclusionary conduct, including Microsoft's agreement to be OpenAI's exclusive provider of compute resources, and OpenAI's exclusive license of its technology to Microsoft, (iii) predatory pricing as to Microsoft's provision of compute to OpenAI at below-cost and OpenAI's below-cost products, (iv) group boycott restricting xAI's access to capital markets, and (v) Microsoft-OpenAI's de facto merger, substantially lessening competition.

10.      Whether Plaintiffs' Unfair Practices Act claim (Count XII) adequately alleges (i) below-cost pricing with OpenAI projected to lose $5 billion this year and $14 billion by 2026, and (ii) secret rebates through preferential pricing arrangements not extended to competitors.

11.      Whether Plaintiffs' claim under Section 3 of the Clayton Act (Count XIII) and Section 16727 of the Cartwright Act (Count XIV) adequately plead (i) Microsoft's compute services and OpenAI's advanced AI models, both involving "tens of thousands of computer

processors" in physical data centers constitute tangible "goods" or "commodities," and (ii) the substantial restriction of competition due to Microsoft's agreement to be OpenAI's exclusive provider of compute and OpenAI's agreement to exclusively provide Microsoft with its advanced AI models.

12.     Whether Plaintiffs claim under Section 7 of the Clayton Act (Count XV) sufficiently alleges (i) Microsoft's acquisition of significant equity in the For-Profit Entities, (ii) exclusive licensing effectively transferring control over OpenAI's technology to Microsoft, and (iii) Microsoft's escalating influence and control over OpenAI's operations and governance constituting a "de facto merger."

13.     Whether Plaintiffs' claim under Section 8 of the Clayton Act (Count XVI) adequately alleges interlocking directorates that harmed competition through the "exclusive exchange between OpenAI and Microsoft of competitively sensitive information," supporting damages.

14.     Whether Plaintiffs' antitrust claims (Counts IX-XVI) adequately allege antitrust injury due to (i) restriction of capital markets via Defendants' group boycott, (ii) discriminatory compute pricing terms; (iii) anticompetitive hiring practices, and (iv) exclusive licensing arrangements that directly harm xAI's competitive position.

15.     Whether Plaintiffs' accessory claims for tortious interference with contract (Count V), aiding and abetting fraud (Count VIII), and aiding and abetting breach of fiduciary duty (Counts XXI and XXIV) are properly pled with (i) allegations that the For-Profit Entities are legally distinct actors with separate economic interests, (ii) specific factual allegations of substantial assistance, and (iii) timeliness under the discovery rule.

16.     Whether Plaintiffs' claim under California's Unfair Competition Law (Count XVII) is properly pled by (i) allegations of specific economic injury to Musk and competitive injury to xAI, (ii) detailed factual allegations of conduct violating all three UCL prongs, and (iii) alongside other causes of action based on the same unlawful conduct, as permitted under California law.

# **TABLE OF CONTENTS**

                                                                                    **Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ......................................................................................1

    A.    The Founding of OpenAI As A Non-Profit Organization.............................1

    B.    Defendants' Scheme To Convert OpenAI Into A
          For-Profit Enterprise. ...................................................................................2

    C.    Defendants Loot The Non-Profit's Assets. ..................................................3

    D.    Microsoft's Control Over OpenAI. ..............................................................3

    E.    Abandonment of OpenAI's Core Principles. ...............................................4

    F.    Anticompetitive Conduct. ............................................................................4

LEGAL STANDARD..............................................................................................5

ARGUMENT ...........................................................................................................5

I.      MUSK PLAUSIBLY PLEADS BREACH OF CONTRACT (COUNT I). .........5

    A.    The FAC Plausibly Alleges the Formation of an Express Contract............5

          1.    *The Well-Pled Contract Terms are Clear and Definite.*...................5

          2.    *Mutual Assent Is Plausibly Alleged.* ..............................................6

          3.    *Consideration Is Plausibly Alleged.* ...............................................8

    B.    The FAC Plausibly Alleges Breach of Contract. .........................................9

II.    MUSK PLAUSIBLY PLEADS AN IMPLIED-IN-FACT CONTRACT (COUNT II).......9

III.   MUSK PLAUSIBLY PLEADS A BREACH OF THE IMPLIED COVENANT
       OF GOOD FAITH AND FAIR DEALING (COUNT III). ................................10

IV.   MUSK PLAUSIBLY PLEADS QUASI-CONTRACT/UNJUST ENRICHMENT
       (COUNT IV).....................................................................................................11

V.    MUSK PLAUSIBLY PLEADS FRAUD (COUNTS VI-VII). ..........................12

    A.    The FAC Plausibly Alleges Fraud. .............................................................12

    B.    Musk Has Standing to Bring a Constructive Fraud Claim..........................14

CASE NO. 24-CV-04722-YGR
PLS.' OPPOSITION TO OAI MTD

VI.   MUSK PLAUSIBLY PLEADS RICO CLAIMS (COUNTS XXV-XXVI). ......................14

    A.   The FAC Plausibly Alleges Predicate Acts of Wire Fraud. ......................................15

        1.   *The FAC Plausibly Alleges Falsity and Fraudulent Intent.* ..............................16

    B.   The FAC Alleges Distinctiveness Between RICO "Persons" and "Enterprise." .......16

    C.   The FAC Plausibly Pleads Investment-Specific Injury Under § 1962(a). ................17

    D.   The FAC Plausibly Pleads Acquisition or Control-Specific Injury
        Under § 1962(b). .......................................................................................................18

    E.   The FAC Plausibly Alleges a RICO Conspiracy Under § 1962(d) ..........................18

VII.  MUSK PLAUSIBLY PLEADS A BREACH OF CHARITABLE TRUST
     (COUNT XX). ................................................................................................................19

VIII. FALSE ADVERTISING CLAIMS (COUNTS XVIII & XIX) ARE WELL PLED. .........19

    A.   The FAC Alleges Commercial Advertising or Promotion. ......................................19

    B.   The FAC Plausibly Alleges False and Misleading Statements. ................................20

    C.   The FAC Plausibly Alleges Commercial Injury. ....................................................21

IX.   MUSK AND ZILIS HAVE STANDING TO BRING WELL-PLED
     DERIVATIVE CLAIMS (COUNTS XXII-XXIV) .......................................................22

    A.   Musk and Zilis Have Standing to Assert Derivative Claims. ..................................22

        1.   *State Law Controls Derivative Standing for Plaintiffs' State Law Claims;*
            *Rule 23.1 Governs Only the Manner of Pleading.* ...........................................22

        2.   *California Law Provides Standing for Musk and Zilis.* ...................................22

    B.   Musk and Zilis Plausibly Plead Breach of Fiduciary Duty (Count XXII). ...............23

    C.   Musk and Zilis Plausibly Plead a Claim for Self-Dealing (Count XXIII). ...............24

X.    XAI HAS PLED PLAUSIBLE ANTITRUST CLAIMS. ...............................................24

    A.   xAI Plausibly Alleges Injury. ..................................................................................24

    B.   The FAC Pleads Plausible *Per Se* and Rule-of-Reason Violations of § 1 of
        the Sherman Act and § 16720 of the Cartwright Act (Counts IX and XI) ................25

        1.   *The FAC Plausibly Alleges a* Per Se *Violation* ...............................................25

        2.   *The FAC Pleads a Plausible Rule-of-Reason Violation.* ..................................27

C.    The FAC's Other Allegations Support § 1 Liability. ...................................................27

D.    The FAC Pleads a Plausible Claim Under § 8 of the Clayton Act (Count XVI). .......28

E.    The FAC Pleads a Plausible Claim Under § 2 of the Sherman Act (Count X)...........28

F.    The FAC Pleads Plausible Predatory Pricing Claims (Counts IX, X, XII)................29

G.    The FAC Pleads Plausible Claims Under § 3 of the Clayton Act and
      § 16727 of the Cartwright Act (Counts XIII and XIV)............................................30

H.    The FAC Pleads a Plausible Claim Under § 7 of the Clayton Act (Count XV). .......31

XI.   OPENAI'S CHALLENGE TO CLAIMS FOR AIDING & ABETTING AND
      UNFAIR COMPETITION FAILS (COUNTS V, VIII, XVII, XXI, & XXIV). .................32

      A.    The Accessory Claims Are Plausibly Pled and Independently Viable. ....................32

      B.    The UCL Claim Is Plausibly Pled. ..........................................................................34

CONCLUSION..............................................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander v. Codemasters Grp.*,
    104 Cal. App. 4th 129 (2002) ........................................................................ 8

*Am. Needle, Inc. v. NFL*,
    560 U.S. 183 (2010) ............................................................................... 29, 31

*Andrews Farms v. Calcot, Ltd.*,
    527 F. Supp. 2d 1239 (E.D. Cal. 2007) ....................................................... 18

*Anunziato v. eMachines, Inc.*,
    402 F. Supp. 2d 1133 (C.D. Cal. 2005) ....................................................... 20

*Asahi Kasei Pharma Corp. v. Actelion Ltd.*,
    222 Cal. App. 4th 945 (2013) ...................................................................... 32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 5

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) ................................................................. 11, 12

*Bader v. Anderson*,
    179 Cal. App. 4th 775 (2009) ...................................................................... 23

*Bay Guardian Co. v. New Times Media LLC*,
    187 Cal. App. 4th 438 (2010) ...................................................................... 29

*Beatty v. Oakland Sheet Metal Supply Co.*,
    111 Cal. App. 2d 53 (1952) ........................................................................... 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 5, 26

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..................................................................... 30

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ............................................................................... 29, 30

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ..................................................................................... 31

*Burch v. Premier Homes, LLC*,
    199 Cal. App. 4th 730 (2011) ........................................................................ 6

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
    2 Cal. 4th 342 (1992) ............................................................................................ 10, 11

*Casey v. U.S. Bank Nat. Assn.*,
    127 Cal. App. 4th 1138 (2005) ............................................................................... 33

*Cedric Kushner Promotions v. King*,
    533 U.S. 158 (2001) ................................................................................................ 16

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ............................................................................................ 34

*Chapman v. Skype Inc.*,
    220 Cal. App. 4th 217 (2013) ................................................................................. 19

*Cheeks v. Fort Myer Constr. Corp.*,
    216 F. Supp. 3d 146 (D.D.C. 2016) ....................................................................... 28

*Coley v. Eskaton*,
    51 Cal. App. 5th 943 (2020) ................................................................................... 23

*Cont'l Airlines, Inc. v. McDonnell Douglas Corp.*,
    216 Cal. App. 3d 388 (1989) .................................................................................. 20

*Copeland v. Energizer Holdings, Inc.*,
    716 F. Supp. 3d 749 (N.D. Cal. 2024) .............................................................. 26, 27

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) ................................................................................................ 31

*Corbello v. DeVito*,
    777 F.3d 1058 (9th Cir. 2015) ................................................................................ 32

*Creative Dimensions In Mgmt., Inc. v. Thomas Grp., Inc.*,
    No. 96-CV-6318, 1997 WL 633684 (E.D. Pa. Sept. 30, 1997) .............................. 17

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) .................................................................................. 25

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) ................................................................................ 15

*Eller v. City of Santa Rosa*,
    No. 10-CV-1094 TEH, 2009 WL 3517610 (N.D. Cal. Oct. 23, 2009) ...................... 7

*Engel v. U.S. Dep't of Navy*,
    No. 19-CV-2077 CAB, 2021 WL 1056560 (S.D. Cal. Mar. 18, 2021) ..................... 8

*Faigin v. Signature Grp. Holdings, Inc.*,
    211 Cal. App. 4th 726 (2012) ................................................................................. 10

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct.*,
114 Cal. App. 4th 309 (2003) ................................................................. 30

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
55 Cal. App. 5th 381 (2020) .................................................................. 25

*Fleming v. Coverstone*,
No. 08-CV-0355 WQH, 2009 WL 764887 (S.D. Cal. Mar. 18, 2009) ................................... 7

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ............................................................... 13, 33

*Furla v. Jon Douglas Co.*,
65 Cal. App. 4th 1069 (1998) ................................................................ 13

*Genus Lifescis. Inc. v. Lannett Co.*,
378 F. Supp. 3d 823 (N.D. Cal. 2019) ....................................................... 19

*Glenn v. Univ. of S. Cal.*,
No. B151776, 2002 WL 31022068 (Cal. Ct. App. 2002) ....................................... 12

*Golden Eagle Ins. Co. v. Foremost Ins. Co.*,
20 Cal. App. 4th 1372 (1993) ................................................................. 9

*Good Meat Project v. GOOD Meat, Inc.*,
716 F. Supp. 3d 783 (N.D. Cal. 2024) ....................................................... 20

*Guz v. Bechtel Nat'l, Inc.*,
24 Cal. 4th 317 (2000) ....................................................................... 10

*Guzman v. Visalia Cmty. Bank*,
71 Cal. App. 4th 1370 (1999) ................................................................. 8

*Holguin v. Dish Network LLC*,
229 Cal. App. 4th 1310 (2014) ................................................................ 6

*Howard v. Am. Online Inc.*,
208 F.3d 741 (9th Cir. 2000) ................................................................ 18

*Huynh v. Chase Manhattan Bank*,
465 F.3d 992 (9th Cir. 2006) ................................................................ 14

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ....................................................... 19

*In re Oracle Corp. Derivative Litig.*,
824 A.2d 917 (Del. Ch. 2003) ................................................................ 23

*In re Toyota Motor Corp. Unintended Acceleration Mktg.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ..................................................... 20

*In re Tyco Int'l., Ltd.*,
   MDL No. 02-1335-B, 2007 WL 1703023 (D.N.H. June 11, 2007) ...................................... 17

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984),
   *abrogated on other grounds by*
   *Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ............................................................................................................. 31

*Jolley v. Chase Home Fin., LLC*,
   213 Cal. App. 4th 872 (2013) ........................................................................................... 13

*Jolly v. Eli Lilly & Co.*,
   44 Cal. 3d 1103 (1988) ...................................................................................................... 14

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991) .............................................................................................................. 22

*Kashmiri v. Regents of Univ. of Cal.*,
   156 Cal. App. 4th 809 (2007) ........................................................................................... 10

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ........................................................................................... 13

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ..................................................................................... 26, 30

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) ........................................................................................................ 34

*L. Offs. of Mathew Higbee v. Expungem't Assist'ce Servs.*,
   214 Cal. App. 4th 544 (2013) ........................................................................................... 34

*Lazar v. Super. Ct.*,
   12 Cal. 4th 631 (1996) ........................................................................................................ 12

*Lectrodryer v. Seoul Bank*,
   77 Cal. App. 4th 723 (2000) ............................................................................................. 11

*Lee v. Fisher*,
   70 F.4th 1129 (9th Cir. 2023) ........................................................................................... 22

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
   No. 15-CV-1086 BRO, 2015 WL 7008185 (C.D. Cal. Sept. 18, 2015) .............................. 29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................................................................ 21

*Maglica v. Maglica*,
   66 Cal. App. 4th 442 (1998) ............................................................................................... 9

xi

*Marshall v. AFGE,*
   996 F. Supp. 1334 (W.D. Okla. 1998) ............................................................... 15

*Marzec v. Cal. Pub. Emps. Ret. Sys.,*
   236 Cal. App. 4th 889 (2015) ......................................................................... 23

*Merced Cnty. Sheriff's Emps.' Assn. v. Cnty. of Merced,*
   188 Cal. App. 3d 662 (1987) ........................................................................... 7

*Nat'l Farm Workers Serv. Ctr. v. M. Caratan,*
   146 Cal. App. 3d 796 (1983) ........................................................................... 8

*Natomas Gardens Inv. Grp. v. Sinadinos,*
   710 F. Supp. 2d 1008 (E.D. Cal. 2010) ........................................................... 19

*Negrete v. Allianz Life Ins. Co.,*
   926 F. Supp. 2d 1143 (C.D. Cal. 2013) ........................................................... 17

*Newcal Indus., Inc. v. Ikon Office Sol.,*
   513 F.3d 1038 (9th Cir. 2008) ................................................................. 19, 27

*NYNEX Corp. v. Discon, Inc.,*
   525 U.S. 128 (1998) ....................................................................................... 26

*Odorizzi v. Bloomfield Sch. Dist.,*
   246 Cal. App. 2d 123 (1966) ......................................................................... 14

*Ohio v. Am. Express Co.,*
   585 U.S. 529 (2018) ....................................................................................... 27

*Omega Envtl. v. Gilbarco, Inc.,*
   127 F.3d 1157 (9th Cir. 1997) ....................................................................... 30

*Pac. Recovery Sols. v. United Behav. Health,*
   481 F. Supp. 3d 1011 (N.D. Cal. 2020) ......................................................... 15

*Pac. Steel Grp. v. Com. Metals Co.,*
   600 F. Supp. 3d 1056 (N.D. Cal. 2022) ......................................................... 27

*Patel v. Liebermensch,*
   45 Cal. 4th 344 (2008) ..................................................................................... 6

*People ex rel. Dep't of Motor Vehicles v. Cars 4 Causes,*
   139 Cal. App. 4th 1006 (2006) ....................................................................... 21

*People v. Orange Cty. Charitable Servs.,*
   73 Cal. App. 4th 1054 (1999) ......................................................................... 21

*PLS.Com, LLC v. Nat'l Ass'n of Realtors,*
   32 F.4th 824 (9th Cir. 2022) ........................................................................... 26

*Prakashpalan v. Engstrom, Lipscomb & Lack*,
    223 Cal. App. 4th 1105 (2014) ................................................................. 11

*Reading, Int'l, Inc. v. Oaktree Cap. Mgmt.*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003) ..................................................... 32

*Reudy v. Clear Channel Outdoors, Inc.*,
    693 F. Supp. 2d 1091 (N.D. Cal. 2010) ................................................... 29

*Rosenbloom v. Pyott*,
    765 F.3d 1137 (9th Cir. 2014) ................................................................. 22

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393, 409 (2010) ......................................................................... 22

*Shearin v. E.F. Hutton Grp.*,
    885 F.2d 1162 (3d Cir. 1989) ................................................................... 17

*Shwarz v. United States*,
    234 F.3d 428 (9th Cir. 2000) ..................................................................... 5

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ................................................................... 32

*Steiner v. Thexton*,
    48 Cal. 4th 411 (2010) ............................................................................... 8

*Sybersound Recs., Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ................................................................. 17

*United States v. Philadelphia Nat. Bank*,
    374 U.S. 321 (1963) ................................................................................. 31

*United States v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) ................................................................. 15

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953) ................................................................................. 28

*Universal Grading Serv. v. eBay, Inc.*,
    No. 09-CV-2755 RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ................... 25

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003) ................................................................. 15

*Voyager Indem. Ins. Co. v. Goldsmith*,
    733 F. Supp. 3d 905 (C.D. Cal. 2024) ....................................................... 8

*Webber v. Inland Empire Invs.*,
    74 Cal. App. 4th 884 (1999) ................................................................... 32

*Weddington Prods., Inc. v. Flick*,
   60 Cal. App. 4th 793 (1998) ....................................................................................... 6

*West v. West*,
   825 F. Supp. 1033 (N.D. Ga. 1992) ......................................................................... 22

*Zeiger v. WellPet LLC*,
   304 F. Supp. 3d 837 (N.D. Cal. Jan. 17, 2018) ..................................................... 20

*Zhang v. Super. Ct.*,
   57 Cal. 4th 364 (2013) ............................................................................................. 35

**Statutes**

15 U.S.C.

   § 1 ...................................................................................................................... 25, 27

   § 2 ............................................................................................................................ 28

   § 14 .......................................................................................................................... 30

   § 18 .......................................................................................................................... 31

   § 19 .......................................................................................................................... 28

   § 1125 ...................................................................................................................... 19

17 U.S.C. § 101 ............................................................................................................. 32

18 U.S.C. § 1962 ................................................................................................... passim

26 U.S.C. § 501 .............................................................................................................. 6

California Business and Professions Code

   § 16720 .................................................................................................................... 25

   § 17024 .................................................................................................................... 29

   § 17043 .................................................................................................................... 29

   § 17200 .................................................................................................................... 34

   § 17500 ............................................................................................................... 19, 21

///

///

California Civil Code

    § 1584 ...................................................................................................................... 9

    § 1589 ...................................................................................................................... 9

    § 1605 ...................................................................................................................... 8

    § 1614 ...................................................................................................................... 8

California Corporations Code

    § 5142 .................................................................................................................... 24

    § 5231 .................................................................................................................... 24

    § 5233 .................................................................................................................... 24

**Rules**

Federal Rule of Civil Procedure 8 ............................................................................... 8

Federal Rule of Civil Procedure 9 .......................................................................... 13, 15

Federal Rule of Civil Procedure 12 ....................................................................... 5, 30

Federal Rule of Civil Procedure 23.1 ........................................................................ 22

**Other Authorities**

Restatement (Second) of Contracts § 19 (Am. Law Inst. 1981) .................................... 7

CASE NO. 24-CV-04722-YGR
PLS.' OPPOSITION TO OAI MTD

## INTRODUCTION

The OpenAI Defendants ("OpenAI") carefully curated narrative mischaracterizes Plaintiff Elon Musk as a frustrated investor pursuing a vendetta. This deflective portrayal not only distorts the factual record and Plaintiffs' legal claims, but OpenAI's *ad hominem* attacks are legally irrelevant to whether OpenAI's conduct is unlawful. This case fundamentally questions whether the assets of a taxpayer-subsidized charity can be diverted to personally enrich insiders like Sam Altman and Greg Brockman through orchestrated, covert deals that violate the charity's founding mission, public commitments, and legal duties.

OpenAI was established as a tax-exempt organization dedicated to the development of safe artificial intelligence for the public good. Musk co-founded OpenAI, recruited its key scientists, and contributed over $44 million with the express understanding and contractual promise that OpenAI would remain a non-profit that would openly share its technology for the public's benefit. Yet Defendants, led by Altman, orchestrated the systematic conversion of the charity's assets, without regulatory approval, to enrich themselves, creating a private, for-profit behemoth that dominates the generative AI market—precisely the outcome the charity was intended to avert.

OpenAI's Motion to Dismiss collapses under scrutiny. *First*, it disregards the First Amended Complaint's ("FAC") extensive factual evidence of an enforceable agreement between Musk and Defendants—documented in writings, correspondence, and public declarations. *Second*, its standing arguments mischaracterize Musk's right to challenge breaches of charitable trust, fiduciary duties, and Defendants' self-dealing. *Third*, it disregards well-pled facts of fraud and antitrust violations, which establish OpenAI's market dominance, anticompetitive behavior, and direct harm to xAI.

At this stage, the Court must accept as true all well-pled allegations and draw all reasonable inferences in Plaintiffs' favor. The FAC provides a detailed account, supported by contemporaneous documentation, of Defendants' systematic conversion of a public charity into a private for-profit, contrary to express promises to its co-founder and mission. OpenAI's motion must be denied.

## STATEMENT OF FACTS

### A.     The Founding of OpenAI as a Non-Profit Organization.

In 2015, concerned about the development of AI by closed, for-profit giants like Google,

Musk agreed, at Sam Altman's urging, to co-found a non-profit research foundation dedicated to developing AI for the public good. FAC ¶¶ 78-88.[1] Musk's contributions were secured on the explicit promises that the organization would be "unconstrained by a need to generate financial return," would "openly share its plans and capabilities," and "open source [its] technology for the public benefit[.]" ¶¶ 86, 89-90. These commitments were further memorialized in OpenAI, Inc.'s Certificate of Incorporation, which specified that the organization would be "exclusively for charitable and/or educational purposes" and that "no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person." ¶ 89 & Ex. 21 at 4.

Musk served as co-chair of OpenAI's board of directors alongside Altman, with Greg Brockman as Chief Technology Officer. ¶ 90. From 2016 to 2020, Musk contributed over $44 million in cash, leased OpenAI's office space, donated vehicles, covered overhead, and played a crucial role in recruiting top AI scientists, including its Chief Scientist, Dr. Ilya Sutskever. ¶¶ 92-97. Musk's recruitment efforts were essential to OpenAI's success, as he leveraged his reputation and connections to attract AI talent who, like him, strongly believed in its charitable mission. ¶¶ 91-94.

**B.    Defendants' Scheme to Convert OpenAI into a For-Profit Enterprise.**

Contrary to OpenAI's founding mission, Altman and Brockman began plotting as early as 2017 to convert the charity into a for-profit enterprise. ¶¶ 102-06. When Musk explicitly opposed this, ¶ 103 ("Either go do something on your own or continue with OpenAI as a non-profit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding to a start-up. Discussions are over."), Altman falsely reassured Musk that he "remain[ed] enthusiastic about the non-profit structure!" ¶¶ 104, 307 & Ex. 13 at 1. This representation was false when made, as Altman and Brockman were continuing to develop plans for converting OpenAI to a for-profit structure. ¶¶ 106-09.

Once Musk stepped down from the board in February 2018 to avoid precisely the kind of conflicts of interest that now infest OpenAI, Defendants accelerated their plans. ¶¶ 96, 108-09. By March 2019, they announced the formation of OpenAI, L.P., the first of many for-profit entities

---

[1] Citations of "¶" or "Ex." are hereinafter to the FAC, unless otherwise stated.

created to siphon assets from the non-profit. ¶¶ 114-16. This web of for-profit entities, in which Altman, Brockman, and Microsoft have material financial stakes, ¶¶ 125-27, now includes at least 20 companies (the "For-Profit Entities") and, while publicly portrayed as mere fundraising vehicles, were, in reality, designed to capture the charity's assets, contrary to its stated mission. ¶¶ 113-24.

### C.    Defendants Loot the Non-Profit's Assets.

Defendants systematically transferred OpenAI, Inc.'s most valuable assets—its IP, staff, and technology—to the For-Profit Entities. ¶¶ 128-32. While OpenAI, Inc. showed a mere $44,485 in revenue in 2022, the For-Profit Entities generated nearly $1.6 billion one year later. ¶ 131. This stark discrepancy shows the extent to which the non-profit has been hollowed out by Defendants.

Altman, with Brockman and the For-Profit Entities' assistance, engaged in extensive self-dealing. ¶¶ 135-45. Altman directed OpenAI to enter into lucrative deals with companies in which he held *significant* equity, including Reddit (7.6% stake), Humane, Limitless, Rain AI, and Helion Energy. ¶¶ 137-44. For payment processing, he selected Stripe, in which Altman and Brockman had major financial interests. ¶ 142. Microsoft played a central role in this scheme too. In July 2019, it secured an exclusive license to OpenAI's technology, contrary to OpenAI's public commitment to open source its AI advancements. ¶¶ 112, 133-34. Since that time, Microsoft has invested approximately $13.75 billion in OpenAI and stands to profit enormously from its monopolistic control over the non-profit and technology that was meant for the public's benefit. ¶¶ 159, 195-96.

### D.    Microsoft's Control Over OpenAI.

Microsoft's dominance over OpenAI was fully demonstrated in November 2023, when OpenAI's board fired Altman as CEO for not being "candid in his communications with the board." ¶¶ 151-52. Microsoft swiftly intervened, hiring Altman to lead a new AI lab and threatening to poach OpenAI's employees. ¶¶ 154-56. Microsoft CEO Satya Nadella boasted about Microsoft's control over OpenAI, stating "We are in there. We are below them, above them, around them." ¶158. He claimed that if "OpenAI disappeared tomorrow," Microsoft would be unaffected because "we have all the IP rights and all the capability… We have the people, we have the compute, we have the data, we have everything." ¶ 157. Under this pressure, the board capitulated, reinstating Altman in just four days and purging the independently-minded directors who had opposed him. ¶¶ 160-61.

Following this coup, Microsoft supplemented Reid Hoffman's five-year board interlock by obtaining its own non-voting seat on OpenAI's board, further enabling it to monitor OpenAI, despite being a direct competitor. ¶¶ 163, 169, 374, 161 (Microsoft's CEO: "We'll definitely take care of all of the governance issues and anything else"). Hoffman and Microsoft only relinquished their seats amid scrutiny from antitrust regulators. ¶ 168. The de facto merger between Microsoft and OpenAI has enabled their dominant 69% worldwide market share for generative AI. ¶ 216.

### E. Abandonment of OpenAI's Core Principles.

As Defendants concentrated on monetizing OpenAI's technology, they abandoned the charity's foundational commitment to openness and safety. While OpenAI's early research was published and openly shared, its more advanced models including GPT-4 and subsequent versions—exclusively licensed to Microsoft—have been kept entirely closed. ¶¶ 173-80.

OpenAI has increasingly prioritized profits over safety. Numerous employees and executives have resigned in protest, including Chief Scientist Dr. Sutskever along with the leader of OpenAI's "Superalignment" safety team, Jan Leike, who stated he could no longer work at a company where safety and societal impact "have taken a backseat to shiny products." ¶¶ 185-93.

Microsoft reportedly has a right to receive 100 times its original investment—approximately $1.4 trillion in profits—subject to 20% annual increases beginning in 2025, ¶ 196, while Defendants work to fully convert OpenAI into a for-profit goliath. ¶¶ 194-95.

### F. Anticompetitive Conduct.

Defendants have engaged in a pattern of anticompetitive conduct to monopolize the generative AI market. This includes OpenAI's exclusive licensing of its technology to Microsoft, Microsoft's exclusive provision of compute to OpenAI on preferential terms not available to competitors, and their joint efforts to block essential investments in competitors. ¶¶ 245-46.

During OpenAI's recent oversubscribed funding round in October 2024, Altman conditioned investors' allotments on their agreement not to invest in OpenAI's competitors, specifically naming xAI. ¶ 201. As reported in the *Financial Times*, OpenAI told potential investors: "We'll give you allocation but we want you to be involved in a meaningful way in the business so you can't commit to our competitors." *Id*. & Ex. 25 at 1. Defendants also engaged in predatory pricing, selling their

AI products below cost to drive out competition. ¶¶ 94, 200, 222-24, 331(n). While OpenAI is projected to lose $5 billion this year, and $14 billion by 2026, it continues to price its products well below cost, a strategy that is only sustainable due to Microsoft's financial backing. ¶ 222.

These anticompetitive actions have directly harmed xAI by restricting its access to capital markets, preventing it from licensing OpenAI's technology, forcing it to pay vastly higher prices for compute resources or build its own compute infrastructure at enormous cost, and making it difficult to recruit critical AI personnel. ¶¶ 227, 246. As a result, competition has been substantially restricted, contrary to the public interest and antitrust law.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pled factual allegations as true and construe them in the light most favorable to the plaintiff and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A claim has facial plausibility when the plaintiff pleads factual content that permits the reasonable inference the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. While the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

### I.     MUSK PLAUSIBLY PLEADS BREACH OF CONTRACT (COUNT I).

OpenAI has increasingly prioritized profits over safety. Numerous employees and executives have resigned in protest, including Chief Scientist Dr. Sutskever and Jan Leike, the leader of OpenAI's Superalignment safety team who stated he could no longer work at a company that prioritized "shiny products" over safety. ¶¶ 185-93.

#### A.     The FAC Plausibly Alleges the Formation of an Express Contract.

##### 1.     *The Well-Pled Contract Terms are Clear and Definite*.

The FAC identifies specific terms, the performance of which is ascertainable, contained in

communications that collectively memorialize the agreement between Musk, on one hand, and Altman and OpenAI, Inc., on the other. ¶ 251. Under California law, a contract may be reached orally and/or may exist in a series of informal writings. *See, e.g., Holguin v. Dish Network LLC*, 229 Cal. App. 4th 1310, 1320-23 (2014) (construing multiple writings as one agreement). Indeed, courts recognize that contracts need not have technical precision to be enforceable when the parties' conduct demonstrates an understanding of their material obligations. *Patel v. Liebermensch*, 45 Cal. 4th 344, 349 (2008) ("The law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if [they] can be ascertained." (internal quotation marks omitted)).

Here, the FAC alleges that Musk made substantial contributions of his money, time, connections, and reputation in exchange for specific commitments from Altman and OpenAI, Inc. that: OpenAI would be a section 501(c)(3) non-profit and retain ownership of all its AI technology, ¶ 251(a); the non-profit's technology would serve public, not private interests, ¶ 251(b)-(c); OpenAI would operate "unconstrained by a need to generate financial return," ¶ 251(d); benefits would be "widely and evenly distributed" to avoid "undue concentrations of power," ¶ 251(e); OpenAI's technology would be open sourced for public benefit, ¶ 251(f); OpenAI would prioritize safety over profit, ¶ 251(g); and further specific subsidiary promises integral to these terms, such as "always assiduously act[ing] to minimize conflicts of interest among our employees and stakeholders that could compromise" the non-profit's mission, ¶ 251(h)-(k) & Ex. 17 at 1. These terms, each of which was proffered by Altman/OpenAI, Inc. and accepted by Musk, establish clear, ascertainable obligations that are sufficiently definite to enforce their agreement.

### 2. *Mutual Assent Is Plausibly Alleged*.

The FAC adequately alleges mutual assent through specific factual allegations concerning the parties' "outward conduct" demonstrating their "intent to be bound." *Burch v. Premier Homes, LLC*, 199 Cal. App. 4th 730, 746 (2011); *see also Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998) (mutual assent is determined objectively). The FAC identifies Musk's assent, by explicit direct statements including "[a]gree on all" in response to Altman's June 2015 email outlining key terms, ¶ 251(a), (g), 252 & Ex. 2 at 1, and "ok" in response to subsequent

communications confirming their agreement, ¶ 252 & Ex. 14 at 1—unambiguously indicating his agreement.[2] *E.g.*, *Fleming v. Coverstone*, 2009 WL 764887, at *7 (S.D. Cal. Mar. 18, 2009) (holding email response of "Agreed" sufficient for contract).

"The manifestation of assent to a contractual provision may be 'wholly or partly by written or spoken words or by other acts or by failure to act.'" *Merced Cnty. Sheriff's Emps.' Assn. v. Cnty. of Merced*, 188 Cal. App. 3d 662, 670 (1987) (quoting Rest. 2d Contracts § 19). "Although mutual assent is a prerequisite for contract formation, an adequate pleading need only allege the contract's existence." *Eller v. City of Santa Rosa*, 2009 WL 3517610, at *5 (N.D. Cal. Oct. 23, 2009). Here, the FAC alleges that OpenAI and Altman assented through their words *and* actions, supported by concrete evidence. For instance, OpenAI, Inc.'s incorporation documents expressly bind it to operate "exclusively for charitable and/or educational purposes" and prohibits any private benefit, promising that "no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person." FAC Ex. 21 at 5. This foundational document represents OpenAI's formal, legally binding commitment to the non-profit structure. Altman reinforced this commitment by similarly representing that "all of [OpenAI's] AI/AGI 'technology would be owned by the foundation,'" ¶ 251(a), directly confirming Altman's understanding and acceptance of the core contractual obligation that OpenAI's technology remain under the non-profit's control. Indeed, Plaintiffs cite multiple statements evincing Altman's assent, ¶¶ 251-52, 307, including, in September 2017, his "enthusiastic" affirmation in response to Musk's demand for a "firm commitment" to the non-profit structure in exchange for continued funding, ¶ 307 & Ex. 13 at 1. The FAC further alleges OpenAI and Altman demonstrated assent through conduct by knowingly accepting Musk's consideration (comprising significant financial and other contributions) made specifically in reliance on OpenAI's express charitable mission and

---

[2] The cases on which OpenAI relies are distinguishable, as they did not involve the kinds of personalized communications between direct and identified counterparties present here. *Haskins* v. *Symantec Corp.*, 2013 WL 6234610, at *10 (N.D. Cal. Dec. 2, 2013) (dismissing as plaintiff merely "purchased [defendant's] software online"); *Verde Media Corp. v. Levi*, No. 14-CV-00891-YGR, 2015 WL 374934 (N.D. Cal. Jan. 28, 2015) ("Plaintiff's counterparty is also undefined."). OpenAI argues that "[w]here everyone else [other than Altman] assented is unpleaded[,]" but that is consistent with Musk's claim, which is only pled against Altman and OpenAI, Inc. ¶ 251.

commitments to open source its AI advancements for public rather than private benefit, while consistently reaffirming their contractual obligations. ¶¶ 92-97, 251-52, 264; *Engel v. U.S. Dep't of Navy*, 2021 WL 1056560, at *5 (S.D. Cal. Mar. 18, 2021) ("Any form of expression showing a clear intention to accept on the terms proposed is sufficient if coupled with no new conditions." (citing *Beatty v. Oakland Sheet Metal Supply Co.*, 111 Cal. App. 2d 53, 62 (1952)).

In light of the parties' conflicting interpretations of the evidence, a trial is required. "While this issue [mutual assent] may sometimes be decided on a motion to dismiss, that is simply not the case where the parties dispute the evidence of contract formation." *Voyager Indem. Ins. Co. v. Goldsmith*, 733 F. Supp. 3d 905, 919 (C.D. Cal. 2024) (citing *Alexander v. Codemasters Grp.*, 104 Cal. App. 4th 129, 141 (2002)); *Guzman v. Visalia Cmty. Bank*, 71 Cal. App. 4th 1370, 1376-77 (1999) ("interpretation of the purported acceptance or rejection of an offer is a question of fact.").

### 3. *Consideration Is Plausibly Alleged*.

The FAC sufficiently alleges consideration.[3] Under California law, consideration consists of either a benefit to the promisor or a detriment to the promisee. Cal. Civ. Code § 1605; *Steiner v. Thexton,* 48 Cal. 4th 411, 420-21 (2010) ("Thus, there are two requirements in order to find consideration. The promisee must confer (or agree to confer) a benefit or must suffer (or agree to suffer) prejudice. We emphasize either alone is sufficient to constitute consideration[.]"). The FAC alleges that Altman and OpenAI, Inc. agreed to the stated terms "in consideration for Musk's contributions [$44 million], leasing of OpenAI, Inc.'s office space, and payment of overhead, and Musk's time, skill, advice, stature, and connections in organizing and operating OpenAI, Inc." ¶ 251. The FAC further explains how Musk's involvement conferred benefits that extended beyond his financial contributions: "The mere fact OpenAI, Inc. was an 'Elon Musk'-sponsored initiative and that Musk served as co-chair were key to its successful recruiting and financing efforts in the company's pivotal early years." ¶ 94. OpenAI argues the benefits Musk conferred were not "bargained for," but that ignores Altman's solicitations and promises to Musk detailed in the FAC,

---

[3] Adequacy of consideration is presumed where, as here, there is written evidence of an agreement. Cal. Civ. Code § 1614. Lack of consideration is also an affirmative defense that Defendants must prove, Fed. R. Civ. P. 8(c); *Nat'l Farm Workers Serv. Ctr. v. M. Caratan*, 146 Cal. App. 3d 796, 808 (1983), rendering it an improper basis on which to dismiss Musk's contract claim.

most saliently the September 2017 email in which Altman promised to continue OpenAI as a non-profit *in exchange* for Musk's continued funding. ¶¶ 103-04, 306-07 & Ex. 13 at 1, 4.

### B. The FAC Plausibly Alleges Breach of Contract.

Defendants' argument that Musk has not plausibly alleged breach is similarly without merit. The FAC identifies multiple breaches of specific terms. ¶¶ 251, 254. For example, the FAC alleges the parties agreed that "all of [OpenAI's] AI/AGI 'technology would be owned by the foundation,'" ¶ 251(a), and that this term was breached because Defendants "assign[ed] OpenAI, Inc.'s intellectual property to the For-Profit Entities and/or Microsoft," ¶ 254(a). The FAC alleges OpenAI promised no property "of the non-profit would 'ever inure to the benefit of any…private person," ¶ 251(b), but this term was breached because Altman "reap[ed] significant financial benefits from commercial activities and self-dealing," ¶ 254(b). Musk's breach of contract claim is plausibly pled.

## II. MUSK PLAUSIBLY PLEADS AN IMPLIED-IN-FACT CONTRACT (COUNT II).

Defendants' challenge to Count II largely replicates their objections to Musk's breach of express contract claim, primarily asserting lack of mutual assent and consideration. These arguments fail for the reasons addressed. Defendants' only additional contention that the FAC inadequately identifies conduct establishing an implied contract is demonstrably incorrect. "[A]n implied-in-fact contract entails… one manifested in conduct rather than expressed in words." *Maglica v. Maglica*, 66 Cal. App. 4th 442, 455 (1998). "Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal." Cal. Civ. Code § 1584. Acceptance of an offer can also "be inferred from retention of the offered benefit." *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1386 (1993); Cal. Civ. Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.").

The FAC delineates conduct exactly meeting this standard: Musk's substantial contributions of capital, time, and professional connections, ¶¶ 92-97, accepted by Altman and OpenAI, Inc. to fund and further OpenAI's operation as a non-profit dedicated to the development of safe and open AI, ¶ 264; OpenAI, Inc.'s initial operation as a non-profit that open sourced its technology

consistent with agreed terms, *id.*; and Defendants' repeated public and private promises and representations regarding OpenAI's charitable purpose, commitment and operation, inducing further contributions from Musk, ¶ 261. OpenAI conspicuously fails to address any of these specific allegations. At a minimum, a trial is necessary to determine under "the totality of the circumstances," *Faigin v. Signature Grp. Holdings, Inc.*, 211 Cal. App. 4th 726, 739, 745 (2012) (finding implied-in-fact agreement), what the "reasonable expectation[s]" of the parties were. *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 831-32 (2007) (same).

### III. MUSK PLAUSIBLY PLEADS A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT III).

Defendants seek to dismiss Count III arguing no agreement has been pled and that it is duplicative of the contract claim. Neither supports dismissal. *First*, the FAC adequately pleads the existence of both an express contract and an implied-in-fact contract. *Second*, the implied covenant claim is not impermissibly duplicative. It exists "to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in original); *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992) ("The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith."). Here, the FAC alleges that Altman and OpenAI, Inc. "did not act fairly and in good faith by, without limitation, failing to observe a reasonable construction of the terms, understandings, and obligations of the parties." ¶ 273.

For example, Defendants promised "OpenAI 'will seek to open source technology for the public benefit'… except where its technology can be 'dangerous,' [] causing genuine 'safety and security concerns.'" ¶ 251(f). While OpenAI and Altman retained limited discretion regarding the timing of open sourcing technology based on legitimate safety concerns, they systematically abused this discretion by locking down the technology entirely as soon as it could be monetized and exclusively licensing it to Microsoft. ¶¶ 173-80. This cannot be reconciled with OpenAI's purported safety justification, as it granted Microsoft unfettered access to the same proprietary technology it claims is too dangerous to share. ¶¶ 133-34, 157, 173-80, 193. Defendants similarly abused their

discretion regarding the For-Profit Entities' supposed support of OpenAI's charitable mission. ¶ 128. While non-profits may conduct limited for-profit activities to support their mission, the FAC alleges these For-Profit Entities were not used to "help fundraise for a non-profit." *Id*. Instead, the For-Profit Entities facilitated a concealed for-profit conversion benefitting insiders in an exploitative structure required to generate an implausible "$2.2 trillion in profits" before "funneling anything more than a nominal 2% back to the charity," ¶¶ 194, 197. While OpenAI, Inc. reported just $44,485 in revenue for 2022, the For-Profit Entities generated a staggering $1.6 billion the following year, ¶ 131, with almost no money furthering charitable causes. The implied covenant of good faith and fair dealing required Altman and OpenAI to exercise their discretion reasonably, consistent with their agreement's purpose. *Carma Devs.*, 2 Cal. 4th at 372. Instead, they systematically violated every material promise in the parties' agreement. ¶ 254(a)-(m).

## IV. MUSK PLAUSIBLY PLEADS QUASI-CONTRACT/UNJUST ENRICHMENT (COUNT IV).

Defendants' contention that Musk's unjust enrichment claim should be dismissed as redundant of his fraud claim fails. As detailed below, the FAC adequately pleads fraud, and regardless, the unjust enrichment claim is independently viable. Quasi-contract/unjust enrichment is an equitable claim that applies when no contract exists between the parties. *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1132 (2014). Its elements are defendant's receipt of a benefit from plaintiff, which would be inequitable to retain. *Id.*; *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). A simple, "straightforward statement" of the claim will do. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (allegations that defendant "had 'entic[ed]' plaintiffs to purchase their products through 'false and misleading' labeling, and that [defendant] was 'unjustly enriched' as a result," are sufficient). Here, the FAC alleges that Musk "contributed considerable money and resources to launch and sustain OpenAI, Inc.," which he did "on the condition that the endeavor would be and remain a non-profit devoted to openly sharing its technology with the public and avoid concentrating its power in the hands of a few." ¶ 279. The FAC further alleges that Defendants have been "unjustly enriched at Musk's expense" by their "improper exploitation for personal profit of OpenAI, Inc.'s resources, intellectual

property, and assets," ¶ 278, and that it would be "unjust and inequitable to allow Defendants to retain the substantial benefits that were obtained as a direct and proximate result of their wrongful conduct," including their "solicitation of capital and other valuable resources from Musk under the false pretense and repeated promises that such would be used for charitable purposes," ¶ 280. Thus, the quasi-contract/unjust enrichment claim should proceed based on the inequitable retention of substantial benefits Musk conferred on Defendants, and cannot be dismissed as merely duplicative. *See Astiana*, 783 F.3d at 762 (To the extent quasi-contract claim is "duplicative of or superfluous to [plaintiff's] other claims, this is not grounds for dismissal.").

## V.    MUSK PLAUSIBLY PLEADS FRAUD (COUNTS VI-VII).

### A.    The FAC Plausibly Alleges Fraud.

To state a claim for fraud, a plaintiff must plead: (1) a misrepresentation; (2) knowledge of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage. *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996). Defendants do not challenge the FAC's allegations concerning Musk's reasonable reliance on their promises, nor his resulting injury.

The FAC identifies actionable promises Defendants made without intention to perform them. *Glenn v. Univ. of S. Cal.*, No. B151776, 2002 WL 31022068 (Cal. Ct. App. 2002) (finding donor's allegation that university promised to fund professorial chair without intending to do so, and did so to encourage donor to endow position, sufficient to state fraud claim). The FAC alleges Altman and Brockman falsely represented that OpenAI would remain a non-profit dedicated to developing AI for the public's benefit rather than private enrichment. ¶¶ 307-08. These were not mere "subjective expressions of opinion," as OpenAI contends, but binding commitments about OpenAI's core structure and mission. *See Lazar*, 12 Cal. 4th at 638 (promise is actionable fraud when made without intention to perform). The FAC alleges that Altman's September 2017 promise to maintain the non-profit structure he had committed to, ¶¶ 86-90, was made with no intention to perform, ¶¶ 103-09. By summer 2017, Altman and Brockman were already "expressly pushing Musk to convert the non-profit to a for-profit entity, in which they planned to endow themselves with significant equity." ¶ 102 & Ex. 11 at 1, Ex. 12 at 1-2. When Musk refused to "fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing

free funding to a start-up," ¶ 306, Altman immediately reassured Musk, writing: "[I] remain enthusiastic about the non-profit structure!" ¶ 307. Brockman communicated the same to Musk through Zilis. *Id.*

As alleged, Altman and Brockman's assurances were binding commitments regarding OpenAI's fundamental structure and mission made in direct response to Musk's demand for a "firm commitment," not speculative opinions or aspirations. *See Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 892 (2013) (holding statements about intentions and future events actionable). In any event, such a determination must be left to the jury, rendering dismissal on this basis improper. *Furla v. Jon Douglas Co.*, 65 Cal.App.4th 1069, 1080-81 (1998) ("Whether a statement is nonactionable opinion or actionable misrepresentation of fact is a question of fact for the jury.").

At this preliminary stage, intent need only be alleged generally under Fed. R. Civ. P. 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) ("malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). Musk's allegations that "Altman and Brockman knew their representations and promises were false when made, [and] had no intention of performing them," ¶ 310, satisfies Rule 9(b). But the FAC goes further: within mere months of Altman's "enthusiastic" recommitment to the non-profit structure, Defendants formally launched their for-profit plan—what became the For-Profit Entities—conceived *the same summer* they made contrary representations to Musk. ¶¶ 103-09. Musk has exceeded his Rule 9(b) burden.

Indeed, Altman's public portrayal of the For-Profit Entities as a mere fundraising mechanism, from which investors should not expect returns, concealed their true purpose as vehicles for his and Brockman's personal enrichment. ¶¶ 124-27. Despite Altman's sworn Senate testimony in 2023 denying any ownership in OpenAI, it was first reported in 2024 that he did have equity. ¶ 127. Only recently, as Altman and Brockman openly pushed to convert OpenAI entirely to a for-profit company *in which they will own substantial equity*, has their true intent to enrich themselves become clear. ¶¶ 194-95. Defendants' statute of limitations argument thus fails because the three-year period did not begin until Musk discovered, or reasonably should have known, that the For-Profit Entities were part of a larger, secret enrichment scheme. *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (accrual postponed until plaintiff "has reason to suspect

an injury and some wrongful cause"); *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988).

Under these circumstances, dismissal on statute of limitations grounds would be inappropriate. *See Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (statute of limitations dismissal improper unless "the running of the statute is apparent on the face of the complaint" (internal quotation marks omitted)). While the FAC alleges that Altman and Brockman proposed a "capped-profit company" in March 2019, it does not allege this disclosure revealed their fraudulent intent, nor did it. Rather, the FAC describes an ongoing scheme only recently exposed. *E.g.*, ¶ 3 ("Some aspects of [Defendants'] promises to Musk and the public are matters of degree, but the intent and effect of OpenAI's actions to flout those promises are now unambiguous."), ¶ 105 ("We now know Altman and Brockman's [September 2017] reaffirmation was a lie."), ¶ 146 ("Altman's scheme has now become clear…"); ¶ 315 ("In recent months, Altman has abandoned all pretense, displaying his true colors… Defendants are actively working to convert OpenAI, Inc. into an *entirely* for-profit business."). Indeed, Public Citizen, a consumer advocacy watchdog whose mission is to monitor and uncover this type of malfeasance, only first alerted the California Attorney General to OpenAI's profiteering on January 9, 2024, demonstrating that these issues have only very recently surfaced to interested observers. ¶ 183.

### B.    Musk Has Standing to Bring a Constructive Fraud Claim.

Defendants do not meaningfully contest that Musk has plausibly alleged a constructive fraud claim. Instead, they simply recycle their already-refuted argument that Altman and Brockman's broken promises are not alleged with sufficient particularity. Their remaining standing argument, conflating breach of charitable trust and constructive fraud, is equally baseless. The FAC alleges constructive fraud resulted from Defendants' breach of their confidential or fiduciary relationship(s) with Musk individually, as distinct from Defendants' breach of duties owed to the OpenAI, Inc. charity. ¶¶ 294-300; *see Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 129 (1966). Regardless, this Court has already ruled Musk has standing to bring a breach of charitable trust claim, Dkt. 121 at 15 n.11, making dismissal on that basis unfounded.

## VI.    MUSK PLAUSIBLY PLEADS RICO CLAIMS (COUNTS XXV-XXVI).

Defendants' challenge to Musk's RICO claims under 18 U.S.C. § 1962(a)-(c) targets only

select elements, not entire claims. Each challenged element is addressed in turn.

### A. The FAC Plausibly Alleges Predicate Acts of Wire Fraud.

To establish RICO violations under 18 U.S.C. § 1962(a)-(c), a plaintiff must plead a pattern of wrongful activity (known as "predicate acts"). When fraud-based predicate acts are alleged, plaintiffs must satisfy Rule 9(b)'s heightened pleading requirements, *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004), but, Defendants overstate what Rule 9(b) demands. The Ninth Circuit has repeatedly held that Rule 9(b) requires allegations of "the who, what, when, where, and how of the misconduct charged," *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1103-04 (9th Cir. 2003), but not "absolute particularity or a recital of the evidence." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).

To state a claim for wire fraud, a plaintiff must allege: "(1) that the defendant formed a scheme to defraud; (2) used the United States wires…in furtherance of the scheme; and (3) did so with a specific intent to deceive or defraud." *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1028 (N.D. Cal. 2020). Here, the FAC specifically alleges that Defendants engaged in a deliberate scheme to defraud Musk by soliciting his donations, time, and connections under false pretenses, and pleads the "who, what, when, where, and how" of the fraud with specificity:

(1) *Who*: The FAC identifies Altman and Brockman as the primary architects of the fraudulent scheme, ¶¶ 82-86, 304-14, with other Defendants including the For-Profit Entities and Microsoft providing substantial assistance, ¶¶ 325, 434, 477; (2) *What*: The FAC details specific false representations regarding OpenAI, Inc. as a charitable non-profit. These include statements in OpenAI's Certificate of Incorporation declaring that: "The corporation is not organized for the private gain of any person" and that "no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person." ¶ 89. Altman further represented: "The technology would be owned by the [OpenAI] foundation[.]" ¶ 86. Altman's profligate self-dealing, enriching himself at the expense of a charity, exemplifies conduct that supports a RICO claim, *Marshall v. AFGE*, 996 F. Supp. 1334, 1337-40 (W.D. Okla. 1998); (3) *When*: The FAC provides specific dates for communications, beginning in May 2015 and continuing through various critical exchanges, including key interactions in June

2015, September 2017, and March 2019, ¶¶ 84-88, 103-04; (4) *Where*: The communications occurred via in-person discussions, public filings, and via email sent across state lines (which Defendants do not contest), as detailed throughout the FAC, *id*; and (5) *How*: The FAC articulates how Defendants used these communications to induce Musk to contribute substantial resources (including his money, time, professional connections, and reputation to OpenAI) while concealing their true intentions, ¶¶ 91-97, 312-15.

The RICO allegations establish a comprehensive fraudulent enterprise orchestrated by Altman and others who exploited multiple donor victims through interstate wire fraud, concealment, and the deliberate manipulation and misuse of OpenAI's charitable form and mission—nefarious elements that transcend simple broken contractual promises—constituting predicate acts.

### 1. *The FAC Plausibly Alleges Falsity and Fraudulent Intent*.

The FAC plausibly alleges that Defendants' statements were knowingly false when made, with the requisite intent to deceive. The timeline of events detailed in the FAC provides compelling circumstantial evidence of this intent. For example, shortly before assuring Musk of their commitment to the non-profit structure in September 2017, ¶¶ 307-08, Defendants had already developed plans for a for-profit move, and shortly thereafter, began actualizing it, ¶¶ 105-07. Brockman's own words reveal this deception: Defendants would present themselves as "a neutral group looking to collaborate widely" because "that's the best way to bootstrap ourselves into being a leading research institution." ¶ 311. Defendants' subsequent actions systematically contradicted every representation made, including their efforts to convert OpenAI to a for-profit entity, ¶¶ 102-14, loot its technology, ¶¶ 128-30, transfer its assets to an opaque web of for-profit entities, ¶¶ 128-32, and engage in serial self-dealing for personal gain, ¶¶ 135-45. This creates far more than just a reasonable inference of fraudulent intent; fraud is the overwhelmingly likely explanation.

### B. The FAC Alleges Distinctiveness Between RICO "Persons" and "Enterprise."

The FAC alleges that Altman and Brockman are the primary RICO "persons" who conducted the affairs of OpenAI, Inc. (the "enterprise") through a pattern of racketeering activity. ¶¶ 508-09. Distinctiveness is explicitly satisfied with respect to these individual Defendants. *Cedric Kushner Promotions v. King*, 533 U.S. 158, 160 (2001) (recognizing that a corporate officer

functioning as a RICO "person" is legally distinct from the corporation itself as the "enterprise," even when they are closely related). Although the FAC includes as belt and suspenders a customary "alter ego" pleading, *see* ¶¶ 241-42 ("*Except as otherwise specified herein*, the unitary enterprise of OpenAI, *or in the alternative* the individual entities…" (emphasis added)), this in no way negates distinctiveness for RICO purposes. *Negrete v. Allianz Life Ins. Co.*, 926 F. Supp. 2d 1143, 1151-54 (C.D. Cal. 2013).

## C. The FAC Plausibly Pleads Investment-Specific Injury Under § 1962(a).

Contrary to Defendants' assertions, the FAC does allege injury distinct from the predicate acts themselves that directly stems from the investment of racketeering proceeds. ¶¶ 517-19, 525-29. To plead an investment-specific injury under § 1962(a), a plaintiff "must allege that the investment of racketeering income was the proximate cause of its injury." *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008).[4] The FAC explains how, for example, Defendants invested the proceeds from their fraudulent scheme (Musk's contributions and proceeds therefrom) in the For-Profit Entities. ¶¶ 130-32. The For-Profit Entities, founded with Musk's misappropriated funds, leveraged these resources in exclusive arrangements with Microsoft, a strategic deployment of the racketeering proceeds that harmed competitors, like xAI. ¶¶ 133-34. The competitive advantage and market dominance resulting from this investment of proceeds misappropriated from the charity directly harms xAI's market position. ¶¶ 9, 226-27, 246, 495, 527. The wire fraud resulted in Musk's direct pecuniary loss of over $44 million and substantial contributions of time and resources, whereas the subsequent investment of these misappropriated assets by Defendants precipitated a separate and distinct competitive injury to xAI, thereby satisfying the proximate causation requirement for investment-specific injuries under § 1962(a)

---

[4] "Income" includes "money derived" from the pattern of misconduct. *Shearin v. E.F. Hutton Grp.*, 885 F.2d 1162, 1164 (3d Cir. 1989), abrogated on other grounds by *Beck v. Prupis*, 529 U.S. 494 (2000); *see also In re Tyco Int'l., Ltd.*, MDL No. 02-1335-B, 2007 WL 1703023 (D.N.H. June 11, 2007) ("the definition of income under federal RICO is broad"); *Creative Dimensions In Mgmt., Inc. v. Thomas Grp., Inc.*, 1997 WL 633684, at *3 (E.D. Pa. Sept. 30, 1997) ("a trade secret or confidential business information might constitute 'income.'").

### D. The FAC Plausibly Pleads Acquisition or Control-Specific Injury Under § 1962(b).

Section 1962(b) requires a plaintiff to allege an injury resulting from defendant's control or acquisition of a RICO enterprise. *Andrews Farms v. Calcot, Ltd*., 527 F. Supp. 2d 1239, 1256 (E.D. Cal. 2007). Here, while the wire fraud resulted in Musk's discrete financial loss of $44 million and non-monetary contributions, the § 1962(b) claim addresses an entirely separate injury. The control-based injury was revealed in November 2023 when Defendants leveraged their power to reinstate Altman in just 4 days and purge the board, removing independent directors who challenged Altman's self-dealing and deceitful conduct, further consolidating their power. ¶¶ 149-61, 163-72.

This conduct directly injured Plaintiffs by transforming OpenAI from its open-source, non-profit mission into a vehicle for Defendants' private gain and domination of the AI market, creating competitive barriers that specifically harmed xAI. ¶¶ 525-28. Unlike the financial injury from wire fraud, this injury flows directly from Defendants' acquisition and maintenance of control over the enterprise, precisely as § 1962(b) requires. *Andrews Farms*, 527 F. Supp. 2d at 1256 ("[P]laintiffs' allegations were sufficient to state a § 1962(b) claim. Plaintiffs had alleged 'that Defendants generated income from their fraudulent scheme, conduct which led to its acquisition, maintenance, and control of the enterprise. This conduct allegedly resulted in economic harm to Plaintiffs.'").

### E. The FAC Plausibly Alleges a RICO Conspiracy Under § 1962(d).

A RICO conspiracy claim requires allegations that the defendant was "aware of the essential nature and scope of the enterprise and intended to participate in it." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). The FAC satisfies this standard by alleging Defendants' knowledge of and agreement to participate in the fraudulent scheme. ¶¶ 82-86, 98-99, 124-27, 133-34, 147-48, 304-15. Having adequately pled violations of § 1962(a)-(c), the FAC properly states a claim for RICO conspiracy under § 1962(d). The FAC details how Defendants agreed to participate in a scheme involving predicate acts of wire fraud, with each playing a specific role in the conspiracy. ¶¶ 494-502, 532-36. Altman and Brockman made fraudulent representations to secure Musk's contributions and support. ¶¶ 82-90, 304-15. The For-Profit Entities served as vehicles to privately exploit OpenAI, Inc.'s fraudulently obtained assets. ¶¶ 113-32, 241-42. Microsoft provided funding

and support for the operation in exchange for exclusive benefits. ¶¶ 98-99, 112, 133-34, 147-61. Finally, the FAC alleges that all Defendants were aware of the fraudulent scheme and agreed to participate in it, which is sufficient to state a claim under § 1962(d). ¶¶ 486-506, 532-37. These allegations are sufficient to survive a motion to dismiss. *See, e.g., In re Chrysler-Dodge-Jeep Ecodiesel Mktg.*, 295 F. Supp. 3d 927, 984 (N.D. Cal. 2018); *Natomas Gardens Inv. Grp. v. Sinadinos*, 710 F. Supp. 2d 1008, 1022-23 (E.D. Cal. 2010).

## VII.    MUSK PLAUSIBLY PLEADS A BREACH OF CHARITABLE TRUST (COUNT XX).

The parties agree the Court has already denied the motion to dismiss on this claim, Dkt. 125 at 2, and therefore Plaintiffs do not brief it further. Dkt. 121 at 15 n.11.

## VIII.   FALSE ADVERTISING CLAIMS (COUNTS XVIII & XIX) ARE WELL PLED.

### A.    The FAC Alleges Commercial Advertising or Promotion.

To state a claim for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), a plaintiff must allege that the defendant made false or misleading representations in "commercial advertising or promotion." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008). Representations qualify if they are: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services." *Genus Lifescis. Inc. v. Lannett Co.*, 378 F. Supp. 3d 823, 834 (N.D. Cal. 2019). "While the representations need not be made in a classic advertising campaign, but may consist instead of more informal types of promotion, the representations must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry." *Id.* (internal quotation marks omitted). In addition, California's False Advertising Law makes it unlawful for any person or entity to make or disseminate any statement concerning real or personal property or services that is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading. *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 227 (2013); *see* Cal. Bus. & Prof. Code § 17500.

The FAC identifies specific statements made by Defendants on "OpenAI's website, online marketing, online blog posts, and Defendants' social media," ¶¶ 392-93, 410, including that: (1) "We cautiously and gradually release new AI systems—with substantial safeguards in place,"

¶ 393(a); (2) "We use a multi-tiered safety system to limit Dall-E 3's ability to generate potentially harmful imagery," ¶ 393(d); (3) "We built GPTs with privacy and safety in mind," ¶ 393(e); and (4) "Safety has always been central to our work," ¶ 393(f).

The above statements are commercial in nature because they serve as marketing assurances designed to drive consumer adoption and revenue and were made to promote OpenAI's products and services, including ChatGPT and other AI models, which OpenAI offers on both free and paid subscription bases. ¶ 224. Indeed, "[a]dvertisements that make representations about safety are actionable." *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 754 F. Supp. 2d 1145, 1176-77 (C.D. Cal. 2010) (denying motion to dismiss state false advertising claims because "the allegations about product safety are more than 'mere puffery'… They constitute a campaign by Toyota in which it represented itself as prioritizing (even 'obsessing over') safety." (citing *Cont'l Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal. App. 3d 388, 424 (1989))); *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 851 (N.D. Cal. Jan. 17, 2018) (finding actionable company's claim that dog food was "safe"); *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133 (C.D. Cal. 2005) (finding the phrase "most stringent quality control tests" was actionable). Here, OpenAI's marketing statements are not abstract or aspirational, but serve to directly enhance consumer confidence and willingness to use its products and/or pay for premium services and are specific product claims designed to differentiate OpenAI's commercial offerings in a marketplace where safety concerns might otherwise deter potential consumers.

The Court's ruling in *OpenAI, Inc. v. Open Artificial Intelligence, Inc.* is distinguishable because the statements at issue there were broader mission statements, No. 23-cv-03918-YGR, at *5 (N.D. Cal. Sept. 25, 2024), ECF No. 127, while the FAC identifies specific product-related safety claims that directly relate to the commercial products OpenAI markets to consumers. ¶ 393

## B. The FAC Plausibly Alleges False and Misleading Statements.

"Falsity is demonstrated by showing that the statement was either literally false, or literally true but likely to mislead or confuse consumers." *Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 808 (N.D. Cal. 2024) (internal quotation marks omitted). Here, the FAC alleges that Defendants claimed their AI products had "substantial safeguards" and were built with "safety in

mind" when in fact, OpenAI "sidelined safety in order to rush the release of new products," ¶ 396; safety teams were given "just nine days to conduct comprehensive safety assessments" of GPT-4o, ¶ 397; safety assessments were not completed before releasing products that exceeded "OpenAI's permissible risk threshold" ¶¶ 398-99; OpenAI released its o1 model before completing safety testing despite knowing it was rated "medium risk" for issues related to chemical, biological, radiological, and nuclear weapons, ¶ 399; OpenAI's Whisper product "inserts fabricated or 'hallucinated' material" in medical transcriptions, ¶ 401; and droves of safety personnel resigned in protest, stating safety at OpenAI has "taken a backseat to shiny products," ¶ 400.

Further, and in contrast to Lanham Act claims, state false advertising claims under Cal. Bus. & Prof. Code § 17500 need not be tied to specific products. False statements made, as here, to solicit donations, are sufficient. *People v. Orange Cty. Charitable Servs.*, 73 Cal. App. 4th 1054, 1075 (1999) ("[T]he false advertising laws of Business and Professions Code section 17500 *et seq.*, prohibiting untrue or misleading statements, undoubtedly apply to representations made by fundraisers with the intent of obtaining charitable solicitations."); *People ex rel. Dep't of Motor Vehicles v. Cars 4 Causes*, 139 Cal. App. 4th 1006, 1017 (2006) (finding inducement of vehicle donations through deceptive advertising fell within the scope of Cal. Bus. & Prof. Code § 17500).

### C.     The FAC Plausibly Alleges Commercial Injury.

"[A] plaintiff suing under [the Lanham Act] ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Plaintiffs have satisfied this requirement by alleging that "consumers are unlikely to seek or purchase duplicate offerings from multiple AI vendors" and that Defendants' misrepresentations "have not only misled potential customers but have directly diverted those customers from Plaintiffs to Defendants, causing Plaintiffs to incur measurable losses in customer acquisition, market penetration, and overall profitability." ¶ 402. The FAC alleges that xAI "competes directly with OpenAI's ChatGPT… in the generative AI market," ¶ 226, establishing the requisite competitive relationship for Lanham Act standing under *Lexmark*. By alleging consumers rely on Defendants' false safety claims in choosing AI providers, the FAC establishes a "direct link" between the misconduct and harm to Musk's

reputation (as a co-founder of OpenAI) and xAI's competitive sales sufficient for standing. *Id*.

## IX. MUSK AND ZILIS HAVE STANDING TO BRING WELL-PLED DERIVATIVE CLAIMS (COUNTS XXII-XXIV).[5]

### A. Musk and Zilis Have Standing to Assert Derivative Claims.

1. *State Law Controls Derivative Standing for Plaintiffs' State Law Claims; Rule 23.1 Governs Only the Manner of Pleading*.

Because Plaintiffs' derivative claims are based on California, not federal law, "the definition of [member] is a substantive question and, therefore, determined pursuant to state law." *West v. West*, 825 F. Supp. 1033, 1054 (N.D. Ga. 1992) (adopting majority position of the Second, Sixth, and Tenth Circuits); *see Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96-97 (1991) (holding in derivative suit that federal courts apply state law shareholder demand requirements); *Lee v. Fisher*, 70 F.4th 1129, 1146-47 (9th Cir. 2023) (looking to state law to determine power to bring derivative action). If, as detailed below, California law provides derivative standing to Plaintiffs, Fed. R. Civ. P. 23.1 merely governs pleading requirements and cannot be construed to abolish that substantive right. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

2. *California Law Provides Standing for Musk and Zilis*.

As detailed in Plaintiffs' preliminary injunction briefs, Musk and Zilis have standing as former members of OpenAI, Inc. to complain of misconduct that occurred *during their service as members*. Dkt. 46 at 18-20; Dkt. 73 at 20-21. The Court has indicated it does not desire further briefing on this topic, Dkt. 121 at 16 n.13, so Plaintiffs rely on their prior briefing to preserve this issue. As the Court's order did not address OpenAI's demand futility arguments, Plaintiffs briefly address these for purposes of preservation. Plaintiffs have adequately alleged they made a demand and, in the alternative, that demand would have been futile due to the adverse domination of OpenAI, Inc.'s board. ¶¶ 446-48, 461-64. This approach is entirely proper. *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1149 (9th Cir. 2014) ("Demand futility 'must be decided by the trial court on a case-by-case basis and not by any rote and inelastic criteria. Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged….").

---

[5] Plaintiffs acknowledge the Court's ruling on derivative standing, Dkt. 121 at 15-16 & n.13, and brief these issues (not briefed in their preliminary injunction motion) for purposes of preservation.

CASE NO. 24-CV-04722-YGR
PLS.' OPPOSITION TO OAI MTD

Defendants' argument that any demand concedes the board's independence misconstrues the FAC. Plaintiffs allege they "brought to the attention of the Board their concerns over Defendants' conduct, of which they were aware at the time, via phone calls, in-person discussions, public statements via social media, and emails," ¶¶ 446, 462, demonstrating their good faith efforts to address wrongdoing. However, such efforts were in vain, as "the adverse domination of the Board rendered futile any effort by Musk and/or Zilis to secure remedial action from the Board," ¶¶ 447, 463. The FAC details extensively how the Board was "dominated by directors with interests conflicted and adverse to those of OpenAI, Inc., Plaintiffs, and the public," ¶ 170; *e.g.*, ¶¶ 161-72, with OpenAI's 2023 board that fired Altman being "the first Board since 2018 not adversely dominated by interests aligned with Altman and Brockman," ¶ 162. In the board's restructuring in November 2023, its AI governance experts were replaced with "underqualified and compliant allies handpicked by Altman and blessed by Microsoft." ¶¶ 148, 167. This amply satisfies the demand futility requirement under both California and Delaware law. *See In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 939-40 (Del. Ch. 2003) (finding demand futility based on lack of director independence); *Bader v. Anderson*, 179 Cal. App. 4th 775, 790-92 (2009).

## B.  Musk and Zilis Plausibly Plead Breach of Fiduciary Duty (Count XXII).

"The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." *Marzec v. Cal. Pub. Emps. Ret. Sys.*, 236 Cal. App. 4th 889, 915 (2015) (quotation marks and citations omitted). The FAC contains extensive allegations regarding how Altman and Brockman breached their fiduciary duties to OpenAI, Inc., none of which are protected by the business judgment rule.[6]

*First*, "[a] director… cannot obtain the benefit of the business judgment rule when acting under a material conflict of interest." *Coley v. Eskaton*, 51 Cal. App. 5th 943, 953 (2020). Here, the FAC alleges Defendants engaged in self-dealing by funneling assets, intellectual property, and other benefits from the non-profit to the For-Profit Entities in which they held significant interests, ¶¶ 113-32, 135-45, directly violating the duty of loyalty they owed to OpenAI, Inc. *Second*, "[a] director shall perform the duties of a director…in good faith, in a manner that director believes to be

---

[6] Defendants are correct re: a typographical error in ¶ 442(b); "286(a)-(i)" should read "387(a)-(i)."

in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." Cal. Corp. Code § 5231(a). The FAC alleges that Defendants breached their duty of care by deliberately concealing conflicts of interest from OpenAI, Inc.'s board, failing to act with reasonable inquiry, and prioritizing their personal interests over those of the non-profit. ¶¶ 151-52 (alleging that Altman "deliberately misrepresented what was happening at OpenAI, Inc., and explicitly lied to the Board to obstruct its ability to carry out its oversight duties"). *Third*, the FAC alleges that Defendants breached their duty of obedience to OpenAI, Inc.'s charitable purpose by, e.g., transforming the organization from a research foundation dedicated to the development of safe, open source AI to an opaque commercial enterprise for their private gain. ¶¶ 173-80; Cal. Corp. Code § 5142.

### C.    Musk and Zilis Plausibly Plead a Claim for Self-Dealing (Count XXIII).

No particularized pleading is required for this claim. The FAC nonetheless identifies numerous specific self-dealing transactions (e.g., Reddit, Humane, Limitless, Rain AI, Helion Energy) in which Altman and Brockman had material financial interests. ¶¶ 113-23, 137-41, 143-44. It details how they failed to meet the requirements of Cal. Corp. Code § 5233(d), including by deliberately withholding "key information and l[ying] about [their] personal holdings and investments both in and outside of OpenAI to keep the Board from discovering [their] glaring conflicts of interest," ¶ 135, and because "neither were the formalities of [Section 5233(d)] observed nor their substantive standards met by Altman and/or Brockman." ¶ 465. Thus, regardless of whether the board was adversely dominated, these were still prohibited self-dealing transactions.

## X.    XAI HAS PLED PLAUSIBLE ANTITRUST CLAIMS.[7]

### A.    xAI Plausibly Alleges Injury.

The FAC alleges sufficient harms to xAI resulting from Defendants' anticompetitive activities. ¶¶ 227, 246. Defendants' contrary arguments do not withstand scrutiny. *First*, Defendants wrongly claim the loss of actual and potential investors from their group boycott does not constitute antitrust injury because "competition as a whole" remains unharmed. Their cited case, *Eagle v.*

---

[7] Given the Court's ruling that Musk lacks standing to bring antitrust claims individually, Dkt. 121 at 6 n.3, Plaintiffs voluntarily dismiss so much of the FAC as makes him a party to antitrust claims.

CASE NO. 24-CV-04722-YGR
PLS.' OPPOSITION TO OAI MTD

*Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987), says nothing of the sort. Instead, it states: "the party alleging the injury must be either a consumer…or a competitor of the alleged violator in the restrained market." *Id.* at 540. OpenAI does not contest it competes with xAI, ¶ 226, and that both raise capital from high-value investors, ¶ 201, in the generative AI market where massive capital investment is essential to compete, ¶¶ 220, 227, 246. Thus, competitive injury from the "alleged violator" is occurring "in the restrained market." *Eagle*, 812 F.2d at 540.

OpenAI's argument that its exclusive technology license to Microsoft cannot injure xAI also fails. While "a refusal to deal *by itself* cannot establish antitrust injury," *Universal Grading Serv. v. eBay, Inc.*, 2011 WL 846060, at *9 (N.D. Cal. Mar. 8, 2011) (emphasis added), xAI alleges more than that: the exclusive license was secured and executed "with the intent to restrain trade" and "substantially lessen[s] competition or tend[s] to create a monopoly in the market for generative AI." ¶¶ 331(c), 353. The same applies to Microsoft's provision of below-cost compute on secret terms unavailable to competitors—both intended to "create or carry out restrictions in the trade of commerce of generative AI," ¶ 340(a), along with other prohibited purposes, ¶ 340(b)-(e).

Indeed, the FAC contains numerous allegations—entirely plausible given Defendants' 69% market share seized through this and additional anticompetitive conduct like group boycotts and interlocking boards—that such conduct serves "the purpose of injuring competitors or destroying competition." *E.g.*, ¶¶ 344-46. Thus, xAI has properly pled injury, including from the reduced pricing of its products, resulting from Microsoft and OpenAI's below-cost pricing designed to "injur[e] competitors or destroy[] competition." *Id.*

**B.      The FAC Pleads Plausible *Per Se* and Rule-of-Reason Violations of § 1 of the Sherman Act and § 16720 of the Cartwright Act (Counts IX and XI).[8]**

1.      *The FAC Plausibly Alleges a* Per Se *Violation*.

In evaluating a motion to dismiss antitrust claims, courts avoid pleading requirements beyond the *Twombly* and *Iqbal* standards, requiring only sufficient factual allegations to suggest

---

[8] As "federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act," Plaintiffs discuss federal cases on the understanding this analysis applies *mutatis mutandis* to their Section 16720 claim. *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 5th 381, 400 (2020).

25                                    CASE NO. 24-CV-04722-YGR
                                       PLS.' OPPOSITION TO OAI MTD

discovery may reveal evidence of necessary elements. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). To establish a *per se* violation, xAI must allege: "(1) unlawful conduct, (2) causing an injury to [it], (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (internal quotation marks omitted). OpenAI's participation in a group boycott, by explicit agreement with Microsoft or as part of a hub-and-spoke conspiracy, constitutes a *per se* violation of Section 1.[9] The Ninth Circuit recently described a group boycott as:

> [A] concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors,…or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, the hallmark of the 'group boycott' is the effort of competitors to barricade themselves from competition at their own level.

*Id.* at 834 (quotation marks omitted); *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).

The FAC alleges Defendants engaged in unlawful conduct by "conditioning the opportunity to invest in OpenAI on an agreement by investors not to deal with and/or invest in the competitors of Microsoft and OpenAI in generative AI," ¶ 331(a), and that "during OpenAI's latest funding round in early October 2024, on information and belief, Altman, in concert with and at the urging of other Defendants, conditioned investors' ability to participate in the heavily oversubscribed offering on their agreeing not to invest in OpenAI's competitors, specifically calling out xAI," ¶ 201. The FAC quotes the *Financial Times* reporting: "OpenAI has asked investors to avoid backing rival start-ups such as Anthropic and Elon Musk's xAI, as it secures $6.6bn in new funding and seeks to shut out challengers to its early lead in generative artificial intelligence." *Id.*

OpenAI's argument that the FAC lacks the "who, what, when, where, and how" of the agreement disregards its specificity. The FAC identifies: the "who" (Altman/OpenAI with other

---

[9] Plaintiffs' assertion in its preliminary injunction motion that OpenAI's boycott should be imputed to Microsoft (due to its control) does not abandon Plaintiffs' argument that Microsoft agreed to the boycott—it supplements it. *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 763 (N.D. Cal. 2024) ("plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.") (quoting *Twombly*, 550 U.S. at 556)).

Defendants, including Microsoft), ¶¶ 331(a), 201; the "what" (conditioning investment in OpenAI on agreeing not to invest in competitors, like xAI), ¶ 331(a); the "when" (during OpenAI's funding round in early October 2024), ¶ 201; the "how" (making participation in OpenAI's oversubscribed funding round contingent on agreeing not to invest in competitors), *id.*; and the "where" (at investment meetings where negotiations occurred), *id*. This detail suffices at the pleading stage, especially because the specifics are in Defendants' and third-party investors' exclusive possession until discovery. *Copeland*, 716 F. Supp. 3d at 763. Multiple news reports from knowledgeable sources, ¶ 201, further support the plausibility of the FAC's allegations and justify discovery, even if they may not have warranted preliminary injunctive relief.

2.  *The FAC Pleads a Plausible Rule-of-Reason Violation*.

To state a rule-of-reason Section 1 claim, a plaintiff need only allege conduct with "a substantial anticompetitive effect that harms consumers" in a "relevant market" by defendants with the market power to cause such harm. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018). The FAC does so by detailing Defendants' funding restriction that "unreasonably reduc[e] competition in the market for generative AI," ¶ 331(a)-(q), by restricting access to the funding necessary for the "tremendous expense" of developing it, ¶¶ 209, 213-15, 220; defining the relevant market as "generative AI models and platforms" with specific qualifying characteristics, ¶¶ 204, 206; *Newcal Indus.*, 513 F.3d at 1045; and by alleging Defendants' market power is sufficient to cause, and has caused, actual competitive harm, ¶¶ 333, 216 (alleging OpenAI-Microsoft collectively control 69% of the generative AI market); *e.g.*, *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1073 (N.D. Cal. 2022) (65% establishes prima facie market power). These allegations present a plausible rule-of-reason claim under Section 1.

**C.  The FAC's Other Allegations Support § 1 Liability.**

OpenAI fails to address xAI's Section 1 rule-of-reason claim built on 16 specifically alleged anticompetitive acts—not just its group boycott. Its omission concedes that the collective impact of these acts sufficiently states a rule-of-reason violation. While OpenAI claims there is no authority, for example, that abuse of tax-exempt status states an antitrust claim, that simply reflects the unprecedented nature of OpenAI's misconduct, not a limitation on antitrust law. ¶ 331.

**D.      The FAC Pleads a Plausible Claim Under § 8 of the Clayton Act (Count XVI).**

Section 8 of the Clayton Act prohibits a "person" from simultaneously serving as a director or officer of competing corporations. 15 U.S.C. § 19. The FAC alleges that both Templeton and Hoffman violated this prohibition. ¶¶ 369-75. As the Court stated at the preliminary injunction hearing after full briefing: "Neither of them have any business being on that board." Hr. Trans. at 40, ln. 5. The Court nonetheless dismissed as moot those portions of this claim seeking *prospective* relief based on Templeton and Hoffman's resignations and indicated further briefing is not required. Dkt. 121 at 11 n.8. xAI maintains—with strong support from the United States and FTC—that its prospective Section 8 claim is not moot. Dkt. 87 at 4-6 (resignation does not moot Section 8 claim, "[o]therwise '[a] defendant [would be] free to return to his old ways,' and that, 'together with a public interest in having the legality of the [disputed] practices settled, militates against a mootness conclusion." (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953))).

xAI emphasizes that, even if the claims are currently moot, that does not eliminate its claim for damages resulting from the prior interlocks. Contrary to OpenAI's assertion, xAI has pled injury from the unlawful interlocks: "xAI has been harmed by…the exclusive exchange between OpenAI and Microsoft of competitively sensitive information, such as customer lists, pricing data, and research, resulting in an unlawful competitive advantage," ¶¶ 227, 246, consistent with "[t]he purpose of the prohibition on interlocking directorates [] to prevent the sharing of competitively sensitive information" and coordination of "anticompetitive activity." ¶ 380.[10]

**E.      The FAC Pleads a Plausible Claim Under § 2 of the Sherman Act (Count X).**

The FAC alleges a joint monopolization scheme between Microsoft and OpenAI. OpenAI, like Microsoft, predicates its arguments on the erroneous belief that joint efforts to monopolize are not actionable. Yet the Supreme Court recognizes that Section 2 liability extends to joint action.

---

[10] OpenAI wrongly suggests interlocks that do not violate Section 8 will also fail to constitute a Section 1 violation. As the U.S. and FTC explained, interlocks that violate the spirit of the law, regardless of technicalities, are a form of unfair competition, Dkt. 87 at 7-10, rendering them independently actionable under California's UCL. OpenAI's *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146 (D.D.C. 2016) citation is not to the contrary. That case's analysis centered on a *RICO claim* and otherwise only concerned "alleg[ed] violations…under 15 U.S.C. § 19" (without the pleading of required elements present here, ¶¶ 278-79, *id* at 164 n.10, which, again, is distinct from an interlock claim under Section 1 or the UCL. Dkt. 87 at 7-10.

*Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) ("Monopoly power may be equally harmful whether it is the product of joint action or individual action."). Moreover, a conspiracy to monopolize *necessarily* requires joint conduct. The cases cited by OpenAI do not contradict this. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) addressed oligopoly *pricing*, not joint market share, and even then, it held only that "oligopoly pricing standing alone does not prove that [a company] has market power." *Id.* at 1442.[11] As detailed above, the FAC alleges far more misconduct than just predatory pricing. *See supra* pp. 25-27.

## F. The FAC Pleads Plausible Predatory Pricing Claims (Counts IX, X, XII).

A predatory pricing claim requires two elements: (1) the predatory price was below the predator's cost of production and (2) the predator had "a dangerous probability of recouping its investment in below-cost prices." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223-24 (1993). The Unfair Practices Act explicitly prohibits below-cost pricing when done for the purpose of injuring competitors or competition. Cal. Bus. & Prof. Code § 17043; *Bay Guardian Co. v. New Times Media LLC*, 187 Cal. App. 4th 438, 456 (2010) (proof of recoupment not required); Bus. & Prof. Code § 17024 (UPA applies to services and intangibles, excluding movie licenses). The FAC alleges that "OpenAI is projected to spend $8.5 billion on just personnel and generative AI training this year alone. Yet OpenAI charges Microsoft and the public considerably less for its generative AI products than they cost to produce." ¶ 222. As a result of this below-cost pricing strategy, "OpenAI is on track to lose $5 billion this year" with "losses expected to soar to $14 billion per year by 2026." *Id*. The FAC further alleges OpenAI is "selling or giving away generative AI to Microsoft and the public at less than the cost thereof for the purpose of injuring competitors or destroying competition," ¶ 345, as part of a coordinated strategy where OpenAI and Microsoft charge identical prices despite "wildly different cost structures," ¶ 224. The

---

[11] *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2015 WL 7008185, at *3-4 (C.D. Cal. Sept. 18, 2015) and *Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal. 2010), cited by OpenAI, are equally distinguishable. *Lenhoff* concerned alleged monopolization by four large talent agencies *operating independently*—at most, an oligopoly. 2015 WL 7008185, at *1. By contrast, the FAC alleges monopolization via a de facto merger with interlocking boards, shared equity, and reciprocal exclusive arrangements. ¶¶ 112, 137, 147-72, 202, 241-42. The integration is so complete, Microsoft's CEO brags about it. ¶ 158. These factors likewise distinguish *Reudy*, 693 F. Supp. 2d at 1127 (addressing oligopolies rather than a de facto combination).

FAC further demonstrates a dangerous probability of recoupment, as OpenAI and Microsoft jointly control "approximately 69% of the worldwide market share for generative AI," ¶ 216, have successfully driven competitors like Inflection to "g[i]ve up its ambition to compete with OpenAI," ¶ 214, and as barriers to entry are prohibitively high, OpenAI will face minimal competitive constraints as rivals are eliminated. At this preliminary stage, the FAC plausibly alleges OpenAI's predatory pricing, *Brooke Grp.*, 509 U.S. at 222-24, especially as cost and pricing data is in OpenAI's exclusive control. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012).

The FAC further alleges OpenAI offers secret discounts and provides "special services or privileges not extended to all purchasers" of generative AI. ¶ 349. As alleged, the opaque corporate structure of the OpenAI-Microsoft For-Profit Entities, ¶¶ 5, 124, 146, undisclosed terms of exclusive licensing agreements, ¶ 348, and concealed financial arrangements shielding preferential pricing from scrutiny, *id,* collectively make xAI's allegation of "secrecy" plausible. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1051 (9th Cir. 2008) ("Newcal's complaint alleges that 'IKON and GE have entered into exclusive dealing arrangements with their IKON Contracts'….That allegation, which we must accept as true, is enough to survive dismissal under Rule 12(b)(6).").

G.     **The FAC Pleads Plausible Claims Under § 3 of the Clayton Act and § 16727 of the Cartwright Act (Counts XIII and XIV).**

Section 3 of the Clayton Act prohibits exclusive dealing that has a "tendency to foreclose existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement." *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (internal quotation marks omitted). Section 16727 of the Cartwright Act prohibits the same, except the percentage of market foreclosure required to state a claim is considerably lower. *Fisherman's Wharf Bay Cruise Corp. v. Super. Ct.*, 114 Cal. App. 4th 309, 336-37 (2003) (20% market foreclosure may suffice).

Even under a rule-of-reason analysis, the FAC alleges sufficient facts showing competitive harm. The Ninth Circuit has held a plaintiff need only plead "enough factual matter (taken as true) to suggest that an agreement was made" and that the agreement unreasonably restrained trade to survive dismissal. *Kendall*, 518 F.3d at 1047. The FAC satisfies this standard by alleging that

Microsoft exclusively licensed OpenAI's technology, ¶¶ 133-34, 352-53, while OpenAI obtains compute exclusively from Microsoft, ¶ 331(d), in markets where both Microsoft and OpenAI have power, "substantially lessen[ing] competition or tend[ing] to create a monopoly," ¶¶ 352-53. OpenAI's "unitary enterprise" argument under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), fails because that doctrine applies to parent-subsidiary relationships, whereas the FAC alleges OpenAI and Microsoft are separate entities with agreements that unreasonably restrain trade. ¶ 331. The test is whether the agreement "deprives the marketplace of independent centers of decision making," *Am. Needle*, 560 U.S. at 195 (internal quotation marks omitted), which occurred here by effectively merging two major AI firms and a key compute firm.

Further, as explained in Plaintiffs' opposition to Microsoft's motion, the fact Section 3 and Section 16727 apply only to "goods" or "commodities" is not dispositive. Courts have applied this provision flexibly in technology markets. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9-18 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (analyzing exclusive arrangements for anesthesiological services under antitrust laws).

**H.      The FAC Pleads a Plausible Claim Under § 7 of the Clayton Act (Count XV).**

Section 7 of the Clayton Act prohibits acquisitions that may "substantially [] lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The FAC alleges Microsoft acquired equity in OpenAI and its assets in ways that substantially lessen competition in the generative AI market. ¶ 361. It details Microsoft's substantial investments in OpenAI, ¶¶ 112, 147-48, 159, acquisition of significant equity in the For-Profit Entities, ¶ 361, escalating operational control over OpenAI, ¶¶ 147-72, and how Defendants exploited this joint power to benefit their private interests while undermining market competition, ¶¶ 156-61.

OpenAI incorrectly narrows Section 7's scope by claiming exclusive licenses fall outside "asset" acquisitions. The Supreme Court has made clear, however, that Section 7 covers any transfer of control over competitively significant assets. *Brown Shoe Co. v. United States*, 370 U.S. 294, 316 (1962) ("no doubt that Congress…[wished] to include within the coverage of the Act the acquisition of assets no less than the acquisition of stock"); *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 340 (1963) (finding that Section 7's expansion was meant to plug "the assets-

acquisition loophole," which allowed effective mergers to be structured as such). Furthermore, the difference between an exclusive IP license and assignment is minimal, e.g., copyright law considers both to be transfers of ownership. *See e.g.*, *Corbello v. DeVito*, 777 F.3d 1058, 1062 (9th Cir. 2015) ("both exclusive licenses and assignments [are] 'transfer[s] of copyright ownership.'" (quoting 17 U.S.C. § 101)). Microsoft's exclusive license of OpenAI's technology effectively transfers control to the exclusion of competitors, posing an "appreciable danger" of anticompetitive effects. *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015). In any event, Microsoft's argument ignores its acquisition of significant equity in the For-Profit Entities, which is unambiguously an asset and is specifically alleged to substantially lessen competition. FAC ¶ 2, 125, 145, 147, 361.

Contrary to OpenAI's argument, the FAC explicitly alleges that such acquisitions and control may "substantially lessen competition or tend to create a monopoly in the market for generative AI," ¶¶ 361-64, which is all Section 7 requires. OpenAI's focus on transaction technicalities over anticompetitive effects prioritizes form over substance, contradicting antitrust principles that emphasize economic realities rather than formalistic distinctions. *See, e.g.*, *Reading, Int'l, Inc. v. Oaktree Cap. Mgmt.*, 317 F. Supp. 2d 301, 327-28 (S.D.N.Y. 2003) (rejecting reading of antitrust statute that "elevate form over substance").

## XI. OPENAI'S CHALLENGE TO CLAIMS FOR AIDING & ABETTING AND UNFAIR COMPETITION FAILS (COUNTS V, VIII, XVII, XXI, & XXIV).

### A. The Accessory Claims Are Plausibly Pled and Independently Viable.

*First*, OpenAI mischaracterizes the FAC claiming it portrays the For-Profit Entities as mere "agents" of Altman. However, the FAC alleges these entities are *legally distinct with* separate economic interests. ¶¶ 324, 433, 476; *see* ¶¶ 241-42. Courts consistently recognize that entities with their own economic interests can be liable for tortious interference even if corporate relationships exist. *See Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 962-63 (2013) (collecting cases); *Webber v. Inland Empire Invs.*, 74 Cal. App. 4th 884, 901 (1999);. The For-Profit Entities are legally distinct actors that knowingly participated in a scheme to divert OpenAI's intellectual property, scientific personnel, and other resources for private gain. ¶¶ 130-32.

*Second*, the FAC alleges how each accessory Defendant provided "substantial assistance" to the primary violations. The For-Profit Entities were formed and operated to enable diversion of intellectual property and other assets from the non-profit OpenAI, Inc., ¶¶ 128-32, facilitating its breach of contract, the breaches of fiduciary duties, and fraud. The FAC details how the For-Profit Entities provided "substantial assistance or encouragement" by furnishing the corporate structure used to divert the charity's assets, exclusively licensing the charity's technology to Microsoft, granting it enormous equity and profit positions in OpenAI, and prioritizing profits over safety—all contrary to OpenAI's charitable mission. ¶¶ 324-25, 434, 477; *see Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1145 (2005) ("[E]ven 'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort.").

*Third*, those of these claims based on Plaintiffs' underlying fraud are not time-barred under the discovery rule for the same reasons discussed *supra* pp. 13-14. Plaintiffs could not have discovered Defendants' aiding and abetting conduct until recently. While the For-Profit Entities existed earlier, their true purpose remained hidden behind Altman's careful public portrayal of them "as a mere fundraising apparatus" from which investors should not expect returns. ¶¶ 124-27. The discovery rule postpones the limitations period until a plaintiff "has reason to suspect an injury and some wrongful cause," *Fox*, 35 Cal. 4th at 807, which only occurred as "Altman's scheme has now become clear," ¶ 146, through recent and overt actions to "convert OpenAI entirely to a for-profit company," ¶¶ 194-95. Even Public Citizen, whose mission is exposing such wrongdoing, did not detect OpenAI's misconduct until January 2024, demonstrating that these violations remained effectively concealed from reasonable observers. ¶ 183.

Finally, Defendants' dismissive "shotgun pleading" argument mischaracterizes the FAC and the underlying facts. The FAC's structure and multiple causes of action result from the deliberately complex and opaque corporate structure and maneuvers engineered by Defendants themselves to exploit the charitable form and skirt the law. *E.g.*, ¶¶ 5, 123-24, 126, 128, 131-32, 146, 313, 331(j). The numerous causes of action, and the need to include all the For-Profit Entities, reflect the breadth and depth of Defendants' misconduct and secrecy. The law does not privilege wrongdoers

who commit multiple violations by requiring Plaintiffs to funnel their misconduct into fewer, simpler claims. The FAC provides as much specificity as could reasonably be expected before discovery, given Defendants' systematic concealment of critical information in their sole possession regarding the precise relationships, roles, and financial arrangements among their myriad entities, prior to any discovery. Indeed, their deliberate lack of transparency regarding corporate structure and governance is itself central to Plaintiffs' claims. ¶¶ 127, 136, 243, 501.

### B. The UCL Claim Is Plausibly Pled.

The UCL is intentionally broad, covering "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Courts have repeatedly recognized that the UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotation marks omitted).

*First*, Plaintiffs have standing under the UCL. Musk has suffered injury in fact through the loss of over $44 million in donations solicited under false pretenses, and his other significant contributions to the charity. ¶¶ 246, 389. This easily satisfies the "economic injury" requirement. *L. Offs. of Mathew Higbee v. Expungem't Assist'ce Servs.*, 214 Cal. App. 4th 544, 561 (2013) ("There are innumerable ways in which economic injury from unfair competition may be shown…[T]he notion of 'lost money' under the UCL is not limited."). xAI has suffered competitive injury from the restriction of capital markets and increased costs resulting from OpenAI's anticompetitive conduct, establishing its standing under the UCL. *See Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 323 (2011) (holding economic injury from unfair competition is sufficient for standing).

*Second*, OpenAI's claim that Plaintiffs fail to specify which UCL prong they invoke is false. The FAC clearly alleges conduct that violates all three prongs of the UCL: (1) "unlawful" business practices through violations of specific statutes, including tax, antitrust, and copyright laws, ¶ 387; (2) "unfair" business practices in violation of established public policies, specifically by soliciting contributions under the false pretense that such would be used for the purposes articulated in OpenAI, Inc.'s governing documents and public communications, ¶ 384; and (3) "fraudulent" practices where Defendants actively deceived Musk and the public by misusing OpenAI, Inc.'s

charitable mission and tax-exempt status to secure donations as free start-up capital to develop valuable technology for Defendants' personal gain, ¶¶ 385, 388.

*Third*, the alleged statutory violations are not "pure conclusions of law" as OpenAI contends, but are based on the FAC's detailed factual allegations, incorporated by reference. ¶ 383. For instance, FAC paragraphs 135-45 detail specific self-dealing transactions; paragraphs 173-80 detail the comprehensive abandonment of OpenAI's open-source commitment; and paragraphs 194-202 document the conversion to a for-profit structure. OpenAI ignores these detailed factual allegations which provide the foundation for the statutory UCL claim.

Finally, the UCL claim is not impermissibly duplicative. California courts have consistently held that UCL claims can be maintained alongside other causes of action based on the same conduct. *See Zhang v. Super. Ct.*, 57 Cal. 4th 364, 383 (2013) ("By proscribing 'any unlawful' business act or practice, the UCL 'borrows' rules set out in other laws and makes violations of those rules independently actionable. However, a practice may violate the UCL even if it is not prohibited by another statute."). Here, the UCL claims are based on independent factual allegations of unfair, unlawful, and fraudulent business practices by OpenAI that harmed both Plaintiffs and the public.

## **CONCLUSION**

For the foregoing reasons, OpenAI's Motion to Dismiss should be denied.


DATED: March 24, 2025              Respectfully Submitted,

                                   TOBEROFF & ASSOCIATES, P.C.

                                   _____/s/ Marc Toberoff_____
                                        Marc Toberoff

                                   *Attorneys for Plaintiffs Elon Musk,*
                                   *Shivon Zilis, and X.AI Corp.*