JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted *pro hac vice*)
BRWilson@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:    (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman,*
*OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,*
*OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,*
*OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,*
*OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,*
*OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,*
*OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,*
*OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,*
*OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,*
*Aestas Management Company, LLC, and Aestas LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **OPENAI DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| v. | |
| SAMUEL ALTMAN, et al., | Date: May 28, 2025 |
| Defendants. | Time: 10:00 a.m.<br>Courtroom: 1 – 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

INTRODUCTION .............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.      MUSK'S ALLEGATIONS CANNOT SUPPORT ANY CONTRACT CLAIM. ............. 2

        A.      Musk fails to plead breach of an express contract (Count I). .................................... 2

        B.      Musk does not plead an implied contract (Count II). ............................................... 6

        C.      Musk does not plead an implied covenant claim (Count III). ................................ 9

II.     PLAINTIFFS' ALLEGATIONS CANNOT SUPPORT ANY FRAUD CLAIM. ........... 10

        A.      Musk's fraud claim is time-barred (Count VII). ..................................................... 10

        B.      Musk fails to plead fraud with particularity (Count VII). ...................................... 11

        C.      Musk's unjust enrichment claim falls with his fraud claim (Count IV). ............... 13

        D.      Musk's constructive fraud claim likewise fails (Count VI). .................................. 13

        E.      Musk and xAI do not plead a civil RICO violation (Counts XXV & XXVI). ....... 14

                1.      Plaintiffs do not allege predicate acts of wire fraud. ................................. 14

                2.      Plaintiffs' RICO claims also fail for independent reasons. ....................... 15

III.    MUSK'S CLAIM FOR BREACH OF CHARITABLE TRUST. ..................................... 16

IV.     THE FALSE ADVERTISING CLAIMS (COUNTS XVIII & XIX) SHOULD BE
        DISMISSED. .................................................................................................................. 16

        A.      Plaintiffs' California false advertising claim (Count XIX) fails. ........................... 17

        B.      Plaintiffs' Lanham Act claim (Count XVIII) fails. ................................................ 19

V.      PLAINTIFFS' DERIVATIVE CLAIMS (COUNTS XXII, XXIV) FAIL. ...................... 20

        A.      Musk and Zilis lack standing to assert derivative claims. ..................................... 20

        B.      Musk and Zilis fail to state a claim for breach of fiduciary duty (Count
                XXII). ..................................................................................................................... 22

VI.     PLAINTIFFS' ANTITRUST CLAIMS (COUNTS IX-XVI). ......................................... 23

VII.    PLAINTIFFS' ACCESSORY CLAIMS (COUNTS V, VIII, XXI & XXIV) FAIL. ....... 23

VIII.   PLAINTIFFS' UCL CLAIM (COUNT XVII) SHOULD BE DISMISSED. ................... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfasigma USA, Inc.* v. *First Databank, Inc.*,
  525 F. Supp. 3d 1088 (N.D. Cal. 2021) ................................................................ 19

*Am. Emps. Grp., Inc.* v. *Emp. Dev. Dep't*,
  154 Cal. App. 4th 836 (2007) .............................................................................. 2

*Aniel* v. *PHH Mortg. Corp.*,
  2022 WL 2164702 (N.D. Cal. June 1, 2022) ....................................................... 14

*Anunziato* v. *eMachines, Inc.*,
  402 F. Supp. 2d 1133 (C.D. Cal. 2005) ............................................................... 18

*Astiana* v. *Hain Celestial Grp., Inc.*,
  783 F.3d 753 (2015) .............................................................................................. 13

*Baba* v. *Hewlett-Packard Co.*,
  2010 WL 2486353 (N.D. Cal. June 16, 2010) ..................................................... 25

*Bader* v. *Anderson*,
  179 Cal. App. 4th 775 (2009) ................................................................ 21, 22 & n.11

*Behnke* v. *State Farm Gen. Ins. Co.*,
  196 Cal. App. 4th 1443 (2011) ....................................................................... 11, 12

*Burch* v. *Premier Homes, LLC*,
  199 Cal. App. 4th 730 (2011) .............................................................................. 2

*Burnett* v. *Chimney Sweep*,
  123 Cal. App. 4th 1057 (2004) ............................................................................ 3

*Case del Caffe Vergnano S.P.A.* v. *ItalFlavors, LLC*,
  816 F.3d 1208 (9th Cir. 2016) ............................................................................. 2

*Casey* v. *U.S. Bank Nat'l Ass'n*,
  127 Cal. App. 4th 1138 (2005) ............................................................................ 23

*Chen* v. *PayPal, Inc.*,
  61 Cal. App. 5th 559 (2021) ......................................................................... 9 n.3

*Copeland* v. *Lane*,
  2013 WL 1899741 (N.D. Cal. May 6, 2013) ............................................... 21 n.10

*Desoto* v. *Condon*,
  371 F. App'x 822 (9th Cir. 2010) ........................................................................ 14

*Diaz* v. *Intuit, Inc.*,
  2018 WL 2215790 (N.D. Cal. May 15, 2018) ..................................................... 24

*Dreifort* v. *DJO Global Inc.*,
    2019 WL 5578240 (S.D. Cal. Oct. 28, 2019) ........................................................ 25

*Durell* v. *Sharp Healthcare*,
    183 Cal. App. 4th 1350 (2010) ........................................................................... 25

*Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ............................................................................ 14

*Fabian* v. *LeMahieu*,
    2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) ......................................................... 8

*Faigin* v. *Signature Group Holdings, Inc.*,
    211 Cal. App. 4th 726 (2012) .............................................................................. 9

*Ferrari* v. *Mercedes-Benz USA, LLC*,
    2016 WL 7188030 (N.D. Cal. Dec. 12, 2016) ..................................................... 15

*Fleming* v. *Coverstone*,
    2009 WL 764887 (S.D. Cal. Mar. 18, 2009) ........................................................ 4

*Gjovik* v. *Apple Inc.*,
    2024 WL 2309100 (N.D. Cal. May 20, 2024) ..................................................... 15

*Glenn* v. *Univ. of S. Cal.*,
    2002 WL 31022068 (Cal. Ct. App. Sept. 10, 2002) ................................... 7, 11, 12

*Haskins* v. *Symantec Corp.*,
    2013 WL 6234610 (N.D. Cal. Dec. 2, 2013) ........................................................ 5

*Haskins* v. *Symantec Corp.*,
    2014 WL 2450996 (N.D. Cal. June 2, 2024) ........................................................ 6

*Holguin* v. *Dish Network LLC*,
    229 Cal. App. 4th 1310 (2014) ........................................................................... 4

*HomeLight, Inc.* v. *Shkipin*,
    694 F. Supp. 3d 1242 (N.D. Cal. 2023) ......................................................... 17, 19

*Huynh* v. *Chase Manhattan Bank*,
    465 F.3d 992 (9th Cir. 2006) ............................................................................ 10

*Impac Warehouse Lending Grp.* v. *Credit Suisse First Boston Corp.*,
    2006 WL 6935318 (C.D. Cal. June 20, 2006) ..................................................... 24

*In re Apple Inc. Device Performance Litig.*,
    386 F. Supp. 3d 1155 (N.D. Cal. 2019) ............................................................... 2

*In re Massey Energy Co. Derivative & Class Action Litig.*,
    160 A.3d 484 (Del. Ch. 2017) ..................................................................... 22 n.11

*In re Toyota Motor Corp. Unintended Acceleration Mktg.*,
    754 F. Supp. 2d 1145 (C.D. Cal. 2010) ............................................................. 18

*In re Verisign, Inc. Derivative Litig.*,
  531 F. Supp. 2d 1173 (N.D. Cal. 2007) ............................................................ 14

*Jara* v. *Suprema Meats, Inc.*,
  121 Cal. App. 4th 1238 (2004) ........................................................................ 5

*Kashmiri* v. *Regents of Univ. of Cal.*,
  156 Cal. App. 4th 809 (2007) ......................................................................... 9

*Kona Enters., Inc.* v. *Estate of Bishop*,
  179 F.3d 767 (9th Cir. 1999)......................................................................... 21

*Laborers' Loc.* v. *Intersil*,
  868 F. Supp. 2d 838 (N.D. Cal. 2012) ...................................................... 22 n.11

*Langan* v. *United Servs. Auto. Ass'n.*,
  69 F. Supp. 3d 965 (N.D. Cal. 2014) ............................................................... 9

*Language Line Servs., Inc.* v. *Language Servs. Assocs., LLC*,
  2011 WL 13153247 (N.D. Cal. Mar. 17, 2011)................................................ 19

*Lantz Ret. Inv., LLC* v. *Glover*,
  2020 WL 528890 (E.D. Cal. Jan. 31, 2020)............................................... 22 n.11

*Lazar* v. *Superior Ct.*,
  12 Cal. 4th 631 (1996) ................................................................................ 12

*L.B. Rsch. & Educ. Found.* v. *UCLA Found.*,
  130 Cal. App. 4th 171 (2005) .......................................................................... 7

*LegalForce, Inc.* v. *LegalZoom.com, Inc.*,
  2019 WL 1170779 (N.D. Cal. Mar. 13, 2019)............................................ 19-20

*Levy* v. *Only Cremations for Pets, Inc.*,
  57 Cal. App. 5th 203 (2020) ....................................................................... 7, 8

*Louis* v. *Nailtiques Cosmetic Corp.*,
  423 F. App'x 711 (9th Cir. 2011) ................................................................... 11

*McCann* v. *Lucky Money, Inc.*,
  129 Cal. App. 4th 1382 (2005) ................................................................. 17, 18

*McMichael* v. *U.S. Filter Corp.*,
  2001 WL 418981 (C.D. Cal. Feb. 23, 2001).................................................... 22

*Melrose Place Holdings* v. *Socotra Opportunity Fund, LLC*,
  2022 WL 3013226 (C.D. Cal. May 31, 2022) ................................................. 24

*Metro Servs. Grp.* v. *Travelers Cas. & Sur. Co. of Am.*,
  2021 WL 2633416 (N.D. Cal. June 25, 2021) ................................................ 16

*Michaelian* v. *State Comp. Ins. Fund*,
  50 Cal. App. 4th 1093 (1996) ......................................................................... 6

*Mintz* v. *Blue Cross of Cal.*,
     172 Cal. App. 4th 1594 (2009) ..................................................................... 23

*Muldoon* v. *DePuy Orthopaedics, Inc.*,
     2024 WL 3522204 (N.D. Cal. July 23, 2024) .................................... 18 n.8

*Negrete* v. *Allianz Life Ins. Co.*,
     926 F. Supp. 2d 1143 (C.D. Cal. 2013) ....................................................... 15

*Netbula, LLC* v. *BindView Dev. Corp.*,
     516 F. Supp. 2d 1137 (N.D. Cal. 2007) ................................................... 5 n.1

*Newcal Indus., Inc.* v. *Ikon Office Sol.*,
     513 F.3d 1038 (9th Cir. 2008) ..................................................................... 18

*Off. Comm. of Bond Holders of Metricom, Inc.* v. *Derrickson*,
     2004 WL 2151336 (N.D. Cal. Feb. 25, 2004) .................................... 22, 23

*Pac. Bay Recovery, Inc.* v. *Cal. Physicians' Servs., Inc.*,
     12 Cal. App. 5th 200 (2017) .......................................................................... 2

*Pacira BioSciences, Inc.* v. *Ventis Pharma, Inc.*,
     2025 WL 576549 (C.D. Cal. Jan. 17, 2025) ....................................... 18 n.8

*Patel* v. *Liebermensch*,
     45 Cal. 4th 344 (2008) ................................................................................... 4

*People ex rel. Dep't of Motor Vehicles* v. *Cars 4 Causes*,
     139 Cal. App. 4th 1006 (2006) ............................................................... 17 n.7

*People* v. *Orange County Charitable Servs.*,
     73 Cal. App. 4th 1054 (1999) ................................................................. 17 n.7

*Potter* v. *Hughes*,
     546 F.3d 1051 (9th Cir. 2008) ..................................................................... 22

*Quinn* v. *Anvil Corp.*,
     620 F.3d 1005 (9th Cir. 2010) ..................................................................... 21

*Rachford* v. *Air Line Pilots Ass'n*,
     2006 WL 1699578 (N.D. Cal. June 16, 2006) ............................................ 24

*Reeder* v. *Specialized Loan Servicing LLC*,
     52 Cal. App. 5th 795 (2020) .......................................................................... 3

*Richardson* v. *Reliance Nat'l Indem. Co.*,
     2000 WL 284211 (N.D. Cal. Mar. 9, 2000) ............................................... 13

*Ross* v. *Sioux Honey Ass'n, Co-op.*,
     2013 WL 146367 (N.D. Cal. Jan. 14, 2013) ................................................. 6

*Sanford* v. *MemberWorks, Inc.*,
     625 F.3d 550 (9th Cir. 2010) ....................................................................... 16

vi

*Seva* v. *Shri Shirdi Sai Baba Sansthin L.A.*,
    2013 WL 1431673 (C.D. Cal. Apr. 9, 2013) .......................................................................... 14

*Shields* v. *Singleton*,
    15 Cal. App. 4th 1611 (1993) ................................................................................................ 21

*Stang* v. *Teal Drones, Inc.*,
    2023 WL 11956372 (N.D. Cal. July 27, 2023) ...................................................................... 23

*Sybersound Records, Inc.* v. *UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ............................................................................................... 15

*Two Ten, LLC* v. *Cellxion, LLC*,
    2012 WL 12905554 (C.D. Cal. Apr. 30, 2012) ..................................................................... 21

*Valencia* v. *Sharp Elecs. Corp.*,
    561 Fed. App'x 591 (9th Cir. 2014) ...................................................................................... 13

*Verde Media Corp.* v. *Levi*,
    2015 WL 374934 (N.D. Cal. Jan. 28, 2015) .............................................................. 5 & n.1, 13

*Voyager Indem. Ins. Co.* v. *Goldsmith*,
    733 F. Supp. 3d 905 (C.D. Cal. 2024) ................................................................................ 5 n.2

*Wagh* v. *Metris Direct, Inc.*,
    363 F.3d 821 (9th Cir. 2003) ................................................................................................. 16

*Weddington Prods., Inc.* v. *Flick*,
    60 Cal. App. 4th 793 (1998) ............................................................................................... 5 n.1

*Westron* v. *Zoom Video Commc'ns, Inc.*,
    2023 WL 3149262 (N.D. Cal. Feb. 15, 2023) ........................................................................ 6

*Wisniewski* v. *Presidio Place Condo. Ass'n*,
    2002 WL 31032464 (Cal. Ct. App. Sept. 12, 2002) .............................................................. 20

*Yari* v. *Producers Guild of Am., Inc.*,
    161 Cal. App. 4th 172 (2008) .................................................................................................. 7

*Zeiger* v. *WellPet LLC*,
    304 F. Supp. 3d 837 (N.D. Cal. 2018) ................................................................................... 18

*Zenith Ins. Co.* v. *O'Connor*,
    148 Cal. App. 4th 998 (2007) .................................................................................................. 7

**Statutes and Rules**

15 U.S.C. § 1125 ........................................................................................................................ 16

18 U.S.C. § 1962 .......................................................................................................... 14, 15, 16

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ............................................................................ 16, 17

Cal. Civ. Code § 1614 .................................................................................................................. 6

Cal. Civ. Code § 1620 ............................................................................................ 2

Cal. Civ. Proc. Code § 338 .................................................................................... 10

Cal. Corp. Code § 5233 .................................................................................. 20 n.9

Cal. Corp. Code § 5710 .................................................................................. 20, 21

Fed. R. Civ. P. 9(b) .................................................................................. 1, 11, 13, 14

Fed. R. Civ. P. 23.1 ................................................................................................ 21

**Other Authorities**

Restatement (Second) of Contracts § 2 .................................................................. 2

Restatement (Second) of Contracts § 17 ................................................................ 2

**INTRODUCTION**

Now on his third complaint, Musk still cannot plead a contract or a fraudulent promise. He says his charitable donations were not donations at all but the product of a *quid pro quo*—exchanged for identifiable contractual undertakings. Yet the only well-pleaded allegations defeat rather than support that characterization. Musk says false promises were made to him, but points to no allegation supporting knowledge that any identifiable promise was false when made. These defects doom many of Plaintiffs' claims, and the others that have not been sustained or stayed should likewise be dismissed with prejudice:

1.      Plaintiffs fail to plausibly plead the existence of any contractual promises governing Musk's alleged donations to OpenAI, Inc. ("OpenAI"). They identify no contractual terms, nor agreement to those terms by contractual counterparties, nor any bargained-for consideration in exchange. Plaintiffs cite no case, from any jurisdiction, sustaining a contract claim in these circumstances. Each of Musk's contract claims fails (Counts I, II, III, V).

2.      Plaintiffs likewise fail to allege any fraudulent promise (Counts IV, VI, VII, VIII), much less one that was broken, and still less so with the particularity required under Rule 9(b). Without that basic predicate, Plaintiffs' civil RICO claims (Counts XXV and XXVI) fail, too. Plaintiffs' fraud claims are also untimely on the face of the complaint and should be dismissed on that independent basis.

3.      Plaintiffs fail to allege the "commercial advertisement" needed to sustain their claims for false advertising under state or federal law (Counts XVIII and XIX), and again identify no case excusing this pleading defect.

4.      Plaintiffs now concede that they lack standing to assert any of their derivative claims pursuant to the Court's prior ruling on their derivative self-dealing claim (Counts XXII and XXIV).

5.      Plaintiffs' accessory claims (Counts V, VIII, XXI, XXIV) against more than a dozen so-called "For-Profit Entities" fail for want of any underlying primary violations, are unsupported by any well-pleaded allegations that any of these entities did anything to "substantially assist" in the alleged wrongdoing, and are legally barred by the "agency immunity" rule in any event.

Apart from claims that have been severed and stayed by the Court, the OpenAI Defendants'

1  motion to dismiss should be granted in full as to all remaining claims at issue (Counts I-VIII, XIX,

2  XXI, XXII, XXIV-XXVI).

3  **ARGUMENT**

4  **I.    MUSK'S ALLEGATIONS CANNOT SUPPORT ANY CONTRACT CLAIM.**

5    **A.    Musk fails to plead breach of an express contract (Count I).**

6     Musk says he has pleaded an express written "contract" with Altman and OpenAI, grounded

7  in the disjointed collection of public filings, emails, blog posts and other documents cited in the

8  FAC. *See* ¶ 251. He has not. As the OpenAI Defendants showed in their opening brief, none of

9  these documents—individually or taken together—reflects the "vital elements" of "mutual assent"

10  and bargained-for "consideration" required to state a claim for breach of an express contract under

11  California law. *Pac. Bay Recovery, Inc.* v. *Cal. Physicians' Servs., Inc.*, 12 Cal. App. 5th 200, 215

12  (2017) (citing Cal. Civ. Code § 1620); *see* Br. at 5-8.

13     ***No mutual assent***. "Plaintiffs fail to state a claim" for breach of an express contract where

14  they "fail to specify what the contract is" or "what its terms are." *See In re Apple Inc. Device*

15  *Performance Litig.*, 386 F. Supp. 3d 1155, 1182 (N.D. Cal. 2019). The FAC flunks this test, as it

16  pleads no facts showing "mutual intention to be bound by an agreement," *i.e.*, "the *sine qua non* of

17  legally enforceable contracts." *Case del Caffe Vergnano S.P.A.* v. *ItalFlavors, LLC*, 816 F.3d 1208,

18  1212 (9th Cir. 2016) (citing Restatement (Second) of Contracts §§ 2, 17). Nothing in the assortment

19  of documents Musk cites shows a "meeting of the minds on all material points" or evidences an

20  objective, and mutual, "intent to be bound" to the terms alleged. *See Am. Emps. Grp., Inc.* v. *Emp.*

21  *Dev. Dep't*, 154 Cal. App. 4th 836, 846-47 (2007); *Burch* v. *Premier Homes, LLC*, 199 Cal. App.

22  4th 730, 746 (2011). This defect alone requires dismissal.

23     In his opposition, Musk simply rehashes the conclusory allegations of the FAC, claiming to

24  have personally received "specific commitments from Altman and OpenAI, Inc.," including (1) that

25  "OpenAI would be a section 501(c)(3) non-profit and retain ownership of all its AI technology,"

26  (2) that its "technology would serve public, not private interests," (3) that it would operate

27  "unconstrained by a need to generate financial return," (4) that its "benefits would be widely and

28  evenly distributed to avoid undue concentrations of power," (5) that its "technology would be open

2

sourced for public benefit," and (6) that it "would prioritize safety over profit." Opp. at 6 (citing ¶ 251). Musk asserts that these "terms" were "proffered by Altman/OpenAI, Inc." and that he personally accepted them. *Id.* But the FAC alleges no facts to support this bare assertion, much less any facts showing "clear, ascertainable [contractual] obligations." *See id.*

The majority of these "terms" are ones Musk purports to draw from OpenAI's initial registration form with the California Attorney General and the Delaware Certificate of Incorporation attached thereto. *See* ¶ 251(a), (b), (c), (d), (e), (f) (citing FAC, Ex. 21). Musk identifies no authority suggesting OpenAI's filings with public regulators—which do not mention Musk—can reflect contractual commitments to him personally. *See Burnett* v. *Chimney Sweep*, 123 Cal. App. 4th 1057, 1069-70 (2004) (third party not mentioned in written instrument could not sue for alleged breach of contract, as a "third party should not be permitted to enforce covenants made not for his benefit, but rather for others[;] [h]e is not a contracting party"). Nor do the emails Musk identifies attaching a draft press release in December 2015 (*see* FAC, Ex. 4) and OpenAI's Charter two-and-a-half years later (*see* FAC, Ex. 17) contain any promises directed toward Musk.

As for the June 2015 email exchange in which Altman and Musk brainstormed a possible "AI lab," (FAC, Ex. 2), it is well-settled that "[p]reliminary negotiations" "are not enforceable contracts." *Reeder* v. *Specialized Loan Servicing LLC*, 52 Cal. App. 5th 795, 802-03 (2020) ("alleged oral agreement" reflecting at most "[p]reliminary negotiations" was "so uncertain and indefinite that the intention of the parties in material particulars [could not] be ascertained"). Altman's email, sent months before OpenAI even existed, is not even that; it is preliminary brainstorming, containing no offer or undertaking to Musk of any kind.

Nor do the pleaded facts show Musk's "assent" to these supposed commitments. Musk claims to have "assented" to these "terms" on two occasions: (1) writing "[a]gree on all" in response to Altman's preliminary brainstorming email in June 2015, sent months before OpenAI—one of two alleged counterparties—even existed (FAC, Ex. 2); and (2) responding "ok" more than two years later to a September 2017 email in which *Zilis* (not an alleged counterparty) purported to summarize *Brockman*'s *and Sutskever*'s (not alleged counterparties) thinking regarding OpenAI's structure and fundraising, in which Zilis expressly *disclaimed* having "spoken to Altman" (the other

alleged counterparty) (FAC, Ex. 14). *See* Opp. at 6. Musk does not dispute that the first of these emails was sent when OpenAI did not even exist and remained entirely hypothetical, nor does he contest that the second email does not involve any of the alleged counterparties to the purported contract. And neither email includes the purported terms of the contract, let alone reflects that any of the alleged counterparties intended to be bound by them.

Musk identifies no case recognizing an enforceable contract in similar circumstances. He invokes *Holguin* v. *Dish Network LLC*, 229 Cal. App. 4th 1310 (2014), for the proposition that a contract "may exist in a series of informal writings" under California law. Opp. at 6. But the "series" of documents in that case included several "written instruments" memorializing a satellite TV purchase—an "Order Form, Residential Customer Agreement, Service Agreements, and Promotion Agreement [that] were part of a single transaction"—and were "so interrelated as to be considered one contract," including because several of them "expressly reference[d] or incorporate[d] one another." *Holguin*, 229 Cal. App. at 1321. In stark contrast, Musk's disparate documents reflect no concrete contractual terms, span several years, cover a wide variety of unrelated topics, largely do not even reference the supposed counterparties to the alleged contract, make no reference to each other, and contain no suggestion that they were intended to "incorporate one another" or to otherwise "be considered one contract." *Id*.

Musk cites *Patel* v. *Liebermensch*, 45 Cal. 4th 344, 349 (2008), to suggest that a lack of "technical precision" will not preclude finding an enforceable contract. *See* Opp. at 6. But the contract at issue in *Patel* was a written option agreement, clearly entitling a tenant to purchase a residential property. The only "[im]precision" at issue was the time and manner of payment contemplated by the written instrument. *Patel*, 45 Cal. 4th at 350.

Finally, Musk cites *Fleming* v. *Coverstone*, 2009 WL 764887 (S.D. Cal. Mar. 18, 2009), for the unremarkable proposition that an email response of "Agreed" can form a contract. *See* Opp. at 6-7. But again, *Fleming* only highlights the deficiencies in Musk's claim. There, the plaintiff sent a message "confirm[ing] that [he] ha[d] agreed to sell and that [the defendant] ha[d] agreed to purchase" certain patents—the email specified the precise patents involved in the sale, the purchase price, closing date, details pertinent to the assignment of the intellectual property, and the manner

4

of acceptance. 2009 WL 764887 at *1. Defendant accepted that contract by emailing "[a]greed. I will wire the [purchase price] tomorrow to your account." *Id*. Nothing approximating that clear, unequivocal agreement to precise contractual terms exists here. That is dispositive. *See, e.g., Haskins* v. *Symantec Corp.*, 2013 WL 6234610, at *10 (N.D. Cal. Dec. 2, 2013) (dismissal where plaintiff "attempt[ed] to cobble together" a contract from disparate sources); *see also Verde Media Corp.* v. *Levi*, 2015 WL 374934, at *7 (N.D. Cal. Jan. 28, 2015) (dismissal; no contract based on an "in-person discussion and a few short and vague instant messages").[1]

For these reasons, Musk is wrong that "conflicting interpretations of the evidence" preclude dismissal. Opp. at 8. Even accepting the well-pleaded allegations of the complaint as true, the assortment of emails and other documents Musk points to do not plausibly suggest the existence of an enforceable written contract as a matter of law. Courts regularly dismiss express contract claims on the pleadings in similar circumstances. *See, e.g.*, *Haskins* v. *Symantec Corp.*, 2013 WL 6234610 at *10; *Verde Media Corp.*, 2015 WL 374934 at *7.[2]

***No bargained-for consideration***. Nor does the FAC plead bargained-for consideration. As the OpenAI Defendants demonstrated in their opening brief (Br. at 8), not one of the documents alleged to constitute Musk's express, written contract indicates that OpenAI or Altman agreed to Musk's "commitments" *in exchange* for his donations—*i.e.*, that any gift Musk conferred was "bargained for," *Jara* v. *Suprema Meats, Inc.*, 121 Cal. App. 4th 1238, 1249 (2004). Indeed, *not a single document* cited by Musk mentions *any* commitment by Musk to do anything at all—no

---

[1] Nor would any of Musk's alleged "terms" be "sufficiently definite . . . to constitute an enforceable contract." *Netbula, LLC* v. *BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007). Contract terms must be certain enough to "provide a basis for determining what obligations the parties have agreed to" and "make possible a determination of whether those agreed obligations have been breached." *Weddington Prods., Inc.* v. *Flick*, 60 Cal. App. 4th 793, 811-12 (1998); *Verde Media*, 2015 WL 374934, at *7. The purported "terms" Musk alleges—*e.g.*, avoiding "undue concentrations of power" and "prioritiz[ing] safety over profit," among others (Opp. at 6)—are too abstract to constitute enforceable contractual terms.

[2] *Voyager Indem. Ins. Co.* v. *Goldsmith*, 733 F. Supp. 3d 905 (C.D. Cal. 2024), does not suggest otherwise—the parties there disputed whether the defendant had orally accepted a formal written settlement demand, a quintessential fact question incapable of being resolved on the pleadings. *Id.* at 918-20.

document reflects a commitment by Musk to contribute to OpenAI, let alone in any specific amount, or in exchange for any specific promises from Altman or OpenAI.

Musk cites Cal. Civ. Code § 1614 for the proposition that "[a]dequacy of consideration is presumed where, as here, there is written evidence of an agreement." Opp. at 8 n.3. Musk is wrong—Section 1614's presumption applies only where a contract is evidenced by a "written instrument," not a series of informal writings. Where the writings alleged are other than "formal legal documents," nothing is presumed. *Michaelian* v. *State Comp. Ins. Fund*, 50 Cal. App. 4th 1093, 1112 (1996) (no presumption applied to letters).

Musk otherwise rehashes the FAC's conclusory assertion that Altman and OpenAI agreed to his terms "in consideration for Musk's contributions [$44 million], leasing of OpenAI, Inc.'s office space, and payment of overhead, and [his] time, skill, advice, stature, and connections." Opp. at 8 (citing ¶ 251). Recognizing that nothing in this allegation reflects any "bargain," Musk points to "Altman's [purported] solicitations and promises to Musk . . . most saliently the September 2017 email in which Altman promised to continue OpenAI as a non-profit in exchange for Musk's continued funding." *See* Opp. at 8-9 (citing ¶¶ 103-04, 306-07 & FAC, Ex. 13 at 1, 4). Setting aside that the majority of Musk's alleged donations preceded Altman's September 2017 email, the email reflects no "solicitation" or "promise" to Musk, nor any commitment by Musk to do anything, nor any other basis of consideration: Altman merely expressed his continued "enthusias[m]" about OpenAI's "non-profit structure." *See* FAC, Ex. 13. If this is a bargain, the concept has no meaning.

### B. Musk does not plead an implied contract (Count II).

Implied contract claims must be dismissed on the pleadings where the plaintiff "alleges only that the parties' implied contract arose in some nonspecific manner from the Parties' acts and conduct" and fails to identify the "source of [the] claimed terms," or to "explain how those terms became part of the parties' legal agreement." *Haskins* v. *Symantec Corp.*, 2014 WL 2450996, at *4 (N.D. Cal. June 2, 2014); *see also Westron* v. *Zoom Video Commc'ns, Inc.*, 2023 WL 3149262, at *2 (N.D. Cal. Feb. 15, 2023) (dismissing for failure to plead implied contract "with sufficient particularity"); *Ross* v. *Sioux Honey Ass'n, Co-op.*, 2013 WL 146367, at *18 (N.D. Cal. Jan. 14, 2013) (dismissal where plaintiff failed to "include any specific allegations suggesting that the

conduct of the parties [] manifested an intent to create a contract, nor what the terms of that contract might be" and failed to "describe [a] bargained-for exchange at the core of the [alleged] implied contract").

Musk's opposition argues that an implied contract was formed when he made "substantial contributions" to OpenAI that were then "accepted by Altman and OpenAI, Inc. to fund and further OpenAI's operation as a non-profit dedicated to the development of safe and open AI." Opp. at 9-10; *see also* ¶ 260. But that is no different than arguing that Musk contributed to OpenAI on the understanding that OpenAI would be a nonprofit. If that generalized allegation were sufficient to create an implied contract under California law, every donor would have an implied contract with the charity they donated to on the same basis.

That is not the law. To the contrary, the few cases that have found enforceable contractual commitments in the donor context have done so only where clear and definite terms directed that donations be used for specific purpose—for example, a contract specifying restrictions on a particular "endowed chair . . . in Cardiothoracic Surgery" within a broader charitable organization. *See L.B. Rsch. & Educ. Found.* v. *UCLA Found.*, 130 Cal. App. 4th 171, 175-76 (2005); *Glenn* v. *Univ. of S. Cal.*, 2002 WL 31022068, at *1, *3 (Cal. Ct. App. Sept. 10, 2002) (cited in Opp. at 12) (permitting breach of contract claim concerning donation "to endow a professional chair to support young, untenured researchers" at a gerontology center). No court has recognized a donor "contract" where, as here, the donor alleges only that he provided funds for general charitable purposes.

In any event, and as Musk does not dispute, the "basic elements" of an implied contract are the same as those of an express one. *See Levy* v. *Only Cremations for Pets, Inc.*, 57 Cal. App. 5th 203, 211 (2020); *Zenith Ins. Co.* v. *O'Connor*, 148 Cal. App. 4th 998, 1010 (2007) (demurrer sustained where plaintiff "did not allege the predicate facts necessary to establish [] an implied contract"). The plaintiff must allege the terms of the agreement, mutual assent to those terms, and bargained-for consideration. The only difference is that one looks "not [to] expressed [] words but [to] . . . the promisor's conduct" to see if the elements are adequately pleaded. *See Yari* v. *Producers Guild of Am., Inc.*, 161 Cal. App. 4th 172, 182 (2008).

Yet Musk identifies no specific conduct purportedly evidencing offer and acceptance of any specific terms by Musk, OpenAI, or Altman. *See Levy*, 57 Cal. App. 5th at 211 (plaintiff asserting an implied contract must allege "some conduct . . . which could have been understood to be an offer to perform," as it "is axiomatic that an acceptor must have knowledge of [an] offer" (cleaned up)). That failure is all the more striking given the breadth of the undertakings Musk now claims were made to him personally, which purportedly govern everything from OpenAI's safety practices, to its corporate structure, to its policies on sharing research. *See* ¶¶ 254(f), (h); 265 (implied contract purportedly bars OpenAI "withholding details on GPT-4, GPT-4T, GPT-4o, and OpenAI o1's architecture, hardware, training method, and training computation," "releasing products that are being used by state actors and cybercriminals to cause harm, as well as products, including but not limited to Whisper, unfit for their intended purpose," among many other alleged commitments). Generalized allegations that Musk donated and that Altman and OpenAI purportedly "agreed" through "conduct" to "further OpenAI's operation as a non-profit" do not plead an implied agreement to make enforceable commitments to Musk.

This Court's decision in *Fabian* v. *LeMahieu*, 2019 WL 4918431 (N.D. Cal. Oct. 4, 2019), is instructive. There, the plaintiff claimed he had an enforceable contract with defendants "related to the safety and security of [a crypto] exchange" that could be implied from the defendants' conduct, including:  (1) "developing the business and marketing scheme to distinguish [a specific cryptocoin] from the vast array of other cryptocurrencies," (2) "approaching [one] [d]efendant [] for the purpose of creating a [] dedicated exchange," (3) "representing to the public that [another defendant] was working hard on solving [certain crypto-related] operational challenges," and (4) "recognizing the importance of and acknowledging responsibility for choosing [] proper exchanges." *Id.* at *10 (cleaned up). This Court dismissed with prejudice, however, holding that because the alleged conduct "merely represent[ed] the [] [d]efendants' conduct relative to the [crypto] [e]xchange" in general; none of it gave "rise to an inference of *mutual assent* of any particular offer and acceptance between plaintiff and the [] [d]efendants" as to the disparate terms alleged. *Id.* (emphasis added). A like conclusion is compelled here.

The cases Musk invokes (*see* Opp. at 9-10) only support the point that an implied contract requires definite obligations arising from specific and readily-identifiable conduct. *Faigin* v. *Signature Group Holdings, Inc.*, 211 Cal. App. 4th 726 (2012), for example, involved an implied contract to terminate the plaintiff from his employment only for good cause. That specific undertaking arose from the parties' respective conduct, including personnel policies and practices the employer had adopted, the plaintiff's length of service, the employer's repeated assurances of continued employment, and industry practice. *Id.* at 738-39. Likewise, in *Kashmiri* v. *Regents of Univ. of Cal.*, 156 Cal. App. 4th 809 (2007), the court found a similarly-circumscribed implied contract right, barring the California Regents from increasing a professional degree fee for certain UC graduate students, based on commitments the Regents made in "catalogues and on the University's website" that created an "implied contract" upon students' "accept[ance] [of] the University's offer of enrollment." *Id.* at 829, 831. Musk alleges nothing like that here.

### C.    Musk does not plead an implied covenant claim (Count III).

Musk's failure to plead the existence of any contract dooms his implied covenant claim. *See* Br. at 9; *Langan* v. *United Servs. Auto. Ass'n.*, 69 F. Supp. 3d 965, 980 (N.D. Cal. 2014). The claim also fails on the independent ground that its premise impermissibly mimics that of his contract claims. *See* Br. at 9. Attempting to dodge this defect, Musk now contends that OpenAI supposedly "abused" the "discretion" conferred on it by the purported terms of the contract. Opp. at 10. But the FAC doesn't identify what purported "terms" conferred that "discretion," nor how it was purportedly "abused." *See* ¶ 273 (alleging that "some" unidentified "terms" of the contract "may have vested" Altman and OpenAI with unspecified "discretion").[3]

---

[3] Musk's argument also mischaracterizes California law, which requires that contract terms *expressly* confer discretion before the implied covenant can be invoked on this basis. *See Chen* v. *PayPal, Inc.*, 61 Cal. App. 5th 559, 571 (2021) (considering whether defendant breached the implied covenant through bad faith exercise of a "provision [expressly] affording [defendant] 'sole discretion' to place" holds on plaintiff's funds). The principle does not operate to transform every claim for alleged breach of a vague and ill-defined contract term into a duplicative claim for breach of the implied covenant.

## II.    PLAINTIFFS' ALLEGATIONS CANNOT SUPPORT ANY FRAUD CLAIM.

### A.    Musk's fraud claim is time-barred (Count VII).

Musk's fraud claim is barred on the face of the complaint by the applicable three-year statute of limitations. *See* Br. at 10; Cal. Civ. Proc. Code § 338(d). As Musk's opposition makes clear, his fraud claim is based on a more than seven-year old email from September 21, 2017 in which Altman wrote: "[I] remain enthusiastic about the nonprofit structure!" Opp. at 2 (citing FAC, Ex. 13). The only theory of fraud pleaded is that this statement amounted to a "promise" that OpenAI would continue as a nonprofit, Opp. at 12; ¶¶ 306-07, and that the "promise" was a "lie" because "Altman and Brockman agreed among themselves to figure out a structure for an equity fundraise—in other words, convert to a for-profit structure"—shortly thereafter. ¶¶ 105-06. Musk admits that "the FAC alleges that Altman and Brockman proposed a 'capped-profit company' in March 2019," Opp. at 14, and "launched" that "for-profit" entity with Musk's full knowledge the same month. FAC ¶¶ 112-16. The only alleged "fraud" thus occurred five years before Musk filed suit.[4]

Musk nevertheless argues that the statute of limitations did not begin to run in March 2019 because he has alleged an "ongoing scheme only recently exposed." Opp. at 14. Nonsense. By Musk's own admission, the "for-profit structure" was disclosed to him and publicly announced in March 2019, supposedly confirming that Altman's "promise" was false. ¶¶ 106, 113-16. Indeed, Musk alleges that he himself described the for-profit entity as OpenAI's "for-profit arm" in 2019 (¶ 115), and asserts in his opposition he "explicitly opposed" an alleged effort to "convert" the nonprofit at this time (Opp. at 2).[5] The claim was thus time-barred three years ago, as are Musk's claims for aiding and abetting fraud (Count VIII) and unjust enrichment (Count IV), which rely on the same underlying alleged fraud.

---

[4] Musk notes that "dismissal on statute of limitations grounds" is only proper where untimeliness is "apparent on the face of the complaint." Opp. at 14 (quoting *Huynh* v. *Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)). It is here—Musk expressly alleges in the FAC that Altman's "promise" was broken no later than March 2019.

[5] To be clear, the 2019 creation of the capped-profit was not a "conversion," and nor is the restructuring currently under contemplation. The nonprofit OpenAI, Inc. remained in existence in 2019 and will remain in existence if the contemplated restructuring occurs. But for purposes of this motion, the OpenAI Defendants accept Musk's characterization of the 2019 change.

10

**B.      Musk fails to plead fraud with particularity (Count VII).**

The claim independently fails because it does not meet the pleading requirements of Rule 9(b). Musk does not dispute that Count VII, while labeled simply "fraud," is a claim for promissory fraud—it is premised on alleged "promises [the OpenAI] Defendants made without intention to perform them." Opp. at 12; *see* Br. at 9. Musk fails to plead even the most fundamental elements of a promissory fraud claim, let alone with particularity, as he does not allege any false "promise" by Altman or Brockman that was made with a present intent of nonperformance. *Behnke* v. *State Farm Gen. Ins. Co.*, 196 Cal. App. 4th 1443, 1453 (2011); *see also* Joint Statement Outlining Elements of Claims, Dkt. 30 at 1 (listing elements).

From Altman's September 2017 email expressing that he "remain[ed] enthusiastic about the nonprofit structure" Opp. at 2 (citing FAC, Ex. 13), Musk divines a "binding commitment[] about OpenAI's core structure and mission," *id.* at 12, apparently for all time, that would preclude the OpenAI nonprofit entity from creating for-profit entities. The statement contains no such commitment—as the law, common sense, and Musk's own allegations confirm. First, statements of subjective opinion or belief like these are not enforceable "promises" or "commitments" as a matter of law. *See Louis* v. *Nailtiques Cosmetic Corp.*, 423 F. App'x 711, 713 (9th Cir. 2011) (collecting cases; statements of opinion not actionable because "[p]romises too vague to be enforced will not support a fraud claim"). The reason is simple: as Musk's own cases explain, promissory fraud "occurs when someone promises to do something without intending to do it." *Glenn*, 2002 WL 31022068 at *3 (cited in Opp. at 12). Altman's subjective statement of enthusiasm simply is not a promise. Second, even if it could be characterized as one, no plausible reading of the email supports the meaning Musk urges now: that Altman agreed to maintain OpenAI's precise corporate structure exactly as it existed in 2017 in perpetuity.[6]

---

[6] The same is true with respect to Zilis's email to Musk in September 2017, stating that "Altman had informed her that he was 'great with keeping OpenAI non-profit and continuing to support it.'" ¶ 308 (citing FAC, Ex. 14). Plaintiffs do not explain how Zilis's recounting of a purported conversation with Altman could reflect an actionable promise to Musk, or how anything in Zilis's email could be read as a binding commitment to maintain OpenAI's corporate structure unchanged forever.

Musk's own allegations refute that reading. Just months after this September 2017 "enthusiasm" exchange, Musk bemoaned OpenAI's corporate structure, writing that the organization was "on a path of certain failure relative to Google" and that there "obviously needs to be immediate and dramatic action" or OpenAI would be "consigned to irrelevance." FAC, Ex. 16. Musk thus endorsed a "for profit pivot" for OpenAI that would have the organization "attach to Tesla as its cash cow" to help it "sell a lot of cars/trucks." *Id*. These exchanges in the immediate aftermath of Altman's purported fraudulent "promise" negate Musk's claim now, more than seven years later, that Altman made a "binding commitment about OpenAI's core structure." Opp. at 12.

Musk's own cited authorities highlight the difference between Altman's subjective statement of enthusiasm, and the clear and unequivocal false "promises" needed to support a claim for promissory fraud. *See* Opp. at 12-13. In *Glenn*, for example, a university promised to "endow a professional chair" if a donor provided funds. 2002 WL 31022068 at *1. The donor provided the funds, but the university "never [] funded the professorship, nor did they tell [the donor] they were not financing the position." *Id*. Likewise, in *Lazar* v. *Superior Ct.*, 12 Cal. 4th 631 (1996), the plaintiff alleged that an employer "in order to induce him to [leave New York and] come to work in California, [] intentionally represented to him he would be employed by the company so long as he performed his job, he would receive significant increases in salary, . . . the company was strong financially," the plaintiff "would enjoy security and a strong future," and the plaintiff "would have a long-term relationship with the company." *Id*. at 636, 639. In reality, the company was at the time "experienc[ing] its worst economic performance in recent history," was "planning an operational merger that would [imminently] eliminate [plaintiff]'s position," and had no "intention of retaining" the plaintiff long term. *Id*. at 636. In contrast to these clear promises and representations, Musk does not even identify what precisely Altman and Brockman are alleged to have undertaken.

Equally fatal is Musk's failure to plead any fact suggesting that Altman and Brockman intended "not to perform" any supposed promise. *Behnke*, 196 Cal. App. 4th at 1453. Musk claims that he need only plead this intent "generally." Opp. at 13. When pleading promissory fraud, however, plaintiffs must make "clear, specific and unequivocal" allegations "differentiating the

[assertedly] false promise from a mere broken promise." *Valencia* v. *Sharp Elecs. Corp.*, 561 Fed. App'x 591, 593-94 (9th Cir. 2014); *Richardson* v. *Reliance Nat'l Indem. Co.*, 2000 WL 284211, at *4-5 (N.D. Cal. Mar. 9, 2000) (claim for promissory fraud failed where plaintiff "allege[d] no facts from which the Court [could] infer that the allegedly fraudulent statements were actually false when made"). Musk offers no particularized allegation suggesting the alleged promise here—Altman's vague statement of enthusiasm for a nonprofit structure—was false when made.

### C.    Musk's unjust enrichment claim falls with his fraud claim (Count IV).

Musk's failure to plead his fraud claim dooms his claim for unjust enrichment, which rests on the same premise—*i.e.*, OpenAI's purported solicitation of Musk's donations through alleged "misrepresent[ations]." *See* ¶ 280. Where, as here, an unjust enrichment claim is predicated on "allegations of fraudulent conduct," "such allegations must [] meet the heightened pleading standard of Rule 9(b)," and failure to plead fraud to that standard is fatal to the claim. *See Verde Media*, 2015 WL 374934, at *8. Musk's authority is in accord. *See* Opp. at 11-12; *Astiana* v. *Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (unjust enrichment requires that "a defendant [be] unjustly conferred a benefit through mistake, *fraud*, coercion, or request" (emphasis added)).

In suggesting his unjust enrichment claim "cannot be dismissed as merely duplicative," Opp. at 12, Musk misrepresents the OpenAI Defendants' argument. The fact that this claim overlaps with Musk's fraud claim does not in itself warrant dismissal—rather, because the unjust enrichment claim "sounds in fraud" and is predicated on the same allegations of fraud, Musk's failure to plead fraud with the requisite particularity is equally fatal to both counts. And because this count is premised on those same allegations, it is likewise untimely. *See supra* at 10; Cal. Civ. Proc. Code § 339(1) (two year statute of limitations for breach of quasi-contract).

### D.    Musk's constructive fraud claim likewise fails (Count VI).

Musk also does not meaningfully dispute that his constructive fraud claim is based on the same alleged "material promises, representations, and reassurances" (¶ 296) as the rest of his fraud claims, none of which is pleaded with the required particularity. *See* Opp. at 14. Thus—while the OpenAI Defendants preserve their argument that Musk lacks standing to assert a claim for breach of charitable trust and cannot circumvent that legal defect by repackaging the claim as one for

constructive fraud (*see* Br. at 15)—Musk's failure to plead fraud provides an independent basis for dismissal. *See In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1219 (N.D. Cal. 2007) (dismissing constructive fraud claim under Rule 9(b).

### E.    Musk and xAI do not plead a civil RICO violation (Counts XXV & XXVI).

In their opposition, Musk and xAI fail to salvage any of the four species of racketeering claims they allege: (1) a § 1962(c) theory premised on Defendants allegedly "conduct[ing] . . . OpenAI, Inc.'s affairs through a pattern of racketeering" (¶¶ 507-14); (2) a § 1962(a) theory premised on their alleged "invest[ing]" of "income derived . . . from a pattern of racketeering activity" in OpenAI (¶¶ 515-19); (3) a § 1962(b) theory premised on their alleged "control over OpenAI, Inc." "through a pattern of racketeering activity" (¶¶ 520-24); and (4) an alleged RICO "conspiracy" under § 1962(d) (Count XXVI).

### 1.    Plaintiffs do not allege predicate acts of wire fraud.

In asserting an alleged pattern of racketeering through wire fraud, Plaintiffs do "not come remotely close to meeting Rule 9(b)'s heightened [pleading] standard," which is particularly "exacting in the [RICO] context." *Aniel* v. *PHH Mortg. Corp.*, 2022 WL 2164702, at *6 (N.D. Cal. June 1, 2022); *see also Desoto* v. *Condon*, 371 F. App'x 822, 824 (9th Cir. 2010) (dismissing "vague and conclusory" wire fraud allegations); *Seva* v. *Shri Shirdi Sai Baba Sansthin L.A.*, 2013 WL 1431673, at *4 (C.D. Cal. Apr. 9, 2013) (dismissing RICO claims predicated on wire fraud relating to charitable donations). Plaintiffs' wire fraud allegations just rehash Musk's deficient contract and promissory fraud claims—concluding, with no particularized factual support, that Altman and Brockman "exploit[ed] Musk and others . . . by inducing them with repeated misrepresentations to make significant . . . contributions"—only to "exploit[] [those donations] to enrich themselves." ¶ 486; *see also* Br. at 11-12. Plaintiffs identify no specific representation that was false when made or that was made with intent to defraud; they come nowhere near adequate pleading of a "pattern of racketeering activity" through putatively criminal acts of wire fraud. *See Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

Trying to cure these infirmities, Plaintiffs in their opposition assert that the "timeline of events detailed in the FAC" shows various statements were "knowingly false when made," and that

"Brockman's own words reveal [Defendants'] deception." Opp. at 16. But the (undefined) "timeline" is not a specific allegation of knowing falsity, and Brockman's email to Musk and Altman in November 2015 saying he hoped for OpenAI to present itself as "a neutral group looking to collaborate widely" because "that's the best way to bootstrap ourselves into being a leading research institution" can't possibly show fraud because, among other things, it was *addressed to Musk*, the supposed victim. *See id.* (quoting ¶ 311); *see also* FAC, Ex. 3.

### 2.    Plaintiffs' RICO claims also fail for independent reasons.

*No "conduct of an enterprise."* Plaintiffs do not dispute that stating a § 1962(c) claim requires alleging "the existence of two distinct entities: (1) a person . . . and (2) an 'enterprise,'" *Ferrari* v. *Mercedes-Benz USA, LLC*, 2016 WL 7188030, at *2 (N.D. Cal. Dec. 12, 2016), or that the FAC expressly alleges that the OpenAI Defendants—who comprise both the alleged "enterprise" and "persons"—"operate together as a unitary enterprise." *See* Opp. at 17; *see also* ¶ 241. Plaintiffs attempt to wave away this pleading defect, saying it amounts only to "belt and suspenders [] 'alter ego' pleading." *Id.* But this does not change that the FAC's own allegations negate the distinctiveness required to plead RICO. Plaintiffs' citation to *Negrete* v. *Allianz Life Ins. Co.*, 926 F. Supp. 2d 1143 (C.D. Cal. 2013), is inapposite—the case does not even mention the effect of pleading that a RICO "enterprise" and "persons" are each other's alter egos and notes that "courts in the Ninth Circuit have dismissed a plaintiff's RICO claim where [a] corporate family . . . constituted both the alleged person and enterprise." *Id.* at 1153 (cleaned up).

*No investment-specific injury.* Section 1962(a) requires particularized allegations showing "an injury" proximately caused by "the use or investment of racketeering income" that is "*distinct* from an injury caused by the predicate acts themselves." *Gjovik* v. *Apple Inc.*, 2024 WL 2309100, at *7 (N.D. Cal. May 20, 2024) (emphasis in original); *see also Sybersound Records, Inc.* v. *UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008) ("an investment injury [must be] separate and distinct from the injury flowing from the predicate act[s]" of fraud). The FAC pleads no such investment-specific injury. *See* ¶¶ 516-18. Plaintiffs now assert that the "competitive advantage and market dominance resulting from [] investment of proceeds misappropriated from the charity directly harms xAI's market position." Opp. at 17. But Plaintiffs do not explain how the alleged misuse of

Musk's donations beginning in 2018 could have "proximately caused" some unidentified and unpleaded competitive harm to xAI, which was not launched until 2023.

*No "control"-specific injury*. Section 1962(b) requires allegations of "injury . . . resulting from defendant's control or acquisition of a [RICO] enterprise." *Metro Servs. Grp.* v. *Travelers Cas. & Sur. Co. of Am.*, 2021 WL 2633416, at *6 (N.D. Cal. June 25, 2021). Plaintiffs now contend they suffered a "control-based injury" "in November 2023 when Defendants leveraged their power to reinstate Altman [after his brief dismissal as CEO] in just 4 days," which purportedly "creat[ed] competitive barriers that specifically harmed xAI." Opp. at 18. But Plaintiffs do not explain, much less allege, how or why Altman's reinstatement as CEO created any "competitive barriers" for xAI. *See Wagh* v. *Metris Direct, Inc.*, 363 F.3d 821, 830 (9th Cir. 2003) (overruled on other grounds) (no control-specific injury where plaintiff "did not include more than the vaguest allusions to the acquisition or maintenance of any interest in or control of the alleged enterprise").

*No conspiracy claim*. Plaintiffs do not dispute that their allegations of RICO conspiracy rise and fall with their substantive RICO claims. *See Sanford* v. *MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010); *see also* Opp. at 18-19. Thus, having failed to plead a substantive RICO claim, Plaintiffs cannot maintain their conspiracy claim.

## III.    MUSK'S CLAIM FOR BREACH OF CHARITABLE TRUST.

The OpenAI Defendants understand that the Court has denied the OpenAI Defendants' motion to dismiss as to this claim and has held, at this stage of the proceedings, that Musk has standing to assert a charitable trust claim "as a settlor" and that "further briefing on this topic is not necessary." PI Order, Dkt. 121 at 15 n.11. The OpenAI Defendants therefore will not brief the issue further at this time, but preserve all arguments.

## IV.    THE FALSE ADVERTISING CLAIMS (COUNTS XVIII & XIX) SHOULD BE DISMISSED.

Plaintiffs assert two claims for false advertising: one under California's false advertising statute, Bus. & Prof. Code §§ 17500 *et seq.* (Count XIX), and a claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count XVIII). Plaintiffs' California false advertising claim should be dismissed for failure to identify any statement made for purposes of "dispos[ing] of real or personal

property." *McCann* v. *Lucky Money, Inc.*, 129 Cal. App. 4th 1382, 1387-88 (2005).[7] The OpenAI Defendants understand the Court to have severed Plaintiffs' Lanham Act claim from the current proceedings. *See* April 4, 2025 CMC Tr.("Tr.") at 6:6-12. But to the extent the Court intends to rule on this claim at this time, dismissal is warranted for the related reason that Plaintiffs fail to identify "a false statement of fact by the defendant in a commercial advertisement about its own or another's product," and on the separate ground that the FAC lacks allegations showing injury "as a result of the false statement, either by direct diversion of sales from [plaintiffs] to defendant or by a lessening of the goodwill associated with [plaintiffs'] products." *HomeLight, Inc.* v. *Shkipin*, 694 F. Supp. 3d 1242, 1254 (N.D. Cal. 2023).

### A.    Plaintiffs' California false advertising claim (Count XIX) fails.

Although Count XIX focuses principally on general statements concerning OpenAI's mission, *see* ¶¶ 393, 409-12, Plaintiffs make no mention of these in their opposition, abandoning them as predicates for the claim. That is for good reason, as this Court recently held that several of those precise statements—which purportedly "contained "false and/or misleading representations" suggesting that OpenAI "would be largely open source for the benefit of humanity, and would not be concentrated or used for private commercial gain" (¶ 409; *see also* ¶ 393)—were untethered to any "specific promotion of goods or services" and thus did not qualify as "actionable commercial speech." Order Granting in Part Motion to Dismiss, *OpenAI, Inc.* v. *Open Artificial Intelligence, Inc.*, No. 23-cv-03918-YGR, at *5 (N.D. Cal. Sept. 25, 2024), ECF No. 127.

The statements Plaintiffs now focus on instead are: that OpenAI (1) has "substantial safeguards in place"; (2) "use[s] a multi-tiered safety system" with respect to Dall-E 3; (3) views "[s]afety" as "central to [its] work"; and (4) has "safety in mind" when building GPTs. Opp. at 19-

---

[7] Plaintiffs argue that "false advertising claims under Cal. Bus. & Prof. Code § 17500 need not be tied to specific products" and that "[f]alse statements made . . . to solicit donations are sufficient." Opp. at 21. But nowhere do Plaintiffs plead that any of the statements identified in the false advertising counts (¶ 393) were made "with the intent of obtaining charitable solicitations." *People* v. *Orange County Charitable Servs.*, 73 Cal. App. 4th 1054, 1075 (1999). Plaintiffs do not even allege that the statements were made when OpenAI was seeking or accepting donations. *Cf. People ex rel. Dep't of Motor Vehicles* v. *Cars 4 Causes*, 139 Cal. App. 4th 1006, 1016 (2006) (respondent had a scheme of obtaining vehicle donations "by representing that the proceeds of sale . . . will be contributed to charities").

20 (citing ¶ 393). But the FAC lacks any allegation suggesting these statements amounted to "advertisements" for specific OpenAI products or that they were otherwise made for purposes of "dispos[ing] of real or personal property." *McCann*, 129 Cal. App. 4th at 1395. The statements therefore cannot support the claim. *Id.*

Plaintiffs contend that "[a]dvertisements that make representations about safety are actionable." Opp. at 20. But that argument assumes its own conclusion that OpenAI's statements qualified as "advertisements." And the cases Plaintiffs cite confirm the contrary and highlight the infirmities in Plaintiffs' pleading. In *Toyota Motor Corp. Unintended Acceleration Mktg.*, the plaintiffs alleged that Toyota made specific representations about the safety of specific car models in "advertisements, brochures, and press kits" for their cars. 754 F. Supp. 2d 1145, 1171 (C.D. Cal. 2010). Plaintiffs, in contrast, have not even pleaded that OpenAI had commercial products on the market at the time the relevant statements were made. And in *Zeiger* v. *WellPet LLC* and *Anunziato* v. *eMachines, Inc.*, the statements challenged under California's false advertising statute were included in materials accompanying the products at issue, rendering the speech plainly commercial in nature. *See Zeiger*, 304 F. Supp. 3d 837, 842, 851 (N.D. Cal. 2018) (product labels); *Anunziato*, 402 F. Supp. 2d 1133, 1139-40 (C.D. Cal. 2005) (user manuals). Plaintiffs do not allege that OpenAI's statements accompanied any particular product or service.[8]

Moreover, even if these statements were actionable advertisements, Plaintiffs have failed to allege their falsity with particularity. No allegation in the FAC—whether asserting that the "Whisper product" exhibited some "hallucinated material," that the o1 was rated "medium risk," or otherwise (Opp. at 21)—can be read to suggest that OpenAI's statements concerning its maintenance of safeguards and its attention to safety as a general matter were false when made. *See Newcal Indus., Inc.* v. *Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (relevant inquiry

---

[8] Nor are Plaintiffs correct that statements about safety are actionable in all circumstances, or that the statements challenged here (Opp. at 19-20) are subject to the false advertising laws. *Cf. Pacira BioSciences, Inc.* v. *Ventis Pharma, Inc.*, 2025 WL 576549, at *10 (C.D. Cal. Jan. 17, 2025) (statements about the "safety" of defendant's product—including that the product was "safe and acceptable for use"—were "general and subjective" and thus did not "support a claim of false advertising"); *Muldoon* v. *DePuy Orthopaedics, Inc.*, 2024 WL 3522204, at *11 (N.D. Cal. July 23, 2024) ("An assertion that a product is 'safe' or 'effective' generally constitutes unactionable puffery . . . .").

is whether statements were "'false or misleading' at the time they were made"). As noted, Plaintiffs do not even allege *when* the statements were made.

### B.   Plaintiffs' Lanham Act claim (Count XVIII) fails.

To the extent the Court intends to consider the Lanham Act claim at this juncture, the claim fails for the same reasons and others. Under the Lanham Act, Plaintiffs must adequately allege that OpenAI, "in commercial competition with [Plaintiffs]," engaged in "commercial speech" that was "sufficiently disseminated to the relevant purchasing public" "for the purpose of influencing consumers to buy defendant's goods or services." *Alfasigma USA, Inc.* v. *First Databank, Inc.*, 525 F. Supp. 3d 1088, 1099 (N.D. Cal. 2021). Plaintiffs do not even plead when the challenged statements were made—let alone that (1) OpenAI was "in commercial competition" with xAI at the time they were made, (2) that the purpose of the speech was commercial, or (3) that the speech reached a sufficient portion of the "purchasing public." *Id.*; *see Language Line Servs., Inc.* v. *Language Servs. Assocs., LLC*, 2011 WL 13153247, at *5 (N.D. Cal. Mar. 17, 2011) ("It is insufficient for a plaintiff's allegations to merely mimic the elements of a false advertising claim without including facts regarding the location, timing, or content of the allegedly false statements."). Without these allegations, Plaintiffs fail to "raise an inference that [OpenAI] made the alleged statement[s] in the context of 'commercial advertising or promotion.'" *Language Line Servs., Inc.*, 2011 WL 13153247, at *5.

Plaintiffs' Lanham Act claim fails for the independent reason that they have not adequately alleged "commercial injury" resulting from OpenAI's challenged statements. In their opposition, Plaintiffs assert that OpenAI's purported "misrepresentations" diverted customers from xAI to OpenAI, "causing Plaintiffs to incur measurable losses in customer acquisition, market penetration, and overall profitability." Opp. at 21 (citing ¶ 402). But this rests on the FAC's conclusory assertions that xAI's products are "comparable" to OpenAI's and that OpenAI's statements have somehow "diverted" potential customers away from xAI. ¶ 402. Those assertions, even if true, cannot plausibly establish that xAI's injury "flow[s] directly from the deception wrought by" OpenAI's general statements concerning safety practices, which "necessarily caused [customers]" not to use xAI's products. *HomeLight*, 694 F. Supp. 3d at 1254-55; *see also LegalForce, Inc.* v.

19

*LegalZoom.com, Inc.*, 2019 WL 1170779, at *1-2 (N.D. Cal. Mar. 13, 2019) (allegations that plaintiff "suffered lost revenue and market share, reduced asset value, and increased advertising costs" as a result of defendant's "infringing conduct" were "conclusory in nature" and thus did not support plaintiff's standing).

## V. PLAINTIFFS' DERIVATIVE CLAIMS (COUNTS XXII, XXIV) FAIL.

### A. Musk and Zilis lack standing to assert derivative claims.

Musk and Zilis assert three derivative claims: Counts XXII (breach of fiduciary duty), XXIII (self-dealing), and XXIV (aiding and abetting breach of fiduciary duty). In its PI Order, the Court dismissed Count XXIII for lack of standing because it was "insufficient as a matter of law" that Musk and Zilis "may have been members" of OpenAI "at one point." Dkt. 121 at 16. Plaintiffs concede that this holding on Count XXIII disposes of their remaining two derivative claims, and brief issues related to those claims only "for purposes of preservation."[9] Opp. at 22 & n.5. While Plaintiffs' concession renders it unnecessary for the Court to reach any of these arguments, the OpenAI Defendants respond briefly to them here for completeness.

Section 5710 of California's Corporations Code governs derivative actions brought by members on behalf of nonprofit organizations—regardless of whether the claims asserted therein are products of statute or common law. *See Wisniewski* v. *Presidio Place Condo. Ass'n*, 2002 WL 31032464, at *5-7 (Cal. Ct. App. Sept. 12, 2002) (applying § 7710(b)(1), the equivalent provision for nonprofit mutual benefit corporations, in a derivative action for breach of fiduciary duty and negligence). Thus, § 5710 applies to all of Musk and Zilis's derivative claims. And the Court has already held that "[d]espite expending considerable paper explaining why the requirements of Section 5710 are met, Musk and Zilis are not currently members of OpenAI" and thus "[n]either . . . have standing to seek relief under the statute." Dkt. 121 at 16.

---

[9] In the parties' Joint Case Management Statement, filed before their opposition brief, Plaintiffs suggested that "equitable claims" for breach of fiduciary duty (Count XXII) and aiding and abetting breach of fiduciary duty (Count XXIV) "could not have been dismissed by the Court's standing analysis" with respect to the derivative self-dealing claim (Count XXIII), "which was brought under Cal. Corp. Code § 5233, a specific statute with its own, detailed standing requirements." Dkt. 125 at 1-2 n.2. Plaintiffs have now abandoned that argument and concede that the Court's holding with respect to the self-dealing claim disposes of their remaining derivative claims. Opp. at 22 & n.5.

20

Federal law would compel this result even if state law did not. *See* Br. at 17. Plaintiffs argue that Federal Rule of Civil Procedure 23.1 "merely governs pleading requirements" and does not displace California "substantive" law of standing. Opp. at 22. But in the Ninth Circuit, Rule 23.1's requirement that "shareholders or members of a corporation" must "fairly and adequately represent the interests of" the corporation's other shareholders or members, Fed. R. Civ. P. 23.1, is procedural and thus governs all derivative claims filed in federal court, *see Kona Enters., Inc.*, 179 F.3d at 769. This means that putative derivative plaintiffs like Musk and Zilis must be members not just at the time they filed suit, but throughout the pendency of the litigation, *see Quinn* v. *Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010). Musk and Zilis thus lack standing to assert derivative claims under Rule 23.1 and Ninth Circuit law—an independent basis for dismissing their derivative claims. *See Two Ten, LLC* v. *Cellxion, LLC*, 2012 WL 12905554, at *2 (C.D. Cal. Apr. 30, 2012) (plaintiff "lack[ed] standing" to bring a derivative suit because it was "no longer a member of [the corporation]").

The third independent defect in Plaintiffs' standing is that they fail to allege demand or demand futility with particularity. *See* Cal. Corp. Code § 5710(b)(2); *see* Br. at 17-19. Because the FAC does not even identify OpenAI's current directors, Plaintiffs cannot assert demand futility.[10] *See Bader* v. *Anderson*, 179 Cal. App. 4th 775, 790 (2009) (demand futility must be assessed "on a director-by-director basis"); *Shields* v. *Singleton*, 15 Cal. App. 4th 1611, 1622 (1993) ("general allegations" that are "indiscriminately level[ed] against all [] directors" insufficient). And they have not pleaded demand: Musk and Zilis's purported expression of unspecified "concerns" to OpenAI's board at unidentified times "via phone calls, in-person discussions, public statements via social media, and emails" (¶ 446) is not the sort of "earnest" effort to "exhaust[] all means within [plaintiff's] reach to obtain, within the corporation itself, the redress of [plaintiff's] grievances."

---

[10] Plaintiffs waived their demand futility argument in any event. Having alleged that they "made a demand" on OpenAI's board, Opp. at 22, Plaintiffs "concede[] the board's independence," *id.* at 23; *see Copeland* v. *Lane*, 2013 WL 1899741, at *7 (N.D. Cal. May 6, 2013) ("A shareholder who makes a demand concedes the disinterestedness and independence of a majority of the board to respond to the demand and waives any claim that demand is excused.").

1    *Bader*, 179 Cal. App. 4th at 789.[11]

2        **B.    Musk and Zilis fail to state a claim for breach of fiduciary duty (Count XXII).**

3        While Plaintiffs concede they lack standing to assert derivative claims pursuant to the

4    Court's PI Order, they argue "for purposes of preservation" that their fiduciary breach claim would

5    be tenable but for the standing defect. Opp. at 22 n.5. Though the Court (again) need not reach the

6    issue, Plaintiffs are wrong.

7        Plaintiffs argue that the FAC's allegations of "self-dealing" establish "a material conflict of

8    interest" sufficient to rebut the business judgment rule. Opp. at 23. Not so. To overcome the

9    business judgment rule, Plaintiffs "must plead facts supporting the conclusion either that [1] a

10   *majority* of directors breached fiduciary duties or [2] that an interested director *controlled* or

11   *dominated* the board as a whole or [3] that the interested director *failed to disclose his interest* in

12   the transaction to the board *and* a reasonable board member would have regarded the existence of

13   the material interest as a significant fact in the evaluation of the proposed transaction." *Off. Comm.*

14   *of Bond Holders of Metricom, Inc.* v. *Derrickson*, 2004 WL 2151336, at *5 (N.D. Cal. Feb. 25,

15   2004) (cleaned up) (emphasis in original).

16       The FAC does none of these things. It alleges only that Altman had purported conflicts

17   (¶¶ 137, 139-44), which is insufficient. *See Potter* v. *Hughes*, 546 F.3d 1051, 1059 n.3 (9th Cir.

18   2008) ("Absent an indication that the Board lacked good faith as a whole (or at least in the majority),

19   the allegations that some members were interested in the transaction does not rebut the presumption

20   that the board's decision was a legitimate business judgment."); *McMichael* v. *U.S. Filter Corp.*,

21   2001 WL 418981, at *14 (C.D. Cal. Feb. 23, 2001) (where plaintiffs failed to plead that "a majority

22   of the Board had any personal interest in the alleged injurious transactions," the board "as a whole"

23   was not deprived of the business judgment rule). The FAC likewise contains no allegations that

---

24   [11] As explained in the OpenAI Defendants' opening brief, *see* Br. at 19 n.5, the law of Delaware
25   (OpenAI's state of incorporation) applies under the "internal affairs doctrine." *See Lantz Ret. Inv.,*
     *LLC* v. *Glover*, 2020 WL 528890, at *9 (E.D. Cal. Jan. 31, 2020); *Laborers' Loc.* v. *Intersil*, 868
26   F. Supp. 2d 838, 844 (N.D. Cal. 2012). Dismissal is required under both California and Delaware
     law. *See In re Massey Energy Co. Derivative & Class Action Litig.*, 160 A.3d 484, 497-98 (Del.
27   Ch. 2017) (continuous membership "at the time of the alleged wrong" and throughout the litigation
     is required); *Bader*, 179 Cal. App. 4th at 790-92 (California law follows Delaware law on issues of
28   demand and demand futility).

Altman failed to disclose any purported "interest in the transaction to the board" or that "a reasonable board member would have regarded the existence of [Altman's] material interest as a significant fact in the evaluation of the proposed transaction." *Stang* v. *Teal Drones, Inc.*, 2023 WL 11956372, at *5 (N.D. Cal. July 27, 2023). And the FAC does not plead that any particular director at any relevant point in time was "controlled or dominated" by Altman. *Derrickson*, 2004 WL 2151336, at *5 (emphasis omitted).

## VI.    PLAINTIFFS' ANTITRUST CLAIMS (COUNTS IX-XVI).

The OpenAI Defendants understand that the Court has stayed Plaintiffs' antitrust claims and deemed the motions to dismiss those claims withdrawn. *See* Tr. at 8:6-9. The OpenAI Defendants reserve the right to renew their motion to dismiss Plaintiffs' antitrust claims at a later juncture.

## VII.   PLAINTIFFS' ACCESSORY CLAIMS (COUNTS V, VIII, XXI & XXIV) FAIL.

Plaintiffs' claims against the "For-Profit Entities" for tortious interference (Count V), aiding and abetting fraud (Count VIII), and aiding and abetting breach of fiduciary duty to Musk (Count XXI) and to OpenAI, Inc. (Count XXIV) fail for numerous reasons.

*First*, there is no well-pleaded underlying claim for breach of contract, fraud, or breach of fiduciary duty. *See supra* at 2-14, 20-23; *Casey* v. *U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1148 (2005).

*Second*, the FAC alleges that the For-Profit Entities are Altman's agents, and vice-versa, foreclosing Plaintiffs' accessory claims. *See Mintz* v. *Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1604, 1607 (2009); Br. at 34. Plaintiffs allege that "OpenAI, Inc. and the For-Profit Entities operate together as a unitary enterprise," that all OpenAI entities (including the For-Profit Entities) have become "alter egos" of Altman and Brockman, and that "the For-Profit Entities" have been used "as shells to conduct illegal activities." ¶ 241; *see also* ¶¶ 113, 322. Notwithstanding these allegations, Plaintiffs now argue that "these entities are *legally distinct with* separate economic interests." Opp. at 32 (citing ¶¶ 324, 433, 476) (emphasis in original). The allegations Plaintiffs cite, however, are wholly conclusory, merely asserting that for purposes of the aiding and abetting claims, the For-Profit Entities were not acting in an agency capacity. *See id.* (citing ¶¶ 324, 433,

476). This inconsistent pleading cannot rescue Plaintiffs' accessory claims. The court held as much in *Rachford* v. *Air Line Pilots Ass'n*, where the plaintiffs argued that the "defendants [were] alter egos for purposes of some claims, and [were not] alter egos for purposes of other claims." 2006 WL 1699578, at *6 (N.D. Cal. June 16, 2006). Despite the plaintiffs' claim that they were "entitled to plead 'inconsistent theories'" and that their "alter ego allegations" were pleaded "separately from the[ir] interference allegations," the defendants "either [were] or [were] not alter egos," and could not "be both," mandating dismissal of the tortious interference claim. *Id.* at *5-6.

 *Third*, the only "substantial assistance or encouragement" the For-Profit Entities are alleged to have given is "the corporate structure necessary" to undertake the challenged conduct, ¶¶ 325, 434, 477; Opp. at 33 (noting For-Profit Entities' alleged "furnishing [of] the corporate structure" used to engage in various purported acts). In other words, the For-Profit Entities are not alleged to have done anything other than exist. That is insufficient. *See Impac Warehouse Lending Grp.* v. *Credit Suisse First Boston Corp.*, 2006 WL 6935318, at *2 (C.D. Cal. June 20, 2006) (no aiding and abetting liability where "plaintiff's allegations indicate[d] that defendants were, at best, passive bystanders to the [alleged] fraud"); *Diaz* v. *Intuit, Inc.*, 2018 WL 2215790, at *8 (N.D. Cal. May 15, 2018) (aiding and abetting claim failed where alleged acts were "too insignificant and passive to constitute substantial assistance"). All the more so here, where Plaintiffs indiscriminately allege that *20* entities—some of which did not even exist at the time of the purported underlying wrongs—provided "substantial assistance or encouragement" without pleading which entity undertook what conduct, when, where, and on whose behalf. *See Melrose Place Holdings* v. *Socotra Opportunity Fund, LLC*, 2022 WL 3013226, at *4-5 (C.D. Cal. May 31, 2022).

 *Fourth*, each of Plaintiffs' accessory claims is time-barred to the extent premised on the same time-barred fraud allegations discussed above. *See supra* at 9-10.

## VIII.   PLAINTIFFS' UCL CLAIM (COUNT XVII) SHOULD BE DISMISSED.

 Based on the Court's guidance at the April 4 case management conference, the OpenAI Defendants understand Plaintiffs' UCL claim to be severed from the current proceedings. *See* Tr. at 6:6-12. To the extent the claim remains in the case at this time, however, it should be dismissed.

*First,* while Plaintiffs argue that the UCL is "intentionally broad" (Opp. at 34), that does not give them license to lob conclusory and indiscriminate allegations that 26 named defendants purportedly violated dozens of statutes and other laws, without any attempt to cogently differentiate who did what, when, or why, or which particular UCL prong is implicated. *See Dreifort* v. *DJO Global Inc.*, 2019 WL 5578240, at *7 (S.D. Cal. Oct. 28, 2019); *Baba* v. *Hewlett-Packard Co.*, 2010 WL 2486353, at *6 (N.D. Cal. June 16, 2010).

*Second*, neither Musk nor xAI has standing because neither is plausibly alleged to have suffered a "loss of money or property caused by" the alleged violation. *Durell* v. *Sharp Healthcare*, 183 Cal. App. 4th 1350, 1359 (2010). Plaintiffs now contend that xAI suffered "competitive injury" (Opp. at 34), but the FAC does not allege any "lost money or property" as a result—it doesn't even identify xAI in the relevant paragraph. *See* ¶ 389. Musk, meanwhile, is claimed to have lost his purported "donations." Opp. at 34. But while the FAC asserts that "[b]ut for" Defendants' alleged UCL violations, "Musk would not have made his significant contributions to OpenAI, Inc." (¶ 386), it does not allege that the myriad alleged statutory violations and other alleged misconduct induced Musk to donate, or otherwise caused any loss to him personally.

*Finally*, to the extent it is predicated on the FAC's other defective claims (¶ 387(a)), the UCL claim fails for all of the reasons above. *See Baba*, 2010 WL 2486353, at *6.

## CONCLUSION

The Court should grant the motion to dismiss without leave to amend.

1  Date: April 10, 2025                    MORRISON & FOERSTER LLP

2
                                           /s/ Jordan Eth
3                                          JORDAN ETH (CA SBN 121617)
                                           JEth@mofo.com
4                                          WILLIAM FRENTZEN (CA SBN 343918)
                                           WFrentzen@mofo.com
5                                          DAVID J. WIENER (CA SBN 291659)
                                           DWiener@mofo.com
6                                          MORRISON & FOERSTER LLP
                                           425 Market Street
7                                          San Francisco, CA 94105
                                           Telephone:    (415) 268-7000
8                                          Facsimile:    (415) 268-7522

9                                          WILLIAM SAVITT (admitted *pro hac vice*)
                                           WDSavitt@wlrk.com
10                                         BRADLEY R. WILSON (admitted *pro hac
                                           vice*)
11                                         BRWilson@wlrk.com
                                           SARAH K. EDDY (admitted *pro hac vice*)
12                                         SKEddy@wlrk.com
                                           NATHANIEL CULLERTON (admitted *pro
13                                         hac vice*)
                                           NDCullerton@wlrk.com
14                                         WACHTELL, LIPTON, ROSEN & KATZ
                                           51 West 52nd Street
15                                         New York, NY 10019
                                           Telephone:    (212) 403-1000
16                                         Facsimile:    (212) 403-2000

17                                         *Attorneys for Defendants Samuel Altman,
                                           Gregory Brockman, OpenAI, Inc., OpenAI L.P.,*
18                                         *OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI*
                                           *OpCo, LLC, OpenAI Global, LLC, OAI*
19                                         *Corporation, LLC, OpenAI Holdings, LLC,*
                                           *OpenAI Startup Fund Management, LLC,*
20                                         *OpenAI Startup Fund GP I, L.L.C., OpenAI*
                                           *Startup Fund I, L.P., OpenAI Startup Fund SPV*
21                                         *GP I, L.L.C., OpenAI Startup Fund SPV GP II,*
                                           *L.L.C., OpenAI Startup Fund SPV GP III,*
22                                         *L.L.C., OpenAI Startup Fund SPV GP IV,*
                                           *L.L.C., OpenAI Startup Fund SPV I, L.P.,*
23                                         *OpenAI Startup Fund SPV II, L.P., OpenAI*
                                           *Startup Fund SPV III, L.P., OpenAI Startup*
24                                         *Fund SPV IV, L.P., Aestas Management*
                                           *Company, LLC, and Aestas LLC*

25

26

27

28

OPENAI DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 4:24-CV-04722-YGR