Lester Lawrence Lessig (MA Bar No. 710593)
*lessig@lessig.law*
*Attorney for Proposed Amici Curiae*
Former OpenAI Employees

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to: Hon. Yvonne Gonzalez Rogers |
| v. | **MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTIONS TO DISMISS** |
| SAMUEL ALTMAN, et al., | |
| Defendants. | (*Filed concurrently with Proposed Amicus Brief and [Proposed] Order*) |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT former OpenAI Employees Steven Adler, Rosemary Campbell, Neil Chowdhury,  Jacob H. Hilton, Daniel B. Kokotajlo,  Gretchen M. Krueger,  Todor M. Markov,  Richard M.C. Ngo,  Girish N. Sastry  William R. Saunders,  Carrol L. Wainwright II, and Jeffrey K. Wu move for leave to file the accompanying *amici curiae* brief in support of the part of Plaintiffs' Opposition to the Motions to Dismiss (Dkt. Nos. 127 (Microsoft), 128 (OpenAI), 129 (CA. AG)). Plaintiffs and Microsoft consent. The consent of the OpenAI Defendants have not yet been obtained, pending further discussion of the contents of the amicus.

"District courts have broad discretion to appoint amici curiae." *Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 951 n.1 (N.D. Cal. 2020) (Rogers, J.) (granting proposed amici curiae's motions) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). *Amici curiae* can be particularly useful in cases where the outcome affects the public beyond the parties to the case. *See Funbus Sys., Inc. v. Cal. Pub. Utils. Comm'n*, 801 F.2d 1120, 1125 (9th Cir. 1986) (describing the "classic role" of amici as "assisting in a case of general public interest" (citations omitted). *Amici* in this case have unique information that can aid the court beyond the help provided by the parties' lawyers. *California by and through Becerra v. United States Department of the Interior*, 381 F.Supp.3d 1153 (2019).

*Amici curiae* are former employees at OpenAI who collectively worked at the organization between 2018 and 2024. During their tenures, which span the organization's formative years through its more recent development, *amici* held various technical and leadership positions within the organization, including Research Scientists, Members of Technical Staff, Policy Researchers, Research Leads and Policy Leads. Through their direct involvement in OpenAI's operations and development, *amici* possess unique firsthand knowledge of the organization's founding principles, research methodologies, governance structures, and technological capabilities. *Amici* have a significant interest in this litigation as it addresses fundamental questions about OpenAI's mission and organizational structure that they helped shape during their employment.

No counsel for any party authored the proposed brief of *amicus curiae* in whole or in part,

and no person or entity, other than counsel, made a monetary contribution intended to fund the preparation or submission of the brief.

For the foregoing reasons, the former OpenAI employees respectfully request that this Court grant it leave to file the accompanying proposed *amicus* brief.

Respectfully submitted,

Dated: April 11, 2025

*/s/ Lester Lessig*

*Attorney for Proposed Amici Curiae*
(*Pro Hac* pending)

EXHIBIT 1

Lester Lawrence Lessig (MA Bar No. 710593)
*lessig@lessig.law*
*Attorney for Proposed Amici Curiae*
Former OpenAI Employees

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to: Hon. Yvonne Gonzalez Rogers |
| v. | |
| SAMUEL ALTMAN, et al., | **PROPOSED BRIEF OF FORMER OPENAI EMPLOYEES AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTIONS TO DISMISS** |
| Defendants. | |
| | (*Filed concurrently with Motion for Leave and [Proposed] Order*) |

## INTEREST OF AMICI CURIAE

*Amici curiae* Steven Adler, Rosemary Campbell, Neil Chowdhury, Jacob H. Hilton, Daniel B. Kokotajlo, Gretchen M. Krueger, Todor M. Markov, Richard M.C. Ngo, Girish N. Sastry  William R. Saunders,  Carrol L. Wainwright II,  and Jeffrey K. Wu are former employees at OpenAI who collectively worked at the organization between 2018 and 2024. During their tenures, which span the organization's formative years through its more recent development, *amici* held various technical and leadership positions within the organization, including Research Scientists, Members of Technical Staff, Policy Researchers, Research Leads and Policy Leads. Through their direct involvement in OpenAI's operations and development, *Amici* possess unique firsthand knowledge of the organization's founding principles, research methodologies, governance structures, and technological capabilities. *Amici* have a significant interest in this litigation as it addresses fundamental questions about OpenAI's mission and organizational structure that they helped shape during their employment. Their experience and perspective on the company from their times in its employ can provide valuable context for this court.

No counsel for any party authored the proposed brief of *amici curiae* in whole or in part, and no person or entity, other than counsel, made a monetary contribution intended to fund the preparation or submission of the brief.

## SUMMARY OF ARGUMENT

*Amici* offer several points relevant to the Court's consideration:

- OpenAI was created exclusively for the purpose of ensuring that artificial general intelligence benefits all of humanity. This mission is explicitly stated in the OpenAI Nonprofit incorporation documents. OpenAI committed to several key principles for executing on that mission in their Charter document. These commitments were taken extremely seriously within the company and were repeatedly communicated and treated internally as being binding.

- OpenAI's unique corporate structure—a nonprofit controlling a group of other subsidiaries—was a crucial part of its overall strategy. The Nonprofit having ultimate control was considered highly important by leadership and staff for OpenAI's ability to

1    successfully execute on its mission.

2    • OpenAI's mission, the OpenAI Charter, and the central controlling role of the

3         Nonprofit were critical to OpenAI's ability to attract and retain talent. They were

4         routinely used to persuade candidates to join the company and to convince employees

5         who were considering leaving to stay.

6    • If the OpenAI Nonprofit agreed to a change in the OpenAI corporate structure which

7         took away its controlling role, that would fundamentally violate its mission.

8    Any fundamental restructuring that removes the Nonprofit's controlling role would not

9    only contradict OpenAI's founding mission and Charter commitments, but would also breach the

10   trust of employees, donors, and other stakeholders who joined and supported the organization

11   based on these commitments. The Court should recognize that maintaining the Nonprofit's

12   governance is essential to preserving OpenAI's unique structure, which was designed to ensure

13   that artificial general intelligence benefits humanity rather than serving narrow financial interests.

## ARGUMENT

### I.    OpenAI Committed to Core Principles for Pursuing Its Mission in its Charter

16   OpenAI, Inc. (the "Nonprofit")'s Mission as set forth in Article Third of its Certificate of

17   Incorporation is "to ensure that artificial general intelligence benefits all of humanity." That article

18   further states that "[t]he resulting technology will benefit the public and the corporation will seek

19   to distribute it for the public benefit when applicable. The corporation is not organized for the

20   private gain of any person."

21   In its Charter, first published in April 2018, OpenAI re-states its Mission and affirms its

22   commitment to four core principles for executing the Mission:

23       OpenAI's mission is to ensure that artificial general intelligence

24       (AGI)—by which we mean highly autonomous systems that

25       outperform humans at most economically valuable work—benefits

26       all of humanity. We will attempt to directly build safe and beneficial

27       AGI, but will also consider our mission fulfilled if our work aids

2

others to achieve this outcome. To that end, we commit to the following principles:

***Broadly distributed benefits***

We commit to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all, and to avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power.

Our primary fiduciary duty is to humanity. We anticipate needing to marshal substantial resources to fulfill our mission, but will always diligently act to minimize conflicts of interest among our employees and stakeholders that could compromise broad benefit.

***Long-term safety***

We are committed to doing the research required to make AGI safe, and to driving the broad adoption of such research across the AI community.

We are concerned about late-stage AGI development becoming a competitive race without time for adequate safety precautions. Therefore, if a value-aligned, safety-conscious project comes close to building AGI before we do, we commit to stop competing with and start assisting this project. We will work out specifics in case-by-case agreements, but a typical triggering condition might be "a better-than-even chance of success in the next

two years."

### *Technical leadership*

To be effective at addressing AGI's impact on society, OpenAI must be on the cutting edge of AI capabilities—policy and safety advocacy alone would be insufficient.

We believe that AI will have broad societal impact before AGI, and we'll strive to lead in those areas that are directly aligned with our mission and expertise.

### *Cooperative orientation*

We will actively cooperate with other research and policy institutions; we seek to create a global community working together to address AGI's global challenges.

We are committed to providing public goods that help society navigate the path to AGI. Today this includes publishing most of our AI research, but we expect that safety and security concerns will reduce our traditional publishing in the future, while increasing the importance of sharing safety, policy, and standards research.

Internally, these commitments were considered to be binding and were taken extremely seriously. The primacy of the Charter is directly referenced in official company documents, as shown in section II, and it was consistently emphasized by senior leadership at company meetings and in informal conversations.

The Charter was positioned as the foundational document guiding all of OpenAI's strategic decisions. Senior leaders such as Sam Altman and Greg Brockman would regularly reference the

4

Charter when explaining the rationale behind organizational decisions or addressing questions about OpenAI's approach to AGI development. The Charter provided guidance on how the organization would address complex questions about ensuring human flourishing, distributing the benefits of AGI equitably, and balancing competitive advancement with safety considerations.

Within OpenAI, there was a dedicated internal working group established with the specific aim of translating the abstract principles of the Charter into concrete, actionable policies and procedures. That group did deep dives into the language and intent of the Charter, trying to answer complex questions about how to apply its commitments in day-to-day operations and strategic decisions. Their work aimed to more concretely align the company's actions and priorities with the Charter commitments.

The Charter's significance was further institutionalized within OpenAI's formal employee evaluation systems. Following the transition to the capped-profit structure, OpenAI leadership implemented performance review processes that explicitly incorporated employees' understanding of and commitment to the mission as defined in the Charter. Understanding, internalizing, and actively upholding the Charter became formal requirements for career advancement within the organization. Employees at all levels were evaluated not just on their technical contributions but also on how well they aligned their work with the Charter's principles and ensured their colleagues did the same.

## II.    Nonprofit Control Over the OpenAI Corporate Structure Was Considered Critical for Upholding the Charter Commitments and Successfully Executing the Mission

OpenAI has a unique corporate structure — a 501(c)(3) public charity that fully controls several for-profit subsidiaries. This structure — and in particular, the Nonprofit's full control over it — was considered critically important for the Nonprofit's ability to uphold the Charter commitments and successfully execute on the mission. This was consistently repeated by OpenAI executives both internally and externally from 2019 until 2024.

When the initial transition to a "capped-profit" structure happened in 2019, the Limited Partnership Agreement clearly stated that the Partnership exists to advance the mission of the Nonprofit, the Nonprofit retains full control, and the General Partner's duty to the mission and the

principles advanced in the Charter take precedence over any obligation to generate a profit:

- "OpenAI, L.P. will be a for-profit Delaware Limited Partnership managed by its General Partner, a single-member Delaware LLC controlled by OpenAI, Inc. (the Nonprofit)'s Board of Directors."

- "The Partnership exists to advance OpenAI Inc's mission of ensuring that safe artificial general intelligence is developed and benefits all of humanity. The General Partner's duty to this mission and the principles advanced in the OpenAI Inc Charter take precedence over any obligation to generate a profit. The Partnership may never make a profit, and the General Partner is under no obligation to do so. The General Partner is free to re-invest any or all of the Operating Entity's (or the Partnership's) cash flow into research and development activities and/or related expenses without any obligation to the Limited Partners. See Section 6.4 of the Operating Entity's Limited Partnership Agreement for additional details."

Sam Altman further reinforced this point in May 16, 2023, testimony before the U.S. Senate Committee on the Judiciary, where he emphasized: "OpenAI has an unusual structure that ensures that it remains focused on this long-term mission," and proceeded to detail the key governance provisions:

- "First, the principal entity in our structure is our Nonprofit, which is a 501(c)(3) public charity."

- "Second, our for-profit operations are subject to profit caps and under a subsidiary that is fully controlled by the Nonprofit."

- "Third, because the board serves the Nonprofit, each director must perform their fiduciary duties in furtherance of its mission—safe AGI that is broadly beneficial. While the for-profit subsidiary is permitted to make and distribute profit, it is subject to this mission. The Nonprofit's principal beneficiary is humanity, not OpenAI investors."

- "Fourth, the board remains majority independent. Independent directors do not hold equity in OpenAI."

- "Fifth, profit for investors and employees is capped by binding legal commitments.

1    The Nonprofit retains all residual value for the benefit of humanity."

2    In his Senate hearing, Sam Altman stated, "[t]his structure enables us to prioritize safe and

3    beneficial AI development." and emphasized that "AGI technologies are explicitly reserved for the

4    Nonprofit to govern," underscoring the deliberate design of placing ultimate control of the most

5    powerful technologies in the hands of the nonprofit entity.

6    The key role and importance of nonprofit control are most directly shown in OpenAI's

7    "Our Structure" document, which was published on OpenAI's website on May 17, 2023, the day

8    after Sam's testimony:

9    •  "The OpenAI Nonprofit would remain intact, with its board continuing as the overall

10    governing body for all OpenAI activities."

11    •  "A new for-profit subsidiary would be formed, capable of issuing equity to raise capital

12    and hire world class talent, but still at the direction of the Nonprofit. Employees

13    working on for-profit initiatives were transitioned over to the new subsidiary."

14    •  "The for-profit would be legally bound to pursue the Nonprofit's mission, and carry

15    out that mission by engaging in research, development, commercialization and other

16    core operations. Throughout, OpenAI's guiding principles of safety and broad benefit

17    would be central to its approach."

18    •  "The for-profit's equity structure would have caps that limit the maximum financial

19    returns to investors and employees to incentivize them to research, develop, and deploy

20    AGI in a way that balances commerciality with safety and sustainability, rather than

21    focusing on pure profit-maximization."

22    •  "The Nonprofit would govern and oversee all such activities through its board in

23    addition to its own operations."

24    The "Our Structure" document then goes into more details regarding how the Nonprofit

25    exerts control:

26    •  "First, the for-profit subsidiary is fully controlled by the OpenAI Nonprofit. We

27    enacted this by having the Nonprofit wholly own and control a manager entity

28    (OpenAI GP LLC) that has the power to control and govern the for-profit subsidiary."

- "Second, because the board is still the board of a Nonprofit, each director must perform their fiduciary duties in furtherance of its mission—safe AGI that is broadly beneficial. While the for-profit subsidiary is permitted to make and distribute profit, it is subject to this mission. The Nonprofit's principal beneficiary is humanity, not OpenAI investors."

The document ends by saying that "...we strive to preserve these core governance and economic components of our structure."

The evidence above shows that OpenAI repeatedly emphasized the fact that for-profit subsidiaries are controlled by the Nonprofit and presented it as a critical factor for enabling the Nonprofit to successfully execute its mission.

**III.    Nonprofit Control and Charter Commitments Were Central to Talent Retention and Acquisition**

The OpenAI Charter played an important role in enhancing the organization's brand identity, serving as a tangible representation of its core values and mission. Physical copies of the Charter were prominently displayed and readily available, acting as a testament to OpenAI's commitment to its stated principles. This consistent visibility, through brochures, guest offerings, and new-hire packets, reinforced the Charter's importance and its role in shaping the company's public image.

When OpenAI was transitioning from a pure nonprofit to the "capped-profit" limited partnership structure in 2019, many employees expressed significant concerns about whether commercial pressures would lead to the elimination or marginalization of the nonprofit's original mission and the Charter commitments. OpenAI took these concerns seriously enough to commission an internal team to do an analysis on how the transition would affect the Nonprofit's mission. During the transition, Sam Altman and other company executives addressed the concerns directly and tried to allay fears across multiple all-hands meetings.

Leadership repeatedly emphasized that the Nonprofit entity maintained full legal control over the capped-profit LP, and that the LP documents explicitly stated that the organization's primary fiduciary obligation was to humanity, not to investors. As the OpenAI LP announcement

1  stated: "OpenAI LP's primary fiduciary obligation is to advance the aims of the OpenAI Charter...

2  All investors and employees sign agreements that OpenAI LP's obligation to the Charter always

3  comes first, even at the expense of some or all of their financial stake."

4      These assurances about the nonprofit's continued control and the legally binding

5  subordination of profit to mission were not treated as mere rhetoric—they were critical to the

6  company's ability to retain talent throughout the transition. Many employees who had joined

7  specifically because of OpenAI's nonprofit mission would have departed without these formal

8  reassurances that the organization would legally prioritize the Charter commitments over financial

9  returns.

10      At the end of 2020, multiple key employees left OpenAI and many others were considering

11  doing the same. To address employee concerns, the company held a virtual summit, including

12  Q&A sessions with leadership. At those sessions CEO Sam Altman emphasized the critical role of

13  nonprofit control in successfully executing OpenAI's mission. He articulated that this unique

14  structure ensured the organization remained focused on its long-term goals of safe and beneficial

15  AGI development. Altman stressed that the nonprofit's governance and oversight were paramount

16  in upholding the commitments outlined in the OpenAI Charter, guaranteeing that safety and broad

17  societal benefits were prioritized over short-term financial gains.

18      After the capped-profit transition, nonprofit control over OpenAI's corporate structure

19  continued being a material condition for attracting talent — particularly those concerned with AI

20  safety and the societal impacts of AI. In recruiting conversations with candidates, it was common

21  to cite OpenAI's unique governance structure as a critical differentiating factor between OpenAI

22  and competitors such as Google or Anthropic and an important reason they should consider

23  joining the company. This same reason was also often used to persuade employees who were

24  considering leaving for competitors to stay at OpenAI — including some of us.

25      The "merge and assist clause" in the OpenAI Charter —"If a value-aligned, safety-

26  conscious project comes close to building AGI before we do, we commit to stop competing with

27  and start assisting this project"—was often cited during these discussions as a structural safeguard

28  that would prevent the company triggering a dynamic in which competitors would race to AGI as

1    anyone got close. This commitment was presented in staff meetings as something only possible

2    under OpenAI's structure, as traditional for-profit companies would be unlikely to subordinate

3    shareholder interests in such a manner.

4        Overall, OpenAI's status as a nonprofit before 2019, and as a capped-profit under the full

5    control of the nonprofit since then, substantially helped OpenAI's recruiting and retention efforts.

6    Many employees were inspired by the nonprofit mission and the Charter commitments and chose

7    to work at OpenAI in large part because of them.

8    **IV.    Loss of Nonprofit Control Over OpenAI Would Violate The Nonprofit's Mission**

9        Today, OpenAI is attempting to transition to a corporate structure in which the Nonprofit

10   might lose its control over the for-profit subsidiaries. Such a loss of control would violate the

11   Nonprofit's mission. The Nonprofit can not "ensure that artificial general intelligence benefits all

12   of humanity" without having effective control over the corporate entity that is actually building

13   artificial general intelligence.

14       This violation becomes especially clear when we look at the specific Charter

15   commitments. Loss of nonprofit control is fundamentally incompatible with the commitment to

16   broadly distribute benefits and with the commitment to long-term safety. It is important to note

17   that in a recent blog post describing the planned evolution of their corporate structure, OpenAI

18   does not mention the Charter a single time. Given how heavily the Charter and the commitments

19   made in it featured in official documents and communication from 2019 to 2024, this is quite

20   surprising — and could potentially indicate that OpenAI themselves are aware that should their

21   proposed restructuring result in a loss of nonprofit control, that would violate commitments made

22   in the Charter.

23       Loss of nonprofit control violates the Charter commitment to broadly distribute benefits

24   because it prevents the nonprofit from "ensuring AGI's deployment is used for the benefit of all"

25   or "avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power," as the

26   nonprofit would no longer have any control over how AGI's deployment is used. Instead, if

27   OpenAI develops AGI, power over it would be concentrated among its shareholders.

28       Loss of nonprofit control also violates the Charter commitment to long-term safety by

essentially removing the "merge-and-assist clause." The Nonprofit can no longer credibly commit to "stop competing with and start assisting" any "value-aligned, safety-conscious project [that] comes close to building AGI before we do" if it does not control the for-profit subsidiary that is building AGI. Instead, for-profit shareholders who would control the subsidiary would be incentivized to do exactly the opposite in such a competitive scenario — race ahead to catch up, potentially cutting corners on safety to do so.

## **CONCLUSION**

OpenAI, Inc. was established with an explicit and unambiguous mission: to ensure artificial general intelligence benefits all of humanity. This mission was not merely aspirational— it was codified in multiple legal documents, reinforced through the OpenAI Charter, and consistently communicated both internally and externally as the organization's North Star. The unique corporate structure placing the Nonprofit in control was intentionally designed as the fundamental safeguard ensuring OpenAI would never stray from this mission.

The evidence presented—from Senate testimony and public statements to communications with employees—demonstrates that OpenAI's leadership, including CEO Sam Altman, consistently emphasized the Nonprofit's controlling role to various stakeholders as essential to "prioritize safe and beneficial AI development." This control mechanism wasn't incidental to OpenAI's mission—it was the central structural feature enabling the organization to uphold its Charter commitments to broadly distribute benefits, ensure long-term safety, maintain technical leadership, and foster cooperative orientation.

Furthermore, the Nonprofit's governance control served as a critical recruiting and retention tool, allowing OpenAI to attract top talent who wanted to work at an organization structurally committed to developing AGI for humanity's benefit. These employees relied on the continued governance role of the Nonprofit as a guarantee that their work would serve humanitarian rather than purely commercial ends.

Any restructuring that removes the Nonprofit's controlling role would therefore constitute a profound breach of trust with employees, donors, policymakers, and the public. More fundamentally, it would render the Nonprofit incapable of fulfilling its mission to ensure AGI

11

benefits humanity, as it would surrender its ability to direct how AGI is developed, deployed, and governed. Without control, the Nonprofit cannot credibly fulfill its Mission and Charter commitments, particularly those relating to broadly distributed benefits and long-term safety.

The Court should recognize that maintaining the Nonprofit's governance control is not merely preferable but essential to holding OpenAI accountable for upholding its charitable purpose. Allowing a restructuring that eliminates this control would effectively permit the diversion of nonprofit assets and contributions toward purposes fundamentally at odds with the Nonprofit's charitable obligations. Such an outcome would not only contravene OpenAI's explicit commitments but would undermine public trust in nonprofit governance structures more broadly.

DATED: April 11, 2025                    Respectfully submitted,


                                         /s/ Lester Lessig

                                         *Attorney for Proposed Amici Curiae*
                                         (*Pro Hac* Pending)

                                         On behalf of:
                                             Steven Adler
                                             Rosemary Campbell,
                                             Neil Chowdhury,
                                             Jacob H. Hilton,
                                             Daniel B. Kokotajlo,
                                             Gretchen M. Krueger,
                                             Todor M. Markov,
                                             Richard M.C. Ngo,
                                             Girish N. Sastry
                                             William R. Saunders,
                                             Carrol L. Wainwright II,
                                             Jeffrey K. Wu

Lester Lawrence Lessig (MA Bar No. 710593)
        *lessig@lessig.law*
*Attorney for Proposed Amici Curiae*
        Former OpenAI Employees

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to: Hon. Yvonne Gonzalez Rogers |
| v. | **DECLARATION OF TODOR M. MARKOV** |
| SAMUEL ALTMAN, et al., | |
| Defendants. | |

## DECLARATION

I, Todor M. Markov, declare as follows:

1.      Beginning in 2018, I worked as a researcher at OpenAI on a variety of teams, culminating in my assignment to the Preparedness team, where I worked on evaluating the persuasion abilities of frontier systems.

2.      I am presently a researcher at Anthropic, where I work on the Knowledge team.

3.      I have helped organize this amicus brief without any encouragement or input from my current employer.

4.      I left OpenAI in 2024 because I lost trust in its leadership team.

5.      I lost trust because in May 2024, I learned that OpenAI was routinely requiring departing employees to sign a general release including a broad lifetime non-disparagement agreement as a precondition for keeping their vested equity. For many employees — myself included — this equity represented a very large fraction of our overall life savings. This condition was intentionally hidden from employees by being phrased in a highly obfuscated manner and by being put in legal documents that we only saw and were asked to sign a few months after our initial joining dates. At an all-hands meeting, CEO Sam Altman was asked directly whether he had known that this was a standard practice for all departing employees. At that meeting, he disclaimed knowledge. Immediately after that meeting, a media article was published showing official company documents with Sam Altman's signature on them which explicitly described the requirement to sign a general release in order to retain one's vested equity in great detail. This course of events led me to believe that CEO Sam Altman was a person of low integrity who had directly lied to employees about the extent of his knowledge and involvement in OpenAI's practices of forcing departing employees to sign lifetime non-disparagement agreements; and that he was very likely lying to employees about a number of other important topics, including but not limited to the sincerity of OpenAI's commitment to the Charter — which had up to that point been considered binding and taken very seriously internally by me and other OpenAI employees.

6.      The Charter was positioned as the foundational document guiding all of our strategic decisions during my time at OpenAI. Senior leaders such as Sam Altman and Greg Brockman

regularly referenced the Charter to explain operational and organizational decisions or to address questions about how OpenAI was developing AGI.

7.    In fact, there was a dedicated working group at OpenAI devoted to interpreting and applying the Charter in concrete terms. Employee understanding of the Charter was made part of our performance evaluations after the transition of OpenAI even to a capped for-profit structure. Employees at all levels were evaluated not just on their technical contributions but also on how well they aligned their work with the Charter's principles and ensured their colleagues did the same.

8.    As repeated by OpenAI executives both internally and externally, OpenAI's nonprofit structure, and in particular the nonprofit's control over all for-profit subsidiaries, was generally considered essential to OpenAI upholding its Charter commitments.

9.    The Charter also played an important role in enhancing the organization's brand identity. Physical copies of the Charter were prominently displayed throughout the offices. It was consistently visible in brochures, guest offerings, and new-hire packets.

10.    When OpenAI began to lose key staff in 2020, Sam Altman repeatedly turned to and emphasized the importance of the Charter and OpenAI's unique nonprofit control structure to retain talent.

11.    Particularly after OpenAI's capped-profit transition, nonprofit control and adherence to the Charter were important for attracting talent—especially the gifted researchers concerned with AI safety and the societal impacts of AI.

12.    The repeated representations by Sam Altman and other OpenAI executives concerning OpenAI's charitable mission and adherence to the Charter persuaded me to stay at OpenAI longer than I otherwise would have.

13.    When I saw Sam Altman and other senior leaders directly lie to employees about the company's transparency practices, I realized that they had also lied to us about many other important decisions and key elements of the company.  I realized the Charter had been used as a smokescreen, something to attract and retain idealistic talent while providing no real check on OpenAI's growth and its pursuit of AGI.

14.    OpenAI's public announcement of a plan to pursue a fully for-profit restructuring,

contrary to its Charter's core commitments, has only served to further convince me that OpenAI's Charter and mission were used all along as a facade to manipulate its workforce and the public.

15.    I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on April 11, 2025.


 */s/ Todor M. Markov*
Todor M. Markov