Lester Lawrence Lessig (MA Bar No. 710593)
　*lessig@lessig.law*
*Attorney for Proposed Amici Curiae*
　Former OpenAI Employees

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to: Hon. Yvonne Gonzalez Rogers |
| v. | **DECLARATION OF TODOR M. MARKOV** |
| SAMUEL ALTMAN, et al., | |
| Defendants. | |

**DECLARATION**

I, Todor M. Markov, declare as follows:

1. Beginning in 2018, I worked as a researcher at OpenAI on a variety of teams, culminating in my assignment to the Preparedness team, where I worked on evaluating the persuasion abilities of frontier systems.

2. I am presently a researcher at Anthropic, where I work on the Knowledge team.

3. I have helped organize this amicus brief without any encouragement or input from my current employer.

4. I left OpenAI in 2024 because I lost trust in its leadership team.

5. I lost trust because in May 2024, I learned that OpenAI was routinely requiring departing employees to sign a general release including a broad lifetime non-disparagement agreement as a precondition for keeping their vested equity. For many employees — myself included — this equity represented a very large fraction of our overall life savings. This condition was intentionally hidden from employees by being phrased in a highly obfuscated manner and by being put in legal documents that we only saw and were asked to sign a few months after our initial joining dates. At an all-hands meeting, CEO Sam Altman was asked directly whether he had known that this was a standard practice for all departing employees. At that meeting, he disclaimed knowledge. Immediately after that meeting, a media article was published showing official company documents with Sam Altman's signature on them which explicitly described the requirement to sign a general release in order to retain one's vested equity in great detail. This course of events led me to believe that CEO Sam Altman was a person of low integrity who had directly lied to employees about the extent of his knowledge and involvement in OpenAI's practices of forcing departing employees to sign lifetime non-disparagement agreements; and that he was very likely lying to employees about a number of other important topics, including but not limited to the sincerity of OpenAI's commitment to the Charter — which had up to that point been considered binding and taken very seriously internally by me and other OpenAI employees.

6. The Charter was positioned as the foundational document guiding all of our strategic decisions during my time at OpenAI. Senior leaders such as Sam Altman and Greg Brockman

regularly referenced the Charter to explain operational and organizational decisions or to address questions about how OpenAI was developing AGI.

7. In fact, there was a dedicated working group at OpenAI devoted to interpreting and applying the Charter in concrete terms. Employee understanding of the Charter was made part of our performance evaluations after the transition of OpenAI even to a capped for-profit structure. Employees at all levels were evaluated not just on their technical contributions but also on how well they aligned their work with the Charter's principles and ensured their colleagues did the same.

8. As repeated by OpenAI executives both internally and externally, OpenAI's nonprofit structure, and in particular the nonprofit's control over all for-profit subsidiaries, was generally considered essential to OpenAI upholding its Charter commitments.

9. The Charter also played an important role in enhancing the organization's brand identity. Physical copies of the Charter were prominently displayed throughout the offices. It was consistently visible in brochures, guest offerings, and new-hire packets.

10. When OpenAI began to lose key staff in 2020, Sam Altman repeatedly turned to and emphasized the importance of the Charter and OpenAI's unique nonprofit control structure to retain talent.

11. Particularly after OpenAI's capped-profit transition, nonprofit control and adherence to the Charter were important for attracting talent—especially the gifted researchers concerned with AI safety and the societal impacts of AI.

12. The repeated representations by Sam Altman and other OpenAI executives concerning OpenAI's charitable mission and adherence to the Charter persuaded me to stay at OpenAI longer than I otherwise would have.

13. When I saw Sam Altman and other senior leaders directly lie to employees about the company's transparency practices, I realized that they had also lied to us about many other important decisions and key elements of the company. I realized the Charter had been used as a smokescreen, something to attract and retain idealistic talent while providing no real check on OpenAI's growth and its pursuit of AGI.

14. OpenAI's public announcement of a plan to pursue a fully for-profit restructuring,

contrary to its Charter's core commitments, has only served to further convince me that OpenAI's Charter and mission were used all along as a facade to manipulate its workforce and the public.

15. I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on April 11, 2025.

                    */s/ Todor M. Markov*
                    Todor M. Markov