# EXHIBIT 7

April 9, 2025

Attorney General Rob Bonta
Office of the Attorney General
California Department of Justice
Attn: Public Inquiry Unit
P.O. Box 944255
Sacramento, CA 94244-2550

## PETITION FOR ATTORNEY GENERAL ACTION
## TO PROTECT THE CHARITABLE NATURE OF OPENAI'S ASSETS

Artificial intelligence institution OpenAI, Inc. is a nonprofit entity that has failed to protect its charitable assets, allowing these charitable assets to be diverted for private profit and subverting its charitable mission to advance safe artificial intelligence. Petitioners, who include national and California nonprofits, labor leaders, and foundations with a long history of advocating on behalf of the Californian public, request that the California Attorney General take immediate action to address these threats to the public's interest in OpenAI's charitable assets.

In the 1990s, as nonprofit health providers around the country converted to for-profit companies, California regulators stepped in to protect the public interest by demanding the establishment of independent nonprofit foundations funded through a full and fair valuation of the billions of dollars in charitable assets at stake. Petitioners request that the Attorney General act now in the instant case to again protect billions of dollars that are under threat as profit-driven hunger for power yields conflicts of interest. As before, the Attorney General's actions can ensure that these charitable assets are transferred to independent nonprofit institutions that will use them to advance the charitable purposes forsaken by OpenAI.

By defending the charitable dedication of OpenAI's assets, the Attorney General not only carries out key duties to protect charitable assets under common law and California statute, but also advances the public's safety and California state policy regarding potential AI threats in this complex regulatory arena.

Petitioners ask the Attorney General to conduct a robust investigation into these issues and file a legal action against OpenAI with the goals of:

- halting the proposed restructuring while the abuse of OpenAI, Inc.'s charitable assets is fully addressed;
- ensuring that the full value of OpenAI, Inc.'s charitable assets is accounted for and protected; and
- ensuring that the charitable assets are transferred to a separate independent nonprofit or nonprofits in order to guarantee that they are under the control of a genuinely independent board of directors and dedicated to the public's interest and the charitable mission, rather than corporate interests and private profit.

## I.     Summary of Petition

OpenAI, best known for its creation of ChatGPT, was founded in 2015 as a nonprofit research entity with the goal of developing safe and beneficial artificial general intelligence.[1] Initially, OpenAI's founders saw the nonprofit structure as essential for ensuring that their research avoided harmful artificial intelligence developments and enabled humanity broadly to benefit from the research.[2] However, OpenAI soon abandoned its commitment to its charitable mission,[3] and initiated a series of steps designed to move its nonprofit governance mechanisms into positions of successively reduced control and influence.[4,5] In consequence, OpenAI, Inc. lost its ability to protect its charitable assets or advance its charitable purposes, as required by California law.

In this filing, petitioners ask the California Attorney General to exercise his duty and responsibility toward California charitable assets and the California public by investigating the ongoing and proposed abuses of OpenAI, Inc.'s nonprofit assets and filing suit to protect the public's interest. This petition begins with this summary (**Section I**), which describes the legal and factual concerns developed in the petition as a whole. Next, in **Section II**, the petition sets out the relevant factual background. In **Section III**, the petition establishes the California Attorney General's jurisdiction and authority to act regarding these matters. In **Section IV**, the petition reviews the relevant legal issues, explaining how the facts establish a violation of law regarding the failure to protect charitable assets in question, including a failure to ensure that charitable assets are dedicated to their designated charitable purpose and violations of federal tax-exempt status. In **Section V**, petitioners enumerate the relief requested. **Section VI** concludes the petition.

### A.   The California Attorney General Has Jurisdiction to Protect OpenAI, Inc.'s Charitable Assets.

The California Attorney General is responsible for supervising charitable assets in California and has the power to investigate transactions and enforce the charitable trust impressed upon assets. (*Holt v. College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2nd 750, 754-55.) Under well established precedent and regular practice, the California Attorney General has jurisdiction to protect the charitable assets of nonprofit entities incorporated in other states under circumstances such as those here, where OpenAI, Inc. amassed its charitable assets in California, has its principal place of business and primary activities in California, and has little to no contact with the jurisdiction in which it was incorporated. (See, e.g., *Lidow v. Superior Court* (2012) 206 Cal.App.4th 351, 358-359.)

---

[1] Ellis Stewart, What is OpenAI? A Look into the AI Firm and its History, Enterprise Management 360, July 3, 2024, https://em360tech.com/tech-articles/what-openai-look-ai-firm-and-its-history.

[2] Greg Brockman, Ilya Sutskever, "Introducing OpenAI," OpenAI, December 11, 2015, https://openai.com/index/introducing-openai/.

[3] Greg Brockman, Ilya Sutskever, "OpenAI LP," OpenAI, March 11, 2019, https://openai.com/index/openai-lp/.

[4] Greg Brockman, Ilya Sutskever, "OpenAI LP," OpenAI, March 11, 2019, https://openai.com/index/openai-lp/.

[5] Hayden Field, Microsoft's decision to give up OpenAI board observer seat doesn't quell key concerns, CNBC, July 11, 2024, https://www.cnbc.com/2024/07/11/microsoft-giving-up-openai-board-observer-seat-doesnt-settle-concerns.html.

### B. As Described in this Petition, OpenAI Has Engaged in Numerous Violations of Law.

As set out in detail in the body of this petition, OpenAI has engaged in the following illegal actions.

**First**, OpenAI has failed to protect nonprofit assets for a charitable purpose. When a nonprofit entity such as OpenAI, Inc. is organized and operates in California for charitable purposes, all of its assets are dedicated exclusively for charitable purposes. (*Lynch v. Spilman* (1967) 67 Cal.2d 251, 260–261.) Such assets are understood to be held in a charitable trust, and the Attorney General is authorized and required to ensure that these assets are used for their designated charitable purposes. (*People v. Orange Cnty. Charitable Servs.* (1999) 73 Cal.App.4th 1054, 1074.) OpenAI's violation of its charitable status has been ongoing for years, but OpenAI's current proposal to remove any control of its operations from nonprofit oversight would elevate these violations to an entirely new level.

The concerns regarding these violations are factually complex, but legally simple:

- In 2019, after three years of significant AI breakthroughs, OpenAI conducted a corporate restructuring that removed its staff, its work product, and computational resources from the OpenAI nonprofit to a for-profit.[6] That transfer of assets only avoided clear impermissibility because the process was "painstakingly structured to protect Nonprofit OpenAI's status as a nonprofit and tax-exempt charity,"[7] in that the new structure placed the nonprofit board of directors in clear control of the new for-profit and its assets as required by law. (*St. David's Health Care Systems v. United States* (5th Cir. 2003) 349 F.3d 232, 238; *Redlands Surgical Services v. Commissioner of Internal Revenue* (T.C. 1999) 113 T.C. 47, *aff'd per curiam* (9th Cir. 2001) 242 F.3d 904.)
- Although this structure was technically acceptable, following this change, the nonprofit board was stymied when it attempted to exercise actual control over its assets in accordance with its fiduciary duty. In November 2023, the board attempted to fire OpenAI CEO Sam Altman due to Altman's dishonesty regarding the safety processes at the heart of the nonprofit's charitable purpose, failure to reveal key financial information, and toxic behavior.[8] However, profit-motivated OpenAI interest holders were able to overturn the nonprofit board's actions, demand the resignation of mission-oriented board

---

[6] Greg Brockman, Ilya Sutskever, "OpenAI LP," OpenAI, March 11, 2019, https://openai.com/index/openai-lp/.

[7] Aprill, Ellen P., Chan Loui, Rose, and Horwitz, Jill R., Board Control of a Charity's Subsidiaries: The Saga of OpenAI, Tax Notes Federal, Volume 182, (2024), February 8, 2024, https://ssrn.com/abstract=4720202.

[8] Hayden Field, "Former OpenAI board member explains why CEO Sam Altman got fired before he was rehired," CNBC, May 29, 2024, https://www.cnbc.com/2024/05/29/former-openai-board-member-explains-why-ceo-sam-altman-was-fired.html#:~:text=In%20November%2C%20OpenAI's%20board%20ousted,ability%20to%20exercise%20its%20responsibilities.%22.

members, and replace them with corporate insiders.[9] The board's inability and failure to protect the charitable assets from improper use and private control demonstrates the need for action by the Attorney General to protect the public interest.[10] (*St. David's Health Care Systems, supra,* 349 F.3d 232, 238.)

- OpenAI's amendment of its purpose clause to eliminate its commitment to open source research was also an illegal diversion of its charitable assets and contributed to private inurement.[11,12] While there is reason for concern about open source AI, the change in mission was driven by the desire to maximize profits and benefit investors, rather than the public good. This change in charitable purpose was a significant one and so it was a violation of charitable trust doctrine to use those assets donated before the amendments – or the products developed with those resources – towards the new mission. (*Pacific Home v. Los Angeles Cnty.* (1953) 41 Cal.2d 844, 852.) This change again showcases the board's inability to protect the charitable assets and mission.

- Now, OpenAI proposes to eliminate any and all control by nonprofit OpenAI, Inc. over OpenAI's core work.[13] Under the new plan, the nonprofit board of directors would lose control over all of OpenAI operations and management, which would be allocated in their entirety to a new for-profit public benefit corporation.[14] Every OpenAI decision that matters – returns for private investors and management, balancing public interest versus private benefit, and addressing safety concerns – would all be made by a corporate board of directors with no accountability for the public interest and no duty to the public. (Del. Gen. Corp. Law, Title 8, §§ 362(a), 365(b, c), 367.) By allowing OpenAI's business interests to direct nonprofit structure and control, the nonprofit board again is failing to protect its charitable assets.

**Second**, OpenAI is also clearly in violation of its federal tax-exempt status, creating a dangerous precedent, and placing OpenAI's charitable assets at risk. A nonprofit organization like OpenAI, Inc. must operate exclusively for charitable purposes, engaging primarily in activities that accomplish its charitable purposes and ensuring that its earnings are not directed to the benefit of private individuals or entities. (*Airlie Found. v. United States* (D.D.C. 1993) 826 F. Supp. 537, 550.) These requirements are violated when private interests reap significant commercial benefits from nonprofit operations. (*Harding Hospital v. United States* (6th Cir. 1974) 505 F.2d 1068, 1072.) Microsoft's $10 billion investment in OpenAI came with the rights to up to 75 percent of OpenAI profits until Microsoft recoups its investment and a 49 percent ownership and profit stake. With

---

[9] Hayden Field, Microsoft's decision to give up OpenAI board observer seat doesn't quell key concerns, CNBC, July 11, 2024, https://www.cnbc.com/2024/07/11/microsoft-giving-up-openai-board-observer-seat-doesnt-settle-concerns.html.

[10] Ellen P. Aprill, Rose Chan Loui and Jill R. Horwitz, The Untold Nonprofit Story of OpenAI, Columbia Law School Blog, March 5, 2024, https://clsbluesky.law.columbia.edu/2024/03/05/the-untold-nonprofit-story-of-openai/.

[11] OpenAI, Inc., Certificate of Incorporation of a Non-Stock Corporation, Article Third, December 8, 2015, attachment to IRS Form 1023, https://www.documentcloud.org/documents/25197523-openai-application-for-tax-exempt-status/.

[12] Brief of Amicus Curiae Delaware Attorney General - Case No: 4:24-Cv-04722-Ygr, Dec. 30, 2024, https://lawprofessors.typepad.com/files/delawareagamicusbrief-musk-v.-altman.pdf.

[13] OpenAI, Why OpenAI's structure must evolve to advance our mission, December 27, 2024.

[14] OpenAI, Why OpenAI's structure must evolve to advance our mission, December 27, 2024.

the profit share of other investors, the nonprofit is entitled to no profits for years, and no more than 2 percent of profits following that for the foreseeable future. This structuring of profits imposes risks and liabilities on nonprofit OpenAI, Inc. while shielding for-profit investors from risk and exploiting nonprofit assets. Moreover, these practices create a dangerous precedent in which other startups, looking at OpenAI as a model, are likely to consider whether to take similar advantage of nonprofit status to create accelerated and amplified possibilities for individual financial benefit.

OpenAI began its work with the goal of developing AI to benefit humanity as a whole, but its current attempt to alter its corporate structure reveals its new goal: providing AI's benefits – the potential for untold profits and control over what may become powerful world-altering technologies – to a handful of corporate investors and high-level employees. Petitioners ask the Attorney General to conduct a robust investigation into these issues and file a legal action against OpenAI with the goals of protecting the public interest in OpenAI, Inc.'s charitable assets through the relief requested in this petition.

## II.    Factual Background

### A.  OpenAI Was Founded as a Nonprofit Entity Dedicated Exclusively to the Charitable Purpose of Safe and Beneficial AI.

OpenAI was founded in 2015 as a nonprofit entity, with key leadership including Sam Altman, Elon Musk, Greg Brockman, and Ilya Sutskever.[15,16] It received early donation investments from Elon Musk, Amazon, Infosys, Peter Thiel, and others, with an initial promised endowment of $1 billion to fund its research and operations.[17] (It is unclear how much money was received in fulfillment of these commitments. According to both Elon Musk and the OpenAI website, Musk invested $44 or $45 million in OpenAI, Inc. in its first five years.[18,19])

The initial 2015 nonprofit entity was registered in Delaware under the name OpenAI, Inc. as a non-stock/exempt corporation. OpenAI, Inc.'s original Certificate of Incorporation, filed with the Delaware Secretary of State on December 8, 2015, listed the following statement of purpose:

"This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code… The specific purpose of this corporation is to provide funding for

---

[15] Ellis Stewart, What is OpenAI? A Look into the AI Firm and its History, Enterprise Management 360, July 3, 2024, https://em360tech.com/tech-articles/what-openai-look-ai-firm-and-its-history.

[16] Karl Montevirgen, OpenAI, Encyclopaedia Britannica, updated Feb 3, 2025, https://www.britannica.com/money/OpenAI.

[17] BBC News, "Tech giants pledge $1bn for 'altruistic AI' venture, OpenAI," December 12, 2015, https://www.bbc.com/news/technology-35082344.

[18] *Musk v. OpenAI*, Complaint, Case No. 3:24-cv-04722 (N.D.Cal. August 5, 2024), https://regmedia.co.uk/2024/08/05/musk_v_openai.pdf.

[19] Greg Brockman et al., OpenAI and Elon Musk, OpenAI, March 5, 2024, https://openai.com/index/openai-elon-musk/.

research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable."[20]

The certificate also stated, "The property of this corporation is irrevocably dedicated to the purposes in Article THREE hereof and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person."[21] OpenAI, Inc. filed for tax-exempt status with the federal IRS in 2016.[22]

OpenAI, Inc. registered to do business in California on January 7, 2016 and registered with the California Attorney General's Registry of Charitable Trusts under section 12585 of the Government Code in 2017.[23] Statements of Information filed with the California Secretary of State list OpenAI's principal address as in California, and its IRS Form 990 tax returns list its address in California. The organization has its headquarters in California.

As noted, OpenAI, Inc. was founded as a nonprofit research lab with the goal of developing safe and beneficial artificial general intelligence. Under California law, artificial intelligence is defined as "an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments." (Gov. Code, § 11546.45.5(a)(1).)

In 2015, Sam Altman explained why OpenAI had selected a nonprofit structure as the optimal form: "Why not try to make a profit? I think that the misaligned incentives there would be suboptimal to the world as a whole."[24] OpenAI further explained this concept in an introductory blog stressing the broader goals of the nonprofit, "OpenAI is a non-profit artificial intelligence research company. Our goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact."[25]

OpenAI explained the need for AI goals around safety and benefits for humankind, describing "concern[s] about AGI's potential to cause rapid change, whether through machines pursuing

---

[20] OpenAI, Inc., Certificate of Incorporation of a Non-Stock Corporation, Article Third, December 8, 2015, attachment to IRS Form 1023, https://www.documentcloud.org/documents/25197523-openai-application-for-tax-exempt-status/.

[21] *Ibid.*

[22] OpenAI, Inc., IRS Form 1023, Application for Tax Exempt Status, September 1, 2016, https://www.documentcloud.org/documents/25197523-openai-application-for-tax-exempt-status/.

[23] OpenAI, Inc., Initial Registration Form, August 28, 2017, https://gwern.net/doc/reinforcement-learning/openai/2017-openai-bylaws.pdf.

[24] Emily Jane Fox, "Sam Altman on His Plan to Keep A.I. Out of the Hands of the 'Bad Guys,'" Vanity Fair, December 15, 2015, https://www.vanityfair.com/news/2015/12/sam-altman-elon-musk-openai.

[25] Greg Brockman, Ilya Sutskever, "Introducing OpenAI," OpenAI, December 11, 2015, https://openai.com/index/introducing-openai/.

goals misspecified by their operator, malicious humans subverting deployed systems, or an out-of-control economy that grows without resulting in improvements to human lives."[26]

### B. Beginning in 2019, Leadership Implemented Substantial Changes to OpenAI's Corporate Structure, Weakening the Nonprofit's Role.

By 2019, OpenAI had achieved significant breakthroughs on the road to artificial intelligence.[27,28,29,30] Investment interest was growing and costs were considerable. With the goal of accessing increased financial resources, OpenAI's leaders took action in March 2019 to change the corporate structure controlling the work of the entity, creating the for-profit OpenAI LP. The structure was designed so that nonprofit OpenAI, Inc. retained legal control of the for-profit branch, with OpenAI, Inc.'s nonprofit board in charge. OpenAI set out its rationale for these changes: "We've created OpenAI LP, a new 'capped-profit' company that allows us to rapidly increase our investments in compute and talent while including checks and balances to actualize our mission."[31]

OpenAI described the details of the questionable structure: "Our solution is to create OpenAI LP as a hybrid of a for-profit and nonprofit—which we are calling a 'capped-profit' company. The fundamental idea of OpenAI LP is that investors and employees can get a capped return if we succeed at our mission, which allows us to raise investment capital and attract employees with startup-like equity. But any returns beyond that amount—and if we are successful, we expect to generate orders of magnitude more value than we'd owe to people who invest in or work at OpenAI LP—are owned by the original OpenAI Nonprofit entity. Going forward (in this post and elsewhere), 'OpenAI' refers to OpenAI LP (which now employs most of our staff), and the original entity is referred to as 'OpenAI Nonprofit.'"[32]

Although OpenAI claimed that its commercial arm had "capped profit," the cap was set preposterously high. OpenAI explained that "[r]eturns for our first round of investors are capped at 100x their investment" while "[a]ny excess returns go to OpenAI Nonprofit."[33] These arrangements were structurally designed to provide enormous profits to the investors while depriving the nonprofit of the benefits of its assets. Note also that OpenAI's high costs and determination to invest enough to beat the competition to marketable products means that it is

---

[26] Greg Brockman, Ilya Sutskever, "OpenAI LP," OpenAI, March 11, 2019, https://openai.com/index/openai-lp/.

[27] Saasha Nair, OpenAI Gym: An Introduction, September 21, 2020, https://saashanair.com/blog/blog-posts/introduction-to-openai-gym.

[28] OpenAI, Milestone: OpenAI Five, June 25, 2018, https://openai.com/index/openai-five/.

[29] OpenAI, Milestone: OpenAI Five defeats Dota 2 world champions, April 15, 2019, https://openai.com/index/openai-five-defeats-dota-2-world-champions/.

[30] OpenAI, Milestone: Better language models and their implications, February 14, 2019, https://openai.com/index/better-language-models/.

[31] Greg Brockman, Ilya Sutskever, "OpenAI LP," OpenAI, March 11, 2019, https://openai.com/index/openai-lp/.

[32] Greg Brockman, Ilya Sutskever, "OpenAI LP," OpenAI, March 11, 2019, https://openai.com/index/openai-lp/.

[33] Greg Brockman, Ilya Sutskever, "OpenAI LP," OpenAI, March 11, 2019, https://openai.com/index/openai-lp/.

currently experiencing enormous losses, and internal projections do not show it generating any profits until 2029.[34,35]

Following this change, the capped profit company raised billions in investor funding, including Microsoft's placement of $1 billion into the partnership. In 2021, Microsoft placed another $2 billion and in 2022 an additional $10 billion into the partnership.[36] Although the terms of these deals are not entirely public, Microsoft is entitled to 75 percent of profits until it recoups its $13 billion and is then entitled to 49 percent of profits, with the nonprofit entitled to only 2 percent of profits, until a cap (apparently $92 billion) is reached.[37,38]

In 2020, OpenAI, Inc., the nonprofit entity, amended and restated its Certificate of Incorporation. The purpose clause was revised to read:

> "This Corporation shall be a nonprofit corporation organized exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code… The specific purpose of this corporation is to ensure that artificial general intelligence benefits all of humanity, including by conducting and/or funding artificial intelligence research. The corporation may also research and/or otherwise support efforts to safely develop and distribute such technology and its associated benefits, including analyzing the societal impacts of the technology and supporting related educational, economic, and safety policy research and initiatives. The resulting technology will benefit the public and the corporation will seek to distribute it for the public benefit when applicable…"[39]

Over the next few years, additional alterations to OpenAI's structure took place. The nonprofit board remained in control of OpenAI, Inc., which had partial ownership over the for-profit subsidiary, but decisions were made that introduced more complexity, a substantial ownership stake by Microsoft, and a significant number of separate intertwined business entities.[40] The effect

---

[34] Muslim Farooque, Report Reveals OpenAI's $44 billion Projected Losses Before 2029 Profitability target, Yahoo! Finance, October 10, 2024, https://finance.yahoo.com/news/report-reveals-openais-44-billion-145334935.html.

[35] Edward Zitron, How Does OpenAI Survive? Jul. 29, 2024, https://www.wheresyoured.at/to-serve-altman/.

[36] LesleyFair, What People Are Missing About Microsoft's $10B Investment In OpenAI, The Decoding, 2023, available at:
https://www.reddit.com/r/singularity/comments/10mhzhk/what_people_are_missing_about_microsofts_10b/.

[37] Trevor Jennewine, Microsoft's $13 Billion Investment in OpenAI May Be "Some of the Best Money Ever Spent," According to Certain Wall Street Analysts, Motley Fool, Nov. 10, 2024,
https://www.fool.com/investing/2024/11/10/microsoft-13-billion-openai-best-money-ever-spent/#:~:text=Additionally%2C%20Microsoft%20will%20ultimately%20recoup,predetermined%20return%20cap%20is%20reached.

[38] Ashu Garg, Why OpenAI's $157B valuation misreads AI's future, Foundation Capital, Oct. 25, 2024, https://foundationcapital.com/why-openais-157b-valuation-misreads-ais-future/.

[39] Brief of Amicus Curiae Delaware Attorney General - Case No: 4:24-Cv-04722-Ygr, Dec. 30, 2024, https://lawprofessors.typepad.com/files/delawareagamicusbrief-musk-v.-altman.pdf.

[40] See, e.g., See Ricky Nave, How OpenAI LEGALLY Switched from Nonprofit to For-Profit, Axiom Alpha, https://axiomalpha.com/how-openai-legally-switched-from-nonprofit-to-for-profit/; also *Musk v. OpenAI*, Complaint, Case No. 3:24-cv-04722 (N.D.Cal. August 5, 2024),

of these actions was to dilute the charitable assets, reduce the nonprofit's oversight, and introduce a byzantine complexity.

These changes to OpenAI created structural fault lines due to the irreconcilable tension between the goal of maximizing profitability versus the goal of developing safe and accessible artificial intelligence. OpenAI's nonprofit goals became less and less important to decisionmakers in contrast with the need to meet investors' interests, particularly their profit and product goals. OpenAI's operational leadership saw the nonprofit board as a hindrance, to be kept at arms' length, rather than the steward of the organizational mission.

### C. By 2023, Struggles Appeared Over OpenAI's Failure to Adhere to its Nonprofit Mission.

These fundamental incompatibilities in the structure of OpenAI burst into public view in November 2023. Acting in its oversight capacity, the nonprofit board of OpenAI, Inc. fired Sam Altman because of its loss of confidence in his honesty and transparency, explaining that "he was not consistently candid in his communications with the board."[41,42] Additional details later emerged about the board's concerns, including allegations of Altman's dishonesty regarding the safety processes at the heart of the charitable purpose, failure to reveal key financial information, and toxic behavior.[43,44] Altman was described as highly manipulative and accused of "outright lying" to the board.[45]

Despite these serious concerns, Altman was rapidly reinstated. Threats by key investor Microsoft and OpenAI's staff (both groups with large equity interests in OpenAI's profitability) led the critical board members to resign and Altman to be reinstated. The board was restructured to include more business interests, including an observer role for a Microsoft appointee, meaning that nonprofit deliberations and decisions were overseen and reported on by OpenAI's primary

https://regmedia.co.uk/2024/08/05/musk_v_openai.pdf (see allegations 93-100, enumerating a dozen or more companies and start-up funds interwoven into the corporate structure).

[41] Associated Press, ChatGPT-maker OpenAI fires CEO Sam Altman for lack of candor with company, NPR, November 17, 2023, https://www.npr.org/2023/11/17/1213892587/chatgpt-open-ai-ceo-sam-altman-ousted.

[42] Hayden Field, OpenAI co-founder Ilya Sutskever says he will leave the startup, CNBC, May 14, 2024, https://www.cnbc.com/2024/05/14/openai-co-founder-ilya-sutskever-says-he-will-leave-the-startup.html.

[43] Hayden Field, "Former OpenAI board member explains why CEO Sam Altman got fired before he was rehired," CNBC, May 29, 2024, https://www.cnbc.com/2024/05/29/former-openai-board-member-explains-why-ceo-sam-altman-was-fired.html#:~:text=In%20November%2C%20OpenAI's%20board%20ousted,ability%20to%20exercise%20its%20responsibilities.%22.

[44] Mike Isaac, Tripp Mickle and Cade Metz, Key OpenAI Executive Played a Pivotal Role in Sam Altman's Ouster, New York Times, March 3, 2024, https://www.nytimes.com/2024/03/07/technology/openai-executives-role-in-sam-altman-ouster.html.

[45] Shakeel Hashim, Sam Altman was 'outright lying to the board', says former board member, Transformer, May 29, 2024, https://www.transformernews.ai/p/sam-altman-was-outright-lying-to.

corporate investor.[46] (Eight months later, Microsoft gave up the observer seat after FTC scrutiny.[47]) Ultimately, Sam Altman rejoined the OpenAI, Inc. board of directors.[48] OpenAI hired a law firm to conduct an investigation into the conflict, but did not release the results publicly.[49]

With the nonprofit's ability to engage in meaningful oversight significantly damaged, the unresolved tensions between goals meant that safety continued to take a back seat in OpenAI operations. In July 2023 OpenAI announced a new high profile safety team dedicated to avoiding long term risks from AI, promising that 20 percent of OpenAI's computing resources would be devoted to its work over the following four years.[50] The team's mission was to develop the needed "scientific and technical breakthroughs to steer and control AI systems much smarter than us."[51] But in May 2024, after less than a year, OpenAI announced that it was disbanding this team.[52] A number of high profile departures ensued. In departing, safety lead Jan Leike cautioned that "[b]uilding smarter-than-human machines is an inherently dangerous endeavor" and mourned the fact that OpenAI's "safety culture and processes have taken a backseat to shiny products."[53] Once again, OpenAI demonstrated that in any conflict between profits and safety, profits would win.

### D. OpenAI's Leadership Plans a Radical Change In Corporate Structure in 2025, Further Reducing the Nonprofit Role and Commitment.

In December 2024, OpenAI confirmed rumors that it planned to transition into a for-profit entity.[54,55] Many news accounts show OpenAI's ravenous appetite for investment.[56] The entity's rapid growth, determination to be at the forefront of AI development, increases in revenue generation, and massive losses have generated an enormous need for funding.

---

[46] Hayden Field, Microsoft's decision to give up OpenAI board observer seat doesn't quell key concerns, CNBC, July 11, 2024, https://www.cnbc.com/2024/07/11/microsoft-giving-up-openai-board-observer-seat-doesnt-settle-concerns.html.

[47] Hayden Field, Microsoft's decision to give up OpenAI board observer seat doesn't quell key concerns, CNBC, July 11, 2024, https://www.cnbc.com/2024/07/11/microsoft-giving-up-openai-board-observer-seat-doesnt-settle-concerns.html.

[48] Hayden Field, Sam Altman rejoins OpenAI board of directors as investigation into his ouster comes to a close, CNBC, Mar. 8, 2024, https://www.cnbc.com/2024/03/08/sam-altman-rejoins-openai-board-company-adds-three-new-members.html.

[49] Hayden Field, Sam Altman rejoins OpenAI board of directors as investigation into his ouster comes to a close, CNBC, Mar. 8, 2024, https://www.cnbc.com/2024/03/08/sam-altman-rejoins-openai-board-company-adds-three-new-members.html.

[50] OpenAI, Introducing Superalignment, July 5, 2023, https://openai.com/index/introducing-superalignment/.

[51] OpenAI, Introducing Superalignment, July 5, 2023, https://openai.com/index/introducing-superalignment/.

[52] Hayden Field, OpenAI dissolves team focused on long-term AI risks, less than one year after announcing it, CNBC, May 17, 2024, https://www.cnbc.com/2024/05/17/openai-superalignment-sutskever-leike.html.

[53] Jan Leike, Twitter, May 17, 2024, https://x.com/janleike/status/1791498184671605209.

[54] OpenAI, Why OpenAI's structure must evolve to advance our mission, December 27, 2024.

[55] Hayden Field, OpenAI sees roughly $5 billion loss this year on $3.7 billion in revenue, CNBC, September 27, 2024, https://www.cnbc.com/2024/09/27/openai-sees-5-billion-loss-this-year-on-3point7-billion-in-revenue.html.

[56] Mike Isaac and Erin Griffith, OpenAI Is Growing Fast and Burning Through Piles of Money, New York Times, Sept 27, 2024, https://www.nytimes.com/2024/09/27/technology/openai-chatgpt-investors-funding.html.

In its December 27th blog post, OpenAI described its current plans "to transform our existing for-profit into a Delaware Public Benefit Corporation (PBC) with ordinary shares of stock and the OpenAI mission as its public benefit interest. The PBC is a structure used by many others that requires the company to balance shareholder interests, stakeholder interests, and a public benefit interest in its decisionmaking. It will enable us to raise the necessary capital with conventional terms like others in this space."[57] OpenAI explained, "The non-profit's significant interest in the existing for-profit would take the form of shares in the PBC at a fair valuation determined by independent financial advisors… The PBC will run and control OpenAI's operations and business, while the non-profit will hire a leadership team and staff to pursue charitable initiatives in sectors such as health care, education, and science."[58]

In 2024, OpenAI had about $5 billion in losses, with revenues of $3.7 billion.[59] OpenAI's proposed restructuring is intended to eliminate any nonprofit constraints on revenue raising or on business and operations decisions designed to maximize profits. Reporting on OpenAI's October 2024 $6.6 billion investment deal indicates that "[u]nder the terms of the new investment round, OpenAI has two years to transform into a for-profit business or its funding will convert into debt."[60]

Meanwhile, concerns about the safety of OpenAI's development of artificial intelligence continue to mount. In June 2024, current and former OpenAI staff members published an open letter describing their profound concerns with AI risks that "range from the further entrenchment of existing inequalities, to manipulation and misinformation, to the loss of control of autonomous AI systems potentially resulting in human extinction."[61] The letter emphasized that "AI companies have strong financial incentives to avoid effective oversight, and we do not believe bespoke structures of corporate governance are sufficient to change this."[62]

### E. Under Current and Proposed Structures, Nonprofit Interests Cannot Compete with Enormously Wealthy and Powerful OpenAI Investors.

Relatedly, the Attorney General must also appreciate the dangers posed by Microsoft's significant interest in and control over OpenAI. Antitrust regulators in the United States and United

---

[57] OpenAI, Why OpenAI's structure must evolve to advance our mission, December 27, 2024.

[58] Ibid.

[59] Hayden Field, OpenAI sees roughly $5 billion loss this year on $3.7 billion in revenue, CNBC, September 27, 2024, https://www.cnbc.com/2024/09/27/openai-sees-5-billion-loss-this-year-on-3point7-billion-in-revenue.html.

[60] Cade Metz, OpenAI Completes Deal That Values Company at $157 Billion, New York Times, Oct. 2, 2024, https://www.nytimes.com/2024/10/02/technology/openai-valuation-150-billion.html.

[61] Jacob Hilton et. al., current & former OpenAI staff, A Right to Warn about Advanced Artificial Intelligence, June 4, 2024, https://righttowarn.ai/.

[62] Jacob Hilton et. al., current & former OpenAI staff, A Right to Warn about Advanced Artificial Intelligence, June 4, 2024, https://righttowarn.ai/.

Kingdom have investigated Microsoft's control over OpenAI.[63],[64] With its initial investments in 2019, Microsoft obtained access to the majority of OpenAI's technology, data, and large language models.[65] The partnership with OpenAI allowed Microsoft to leap over its tech rivals.[66] One analysis described OpenAI's relationship with Microsoft as a "devil's deal," one "with the dice rigged in Microsoft's favor."[67] Since 2019, OpenAI's contracts with Microsoft have included a clause that states that Microsoft would not have access to artificial general intelligence (AGI) once it is developed.[68] OpenAI has explained, "Such a system [AGI] is excluded from IP licenses and other commercial terms with Microsoft, which only apply to pre-AGI technology."[69] However, as part of the new restructuring proposed, OpenAI is also considering eliminating this restriction on Microsoft's ability to access and control AGI.[70]

A recent valuation of OpenAI put its worth at $300 billion.[71] By February 2025, reports indicated that OpenAI was valued at $300 billion.[72] Japanese investment company SoftBank is in the process of investing $40 billion in OpenAI, meaning that it would surpass Microsoft's investment in OpenAI.[73] Meanwhile, a group of investors led by Elon Musk made an offer to buy nonprofit OpenAI, Inc.'s assets for $97.4 billion. Although Sam Altman immediately rejected the offer, the offer will be required to be given due consideration by the OpenAI, Inc. board, and is seen as setting a floor for the value of the charitable assets.[74]

[63] Foo Yun Chee, Microsoft ditches OpenAI board observer seat to stave off antitrust scrutiny, July 10, 2024, https://www.reuters.com/technology/microsoft-ditches-openai-board-observer-seat-amid-regulatory-scrutiny-2024-07-10/.

[64] Hayden Field, Microsoft's decision to give up OpenAI board observer seat doesn't quell key concerns, CNBC, July 11, 2024, https://www.cnbc.com/2024/07/11/microsoft-giving-up-openai-board-observer-seat-doesnt-settle-concerns.html.

[65] Charles Duhigg, The Inside Story of Microsoft's Partnership with OpenAI, New Yorker, December 11, 2023, https://www.newyorker.com/magazine/2023/12/11/the-inside-story-of-microsofts-partnership-with-openai.

[66] Charles Duhigg, The Inside Story of Microsoft's Partnership with OpenAI, New Yorker, December 11, 2023, https://www.newyorker.com/magazine/2023/12/11/the-inside-story-of-microsofts-partnership-with-openai.

[67] https://www.wheresyoured.at/to-serve-altman/.

[68] Sarah Jackson, OpenAI wants to remove a clause about AGI from its Microsoft contract to encourage additional investments, report says, Business Insider, Dec. 6, 2024, https://www.businessinsider.com/openai-wants-remove-agi-clause-from-microsoft-contract-future-investment-2024-12.

[69] OpenAI, Our Structure, 2019, https://openai.com/our-structure/.

[70] Sarah Jackson, OpenAI wants to remove a clause about AGI from its Microsoft contract to encourage additional investments, report says, Business Insider, Dec. 6, 2024, https://www.businessinsider.com/openai-wants-remove-agi-clause-from-microsoft-contract-future-investment-2024-12.

[71] OpenAI, New Funding to Build Towards AGI, March 31, 2025, https://openai.com/index/march-funding-updates/

[72] Cade Metz and Lauren Hirsch, OpenAI Close to Deal That Values Company at $300 Billion, New York Times, Feb. 7, 2025, https://www.nytimes.com/2025/02/07/technology/openai-softbank-investment.html.

[73] Hayden Field, Softbank set to invest $40 billion in OpenAI at $260 billion valuation, sources say, CNBC, Feb. 7, 2025, https://www.cnbc.com/2025/02/07/softbank-set-to-invest-40-billion-in-openai-at-260-billion-valuation-sources-say.html.

[74] Matt O'Brien, Thalia Beaty, and Kelvin Chan, How Elon Musk $97.4 billion bid complicates matters for OpenAI, AP Feb. 11, 2025, https://apnews.com/article/elon-musk-sam-altman-openai-bid-chatgpt-58d9bc3d59497468d7b37eed5d9ff5e6.

III. **California's Attorney General Has Jurisdiction to Ensure that OpenAI's Charitable Trust Remains Dedicated to its Charitable Purposes.**

The California Attorney General is responsible for supervising charitable assets in California and has the power to investigate transactions and enforce the charitable trust impressed on assets. This responsibility has historically resided in each state's attorney general via common law, and the duty has been codified in California's Government Code, providing authority to protect charitable assets within the jurisdiction of the state, to ensure compliance with foundational documents, and to seek judicial relief to protect the public's interest in those assets. (Gov. Code, §§ 12582.1, 12588, 12598.)

California case law recognizes the authority of the California Attorney General to enforce the charitable trust impressed on the assets of nonprofit charitable corporations. (*See Holt v. College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2nd 750, 754-55 (stating that "the Attorney General has primary responsibility for the enforcement of charitable trusts" and "the Attorney General has been empowered to oversee charities as the representative of the public").)

Because OpenAI, Inc. was incorporated in Delaware but its principal place of business and physical presence since incorporation have been in California, the internal affairs doctrine comes into play. The internal affairs doctrine seeks to minimize conflicts between states' treatment of internal regulation of a corporation by delegating responsibility for internal affairs to the state of incorporation. (See *Lidow v. Superior Court* (2012) 206 Cal.App.4th 351, 358-359.) However, there is a "vital limitation" to this internal affairs doctrine when "some other state has a more significant relationship…to the parties and the transaction." (*Id.* at 359.) Applying this law to the present circumstances, Delaware corporate law governs the internal affairs of the nonprofit, such as adoption of bylaws and holding of meetings, because the nonprofit was incorporated in Delaware. However, California has the more significant relationship to the charitable trust impressed on the assets of OpenAI, Inc. because the nonprofit has always been headquartered in this state, conducts its operations in this state, and amassed its charitable assets while based in and operating in California.

The Supervision of Trustees and Fundraisers for Charitable Purposes Act confirms the Attorney General's investigatory power and enforcement authority. (Gov. Code, §§12580 et. seq.) Subsection a of section 12598 provides: "The primary responsibility for supervising charitable trusts in California, for ensuring compliance with trusts and articles of incorporation, and for protection of assets held by charitable trusts and public benefit corporations, resides in the Attorney General. The Attorney General has broad powers under common law and California statutory law to carry out these charitable trust enforcement responsibilities." The Act applies to all "charitable corporations…over which the state or the Attorney General has enforcement or supervisory powers." (Gov. Code, § 12581.) The term "charitable corporation" is defined to mean any nonprofit corporation organized under the laws of California "for charitable or eleemosynary purposes and any similar foreign corporation doing business or holding property in this State for such purposes." (Gov. Code, § 12582.1.) OpenAI, Inc., is a charitable corporation within the meaning of this definition, as it is organized for charitable purposes and is both registered to do business in California and primarily based in this state.

Accordingly, OpenAI, Inc. is subject to Section 12588 of the Government Code, which provides:

> "The Attorney General may investigate transactions and relationships of corporations and trustees subject to this article for the purpose of ascertaining whether or not the purposes of the corporation or trust are being carried out in accordance with the terms and provisions of the articles of incorporation or other instrument. The Attorney General may require any agent, trustee, fiduciary, beneficiary, institution, association, or corporation, or other person to appear, at a named time and place, in the county designated by the Attorney General, where the person resides or is found, to give information under oath and to produce books, memoranda, papers, documents of title, and evidence of assets, liabilities, receipts, or disbursements in the possession or control of the person ordered to appear."

Moreover, the Act is explicit that the authority conferred by the statutes cited above is "in addition to the Attorney General's existing powers and duties," including the Attorney General's common law authority to enforce charitable trusts. (Gov. Code, § 12591.)

The Attorney General, exercising supervisory authority over California charitable trusts, can investigate the terms of any corporate restructuring and take enforcement action as needed. As a result, the Attorney General may act to ensure that nonprofit OpenAI, Inc. receives full fair market value for its assets in any restructuring, is managed by an independent board of directors, and uses its assets to fulfill its declared charitable purposes.

## IV.  OpenAI's Operations and Proposed Restructuring Misuse its Nonprofit Charitable Assets in Violation of the Public Interest and Charitable Trust.

### A.  OpenAI Has Failed to Protect Nonprofit Assets for a Charitable Purpose.

"The assets of nonprofit corporations…, organized solely for charitable purposes, are impressed with a charitable trust which the Attorney General has a duty to protect." (*People v. Orange Cnty. Charitable Servs.* (1999) 73 Cal.App.4th 1054, 1074.) "A charitable corporation is one organized for the purpose, among other things, of promoting the welfare of mankind at large, or of a community, or of some class forming a part of it indefinite as to numbers and individuals… Simply stated, a charitable corporation is one created for or devoted to charitable purposes." (*Lynch v. Spilman* (1967) 67 Cal.2d 251, 260–261 (internal quotation marks omitted).) A charity's acceptance of assets "establishes a charitable trust for the declared corporate purposes…as though the assets had been accepted from a donor" who has expressly limited their use. (*In Re L.A. County Pioneer Society* (1953) 40 Cal.2d 840, 852.) Nonprofit corporate assets that are impressed with a charitable trust cannot legally be diverted to a non-charitable purpose. (*Pacific Home*, *supra*, 41 Cal.2nd at 852.)

As set forth below, OpenAI has failed to protect its charitable assets, acting time and again in ways that advanced the interests of its corporate investors at the expense of its charitable mission. As a

result, the Attorney General must intervene to protect these assets and ensure their use to promote the specified charitable purposes as required by the charitable trust doctrine.

### 1. OpenAI, Inc.'s Assets Were Impressed with A Charitable Trust.

OpenAI, Inc.'s assets were unquestionably impressed with a charitable purpose and thus it is incumbent upon California's Attorney General to take steps to effectively protect these assets. As the California Supreme Court has explained, "neither plaintiff nor its successor could legally divert its assets to any purpose other than charitable purposes, and said property was therefore 'irrevocably dedicated' to exempt purposes." (*Pacific Home v. Los Angeles Cnty.* (1953) 41 Cal.2d 844, 852.)

Under California law, courts look at both the charter of an organization and its operations to confirm that its assets are impressed with a charitable trust. OpenAI, Inc.'s original Certificate of Incorporation stated unmistakably: "This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code." OpenAI, Inc. operations for many years demonstrated its charitable dedication, with its 2018 IRS filings for example explaining how it worked to carry out its charitable purposes through its research, its release of a charter setting out the principles for achieving its missions, and through its testimony to Congress re the importance of ethical norms in developing AI.[75] At no point has the leadership of OpenAI contested the charitable dedication of OpenAI, Inc.'s assets.[76,77] Because OpenAI, Inc. was organized exclusively for charitable purposes and its initial operations demonstrated it to be exclusively charitable in nature, all of OpenAI, Inc.'s assets were impressed with a charitable trust and irrevocably dedicated to exempt purposes.

### 2. OpenAI's Questionable Restructuring in 2019 Exposed its Charitable Assets to Threat.

OpenAI, Inc.'s assets in 2019 included its operations, staff, intellectual property, and donations. In 2018, for example, OpenAI, Inc. received almost $50 million in donations and grants.[78] Over the course of its first several years of existence, OpenAI, Inc. leveraged tax-exempt donations and its nonprofit board to recruit exceptionally talented professionals and assemble a substantial team of top AI scientists devoted to the work and mission of the entity. The work of the nonprofit's scientists and staff during this time achieved substantial breakthroughs on the path to artificial intelligence. All of these assets – investments, intellectual property, operations, and staffing – were impressed with a charitable trust and irrevocably dedicated to exempt purposes.

---

[75] OpenAI, Inc., Form 990, Return of Organization Exempt From Income Tax, filed November 15, 2019 (2018 fiscal year), https://projects.propublica.org/nonprofits/organizations/810861541/201943199349318399/full.

[76] Greg Brockman, Ilya Sutskever, "Introducing OpenAI," OpenAI, December 11, 2015, https://openai.com/index/introducing-openai/.

[77] OpenAI, Why OpenAI's structure must evolve to advance our mission, December 27, 2024.

[78] OpenAI, Inc., Form 990, Return of Organization Exempt From Income Tax, filed November 15, 2019 (2018 fiscal year), https://projects.propublica.org/nonprofits/organizations/810861541/201943199349318399/full.

As noted, over its first few years in existence, OpenAI, Inc. had overcome significant hurdles and achieved a number of significant breakthroughs for AI. For example, OpenAI released the OpenAI Gym in 2016, which solved key problems of benchmarking and standardization in the field of reinforcement learning and is still widely used in the field.[79,80,81] In 2018, OpenAI developed an e-sports team of five neural networks, OpenAI Five, that could compete at premier e-sport Dota 2; less than 10 months later, the team became the first AI to beat world champions in a live game, demonstrating AI's ability to achieve previously unseen levels of strategic decision-making, coordination, and long-term planning.[82,83,84] In 2019, OpenAI released GPT-2 (Generative Pretrained Transformer 2), a groundbreaking and foundational neural network system that was the precursor to the household name ChatGPT; GPT-2 provided what was then an unprecedented step forward when, based upon unsupervised learning on huge datasets, it was able to engage in natural language processing, comprehending questions worded in normal language (rather than bounded computer queries) and generating coherent paragraphs of text in response.[85,86] All of this intellectual property, along with the organizational structure and design that generated it, was impressed with a charitable trust and irrevocably dedicated to the exempt purposes set out in OpenAI, Inc.'s mission.

In 2019 OpenAI restructured to remove its staff, its work product to date, the bulk of its operations, and its computational resources from the OpenAI nonprofit to a for-profit. That movement constituted a transfer of assets. Under California law, this transfer should have been reported to the California Attorney General. (Corp. Code, § 5913.)

The transfer only avoided clear impermissibility because the new structure placed the nonprofit board of directors in control of the new for-profit and its assets. (*St. David's Health Care Systems v. United States* (5th Cir. 2003) 349 F.3d 232, 238; *Redlands Surgical Services v. Commissioner of Internal Revenue* (T.C. 1999) 113 T.C. 47, *aff'd per curiam* (9th Cir. 2001) 242 F.3d 904.)

Despite the structural control provided to the nonprofit board of directors, the capped profit structure of the for-profit entity was highly questionable, allowing private investors in the for-

[79] Saasha Nair, OpenAI Gym: An Introduction, September 21, 2020, https://saashanair.com/blog/blog-posts/introduction-to-openai-gym.

[80] Mukilan Krishnakumar,, A Gentle Introduction to OpenAI Gym, Weights & Biases, https://wandb.ai/mukilan/intro_to_gym/reports/A-Gentle-Introduction-to-OpenAI-Gym--VmlldzozMjg5MTA3#:~:text=OpenAI%20Gym%20is%20a%20Pythonic,toolkit%20for%20training%20RL%20algorithms.

[81] Idowu Omisola, What Is OpenAI Gym and How Can You Use It? Make Use Of, March 23, 2023, https://www.makeuseof.com/what-is-openai-gym-how-can-you-use-it/.

[82] OpenAI, Milestone: OpenAI Five, June 25, 2018, https://openai.com/index/openai-five/.

[83] OpenAI, Milestone: OpenAI Five defeats Dota 2 world champions, April 15, 2019, https://openai.com/index/openai-five-defeats-dota-2-world-champions/.

[84] Kelsey Piper, AI triumphs against the world's top pro team in strategy game Dota 2, Vox, April 13, 2019, https://www.vox.com/2019/4/13/18309418/open-ai-dota-triumph-og.

[85] OpenAI, Milestone: Better language models and their implications, February 14, 2019, https://openai.com/index/better-language-models/.

[86] John Rush, ChatGPT and OpenAI's Evolution: From GPT-2 to GPT-4, All Large Language Models Directory, June 10, 2024, https://llmmodels.org/blog/chatgpt-and-openais-evolution-from-gpt-2-to-gpt-4/.

profit entity to receive returns of up to 100 times on their investments before any financial benefit would return to the nonprofit.[87] Note that a return of 100 times on an investment would be quite extraordinary, meaning that the cap on profits might be entirely theoretical.[88] These arrangements were structured so that the nonprofit bore the risks and liabilities, shielding investors from risk and entitling them to enormous profits, and depriving the nonprofit of the benefits of its assets. The Attorney General should explore whether these terms were negotiated in an arms' length manner and whether the nonprofit board properly exercised its fiduciary duties in these arrangements.

Subsequently, over the next few years, the structure became considerably more convoluted and the control exercised by the nonprofit more attenuated and dubious.[89] Meanwhile, there was no transparent tracking or protection of the nonprofit charitable assets. In addition, there has been no transparency regarding what is understood to be the nonprofit's current ownership stake, whether that assessment is accurate and objective, and whether there was full disclosure and arms' length negotiation in the deals that diluted the nonprofit share. A range of key issues have been hidden from view related to the share and value of the nonprofit assets.

### 3. By 2023, the Nonprofit Could No Longer Protect its Assets or Advance its Mission.

The turmoil at OpenAI in November 2023 showcases the fact that by that point, the charitable assets were no longer dedicated to the nonprofit mission. When the nonprofit board fired CEO Sam Altman in November 2023, the board was motivated by the fact that Altman "was not consistently candid in his communications with the board, hindering its ability to exercise its responsibilities."[90] The board explained that as a result, "The board no longer has confidence in his ability to continue leading OpenAI."[91] More information was later provided about the board's concerns, including Altman's dishonesty regarding the safety processes at the heart of the

---

[87] Mike Isaac and Erin Griffith, OpenAI Is Growing Fast and Burning Through Piles of Money, New York Times, Sept 27, 2024, https://www.nytimes.com/2024/09/27/technology/openai-chatgpt-investors-funding.html.

[88] UpStock, Understanding the Concept: OpenAI's Capped Profit Model, https://www.upstock.io/post/understanding-the-concept-openai-capped-profit-model.

[89] See Ricky Nave, How OpenAI LEGALLY Switched from Nonprofit to For-Profit, Axiom Alpha, https://axiomalpha.com/how-openai-legally-switched-from-nonprofit-to-for-profit/ (charts show changes in OpenAI's control and ownership structures).

[90] Taylor Soper, Sam Altman leaving OpenAI after board says he was 'not consistently candid in his communications', GeekWire, Nov. 17, 2023, https://www.geekwire.com/2023/sam-altman-leaving-openai-after-board-says-he-was-not-consistently-candid-in-his-communications/#:~:text=In%20a%20statement%2C%20OpenAI%20said,OpenAI%2C%E2%80%9D%20the%20company%20said.

[91] Ibid.

nonprofit's charitable purpose, failure to reveal key financial information, and toxic behavior.[92],[93] However, despite the depth of the board's concerns and its attempt to fulfill its fiduciary duty to the nonprofit, Altman was rapidly reinstated following threats by OpenAI staff and investors, both groups with enormous financial stakes in maximizing the profits generated by OpenAI. As one analysis by legal experts concluded, "it seems as though Altman amassed so much power within the company and Silicon Valley that he was in charge and not the board."[94] The board's inability and failure to protect the charitable assets from improper use and private control demonstrates the need for action by the Attorney General to protect the public interest. (*St. David's Health Care Systems v. United States* (5th Cir. 2003) 349 F.3d at 238.)

Two key issues motivating the board's decision showcase their inability to protect the nonprofit's charitable assets before or after the firing. First, the board recognized that Altman's actions on a number of fronts were preventing them from advancing the safety interests at the core of OpenAI, Inc.'s mission. Altman had engaged in deceit or misrepresentations to the board regarding the very limited nature of OpenAI's safety processes.[95] These misrepresentations were intended to create the impression that these safety processes were robust rather than minimal.[96] Moreover, shortly before the firing, the board had received a letter from internal researchers warning of dangers from new AI technology under development.[97] Events surrounding the release of GPT-2 also played into the board's concerns. OpenAI had initially engaged in a cautious and limited release of GPT-2 due to concerns about its potential for misuse, but Altman did not inform the board when he and other executives decided to release a more complete version.[98]

[92] Hayden Field, "Former OpenAI board member explains why CEO Sam Altman got fired before he was rehired," CNBC, May 29, 2024, https://www.cnbc.com/2024/05/29/former-openai-board-member-explains-why-ceo-sam-altman-was-fired.html#:~:text=In%20November%2C%20OpenAI's%20board%20ousted,ability%20to%20exercise%20its%20responsibilities.%22.

[93] Charles Duhigg, The Inside Story of Microsoft's Partnership with OpenAI, New Yorker, December 11, 2023, https://www.newyorker.com/magazine/2023/12/11/the-inside-story-of-microsofts-partnership-with-openai.

[94] Aprill, Ellen P., Chan Loui, Rose, and Horwitz, Jill R., Board Control of a Charity's Subsidiaries: The Saga of OpenAI, Tax Notes Federal, Volume 182, (2024), February 8, 2024, https://ssrn.com/abstract=4720202.

[95] Hayden Field, "Former OpenAI board member explains why CEO Sam Altman got fired before he was rehired," CNBC, May 29, 2024, https://www.cnbc.com/2024/05/29/former-openai-board-member-explains-why-ceo-sam-altman-was-fired.html#:~:text=In%20November%2C%20OpenAI's%20board%20ousted,ability%20to%20exercise%20its%20responsibilities.%22.

[96] Hayden Field, "Former OpenAI board member explains why CEO Sam Altman got fired before he was rehired," CNBC, May 29, 2024, https://www.cnbc.com/2024/05/29/former-openai-board-member-explains-why-ceo-sam-altman-was-fired.html#:~:text=In%20November%2C%20OpenAI's%20board%20ousted,ability%20to%20exercise%20its%20responsibilities.%22.

[97] Anna Tong, Jeffrey Dastin and Krystal Hu, OpenAI researchers warned board of AI breakthrough ahead of CEO ouster, sources say, Reuters, Nov. 22, 2023, https://www.reuters.com/technology/sam-altmans-ouster-openai-was-precipitated-by-letter-board-about-ai-breakthrough-2023-11-22/.

[98] Inno Flores, Former OpenAI Board Member Reveals Board Was Unaware of ChatGPT Launch Until Public Release, TechTimes, May 24, 2024, https://www.techtimes.com/articles/305098/20240529/former-openai-board-member-reveals-board-unaware-chatgpt-launch-until-public-release.htm.

Instead of being engaged in weighing these key mission-relevant issues, the board learned of the full release via Twitter.[99]

The core mission of OpenAI, Inc. involves the safe development of AI. It is widely agreed that artificial intelligence has the potential to be dangerous,[100,101] with potential harms including job losses, deepfakes, lack of transparency and bias in algorithms, surveillance, and more.[102,103] Such concerns were one of the primary motives for starting OpenAI, and ensuring safe AI is core to the charitable purpose of the nonprofit under both the original and amended articles in the certificate of incorporation. The board could not protect these interests or advance this goal when key information and decisions were withheld from them and safety processes misrepresented.

Second, the board had cause for concern about financial impropriety, going to the issue of whether there was improper use of charitable assets for private gain. Altman had not kept the board informed with regard to key information about ownership and control of OpenAI affiliated companies. Specifically, he had withheld from the board the fact that he was the owner of OpenAI's Startup Fund, a venture capital fund intertwined with the corporate structure.[104] The fund was initiated in late 2021, with the goal of investing in other AI work and startups, and it had $175 million of commitments by May 2023.[105] Members of the board were concerned that Altman's ownership and control of the startup fund were being used to evade accountability from the board.[106] Post hoc rationalizations for Altman's ownership of the fund included the claim that putting Altman in legal charge was simply a way to get the fund up and running rapidly; were this true, it would demonstrate that there had been increased need for transparency and guidance from the nonprofit board, rather than providing any justification for withholding the information from

[99] Inno Flores, Former OpenAI Board Member Reveals Board Was Unaware of ChatGPT Launch Until Public Release, TechTimes, May 24, 2024, https://www.techtimes.com/articles/305098/20240529/former-openai-board-member-reveals-board-unaware-chatgpt-launch-until-public-release.htm.

[100] See, e.g., Tamlyn Hunt, Here's Why AI May Be Extremely Dangerous—Whether It's Conscious or Not, Scientific American, May 25, 2023, https://www.scientificamerican.com/article/heres-why-ai-may-be-extremely-dangerous-whether-its-conscious-or-not.

[101] Nestor Maslej et al., Artificial Intelligence Index Report 2023, AI Index Steering Committee, Institute for Human-Centered AI, Stanford University, April 2023, https://aiindex.stanford.edu/wp-content/uploads/2023/04/HAI_AI-Index-Report_2023.pdf.

[102] Mike Thomas, 14 Risks and Dangers of Artificial Intelligence (AI), Built In, updated by Matthew Urwin, July 25, 2024, https://builtin.com/artificial-intelligence/risks-of-artificial-intelligence.

[103] Frederik Federspiel et al., Threats by artificial intelligence to human health and human existence, BMJ Glob Health. 2023 May;8(5):e010435. doi: 10.1136/bmjgh-2022-010435, https://pmc.ncbi.nlm.nih.gov/articles/PMC10186390/.

[104] Hayden Field, "Former OpenAI board member explains why CEO Sam Altman got fired before he was rehired," CNBC, May 29, 2024, https://www.cnbc.com/2024/05/29/former-openai-board-member-explains-why-ceo-sam-altman-was-fired.html#:~:text=In%20November%2C%20OpenAI's%20board%20ousted,ability%20to%20exercise%20its%20responsibilities.%22.

[105] Dan Primack, Sam Altman owns OpenAI's venture capital fund, Axios, Feb 15, 2024, https://www.axios.com/2024/02/15/sam-altman-openai-startup-fund.

[106] Mike Isaac, Tripp Mickle, and Cade Metz, Key OpenAI Executive Played a Pivotal Role in Sam Altman's Ouster, New York Times, March 3, 2024, https://www.nytimes.com/2024/03/07/technology/openai-executives-role-in-sam-altman-ouster.html.

the board.[107] In addition, it was widely acknowledged that the structure posed clear legal perils, given that Altman personally owned the company and there was no control by any OpenAI business entity[108] and Altman relinquished control of the fund in March 2024.[109]

Despite the board's attempt to protect the nonprofit and its mission by firing Sam Altman, Microsoft and other profit-motivated OpenAI interest holders were able to overturn the nonprofit board's actions, demand the resignation of mission-oriented board members, and replace them with corporate insiders.[110] Following these actions, it was clear that the nonprofit board would not be permitted to exercise control over the for-profit entities when there was a conflict between for-profit and nonprofit goals. The board's inability and failure to protect the charitable assets from improper use and private control demonstrates the need for action by the Attorney General to protect the public interest.

### 4.    OpenAI's Inc.'s Amendment of its Purpose Clause Was Motivated by and Yielded Significant Private Benefit and Illegally Diverted Its Charitable Assets.

In addition, shortly after the commencement of OpenAI's partnership with Microsoft, OpenAI filed an amended and restated Certificate of Incorporation with a revised charitable purpose statement. OpenAI, Inc.'s commitment to open source technology was struck from its purpose clause. Instead of "seek[ing] to open source technology for the public benefit when applicable," the revised statement noted, "[t]he resulting technology will benefit the public and the corporation will seek to distribute it for the public benefit when applicable."[111]

Petitioners note that there is significant cause for concern about open source AI, with meaningful arguments for and against an open source approach to AI development.[112] But OpenAI's pivot away from open source AI occurred immediately after OpenAI's strategic partnership with Microsoft began, and it provided Microsoft with the exclusive ability to offer access to OpenAI's

---

[107] Dan Primack, Sam Altman owns OpenAI's venture capital fund, Axios, Feb 15, 2024, https://www.axios.com/2024/02/15/sam-altman-openai-startup-fund.

[108] Dan Primack, Sam Altman owns OpenAI's venture capital fund, Axios, Feb 15, 2024, https://www.axios.com/2024/02/15/sam-altman-openai-startup-fund.

[109] Robert Hart, Sam Altman Cut From OpenAI's Startup Fund—Here's What The ChatGPT Maker Invests In, Forbes, April 2, 2024, https://www.forbes.com/sites/roberthart/2024/04/02/sam-altman-cut-from-openais-startup-fund-heres-what-the-chatgpt-maker-invests-in/.

[110] Tripp Mickle, Cade Metz, Mike Isaac, and Karen Weise, Inside OpenAI's Crisis Over the Future of Artificial Intelligence, New York Times, December 9, 2023, https://www.nytimes.com/2023/12/09/technology/openai-altman-inside-crisis.html.

[111] Brief of Amicus Curiae Delaware Attorney General - Case No: 4:24-Cv-04722-Ygr, Dec. 30, 2024, https://lawprofessors.typepad.com/files/delawareagamicusbrief-musk-v.-altman.pdf.

[112] Yujin Potter, Michael Potter, Dawn Song, "As an AI, I believe AI models should be open source," UC Berkeley, Department of Electrical Engineering and Computer Sciences, 2024, https://rdi.berkeley.edu/research/uploads/LLM_open_vs_closed.pdf (setting out synopsis of argument pros and cons in introduction).

technologies as a proprietary service.[113] The evidence suggests that the change in purpose was motivated by private profit motive, rather than the public good.

Assets of a charitable corporation must be used not only for charitable purposes, but for the particular charitable purposes of the institution. In *Queen of Angeles Hospital v. Younger*, a California appellate court ruled that the assets of a corporation that had operated a hospital for many years could not be used to fund medical clinics. The court emphasized that "the issue is not the desirability of the new use," but rather whether the use was consistent with the purposes and charter of the organization. (*Queen of Angels Hospital v. Younger* (1977) 66 Cal.App.3d 359, 369.) As the California Supreme Court has stated, "Although the public in general may benefit from any number of charitable purposes, charitable contributions must be used only for the purposes for which they were received in trust." (*Holt v. College of Osteopathic Physicians & Surgeons*, *supra*, 61 Cal.2nd at 754; see also *Queen of Angels, supra*, 66 Cal.App.3rd at 368-69.)

Here, the shift in charitable purpose was significant, with OpenAI's approach to open source technology swinging from commitment before its partnership with Microsoft to aversion afterwards,[114] as the entity moved from open publication of detailed scientific papers to proprietary secrecy.[115] The timing and commercial exploitation of the change in mission strongly suggests that the change was motivated by the opportunity for private inurement. Thus, the change in mission provides evidence that the nonprofit's directors were acting to advance private benefits, rather than complying with their fiduciary duties to the nonprofit. The Attorney General must act to address this violation.

5. **The Proposed Restructuring Expressly Strips Away Charitable Control from OpenAI Operations.**

In announcing its new proposed structure, OpenAI plans to eliminate any role for nonprofit OpenAI, Inc. in operations and control of the business.[116] Under the new plan, the nonprofit board of directors would lose control over all of OpenAI operations and management, which would be allocated in their entirety to the new, for-profit corporation, which "will run and control OpenAI's operations and business."[117] Under this proposal, crucial decisions regarding returns for private investors, compensation of management, and balancing public interest versus private benefit would all be made by an entirely unaccountable corporate board of directors.

OpenAI plans to have its captive nonprofit board sign off on this prima facie violation of charitable trust doctrine, in which the control that the board has until now nominally had over

---

[113] Microsoft Corporate Blog, Microsoft and OpenAI evolve partnership to drive the next phase of AI, Jan. 21, 2025, https://blogs.microsoft.com/blog/2025/01/21/microsoft-and-openai-evolve-partnership-to-drive-the-next-phase-of-ai/.

[114] Alek Tarkowski, Data Governance in Open Source AI Enabling Responsible and Systemic Access," Open Source Initiative & Open Future, February 3, 2025, https://opensource.org/wp-content/uploads/2025/02/2025-OSI-DataGovernanceOSAI-final-v5.pdf.

[115] OpenAI, GPT-2: 6-month follow-up, August 20, 2019, https://openai.com/index/gpt-2-6-month-follow-up/.

[116] OpenAI, Why OpenAI's structure must evolve to advance our mission, December 27, 2024.

[117] OpenAI, Why OpenAI's structure must evolve to advance our mission, December 27, 2024.

charitable assets such as OpenAI's staffing, processes, and intellectual property will be entirely eliminated. The fact that OpenAI, Inc.'s nonprofit board would consent to discard its foundational roles shows just how fundamentally it is failing to protect its charitable assets.

OpenAI seeks to distract from this monumental change in control by altering the structure of the for-profit running the show, changing the corporate status from a traditional corporation to a Delaware public benefit corporation. But it is crucial to understand that despite the friendly name, nothing about a public benefit corporation provides any commitment to acting in the public interest, and the structure provides no accountability or enforceability towards that end. (Del. Gen. Corp. Law, Title 8, §§ 365(b, c), 367.) The key reason for creating a public benefit corporation is not to commit to a beneficial objective, but simply that it legally allows a corporation to have goals in addition to maximizing profits.[118] It is certainly important for a corporation to be permitted to take actions in the public interest, since otherwise it is required to act only for shareholder benefits. But nothing about control by a public benefit corporation is equivalent to the duties and responsibilities of a nonprofit. OpenAI's new entity would be *permitted* to act for the public good as a public benefit corporation; that is entirely different from being *required* to act to promote charitable goals, as nonprofit OpenAI, Inc. is.

Delaware law provides that the management of a public benefit corporation should balance three different interests: shareholder interests, the interests of those affected by the corporation's conduct, and the public benefit mission of the corporation.[119] (Del. Gen. Corp. Law, Title 8, § 362(a).) However, the law does not provide a mechanism for enforcement of the balancing requirement with regard to the public benefit mission. In fact, the law makes the Attorney General ineligible to protect the public interest, because it is structured to require a substantial ownership share in order to bring suit. (Del. Gen. Corp. Law, Title 8, § 367.) Moreover, Delaware law provides that the directors of a public benefit corporation have no duty to the public with regard to the public benefit provisions, establishes as a matter of law that ownership of stock or other financial interests do not create a conflict of interest for the director, and provides that a failure to satisfy the balancing requirement does not constitute a breach of the duty of loyalty or a failure to act in good faith. (Del. Gen. Corp. Law, Title 8, § 365(b, c).) The goal of this corporate structure is not to create accountability for public benefits; it is to allow a corporation to consider goals in addition to profit maximizing without experiencing shareholder lawsuits.[120]

---

[118] Eric S. Klinger-Wilensky, and Melissa A. DiVincenzo, Practical Law: Public Benefit Corporations (Delaware), Thomson Reuters, 2020,
https://www.morrisnichols.com/media/publication/15023_2020_PracticalLaw_PublicBenefitCorpDEPracticeNote.pdf.

[119] Delaware General Corporation Law, Title 8, § 362, subdivision (a), provides: "A 'public benefit corporation' is a for-profit corporation organized under and subject to the requirements of this chapter that is intended to produce a public benefit or public benefits and to operate in a responsible and sustainable manner. To that end, a public benefit corporation shall be managed in a manner that balances the stockholders' pecuniary interests, the best interests of those materially affected by the corporation's conduct, and the public benefit or public benefits identified in its certificate of incorporation."

[120] Eric S. Klinger-Wilensky, and Melissa A. DiVincenzo, Practical Law: Public Benefit Corporations (Delaware), Thomson Reuters, 2020,
https://www.morrisnichols.com/media/publication/15023_2020_PracticalLaw_PublicBenefitCorpDEPracticeNote.pdf.

This proposed restructuring will eliminate OpenAI Inc.'s ability to exert any control over OpenAI's product development or to ensure that safety or public benefits will be advanced. Meanwhile, the new public benefit corporation will have no obligation or duty to act to advance safety or the public good. These changes will cause irreparable harm to OpenAI, Inc. and the public's interest in its charitable assets, while failing to advance the charitable purposes at issue.

### B. OpenAI, Inc. Is Endangering its Charitable Assets and Setting a Dangerous Precedent by Operating in Violation of its Federal Tax-Exempt Status.

The activities of OpenAI, Inc. are benefiting commercial partners to the tune of billions of dollars, with investment shares by private parties valued at tens or hundreds of billions of dollars. By allowing private entities to benefit from charitable assets in violation of its federal tax-exempt status, these actions are causing harm to the public, creating a dangerous precedent, and endangering OpenAI's charitable assets. Federal caselaw provides a road map for the California Attorney General. "[R]einforced by the interpretation of analogous federal law," the Attorney General must act to address the abuse of OpenAI Inc.'s charitable assets and the impropriety of their dedication to private interests and commercial partners. (*Greek Theatre Assn. v. Cnty. of Los Angeles* (Ct. App. 1978) 76 Cal.App.3d 768, 778.)

As has long been established, "[c]haritable exemptions are justified on the basis that the exempt entity confers a public benefit – a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues." (*Bob Jones Univ. v. United States* (1983) 461 U.S. 574, 591.) "The public-benefit requirement highlights the quid pro quo nature of tax exemptions: the public is willing to relieve an organization from the burden of taxation in exchange for the public benefit it provides." (*IHC Health Plans, Inc. v. Commissioner* (10th Cir. 2003) 325 F.3d 1188, 1195 (internal quotation marks & citation omitted).)

In order to qualify for federal tax-exempt status, nonprofit organizations must be able to show that they are "organized and operated exclusively for" charitable purposes. (26 U.S.C., § 501(c)(3).) A nonprofit must comply with the operational test, requiring that it operate exclusively for exempt (or charitable) purposes.[121] This requires a showing that: (1) the entity engages primarily in activities that accomplish its exempt purpose; and (2) the entity's earnings do not inure to the benefit of private parties. (26 C.F.R., § 1.501(c)(3)-1(c)).

Earnings inure to a private individual when private interests "reap commercial benefits from the operation of the instrumentality." (*Harding Hospital v. United States* (6th Cir. 1974) 505 F.2d 1068, 1072 (internal quotation marks omitted)(holding that contract constituted private inurement when it gave physicians control over nonprofit hospital's patients and their income stream, reduced rent,

---

[121] Note that the Supreme Court has cautioned that "[w]hile the word 'exclusively' does not mean solely or without exception, 'the presence of a single [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes.'" (*Better Business Bureau v. United States* (1945) 326 U.S. 279, 283 (internal citations omitted).) In the instant case, OpenAI's substantial nonexempt purposes provide an additional basis for concluding that the entity fails to comply with requirements for tax-exemption.

and other benefits).) "The potential for abuse may also exist when the founder of an exempt organization also controls other non-exempt entities and those entities interact, if the exempt entities operate to benefit the non-exempt entities." (*Airlie Found. v. United States* (D.D.C. 1993) 826 F. Supp. 537, 550.)

Although the requirement that the organization engages primarily in activities that accomplish its exempt purpose is distinct from the issue of whether any private inurement occurs, in practice these issues often run together. (*Airlie Found., supra,* 826 F. Supp. at 550.) This occurs because one of the main types of nonexempt purposes that would-be charities are found to pursue involves business or commercial ends, or the benefit of private parties. An organization that has substantially undertaken such activity generally is also found to have allowed its earnings to inure to the benefit of private parties. (See, e.g., *Redlands Surgical Services v. Commissioner of Internal Revenue* (T.C. 1999) 113 T.C. 47, 78.) "An organization's property may be impermissibly devoted to a private use where private interests have control, directly or indirectly, over its assets, and thereby secure nonincidental private benefits." (*Id.* at 75.)

In determining the existence of private benefits or of inurement, courts have consistently looked past putative controls to examine the essence of the relationship. For example, in *Est of Hawaii v. Comm'r of Internal Revenue* (1979 T.C.), the US Tax Court found private inurement where the nonprofit was entangled with for-profits so that "its affiliation with this system taints it with a substantial commercial purpose." (71 T.C. 1067, 1080, aff'd (9th Cir. 1981), 647 F.2d 170.) The "ultimate beneficiaries" of the nonprofit's activities were the for-profit corporations, and the nonprofit "was simply the instrument to subsidize the for-profit corporations and not vice versa." (*Id.* at 1082.)

In the present case, the activities of OpenAI, Inc. are benefiting commercial partners in the amount of billions of dollars. In its original capped profit structure, OpenAI was designed so that the nonprofit would not benefit from activities until its for-profit partners and investors made 100 times their investments. Subsequently, major deals with investors included Microsoft's $10 billion investment in OpenAI Global LLC, which came with a 49 percent ownership stake, rights to up to 75 percent of profits until the time it receives back its investment,[122] and a subsequent entitlement to 49 percent of profits, with the nonprofit entitled to only 2 percent of profits, until a cap of $92

---

[122] Hammad Sadiq, Microsoft's Strategic Stake in OpenAI Unlocks Unique Investment Avenues, Yahoo Finance, March 8, 2024, https://finance.yahoo.com/news/microsofts-strategic-stake-openai-unlocks-130001230.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQA AADVWyUot3EdOeaqM3qIoTF2CJJ2oda0onW4XZxSFnewzDnXuAJuKWHlIDOE-KF5xJdejq160SDVjVMC_epmxvvLS5t_uke4uwa0mrG8TU4xgFIanRH-JUQ6bkmp7E6lxnnWoGqX5xpbSxzlH0w3IUdcUMH7cpQ0EhBUobrx6gjY9Y.

billion is reached.[123,124,125] This structuring of profits imposes risks and liabilities on nonprofit OpenAI, Inc., shielding for-profit investors from many risks while providing no such protection or benefit to the nonprofit.

A recent valuation of OpenAI put its worth at $157 billion.[126] By February 2025, reports indicated that OpenAI was valued at $300 billion.[127] As a nonprofit entity, OpenAI, Inc. was able to receive tax-exempt donations and was free from taxation upon its assets as it established itself and grew. These privileges allowed OpenAI, Inc. to obtain capital to begin its operations and maximize the reach of those donations, accelerating its success as a technology research lab and enabling it to leap over its competitors, while also providing tax benefits to its donors. The proposed restructuring constitutes an abuse of the tax exemption process, with OpenAI taking advantage of the tax benefits of nonprofit exemption during its early years, and now attempting to turn those benefits into enormous investment returns for powerful corporate backers.

With hundreds of billions of dollars at stake, OpenAI, Inc.'s activities are not only providing private inurement, but private investors are in operational control over core nonprofit mission issues such as safety, transparency, and access. Clearly, investors are the ultimate beneficiaries of OpenAI's operations and activities. These practices create a dangerous precedent and put the fundamental principle of the purpose of nonprofits at risk. With the high profile example of OpenAI constantly in the news, other startups are likely to consider whether to take advantage of nonprofit status in a similar manner – not as a means to accomplishing a charitable purpose, but instead to create accelerated and amplified possibilities for individual financial benefit. The Attorney General must act to protect OpenAI's charitable assets from being used to create profits for and carry out the non-exempt purposes of private parties.

## V.    Relief Requested

We understand that, responding to the extensive concerns previously raised by ourselves and others, the Attorney General has opened an investigation of OpenAI's compliance with the laws regulating nonprofit assets and governance. We applaud this action.

As detailed above, OpenAI has cast aside the public interest elements of its mission, diverted charitable assets, and allowed private inurement in violation of both state charitable trust

[123] Trevor Jennewine, Microsoft's $13 Billion Investment in OpenAI May Be "Some of the Best Money Ever Spent," According to Certain Wall Street Analysts, Motley Fool, Nov. 10, 2024, https://www.fool.com/investing/2024/11/10/microsoft-13-billion-openai-best-money-ever-spent/#:~:text=Additionally%2C%20Microsoft%20will%20ultimately%20recoup,predetermined%20return%20cap%20is%20reached.

[124] Gary Marcus, Is Microsoft about to get the deal of the century? Or is Sam Altman unloading OpenAI at just the right time? Marcus on AI, Jan. 11, 2023, https://garymarcus.substack.com/p/is-microsoft-about-to-get-the-deal.

[125] Ashu Garg, Why OpenAI's 157B valuation misreads AI's future, Foundation Capital, Oct. 25, 2024, https://foundationcapital.com/why-openais-157b-valuation-misreads-ais-future/.

[126] Cade Metz, OpenAI Completes Deal That Values Company at $157 Billion, New York Times, Oct. 2, 2024, https://www.nytimes.com/2024/10/02/technology/openai-valuation-150-billion.html.

[127] Cade Metz and Lauren Hirsch, OpenAI Close to Deal That Values Company at $300 Billion, New York Times, Feb. 7, 2025, https://www.nytimes.com/2025/02/07/technology/openai-softbank-investment.html.

requirements and federal law governing nonprofit entities. Action by the Attorney General is essential to address OpenAI's threats to the public's interest in its charitable assets, ensuring protection for assets that are irrevocably dedicated to advancing safe, beneficial artificial general intelligence.

OpenAI's repeated and ongoing breaches of trust demonstrate that these charitable assets will not be safe from exploitation and misuse while they remain in the hands of the for-profit entities and investors who have manipulated the nonprofit and charitable trust forms to support their own interests. Actions by the Attorney General in the 1990s ensured that billions of dollars in charitable assets at risk due to nonprofit health conversions went to establish independent nonprofit foundations that continue to benefit Californians today.[128] Similarly, it is imperative that the Attorney General demand the distribution of OpenAI, Inc.'s charitable assets to independent nonprofit entities that will use these assets for public benefit.

California's 2024 legislative session demonstrates the State's growing recognition that unregulated AI has the potential to present real challenges to Californians. Lawmakers sent 38 bills regulating AI to the Governor's desk; the Governor signed 18 of these into law.[129] By defending the dedication of OpenAI's assets to its charitable mission, the Attorney General not only carries out key duties to protect charitable assets under common law and California statute, but also advances the public's safety and California state policy regarding the need for oversight of AI development in this complex regulatory arena.

We ask that your office:

1. Conduct a robust investigation, including extensive fact-finding, discovery, and forensic accounting, in order to fully understand the nature of the assets, conflicts, and governance at issue and to enable a clear assessment of the legality of the proposed conversion as well as the nature and extent of the private benefit and private inurement at issue; and


2. File a legal action against OpenAI, with the goal of ensuring that:
   - The proposed restructuring be enjoined until all concerns about charitable assets, control, and purpose are fully and adequately addressed;
   - Charitable assets are fully protected and are properly valued in accordance with the following requirements:
     - A full accounting is made of all assets received, disbursed, invested, and developed;

[128] Nancy M. Kane, Some Guidelines for Managing Charitable Assets from Conversions, Health Affairs, Vol. 16, No. 2, 1997, https://www.healthaffairs.org/doi/10.1377/hlthaff.16.2.229.

[129] Dan Jasnow, California Governor Signs 18 AI Bills Into Law, ArentFoxSchiff Blog, October 1, 2024, https://www.afslaw.com/perspectives/ai-law-blog/california-governor-signs-18-ai-bills-law#:~:text=On%20September%2029%2C%20California%20Governor,framework%20in%20the%20United%20States..

- ■ Any assessment of full fair market value of the charitable assets include the value of the nonprofit's existing right to control the direction and operations of OpenAI;
- ■ Any valuation of charitable assets equal or exceed $97.4 billion, the bid tendered for those assets by Elon Musk and fellow investors;
- ○ All charitable assets are distributed to new or existing charitable organizations that are fully independent of OpenAI and have a strong independent board of directors, as well as the skills, organizational structure, internal controls, and track record to show that they can advance the charitable purposes without conflict and free from any control by OpenAI's powerful management, investors, or for-profit arms and are able to forcefully act to advance the charitable purposes at issue.

## VI.    Conclusion

The issues presented in this case are of the utmost importance for the oversight of charitable institutions established to advance the public good, while also affecting the safety of groundbreaking technological developments. The outcome here will yield key precedent for protecting the public's interest in exempt organizations and charitable assets. This case demonstrates the perils of ventures that intertwine commercial and nonprofit entities. Here, over time, the unprecedented size of potential profits and the power available to those that control this technology has entirely undermined the willingness and ability of OpenAI to advance its once central charitable goals.

As a result, it is essential that the Attorney General take action to transfer OpenAI's charitable assets to a truly independent nonprofit or nonprofits able to work toward the crucial goals set out in the certificate of incorporation without conflicts of interest. As recognized by California's increasing regulation of the potential threats of artificial intelligence, the public interest demands that we support strong institutions with an understanding of the impacts and implications of AI and a commitment to the best interest of the people of California.

By enforcing legal requirements for a strong and independent nonprofit entity dedicated not to profits but to charitable purposes related to safe and beneficial artificial intelligence, the Attorney General will protect OpenAI's charitable assets and the interests, safety, and well-being of Californians.

The petitioners listed below request that the California Attorney General take immediate action to address these threats to the public's interest in OpenAI's charitable assets.

- Fred Blackwell, CEO, San Francisco Foundation
- Orson Aguilar, President and CEO, LatinoProsperity
- Aarti Kohli, Executive Director, Asian Law Caucus
- Sean Taketa McLaughlin, Emeritus, Access Humboldt
- Mark Philpart, President and CEO, California Black Freedom Fund
- Sabrina Smith, CEO, California Calls
- Adam Briones, CEO, California Community Builders

- Miguel Santana, President and CEO, California Community Foundation
- Brenda Solorzano, President and CEO, The California Endowment
- Shane Gusman, Director, California Teamsters Public Affairs Council
- Richard Tate, President and CEO, The California Wellness Foundation
- Alex Tom, Executive Director, Center for Empowered Politics
- Dr. Kyra Green, Executive Director, Center for Policy Initiatives
- Lucas Zucker, Co-Executive Director, Central Coast Alliance United for a Sustainable Economy (CAUSE)
- Allen-Kyle Portia, Interim Executive Director, Color of Change
- Juan Hernandez III, CEO and co-founder, Creser Capital
- George Galvis, Executive Director, Communities United for Restorative Justice
- Terah Lawyer, Executive Director, CROP
- Taifa Smith Butler, President, Demos
- Kate O'Hara, Executive Director, EBASE
- Natalie Foster, President and Founder, Economic Security Project
- Monica Mejia, Executive Director, ELACC
- Cathy Cha, President and CEO, Evelyn and Walter Haas, Jr. Fund
- Caroline Peattie, Executive Director, Fair Housing Advocates of Northern California
- Chief Royal Ramey, CEO and Co-Founder, Forestry and Fire Recruitment Program
- James King, Co-Director of Programs, Ella Baker Center for Human Rights
- Olga Talamante, Interim President, Greenlining Institute
- Morning Star Gali, Executive Director, Indigenous Justice
- Michelle Vilchez, CEO, Innovate
- Don Howard, President and CEO, The James Irvine Foundation
- Freada Kapor Klein, PhD, Co-Chair & Mitch Kapor, Co-Chair, Kapor Center
- Lili Gangas, Chief Technology Community Officer, Kapor Foundation
- Allison Scott, Ph.D, CEO, Kapor Foundation
- Victor Sanchez, Executive Director, LAANE
- Aaron Ortiz, CEO, La Familia
- Sonja Diaz, Co-Founder, Latina Futures Lab 2050
- Rey Leon, CEO, LEAP Institute
- Shane Goldsmith, President and CEO, Liberty Hill Foundation
- José A. Quiñonez, Founder and CEO, Mission Asset Fund
- Juan Flores, Executive Director, Mujeres Unidas y Activas
- Aaron Dorfman, President and CEO, National Committee for Responsive Philanthropy
- Ivon Peña and Marisol Ramirez, Co-Directors, OCCORD
- Mike Kubzansky, CEO, Omidyar Network LLC
- Tracy Rosenberg, Advocacy Director, Oakland Privacy
- Saru Jayaraman, President, One Fair Wage
- Joseph Tomás McKellar, Executive Director, PICO California
- Paul Briley, Executive Director, Prisoners with Children
- Guillermo Mayer, CEO, Public Advocates
- Ted Mermin, Executive Director, Public Good Law Center
- Paulina Gonzalez-Britto, CEO, Rise Economy
- "DC" Carole Dorham-Kelly, Ph.D., President and CEO, Rubicon Programs

- Catherine Bracy, CEO and Founder, Tech Equity Collaborative
- Marjorie Connolly, Communications Director, Tech Oversight California
- Pete Manzo, President and CEO, United Ways of California
- Caroline Peattie, Executive Director, Fair Housing Advocates of Northern California
- Kristin Heidelbach, Senior Director of External Affairs, UFCW Western States Council
- Kristina Bas Hamilton, Senior Director, UDW/AFSCME Local 3930
- Chris Iglesias, CEO, The Unity Council
- Astrid Zuniga, President, United Domestic Workers
- Fred Sotelo, Chairman, Urban Leadership Development Institute
- Sikander Iqbal, Deputy Director, Urban Peace Movement
- Maria Noel Fernandez, Executive Director, Working Partnerships USA