Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs Elon Musk,
and X.AI Corp.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to Hon. Yvonne Gonzalez Rogers |
| v. | **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO DISMISS OPENAI'S COUNTERCLAIMS** |
| SAMUEL ALTMAN, et al., | Date:      June 17, 2025 |
| Defendants. | Time:     2:00 p.m. |
|  | Place:    Courtroom 1 (4th Fl.) |
|  |              1301 Clay St. |
|  |              Oakland, CA 94612 |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on June 17, 2025, at 2:00 p.m., or as soon as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers at the United States District Court for the Northern District of California, Ronald V. Dellums Federal Building and United States Courthouse, Courtroom 1 (4th Floor), 1301 Clay Street, Oakland, California 94612, Plaintiffs Elon Musk and X.AI Corp. ("xAI," and collectively, "Plaintiffs") will, and hereby do, move the Court to dismiss the Counterclaims filed by defendants OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC,[1] pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and Civil Local Rule 7-2.

As detailed in the Proposed Order submitted with this Motion, Plaintiffs seek an order dismissing OpenAI's Counterclaims with prejudice. This Motion is made on the grounds that: (1) all of Plaintiffs' conduct alleged in the Counterclaims is protected by the First Amendment; (2) all of Plaintiffs' conduct alleged in the Counterclaims is protected by the litigation privilege; and (3) both Counterclaims fail to state a claim, whether judged under the general plausibility standard of Federal Rule of Civil Procedure 8 or, as appropriate here, Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for allegations sounding in fraud.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Plaintiffs' Verified First Amended Complaint ("FAC"), Dkt. 32, OpenAI's Answer, Counterclaims, and Defenses, Dkt. 147, all matters of which the Court may take judicial notice, all other pleadings on file in this action, and any other written or oral argument or evidence that Plaintiffs may present to the Court.

DATED: May 7, 2025

Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

_____/s/ Marc Toberoff_____
Marc Toberoff

*Attorneys for Plaintiffs Elon Musk,*
*and X.AI Corp.*

---

[1] "OpenAI," as used herein, refers collectively to OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC, and "Plaintiffs" refers collectively to Elon Musk and xAI, unless otherwise stated.

**STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Local Civil Rule 7-4(a)(3), Plaintiffs identify the following issues to be decided:

1.      Whether OpenAI's Counterclaims (Counts 1-2) should be dismissed because they target Plaintiffs' constitutionally protected petitioning activity in violation of the First Amendment and *Noerr-Pennington* doctrine.

2.      Whether OpenAI's Counterclaims should be dismissed because they are barred by California's litigation privilege under California Civil Code § 47(b).

3.      Whether OpenAI's Unfair Competition Law claim (Count 1) should be dismissed for failure to adequately plead an "unfair" or "fraudulent" business practice with the particularity required by Federal Rule of Civil Procedure 9(b).

4.      Whether OpenAI's claim for tortious interference with prospective economic advantage (Count 2) should be dismissed because it is entirely predicated on an alleged UCL violation, and therefore necessarily fails with the UCL claim as a matter of law.

5.      Whether OpenAI's claim for tortious interference with prospective economic advantage (Count 2) should be dismissed for failure to adequately plead: (i) an independently wrongful act; (ii) disruption of a specific economic relationship; and (iii) actual disruption or economic harm.

6.      Whether, in the alternative, OpenAI's Counterclaims should be stayed until the Phase Two trial given that Plaintiffs' related unfair competition and antitrust claims have already been designated for and stayed until Phase Two of this litigation.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

LEGAL STANDARD ............................................................................................................... 6

ARGUMENT ............................................................................................................................ 7

I.  OPENAI'S COUNTERCLAIMS ARE BARRED BY THE PETITION CLAUSE
    OF THE FIRST AMENDMENT ................................................................................... 7

    A.  Plaintiffs' Challenged Communications Are Protected Petitioning Activity. ............... 8

    B.  The "Sham" Exception Does Not Apply. .................................................................. 10

II.  OPENAI'S COUNTERCLAIMS ARE BARRED BY CALIFORNIA'S
     LITIGATION PRIVILEGE ....................................................................................... 12

     A.  Plaintiffs' Communications Are Protected by the Litigation Privilege. ..................... 13

     B.  The Litigation Privilege Bars Both of OpenAI's Counterclaims. .............................. 16

III.  OPENAI'S COUNTERCLAIMS EACH FAIL TO STATE A CLAIM AND
      ARE NOT PLED WITH THE REQUIRED PARTICULARITY ........................................ 17

     A.  OpenAI Fails to State a UCL Claim, and Certainly Not with Particularity ................. 18

         1.  *OpenAI Fails to Allege an "Unfair" Business Practice With Particularity.* ....... 18

         2.  *OpenAI Fails to Allege a "Fraudulent" Business Practice With Particularity* .. 20

     B.  OpenAI Fails to State a Claim for Tortious Interference with Prospective
         Economic Advantage. ............................................................................................. 21

         1.  *OpenAI Fails to Allege an Independently Wrongful Act.* ............................... 22

         2.  *OpenAI Fails to Allege Disruption of a Specific Economic Relationship.* ......... 22

         3.  *OpenAI Fails to Allege Actual Disruption or Economic Harm.* ...................... 23

IV.  OPENAI'S COUNTERCLAIMS SHOULD BE DISMISSED, OR
     ALTERNATIVELY STAYED UNTIL THE PHASE TWO TRIAL .................................... 23

CONCLUSION ....................................................................................................................... 24

CASE NO. 24-CV-04722-YGR
PLAINTIFFS' MOT. TO DISMISS

## TABLE OF AUTHORITIES

**Cases**

*Abraham v. Lancaster Cmty. Hosp.*,
217 Cal. App. 3d 796 (1990) ............................................................................15

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
41 Cal. 4th 1232 (2007) ...................................................................................15

*AliveCor, Inc. v. Apple Inc.*, No. 21-CV-3958 JSW,
2023 WL 9181478 (N.D. Cal. June 30, 2023) ....................................................8

*Apex.AI, Inc. v. Langmead*, No. 23-CV-2230 BLF,
2024 WL 1117055 (N.D. Cal. Mar. 13, 2024) .............................................13, 15

*Arenas v. Shed Media U.S. Inc.*,
881 F. Supp. 2d 1181 (C.D. Cal. 2011),
*aff'd*, 462 F. App'x 709 (9th Cir. 2011) ...........................................................15

*Aronson v. Kinsella*,
58 Cal. App. 4th 254 (1997) .............................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................................6

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1988) ..............................................................................6

*BE & K Constr. Co. v. NLRB*,
536 U.S. 516 (2002) ...........................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................................6

*Better Meat Co. v. Emergy, Inc.*,
No. 21-CV-2338 KJM, 2023 WL 2977786 (E.D. Cal. Apr. 17, 2023) ...........13, 15

*Boone v. Redev. Agency of City of San Jose*,
841 F.2d 886 (9th Cir. 1988) ............................................................................10

*Bowen v. Lin*,
80 Cal. App. 5th 155 (2022) .............................................................................12

*Cal. Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) .......................................................................................9, 12

*Canatella v. Reverse Mortg. Sols. Inc.*,
No. 13-CV-05937 YGR, 2014 WL 7205146 (N.D. Cal. Dec. 17, 2014) ...............20

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ............................................................................18, 19, 20, 21

*Chacon v. Litke*,
   181 Cal. App. 4th 1234 (2010) ...........................................................................12

*City of Columbia v. Omni Outdoor Advert., Inc.*,
   499 U.S. 365 (1991) ........................................................................................7, 10

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) ............................................................................7, 17

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
   11 Cal. 4th 376 (1995) .......................................................................................22

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ...............................................................................................7

*Empress LLC v. City & Cnty. of San Francisco*,
   419 F.3d 1052 (9th Cir. 2005) ................................................................................8

*Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*,
   542 F.2d 1076 (9th Cir. 1976) ..............................................................................17

*Gosewisch v. Doran*,
   161 Cal. 511 (1911) .............................................................................................15

*Hagberg v. Cal. Fed. Bank FSB*,
   32 Cal. 4th 350 (2004) ....................................................................................12, 13

*Hall v. Time Inc.*,
   158 Cal. App. 4th 847 (2008) .............................................................................21

*Hill v. Roll Int'l Corp.*,
   195 Cal. App. 4th 1295 (2011) .......................................................................20, 21

*Hilton v. Hallmark Cards*,
   599 F.3d 894 (9th Cir. 2010) ..............................................................................15

*Holt v. Coll. of Osteopathic Phys. & Surgeons*,
   61 Cal. 2d 750 (1964) .........................................................................................14

*In re Apple Inc. Device Performance Litig.*,
   386 F. Supp. 3d 1155 (N.D. Cal. 2019) ..............................................................17

*In re Firearm Cases*,
   126 Cal. App. 4th 959 (2005) .............................................................................19

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ........................................................................................20

*Kashian v. Harriman*,
    98 Cal. App. 4th 892 (2002) .................................................................................... 13, 16

*KBS Holdco, LLC v. City of W. Hollywood*,
    No. 22-CV-5750 FLA, 2024 WL 4800072 (C.D. Cal. July 8, 2024) ........................... 7

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ................................................................................... 17

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    No. 07-CV-1057 MJJ, 2007 WL 2318906 (N.D. Cal. Aug. 4, 2007) ......................... 19

*Kwikset Corp. v. Super. Ct.*,
    51 Cal. 4th 310 (2011) ............................................................................................... 21

*Manistee Town Ctr. v. City of Glendale*,
    227 F.3d 1090 (9th Cir. 2000) ..................................................................................... 8

*Microsoft Corp. v. M. Media*,
    No. 17-CV-0347 MWF, 2018 WL 5094969 (C.D. Cal. Mar. 13, 2018) ..................... 16

*MMM Holdings, Inc. v. Reich*,
    21 Cal. App. 5th 167, 187 (2018) ............................................................................. 15

*Morgan v. AT&T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235, 1254 (2009) ....................................................................... 20

*Neville v. Chudacoff*,
    160 Cal. App. 4th 1255 (2008) ............................................................................ 12, 16

*Next Vietnam Projects Found., Inc. v. Koster Films, LLC*,
    751 F. Supp. 3d 1005 (C.D. Cal. 2024) .................................................................... 16

*Olsen v. Harbison*,
    191 Cal. App 4th 325 (2010) ..................................................................................... 12

*Oregon Nat. Res. Council v. Mohla*,
    944 F.2d 531 (9th Cir. 1991) ................................................................................. 6, 10

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
    946 F. Supp. 2d 957 (N.D. Cal. 2013) ...................................................................... 23

*Pirozzi v. Apple, Inc.*,
    913 F. Supp. 2d 840, 851 (N.D. Cal. 2012) ............................................................... 7

*Procongps, Inc. v. Star Sensor LLC*,
    No. 11-CV-3975 SI, 2011 WL 5975271, at *3 (N.D. Cal. Nov. 29, 2011) ............... 19

*Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) .................................................................................................... 10

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*,
   612 F. Supp. 3d 1131, 1142 (S.D. Cal. 2020) ........................................15

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
   732 F. Supp. 3d 1101 (N.D. Cal. 2024) ...............................................9

*Rohde v. Wolf*,
   154 Cal. App. 4th 28 (2007) ...........................................................14

*Rubin v. Green*,
   4 Cal. 4th 1187 (1993) ..............................................................12, 16

*Seltzer v. Barnes*,
   182 Cal. App. 4th 953 (2010) ........................................................13

*Sepehry-Fard v. Dep't Stores Nat'l Bank*,
   No. 13-CV-3131 WHO, 2013 WL 6574774 (N.D. Cal. Dec. 13, 2013) ................16

*Shaeffer v. Califia Farms, LLC*,
   44 Cal. App. 5th 1125 (2020) ........................................................21

*Silberg v. Anderson*,
   50 Cal. 3d 205 (1990) ..........................................................12, 15, 16

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
   983 F. Supp. 1303 (N.D. Cal. 1997) .................................................23

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) .....................................................7, 9, 10

*Stevenson Real Estate Servs., Inc. v. CB Richard Ellis Real Estate Servs., Inc.*,
   138 Cal. App. 4th 1215, 1225 (2006) ................................................20

*Tatung Co. v. Shu Tze Hsu*,
   43 F. Supp. 3d 1036 (C.D. Cal. 2014) ...............................................23

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ..........................................................7

*Timothy W. v. Julie W.*,
   85 Cal. App. 5th 648 (2022) .........................................................12

*Turner v. Victoria*,
   15 Cal. 5th 99 (2023) ...............................................................13

*UCP Int'l Co. Ltd. v. Balsam Brands Inc.*,
   420 F. Supp. 3d 966 (N.D. Cal. 2019) ...............................................10

*United Artists Corp. v. United Artist Studios LLC*,
   No. 19-CV-0828 MWF, 2019 WL 8221088 (C.D. Cal. Aug. 2, 2019) ................13

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) ...................................................................................................7

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*,
    31 F.3d 800 (9th Cir. 1994) .......................................................................................10

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ...................................................................................17

*Vidillion, Inc. v. Pixalate, Inc.*,
    No. 18-CV-7270 DSF, 2019 WL 3308768 (C.D. Cal. June 5, 2019) ...................17

*Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*,
    814 F. Supp. 2d 1033 (S.D. Cal. 2011) ....................................................................15

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ......................................................................................22

*Wise v. Thrifty Payless, Inc.*,
    83 Cal. App. 4th 1296 (2000) ....................................................................................14

**Statutes**

California Business and Professions Code § 17200 .......................................... passim

California Civil Code § 47 .........................................................................................12

California Corporations Code § 5233 .......................................................................23

California Government Code § 12598 ........................................................................13

Delaware Code, tit. 8, § 124 ......................................................................................13

**Rules**

Federal Rule of Civil Procedure 9 ...................................................................... passim

Federal Rule of Civil Procedure 12 .................................................................... passim

**Constitutional Provisions**

U.S. Const. amend. I........................................................................................Apassim

CASE NO. 24-cv-04722-YGR
PLAINTIFFS' MOT. TO DISMISS

**INTRODUCTION**

OpenAI's counterclaims—alleging unfair competition and tortious interference with prospective economic advantage ("Counterclaims")—are predicated entirely on Plaintiffs' constitutionally and statutorily protected speech and petitioning activity. They target two forms: (1) communications by Plaintiffs' counsel with OpenAI's regulators, the California and Delaware Attorneys General ("Attorneys General"), concerning its for-profit conversion and the announced sale of the charity's assets to OpenAI's for-profit enterprise; and (2) a letter of intent dated February 10, 2025 ("LOI") sent by Plaintiffs' counsel to OpenAI, Inc.'s board of directors ("Board") via its litigation counsel, expressing interest in purchasing such assets in the event, notwithstanding Plaintiffs' objections, the Attorneys General approve the conversion and sale.

Both sets of communications made by Plaintiffs' litigation counsel represent protected expressions of interest and concern directed to appropriate parties in ongoing litigation regarding OpenAI's unprecedented pivot to a for-profit corporation. Such communications with government officials and opposing counsel in litigation are lawful, justified, and protected under both the *Noerr-Pennington* doctrine and California's robust litigation privilege—they are not tortious and cannot sustain OpenAI's meritless Counterclaims.

Beyond the constitutional and statutory protections that independently mandate dismissal of the Counterclaims, OpenAI also fails to state a claim. OpenAI does not allege the required elements of either unfair competition or tortious interference with prospective economic advantage, particularly given the heightened pleading standards applicable to both claims, which are predicated on a purported "sham" sounding in fraud.

Indeed, OpenAI's Counterclaims collapse under the weight of their own contradictions. OpenAI claims that reasonable members of the public viewed Plaintiffs' LOI as a joke, while simultaneously alleging it was deceptive because it was taken seriously. *Compare* Dkt. 147 ¶¶ 88-89 *with id.* ¶¶ 92-96. It characterizes Plaintiffs' LOI as a "sham," while acknowledging it was backed by numerous credible investors with a documented history of closing major deals with Musk. *Compare id.* ¶¶ 83-84 *with id.* ¶ 87. It claims harm from being "forced" to evaluate the LOI that OpenAI's CEO Sam Altman publicly rejected out-of-hand before even receiving it. *Compare id.* ¶ 111 *with* Dkt. 117

at 1. And after repeatedly demanding strict legal separation between Musk and xAI, OpenAI now sues Musk personally for a proposal made by xAI and third-party investors. *Compare* Dkt. 147 ¶ 104 *with* Dkt. 102 at 18-19 (Microsoft MTD argument) *and* Dkt. 103 at 29 n.12 (OpenAI incorporating argument by reference).

OpenAI's Counterclaims exemplify its pattern of suppressing protected speech and petitioning activity. Its track record speaks for itself: a trail of whistleblower departures from OpenAI, its documented retaliation against employees who raise legitimate safety concerns, and its systematic deployment of legally questionable nondisclosure agreements that threaten to nullify employee equity should they dare speak out against the company. Dkt. 32 ¶¶ 185-92 (detailing mass exodus of safety-conscious team members who "lost trust in OpenAI leadership"); *id*. Ex. 26. After muzzling internal concerns, OpenAI now weaponizes state tort law to silence external concern.

Indeed, OpenAI's Counterclaims not only fail as a matter of law, they confirm OpenAI's betrayal of its charitable mission, and the public at large. Even OpenAI's "damages"—i.e., having to pay the charity fair market value for the assets it wants to privatize—reveals that the non-profit is nothing more than an inconvenience standing in the way of Altman's profit-driven ambitions. Plaintiffs respectfully request the Court dismiss both Counterclaims with prejudice.

## STATEMENT OF FACTS

Plaintiffs have consistently opposed OpenAI's abandonment of its charitable mission since the inception of this dispute. As early as 2019, Musk made clear his opposition to OpenAI's for-profit endeavors, distancing himself from OpenAI, L.P.—the first of *many* OpenAI for-profit subsidiaries—and ensuring his position was widely known. Dkt. 147 ¶ 47 ("Musk asked Altman to make clear to others that he had 'no financial interest in the for-profit arm of OpenAI'"). With prescience, Plaintiffs' August 2024 Complaint in this action specifically identified the risk that OpenAI would attempt to convert to a for-profit entity, Dkt. 1 ¶ 146, a concern that materialized mere months later when OpenAI announced precisely such a plan and secured investments predicated on it. Dkt. 147 ¶ 76; Dkt. 32 ¶¶ 2, 194-95. Plaintiffs then moved for a preliminary injunction to stop OpenAI from converting to a for-profit company or otherwise selling its assets absent proper regulatory approval by the Attorneys General. Dkt. 46.

OpenAI has finally acknowledged its orchestration of an insider deal to sell its assets to a new OpenAI for-profit company in which Sam Altman and other directors of the charity would have major equity. Dkt. 147 ¶ 77. OpenAI announced the sale in public blog posts, Dkt. 77-3, raised billions conditioned on the sale of the charity's assets, Dkt. 147 ¶ 76, hired investment banks to facilitate the sale, Dkt. 32 ¶ 195, and discussed the considerable equity Sam Altman and Greg Brockman would receive as part of the deal, Dkt. 73-23 at 5. This maneuver represents nothing less than an attempt to privatize billions of dollars in charitable assets to enrich Altman, Brockman, and their investors at the expense of the charity and its public beneficiaries.[2]

Plaintiffs are hardly alone in their concerns. OpenAI's scheme—over which the Attorneys General have regulatory authority[3]—has sparked opposition from diverse stakeholders including non-profit groups, labor organizations, distinguished legal, business, and technical experts, and OpenAI's former employees. Dkt. 32 ¶ 183; Dkt. 152; Dkt. 158; Dkt. 161. Each of these groups has raised legitimate concerns with government officials and sought to prevent OpenAI's planned for-profit conversion. *Id*. Just weeks ago, more than sixty labor and non-profit groups did the same. Dkt. 158-8 at 28-30. Shortly after that, multiple Nobel laureates and leading law professors joined the call. Dkt. 161-1 at 30. Public Citizen has urgently pressed the California Attorney General to investigate OpenAI's for-profit pivot and tax-exempt status, Dkts. 158-2–158-6, while the Securities and Exchange Commission, Federal Trade Commission, and various international regulators have launched investigations into this unprecedented attempt to convert billions in charitable assets for private gain. Dkt. 32 ¶ 182.

Beginning in November 2024, Plaintiffs alerted the Attorneys General to ensure proper

---

[2] OpenAI's most recent PR announcement suggests that the complete disassociation of the charity from OpenAI's for-profit enterprise is on pause. But like so many of Altman's vague, self-serving press statements, this bears no relevance to this Motion or this case. By all indications, OpenAI's latest announcement, conveniently made right after the Court set Plaintiffs' core claims for trial, is a façade concealing Defendants' prior looting of the charity and ongoing profiteering from it. This is already evidenced by the simultaneous announcement that OpenAI has removed all previous profit caps on outside investment, and that the tens of billions of dollars in investment expressly conditioned on its for-profit conversion will now vest. https://www.nytimes.com/2025/05/06/business/dealbook/altman-openai-plan-b.html.

[3] For the avoidance of doubt, regulatory approval by the Attorneys General could not and would not resolve all claims Plaintiffs assert in their FAC.

CASE NO. 24-cv-04722-YGR
PLAINTIFFS' MOT. TO DISMISS

oversight of OpenAI's unprecedented for-profit plans. Dkt. 32 ¶ 421. Plaintiffs took the extraordinary step of seeking relator status from the California Attorney General to help safeguard OpenAI's charitable trust and assets. Dkt. 157-1. After this request was initially stymied and OpenAI announced it was seeking regulatory approval from the Attorneys General to sell the charity's assets to a consolidated for-profit OpenAI corporation, Plaintiffs grew concerned that the charity would be shortchanged in an insider sweetheart deal, compromised by Altman's conflicted positions on both sides of the negotiation.[4] Dkt. 103-5 at 2. On January 7, 2025, Plaintiffs' litigation counsel sent the Attorneys General a letter stressing their fiduciary obligation to ensure the charity receives fair market value for its assets, specifically requesting they open a competitive bidding process if the sale were to proceed—the proper approach for the sale of charitable assets. Dkt. 103-5 at 2 ("As both your offices must ensure any such transactional process relating to OpenAI's charitable assets provides at least fair market value to protect the public's beneficial interest, we assume you will provide a process for competitive bidding to actually determine that fair market value. We write to inquire as to the nature, terms, and timing of that process.").

Throughout, Plaintiffs adamantly opposed OpenAI's for-profit conversion and misuse of the charitable form. But, if a of sale the charity's assets proceeded, Plaintiffs insisted the charity receive fair market value. Faced with continued silence by the Attorneys General, and amid widespread opposition to OpenAI's insider dealings, on February 10, 2025, xAI and six major funds submitted the LOI through litigation counsel to OpenAI, Inc.'s Board proposing to open negotiations to purchase assets that the Board seemed determined to sell despite Plaintiffs' fervent objections.[5] Dkt.

---

[4] While OpenAI's causes of action emphasize the LOI, its Counterclaims incorporate by reference earlier factual allegations regarding Plaintiffs' communications with the Attorneys General as well as this and prior litigation. Dkt. 147 ¶¶ 65-66, 68-69, 103, 115. As the record demonstrates, the LOI was not an isolated action but rather the inevitable extension of Plaintiffs' ongoing, good-faith efforts to ensure regulatory oversight of OpenAI's attempt to convert charitable assets in the vacuum of apparent regulatory neglect by the Attorneys General.

[5] Notably, OpenAI has admitted that the LOI was sent solely on behalf of xAI—not Plaintiffs collectively. Dkt. 147 ¶ 104 (noting the LOI was sent "on behalf of a group of private investors, led by Musk in his capacity as CEO of xAI[.]"). This distinction matters. While "Plaintiffs" is used through this Motion for simplicity because the Counterclaims name Musk personally, this does not change the fundamental fact that, given OpenAI's own repeated arguments in this case, Dkt. 102 at 18-19 (Microsoft MTD); Dkt. 103 at 29 n.12 (OpenAI incorporating by reference these arguments), there can be no claim against Musk personally for the conduct of xAI.

116. Even OpenAI acknowledges the LOI was backed by credible investors with proven track records and the financial capacity to complete major transactions like this. Dkt. 147 ¶ 87. The LOI addressed core issues in this litigation and served legitimate purposes—embodying Plaintiffs' requests to the Attorneys General by seeking to initiate a competitive bidding process to ensure fair valuation of the charity's assets and forestalling further self-dealing by Altman and the Board he dominates.

The LOI's accompanying announcement clearly stated—and Plaintiffs confirmed to both the OpenAI Defendants and the Court—that the LOI was entirely contingent on OpenAI proceeding with the for-profit pivot it announced on December 27, 2024. Dkt. 77-3. Plaintiffs never wavered from their opposition to OpenAI's for-profit conversion or their commitment to restore OpenAI as the truly charitable organization Musk co-founded. Dkt. 117 at 2. Plaintiffs even explicitly offered to withdraw the LOI if OpenAI agreed to keep the assets (truly) under the charity's control: "If OpenAI, Inc.'s Board is prepared to preserve the charity's mission and stipulate to take the 'for sale' sign off its assets by halting its conversion, Musk will withdraw the bid." *Id.*

In its Answer, OpenAI asserts two Counterclaims based on these events. *First*, it alleges Plaintiffs violated California's Unfair Competition Law ("UCL") through "unfair and fraudulent business practices" by: (1) sending "letters to the Attorneys General of California and Delaware, encouraging them to take action against OpenAI" and (2) "orchestrating a sham bid to purportedly acquire [] OpenAI, Inc.'s assets[.]" Dkt. 147 ¶¶ 69, 103. *Second*, OpenAI claims Plaintiffs tortiously interfered with OpenAI's prospective economic relationships through the same conduct. *Id.* ¶¶ 115-27. The sole purported evidence supporting OpenAI's claim the LOI was a "sham": numerology.[6] *Id.* ¶ 89.

OpenAI's Counterclaims omit key details. For example, OpenAI fails to explain that Plaintiffs' communications with the Attorneys General addressed OpenAI's charitable trust violations—precisely what these officials regulate—and demanded corrective action to ensure any sale of OpenAI's assets provides the charity with fair market value. *Id.* ¶ 69. And while OpenAI

---

[6] OpenAI alleges that the $97.375 billion proposal, which OpenAI rounds to "974," "was a joking reference to 974 Praf," a character in a science fiction book. Dkt. 147 ¶ 89. In reality, the LOI's valuation of OpenAI, Inc.'s assets had nothing to do with literary references; it was entirely based on publicly reported financial and governance data. Dkt. 116-1 at 5 (¶ 1).

claims damages from the LOI's media coverage, it conveniently ignores that its own CEO directly amplified this publicity. Rather than evaluating Plaintiffs' proposal on the merits, Altman reflexively rejected it before even receiving it with a flippant post on X: "no thank you but we will buy twitter for $9.74 billion if you want."[7] Altman's headline-grabbing response directly fueled the very media attention OpenAI now claims caused it harm. In context, Plaintiffs' actions reflect not improper interference, but the legitimate exercise of their rights after seeking governmental oversight of what appears to be the unprecedented conversion of billions in charitable assets for private gain through a self-dealing transaction orchestrated by Altman and his Board.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the court must accept factual allegations as true, it need not accept legal conclusions as true. *Id.* "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In the Ninth Circuit, dismissal under Rule 12(b)(6) may be based on "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988). When claims target constitutionally protected speech and petitioning activity—as here—courts demand more rigorous and detailed pleading. *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991).

Additionally, because OpenAI's "sham" allegations sound in fraud, Rule 9(b)'s heightened pleading standard applies as well, and demands OpenAI plead its claims with particularity, "identify[ing] the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v.*

---

[7] Dkt. 117; https://x.com/sama/status/1889059531625464090?lang=en.

*Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (internal quotation marks omitted). Though "knowledge" and "intent" may be alleged generally, the Ninth Circuit requires factual allegations that give rise to a strong inference of fraudulent intent. *Pirozzi v. Apple, Inc.*, 913 F. Supp. 2d 840 (N.D. Cal. 2012) (dismissing UCL claim for failure to plead with particularity).

## ARGUMENT

### I.    OPENAI'S COUNTERCLAIMS ARE BARRED BY THE PETITION CLAUSE OF THE FIRST AMENDMENT

OpenAI's Counterclaims must be dismissed because they are barred as a matter of law, as they target activity protected by the First Amendment's right to petition. The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. This right is "one of 'the most precious of the liberties safeguarded by the Bill of Rights'" and is "implied by the very idea of a government, republican in form." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002) (citation omitted).

Under the *Noerr-Pennington* doctrine, which derives from the Petition Clause, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (citing *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965)). The doctrine shields Plaintiffs' "effort to influence public officials [(here, the courts and Attorneys General,)] *regardless of intent or purpose*." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (emphasis added).

Although the *Noerr-Pennington* doctrine originated in the antitrust context, the Ninth Circuit has explicitly held that it applies to *both* UCL and tortious interference with prospective economic advantage claims, as made by OpenAI here. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *Sosa*, 437 F.3d at 942; *KBS Holdco, LLC v. City of W. Hollywood*, No. 22-CV-5750 FLA, 2024 WL 4800072, at *3 (C.D. Cal. July 8, 2024) (striking UCL and tortious interference claims; "This doctrine has also been extended beyond the statutory context to bar state law torts based on activity that implicates the Petition Clause, including tortious interference with prospective economic advantage claims." (citing *Theme Promotions*, 546 F.3d at 1007)); *AliveCor,*

*Inc. v. Apple Inc.*, No. 21-CV-3958 JSW, 2023 WL 9181478, at *2 (N.D. Cal. June 30, 2023)

(granting motion to dismiss state unfair competition claims under *Noerr-Pennington* doctrine).

### A.    Plaintiffs' Challenged Communications Are Protected Petitioning Activity.

The First Amendment bars OpenAI's Counterclaims on several independent bases: Plaintiffs'

communications with state Attorneys General and separately their litigation concerning OpenAI's

unlawful conduct are protected petitioning activity under the *Noerr-Pennington* doctrine, while

Plaintiffs' LOI and media communications are likewise protected as incidental conduct related to

such petitioning activity.[8] The *Noerr-Pennington* doctrine immunizes "petitions directed at any

branch of government, including the executive, legislative, judicial and administrative agencies."

*Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000). "[T]hose who petition

all departments of the government for redress are generally immune from liability." *Empress LLC v.*

*City & Cnty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005).

OpenAI's own Counterclaims explicitly acknowledge that Plaintiffs petitioned the Attorneys

General, encouraging regulatory oversight and advocating a bidding process to ensure that any

transfer of OpenAI, Inc.'s assets, if it must occur at all, will be at fair market value.[9] Dkt. 147 ¶ 69

("Musk demanded that regulators investigate OpenAI. He sent several letters to the Attorneys General

of California and Delaware, encouraging them to take action against OpenAI[.]"). These

communications represent quintessential petitioning activity protected by the First Amendment.

The Ninth Circuit further recognizes that First Amendment protection extends beyond direct

government communications to encompass "incidental" conduct, including "public relations

---

[8] As detailed below, Plaintiffs' communications with the Attorneys General and the LOI are further
covered by California's litigation privilege and are doubly, if not triply, protected by the fact that the
California Attorney General *is a party to this litigation*, and the Delaware Attorney General has
participated in this matter as amicus. Dkt. 121 at 2; Dkt. 134. OpenAI's position reveals a convenient
double-standard: OpenAI recognizes that both Attorneys General have proper supervisory authority
and has itself directly engaged with them concerning its planned sale of charitable assets, Dkt. 147 ¶
108—yet, it simultaneously claims Plaintiffs' communications with these same officials (who are also
participants in this case) and related advocacy speech is somehow tortious.

[9] Plaintiffs' January 7, 2025 letter to the Attorneys General, Dkt. 103-5 at 2, represents merely one
instance in a sustained course of legitimate regulatory engagement—from initial outreach, to seeking
relator status, to formal requests for intervention as OpenAI's conversion plans crystalized into
concrete plans to privatize billions in charitable assets.

campaign[s]," when such activities are "sufficiently related to petitioning activity." *Sosa*, 437 F.3d at 934-35 (citation omitted). Here, Plaintiffs' communications with state Attorneys General specifically addressed OpenAI's alleged charitable trust violations and requested that the Attorneys General "provide a process for competitive bidding to actually determine that fair market value" of OpenAI's charitable assets. Dkt. 103-5 at 2. After being met with silence by the Attorneys General, Plaintiffs followed up on their request with a substantial, credible LOI to the Board—the practical implementation of, and conduct "incidental" to, their petition to the Attorneys General.[10] *See Sosa*, 437 F.3d at 934-35.

Plaintiffs' LOI also directly related to core issues in this litigation, including Plaintiffs' then-pending Motion for a Preliminary Injunction. *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the Government[,]" including "the courts[.]"). Given OpenAI's efforts to convert its charitable assets for profit, the LOI provided guardrails against OpenAI, Inc. further breaching its charitable trust by: (1) avoiding a self-dealing transaction that undervalued its assets; and (2) ensuring OpenAI's technology remained under stewardship committed to furthering the charity's founding mission of safety and transparency. While an actual fair market value sale of such assets would not have resolved this entire case, it may well have settled parts of it.

Further still, Plaintiffs' communications with the media regarding the LOI are manifestly "related" to this litigation and Plaintiffs' petitioning of the Attorneys General concerning OpenAI's asset sale, and thereby also constitute protected activity. *See Realtek Semiconductor Corp. v. MediaTek, Inc.*, 732 F. Supp. 3d 1101, 1113 (N.D. Cal. 2024); ("[P]urportedly anticompetitive communications between [parties] and third parties," like the media here, that involve ongoing litigation are "'related' to that petitioning activity and are protected by *Noerr-Pennington* to the extent that they contributed to [the] litigation efforts."); *id.* n.5 (noting additional, separate basis for barring such claims under California's litigation privilege).

---

[10] Plaintiffs' LOI should be additionally protected because it addressed matters of public concern (assets of a charity subsidized by the public) and was directed to OpenAI's Board, charged with governance and a fiduciary duty to the public regarding such assets.

1    This alone bars OpenAI's Counterclaims. *See Sosa*, 437 F.3d at 934-35.

2    **B.    The "Sham" Exception Does Not Apply.**

3    So robust is the First Amendment's Petition Clause protection that it applies regardless of the

4    petitioner's motive. *See Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49,

5    56 (1993); *City of Columbia*, 499 U.S. at 380 (*Noerr-Pennington* doctrine shields conduct "regardless

6    of intent or purpose"). The only recognized limitation on this doctrine is the "sham" exception. *USS-*

7    *POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 810 (9th Cir.

8    1994) (citing *Prof'l Real Estate Invs.*, 508 U.S. at 60).

9    While OpenAI repeatedly, and with zero alleged facts, labels the LOI a "sham" in its

10   Counterclaims, this word is not talisman. The exception applies only when a party pleads *with*

11   *particularly* facts sufficient to satisfy a two-part test. *First*, the petitioning activity "must be

12   objectively baseless in the sense that no reasonable [petitioner] could realistically expect success on

13   the merits." *Id. Second*, and only if the first condition is met, "may a court examine the [petitioner's]

14   subjective motivation." *Id.* This examination focuses on "whether the baseless [petitioning activity]

15   conceals 'an attempt to interfere directly with the business relationships of a competitor,' through the

16   use [of] the governmental process—*as opposed to the outcome of that process*—as an anticompetitive

17   weapon[.]" *Id.* at 60-61 (emphasis added). Importantly, pleading this exception requires "specific

18   allegations demonstrating that the *Noerr-Pennington* protections do not apply." *Boone v. Redev.*

19   *Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988); *UCP Int'l Co. Ltd. v. Balsam Brands*

20   *Inc.*, 420 F. Supp. 3d 966, 981 (N.D. Cal. 2019) (must plead "exception with specificity" (citing

21   *Mohla,* 944 F.2d at 534-35) (applying *Noerr-Pennington* to both California UCL and intentional

22   interference with prospective economic advantage claims)).

23   Here, OpenAI has failed to allege conduct that would even trigger the exception: using "the

24   governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."

25   *Prof'l Real Estate Invs.*, 508 U.S. at 61 (emphasis in original). This critical distinction is

26   determinative. Plaintiffs have consistently pursued substantive relief from both the Attorneys General

27   and this Court, namely, protection of OpenAI's charitable trust and prevention of a conversion of its

28

CASE NO. 24-CV-04722-YGR
PLAINTIFFS' MOT. TO DISMISS

assets, most especially in any undervalued self-dealing transaction[11]—not procedural harassment. But even if OpenAI's allegations had triggered the exception, its Counterclaims fail both parts of the demanding test.

*First*, Plaintiffs' communications with the Attorneys General were substantive and legitimate. These communications raised valid concerns about OpenAI's governance structure and operations that potentially violate state non-profit laws—concerns raised by Plaintiffs in this litigation and independently and repeatedly echoed by numerous third parties, including dozens of labor and non-profit groups, professors and Nobel laureates alike. Dkts. 158-2–158-8; Dkt. 161-1. OpenAI's own admission that Plaintiffs' communications prompted "discussions with both the Delaware and California Attorneys General," Dkt. 147 ¶ 108, demonstrates the serious and substantive nature of the concerns. And the fact the state officials have actually engaged with these issues shows that they are not objectively baseless. Indeed, the Delaware Attorney General finally indicated her office is examining OpenAI's proposed conversion, particularly the issue of fair market value and self-dealing. Dkt. 77-1.

*Second*, the LOI by a well-funded group was not objectively baseless. Formally communicated by counsel to OpenAI's counsel and Board, and signed by xAI and multiple highly liquid funds, the proposal reflected genuine financial capacity, serious intent, and was—at least according to publicly available information—quite strong. Dkt. 147 ¶¶ 80, 83-84. While the LOI, like all letters of intent, appropriately contained standard due diligence provisions regarding OpenAI's non-public financials, Dkt. 116-1 at 2-3 (¶ 2), 5 (¶ 3), it was reasonably tethered to publicly available financial information, including OpenAI's October 2024 funding round wherein it successfully raised financing at a valuation of $157 billion, Dkt. 32 ¶ 5; Dkt. 46-10 at 2. The LOI's valuation naturally reflected OpenAI, Inc.'s primary asset—approximately 51% ownership of OpenAI's for-profit entities worth roughly $80.1 billion—plus a premium consistent with OpenAI's historically rapid valuation growth over a matter of months. OpenAI's hasty rejection, occurring before even receiving the LOI and without proper Board consideration, does not render the proposal baseless. Dkt. 147 ¶ 91;

---

[11] Again, this litigation encompasses additional issues, including Defendants' misconduct toward Musk as a donor and xAI as a competitor.

CASE NO. 24-cv-04722-YGR
PLAINTIFFS' MOT. TO DISMISS

Dkt. 117 at 2.

The considered LOI backed by xAI and six established investment funds, the widespread support from civic groups and academics for Plaintiffs' regulatory advocacy, and the active investigations by the Attorneys General into the fair market value of OpenAI's assets, conclusively demonstrate that Plaintiffs' petitioning activity was substantive and legitimate. *See Trucking Unlimited*, 404 U.S. at 510-11. Nothing in OpenAI's Counterclaims plausibly suggests otherwise, much less with the particularity the law demands.

## II.   OPENAI'S COUNTERCLAIMS ARE BARRED BY CALIFORNIA'S LITIGATION PRIVILEGE

Even if Plaintiffs' communications were not protected as petitioning activity—which they are—OpenAI's Counterclaims would still be barred as a matter of law by California's expansive litigation privilege, which provides an additional and independent basis for dismissal. *Timothy W. v. Julie W*., 85 Cal. App. 5th 648, 661 (2022) ("A plaintiff cannot establish a prima facie case if the litigation privilege precludes [] liability on the claim." (citations omitted)); *Chacon v. Litke*, 181 Cal. App. 4th 1234, 1255 (2010) (whether conduct falls within the scope of the litigation privilege "is an issue of law, and not fact").

California Civil Code § 47(b) establishes an absolute privilege barring all tort claims, except malicious prosecution, and protects "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990); *Hagberg v. Cal. Fed. Bank FSB*, 32 Cal. 4th 350, 360 (2004).

"The breadth of the litigation privilege cannot be understated." *Olsen v. Harbison*, 191 Cal. App 4th 325, 333 (2010). "Any doubt about whether the privilege applies is resolved in favor of applying it." *Bowen v. Lin*, 80 Cal. App. 5th 155, 165 (2022). To that end, the California Supreme Court mandates broad interpretation of the litigation privilege, covering communications made during litigation or in connection with anticipated litigation. *Rubin v. Green*, 4 Cal. 4th 1187, 1194 (1993). Indeed, to be privileged, a statement need only be "reasonably relevant" to pending or contemplated litigation. *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1266 (2008). Consistent with this treatment,

"courts have adopted a fairly expansive view of what constitutes litigation-related activities within the scope of" the statute. *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 962 (2010).

## A.    Plaintiffs' Communications Are Protected by the Litigation Privilege.

The communications by Plaintiffs' litigation counsel with the Attorneys General and with the Board via OpenAI's litigation counsel are unequivocally protected by California's litigation privilege. *First*, communications with state attorneys general regarding potential legal violations are privileged as a matter of law. *Hagberg*, 32 Cal. 4th at 361. *Second,* communications from Plaintiffs' litigation counsel to the Board—members of a public charity entrusted with fiduciary duties to safeguard assets held irrevocably for the public benefit—as well as communications that reach "(1) third-party investors, (2) employees, and (3) customers," Dkt. 147 ¶ 116, are also protected. *United Artists Corp. v. United Artist Studios LLC*, No. 19-CV-0828 MWF, 2019 WL 8221088, at *6-7 (C.D. Cal. Aug. 2, 2019) (communication of offer to purchase opposing party protected by litigation privilege); *Apex.AI, Inc. v. Langmead*, No. 23-CV-2230 BLF, 2024 WL 1117055, at *3-4 (N.D. Cal. Mar. 13, 2024) (applying privilege to communications to defendant's "customers and business partners"); *Better Meat Co. v. Emergy, Inc.,* No. 21-CV-2338 KJM, 2023 WL 2977786, at *5-6 (E.D. Cal. Apr. 17, 2023) (applying privilege to letter sent to competitor's lead investor).

As to the first point, in *Hagberg*, the California Supreme Court held that reports to law enforcement or regulatory authorities concerning possible legal violations are protected by the litigation privilege, irrespective of whether formal proceedings have been initiated. 32 Cal. 4th at 361; *see also Kashian v. Harriman*, 98 Cal. App. 4th 892, 927 (2002) (holding that attorney communications with an attorney general regarding a charitable trust were protected by the litigation privilege). Application of the litigation privilege to communications with attorneys general reflects the vital role private citizens play in supporting regulatory oversight, particularly in the non-profit context. While state attorneys general possess broad statutory authority to safeguard charitable assets under both California law, Cal. Gov. Code § 12598(a), and Delaware law, Del. Code Ann., tit. 8, § 124, the California Supreme Court has recognized that they often operate with limited resources that constrain their ability to supervise effectively. *Turner v. Victoria*, 15 Cal. 5th 99, 130-31 (2023). Private communications from knowledgeable citizens, like Plaintiffs, therefore serve as an essential

1  supplement to official oversight. *Id*. Indeed, California courts have long recognized the

2  complementary relationship between private enforcement and an attorney general's supervisory

3  authority over charities. *Holt v. Coll. of Osteopathic Phys. & Surgeons*, 61 Cal. 2d 750, 757 (1964).

4      Here, Plaintiffs' communications with state Attorneys General regarding their duty to ensure

5  that the OpenAI charity receives fair market value for the announced sale of its assets to Altman's

6  for-profit enterprise, Dkt. 103-5, and subsequent LOI to OpenAI's counsel, are protected by the

7  litigation privilege in multiple ways. *First,* Plaintiffs' communications with the Attorneys General

8  occurred (1) during Plaintiffs' ongoing litigation against OpenAI, (2) during Plaintiffs' quasi-judicial

9  proceedings requesting relator status from the California Attorney General, and (3) in contemplation

10  that the Attorneys General themselves might initiate quasi-judicial proceedings or lawsuits

11  concerning OpenAI's unlawful conversion. Dkt. 147 ¶ 69; *Wise v. Thrifty Payless, Inc*., 83 Cal. App.

12  4th 1296, 1303 (2000) ("The litigation privilege is not limited to the courtroom, but encompasses

13  actions by administrative bodies and quasi-judicial proceedings. The privilege extends beyond

14  statements made in the proceedings, and includes statements made to initiate official action."

15  (citations omitted)). The application of the litigation privilege is particularly appropriate here, where

16  both Attorneys General have been *directly involved* in this litigation. Dkt. 32; Dkt. 134.

17      *Second*, California courts consistently hold that demand letters and communications related to

18  settlement fall squarely within the litigation privilege's protective scope. *See, e.g., Aronson v.*

19  *Kinsella*, 58 Cal. App. 4th 254, 266 (1997) (protecting demand letters); *Rohde v. Wolf*, 154 Cal. App.

20  4th 28, 38 (2007) (protecting settlement offers). Here, the LOI expressing interest in acquiring

21  OpenAI's assets at fair market value constitutes a communication that directly relates to this

22  litigation, and ultimately may have settled certain aspects of it, as well as anticipated intervention or

23  litigation by the Attorneys General.

24      Plaintiffs' counsel explicitly stated to OpenAI's counsel and the Court: "If OpenAI, Inc.'s

25  Board is prepared to preserve the charity's mission and stipulate to take the 'for sale' sign off its

26  assets by halting its conversion, Musk will withdraw the bid." Dkt. 117 at 2. The LOI directly

27  addressed a central issue in Plaintiffs' Preliminary Injunction Motion—OpenAI's unprecedented for-

28  profit conversion and insider self-dealing, Dkt. 46 at 15, 28, 31-32—and proposed a fair market

resolution that may have narrowed the scope of this litigation. Recognizing its litigation-related character, OpenAI immediately filed the LOI with this Court. Dkt. 116. Having treated the LOI as litigation-related when it believed it was advantageous to do so, OpenAI cannot now disavow its status. *MMM Holdings, Inc. v. Reich*, 21 Cal. App. 5th 167 (2018) (holding that conduct that is "'reasonably relevant' to pending or contemplated litigation [is] protected by the litigation privilege," even if otherwise alleged to be tortious).

*Third*, in many respects, what OpenAI's Counterclaims truly target is not the LOI itself, but rather the news coverage it generated and Plaintiffs' public responses to the media. Dkt. 147 ¶¶ 83-84. The litigation privilege prevents OpenAI from doing so, as it protects not only direct communications between litigants (the LOI), but also statements to the media, public, and business partners of OpenAI. *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1241 (2007) (A "'publication or broadcast' made as part of a 'judicial proceeding' is privileged. This privilege is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.'" (emphasis in original) (quoting *Silberg*, 50 Cal.3d at 216)); *Abraham v. Lancaster Cmty. Hosp.*, 217 Cal. App. 3d 796, 823 (1990) ("*If it be pertinent* [to litigation]*, the defendant's malice or bad faith does not affect the privileged character of the publication.*" (emphasis in original) (quoting *Gosewisch v. Doran*, 161 Cal. 511, 514 (1911)); *Apex.AI, Inc.*, 2024 WL 1117055, at *3-4 (letter to customers and business partners); *Better Meat Co.,* 2023 WL 2977786, at *5-6 (letter to lead investor); *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 612 F. Supp. 3d 1131 (S.D. Cal. 2020) (communications to parties with interest in litigation); *Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp. 2d 1033, 1040-41 (S.D. Cal. 2011) (same). OpenAI's alleged harms from media reports on matters of public interest, like the LOI and this litigation, implicates the category of speech most stringently protected by public policy across all jurisdictions. *See, e.g.*, *Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181, 1191 (C.D. Cal. 2011), *aff'd*, 462 F. App'x 709 (9th Cir. 2011) ("Under the public interest defense, 'no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'") (quoting *Hilton v. Hallmark Cards*, 599 F.3d 894, 912 (9th Cir. 2010).

1    Plaintiffs' communications with the media about the LOI are thus independently protected.

2    Moreover, OpenAI cannot in good faith object to media coverage that it deliberately magnified

3    through its CEO's headline-grabbing post on X (Altman: "no thank you but we will buy twitter for

4    $9.74 billion if you want."), nor can it transform protected communications with the press regarding

5    the LOI—one made in connection with issues in ongoing litigation—into a tort simply because the

6    resulting publicity allegedly inconvenienced its unlawful for-profit conversion to enrich Altman and

7    his cohorts. *Sepehry-Fard v. Dep't Stores Nat'l Bank*, No. 13-CV-3131 WHO, 2013 WL 6574774, at

8    *10 (N.D. Cal. Dec. 13, 2013) ("The privilege applies, 'regardless whether the communication was

9    made with [alleged] malice or the intent to harm.'" (quoting *Kashian,* 98 Cal. App. 4th at 913)).

10        **B.      The Litigation Privilege Bars Both of OpenAI's Counterclaims.**

11    Plaintiffs' LOI and communications with the Attorneys General and the media—which

12    constitute the sole predicates for OpenAI's Counterclaims—all possess a substantial litigation nexus

13    evidenced by, among other things, OpenAI filing with the Court (i) the LOI, Dkt. 116-1, and (ii) the

14    letter Plaintiffs' counsel sent to the Attorneys General requesting they open a bidding process to

15    achieve fair market value for OpenAI's assets, Dkt. 103-5. *See Neville*, 160 Cal. App. 4th at 1266 (a

16    privileged statement need only be "reasonably relevant" to litigation). The expansive privilege thus

17    bars OpenAI's Counterclaims for unfair competition under Cal. Bus. & Prof. Code § 17200 and

18    tortious interference with prospective economic advantage. *See Rubin*, 4 Cal. 4th at 1193-94 (holding

19    litigation privilege barred section 17200 claim); *Silberg*, 50 Cal. 3d at 215-16 (holding privilege

20    barred claim for intentional interference with prospective economic advantage). The Counterclaims

21    must therefore be dismissed with prejudice. *Next Vietnam Projects Found., Inc. v. Koster Films, LLC*,

22    751 F. Supp. 3d 1005, 1012 (C.D. Cal. 2024) (granting motion to dismiss based on litigation privilege

23    without leave to amend); *see also Microsoft Corp. v. M. Media*, No. 17-CV-0347 MWF, 2018 WL

24    5094969, at *7 (C.D. Cal. Mar. 13, 2018) (holding that because defendants' counterclaims are barred

25    by the litigation privilege, they "cannot possibly remedy their claims" by amendment).

26

27    ///

28    ///

CASE NO. 24-cv-04722-YGR
PLAINTIFFS' MOT. TO DISMISS

### III. OPENAI'S COUNTERCLAIMS EACH FAIL TO STATE A CLAIM AND ARE NOT PLED WITH THE REQUIRED PARTICULARITY

Even assuming, *arguendo*, that Plaintiffs' communications were protected by neither the First Amendment nor California's litigation privilege (they are protected by both), OpenAI's Counterclaims still fail to state a claim. Because they rest entirely on allegations of purportedly fraudulent conduct—a supposed "sham" LOI—the Counterclaims are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.[12] This exacting standard, not Rule 8's more lenient notice pleading, governs the analysis. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (holding that UCL claims "grounded in fraud" must satisfy Rule 9(b)'s particularity requirement); *In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1175 (N.D. Cal. 2019) (requiring UCL claims based on fraudulent conduct to be pled with particularity). This heightened standard applies regardless of whether a claim is expressly labeled "fraud." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) ("[If the] the claim is said to be 'grounded in fraud' or to 'sound in fraud,' [] the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."). OpenAI must therefore plead with specificity and "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson*, 889 F.3d at 964 (internal quotation marks omitted). Under this demanding standard, the Counterclaims fail as a matter of law.

If anything, the actual facts OpenAI alleges (as opposed to legal conclusions) support the LOI's legitimacy. OpenAI admits that: (1) the LOI was backed by credible investors with established track records of successfully completing high-value acquisitions, Dkt. 147 ¶ 83 (naming multiple

---

[12] Even without Rule 9(b)'s heightened pleading standard, OpenAI must still plead falsity with particularity because all the challenged conduct involves speech protected under the First Amendment and thus requires either strict scrutiny (communications with the Attorneys General and press) or intermediate scrutiny (the LOI, as protected commercial speech). *Vidillion, Inc. v. Pixalate, Inc.*, No. 18-CV-7270 DSF, 2019 WL 3308768, at *1 (C.D. Cal. June 5, 2019) ("'[W]here a plaintiff seeks damages or injunctive relief, or both, for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.'" (quoting *Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082-83 (9th Cir. 1976))).

1    reputable investor groups); (2) the LOI was communicated through formal legal channels via counsel,

2    *id.* ¶ 83, following standard practice for serious acquisition proposals; (3) the LOI coincided with

3    OpenAI's own plans to sell its assets to a for-profit company, rendering the LOI objectively timely,

4    *id.* ¶ 77; and (4) many of the named investors already had substantial investments in other Musk-led

5    ventures, demonstrating both the capacity and willingness to complete large transactions like this, *id.*

6    ¶ 87 ("The investors who backed the [LOI] are close confederates of Musk, some with large stakes in

7    Musk-founded companies including, Tesla, SpaceX, The Boring Company, X, and Neuralink.").

8    None of these alleged facts suggests anything but a legitimate LOI. OpenAI's resort to numerology,

9    *id.* ¶ 89, only highlights the glaring factual void at the heart of its "sham" theory.

10        **A.      OpenAI Fails to State a UCL Claim, and Certainly Not with Particularity.**

11        To state a claim under Cal. Bus. & Prof. Code § 17200, a plaintiff must allege facts showing

12   that the defendant engaged in an unlawful, unfair, or fraudulent business act or practice. *Cel-Tech*

13   *Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). OpenAI alleges that

14   Plaintiffs' conduct was both "unfair" and "fraudulent," Dkt. 147 ¶¶ 109-10, but fails to support either

15   theory with allegations that satisfy even basic plausibility standards, let alone the heightened

16   particularity Rule 9(b) and the First Amendment demand.

17            1.      *OpenAI Fails to Allege an "Unfair" Business Practice With Particularity.*

18        A business practice is "unfair" under the UCL only when it "threatens an incipient violation of

19   an antitrust law, or violates the policy or spirit of one of those laws . . . or otherwise significantly

20   threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. OpenAI's conclusory allegations

21   manifestly fail this standard. OpenAI merely claims that Plaintiffs' purported "sham bid" was unfair

22   because it was "intended to disrupt [OpenAI's] operations for the purpose of impairing [OpenAI's]

23   ability to raise funds and effectively compete in the nascent market to develop AI technologies." Dkt.

24   147 ¶ 109. Yet, even accepting OpenAI's conclusory characterization of the LOI as a "sham," these

25   threadbare allegations do not establish an incipient antitrust violation or any conduct that violates the

26   policy or spirit of antitrust law.

27        *First*, OpenAI fails to allege any facts suggesting Plaintiffs' conduct violated, or threatened to

28   violate, any specific antitrust law. The pleading contains no assertion, for example, that Plaintiffs

engaged in price-fixing, market allocation, or any other recognized antitrust violation. Nor does OpenAI allege facts establishing Plaintiffs' market power in any relevant market or demonstrating any actual anticompetitive effects flowing from the challenged conduct. These fundamental deficiencies are fatal to OpenAI's claim of an "unfair" business practice under controlling precedent. *See Cel-Tech*, 20 Cal. 4th at 187; *see also Korea Kumho Petrochemical v. Flexsys Am. LP*, No. 07-CV-1057 MJJ, 2007 WL 2318906, at *4-5 (N.D. Cal. Aug. 4, 2007) ("failure to plead a cognizable antitrust injury [] requires dismissal of [the] Section 17200 claim . . . [and] dismissal of the tortious interference [with prospective economic advantage] claim as well").

*Second*, absent any violation of the antitrust laws—incipient or otherwise—OpenAI's bare assertion that Plaintiffs intended to "disrupt" or "impair" its operations further fails to establish an unfair business practice under the "policy or spirit" analysis. "[W]here a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be tethered to specific constitutional, statutory or regulatory provisions." *In re Firearm Cases*, 126 Cal. App. 4th 959, 981 (2005). OpenAI has identified no "constitutional, statutory, or regulatory" provision to which it tethers its baseless claim, nor any facts demonstrating Plaintiffs' conduct violates established public policy.

To the contrary, Plaintiffs' communications with law enforcement regarding a process to ensure fair market value, and the LOI contemplating an acquisition at fair market value of assets the Altman-led Board intended to sell to Altman's for-profit enterprise, *further* public policy by seeking to protect a charity from unlawful conversion and self-dealing. That the LOI may have "complicated" OpenAI's unlawful plan by forcing an assessment of fair market value, in accordance with law, does not harm competition in the generative AI marketplace or constitute an "unfair" practice under section 17200. *Cel-Tech*, 20 Cal. 4th at 186 ("Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws."); *Procongps, Inc. v. Star Sensor LLC*, No. 11-CV-3975 SI, 2011 WL 5975271 (N.D. Cal. Nov. 29, 2011) (Loss of customers is insufficient to state a claim for unfair business practices because "[h]arm to a competitor is not the same as harm to competition[.]").

1    OpenAI itself initiated the process of selling its assets. Dkt. 147 ¶ 77. Plaintiffs requested of

2    the Attorneys General that members of the public should be able to participate fairly in that process,

3    and their LOI concretized that request. Indeed, far from constituting anticompetitive conduct, the

4    LOI's introduction of a competitive bidding process for OpenAI's assets—where previously no such

5    competition existed—represents *procompetitive*, not anticompetitive conduct. *Stevenson Real Estate*

6    *Servs., Inc. v. CB Richard Ellis Real Estate Servs., Inc.*, 138 Cal. App. 4th 1215 (2006) (finding unfair

7    business practice claim insufficiently pled because the challenged conduct was "competitive, not

8    anticompetitive").

9    The only "disruption" was to Altman's apparent strategy to sell OpenAI's charitable assets in

10   a self-dealing transaction to a for-profit corporation in which he, Brockman, and others would hold

11   substantial equity without independent or competitive valuation of such assets—the type of

12   anticompetitive conduct the antitrust laws seek to prevent. *See Cel-Tech*, 20 Cal. 4th at 186 (antitrust

13   laws protect "competition, not competitors").

14                2.    *OpenAI Fails to Allege a "Fraudulent" Business Practice With Particularity*.

15   A business practice is "fraudulent" under section 17200 if "members of the public are likely to

16   be deceived." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). To state such a claim, a plaintiff

17   must allege facts showing that the defendant's conduct was likely to deceive "reasonable consumers."

18   *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235 (2009).

19   OpenAI's allegations of fraud collapse under their own circular logic. It claims the alleged

20   "sham bid is a fraudulent business practice because the purpose of the bid was to deceive members of

21   the public that [Plaintiffs'] true intentions were to acquire [] OpenAI, Inc.'s assets for $97.375 billion,

22   rather than to disrupt [OpenAI's] operations. . . ." Dkt. 147 ¶ 110. In other words, OpenAI alleges the

23   bid was fraudulent because it was deceptive, and it was a deceptive because its intent was

24   fraudulent—this will not do. *Canatella v. Reverse Mortg. Sols. Inc.*, No. 13-CV-05937 YGR, 2014

25   WL 7205146, at *9 (N.D. Cal. Dec. 17, 2014) ("[T]he Court will not credit that bare and conclusory

26   allegation—particularly in light of Rule 9(b) pleading requirements.").

27   OpenAI generally claims the LOI has "deceive[d] members of the public" but pleads

28   no facts to support it. *See Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1304 (2011) (the test

"requires a plaintiff to show potential deception of consumers acting reasonably in the circumstances," not that the "least sophisticated consumer" or "the *unwary* consumer" would be deceived (emphasis in original)). In fact, OpenAI alleges that it immediately "recognized the bid as a feint[,]" Dkt. 147 ¶ 90, and that media reports "recogniz[ed] it as a sham," *id*. ¶ 85, pleading facts that squarely *contradict* its claim of consumer deception. If media coverage—the only way consumers would have learned about the LOI—characterized it as a "sham" (according to OpenAI), then it is hard to imagine how any reasonable consumer was deceived, severing the requisite causal link to OpenAI's alleged harm. *See Kwikset Corp. v. Super. Ct.,* 51 Cal. 4th 310, 326 (2011) ("[A] plaintiff must show that the misrepresentation [to consumers] was an immediate cause of the injury-producing conduct."); *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 855 (2008) (finding no UCL standing absent causal link to misrepresentation to consumer); *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1140 (2020) (whether consumers are likely to be deceived "may be resolved on demurrer if 'the facts alleged fail as a matter of law to show' that a 'reasonable consumer would be misled'" (quoting *Hill*, 195 Cal. App. 4th at 1301)). OpenAI effectively pleads itself out of court.

OpenAI further fails to identify any consumers who were deceived or to explain how they were deceived. These omissions are glaring given Rule 9(b)'s requirement to "identify the who, what, when, where, and how of the misconduct charged." *Davidson*, 889 F.3d at 964. The only one OpenAI claims was harmed is OpenAI itself—not consumers or the general public. Dkt. 147 ¶ 111. This fundamentally misconceives the UCL's purpose, which is to protect consumers, "not competitors." *Cel-Tec*h, 20 Cal. 4th at 180. Without these necessary elements pled with the requisite particularity, OpenAI has utterly failed to state a claim under the UCL's "fraudulent" prong.

### B.    OpenAI Fails to State a Claim for Tortious Interference with Prospective Economic Advantage.

OpenAI's claim for tortious interference with prospective economic advantage also fails as a matter of law because it does not adequately allege the required elements of the tort. To state a claim for this tort, a plaintiff must allege: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the

relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). Additionally, a plaintiff must allege that the defendant's conduct was "independently wrongful," meaning that it was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).

### 1.    *OpenAI Fails to Allege an Independently Wrongful Act*.

OpenAI's tortious interference claim fails to adequately allege that Plaintiffs engaged in conduct that was "independently wrongful." This requirement is essential to any claim for tortious interference with prospective economic advantage. *Korea Supply*, 29 Cal. 4th at 1158. Here, OpenAI's sole claim of independently wrongful conduct supporting tortious interference is that the alleged "sham bid" constituted "an unfair and fraudulent business practice in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200." Dkt. 147 ¶ 125. But because OpenAI has failed to establish a viable UCL claim—and is further barred from doing so by both the litigation privilege and First Amendment protections—its derivative tortious interference claim also necessarily fails as a matter of law and must be dismissed. *Korea Kumho Petrochemical v. Flexsys Am. LP*, 2007 WL 2318906, at *4-5 (N.D. Cal. Aug. 4, 2007) (noting that, when a UCL claim fails, a derivative tortious interference claim fails as well).

### 2.    *OpenAI Fails to Allege Disruption of a Specific Economic Relationship*.

OpenAI also fails to allege the disruption of any specific economic relationship. California courts have consistently held that a plaintiff must identify the specific economic relationships that were disrupted by the defendant's conduct. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996) (requiring the plaintiff to identify "an economic relationship" with a "*particular* third party as opposed to a prospective relationship with an unknown class of potential buyers or investors" (emphasis added)). Although OpenAI broadly claims that it maintained "economic relationships with (1) third-party investors, (2) employees, and (3) customers," Dkt. 147 ¶ 116, it identifies no causal link between Plaintiffs' conduct and disruption of any specific economic relationship. OpenAI's vague references to relationships with unidentified "investors," "employees," and "customers" plainly fail to meet even the ordinary pleading standard, and certainly fall short of

the heightened particularity requirements imposed by both the First Amendment and Rule 9(b). *Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1060 (C.D. Cal. 2014) (applying Rule 9(b)'s heightened pleading standard to state law claims brought in federal court); *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.,* 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013) (dismissing a tortious interference claim where the plaintiff failed to identify an economic relationship with "a specific third party" that was allegedly damaged).

3.    *OpenAI Fails to Allege Actual Disruption or Economic Harm*.

Finally, OpenAI fails to allege that any economic relationship was actually disrupted or that it suffered any economic harm as a result of Plaintiffs' LOI. The closest OpenAI comes is to allege in conclusory fashion that the LOI "could 'frighten[] potential investors,'" Dkt. 147 ¶ 96, and "may ultimately raise [OpenAI's] cost of capital," *id*. ¶ 121. But these speculative allegations of potential future harm are insufficient to establish "actual disruption" and "economic harm" sufficient to state a claim. *Korea Supply*, 29 Cal. 4th at 1153; *see also Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1311 (N.D. Cal. 1997) (requiring "the *probability* of future economic relationship[s]" rather than "overly speculative expectancies").

OpenAI's true complaint appears to be that Plaintiffs' LOI might have compelled it to comply with the law requiring fair market valuation and prohibiting self-dealing. Cal. Corp. Code § 5233. But "disruption" of unlawful conduct cannot, as a matter of law, constitute the "actual disruption" or "economic harm" required to support Defendants' counterclaim. *Korea Supply*, 29 Cal. 4th at 1153.

## IV.    OPENAI'S COUNTERCLAIMS SHOULD BE DISMISSED, OR ALTERNATIVELY STAYED UNTIL THE PHASE TWO TRIAL

OpenAI's Counterclaims should be dismissed for the foregoing reasons. But if they are not, Plaintiffs respectfully submit that they should be stayed until Phase Two of this case. *First*, OpenAI's Counterclaims fundamentally constitute competition-related claims already designated for Phase Two adjudication by this Court. Dkt. 144 (Hr. Trans. of 4/4/2025 at 8, lns. 6-9). The UCL claim explicitly alleges anticompetitive conduct, Dkt. 147 ¶¶ 107, 109, while the tortious interference claim derives entirely from the alleged UCL violation as its alleged "independent wrong," *id*. ¶ 125. These claims necessitate evidence, witnesses, and legal analyses regarding antitrust and UCL issues properly

reserved for Phase Two determination.

*Second*, consolidating these disparate matters would unnecessarily complicate Phase One proceedings, causing prejudicial delay to Plaintiffs' straightforward core claims ripe for adjudication. Indeed, OpenAI's discovery efforts to date are overwhelmingly directed towards third parties concerning its deflective Counterclaims, rather than addressing the more pressing public interest issues designated by the Court for Phase One resolution.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court dismiss both of OpenAI's Counterclaims with prejudice. In the alternative, if either or both Counterclaims survive, they should be stayed until Phase Two of this litigation.

DATED: May 7, 2025

Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

_____*/s/ Marc Toberoff*_____
Marc Toberoff

*Attorneys for Plaintiffs Elon Musk,*
*and X.AI Corp.*