Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ELON MUSK, an individual; X.AI CORP., a Nevada benefit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> SAMUEL ALTMAN, an individual; GREGORY BROCKMAN, an individual; OPENAI, INC., a Delaware corporation; OPENAI, L.P., a Delaware limited partnership; OPENAI, L.L.C., a Delaware limited liability company; OPENAI GP, L.L.C., a Delaware limited liability company; OPENAI OPCO, LLC, a Delaware limited liability company; OPENAI GLOBAL, LLC, a Delaware limited liability company; OAI CORPORATION, a Delaware corporation; OPENAI HOLDINGS, LLC, a Delaware limited liability company; OPENAI STARTUP FUND MANAGEMENT, LLC, a Delaware limited liability company; OPENAI STARTUP FUND GP I, L.L.C., a limited liability company; OPENAI STARTUP FUND I, L.P. a Delaware limited partnership; OPENAI STARTUP FUND SPV GP I, L.L.C., a Delaware limited liability company; | Case No. 4:24-cv-04722-YGR <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> 1. **BREACH OF EXPRESS CONTRACT** <br> 2. **BREACH OF IMPLIED-IN-FACT CONTRACT** <br> 3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br> 4. **BREACH OF QUASI-CONTRACT/ UNJUST ENRICHMENT** <br> 5. **TORTIOUS INTERFERENCE WITH CONTRACT** <br> 6. **CONSTRUCTIVE FRAUD** <br> 7. **FRAUD** <br> 8. **VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1** <br> 9. **VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2** <br> 10. **VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16720** <br> 11. **VIOLATIONS OF THE UNFAIR PRACTICES ACT, CAL. BUS. & PROF. CODE § 17043** <br> 12. **VIOLATIONS OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14** |

OPENAI STARTUP FUND SPV GP II,
L.L.C., a Delaware limited liability
company; OPENAI STARTUP FUND
SPV GP III, L.L.C., a Delaware limited
liability company; OPENAI STARTUP
FUND SPV GP IV, L.L.C., a Delaware
limited liability company; OPENAI
STARTUP FUND SPV I, L.P., a
Delaware limited partnership; OPENAI
STARTUP FUND SPV II, L.P., a
Delaware limited partnership; OPENAI
STARTUP FUND SPV III, L.P., a
Delaware limited partnership; OPENAI
STARTUP FUND SPV IV, L.P., a
Delaware limited partnership; AESTAS
MANAGEMENT COMPANY, LLC, a
Delaware limited liability company;
AESTAS, LLC, a Delaware limited
liability company; DEANNAH
TEMPLETON, an individual; REID
HOFFMAN, an individual;
MICROSOFT CORP., a Washington
corporation; and DOES 1-100,

                        Defendants.

13. **VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16727**

14. **VIOLATIONS OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18 ¶¶ 1 & 2**

15. **VIOLATIONS OF SECTION 8 OF THE CLAYTON ACT, 15 U.S.C. § 19**

16. **UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE §§ 17200 *et seq.***

17. **FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(B)**

18. **BREACH OF CHARITABLE TRUST**

19. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY TO MUSK**

20. **VIOLATIONS OF FEDERAL CIVIL RICO, 18 U.S.C. § 1962(C)**

21. **CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO, 18 U.S.C. § 1962(D)**

**DEMAND FOR JURY TRIAL**

Plaintiffs Elon Musk ("Musk") and X.AI Corp. ("xAI," and collectively, "Plaintiffs") for their Second Amended Complaint ("SAC")[1] against defendants Samuel Altman ("Altman"), Gregory Brockman ("Brockman"), OpenAI, Inc., OpenAI, L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, Aestas, LLC,[2] Deannah Templeton ("Templeton"), Reid Hoffman ("Hoffman"), and Microsoft Corp. ("Microsoft," and collectively, "Defendants"), allege as follows, incorporating by reference as though fully set forth herein each exhibit attached to the Declaration of Marc Toberoff, filed concurrently herewith:

## NATURE OF THE ACTION

1.      Never before has a corporation gone from tax-exempt charity to a $157 billion for-profit, market-paralyzing gorgon—and in just eight years. Never before has it happened,

---

[1] Pursuant to the Court's order, Dkt. 163 at 11, Plaintiffs have not, other than to conform grammar, update cross-references, and delete references to dismissed claims and parties, amended any aspect of the First Amended Complaint ("FAC") except the claims now numbered Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) and Counts XX-XXI (RICO and RICO Conspiracy). Plaintiffs reserve the right to conform the pleadings to the evidence, particularly as to factual developments after the filing of the FAC, prior to the Phase One trial or at the outset of Phase Two. Further, in removing those claims dismissed without leave to amend and their corresponding parties, Plaintiffs expressly rely on *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (en banc), which holds that such claims remain preserved without being re-pled. Finally, the FAC's structure would require extensive amendments to remaining causes of action if all supporting statements in Count I (Breach of Express Contract) were deleted. The SAC therefore retains this claim, which Plaintiffs acknowledge the Court dismissed without leave to amend.

[2] This SAC uses "OpenAI" to refer collectively to the non-profit or charity (OpenAI, Inc.) and all other OpenAI entities (which include Aestas Management Company, LLC and Aestas, LLC). It uses "Defendants" to refer to all OpenAI entities as well as Microsoft, but it excludes Deannah Templeton and Reid Hoffman except in Counts XV-XVI, as detailed in the respective captions of those counts.

because doing so violates almost every principle of law governing economic activity. It requires lying to donors, lying to members, lying to markets, lying to regulators, and lying to the public. No amount of clever drafting nor surfeit of creative dealmaking can obscure what is happening here. OpenAI, Inc., co-founded by Musk as an independent charity committed to safety and transparency—and nurtured in its infancy by Musk's money, advice, recruiting efforts and connections—is, at the direction of Altman, Brockman, and Microsoft, fast becoming a fully for-profit subsidiary of Microsoft. *See infra* ¶¶ 192-200.

2. Three events occasioned the filing of the FAC. *First*, the wholescale conversion of OpenAI, Inc. into a for-profit entity, which the original Complaint merely anticipated, *see* Dkt. No. 1 at 30, ¶ 146, is now in full swing. OpenAI and Microsoft have hired investment banks to negotiate Microsoft's enormous stake and set a hard two-year deadline to complete the conversion. *See infra* ¶ 193. *Second*, Microsoft and OpenAI, apparently unsatisfied with their monopoly, or near so, in generative artificial intelligence ("AI") are now actively trying to eliminate competitors, such as xAI, by extracting promises from investors not to fund them. *See infra* ¶ 199. *Third*, OpenAI's safety practices have devolved from shambolic at the time of the original Complaint to affirmatively harmful today, with droves of security researchers resigning in protest, or being forced out, and whole safety teams dissolved, all to make way for "security" personnel whose real job is to facilitate military contracting. *See infra* ¶¶ 73, 191.

3. Some aspects of Altman, Brockman, and OpenAI's promises to Musk and the public are matters of degree, but the intent and effect of OpenAI's actions to flout those promises are now unambiguous. No reasonable person could conclude OpenAI is proceeding in good faith as a charity committed to safety and transparency above profit, organized for public rather than private benefit, and working to avoid the undue concentration of powerful AI technology. Defendants have admitted as much by their commitments to investors to convert OpenAI to a fully for-profit enterprise.

4. As the original Complaint detailed, Altman, in concert with other Defendants, intentionally courted and deceived Musk, preying on Musk's humanitarian concern about the dangers posed by AI. *See infra* ¶ 73. The idea Altman sold Musk was that a non-profit, funded

and backed by Musk, would attract world-class scientists, conduct leading AI research and development, and, as a meaningful counterweight to Google's DeepMind in the race for Artificial General Intelligence ("AGI"), decentralize its technology by making it open source. *See infra* ¶¶ 76-84. Altman repeatedly assured Musk and regulators that the non-profit structure guaranteed neutrality and a focus on safety and openness for the benefit of humanity, not shareholder value or individual enrichment. *See infra* ¶¶ 84-88. But after Musk lent his name to the venture as its co-chairman, invested significant time, tens of millions of dollars in seed capital, and recruited top AI scientists for OpenAI, Inc., Musk and the non-profit's namesake objective were betrayed by Altman and his accomplices.

5.    These efforts by Altman and his cohorts to cash in and squeeze others out have their roots in OpenAI's partnership with Microsoft. Together, they established an opaque web of for-profit OpenAI affiliates, the only value of which came from looting OpenAI, Inc. of the intellectual property, employees, and relationships developed by exploiting Musk's name and contributions, the charity's tax status, and the goodwill generated by its supposed philanthropic commitment. *See infra* ¶¶ 111-30. The resulting OpenAI network, in which, on information and belief, Altman, Microsoft, and Brockman hold significant interests, was valued at the time of the original Complaint at an eye-popping $100 billion; in the merely three months since, it has been valued at a staggering $157 billion, making it the second most valuable start-up in American history.

6.    Throughout this process, Altman has engaged in rampant self-dealing, *see infra* ¶¶ 134-43, leveraged Microsoft's stranglehold on OpenAI's most important raw material (computing power) to seize control of its Board, *see infra* ¶¶ 110, 146-59, and joined with Microsoft in a de facto merger to pursue the kinds of anticompetitive conduct for which Microsoft is notorious. *See infra* ¶¶ 131, 145-46, 176, 199-200. Microsoft is now OpenAI, and OpenAI, Microsoft. *See infra* ¶¶ 145-70.

7.    The world has gotten wise to Defendants' scheme: there are several pending lawsuits against OpenAI over its unlawful practices; it is under investigation by Senators and multiple federal agencies (including the Securities and Exchange Commission ("SEC") and the

Federal Trade Commission ("FTC")), *see infra* ¶ 180; it is the subject of numerous consumer advocacy complaints to the Attorney General of California, *see infra* ¶ 181; and a recent spate of OpenAI executives and insiders have blown the whistle on Altman, exposing his unscrupulous maneuvering and self-dealing, while numerous departing AI-safety experts have sounded the alarm. *See infra* ¶¶ 183-90.

8.    As a result of their unlawful actions, Defendants have been unjustly enriched to the tune of hundreds of billions of dollars in value, while Musk has been conned along with the public.

9.    Musk brings this remedial action to divest Defendants of their ill-gotten gains and ensure OpenAI maintains its namesake mission to develop safe and open AI for the public good.

10.    xAI, a public benefit corporation founded by Musk to help accelerate scientific research via AI, brings this action to ensure that competition in the marketplace for generative AI remains healthy and that AI development proceeds in a safe and responsible manner for all stakeholders and society at large.

## **PARTIES**

11.    Plaintiff Elon Musk is an individual, citizen, and resident of Texas.

12.    Plaintiff X.AI Corp. is a public benefit corporation formed under the laws of Nevada with its principal place of business at 3180 18th Street, San Francisco, CA 94110.

13.    Plaintiffs are informed and believe and thereon allege that Defendant Samuel Altman is a citizen and resident of San Francisco, California.

14.    Plaintiffs are informed and believe and thereon allege that Defendant Gregory Brockman is a citizen and resident of San Francisco, California.

15.    Plaintiffs are informed and believe and thereon allege that Defendant Deannah Templeton is a citizen and resident of Washington.

16.    Plaintiffs are informed and believe and thereon allege that Defendant Reid Hoffman is a citizen and resident of Washington.

17.    Defendant OpenAI, Inc. is a registered non-profit organization incorporated

under the laws of Delaware on December 8, 2015. OpenAI, Inc. is registered as an out-of-state corporation with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

18.    Defendant OpenAI, L.P. is a limited partnership formed under the laws of Delaware on September 19, 2018, originally as SummerSafe, L.P. On information and belief, on January 23, 2023, OpenAI, L.P. was converted to Defendant OpenAI OpCo, LLC. OpenAI, L.P. is registered as an out-of-state limited partnership with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

19.    Defendant OpenAI, L.L.C. is a limited liability company formed in Delaware on September 17, 2020. OpenAI, L.L.C. maintains its principal place of business in California.

20.    Defendant OpenAI GP, L.L.C. is a limited liability company formed in Delaware on September 19, 2018. OpenAI GP, L.L.C. is registered as an out-of-state limited liability company registered with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

21.    Defendant OpenAI OpCo, LLC is a limited liability company formed in Delaware on September 19, 2018, as OpenAI, L.P., but was later converted on January 23, 2023, to OpenAI OpCo, LLC. OpenAI OpCo, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

22.    Defendant OpenAI Global, LLC is a limited liability company formed in Delaware on December 28, 2022. OpenAI Global, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

23.    Defendant OAI Corporation is a corporation formed in Delaware. OAI Corporation maintains its principal place of business in California.

24.    Defendant OpenAI Holdings, LLC is a limited liability company formed in Delaware on March 17, 2023. OpenAI Holdings, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business

at 1960 Bryant Street, San Francisco, CA 94110.

25.    Defendant OpenAI Startup Fund Management, LLC is a limited liability company formed in Delaware on July 16, 2021. OpenAI Startup Fund Management, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

26.    Defendant OpenAI Startup Fund GP I, L.L.C. is a limited liability company formed in Delaware on July 28, 2021. OpenAI Startup Fund GP I, L.L.C. is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

27.    Defendant OpenAI Startup Fund I, L.P. is a limited partnership formed in Delaware on July 28, 2021. OpenAI Startup Fund I, L.P. is registered as an out-of-state limited partnership with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

28.    Defendant OpenAI Startup Fund SPV GP I, L.L.C. is a limited liability company formed in Delaware on December 5, 2023. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP I, L.L.C. maintains its principal place of business in San Francisco, California.

29.    Defendant OpenAI Startup Fund SPV GP II, L.L.C. is a limited liability company formed in Delaware on April 4, 2024. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP II, L.L.C. maintains its principal place of business in San Francisco, California.

30.    Defendant OpenAI Startup Fund SPV GP III, L.L.C. is a limited liability company formed in Delaware on April 4, 2024. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP III, L.L.C. maintains its principal place of business in San Francisco, California.

31.    Defendant OpenAI Startup Fund SPV GP IV, L.L.C. is a limited liability company formed in Delaware on May 9, 2024. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP IV, L.L.C. maintains its principal place of business in

San Francisco, California.

32.     Defendant OpenAI Startup Fund SPV I, L.P. is a limited partnership formed in Delaware on December 5, 2023. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV I, L.P. maintains its principal place of business in San Francisco, California.

33.     Defendant OpenAI Startup Fund SPV II, L.P. is a limited partnership formed in Delaware on April 4, 2024. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV II, L.P. maintains its principal place of business in San Francisco, California.

34.     Defendant OpenAI Startup Fund SPV III, L.P. is a limited partnership formed in Delaware on April 4, 2024. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV III, L.P. maintains its principal place of business in San Francisco, California.

35.     Defendant OpenAI Startup Fund SPV IV, L.P. is a limited partnership formed in Delaware on May 9, 2024. Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV IV, L.P. maintains its principal place of business in San Francisco, California.

36.     Defendant Aestas Management Company, LLC, is a Delaware limited liability company formed in Delaware on February 10, 2023. Aestas Management Company, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

37.     Defendant Aestas, LLC is a limited liability company formed in Delaware on September 19, 2018. Aestas, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

38.     Defendant Microsoft Corp. is a corporation formed under the laws of Washington with its principal place of business at One Microsoft Way, Redmond, WA 98052.

39.     Plaintiffs are informed and believe and based thereon allege that the fictitiously named defendants captioned hereinabove as Does 1 through 100, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events,

transactions, and circumstances alleged herein. The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiffs, and Plaintiffs will amend this SAC to assert the true names and capacities of such fictitiously named defendants when they have been ascertained. For convenience, each reference herein to the named Defendants shall also refer to the Doe defendants and each of them.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

40.     This Court has subject matter jurisdiction under 15 U.S.C. § 4, 15 U.S.C § 1121, 18 U.S.C. § 1964, and 28 U.S.C. § 1331, because this is a civil case arising under the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*, the Clayton Act, 15 U.S.C. §§ 12 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1111 *et seq.*

41.     Further, Plaintiffs' state-law claim for unfair competition (Count XVI) arises under federal law for purposes of 28 U.S.C. § 1331 and necessarily raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities, in particular claims under the federal civil and criminal revenue, competition, copyright, and trademark laws.

42.      The Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367, because all claims form part of the same case or controversy under Article III of the United States Constitution.

43.     Jurisdiction over Samuel Altman is proper because he is domiciled in the State of California and this District, has continuous and systematic contacts with the State of California and this District, including contacts giving rise to the specific causes of action against him, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

44.     Jurisdiction over Gregory Brockman is proper because he is domiciled in the State of California and this District, has continuous and systematic contacts with the State of

California and this District, including contacts giving rise to the specific causes of action against him, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

45.     Jurisdiction over Deannah Templeton is proper because she has continuous and systematic contacts with the State of California and this District, including contacts giving rise to the specific causes of action against her, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

46.     Jurisdiction over Reid Hoffman is proper because he has continuous and systematic contacts with the State of California and this District, including contacts giving rise to the specific causes of action against him, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

47.     Jurisdiction over OpenAI, Inc. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

48.     Jurisdiction over OpenAI, L.P. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

49.     Jurisdiction over OpenAI, L.L.C. is proper because it has its principal place of business in the State of California, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District, where it transacts business and may be found.

50.     Jurisdiction over OpenAI GP, L.L.C. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

51.     Jurisdiction over OpenAI OpCo, LLC is proper because it has its principal place

of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

52.    Jurisdiction over OpenAI Global, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

53.    Jurisdiction over OAI Corporation is proper because it has its principal place of business in the State of California, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District, where it transacts business and may be found.

54.    Jurisdiction over OpenAI Holdings, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

55.    Jurisdiction over OpenAI Startup Fund Management, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

56.    Jurisdiction over OpenAI Startup Fund GP I, L.L.C. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

57.    Jurisdiction over OpenAI Startup Fund I, L.P. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

58.    Jurisdiction over OpenAI Startup Fund SPV GP I, L.L.C. is proper because it

has its principal place of business in the State of California and in this District, where it

transacts business and may be found, and because a substantial portion of the relevant acts

complained of herein occurred in the State of California and in this District.

59.     Jurisdiction over OpenAI Startup Fund SPV GP II, L.L.C. is proper because it

has its principal place of business in the State of California and in this District, where it

transacts business and may be found, and because a substantial portion of the relevant acts

complained of herein occurred in the State of California and in this District.

60.     Jurisdiction over OpenAI Startup Fund SPV GP III, L.L.C. is proper because it

has its principal place of business in the State of California and in this District, where it

transacts business and may be found, and because a substantial portion of the relevant acts

complained of herein occurred in the State of California and in this District.

61.     Jurisdiction over OpenAI Startup Fund SPV GP IV, L.L.C. is proper because it

has its principal place of business in the State of California and in this District, where it

transacts business and may be found, and because a substantial portion of the relevant acts

complained of herein occurred in the State of California and in this District.

62.     Jurisdiction over OpenAI Startup Fund SPV I, L.P. is proper because it has its

principal place of business in the State of California and in this District, where it transacts

business and may be found, and because a substantial portion of the relevant acts complained

of herein occurred in the State of California and in this District.

63.     Jurisdiction over OpenAI Startup Fund SPV II, L.P. is proper because it has its

principal place of business in the State of California and in this District, where it transacts

business and may be found, and because a substantial portion of the relevant acts complained

of herein occurred in the State of California and in this District.

64.     Jurisdiction over OpenAI Startup Fund SPV III, L.P. is proper because it has its

principal place of business in the State of California and in this District, where it transacts

business and may be found, and because a substantial portion of the relevant acts complained

of herein occurred in the State of California and in this District.

65.     Jurisdiction over OpenAI Startup Fund SPV IV, L.P. is proper because it has its

principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

66.     Jurisdiction over Aestas Management Company, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

67.     Jurisdiction over Aestas, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

68.     Jurisdiction over Microsoft Corp. is proper because it has continuous and systematic contacts with the State of California and this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

69.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action, is situated in this District.

70.     This action is properly assigned to the San Francisco Division of this District under Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, and a substantial part of the property that is the subject of the action is situated, in San Francisco County, which is served by the San Francisco Division.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.    *The Dangers of AI*

71.     Over the course of the 20th century, the United States gradually shifted from a primarily labor-based economy to a knowledge-based one, with economic value increasingly generated by human intelligence. As the century progressed, another paradigm shift was

already underway: value creation through AI.

72.    Starting in the late 2000s and early 2010s, an algorithm called "deep learning" was developed, the hallmark of which was that it no longer needed to be designed with significant knowledge of the task at hand because it could essentially "learn" from examples and program itself. As deep learning algorithms became increasingly sophisticated, some of the world's leading AI researchers set their sights on AGI. The basic concept of AGI is a general-purpose AI system, a machine having intelligence for a wide variety of tasks like a human.

73.    Musk has long been concerned by the grave threat these advanced systems pose to humanity, which he has repeatedly warned is likely the greatest existential threat we face today. These dangers include, without limitation (or exaggeration), completely replacing the human workforce, supercharging the spread of disinformation, malicious human impersonation, and the manipulation of political and military systems (which military-related contracting OpenAI is now reported to be pursuing aggressively), ultimately leading to the extinction of humanity. Musk's concerns have been shared by other leading figures including Stephen Hawking and 2024 physics Nobel laureate Geoffrey Hinton, who warned "this is not science fiction."[3]

74.    Musk has publicly called for a variety of measures to address the dangers of AI, from voluntary moratoria to regulation, but his calls have largely fallen on deaf ears or were drowned out by OpenAI's use of putative charitable assets to oppose safety regulation, such as its successful killing of California SB 1047 (the Safe and Secure Innovation for Frontier Artificial Intelligence Models Act).

75.    Where some like Musk see AGI as an existential threat,[4] others like Google—

---

[3] In the short-term, AI, even before reaching AGI, is leading to a proliferation in child sexual abuse material and revenge pornography, cyberattacks, the automation of cybercrime, and the development of weapons, all while accelerating the economic dislocation of knowledge workers.

[4] This is the reason Musk organized xAI as a public benefit corporation, which is required to report the results of an annual analysis of the company's social impact. Nev. Benefit Corp. Act, Nev. Rev. Stat. Ann. § 78B.020, -.40, -.60, -.80.

1    and as it would turn out, Defendants—see it as a source of even greater profit and power.

2        76.    At the end of 2013, Musk learned that Google was planning to acquire

3    DeepMind, which at the time was one of the most advanced AI companies in the industry.

4    Musk, who is well-known for his opposition to closed technology—e.g., Musk's rocket

5    company SpaceX holds almost no patents, and his electric vehicle company Tesla makes its

6    patents open and available for public use—was deeply troubled by this development. He

7    believed that such an important and potentially dangerous technology as AGI in the hands of a

8    giant, private and rapacious company like Google was a matter of grave concern.

9        77.    To prevent this, Musk tried to stop the sale of DeepMind but was ultimately

10   unsuccessful. In 2014, Google acquired DeepMind, and with its team, Google immediately

11   catapulted to the front of the race for AGI.

12       78.    Following Google's acquisition, Musk began hosting a series of dinner

13   discussions on ways to counter Google and promote AI safety. He even reached out to

14   President Barack Obama in 2015 to discuss his concerns. But regulation never came.

15       79.    Musk continued to advocate for safe AI practices and in 2015, he thought he

16   found someone who understood his apprehensions: Sam Altman.

17       **B.**    ***Altman Induces Musk to Back OpenAI, Inc.***

18       80.    From the start, Altman courted Musk by presenting himself as sharing Musk's

19   well-known concerns over the threat posed by AI/AGI. Altman, an experienced tech player,

20   feigned altruism to convince Musk to give him free start-up capital and, as importantly in a

21   marketplace where talent is scarce and connections and credibility are everything, to recruit top

22   AI scientists.

23       81.    Altman began by testing the waters. In early March 2015, he approached Musk

24   to help draft an open letter to the U.S. Government emphasizing the need for regulation to

25   ensure the safe creation of AI. Musk agreed, and the two began preparing the open letter and

26   approaching Musk's influential contacts in the technology and AI sectors about signing it.

27       82.    Sensing opportunity, Altman suggested to Musk on May 25, 2015 that they

28   endeavor to beat Google in the race to develop AGI. He wrote that he'd "[b]een thinking a lot

about whether it's possible to stop humanity from developing AI. I think the answer is almost definitely not. If it's going to happen, it seems like it would be good for someone other than Google to do it first." Declaration of Marc Toberoff, Ex. 1 at 1.[5] Altman proposed that they start an AI "Manhattan Project" and, to win Musk's backing, offered to "structure it so that the tech belongs to the world via some sort of nonprofit but the people working on it get startup-like compensation if it works. Obviously we'd comply with/aggressively support all regulation." *Id*. Still noncommittal, Musk merely responded: "Probably worth a conversation." *Id*.

83.    To convince Musk of his sincerity, Altman promised that he too would have skin in the game and would make meaningful financial contributions to the non-profit. It has since been revealed that Altman grossly inflated what his actual financial contributions would be, which paled in comparison to what he had promised.

84.    A month later, on June 24, 2015, Altman tried again, this time wooing Musk with a detailed proposal for a new AI lab: "The mission would be to create the first general AI [AGI] and use it for individual empowerment—ie, the distributed version of the future that seems the safest. More generally, safety should be a first-class requirement." Ex. 2 at 1. "The technology would be owned by the foundation and used 'for the good of the world[.]'" *Id*. OpenAI's "researchers would have significant financial upside but it would be uncorrelated to what they build, which should eliminate some of the conflict (we'll pay them a competitive salary and give them [Y Combinator] equity for the upside)." *Id*. This time Musk agreed. *Id*.

85.    Soon thereafter, Altman recruited Stripe's Chief Technology Officer ("CTO") Gregory Brockman, his long-time colleague, who helped him seal the deal.

86.    Altman's plan worked. In June 2015, Musk agreed to commit funding and help recruit the top scientists necessary to make Altman's project a success provided that, as promised, OpenAI, Inc. would be a non-profit devoted to developing AI/AGI responsibly by (i) distributing its research and technology openly, preventing its concentration, (ii) focusing on

---

[5] Subsequent "Ex." citations are to the Toberoff Declaration.

safety, not profits, and (iii) working to benefit the public and humanity rather than for private gain. Indeed, to celebrate what he was led to believe was their mission, Musk named the endeavor "OpenAI."

87.    On December 8, 2015, a Certificate of Incorporation for OpenAI, Inc. was filed with the Delaware Secretary of State that reaffirmed Altman and Brockman's promises to Musk:

> This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue law. **The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person. . . .** The property of this corporation is irrevocably dedicated to the[se] purposes **. . . and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person.**

Ex. 21 at 4 (emphasis added).[6]

88.    OpenAI, Inc. was publicly announced on December 11, 2015, and leveraged Musk's name by making him co-chair of its Board of Directors ("Board") alongside Altman, with Brockman as CTO. The promotional announcement published on OpenAI's website further touted: "OpenAI is a non-profit artificial intelligence research company [whose] goal is

---

[6] OpenAI's filing for charitable status with California was slightly more general, but taken together, these representations are unambiguous:

> OpenAI, Inc. ("OpenAI") is a nonprofit artificial intelligence ("AI") scientific research organization. **Its goal is to engage in research activities that advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return.** AI technology will help shape the 21st century, and **OpenAI wants to help the world build safe AI technology and ensure that AI's benefits are as widely and evenly distributed as possible.** To that end, OpenAI hopes to build AI as part of a larger community, and wants to openly share its plans and capabilities along the way.

Ex. 21 at 2 (emphases added).

to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact."

### C. *Musk's Crucial Contributions to OpenAI, Inc.*

89.    In an email to Altman and Brockman on the day of OpenAI, Inc.'s public announcement, Musk stated: "Our most important consideration is recruitment of the best people[,]" Ex. 6 at 1, and pledged that helping in this effort would be his "absolute top priority 24/7[,]" Ex. 5 at 1. He wrote: "We are outmanned and outgunned by a ridiculous margin by organizations you know well, but we have right on our side and that counts for a lot. I like the odds." Ex. 6 at 1.

90.    As Altman had devised, Musk proved to be a driving force in the founding of OpenAI, Inc. Musk, directly and through his company Musk Industries, LLC ("Musk Industries"), contributed the majority of OpenAI, Inc.'s funding in its first several years, covered rent and overhead, provided valuable advice and guidance on research directions, and most importantly, Musk donated his time, effort, and connections to recruit some of the world's leading scientists and engineers to work at the non-profit. In fact, recruiting for OpenAI, Inc. was a Herculean task in the face of relentless counter-recruiting by Google/DeepMind, which offered lavish compensation packages to squelch the new venture.

91.    But Musk persevered and proved instrumental in securing key talent, including Chief Scientist Dr. Ilya Sutskever ("Dr. Sutskever"), whom he hired away from Google, as well as top research scientists Tim Salimans, Filip Wolski, and others.

92.    Just as Altman planned, Musk used his connections, credibility, and clout to launch the venture. The mere fact OpenAI, Inc. was an "Elon Musk"-sponsored initiative and that Musk served as co-chair were key to its successful recruiting and financing efforts in the company's pivotal early years.

93.    Musk also brought the start-up capital to give OpenAI, Inc. a fighting chance. In late February 2016, he emailed Altman and Brockman: "Whatever it takes to bring on ace talent is fin[e] by me. Deepmind is causing me extreme mental stress. If they win, it will be

1    really bad news with their one mind to rule the world philosophy." Ex. 7 at 1.

2        94.    In fact, Musk was OpenAI, Inc.'s largest financial backer. In 2016, Musk

3    contributed over $15 million, and in 2017 he contributed nearly $20 million. Additionally,

4    through Musk Industries, he leased OpenAI, Inc.'s office space in the Pioneer Building in San

5    Francisco, paid its monthly overhead expenses, and even though he stepped down from the

6    Board and relinquished his status as member on February 21, 2018, he nevertheless continued

7    to make regular contributions to OpenAI, Inc. until September 14, 2020. All told, Musk

8    contributed more than $44 million in cash alone to OpenAI, Inc. in its first five critical years.

9        95.    It is fair to say that without Musk's involvement, backing, and substantial

10   supportive efforts, there would have been no OpenAI.

11       **D.    _Microsoft Gets Involved_**

12       96.    Even early on, Microsoft, which was working to develop its own AI, was keen

13   to exploit OpenAI, Inc. But as the non-profit had no shareholders and Microsoft could not

14   simply purchase influence, it obtained leverage in other ways by, for example, causing

15   OpenAI, Inc. to become inextricably dependent on Microsoft's cloud computing system

16   ("compute").

17       97.    In September 2016, Altman and Microsoft arranged for it to sell compute to

18   OpenAI, Inc. at a steep discount so long as the non-profit agreed to publicly promote

19   Microsoft's products. Ex. 10 at 3-5. Musk rejected the "donation" and marketing ploy, writing

20   to Altman: "This actually made me feel nauseous. It sucks and is exactly what I would expect

21   from them." _Id_. at 2. The deal eventually went through, but without marketing gimmicks and at

22   a more fulsome, but still below-market, price. _Id_. at 1.

23       98.    While Musk had expressed an affinity for Microsoft's CEO Satya Nadella

24   ("Nadella"), the values of Microsoft and OpenAI, Inc. did not align. Whereas Musk was

25   concerned that AI posed an existential danger to humankind and believed the technology

26   should be decentralized and open, Nadella and Microsoft's co-founder Bill Gates minimized

27   Musk's concerns as "panic" and too far off in the future.

28       99.    Musk wrote: "History unequivocally illustrates that a powerful technology is a

double-edged sword . . . The recent example of Microsoft's AI chatbot shows how quickly it can turn incredibly negative. The wise course of action is to approach the advent of AI with caution and ensure that its power is widely distributed and not controlled by any one company or person. **That is why we created OpenAI**." Ex. 9 at 1 (emphasis added).

### E.    *Defendants Try to Convert OpenAI, Inc. to a For-Profit*

100.    In 2017-2018, Altman and Brockman moved to recast the non-profit as a moneymaking endeavor to bring in shareholders, sell equity, and raise capital, and pressed Musk to agree. Ex. 12 at 1-2. Musk briefly toyed with the idea of using Tesla as OpenAI, Inc.'s "cash cow" to solve the non-profit's cash-flow concerns, while keeping it in good hands and maintaining its mission. Ex. 16 at 1-2.

101.    After some back and forth, Musk wrote to Altman and Brockman on September 20, 2017: "Either go do something on your own or continue with OpenAI as a non-profit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding to a start-up. Discussions are over." Ex. 13 at 4.

102.    Altman tried to play the whole thing off, reassuring Musk the next day: "[I] remain enthusiastic about the non-profit structure!" *id*. at 1, with Brockman soon following suit. Ex. 14 at 1. On September 22, 2017, Shivon Zilis, who had been working at OpenAI, Inc. since 2016, providing strategic guidance, e-mailed Musk that Altman had reassured her also that he was "Great with keeping [it a] non-profit and continuing to support it." Ex. 14 at 1.

### F.    *Defendants Do Secretly What They Failed to Do Openly*

103.    We now know Altman and Brockman's reaffirmation was a lie. In January 2018, mere months after their September 2017 "enthusias[m]," Altman proposed a scam-worthy "ICO," or initial coin offering, that would have seen OpenAI, Inc. sell its own cryptocurrency. Ex. 15 at 1. Musk shot down this idea too, stating "it would simply result in a massive loss of credibility for OpenAI and everyone associated with the ICO." Ex. 16 at 3.

104.    On information and belief, mere weeks after Musk stopped their *second* get-rich-quick scheme (the ICO), and no later than February 11, 2018, Altman and Brockman agreed among themselves to figure out a structure for an equity fundraise—in other words,

1   convert to a for-profit structure.

2      105.   On information and belief, this plan grew out of their discussions that had begun

3   in or around July 2017. Ex. 11 at 1 ("Coming up: Designing the for-profit structure").

4      106.   Notably, on March 25, 2018, barely a month after Musk stepped down from

5   OpenAI, Inc.'s Board, Altman proposed the selling of equity in an unusual "fixed maximum

6   return" structure, sufficiently developed to be actionable within four to six weeks. Ex. 18 at 1-2.

7      107.   It would ordinarily take months for such a billion-dollar proposal to reach this

8   advanced, concrete stage, and, on information and belief, for a novel mechanism like this,

9   preparations began no later than the summer of 2017. And, of course, a purported fixed

10  maximum return scheme is exactly what Defendants wound up confecting.

11     108.   This unusual structure, what Defendants call a "capped-profit company," is one

12  where investors can make a profit capped at a certain multiple of their investment. On

13  information and belief, Defendants intended to set the multiple at 100x.

14     109.   In early 2019, Altman finally succeeded in his multi-year effort to become

15  OpenAI, Inc.'s CEO.

16     110.   On information and belief, with its confederate Altman now in charge,

17  Microsoft extracted a July 22, 2019 agreement from OpenAI giving Microsoft the exclusive

18  right to supply OpenAI's single most important raw material, compute, without which OpenAI

19  would cease to exist. This agreement was extended in 2021 and again, on January 23, 2023.

20     111.   On information and belief, at Altman's urging and with Brockman's assistance,

21  Defendants began forming numerous for-profit entities, in which Altman, Brockman, and

22  Microsoft hold generous stakes, and weaving them into an increasingly labyrinthian OpenAI

23  corporate web for the purpose of profiting from OpenAI, Inc.'s assets.

24     112.   On March 6, 2019, Altman emailed Musk a draft of an announcement stating he

25  was forming a "new entity," OpenAI, L.P., as a capped-profit company, appointing himself as

26  CEO and Brockman as board chair. Ex. 19 at 1-4. The entity was not new, however. Altman

27  had caused its incorporation in Delaware on September 19, 2018.

28     113.   In response, and with evident displeasure, Musk demanded: "Please be explicit

that I have no financial interest in the for-profit arm of OpenAI." Ex. 20 at 1.

114.    On March 11, 2019, Altman and Brockman "launched" OpenAI, L.P. On January 23, 2023, OpenAI, L.P. was converted to OpenAI OpCo, LLC. After its conversion, it would be operated by OpenAI GP, L.L.C., which on September 19, 2018 was formed in Delaware.

115.    On September 17, 2020, OpenAI, L.L.C. was formed in Delaware. OpenAI, L.L.C.'s sole member is currently OpenAI Global, LLC.

116.    On December 28, 2022, OpenAI Global, LLC was formed in Delaware. On information and belief, OpenAI Global, LLC, like OpenAI, L.P., is a "capped" for-profit entity. OpenAI Global, LLC has two members: Microsoft and OAI Corporation.

117.    On information and belief, OpenAI Global, LLC, like OpenAI OpCo, LLC, is managed by OpenAI GP, L.L.C.

118.    On March 17, 2023, OAI Corporation was formed in Delaware as a corporation. Prior to September 2023, Defendant OAI Corporation was OAI Corporation, LLC, a limited liability company formed in Delaware with its principal place of business in California. The sole owner of OAI Corporation is OpenAI Holdings, LLC.

119.    On March 17, 2023, OpenAI Holdings, LLC was formed in Delaware, and has multiple members, including Aestas, LLC and various individuals.

120.    On February 10, 2023, Aestas Management Company, LLC was formed as a limited liability company in Delaware and is also managed by OpenAI GP, L.L.C.

121.    On information and belief, the other entities—OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P. (collectively, with those entities named in paragraphs 114-20, *supra*, the "For-Profit Entities")—are also interwoven into Defendants' corporate web for the purpose of profiting from the non-profit OpenAI, Inc.'s assets. Many of these entities were only

recently registered and indeed, more OpenAI entities are popping up almost every month as part of Defendants' shell game.

122.     The complex and largely opaque profiteering arm of OpenAI—in which, on information and belief, Microsoft, Altman, and Brockman are significant shareholders—while publicly cloaked as a mere fundraising apparatus, is in reality, the foundation for Defendants' scheme to control and cash in on OpenAI, Inc.'s technology.

123.     We know, for example, that Microsoft owns a significant stake in OpenAI Global, LLC, which in turn is an owner of OpenAI, L.L.C. and OpenAI OpCo, LLC, Dkt. No. 18 at 1, ¶¶ 2-3, 5—the entity to which OpenAI, Inc.'s proprietary intellectual property was diverted. We also know that Altman named himself as the manager of OpenAI Startup Fund I, L.P., which raised $175,250,000.00 and in which, once again, Microsoft holds a significant ownership interest, Dkt. No. 18 at 2, ¶ 10.

124.     But because OpenAI, Inc. has intentionally chosen entity configurations that, by and large, do not require public disclosures, contrary to its commitments to transparency and its role as a publicly supervised charity, the true extent of Altman, Brockman, and Microsoft's conflicted dealings is unknown.

125.     What is clear is that Altman's repeated public proclamations to own no "equity" in these entities, is, as with so many of his statements, grossly and intentionally misleading because, on information and belief, he (or an entity owned or controlled by him) does.

**G.     *Defendants Use Their For-Profit Entities to Loot OpenAI, Inc.***

126.     As with many things, the issue here is one of degree. While there is little concern with using a for-profit entity to help fundraise for a non-profit, it is quite another thing to launch a dense fleet of dozens of for-profit entities to loot the non-profit of its only valuable assets (intellectual property and employees) and facilitate veiled and unchecked profiteering, rife with conflicts, as Defendants have done.

127.     To facilitate their profiteering, Defendants locked down and began withholding the non-profit's technology and scientific research.

128.     Defendants also transferred most of OpenAI, Inc.'s intellectual property to

OpenAI, L.P. in 2019 and 2020. Ex. 22 at 2; Ex. 23 at 2. Since then, such transfers have continued apace with, for example, the issuance of patents and trademarks to OpenAI OpCo, LLC, which is listed on the U.S. Patent and Trademark Office website as the owner of most of OpenAI's registered intellectual property.

129.    Indeed, just *follow the money*. OpenAI, Inc.'s 2022 IRS tax return showed a mere $44,485 in revenue,[7] but one year later, OpenAI overall reportedly generated *$1.6 billion* in revenue.

130.    Defendants also drained the non-profit OpenAI, Inc. of most of its staff and transferred them over to the new private, for-profit company (now OpenAI OpCo, LLC), which also presently houses much of OpenAI's research and development. This strategic move conveniently shields Defendants from the public oversight and financial disclosures non-profits like OpenAI, Inc. must make.

131.    From there, on information and belief, beginning September 22, 2020, Altman caused the non-profit to exclusively license its technology to Microsoft, the world's then-largest for-profit corporation, diverging from Altman and OpenAI, Inc.'s promises to Musk and the non-profit's black-letter commitments—e.g., OpenAI, Inc.'s Certificate of Incorporation: "no part of the net income or assets of this corporation shall ever inure to the benefit of . . . any private person," Ex. 21 at 4; and Charter: "We commit to . . . avoid enabling uses of AI or AGI that . . . unduly concentrate power[,]" Ex. 17 at 1.

132.    The Microsoft license is expansive and includes all OpenAI, Inc.'s "pre-AGI" technologies, and tasks the Board with determining when "AGI" has been attained. To date, the Board has made no such finding, thus giving Microsoft unfettered access to OpenAI's suite of technology.

133.    In addition, Altman, with the assistance and/or cooperation of Brockman and the For-Profit Entities, began to self-deal with impunity. On information and belief, while

---

[7] Notably, 2022 was the last year Defendants made such documents readily available to the public, yet another curious decision for a putative non-profit.

serving on OpenAI, Inc.'s Board, Altman deliberately withheld key information and lied about his personal holdings and investments both in and outside of OpenAI to keep the Board from discovering his glaring conflicts of interest.

134.    For example, on information and belief, Altman controls OpenAI Startup Fund I, L.P., and stands to personally profit from its association with OpenAI.

135.    In May 2024, Altman is reported to have induced OpenAI to strike a deal with Reddit wherein OpenAI would pay to license Reddit's content to train ChatGPT. On information and belief, Altman and/or entities he controls own a whopping 7.6% of Reddit, making him one of its largest outside shareholders. After the deal was announced, Reddit's stock shot up 10%, boosting Altman's stake by $69 million. On October 29, 2024, Reddit finally posted its first profit as a public company due in large part to the revenue generated by its licensing deal with OpenAI, causing the company's stock price to skyrocket more than 40% the following day.

136.    By contrast, Altman and OpenAI made no such deal to use data from content providers such as *The New York Times* or the *Chicago Tribune*, in which Altman had no ownership, and which are now suing OpenAI for copyright infringement.

137.    On information and belief, in 2019, Altman caused OpenAI to sign a $51 million AI chip deal with Rain AI, a company in which he held a significant interest.

138.    On information and belief, in 2020 Altman invested in the hardware company Humane, which plans to power its devices using OpenAI's software. Holding companies controlled by Altman own 15% of Humane's equity—a greater amount than each of the company's founders.

139.    On information and belief, Altman invested in yet another hardware company, Limitless, which also plans to power its devices using OpenAI's software. The timing of this investment is not yet known.

140.    On information and belief, no later than March 15, 2023, OpenAI selected Stripe, in which Altman and Brockman have significant ownership interests, as its commercial partner to process payments as OpenAI moved to monetize its technology.

141.    On information and belief, no later than September 2023, Altman and former Apple chief design officer, Jony Ive, made plans to launch their own AI device company to exploit OpenAI's technology to compete with Apple's iPhone.

142.    On information and belief, OpenAI is hammering out a deal with Helion Energy (in which Altman owns a massive stake) for OpenAI to buy vast quantities of electricity to power its data centers. And in May 2023, Altman's ally Microsoft enriched him by striking such a deal with Helion Energy.

143.    On information and belief, Altman, Brockman, Microsoft, and the For-Profit Entities have been and will continue to be enriched by their respective stake in OpenAI's for-profit machine. Altman alone stands to make billions from the non-profit Musk co-founded and invested considerable money, time, recruiting efforts, and goodwill in furtherance of its stated mission.

144.    Altman's scheme has now become clear: lure Musk with phony philanthropy; exploit his money, stature, and contacts to secure world-class AI scientists to develop leading technology; then feed the non-profit's lucrative assets into an opaque profit engine and proceed to cash in as OpenAI and Microsoft monopolize the generative AI market.

145.    On information and belief, Microsoft, acting in lockstep with the other Defendants, stands to make hundreds of billions from its methodical infiltration of, and increasing leverage over, the non-profit, its technology, and employees, to the point that Microsoft now exercises effective control over OpenAI—a de facto merger in terms of Microsoft's accumulation of assets, equity, and dominance over OpenAI.

### H.    *Microsoft Demonstrates Its Dominance and Control After OpenAI, Inc.'s Board Shows Independence*

146.    Microsoft demonstrated its dominance in a series of extraordinary developments culminating on November 22, 2023. Microsoft and Altman leveraged their positions to force all but one member of OpenAI, Inc.'s Board to resign and replaced them with underqualified and compliant allies handpicked by Altman and blessed by Microsoft.

147.    Before this coup, the Board consisted of Chief Scientist Dr. Sutskever,

Brockman, Altman, Helen Toner ("Toner"), Adam D'Angelo ("D'Angelo"), and Tasha McCauley ("McCauley"). In addition to serving on the Board, Toner is a researcher and advisor for the Center for the Governance of AI ("GovAI") and the Director of Strategy at Georgetown's Center for Security and Emerging Technology. McCauley is a Senior Management Scientist at RAND Corporation, a non-profit which specializes in public policy decision making. Like Toner, McCauley is also an advisor for GovAI.

148.    The choice to include on the Board multiple academics and public policy experts with deep AI policy experience, most of whom had no financial stake in OpenAI, was deliberate. This composition of financially disinterested Board members with strong records of public service ensured that the Board would put the non-profit's principles of openness and safety before financial success—which it did.

149.    On November 17, 2023, OpenAI, Inc.'s Board dismissed Altman as CEO and from the Board, announcing he was fired following "a deliberative review process by the board, which concluded that he was not consistently candid in his communications with the board, hindering its ability to exercise its responsibilities. The board no longer has confidence in his ability to continue leading OpenAI." Brockman was also dismissed from the Board, but not as OpenAI, Inc.'s CTO, though he resigned in solidarity with Altman shortly thereafter.

150.    It has been reported that the Board fired Altman because he had deliberately misrepresented what was happening at OpenAI, Inc. and explicitly lied to the Board to obstruct its ability to carry out its oversight duties. The Board was likewise concerned by Altman's numerous side hustles and conflicts of interest and his purposeful withholding of information necessary for the Board to evaluate the scope and extent of his self-dealing and myriad conflicts.

151.    News reports further suggest Altman's firing was due in part to OpenAI, Inc.'s breakthroughs in AGI and Altman's prioritizing profit over safety and the non-profit's founding principles.

152.    On information and belief, when Microsoft's CEO Nadella learned of Altman's firing, he was furious. As perhaps the largest shareholder in OpenAI's for-profit arm, Nadella felt Microsoft should have been consulted before the decision was made.

153.    On information and belief, aside from Altman and Brockman, OpenAI, Inc.'s then-constituted Board had no ties to Microsoft. Rather, Altman was the primary liaison between Microsoft and OpenAI, Inc., and with him gone, Microsoft's continued exclusive license of the non-profit's evolving technology (i.e., AGI) was in jeopardy.

154.    Microsoft's response was swift. Nadella hired Altman and Brockman to lead a new Microsoft AI research lab, unbound by the constraints of OpenAI, Inc.'s humanitarian mission, and the three actively solicited OpenAI's employees to leave and join Microsoft's new lab. On information and belief, Altman and Brockman became senior employees of Microsoft.

155.    Microsoft was nevertheless confident that, whatever happened, it could still capitalize on OpenAI, Inc.'s research and technology. Indeed, during an interview shortly after Altman's firing, Nadella stated:

> We have all the IP rights and all the capability. If OpenAI disappeared tomorrow, I don't want any customer of ours to be worried about it quite honestly, because we have all of the rights to continue the innovation. Not just to serve the product, but we can go and just do what we were doing in partnership ourselves. We have the people, we have the compute, we have the data, we have everything.

156.    Despite Microsoft's bold statements, it apparently still wanted its man Altman on the inside as OpenAI, Inc.'s CEO. In the days following his firing, OpenAI, Inc.'s Board faced mounting pressure from Microsoft to reinstate Altman. Nadella even bragged about Microsoft's influence over the non-profit: "We are in there. We are below them, above them, around them."

157.    Microsoft indeed had leverage. On information and belief, at the time of Altman's ouster, Microsoft had paid only a fraction of the $13 billion commitment it had made to OpenAI. And if Microsoft were to withhold its compute on which OpenAI was reliant, it would be effectively incapacitated.

158.    The pressure on the Board from Altman, Brockman, and Microsoft continued until November 21, 2023, when Altman was reinstated as CEO after his dismissal, and Brockman as CTO. The coup took Defendants just four days.

159.    Upon his return, Altman and Microsoft demanded the resignation of Toner,

McCauley, and Dr. Sutskever from the Board, taking the opportunity to clean house and purge those who ousted Altman, as Nadella had vowed: "We'll definitely take care of all of the governance issues and anything else . . . we have all the rights, so therefore we will make sure that we are very, very clear that the governance gets fixed[.]" Notably, D'Angelo—the sole Board member to remain after Altman's reinstatement—is a tech CEO and entrepreneur.

160.    In fact, the 2023 Board that dismissed Altman, consisting, on information and belief, of only Altman, Dr. Sutskever, D'Angelo, and the two AI governance experts, Toner and McCauley (Brockman was reportedly absent from the Board meeting), was the first Board since 2018 not adversely dominated by interests aligned with Altman and Brockman.

161.    The 2022 Board consisted of Dr. Sutskever, Brockman, and Altman (both CEO and President), as directors simultaneously working full time at OpenAI; and Will Hurd ("Hurd") (of Allen & Company, a major investment bank catering to technology companies), Reid Hoffman (general partner at tech venture capital firm Greylock Partners ("Greylock"), a member of Microsoft's Board since March 2017, and a co-founder of the generative AI company Inflection AI, Inc. ("Inflection")[8]), and D'Angelo, as directors aligned with Brockman and Altman's interests as technology entrepreneurs; and Zilis, Toner, and McCauley, as the only truly independent directors.

162.    The 2021 Board was no better: Altman, as President again, Brockman, Hoffman, D'Angelo, Hurd, Zilis, McCauley, Toner, and a charity CEO, Holden Karnofsky ("Karnofsky"), whose enterprises are primarily dependent on funding from tech entrepreneurs, in place of Dr. Sutskever. Even counting Karnofsky with the independents,[9] they were still in the minority, and Altman and Brockman represented 100% of the directors working at OpenAI full time.

---

[8] Notwithstanding his obvious conflicts, Hoffman was reportedly reluctant to step down from OpenAI, Inc.'s Board when he resigned in or about March 2023.

[9] This is generous to Karnofsky, given that, when he resigned, he cited as a potential conflict that his wife, Daniela Amodei, and her brother, Dario Amodei (both ex-OpenAI employees) were co-founding Anthropic, now the largest direct competitor to OpenAI/Microsoft's monopoly.

1    163.    The 2020 Board had seven members: Altman as President, Brockman, Hoffman,

2    D'Angelo, Zilis, McCauley, and Karnofsky. Again, even counting Karnofsky with Zilis and

3    McCauley, the breakdown still has independents in the minority, with Altman and Brockman as

4    the only full-time working directors.

5    164.    The 2019 Board was even worse, with Sue Yoon, a former venture capitalist

6    now at Google, serving in what would become Zilis' spot on the Board.

7    165.    On information and belief, to avoid replicating the 2023 independent Board

8    setup that led to Altman's ouster, upon Altman's reinstatement, he handpicked a new Board that

9    lacked the technical expertise and substantial background in AI governance, which the

10    previous Board had by design. The new members were reportedly "big fans of Altman."

11    166.    Microsoft also obtained an influential non-voting director seat on the Board

12    from which it could keep a close eye on its non-profit golden goose. Though on July 9, 2024,

13    Microsoft relinquished its seat amid scrutiny and pressure from antitrust agencies in the U.S.

14    and Europe suspicious of its all-too-cozy relationship with OpenAI, there is no un-ringing this

15    bell.

16    167.    The same pertains to Hoffman's highly conflicted simultaneous service as a

17    member of the boards of OpenAI, Inc., Microsoft, and Inflection. Notwithstanding their glaring

18    conflicts, by virtue of their Board service, Microsoft and Hoffman had open access to *all*

19    internal OpenAI, Inc. materials as a matter of right under its Bylaws. Ex. 21 at 12.

20    168.    On information and belief, OpenAI, Inc.'s present Board is now dominated by

21    directors with interests conflicted and adverse to those of OpenAI, Inc., Plaintiffs, and the

22    public.

23    169.    With the reinstatement of Altman and the restructuring of OpenAI, Inc.'s Board,

24    the once carefully crafted non-profit structure Musk agreed to is now thoroughly compromised

25    by a fully profit-driven CEO (Altman) and sometimes-President (Brockman), a compliant

26    Board with inferior technical expertise and almost no AI-governance experience, and a trillion-

27    dollar pro-profit partner (Microsoft).

28    170.    The loss of the Board's technical expertise in AI, neutrality, and commitment to

OpenAI, Inc.'s non-profit purposes are particularly compromising as it is the Board that determines whether OpenAI has attained AGI, which, as detailed above, OpenAI had previously excluded from its license to Microsoft. Given Microsoft and OpenAI's de facto merger and enormous financial interest in the continued exploitation of the non-profit's technology, OpenAI, Inc.'s newly captured, conflicted, and compliant Board will have every reason to delay ever making a finding that OpenAI has attained AGI. The Microsoft-OpenAI for-profit leviathan may now operate fully unchecked.

### I.    *Altman Reneges in 2023 on His Repeated Promises to Musk, Regulators, and the Public to Open Source the Non-Profit's Technology*

171.    In its early years, OpenAI, Inc.'s research and development were performed in the open—as required by Musk's donations and OpenAI, Inc.'s filings with Delaware and California—providing the public with free access to the non-profit's designs, models, and code.

172.    For example, in June 2018, when OpenAI, Inc. researchers discovered that an algorithm called "Transformers" could perform natural language tasks without any explicit training, entire communities from open-source, grass-roots groups to commercial endeavors sprung up to enhance and extend OpenAI, Inc.'s models—the intended benefit of making the non-profit's research open source.

173.    In 2019, OpenAI released the full, open version of a second-generation Generative Pre-Trained Transformer ("GPT"), GPT-2 with the stated hope that it would "be useful to developers of future powerful models." It also released a detailed report describing the new model and acknowledged some of the many benefits of openly releasing such models to the public.

174.    In 2020, OpenAI, Inc. announced a third version of its model, GPT-3, and again, published a research paper detailing its complete implementation for others to build on.

175.    OpenAI, Inc.'s initial findings, while technologically interesting, had little commercial value and were openly published by Altman. But, as we now know, once OpenAI reached the threshold of commercially viable AI, Altman about-faced and began locking down

the non-profit's technology for personal gain.

176.    It is also no coincidence that OpenAI veered away from open-sourcing its models after it began exclusively licensing its technology to Microsoft.

177.    On March 14, 2023, OpenAI, Inc. released its most advanced model to date, GPT-4, which many including Microsoft celebrated as "a form of general intelligence." Microsoft's scientists stated that, given GPT-4's advanced capabilities, "we believe [it] could reasonably be viewed as an early (yet still incomplete) version of an artificial general intelligence (AGI) system." Defendants, however, publicly released no report or code regarding GPT-4, preventing the public from building on the non-profit's AI advancements as Musk had been promised.

178.    Defendants have kept GPT-4, and subsequent models including without limitation, GPT-4T, GPT-4o (released May 2024), and OpenAI o1 (released September 2024), entirely closed. On information and belief, the internal details of these models are known only to Defendants. The reason for the secrecy is obvious: OpenAI and Microsoft stand to make a fortune from exclusive control over the non-profit's technology and selling its applications to the public, which would not be possible if the non-profit made its research and technology freely available, as Altman had repeatedly promised Musk, regulators and the public.

**J.    _OpenAI Today_**

179.    Defendants' unbridled power and profit focus have led to a recent flurry of safety and legal concerns and forceful pushback against OpenAI and Altman for abandoning their non-profit mission.

180.    Along with pending civil litigation from media outlets like _The New York Times_ and the _Chicago Tribune_ concerning OpenAI's illegal use of their content to train GPT models, the takeover of the Board and Microsoft's increasingly close relationship with OpenAI have sparked numerous ongoing investigations by the SEC, FTC, and various U.K. and E.U. regulators. On July 22, August 1, and August 8, 2024, Senators sent Altman demand letters seeking documents and questioning OpenAI's commercial practices, commitment to safety, Altman's self-dealing, and illegal attempts to muzzle employee-whistleblowers.

181.    Further, in a series of letters dated January 9, March 5, June 6, and September 30, 2024, to the California Attorney General, the prominent consumer advocacy organization Public Citizen detailed numerous issues concerning Altman's self-dealing, the troublesome power OpenAI's for-profit arm is wielding over the non-profit, and the recent move to convert OpenAI, Inc. to a fully for-profit company, urging the Attorney General to investigate OpenAI, Inc.'s tax-exempt status.

182.    OpenAI has also continuously hemorrhaged employees and executives. On information and belief, the resignations largely appear to be in protest of Altman and OpenAI's increasingly unfettered and conflicted pursuit of profits at the expense of safety.

183.    For instance, in May 2024, Chief Scientist Dr. Sutskever and OpenAI, Inc. executive Jan Leike resigned. The two had led OpenAI, Inc.'s "Superalignment" team tasked with managing the risk that its technology "could lead to the disempowerment of humanity or even human extinction." Leike stated he could no longer work at the company because he was concerned that safety and societal impact "have taken a backseat to shiny products."

184.    Such shiny products include, for example, OpenAI's Whisper, an audio transcription system which OpenAI released knowing it tended to fabricate even highly important information (e.g., once released, Whisper fabricated medical records). Releasing products with alarming defects like this can be lethal and is not something a true safety-conscious non-profit with no pressure to generate revenue would rush to do.

185.    Other employees, including Daniel Kokotajlo resigned because they "lost trust in OpenAI leadership and their ability to responsibly handle AGI." In an interview with Vox on May 18, 2024, Kokotajlo stated: "I joined with substantial hope that OpenAI would rise to the occasion and behave more responsibly as they got closer to achieving AGI. It slowly became clear to many of us that this would not happen." That same article reported numerous other departures: "at least seven people [] tried to push OpenAI to greater safety from within, but ultimately lost so much faith in its charismatic leader [Altman] that their position became untenable."

186.    Carroll Wainwright, a former alignment researcher for OpenAI, also resigned in

May 2024: "I worry that the board will not be able to effectively control the for-profit subsidiary, and I worry that the for-profit subsidiary will not be able to effectively prioritize the mission when the incentive to maximize profits is so strong."

187.    In June 2024, one month after leaving OpenAI, Dr. Sutskever launched Safe Superintelligence, Inc., whose mission is, pointedly, to focus on the development of safe AI.

188.    On August 5, 2024, John Schulman, with OpenAI since the beginning, quit to work at the safety-focused AI startup, Anthropic, and to "deepen [his] focus on AI alignment[.]"

189.    On September 25, 2024, OpenAI's CTO Mira Murati, who served as interim CEO during Altman's firing, abruptly left the company, along with Chief Research Officer Bob McGrew and the Head of Post-Training, Barret Zoph.

190.    On October 23, 2024, Miles Brundage, a policy researcher at OpenAI and senior adviser on OpenAI's AGI Readiness team resigned, stating: "In short, neither OpenAI nor any other frontier lab is ready" for AGI. His announcement also revealed the disbanding of OpenAI's AGI Readiness Team. And just last week, Lilian Weng, OpenAI's VP of Research and Safety, announced her resignation after seven years at the company.

191.    In January 2024, notwithstanding Altman's promise to Musk that "safety should be a first-class requirement" Ex. 2 at 1, OpenAI dropped a clause from its Usage Policies banning the use of its technology for "activity that has a high risk of physical harm" such as "weapons development" or "military and warfare." On October 25, 2024, OpenAI reportedly secured its first contract with a combat division of the Department of Defense.

192.    A June 15, 2024 article in *Cointelegraph* entitled "OpenAI Reportedly Considering Shift to For-profit as CEO Stacks Board" detailed how Altman "told shareholders he was considering the [for-profit] move sometime during the week of June 10. If realized, the pivot would ostensibly result in OpenAI's nonprofit board losing control of the company." Altman is now fast-tracking his plan to turn the non-profit Musk co-founded into the for-profit business Altman had always envisaged.

193.    Since the filing of the original Complaint, this transformation has only

accelerated, with OpenAI and Microsoft hiring investment banks to negotiate their deal and a two-year deadline to complete OpenAI's for-profit conversion.

194.    The most recent reporting on those plans by the *Wall Street Journal* reveals that Microsoft has a right to 75% of OpenAI's profits after the first $194 million until reaching $17.3 billion. Then Microsoft's share will drop to 49% until it receives 100 times its original investment, or *profits* (not revenue) of $1.4 *trillion*. It has also been reported this "100 times investment" cap is merely "theoretical," as the "cap" is subject to increase 20% annually beginning in 2025.[10]



195.    On information and belief, OpenAI has raised a total of $21.9 billion in its funding rounds. Even if *all* of the For-Profit Entities are capped—something far from certain— OpenAI would need to generate $2.2 *trillion* in *profits* (not just revenues) before this for-profit scheme would begin funneling anything more than a nominal 2% back to the charity.

196.    This profit cap will not be reached anytime soon. On information and belief, the entire worldwide market—the total value of the AI sector, not just profits—is presently $214.6

---

[10] Notably, this *Wall Street Journal* article appears to be based on OpenAI and Microsoft's projections—"Source: company documents"—and is therefore likely the most favorable possible presentation of this information.

billion. Public projections suggest AI's worldwide market value—again, not profits but total market value—will be just $1.3 trillion in 2030. Given these numbers, which are for all AI products and services, not just generative AI, the idea that a single generative AI company can make $2.2 trillion in *profits* over even the medium-term is implausible.

197.    If one considers that some of the For-Profit Entities might not be capped, and that any cap may begin rising by 20% per year in 2025, then Defendants' scheme moves from an implausible way to compensate OpenAI, Inc. for its value to an impossible one.

198.    As massive profits come into view, OpenAI and Microsoft's anticompetitive practices have intensified. For instance, on information and belief OpenAI has attempted to starve competitors of AI talent by aggressively recruiting employees with offers of lavish compensation, and is on track to spend $1.5 billion on personnel for just 1,500 employees.

199.    Further, during OpenAI's latest funding round in early October 2024, on information and belief, Altman, in concert with and at the urging of other Defendants, conditioned investors' ability to participate in the heavily oversubscribed offering on their agreeing *not* to invest in OpenAI's competitors, specifically calling out xAI. As reported in the *Financial Times* on October 3, 2024:

> OpenAI has asked investors to avoid backing rival start-ups such as Anthropic and Elon Musk's xAI, as it secures $6.6bn in new funding and seeks to shut out challengers to its early lead in generative artificial intelligence. . . . During the negotiations, the company made clear that it expected an exclusive funding arrangement, according to three people with knowledge of the discussions.
>
> Seeking exclusive relationships with investors restricts rivals' access to capital and strategic partnerships. . . . OpenAI can command unusual terms and an outsized valuation because investors believe the company could dominate the next wave of AI innovation, which they argue will be as significant a shift in consumer behaviour as the internet or mobile.
>
> "Because the round was so oversubscribed, OpenAI said to people: 'We'll give you allocation but we want you to be involved in a meaningful way in the business so you can't commit to our competitors,'" according to one person with knowledge of the deal.

Ex. 25 at 1.

200.    More tell-tale signs of OpenAI's de facto merger with Microsoft have also begun to surface. In February 2023, Microsoft began making co-working space available for

OpenAI employees in San Francisco. And recently, OpenAI has opened an outpost close to Microsoft's Washington headquarters, facilitating the ongoing merry-go-round of senior executives and engineers shuffling between the two companies.

**K.**  **_The Market for AI_**

201.  The relevant geographic market for OpenAI and Microsoft's conduct at issue is worldwide (excluding countries such as the People's Republic of China that substantially restrict international internet access).

202.  The relevant product market for antitrust purposes is that of generative AI models and platforms. Governments, businesses, and individual users employ generative AI to, without limitation, solve complex problems that would otherwise require human reasoning; to generate informational and media content; and to automate a large and diverse number of processes using the same platform, such as, by way of example, writing computer code for vastly different purposes.

203.  Not all AI is generative AI. For example, there are narrow AI systems trained for specific tasks, traditional machine learning models, and rule-based automation systems.

204.  What characterizes generative AI is its ability to process natural language inputs and generate human-like outputs across multiple domains, while being adaptable to specific applications and providing a platform for independent developers to generate specialized models. Generative AI can write a short story in the style of Shirley Jackson, describe different theories on boiling an egg perfectly, script a Python application to calculate the radius of a circle, and suggest the perfect itinerary for your Roman holiday, all in the same platform, using the same interface, by a person with no more training than required to ask a question.

205.  Examples of flagship products in the relevant market are ChatGPT (OpenAI), Copilot (Microsoft), Gemini (Google, and what became of DeepMind), Claude (Anthropic), LLaMA (Meta), Mistral (Mistral AI), Grok (xAI), and Perplexity (Perplexity). These products are sometimes called "chatbots."

206.  The generative AI market exhibits pronounced network effects, i.e., when people use the product, it increases in value, attracting more users, and so on. As developers

create specialized applications through a platform-specific application programming interface, the platform becomes more useful, further attracting users. Generative AI platforms also learn from user interactions to further train and refine their systems. More users means better generative AI, which again leads to more users.

207.    As a consequence, separate and apart from the tremendous expense involved in purchasing, programming, and powering generative AI hardware and training a model using personnel from a very limited talent pool, there are significant barriers to entry by new market participants.

208.    Because of the non-profit's substantial lead in producing generative AI, the but-for and proximate causes of which are Musk's recruitment, financial, and other contributions, OpenAI is estimated to have reached 100 million monthly active users for ChatGPT just two months after launch, making it the fastest-growing consumer application in history.

209.    On information and belief, by November 2023, two million developers were already using OpenAI's platform, including more than 92% of Fortune 500 companies.

210.    The result is that, aside from OpenAI and Microsoft, few other generative AI developers are producing much software revenue.

211.    Even some of the best-known AI developers, such as Anthropic, face questions about their future profit margins, given the costly nature of developing the software.

212.    In March 2024, Inflection, the well-funded and highly valued generative AI developer that Hoffman had co-founded (and served as a director of while serving on the Boards of both OpenAI and Microsoft), was reported to "g[i]ve up its ambition to compete with OpenAI" and most of its founders and employees moved to Microsoft in an unusually structured deal.[11]

---

[11] Regulators in the U.K. classified Microsoft's acquisition of Inflection as a merger, despite Microsoft's efforts to evade such designation by structuring the deal as a mere acquisition of assets and personnel, a tactic similarly deployed by Defendants in the relationships between OpenAI, Inc., the For-Profit Entities, and Microsoft. Prior to the merger, Inflection, incorporated February 3, 2022, was in the business of providing generative AI, in particular a chatbot called "Pi," in direct competition with xAI's Grok, OpenAI's ChatGPT, and Microsoft's Copilot.

213.     Cohere, founded in 2019 by the legendary Aidan Gomez, who was only twenty years old when he wrote the paper that inspired OpenAI, has struggled to secure funding recently, even without trying to go head-to-head with OpenAI/Microsoft in consumer generative AI.

214.     On information and belief, as of the end of 2023, the last full year for which data is available, OpenAI and Microsoft held approximately 69% of the worldwide market share for generative AI, while the next largest competitor, Amazon Web Services ("AWS"), held only 8%:



215.     As of the end of 2023, the last full year for which data is available, Microsoft was reported to hold approximately 24% of the worldwide market for OpenAI's most important raw material, compute, putting it in second place behind AWS (31%) and ahead of Google (11%). Together, these top three market participants (Microsoft, AWS, and Google)

control 66% of the world's supply of compute.[12]

216.    On information and belief, in 2017, OpenAI spent $7.9 million on compute. On information and belief, in the twelve months preceding Microsoft's 2019 investment of $1 billion in OpenAI, it spent less than $1 million on all Microsoft products and services combined, including compute, notwithstanding OpenAI's ever-increasing compute usage, which reportedly doubles every five months.

217.    In the two-and-a-half years after Microsoft's 2019 investment, on information and belief OpenAI's *total* spending on all Microsoft products and services combined was less than $230,000.

218.    Generating compute is a hugely expensive undertaking. In addition to buying and maintaining the tens of thousands of computer processors that Microsoft sells and/or rents to customers such as OpenAI, Microsoft must pay highly-skilled personnel to design and operate the data centers housing its processors, as well as incur significant real estate and energy expenses in operating them, sometimes consuming more power than an entire city.

219.    It is apparent from OpenAI's incredibly small expenditures on this valuable commodity that Microsoft is charging OpenAI far less than it costs to produce it, and in any event, vastly less than Microsoft charges other, similarly situated buyers. Selling compute through Microsoft's Azure platform generated $62 billion in revenues as of the close of its June 2024 fiscal year, and OpenAI is one of Azure's largest users.

220.    Creating generative AI is a hugely expensive undertaking. In addition to extremely expensive scientific personnel, drawn from a very limited pool, lawful generative AI incurs significant costs in licensing material for training models, as well as to complete the training itself. OpenAI is projected to spend $8.5 billion on just personnel and generative AI training this year alone. Yet OpenAI charges Microsoft and the public considerably less for its generative AI products than they cost to produce. The economics are obvious from the fact

---

[12] Security and other practical considerations largely limit U.S. enterprises that consume compute, such as OpenAI, to U.S. providers, which means in practice, Microsoft, AWS, and Google in fact control much more than 66% of the compute available to OpenAI.

OpenAI is on track to lose $5 billion this year and losses are expected to soar to $14 billion per year by 2026.

221.    Microsoft also charges the public considerably less for its generative AI than it costs to produce.

222.    OpenAI charges $20 per month for its "ChatGPT Plus" plan. When Microsoft launched its "Copilot Pro" plan less than a year later, it also charged $20 per month for almost mirror-image benefits. Little wonder, then, that when Google launched its subscription product, Gemini Advanced, the month after Microsoft, it had to charge $19.99 per month. There is no reason to believe prices should have synchronized so quickly despite wildly different cost structures for putatively different products.

223.    With U.S. and European antitrust regulators drawing nearer, Microsoft's Form 10-K for the fiscal year ending June 30, 2024 listed OpenAI as a "competitor" for the very first time. Although Microsoft is spending billions investing in other AI companies, the same filing lists only a single "strategic partner": OpenAI.

224.    xAI's Grok competes directly with OpenAI's ChatGPT and Microsoft's Copilot in the generative AI market. xAI also competes directly with OpenAI to acquire compute from suppliers such as Microsoft, and xAI and OpenAI compete directly for the same investors.

225.    xAI has been harmed by, without limitation: investors declining to invest in xAI because of the exclusivity agreement Defendants extracted during OpenAI's most recent funding round; an inability to license OpenAI technology given Microsoft's exclusive license thereto; an inability to obtain compute from Microsoft on terms anywhere near as favorable as OpenAI receives, requiring xAI to invest tremendous sums to develop its own infrastructure to produce compute; difficulty recruiting scientists and other technically skilled employees, whom Defendants have locked down to prevent competitive hiring; and the exclusive exchange between OpenAI and Microsoft of competitively sensitive information, such as customer lists, pricing data, and research, resulting in an unlawful competitive advantage.

## COMMON STANDING ALLEGATIONS

226.    Defendants have no meaningful relationship with Delaware, whose laws apply only insofar as they concern the legality of OpenAI, Inc.'s Certificate of Incorporation and/or Bylaws.

227.    In all other respects, California law governs. Indeed, under the Attorney General of California's interpretation of Cal. Corp. Code § 6910 as evidenced in practice, foreign non-profit corporations doing business in California, like OpenAI, Inc., are subject to California law.

228.    Though OpenAI, Inc.'s Certificate of Incorporation states, contrary to Delaware law applicable to charities, "[t]he corporation shall not have any members," Ex. 21 at 5, its Bylaws expressly provide for membership and do not provide another means for electing directors or otherwise exercising ultimate control over the corporation. Ex. 21 at 8-10.

229.    By virtue of Article II, § 1 of OpenAI, Inc.'s Bylaws, Musk was a member of OpenAI, Inc. from its founding until his resignation on February 21, 2018.

230.    Article III, § 1 of OpenAI, Inc.'s Bylaws expressly grants the persons defined to be members, such as Musk, "the right to vote": "for the election of a director or directors"; "on a disposition of all or substantially all of the assets of [the] corporation"; "on a merger or on a dissolution"; and "on changes to the articles or bylaws." *Id.* § 1(a), (c)-(f).

231.    Musk was thus not only a member of OpenAI, Inc. pursuant to the express language designating directors as members in the Bylaws, but also by virtue of his powers recited therein.

232.    Musk was therefore a member at the time of the transactions, in whole or in part, of which he complains. He is no longer a member for reasons related to his attempts to address the harms to OpenAI, Inc., including without limitation, those alleged herein.

233.    Adverse domination of OpenAI, Inc.'s Board during all periods except that from July 13, 2023 (upon the resignation of Hurd), through November 21, 2023 (upon Altman's return), as detailed in paragraphs 159-70, *supra*, excuses Musk from attempting to secure remedial action from the Board.

234.    As the settlor of a charitable trust and/or by virtue of the Contract detailed in

1  paragraph 247, *infra*, Musk has standing to enforce compliance with the conditions of his

2  donations.

3      235.    As a co-founder, early director, and critical donor, among other roles, Musk has

4  a special interest in OpenAI's operation.

5      236.    Musk has delivered to OpenAI, Inc. and its Board a true copy of the SAC by

6  providing it to counsel for OpenAI, Inc., prior to this filing.

7                   **COMMON OPERATIONS ALLEGATIONS**

8      237.    Except as otherwise specified herein, OpenAI, Inc. and the For-Profit Entities

9  operate together as a unitary enterprise, the primary purpose of which is now for-profit.

10  OpenAI, Altman, Brockman, and Microsoft have become alter egos of one another.

11  Defendants' corporate veils should be pierced and their separate forms should now be

12  disregarded because on information and belief, a single shareholder controls other entities (e.g.,

13  OpenAI, Inc. controls OpenAI OpCo, LLC, OpenAI GP, L.L.C., OpenAI, L.L.C., etc.) and

14  because Defendants, some of which are undercapitalized, have commingled funds and/or assets

15  (e.g., the intellectual property OpenAI, Inc. transferred to the For-Profit Entities), failed to

16  respect corporate formalities, and have and continue to use the For-Profit Entities as shells to

17  conduct illegal activities and/or to conceal or misrepresent the identity of their responsible

18  ownership and respective business activities. Failing to ignore Defendants' corporate forms

19  would produce an inequitable result.

20      238.    Except as otherwise specified herein, the unitary enterprise of OpenAI, or in the

21  alternative the individual entities comprising it, have engaged in a de facto merger with one

22  another and Microsoft. On information and belief, following the asset transfers structured to

23  avoid merger review, there exists a continuity of ownership; an effective cessation of business

24  by many of the OpenAI entities, including OpenAI, Inc. itself (which had only $44,485 in

25  revenue in 2022); sharing of officers, directors, and stockholders between OpenAI, Inc., the

26  For-Profit Entities, and/or Microsoft; a continuity of operations; and use of OpenAI, Inc.'s

27  assets, including its name. No adequate consideration has been given for OpenAI, Inc.'s assets

28  and made available to meet the claims of its unsecured creditors.

239.     Defendants have intentionally concealed their wrongful conduct, which prevented Plaintiffs from discovering their scheme, notwithstanding Plaintiffs' exercise of due diligence.

240.     xAI, Microsoft, and OpenAI (both the non-profit and the For-Profit Entities) are engaged in interstate and foreign commerce, and all of their complained-of actions are occurring in commerce and/or are activities affecting commerce. These parties' goods, commodities, and/or services are sold, leased, used, consumed, and/or resold, and/or contracts for their lease, sale, use, consumption, or resale occur throughout the United States, including in California.

## COMMON ANTITRUST ALLEGATIONS

241.     OpenAI alone, Microsoft alone, and/or OpenAI in combination with Microsoft, have market power in generative AI. Microsoft has market power in compute.

242.     As a direct and intended result of Defendants' conduct, Musk and xAI have been injured by, without limitation, higher prices for compute, lower prices for their generative AI products, fewer opportunities to compete in selling their generative AI goods, reduced ability to attract and retain the highly skilled personnel critical to success in this market, and reduced access to capital markets, all leading to reduced choices among consumers.

243.     Although each of Defendants' acts is anticompetitive in its own right, the interrelated and interdependent actions giving rise to the claims in this SAC have had a cumulative and synergistic effect that has harmed Musk and xAI, competition, the competitive process, and consumers.

244.     The cumulative actions of Defendants are either per se illegal, or their obvious and likely anticompetitive effects require only a "quick look" rule-of-reason inquiry.

245.     Defendants' exclusionary acts lack a pro-competitive justification sufficient to offset the significant harms caused by their anticompetitive and unlawful conduct.

## COUNT I: BREACH OF EXPRESS CONTRACT
### (Musk Against Altman and OpenAI, Inc.)

246.     Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through

245 inclusive, as though fully set forth herein.

247.    Without limitation, the following agreement to do or not do a thing, as evidenced in a series of writings beginning in 2015, were made by Musk, on the one hand, and Altman and OpenAI, Inc., on the other, in consideration for Musk's donations, leasing of OpenAI, Inc.'s office space, and payment of overhead, and Musk's time, skill, advice, stature, and connections in organizing and operating OpenAI, Inc., particularly its recruitment of persons with the technical expertise necessary to such operations, and constitute the valid, enforceable, and binding contract (the "Contract"), as modified, between them with the following terms:

a.    OpenAI, Inc. "shall be a [section 501(c)(3)] nonprofit," Ex. 21 at 4, and all of its AI/AGI "technology would be owned by the foundation," Ex. 2 at 1;

b.    The technology would be used "for the good of the world," Ex. 2 at 1, and in the way "most likely to benefit humanity as a whole," Ex. 4 at 1, rather than "for the private gain of any person," Ex. 21 at 4;

c.    OpenAI, Inc. "is a nonprofit," *id*. at 2, and, as such, no "property," "net income," or "assets" of the non-profit would "ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person," *id*. at 4;

d.    OpenAI, Inc. would operate "unconstrained by a need to generate financial return," *id*. at 2;

e.    The goal of OpenAI, Inc. is to "ensure that AI's benefits are as widely and evenly distributed as possible," *id*. at 2, avoiding "undu[e] concentrat[ions] [of] power," Ex. 17 at 1;

f.    Accordingly, OpenAI "will seek to open source technology for the public benefit," Ex. 21 at 4, and "openly share its plans and capabilities along the way," *id*. at 2, except where its technology can be "dangerous," Ex. 8 at 1, causing genuine "safety and security concerns," Ex. 17 at 2;

g.    "[S]afety should be a first-class requirement" of the non-profit's research and development of AI, Ex. 2 at 1;

h.    OpenAI, Inc.'s "researchers would have significant financial upside but it would be uncorrelated to what they build, which should eliminate some of the conflict (we'll pay them a competitive salary and give them [Y Combinator] equity for the upside)," *id.* at 1;

i.    OpenAI, Inc. would "always assiduously act to minimize conflicts of interest among our employees and stakeholders that could compromise" the non-profit's mission, Ex. 17 at 1;

j.    Effective no later than September 22, 2017, Altman "made a firm commitment" to "continue with OpenAI as a nonprofit," in exchange for Musk continuing to "fund OpenAI," Ex. 13 at 1, 4;

k.    Any for-profit entity used to support OpenAI, Inc., if subsequently agreed to by the parties (which agreement never materialized), would have a "fixed maximum return" structure, Ex. 18 at 1, and be organized "in a way all investors are clear that they should never expect a profit," Ex. 19 at 1.

248.    Without limitation, assent to these terms in exchange for the consideration alleged above was manifested in writing by phrases such as "agree on all," Ex. 2 at 1, and "ok," Ex. 14 at 1, as well as the parties' conduct, such as OpenAI, Inc.'s receipt and acceptance of Musk's promised donations, time, skill, and connections, all while OpenAI, Inc. and Altman repeatedly continued to make substantially similar representations and reassurances to Musk, regulators, and the public.

249.    Musk fulfilled all his obligations and has performed and/or complied with all terms and conditions of this agreement that he was required to perform and/or comply with, except those which were waived and/or excused, or the non-performance of which was justified, and is in no matter or respect in breach of said agreement, as detailed above.

250.    Altman and OpenAI, Inc. have breached their Contract with Musk by, without limitation:

a.    Causing less than all of OpenAI, Inc.'s technology to be owned by OpenAI, Inc. by, for example, assigning OpenAI, Inc.'s intellectual property to the For-Profit Entities and/or Microsoft, in violation of the Contract term set forth in paragraph 247(a), *supra*;

b.  Operating OpenAI, Inc. for the private gain of Altman, Brockman, the For-Profit Entities, and Microsoft by, for example, allowing each to reap significant financial benefits from commercial activities and self-dealing, in violation of the Contract terms set forth in paragraph 247(a)-(c), *supra*;

c.  Operating OpenAI, Inc. in a manner such that the property, net income, or assets of OpenAI, Inc. inured to the benefit of directors, officers, members, and/or any private person, in particular Altman, Brockman, the For-Profit Entities, and Microsoft by, for example, allowing each to reap significant financial benefits from OpenAI, Inc.'s commercial activities and/or from self-dealing, in violation of the Contract terms set forth in paragraph 247(a)-(c), *supra*;

d.  Operating OpenAI, Inc. in a manner such that it is not unconstrained by a need to generate financial return by, for example, indebting OpenAI, Inc. to persons with a profit motive, such as Microsoft and investors in the For-Profit Entities, in violation of the Contract term set forth in paragraph 247(d), *supra*;

e.  Failing to ensure AI's benefits are widely distributed by causing and/or allowing an undue concentration of power of AI in OpenAI, Microsoft, and/or OpenAI and Microsoft in combination, such as by licensing and/or furnishing OpenAI, Inc.'s GPT-4, OpenAI o1, and related technology exclusively to Microsoft, and providing Microsoft leverage over OpenAI through its exclusive right to supply compute, in violation of the Contract term set forth in paragraph 247(e), *supra*;

f.  Failing to open source and/or otherwise publicly disclose OpenAI's research and development by, for example, withholding details on GPT-4, GPT-4T, GPT-4o, and OpenAI o1's architecture, hardware, training method, and training computation, in violation of the Contract term set forth in paragraph 247(f), *supra*;

g.  Additionally, and in the alternative, to the extent a safety or security concern justifies such withholding of OpenAI's research and development, OpenAI's rushed development of such dangerous and unsafe technology, *see infra* ¶¶ 383-88, in violation of the requirement to develop AI in the way "most likely to benefit humanity as a whole" with safety

as a "first-class requirement," violated the Contract terms set forth in paragraph 247(b) and (g), *supra*;

h.    Failing to ensure safety is a first-class requirement by, for example, releasing products that are being used by state actors and cybercriminals to cause harm, as well as products, including but not limited to Whisper, unfit for their intended purpose, posing a danger to the public, in violation of the Contract terms set forth in paragraph 247(b) and (g), *supra*;

i.    Providing OpenAI's research and development personnel with compensation in the form of equity, units, or other things of value in the For-Profit Entities, and thereby failing to ensure that the compensation of OpenAI's personnel is uncorrelated to the market success of its products and services, in violation of the Contract term set forth in paragraph 247(h), *supra*;

j.    Flagrantly failing to "assiduously act to minimize conflicts of interest among [OpenAI's] employees and stakeholders that could compromise broad benefit" by, for example, engaging in self-dealing, interlocking directorates, the provision of equity, units, or other things of value to such employees and stakeholders, in violation of the Contract term set forth in paragraph 247(i), *supra*;

k.    Closing off OpenAI, Inc.'s technology for profit and erecting a "paywall" excluding the public from open usage of GPT-4, OpenAI o1, and related technology, to advance Defendants' own private commercial interests, in violation of the Contract terms set forth in paragraph 247(b)-(f) and (i)-(j), *supra*;

l.    Currently working to convert the non-profit into a fully for-profit commercial entity without making it clear to investors that they should never expect a profit and/or without the use of a reasonable fixed maximum return structure, in violation of the Contract terms set forth in paragraph 247(j) and (k), *supra*; and/or

m.    Failing to observe all legal duties incumbent upon Defendants, as detailed in paragraph 374(a)-(i), *infra*, the observation of which is an implicit condition of any lawful agreement.

251.    Defendants' obligations to perform were not waived nor were their breaches and/or failures to perform justified and/or excused.

252.    As a direct and proximate result of Altman and OpenAI, Inc.'s conduct, acts, and/or omissions, Defendants have deprived Musk of the benefit of the parties' agreement and have caused Musk to suffer damages, including but not limited to the financial contributions he made to OpenAI, Inc., the loss of the time and resources Musk expended to direct research and recruit talent, and damage to his reputation, along with all benefit-of-the-bargain and consequential damages, in an amount to be adjudicated and determined at trial, including prejudgment interest, costs, and fees.

253.    Musk has no adequate remedy at law for many of the injuries he suffered and continues to suffer as a result of Defendants' breaches and failures, and such injuries cannot reasonably, adequately, or precisely be measured or compensated in damages. Thus, Musk also seeks and is entitled to specific performance of Defendants' contractual obligations.

## COUNT II: BREACH OF IMPLIED-IN-FACT CONTRACT

### (In the alternative to Count I)
### (Musk Against Altman and OpenAI, Inc.)

254.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 253 inclusive, as though fully set forth herein.

255.    The relationship, surrounding circumstances, and intentional course of conduct between Musk, on the one hand, and Altman and OpenAI, Inc., on the other, resulted in a valid, enforceable, and binding implied-in-fact contract.

256.    Altman proposed that he and Musk co-found an AI research non-profit that Altman promised would make its findings open source for the good of all and would avoid concentrating its technology for the profit of any person or company. Musk assented and in turn agreed to use his time, name, and extensive connections to recruit premier scientific talent, attract investment, and made significant financial contributions to establish the non-profit.

257.    Subsequently, Altman, individually and/or on behalf of OpenAI, Inc., continued to reaffirm, both publicly and to Musk directly, that OpenAI, Inc., as a non-profit, would

develop and openly share AI technology for the good of the public and not for private commercial gain. Such reaffirmations by Altman and/or OpenAI, Inc. were made, without limitation, in OpenAI, Inc.'s Certificate of Incorporation, the non-profit's Charter (circulated to Musk), numerous OpenAI online announcements, and countless communications to Musk from 2015 to 2020, as alleged in detail hereinabove.

258.    The conduct of Musk, on the one hand, and Altman and OpenAI, Inc., on the other, was intentional, and each knew or had reason to know that the other party(ies) would interpret their conduct as reflecting an agreement.

259.    Musk fulfilled any and all obligations and has performed and/or complied with any and all terms and conditions of said agreement that he was required to perform and/or comply with, except those which were waived and/or excused, or the non-performance of which was justified, and is in no matter or respect in breach of said agreement.

260.    Initially, Altman and OpenAI, Inc. performed their obligations and publicly disclosed the non-profit's findings and research regarding its preliminary GPT models.

261.    Altman and OpenAI, Inc., however, breached their implied-in-fact contract by, without limitation, the acts detailed in paragraph 250(a)-(m), *supra*.

262.    Defendants' obligations to perform were not waived nor were their breaches and/or failures to perform justified and/or excused.

263.    As a direct and proximate result of Altman and OpenAI, Inc.'s conduct, acts, and/or omissions, Defendants have deprived Musk of the benefit of the parties' agreement and have caused Musk to suffer damages, including but not limited to the loss of the time and resources he expended to direct research and recruit scientific talent for the non-profit, the financial contributions he made to OpenAI, Inc., as well as damage to his reputation, along with all benefit-of-the-bargain and consequential damages, in an amount to be adjudicated and determined at trial, plus prejudgment interest, costs, and fees.

264.    Musk has no adequate remedy at law for many of the injuries he suffered and continues to suffer as a result of Defendants' breaches and failures, and such injuries cannot reasonably, adequately, or precisely be measured or compensated in damages. Musk therefore

also seeks and is entitled to specific performance of Defendants' contractual obligations.

## COUNT III: BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

### (Musk Against Altman and OpenAI, Inc.)

265.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 264 inclusive, as though fully set forth herein.

266.    Implied in every agreement is a covenant of good faith and fair dealing that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the agreement.

267.    Musk entered into the valid, binding, and enforceable implied agreement with Altman and OpenAI, Inc. with the purpose of developing AI/AGI technology to be openly shared with the public for the benefit of all and not for private profiteering.

268.    Musk fulfilled any and all obligations and has performed and/or complied with any and all terms and conditions of the agreement with Altman and OpenAI, Inc. that he was required to perform and/or comply with, except those which were waived and/or excused, or the non-performance of which was justified, and is in no matter or respect in breach of said agreement.

269.    Altman and OpenAI, Inc. did not act fairly and in good faith, engaging in conduct that frustrated the purpose of the parties' agreement and Musk's reasonable expectations under it. Specifically, in addition to and distinct from their breach of contract:

a.    Defendants systematically and unilaterally reinterpreted key terms of their agreement in ways that undermined it, including by evading conflict-of-interest protections by defining board member "independence" in an extraordinarily narrow fashion—considering, for example, only whether board members *directly or personally* held equity in OpenAI's For-Profit Entities—while rejecting standard independence disqualifiers;

b.    Defendants obscured OpenAI's for-profit activities through complex corporate structures, deliberately designed to prevent Musk and the public from discovering their actual operations, and by purporting to maintain the charity's control of their for-profit

business when, in fact, the opposite is true; and

        c.     Defendants engaged in all acts *supra* ¶¶ 250(a)-(m) to the extent any such acts are determined not to breach the terms of parties' implied-in-fact contract.

270. These bad faith actions undermined the fundamental basis of the parties' agreement and deprived Musk of the benefits he legitimately expected, even if such actions did not technically breach a specific contractual term. This conduct constitutes a violation of the implied covenant of good faith and fair dealing separate and distinct from Defendants' breach of contract.

271. Defendants' obligations to perform were not waived nor were their breaches and/or failures to perform justified and/or excused.

272. As a direct and proximate result of Altman and OpenAI, Inc.'s conduct, acts, and/or omissions, Defendants have caused Musk to suffer damages, including but not limited to the financial contributions he made to OpenAI, Inc., the loss of the time and resources Musk expended to recruit talent and direct research, as well as damage to his reputation, along with all benefit-of-the-bargain and consequential damages, in an amount to be adjudicated and determined at trial, plus prejudgment interest, costs, and fees.

273. Musk has no adequate remedy at law for many of the injuries he suffered and is suffering as a result of Defendants' breaches and failures, and such injuries cannot reasonably, adequately, or precisely be measured or compensated in damages. Accordingly, Musk also seeks and is entitled to specific performance of Defendants' contractual obligations.

## COUNT IV: BREACH OF QUASI-CONTRACT/UNJUST ENRICHMENT
### (Musk Against Altman, Brockman, OpenAI,[13] and Microsoft)

274. Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 273 inclusive, as though fully set forth herein.

275. Even in the absence of an enforceable agreement, Defendants have still been

---

[13] As defined in note 2, *supra*, "OpenAI" refers to the non-profit OpenAI, Inc. and the For-Profit Entities, collectively.

unjustly enriched at Musk's expense as a result of their improper exploitation for personal profit of OpenAI, Inc.'s resources, intellectual property, and assets as detailed above.

276.    Musk contributed considerable money and resources to launch and sustain OpenAI, Inc., which was done on the condition that the endeavor would be and remain a non-profit devoted to openly sharing its technology with the public and avoid concentrating its power in the hands of a few.

277.    It would be unjust and inequitable to allow Defendants to retain the substantial benefits that were obtained as a direct and proximate result of their wrongful conduct including, without limitation, their solicitation of capital and other valuable resources from Musk under the false pretense and repeated promises that such would be used for charitable purposes, and while misrepresenting to Musk, regulators, and the public that OpenAI, Inc. was developing AI/AGI for the public's benefit and not for private gain.

278.    Musk has been directly and proximately injured by Defendants' conduct, acts, and/or omissions, for which Defendants are jointly and severally liable. Defendants' wrongful conduct, acts, and omissions have caused and will continue to cause Plaintiff irreparable harm if allowed to continue without restraint, and as to which Plaintiff has no adequate remedy at law.

279.    Defendants have been and will continue to be unjustly enriched, in an amount to be adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement are appropriate. The primary remedy is correction, via the imposition of a constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

280.    Musk therefore seeks a judgment against Defendants for compensatory damages, an accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and fees.

## COUNT V: TORTIOUS INTERFERENCE WITH CONTRACT
### (Musk Against Microsoft)

281.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 280 inclusive, as though fully set forth herein.

282.    Microsoft and the For-Profit Entities knew Musk had a valid contract with Altman and OpenAI, Inc. and that the agreement required OpenAI, Inc.'s technology to be predominantly open source for the benefit of the public, not for private commercial gain. Aside from the name "OpenAI"—an appellation ironically shared by almost all the For-Profit Entities—these Defendants all had knowledge of the charitable purpose for which Musk co-founded the non-profit, as, on information and belief, the formation documents and investment term sheets of the For-Profit Entities included a recitations of the non-profit's charitable purpose, and the diligence Microsoft undoubtedly performed before investing significant sums in OpenAI would have revealed such purpose.

283.    With respect to the conduct alleged Count V, neither Microsoft nor the For-Profit Entities acted as an agent of Altman and/or OpenAI, Inc.

284.    On information and belief, Microsoft and the For-Profit Entities intended to disrupt Altman and OpenAI, Inc.'s performance of their contract with Musk and/or knew that such disruption of their performance was certain or substantially certain to occur as a result of Microsoft and the For-Profit Entities' conduct.

285.    Microsoft, in concert with the For-Profit Entities, unlawfully exploited its position of power over OpenAI, Inc.—e.g., by leveraging its position as OpenAI's exclusive compute supplier and primary current funder—to induce OpenAI, Inc. to breach its agreement with Musk, and it engaged in further independently wrongful conduct by siphoning, and conspiring to siphon, the non-profit's most valuable assets into Defendants' for-profit apparatus, as well as executing exclusive licenses and agreements for Defendants' benefit. On information and belief, the For-Profit Entities currently employ much of the non-profit's former staff, house its research and intellectual property, and have facilitated rampant self-dealing by Defendants.

286.    Musk has been directly and proximately injured by Defendants' conduct, acts, and/or omissions, for which Defendants are jointly and severally liable. Defendants' wrongful conduct, acts, and omissions have caused and will continue to cause Musk irreparable harm if allowed to continue without restraint, and as to which Musk has no adequate remedy at law.

287.    Defendants have been and will continue to be unjustly enriched, in an amount to be adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement are appropriate. The primary remedy is correction, via the imposition of a constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

288.    Musk therefore seeks a judgment against Defendants for compensatory damages, an accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and fees.

289.    Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a) because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm Musk.

## COUNT VI: CONSTRUCTIVE FRAUD
### (Musk Against Altman, Brockman, and OpenAI, Inc.)

290.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 289 inclusive, as though fully set forth herein.

291.    As a charity and as persons soliciting contributions on behalf of a charity, OpenAI, Inc., Altman, and Brockman are in a fiduciary relationship with, and each owe a fiduciary duty to Musk, from whom charitable contributions were solicited, including under Cal. Bus. & Prof. Code § 17510.8.

292.    As fiduciaries, Altman, Brockman, and OpenAI, Inc. owe Musk a duty to use his contributions for the declared charitable purposes for which they were sought, and are liable for constructive fraud for any advantages they gained by misleading Musk with their repeated promises, representations, and reassurances, regardless of whether they intended to deceive him.

293.    Altman and Brockman solicited and obtained contributions from Musk by making repeated and material promises, representations, and reassurances to him as described in paragraph 247(a)-(k), *supra*.

294.    Defendants knew or could have reasonably foreseen that their promises,

representations, and reassurances would be and were relied upon by and were material to Musk.

295.    Defendants misled Musk by failing to disclose information and/or by providing him with information that was inaccurate and/or incomplete.

296.    Defendants breached each and every promise, representation, and reassurance to Musk in the manners described in paragraph 250(a)-(m), *supra*.

297.    Musk has been directly and proximately injured by Defendants' conduct, acts, and/or omissions, for which Defendants are jointly and severally liable. Defendants' wrongful conduct, acts, and omissions have caused and will continue to cause Plaintiff irreparable harm if allowed to continue without restraint, and as to which Plaintiff has no adequate remedy at law.

298.    Defendants have been and will continue to be unjustly enriched, in an amount to be adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement are appropriate. The primary remedy is correction, via the imposition of a constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

299.    Musk therefore seeks a judgment against Defendants for compensatory damages, an accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and fees.

300.    Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a) because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm Musk.

## COUNT VII: FRAUD

### (Musk Against Altman, Brockman, and OpenAI, Inc.)

301.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 300 inclusive, as though fully set forth herein.

302.    By summer, 2017, Altman and Brockman were expressly pushing Musk to convert the non-profit to a for-profit entity, in which they planned to endow themselves with significant equity. Ex. 11 at 1; Ex. 12 at 1-2.

303.     By September, 2017, Musk was fed up, and gave Altman and Brockman an ultimatum: "Either go do something on your own or continue with OpenAI as a non-profit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding to a start-up. Discussions are over." Ex. 13 at 4.

304.     Altman wrote Musk the very next day: "[I] remain enthusiastic about the non-profit structure!" with Brockman soon following suit. Ex. 13 at 1.

305.     In addition, on September 22, 2017, Zilis e-mailed Musk that Altman had informed her that he was "[g]reat with keeping [OpenAI] non-profit and continuing to support it." Ex. 14 at 1.

306.     Altman and Brockman knew or could have reasonably foreseen that their express promises, representations, and assurances would be relied upon by Musk. Indeed, they obviously intended Musk to rely on such statements and in good faith, Musk reasonably did rely on them to his detriment by thereafter contributing to OpenAI, Inc. an additional $10,275,000 and, through Musk Industries, paying for OpenAI's pricey lease and overhead.

307.     Altman and Brockman knew their representations and promises were false when made, had no intention of performing them, and failed to perform them. In reality, Altman and Brockman wished to launch a competitor to Google's DeepMind, which was so far ahead of all other AI companies that a small for-profit start-up had zero chance of success without an angle. To Altman and Brockman, "non-profit" and "open source" were philanthropic hooks, altruistic buzzwords to attract wealthy, connected donors like Musk and talented scientists to back and participate in their endeavor.

308.     Brockman essentially admitted as much. He wrote: "I hope for us to enter the field as a neutral group looking to collaborate widely and shift the dialog towards being about humanity winning rather than any particular group or company. (**I think that's the best way to bootstrap ourselves into being a leading research institution.**)." Ex. 3 at 1 (emphasis added).

309.     Once they got Musk's backing, and Dr. Sutskever and the talented team of scientists Musk recruited were in place, Defendants' objective was to develop valuable AI/AGI

1    and from there, convert the non-profit to a for-profit enterprise and cash in—essentially

2    converting Musk's contributions into free start-up capital and years of section 501(c)(3) tax

3    benefits into a free government subsidy.

4         310.    After Musk's unequivocal September 20, 2017, refutation of Altman's proposal

5    to convert to a non-profit structure, Defendants, still committed to their scheme, became even

6    more cunning and deceptive. They sequestered OpenAI, Inc.'s technology and orchestrated an

7    increasingly opaque corporate web, including the For-Profit Entities, in which, on information

8    and belief, they were major stakeholders, thus enabling them to covertly self-deal for enormous

9    future profits.

10        311.    On information and belief, Altman engaged in rampant self-dealing, and abused

11   his position of trust at OpenAI, Inc. to enrich himself by causing it to make deals with

12   numerous side companies he owned or held major stakes in, as detailed in paragraphs 133-143,

13   *supra*.

14        312.    In recent months, Altman has abandoned all pretense, displaying his true colors.

15   With Musk out of the picture and OpenAI, Inc.'s Board stacked with compliant allies,

16   Defendants are actively working to convert OpenAI, Inc. into an *entirely* for-profit business.

17        313.    Musk has been directly and proximately injured by Defendants' conduct, acts,

18   and/or omissions, for which Defendants are jointly and severally liable. Defendants' wrongful

19   conduct, acts, and omissions have caused and will continue to cause Musk irreparable harm if

20   allowed to continue without restraint, and as to which Musk has no adequate remedy at law.

21        314.    Defendants have been and will continue to be unjustly enriched, in an amount to

22   be adjudicated and determined at trial, and for which restitution and nonrestitutionary

23   disgorgement are appropriate. The primary remedy is correction, via the imposition of a

24   constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all

25   contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

26        315.    Musk therefore seeks a judgment against Defendants for compensatory

27   damages, an accounting, the imposition of a constructive trust, preliminary and permanent

28   injunctive relief, prejudgment interest, an award of costs, and fees.

316.    Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a) because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm Musk.

## COUNT VIII: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

### (xAI Against Microsoft and OpenAI)

317.    Plaintiff xAI re-alleges and incorporates by reference paragraphs 1 through 316 inclusive, as though fully set forth herein.

318.    OpenAI and Microsoft have willfully and intentionally undertaken the following actions, without limitation, to contract, combine, and conspire to contract and combine in restraint of trade by engaging in per se illegal conduct and/or unreasonably reducing competition in the market for generative AI:

a.    Conditioning the opportunity to invest in OpenAI on an agreement by investors not to deal with and/or invest in the competitors of Microsoft and OpenAI in generative AI—a per se illegal agreement—whether characterized as a group boycott or otherwise;

b.    Exclusively selling and/or licensing, and/or contracting to sell and/or license OpenAI's goods, commodities, assets, and/or services to Microsoft, in particular and without limitation, ChatGPT, in a market where both Microsoft and OpenAI have market power;

c.    Exclusively transferring OpenAI, Inc.'s goods, commodities, assets, and/or services, in particular and without limitation, OpenAI, Inc.'s employees and proprietary intellectual property, to the For-Profit Entities with the intent to restrain trade and/or monopolize;

d.    Requiring OpenAI to exclusively obtain its compute from Microsoft in a market where Microsoft has market power;

e.    Pricing OpenAI's generative AI products to the public and Microsoft at well below their cost to produce and/or as "loss leaders";

f.    Pricing Microsoft's generative AI products to the public at well below their cost to produce and/or as "loss leaders";

g.    Pricing Microsoft's compute to OpenAI at well below its cost to produce and/or as a "loss leader";

h.    Providing preferential pricing and other preferential treatment to Microsoft with respect to OpenAI's generative AI products, which preferences are not open to other competitors;

i.    Providing preferential pricing and other preferential treatment to OpenAI with respect to Microsoft's compute, which preferences are not open to other competitors;

j.    Abusing OpenAI's non-profit structure to obtain financial, reputational, and other competitive advantages over other market participants;

k.    Engaging in a de facto merger without regulatory approval and with anticompetitive effects, as Microsoft's CEO publicly admitted, "We have the people, we have the compute, we have the data, we have everything," such that Microsoft has "all the IP rights and all the capability," and as further evidenced by Microsoft's ability to force OpenAI to rehire Altman and to purge the Board using its position "in there" and "below them, above them, around them," as well as Microsoft and OpenAI's exchanges of employees, information, and intellectual property and the pursuit of a unified strategy to compete in and dominate the market for generative AI;

l.    Purchasing stock and other share capital and assets of OpenAI with the effect of substantially lessening competition and tending to create a monopoly;

m.    Interlocking OpenAI's and Microsoft's boards, despite Microsoft and OpenAI being competitors, as well as, on information and belief, permitting, encouraging, directing, or effectuating other interlocking directorates, such as Hoffman's simultaneous service on the boards of Microsoft, and OpenAI while also a partner at Greylock;

n.    Offering vastly inflated compensation to hire AI-industry talent in excess of legitimate business needs to prevent competitors from hiring such personnel;

o.    Colluding and conspiring to exchange confidential information and trade secrets, including intellectual property, customer lists, and pricing information, for the purpose of fixing prices and/or otherwise substantially lessening competition;

p.    Violating the terms of the promises made to Musk, regulators, and the public, including competing market participants, and relied upon by them, including, without limitation, Altman and OpenAI, Inc.'s violation of all terms of the Contract with Musk detailed in paragraph 247, *supra*; and/or

q.    All such other unlawful conduct alleged in this SAC.

319.    OpenAI can be a charity with some leeway in its market activities, but it cannot be a for-profit not-for-profit, as it has long tried to be.

320.    As a direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of 15 U.S.C. § 1, Plaintiff has been and continues to be harmed and are entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and preliminary and permanent injunctive relief as provided in 15 U.S.C. § 26.

## COUNT IX: VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2

### (xAI Against Microsoft and OpenAI)

321.    Plaintiff xAI re-alleges and incorporates by reference paragraphs 1 through 320 inclusive, as though fully set forth herein.

322.    OpenAI and Microsoft have willfully and intentionally undertaken to monopolize, or in the alternative to attempt to monopolize or conspire to monopolize, the market for generative AI, by engaging, without limitation, in the same conduct detailed in paragraph 318(a)-(q), *supra*.

323.    As a direct and intended result of Defendants' conduct, they possess a nearly 70% share of the generative AI market, constituting a monopoly, or, in the alternative, an attempt or conspiracy to monopolize the generative AI market.

324.    As a direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of 15 U.S.C. § 2, Plaintiff has been and continues to be harmed and are

entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and preliminary and permanent injunctive relief as provided in 15 U.S.C. § 26.

### COUNT X: VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16720

**(xAI Against Microsoft and OpenAI)**

325.    Plaintiff xAI re-alleges and incorporates by reference paragraphs 1 through 324 inclusive, as though fully set forth herein.

326.    OpenAI and Microsoft have willfully and intentionally undertaken the actions, without limitation, detailed in paragraph 318(a)-(q), *supra*, to form a "trust" or, in the alternative, to conspire to form a trust, as that term is defined in Cal. Bus. & Prof. Code § 16720.

327.    The purposes of this trust or conspiracy to form a trust are, without limitation:

    a.    To create or carry out restrictions in the trade or commerce of generative AI;

    b.    To limit or reduce the production or increase the price of generative AI;

    c.    To prevent competition in the manufacturing, making, transportation, sale, or purchase of generative AI;

    d.    To make, enter into, execute, or carry out contracts, obligations, or agreements by which OpenAI and Microsoft establish or settle the price of compute or generative AI between them, so as to directly or indirectly preclude free and unrestricted competition among themselves, purchasers, or consumers in the sale of compute or generative AI; and/or

    e.    To agree to pool, combine, or directly or indirectly unite interests they have concerning the sale of generative AI, which may affect the price thereof.

328.    As a direct and intended result of Defendants' conduct, they possess a nearly 70% share of the market for generative AI, constituting a trust, or in the alternative a conspiracy by Microsoft, OpenAI, Inc., and/or the For-Profit Entities to create a trust.

329.    As a direct and proximate consequence of Defendants' conduct, acts, and/or

omissions in violation of Cal. Bus. & Prof. Code § 16720, Plaintiff has been and continues to be harmed and are entitled to treble damages, costs, attorneys' fees, and prejudgment interest as provided in Cal. Bus. & Prof. Code §§ 16750(a), 16761, and to preliminary and permanent injunctive relief as provided in Cal. Bus. & Prof. Code § 16750(a). Plaintiff is also entitled to exemplary damages because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm competitors, including xAI. Cal. Civ. Code § 3294(a).

## COUNT XI: VIOLATIONS OF THE UNFAIR PRACTICES ACT, CAL. BUS. & PROF. CODE § 17043

### (xAI Against Microsoft and OpenAI)

330.    Plaintiff xAI re-alleges and incorporates by reference paragraphs 1 through 329 inclusive, as though fully set forth herein.

331.    Microsoft is selling or giving away compute to OpenAI at less than the cost thereof for the purpose of injuring competitors or destroying competition.

332.    OpenAI is selling or giving away generative AI to Microsoft and the public at less than the cost thereof for the purpose of injuring competitors or destroying competition.

333.    Microsoft is selling or giving away generative AI to the public at less than the cost thereof for the purpose of injuring competitors or destroying competition.

334.    The sale or use of OpenAI's ChatGPT and Microsoft's Copilot, as well as Microsoft's provision of compute to OpenAI, are all prohibited as "loss leaders" because they are articles or products sold at less than cost where the purpose is to induce, promote, or encourage the purchase of other merchandise, the effect of which is a tendency or capacity to mislead or deceive purchasers or prospective purchasers, and/or to divert trade from or otherwise injure competitors, including xAI. Cal. Bus. & Prof. Code § 17030(c); Cal. Bus. & Prof. Code § 17024.

335.    Microsoft is providing the secret payment or allowance of rebates, refunds, or unearned discounts and secretly extending to OpenAI special services or privileges not extended to all purchasers of compute purchasing upon like terms and conditions, such as by

providing priority compute access at discounted prices, to the injury of Plaintiff and where such payment or allowance tends to destroy competition.

336.    OpenAI is providing the secret payment or allowance of rebates, refunds, or unearned discounts and secretly extending to Microsoft special services or privileges not extended to all purchasers of generative AI purchasing upon like terms and conditions, such as providing to Microsoft technical and propriety software information underpinning its GPT models that are not provided to other purchasers, to the injury of Plaintiff and where such payment or allowance tends to destroy competition.

337.    As a direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of Cal. Bus. & Prof. Code §§ 17043-17045, Plaintiff has been and continues to be harmed and is entitled to treble damages, costs, attorneys' fees, and prejudgment interest as provided in Cal. Bus. & Prof. Code § 17082, and preliminary and permanent injunctive relief as provided in Cal. Bus. & Prof. Code § 17078. Plaintiff is also entitled to exemplary damages because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm competitors, including xAI. Cal. Civ. Code § 3294(a).

## COUNT XII: VIOLATIONS OF SECTION 3
## OF THE CLAYTON ACT, 15 U.S.C. § 14

### (xAI Against Microsoft and OpenAI)

338.    Plaintiff xAI re-alleges and incorporates by reference paragraphs 1 through 337 inclusive, as though fully set forth herein.

339.    Microsoft leases, sells, or contracts for the sale of compute to OpenAI on the condition, agreement, or understanding that OpenAI shall not use or deal in the compute of a competitor or competitors of Microsoft where the effect may be to substantially lessen competition or tend to create a monopoly in the market for generative AI.

340.    OpenAI leases, sells, or contracts for the sale of generative AI to Microsoft on the condition, agreement, or understanding that Microsoft shall not use or deal in the generative AI of a competitor or competitors of OpenAI where the effect may be to

substantially lessen competition or tend to create a monopoly in the market for generative AI.

341.    As a direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of 15 U.S.C. § 14, Plaintiff has been and continues to be harmed and are entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C.    § 15, and preliminary and permanent injunctive relief as provided in 15 U.S.C. § 26.

## COUNT XIII: VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16727

### (xAI Against Microsoft and OpenAI)

342.    Plaintiff xAI re-alleges and incorporates by reference paragraphs 1 through 341 inclusive, as though fully set forth herein.

343.    Microsoft leases, sells, or contracts for the sale of compute to OpenAI or to fix the price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that OpenAI shall not use or deal in the compute of a competitor or competitors of Microsoft, where the effect may be to substantially lessen competition or tend to create a monopoly in the market for generative AI.

344.    OpenAI leases, sells, or contracts for the sale of generative AI to Microsoft or to fix the price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that Microsoft shall not use or deal in the generative AI of a competitor or competitors of OpenAI, where the effect may be to substantially lessen competition or tend to create a monopoly in the market for generative AI.

345.    As a direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of Cal. Bus. & Prof. Code § 16727, Plaintiff has been and continues to be harmed and is entitled to treble damages, costs, attorneys' fees, and prejudgment interest as provided in Cal. Bus. & Prof. Code §§ 16750(a), 16761, and preliminary and permanent injunctive relief as provided in Cal. Bus. & Prof. Code § 16750(a). Plaintiff is also entitled to exemplary damages because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm competitors, including xAI. Cal. Civ. Code § 3294(a).

## COUNT XIV: VIOLATIONS OF SECTION 7 OF THE CLAYTON ACT,
## 15 U.S.C. § 18 ¶¶ 1 & 2

### (xAI Against Microsoft and OpenAI)

346.    Plaintiff xAI re-alleges and incorporates by reference paragraphs 1 through 345 inclusive, as though fully set forth herein.

347.    Microsoft and OpenAI are subject to the jurisdiction of the FTC.

348.    Microsoft has acquired, directly or indirectly, the whole or a part of the stock (or other share capital) and/or assets of OpenAI, in particular and without limitation, the intellectual property of OpenAI, where the effect of such acquisition(s), or of the use of such stock by voting or by granting proxies, may be to substantially lessen competition or tend to create a monopoly in the market for generative AI.

349.    OpenAI has acquired, directly or indirectly, the whole or a part of the assets of Microsoft, in particular and without limitation, the compute of Microsoft, where the effect may be to substantially lessen competition or tend to create a monopoly in the market for generative AI.

350.    OpenAI, Inc. has acquired, directly or indirectly, the whole or a part of the stock (or other share capital) and/or assets of the For-Profit Entities, in whole or in part, where the effect of such acquisition, or of the use of such stock by voting or by granting proxies or otherwise, may be substantially to lessen competition or tend to create a monopoly in the market for generative AI.

351.    The For-Profit Entities have acquired, directly or indirectly, the whole or a part of the assets of OpenAI, Inc., in particular and without limitation, the intellectual property of OpenAI, Inc., where the effect of such acquisition(s) may be substantially to lessen competition or tend to create a monopoly in the market for generative AI.

352.    Defendants have not acquired stock, if any, in the foregoing solely for investment and are using the same by voting or otherwise to bring about or attempt to bring about the substantial lessening of competition.

353.    None of these transactions has been or is contemplated to be duly consummated

pursuant to the authority granted to the SEC in the exercise of its jurisdiction under 15 U.S.C. § 79j.

354.    As a direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of 15 U.S.C. § 18 ¶¶ 1 & 2, Plaintiff has been and continues to be harmed and is entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and preliminary and permanent injunctive relief as provided in 15 U.S.C. § 26.

## COUNT XV: VIOLATIONS OF SECTION 8
## OF THE CLAYTON ACT, 15 U.S.C. § 19

### (xAI Against All Defendants Including Templeton and Hoffman)

355.    Plaintiff xAI re-allege and incorporate by reference paragraphs 1 through 354 inclusive, as though fully set forth herein.

356.    Templeton is the Vice President of Partnerships and Operations in the Technology & Research division at Microsoft and serves as an advisor to its Chief Technology Officer and Executive Vice President of AI Kevin Scott ("Scott"), where she oversees operations for the nearly 1,500 scientists and engineers comprising Microsoft's Technology & Research division.

357.    Templeton is the agent and/or alter ego of Scott who in turn is an agent and/or alter ego of Nadella, Microsoft's CEO and an officer and director.

358.    Templeton was Microsoft's agent and alter ego tasked to represent Microsoft, rather than herself as an individual, while serving on OpenAI, Inc.'s Board as a non-voting member from approximately November 29, 2023 until July 9, 2024, when it was widely reported she stepped down amid renewed enforcement by the FTC of the Clayton Act's prohibition on interlocking directorates.

359.    OpenAI, Inc.'s Bylaws do not provide for non-voting members, though neither do the Bylaws prohibit them. OpenAI, Inc. has not generally concerned itself with observing the formalities of its Bylaws in any event (e.g., the most current, publicly available version of OpenAI, Inc.'s Bylaws limit its Board to seven members, Ex. 21 at 10, though there have frequently been nine, *see supra* (¶¶ 161-62)).

360.    Templeton served as a director or officer of OpenAI, Inc. while also serving as an officer, agent, employee, and/or alter ego of Microsoft. Both corporations are engaged in commerce and by virtue of their business and location of operation, are competitors (i.e., Microsoft's Copilot competes against OpenAI's ChatGPT), such that the elimination of competition by agreement between them would constitute a violation of the antitrust laws, 15 U.S.C. § 19(a)(1).

361.    Hoffman served on OpenAI, Inc.'s Board while serving as a director of Microsoft, corporations engaged in commerce and, by virtue of their business and location of operation, are competitors (Microsoft's Copilot against OpenAI's ChatGPT), such that the elimination of competition by agreement between them would also constitute a violation of, 15 U.S.C. § 19(a)(1).

362.    In addition, Hoffman's service on the boards of both OpenAI, Inc. and Microsoft while a general partner at Greylock constituted an interlocking directorate under a deputization or indirect interlock theory.

363.    On information and belief, directors or officers of OpenAI's competitors also serve as directors or officers of one or more of the For-Profit Entities, whether directly or under a deputization or indirect interlock theory.

364.    On information and belief, Altman and Brockman conspired, directed, enabled, encouraged, aided and abetted, and/or permitted these interlocking director arrangements, including their own in service with one or more of the For-Profit Entities, to occur.

365.    On information and belief, Microsoft, OpenAI, Inc., and Greylock each have capital, surplus, and undivided profits totaling more than $48,559,000, and competitive sales more than $4,855,900. 89 Fed. Reg. 3926 (Jan. 22, 2024).

366.    On information and belief, the competitive sales of Microsoft, OpenAI, Inc., and Greylock are not less than 2% of that corporation's respective total sales; and each of Microsoft, OpenAI, Inc., and Greylock's competitive sales are not less than 4% of their respective total sales.

367.    The purpose of the prohibition on interlocking directorates is to prevent the

sharing of competitively sensitive information in violation of the antitrust laws and/or providing a forum for the coordination of other anticompetitive activity. Allowing Templeton and Hoffman to serve as members of OpenAI, Inc.'s Board undermined this purpose.

368.    Defendants' conduct is per se illegal.

369.    As direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of 15 U.S.C. § 19, Plaintiff has been and continues to be harmed and is entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and to preliminary and permanent injunctive relief as provided in 15 U.S.C. § 26.

## COUNT XVI: UNFAIR COMPETITION UNDER
## CAL. BUS. & PROF. CODE §§ 17200 *et seq.*

**(Musk and xAI Against All Defendants Including Templeton and Hoffman)**

370.    Plaintiffs Musk and xAI re-allege and incorporate by reference paragraphs 1 through 369 inclusive, as though fully set forth herein.

371.    Defendants engaged in unfair, unlawful, and/or fraudulent business practices and/or acts by soliciting contributions from Musk and others under the false pretense that such funds would be used for the non-profit's purposes as articulated in OpenAI, Inc.'s Certificate of Incorporation, Charter, website, online marketing, blog posts, emails, and/or other communications.

372.    Defendants actively deceived Musk and the public by effectively using OpenAI, Inc.'s charitable mission and tax-exempt status to secure and use donations as free start-up capital to develop valuable technology, which they exploited for their own personal gain.

373.    But for Defendants' unfair, unlawful, and/or fraudulent business practices and/or acts, Musk would not have made his significant contributions to OpenAI, Inc.

374.    Defendants further and without limitation engaged in the following unfair, unlawful, and/or fraudulent business practices and/or acts:

  a.    Those giving rise to each cause of action in this SAC;

  b.    Altman, Brockman, and OpenAI, Inc.'s violation of the fiduciary duties each owe Musk under Cal. Bus. & Prof. Code § 17510.8;

c.      OpenAI, Inc.'s de facto merger with Microsoft without abiding by the procedure provided in Cal. Corp. Code § 6010;

d.      Organizing and/or operating, or directing, encouraging, and/or allowing the organization and/or operation of OpenAI, Inc. for the benefit of private interests, and/or directing, encouraging, and/or allowing a part of OpenAI, Inc.'s property, assets, and/or net earnings to inure to the benefit of any private individual, via excess benefit transactions, private inurement, and/or otherwise, in violation of 26 U.S.C. § 501(c)(3) (charitable status), *id.* § 4958 (excess benefit transactions), *id.* § 7201 (tax evasion), *id.* § 7206 (fraud and false statements, including aiding in preparation), *id.* § 7207 (fraudulent returns, statements, or other documents), 18 U.S.C. § 371 (conspiracy to defraud the United States), and *id.* § 1001 (false statements), whether as principals or otherwise, and/or attempting the same, as further detailed by the transactions and/or proposed transactions described herein;

e.      Organizing and/or operating OpenAI, Inc. for the benefit of private interests, and/or directing, encouraging, and/or allowing a part of OpenAI, Inc.'s property, assets, and/or net earnings to inure to the benefit of any private shareholder or individual, via excess benefit transactions, private inurement, and/or otherwise, as well as failing to maintain the irrevocable dedication of OpenAI, Inc.'s assets to its exempt purposes, in violation of California Revenue and Taxation Code § 23701d(a) (charitable status), *id.* § 23703 (false application for exempt status), *id.* § 23701 (abuse of exempt status), *id.* § 19701 (tax fraud and false returns), *id.* § 19705 (tax evasion and false statements), Cal. Corp. Code § 6811 (false reports), *id.* § 6215 (false statements to the Attorney General), and Cal. Gov. Code § 12591.1 (charitable trust violations), whether as principals or otherwise, and/or attempting the same, as further detailed by the transactions and/or proposed transactions described herein;

f.      Violating the requirements of 15 U.S.C. § 18a:

(i)      By acquiring, directly or indirectly, voting securities or assets of any other person (in the case of Microsoft, of OpenAI; in the case of OpenAI, Inc., of the For-Profit Entities; in the case of the For-Profit Entities, of OpenAI, Inc.), without either or both persons filing notification(s) pursuant to rules under subsection (d)(1), 16 C.F.R. Parts 801 &

803, and/or waiting for the period described in subsection (b)(1) to expire;

(ii)    Where the size-of-the-transaction amounts in subsection (a)(2)(A) and/or subsection (a)(2)(B), as adjusted in 89 Fed. Reg. 7708 (Feb. 5, 2024), have been exceeded, such as without limitation Microsoft's $13.75 billion investment in OpenAI and the For-Profit Entities' acquisition of OpenAI, Inc.'s intellectual property; and

(iii)    Where none of the exemptions in subsection (c) have been met;

g.    Imposing or agreeing to employment, severance, non-disparagement, and/or non-disclosure agreements that violate 15 U.S.C. § 78u-6 and 17 C.F.R. § 240.21F-17(a) by impeding an individual from communicating directly with SEC staff about a possible securities law violation, Ex. 26 at 1-6;

h.    Engaging in rampant direct, vicarious, and contributory copyright infringement in violation of 17 U.S.C. § 501 as principals, or attempting or conspiring to do such, for commercial advantage and/or private financial gain and/or through the reproduction of one or more copyrighted works over a 180-day period, which work or works have a total retail value of more than $1,000, in violation of 17 U.S.C. § 506(a)(1)(A)-(B), which copyrighted works include, without limitation, on information and belief: 209,707 copyrighted works by *The New York Times*, Ex. 24; 44,134 copyrighted works from the *New York Daily News*; 38,779 copyrighted works from the *Chicago Tribune*; 16,351 copyrighted works from the *Denver Post*; 15,933 copyrighted works from the *San Jose Mercury News*; 8,841 copyrighted works from the *Orlando Sentinel*; 8,516 copyrighted works from the *Sun Sentinel*; 6,536 copyrighted works from the *Orange County Register*; and 6,130 copyrighted works from the *Pioneer Press*; and/or

i.    Diluting by blurring and/or tarnishing the distinctive and famous trademarks of the copyrighted works detailed in paragraph 374(h), *supra*, by engaging in their unauthorized use in connection with the sale of goods and/or services to the public and/or pairing them with lower quality writing in violation of 15 U.S.C. § 1125(c).

375.    All such conduct has deceived, and will likely continue to deceive, the public, and is unethical, immoral, substantially injurious to consumers, and/or violates public policy.

376. As a direct and proximate result of Defendants' conduct, acts, and omissions, Plaintiffs have suffered injuries in fact and lost money or property, including, without limitation, Musk's donations, additional money, and property interests (such as leased office space) he provided to Defendants. As a direct and proximate consequence of Defendants' conduct, acts, and/or omissions in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Plaintiffs have been and continue to be harmed and are entitled to restitution, prejudgment interest, and preliminary and permanent injunctive relief as provided in Cal. Bus. & Prof. Code § 17203, and attorneys' fees and the costs of suit as provided in Cal. Code Civ. Proc. § 1021.5.

## COUNT XVII: FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(B)

### (xAI Against Altman, Brockman, and OpenAI)

377. Plaintiffs Musk and xAI re-allege and incorporate by reference paragraphs 1 through 376 inclusive, as though fully set forth herein.

378. Defendants in their marketing, advertisements, and promotions of OpenAI's products and services made knowingly false and/or misleading representations to the public that OpenAI would be dedicated to the development of AI/AGI technology for the public good, promoting safety as "a first-class requirement[.]" Ex. 2 at 1.

379. Defendants made material, false, and misleading representations of fact about the nature, characteristics, and qualities of OpenAI's products and services in commercial advertising or promotion in interstate commerce, namely, OpenAI's website, online marketing, online blog posts, and Defendants' social media.

380. For example, OpenAI's website represented that:

    a.    "We cautiously and gradually release new AI systems—with substantial safeguards in place[.]"

    b.    "OpenAI is a non-profit artificial intelligence research company [whose] goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact."

c.   "Our mission is to ensure that [AGI] benefits all humanity, primarily by attempting to build safe AGI and share the benefits with the world."

d.   "We use a multi-tiered safety system to limit Dall-E 3's ability to generate potentially harmful imagery[.]"

e.   "We built GPTs with privacy and safety in mind[.]"

f.   "Safety has always been central to our work, from aligning model behavior to monitoring for abuse, and we're investing even further as we develop more capable models."

381.   These false and misleading statements regarding OpenAI's products and services have deceived and/or are likely to deceive a substantial segment of the public.

382.   Defendants' false and misleading claims are material because they induced and/or are likely to induce the relevant public to purchase and/or use Defendants' products (e.g., ChatGPT and related technology) and services in the false belief Defendants' AI products are safe, when in fact, on information and belief, they were not.

383.   OpenAI has increasingly sidelined safety in order to rush the release of new products.

384.   In May 2024, for instance, OpenAI's safety teams were given just nine days to conduct comprehensive safety assessments of its latest GPT-4o model in an effort by OpenAI executives to rush its release ahead of Google's developer conference on May 14, 2024, at which Google planned to introduce its latest AI model with capabilities similar to GPT-4o. Safety teams reportedly "pleaded" for more time, but such requests were overridden by OpenAI's commercial teams and executives. OpenAI released GPT-4o on May 13, 2024, the day before Google's launch, even though safety testing had not concluded or been verified.

385.   It was later discovered that GPT-4o exceeded OpenAI's permissible risk threshold for "persuasion," i.e., a model's ability to convince a user to change their beliefs and engage in potentially dangerous or illegal behavior.

386.   Similarly, in September 2024, Altman reportedly pushed for the immediate release of OpenAI's latest o1 model because he was eager to prove to potential investors in the company's upcoming $6.5 billion funding round that OpenAI remained at the forefront of AI

development, even though o1 was rated "medium risk" for issues relating to chemical, biological, radiological, and nuclear weapons—the highest risk OpenAI has ever publicly acknowledged. It has since come to light that o1 had not completed safety testing prior to its release, exposing consumers and the public to this potentially hazardous system.

387.   Indeed, as described above, numerous high-level executives and safety personnel have resigned in protest to OpenAI's compromised safety practices, and have admitted safety at OpenAI has "taken a backseat to shiny products."

388.   One such shiny product, Whisper, is now known to insert fabricated or "hallucinated" material when transcribing medical professionals' dictations into patient records.

389.   Given the comparable nature of AI products on the market, consumers are unlikely to seek or purchase duplicate offerings from multiple AI vendors. Defendants' calculated misstatements to the relevant public have not only misled potential customers but have directly diverted those customers from Plaintiffs to Defendants, causing Plaintiffs to incur measurable losses in customer acquisition, market penetration, and overall profitability.

390.   Defendants' conduct constitutes false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

391.   Defendants' deceptive conduct and false and misleading statements have also injured and will continue to injure Musk and xAI's commercial interests.

392.   Musk and xAI have been injured as a direct and proximate result of Defendants' conduct, acts, and/or omissions, for which Defendants are jointly and severally liable. Musk and xAI are entitled to damages, prejudgment interest, attorneys' fees, and the costs of suit.

393.   Unless enjoined by this Court pursuant to 15 U.S.C. § 1116, Defendants will continue to mislead the public and cause harm to Musk and xAI. Plaintiffs are therefore entitled to an injunction during the pendency of this action and a permanent injunction enjoining Defendants, their officers, agents, and employees, and all persons acting in concert with them, from engaging in such further acts.

394.   Defendants' false and misleading claims are deliberate, willful, fraudulent, and

without extenuating circumstances. Defendants' conduct is thus an "exceptional case" within the meaning of section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). Musk and xAI are therefore entitled to recover three times the amount of their actual damages and their attorneys' fees and costs incurred in this action.

## COUNT XVIII: BREACH OF CHARITABLE TRUST
### (Musk Against Altman, Brockman, and OpenAI, Inc.)

395.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 394 inclusive, as though fully set forth herein.

396.    Musk's contributions to OpenAI, Inc., as solicited by Altman and Brockman, created a charitable trust.

397.    Under Cal. Bus. & Prof. Code § 17510.8 and California common law as supplemented by the California Probate Code, Altman, Brockman, and OpenAI, Inc. owed Musk a fiduciary duty with respect to his donations, which he provided in a manner manifesting an intention to create that relationship, such that Altman, Brockman and OpenAI, Inc. owed Musk a duty to use his donations for the benefit of the charity, and subject to the conditions they agreed to.

398.    In light of Musk's status as settlor of a trust in favor of OpenAI, Inc., and his special interest in OpenAI, Inc., Musk has standing to bring claims for violating the terms of his donations, whether under California common law as supplemented by its Probate Code or Cal. Corp. Code § 5142(a).

399.    Defendants have breached the terms of Musk's donations, and therefore the trust, by, without limitation:

a.    All acts and/or omissions identified in paragraph 250(a)-(l), *supra*; and/or

b.    The violations of all laws identified in paragraph 374(a)-(i), *supra*, the observation of which is an implicit condition of any trust.

400.    The Attorney General of California has been notified by Musk of his intent to file this SAC.

401. The charitable trust and Musk have been directly and proximately injured by Defendants' conduct, acts, and/or omissions in violation of Cal. Corp. Code § 5142 and California common law as supplemented by its Probate Code, for which Defendants are jointly and severally liable.

402. Defendants have been and will continue to be unjustly enriched, in an amount to be adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement are appropriate. The primary remedy is correction, via the imposition of a constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

403. Defendants' wrongful conduct, acts, and omissions have caused and will continue to cause Musk irreparable harm if allowed to continue without restraint, and as to which Musk has no adequate remedy at law.

404. Musk therefore seeks a judgment against Defendants for compensatory damages, an accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and fees.

405. Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a) because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm Musk.

### COUNT XIX: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY TO MUSK

**(Musk Against Microsoft)**

406. Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 405 inclusive, as though fully set forth herein.

407. As a charity and persons soliciting contributions on behalf of a charity, OpenAI, Inc., Altman, and Brockman each owe a fiduciary duty to Musk, from whom charitable contributions were actively solicited, including under Cal. Bus. & Prof. Code § 17510.8.

408. Altman, Brockman, and OpenAI, Inc. solicited and obtained contributions from Musk by making repeated and material promises, representations, and reassurances to him that

they would develop AI for the benefit of humanity, would predominantly open source their technology, avoid concentrating it, and would not operate for the profit of any person or company, as evidenced in, without limitation, the emails, corporate filings, and online pronouncements alleged above.

409.    Altman, Brockman, and OpenAI, Inc. breached their fiduciary duties to Musk in the same manner by which they violated the terms of the Contract as either an express written agreement or implied-in-fact contract, and/or the trust Musk created for OpenAI, Inc.'s benefit, as detailed in paragraph 250(a)-(m), *supra*, because such actions failed to observe, without limitation, the duties of obedience, loyalty, and/or care imposed by Cal. Bus. & Prof. Code § 17510.8.

410.    The For-Profit Entities had actual knowledge of the fiduciary duties Altman, Brockman, and OpenAI, Inc. owed to Musk, because the very purpose of the For-Profit Entities is to enable Altman and Brockman to operate for non-charitable purposes and to circumvent the fiduciary duties they owe to the donors. Further, the knowledge and intent of the officers, agents, employees, and/or owners of the For-Profit Entities, who on information and belief were aware of Altman, Brockman, and OpenAI, Inc.'s duties and breaches thereof, is imputed to the For-Profit Entities.

411.    Microsoft had actual knowledge of the fiduciary duties Altman, Brockman, and OpenAI, Inc. owed to Musk. Microsoft shared a board member with OpenAI, Inc. (i.e., Hoffman) and on information and belief, Microsoft's due diligence process before investing $13.75 billion would have required, at a minimum, review of OpenAI, Inc.'s Certificate of Incorporation and regulatory filing with the Attorney General of California, and on further information and belief, Microsoft knew of the donations by Musk and their conditions.

412.    With respect to conduct alleged in this Count XIX, Microsoft and the For-Profit Entities did not act within any agency relationship with Altman, Brockman, and/or OpenAI, Inc.

413.    The For-Profit Entities and Microsoft provided substantial assistance or encouragement to Altman, Brockman, and OpenAI, Inc., aiding and abetting their breaches of fiduciary duty to Musk by, without limitation, providing the corporate forms necessary to loot

OpenAI, Inc. of its intellectual property and employees, drafting and executing exclusive licensing and other contracts contrary to the purposes of OpenAI, Inc., and requiring the pursuit of profits over safety and transparency. These actions were substantial factors in causing harm to Musk.

414.    On information and belief, Defendants have been greatly enriched by their resulting misappropriation of the non-profit's assets and their self-dealing in blatant derogation of the fiduciary duties Altman, Brockman, and OpenAI, Inc. owed and continue to owe Musk.

415.    Musk has been directly and proximately injured by Defendants' conduct, acts, and/or omissions, for which Defendants are jointly and severally liable. Defendants' wrongful conduct, acts, and omissions have caused and will continue to cause Musk irreparable harm if allowed to continue without restraint, and as to which Musk has no adequate remedy at law.

416.    Defendants have been and will continue to be unjustly enriched, in an amount to be adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement are appropriate. The primary remedy is correction, via the imposition of a constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

417.    Musk therefore seeks a judgment against Defendants for compensatory damages, an accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and fees.

418.    Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a) because Defendants have acted with oppression, fraud, malice, and/or willful and wanton negligence by, without limitation, acting with intent to harm Musk.

## COUNT XX: VIOLATIONS OF FEDERAL CIVIL RICO, 18 U.S.C. § 1962(c)

**(Musk and xAI Against Altman, Brockman, Microsoft, and the For-Profit Entities)**

419.    Plaintiffs Musk and xAI re-allege and incorporate by reference paragraphs 1 through 418 inclusive, as though fully set forth herein.

420.    The federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1962, 1964, provides a private right of action for plaintiffs to recover against defendants who harm them through a pattern of racketeering activity as well as defendants who conspire to do so. The statute specifically targets scenarios, like that present here, where defendants exploit legitimate companies, including non-profits, through a concerted pattern of unlawful conduct detrimental to the public interest (here, repeated wire fraud in connection with a publicly subsidized charity), so as to halt the manipulation and corruption of legitimate entities and prevent defendants from profiting from their wrongdoing.

### A.    *Wire Fraud Predicate Offenses*

421.    Altman and Brockman knowingly engaged in a scheme to exploit Musk and others (including donors Jessica Livingston, Peter Thiel, and Open Philanthropy) by inducing them with repeated misrepresentations to make significant financial and other contributions to develop valuable AI/AGI for ostensibly charitable purposes, which Defendants exploited to enrich themselves.

422.    In furtherance of this scheme, Altman and Brockman transmitted, or caused to be transmitted writings by means of wire communication in interstate commerce (emails), in violation of 18 U.S.C. § 1343. The specific emails sent in furtherance of Defendants' scheme include, but are not limited to, those detailed in paragraph 247, *supra.*

423.    Altman and Brockman's specific intent to defraud Musk is clear from, *inter alia*, their express misrepresentations and assurances to Musk in September 2017 that they remained committed to the original non-profit structure and mission of OpenAI, Inc., while simultaneously plotting to loot the charity's technology and employees for exploitation by the For-Profit Entities and Defendants' private gain. *See supra* ¶¶ 100-02.

424.    Altman and Brockman intended Musk to rely, or knew or could have reasonably foreseen that Musk would rely, on their express promises, representations, and assurances, and in good faith Musk reasonably did rely on them to his detriment. Based thereon, Musk caused to be wired tens of millions of dollars of seed money to OpenAI, Inc. as follows:

| Date | Amount |
|------|--------|
| 05/27/2016 | $500,000.00[14] |
| 06/08/2016 | $5,000,000.00 |
| 08/26/2016 | $4,500,000.00 |
| 10/03/2016 | $142,000.00 |
| 10/25/2016 | $142,000.00 |
| 11/21/2016 | $750,000.00 |
| 11/23/2016 | $142,000.00 |
| 12/07/2016 | $4,250,000.00 |
| 01/01/2017 | $1,140,000.00 |
| 01/01/2017 | $700,000.00 |
| 01/01/2017 | $16,028,500.00 |
| 01/05/2017 | $142,000.00 |
| 01/27/2017 | $142,000.00 |
| 07/18/2017 | $175,000.00 |
| 08/14/2017 | $175,000.00 |
| 09/15/2017 | $175,000.00 |
| 09/29/2017 | $85,000.00 |
| 10/16/2017 | $235,000.00 |
| 11/14/2017 | $235,000.00 |
| 12/14/2017 | $235,000.00 |
| 01/18/2018 | $290,000.00 |
| 02/20/2018 | $390,000.00 |
| 03/14/2018 | $290,000.00 |

[14] On information and belief, Musk's initial $10 million in donations to OpenAI, Inc. in 2016 were first wired to Altman's "YC Org.," and then wired by YC Org. to OpenAI, Inc. once OpenAI, Inc. obtained its section 501(c)(3) status.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Date | Amount |
|------|--------|
| 04/16/2018 | $290,000.00 |
| 05/15/2018 | $290,000.00 |
| 06/14/2018 | $290,000.00 |
| 07/16/2018 | $290,000.00 |
| 08/14/2018 | $290,000.00 |
| 09/18/2018 | $290,000.00 |
| 10/17/2018 | $290,000.00 |
| 11/14/2018 | $290,000.00 |
| 12/17/2018 | $290,000.00 |
| 01/16/2019 | $290,000.00 |
| 02/14/2019 | $290,000.00 |
| 03/22/2019 | $290,000.00 |
| 04/16/2019 | $290,000.00 |
| 05/14/2019 | $290,000.00 |
| 06/14/2019 | $290,000.00 |
| 07/17/2019 | $290,000.00 |
| 08/14/2019 | $290,000.00 |
| 09/16/2019 | $290,000.00 |
| 10/17/2019 | $290,000.00 |
| 11/15/2019 | $290,000.00 |
| 12/17/2019 | $290,000.00 |
| 01/14/2020 | $290,000.00 |
| 02/14/2020 | $290,000.00 |
| 03/16/2020 | $290,000.00 |
| 04/13/2020 | $290,000.00 |
| 05/13/2020 | $290,000.00 |

| Date | Amount |
|------|--------|
| 06/15/2020 | $290,000.00 |
| 07/14/2020 | $290,000.00 |
| 08/17/2020 | $290,000.00 |
| 09/14/2020 | $290,000.00 |
| **Total:** | $44,563,500.00 |

425.    During this period, Musk also caused Musk Industries to pay by interstate bank wire the monthly rent and overhead for OpenAI, Inc.'s office.

426.    Musk further invested his time, reputation, and connections to recruit top AI scientists and engineers for the non-profit, which included the transmission of emails and cellular telephonic communications.

427.    It was reasonably foreseeable that interstate wires would be used in connection with Defendants' scheme. In addition to the wire transmissions described above, Altman and Brockman, acting in concert with the For-Profit Entities and Microsoft, relied on wires to invest such funds in furtherance of their fraudulent scheme, and, on information and belief, relied on email or other forms of electronic communication to exchange information about their receipt and usage of such funds and contributions.

428.    In addition, from December 11, 2015 to today, Defendants in their online marketing (e.g., website), advertisements, and promotions made knowingly false and/or misleading representations to defraud the public and induce the false belief that OpenAI, Inc. would be a non-profit whose charitable mission is to develop safe and open-source AI/AGI technology for the public good, not private gain, as detailed in paragraphs 82-88 and 247, *supra*. These false and/or misleading public pronouncements served to further reassure Musk and induce him to make further contributions.

429.    Altman and Brockman knowingly and repeatedly accepted contributions from Musk and other member of the public in order to develop AI/AGI with no intention of honoring and performing their promises at the time they were made, and failed to perform them. For instance, OpenAI's recent GPT-4, GPT-4T, GPT-4o, and OpenAI o1 models are all

closed source and shrouded in secrecy for Defendants' commercial advantage and gain.

430.     Altman and Brockman used and exploited Musk's contributions to fund and support OpenAI, Inc.'s research and development of AI/AGI, and on information and belief, to attract massive investment by Microsoft, as well as to launch the For-Profit Entities, in which, on information and belief, Altman and Microsoft are significant shareholders.

431.     Microsoft and the For-Profit Entities were aware of, benefitted from, and aided and abetted the continuation of this unlawful conduct by, without limitation, providing the capital, corporate structure(s), and advice and encouragement to exploit OpenAI, Inc. and its assets for Defendants' enrichment rather than the public's benefit. Microsoft and the For-Profit Entities further participated by siphoning off and exploiting OpenAI, Inc.'s valuable AI/AGI technology and highly skilled personnel and by facilitating and concealing Defendants' profiteering, as described in detail in paragraphs 127-133, *supra*.

432.     While publicly cloaked as a mere fundraising apparatus, the For-Profit Entities are, in reality, the foundation of Defendants' scheme to control, co-opt, and cash in on OpenAI, Inc.'s valuable technology developed with Musk's significant contributions.

433.     For instance, after Altman and Brockman launched OpenAI, L.P. (now OpenAI OpCo, LLC), they transferred much of the non-profit's staff over to the new company, which also now houses and operates much of OpenAI's technological research and development. Altman, Brockman, and the For-Profit Entities' reshuffling of OpenAI, Inc.'s assets, in concert with Microsoft, served to conveniently shield them and their scheme from public scrutiny and to evade the financial disclosures non-profits like OpenAI, Inc. must make.

434.     Each of the predicate acts by Altman and/or Brockman alleged hereinabove were committed within the scope of their employment, their positions as officers and/or directors at, or their agency relationship with, the For-Profit Entities and/or Microsoft.

435.     In addition, Altman, with the assistance and cooperation of Brockman, the For-Profit Entities, and/or Microsoft, brazenly engaged in rampant self-dealing involving OpenAI, Inc. and its assets, as described in detail in paragraphs 135-45, *supra*.

436.     Altman and Brockman, in concert with the For-Profit Entities and Microsoft,

intentionally concealed their unlawful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence. Musk would not have contributed to OpenAI, Inc. had he known of Defendants' true intentions and scheme.

437.    Altman, Brockman, Microsoft, and the For-Profit Entities directly and indirectly committed or aided and abetted these numerous predicate acts of wire fraud in furtherance of their scheme. The predicate acts by Microsoft and the For-Profit Entities were committed by Altman, Brockman, and/or representatives of such entities acting through, or on behalf of and for the benefit of those entities. Each of these Defendants voluntarily and intentionally committed and/or aided and abetted the commission of the predicate acts to effectuate and/or further their illicit scheme.

**B.    _Pattern of Racketeering Activity_**

438.    Defendants committed multiple predicate acts of wire fraud which are indictable under 18 U.S.C. § 1961(1)(B). Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

439.    Altman, Brockman, the For-Profit Entities, and/or Microsoft committed, or conspired with or aided and abetted one another in committing, at least two (and in fact, numerous) predicate acts of wire fraud constituting a continuous course of conduct spanning a period from at least March 2015 to the present. The temporal duration and the number of predicate acts are so extensive as to constitute a cognizable pattern of racketeering activity with, at minimum, closed-ended continuity, though, on information and belief, such conduct is continuing—e.g., Defendants continue to form new for-profit entities, and to exploit the non-profit's technology for their private gain, all while continuing to promote their counterfeit charitable mission—and there exists a specific threat such conduct will persist indefinitely, constituting a pattern of racketeering activity that is open-ended.

440.    In order to implement their scheme, Defendants repeatedly used the interstate wires to defraud Musk and other contributors. The predicate acts were related, having the same or similar purposes and results (e.g., to obtain significant financial and other contributions to

develop valuable AI/AGI technology to be wrongfully exploited for Defendants' self-enrichment); involved the same or similar participants (e.g., Defendants); and victims (e.g., Plaintiffs, donors, AI scientists and engineers, and other contributors); and involved the same or similar methods of commission (e.g., misrepresentations via email, online marketing, etc.).

441.    Altman, Brockman, the For-Profit Entities, and Microsoft each participated as a principal in the pattern of racketeering activity by, acting with intent or knowledge, committing, causing, aiding, abetting, counseling, commanding, inducing, or procuring the commission of, two or more acts of wire fraud that make up the alleged pattern of racketeering activity, or by willfully causing the commission of two or more acts of wire fraud that make up the pattern of racketeering activity, which, if Altman, Brockman, the For-Profit Entities, or Microsoft directly performed, would constitute the commission of two or more acts of wire fraud comprising such pattern.

C.    ***Violations of Section 1962(c)***

442.    Title 18, Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"

443.    OpenAI, Inc. is an "enterprise" as defined by 18 U.S.C. § 1961(4), and engaged in, and its activities affected, interstate and foreign commerce. At all relevant times, OpenAI, Inc. had an existence separate and distinct from the pattern of racketeering in which Altman, Brockman, the For-Profit Entities, and Microsoft engaged.

444.    Altman, Brockman, the For-Profit Entities, and Microsoft are "persons" within the definition of 18 U.S.C. § 1961(3), and at all relevant times were employed by and/or associated with OpenAI, Inc. Altman and Brockman are OpenAI, Inc.'s CEO and sometimes President/CTO, respectively, and at various times have sat, and Altman currently sits, on its Board. On information and belief, from November 29, 2023 to July 9, 2024, Microsoft held its so-called "observer seat" on the Board, from which it participated in the management, operation, and/or control of OpenAI, Inc. The For-Profit Entities, which on information and belief are largely owned, operated, and/or controlled by Altman and Microsoft, knowingly

implemented decisions of Altman, Brockman, and/or Microsoft and have now so thoroughly infiltrated OpenAI, Inc., and are so intertwined with OpenAI, Inc., so as to effectively participate in, manage, control, and/or operate the non-profit with impunity for Defendants private gain.

445.    Defendants conducted the affairs of OpenAI, Inc. through a pattern of racketeering activity by systematically engaging in wire fraud to direct, operate, and manage the enterprise. Specifically:

a.    Altman and Brockman, as officers with operational control, used their positions within OpenAI, Inc. to execute and direct the enterprise's core activities through the commission of multiple predicate acts of wire fraud. Defendants directed OpenAI, Inc.'s solicitation of charitable contributions and managed its fundraising operations through interstate wires containing systematic fraudulent misrepresentations about the enterprise's non-profit mission, as detailed above. Indeed, in reliance on Defendants' repeated misrepresentations, Musk contributed approximately $44,811,795.00[15] in seed capital via interstate wires to OpenAI, Inc. as set forth in the detailed table above, provided office rent and overhead through Musk Industries, and invested his time, reputation, and connections to recruit premier AI scientists and engineers for the non-profit; and

b.    After securing initial control over the enterprise through multiple systematic predicate acts of wire fraud, Defendants maintained and strengthened their control by transmitting additional express misrepresentations via interstate wires to Musk in September 2017, falsely claiming a continuing commitment to and enthusiasm for OpenAI's non-profit structure and charitable mission, as detailed above. These strategic misrepresentations induced Musk to continue to make substantial financial contributions to the enterprise (evidenced by numerous wire transfers after September 2017), allowing Defendants to maintain control over the enterprise's financing and operations.

446.    The For-Profit Entities and Microsoft did more than just benefit from this

---

[15] In addition to his wired contributions, Musk donated Model 3 Teslas to OpenAI, Inc., valued at $248,295.00, which contribution required communication over e-mail.

pattern of racketeering activity, they were vital to the scheme's success and actively aided and abetted Altman and Brockman in operating the enterprise through this pattern by:

a.    Knowingly providing the capital, corporate structure(s), and advice and encouragement that enabled Altman and Brockman to perpetuate their continuing wire fraud scheme, thereby aiding and abetting the operation of the enterprise through the ongoing transmission of fraudulent representations via interstate wires;

b.    Willfully participating in the deception of donors and the public by facilitating and concealing Defendants' profiteering, thus aiding and abetting the continued operation of OpenAI, Inc. through wire fraud that misrepresented its charitable mission and obscured Defendants' profiteering;

c.    Serving as vital participants in siphoning off and exploiting OpenAI, Inc.'s valuable AI/AGI technology and highly skilled personnel, acts that directly aided and abetted the core wire fraud scheme; and

d.    Intentionally executing the reshuffling of OpenAI, Inc.'s assets that served to conveniently shield them and their scheme from public scrutiny and to evade the financial disclosures non-profits like OpenAI, Inc. must make, thus directly aiding and abetting the wire fraud. The concealment of Defendants' scheme from Musk, regulators, and the public was critical to its success.

447.    Further, the For-Profit Entities did not simply aid and abet the wire fraud scheme but actively participated in it by making material misrepresentations transmitted via interstate wires about their purpose and investors' expected returns, including falsely stating that investors should "consider their investment in the spirit of a donation" and that it is "clear that [investors] should never expect a profit," and claiming that "The [for-profit endeavor] exists to advance OpenAI, Inc.'s mission." These fraudulent communications, deliberately directed at both Musk and the public, served to reassure Musk and induced him to make further financial contributions to the enterprise. The For-Profit Entities themselves participated in the operation of the enterprise and directed its affairs by utilizing wire fraud to secure the enterprise's funding while concealing that its structure was designed to retain the vast majority

of revenue in the For-Profit Entities and to maximize private financial returns, as revealed, for example, by OpenAI's recent agreement to remove all profit caps to amplify its investors' financial gains.

448.    Defendants' concerted pattern of racketeering activity was not merely coincidental to the enterprise but was integral to its operation. Defendants did not simply commit predicate acts of wire fraud while associated with OpenAI, Inc., their ongoing wire fraud constituted the primary means through which they directed and controlled the enterprise's most critical functions: securing the necessary capital and top AI scientific talent to develop valuable AI technology so that Defendants could systematically loot and exploit that technology for their own enrichment.

*    *    *

449.    The foregoing unlawful actions of Altman, Brockman, the For-Profit Entities, and Microsoft directly, illegally, and proximately caused and continue to cause injuries to Musk and xAI's respective business and property in an amount to be proven at the time of trial.

450.    In addition to the loss of Musk's considerable contributions to OpenAI, Inc., Plaintiffs were further harmed by Defendants' investment of the proceeds from their unlawful conduct in OpenAI, Inc. and/or Defendants' acquisition of an interest in, or control over, OpenAI, Inc. in furtherance of their scheme.

451.    OpenAI, now a competitor to xAI, used Musk's tax-free startup capital to gain an unfair competitive advantage in the market for generative AI, resulting in decreased market share and profits for xAI, diversion of customers/investors away from them, and/or the competitive injuries detailed in Counts VIII-XVII.

452.    Defendants further leveraged their control over OpenAI, Inc. and market power, acquired through the pattern of unlawful activity described above, to undercut and block Musk and xAI's entrance and/or growth in the generative AI market, including by controlling the limited supply of available compute, investors, and limited pool of qualified AI talent.

453.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Musk and xAI are entitled to recover three times the damages they sustained, reasonable attorneys' fees, and

costs of litigation, as well as any other relief as authorized by statute.

### COUNT XXI: CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO, 18 U.S.C. § 1962(d)

**(Musk and xAI Against Altman, Brockman, Microsoft, and the For-Profit Entities)**

454.    Plaintiffs Musk and xAI re-allege and incorporate by reference paragraphs 1 through 453 inclusive, as though fully set forth herein.

455.    Altman, Brockman, the For-Profit Entities, and Microsoft have undertaken the wrongful acts described in Count XX above as part of a common scheme. Defendants willfully, knowingly, and unlawfully conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Defendants intentionally concealed their illicit conduct, which prevented Plaintiffs from discovering their scheme, notwithstanding Plaintiffs' exercise of due diligence.

456.    Altman, Brockman, the For-Profit Entities, and Microsoft were aware of the unlawful activity alleged hereinabove. Altman, as OpenAI, Inc.'s co-founder, CEO, and Board member, and Brockman, as its President and prior CTO and Board member, in concert with Microsoft, knew that Altman, Brockman and through them, OpenAI. Inc., had made false and/or misleading representations to Musk and other contributors that OpenAI, Inc. would be a non-profit devoted to the open-source development of AI/AGI for the public's benefit, and that Musk's financial or other contributions were supposed to be used solely to further such charitable purpose. On information and belief, Altman and Brockman have at all relevant times been officers, agents, employees, and/or owners whose knowledge and intent is imputed to the For-Profit Entities. The For-Profit Entities and Microsoft knew of and agreed to facilitate the operation of OpenAI, Inc. and/or Defendants' scheme.

457.    Altman, Brockman, and Microsoft directed and caused the For-Profit Entities to engage in the racketeering activity alleged hereinabove.

458.    Altman and Brockman understood that they were committing numerous RICO predicate acts and participating in a racketeering scheme, evidenced among other things, by their overt acts and involvement in repeatedly promulgating false and/or misleading

representations via wire transmissions, including email correspondence, online transmittal, and social media posts, and receiving financial and other contributions, including wired funds, in response to those fraudulent communications. In addition, on information and belief, the For-Profit Entities and Microsoft understood they were facilitating and/or aiding and abetting Altman and Brockman's self-dealing and furthering the scheme by helping to conceal their fraudulent conduct and aiding in the exploitation of the non-profit's assets for private inurement.

459.    The participation and agreement of Altman, Brockman, each of the For-Profit Entities, and Microsoft was necessary to the scheme. Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme, and agreed and conspired to conduct and participate in the affairs of OpenAI, Inc. through a consistent and continual pattern of racketeering activity. Further evidence of the agreement among Altman, Brockman, the For-Profit Entities, and Microsoft is peculiarly within the knowledge and control of Defendants.

460.    As a direct and proximate result of Defendants' conspiracy and violations of 18 U.S.C. § 1962(d), Musk and xAI have been injured in their business and property, as alleged herein, and are entitled to treble damages, attorneys' fees, and costs of suit.

## **PRAYER FOR RELIEF**

WHEREFORE, each Plaintiff respectfully prays for judgment on the causes of action as pleaded against Defendants, including Deannah Templeton and Reid Hoffman, as follows:

1.    For compensatory, consequential, and statutory damages, restitution, and non-restitutionary disgorgement, and any other relief that may be permitted by law or equity, according to proof in an amount to be determined at trial, together with interest thereon as provided by law;

2.    For a constructive trust on Defendants' ill-gotten gains, property, and assets traceable to Musk's significant contributions to OpenAI, Inc. and/or all unlawful benefits received by Defendants;

3.    For an accounting of all gains, profits, and advantages Defendants have derived

from their solicitation, receipt, use, and expenditure of Musk's contributions to OpenAI, Inc.,

including the intellectual property and derivative works funded by the same and from

Defendants' use of the same for their benefit or the benefit any third party;

4.    For an order compelling specific performance of Defendants' contractual

promises to Musk;

5.    For a preliminary and permanent injunction enjoining Defendants' unlawful,

unfair, fraudulent, and unjust conduct;

6.    For treble damages pursuant to 15 U.S.C. § 15, 18 U.S.C. § 1964(a)-(c), 15

U.S.C. § 1117(a), and Cal. Bus. & Prof. Code §§ 16750(a), 17082;

7.    For punitive and/or exemplary damages as provided by law;

8.    For prejudgment interest, including without limitation at the statutory rate

provided in Cal. Bus. & Prof. Code § 16761;

9.    For costs of suit;

10.    For attorneys' fees pursuant to 15 U.S.C. § 15, 15 U.S.C. § 1117(a), 18 U.S.C. §

1964(c), Cal. Civ. Proc. § 1021.5, Cal. Bus. & Prof. Code §§ 16750(a), 17082, and as

otherwise permitted by law; and

11.    For such other and further relief as the Court deems just and appropriate.


DATED: May 22, 2025                    Respectfully Submitted,

                                       TOBEROFF & ASSOCIATES, P.C.

                                       By: */s/ Marc Toberoff*
                                            Marc Toberoff

                                       *Attorneys for Plaintiffs Elon Musk*
                                       *and X.AI Corp.*

1

### DEMAND FOR JURY TRIAL

2       Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby

3   demand a trial by jury for all issues triable to a jury.

4

5    DATED: May 22, 2025                 Respectfully Submitted,

6                                       TOBEROFF & ASSOCIATES, P.C.

7                                       By: */s/ Marc Toberoff*_____

8                                           Marc Toberoff

9                                       *Attorneys for Plaintiffs Elon Musk*
                                        *and X.AI Corp.*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28