JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted *pro hac vice*)
BRWilson@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:    (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman,*
*OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,*
*OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,*
*OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,*
*OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,*
*OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,*
*OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,*
*OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,*
*OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,*
*Aestas Management Company, LLC, and Aestas LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **OPPOSITION TO MOTION TO DISMISS OPENAI'S COUNTERCLAIMS** |
| v. | |
| SAMUEL ALTMAN, et al., | Date:  July 1, 2025 |
| Defendants. | Time:  2:00 p.m.<br>Courtroom:  1 – 4th Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether OpenAI's counterclaims for unfair and fraudulent business acts or practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* (First Counterclaim) and for tortious interference with prospective economic advantage (Second Counterclaim), both of which are predicated on Plaintiffs' sham bid and its attendant media hype, fall outside the scope of the *Noerr-Pennington* doctrine because the predicate conduct is neither petitioning activity nor incidental to any petitioning activity.

2.     Whether those same counterclaims fall outside the scope of California's litigation privilege because the communications at issue were neither made in judicial or quasi-judicial proceedings nor constituted a necessary or useful step in any litigation or regulatory process.

3.     Whether OpenAI's First Counterclaim adequately alleges (i) unfair business acts or practices based on the threatened anticompetitive effects of Plaintiffs' sham bid and its attendant media hype and (ii) fraudulent business acts or practices based on the likelihood of Plaintiffs' sham bid and its attendant media hype deceiving reasonable consumers into falsely believing that Plaintiffs intended to acquire OpenAI Inc.'s assets.

4.     Whether OpenAI's Second Counterclaim adequately alleges (i) an independently wrongful act based on Plaintiffs' unfair and fraudulent business acts or practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, (ii) economic relationships with investors, employees, and customers that had a probability of future economic benefit to OpenAI, and (iii) actual disruption and economic harm resulting from Plaintiffs' sham bid and its attendant media hype making OpenAI's performance of those economic relationships more costly or burdensome.

5.     Whether OpenAI's counterclaims share a common nucleus of operative facts with, and therefore should be tried alongside, Plaintiffs' claims designated for Phase One of this litigation, such that a stay of OpenAI's counterclaims is not warranted.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 5

I.    NEITHER THE *NOERR-PENNINGTON* DOCTRINE NOR CALIFORNIA'S
      LITIGATION PRIVILEGE SHIELDS PLAINTIFFS FROM LIABILITY ..................... 5

      A.    *Noerr-Pennington* does not apply to the LOI ........................................... 6

      B.    Plaintiffs' media hype of the LOI is not subject to *Noerr-Pennington* .................. 8

      C.    The counterclaims' reference to Plaintiffs' communications with the
            Attorneys General does not trigger *Noerr-Pennington* ........................................ 9

      D.    California's litigation privilege does not apply .................................................... 10

II.   OPENAI ADEQUATELY PLEADS BOTH COUNTERCLAIMS ................................. 13

      A.    OpenAI states a claim under California's UCL (First Counterclaim).................. 14

            1.    OpenAI states a claim of unfair business acts or practices ...................... 14

            2.    OpenAI states a claim of fraudulent business acts or practices ............... 18

      B.    OpenAI states a claim of tortious interference with prospective economic
            advantage (Second Counterclaim).......................................................................... 20

III.  THE COUNTERCLAIMS SHOULD BE PROMPTLY TRIED .................................... 22

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Apartment Ass'n, Inc.* v. *City of Santa Monica*,
  41 Cal. 4th 1232 (2007) ................................................................ 12 n.10

*Amin* v. *Subway Rests., Inc.*,
  2022 WL 20184652 (N.D. Cal. July 7, 2022) ........................................ 13

*Arenas* v. *Shed Media U.S. Inc.*,
  881 F. Supp. 2d 1181 (C.D. Cal. 2011).............................................. 12 n.10

*Argentieri* v. *Zuckerberg*,
  8 Cal. App. 5th 768 (2017)......................................................... 10, 11, 12

*Arista Networks, Inc.* v. *Cisco Sys. Inc.*,
  2018 WL 11230167 (N.D. Cal. May 21, 2018) ............................................ 6

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) .......................................................................... 13

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)........................................................................... 13

*Better Meat Co.* v. *Emergy, Inc.*,
  2023 WL 2977786 (E.D. Cal. Apr. 17, 2023) ......................................... 12 n.10

*Byton N. Am. Co.* v. *Breitfeld*,
  2020 WL 3802700 (C.D. Cal. Apr. 28, 2020) ........................................... 20-21

*Cal. Med. Ass'n* v. *Aetna Health of Cal. Inc.*,
  14 Cal. 5th 1075 (2023) ..................................................................... 20

*Canatella* v. *Reverse Mortg. Sols. Inc.*,
  2014 WL 7205146 (N.D. Cal. Dec. 17, 2014) ........................................ 19 n.15

*Cascades Comp. Innov. LLC* v. *RPX Corp.*,
  2013 WL 6247594 (N.D. Cal. Dec. 3, 2013) ...................................... 6, 7 n.5, 8

*Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ............................................................. 14, 15, 16, 17

*City of Costa Mesa* v. *D'Alessio Inv., LLC*,
  214 Cal. App. 4th 358 (2013)...................................................... 10, 11, 12

*Comm. on Children's Television, Inc.* v. *Gen. Foods Corp.*,
  35 Cal. 3d 197 (1983) ....................................................................... 19

*CRST Van Expedited, Inc.* v. *Werner Enters., Inc.*,
  479 F.3d 1099 (9th Cir. 2007)............................................................... 20

*Empress LLC* v. *City & Cnty. of S.F.*,
    419 F.3d 1052 (9th Cir. 2005)....................................................................................... 13 n.11

*Epic Games, Inc.* v. *Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023)........................................................................................... 17

*Franchise Realty Interstate Corp.* v. *S.F. Loc. Joint Exec.*
    *Bd. of Culinary Workers*,
    542 F.2d 1076 (9th Cir. 1976)....................................................................................... 13 n.11

*Freeman* v. *Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005)......................................................................................... 6

*Galbraith* v. *Cnty. of Santa Clara*,
    307 F.3d 1119 (9th Cir. 2002)....................................................................................... 13 n.11

*Ghazarian* v. *Magellan Health, Inc.*,
    53 Cal. App. 5th 171 (2020)........................................................................................... 20

*Gruen* v. *EdFund*,
    2009 WL 2136785 (N.D. Cal. July 15, 2009)............................................................... 13 n.11

*Hagberg* v. *Cal. Fed. Bank*,
    32 Cal. 4th 350 (2004) ................................................................................................... 10

*Hall* v. *Time Inc.*,
    158 Cal. App. 4th 847 (2008)......................................................................................... 20

*Hernandez* v. *Amcord, Inc.*,
    215 Cal. App. 4th 659 (2013)........................................................................................... 9

*Hill* v. *Roll Int'l Corp.*,
    195 Cal. App. 4th 1295 (2011)....................................................................................... 19

*Humboldt Wholesale, Inc.* v. *Humboldt Nation Distrib., LLC*,
    2012 WL 2572065 (N.D. Cal. July 2, 2012) ................................................................. 21

*In re Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................................. 6

*In re Diadexus, Inc.*,
    2019 WL 3412928 (N.D. Cal. July 29, 2019) ................................................................ 13

*In re Firearm Cases*,
    126 Cal. App. 4th 959 (2005)......................................................................................... 17

*In re Mattel, Inc.*,
    588 F. Supp. 2d 1111 (C.D. Cal. 2008).......................................................................... 13 n.11

*Korea Kumho Petrochemical* v. *Flexsys Am. LP*,
    2007 WL 2318906 (N.D. Cal. Aug. 13, 2007)............................................................... 17

*Kowalsky* v. *Hewlett-Packard Co.*,
    2011 WL 3501715 (N.D. Cal. Aug. 10, 2011)............................................................... 19

iv

*Kwikset Corp.* v. *Superior Ct.*,
    51 Cal. 4th 310 (2011) ........................................................................................... 20

*LegalForce RAPC Worldwide P.C.* v. *UpCounsel, Inc.*,
    2019 WL 160335 (N.D. Cal. Jan. 10, 2019) .......................................................... 16

*Lozano* v. *AT&T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ................................................................................. 14

*Makaeff* v. *Trump Univ., LLC*,
    715 F.3d 254 (9th Cir. 2013) ................................................................................. 10

*Merritt* v. *Countrywide Fin. Corp.*,
    759 F.3d 1023 (9th Cir. 2014) .................................................................................. 8

*Metricolor LLC* v. *L'Oréal S.A.*,
    2020 WL 3802942 (C.D. Cal. July 7, 2020) ................................................... 16, 17

*Morgan* v. *AT&T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235 (2009) .......................................................................... 18, 19

*NJOY, LLC* v. *Imiracle (HK) Ltd.*,
    760 F. Supp. 3d 1084 (S.D. Cal. 2024) ........................................................... 16, 17

*Ore. Nat. Res. Council* v. *Mohla*,
    944 F.2d 531 (9th Cir. 1991) ........................................................................... 13 n.11

*Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.*,
    42 Cal. 3d 1157 (1986) ........................................................................................... 12

*Overhill Farms, Inc.* v. *Lopez*,
    190 Cal. App. 4th 1248 (2010) ............................................................................... 22

*Pac. Gas & Elec. Co.* v. *Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ........................................................................................... 21

*Pampena* v. *Musk*,
    705 F. Supp. 3d 1018 (N.D. Cal. 2023) ................................................................ 7, 9

*Piping Rock Partners, Inc.* v. *David Lerner Assocs., Inc.*,
    946 F. Supp. 2d 957 (N.D. Cal. 2013) .............................................................. 21 n.16

*Planned Parenthood Fed'n of Am., Inc.* v. *Ctr. for Med. Progress*,
    214 F. Supp. 3d 808 (N.D. Cal. 2016) ................................................................... 16

*ProconGPS, Inc.* v. *Star Sensor LLC*,
    2011 WL 5975271 (N.D. Cal. Nov. 29, 2011) .................................................. 16 n.13

*Realtek Semiconductor Corp.* v. *MediaTek, Inc.*,
    732 F. Supp. 3d 1101 (N.D. Cal. 2024) .............................................................. 9 n.8

*Rodriguez* v. *Panayiotou*,
    314 F.3d 979 (9th Cir. 2002) .................................................................................. 12

*Rothman* v. *Jackson*,
49 Cal. App. 4th 1134 (1996) .................................................................................. 12

*Sebastian Int'l, Inc.* v. *Russolillo*,
128 F. Supp. 2d 630 (C.D. Cal. 2001) ...................................................................... 21

*Select Portfolio Servicing* v. *Valentino*,
875 F. Supp. 2d 975 (N.D. Cal. 2012) ................................................................. 10-11

*Shaeffer* v. *Califia Farms, LLC*,
44 Cal. App. 5th 1125 (2020) .................................................................................. 20

*Silberg* v. *Anderson*,
50 Cal. 3d 205 (1990) .............................................................................................. 10

*Silicon Knights, Inc.* v. *Crystal Dynamics, Inc.*,
983 F. Supp. 1303 (N.D. Cal. 1997) ........................................................................ 22

*Sosa* v. *DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ..................................................................................... 6

*Souter* v. *Edgewell Personal Care Co.*,
2023 WL 5011747 (9th Cir. Aug. 7, 2023) .............................................................. 19

*Stevenson Real Est. Servs., Inc.* v. *CB Richard Ellis Real Est. Servs., Inc.*,
138 Cal. App. 4th 1215 (2006) .......................................................................... 18 n.14

*TYR Sport Inc.* v. *Warnaco Swimwear Inc.*,
679 F. Supp. 2d 1120 (C.D. Cal. 2009) ................................................................... 21

*United Artists Corp.* v. *United Artist Studios LLC*,
2019 WL 12372078 (C.D. Cal. June 17, 2019) .................................................. 11 n.9

*United Mine Workers of Am.* v. *Pennington*,
381 U.S. 657 (1965) ................................................................................................. 10

*Vidillion, Inc.* v. *Pixalate, Inc.*,
2019 WL 3308768 (C.D. Cal. June 5, 2019) ...................................................... 13 n.11

*Westside Ctr. Assocs.* v. *Safeway Stores 23, Inc.*,
42 Cal. App. 4th 507 (1996) .................................................................................... 21

*White* v. *W. Title Ins. Co.*,
40 Cal. 3d 870 (1985) ......................................................................................... 12-13

*Williams* v. *Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) .................................................................................... 18

*Wisk Aero LLC* v. *Archer Aviation Inc.*,
2021 WL 4932734 (N.D. Cal. Sept. 14, 2021) ........................................... 6, 8, 9, 12

**Statutes and Rules**

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ..................... 2, 14

Fed. Rule Civ. Proc. 9(b) ..................................................................................................... 13 n.11

**Other Authorities**

Rutter, Cal. Prac. Guide: Civ. Proc. Before Trial, Claims & Defenses Ch. 3(II)-B .................... 21

# INTRODUCTION

Plaintiffs' motion to dismiss OpenAI's counterclaims relies on mischaracterizations of Plaintiffs' own conduct that have no grounding in the facts and—more importantly for this motion—no grounding in OpenAI's pleading. The fake "bid" that xAI and other would-be investors lobbed at OpenAI's board was no "petitioning" of any government body or court. Rather, as the well-pleaded facts show, it was rank manipulation, pursued with the intention and effect of distorting the market and disrupting OpenAI's efforts to compete. Because this culmination of a years-long campaign of harassment—and not Musk's communications relating to any governmental proceeding or any other activity protected by the First Amendment—forms the predicate for OpenAI's counterclaims, the *Noerr-Pennington* doctrine and California's litigation privilege afford no shelter.

As for Plaintiffs' argument that the counterclaims otherwise fail to state a viable claim, this ignores the pleading and rests instead on an imaginary alternative narrative based on nothing properly before the Court on the motion. Most extravagantly, Plaintiffs falsely recount supposed "admissions" by OpenAI: Contrary to the motion, OpenAI has never "admit[ted]" that the fake bid "was backed by credible investors with established track records of successfully completing high-value acquisitions." MTD 17.[1] Nor has it "admit[ted]" that the way the bid was communicated—through Musk's litigation counsel—"follow[ed] standard practice for serious acquisition proposals." *Id.* at 17-18. Or that the bid was "objectively timely." *Id.* Nor has OpenAI ever "acknowledged" an "orchestration of an insider deal to sell its assets to a new OpenAI for-profit company[.]" *Id.* at 3. Or "admi[tted]" that Musk's and xAI's "communications prompted 'discussions with both the Delaware and California Attorneys General.'" *Id.* at 11 (citing ¶ 108). These assertions are contrary to the truth and to OpenAI's well-pleaded allegations.

Musk and xAI have used this litigation to advance a catalogue of self-serving

---

[1] Citations of "MTD" refer to Plaintiffs' Motion to Dismiss OpenAI's Counterclaims. Citations in the form "¶ __" are of OpenAI's Counterclaims. Citations in the form "FAC ¶ __" are of Plaintiffs' First Amended Complaint. "Plaintiffs" in this brief refers to Plaintiffs and Counterclaim Defendants Elon Musk and xAI. "OpenAI" in this brief refers to Defendants and Counterclaim Plaintiffs OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC.

misrepresentations—chief among them that OpenAI intended to undertake a "conversion" from a nonprofit to a for-profit enterprise, when in reality the contemplated reorganization would keep the nonprofit in place, in control, and better-resourced than ever.[2] But the pretense that OpenAI has "admitted" Plaintiffs' various falsehoods is new, and only confirms Plaintiffs' inability to attack the counterclaims as pleaded (and as will be proven). The motion should be denied, and OpenAI's counterclaims—which share the same nucleus of operative facts as the other claims to be tried beginning in March 2026—should be resolved on the expedited track rather than stayed.

## BACKGROUND

OpenAI has pleaded two claims against Musk and xAI: (1) unfair and fraudulent business practices, in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, based on Plaintiffs' "orchestrating a sham bid to purportedly acquire [] OpenAI, Inc.'s assets," and (2) tortious interference with prospective economic advantage, again based on the "purported bid." ¶¶ 102-27.

The "bid" that predicates these claims is contained in a February 10, 2025 "Letter of Intent" ("LOI") directed not to any court or government regulator, but instead to OpenAI, Inc.'s board of directors. ¶ 83. The LOI—which Plaintiffs leaked to the press before it even reached the board, ¶ 84—was a "naked effort to disrupt the [OpenAI, Inc. nonprofit] board's consideration" of a corporate reorganization that the board has been considering for roughly a year. ¶ 95. That contemplated structure change is "*not* a 'conversion' of the nonprofit into a for-profit entity" but rather a change "in which the nonprofit would continue to exist and pursue its mission of ensuring that AGI benefits all of humanity," while the for-profit subsidiary that OpenAI, Inc. created years ago, in 2019, would become a public benefit corporation. ¶ 77; *see also* ¶¶ 46-47. The nonprofit board has been considering this change because OpenAI's current structure poses "challenges in attracting new investment and retaining and attracting highly skilled personnel," which threaten the pursuit of OpenAI's mission to develop safe and beneficial AGI. ¶¶ 75-77. Musk and xAI seek to interfere with this reorganization because they want OpenAI to fail: "If a restructuring designed to

---

[2] *See Evolving OpenAI's structure*, OpenAI (May 5, 2025), https://openai.com/index/evolving-our-structure.

serve the advancement of the mission is halted," "OpenAI's competitors—entities like Musk's xAI that do not share OpenAI's mission—will benefit." ¶ 79.

As pleaded facts demonstrate, the LOI seeks to achieve by unfair commercial means one of Musk's objectives in suing and provoking regulators to investigate OpenAI: disrupting OpenAI's corporate reorganization. While Plaintiffs cast the LOI as part of their petitioning of government authorities, MTD 8, the document makes no mention of this litigation or of any investigation or proceeding by or before any government entity, *see* Dkt. 116-1. And while its signatories include xAI and—by Plaintiffs' admission to this Court—comprise a "Musk-led consortium" (Dkt. 117 at 1), they also include several people who are not parties to this litigation. ¶ 83.

The "bid" communicated by the LOI was a sham. ¶¶ 85-88. "[S]avvy media commentators recognized it as" such, ¶ 85, and the LOI "included no evidence of financing to pay the nearly $100 billion purchase price," which purportedly was based in part on "projections" that OpenAI has never provided to Musk, any other signatory of the LOI, or the public, ¶ 86. "None of the investors had conducted any diligence on the business," *id.*, and when one of them was asked about the LOI on CNBC, he "became flustered," admitting "the point of the bid, as pitched to him (plainly by Musk) was not to buy OpenAI's assets, but instead to obtain 'discovery' and 'get behind the wall' at OpenAI." ¶ 88. The purchase price noted in the LOI—$97.375 billion—"was a joking reference to 974 Praf," a character from a work of fiction "from which Musk has also drawn names for multiple SpaceX rockets." ¶ 89.[3]

Sham though it was, "the 'bid' dominated international news for days," ¶ 84, and "required OpenAI to expend significant resources in responding to it." ¶ 90. This "effort to disrupt the [OpenAI] board's consideration of a potential restructuring and sow confusion among employees and potential investors" has interfered with the valuation exercise implicated in OpenAI's planned

---

[3] Plaintiffs' denial of this point not only is powerless to negate the well-pleaded facts of the counterclaims, but rests on a representation made in the LOI that the counterclaims specifically identify as false: that referring to the bid price supposedly is "based on publicly reported financial and governance data," referring to the purported "financial results as well as projections" from OpenAI described in the LOI. MTD 5 n.6 (citing Dkt. 116-1 at 5 (¶ 1)). As the counterclaims plead, "OpenAI has never disclosed 'projections' publicly or provided them to Musk or any of the investors named in the letter. None of the investors had conducted any diligence on the business." ¶ 86.

reorganization. ¶ 95. "With no involvement in OpenAI's valuation process," Plaintiffs and their associates "purported to put a price on OpenAI, Inc.'s assets," and even announced preparedness to match or exceed any higher bid. *Id.* "This very public effort to artificially 'raise[] the floor for the nonprofit's valuation' has already caused confusion." *Id.* The "bid"—which "came at a time when, as Musk knew, OpenAI was engaged in an extremely competitive process to raise funds"— threatens OpenAI's relationships with its investors, and has "already made maintenance of those business relationships more costly and burdensome." ¶ 96; *see also* ¶¶ 107-08, 121-24. "Still worse, the threat of a Musk takeover is a threat to the very mission of building beneficial AGI—the mission to which OpenAI employees are dedicated." ¶ 100.

The sham bid threatens competitive harm as well. Plaintiffs' purpose in pursuing the bid was "to slow OpenAI's progress and impair its ability to compete effectively in an increasingly crowded field," and "also to seize and maintain for xAI an unearned edge designed to impair competition more broadly for the sole benefit of Musk's xAI, at the expense of the public interest." ¶ 98. One "effect of the sham bid" has been "to threaten to reduce lawful competition in the market." ¶ 109.

Among the forms of relief OpenAI seeks on its counterclaims are (1) damages stemming from the sham bid; and (2) injunctive relief. ¶¶ 114, 127. In support of its request for injunctive relief, and in particular to demonstrate "the risk of future, irreparable harm," OpenAI has pleaded facts establishing that the fake "bid" is part of a "years-long pattern of abusive conduct." ¶ 127; *see also* ¶ 112. That conduct—part of Musk's campaign to take down OpenAI after it began succeeding without him and threatening his own plans for domination of AI technology—has included, among other things, (1) calling for a "six-month 'moratorium' on the development of AI more advanced than OpenAI's just-released GPT-4" in order to "stall OpenAI while all others, most notably Musk"—and xAI, which he had "quietly created" just days earlier—could catch up (¶¶ 59-60); (2) issuing a pretextual and deceptive records demand for "confidential and commercially sensitive internal documents," "[f]eigning concern as a former donor and director . . . without ever disclosing that he was a building a competitor [xAI] in secret" (¶ 61); and (3) "repeatedly disparaging [OpenAI] on false and derogatory grounds, including on [Musk's and xAI's] X platform to an

audience of hundreds of millions" (¶ 112, *see also* ¶¶ 59-64, 70-72).

The pleaded background of the counterclaims notes that Plaintiffs have sought to pressure the Attorneys General for California and Delaware to take action against OpenAI. That fact is pleaded to illustrate Plaintiffs' broader pattern of harassment—not as the basis for liability. *See* ¶ 69 ("Around the same time he filed this action, Musk demanded that regulators investigate OpenAI. He sent several letters to the Attorneys General of California and Delaware, encouraging them to take action against OpenAI—most explosively, to force OpenAI, Inc., without legal basis, to auction off its assets for the benefit of Musk and his associates."); *compare* ¶¶ 103-14, 116-27 (making no mention of these communications).

## ARGUMENT

### I.   NEITHER THE *NOERR-PENNINGTON* DOCTRINE NOR CALIFORNIA'S LITIGATION PRIVILEGE SHIELDS PLAINTIFFS FROM LIABILITY

Plaintiffs' pitch for dismissal under the *Noerr-Pennington* doctrine and California's litigation privilege turns on the premise that OpenAI's counterclaims are "predicated" on (1) Plaintiffs' communications with the Delaware and/or California Attorneys General and/or (2) communications "incidental to" or constituting a "necessary or useful step" in the pursuit of proceedings before the Attorneys General and/or this litigation. *See* MTD 1. But the premise is false. Plaintiffs' letters to the Attorneys General, mentioned in a lone paragraph of the counterclaims' factual narrative, are not the basis for OpenAI's counterclaims. *See* ¶ 69. Nothing in OpenAI's counterclaims is "predicated" on that correspondence; no part of the claims rises or falls on that correspondence. To the contrary: the sham bid itself and its attendant media hype are what ground those claims. And back when it served them to do so—when OpenAI submitted the LOI to this Court as evidence belying Musk's claim for breach of charitable trust and undermining his then-pending request for a preliminary injunction—Plaintiffs portrayed the LOI conveying the sham bid as "entirely irrelevant" and "distract[ing] from the core issues before this Court." Dkt. 117 at 1.[4] They cannot now insist—and the pleaded facts cannot in any event support—that it was actually an important part of their court- and regulator-facing petitioning activity.

---

[4] The Court accepted OpenAI's filing of the LOI. *See* Dkt. 121 at 13-14 n.10.

### A.    *Noerr-Pennington* does not apply to the LOI

The "seldom-used" *Noerr-Pennington* doctrine "protects 'those who petition any department of the government for redress . . . from statutory liability *for their petitioning conduct*.'" *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020) (quoting *Sosa* v. *DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006)) (emphasis added). The doctrine protects only "(1) petitioning activity itself—for instance, '[a] complaint, an answer, a counterclaim'—and (2) 'conduct incidental to a petition.'" *Cascades Comp. Innov. LLC* v. *RPX Corp.*, 2013 WL 6247594, at *16 (N.D. Cal. Dec. 3, 2013) (quoting *Freeman* v. *Lasky, Haas & Cohler*, 410 F.3d 1180, 1183-84 (9th Cir. 2005)). And "conduct incidental to a petition" is captured only where "'sufficiently related to petitioning activity,'" *id.* (quoting *Sosa*, 437 F.3d at 935), and where protecting the challenged activity is necessary "'to preserve the breathing space required for the exercise of the rights [the Petition Clause] protects,'" *Arista Networks, Inc.* v. *Cisco Sys. Inc.*, 2018 WL 11230167, at *11 (N.D. Cal. May 21, 2018) (quoting *Sosa*, 437 F.3d at 933).

Accordingly, "extra-judicial communications" such as the LOI fall within *Noerr-Pennington* only where there exists a "tight connection to furthering the [proceeding] and the values underlying the [*Noerr-Pennington*] doctrine." *Wisk Aero LLC* v. *Archer Aviation Inc.*, 2021 WL 4932734, at *7 (N.D. Cal. Sept. 14, 2021). "Conduct 'incidental' to a lawsuit [or quasi-judicial proceeding] does not mean conduct 'in any way related' to a lawsuit" or proceeding, *see id.*, and the requisite "tight connection" to the lawsuit or proceeding must be evident from the face of the pleading before a communication will be deemed off-limits as a predicate for liability, *see Cascades Comp.*, 2013 WL 6247594, at *17 (plaintiff does not "bear the burden of pleading around *Noerr-Pennington*" where "the doctrine is implicated by 'conduct incidental to a petition' instead of direct petitioning activity itself"); *see also In re Apple*, 2020 WL 2857397, at *18 (declining to dismiss on *Noerr-Pennington* grounds claim predicated on letter to Congress where "underdeveloped factual record" failed to show "any particular legislation or government effort" letter was "intended to influence"). As another judge in this District recently recognized when Musk sought (unsuccessfully) to invoke *Noerr-Pennington* as a shield, the communications that courts have found bear the requisite "intimate relationship" to litigation comprise a limited set: "pre-suit

demand letters, discovery communications, [and] the refusal to enter into settlement negotiations." *Pampena* v. *Musk*, 705 F. Supp. 3d 1018, 1054 (N.D. Cal. 2023) (quotation marks omitted).

The LOI comes nowhere near *Noerr-Pennington*'s zone of protection. Even Plaintiffs do not try to bill it as an actual "petition" to the Court or any government body.[5] Nor does the LOI help Plaintiffs prosecute their claims in this litigation. In fact the opposite. Plaintiffs missed the mark when characterizing the LOI as "irrelevant" and a "distract[ion] from the core issues," Dkt. 117 at 1, because their high-dollar fake bid shows that Musk does not really believe OpenAI Inc.'s assets are impressed with a restriction preventing their transfer to private interests—a central tenet of his charitable trust claim. *See* Dkt. 121 at 13-14 n.10; Dkt. 116 at 1 (noting that Musk's legal filings sought to bar any transfer of OpenAI's assets while, "out of court, those constraints evidently do not apply, so long as Musk and his allies are the buyers"). But the letter is relevant to the litigation only in the sense that the very fact of it is *evidence against Musk*—not because it is part of Musk's litigating position.

Plaintiffs assert the LOI is "the practical implementation of, and conduct 'incidental' to, their petition to the Attorneys General." MTD 9. By "petition to the Attorneys General," Plaintiffs apparently mean: (1) a November 14, 2024 letter their counsel sent on their behalf to the Attorney General for Delaware enclosing a copy of the First Amended Complaint (*see* FAC ¶ 421); (2) a January 7, 2025 letter from that same counsel but this time on behalf of "certain major investors in generative artificial intelligence" to the Attorneys General of California and Delaware expressing interest in "bidding on the assets of OpenAI, Inc." (Dkt. 103-5); and/or (3) an unsuccessful application to the California Attorney General for relator status (Dkt. 157-1[6]). *See* MTD 3-4, 9 n.8. But even imagining any of these qualified as a "petition," the LOI is not "incidental" to any of

---

[5] Because the LOI is not a petition, OpenAI bears no burden to plead around *Noerr-Pennington* through the sham exception. *Cascades Comp.*, 2013 WL 6247594, at *17. Plaintiffs' argument about that exception tackles a straw man. *See* MTD 10-12. By calling the LOI a "sham," OpenAI's counterclaims are stating a fact—not invoking a legal doctrine.

[6] This application, which OpenAI's counterclaims do not mention and which therefore is irrelevant to this motion, was rejected based on findings that Plaintiffs had not sufficiently raised "a question of California law or fact" with respect to any of their claims and that their application would not "serve the overall public interest of the People of the State of California." *See* Dkt. 157-1 at 2-3.

them. The LOI was not "useful or necessary to successfully petition [either Attorney General] for redress." *Wisk Aero*, 2021 WL 4932734, at *8. It was sent on behalf of a group different from the Plaintiffs in this suit; it was addressed not to a regulator or the Court but to the OpenAI, Inc. board; and it doesn't even mention any litigation or regulatory investigation.

Nothing on the face of the LOI, or in any fact pleaded in OpenAI's counterclaims, shows any link between the LOI and Plaintiffs' petitioning of this Court or the Attorneys General. Trying to manufacture a connection, Plaintiffs assert in their motion that Musk and his associates lobbed in the LOI because they were "met with silence by the Attorneys General." MTD 9. Of course that assertion cannot be considered on this motion to dismiss, since it is not pleaded in OpenAI's counterclaims. *See Merritt* v. *Countrywide Fin. Corp.*, 759 F.3d 1023, 1035 (9th Cir. 2014) (rejecting "defendants' representations" in light of "court's duty to accept the plaintiffs' allegations as true at the pleading stage of the litigation"); *see also Cascades Comp.*, 2013 WL 6247594, at *17 (declining to apply *Noerr-Pennington* where doing so would require adopting defendants' view of the record and "impermissibly . . . draw[ing] inferences in [defendants'] favor"). But were it considered, it could not bring the counterclaims within *Noerr-Pennington*—which protects petitioning activity and conduct with a "tight connection" to a petition, not *alternatives* to petitioning the government. *See, e.g.*, *Wisk Aero*, 2021 WL 4932734, at *8 (where liability for communications about, but parallel to, litigation "would not hamper [defendant's] ability to prosecute this case," those communications were not "useful or necessary to successfully petition" as necessary to bring them within *Noerr-Pennington*). Plaintiffs' argument is exorbitant: to accept it would mean that any party could invoke the protection of *Noerr-Pennington* just by appending a manipulative commercial demand or statement to a letter to the government and then complaining that the government failed to act.

### B.    Plaintiffs' media hype of the LOI is not subject to *Noerr-Pennington*

For the same reasons, Plaintiffs get no protection for their hyping of the LOI, which was calculated to and did magnify the mischief wrought and damage caused. *See ¶¶* 84, 90, 95.[7] The

---

[7] That Sam Altman took pains to *counter* Plaintiffs' hype with responses on social media seeking

leaking to the media and attendant commentary were no more tethered to this litigation or to proceedings before the Attorneys General than the LOI itself. Even where media commentary *is* about a lawsuit or other petitioning activity, it does not qualify for protection. *See, e.g.*, *Pampena*, 705 F. Supp. 3d at 1054 ("tweeting and publicly speaking about a transaction" that was the subject of a Delaware lawsuit was not protected); *Wisk Aero*, 2021 WL 4932734, at *8 ("blog posts and press release" that "communicated with the public about the [underlying] lawsuit" did not qualify, as "they did not, in any manner, affect . . . or advance [defendant's] interests in [the lawsuit]" (emphasis removed)).[8]

### C.    The counterclaims' reference to Plaintiffs' communications with the Attorneys General does not trigger *Noerr-Pennington*

The LOI and its attendant publicity constitute the predicate for OpenAI's counterclaims. Other conduct, including Plaintiffs' letters to the Delaware and California Attorneys General, is pleaded to contextualize the sham bid and demonstrate the risk of future harm. That pleading, and the anticipated introduction at trial of evidence supporting these allegations, are entirely proper under *Noerr-Pennington*. Courts have recognized that *Noerr-Pennington* is not a rule of evidence; it "does not provide a basis for exclusion" from trial of conduct that might be protected were it pleaded as the basis for liability. *See, e.g.*, *Hernandez* v. *Amcord, Inc.*, 215 Cal. App. 4th 659, 679-80 (2013) (collecting federal cases); *see also id.* at 679 ("[W]hile a corporation's petitioning of government officials may not itself form the basis of liability, evidence of such petitioning activity may be admissible if otherwise relevant to show the purpose and character of other actions of the corporation."). The Supreme Court recognized as much in one of the two cases giving the doctrine

---

to expose the LOI's sham character, *see* MTD 6, 16, (1) is not pleaded in the counterclaims and therefore is irrelevant for purposes of this motion and (2) only underscores the harm wrought by Plaintiffs' conduct.

[8] *Realtek Semiconductor Corp.* v. *MediaTek, Inc.*, 732 F. Supp. 3d 1101 (N.D. Cal. 2024), does not say otherwise. The Court there explained that the defendants' "disparaging communications with [plaintiff's] customers" about pending litigation would warrant protection under *Noerr-Pennington* only "to the extent that they contributed to [the] litigation efforts"—a finding that could not be made because it was "unclear how [the] communications could have contributed to the litigation." *Id.* at 1113-14. The Court went on to dismiss that portion of the claim, not because of *Noerr-Pennington*, but because the allegations failed to state a claim. *Id.* at 1114.

9

its name. In *United Mine Workers of Am.* v. *Pennington*, the Court expressly observed that petitioning activity which was off-limits as a predicate for liability may still be admissible as evidencing the "purpose and character of the particular transactions under scrutiny." 381 U.S. 657, 670 n.3 (1965). Similarly, Musk's efforts to provoke regulators into action against OpenAI, his filing and belatedly withdrawing legal claims in state court for the purpose of harassment, and his deployment of media and social media for the purpose of disparagement are all relevant to OpenAI's counterclaims even though not the basis for liability. They tend to show, among other things, Plaintiffs' intent in causing submission of the LOI; the "purpose and character" of the false bid, *id.*; and the risk of continued harm to OpenAI if Plaintiffs are not enjoined.

## D.    California's litigation privilege does not apply

For largely the same reasons, California's litigation privilege furnishes no basis to dismiss OpenAI's counterclaims.

The "privilege generally applies to 'any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'" *Argentieri* v. *Zuckerberg*, 8 Cal. App. 5th 768, 780 (2017) (quoting *Silberg* v. *Anderson*, 50 Cal. 3d 205, 212 (1990)); *accord Makaeff* v. *Trump Univ., LLC*, 715 F.3d 254, 264 (9th Cir. 2013). Like the *Noerr-Pennington* doctrine, the litigation privilege at its core protects statements made to initiate, or in the context of, a legal or regulatory proceeding. *See, e.g.*, *Hagberg* v. *Cal. Fed. Bank*, 32 Cal. 4th 350, 362 (2004) (affirming application of privilege to a "communication intended to prompt an administrative agency charged with enforcing the law to investigate or remedy a wrongdoing"). And while the privilege may extend to out-of-court statements, it similarly may do so only in limited circumstances—"[f]or the litigation privilege to apply, . . . there must be a sufficient nexus between the statement and the litigation." *Argentieri*, 8 Cal. App. 5th at 785. Specifically, "the communication must function as a necessary or useful step in the litigation [or regulatory] process and must serve its purposes." *See City of Costa Mesa* v. *D'Alessio Inv., LLC*, 214 Cal. App. 4th 358, 382 (2013) (quotation marks omitted); *see also Select Portfolio Servicing* v. *Valentino*, 875 F. Supp. 2d 975, 989 (N.D. Cal. 2012) ("[T]he communicative act—be it a

10

document filed with the court, a letter between counsel or an oral statement—must function as a necessary or useful step in the litigation process and must serve its purposes." (quotation marks omitted)). Not covered are extra-judicial or extra-quasi-judicial statements that may be merely "related in some way to the subject matter of the litigation" or proceeding, *see Argentieri*, 8 Cal. App. 5th at 786 (quotation marks omitted), or "only serve interests that happen to parallel or complement a party's interests in the litigation [or regulatory proceeding], including vindication in the court of public opinion," *see City of Costa Mesa*, 214 Cal. App. 4th at 382 (quotation marks omitted).

The LOI is not covered by the privilege because it was not addressed to a court or regulator, and in no way "function[ed] as a necessary or useful step" in either this litigation or Musk's efforts to provoke the Attorneys General. The sham bid was a commercial tactic Musk and his associates deployed to interfere with OpenAI's planned reorganization and economic relationships, and to enhance xAI's competitive position to the detriment of OpenAI and competition more broadly.

Plaintiffs' argument that the LOI amounted to a settlement demand, *see* MTD 13-14, is farcical. The LOI was not even sent on behalf of the same group comprising Plaintiffs in this litigation, and makes no reference to this litigation. The statement Plaintiffs quote in which their counsel offered to "withdraw the bid" if OpenAI's board "stipulat[ed] to take the 'for sale' sign off its assets" (MTD 14) is not from the LOI or OpenAI's counterclaims but from a filing Plaintiffs made in this Court resisting the Court's consideration of the LOI on the basis that it was "irrelevant" to and "distract[ed] from the core issues" in the litigation. *See* Dkt. 117 at 1. More fundamentally, the notion that a threatened takeover of OpenAI could plausibly be construed as a demand to "settle" a lawsuit seeking relief from breach of charitable trust and related claims is ridiculous.[9]

---

[9] *United Artists Corp.* v. *United Artist Studios LLC*, 2019 WL 8221088 (C.D. Cal. Aug. 2, 2019), does not help Plaintiffs on this score. Though the counterclaim at issue in that case alleged attempts to purchase the defendant company, under defendants' own theory, the events culminating in the litigation were set off "[w]hen Defendants refused" those attempts. *Id.* at *2. As the counterclaims in that case alleged: "Counterclaimants refused to sell, which resulted in threatening phone calls, at least one negative press release, a cease and desist letter and the eventual filing of this action against Counterclaimants." Second Amended Counterclaim, *United Artists Corp.* v. *United Artist Studios LLC*, 2019 WL 12372078, at ¶ 83 (C.D. Cal. June 17, 2019). There is no comparable

Next, the litigation privilege cannot immunize the press campaign surrounding the sham bid. Courts have found time and again that the privilege "will not protect statements that are made to persons who lack a substantial interest in the litigation," including statements to inherently disinterested media outlets. *Argentieri*, 8 Cal. App. 5th at 784-85 (litigation privilege does not apply to statements "sent to the press," including those related to the underlying case); *see also Rodriguez* v. *Panayiotou*, 314 F.3d 979, 988 (9th Cir. 2002) ("[T]he litigation privilege does not extend to 'litigating in the press.'" (quoting *Rothman* v. *Jackson*, 49 Cal. App. 4th 1134, 1149 (1996))); *Wisk Aero*, 2021 WL 4932734, at *10 ("blog posts and press release [were] not shielded by [California's litigation] privilege," as they were not published "to achieve the objects of the litigation" (quotation marks omitted)); *City of Costa Mesa*, 214 Cal. App. 4th at 381-82 (statements made to a third party relating to the litigation goals of an "underlying nuisance action," while "arguably made in tangential pursuit of the goals of the litigation," were not protected by the litigation privilege because they did not "function[] to advance the . . . nuisance action"). These media statements are no more protected by the litigation privilege than by *Noerr-Pennington*.[10]

Finally, as with *Noerr-Pennington*, the litigation privilege does not bar OpenAI from pleading or adducing as evidence of its counterclaims—and, indeed, its affirmative defenses— conduct that would be protected by the litigation privilege if presented as the predicate for the claim, including Plaintiffs' communications with the Attorneys General. *See, e.g.*, *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal. 3d 1157, 1168 (1986) (litigation privilege "does not create an evidentiary privilege" and thus "statements made during the course of a judicial proceeding may be used for evidentiary purposes"); *White* v. *W. Title Ins. Co.*, 40 Cal. 3d 870, 888 (1985) (drawing "distinction between a cause of action based squarely on a privileged

---

allegation in OpenAI's counterclaims that the LOI set off, whether directly or indirectly, any judicial or quasi-judicial proceeding.

[10] Plaintiffs cite inapposite cases involving communications wholly unlike the media statements alleged here. MTD 15; *see, e.g.*, *Action Apartment Ass'n, Inc.* v. *City of Santa Monica*, 41 Cal. 4th 1232, 1250-52 (2007) (notice of eviction); *Better Meat Co.* v. *Emergy, Inc.*, 2023 WL 2977786, at *1, *4-6 (E.D. Cal. Apr. 17, 2023) (email and letter sent to plaintiff and its investor threatening litigation). Plaintiffs' reliance on *Arenas* v. *Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181 (C.D. Cal. 2011), is likewise misplaced, as the "public interest defense" discussed therein applies specifically to a "right of publicity claim" under California law, *id.* at 1190, which OpenAI does not assert.

12

communication," to which the litigation privilege applies, "and one based upon an underlying course of conduct evidenced by the communication," to which the privilege does not apply).

## II.     OPENAI ADEQUATELY PLEADS BOTH COUNTERCLAIMS

A motion to dismiss must be denied where the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences must be drawn in favor of the non-moving party." *In re Diadexus, Inc.*, 2019 WL 3412928, at *10 (N.D. Cal. July 29, 2019). OpenAI's detailed allegations readily clear this bar and amply sustain both its UCL claim, which alleges that Plaintiffs' sham bid constituted "unfair" and "fraudulent" conduct, and its claim for tortious interference with prospective economic advantage, which likewise centers on Plaintiffs' sham bid. This is true even if heightened particularity—entailing some specification of "the who, what, when, where, and how of the misconduct charged," *Amin* v. *Subway Rests., Inc.*, 2022 WL 20184652, at *4 (N.D. Cal. July 7, 2022)—is required.[11] Plaintiffs call OpenAI's allegations "threadbare" and "conclusory," but in support of that preposterous characterization they address just four paragraphs in the entirety of the 26-page pleading to the exclusion of all others. MTD 18 (citing ¶ 109); *id.* at 20 (citing ¶ 110); *id.* at 23 (citing ¶¶ 96, 121).

---

[11] Plaintiffs say the counterclaims are subject to a heightened pleading standard under old Ninth Circuit precedent seeming to apply a "more rigorous and detailed pleading" standard to claims involving speech, MTD 6, 17 n.12 (citing *Ore. Nat. Res. Council* v. *Mohla*, 944 F.2d 531 (9th Cir. 1991), *Vidillion, Inc.* v. *Pixalate, Inc.*, 2019 WL 3308768 (C.D. Cal. June 5, 2019), and *Franchise Realty Interstate Corp.* v. *S.F. Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976), on which *Vidillion* relies), and under Rule 9(b) (because OpenAI invokes the UCL's "fraudulent" prong, MTD 17. They are wrong. The Ninth Circuit has clarified since *Mohla* and *Franchise Realty* that under intervening Supreme Court precedent, heightened pleading standards are not warranted unless dictated by the Federal Rules. *See Empress LLC* v. *City & Cnty. of S.F.*, 419 F.3d 1052, 1055-56 (9th Cir. 2005) (prior "common-law-developed heightened pleading standards do not survive" Supreme Court precedent); *Galbraith* v. *Cnty. of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002) (rejecting "any heightened pleading standard in cases other than those" required by the Federal Rules). As to Rule 9(b), alleging conduct that is "likely to deceive" as necessary to satisfy the UCL's "fraudulent" prong "is not the same as pleading common law fraud," and does not, standing alone, entail an obligation to plead the elements of fraud with particularity. *See Gruen* v. *EdFund*, 2009 WL 2136785, at *5 (N.D. Cal. July 15, 2009); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1118 (C.D. Cal. 2008). But in any event, OpenAI's allegations satisfy the heightened pleading standard Plaintiffs argue applies.

13

Worse than ignoring OpenAI's actual allegations, Plaintiffs' motion invents an alternate factual reality featuring misrepresentations contradicted by OpenAI's allegations. Plaintiffs claim that OpenAI has "admit[ted]" the following key facts they say show their "bid" was neither unfair nor fraudulent: (1) it was "backed by credible investors with established track records of successfully completing high-value acquisitions," (2) it was "communicated through formal legal channels via counsel, . . . following standard practice for serious acquisition proposals," (3) it was "objectively timely," and (4) its backers had demonstrated "capacity and willingness to complete large transactions." MTD 17-18. None of this is true. These "facts" are not contained in the counterclaims, have never been "admitted" by OpenAI, and are directly contradicted by what's actually pleaded.

### A.    OpenAI states a claim under California's UCL (First Counterclaim)

"Unfair competition" under California's Unfair Competition Law includes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "The UCL is a broad remedial statute" allowing challenges to "wrongful business conduct in whatever context such activity might occur." *Lozano* v. *AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). OpenAI pleads a claim under both the "unfair" and "fraudulent" prongs of the UCL.

### 1.    OpenAI states a claim of unfair business acts or practices

Under the UCL, "unfairness to competitors" is "conduct that [1] threatens an incipient violation of an antitrust law, or [2] violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or [3] otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc.* v. *L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999). OpenAI's allegations readily meet this standard.

As the counterclaims allege, companies including Google, Amazon, Meta, and now xAI are "pouring billions into AI development and competing with OpenAI for scarce compute." ¶ 74. Musk's xAI in particular has been "raising capital at unprecedented speed and scale," and with its recently announced acquisition of X, it also possesses the "major competitive advantage" of being able to train its AI models on "all the user data flowing through the [X] platform." ¶ 71. For these reasons, OpenAI's capital needs are now "more pressing than ever." ¶ 74. But OpenAI's current

structure, which is not as familiar as the structure of its significant competitors, poses "challenges in attracting new investment and retaining and attracting highly skilled personnel." ¶ 75. OpenAI has therefore been considering a structure change that would allow it to compete more effectively for capital and skilled personnel. ¶¶ 77-79.

Musk, meanwhile, has long sought to "take down OpenAI and clear the field for himself" and xAI. ¶ 58. He has "tried every tool available to harm" OpenAI in a "years-long campaign of harassment," including "calling for a 'moratorium' on the development of advanced AI technology for purposes of stalling [OpenAI's] progress and benefitting [xAI]; issuing a pretextual and deceptive records demand for the purpose of gathering and distorting competitively-sensitive information about [OpenAI]; repeatedly disparaging [OpenAI] on false and derogatory grounds, including on [his] X platform to an audience of hundreds of millions; and filing and belatedly withdrawing legal claims for purposes of harassing [OpenAI]." ¶¶ 7, 112.

The culmination of this campaign of harassment is Musk's and xAI's effort to interfere with OpenAI's contemplated reorganization—to "stop it from happening"—through every means possible, including the sham, highly publicized bid purporting to offer over $97 billion for OpenAI, Inc.'s assets. ¶¶ 80, 83. Valuing OpenAI, Inc.'s interests in the capped-profit entity is an "important procedural aspect of a corporate reorganization of OpenAI"; and now, by publicizing the sham bid and announcing that the Musk-led investor group "is prepared to match or exceed any bids higher than their own," Plaintiffs have sought to "artificially raise the floor for the nonprofit's valuation." *See* ¶ 95. The sham bid, which came at a time when Plaintiffs knew OpenAI "was engaged in an extremely competitive process to raise funds," threatened to "frighten potential investors," "increase OpenAI's cost of capital," and ultimately "derail efforts to raise money from existing and new investors." ¶ 96. Through this conduct, Plaintiffs have sought to "impair[] [OpenAI's] ability to raise funds and effectively compete in the nascent market to develop AI technologies" and enhance xAI's position by reducing competition from OpenAI—and thereby "threaten to reduce lawful competition in the market." ¶ 109; *see also* ¶ 98.

Under any pleading standard, these allegations suffice to state a claim of unfair conduct that "significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. What's pleaded is an

effort to improperly create an "uneven playing field" and "unfair marketplace." *NJOY, LLC* v. *Imiracle (HK) Ltd.*, 760 F. Supp. 3d 1084, 1097, 1116 (S.D. Cal. 2024); *see LegalForce RAPC Worldwide P.C.* v. *UpCounsel, Inc.*, 2019 WL 160335, at *18 (N.D. Cal. Jan. 10, 2019) (allegations that legal services business engaged in improper fee-sharing with non-attorneys pled unfairness claim where plaintiffs were "not able to compete fairly" by engaging in the same practice); *Metricolor LLC* v. *L'Oréal S.A.*, 2020 WL 3802942, at *17-18 (C.D. Cal. July 7, 2020) (unfairness claim pled based on allegations that defendant's bad-faith negotiations caused plaintiff "to suffer from a competitive disadvantage" of two-year delay in market entry). Plaintiffs sought through the sham bid to disrupt and ultimately prevent an OpenAI structure change—all to impair OpenAI's "ab[ility] to compete fairly," *i.e.*, to raise needed capital on equal footing with competitors. *LegalForce*, 2019 WL 160335, at *18. Musk's "goal" of hobbling OpenAI confirms the unfairness of the conduct.[12] *Planned Parenthood Fed'n of Am., Inc.* v. *Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 837 (N.D. Cal. 2016) (allegations that "defendants' goal was to put plaintiffs—one of the largest providers of reproductive health services in the country—out of business" pled unfairness claim).[13] As the counterclaims allege, the impugned conduct is directed at "impair[ing] [OpenAI's] ability to compete effectively in an increasingly crowded field" (¶ 98), "seiz[ing] and maintain[ing] for xAI an unearned edge designed to impair competition" (¶ 98), and thereby "threaten[ing] to reduce lawful competition in the market" (¶ 109).

Only by distorting the *Cel-Tech* standard are Plaintiffs able to argue that these allegations fall short. Plaintiffs insist that OpenAI must allege a violation of a "specific antitrust law"—such as "price-fixing, market allocation, or any other recognized antitrust violation"—and "facts

---

[12] Musk can be held liable "personally for the conduct of xAI" in submitting the LOI. *Cf.* MTD 4 n.5. Plaintiffs themselves told the Court the LOI was submitted by a "Musk-led consortium." Dkt. 117 at 1. And nothing about naming Musk in the counterclaims is inconsistent with "OpenAI's own repeated arguments in this case." MTD 4 n.5 (citing Dkt. 103 at 29 n.12). That Musk lacked standing in his individual capacity to *sue* for federal antitrust violations—an argument advanced not by OpenAI but by Microsoft, *cf.* Dkt. 103 at 29 n.12 (joining Microsoft's motion to dismiss "insofar as [Microsoft] argue[d] [Plaintiffs'] challenges" to "Microsoft's pricing of its 'compute[]' and 'generative AI products'" "do not state a claim")—has no bearing on whether Musk can be held accountable for *his own* conduct amounting to unfair business practices.

[13] *ProconGPS, Inc.* v. *Star Sensor LLC*, 2011 WL 5975271 (N.D. Cal. Nov. 29, 2011), is not to the contrary, as the only alleged harm to competition was the loss of "at least one customer." *Id.* at *3.

16

establishing Plaintiffs' market power." MTD 18-19. That is wrong; "a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech*, 20 Cal. 4th at 180. Competitor unfairness claims manifestly "are not limited to violations of existing antitrust laws." *NJOY*, 760 F. Supp. 3d at 1115. Nor must a plaintiff plead "specific product or geographic markets, market power, or other allegations typical of claims alleging violations of state or federal antitrust laws." *Metricolor*, 2020 WL 3802942, at *17. As the Ninth Circuit has emphasized, "[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition." *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023) (courts need not "define a relevant market" for claims under the UCL).

The cases Plaintiffs cite do not support their attempt to skirt *Cel-Tech* and engraft additional requirements on the UCL. The claim in *Korea Kumho Petrochemical* v. *Flexsys Am. LP*, 2007 WL 2318906 (N.D. Cal. Aug. 13, 2007), was based solely on "alleged antitrust violations," *id.* at *4, and so the court had no occasion to consider the *Cel-Tech* test. The discussion of "specific constitutional, statutory or regulatory provisions" in *In re Firearm Cases*, 126 Cal. App. 4th 959, 980 (2005), is inapposite, as it involved a claim of *consumer* unfairness, which *Cel-Tech* did not address and OpenAI does not assert, *see* 20 Cal. 4th at 187 n.12. For a claim "by a competitor alleging anticompetitive practices"—the type of claim OpenAI brings here—the *Cel-Tech* standard controls. *Id.*; *see also Epic Games*, 67 F.4th at 1000 (following *Cel-Tech* test for UCL claim of competitor unfairness).

Finally, Plaintiffs' assertions that their conduct "*further[ed]* public policy by seeking to protect [OpenAI] from unlawful conversion and self-dealing," and was "*procompetitive*" in that it purportedly introduced a "competitive bidding process for OpenAI's assets," are just self-serving statements that are contradicted by the counterclaims' well-pleaded allegations and are entirely out of bounds. *See* MTD 19-20. As pleaded (and as the evidence will support), the structure change OpenAI's board has been considering is "*not* a 'conversion' of the nonprofit into a for-profit entity." ¶ 77. And the charge of self-dealing is not just unsupported but contradicted by detailed allegations of the board's extensive consideration of a structure change to further crucial mission-facing objectives. ¶¶ 73-79. Defeating any suggestion that the board would act "without independent or

competitive valuation of [OpenAI's] assets," MTD 20, the counterclaims allege that the sham bid came at a time when the board "was engaged in an extremely competitive process to raise funds" and that the board "commission[ed] legal and financial analyses" of the bid, ¶¶ 90, 96. Far from an attempt to create a "competitive bidding process," MTD 20, the sham bid was an effort to corrupt OpenAI's valuation process by purporting to place an "artificial" and baseless price on OpenAI, Inc.'s assets, ¶ 95.[14]

### 2. OpenAI states a claim of fraudulent business acts or practices

OpenAI also states a claim of "fraudulent" business acts or practices, which requires pleading that "members of the public are likely to be deceived." *Morgan* v. *AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254 (2009). That entails pleading "the likely effect [the impugned] practice would have on a reasonable consumer." *Id.* at 1256-57. As the Ninth Circuit has recognized, "whether a business practice is deceptive will usually be a question of fact not appropriate for decision on [the pleadings]," and thus dismissal based on the issue will be "rare." *Williams* v. *Gerber Prods. Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008).

OpenAI's allegations amply plead the sham bid was likely to deceive reasonable consumers. Plaintiffs certainly billed the bid (and continue to bill it) as legitimate, stirring up a "media firestorm" with "maximum buzz"; leaking the LOI to the *Wall Street Journal*; and announcing that the investor group would "match or exceed any bids higher than their own." ¶¶ 84, 90, 95. At the same time, they sought (and continue to seek) to conceal its sham character. The LOI portrayed the valuation as "based on OpenAI's 'historical financial results' and 'projections'"—even though OpenAI had never provided the financial projections on which the bid was supposedly based, and even though "[n]one of the investors had conducted any diligence on the business." ¶ 86. Similarly, Plaintiffs never disclosed that "the point of the bid . . . was not to buy OpenAI's assets, but instead to obtain 'discovery' and get 'behind the wall' at OpenAI." ¶ 88. All of this was calculated "to

---

[14] *Stevenson Real Est. Servs., Inc.* v. *CB Richard Ellis Real Est. Servs., Inc.*, 138 Cal. App. 4th 1215 (2006), does not support Plaintiffs' argument. The court there concluded that the complaint pleaded "competitive, not anticompetitive, conduct" where the allegations merely showed two real estate brokers competing over a single client's lease.

deceive members of the public" into believing that Plaintiffs' "true intentions were to acquire [OpenAI, Inc.'s] assets for $97.375 billion." ¶ 110.[15]

That OpenAI—long exposed to Musk's pretextual and harassing conduct, ¶ 93—and "savvy media commentators" (¶ 85) recognized Plaintiffs' bid as a sham does not impair the adequacy of OpenAI's pleading. The "reasonable consumer" standard "is evaluated from the perspective of 'the ordinary consumer within the larger population,' who is not typically 'exceptionally acute [or] sophisticated' or 'wary [and] suspicious.'" *Souter* v. *Edgewell Personal Care Co.*, 2023 WL 5011747, at *1 (9th Cir. Aug. 7, 2023) (quoting *Hill* v. *Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1304 (2011)). Nor was OpenAI required to "identify any consumers who were deceived." MTD 21. What's required is pleading that "members of the public"—reasonable consumers—are "*likely* to be deceived." *Morgan*, 177 Cal. App. 4th at 1254 (emphasis added). That does not require identifying "those to whom [deceptions] were made," *Comm. on Children's Television, Inc.* v. *Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983), or pleading "actual deception," *see Kowalsky* v. *Hewlett-Packard Co.*, 2011 WL 3501715, at *6 (N.D. Cal. Aug. 10, 2011). And even were such a showing required, Plaintiffs' own filings make it. Plaintiffs docketed in this action a petition submitted by a group of nonprofits to the California Attorney General arguing that "[a]ny valuation of [OpenAI's] charitable assets [must] equal or exceed $97.4 billion, the bid tendered for those assets by Elon Musk and fellow investors." Dkt. 158-8 at 28. Reasonable consumers, including these petitioners, have been misled by Plaintiffs' antics.

Finally, the counterclaims adequately plead "the requisite causal link to OpenAI's alleged harm." MTD 21. The existence of the sham bid "and the media firestorm surrounding it"—the actions calculated to deceive members of the public—required OpenAI to "expend significant resources in responding to it." ¶¶ 90, 110. In the ensuing days, OpenAI's board "engaged in the formal process of reviewing and assessing" the LOI. ¶ 90. OpenAI was forced to immediately "bear substantial costs" in the form of "resources expended in hiring advisors to evaluate and respond to

---

[15] *Canatella* v. *Reverse Mortg. Sols. Inc.*, 2014 WL 7205146 (N.D. Cal. Dec. 17, 2014), does not help Plaintiffs. OpenAI's factual allegations are far more detailed than the "bare and conclusory" allegations in that case, which were "targeted at the [defendant's] industry as a whole, as opposed to [the defendant] in particular." *Id.* at *9.

the bid and costs associated with the diversion of [OpenAI's] employees' time to respond to the bid," ¶ 111—resource expenditures that readily satisfy the UCL, *Cal. Med. Ass'n* v. *Aetna Health of Cal. Inc.*, 14 Cal. 5th 1075, 1088 (2023) ("diversion of salaried staff time and other office resources" in response to unfair business practice); *Ghazarian* v. *Magellan Health, Inc.*, 53 Cal. App. 5th 171, 193 (2020) (cost of hiring an attorney in response to unfair business practice). This case is thus nothing like *Hall* v. *Time Inc.*, 158 Cal. App. 4th 847, 857 (2008), where the plaintiff did not respond for 10 months to the defendant's allegedly deceptive invoice, or *Shaeffer* v. *Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1143-44 (2020), where the plaintiff failed to allege that her purchase "had anything to do with" the allegedly deceptive label. Instead, as *Kwikset Corp.* v. *Superior Ct.*, 51 Cal. 4th 310 (2011), instructs, OpenAI adequately alleged that its "economic injury [came] as a result of the unfair competition." *Id.* at 326.

## B.    OpenAI states a claim of tortious interference with prospective economic advantage (Second Counterclaim)

OpenAI's second counterclaim is likewise adequately pleaded. To state a claim for tortious interference with prospective economic advantage, a party must allege: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *CRST Van Expedited, Inc.* v. *Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007). Also required is pleading "an act that is wrongful independent of the interference itself." *Id.* All of these elements are well pleaded here:

***Independently wrongful act.*** The "requirement of an independently wrongful act . . . may be satisfied [] by an alleged violation of . . . the UCL." *Id.* at 1110-11. Because OpenAI has pleaded a viable UCL claim, this element is met.

***Economic relationship.*** OpenAI pleads "economic relationships with (1) third-party investors, (2) employees, and (3) customers." ¶ 116. Relationships of this kind are routinely held to satisfy the "economic relationship" element. *Byton N. Am. Co.* v. *Breitfeld*, 2020 WL 3802700,

20

at *4 (C.D. Cal. Apr. 28, 2020) (employees); *Humboldt Wholesale, Inc.* v. *Humboldt Nation Distrib., LLC*, 2012 WL 2572065, at *6 (N.D. Cal. July 2, 2012) (distributors and retailers); *Sebastian Int'l, Inc.* v. *Russolillo*, 128 F. Supp. 2d 630, 637 (C.D. Cal. 2001) (customers).

*Westside Ctr. Assocs.* v. *Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507 (1996), is not to the contrary. That case—which was not even decided at the pleading stage and is inapposite for that reason alone, *see TYR Sport Inc.* v. *Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1139 (C.D. Cal. 2009) (refusing to apply *Westside* on motion to dismiss); *Sebastian Int'l*, 128 F. Supp. 2d at 637 (same)—rejected a plaintiff's reliance on "purely hypothetical relationship[s]" with "all potential buyers" in the market rather than on "existing relationship[s]," *Westside*, 42 Cal. App. 4th at 522-23, 527. That is a far cry from OpenAI's pleading, which alleges (among other things) that it has "maintained" economic relationships with investors, employees, and customers "[a]t all times relevant to this action," ¶ 116; that Plaintiffs disrupted and burdened OpenAI's relationships with "*current* and prospective investors" and existing employees and customers, ¶¶ 121-22 (emphasis added); and that Plaintiffs seek to sow confusion among employees and derail efforts to raise money "from *existing* and new investors," ¶¶ 95-96 (emphasis added).[16]

**Actual disruption and economic harm.** Finally, OpenAI has more than adequately alleged actual disruption and economic harm. Actual disruption "includes making plaintiff's performance more burdensome or expensive," Rutter, Cal. Prac. Guide: Civ. Proc. Before Trial, Claims & Defenses Ch. 3(II)-B (citing *Pac. Gas & Elec. Co.* v. *Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (1990)), and OpenAI pleads just that: that the sham bid has "complicated the process for undertaking any corporate reorganization," ¶ 121, and has "already made maintenance of [its] business relationships [with investors] more costly and burdensome," given that the bid "came at a time when . . . OpenAI was engaged in an extremely competitive process to raise funds," ¶ 96. The counterclaims also allege that Plaintiffs' conduct has made OpenAI's relationships with employees and customers "more costly and burdensome," ¶ 122, including by "sow[ing] confusion among

---

[16] *Piping Rock Partners, Inc.* v. *David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957 (N.D. Cal. 2013), is similarly distinguishable. The inadequate pleading there was a "vague[]" allegation of having "solicited" "additional investors." *Id.* at 980. Here, OpenAI alleges economic relationships not only with prospective investors but also current ones, as well as existing employees and customers.

21

[OpenAI] employees," ¶ 95, who recognize the "chaos and arbitrary employment action" that come with a takeover by Musk, ¶ 99. Unlike in *Silicon Knights, Inc.* v. *Crystal Dynamics, Inc.*, where there was "no factual allegation" at all that the defendants' poaching of the plaintiff's employees disrupted the plaintiff's relationship with a third company, 983 F. Supp. 1303, 1311 (N.D. Cal. 1997), here the disruption of economic relationships and attendant economic harm are clearly laid out. *See, e.g.*, *Overhill Farms, Inc.* v. *Lopez*, 190 Cal. App. 4th 1248, 1266-67 (2010) (actual disruption and causation of harm established where defendants' statements caused plaintiff's customer to demand that plaintiff audit its labor practices).

## III.    THE COUNTERCLAIMS SHOULD BE PROMPTLY TRIED

In their third pitch to avoid having to answer and defend OpenAI's counterclaims, Plaintiffs argue those claims "should be stayed until Phase Two of this case" because they "fundamentally constitute competition-related claims." MTD 23. That ignores the test the Court (properly) adopted for deciding which claims should be tried on an expedited schedule and which should be stayed. Under the Court's ruling, what matters is not the legal theory advanced but the factual predicate. *See* Dkt. 144 at 6, lns. 6-12. Judged by that correct standard, the counterclaims should be included in the expedited proceeding.

In the parties' joint case management statement, OpenAI advocated that any claims—including counterclaims—"shar[ing] a common nucleus of operative facts" be included in the expedited proceedings. Dkt. 125 at 4. That excluded Plaintiffs' antitrust claims, which focused not on "the circumstances of Musk's donations to OpenAI, Inc. and the OpenAI Defendants' alleged breach of purported commitments to Musk in connection with those donations," but rather on allegations that OpenAI and Microsoft "have entered into investment agreements, exclusivity arrangements, and pricing decisions that purportedly hinder competition in the generative AI industry." *Id.* at 4-5. The Court agreed with OpenAI's approach. *See* Dkt. 144 at 6, lns. 6-9 ("[M]y sense is that the defendants' approach to what should be in the trial makes more sense in terms of the facts and the factual issues that would be tried."). Implementing that approach, the Court stayed one false advertising claim while allowing another such claim (later dismissed on the pleadings) to proceed. *Id.* at 6, lns. 9-10.

Like those of Plaintiffs' claims designated for Phase One of this litigation, OpenAI's counterclaims focus on the course of conduct between OpenAI, its founders, and Musk from OpenAI's founding until the present (*see, e.g.*, ¶¶ 1-9; *cf.* FAC ¶¶ 1-9)—including early understandings of OpenAI's charitable purpose (¶¶ 19-27; *cf.* FAC ¶¶ 82-90), its need for funding from outside investors (¶¶ 28-30; *cf.* FAC ¶¶ 91-97), and its creation of a capped-profit subsidiary to facilitate that funding (¶¶ 45-48; *cf.* FAC ¶¶ 102-16). They also concern Musk's visions of OpenAI's future, his attempts to control the company, and his abandonment, and subsequent targeting, of it when those attempts failed (¶¶ 31-39, 55-64, 70-72, 112; *cf.* FAC ¶¶ 102-104)—factual allegations that squarely challenge the basis of Musk's Phase One claims. OpenAI's factual allegations pertaining to Plaintiffs' sham bid—the culmination of Plaintiffs' years-long campaign of harassment—also undermine the premise of Musk's Phase One claims, *see* ¶¶ 83-91, demonstrating that Musk objects not to OpenAI's contemplated restructuring or to its funding efforts as inconsistent with its charitable purpose (*see* ¶ 95 (alleging that the sham bid "did not so much as acknowledge OpenAI's mission"); *cf.* FAC ¶¶ 1-9, 181-99), but to its leadership—and more specifically, the fact that he is not in charge. There is thus a close relationship between the facts to be tried on Musk's Phase One claims and the facts to be tried on OpenAI's counterclaims. Staying these counterclaims "until Phase Two of this case" as Plaintiffs suggest, MTD 23, would require the Court to adjudicate claims resting on an identical factual predicate twice, contrary to the Court's guidance and to judicial efficiency.

And while OpenAI's counterclaim under the UCL's "unfair" prong is predicated on anticompetitive effects stemming from Plaintiffs' conduct underlying the Phase One claims, it shares no "common nucleus of operative facts" with the antitrust claims slated for Phase Two of the trial—which are based on agreements and arrangements between OpenAI and Microsoft, rather than a campaign of harassment and misinformation designed to tilt the competitive playing field away from OpenAI and toward xAI.

Viewed through the proper lens, no stay is warranted. OpenAI's counterclaims should proceed now.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

The motion to dismiss should be denied in its entirety, as should the alternative request for a stay of OpenAI's counterclaims.

1   Date: May 28, 2025

MORRISON & FOERSTER LLP

2

*/s/ Jordan Eth*
JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:     (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted *pro hac vice*)
BRWilson@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:     (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC*