Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs Elon Musk,
and X.AI Corp.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to Hon. Yvonne Gonzalez Rogers |
| v. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO DISMISS OPENAI'S COUNTERCLAIMS** |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date:     July 1, 2025<br>Time:     2:00 p.m.<br>Place:    Courtroom 1 (4th Fl.)<br>              1301 Clay St.<br>              Oakland, CA 94612 |

**STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Local Civil Rule 7-4(a)(3), Plaintiffs identify the following issues to be decided:

1.      Whether OpenAI's[1] Counterclaims (Counts 1-2) should be dismissed because they target Plaintiffs' constitutionally protected petitioning activity in violation of the First Amendment and *Noerr-Pennington* doctrine.

2.      Whether OpenAI's Counterclaims should be dismissed because they are barred by California's litigation privilege under California Civil Code § 47(b).

3.      Whether OpenAI's Unfair Competition Law claim (Count 1) should be dismissed for failure to adequately plead an "unfair" or "fraudulent" business practice with the particularity required by Federal Rule of Civil Procedure 9(b).

4.      Whether OpenAI's claim for tortious interference with prospective economic advantage (Count 2) should be dismissed because it is entirely predicated on an alleged UCL violation, and therefore necessarily fails with the UCL claim as a matter of law.

5.      Whether OpenAI's claim for tortious interference with prospective economic advantage should be dismissed for failure to adequately plead: (i) an independently wrongful act; (ii) disruption of a specific economic relationship; and (iii) actual disruption or economic harm.

6.      Whether, in the alternative, OpenAI's Counterclaims, to the extent any survive dismissal, should be stayed until the Phase Two trial given that Plaintiffs' related unfair competition and antitrust claims have already been designated for and stayed until Phase Two of this litigation.

---

[1] "OpenAI," as used herein, refers collectively to OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC, and "Plaintiffs" refers collectively to Elon Musk and xAI, unless otherwise stated.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT .................................................................................................................... 4

I.    OPENAI CANNOT DISAVOW ITS OWN PLEADINGS TO AVOID DISMISSAL........... 4

II.   EVEN IF OPENAI HAD NOT SUED BASED ON PROTECTED CONDUCT, THE FIRST
      AMENDMENT AND THE LITIGATION PRIVILEGE PROTECT THE LOI AS
      "INCIDENTAL" TO PRIVILEGED CONDUCT. ................................................................ 6

      A.    California's Robust and Expansive Litigation Privilege Protects the LOI. .................... 6

      B.    The *Noerr-Pennington* Doctrine Protects the LOI. ..................................................... 10

III.  OPENAI FAILS TO STATE PLAUSIBLE CLAIMS. ........................................................ 13

      A.    OpenAI Fails to Plead a Plausible UCL Claim ............................................................. 13

      B.    OpenAI Fails to Plead a Plausible Tortious Interference Claim .................................... 14

IV.   AT A MINIMUM, OPENAI'S COUNTERCLAIMS SHOULD BE STAYED. .................. 15

CONCLUSION ................................................................................................................ 15

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
    41 Cal. 4th 1232 (2007)..................................................................................7

*Ah Quin v. County of Kauai Dep't of Transp.*,
    733 F.3d 267 (9th Cir. 2013)..........................................................................9

*Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*,
    634 F. Supp. 316 (D. Kan. 1986) ................................................................12

*AlterG v. Boost Treadmill LLC*,
    388 F. Supp. 3d 1133 (N.D. Cal. 2019).......................................................14

*Argentieri v. Zuckerberg*,
    8 Cal. App. 5th 768 (2017)...........................................................................10

*Aronson v. Kinsella*,
    58 Cal. App. 4th 254 (1997).......................................................................4, 5

*Better Meat Co. v. Emergy, Inc.*,
    No. 21-CV-2338 KJM, 2023 WL 2977786 (E.D. Cal. Apr. 17, 2023)...................6

*Bowen v. Lin*,
    80 Cal. App. 5th 155 (2022).........................................................................6

*Byton N. Am. Co. v. Breitfeld*,
    No. 19-CV-10563-DMG, 2020 WL 3802700 (C.D. Cal. Apr. 28, 2020) ..............14

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999)..................................................................................13

*City of Costa Mesa v. D'Alessio Inv., LLC*,
    214 Cal. App. 4th 358 (2012).....................................................................9, 10

*Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
    944 F.2d 1525 (9th Cir. 1991),
    *aff'd*, 508 U.S. 49 (1993)..............................................................................12

*Cont'l Advisors S.A. v. GSV Asset Mgmt., LLC*,
    No. 14-CV-5609-YGR, 2015 WL 7720752 (N.D. Cal. Nov. 30, 2015) ...............14

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
    11 Cal. 4th 376 (1995)..................................................................................14

*Evans Hotels, LLC v. Unite Here Loc. 30*,
    433 F. Supp. 3d 1130 (S.D. Cal. 2020) ........................................................11

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 24-CV-04722-YGR
PLAINTIFFS' REPLY ISO MOT. TO DISMISS

*Gopher Media, LLC v. Malone*,
    129 F.4th 1196 (9th Cir. Mar. 3, 2025) ........................................................................11

*Hagberg v. Cal. Fed. Bank FSB*,
    32 Cal. 4th 350 (2004)..........................................................................................................5

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001).................................................................................................9

*Heitkoetter v. Domm*,
    No. 22-CV-0368-BAM, 2024 WL 325134 (E.D. Cal. Jan. 29, 2024) ..................................10

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003)..................................................................................................5, 15

*Morgan v. AT&T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235 (2009).............................................................................................13

*Neville v. Chudacoff*,
    160 Cal. App. 4th 1255 (2008)...............................................................................................6

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ...............................................................................................................6

*Olsen v. Harbison*,
    191 Cal. App. 4th 325 (2010)................................................................................................6

*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*,
    42 Cal. 3d 1157 (1986).........................................................................................................6

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
    732 F. Supp. 3d 1101 (N.D. Cal. 2024)..............................................................................10

*Rubin v. Green*,
    4 Cal. 4th 1187 (1993).........................................................................................................6

*Sharper Image Corp. v. Target Corp.*,
    425 F. Supp. 2d 1056 (N.D. Cal. 2006)...............................................................................10

*Silberg v. Anderson*,
    50 Cal. 3d 205 (1990).........................................................................................................6

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006).....................................................................................4, 5, 11

*Sybersound Recs., Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008).............................................................................................15

*UCP Int'l Co. Ltd. v. Balsam Brands Inc.*,
    420 F. Supp. 3d 966 (N.D. Cal. 2019)................................................................................11

iv

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) ....................................................................................................6

*Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC,*
    814 F. Supp. 2d 1033 (S.D. Cal. 2011) ...............................................................8, 10

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ....................................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................................5

*Wisk Aero LLC v. Archer Aviation Inc.*,
    No. 21-CV-2450-WHO, 2021 WL 4932734 (N.D. Cal. Sept. 14, 2021) ............11, 12

*Youngevity Int'l Corp. v. Andreoli*,
    749 F. App'x 634 (9th Cir. 2019) .............................................................................10

**Statutes**

28 U.S.C. § 1292 .................................................................................................................4

California Business and Professions Code § 17200 ...........................................................13

**Rules**

Federal Rule of Civil Procedure 9 ......................................................................................13

**Constitutional Provisions**

U.S. Const. amend. I.................................................................................................. Passim

**INTRODUCTION**

From day one, Musk has fought OpenAI's drift from its charter commitments to the open and safe development of AI for the public benefit rather than private profit—commitments it brazenly reversed in 2023. Since 2019, Musk has consistently opposed OpenAI's abandonment of its charitable mission, publicly distanced himself from its for-profit subsidiaries, and ensured it was known he had "no financial interest in the for-profit arm of OpenAI." Dkt. 176 ¶ 47. When OpenAI orchestrated an insider deal to sell billions in charitable assets to its contemplated for-profit corporation to enrich Defendants Sam Altman, Greg Brockman, and their investors—hiring investment banks, raising funding contingent on its for-profit conversion, involving considerable equity for Altman and other insiders—Plaintiffs sought a preliminary injunction and petitioned the California and Delaware Attorneys General for regulatory oversight and to establish an open bidding process to ensure fair market value for the charity's assets in any conversion. Dkts. 46, 103-5 at 2. When the Attorneys General failed to act, Plaintiffs' LOI, proposing to purchase assets OpenAI seemed determined to sell, effectuated the process Musk had sought from those regulators and that the law requires. Musk was not alone; sixty labor groups, Nobel laureates, federal agencies, and many others have sounded alarms about OpenAI's plans. *See e.g.*, Dkts. 158, 161.

Now, in opposing Plaintiffs' Motion to Dismiss,[2] OpenAI tries to have its cake and eat it too—like a charity's CEO chasing billions for himself while preaching philanthropy. OpenAI vigorously maintained that the LOI was litigation-related when it opposed Plaintiffs' Motion for a Preliminary Injunction, Dkt. 118 at 1, but now it asserts the LOI is *not* litigation related for purposes of *Noerr-Pennington* and the litigation privilege. Dkt. 172 at 5-13. OpenAI vigorously maintained that Plaintiffs' UCL claim was a Phase Two competition-related claim when it opposed Plaintiffs' trial plan, Dkt. 125 at 1-2, 6, but now maintains *its* UCL claim belongs in Phase One. Dkt. 172 at 22-23. OpenAI alleged that the LOI was backed by "investors who . . . are close confederates of Musk, some with large stakes in Musk-founded companies including Tesla, SpaceX, The Boring Company, X, and Neuralink," Dkt. 176 ¶ 87, but now claims it is an "extravagan[t]" lie for Plaintiffs to assert

---

[2] References throughout are to both the operative Second Amended Complaint, Dkt. 170, and OpenAI's amended Answer, Dkt. 176, except where otherwise specified, as the parties have agreed amendments to their pleadings have no bearing on this motion.

CASE NO. 24-cv-04722-YGR
PLAINTIFFS' REPLY ISO MOT. TO DISMISS

that OpenAI acknowledged the LOI "was backed by credible investors." Dkt. 172 at 1. Indeed, OpenAI even calls Plaintiffs' course of petitioning conduct, including a full agency adjudication, before the California Attorney General "irrelevant" to the case, *id.* at 7 n.6, yet continues to file updates about that same petitioning conduct with the Court (including one just last night, to which Plaintiffs will respond in due course). Dkts. 157, 178.

The list goes on. OpenAI's Counterclaims, like so much of its conduct surrounding this litigation, amount to a crisis-comms campaign designed to distract from the one indisputably true and inescapable fact: OpenAI, Inc. was founded as a charity for the public's benefit, but now it desires to enrich insiders like Sam Altman and his investors instead. And the less the charity is compensated for its assets, the greater their profits. Plaintiffs have engaged in a continuous and interrelated course of petitioning and litigation intended to: (1) stop OpenAI and Altman from breaching the charitable trust Musk endowed, and violating of other legal duties, by converting to a for-profit enterprise; or, at the very least, (2) ensure the charity receives proper compensation for assets developed with Musk's contributions. The LOI was essential to the second purpose.

OpenAI's Counterclaims are not just meritless; they attack quintessentially privileged and protected conduct. OpenAI's entire rationale for silencing Plaintiffs' advocacy, protected under both California's robust litigation privilege and *Noerr-Pennington*, rests on a single repeated assertion: "Because [the LOI]—and not Musk's communications relating to any governmental proceeding or any other activity protected by the First Amendment—forms the predicate for OpenAI's counterclaims, the *Noerr-Pennington* doctrine and California's litigation privilege afford no shelter." Dkt. 172 at 1. This argument fails on at least two levels.

*First*, OpenAI's own pleading belies the characterization of the Counterclaims as predicated solely and exclusively on the LOI. In fact, it does so in bolded section headers: e.g., "**G. Musk takes his harassment campaign to *courts and regulators***" (italics added), Dkt. 176 at 12; "**J. *Musk seeks to enjoin the possible restructuring and much of OpenAI's business*, then makes a sham bid for the nonprofit's assets**" (italics added), *id.* at 16. OpenAI, which chose to draft a complaint in this fashion to deflect and serve its crisis-comms campaign, must bear the consequences of that choice. In addition to incorporating these facts into OpenAI's causes of action, the causes of action themselves

complain about unambiguously protected conduct such as demand letters and lawsuits. *Id.* ¶¶ 112-13, 127. OpenAI's opposition even admits these facts are pled to establish necessary elements of its claims and request for injunctive relief. Dkt. 172 at 10.

*Second*, even if the LOI were the sole basis for OpenAI's Counterclaims (it is not), the LOI itself, along with any attendant media attention, is constitutionally and statutorily protected conduct as a matter incidental to this suit and Plaintiffs' petitioning of the Attorneys General. Indeed, OpenAI's own litigation conduct forecloses its attempt to argue otherwise. Having succeeded in filing the LOI with this Court as relevant to Plaintiffs' then-pending preliminary injunction motion, Dkt. 121 at 13-14 n.10, over Plaintiffs' objections, Dkts. 117, 119, OpenAI is judicially estopped from denying what it took such pains to establish: the LOI's litigation-related character. So too with OpenAI's argument that Plaintiffs' petitioning of the California Attorney General is irrelevant, Dkt. 172 at 7 n.6, when OpenAI provides the Court with continuous updates on the same, Dkt. 157, 178, and, in its own motion to dismiss, relied on Plaintiffs' letter demanding the Attorneys General establish a competitive valuation process, Dkt. 103-5 at 2. Accordingly, both California's litigation privilege and *Noerr-Pennington* interpose absolute bars to OpenAI's Counterclaims.

Even if OpenAI could somehow overcome these privileges by amendment (it cannot), its opposition exposes further fatal deficiencies that cannot be cured. OpenAI's UCL claim, predicated on the theory people were deceived by the LOI, Dkt. 176 ¶¶ 109-10, is directly contradicted by OpenAI's simultaneous allegation that people viewed the LOI as a "feint" and a "jok[e]," *id.* ¶¶ 85, 89. OpenAI's tortious inference claim, which is wholly derivative of its UCL claim, *id.* ¶ 125, falls with the UCL claim—and additionally for its total lack of specificity as to the *particular* economic relationships *actually* harmed by what, according to OpenAI, no one took seriously.

Finally, given the Court's ruling that competition-related claims belong in Phase Two, OpenAI's competition-related Counterclaims, to the extent any survive, should be heard alongside those of Plaintiffs. If Plaintiffs must wait to present their UCL-related arguments, so too should OpenAI. Moreover, there is no meaningful factual overlap between OpenAI's founding and commitments to Musk (the crux of Phase One) and the LOI. As such, there would be no judicial efficiency in enlarging the Phase One issues this late in discovery.

## ARGUMENT

## I.    OPENAI CANNOT DISAVOW ITS OWN PLEADINGS TO AVOID DISMISSAL

OpenAI cannot escape dismissal under the litigation privilege and *Noerr-Pennington* by labeling protected conduct as mere "background" when its Counterclaims depend on these same activities. Dkt. 172 at 5, 9. OpenAI's "Factual Allegations"—expressly incorporated into both its Counterclaims, Dkt. 176 ¶¶ 102, 115—concern quintessentially protected conduct: communications with Attorneys General, demand letters by counsel, and filing legal claims. *Id.* ¶¶ 7-9, 61, 65-69. These are operative allegations also pled within the causes of action themselves. *Id.* ¶¶ 112-13, 127.

Indeed, the *opening page* of OpenAI's Counterclaims complains that Musk made "a pretextual demand for corporate records." Dkt. 176 ¶¶ 7, 61. Given that both the litigation privilege and *Noerr-Pennington* require courts to ignore subjective motivation, *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 266 (1997) (litigation privilege); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (*Noerr-Pennington*), this distills to suing over a demand letter, which both doctrines forbid. *Id.* OpenAI's pleading next complains that Musk filed "harassing legal claims." Dkt. 176 ¶¶ 7, 65-69.[3] But as OpenAI has not pled (and could not plead) malicious prosecution and has affirmatively *waived* the "sham litigation" exception, Dkt. 172 at 7 n.5, Musk's filings are also manifestly protected conduct. The very next paragraph of the Counterclaims complains that "[p]retending to represent the public, Musk seeks to prevent [OpenAI's for-profit] restructuring." Dkt. 176 ¶ 8. This allegation plainly refers to this litigation, where the Court has already ruled Musk's claims regarding OpenAI's proposed "restructuring" are plausible. Dkt. 163.

OpenAI's next paragraph makes clear its Counterclaims concern Musk's alleged "campaign" of harassment as a whole, Dkt. 176 ¶ 9, when such "campaign" includes Musk's demand letter and legal claims, *id.* ¶ 7. Finally, OpenAI sues Musk for having "sent several letters to the Attorneys General of California and Delaware, encouraging them to take action against OpenAI" and to establish an open bidding process should OpenAI persist with its contemplated sale of charitable

---

[3] OpenAI's continued characterization of Plaintiffs' claims as actionable "harassment," *e.g.*, Dkt. 172 ¶¶ 58, 92, 95, 112-13, following the Court's ruling on OpenAI's Motion to Dismiss, Dkt. 163, warrants scrutiny. If OpenAI genuinely believed the Court had allowed claims so frivolous as to constitute harassment to go forward, it possessed clear recourse: a motion for interlocutory review under 28 U.S.C. § 1292(b). OpenAI did not pursue this avenue.

assets, *id.* ¶ 69, which the LOI sought to operationalize. Dkt. 103-5 at 2 (Jan. 7, 2025 letter to California and Delaware Attorneys General); Dkt. 172 at 7-8 (OpenAI describing the letter).

This pattern of complaining about unambiguously protected conduct pervades OpenAI's pleading, including the repetition of these facts not merely by incorporation but explicitly in the causes of action themselves. Dkt. 176 ¶¶ 112-13, 127. OpenAI's formal recitation of its First Claim for Relief (Unfair Competition) expressly complains about "issuing a pretextual and deceptive records demand" and "filing and belatedly withdrawing legal claims" as supposed actionable conduct. *Id.* ¶ 112. OpenAI's Second Claim for Relief (Tortious Interference) fares no better as it is explicitly predicated upon the alleged wrongfulness of these unambiguously, and absolutely, protected activities. *Id.* ¶ 125. Demand letters sent through counsel are protected regardless of alleged "pretextual" motives. *Aronson* 58 Cal. App. 4th at 266 (litigation privilege); *Sosa*, 437 F.3d at 934-35 (*Noerr-Pennington*). Filing and withdrawing legal claims receives absolute protection regardless of any alleged "harassing" intent, *see Hagberg v. Cal. Fed. Bank FSB*, 32 Cal. 4th 350, 360 (2004) (litigation privilege), so long as they do not amount to malicious prosecution—a claim OpenAI has declined to plead—or satisfy the "sham" exception to *Noerr-Pennington*, which OpenAI affirmatively disclaims. Dkt. 172 at 7 n.5.

In fact, OpenAI *admits* these protected activities are essential to the relief it seeks. Its opposition explains that such facts were pled "in support of [OpenAI's] request for injunctive relief, and in particular to demonstrate 'the risk of future, irreparable harm,'" Dkt. 172 at 4, essential for such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-21 (2008). It also asserts these protected activities "tend to show … Plaintiffs' intent in causing submission of the LOI [and] the 'purpose and character' of the false bid." Dkt. 172 at 10. Plaintiffs' "intent" is, of course, essential to OpenAI's tortious interference claim, which requires a showing of "intentional acts" by Plaintiffs. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). OpenAI's own pleading acknowledges this intent requirement as to its tortious interference, Dkt. 176 ¶ 118, and UCL claims, *id.* ¶ 103, and as such, the "purpose … of the false bid" is equally essential to both.[4] Because

---

[4] OpenAI attempts to evade the consequences of its own pleading choices by stating that *Noerr-Pennington* does not govern the admissibility of evidence applicable to trial. Dkt. 172 at 9-10. This is a red herring. The parties are not at trial and OpenAI is not simply trying to introduce evidence of Plaintiffs' protected conduct. It elected to allege protected conduct as part of its *prima facie* case. As

1    OpenAI's Counterclaims expressly incorporate factual allegations of clearly protected activities and

2    rely on them for essential elements, and its case as a whole, it cannot escape dismissal by subjectively

3    recharacterizing these expressly pled facts as mere background.

4    **II.    EVEN IF OPENAI HAD NOT SUED BASED ON PROTECTED CONDUCT,
         THE FIRST AMENDMENT AND THE LITIGATION PRIVILEGE PROTECT**

5    **THE LOI AS "INCIDENTAL" TO PRIVILEGED CONDUCT**

6             OpenAI could have pled its Counterclaims as based solely on the LOI, but it chose not to.

7    Even if it had, California's litigation privilege and *Noerr-Pennington* would protect the LOI and its

8    related media coverage as incidental to this litigation and Plaintiffs' advocacy with respect to the

9    California and Delaware Attorneys General.

10        **A.    California's Robust and Expansive Litigation Privilege Protects the LOI.**

11            Courts have emphasized that "[t]he breadth of the litigation privilege cannot be understated,"

12   *Olsen v. Harbison*, 191 Cal. App. 4th 325, 333 (2010), and "[a]ny doubt about whether the privilege

13   applies is resolved in favor of applying it." *Bowen v. Lin*, 80 Cal. App. 5th 155, 165 (2022). It has, as

14   the parties agree, four elements. It protects any (1) communication (2) with a connection or logical

15   relationship to litigation (or contemplated litigation) (3) by those current or contemplated litigants (4)

16   to achieve the objects of the litigation. *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990). Even in

17   isolation, the LOI and the media's attention to it satisfy all four elements.

18            *First*, the LOI was issued during these judicial proceedings—litigation concerning OpenAI's

19   governance, for-profit conversion, self-dealing that undervalues OpenAI, Inc.'s assets to enrich

20   insiders, and numerous other violations of legal duties. OpenAI's contention that communications

21   must be made "in" rather than "during" proceedings lacks support in California law, which protects

22   communications made outside the courtroom, and even *before* litigation begins, *Rubin v. Green*, 4

23   Cal. 4th 1187, 1194 (1993), provided they are "reasonably relevant" to pending or contemplated

24   litigation, *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1266 (2008).

25   such conduct "form[s] the basis for a suit," it is prohibited by the same footnote in *United Mine
     Workers of Am. v. Pennington* that OpenAI cites. 381 U.S. 657, 670 n.3 (1965); Dkt. 172 at 10.

26   Though OpenAI does not raise this argument as to California's litigation privilege, the law is equally

27   clear that claims "predicate[d]" on protected conduct must be dismissed, regardless of whether such
     conduct might be admissible at trial as to claims not predicated on it. *Oren Royal Oaks Venture v.*

28   *Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal. 3d 1157, 1168 (1986).

Beyond its direct relevance to Plaintiffs' claims in this case, the LOI relates to Plaintiffs' demands of the California and Delaware Attorneys General (both of whom have appeared in this litigation) to establish a bidding process to ensure fair market value for OpenAI, Inc.'s assets. Dkt. 103-5 at 2 (counsel's letter to the Attorneys General); Dkt. 78 (Delaware Attorney General's *amicus*); Dkt. 32 ¶¶ 421, 459 (detailing involvement of California's Attorney General); Dkt. 101 (California Attorney General's motion to dismiss); Dkt. 172 at 7 (OpenAI detailing Plaintiffs' communications with the Attorneys General). Indeed, OpenAI recognized as much when it filed the letter demanding a competitive valuation process as part of its first motion to dismiss. Dkt. 103-5 at 2. It beggars belief that, after repeatedly filing all of Plaintiffs' communications with these participating litigants, including the very communication that gave rise to the LOI and the LOI itself, the LOI is now somehow not litigation related.

The same is true of media coverage of the LOI. As Plaintiffs' Motion to Dismiss explained with a summary of six cases (excluding those cases' quoted citations), the litigation privilege protects statements to the media, public, and business partners of OpenAI. *See* Dkt. 166 at 15. OpenAI attempts to distinguish only two of those cases, Dkt. 172 at 12 n.10, and even there it fails. It claims the injury from the "malicious publication[]" of a notice of eviction in *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1251 (2007), is "wholly unlike" that suffered by OpenAI. Dkt. 172 at 12 n.10. But the burden of losing one's home far outstrips the supposed "burden" of considering a letter of intent in a comfortable boardroom. Yet even in that eviction action, the California Supreme Court decreed that such "malicious publications" made "without a good faith belief in their truth," are protected "as part of the price paid for affording litigants the utmost freedom of access to the courts." *Id.* As the other case (which OpenAI tries to limit to its facts, Dkt. 172 at 12 n.10) explains: "[The litigation privilege] applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, *even though the publication is made outside the courtroom . . . .*" *Better Meat Co. v. Emergy, Inc.*, 2023 WL 2977786, at *3 (E.D. Cal. Apr. 17, 2023) (emphasis added).

*Second*, the LOI was transmitted between litigants through their litigation counsel. Dkt. 118-1 at 1. That additional parties joined as potential co-investors should the LOI be accepted does not alter

this fundamental characteristic. Just as a non-party insurer's participation in settlement discussions would not strip away litigation-related protection because the core communication remains between the litigants, the involvement of potential co-investors cannot transform protected party-to-party communication into unprotected conduct. *See, e.g.*, *Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, Inc.*, 814 F. Supp. 2d 1033, 1041 (S.D. Cal. 2011). In any event, OpenAI itself characterizes the LOI as essentially an undertaking by Musk. Dkt. 176 ¶¶ 87, 95. The LOI cannot be Musk's for purposes of the Counterclaims, and at the same time that of a consortium of investors, unrelated to this litigation, for purpose of the litigation privilege.

*Third*, the LOI advanced this litigation's objectives. While Musk's primary goal remains stopping OpenAI's wholesale abandonment of its charitable mission, the competitive bidding process Plaintiffs sought would prevent the secondary harm this case also challenges: OpenAI's insider asset grab that enriches Altman and investors at the expense of the charity and its non-profit purposes. The LOI ensured that if conversion proceeded despite legal challenges, the non-profit would at least receive fair compensation, rather than be exploited for private gain.

OpenAI does not like Musk and evidently does not believe these are his true objectives. *E.g.*, Dkt. 176 ¶ 100. But, and the point bears repeating, the one inescapable fact in this litigation is that Musk co-founded and gave tens of millions of dollars to a charity he was assured would be committed to safety, transparency, and the public (rather than private) benefit. Musk stands to benefit *nothing* beyond his commitment to these values if OpenAI's charter is enforced. Altman and Microsoft, by contrast, stand to make billions of dollars if they continue to breach that charter.

OpenAI nevertheless argues the LOI was not "necessary or useful" to achieving Plaintiffs' litigation goals. Dkt. 172 at 8, 10-11. But OpenAI never explains how ensuring the charity receives fair market value for its assets, rather than maximizing Altman's windfall, could be anything but fundamental to this case. *E.g.*, Dkt. 170 at ¶ 250(b)-(d), (l) (cataloging how OpenAI's operation for the benefit of insiders, rather than the public, breached its commitments to Musk and to regulators).

*Fourth*, the LOI has a direct connection and logical relation to this action. OpenAI itself immediately filed the LOI with this Court as a litigation document, treating it as sufficiently connected to the case to warrant judicial notice as bearing on Plaintiffs' then-pending Motion for a

Preliminary Injunction. Dkts. 116, 118. Indeed, OpenAI is judicially estopped from claiming

otherwise. The Ninth Circuit applies the doctrine where: "(1) a party's later position is 'clearly

inconsistent' with its earlier position; (2) the party succeeded in persuading a court to accept its

earlier position; and (3) the party would derive an unfair advantage if not estopped." *Ah Quin v.*

*County of Kauai Dep't of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013).

All three factors are satisfied here. OpenAI's positions are irreconcilably inconsistent; it now

claims the LOI was a mere commercial transaction irrelevant to this litigation, yet previously argued

it was sufficiently relevant to necessitate leave to file it for the Court's consideration of Plaintiffs'

then-pending motion. Dkt. 118 at 1. When OpenAI sought to file the LOI with this Court on February

12, 2025, Plaintiffs opposed the filing, arguing it would "distract from the core issues before this

Court." Dkts. 117, 119. The Court rejected Plaintiffs' position and granted OpenAI leave to file the

LOI. Dkt. 121 at 13-14 n.10. OpenAI thus "succeeded in persuading [the] court to accept [its] earlier

position" that the LOI was connected to this litigation. *New Hampshire*, 532 U.S. at 750.

Finally, permitting OpenAI to now disavow the LOI's connection to this litigation would give

it an unfair advantage and create "the perception that . . . the . . . court was misled." *Id.* OpenAI

wielded the LOI as a sword—filing it to undermine Plaintiffs' preliminary injunction—but now

brandishes it as a shield by denying its litigation relevance in defending its Counterclaims. This

tactical flip-flopping exemplifies the "playing fast and loose with the courts" that judicial estoppel

prevents. *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 782 (9th Cir. 2001).

Apart from estoppel, OpenAI's attempts to distinguish controlling California authority fail on

the merits. OpenAI argues that *City of Costa Mesa v. D'Alessio Inv., LLC*, 214 Cal. App. 4th 358, 382

(2012), precludes protection of the LOI because it was not "useful" to the litigation. But as detailed

above, it *was* useful. It would have achieved a subset of Plaintiffs' objectives: to prevent the misuse

of charitable assets in a self-dealing conversion and protect the public interest by ensuring fair-market

value for charitable assets, rather than a lowball configuration to benefit insiders like Altman,

Brockman and their investors. *See, e.g.*, Dkt. 170 at ¶ 250(b)-(d), (l).

Regardless, *Costa Mesa* did not concern the "reasonably related" standard itself—it asked

whether a party's speech seeking to advance its case "in the court of public opinion" qualified for

1  protection even when it did not "advance a litigant's case." 214 Cal. App. 4th at 382. Here, accepting

2  the LOI's invitation to negotiate an arm's length purchase of OpenAI, Inc.'s assets would have

3  intrinsically resolved the core issue of the charity's receipt of fair market value for its assets if

4  OpenAI persisted with its conversion.

5      As to the LOI's media coverage, OpenAI insists its claims turn on the LOI alone, Dkt. 172 at

6  2, rendering media coverage irrelevant—and nonetheless protected. *Realtek Semiconductor Corp. v.*

7  *MediaTek, Inc.*, 732 F. Supp. 3d 1101, 1113 (N.D. Cal. 2024)[5]; *Heitkoetter v. Domm*, 2024 WL

8  325134, at *9 (E.D. Cal. Jan. 29, 2024) (dismissing UCL counterclaim premised on public YouTube

9  video likely to be seen by interested parties which commented on underlying lawsuit); *Weiland*

10  *Sliding Door*s, 814 F. Supp. 2d at 1041 ("The Court finds that those who received the Press Release

11  were parties with substantial interest in the outcome of the pending litigation."); *Sharper Image Corp.*

12  *v. Target Corp.*, 425 F. Supp. 2d 1056, 1076 (N.D. Cal. 2006) (UCL and interference claims barred

13  by litigation privilege where communications were made to "potential buyers of [plaintiff's product],

14  and the media representatives were advertisers whose business is to influence potential customers.").

15  The LOI was discussed in financial circles and the financial press—persons with no less a

16  "substantial interest" in OpenAI's business conduct than the "marketing community" in *Youngevity*

17  *Int'l Corp. v. Andreoli*, 749 F. App'x 634, 635 (9th Cir. 2019), thus OpenAI's citation to *Argentieri v.*

18  *Zuckerberg*, 8 Cal. App. 5th 768 (2017), is unavailing.

19  **B.    The *Noerr-Pennington* Doctrine Protects the LOI.**

20      OpenAI notes that the Court has previously described *Noerr-Pennington* as "seldom-used."

21  Dkt. 172 at 6. This observation, while accurate, deserves critical context. The doctrine appears

22  infrequently in modern litigation not due to any inherent limitation, but because comprehensive anti-

23

24

---

25  [5] OpenAI's attempt to distinguish the *Noerr-Pennington* holding in *Realtek* fails. Dkt. 172 at 9 n.8.
    *Realtek's failure-to-state-a-claim* holding was alternative to its *Noerr-Pennington* holding. 732 F.

26  Supp. 3d at 1114 (stating that "[e]ven if [the] communications with third parties were too peripheral

27  to the Future Link litigation to justify application of *Noerr-Pennington*," the allegations failed to state
    a claim). Further, only a *non-party*'s communications raised questions about contributing to litigation

28  for purposes of *Noerr-Pennington*. *Id.* at 1113. Here, both Musk and xAI are parties.

CASE NO. 24-cv-04722-YGR
PLAINTIFFS' REPLY ISO MOT. TO DISMISS

1    SLAPP statutes now impose significant attorneys' fees on those who target protected activity.[6]

2    OpenAI's substantive argument that the First Amendment does not protect the LOI and its

3    media coverage because they occurred outside of court (that is, until OpenAI chose to file the LOI

4    with this Court) also fails. It is predicated entirely on a narrow district court decision while

5    disregarding controlling precedent. Dkt. 172 at 6-9 (citing *Wisk Aero LLC* v. *Archer Aviation Inc.*,

6    2021 WL 4932734 (N.D. Cal. Sept. 14, 2021)). As the Ninth Circuit has explained, "the law of this

7    circuit establishes that communications between private parties are sufficiently within the protection

8    of the Petition Clause to trigger the *Noerr–Pennington* doctrine, so long as they are sufficiently

9    related to petitioning activity." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

10    This is so even "prior to initiating any actual litigation." *Id.* In other words, the LOI must be

11    assessed not only with respect to this litigation, during which it issued, but also as to the

12    administrative proceeding before the California Attorney General (referenced by OpenAI in its

13    opposition, Dkt. 172 at 7 n.6), and the multiple written demands by Plaintiffs' litigation counsel to the

14    Delaware and California Attorneys General (that OpenAI also repeatedly references, *id.* at 7-8, and

15    has filed with this Court, Dkt. 103-5 at 2). The LOI must *also* be assessed with respect to the

16    litigation Plaintiffs contemplate should the Attorneys General approve any "restructuring" that

17    enriches the charity's insiders and investors at the expense of its beneficiaries. *See, e.g., Evans Hotels,*

18    *LLC v. Unite Here Loc. 30*, 433 F. Supp. 3d 1130, 1146 (S.D. Cal. 2020) ("Threats to file a lawsuit, to

19    lobby, file CEQA challenges, and engage in a negative publicity campaign are incidental to

20    petitioning activity and fall within the scope of the Petition Clause.").

21    Regardless of "[w]hether additional reasons motivated [the LOI and media coverage]—

22    including a desire to [benefit one's business] … they are still covered by privilege." *UCP Int'l Co.*

23    *Ltd. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 983 (N.D. Cal. 2019). No other result would afford

24    the First Amendment "breathing space" *Sosa* held is necessary under *Noerr-Pennington*. 437 F.3d at

25    934. The breadth and scope of its protection reflects the reality that effective petitioning requires

26
27    [6] Were it not for the question as to whether state-law anti-SLAPP statutes will continue to apply in
      federal courts within the Ninth Circuit, *Gopher Media, LLC v. Malone*, No. 24-2626, 129 F.4th
      1196 (9th Cir. Mar. 3, 2025) (*en banc* argument set for June 24, 2025), Plaintiffs would most
28    certainly have filed this as a special motion to strike.

1   multiple forms of advocacy. A rule that protects only formal petitions themselves, while subjecting

2   the petitioner to liability for related conduct would render the right to petition a hollow one indeed.

3          OpenAI ignores all of this, arguing there is not a "tight connection" between the LOI and this

4   litigation or Plaintiffs' letters to the Attorneys General. Dkt. 172 at 6, 8 (quoting *Wisk Aero LLC v.*

5   *Archer Aviation Inc.*, 2021 WL 4932734, at *1, *7 (N.D. Cal. Sept. 14, 2021)). But OpenAI's

6   argument does not withstand scrutiny. *First*, while *Wisk* undoubtedly represents a thoughtful effort to

7   address these issues, it acknowledges that its holding is inconsistent with a case the Ninth Circuit

8   cited favorably in a leading *Noerr-Pennington* decision affirmed by the Supreme Court. 2021 WL

9   4932734, at *7 n.5 ("*Columbia Pictures* [*Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1528

10  (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993)] passingly cited one district court case that cuts against my

11  holding here . . . ."). The case to which *Wisk* refers, *Aircapital Cablevision, Inc. v. Starlink Commc'ns*

12  *Grp., Inc.*, 634 F. Supp. 316, 326 (D. Kan. 1986) does not merely "cut[] against" *Wisk*'s restrictive

13  "tight connection" standard—it holds the opposite. As *Wisk* itself concedes, "[*Aircapital*] *did* hold

14  that publicity attendant to a lawsuit was protected by the doctrine." *Id.* at *9 (emphasis in original).

15  More significantly, the Ninth Circuit in *Columbia Pictures* directly stated as much: "[W]here

16  underlying litigation is not a sham, attendant publicity is protected by *Noerr-Pennington* doctrine."

17  *Id.* (quoting *Columbia Pictures*, 944 F.2d at 1529).

18         *Second,* even accepting *arguendo* OpenAI's *Wisk* standard, the LOI satisfies it. The nexus

19  between Plaintiffs' counsel's petitioning of the Attorneys General for a competitive bidding process

20  to ensure fair market value to the charity in the event of its for-profit conversion, and subsequent

21  delivery of the LOI to opposing counsel, is direct and unambiguous. Furthermore, as to contemplated

22  future litigation, if Plaintiffs did not at least try to open negotiations over OpenAI's insider sale of the

23  charity's assets, Plaintiffs might very well lack standing to sue either Attorney General for ignoring

24  Plaintiffs' demand to determine the fair market value of OpenAI, Inc.'s assets via a competitive

25  bidding process. Dkt. 103-5 at 2. Accordingly, the LOI was part and parcel of Plaintiffs' ongoing

26  advocacy, and protected petitioning activity.

27

28

1    **III.    OPENAI FAILS TO STATE PLAUSIBLE CLAIMS**

2        **A.    OpenAI Fails to Plead a Plausible UCL Claim.**

3            Beginning with the UCL claim's "unfair" prong, OpenAI's opposition virtually abandons any

4    attempt to satisfy *Cel-Tech*'s requirement that "any finding of unfairness to competitors under section

5    17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact

6    on competition." 20 Cal. 4th 163, 186-87 (1999). OpenAI identifies no antitrust law or policy that

7    Plaintiffs allegedly violated and provides zero "proof" of any anticompetitive impact. Instead, it

8    offers only the vague, conclusory assertion that the LOI was intended to "slow OpenAI's progress"

9    and "impair its ability to compete effectively." Dkt. 176 ¶ 98. Challenging a competitor's business

10   plans is not an antitrust violation—it is competition itself. If it were otherwise, every competing bid

11   or tender offer would constitute unfair competition.

12           More fundamentally, OpenAI's theory of unfairness reduces to a complaint that Plaintiffs' bid

13   complicated Altman's plans to convert OpenAI's charitable assets in a self-dealing transaction, which

14   would have resulted in far less money (and a small fraction of the assets' actual value) going to the

15   charity, than the LOI proposed. Needless to say, ensuring competitive bidding and fair market value

16   serves rather than violates the policies underlying antitrust law. Pro-competition laws and policies

17   promote market-based pricing to prevent sweetheart deals, not to protect them from disruption—

18   especially here, where charitable assets are concerned.

19           The "fraudulent" prong of OpenAI's UCL claim—patently subject to Rule 9(b)—faces an

20   even more fundamental problem: OpenAI's own allegations defeat the required showing. To establish

21   fraudulent business practices, OpenAI must demonstrate that "members of the public are likely to be

22   deceived." Dkt. 172 at 18 (quoting *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235,

23   1254 (2009)). This requires a showing that reasonable consumers would likely be misled by the

24   challenged conduct. Yet OpenAI alleges facts that directly contradict any likelihood of consumer

25   deception. OpenAI alleges it "immediately recognized the bid as a feint," Dkt. 176 ¶ 90; that media

26   commentators publicly "recognized it as a sham," *id.* ¶ 85; and that the proposed price was obviously

27   "a joking reference" to science fiction, *id.* ¶ 89. Moreover, as Plaintiff's motion explains, and OpenAI

28   nowhere contests, Altman immediately laughed the LOI off, *publicly* proclaiming: "no thank you but

1  we will buy twitter for $9.74 billion if you want." Dkt. 166 at 15.

2          OpenAI tries to square this circle by pointing to certain non-profit organizations that cited the

3  LOI in their own advocacy to the Attorneys General to ensure any for-profit conversion fairly

4  compensated the charity. This fails in multiple respects. *First*, after chiding Plaintiffs for citing

5  materials outside the record (but not reasonably capable of dispute, such as Altman's statement on X),

6  OpenAI's Counterclaims plead nothing about this. *Second*, even if they had, it would not establish

7  consumer deception. These organizations cited the LOI for what it was: a proposal by qualified

8  investors to acquire OpenAI's assets at a stated price, subject to customary due diligence.

9          **B.    OpenAI Fails to Plead a Plausible Tortious Interference Claim.**

10         OpenAI's claim for tortious interference suffers from additional, independent defects that

11  OpenAI's opposition fails to address. For tortious interference claims, California law requires

12  pleading an independently wrongful act separate and apart from the interference itself. *Della Penna v.*

13  *Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). OpenAI relies entirely on its

14  allegations of a supposed UCL violation as this independent wrong. Dkt. 176 ¶ 125. Thus, when

15  OpenAI's UCL claim fails, as it must, its interference claim necessarily fails with it.

16         Even if the UCL claim somehow survived, OpenAI has not adequately pled the remaining

17  elements of tortious interference. California law requires identification of the specific economic

18  relationships disrupted. OpenAI's vague references to broad categories of persons, such as

19  "investors," "employees," and "customers," without identifying any "particular" relationship(s)

20  damaged falls far short of this requirement. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal.

21  App. 4th 507, 527 (1996); *see also AlterG v. Boost Treadmill LLC*, 388 F. Supp. 3d 1133, 1151-52

22  (N.D. Cal. 2019) (dismissing interference claim because the plaintiff did not "identify" the "vendors,

23  suppliers, and prospective or current customers" or allege "facts to explain their economic

24  relationship"); *Cont'l Advisors S.A. v. GSV Asset Mgmt., LLC*, No. 14-CV-05609-YGR, 2015 WL

25  7720752, at *7 (N.D. Cal. Nov. 30, 2015) (dismissing tortious interference claim where complaint

26  "does not include allegations regarding *specific* pre-existing relationships" (emphasis added)). While

27  OpenAI points to cases allowing some level of generality, even its own cases require *specific* persons

28  be pled. *See, e.g.*, Dkt. 172 at 20-21 (citing *Byton N. Am. Co. v. Breitfeld*, 2020 WL 3802700, at *4

1    (C.D. Cal. Apr. 28, 2020) ("In this case, however, Plaintiffs' expectation of a future economic benefit

2    was based on far more than a 'hope' or 'desire' for an economic relationship—it was based on the

3    continued employment of *specific* current employees." (emphasis added))).

4         The requirement of actual disruption presents another insurmountable obstacle for OpenAI.

5    *Korea Supply Co.*, 29 Cal. 4th at 1153. OpenAI alleges only that the LOI made things "more costly or

6    burdensome" and "complicated the process." Dkt. 176 ¶ 96. *First,* every competing bid or tender offer

7    "complicate[s] the process." That is not tortious interference, but rather the operation of markets.

8    *Second,* as with its UCL claim, OpenAI's vague allegations that the LOI caused disruption contradict

9    its own allegations that everyone "recognized it as a sham." *Id.* ¶ 85. OpenAI must allege *actual*

10   disruption of *specific* relationships, not mere inconvenience or the need to evaluate competing

11   proposals. *Korea Supply*, 29 Cal. 4th at 1153; *see also Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d

12   1137, 1151 (9th Cir. 2008) (dismissing complaint where "Sybersound merely states in a conclusory

13   manner that it 'has been harmed because its ongoing business and economic relationships with

14   Customers have been disrupted' [and] does not allege, for example, that it lost a contract nor that a

15   negotiation with a Customer failed.").

16   **IV.    AT A MINIMUM, OPENAI'S COUNTERCLAIMS SHOULD BE STAYED**

17        OpenAI's UCL claim explicitly alleges anticompetitive conduct and/or the effects of

18   Plaintiffs' alleged actions on competition in the AI market. OpenAI's tortious interference claim

19   necessarily involves the same competition-related evidence and analysis because it is entirely

20   derivative of the UCL claim. Dkt. 176 ¶ 125. If OpenAI's Counterclaims belong anywhere, they

21   belong in Phase Two of this case alongside Plaintiffs' UCL claim that OpenAI fought hard (and

22   succeeded) to have heard in Phase Two. Dkt. 125 at 6. It would be fundamentally unfair to allow

23   OpenAI to paint a picture of competitive interference—sharing little or no operative facts with the

24   other Phase One claims—while depriving Plaintiffs of the same opportunity on these grounds.

25                                    <u>**CONCLUSION**</u>

26        For the foregoing reasons, Plaintiffs respectfully request the Court dismiss OpenAI's

27   Counterclaims with prejudice or, in the alternative, stay them until Phase Two.

28

DATED: June 11, 2025                    Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

_____*/s/ Marc Toberoff*_____
Marc Toberoff

*Attorneys for Plaintiffs Elon Musk,
and X.AI Corp.*