Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs Elon Musk,
and X.AI Corp.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELON MUSK, et al.,<br><br>                         Plaintiffs,<br><br>          v.<br><br>SAMUEL ALTMAN, et al.,<br><br>                         Defendants. | Case No. 4:24-cv-04722-YGR<br><br>Assigned to Hon. Yvonne Gonzalez Rogers<br><br>**PLAINTIFFS' OPPOSITION TO OPENAI DEFENDANTS' MOTION TO DISMISS COUNTS III, XX, XXI**<br><br>Date:      July 15, 2025<br>Time:     2:00 p.m.<br>Place:     Courtroom 1 (4th Fl.)<br>              1301 Clay St.<br>              Oakland, CA 94612 |

## STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Local Civil Rule 7-4(a)(3), Plaintiffs identify the following issues to be decided:

1.    Whether Count III states a claim for breach of the implied covenant of good faith and fair dealing by alleging that Defendants systematically undermined the charitable purpose of their agreement through: (a) manipulative redefinition of key terms to evade conflict-of-interest protections; (b) creation of elaborate corporate structures to conceal their transformation of the charity to a for-profit enterprise; and (c) other bad faith conduct that frustrated the purpose and benefits of the parties' agreement.

2.    Whether Counts XX and XXI state claims under 18 U.S.C. § 1962(c) and (d) by alleging with particularity: (a) that Defendants committed multiple acts of wire fraud spanning from 2015 to present; (b) that these acts constitute a pattern of racketeering activity, demonstrating both relatedness and continuity; (c) in controlling and conducting OpenAI, Inc.'s affairs; and (d) that OpenAI, Inc. is an enterprise, distinct from the RICO defendants.

3.    Whether Plaintiff xAI has standing to assert RICO claims based on injuries in the generative AI market proximately caused by Defendants' pattern of racketeering conduct.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARD ........................................................................................................ 2

ARGUMENT ..................................................................................................................... 2

I.    THE IMPLIED COVENANT CLAIM STATES A COGNIZABLE CAUSE OF
      ACTION DISTINCT FROM BREACH OF CONTRACT. ...................................... 2

      A.   The Implied Covenant Protects Against Abuses of Discretion that Frustrate
           a Contract's Purpose Without Breaching Specific Terms. ............................... 2

      B.   The SAC Alleges Two Categories of Distinct Bad Faith Conduct
           In Addition to Defendants' Abuses of Discretion. ........................................... 5

           1.   Systematic Manipulation Through Redefinition. ................................... 5

           2.   Concealment Through Corporate Subterfuge. ....................................... 6

      C.   Defendants' Authorities Are Distinguishable. ................................................. 6

II.   THE RICO CLAIMS SATISFY ALL STATUTORY REQUIREMENTS. ............... 8

      A.   The SAC Pleads Multiple Predicate Acts With Rule 9(b) Particularity. ......... 9

      B.   The Predicate Acts Form a Cognizable Pattern. ............................................ 10

           1.   *The Acts Are Related Through Common Purpose and Method.* ......... 10

           2.   The Pattern Demonstrates Both Closed and Open-Ended Continuity. ... 11

           3.   The Scope of Those Victimized Supports The Finding of a Pattern. .... 12

      C.   Defendants Conducted OpenAI, Inc.'s Affairs Through a Pattern
           of Racketeering Activity. ............................................................................... 12

           1.   *Altman and Brockman Were and Remain Enterprise Management.* .... 13

           2.   The For-Profit Entities Participated in Enterprise Management. ......... 14

           3.   Microsoft Exercised Operational Control Over the Enterprise. .......... 14

      D.   The Enterprise-Person Distinctness Requirement Is Satisfied. ..................... 15

      E.   xAI Has Standing to Assert RICO Claims. .................................................... 16

III.  OPENAI'S FAILURE TO CHALLENGE THE CONSPIRACY COUNT
      WAIVES ANY OBJECTION TO IT. ................................................................... 17

CONCLUSION ............................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Allwaste, Inc. v. Hecht,*
  65 F.3d 1523 (9th Cir. 1995) ................................................................................................12

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006) ............................................................................................................17

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,*
  818 F.2d 1466 (9th Cir. 1987) ............................................................................................12

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,*
  222 Cal. App. 3d 1371 (1990) ..............................................................................................6

*Cedric Kushner Promotions, Ltd. v. King,*
  533 U.S. 158 (2001) ......................................................................................................15, 16

*Chagby v. Target Corp.,*
  358 F. App'x 805 (9th Cir. 2009) ........................................................................................16

*Ferrari v. Mercedes-Benz USA, LLC,*
  No. 15-CV-4379-YGR, 2016 WL 7188030 (N.D. Cal. Dec. 12, 2016) ................................16

*Garvey v. Wells Fargo & Co.,*
  No. 11–CV-6497 MMM (MANx), 2011 WL 13221027 (C.D. Cal. Nov. 23, 2011) ...............7

*Ghebreyesus v. Fed. Dem. Rep. of Ethiopia,*
  No. 22-CV-1717-RFB-EJY, 2023 WL 6392611 (D. Nev. Sept. 30, 2023) ..........................18

*Guz v. Bechtel Nat'l, Inc.,*
  24 Cal. 4th 317 (2000) ..........................................................................................................4

*H.J. Inc. v. Nw. Bell Tel. Co.,*
  492 U.S. 229 (1989) ..............................................................................................10, 11, 12

*Howard v. Am. Online Inc.,*
  208 F.3d 741 (9th Cir. 2000) ..............................................................................................18

*Ikuno v. Yip,*
  912 F.2d 306 (9th Cir. 1990) ..............................................................................................12

*Ketayi v. Health Enrollment Grp.,*
  516 F. Supp. 3d 1092 (S.D. Cal. 2021) ..............................................................................14

*Locke v. Warner Bros., Inc.,*
  57 Cal. App. 4th 354 (1997) ..................................................................................................4

*Marshall v. AFGE*,
    996 F. Supp. 1334 (W.D. Okla. 1998) .......................................................................10

*Nat'l Immunogenics Corp. v. Newport Trial Grp.*,
    No. 15-CV-2034 JVS (JCGx), 2016 WL 11520711 (C.D. Cal. Aug. 1, 2016) .......................18

*Oki Semiconductor Co. v. Wells Fargo Bank*,
    298 F.3d 768 (9th Cir. 2002) .......................................................................18

*Pac. Recovery Sols. v. United Behav. Health*,
    481 F. Supp. 3d 1011 (N.D. Cal. 2020) .......................................................................9

*Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*,
    948 F. Supp. 2d 1131 (D. Haw. 2013) .......................................................................11

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) .......................................................................12, 14

*Salinas v. United States*,
    522 U.S. 52 (1997) .......................................................................18

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) .......................................................................17, 18

*Storek & Storek, Inc. v. Citicorp Real Est., Inc.*,
    100 Cal. App. 4th 44 (2002) .......................................................................3

*Sun Sav. & Loan Ass'n v. Dierdorff*,
    825 F.2d 187 (9th Cir. 1987) .......................................................................10, 12

*Synopsys, Inc. v. Real Intent, Inc.*,
    No. 20-CV-2819-EJD, 2024 WL 5364480 (N.D. Cal. Aug. 26, 2024) .......................7

*Tatung Co., Ltd. v. Shu Tze Hsu*,
    217 F. Supp. 3d 1138 (C.D. Cal. 2016) .......................................................................18

*Thrifty Payless, Inc. v. Americana at Brand LLC*,
    218 Cal. App. 4th 1230 (2013) .......................................................................2, 3, 4

*Ticor Title Ins. Co. v. Florida*,
    937 F.2d 447 (9th Cir. 1991) .......................................................................12

*U.S. Bank, N.A. v. Miller*,
    No. 12-CV-5632 MMM (MANx), 2013 WL 12183652 (C.D. Cal. May 8, 2013) .......................7

*United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys.*,
    837 F.2d 356 (9th Cir. 1988) .......................................................................12

*United States v. Pace*,
    314 F.3d 344 (9th Cir. 2002) .......................................................................10

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003) ................................................................................9

*Walter v. Drayson,*
    538 F.3d 1244 (9th Cir. 2008) ..............................................................................13

**Statutes, Rules and Regulations**

18 U.S.C. § 1961 ....................................................................................................10

18 U.S.C. § 1962 ............................................................................................ passim

26 U.S.C. § 501 ......................................................................................................15

28 U.S.C. § 2 ............................................................................................................4

California Business and Professions Code § 17510.8 ............................................4

Federal Rule of Civil Procedure 9 ......................................................................9, 10

**INTRODUCTION**

The Second Amended Complaint ("SAC") cures the deficiencies identified in the Court's May 1, 2025 Order, Dkt. 163, and states cognizable claims for breach of the implied covenant of good faith and fair dealing (Count III) and both a substantive RICO claim (Counts XX) and a RICO conspiracy claim (Count XXI).

*First*, the implied covenant of good faith and fair dealing exists because parties can violate the fundamental purpose of an agreement while technically adhering to contractual language—which is precisely why a claim for breach of the covenant is a distinct cause of action. Here, Count III is no longer duplicative of Plaintiffs' contract claim, but targets a distinct form of wrongdoing: Defendants' bad faith manipulation of the parties' contractual relationship to frustrate its fundamental charitable purpose while maintaining the pretense of compliance. Defendants' systematic subversion—through strategic redefinitions, elaborate and opaque corporate shells, and deliberate concealment—violates the implied covenant even if found not to breach specific contractual terms. OpenAI's effort to squeeze the implied covenant of good faith and fair dealing out of implied-in-fact agreements, while denying the terms of the implied-in-fact agreement the Court has already found plausibly pled, should be rejected. OpenAI cannot have it both ways, simultaneously claiming the covenant of good faith and fair dealing is duplicative of contractual terms it claims do not exist.

*Second*, Counts XX and XXI establish a textbook RICO violation: a pattern of wire fraud (predicate acts), spanning years, through which Defendants methodically manipulated and looted a charity (the enterprise). From the initial fraudulent inducements of Musk in 2015, through Defendants' false reassurances when he threatened withdrawal in 2017, to their ongoing deceptive statements to the public and investors, Defendants have systematically conducted OpenAI, Inc.'s affairs through a pattern of wire fraud, designed to convert valuable charitable assets under the guise of a fake charitable mission. This pattern and knowing abuse of the charitable form enabled Defendants to secure Musk's "free funding" and recruit key AI talent under false pretenses, Dkt. 170 ¶ 303, and ultimately, convert those charitable contributions into billions in private equity for their own enrichment. The scheme continues to this day, as Defendants work to complete their transformation into a for-profit "start-up" built on a foundation of fraudulent philanthropy. It has

victimized not only Musk, but other donors, as well as scores of leading AI scientists, who like Musk, were instrumental to Defendants' scheme and deceived by their charitable façade. This is precisely the kind of coordinated unlawful corruption of an enterprise Congress designed civil RICO to reach, and both Musk and xAI have standing to assert these claims.

OpenAI's renewed Motion to Dismiss should be denied.

## LEGAL STANDARD

The Court is well-versed in the standard of review applicable to motions to dismiss, which is not in dispute.

## ARGUMENT

### I.   THE IMPLIED COVENANT CLAIM STATES A COGNIZABLE CAUSE OF ACTION DISTINCT FROM BREACH OF CONTRACT.

Defendants' Motion rests on a fundamental misapprehension of California law. They contend that because the implied covenant of good faith and fair dealing cannot create new substantive obligations, any claim based on it must be duplicative of a breach of contract claim. Dkt. 175 at 3-7. Musk's implied covenant claim creates no new obligations—it addresses Defendants' bad faith subversion of *existing* duties to frustrate the agreement's purpose and deny Musk its intended benefits. Such bad faith is actionable under California law, separate and apart from a breach of contract claim. California recognizes this cause of action for precisely this scenario—to address conduct, that while argued not to technically breach contractual terms, frustrates the purpose and benefits of the agreement. *See Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992). By definition, this cause of action is not duplicative of a breach of contract claim. *See Thrifty Payless, Inc. v. Americana at Brand LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (explaining how "engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract" violates the implied covenant of good faith and fair dealing).

### A.   The Implied Covenant Protects Against Abuses of Discretion that Frustrate a Contract's Purpose Without Breaching Specific Terms.

The SAC alleges that, even if none of the OpenAI Defendants' violation of their promises are

determined to constitute breaches of the parties' agreement, they nevertheless violated the implied covenant of good faith and fair dealing. Dkt. 170 ¶ 269(c). This allegation is precisely what California law requires to state a valid claim. In *Thrifty Payless*, for example, the defendant shopping center technically complied with its lease, which failed to specify the plaintiff tenant's "pro rata share" of certain common expenses the shopping center was entitled to impose on the tenant. 218 Cal. App. 4th at 1244. While the court found no breach of express terms—"Merely charging higher rates for these items than estimated during negotiations does not ostensibly breach the express language of the lease"—it held defendant still violated the implied covenant by "improperly exercising its discretion in allocating" these expenses. *Id*.

Similarly, as the SAC alleges, while OpenAI had discretion to engage in limited for-profit activity to fund its charitable mission, Dkt. 170 ¶ 3, 126, its wholesale conversion, without regulatory approval, into a massive for-profit enterprise mirrors *Thrifty*'s bad faith exercise of its discretion. The SAC alleges that OpenAI captured billions of dollars while the charity received just $44,485. *Id*. ¶ 129. Just as *Thrifty*'s defendant could set expense rates but could not improperly exercise its discretion to unfairly burden its tenant, OpenAI cannot transform charitable donations into billions in private gain while claiming technical compliance with its non-profit obligations.

"[T]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Carma Developers*, 2 Cal. 4th at 372. Here, as one example, Musk entrusted Defendants with a modicum of discretion to determine when "genuine safety and security concerns" might properly supersede OpenAI's commitment to "open source technology for the public benefit." Dkt. 170 ¶ 247(f). While reasonable debate exists about safe levels of openness, the SAC alleges, at minimum, a *plausible* abuse of that discretion by Defendants. For OpenAI to consistently open source its technology until it became commercially valuable, then suddenly declare every profitable technological development must remain closed source for reasons of "safety" or "security," defies credulity. *Id*. ¶¶ 171-76, 250(g). Such circumstances demand precisely the protection the implied covenant provides. *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*, 100 Cal. App. 4th 44, 57 (2002) ("After a thorough review of the case law, the court explained that when a party is given absolute discretion by express contract language, the

1  courts will imply a covenant of good faith and fair dealing to limit that discretion in order to create a

2  binding contract and avoid a finding that the promise is illusory.").[1]

3          When subjectivity is involved in assessing a party's discretionary contractual performance, the

4  covenant ensures that "the subjective standard of *honest satisfaction* is applicable." *Locke v. Warner*

5  *Bros., Inc.*, 57 Cal. App. 4th 354, 364 (1997) (emphasis in original). OpenAI's systematic

6  interpretation of every term to maximize profits and commercial advantage creates a jury question

7  whether Defendants *honestly* exercised their discretion under their implied-in-fact agreement with

8  Musk. This cause of action for breach of the implied covenant, and the many cases supporting it,

9  addresses Defendants' contention that the terms of the parties' agreement are allegedly too vague to

10  be enforceable—as they unsuccessfully argued in their first motion to dismiss and doubtless will

11  again at summary judgment and trial—while claiming, at the same time, there can be no breach of the

12  covenant, as it is allegedly duplicative. Dkt. 103 at 7 ("Nor would Musk's alleged 'terms' be

13  'sufficiently definite . . . to constitute an enforceable contract.'").

14          California law allows *both* breach of contract and breach of the implied covenant to be pled

15  together, just as Musk has done, and indeed they often are. *Thrifty Payless,* 218 Cal. App. 4th at 1244

16  ("Thrifty has alleged Americana has breached paragraph 1.1 by improperly exercising its discretion in

17  allocating costs between retail and nonretail space; this conduct as alleged can constitute both a

18  breach of contract and breach of the implied covenant. Thus, the trial court erred in sustaining the

19  demurrer to Thrifty's fifth and sixth causes of action."). Defendants cite *Guz v. Bechtel Nat'l, Inc.*, 24

20  Cal. 4th 317 (2000), for the contrary proposition, but *Guz* addressed whether the implied covenant

21  could create substantive employment obligations beyond an at-will contract. *Id.* at 349-51. It did not

22  hold—and no case has held—that the covenant claim must be dismissed whenever there is a breach of

23  contract claim.

24          OpenAI's unprecedented abuse of a non-profit's ability to sponsor limited for-profit activity *to*

25  *raise revenue for the non-profit*, and OpenAI's wholesale abandonment of its founding (and

26

27  ───────────────
    [1] Defendants' efforts to evade responsibility for the promises made to Musk should be scrutinized
    with an especially careful eye given such promises were not made in an arms-length commercial
28  transaction, but in the context of a fiduciary relationship between Musk as a donor and Defendants as
    persons soliciting funding for a charity. Cal. Bus. & Prof. Code § 17510.8.

CASE NO. 24-CV-04722-YGR
PLAINTIFFS' OPP. TO OAI MTD

namesake) open source mission for private commercial gain, cannot be reconciled with honest performance. Even if a jury accepted that OpenAI, for example, is *not* obligated to "'always assiduously act to minimize conflicts of interest among [its] employees and stakeholders that could compromise' the non-profit's mission," Dkt. 170 ¶ 247(i), it could still conclude that Sam Altman's egregious conflicts of interests and serial self-dealing deprived Musk of the benefit of his bargain that OpenAI would use technology "for the good of the world . . . rather than for the private gain of any person." *Id.* ¶ 247(b). Thus, a jury must determine whether OpenAI's conduct constitutes either literal breach or bad faith performance contrary to the purpose and intended benefits of the parties' agreement.

> **B.** **The SAC Alleges Two Categories of Distinct Bad Faith Conduct In Addition to Defendants' Abuses of Discretion.**

Separate and apart from OpenAI's effort to squeeze California's good faith performance requirement out of its implied-in-fact agreement, its Motion should be denied because the SAC also carefully delineates how Defendants' bad faith frustrated the contract's charitable purpose through two additional categories of conduct entirely distinct from breach.

> 1. *Systematic Manipulation Through Redefinition*.

The first category alleged in the SAC involves Defendants' calculated manipulation of contractual concepts to evade their obligations while maintaining surface compliance. Dkt. 170 ¶ 269(a). This goes to the heart of bad faith performance.

Consider the alleged duty to "assiduously act to minimize conflicts of interest[.]" *Id.* ¶ 247(i). One can imagine various ways to perform this obligation. While good faith would require robust conflict policies and independent oversight, and even weak conflict policies might achieve technical compliance, Defendants instead strategically redefined "independence" so narrowly that obviously conflicted directors still qualified. By limiting conflicts to "directly or personally held equity," *id.* ¶ 269(a), while ignoring significant indirect holdings, interlocking directorates, and financial dependencies, Defendants subverted the duty's purpose while maintaining its façade.

This conduct differs categorically from breach. A party can maintain weak conflict policies without breaching a duty to "minimize conflicts"—a term that admits degrees. But systematically

manipulating definitions to gut conflict protections while maintaining their façade constitutes bad faith performance. This is but one relevant example, capturing the essential difference between breach of a term and its deliberate subversion in bad faith.

2.    *Concealment Through Corporate Subterfuge.*

The second category alleged in the SAC addresses Defendants' elaborate concealment campaign—not merely failing to disclose material information, but actively creating complex corporate structures to evade detection and hide their ongoing transformation of the charity to a fully for-profit enterprise for the enrichment of the charity's principals. *Id.* ¶ 269(b).

Defendants mischaracterize this as a "failure to disclose contractual breaches." Dkt. 175 at 6. The allegation is not that Defendants failed to announce their breaches, but that they engineered an elaborate shell game—consisting of over twenty opaque entities with hidden ownership—specifically designed to obscure their profiteering activities, while maintaining OpenAI, Inc.'s charitable façade. Defendants filed minimal public disclosures and refused to reveal ownership stakes, Dkt. 170 ¶¶ 124-25, and made repeated public statements touting OpenAI's non-profit mission while quietly planning its for-profit conversion, *id.* ¶¶ 310, 428.

This violated the fundamental expectation inherent in charitable giving—that fiduciaries exercise discretion openly and honestly, not through byzantine corporate structures designed to conceal self-dealing. The implied covenant of good faith and fair dealing demands transparency and honesty from charity fiduciaries managing donor funds, not elaborate schemes to obscure private enrichment.

**C.    Defendants' Authorities Are Distinguishable.**

The cases Defendants cite in support of dismissal involve routine commercial disputes where implied covenant claims merely repackaged breach allegations without identifying distinct bad faith conduct and abuses of discretion. Critically, none address contracts involving the discretion of fiduciaries managing charitable assets—the precise context where law should most vigilantly police good faith performance.

Defendants' repeated citation to *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371 (1990), proves the point. There, the court addressed a straightforward loan dispute where the

implied covenant claim "rel[ied] upon the same alleged acts" as simple breach—failure to fund committed loans. *Id.* at 1395. The SAC does not do this. Unlike the plaintiff in *Careau* who identified no bad faith beyond the breach itself, Musk alleges elaborate bad faith schemes of concealment and manipulation distinct from any specific breach. Dkt. 170 ¶ 269.

The same fundamental distinction applies to *Garvey v. Wells Fargo & Co.*, 2011 WL 13221027 (C.D. Cal. Nov. 23, 2011), and *U.S. Bank, N.A. v. Miller*, 2013 WL 12183652 (C.D. Cal. May 8, 2013), both of which involved implied covenant claims that merely incorporated breach allegations without any additional bad faith components or theory of liability. *Garvey*, 2011 WL 13221027, at *5; *Miller*, 2013 WL 12183652, at *6. Finally, Defendants cite *Synopsys, Inc. v. Real Intent, Inc.*, 2024 WL 5364480 (N.D. Cal. Aug. 26, 2024), which actually supports Musk. There the court dismissed an implied covenant claim based on "active concealment of breach" because the "core allegation" was breach itself. *Id.* at *26. Here, the core allegations comprising the implied covenant claim are not breach, but systematic bad faith subversion of a charity through manipulation and concealment—conduct that would violate the covenant even absent technical breach.

Unsurprisingly, none of Defendants' authorities involve fiduciary relationships—reason enough to reject them entirely. The California Supreme Court has defined the essence of this cause of action as applied to the kinds of close, trusting relationships where parties permit each other to exercise discretion: "In this context, breach of the covenant of good faith has been characterized as an attempt by the party holding the discretionary power to use it to recapture opportunities forgone in contracting. 'Bad faith performance occurs precisely when discretion is used to recapture opportunities forgone upon contracting—when the discretion-exercising party refuses to pay the expected cost of performance.'" *Carma Devs.*, 2 Cal. 4th at 372 n.11 (citation omitted). By systematically abusing the discretion afforded by the charitable form and Musk's charitable contributions to "recapture opportunities forgone" such as "free funding to a start-up," Defendants' conduct exemplifies the bad faith California law condemns and this cause of action is designed to redress. Dkt. 170 ¶¶ 101-02.

## II. THE RICO CLAIMS SATISFY ALL STATUTORY REQUIREMENTS.

The SAC alleges a textbook civil RICO violation. Defendants conducted the affairs of the publicly subsidized OpenAI, Inc. charity (the enterprise) through a repeated pattern of wire fraud (the predicate acts), and concealed manipulations to transform it into a for-profit moneymaking machine for their private enrichment. Beginning in 2015 with fraudulent solicitations, escalating through 2017 with false reassurances to retain and promote further funding, and continuing to the present with ongoing deceptions of investors and the public, Defendants executed the long con—a covert racketeering scheme that methodically diverted over $44 million in charitable donations through repeated wire fraud for massive private gain.

As an initial matter, the OpenAI Defendants' renewed RICO arguments violate the Court's instruction in its May 1, 2025 Order that the parties should confine their arguments to the issues identified in the Order. Dkt. 163 at 11 ("Parties shall not renew arguments already made and resolved in this Order. Nor may defendant assert new arguments that could have been asserted in the first instance."). Despite that instruction, Defendants make threshold attacks on Plaintiffs' RICO claims that the Court rejected in finding the FAC's deficiency was Plaintiffs' failure "to identify how the named defendants operated the entity through a pattern of racketeering activity." *Id.* at 10.

In particular, in their initial motion to dismiss and now again, Defendants challenge the RICO claims on the grounds that Plaintiffs purportedly did not plead: predicate acts of wire fraud with particularity, *compare* Dkt. 103 at 11-12 *with* Dkt. 175 at 8-9; the "conduct of an enterprise" under § 1962(c), *compare* Dkt. 103 at 12 *with* Dkt. 175 at 12; and the enterprise-person distinctness requirement, *compare* Dkt. 103 at 12 *with* Dkt. 175 at 13-14.

Defendants cannot simply reframe arguments the Court has already rejected by peppering in a few new citations or slightly different phrasing. This is precisely the kind of improper relitigation and waste of judicial resources that the Court instructed the parties to avoid. If OpenAI believed the Court erred in its initial ruling, its remedy was to seek reconsideration under the appropriate standard or to preserve the issues for appeal.

Accordingly, the Court should disregard all of Defendants' arguments except those directed to the defect the Court identified: "[The FAC's] allegations fail to identify how the named defendants

operated the entity through a pattern of racketeering activity." Dkt 163 at 10. Or put another way, the SAC must "demonstrate how the defendants named under Section 1962(c) conducted OpenAI's affairs in a manner RICO was intended to reach." *Id.*

### A.    The SAC Pleads Multiple Predicate Acts With Rule 9(b) Particularity.

Defendants claim the SAC alleges "at best a single RICO predicate with a single purported victim." Dkt. 175 at 8. Having engaged in concerted ongoing conduct to accomplish the systematic looting of a charity through years of repeated wire fraud, Defendants essentially now claim their scheme was too simple and brief to violate federal law. The Court should reject this revisionism. The SAC alleges a distinct pattern of wire fraud, each involving numerous predicate acts and multiple victims.

The September 2017 episode provides a paradigmatic instance of Defendants' wire fraud within the broader racketeering scheme. After Defendants persistently pushed for OpenAI, Inc.'s for-profit conversion throughout summer 2017, Altman and Brockman faced Musk's ultimatum: remain a non-profit or lose his funding. Dkt. 170 ¶¶ 302-03. Their response—immediate false assurances communicated via email of their commitment to the non-profit while secretly planning the opposite— constitutes wire fraud. *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1028 (N.D. Cal. 2020). This concrete example illustrates with crystalline specificity how the broader fraudulent scheme operated.

Indeed, Rule 9(b)'s particularity requirement—the who, what, when, where, and how, *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1103-04 (9th Cir. 2003)—is amply satisfied by the SAC: (1) *Who*: The SAC identifies Altman and Brockman as the scheme's principal architects, Dkt. 170 ¶¶ 80-85, 302-12; (2) *What*: The SAC specifies Defendants' knowingly false statements about OpenAI's charitable status and commitments, including misrepresentations in OpenAI's Certificate of Incorporation that: "The corporation is not organized for the private gain of any person" and "no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person." *Id.* ¶ 87. Altman declared: "The technology would be owned by the [OpenAI] foundation[.]" *Id.* ¶ 84. In addition, "Defendants in their online marketing (e.g., website), advertisements, and promotions made knowingly false and/or misleading

representations to defraud the public and induce the false belief that OpenAI, Inc. would be a non-profit whose charitable mission is to develop safe and open-source AI/AGI technology for the public good, not private gain," which "false and/or misleading public pronouncements served to further reassure Musk and induce him to make further contributions."[2] *Id.* ¶ 428. Altman's habitual self-dealing at a charity's expense typifies conduct supporting RICO liability. *See Marshall v. AFGE*, 996 F. Supp. 1334, 1337-40 (W.D. Okla. 1998); (3) *When*: The SAC establishes precise dates for fraudulent communications from May 2015 through critical exchanges in June 2015, September 2017, March 2019, and continuing to this day, *id.* ¶¶ 82-86, 101-02, 428; (4) *Where*: Such communications were made at in-person meetings, in public filings, and interstate emails (uncontested by Defendants), as detailed throughout the SAC, *id*; and (5) *How*: The SAC demonstrates how Defendants deployed these fraudulent misrepresentations to secure Musk's substantial contributions—money, time, connections, and reputation—while concealing their actual intentions, *id.* ¶¶ 89-95, 309-12.

Lest there be any doubt, the Court has already deemed the specificity with which Plaintiffs pled Defendants' fraudulent conduct and intent in Count VII to be sufficient under Rule 9(b)'s pleading standard. Dkt. 163 at 8.

**B.    The Predicate Acts Form a Cognizable Pattern.**

Even accepting Defendants' narrow reading of the predicate acts alleged, they nevertheless form a clear, cognizable pattern under RICO, which requires just "two acts of racketeering activity." *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 193 (9th Cir. 1987) (quoting 18 U.S.C. § 1961(5)). Plaintiffs' allegations readily exceed this threshold. *See, e.g.,* Dkt. 170 ¶¶ 424, 428. The pattern requirement has two additional components: relatedness and continuity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The SAC establishes both.

1.    *The Acts Are Related Through Common Purpose and Method*.

Relatedness requires that predicate acts "have the same or similar purposes, results,

---

[2] Each communication, including each statement released over the internet, such as those identified in Dkt. 170 ¶ 380(a)-(f), furthering the fraud constitutes a separate RICO predicate. *United States v. Pace*, 314 F.3d 344, 350 (9th Cir. 2002) (noting that "each use of the wires constitutes an independent violation of the law").

participants, victims, or methods of commission." *Id.* at 240. The SAC alleges all these factors.

Every predicate act served the common purpose of transforming OpenAI from a charity to a for-profit while maintaining a philanthropic façade to continue attracting support. Dkt. 170 ¶¶ 307-10, 421, 440. The scheme had a common result in successfully diverting over $44 million in charitable donations to build a $300 billion for-profit enterprise on the back of a tax-exempt charity. *Id.* ¶¶ 5, 424. Altman and Brockman orchestrated every aspect, with Microsoft providing essential support, making them common participants. *Id.* ¶¶ 421-37, 439, 444-48.

While Musk was the primary target, the scheme's false promises of safety and openness for the public's benefit conned far more victims. OpenAI's fraudulent charitable mission drew the world's leading AI scientists and engineers, who believed they were joining a non-profit dedicated to humanity's benefit. *Id.* ¶¶ 307-08. These top researchers have since fled OpenAI in droves upon discovering the deception—a mass exodus that exposes Defendants' fraud. *Id.* ¶¶ 182-90. One such scientist stated in a May 18, 2024 interview: "I joined with substantial hope that OpenAI would rise to the occasion and behave more responsibly as they got closer to achieving AGI. It slowly became clear to many of us that this would not happen." *Id.* ¶ 185. The scheme also victimized other major donors (Jessica Livingston, Peter Thiel, Open Philanthropy), the public, competing AI companies, and American taxpayers who subsidized what they believed was a legitimate charity but was actually a vehicle for competitive advantage and private enrichment. *Id.* ¶¶ 421, 428, 447.

All acts involved fraudulent misrepresentations transmitted via interstate wires about OpenAI's charitable mission and purpose, fraudulently inducing donations via interstate wire transfers and attracting essential AI talent, establishing a common pattern of deception. *Id.* ¶ 440. This plain commonality establishes relatedness under any standard. *See, e.g.*, *Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 948 F. Supp. 2d 1131, 1160 (D. Haw. 2013).

2.    *The Pattern Demonstrates Both Closed and Open-Ended Continuity.*

Continuity exists in two forms: "closed-ended" (past conduct extending over a substantial period) or "open-ended" (past conduct threatening future repetition). *H.J. Inc.*, 492 U.S. at 241. The SAC establishes both.

As to close-ended continuity, the scheme spans nearly a decade, from initial fraudulent solicitations in 2015 through ongoing deceptions today. Dkt. 170 ¶¶ 82-88, 428, 439. This far exceeds the "substantial period" requirement. *See Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469 (9th Cir. 1987) (five months sufficient); *United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys.*, 837 F.2d 356, 360 (9th Cir. 1988) (five months sufficient); *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991) (thirteen months sufficient); *Dierdorff*, 825 F.2d at 190 (two-month period). Defendants claim the relevant period is "a discrete time period in 2017." Dkt. 175 at 10. This ignores the SAC's express allegations of fraud from "December 11, 2015 to today." Dkt. 170 ¶ 428. Even focusing solely on Musk's fraudulently induced wire transfers, these span from May 2016 through September 2020—over four years. *Id.* ¶ 424.

"Open-ended continuity is shown by 'past conduct that by its nature projects into the future with a threat of repetition.' Predicate acts that specifically threaten repetition or that become a 'regular way of doing business' satisfy the open-ended continuity requirement." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) (quoting *H.J. Inc.*, 492 U.S. at 241-43). Here, the threat of continued racketeering is manifest. Defendants are actively working to complete OpenAI's for-profit conversion within two years, *id.* ¶ 193, while continuing to make false representations on OpenAI's website and otherwise regarding its charitable façade, *id.* ¶ 428.

3.    *The Scope of Those Victimized Supports The Finding of a Pattern.*

Defendants claim only Musk was defrauded, precluding the finding of a pattern. Dkt. 175 at 10. This misstates both law and fact. *First*, as a matter of law, multiple victims are not required for a pattern. *See, e.g.*, *Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990) (single victim). *Second*, the SAC alleges multiple victims, including other donors and top AI scientists. Dkt. 170 ¶¶ 307-08, 421.

**C.    Defendants Conducted OpenAI, Inc.'s Affairs Through a Pattern of Racketeering Activity.**

In order to plead a RICO violation, Plaintiffs must allege sufficient facts to establish that the Defendants conducted the affairs of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). RICO defendants must "participate in the operation or management of the enterprise itself" by having "some part in directing those affairs." *Id. at 179.* "Of course . . . RICO liability is not limited to those

with primary responsibility for the enterprise's affairs . . . [or] to those with a formal position in the enterprise, but . . . one must participate in the operation or management of the enterprise itself." *Id*. at 179, 185.

"In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal in that the defendant's position is 'vital' to the mission's success." *Ketayi v. Health Enrollment Grp.*, 516 F. Supp. 3d 1092, 1136 (S.D. Cal. 2021) (internal quotation marks omitted) (citing *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). The SAC specifically alleges how each Defendant participated in conducting OpenAI, Inc.'s affairs through a pattern of racketeering activity.

### 1. *Altman and Brockman Were and Remain Enterprise Management*.

As CEO and President/CTO respectively, Altman and Brockman held ultimate operational authority over OpenAI, Inc. Dkt. 170 ¶¶ 109, 114, 149, 445(a). They "used their positions within OpenAI, Inc. to execute and direct the enterprise's core activities through the commission of multiple predicate acts of wire fraud." *Id.* ¶ 445(a). There can be no question that these Defendants' position and conduct, as alleged, satisfy any definition of operational participation and management of the enterprise.

*First*, they "directed OpenAI, Inc.'s solicitation of charitable contributions" through fraudulent misrepresentations, generating over $44 million. *Id.* This essential fundraising—conducted through wire fraud—constituted core enterprise operations. *Id.* ¶ 430. *Second*, they "executed and directed the enterprise's core activities," including decisions about corporate structure, technology licensing, and public communications, *id.*—fundamental decisions in managing the enterprise's affairs. *Third*, as daily operational managers, they transmitted fraudulent statements via interstate wires about OpenAI's mission, while executing its transformation to a fully for-profit enterprise for their private gain, at the core of the enterprise's affairs. When Altman, as the CEO of a charity, lies to donors and AI talent to fund operations and develop charitable assets for his personal enrichment, he

is fraudulently conducting the enterprise's affairs. *Reves*, 507 U.S. at 179 (liability for those with "some part in directing the [enterprise's] affairs").

### 2.    *The For-Profit Entities Participated in Enterprise Management*.

Defendants argue that the For-Profit Entities' participation in their ongoing scheme to defraud their donors cannot constitute participation in the operation of the enterprise's affairs. Dkt 175 at 13. But this ignores the SAC's allegations. The For-Profit Entities are integral to the pattern of fraudulent racketeering activity alleged, as the vehicles through which Defendants looted OpenAI Inc.'s assets, including its AI scientists recruited with misrepresentations of its fake charitable mission, and the technology those scientists developed with donor funds. Dkt. 170 ¶¶ 127-30, 433. In short, the For-Profit Entities are the operational arm of the ongoing enterprise. Indeed, in 2022, the charity only had $44,485 in revenue, while the For-Profit Entities one year later generated $1.6 *billion* in revenue. *Id.* ¶ 129. The systematic transfer and exploitation of OpenAI's assets to and by these entities obviously required their active participation in enterprise operations. *Id.* ¶¶ 127-30. These entities "knowingly implemented decisions of" Altman, Brockman, and Microsoft, and were "indispensable to achievement of the enterprise's goal." *Ketayi*, 516 F. Supp. 3d at 1136 (holding allegation that defendant's "position was 'vital' to the success of an alleged enterprise" was sufficient to survive motion to dismiss).

### 3.    *Microsoft Exercised Operational Control Over the Enterprise*.

Microsoft's participation in OpenAI, Inc.'s management is extensive and direct, including through the placement of its agents on OpenAI, Inc.'s Board, Dkt. 170 ¶¶ 161, 167, 358; leveraging its exclusive control over OpenAI's essential compute resources to give it veto power over all significant decisions, *id.* ¶¶ 110, 157; using that power to purge OpenAI, Inc.'s Board and re-instate Altman after he had been fired, *id.* ¶¶ 146-59, and directing strategic decisions, such as the ongoing for-profit conversion of the enterprise, *id.* ¶¶ 193-94. This evidences giving, rather than taking, directions, occupying (through Reid Hoffman and Deannah Templeton, *id.* ¶¶ 358, 361) a position in the "chain of command," and that Microsoft's resources were "indispensable to achievement of the enterprise's goal." *Ketayi*, 516 F. Supp. 3d at 1136.

### D.    The Enterprise-Person Distinctness Requirement Is Satisfied.

Defendants fundamentally misconstrue the SAC's general alter ego allegations, pled for liability purposes and to preserve the possibility of a complete remedy, given Defendants' corporate shell game. The SAC alleges that, for purposes of liability, certain defendants should be treated as "alter egos of one another" and, in the event of liability, "Defendants' corporate veils should be pierced," not that OpenAI, Inc. is indistinguishable from the defendants for purposes of RICO. Dkt. 170 ¶ 237. This distinction is critical. Section 1962(c) requires only that, as here, the "enterprise" be legally distinct from the "person[s]" conducting its affairs. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 166 (2001) (holding that § 1962(c) "requires no more than the formal legal distinction between 'person' and 'enterprise' (namely, incorporation)"; "hence, the RICO provision before us applies when a corporate employee unlawfully conducts the affairs of the corporation" even when he is "the sole owner"). This, of course, does not require complete separation or independence—only that the enterprise maintains a distinct legal existence from each person alleged to conduct its affairs. *Id.*

As a § 501(c)(3) non-profit corporation, OpenAI, Inc. maintains a separate legal existence with its own, corporate charter and bylaws, Dkt. 170 ¶ 87, board of directors, *id.* ¶¶ 147, 160-65, tax-exempt status and filing obligations, *id.* ¶¶ 129, 374(d)-(e), and assets and operations, *id.* ¶¶ 17, 127-30. Meanwhile, Altman and Brockman are natural persons; and Microsoft is a giant, separately incorporated company, with its own charter, bylaws, board of directors, assets and operations. *Id.* ¶¶ 38, 223. So too are the For-Profit Entities. *Id.* ¶¶ 114-21. This more than satisfies §1962(c)'s distinctiveness requirement.

The Supreme Court's decision in *Cedric Kushner* forecloses Defendants' argument. There, a corporation's owner violated RICO in conducting its affairs—despite being "the president and sole shareholder of [the] closely-held corporation and exercising complete control over it." 533 U.S. at 160, 163. If a sole owner can be distinct from his closely-held and operated company, certainly the individual Defendants, affiliated For-Profit Entities, and Microsoft (which are legally distinct and not sole owners of the enterprise) are "distinct" from OpenAI, Inc. for purposes of §1962(c). "Further, to apply RICO in these circumstances is consistent with the statute's basic purposes of protecting both a

1  legitimate 'enterprise' from those who would use unlawful acts to victimize it, and the public from

2  those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle'

3  through which unlawful activity is committed." *Id.* at 160 (internal citations omitted).

4      In an effort to avoid this crystal-clear Supreme Court holding, OpenAI cites two cases. *First*,

5  an *unpublished* Ninth Circuit decision, *Chagby v. Target Corp.*, 358 F. App'x 805, 808 (9th Cir.

6  2009), that summarily states Target and its wholly owned subsidiaries failed to meet the

7  distinctiveness requirement of RICO. Here, the enterprise (OpenAI, Inc.) does not wholly own the

8  For-Profit Entities, in which Microsoft and others appear to have significant interests, Dkt. 170 ¶ 123,

9  and there is no question that Microsoft is considerably more distinct from OpenAI, Inc. for purposes

10  of RICO than was the president and sole shareholder in *Cedric Kushner*. 533 U.S. at 163. Moreover,

11  the authority *Chagby* cites for this proposition actually *reversed* a grant of judgment on the pleadings

12  as to RICO, because "there is no question that law firms retained by DuPont are distinctive entities,"

13  just as Microsoft and the For-Profit Entities are here. *Living Designs, Inc. v. E.I. Dupont de Nemours*

14  *& Co.,* 431 F.3d 353, 361 (9th Cir. 2005) (internal citation omitted).

15      The second citation is to this Court's ruling in *Ferrari v. Mercedes-Benz USA, LLC*, No. 15-

16  CV-4379-YGR, 2016 WL 7188030 (N.D. Cal. Dec. 12, 2016), which supports Plaintiffs' position. As

17  the Court correctly observed, "the requirement that the defendant and enterprise be distinct from one

18  another cannot be evaded by alleging that a corporation has violated the statute by conducting an

19  enterprise that consists of itself plus all or some of its officers or employees." *Id.* at *2 (internal

20  quotation marks omitted). Under *Cedric Kushner*, the enterprise (here, OpenAI, Inc.) is legally

21  distinct from the "person[s]" conducting its affairs, and, of course, both the For-Profit Entities and

22  Microsoft. 533 U.S. at 163. Further, as this Court noted, "A corporate employee," such as Altman or

23  Brockman, "may be liable as a 'person' if the employee uses the corporation as a vehicle for

24  conducting an unlawful RICO pattern of racketeering activity," which is what these RICO Defendants

25  did by abusing OpenAI's charitable form to defraud Musk, additional donors, its AI talent, and the

26  public. *Id.*

27      **E.    xAI Has Standing to Assert RICO Claims.**

28      Defendants relegate their challenge to xAI's standing to a footnote, claiming it cannot

1    establish injury "by reason of" the RICO violations. Dkt. 175 at 10 n.10. This cursory treatment

2    ignores the direct competitive injuries xAI, along with many other legitimate AI start-ups, suffered

3    from Defendants' pattern of unlawful acts. As alleged, Defendants engaged in repeated wire fraud to

4    solicit charitable donations to OpenAI, Inc., and secure competitive advantages by, for example,

5    monopolizing scarce AI talent (seduced, like donors, by OpenAI's phony mission, Dkt. 170 ¶ 421), to

6    develop and deploy AI technology, *id*. ¶¶ 198, 318(n), and engaging in predatory pricing—resulting

7    in early market domination, *id*. ¶ 451, enabled by fraudulently obtained funding, *id*. ¶¶ 220-22,

8    318(e)-(f). But for Defendants' pattern of fraudulent activity, spanning years, transforming a publicly

9    subsidized charity into a commercial behemoth, xAI would face normal competition—not a rival built

10   on $44 million in tax-free donations, charitable goodwill, and ensuing anticompetitive practices.

11        Defendants invoke *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), but that case is

12   inapposite. *Anza* rejected standing based solely on "indirect" competitive injury from a rival's tax

13   fraud because the alleged injury flowed only from unfair competition, not the fraud itself. *Id*. at 458.

14   There is certainly injury to xAI from OpenAI using its tax-exempt status to grow into a for-profit

15   monopolist. But that is but one part of the injury xAI claims here. Moreover, the injury to xAI—like

16   all other market participants—flows from OpenAI's fraudulent representations not to the IRS, but to

17   Musk, competitors, and the public at large that it is committed to the safe and open source

18   development of AI/AGI for the benefit of all humanity rather than private pecuniary gain. OpenAI

19   has, while accepting donations premised on those representations, systematically violated each of

20   them to gain, what many now believe is, a nearly insurmountable competitive advantage. Thus, "the

21   alleged violation[s]," rather than the fraud on the IRS and California's revenue authority, "led directly

22   to [xAI's] injuries." *Id*. at 461.

23   **III.    OPENAI'S FAILURE TO CHALLENGE THE CONSPIRACY COUNT**
24   **          WAIVES ANY OBJECTION TO IT.**

25        The full extent of OpenAI's challenge to Count XXI is this: "Because the substantive count

26   fails, so too does the conspiracy claim on which it is based. *See Sanford v. MemberWorks, Inc.*, 625

27   F.3d 550, 559 (9th Cir. 2010)." Dkt 175 at 8. Presumably Defendants mean to refer to the sentence in

28   *Sanford* stating "'Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not

adequately plead a substantive violation of RICO.'" 625 F.3d at 559 (quoting *Howard v. Am. Online Inc.,* 208 F.3d 741, 751 (9th Cir. 2000)). But as the Ninth Circuit later clarified in *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774-75 (9th Cir. 2002): "It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy."

As the Supreme Court explained: "It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues." *Salinas v. United States*, 522 U.S. 52, 65 (1997). The only way to square the sentence from *Howard* (that *Sanford* quotes, and on which Defendants rest their argument entirely) with *Salinas*, is to continue reading. *Howard* does not limit RICO conspiracy claims to ones where there are substantive RICO violations. In fact, it says the opposite: "To establish a violation of section 1962(d), Plaintiffs must allege *either* an agreement that is a substantive violation of RICO *or* that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard*, 208 F.3d at 751 (emphasis added). That is, an agreement alone is sufficient, and district courts have regularly so held since. *Ghebreyesus v. Fed. Dem. Rep. of Ethiopia*, No. 22-CV-1717-RFB-EJY, 2023 WL 6392611, at *10 (D. Nev. Sept. 30, 2023) ("[I]t is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy. Rather, [i]t is the mere agreement to violate RICO that § 1962(d) forbids." (internal quotation marks and citations omitted)); *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1170 (C.D. Cal. 2016) (same); *Nat'l Immunogenics Corp. v. Newport Trial Grp.*, No. 15-CV-2034 JVS (JCGx), 2016 WL 11520711, at *13 (C.D. Cal. Aug. 1, 2016) (same).

OpenAI did not challenge the conspiracy count's pleading of an agreement to violate RICO. Dkt. 170 ¶ 455. Whether or not Plaintiffs' substantive RICO count survives, OpenAI's waiver means the conspiracy count will stand.

## CONCLUSION

For nearly a decade, Defendants have perpetrated one of the most audacious corporate frauds in history—corrupting and transforming a tax-exempt public charity through systematic deception into a $300 billion for-profit empire for their own enrichment on an obscene scale. When OpenAI's independent Board discovered the scheme, Defendants purged it. When regulators investigated,

Defendants lied, while accelerating their conversion. Now they seek dismissal on grounds that would reward their bad faith and punish their victims. The Court should not countenance this stratagem.

The SAC adequately pleads all the claims Defendants challenge. Count III alleges habitual bad faith that frustrated a charitable endeavor's fundamental purpose—conduct that violates the implied covenant of good faith and fair dealing even if it does not constitute a technical breach of specific terms. Counts XX and XXI plausibly allege how Defendants operated the OpenAI, Inc. enterprise, a publicly subsidized charity, through a pattern of racketeering activity involving repeated predicate acts of wire fraud spanning years to accomplish its illegal transformation to a for-profit enterprise for their private gain.

Accepting all well-pled allegations as true, Plaintiffs have plausibly stated cognizable claims deserving adjudication on the merits. The Motion should be denied.

DATED: June 20, 2025                           Respectfully Submitted,

                                               TOBEROFF & ASSOCIATES, P.C.

                                               _____*/s/ Marc Toberoff*_____
                                               Marc Toberoff

                                               *Attorneys for Plaintiffs Elon Musk,*
                                               *and X.AI Corp.*