Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | Assigned to Hon. Yvonne Gonzalez Rogers |
| v. | **PLAINTIFFS' OPPOSITION TO MICROSOFT'S MOTION TO DISMISS COUNTS XX AND XXI** |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date:   July 15, 2025<br>Time:   2:00 p.m.<br>Place:  Courtroom 1 (4th Fl.)<br>         1301 Clay St.<br>         Oakland, CA 94612 |

**STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Local Civil Rule 7-4(a)(3), Plaintiffs identify the following issues to be decided:

1. Whether Microsoft's Motion to Dismiss Count XX (violations of RICO, Section 1962(c)) should be denied because the Court has already determined the Plaintiffs have plausibly pled Microsoft's specific intent and conduct constituting predicate acts under RICO, which the SAC alleges were integral parts of the operation of an enterprise through a pattern of racketeering activity that RICO was intended to reach.

2. Whether Microsoft's Motion to Dismiss Count XXI (conspiracy to violate RICO, Section 1962(d)) should be denied because Plaintiffs have plausibly alleged a substantive RICO violation and, even in the purported absence of such, Plaintiffs have plausibly alleged an *agreement* to violate RICO.

**INTRODUCTION**

Microsoft's renewed Motion to Dismiss purports to make three arguments,[1] but in reality, its Motion centers on a single theory: that all alleged predicate acts were committed by OpenAI before Microsoft's involvement, thereby absolving Microsoft of RICO liability. This position, however, wholly ignores both the Court's prior rulings and the Second Amended Complaint's ("SAC") specific factual allegations regarding Microsoft's infiltration of, and active participation in, the enterprise at issue.

Microsoft's first argument—that the SAC fails to allege predicate acts and specific intent— is a transparent attempt to relitigate the Court's order on Microsoft's original Motion to Dismiss. The Court has already determined that Plaintiffs plausibly pled at least two claims dependent on Microsoft's knowledge and specific intent to engage in activities integral to OpenAI's pattern of fraud. Dkt. 163 at. 4-5 (tortious interference with contract); *id.* at 8 (aiding and abetting breach of fiduciary duty); *see* Dkt. 170 ¶¶ 282, 284-85 (detailing Microsoft's *knowing* and *intentional* "unlawful[] exploit[ation]"); *id.* ¶¶ 411, 413, 418 ("actual knowledge" and "act[ed] with intent").

Even if those holdings did not control, the Court's order was clear: The defect in Plaintiffs' First Amended Complaint ("FAC") was a failure to "identify how the named defendants operated the entity *through a pattern* of racketeering activity," Dkt. 163 at 10—not any defect in the allegations of Microsoft's specific intent or participation in predicate acts, which the Court already determined were plausibly pled earlier in the complaint, and which are both incorporated by reference and repeated in the RICO claims. Dkt. 170 ¶¶ 419, 454. Regardless, the SAC pleads such elements with as much particularity as possible under the circumstances and given the positions of the parties.

Microsoft's Statement of Issues splits its next argument into two: whether the SAC plausibly "plead[s] the operation of an enterprise through racketeering activity" and whether "Microsoft

---

[1] The Court's Standing Order bars incorporation by reference (¶ 21(b)), yet Microsoft—despite ample available space in its Motion—utterly fails, beyond reference to OpenAI's renewed motion, to supply argument, authority, or even citation to the challenged pleading for the arguments it makes in Part IV.A. Dkt. 173 at 4-5. Even were the Court to grant relief to OpenAI on one of these theories, it should deny relief to Microsoft based on waiver.

conducted [the enterprise's] affairs in a manner RICO was intended to reach." Dkt. 173 at ii. But as Microsoft's Motion makes clear, these are but a single argument. *Id.* at 6-7. Regardless, neither argument engages the SAC's specific allegations of Microsoft's active participation in the OpenAI Defendants' fraudulent scheme. Contrary to Microsoft's characterization, the SAC does not allege that Microsoft was a passive bystander to OpenAI's conduct. It alleges that Microsoft actively participated in a systematic scheme to loot a charity (the enterprise) of its assets, which involved the use of interstate electronic communications to convey fraudulent misrepresentations to donors and AI talent, and otherwise to implement the scheme; interstate wire transfers of fraudulently obtained donations, and Microsoft's active participation in the structuring of covert deals to divert OpenAI, Inc.'s charitable assets (technology and AI talent), even while Musk was still actively donating to the non-profit. Dkt. 170 ¶¶ 94, 110-11, 446.

Microsoft achieved this by securing for itself exclusive agreements that maximized its leverage over OpenAI and knowingly violated the conditions of Musk's donations, *id.* ¶¶ 110, 131, while simultaneously coordinating the creation of a complex web of for-profit entities, in which Microsoft holds significant stakes, *id.* ¶¶ 121-23, 194, to exploit the charity's assets with little or no revenues flowing to the charity, *id.* ¶ 129. The result: Microsoft obtained "a right to 75% of OpenAI's profits," *id.* ¶ 194, structured so that "OpenAI would need to generate $2.2 *trillion* in *profits* before this for-profit scheme would begin funneling anything more than a nominal 2% back to the charity," *id.* ¶ 195—all but ensuring the diversion of OpenAI, Inc.'s charitable assets to Microsoft's benefit. A strikingly one-sided and generous arrangement for an uninvolved, arms-length bystander, indeed.

And lest there be any doubt, the boastful proclamation of Microsoft's own CEO belies any claim that it was a passive participant and supports the systematic infiltration and control of the enterprise by this RICO defendant: "We are in there [OpenAI]. We are below them, above them, around them." *Id.* ¶ 156.

## LEGAL STANDARD

The Court is well-versed in the standard of review applicable to motions to dismiss, which is not in dispute.

# ARGUMENT

## I. THE SAC ADEQUATELY PLEADS PREDICATE ACTS BY MICROSOFT.

Microsoft's primary argument—that it committed no predicate acts—fails on the merits because it ignores that Plaintiffs' RICO claims plead the *continuing* nature of the fraudulent scheme and Microsoft's active participation in *perpetuating* it. *E.g.*, Dkt. 170 ¶ 439. The underlying wire fraud scheme was simple: obtain donations from Musk and convince him to recruit instrumental AI talent under the false pretense of developing AI technology for charitable purposes, then systematically divert that technology, talent and the resulting value to enrich Defendants through an opaque web of for-profit entities. *Id.* ¶ 421. The SAC alleges that Microsoft served as the essential partner in this operation, helping Defendants unlawfully exploit OpenAI's charitable assets— including orchestrating the effective for-profit conversion of the charity, without regulatory approval, founding and funding the for-profit entities, and pillaging the non-profit's assets, tied to exclusive contracts for Microsoft's private gain, while actively making and endorsing misrepresentations about OpenAI's mission to conceal the ongoing fraud and induce further contributions from Musk. *Id.* ¶¶ 431, 446.

The SAC alleges "Microsoft[] relied on wires to invest [funds obtained from Musk] in furtherance of their fraudulent scheme, and, on information and belief, relied on email or other forms of electronic communication to exchange information about their receipt and usage of such funds and contributions." *Id.* ¶ 427. Microsoft's pervasive conduct extends beyond passive investor to active operator. *Id.* ¶ 156 ("We are in there. We are below them, above them, around them.").

Microsoft use of interstate wires as the *primary* funder of a fraudulent enterprise, *id.* ¶ 285, with knowledge of the fraudulent scheme and the specific intent to profit therefrom, constitutes the core of its RICO liability. While mere investment in a Ponzi scheme is not a RICO violation, knowingly and intentionally providing the capital to operate such a scheme—while claiming 49% of the profits from the scheme and exercising operational control—certainly is.[2]

---

[2] To the extent Microsoft finds the comparison to a Ponzi scheme inapt, fraud is fraud—and the Court has already determined Plaintiffs pled two species of fraud against OpenAI, Altman, and Brockman *with specificity*. Dkt. 163 at 5-6.

   Plaintiffs also allege that, beginning in 2019 (while Musk was still donating), Microsoft helped create an "opaque web of for-profit OpenAI affiliates" designed to siphon OpenAI, Inc.'s charitable assets into private entities in which Microsoft held a massive stake, and to conceal OpenAI's for-profit conversion without regulatory approval. *Id*. ¶¶ 5, 94, 446(d). Microsoft provided "the capital, corporate structure(s), and advice and encouragement that enabled Altman and Brockman to perpetuate their continuing wire fraud scheme." *Id.* ¶ 446(a). Microsoft exploited this labyrinthine for-profit corporate maze to obscure its control and financial interest in OpenAI's conversion, making it nearly impossible for donors, regulators, or the public to trace the diversion of charitable assets for Microsoft's benefit. *Id.* ¶ 446(d). Microsoft's participation in the predicate acts was not incidental—the resulting structure "constituted the primary means through which [Defendants] directed and controlled the enterprise's most critical functions: securing the necessary capital and top AI scientific talent to develop valuable AI technology so that Defendants could systematically loot and exploit that technology for their own enrichment." *Id.* ¶ 448.

   The SAC further alleges that Microsoft was "vital to the scheme's success," misrepresenting OpenAI's non-profit status as cover while orchestrating the diversion of its charitable assets. *Id.* ¶¶ 126-30, 446(b). The SAC alleges Microsoft made and caused to be made numerous false representations via interstate wires to maintain the façade of OpenAI's charitable mission while actively cooperating in Altman and Brockman's conversion of the charity to a fully for-profit enterprise, without regulatory approval. Microsoft, like other Defendants, used "online marketing (e.g., website), advertisements, and promotions" to disseminate "knowingly false and/or misleading representations to defraud the public and induce the false belief that OpenAI, Inc. would be a non-profit whose charitable mission is to develop safe and open-source AI/AGI technology for the public good, not private gain." *Id.* ¶ 428. "*These false and/or misleading public pronouncements served to further reassure Musk and induce him to make further contributions.*" *Id*. (emphasis added). Microsoft bears liability for all these fraudulent communications—including those made by OpenAI—because Microsoft "participated in the management, operation, and/or control of OpenAI, Inc." and exercised de facto control over the organization. *Id.* ¶¶ 145-70, 200, 444.

   The SAC's specific allegations demonstrate "the commission of two or more acts of wire

1  fraud comprising [a] pattern" of "racketeering activity," *id.* ¶ 441, readily satisfying the pleading
2  standard for Microsoft's RICO liability.

3  For instance, the RICO claim alleges Microsoft's predicate acts included "aid[ing] and
4  abett[ing] the continuation of this unlawful conduct by, without limitation, providing the capital,
5  corporate structure(s), and advice and encouragement to exploit OpenAI, Inc. and its assets for
6  Defendants' enrichment rather than the public's benefit" and "siphoning off and exploiting OpenAI,
7  Inc.'s valuable AI/AGI technology and highly skilled personnel and by facilitating and concealing
8  Defendants' profiteering." Dkt. 170 ¶ 431.

9  As to the tortious interference claim, the Court held that Plaintiffs plausibly alleged that
10 "Microsoft . . . unlawfully exploited its position of power over OpenAI, Inc.—e.g., by leveraging its
11 position as OpenAI's exclusive compute supplier and primary current funder—to induce OpenAI,
12 Inc. to breach its agreement with Musk." Dkt. 163 at 4-5; Dkt. 170 ¶ 285. The tortious interference
13 claim further alleges "*independently wrongful conduct* by [Microsoft's] siphoning, and conspiring to
14 siphon, the non-profit's most valuable assets into Defendants' for-profit apparatus, as well as
15 executing exclusive licenses and agreements for Defendants' benefit." *Id*. (emphasis added). This
16 conduct is indistinguishable from the RICO predicate acts, and is both incorporated by reference
17 and re-pled in the RICO claims. Dkt. 170 ¶¶ 419, 446.

18 So too is the aiding and abetting claim, which alleges that "Microsoft provided substantial
19 assistance or encouragement to Altman, Brockman, and OpenAI, Inc., aiding and abetting their
20 breaches of fiduciary duty to Musk by, without limitation, providing the corporate forms necessary
21 to loot OpenAI, Inc. of its intellectual property and employees, drafting and executing exclusive
22 licensing and other contracts contrary to the purposes of OpenAI, Inc., and requiring the pursuit of
23 profits over safety and transparency." *Id*. ¶ 413. The Court has already held Plaintiffs plausibly pled
24 those allegations, Dkt. 163 at 8, and there is no basis for Microsoft to relitigate them now.

25 **II.    THE COURT HAS ALREADY HELD THAT THE SAC PLEADS MICROSOFT'S
          SPECIFIC INTENT.**
26

27 Microsoft's next argument that the SAC "remains silent" as to its specific intent is both
28 demonstrably false and ignores the Court's ruling on Microsoft's prior motion to dismiss. The Court

1  has determined that Plaintiffs adequately pled Microsoft's knowing participation and specific intent
2  for tortious interference and aiding and abetting breach of fiduciary duty based on the identical
3  conduct now alleged as RICO predicate acts. Dkt. 163 at 4-5, 8; Dkt. 170 ¶¶ 284, 289, *see also id*.
4  419, 446 (incorporating by reference in the RICO claims the allegations in these cause action).
5  Microsoft cannot now claim an absence of specific intent as to predicate acts for RICO purposes
6  when the Court has already found these same allegations sufficient to state claims for intentional
7  torts based on the same underlying conduct. *Id*.

8        Further, as Microsoft knows from a prior RICO ruling, "specific intent to deceive or defraud
9  [] requires only a showing of the defendants' state of mind, for which general allegations are
10 sufficient." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (en banc). "The only
11 aspects of wire fraud that require particularized allegations are the factual circumstances of the
12 fraud itself." *Id.* Here, the SAC contains numerous allegations of Microsoft's intent that satisfy
13 *Odom*. The RICO claim alleges Microsoft "intentionally concealed" its conduct, Dkt. 170 ¶ 436,
14 "voluntarily and intentionally committed" predicate acts, *id.* ¶ 437, "participated as a principal in
15 the pattern of racketeering activity by, acting with intent or knowledge," *id.* ¶ 441, acted "willfully"
16 in deceiving donors and the public, *id.* ¶ 446(b), and "intentionally execut[ed] the reshuffling of
17 OpenAI, Inc.'s assets," *id.* ¶ 446(d). The law requires nothing more.

18 **III.  THE SAC ADEQUATELY PLEADS MICROSOFT'S PARTICIPATION IN
19       OPERATING A RICO ENTERPRISE CONGRESS INTENDED TO REACH.**

20       This Court directed Plaintiffs to "demonstrate how the defendants named under Section
21 1962(c) conducted OpenAI's affairs in a manner RICO was intended to reach." Dkt. 163 at 10. The
22 SAC does exactly that—showing how Microsoft exercised control over OpenAI's operations to
23 knowingly perpetuate and profit from a web of wire fraud, corruption, and misuse of the charitable
24 form, detailed hereinabove.

25       As the SAC alleges, Microsoft was no passive investor—its exclusive compute agreement
26 gave it absolute power over OpenAI's most precious resource and thus, OpenAI itself. Dkt. 170
27 ¶¶ 110, 157. And, as stated above, the Court has already held that Plaintiffs plausibly alleged that
28 "Microsoft . . . unlawfully exploited its position of power over OpenAI, Inc.—e.g., by leveraging its

position as OpenAI's exclusive compute supplier and primary current funder[.]" Dkt. 163 at 4-5; Dkt. 170 ¶ 285. Microsoft furthered and maintained its operational control of OpenAI through Reid Hoffman, who simultaneously served on Microsoft's and OpenAI's boards from 2017 to March 2023, acting as Microsoft's agent in directing the enterprise's affairs. *Id*. ¶¶ 161, 367. When Altman's dismissal threatened Microsoft's control over the OpenAI enterprise, it forcibly intervened, pressuring the removal of independent Board members, reinstating Altman in just five days, and planting its agent, Deannah Templeton, on OpenAI's Board. *Id*. ¶¶ 146-70. Microsoft only stepped down from the Board after it was widely reported that the FTC was investigating the Microsoft-OpenAI relationship for antitrust violations—in other words, because Microsoft had *monopolistic control* over OpenAI. *Id*. ¶ 358. While Microsoft now distances itself from OpenAI amid litigation and U.S. and foreign antitrust investigations, its systematic infiltration and manipulation delivered precisely what it boasted: "all the IP rights and all the capability" to run OpenAI independently. *Id*. ¶ 155 ("We have the people, we have the compute, we have the data, we have everything."), ¶ 156 (Microsoft's CEO: "We are in there. We are below them, above them, around them."). Microsoft did not exercise the power it accumulated over OpenAI through legitimate means—it operated the enterprise to perpetuate and maximize the benefits of systematic wire fraud and charitable asset diversion, as detailed above. There is perhaps no better demonstration of the corporatization of systematic unlawful conduct that RICO was enacted to combat than Microsoft's own characterization of the foregoing as "normal business activity," Dkt. 173 at 7.

 Microsoft's contention that applying RICO here "distorts the law's purpose," is misplaced—RICO was enacted precisely to address schemes like this, where legitimate businesses are infiltrated, corrupted, and operated through ongoing patterns of fraud. The Ninth Circuit sitting *en banc* has already determined that Microsoft itself is subject to RICO liability for analogous fraudulent business conduct. *Odom*, 486 F.3d at 543 (reversing and remanding improper dismissal of RICO claims against corporate defendants where "the policies and practices by Best Buy and its employees relating to distribution of the Trial CDs—including but not limited to the deliberate *failure to make disclosures* and making of *misrepresentations*—have been formulated and

1  implemented by Best Buy *jointly with Microsoft*, *by agreement with Microsoft, and/or with*
2  *Microsoft's knowledge and approval* for the benefit of both Best Buy and Microsoft.") (emphasis
3  added).

4      The Supreme Court has also made short shrift of courts that condemn the use of civil RICO
5  as "outrageous" because "[i]nstead of being used against mobsters and organized criminals, it has
6  become a tool for everyday fraud cases brought against 'respected and legitimate enterprises.'"
7  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985). "Congress wanted to reach both
8  'legitimate' and 'illegitimate' enterprises." *Id.* Indeed, while "[i]t is true that private civil actions
9  under the statute are being brought almost solely against ['legitimate'] defendants, rather than
10 against the archetypal, intimidating mobster . . . . this defect—if defect it is—is inherent in the
11 statute as written, and its correction must lie with Congress." *Id.*

12     Finally, as RICO's drafter, Professor G. Robert Blakey, pointedly observed, "We don't want
13 one set of rules for people whose collars are blue or whose names end in vowels, and another set for
14 those whose collars are white and have Ivy League diplomas." Hannah Borowski, *Union Autonomy*
15 *and Federal Intrusion*, 95 U. Colo. L. Rev. 267, 280 (2024) (quoting Alain L. Sanders & Priscilla
16 Painton, Showdown At Gucci Gulch: Designed as a Mob Buster, RICO Has Become a Powerful
17 Catchall, Time, Aug. 21, 1989, at 48.). Microsoft's suggestion that it deserves immunity from RICO
18 because its frauds occur in boardrooms rather than backrooms smacks of exactly that kind of two-
19 tiered justice.

### IV. AT A MINIMUM, THE RICO CONSPIRACY COUNT SHOULD SURVIVE AGAINST MICROSOFT.

22     Even in the unlikely event this Court still agreed with Microsoft's arguments regarding the
23 underlying RICO claim, Microsoft's Motion to Dismiss the conspiracy claim (Count XXI) should
24 be denied because the SAC contains ample allegations from which to infer Microsoft's agreement to
25 participate in the other Defendants' fraudulent enterprise, which is all the conspiracy provision
26 requires.

### A. RICO Conspiracy Does Not Require Microsoft to Have Committed Predicate Acts.

Microsoft's primary defense—that it committed no predicate acts—is legally irrelevant to the conspiracy charge. The Supreme Court settled this in *Salinas v. United States*, 522 U.S. 52, 61-66 (1997), holding that conspiracy liability requires only that a defendant "adopt the goal of furthering or facilitating" the enterprise's objectives. *Id.* at 65. "He may do so in any number of ways short of agreeing to undertake all of the acts necessary" for the underlying substantive violation. *Id.* The Ninth Circuit consistently applies this principle: "[A] defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees *to facilitate a scheme* which includes the operation or management of a RICO enterprise." *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) (internal quotation marks omitted) (emphasis added); *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774-75 (9th Cir. 2002).

### B. Microsoft's Agreement to Participate in the Fraudulent Enterprise Can Be Readily Inferred from Its Conduct.

RICO conspiracy requires only allegations of an agreement to participate in the fraudulent enterprise. As the Ninth Circuit explained in *Oki Semiconductor*, 298 F.3d at 774-75: "It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy." Moreover, "[t]he illegal agreement need not be express as long as its existence can be inferred from words, actions, or interdependence of activities and persons involved." *Id.* at 775 (internal quotation marks omitted).

Microsoft's agreement to participate in the RICO conspiracy is demonstrated by its systematic conduct over multiple years. Microsoft invested $13.75 billion in the for-profit scheme knowing OpenAI purported to be a charity while deliberately structuring its investment to extract maximum commercial value for its For-Profit Entities, at the expense of the charity, Dkt. 170 ¶ 348; purged the charity's Board when it threatened Microsoft's interests, *id.* ¶ 159; and engaged in the conduct detailed above showing its specific intent to further OpenAI's fraudulent scheme for Microsoft's primary benefit. This pattern of coordinated activity establishes the requisite agreement under § 1962(d) through Microsoft's "words, actions, [and the] interdependence of activities." *Oki*

*Semiconductor*, 298 F.3d at 775.

Once an agreement is established, "[a]ll conspirators are liable for the acts of their co-conspirators." *Id*. Microsoft cannot escape liability by claiming it joined the conspiracy after it was already underway as conspirators need not agree simultaneously. A defendant who joins an ongoing conspiracy becomes liable for the entire enterprise. *United States v. Saavedra*, 684 F.2d 1293, 1301 (9th Cir. 1982) (In conspiracy to commit wire fraud, "a conspirator who joins a pre-existing conspiracy is bound by all that has gone on before in the conspiracy.") (citations omitted). The SAC alleges Microsoft's knowing agreement to participate in and further the fraudulent enterprise, and that is enough. Dkt. 170 ¶¶ 455-56.

## CONCLUSION

The SAC adequately pleads that Microsoft committed predicate acts, possessed fraudulent intent, and actively participated in the operation and knowing facilitation of a RICO enterprise. Microsoft's Motion attempts to portray it as an innocent latecomer to isolated acts of prior fraud, but the SAC reveals Microsoft as an architect which infiltrated OpenAI, Inc. and helped to systematically transform donor deception into an unlawful enterprise from which Microsoft has reaped, and continues to reap, considerable benefits. The Motion should be denied, and Microsoft must answer for its central role in corrupting a charity for its private gain.

DATED: June 20, 2025                    Respectfully Submitted,

                                        TOBEROFF & ASSOCIATES, P.C.

                                         */s/ Marc Toberoff*
                                            Marc Toberoff

                                        *Attorneys for Plaintiffs Elon Musk
                                        and X.AI Corp.*