JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:     (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted *pro hac vice*)
BRWilson@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:     (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman,*
*OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,*
*OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,*
*OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,*
*OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,*
*OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,*
*OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,*
*OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,*
*OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,*
*Aestas Management Company, LLC, and Aestas LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **OPENAI DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| v. | |
| SAMUEL ALTMAN, et al., | Date:  July 15, 2025 |
| Defendants. | Time:  2:00 p.m. |
| | Courtroom:  1 – 4th Floor |
| | Judge:  Hon. Yvonne Gonzalez Rogers |

1

**TABLE OF CONTENTS**

2    INTRODUCTION ........................................................................................................... 1

3    ARGUMENT ................................................................................................................... 1

4    I.       MUSK'S IMPLIED COVENANT CLAIM IS DUPLICATIVE ........................................ 1

5            A.     California law does not allow a plaintiff to plead an implied covenant claim
                    based on the same conduct alleged to breach an implied-in-fact contract .............. 2

6            B.     The only pleaded bases for Musk's implied covenant claim are coextensive
7                   with the bases for his contract claim ...................................................................... 4

8            C.     Musk's other, unpleaded "discretion" theories cannot salvage the claim .............. 7

9    II.      PLAINTIFFS' RICO CLAIMS CANNOT BE SUSTAINED ......................................... 8

10           A.     The Court has not resolved against the OpenAI Defendants any of the
                    issues raised in this motion ..................................................................................... 9
11
             B.     Plaintiffs fail to plead a pattern of racketeering activity ........................................ 9
12
             C.     Plaintiffs fail to plead the conduct of OpenAI, Inc.'s affairs through
13                  racketeering acts ..................................................................................................... 11

14           D.     Plaintiffs' alter ego allegations independently defeat their RICO claims ............. 13

15           E.     Plaintiffs fail to plead that xAI was injured "by reason of" a RICO violation ...... 13

16           F.     Plaintiffs fail to plead a RICO conspiracy ............................................................. 14

17   CONCLUSION ................................................................................................................ 15

18

19

20

21

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Airwair Int'l Ltd.* v. *Zoetop Bus. Co., Ltd.*,
5
    2025 WL 1282633 (N.D. Cal. May 2, 2025) ..................................................... 5, 6

6

*Anza* v. *Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ........................................................................... 11 n.6, 14

7

*Careau & Co.* v. *Sec. Pac. Bus. Credit, Inc.*,
8
    222 Cal. App. 3d 1371 (1990) ................................................................... 2, 6

9

*Carma Devs. (Cal.), Inc.* v. *Marathon Dev. Cal., Inc.*,
10
    2 Cal. 4th 342 (1992) ............................................................................ 3, 4

11

*Cedric Kushner Promotions, Ltd.* v. *King*,
    533 U.S. 158 (2001) .................................................................................. 13

12

*Durning* v. *Citibank, Int'l*,
13
    990 F.2d 1133 (9th Cir. 1993) .................................................................... 11

14

*Ferrari* v. *Mercedes-Benz USA, LLC*,
15
    2016 WL 7188030 (N.D. Cal. Dec. 12, 2016) ............................................ 12

16

*Foley* v. *Interactive Data Corp.*,
    47 Cal. 3d 654 (1988) ........................................................................ 2, 3, 5

17

*Guz* v. *Bechtel Nat'l, Inc.*,
18
    24 Cal. 4th 317 (2000) ...................................................................... *passim*

19

*Howard* v. *Am. Online Inc.*,
20
    208 F.3d 741 (9th Cir. 2000) ............................................................ 9, 14, 15

21

*Illinois ex rel. Ryan* v. *Brown*,
    227 F.3d 1042 (7th Cir. 2000) ............................................................. 11 n.6

22

*Lamke* v. *Sunstate Equip. Co., LLC*,
23
    387 F. Supp. 2d 1044 (N.D. Cal. 2004) ...................................................... 2

24

*Living Designs, Inc.* v. *E.I. Dupont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ..................................................................... 13

25

*Locke* v. *Warner Bros., Inc.*,
26
    57 Cal. App. 4th 354 (1997) ..................................................................... 3, 4

27

*Mitsui O.S.K. Lines, Ltd.* v. *Dynasea Corp.*,
28
    72 Cal. App. 4th 208 (1999) ....................................................................... 3

*Moorer* v. *Stemgenex Med. Grp., Inc.*,
   2017 WL 1281882 (S.D. Cal. Apr. 6, 2017) ............................................................. 13

*Oki Semiconductor Co.* v. *Wells Fargo Bank*,
   298 F.3d 768 (9th Cir. 2002) ................................................................................... 15

*Prime Partners IPA of Temecula, Inc.* v. *Chaudhuri*,
   2012 WL 1669726 (C.D. Cal. May 14, 2012) .......................................................... 12

*Religious Tech. Ctr.* v. *Wollersheim*,
   971 F.2d 364 (9th Cir. 1992) ................................................................................... 14

*Sako* v. *Wells Fargo Bank, Nat'l Ass'n*,
   2015 WL 5022326 (S.D. Cal. Aug. 24, 2015) ........................................................... 3

*Salari* v. *Walt Disney Parks & Resorts U.S., Inc.*,
   2023 WL 11983325 (C.D. Cal. Aug. 28, 2023) ......................................................... 7

*Salinas* v. *United States*,
   522 U.S. 52 (1997) ................................................................................................... 15

*Sanford* v. *MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) ........................................................................... 14 & n.7

*Scottsdale Ins. Co.* v. *Fineman*,
   2021 WL 411360 (N.D. Cal. Feb. 5, 2021) ................................................................ 7

*Shin* v. *Umeken, U.S.A., Inc.*,
   2017 WL 6885380 (C.D. Cal. Oct. 26, 2017) .......................................................... 13

*Storek & Storek, Inc.* v. *Citicorp Real Est., Inc.*,
   100 Cal. App. 4th 44 (2002) .......................................................................... 3, 4, 5, 8

*Synopsys, Inc.* v. *Real Intent, Inc.*,
   2024 WL 5374480 (N.D. Cal. Aug. 26, 2024) ........................................................... 5

*Tam* v. *Qualcomm, Inc.*,
   300 F. Supp. 3d 1130 (S.D. Cal. 2018) ...................................................................... 3

*Tavares* v. *Capitol Records, LLC*,
   2013 WL 968272 (N.D. Cal. Mar. 12, 2013) ............................................................. 4

*Thrifty Payless, Inc.* v. *The Americana at Brand, LLC*,
   218 Cal. App. 4th 1230 (2013) ............................................................................... 3, 4

*Turner* v. *Cook*,
   362 F.3d 1219 (9th Cir. 2004) ................................................................................. 14

*Verde Media Corp.* v. *Levi*,
   2015 WL 374934 (N.D. Cal. Jan. 28, 2015) ............................................................ 14

*Waller* v. *Truck Ins. Exch., Inc.*,
    11 Cal. 4th 1 (1995) ............................................................................................... 2, 7

*Yetter* v. *Ford Motor Co.*,
    428 F. Supp. 3d 210 (N.D. Cal. 2019) ..................................................................... 10

**Statutes and Rules**

18 U.S.C. § 1962 ................................................................................... 12, 14 n.7, 15

18 U.S.C. § 1964 ................................................................................................ 11 n.6, 13

Fed. R. Civ. P. 9(b) .................................................................................... 9, 10, 13

**Other Authorities**

23 *Williston on Contracts* § 63:22 (4th ed.) .......................................................... 3

1  **INTRODUCTION**

2      Plaintiffs' opposition brief only highlights the defects in their renewed claims.

3      Unable to defend the duplicative implied covenant claim they've pleaded, Plaintiffs lead

4  with an *un*pleaded theory: that a contractual grant of "discretion" imposed a freestanding duty to

5  act in "good faith." Opp. 2-6.[1] This is a Hail Mary; the amended pleading does not allege that any

6  defendant had "discretion" to confer or withhold contractual benefits. The assertion instead is that

7  OpenAI, Inc. and Sam Altman promised to run the enterprise as *Musk* directs based on how *Musk*

8  purports to construe founding concepts and documents. That the alleged "terms" are vague does

9  not mean they grant discretion implicating the implied covenant. It makes them unenforceable.

10     As to RICO, Plaintiffs again lead with a telling move: They seek to block the Court from

11  considering the renewed claims' many defects, purportedly because the challenges raised in this

12  motion were "'resolved'" against the OpenAI Defendants by the Court's May 1, 2025 order and

13  considering them would be a "waste of judicial resources." Opp. 8 (quoting Dkt. 163 at 11). The

14  premise is false. The Court resolved that *Plaintiffs* had failed to "identify how the named defendants

15  operated [OpenAI, Inc.] *through a pattern* of racketeering activity." Dkt. 163 at 10. That is a

16  multifaceted defect which has not been remedied, and to which the OpenAI Defendants' arguments

17  are directed. Those arguments compel dismissal on several independent bases.

18     Counts III, XX, and XXI should be dismissed with prejudice.

19  **ARGUMENT**

20  **I.    MUSK'S IMPLIED COVENANT CLAIM IS DUPLICATIVE**

21     The Court dismissed Musk's implied covenant claim because it was "based on the same

22  conduct as the breach of implied contract" claim. *Id.* at 3. Granted the opportunity to replead, Musk:

23  (1) reworded the allegation that OpenAI, Inc. and Altman "fail[ed] to observe a reasonable

24  construction" of contractual terms to say "Defendants systematically and unilaterally reinterpreted

25  key terms"; (2) asserted within the implied covenant count (instead of just elsewhere, *see* FAC

26  _____

27  [1] Citations in the form "MTD __" and "Opp. __" are of the OpenAI Defendants' Motion to Dismiss the Second Amended Complaint, Dkt. 175, and Plaintiffs' Opposition to that motion, Dkt. 181,

28  respectively. Citations in the form "FAC ¶ __" are of the First Amended Complaint (the "FAC"), Dkt. 32. Citations in the form "¶ __" are of the Second Amended Complaint (the "SAC"), Dkt. 170.

¶¶ 241, 243, 535) that "Defendants obscured" the same "for-profit activities" asserted as breaches of contract; and (3) alleged that every breach of the purported contract doubles as a breach of the implied covenant "to the extent" not adjudicated a breach of an agreed term. *Compare* ¶ 269 *with* FAC ¶ 273. In moving to dismiss, Defendants argued that all of these changes were superficial, *see* MTD 4-6, so that the claim again failed to identify "behavior constituting breach of the implied covenant distinct from that giving rise to the breach of contract claim," Dkt. 163 at 3.

In response, Musk barely defends what he pleaded. Instead, he falsely accuses Defendants of misstating the law, and argues the validity of an unpleaded and untenable "discretion"-based implied covenant theory. The claim should be dismissed for good.

### A. California law does not allow a plaintiff to plead an implied covenant claim based on the same conduct alleged to breach an implied-in-fact contract

Musk begins by swiping at a straw man: Defendants do *not* "contend that . . . any claim based on [the implied covenant] must be duplicative of a breach of contract claim," or that a "covenant claim must be dismissed whenever there is a breach of contract claim." Opp. 2, 4. Defendants maintain instead, consistent with black-letter California law and this Court's order, that an implied covenant claim predicated on the same alleged conduct supporting a breach of contract claim must be dismissed as duplicative. *See Guz* v. *Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 352 (2000); *Careau & Co.* v. *Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990). The same conduct may violate both an agreed term and the implied covenant, but an implied covenant claim will in that case be sustained only if, *beyond* breaching the contract, the defendant did something that "unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Id.* at 1395. Otherwise, "in most cases, a claim for breach of the implied covenant can add nothing to a claim for breach of contract." *Lamke* v. *Sunstate Equip. Co., LLC*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004).

That is especially true where, as here, the alleged contract is implied rather than express. Ordinarily "the covenant is implied as a supplement to the *express* contractual covenants." *Waller* v. *Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995) (emphasis added); *see also, e.g.*, *Foley* v. *Interactive Data Corp.*, 47 Cal. 3d 654, 690 (1988) (the "covenant of good faith is read into

contracts in order to protect the *express* covenants or promises of the contract" (emphasis added)). Musk makes this point, saying the covenant "exists because parties can violate the fundamental purpose of an agreement while technically adhering to *contractual language*," Opp. 1 (emphasis added), and relying on cases involving express contracts, *see id.* at 2-7 (citing *Carma Devs. (Cal.), Inc.* v. *Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373-74, 376 (1992) (implied covenant claim dismissed as inconsistent with express contract); *Thrifty Payless, Inc.* v. *The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1236 & n.4, 1244 (2013) (allowing implied covenant claim with express contract breach claim); *Locke* v. *Warner Bros., Inc.*, 57 Cal. App. 4th 354, 358, 367 (1997) (allowing implied covenant claim with express contract breach claim); *Storek & Storek, Inc.* v. *Citicorp Real Est., Inc.*, 100 Cal. App. 4th 44, 58, 64 (2002) (rejecting implied covenant claim alleging bad faith in performing express term)).

Because an implied-in-fact contract is "evidenced in part or whole by the parties' conduct rather than by an express exchange of promises," *Mitsui O.S.K. Lines, Ltd.* v. *Dynasea Corp.*, 72 Cal. App. 4th 208, 212 (1999), the implied covenant necessarily plays a lesser role in this context. The covenant is meant to track the parties' "reasonable or justified expectations," which, "in turn, are to be determined by considering the various factors and circumstances that surround the parties' relationship and thereby shape or give contour to the expectations in the first instance." 23 *Williston on Contracts* § 63:22 (4th ed.). Yet those same considerations guide the identification of an implied contract's terms, *see, e.g.*, *Foley*, 47 Cal. 3d at 681, rendering an implied covenant inquiry redundant in most cases. *See, e.g.*, *Tam* v. *Qualcomm, Inc.*, 300 F. Supp. 3d 1130, 1146 (S.D. Cal. 2018) ("[A]lleging breach of *both* an implied-in-fact contract and the implied covenant, for the same term . . . is superfluous and both causes cannot be maintained."); *Sako* v. *Wells Fargo Bank, Nat'l Ass'n*, 2015 WL 5022326, at *6 (S.D. Cal. Aug. 24, 2015) ("a breach of the implied covenant of good faith and fair dealing cannot be based on breach of an implied in fact contract").

But even setting aside this redundancy, the circumstances that will support assertion of an implied covenant claim in any case are limited. To avoid the *Guz* bar, the implied covenant claim must plead violative conduct *different from* breach of the contractual term that the plaintiff claims conferred a benefit. So, for example, a producer's payment of low royalties may or may not violate

a contractual obligation, but an artist states a claim under the implied covenant only if the producer is alleged to have done something more than withhold the benefit—for instance, manipulating royalty statements to avoid triggering the higher payment obligation. *See Tavares* v. *Capitol Records, LLC*, 2013 WL 968272, at *4 (N.D. Cal. Mar. 12, 2013).

The implied covenant can also be invoked where the contract grants one party unfettered discretion to deny a counterparty a benefit, or conditions conferral of the benefit on one party's subjective judgment. Because strict construction of such a provision would render the contract's promise illusory, courts may use the covenant to read in a duty to exercise the discretion or judgment in subjective good faith. *See, e.g.*, *Carma Devs.*, 2 Cal. 4th at 371-72 (recognizing this application of the covenant); *Guz*, 24 Cal. 4th at 353 n.18 (allowing that implied covenant could prohibit bad-faith exercise of unfettered discretion to terminate an at-will employee); *Locke*, 57 Cal. App. 4th at 363 ("when it is a condition of an obligor's duty that he or she be subjectively satisfied with respect to the obligee's performance, the subjective standard of *honest satisfaction* is applicable"); *Thrifty*, 218 Cal. App. 4th at 1236 & n.4, 1244 (allowing implied covenant claim where express term granted landlord "reasonable discretion" to allocate costs); *cf. Storek & Storek*, 100 Cal. App. 4th at 61 (where defendant's obligation was conditional on "*objectively* reasonable satisfaction" that project budget was in balance, implied covenant had no role (emphasis added)).

In the above-described limited circumstances, the implied covenant fills a gap in the contract's terms by prohibiting conduct that is not addressed by the contract but undertaken to frustrate the contract's benefits. Those circumstances do not obtain here, as the SAC makes plain.

**B.    The only pleaded bases for Musk's implied covenant claim are coextensive with the bases for his contract claim**

Having pleaded three theories for his implied covenant claim—(1) "redefinition" of contract terms; (2) "obscur[ing]" of contract breaches; and (3) alleged violations of contractual terms "to the extent" those violations are not found to be breaches, ¶ 269—Musk now all but abandons the third theory and offers only perfunctory defenses of the first two. No wonder; the pleaded theories are all foreclosed by the *Guz* rule.

Musk's "reinterpret[ation]" theory is just a rehash of the theory from the FAC that

4

Defendants "fail[ed] to observe a reasonable construction of the terms" of the alleged contract, FAC ¶ 273, and it fails for the reason the Court already found: the theory is based on the exact same conduct underlying Musk's claim that Defendants breached the supposedly "redefined" terms. Take the example Musk uses: the purported contract term requiring Defendants to "assiduously act to minimize conflicts of interest." Opp. 5 (quoting ¶ 247(i)). If this obligation existed and Defendants did not perform—because they impermissibly "redefined" the obligation, or for any other reason— then they would be in breach of that term. If the obligation did not exist, or could not be enforced, then there was no contractual benefit to protect, and any "redefinition" cannot therefore have violated the implied covenant. The covenant does not operate as a backstop for failed contract claims; it serves to protect the benefits conferred by actual contract terms. *See, e.g.*, *Airwair Int'l Ltd.* v. *Zoetop Bus. Co., Ltd.*, 2025 WL 1282633, at *5 (N.D. Cal. May 2, 2025).

Musk's efforts to salvage his "redefinition" theory only further expose its infirmity. Musk says the alleged redefinition "differs categorically from breach" and is "bad faith performance." Opp. 5-6. This is unintelligible. "[B]ad faith performance" does not violate the implied covenant unless a good-faith performance duty is read into an existing contractual provision giving the defendant the right, in its absolute discretion or sole judgment, to withhold a benefit. *Storek & Storek*, 100 Cal. App. 4th at 58-59, 63. Where, as here, no such provision is alleged, the concept has no relevance. *Id.* There is no freestanding obligation to act in good faith apart from what the contract requires. *See, e.g.*, *Guz*, 24 Cal. 4th at 349-50 (the implied covenant cannot "be endowed with an existence independent of its contractual underpinnings"); *Foley*, 47 Cal. 3d at 690 (covenant does not "protect some general public policy interest not directly tied to the contract's purposes").

Likewise untenable is Musk's theory that OpenAI, Inc. and Altman breached the implied covenant by "obscur[ing]" the "for-profit activities" that are alleged to have breached the supposed contract. ¶ 269(b). As Defendants pointed out in their opening brief, concealment of a purported contractual breach is not actionable under the implied covenant where the "core allegation" is the underlying breach. MTD 5-6 (citing *Synopsys, Inc.* v. *Real Intent, Inc.*, 2024 WL 5374480, at *26 (N.D. Cal. Aug. 26, 2024)). Rather than deny this, Musk argues that the alleged concealment here independently "violated the fundamental expectation inherent in charitable giving—that fiduciaries

exercise discretion openly and honestly." Opp. 6. But that is made up. The SAC does not allege a contract term governing *any* exercise of discretion; Musk's story is that Defendants were required by his imagined contract to operate OpenAI in conformity with the interpretation he places upon its founding documents, not in the exercise of their own "discretion." And the implied covenant cannot impose new "inherent" obligations. *See Guz,* 24 Cal. 4th at 349-50.

Relatedly, the Court should reject Musk's effort to bootstrap himself into an implied covenant claim through his allegation of a "fiduciary relationship." Opp. 4 & n.1, 6-7. Even if OpenAI owed Musk a fiduciary duty, that would not matter for this claim. A "special relationship" between the parties has been held to support a claim of *tortious* implied covenant breach. *See Careau*, 222 Cal. App. 3d at 1395-1400 (discussing cases). But Musk's implied covenant claim sounds in contract, not tort, *see* ¶¶ 265-68 (asserting elements of contractual implied covenant claim); *see also* ¶¶ 263, 272 (seeking same damages for breach of contract and implied covenant claims), and the "special relationship" doctrine has thus far been recognized only in disputes between insurers and insureds, *see Airwair*, 2025 WL 1282633, at *4 ("Outside of the insurance context, the implied covenant is an action that can only be brought in contract, not in tort."). The relationship between the parties here, whether commercial or fiduciary, has no bearing on whether Musk can sustain the implied covenant claim he has attempted to plead. He cannot.

Finally, Musk does not devote any section of his brief to defending the theory that the supposed contract breaches pleaded in paragraph 250 of the SAC can properly double as implied covenant breaches. *See* ¶ 269(c). Instead, he tries a sideways approach, offering an example: "Even if a jury accepted that OpenAI . . . is not obligated to always assiduously act to minimize conflicts of interest among [its] employees and stakeholders that could compromise the nonprofit's mission," Musk maintains, "it could still conclude that Sam Altman's egregious conflicts of interest[] and serial self-dealing deprived Musk of the benefit of his bargain that OpenAI would use technology for the good of the world . . . rather than for the private gain of any person." Opp. 5 (cleaned up). But the example just illustrates the incoherence of Musk's position.

The scenario Musk posits implicates two separate "terms" alleged as part of the imagined contract. *See* ¶ 247(b), (i). Indulging the fantasy that the second ("that OpenAI would use its

technology for the good of the world") was a mutually agreed-upon contractual undertaking clear enough to enforce, then breach of that undertaking, by whatever means, was a breach of that term—not of the implied covenant. *See Salari* v. *Walt Disney Parks & Resorts U.S., Inc.*, 2023 WL 11983325, at *3 (C.D. Cal. Aug. 28, 2023) (if contract included implied undertaking, then breach of that undertaking would breach the contract term—not the implied covenant). And if both alleged "terms" fail as contract terms—because they were not agreed to, not supported by bargained-for consideration, and/or too vague to be enforceable—neither gets a second life under the implied covenant. *See, e.g.*, *Waller*, 11 Cal. 4th at 36 ("Absent [a primary] contractual right . . . the implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." (cleaned up)); *Scottsdale Ins. Co.* v. *Fineman*, 2021 WL 411360, at *10 (N.D. Cal. Feb. 5, 2021) ("If a party does not have any rights under an agreement in the first place, there are no contractual rights to injure." (cleaned up)).

## C.    Musk's other, unpleaded "discretion" theories cannot salvage the claim

Having tried—and failed—to resuscitate his *pleaded* implied covenant theories by reference to the "discretion" line of cases, Musk takes matters further, advancing new "discretion" theories untethered in any way to the SAC. Opp. 2-5. These are at least as meritless.

Musk claims that "OpenAI had discretion to engage in limited for-profit activity to fund its charitable mission," and "its wholesale conversion, without regulatory approval, into a massive for-profit enterprise" is a "bad faith exercise of its discretion." Opp. 3. But this (utterly baseless[2]) theory does not appear in the implied covenant count or anywhere else in the SAC—which does not even mention "discretion."[3] Musk cites paragraphs 3, 126, and 129 of the SAC, *see id.*, but these background allegations do not purport to identify any contractual term, much less one granting Defendants discretion.[4] Paragraphs 247(f) and 250(g), which Musk also cites, allege that

---

[2] The 2019 creation of a capped-profit entity was not a "conversion"; nor is the reorganization currently under contemplation. The nonprofit OpenAI, Inc. remained in existence in 2019 and will remain in existence if the contemplated reorganization occurs.

[3] The (dismissed) FAC version of the implied covenant claim *did* use the word "discretion," in passing. *See* FAC ¶ 273. That allegation was removed from the SAC.

[4] The SAC's acknowledgment that some "degree" of for-profit activity is permitted, ¶¶ 3, 126, does

Defendants promised OpenAI would "seek to open source technology for the public benefit, and openly share its plans and capabilities along the way, except where its technology can be dangerous, causing genuine safety and security concerns," ¶ 247(f) (cleaned up), and accuse OpenAI of "rush[ing] development of . . . dangerous and unsafe technology, in violation of the requirement to develop AI in the way most likely to benefit humanity as a whole with safety as a first-class requirement," ¶ 250(g) (cleaned up). The "terms" identified here are not alleged to grant discretion.

To be sure, the supposed terms are *vague*. But Musk gets the law backward in suggesting that the covenant can transform unenforceably vague contractual terms into enforceable, freestanding "good faith" obligations. *See* Opp. 4 ("This cause of action for breach of the implied covenant . . . addresses Defendants' contention that the terms of the parties' agreement are allegedly too vague to be enforceable[.]"). When a court reads a good-faith exercise requirement into a provision granting one side discretion to confer contractual benefits, it is not solving for vagueness or even ambiguity, but rather preventing literal enforcement of clear terms in a way that would render the contract's benefits illusory. *See Storek & Storek*, 100 Cal. App. 4th at 57, 61. Here, there is no alleged contractual term purporting to grant anyone discretion to confer contractual benefits, and therefore no need for or authority to require good-faith exercise of discretion. The "discretion" line of cases is inapposite.

## II.    PLAINTIFFS' RICO CLAIMS CANNOT BE SUSTAINED

Plaintiffs' revisions to their RICO claims—which leave unchanged the FAC's "Wire Fraud Predicate Offenses" and "Pattern of Racketeering Activity" allegations—fail to "identify how the named defendants operated [OpenAI, Inc.] *through a pattern* of racketeering activity." Dkt. 163 at 10. Instead, like the FAC, the SAC takes a single purported predicate act centered on a "September 2017 episode," Opp. 9, embellishes that episode with statements made before and after it (but not pleaded as independent fraudulent acts), and adds gratuitous references to "victims" as to whom no cognizable fraud is alleged. Altman and Brockman are alleged to have committed fraud as part of

---

not plausibly allege a contract term, let alone one granting Defendants discretion on the issue. That Musk arbitrarily draws the line at "using a for-profit entity to help fundraise for a non-profit," ¶ 126, further confirms that his theory is that Defendants breached *his interpretation* of the supposed contract, not that it granted Defendants "discretion" without using the word.

the September 2017 episode, but not in the conduct of OpenAI, Inc.'s affairs—in the conduct of their *own* affairs. The "For-Profit Entities," meanwhile, stand accused of engaging in no predicate acts at all; Plaintiffs do not dispute that their single drive-by allegation on this score fails Rule 9(b)'s particularity test. And because all of these "persons" named in the RICO counts are alleged to be alter egos of the enterprise itself, the pleading does not meet RICO's distinctiveness requirement. Finally, settled Ninth Circuit precedent holds that the failure to plead a substantive RICO violation also dooms the corresponding RICO conspiracy claim.

Plaintiffs' opposition, which ignores several of these defects and raises meritless procedural objections to others, only confirms that their RICO claims cannot be sustained.

### A.    The Court has not resolved against the OpenAI Defendants any of the issues raised in this motion

As a threshold matter, none of the arguments the OpenAI Defendants have raised is barred by the Court's admonition that the "Parties shall not renew arguments already made and resolved" in its May 1, 2025 order. Dkt. 163 at 11; *see* Opp. 8-9. In dismissing Plaintiffs' first set of RICO claims, the Court did not expressly reject any of the OpenAI Defendants' arguments, and described the overarching defect in the RICO claims broadly, as a failure to "identify how the named defendants operated [OpenAI, Inc.] *through a pattern* of racketeering activity." Dkt. 163 at 10. The Court sustained against a Rule 9(b) objection Plaintiffs' common-law fraud claim centered on the "September 2017 episode," and that ruling may have also disposed of the OpenAI Defendants' argument that Plaintiffs failed to plead even a single predicate act of wire fraud. MTD 8 n.6. But none of the other issues raised on this motion has been addressed, much less "resolved" against the OpenAI Defendants. All of them go to whether each Plaintiff has pleaded as to each defendant the operation of an enterprise through a pattern of racketeering activity.

### B.    Plaintiffs fail to plead a pattern of racketeering activity

The "September 2017 episode" is the lone "instance of Defendants' wire fraud" identified in Plaintiffs' brief. Opp. 9. One predicate act is far short of a RICO "pattern," which requires two or more predicate acts indicative of the sort of "threat of repetition" RICO targets. *Howard* v. *Am. Online Inc.*, 208 F.3d 741, 746, 750 (9th Cir. 2000) (cleaned up). Though Plaintiffs point to other

statements besides those made as part of the "September 2017 episode," and call that "repeated wire fraud," Opp. 9, they neither plead nor even explain in their brief how these other statements qualify as separate acts of wire fraud.

Plaintiffs first point to two documents from before OpenAI, Inc.'s public launch: the December 8, 2015 OpenAI, Inc. Certificate of Incorporation and a June 2015 email from Altman to Musk stating that "[t]he technology would be owned by the foundation." Opp. 9 (citing ¶¶ 84, 87). The SAC does not allege what made these statements false, as Rule 9(b) requires, or even that they *were* false when made. *See Yetter* v. *Ford Motor Co.*, 428 F. Supp. 3d 210, 219-20, 231-33 (N.D. Cal. 2019). Notably, while Plaintiffs cite these documents in their contract claim, ¶ 247, they do not rely on them for their common-law fraud claim, ¶¶ 301-16.

Plaintiffs also invoke the SAC's allegation that from December 11, 2015 to today, "Defendants in their online marketing (e.g., website), advertisements, and promotions made knowingly false and/or misleading representations" and that these "public pronouncements served to further reassure Musk and induce him to make further contributions." Opp. 9-10 (citing ¶ 428).[5] But as the OpenAI Defendants pointed out in their opening brief, *see* MTD 10-11, these allegations bear none of the particulars Rule 9(b) requires. Plaintiffs offer no response to this point.

Having failed to plead additional instances of wire fraud, Plaintiffs level sweeping accusations that "the scheme's false promises . . . conned far more victims" than Musk, namely "other major donors," "AI scientists and engineers," and "the public, competing AI companies, and American taxpayers." Opp. 11. None of this establishes additional wire fraud predicates pleaded with the particularity Rule 9(b) requires. No facts are pleaded to show the who, what, when, where, or how of supposed misrepresentations to any of the other donors the SAC names, *see* ¶ 421, and the purported scheme to defraud scientists and engineers is yet another allegation made up for Plaintiffs' opposition brief and appearing nowhere in the pleading. The SAC quotes a former OpenAI employee's expression of unfulfilled "hope," *see* ¶ 185 (quoted at Opp. 11), but does not

---

[5] Plaintiffs also, in a footnote, cite statements identified in their Lanham Act claim as having appeared on OpenAI's website. Opp. 10 n.2 (citing ¶ 380). Most of these are not even referenced in the SAC's RICO counts, and in any event carry no particulars identifying when the statements were made, who made them, or why they were false or misleading when made.

allege that the disappointment was an instance of wire fraud. Nor does the SAC's passing reference to "defraud[ing] the public," ¶ 428, plead wire fraud, let alone with the requisite particularity. As for the supposed "fraud" against competitors and "American taxpayers," this charge too is new in Plaintiffs' briefing and finds no grounding in the SAC.[6]

We come back, then, to the "September 2017 episode," which the SAC alleges caused Musk to make numerous "fraudulently induced wire transfers." Opp. 12 (citing ¶ 424). Plaintiffs try to characterize this as sufficient to establish a pattern, but Ninth Circuit law holds otherwise: even "numerous predicate acts" of wire fraud do not establish a pattern of racketeering activity if they "arose from a single, isolated event," such as an initial misrepresentation. *Durning* v. *Citibank, Int'l*, 990 F.2d 1133, 1139 (9th Cir. 1993). That makes sense. RICO is concerned with the corrupt deployment of organizations to facilitate serial criminal acts, and the threat of repetition inherent in that deployment. Where all that is cognizably alleged is a single wire fraud episode against a single supposed victim—even one resulting in multiple wirings—RICO has no application.

## C.    Plaintiffs fail to plead the conduct of OpenAI, Inc.'s affairs through racketeering acts

Even had they pleaded a pattern of racketeering activity, Plaintiffs' RICO claims would fail because the SAC does not plausibly allege that the supposed acts of wire fraud by Altman and Brockman were the conduct of OpenAI, Inc.'s affairs, and does not adequately allege *any* racketeering acts—*i.e.*, wire fraud—by any other defendant.

### 1.    The September 2017 episode was not the conduct of OpenAI, Inc.'s affairs

Plaintiffs claim to have pleaded that Altman and Brockman "participated in conducting OpenAI, Inc.'s affairs through a pattern of racketeering activity" by alleging facts about Altman's and Brockman's responsibilities and decisionmaking authority at OpenAI. Opp. 13-14. But the

---

[6] Any "fraud" against these third parties could not form the basis for a claim by these Plaintiffs. *See* 18 U.S.C. § 1964(c) (plaintiff must have suffered injury "in his business or property by reason of" the asserted racketeering activity); *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) (rejecting RICO claim for indirect harm to competitor); *Illinois ex rel. Ryan* v. *Brown*, 227 F.3d 1042, 1045 (7th Cir. 2000) (rejecting RICO claim for generalized harm to taxpayers).

11

question under RICO is not whether a defendant had authority over the enterprise's affairs generally; it is whether that authority was exercised "through a pattern of racketeering activity." 18 U.S.C. § 1962(c); Dkt. 163 at 10; *see, e.g.*, *Ferrari* v. *Mercedes-Benz USA, LLC*, 2016 WL 7188030, at *3 (N.D. Cal. Dec. 12, 2016) (insufficient to plead conduct of "just the business of [the enterprise] separate and apart from any alleged racketeering acts"); *Prime Partners IPA of Temecula, Inc.* v. *Chaudhuri*, 2012 WL 1669726, at *12 (C.D. Cal. May 14, 2012) (complaint must plead "connection" between conduct and racketeering activity). The SAC does not plead this.

The only arguable racketeering act alleged in the SAC is the "September 2017 episode," the allegations of which are unchanged from the FAC. Those allegations center on two email chains attached to the SAC, in which Altman conveyed to Musk that he "remain[ed] enthusiastic about the non-profit structure" and Shivon Zilis reported to Musk that Brockman "would like to continue with the non-profit structure." ¶¶ 101-02; Dkt. 170-14, 170-15. As is apparent from the face of the documents, these statements were made in the context of discussions with Musk about whether Altman and Brockman would stay with OpenAI or leave for other pursuits. *See* ¶ 101 (Musk demanding to know whether Altman and Brockman would make "a firm commitment to stay"); Dkt. 170-15 at 1 (Zilis telling Musk that Altman "[n]eeds to figure out . . . how much time he wants to spend" at OpenAI and that Brockman knows he "need[s] to provide a guarantee that [he] won't go off doing something else"). These statements involve Altman's and Brockman's career paths— their "*own* affairs"—not the affairs of OpenAI, Inc. *Ferrari*, 2016 WL 7188030, at *2. They are "not tethered to the *enterprise*'s conduct." Dkt. 163 at 10 (emphasis added).

**2.    The For-Profit Entities are not alleged to have conducted racketeering activity at all**

As for the For-Profit Entities, Plaintiffs again ignore the operative question by focusing not on conduct through racketeering activity but on these entities' alleged participation in OpenAI, Inc.'s affairs generally—by receiving a "transfer" of assets that included "AI scientists . . . and the technology those scientists developed," and "exploit[ing]" those assets to generate revenue. Opp. 14. These are not racketeering acts. Dkt. 163 at 10. The SAC further charges that the For-Profit Entities "utiliz[ed] wire fraud to secure the enterprise's funding" with statements *about the*

*For-Profit Entities*. ¶ 447. But, as the OpenAI Defendants argued in their opening brief, that incoherent allegation fails both logic and Rule 9(b), and thus the SAC does not plead racketeering activity in the conduct of *anyone's* affairs. MTD 11-13. Plaintiffs offer no response to this point.

### D.    Plaintiffs' alter ego allegations independently defeat their RICO claims

Plaintiffs unmistakably allege that OpenAI, Inc. and the For-Profit Entities "operate together as a unitary enterprise," and that OpenAI, Altman, and Brockman "have become alter egos of one another." ¶ 237. Whatever "purposes of liability" these allegations may serve, Opp. 15, they have been asserted—and reasserted even after (1) the OpenAI Defendants argued that they defeated the RICO claims, Dkt. 103 at 12, and (2) the Court dismissed the FAC's accessory claims against the For-Profit Entities because the FAC "allege[d] [they] are mere alter-egos of OpenAI," *see* Dkt. 163 at 4. Plaintiffs cannot now escape the effect of these allegations.

That effect is to defeat the distinctiveness RICO requires between an enterprise and the "persons" alleged to have conducted its affairs. *See, e.g.*, *Shin* v. *Umeken, U.S.A., Inc.*, 2017 WL 6885380, at *4 n.5 (C.D. Cal. Oct. 26, 2017) (alter-ego allegation "runs afoul of the RICO statute requirement that the alleged RICO 'enterprise' is separate from the RICO defendant"). Plaintiffs' authorities are not to the contrary; those cases did not involve alter-ego allegations. *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158 (2001) (no consideration of alter-ego allegations); *Living Designs, Inc.* v. *E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361-62 (9th Cir. 2005) (same). Where, as here, plaintiffs allege "[i]n one breath" that defendants are alter egos of an enterprise, they cannot allege "in the next" breath that they are distinct. *Moorer* v. *Stemgenex Med. Grp., Inc.*, 2017 WL 1281882, at *12-13 (S.D. Cal. Apr. 6, 2017) (dismissing RICO claim for failure to allege enterprise distinct from defendants). This is an independent basis for dismissal.

### E.    Plaintiffs fail to plead that xAI was injured "by reason of" a RICO violation

Even if Musk could plead a plausible RICO claim, xAI could not because it has not pleaded injury "by reason of" the alleged RICO violation. 18 U.S.C. § 1964(c). Plaintiffs insist that xAI suffered "competitive injuries" because the OpenAI Defendants allegedly used funds obtained from wire fraud to "secure competitive advantages by, for example, monopolizing scarce AI talent[,] . . . develop[ing] and deploy[ing] AI technology, and engaging in predatory pricing." Opp. 17 (cleaned

1    up). This theory is foreclosed by Supreme Court precedent.

2        In *Anza*, the plaintiff claimed it was harmed when a competitor "us[ed] the proceeds from

3    the fraud" of a third party "to offer lower prices designed to attract more customers." 547 U.S. at

4    457-58. The Court rejected the causation argument as too "attenuated," holding that the asserted

5    harms were caused by "a set of actions (offering lower prices) entirely distinct from the alleged

6    RICO violation (defrauding the [third party])." *Id.* at 458-59. The same is true here. As in *Anza*, the

7    purported harm to xAI was caused by business actions (hiring employees, developing technology,

8    and setting prices) entirely distinct from the putative racketeering pattern (allegedly fraudulent

9    solicitation of donations from Musk). *See* Dkt. 163 at 10 ("The development of technology and

10   creation of various corporate subsidiaries are not predicate acts[.]"). Indeed, the disconnect between

11   the alleged fraud and the asserted competitive harm is even clearer here than in *Anza* given that xAI

12   did not exist until years after the alleged donations. *See id.* at 9 n.8 (making this observation).

13       **F.    Plaintiffs fail to plead a RICO conspiracy**

14       The Ninth Circuit has long held that "[p]laintiffs cannot claim that a conspiracy to violate

15   RICO existed if they do not adequately plead a substantive violation of RICO." *Sanford* v.

16   *MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010); *see, e.g.*, *Turner* v. *Cook*, 362 F.3d 1219,

17   1231 n.17 (9th Cir. 2004); *Howard*, 208 F.3d at 751; *Religious Tech. Ctr.* v. *Wollersheim*, 971 F.2d

18   364, 367 n.8 (9th Cir. 1992). And district courts, including this Court, regularly apply the rule. *E.g.*,

19   Dkt. 163 at 10 ("Because the motions as to the underlying RICO offenses are granted, the Court

20   also grants the motions to dismiss" the RICO conspiracy count); *Verde Media Corp.* v. *Levi*, 2015

21   WL 374934, at *6 (N.D. Cal. Jan. 28, 2015). Plaintiffs did not dispute the rule when the OpenAI

22   Defendants moved to dismiss the FAC. *See* Dkt. 128 at 18-19. Yet now, wielding a single line from

23   *Howard* and case law about proof rather than pleading standards, they contend that *Sanford*

24   misstated the law and that pleading "an agreement alone is sufficient." Opp. 18.[7] That is flat wrong.

[7] In their motion to dismiss the FAC's RICO claims, the OpenAI Defendants argued, citing *Sanford*, that "[w]ithout a substantive RICO claim, Plaintiffs' conspiracy claim under § 1962(d) also fails." Dkt. 103 at 13. In opposing the motion, Plaintiffs accepted this premise, arguing that, "[h]aving adequately pled violations of § 1962(a)-(c), the FAC properly states a claim for RICO conspiracy under § 1962(d)." Dkt. 128 at 18. Against this procedural backdrop, Plaintiffs' contention that the

14

The holding of *Howard*, stated no fewer than three times in the opinion, is that "the failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy." 208 F.3d at 751; *see also id.* ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *id.* ("[T]he failure to allege substantive violations precludes their claim that there was a conspiracy to violate RICO."). *Oki Semiconductor Co.* v. *Wells Fargo Bank*, which Plaintiffs cite, did not purport to change this pleading rule, did not address the rule at all, and indeed did not reach the adequacy of the conspiracy allegations in that case. Instead, it assumed the existence of a RICO conspiracy, 298 F.3d 768, 775 (9th Cir. 2002), and dismissed the plaintiff's claim on an unrelated issue of vicarious liability, *id.* at 777. The line that Plaintiffs quote—that under § 1962(d) "it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy," *id.* at 774-75—is on its face about proof of the object's completion, not pleading of the object.

Finally, *Salinas* v. *United States*, which Plaintiffs also cite, supports rather than undercuts that a RICO conspiracy count must plead the substantive RICO violation that is identified as the conspiracy's object. The issue in *Salinas* was whether, "under the RICO conspiracy provision, the defendant must *himself* commit or agree to commit two or more predicate acts." 522 U.S. 52, 61 (1997) (emphasis added). The answer was no, but the Supreme Court reaffirmed that the object of a conspiracy—what the conspirators intend to accomplish—must be "an endeavor which, if completed, would satisfy *all of the elements of a substantive criminal offense*." *Id.* at 65 (emphasis added); *accord Howard*, 208 F.3d at 751 (quoting this language). Indeed, the Court upheld the defendant's RICO conspiracy conviction in that case because there was "ample evidence that he conspired *to violate subsection (c)*." *Salinas*, 522 U.S. at 65 (emphasis added).

To sustain their RICO conspiracy claim, Plaintiffs were required under longstanding law to plead the substantive RICO offense. Having failed to do so, their claim must be dismissed.

### CONCLUSION

The Court should grant the motion to dismiss without leave to amend.

---

OpenAI Defendants "waived" their challenge to the RICO conspiracy count is not just specious but upside down; Plaintiffs are the ones who have waived.

1    Date: June 27, 2025                       MORRISON & FOERSTER LLP

2

3                               */s/ Jordan Eth*
                              JORDAN ETH (CA SBN 121617)
                              JEth@mofo.com

4                               WILLIAM FRENTZEN (CA SBN 343918)
                              WFrentzen@mofo.com

5                               DAVID J. WIENER (CA SBN 291659)
                              DWiener@mofo.com

6                               MORRISON & FOERSTER LLP
                              425 Market Street

7                               San Francisco, CA 94105
                              Telephone:    (415) 268-7000

8                               Facsimile:    (415) 268-7522

9                               WILLIAM SAVITT (admitted *pro hac vice*)
                              WDSavitt@wlrk.com

10                               BRADLEY R. WILSON (admitted *pro hac vice*)
                              BRWilson@wlrk.com

11                               SARAH K. EDDY (admitted *pro hac vice*)

12                               SKEddy@wlrk.com
                              NATHANIEL CULLERTON (admitted *pro hac vice*)

13                               NDCullerton@wlrk.com

14                               WACHTELL, LIPTON, ROSEN & KATZ
                              51 West 52nd Street

15                               New York, NY 10019
                              Telephone:    (212) 403-1000

16                               Facsimile:    (212) 403-2000

17                               *Attorneys for Defendants Samuel Altman,*
                              *Gregory Brockman, OpenAI, Inc., OpenAI L.P.,*

18                               *OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI*
                              *OpCo, LLC, OpenAI Global, LLC, OAI*

19                               *Corporation, LLC, OpenAI Holdings, LLC,*
                              *OpenAI Startup Fund Management, LLC,*

20                               *OpenAI Startup Fund GP I, L.L.C., OpenAI*
                              *Startup Fund I, L.P., OpenAI Startup Fund SPV*

21                               *GP I, L.L.C., OpenAI Startup Fund SPV GP II,*
                              *L.L.C., OpenAI Startup Fund SPV GP III,*

22                               *L.L.C., OpenAI Startup Fund SPV GP IV,*
                              *L.L.C., OpenAI Startup Fund SPV I, L.P.,*

23                               *OpenAI Startup Fund SPV II, L.P., OpenAI*
                              *Startup Fund SPV III, L.P., OpenAI Startup*

24                               *Fund SPV IV, L.P., Aestas Management*
                              *Company, LLC, and Aestas LLC*

25

26

27

28