# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELON MUSK et al.,<br><br>                Plaintiffs,<br><br>vs.<br><br>SAMUEL ALTMAN et al.,<br><br>                Defendants. | Case No. 24-cv-04722-YGR<br><br>**JOINT LETTER BRIEF**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Thomas S. Hixson<br><br>Date Action Filed: August 5, 2024<br>Trial Date: March 30, 2026 |

July 7, 2025

The Honorable Thomas S. Hixson
San Francisco Courthouse
Courtroom E, 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Magistrate Judge Hixson:

      Pursuant to Your Honor's Discovery Standing Order, the parties respectfully submit this joint letter addressing:

1. Plaintiff's First Set of Requests for Production to the OpenAI Defendants;
2. Plaintiff's First Set of Interrogatories to Defendant Samuel Altman;
3. Plaintiff's First Set of Interrogatories to Defendant Gregory Brockman;
4. Plaintiff's First Set of Interrogatories to Defendant OpenAI, Inc.; and
5. Plaintiff's First Set of Requests for Admission to each of the OpenAI For-Profit Entities.

      The parties attest that they met and conferred in good faith in an effort to resolve these disputes before filing this joint letter.

<table>
<tr><td>

*/s/ Jaymie Parkkinen*
Jaymie Parkkinen, SBN 318394
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101


*Attorneys for Plaintiffs Elon Musk and X.AI Corp.*

</td><td>

*/s/ Bradley R. Wilson*
Bradley R. Wilson (admitted *pro hac vice*)
Nathaniel Cullerton (admitted *pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

*Attorneys for Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC*

</td></tr>
</table>

**Plaintiff's Statement**[1]

***Background***: Plaintiff Musk co-founded and substantially funded OpenAI as a *non-profit* organization specifically to ensure AI development would be open and prioritize safety and humanity's benefit over profits. Dkt. 170 ¶¶ 4-5, 73, 84, 86-88. This case seeks remedial action to address Defendants' systematic conversion of that OpenAI charity into a massive *for-profit* enterprise, without regulatory approval, through deception and self-dealing. *Id.* ¶¶ 1-2, 6, 133-43. Defendants systematically transferred OpenAI's intellectual property and employees from the non-profit to an opaque web of private for-profit entities (the "For-Profit Entities")—in which the charity's principals, Sam Altman and Greg Brockman, along with Microsoft, hold significant stakes—draining the charity of its valuable assets while enriching themselves. *Id.* ¶¶ 5, 111-30. When OpenAI's (then) safety-focused Board of Directors finally attempted to fire CEO Altman in November 2023 for his lack of candor, prioritization of commercial interests over safety, and extensive conflicts of interest, Defendants successfully forced his reinstatement within days and eliminated the independent Board members who had dared to challenge their scheme. *Id.* ¶¶ 146-65. Emboldened, Defendants have been in recent months actively lobbying for a complete for-profit conversion that would permanently separate the charity from its assets at well below market value, ensuring virtually all future OpenAI profit flows to them and their investors, not to the OpenAI charity Musk co-founded. *Id.* ¶¶ 2, 181, 192-97.

***Altman's Firing***: Altman's conflicts of interest, self-dealing, deceit, and prioritization of profits over safety are central to nearly every claim proceeding to trial in Phase One, underpinning allegations of breaches of fiduciary duty, breaches of charitable trust, and outright fraud. *Id.* ¶¶ 146-50, 250(a)-(b) and (j), 261, 269(c), 285, 310-11, 414, 435, 458. Plaintiff therefore sought discovery concerning Altman's firing,[2] given that he was terminated for this very conduct before he forced his reinstatement through intense pressure from powerful investors in the For-Profit Entities (e.g., Microsoft, which Plaintiffs already have evidence suggesting exercises de facto control over the charity in breach of the trust). *Id.* ¶¶ 149-51, 156. Defendants agreed to produce information concerning Altman's firing only from November 1 to November 17, 2023—the narrow window ending with his dismissal—while categorically excluding all equally relevant communications concerning his firing that occurred after November 17, Altman's subsequent return to power, and the internal OpenAI investigation into Altman's conduct that continued through Spring 2024. There is no justification for this artificial limitation on relevant information. Defendants must produce all responsive documents.

***Altman and Brockman's Conflicts of Interest***: Plaintiff sought information concerning Altman and Brockman's conflicts of interest[3] and identified various entities where serious conflicts and self-dealing have been reported by the news media (including, for example, Stripe, Reddit, Limitless, Humane, Cerebras). *Id.* ¶¶ 135-42. Defendants improperly limited their responses to

---

[1] Exhibit 1 reproduces the relevant discovery requests and OpenAI Defendants' final positions on each. Unfortunately, OpenAI Defendants marked many of even their non-substantive discovery responses as "Confidential," complicating public filing. Notwithstanding this, Plaintiff would be happy to provide copies of any referenced documents if the Court desires.

[2] RFP Nos. 12, 41, 73; OpenAI, Inc. ROG No. 13.

[3] RFP Nos. 31, 33; Altman ROG No. 4; Brockman ROG No. 4; OpenAI, Inc. ROG No. 10.

only those specifically named entities. Plaintiff is entitled to information concerning all of Altman and Brockman's conflicts of interest at OpenAI, not merely those uncovered by investigative journalists so far. If OpenAI has authority establishing a *de minimus* exception to fraud or Plaintiffs' other claims, Plaintiffs stand ready to hear how Altman's profiteering satisfies it.

***OpenAI Financial Information***: Plaintiff requested essential financial documents including OpenAI's financial projections, valuations, and investor materials.[4] Such documents are critical to establish damages and disgorgement of the massive value extracted from the Musk-funded charity; demonstrate that the charity received no compensation or compensation well below fair market value when compelled to transfer its IP and employees to the For-Profit Entities; trace how Musk's $44 million in contributions were converted into valuable assets now held by the For-Profit Entities to support Plaintiff's constructive trust and other remedies; and to confirm that the charity has been systematically deprived of revenue for the private gain of Defendants and their investors, and all at the expense of OpenAI's non-profit mission. *Id*. ¶¶ 128-31, 250(b)-(d), 279, 287, 298, 314, 402, 416. And of course, whether the proposed conversion violates the trust depends, in part, on valuation, as do all damages calculations. OpenAI's inadequate offer to solely produce "audited financial statements" will not do. After trying to evade comparable discovery, OpenAI was ordered to produce similar financial documents in *The New York Times Co. v. Microsoft Corp., et al.*, No. 1:23-cv-08292-SHS-OTW (Dkt. 503 at 2) (copyright infringement action), and thus cannot claim burden or assert legitimate objections to producing, at a minimum, those materials here.

***OpenAI's For-Profit Conversion***: Plaintiff sought documents concerning OpenAI's conversion to a for-profit enterprise, RFP No. 36, including the launching of numerous For-Profit Entities to which Defendants caused the OpenAI charity to funnel all its intellectual property and personnel, enabling Defendants to self-deal with impunity, as well as OpenAI's recent attempts to force the charity to sell its assets to a for-profit company at well below market value—all in breach of the OpenAI charitable trust and their contract with Musk. Dkt. 170 ¶¶ 247, 250, 261, 399(a). Defendants only agreed to produce responsive documents through 2019 (the year the first OpenAI for-profit entity was launched), notwithstanding that, since then, OpenAI has established numerous other for-profit entities, and as recently as *this year*, OpenAI has continued to pursue full for-profit status. Such conversion was only paused because of this litigation, not because OpenAI abandoned the plan. As Defendants' abuse of the charitable form *through the For-Profit Entities* lies at the heart of this matter, they must produce all responsive documents up to the present.

***Documents for Use at Depositions***: Both Plaintiff and Defendants propounded nearly identical Requests for Production seeking all documents the responding party intends to rely upon "at trial, or at any deposition or hearing in this Action." RFP No. 80. While Plaintiff agreed to a full production of such documents without equivocation, Defendants expressly refused to produce publicly available documents they intend to use at depositions. When Plaintiff objected to this sandbagging tactic, OpenAI dismissed the concern. "[T]he fact that the documents may be available elsewhere does not relieve parties of their duty to produce documents within their possession, custody, or control." *TIW Holdings LLC v. Evo Brands LLC*, 2024 WL 2107379, at *8 (C.D. Cal. May 6, 2024) (overruling objection) (citing *Morgan v. Haviland,* 2011 WL 2433648, at

---

[4] RFP Nos. 7, 54-55; *see also* OpenAI, Inc. ROG No. 4 (Plaintiff asked OpenAI, Inc. to state the consideration it was paid for the transfer of its IP to the For-Profit Entities. OpenAI evasively stated it received "fair-market value." OpenAI must provide a direct and specific answer.).

*1 (E.D. Cal. June 14, 2011) (noting that courts reject the objection that the information sought is equally available to the requesting party or publicly available)). OpenAI should be compelled to disclose all responsive documents, particularly given that most depositions will occur *after* the close of fact discovery. OpenAI's willful withholding of documents for tactical surprise at depositions cannot be permitted.

***RFAs to OpenAI For-Profit Entities:*** Plaintiff served just forty-four RFAs on each of the OpenAI For-Profit Entities, yet, in one joint submission, they categorically refused to respond to *any* of Plaintiff's requests, undermining the fundamental purpose of RFAs to narrow issues for trial by establishing undisputed facts. *Nationwide Mut. Ins. Co. v. Pipe Constructors, Inc.*, No. 5:23-CV-0721-KK-SPX, 2024 WL 944235, at *2-3 (C.D. Cal. Feb. 21, 2024) (citation omitted) (granting motion to compel RFAs, explaining "[r]equests for admission are intended to narrow the issues for trial by identifying and eliminating the matters on which the parties agree."). Each OpenAI For-Profit Entity occupies a distinct position and may possess different information, making individualized responses essential to understanding each entity's role in the profiteering scheme. For example, RFA No. 10 requests an admission that the OpenAI, Inc. non-profit transferred its intellectual property to each respective For-Profit Entity. Plaintiff is aware that at least one entity holds the charity's IP, but it is not clear how many others do as well. By stonewalling, Defendants are needlessly expanding the scope of trial. Defendants' burden objections are without merit. Where appropriate, Plaintiff has gone out of his way to minimize burden by, for instance, serving consolidated document requests. RFAs however are different and require entity-specific admissions. Plaintiff proposes the For-Profit Entities each admit or deny Nos. 1-2, 10-38, and 43.

## OpenAI Defendants' Statement

***Background.*** Since its founding, OpenAI's charitable mission has been to develop artificial general intelligence, or AGI, and ensure that it benefits all humanity. OpenAI was established as a standalone nonprofit, but within a few years, all of its founders, including Musk, recognized that OpenAI could not achieve the mission without billions in additional capital—money that could not be raised through donations alone. Musk wanted to transform OpenAI into a fully for-profit enterprise under his control, or fold it into Tesla, but OpenAI's other founders balked at those demands. So in 2018, Musk quit, and declared that OpenAI was doomed to fail. OpenAI addressed its funding needs in 2019 by creating a "capped" for-profit affiliate, OpenAI, L.P., that is bound to pursue the mission and subject to the nonprofit board's control. Musk had advance notice of the formation of the for-profit and raised no objection—at least not until he started a competitor, xAI.

***Discovery Process.*** On April 29, the OpenAI Defendants served R&Os that made clear what they would produce in response to Plaintiffs' 83 RFPs. Attorneys then began reviewing tens of thousands of documents to ensure compliance with the July 14 substantial completion deadline. The OpenAI Defendants have already made seven productions, and more are coming over the next week. For more than a month, Plaintiffs raised no concerns with the OpenAI Defendants' discovery program. It was not until June 3—after the OpenAI Defendants began their rolling production and raised concerns about Plaintiffs' collection efforts and positions on scope—that Plaintiffs expressed dissatisfaction. The OpenAI Defendants responded promptly and agreed to withdraw multiple objections in the spirit of compromise. After the June 12-13 meet-and-confer, the OpenAI Defendants sent another letter on June 19 that made further compromises. Because of the demands of the expedited schedule, the OpenAI Defendants could not wait to start their review and have

had to adjust their search and review parameters on the fly to account for these compromises. The OpenAI Defendants thus implored Plaintiffs to respond promptly to the June 19 letter to surface any remaining disputes, but Plaintiffs ignored that request and allowed two more weeks to elapse. Then, after 9 p.m. on July 3, Plaintiffs sent their section of this statement, demanding that the OpenAI Defendants respond less than one business day later. Their submission confirms that Musk and xAI are using this case to pursue from a competitor invasive and burdensome discovery that is not relevant to any triable claim, all while blocking core discovery into their own files.

*Altman's Removal.* The circumstances that led to Sam Altman's temporary removal as OpenAI's CEO are not relevant to the Phase One trial. The removal took place in November 2023—years after Musk voluntarily ended his involvement with OpenAI—and Musk does not allege that he has any right (contractual or otherwise) to dictate who serves as OpenAI executives or board members. Nevertheless, in an effort to respond to Plaintiffs' arguments about how the removal supposedly ties to their claims, the OpenAI Defendants agreed to produce documents "reflecting concerns about Altman's self-dealing, conflicts of interest, truthfulness, or approach to safety-related issues" that were discussed in the period that immediately preceded the board's removal decision. Plaintiffs do not explain why the additional discovery they seek—*e.g.* relating to Altman's reinstatement—is relevant to any triable issue, as the only claim that references the reinstatement has been stayed. Dkt. 170 ¶ 331(k). Nor would further searches targeting even more attenuated issues be proportional at this very late stage of the document discovery period.

*Altman/Brockman Financial Interests.* The SAC contains "information and belief" allegations about seven entities in which Altman and/or Brockman have a financial interest that have purportedly done business with OpenAI. Although the OpenAI Defendants do not agree that these allegations are relevant to the Phase One trial, they have committed to produce documents showing (i) Altman and/or Brockman's direct and indirect interests in each of the seven entities; and (ii) board-level communications regarding potential transactions between those entities and OpenAI. Plaintiffs' demand for documents relating to any entity in which Altman/Brockman have a direct or indirect interest—however small—that has "ever discussed or consummated" a transaction with OpenAI—of whatever type or value—is not proportional to the needs of this case. Despite repeated requests, Plaintiffs have refused to limit their sweeping demand to something that the OpenAI Defendants could possibly comply with. They should bear the consequence of that choice.

*Financial Information.* Plaintiffs seek a staggering amount of OpenAI's financial records—including some of its most highly sensitive materials—from OpenAI's entire 10+ year existence. They are demanding all OpenAI documents that reflect any "payment[s] of overhead expenses," including all "invoices, receipts, ledgers, and bank statements." They are also seeking "budgets," "financial projections," "valuations," and "investor presentations" for all OpenAI entities.

Plaintiffs say they need the expense records to "trace" how Musk's donations were spent. Even though those donations ended in 2020, the OpenAI Defendants have agreed to provide audited financial statements, as well as the back-up data underlying them, for each year of OpenAI's existence. That should suffice to show OpenAI's annual expenditures by category, but the OpenAI Defendants also repeatedly offered to consider providing more data if Plaintiffs specified what might be missing. They refused and continued to insist on receiving more than a decade's worth of granular financial records. Those are neither relevant nor remotely proportional to this expedited

case. Plaintiffs next say they need budgets, projections, valuations, and similar documents so they can determine OpenAI's value, but no pleaded claim depends on OpenAI's current value. Plaintiffs elide this point and focus on the value ascribed to the assets the nonprofit transferred to its for-profit affiliate in 2019. Yet they fail to mention that the OpenAI Defendants have already agreed to produce the valuation report prepared for OpenAI's board in connection with that transaction.

Moreover, budgets, projections, and investor decks are among OpenAI's most competitively sensitive documents, and Plaintiffs are a key OpenAI competitor (xAI) and its controller (Musk). That distinguishes this case from the NYT decision—the scope of which Plaintiffs greatly exaggerate in any event—and should weigh heavily in the proportionality analysis. But if current value is fair game, discovery must be reciprocal: Plaintiffs must produce documents showing how they are valuing xAI, as the assumptions used in those documents would be relevant to assessing the reasonableness of any valuation analysis for OpenAI that Plaintiffs seek to present at trial.

***Creation of For-Profit.*** OpenAI established its for-profit arm in 2019. Ever since, the nonprofit board has controlled the for-profit entities. The OpenAI Defendants are providing significant discovery relating to the 2019 transaction. After 2019, new entities were created within OpenAI's for-profit arm, but none of those transactions involved any exchange of assets with the nonprofit. The OpenAI Defendants have also agreed to produce the governance documents and agreements for these entities. Plaintiffs do not explain why they need anything more or why additional searches for communications related to the formation of the additional entities would be proportional.

Plaintiffs assert that OpenAI is currently "pursu[ing] full for-profit status" through a "conversion that would permanently separate the charity from its assets." That is demonstrably false, as Plaintiffs well know: OpenAI has no plans to abandon its nonprofit status or mission. Nor is any such plan on "pause." Rather, as it has publicly disclosed, OpenAI's nonprofit board is considering transitioning its for-profit subsidiary into a public benefit corporation that would remain under the control of the nonprofit board.[5] But that transition has not taken place, and Plaintiffs have made no showing they need extensive discovery into an inchoate transaction that will leave the nonprofit intact and in control. The OpenAI Defendants are already producing board minutes related to this potential transition, and no further discovery is warranted.

***Deposition Documents.*** Use of a publicly available document at a deposition is not "sandbagging." It is entirely customary for parties to use as deposition exhibits public documents that have not been produced in discovery. By insisting that the parties take a different approach in this case, Plaintiffs are attempting to gain an unfair preview of the OpenAI Defendants' deposition strategy.

***RFAs.*** Musk served more than 1,000 RFAs. Nearly 200 of them were directed at Altman, Brockman, and OpenAI, Inc. (the controlling nonprofit), and those have been answered. Musk also served 44 identical RFAs on each of the other 20 OpenAI entities—all of which OpenAI, Inc. already answered. Fact discovery closes in a few weeks, and requiring more defendants to answer another 800+ RFAs would not be proportional to the needs of this case—particularly in the absence of any showing by Plaintiffs that entity-by-entity responses are important to any triable issue.[6]

---

[5] *Evolving OpenAI's structure*, https://openai.com/index/evolving-our-structure/ (May 5, 2025).
[6] *See, e.g.*, *I-Enterprise* v. *Draper-Fisher Jurvetson Mgmt. Co.*, 2005 WL 8177424, at *2 (N.D. Cal. Mar. 23, 2005).