United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**ELON MUSK, ET AL.,**

Plaintiffs and Counterclaim-Defendants,

v.

**OPENAI, INC., ET AL.,**

Defendants and Counterclaim-Plaintiffs.

**Case No.: 4:24-CV-4722-YGR**

**ORDER DENYING PLAINTIFFS AND COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS OPENAI'S COUNTERCLAIMS;**

**ORDER GRANTING WITHOUT LEAVE TO AMEND DEFENDANTS' MOTIONS TO DISMISS COUNTS III, XX, AND XXI OF THE SECOND AMENDED COMPLAINT**

Re: Dkt. Nos. 166, 173, 175, & 227

This order addresses two pending motions: (i) plaintiffs' motion to dismiss the two counterclaims asserted by defendant/counterclaim-plaintiff OpenAI, Inc.[1] for California's Unfair Competition Law ("UCL") as well as tortious interference with prospective economic advantage and (ii) OpenAI's and co-defendant Microsoft Corp.'s motions to dismiss Counts III, XX, and XXI re-pled in plaintiffs' second amended complaint ("SAC"). Count III alleges breach of the implied covenant of good faith and fair dealing, Counts XX and XXI allege violations of the civil Racketeer Influenced and Corrupt Organizations Act ("RICO").

Having carefully considered the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby **DENIES** plaintiffs' motion to dismiss the counterclaims and **GRANTS** defendants' motions to dismiss the re-pled claims in the SAC without leave to amend.[2]

[1] Plaintiffs bring this action against Samuel Altman, Gregory Brockman, OpenAI, Inc., and several corporate entities affiliated with OpenAI, Inc. For the sake of simplicity, unless specifically stated otherwise, the court refers to that group of defendants and counterclaim-plaintiffs in the singular as "OpenAI."

[2] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.

## I. Background

The Court presumes familiarity with the facts of this case.

Following this Court's denial of plaintiffs' injunction request, OpenAI filed an answer to the first amended complaint ("FAC") which included two counterclaims asserted against plaintiffs Elon Musk and xAI Corp. (Dkt. No. 147 ("Counterclaims").) The Court only recounts here the additional allegations necessary to address the viability of the counterclaims. OpenAI pleads as follows:

This litigation is part of a years-long harassment campaign perpetrated by Musk against OpenAI because he "could not tolerate seeing . . . success for an enterprise he had abandoned and declared doomed." (*Id.* ¶ 6.) Part of this campaign has been an effort to mischaracterize OpenAI's corporate reorganization. As the AI field grows to include competitors from large corporations, "OpenAI's capital needs have become more pressing than ever" and "the demands for, and costs of, retaining and attracting scarce top talent in the field" continue to rise. (*Id.* ¶ 74.) The counterclaim complaint states:

> OpenAI's current structure poses challenges in attracting new investment and retaining and attracting highly skilled personnel. Every one of OpenAI's significant competitors has a familiar corporate structure that allows for offers of conventional equity—an attraction not just for investors contemplating multi-billion-dollar commitments but for current and prospective employees who want a stake in the enterprise they're helping to build. The profit interests in OpenAI's capped-profit are less familiar. . . .
>
> Given these challenges, and the threat they pose to the pursuit of the mission, OpenAI's board has for many months been considering *not* a "conversion" of the nonprofit into a for-profit entity—as Musk has falsely and repeatedly claimed—but a structure change in which the nonprofit would continue to exist and pursue its mission of ensuring that AGI benefits all of humanity, while the capped-profit would become a public benefit corporation ("PBC") serving the exact same mission but also having accountability to investors and employees. The nonprofit would exchange its current economic interest in the capped-profit entity for an equity stake in the PBC— thus sharing in the PBC's financial success while pursuing mission-advancing projects.

(*Id.* ¶¶ 75, 77 (emphasis in original).)

Before the Court issued its order denying the injunction, "Musk's litigation counsel sent a 'Letter of Intent' to OpenAI's board on behalf of a consortium of private investors [which] purported to offer $97.375 billion for the purchase of OpenAI, Inc.'s assets." (*Id.* ¶ 83.) Musk then sent the LOI to the *Wall Street Journal*, which caused extended media focus on the offer. (*Id.* ¶ 84.) This "stunt" and "scam" garnered significant media attention and caused significant harm. (*See id.* ¶¶ 85-90.) For one, it "required OpenAI to expend significant resources in responding to it," including a full review of the offer by the board. (*Id.* ¶ 90.) Further, the move represented a "very public effort to artificially raise[] the floor for the nonprofit's valuation," caused confusion, and could significantly impact "OpenAI's ability to pursue its mission on terms uncorrupted by unlawful harassment and interference." (*Id.* ¶ 95.)

The threat of future injury remains. "Musk's takeover threats could also imperil OpenAI's relationships with investors and have already made maintenance of those business relationships more costly and burdensome" because "the specter of a Musk-dominated OpenAI could" deter would-be investors from funding the venture. (*Id.* ¶ 96.) The "sham bid" constitutes an unfair and fraudulent business practice under California's UCL as well as tortious interference with prospective economic advantage.

Plaintiffs move to dismiss both counterclaims. Further, should the counterclaims survive, the parties dispute whether they properly belong in phase of II of this bifurcated action.

**LEGAL STANDARD**

In evaluating a motion to dismiss, a court accepts factual allegations in a complaint as true and construes them in the light most favorable to the plaintiff. *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886-87 (9th Cir. 2018.) "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).) Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

///

///

United States District Court
Northern District of California

## II. ANALYSIS

### A. Motion to Dismiss Counterclaims

Plaintiff urges dismissal of the counterclaims on three grounds: one, they are barred by California's litigation privilege; two, they are barred by the First Amendment to the United States Constitution; and three, they are not pled with the required particularity.

#### 1. California's Litigation Privilege[3]

"California's litigation privilege applies to any communication '(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that ha[s] some connection or logical relation to the action.'" *Graham-Sult v. Clainos*, 756 F.3d 724, 741 (9th Cir. 2014) (quoting *Mansell v. Otto*, 108 Cal.App.4th 265, 271 (2003)). As to the relation requirement, California courts have held that:

> The "connection or logical relation" which a communication must bear to litigation in order for the privilege to apply, is a functional connection, i.e., the communication must function as a necessary or useful step in the litigation process and must serve its purposes. The test cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation, including vindication in the court of public opinion. Instead, the connection or logical relation prong of the test can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case.

*Sharper Image Corp. v. Target Corp.*, 425 F.Supp.2d 1056, 1078 (N.D. Cal. 2006) (cleaned up, internal citations omitted). Intent is irrelevant to a determination of whether the privilege applies to a given communication. *See Geragos v. Abelyan*, 88 Cal.App.5th 1005, 1031-32 (2023) ("The litigation privilege protects even communication made with an intent to harm, so long as the communication is made in relation to a pending/ongoing or genuinely contemplated judicial or

---

[3] In opposition, OpenAI clarifies that the counterclaims are not based on any direct communication between plaintiffs and government officials. (*See* Dkt. No. 172, Opposition to Motion to Dismiss OpenAI's Counterclaims ("Oppo.") at 5.) OpenAI's counterclaims are grounded entirely in what it refers to as "the sham bid itself and its attendant media hype," and the Court therefore focuses its analysis on those actions only. Relatedly, OpenAI clarifies that its use of the word "sham" is not intended to invoke the doctrine of the sham exception to the *Noerr-Pennington* doctrine, and the Court therefore does not address those arguments either. (*See id.* at 7 n.5.)

other official proceeding. . . . [T]he litigation privilege applies regardless of the existence of malice or intent to harm.") (internal citation omitted).

Here, two sets of "statements" are analyzed: one, the LOI itself, and two, the statements made to the media and published in the *Wall Street Journal*. More particularly, defendants allege that before the LOI even reached OpenAI's board, Musk's counsel set about building maximum buzz and maximum disruption by providing the LOI to the *Wall Street Journal* (where the story appeared on the front page), and the "bid" dominated international news for days. (SAC ¶ 84.) Every other reference to media statements either focuses on the impact of those statements, or involves a statement not actually made by a counterclaim defendant (*see, e.g.*, SAC ¶ 88 (describing a statement made by "one of the investors backing Musk and a longtime Musk booster and major investor in Musk's businesses").)

First, with respect to the LOI, the Court does not consider plaintiffs' intent in sending the letter, but rather whether it could "achieve the objects of the litigation" and had "some connection or logical relation to the action."[4] Said differently, the question is whether the LOI created a vehicle through which Musk could have obtained satisfaction of his litigation-based demand to halt OpenAI's conversion. In opposition, OpenAI claims that the letter was merely a "sham bid" and a "commercial tactic" designed to interfere in OpenAI's business, and that the LOI could not possibly be a demand letter, as the consortium of investors on whose behalf the letter was sought is comprised of a different group of parties than plaintiffs to the action. Open AI's argument is grounded in Musk's intent, which is irrelevant to the inquiry. The issue is one of functional connection to the litigation. Had defendants accepted the offer, several claims in the underlying

[4] Both parties rely on the other's filing with this Court in connection with the LOI. OpenAI filed the LOI on the Court's docket when the Court was still considering the injunction request. At the time, OpenAI asserted the LOI revealed the hollow nature of Musk's alleged concern with the charity's foundational purposes and evidenced simply a desire to gain a business advantage. Musk states it is hypocritical for OpenAI to claim the LOI was relevant enough to file on the docket months ago and yet forswear any connection to these proceedings now.

Musk, for his part, in responding to that filing, foreswore any connection between the LOI and the litigation at the time, a claim OpenAI now jumps on as well in accusing Musk of hypocrisy.

The gamesmanship of both sides is obvious, as each flip flops. The test the Court applies here is objective and asks only whether, regardless of plaintiffs' subjective intent, the LOI serves enough of a functional purpose to be considered connected to the litigation.

action would have been moot. For this reason, OpenAI's argument that the letter cannot be characterized as a "settlement demand," as plaintiff describes it, misses the mark. The proper test is not whether the letter is a settlement demand, but rather whether it bears a "functional connection" or serves a useful prupose in the litigation. Because the Court finds the LOI does, it therefore satisfies the third and fourth element objectively speaking.

Second, with respect to media publication, the analysis is different. The privilege extends only far enough to "include publication to nonparties with a substantial interest in the proceeding" but not to "publication to the general public through the press." *Argentieri v. Zuckerberg*, 8 Cal.App.5th 768, 782 (2017) (internal citation omitted). Here, the counterclaim complaint focuses the claim on the publication of the LOI in the *Wall Street Journal* and an announcement by Musk's counsel to the media on the day the LOI was delivered. Construing the pleadings in the light most favorable to the counterclaim-plaintiffs, these press appearances were statements made to the general public and thus not made to individuals with a special interest in the proceedings. Musk portrays the relevant media as directed at "financial circles and the financial press," but this represents far too general an audience to merit the protection of the privilege.

The Court therefore finds that California's litigation privilege shields the delivery of the LOI to the defendants, but not the publication of the LOI in the *Wall Street Journal* or attendant media-related allegations. On this ground, the motions fails in part.

**2. The *Noerr-Pennington* Doctrine**

Following the above analysis, the Court must next determine whether statements to the media are protected under the *Noerr-Pennington* doctrine.

"[I]n the litigation context, not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit' is protected by the *Noerr–Pennington* doctrine." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934-35 (9th Cir. 2006) (quoting *Columbia Pictures Indus., Inc. v. Pro. Real Estate Invs., Inc.*, 944 F.2d 1525, 1528–29 (9th Cir.1991), *aff'd* 508 U.S. 49 (1993)).

*Wisk Aero LLC v. Archer Aviation Inc.* is instructive in the context of statements made to third parties.

> Although district courts have divided on this issue, most courts within this Circuit to have addressed the question have concluded that a communication like this that simply describes the lawsuit is not protected by the doctrine. . . . Conduct "incidental" to a lawsuit does not mean conduct "in any way related" to a lawsuit. . . . Wisk's blog posts and press release were not "incidental to the prosecution of the lawsuit." The blog posts and press release communicated with the public *about* the lawsuit. But they did not, in any manner, affect it or advance Wisk's interests in it. Not giving them *Noerr-Pennington* immunity also does not threaten the values underlying the doctrine: If Wisk were subject to liability for the blog post and press release, it would not hamper its ability to prosecute this case at all. It is not like pre-suit demand letters, discovery communications, or other conduct that is useful or necessary to successfully petition a court for redress, to give Wisk adequate "breathing space" to petition the court, or to achieve the materially same end as litigation.

2021 WL 4932734 at *7-8 (N.D. Cal. 2021).

The same analysis applies to the alleged media campaign. The publicity attendant to the LOI did not assist Musk in petitioning any member of government or the courts. The media appearances discussed here were neither necessary to bring the suit nor did they impact the actual prosecution of Musk's litigation. The Court therefore finds that the statements made to the media in this instance fall outside the protection of the *Noerr-Pennington* doctrine. The motion on this ground fails.

**3. Adequacy of the Pleadings**

Finally, Musk argues that the counterclaims are inadequately pled. The parties dispute whether Rule 9(b)'s heightened pleadings standards apply to the counterclaims. The Court need not resolve that issue as it finds the counterclaims adequately pled regardless. Thus:

OpenAI asserts a claim under two of the three prongs giving rise to a UCL claim. Under the unfair prong, a plaintiff must allege "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 187 (1999). A claim under the fraudulent prong must plead a business practice "that is likely to deceive members of the public," which can include representations that are untrue or true but "couched in such a manner that it is

likely to mislead or deceive the consumer, such as by failure to disclose other relevant information." *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal.App.4th 1235, 1255 (2009). With respect to the elements of a tortious interference claim, a plaintiff must plead:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003) (internal citation omitted).

OpenAI sufficiently puts counterclaim-defendants on notice as to the "who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018). The counterclaim complaint alleges that Musk "provided the letter to the *Wall Street Journal* (where the story appeared on the front page)." (Counterclaims ¶ 84.) Whereas the Court cannot take into account Musk's motivation under the litigation privilege analysis, for the purposes of pleading an unfair or fraudulent business practice, it is sufficient to allege that the bid was a sham and designed to mislead. More specifically, OpenAI puts Musk on notice that it alleges the media campaign "significantly threaten[ed] or harm[ed] competition,"[5] was either untrue or misleading and deceiving to an actual customer,[6] and was designed to–and

---

[5] "Every phase of Musk's campaign has been designed to force OpenAI to divert resources, expend money, or both. From countering Musk's false statements and other public attacks; to addressing Musk's pretextual corporate records demand; . . . OpenAI has borne costs, and been harmed, by Musk's abusive tactics and unrelenting efforts to mislead the public for his own benefit and to OpenAI's detriment and the detriment of its mission." (Counterclaims ¶ 93); "Musk has engaged in these efforts to slow OpenAI's progress and impair its ability to compete effectively in an increasingly crowded field, but also to seize and maintain for xAI an unearned edge designed to impair competition more broadly for the sole benefit of Musk's xAI, at the expense of the public interest." (*Id.* ¶ 98.)

[6] "Counterclaim Defendants' sham bid is a fraudulent business practice because the purpose of the bid was to deceive members of the public that Counterclaim Defendants' true intentions were to acquire Counterclaim Plaintiff OpenAI, Inc.'s assets for $97.375 billion, rather than to disrupt

ultimately did–disrupt a business relationship leading to economic harm.[7] At this stage, the allegations are sufficient.

***

Having so found, the Court further holds that the counterclaims properly belong in Phase II of the action. In considering the parties' competing proposals as to bifurcation, the Court ruled that the factual predicate for the claims controlled the analysis and claims sharing a common nucleus of facts properly belonged together in phase I. Though OpenAI properly notes that the counterclaims "focus on the course of conduct between OpenAI, its founders, and Musk from OpenAI's founding until the present . . . including early understandings of OpenAI's charitable purpose," the counterclaims themselves stem from actions taken far after the actions forming the basis of plaintiff's breach of contract claims. (Oppo. at 23.) Indeed, the acts giving rise to the counterclaims occurred after this litigation began. The counterclaims will be tried in Phase II.

***

Based on the above, the motion to dismiss the counterclaims is **DENIED.**

**B. Motion to Dismiss the SAC**

1. **Breach of the Implied Covenant (Count III)**

The Court dismissed the breach of the implied covenant claim as pled in the FAC, noting that it was "based on the same conduct as the breach of implied contract and [was] therefore impermissibly duplicative." (Dkt. No. 163 at 3.) Plaintiffs now replead the claim and add:

> Specifically, in addition to and distinct from their breach of contract:
>
> a. Defendants systematically and unilaterally reinterpreted key terms of their agreement in ways that undermined it, including by evading conflict-of-interest protections by defining board member "independence" in an extraordinarily narrow fashion— considering, for example, only whether board members directly or personally held

Counterclaim Plaintiffs' operations and interfere with its business relationships." (Counterclaims ¶ 110.)

[7] "[T]he media firestorm surrounding" the LOI "required OpenAI to expend significant resources in responding to it." (Counterclaims ¶ 90.)



United States District Court
Northern District of California

> equity in OpenAI's For-Profit Entities—while rejecting standard independence disqualifiers;
>
> b. Defendants obscured OpenAI's for-profit activities through complex corporate structures, deliberately designed to prevent Musk and the public from discovering their actual operations, and by purporting to maintain the charity's control of their for-profit business when, in fact, the opposite is true; and
>
> c. Defendants engaged in all acts supra ¶¶ 250(a)-(m)[8] to the extent any such acts are determined not to breach the terms of parties' implied-in-fact contract.

(SAC ¶ 269.)

Upon close inspection, these additions fail to allege conduct distinct from the actions which form the bases of the surviving implied breach of contract claim. Those actions are listed extensively in the SAC and include, by way of example: "Flagrantly failing to assiduously act to minimize conflicts of interest among [OpenAI's] employees and stakeholders that could compromise broad benefit" (¶ 250(j)); "Currently working to convert the non-profit into a fully for-profit commercial entity without making it clear to investors that they should never expect a profit . . . ." (¶ 250(l)); "Failing to observe all legal duties incumbent upon Defendants" (¶ 250(m)); and "Operating OpenAI, Inc. in a manner such that it is not unconstrained by a need to generate financial return" (¶ 250(d)). The Court fails to see how "systematically and unilaterally reinterpret[ing] key terms" or "obscure[ing] OpenAI's for-profit activities" alleges any new behavior not encompassed by the preceding list in a nonconclusory manner. Nor will it suffice to explicitly reallege the behaviors listed in the breach of contract claims and claim they are pled in the alternative, should a jury disagree those acts give rise to liability.

The motion to dismiss the claim for breach of the implied covenant is **GRANTED WITHOUT LEAVE TO AMEND.**

---

[8] The actions listed in paragraph 250 refer to actions initially alleged to constitute breaches of the express contract claim, which the Court dismissed without leave to amend. Upon amendment, plaintiffs left the breach of contract language unchanged from the FAC, while acknowledging the Court's dismissal. In the portion of the SAC alleging breach of the implied contract, however, plaintiffs reincorporate the actions listed in paragraph 250 to support the claim for breach of the implied contract. Therefore, in anayzing any redundancy between the actions alleged to constitute breach of the *implied covenant* and those alleged to constitute breach of the *implied contract*, the Court looks to the actions listed in paragraph 250 of the SAC.

2. **RICO Claims (Counts XX and XXI)**

Plaintiffs also replead the RICO claims dismissed in the prior order.[9] The Court previously found as follows:

> After parroting the statutory language, the FAC states the named defendants participated in the affairs of the enterprise in order to: "exploit" Musk's donations, "develop valuable AI/AGI technology" they could use to enrich themselves, and engage in self-dealing, and that they did so by creating the for-profit entities. (See FAC ¶¶ 510-15.) These allegations fail to identify how the named defendants operated the entity *through a pattern* of racketeering activity. The development of technology and creation of various corporate subsidiaries are not predicate acts, and the other allegations are not tethered to the enterprise's conduct. The motions to dismiss as to this subsection are therefore **GRANTED**. Here, the Court will grant plaintiffs leave to amend, but any further amended complaint must demonstrate how the defendants named under Section 1962(c) conducted OpenAI's affairs in a manner RICO was intended to reach.

(Dkt. No. 163 at 9-10 (emphasis in original).) Thus, in its prior order, the Court required plaintiffs to re-plead with specificity how Altman and Brockman conducted OpenAI through a pattern of racketeering activity via acts tethered to OpenAI's conduct.

First, the SAC begins with a generic statement[10] which is supported with the following examples:

- alleged pre-2017 "systematic fraudulent misrepresentations about the enterprise's non-profit mission" which induced seed money from Musk; and
- "additional express misrepresentations via interstate wires to Musk in September 2017, falsely claiming a continuing commitment to and enthusiasm for OpenAI's non-profit structure and charitable mission."

(SAC ¶ 445.) Plaintiffs summarize their position as follows: "When Altman, as the CEO of a charity, lies to donors and AI talent to fund operations and develop charitable assets for his personal

---

[9] The prior complaint alleged violations of three RICO subsections, but the SAC pleads only a violation of subsection (c).

[10] Defendants "conducted the affairs of OpenAI, Inc. through a pattern of racketeering activity by systematically engaging in wire fraud to direct, operate, and manage the enterprise." (SAC ¶ 445.)

enrichment, he is fraudulently conducting the enterprise's affairs." (Dkt. No. 181, Plaintiff's Opposition to OpenAI Motion to Dismiss at 13-14.)

This reformulation does not add detail on how defendants operated the enterprise through a pattern of racketeering activity. Although the law requires only two acts to form such a pattern, the SAC essentially rests on the same factual allegations as the FAC. To the extent the 2015 and 2017 communications with Musk form the pattern, the Court found last time these were insufficient to show the operation of OpenAI as a fraudulent enterprise. To the extent additional misrepresent-tations are alleged to form that pattern, OpenAI is correct that the SAC fails to provide the level of detail surrounding those newly pled allegations needed to satisfy Rule9(b).

As to the other defendants named in these counts, allegations are provided in paragraphs 446-48 of the SAC. Microsoft's liability allegedly stems from the following: "[k]nowingly providing the capital, corporate structure(s), and advice and encouragement that enabled Altman and Brockman to perpetuate their continuing wire fraud scheme;" "[w]illfully participating in the deception of donors and the public by facilitating and concealing Defendants' profiteering;" "[s]erving as vital participants in siphoning off and exploiting OpenAI, Inc.'s valuable AI/AGI technology and highly skilled personnel;" and "[i]ntentionally executing the reshuffling of OpenAI, Inc.'s assets that served to conveniently shield them and their scheme from public scrutiny." (SAC ¶ 446.) The other OpenAI entities are also alleged to have committed RICO violations by "making material misrepresentations transmitted via interstate wires about their purpose and investors' expected returns." (*Id.* ¶ 447.)[11]

These allegations also fail. First, no detail is provided about the alleged misrepresentations made by the other OpenAI entities. Second, as Microsoft notes in its motion, its involvement relevant to the RICO claims began in 2019, well after the 2017 email which forms the latest

[11] Here, the SAC offers two quotes allegedly from the other OpenAI entities, though no details are provided anywhere in the SAC about them, such as who specifically said them, to whom, and in what context. Further, the Court notes that the SAC identifies the language quoted above as the source of the other entities' RICO liability, whereas in opposition, plaintiffs allege the source of the entities' RICO liability is not misrepresentations made over interstate wires, but rather that they are "the vehicles through which Defendants looted OpenAI Inc.'s assets" and "are the operational arm of the ongoing enterprise." (*Compare* SAC ¶ 447, *with* Dkt. No. 181 at 14.)

United States District Court
Northern District of California

predicate act pled with specificity. (*See* Dkt. No. 173 at 3.) Plaintiffs' refrain that "Microsoft's primary argument—that it committed no predicate acts—fails on the merits because it ignores that Plaintiffs' RICO claims plead the *continuing* nature of the fraudulent scheme and Microsoft's active participation in *perpetuating* it" also fails. (*See* Dkt. No. 182 at 3 (emphasis in original).) Where plaintiffs fail to adequately plead the ways in which defendants operated OpenAI as a racketeering enterprise, an additional allegation that the scheme was "continuing" in nature will not suffice to make an additional party liable.

For the reasons set forth above, the motions to dismiss Counts XX and XXI are **GRANTED WITHOUT LEAVE TO AMEND**.

## III. MOTION TO AMEND AFFIRMATIVE DEFENSES

Defendants seek leave to amend their answer to replead the following five affirmative defenses: (1) statute of limitations; (2) laches; (3) statute of frauds; (4) termination of alleged contract; and (5) unclean hands. Plaintiffs have agreed not to oppose but would not agree without a concession on the topic of bifurcation. Having read and reviewed the motion, and understanding the relevant standard, the Court **GRANTS** the motion. Further briefing is not necessary, the request is limited in scope and adequate justification has been provided.

## IV. CONCLUSION

The Court finds as follows:

- Plaintiffs' motion to dismiss OpenAI's counterclaims is **DENIED.**
- OpenAI's motion to dismiss Count III is **GRANTED WITHOUT LEAVE TO AMEND**.
- Open AI and Microsoft's motions to dismiss Counts XX and XXI are **GRANTED WITHOUT LEAVE TO AMEND**.
- OpenAI's motion to amend its answer is **GRANTED**.

This terminates Docket Nos. 166, 173, 175 & 227.

**IT IS SO ORDERED.**

Date: August 12, 2025

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE