JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted *pro hac vice*)
BRWilson@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:    (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman,
OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,
OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,
OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,
OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,
OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,
OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,
OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,
OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,
Aestas Management Company, LLC, and Aestas LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **OPENAI DEFENDANTS' AMENDED COUNTERCLAIMS, ANSWER, AND DEFENSES** |
| v. | |
| SAMUEL ALTMAN, et al., | |
| Defendants. | |

Defendants and Counterclaim Plaintiffs OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC (collectively "Counterclaim Plaintiffs" or "OpenAI") allege, upon knowledge as to themselves and their own acts, and otherwise upon information and belief:

## COUNTERCLAIMS

### PRELIMINARY STATEMENT

1.      Since its founding as an AI research lab in December 2015, OpenAI has had one mission: to ensure that artificial intelligence with the ability to outperform humans—artificial general intelligence, or "AGI"—benefits all humanity.

2.      Counterclaim Defendant Elon Musk worked with Sam Altman, Greg Brockman, and Ilya Sutskever to help launch OpenAI. He sat on OpenAI's board and pledged $1 billion in donations to the organization, which was set up as a nonprofit.

3.      But Musk's involvement with OpenAI was short-lived. In 2017 and 2018, Altman, Brockman, and Sutskever refused to bow to Musk's demands for control of the enterprise or, alternatively, its absorption into Musk's electric car company, Tesla. So Musk quit, declaring that OpenAI would fail without him and that he would focus on AI development at Tesla. The $1 billion commitment he'd made to OpenAI was never satisfied—not even close.

4.      Years later, in 2022, OpenAI launched ChatGPT, an AI chatbot that attracted attention and users on an unprecedented scale. ChatGPT drew a new spotlight onto OpenAI. Musk had nothing to do with it.

5.      In March 2023, GPT-4, OpenAI's then-latest technology, was hailed as a transformative breakthrough on the path to AGI. Again Musk was on the sidelines.

6.      Musk could not tolerate seeing such success for an enterprise he had abandoned and declared doomed. He made it his project to take down OpenAI, and to build a direct competitor that would seize the technological lead—not for humanity but for Elon Musk.

7.      The ensuing campaign has been relentless. Through press attacks, malicious campaigns broadcast to Musk's more than 200 million followers on the social media platform he controls, a pretextual demand for corporate records, harassing legal claims, and a sham bid for OpenAI's assets, Musk has tried every tool available to harm OpenAI.

8.      Those efforts have only intensified in recent months, as OpenAI has announced a possible restructuring that would see the existing for-profit entity under the nonprofit OpenAI, Inc. become a public benefit corporation, allowing it to better compete for capital and top talent in service of the mission to develop AGI for the benefit of humanity. Pretending to represent the public, Musk seeks to prevent that restructuring—even though, years ago, he advised that a similar reorganization was needed to salvage OpenAI's mission. Musk peddles the false claim that OpenAI is planning to "convert" from a nonprofit into a for-profit enterprise. He does so knowing the nonprofit not only would continue to exist, but would be one of the best-resourced in history.

9.      OpenAI is resilient, and the employees, investors, and partners at the core of its mission recognize that Musk's claims are as meritless as they are self-serving. But Musk's actions have taken a toll. Should his campaign persist, greater harm is threatened—to OpenAI's ability to govern in service of its mission, to the relationships that are essential to furthering that mission, and to the public interest. Investors, partners, and employees saw what happened to Twitter when Musk took it over in 2022: the company's value plummeted, business partners were left hanging, most employees were sent packing, and the business was ultimately absorbed into Musk's AI company. Musk's continued attacks on OpenAI, culminating most recently in the fake takeover bid designed to disrupt OpenAI's future, must cease. Musk should be enjoined from further unlawful and unfair action, and held responsible for the damage he has already caused.

## PARTIES

10.     Counterclaim Plaintiff OpenAI, Inc. is a registered nonprofit corporation incorporated under the laws of Delaware on December 8, 2015. OpenAI, Inc. is registered as an out-of-state nonprofit corporation with the California Secretary of State and has its principal place of business at 1455 3rd St., San Francisco, CA 94158.

11.     Counterclaim Plaintiff OpenAI Global, LLC is a registered limited liability company formed under the laws of Delaware on December 28, 2022. OpenAI Global, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1455 3rd St., San Francisco, CA 94158.

12.     Counterclaim Plaintiff OpenAI OpCo, LLC is a registered limited liability company formed under the laws of Delaware on September 19, 2018 as OpenAI L.P. that was later converted to OpenAI OpCo, LLC on January 23, 2023. OpenAI OpCo, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1455 3rd St., San Francisco, CA 94158.

13.     Counterclaim Defendant Elon Musk is an individual residing in Texas.

14.     Counterclaim Defendant X.AI Corp. ("xAI") is a public benefit corporation formed under the laws of Nevada with its principal place of business at 3180 18th Street, San Francisco, CA 94110.

### JURISDICTION

15.     The Court has supplemental jurisdiction over Counterclaim Plaintiffs' claims pursuant to 28 U.S.C. § 1367 because the claims form part of the same case or controversy and arise out of the same transaction or occurrence as Counterclaim Defendants' claims under Article III of the United States Constitution.

16.     The Court has personal jurisdiction over Counterclaim Defendant Musk, who has availed himself of this forum by asserting claims in this Court against the OpenAI Defendants.

17.     The Court has personal jurisdiction over Counterclaim Defendant xAI, a corporation headquartered in California that has also availed itself of this forum by asserting claims in this Court against the OpenAI Defendants.

18.     Venue is proper in the Northern District of California because the counterclaims asserted herein are compulsory counterclaims, and venue is proper in the original action, and, under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the counterclaims occurred in this District and this Court has personal jurisdiction over the Counterclaim Defendants.

## FACTUAL ALLEGATIONS

### A. OpenAI is founded

19.    In May 2015, Sam Altman proposed to Elon Musk an idea he had discussed with Greg Brockman: the formation of an "AI lab" with the mission of "creat[ing] the first general AI and us[ing] it for individual empowerment."

20.    Altman and Brockman understood that attaining AGI—highly advanced artificial intelligence systems that are generally smarter than humans and can outperform humans at most economically valuable work—could prove transformative. The technology could exponentially advance scientific and medical knowledge, expand the limits of human ingenuity and creativity, and turbocharge the economy. But the technology presented risks. The new AI lab would therefore be committed to developing AGI in the interests of humanity as a whole.

21.    Musk expressed support for these ideas. In July 2015, he had dinner with Altman, Brockman, and Ilya Sutskever, among others, to explore the project under contemplation. The discussion centered on the feasibility of launching an AGI project that could become and stay competitive with DeepMind, an AI company under the umbrella of Google.

22.    Immediately following the July 2015 dinner, Altman and Brockman resolved to move forward with this idea and began recruiting a team. The original plan was to associate the lab with Y Combinator, the startup accelerator where Altman worked. By November 2015, Altman, Brockman, and Sutskever had issued offers to their founding team.

23.    After meeting the prospective team members to help persuade them to accept their offers, Musk said he wanted to become more involved in the lab—provided it did not operate under the auspices of Y Combinator. Altman, Brockman, and Sutskever agreed.

24.    In December 2015, Altman, Brockman, Sutskever, and Musk launched OpenAI. The organization—OpenAI, Inc.—took the form of a Delaware nonprofit corporation organized for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code. Musk thought the nonprofit structure not "optimal," and advised it would "[p]robably be better to have a standard C corp with a parallel nonprofit"—*i.e.*, a for-profit corporation with an affiliated nonprofit. But the founders ultimately were satisfied that a nonprofit

alone would serve the mission for the time being. Musk became a "member" of the nonprofit and a co-chair of OpenAI, Inc.'s board of directors.

25.     The "specific purpose" of OpenAI, Inc., as reflected in its founding Certificate of Incorporation, was "to provide funding for research, development and distribution of technology related to artificial intelligence." The Certificate stated that the "technology will benefit the public" and "the corporation will seek to open source technology for the public benefit where applicable." These statements comported with discussions Altman, Brockman, Musk, and Sutskever had in the months before and shortly after OpenAI's formation. In June 2015, Musk agreed with Altman to "have an ongoing conversation about what work should be open-sourced and what shouldn't." In January 2016, Sutskever proposed and Musk agreed that "[a]s we get closer to building AI, it will make sense to start being less open. The Open in [O]penAI means that everyone should benefit from the fruits of AI after it[']s built, but it's totally OK to not share science."

26.     OpenAI's mission, as stated in the OpenAI, Inc. Charter, is to "ensure that artificial general intelligence . . . benefits all of humanity." The Charter recognizes that "to be effective at addressing AGI's impact on society, OpenAI must be on the cutting edge of AI capabilities."

27.     OpenAI was, and has remained, committed to its mission.

## B.  OpenAI's founders, including Musk, consider a restructuring to facilitate furtherance of the mission

28.     OpenAI's founders knew the project of developing AGI that benefits humanity would require significant funding. Musk was especially attuned to this reality. When his co-founders proposed raising an initial $100 million, Musk insisted instead they "say that we are starting with a $1B funding commitment." That commitment, Musk assured, would come from him. If others did not come through, he would "cover what anyone else doesn't provide."

29.     Early research advances by OpenAI and others soon revealed that OpenAI would need much more than even the $1 billion Musk had pledged to advance its mission. The initial insight came from OpenAI's development of technology for a competitive video game, Dota, which showed that more computing power—"compute"—with a general learning algorithm yielded better

performance seemingly without limit. Compute was thus identified as a key to progress toward AGI, and its costs would run in the billions of dollars annually.

30.     To attract the capital needed to advance the mission, OpenAI's founders began considering an organizational change that would allow supporters not just to donate, but to invest. Musk endorsed the change. In mid-2017, he observed that the nonprofit structure "may not be the right one now," and suggested that China's evident intent to "do whatever it takes to obtain what [OpenAI] develop[ed]" favored a determination to "change course." When, in August 2017, OpenAI's technology beat one of the world's best players in Dota 1v1, Musk declared it the "triggering event" signaling it was "[t]ime to make the next step for OpenAI."

31.     But Musk wanted more than an organizational change that would better advance OpenAI's mission. He wanted control, for himself.

32.     Altman, Brockman, and Sutskever agreed with Musk that it was time to create a for-profit entity. They envisioned a collaborative approach to the new entity.

33.     Musk had a different idea. He demanded sole control of the new for-profit, at least in the short term: He would be CEO, own a majority equity stake, and control a majority of the board. He would—in his own words—"unequivocally have initial control of the company." Musk explained to Brockman and Sutskever that he needed the lion's share of the economic interest in the contemplated for-profit enterprise because he required $80 billion to create a self-sustaining colony on Mars.

34.     Musk began implementing his plan. He directed his personal wealth manager, Jared Birchall, to incorporate a Delaware public benefit corporation called "Open Artificial Intelligence Technologies, Inc." The certificate was registered on September 15, 2017.

35.     But Altman, Brockman, and Sutskever refused to accept a venture dominated by Musk. As Sutskever explained to Musk in an email copying Brockman and Altman, an "AGI dictatorship" would be inconsistent with OpenAI's mission: "You stated that you don't want to control the final AGI, but during this negotiation, you've shown to us that absolute control is extremely important to you . . . . The goal of OpenAI is to make the future good and to avoid an

AGI dictatorship . . . So it is a bad idea to create a structure where you could become a dictator if you chose to, especially given that we can create some other structure that avoids this possibility."

36.     Musk was incensed. If he could not control the contemplated for-profit entity, he would not participate in it: "Guys, I've had enough. This is the final straw. Either go do something on your own or continue with OpenAI as a nonprofit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding for you to create a startup. Discussions are over."

37.     Discussions were not over—nor were Musk's efforts to dominate OpenAI for his own ends. In late 2017 and again in early 2018, Musk proposed to absorb OpenAI into Tesla. This "for-profit pivot" would allow OpenAI to use "Tesla as its cash cow." In Musk's view, without this move OpenAI was doomed to fail: "OpenAI is on a path of certain failure relative to Google. There obviously needs to be immediate and dramatic action or everyone except for Google will be consigned to irrelevance. . . Either we fix things and my engagement increases a lot or we don't and I will drop to near zero and publicly reduce my association. I will not be in a situation where the perception of my influence and time doesn't match the reality."

38.     Musk declared: "Tesla is the only path that could even hope to hold a candle to Google."

39.     Altman, Brockman, and Sutskever disagreed. Committing AGI's development to a Musk-controlled entity was not, in their view, consistent with OpenAI's mission. So they declined.

**C.  Musk parts ways with OpenAI**

40.     Musk's withdrawal from OpenAI in February 2018 was noisy but relatively amicable. Musk resigned from OpenAI's board to focus on the only AGI development path he deemed viable: Tesla AI. During the final all-employee meeting he attended, Musk reiterated his view that OpenAI needed to raise billions of dollars a year to be a plausible competitor to DeepMind, and encouraged the organization to pursue that funding however it could.

41.     Though Musk facilitated a few more contributions to OpenAI, Inc., he never honored the $1 billion pledge he'd made upon OpenAI's launch.

### D. <u>OpenAI forms a capped-profit subsidiary to raise needed capital</u>

42.    Musk had declared that without "billions per year immediately," OpenAI would fail in its mission. That pronouncement reflected both the astronomical increases in AI compute demands since OpenAI's founding, and the rising cost of retaining and attracting top talent in an increasingly competitive AI field.

43.    OpenAI's generative pre-trained transformer model GPT-1, released in mid-2018, was a tremendous achievement. But its capabilities, and the resources required to train it, would be dwarfed by later models, and its launch marked a new phase of exponential growth in the demand for compute to support and develop emerging AI technology. GPT-3, released in 2020, would require over *17,000 times* the computing power required to develop GPT-1.

44.    Demand for scarce top talent in the AI industry had increased exponentially as well, particularly as more well-resourced companies joined the serious pursuit of AGI. Musk recognized this better than anyone. In 2017, Musk caused top AI engineers from OpenAI to be seconded to Tesla so they could impart scarce AI learning to Tesla employees. He even poached one of those OpenAI engineers for Tesla and, as he separated from OpenAI, sought (unsuccessfully) to recruit more.

45.    Through 2018, Altman kept Musk apprised of OpenAI's fundraising efforts, and OpenAI's board considered an organizational change that would attract $10 billion—the amount that Altman, Brockman, and Sutskever estimated would be required to develop AGI—while preserving and protecting the mission.

46.    The change the board ultimately approved was the creation of a "capped" for-profit entity, OpenAI, L.P. The new for-profit was bound to pursue the nonprofit's mission and subject to the control of the OpenAI, Inc. board, but presented investors and employees with the opportunity to participate in any profits OpenAI's operations might ultimately yield. These participation interests were "capped"—their holders could see returns up to a certain fixed point, with any residual profits flowing to the nonprofit. This capped-profit structure remains in place today.

47.     The creation of the capped-profit entity was no secret. Brockman, Sutskever, and OpenAI announced it in a blog post in early March 2019. Musk had advance notice; he was offered, and declined, equity in the new entity. The day the blog post went live, Musk asked Altman to make clear to others that he had "no financial interest in the for-profit arm of OpenAI."

48.     Musk raised no objection to the formation of OpenAI, L.P.

**E.   OpenAI flourishes and advances the mission without Musk**

49.     The same year it was created, OpenAI, L.P. was able to raise $1 billion from Microsoft Corporation, as part of a deal to supply OpenAI with needed compute. From there, OpenAI's technological breakthroughs and public exposure accelerated dramatically.

50.     OpenAI's launch of GPT-3 in June 2020 was recognized as an enormous "leap forward" marking a "pivotal moment when the world started acknowledging [the] groundbreaking technology" of generative AI.[1]

51.     OpenAI began making its models available to developers and institutional users through an application programming interface, or "API." In August 2021, OpenAI released through the API a revolutionary model called "Codex," which was capable of interpreting simple, natural language commands and executing them in dozens of programming languages. OpenAI's coding model was integrated in GitHub's AI tool, Copilot, making it available to a much broader user base. Copilot—powered by OpenAI technology—prompted praise from Musk, who noted on Twitter, "Nice work by OpenAI[,] [i]t is hard to do useful things."

52.     In November 2022, OpenAI launched ChatGPT, an updated model with an online chat interface allowing users to interact with the model in a conversational way. ChatGPT introduced the public to the power of generative AI—and OpenAI's models—on an unprecedented scale. Hundreds of millions use ChatGPT for free every week.

53.     In March 2023, OpenAI released GPT-4, a model hailed as a "stunning" technological advancement that "promise[d] to blow previous iterations [of OpenAI's models] out

---

[1] Bernard Marr, *A Short History Of ChatGPT: How We Got To Where We Are Today*, Forbes (Mar. 19, 2023), https://www.forbes.com/sites/bernardmarr/2023/05/19/a-short-history-of-chatgpt-how-we-got-to-where-we-are-today/.

of the water, potentially changing the way we use the internet to work, play and create."[2] Bill Gates went so far as to describe GPT-4 as "the most important advance in technology since the graphical user interface" was first developed in 1980.[3]

54.    Through these releases of increasingly useful products, OpenAI has defined the now industry-standard principle of "iterative deployment," which allows for the gathering of information about AI technology that cannot be gained in the lab alone. Making AI tools available to the public is a crucial means of learning how users interact with AI systems and the practical strengths and weaknesses of those systems. It also facilitates understanding of and adaptation to new AI capabilities.

**F.    Musk begins his attacks on OpenAI while quietly building a competitor**

55.    Over and over in OpenAI's early years, Musk predicted that the enterprise would fail unless it bowed to his vision, his plans, and his control. Around the time of his resignation from the OpenAI board, Musk declared OpenAI was "on a path of certain failure relative to Google"; "should assume failure"; and was "on a path to be irrelevant." Musk's "probability assessment of OpenAI being relevant to [competitors] without a dramatic change in execution and resources" was, he announced, "0%." "Not 1%." OpenAI was in Musk's estimation "not a serious counterweight to DeepMind/Google and will only get further behind." All this was "obvious," said Musk.

56.    Yet here was OpenAI, a few years later, pursuing its mission with more success than any other actor in the field, proving Musk wrong.

57.    Musk could not abide it.

58.    So he set in motion a campaign of harassment, interference, and misinformation designed to take down OpenAI and clear the field for himself.

---

[2] Samantha Murphy Kelly, *5 jaw-dropping things GPT-4 can do that ChatGPT couldn't*, CNN (Mar. 16, 2023), https://www.cnn.com/2023/03/16/tech/gpt-4-use-cases/index.html.

[3] Kif Leswing, *Bill Gates says OpenAI's GPT is the most important advance in technology since 1980*, CNBC (Mar. 21, 2023), https://www.cnbc.com/2023/03/21/bill-gates-openai-gpt-most-important-advance-in-technology-since-1980.html.

59.     In March 2023, Musk quietly created a new AI development company, Counterclaim Defendant xAI. He incorporated xAI as a for-profit public benefit corporation in Nevada, but made no public announcement of his intentions to launch a competitor at the time. That would come only months later.

60.     Meanwhile, days after the clandestine incorporation of his nascent competitor, Musk noisily supported a six-month "moratorium" on development of AI any more advanced than OpenAI's just-released GPT-4—which Musk warned posed "profound risks to society and humanity." The effect of this "moratorium" would have been to stall OpenAI while all others, most notably Musk, caught up.

61.     A few weeks later, Musk's personal lawyer contacted OpenAI and demanded access to OpenAI's confidential and commercially sensitive internal documents. Feigning concern as a former donor and director of OpenAI, and without ever disclosing he was building a competitor in secret, Musk framed his request as wanting to ensure OpenAI was not being taken advantage of or corrupted by Microsoft. When OpenAI sought to place customary restrictions on the use of the information sought, Musk's lawyer threatened that OpenAI would "regret this conversation" because Musk wanted the documents right away.

62.     Just two weeks after gaining access to the information he had sought, Musk denigrated OpenAI on national television and insinuated that its partnership with Microsoft was improper.[4]

63.     Not until July 12, 2023 did Musk finally announce publicly the formation of xAI. Musk had used the months between quiet incorporation and public announcement to recruit researchers with the promise of creating a rival to OpenAI.

64.     In November 2023, after Altman was briefly removed and reinstated as OpenAI's CEO, Musk again sought to destabilize the organization. On November 21, 2023, the day the agreement was reached to accomplish Altman's return, Musk posted to his more than 200 million

---

[4] *See Elon Musk on Sam Altman and ChatGPT: I am the reason OpenAI exists*, CNBC (May 15, 2023), https://www.cnbc.com/video/2023/05/16/elon-musk-on-sam-altman-and-chatgpt-i-am-the-reason-openai-exists.html.

CASE No. 4:24-CV-04722-YGR
OPENAI DEFENDANTS' AMENDED
COUNTERCLAIMS, ANSWER, AND DEFENSES

X followers a link to a letter purporting to come from disgruntled OpenAI employees, but widely recognized as a hoax. The letter accused Altman and Brockman of a "disturbing pattern of deceit and manipulation," and of having silenced or sidelined employees. On the basis of the fake letter, Musk added his own commentary, designed to increase his competitor's jeopardy: "These seem like concerns worth investigating."

**G.  Musk takes his harassment campaign to courts and regulators**

65.    Having failed to impede OpenAI's progress and pursuit of its mission, Musk intensified his attacks—this time using the courts and a parallel, carefully coordinated media campaign.

66.    On February 29, 2024, Musk sued Altman, Brockman, OpenAI, Inc., OpenAI, L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, and OpenAI Holdings, LLC in California Superior Court. In his headline claim, Musk asserted that OpenAI, Inc.'s Certificate of Incorporation, an email exchange he had with Altman in 2015 brainstorming an AI lab, and a blog post together comprised an enforceable written contract—a "Founding Agreement" in which all of the defendants purportedly promised Musk they would conduct their operations in ways that Musk (helming a direct competitor) preferred: open-sourcing all their latest technology and refraining from licensing it to Microsoft. Musk immediately began tweeting about the lawsuit, broadcasting to his enormous audience that "OpenAI is a house of cards."

67.    Defendants in the Superior Court action filed a demurrer, arguing that none of Musk's claims could stand. With the demurrer fully briefed, argument was set for 10 a.m. PT on June 12, 2024. Rather than defend his claims, Musk, through counsel, informed defendants at 11:40 a.m. PT on June 11, 2024 that he was withdrawing his lawsuit. No explanation was offered.

68.    Two months later, Musk filed this federal action with new counsel. Musk's action—as it has shifted shape in the ensuing months—now includes new plaintiffs xAI and former OpenAI director and Musk associate Shivon Zilis, as well as new defendant Microsoft. And it now asserts a sprawling array of theories: antitrust violations, false advertising, fiduciary breach, fraud, contract and charitable trust breach, and even racketeering. The filing of the federal suit was accompanied

by another media blast, this time from Musk's current counsel, who called the withdrawn state-court action a "Goldfish" that "lacked teeth"[5] but said the new one (based on the same factual narrative) was a "Great White."[6]

69. Around the same time he filed this action, Musk demanded that regulators investigate OpenAI. He sent several letters to the Attorneys General of California and Delaware, encouraging them to take action against OpenAI—most explosively, to force OpenAI, Inc., without legal basis, to auction off its assets for the benefit of Musk and his associates.

**H. Musk intensifies his attacks on OpenAI and grows xAI**

70. Meanwhile, Musk supercharged his public attacks on OpenAI. Using his social-media platform, X, he unleashed a barrage of invective against the enterprise and its leadership, variously describing OpenAI as a "digital Frankenstein's monster," "a lie," "evil," and a "a total scam."

71. At the same time, Musk has been wielding his ever-growing influence and the web of companies under his control to turn xAI into a major player in a highly competitive industry—one that is raising capital at unprecedented speed and scale.[7] Two weeks ago, xAI announced that its valuation is now $80 billion, and that it had acquired X. The acquisition gives xAI unprecedented direct access to all the user data flowing through the platform formerly known as Twitter—and therefore a major competitive advantage in an industry dependent on such data for model training.

72. At Musk's direction, xAI built in three months what is believed to be the world's largest supercomputer, dubbed "Colossus." The project used 100,000 next-generation NVIDIA

---

[5] *See* Cade Metz, *Elon Musk Revives Lawsuit Against OpenAI and Sam Altman*, N.Y. Times (Aug. 5, 2024), https://www.nytimes.com/2024/08/05/technology/elon-musk-openai-lawsuit.html; Mike Scarcella, *Elon Musk Taps Copyright Law Vet Toberoff for OpenAI Lawsuit*, Reuters (Aug. 7, 2024), https://www.reuters.com/legal/litigation/elon-musk-taps-copyright-law-vet-toberoff-openai-lawsuit-2024-08-07/.

[6] *See* Scarcella, *supra* note 5.

[7] Meghan Bobrowsky, Berber Jin & Tom Dotan, *Inside Elon Musk's Quest to Beat OpenAI at its Own Game*, The Wall Street Journal (Nov. 27, 2024), https://www.wsj.com/tech/ai/elon-musk-x-open-ai-03ff1ead.

GPU chips, some of which Musk diverted from Tesla. Musk reportedly plans a "tenfold" expansion of "Colossus" to "incorporate more than 1 [million] graphics processing units . . . to leap ahead of rivals," including OpenAI.[8]

## I.    OpenAI considers a restructuring

73.    While Musk was ginning up lawsuits and press campaigns and provoking regulators, OpenAI's board was focused on its mission. As part of that work, it was considering whether the mission might best be served by a further evolution of OpenAI's structure.

74.    With companies like Google, Amazon, Meta, and now xAI pouring billions into AI development and competing with OpenAI for scarce compute, OpenAI's capital needs have become more pressing than ever. Training GPT-4, which OpenAI released in 2023, required *67 times* more computing power (measured in petaFLOPS) than GPT-3, released just three years prior, and nearly *1.2 million times* more than GPT-1, released in 2018. The demands and the costs are only rising. So too are the demands for, and costs of, retaining and attracting scarce top talent in the field.

75.    OpenAI's current structure poses challenges in attracting new investment and retaining and attracting highly skilled personnel. Every one of OpenAI's significant competitors has a familiar corporate structure that allows for offers of conventional equity—an attraction not just for investors contemplating multi-billion-dollar commitments but for current and prospective employees who want a stake in the enterprise they're helping to build. The profit interests in OpenAI's capped-profit are less familiar.

76.    The challenges OpenAI faces are reflected in its most recent fundraising rounds, in which investors have insisted on conditions freeing them from certain funding commitments or allowing redemption of invested funds with interest in the event OpenAI fails to simplify its capital structure.

77.    Given these challenges, and the threat they pose to the pursuit of the mission, OpenAI's board has for many months been considering *not* a "conversion" of the nonprofit into a

---

[8] *See* Stephen Morris and Tabby Kinder, *Elon Musk plans to expand Colossus AI super-computer tenfold*, Financial Times (Dec. 4, 2024).

for-profit entity—as Musk has falsely and repeatedly claimed—but a structure change in which the nonprofit would continue to exist and pursue its mission of ensuring that AGI benefits all of humanity, while the capped-profit would become a public benefit corporation ("PBC") serving the exact same mission but also having accountability to investors and employees. The nonprofit would exchange its current economic interest in the capped-profit entity for an equity stake in the PBC—thus sharing in the PBC's financial success while pursuing mission-advancing projects.

78.   Any decision to restructure will have been made following extensive deliberation by a well-qualified board. In addition to Altman, the current board comprises the following directors:

    a.   Bret Taylor (Chair), who led Twitter's board of directors before and during its acquisition by Musk and is former co-CEO of Salesforce and former Chief Technology Officer of Facebook;

    b.   Adam D'Angelo, CEO and co-founder of Quora;

    c.   Dr. Sue Desmond-Hellmann, former CEO of the Bill & Melinda Gates Foundation, former Chancellor of the University of California at San Francisco, and current director of Pfizer Corporation;

    d.   Paul Nakasone, a retired U.S. Army General and leading expert in cybersecurity, technology advancement, and global cyber defense who once led the National Security Agency;

    e.   Nicole Seligman, former Executive Vice President and Global General Counsel of Sony Corporation and former President of Sony Entertainment;

    f.   Larry Summers, a former President of Harvard University and former Secretary of the U.S. Treasury;

    g.   Zico Kolter, Director of the Machine Learning Department at Carnegie Mellon University; and

    h.   Adebayo Ogunlesi, Founding Partner, Chairman, and CEO of Global Infrastructure Partners, a leading infrastructure investing platform, and a Senior Managing Director at BlackRock.

79.     If a restructuring designed to serve the advancement of the mission is halted, the mission will be impaired. OpenAI's competitors—entities like Musk's xAI that do not share OpenAI's mission—will benefit.

**J.   Musk seeks to enjoin the possible restructuring and much of OpenAI's business, then makes a sham bid for the nonprofit's assets**

80.     The prospect of a possible restructuring became public in or about the fall of 2024. Never one to miss an opportunity, Musk, on November 29, 2024, sought emergency relief to stop it from happening—and, for good measure, to halt large swaths of OpenAI's business activities.

81.     The supposed predicate for this preliminary injunction motion was long-ago donations of approximately $40 million Musk claims to have made to OpenAI—funding provided before Musk decided to abandon OpenAI and the $1 billion pledge he'd made at the enterprise's founding.

82.     The Court heard argument on Musk's motion on February 4, 2025 and reserved ruling.[9]

83.     Before the Court could rule, Musk turned immediately to other means. On February 10, 2025, Musk's litigation counsel sent a "Letter of Intent" to OpenAI's board on behalf of a consortium of private investors—including xAI, Baron Capital Group, Inc., Valor Management LLC, Atreides Management, LP, Vy Fund III, L.P., Emanuel Capital Management, LLC, Eight Partners VC, LLC, and others who remain unidentified. The letter purported to offer $97.375 billion for the purchase of OpenAI, Inc.'s assets.

84.     Before the letter even reached OpenAI's board, Musk's counsel set about building maximum buzz and maximum disruption for OpenAI. He provided the letter to the *Wall Street Journal* (where the story appeared on the front page), and the "bid" dominated international news for days.

---

[9] The Court ultimately denied Musk's preliminary injunction motion in its entirety on March 4, 2025, finding Musk had failed to meet his burden of proof in seeking such "extraordinary relief." *See* Order Denying Motion for a Preliminary Injunction, Dkt. 121 at 1 (Mar. 4, 2025).

85.     After studying Musk's stunt, savvy media commentators recognized it as a sham, variously describing Musk's "bid" as "less [] a serious effort to take control of OpenAI than as a gambit" to interfere with OpenAI's contemplated corporate reorganization;[10] a "spoiler" aimed at disrupting OpenAI's fundraising and reorganization efforts;[11] and a "wrecking ball against an opponent" and rival.[12]

86.     Among other things, the letter included no evidence of financing to pay the nearly $100 billion purchase price, which the letter described as based on OpenAI's "historical financial results" and "projections." OpenAI has never disclosed financial "projections" publicly or provided them to Musk or any of the other investors named in the letter. None of the investors had conducted any diligence on the business.

87.     The investors who backed the purported takeover bid are close confederates of Musk, some with large stakes in Musk-founded companies including Tesla, SpaceX, The Boring Company, X, and Neuralink.

88.     When asked about the bid on *CNBC*, Ron Baron, one of the investors backing Musk and a longtime Musk booster and major investor in Musk's businesses, became flustered. He then admitted he'd done very little work on the project, hadn't been following it closely, and had only committed $5 million (or 0.00513% of the alleged bid price), which he first claimed to have done in his personal capacity—even though the letter was signed on behalf of his fund. Baron went on to suggest that the point of the bid, as pitched to him (plainly by Musk) was not to buy OpenAI's assets, but instead to obtain "discovery" and get "behind the wall" at OpenAI.

---

[10] Scott Rosenberg, *Musk lawyers say he'll drop bid for OpenAI if it gives up for-profit plan*, Axios (Feb. 13, 2025), https://www.axios.com/2025/02/13/musk-altman-openai-nonprofit-filing.

[11] *Elon Musk's $97bn offer is a headache for Sam Altman's OpenAI*, The Economist (Feb. 11, 2025), https://www.economist.com/business/2025/02/11/elon-musks-97bn-offer-is-a-headache-for-sam-altmans-openai.

[12] Chris Stokel-Walker, *Elon Musk owning OpenAI would be a terrible idea. That doesn't mean it won't happen*, The Guardian (Feb. 12, 2025), https://www.theguardian.com/commentisfree/2025/feb/12/elon-musk-owning-openai-trump-ai-sam-altman.

89.     The purchase price noted in the Letter of Intent was a joking reference to 974 Praf, a character in Iain Banks' science fiction series, *Look to Windward*, from which Musk has also drawn names for multiple SpaceX rockets.[13]

90.     Although OpenAI recognized the bid as a feint, its mere existence—and the media firestorm surrounding it—required OpenAI to expend significant resources in responding to it. Following news of Musk's move, OpenAI's board engaged in the formal process of reviewing and assessing the "bid." This entailed convening a discussion of the Letter of Intent and consideration of next steps in the event Musk's attempts to gain control of OpenAI escalated. It further entailed commissioning legal and financial analyses of the bid's purported "terms" and soliciting briefing from high-level OpenAI employees to inform the board's deliberations.

91.     On February 14, 2024, OpenAI's board unanimously rejected Musk's purported overture.

## K.  Musk's campaign has already injured OpenAI and poses a threat to its economic relationships

92.     OpenAI is a resilient organization. It has succeeded where Musk said it could only fail. But the enterprise and its people have suffered harm as a result of Musk's unlawful campaign of harassment, interference, and misinformation. And those actions threaten further, irreparable harm.

93.     Every phase of Musk's campaign has been designed to force OpenAI to divert resources, expend money, or both. From countering Musk's false statements and other public attacks; to addressing Musk's pretextual corporate records demand; to defending against harassing, withdrawn-at-the-last-minute legal claims; to countering Musk's repeated lies and mischaracterizations intended to damage OpenAI's reputation; to responding to the sham bid for OpenAI, Inc.'s assets, OpenAI has borne costs, and been harmed, by Musk's abusive tactics and unrelenting efforts to mislead the public for his own benefit and to OpenAI's detriment and the detriment of its mission.

---

[13] *See* Stokel-Walker, *supra* note 12.

94.     Musk's most recent ploy, pretending to try to take over OpenAI, threatens a more serious toll—on OpenAI's ability to govern itself in service of the mission, on its relationships with investors, on its relationships with employees, and ultimately on advancement of the mission to develop AGI for the benefit of all humanity.

95.     The February 10, 2025 Letter of Intent did not so much as acknowledge OpenAI's mission; it was a naked effort to disrupt the board's consideration of a potential restructuring and sow confusion among employees and potential investors. An important procedural aspect of a corporate reorganization of OpenAI may be a valuation of OpenAI, Inc.'s interests in the capped-profit entity. With no involvement in OpenAI's valuation process, Musk—through xAI and its consortium of Musk-associated private investors—has now purported to put a price on OpenAI, Inc.'s assets. Musk's counsel even announced that the "investor group is prepared to match or exceed any bids higher than their own."[14] This very public effort to artificially "raise[] the floor for the nonprofit's valuation"[15] has already caused confusion, and were it (or something like it) pursued further, the consequence could be a significant impairment of OpenAI's ability to pursue its mission on terms uncorrupted by unlawful harassment and interference.

96.     Musk's takeover threats could also imperil OpenAI's relationships with investors and have already made maintenance of those business relationships more costly and burdensome. The February 10, 2025 Letter of Intent came at a time when, as Musk knew, OpenAI was engaged in an extremely competitive process to raise funds. Commentators have noted that the specter of a Musk-dominated OpenAI could "frighten[] potential investors and increase OpenAI's cost of

---

[14] Jessica Toonkel and Berber Jin, *Elon Musk-Led Group Makes $97.4 Billion Bid for Control of OpenAI*, The Wall Street Journal (Feb. 10, 2025), https://www.wsj.com/tech/elon-musk-openai-bid-4af12827.

[15] Allison Morrow, *What Elon Musk's $100 billion bid for OpenAI is really all about*, CNN (Feb. 12, 2025), https://www.cnn.com/2025/02/12/business/musk-altman-openai-nightcap/index.html.

capital" in an extremely competitive and capital-intensive market.[16] That is precisely what Musk is seeking to achieve: to "derail[] efforts" to raise money from existing and new investors.[17]

97.    That motive was on display earlier this year. In January 2025, when OpenAI, Oracle, and Softbank announced their new Stargate venture—which President Trump heralded as an unprecedented investment in "colossal data centers" that will yield hundreds of thousands of jobs and push the frontiers of scientific discovery—Musk immediately sought to cast doubt on the project's viability. In private, trying to strangle the venture in the cradle, Musk encouraged any investor who would listen not to invest in Stargate.

98.    Musk has engaged in these efforts to slow OpenAI's progress and impair its ability to compete effectively in an increasingly crowded field, but also to seize and maintain for xAI an unearned edge designed to impair competition more broadly for the sole benefit of Musk's xAI, at the expense of the public interest.

99.    Meanwhile, for OpenAI employees all too familiar with the fallout at Twitter/X, the prospect of a Musk takeover means chaos and arbitrary employment action. Within six months of buying Twitter, Musk fired more than 6,000 of its employees, eliminating approximately 80% of the company's workforce, while refusing to pay required severance.

100.    Still worse, the threat of a Musk takeover is a threat to the very mission of building beneficial AGI—the mission to which OpenAI employees are dedicated. Musk's safety, security, and misinformation record is dismal. According to a study that evaluated the "risk-management practices of top AI companies," "the worst offender" in terms of "inadequate safety measures" was "Elon Musk's xAI." xAI received a total score of 0/5 in this study because it has "barely published anything about risk management."[18] xAI's Grok has also become a leading spreader of misinformation and inflammatory political rhetoric. Just recently, Grok was reported to have

---

[16] Stephanie Palazzolo and Rocket Drew, *The Strategy Behind Musk's $97 Billion Bid for OpenAI*, The Information (Feb. 11, 2025), https://www.theinformation.com/articles/the-strategy-behind-musks-97-billion-bid-for-openai.

[17] *See Elon Musk's $97bn offer is a headache for Sam Altman's OpenAI*, *supra* note 11.

[18] Andrew R. Chow, *Some Top AI Labs Have 'Very Weak' Risk Management, Study Finds*, Time (Oct. 2, 2024), https://time.com/7026972/saferai-study-xai-meta/.

provided users with "detailed instructions on how to make chemical weapons of mass destruction," complete with "full list[s] of suppliers" and "[d]etailed instructions on how to get the needed materials."[19] Users also discovered that Grok would "consistently say that President Donald Trump and Musk deserve the death penalty"—a phenomenon xAI representatives themselves described as a "really terrible and bad failure."[20]

101.    The risk of future, irreparable harm from Musk's unlawful conduct is acute, and the risk that that conduct continues is high. With every month that has passed, Musk has intensified and expanded the fronts of his campaign against OpenAI, and has proven himself willing to take ever more dramatic steps to seek a competitive advantage for xAI and to harm Altman, whom, in the words of the President of the United States, Musk "hates."[21]

---

[19] Noor Al-Sibai, *Elon's Grok 3 AI Provides "Hundreds of Pages of Detailed Instructions" on Creating Chemical Weapons*, Futurism (Feb 25, 2025), https://futurism.com/elon-musk-grok-3-chemical-weapons.

[20] Kyle Wiggers, *Grok 3 appears to have briefly censored unflattering mentions of Trump and Musk*, TechCrunch (Feb. 23, 2025), https://techcrunch.com/2025/02/23/grok-3-appears-to-have-briefly-censored-unflattering-mentions-of-trump-and-musk/.

[21] *See* Max Chafkin, *Musk Can't Help Bringing His Rivalries to the White House*, Bloomberg (Jan. 24, 2025), https://www.bloomberg.com/news/newsletters/2025-01-24/elon-musk-sam-altman-feud-plays-out-in-trump-white-house-over-stargate.

**FIRST CLAIM FOR RELIEF**

**Unfair Competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.***

**(By OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC against Musk and xAI)**

102.    Counterclaim Plaintiffs re-allege and incorporate by reference each of Paragraphs 1 through 101 as though fully set forth herein.

103.    Counterclaim Defendants intentionally engaged in unfair and fraudulent business practices by orchestrating a sham bid to purportedly acquire Counterclaim Plaintiff OpenAI, Inc.'s assets.

104.    On February 10, 2025, Musk's counsel announced to the media that he had sent a letter on behalf of a group of private investors, led by Musk in his capacity as CEO of xAI, to OpenAI, Inc.'s board of directors. The letter purported to make a bid to purchase Counterclaim Plaintiff OpenAI, Inc.'s assets for $97.375 billion.

105.    Counterclaim Defendants' bid was a sham designed to disrupt Counterclaim Plaintiffs' operations and to gain an unfair business advantage.

106.    Many of the investors who participated in the purported takeover bid are close associates of Musk whose economic fortunes have turned in large part on the success of Musk-founded companies. One of those investors admitted to the lack of valuation analysis supporting the bid. The bid did not evidence any available financing to support the purported purchase price, and the proposed purchase price for Counterclaim Plaintiff OpenAI, Inc.'s assets had no discernible basis other than a comedic reference to Musk's favorite sci-fi series.

107.    The purpose of the bid was to hinder Counterclaim Plaintiffs in their ability to compete by impeding their ability to raise capital; complicating the process for undertaking any corporate reorganization; introducing unwarranted complexity into the process for valuing assets; attempting to interfere with Counterclaim Plaintiffs' relationships with current and prospective investors; and attempting to interfere with Counterclaim Plaintiffs' business relationships with employees and API developers, including by raising the prospect of working and/or partnering with a Musk-affiliated entity with no strong commitment to OpenAI's mission or to AI safety. These concerns are particularly acute in light of the Counterclaim Defendants' stated intent to wage a

bidding war for Counterclaim Plaintiff OpenAI, Inc.'s assets, which was intended to cast a pall of uncertainty over Counterclaim Plaintiffs' commercial future.

108.    Counterclaim Defendants' intent to undermine OpenAI through this sham bid is further confirmed by the bid's timing; the bid was announced when public reporting indicated that OpenAI's board was actively, and intensively, deliberating on a potential structure change while in discussions with both the Delaware and California Attorneys General, such that the bid's announcement at that time was evidently intended to be maximally disruptive.

109.    Counterclaim Defendants' sham bid is an unfair business practice because it was intended to disrupt Counterclaim Plaintiffs' operations for the purpose of impairing Counterclaim Plaintiffs' ability to raise funds and effectively compete in the nascent market to develop AI technologies. The purpose of this unfair business practice was to enhance the position of Counterclaim Defendants in the market by reducing competition from Counterclaim Plaintiffs, thus amounting to an incipient violation of federal and/or California antitrust law and/or a violation of the policy and spirit of those antitrust laws, as the effect of the sham bid was to threaten to reduce lawful competition in the market.

110.    Counterclaim Defendants' sham bid is a fraudulent business practice because the purpose of the bid was to deceive members of the public that Counterclaim Defendants' true intentions were to acquire Counterclaim Plaintiff OpenAI, Inc.'s assets for $97.375 billion, rather than to disrupt Counterclaim Plaintiffs' operations and interfere with its business relationships.

111.    As a direct and proximate result of Counterclaim Defendants' sham bid, Counterclaim Plaintiffs were forced to bear substantial costs and have thus suffered injuries in fact and lost money or property, including, without limitation, resources expended in hiring advisors to evaluate and respond to the bid and costs associated with the diversion of Counterclaim Plaintiffs' employees' time to respond to the bid.

112.    There is a substantial probability that Counterclaim Defendants' unfair and fraudulent conduct will recur in the absence of preliminary and permanent injunctive relief, as Counterclaim Defendants' sham bid is only the latest episode in a years-long campaign of harassment against Counterclaim Plaintiffs, which has also involved, among other things, calling

for a "moratorium" on the development of advanced AI technology for purposes of stalling Counterclaim Plaintiffs' progress and benefitting Counterclaim Defendants' rival AI company; issuing a pretextual and deceptive records demand for the purpose of gathering and distorting competitively-sensitive information about Counterclaim Plaintiffs; repeatedly disparaging Counterclaim Plaintiffs on false and derogatory grounds, including on Counterclaim Defendants' X platform to an audience of hundreds of millions; and filing and belatedly withdrawing  legal claims for purposes of harassing Counterclaim Plaintiffs.

113.    Counterclaim Defendants' motivation in conducting this harassment campaign has been to impose costs on Counterclaim Plaintiffs and disrupt their operations for the ultimate purpose of undermining Counterclaim Plaintiffs' ability to compete in the nascent market for AI technologies, and enhancing Counterclaim Defendants' competitive position in that market.

114.    Thus, as a direct and proximate consequence of Counterclaim Defendants' conduct, acts, and/or omissions in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Counterclaim Plaintiffs have been and will continue to be harmed and are entitled to restitution, prejudgment interest, and preliminary and permanent injunctive relief from any further unfair or fraudulent business practices as provided in Cal. Bus. & Prof. Code § 17203.

**SECOND CLAIM FOR RELIEF**

**Tortious Interference with Prospective Economic Advantage**

**(By OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC against Musk and xAI)**

115.    Counterclaim Plaintiffs re-allege and incorporate by reference each of Paragraphs 1 through 114 as though fully set forth herein.

116.    At all times relevant to this action, Counterclaim Plaintiffs have maintained economic relationships with (1) third-party investors, (2) employees, and (3) customers that were or are likely to yield future and continued benefits to Counterclaim Plaintiffs.

117.    Counterclaim Defendants knew of these economic relationships and the probability of continued benefits to Counterclaim Plaintiffs.

118.    Counterclaim Defendants intentionally engaged in actions designed to disrupt Counterclaim Plaintiffs' economic relationships and did in fact disrupt those relationships.

119.    Specifically, on February 10, 2025, Musk's counsel announced to the media that he had sent a letter on behalf of a group of private investors, led by Musk in his capacity as CEO of xAI, to OpenAI, Inc.'s board of directors. The letter purported to make a bid on behalf of a consortium of named and unnamed private investors to purchase Counterclaim Plaintiff OpenAI, Inc.'s assets for $97.375 billion.

120.    Counterclaim Defendants' purported bid was a sham designed to disrupt Counterclaim Plaintiffs' economic relationships.

121.    The bid was intended to disrupt Counterclaim Plaintiffs' relationships with current and prospective investors and has rendered the performance of those business relationships more costly and burdensome. Without limitation, the bid complicated the process for undertaking any corporate reorganization, and may ultimately raise Counterclaim Plaintiffs' cost of capital.

122.    On information and belief, the bid was intended to, and did in fact, disrupt Counterclaim Plaintiffs' business relationships with their employees and customers and has rendered the performance of those business relationships more costly and burdensome.

123.    But for the Counterclaim Defendants' sham bid, Counterclaim Plaintiffs likely would have enjoyed the full scope of economic benefits from these business relationships.

124.    As a direct and proximate result of Counterclaim Defendants' wrongful conduct, Counterclaim Plaintiffs have suffered damages in an amount to be proven at trial.

125.    Counterclaim Defendants' conduct was independently wrongful because it constituted an unfair and fraudulent business practice in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (*see* Claim 1).

126.    Counterclaim Defendants engaged in wrongful conduct with malice, oppression, and fraud. Accordingly, Counterclaim Plaintiffs request that punitive damages be awarded in an amount sufficient to sanction this conduct and to deter those who would commit or knowingly seek to profit from similar actions, now or in the future.

127.    In addition to recovering damages, a preliminary and permanent injunction of any further interference with Counterclaim Plaintiffs' economic relationships is warranted because there is no adequate remedy at law for Counterclaim Defendants' tortious interference and the risk of future, irreparable harm is acute, in light of Counterclaim Defendants' years-long pattern of abusive conduct, involving, among other things, calling for a "moratorium" on the development of advanced AI technology to stall Counterclaim Plaintiffs' progress; issuing a pretextual and deceptive corporate records request; filing and withdrawing legal claims for purposes of harassing Counterclaim Plaintiffs; and orchestrating a sham bid to purportedly acquire Counterclaim Plaintiff OpenAI, Inc.'s assets (*see* Claim 1).

1

## ANSWER

2      Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI,

3  L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,

4  OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I,

5  L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup

6  Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP

7  IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup

8  Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and

9  Aestas LLC (the "OpenAI Defendants") hereby answer Counts II (Breach of Implied-in-Fact

10  Contract), III (Breach of Implied Covenant of Good Faith and Fair Dealing), IV (Breach of Quasi-

11  Contract/Unjust Enrichment), VI (Constructive Fraud), VII (Fraud), XVIII (Breach of Charitable

12  Trust), XX (Violations of Federal Civil RICO), and XXI (Conspiracy to Violate Federal Civil

13  RICO) (together, the "Subject Claims")[22] of the Second Amended Complaint of Plaintiffs Elon

14  Musk and X.AI Corp., dated May 22, 2025 (Dkt. No. 170).

15

## NATURE OF THE ACTION

16      1.      Never before has a corporation gone from tax-exempt charity to a $157 billion for-

17  profit, market-paralyzing gorgon—and in just eight years.  Never before has it happened, because

18  doing so violates almost every principle of law governing economic activity.  It requires lying to

19  donors, lying to members, lying to markets, lying to regulators, and lying to the public.  No amount

20  of clever drafting nor surfeit of creative dealmaking can obscure what is happening here.  OpenAI,

21  Inc., co-founded by Musk as an independent charity committed to safety and transparency—and

22  nurtured in its infancy by Musk's money, advice, recruiting efforts and connections—is, at the

23  direction of Altman, Brockman, and Microsoft, fast becoming a fully for-profit subsidiary of

24

---

25  [22] The OpenAI Defendants interpret the Court's Order Granting in Part and Denying in Part
Defendants' Motions to Dismiss First Amended Complaint, Dkt. 163, to require them to answer
26  and move to dismiss Plaintiffs' amended claims in the Second Amended Complaint by June 5,
2025, *id.* at 11. Plaintiffs' amended claims for breach of the implied covenant of good faith and fair
27  dealing (Count III) and for violations of federal civil RICO (Counts XX-XXI) remain subject to a
pending motion to dismiss.

28

Microsoft.  *See infra* ¶¶ 192-200.

**RESPONSE:**   Denied.

2.       Three events occasioned the filing of the FAC.  *First*, the wholesale conversion of OpenAI, Inc. into a for-profit entity, which the original Complaint merely anticipated, *see* Dkt. No. 1 at 30, ¶ 146, is now in full swing.  OpenAI and Microsoft have hired investment banks to negotiate Microsoft's enormous stake and set a hard two-year deadline to complete the conversion.  *See infra* ¶ 193.  *Second*, Microsoft and OpenAI, apparently unsatisfied with their monopoly, or near so, in generative artificial intelligence ("AI") are now actively trying to eliminate competitors, such as xAI, by extracting promises from investors not to fund them.  *See infra* ¶ 199.  *Third*, OpenAI's safety practices have devolved from shambolic at the time of the original Complaint to affirmatively harmful today, with droves of security researchers resigning in protest, or being forced out, and whole safety teams dissolved, all to make way for "security" personnel whose real job is to facilitate military contracting.  *See infra* ¶¶ 73, 191.

**RESPONSE:**   Denied.

3.       Some aspects of Altman, Brockman, and OpenAI's promises to Musk and the public are matters of degree, but the intent and effect of OpenAI's actions to flout those promises are now unambiguous.  No reasonable person could conclude OpenAI is proceeding in good faith as a charity committed to safety and transparency above profit, organized for public rather than private benefit, and working to avoid the undue concentration of powerful AI technology.  Defendants have admitted as much by their commitments to investors to convert OpenAI to a fully for-profit enterprise.

**RESPONSE:**   Denied.

4.       As the original Complaint detailed, Altman, in concert with other Defendants, intentionally courted and deceived Musk, preying on Musk's humanitarian concern about the dangers posed by AI.  *See infra* ¶ 73.  The idea Altman sold Musk was that a non-profit, funded and backed by Musk, would attract world-class scientists, conduct leading AI research and development, and, as a meaningful counterweight to Google's DeepMind in the race for Artificial General Intelligence ("AGI"), decentralize its technology by making it open source.  *See infra* ¶¶

76-84. Altman repeatedly assured Musk and regulators that the non-profit structure guaranteed neutrality and a focus on safety and openness for the benefit of humanity, not shareholder value or individual enrichment. *See infra* ¶¶ 84-88. But after Musk lent his name to the venture as its co-chairman, invested significant time, tens of millions of dollars in seed capital, and recruited top AI scientists for OpenAI, Inc., Musk and the non-profit's namesake objective were betrayed by Altman and his accomplices.

**RESPONSE:**   Denied.

5.      These efforts by Altman and his cohorts to cash in and squeeze others out have their roots in OpenAI's partnership with Microsoft. Together, they established an opaque web of for-profit OpenAI affiliates, the only value of which came from looting OpenAI, Inc. of the intellectual property, employees, and relationships developed by exploiting Musk's name and contributions, the charity's tax status, and the goodwill generated by its supposed philanthropic commitment. *See infra* ¶¶ 111-30. The resulting OpenAI network, in which, on information and belief, Altman, Microsoft, and Brockman hold significant interests, was valued at the time of the original Complaint at an eye-popping $100 billion; in the merely three months since, it has been valued at a staggering $157 billion, making it the second most valuable start-up in American history.

**RESPONSE:**   Denied.

6.      Throughout this process, Altman has engaged in rampant self-dealing, *see infra* ¶¶ 134-43, leveraged Microsoft's stranglehold on OpenAI's most important raw material (computing power) to seize control of its Board, *see infra* ¶¶ 110, 146-59, and joined with Microsoft in a de facto merger to pursue the kinds of anticompetitive conduct for which Microsoft is notorious. *See infra* ¶¶ 131, 145-46, 176, 199-200. Microsoft is now OpenAI, and OpenAI, Microsoft. *See infra* ¶¶ 145-70.

**RESPONSE:**   Denied.

7.      The world has gotten wise to Defendants' scheme: there are several pending lawsuits against OpenAI over its unlawful practices; it is under investigation by Senators and multiple federal agencies (including the Securities and Exchange Commission ("SEC") and the Federal Trade Commission ("FTC")), *see infra* ¶ 180; it is the subject of numerous consumer

advocacy complaints to the Attorney General of California, *see infra* ¶ 181; and a recent spate of OpenAI executives and insiders have blown the whistle on Altman, exposing his unscrupulous maneuvering and self-dealing, while numerous departing AI-safety experts have sounded the alarm. *See infra* ¶¶ 183-90.

**RESPONSE:**   Denied.

8.     As a result of their unlawful actions, Defendants have been unjustly enriched to the tune of hundreds of billions of dollars in value, while Musk has been conned along with the public.

**RESPONSE:**   Denied.

9.     Musk brings this remedial action to divest Defendants of their ill-gotten gains and ensure OpenAI maintains its namesake mission to develop safe and open AI for the public good.

**RESPONSE:**   Denied.

10.     xAI, a public benefit corporation founded by Musk to help accelerate scientific research via AI, brings this action to ensure that competition in the marketplace for generative AI remains healthy and that AI development proceeds in a safe and responsible manner for all stakeholders and society at large.

**RESPONSE:**   Denied.

## PARTIES

11.     Plaintiff Elon Musk is an individual, citizen, and resident of Texas.

**RESPONSE:**   Admitted.

12.     Plaintiff X.AI Corp. is a public benefit corporation formed under the laws of Nevada with its principal place of business at 3180 18th Street, San Francisco, CA 94110.

**RESPONSE:**   Admitted.

13.     Plaintiffs are informed and believe and thereon allege that Defendant Samuel Altman is a citizen and resident of San Francisco, California.

**RESPONSE:**   The OpenAI Defendants admit that Altman is a citizen and resident of San Francisco, California.

14.     Plaintiffs are informed and believe and thereon allege that Defendant Gregory Brockman is a citizen and resident of San Francisco, California.

1    **RESPONSE:**    The OpenAI Defendants admit that Brockman is a citizen and resident of

2    San Francisco, California.

3    15.    Plaintiffs are informed and believe and thereon allege that Defendant Deannah

4    Templeton is a citizen and resident of Washington.

5    **RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form

6    a belief as to the truth of the allegations in Paragraph 15 and deny them on that basis.

7    16.    Plaintiffs are informed and believe and thereon allege that Defendant Reid Hoffman

8    is a citizen and resident of Washington.

9    **RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form

10    a belief as to the truth of the allegations in Paragraph 16 and deny them on that basis.

11    17.    Defendant OpenAI, Inc. is a registered non-profit organization incorporated under

12    the laws of Delaware on December 8, 2015.    OpenAI, Inc. is registered as an out-of-state

13    corporation with the California Secretary of State and has its principal place of business at 550

14    Terry A Francois Blvd., San Francisco, CA 94158.

15    **RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of

16    Paragraph 17, admit that OpenAI, Inc. is registered as an out-of-state corporation with the

17    California Secretary of State, and otherwise deny the allegations in the second sentence of

18    Paragraph 17.

19    18.    Defendant OpenAI, L.P. is a limited partnership formed under the laws of Delaware

20    on September 19, 2018, originally as SummerSafe, L.P.  On information and belief, on January 23,

21    2023, OpenAI, L.P. was converted to Defendant OpenAI OpCo, LLC.  OpenAI, L.P. is registered

22    as an out-of-state limited partnership with the California Secretary of State and has its principal

23    place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

24    **RESPONSE:**    The OpenAI Defendants admit the allegations in the first two sentences of

25    Paragraph 18, admit that OpenAI, L.P. is registered as an out-of-state limited partnership with the

26    California Secretary of State, and otherwise deny the allegations in the third sentence of Paragraph

27    18.

28    19.    Defendant OpenAI, L.L.C. is a limited liability company formed in Delaware on

-31-

September 17, 2020.  OpenAI, L.L.C. maintains its principal place of business in California.

**RESPONSE:**    Admitted.

20.    Defendant OpenAI GP, L.L.C. is a limited liability company formed in Delaware on September 19, 2018.  OpenAI GP, L.L.C. is registered as an out-of-state limited liability company registered with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

**RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of Paragraph 20, admit that OpenAI GP, L.L.C. is registered as an out-of-state limited liability company with the California Secretary of State, and otherwise deny the allegations in the second sentence of Paragraph 20.

21.    Defendant OpenAI OpCo, LLC is a limited liability company formed in Delaware on September 19, 2018, as OpenAI, L.P., but was later converted on January 23, 2023, to OpenAI OpCo, LLC.  OpenAI OpCo, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

**RESPONSE:**    The OpenAI Defendants deny the allegations in the first sentence of Paragraph 21. The OpenAI Defendants admit that OpenAI OpCo, LLC is registered as an out-of-state limited liability company with the California Secretary of State, and otherwise deny the allegations in the second sentence of Paragraph 21.

22.    Defendant OpenAI Global, LLC is a limited liability company formed in Delaware on December 28, 2022.  OpenAI Global, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

**RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of Paragraph 22, admit that OpenAI Global, LLC is registered as an out-of-state limited liability company with the California Secretary of State, and otherwise deny the allegations in the second sentence of Paragraph 22.

23.    Defendant OAI Corporation is a corporation formed in Delaware.  OAI Corporation

1    maintains its principal place of business in California.

2        **RESPONSE:**    Admitted.

3        24.    Defendant OpenAI Holdings, LLC is a limited liability company formed in

4    Delaware on March 17, 2023.  OpenAI Holdings, LLC is registered as an out-of-state limited

5    liability company with the California Secretary of State and has its principal place of business at

6    1960 Bryant Street, San Francisco, CA 94110.

7        **RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of

8    Paragraph 24, admit that OpenAI Holdings, LLC is registered as an out-of-state limited liability

9    company with the California Secretary of State, and otherwise deny the allegations in the second

10   sentence of Paragraph 24.

11       25.    Defendant OpenAI Startup Fund Management, LLC is a limited liability company

12   formed in Delaware on July 16, 2021.  OpenAI Startup Fund Management, LLC is registered as an

13   out-of-state limited liability company with the California Secretary of State and has its principal

14   place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

15       **RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of

16   Paragraph 25, admit that OpenAI Startup Fund Management, LLC is registered as an out-of-state

17   limited liability company with the California Secretary of State, and otherwise deny the allegations

18   in the second sentence of Paragraph 25.

19       26.    Defendant OpenAI Startup Fund GP I, L.L.C. is a limited liability company formed

20   in Delaware on July 28, 2021.  OpenAI Startup Fund GP I, L.L.C. is registered as an out-of-state

21   limited liability company with the California Secretary of State and has its principal place of

22   business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

23       **RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of

24   Paragraph 26, admit that OpenAI Startup Fund GP I, L.L.C. is registered as an out-of-state limited

25   liability company with the California Secretary of State, and otherwise deny the allegations in the

26   second sentence of Paragraph 26.

27       27.    Defendant OpenAI Startup Fund I, L.P. is a limited partnership formed in Delaware

28   on July 28, 2021.  OpenAI Startup Fund I, L.P. is registered as an out-of-state limited partnership

with the California Secretary of State and has its principal place of business at 550 Terry A Francois Blvd., San Francisco, CA 94158.

**RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of Paragraph 27, admit that OpenAI Startup Fund I, L.P. is registered as an out-of-state limited partnership with the California Secretary of State, and otherwise deny the allegations in the second sentence of Paragraph 27.

28.    Defendant OpenAI Startup Fund SPV GP I, L.L.C. is a limited liability company formed in Delaware on December 5, 2023.  Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP I, L.L.C. maintains its principal place of business in San Francisco, California.

**RESPONSE:**    Admitted.

29.    Defendant OpenAI Startup Fund SPV GP II, L.L.C. is a limited liability company formed in Delaware on April 4, 2024.  Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP II, L.L.C. maintains its principal place of business in San Francisco, California.

**RESPONSE:**    Admitted.

30.    Defendant OpenAI Startup Fund SPV GP III, L.L.C. is a limited liability company formed in Delaware on April 4, 2024.  Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP III, L.L.C. maintains its principal place of business in San Francisco, California.

**RESPONSE:**    Admitted.

31.    Defendant OpenAI Startup Fund SPV GP IV, L.L.C. is a limited liability company formed in Delaware on May 9, 2024.  Plaintiffs are informed and believe and thereon allege that OpenAI Startup Fund SPV GP IV, L.L.C. maintains its principal place of business in San Francisco, California.

**RESPONSE:**    Admitted.

32.    Defendant OpenAI Startup Fund SPV I, L.P. is a limited partnership formed in Delaware on December 5, 2023.  Plaintiffs are informed and believe and thereon allege that OpenAI

1    Startup Fund SPV I, L.P. maintains its principal place of business in San Francisco, California.

2    **RESPONSE:**    Admitted.

3    33.    Defendant OpenAI Startup Fund SPV II, L.P. is a limited partnership formed in

4    Delaware on April 4, 2024.  Plaintiffs are informed and believe and thereon allege that OpenAI

5    Startup Fund SPV II, L.P. maintains its principal place of business in San Francisco, California.

6    **RESPONSE:**    Admitted.

7    34.    Defendant OpenAI Startup Fund SPV III, L.P. is a limited partnership formed in

8    Delaware on April 4, 2024.  Plaintiffs are informed and believe and thereon allege that OpenAI

9    Startup Fund SPV III, L.P. maintains its principal place of business in San Francisco, California.

10    **RESPONSE:**    Admitted.

11    35.    Defendant OpenAI Startup Fund SPV IV, L.P. is a limited partnership formed in

12    Delaware on May 9, 2024.  Plaintiffs are informed and believe and thereon allege that OpenAI

13    Startup Fund SPV IV, L.P. maintains its principal place of business in San Francisco, California.

14    **RESPONSE:**    Admitted.

15    36.    Defendant Aestas Management Company, LLC, is a Delaware limited liability

16    company formed in Delaware on February 10, 2023.  Aestas Management Company, LLC is

17    registered as an out-of-state limited liability company with the California Secretary of State and

18    has its principal place of business at 1960 Bryant Street, San Francisco, CA 94110.

19    **RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of

20    Paragraph 36, admit that Aestas Management Company, LLC is registered as an out-of-state limited

21    liability company with the California Secretary of State, and otherwise deny the allegations in the

22    second sentence of Paragraph 36.

23    37.    Defendant Aestas, LLC is a limited liability company formed in Delaware on

24    September 19, 2018.  Aestas, LLC is registered as an out-of-state limited liability company with

25    the California Secretary of State and has its principal place of business at 1960 Bryant Street, San

26    Francisco, CA 94110.

27    **RESPONSE:**    The OpenAI Defendants admit the allegations in the first sentence of

28    Paragraph 37, admit that Aestas, LLC is a registered as an out-of-state limited liability company

with the California Secretary of State, and otherwise deny the allegations in the second sentence of Paragraph 37.

38.    Defendant Microsoft Corp. is a corporation formed under the laws of Washington with its principal place of business at One Microsoft Way, Redmond, WA 98052.

**RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and deny them on that basis.

39.    Plaintiffs are informed and believe and based thereon allege that the fictitiously named defendants captioned hereinabove as Does 1 through 100, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions, and circumstances alleged herein.  The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiffs, and Plaintiffs will amend this SAC to assert the true names and capacities of such fictitiously named defendants when they have been ascertained.  For convenience, each reference herein to the named Defendants shall also refer to the Doe defendants and each of them.

**RESPONSE:**    OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and deny them on that basis.

### JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

40.    This Court has subject matter jurisdiction under 15 U.S.C. § 4, 15 U.S.C § 1121, 18 U.S.C. § 1964, and 28 U.S.C. § 1331, because this is a civil case arising under the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*, the Clayton Act, 15 U.S.C. §§ 12 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1111 *et seq.*

**RESPONSE:**    Paragraph 40 sets forth a legal conclusion to which no response is required.

41.    Further, Plaintiffs' state-law claim for unfair competition (Count XVI) arises under federal law for purposes of 28 U.S.C. § 1331 and necessarily raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities, in particular claims under the federal civil and criminal revenue, competition, copyright, and trademark laws.

1    **RESPONSE:**    Paragraph 41 sets forth a legal conclusion to which no response is required.

2    42.    The Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C.

3    § 1367, because all claims form part of the same case or controversy under Article III of the United

4    States Constitution.

5    **RESPONSE:**    Paragraph 42 sets forth a legal conclusion to which no response is required.

6    43.    Jurisdiction over Samuel Altman is proper because he is domiciled in the State of

7    California and this District, has continuous and systematic contacts with the State of California and

8    this District, including contacts giving rise to the specific causes of action against him, and because

9    a substantial portion of the relevant acts complained of herein occurred in the State of California

10    and in this District.

11    **RESPONSE:**    Paragraph 43 sets forth a legal conclusion to which no response is required.

12    44.    Jurisdiction over Gregory Brockman is proper because he is domiciled in the State

13    of California and this District, has continuous and systematic contacts with the State of California

14    and this District, including contacts giving rise to the specific causes of action against him, and

15    because a substantial portion of the relevant acts complained of herein occurred in the State of

16    California and in this District.

17    **RESPONSE:**    Paragraph 44 sets forth a legal conclusion to which no response is required.

18    45.    Jurisdiction over Deannah Templeton is proper because she has continuous and

19    systematic contacts with the State of California and this District, including contacts giving rise to

20    the specific causes of action against her, and because a substantial portion of the relevant acts

21    complained of herein occurred in the State of California and in this District.

22    **RESPONSE:**    Paragraph 45 sets forth a legal conclusion to which no response is required.

23    46.    Jurisdiction over Reid Hoffman is proper because he has continuous and systematic

24    contacts with the State of California and this District, including contacts giving rise to the specific

25    causes of action against him, and because a substantial portion of the relevant acts complained of

26    herein occurred in the State of California and in this District.

27    **RESPONSE:**    Paragraph 46 sets forth a legal conclusion to which no response is required.

28    47.    Jurisdiction over OpenAI, Inc. is proper because it has its principal place of business

in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 47 sets forth a legal conclusion to which no response is required.

48.    Jurisdiction over OpenAI, L.P. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 48 sets forth a legal conclusion to which no response is required.

49.    Jurisdiction over OpenAI, L.L.C. is proper because it has its principal place of business in the State of California, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District, where it transacts business and may be found.

**RESPONSE:**    Paragraph 49 sets forth a legal conclusion to which no response is required.

50.    Jurisdiction over OpenAI GP, L.L.C. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 50 sets forth a legal conclusion to which no response is required

51.    Jurisdiction over OpenAI OpCo, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 51 sets forth a legal conclusion to which no response is required.

52.    Jurisdiction over OpenAI Global, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

1    **RESPONSE:**    Paragraph 52 sets forth a legal conclusion to which no response is required.

2    53.    Jurisdiction over OAI Corporation is proper because it has its principal place of

3    business in the State of California, and because a substantial portion of the relevant acts complained

4    of herein occurred in the State of California and in this District, where it transacts business and may

5    be found.

6    **RESPONSE:**    Paragraph 53 sets forth a legal conclusion to which no response is required.

7    54.    Jurisdiction over OpenAI Holdings, LLC is proper because it has its principal place

8    of business in the State of California and in this District, where it transacts business and may be

9    found, and because a substantial portion of the relevant acts complained of herein occurred in the

10    State of California and in this District.

11    **RESPONSE:**    Paragraph 54 sets forth a legal conclusion to which no response is required.

12    55.    Jurisdiction over OpenAI Startup Fund Management, LLC is proper because it has

13    its principal place of business in the State of California and in this District, where it transacts

14    business and may be found, and because a substantial portion of the relevant acts complained of

15    herein occurred in the State of California and in this District.

16    **RESPONSE:**    Paragraph 55 sets forth a legal conclusion to which no response is required.

17    56.    Jurisdiction over OpenAI Startup Fund GP I, L.L.C. is proper because it has its

18    principal place of business in the State of California and in this District, where it transacts business

19    and may be found, and because a substantial portion of the relevant acts complained of herein

20    occurred in the State of California and in this District.

21    **RESPONSE:**    Paragraph 56 sets forth a legal conclusion to which no response is required.

22    57.    Jurisdiction over OpenAI Startup Fund I, L.P. is proper because it has its principal

23    place of business in the State of California and in this District, where it transacts business and may

24    be found, and because a substantial portion of the relevant acts complained of herein occurred in

25    the State of California and in this District.

26    **RESPONSE:**    Paragraph 57 sets forth a legal conclusion to which no response is required.

27    58.    Jurisdiction over OpenAI Startup Fund SPV GP I, L.L.C. is proper because it has

28    its principal place of business in the State of California and in this District, where it transacts

1    business and may be found, and because a substantial portion of the relevant acts complained of

2    herein occurred in the State of California and in this District.

3        **RESPONSE:**    Paragraph 58 sets forth a legal conclusion to which no response is required.

4        59.    Jurisdiction over OpenAI Startup Fund SPV GP II, L.L.C. is proper because it has

5    its principal place of business in the State of California and in this District, where it transacts

6    business and may be found, and because a substantial portion of the relevant acts complained of

7    herein occurred in the State of California and in this District.

8        **RESPONSE:**    Paragraph 59 sets forth a legal conclusion to which no response is required.

9        60.    Jurisdiction over OpenAI Startup Fund SPV GP III, L.L.C. is proper because it has

10   its principal place of business in the State of California and in this District, where it transacts

11   business and may be found, and because a substantial portion of the relevant acts complained of

12   herein occurred in the State of California and in this District.

13       **RESPONSE:**    Paragraph 60 sets forth a legal conclusion to which no response is required.

14       61.    Jurisdiction over OpenAI Startup Fund SPV GP IV, L.L.C. is proper because it has

15   its principal place of business in the State of California and in this District, where it transacts

16   business and may be found, and because a substantial portion of the relevant acts complained of

17   herein occurred in the State of California and in this District.

18       **RESPONSE:**    Paragraph 61 sets forth a legal conclusion to which no response is required.

19       62.    Jurisdiction over OpenAI Startup Fund SPV I, L.P. is proper because it has its

20   principal place of business in the State of California and in this District, where it transacts business

21   and may be found, and because a substantial portion of the relevant acts complained of herein

22   occurred in the State of California and in this District.

23       **RESPONSE:**    Paragraph 62 sets forth a legal conclusion to which no response is required.

24       63.    Jurisdiction over OpenAI Startup Fund SPV II, L.P. is proper because it has its

25   principal place of business in the State of California and in this District, where it transacts business

26   and may be found, and because a substantial portion of the relevant acts complained of herein

27   occurred in the State of California and in this District.

28       **RESPONSE:**    Paragraph 63 sets forth a legal conclusion to which no response is required.

64.     Jurisdiction over OpenAI Startup Fund SPV III, L.P. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 64 sets forth a legal conclusion to which no response is required.

65.     Jurisdiction over OpenAI Startup Fund SPV IV, L.P. is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 65 sets forth a legal conclusion to which no response is required.

66.     Jurisdiction over Aestas Management Company, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 66 sets forth a legal conclusion to which no response is required.

67.     Jurisdiction over Aestas, LLC is proper because it has its principal place of business in the State of California and in this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 67 sets forth a legal conclusion to which no response is required.

68.     Jurisdiction over Microsoft Corp. is proper because it has continuous and systematic contacts with the State of California and this District, where it transacts business and may be found, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and in this District.

**RESPONSE:**    Paragraph 68 sets forth a legal conclusion to which no response is required.

69.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action, is situated in this District.

1    **RESPONSE:**    Paragraph 69 sets forth a legal conclusion to which no response is required.

2    70.    This action is properly assigned to the San Francisco Division of this District under

3    Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to Plaintiffs'

4    claims occurred, and a substantial part of the property that is the subject of the action is situated, in

5    San Francisco County, which is served by the San Francisco Division.

6    **RESPONSE:**    Paragraph 70 sets forth a legal conclusion to which no response is required.

7    <u>**FACTS COMMON TO ALL CLAIMS FOR RELIEF**</u>

8    A.    ***The Dangers of AI***

9    71.    Over the course of the 20th century, the United States gradually shifted from a

10    primarily labor-based economy to a knowledge-based one, with economic value increasingly

11    generated by human intelligence.  As the century progressed, another paradigm shift was already

12    underway:  value creation through AI.

13    **RESPONSE:**    The OpenAI Defendants admit that AI research and development

14    progressed during the second half of the 20th century, but otherwise lack knowledge or information

15    sufficient to form a belief as to the truth of the allegations in Paragraph 71 and deny them on that

16    basis.

17    72.    Starting in the late 2000s and early 2010s, an algorithm called "deep learning" was

18    developed, the hallmark of which was that it no longer needed to be designed with significant

19    knowledge of the task at hand because it could essentially "learn" from examples and program

20    itself.  As deep learning algorithms became increasingly sophisticated, some of the world's leading

21    AI researchers set their sights on AGI.  The basic concept of AGI is a general-purpose AI system,

22    a machine having intelligence for a wide variety of tasks like a human.

23    **RESPONSE:**    The OpenAI Defendants admit that "deep learning" algorithms progressed

24    in the late 2000s and early 2010s due to advances in computational power and GPU (Graphics

25    Processing Unit) technology, that "deep learning" is a process whereby a neural network of billions

26    of interconnected layered nodes performs computations on a massive scale, and that leading AI

27    researchers are focused on the development of AGI systems. The OpenAI Defendants otherwise

28    deny the allegations in Paragraph 72.

73.     Musk has long been concerned by the grave threat these advanced systems pose to humanity, which he has repeatedly warned is likely the greatest existential threat we face today. These dangers include, without limitation (or exaggeration), completely replacing the human workforce, supercharging the spread of disinformation, malicious human impersonation, and the manipulation of political and military systems (which military-related contracting OpenAI is now reported to be pursuing aggressively), ultimately leading to the extinction of humanity.  Musk's concerns have been shared by other leading figures including Stephen Hawking and 2024 physics Nobel laureate Geoffrey Hinton, who warned "this is not science fiction."[23]

**RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73 and deny them on that basis, and further deny the allegations to the extent they purport to characterize OpenAI's actions or the implications of AI technology.

74.     Musk has publicly called for a variety of measures to address the dangers of AI, from voluntary moratoria to regulation, but his calls have largely fallen on deaf ears or were drowned out by OpenAI's use of putative charitable assets to oppose safety regulation, such as its successful killing of California SB 1047 (the Safe and Secure Innovation for Frontier Artificial Intelligence Models Act).

**RESPONSE:**    Denied. The OpenAI Defendants aver that Musk publicly called for a six-month "moratorium" on the development of advanced artificial intelligence days after incorporating his own AI development company, X.AI Corp., in order to advantage that nascent enterprise.

75.     Where some like Musk see AGI as an existential threat,[24] others like Google—and as it would turn out, Defendants—see it as a source of even greater profit and power.

---

[23] In the short-term, AI, even before reaching AGI, is leading to a proliferation in child sexual abuse material and revenge pornography, cyberattacks, the automation of cybercrime, and the development of weapons, all while accelerating the economic dislocation of knowledge workers.

[24] This is the reason Musk organized xAI as a public benefit corporation, which is required to report the results of an annual analysis of the company's social impact.  Nev. Benefit Corp. Act, Nev. Rev. Stat. Ann. § 78B.020, -.40, -.60, -.80.

1      **RESPONSE:**   Denied.

2          76.    At the end of 2013, Musk learned that Google was planning to acquire DeepMind,

3   which at the time was one of the most advanced AI companies in the industry.  Musk, who is well-

4   known for his opposition to closed technology—e.g., Musk's rocket company SpaceX holds almost

5   no patents, and his electric vehicle company Tesla makes its patents open and available for public

6   use—was deeply troubled by this development.  He believed that such an important and potentially

7   dangerous technology as AGI in the hands of a giant, private and rapacious company like Google

8   was a matter of grave concern.

9      **RESPONSE:**   The OpenAI Defendants lack knowledge or information sufficient to form

10  a belief as to the truth of the allegations in Paragraph 76 and deny them on that basis.

11         77.    To prevent this, Musk tried to stop the sale of DeepMind but was ultimately

12  unsuccessful.   In 2014, Google acquired DeepMind, and with its team, Google immediately

13  catapulted to the front of the race for AGI.

14     **RESPONSE:**   The OpenAI Defendants lack knowledge or information sufficient to form

15  a belief as to the truth of the allegations in Paragraph 77 and deny them on that basis.

16         78.    Following Google's acquisition, Musk began hosting a series of dinner discussions

17  on ways to counter Google and promote AI safety.  He even reached out to President Barack Obama

18  in 2015 to discuss his concerns.  But regulation never came.

19     **RESPONSE:**   The OpenAI Defendants lack knowledge or information sufficient to form

20  a belief as to the truth of the allegations in Paragraph 78 and deny them on that basis.

21         79.    Musk continued to advocate for safe AI practices and in 2015, he thought he found

22  someone who understood his apprehensions:  Sam Altman.

23     **RESPONSE:**   The OpenAI Defendants lack knowledge or information sufficient to form

24  a belief as to the truth of the allegations in Paragraph 79 and deny them on that basis.

25     **B.    _Altman Induces Musk to Back OpenAI, Inc._**

26         80.    From the start, Altman courted Musk by presenting himself as sharing Musk's well-

27  known concerns over the threat posed by AI/AGI.  Altman, an experienced tech player, feigned

28  altruism to convince Musk to give him free start-up capital and, as importantly in a marketplace

1   where talent is scarce and connections and credibility are everything, to recruit top AI scientists.

2       **RESPONSE:**   Denied.

3       81.    Altman began by testing the waters.  In early March 2015, he approached Musk to

4   help draft an open letter to the U.S. Government emphasizing the need for regulation to ensure the

5   safe creation of AI.  Musk agreed, and the two began preparing the open letter and approaching

6   Musk's influential contacts in the technology and AI sectors about signing it.

7       **RESPONSE:**   The OpenAI Defendants admit that Altman and Musk prepared a letter to

8   the U.S. government regarding AI regulation, but otherwise deny the allegations in Paragraph 81.

9       82.    Sensing opportunity, Altman suggested to Musk on May 25, 2015 that they

10  endeavor to beat Google in the race to develop AGI.  He wrote that he'd "[b]een thinking a lot

11  about whether it's possible to stop humanity from developing AI.  I think the answer is almost

12  definitely not.  If it's going to happen, it seems like it would be good for someone other than Google

13  to do it first."  Declaration of Marc Toberoff, Ex. 1 at 1.[25]  Altman proposed that they start an AI

14  "Manhattan Project" and, to win Musk's backing, offered to "structure it so that the tech belongs

15  to the world via some sort of nonprofit but the people working on it get startup-like compensation

16  if it works.  Obviously we'd comply with/aggressively support all regulation."  *Id*.  Still

17  noncommittal, Musk merely responded:  "Probably worth a conversation."  *Id*.

18      **RESPONSE:**   Paragraph 82 purports to quote from and characterize a May 25, 2015 email

19  attached as Exhibit 1 to the Second Amended Complaint, to which the OpenAI Defendants

20  respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants

21  otherwise deny the allegations in Paragraph 82.

22      83.    To convince Musk of his sincerity, Altman promised that he too would have skin in

23  the game and would make meaningful financial contributions to the non-profit.  It has since been

24  revealed that Altman grossly inflated what his actual financial contributions would be, which paled

25  in comparison to what he had promised.

26      **RESPONSE:**   Denied.

27

28  _____
    [25] Subsequent "Ex." citations are to the Toberoff Declaration.

84.     A month later, on June 24, 2015, Altman tried again, this time wooing Musk with a detailed proposal for a new AI lab:  "The mission would be to create the first general AI [AGI] and use it for individual empowerment—ie, the distributed version of the future that seems the safest. More generally, safety should be a first-class requirement."  Ex. 2 at 1.  "The technology would be owned by the foundation and used 'for the good of the world[.]'" *Id*.  OpenAI's "researchers would have significant financial upside but it would be uncorrelated to what they build, which should eliminate some of the conflict (we'll pay them a competitive salary and give them [Y Combinator] equity for the upside)."  *Id*.  This time Musk agreed.  *Id*.

**RESPONSE:**    Paragraph 84 purports to quote from and characterize June 24, 2015 emails attached as Exhibit 2 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents.  The OpenAI Defendants otherwise deny the allegations in Paragraph 84.

85.     Soon thereafter, Altman recruited Stripe's Chief Technology Officer ("CTO") Gregory Brockman, his long-time colleague, who helped him seal the deal.

**RESPONSE:**    The OpenAI Defendants admit that Altman and Brockman, who was previously CTO of Stripe, Inc., decided together to start OpenAI.  The OpenAI Defendants otherwise deny the allegations in Paragraph 85.

86.     Altman's plan worked.  In June 2015, Musk agreed to commit funding and help recruit the top scientists necessary to make Altman's project a success provided that, as promised, OpenAI, Inc. would be a non-profit devoted to developing AI/AGI responsibly by (i) distributing its research and technology openly, preventing its concentration, (ii) focusing on safety, not profits, and (iii) working to benefit the public and humanity rather than for private gain.  Indeed, to celebrate what he was led to believe was their mission, Musk named the endeavor "OpenAI."

**RESPONSE:**    The OpenAI Defendants admit that Musk made funding commitments to OpenAI, Inc. in June 2015, and otherwise deny the allegations in Paragraph 86.

87.     On December 8, 2015, a Certificate of Incorporation for OpenAI, Inc. was filed with the Delaware Secretary of State that reaffirmed Altman and Brockman's promises to Musk:

> This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue law. **The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person.** . . . The property of this corporation is irrevocably dedicated to the[se] purposes . . . **and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person.**

Ex. 21 at 4 (emphasis added).[26]

**RESPONSE:**    Paragraph 87 purports to selectively quote from and characterize OpenAI, Inc.'s Certificate of Incorporation, filed with the Delaware Secretary of State, and OpenAI, Inc.'s Initial Registration Form, filed with the State of California, Office of the Attorney General, Registry of Charitable Trusts, both of which are attached as Exhibit 21 to the Second Amended Complaint, and to which the OpenAI Defendants respectfully refer the Court for their complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 87.

88.    OpenAI, Inc. was publicly announced on December 11, 2015, and leveraged Musk's name by making him co-chair of its Board of Directors ("Board") alongside Altman, with Brockman as CTO. The promotional announcement published on OpenAI's website further touted: "OpenAI is a non-profit artificial intelligence research company [whose] goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better

---

[26] OpenAI's filing for charitable status with California was slightly more general, but taken together, these representations are unambiguous:

> OpenAI, Inc. ("OpenAI") is a nonprofit artificial intelligence ("AI") scientific research organization. **Its goal is to engage in research activities that advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return.** AI technology will help shape the 21st century, and **OpenAI wants to help the world build safe AI technology and ensure that AI's benefits are as widely and evenly distributed as possible.** To that end, OpenAI hopes to build AI as part of a larger community, and wants to openly share its plans and capabilities along the way.

Ex. 21 at 2 (emphases added).

focus on a positive human impact."

**RESPONSE:**   The OpenAI Defendants admit that OpenAI, Inc. was publicly announced on December 11, 2015, that Musk and Altman were named as co-chairs of the board of OpenAI, Inc., and that Brockman was named as CTO of OpenAI, and otherwise deny the allegations in the first sentence of Paragraph 88. The second sentence of Paragraph 88 purports to quote from and characterize OpenAI's website, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 88.

### C.   *Musk's Crucial Contributions to OpenAI, Inc.*

89.   In an email to Altman and Brockman on the day of OpenAI, Inc.'s public announcement, Musk stated:   "Our most important consideration is recruitment of the best people[,]" Ex. 6 at 1, and pledged that helping in this effort would be his "absolute top priority 24/7[,]" Ex. 5 at 1.   He wrote:   "We are outmanned and outgunned by a ridiculous margin by organizations you know well, but we have right on our side and that counts for a lot.   I like the odds." Ex. 6 at 1.

**RESPONSE:**   Paragraph 89 purports to quote from and characterize December 11, 2015 emails attached as Exhibits 5 and 6 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents.

90.   As Altman had devised, Musk proved to be a driving force in the founding of OpenAI, Inc.  Musk, directly and through his company Musk Industries, LLC ("Musk Industries"), contributed the majority of OpenAI, Inc.'s funding in its first several years, covered rent and overhead, provided valuable advice and guidance on research directions, and most importantly, Musk donated his time, effort, and connections to recruit some of the world's leading scientists and engineers to work at the non-profit.  In fact, recruiting for OpenAI, Inc. was a Herculean task in the face of relentless counter-recruiting by Google/DeepMind, which offered lavish compensation packages to squelch the new venture.

**RESPONSE:**   The OpenAI Defendants admit that Musk helped OpenAI's initial efforts to recruit leading scientists and engineers, that the market for talent was and continues to be

competitive, and that Musk provided advice to OpenAI in its early years. The OpenAI Defendants otherwise deny the allegations in Paragraph 90, including to the extent they allege that Musk directly contributed the majority of OpenAI's funding through personal donations and that Musk was the "driving force" in the founding of OpenAI.

91.    But Musk persevered and proved instrumental in securing key talent, including Chief Scientist Dr. Ilya Sutskever ("Dr. Sutskever"), whom he hired away from Google, as well as top research scientists Tim Salimans, Filip Wolski, and others.

**RESPONSE:**    The OpenAI Defendants admit that Sutskever, Salimans, and Wolski joined OpenAI, and otherwise deny the allegations in Paragraph 91.

92.    Just as Altman planned, Musk used his connections, credibility, and clout to launch the venture.  The mere fact OpenAI, Inc. was an "Elon Musk"-sponsored initiative and that Musk served as co-chair were key to its successful recruiting and financing efforts in the company's pivotal early years.

**RESPONSE:**    Denied.

93.    Musk also brought the start-up capital to give OpenAI, Inc. a fighting chance.  In late February 2016, he emailed Altman and Brockman:  "Whatever it takes to bring on ace talent is fin[e] by me.  Deepmind is causing me extreme mental stress.  If they win, it will be really bad news with their one mind to rule the world philosophy." Ex. 7 at 1.

**RESPONSE:**    Paragraph 93 purports to quote from and characterize February 2016 emails attached as Exhibit 7 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 93.

94.    In fact, Musk was OpenAI, Inc.'s largest financial backer.  In 2016, Musk contributed over $15 million, and in 2017 he contributed nearly $20 million.  Additionally, through Musk Industries, he leased OpenAI, Inc.'s office space in the Pioneer Building in San Francisco, paid its monthly overhead expenses, and even though he stepped down from the Board and relinquished his status as member on February 21, 2018, he nevertheless continued to make regular contributions to OpenAI, Inc. until September 14, 2020.  All told, Musk contributed more than $44

1    million in cash alone to OpenAI, Inc. in its first five critical years.

2        **RESPONSE:**    The OpenAI Defendants deny the allegations in the first sentence of

3    Paragraph 94 on the basis that Musk did not personally make any direct contributions to OpenAI,

4    Inc., and on the further basis that the sentence does not specify the time period during which Musk

5    is claimed to have been OpenAI, Inc.'s largest financial backer. The OpenAI Defendants deny the

6    allegations in the second sentence of Paragraph 94. With respect to the allegations in the third

7    sentence of Paragraph 94, the OpenAI Defendants admit that Musk Industries leased office space

8    to OpenAI, Inc., and admit that Musk stepped down from the OpenAI board and relinquished his

9    status as a member on February 21, 2018, but deny that Musk directly paid for rent or overhead,

10    and deny that Musk personally continued to make regular direct contributions to OpenAI, Inc. after

11    resigning from the board. The OpenAI Defendants deny the allegations in the fourth sentence of

12    Paragraph 94.

13        95.    It is fair to say that without Musk's involvement, backing, and substantial supportive

14    efforts, there would have been no OpenAI.

15        **RESPONSE:**    Denied.

16        **D.    _Microsoft Gets Involved_**

17        96.    Even early on, Microsoft, which was working to develop its own AI, was keen to

18    exploit OpenAI, Inc.  But as the non-profit had no shareholders and Microsoft could not simply

19    purchase influence, it obtained leverage in other ways by, for example, causing OpenAI, Inc. to

20    become inextricably dependent on Microsoft's cloud computing system ("compute").

21        **RESPONSE:**    Denied.

22        97.    In September 2016, Altman and Microsoft arranged for it to sell compute to OpenAI,

23    Inc. at a steep discount so long as the non-profit agreed to publicly promote Microsoft's products.

24    Ex. 10 at 3-5.  Musk rejected the "donation" and marketing ploy, writing to Altman:  "This actually

25    made me feel nauseous.  It sucks and is exactly what I would expect from them."  _Id_. at 2.  The deal

26    eventually went through, but without marketing gimmicks and at a more fulsome, but still below-

27    market, price. _Id_. at 1.

28        **RESPONSE:**    Paragraph 97 purports to quote from and characterize September 2016

emails attached as Exhibit 10 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 97.

98.    While Musk had expressed an affinity for Microsoft's CEO Satya Nadella ("Nadella"), the values of Microsoft and OpenAI, Inc. did not align. Whereas Musk was concerned that AI posed an existential danger to humankind and believed the technology should be decentralized and open, Nadella and Microsoft's co-founder Bill Gates minimized Musk's concerns as "panic" and too far off in the future.

**RESPONSE:**    The OpenAI Defendants deny the allegation that the values of Microsoft and OpenAI, Inc. did not align, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and deny them on that basis.

99.    Musk wrote:  "History unequivocally illustrates that a powerful technology is a double-edged sword . . . The recent example of Microsoft's AI chatbot shows how quickly it can turn incredibly negative.  The wise course of action is to approach the advent of AI with caution and ensure that its power is widely distributed and not controlled by any one company or person. **That is why we created OpenAI**."  Ex. 9 at 1 (emphasis added).

**RESPONSE:**    Paragraph 99 purports to quote from and characterize April 27, 2016 emails attached as Exhibit 9 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents.

E.    _**Defendants Try to Convert OpenAI, Inc. to a For-Profit**_

100.    In 2017-2018, Altman and Brockman moved to recast the non-profit as a moneymaking endeavor to bring in shareholders, sell equity, and raise capital, and pressed Musk to agree. Ex. 12 at 1-2. Musk briefly toyed with the idea of using Tesla as OpenAI, Inc.'s "cash cow" to solve the non-profit's cash-flow concerns, while keeping it in good hands and maintaining its mission. Ex. 16 at 1-2.

**RESPONSE:**    Paragraph 100 purports to quote from and characterize emails from August 2017 and early 2018 attached as Exhibits 12 and 16, respectively, to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their complete and

accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 100 and aver that Musk stepped down as OpenAI's co-chair on February 21, 2018, following his failed bids to seize control of OpenAI through a reorganization that would have placed Musk at the helm of a for-profit OpenAI entity or, alternatively, through an acquisition of OpenAI by Tesla.

101.    After some back and forth, Musk wrote to Altman and Brockman on September 20, 2017: "Either go do something on your own or continue with OpenAI as a non-profit.  I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding to a start-up.  Discussions are over." Ex. 13 at 4.

**RESPONSE:**    Paragraph 101 purports to quote from and characterize September 2017 emails attached as Exhibit 13 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents.

102.    Altman tried to play the whole thing off, reassuring Musk the next day: "[I] remain enthusiastic about the non-profit structure!" *id*. at 1, with Brockman soon following suit.  Ex. 14 at 1.  On September 22, 2017, Shivon Zilis, who had been working at OpenAI, Inc. since 2016, providing strategic guidance, e-mailed Musk that Altman had reassured her also that he was "Great with keeping [it a] non-profit and continuing to support it."  Ex. 14 at 1.

**RESPONSE:**    Paragraph 102 purports to quote from and characterize September 2017 emails attached as Exhibits 13 and 14 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 102.

F.    **_Defendants Do Secretly What They Failed to Do Openly_**

103.    We now know Altman and Brockman's reaffirmation was a lie.  In January 2018, mere months after their September 2017 "enthusias[m]," Altman proposed a scam-worthy "ICO," or initial coin offering, that would have seen OpenAI, Inc. sell its own cryptocurrency.  Ex. 15 at 1.  Musk shot down this idea too, stating "it would simply result in a massive loss of credibility for OpenAI and everyone associated with the ICO."  Ex. 16 at 3.

**RESPONSE:**    The OpenAI Defendants deny the allegations in the first sentence of Paragraph 103. The second sentence of Paragraph 103 purports to quote from and characterize

January 21, 2018 emails attached as Exhibit 15 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents. The third sentence of Paragraph 103 purports to quote from and characterize January 31, 2018 emails attached as Exhibit 16 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 103.

104.    On information and belief, mere weeks after Musk stopped their *second* get-rich-quick scheme (the ICO), and no later than February 11, 2018, Altman and Brockman agreed among themselves to figure out a structure for an equity fundraise—in other words, convert to a for-profit structure.

**RESPONSE:**    Denied.

105.    On information and belief, this plan grew out of their discussions that had begun in or around July 2017.  Ex. 11 at 1 ("Coming up:  Designing the for-profit structure").

**RESPONSE:**    Paragraph 105 purports to quote from and characterize a June 20, 2017 email attached as Exhibit 11 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 105.

106.    Notably, on March 25, 2018, barely a month after Musk stepped down from OpenAI, Inc.'s Board, Altman proposed the selling of equity in an unusual "fixed maximum return" structure, sufficiently developed to be actionable within four to six weeks.  Ex. 18 at 1-2.

**RESPONSE:**    Paragraph 106 purports to quote from and characterize emails from March and April 2018 attached as Exhibit 18 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 106.

107.    It would ordinarily take months for such a billion-dollar proposal to reach this advanced, concrete stage, and, on information and belief, for a novel mechanism like this, preparations began no later than the summer of 2017.  And, of course, a purported fixed maximum return scheme is exactly what Defendants wound up confecting.

**RESPONSE:**    Denied.

108.    This unusual structure, what Defendants call a "capped-profit company," is one where investors can make a profit capped at a certain multiple of their investment.  On information and belief, Defendants intended to set the multiple at 100x.

**RESPONSE:**    The OpenAI Defendants admit that a capped-profit entity is one in which investors are able to receive returns capped at certain multiples of their investments, and otherwise deny the allegations in Paragraph 108.

109.    In early 2019, Altman finally succeeded in his multi-year effort to become OpenAI, Inc.'s CEO.

**RESPONSE:**    The OpenAI Defendants admit that Altman became CEO of OpenAI, Inc. in early 2019, and otherwise deny the allegations in Paragraph 109.

110.    On information and belief, with its confederate Altman now in charge, Microsoft extracted a July 22, 2019 agreement from OpenAI giving Microsoft the exclusive right to supply OpenAI's single most important raw material, compute, without which OpenAI would cease to exist.  This agreement was extended in 2021 and again, on January 23, 2023.

**RESPONSE:**    The OpenAI Defendants deny the allegations in the first sentence of Paragraph 110. The OpenAI Defendants aver that OpenAI and Microsoft entered into an agreement, dated July 2, 2019, pursuant to which OpenAI agreed to port its cloud services to run on Microsoft's Azure cloud computing platform. The OpenAI Defendants admit the allegations in the second sentence of Paragraph 110. The OpenAI Defendants aver that Microsoft is not OpenAI's exclusive cloud provider.

111.    On information and belief, at Altman's urging and with Brockman's assistance, Defendants began forming numerous for-profit entities, in which Altman, Brockman, and Microsoft hold generous stakes, and weaving them into an increasingly labyrinthian OpenAI corporate web for the purpose of profiting from OpenAI, Inc.'s assets.

**RESPONSE:**    Denied.

112.    On March 6, 2019, Altman emailed Musk a draft of an announcement stating he was forming a "new entity," OpenAI, L.P., as a capped-profit company, appointing himself as CEO and Brockman as board chair.  Ex. 19 at 1-4.  The entity was not new, however.  Altman had caused its

incorporation in Delaware on September 19, 2018.

**RESPONSE:**    The first sentence of Paragraph 112 purports to quote from and characterize a March 6, 2019 email attached as Exhibit 19 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants admit that OpenAI, L.P. was incorporated in Delaware as SummerSafe, L.P. on September 19, 2018, but otherwise deny the allegations in Paragraph 112.

113.    In response, and with evident displeasure, Musk demanded:  "Please be explicit that I have no financial interest in the for-profit arm of OpenAI."  Ex. 20 at 1.

**RESPONSE:**    Paragraph 113 purports to quote from and characterize a March 11, 2019 email attached as Exhibit 20 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 113.

114.    On March 11, 2019, Altman and Brockman "launched" OpenAI, L.P.   On January 23, 2023, OpenAI, L.P. was converted to OpenAI OpCo, LLC.  After its conversion, it would be operated by OpenAI GP, L.L.C., which on September 19, 2018 was formed in Delaware.

**RESPONSE:**    The OpenAI Defendants admit that the creation of OpenAI, L.P. was announced on March 11, 2019 in a blog post authored by Brockman and Sutskever; that OpenAI, L.P. was subsequently converted to OpenAI OpCo, LLC on January 23, 2023; that OpenAI OpCo, LLC was managed by OpenAI GP, L.L.C.; and that OpenAI GP, L.L.C. was formed in Delaware on September 19, 2018, but otherwise deny the allegations in Paragraph 114.

115.    On September 17, 2020, OpenAI, L.L.C. was formed in Delaware.   OpenAI, L.L.C.'s sole member is currently OpenAI Global, LLC.

**RESPONSE:**    The OpenAI Defendants admit that OpenAI, L.L.C. was formed in Delaware on September 17, 2020. The OpenAI Defendants deny that OpenAI, L.L.C.'s sole member is OpenAI Global, LLC.

116.    On December 28, 2022, OpenAI Global, LLC was formed in Delaware.   On information and belief, OpenAI Global, LLC, like OpenAI, L.P., is a "capped" for-profit entity. OpenAI Global, LLC has two members:  Microsoft and OAI Corporation.

1    **RESPONSE:**    Admitted.

2    117.    On information and belief, OpenAI Global, LLC, like OpenAI OpCo, LLC, is

3    managed by OpenAI GP, L.L.C.

4    **RESPONSE:**    Admitted.

5    118.    On March 17, 2023, OAI Corporation was formed in Delaware as a corporation.

6    Prior to September 2023, Defendant OAI Corporation was OAI Corporation, LLC, a limited

7    liability company formed in Delaware with its principal place of business in California.  The sole

8    owner of OAI Corporation is OpenAI Holdings, LLC.

9    **RESPONSE:**    The OpenAI Defendants deny the allegations in the first sentence in

10    Paragraph 118. The OpenAI Defendants admit that OAI Corporation, LLC was converted to a

11    corporation registered in Delaware on September 5, 2023. The OpenAI Defendants admit the

12    allegations in the third sentence of Paragraph 118.

13    119.    On March 17, 2023, OpenAI Holdings, LLC was formed in Delaware, and has

14    multiple members, including Aestas, LLC and various individuals.

15    **RESPONSE:**    Admitted.

16    120.    On February 10, 2023, Aestas Management Company, LLC was formed as a limited

17    liability company in Delaware and is also managed by OpenAI GP, L.L.C.

18    **RESPONSE:**    Admitted.

19    121.    On information and belief, the other entities—OpenAI Startup Fund Management,

20    LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV

21    GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C.,

22    OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund

23    SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P. (collectively,

24    with those entities named in paragraphs 114-20, *supra*, the "For-Profit Entities")—are also

25    interwoven into Defendants' corporate web for the purpose of profiting from the non-profit

26    OpenAI, Inc.'s assets.  Many of these entities were only recently registered and indeed, more

27    OpenAI entities are popping up almost every month as part of Defendants' shell game.

28    **RESPONSE:**    Denied.

122.    The complex and largely opaque profiteering arm of OpenAI—in which, on information and belief, Microsoft, Altman, and Brockman are significant shareholders—while publicly cloaked as a mere fundraising apparatus, is in reality, the foundation for Defendants' scheme to control and cash in on OpenAI, Inc.'s technology.

**RESPONSE:**    Denied.

123.    We know, for example, that Microsoft owns a significant stake in OpenAI Global, LLC, which in turn is an owner of OpenAI, L.L.C. and OpenAI OpCo, LLC, Dkt. No. 18 at 1, ¶¶ 2-3, 5—the entity to which OpenAI, Inc.'s proprietary intellectual property was diverted.  We also know that Altman named himself as the manager of OpenAI Startup Fund I, L.P., which raised $175,250,000.00 and in which, once again, Microsoft holds a significant ownership interest, Dkt. No. 18 at 2, ¶ 10.

**RESPONSE:**    The OpenAI Defendants admit that OpenAI Global, LLC is an owner of OpenAI OpCo, LLC and an indirect owner of OpenAI, L.L.C., but otherwise deny the allegations in the first sentence of Paragraph 123. The OpenAI Defendants deny the allegations in the second sentence of Paragraph 123.

124.    But because OpenAI, Inc. has intentionally chosen entity configurations that, by and large, do not require public disclosures, contrary to its commitments to transparency and its role as a publicly supervised charity, the true extent of Altman, Brockman, and Microsoft's conflicted dealings is unknown.

**RESPONSE:**    Denied.

125.    What is clear is that Altman's repeated public proclamations to own no "equity" in these entities, is, as with so many of his statements, grossly and intentionally misleading because, on information and belief, he (or an entity owned or controlled by him) does.

**RESPONSE:**    Denied.

**G.    _Defendants Use Their For-Profit Entities to Loot OpenAI, Inc._**

126.    As with many things, the issue here is one of degree.  While there is little concern with using a for-profit entity to help fundraise for a non-profit, it is quite another thing to launch a dense fleet of dozens of for-profit entities to loot the non-profit of its only valuable assets

(intellectual property and employees) and facilitate veiled and unchecked profiteering, rife with conflicts, as Defendants have done.

**RESPONSE:**    Denied.

127.    To facilitate their profiteering, Defendants locked down and began withholding the non-profit's technology and scientific research.

**RESPONSE:**    Denied.

128.    Defendants also transferred most of OpenAI, Inc.'s intellectual property to OpenAI, L.P. in 2019 and 2020. Ex. 22 at 2; Ex. 23 at 2. Since then, such transfers have continued apace with, for example, the issuance of patents and trademarks to OpenAI OpCo, LLC, which is listed on the U.S. Patent and Trademark Office website as the owner of most of OpenAI's registered intellectual property.

**RESPONSE:**    The OpenAI Defendants admit that OpenAI, Inc. contributed certain tangible and intangible assets to OpenAI, L.P. in 2019. The first sentence of Paragraph 128 otherwise purports to characterize OpenAI, Inc.'s Annual Registration Renewal Fee Reports, filed with the Attorney General of California, from 2019 and 2020, attached as Exhibits 22 and 23 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their complete and accurate contents. The second sentence of Paragraph 128 purports to characterize the U.S. Patent and Trademark Office's website, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 128.

129.    Indeed, just *follow the money*. OpenAI, Inc.'s 2022 IRS tax return showed a mere $44,485 in revenue,[27] but one year later, OpenAI overall reportedly generated *$1.6 billion* in revenue.

**RESPONSE:**    The OpenAI Defendants admit that OpenAI, Inc. reported $44,485 in revenue to the IRS in its 2022 Form 990 filing. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of

---

[27] Notably, 2022 was the last year Defendants made such documents readily available to the public, yet another curious decision for a putative non-profit.

Paragraph 129 to the extent they purport to characterize unidentified reporting, and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 129.

130.    Defendants also drained the non-profit OpenAI, Inc. of most of its staff and transferred them over to the new private, for-profit company (now OpenAI OpCo, LLC), which also presently houses much of OpenAI's research and development.    This strategic move conveniently shields Defendants from the public oversight and financial disclosures non-profits like OpenAI, Inc. must make.

**RESPONSE:**    Denied.

131.    From there, on information and belief, beginning September 22, 2020, Altman caused the non-profit to exclusively license its technology to Microsoft, the world's then-largest for-profit corporation, diverging from Altman and OpenAI, Inc.'s promises to Musk and the non-profit's black-letter commitments—e.g., OpenAI, Inc.'s Certificate of Incorporation: "no part of the net income or assets of this corporation shall ever inure to the benefit of . . . any private person," Ex. 21 at 4; and Charter: "We commit to . . . avoid enabling uses of AI or AGI that . . . unduly concentrate power[,]" Ex. 17 at 1.

**RESPONSE:**    Paragraph 131 purports to selectively quote from and characterize the Certificate of Incorporation and online Charter of OpenAI, Inc. attached as Exhibits 21 and 17, respectively, to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for their complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 131.

132.    The Microsoft license is expansive and includes all OpenAI, Inc.'s "pre-AGI" technologies, and tasks the Board with determining when "AGI" has been attained.  To date, the Board has made no such finding, thus giving Microsoft unfettered access to OpenAI's suite of technology.

**RESPONSE:**    Denied. The OpenAI Defendants aver that, in January 2023, OpenAI and Microsoft entered into an agreement, pursuant to which OpenAI granted Microsoft a license to OpenAI's pre-AGI intellectual property and technology, and otherwise deny the allegations in Paragraph 132.

133.    In addition, Altman, with the assistance and/or cooperation of Brockman and the For-Profit Entities, began to self-deal with impunity.  On information and belief, while serving on OpenAI, Inc.'s Board, Altman deliberately withheld key information and lied about his personal holdings and investments both in and outside of OpenAI to keep the Board from discovering his glaring conflicts of interest.

**RESPONSE:**    Denied.

134.    For example, on information and belief, Altman controls OpenAI Startup Fund I, L.P., and stands to personally profit from its association with OpenAI.

**RESPONSE:**    Denied.

135.    In May 2024, Altman is reported to have induced OpenAI to strike a deal with Reddit wherein OpenAI would pay to license Reddit's content to train ChatGPT.  On information and belief, Altman and/or entities he controls own a whopping 7.6% of Reddit, making him one of its largest outside shareholders.  After the deal was announced, Reddit's stock shot up 10%, boosting Altman's stake by $69 million.  On October 29, 2024, Reddit finally posted its first profit as a public company due in large part to the revenue generated by its licensing deal with OpenAI, causing the company's stock price to skyrocket more than 40% the following day.

**RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 135 to the extent they purport to characterize unidentified reporting, and deny them on that basis. The OpenAI Defendants deny the allegations in the second sentence of Paragraph 135. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third and fourth sentences of Paragraph 135 and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 135.

136.    By contrast, Altman and OpenAI made no such deal to use data from content providers such as *The New York Times* or the *Chicago Tribune*, in which Altman had no ownership, and which are now suing OpenAI for copyright infringement.

**RESPONSE:**    The OpenAI Defendants admit that OpenAI has no content deal with *The New York Times* or *The Chicago Tribune*, that OpenAI is in litigation with both publishers, and that

Altman has no ownership interest in *The New York Times* or the *Chicago Tribune*. The OpenAI Defendants otherwise deny the allegations in Paragraph 136.

137.    On information and belief, in 2019, Altman caused OpenAI to sign a $51 million AI chip deal with Rain AI, a company in which he held a significant interest.

**RESPONSE:**    Denied.

138.    On information and belief, in 2020 Altman invested in the hardware company Humane, which plans to power its devices using OpenAI's software.  Holding companies controlled by Altman own 15% of Humane's equity—a greater amount than each of the company's founders.

**RESPONSE:**    The OpenAI Defendants admit that Altman has an investment interest in Humane, but otherwise deny the allegations in Paragraph 138.

139.    On information and belief, Altman invested in yet another hardware company, Limitless, which also plans to power its devices using OpenAI's software.  The timing of this investment is not yet known.

**RESPONSE:**    The OpenAI Defendants admit that Altman has an investment interest in Limitless, but otherwise deny the allegations in Paragraph 139.

140.    On information and belief, no later than March 15, 2023, OpenAI selected Stripe, in which Altman and Brockman have significant ownership interests, as its commercial partner to process payments as OpenAI moved to monetize its technology.

**RESPONSE:**    Denied.

141.    On information and belief, no later than September 2023, Altman and former Apple chief design officer, Jony Ive, made plans to launch their own AI device company to exploit OpenAI's technology to compete with Apple's iPhone.

**RESPONSE:**    Denied.

142.    On information and belief, OpenAI is hammering out a deal with Helion Energy (in which Altman owns a massive stake) for OpenAI to buy vast quantities of electricity to power its data centers.  And in May 2023, Altman's ally Microsoft enriched him by striking such a deal with Helion Energy.

**RESPONSE:**    Denied.

143.    On information and belief, Altman, Brockman, Microsoft, and the For-Profit Entities have been and will continue to be enriched by their respective stake in OpenAI's for-profit machine.  Altman alone stands to make billions from the non-profit Musk co-founded and invested considerable money, time, recruiting efforts, and goodwill in furtherance of its stated mission.

**RESPONSE:**    Denied.

144.    Altman's scheme has now become clear:  lure Musk with phony philanthropy; exploit his money, stature, and contacts to secure world-class AI scientists to develop leading technology; then feed the non-profit's lucrative assets into an opaque profit engine and proceed to cash in as OpenAI and Microsoft monopolize the generative AI market.

**RESPONSE:**    Denied.

145.    On information and belief, Microsoft, acting in lockstep with the other Defendants, stands to make hundreds of billions from its methodical infiltration of, and increasing leverage over, the non-profit, its technology, and employees, to the point that Microsoft now exercises effective control over OpenAI—a de facto merger in terms of Microsoft's accumulation of assets, equity, and dominance over OpenAI.

**RESPONSE:**    Denied.

### H.    *Microsoft Demonstrates Its Dominance and Control After OpenAI, Inc.'s Board Shows Independence*

146.    Microsoft demonstrated its dominance in a series of extraordinary developments culminating on November 22, 2023.  Microsoft and Altman leveraged their positions to force all but one member of OpenAI, Inc.'s Board to resign and replaced them with underqualified and compliant allies handpicked by Altman and blessed by Microsoft.

**RESPONSE:**    Denied.

147.    Before this coup, the Board consisted of Chief Scientist Dr. Sutskever, Brockman, Altman, Helen Toner ("Toner"), Adam D'Angelo ("D'Angelo"), and Tasha McCauley ("McCauley").  In addition to serving on the Board, Toner is a researcher and advisor for the Center for the Governance of AI ("GovAI") and the Director of Strategy at Georgetown's Center for Security and Emerging Technology.  McCauley is a Senior Management Scientist at RAND

Corporation, a non-profit which specializes in public policy decision making. Like Toner, McCauley is also an advisor for GovAI.

**RESPONSE:** The OpenAI Defendants admit that, prior to November 17, 2023, the board of OpenAI, Inc. consisted of Sutskever, D'Angelo, McCauley, Toner, Altman, and Brockman, and otherwise deny the allegations in the first sentence of Paragraph 147. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second, third, and fourth sentences of Paragraph 147 and deny them on that basis

148. The choice to include on the Board multiple academics and public policy experts with deep AI policy experience, most of whom had no financial stake in OpenAI, was deliberate. This composition of financially disinterested Board members with strong records of public service ensured that the Board would put the non-profit's principles of openness and safety before financial success—which it did.

**RESPONSE:** The OpenAI Defendants admit that the composition of OpenAI, Inc.'s board in 2023 reflected deliberation and a commitment to pursuit of the nonprofit's mission. The OpenAI Defendants aver that the composition of OpenAI, Inc.'s board today likewise reflects deliberation and a commitment to pursuit of the nonprofit's mission. The OpenAI Defendants otherwise deny the allegations in Paragraph 148.

149. On November 17, 2023, OpenAI, Inc.'s Board dismissed Altman as CEO and from the Board, announcing he was fired following "a deliberative review process by the board, which concluded that he was not consistently candid in his communications with the board, hindering its ability to exercise its responsibilities. The board no longer has confidence in his ability to continue leading OpenAI." Brockman was also dismissed from the Board, but not as OpenAI, Inc.'s CTO, though he resigned in solidarity with Altman shortly thereafter.

**RESPONSE:** The first sentence of Paragraph 149 purports to quote from and characterize OpenAI's website, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants admit that Altman and Brockman were dismissed from OpenAI, Inc.'s board on November 17, 2023 and that Brockman resigned from OpenAI on November 17, 2023. The OpenAI Defendants otherwise deny the allegations in Paragraph 149.

1    150.    It has been reported that the Board fired Altman because he had deliberately
2    misrepresented what was happening at OpenAI, Inc. and explicitly lied to the Board to obstruct its
3    ability to carry out its oversight duties.  The Board was likewise concerned by Altman's numerous
4    side hustles and conflicts of interest and his purposeful withholding of information necessary for
5    the Board to evaluate the scope and extent of his self-dealing and myriad conflicts.

6    **RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form
7    a belief as to the truth of the allegations in Paragraph 150 to the extent they purport to characterize
8    unidentified reporting, and deny them on that basis. The OpenAI Defendants otherwise deny the
9    allegations in Paragraph 150.

10    151.    News reports further suggest Altman's firing was due in part to OpenAI, Inc.'s
11    breakthroughs in AGI and Altman's prioritizing profit over safety and the non-profit's founding
12    principles.

13    **RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form
14    a belief as to the truth of the allegations in Paragraph 151 to the extent they purport to characterize
15    unidentified reporting, and deny them on that basis. The OpenAI Defendants otherwise deny the
16    allegations in Paragraph 151.

17    152.    On information and belief, when Microsoft's CEO Nadella learned of Altman's
18    firing, he was furious.  As perhaps the largest shareholder in OpenAI's for-profit arm, Nadella felt
19    Microsoft should have been consulted before the decision was made.

20    **RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form
21    a basis as to the truth of certain allegations in Paragraph 152, and deny them on that basis. The
22    OpenAI Defendants otherwise deny the allegations in Paragraph 152.

23    153.    On information and belief, aside from Altman and Brockman, OpenAI, Inc.'s then-
24    constituted Board had no ties to Microsoft.  Rather, Altman was the primary liaison between
25    Microsoft and OpenAI, Inc., and with him gone, Microsoft's continued exclusive license of the
26    non-profit's evolving technology (i.e., AGI) was in jeopardy.

27    **RESPONSE:**    Denied.

28    154.    Microsoft's response was swift.  Nadella hired Altman and Brockman to lead a new

1    Microsoft AI research lab, unbound by the constraints of OpenAI, Inc.'s humanitarian mission, and

2    the three actively solicited OpenAI's employees to leave and join Microsoft's new lab.    On

3    information and belief, Altman and Brockman became senior employees of Microsoft.

4         **RESPONSE:**    The OpenAI Defendants admit that Microsoft announced that it had hired

5    Altman and Brockman on November 20, 2023 to lead a new AI research team, and otherwise deny

6    the allegations in Paragraph 154.

7         155.    Microsoft was nevertheless confident that, whatever happened, it could still

8    capitalize on OpenAI, Inc.'s research and technology.    Indeed, during an interview shortly after

9    Altman's firing, Nadella stated:

10        We have all the IP rights and all the capability.  If OpenAI disappeared tomorrow,
         I don't want any customer of ours to be worried about it quite honestly, because we
11        have all of the rights to continue the innovation.  Not just to serve the product, but
         we can go and just do what we were doing in partnership ourselves.  We have the
12        people, we have the compute, we have the data, we have everything.

13

14        **RESPONSE:**    Paragraph 155 purports to quote from and characterize an interview of

15   Satya Nadella by Kara Swisher on November 21, 2023, published in *New York Magazine*, to which

16   the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The

17   OpenAI Defendants otherwise deny the allegations in Paragraph 155.

18        156.    Despite Microsoft's bold statements, it apparently still wanted its man Altman on

19   the inside as OpenAI, Inc.'s CEO.  In the days following his firing, OpenAI, Inc.'s Board faced

20   mounting pressure from Microsoft to reinstate Altman.  Nadella even bragged about Microsoft's

21   influence over the non-profit:  "We are in there.  We are below them, above them, around them."

22        **RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form

23   a belief as to the truth of the allegations in the first sentence of Paragraph 156 and deny them on

24   that basis. The second and third sentences of Paragraph 156 purport to quote from and characterize

25   an interview of Satya Nadella by Kara Swisher on November 21, 2023, published in *New York*

26   *Magazine*, to which the OpenAI Defendants respectfully refer the Court for its complete and

27   accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 156.

28        157.    Microsoft indeed had leverage.  On information and belief, at the time of Altman's

1  ouster, Microsoft had paid only a fraction of the $13 billion commitment it had made to OpenAI.

2  And if Microsoft were to withhold its compute on which OpenAI was reliant, it would be effectively

3  incapacitated.

4      **RESPONSE:**    Denied.

5      158.    The pressure on the Board from Altman, Brockman, and Microsoft continued until

6  November 21, 2023, when Altman was reinstated as CEO after his dismissal, and Brockman as

7  CTO.  The coup took Defendants just four days.

8      **RESPONSE:**    The OpenAI Defendants admit that a decision was made to reinstate

9  Altman as CEO of OpenAI, Inc. and OpenAI OpCo, LLC, and Brockman as President of OpenAI

10  OpCo, LLC, on November 21, 2023. The OpenAI Defendants otherwise deny the allegations in

11  Paragraph 158.

12      159.    Upon his return, Altman and Microsoft demanded the resignation of Toner,

13  McCauley, and Dr. Sutskever from the Board, taking the opportunity to clean house and purge

14  those who ousted Altman, as Nadella had vowed:  "We'll definitely take care of all of the

15  governance issues and anything else . . . we have all the rights, so therefore we will make sure that

16  we are very, very clear that the governance gets fixed[.]" Notably, D'Angelo—the sole Board

17  member to remain after Altman's reinstatement—is a tech CEO and entrepreneur.

18      **RESPONSE:**    The OpenAI Defendants admit that D'Angelo is the co-founder and CEO

19  of Quora, and otherwise deny the allegations in Paragraph 159.

20      160.    In fact, the 2023 Board that dismissed Altman, consisting, on information and belief,

21  of only Altman, Dr. Sutskever, D'Angelo, and the two AI governance experts, Toner and McCauley

22  (Brockman was reportedly absent from the Board meeting), was the first Board since 2018 not

23  adversely dominated by interests aligned with Altman and Brockman.

24      **RESPONSE:**    Denied.

25      161.    The 2022 Board consisted of Dr. Sutskever, Brockman, and Altman (both CEO and

26  President), as directors simultaneously working full time at OpenAI; and Will Hurd ("Hurd") (of

27  Allen & Company, a major investment bank catering to technology companies), Reid Hoffman

28  (general partner at tech venture capital firm Greylock Partners ("Greylock"), a member of

-66-

Microsoft's Board since March 2017, and a co-founder of the generative AI company Inflection AI, Inc. ("Inflection")[28]), and D'Angelo, as directors aligned with Brockman and Altman's interests as technology entrepreneurs; and Zilis, Toner, and McCauley, as the only truly independent directors.

**RESPONSE:** The OpenAI Defendants admit that Altman, Brockman, Sutskever, D'Angelo, McCauley, Hoffman, Zilis, Hurd, and Toner served on the board of OpenAI, Inc. in 2022, and otherwise deny the allegations in Paragraph 161.

162.    The 2021 Board was no better:  Altman, as President again, Brockman, Hoffman, D'Angelo, Hurd, Zilis, McCauley, Toner, and a charity CEO, Holden Karnofsky ("Karnofsky"), whose enterprises are primarily dependent on funding from tech entrepreneurs, in place of Dr. Sutskever.  Even counting Karnofsky with the independents,[29] they were still in the minority, and Altman and Brockman represented 100% of the directors working at OpenAI full time.

**RESPONSE:** The OpenAI Defendants admit that Altman, Brockman, Hoffman, D'Angelo, Hurd, Zilis, McCauley, Toner, and Karnofsky served on the board of OpenAI, Inc. at various times in 2021, and otherwise deny the allegations in Paragraph 162.

163.    The 2020 Board had seven members:  Altman as President, Brockman, Hoffman, D'Angelo, Zilis, McCauley, and Karnofsky.  Again, even counting Karnofsky with Zilis and McCauley, the breakdown still has independents in the minority, with Altman and Brockman as the only full-time working directors.

**RESPONSE:** The OpenAI Defendants admit that Altman, Brockman, Hoffman, D'Angelo, Zilis, McCauley, and Karnofsky served on the board of OpenAI, Inc. at various times in 2020, and otherwise deny the allegations in Paragraph 163.

164.    The 2019 Board was even worse, with Sue Yoon, a former venture capitalist now at Google, serving in what would become Zilis' spot on the Board.

---

[28] Notwithstanding his obvious conflicts, Hoffman was reportedly reluctant to step down from OpenAI, Inc.'s Board when he resigned in or about March 2023.

[29] This is generous to Karnofsky, given that, when he resigned, he cited as a potential conflict that his wife, Daniela Amodei, and her brother, Dario Amodei (both ex-OpenAI employees) were co-founding Anthropic, now the largest direct competitor to OpenAI/Microsoft's monopoly.

1    **RESPONSE:**    The OpenAI Defendants admit that Yoon served on the board of OpenAI,

2    Inc. for a time during 2019, and otherwise deny the allegations in Paragraph 164.

3    165.    On information and belief, to avoid replicating the 2023 independent Board setup

4    that led to Altman's ouster, upon Altman's reinstatement, he handpicked a new Board that lacked

5    the technical expertise and substantial background in AI governance, which the previous Board had

6    by design.  The new members were reportedly "big fans of Altman."

7    **RESPONSE:**    Denied.

8    166.    Microsoft also obtained an influential non-voting director seat on the Board from

9    which it could keep a close eye on its non-profit golden goose.  Though on July 9, 2024, Microsoft

10   relinquished its seat amid scrutiny and pressure from antitrust agencies in the U.S. and Europe

11   suspicious of its all-too-cozy relationship with OpenAI, there is no un-ringing this bell.

12   **RESPONSE:**    The allegations in Paragraph 166 are relevant only to Plaintiffs' claim

13   under Section 8 of the Clayton Act, 15 U.S.C. § 19 (Count XV) and that part of Plaintiffs' claim

14   for unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Count XVI) predicated on

15   Count XV, which the Court's Order Denying Motion for a Preliminary Injunction (ECF No. 121)

16   held untenable for lack of standing. The OpenAI Defendants therefore will not answer these

17   allegations unless ordered to do so by the Court.

18   167.    The same pertains to Hoffman's highly conflicted simultaneous service as a member

19   of the boards of OpenAI, Inc., Microsoft, and Inflection.  Notwithstanding their glaring conflicts,

20   by virtue of their Board service, Microsoft and Hoffman had open access to *all* internal OpenAI,

21   Inc. materials as a matter of right under its Bylaws.  Ex. 21 at 12.

22   **RESPONSE:**    The allegations in Paragraph 167 are relevant only to Plaintiffs' claim

23   under Section 8 of the Clayton Act, 15 U.S.C. § 19 (Count XV) and that part of Plaintiffs' claim

24   for unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Count XVI) predicated on

25   Count XV, which the Court's Order Denying Motion for a Preliminary Injunction (ECF No. 121)

26   held untenable for lack of standing. The OpenAI Defendants will therefore not answer these

27   allegations unless ordered to do so by the Court.

28   168.    On information and belief, OpenAI, Inc.'s present Board is now dominated by

directors with interests conflicted and adverse to those of OpenAI, Inc., Plaintiffs, and the public.

**RESPONSE:**    Denied.

169.    With the reinstatement of Altman and the restructuring of OpenAI, Inc.'s Board, the once carefully crafted non-profit structure Musk agreed to is now thoroughly compromised by a fully profit-driven CEO (Altman) and sometimes-President (Brockman), a compliant Board with inferior technical expertise and almost no AI-governance experience, and a trillion-dollar pro-profit partner (Microsoft).

**RESPONSE:**    Denied.

170.    The loss of the Board's technical expertise in AI, neutrality, and commitment to OpenAI, Inc.'s non-profit purposes are particularly compromising as it is the Board that determines whether OpenAI has attained AGI, which, as detailed above, OpenAI had previously excluded from its license to Microsoft.  Given Microsoft and OpenAI's de facto merger and enormous financial interest in the continued exploitation of the non-profit's technology, OpenAI, Inc.'s newly captured, conflicted, and compliant Board will have every reason to delay ever making a finding that OpenAI has attained AGI.  The Microsoft-OpenAI for-profit leviathan may now operate fully unchecked.

**RESPONSE:**    Denied.

I.    ***Altman Reneges in 2023 on His Repeated Promises to Musk, Regulators, and the Public to Open Source the Non-Profit's Technology***

171.    In its early years, OpenAI, Inc.'s research and development were performed in the open—as required by Musk's donations and OpenAI, Inc.'s filings with Delaware and California—providing the public with free access to the non-profit's designs, models, and code.

**RESPONSE:**    The OpenAI Defendants admit that OpenAI has published certain research, code, and model weights, and otherwise deny the allegations in Paragraph 171.

172.    For example, in June 2018, when OpenAI, Inc. researchers discovered that an algorithm called "Transformers" could perform natural language tasks without any explicit training, entire communities from open-source, grass-roots groups to commercial endeavors sprung up to enhance and extend OpenAI, Inc.'s models—the intended benefit of making the non-profit's research open source.

1    **RESPONSE:**    The OpenAI Defendants admit that OpenAI published research regarding

2    transformers and unsupervised pre-training in June 2018 in conjunction with the release of GPT-1,

3    the first generative pre-trained transformer introduced to the market, and otherwise deny the

4    allegations in Paragraph 172.

5        173.    In 2019, OpenAI released the full, open version of a second-generation Generative

6    Pre-Trained Transformer ("GPT"), GPT-2 with the stated hope that it would "be useful to

7    developers of future powerful models." It also released a detailed report describing the new model

8    and acknowledged some of the many benefits of openly releasing such models to the public.

9        **RESPONSE:**    The OpenAI Defendants admit that GPT-2 was released in 2019. The first

10    sentence of Paragraph 173 otherwise purports to quote from and characterize OpenAI's website, to

11    which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.

12    The second sentence of Paragraph 173 seemingly purports to characterize a report titled "Release

13    Strategies and the Social Impacts of Large Language Models," and published by OpenAI in

14    November 2019, to which the OpenAI Defendants respectfully refer the Court for its complete and

15    accurate contents.

16        174.    In 2020, OpenAI, Inc. announced a third version of its model, GPT-3, and again,

17    published a research paper detailing its complete implementation for others to build on.

18        **RESPONSE:**    The OpenAI Defendants admit that GPT-3 was released in 2020. To the

19    extent the allegations in Paragraph 174 purport to characterize a report published by OpenAI

20    researchers titled "Language Models are Few-Shot Learners," published in 2020, the OpenAI

21    Defendants respectfully refer the Court to such report for its complete and accurate contents. The

22    OpenAI Defendants otherwise deny the allegations in Paragraph 174.

23        175.    OpenAI, Inc.'s initial findings, while technologically interesting, had little

24    commercial value and were openly published by Altman. But, as we now know, once OpenAI

25    reached the threshold of commercially viable AI, Altman about-faced and began locking down the

26    non-profit's technology for personal gain.

27        **RESPONSE:**    Denied.

28        176.    It is also no coincidence that OpenAI veered away from open-sourcing its models

-70-

1  after it began exclusively licensing its technology to Microsoft.

2          **RESPONSE:**   Denied.

3          177.    On March 14, 2023, OpenAI, Inc. released its most advanced model to date, GPT-4,

4  which many including Microsoft celebrated as "a form of general intelligence."  Microsoft's

5  scientists stated that, given GPT-4's advanced capabilities, "we believe [it] could reasonably be

6  viewed as an early (yet still incomplete) version of an artificial general intelligence (AGI) system."

7  Defendants, however, publicly released no report or code regarding GPT-4, preventing the public

8  from building on the non-profit's AI advancements as Musk had been promised.

9          **RESPONSE:**   The OpenAI Defendants admit that GPT-4 was released on March 14,

10  2023. The first two sentences of Paragraph 177 otherwise purport to quote from and characterize a

11  March 2023 paper written by Microsoft researchers, titled "Sparks of Artificial General

12  Intelligence: Early experiments with GPT-4," to which the OpenAI Defendants respectfully refer

13  the Court for its complete and accurate contents. With respect to the third sentence of Paragraph

14  177, the OpenAI Defendants respectfully refer the Court to a report published by OpenAI

15  researchers in March 2023, titled "GPT-4 Technical Report," for its full and accurate contents. The

16  OpenAI Defendants otherwise deny the allegations in Paragraph 177.

17          178.    Defendants have kept GPT-4, and subsequent models including without limitation,

18  GPT-4T, GPT-4o (released May 2024), and OpenAI o1 (released September 2024), entirely closed.

19  On information and belief, the internal details of these models are known only to Defendants.  The

20  reason for the secrecy is obvious:  OpenAI and Microsoft stand to make a fortune from exclusive

21  control over the non-profit's technology and selling its applications to the public, which would not

22  be possible if the non-profit made its research and technology freely available, as Altman had

23  repeatedly promised Musk, regulators and the public.

24          **RESPONSE:**   The OpenAI Defendants admit that GPT-4o was released in May 2024 and

25  that a preview of OpenAI o1 was released in September 2024, and otherwise deny the allegations

26  in Paragraph 178.

27          **J.**   ***OpenAI Today***

28          179.    Defendants' unbridled power and profit focus have led to a recent flurry of safety

and legal concerns and forceful pushback against OpenAI and Altman for abandoning their non-profit mission.

**RESPONSE:**    Denied.

180.    Along with pending civil litigation from media outlets like *The New York Times* and the *Chicago Tribune* concerning OpenAI's illegal use of their content to train GPT models, the takeover of the Board and Microsoft's increasingly close relationship with OpenAI have sparked numerous ongoing investigations by the SEC, FTC, and various U.K. and E.U. regulators.  On July 22, August 1, and August 8, 2024, Senators sent Altman demand letters seeking documents and questioning OpenAI's commercial practices, commitment to safety, Altman's self-dealing, and illegal attempts to muzzle employee-whistleblowers.

**RESPONSE:**    Paragraph 180 purports to characterize letters from various U.S. Senators to OpenAI, dated July 22, 2024, August 1, 2024, and August 8, 2024, to which the OpenAI Defendants respectfully refer the Court for their complete contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 180.

181.    Further, in a series of letters dated January 9, March 5, June 6, and September 30, 2024, to the California Attorney General, the prominent consumer advocacy organization Public Citizen detailed numerous issues concerning Altman's self-dealing, the troublesome power OpenAI's for-profit arm is wielding over the non-profit, and the recent move to convert OpenAI, Inc. to a fully for-profit company, urging the Attorney General to investigate OpenAI, Inc.'s tax-exempt status.

**RESPONSE:**    Paragraph 181 purports to characterize letters from Robert Weissman, Co-President of Public Citizen, to the California Department of Justice's Office of the Attorney General, dated January 9, 2024, March 5, 2024, June 6, 2024, and September 30, 2024, to which the OpenAI Defendants respectfully refer the Court for their complete contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 181.

182.    OpenAI has also continuously hemorrhaged employees and executives.    On information and belief, the resignations largely appear to be in protest of Altman and OpenAI's increasingly unfettered and conflicted pursuit of profits at the expense of safety.

1    **RESPONSE:**    Denied.

2        183.    For instance, in May 2024, Chief Scientist Dr. Sutskever and OpenAI, Inc. executive

3    Jan Leike resigned.  The two had led OpenAI, Inc.'s "Superalignment" team tasked with managing

4    the risk that its technology "could lead to the disempowerment of humanity or even human

5    extinction."  Leike stated he could no longer work at the company because he was concerned that

6    safety and societal impact "have taken a backseat to shiny products."

7        **RESPONSE:**    The OpenAI Defendants admit that Sutskever and Leike resigned in May

8    2024. The second sentence of Paragraph 183 purports to quote from and characterize OpenAI's

9    website, to which the OpenAI Defendants respectfully refer the Court for its complete contents.

10   The third sentence of Paragraph 183 purports to quote from and characterize a post on X by Leike,

11   dated May 17, 2024, to which the OpenAI Defendants respectfully refer the Court for its complete

12   and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 183.

13       184.    Such shiny products include, for example, OpenAI's Whisper, an audio transcription

14   system which OpenAI released knowing it tended to fabricate even highly important information

15   (e.g., once released, Whisper fabricated medical records).  Releasing products with alarming

16   defects like this can be lethal and is not something a true safety-conscious non-profit with no

17   pressure to generate revenue would rush to do.

18       **RESPONSE:**    Denied.

19       185.    Other employees, including Daniel Kokotajlo resigned because they "lost trust in

20   OpenAI leadership and their ability to responsibly handle AGI."  In an interview with Vox on May

21   18, 2024, Kokotajlo stated:  "I joined with substantial hope that OpenAI would rise to the occasion

22   and behave more responsibly as they got closer to achieving AGI.  It slowly became clear to many

23   of us that this would not happen."  That same article reported numerous other departures:  "at least

24   seven people [] tried to push OpenAI to greater safety from within, but ultimately lost so much faith

25   in its charismatic leader [Altman] that their position became untenable."

26       **RESPONSE:**    Paragraph 185 purports to quote from and characterize an article in *Vox*

27   dated May 18, 2024, to which the OpenAI Defendants respectfully refer the Court for its complete

28   and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 185.

186.    Carroll Wainwright, a former alignment researcher for OpenAI, also resigned in May 2024: "I worry that the board will not be able to effectively control the for-profit subsidiary, and I worry that the for-profit subsidiary will not be able to effectively prioritize the mission when the incentive to maximize profits is so strong."

**RESPONSE:**    Paragraph 186 purports to quote from and characterize a post on X by Wainwright, dated June 4, 2024, to which the OpenAI Defendants respectfully refer the Court for its complete contents. The OpenAI Defendants admit that Wainwright resigned in May 2024, and otherwise deny the allegations in Paragraph 186.

187.    In June 2024, one month after leaving OpenAI, Dr. Sutskever launched Safe Superintelligence, Inc., whose mission is, pointedly, to focus on the development of safe AI.

**RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 187 and deny them on that basis.

188.    On August 5, 2024, John Schulman, with OpenAI since the beginning, quit to work at the safety-focused AI startup, Anthropic, and to "deepen [his] focus on AI alignment[.]"

**RESPONSE:**    Paragraph 188 purports to quote from and characterize a post on X by Schulman, dated August 5, 2024, to which the OpenAI Defendants respectfully refer the Court for its complete contents. The OpenAI Defendants admit that Schulman resigned on August 5, 2024 to join Anthropic PBC, and otherwise deny the allegations in Paragraph 188.

189.    On September 25, 2024, OpenAI's CTO Mira Murati, who served as interim CEO during Altman's firing, abruptly left the company, along with Chief Research Officer Bob McGrew and the Head of Post-Training, Barret Zoph.

**RESPONSE:**    The OpenAI Defendants admit that Murati, McGrew, and Zoph announced their resignations from OpenAI on September 25, 2024, and that Murati served as OpenAI's interim CEO, and otherwise deny the allegations in Paragraph 189.

190.    On October 23, 2024, Miles Brundage, a policy researcher at OpenAI and senior adviser on OpenAI's AGI Readiness team resigned, stating: "In short, neither OpenAI nor any other frontier lab is ready" for AGI. His announcement also revealed the disbanding of OpenAI's AGI Readiness Team. And just last week, Lilian Weng, OpenAI's VP of Research and Safety,

announced her resignation after seven years at the company.

**RESPONSE:**    The OpenAI Defendants admit that Brundage announced his resignation from OpenAI on October 23, 2024. The first sentence of Paragraph 190 otherwise purports to quote from and characterize a blog post by Brundage, dated October 23, 2024, to which the OpenAI Defendants respectfully refer the Court for its complete contents. The OpenAI Defendants admit that membership and responsibilities of the AGI Readiness Team were distributed to other internal groups to create a more effective and streamlined structure for safety, tighter feedback loops, and stronger alignment towards OpenAI's mission. The OpenAI Defendants otherwise deny the allegations in the second sentence of Paragraph 190. The OpenAI Defendants admit the allegations in the third sentence of Paragraph 190.

191.    In January 2024, notwithstanding Altman's promise to Musk that "safety should be a first-class requirement" Ex. 2 at 1, OpenAI dropped a clause from its Usage Policies banning the use of its technology for "activity that has a high risk of physical harm" such as "weapons development" or "military and warfare." On October 25, 2024, OpenAI reportedly secured its first contract with a combat division of the Department of Defense.

**RESPONSE:**    The first sentence of Paragraph 191 purports to quote from and characterize June 24, 2015 emails attached as Exhibit 2 to the Second Amended Complaint, and an article in *The Intercept* dated January 12, 2024, to which the OpenAI Defendants respectfully refer the Court for their complete contents. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 191 to the extent they purport to characterize unidentified reporting, and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 191.

192.    A June 15, 2024 article in *Cointelegraph* entitled "OpenAI Reportedly Considering Shift to For-profit as CEO Stacks Board" detailed how Altman "told shareholders he was considering the [for-profit] move sometime during the week of June 10. If realized, the pivot would ostensibly result in OpenAI's nonprofit board losing control of the company." Altman is now fast-tracking his plan to turn the non-profit Musk co-founded into the for-profit business Altman had always envisaged.

1    **RESPONSE:**    The first sentence of Paragraph 192 purports to quote from and characterize

2    an article in *Cointelegraph* titled "OpenAI reportedly considering shift to for-profit as CEO stacks

3    board," dated June 15, 2024, to which the OpenAI Defendants respectfully refer the Court for its

4    complete contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 192.

5        193.    Since the filing of the original Complaint, this transformation has only accelerated,

6    with OpenAI and Microsoft hiring investment banks to negotiate their deal and a two-year deadline

7    to complete OpenAI's for-profit conversion.

8    **RESPONSE:**    The OpenAI Defendants admit that the board of OpenAI, Inc. has retained

9    independent financial advisors to review options for a potential corporate reorganization, and

10   otherwise deny the allegations in Paragraph 193.

11       194.    The most recent reporting on those plans by the *Wall Street Journal* reveals that

12   Microsoft has a right to 75% of OpenAI's profits after the first $194 million until reaching $17.3

13   billion.  Then Microsoft's share will drop to 49% until it receives 100 times its original investment,

14   or *profits* (not revenue) of $1.4 *trillion*.  It has also been reported this "100 times investment" cap

15   is merely "theoretical," as the "cap" is subject to increase 20% annually beginning in 2025.[30]

16

17

18

19

20

21

22

23

24

25

26

---

27   [30] Notably, this *Wall Street Journal* article appears to be based on OpenAI and Microsoft's projections—"Source:  company documents"—and is therefore likely the most favorable possible

28   presentation of this information.

**Profits from Nonprofit**
How OpenAI's returns are distributed under its current structure as a nonprofit organization with a for-profit subsidiary
**Share of OpenAI profits distributed in each tranche, by recipient**

❶ The first **$194 million** of the company's profits are reserved for paying back its **first investors**, which include Khosla Ventures and LinkedIn co-founder Reid Hoffman.

❷ The next **$17.3 billion** of profits will make Microsoft whole on its initial $13 billion investment and start paying out returns to that **first group of investors**, along with OpenAI employees.

FIRST OPENAI INVESTORS
100% OF FIRST TRANCHE OF PROFITS

MICROSOFT
75%

❸ After that, profits are split into the following shares until each group reaches a predetermined cap on their returns.

❹ Only then will all further profits go toward the **OpenAI nonprofit**.

MICROSOFT
49%

OPENAI EMPLOYEES
41%

NONPROFIT 2%

OPENAI NONPROFIT
100%

Source: company documents

**RESPONSE:**    Paragraph 194 purports to quote from and characterize an article in *The Wall Street Journal* titled "The $14 Billion Question Dividing OpenAI and Microsoft," dated October 18, 2024, to which the OpenAI Defendants respectfully refer the Court for its complete contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 194.

195.    On information and belief, OpenAI has raised a total of $21.9 billion in its funding rounds.  Even if *all* of the For-Profit Entities are capped—something far from certain—OpenAI would need to generate $2.2 *trillion* in *profits* (not just revenues) before this for-profit scheme would begin funneling anything more than a nominal 2% back to the charity.

**RESPONSE:**    Denied.

196.    This profit cap will not be reached anytime soon.  On information and belief, the entire worldwide market—the total value of the AI sector, not just profits—is presently $214.6 billion.  Public projections suggest AI's worldwide market value—again, not profits but total market value—will be just $1.3 trillion in 2030.  Given these numbers, which are for all AI products and services, not just generative AI, the idea that a single generative AI company can make $2.2 trillion in *profits* over even the medium-term is implausible.

**RESPONSE:**    Denied.

197.    If one considers that some of the For-Profit Entities might not be capped, and that

any cap may begin rising by 20% per year in 2025, then Defendants' scheme moves from an implausible way to compensate OpenAI, Inc. for its value to an impossible one.

**RESPONSE:** Denied.

198.    As massive profits come into view, OpenAI and Microsoft's anticompetitive practices have intensified. For instance, on information and belief OpenAI has attempted to starve competitors of AI talent by aggressively recruiting employees with offers of lavish compensation, and is on track to spend $1.5 billion on personnel for just 1,500 employees.

**RESPONSE:** The allegations in Paragraph 198 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

199.    Further, during OpenAI's latest funding round in early October 2024, on information and belief, Altman, in concert with and at the urging of other Defendants, conditioned investors' ability to participate in the heavily oversubscribed offering on their agreeing *not* to invest in OpenAI's competitors, specifically calling out xAI. As reported in the *Financial Times* on October 3, 2024:

> OpenAI has asked investors to avoid backing rival start-ups such as Anthropic and Elon Musk's xAI, as it secures $6.6bn in new funding and seeks to shut out challengers to its early lead in generative artificial intelligence. . . . During the negotiations, the company made clear that it expected an exclusive funding arrangement, according to three people with knowledge of the discussions.

> Seeking exclusive relationships with investors restricts rivals' access to capital and strategic partnerships. . . . OpenAI can command unusual terms and an outsized valuation because investors believe the company could dominate the next wave of AI innovation, which they argue will be as significant a shift in consumer behaviour as the internet or mobile.

> "Because the round was so oversubscribed, OpenAI said to people: 'We'll give you allocation but we want you to be involved in a meaningful way in the business so you can't commit to our competitors,'" according to one person with knowledge of the deal.

Ex. 25 at 1.

**RESPONSE:** The allegations in Paragraph 199 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

200.    More tell-tale signs of OpenAI's de facto merger with Microsoft have also begun to surface. In February 2023, Microsoft began making co-working space available for OpenAI employees in San Francisco. And recently, OpenAI has opened an outpost close to Microsoft's Washington headquarters, facilitating the ongoing merry-go-round of senior executives and engineers shuffling between the two companies.

**RESPONSE:**    The allegations in Paragraph 200 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

### K.    *The Market for AI*

201.    The relevant geographic market for OpenAI and Microsoft's conduct at issue is worldwide (excluding countries such as the People's Republic of China that substantially restrict international internet access).

**RESPONSE:**    The allegations in Paragraph 201 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

202.    The relevant product market for antitrust purposes is that of generative AI models and platforms. Governments, businesses, and individual users employ generative AI to, without limitation, solve complex problems that would otherwise require human reasoning; to generate informational and media content; and to automate a large and diverse number of processes using the same platform, such as, by way of example, writing computer code for vastly different purposes.

**RESPONSE:**    The allegations in Paragraph 202 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

203.    Not all AI is generative AI. For example, there are narrow AI systems trained for specific tasks, traditional machine learning models, and rule-based automation systems.

**RESPONSE:**    The allegations in Paragraph 203 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

1    The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

2        204.    What characterizes generative AI is its ability to process natural language inputs and

3    generate human-like outputs across multiple domains, while being adaptable to specific

4    applications and providing a platform for independent developers to generate specialized models.

5    Generative AI can write a short story in the style of Shirley Jackson, describe different theories on

6    boiling an egg perfectly, script a Python application to calculate the radius of a circle, and suggest

7    the perfect itinerary for your Roman holiday, all in the same platform, using the same interface, by

8    a person with no more training than required to ask a question.

9        **RESPONSE:**    The allegations in Paragraph 204 are irrelevant to the Subject Claims and

10   relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

11   The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

12       205.    Examples of flagship products in the relevant market are ChatGPT (OpenAI),

13   Copilot (Microsoft), Gemini (Google, and what became of DeepMind), Claude (Anthropic),

14   LLaMA (Meta), Mistral (Mistral AI), Grok (xAI), and Perplexity (Perplexity).  These products are

15   sometimes called "chatbots."

16       **RESPONSE:**    The allegations in Paragraph 205 are irrelevant to the Subject Claims and

17   relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

18   The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

19       206.    The generative AI market exhibits pronounced network effects, i.e., when people

20   use the product, it increases in value, attracting more users, and so on.  As developers create

21   specialized applications through a platform-specific application programming interface, the

22   platform becomes more useful, further attracting users.  Generative AI platforms also learn from

23   user interactions to further train and refine their systems.  More users means better generative AI,

24   which again leads to more users.

25       **RESPONSE:**    The allegations in Paragraph 206 are irrelevant to the Subject Claims and

26   relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

27   The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

28       207.    As a consequence, separate and apart from the tremendous expense involved in

purchasing, programming, and powering generative AI hardware and training a model using personnel from a very limited talent pool, there are significant barriers to entry by new market participants.

**RESPONSE:**  The allegations in Paragraph 207 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

208.    Because of the non-profit's substantial lead in producing generative AI, the but-for and proximate causes of which are Musk's recruitment, financial, and other contributions, OpenAI is estimated to have reached 100 million monthly active users for ChatGPT just two months after launch, making it the fastest-growing consumer application in history.

**RESPONSE:**  The allegations in Paragraph 208 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

209.    On information and belief, by November 2023, two million developers were already using OpenAI's platform, including more than 92% of Fortune 500 companies.

**RESPONSE:**  The allegations in Paragraph 209 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

210.    The result is that, aside from OpenAI and Microsoft, few other generative AI developers are producing much software revenue.

**RESPONSE:**  The allegations in Paragraph 210 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

211.    Even some of the best-known AI developers, such as Anthropic, face questions about their future profit margins, given the costly nature of developing the software.

**RESPONSE:**  The allegations in Paragraph 211 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

212.    In March 2024, Inflection, the well-funded and highly valued generative AI developer that Hoffman had co-founded (and served as a director of while serving on the Boards of both OpenAI and Microsoft), was reported to "g[i]ve up its ambition to compete with OpenAI" and most of its founders and employees moved to Microsoft in an unusually structured deal.[31]

**RESPONSE:**    The allegations in Paragraph 212 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

213.    Cohere, founded in 2019 by the legendary Aidan Gomez, who was only twenty years old when he wrote the paper that inspired OpenAI, has struggled to secure funding recently, even without trying to go head-to-head with OpenAI/Microsoft in consumer generative AI.

**RESPONSE:**    The allegations in Paragraph 213 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

214.    On information and belief, as of the end of 2023, the last full year for which data is available, OpenAI and Microsoft held approximately 69% of the worldwide market share for generative AI, while the next largest competitor, Amazon Web Services ("AWS"), held only 8%:

---

[31] Regulators in the U.K. classified Microsoft's acquisition of Inflection as a merger, despite Microsoft's efforts to evade such designation by structuring the deal as a mere acquisition of assets and personnel, a tactic similarly deployed by Defendants in the relationships between OpenAI, Inc., the For-Profit Entities, and Microsoft.  Prior to the merger, Inflection, incorporated February 3, 2022, was in the business of providing generative AI, in particular a chatbot called "Pi," in direct competition with xAI's Grok, OpenAI's ChatGPT, and Microsoft's Copilot.



**RESPONSE:** The allegations in Paragraph 214 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

215.    As of the end of 2023, the last full year for which data is available, Microsoft was reported to hold approximately 24% of the worldwide market for OpenAI's most important raw material, compute, putting it in second place behind AWS (31%) and ahead of Google (11%). Together, these top three market participants (Microsoft, AWS, and Google) control 66% of the world's supply of compute.[32]

**RESPONSE:** The allegations in Paragraph 215 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

_____

[32] Security and other practical considerations largely limit U.S. enterprises that consume compute, such as OpenAI, to U.S. providers, which means in practice, Microsoft, AWS, and Google in fact control much more than 66% of the compute available to OpenAI.

216.    On information and belief, in 2017, OpenAI spent $7.9 million on compute.    On information and belief, in the twelve months preceding Microsoft's 2019 investment of $1 billion in OpenAI, it spent less than $1 million on all Microsoft products and services combined, including compute, notwithstanding OpenAI's ever-increasing compute usage, which reportedly doubles every five months.

**RESPONSE:**    The allegations in Paragraph 216 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

217.    In the two-and-a-half years after Microsoft's 2019 investment, on information and belief OpenAI's *total* spending on all Microsoft products and services combined was less than $230,000.

**RESPONSE:**    The allegations in Paragraph 217 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

218.    Generating compute is a hugely expensive undertaking.    In addition to buying and maintaining the tens of thousands of computer processors that Microsoft sells and/or rents to customers such as OpenAI, Microsoft must pay highly-skilled personnel to design and operate the data centers housing its processors, as well as incur significant real estate and energy expenses in operating them, sometimes consuming more power than an entire city.

**RESPONSE:**    The allegations in Paragraph 218 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

219.    It is apparent from OpenAI's incredibly small expenditures on this valuable commodity that Microsoft is charging OpenAI far less than it costs to produce it, and in any event, vastly less than Microsoft charges other, similarly situated buyers.    Selling compute through Microsoft's Azure platform generated $62 billion in revenues as of the close of its June 2024 fiscal year, and OpenAI is one of Azure's largest users.

**RESPONSE:**    The allegations in Paragraph 219 are irrelevant to the Subject Claims and

1    relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

2    The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

3        220.    Creating generative AI is a hugely expensive undertaking.  In addition to extremely

4    expensive scientific personnel, drawn from a very limited pool, lawful generative AI incurs

5    significant costs in licensing material for training models, as well as to complete the training itself.

6    OpenAI is projected to spend $8.5 billion on just personnel and generative AI training this year

7    alone.  Yet OpenAI charges Microsoft and the public considerably less for its generative AI

8    products than they cost to produce.  The economics are obvious from the fact OpenAI is on track

9    to lose $5 billion this year and losses are expected to soar to $14 billion per year by 2026.

10        **RESPONSE:**    The allegations in Paragraph 220 are irrelevant to the Subject Claims and

11    relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

12    The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

13        221.    Microsoft also charges the public considerably less for its generative AI than it costs

14    to produce.

15        **RESPONSE:**    The allegations in Paragraph 221 are irrelevant to the Subject Claims and

16    relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

17    The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

18        222.    OpenAI charges $20 per month for its "ChatGPT Plus" plan.  When Microsoft

19    launched its "Copilot Pro" plan less than a year later, it also charged $20 per month for almost

20    mirror-image benefits.  Little wonder, then, that when Google launched its subscription product,

21    Gemini Advanced, the month after Microsoft, it had to charge $19.99 per month.  There is no reason

22    to believe prices should have synchronized so quickly despite wildly different cost structures for

23    putatively different products.

24        **RESPONSE:**    The allegations in Paragraph 222 are irrelevant to the Subject Claims and

25    relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

26    The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

27        223.    With U.S. and European antitrust regulators drawing nearer, Microsoft's Form 10-

28    K for the fiscal year ending June 30, 2024 listed OpenAI as a "competitor" for the very first time.

Although Microsoft is spending billions investing in other AI companies, the same filing lists only a single "strategic partner":  OpenAI.

**RESPONSE:**   The allegations in Paragraph 223 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

224.   xAI's Grok competes directly with OpenAI's ChatGPT and Microsoft's Copilot in the generative AI market.  xAI also competes directly with OpenAI to acquire compute from suppliers such as Microsoft, and xAI and OpenAI compete directly for the same investors.

**RESPONSE:**   The allegations in Paragraph 224 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

225.   xAI has been harmed by, without limitation:  investors declining to invest in xAI because of the exclusivity agreement Defendants extracted during OpenAI's most recent funding round; an inability to license OpenAI technology given Microsoft's exclusive license thereto; an inability to obtain compute from Microsoft on terms anywhere near as favorable as OpenAI receives, requiring xAI to invest tremendous sums to develop its own infrastructure to produce compute; difficulty recruiting scientists and other technically skilled employees, whom Defendants have locked down to prevent competitive hiring; and the exclusive exchange between OpenAI and Microsoft of competitively sensitive information, such as customer lists, pricing data, and research, resulting in an unlawful competitive advantage.

**RESPONSE:**   The allegations in Paragraph 225 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court

## COMMON STANDING ALLEGATIONS

226.   Defendants have no meaningful relationship with Delaware, whose laws apply only insofar as they concern the legality of OpenAI, Inc.'s Certificate of Incorporation and/or Bylaws.

**RESPONSE:**   Denied.

227.   In all other respects, California law governs.  Indeed, under the Attorney General of

California's interpretation of Cal. Corp. Code § 6910 as evidenced in practice, foreign non-profit corporations doing business in California, like OpenAI, Inc., are subject to California law.

**RESPONSE:**    Paragraph 227 sets forth legal conclusions to which no response is required.

228.    Though OpenAI, Inc.'s Certificate of Incorporation states, contrary to Delaware law applicable to charities, "[t]he corporation shall not have any members," Ex. 21 at 5, its Bylaws expressly provide for membership and do not provide another means for electing directors or otherwise exercising ultimate control over the corporation.  Ex. 21 at 8-10.

**RESPONSE:**    Paragraph 228 purports to quote from and characterize OpenAI, Inc.'s Certificate of Incorporation, attached as Exhibit 21 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 228.

229.    By virtue of Article II, § 1 of OpenAI, Inc.'s Bylaws, Musk was a member of OpenAI, Inc. from its founding until his resignation on February 21, 2018.

**RESPONSE:**    Admitted.

230.    Article III, § 1 of OpenAI, Inc.'s Bylaws expressly grants the persons defined to be members, such as Musk, "the right to vote":  "for the election of a director or directors"; "on a disposition of all or substantially all of the assets of [the] corporation"; "on a merger or on a dissolution"; and "on changes to the articles or bylaws."  *Id.* § 1(a), (c)-(f).

**RESPONSE:**    Paragraph 230 purports to quote from and characterize OpenAI, Inc.'s bylaws, to which the OpenAI Defendants respectfully refer the Court for their complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 230.

231.    Musk was thus not only a member of OpenAI, Inc. pursuant to the express language designating directors as members in the Bylaws, but also by virtue of his powers recited therein.

**RESPONSE:**    Admitted.

232.    Musk was therefore a member at the time of the transactions, in whole or in part, of which he complains.  He is no longer a member for reasons related to his attempts to address the harms to OpenAI, Inc., including without limitation, those alleged herein.

**RESPONSE:**    Denied.

233.    Adverse domination of OpenAI, Inc.'s Board during all periods except that from July 13, 2023 (upon the resignation of Hurd), through November 21, 2023 (upon Altman's return), as detailed in paragraphs 159-70, *supra*, excuses Musk from attempting to secure remedial action from the Board.

**RESPONSE:**    Denied.

234.    As the settlor of a charitable trust and/or by virtue of the Contract detailed in paragraph 247, *infra*, Musk has standing to enforce compliance with the conditions of his donations.

**RESPONSE:**    Denied.

235.    As a co-founder, early director, and critical donor, among other roles, Musk has a special interest in OpenAI's operation.

**RESPONSE:**    Denied.

236.    Musk has delivered to OpenAI, Inc. and its Board a true copy of the SAC by providing it to counsel for OpenAI, Inc., prior to this filing.

**RESPONSE:**    The OpenAI Defendants admit that approximately thirty minutes before filing the Second Amended Complaint, counsel for Musk emailed a copy of the complaint to litigation counsel for the OpenAI Defendants. The OpenAI Defendants otherwise deny the allegations in Paragraph 236.

## COMMON OPERATIONS ALLEGATIONS

237.    Except as otherwise specified herein, OpenAI, Inc. and the For-Profit Entities operate together as a unitary enterprise, the primary purpose of which is now for-profit. OpenAI, Altman, Brockman, and Microsoft have become alter egos of one another. Defendants' corporate veils should be pierced and their separate forms should now be disregarded because on information and belief, a single shareholder controls other entities (e.g., OpenAI, Inc. controls OpenAI OpCo, LLC, OpenAI GP, L.L.C., OpenAI, L.L.C., etc.) and because Defendants, some of which are undercapitalized, have commingled funds and/or assets (e.g., the intellectual property OpenAI, Inc. transferred to the For-Profit Entities), failed to respect corporate formalities, and have and continue to use the For-Profit Entities as shells to conduct illegal activities and/or to conceal or misrepresent the identity of their responsible ownership and respective business activities. Failing to ignore

1  Defendants' corporate forms would produce an inequitable result.

2  **RESPONSE:**    Denied.

3  238.    Except as otherwise specified herein, the unitary enterprise of OpenAI, or in the

4  alternative the individual entities comprising it, have engaged in a de facto merger with one another

5  and Microsoft.  On information and belief, following the asset transfers structured to avoid merger

6  review, there exists a continuity of ownership; an effective cessation of business by many of the

7  OpenAI entities, including OpenAI, Inc. itself (which had only $44,485 in revenue in 2022); sharing

8  of officers, directors, and stockholders between OpenAI, Inc., the For-Profit Entities, and/or

9  Microsoft; a continuity of operations; and use of OpenAI, Inc.'s assets, including its name.  No

10  adequate consideration has been given for OpenAI, Inc.'s assets and made available to meet the

11  claims of its unsecured creditors.

12  **RESPONSE:**    Denied.

13  239.    Defendants have intentionally concealed their wrongful conduct, which prevented

14  Plaintiffs from discovering their scheme, notwithstanding Plaintiffs' exercise of due diligence.

15  **RESPONSE:**    Denied.

16  240.    xAI, Microsoft, and OpenAI (both the non-profit and the For-Profit Entities) are

17  engaged in interstate and foreign commerce, and all of their complained-of actions are occurring in

18  commerce and/or are activities affecting commerce.  These parties' goods, commodities, and/or

19  services are sold, leased, used, consumed, and/or resold, and/or contracts for their lease, sale, use,

20  consumption, or resale occur throughout the United States, including in California.

21  **RESPONSE:**    Denied.

22  **COMMON ANTITRUST ALLEGATIONS**

23  241.    OpenAI alone, Microsoft alone, and/or OpenAI in combination with Microsoft, have

24  market power in generative AI.  Microsoft has market power in compute.

25  **RESPONSE:**    The allegations in Paragraph 241 are irrelevant to the Subject Claims and

26  relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025.

27  The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

28  242.    As a direct and intended result of Defendants' conduct, Musk and xAI have been

injured by, without limitation, higher prices for compute, lower prices for their generative AI products, fewer opportunities to compete in selling their generative AI goods, reduced ability to attract and retain the highly skilled personnel critical to success in this market, and reduced access to capital markets, all leading to reduced choices among consumers.

**RESPONSE:**    The allegations in Paragraph 242 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

243.    Although each of Defendants' acts is anticompetitive in its own right, the interrelated and interdependent actions giving rise to the claims in this SAC have had a cumulative and synergistic effect that has harmed Musk and xAI, competition, the competitive process, and consumers.

**RESPONSE:**    The allegations in Paragraph 243 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

244.    The cumulative actions of Defendants are either per se illegal, or their obvious and likely anticompetitive effects require only a "quick look" rule-of-reason inquiry.

**RESPONSE:**    The allegations in Paragraph 244 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

245.    Defendants' exclusionary acts lack a pro-competitive justification sufficient to offset the significant harms caused by their anticompetitive and unlawful conduct.

**RESPONSE:**    The allegations in Paragraph 245 are irrelevant to the Subject Claims and relate only to claims in this action that were stayed at the direction of the Court on April 4, 2025. The OpenAI Defendants will answer these allegations if and when ordered to do so by the Court.

## COUNT II:  BREACH OF IMPLIED-IN-FACT CONTRACT

### (In the alternative to Count I)
### (Musk Against Altman and OpenAI, Inc.)

254.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 253

inclusive, as though fully set forth herein.

**RESPONSE:**   The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Second Amended Complaint.

255.    The relationship, surrounding circumstances, and intentional course of conduct between Musk, on the one hand, and Altman and OpenAI, Inc., on the other, resulted in a valid, enforceable, and binding implied-in-fact contract.

**RESPONSE:**   Denied.

256.    Altman proposed that he and Musk co-found an AI research non-profit that Altman promised would make its findings open source for the good of all and would avoid concentrating its technology for the profit of any person or company.  Musk assented and in turn agreed to use his time, name, and extensive connections to recruit premier scientific talent, attract investment, and made significant financial contributions to establish the non-profit.

**RESPONSE:**   The OpenAI Defendants admit that Altman proposed to Musk the creation of an AI lab in May 2015, that OpenAI, Inc.'s founding Certificate of Incorporation stated that the "technology will benefit the public" and "the corporation will seek to open source technology for the public benefit when applicable," and that Musk helped OpenAI's initial efforts to recruit leading scientists and engineers. The OpenAI Defendants otherwise deny the allegations in Paragraph 256.

257.    Subsequently, Altman, individually and/or on behalf of OpenAI, Inc., continued to reaffirm, both publicly and to Musk directly, that OpenAI, Inc., as a non-profit, would develop and openly share AI technology for the good of the public and not for private commercial gain.  Such reaffirmations by Altman and/or OpenAI, Inc. were made, without limitation, in OpenAI, Inc.'s Certificate of Incorporation, the non-profit's Charter (circulated to Musk), numerous OpenAI online announcements, and countless communications to Musk from 2015 to 2020, as alleged in detail hereinabove.

**RESPONSE:**   Denied.

258.    The conduct of Musk, on the one hand, and Altman and OpenAI, Inc., on the other, was intentional, and each knew or had reason to know that the other party(ies) would interpret their conduct as reflecting an agreement.

1    **RESPONSE:**    Denied.

2    259.    Musk fulfilled any and all obligations and has performed and/or complied with any

3    and all terms and conditions of said agreement that he was required to perform and/or comply with,

4    except those which were waived and/or excused, or the non-performance of which was justified,

5    and is in no matter or respect in breach of said agreement.

6    **RESPONSE:**    Denied.

7    260.    Initially, Altman and OpenAI, Inc. performed their obligations and publicly

8    disclosed the non-profit's findings and research regarding its preliminary GPT models.

9    **RESPONSE:**    The OpenAI Defendants admit that OpenAI has published certain research,

10   code, and model weights, and otherwise deny the allegations in Paragraph 260.

11   261.    Altman and OpenAI, Inc., however, breached their implied-in-fact contract by,

12   without limitation, the acts detailed in paragraph 250(a)-(m), *supra*.

13   **RESPONSE:**    Denied. The OpenAI Defendants further deny the allegations in Paragraph

14   250(a)-(m).

15   262.    Defendants' obligations to perform were not waived nor were their breaches and/or

16   failures to perform justified and/or excused.

17   **RESPONSE:**    Denied.

18   263.    As a direct and proximate result of Altman and OpenAI, Inc.'s conduct, acts, and/or

19   omissions, Defendants have deprived Musk of the benefit of the parties' agreement and have caused

20   Musk to suffer damages, including but not limited to the loss of the time and resources he expended

21   to direct research and recruit scientific talent for the non-profit, the financial contributions he made

22   to OpenAI, Inc., as well as damage to his reputation, along with all benefit-of-the-bargain and

23   consequential damages, in an amount to be adjudicated and determined at trial, plus prejudgment

24   interest, costs, and fees.

25   **RESPONSE:**    Denied.

26   264.    Musk has no adequate remedy at law for many of the injuries he suffered and

27   continues to suffer as a result of Defendants' breaches and failures, and such injuries cannot

28   reasonably, adequately, or precisely be measured or compensated in damages.  Musk therefore also

1    seeks and is entitled to specific performance of Defendants' contractual obligations.

2    **RESPONSE:**    Denied.

3    ## COUNT III:  BREACH OF IMPLIED COVENANT
     ## OF GOOD FAITH AND FAIR DEALING

4
5    **(Musk Against Altman and OpenAI, Inc.)**

6    265.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 264

7    inclusive, as though fully set forth herein.

8    **RESPONSE:**    The OpenAI Defendants repeat and incorporate by reference their

9    responses to the foregoing allegations in the Second Amended Complaint.

10    266.    Implied in every agreement is a covenant of good faith and fair dealing that each

11    party will not do anything to unfairly interfere with the right of any other party to receive the

12    benefits of the agreement.

13    **RESPONSE:**    Paragraph 266 sets forth a legal conclusion to which no response is

14    required.

15    267.    Musk entered into the valid, binding, and enforceable implied agreement with

16    Altman and OpenAI, Inc. with the purpose of developing AI/AGI technology to be openly shared

17    with the public for the benefit of all and not for private profiteering.

18    **RESPONSE:**    Denied.

19    268.    Musk fulfilled any and all obligations and has performed and/or complied with any

20    and all terms and conditions of the agreement with Altman and OpenAI, Inc. that he was required

21    to perform and/or comply with, except those which were waived and/or excused, or the non-

22    performance of which was justified, and is in no matter or respect in breach of said agreement.

23    **RESPONSE:**    Denied.

24    269.    Altman and OpenAI, Inc. did not act fairly and in good faith, engaging in conduct

25    that frustrated the purpose of the parties' agreement and Musk's reasonable expectations under it.

26    Specifically, in addition to and distinct from their breach of contract:

27    a.    Defendants systematically and unilaterally reinterpreted key terms of their

28    agreement in ways that undermined it, including by evading conflict-of-interest protections by

defining board member "independence" in an extraordinarily narrow fashion—considering, for example, only whether board members *directly or personally* held equity in OpenAI's For-Profit Entities—while rejecting standard independence disqualifiers;

b.    Defendants obscured OpenAI's for-profit activities through complex corporate structures, deliberately designed to prevent Musk and the public from discovering their actual operations, and by purporting to maintain the charity's control of their for-profit business when, in fact, the opposite is true; and

c.    Defendants engaged in all acts *supra* ¶¶ 250(a)-(m) to the extent any such acts are determined not to breach the terms of parties' implied-in-fact contract.

**RESPONSE:**    Denied. The OpenAI Defendants further deny the allegations in Paragraph 250(a)-(m).

270.    These bad faith actions undermined the fundamental basis of the parties' agreement and deprived Musk of the benefits he legitimately expected, even if such actions did not technically breach a specific contractual term.  This conduct constitutes a violation of the implied covenant of good faith and fair dealing separate and distinct from Defendants' breach of contract.

**RESPONSE:**    Denied.

271.    Defendants' obligations to perform were not waived nor were their breaches and/or failures to perform justified and/or excused.

**RESPONSE:**    Denied.

272.    As a direct and proximate result of Altman and OpenAI, Inc.'s conduct, acts, and/or omissions, Defendants have caused Musk to suffer damages, including but not limited to the financial contributions he made to OpenAI, Inc., the loss of the time and resources Musk expended to recruit talent and direct research, as well as damage to his reputation, along with all benefit-of-the-bargain and consequential damages, in an amount to be adjudicated and determined at trial, plus prejudgment interest, costs, and fees.

**RESPONSE:**    Denied.

273.    Musk has no adequate remedy at law for many of the injuries he suffered and is suffering as a result of Defendants' breaches and failures, and such injuries cannot reasonably,

1    adequately, or precisely be measured or compensated in damages.  Accordingly, Musk also seeks

2    and is entitled to specific performance of Defendants' contractual obligations.

3        **RESPONSE:**  Denied.

4        **COUNT IV:  BREACH OF QUASI-CONTRACT/UNJUST ENRICHMENT**

5        **(Musk Against Altman, Brockman, OpenAI,[33] and Microsoft)**

6        274.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 273

7    inclusive, as though fully set forth herein.

8        **RESPONSE:**  The OpenAI Defendants repeat and incorporate by reference their

9    responses to the foregoing allegations in the Second Amended Complaint.

10       275.    Even in the absence of an enforceable agreement, Defendants have still been

11   unjustly enriched at Musk's expense as a result of their improper exploitation for personal profit of

12   OpenAI, Inc.'s resources, intellectual property, and assets as detailed above.

13       **RESPONSE:**  Denied.

14       276.    Musk contributed considerable money and resources to launch and sustain OpenAI,

15   Inc., which was done on the condition that the endeavor would be and remain a non-profit devoted

16   to openly sharing its technology with the public and avoid concentrating its power in the hands of

17   a few.

18       **RESPONSE:**  Denied.

19       277.    It would be unjust and inequitable to allow Defendants to retain the substantial

20   benefits that were obtained as a direct and proximate result of their wrongful conduct including,

21   without limitation, their solicitation of capital and other valuable resources from Musk under the

22   false pretense and repeated promises that such would be used for charitable purposes, and while

23   misrepresenting to Musk, regulators, and the public that OpenAI, Inc. was developing AI/AGI for

24   the public's benefit and not for private gain.

25       **RESPONSE:**  Denied.

26       278.    Musk has been directly and proximately injured by Defendants' conduct, acts,

27   _____

[33] As defined in note 2, *supra*, "OpenAI" refers to the non-profit OpenAI, Inc. and the For-Profit

28   Entities, collectively.

and/or omissions, for which Defendants are jointly and severally liable. Defendants' wrongful conduct, acts, and omissions have caused and will continue to cause Plaintiff irreparable harm if allowed to continue without restraint, and as to which Plaintiff has no adequate remedy at law.

**RESPONSE:**    Denied.

279.    Defendants have been and will continue to be unjustly enriched, in an amount to be adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement are appropriate. The primary remedy is correction, via the imposition of a constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

**RESPONSE:**    Denied.

280.    Musk therefore seeks a judgment against Defendants for compensatory damages, an accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and fees.

**RESPONSE:**    The OpenAI Defendants admit that Plaintiff Musk purports to seek the relief described in Paragraph 280, but deny that he is entitled to any such relief.

## COUNT VI:  CONSTRUCTIVE FRAUD
### (Musk Against Altman, Brockman, and OpenAI, Inc.)

290.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 289 inclusive, as though fully set forth herein.

**RESPONSE:**    The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Second Amended Complaint.

291.    As a charity and as persons soliciting contributions on behalf of a charity, OpenAI, Inc., Altman, and Brockman are in a fiduciary relationship with, and each owe a fiduciary duty to Musk, from whom charitable contributions were solicited, including under Cal. Bus. & Prof. Code § 17510.8.

**RESPONSE:**    Denied.

292.    As fiduciaries, Altman, Brockman, and OpenAI, Inc. owe Musk a duty to use his contributions for the declared charitable purposes for which they were sought, and are liable for

constructive fraud for any advantages they gained by misleading Musk with their repeated promises, representations, and reassurances, regardless of whether they intended to deceive him.

**RESPONSE:**   Denied.

293.   Altman and Brockman solicited and obtained contributions from Musk by making repeated and material promises, representations, and reassurances to him as described in paragraph 247(a)-(k), *supra*.

**RESPONSE:**   Denied. The OpenAI Defendants further deny the allegations in Paragraph 247(a)-(k).

294.   Defendants knew or could have reasonably foreseen that their promises, representations, and reassurances would be and were relied upon by and were material to Musk.

**RESPONSE:**   Denied.

295.   Defendants misled Musk by failing to disclose information and/or by providing him with information that was inaccurate and/or incomplete.

**RESPONSE:**   Denied.

296.   Defendants breached each and every promise, representation, and reassurance to Musk in the manners described in paragraph 250(a)-(m), *supra*.

**RESPONSE:**   Denied. The OpenAI Defendants further deny the allegations in Paragraph 250(a)-(m).

297.   Musk has been directly and proximately injured by Defendants' conduct, acts, and/or omissions, for which Defendants are jointly and severally liable.  Defendants' wrongful conduct, acts, and omissions have caused and will continue to cause Plaintiff irreparable harm if allowed to continue without restraint, and as to which Plaintiff has no adequate remedy at law.

**RESPONSE:**   Denied.

298.   Defendants have been and will continue to be unjustly enriched, in an amount to be adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement are appropriate.  The primary remedy is correction, via the imposition of a constructive trust over Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s) that are contrary to the non-profit's charitable purposes.

1      **RESPONSE:**   Denied.

2      299.    Musk therefore seeks a judgment against Defendants for compensatory damages, an

3  accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief,

4  prejudgment interest, an award of costs, and fees.

5      **RESPONSE:**   The OpenAI Defendants admit that Plaintiff Musk purports to seek the

6  relief described in Paragraph 299, but deny that he is entitled to any such relief.

7      300.    Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a)

8  because Defendants have acted with oppression, fraud, malice, and/or willful and wanton

9  negligence by, without limitation, acting with intent to harm Musk.

10     **RESPONSE:**   Denied.

11                           **COUNT VII:  FRAUD**

12                  **(Musk Against Altman, Brockman, and OpenAI, Inc.)**

13     301.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 300

14  inclusive, as though fully set forth herein.

15     **RESPONSE:**   The OpenAI Defendants repeat and incorporate by reference their

16  responses to the foregoing allegations in the Second Amended Complaint.

17     302.    By summer, 2017, Altman and Brockman were expressly pushing Musk to convert

18  the non-profit to a for-profit entity, in which they planned to endow themselves with significant

19  equity.  Ex. 11 at 1; Ex. 12 at 1-2.

20     **RESPONSE:**   Denied.

21     303.    By September, 2017, Musk was fed up, and gave Altman and Brockman an

22  ultimatum:  "Either go do something on your own or continue with OpenAI as a non-profit.  I will

23  no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool

24  who is essentially providing free funding to a start-up.  Discussions are over."  Ex. 13 at 4.

25     **RESPONSE:**   Denied.

26     304.    Altman wrote Musk the very next day:  "[I] remain enthusiastic about the non-profit

27  structure!" with Brockman soon following suit.  Ex. 13 at 1.

28     **RESPONSE:**   Paragraph 304 purports to quote from and characterize September 2017

emails attached as Exhibit 13 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for its contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 304.

305.    In addition, on September 22, 2017, Zilis e-mailed Musk that Altman had informed her that he was "[g]reat with keeping [OpenAI] non-profit and continuing to support it." Ex. 14 at 1.

**RESPONSE:**   Paragraph 305 purports to quote from and characterize September 2017 emails attached as Exhibit 14 to the Second Amended Complaint, to which the OpenAI Defendants respectfully refer the Court for its contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 305.

306.    Altman and Brockman knew or could have reasonably foreseen that their express promises, representations, and assurances would be relied upon by Musk.  Indeed, they obviously intended Musk to rely on such statements and in good faith, Musk reasonably did rely on them to his detriment by thereafter contributing to OpenAI, Inc. an additional $10,275,000 and, through Musk Industries, paying for OpenAI's pricey lease and overhead.

**RESPONSE:**   Denied.

307.    Altman and Brockman knew their representations and promises were false when made, had no intention of performing them, and failed to perform them.  In reality, Altman and Brockman wished to launch a competitor to Google's DeepMind, which was so far ahead of all other AI companies that a small for-profit start-up had zero chance of success without an angle.  To Altman and Brockman, "non-profit" and "open source" were philanthropic hooks, altruistic buzzwords to attract wealthy, connected donors like Musk and talented scientists to back and participate in their endeavor.

**RESPONSE:**   Denied.

308.    Brockman essentially admitted as much.  He wrote: "I hope for us to enter the field as a neutral group looking to collaborate widely and shift the dialog towards being about humanity winning rather than any particular group or company.  (**I think that's the best way to bootstrap ourselves into being a leading research institution.**)."  Ex. 3 at 1 (emphasis added).

1    **RESPONSE:**   Denied.

2        309.    Once they got Musk's backing, and Dr. Sutskever and the talented team of scientists

3    Musk recruited were in place, Defendants' objective was to develop valuable AI/AGI and from

4    there, convert the non-profit to a for-profit enterprise and cash in—essentially converting Musk's

5    contributions into free start-up capital and years of section 501(c)(3) tax benefits into a free

6    government subsidy.

7        **RESPONSE:**   Denied.

8        310.    After Musk's unequivocal September 20, 2017, refutation of Altman's proposal to

9    convert to a non-profit structure, Defendants, still committed to their scheme, became even more

10   cunning and deceptive.   They sequestered OpenAI, Inc.'s technology and orchestrated an

11   increasingly opaque corporate web, including the For-Profit Entities, in which, on information and

12   belief, they were major stakeholders, thus enabling them to covertly self-deal for enormous future

13   profits.

14       **RESPONSE:**   Denied.

15       311.    On information and belief, Altman engaged in rampant self-dealing, and abused his

16   position of trust at OpenAI, Inc. to enrich himself by causing it to make deals with numerous side

17   companies he owned or held major stakes in, as detailed in paragraphs 133-143, *supra*.

18       **RESPONSE:**   Denied. The OpenAI Defendants repeat and incorporate by reference their

19   responses to Paragraphs 133-43.

20       312.    In recent months, Altman has abandoned all pretense, displaying his true colors.

21   With Musk out of the picture and OpenAI, Inc.'s Board stacked with compliant allies, Defendants

22   are actively working to convert OpenAI, Inc. into an *entirely* for-profit business.

23       **RESPONSE:**   Denied.

24       313.    Musk has been directly and proximately injured by Defendants' conduct, acts,

25   and/or omissions, for which Defendants are jointly and severally liable.   Defendants' wrongful

26   conduct, acts, and omissions have caused and will continue to cause Musk irreparable harm if

27   allowed to continue without restraint, and as to which Musk has no adequate remedy at law.

28       **RESPONSE:**   Denied.

1    314.    Defendants have been and will continue to be unjustly enriched, in an amount to be

2  adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement

3  are appropriate.  The primary remedy is correction, via the imposition of a constructive trust over

4  Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s)

5  that are contrary to the non-profit's charitable purposes.

6    **RESPONSE:**    Denied.

7    315.    Musk therefore seeks a judgment against Defendants for compensatory damages, an

8  accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief,

9  prejudgment interest, an award of costs, and fees.

10    **RESPONSE:**    The OpenAI Defendants admit that Plaintiff Musk purports to seek the

11  relief described in Paragraph 315, but deny that he is entitled to any such relief.

12    316.    Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a)

13  because Defendants have acted with oppression, fraud, malice, and/or willful and wanton

14  negligence by, without limitation, acting with intent to harm Musk.

15    **RESPONSE:**    Denied.

16    **<u>COUNT XVIII:  BREACH OF CHARITABLE TRUST</u>**

17    **(Musk Against Altman, Brockman, and OpenAI, Inc.)**

18    395.    Plaintiff Musk re-alleges and incorporates by reference paragraphs 1 through 394

19  inclusive, as though fully set forth herein.

20    **RESPONSE:**    The OpenAI Defendants repeat and incorporate by reference their

21  responses to the foregoing allegations in the Second Amended Complaint.

22    396.    Musk's contributions to OpenAI, Inc., as solicited by Altman and Brockman,

23  created a charitable trust.

24    **RESPONSE:**    Denied.

25    397.    Under Cal. Bus. & Prof. Code § 17510.8 and California common law as

26  supplemented by the California Probate Code, Altman, Brockman, and OpenAI, Inc. owed Musk a

27  fiduciary duty with respect to his donations, which he provided in a manner manifesting an intention

28  to create that relationship, such that Altman, Brockman and OpenAI, Inc. owed Musk a duty to use

1    his donations for the benefit of the charity, and subject to the conditions they agreed to.

2        **RESPONSE:**    Denied.

3        398.    In light of Musk's status as settlor of a trust in favor of OpenAI, Inc., and his special

4    interest in OpenAI, Inc., Musk has standing to bring claims for violating the terms of his donations,

5    whether under California common law as supplemented by its Probate Code or Cal. Corp. Code

6    § 5142(a).

7        **RESPONSE:**    Denied.

8        399.    Defendants have breached the terms of Musk's donations, and therefore the trust,

9    by, without limitation:

10            a.        All acts and/or omissions identified in paragraph 250(a)-(l), *supra*; and/or

11            b.        The violations of all laws identified in paragraph 374(a)-(i), *supra*, the

12    observation of which is an implicit condition of any trust.

13        **RESPONSE:**    Denied. The OpenAI Defendants further deny the allegations in Paragraph

14    250(a)-(l) and Paragraph 374(a)-(i).

15        400.    The Attorney General of California has been notified by Musk of his intent to file

16    this SAC.

17        **RESPONSE:**    The OpenAI Defendants lack knowledge or information sufficient to form

18    a belief as to the truth of the allegations in Paragraph 400 and deny them on that basis.

19        401.    The charitable trust and Musk have been directly and proximately injured by

20    Defendants' conduct, acts, and/or omissions in violation of Cal. Corp. Code § 5142 and California

21    common law as supplemented by its Probate Code, for which Defendants are jointly and severally

22    liable.

23        **RESPONSE:**    Denied.

24        402.    Defendants have been and will continue to be unjustly enriched, in an amount to be

25    adjudicated and determined at trial, and for which restitution and nonrestitutionary disgorgement

26    are appropriate.  The primary remedy is correction, via the imposition of a constructive trust over

27    Defendants and their ill-gotten gains, as well as the voiding of all contracts with any Defendant(s)

28    that are contrary to the non-profit's charitable purposes.

1    **RESPONSE:**   Denied.

2         403.    Defendants' wrongful conduct, acts, and omissions have caused and will continue

3    to cause Musk irreparable harm if allowed to continue without restraint, and as to which Musk has

4    no adequate remedy at law.

5    **RESPONSE:**   Denied.

6         404.    Musk therefore seeks a judgment against Defendants for compensatory damages, an

7    accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief,

8    prejudgment interest, an award of costs, and fees.

9    **RESPONSE:**   The OpenAI Defendants admit that Plaintiff Musk purports to seek the

10   relief described in Paragraph 404, but deny that he is entitled to any such relief.

11        405.    Musk is further entitled to exemplary damages under Cal. Civ. Code § 3294(a)

12   because Defendants have acted with oppression, fraud, malice, and/or willful and wanton

13   negligence by, without limitation, acting with intent to harm Musk.

14   **RESPONSE:**   Denied.

15   ### COUNT XX:  VIOLATIONS OF FEDERAL CIVIL RICO,
16   ### 18 U.S.C. § 1962(c)

17   **(Musk and xAI Against Altman, Brockman, Microsoft, and the For-Profit Entities)**

18        419.    Plaintiffs Musk and xAI re-allege and incorporate by reference paragraphs 1 through

19   418 inclusive, as though fully set forth herein.

20   **RESPONSE:**   The OpenAI Defendants repeat and incorporate by reference their

21   responses to the foregoing allegations in the Second Amended Complaint.

22        420.    The federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

23   U.S.C. §§ 1962, 1964, provides a private right of action for plaintiffs to recover against defendants

24   who harm them through a pattern of racketeering activity as well as defendants who conspire to do

25   so.   The statute specifically targets scenarios, like that present here, where defendants exploit

26   legitimate companies, including non-profits, through a concerted pattern of unlawful conduct

27   detrimental to the public interest (here, repeated wire fraud in connection with a publicly subsidized

28   charity), so as to halt the manipulation and corruption of legitimate entities and prevent defendants

from profiting from their wrongdoing.

**RESPONSE:** Denied.

A. _**Wire Fraud Predicate Offenses**_

421. Altman and Brockman knowingly engaged in a scheme to exploit Musk and others (including donors Jessica Livingston, Peter Thiel, and Open Philanthropy) by inducing them with repeated misrepresentations to make significant financial and other contributions to develop valuable AI/AGI for ostensibly charitable purposes, which Defendants exploited to enrich themselves.

**RESPONSE:** Denied.

422. In furtherance of this scheme, Altman and Brockman transmitted, or caused to be transmitted writings by means of wire communication in interstate commerce (emails), in violation of 18 U.S.C. § 1343. The specific emails sent in furtherance of Defendants' scheme include, but are not limited to, those detailed in paragraph 247, _supra_.

**RESPONSE:** Denied. The OpenAI Defendants further deny the allegations in Paragraph 247.

423. Altman and Brockman's specific intent to defraud Musk is clear from, _inter alia_, their express misrepresentations and assurances to Musk in September 2017 that they remained committed to the original non-profit structure and mission of OpenAI, Inc., while simultaneously plotting to loot the charity's technology and employees for exploitation by the For-Profit Entities and Defendants' private gain. _See supra_ ¶¶ 100-02.

**RESPONSE:** Denied.

424. Altman and Brockman intended Musk to rely, or knew or could have reasonably foreseen that Musk would rely, on their express promises, representations, and assurances, and in good faith Musk reasonably did rely on them to his detriment. Based thereon, Musk caused to be wired tens of millions of dollars of seed money to OpenAI, Inc. as follows:

| Date | Amount |
|------|--------|
| 05/27/2016 | $500,000.00[34] |
| 06/08/2016 | $5,000,000.00 |
| 08/26/2016 | $4,500,000.00 |
| 10/03/2016 | $142,000.00 |
| 10/25/2016 | $142,000.00 |
| 11/21/2016 | $750,000.00 |
| 11/23/2016 | $142,000.00 |
| 12/07/2016 | $4,250,000.00 |
| 01/01/2017 | $1,140,000.00 |
| 01/01/2017 | $700,000.00 |
| 01/01/2017 | $16,028,500.00 |
| 01/05/2017 | $142,000.00 |
| 01/27/2017 | $142,000.00 |
| 07/18/2017 | $175,000.00 |
| 08/14/2017 | $175,000.00 |
| 09/15/2017 | $175,000.00 |
| 09/29/2017 | $85,000.00 |
| 10/16/2017 | $235,000.00 |
| 11/14/2017 | $235,000.00 |
| 12/14/2017 | $235,000.00 |
| 01/18/2018 | $290,000.00 |
| 02/20/2018 | $390,000.00 |
| 03/14/2018 | $290,000.00 |

---

[34] On information and belief, Musk's initial $10 million in donations to OpenAI, Inc. in 2016 were first wired to Altman's "YC Org.," and then wired by YC Org. to OpenAI, Inc. once OpenAI, Inc. obtained its section 501(c)(3) status.

| Date | Amount |
|------|--------|
| 04/16/2018 | $290,000.00 |
| 05/15/2018 | $290,000.00 |
| 06/14/2018 | $290,000.00 |
| 07/16/2018 | $290,000.00 |
| 08/14/2018 | $290,000.00 |
| 09/18/2018 | $290,000.00 |
| 10/17/2018 | $290,000.00 |
| 11/14/2018 | $290,000.00 |
| 12/17/2018 | $290,000.00 |
| 01/16/2019 | $290,000.00 |
| 02/14/2019 | $290,000.00 |
| 03/22/2019 | $290,000.00 |
| 04/16/2019 | $290,000.00 |
| 05/14/2019 | $290,000.00 |
| 06/14/2019 | $290,000.00 |
| 07/17/2019 | $290,000.00 |
| 08/14/2019 | $290,000.00 |
| 09/16/2019 | $290,000.00 |
| 10/17/2019 | $290,000.00 |
| 11/15/2019 | $290,000.00 |
| 12/17/2019 | $290,000.00 |
| 01/14/2020 | $290,000.00 |
| 02/14/2020 | $290,000.00 |
| 03/16/2020 | $290,000.00 |
| 04/13/2020 | $290,000.00 |
| 05/13/2020 | $290,000.00 |

| Date | Amount |
|------|--------|
| 06/15/2020 | $290,000.00 |
| 07/14/2020 | $290,000.00 |
| 08/17/2020 | $290,000.00 |
| 09/14/2020 | $290,000.00 |
| **Total:** | $44,563,500.00 |

**RESPONSE:**   Denied.

425.    During this period, Musk also caused Musk Industries to pay by interstate bank wire the monthly rent and overhead for OpenAI, Inc.'s office.

**RESPONSE:**   Denied.

426.    Musk further invested his time, reputation, and connections to recruit top AI scientists and engineers for the non-profit, which included the transmission of emails and cellular telephonic communications.

**RESPONSE:**   Denied.

427.    It was reasonably foreseeable that interstate wires would be used in connection with Defendants' scheme.  In addition to the wire transmissions described above, Altman and Brockman, acting in concert with the For-Profit Entities and Microsoft, relied on wires to invest such funds in furtherance of their fraudulent scheme, and, on information and belief, relied on email or other forms of electronic communication to exchange information about their receipt and usage of such funds and contributions.

**RESPONSE:**   Denied.

428.    In addition, from December 11, 2015 to today, Defendants in their online marketing (e.g., website), advertisements, and promotions made knowingly false and/or misleading representations to defraud the public and induce the false belief that OpenAI, Inc. would be a non-profit whose charitable mission is to develop safe and open-source AI/AGI technology for the public good, not private gain, as detailed in paragraphs 82-88 and 247, *supra*.  These false and/or misleading public pronouncements served to further reassure Musk and induce him to make further

1    contributions.

2    **RESPONSE:**    Denied. The OpenAI Defendants repeat and incorporate by reference their

3    responses to the allegations in Paragraphs 82-88, and further deny the allegations in Paragraph 247.

4    429.    Altman and Brockman knowingly and repeatedly accepted contributions from Musk

5    and other member of the public in order to develop AI/AGI with no intention of honoring and

6    performing their promises at the time they were made, and failed to perform them.  For instance,

7    OpenAI's recent GPT-4, GPT-4T, GPT-4o, and OpenAI o1 models are all closed source and

8    shrouded in secrecy for Defendants' commercial advantage and gain.

9    **RESPONSE:**    Denied.

10   430.    Altman and Brockman used and exploited Musk's contributions to fund and support

11   OpenAI, Inc.'s research and development of AI/AGI, and on information and belief, to attract

12   massive investment by Microsoft, as well as to launch the For-Profit Entities, in which, on

13   information and belief, Altman and Microsoft are significant shareholders.

14   **RESPONSE:**    Denied.

15   431.    Microsoft and the For-Profit Entities were aware of, benefitted from, and aided and

16   abetted the continuation of this unlawful conduct by, without limitation, providing the capital,

17   corporate structure(s), and advice and encouragement to exploit OpenAI, Inc. and its assets for

18   Defendants' enrichment rather than the public's benefit.  Microsoft and the For-Profit Entities

19   further participated by siphoning off and exploiting OpenAI, Inc.'s valuable AI/AGI technology

20   and highly skilled personnel and by facilitating and concealing Defendants' profiteering, as

21   described in detail in paragraphs 127-133, *supra*.

22   **RESPONSE:**    Denied. The OpenAI Defendants repeat and incorporate by reference their

23   responses to the allegations in Paragraphs 127-33.

24   432.    While publicly cloaked as a mere fundraising apparatus, the For-Profit Entities are,

25   in reality, the foundation of Defendants' scheme to control, co-opt, and cash in on OpenAI, Inc.'s

26   valuable technology developed with Musk's significant contributions.

27   **RESPONSE:**    Denied.

28   433.    For instance, after Altman and Brockman launched OpenAI, L.P. (now OpenAI

-108-

OpCo, LLC), they transferred much of the non-profit's staff over to the new company, which also now houses and operates much of OpenAI's technological research and development.  Altman, Brockman, and the For-Profit Entities' reshuffling of OpenAI, Inc.'s assets, in concert with Microsoft, served to conveniently shield them and their scheme from public scrutiny and to evade the financial disclosures non-profits like OpenAI, Inc. must make.

**RESPONSE:**    Denied.

434.    Each of the predicate acts by Altman and/or Brockman alleged hereinabove were committed within the scope of their employment, their positions as officers and/or directors at, or their agency relationship with, the For-Profit Entities and/or Microsoft.

**RESPONSE:**    Denied.

435.    In addition, Altman, with the assistance and cooperation of Brockman, the For-Profit Entities, and/or Microsoft, brazenly engaged in rampant self-dealing involving OpenAI, Inc. and its assets, as described in detail in paragraphs 135-45, *supra*.

**RESPONSE:**    Denied. The OpenAI Defendants repeat and incorporate by reference their responses to the allegations in Paragraphs 135-45.

436.    Altman and Brockman, in concert with the For-Profit Entities and Microsoft, intentionally concealed their unlawful conduct, which prevented Musk from discovering their scheme, notwithstanding his exercise of due diligence.  Musk would not have contributed to OpenAI, Inc. had he known of Defendants' true intentions and scheme.

**RESPONSE:**    Denied.

437.    Altman, Brockman, Microsoft, and the For-Profit Entities directly and indirectly committed or aided and abetted these numerous predicate acts of wire fraud in furtherance of their scheme.  The predicate acts by Microsoft and the For-Profit Entities were committed by Altman, Brockman, and/or representatives of such entities acting through, or on behalf of and for the benefit of those entities.  Each of these Defendants voluntarily and intentionally committed and/or aided and abetted the commission of the predicate acts to effectuate and/or further their illicit scheme.

**RESPONSE:**    Denied.

**B.** *Pattern of Racketeering Activity*

438.    Defendants committed multiple predicate acts of wire fraud which are indictable under 18 U.S.C. § 1961(1)(B).  Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**RESPONSE:**    Denied.

439.    Altman, Brockman, the For-Profit Entities, and/or Microsoft committed, or conspired with or aided and abetted one another in committing, at least two (and in fact, numerous) predicate acts of wire fraud constituting a continuous course of conduct spanning a period from at least March 2015 to the present.  The temporal duration and the number of predicate acts are so extensive as to constitute a cognizable pattern of racketeering activity with, at minimum, closed-ended continuity, though, on information and belief, such conduct is continuing—e.g., Defendants continue to form new for-profit entities, and to exploit the non-profit's technology for their private gain, all while continuing to promote their counterfeit charitable mission—and there exists a specific threat such conduct will persist indefinitely, constituting a pattern of racketeering activity that is open-ended.

**RESPONSE:**    Denied.

440.    In order to implement their scheme, Defendants repeatedly used the interstate wires to defraud Musk and other contributors.  The predicate acts were related, having the same or similar purposes and results (e.g., to obtain significant financial and other contributions to develop valuable AI/AGI technology to be wrongfully exploited for Defendants' self-enrichment); involved the same or similar participants (e.g., Defendants); and victims (e.g., Plaintiffs, donors, AI scientists and engineers, and other contributors); and involved the same or similar methods of commission (e.g., misrepresentations via email, online marketing, etc.).

**RESPONSE:**    Denied.

441.    Altman, Brockman, the For-Profit Entities, and Microsoft each participated as a principal in the pattern of racketeering activity by, acting with intent or knowledge, committing, causing, aiding, abetting, counseling, commanding, inducing, or procuring the commission of, two

or more acts of wire fraud that make up the alleged pattern of racketeering activity, or by willfully causing the commission of two or more acts of wire fraud that make up the pattern of racketeering activity, which, if Altman, Brockman, the For-Profit Entities, or Microsoft directly performed, would constitute the commission of two or more acts of wire fraud comprising such pattern.

**RESPONSE:**   Denied.

**C.    _Violations of Section 1962(c)_**

442.    Title 18, Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"

**RESPONSE:**   Paragraph 442 purports to quote from and characterize 18 U.S.C. § 1962(c), to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.

443.    OpenAI, Inc. is an "enterprise" as defined by 18 U.S.C. § 1961(4), and engaged in, and its activities affected, interstate and foreign commerce.  At all relevant times, OpenAI, Inc. had an existence separate and distinct from the pattern of racketeering in which Altman, Brockman, the For-Profit Entities, and Microsoft engaged.

**RESPONSE:**   Denied.

444.    Altman, Brockman, the For-Profit Entities, and Microsoft are "persons" within the definition of 18 U.S.C. § 1961(3), and at all relevant times were employed by and/or associated with OpenAI, Inc.  Altman and Brockman are OpenAI, Inc.'s CEO and sometimes President/CTO, respectively, and at various times have sat, and Altman currently sits, on its Board.  On information and belief, from November 29, 2023 to July 9, 2024, Microsoft held its so-called "observer seat" on the Board, from which it participated in the management, operation, and/or control of OpenAI, Inc.  The For-Profit Entities, which on information and belief are largely owned, operated, and/or controlled by Altman and Microsoft, knowingly implemented decisions of Altman, Brockman, and/or Microsoft and have now so thoroughly infiltrated OpenAI, Inc., and are so intertwined with OpenAI, Inc., so as to effectively participate in, manage, control, and/or operate the non-profit with impunity for Defendants private gain.

1    **RESPONSE:**   Denied.

2    445.    Defendants conducted the affairs of OpenAI, Inc. through a pattern of racketeering

3    activity by systematically engaging in wire fraud to direct, operate, and manage the enterprise.

4    Specifically:

5         a.    Altman and Brockman, as officers with operational control, used their

6    positions within OpenAI, Inc. to execute and direct the enterprise's core activities through the

7    commission of multiple predicate acts of wire fraud.   Defendants directed OpenAI, Inc.'s

8    solicitation of charitable contributions and managed its fundraising operations through interstate

9    wires containing systematic fraudulent misrepresentations about the enterprise's non-profit

10    mission, as detailed above.  Indeed, in reliance on Defendants' repeated misrepresentations, Musk

11    contributed approximately \$44,811,795.00[35] in seed capital via interstate wires to OpenAI, Inc. as

12    set forth in the detailed table above, provided office rent and overhead through Musk Industries,

13    and invested his time, reputation, and connections to recruit premier AI scientists and engineers for

14    the non-profit; and

15         b.    After securing initial control over the enterprise through multiple systematic

16    predicate acts of wire fraud, Defendants maintained and strengthened their control by transmitting

17    additional express misrepresentations via interstate wires to Musk in September 2017, falsely

18    claiming a continuing commitment to and enthusiasm for OpenAI's non-profit structure and

19    charitable mission, as detailed above.  These strategic misrepresentations induced Musk to continue

20    to make substantial financial contributions to the enterprise (evidenced by numerous wire transfers

21    after September 2017), allowing Defendants to maintain control over the enterprise's financing and

22    operations.

23    **RESPONSE:**   Denied.

24    446.    The For-Profit Entities and Microsoft did more than just benefit from this pattern of

25    racketeering activity, they were vital to the scheme's success and actively aided and abetted Altman

26    and Brockman in operating the enterprise through this pattern by:

27    _____

[35] In addition to his wired contributions, Musk donated Model 3 Teslas to OpenAI, Inc., valued at
28    \$248,295.00, which contribution required communication over e-mail.

a.    Knowingly providing the capital, corporate structure(s), and advice and encouragement that enabled Altman and Brockman to perpetuate their continuing wire fraud scheme, thereby aiding and abetting the operation of the enterprise through the ongoing transmission of fraudulent representations via interstate wires;

b.    Willfully participating in the deception of donors and the public by facilitating and concealing Defendants' profiteering, thus aiding and abetting the continued operation of OpenAI, Inc. through wire fraud that misrepresented its charitable mission and obscured Defendants' profiteering;

c.    Serving as vital participants in siphoning off and exploiting OpenAI, Inc.'s valuable AI/AGI technology and highly skilled personnel, acts that directly aided and abetted the core wire fraud scheme; and

d.    Intentionally executing the reshuffling of OpenAI, Inc.'s assets that served to conveniently shield them and their scheme from public scrutiny and to evade the financial disclosures non-profits like OpenAI, Inc. must make, thus directly aiding and abetting the wire fraud.  The concealment of Defendants' scheme from Musk, regulators, and the public was critical to its success.

**RESPONSE:**    Denied.

447.    Further, the For-Profit Entities did not simply aid and abet the wire fraud scheme but actively participated in it by making material misrepresentations transmitted via interstate wires about their purpose and investors' expected returns, including falsely stating that investors should "consider their investment in the spirit of a donation" and that it is "clear that [investors] should never expect a profit," and claiming that "The [for-profit endeavor] exists to advance OpenAI, Inc.'s mission."  These fraudulent communications, deliberately directed at both Musk and the public, served to reassure Musk and induced him to make further financial contributions to the enterprise.  The For-Profit Entities themselves participated in the operation of the enterprise and directed its affairs by utilizing wire fraud to secure the enterprise's funding while concealing that its structure was designed to retain the vast majority of revenue in the For-Profit Entities and to maximize private financial returns, as revealed, for example, by OpenAI's recent agreement to

1  remove all profit caps to amplify its investors' financial gains.

2      **RESPONSE:**   Denied.

3      448.   Defendants' concerted pattern of racketeering activity was not merely coincidental

4  to the enterprise but was integral to its operation.  Defendants did not simply commit predicate acts

5  of wire fraud while associated with OpenAI, Inc., their ongoing wire fraud constituted the primary

6  means through which they directed and controlled the enterprise's most critical functions:  securing

7  the necessary capital and top AI scientific talent to develop valuable AI technology so that

8  Defendants could systematically loot and exploit that technology for their own enrichment.

9      **RESPONSE:**   Denied.

10                     *       *       *

11      449.   The foregoing unlawful actions of Altman, Brockman, the For-Profit Entities, and

12  Microsoft directly, illegally, and proximately caused and continue to cause injuries to Musk and

13  xAI's respective business and property in an amount to be proven at the time of trial.

14      **RESPONSE:**   Denied.

15      450.   In addition to the loss of Musk's considerable contributions to OpenAI, Inc.,

16  Plaintiffs were further harmed by Defendants' investment of the proceeds from their unlawful

17  conduct in OpenAI, Inc. and/or Defendants' acquisition of an interest in, or control over, OpenAI,

18  Inc. in furtherance of their scheme.

19      **RESPONSE:**   Denied.

20      451.   OpenAI, now a competitor to xAI, used Musk's tax-free startup capital to gain an

21  unfair competitive advantage in the market for generative AI, resulting in decreased market share

22  and profits for xAI, diversion of customers/investors away from them, and/or the competitive

23  injuries detailed in Counts VIII-XVII.

24      **RESPONSE:**   Denied.

25      452.   Defendants further leveraged their control over OpenAI, Inc. and market power,

26  acquired through the pattern of unlawful activity described above, to undercut and block Musk and

27  xAI's entrance and/or growth in the generative AI market, including by controlling the limited

28  supply of available compute, investors, and limited pool of qualified AI talent.

1    **RESPONSE:**   Denied.

2    453.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Musk and xAI are

3    entitled to recover three times the damages they sustained, reasonable attorneys' fees, and costs of

4    litigation, as well as any other relief as authorized by statute.

5    **RESPONSE:**   Denied.

6    **COUNT XXI:  CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO,**

7    **18 U.S.C. § 1962(d)**

8    **(Musk and xAI Against Altman, Brockman, Microsoft, and the For-Profit Entities)**

9    454.    Plaintiffs Musk and xAI re-allege and incorporate by reference paragraphs 1 through

10    453 inclusive, as though fully set forth herein.

11    **RESPONSE:**   The OpenAI Defendants repeat and incorporate by reference their

12    responses to the foregoing allegations in the Second Amended Complaint.

13    455.    Altman, Brockman, the For-Profit Entities, and Microsoft have undertaken the

14    wrongful acts described in Count XX above as part of a common scheme.  Defendants willfully,

15    knowingly, and unlawfully conspired, confederated, and agreed together and with others to violate

16    18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  Defendants intentionally concealed their

17    illicit conduct, which prevented Plaintiffs from discovering their scheme, notwithstanding

18    Plaintiffs' exercise of due diligence.

19    **RESPONSE:**   Denied.

20    456.    Altman, Brockman, the For-Profit Entities, and Microsoft were aware of the

21    unlawful activity alleged hereinabove.  Altman, as OpenAI, Inc.'s co-founder, CEO, and Board

22    member, and Brockman, as its President and prior CTO and Board member, in concert with

23    Microsoft, knew that Altman, Brockman and through them, OpenAI. Inc., had made false and/or

24    misleading representations to Musk and other contributors that OpenAI, Inc. would be a non-profit

25    devoted to the open-source development of AI/AGI for the public's benefit, and that Musk's

26    financial or other contributions were supposed to be used solely to further such charitable purpose.

27    On information and belief, Altman and Brockman have at all relevant times been officers, agents,

28    employees, and/or owners whose knowledge and intent is imputed to the For-Profit Entities.  The

For-Profit Entities and Microsoft knew of and agreed to facilitate the operation of OpenAI, Inc. and/or Defendants' scheme.

**RESPONSE:** Denied.

457. Altman, Brockman, and Microsoft directed and caused the For-Profit Entities to engage in the racketeering activity alleged hereinabove.

**RESPONSE:** Denied.

458. Altman and Brockman understood that they were committing numerous RICO predicate acts and participating in a racketeering scheme, evidenced among other things, by their overt acts and involvement in repeatedly promulgating false and/or misleading representations via wire transmissions, including email correspondence, online transmittal, and social media posts, and receiving financial and other contributions, including wired funds, in response to those fraudulent communications. In addition, on information and belief, the For-Profit Entities and Microsoft understood they were facilitating and/or aiding and abetting Altman and Brockman's self-dealing and furthering the scheme by helping to conceal their fraudulent conduct and aiding in the exploitation of the non-profit's assets for private inurement.

**RESPONSE:** Denied.

459. The participation and agreement of Altman, Brockman, each of the For-Profit Entities, and Microsoft was necessary to the scheme. Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme, and agreed and conspired to conduct and participate in the affairs of OpenAI, Inc. through a consistent and continual pattern of racketeering activity. Further evidence of the agreement among Altman, Brockman, the For-Profit Entities, and Microsoft is peculiarly within the knowledge and control of Defendants.

**RESPONSE:** Denied.

460. As a direct and proximate result of Defendants' conspiracy and violations of 18 U.S.C. § 1962(d), Musk and xAI have been injured in their business and property, as alleged herein, and are entitled to treble damages, attorneys' fees, and costs of suit.

**RESPONSE:** Denied.

**PRAYER FOR RELIEF**

Answering the prayer for relief, the OpenAI Defendants deny that Plaintiffs are entitled to any of the relief sought.

**AFFIRMATIVE DEFENSES**[36]

The OpenAI Defendants assert the following defenses, which are based on, without limitation, the allegations asserted in Paragraphs 1 through 127 of the foregoing Amended Counterclaims, Answer, and Defenses, as well as the OpenAI Defendants' responses to the allegations of the Second Amended Complaint. These allegations and responses are incorporated as though fully set forth herein.

**FIRST DEFENSE: STATUTE OF LIMITATIONS**

Each of the Subject Claims is barred, in whole or in part, by statutes of limitations:

Counts II (Breach of Implied-in-Fact Contract) and III (Breach of Implied Covenant of Good Faith and Fair Dealing) are time-barred under Cal. Code Civ. Proc. § 339(1)'s two-year limitations period. Musk claims that Altman and OpenAI, Inc. breached his alleged contract by, among other things, (1) "[c]ausing less than all of OpenAI, Inc.'s technology to be owned by OpenAI, Inc. by . . . assigning OpenAI, Inc.'s intellectual property to the For-Profit Entities" (SAC ¶ 250(a)); (2) "[o]perating OpenAI, Inc. for the private gain of . . . the For-Profit Entities . . . by . . . allowing [the For-Profit Entities] to reap significant financial benefits from commercial activities" (SAC ¶ 247(b)); and (3) "[p]roviding OpenAI's research and development personnel with compensation in the form of equity, units, or other things of value in the For-Profit Entities" (SAC ¶ 250(i)).

Musk was aware of the conduct purportedly constituting these alleged breaches no later than 2019, well outside the limitations period. OpenAI, Inc. publicly announced the incorporation of the capped-profit subsidiary, OpenAI L.P.—which Musk alleges amounted to a "mov[e] to recast

---

[36] The OpenAI Defendants have not included in this proposed amended answer three defenses on which Plaintiffs bear the burden: (1) excusal of performance; (2) no consideration; and (3) economic loss rule. The OpenAI Defendants reserve the right to raise these defenses on summary judgment or at trial to the extent they negate elements of Plaintiffs' claims, as set forth in the OpenAI Defendants' opposition to Plaintiffs' motion to strike. *See* Dkt. 205 at 15 & n.4.

the [OpenAI] non-profit as a moneymaking endeavor to bring in shareholders, sell equity, and raise capital," and an effort to "convert to a for-profit structure" (SAC ¶¶ 100, 104)—in a blog post in March 2019; Altman notified Musk of OpenAI, L.P.'s incorporation around that time; Musk was offered, and declined, equity in the new entity; and Musk raised no objection to the new entity's formation.

In August 2018, prior to the public announcement of the capped-profit's incorporation, Altman sent Musk a draft summary of the transaction's principal terms and solicited his feedback. That term sheet made clear (a) that OpenAI, L.P. would be capitalized through the contribution of OpenAI, Inc.'s assets (*i.e.*, that "less than all of OpenAI, Inc.'s technology [would] be owned by OpenAI, Inc." and would instead be owned by the so-called "For-Profit Entities"); (b) that OpenAI, L.P., in connection with its commercial activities, would distribute profits to investors in proportion to their respective capital contributions and potentially generate "significant revenue" by "commercializ[ing] [OpenAI's] technology" (*i.e.*, that the For-Profit Entities would be "allow[ed] . . . to reap significant financial benefits from commercial activities"); and (c) that OpenAI employees would hold "profit interests" in the capped-profit enterprise as part of their compensation (*i.e.*, that "OpenAI's research and development personnel" would be provided "with compensation in the form of equity, units, or other things of value in the For-Profit Entities").

Moreover, Musk personally reviewed a draft press release in March 2019 that included information consistent with the draft term sheet regarding the incorporation of OpenAI, L.P. Musk sent Altman a press story shortly after the incorporation of OpenAI, L.P., which likewise described the conduct allegedly amounting to breach of Musk's purported contract. And in November 2020, OpenAI, Inc. filed an annual registration renewal with the California Attorney General's Registry of Charitable Trusts that described the formation of OpenAI, L.P. in detail, including the contribution of assets from OpenAI, Inc. to OpenAI, L.P. This registration renewal form is publicly available on the Attorney General's website. Given all of these facts, Musk engaged in inexcusable delay in asserting his contract claims for the first time in 2024.

For the same reasons, Musk's claim for constructive fraud (Count VI) is time-barred under Cal. Code Civ. Proc. § 338(d)'s three-year limitations period, and his claim for breach of charitable

trust (Count XVIII) is time-barred under Cal. Code Civ. Proc. § 338(d)'s three-year limitations period and/or Cal. Prob. Code § 16460(a)'s three-year limitations period if applicable, and in all events under Cal. Code Civ. Proc. § 343's four-year limitations period. Each of these claims is grounded in the same alleged breaches as Musk's breach of implied contract claim (*see* SAC ¶¶ 296, 399).

Likewise, Musk's fraud claim (Count VII) is time-barred under Cal. Code Civ. Proc. § 338(d); his claim for breach of quasi-contract/unjust enrichment (Count IV) is time-barred under Cal. Code Civ. Proc. § 339(1)'s two-year limitations period and/or Cal. Code Civ. Proc. § 338(d)'s three-year limitations period; and Plaintiffs' claims for violations of federal civil RICO (Count XX) and conspiracy to violate federal civil RICO (Count XXI) are time-barred under the four-year statute of limitations applicable to civil RICO claims. The alleged breach or fraud asserted in each of these claims is grounded in OpenAI, Inc.'s creation of its capped-profit enterprise, which was disclosed to Musk in 2018 and 2019, as described above.

## SECOND DEFENSE: LACHES

The Subject Claims are barred, in whole or in part, by the doctrine of laches, to the extent the Subject Claims are equitable in nature (Counts IV, XVIII) or request equitable relief (Counts II, III, IV, VI, VII, XVIII) because (a) Musk's delay in asserting these claims was unreasonable and (b) his delay resulted in prejudice to the OpenAI Defendants.

Musk's delay in bringing the Subject Claims was unreasonable, including in light of analogous statutes of limitations identified above. Musk was aware of the OpenAI Defendants' actions now identified as the basis of the Subject Claims no later than 2019, yet Musk failed to bring suit until 2024—far outside the analogous two-, three-, and/or four-year limitations periods.

Musk claims he was aware, as early as 2017 or 2018, that "Altman and Brockman" were allegedly "mov[ing] to recast the [OpenAI] non-profit as a moneymaking endeavor to bring in shareholders, sell equity, and raise capital" (SAC ¶ 100)—the conduct asserted as grounding the Subject Claims. Moreover, Musk claims he knew by no later than March 2019 that "Altman and Brockman had [purportedly] agreed . . . [to] convert to a for-profit structure," *i.e.*, by launching a capped-profit subsidiary enterprise (SAC ¶ 104). Brockman, Sutskever, and OpenAI, Inc.

announced the incorporation of the capped-profit enterprise, OpenAI L.P., in a blog post in March 2019; Altman personally notified Musk of that incorporation, including by providing Musk a draft term sheet and draft press release for the transaction and soliciting Musk's feedback concerning the same; Musk was offered, and declined, equity in the new entity; and Musk raised no objection to the new entity's formation. In 2022, years after OpenAI, L.P.'s incorporation, Musk praised Altman's leadership of OpenAI, saying he had done an "amazing job." Musk engaged in inexcusable delay in asserting the Subject Claims for the first time in 2024.

Musk's conduct demonstrates his acquiescence in the acts he now challenges in the Subject Claims, and his delay in asserting the Subject Claims has prejudiced the OpenAI Defendants. During the period of delay, the OpenAI Defendants have developed OpenAI's capped-profit enterprise, planned a potential reorganization of OpenAI's capped-profit entities, developed business relationships with third-party investors, and made decisions regarding the open-sourcing of OpenAI's technology—all in furtherance of OpenAI's mission, yet now, according to Musk, all inconsistent with purported rights owed to Musk personally. The OpenAI Defendants have also been prejudiced in their ability to properly defend this action due to the passage of time, and the pre-judgment interest Musk seeks to impose on the OpenAI Defendants has increased in that time.

### THIRD DEFENSE: STATUTE OF FRAUDS

Counts II (Breach of Implied-in-Fact Contract) and III (Breach of Implied Covenant of Good Faith and Fair Dealing) are barred by California's statute of frauds, Cal. Civ. Code § 1624(a)(1), because the contract alleged in Count II was not intended to be performed or capable of being performed within one year. This includes, for example, (1) the alleged commitment that Altman and OpenAI, Inc. purportedly made in 2016, 2017, and 2018 to "open source technology for the public benefit . . . except where [that] technology can be dangerous" (SAC ¶ 247(f)), which OpenAI, Inc. and Altman allegedly breached through their "[f]ailure to open source  . . . . o1's architecture, hardware, training method, and training computation" in September 2024 (SAC ¶ 250(f)); and (2) the alleged requirement, "[e]ffective no later than September 22, 2017," that OpenAI, Inc. and Altman "continue with OpenAI as a nonprofit" (SAC ¶ 247(j)), which Plaintiffs claim has been breached by OpenAI, Inc. and Altman "[c]urrently working to convert the

non-profit into a fully for-profit commercial entity without making it clear to investors that they should never expect a profit" (SAC ¶ 250(l)).

### FOURTH DEFENSE: TERMINATION OF ALLEGED CONTRACT

Counts II (Breach of Implied-in-Fact Contract) and III (Breach of Implied Covenant of Good Faith and Fair Dealing) fail because, to the extent the contract alleged in Count II existed, it terminated prior to the conduct alleged to constitute a breach of the purported contract. The pleaded contract would have expired no later than Musk's decision to end his affiliation with and support of OpenAI, Inc in 2018. Musk's termination of his affiliation and support for OpenAI, Inc. was reflected in, among other things: (1) his decision to resign from OpenAI, Inc.'s board in February 2018; (2) his decision to stop providing financial support to OpenAI, Inc.; (3) his decision to directly compete with OpenAI; and (4) his engagement in a relentless campaign of harassment against OpenAI. Alternatively, such contract was terminable at will after a reasonable time with reasonable notice and was in fact terminated by Musk through his conduct with respect to OpenAI, Inc. since resigning from its board of directors.

### FIFTH DEFENSE: UNCLEAN HANDS

Each of the Subject Claims is barred, in whole or in part, by Musk's unclean hands because Musk engaged in inequitable conduct directly related to the Subject Claims. Musk engaged in conduct that violates conscience, good faith, and/or equitable standards of conduct, including as follows:

- Musk sought a for-profit restructuring of OpenAI in 2017 that would afford him "sole control of the new [entity], at least in the short term," entitling Musk, as the hypothetical for-profit's CEO, to a "majority equity stake, and control [of] the majority of the board";

- In 2017, while serving as co-Chair of OpenAI, Inc., Musk caused top AI engineers from OpenAI to be seconded to his for-profit entity, Tesla, so they could impart scarce AI learning to Tesla employees. He also poached one of OpenAI's top engineers on behalf of Tesla. Following Musk's resignation from OpenAI, he continued to try to recruit OpenAI engineers on behalf of businesses under his control;

- In early 2018, Musk proposed absorbing OpenAI into Tesla through a for-profit pivot

that would have Tesla operate as OpenAI's "cash cow";

- In 2023, only days after quietly incorporating nascent OpenAI competitor xAI, Musk called for a six-month "moratorium" on development of advanced AI of the kind OpenAI was then pursuing;

- A few weeks later, Musk demanded access to OpenAI's confidential and commercially sensitive internal documents, feigning concern as a former donor to, and director of OpenAI, Inc., and without ever disclosing he was building a competitor in secret; and

- In February 2025, Musk, along with a "consortium of private investors," orchestrated a sham bid to purchase OpenAI, Inc.'s assets for $97.375 billion, without a shred of diligence or evidence of financing, as a naked effort to disrupt the OpenAI, Inc. board's consideration of a potential restructuring and to sow confusion among employees and potential investors, for the ultimate purpose of threatening OpenAI's ability to pursue its mission on terms uncorrupted by unlawful harassment and interference.

Musk's inequitable conduct relates directly to the Subject Claims. Those Claims are grounded in Musk's allegation that his alleged charitable contributions to OpenAI, Inc. afforded him certain rights, including the right to bar the OpenAI Defendants from engaging in certain for-profit activities and partnering with for-profit interests to advance OpenAI's mission. At the same time, Musk's inequitable conduct toward the OpenAI Defendants demonstrates that he has repeatedly sought to leverage OpenAI for his own for-profit gain and, since abandoning OpenAI, has attempted to interfere with its business for his own competitive benefit, and the benefit of his entity, xAI.

## NEGATIVE DEFENSES[37]

### SIXTH DEFENSE: FAILURE TO STATE A CLAIM

The Second Amended Complaint fails to state a claim upon which relief may be granted.

---

[37] The OpenAI Defendants omitted these negative defenses in their proposed amended answer, submitted as Ex. A to their opposition to Plaintiffs' motion to strike (Dkt. 205-2), based on Plaintiffs' representations and subject to the understanding that removing the defenses would not prejudice the OpenAI Defendants' ability to raise them at summary judgment or trial. The OpenAI Defendants remain willing to omit these defenses, based on that understanding, but have retained and renumbered them in this answer in light of the Court's denial of Plaintiffs' motion as to these

1

## SEVENTH DEFENSE: LACK OF STANDING

2

Plaintiff Musk lacks standing to assert Count XVIII (Breach of Charitable Trust).

3

## EIGHTH DEFENSE: LACK OF SUBJECT-MATTER JURISDICTION

4

Plaintiff Musk has failed to establish that the Court possesses subject-matter jurisdiction to

5

adjudicate Count XVIII (Breach of Charitable Trust) because Plaintiff Musk does not have

6

Article III standing to assert the claim.

7

## NINTH DEFENSE: LACK OF CHARITABLE TRUST

8

Count XVIII (Breach of Charitable Trust) fails because no charitable trust has been formed

9

under California or any other source of law.

10

## TENTH DEFENSE: NO BREACH OF CHARITABLE TRUST

11

Count XVIII (Breach of Charitable Trust) fails because, to the extent the charitable trust

12

alleged in Count XVIII existed, the OpenAI Defendants did not breach it.

13

## ELEVENTH DEFENSE: NO BREACH OF ALLEGED CONTRACT

14

Count II (Breach of Implied-in-Fact Contract) fails because, to the extent the contract

15

alleged in Count II existed, the OpenAI Defendants did not breach any of its terms.

16

## TWELFTH DEFENSE: INDEFINITENESS OF ALLEGED CONTRACT

17

Count II (Breach of Implied-in-Fact Contract) fails because the terms of Plaintiff Musk's

18

purported contract, as alleged in Count II, are too vague, indefinite, and/or uncertain to constitute

19

an enforceable contract.

20

## THIRTEENTH DEFENSE: LACK OF IMPLIED-IN-FACT CONTRACT

21

Counts II (Breach of Implied-in-Fact Contract) and III (Breach of Implied Covenant of

22

Good Faith and Fair Dealing) fail because no implied-in-fact contract exists.

23

## FOURTEENTH DEFENSE: NO MUTUAL ASSENT

24

Counts II (Breach of Implied-in-Fact Contract) and III (Breach of Implied Covenant of

25

Good Faith and Fair Dealing) fail for lack of mutual assent.

26

27

_____

28

defenses (Dkt. 222).

**FIFTEENTH DEFENSE: NO UNFAIR INTERFERENCE**

Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) fails because, to the extent the contract alleged in Count II (Breach of Implied-in-Fact Contract) existed, none of the OpenAI Defendants unfairly interfered with Plaintiff Musk's right to receive the benefits of the alleged contract.

**SIXTEENTH DEFENSE: NO BREACH OF ALLEGED IMPLIED COVENANT**

Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) fails because, to the extent the contract alleged in Count II (Breach of Implied-in-Fact Contract) existed, the OpenAI Defendants did not breach any implied covenant contained therein.

**SEVENTEENTH DEFENSE: NO HARM**

Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) fails because, to the extent the conduct alleged in Count III occurred, Plaintiff Musk was not harmed by that conduct.

**EIGHTEENTH DEFENSE: IMPERMISSIBLY DUPLICATIVE**

Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) fails because it is impermissibly duplicative of Count II (Breach of Implied-in-Fact Contract).

**NINETEENTH DEFENSE: NO BENEFIT**

Count IV (Breach of Quasi-Contract/Unjust Enrichment) fails because Plaintiff Musk did not confer a benefit on any OpenAI Defendant at his expense.

**TWENTIETH DEFENSE: NO UNJUST RETENTION OF A BENEFIT**

Count IV (Breach of Quasi-Contract/Unjust Enrichment) fails because none of the OpenAI Defendants unjustly retained a benefit at the expense of Plaintiff Musk.

**TWENTY-FIRST DEFENSE: NO FIDUCIARY/CONFIDENTIAL RELATIONSHIP**

Count VI (Constructive Fraud) fails because no fiduciary or confidential relationship existed between Altman, Brockman, or OpenAI, Inc., on the one hand, and Plaintiff Musk, on the other hand.

**TWENTY-SECOND DEFENSE: NO BREACH OF ANY DUTY**

Count VI (Constructive Fraud) fails because, to the extent the fiduciary or confidential relationship alleged in Count VI existed, there was no act, omission, or concealment that resulted in a breach of that alleged duty.

**TWENTY-THIRD DEFENSE: NO FALSE STATEMENT**

Counts VII (Fraud), XX (Violations of Federal Civil RICO), and XXI (Conspiracy to Violate Federal Civil RICO) fail because Plaintiff Musk does not identify, and the OpenAI Defendants did not make, any actionably false or misleading statement or omission of material fact.

**TWENTY-FOURTH DEFENSE: LACK OF SCIENTER**

Counts VII (Fraud), XX (Violations of Federal Civil RICO), and XXI (Conspiracy to Violate Federal Civil RICO) fail because the OpenAI Defendants lacked the requisite scienter.

**TWENTY-FIFTH DEFENSE: LACK OF INTENT TO DEFRAUD**

Counts VII (Fraud), XX (Violations of Federal Civil RICO), and XXI (Conspiracy to Violate Federal Civil RICO) fail because the OpenAI Defendants lacked intent to defraud or deceive.

**TWENTY-SIXTH DEFENSE: NO BREACHED PROMISE**

Counts VII (Fraud), XX (Violations of Federal Civil RICO), and XXI (Conspiracy to Violate Federal Civil RICO) fail because the OpenAI Defendants did not breach the promises alleged to have been made to Plaintiff Musk.

**TWENTY-SEVENTH DEFENSE: LACK OF RELIANCE**

Counts VI (Constructive Fraud), VII (Fraud), XX (Violations of Federal Civil RICO), and XXI (Conspiracy to Violate Federal Civil RICO) fail because Plaintiff Musk did not reasonably rely on any promise, representation, or reassurance alleged to have been made to him.

**TWENTY-EIGHTH DEFENSE: SUBSTANTIAL FACTOR**

Counts VII (Fraud), XX (Violations of Federal Civil RICO), and XXI (Conspiracy to Violate Civil RICO) fail because, to the extent Plaintiff Musk reasonably relied on any promise, representation, or reassurance alleged to have been made to him, such reliance was not a substantial factor in causing Plaintiff Musk's alleged harm.

**TWENTY-NINTH DEFENSE: NO ACTS OF RACKETEERING ACTIVITY**

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail because the OpenAI Defendants did not commit any acts of racketeering activity, including wire fraud in violation of 18 U.S.C. § 1343.

**THIRTIETH DEFENSE: LACK OF CONDUCT**

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail as to the For-Profit Entities because the For-Profit Entities had no part in directing the affairs, or participating in the operation or management, of OpenAI, Inc.

**THIRTY-FIRST DEFENSE: LACK OF DISTINCTIVENESS**

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail for lack of distinctiveness between the alleged persons and the alleged enterprise.

**THIRTY-SECOND DEFENSE: NO PATTERN**

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail because none of the OpenAI Defendants, individually or collectively, has committed two or more acts of racketeering activity.

**THIRTY-THIRD DEFENSE: NO RELATED ACTS**

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail because any acts of racketeering activity were not sufficiently related to form a pattern of racketeering activity.

**THIRTY-FOURTH DEFENSE: NO CONTINUOUS ACTS**

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail because any acts of racketeering activity were not sufficiently continuous to form a pattern of racketeering activity.

**THIRTY-FIFTH DEFENSE: LACK OF CONDUCT OF AN ENTERPRISE**

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail because any alleged racketeering activity was not the conduct of OpenAI, Inc.'s affairs.

### THIRTY-SIXTH DEFENSE: LACK OF INJURY

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail because Plaintiffs did not suffer any cognizable injury to their business or property.

### THIRTY-SEVENTH DEFENSE: LACK OF CAUSATION

Counts XX (Violations of Federal Civil RICO) and XXI (Conspiracy to Violate Federal Civil RICO) fail because the OpenAI Defendants' alleged conduct was not a but-for cause or the proximate cause of Plaintiffs' purported injury.

### THIRTY-EIGHTH DEFENSE: NO AGREEMENT TO VIOLATE RICO

Count XXI (Conspiracy to Violate Federal Civil RICO) fails because the OpenAI Defendants did not enter into any agreement to commit a substantive violation of 18 U.S.C. § 1962(c) or any other RICO provision.

### THIRTY-NINTH DEFENSE: LACK OF STANDING

Plaintiffs lack standing to assert the Subject Claims.

### FORTIETH DEFENSE: LACK OF SUBJECT-MATTER JURISDICTION

Plaintiffs have failed to establish that the Court possesses subject-matter jurisdiction to adjudicate any of the Subject Claims because Plaintiffs do not have Article III standing to assert the Subject Claims.

### FORTY-FIRST DEFENSE: RIPENESS/MOOTNESS

Plaintiffs' claims are barred, in whole or in part, by the doctrines of ripeness and mootness.

### FORTY-SECOND DEFENSE: NO DAMAGES

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered any injury, loss, or damages from the conduct challenged in the Second Amended Complaint.

### FORTY-THIRD DEFENSE: NO ENHANCED DAMAGES

Plaintiffs' requests for punitive, exemplary, or other enhanced damages are barred because the OpenAI Defendants did not at any time act with oppression, fraud, malice, and/or willful or wanton negligence and such an award would, if granted, also violate the OpenAI Defendants' state and federal rights.

**FORTY-FOURTH DEFENSE: NO EQUITABLE RELIEF**

Plaintiffs are not entitled to equitable relief, including but not limited to injunctive relief, because they have an adequate remedy at law and cannot show that they will suffer any irreparable harm, that the balance of equities tips in their favor, or that the public interest supports relief.

## <u>DEMAND FOR JURY TRIAL</u>

Counterclaim Plaintiffs hereby demand a trial by jury for all issues triable to a jury under Rule 38(b) of the Federal Rules of Civil Procedure.

1    DATED:  August 6, 2025                    MORRISON & FOERSTER LLP

2
                                             */s/ Jordan Eth*
3                                             _____
                                             JORDAN ETH (CA SBN 121617)
                                             JEth@mofo.com
4                                             WILLIAM FRENTZEN (CA SBN 343918)
                                             WFrentzen@mofo.com
5                                             DAVID J. WIENER (CA SBN 291659)
                                             DWiener@mofo.com
6                                             MORRISON & FOERSTER LLP
                                             425 Market Street
7                                             San Francisco, CA 94105
                                             Telephone:   (415) 268-7000
8                                             Facsimile:   (415) 268-7522

9                                             WILLIAM SAVITT (admitted *pro hac vice*)
                                             WDSavitt@wlrk.com
10                                            BRADLEY R. WILSON (admitted *pro hac
                                             vice*)
11                                            BRWilson@wlrk.com
                                             SARAH K. EDDY (admitted *pro hac vice*)
12                                            SKEddy@wlrk.com
                                             NATHANIEL CULLERTON (admitted *pro
13                                            hac vice*)
                                             NDCullerton@wlrk.com
14                                            STEVEN WINTER (admitted *pro hac vice*)
                                             SWinter@wlrk.com
15                                            WACHTELL, LIPTON, ROSEN & KATZ
                                             51 West 52nd Street
16                                            New York, NY 10019
                                             Telephone:   (212) 403-1000
17                                            Facsimile:   (212) 403-2000

18                                            *Attorneys for Defendants Samuel Altman,*
                                             *Gregory Brockman, OpenAI, Inc., OpenAI*
19                                            *L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,*
                                             *OpenAI OpCo, LLC, OpenAI Global, LLC,*
20                                            *OAI Corporation, LLC, OpenAI Holdings,*
                                             *LLC, OpenAI Startup Fund Management,*
21                                            *LLC, OpenAI Startup Fund GP I, L.L.C.,*
                                             *OpenAI Startup Fund I, L.P., OpenAI Startup*
22                                            *Fund SPV GP I, L.L.C., OpenAI Startup Fund*
                                             *SPV GP II, L.L.C., OpenAI Startup Fund SPV*
23                                            *GP III, L.L.C., OpenAI Startup Fund SPV GP*
                                             *IV, L.L.C., OpenAI Startup Fund SPV I, L.P.,*
24                                            *OpenAI Startup Fund SPV II, L.P., OpenAI*
                                             *Startup Fund SPV III, L.P., OpenAI Startup*
25                                            *Fund SPV IV, L.P., Aestas Management*
                                             *Company, LLC, and Aestas LLC*
26

27

28