UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELON MUSK et al., <br><br>         Plaintiffs, <br><br> vs. <br><br> SAMUEL ALTMAN et al., <br><br>         Defendants. | Case No.  24-cv-04722-YGR <br><br> **JOINT LETTER BRIEF** <br><br> Judge:  Hon. Yvonne Gonzalez Rogers <br><br> Magistrate Judge:  Hon. Thomas S. Hixson <br><br> Date Action Filed: August 5, 2024 <br> Trial Date: March 30, 2026 |

September 2, 2025

The Honorable Thomas S. Hixson
San Francisco Courthouse
Courtroom E, 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Magistrate Judge Hixson:

      Pursuant to Your Honor's Discovery Standing Order, the parties respectfully submit this joint letter addressing:

1. Plaintiffs' Motion to Compel Production of OpenAI Documents Withheld or Redacted under the Business Strategy Doctrine

      The parties attest that they met and conferred in good faith in an effort to resolve these disputes before filing this joint letter.

      **Defendant Microsoft Corp. has indicated its intent to file a submission in connection with this dispute, together with Plaintiffs' response, on September 3 or 4, 2025.**

<div style="display: flex;">

<div>

*/s/ Jaymie Parkkinen*
Jaymie Parkkinen, SBN 318394
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Steven F. Molo (*pro hac vice*)
Robert K. Kry (*pro hac vice*)
Jennifer Schubert (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk and X.AI Corp.*

</div>

<div>

*/s/ Bradley R. Wilson*
Bradley R. Wilson (admitted *pro hac vice*)
Nathaniel Cullerton (admitted *pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC*

</div>

</div>

**Plaintiffs' Statement**

Plaintiffs move to compel production of documents that the OpenAI Defendants ("OpenAI") have withheld or redacted on the basis of a supposed "business strategy privilege." The documents relate to OpenAI's proposed restructuring into a for-profit entity, in particular (1) the board's consideration of how to allocate ownership stakes in the new entity; (2) the valuation materials underlying those analyses; and (3) the board's negotiating strategies relating to Microsoft's role in the restructuring. Those documents are highly relevant. No "business strategy privilege" justifies withholding them. The Court should order the documents produced.

*Background.* Musk contributed about $40 million to OpenAI on the understanding that the company would remain a non-profit dedicated to the public good. Soon after Musk left, Defendants began restructuring OpenAI into a for-profit venture backed by Microsoft – efforts that accelerated in 2024 and 2025 as OpenAI announced more plans to cement its for-profit status. Musk alleges breach of trust, breach of contract, unjust enrichment, and other claims on the ground that Defendants breached their duties by restructuring OpenAI into a for-profit entity. Dkt. 170. Among other remedies, Musk seeks disgorgement of profits that Defendants derived from his contributions, including unrealized profits from OpenAI's increased valuation. *Id.* Musk also seeks a permanent injunction against OpenAI's proposed for-profit recapitalization. *Id.* OpenAI's restructuring plans, Microsoft's role, and OpenAI's valuations are thus critical issues in the case.

On February 10, 2025, Musk's litigation counsel sent a Letter of Intent to OpenAI's board on behalf of a consortium of investors, proposing to open negotiations to purchase the company's assets for $97.375 billion in the event that OpenAI proceeded with its for-profit conversion. Dkt. 229 ¶ 83; Dkt. 119 at 1. OpenAI's board rejected that offer four days later, on February 14, 2025. Dkt. 229 ¶ 91. That was over six months ago. Musk has not submitted another proposal since.

On August 25, 2025, OpenAI served a privilege log showing that it had withheld or redacted 159 documents based on "business strategy privilege" – 98 of them solely on that basis. The documents span fourteen months, from May 2024 to June 2025. OpenAI's counsel has described them as relating to OpenAI's proposed restructuring, in particular (1) the board's consideration of how to allocate ownership stakes in the new corporate entity; (2) the valuation materials underlying those analyses; and (3) the board's negotiating strategies relating to Microsoft's role in the restructuring.

*Argument.* The Court should reject OpenAI's assertions of the business strategy privilege and order OpenAI to produce the materials withheld or redacted on that basis. Although some courts have recognized a narrow business strategy doctrine, that doctrine applies only in the context of a live corporate takeover situation, which does not exist here. In any event, the highly relevant nature of the materials and the speculative nature of any prejudice favor disclosure.

The leading case for the business strategy doctrine is *BNS Inc. v. Koppers Co.*, 683 F. Supp. 454 (D. Del. 1988). In that case, BNS made a $60 per share offer to acquire a company and then, ***while the offer was still pending***, sought discovery into the board's consideration of the offer and any defensive measures. *Id.* at 455-56. The court rejected the argument that any privilege applied. *Id.* at 457. But applying Rule 26(c)'s general standards for protective orders, the court balanced the "countervailing legitimate interests" and held that "the equities favor not producing documents

available to the board *during its ongoing consideration of the BNS $60 offer*." *Id.* (emphasis added). Central to the court's reasoning was that the plaintiff could obtain the documents later if and when the board rejected the bid: "[A]t some future point BNS may be immediately entitled to that which has been refused it today. ***That point will be reached with respect to the $60 offer if, and when, the Koppers board formally rejects it***." *Id.* at 458 (emphasis added).

Other cases interpret the doctrine the same way. In *Allergan, Inc. v. Valeant Pharmaceuticals International, Inc.*, No. 14-1214, 2014 WL 12573358 (C.D. Cal. Sept. 22, 2014) – apparently the only California case on point – the court explained that the doctrine applies "when documents reveal strategies for retaining or obtaining corporate control ***during a live corporate takeover situation***." *Id.* at *1 (emphasis added). The court noted that "the documents must be produced sooner or later" and denied protection because the plaintiffs had "not proposed a limited time period for protection." *Id.* at *1-2. Similarly, in *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 959 A.2d 47 (Del. Ch. 2008), the court refused to apply the business strategy doctrine where a party sought discovery into an ***already concluded*** merger agreement. *Id.* at 53. The court found it insufficient that "the information sought could be used by Hexion to ***renegotiate*** the transaction," explaining that "almost any piece of relevant discovery could be used to renegotiate the deal and that fact, standing alone, will not prevent discovery." *Id.* (emphasis added); *see also Grand Metro. PLC v. Pillsbury Co.*, No. Civ. A. 10319, 1988 WL 130637, at *3 (Del. Ch. Nov. 22, 1988).

The business strategy doctrine does not apply here because this is not a "***live*** corporate takeover situation." *Allergan*, 2014 WL 12573358, at *1 (emphasis added). Musk's counsel served the Letter of Intent over six months ago on February 10. Dkt. 176 ¶ 83. OpenAI's board rejected the proposal four days later, publicly proclaiming that "OpenAI is not for sale." *Id.* ¶ 91; OpenAI Newsroom, X (Feb. 14, 2025). Any protections expired that day. A "live corporate takeover situation" does not persist indefinitely merely because Musk might someday make a new offer – even if Musk supposedly "previewed" six months ago the possibility of another proposal at some unknown future date. *See Hexion*, 959 A.2d at 53 (mere prospect of "renegotiat[ing] the transaction" insufficient). OpenAI's claim that its discussions ***with Microsoft*** concern a sensitive strategic transaction is beside the point. The business strategy doctrine is not a blanket privilege for sensitive discussions. It allows a defendant to withhold documents ***from a plaintiff who has a live takeover bid pending***. *See, e.g.*, *BNS*, 683 F. Supp. at 458. Once OpenAI rejected Musk's proposal, there was no justification for withholding relevant discovery ***from Musk*** merely because OpenAI was still having discussions with someone else.

Even apart from that issue, the Court would still have to conduct the usual Rule 26(c) balancing analysis before upholding a business strategy doctrine claim. *See Allergan*, 2014 WL 12573358, at *1 ("[C]ourts must balance the interests of the litigant who needs the documents to prepare for trial and the interests of the litigant who seeks to protect its offensive or defensive corporate control strategy."); *BNS*, 683 F. Supp. at 457 (court must "strik[e] a balance"). Plaintiffs' need for the evidence is substantial, and OpenAI cannot show any serious threat of prejudice.

OpenAI is withholding evidence directly relevant to key disputed issues in the case. OpenAI's restructuring into a for-profit company and Microsoft's role in that restructuring are central to Musk's breach of trust, breach of contract, and unjust enrichment claims. OpenAI's valuations are also critical because one of the remedies Plaintiffs seek is disgorgement of wrongful profits based

on OpenAI's increase in value. *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 171 Cal. Rptr. 3d 548, 576-77 (Cal. Ct. App. 2014) (allowing disgorgement for increase in value); Restatement (Third) of Restitution § 51 cmt. e & illus. 2 (2011) (similar). Musk also seeks a permanent injunction against OpenAI's for-profit conversion. This is not a case like *BNS* where a party waging a corporate takeover campaign seeks discovery specifically about the board's ongoing response to that campaign. 683 F. Supp. at 455-56. Rather, Plaintiffs seek documents that are plainly highly relevant to their preexisting Phase I claims.

Any prejudice to OpenAI is minimal. OpenAI has withheld documents over a sprawling **fourteen month** period from May 2024 to June 2025 that began nine months before Musk's counsel even served the Letter of Intent. Disclosing those documents would not threaten the same prejudice to corporate governance at issue in cases like *BNS*, where the plaintiff sought documents created during the takeover process itself. 683 F. Supp. at 455-56.

Finally, the protective order permits parties to designate documents "Highly Confidential," preventing the documents from being disclosed to a party's officers or employees (even in-house counsel) who might be involved in preparing a hypothetical future proposal. Dkt. 171 §§ 2.7, 7.3. That provision adequately mitigates any risk of prejudice to OpenAI. *See Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Servs. of Cincinnati, Inc.*, No. Civ. A. 13389, 1995 WL 347799, at *3 (Del. Ch. May 17, 1995) ("'[A]ttorneys' eyes only' restriction . . . will provide [party] with sufficient protections . . . ."); *Computervision Corp. v. Prime Computer, Inc.*, No. Civ. A. 9513, 1988 WL 909326, at *1 (Del. Ch. Jan. 26, 1988) (similar).

**OpenAI Defendants' Statement**

This is a lawsuit brought by one of OpenAI's main competitors, xAI, and its CEO and controller, Elon Musk. Plaintiffs, who have already received extensive discovery into some of OpenAI's most closely-held corporate documents, now ask the Court to compel disclosure of sensitive board materials concerning OpenAI's evaluation of a potential recapitalization of its existing for-profit arm. The board's process largely post-dates the filing of this litigation, and that process is ongoing. No recapitalization has occurred or even been approved by the OpenAI board, and OpenAI is engaged in active negotiations with Microsoft on the subject. At the same time, Musk and his bidding consortium are standing by, having previously offered $97 billion to purchase OpenAI's assets with a promise to meet or exceed the terms of any recapitalization deal—a promise they have not withdrawn. These are precisely the circumstances involving an active transaction process in which courts have applied the business strategy immunity to protect "live" board deliberations. And protecting those deliberations is particularly warranted here given the Court's recent ruling that post-filing events—which would include both Musk's bid and the potential recapitalization to which that bid was directed—are only marginally relevant to Phase I. *See* Dkt. 237 at 2-3.

*Background*. The OpenAI board is considering a potential recapitalization of OpenAI's for-profit arm into a public benefit corporation (PBC) still under the non-profit's control. "Conversion" is not on the table: "the nonprofit would continue to exist and pursue its mission of ensuring that AGI benefits all of humanity." Dkt. 229 at 2. Co-defendant Microsoft is a major investor in the for-profit arm, and the OpenAI board has been in intensive negotiations with Microsoft as to the relative economic interests in any eventual PBC as between the non-profit and OpenAI's investors.

In February 2025, Musk (and xAI) led a highly publicized, unsolicited $97 billion bid for the assets of the nonprofit. As his court filings confirm, Musk conceives of the bid as a response to the potential recapitalization, and the bid was supposedly "conditional" on that transaction moving forward. Dkt. 236 at 4. Although the OpenAI board rejected Musk's original bid, Musk's litigation counsel (Mr. Toberoff), who orchestrated the bid and represented the bidding consortium, has made it clear that "Musk's investor group is prepared to match or exceed" any competing transaction. Jessica Toonkel & Berber Jin, *Elon Musk-Led Group Makes $97.4 Billion Bid for Control of OpenAI*, WALL ST. J. (Feb. 10, 2025). No one representing Musk has retracted their declaration of a future intention to bid, and Plaintiffs' counsel declined to do so on a recent meet-and-confer. Musk and xAI must therefore be regarded as active bidders for OpenAI, Inc.'s assets.

*Argument*. The OpenAI Defendants have produced thousands of pages and multiple years' worth of board minutes, board presentations, financial statements, and internal and third-party valuation reports—among many other similarly sensitive documents—in a good-faith effort to comply with Plaintiffs' broad discovery demands, and in accordance with the Court's July 9 discovery order. At the same time, with respect to a discrete category of responsive—but extraordinarily sensitive—information related to the OpenAI board's ongoing assessment and negotiation of the potential recapitalization, the OpenAI Defendants applied redactions based on the business strategy immunity. Specifically, the OpenAI Defendants have redacted board-level information revealing: (i) OpenAI's strategies for negotiating the recapitalization with Microsoft (ii) OpenAI's perspectives on the appropriate allocation of equity interests in the for-profit PBC as between the

controlling nonprofit, Microsoft, and other investors; and (iii) the valuation analyses that underlie those contemplated allocations. The OpenAI Defendants have logged all such redactions.

The redacted information at issue falls within the heartland of the "business strategy immunity," which is one "basis on which courts can find 'good cause' to protect documents under Rule 26(c)." *Allergan, Inc.* v. *Valeant Pharms. Int'l, Inc.*, 2014 WL 12573358, at *1 (C.D. Cal. Sept. 22, 2014). The immunity applies, for example, when "documents reveal strategies for retaining or obtaining corporate control." *Id.* Courts applying it seek to balance the "risk of nonlitigation injury" against a requesting party's interest in disclosure, in view of "the importance of the matter sought to be discovered." *Parsons* v. *Jefferson-Pilot Corp.*, 141 F.R.D. 408, 419 (M.D.N.C. 1992).

Plaintiffs acknowledge that the immunity exists, but say it cannot apply without a "live . . . takeover situation." But Plaintiffs are wrong on both the facts and the law. As to the facts, OpenAI *is* in the midst of a "live takeover situation": On the one hand, OpenAI's board is actively considering a recapitalization of OpenAI's for-profit arm that would leave the nonprofit's control intact. On the other, Musk, xAI, and other profit-seeking investors have made one competing bid and previewed that another is coming if and when OpenAI announces a recapitalization. If Musk's bid prevails, OpenAI's nonprofit mission will be defunct—and its assets will be under Musk's control.

As to the law, the business strategy immunity is not nearly as cramped as Plaintiffs contend. Courts have expressly rejected the argument that the immunity cannot apply if "there is no takeover at issue," and explained that it may be invoked in comparable circumstances where "disclosure would [] harm the corporation." *See Matter of Heizer Corp.*, 1987 WL 19560 (Del. Ch. Nov. 9, 1987) (applying immunity to protect documents related to "ongoing negotiations over the disposition of trust assets"). Federal and state courts have therefore applied the immunity in other contexts, including proxy contests, *see Parsons*, 141 F.R.D. at 418-20, and shareholder derivative suits, *see Gioia* v. *Texas Air Corp.*, 1988 WL 18224 (Del. Ch. Mar. 3, 1988).

*BNS Inc.* v. *Koppers Co.* is not to the contrary. In that case, there was only one transaction under consideration (the BNS bid), and thus the court explained that there would be no need to continue to shield the Koppers board's deliberations once it rejected that bid. *See* 683 F. Supp. 454, 457-58 (D. Del. 1988). But here there is an ongoing board evaluation (of the potential recapitalization) and a related negotiation with Microsoft. In a circumstance like that, the BNS court made clear, the immunity would apply with full force, because disclosing the board's documents would "seriously impair, if not destroy, [its] ability to negotiate" the best possible transaction. *Id.* at 457.

Here, the balance of interests tilts decisively in favor of protecting the OpenAI information at issue. Requiring OpenAI to reveal its negotiating strategies, views on acceptable equity allocations, and supporting valuation analyses in this litigation would significantly impair the OpenAI board's ongoing efforts to reach agreement on a recapitalization with the best possible terms for the nonprofit. Plaintiffs' countervailing interest in obtaining this highly sensitive information pales in comparison. Plaintiffs say they need to invade the OpenAI board's deliberative process to establish a purported claim for "disgorgement," but they never explain why that is the case. Nor could they, given the substantial amount of discovery Plaintiffs have already received on the recapitalization and OpenAI's valuation. Plaintiff also refer in passing to their prayer for a permanent injunction, but there is no transaction to enjoin—only an ongoing board process and related negotiation.

As courts have recognized, the business strategy immunity provides protection when "justice requires," such as where a company's "important ongoing business plans" are "at risk of disclosure to its negotiating adversary." *Gioia*, 1988 WL 18224 at *3. That is the situation here: Plaintiffs are asking OpenAI to disclose key board-level documents to a negotiating counterparty (Microsoft) and a hostile bidding consortium (led by Musk) in the middle of a live board process. None of Plaintiffs' cases is remotely analogous.

The Court's recent order underscores the marginal significance of the redacted information to Phase I. In granting Plaintiffs' motion for a protective order, the Court reasoned that additional written discovery related to Musk's $97 billion bid was not proportional because it "stem[med] from actions taken far after the actions forming the basis" of Plaintiffs' Phase I claims and did not have "anything to do with the obligations OpenAI did or did not take on . . . nor with whether OpenAI did or did not live up to those alleged obligations." Dkt. 237 at 2-3. The same reasoning applies to the ongoing recapitalization discussions—the discussions that triggered Musk's bid. OpenAI's consideration of a potential future transaction cannot amount to a completed breach of contract or breach of charitable trust, which are the claims Musk is pursuing in Phase I.

Finally, the existence of a protective order does not override the business strategy immunity. When the prerequisites for applying the immunity are satisfied, courts allow parties to invoke it even if a confidentiality order is in place, recognizing that such orders do not provide "absolute protection." *Gioia*, 1988 WL 18224, at *3. After all, maximum care should be taken to ensure that a litigant does not obtain an "unfair advantage . . . through the discovery process." *Id*. This reasoning applies with special force in this case, because Mr. Toberoff—who by his own choice is simultaneously representing Musk in this litigation and advising Musk's bidding consortium—would have access to every discovery document, even those designated "Highly Confidential."