1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Thomas S. Hixson, Magistrate Judge

4

5  MUSK,                          )
                                  )
6           Plaintiff,            )
                                  )
7  vs.                            )   No. C 24-04722-YGR
                                  )
8  ALTMAN, et al.,                )
                                  )
9           Defendants.           )
   ───────────────────────────────)

10

11                                 San Francisco, California
                                   Friday, September 5, 2025

12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                RECORDING 3:30 - 4:24 = 54 MINUTES

14

15  APPEARANCES:

16  For Plaintiff:
                                   MoloLamken LLP
17                                 600 New Hampshire Avenue
                                   Washington, DC 20037
18                        BY:  ROBERT KRY, ESQ.

19                                 MoloLamken LLP
                                   430 Park Avenue
20                                 Sixth Floor
                                   New York, New York 10022
21                        BY:  JENNIFER SCHUBERT, ESQ.

22

23

24           (APPEARANCES CONTINUED ON NEXT PAGE)

25

                                                                        2

1   For Defendants:

2                                   Wachtell, Liptom, Rosen & Katz
                                    51 West 52nd Street
                                    New York, New York 10019
3                           BY:     BRADLEY R. WILSON, ESQ.
                                    NATHANIEL CULLERTON, ESQ.
4
                                    Dechert, LLP
5                                   45 Fremont Street
                                    26th Floor
6                                   San Francisco, California
                                     94105
7                           BY:     RUSSELL P. COHEN, ESQ.
                                    HOWARD M. ULLMAN, ESQ.
8
    Transcribed by:                 Echo Reporting, Inc.
9                                   Contracted Court Reporter/
                                    Transcriber
10                                  echoreporting@yahoo.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<u>Friday, September 5, 2025</u>                        <u>3:30 p.m.</u>

                    P-R-O-C-E-E-D-I-N-G-S

                         --oOo--

        (Call to order of the Court.)

            THE CLERK:  We are now calling Civil Case
24-4722-YGR, Musk versus Altman, et al.

        Counsel, starting with the Plaintiff, please state your
appearances for the record.

            MR. KRY (via Zoom):  Good afternoon, your Honor.
This is Robert Kry from MoloLamken.  I represent the
Plaintiff, Elon Musk, as well as non-parties Jared Birchall
and Shivon Zilis, and I'm joined today by Jen Schubert, also
from MoloLamken.

            THE COURT:  Good afternoon.

            MR. WILSON (via Zoom):  Good afternoon, your
Honor.  Bradley Wilson from the Wachtell, Liptom, firm,
counsel to OpenAI, Inc., and the other OpenAI Defendants.
I'm joined here today by my partner, Nate Cullerton.

            THE COURT:  Good afternoon.

            MR. COHEN (via Zoom):  And good afternoon, your
Honor.  Russell Cohen from the Dechert firm on behalf of
Microsoft, and I am joined by Mr. Howard Ullman.

            THE COURT:  Good afternoon.

        We are here on two joint discovery letter briefs, ECF
Numbers 139 and 141, to deal with the business strategy

4

1  doctrine, and first we have -- one of the letter briefs is

2  between Plaintiffs and OpenAI, and the other is between

3  Plaintiffs and Microsoft.

4      I would like to turn first to the Microsoft dispute.

5  Is it correct that the deposition is still scheduled for

6  this upcoming Monday?

7          MR. KRY:  It is, your Honor.

8          MR. COHEN:  Yes, it is.  Yes, it is, your Honor.

9  It's scheduled for Monday as a 30(b)(6) deposition here in

10 Seattle at 9:00 a.m.

11         THE COURT:  All right.  Thank you for that update.

12     Under the case law, the business strategy doctrine

13 applies during a live corporate takeover situation, and so,

14 as to Microsoft and its ongoing negotiations with OpenAI, I

15 think the first thing I need to determine is whether there

16 is a live corporate takeover situation, and in the discovery

17 letter briefs, OpenAI and Microsoft did not necessarily

18 characterize the relationship between those two entities in

19 that day.  They talked about recapitalization and things

20 like that that seemed maybe a little bit to the side of the

21 business strategy doctrine.

22     So I do want to turn to Microsoft, and get your

23 thoughts about whether you fit within the business strategy

24 doctrine, because there is a live corporate takeover

25 situation.

5

1       Of course, I also want to be sensitive to the fact that

2  this is a public hearing, and so you shouldn't say things

3  that are confidential, and so I'm going to leave it to the

4  parties to decide what they are able to say in a public

5  hearing.  It is perfectly fine for any party to tell me that

6  there is something that you don't want to say in a public

7  hearing, and that's an acceptable answer, and then I'll just

8  have to deal with that.

9       So let me turn to Microsoft.  Are you able to explain

10 more, or to characterize whether the relationship between

11 Microsoft and OpenAI is similar to a live corporate takeover

12 situation?

13          MR. COHEN:  Thank you, your Honor.  I'd like to

14 say two things.  First of all, I'll describe what the

15 situation is, mindful of the fact that this is a public

16 hearing, and, second of all, I would like to explain to your

17 Honor that this doctrine is not so limited to live takeover

18 situations.  It does extend to other sensitive matters like

19 what is going on presently.

20      So, as is reported in the letter briefs, OpenAI is in

21 the process of a recapitalization.  As I believe your Honor

22 knows, Microsoft is a significant early investor in OpenAI,

23 and has been negotiating with OpenAI regarding its interest

24 following the recapitalization.  Those negotiations are

25 going on, and they are very active, and they are very

6

1 sensitive.

2    We raised with the Plaintiffs whether they intend to
3 take discovery into the matters that are currently being
4 negotiated, and they confirmed that they would be taking
5 that discovery.  Now, your Honor, we would say that is not
6 at all relevant, but, even if it were, it would be protected
7 by the business strategy doctrine.

8    I would refer the Court to the <u>Matter of Heiser Corp.</u>
9 (phonetic) case, which is referenced in both briefs.  That's
10 a matter that did not involve the live takeover situation.
11 It involved a dispute over trust assets, and the Court there
12 was mindful of the sensitivity of disclosing such
13 information in the midst of a dispute between the parties,
14 and that is precisely the situation here.

15    There is a deposition that's scheduled for Monday.  You
16 could imagine, your Honor, a situation in which the
17 Plaintiff asks the Microsoft witness what it is willing to
18 accept in a negotiation, what its strategy is for continuing
19 the negotiation, what sorts of analysis it's done to support
20 its position and how it intends to advance it.  Those are
21 precisely the kinds of sensitive questions that could derail
22 the negotiation at this stage.

23    And let me be clear, your Honor.  There is no relevance
24 in this dispute to any of that internal undisclosed
25 negotiating strategy or positions.  To Plaintiff's claims

7

1  against Microsoft, what is relevant is what Microsoft knew,

2  what Microsoft did, and what Microsoft obtained, and what

3  Microsoft is negotiating for, actively and presently, and

4  what it internally assesses it is entitled to, and how it

5  intends to seek that in a negotiation, is none of those

6  things.

7         THE COURT:  Let me stop you right there.  You do

8  make a relevance argument in the joint discovery letter

9  brief, and I did see that.  Broadly speaking, Microsoft is

10 moving for a protective order on two categories of documents

11 and information.  I am not able to say that, categorically

12 speaking, every single document or every single piece of

13 information in those two subjects is absolutely irrelevant

14 to phase one.  I just -- that would be a very sweeping

15 declaration, and I'm not able to paint with that broad a

16 brush.

17     So I'm not going to grant the protective order on

18 relevance grounds, because I'm not able to say that

19 absolutely everything in those categories is irrelevant.  It

20 would depend, in part, on what particular documents say, and

21 what a witness might give as an answer.  So you're not going

22 to win the protective order on the sweeping relevance

23 grounds.

24     I do want you to focus on the business strategy

25 doctrine, and you make a good point that it's -- that --

8

about whether it's limited to a live corporate takeover.
That's the heart of the doctrine.  However, because the
doctrine is itself just an application of Rule 26(c), it's
more a matter of discretion.

So, if you could turn back to discussing the nature of
the negotiation.  In the case law, there are sometimes
referred to bids that are being considered, or the company,
the target company, has to decide on the defensive strategy,
in other words, decisions that will be made at a certain
point of time, and, once they are decided, then there's no
bar to discovery anymore.  Are you -- and that's why courts
say that this doctrine is really about when discovery
happens, not whether discovery happens.

Are you able to tell me anything more about potential
timing, to fit it within the scope of the case law that says
this is a ban on discovery for a limited period of time?
Can you talk to me about that?

MR. COHEN:  Right.  Your Honor, I read the cases
in the same way.  If you're asking me when these
negotiations are going to be concluded, I cannot answer that
question.  They are ongoing, and they have been ongoing for
some time.  They may be concluded at some point in the near
term, or they may not.  I cannot say that for certain.  But,
when they are concluded, Microsoft acknowledged in its
papers that it would provide the term sheet or the

9

1  agreement, or whatever it is that documents that agreement,

2  and Plaintiffs can take discovery into that.  What we have

3  focused on here is far narrower, and it is the internal

4  undisclosed negotiating positions.

5      So your Honor asked, why is this analogous to a

6  takeover situation, and how would we look at the Rule 26(c)

7  balancing?  This is a situation in which, as I explained,

8  Microsoft is negotiating with OpenAI regarding an interest

9  in a potentially recapitalized OpenAI for-profit entity that

10  is controlled by the not-for-profit, and so those

11  negotiations are ongoing, and they are sensitive, and, to

12  the extent Microsoft were required to disclose in discovery,

13  in a deposition as early as Monday, what its position is

14  that has not yet been communicated to OpenAI, or the

15  rationale for its position, as you could imagine, that would

16  have serious repercussions for Microsoft at the negotiating

17  table, if it were required to disclose it.

18      As we noted in our papers, OpenAI is represented by

19  members of the same firm who are advising it on the

20  restructuring or recapitalization, and so the protective

21  order does not provide the protections that we need here.

22  So what we are asking for -- and I understand your Honor's

23  position on relevance.  We continue to maintain that these

24  internal negotiating positions are not relevant.  We can

25  discuss whether a term sheet at the end of the day is

10

1   relevant, but, for these purposes, your Honor, there will be

2   discovery into these matters at some point.

3       At this point, there is limited, if no, utility in

4   getting discovery into Microsoft's internal positions, and

5   there is significant prejudice.  So we think this is

6   precisely the kind of situation that is analogous to the

7   cases that raise the business strategy doctrine, because you

8   have these out-of-litigation concerns that have to be

9   balanced against litigation interests.

10          THE COURT:  Understood.  And if I understand

11  correctly, the focus of Microsoft's concern is having this

12  type of information be turned over to OpenAI, because

13  they're the counterparty in the negotiations.  Is that

14  correct?

15          MR. COHEN:  That is correct, your Honor.  And I

16  understand OpenAI has a further concern regarding Mr. Musk's

17  prior bid for OpenAI.  I will let them speak to that, but

18  yes, Microsoft's focus is on having to disclose information

19  to a counterparty in an active negotiation.

20          THE COURT:  Are there modifications that could be

21  made to the protective order that would allow the Plaintiffs

22  to take the deposition that they think is relevant, while

23  also protecting Microsoft's interests?  For example, you

24  mentioned that some of OpenAI's litigation counsel are at

25  the same firm as their restructuring counsel.  That could be

1  dealt with in a protective order by specifying, for example,

2  by name, who is able to see this among -- by outside

3  counsel.  What are your thoughts about that?

4          MR. COHEN:  Your Honor, we remain concerned about

5  it, given the highly, highly sensitive information that

6  we're talking about, and the marginal relevance, if any, of

7  that information to Plaintiff's case, particularly at this

8  time.

9      We're talking about Microsoft's negotiating positions,

10  the undisclosed negotiating positions, being disclosed in

11  the course of this litigation, for no utility in the

12  litigation to the counterparties that Microsoft is actively

13  negotiating with, and we simply don't view a protective

14  order, even modified, as providing sufficient protection

15  under those circumstances.

16      We recognize this is a balancing, and I appreciate your

17  Honor inquiring into the protective order, but I think,

18  given the high sensitivity and the very low relevance of the

19  information, and the fact that there can be discovery at a

20  point in the future where there is something concrete, if

21  there is something concrete, then we don't believe that that

22  would solve the problem.

23      I also don't know to what extent there is any crossover

24  on the OpenAI counsel side.  I have no reason to believe

25  there is, but I also don't know whether there isn't, and so

12

1  I simply don't know whether a modification would even

2  accomplish that, but we remain highly concerned, given the

3  sensitivity of the information.

4          THE COURT:  I see.  So, even if I'm not able to

5  say that, categorically, everything in these two subjects is

6  irrelevant, you would take the view that, even if there is

7  some relevance, the great sensitivity to Microsoft on these

8  matters would counterbalance that under Rule 26.  Is that

9  right?

10          MR. COHEN:  That's right, your Honor.

11          THE COURT:  Okay.  Then let me turn to Plaintiffs

12  for your response.

13          MR. KRY:  Sure, your Honor.  I have several

14  responses.  First of all, your Honor is correct to focus on

15  the question of whether this is or is (sic) analogous to a

16  live takeover situation.  That's the language of the one and

17  only California case that's ever recognized this doctrine,

18  and that nothing has been publicly reported about this

19  transaction, and there's no reason to think that this

20  transaction is in any way comparable to a live corporate

21  takeover situation.

22      Microsoft, as has been reported in the press

23  previously, has some equity stake in the for-profit arm of

24  OpenAI, and it's in the course of renegotiating what the

25  exact contours of that stake are going to be, but nobody, to

1 my knowledge, thinks that this negotiation is going to end

2 with Microsoft controlling or taking over OpenAI.  All the

3 cases applying this doctrine involve, you know, the

4 corporate matters of who is going to control the company,

5 whether a takeover or a proxy context, or even the trust

6 case that Mr. Cohen referred to.  That was a case where it

7 was basically an asset sale.  They were completely

8 liquidating the entire trust, so it was not just an

9 important transaction with one, effectively, minority stake

10 LP investor in the company.  It was a -- they were all much

11 more foundational than that.  And so this would be quite an

12 extension of what any case has applied this doctrine to.

13      The other point I want to make about that, though, is,

14 as this doctrine has been traditionally applied, it is not a

15 doctrine that says that, if there is a takeover dispute, the

16 sensitive documents relating to that can be shielded from

17 anyone in the world.  The traditional application of this

18 doctrine is the party that's making the takeover bid is

19 seeking during that takeover bid to find out its

20 adversaries' thinking and defense mechanisms to that big.

21      So, in the leading Delaware case, the BNS (phonetic)

22 case, that was exactly the fact pattern.  You had a

23 plaintiff that had a takeover bid for a corporation, and

24 then it served discovery demands, saying, "Show me your

25 defense mechanisms."

14

1     This is completely different because, as your Honor

2 pointed out, even if there are ongoing discussions between

3 something far sort of a takeover bid between Microsoft and

4 OpenAI, Musk, the Plaintiff in this case, is not a party to

5 those discussions, and so a deposition or other order that

6 results in information that's relevant to Musk's claims

7 being shared with him does not share that information with

8 the adversary in an ongoing takeover situation, the way that

9 is present in the typical case applying this doctrine, and

10 the reason your Honor can ensure that is exactly the one

11 your Honor raised, which is the protective order.

12     As currently written, that protective order limits

13 highly confidential information to the parties' outside

14 litigation counsel and other counsel at the same firm, and

15 so, no question, your Honor can and should supplement that

16 order by telling OpenAI that they cannot share any of this

17 material with their restructuring counsel, but there has

18 been no showing, despite the opportunity to make it, that

19 there is any overlap between the counsel who are litigating

20 this matter, at whichever firm that is, and the ones that

21 are advising OpenAI in the restructuring, and in the absence

22 of any evidence that there's some kind of overlap there,

23 your Honor can just, on the record today, tell OpenAI that

24 they cannot share that highly confidential information with

25 their restructuring counsel.

1    And OpenAI is represented by highly reputable and

2 experienced counsel in this case.  There's simply no reason

3 to believe they wouldn't abide by such an order, and I think

4 Microsoft is really trying to play up concerns that are not

5 even speculative.  They just don't exist on this record, to

6 try and say that that would not be an adequate remedy.

7    The last point I wanted to make, your Honor, goes to

8 relevance, and we do appreciate and are grateful for your

9 Honor's conclusion that there is some relevance to the

10 information we're seeking through this deposition, but I

11 want to go even a step further than that because, to the

12 extent your Honor might think this case is on the outside

13 margins, or maybe a modest extension of the business

14 strategy doctrine as it's traditionally been applied, your

15 Honor might want to consider whether this information is

16 only marginally relevant to Mr. Musk's claims, and it is

17 not, by any measure.  This is critically important

18 information, and that's so for a couple reasons.

19    First of all, one of the claims we brought in this case

20 is a claim to get a permanent injunction enjoining the very

21 transaction that Microsoft and OpenAI are negotiating over.

22 It's hard to imagine any evidence that could be more

23 relevant to a claim seeking to enjoin a transaction than the

24 parties' very discussions about what that transaction is

25 going to look at.

1    Mr. Cohen said, "Well, they can just wait until the

2 transaction is done, and then they'll know," but that

3 defeats the whole purpose of getting an injunction against

4 doing the transaction.  So that's -- it's -- you know, that

5 is a very straightforward analysis, and I did not see any

6 response to it in the letter.  If we are seeking to enjoin a

7 transaction, then the parties' secret negotiations of how

8 they are going to transact is incredibly relevant.  And so

9 that's one point.

10    The second point is on the breach of trust and the

11 breach of contract, and the similar claims like that.  The

12 basic thrust of this case is that Mr. Musk contributed to

13 OpenAI in his early years, on the understanding that it was

14 going to be and going to engage in nonprofit activities for

15 the public benefit of mankind, and the breach that is

16 alleged of those trust obligations, those fiduciary and

17 contractual obligations, is that, over the years since then,

18 OpenAI has taken increasingly egregious steps to transform

19 itself into a for-profit entity.

20    And so I don't think there's any dispute that whatever

21 shape this transaction takes, once Microsoft and OpenAI

22 conclude it, is going to be highly relevant to that, because

23 that would establish one of the breaches we're complaining

24 about.  The only claim is that all the discussions leading

25 up to that aren't, but that's not correct, your Honor,

because, if you have a fiduciary duty, if you're a charity,
and you have a duty to your contributor not to engage in
for-profit activities, the fact that you're spending 14
months engaged in intensive negotiations about how, exactly,
to go about transforming this charity into a for-profit
entity, that itself is part and parcel of the breach.

If you have a fiduciary duty to a charity, you cannot
be out there for 14 months negotiating about how to
transform it into a for-profit entity, and claim that you
have done nothing wrong, claim that you have been a faithful
fiduciary until the very moment when you sign on the bottom
line.  That's just not the way that those sorts of fiduciary
duties and trust duties work.

And so, these negotiations, it's not just Microsoft's
subjective view.  We don't know what the final deal is going
to look like, but, if those documents or that testimony
shows that, for example, Microsoft and OpenAI both agree on
point A, B, C, and D, and the only dispute is about point E,
but those undisputed points, A, B, C, and D, are all
extremely relevant to our claim for breach of duty and
breach of trust, why would we not be entitled to that
information?

The fact that both parties to this deal have as a
common ground that they're going to adopt the structure,
which would be a flagrant breach of the trust in the

18

1  fiduciary duties on which our claim is based, your Honor,

2  that's not marginally relevant.  That is extremely relevant.

3  And so I think it's -- what they're trying to shield here is

4  core information that goes to our claim.

5       If this was a case like <u>BNS</u>, if Mr. Musk still had a

6  bid pending in front of the company to take it over, we

7  could talk about the implications of this, but this is not a

8  case where the Court should engage in some expansive,

9  unprecedented interpretation of the business strategy

10  doctrine to cover something, to avoid a result where the

11  plaintiff is seeking marginally relevant information.  This

12  is core relevant information.

13       The prejudice can absolutely be completely addressed

14  just by a modest supplementation to the protective order,

15  which your Honor can enter on the record this evening as --

16  you know, for our purposes.  And so, whether you approach it

17  under the lens of the business strategy doctrine or just as

18  a matter of Rule 26 balancing, we think that they have not

19  made the showing that would justify putting these documents

20  and this testimony off limits.

21          THE COURT:  So, then, to make sure I understand,

22  is it Plaintiff's point of view that what Microsoft and

23  OpenAI are currently negotiating is what you say is the

24  breach of fiduciary duty and the breach of the charitable

25  obligations, and you are seeking an injunction to prevent

19

1  this transaction from going forward?

2          MR. KRY:  This is one of multiple breaches, but

3  this latest breach that we're trying to enjoin from

4  happening is what they are negotiating over.

5          THE COURT:  Understood.

6      Well, let me turn back to Microsoft, then, and to have

7  your thoughts on what the other side has just said, and, in

8  particular, their arguments about how they think this is

9  very important information, including that they believe that

10 this transaction that's currently being negotiated is, I

11 guess they clarified, not the first or the beginning breach,

12 but would kind of be the culmination, and is the transaction

13 they're seeking to enjoin.  What are your thoughts about

14 that?

15         MR. COHEN:  Yes, your Honor.  And let me be

16 crystal clear about what Microsoft is asking the Court for.

17 It is a narrow, narrow protective order that is limited to

18 the internal Microsoft deliberations or communications

19 regarding its engagement strategy or its negotiation

20 positions vis-a-vis OpenAI's potential restructuring, and it

21 is also the valuations and analyses that support that.

22     Let me be clear about what Microsoft is not saying.

23 Microsoft is not saying that Plaintiffs can -- Microsoft is

24 not saying that Plaintiffs are prohibited from asking about

25 the recapitalization, Microsoft's role in it, the

20

1  negotiations to date, positions that Microsoft has taken to

2  date, Microsoft's understanding and expectations.  It can

3  ask about those things.  We are not seeking a protective

4  order around any of those things.

5      We are seeking a narrow protective order to preserve

6  the sanctity of an ongoing negotiation as part of a

7  balancing under Rule 26(c), to ensure that the litigation is

8  balanced against the potential harm from outside of the

9  litigation.  So, to be clear, this is a very, very narrow

10  request from Microsoft.

11      In terms of Plaintiff's statement about the breach, I

12  mean, Plaintiffs, as you know, your Honor, moved for a

13  preliminary injunction.  It was denied, and that was earlier

14  in the case.  And so, at this point, Plaintiffs are engaged

15  in discovery, and, as I said, they are free to ask the

16  Microsoft witnesses about the ongoing process.  We're simply

17  trying to protect the negotiations as they stand, and

18  protect Microsoft from having to disclose on the record in

19  such a situation, to its counterparty, its internal

20  positions that it's going to be taking or anticipating

21  taking in that negotiation.

22          THE COURT:  And what would be reasons why a

23  revised protective order would be insufficient?  You stated

24  that you don't think that any modification to the protective

25  order would be sufficient, but don't you think that, if we

21

1  entered an appropriate order, that we could count on OpenAI

2  to comply with it?

3          MR. COHEN:  I have absolutely no hesitation with

4  respect to the counsel for OpenAI.  They are represented by

5  excellent and reputable counsel.  I am not suggesting

6  anything to the contrary.  It is simply that what we are

7  talking about are highly sensitive ongoing negotiations, and

8  there is simply, in our view, no reason to require

9  disclosure of that internal information to Plaintiffs at

10  this point, given the discovery that Microsoft has and is

11  prepared to provide.

12      And so there is simply a concern, a deep-seated

13  concern, that, in the midst of such a sensitive negotiation,

14  that even disclosing it under a modified protective order

15  still poses significant risk to the integrity of the

16  negotiation, and it's simply not necessary, in our view,

17  your Honor, because of the marginal or lack of relevance of

18  this limited category of information.

19          THE COURT:  All right.  Thank you, Counsel.

20      I would now like to turn to ECF Number 139, and that's

21  the dispute between Plaintiffs and OpenAI, and let me first

22  ask OpenAI that -- I understand, or I think I understand,

23  what OpenAI is saying as to Musk.  You've said that Musk and

24  xAI must, therefore, be regarded as active bidders for

25  OpenAI's assets, and so you're characterizing Musk as the

22

attempted takeover, and then OpenAI, in that view, would be
the target.

I'm having a little bit of difficulty understanding
where you're putting Microsoft in the business strategy
doctrine.  For the target company, there are things that
would be protected, at least during the period of
consideration, is responses to a takeover bid, and then
defensive strategies, or the decisions about which defensive
strategies to employ.

Where is Microsoft in this?  Is Microsoft another
attempted takeover, or is Microsoft defensive strategies in
the face of a takeover, or is there maybe a third or a
fourth bucket that you think Microsoft would go in?  I see
where you've put Musk and xAI, but it's less clear to me
where in this doctrine you've located Microsoft.  So, if you
could talk to that, please.

MR. WILSON:  Certainly, your Honor.  Microsoft is
the negotiating counterparty on what has been a very
significant, long-running, high-stakes negotiation over the
amount of capitalization or the recapitalized entity that
each of the respective nonprofit -- the other vehicles that
have investments in Microsoft will own in this venture.

So they're an ongoing negotiating counterparty, and
your Honor is correct that, although a lot of these cases do
arise in the takeover context, a lot of them don't, and they

23

1 really all flow from Rule 26(c).  All of the cases say that,

2 that this is a specific application of the good cause

3 balancing test that's recognized under Rule 26(c).  And so

4 there are a number of cases.

5      I would specifically cite to the <u>Goya</u> (phonetic) case,

6 which is cited in our papers, which is cited with approval

7 in the leading <u>BNS</u> case that our adversaries cite.  That is

8 not a takeover case.  It's not a proxy contest.  It was a

9 case in which class action plaintiffs were also

10 representatives of a labor union that was involved in

11 ongoing discussions with Eastern Airlines, and they were

12 seeking discovery into Eastern Airlines' strike-planning

13 documents, how they would prepare in the event that the

14 employee union decided to strike, and the Delaware judge in

15 that case held that the sensitivity of those documents and

16 their marginal relevance -- they were not irrelevant, but

17 they were marginally relevant -- was outweighed in that case

18 by the very significant harm that would flow to the company,

19 the airline, if their negotiating adversaries in the labor

20 bargaining union saw how they were planning to deal with the

21 possibility of there being a strike.

22      So I would submit to you, your Honor, that Rule

23 26(c) -- and these cases are generally bucketed as business

24 strategy -- allows for people to be bucketed as either a

25 takeover counterparty or as a negotiating counterparty, and

24

1  here Microsoft is in the negotiating counterparty bucket.

2          THE COURT:  I see.  So, if we take a broader view

3  of the doctrine, and it's not just takeovers, but also

4  negotiators, then Microsoft would be a negotiator.  So

5  they're not defense strategies.  It would be, they're not

6  the same as Musk, but would be, in your view, sufficiently

7  similar, because they're a counterparty.  Is that right?

8          MR. WILSON:  That's correct.  And, your Honor,

9  counsel for the Plaintiff made the point that, in a lot of

10 these cases, it is the party that is the counterparty in the

11 lawsuit that is seeking the documents, that that is the

12 party that you're worried about, and, as you've alluded to,

13 we have very significant concerns, because we do regard Mr.

14 Musk and xAI as active takeover candidates.  They are

15 candidates that have bid, promised to bid again.

16      But, leaving that to the side, Mr. Kry, I think,

17 ignores the fact that Microsoft is a party to this case.

18 So, even if it's not Mr. Cohen's client, Microsoft, who's

19 asking for the documents, the consequence of our producing

20 the documents to Mr. Musk is that Microsoft will get those

21 documents.  So the notion that it doesn't matter who's -- or

22 it matters who's asking, I think, is a little bit

23 oversimplifying a very significant problem.

24      We have the fact that Microsoft is in this case.  Mr.

25 Musk chose to add Microsoft as a Defendant.  They're still

25

1  here, and we're going to have to give our documents to them.

2  We don't want to do that. They're going to have to give

3  their documents to us, and they understandably don't want to

4  do that, either. We don't want those documents. We want

5  this issue to be negotiated fairly, at arm's length, across

6  a bargaining table, but, if we have to turn the documents

7  over to Mr. Kry's clients, then Mr. Cohen is going to get

8  those documents all the same, and I think Plaintiffs ignore

9  that very significant problem.

10       THE COURT: This didn't come across as well in

11  your joint discovery letter brief. You focused more on Musk

12  and xAI. But I hear what you're saying now, and it sounds

13  like the flip side of what Microsoft is saying. Is it

14  correct that, in some instances where you've invoked this

15  privilege, sometimes it was concerns about producing things

16  to Musk, and other times it was concerns about having things

17  end up in Microsoft's hands?

18       MR. WILSON: I think it's the same set of

19  documents, your Honor, or the same redacted documents. It's

20  showing either our negotiating counterparty or the potential

21  bidder for the assets of OpenAI, Inc., how we are valuing

22  ourselves in the context of the recapitalization, what

23  strategies we are employing vis-a-vis Microsoft to maximize

24  the value and the interest that the not-for-profit gets in

25  this PBC (phonetic), should this transaction happen.

26

1    I mean, that's what we're talking about here.  The
2  concern that we have -- it is the flip side, your Honor, but
3  the concern that we have is that if Microsoft gets access to
4  our internal documents, our internal reserve price, our
5  internal strategies, the not-for-profit is going to get a
6  lower share of this entity than it otherwise would, which is
7  going to harm all of the beneficiaries of this
8  not-for-profit.
9    I mean, the irony of Mr. Musk's position is that he is
10  asking this not-for-profit that he says is straying from its
11  missions to protect humanity, and he's asking it to turn
12  over some of its most sensitive internal corporate
13  documents, at a point of maximum sensitivity, to the party
14  that it's negotiating with.  He says Microsoft is the bad
15  guy in the story, but he wants us to give Microsoft the
16  documents.  It doesn't make any sense.
17    And, your Honor, if I could, I do want to chime in a
18  little bit on the point you were discussing with both the
19  Plaintiffs and Microsoft regarding the balancing here and
20  the relevance of these issues, because I take your Honor's
21  point.  This is relevant in some way to phase one, and
22  that's why we've produced quite a number of board documents,
23  board decks, e-mails, text messages about this transaction.
24  The Plaintiffs know the general structure of the transaction
25  that's being discussed.  They know the arc of that story.

27

They know who's involved.  They know who is negotiating
this.

What they don't know is the most sensitive pieces.
What are the numbers that are being discussed?  Who is
getting what share of the PBC under various proposals, and
how are the two sides coming up with those numbers, and how
are they presenting them to each other?  There is no need
for them to have that information at this time.

This issue, if there is going to be a claim for breach
of contract, will ripen when there is a transaction.  If
tomorrow the negotiations collapse -- and I'm not saying
there's any reason to think that they will, but, if they
were to do that, there would be no claim for breach of
contract based on this transaction.  We would revert to the
transaction structure that we've had for a number of years,
and the Plaintiffs would have to try this case based on the
facts that existed before we started negotiating this
recapitalization.

Mr. Kry says it's relevant to his breach of contract
claim, but he's never said why, how it could be that an
inchoate transaction that doesn't happen is a breach of
contract.  Plaintiffs were here last week, your Honor, when
we were seeking discovery about the bid, which was very much
a response to this very transaction, and they told your
Honor that this was all a sideshow, that this was after the

28

1 complaint was filed, it was a transaction that doesn't

2 really tie back to the alleged breaches of contract or

3 charitable trust that they've alleged in this case.

4     That's what they told you last week, and your Honor

5 ruled, and we respect the Court's ruling, and we have now

6 had to stand down.  We are not seeking any more bid

7 discovery in this case.  But, if we can't seeking discovery

8 about the transaction that was a response to the

9 recapitalization, I don't see how we can be fairly ordered

10 to turn over all of our internal files to both the bidder

11 and to Microsoft.  It can't be both ways.  Either this is in

12 or it's out, and it sounds like it's out, at least until

13 such time as we have a transaction.

14     So I think that, on the balancing test, we come out

15 very, very far ahead.  We are talking about the most

16 sensitive materials in the company, and we are talking about

17 something that is essentially relatedly to a potential claim

18 that could exist at some point in the future when, as, and

19 if there's a transaction, and, as Mr. Cohen said, if there

20 is a transaction, we can revisit this, and these documents

21 can be produced, and we can have a trial about that, but

22 there very well may not be.

23         THE COURT:  So is it correct, then, that the true

24 confidentiality concern for OpenAI isn't so much Plaintiffs,

25 but Microsoft?

29

         MR. WILSON:  I would not agree with that, your
Honor.  It's both.  If you asked me to rank them, certainly
Microsoft is the most immediate problem, because they are
currently the negotiating counterparty.  These discussions
are ongoing at the highest levels of both organizations.
But there is the fact that we had a bid from Mr. Musk, xAI,
and a number of other for-profit entities back in February,
and when they made that bid for $97,000,000,000, Mr.
Toberoff, who is representing -- he's not here today, but
he's representing the Plaintiffs in this case -- stood up
and said, "I represent this group of bidders, and they will
beat or match any other bid that comes along the way."

     They said that.  They said that to the <u>Wall Street</u>
<u>Journal</u>.  It's been widely reported publicly, and I had a
conversation with Mr. Kry two weeks ago on a
meet-and-confer, and I pointed this out to him, and I said,
"Are you prepared to withdraw that statement?  Is Mr.
Toberoff and Mr. Musk -- are they prepared to disavow any
intention to bid in the future?"

     And Mr. Kry didn't say anything, because they're not
prepared to do that, because what Mr. Toberoff said was
true, and they have every intention of seriously considering
bidding for this entity.  So Mr. Musk and his bidding
consortium are very much a concern for this board, and they
are very concerned about the same materials they don't want

30

1    to put in Microsoft's hands getting turned over to Mr. Musk.

2         THE COURT:  Well, as to Musk, it seems that, under

3    the business strategy doctrine, you've run into the problem

4    that he made an offer, the board considered it, and the

5    board said no, so that's done.  The argument you're making

6    now is that he might potentially make another offer in the

7    future, and maybe that's true, but I didn't see anything in

8    the case law that says that maybe potential offers in the

9    future would justify the business strategy doctrine.  It

10   looked more like there has to be something actually on the

11   table that's being considered.

12        MR. WILSON:  Well, I will grant you, your Honor,

13   that the cases don't match this fact pattern, but I think,

14   if you step back and actually think about what the rationale

15   of the rule is, it should apply with full force here.

16        In BNS, the case that you're referring to, there was

17   one bidder.  There was a hostile bidder that made a bid for

18   the company, and it was live at the time of the Court's

19   decision, but the Court said, "If this bid is rejected, then

20   there will be no longer a business strategy immunity case,"

21   and what it would shift to is a court proceeding where the

22   stockholder that was bringing the hostile bid would sue in

23   court and say that "The board breached its fiduciary duties

24   by not taking my offer."  And at that point, there would be

25   no active board discussions about the bid, and you could

31

have discovery into the reasons why the board rejected the

prior bid, and you'd have a case.

What didn't exist there was that there was an ongoing

discussion with a counterparty other than the original

bidder, that would present all of the same sensitivities in

the circumstance where could be a follow-on bid from the

bidder.  So, in other words, here we have a situation where

Mr. Musk made his bid.  It was rejected, but he said, "Well,

I'm going to hang here on the sidelines.  I'm going to wait,

and when there's another -- if there's a deal announced with

Microsoft, then I'm going to make another bid."  He's made

that clear.

So, if we give Mr. Musk now the ongoing internal

deliberations and valuations and calculations about what

reserve price we have, for example, for these assets, Mr.

Musk can use that to his advantage to formulate a new bid.

It distinguishes this case from the Court was saying in BNS,

because the documents that the board is creating now are

very much relevant, and would be very useful to a bidder,

and, therefore, detrimental to the target corporation.

THE COURT:  I see.

Let me hear from Plaintiffs.

MR. KRY:  Your Honor, a couple points I wanted to

mention.  First off, it seems to me that there's quite a

significant difference between the position that Mr. Cohen

32

1  and the position that Mr. Wilson took, if I understood the

2  articulations correctly.

3      I believe Mr. Cohen said that they would not invoke the

4  doctrine to the extent we were asking about what was said

5  during negotiations, what was communicated to OpenAI.  It

6  would only be sort of their undisclosed subjective intent

7  about what to do.  But my understanding is that OpenAI has

8  invoked the doctrine more broadly to cover not only their

9  reserve price, which they keep holding up as kind of the

10  paradigm example of what they're going after, but anything

11  about the internal negotiations.

12      Our position would be that, to the extent you're going

13  to look at this as an effort to protect the discussions

14  between OpenAI and Microsoft, first of all, we don't think

15  the doctrine should apply at all, because the protective

16  order with the modification we've suggested would be fully

17  sufficient to address any potential prejudice, but, if your

18  Honor for some reason don't think that's sufficient, then

19  there is no justification that's been articulated for why

20  the business strategy doctrine would allow OpenAI and

21  Microsoft to withhold documents or information that reflects

22  what they actually negotiated or communicated to each other,

23  nor would there be anything that would justify withholding,

24  for example, internal memos, but ones that don't reflect the

25  reserve price, but instead reflect what they intend to

33

communicate or what they have communicated to each other.

You know, there's no valid, just -- if you're only trying to protect OpenAI and Microsoft as against each other, there's no conceivable justification that would extend that doctrine to those sorts of communications, whether they are actual communications between the parties or even if they're just internal documents, documenting what was communicated or what should or will be communicated.

At most, that would apply to a very narrow category of information that really is like the reserve price, the undisclosed internal deliberation about what not to say is, and so that -- I don't want that distinction between the two positions to be lost, because the one that OpenAI is advocating far outstrips the rationale, if what you're worried about is protecting their information against Microsoft.

I also want to respond to the -- your Honor was quite right that with -- to the extent OpenAI is trying to prevent this information from reaching Mr. Musk, the problem there is that that just outstrips anything the case law says. Your Honor quite rightly observed that.  Once there is -- it's a doctrine that protects a company from having to disclose information to its adversary during a live bidding situation, and so, once the board rejected Musk's bid, the logic and the language of all the cases you've relied on say

34

1   that that protection expires at that point.

2       This one quote that they keeping mentioning from the

3   Wall Street Journal about "Well, maybe we'll come back, you

4   know, someday and pop some other bid," first of all, that

5   was seven months ago.  At some point, the business strategy

6   doctrine cannot extend indefinitely after the board has

7   rejected a bid.  So it's always a possibility that someone

8   may come back later with a different or additional bid, but

9   the business strategy doctrine requires that there be a live

10  corporate takeover decision, not a dead corporate takeover

11  decision that may yet be resurrected at a future date and on

12  different terms, and it seems to me like that's the kind of

13  application that Mr. Wilson is advocating for here.

14      So, you know, the bottom line, to the extent you are

15  invoking the business strategy doctrine in its traditional

16  form to protect against disclosure to Musk, it just doesn't

17  apply on these facts, because there is no live takeover

18  situation with respect to Musk.  To the extent you're

19  invoking that doctrine to protect disclosures as between

20  OpenAI and Microsoft, OpenAI is advocating a far over-broad

21  application of that doctrine, because they're basically

22  seeking to protect a wide range of documents, beyond what

23  Microsoft is arguing for.

24      And to the extent you're relying on General Rule 26

25  principles, I just rely on what I said before.  This is

1  extremely relevant information.  The argument that Mr.

2  Wilson made about how our position is inconsistent with what

3  we said last week about the discovery and the bidding, your

4  Honor was sensitive to the nuances of the arguments last

5  week, and I think you appreciate it is not just a temporal

6  issue.

7      It's not just the fact that the bid occurred several

8  years after the formative years of OpenAI.  It's also a

9  subject matter issue.  It's the fact that the bid that is

10 being complained about in the counterclaims is basically a

11 harassment-type claim.  It's not related, in terms of its

12 nucleus operative facts, to the underlying breach of trust

13 and breach of contract claims.

14     The permanent injunction we're seeking is completely

15 factually related.  It is the same nucleus of facts.  We are

16 complaining about a breach of trust, based on having given

17 charitable contributions to this entity back many years ago,

18 and now having the entity turn around and use them for

19 for-profit purposes, and this current negotiation that we're

20 trying to enjoin is -- it cannot be more connected to that

21 nucleus of operative facts.

22     It is the latest example of the breaches that they have

23 carried out, and the most egregious one, and the one that

24 hasn't happened yet, and that's why we're still trying to

25 enjoin it.  And so those things cannot be said about the

1    counterclaim, about the bid.  That was factually quite

2    unrelated to the claims that were being made in the

3    complaint.  Our injunction claim seeking to prevent this

4    latest for-profit transformation of the company is very much

5    at the heart of what the phase one claim is about.

6         And the final thing I'll say is the Court denied our

7    preliminary injunction.  I recall the language she used was

8    because she thought it was a "tossup on the merits."  She

9    couldn't tell on the record at that point who had -- which

10   of the two sides had the better argument.

11        For purposes of discovery, the finder of fact on a full

12   evidentiary record now will decide who has the better of the

13   arguments, and so I think the Court's ruling at the

14   preliminary stage that it was -- could go either way --

15   tends to reinforce the importance of this discovery, so that

16   the Court can fully consider the merits of our claims in

17   deciding whether to grant the permanent injunction.  The

18   fact that she thought we'd only fought it to a draw at the

19   preliminary stage certainly does not justify denying us the

20   information we need to prove our case on the ultimate

21   merits.  And so, for that reason, too, we don't feel that

22   Microsoft or OpenAI has justified the extraordinary remedy

23   they're seeking here.

24            THE COURT:  All right.  Thank you.

25        And would OpenAI like to respond?

1          MR. WILSON:  Briefly, your Honor, I would.  On the

2    injunction point, I'll just said that -- I think I said this

3    before, but it bears repeating -- if a transaction is

4    announced, then this issue can become part of the case, from

5    their perspective.  They can seek discovery into the

6    negotiating history, and they can seek an injunction against

7    the transaction.  But, as I said, it's also possible that

8    there is no transaction, at which point there is going to be

9    no claim.

10         It seems to me that, in circumstances where we're six

11   and a half months out from trial, I understood your question

12   to Mr. Cohen -- I'm not in a position now to say when these

13   negotiations will be over, but I do know that there's plenty

14   of runway now between the trial date and today to let those

15   negotiations, hopefully, conclude one way or the other

16   before we start turning over these files.

17         It's really akin to a situation where Mr. Musk has made

18   a bid on an asset.  Mr. Kry very clearly did not say -- it

19   would have been very easy for him to say, "It was seven

20   months ago, and, by the way, we're not bidding again."  He

21   didn't say that, and I think, reading between the lines,

22   what he's saying is "Yes.  What Mr. Toberoff said was true

23   then, and it's true now.  We're ready to bid again."

24         And I just don't see how, in circumstances where we're

25   being told by opposing counsel that the bid is not related

1  to phase one -- if it's in phase one -- excuse me.  If it's

2  not in phase one, then I don't see how this, which the bid

3  was a response to, this recapitalization, is in phase one in

4  the way that he's describing it.  If it's truly central to

5  their case, as we're now hearing, then I think it is not

6  correct that we should have been denied discovery into the

7  bid last week.  That's our position on that subject.

8      And, finally, I'll just say, this question about a

9  delta between our position and Microsoft's, I don't think

10  that there is any distinction between the reserve price and

11  our internal deliberations and analyses about what numbers

12  to propose.  It will -- if you get that information, it is a

13  road map to our strategy in the negotiation.  It is a road

14  map to what numbers we might be willing to accept, and an

15  expert, such as an expert witness in this case or a

16  financial advisor for Mr. Musk, could learn quite a lot of

17  information that would essentially get you to the bottom

18  line, by getting access to the kinds of documents that we're

19  talking about.

20      THE COURT:  I see.  Plaintiffs say that OpenAI has

21  withheld or redacted 159 documents based on this doctrine,

22  98 of them solely on that ground.  I don't know if you have

23  that information at your fingertips, but I wanted to ask

24  OpenAI, do you agree with those numbers?

25      MR. WILSON:  I have no basis to disagree with it,

39

1  your Honor.  I think it's directionally correct.  I assume

2  that it's a calculation based on our privilege log.

3          THE COURT:  Got it.  And then is it correct that

4  these documents span May 2024 to June 2025?

5          MR. WILSON:  It is, your Honor.

6          THE COURT:  Okay.  All right.  Well, thank you,

7  Counsel.  I found these arguments very helpful.  I will

8  think about them some more, and I will issue a written

9  order.  For planning purposes, you should not expect to

10 receive a written order before Monday's deposition.  I want

11 to take some time to think about it before issuing a written

12 order.

13     So I think, in the brief, Microsoft detailed that you

14 have a backup plan in mind if you don't get a court order

15 before Monday.  Is that right?

16         MR. COHEN:  We do, your Honor.  We have an

17 understanding with Plaintiffs that we will reserve all

18 rights.  If your Honor rules against us on this, we will

19 bring back a witness, and they will have a chance to ask

20 their questions, subject, of course, to seeking review of

21 the decision, if that's something that we need to do, and,

22 of course, if your Honor rules in favor us, there would be

23 nothing to bring back.  So we do have an understanding.

24 Thank you.

25         THE COURT:  And, Plaintiffs, do you agree that

40

1  that's the understanding?

2          MR. KRY:  It is, your Honor.

3          THE COURT:  Okay.  All right.  Well, thank you,

4  Counsel.  The matter is submitted, and I will issue a

5  written order, but it will not come out before Monday.

6          MR. COHEN:  Thank you, your Honor.

7          MR. WILSON:  Thank you, your Honor.

8          MR. KRY:  Thank you.

9      (Proceedings adjourned at 4:24 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

CERTIFICATE OF TRANSCRIBER

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17      Echo Reporting, Inc., Transcriber

18         Tuesday, September 9, 2025

19

20

21

22

23

24

25