RUSSELL P. COHEN (SBN 213105)
Russ.cohen@dechert.com
HOWARD M. ULLMAN (SBN 206760)
Howard.ullman@dechert.com
DECHERT LLP
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4500
Facsimile: (415) 262-45555

NISHA PATEL (SBN 281628)
Nisha.patelgupta@dechert.com
DECHERT LLP
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700
Facsimile: (213) 808-5760

ANDREW J. LEVANDER (admitted *pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

JOHN (JAY) JURATA, JR. (admitted *pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

*Attorneys for Defendant Microsoft Corporation*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>SAMUEL ALTMAN, et al.,<br><br>                    Defendants. | Case No. 4:24-cv-04722-YGR<br><br>Judge Yvonne Gonzalez Rogers<br><br>**DEFENDANT MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT**<br><br>***Statement of Material Facts in Support of Its Motion for Summary Judgment Filed Concurrently Herewith***<br><br>**Date:          January 7, 2026**<br>**Time:          2:00 p.m.**<br>**Place:         Courtroom 1 (4th Floor)**<br>                   **1301 Clay St.**<br>                   **Oakland, CA 94612**<br><br>**Action filed:  August 5, 2024** |

1

## <u>NOTICE OF MOTION AND MOTION</u>

2    NOTICE IS HEREBY GIVEN THAT, on January 7, 2026, at 2:00 p.m., or as soon

3 thereafter as the matter may be heard, before Judge Yvonne Gonzalez Rogers in Courtroom 1 of

4 the U.S. District Court for the Northern District of California, 1301 Clay Street, Oakland,

5 California, Defendant Microsoft Corporation will and hereby does move this Court, pursuant to

6 Federal Rule of Civil Procedure 56, for summary judgment on all of the Phase I claims asserted

7 against it in the Second Amended Complaint ("SAC").

8    This Motion is based on this Notice of Motion, the accompanying Memorandum of Points

9 and Authorities, separately filed Statement of Material Facts, the Declaration of Russell P. Cohen

10 and accompanying exhibits, including the Declaration of Michael Wetter, all pleadings, records,

11 and papers on file, and such other argument and materials as may be presented before the Court

12 takes this matter under submission.

13    A Proposed Order is filed herewith.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT
4:24-CV-04722-YGR

### STATEMENT OF ISSUES TO BE DECIDED (LOCAL RULE 7-4(A)(3))

1. Whether Microsoft is entitled to summary judgment on Plaintiff's aiding and abetting breach of fiduciary duty to Musk claim (SAC Count 19) because there is no evidence Microsoft had: (a) actual knowledge of any OpenAI, Altman, or Brockman fiduciary duties to Musk or breach thereof; or (b) the requisite intent to interfere with such duties.

2. Whether Microsoft is entitled to summary judgment on Plaintiff's breach of quasi contract / unjust enrichment claim (SAC Count 4) because: (a) it is predicated on the same conduct as Count 19, which fails for lack of evidence; (b) it seeks the same relief as Count 19, making it impermissible; and (c) there is no evidence that Microsoft, as a third party investing in OpenAI's for-profit subsidiary and entering into agreements with OpenAI and its for-profit subsidiary, upon the OpenAI nonprofit board's approval, had knowledge of any alleged duties or breaches by OpenAI, Altman, or Brockman.

## **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ................................................................................. i

STATEMENT OF ISSUES TO BE DECIDED (Local rule 7-4(A)(3)) ..................................... ii

I.     INTRODUCTION ................................................................................. 1

II.     BACKGROUND ................................................................................. 3

    A.     OpenAI's Formation and Early Years................................................. 3

        1.     2015-2017: OpenAI's Founding and Initial Computing Needs ................. 3

        2.     2017-2019: OpenAI Created a For-Profit Subsidiary to Attract Investments to Fund the Computing Requirements Needed to Pursue OpenAI's Nonprofit Mission ..................................... 4

    B.     Microsoft's Strategic Collaboration with OpenAI.................................. 5

        1.     July 2019: Microsoft Made Its First Investment in OpenAI's For-Profit Subsidiary and Entered a Strategic Partnership with OpenAI and Its Subsidiary................................. 6

        2.     March 2021: Microsoft Made an Additional $2 Billion Investment in OpenAI's For-Profit Subsidiary and the Parties Updated Their Strategic Collaboration........................... 7

        3.     January 2023: Microsoft Made an Additional $10 Billion Investment in OpenAI's For-Profit Subsidiary and the Parties Further Updated Their Strategic Collaboration........................... 8

    C.     November 2023: The OpenAI Board Made the Independent Decision to Fire, and Rehire, Altman ................................. 9

    D.     2024-2025: Continued Fundraising by OpenAI's For-Profit Subsidiary and OpenAI's Potential Recapitalization................................. 10

    E.     Musk Filed Suit Years After He Learned About OpenAI's Creation of a Capped For-Profit Subsidiary and Microsoft's Collaboration with OpenAI........ 12

III.     LEGAL STANDARD................................................................................. 12

IV.     ARGUMENT ................................................................................. 13

    A.     Summary Judgment Should Be Granted on Count 19 (Aiding and Abetting)...... 14

        1.     Microsoft Did Not Have Knowledge of Duties Supposedly Owed to Musk or Their Breach ................................. 14

            (a)     Aiding and Abetting Requires Actual Knowledge....................... 14

            (b)     No One Told Microsoft, and Microsoft Did Not Learn, About Purported Duties or Obligations to Musk or their Breach ................................. 16

        2.     Microsoft Could Not Intend to Provide Substantial Assistance to Breach an Obligation of Which It Lacked Knowledge............................ 18

            (a)     Aiding and Abetting Also Requires Intent................................... 18

            (b)     Microsoft Did Not Intend and Could Not Have Intended to Assist in the Breach of Unknown Duties or Obligations............. 19

    B.     Summary Judgment Should Be Granted on Count 4 (Quasi Contract / Unjust Enrichment) ................................. 20

- iii -

1.  The Unjust Enrichment Claim Fails Because It Is Based on the Same Facts as Musk's Deficient Aiding and Abetting Claim .................. 21

2.  The Unjust Enrichment Claim Fails Because It Seeks the Same Relief as the Aiding and Abetting Claim ................................................... 21

3.  The Unjust Enrichment Claim Also Fails Because It Requires Knowledge of Purported Duties or Obligations to Musk ........................ 22

V.  CONCLUSION ................................................................................................ 24

DEFENDANT MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT
4:24-CV-04722-YGR

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4    *Adler v. Manor Healthcare Corp.,*
       7 Cal. App. 4th 1110 (1992)............................................................. 23

5    *Anderson v. Liberty Lobby, Inc.,*
       477 U.S. 242 (1986) ....................................................................... 13

6
     *AngioScore, Inc. v. TriReme Med., LLC,*
7      70 F. Supp. 3d 951 (N.D. Cal. 2014) (Gonzalez Rogers, J.).................. 2, 15, 17, 18

8    *Casey v. United States Bank Nat'l Ass'n,*
       127 Cal. App. 4th 1138 (2005)...........................................................*passim*

9
     *Celotex Corp. v. Catrett,*
10     477 U.S. 317 (1986) ................................................................ 1, 12, 13

11   *Chance World Trading E.C. v. Heritage Bank of Com.,*
       438 F. Supp. 2d 1081 (N.D. Cal. 2005) ............................................ 15, 17

12   *City of Hope Nat. Med. Ctr. v. Superior Court,*
       8 Cal. App. 4th 633 (1992)............................................................... 23

13
     *In re Columbia Pipeline Group, Inc. Merger Litig.,*
14     2025 WL 1693491 (Del. June 17, 2025)............................................ 17, 18

15   *Davis v. Nadrich,*
       174 Cal. App. 4th 1 (2009)......................................................... 15, 19

16   *Fairbank v. Wunderman Cato Johnson,*
17     212 F.3d 528 (9th Cir. 2000)............................................................ 13

18   *First Nationwide Savings v. Perry,*
       11 Cal. App. 4th 1657 (1992)...................................................... 1, 2, 23

19   *Freeman v. Arpaio,*
       125 F.3d 732 (9th Cir. 1997)............................................................ 13
20
     *Girard v. Toyota Motor Sales, U.S.A., Inc.,*
21     316 F. App'x 561 (9th Cir. 2008) ..................................................... 21

22   *Howard v. Superior Court,*
       2 Cal. App. 4th 745 (1992)......................................................... 18, 20

23   *Keenan v. Allan,*
       91 F.3d 1275 (9th Cir. 1996)............................................................ 13
24
     *Ketayi v. Health Enrollment Grp.,*
25     2021 WL 2864481 (S.D. Cal. July 8, 2021) ........................................ 22

26   *Melendrez v. D & I Inv., Inc.,*
       127 Cal. App. 4th 1238 (2005)........................................................... 23
27
     *In re Mindbody, Inc., Stockholder Litig.,*
28     332 A.3d 349 (Del. 2024) ................................................................ 17

*MSP Recovery Claims, Series LLC v. Avanir Pharm., Inc.*,
    2022 WL 17220647 (C.D. Cal. Oct. 20, 2022) .............................................. 22, 23

*Musk v OpenAI, Inc., et al*,
    No. CGC-24-596412 (Cal. Super. Ct.)........................................................ 12

*Oakley, Inc. v. Nike, Inc.*,
    988 F. Supp. 2d 1130 (C.D. Cal. 2013)...................................................... 19

*In re Radnor Holdings Corp.*,
    353 B.R. 820 (Bankr. D. Del. 2006) ..................................................... 18, 20

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*,
    2020 WL 12948055 (C.D. Cal. Dec. 29, 2020), *aff'd*, 2022 WL 18906 (9th Cir.
    Jan. 3, 2022) ...................................................................................... 15, 21

*Rouze v. One World Tech., Inc.*,
    2021 WL 5304016 (E.D. Cal. Nov. 15, 2021) .............................................. 21

*Schroeder v. James B. Nutter and Co.*,
    2013 WL 12114824 (C.D. Cal. Jan. 29, 2013) .............................................. 15

*Sepanossian v. National Ready Mixed Concrete Co.*,
    97 Cal. App. 5th 192 (2023)...................................................................... 22

*Sonner v. Premier Nutrition Corp.*,
    49 F.4th 1300 (9th Cir. 2022)................................................................... 21

*Stapleton v. JPMorgan Chase Bank, N.A.*,
    779 F. Supp. 3d 1059 (N.D. Cal. 2025) .................................................. 2, 22

*Thomas v. Thomas*,
    2014 WL 12577078 (C.D. Cal. Dec. 11, 2014) ............................................ 15

*Winchester Mystery House, LLC v. Global Asylum, Inc.*,
    210 Cal. App. 4th 579 (2012)................................................................... 15

**Court Rules**

Fed. R. Civ. P. 56(c) ....................................................................................... 13

Fed. R. Civ. P. 56(e)(3) ................................................................................... 13

R. Civ. P. 56(e) ............................................................................................... 13

**Other Authorities**

Restatement (Second) of Torts § 876(b) (1979).......................................... 17

Restatement (Third) of Restitution § 66 and Comment ............................. 23

- vi -

1    **I.    INTRODUCTION**

2            Only two claims remain against Microsoft in Phase I of this case: aiding and abetting

3    breach of fiduciary duty and unjust enrichment.[1] The Court should dispose of both because there

4    is no evidence that Microsoft knew of any alleged "obligations" or "promises" OpenAI or its

5    founders supposedly made to Musk. This is fatal to both claims.

6            Microsoft played no role in either OpenAI's formation or its 2018 decision to create a for-

7    profit subsidiary.[2] In 2019, Microsoft entered a negotiated investment with that subsidiary and a

8    commercial collaboration agreement with the subsidiary and the nonprofit. Microsoft, OpenAI,

9    and OpenAI's subsidiary later amended both agreements in 2021 and 2023. OpenAI's nonprofit

10   board—including former co-Plaintiff Shivon Zilis in 2021 and 2023—approved those agreements,

11   finding them in the nonprofit's best interests and in furtherance of its mission. OpenAI and its

12   subsidiary also represented and warranted to Microsoft that OpenAI and its subsidiary had

13   authority to enter the agreements and that doing so would not breach any third-party obligations.

14           No one at OpenAI told Microsoft that they, Altman, or Brockman had any obligations to

15   Musk preventing those agreements, and the undisputed record shows that Microsoft had no such

16   knowledge. That alone disposes of the claims. And, without knowledge, Microsoft could not have

17   intended to substantially assist in breaching any duties and could not have been unjustly enriched

18   by its arm's length, for-value investments in OpenAI's for-profit subsidiary and the corresponding

19   commercial agreements. There is no genuine dispute as to these facts, defeating Musk's remaining

20   Phase I claims against Microsoft. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

21           The Court should grant summary judgment for Microsoft for the following reasons:

22           ***First***, Plaintiff's aiding and abetting claim (Count 19) fails because (a) there is no evidence

23   that Microsoft knew about any purported underlying promises or duties OpenAI, Altman, or

24   Brockman owed to Musk or any purported breach of such promises or duties, and (b) there is no

---

[1] Plaintiff abandoned his implied-in-fact contract claim against OpenAI, and, thus, his derivative tortious interference with contract claim against Microsoft, in favor of an unjust enrichment theory. [Dkt. No. 313]. Judgment should necessarily be entered on the tortious interference claim (Count 5), too. *See infra* at 19 n.13.

[2] Unless otherwise specified, references to "OpenAI" are to OpenAI, Inc., the nonprofit.

1   evidence that Microsoft intended to substantially assist any breach of any purported promise. No

2   witness—including Plaintiff Musk, former co-Plaintiff Zilis, or anyone from OpenAI—testified

3   that Microsoft was informed of any alleged "promises." Quite the opposite. Numerous witnesses

4   testified that Microsoft was never told anything of the sort. No documents show that Microsoft

5   knew of purported obligations owed by OpenAI, Altman, or Brockman to Musk. Absent actual

6   knowledge, there can be no aiding-and-abetting liability. *AngioScore, Inc. v. TriReme Med., LLC*,

7   70 F. Supp. 3d 951, 957 (N.D. Cal. 2014) (Gonzalez Rogers, J.) (actual knowledge of fiduciary

8   duty breaches required for aiding and abetting). And far from intentionally seeking to breach

9   (unknown) promises, Microsoft entered into arm's-length transactions approved by OpenAI's

10  nonprofit board that OpenAI and its subsidiary represented and warranted they could enter without

11  violating any third-party obligations. Microsoft proceeded based on those approvals,

12  representations, and warranties—as commercial parties regularly do.

13       ***Second***, the quasi contract / unjust enrichment claim (Count 4) fails for three independently

14  sufficient reasons: (a) Musk premises this claim on the same underlying alleged conduct as his

15  defective aiding and abetting claim, so Microsoft cannot be "unjustly" enriched as a matter of law,

16  May 1 Order on Motions to Dismiss [Dkt. No. 163] at 3 and October 7 Order Requiring Further

17  Election [Dkt. No. 298] at 1 (citing *Gudgel v. Clorox Co.*, 514 F. Supp. 3d 1177, 1188 (N.D. Cal.

18  2021)); (b) the unjust enrichment claim impermissibly seeks the same relief as the aiding and

19  abetting claim, *Stapleton v. JPMorgan Chase Bank, N.A.*, 779 F. Supp. 3d 1059, 1076 (N.D. Cal.

20  2025) (dismissing unjust enrichment claim because it "merely incorporate[d] the allegations for

21  aiding and abetting"); and (c) even if it could be a stand-alone claim, Microsoft, as a third party

22  transacting with OpenAI and its subsidiary with the approval of OpenAI's nonprofit board, was

23  not unjustly enriched because it had no knowledge of any supposed restrictions on either entity's

24  ability to enter those agreements. *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1663

25  (1992) ("restitution is commonly denied against an innocent transferee or beneficiary . . . .").

26       Upon the approval of OpenAI's nonprofit board, Microsoft provided OpenAI's for-profit

27  subsidiary with ***almost $14 billion*** in capital and computing power needed to advance OpenAI's

28  nonprofit research mission. Microsoft entered all the negotiated agreements without any

- 2 -

1    knowledge of Musk's claimed conditions. There is no evidence supporting essential legal elements

2    of each of Plaintiff's Phase I claims, and the Court should grant summary judgment for Microsoft.[3]

3    **II.    BACKGROUND**

4        **A.    OpenAI's Formation and Early Years**

5            **1.    2015-2017: OpenAI's Founding and Initial Computing Needs**

6        OpenAI was publicly announced in December 2015. It described itself as "a non-profit

7    artificial intelligence research company" with a broad goal of "benefitting humanity"; identified

8    various well-known individuals associated with the effort; and named Sam Altman and Elon Musk

9    as "co-chairs." Ex. 1. Microsoft was not involved in OpenAI's formation. *Id.*[4]

10       OpenAI originally focused its research on reinforced machine learning (*i.e.*, training agents

11   through trial and error), including training AI to compete against humans in live video games. Ex.

12   2 (Nadella Tr. 61:22-62:18). To support this research, OpenAI initially used Amazon's cloud

13   computing resources. Ex. 2 (Nadella Tr. 61:11-17). Microsoft recognized that OpenAI could be a

14   potential customer for Microsoft's Azure cloud computing business, while also boosting

15   Microsoft's visibility in the AI industry. Ex. 2 (Nadella Tr. 53:3-24; 61:3-10). Google was another

16   potential partner for OpenAI as it, like Amazon and Microsoft, operated a large-scale cloud

17   services business. Ex. 2 (Nadella Tr. 38:21-24; 103:11-19).

18       In 2016, ████████████████████████████████████████

19   ████████████████████████ Ex. 3 (Musk Tr. 344:11-24); Ex. 4. Shortly after, Musk ████████

20   ████████████████████████ Ex. 3 (Musk Tr. 344:12-14; 348:15-22); Ex. 5; *see also*

21   Ex. 2 (Nadella Tr. 27:17-27:25; 51:13-20) (Musk reached out to Microsoft's CEO Satya Nadella

22   regarding Azure compute). In late 2016, OpenAI procured a limited amount of Azure cloud

23   computing services from Microsoft. In exchange, Microsoft obtained marketing benefits from its

24   association with OpenAI. Ex. 8 ("2016 Azure Licensing Agreement"); Ex. 2 (Nadella Tr. 197:14-

---

[3] Microsoft also joins and incorporates by reference the OpenAI Defendants' Motion for Summary Judgment, including specifically their arguments on Musk's breach of charitable trust claim (Count 18), constructive fraud claim (Count 6), and fraud claim (Count 7), to the extent such claims provide the predicate for the two remaining claims asserted against Microsoft.

[4] References to "Ex." are to exhibits to the Cohen Decl.; references to "SUF" are to the Statement of Material Facts.

22) (Microsoft's relationship with OpenAI at this time was just "a regular Azure marketing customer relationship.").

With the benefit of Microsoft's cloud computing services, in August 2017, OpenAI defeated a professional human player in the multiplayer, online Dota 2 video game. Ex. 9; Ex. 2 (Nadella Tr. 59:22-61:10). Musk thanked Microsoft for the role its cloud computing services played in that accomplishment. Ex. 9; Ex. 7.

But to continue its AI research, OpenAI needed significantly more computing resources. OpenAI's founders discussed the need to increase its computing power capabilities by almost tenfold. Ex. 10 ██████████████████████████████████████. In late 2017, OpenAI approached Microsoft for a much larger allotment of discounted Azure compute resources, but Microsoft struggled to justify the benefits of that non-strategic arrangement. Ex. 2 (Nadella Tr. 61:22-62:18). As a result, OpenAI instead contracted with Google for those services. Ex. 2 (Nadella Tr. 61:11-21).

> **2.    2017-2019: OpenAI Created a For-Profit Subsidiary to Attract Investments to Fund the Computing Requirements Needed to Pursue OpenAI's Nonprofit Mission**

████████████████████████████████████████████████ ████████████████ (Sutskever Tr. 81:6-10). In need of more capital, and uncertain it could raise those funds from donations alone, in 2017 OpenAI began exploring ways to raise that capital. Ex. 12 (Altman Tr. 303:15-19 and 329:20-331:5); Ex. 13 (Brockman Tr. 213:25-215:25); Ex. 10. OpenAI's founders, including Musk, discussed various ways to fulfill that need, including converting OpenAI to a for-profit entity. Ex. 14; Ex. 12 (Altman Tr. 303:15-19). ██████ ████████████████████████████████████████████████ ████████████████ Ex. 14; Ex. 3 (Musk Tr. 106:4-107:24); Ex. 11 (Sutskever Tr. 241:12-243:11). █ ████████████████████████████████████████████████████ Ex. 3 (Musk Tr. 74:9–22). ████████████████████████ ████████████ Ex. 15; Ex. 3 (Musk Tr. 136:3-17).

Around the same time, OpenAI pivoted from focusing on reinforcement learning to building large language models ("LLMs"). Ex. 2 (Nadella Tr. 61:22-62:18). LLMs are systems

- 4 -

1    trained on massive text datasets to predict the next word in a sequence and generate fluent text

2    output. SAC ¶¶ 173-74, 177, 218. Training LLMs at the scale OpenAI pursued required far more

3    computing power, including custom supercomputers and large-scale clusters of cloud computing

4    resources. Ex. 16; Ex. 17 (Templeton Decl. ¶ 6). Musk acknowledged that ███████████████

5    ██████████████████████████████████████████████ Ex. 3 (Musk Tr. 345:14-18).

6            After Musk's departure, OpenAI's remaining co-founders continued trying to find ways to

7    raise the necessary capital to achieve the nonprofit's mission. They began discussing creating a

8    for-profit subsidiary that would remain controlled by the OpenAI nonprofit and raise capital from

9    investors. Ex. 12 (Altman Tr. 329:20-332:14). ████████████████████████████████████

10   ██████████████████████████ Ex. 18; Ex. 3 (Musk Tr. 142:17-143:8); Ex. 19. In

11   September 2018, OpenAI formed OpenAI, L.P., a Delaware limited partnership and subsidiary of

12   OpenAI, which was approved by OpenAI's nonprofit board.[5] Ex. 20; Ex. 21; Ex. 22. OpenAI also

13   began approaching cloud computing providers, as well as other individuals and entities, to

14   consider investing in this new entity. Ex. 12 (Altman Tr. 330:5-9); Ex. 2 (Nadella Tr. 103:11-25).

15   OpenAI publicly announced its for-profit subsidiary in March 2019. Ex. 23.

16           OpenAI's subsidiary was structured to allow investors to earn a return on their investment

17   but only up to a certain multiple or cap. Ex. 19. Microsoft was not involved with conceiving,

18   forming, or announcing OpenAI's for-profit subsidiary. Ex. 12 (Altman Tr. 351:25-352:9); Ex. 2

19   (Nadella Tr. 93:1-19).

20           **B.    Microsoft's Strategic Collaboration with OpenAI**

21           On July 2, 2019, months after OpenAI's for-profit subsidiary was announced, Microsoft

22   agreed to invest in that subsidiary as part of a broader commercial collaboration with OpenAI. Ex.

23   12 (Altman Tr. 332:20-333:4); Ex. 24 (Microsoft 30(b)(6) Tr. 130:9-13) ("OpenAI, the non-profit

24   created a for-profit entity prior to our 2019 agreement."). The shift in OpenAI's research to LLMs

25   aligned with Microsoft's own AI priorities. Ex. 2 (Nadella Tr. 61:22-62:18). And, from

26   Microsoft's perspective, the fact OpenAI had formed a commercial, for-profit subsidiary was the

27   

---

28   [5] For simplicity, this brief uses the words "subsidiary" or "for-profit subsidiary" when referring
     to OpenAI, L.P. and later-established vehicles in which investors held their economic interests.

"foundational piece that allowed us to even do [a] deal." Ex. 2 (Nadella Tr. 93:1-19).

### 1. July 2019: Microsoft Made Its First Investment in OpenAI's For-Profit Subsidiary and Entered a Strategic Partnership with OpenAI and Its Subsidiary

Microsoft's July 2019 strategic partnership with OpenAI and its subsidiary was the result of arm's length negotiations of the terms of the investment and the collaboration. Ex. 25 (OpenAI 30(b)(6) Tr. 77:11-20). Microsoft would build the supercomputers required for training AI research models, provide those supercomputers exclusively for the use of OpenAI and its subsidiary, fund certain operating and other expenses for OpenAI's subsidiary, and provide the Azure services required to serve its business and customers. Ex. 26 at 55177, 55183-84. In exchange, OpenAI and its subsidiary committed to using Azure as the only cloud platform through which its models would be accessed. Ex. 26 at 55177; Ex. 2 (Nadella Tr. 109:18-110:1).

As part of this collaboration, Microsoft made a $1 billion investment in OpenAI's subsidiary. Ex. 27 at -01191; Ex 24 (Microsoft 30(b)(6) Tr. 133:20-23) (the "2019 Investment"). In return for that investment, Microsoft did not receive a conventional equity ownership interest in OpenAI's for-profit subsidiary, but rather potential investment returns. Ex. 24 (Microsoft 30(b)(6) Tr. 235:14-24). As an early-stage investment in an early-stage research lab, Microsoft's investment in OpenAI's subsidiary was "very, very risky." Ex. 2 (Nadella Tr. 61:22-62:18). Despite these risks, ████████████████████████████████████████████████[6] Ex. 24 (Microsoft 30(b)(6) Tr. 183:4-5). Nor did Microsoft have any rights in the nonprofit parent entity.

At the same time, Microsoft, OpenAI, and its for-profit subsidiary entered a Joint Development and Collaboration Agreement ("JDCA"). Ex. 26. The JDCA outlined the way Microsoft, OpenAI, and its subsidiary would work together to develop technology and deploy commercialized products. Ex. 12 (Altman Tr. 361:17-362:5). The JDCA forged a strategic

---

[6] ████████ Microsoft ██████████████████████████████████████████ did not "have anyone on the board" as its appointee. Ex. 2 (Nadella Tr. 175:16-20). *See also* Ex. 24 (Microsoft 30(b)(6) Tr. 150:14-20, 197:20-198:9) (Microsoft never appointed Hoffman to sit on OpenAI's board). ████████████████████████ ██████████. Ex. 24 (Microsoft 30(b)(6) Tr. at 150:14-20).

- 6 -

collaboration that would combine Microsoft Azure's cloud and AI supercomputing capabilities for AI research—providing cloud computing resources to train AI models, jointly developing next-generation supercomputers for that training, and providing certain commercialization options for the resulting technology. Ex. 17 (Templeton Decl. ¶ 7); Ex. 26.

OpenAI's nonprofit board approved the 2019 Investment and the JDCA. Ex. 25 (OpenAI 30(b)(6) Tr. 126:23-127:15). This collaboration allowed OpenAI to continue advancing its nonprofit mission by training and developing LLMs on Microsoft's supercomputing infrastructure. Ex. 12 (Altman Tr. 355:5-356:9; 361:17-363:1).

No one has testified that OpenAI, its subsidiary, Musk, or anyone else communicated to Microsoft that there were any agreements with Musk, duties owed to Musk, or conditions relating to OpenAI's founding that would prevent Microsoft from entering into the 2019 Investment and JDCA. SUF Nos. 21-27. On the contrary, the 2019 Investment agreement and JDCA specifically stated that both OpenAI and its for-profit subsidiary had the legal authority to enter those agreements, and that Microsoft's investment and resulting strategic partnership would not violate the rights of any third party. Ex. 27 at 11926 (2019 Investment); Ex. 26 at 55186 (JDCA); Ex. 12 (Altman Tr. 355:9-358:19; 362:13-364:9).

Leading up to the July 2019 agreements, Microsoft also conducted due diligence on OpenAI and its for-profit subsidiary. Ex. 28 (Wetter Decl. ¶7). That diligence revealed no agreements with or duties owed to Musk, and OpenAI's tax exemption application included in the materials *was silent as to any agreement with Musk* in responding to express questions about agreements with officers, directors, trustees, and others. *Id.* at ¶ 8; Ex. 29 at 36530.

### 2. March 2021: Microsoft Made an Additional $2 Billion Investment in OpenAI's For-Profit Subsidiary and the Parties Updated Their Strategic Collaboration

As OpenAI's research continued to advance, so too did the need for more capital and computing resources. To meet those needs, in March 2021, Microsoft made a second investment of up to $2 billion in OpenAI's for-profit subsidiary. Ex. 30 at 055898 (the "2021 Investment"); Ex. 24 (Microsoft 30(b)(6) Tr. 201:3-17).

At the same time as the 2021 Investment, Microsoft, OpenAI, and its for-profit subsidiary

- 7 -

amended the JDCA. Ex. 31 ("Amended JDCA"). That amendment obligated Microsoft to build out additional supercomputing capacity to both train and develop increasingly advanced AI research models. Ex. 31 at 64523. In return, Microsoft received expanded rights to commercialize certain resulting IP and revenue generated through commercialization activities. Ex. 31 at 64524-25.

As in 2019, OpenAI's nonprofit board approved the 2021 Investment and the Amended JDCA. Ex. 25 (OpenAI 30(b)(6) Tr. 136:7-10). The board authorized a group of directors, including former co-Plaintiff Zilis, to finalize and execute the 2021 terms. Ex. 32. As in 2019, the 2021 Investment agreement and Amended JDCA stated that OpenAI and its for-profit subsidiary had the legal authority to enter those agreements, and that Microsoft's investment and strategic partnership would not violate the rights of any third party. Ex. 30 at 55914-55915 (2021 Investment); Ex. 12 (Altman Tr. 358:25-361:9); Ex. 31 at 64530 (Amended JDCA); Ex. 12 (Altman Tr. 365:1-366:10).

### 3. January 2023: Microsoft Made an Additional $10 Billion Investment in OpenAI's For-Profit Subsidiary and the Parties Further Updated Their Strategic Collaboration

Recognizing the need for ever larger supercomputers and more capital, in the summer of 2022, OpenAI, its subsidiary, and Microsoft began discussions to expand their collaboration with a substantially larger additional investment. At the time, OpenAI was nearing completion of ChatGPT, the conversational LLM that gained widespread public attention following its public release in November 2022. *See* https://openai.com/index/chatgpt/.

In January 2023, Microsoft invested an additional $10 billion in OpenAI's for-profit subsidiary. Ex. 33 (the "2023 Investment").[7] That amount was a significant increase in commitment that carried substantial additional risk for Microsoft. Ex. 2 (Nadella Tr. 141:23-142:6). At the same time, Microsoft, OpenAI, and its for-profit subsidiary further amended the

---

[7] By this time, OpenAI Global, LLC had replaced OpenAI, L.P. as the vehicle in which investors held their economic interests, and Microsoft obtained a membership interest in the LLC. Ex. 34. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 24 (Microsoft 30(b)(6) Tr. 160:8-163:22; 183:4-10).

- 8 -

JDCA. Ex. 35 ("Second Amended JDCA"). That amendment obligated Microsoft to build out substantially more supercomputing capacity to allow for more advanced training and development of the research models necessary to pursue OpenAI's nonprofit mission. Ex. 35 at 55102. In return, the Second Amended JDCA ████████████████████████████████████████████ ████████████████████████████ Ex. 35 at 55120. ██████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Ex. 35 at 55120.

OpenAI's nonprofit board unanimously consented to the 2023 Investment and Second Amended JDCA. Ex. 36 at 26483, 26485, 26492, 26496. This board included Zilis, who again approved both agreements—██████████████████████████████ ██████ *Id.* at 26485; Ex. 37 (Zilis Tr. 263:22-264:22). Like the earlier agreements, the Second Amended JDCA stated that OpenAI and its for-profit subsidiary had the legal authority to enter the agreements and that Microsoft's collaboration would not violate the rights of any third party. Ex. 35 at 55127; Ex. 12 (Altman Tr. 366:18-367:25).

**C.     November 2023: The OpenAI Board Made the Independent Decision to Fire, and Rehire, Altman**

On November 17, 2023, OpenAI's nonprofit board suddenly and unexpectedly fired Altman.[8] Microsoft was stunned by the development. Ex. 2 (Nadella Tr. 207:20-7). Nadella had "no inkling" there were any issues with Altman and the board. *Id.* Microsoft also became concerned that AI competitors would poach OpenAI's talented researchers, offered OpenAI support to try to quickly stabilize the situation, and endeavored to reassure Microsoft's customers and shareholders that there would be continuity of services. Ex. 2 (Nadella Tr. 213:21-214:3;

---

[8] Each of the OpenAI nonprofit board members who voted to fire Altman previously approved one or more iterations of the strategic partnership. Adam D'Angelo, and Tasha McCauley authorized a subset of the board to finalize and execute the 2019 Investment and JDCA. Ex. 38 (OpenAI, Inc.'s R&Os to Musk's First ROGs at 12). Sutskever, D'Angelo, and McCauley authorized a subset of the board (which included Zilis and McCauley) to approve the terms of the 2021 agreements. Ex. 32. Those same board members, joined now by Helen Toner, also signed the Unanimous Written Consent approving the 2023 Investment and JDCA. Ex. 36 at 26485.

1    220:22-221:8; 233:15-235:21).

2          Throughout, Microsoft remained supportive of its strategic partnership with OpenAI and

3    its for-profit subsidiary. On November 17th, Microsoft was asked for and provided a statement of

4    support for OpenAI and newly announced interim CEO Mira Murati. Ex. 39; Ex. 2 at (Nadella Tr.

5    224:8-25). On the evening of November 19th, Microsoft announced its support for her

6    replacement, Emmett Shear. Ex. 39; Ex. 2 (Nadella Tr. 234:4-235:4). ████████████████

7    ████████████████████████████████████████████████████████████████████████████████████

8    ██████████████████████████████ Ex. 40 (Toner Tr. 124:2-12); Ex. 41 (McCauley Tr. 285:3-21).

9    Microsoft's primary concern, which it repeatedly relayed to the nonprofit board through

10   discussions between Microsoft's CEO and D'Angelo, was to stabilize the situation to avoid the

11   loss of researchers to competing AI companies, including xAI. Ex. 2 at (Nadella Tr. 224:8-

12   225:16). And ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████████████████

14   ██████████████████████████████ Ex. 41 (McCauley Tr.107:9-20). In fact, none of the

15   newly appointed interim board members were candidates identified by Microsoft. Ex. 12, (Altman

16   Tr. 351:18-24).

17         After Altman returned to OpenAI as CEO and a new interim board was put into place,

18   Microsoft sought and was given the right to have a non-voting observer of OpenAI's nonprofit

19   board. Ex. 2 (Nadella Tr. 243:16-21). Microsoft's designee attended only four meetings, had no

20   vote, and had no access to competitively sensitive information. Ex. 17 (Templeton Decl. ¶¶ 13-

21   14, 16). Microsoft relinquished its right to have a non-voting board observer in July 2024, by

22   which time OpenAI's governance had stabilized. *Id.* at ¶ 15; Ex. 24 (Microsoft 30(b)(6) Tr.

23   269:11-270:1).

24         **D.    2024-2025: Continued Fundraising by OpenAI's For-Profit Subsidiary and**
            **OpenAI's Potential Recapitalization**

25

26         OpenAI's for-profit subsidiary continued to raise funds from Microsoft and others to

27   pursue the mission, including in fall 2024 and spring 2025. Ex. 24 (Microsoft 30(b)(6) Tr. 237:3-

28   15) ██████████████████████████████████████████████████████████████ ; *id.* at

- 10 -

237:20-238:7 ████████████████████████████████████████

Around the same time, OpenAI's nonprofit board became concerned that the capped-profit structure of its subsidiary was limiting its ability to pursue the nonprofit's mission, in part due to the intense competition for talent from xAI, Google, Meta, and other deep-pocketed companies. Ex. 25 (OpenAI 30(b)(6) Tr. 51:9-54:23). To raise more funds and attract additional investors and AI researchers, OpenAI decided to consider a new structure for its for-profit subsidiary. Ex. 25 (OpenAI 30(b)(6) Tr. 210:10-214:3). That discussion was independent of Microsoft. *Id.* at 232:14-20). On May 5, 2025, OpenAI—again, independent of Microsoft—announced it was focused on potentially converting its for-profit subsidiary into a Public Benefit Corporation ("PBC"). Ex. 42.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ Ex. 24 (Microsoft 30(b)(6) Tr. 308:10-19). ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ Ex. 24 (Microsoft 30(b)(6) Tr. 178:10-25, 182:25-83:10). Negotiations between OpenAI and Microsoft regarding Microsoft's interests continued during 2025.

The negotiations also encompassed potential modifications to the overall strategic partnership. This included the ability of OpenAI to source certain supercomputing resources from other cloud providers, which have since been announced. Ex. 24 (Microsoft 30(b)(6) Tr. 166:10-22). For example, in September 2025, OpenAI and Oracle announced they had entered into an agreement for cloud computing reportedly valued at $300 billion over five years. https://openai.com/index/five-new-stargate-sites/.

On September 11, 2025, Microsoft and OpenAI entered into a nonbinding Memorandum of Understanding ("MOU") that would allow for the conversion of Microsoft's investment in the for-profit subsidiary into an equity stake in a successor PBC that would remain under OpenAI's control. *See* https://blogs.microsoft.com/blog/2025/09/11/a-joint-statement-from-microsoft-and-openai/. At the same time, Microsoft, OpenAI, and its for-profit subsidiary agreed to a nonbinding

- 11 -

1    term sheet to further amend the Second Amended JDCA. Ex. 24 (Microsoft 30(b)(6) Tr. 317:22-

2    318:2). ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████ Ex. 2 (Nadella Tr.

4    200:14-25). OpenAI's for-profit subsidiary has not yet been converted to a PBC, and the Second

5    Amended JDCA remains in effect. Ex. 24 (Microsoft 30(b)(6) Tr. 320:7-14, 330:14-20).

6        **E.**       **Musk Filed Suit Years After He Learned About OpenAI's Creation of a
7                   Capped For-Profit Subsidiary and Microsoft's Collaboration with OpenAI**

8         In February 2024, Musk sued OpenAI and its subsidiaries in California state court. *Musk*

9    *v. OpenAI, Inc., et al*, No. CGC-24-596412 (Cal. Super. Ct.). One day before the state court was

10   to hear OpenAI's motion to dismiss, Musk voluntarily withdrew his lawsuit.

11        On August 5, 2024, Musk filed this case. He first named Microsoft as a defendant in the

12   First Amended Complaint, filed November 14, 2024 [Dkt. No. 32]. Musk, however, █████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████ Ex. 43; Ex. 3 (Musk

15   Tr. 162:6-9; 164:5-169:22, 357:4-358:17); Ex. 43. Musk filed a SAC on May 22, 2025. [Dkt. No.

16   170].

17        After denying Musk's Motion for a Preliminary Injunction [Dkt. No. 121], this Court

18   designated certain claims as Phase I and others as Phase II. April 4, 2024 CMC Tr. Following this

19   Court's rulings on the Motions to Dismiss [Dkt. Nos. 163 and 228], and Musk's October 9 election

20   [Dkt. No. 313], only two Phase I claims remain against Microsoft, each of which is predicated on

21   the same conduct, *i.e.*, knowledge of and assistance with breaches of purported restrictions relating

22   to Musk's contributions to OpenAI. May 1, 2025 Order on MTDs at 3, 4, 6. These claims are

23   Count 19, aiding and abetting breach of fiduciary duty to Musk, and Count 4, quasi contract /

24   unjust enrichment.

25   **III.    LEGAL STANDARD**

26        A principal purpose of summary judgment is to identify and dispose of factually

27   unsupported claims. *Celotex Corp.*, 477 U.S. at 323-24. Summary judgment is proper when the

28   "pleadings, depositions, answers to interrogatories, and admissions on file, together with the

1    affidavits, if any," show that there is "no genuine issue as to any material fact and that the moving

2    party is entitled to judgment as a matter of law." *Id*. (citing then-Fed. R. Civ. P. 56(a)). "In

3    considering a motion for summary judgment, the court may not weigh the evidence or make

4    credibility determinations, and is required to draw all inferences in a light most favorable to the

5    non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

6            The party moving for summary judgment bears the initial burden of demonstrating the

7    absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P.

8    56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder

9    to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

10   "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

11   insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

12   at 252. Thus, the court must ask whether there is evidence upon which a jury can properly proceed

13   to find a verdict for the party producing it, upon whom the onus of proof is imposed. *Id*. A fact is

14   "material" if it may affect the outcome of the case. *Id*. at 248.

15           Once the moving party meets its initial burden—including by arguing that there is an

16   ***absence*** of evidence of an element where the non-movant bears the burden of proof, *Fairbank v.*

17   *Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000)—the non-moving party must go

18   beyond the pleadings and, by its ***own*** evidence, "set forth specific facts showing that there is a

19   genuine issue for trial." *Anderson*, 477 U.S. at 248 (citing then-Fed. R. Civ. P. 56(e)). To make

20   this showing, the non-moving party must "identify with reasonable particularity the evidence that

21   precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting

22   *Richards v. Combined Ins. Co*., 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district

23   court's task to "scour the record in search of a genuine issue of triable fact"); *see also* Fed. R. Civ.

24   P. 56(e). If the non-moving party fails to point to evidence precluding summary judgment, the

25   moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323; Fed. R. Civ. P.

26   56(e)(3).

27   **IV.    ARGUMENT**

28           There is no evidence that Microsoft had knowledge of any alleged fiduciary duties owed

- 13 -

to Musk, or of any breach of such alleged duties. Nobody ever told Microsoft about any duties or obligations to Musk, and there is no evidence that Microsoft intended to substantially assist violating any such (unknown to Microsoft) duties or obligations to Musk. On the contrary, both OpenAI and its for-profit subsidiary affirmatively represented and warranted that they had the power to enter into agreements with Microsoft and that the agreements would **not** violate any third-party rights. For these reasons, Microsoft is entitled to summary judgment.

A.      **Summary Judgment Should Be Granted on Count 19 (Aiding and Abetting)**

Musk alleges that Microsoft aided and abetted OpenAI, Altman, and Brockman's breach of fiduciary duties to Musk, which he says purportedly sprang from: (i) their status as a charity and persons soliciting contributions on behalf of a charity; and (ii) the supposed conditions they allegedly agreed to with Musk in exchange for his claimed donations to OpenAI. SAC ¶¶ 407-08; May 1 Order on MTDs at 5. Musk does not claim that Microsoft owed any direct fiduciary duties to him or that its own conduct has directly breached a duty to him. *Id*. at 8 ("none of these entities [aiding and abetting claim defendants] owed [Musk] any duty."). Having had the chance to conduct extensive fact discovery, Musk still cannot show that Microsoft had actual knowledge of any duty owed to him or the breach of any such duty. And without knowledge of any duty, there is no evidence that Microsoft intended to substantially assist OpenAI in violating such duties. The claim for aiding and abetting breach of fiduciary duty to Musk fails (Count 19).

1.      **Microsoft Did Not Have Knowledge of Duties Supposedly Owed to Musk or Their Breach**

(a)      **Aiding and Abetting Requires Actual Knowledge**

To establish a claim for aiding and abetting breach of fiduciary duty, Musk must prove: (a) knowledge that another's conduct constitutes breach of fiduciary duty; and (b) substantial assistance or encouragement to the other to so act. May 1 Order on MTDs at 6, citing *Casey v. United States Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144, 1148 (2005).[9] If an aiding and

---

[9] The second type of aiding and abetting liability under California law, where providing substantial assistance to the other in accomplishing a tortious result and the defendant's own conduct, separately considered, constitutes a breach of duty to the third person, is not at issue here. *Casey*, 127 Cal App. 4th at 1144.

- 14 -

abetting defendant does not have "***actual knowledge*** of the specific primary wrong the defendant substantially assisted," the claim must fail. *AngioScore*, 70 F. Supp. 3d at 957 (cit. omit.) (emphasis added).[10] "[T]he requirement of ***knowing*** participation means plaintiff must [show] that the defendant had ***actual knowledge*** that the acts of the fiduciary constituted a breach." *Id.* (first emphasis in original; second added). "[A] vague suspicion of wrongdoing … [or] hunch that 'something fishy was going on'" does not sufficiently demonstrate knowledge. *Id.* (cit. omit.). As such, "[k]nowledge is the crucial element." *Casey*, 127 Cal. App. 4th at 1145; *id.* at 1147 (defendant must have "actual knowledge of the specific primary wrong [it] substantially assisted."); *see also Chance World Trading E.C. v. Heritage Bank of Com.*, 438 F. Supp. 2d 1081, 1085 (N.D. Cal. 2005) (granting summary judgment for a bank defendant that had insufficient knowledge to have aided and abetted a customer's fraudulent transactions despite knowledge that an investor had earmarked misused funds for a different purpose).

This makes sense, because if an alleged aider and abettor does not actually know about the existence of a duty, it cannot possibly be said to have aided and abetted in any breach of it. The law has long recognized this principle, including in similar circumstances such as in tortious interference claims like the one Musk just abandoned. *See, e.g.*, *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*, 2020 WL 12948055, at *5 (C.D. Cal. Dec. 29, 2020), *aff'd*, 2022 WL 18906 (9th Cir. Jan. 3, 2022); *Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 596 (2012) (actual knowledge of agreement required tortious interference); *Davis v. Nadrich*, 174 Cal. App. 4th 1, 10–11 (2009) (affirming summary judgment when defendant was not "sufficiently aware of the details of the [] contract to form an intent to harm it").[11]

---

[10] While *AngioScore* was decided on a motion to dismiss, its discussion about aiding and abetting claims and their essential elements applies equally at the summary judgment stage.

[11] Charitable trust law (the subject of SAC Count 18 against OpenAI, Altman, and Brockman but not against Microsoft) also requires ***actual knowledge*** of charitable trust restrictions to hold third parties liable for violating a trust. *Thomas v. Thomas*, 2014 WL 12577078, at *2 (C.D. Cal. Dec. 11, 2014) (citing Cal. Prob. Code § 18100, which provides that a third person with no knowledge that a trustee is exceeding her powers or improperly exercising them is "fully protected," has no duty to inquire whether trustee has power to act or is properly exercising power, and "may assume without inquiry the existence of a trust power and its proper exercise"); *Schroeder v. James B. Nutter and Co.*, 2013 WL 12114824, at *2-*3 (C.D. Cal. Jan. 29, 2013) (same).

**(b)      No One Told Microsoft, and Microsoft Did Not Learn, About Purported Duties or Obligations to Musk or their Breach**

Microsoft did not know about any purported duties or obligations OpenAI, Altman, or Brockman supposedly owed to Musk, or any breach of those purported duties, and there is no evidence establishing otherwise. That is unsurprising because the alleged underlying fiduciary duties are based on a series of alleged private communications between Musk, Altman, and Brockman, never memorialized in a single written document, and none of which involved Microsoft. Even assuming these alleged communications could create fiduciary duties, unless Microsoft was provided or told about them, Microsoft could not have known about them.

The undisputed evidence is that no one—not Musk or his agents, not OpenAI, not anyone else—ever told anyone at Microsoft about any purported duties or obligations OpenAI, Altman, or Brockman owed to Musk. *See* SUF Nos. 21 (Musk interrogatory responses), 22 (Plaintiff-affiliated witnesses), 23 (OpenAI witnesses), and 25-27 (Microsoft witnesses). In fact, three of Musk's closest associates testified that ███████████████████████████████████ ████████████████████████████████████████████████ Ex. 44 (Teller Tr. 276:23-279:16); Ex. 45 (Birchall Tr. 162:15-165:3); Ex. 37 (Zilis Tr. 312:13-313:24).

Nor did Microsoft learn about any purported duties or obligations to Musk in any other manner. Before closing its 2019 Investment and JDCA, Microsoft conducted due diligence, including a review by Microsoft's outside counsel of documents provided by OpenAI relating to it and its for-profit subsidiary's governance, structure, capitalization, and tax status. Ex. 28 (Wetter Decl. ¶ 7). These documents specifically included OpenAI's IRS tax exemption application and its Delaware Certificate of Incorporation. Ex. 29 at 36539; Ex. 24 (Microsoft 30(b)(6) Tr. 125:19-126:14). Nothing in these documents or in Microsoft's due diligence more generally revealed or even suggested any duties or obligations owed to Musk. Ex. 28 (Wetter Decl. ¶ 8). In fact, the due diligence showed exactly the opposite. In OpenAI's IRS tax exemption application, OpenAI, in response to express questions about agreements with officers, directors, trustees, and others, *reported nothing about and no agreement with Musk*. Ex. 29 at 36530, 36562.

1    Because there is no evidence anyone told Microsoft about any purported duties or

2  obligations to Musk or that Microsoft received such information during due diligence, and due

3  diligence showed exactly the opposite, Microsoft is entitled to summary judgment on the aiding

4  and abetting claim. *AngioScore*, 70 F. Supp. 3d at 957. *See also* Restatement (Second) of Torts §

5  876(b) (1979) (for harm to a third person from the tortious conduct of another, one is subject to

6  liability only if he "knows that the other's conduct constitutes a breach of duty" and gives

7  substantial assistance); *Casey*, 127 Cal. App. 4th at 1144-46 (following Restatement approach and

8  requiring actual knowledge of duty and its breach); *id.* at 1148 (complaint "fails to establish that

9  the banks had actual knowledge of the primary violation in which they purportedly participated");

10  *Chance World Trading*, 438 F. Supp. 2d at 1085 (granting summary judgment because "Chance

11  World has offered no evidence that shows Heritage Bank had the requisite knowledge to be held

12  liable, under California law, for aiding and abetting … fraud.").

13    Cases under Delaware law, which this Court has recognized is essentially the same as

14  California law,[12] reach the same result: they require proof of actual knowledge. *In re Columbia*

15  *Pipeline Group, Inc. Merger Litig.*, 2025 WL 1693491, *23 (Del. June 17, 2025) (cit. omit.). In

16  that case, a stockholder filed suit against C-suite executives for breaches of fiduciary duty, as well

17  as against the successful bidder for purchasing the company for aiding and abetting those breaches.

18  *Id.* at *1, *20. In analyzing those claims, the court held that "[a]bsent the requisite actual

19  knowledge of the underlying breaches, [the bidder] could not know that its own conduct was

20  legally impermissible. Put differently, lacking actual knowledge of the sell-side breaches, [the

21  bidder] could not have knowingly participated in them." *Id.* at *26; *see also In re Mindbody, Inc.,*

22  *Stockholder Litig.*, 332 A.3d 349 (Del. 2024) (aider and abettor must act with knowledge that the

23  primary party's conduct constitutes a breach of fiduciary duty and that its own conduct is legally

24  improper). So too here. There is no evidence Microsoft had actual knowledge of any alleged duties

25  OpenAI, Altman, or Brockman owed Musk, and so "could not have knowingly participated" in a

26  breach of them. *See In Re Columbia Pipeline Group*, 2025 WL 1693491, at *26. And not only is

27

28  ───────────────
[12] *AngioScore*, 70 F. Supp. 3d at 957.

1    there no evidence that Microsoft had knowledge, but also witnesses, including Microsoft's

2    Nadella and Wetter, affirmatively stated Microsoft did not have any such knowledge. *See supra*

3    at 16.

4         Lacking any evidence of ***actual knowledge***, Musk contends in his interrogatory responses

5    that Microsoft ***should have*** known about fiduciary duties to Musk and breaches, through its due

6    diligence or otherwise. But under settled law, constructive knowledge is not enough to establish

7    liability for the tort of aiding and abetting. *AngioScore*, 70 F. Supp. 3d at 957; *In Re Columbia*

8    *Pipeline Group*, 2025 WL 1693491, at *23 (aider and abettor must have actual, not just

9    constructive, knowledge of fiduciary duty breach). Without proof of actual knowledge, Musk's

10   aiding and abetting claim cannot survive summary judgment

11           **2.    Microsoft Could Not Intend to Provide Substantial Assistance to**
              **Breach an Obligation of Which It Lacked Knowledge**
12

13        There also is no evidence showing that Microsoft intended to assist OpenAI, Altman, or

14   Brockman in violating those duties. That lack of intent independently warrants summary judgment

15   on Count 19.

16                **(a)    Aiding and Abetting Also Requires Intent**

17        The words "aid and abet" have a "well understood meaning" and are construed to imply

18   an "intentional participation with knowledge of the object to be obtained." *Casey*, 127 Cal. App.

19   4th at 1146 (cleaned up). A defendant can be held liable as a tortfeasor for acting in concert only

20   if he or she knew that a tort had been, or was to be, committed, and acted "***with the intent of***

21   ***facilitating the commission of that tort***." *Id*. (emphasis in original, cit. omit.); *see also Howard v.*

22   *Superior Court*, 2 Cal. App. 4th 745, 749 (1992) ("aiding and abetting … necessarily requires a

23   defendant to reach a conscious decision to participate in tortious activity for the purpose of

24   assisting another in performing a wrongful act."). *In re Radnor Holdings Corp*., 353 B.R. 820

25   (Bankr. D. Del. 2006), is also instructive. In that case, the court held that "a representation"

26   negated any "reason to know that fiduciary duties were even owed to creditors, much less that

27   they were breached." *Id*. at 844. A defendant with no knowledge of duties and their breaches—as

28   is the case here—cannot intend to participate in their violation.

- 18 -

Again, this makes sense. Commercial parties must be able to rely on their counterparties' representations as to their ability to enter transactions without breaching fiduciary duties. Any other rule would bring commercial negotiations to a halt. And indeed, these principles apply in other similar contexts, such as Musk's abandoned tortious interference claim. There, like here, courts recognize that a third party cannot tortiously interfere with a purported contract when the counterparty represents that there is no contract or breach. *Oakley, Inc. v. Nike, Inc.,* 988 F. Supp. 2d 1130, 1136 (C.D. Cal. 2013) ("California [tortious interference] law … provides that when information is within the knowledge of a person making a claim and not within the knowledge of the person to whom the claim is made, the latter may rely on the former's representations concerning such information.") (cit. omit.).[13] Thus, if an informed party tells the defendant that no obligations exist, the defendant cannot know that interference with contractual rights would occur. *Id.* at 1138; *see also Davis*, 174 Cal. App. 4th at 10–11 (affirming summary judgment when defendant was not "sufficiently aware of the details of the [] contract ***to form an intent to harm it***") (emphasis added).

> **(b)      Microsoft Did Not Intend and Could Not Have Intended to Assist in the Breach of Unknown Duties or Obligations**

Because the due diligence and agreements showed that OpenAI and its for-profit subsidiary had authority to enter the agreements and that no third-party rights would be violated, and because no one told Microsoft otherwise, Microsoft did not intend—and could not have intended—to assist in the purported violation of any duties or obligations to Musk. In other words, the representations and warranties negate any alleged knowledge of phantom duties OpenAI, Altman, or Brockman supposedly owed Musk which, in turn, means that Microsoft could not have intended to assist in the breach of unknown obligations.

OpenAI's nonprofit board approved each of the agreements with Microsoft. Ex. 25 (OpenAI 30(b)(6) Tr. 126:23-127:15); Ex. 32 (Zilis Ex. 35); Ex. 36 at 26483, 26485. Former co-

---

[13] The same deficiencies of proof as to Microsoft's knowledge and intent would therefore also have barred the now mooted tortious interference with implied-in-fact contract claim, which is another reason the Court should enter judgment on that claim.

1    Plaintiff Zilis was on the OpenAI nonprofit board at the time of the 2021 and 2023 agreements

2    and was among the directors who approved them. Ex. 32; Ex. 36 at 26483, 26485; Ex. 38 (OpenAI,

3    Inc.'s R&Os to Musk's First ROGs at 12).

4        . For its part, Microsoft understood that OpenAI's nonprofit board had a responsibility to

5    do what was obviously in the interests of its mission. Ex. 12 (Altman Tr. 362:17-363:1).

6        Microsoft, however, did not merely assume that OpenAI was abiding by any restraints on

7    its operations. OpenAI and its for-profit subsidiary also repeatedly represented and warranted to

8    Microsoft that they had the power to enter into the agreements with Microsoft and that the

9    agreements would *not* violate any third-party rights. Ex. 27 (2019 Investment) at 11926; Ex. 30

10    (2021 Investment) at 55914-15 (similar). And in each of the three versions of the JDCA, OpenAI

11    and its subsidiary similarly "continuously" represented and warranted that they had the legal

12    authority to enter their obligations and that the agreements would not violate third-party rights.

13    Ex. 26 at 55186 (2019 JDCA); Ex. 31 at 64530 (2021 JDCA); Ex. 35 at 55127 (2023 JDCA).

14        Given the above undisputed facts, Microsoft could not have consciously chosen to

15    participate in OpenAI's purportedly tortious activity. Microsoft simply "had no reason to know"

16    about such duties or their breach given OpenAI's representations. *In re Radnor Holdings Corp*.,

17    353 B.R. at 844. Absent such knowledge, Microsoft could not have aided and abetted anything.

18    *Casey* at 1146 (for aiding and abetting, intent to facilitate the commission of a tort is required);

19    *see also Howard*, 2 Cal. App. 4th at 749 (defendant must "reach a conscious decision to participate

20    in tortious activity for the purpose of assisting another in performing a wrongful act.").

21    **B.    Summary Judgment Should Be Granted on Count 4 (Quasi Contract / Unjust**
22    **Enrichment)**

23        Musk's unjust enrichment claim fails as a matter of law because: (1) it rests on the same

24    underlying conduct as his aiding and abetting claim, which fails for the reasons explained above;

25    (2) it impermissibly seeks the same remedies as the aiding and abetting claim; and (3) without

26    knowledge of any underlying breach or wrongful act, there is no basis to deem the benefits from

27    Microsoft's almost $14 billion arms-length investment unjust.

28

- 20 -

1

2

### 1.    The Unjust Enrichment Claim Fails Because It Is Based on the Same Facts as Musk's Deficient Aiding and Abetting Claim

Musk predicates his unjust enrichment claim on the same conduct as his aiding and abetting claim. SAC ¶ 409 (alleging that the OpenAI Defendants breached their duties to Musk "in the same manner by which they violated the terms of the Contract…."); *id.* ¶ 275 (alleging unjust enrichment based on same facts "as detailed above"). But an unjust enrichment claim built on the same facts as a tort claim will fall when the tort claim fails for lack of evidence of an essential element. *Rosenthal*, 2022 WL 18906, at *1 (failure to raise a material issue of fact on a tortious interference claim also supports entry of summary judgment on unjust enrichment; "[t]he person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is ***unjust*** for the person to retain it") (cit. omit., emphasis in original); *Girard v. Toyota Motor Sales, U.S.A., Inc*., 316 F. App'x 561, 562 (9th Cir. 2008) (unjust enrichment claim based on the same facts failing to state a California Unfair Competition Law claim must fail); *Rouze v. One World Tech., Inc*., 2021 WL 5304016, at *6 (E.D. Cal. Nov. 15, 2021) (because unjust enrichment claim was grounded in same underlying conduct as other deficient fraud claims, unjust enrichment claim fails as well).

Indeed, as the Court already determined in its May 1 Order and reiterated in its October 7, 2025 Order Requiring Further Election [Dkt. No. 298], "[w]here a plaintiff's unjust enrichment claim is premised on the same factual allegations as claims that are dismissed, the claim for unjust enrichment must fail." May 1 Order at 3 and Order Requiring Further Election at 1 (citing *Gudgel*, 514 F. Supp. 3d at 1188). Because Musk's aiding and abetting claim is deficient, the Court should also grant summary judgment on Musk's unjust enrichment claim.

### 2.    The Unjust Enrichment Claim Fails Because It Seeks the Same Relief as the Aiding and Abetting Claim

Under *Sonner v. Premier Nutrition Corp*., 49 F.4th 1300 (9th Cir. 2022), federal common law requires a plaintiff to establish that it does not have an adequate remedy at law before securing equitable restitution in federal court for past harm under California law. *Id*. at 1303. But where, as here, the plaintiff seeks the same relief in an aiding and abetting claim and an unjust enrichment

- 21 -

claim, the plaintiff cannot make that showing. "Where a plaintiff brings a cause of action for unjust enrichment with a claim for aiding and abetting breach of fiduciary duty or fraud, courts will dismiss the claim for unjust enrichment so that a plaintiff can pursue it as an equitable remedy rather than a separate cause of action." *Stapleton*, 779 F. Supp. 3d at 1076; *see also id.* ("Because the unjust enrichment claim merely incorporates the allegations for aiding and abetting, and restitution is an adequate remedy for such claims, a separate claim for unjust enrichment is unnecessary."). California law is similar. *Sepanossian v. National Ready Mixed Concrete Co.*, 97 Cal. App. 5th 192, 207-08 (2023) ("In light of the adequate legal remedies [under the Unfair Competition Law], we conclude the complaint does not state a claim for restitution based on unjust enrichment.").

Here, Musk has requested ***identical*** relief for his aiding and abetting and unjust enrichment claims. *Compare* Count 19 (aiding and abetting) ¶ 417 (seeking "compensatory damages, an accounting, the imposition of a constructive trust, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and fees") *with* Count 4 (unjust enrichment) ¶ 280 (seeking precisely the same relief). Because Musk has an identical remedy at law for his (deficient) aiding and abetting claim, his duplicative standalone unjust enrichment claim should be dismissed.[14]

### 3.    The Unjust Enrichment Claim Also Fails Because It Requires Knowledge of Purported Duties or Obligations to Musk

Even if the Court independently analyzes Musk's quasi contract / unjust enrichment claim, it still fails for the same reason as his defective aiding and abetting claim: there is no evidence that Microsoft had knowledge of any duties owed to Musk or any breaches of any such unknown duties, and so any benefits Microsoft received under the strategic partnership with OpenAI's for-profit subsidiary cannot be deemed "unjust."

Under California law, there is no standalone cause of action for "unjust enrichment," which

---

[14] It is not even required that "an adequate legal remedy … be an identical legal remedy." *Ketayi v. Health Enrollment Grp.*, 2021 WL 2864481, at *10 (S.D. Cal. July 8, 2021). "It would be anomalous for *Sonner*'s rule to be avoidable merely because of the reality that claims for restitution and damages often will result in different recoveries." *Id.*

is synonymous with "restitution." *MSP Recovery Claims, Series LLC v. Avanir Pharm., Inc.*, 2022 WL 17220647, at \*7 (C.D. Cal. Oct. 20, 2022); *see also* Order Requiring Further Election at 2 (claim for unjust enrichment is claim for quasi contract). This means Musk's claim for unjust enrichment is really one for restitution.

But there is nothing wrong with realizing financial gain in a commercial partnership. Restitution is not mandated or even appropriate merely because one party realized gain at another's expense. *MSP Recovery Claims*, 2022 WL 17220647, at \*7. More specifically, when restitution is sought from a third party who has not directly engaged with the plaintiff but who instead dealt with a counterparty to the plaintiff, knowledge of some underlying violation is required for enrichment to be "unjust." *First Nationwide Savings*, 11 Cal. App. 4th at 1664 ("innocent recipients may be treated differently than those persons who acquire a benefit with knowledge"). In the absence of knowledge, "[r]estitution will be denied." *City of Hope Nat. Med. Ctr. v. Superior Court*, 8 Cal. App. 4th 633, 637 (1992); *see also Adler v. Manor Healthcare Corp.*, 7 Cal. 4th 1110, 1116 (1992) (third-party buyer of trust property protected where they had no actual knowledge of breach); *Melendrez v. D & I Inv., Inc.*, 127 Cal. App. 4th 1238, 1253 (2005) (third party buyer who had "***no knowledge or notice*** of the asserted rights of another" is protected under the law (italics in original)). *See generally* Restatement (Third) of Restitution § 66 and cmt. b (person who acquires assets without notice of grantor's legal interest takes the assets free of equitable interests that a restitution claimant might have against the grantor).

Musk may argue that Microsoft should have known about Musk's charitable contributions to OpenAI and the purported restrictions on them, and so Microsoft was allegedly unjustly enriched at Musk's expense. Ex. 46 (Musk Rog Response No. 9). But the evidence does not support this theoretical proposition. *See supra* at 16. Microsoft, therefore, was not and could not have been "unjustly" enriched by its arm's length, for-value commercial dealings with OpenAI and its for-profit subsidiary. *First Nationwide Savings*, 11 Cal. App. 4th at 1663-64 (restitution is commonly denied against an innocent transferee or beneficiary); *City of Hope*, 8 Cal. App. 4th at 637 (payor cannot recover mistaken payment to a bona fide creditor of a third person if payee had no notice of payor's mistake).

1  **V.    CONCLUSION**

2          This dispute concerns alleged promises among Musk, OpenAI, Altman, and Brockman—

3  not Microsoft. Microsoft did not participate in OpenAI's founding or its decision to create a for-

4  profit subsidiary, made no promises to Musk, and lacked actual knowledge of any promises

5  allegedly made by others. Microsoft's strategic partnership with OpenAI began in the summer of

6  2019—after OpenAI formed its for-profit subsidiary—and that collaboration was repeatedly

7  approved by OpenAI's nonprofit board. The undisputed record shows no wrongful act, no

8  knowledge or intent to aid any breach, and no benefit unjustly retained. Allowing these claims to

9  proceed on this record would chill good-faith collaborations, deter innovation, and complicate the

10  issues presented at trial, but the legal deficiencies alone warrant summary judgment on all of

11  Musk's Phase I claims remaining against Microsoft.

12

13  DATED: October 17, 2025                    Respectfully Submitted,

14                                             DECHERT LLP

15

16                                       By:   */s/ Russell P. Cohen*
                                               Russell P. Cohen (SBN 213105)
17                                             Russ.cohen@dechert.com
                                               Howard M. Ullman (SBN 206760)
18                                             Howard.ullman@dechert.com
                                               45 Fremont Street, 26th Floor
19                                             San Francisco, CA 94105
                                               Telephone: (415) 262-4500
20                                             Facsimile: (415) 262-45555

21                                             Nisha Patel (SBN 281628)
                                               Nisha.patelgupta@dechert.com
22                                             DECHERT LLP
                                               633 West 5th Street, Suite 4900
23                                             Los Angeles, CA 90071
                                               Telephone: (213) 808-5700
24                                             Facsimile: (213) 808-5760

25                                             Andrew J. Levander (admitted *pro hac vice*)
                                               Andrew.levander@dechert.com
26                                             DECHERT LLP
                                               Three Bryant Park
27                                             1095 Avenue of the Americas
                                               New York, NY 10036
28                                             Telephone: (212) 698-3500
                                               Facsimile: (212) 698-3599

- 24 -

1

2    John (Jay) Jurata, Jr. (admitted *pro hac vice*)
     Jay.jurata@dechert.com
3    DECHERT LLP1900 K Street, N.W.
     Washington, DC 20006
4    Telephone: (202) 261-3300
     Facsimile: (202) 261-3333
5
     *Attorney for Defendant Microsoft*
6    *Corporation*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT
4:24-CV-04722-YGR