MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
JAYMIE PARKKINEN (CA SBN 318394)
JParkkinen@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA  90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ELON MUSK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SAMUEL ALTMAN, et al., <br><br> Defendants. | Case No. 4:24-cv-04722-YGR (TSH) <br><br> **PLAINTIFF'S ADMINISTRATIVE MOTION TO AUTHORIZE ALTERNATIVE SERVICE OF DEPOSITION SUBPOENA AND COMPEL COMPLIANCE** |

Plaintiff Elon Musk moves for an order authorizing alternative service of a deposition subpoena on nonparty Ermira Murati, finding that Murati has been adequately served, and compelling Murati's compliance with the subpoena. Murati is an important witness. She was OpenAI's Chief Technology Officer. She was a central player in Sam Altman's 2023 ouster from OpenAI. And she appears to have managed OpenAI's relationship with Microsoft. Given her role, she is likely to have unique knowledge that is highly relevant to this lawsuit. Yet, despite Plaintiff's numerous attempts to serve Murati, she has not accepted service. Plaintiff has attempted to serve Murati a deposition subpoena in person *eleven times* at different locations. Murati's security personnel have made it clear that they "*know what the documents are*," but they have continuously refused to accept them or let Plaintiff's process servers near Murati.

Serving process should not be reduced to a game of cat and mouse. Given Plaintiff's diligent efforts, Murati's apparent actual knowledge of the current subpoena, and the likely futility of additional personal service attempts, Plaintiff respectfully requests the Court authorize alternative service and deem Plaintiff's latest efforts – service via FedEx overnight delivery to Murati's residence and workplace, after leaving a copy of the service packet with Murati's security team at her residence – sufficient. Plaintiff further requests the Court order compliance with the subpoena. Alternatively, Plaintiff requests an extension of time to serve Murati using any alternative measures the Court considers appropriate.

I.  **Factual Background**

   a.  **Murati's Relevance to the Litigation**

According to public reporting, Murati worked at OpenAI from 2018 to 2024, until she left to found an AI company called Thinking Machines Lab.[1] Murati served as OpenAI's CTO from 2022 to 2024, except for a brief period when she replaced Altman as CEO in November 2023. Deposition witnesses have testified that prior to Altman's ouster, Murati raised concerns about Altman with OpenAI's board, including concerns regarding "abuse from Sam," his "toxic culture of

---

[1] Thinking Machines Lab was recently valued at $12 billion. *Mira Murati's AI startup Thinking Machines valued at $12 billion in early-stage funding*, REUTERS (July 15, 2025), https://www.reuters.com/technology/mira-muratis-ai-startup-thinking-machines-raises-2-billion-a16z-led-round-2025-07-15/.

lying," and his dishonesty surrounding safety issues. McCauley Tr. 84:24-85:16, 87:3-88:1, 138:3-139:5, 225:2-14; Sutskever Tr. 118:11-120:1; 128:20-129:8. Former OpenAI Board members who elected to fire Altman confirmed that Murati's concerns factored into that decision. McCauley Tr. 221:25-225:14.

Murati was also involved in OpenAI's relationship with Microsoft. According to public reporting, Murati "managed the technical relationship between OpenAI and its biggest investor, Microsoft, as well as how Microsoft would use OpenAI's conversational AI in its products."[2] Former OpenAI board members also confirmed Murati was "a significant piece of the relationship with Microsoft," was "frequently in touch with Microsoft," and "was kind of the administrator . . . of that communication . . . on behalf of the board." McCauley Tr. 272:3-4, 101:6-14.

### b. Plaintiff's Service Attempts on Murati

Plaintiff has repeatedly tried to personally serve Murati, without success. In August, Plaintiff attempted to serve Murati a document subpoena at two different residences associated with Murati. At the first ("Residence One"), Plaintiff's process server never received an answer, despite trying on five different days. Parkkinen Decl. ¶¶2-3, Exs. 1, 2. At the second ("Residence Two"), security refused to confirm whether Murati, in fact, resided there. Parkkinen Decl. ¶¶2-3, Exs. 1, 2.

Plaintiff then attempted to serve Murati a deposition subpoena. On September 11, Plaintiff's process server delivered a deposition subpoena directed to Murati to a security officer at Thinking Machines Lab's office in San Francisco. Parkkinen Decl. ¶4, Ex. 4. The security officer who received the subpoena represented that he was authorized to accept service on Murati's behalf. Parkkinen Decl. ¶4, Ex. 4. But Murati never contacted Plaintiff following her employee's acceptance of service, and Plaintiff could not reach her regarding her deposition.

So Plaintiff tried again. Between September 15 and September 19, Plaintiff attempted to serve Murati a deposition subpoena at her workplace every day. Parkkinen Decl. ¶5, Ex. 6. On September 15, security told Plaintiff's process server that Murati was not in and refused to provide

---

[2] Stephanie Palazzolo and Amir Efrati, *Can Greg Brockman Find a Future Back at OpenAI?*, The Information (Oct. 18, 2024), https://www.theinformation.com/articles/can-greg-brockman-find-a-future-back-at-openai.

1  a time when Murati would typically be at the office.  Parkkinen Decl. ¶5, Ex. 6.  Plaintiff's process
2  server returned at a different time each day that week, but he always received a similar response.
3  Parkkinen Decl. ¶5, Ex. 6.  Plaintiff continued trying to serve Murati a deposition subpoena at her
4  work throughout September, but the same result occurred each time.  *See* Parkkinen Decl., Ex. 8.

5  Stonewalled, Plaintiff engaged investigators to search for additional addresses associated
6  with Murati.  Parkkinen Decl. ¶6.  The investigators determined that Residence Two was, in fact,
7  associated with Murati.  Parkkinen Decl. ¶8.  So, on September 30, Plaintiff's investigators once
8  again attempted service there.  Conner Decl. ¶¶5-15; Parkkinen Decl. ¶¶7-9, Exs. 7, 8.  When
9  Plaintiff's investigators approached Residence Two, they were confronted by staff whom they
10 understood to be security personnel associated with the residence.  Conner Decl. ¶7.  When
11 Plaintiff's investigator informed those security personnel of the time-sensitive nature of the
12 documents and the need to deliver them, one of the security guards stated that she "know[s] what
13 the documents are" and that the residence would not accept any documents.  Conner Decl. ¶7.

14 Plaintiff's investigators returned to Residence Two later in the day.  Conner Decl. ¶¶9-15.
15 This time, as soon as Plaintiff's investigators started explaining that they were attempting "to serve
16 Ms. Murati," the security officer walked away, saying "I'm not taking any papers."  Conner
17 Decl. ¶11.  As the security officer left, Plaintiff's investigators explained that they were leaving a
18 copy of the service packet in the security guard's vehicle—placed on the dashboard through the
19 parked car's open window—and another copy would be coming by mail.  Conner Decl. ¶¶12-15.

20 That evening, having heard nothing from Murati, Plaintiff mailed two copies of the
21 deposition subpoena via FedEx overnight delivery.  One went to Residence Two, and the other to
22 Thinking Machines Lab's office, with delivery confirmed on October 1.  Parkkinen Decl., Ex. 9.

23 **II.    Argument**

24 a. **Plaintiff's Efforts Constitute Adequate Service**

25 Under Rule 45, service of a deposition subpoena is accomplished by "delivering a copy to
26 the named person."  Fed. R. Civ. P. 45(b)(1).  While personal service is often considered the default,
27 "effective service under Rule 45 is not limited to personal service."  *Green v. Baca*, No. 02-cv-
28 204744, 2005 WL 283361, at *1 n.1 (C.D. Cal. Jan. 31, 2005).  Especially where good-faith efforts

at personal service have been made, courts routinely find that alternative methods of service satisfy Rule 45.  *E.g.*, *Toni Brattin & Co. v. Mosaic Int'l, LLC*, No. 15-mc-80090, 2015 WL 1844056, at *4 (N.D. Cal. Apr. 9, 2015); *Green*, 2005 WL 283361, at *1 n.1 (collecting cases); *Sanchez v. Am. Media, Inc.*, No. 20-cv-2924, 2022 WL 22879634, at *2 (C.D. Cal. July 14, 2022) (collecting cases).  Adequate service, those courts find, is not defined by physically catching an elusive witness.  It turns instead on whether the method used is "reasonably calculated under the circumstances to provide . . . both notice and an opportunity to present objections."  *Toni Brattin*, 2015 WL 1844056, at *4; *Green*, 2005 WL 283361, at *1 n.1.

Plaintiff's attempts to serve Murati easily satisfy that standard.  At considerable expense, Plaintiff has engaged registered process servers and investigators to attempt personal service of Murati's deposition subpoena at least ***eight*** times at Murati's confirmed workplace and ***three*** times at her confirmed personal residence.  Not only were those efforts "reasonably calculated" to provide notice, they appear to have ***actually*** provided notice to Murati.  The drastic switch in attitude towards Plaintiff's process server at Thinking Machines Lab—with security representing that it could accept service one day to stonewalling the next—suggests information about the subpoena did, in fact, reach Murati.  And Murati's security team's conduct at her residence all but confirms the point.  Little else could explain her security guard's statements that she "know[s] what the documents are" and, as a result, would not accept them.  Conner Decl. ¶7.  Given that it is likely Murati is actually "aware of and [has] received the Rule 45 subpoena," compelling attendance at her deposition is warranted.  *Chambers v. Whirlpool Corp.*, No. 11-cv-1733, 2016 WL 9451361, at *3 (C.D. Cal. Aug. 12, 2016) (compelling attendance at deposition notwithstanding lack of personal service where court was "satisfied" witness was aware of subpoena).

Even without actual notice, Plaintiff's efforts satisfy Rule 45.  Plaintiff's sustained attempts far exceed what this court and others typically require before authorizing service through the mail.  *See Toni Brattin*, 2015 WL 1844056, at *4 (authorizing service via certified mail after two attempts at witness's workplace and four at her residence); *Chambers*, 2016 WL 9451361, at *3 (ordering attendance at deposition where "process server attempted personal service at least three times").  Plaintiff's efforts have been specifically tailored to where Murati is likely to be.  And the responses

Plaintiff's process servers have received at both Murati's workplace and her residence confirm that she does, in fact, work and reside at those locations. Pp. 2-3, *supra*. Unlike an ordinary employee, Murati is the founder of Thinking Machines Lab, with the authority to direct security there. Unlike an ordinary citizen, she has private security to answer—or blockade—her door. Those with resources sufficient "to insulate themselves from the public," can render personal service "almost a practical impossibility." *Sanchez*, 2022 WL 22879634, at *3. But that does not justify avoiding ordinary court procedures, especially where alternative forms of service are reasonably calculated to provide notice and the opportunity to object. *Id.* (authorizing service by mail). Here, the record shows the service materials were repeatedly delivered to Murati's actual workplace and residence. Parkkinen Decl., Exs. 4-10; Conner Decl. ¶¶ 5-15. Rule 45 requires nothing further.

Murati's testimony is non-duplicative and highly relevant. Her concerns about Altman's failure to follow AI safety procedures were one of the reasons the board fired Altman, McCauley Tr. 138:3-139:6, 221:25-225:14, and the extent to which Altman was sidelining safety procedures in the pursuit of commercial interests is crucial to this case. Murati was also a "significant piece" of OpenAI's relationship with Microsoft, McCauley Tr. 272:3-4, 101:6-14, which is another critical aspect of Plaintiff's claims. Precluding Plaintiff from exploring Murati's potentially unique knowledge on those issues risks prejudicing Plaintiff. In light of Defendants' naturally superior knowledge of Murati's conduct at OpenAI, allowing Murati to avoid a deposition also threatens to disadvantage Plaintiff at trial.

    **b. Alternatively, the Court Should Extend Plaintiff's Time to Serve Murati**

In the event the Court disagrees that Plaintiff's efforts constitute adequate service under Rule 45, Plaintiff respectfully requests the Court grant an extension of time in which Plaintiff is authorized to serve Murati using any alternative measures the Court considers appropriate.

### III. Conclusion

Plaintiff respectfully requests the Court authorize alternative service of a deposition subpoena on nonparty Ermira Murati, find that Murati has been adequately served, and order Murati to comply with the subpoena. Alternatively, Plaintiff respectfully requests an extension of time in which to serve Murati using any alternative measures the Court considers appropriate.

DATED: October 7, 2025

Respectfully submitted,

TOBEROFF & ASSOCIATES, P.C.

*/s/ Jaymie Parkkinen*
Jaymie Parkkinen

*Attorneys for Plaintiff Elon Musk*