# EXHIBIT 4

**In the Matter Of:**

*MUSK v*

*ALTMAN*

---

*ILYA SUTSKEVER*

*October 01, 2025*

---



1

1          UNITED STATES DISTRICT COURT

2            NORTHERN OF CALIFORNIA

3              OAKLAND DIVISION

   _____
4  ELON MUSK, et al.,          )
                               )
5          Plaintiffs,         )
                               )
6  v.                          )   Case No. 4:24-cv-04722-YGR
                               )
7  SAMUEL ALTMAN, et al.,      )
                               )
8          Defendants.         )
   _____)
9

10

11

12          ** HIGHLY CONFIDENTIAL **

13   Videotaped Deposition of ILYA SUTSKEVER

14          San Francisco, California

15         Wednesday, October 1, 2025

16

17

18

19

20

21

22

23          Reported Stenographically by

24    Michael P. Hensley, RDR, CSR No. 14114

25

2

1               UNITED STATES DISTRICT COURT

2               NORTHERN OF CALIFORNIA

3                  OAKLAND DIVISION

4    ELON MUSK, et al.,            )
                                   )
5            Plaintiffs,           )
                                   )
6    v.                            )    Case No. 4:24-cv-04722-YGR
                                   )
7    SAMUEL ALTMAN, et al.,        )
                                   )
8            Defendants.           )
                                   )

9

10

11       Videotaped Deposition of ILYA SUTSKEVER,

12   commencing at the hour of 10:19 AM and concluding at

13   the hour of 8:07 PM on Wednesday, October 1, 2025,

14   at the location of Cooley, LLP,

15   3 Embarcadero Center, 20th Floor, San Francisco,

16   California 94111, before Michael Hensley, Registered

17   Diplomate Reporter, Certified Shorthand Reporter

18   No. 14114, in and for the State of California.

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   For Plaintiffs:

 3           MOLOLAMKEN LLP
             BY:  STEVEN F. MOLO, ESQ.
 4                JENNIFER SCHUBERT, ESQ.
                  SARA TOFIGHBAKHSH, ESQ.
 5           430 Park Avenue
             New York, New York 10022
 6           212.607.8170
             smolo@mololamken.com
 7           jschubert@mololamken.com
             stofighbakhsh@mololamken.com

 8

 9   For Defendant Microsoft Corporation:

10           DECHERT LLP
             BY:  RUSSELL P. COHEN , ESQ.
11                YOSEF WEITZMAN, ESQ.
             45 Fremont Street, 26th Floor
12           San Francisco, California 94105
             415.262.4506
13           russ.cohen@dechert.com
             yosi.weitzman@dechert.com

14

15   For Defendant OpenAI:

16           WACHTELL, LIPTON, ROSEN & KATZ
             BY:  SARAH K. EDDY, ESQ.
17                KELSEY BORENZWEIG, ESQ.
                  WILLIAM SAVITT, ESQ.
18           51 West 52nd Street
             New York, New York 10019
19           212.403.1219
             skeddy@wlrk.com
20           kaborenzweig@wlrk.com
             wdsavitt@wlrk.com

21

22

23

24

25
```

```
1   APPEARANCES (CONTINUED):

2   For Deponent Ilya Sutskever:

3           COOLEY LLP
            BY:  SIMONA AGNOLUCCI, ESQ.
4                EDUARDO SANTACANA, ESQ.
                 ANIKA HOLLAND, ESQ.
5                REMY CARREIRO, ESQ.
            3 Embarcadero Center, 20th Floor
6           San Francisco, CA 94111
            415.693.2535
7           sagnolucci@cooley.com
            esantacana@cooley.com
8           anika.holland@cooley.com
            rcarreiro@cooley.com

9

10  Also Present:

11          MIGUEL CONCEPCION, Videographer

12

13  Present Remotely:

14          ELIZABETH PRADO, AV Monitor

15          JAYMIE PARKKINEN, ESQ.

16          IANNI DRIVAS, ESQ.

17

18

19

20

21

22

23

24

25
```

1          Well, you put -- you put these two

2     screenshots in your memo; correct?

3          A.   Yes.

4          Q.   All right.

13:51:45  5          And then you sent your 52-page memo,

6     Exhibit 19, to the independent directors of the

7     board; correct?

8          A.   Correct.

9          Q.   All right.

13:51:52 10          Why didn't you send it to the entire

11    board?

12         A.   Because we were having the discussions

13    with the independent directors only.

14         Q.   Okay.

13:52:01 15          And what -- why didn't you send it to Sam

16    Altman?

17         A.   Because I felt that, had he become aware

18    of these discussions, he would just find a way to

19    make them disappear.

13:52:14 20         Q.   Okay.

21          Were you careful about what you included

22    in this document?

23          ATTORNEY AGNOLUCCI:  Object to form.

24          THE WITNESS:  So the way I wrote this

13:52:25 25    document was to -- the context for this document is

 1   that the independent board members asked me to

 2   prepare it.  And I did.

 3           And I was pretty careful.  Most of the

 4   screenshots that I have that I -- most or all, I

13:52:56  5   don't remember.  I get them from Mira Murati.

 6           It made sense to include them in order to

 7   paint a picture from a large number of small pieces

 8   of evidence or items.

 9   BY ATTORNEY MOLO:

13:53:14 10       Q.   Okay.

11           And which independent directors asked you

12   to prepare your memo Exhibit 19?

13       A.   It was most likely Adam D'Angelo.

14       Q.   Okay.

13:53:26 15           And did you recall when he asked you to do

16   that?

17       A.   No.

18       Q.   Okay.

19           Do you recall what it was that he said to

13:53:32 20   you that caused you to prepare this memo?

21       A.   I don't remember what he said exactly.

22       Q.   What's your best recollection of what he

23   said?

24       A.   He said something like -- he ask me if I

13:53:43 25   have screenshots.

1      Q.   Well, before he asked you if you had

2   screenshots, I mean, what caused him -- to your

3   knowledge, you know, to ask you to prepare this?

4      A.   I had discussions with the independent

13:53:56   5   board members discussing the subject matter of these

6   documents.  And after having some discussions,

7   either Adam or the three of them together, I don't

8   remember, have asked me to collect supporting

9   screenshots.

13:54:11  10      Q.   Okay.

11           And the three of them together were Adam

12   D'Angelo, Helen Toner, and Tasha McCauley?

13      A.   Correct.

14      Q.   All right.

13:54:20  15           And the document that you prepared, the

16   very first page says:

17           [As Read]  Sam exhibits a consistent

18           pattern of lying, undermining his execs,

19           and pitting his execs against one another.

13:54:31  20           That was clearly your view at the time?

21      A.   Correct.

22      Q.   All right.

23           And the -- you had expressed that view to

24   the independent directors before sending them this

13:54:43  25   memo?

1      A.   Correct.

2      Q.   All right.

3           Did they express concern over that to you?

4      A.   Correct.

13:54:48  5      Q.   And did you want them to take action over

6  what you wrote?

7           ATTORNEY AGNOLUCCI:  Object to form.

8           THE WITNESS:  I wanted them to become

9  aware of it.  But my opinion was that action was

13:55:13  10  appropriate.

11  BY ATTORNEY MOLO:

12      Q.   Okay.

13           And what action did you think was

14  appropriate?

13:55:25  15      A.   Termination.

16      Q.   Okay.

17           And you sent it using a form of a

18  disappearing email; is that right?

19      A.   Yes.

13:55:34  20      Q.   Why?

21      A.   Because I was worried that those memos

22  will somehow leak.

23      Q.   Okay.

24           What would happen if they leaked?

13:55:44  25           ATTORNEY AGNOLUCCI:  Object to form.

1   BY ATTORNEY MOLO:

2       Q.   I mean, excuse me, what was your concern

3   about them leaking?

4       A.   It was a generalized concern.

13:55:51  5     Q.   Okay.

6            You drafted a similar memo that was

7   acritical of Greg Brockman; correct?

8       A.   Yes.

9       Q.   You sent that to the board too?

13:55:57 10     A.   Yes.

11      Q.   Does a version of your memo about Greg

12  Brockman exist anywhere in any form?

13           ATTORNEY AGNOLUCCI:  Object to form.

14           THE WITNESS:  I believe various lawyers

13:56:30 15  have a copy.

16  BY ATTORNEY MOLO:

17      Q.   Who has a copy?

18      A.   Various lawyers.

19      Q.   Which lawyers would those be?

13:56:38 20          ATTORNEY AGNOLUCCI:  Object to form.

21           And, obviously, I'm instructing the

22  witness not to answer with respect to any documents

23  that he may have provided to his own counsel.  So if

24  you know --

13:56:51 25          ATTORNEY MOLO:  Well, that doesn't make

1    them privileged.

2              ATTORNEY AGNOLUCCI:  -- if you know -- and

3    I'm happy to meet and confer about this off the

4    record.  But for the time being, if you know whether

13:56:59  5    other lawyers and which lawyers have the documents,

6    you can testify.

7              THE WITNESS:  I know that my lawyers have

8    a copy.

9    BY ATTORNEY MOLO:

13:57:24 10        Q.   Okay.

11             ATTORNEY AGNOLUCCI:  And I'm not -- and

12   I'm instructing you not to answer with respect to

13   any information that you learned from your lawyers

14   about who else might have a copy of the document.

13:57:35 15            THE WITNESS:  Yeah.  Okay.

16             ATTORNEY MOLO:  Well, why are you

17   instructing him not to answer?

18             ATTORNEY AGNOLUCCI:  Because it reveals

19   the content of his communications with counsel.  It

13:57:46 20   reveals his counsel's strategy.  It reveals,

21   potentially, other privileged information and we

22   can -- we can have a discussion with this off the

23   record.  And, you know, if we're all convinced that

24   it's appropriate, we can come back and ask questions

13:58:00 25   about it.

 1  BY ATTORNEY MOLO:

 2       Q.   Okay.

 3            Did you provide your lawyers with a copy

 4  of the Brockman memo?

13:58:06  5       A.   I don't remember exactly how -- the manner

 6  through which I gave it to them.

 7       Q.   Okay.

 8            Do you know of any other copies that exist

 9  anywhere?

13:58:20 10            ATTORNEY AGNOLUCCI:  Same objections and

11  instructions.

12            THE WITNESS:  And I'm not sure I should

13  answer.

14  BY ATTORNEY MOLO:

13:58:42 15       Q.   I'm sorry.  You're not sure you should

16  answer or --

17            ATTORNEY AGNOLUCCI:  I'm instructing you

18  not to.

19            ATTORNEY MOLO:  Let him.

13:58:47 20  BY ATTORNEY MOLO:

21       Q.   Are you saying you -- you're saying you're

22  not sure you should answer?

23       A.   Yes.

24       Q.   Okay.

13:58:52 25            And your lawyer's instructing you not to

1   answer?

2       A.   That's what I'm hearing.

3            ATTORNEY MOLO:  Okay.

4            ATTORNEY AGNOLUCCI:  And I think there's

13:58:58  5  some ambiguity about -- in his mind what's

6   privileged and so.

7            ATTORNEY MOLO:  He knows what's in his

8   mind.

9            ATTORNEY AGNOLUCCI:  I'm happy to meet and

13:59:07 10  confer further, but I think we need to move on.

11            ATTORNEY MOLO:  I'm going to show you

12   Exhibit 20.

13            (Exhibit 20 was marked for

14            identification.)

13:59:30 15  BY ATTORNEY MOLO:

16       Q.   This is an article from "The Wall Street

17   Journal" dated March 28th of 2025; byline by

18   Keith -- excuse me -- Hagey; headline "The Secrets

19   of Misdirection Behind Sam Altman's Firing From

13:59:47 20  OpenAI."

21            You're familiar with this article?

22       A.   No.

23       Q.   Okay.

24            At page 440, at the bottom of the article,

13:59:59 25  if you look at the third line, there's a sentence

1          I'm asking about at that time in

2     November --

3          A.   Yeah.

4          Q.   -- on the Saturday after Altman was

14:57:05  5     fired --

6          A.   Yeah.  I'm talking about that time --

7               (Court reporter clarification.)

8     BY ATTORNEY MOLO:

9          Q.   And I'm directing your attention

14:57:14 10     specifically to the Saturday after Altman's firing?

11          A.   Yeah, I'm talking about the Saturday as

12     well.

13          Q.   Okay.

14               Were you concerned about losing your

14:57:24 15     equity in OpenAI at the time?

16               ATTORNEY AGNOLUCCI:  Object to form.

17               THE WITNESS:  I was not concerned.

18     BY ATTORNEY MOLO:

19          Q.   What -- what was your equity at OpenAI

14:57:32 20     worth at the time?  What did you think it was worth?

21               ATTORNEY AGNOLUCCI:  Object to form.

22     Relevance.

23               Can we meet and confer about why this is

24     relevant.

25                         ///

```
 1   BY ATTORNEY MOLO:

 2        Q.   What was --

 3             ATTORNEY AGNOLUCCI:  I'm --

 4             ATTORNEY MOLO:  Look, it doesn't have to
 5   be directly relevant.

 6             So it's certainly relevant.

 7   BY ATTORNEY MOLO:

 8        Q.   In any event, do you recall --

 9             ATTORNEY AGNOLUCCI:  Well --

10             ATTORNEY MOLO:  Let me ask a question.

11             ATTORNEY AGNOLUCCI:  Well, you've
12   interrupted me in the middle of making an objection.
13   So let me finish.

14             ATTORNEY MOLO:  That's all you've done the
15   entire deposition is object.

16             ATTORNEY AGNOLUCCI:  That's my job.  So --

17             ATTORNEY MOLO:  Actually, it's not.

18             ATTORNEY AGNOLUCCI:  -- if he has a
19   privacy interest in his financial information --

20             ATTORNEY MOLO:  You've -- you've
21   designated this highly confidential from the outset.

22             ATTORNEY AGNOLUCCI:  That doesn't mean
23   that he has to answer your question.

24             Why is it relevant?

25             ATTORNEY MOLO:  It's relevant whether or
```

Timestamps (left margin):
14:57:44 — line 5
14:57:49 — line 10
14:57:55 — line 15
14:58:00 — line 20
14:58:09 — line 25

1  not he was losing value of his -- of his equity or

2  whether he thought he was at the time.

3            ATTORNEY AGNOLUCCI:  Well, then you can

4  ask him that question but not how much.

14:58:19  5            ATTORNEY MOLO:  It certainly does matter

6  how much.

7            What did you think the value of your

8  equity at OpenAI was at the time Sam Altman was

9  fired?

14:58:30  10            ATTORNEY AGNOLUCCI:  And I have the same

11  objection, and I'm instructing him not to put a

12  number on it.

13  BY ATTORNEY MOLO:

14       Q.   What did you think the value was?

14:58:36  15            ATTORNEY AGNOLUCCI:  You can answer the

16  question that he has saying is relevant here, which

17  is whether you thought you were going to lose value.

18            ATTORNEY MOLO:  It isn't my question.  I

19  have a right to ask a question.  You can object to

14:58:46  20  the question.

21  BY ATTORNEY MOLO:

22       Q.   My question is what did you think the

23  value of your equity in OpenAI was at the time of

24  Sam Altman's firing?

14:58:53  25            ATTORNEY AGNOLUCCI:  And I'm instructing

 1    the witness not to answer as to the money value.

 2    BY ATTORNEY MOLO:

 3        Q.   Are you going to not answer?

 4        A.   I mean, I have to obey my attorney.

14:59:06  5      Q.   Okay.

 6             So you're not going to answer?

 7        A.   I'll do what my attorney tells me to.

 8        Q.   Okay.

 9             Were you concerned about possibly losing

14:59:16 10   your equity at the time that -- I withdraw the

11    question.

12             Eventually, the board agreed to resign and

13    restore Sam Altman, didn't it?

14        A.   Yes.

14:59:25 15      Q.   When was that?

16        A.   Later in the week.

17        Q.   And why did they do that?

18             ATTORNEY AGNOLUCCI:  Object to form.

19             THE WITNESS:  There was a question of why

14:59:45 20   the board did it?

21    BY ATTORNEY MOLO:

22        Q.   Correct.

23        A.   Or is the question why I supported this?

24        Q.   First, I'm asking you why did the board

14:59:52 25   decide to resign and reinstate Sam Altman?

1    follows:  Right now, my view is that, with very few

2    exceptions, most likely a person who is going to be

3    in charge is going to be very good with the way of

4    power.  And it will be a lot like choosing between

18:46:03  5    different politicians.

6    BY ATTORNEY EDDY:

7         Q.    The person in charge of what?

8         A.    AGI.

9         Q.    And why do you say that?

18:46:15 10         ATTORNEY AGNOLUCCI:  Object to form.

11         THE WITNESS:  That's how the world seems

12    to work.  I think it's very -- I think it's not

13    impossible, but I think it's very hard for someone

14    who would be described as a saint to make it.  I

18:46:48 15    think it's worth trying.  I just think it's -- it's

16    like choosing between different politicians.

17         Who is going to be the head of the state?

18    BY ATTORNEY EDDY:

19         Q.    Looking back at the process that -- that

18:47:11 20    preceded the removal of Sam and Greg from the board,

21    what's your assessment of that process?

22         ATTORNEY AGNOLUCCI:  Objection.  Vague.

23         Calls for speculation.  Lacks foundation.

24         THE WITNESS:  Can you elaborate on what

18:47:35 25    you mean.

BY ATTORNEY EDDY:

         Q.   You've had time to reflect on -- on the

process that preceded the removal; right?

         A.   I had time.

18:47:41    Q.   And in reviewing the steps that preceded

the removal, do you think that process was correct?

              ATTORNEY AGNOLUCCI:  Same objections.

Lacks foundation.  Calls for speculation.  Vague.

              THE WITNESS:  One thing I can say is that

18:48:20  the process was rushed.

BY ATTORNEY EDDY:

         Q.   Why was it rushed?

         A.   I think it was rushed because the board

was inexperienced.

18:49:08    Q.   Inexperienced in what?

         A.   In board matters.

         Q.   Before your conversation with Helen Toner

that you've described concerning Sam's management

problems, how frequently had you interacted with her

18:49:22  in 2023?

         A.   Not too frequently.

         Q.   And how frequently did you interact with

Tasha McCauley?

              (Court reporter clarification.)

18:49:34    THE WITNESS:  Also not frequently.

1    BY ATTORNEY EDDY:

2         Q.   Where did Tasha live when she was a member

3    of the board?

4         A.   I don't know.

18:49:40   5         ATTORNEY AGNOLUCCI:  Object to form.

6    BY ATTORNEY EDDY:

7         Q.   Did -- did you see her at OpenAI premises?

8         A.   From time to time.

9         Q.   About how frequently?

18:49:48  10         A.   As frequently as board meetings.

11         Q.   And when were those?

12         A.   I don't actually remember exactly, but

13    there is information.  It can -- this is -- this

14    information can be determined.

18:50:00  15         Q.   Did -- did -- did Tasha show up physically

16    for board meetings every time?

17         A.   From time to time.  I cannot confirm if

18    it's every time.

19         Q.   And what about Helen?  Did she show up

18:50:11  20    physically for board meetings?

21         A.   From time to time.

22         Q.   Not every time?

23         A.   I don't think every time also.

24         Q.   Where did Helen live, if you know, during

18:50:17  25    the time she was on the board?

1          A.    I don't know for sure.  I believe she

2     lived in D.C. at least part of the time.

3          Q.    How -- how familiar did Tasha and Helen

4     appear to you to be with OpenAI's operations?

18:50:30  5             ATTORNEY AGNOLUCCI:  Object to form.

6             THE WITNESS:  They seemed to have some

7     familiarity, but it's hard for me to assess.

8     BY ATTORNEY EDDY:

9          Q.    Did you view them as experts in AI safety?

18:50:55 10             ATTORNEY AGNOLUCCI:  Object to form and

11     relevance.

12             Counsel, we have limited time left here.

13     We're not making the witness available for more than

14     seven hours.  Why is the process the board engaged

18:51:07 15     in relevant to this lawsuit?

16             ATTORNEY EDDY:  It is relevant because the

17     magistrate has ruled that these matters from

18     November 2023 are relevant.

19             ATTORNEY AGNOLUCCI:  My understanding is

18:51:16 20     that the ruling was that the termination was

21     relevant.  But why is the process and where the

22     board members lived and how engaged they were as

23     board members relevant?

24             ATTORNEY EDDY:  I'm asking questions that

18:51:27 25     relate to the matters that are relevant to this --

1   this lawsuit; so I won't have a lot more on this

2   topic.  And we're not going to keep the witness

3   beyond time that's been allotted to us.

4              ATTORNEY AGNOLUCCI:  Okay.

18:51:39  5              So it sounds like the only basis of

6   relevance is that they relate generally to the

7   termination, these questions.

8              ATTORNEY EDDY:  They relate to the

9   termination, yes.

18:51:52  10  BY ATTORNEY EDDY:

11      Q.   Helen Toner was associated with Open

12  Philanthropy at some point.

13              Do you recall that?

14              ATTORNEY AGNOLUCCI:  Same objections.

18:52:00  15              THE WITNESS:  I have vague knowledge of

16  that.

17  BY ATTORNEY EDDY:

18      Q.   Is Open Philanthropy, in turn, associated

19  with Holden Karnofsky?

18:52:08  20      A.   I believe that to be the case -- or at

21  least used to be case at some point.

22      Q.   And Holden Karnofsky is married to Daniela

23  Amodei?

24      A.   Yes.

18:52:12  25              ATTORNEY AGNOLUCCI:  Same objections about

1   relevance.  Waste of time.  Not within the scope of

2   the magistrate's ruling.

3            ATTORNEY EDDY:  Very much disagree.

4   BY ATTORNEY EDDY:

18:52:24   5        Q.   The -- Daniela Amodei is married to Dario

6   Amodei; is that right?

7        A.   No.

8        Q.   Sorry, the sister.  Definitely not

9   married.

18:52:33   10           They are -- they are brother and sister;

11   is that right?

12       A.   Yes, that's right.

13       Q.   And they are both with Anthropic; is that

14   right?

18:52:38   15       A.   Yes, that's right.

16       Q.   Holden Karnofsky is also associated with

17   Anthropic?

18       A.   I don't know if that's definitely the

19   case.  I have some -- I believe it was the case at

18:52:48   20  least at some point.

21       Q.   Okay.

22           Do you recall in October 2023 Helen Toner

23   publishing an article criticizing OpenAI?

24       A.   I do recall.

18:52:58   25       Q.   What -- what do you recall about that?

1          A.   I don't -- I don't recall the nature of

2     the criticism, but I recall it was praising

3     Anthropic.

4          Q.   And what was your reaction to that

18:53:08  5     article?

6          A.   I found it a strange article.

7          Q.   Why?

8          A.   I found it a strange thing for her to do.

9          Q.   Did you think it was appropriate for her

18:53:18 10     to do as a board member of OpenAI?

11          A.   I thought it was not far from obviously

12     inappropriate.

13          Q.   Did -- did you discuss with anyone the

14     prospect of Helen being asked to leave the board

18:53:31 15     at -- at that time?

16          A.   Yes.

17          Q.   What do you remember about that?

18          A.   I discussed it, at least, with Sam.

19          Q.   And what was that discussion?

18:53:37 20          A.   Something to the effect of -- I don't

21     remember the specifics.

22          Q.   Did you support removing Helen Toner from

23     the board or asking her to leave?

24               ATTORNEY AGNOLUCCI:  Same line of

18:53:47 25     objections about relevance, waste of time, scope of

MUSK v
ALTMAN

Highly Confidential

Ilya Sutskever
October 01, 2025

307

1    the magistrate's order.

2            THE WITNESS:  At least at one point, I

3    expressed support.

4    BY ATTORNEY EDDY:

18:53:58  5        Q.   After Sam was removed, do you recall Helen

6    Toner telling employees that allowing the company to

7    be destroyed would be consistent with the mission?

8            A.   I do recall.

9            Q.   And what was the context of that comment?

18:54:12 10        A.   The executives -- it was a meeting with

11    the board members and the executive team.  The

12    executives told the board that, if Sam does not

13    return, then OpenAI will be destroyed, and that's

14    inconsistent with OpenAI's mission.

18:54:29 15            And Helen Toner said something to the

16    effect of that it is consistent, but I think she

17    said it even more directly than that.

18            Q.   More directly than you've related here?

19            A.   Yes.

18:54:40 20        Q.   Okay.

21            And what was your reaction to that?

22            A.   I don't remember my reaction at the time.

23            Q.   Did you think that would be consistent

24    with the mission?

18:54:54 25            ATTORNEY AGNOLUCCI:  Object to form.

MUSK v
ALTMAN
Highly Confidential
Ilya Sutskever
October 01, 2025

308

1          THE WITNESS:  I could imagine hypothetical

2     extreme circumstances that answer would be "Yes";

3     but at that point in time, the answer was definitely

4     "No" for me.

18:55:08  5     BY ATTORNEY EDDY:

6          Q.   I wanted to just ask a few questions about

7     this document that --

8          A.   Yes, please.

9          Q.   -- you prepared --

18:55:15 10        A.   Yes.

11         Q.   -- Exhibit 19.

12         A.   Yes.

13         Q.   Did -- did you show the final document

14    that -- this document here, Exhibit 19, to Mira

18:55:25 15   Murati?

16         A.   I think it is possible and likely, but I

17    don't have a definite recollection.

18         Q.   Okay.

19              And did you show it to anybody else at

18:55:33 20   OpenAI before conveying it to the board with the

21    disappearing link?

22         A.   No.

23         Q.   I want to just look at page 529, the

24    second page in.

18:55:49 25        A.   Yes.

1      Q.   And you say here there's reason to believe

2   that Sam was removed from YC in the past for a

3   reason similar to the one that you identify in this

4   document?

18:56:01  5      A.   Yes.

6      Q.   And you say:

7           [As Read]  Sam was pushed out from YC

8           for similar behaviors.  He was creating

9           chaos, starting lots of new projects,

18:56:12  10           pitting people against each other, and

11           thus was not managing YC well.

12           Am I right the basis for this is a

13   conversation that Mira had with Brad Lightcap?

14           ATTORNEY AGNOLUCCI:  Object to form.

18:56:24  15           THE WITNESS:  The basis of this is a

16   conversation that I had with Mira.

17   BY ATTORNEY EDDY:

18      Q.   I see.

19           And did -- did -- was Mira relating to you

18:56:36  20   a conversation she had had with Brad Lightcap?

21      A.   That's what it -- that's what this text

22   says.

23      Q.   Did you speak to Brad Lightcap?

24      A.   No.

18:56:44  25      Q.   Okay.

1          So this information came only from Mira?

2     A.   Yes.

3     Q.   Did you -- did you seek to verify the

4  information with Brad?

18:56:53  5     A.   No.

6     Q.   You also write here at the bottom:

7          [As Read]  Interestingly, it is my

8          understanding that Greg has -- was

9          essentially fired from Stripe as well.

18:57:04 10     A.   Yes.

11     Q.   What was the basis for that allegation?

12     A.   Mira told me.

13     Q.   Did you seek to verify it with Greg?

14     A.   No.

18:57:14 15     Q.   Why not?

16     A.   It didn't occur to me.

17     Q.   Why didn't it occur to you?

18          ATTORNEY AGNOLUCCI:  Object to form.

19          THE WITNESS:  I -- it just didn't.

18:57:27 20  BY ATTORNEY EDDY:

21     Q.   Okay.

22     A.   I thought that -- I fully believed the

23  information that Mira was giving me.

24     Q.   If you go to page 531, this is the -- a

18:57:41 25  page you reviewed with Mr. Molo earlier.

         1          A.   Yes.

         2          Q.   It's the section entitled lying -- "Lying

         3   to Mira About Jason's Opinion About the DSB."

         4          A.   Yes.

18:57:52 5          Q.   The screenshot -- am I right?  The

         6   screenshots in this section all came from Mira?

         7          A.   Correct.

         8          Q.   Did you -- and -- and there are references

         9   here to Jason.  Obviously, Jason Kwon.

18:58:04 10         A.   Yes.

         11         Q.   By the way, are you sure he was general

         12   counsel at the time?

         13         A.   I do not remember his title at the time.

         14         Q.   Okay.

18:58:11 15              Did you speak to Jason about --

         16         A.   No.

         17         Q.   -- the Turbo matter?

         18         A.   No.

         19         Q.   Do you know whether, in fact, Jason was

18:58:24 20   disturbed by his discussions with Sam about this?

         21              ATTORNEY AGNOLUCCI:  Object to form.

         22              THE WITNESS:  I got this information from

         23   Mira, and I believed it.

         24   BY ATTORNEY EDDY:

18:58:44 25         Q.   Do you know whether GPT-4 Turbo actually

1    went through the DSB?

2         A.   I don't know.

3         Q.   And do you know whether Sam supported or

4    opposed it going through the DSB?

18:59:04  5    A.   I --

6              In hindsight, I realize that I didn't know

7    it.  But back then, I thought I knew it.  But I knew

8    it through secondhand knowledge.

9         Q.   I see.

18:59:28 10             And you've since learned facts that the

11   have changed your view?

12        A.   No.

13        Q.   Okay.

14        A.   Instead I've -- I've learned the critical

18:59:41 15   importance of firsthand knowledge for matters like

16   this.

17        Q.   Do you think it was a mistake to rely on

18   secondhand knowledge?

19             ATTORNEY AGNOLUCCI:  Object to form.

18:59:49 20             THE WITNESS:  I think secondhand knowledge

21   can be very useful, but I think that secondhand

22   knowledge is an invitation for further

23   investigation.

24   BY ATTORNEY EDDY:

18:59:59 25        Q.   For what?

 1          A.    For further --

 2          Q.    Investigation?

 3          A.    -- investigation or exploration.

 4          Q.    At a number of points in your document,

19:00:06  5   you suggest that the reader or the board may want to

 6   talk to certain people.

 7          A.    Yes.

 8          Q.    And one of those, I think, is Bob McGrew;

 9   right?

19:00:18 10        A.    Yes.

11          Q.    And you suggest talking to Nick Ryder too;

12   right?

13          A.    Yes.

14          Q.    Were those suggestions not followed

19:00:29 15   through on?

16          A.    I don't know.

17          Q.    Did you have any discussion with the other

18   board members about following through on those

19   suggestions?

19:00:38 20        A.    No.

21          Q.    Okay.

22                Can you turn to page 540, please.

23          A.    Yeah.

24          Q.    This is -- sorry.

19:01:04 25        A.    Okay.

         1        Q.   This is the section entitled "Pitting

         2   People Against Each Other."

         3             Do you see that?

         4        A.   Yes.

19:01:08  5        Q.   And turning on the next page, you see an

         6   example that's offered is "Daniela versus Mira"?

         7        A.   Yes.

         8        Q.   Is "Daniela" Daniela Amodei?

         9        A.   Yes.

19:01:23 10        Q.   Who told that you Sam pitted Daniela

        11   against Mira?

        12        A.   Mira.

        13        Q.   In the section below that where it says

        14   "Dario versus Greg, Ilya" --

19:01:35 15        A.   Yes.

        16        Q.   -- you see that?

        17        A.   Yes.

        18        Q.   The complaint -- it says -- you say here

        19   that:

19:01:42 20             [As Read]  Sam was not taking a firm

        21             position in respect of Dario wanting to

        22             run all of research at OpenAI to have Greg

        23             fired -- and to have Greg fired?

        24             Do you see that?

19:01:53 25        A.   I do see that.

1      Q.   And "Dario" is Dario Amodei?

2      A.   Yes.

3      Q.   Why were you faulting Sam for Dario's

4  efforts?

19:02:04   5           ATTORNEY AGNOLUCCI:  Same objection to

6  form.  Relevance.  Waste of time.  Outside the scope

7  of the magistrate's order.

8           THE WITNESS:  So my recollection of what I

9  wrote here is that I was faulting Sam for not

19:02:24  10  accepting or rejecting Dario's conditions.

11  BY ATTORNEY EDDY:

12      Q.   Did you think Dario's conditions were

13  fair?

14           ATTORNEY AGNOLUCCI:  Same objections.

19:02:49  15           THE WITNESS:  I don't have precise enough

16  knowledge of Dario's conditions, but my overall

17  sense is that they were not fair and that Sam

18  should've rejected them outright.

19  BY ATTORNEY EDDY:

19:03:01  20      Q.   At page 542, you see there's a reference

21  to Peter Welinder --

22      A.   Yes.

23      Q.   -- as a witness.

24           Did you ever speak to him or did anybody

19:03:16  25  else on the board speak with him about these

     1   matters?

     2        A.   Not to my knowledge.

     3        Q.   And then at -- at 548, this is the -- the

     4   beginning of the Jakub story.

19:03:45  5        Am I pronouncing that right?  Jakub?

     6        A.   Yes.

     7        Q.   And you say:

     8             [As Read]  Involves Sam lying,

     9             undermining Mira, undermining Ilya, and

19:03:52 10             pitting Jakub against Ilya.  Joint work

    11             with Greg and Jakub?

    12             What was the lying in the episode -- by

    13   Sam in the episode involving Jakub?

    14             ATTORNEY AGNOLUCCI:  Same objections to

19:04:04 15   form.  Relevance.  Waste of time.  Outside the scope

    16   of the magistrate's order.

    17             THE WITNESS:  Sam was telling me and Jakub

    18   conflicting things about the way the company would

    19   be run.

19:04:19 20   BY ATTORNEY EDDY:

    21        Q.   And you perceived that as lying?

    22             ATTORNEY AGNOLUCCI:  Object to form.

    23             We're now bordering on harassing the

    24   witness, and I am going to shut it down.

19:04:32 25             ATTORNEY EDDY:  I don't think that's fair

1  at all.  This is squarely within the -- the

2  examination that's been conducted already and -- and

3  that is within the scope of the discovery that the

4  plaintiffs have sought.

5          ATTORNEY AGNOLUCCI:  Well, the reasons for

6  Sam's termination have been made clear.  These are

7  granular details of examples.  And with the limited

8  time that we have and their very attenuated

9  relevance to the termination, let alone to this

10  lawsuit, I -- I think we're wasting time here and --

11  and we should move on.

12          ATTORNEY EDDY:  I do not have a lot

13  left -- so you'll be glad to hear that -- on this.

14  BY ATTORNEY EDDY:

15      Q.   I want to turn to 564, please.

16      A.   Yes.

17      Q.   You see this is entitled "Subtle

18  Retaliation in Response to Mira's Feedback."

19      A.   564, okay.

20      Q.   Yeah.

21      A.   Yes.

22      Q.   And there's discussion of Diane Yoon

23  having been present for meetings with Mira and Sam.

24          Do you see that?

25      A.   Yes, I do.

 1        Q.   Did you speak to Diane Yoon about the

 2   events discussed in these pages?

 3        A.   No.

 4        Q.   And -- and why not speak to any of these

 5   individuals who are named?

 6        A.   It didn't occur to me.

 7        Q.   And you don't recall any discussion with

 8   any of the other board members about speaking with

 9   any of these individuals?

10        A.   Correct.

11        Q.   And then could you look at page 570.

12        A.   Yes.

13        Q.   These are -- this is a screenshot of texts

14   between Greg and Sam.

15        A.   Yes.

16        Q.   How did you get those?

17        A.   I don't remember.

18        Q.   Did they come from Mira Murati?

19        A.   Oh, I think they came from Mira Murati,

20   yes.

21        Q.   Okay.

22             And same with this screenshot that you

23   reviewed with Mr. Molo earlier of Mira's -- this is

24   at pages 565 and 566 -- of Mira's review of Sam?

25        A.   Yes.

1          Q.   Okay.

2               During November 2023, did any board member

3     receive outreach from Anthropic?

4          A.   I don't have direct confirmation of that.

19:06:57  5     Q.   Do you have -- did you hear that anybody

6     had gotten a reach-out from Anthropic?

7               ATTORNEY AGNOLUCCI:  Object to form.

8               THE WITNESS:  I don't -- I did not.

9               I have heard speculation, but I have not

19:07:10 10    heard anything definitive.

11    BY ATTORNEY EDDY:

12         Q.   Do you know whether a proposal was made

13    around that time for OpenAI to merge with Anthropic?

14         A.   I do know that.

19:07:17 15    Q.   Tell me about that.

16         A.   I don't -- I don't know whether it was

17    Helen who reached out to Anthropic or whether

18    Anthropic reached out to Helen.  But they reached

19    out with a proposal to be merged with OpenAI and

19:07:31 20   take over its leadership.

21         Q.   When was that?

22         A.   On Saturday.

23         Q.   Saturday, November 18th?

24         A.   That must be the day.

19:07:37 25    Q.   The day -- was it short -- shortly after

1    the removal of Sam and Greg?

2         A.   Yes.  It was before -- it was either on

3    Saturday or on Sunday.  It was not on Monday.

4         Q.   And how did you hear about that?

19:07:50  5    A.   Because there was a board call with Helen

6    and the other board members where she told us about

7    it.  There has been a subsequent call with the

8    leadership of Anthropic.

9         Q.   And were you present for that call?

19:08:05 10    A.   Yes.

11        Q.   What do you recall from that conversation?

12        A.   I recall Anthropic expressing their

13   excitement about it and expressing the issue -- the

14   practical challenges that they would have with it.

19:08:17 15    Q.   Who from Anthropic was on that call?

16        A.   I recall Dario Amodei on the call and

17   Daniela Amodei.  There would be at least one other

18   person that I don't remember.  Possibly more.

19        Q.   And what was your response to that?

19:08:27 20    A.   I was very unhappy about it.

21        Q.   Why?

22        A.   Because I really did not want OpenAI to

23   merge with Anthropic.

24        Q.   Why not?

19:08:34 25    A.   I just didn't want to.

1      Q.   And what about the other board members?
2  Were they supportive?
3      A.   They were a lot more supportive, yes.
4      Q.   Were all of them supportive?
5      A.   I think -- at the very least, none were
6  unsupportive.
7      Q.   Did anybody advocate for the merger?
8      A.   I don't remember definitively.
9      Q.   Among the board members, who struck you as
10  most supportive?
11     A.   I would say my recollection is that Helen
12  was the most supportive.
13     Q.   And what happened with the proposal?
14     A.   I believe -- my recollection is that there
15  were some practical obstacles that Anthropic has
16  raised, and so the proposal did not continue.
17     Q.   Do you know what the practical obstacles
18  were?
19     A.   No.
20     Q.   How long did those discussions with
21  Anthropic continue?
22     A.   Extremely briefly.
23     Q.   A special committee of the board was
24  formed to investigate the -- the -- the removal of
25  Sam and Greg.

          1             Do you remember that?

          2      A.   I remember.

          3      Q.   Do you have any reason to doubt the

          4   independence of Bret Taylor and Larry Summers?

19:09:42  5      A.   No.

          6           ATTORNEY AGNOLUCCI:  Object to form.

          7           THE WITNESS:  Nothing to my knowledge.

          8   BY ATTORNEY EDDY:

          9      Q.   They -- they hired a law firm, WilmerHale,

19:09:49 10   to conduct the investigation?

         11           ATTORNEY AGNOLUCCI:  Objection.

         12   BY ATTORNEY EDDY:

         13      Q.   Do you remember that?

         14      A.   I remember --

19:09:52 15           ATTORNEY AGNOLUCCI:  Lacks foundation.

         16   Calls for speculation.

         17           THE WITNESS:  I remember they hired a law

         18   firm.  I don't remember its name.

         19   BY ATTORNEY EDDY:

19:09:58 20      Q.   Okay.

         21           Did -- did they interview you?

         22      A.   Yes.

         23      Q.   And do you have any reason to question the

         24   integrity of the investigation that was undertaken?

19:10:07 25           ATTORNEY AGNOLUCCI:  Objection.  Lacks

1    foundation.

2           THE WITNESS:  At this point, I was too

3    removed from those procedures.

4    BY ATTORNEY EDDY:

19:10:22  5      Q.   So you just can't evaluate one way or the

6    other?

7        A.   Correct.

8        Q.   Okay.

9           I want to show you one more exhibit for

19:10:34 10  now.

11          Actually, I think it's been -- you have

12   it.  Exhibit 20 -- I'm sorry -- in front of you.

13       A.   20?

14       Q.   This is the article you reviewed with

19:10:47 15  Mr. Molo.

16       A.   Yeah.

17       Q.   I need our copy.

18       A.   Okay.

19          Which number did you say it is?

19:11:25 20      Q.   20.  It looks like this.

21       A.   Yeah.  I remember how it looks like.  I'm

22   having trouble finding it.

23       Q.   Do you want me to just --

24          ATTORNEY AGNOLUCCI:  Is it under the --

19:11:35 25          THE WITNESS:  Doubtful.

```
 1    BY ATTORNEY EDDY:

 2         Q.   I can hand you another copy.

 3         A.   Oh, here it is.  Here it is.  I found it.

 4         Q.   Great.

 5              Did you speak to the reporter, Keach

 6    Hagey, in connection with this article?

 7         A.   No.

 8         Q.   Do you know who did?

 9         A.   No.

10         Q.   If you turn to the page ending in 1442.

11         A.   Yes.

12         Q.   You see at the very bottom of the page, it

13    says:

14              [As Read]  Sutskever had been waiting

15              for a moment when the board dynamics would

16              allow for Altman to be replaced as the

17              CEO.

18         A.   Yes.

19         Q.   Is that -- is that correct?

20         A.   Yes.

21         Q.   And what were the dynamics you were

22    waiting for?

23         A.   That the majority of the board is not

24    obviously friendly with Sam.

25         Q.   And when -- when did that happen?
```

19:11:41 (line 5)
19:12:00 (line 10)
19:12:17 (line 15)
19:12:24 (line 20)
19:12:32 (line 25)

1        A.   When someone -- there was a sequence of

2   rapid departures from the board for different

3   reasons.  I don't remember what they were.  I don't

4   remember who exactly left, but that's what it's

19:12:47  5   referring to.

6        Q.   So for -- for how long had you been

7   planning to propose removal of Sam?

8        A.   For some time.  I mean, "planning" is the

9   wrong word because it didn't seem feasible.

19:13:09 10        Q.   It didn't seem feasible?

11        A.   It was not feasible prior; so I was not

12   planning.

13        Q.   How -- how long had you been considering

14   it?

19:13:16 15        A.   At least a year.

16             ATTORNEY AGNOLUCCI:  Object to form.

17   Relevance.  Waste of time.  Scope of magistrate

18   judge's order.

19             THE WITNESS:  That's it.

19:13:27 20   BY ATTORNEY EDDY:

21        Q.   You said at least a year?

22        A.   Yes.

23        Q.   Okay.

24             And then if you can turn to page 1444,

19:13:38 25   again, near the bottom of the page, you see it

MUSK v
ALTMAN

Highly Confidential

Ilya Sutskever
October 01, 2025

326

 1    says --

 2         A.    Yes.

 3         Q.         [As Read]   Sutskever was astounded.

 4              He had expected the employees of OpenAI to

19:13:45  5         cheer.

 6              Is that true?

 7         A.    I had not expected them to cheer, but I

 8    have not expected them to feel strongly either way.

 9         Q.    And why is that?

19:13:54 10         A.    That's what I thought.

11              ATTORNEY EDDY:   Okay.

12              I'm going to reserve the remainder of my

13    time, but I'll pass the witness to Microsoft.

14              THE WITNESS:   Okay.

19:14:05 15         ATTORNEY EDDY:   Thank you for your time.

16              THE WITNESS:   Thank you.

17              ATTORNEY COHEN:   Can we go off the record.

18              ATTORNEY AGNOLUCCI:   How much time do we

19    have left?

19:14:13 20         THE VIDEOGRAPHER:   Going off the record at

21    7:14 PM.

22              (Discussion off the record.)

23              THE VIDEOGRAPHER:   And we're back on the

24    record at 7:16 PM.

25                            ///

1             THE WITNESS:  I don't have an affirmative

2      recollection.

3      BY ATTORNEY MOLO:

4          Q.   Okay.

19:44:12    5          Is it your belief that Sam Altman will

6      have a financial interest in OpenAI someday?

7             ATTORNEY EDDY:  Objection.

8             THE WITNESS:  I recall reading about it in

9      the news, but I don't know how accurate it is.

19:44:25   10   BY ATTORNEY MOLO:

11         Q.   Okay.

12             When you left OpenAI, you resigned in May

13      of 2024; is that right?

14         A.   I don't remember, but it sounds within the

19:44:44   15   range.

16         Q.   Why did you leave?

17             ATTORNEY AGNOLUCCI:  Object to form.

18             THE WITNESS:  Ultimately, I had a big new

19      vision, and it felt more suitable for a new company.

19:44:58   20   BY ATTORNEY MOLO:

21         Q.   Okay.

22             At the time immediately prior to your

23      departure of OpenAI, did you have an equity stake in

24      the company?

19:45:09   25       A.   Yes.

1          Q.   What do you believe value of that equity

2     stake was at the time you left?

3               ATTORNEY AGNOLUCCI:  Same objection.  Same

4     instruction as before not to answer.

19:45:18  5               ATTORNEY MOLO:  Well, this is directly

6     relevant.  This is his interest in a defendant in

7     the case.  This is his interest -- his financial

8     interest.  This is -- this is -- clearly goes to the

9     issue of interest and bias.

19:45:32 10               ATTORNEY AGNOLUCCI:  I have the same

11    instruction.

12               ATTORNEY MOLO:  So you're telling him not

13    to answer a question about his interest in the

14    defendant?

19:45:38 15               ATTORNEY AGNOLUCCI:  I'm telling him not

16    to answer.

17               ATTORNEY MOLO:  -- or his financial -- let

18    me finish.  Let me finish.

19               We've heard a lot of you today; so let me

19:45:46 20    finish.

21               You're instructing the witness who has a

22    financial interest in the defendant in the case --

23    and the defendant is being sued for great sum of

24    money here -- not to answer -- not to answer the

19:46:01 25    question; is that correct?

1          I just want to make sure that it's clear

2     on record.

3          ATTORNEY AGNOLUCCI:  I'm instructing him

4     not to answer the amount of his financial interest.

19:46:11  5  He can answer whether he has an interest, but he

6     cannot quantify it.

7     BY ATTORNEY MOLO:



19     BY ATTORNEY MOLO:

19:46:47 20       Q.   Okay.

21          Do you still have a financial interest in

22     OpenAI?

23       A.   Yes.

24       Q.   Okay.

19:46:54 25       Has the amount of the interest increased

1    or decreased since you've left OpenAI?

2        A.   Increased.

3        Q.   Okay.

4             And has the value of the interest

19:47:05  5  increased or decreased since you got --

6        A.   Sorry.  Can you repeat the previous

7    question.

8        Q.   Okay.

9             So -- okay.

19:47:11 10            Okay.

11            Has the value of your interest in OpenAI

12   increased or decreased since you left OpenAI?

13       A.   Increased.

14       Q.   Okay.

19:47:19 ██████████████████████████████████████████

██████████████████████████████████████

████████████████████

18            ATTORNEY AGNOLUCCI:  Same instruction not

19   to answer.

19:47:31 20            Don't answer that.

21   BY ATTORNEY MOLO:

22       Q.   Sir?

23            ATTORNEY AGNOLUCCI:  He's not answering

24   the question.

25                        ///

     1  BY ATTORNEY MOLO:

     2      Q.   Are you refusing to answer the question?

     3           ATTORNEY AGNOLUCCI:  He's following my

     4  instruction.

19:47:44   5           ATTORNEY MOLO:  Would you please allow the

     6  witness to speak.

     7           ATTORNEY AGNOLUCCI:  I am allowing the

     8  witness to speak.

     9           ATTORNEY MOLO:  No, you're not.

19:47:48  10           ATTORNEY AGNOLUCCI:  Be courteous and

    11  respectful.

    12           ATTORNEY MOLO:  You be courteous and

    13  respectful.

    14           (Indiscernible cross-talk.)

    15           THE COURT REPORTER:  The court reporter is

    16  noting for the record that it cannot be taken due to

    17  simultaneous cross-talk.  Once counsel can continue

    18  with decorum in a professional manner, the record

    19  will resume.

    20           Let's take five.

    21           ATTORNEY MOLO:  Yeah, don't raise your

    22  voice.

    23           ATTORNEY AGNOLUCCI:  I'm tired of being

    24  told that I'm talking too much.

19:48:17  25           ATTORNEY MOLO:  Well, you are.

354

```
 1              ATTORNEY AGNOLUCCI:  Check yourself.

 2    BY ATTORNEY MOLO:

 3         Q.   Did --

 4              You announced your current company

 5    super -- Safe Superintelligence in 2024?

 6         A.   Yes.

 7         Q.   And what's the purpose of that -- that

 8    company?

 9         A.   To do a new and different kind of

10    research.

11         Q.   Okay.

12              And what does that mean exactly?

13         A.   I have a new idea of how to do things, and

14    I want to try and do them.

15         Q.   Okay.

16              Who is paying your legal fees for this --

17              ATTORNEY AGNOLUCCI:  Objection.

18    BY ATTORNEY MOLO:

19         Q.   -- for this deposition?

20              ATTORNEY AGNOLUCCI:  And instruction not

21    to answer.

22    BY ATTORNEY MOLO:

23         Q.   Are you --

24         A.   I've been instructed not to answer.

25         Q.   Okay.
```

1              Did you discuss your deposition with

2     anyone other than your lawyers prior to today?

3          A.   No.

4          Q.   When was the last time you spoke with Sam

19:49:27  5   Altman?

6          A.   A while ago.  Maybe ten months ago, a year

7     ago.  Something like this.

8          Q.   Have you ever discussed this lawsuit with

9     Sam Altman?

19:49:35 10        A.   No.

11         Q.   I'm sorry?

12         A.   No.

13         Q.   Okay.

14              Have you ever -- when was the last time

19:49:41 15   you spoke with Greg Brockman?

16         A.   Maybe a year and a quarter ago.

17         Q.   Okay.

18              Have you discussed this lawsuit with Greg

19     Brockman?

19:49:53 20        A.   No.

21              ATTORNEY AGNOLUCCI:  I'm going to withdraw

22     the objection about who's paying the legal fees.  I

23     think he can actually answer that.

24     BY ATTORNEY MOLO:

19:50:08 25        Q.   Okay.

1              Who is paying your legal fees?

2              ATTORNEY AGNOLUCCI:  If he knows.

3              THE WITNESS:  I -- I -- I'm not sure.

4    BY ATTORNEY MOLO:

19:50:14   5      Q.   Okay.

6              Okay.

7         A.   I have a guess, but I'm not 100 percent

8    sure.

9         Q.   How did you come to retain counsel?

19:50:24  10              ATTORNEY AGNOLUCCI:  That, I'm going to

11   instruct him not to answer.

12              ATTORNEY MOLO:  I'm sure you are.

13   BY ATTORNEY MOLO:

14        Q.   How -- how did you come to retain counsel?

19:50:35  15      A.   I --

16              ATTORNEY AGNOLUCCI:  Instruction not to

17   answer.

18              Do you mean in connection with this

19   lawsuit?

19:50:41  20              ATTORNEY MOLO:  Correct.

21   BY ATTORNEY MOLO:

22        Q.   I'm not asking you for privileged

23   communications between you and your lawyer.  I'm

24   just asking you how you came to retain these

19:50:52  25   lawyers.

1          ATTORNEY AGNOLUCCI:  For this lawsuit, you

2     can answer.

3               THE WITNESS:  I've been --

4               So how did it happen?

19:51:15  5          I recall -- I don't recall exactly.  I

6     believe I started working with a different lawyer in

7     Willkie.  And I'm pretty sure that -- I think my --

8     my then-girlfriend found Simona, and I reached out

9     to Simona.  That's my recollection.

19:51:33 10   BY ATTORNEY MOLO:

11        Q.   Okay.

12             Have you received any bills for legal

13    fees?

14             ATTORNEY AGNOLUCCI:  And you're asking

19:51:46 15   about this litigation?

16             ATTORNEY MOLO:  Yeah.

17             THE WITNESS:  No.

18    BY ATTORNEY MOLO:

19        Q.   You -- "No," you haven't?

19:51:51 20   A.   No.

21        Q.   Okay.

22             Is OpenAI paying your legal fees?

23        A.   I think that's probably the case.

24        Q.   Okay.

19:52:00 25        What makes you think that?

1        A.   Because I don't know who else it would be.

2        Q.   Okay.

3             Did somebody at OpenAI tell you to come

4   meet with these lawyers and hire them --

19:52:11  5        A.   No.  No.

6        Q.   Have you discussed this lawsuit with

7   anyone else at OpenAI -- excuse me, with anyone at

8   OpenAI since it was filed?

9        A.   No.

19:52:27  10        Q.   Did you discuss this deposition with

11  anyone at OpenAI?

12        A.   No.

13        Q.   Have you discussed this lawsuit with

14  anyone who's a representative of OpenAI?

19:52:53  15        A.   No.

16             ATTORNEY MOLO:  Give me just a couple of

17  minutes, and we might be done.

18             We can go off the record.

19             THE VIDEOGRAPHER:  Going off the record at

19:53:13  20  7:53 PM.

21             (A break was taken.)

22             THE VIDEOGRAPHER:  And we're back on the

23  record at 8:01 PM.

24  BY ATTORNEY MOLO:

20:00:49  25        Q.   Okay.

1          Ilya, you testified a few moments ago that

2     you believe that OpenAI may be paying your legal

3     fees; is that right?

4          A.   Yes.

20:00:57  5     Q.   Okay.

6          Are you deriving any other financial

7     benefits from OpenAI at this time?

8          A.   Nothing beyond what you've already

9     mentioned.

20:01:07  10    Q.   Okay.

11         And then other than the instructions from

12    your lawyer here today, do you believe there's any

13    reason you cannot disclose the details of your

14    financial interest in OpenAI?

20:01:18  15    A.   No.

16              ATTORNEY AGNOLUCCI:  Object to form.

17    BY ATTORNEY MOLO:

18         Q.   Okay.

20:01:23

23              ATTORNEY AGNOLUCCI:  Object to form.

24              ATTORNEY EDDY:  Objection.

20:01:33  25        THE WITNESS:  I was not aware.

1          ATTORNEY COHEN:  That has a protective

2     order.  You should withdraw the question.

3          ATTORNEY EDDY:  That's a violation of the

4     protective order.

20:01:42  5          ATTORNEY MOLO:  Well, that was certainly

6     not my intention.  I'll withdraw the question.

7          Anything else?

8          No further questions.

9          Thank you very much, Ilya.

20:01:55  10          THE WITNESS:  Okay.

11          ATTORNEY MOLO:  We have issues, though, in

12     terms of the deposition remaining open because

13     there's documents that have not been produced to us.

14     We have the issue of the Brockman report, which we

20:02:14  15     learned of today, and you possess it, and it's not

16     been produced.  And we have these issues about, you

17     know, Ilya's financial interest.

18          So this -- we're not done.

19          ATTORNEY AGNOLUCCI:  We obviously

20:02:28  20     disagree.  As for the Brockman memo, it was

21     referenced in one of the exhibits that you used in

22     your questioning.  You've known about it for some

23     time.  And perhaps you should talk to your colleague

24     who handled the meet-and-confer because the memo was

20:02:45  25     never requested.  You all were aware that it

1   existed.  You didn't ask for it, and it's not called

2   for by the requests.

3           We've had extensive meet-and-confers about

4   what we were and weren't producing.  So if you

20:03:01  5   wanted the memo, you should've asked for it before

6   today.

7           But it's clearly referenced in both the

8   exhibit that you brought today and in public

9   reporting, and the fact that you didn't know about

20:03:14 10   it before today is false.

11           ATTORNEY MOLO:  No.

12           ATTORNEY AGNOLUCCI:  In fact, you're the

13   one who mentioned it today for the first time.

14           ATTORNEY MOLO:  We mentioned it.  You're

20:03:23 15   the one that said you withheld it.  We'll take it up

16   with the court.

17           ATTORNEY AGNOLUCCI:  I don't know what you

18   mean by --

19           ATTORNEY MOLO:  We're -- we're taking it

20:03:30 20   up with the court; right?

21           ATTORNEY AGNOLUCCI:  I'm -- well, we

22   should have a record here and we should have a

23   meet-and-confer because we're not agreeing to bring

24   the witness back.

20:03:32 25           Have you spoken with your colleague Jimmy

1   who handled the meet-and-confer about what we were

2   and weren't producing about this memo?

3          ATTORNEY MOLO:  I think we're happy to

4   talk to colleagues.  We're happy to talk to you

20:03:45  5   again.  We're not done with the deposition.

6          ATTORNEY AGNOLUCCI:  I think you should

7   talk to your colleagues because we had extensive

8   meet-and-confer --

9          ATTORNEY MOLO:  I just told you.  I just

20:03:52  10   told you --

11          ATTORNEY AGNOLUCCI:  Excuse me.

12          ATTORNEY MOLO:  -- that we are happy to

13   talk to our colleagues.  All right?

14          ATTORNEY AGNOLUCCI:  We had extensive

20:03:57  15   meet-and-confer about what we would and wouldn't

16   produce.  The memo was not called for.  You never

17   asked for it.  You were aware of it.  And we didn't

18   agree to produce it because you didn't ask for it.

19          ATTORNEY MOLO:  We disagree.

20:04:09  20          ATTORNEY AGNOLUCCI:  But we're not

21   bringing the witness back.

22          ATTORNEY MOLO:  We'll see what the court

23   says.

24          ATTORNEY EDDY:  I have a matter to put on

20:04:18  25   the record, which is that it has come to our

 1   attention that many of the exhibits that plaintiffs

 2   have shown the witness have been prehighlighted.

 3          For the record, none of the highlighting

 4   appearing in the documents that are marked as

20:04:31  5   exhibits is native to those documents.

 6          ATTORNEY MOLO:  Correct.

 7          ATTORNEY EDDY:  We did not see a copy of

 8   the highlighting that was handed to the witness.  We

 9   got unhighlighted copies handed out to us during the

20:04:41 10   deposition.

11          So we reserve all rights, and we note that

12   for the record.

13          ATTORNEY COHEN:  And counsel for Microsoft

14   joins that objection.

20:04:49 15          ATTORNEY AGNOLUCCI:  And can -- just to

16   clarify your comment about financials.

17          Do you mean financial documents?

18          ATTORNEY MOLO:  I don't know what you're

19   talking about.

20:04:57 20          ATTORNEY AGNOLUCCI:  You had an objection

21   on the basis of documents that weren't produced, and

22   you said something about financials.

23          ATTORNEY MOLO:  Oh, no.  The question's to

24   Ilya about his financial interest in OpenAI.

20:05:15 25          ATTORNEY AGNOLUCCI:  Understood.  But

 1   you're not talking about any documents.

 2              ATTORNEY MOLO:  I don't know if there are

 3   documents that relate to that.

 4              ATTORNEY AGNOLUCCI:  Well, they -- they

20:05:22  5   weren't within the scope of the subpoena called for

 6   or the subject of any --

 7              ATTORNEY MOLO:  We'll take it up with the

 8   court.  That's why there's courts.

 9              ATTORNEY AGNOLUCCI:  And so last thing,

20:05:29 10   actually.  Exhibit 19.  In accordance with the

11   parties' agreement, we are going to keep the marked

12   copy of Exhibit 19.

13              If there are other copies of Exhibit 19,

14   the agreement was that, I believe, the parties can

20:05:41 15   keep it for three days and then have to return it.

16   But we're happy to take the copies now.

17              But, I guess, so that we have a clear

18   record, who has a copy of Exhibit 19?

19              ATTORNEY EDDY:  We have a copy, and we

20:06:00 20   want to meet and confer with you about the use of

21   that.

22              So let's put a pin in that if we could.

23              ATTORNEY AGNOLUCCI:  Okay.

24              And, Mr. Molo, do you all have a copy of

20:06:12 25   Exhibit 19?

1              ATTORNEY SCHUBERT:  We have three copies.

2    We will provide them to you.

3              ATTORNEY AGNOLUCCI:  Okay.

4              ATTORNEY TOFIGHBAKHSH:  You have one.

20:06:16   5    They have one of ours.  The witness has the other

6    one.  So...

7              ATTORNEY AGNOLUCCI:  I have one that's

8    marked as Exhibit 19.  I have one that was handed to

9    us, and then --

20:06:25  10             ATTORNEY SANTACANA:  The third one is down

11   there somewhere.

12             ATTORNEY AGNOLUCCI:  Counsel --

13             (Indiscernible cross-talk.)

14             (Admonition by the court reporter.)

20:06:36  15             ATTORNEY AGNOLUCCI:  Okay.  Excellent.

16             ATTORNEY SAVITT:  Can I ask what the

17   status of the -- of the confidentiality the

18   transcript is.  Has anyone designated --

19             ATTORNEY AGNOLUCCI:  We designated it at

20:06:46  20   the opening of the deposition as attorneys' eyes

21   only, highly confidential under the protective

22   order.

23             ATTORNEY SAVITT:  Thank you.

24             ATTORNEY SANTACANA:  Don't you each need

20:06:53  25   to do that for yourself?  That's for ourselves.