MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
WALTER H HAWES IV (*pro hac vice*)
ALEXANDRA C. EYNON (*pro hac vice*)
SARA TOFIGHBAKHSH (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO OPENAI DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| SAMUEL ALTMAN et al., | Date: January 7, 2026 |
| Defendants. | Time: 2:00 PM |
| | Courtroom: 1 – 4th Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | **PUBLIC REDACTED VERSION** |

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Musk has standing to bring his breach of charitable trust and constructive fraud claims as a settlor of the charitable trust.

2. Whether Musk has standing to bring his breach of charitable trust and constructive fraud claims under Cal. Corp. Code § 5142 or Cal. Bus. & Prof. Code § 17510.8.

3. Whether Musk must elect before trial between his unjust enrichment claim and his breach of charitable trust or fraud claims.

4. Whether Musk's unjust enrichment claim requires expectation of compensation.

5. Whether Musk's unjust enrichment claim is time-barred as a matter of law.

6. Whether there are genuine disputes of fact over Musk's fraud claim with respect to the existence of actionable misrepresentations, justifiable reliance, or the statute of limitations.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    A.    Musk and Altman's Formation of OpenAI as a Nonprofit ...................................... 2

    B.    Musk's Many Contributions to OpenAI ................................................................... 3

    C.    The Parties' Restructuring Discussions ................................................................... 5

    D.    Defendants' Operation of OpenAI as a For-Profit Venture ..................................... 6

    E.    Musk's Discovery of OpenAI's Plans and the Filing of This Lawsuit ................... 8

ARGUMENT ...................................................................................................................... 10

I.    Musk Has Standing To Bring Breach of Trust and Constructive Fraud Claims ................ 10

    A.    Musk Has Common Law Standing as a Settlor of the Trust ................................... 10

        1.    Musk's Common Law Settlor Standing Does Not Depend on
            Whether Musk Made His Contributions Through an Intermediary ........... 11

        2.    Musk Has Standing for Contributions Through YC.org ........................... 12

        3.    Musk Has Standing for Contributions Through His
            Donor Advised Funds ................................................................................ 14

        4.    Musk Has Standing for His Direct Contributions of Four Teslas ............... 15

        5.    Musk's Charitable Purposes Were Sufficiently Specific ........................... 15

    B.    Musk Has Statutory Standing ................................................................................. 16

        1.    Musk Has Standing Under Cal. Corp. Code § 5142 .................................. 16

        2.    Musk Has Standing Under Cal. Bus. & Prof. Code § 17510.8 .................. 18

II.    Substantial Evidence Supports Musk's Unjust Enrichment Claim ..................................... 19

    A.    Musk Need Not Elect Between Unjust Enrichment and Tort Claims ..................... 19

    B.    Musk Need Not Show Expectation of Compensation ............................................. 20

    C.    Musk's Unjust Enrichment Claim Is Not Time-Barred ......................................... 21

III.    Substantial Evidence Supports Musk's Fraud Claim ......................................................... 22

    A.    Defendants Made Actionable Misrepresentations ................................................. 22

    B.    There Are Genuine Disputes over Justifiable Reliance ......................................... 23

C.     There Are Genuine Disputes over Timeliness ........................................................ 24

CONCLUSION .............................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

Page(s)

*All. Mortg. Co. v. Rothwell*,
10 Cal. 4th 1226 (1995)......................................................................................... 7, 23, 24

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
225 Cal. App. 4th 1451 (2014) ............................................................................... 20

*Arias v. Superior Court*,
46 Cal. 4th 969 (2009)............................................................................................. 18

*Aryeh v. Canon Bus. Sols., Inc.*,
55 Cal. 4th 1185 (2013)........................................................................................... 21, 22

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015)................................................................................... 20

*In re Brooks*,
844 F.2d 258 (5th Cir. 1988)................................................................................... 11

*Carne v. Worthington*,
246 Cal. App. 4th 548 (2016) ................................................................................. 11

*Copart, Inc. v. Sparta Consulting, Inc.*,
277 F. Supp. 3d 1127 (E.D. Cal. 2017).................................................................. 22

*Crusader Ins. Co. v. Scottsdale Ins. Co.*,
54 Cal. App. 4th 121 (1997) ................................................................................... 18

*Dones v. Life Ins. Co. of N. Am.*,
55 Cal. App. 5th 665 (2020).................................................................................... 13, 14

*Dudek v. Dudek*,
34 Cal. App. 5th 154 (2019).................................................................................... 11

*Duffey v. Tender Heart Home Care Agency, LLC*,
31 Cal. App. 5th 232 (2019).................................................................................... 13

*FDIC v. Dintino*,
167 Cal. App. 4th 333 (2008) ................................................................................. 22

*Forsyth v. Rowe*,
629 A.2d 379 (Conn. 1993)..................................................................................... 12

*Gray v. First Winthrop Corp.*,
82 F.3d 877 (9th Cir. 1996)..................................................................................... 25

*Grimes v. United Parcel Serv., Inc.*,
No. C 05-01824, 2008 WL 217153 (N.D. Cal. Jan. 24, 2008) .............................. 17

*Guar. Tr. Co. of N.Y. v. N.Y. Tr. Co.*,
74 N.E.2d 232 (N.Y. 1947) ..................................................................................... 11

*Herrera v. L.A. Unified Sch. Dist.*,
    18 F.4th 1156 (9th Cir. 2021) ........................................................................................ 10

*In re Hertsberg Inter Vivos Tr.*,
    578 N.W.2d 289 (Mich. 1998) ...................................................................................... 12

*Holt v. Coll. of Ostheopathic Phys. & Surgeons*,
    61 Cal. 2d 750 (1964) .................................................................................................... 10

*Huskinson & Brown v. Wolf*,
    32 Cal. 4th 453 (2004) ................................................................................................... 21

*J.SH Sec. Indus. D.C.S., Ltd. v. Bartech Sys. Int'l, Inc.*,
    No. 20:7-cv-00277, 2010 WL 11575538 (D. Nev. Jan. 21, 2010) ................................ 17

*Kaplan v. Coldwell Banker Residential Affiliates, Inc.*,
    59 Cal. App. 4th 741 (1997) ......................................................................................... 13

*L.B. Rsch. & Educ. Found. v. UCLA Found.*,
    130 Cal. App. 4th 171 (2005) ........................................................................................ 10

*Lamb v. Cal. Water & Tel. Co.*,
    21 Cal. 2d 33 (1942) ............................................................................................... 20, 21

*Lazar v. Superior Court*,
    12 Cal. 4th 631 (Cal. 1996) .................................................................................... 19, 22

*Lectrodryer v. Seoulbank*,
    77 Cal. App. 4th 723 (2000) ......................................................................................... 20

*Lehman v. Comm'r*,
    109 F.2d 99 (2d Cir. 1940) ........................................................................................... 11

*McBride v. Boughton*,
    123 Cal. App. 4th 379 (2004) ....................................................................................... 20

*Murphy v. DirecTV, Inc.*,
    724 F.3d 1218 (9th Cir. 2013) ................................................................................ 13, 14

*In re MyFord Touch Consumer Litig.*,
    291 F. Supp. 3d 936 (N.D. Cal. 2018) .......................................................................... 23

*OCM Principal Opportunities Fund v. CIBC World Markets Corp.*,
    157 Cal. App. 4th 835 (2007) ....................................................................................... 23

*Patterson v. Domino's Pizza, LLC*,
    60 Cal. 4th 474 (2014) ........................................................................................... 13, 14

*Pinkert v. Schwab Charitable Fund*,
    48 F.4th 1051 (9th Cir. 2022) ................................................................................. 14, 15

*Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*,
    29 Cal. App. 5th 230 (2018) ............................................................................. 19, 20, 21

*Ruocco v. Bateman, Eichler, Hill, Richards, Inc.*,
  903 F.2d 1232 (9th Cir. 1990) ............................................................................................. 11

*SEC v. Seaboard Corp.*,
  677 F.2d 1301 (9th Cir. 1982) ............................................................................................. 24

*Security-First Nat'l Bank of L.A. v. Wright*,
  47 Cal. App. 2d 787 (1941) ................................................................................................. 11

*SVF II Aggregator (DE) LLC v. Shafi*,
  No. 23-cv-03834-YGR, 2024 WL 3324623 (N.D. Cal. May 2, 2024) .................................. 20

*Tanforan v. Tanforan*,
  173 Cal. 270 (1916) ............................................................................................................. 19

*Tenzer v. Superscope, Inc.*,
  39 Cal. 3d 18 (1985) ............................................................................................................ 20

*Thompson ex rel. Thorp Family Charitable Remainder Unitrust v. Federico*,
  324 F. Supp. 2d 1152 (D. Or. 2004) .................................................................................... 22

*Water Audit Cal. v. Merced Irrig. Dist.*,
  111 Cal. App. 5th 1147 (2025) ............................................................................................ 22

*Welborne v. Ryman-Carroll Found.*,
  22 Cal. App. 5th 719 (2018) ................................................................................................ 20

*Williams v. Marshall*,
  37 Cal. 2d 445 (1951) .......................................................................................................... 19

## STATUTES AND RULES

Cal. Bus. & Prof. Code § 17510.6 ............................................................................................ 18

Cal. Bus. & Prof. Code § 17510.8 ............................................................................. 16, 18, 19

Cal. Civ. Code § 2330 ..................................................................................................... 13, 14

Cal. Code Civ. Proc. § 338(d) ................................................................................................ 24

Cal. Code Civ. Proc. § 343 ...................................................................................................... 21

Cal. Corp. Code § 5142 ........................................................................................................... 16

Cal. Corp. Code § 5142(a) ...................................................................................................... 17

Cal. Corp. Code § 5142(a)(4) ................................................................................................. 17

Fed. R. Civ. P. 56(a) ............................................................................................................... 10

N.D. Cal. Civ. L.R. 7-9(b) ....................................................................................................... 10

## OTHER AUTHORITIES

George T. Bogert et al., *Law of Trusts and Trustees* § 41 (3d ed. rev. 2025) ............................... 12

Judicial Council of California Civil Jury Instructions No. 375 (2025 ed.) ................................... 20

Restatement (Third) of Agency § 1.01 (2006)................................................................ 13

Restatement (Third) of Agency § 1.02 (2006)................................................................ 13

Restatement (Third) of Restitution § 11 cmt. b illus. 5 (2011)....................................... 21

Restatement (Third) of Restitution § 34 cmt. c illus. 7 (2011)....................................... 21

Restatement (Third) of Restitution § 43 cmt. b (2011)................................................... 21

Restatement (Third) of Trusts § 28 cmt. a (2003) ......................................................... 16

Restatement (Third) of Trusts § 28 cmt. g (2003) ......................................................... 15

Restatement (Third) of Trusts § 28 cmt. h (2003) ......................................................... 15

Restatement (Third) of Trusts § 28 cmt. i (2003) .......................................................... 16

Restatement (Third) of Trusts § 28 cmt. j (2003) .......................................................... 16

Restatement (Third) of Trusts § 28 cmt. k (2003) ......................................................... 16

Restatement (Third) of Trusts § 28 cmt. *l* (2003) ........................................................ 16

Restatement (Third) of Trusts § 58 cmt. f (2003)........................................................... 12

Restatement (Third) of Trusts § 93 (2012)..................................................................... 19

Restatement (Third) of Trusts § 94 (2012)..................................................................... 10

Restatement (Third) of Trusts § 94(2) (2012) ................................................................ 10

Restatement (Third) of Trusts § 94 cmt. g (2012) .......................................................... 10

Austin W. Scott et al., *Scott and Ascher on Trusts* § 156.3
(5th ed., Wolters Kluwer 2010)...................................................................................... 11

4 Witkin, *California Procedure: Pleading* § 418 (6th ed. 2025) .................................... 19

**INTRODUCTION**

Plaintiff Elon Musk contributed $38 million to OpenAI – roughly ██% of the nonprofit's early funding.  He also contributed countless non-monetary benefits, including prestige and reputation that gave the nonprofit instant credibility with recruits and business partners.  Musk made those contributions on the understanding that OpenAI was and would remain a nonprofit dedicated to the public good.  But once Musk left the nonprofit, his co-founders reinvented OpenAI as a get rich quick scheme, selling out the nonprofit for personal gain.

OpenAI now seeks to deny Musk any remedy for that misconduct based on technicalities.  It asserts that Musk lacks standing to sue for breach of charitable trust or constructive fraud because Musk made most of his contributions indirectly – some through his personal donor advised funds ("DAFs") and others through the fiscal sponsor YC.org that OpenAI designated to receive contributions on its behalf while it waited for the IRS to approve its own tax exemption.

Those arguments are meritless.  This Court has already ruled that the "settlor" of a trust has standing to sue.  Dkt. 121 at 15 n.11.  Musk was the settlor of his contributions to OpenAI, whether he made them directly or through intermediaries.  Moreover, YC.org acted as OpenAI's agent – and the DAFs acted as Musk's agents – when they processed charitable contributions.  OpenAI's insistence that those intermediaries exercised independent discretion over donations is a fiction based on generic terms in written policies and program guidelines that do not track the actual role those intermediaries played.  Longstanding California case law makes clear that language in contracts or other documents that purports to describe the parties' relationship is not grounds for summary judgment when other evidence shows that the true facts are otherwise.

OpenAI fares no better challenging the unjust enrichment and fraud claims.  Musk can pursue his unjust enrichment claim in the alternative to his tort claims.  And OpenAI's "expectation of compensation" requirement purports to impose an arbitrary limitation on a cause of action that California law frames in conspicuously broad and flexible terms.  Finally, OpenAI's challenge to the fraud claim rests on factual disputes that are plainly questions for the jury.

OpenAI's motion should be denied.  This case should proceed to trial.

---

## BACKGROUND

### A.    Musk and Altman's Formation of OpenAI as a Nonprofit

In 2015, Musk harbored deep concerns about artificial intelligence.  For-profit companies like Google, he worried, were not "taking AI safety seriously."  Ex. 1 (Musk Tr.) at 22:5-23:3.  Musk believed that AI should be pursued instead by a nonprofit that would develop AI safely for the benefit of humanity as a whole.  *Id.*

Musk thought he had found kindred spirits in Sam Altman and Greg Brockman.  Over several months, the three of them discussed setting up a new nonprofit to pursue AI research for the public good.  Throughout those discussions, Altman and Brockman reassured Musk that they shared his priorities.  In May 2015, for example, Altman proposed that they "structure [the entity] so that the tech belongs to the world via some sort of nonprofit."  Ex. 2.  He later added:  "The technology would be owned by the foundation and used 'for the good of the world,' " and "safety should be a first-class requirement."  Ex. 3.  Musk "[a]gree[d] on all."  *Id.*; Ex. 1 (Musk Tr.) at 23:9-27:19.  Brockman similarly wrote that the "organization needed to be a non-profit, without any competing incentives to dilute its mission," "to ensure that AI was beneficial."  Ex. 4 at 4-5.

Altman proposed that Musk be the nonprofit's primary financial supporter.  Ex. 5.  Musk responded that "governance" was "critical," because he "[did]n't want to fund something that goes in what turns out to be the wrong direction."  *Id.*  Musk proposed "[d]oing this as an independent, pure play 501c3, but with a crystal clear focus on the positive advent of strong AI distributed widely to humanity."  Ex. 6 at 2.  Altman agreed that "an independent 501c3 is correct."  *Id.*

Based on those understandings, the parties founded OpenAI as a nonprofit in December 2015.  OpenAI's Delaware certificate of incorporation states that the nonprofit's purpose is "to provide funding for research, development and distribution of technology related to artificial intelligence," that "[t]he resulting technology will benefit the public," and that "[t]he corporation is not organized for the private gain of any person."  Ex. 7 at 1.  OpenAI's California charitable registration similarly states that the nonprofit's goal is to promote "research activities that advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return," and that OpenAI "wants to help the world build safe AI

2

1   technology and ensure that AI's benefits are as widely and evenly distributed as possible." Ex. 8 at

2   2. OpenAI's public blog post announcing its launch – carefully crafted by Musk, Altman, and

3   Brockman – reiterated that, "[s]ince our research is free from financial obligations, we can better

4   focus on a positive human impact." Ex. 9 at 1.

5           **B.      Musk's Many Contributions to OpenAI**

6           Over several years, Musk contributed money, time, assistance, advice, and credibility to

7   make OpenAI a success. Ex. 1 (Musk Tr.) at 51:20-53:13; Ex. 10 (Wazzan Rep.) ¶¶ 72-92. Musk

8   made those contributions on the understanding that OpenAI would remain a nonprofit dedicated to

9   the public good. Ex. 1 (Musk Tr.) at 54:5-15, 266:15-20, 285:14-286:24.

10          Musk's monetary contributions totaled approximately $38 million. Ex. 11 at 29-31 (Musk

11  Supplemental Interrogatory Response); Ex. 12 (OpenAI IRS Form 990 schedules of contributors).

12  Those contributions included five quarterly grants of $5 million each in 2016 and 2017. Ex. 11 at

13  29-31; Ex. 13; Ex. 14 (Birchall Tr.) at 75:8-78:22. They also included $12.7 million to pay

14  OpenAI's rent at the Pioneer building from September 2016 to September 2020. Ex. 11 at 29-31;

15  Ex. 15 at 1-2; Ex. 14 (Birchall Tr.) at 78:11-14, 79:2-6. And they included four Teslas that Musk

16  contributed for four key OpenAI employees "in appreciation for what [they've] done to get OpenAI

17  to where it is today." Ex. 16; *see* Ex. 14 (Birchall Tr.) at 51:5-15; Ex. 12 at -6061, -5433.[1]

18          During OpenAI's early years, Musk made contributions through OpenAI's temporary fiscal

19  sponsor, YC.org. Ex. 11 at 29-31; Ex. 69. OpenAI directed donors to use that entity as a conduit

20  because OpenAI had not yet obtained its own 501(c)(3) status. Ex. 14 (Birchall Tr.) at 175:3-15;

21  Ex. 17 at -121-22; Ex. 18 at 1. OpenAI told donors that the contributions would be passed on to

22  OpenAI. Ex. 14 (Birchall Tr.) at 58:9-60:13, 175:16-176:7; Ex. 17 at -120 ("YC.org . . . will be the

23  entity to which the donations are made, and YC.org will then be able to issue project grants to

24  OpenAI."); *id.* at -131 ("YC.org is the fiscal sponsor of a charitable program known as 'The OpenAI

25  Artificial Intelligence Research Program' that is currently being conducted by OpenAI, Inc.").

27  [1] OpenAI incorrectly asserts that Musk's rent contributions also paid for Neuralink's rent. OpenAI
    Mem. at 3. In fact, Neuralink reimbursed OpenAI for its portion of the rent under a cost-sharing
28  agreement. Ex. 19.

1   ***OpenAI described those contributions as*** ████████████ ***on its tax forms.*** Ex. 12 at -4698,

2   -6061 ("████████████████████████████████████████████").

3       Musk made approximately two-thirds of his contributions ($27 out of $38 million) through

4   charitable vehicles known as donor advised funds ("DAFs") administered by Vanguard or Fidelity.

5   Ex. 11 at 29-31.  All the funds in the DAFs came from Musk, either directly or through his private

6   foundation. Ex. 14 (Birchall Tr.) at 170:24-171:1, 172:6-9.  When contributions were made through

7   the DAFs, Musk was the one who decided to make the contributions.  *Id.* at 171:14-22.  "[Musk]

8   would say that a donation needed to be made," and his personal financial advisor would then

9   "consult on the best vehicle through which to make the donation" and "give the mandate to execute

10  the donation."  *Id.* at 171:23-172:5; *e.g.*, Ex. 20; Ex. 21; Ex. 22; Ex. 23.  The DAFs never once

11  refused to make a contribution to OpenAI that Musk directed.  Ex. 14 (Birchall Tr.) at 172:10-17.

12  They never made a contribution without Musk's authorization or direction either.  *Id.* at 172:18-22.

13  Over the span of ten years, there was only a single instance involving ***any*** payee where a DAF did

14  not make a contribution Musk had directed – in that case, because Musk inadvertently attempted to

15  donate to an entity that turned out not to be a real charity.  *Id.* at 172:23-174:24.  Once again, ***OpenAI***

16  ***described the DAF payments as*** ████████████ ***on its tax forms.***  Ex. 12 at -6061 ("████████

17  ████████████████████████████").

18      While most of Musk's contributions to OpenAI were made through YC.org or the DAFs,

19  some were not.  Musk personally donated the four Teslas (and a related upgrade) directly to OpenAI.

20  Ex. 11 at 29-31; Ex. 12 at -6061, -5433.

21      Overall, Musk's financial contributions accounted for about ██% of OpenAI's funding from

22  its formation through the end of 2017.  Ex. 12.  In sharp contrast to Musk's $38 million, Altman

23  contributed only $██ million to OpenAI.  *Id.* at -4698.  Brockman ████████████████████.  Ex.

24  24 (Brockman Tr.) at 65:15-22.

25      Musk also made innumerable non-monetary contributions.  Ex. 10 (Wazzan Rep.) ¶¶ 75-92.

26  Musk played a key role in recruiting top talent, such as OpenAI's Chief Scientist Ilya Sutskever.  Ex.

27  25 (Sutskever Tr.) at 26:3-31:15 (Sutskever was "████████████████████████████████████

28  ████████████");  *id.* at 35:4-36:6, 40:6-48:16; Ex. 1 (Musk Tr.) at 45:3-48:18.  Other recruits similarly

4

1    joined because of ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 26 at 1 ("▮▮▮▮▮▮▮▮▮▮▮▮▮."); Ex.

2    27 (Murati Tr.) at 20:5-21:9 (Murati "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 24 (Brockman Tr.) at 49:5-53:3.

4         Musk provided essential guidance to the fledgling company, teaching his co-founders

5    "everything [he] knew about creating a successful start-up." Ex. 1 (Musk Tr.) at 43:17-25; *see also*

6    Ex. 25 (Sutskever Tr.) at 45:10-58:4 (Musk "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮"); Ex. 28 (citing Musk's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 29 ("▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); Ex. 30; Ex. 31. Musk used

9    his business contacts to secure critical opportunities, including discounted compute from Microsoft

10   and first-of-its-kind hardware from Nvidia. Ex. 1 (Musk Tr.) at 43:17-25; Ex. 32 (Nadella Tr.) at

11   27:17-28:6; Ex. 33; Ex. 34. Musk's prestige and reputation gave OpenAI immense credibility. Ex.

12   10 (Wazzan Rep.) ¶¶ 75-84; Ex. 1 (Musk Tr.) at 44:22-25.

13        Altman acknowledged "how critical [Musk's] early contributions to OpenAI [we]re" and

14   "[did]n't think OpenAI would have happened without [Musk]." Ex. 35; Ex. 36. Even in his

15   deposition in this litigation, Altman admitted that Musk's contributions were ▮▮▮▮▮ Ex. 37

16   (Altman Tr.) at 163:1-5.

17        **C.    The Parties' Restructuring Discussions**

18        In 2017, OpenAI's founders became concerned that developing artificial general intelligence

19   would require more resources than a nonprofit could raise through charitable donations. Ex. 38.

20   They discussed numerous ideas, including creating a for-profit arm for OpenAI, collaborating with

21   an existing company, or restructuring in some other manner. Ex. 1 (Musk Tr.) at 70:6-72:15, 78:18-

22   79:14, 95:8-16. Musk insisted that any new entity "support[] the nonprofit's mission" and that

23   OpenAI remain ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 (Musk Tr.) at 71:3-15; Ex. 39 at 3.

24        Musk's co-founders purported to share those priorities. Altman reassured Musk: "[I] remain

25   enthusiastic about the non-profit structure!" Ex. 40; *see also* Ex. 41; Ex. 42 at 1 ("Great with

26   keeping [the] non-profit and continuing to support it."). Brockman likewise claimed he "would like

27   to continue with the non-profit." Ex. 42 at 2. In November 2017, Brockman and Sutskever ▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    ███████████████████████████████████. Ex. 43 at 8-9; Ex. 24 (Brockman Tr.) at 237:14-245:9.

2    Even as late as January 2018, Brockman represented to Musk that they wanted to "[t]ry our best to

3    remain a non-profit." Ex. 44 at 2.

4         But Musk's co-founders secretly had other plans.  On November 6, 2017, █████████

5    ███████████████, Brockman admitted █████████████ that their █████████

6    ████████████████." Ex. 43 at 2; Ex. 24 (Brockman Tr.) at 229:2-233:5.  Six days later he

7    wrote: "[█████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████." Ex. 45 at

9    1. Brockman's musings reveal his true motives: "[████████████████████████████

10   ████████████████" Ex. 46; Ex. 24 (Brockman Tr.) at 218:4-219:7.  Brockman reasoned that, "

11   █████████████████████████████████████████████████" too.  Ex. 24

12   (Brockman Tr.) at 233:19-234:5.

13        Brockman privately fretted about █████████████████. "[████████████████

14   ███████████████████████████████████████████████████████████████████

15   █████████████████" Ex. 43 at 2. "[███████████████████████████████████

16   ████████████████████████████" *Id.* at 3. "[████████████████████

17   ████████████████████████████████████████████████████████████████."

18   *Id.* at 9; Ex. 24 (Brockman Tr.) at 229:2-245:23.  Despite those purported misgivings, Musk's co-

19   founders never disclosed their true plans to Musk at the time.

20        Ultimately, the founders were unable to agree on a path forward for restructuring.  Musk

21   resigned from OpenAI's board in February 2018.  Ex. 47.  Even so, unaware of his co-founders'

22   covert plans, Musk continued to support OpenAI financially, paying another $9.4 million in rent

23   over three years.  Ex. 11 at 29-31.

### D.    Defendants' Operation of OpenAI as a For-Profit Venture

25        Within weeks of Musk's departure, his co-founders began to move forward with their plans

26   to operate OpenAI as a for-profit.  They did not implement those plans in one fell swoop.  Instead,

27   they undertook them incrementally, while concealing key details from Musk and the public.

28        In March 2018, Altman ████████████████████████████████████████████████

1  ██████████████████ Ex. 48 at 2.  The following year, in March 2019, OpenAI publicly announced

2  the formation of "OpenAI LP," a for-profit affiliate that would allow investors to earn returns up to

3  specified caps, with the residual going to the nonprofit.  Ex. 49.  In July 2019, OpenAI announced

4  that Microsoft was investing $1 billion into that new entity.  Ex. 50.  Microsoft invested another $2

5  billion in March 2021, without publicly disclosing the investment.  Ex. 51 (OpenAI Tr.) at 135:19-

6  136:6; Ex. 52 (Fortune).  Microsoft then invested another $10 billion in January 2023.  Ex. 51

7  (OpenAI Tr.) at 170:13-173:4; Ex. 52 (Fortune).

8          OpenAI's bare-bones public disclosures obscured the degree to which OpenAI was

9  transforming itself into a commercial concern.  For example, Musk's co-founders secretly ████

10  ██████████████████ OpenAI transferred ████████████ " its intellectual property

11  to the for-profit and ██████████ employees.  Ex. 51 (OpenAI Tr.) at 102:12-17, 195:12-16.

12          Moreover, while OpenAI touted the profit caps as a means to ensure that the nonprofit

13  retained the ultimate economic stake, in reality OpenAI set the caps so high that ████████████

14  ██████████ – OpenAI would have to ████████████ for the nonprofit to receive its residual stake.

15  Ex. 53 (Schizer Rep.) ¶¶97-122; Ex. 51 (OpenAI Tr.) at 176:22-177:9 (admitting that investors

16  would have to earn " ████████████ before the nonprofit received any residual).  OpenAI

17  handed out lucrative profit stakes to investors without ████████████████████

18  ██████████████████ Ex. 53 (Schizer Rep.) ¶¶123-150; Ex. 51 (OpenAI Tr.) at

19  173:10-176:20; Ex. 54 ¶6.  By the time of Microsoft's $10 billion investment in 2023, for-profit

20  investments in OpenAI dwarfed charitable contributions by ████████████ Ex. 53 (Schizer

21  Rep.) ¶¶151-155; Ex. 12.  Microsoft admitted internally that, "[████████████████████

22  ███████████████████████████████████████████████████████████████████

23  ██████████ " Ex. 55 at 1.

24          OpenAI gave Microsoft an ever-increasing role in its operations.  OpenAI granted Microsoft

25  ██████████████████ " Ex. 53 (Schizer Rep.) ¶161; Ex. 51 (OpenAI Tr.) at

26  119:10-122:13.  With each investment, OpenAI gave Microsoft broader and broader ████████

27  ██████████████████ Ex. 53 (Schizer Rep.) ¶159; Ex. 51 (OpenAI Tr.) at 145:2-12,

28  182:10-184:13, 204:11-19.  And OpenAI granted Microsoft ████████████████████ Ex.

7

1   53 (Schizer Rep.) ¶¶ 66-76; Ex. 51 (OpenAI Tr.) at 154:20-158:1.  Brockman ███████

2   ███████████████████████████████ in an internal document he called ████████████

3   ████████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████ Ex. 56.

6        Altman repeatedly concealed safety process failures from OpenAI's nonprofit board to

7   advance OpenAI's commercial objectives.  Ex. 53 (Schizer Rep.) ¶¶ 82-91, 187-228; Ex. 57 (Toner

8   Tr.) at 45:11-93:3, 156:19-157:13, 316:17-318:19; Ex. 58 (McCauley Tr.) at 62:3-84:23, 128:2-

9   142:19, 288:8-291:11.  The board ultimately had such grave concerns that it fired Altman.  Ex. 59;

10  Ex. 57 (Toner Tr.) at 102:25-106:11; Ex. 58 (McCauley Tr.) at 58:18-61:24.  Microsoft promptly

11  sprung into action, offering to hire Altman and Brockman to lead a new AI division and making an

12  open offer to hire all OpenAI employees, matching their OpenAI compensation.  Ex. 60; Ex. 57

13  (Toner Tr.) at 147:11-148:16.

14       Faced with the prospect of OpenAI disintegrating, nearly all of OpenAI's independent board

15  members were forced to resign.  Ex. 57 (Toner Tr.) at 148:17-149:21.  Altman then hand-picked a

16  new board focused on loyalty and commercial priorities rather than AI safety.  Ex. 37 (Altman Tr.)

17  at 77:18-79:18; Ex. 58 (McCauley Tr.) at 256:6-258:16; Ex. 57 (Toner Tr.) at 24:25-25:8.  Microsoft

18  ████████████████████████████████████████████████████████████████████████████████

19  ████████████████████ Ex. 61; Ex. 53 (Schizer Rep.) ¶¶ 245-249.  Altman concluded by texting

20  Microsoft: "[████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████." Ex. 61 at 5 (emphasis added).

22       **E.    Musk's Discovery of OpenAI's Plans and the Filing of This Lawsuit**

23       When Musk left OpenAI in February 2018, he did not know about and could not have

24  foreseen the full extent of his co-founders' plans.  In April 2018, Altman mentioned vague plans

25  about for-profit investors to Shivon Zilis, who passed the information on to Musk.  Ex. 62.  In

26  August 2018, Altman sent Musk a proposed term sheet for OpenAI LP.  Ex. 63.  Musk did not read

27  it.  Ex. 1 (Musk Tr.) at 151:18-23.  In March 2019, Altman sent Musk a draft of the blog post

28  announcing OpenAI LP.  Ex. 64.  Altman's comments provided no details and instead downplayed

8

the entity's commercial nature: "We did this in a way where all investors are clear that they should never expect a profit." *Id.* at 1.

Musk felt "uncomfortable," but the new entity "didn't seem like a showstopper, because the profit was capped." Ex. 1 (Musk Tr.) at 142:1-143:8; *see also id.* at 164:13-23, 360:7-361:17. Over the ensuing years, however, OpenAI, "by degrees, inverted the entire . . . mission of the company, [went] from a nonprofit open source to a closed for-maximum-profit company by degrees." *Id.* at 154:4-16. After the January 2023 deal in which Microsoft invested ***$10 billion*** in OpenAI, Musk "finally came to the conclusion . . . that OpenAI was really going to become . . . a profit-maximizing, closed-source organization." *Id.* at 361:18-25; *see also id.* at 183:22-184:12, 233:8-25, 287:20-288:19.

In May 2023, Musk engaged counsel to investigate his claims by seeking OpenAI's formation documents. Ex. 14 (Birchall Tr.) at 155:25-156:18. Musk then filed this federal lawsuit on August 5, 2024. Dkt. 1. The suit seeks, among other relief, disgorgement of the wrongful gains that OpenAI and Microsoft derived from misuse of Musk's contributions. Ex. 10 (Wazzan Rep.) ¶¶40-106. On March 4, 2025, this Court denied a preliminary injunction, deeming the evidence a "toss-up," but ordered an expedited trial for March 2026. Dkt. 121 at 13; Dkt. 146.

Despite that impending trial date, Defendants plowed ahead. On September 11, 2025, OpenAI and Microsoft announced a "Memorandum of Understanding" to create a new for-profit public benefit corporation without any profit caps. Ex. 65. On October 28, 2025, OpenAI and Microsoft consummated that transaction. Ex. 66. The OpenAI nonprofit now owns only a traditional minority equity stake in the new entity that is smaller than Microsoft's stake, recently valued at ***$135 billion***. Ex. 65 at Annex A; Ex. 66.

The closing of this latest transaction has no impact on Musk's monetary claims and does not preclude the Court from awarding appropriate injunctive relief. Even now, OpenAI is plotting a trillion-dollar initial public offering for sometime in 2026. Ex. 67.

1

## ARGUMENT

2        Summary judgment is appropriate only if "there is no genuine dispute as to any material fact

3   and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must

4   view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable

5   inferences in that party's favor." *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1158 (9th Cir.

6   2021). OpenAI fails to show any basis for summary judgment here.

7

8   **I.    MUSK HAS STANDING TO BRING BREACH OF TRUST AND CONSTRUCTIVE FRAUD CLAIMS**

9        OpenAI asserts that Musk lacks standing to sue for breach of trust or constructive fraud

10  because Musk made some of his contributions through donor advised funds and other contributions

11  through YC.org – an entity that OpenAI designated to receive contributions on its behalf while it

12  waited for approval of its own nonprofit status. That argument fails. Musk has common law

13  standing as a settlor of the trust. He also has statutory standing under California law. Neither basis

14  for standing turns on the precise intermediaries through which Musk made his contributions.

15       **A.    Musk Has Common Law Standing as a Settlor of the Trust**

16       For over sixty years, California law has recognized that "person[s] having a sufficient special

17  interest" in a charitable trust may sue for breach. *Holt v. Coll. of Osteopathic Phys. & Surgeons*,

18  61 Cal. 2d 750, 753 (1964). One prime example is "donors who have directed that their

19  contributions be used for certain charitable purposes." *Id.* at 754. Consistent with *Holt*, the

20  Restatement (Third) of Trusts makes clear that "[a] suit for the enforcement of a charitable trust may

21  be maintained . . . by a settlor, or by another person who has a special interest in the enforcement of

22  the trust." Restatement (Third) of Trusts § 94(2) (2012). This Court already ruled in its preliminary

23  injunction order that "[Musk's] standing [is] sufficient as a settlor given the modern trend in that

24  direction." Dkt. 121 at 15 n.11 (citing Restatement § 94 & cmt. g).

25       OpenAI asks this Court to reconsider that ruling. OpenAI Mem. at 9-10. But it fails to make

26  the demanding showing required for what amounts to a belated motion for reconsideration. N.D.

27  Cal. Civ. L.R. 7-9(b). In any event, this Court's holding has ample support in California law. *See,*

28  *e.g.*, *L.B. Rsch. & Educ. Found. v. UCLA Found.*, 130 Cal. App. 4th 171, 180-81 (2005) (plaintiff

10

had standing as settlor even assuming he lacked contractual reversionary interest); *Carne v. Worthington*, 246 Cal. App. 4th 548, 557 (2016) (California courts "look to the Restatement Third of Trusts for guidance"); *Dudek v. Dudek*, 34 Cal. App. 5th 154, 165 n.10 (2019) (similar). OpenAI offers no reason for this Court to revisit that ruling.

OpenAI seeks to avoid this Court's ruling by arguing that Musk was not truly the "settlor" for the contributions he made through intermediaries. But that argument likewise fails.

### 1.    *Musk's Common Law Settlor Standing Does Not Depend on Whether Musk Made His Contributions Through an Intermediary*

The "settlor" of a trust is the "one who furnishes the consideration for [the] trust." *Ruocco v. Bateman, Eichler, Hill, Richards, Inc.*, 903 F.2d 1232, 1239 (9th Cir. 1990). OpenAI claims that Musk does not qualify under that definition because the DAFs and YC.org contributed his funds to OpenAI. OpenAI Mem. at 5-8. That argument ignores that the "settlor" is the person who supplies the consideration to create the trust, even if the funds flow through an intermediary.

In *Security-First National Bank of Los Angeles v. Wright*, 47 Cal. App. 2d 787 (1941), for example, the court held that a decedent wife was the settlor of a trust because she supplied the trust funds, even though "the husband transferred [the funds] to the . . . trustee." *Id.* at 789, 793. "[T]he wife furnished the consideration for the declaration of trust, and not the husband. Hence she, rather than the husband, must be deemed the settlor." *Id.* at 793.

Similarly, in *Lehman v. Commissioner*, 109 F.2d 99 (2d Cir. 1940), a case the Ninth Circuit relied on in *Ruocco*, 903 F.2d at 1239, the Second Circuit held that a decedent taxpayer was the settlor of a trust even though he contributed the funds through his brother. "A person who furnishes the consideration for the creation of a trust is the settlor, even though ***in form*** the trust is created by another." 109 F.2d at 100 (quoting Scott on Trusts § 156.3) (emphasis added).

Other cases reach similar results. *See, e.g.*, *In re Brooks*, 844 F.2d 258, 263 (5th Cir. 1988) ("The mold in which the transaction is cast does not determine who is the settlor of a trust. The person who provides the consideration for a trust is the settlor even if another person or entity nominally creates the trust."); *Guar. Tr. Co. of N.Y. v. N.Y. Tr. Co.*, 74 N.E.2d 232, 234 (N.Y. 1947) ("[T]he trust was created at the behest of Sullivan's undisclosed client, and its corpus formed from

11

securities supplied by him.  There can be no doubt that the person who furnishes the consideration for the creation of a trust is the settlor, even though, in form, the trust is created by another."); *In re Hertsberg Inter Vivos Tr.*, 578 N.W. 2d 289, 292 (Mich. 1998); *Forsyth v. Rowe*, 629 A.2d 379, 384 (Conn. 1993).  The leading treatise explains that "[t]he settlor of an express private trust is the person who, ***directly or indirectly***, causes the trust relationship to come into existence."  George Taylor Bogert et al., *Law of Trusts and Trustees* §41 (3d ed. rev. 2025) (footnote omitted) (emphasis added); *see also* Restatement (Third) of Trusts §58 cmt. f (2003) (person who "supplies part of the consideration to fund a trust . . . is ordinarily [a] settlor" whether or not that person "actually conveyed the property to the trust").

Those principles govern here.  Musk's status as a settlor depends on whether Musk supplied the consideration to create the trust.  Ample evidence supports a jury finding in Musk's favor on that issue, both for the YC.org contributions and the DAF contributions.

### 2.    *Musk Has Standing for Contributions Through YC.org*

Musk's standing is particularly clear for the $10.5 million that Musk contributed through YC.org that never went through either of his DAFs.  Ex. 11 at 29-31.  OpenAI told Musk to send those early contributions to its fiscal sponsor YC.org because the IRS had not yet approved OpenAI's own 501(c)(3) status.  Ex. 17 at -121-22; Ex. 14 (Birchall Tr.) at 175:3-15.  OpenAI repeatedly assured Musk that YC.org would pass those contributions on directly to OpenAI.  Ex. 17 at -120 ("YC.org . . . will be the entity to which the donations are made, and YC.org will then be able to issue project grants to OpenAI."); Ex. 14 (Birchall Tr.) at 58:9-19 ("[T]here was communication indicating that they would . . . be the conduit to funnel any donation that Elon were to make to YC org to ensure it made it to OpenAI."); *id.* at 175:16-176:7 ("[The donations] were going to be directly given to OpenAI for their use. . . .  [W]e had email exchanges confirming that this is exactly what the arrangement was going to be from Chris Clark and others.").

A jury could readily find that Musk was the "settlor" for those contributions.  Musk was the source of all the funds he contributed to OpenAI through YC.org.  Ex. 11 at 29-31; Ex. 14 (Birchall Tr.) at 170:24-171:1, 172:6-9.  Musk was the one who decided to make those contributions.  Ex. 14 (Birchall Tr.) at 170:8-23.  YC.org was a mere intermediary that OpenAI inserted into the process

12

to address its own delays obtaining nonprofit approval.  YC.org was not in any realistic sense the "settlor" of the OpenAI charitable trust.  Tellingly, ***OpenAI itself described the contributions as*** ▮▮▮▮▮▮▮▮▮▮ ***on its tax forms***.  Ex. 12 at -4698, -6061 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮").

Alternatively, the jury could reasonably find that YC.org was acting as an agent accepting contributions on OpenAI's behalf.  Under California law, "all the rights and liabilities which would accrue to the agent from transactions within [its authority] . . . accrue to the principal."  Cal. Civ. Code § 2330.  An agency relationship exists where "the principal maintain[s] control over the agent's actions."  *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013); *see* Restatement (Third) of Agency § 1.01 (2006).  A jury could easily find that OpenAI controlled YC.org as a mere intermediary accepting payments on its behalf.  Even absent an actual agency relationship, OpenAI certainly created the ***impression*** that YC.org was accepting funds on its behalf.  That is sufficient to create an apparent or ostensible agency relationship.  Cal. Civ. Code § 2330; *Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal. App. 4th 741, 748 (1997).

OpenAI points to language in YC.org's fiscal sponsorship agreement that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  OpenAI Mem. at 7.  But the one-page summary Musk's financial advisor received stated only that OpenAI would "use [the] funds to accomplish the charitable purposes of the approved program," defined as "'The OpenAI Artificial Intelligence Research Program' that is currently being conducted by OpenAI, Inc."  Ex. 17 at -131.  That language left no serious doubt about where the money was going.

Even if those documents supported OpenAI's position, California courts have repeatedly held that contract language purporting to describe the parties' relationship is not dispositive when other evidence shows that the parties acted in a different manner.  *See, e.g.*, *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 501 (2014) ("[T]he parties' characterization of their relationship . . . is not dispositive."); *Dones v. Life Ins. Co. of N. Am.*, 55 Cal. App. 5th 665, 685-86 (2020) ("In determining whether an agency relationship exists, '[t]he declarations of the parties in the agreement respecting the nature of the relationship created thereby are not controlling.'"); *Duffey v. Tender Heart Home Care Agency, LLC*, 31 Cal. App. 5th 232 (2019); Restatement (Third) of Agency § 1.02

13

1  (2006). Here, there is ample evidence that all parties understood and intended that YC.org was

2  accepting funds on OpenAI's behalf and would pass them on accordingly. *See, e.g.*, Ex. 14 (Birchall

3  Tr.) at 58:9-19, 175:16-176:7. Any disputes are for the jury to resolve.

4  　　　　　　　**3.**　　　***Musk Has Standing for Contributions Through His Donor Advised Funds***

5  　　　For similar reasons, Musk was the "settlor" for the $27 million he contributed to OpenAI

6  through his DAFs at Vanguard and Fidelity. Ex. 11 at 29-31. Musk supplied all the funds that he

7  contributed through those DAFs. Ex. 14 (Birchall Tr.) at 170:24-171:1, 172:6-9. The DAFs paid

8  the funds to OpenAI ***only*** because Musk directed them to do so. Ex. 14 (Birchall Tr.) at 171:14-

9  172:5; *e.g.*, Ex. 20; Ex. 21; Ex. 22; Ex. 23. The DAFs never refused to make a contribution to

10  OpenAI that Musk directed, and they never made a contribution without Musk's direction. Ex. 14

11  (Birchall Tr.) at 172:10-22. It is telling that the ***only*** occasion when the DAFs ever refused to make

12  a payment to ***any*** payee was when Musk accidentally tried to donate funds to an entity that was ***not***

13  ***actually a charity***. *Id.* at 172:23-174:24. That is the proverbial exception that proves the rule.

14  　　　Alternatively, a jury could reasonably find that the DAFs were acting as Musk's agents when

15  they made contributions on his behalf. Cal. Civ. Code § 2330; *Murphy*, 724 F.3d at 1232. The

16  DAFs made contributions to OpenAI only if and when Musk told them to do so. Ex. 14 (Birchall

17  Tr.) at 172:10-22. That evidence supports a finding of control.

18  　　　OpenAI points to language in the DAFs' written policies purporting to grant the DAFs

19  discretion over where to contribute funds. OpenAI Mem. 6. But while those written policies may

20  ***create*** a genuine dispute of fact, they do not ***eliminate*** a dispute when other evidence points the

21  other way. *See Patterson*, 60 Cal. 4th at 501; *Dones*, 55 Cal. App. 5th at 684-85. Tellingly, ***OpenAI***

22  ***itself described the DAFs as ▆▆▆▆▆▆▆ on its tax forms***. Ex. 12 at -6061 ("▆▆▆▆▆▆▆▆▆

23  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆").

24  　　　OpenAI relies on *Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051 (9th Cir. 2022). But

25  *Pinkert* has no bearing here. In *Pinkert*, a donor ***sued his DAF*** for allegedly charging excessive

26  fees. *Id.* at 1053-54. Whether a donor may sue his DAF for engaging in conduct that the contract

27  expressly permits is a far different question from whether a donor has standing to sue a third-party

28  charity for breach of trust based on donations he made ***through*** the DAF. Moreover, the plaintiff

14

1    in *Pinkert* offered no evidence to contradict the language in the DAF's written program policies.  *Id.*

2    at 1055-56.  That is exactly what Musk has done here.

### 4.    *Musk Has Standing for His Direct Contributions of Four Teslas*

4    There is no dispute that Musk personally contributed four Teslas and an upgrade directly to

5    OpenAI.  OpenAI Mem. at 14; Ex. 11 at 29-31.  OpenAI urges that those four Teslas cannot support

6    a claim for breach of trust because there is "no evidence . . . that OpenAI used them in a manner

7    inconsistent" with Musk's intentions.  OpenAI Mem. at 14.  But the jury could reasonably find that

8    OpenAI did *not* in fact use the four Teslas for their intended purpose.  Musk contributed the Teslas

9    as compensation for four employees "in appreciation for what [they've] done to get OpenAI to

10   where it is today."  Ex. 16.  Those employees included Greg Brockman, who was secretly plotting

11   to turn OpenAI into a for-profit entity to enrich himself.  A jury could easily conclude that Musk

12   did not intend to compensate OpenAI employees in those circumstances and that giving Teslas to

13   faithless employees was an unauthorized use.

### 5.    *Musk's Charitable Purposes Were Sufficiently Specific*

15   OpenAI finally contends that Musk lacks common law settlor standing because his "claimed

16   donations were not subject to any specific restrictions," as purportedly required for a settlor to create

17   an enforceable trust.  OpenAI Mem. at 9.  But as OpenAI concedes, Musk did articulate two

18   "fundamental" restrictions: that OpenAI would be "open source" and "nonprofit."  OpenAI Mem.

19   at 10 (quoting Ex. 1 (Musk Tr.) at 285:19-286:24).  Those restrictions track what Altman and Musk

20   discussed when Musk first agreed to fund OpenAI.  *See, e.g.*, Ex. 5 ("governance" was "critical"

21   because Musk "[did]n't want to fund something that goes in what turns out to be the wrong

22   direction"); Ex. 6 at 2 (agreeing on "an independent, pure play 501c3, but with a crystal clear focus

23   on the positive advent of strong AI distributed widely to humanity").

24   Those terms were sufficiently specific to support settlor standing under the Third

25   Restatement.  OpenAI urges that Section 28 of the Restatement requires that a charitable trust have

26   a "specific" purpose.  OpenAI Mem. at 9.  But Section 28 lists many examples of charitable purposes

27   that are no more "specific" than the ones Musk and Altman discussed.  *See, e.g.*, Restatement (Third)

28   of Trusts § 28 cmt. g (2003) ("to establish or maintain a home for the poor"); *id.* cmt. h ("to establish

1  or maintain public libraries, museums, or other facilities"); *id.* cmt. i ("domestic or foreign

2  missions"); *id.* cmt. j (a "hospital" or "health facility"); *id.* cmt. k (a "public school or library"); *id.*

3  cmt. *l* ("to provide care for stray animals").

4      OpenAI claims that Musk's stated purposes cannot create a charitable trust because they

5  merely track the purposes set forth in OpenAI's founding documents. OpenAI Mem. at 10. But the

6  Restatement does not suggest that a charity's founder and primary financial backer cannot enforce

7  the trust unless the founder attaches ***additional*** restrictions to each donation above and beyond the

8  ones imposed when he created the charity. OpenAI relies on a Restatement comment stating that

9  "[a]n outright devise[] or donation to a nonproprietary hospital or university or other charitable

10 institution, expressly or impliedly to be used for its general purposes, is charitable but does not

11 create a trust as that term is used in this Restatement." Restatement (Third) of Trusts § 28 cmt. a.

12 But that language refers to situations where a member of the public makes a general contribution to

13 some ***existing*** charity. It does not mean that the charity's ***founder*** must attach conditions to each

14 donation beyond the conditions imposed when he founded the charity.

15     Finally, OpenAI points out that its tax filings report no "restricted donations." OpenAI Mem.

16 at 9-10. That argument is a red herring. The IRS's regulatory distinction between restricted and

17 general purpose donations does not track Section 28's standard for what purposes are sufficient to

18 create a charitable trust. In any event, OpenAI's tax forms could only create a genuine dispute over

19 this issue. They do not entitle OpenAI to summary judgment.

20     **B.    Musk Has Statutory Standing**

21     Even apart from his common law settlor standing, Musk independently has standing under

22 California statutory law. Musk has standing under California Corporations Code § 5142 because he

23 has a contractual interest in the trust funds, and he has standing under California Business and

24 Professions Code § 17510.8 because Defendants solicited contributions from him. Neither statute

25 turns on whether Musk made his contributions directly or through intermediaries – only on his status

26 as a contracting party or target of solicitations. And Musk satisfies the requirements of both statutes.

27     **1.    *Musk Has Standing Under Cal. Corp. Code § 5142***

28     California Corporations Code § 5142 states that "any of the following may bring an action

16

1    to enjoin, correct, obtain damages for or to otherwise remedy a breach of a charitable trust:  (1) The

2    corporation, or a member in the name of the corporation . . . .  (2) An officer of the corporation.

3    (3) A director of the corporation.  (4) A person with a reversionary, contractual, or property interest

4    in the assets subject to such charitable trust.  (5) The Attorney General, or any person granted relator

5    status by the Attorney General."  Cal. Corp. Code § 5142(a).  Musk has standing under the fourth

6    prong because he has a "contractual . . . interest in the assets subject to [the] charitable trust."  *Id.*

7    Musk's founding correspondence with Altman shows that Musk ***agreed*** to fund OpenAI only on the

8    condition that it would remain a nonprofit dedicated to the public good.  *See* Ex. 2; Ex. 5; Ex. 6.

9    That agreement was sufficient to give Musk a "contractual . . . interest in the assets" under California

10   Corporations Code § 5142(a).

11       OpenAI argues that Section 5142(a) does not apply to Delaware nonprofits like OpenAI

12   because the statute defines "corporation" to include only charities incorporated in California.

13   OpenAI Mem. at 11-12.  But the fourth prong of Section 5142(a) does not use the word

14   "corporation" and thus is not limited to California charities.  Cal. Corp. Code § 5142(a)(4).  That

15   makes sense:  The first three prongs of Section 5142, which ***do*** refer to "corporations," involve suits

16   by insiders that implicate the internal affairs doctrine.  By contrast, the fourth prong involves suits

17   by contract counterparties and other outsiders that do not implicate that doctrine.  The legislature's

18   express use of the term "corporation" in the first three prongs, and the omission of that term from

19   the last two, implies an intentional difference of scope that should be given effect.

20       OpenAI argues that Musk cannot claim contractual standing because the Court required

21   Musk to elect between his implied contract and unjust enrichment claims.  OpenAI Mem. at 13.  But

22   the Court ordered Musk to elect between those two "claim[s]."  Dkt. 298 at 3.  The dismissal of a

23   claim does not preclude a party from relying on the same evidence to support other claims.  *See*

24   *Grimes v. United Parcel Serv., Inc.*, No. C 05-01824, 2008 WL 217153, at *2 (N.D. Cal. Jan. 24,

25   2008) ("[T]he mere fact that particular evidence relates to a dismissed claim does not ***necessarily***

26   mean it lacks any probative value under the claims that remain."); *J.SH Sec. Indus. D.C.S., Ltd. v.*

27   *Bartech Sys. Int'l, Inc.*, No. 2:07-cv-00277, 2010 WL 11575538, at *4 (D. Nev. Jan. 21, 2010)

28   (dismissal of contract claim "does not mean the evidence regarding an oral agreement is

1    inadmissible for some other purpose"). Musk's election thus does not preclude him from relying

2    on the factual existence of a contract to bring *other* claims, like breach of charitable trust.

### 2.    *Musk Has Standing Under Cal. Bus. & Prof. Code § 17510.8*

4        Musk also has standing under California's Business and Professions Code. Section 17510.8

5    states that, "[n]otwithstanding any other provision of this article, there exists a fiduciary relationship

6    between a charity or any person soliciting on behalf of a charity, and the person from whom a

7    charitable contribution is being solicited," and that "[t]he acceptance of charitable contributions by

8    a charity or any person soliciting on behalf of a charity establishes a charitable trust and a duty . . .

9    to use those charitable contributions for the declared charitable purposes for which they are sought."

10   Cal. Bus. & Prof. Code § 17510.8. OpenAI does not dispute that Altman and OpenAI "solicited"

11   charitable contributions from Musk. *See, e.g.*, Ex. 5 (asking if Musk could "donate $30MM over

12   the next 5 years"); Ex. 13 (asking if Musk could "do $20MM a year for each of the next 3 years").

13   Altman and OpenAI therefore owed Musk a fiduciary duty to use his charitable contributions only

14   for the purposes for which they were sought. By making Musk the express statutory object and

15   beneficiary of that traditional common law duty, the statute implicitly grants Musk standing to

16   enforce it. *See Crusader Ins. Co. v. Scottsdale Ins. Co.*, 54 Cal. App. 4th 121, 125 (1997) (approving

17   "use of statutes to establish elements of pre-existing common law causes of action").

18       OpenAI contends that Section 17510.8 does not apply because Musk was a "member of

19   OpenAI . . . until his resignation from the Board on February 21, 2018," OpenAI Mem. at 14, and a

20   separate code provision states that "[t]he provisions of this article shall not apply to solicitations . . .

21   within the membership of a charitable organization or upon its regular occupied premises," Cal.

22   Bus. & Prof. Code § 17510.6. But Section 17510.8 applies "[n]otwithstanding any other provision

23   of this article." Cal. Bus. & Prof. Code § 17510.8. That "notwithstanding" clause signals

24   "legislative intent to override all *contrary* law," including Section 17510.6. *Arias v. Superior Court*,

25   46 Cal. 4th 969, 983 (2009).

26       At the very least, Musk has standing under Section 17510.8 to sue for the three years of

27   contributions he made *after* he resigned from OpenAI's board in February 2018. Ex. 11 at 29-31.

28   OpenAI urges that it "did not solicit Musk for contributions after he resigned." OpenAI Mem. at

14.  In fact, OpenAI explicitly asked Musk for a "final one-time donation" of $570,000 in July 2020. Ex. 68; *see also* Ex. 47 (publicly stating that Musk "will continue to donate").   And regardless, the statute is triggered by "[t]he ***acceptance*** of charitable contributions," not just solicitations.  Cal. Bus. & Prof. Code § 17510.8 (emphasis added).  OpenAI indisputably "accept[ed]" Musk's contributions long after he left OpenAI's board.

## II.   SUBSTANTIAL EVIDENCE SUPPORTS MUSK'S UNJUST ENRICHMENT CLAIM

There is no basis for summary judgment on Musk's unjust enrichment claim either.

### A.   Musk Need Not Elect Between Unjust Enrichment and Tort Claims

This Court already required Musk to elect between his unjust enrichment and breach of contract claims.  Dkt. 298.  OpenAI now demands that Musk elect between his unjust enrichment and tort claims too.  OpenAI Mem. at 20-21.  That demand is baseless.  The unjust enrichment and tort claims have different elements, and Musk may present both theories to the jury at trial.

"The elements of a cause of action for unjust enrichment are simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of another.' " *Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 238 (2018).  Musk's tort claims have different elements.  *See* Restatement (Third) of Trusts § 93 (2012) ("A breach of trust is a failure by the trustee to comply with any duty that the trustee owes . . . to further the charitable purpose . . . of the trust."); *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (elements of fraud are misrepresentation, scienter, intent to induce reliance, justifiable reliance, and damages).

Where different claims have different elements, the plaintiff may present both claims to the jury, and the jury can then decide which claim or claims are supported by the evidence.  A court may not "force upon the plaintiff an election between those causes which he has a right to plead. Plaintiff is entitled to introduce his evidence upon each and all of these causes of action, and the election . . . [is] a matter for the judge or the jury." *Tanforan v. Tanforan*, 173 Cal. 270, 274 (1916); *see also Williams v. Marshall*, 37 Cal. 2d 445, 457 (1951); 4 Witkin, *California Procedure: Pleading* § 418 (6th ed. 2025).  Of course, a jury may not award duplicative or inconsistent ***remedies***. But that issue is properly handled through jury instructions, not by requiring the plaintiff to guess

19

before trial which claim the jury may accept.

Consistent with those principles, courts allow plaintiffs to pursue unjust enrichment claims and tort claims in the alternative. *See, e.g.*, *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015) ("To the extent the district court concluded that the [unjust enrichment] cause of action was nonsensical because it was duplicative of or superfluous to Astiana's [tort] claims, this is not grounds for dismissal."); *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 25-31 (1985) (reinstating both unjust enrichment and fraud claims as "alternative bas[es] for relief"); *SVF II Aggregator (DE) LLC v. Shafi*, No. 23-cv-03834-YGR, 2024 WL 3324623, at *2 (N.D. Cal. May 2, 2024) (holding that "an unjust enrichment claim may be sustained as [a] claim for relief in the alternative" to a fraud claim). OpenAI cites cases for the point that a plaintiff "may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory." *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004). But that permissive language does not ***prohibit*** plaintiffs from pursuing both claims in the alternative. That is what Musk is doing here.

### B.    Musk Need Not Show Expectation of Compensation

OpenAI argues that Musk's unjust enrichment claim fails on the merits because Musk never expected compensation for his contributions to OpenAI. OpenAI Mem. at 21-22. That argument improperly adds a nonexistent element to Musk's claim.

Again, "[t]he elements of a cause of action for unjust enrichment are simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of another.'" *Pro. Tax Appeal*, 29 Cal. App. 5th at 238; *see also Welborne v. Ryman-Carroll Found.*, 22 Cal. App. 5th 719, 725 (2018); *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1481-82 (2014); *Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (2000); Judicial Council of California Civil Jury Instructions No. 375 (2025 ed.). Although a failure of compensation where the plaintiff reasonably expected compensation could be ***one*** reason why the defendant's retention of benefits is unjust, it is not the ***only*** reason.

Courts have found retention of benefits unjust in a variety of circumstances not involving any expectation of compensation. In *Lamb v. California Water & Telephone Co.*, 21 Cal. 2d 33 (1942), for example, the court permitted a landowner to sue where he provided an easement in return

20

for preferential service but regulations later rendered that arrangement unlawful. *Id.* at 43-44; *see also* Restatement (Third) of Restitution § 34 cmt. c illus.7 (2011) (similar facts). A plaintiff may also sue if he intended to convey property for "cemetery purposes only" but "erroneously convey[ed] an unrestricted [property right]." *Id.* § 11 cmt. b illus. 5. And it is well-established that a plaintiff may recover wrongful gains from a breaching fiduciary, whether or not the plaintiff had any expectation of compensation. *Id.* § 43 cmt. b.

OpenAI's sole support for its "expectation of compensation" requirement is "quantum meruit" cases where "the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered." *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004). Those cases do not suggest that the expectation of compensation requirement applies **outside** the quantum meruit context. Although a failure to pay reasonably expected compensation is certainly **one** reason why a counterparty's retention of benefits may be unjust, it is not the **only** reason. None of OpenAI's cases says otherwise.

California's cause of action for unjust enrichment is framed in conspicuously broad and flexible terms that defy OpenAI's categorical rules. Musk contributed funding and other benefits to OpenAI on the understanding that OpenAI would remain a nonprofit charity dedicated to the public good. OpenAI used those contributions to build a for-profit behemoth. Its retention of Musk's benefits is plainly "unjust" within the broad contours of California law.

### C.    Musk's Unjust Enrichment Claim Is Not Time-Barred

Because California law does not specify a limitations period for unjust enrichment, the catchall four-year period applies. Cal. Code Civ. Proc. § 343. Under the well-established "last element" rule, a claim accrues upon "the occurrence of the last element essential to the cause of action." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1191 (2013). For unjust enrichment, the "last element" is the defendant's "unjust retention of the benefit," not the plaintiff's payment. *Pro. Tax Appeal*, 29 Cal. App. 5th at 238; *contrast* OpenAI Mem. at 23 (citing cases where unjust retention coincided with payment). This suit is timely under those principles for several reasons.

First, Musk continued making contributions to OpenAI through September 2020. Ex. 11 at 29-31. Musk filed this suit less than four years later on August 5, 2024. Dkt. 1. Thus, this suit is

1    timely even under OpenAI's erroneous view of accrual.

2        Second, "whenever there is a continuing or recurring obligation, . . . 'a cause of action

3    accrues each time a wrongful act occurs, triggering a new limitations period.' " *Aryeh*, 55 Cal. 4th

4    at 1198-99; *see Water Audit Cal. v. Merced Irrig. Dist.*, 111 Cal. App. 5th 1147, 1192 (2025)

5    (district's "breach of the duty to keep the fish ladder open and unobstructed" accrued continually

6    for decades after closure).  Thus, even assuming that Musk can no longer sue over OpenAI's

7    wrongful retention of benefits in 2019, he can still sue over OpenAI's more recent misconduct that

8    renders its retention of benefits unjust, such as OpenAI's $2 billion deal with Microsoft in 2021, its

9    $10 billion deal in 2023, and its recent conversion into a public benefit corporation.

10       Finally, "the discovery rule . . . 'postpones accrual of a cause of action until the plaintiff

11   discovers, or has reason to discover, the cause of action.' " *Aryeh*, 55 Cal. 4th at 1192; *see FDIC v.

12   Dintino*, 167 Cal. App. 4th 333, 350 (2008) (applying discovery rule to unjust enrichment claim).

13   Musk testified that he did not appreciate the true nature of OpenAI's actions until after Microsoft

14   made its $10 billion investment in January 2023. Ex. 1 (Musk Tr.) at 142:1-143:8, 154:4-16, 164:13-

15   23, 360:7-361:25.  Factual disputes thus preclude summary judgment on this issue.  The jury must

16   determine whether Musk should have discovered his cause of action sooner.

17   **III.    SUBSTANTIAL EVIDENCE SUPPORTS MUSK'S FRAUD CLAIM**

18       **A.    Defendants Made Actionable Misrepresentations**

19       California law recognizes that "[a] promise to do something necessarily implies the intention

20   to perform; hence, where a promise is made without such intention, there is an implied

21   misrepresentation of fact that may be actionable fraud." *Lazar v. Superior Court*, 12 Cal. 4th 631,

22   638 (Cal. 1996); *see, e.g.*, *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1149-50

23   (E.D. Cal. 2017) (allowing fraud claim where software company "reassured [plaintiff] it would

24   ensure 100% . . . functionality, despite evidence that it intended [less than that]"); *Thompson ex rel.

25   Thorp Family Charitable Remainder Unitrust v. Federico*, 324 F. Supp. 2d 1152, 1168 (D. Or. 2004)

26   (allowing fraud claim for "broken promises to liquidate the Trust's equity holdings").

27       Altman and Brockman committed promissory fraud by repeatedly reassuring Musk in late

28   2017 and early 2018 that they would maintain OpenAI as a nonprofit when they secretly intended

to turn it into a for-profit.  Altman assured Musk that he "remain[ed] enthusiastic about the non-profit structure" and was "[g]reat with keeping [the] non-profit and continuing to support it."  Ex. 40 at 1; Ex. 42 at 1.  Brockman stated that he "would like to continue with the non-profit" and that they would "[t]ry our best to remain a non-profit."  Ex. 42 at 2; Ex. 44 at 2.  Brockman and Sutskever ███████████████████████████████████████████████████████.  Ex. 43 at 8-9.

Those representations were false because, in reality, Musk's co-founders had no intention whatsoever of keeping OpenAI as a nonprofit.  Instead, as Brockman revealed ████████████ ████████████████████████████████████████████████████████████████████████████████ ██████████████████████  Ex. 45 at 1; *see also* Ex. 46 ("█████████████████████████████ ████████████████████████ " (emphasis added)).  Brockman all but admitted that he was "████ ██████████████████████████████ " Ex. 43 at 2, 9.

OpenAI dismisses these misrepresentations as mere "expressions of present feeling."  OpenAI Mem. at 17.  They were nothing of the sort.  Altman and Brockman repeatedly reassured Musk that they would keep OpenAI as a nonprofit when in fact they secretly planned to convert it into a for-profit so they could make billions.  These were not vague comments on some collateral issue.  They were misrepresentations of intent on an issue that Altman and Brockman knew to be highly material to Musk.  A jury could readily find fraud on these facts.

**B.    There Are Genuine Disputes over Justifiable Reliance**

The record also supports a finding of justifiable reliance.  "Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent."  *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239-40 (1995).  California courts deny recovery only "[i]f the conduct of the plaintiff in the light of his own intelligence and information was ***manifestly unreasonable***."  *Id.* at 1240 (emphasis added).  "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."  *Id.* at 1239; *see also OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 863-69 (2007) (upholding jury finding of justifiable reliance despite alleged disclosures of fraud); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 978 (N.D. Cal. 2018) ("[J]ustifiable reliance

23

1    is a fact-specific question that is usually appropriate for jury resolution.").

2        Justifiable reliance is clearly a fact issue here.  Defendants assert that "Musk's own

3    deposition testimony" shows that Musk "never believed" their misrepresentations.  OpenAI Mem.

4    at 17.  Viewed as a whole, Musk's testimony tells a different story.  Musk "***started to suspect*** that

5    [he] was being swindled" in 2017.  Ex. 1 (Musk Tr.) at 76:16-77:5 (emphasis added).  But he

6    "became uncomfortable by degrees."  *Id.* at 288:11-19.  Despite his misgivings, he was "prepared

7    to continue to fund" OpenAI so long as he "underst[ood] what [OpenAI's] forward structure [would

8    be] to make sure that the fundamental mission of being a nonprofit open-source company

9    continued."  *Id.* at 86:6-13.  Those are precisely the plans that Defendants concealed from him.

10   OpenAI "[went] from a nonprofit open source to a closed for-maximum-profit company ***by***

11   ***degrees***."  *Id.* at 154:4-16 (emphasis added); *see also id.* at 183:22-184:9.  Musk did not discover

12   the full truth until after Microsoft's $10 billion investment in 2023.  *Id.* at 184:10-12.

13       Defendants actively concealed the truth from Musk.  Altman never told Musk that he had

14   ███████████████████████████████████████████████ mere weeks after Musk left

15   OpenAI.  Ex. 48 at 2.  Altman then obscured the commercial nature of their plans by falsely

16   reassuring Musk that "[w]e did [OpenAI LP] in a way where all investors are clear that they should

17   never expect a profit."  Ex. 64.  The fact that Musk continued paying $9.4 million for OpenAI's rent

18   for another three years refutes the suggestion that Musk knew he was being defrauded.  Ex. 11 at

19   29-31.  Any ambiguities or contradictions in Musk's testimony are for the jury to evaluate.  This is

20   not one of the rare cases where the plaintiff's conduct was "manifestly unreasonable" as a matter of

21   law.  *All. Mortg.*, 10 Cal. 4th at 1239-40.

22       **C.    There Are Genuine Disputes over Timeliness**

23       For similar reasons, Musk's fraud claim is not time-barred.  Fraud has a three-year statute of

24   limitations that starts to run upon "the discovery, by the aggrieved party, of the facts constituting

25   the fraud."  Cal. Code Civ. Proc. § 338(d).  "Because . . . notice of fraud is for the trier of fact, the

26   party seeking summary disposition has an ***extremely difficult burden*** to show that there exists no

27   issue of material fact regarding notice."  *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1309-10 (9th Cir.

28   1982) (emphasis added).  "Summary judgment is appropriate only 'when uncontroverted evidence

24

irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct.'"
*Gray v. First Winthrop Corp.*, 82 F.3d 877, 881-83 (9th Cir. 1996).

For the same reasons there are factual disputes over Musk's justifiable reliance, there are factual disputes over when Musk discovered or should have discovered the fraud. Musk testified that he did not discover the truth about OpenAI's full-blown commercial status until after Microsoft made its ***$10 billion*** investment in 2023. Ex. 1 (Musk Tr.) at 183:22-184:12. There was nothing unreasonable about that timing. OpenAI transformed into a commercial venture gradually, by degrees. Defendants sharply limited the information they disclosed and actively downplayed their commercial objectives in communications with Musk. Ex. 64. Whether Musk should have discovered the truth sooner is a paradigmatic question of fact for the jury.

## CONCLUSION

The OpenAI Defendants' motion should be denied.

Dated:  November 7, 2025                          MOLOLAMKEN LLP

                                        By:      /s/ Steven F. Molo
                                                 Steven F. Molo (*pro hac vice*)

                                                 Marc Toberoff (CA SBN 188547)
                                                 MToberoff@toberoffandassociates.com
                                                 TOBEROFF & ASSOCIATES, P.C.
                                                 23823 Malibu Road, Suite 50-363
                                                 Malibu, CA 90265
                                                 Telephone: (310) 246-3333

                                                 Robert K. Kry (*pro hac vice*)
                                                 Jennifer M. Schubert (*pro hac vice*)
                                                 Walter H Hawes IV (*pro hac vice*)
                                                 Alexandra C. Eynon (*pro hac vice*)
                                                 Sara Tofighbakhsh (*pro hac vice*)
                                                 MOLOLAMKEN LLP
                                                 430 Park Avenue
                                                 New York, NY  10022
                                                 Telephone: (212) 607-8160

                                                 *Attorneys for Plaintiffs Elon Musk*
                                                 *and X.AI Corp.*