RUSSELL P. COHEN (SBN 213105)
Russ.cohen@dechert.com
HOWARD M. ULLMAN (SBN 206760)
Howard.ullman@dechert.com
DECHERT LLP
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4500
Facsimile: (415) 262-45555

NISHA PATEL (SBN 281628)
Nisha.patelgupta@dechert.com
DECHERT LLP
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700
Facsimile: (213) 808-5760

ANDREW J. LEVANDER (admitted *pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

JOHN (JAY) JURATA, JR. (admitted *pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

Attorneys for Defendant Microsoft Corporation

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ELON MUSK et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>SAMUEL ALTMAN, et al.,<br><br>　　　　Defendants. | Case No. 4:24-cv-04722-YGR<br><br>Judge Yvonne Gonzalez Rogers<br><br>**DEFENDANT MICROSOFT CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>*Statement of Material Facts in Support of Its Motion for Summary Judgment Filed Concurrently Herewith*<br><br>**Date:**　　　　**January 7, 2026**<br>**Time:**　　　　**2:00 p.m.**<br>**Place:**　　　　**Courtroom 1 (4th Floor)**<br>　　　　　　　**1301 Clay St.**<br>　　　　　　　**Oakland, CA 94612**<br><br>**Action filed: August 5, 2024** |

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY ............................................................................... 1

II. ARGUMENT ..................................................................................................................... 3

    A. The Court Should Grant Summary Judgment on Count 19 (Aiding and Abetting) ................................................................................................................ 3

        1. There Is No Direct or Circumstantial Evidence That Microsoft Actually Knew of Duties to Musk or Their Breach .................................... 3

        2. OpenAI's Approvals, Representations, and Warranties Preclude Any Inference of Microsoft's Actual Knowledge ....................................... 8

        3. Constructive Knowledge Does Not Suffice, and There Is No Evidence That Microsoft Had Constructive Knowledge of Duties to Musk ..................................................................................................... 9

        4. Microsoft's Commercial Dealings with OpenAI and Microsoft's Alleged Motives Do Not Establish Actual Knowledge ............................ 11

        5. There Is No Evidence Microsoft Intended to Provide Substantial Assistance to Breach a Duty to Musk ......................................................... 12

    B. The Court Should Grant Summary Judgment on Count 4 (Quasi Contract / Unjust Enrichment) ............................................................................................... 14

        1. Unjust Enrichment Requires Actual Knowledge and Microsoft Had No Reason to Know in any Event ................................................................. 14

        2. The Unjust Enrichment Claim Fails Because Musk Bases It on Facts in Common with the Aiding-and-Abetting Claim ........................... 14

        3. Under Applicable Federal Common Law, the Unjust Enrichment Claim Fails Where an Adequate Legal Remedy Exists ............................ 15

III. CONCLUSION ................................................................................................................ 15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Adler v. Manor Healthcare Corp.*,
  7 Cal. App. 4th 1110 (1992) .................................................................................................... 8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................................. 5

*AngioScore, Inc. v. TriReme Med., LLC*,
  70 F. Supp. 3d 951 (N.D. Cal. 2014) ........................................................................... 1, 4, 5, 7

*Casey v. United States Bank Nat'l Ass'n*,
  127 Cal. App. 4th 1138 (2005) ......................................................................................... *passim*

*Chance World Trading E.C. v. Heritage Bank of Com.*,
  438 F. Supp. 2d 1081 (N.D. Cal. 2005) ................................................................................ 4, 8

*In re Columbia Pipeline Grp., Inc. Merger Litig.*,
  342 A.3d 324 (Del. June 17, 2025) ..................................................................................... 9, 10

*Consolidated Elec. Co. v. U.S. for Use & Benefit of Gough Indus., Inc.*,
  355 F.2d 437 (9th Cir. 1966) .................................................................................................... 4

*Das v. Bank of Am., N.A.*,
  186 Cal. App. 4th 727 (2010) ................................................................................................. 12

*In re Essendent, Inc. Stockholder Litig.*,
  2019 WL 7290944 (Del. Ch. Dec. 30, 2019) ..................................................................... 2, 12

*In re First All. Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ...................................................................................... 10, 11, 12

*First Nationwide Sav v. Perry*,
  11 Cal. App. 4th 1657 (1992) ................................................................................................. 14

*Gen Star Indem. Co. v. First Am. Title Ins. Co. of Napa*,
  2021 WL 916850 (N.D. Cal. Mar. 10, 2021) .......................................................................... 14

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ............................................................................................................... 15

*Hough v. Carroll*,
  2025 WL 1674425 (C.D. Cal. May 5, 2025) .......................................................................... 13

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
  589 U.S. 178 (2020) .............................................................................................................. 5, 9

*Jogani v. Superior Ct.*,
  165 Cal. App. 4th 901 (2008) ................................................................................................. 15

*Martinez v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
  82 Cal. App. 4th 883 (2000) ..................................................................................................... 5

*In re Mindbody, Inc., Stockholder Litig.*,
  332 A.3d 349 (Del. 2024) ....................................................................................................... 10

*Morgan v. Cash*,
   2010 WL 2803746 (Del. Ch. July 16, 2010) .......................................................................... 12

*Neilson v. Union Bank of California*, *N.A.*,
   290 F. Supp. 2d 1101 (C.D. Cal. 2003) ............................................................................ 7, 13

*Pietosi v. HP, Inc.*,
   2025 WL 30365909 (N.D. Cal. Oct. 30, 2025) ...................................................................... 15

*Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*,
   29 Cal. App. 5th 230 (2018) .................................................................................................. 14

*RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*,
   45 A.3d 107 (Del. 2012) .......................................................................................................... 8

*In re Radnor Holdings Corp.*,
   353 B.R. 820 (Bankr. D. Del. 2006) ....................................................................................... 9

*River Colony Estates Gen. P'ship v. Bayview Fin. Trading Grp., Inc.*,
   287 F. Supp. 2d 1213 (S.D. Cal. 2003) ................................................................................... 9

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*,
   2022 WL 18906 (9th Cir. Jan. 3, 2022) ................................................................................. 14

*Simi Mgmt. Corp. v. Bank of Am., N.A.*,
   930 F. Supp. 2d 1082 (N.D. Cal. 2013) ............................................................................ 7, 12

*Sonner v. Premier Nutrition Corp.*,
   49 F. 4th 1300 (9th Cir. 2022) ............................................................................................... 15

*Stapleton v. JPMorgan Chase Bank, N.A.*,
   779 F. Supp. 3d 1059 (N.D. Cal. 2025) ................................................................................ 15

*Tanforan v. Tanforan*,
   173 Cal. 270 (1916) ............................................................................................................... 15

*Wells Fargo Bank Northwest, N.A. v. Polaris Holding Co.*,
   2005 WL 1889385 (N.D. Cal. Aug. 9, 2005) .......................................................................... 4

**Statutes**

Cal. Bus. and Prof. Code § 17510.8 ............................................................................................. 10

**Other Authorities**

Restatement of Torts (Second) § 876 ........................................................................................... 13

## I. INTRODUCTION AND SUMMARY

Musk agrees that to survive summary judgment, he must show (a) on his aiding-and-abetting claim that Microsoft *actually knew* that OpenAI, Altman, or Brockman owed, and breached, fiduciary duties to donors and that Microsoft intended to take actions to aid and abet the breach, and (b) on his unjust enrichment claim that Microsoft knowingly and "wrongfully" retained a benefit. And because Musk brought this case claiming the breach of specific duties owed to him, he must also show that Microsoft actually knew of a breach of specific duties owed *to Musk*, and that Microsoft knowingly and wrongfully retained a benefit at *Musk's* expense.

Unable to point to *any* such evidence, Musk asks the Court to make several unsupported leaps. First, Musk seeks to infer actual knowledge from an email written by Microsoft's Chief Technology Officer (the "Scott Email") that says nothing about duties owed to any donor, let alone to Musk, as well as the mere fact that Microsoft was aware of OpenAI's nonprofit mission (which again is silent about duties owed to Musk or anyone else). Second, Musk seeks to infer intent because Microsoft entered commercial transactions with OpenAI's for-profit subsidiary, which Musk admits the OpenAI nonprofit Board, including former co-Plaintiff Zilis, approved. And third, Musk seeks to establish unjust enrichment simply because Microsoft benefited from its commercial relationship with that for-profit subsidiary. He asks the Court to make these leaps even though he acknowledges that Microsoft contributed $14 billion to OpenAI, which has helped to fund one of the largest nonprofits in the world. Microsoft's contribution was necessary for OpenAI to pursue its mission and vastly exceeded Musk's alleged $38 million financial donation. But as explained below, none of these raises an issue of material fact on essential elements of Musk's claims or comes close to justifying a trial against Microsoft.

**<u>No Evidence of Microsoft's Knowledge.</u>** Aiding and abetting requires *actual knowledge* of the "specific primary wrong the defendant substantially assisted." *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 957 (N.D. Cal. 2014) (cit. omit.). It is undisputed that *nobody told Microsoft about any duties owed to Musk or their breach*. Given that undeniable fact, Musk retreats to arguing about the importance of circumstantial evidence, but he then fails to offer any circumstantial evidence from which a reasonable jury could infer that Microsoft had actual

- 1 -

knowledge *of duties owed to him*. Rather, he focuses on a statement in the Scott Email, which Scott wrote upon first learning about OpenAI's future commercialization plans and in which Scott speculated about how OpenAI's donors *might react* to that announcement. Importantly, Scott said nothing about whether those donations were conditioned on any promises, much less whether Musk himself made donations subject to return promises or even what those promises were. It also is undisputed that the Scott Email predated Scott's conversation with Altman seven months later, in which Altman put to bed any possible speculation by explaining that OpenAI's newly created for-profit subsidiary was controlled by the nonprofit Board, which in turn would serve the nonprofit mission. And Microsoft did not enter its strategic partnership with OpenAI until another six months after that. Far from being a "smoking gun," the Scott Email—even viewed in isolation—is not circumstantial evidence of knowledge of a duty owed to Musk or its breach.

Beyond the Scott Email, Musk relies on what could only be described as "constructive knowledge"—*i.e.*, that Microsoft *should have known* about duties owed to Musk. He bases this argument on OpenAI's Certificate of Incorporation ("COI"), other public documents, and Microsoft's commercial relationship with OpenAI. But that fares no better. Even if constructive knowledge could suffice—and Musk himself agrees it does not—the COI does not mention Musk or refer to obligations owed to donors. What's more, Microsoft's (i) commercial conduct vis-à-vis OpenAI, (ii) purported motive to earn a profit, and (iii) early speculation about the likelihood of success of Microsoft's initial investment is not evidence—whether direct or circumstantial—that Microsoft actually knew of duties owed by OpenAI or its founders to Musk, or any breaches of them. None of this creates a triable issue on a required element of Musk's aiding-and-abetting claim: knowledge that OpenAI breached specific duties to Musk. *Casey v. United States Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1148 (2005); *see also In re Essendent, Inc. Stockholder Litig.*, 2019 WL 7290944, *18 (Del. Ch. Dec. 30, 2019) (desire to make a profit or strike a better deal is not evidence of aiding-and-abetting knowledge).

**No Evidence of Intent.** It is undisputed that *OpenAI repeatedly represented and warranted* to Microsoft *that no such duties to Musk* (or any other donor for that matter) existed. That alone shows that Microsoft could not have intended to aid and abet any purported breach.

- 2 -

Mot. at 19. Musk ironically labels those legally binding commitments as "boilerplate." But unlike the alleged commitments that serve as the basis for his lawsuit, these provisions are set forth in carefully negotiated written agreements. Musk also argues that he need not show "specific" intent, but Microsoft never argued otherwise. Musk simply confuses specific intent to commit the underlying tort with intent to aid and abet, *i.e.*, to facilitate a breach, which he does have to show here and of which there is no evidence. At bottom, engaging in commercial transactions approved by OpenAI's nonprofit Board, and in reliance upon representations and warranties commonly contained in commercial agreements, cannot amount to intent to aid and abet a breach of duty.

**No Unjust Enrichment.** Finally, Musk's arguments to salvage his unjust enrichment claim fare no better. First, his pleading-stage cases involving special rules for real property records do not establish the requisite knowledge element for wrongly retained benefits here. But even under a "reason to know" standard, again, there is no evidence that Microsoft had reason to know of purported duties to Musk or any breaches of them. Second, the core factual overlap and the essential knowledge element common to both claims make Musk's argument that the claim elements are not identical a distinction without a difference. Finally, Musk's argument that the claim is legal rather than equitable is inconsistent with his own complaint and relies on inapposite state law cases rather than controlling federal law.

## II.   ARGUMENT

### A.   The Court Should Grant Summary Judgment on Count 19 (Aiding and Abetting)

#### 1.   There Is No Direct or Circumstantial Evidence That Microsoft Actually Knew of Duties to Musk or Their Breach

**No Direct Evidence**. As Microsoft showed in its Opening Brief (Mot. at 16), there is no direct evidence that Microsoft had actual knowledge that OpenAI or its founders owed any duties to Musk arising from donations. Musk's Opposition does not dispute that no one ever told Microsoft about any such duties, nor that they had been breached. That is unsurprising given Musk claims that the purported duties to him were created by private oral and email communications between *only* him, OpenAI, and its co-founders. Opp. to OpenAI MSJ at 2, 17 (citing Pl. Ex. 2, 5, and 6). These communications also predate Microsoft's investment in and collaboration with

- 3 -

OpenAI. Unless someone told Microsoft about them—and again, Musk does not contend that anyone did—Microsoft could not have known about them.[1]

Further, the only knowledge that is relevant is knowledge of duties specifically owed to Musk and their breach. That is because (a) knowledge of the "specific primary wrong" is required, *AngioScore*, 70 F. Supp. 3d at 957; and (b) Musk lacks standing to sue for a breach of duties other than those to him, Mot. at 3 n.3. The Opposition's suggestion that it is enough that Microsoft purportedly knew that a charity has duties to its donors does not suffice to show actual knowledge of the "specific primary wrong" alleged by Musk—*see* SAC ¶¶ 397, 408 (claiming the duties arose from ***Musk's*** donations to OpenAI in connection with OpenAI, Altman, and Brockman's solicitations ***of Musk***), nor could Musk enforce such duties allegedly owed to others.[2] Musk glosses over this critical distinction for the simple reason that there is no evidence that Microsoft knew of duties ***to him***.

Musk's summary judgment standard cases, Opp. at 12, do not relieve him of his burden to show actual knowledge. *Consolidated Elec. Co. v. U.S. for Use & Benefit of Gough Indus., Inc.*, 355 F.2d 437 (9th Cir. 1966), predates modern summary judgment law by two decades and did not involve a claim where knowledge is an element on which the non-moving party has the burden. Similarly, in *Wells Fargo Bank Northwest, N.A. v. Polaris Holding Co.*, 2005 WL 1889385 (N.D. Cal. Aug. 9, 2005), the court did not consider a knowledge element and instead found a genuine dispute because "specific facts … provide[d] a basis" for questioning the witness' credibility on the issue. *Id*. at *12. The fundamental defects in Musk's evidence cannot be cured by an evaluation of the credibility of live witnesses. Where knowledge ***is*** a claim element, as it is here, Mot. at 14, 22, courts routinely grant summary judgment if the plaintiff fails to meet its burden. *See, e.g.*, *Chance World Trading E.C. v. Heritage Bank of Com.*, 438 F. Supp. 2d 1081, 1085 (N.D. Cal. 2005) (granting summary judgment on aiding-and-abetting claim where no showing of knowledge

---

[1] In the SUF, Musk nitpicks that some witnesses testified that they "did not recall" communicating with Microsoft as opposed to stating they did not do so. Given that Musk has the burden to establish Microsoft's actual knowledge, this is of no material difference.

[2] Microsoft incorporates OpenAI's arguments in support of summary judgment, including that Musk lacks standing to assert his breach of charitable trust claim.

- 4 -

made); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (a "scintilla of evidence" is insufficient to defeat summary judgment).

**No Circumstantial Evidence**. In the absence of direct evidence, a plaintiff may rely on substantial circumstantial evidence, but it must still be evidence of ***actual knowledge***. *AngioScore*, 70 F. Supp. 3d at 957. *Martinez v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 82 Cal. App. 4th 883, 891 (2000), which is not an aiding-and-abetting case, does not alter the applicable standard. While the court held that circumstantial evidence that the bank "***must*** have known" certain information sufficed, *id*. at 891 (emphasis in original), the court also found that a suggestion it "should have known" did not. *Id*. at 891 n.2. Thus, under *Martinez*, "must have known" is just "circumstantial evidence" raising an "inference" of "actual knowledge." *Id*.

Here, Musk points to no circumstantial evidence that Microsoft had actual knowledge. Instead, he anchors his Opposition to the Scott Email. That email was sent to Microsoft's CEO and others after Altman first told Scott that OpenAI planned to launch a commercial venture to raise funds to purchase the computing power that was undisputedly necessary to continue OpenAI's research. In that email, Scott noted "questions" about OpenAI's plans and merely "wonder[ed]" whether "big" OpenAI donors were aware of OpenAI's plans to add a commercial venture. With no actual information about those donors' intentions, or their reactions, Scott "imagine[d]" that "[i]deologically" they might not have funded an open effort to concentrate machine learning talent so that OpenAI could build a "closed, for profit thing on its back." [Pl. Ex. 1.] Importantly, Scott did not say that he knew about any promises made ***in exchange for*** those donations, much less promises made ***to Musk***. On its face, this email reveals no actual knowledge of any such duties, or their breach. Nor is the Scott Email circumstantial evidence raising an inference of actual knowledge as it is mere speculation about donors' intent. People routinely speculate, but if such speculation sufficed to establish knowledge, that would read out of the law the actual knowledge element of aiding and abetting. *AngioScore*, 70 F. Supp. 3d at 957 (vague suspicions of wrongdoing, or hunches that something fishy was going on, are insufficient to show knowledge); *Casey*, 127 Cal. App. 4th at 1147 ("suspicion and surmise do not constitute actual knowledge"); see *also Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 186 (2020)

- 5 -

(if a party is "not aware of a fact," he "does not have 'actual knowledge' of that fact however close at hand it may be.").

Moreover, Musk's argument about the 2018 email looks at a snapshot in time—March 2018—while ignoring all later events. For instance, despite citing it in his Opposition, Musk disregards a document memorializing Scott's November 2018 discussion with Altman. In that document, Scott reported that Altman clarified and explained the new OpenAI structure featuring (i) a for-profit subsidiary (the LLC) for investments, (ii) control by the OpenAI nonprofit Board, and (iii) retention of returns by the non-profit above a cap. [Pl. Ex. 20]. In other words, Musk focuses on Scott's March 2018 speculation but ignores later evidence showing what Scott actually knew: the nonprofit Board controlled the commercialization, which in turn would serve the nonprofit mission. The Scott email from March 2018 also preceded Microsoft's due diligence, including its review of an OpenAI IRS tax exemption application. In that application, in which OpenAI was responding to a specific IRS question about agreements with officers, directors, trustees, and others, OpenAI did ***not report anything about any agreement with Musk***. Mot. at 16.[3] And, of course, the OpenAI Board—including former co-Plaintiff Zilis—approved the Microsoft agreements, and OpenAI confirmed no third-party rights would be infringed. This undisputed timeline confirms a lack of knowledge and that the earlier speculation was immaterial.

Musk's other supposed evidence also does not move the knowledge needle—it is either speculative, not even circumstantial, or at most insufficient "should have known" evidence:

1.   Musk cites his tweet and Nadella's response in fall 2020 as evidence of Microsoft's knowledge. They reveal nothing of the kind. Musk's tweet stated that Microsoft's exclusive commercial ChatGPT license meant that OpenAI was closed or "captured;" it said nothing about any agreement or duties Musk now claims are owed to him. [Pl. Ex. 31]. Similarly, Nadella's October 2020 comment that Microsoft should "think . . . through" Musk's tweet [Pl. Ex. 32, -

---

[3] Musk notes that the OpenAI IRS application also indicated that OpenAI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At any rate, this discussion ▮▮▮▮ did not convey information about duties to Musk and so is not material.

58648.31] says nothing about a duty to Musk or its breach; it is just another example of speculation that does not suffice to establish actual knowledge. *AngioScore*, 70 F. Supp. 3d at 957.

2. OpenAI's February 2022 restructuring slide deck [Pl. Ex. 37] revealed no duties to donors generally, let alone to Musk. The Opposition also omits that the same deck ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ These statements refute any possible inference that the deck acknowledged that the restructuring would breach any specific donor duties.

3. Musk's December 2022 tweet noted that OpenAI was scraping Twitter/"X" data and complained that while OpenAI was started as open source and non-profit, those things were no longer true. [Pl. Ex. 44] But Musk's complaints about OpenAI are not evidence of duties owed to him or their breach.

4. Musk notes that Reid Hoffman served on the OpenAI and Microsoft Boards and suggests that Hoffman's knowledge should be imputed to Microsoft. Opp. at 6, 16-17. But Musk points to no evidence that Hoffman knew about duties to Musk and their breach, so there is nothing to impute. And because Microsoft did not appoint Hoffman to OpenAI's Board and Hoffman was not Microsoft's OpenAI agent (and Musk cites no evidence to the contrary), there is no basis to impute anything to Microsoft. 3 Witkin, Summary 11th Agency § 161 (2025).

Because Musk can point to no evidence that Microsoft had actual knowledge of duties owed to him or their breach, this case is a far cry from those finding that substantial circumstantial evidence supports an inference of actual knowledge. For example, in *Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1100 (N.D. Cal. 2013), the court denied summary judgment on an aiding-and-abetting claim. There "numerous aspects" of the CFO embezzler's actions, including prolific use of cashier's checks, paying for personal goods and services, altering remitter information, and structuring transactions to avoid the money laundering reporting rule, could have put the bank on notice of the embezzler's breaches of fiduciary duties to his former employer. Also, in *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003), the court refused to dismiss the plaintiff's complaint because it adequately alleged that the banks

utilized atypical banking procedures to service a Ponzi schemer's accounts, raising an inference that they knew of the scheme and sought to accommodate it. *Id*. at 1120. While extensive and repeated instances of circumstantial evidence may suffice at the pleading stage, at summary judgment, no evidence—or even a scintilla—does not. Musk's failure to present any evidence of actual knowledge is dispositive. *Id*. at 1121 n. 68; *see also Chance World Trading E.C.*, 438 F. Supp. 2d at 1085 (granting summary judgment to a bank defendant that had insufficient knowledge to have aided and abetted a customer's fraudulent transactions despite knowledge that an investor had earmarked misused funds for a different purpose); *Casey*, 127 Cal. App. 4th at 1149, 1152 (knowledge of "*something* fishy," including illegitimate businesses, forged checks, checks exceeding written limits, and the removal of large, unreported amounts of cash in duffel bags insufficient absent evidence bank actually knew of misappropriation).

### 2. OpenAI's Approvals, Representations, and Warranties Preclude Any Inference of Microsoft's Actual Knowledge

It is undisputed that OpenAI's nonprofit Board approved each of the agreements with Microsoft. Mot. at 19.[4] Moreover, OpenAI and its for-profit subsidiary repeatedly represented and warranted to Microsoft that they had the power to enter into the agreements with Microsoft and that the agreements ***would not violate any third-party rights***. *Id.* at 20. Musk attempts to dismiss these as "boilerplate" (*see* Opp. at 18:22). But of course, it would be important to Microsoft—or any counterparty—that OpenAI made such written representations, which are routinely enforced. *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 117, 119 (Del. 2012) (public policy favors enforcing written warranties/representations in agreements resulting from arm's length negotiations between sophisticated parties, even if embedded in standard language).[5] These assurances confirm that Microsoft did not know and had no reason to believe (if that were the

---

[4] In his SUF response, Musk suggests that the OpenAI non-profit was not a 2023 JDCA party that made representations and provided warranties, but that suggestion is simply wrong on the face of the JDCA. SUF Reply at 7. And in 2019 and 2021, both OpenAI and its for-profit subsidiary gave similar representations and warranties, *see id*. at 4-6.

[5] *See also* Mot. at 15 n.11 (under California trust law, an innocent third party is "fully protected" in relying on trustee); *Adler v. Manor Healthcare Corp.*, 7 Cal. App. 4th 1110, 1119 (1992) (third party has "absolute right" to rely on trustee's representations).

1  standard, and it is not) of any purported duties owed to Musk. *In re Radnor Holdings Corp.*, 353
2  B.R. 820, 844 (Bankr. D. Del. 2006) (representations and warranties preclude a finding that there
3  was reason to know of fiduciary duties).

4      Musk argues *In re Radnor* does not apply because a party cannot rely on representations
5  and warranties while turning a blind eye to other evidence. But there is ***no evidence*** that Microsoft
6  put its head in the sand. Musk cannot point to any evidence to show that "Microsoft had substantial
7  reason to doubt OpenAI's representations." Opp. at 19:13. As discussed *supra* at 3-8, there is no
8  evidence extrinsic to the representations and warranties that Microsoft had actual knowledge of
9  purported duties to Musk or their breach. On that basis, *River Colony Estates Gen. P'ship v.*
10 *Bayview Fin. Trading Grp., Inc.*, 287 F. Supp. 2d 1213 (S.D. Cal. 2003), likewise has no
11 application here. In that case, investors presented substantial evidence that a lender had actual
12 knowledge that its loan varied substantially and materially from terms set forth in an offering
13 memorandum to the investors and that the investors were not notified of the variance. There is no
14 such conflicting evidence here.

### 3. Constructive Knowledge Does Not Suffice, and There Is No Evidence That Microsoft Had Constructive Knowledge of Duties to Musk

17     Musk agrees that aiding-and-abetting liability requires ***actual knowledge*** of duty and
18 breach, but he fundamentally relies on ***constructive*** knowledge. That, the law does not allow.

19     Where constructive knowledge is permitted, it exists where the law attributes or imputes
20 knowledge to a person when, using reasonable care and diligence, that person should have known.
21 *In re Columbia Pipeline Grp., Inc. Merger. Litig.*, 342 A.3d 324, 356 n.194 (Del. June 17, 2025);
22 *see also Intel Corp. Inv. Policy Comm.*, 589 U.S. at 185 (constructive knowledge is imputed by
23 law). In contrast, actual knowledge is "[r]eal knowledge" that is "clear and direct." *In re Columbia*
24 *Pipeline Grp., Inc.*, 342 A.3d at 356 n.194, citing *Intel Corp. Inv.* 589 U.S. at 184-85 (unread
25 disclosures did not provide "actual" knowledge triggering statute of limitations for ERISA breach
26 of fiduciary duty claim; to have "actual knowledge" of information, one must "in fact be aware of
27 it").

28     Musk leans on the COI to argue that Microsoft should have known of duties to Musk.

- 9 -

Through due diligence, Microsoft received OpenAI's COI and Musk contends that Microsoft had sufficient knowledge for his aiding-and-abetting claim because it was aware of (i) OpenAI's basic corporate purposes as embodied in the COI [Pl. Ex. 24], and (ii) the fact that OpenAI had donors, including Musk. Opp. at 13-14. Musk's argument fails for three reasons.[6]

***First***, Musk's argument relies on an inapplicable statute and on immaterial constructive knowledge. Musk asserts that Microsoft's awareness of OpenAI's COI, combined with Cal. Bus. and Prof. Code § 17510.8, put Microsoft on notice of duties to OpenAI's charitable donors, including Musk. Opp. at 13:7-16, 14:15-19. Not so. There is no evidence Microsoft knew of any specific solicitation to Musk or any conditions attached to his contributions; without that predicate, Section 17510.8 provides nothing from which to infer Microsoft's knowledge of duties owed to him. More generally, the argument relies on constructive knowledge—what Microsoft ***should have known*** given the COI. But California law and the leading Delaware authorities of *In re Columbia Pipeline Grp., Inc*. and *In re Mindbody, Inc., Stockholder Litig*., 332 A.3d 349 (Del. 2024), neither of which the Opposition addresses, reject constructive knowledge. Mot. at 17-18. Under settled applicable law, then, awareness of a nonprofit's governing document is not evidence of actual knowledge of donor-specific duties, and Musk cites no authority to the contrary. *See also supra* at 4 (only knowledge of duty ***to Musk*** could be actionable). Musk attempts to brush off the distinction between knowledge of the COI and knowledge of purported duties to him as a "quibble," Opp. at 20 n.12. But there is no legal basis for conflating the two. And this makes sense, as a contrary result would improperly impute a nonprofit's knowledge to a for-profit partner, chilling legitimate collaborations.

***Second***, it does not matter that Microsoft knew that OpenAI had donors generally. Virtually every charity has donors. So, it is no surprise that Musk fails to cite a single case suggesting that knowledge of donors alone meets the standard for establishing actual knowledge of a duty to a specific donor and its breach. In *In re First All. Mortg. Co.*, 471 F.3d 977 (9th Cir.

---

[6] Musk also cites Microsoft's knowledge of OpenAI's introductory blog post about its "mission" [Pl. Ex. 2, 7] and internal Microsoft emails about OAI's nonprofit status (Opp. at 2). But those communications add nothing to the terms of the COI itself, rendering them merely cumulative.

1  2006), the court found that Lehman had actual knowledge of a lender's fraud, even without
2  knowing the identity of each defrauded class member. *Id*. at 994. Here, by contrast, the record
3  shows that Microsoft had no knowledge of specific duties to *any* individual donors, not that it
4  knew of duties to several donors but was unaware Musk was among them. Musk also suggests
5  that *Casey*, 127 Cal. App. 4th 1138, found sufficient allegations of knowledge, Opp. at 15. But
6  *Casey* merely focused on the sufficiency of allegations of the primary underlying wrong. *Casey*
7  has no bearing on the question of whether Microsoft's general awareness of donors qualifies as
8  actual knowledge of purported duties specific to Musk.

9  ***Third***, just like the rest of Musk's cited evidence, the 2016 COI must be read in context.
10 As explained, OpenAI's nonprofit Board formed the for-profit subsidiary, approved the
11 agreements with Microsoft, and warranted that those agreements would not encumber any third-
12 party rights. Against all of that evidence, the mere fact of the COI cannot reasonably raise an
13 inference that Microsoft nevertheless had actual knowledge of duties owed to Musk.

### 4.  Microsoft's Commercial Dealings with OpenAI and Microsoft's Alleged Motives Do Not Establish Actual Knowledge

16 Musk next attempts to substitute for actual knowledge the fact that Microsoft engaged in
17 conduct that might be relevant for the substantial assistance prong of aiding and abetting, but that
18 conduct says nothing about Microsoft's knowledge of duties to Musk and their breach.

19 Specifically, Musk's Opposition devotes a substantial amount of space to topics such as
20 Microsoft's purported "pushing" of OpenAI to commercialize its technology, expansion of
21 contractual rights as Microsoft's investment in OpenAI grew, participation by Microsoft on an
22 OpenAI safety board, and the fact that Microsoft offered (unimplemented) suggestions for
23 potential OpenAI Board members after Altman's firing. Opp. at 5-11. But conduct, whether in the
24 form of investment in or collaboration with OpenAI, does not establish requisite actual knowledge.
25 For instance, in *Casey*, the court held that "though the complaint provides ample details of the
26 banks' improper ***conduct*** in their business dealings with the unscrupulous . . . Fiduciaries, the
27 complaint fails to establish that the banks had actual knowledge of the primary violation in which

1  they purportedly participated. Absent such knowledge, the banks cannot be held liable on an aiding
2  and abetting theory." *Id.* at 1148 (emphasis in original).

3  The Opposition also tries to collapse the knowledge and substantial assistance elements by
4  arguing that the Microsoft-OpenAI agreements were "atypical." Opp. at 15-16. But that
5  characterization is not material evidence of anything. While the Microsoft-OpenAI transactions
6  reflect unique, complex deals involving innovative technology, that does not make them
7  "irregular," and even irregularity is not enough without evidence of actual knowledge. *Casey*, 127
8  Cal. App. 4th at 1149-53 ("irregular" banking transactions do not establish aiding and abetting
9  absent proof the bank knew of the fiduciary breach); *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th
10 727, 745 (2010) (rejecting aiding-and-abetting theories where allegations showed irregularities in
11 ordinary services but not actual knowledge of the fiduciary's breach). *Simi Mgmt. Corp.*, 930 F.
12 Supp. 2d 1082, is not to the contrary. That case involved numerous red flags regarding a
13 fiduciary's use of cashier's checks to embezzle funds. *Id.* at 1100. There are no analogous facts
14 here; a complex commercial transaction—even one that is unique—is not remotely equivalent to
15 numerous red flags in a standard banking relationship.

16 Musk also tries to argue that Microsoft's interest in not losing money is somehow evidence
17 that Microsoft knew about duties owed to Musk. Op. at 16:6. But neither Microsoft's alleged
18 reason for partnering with OpenAI, nor its CFO's quip that the profit cap's limit on Microsoft's
19 profits did not seem "terribly altruistic" [Pl. Ex. 26], provides evidence that Microsoft had actual
20 knowledge of OpenAI's obligations to Musk. *In re Essendent, Inc.*, 2019 WL 7290944, *18
21 (bidder's desire for advantage and knowledge that its proposal was inferior to another's and that
22 the target board was nevertheless favoring it were inadequate to state an aiding-and-abetting claim;
23 facts were consistent with typical, arms-length negotiations); *Morgan v. Cash*, 2010 WL 2803746,
24 at *5 (Del. Ch. July 16, 2010) (a bidder's attempt to reduce a merger price through arm's length-
25 negotiations cannot give rise to aiding-and-abetting liability).

26 **5.    There Is No Evidence Microsoft Intended to Provide Substantial
27          Assistance to Breach a Duty to Musk**

28 Relying on *In re First All. Mortg. Co.*, 471 F.3d 977, Musk argues that aiding and abetting

- 12 -

does not require proof of "specific" intent, only actual knowledge. Opp. at 17. But Microsoft never argued that aiding and abetting requires evidence of specific intent, and Musk simply confuses specific and ordinary intent. Specific intent means an agreement as to a common design, which is required for civil conspiracy. Restatement of Torts (Second) § 876(a). Aiding and abetting does not require an agreement to commit the underlying tort, *id.* § 876(b). But it **does** require a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act. Mot. at 18; *Hough v. Carroll*, 2025 WL 1674425, at *8 (C.D. Cal. May 5, 2025) (an alleged aider and abettor must have "acted with the intent of facilitating the commission of [the underlying] tort.") (cit. omit.); *Casey*, 127 Cal. App. 4th at 1146; *Neilson*, 290 F. Supp. 2d at 1119 (conscious decision to participate in tortious activity required). In response, Musk cites no evidence of intent, but only of Microsoft's conduct, including its investments in OpenAI and its urging of OpenAI to commercialize products. Opp. at 18. But evidence of Microsoft's commercial conduct is not evidence of knowledge or intent to assist another's tortious activity, *see supra* at 11. If anything, Microsoft's conduct shows Microsoft's investments assisted OpenAI's nonprofit Board in achieving its mission: as Mr. Nadella testified, "I'm proud that Microsoft [] has contributed to the two largest nonprofits in the world, … the Gates Foundation and the OpenAI nonprofit." Nadella Dep. 129:15-18 [Pl. Ex. 9] (cleaned up). While Microsoft does not need to prove that is so, the actual evidence dispels any notion that Microsoft intended to substantially assist OpenAI in breaching alleged duties (of which Microsoft had no knowledge) to Musk.

In effect, Musk argues that Microsoft's commercial deal is *per se* wrong. But the law does not support that theory, and Musk's complaints about Microsoft's transactions with OpenAI do not evidence make. What the evidence shows is Microsoft did not know of duties to Musk or their breach, and OpenAI repeatedly warranted there were none. On the evidence, Microsoft could not have intended to facilitate any underlying tort, requiring summary judgment for Microsoft.

**B.  The Court Should Grant Summary Judgment on Count 4 (Quasi Contract / Unjust Enrichment)**

**1.  Unjust Enrichment Requires Actual Knowledge and Microsoft Had No Reason to Know in any Event**

Innocent third parties without knowledge of underlying violations do not owe restitution, the remedy for unjust enrichment. Mot. at 23. For the reasons discussed, Microsoft had no knowledge—and no reason to know—about any alleged duties owed to Musk or their breach. Moreover, the Opposition's "reason to know" argument does not suffice for unjust enrichment, and Musk's three pleading-stage cases do not say otherwise. *Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230 (2018), involved special rules regarding constructive notice of recorded real property liens. In that narrow context, the court found that plaintiff alleged subsequent owner-defendants knew or had reason to know of plaintiff's claim against an earlier property owner, *id*. at 237, 241. But the court specifically noted that it was not ruling the plaintiff could prove knowledge, *id*. at 241. *First Nationwide Sav v. Perry*, 11 Cal. App. 4th 1657 (1992), arose in a similar context, and is a case in which the defendant "clearly had notice of the reconveyance" because it received a mail copy. *Id.* at 1669. The court's statement that where a defendant "knew or should have known" it can be unjustly enriched (*id*. at 1671) is *dicta* because the court also noted that "knowledge is critical" to an unjust enrichment claim and found there was such knowledge. *Id*. at 1669. And *Gen Star Indem. Co. v. First Am. Title Ins. Co. of Napa*, 2021 WL 916850, *4 (N.D. Cal. Mar. 10, 2021), merely quoted *First Nationwide* but did not analyze the question of knowledge.

**2.  The Unjust Enrichment Claim Fails Because Musk Bases It on Facts in Common with the Aiding-and-Abetting Claim**

Musk's unjust enrichment claim also fails because it relies on the same core facts as the aiding-and-abetting claim. Mot. at 21. Musk responds that the claims involve different elements, Opp. at 21, and the facts do not overlap completely, *id.* at 22. But he does not deny that the overlap is substantial. And there is no question that both claims require proof that Microsoft knew of duties to Musk and their breach. *See supra* at 14:4-20. Where proof of a common element is lacking, as it is here, the unjust enrichment claim fails. *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading,*

- 14 -

*LLC*, 2022 WL 18906, *1 (9th Cir. Jan. 3, 2022).

### 3. Under Applicable Federal Common Law, the Unjust Enrichment Claim Fails Where an Adequate Legal Remedy Exists

The equitable unjust enrichment claim also fails under *Sonner v. Premier Nutrition Corp.*, 49 F. 4th 1300 (9th Cir. 2022), because Musk had an adequate remedy at law under that the aiding and abetting claim when he pled it. Musk argues that the *Sonner* rule applies only to relief sought under the same claim, Opp. at 22. Not so. *Sonner* itself dismissed a UCL claim for restitution because the plaintiff asserted a separate CLRA claim for damages, *id.* at 1302. Federal courts routinely dismiss unjust enrichment claims when, as here, a plaintiff brings a claim providing an adequate remedy and a separate unjust enrichment claim, treating the latter as an equitable remedy rather than a standalone cause of action. *Stapleton v. JPMorgan Chase Bank, N.A.*, 779 F. Supp. 3d 1059, 1076 (N.D. Cal. 2025). For the *Sonner* rule to apply, the claim elements and proof need not be identical. *Pietosi v. HP, Inc.*, 2025 WL 30365909, *3 (N.D. Cal. Oct. 30, 2025) (different fraud and quasi-contract claim elements).

Musk ignores this federal common law and focuses solely on inapposite state law cases. *Tanforan v. Tanforan*, 173 Cal. 270 (1916) (not addressing *Sonner*-type adequacy of legal remedy). And *Jogani v. Superior Ct.*, 165 Cal. App. 4th 901, 911 (2008), agreed that unjust enrichment is not a separate cause of action. Here, Musk seeks restitution/disgorgement via a constructive trust, SAC ¶¶ 279, 416, so the restitution he seeks is equitable in nature.[7] And he bases the unjust enrichment claim on the same facts, SAC ¶¶ 275, 409, and seeks identical remedies, *id.* ¶¶ 280, 417, as the aiding-and-abetting claim. As a result, the unjust enrichment claim cannot survive because Musk had an adequate remedy at law.

### III. CONCLUSION

For all the above reasons, Microsoft's Motion should be granted.

---

[7] Federal common law applies to the nature of restitution. *Sonner*, 49 F.4th at 1303. And, under that law, when a plaintiff seeks a constructive or equitable lien, and "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession," the restitutionary remedy is equitable. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).

DATED: November 21, 2025

Respectfully Submitted,

DECHERT LLP

By: */s/ Russell P. Cohen*
Russell P. Cohen (SBN 213105)
Russ.cohen@dechert.com
Howard M. Ullman (SBN 206760)
Howard.ullman@dechert.com
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4500
Facsimile: (415) 262-45555

Nisha Patel (SBN 281628)
Nisha.patelgupta@dechert.com
DECHERT LLP
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700
Facsimile: (213) 808-5760

Andrew J. Levander (admitted *pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

John (Jay) Jurata, Jr. (admitted *pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

*Attorney for Defendant Microsoft Corporation*