1  JORDAN ETH (CA SBN 121617)
   JEth@mofo.com
2  WILLIAM FRENTZEN (CA SBN 343918)
   WFrentzen@mofo.com
3  DAVID J. WIENER (CA SBN 291659)
   DWiener@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, CA 94105
   Telephone:    (415) 268-7000
6  Facsimile:    (415) 268-7522

7  WILLIAM SAVITT (admitted *pro hac vice*)
   WDSavitt@wlrk.com
8  BRADLEY R. WILSON (admitted *pro hac vice*)
   BRWilson@wlrk.com
9  SARAH K. EDDY (admitted *pro hac vice*)
   SKEddy@wlrk.com
10 STEVEN WINTER (admitted *pro hac vice*)
   SWinter@wlrk.com
11 NATHANIEL CULLERTON (admitted *pro hac vice*)
   NDCullerton@wlrk.com
12 WACHTELL, LIPTON, ROSEN & KATZ
   51 West 52nd Street
13 New York, NY 10019
   Telephone:    (212) 403-1000
14 Facsimile:    (212) 403-2000

15 *Attorneys for Defendants Samuel Altman, Gregory Brockman,*
   *OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,*
16 *OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,*
   *OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,*
17 *OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,*
   *OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,*
18 *OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,*
   *OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,*
19 *OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,*
   *Aestas Management Company, LLC, and Aestas LLC*

20

21

22

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **OPENAI DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date: January 7, 2026 |
| | Time: 2:00 p.m. |
| | Courtroom: 1 – 4th Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR COUNSEL: Please take notice that on January 7, 2026 at 2:00 p.m., or at such other time as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers, in Courtroom 1 of the U.S. District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC (the "OpenAI Defendants") will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 56 for an order entering summary judgment in favor of the OpenAI Defendants on Counts IV, VI, VII, and XVIII of the second amended complaint of Plaintiffs Elon Musk and X.AI Corp., dated May 22, 2025.

This motion seeks summary judgment in favor of the OpenAI Defendants on Musk's claims for breach of charitable trust (Count XVIII), constructive fraud (Count VI), fraud (Count VII), and unjust enrichment (Count IV). Because there are no genuine disputes of material fact regarding the grounds for this motion, the OpenAI Defendants are entitled to judgment as a matter of law as to each claim.

The OpenAI Defendants' motion is based on this Notice of Motion and Motion for Summary Judgment, the accompanying Memorandum of Points and Authorities, the OpenAI Defendants' Separate Statement of Undisputed Material Facts ("SUF") and accompanying exhibits in support thereof attached to the Declaration of David J. Weiner, and the records in this action and such further evidence and argument that may be presented at the hearing of this Motion and that the Court may consider.

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether summary judgment should be granted in favor of the OpenAI Defendants on Musk's breach of charitable trust claim (Count XVIII) because there is no genuine dispute of material fact that Musk lacks standing to pursue the claim, and there is otherwise no charitable trust for Musk to enforce.

2.      Whether summary judgment should be granted in favor of the OpenAI Defendants on Musk's constructive fraud claim (Count VI) because there is no genuine dispute of material fact that: (a) there is no fiduciary relationship between Musk and the OpenAI Defendants; (b) Musk lacks standing to pursue the claim; and (c) the claim fails for the same reason as Musk's fraud claim and is time-barred under the applicable three-year statute of limitations.

3.      Whether summary judgment should be granted in favor of the OpenAI Defendants on Musk's fraud claim (Count VII) because there is no genuine dispute of material fact that: (a) there was no actionable misrepresentation; (b) Musk did not justifiably rely on the alleged misrepresentations; and (c) the claim is time-barred under the applicable three-year statute of limitations.

4.      Whether summary judgment should be granted in favor of the OpenAI Defendants on Musk's unjust enrichment claim (Count IV) because there is no genuine dispute of material fact that: (a) California law bars the claim because Musk has chosen to pursue tort claims based on the same alleged conduct; (b) any request-based quasi-contract theory fails because there was no expectation that Musk would be compensated for his alleged contributions to OpenAI; (c) any fraud-based theory of unjust enrichment fails because (i) the alleged misrepresentations are not actionable, and (ii) Musk also did not justifiably rely on them; and (d) the claim is time-barred under both the two-year statute of limitations applicable to quasi-contract claims and the three-year statute of limitations applicable to unjust enrichment claims grounded in fraud.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 5

I. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S BREACH OF CHARITABLE TRUST CLAIM (COUNT XVIII) ................... 5

    A. Musk lacks standing to bring his charitable trust claim because he did not make the cash donations to OpenAI on which his claim rests. .............................. 5

    B. Musk cannot rely on "settlor standing" under the Third Restatement. ................... 8

    C. Even if Musk had donated directly to OpenAI, he would still lack standing ........ 11

    D. Musk's noncash contributions do not save his claim. ........................................... 14

II. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S CONSTRUCTIVE FRAUD CLAIM (COUNT VI) ......................................... 15

III. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S FRAUD CLAIM (COUNT VII) ........................................................................ 15

    A. The record is devoid of any actionable misrepresentation. ................................... 16

    B. The record evidence negates the element of justifiable reliance. .......................... 17

    C. Musk's fraud and constructive fraud claims are time-barred. ............................... 18

IV. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S UNJUST ENRICHMENT CLAIM (COUNT IV) ........................................... 20

    A. Musk's pursuit of tort claims bars his unjust enrichment claim. ........................... 20

    B. Any request-based quasi-contract theory fails as a matter of law. ........................ 21

    C. Any theory of unjust enrichment based on fraud fails as a matter of law. ............ 23

    D. Musk's unjust enrichment claim is time-barred. .................................................. 23

CONCLUSION .................................................................................................................. 24

**Cases**

*Anderson* v. *Am. Airlines, Inc.*,
  2011 WL 855820 (N.D. Cal. Mar. 9, 2011) ............................................................................ 22

*Anderson* v. *Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................................. 5

*Autonomous Region of Narcotics Anonymous* v. *Narcotics Anonymous World
  Servs., Inc.*,
  77 Cal. App. 5th 950 (2022) ............................................................................................... 9 n.6

*Best Carpet Values, Inc.* v. *Google, LLC*,
  90 F.4th 962 (9th Cir. 2024) .................................................................................................. 20

*Civic Partners Stockton, LLC* v. *Youssefi*,
  218 Cal. App. 4th 1005 (2013) .............................................................................................. 20

*Clay* v. *Koch*,
  1996 WL 417241 (N.D. Cal. July 22, 1996) ........................................................................ 17

*Coleman* v. *Frontier Mission Fellowship, Inc.*,
  2023 WL 7035846 (Cal. Ct. App. Oct. 26, 2023) ........................................................... 22 n.12

*Derblom* v. *Archdiocese of Hartford*,
  289 A.3d 1187 (Conn. 2023) .................................................................................................. 10

*Dey* v. *Robinhood Mkts., Inc.*,
  780 F. Supp. 3d 882 (N.D. Cal. 2025) .................................................................................. 17

*Exec. Comm.* v. *Kaplan*,
  2004 WL 6084228 (C.D. Cal. Sept. 17, 2004) ...................................................................... 14

*Fabian* v. *LeMahieu*,
  2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) ......................................................................... 15

*Fairbairn* v. *Fidelity Invs. Charitable Gift Fund*,
  2018 WL 6199684 (N.D. Cal. Nov. 28, 2018) ................................................................... 8 n.5

*Fund for Anonymous Gifts* v. *I.R.S.*,
  1997 WL 198108 (D.D.C. Apr. 15, 1997) ............................................................................... 6

*Gerling Glob. Reinsurance Corp.* v. *Fremont Gen. Corp.*,
  2007 WL 9757934 (C.D. Cal. Jan. 10, 2007) ........................................................................ 24

iv

*Gonsalves* v. *Hodgson*,
   38 Cal. 2d 91 (1951) ................................................................ 15

*Hamilton Materials, Inc.* v. *Dow Chem. Corp.*,
   494 F.3d 1203 (9th Cir. 2007) ................................................ 18

*Holt* v. *Coll. of Osteopathic Phys. & Surgeons*,
   61 Cal. 2d 750 (1964) ........................................................... 7, 9

*Horiike* v. *Humane Soc.*,
   2016 WL 11744969 (C.D. Cal. June 20, 2016) ................ 13, 14, 22

*Huntsman* v. *Corp. of the President of the Church of Jesus Christ of Latter-Day
   Saints*,
   127 F.4th 784 (9th Cir. 2025) ............................................. 16, 17

*Huskinson & Brown, LLP* v. *Wolf*,
   32 Cal. 4th 453 (2004) ........................................................... 21

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
   2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ....................... 21

*In re National Heritage Foundation*,
   510 B.R. 526 (E.D. Va. 2014) ................................................. 8

*In re Oracle Corp. Secs. Litig.*,
   627 F.3d 376 (9th Cir. 2010) .................................................. 5

*Isaacs* v. *USC Keck Sch. of Med.*,
   853 F. App'x 114 (9th Cir. 2021) ........................................... 18

*Jimirro* v. *Paley Ctr. for Media*,
   2025 WL 1112736 (C.D. Cal. Apr. 4, 2025) ........................... 13

*L.B. Rsch. & Educ. Found.* v. *UCLA Found.*,
   130 Cal. App. 4th 171 (2005) ................................................ 13

*Louis* v. *Nailtiques Cosmetic Corp.*,
   423 F. App'x 711 (9th Cir. 2011) ..................................... 16, 17

*Mahon* v. *Mainsail LLC*,
   2024 WL 3455277 (N.D. Cal. May 8, 2024) ........................... 18

*Major* v. *Ocean Spray Cranberries, Inc.*,
   2015 WL 859491 (N.D. Cal. Feb. 26, 2015) ........................... 17

*Marentes* v. *State Farm Mut. Auto. Ins. Co.*,
   224 F. Supp. 3d 891 (N.D. Cal. 2016) ..................................... 9

*McBride* v. *Boughton*,
123 Cal. App. 4th 379 (2004) ....................................................................................... 20, 21

*Oberly* v. *Kirby*,
592 A.2d 445 (Del. 1991) ..................................................................................................... 10

*Olivier* v. *Baca*,
913 F.3d 852 (9th Cir. 2019) ................................................................................................. 5

*Pac. Home* v. *L.A. Cnty.*,
41 Cal. 2d 844 (1953) ........................................................................................................... 10

*Patton* v. *Sherwood*,
152 Cal. App. 4th 339 (2007) ............................................................................................. 13

*People* v. *Orange Cnty. Charitable Servs.*,
73 Cal. App. 4th 1054 (1999) ............................................................................................. 14

*Pinkert* v. *Schwab Charitable Fund*,
2021 WL 2476869 (N.D. Cal. June 17, 2021) ............................................................... *passim*

*Pinkert* v. *Schwab Charitable Fund*,
48 F.4th 1051 (9th Cir. 2022)......................................................................................... *passim*

*Prostar Wireless Grp., LLC* v. *Domino's Pizza, Inc.*,
360 F. Supp. 3d 994 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) ................... 17

*Siebach* v. *Brigham Young Univ.*,
361 P.3d 130 (Utah Ct. App. 2015) ............................................................................... 15, 22

*Silver* v. *Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) ............................................................ 20, 21, 23

*Smolen* v. *Deloitte, Haskins & Sells*,
921 F.2d 959 (9th Cir. 1990)............................................................................................... 17

*Stanford Hosp. & Clinics* v. *Guarantee Tr. Life Ins. Co.*,
2012 WL 694743 (N.D. Cal. Mar. 1, 2012)...................................................................... 23

*State Farm Mut. Auto. Ins. Co.* v. *Super. Ct.*,
114 Cal. App. 4th 434 (2003)............................................................................................. 12

*Styles* v. *Friends of Fiji*,
373 P.3d 965 (Nev. 2011) ...................................................................................................... 8

*SVF II Aggregator (DE) LLC* v. *Shafi*,
2024 WL 3324623 (N.D. Cal. May 2, 2024) ............................................................... 21 n.11

*Taylor* v. *Google, LLC*,
2024 WL 837044 (9th Cir. Feb. 28, 2024)............................................................... 20, 21, 22

*Turner* v. *Victoria*,
   15 Cal. 5th 99 (2023) ................................................................................................ 12

*United States* v. *Am. Bar Endowment*,
   477 U.S. 105 (1986) ................................................................................................. 22

*Vazquez* v. *DataRobot, Inc.*,
   2023 WL 6323101 (N.D. Cal. Sept. 28, 2023) ........................................................ 16

*Vera* v. *REL-BC, LLC*,
   66 Cal. App. 5th 57 (2021) ................................................................................ 18, 19

*Voss* v. *Sutardja*,
   2015 WL 349444 (N.D. Cal. Jan. 26, 2015) ........................................................... 12

*Williford* v. *Ocwen Loan Serv., LLC*,
   2011 WL 13182978 (C.D. Cal. July 28, 2011) ....................................................... 18

*Wood* v. *Motorola Mobility, Inc.*,
   2012 WL 892166 (N.D. Cal. Mar. 14, 2012) .......................................................... 23

*Wu* v. *Sunrider Corp.*,
   2018 WL 6266577 (C.D. Cal. May 22, 2018), *aff'd*, 793 F. App'x 507 (9th Cir.
   2019) ........................................................................................................................ 23

*Young* v. *Cree, Inc.*,
   2021 WL 4749384 (N.D. Cal. Oct. 12, 2021) ......................................................... 23

*Yu-Sze Yen* v. *Buchholz*,
   2013 WL 1165013 (N.D. Cal. Mar. 20, 2013) ........................................................ 16

*Zeichner* v. *Nord Sec. Inc.*,
   2024 WL 4951261 (N.D. Cal. Dec. 2, 2024) .......................................................... 21

*Zhang* v. *Yuan*,
   2024 WL 3906751 (N.D. Cal. Aug. 21, 2024) ........................................................ 24

**Statutes and Rules**

26 U.S.C. § 4942 .............................................................................................................. 6 n.4

26 U.S.C. § 4966(d)(2) .......................................................................................................... 6

Cal. Bus & Prof. Code § 17510 ......................................................................................... 14

Cal. Bus & Prof. Code § 17510.6. ..................................................................................... 14

Cal. Bus & Prof. Code § 17510.8 .................................................................... 11, 13, 14, 15

Cal. Civ. Proc. Code § 338(d) ..................................................................................... 18, 24

Cal. Corp. Code § 5003(a)(2) ................................................................. 12

Cal. Corp. Code § 5046(b) ..................................................................... 11

Cal. Corp. Code § 5122(b) ............................................................... 12 n.9

Cal. Corp. Code § 5141 ........................................................................... 12

Cal. Corp. Code § 5142 ..................................................................... 11, 12

Cal. Corp. Code § 5234(a) ............................................................... 12 n.9

Cal. Corp. Code § 6910 ........................................................................... 12

Cal. Prob. Code § 15202 ......................................................................... 14

Fed. R. Civ. P. 56(a) ................................................................................. 5

Treas. Reg. § 53.4945-5(a)(6)(i) ............................................................... 7

**Other Authorities**

60 Cal. Jur. 3d Trusts § 24 ...................................................................... 15

Evelyn Brody, *From the Dead Hand to the Living Dead: The Conundrum of
    Charitable-Donor Standing*, 41 Ga. L. Rev. 1183 (2007) ...................... 9

George G. Bogert, *The Law of Trusts and Trustees* § 323 (3d. ed. 2014) ................... 11

Gregory L. Colvin & Stephanie L. Petit, Fiscal Sponsorship: 6 Ways To Do It
    Right (3d ed. 2019) ............................................................................. 7

IRS Rev. Rul. 68-489 (1968) ..................................................................... 7

Internal Revenue Service, *Instructions for Form 990 Return of Organization
    Exempt from Income Tax* (2022) .......................................................... 10

Iris J. Goodwin, *Donor Standing to Enforce Charitable Gifts: Civil Society v.
    Donor Empowerment*, 58 Vand. L. Rev. 1093 (2005) ........................... 13

Restatement (Third) of Trusts § 2 ........................................................... 14

Restatement (Third) of Trusts § 3 ........................................................... 11

Restatement (Third) of Trusts § 10 ......................................................... 11

Restatement (Third) of Trusts § 28 ..................................................... 9, 11

Restatement (Third) of Trusts § 94 ........................................................ 8, 9

Witkin, Contracts § 1057 ......................................................................... 20

Witkin, Contracts § 1072 .................................................................................... 20

Witkin, Contracts § 1073 .................................................................................... 21

OPENAI DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:24-CV-04722-YGR

**INTRODUCTION**

Elon Musk and xAI, the artificial intelligence company Musk controls, brought this kitchen-sink lawsuit in 2024, promising to prove the breach of an alleged founding agreement and more than two dozen other related claims. Many of Musk's 26 causes of action were rejected at the threshold for failure to state a claim. And now, after extensive discovery, Musk's remaining claims have been revealed to lack any support in the evidence. Pressed under oath to substantiate his marquee contract claim, Musk offered no facts, only evasion: "A contract?," he asked. "For what?" "I'm not sure what you mean by a contract." So it is no surprise that on the eve of this summary judgment motion, Musk jettisoned his lead contract claim entirely, electing to pursue an amorphous claim of unjust enrichment where his alleged founding agreement once stood.

All of Musk's remaining claims are equally unsupported by the evidentiary record. Musk seeks to enforce a "charitable trust" on the basis of donations to OpenAI, but the undisputed facts show he did not make those donations and that the general-purpose donations that were made do not create a charitable trust that Musk has standing to enforce. Point I, *infra*. The same undisputed facts and well-settled law doom Musk's constructive fraud claim. Point II, *infra*.

Musk's fraud claims likewise fail on the undisputed facts and law. There is no evidence to support Musk's allegation that his co-founders misled him in 2017. And the undisputed evidence negates Musk's claim that he relied on any representations they did make. The fraud claims fail on each of these grounds. They also fail because they are long-since time-barred. Point III, *infra*.

Finally, Musk's claim for unjust enrichment should likewise be dismissed. California law bars unjust enrichment claims when a plaintiff pursues tort claims for the same conduct, as Musk does here. Even setting aside that bar, the claim fails as a matter of law. To the extent Musk means Defendants were unjustly enriched by virtue of a quasi-contract, the basic elements are missing: the uncontroverted evidence is that Musk did not and could not have any expectation that he would be compensated for the benefits he claims to have bestowed upon OpenAI. To the extent Musk intends to ground a claim for unjust enrichment on an underlying fraud, the claim fails for want of evidence to sustain a fraud claim, as summarized above. And no matter the theory, Musk's unjust enrichment claim accrued and expired long ago. Point IV, *infra*.

This lawsuit was filed with maximum press fanfare and the promise of proving up an egregious series of misrepresentations. The evidence shows that promise to be empty. And it confirms that this suit is about a frustrated commercial competitor seeking to slow down a mission-driven market leader. Musk has been given every opportunity to develop evidence to support his case. But the evidence just isn't there. And never was. Summary judgment is in order.

## BACKGROUND

OpenAI, Inc. ("OpenAI") is a Delaware nonprofit corporation headquartered in California. SUF 1.[1] It was founded in 2015 by Sam Altman, Greg Brockman, Ilya Sutskever, and Elon Musk. Altman and Musk were named as OpenAI's co-chairs. Ex. 70 at 3. Musk remained a director and member of OpenAI until he resigned from the board in February 2018. SUF 39; Ex. 54. Altman became CEO in 2019, and today still serves as CEO and a director of OpenAI. Ex. 81; Dkt. 107.1.

Before incorporating OpenAI, the founders discussed the new organization's mission. That mission, reflected in a number of public documents, "is to ensure that artificial general intelligence … benefits all of humanity." SUF 4; Ex. 3. OpenAI's original certificate of incorporation, filed with the Delaware Secretary of State in December 2015, stated that "[t]he specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence," and that "[t]he resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable." SUF 23; Ex. 1. OpenAI's amended certificate, filed in April 2020, provides that OpenAI's "specific purpose" "is to ensure that artificial general intelligence benefits all of humanity," and that the "resulting technology will benefit the public and the corporation will seek to distribute it for the public benefit when applicable." SUF 24; Ex. 2.

From the outset, it was clear that pursuit of OpenAI's mission would require substantial funding. To "avoid sounding hopeless relative to what Google or Facebook are spending," Musk proposed in November 2015 that OpenAI "say that we are starting with a $1B funding

---

[1] "SUF" refers to the OpenAI Defendants' Statement of Undisputed Facts, and "Ex." refers to the exhibits attached to the transmittal declaration of David J. Weiner, each filed herewith. Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted.

commitment," and committed to "cover whatever anyone else doesn't provide." Ex. 80. OpenAI accordingly announced in its December 2015 founding blog post that its donors had "committed $1 billion." Ex. 70 at 3. In February 2016, Musk told Altman that he would donate $20 million for each of the next three years, in quarterly $5 million installments. SUF 41; Ex. 55 at 2-3.

As reflected in its tax filings, OpenAI received approximately $133.2 million in charitable contributions between 2016 and 2020. SUF 5. That included $90 million from four donors with no relation to Musk. SUF 5. Another approximately $27 million came from donor-advised funds ("DAFs") administered by Vanguard Charitable ("Vanguard") and Fidelity Charitable ("Fidelity") on behalf of Musk. SUF 9; Ex. 4. An additional $10.5 million came from OpenAI's fiscal sponsor, YC Org. ("YC"), after Musk or his private foundation directed those sums to YC. *Id.*

OpenAI used about $12.5 million of the donated funds to make monthly payments of office rent under a lease naming a Musk affiliate (Musk Industries) as the sole leaseholder. Those payments covered rent for both OpenAI and Neuralink, another Musk-affiliated entity that shared the building with OpenAI. SUF 43. In 2017, Musk donated four Tesla vehicles, with a total fair market value of $262,400, to OpenAI as bonuses for select employees. SUF 34-35. Apart from the four cars, Musk himself made no donations to OpenAI. Ex. 4.

By 2017, it had become clear that to advance its mission OpenAI would need more capital than could be raised exclusively through charitable donations. Altman, Brockman, Sutskever, and Musk discussed several different corporate restructuring options, including options to create a for-profit affiliate. SUF 52; Ex. 58. Musk proposed that OpenAI "attach to Tesla." SUF 53.

In the midst of discussions about a for-profit restructuring, Musk halted the quarterly $5 million contributions. SUF 45; Ex. 71. OpenAI received the last such contribution in May 2017. SUF 42; Ex. 4. OpenAI did not combine with Tesla, and Musk resigned from the board effective February 21, 2018. SUF 39. The only Musk-claimed contributions OpenAI received from that point forward were monthly contributions to cover the rent for OpenAI and Neuralink. SUF 43; Ex. 4. Those ceased in September 2020. Ex. 4.

To raise the capital it needed to further its mission, in 2018 OpenAI decided to create a for-profit subsidiary that presented investors with the opportunity to make a return on their investment.

Musk was advised of the for-profit plan in April 2018. Ex. 60. In August 2018, Altman sent Musk a term sheet summarizing the transaction's key terms. Ex. 61. The term sheet provided that the for-profit subsidiary would "initially be capitalized by a contribution of assets from [OpenAI]" and may "seek[] to commercialize technology in a way that will generate significant revenue." *Id.* at 2, 4. OpenAI invited Musk to invest in the subsidiary, Ex. 64 at 4, but he declined. Ex. 65. In March 2019, Altman sent Musk a draft press release announcing the for-profit subsidiary. Ex. 66. In response, Musk asked Altman to "be explicit that [Musk] ha[d] no financial interest in the for-profit arm of OpenAI," Ex. 68, and to let reporters know on background that Musk was still supportive of the organization. Ex. 72. In July 2019, OpenAI announced that Microsoft made a $1 billion investment in OpenAI's for-profit subsidiary. SUF 60.

More than five years later, in August 2024, Musk filed this lawsuit. Dkt. 1.[2] He amended his complaint in November 2024, Dkt. 32, and again in May 2025, Dkt. 170.

\* \* \*

Musk and xAI asserted 26 causes of action against the OpenAI Defendants. In its rulings on the OpenAI Defendants' motions to dismiss, the Court dismissed Musk's claims for breach of express contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, aiding and abetting fraud, a Clayton Act violation, false advertising under the Lanham Act, false advertising under California law, aiding and abetting breach of fiduciary duty to Musk, breach of fiduciary duty to OpenAI, self-dealing, aiding and abetting breach of fiduciary duty to OpenAI, civil RICO, and RICO conspiracy. Dkt. 121 at 11 n.8, 16 n.13; Dkt. 163; Dkt. 228 at 9-13. The Court permitted Musk's claims for breach of implied contract, breach of quasi-contract/unjust enrichment, constructive fraud, fraud, and breach of charitable trust to proceed to discovery. Dkt. 163. On October 9, 2025, Musk filed a notice electing to proceed with his quasi-contract/unjust enrichment claim, abandoning his implied contract claim. Dkt. 313.

---

[2] Musk previously filed a lawsuit in state court on February 29, 2024, which he dismissed on June 11, 2024 (the day before the hearing on the defendants' demurrer). Dkt. 103.2 & 103.3.

# ARGUMENT

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Musk "will have the burden of proof at trial," the OpenAI Defendants "need only point out that there is an absence of evidence to support [his] case." *Olivier* v. *Baca*, 913 F.3d 852, 857 (9th Cir. 2019). Musk must "designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Musk's "burden is not a light one," *id.*, as he must present "significant probative evidence" to show a genuine factual dispute, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

As detailed below, summary judgment is warranted on each of Musk's remaining Phase I claims: breach of charitable trust (Count XVIII); constructive fraud (Count VI); fraud (Count VII); and unjust enrichment (Count IV).[3]

## I. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S BREACH OF CHARITABLE TRUST CLAIM (COUNT XVIII)

### A. Musk lacks standing to bring his charitable trust claim because he did not make the cash donations to OpenAI on which his claim rests.

As explained below, Musk did not make any cash donations to OpenAI. Instead, Musk donated to two DAFs and to OpenAI's fiscal sponsor, YC. At the time of Musk's donations, those entities took ownership and control of the funds, and later donated to OpenAI. Musk received tax benefits upon his donations to the DAFs and YC. Those donations to the DAFs and YC severed Musk's legal interest in the funds before they were later donated to OpenAI. As a matter of law, Musk lacks standing to bring a charitable trust claim based on those donations.

---

[3] Because Musk elected to proceed with his unjust enrichment claim instead of his implied contract claim, he has now abandoned his "allegations that a contract existed between the parties." Dkt. 298 at 3. This motion accordingly does not address the reasons why (i) Musk's previously asserted implied contract claim was legally infirm and (ii) California's independent tort principles bar Musk's fraud claim. *See* Dkt. 249 at 2-3. To the extent Musk's opposition attempts to raise his now abandoned alleged contract to support any remaining Phase I claim, the OpenAI Defendants reserve the right to renew those arguments.

### 1. Because Musk's donations were to the DAFs and YC, Musk relinquished legal control of the funds.

A DAF is a "charitable giving vehicle that allows donors" to take immediate tax deductions for contributions, retaining only "advisory privileges with respect to" donations the DAF may in turn make with those contributions. *Pinkert* v. *Schwab Charitable Fund*, 48 F.4th 1051, 1052-53 (9th Cir. 2022). Under the federal tax laws and "[c]onsistent with general principles governing charitable deductions," donations to DAFs are tax-deductible only because the DAF "'own[s] and control[s]' the assets" and "is not legally obligated to comply with the donor's advice." *Id.* (quoting 26 U.S.C. § 4966(d)(2)); *see also Fund for Anonymous Gifts* v. *I.R.S.*, 1997 WL 198108, at \*4-5 (D.D.C. Apr. 15, 1997). Both Vanguard and Fidelity operationalize these legal requirements in their respective policies, which governed Musk's contributions to those entities and provide:

- The donor loses ownership and control of the assets once contributed to the DAF. SUF 11, 13.

- Any later donation is made by the DAF, not the donor. *Id.*

- A donor may take an immediate tax deduction for assets contributed to the DAF, regardless of when, or even whether, the DAF later distributes those funds. *Id.*

- The donor cannot impose binding restrictions on the DAF's later donations. *Id.*

- And the donor cannot use the DAF's later donations to satisfy a legal obligation. *Id.*

Musk agreed to the DAFs' terms and took advantage of the tax benefits, both for himself and his foundation. SUF 10, 12, 18, 20.[4] In total, $27,037,000 of the $37,537,000 of Musk's claimed cash donations were made by DAFs to OpenAI or YC, not by Musk. Ex. 4. (More than half of Musk's DAF contributions were thereafter donated to YC, and only then donated to OpenAI, rendering Musk at least twice removed from those contributions to OpenAI. *Id.*)

Musk contributed the remaining $10,500,000 to YC, which served as OpenAI's tax-exempt fiscal sponsor. SUF 9, 14. YC later donated the funds to OpenAI. SUF 9. Fiscal sponsorship arrangements allow a charitable project to benefit from tax-deductible donations even if the project

---

[4] Private foundations like the Musk Foundation are required to make a minimum amount of "qualifying distributions" to charitable organizations each year. 26 U.S.C. § 4942; Ex. 35 (Birchall Tr.) 48:2-12 (acknowledging that DAF contributions count toward satisfying that requirement).

is not yet exempt under Section 501(c)(3). IRS Rev. Rul. 68-489 (1968). Fiscal sponsors offer the same fundamental bargain offered by DAFs: in exchange for an immediate tax benefit, the donor relinquishes "control and discretion over use of the funds." IRS Rev. Rul. 68-489; *see also* Treas. Reg. § 53.4945-5(a)(6)(i) (fiscal sponsor must "exercise[] control, in fact, over the selection process and actually make[] the selection completely independently of the [donor]"); Gregory L. Colvin & Stephanie L. Petit, Fiscal Sponsorship: 6 Ways To Do It Right 7 (3d ed. 2019) ("[T]here must not be any agreement whereby the [donor] can cause the selection of the project recipient.").

YC's fiscal sponsorship agreement with OpenAI reflects those requirements, confirming that "Grantor [YC] has exercised and shall retain full discretion and control over the [grant] selection process, acting completely independently of … any funding source." SUF 16. Musk again took full advantage. SUF 18, 20; *e.g.*, Ex. 37 at 7 (2016 tax deduction for contribution to YC); Ex. 39 at 8 (Musk Foundation made qualifying distribution to YC).

### 2.    Donors like Musk who relinquish control lack standing.

Because Musk relinquished control over the contributed funds, he lacks standing under both Article III and California law to assert claims for breach of charitable trust. In *Pinkert*, the Ninth Circuit held that a donor lacked Article III standing to sue Schwab (the DAF) for mismanaging his contributions. *Pinkert* v. *Schwab Charitable Fund*, 48 F.4th 1051 (9th Cir. 2022), *aff'g*, 2021 WL 2476869 (N.D. Cal. June 17, 2021). As in *Pinkert*, Musk "lacks Article III standing because – as the statutory framework for [DAFs] provides – he gave up title to and control of his donation in exchange for an immediate tax deduction," severing his "legally protected interest" in those assets. 2021 WL 2476869 at *3; 48 F.4th at 1055-56.

Even if Musk could surmount Article III's bar, he also lacks standing under California law. In *Holt* v. *Coll. of Osteopathic Phys. & Surgeons*, the California Supreme Court explained that "the only person who can object to the disposition of the trust property is one having some definite interest in the property—he must be a trustee, or a *cestui* [*i.e.*, a beneficiary], or have some reversionary interest in the trust property." 61 Cal. 2d 750, 753 (1964). Following *Holt*, the district court in *Pinkert* concluded that donors who relinquish "exclusive legal control" do "not have a reversionary, contractual, or property interest in the assets," as required by the California statute

applicable to those donations. *Pinkert*, 2021 WL 2476869, at *5; *infra* pp. 11-13. Nor can such donors claim "special interest" standing, because they lack the requisite "definite interest in the property." *Id.*; *infra* p. 13. (The Ninth Circuit did not address standing under California law, because, like here, the donor's lack of standing under Article III was dispositive. 48 F.4th at 1056.)

Cases from other jurisdictions are in accord. The district court in *In re National Heritage Foundation* explained that "[i]t is well established in [the Fourth Circuit] that a donor to a DAF has no right, title, or interest in the DAF's assets following the donation." 510 B.R. 526, 540 (E.D. Va. 2014). "Without a legal claim to ownership in the assets of the [DAF]," the court ruled, "the [donors] can have no claim … for any alleged confiscation of those assets." *Id.* "[W]hen the [donors] accepted the special tax advantages derived from contributing to a DAF," as Musk did, "they gave up their right to make [such] claims." *Id.* And as the Nevada Supreme Court ruled in *Styles* v. *Friends of Fiji*, a donor who "gave up any interest in the money when he made the unrestricted gift to" a DAF "suffered no damages" from the DAF's alleged failure to maintain its "public charity status" because "he no longer had any interest in or control over the donation." 373 P.3d 965 (Table) (Nev. 2011).

Musk's claim to standing here is even weaker than in the other DAF cases: He is not suing any direct donee, but rather the charity to which the DAFs and the fiscal sponsor later donated.[5] No case has ever found that a donor to a DAF or fiscal sponsor retains standing to sue a charity for breach of charitable trust based on donations made by the DAF or fiscal sponsor.

**B.**     **Musk cannot rely on "settlor standing" under the Third Restatement.**

Before discovery, the Court ruled that "for the purposes of" the OpenAI Defendants' motion to dismiss under Rule 12(b)(6), Musk's standing was "sufficient as a settlor," referencing § 94(2) of the Restatement (Third) of Trusts. Dkt. 121 at 15 n.11. Musk's reliance on the Third Restatement fails at this stage for three independent reasons.

**(1)** California has not adopted the Third Restatement's expansion of settlor standing. As a

---

[5] *Fairbairn* v. *Fidelity Invs. Charitable Gift Fund*, 2018 WL 6199684 (N.D. Cal. Nov. 28, 2018), is not to the contrary, as that case involved claims by a donor against the DAF for breaches of bespoke promises made by the DAF to the donor. *Id.* at *3, 6.

federal court sitting in diversity, this Court "is bound by the decisions of the highest state court," and must apply "existing state law without predicting potential changes in that law." *Marentes* v. *State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 904 (N.D. Cal. 2016). The Third Restatement "represents a departure from the general insistence of traditional trust doctrine that the settlor, as such, lacks standing to enforce a charitable trust." § 94 cmt. g(3) (2012). No California case has endorsed that departure.[6] California courts have uniformly adhered to the rule, articulated by the California Supreme Court in *Holt*, that a donor must "have some reversionary interest in the trust property" to have standing—which, as explained below, Musk concedes he does not. *Holt*, 61 Cal. 2d at 753; *see infra* p. 13.

**(2)** There is no trust for Musk to enforce within the meaning of the Third Restatement. A charitable trust is created "for purposes of" the "rules of [this] Restatement" only when a donation to a charity is made "for a *specific* purpose." § 28 cmt. a (2003). An "outright devise[] or donation … expressly or impliedly to be used for [the corporation's] *general* purposes, is charitable but does not create a trust as that term is used in this Restatement." *Id.*; Evelyn Brody, *From the Dead Hand to the Living Dead: The Conundrum of Charitable-Donor Standing*, 41 Ga. L. Rev. 1183, 1207 (2007) ("[c]ommentary to the [Third Restatement] declares that it covers gifts made to corporate charities that carry restrictions, but not gifts made for a corporate charity's general purposes").

The undisputed facts show that Musk's claimed donations were not subject to any specific restrictions. Musk lacked the power to impose binding restrictions on the DAFs' or YC's donations to OpenAI, and there is no evidence that the DAFs or YC did so. SUF 25-28; *see Pinkert*, 2021 WL 2476869, at *1 (like Fidelity and Vanguard, Schwab "advises its donors in writing that … donors cannot make donations subject to any material restrictions or conditions").[7] OpenAI's tax filings

---

[6] The California Court of Appeal's decision in *Autonomous Region* did not endorse, or even address, the Third Restatement's expansion of settlor standing. *See Autonomous Region of Narcotics Anonymous* v. *Narcotics Anonymous World Servs., Inc.*, 77 Cal. App. 5th 950 (2022) (addressing special interest standing for potential beneficiaries of a revocable trust).

[7] Jared Birchall, who managed Musk's charitable contributions, also testified at deposition that he did not recall himself or Musk ever communicating, including to Vanguard, Fidelity, or YC, that the contributions should be used only for a specific purpose. SUF 25. Musk lacked the power to impose such restrictions and there is no evidence he tried to do so.

and audited financial statements reported that OpenAI had received no such restricted donations. SUF 29-30; *see* IRS Instructions for Form 990 Return of Organization Exempt from Income Tax at 60 (2022) (Ex. 73) (defining a donor-imposed restriction as a "use for a contributed asset that is more specific than broad limits resulting from ... [t]he purposes specified in its articles of incorporation or bylaws"). Musk had access to those filings, and lodged no objection. SUF 31-32.

And Musk himself has identified no special purpose or restriction attached to his claimed contributions. At deposition, he testified there were only "two fundamental" "terms attached to [his alleged] donations"—that OpenAI "would be open source and a nonprofit"—and that these alleged terms were no "different than the promises that were made to the public," including as reflected in OpenAI's certificate of incorporation. SUF 21-22.

Even before that dispositive testimony, the only "restrictions" Musk's counsel could point to were the same as OpenAI's public commitments in its certificate of incorporation, charter, and other public-facing documents. *See* SAC ¶¶ 247, 399;[8] Ex. 13 (Musk Supp. Interrog. Response 15) at 9-10; Dkt. 261 ("Musk Letter") at 2 (citing "specific public objectives reflected in [OpenAI's] formation documents" and "its charter" as grounding Musk's claim to settlor standing). *All* charitable donations are made subject to public undertakings like these about the organization's mission and goals—its "general purposes." *Derblom* v. *Archdiocese of Hartford*, 289 A.3d 1187, 1197 (Conn. 2023) ("only limitation" in a gift to be used for an organization's "general uses and purposes" "is that the organization must use it in furtherance of the duties imposed [on] it by its charter or articles of incorporation"—a limitation that "applies to *all* charitable gifts"); *see also, e.g.*, *Pac. Home* v. *L.A. Cnty.*, 41 Cal. 2d 844, 852-54 (1953) ("[A]ll the assets of a corporation organized solely for charitable purposes must be deemed to be impressed with a charitable trust by virtue of the express declaration of the corporation's purposes," as defined by its "articles of incorporation"); *Oberly* v. *Kirby*, 592 A.2d 445, 462, 467 (Del. 1991) ("the founder of a charitable corporation makes a gift 'outright to the corporation to be used for its corporate purposes,'" subject to the limitations in "the Certificate of Incorporation and the Corporate By-Laws").

To claim standing under the Third Restatement, Musk had to identify *specific* restrictions

---

[8] *Compare, e.g.*, SAC ¶¶ 247(a)-(g), (i), *with* Ex. 1 at 2 (Certificate), *and* Ex. 3 at 1-2 (Charter).

*particular* to his own gifts. He failed to do so.

(**3**) Even if a charitable trust were created within the meaning of the Third Restatement, the "settlors" would be Vanguard, Fidelity, and YC, not Musk. "The person who creates a trust is the settlor" and it is the "disposition to" a charitable corporation that "creates a charitable trust." Third Restatement §§ 3(1), 28 cmt. a. Here, there is no dispute that the DAFs and YC, not Musk, made the alleged donations to OpenAI, and that DAFs and YC had ownership and control over those funds when they donated them to OpenAI. SUF 10-13; *supra* p. 6.

Moreover, to "creat[e] a charitable trust" a settlor must have a "definite interest in [the] described property." George G. Bogert, *The Law of Trusts and Trustees* § 323 (3d. ed. 2014); *see also* Third Restatement § 10 & cmt. g (referring to "property owner" as settlor). Musk was not the settlor as discussed above, and also had no such interest in the donated property, again as a matter of law—he relinquished ownership and control of the funds, and accordingly lost any "definite interest in the property," when he contributed the funds to the DAFs and YC. *Pinkert*, 2021 WL 2476869, at *5; *supra* pp. 6-8. This dooms his claim to settlor standing, including under the Third Restatement (even were it applicable to Musk's claim).

### C. Even if Musk had donated directly to OpenAI, he would still lack standing.

Even if Musk had contributed directly to OpenAI, he would still lack standing to pursue his claim. Musk invokes three bases for standing under California law: (i) statutory standing under Cal. Corp. Code. § 5142; (ii) common-law "special interest" standing; and (iii) Cal. Bus. & Prof. Code § 17510.8, California's charitable solicitations statute. None support Musk's claim.

### 1. No standing under Cal. Corp. Code § 5142

Musk's reliance on § 5142 of California's Corporations Code is misplaced for two reasons: (a) that provision does not apply to nonprofit corporations incorporated outside of California like OpenAI, and (b) Musk does not meet any of the provision's standing requirements.

(**a**) Section 5142's text confirms it does not apply to corporations chartered outside of California. Section 5142 applies to a "corporation," defined in Part 2 of the Code (which includes § 5142) as "a nonprofit public benefit corporation as defined in section 5060." § 5046(b). Section 5060 in turn defines a "nonprofit public benefit corporation" as a corporation (i) "organized under

Part 2"—which OpenAI is not (as it is organized under Delaware law)—or (ii) "subject to Part 2 under the provisions of subdivision (a) of Section 5003," none of which applies. *See* § 5003(a)(2) (referring to corporations "expressly subject" to a "particular provision … or other specific statutory provision").

The Code treats foreign corporations separately. Chapter 19 of Part 2, titled "Foreign Corporations," states that "[f]oreign corporations" need only "comply with Chapter 21 … of Division 1, except as to matters specifically otherwise provided for in this part …." § 6910. Chapter 21 does not include § 5142. And § 5142, unlike other provisions in Part 2, makes no "specific[]" mention of "foreign corporations."[9]

That makes perfect sense, and reflects California's commitment to the internal affairs doctrine. *See State Farm Mut. Auto. Ins. Co.* v. *Super. Ct.*, 114 Cal. App. 4th 434, 442 (2003) (recognizing conflict of laws principle that "only one State should have the authority to regulate a corporation's internal affairs"). Section 5142 is located in Chapter 1, titled "Organization and Bylaws," and by its terms is a limitation on § 5141, which addresses invocation of *ultra vires*—a classic "internal affairs" doctrine. § 5142(a) ("Notwithstanding Section 5141…."); *Voss* v. *Sutardja*, 2015 WL 349444, at *6-7, 10 (N.D. Cal. Jan. 26, 2015) (applying internal affairs doctrine to claim of "ultra vires" conduct). The California legislature made the judgment that California laws governing *ultra vires* should apply only to California corporations.

No case has ever applied § 5142 to a corporation incorporated outside of California.

**(b)** Musk does not meet § 5142's separate standing requirements in any event. Musk is neither "[t]he corporation," nor an "officer" or "director" of the corporation. § 5142(a)(1)-(3); *Turner* v. *Victoria*, 15 Cal. 5th 99, 108, 114-17, 133 (2023) (past directors do not have standing). Musk is not the Attorney General of California, and his application for relator status was denied. § 5142(a)(5); SUF 37-38; Dkt. 157. And Musk cannot claim a "reversionary, contractual, or property interest *in the assets*" subject to any charitable trust. § 5142(a)(4). Musk could not have

---

[9] *See, e.g.*, §§ 5122(b) ("The name of any *foreign corporation* authorized to transact business in this state."); 5234(a) ("No contract or other transaction between a corporation and any domestic *or foreign corporation*"); 6010(a), 6018 (addressing mergers involving "*foreign corporations*").

retained such interests because he relinquished all ownership and control over those assets before they were donated to OpenAI. *Pinkert*, 2021 WL 2476869, at *5 ("[T]he plaintiff does not have a reversionary, contractual, or property interest in the assets."). Musk likewise expressly disclaimed any "reversionary interest" in his claimed donations, first in filings with this Court (Dkt. 73 at 18) and again at his deposition. SUF 33. And Musk's election to abandon his contract claim further confirms that Musk never had, and certainly cannot now claim, "a contractual interest in [those] funds." Dkt. 313; Musk Letter at 1.

## 2. No common-law special interest standing

Musk's lack of reversionary interest in his alleged donations also forecloses any claim to "special interest" standing. Under California law, "[i]t is well established that the settlor of a charitable trust who retains no reversionary interest in the trust property lacks standing to bring an action to enforce the trust." *Horiike* v. *Humane Soc.*, 2016 WL 11744969, at *16 (C.D. Cal. June 20, 2016) (quoting *Patton* v. *Sherwood*, 152 Cal. App. 4th 339, 342 (2007)).

The California Court of Appeal's decision in *L.B. Research* reflects this established rule. The contract in that case provided for a reversion of the donation if the defendant did not "meet the terms and conditions" of the agreement. *L.B. Rsch. & Educ. Found.* v. *UCLA Found.*, 130 Cal. App. 4th 171, 175-76 (2005). The court recited the *Holt* rule that donor standing requires "some reversionary interest in the trust property," and so explained that "in this type of case"—where the donor had a contractual reversionary interest—the donor would have standing. *Id.* at 180-81. That decision thus did "not establish that a donor without a reversionary interest may enforce a charitable trust." *Horiike*, 2016 WL 11744969, at *17; *see also Jimirro* v. *Paley Ctr. for Media*, 2025 WL 1112736, at *7 (C.D. Cal. Apr. 4, 2025) (same). In fact, the law is the opposite: "[N]early all the modern American authorities—decisions, model acts, statutes, and commentaries—deny a donor standing to enforce a restricted gift to public charity absent express retention of a reversion in the donative instrument." Iris J. Goodwin, *Donor Standing to Enforce Charitable Gifts: Civil Society v. Donor Empowerment*, 58 Vand. L. Rev. 1093, 1145 & n.174 (2005).

## 3. No standing under Cal. Bus. & Prof. Code § 17510.8

Section 17510.8 of California's charitable solicitations statute does not give Musk standing

either. *First*, § 17510.8 is simply "declarative of existing trust law principles," and does not purport to extend standing to anyone. Cal. Bus. & Prof. Code § 17510.8. Courts applying the provision have uniformly held that donors do not have standing to sue for a breach of any trust imposed by the statute—a power reserved for the Attorney General. *Horiike*, 2016 WL 11744969, at *15-16 ("claims that arise from the duties imposed by [§ 17510.8] may only be brought by the Attorney General or an authorized relator"); *Exec. Comm.* v. *Kaplan*, 2004 WL 6084228, at *8 (C.D. Cal. Sept. 17, 2004) (same); *see also People* v. *Orange Cnty. Charitable Servs.*, 73 Cal. App. 4th 1054, 1075 (1999) (the "Attorney General's power to oversee charities extends" to the "charitable solicitation statutes, namely Business and Professions Code sections 17510 et seq.").

*Second*, the statute applies to public "solicitations," and not, as here, to solicitations "within the membership of a charitable organization." §§ 17510, 17510.6. As Musk alleged in his verified complaint, and later admitted in a sworn discovery response, he was a "member of OpenAI, Inc. from the time of its founding until [his] resignation from the Board on February 21, 2018." Ex. 53 (Musk Response RFA No. 51); SAC ¶ 229. Although the monthly indirect contributions for rent continued until September 2020 (after the promised quarterly $5 million contributions were halted in 2017), § 17510.8 is triggered by *solicitations*, not contributions, and OpenAI did not solicit Musk for contributions after he resigned from the board. SUF 40.

### D. Musk's noncash contributions do not save his claim.

Musk's only alleged direct contributions to OpenAI are four Teslas that were donated in late 2017. Ex. 4. To the extent the Teslas could be deemed a restricted gift, Musk has identified no evidence that he retained a reversionary interest in them, nor that OpenAI used them in a manner inconsistent with any restriction: Musk identified four specific employees who should receive the cars, and those four received them as bonuses. SUF 35-36.

Musk's alleged contributions of "personal investment of time, expertise, guidance, and use of his reputation and professional network," even if valuable, cannot ground his claim because they are not "trust property." Ex. 13 (Musk Interrog. Response 15). A trust is a "fiduciary relationship with respect to property," and "[a] trust is created only if there is trust property." Third Restatement § 2; Cal. Prob. Code § 15202. Contributions of "knowledge[,] skill, and [] labor … do not constitute

property that may be held in trust." 60 Cal. Jur. 3d Trusts § 24; *Gonsalves* v. *Hodgson*, 38 Cal. 2d 91, 98-99 (1951) (same).

## II. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S CONSTRUCTIVE FRAUD CLAIM (COUNT VI)

Musk's constructive fraud claim is premised on the existence of an alleged "fiduciary relationship" arising from § 17510.8 and the same contributions on which Musk bases his charitable trust claim. SAC ¶¶ 291-93. Summary judgment is warranted on this claim, because as shown, (i) § 17510.8 does not apply to Musk's alleged contributions; (ii) even if it did, Musk did not make those contributions, severing any alleged fiduciary relationship; and (iii) for all the reasons explained in Point I, Musk lacks standing to sue OpenAI for an alleged failure to "use [the] charitable contributions for the declared charitable purposes for which they [were] sought," SAC ¶ 292 (citing § 17510.8). *See Fabian* v. *LeMahieu*, 2019 WL 4918431, at *14 (N.D. Cal. Oct. 4, 2019) (dismissing breach of fiduciary duty and constructive fraud claims for absence of fiduciary duty); *Pinkert*, 2021 WL 2476869, at *1 (dismissing breach of fiduciary duty claim because plaintiff lacked standing to sue for breach of charitable trust); *Siebach* v. *Brigham Young Univ.*, 361 P.3d 130, 141 (Utah Ct. App. 2015) (dismissing charitable trust claim for "lack [of] standing" along with all claims "aimed at enforcing … donative intent," including breach of fiduciary duty, as "[e]ach of these claims … can be prosecuted only by the attorney general").[10]

## III. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S FRAUD CLAIM (COUNT VII)

The fraud theory Musk pleaded is that Altman and Brockman made false representations in two September 2017 communications: an email from Altman to Musk saying that he was "enthusiastic about the non-profit structure," and a second-hand report to Musk, filtered through Shivon Zilis, that Brockman "would like to continue with the non-profit structure" and that Altman was "[g]reat with keeping [OpenAI] non-profit." SAC ¶¶ 303-05; Dkt. 170.14 & 170.15. At the pleading stage, the Court called the question whether Musk had identified "legally binding

---

[10] Musk's constructive fraud claim also fails because the record evidence negates the element of justifiable reliance and the claim is time-barred, as set forth in Point III.B-C, *infra*.

promises" a "toss-up" before concluding, based on the complaint alone and assuming the truth of its allegations, that the claim was adequately alleged. Dkt. 163 at 5.

While Musk avoided dismissal on the pleadings, discovery has now confirmed the fundamental flaws that doom his fraud claim, which fails on multiple independent grounds: (1) the record is devoid of evidence of an actionable misrepresentation; (2) the record evidence negates the element of justifiable reliance; and (3) the claim is time-barred.

### A. The record is devoid of any actionable misrepresentation.

"To constitute fraud, the misrepresentation [] must be a material and knowingly false representation of fact." *Huntsman* v. *Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 790 (9th Cir. 2025). Absent competent evidence that the speaker represented a current or future fact with knowledge of its falsity, summary judgment is warranted. *See Yu-Sze Yen* v. *Buchholz*, 2013 WL 1165013, at *7 (N.D. Cal. Mar. 20, 2013) ("Because plaintiff has not identified a false statement of material fact, the court grants summary judgment on plaintiff's claim for misrepresentation."); *Louis* v. *Nailtiques Cosmetic Corp.*, 423 F. App'x 711, 713 (9th Cir. 2011) ("Promises too vague to be enforced will not support a fraud claim any more than they will one in contract."); *Vazquez* v. *DataRobot, Inc.*, 2023 WL 6323101, at *12 (N.D. Cal. Sept. 28, 2023) (predictions "about future events and goals" "generally are not actionable fraud"). No such evidence exists here; there is no actionable misrepresentation.

It is undisputed that the September 2017 communications on which Musk's claim is based were made after Altman, Brockman, Sutskever, and Musk failed to come to terms on the creation of an OpenAI for-profit; after Musk's promised $5 million quarterly contributions were suspended (never to be resumed); and right before Musk sought, unsuccessfully, to extract benefits as conditions to funding resumption. SUF 48-49. At his deposition, the only support Musk offered for why Altman's statement in September 2017 that he "remain[ed] enthusiastic about the non-profit structure" was a "huge lie" was that, "as things have turned out, really [OpenAI has] become a maximum –a profit-maximizing entity, not a nonprofit." Ex. 12 (Musk Tr.) at 91:17-92:7. That's it. Even assuming this transformation happened—it did not—there is no evidence to show that Altman's expressions of "enthusiasm" were factual representations of any kind. The same goes for

the second-hand report of Brockman's support for the nonprofit structure. These statements were, at best, expressions of present feeling. Because there was no actionable misrepresentation, the fraud claim must now be dismissed for want of evidentiary support. *See, e.g.*, *Louis*, 423 F. App'x at 713 (affirming grant of summary judgment where statements "about [plaintiff's] future success were merely expressions of opinion, not representations as to facts"); *Clay* v. *Koch*, 1996 WL 417241, at *3 (N.D. Cal. July 22, 1996) (granting summary judgment where statement that defendant was "committed" to the company was "not false" and was "so vague that it cannot support a finding of fraud").

**B.     The record evidence negates the element of justifiable reliance.**

An "element[] of fraud under California law" is "justifiable reliance." *Huntsman*, 127 F.4th at 789-90; *see also Smolen* v. *Deloitte, Haskins & Sells*, 921 F.2d 959, 964 (9th Cir. 1990) (same for constructive fraud). To prove justifiable reliance, "plaintiff[s] must show (1) that they actually relied on the defendant's misrepresentations, and (2) that they were reasonable in doing so." *Dey* v. *Robinhood Mkts., Inc.*, 780 F. Supp. 3d 882, 891 (N.D. Cal. 2025); *see also Prostar Wireless Grp., LLC* v. *Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1017-18 (N.D. Cal. 2018) (granting summary judgment for lack of justifiable reliance), *aff'd*, 815 F. App'x 117 (9th Cir. 2020). There can be no reliance as a matter of law if a plaintiff's "own deposition testimony establishes that she never believed" the alleged misrepresentation. *Major* v. *Ocean Spray Cranberries, Inc.*, 2015 WL 859491, at *4 (N.D. Cal. Feb. 26, 2015). Here, Musk's own deposition testimony established exactly that, negating this essential element of a fraud claim.

Far from being duped, Musk repeatedly testified at deposition that he believed that Altman and Brockman "were being deceptive" in the September 2017 statements (Musk Tr. at 84:15-25); that "what they were saying was not honest" (*id.* at 84:9-13); and that "they just intended to create a for-profit entity to enrich themselves" (*id.*). With respect to Altman's statement that he "remain[ed] enthusiastic about the nonprofit structure"—the core alleged misrepresentation that grounds this claim—Musk testified that he "had already concluded [he] couldn't trust [Altman]" upon receiving this message. *Id.* at 91:17-92:7.

What's more, Musk had already ceased significant funding for OpenAI before these

supposed misrepresentations: in August 2017, a month before the alleged September 2017 misrepresentations, Musk directed his team to stop the $5 million quarterly donations intended for OpenAI. Ex. 71; Ex. 12 (Musk Tr.) at 288:3-10. Musk testified that he did not "want to be associated with" Altman and Brockman, was "done with" them, and as a result "declined to provide significant further funding." *Id.* at 90:18-91:16; 94:5-11; *see also id.* at 287:20-288:10; 289:20-290:7 (testifying that he "suspend[ed] [his quarterly] contributions" when he "lost confidence that they were going to be a nonprofit, open source"). As noted, the last quarterly $5 million donation was in May 2017, and Musk testified that he could not recall providing any other support to OpenAI after September 2017—other than continuing the monthly payments for rent. SUF 62.

Musk's testimony thus precludes a showing of actual reliance on the alleged misrepresentations, and forecloses any suggestion that reliance would have been reasonable. Summary judgment is therefore warranted. *See Mahon* v. *Mainsail LLC*, 2024 WL 3455277, at *10 (N.D. Cal. May 8, 2024) (granting summary judgment because "admissible evidence negates essential elements" of fraud claim); *Williford* v. *Ocwen Loan Serv., LLC*, 2011 WL 13182978, at *6 (C.D. Cal. July 28, 2011) (granting summary judgment; no reliance where "Plaintiffs make clear that they never believed th[e] representation").

## C. Musk's fraud and constructive fraud claims are time-barred.

Musk's fraud and constructive fraud claims are also barred by California's three-year statute of limitations. Cal. Civ. Proc. Code § 338(d). Such claims accrue when a reasonable person "would have been on notice of a potential misrepresentation." *Hamilton Materials, Inc.* v. *Dow Chem. Corp.*, 494 F.3d 1203, 1207 (9th Cir. 2007); *Isaacs* v. *USC Keck Sch. of Med.*, 853 F. App'x 114, 116 (9th Cir. 2021) (fraud and constructive fraud). "[A]ctual knowledge is not necessary"; the claim accrues when the plaintiff learns "facts that should raise suspicion and trigger a further investigation." *Vera* v. *REL-BC, LLC*, 66 Cal. App. 5th 57, 69 (2021).

As noted, Musk's fraud claim is premised on alleged misrepresentations by Altman and Brockman in September 2017 regarding commitments to "continue with OpenAI as a non-profit." SAC ¶¶ 302-05. Musk repeatedly testified at his deposition that he "suspect[ed]" he was being "swindled" at the time Altman and Brockman made these alleged commitments. Ex. 12 (Musk Tr.)

at 77:1-5 (testifying that, in 2017, Musk "started to suspect that [he] was being swindled and that they [*i.e.*, Altman and Brockman] were essentially taking money that was donated to a nonprofit and would ultimately use that to enrich themselves"); *id.* at 83:10-85:1 (testifying that, as of September 2017, Musk "felt that [he] was being deceived by Sam and Greg" and his "conclusion was that [he] was being swindled"); *id.* at 87:15-88:5 (testifying that, as of September 2017, Musk's "suspicions were sufficient to – that [he] no longer trusted" Altman and Brockman); SUF 51.

Musk's own testimony thus establishes that he believed he had "reason to be suspicious and should have investigated [the alleged] fraud" no later than September 2017. *Vera*, 66 Cal. App. 5th at 70 (affirming grant of summary judgment). His fraud and constructive fraud claims thus accrued seven years before he filed suit (in August 2024), well outside the three-year limitations period.

Beyond Musk's testimony, the undisputed documentary record confirms that Musk was aware no later than 2019 of the key terms of the alleged for-profit pivot grounding his fraud claim. *See* SUF 54-59. Musk participated in discussions in 2017 about the possibility of creating a for-profit entity, and himself proposed that OpenAI "attach to Tesla." SUF 52-53. After resigning from the board in February 2018, Musk was informed in April 2018 of the plan to create a for-profit subsidiary. Ex. 60. Musk raised no objection. Altman then sent Musk a term sheet in August 2018 summarizing the transaction's principal terms, which made clear that the for-profit subsidiary would "initially be capitalized by a contribution of assets from [OpenAI]" and "seek[] to commercialize technology in a way that will generate significant revenue"—steps that Musk now claims evidence the alleged fraud, but were met at the time with silence. SAC ¶¶ 100-14; Ex. 61 at 2, 4; SUF 54-59. Musk was even offered equity in the for-profit entity, and declined. Ex. 64 at 4; Ex. 65. And when Altman sent Musk a draft press release announcing the subsidiary, Musk responded by asking Altman to "be explicit that [Musk] ha[d] no financial interest in the for-profit arm of OpenAI," and to let reporters know on background that Musk was still supportive of OpenAI. Exs. 68, 72. Musk thus was not only aware of these facts, but even took steps to protect his interests, without crying "fraud" for years.

Musk's fraud and constructive fraud claims accrued in 2017, and in all events no later than 2019, and remain time-barred.

## IV. THE OPENAI DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON MUSK'S UNJUST ENRICHMENT CLAIM (COUNT IV)

Unjust enrichment "is not a standalone cause of action" under California law. *Silver* v. *Stripe Inc.*, 2021 WL 3191752, at *8 (N.D. Cal. July 28, 2021). In the Ninth Circuit, "courts have construed purported claims for unjust enrichment as quasi-contract claims seeking restitution." *Brodsky* v. *Apple Inc.*, 2019 WL 4141936, at *10 (N.D. Cal. Aug. 30, 2019); Dkt. 298 at 2. The claim requires proof of the defendant's "receipt of a benefit and unjust retention of the benefit at the expense of another." Dkt. 163 at 3. As Witkin explains, "[i]t must ordinarily appear that the benefits were conferred by mistake, fraud, coercion, or request"; otherwise, the enrichment "is not unjust." Witkin, Contracts § 1057; *see McBride* v. *Boughton*, 123 Cal. App. 4th 379, 388 (2004) (unjust enrichment permits restitution where "the defendant obtained [the] benefit … by fraud, duress, conversion, or similar conduct"); *Best Carpet Values, Inc.* v. *Google, LLC*, 90 F.4th 962, 974 (9th Cir. 2024) (an unjust enrichment claim based on the defendant's alleged "wrongful act" requires a showing that a "cognizable legal right of [the plaintiff] has been violated"). And a request-based quasi-contract claim can stand only if the plaintiff rendered the requested services in circumstances where "it was the expectation of both parties during the time that the services were rendered that compensation should be made." Witkin, Contracts §§ 1072-73; *accord Taylor* v. *Google, LLC*, 2024 WL 837044, at *2 (9th Cir. Feb. 28, 2024).

Musk's unjust enrichment claim fails on several grounds: (1) California law bars the claim because Musk is pursuing tort claims based on the same alleged conduct; (2) any request-based quasi-contract theory fails because there was no expectation Musk would be compensated for his alleged contributions; (3) any fraud-based unjust enrichment theory is impermissibly duplicative and fails in all events; and (4) under either theory, the claim is barred by statutes of limitations.

### A. Musk's pursuit of tort claims bars his unjust enrichment claim.

A plaintiff may pursue an unjust enrichment claim under California law only if he "choose[s] not to sue in tort, but instead to seek restitution on a quasi-contract theory." *McBride*, 123 Cal. App. 4th at 388; *see id.* at 384 (plaintiff claiming "unjust enrichment" abandoned misrepresentation claims); *Civic Partners Stockton, LLC* v. *Youssefi*, 218 Cal. App. 4th 1005, 1013

(2013) (plaintiff "waive[d] its tort claim for conversion" and sought restitution). Plaintiffs who pursue tort claims based on "the same alleged conduct" for which they seek restitution "have chosen to sue in tort" and thus "cannot proceed" on their claim for restitution. *Zeichner* v. *Nord Sec. Inc.*, 2024 WL 4951261, at *8 (N.D. Cal. Dec. 2, 2024).

This substantive requirement of California law bars Musk's unjust enrichment claim. That claim is based on the alleged "exploitation for personal profit of OpenAI, Inc.'s resources" and "solicitation of capital and other valuable resources from Musk under the false pretense and repeated promises that such would be used for charitable purposes." SAC ¶¶ 275-77. Musk's various tort claims—constructive fraud, fraud, and breach of charitable trust—are based on the same underlying alleged conduct. *See* SAC ¶¶ 292-93, 306-09, 397-99. Because Musk has chosen to "sue in tort," he may not maintain his unjust enrichment claim. *See, e.g.*, *Silver*, 2021 WL 3191752, at *8 (dismissing "unjust enrichment" claim because plaintiffs "chose to 'sue in tort,' by also proceeding with their tort and statutory claims"); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *24 (N.D. Cal. Sept. 22, 2021) (dismissing "unjust enrichment" claim where plaintiffs pursuing UCL claims "have chosen to sue in tort").[11]

### B. Any request-based quasi-contract theory fails as a matter of law.

Quasi-contract in the narrow sense, "[o]ften called quantum meruit," *McBride*, 123 Cal. App. 4th at 388 n.6, requires proof that the plaintiff conferred a benefit on the defendant "under some understanding or expectation of both parties that compensation therefor was to be made." *Taylor*, 2024 WL 837044, at *2; *Huskinson & Brown, LLP* v. *Wolf*, 32 Cal. 4th 453, 458 (2004); Witkin, Contracts § 1073. No evidence at all indicates that Musk and the OpenAI Defendants understood or expected that Musk would be compensated for his alleged contributions to OpenAI. The proof is to the contrary: Musk testified at deposition that he had no such expectation—he contributed money, time, credibility, and recruiting help to OpenAI "to create a nonprofit, open-source organization," and there were "[n]o" other terms of the deal. Ex. 12 (Musk Tr.) at 52:11-

---

[11] *SVF II Aggregator (DE) LLC* v. *Shafi*, 2024 WL 3324623, at *2 (N.D. Cal. May 2, 2024) (cited in Musk's Letter at 2), held that an unjust enrichment claim could be pled in the alternative to a fraud claim as a matter of federal procedure, but it did not address the substantive principle of California law that a plaintiff who sues in tort may not pursue an unjust enrichment claim.

21

54:23. Moreover, Musk could not possibly have expected compensation in exchange for his alleged charitable contributions—because "[a] payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." *E.g.*, *United States* v. *Am. Bar Endowment*, 477 U.S. 105, 116-17 (1986). The total lack of evidence that Musk or the OpenAI Defendants had "any expectation of payment" to Musk for his claimed contributions means that the quasi-contract theory fails. *Taylor*, 2024 WL 837044, at *2-3 (affirming dismissal of quasi-contract/quantum meruit claim); *see also Anderson* v. *Am. Airlines, Inc.*, 2011 WL 855820, at *5 (N.D. Cal. Mar. 9, 2011) (granting summary judgment on quantum meruit claim for lack of evidence that "additional compensation by [defendant] to Plaintiff ever was contemplated").

Nor may Musk base a quasi-contract claim on OpenAI's alleged failure to comply with the supposed restrictions attached to his alleged donations. *See* SAC ¶ 276 (alleging that Musk made contributions "on the condition that the endeavor would be and remain a nonprofit devoted to openly sharing its technology with the public and avoid concentrating its power in the hands of a few"). An expectation of adherence to conditions is not an expectation of compensation.[12] Moreover, because Musk lacks standing to maintain his breach of charitable trust claim as discussed in Point I, *supra*, he likewise lacks standing to enforce the alleged restrictions on his donations through other causes of action. *See Horiike*, 2016 WL 11744969, at *17 (dismissing claims for breach of fiduciary duty, deceptive and misleading solicitations, and negligence, as "[p]laintiffs lack standing to enforce a charitable trust, so long as their claim is in effect an attempt to enforce a charitable trust"); *accord, e.g.*, *Siebach*, 361 P.3d at 141 (concluding that plaintiffs "lack[ed] standing to pursue claims aimed at enforcing their donative intent," including "causes of action for … unjust enrichment" predicated on the misuse of "donated funds").

---

[12] *Coleman* v. *Frontier Mission Fellowship, Inc.*, 2023 WL 7035846 (Cal. Ct. App. Oct. 26, 2023), while unpublished, is directly on point. The plaintiff alleged that he donated his services on the condition that the recipient university would maintain a campus permanently. *Id.* at *4. The Court affirmed the dismissal of the quasi-contract/quantum meruit claim, holding that the condition attached to the donation did not satisfy the "expectation of compensation" requirement. *Id.* at *10. The claim was "an attempt to enforce the terms of a conditional donation, rather than an attempt to enforce a quasi-contract for services," and there was no authority permitting a plaintiff to recover the value of "conditional[] donat[ions] to a nonprofit institution" on a quasi-contract theory. *Id.*

## C. Any theory of unjust enrichment based on fraud fails as a matter of law.

Musk also alleges that the OpenAI Defendants obtained benefits "as a … result of their wrongful conduct," namely the "solicitation of capital and other valuable resources from Musk under … false pretense[s]." SAC ¶ 277. While the complaint is obscure, Musk may also claim to rely on cases applying unjust enrichment as "a species of fraud." *Silver*, 2021 WL 3191752, at *8.

But this fraud-based variant of an unjust enrichment theory cannot be sustained for the same reasons the fraud claim itself cannot: As discussed in Point III.A-B, *supra*, the record evidence is devoid of any actionable misrepresentation and also negates the essential element of justifiable reliance. These fatal defects also "defeat[] [Musk's] unjust enrichment claim." *Young* v. *Cree, Inc.*, 2021 WL 4749384, at *10 (N.D. Cal. Oct. 12, 2021) (granting summary judgment on fraud and unjust enrichment claims for "lack of evidence of reliance"); *Wood* v. *Motorola Mobility, Inc.*, 2012 WL 892166, at *8-10 (N.D. Cal. Mar. 14, 2012) (dismissing fraud claims for lack of reliance and unjust enrichment claim for "fail[ure] to allege actionable fraud"); Dkt. 163 at 3 ("Where a plaintiff's unjust enrichment claim is premised on the same factual allegations as claims that are dismissed, the claim for unjust enrichment must fail.").

## D. Musk's unjust enrichment claim is time-barred.

To the extent Musk's unjust enrichment claim is founded on a quasi-contract theory, it is subject to a two-year statute of limitations. *Wu* v. *Sunrider Corp.*, 2018 WL 6266577, at *5-6 (C.D. Cal. May 22, 2018), *aff'd*, 793 F. App'x 507 (9th Cir. 2019). Where, as here, the claim is based on alleged payments from the plaintiff to the defendant, it accrues "no later" than when the plaintiff "last made a payment." *Id.*; *see also Stanford Hosp. & Clinics* v. *Guarantee Tr. Life Ins. Co.*, 2012 WL 694743, at *3 (N.D. Cal. Mar. 1, 2012) (untimely quasi-contract claim accrued when "the last service [was] rendered by the plaintiff to the defendant"). It is undisputed that Musk's alleged donations mostly ended by mid-2017, except for monthly rent payments, and even those ended by 2020. SUF 61-62; Ex. 4. The claim is therefore time-barred because Musk did not file this suit until 2024, years after the limitations period expired.

To the extent Musk's unjust enrichment claim is founded on a fraud theory, it accrued at the same time as his fraud claim, is subject to the same three-year statute of limitations, Cal. Civ.

Proc. Code § 338(d), and is untimely for the same reasons as Musk's fraud claim. *See, e.g.*, *Zhang v. Yuan*, 2024 WL 3906751, at \*1 (N.D. Cal. Aug. 21, 2024) (unjust enrichment claim "based on fraud" accrues when plaintiff "has reason to suspect that a type of wrongdoing has injured [him]"); *Gerling Glob. Reinsurance Corp.* v. *Fremont Gen. Corp.*, 2007 WL 9757934, at \*6, \*9, \*11-12 (C.D. Cal. Jan. 10, 2007) (concluding on summary judgment that fraud and unjust enrichment claims accrued based on same suspicions and were time-barred); Point III.C, *supra*.

## CONCLUSION

The Court should grant the OpenAI Defendants' motion for summary judgment on Musk's remaining Phase I claims.

Date: October 17, 2025

MORRISON & FOERSTER LLP

_/s/ Jordan Eth_
JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:   (415) 268-7000
Facsimile:   (415) 268-7522

WILLIAM SAVITT (admitted _pro hac vice_)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted _pro hac vice_)
BRWilson@wlrk.com
SARAH K. EDDY (admitted _pro hac vice_)
SKEddy@wlrk.com
STEVEN WINTER (admitted _pro hac vice_)
SWinter@wlrk.com
NATHANIEL CULLERTON (admitted _pro hac vice_)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:   (212) 403-1000
Facsimile:   (212) 403-2000

_Attorneys for the OpenAI Defendants_