# Exhibit 35

## (Excerpted)

## Not Under Seal

Elon Musk v.
Samuel Altman

**FINAL**
**[CONFIDENTIAL]**

September 10, 2025
Jared Birchall

---

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
-----------------------------------------
ELON MUSK, et al.,
     Plaintiffs,
v.
SAMUEL ALTMAN, et al.,
     Defendants.

Case No. 4:24-cv-04722-YGR
-----------------------------------------

VIDEO DEPOSITION OF
Jared Birchall
September 10, 2025
San Francisco, California
Lead: Nathaniel Cullerton, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING - 1-800-825-3341

---

Page 3

APPEARANCES (Cont'd)

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:
   NATHANIEL CULLERTON, ESQUIRE
   ndcullerton@wlrk.com
   WILLIAM SAVITT, ESQUIRE
   wdsavitt@wlrk.com
   HAYLEY SMITH, ESQUIRE
   hbsmith@wlrk.com
   EMILY ROSS, ESQUIRE
   epross@wlrk.com
   WACHTELL, LIPTON, ROSEN & KATZ
   51 West 52nd Street
   New York, New York 10019
   212.403.1329

   -and

   WILLIAM FRENTZEN, ESQUIRE  (Via Zoom)
   wfrentzen@mofo.com
   MORRISON & FOERSTER LLP
   425 Market Street
   San Francisco, California 94105
   415.268.6413

---

Page 2

APPEARANCES

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
   ROBERT KRY, ESQUIRE
   rkry@mololamken.com
   WALTER HAWES IV, ESQUIRE
   whawes@mololamken.com
   MOLOLAMKEN LLP
   600 New Hampshire Avenue, NW, Suite 660
   Washington, D.C. 20037
   202.556.2011

   -and-

   MARC TOBEROFF, ESQUIRE
   mtoberoff@toberoffandassociates.com
   JAYMIE PARKKINEN, ESQUIRE (Via Zoom)
   jparkkinen@toberoffandassociates.com
   TOBEROFF & ASSOCIATES PC
   23823 Malibu Road, Suite 50-363
   Malibu, California 90265
   310.246.3333

---

Page 4

APPEARANCES (Cont'd)

ATTORNEY(S) FOR DEFENDANT MICROSOFT:
   NISHA PATEL GUPTA, ESQUIRE
   nisha.patelgupta@dechert.com
   HANNAH LEONE, ESQUIRE
   hannah.leone@dechert.com
   DECHERT LLP
   US Bank Tower
   633 West 5th Street, Suite 4900
   Los Angeles, California 90071
   213.808.5735

   JANE ROSE REPORTING
   74 Fifth Avenue
   New York, New York 10011
   1-800-825-3341
   Gail L. Inghram, Court Reporter
   BA, CRR, CLR, RDR, CSR-CA (No. 8635)
   Vinny Bezerra, Videographer
   CALIFORNIA FIRM CERT 254

---

JANE ROSE REPORTING
1-800-825-3341

California Firm No. 254
janerose@janerosereporting.com

Elon Musk v.                    FINAL                    September 10, 2025
Samuel Altman              [CONFIDENTIAL]                    Jared Birchall

---

Page 5

## TABLE OF CONTENTS

EXAMINATION OF                    PAGE
JARED BIRCHALL
    By Attorney Cullerton ............7
    By Attorney Patel ..............162
    By Attorney Kry ................169
    By Attorney Cullerton ..........176

Instructions to Read and Sign ........ Page 184
Reporter Certificate ................. Page 187
Index of Exhibits ................... Page 188

---

Page 7

1    My name is Gail Inghram.  I'm a
2  California Certified Stenographic Shorthand
3  Reporter, Number 8635.  I will be handling the
4  transcript per California code today.
5    And would you raise your right hand to
6  be sworn, please.
7  WHEREUPON,
8         JARED BIRCHALL,
9  being first duly sworn or affirmed to testify to the
10  truth, the whole truth, and nothing but the truth,
11  was examined and testified as follows:
12
13         EXAMINATION
14  BY ATTORNEY CULLERTON:
15    Q.  Good morning, Mr. Birchall.
16       Did you do anything to prepare for your
17  deposition today?
18    A.  I did.
19    Q.  What did you do to prepare?
20    A.  I met with the legal team yesterday.
21    Q.  Okay.  About how long was that meeting?
22    A.  Approximately 5 hours.
23    Q.  And when you refer to the legal team,
24  who do you mean?
25    A.  The gentlemen sitting here at the table.

---

Page 6

1         Wednesday, September 10, 2025
2         San Francisco, California
3            -  -  -
4       THE VIDEOGRAPHER:  Good morning.  This
5  is the beginning of Volume 1, Media Number 1, in
6  the deposition of Jared Birchall in the matter of
7  Elon Musk versus Samuel Altman, filed in the
8  United States District Court, Northern District of
9  California, Oakland Division.  The case number is
10  4:24-cv-04722-YGR.
11       Today's date is September 10th of
12  2025.  The time is approximately 9:11 a.m.
13       The video operator today is Vinny
14  Bezerra contracted by Jane Rose Reporting.  This
15  video deposition is taking place at 755 Sansome
16  Street in San Francisco, California.
17       All attending will be noticed by the
18  stenographic record.
19       Will the court reporter please introduce
20  yourself and swear in the witness.
21       THE COURT REPORTER:  Yes, per AB 3252
22  amending California Business and Professions Code
23  8016, all reporters need to state the following to
24  ensure you have a stenographic reporter covering
25  your proceedings.

---

Page 8

1    Q.  Anybody else meet with you?
2    A.  No.
3    Q.  Okay.  Did you review any documents in
4  preparing for your deposition?
5    A.  Yes.
6    Q.  And have you talked to anybody else
7  about your deposition today, other than your
8  legal team?
9    A.  No.
10    Q.  Have you been deposed before?
11    A.  I have.
12    Q.  How many times?
13    A.  Approximately 10.
14    Q.  Have you given testimony at a trial
15  before?
16    A.  I have.
17    Q.  And what were the trials in which
18  you've given trial testimony?
19    A.  There was a defamation case, which is
20  the only one at trial that I've given testimony
21  on.
22    Q.  Is that for the defamation case against
23  Mr. Musk?
24    A.  That's correct.
25    Q.  So apart from that, you've never given

---

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

| Page 9 | Page 11 |
|---|---|
| 1 testimony at trial? | 1 BY ATTORNEY CULLERTON: |
| 2    A. No. | 2    Q. And you mentioned The Boring Company, |
| 3    Q. Where do you work, Mr. Birchall? | 3 that you were the corporate secretary there. Do |
| 4     ATTORNEY KRY: Objection; vague. | 4 you have any other positions at |
| 5    A. I am employed by Excession LLC. | 5 The Boring Company? |
| 6 BY ATTORNEY CULLERTON: | 6    A. I do serve as a board member. |
| 7    Q. And what is Excession LLC? | 7    Q. Any other positions at |
| 8    A. The family office for Elon Musk. | 8 The Boring Company? |
| 9    Q. What is the family office? | 9    A. No. |
| 10    A. It is the team that oversees the | 10    Q. And how long have you been a board |
| 11 financial well-being and overall situation of its | 11 member of The Boring Company? |
| 12 principal -- in this case, Elon. | 12    A. Since its founding. |
| 13    Q. And when did you start working at | 13    Q. And how about corporate secretary; how |
| 14 Excession LLC? | 14 long have you been corporate secretary? |
| 15    A. In first half of 2016. | 15    A. Since its founding. |
| 16    Q. And do you have any positions at any | 16    Q. And when was it founded, approximately? |
| 17 other Musk-affiliated companies? | 17    A. Approximately 2016. |
| 18    A. I do. | 18    Q. Okay. I believe you mentioned you're |
| 19    Q. Can you tell me what those are. | 19 currently the CFO at Neuralink; is that right? |
| 20    A. Yes. I am the corporate secretary at | 20    A. Yeah. I believe I am the named CFO at |
| 21 xAI. I am the corporate secretary at The Boring | 21 Neuralink, yes. |
| 22 Company, as well as the corporate secretary and | 22    Q. What do you mean -- you seemed to |
| 23 named CFO at Neuralink. | 23 hesitate there. What do you mean by "named CFO"? |
| 24    Q. Do you have any other positions at xAI, | 24 Is there a distinction I should be aware of? |
| 25 other than corporate secretary? | 25    A. We've hired a head of finance at the |

| Page 10 | Page 12 |
|---|---|
| 1    A. No. | 1 company and have just not formally transferred the |
| 2    Q. Have you ever had another position at | 2 title yet. |
| 3 X.AI Corp., other than corporate secretary? | 3    Q. And when did you start as CFO of |
| 4    A. I have. | 4 Neuralink? |
| 5    Q. What position was that? | 5    A. At the founding. |
| 6    A. The CFO. | 6    Q. And when was Neuralink founded? |
| 7    Q. And when did you become CFO of X.AI | 7    A. Also, approximately end of 2016, |
| 8 Corp.? | 8 beginning of 2017. |
| 9    A. At the founding of the company. | 9    Q. Were you ever the CEO of Neuralink? |
| 10    Q. When was that? | 10    A. Yes. |
| 11    A. First half of 2023. | 11    Q. Okay. And when were you the CEO of |
| 12    Q. And how long were you in the role of | 12 Neuralink? |
| 13 CFO of xAI? | 13    A. At the founding. |
| 14    A. Approximately -- I don't know -- 14, 16 | 14    Q. Okay. Until approximately when? |
| 15 months, something like that. | 15    A. I don't recall what date that was. I |
| 16    Q. Do you remember when you stepped down | 16 was, to be clear, never the acting CEO. That was |
| 17 from that role or when you stopped having that | 17 an administrative position upon founding the |
| 18 role? | 18 company. As you likely know, you need to name |
| 19    A. Yeah, I don't remember the exact date, | 19 certain positions when you're creating a legal |
| 20 but -- yeah, I do recall when -- | 20 entity, and CEO is one of them. |
| 21    Q. Sometime mid-2024 maybe? Does that | 21     And so I was named CEO for several |
| 22 sound about right? | 22 years -- yes. |
| 23    A. Yes. | 23    Q. Do you have any position at Tesla? |
| 24     ATTORNEY KRY: Objection. | 24    A. No. |
| 25 /// | 25    Q. Have you ever had a position at Tesla? |

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

Page 13

1      A.   No.
2      Q.   Do you have any position at SpaceX?
3      A.   No.
4      Q.   Ever had a position at SpaceX?
5      A.   No.
6      Q.   And what about X Corp.; do you have a
7  position at X Corp., the successor to Twitter, is
8  my understanding.
9      A.   Yes.  Granted, X Corp. rolls up into
10 xAI Holdings now.  But I believe I'm still
11 corporate secretary at X Corp.
12     Q.   And you mentioned xAI Holdings.  Do you
13 have any positions at xAI Holdings?
14     A.   Yeah.  Corporate secretary.
15     Q.   Okay.  Do you have any role at the Musk
16 Foundation?
17     A.   I do.
18     Q.   And what is your role at the Musk
19 Foundation?
20     A.   CFO.
21     Q.   And how long have you had that
22 position?
23     A.   I don't recall exactly when I received
24 that title, but I would guestimate approximately
25 2017.

Page 14

1      Q.   Any other positions at the Musk
2  Foundation?
3      A.   I serve as a board member.
4      Q.   And how long have you been on the
5  board?
6      A.   I believe since 2017/2018 time frame.
7      Q.   Okay.  And what is the Musk Foundation?
8          ATTORNEY KRY:  Objection; vague.
9      A.   The charitable giving arm of Elon Musk.
10 BY ATTORNEY CULLERTON:
11     Q.   Okay.  And where do you live,
12 Mr. Birchall?
13     A.   I live in Austin, Texas.
14     Q.   Do you own any property in California?
15     A.   I do not.
16     Q.   You have a rental property in
17 California?
18     A.   No.
19     Q.   Do you work in California at all?
20     A.   I come periodically to different
21 companies.
22     Q.   Okay.  I think you mentioned you had a
23 position at xAI; correct?
24     A.   That's right.
25     Q.   And xAI's headquarters are in

Page 15

1  California; correct?
2      A.   Correct.
3      Q.   You have a position at Neuralink, I
4  believe you said; right?
5      A.   Yes.
6      Q.   Okay.  And Neuralink's headquarters are
7  in California as well; correct?
8      A.   No.  I believe, technically, the
9  Neuralink headquarters are now in Austin.
10     Q.   Do they still have offices in
11 California?
12     A.   They do.
13     Q.   Okay.  Where are those offices?
14     A.   Fremont.
15     Q.   And you said you come to California
16 periodically.  That's for -- in connection with
17 your work to the various Musk entities we've been
18 discussing?
19     A.   That's correct.
20     Q.   How often do you come, do you think?
21 If you had to estimate.
22     A.   It depends on what is happening at the
23 companies; but it could be very infrequent, to --
24 if there's a sprint or whatever that we're working
25 on at one of the companies, it could be, you know,

Page 16

1  a couple of days a week for a period of time.
2      Q.   Okay.  So in connection with your
3  various roles at Musk companies, how do you -- do
4  you communicate regularly with Mr. Musk?
5      A.   I do.
6      Q.   How do you communicate with him?  What
7  form do those communications take?
8      A.   Primarily in a face-to-face, weekly
9  meeting that is scheduled as a recurring meeting
10 on Fridays.
11     Q.   You email with him?
12     A.   Almost never.
13     Q.   Do you text with him?
14     A.   If you're asking about iMessage --
15     Q.   Yes.
16     A.   -- yes, but rarely.
17     Q.   If you had to estimate the frequency
18 with which you iMessage with him, what would the
19 estimate be?
20     A.   Maybe once or twice a month maybe.
21     Q.   Okay.  Has that always been the
22 frequency; or in the past, have you exchanged
23 iMessages with Mr. Musk more frequently?
24     A.   Maybe slightly more frequently than
25 that, but not much more.

JANE ROSE REPORTING
1-800-825-3341

California Firm No. 254
janerose@janerosereporting.com

**EXCERPTED**

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

---

Page 25

1    Q.  Okay.  And so what was it used for?
2    A.  As we're tasked with doing many things
3  for our principal, being able to correspond
4  without broadcasting specifically who we're
5  working for, at times it's helpful when we're
6  dealing with transactions and other things like
7  that.
8    Q.  Is that email account still active?
9    A.  I assume it -- it may be.  I haven't
10  checked it in years, but ...
11    Q.  When was the last time you used it if
12  you had to estimate?
13    A.  If I had to estimate, the last time I
14  used it would have been maybe in 2018/2019.
15    Q.  Okay.  Did Ms. Zilis have an account at
16  Atlantica, to your knowledge?
17    ATTORNEY KRY:  Objection.
18    A.  No.
19  BY ATTORNEY CULLERTON:
20    Q.  And do you know who Sam Teller is?
21    A.  I do.
22    Q.  Do you know if Mr. Teller had an
23  account at Atlantica?
24    A.  I don't recall.
25    Q.  Okay.  Who else do you recall having an

---

Page 26

1  account there?
2    A.  Again, I don't recall others having
3  accounts there.
4    Q.  So your recollection is that you only
5  recall yourself having one --
6    ATTORNEY KRY:  Objection.
7  BY ATTORNEY CULLERTON:
8    Q.  -- having an account there?
9    A.  Yes.  It's not impossible that there
10  could have been someone else had an account there;
11  I just don't recall.
12    Q.  And your testimony is Mr. Musk did not
13  have an account there; is that right?
14    A.  That's correct.
15    ATTORNEY KRY:  Objection to form.
16  BY ATTORNEY CULLERTON:
17    Q.  Do you still have access to the
18  account, the Atlantica account?
19    A.  I assume I do, yes.
20    Q.  And do you know whether that Atlantica
21  account was ever used to communicate regarding
22  OpenAI?
23    ATTORNEY KRY:  Objection -- withdrawn.
24    A.  Highly doubt it.  Very unlikely.
25  ///

---

Page 27

1  BY ATTORNEY CULLERTON:
2    Q.  It's possible?
3    A.  I guess anything is in the realm of
4  possibility, but highly unlikely.
5    Q.  Okay.  When you say it's highly
6  unlikely, what makes you think that?
7    A.  That wouldn't have been a topic that I
8  would have communicated using that domain.  There
9  were a set -- two domains that were -- I guess,
10  technically, three domains that were primarily
11  used that would have ever involved communications
12  about OpenAI.
13    Q.  And are you familiar, Mr. Birchall,
14  with the allegations made by Mr. Musk in his
15  complaint in this action?
16    A.  Generally, yes.
17    Q.  Okay.  Did you review the complaint
18  before it was filed?
19    A.  I would have, yeah, reviewed it at some
20  level, yes.
21    Q.  And did you have any role in drafting
22  the complaint?
23    ATTORNEY KRY:  Objection to form.
24    A.  I did not.
25  ///

---

Page 28

1  BY ATTORNEY CULLERTON:
2    Q.  Did you have any role in obtaining
3  information to be used for the complaint?
4    ATTORNEY KRY:  The objection -- you can
5  answer that "yes" or "no."
6    A.  I don't recall.
7  BY ATTORNEY CULLERTON:
8    Q.  Do you understand that Mr. Musk alleges
9  in his complaint that he made donations to
10  OpenAI, Inc., over the years?
11    A.  Yes.
12    Q.  Okay.  And OpenAI, Inc., was a
13  nonprofit corporation; correct?
14    A.  Yes.
15    Q.  Okay.  And part of your work for
16  Mr. Musk involved managing -- or involves
17  managing his charitable giving; correct?
18    ATTORNEY KRY:  Objection to form.
19    A.  Helping to manage that.
20  BY ATTORNEY CULLERTON:
21    Q.  Helping to manage?
22    A.  Yeah.
23    Q.  Okay.  And did you also help to manage
24  Mr. Musk's donations in connection with OpenAI?
25    A.  I did help with that, yes.

---

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

| Page 29 |
| --- |

1    Q.   Okay.  And how would you describe your
2  role with respect to Mr. Musk's alleged donations
3  to OpenAI?
4    A.   He would have directed that a donation
5  be made, and then I would have executed on that.
6    Q.   So you were the primary person -- if he
7  said, Hey, I'm just -- I want to give a million
8  dollars to OpenAI next month, he would have
9  called you to implement that request; is that
10  fair?
11    A.   Yes.
12    Q.   Okay.  Did you work with anybody else
13  in connection with the work you did to help
14  Mr. Musk manage his donations in connection with
15  OpenAI?
16    A.   Yes.
17    Q.   Okay.  Who else would you work with?
18    A.   We would have worked with tax counsel
19  and custodians of the different vehicles that were
20  used to make those donations.
21    Q.   Did Mr. Musk have any other financial
22  advisors at the time?
23        ATTORNEY KRY:  Objection; foundation.
24        ATTORNEY CULLERTON:  Actually, let me
25  strike that.  I'll try to make this a little more

| Page 30 |
| --- |

1  specific.
2  BY ATTORNEY CULLERTON:
3    Q.   Do you know a company called CTC myCFO?
4    A.   I do.
5    Q.   And is there a gentleman named
6  Ronald Gong that worked there?
7    A.   Correct.
8    Q.   And did CTC myCFO or Mr. Gong play any
9  role in helping you manage Mr. Musk's donations
10  to OpenAI?
11    A.   Yes.
12    Q.   Okay.  And what was their role?
13    A.   They were general advisors and -- in
14  just the philanthropic efforts, the vehicles to
15  use.  Their expertise is in taxes, and they have
16  in-house philanthropic expertise as well.  So they
17  were used as an advisor.
18    Q.   And you would have been the one
19  primarily interacting with them in connection
20  with any charitable activity between Mr. Musk and
21  OpenAI?
22    A.   Yes.
23    Q.   Okay.  And you mentioned tax counsel.
24  Who was tax counsel that you referred to?
25    A.   I was referring to Ron and his team.

| Page 31 |
| --- |

1    Q.   Okay.  Is it correct that some of
2  Mr. Musk's alleged donations to OpenAI came from
3  the Musk Foundation?
4    A.   Yes.
5    Q.   Okay.  And is it correct that some of
6  the donations that Mr. Musk alleges to OpenAI
7  were made through donor-advised funds?
8    A.   Yes.
9    Q.   Okay.  And is one of those
10  donor-advised funds Fidelity, maintained at
11  Fidelity Charitable?
12    A.   Yes.
13    Q.   And one was maintained at Vanguard
14  Charitable; is that right?
15    A.   Yes.
16    Q.   Were there any other donor-advised
17  funds that you're aware that were used to make
18  contributions to OpenAI by Mr. Musk or the Musk
19  Foundation?
20    A.   No.
21    Q.   Okay.  Fair to say that if Mr. Musk or
22  one of his entities had made a donation to
23  OpenAI, you would know about it?
24        ATTORNEY KRY:  Objection; foundation.
25    A.   At the time, yes.  Whether I could

| Page 32 |
| --- |

1  recollect all of them in this moment is a
2  different thing.  But, yes, at the moment of
3  giving, I would have known about it.
4        ATTORNEY CULLERTON:  Okay.  Let's mark
5  the first exhibit.  It's at Tab 108.
6        (Whereupon, Birchall Exhibit Number 1
7        was marked for identification and is
8        attached hereto.)
9  BY ATTORNEY CULLERTON:
10    Q.   Handing to you, Mr. Birchall, what's
11  been marked as Exhibit 1, a document beginning
12  Bates number EXMF0003841.  And it's an email from
13  you to a Hayley Cuccinello at forbes.com, dated
14  August 4th, 2022.
15        And got a lot of redacted attachments,
16  and you can flip through.  But I'm just going to
17  ask you a few questions about this document.
18        First of all, do you recognize this?
19    A.   Yes.
20    Q.   Okay.  And who's Hayley Cuccinello?
21    A.   As I understand it, she's a reporter.
22    Q.   Okay.  And you'll see at the first page
23  here, 3841, it lists the attachments.  And it
24  looks like it's got four attachments.  One is
25  Musk Foundation Grant Summary.  One is Fidelity

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

| Page 33 |
| --- |

1    DAF.  One is Vanguard Charitable.  And one is Tax
2    Return Charitable Contribution Summary.
3              Do you see that?
4        A.  I do.
5        Q.  And did you prepare these attachments?
6              ATTORNEY KRY:  Objection to form.
7        A.  I would have helped prepare the
8    attachments in some way.
9    BY ATTORNEY CULLERTON:
10       Q.  Do you know who else was involved in
11   preparing the attachments?
12       A.  The team you mentioned led by Ron Gong
13   would have been part of that process.
14       Q.  Okay.  And anyone at the Musk
15   Foundation that would have been involved in
16   gathering information for a request like this?
17       A.  No.
18       Q.  So why don't we turn to the first
19   attachment.  Starts 3845, piece of paper that
20   says "File Produced Natively."
21       A.  Yep.
22       Q.  And then right after that, there's a
23   blue sheet.  And you'll see this is the Musk
24   Foundation Grant Summary.
25       A.  Okay.

| Page 34 |
| --- |

1        Q.  Sorry.  Just stepping back, do you
2    remember why you were sending these documents to
3    Forbes?
4        A.  As I recall, they were doing a story on
5    charitable giving, and they were asking for a
6    record of Elon's specific charitable giving.
7        Q.  Okay.  So you worked with, it sounds
8    like, the team -- you know, Ron's team to pull
9    together the historical information about Elon's
10   charitable giving; is that accurate?
11       A.  Yes.
12       Q.  Okay.  And so this first attachment, it
13   looks like it included a summary of grant
14   activity from the Musk Foundation; correct?
15       A.  Yes.
16       Q.  Okay.  And there's a lot of redactions
17   here.  But if you flip to page 10 of this
18   document, you'll see we've got one unredacted
19   row.  And it identifies, it looks like, a
20   $10 million grant to YC org.
21              Do you see that?
22              ATTORNEY KRY:  Objection; misstates the
23   document.
24   BY ATTORNEY CULLERTON:
25       Q.  I certainly don't want to misstate the

| Page 35 |
| --- |

1    document.  So what do you think this row shows?
2        A.  It shows over a period of time an amount
3    that was given to YC org.
4        Q.  It's got the date range here,
5    July 1st, 2016, to June 30th, 2017; is that
6    right?
7        A.  Yes.
8        Q.  Okay.  And do you know what YC org is?
9        A.  Not super well.  But as I understand it,
10   it was the charitable arm of the YC organization.
11       Q.  Do you understand that it was the
12   fiscal sponsor for OpenAI in the early days?
13       A.  Yes.
14       Q.  And so if you flip -- let's just
15   flip to the next attachment.  And so -- sorry.
16   Back up before we leave that one.
17              This would have been reflected donations from
18   the Musk Foundation to YC org in total as of the
19   date of the email that you sent to Forbes;
20   correct?
21       A.  I believe so.
22       Q.  Okay.  Let's go to the next one.  I
23   think it starts 3846.
24              And the first attachment behind 3846 --
25   let me see my copy.

| Page 36 |
| --- |

1              It's a little bit unwieldy, and the
2    print is very small.  Give me a second.
3              All right.  So looking at the first
4    attachment to the first page to 3846, these
5    aren't individually Bates-numbered because
6    they're native files.  So you're going to bear
7    with me.
8              Do you see at the top there it says,
9    "Giving Account, Musk Foundation Charitable
10   Trust"?
11       A.  I do.
12       Q.  Okay.  And was that the DAF account
13   maintained at Fidelity?
14              And if it helps, if you flip back to the
15   cover email, it lists the attachments in order.
16   And if you flip to the next attachment, it's
17   identified as Vanguard.
18       A.  Yeah, I don't recall the exact naming,
19   but I trust that that sounds right.
20       Q.  Okay.  And you see here the unredacted
21   rows identify various donations, then, from the
22   Musk Foundation Charitable Fund maintained at
23   Fidelity to OpenAI; is that right?
24       A.  Yes.
25       Q.  Again, this would have been a complete

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

Page 37

1  summary of those donations as of the date of the
2  email that you sent to Ms. Cuccinello at Forbes;
3  correct?
4        ATTORNEY KRY:  Objection to form.  The
5  witness didn't do the redactions.  So if you're
6  asking about that --
7        ATTORNEY CULLERTON:  Sorry.
8  BY ATTORNEY CULLERTON:
9        Q.  Complete summary of the donations to
10 OpenAI would be -- from this Fidelity DAF account
11 as of the date of the email would be reflected in
12 this document; correct?
13       ATTORNEY KRY:  I still object to form.
14 The witness didn't do the redactions, so he can't
15 testify to what this document would show.  If you
16 want to ask him if the things that are shown there
17 are what you just mentioned, that seems
18 appropriate.
19       ATTORNEY CULLERTON:  Okay.  Well, I
20 think that's what I was asking him.  And I
21 certainly didn't apply the redactions.  So if
22 you're trying to say the redactions are
23 inaccurate, then we'll ask for an unredacted copy
24 and we can ask him the questions again.
25       But, in any event --

Page 38

1        ATTORNEY KRY:  That is not what I'm
2  saying.
3  BY ATTORNEY CULLERTON:
4        Q.  Okay.  Let me try this again.
5        Was the intent of this document when you
6  sent it to Forbes to summarize Mr. Musk's
7  charitable activities as of the date of the email
8  sent to Forbes?
9        A.  That was the intent, yes.
10       Q.  Okay.  And we've looked at the first
11 attachment at 3846.  And these are -- just to
12 confirm whether -- we can debate whether it's the
13 complete or not.  But these identify, in the
14 unredacted rows, grants being made from the DAF
15 account at Fidelity to OpenAI; is that correct?
16       A.  Yeah, that's what it appears to be
17 showing.
18       Q.  Okay.  And if you flip to the next one,
19 which begins at 3847, and this one is titled at
20 the top, "Vanguard Charitable, Musk Foundation
21 Charitable Fund."
22       A.  Yes, I'm there.
23       Q.  And, again, this identifies -- is it
24 your understanding that this identifies grants to
25 OpenAI from the Vanguard Charitable DAF account?

Page 39

1        A.  Yes.  This was an attempt to identify
2  that, yes.
3        Q.  Okay.  And you'll see on this one it
4  has some -- it lists as the charity name also
5  YC org.
6        Do you see that?
7        A.  I do.
8        Q.  And so this would also -- these reflect
9  donations from the Vanguard DAF account to
10 YC org; correct?
11       ATTORNEY KRY:  Objection to form.
12       A.  Yes.
13 BY ATTORNEY CULLERTON:
14       Q.  Okay.  And so we've got donations from
15 the Musk Foundation to YC org; correct?  That's
16 what we just looked at.  There were some
17 donations from the Fidelity DAF account to
18 OpenAI; correct?
19       A.  Yes.
20       Q.  And there were donations to -- from the
21 Vanguard DAF account to OpenAI or YC org;
22 correct?
23       A.  Yes.
24       Q.  Okay.  Other than donations from --
25 sorry.  Strike that.

Page 40

1        Other than donations to YC org or
2  through one of the two DAF accounts that -- the
3  one at Fidelity and the one at Vanguard, are you
4  aware of any direct donations from Mr. Musk to
5  OpenAI?
6        A.  Yes, I believe there was at least one.
7        Q.  Okay.
8        ATTORNEY KRY:  If you need to, you can
9  feel free to review the entire document.
10       A.  You're saying in this document?
11 BY ATTORNEY CULLERTON:
12       Q.  Yeah, yeah.
13       Maybe while you're reviewing it, let me
14 ask a somewhat different question, because I may
15 have mangled my question a little bit.
16       Other than donations to YC org or
17 through one of the two DAFs we've been talking
18 about, are you aware of any other donations
19 affiliated with Mr. Musk made to OpenAI?
20       A.  If I understood the question correctly,
21 yes, he made additional donations from the Musk
22 Foundation and personally from his trust.
23       Q.  Okay.  And, well, let's look at the
24 document.  The first attachment is summarizing
25 the Musk Foundation donations; correct?  We just

Elon Musk v.                              FINAL                        September 10, 2025
Samuel Altman                        [CONFIDENTIAL]                         Jared Birchall

Page 41

1    looked at it.
2        A.   Yes.
3        Q.   And as of 8/20/2017 -- or, sorry,
4    8/4/2020, which is the date of this email, the
5    summary of Musk Foundation grants identifies
6    $10 million to YC org; correct?
7        A.   In this document, yes.
8        Q.   Okay.  And you already testified this
9    was an effort to make a complete summary of
10   Mr. Musk's or the Musk Foundation's charitable
11   activities over time, correct, as of the date of
12   this email?
13       A.   Yes.  Whether or not there was an error,
14   I'm not -- I'm not testifying to that.  But, yes,
15   that was the intent, to properly summarize the
16   giving.
17       Q.   Okay.  And this Musk Foundation grant
18   summary does not identify any donations directly
19   to OpenAI; correct?  At least in the unredacted
20   portion; correct?
21           ATTORNEY KRY:  You mean all four
22   attachments or just this one --
23           ATTORNEY CULLERTON:  Just the Musk
24   Foundation Grant Summary at attachment 1; correct.
25       A.   The Musk Foundation donation to YC org

Page 42

1    was to OpenAI.
2    BY ATTORNEY CULLERTON:
3        Q.   Okay.  But I just want to make sure
4    we're very clear.  I'm trying understand the
5    testimony.  Other than that Musk Foundation
6    donation to YC org, are you aware of any other
7    Musk Foundation donations to OpenAI?
8            ATTORNEY KRY:  Hang on.
9            Objection.  Do you mean excluding the
10   ones that went through the DAFs or not?
11           ATTORNEY CULLERTON:  Excluding the ones
12   that went through the DAFs; correct.
13       A.   I haven't gone through to, like, be able
14   to thoroughly answer that question.  But per this
15   document, it appears that this is the extent.
16   BY ATTORNEY CULLERTON:
17       Q.   Okay.  Maybe I can ask it this way:  To
18   the extent that Mr. Musk made donations to YC org
19   or to OpenAI or to these DAFs that ultimately
20   went to OpenAI, those would have been documented;
21   correct?
22       A.   In some form.
23           ATTORNEY KRY:  Objection to form.
24       A.   In some form, yes.  Whether they're
25   properly documented in this document, I'm not --

Page 43

1    BY ATTORNEY CULLERTON:
2        Q.   Sure.  Setting this document aside,
3    there would have been records of the donations?
4        A.   Correct.
5        Q.   Okay.  And for the DAF donations, for
6    example, you would have gotten, there would have
7    been receipts from the DAFs; correct?
8        A.   There would have been email exchanges
9    memorializing those.
10       Q.   Same thing for Musk Foundation:  Any
11   Musk Foundation grants that went to OpenAI, those
12   would have been documented; correct?
13       A.   In some form, yes.
14       Q.   You referenced a personal donation from
15   Mr. Musk's trust.
16           Do you remember that?
17       A.   I do.
18       Q.   And do you know whether that donation
19   went to YC org or direct to OpenAI?  To your
20   recollection.
21       A.   Per the document, it went to YC org, but
22   that's the only basis that I would have to say
23   that it went to YC org.  I don't recall what --
24   yeah.
25       Q.   Okay.  And so let me ask the question

Page 44

1    that I was asking before again.
2            Other than donations to YC org through
3    Fidelity DAF or through Vanguard DAF, are you
4    aware of any other cash donations by Mr. Musk to
5    OpenAI?
6            ATTORNEY KRY:  Sorry.  Hang on.
7            Objection to form.  I don't think that
8    question was what you meant to ask.
9            ATTORNEY CULLERTON:  Let me look at how
10   it's come out.
11   BY ATTORNEY CULLERTON:
12       Q.   Other than donations to YC org or
13   through Fidelity DAF or through Vanguard DAF, are
14   you aware of any other donations from Mr. Musk to
15   OpenAI?
16           ATTORNEY KRY:  Objection to form.  You
17   mean are you including donations through the
18   foundation or just the donations from him
19   directly?
20   BY ATTORNEY CULLERTON:
21       Q.   Let's just start with Mr. Musk directly
22   first.
23       A.   If I understood the answer correctly,
24   yes.  There were two other ways that he gave money
25   beyond the two DAFs.

JANE ROSE REPORTING                              California Firm No. 254
1-800-825-3341                            janerose@janerosereporting.com

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

---

Page 45

1    Q.   Okay.  And what were those?
2    A.   In his personal capacity through his
3   trust and through the Musk Foundation.
4    Q.   Okay.  And for the Musk Foundation, are
5   you aware of any donations, excluding DAF
6   donations, that went directly from the Musk
7   Foundation to OpenAI?
8    A.   I believe so, though, again, I'm not
9   looking directly at the records to confirm that.
10   But I believe the answer is yes.
11   Q.   Okay.  And you mentioned Elon's trust a
12   moment ago; correct?
13   A.   Yes.
14   Q.   Okay.  And I think we were able to
15   agree that donation from his trust, your
16   recollection is it would have gone to YC org; is
17   that right?
18   A.   Per the document, I believe that's true.
19   Q.   Okay.  Just sticking on this document,
20  the summaries of the Fidelity DAF and Vanguard
21  DAF giving that we're talking about, you see
22  there's a lot of redactions here; correct?
23   A.   You're asking if there are a lot of
24  redactions?
25   Q.   Yeah, I'm asking if there are a lot of

---

Page 46

1   redactions.
2    A.   Yeah, it appears so.
3    Q.   Okay.  And is it your understanding
4   that the redacted content would reflect grants
5   from these DAFs to organizations that were not
6   associated with OpenAI?
7    ATTORNEY KRY:  Objection; lack of
8   foundation.
9    A.   I believe so.
10  BY ATTORNEY CULLERTON:
11   Q.   Okay.  Did the donor-advised funds
12  maintained at Fidelity and Vanguard make grants
13  to organizations other than OpenAI or YC org?
14   A.   Yes; under our direction.
15   Q.   Okay.  So fair to say that DAFs funded
16  by Mr. Musk contributed to other organizations
17  other than OpenAI or YC org?
18   A.   Correct.  Under our direction, they
19  donated -- or contributed to the exact
20  organizations that we asked them to contribute to.
21   Q.   And were DAFs funded by the Musk
22  Foundation -- do those DAF accounts contribute to
23  other organizations other than OpenAI or YC org?
24   A.   I think I just answered that question.
25   ATTORNEY KRY:  Yeah, asked and answered.

---

Page 47

1   BY ATTORNEY CULLERTON:
2    Q.   I think I asked the first time about
3   DAFs funded by Mr. Musk separate as DAFs funded
4   from the Musk Foundation, so I was trying to get
5   an answer to both questions.  But let's just back
6   up, and maybe we can clarify.
7    Sometimes Mr. Musk funds a DAF account;
8   correct?
9    A.   I guess -- I think the answer is "yes"
10  to that.  At times directly.  Mostly it is funded
11  by the Musk Foundation.
12   Q.   And so -- just so the record is clear,
13  DAFs -- to the extent Mr. Musk has funded some of
14  these DAF accounts, those DAF accounts
15  contributed to organizations other than OpenAI
16  and YC org; correct?
17   A.   Elon contributed to other organizations
18  through those vehicles, yes.
19   Q.   And same question for any DAFs funded
20  by the Musk Foundation; those DAFs made
21  contributions to or made grants to organizations
22  other than OpenAI and YC org; correct?
23   ATTORNEY KRY:  Objection to form.
24   A.   Again, they made donations to where Elon
25  directed them to make donations.

---

Page 48

1   BY ATTORNEY CULLERTON:
2    Q.   I'll get to that.
3    Was Musk Foundation required to make a
4   certain amount of contributions each year?
5    A.   Yes.
6    Q.   Okay.  And do contributions to the --
7   to a donor-advised fund count against that --
8   count towards satisfying that requirement?
9    ATTORNEY KRY:  Objection; calls for a
10  legal conclusion.
11   But you can answer if you know.
12   A.   I believe they do.
13  BY ATTORNEY CULLERTON:
14   Q.   Do you know what the requirement -- the
15  requirement threshold is for -- do you know --
16  sorry.  Strike that.
17   Do you know how much the foundation
18  needs to give away each year?
19   ATTORNEY KRY:  Same objection.
20   A.   I'm not a nonprofit expert, but I
21  believe it's 5 percent.
22  BY ATTORNEY CULLERTON:
23   Q.   5 percent of what?
24   A.   Of the -- there's some calculation of
25  value over the course of a year that is used to

---

JANE ROSE REPORTING
1-800-825-3341

California Firm No. 254
janerose@janerosereporting.com

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

Page 49

1 determine that 5 percent that, again, I'm not an
2 expert on that.
3          ATTORNEY CULLERTON:  Can we take five
4 minutes here?
5          ATTORNEY KRY:  Yeah, sure.
6          ATTORNEY CULLERTON:  Thanks.
7          THE VIDEOGRAPHER:  This is the end of
8 Media Number 1.  We are off the record
9 at 10:07 a.m.
10          (Recess taken from 10:07 a.m. to
11          10:20 a.m.)
12          THE VIDEOGRAPHER:  This is the beginning
13 of Media Number 2.  We are back on the record at
14 10:20 a.m.
15 BY ATTORNEY CULLERTON:
16     Q.  Mr. Birchall, let's stick on Exhibit 1
17 here for another moment.
18          I'm now looking at the last attachment,
19 which ends in 3848.
20     A.  Yes.
21     Q.  And the header on the document is "Elon
22 Musk Personal Tax Return Contribution Summary."
23          Do you see that?
24     A.  I do.
25     Q.  Do you know what this document is

Page 50

1 intended to reflect?
2     A.  As I recall, it was meant to reflect
3 charitable donations that were made directly from
4 Elon's personal trust.
5     Q.  Okay.  And you'll see on the back page
6 of this, there are some rows that are not
7 redacted.
8          Do you see the first row identifies cash
9 contribution to YC org of 500,000.
10          Do you see that?
11     A.  I do.
12     Q.  So is it your understanding that in
13 terms of cash contributions directly from
14 Mr. Musk's trust, this contribution to YC org was
15 the only contribution relating to OpenAI?
16     A.  I believe that is the case.
17     Q.  Okay.  And you see further down, it has
18 "noncash contributions."
19          Do you see that?
20     A.  I do.
21     Q.  That identifies OpenAI, Inc., four
22 Tesla Model 3.
23          Do you see that?
24     A.  Yes.
25     Q.  Okay.  And then there's an additional

Page 51

1 row a little further down, additional payment for
2 one Tesla Model 3, $14,105.
3          Do you see that?
4     A.  I do.
5     Q.  Do you recall Mr. Musk giving four
6 Teslas to certain employees at OpenAI, Inc.?
7     A.  I do.
8     Q.  The intent of that donation was to
9 serve as bonus compensation for those employees;
10 correct?
11          ATTORNEY KRY:  Objection; foundation.
12     A.  You'd have to ask him specifically the
13 intent.  I know he was giving those to -- for the
14 use of OpenAI employees based on -- yeah, his
15 feelings about the work they were doing.
16 BY ATTORNEY CULLERTON:
17     Q.  Let's look at a document.  Maybe that
18 will help refresh your recollection.  Why don't
19 we look at Tab 68.
20          ATTORNEY CULLERTON:  This will be
21 Exhibit 2.
22          (Whereupon, Birchall Exhibit Number 2
23          was marked for identification and is
24          attached hereto.)
25 ///

Page 52

1 BY ATTORNEY CULLERTON:
2     Q.  I'm marking as Exhibit 2 an email from
3 Chris Clark to Jared Birchall, dated
4 September 8th, 2017.  Bates number- is
5 OPENAI_MUSK00008795.
6          Do you recognize this, Mr. Birchall?
7     A.  Yes, generally.
8     Q.  All right.  And you see there's a --
9 about middle way down, there's a September 7th
10 email from you to Mr. Clark where you write:
11          "We need to circle back on how to
12          properly account for these vehicles.
13          Elon's intent was to provide them as
14          bonuses for the team's great work."
15          Do you see that?
16     A.  I do.
17     Q.  Does that refresh your recollection
18 that Mr. Musk's intent was to provide the Teslas
19 as bonuses for certain OpenAI, Inc., employees?
20          ATTORNEY KRY:  Objection; form.
21     A.  Yes.
22 BY ATTORNEY CULLERTON:
23     Q.  Do you have a recollection of having
24 that conversation with Mr. Musk and learning that
25 that was his intent?

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

Page 53

1    A.  I don't specifically have that
2  recollection.
3    Q.  But you have no reason to doubt that
4  that was his intent, since that's what you
5  relayed to Mr. Clark; correct?
6        ATTORNEY KRY:  Objection to form.
7    A.  It appears to be that, yes.
8  BY ATTORNEY CULLERTON:
9    Q.  Sticking -- let's flip back to
10  Exhibit 1.
11        And I'm going to look at the attachment
12  beginning 3846.
13        I'm looking at the spreadsheet
14  summarizing grants from the Fidelity DAF.  Let me
15  know when you're there.
16    A.  I'm there.
17    Q.  Okay.  And you see there's a column
18  over to the right that says, "Designation"?
19        Do you see that?  I know it's a little
20  small but --
21    A.  I see that, yes.
22    Q.  And then underneath -- and you can take
23  a moment to scroll through them all.  But just
24  looking at the first unredacted row dated
25  11/13/2020, I think, it says "General Support" as

Page 54

1  the designation for the grant to OpenAI, Inc.?
2        Do you see that?
3    A.  I do.
4    Q.  Okay.  And then as you go down, general
5  support gets listed over and over again as the
6  designation.
7        Do you see that?
8    A.  I do see that.
9    Q.  And do you understand that the -- do
10  you have an understanding that the designation
11  there was the purpose for which the grant was
12  designated?
13        ATTORNEY KRY:  Objection; form.
14    A.  In general, yes.
15  BY ATTORNEY CULLERTON:
16    Q.  And do you understand that "General
17  Support" designation means that there was no
18  specific purpose for the grant?
19        ATTORNEY KRY:  Objection to form.
20    A.  I don't recall the purpose behind
21  listing "General Support."  I think it was -- I
22  don't even know who filled in this form and
23  designated it as that.  But it was obviously
24  listed as general support.  I don't know the
25  rationale behind that.

Page 55

1  BY ATTORNEY CULLERTON:
2    Q.  Do you know whether any of the grants
3  to OpenAI from the Fidelity DAF account were
4  designated for anything more specific than
5  general support?
6    A.  Is there a specific one that you are
7  referring to?
8    Q.  General.
9        ATTORNEY KRY:  Objection.
10        If you need to, remember, you can review
11  the whole document.
12    A.  I'm just -- I am reviewing it here.
13        (Witness reviews document.)
14    A.  I believe some of them were -- I guess,
15  ultimately, they could have decided what they did
16  with the money.  But I believe some of them were
17  intended to cover their rent.
18  BY ATTORNEY CULLERTON:
19    Q.  Okay.  And we'll talk about the rent in
20  a little bit.
21        But other than the rent, are you aware
22  of any other specific instructions from Fidelity
23  to OpenAI to use the grants for any purpose more
24  specific than general support?
25        ATTORNEY KRY:  Objection to form.

Page 56

1    A.  I don't specifically recall that, no.
2  BY ATTORNEY CULLERTON:
3    Q.  Did you ever have any communications
4  with anyone at Fidelity in which you told them
5  that grants to OpenAI should be directed to
6  anything more specific than general support?
7    A.  The custodian of the Fidelity account
8  was UBS, and so my communications were with UBS.
9    Q.  Okay.  So the answer to the first
10  question, though, is, no, you didn't have any
11  communications with Fidelity --
12    A.  With Fidelity.
13    Q.  -- directing them to use the grant
14  via -- directed the grants be used for anything
15  more specific than general support; correct?
16    A.  Correct.
17    Q.  Okay.  And did you have any such
18  conversations with anyone at UBS?
19    A.  Not that I recall.
20    Q.  And same question for Vanguard:  Did
21  you ever have any communications with anyone at
22  Vanguard directing that grants from Vanguard to
23  OpenAI should be used for anything more specific
24  than general support?
25    A.  Not that I recall.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

---

Page 57

1      Q.   Okay.  Are you aware of any
2  communications by Fidelity to OpenAI directing
3  that any of their grants to OpenAI be used for
4  any specific purpose other than general support?
5      A.   I don't believe I'm aware of any such
6  communications.
7      Q.   Are you aware of any such
8  communications by anyone at Vanguard
9  communicating to anyone at OpenAI directing that
10  grants from Vanguard be used for a specific
11  purpose?
12      A.   I'm not aware of any such communication.
13      Q.   Are you aware of anyone having
14  communicated to anyone at Fidelity that grants
15  from Fidelity to OpenAI should be used for a
16  specific purpose?
17          ATTORNEY KRY:  Objection to form.
18      A.   I'm not aware of --
19  BY ATTORNEY CULLERTON:
20      Q.   And are you aware of any -- anyone
21  other than you having communicated with anyone at
22  Vanguard to tell them that grants from Vanguard
23  to OpenAI be used for a specific purpose?
24          ATTORNEY KRY:  Objection; foundation.
25      A.   I'm not aware, no.

---

Page 58

1  BY ATTORNEY CULLERTON:
2      Q.   Again, setting aside the lease payments
3  that you mentioned earlier, did you ever have any
4  communications that you can recall with Mr. Musk
5  in which he directed that the -- that donations
6  to OpenAI should be used for any purpose more
7  specific than general support?
8      A.   I don't recall.
9      Q.   We talked about YC org a little while
10  ago.
11          Are you aware of any agreement between
12  YC org and Mr. Musk regarding his donations to
13  YC org?
14          ATTORNEY KRY:  Objection to form.
15      A.   I know there was communication
16  indicating that they would -- I don't know if the
17  proper language is sponsor OpenAI and be the
18  conduit to funnel any donation that Elon were to
19  make to YC org to ensure it made it to OpenAI.
20  BY ATTORNEY CULLERTON:
21      Q.   But you're not aware of any agreement
22  between YC org -- written agreement between or
23  any other type of agreement between YC org and
24  Mr. Musk?
25          ATTORNEY KRY:  Objection; compound.

---

Page 59

1  BY ATTORNEY CULLERTON:
2      Q.   Fair enough.  You're not aware of any
3  written agreement between Mr. Musk and YC org
4  governing how his donations would be used by
5  YC org; correct?
6      A.   If you're asking about a contractual
7  agreement, I can't recall a contractual agreement.
8          I do recall some form of written
9  correspondence where it was made clear that that
10  was what would happen.
11      Q.   Okay.  And other than what you just
12  said, which is that your understanding was that
13  YC org was serving as the fiscal sponsor and that
14  the money would ultimately go through OpenAI, are
15  you aware of any communications --
16          ATTORNEY KRY:  Objection; misstates the
17  testimony.
18  BY ATTORNEY CULLERTON:
19      Q.   Are you aware of any agreements --
20  sorry.  Strike that.  Let me start over.
21          Other than that the money should go
22  from YC org to OpenAI, are you -- did you ever
23  communicate to anyone at YC org that the grants
24  should be used for a specific purpose by OpenAI?
25      A.   Not that I can recall.

---

Page 60

1      Q.   Okay.  And are you aware of any such
2  communications by Mr. Musk to anyone at YC org
3  instructing them that the money should be used by
4  OpenAI for a specific purpose?
5      A.   I was not privy to any discussions of
6  that nature.
7      Q.   Okay.  So the correspondence you were
8  referencing a moment ago would have been
9  correspondence relating to the idea that YC org
10  would accept donations and that those donations
11  would ultimately make their way to OpenAI;
12  correct?
13      A.   Yes.
14      Q.   Okay.  Do you have an understanding
15  that if Mr. Musk donates or contributes to a
16  donor-advised fund, he can take a charitable
17  deduction for tax purposes at that time?
18          ATTORNEY KRY:  Objection; calls for a
19  legal conclusion.
20          But you can answer.
21      A.   If he does so directly in his personal
22  capacity, yes.  If he's doing so from the
23  Musk Foundation, he would have already taken the
24  deduction.
25  ///

---

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

| Page 61 |
|---|

1    BY ATTORNEY CULLERTON:
2       Q.   Okay.  And is it your understanding
3    that when the DAF subsequently -- if the DAF
4    subsequently contributes to or makes a grant to
5    an ultimate recipient, Mr. Musk would not get a
6    second tax deduction in that scenario; correct?
7           ATTORNEY KRY:  Same objection.
8       A.   It's all -- yeah, one and the same.
9    His -- he would have made the donation with the
10   end donee in mind, and there would not be multiple
11   layers of deductions.
12   BY ATTORNEY CULLERTON:
13      Q.   He takes the deduction for the
14   contribution to the DAF, but not a second
15   deduction when the DAF maybe later on makes a --
16   distributes the money to a recipient --
17          ATTORNEY KRY:  Same objection.
18   BY ATTORNEY CULLERTON:
19      Q.   -- is that right?
20      A.   Correct.  Only one deduction is taken.
21      Q.   Is it correct that one of Musk's
22   companies leased office space in San Francisco
23   that was used by OpenAI?
24      A.   Yes.
25      Q.   And was that the Pioneer Building?

| Page 62 |
|---|

1       A.   Yes.
2       Q.   And the Musk company that was on the
3    lease was Musk Industries; correct?
4       A.   That's right.
5       Q.   What is Musk Industries?
6       A.   It's just a pass-through vehicle, an LLC
7    that was created to do things like this.
8       Q.   Does it have any employees?
9       A.   No.
10          ATTORNEY KRY:  Why don't we mark the
11   next exhibit, which is going to be Tab 23 in my
12   binder, Exhibit 3.
13          (Whereupon, Birchall Exhibit Number 3
14          was marked for identification and is
15          attached hereto.)
16   BY ATTORNEY CULLERTON:
17      Q.   I'm showing you what has been marked as
18   Exhibit 3, the beginning Bates number SPX-002475,
19   which is an email from you, Mr. Birchall, to
20   Elon Musk, cc'ing others, attaching the Pioneer
21   lease.
22          Do you recognize this, Mr. Birchall?
23      A.   Yes, in general.
24      Q.   And this looks like the executed lease
25   between Bridgerton [sic] Pioneer property, as

| Page 63 |
|---|

1    landlord, and Musk Industries; is that right?
2       A.   Yes.
3       Q.   Okay.  And Musk Industries is
4    controlled by Mr. Musk; correct?
5           ATTORNEY KRY:  Objection to form.
6       A.   Yes.
7    BY ATTORNEY CULLERTON:
8       Q.   Is it owned by Mr. Musk?
9       A.   Yes.
10      Q.   And just direct you to the first page
11   of the lease.  It says "Office Lease Agreement"
12   on top.
13          Do you see that?
14      A.   Yes, I do.
15      Q.   Okay.  And under "Premises," identifies
16   that Musk Industries is leasing the entire
17   rentable space in the building, commonly known as
18   the Pioneer Building.
19          Do you see that?
20      A.   I do.
21      Q.   So was Musk Industries leasing the
22   entire building, then?
23      A.   Yes.
24      Q.   Okay.  And the term of the lease is
25   10 years; correct?

| Page 64 |
|---|

1       A.   Yes.
2       Q.   Is the lease still active?
3       A.   It is.
4       Q.   Okay.  And who is the -- who is
5    occupying the space now?
6       A.   As of this moment, I believe there are
7    some xAI employees that --
8       Q.   Any other Musk companies using the
9    office space?
10      A.   I don't believe so, but I'm not certain.
11      Q.   And it's true that OpenAI used office
12   space in the Pioneer Building for a time;
13   correct?
14      A.   Yes.
15      Q.   And do you recall that to facilitate
16   that, Musk Industries entered into a separate
17   agreement with OpenAI?
18      A.   Yes.
19          ATTORNEY CULLERTON:  And why don't we
20   take a look at that.  It's Tab 21.  We'll mark
21   that as Exhibit 4.
22          (Whereupon, Birchall Exhibit Number 4
23          was marked for identification and is
24          attached hereto.)
25   ///

JANE ROSE REPORTING
1-800-825-3341

California Firm No. 254
janerose@janerosereporting.com

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

---

Page 65

1  BY ATTORNEY CULLERTON:
2      Q.  I'm showing you what's been marked as
3  Exhibit 4.  It's an email from Chris Clark to
4  you, Mr. Birchall, attaching an agreement for
5  tenancy-at-will.
6          Do you see that?
7      A.  I do.
8      Q.  Do you recognize this as the agreement
9  between OpenAI and Musk Industries by which
10  OpenAI was able to use the space at the Pioneer
11  Building?
12     A.  Yeah, it appears to be that.
13     Q.  Okay.  And just look down at
14  paragraph 4 of the agreement.
15         It says:
16         "At any time in its sole
17     discretion, Musk Industries LLC may
18     terminate OpenAI's permission to use and
19     occupy the premises" -- and then it goes
20     on to say -- "provided there's 30 days'
21     written notice."
22         Do you see that?
23     A.  Yes.
24     Q.  Okay.  So Musk Industries remained in
25  full control of the building; correct?

Page 66

1          ATTORNEY KRY:  Objection to form.
2      A.  They're the lessor, yes.
3  BY ATTORNEY CULLERTON:
4      Q.  Okay.  And with 30 days' written
5  notice, they could cause OpenAI to leave the
6  building; correct?
7      A.  Yes.
8      Q.  As a practical matter, that means
9  Mr. Musk could cause that to happen; correct?
10         ATTORNEY KRY:  Objection to form.
11     A.  Technically, yes.
12  BY ATTORNEY CULLERTON:
13     Q.  Just look at paragraph 5.  It says:
14     "For any period in which
15     Musk Industries allows OpenAI to use and
16     occupy the premises, upon 10 days'
17     written notice to OpenAI, Musk
18     Industries LLC may require OpenAI to pay
19     all of the rent and other charges set
20     forth in Section 4 of the Pioneer
21     Building lease."
22         Do you see that?
23     A.  Yes.
24     Q.  Okay.  So the arrangement was that
25  OpenAI would pay the rent -- monthly rent

Page 67

1  directly to the landlord; correct?
2      A.  That's right.
3      Q.  Okay.  And it was paying for the entire
4  premises; correct?
5          ATTORNEY KRY:  Objection to the time
6      frame and also objection to form.
7      A.  I believe there were periods where that
8  was the case.  And at other periods, it was
9  supplemented by additional people using the
10  building.
11  BY ATTORNEY CULLERTON:
12     Q.  And when you say "additional people,"
13  who are you referring to?  Is that Neuralink?
14     A.  Yes.
15     Q.  Okay.  And I think we touched on this a
16  little bit earlier.  But when paying the rent,
17  OpenAI was using funds that had been donated to
18  it by Mr. Musk; correct?
19     A.  That's right.
20     Q.  Okay.  And do you recall that Mr. Musk
21  made monthly contributions, either from the Musk
22  Foundation or through one of the DAFs, in order
23  to allow OpenAI to pay monthly rent on the
24  Pioneer Building?
25         ATTORNEY KRY:  Objection to form.

Page 68

1      A.  Yes.
2  BY ATTORNEY CULLERTON:
3      Q.  Okay.
4          So apart from manager -- helping to
5  manage Mr. Musk's alleged donations to OpenAI, do
6  you have other responsibilities for Mr. Musk in
7  connection with his affiliation with OpenAI?
8      A.  Any other responsibilities with regard
9  to his relationship with OpenAI?  Is that what you
10  asked?
11     Q.  Yes.
12     A.  Not that readily come to mind.
13     Q.  Did you help him monitor sort of the
14  operations at OpenAI?
15     A.  Oh.  I would communicate with Chris
16  Clark to get the read on their financial status
17  and whatnot, yeah.
18     Q.  And you helped deal with the facility
19  issues that came up, any facility issues that
20  come up at the Pioneer Building; correct?
21     A.  Periodically, yes.
22     Q.  And who was your principal point of
23  contact at OpenAI for that type of work?
24     A.  Chris Clark.
25     Q.  Okay.  And do you recall, was Ms. Zilis

---

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 10, 2025
Jared Birchall

Page 69

1  working at OpenAI at the time?
2          ATTORNEY KRY:  Objection to the time
3  frame.
4  BY ATTORNEY CULLERTON:
5      Q.  Let's say starting in 2016, do you
6  recall whether Ms. Zilis was working at OpenAI
7  then?
8      A.  I don't believe so.
9      Q.  Okay.  Did there come a time that
10  Ms. Zilis began working at OpenAI?
11      A.  As I recall, I don't think she was ever
12  employed by OpenAI, though I think at some point
13  she was on the board.
14      Q.  Okay.  Well, what's your recollection,
15  then, of her involvement in OpenAI, setting aside
16  her board service?
17      A.  Frankly, I don't know much about her
18  involvement, other than she was, at minimum,
19  friendly and/or communicative with members of the
20  team there.
21      Q.  Okay.  And what about Mr. Teller?  Do
22  you know who Sam Teller is?
23      A.  I do.
24      Q.  And are you aware of whether he had any
25  role at OpenAI during the time that Mr. Musk was

Page 70

1  affiliated with OpenAI?
2      A.  I believe he -- well he was employed
3  when the initial organization was formed and I
4  think the initial discussions and planning
5  happened.  I don't think he ever had a formal
6  role, though.  I could be wrong.
7      Q.  Was he employed by Mr. Musk at the
8  time?
9      A.  Yes, in -- yes.
10      Q.  What was his role for Mr. Musk?
11      A.  He was a quasi-chief of staff.
12      Q.  Was Ms. Zilis employed by Mr. Musk in
13  2016?
14      A.  I don't recall if specifically in 2016
15  she was.  She ultimately was employed by Mr. Musk.
16  I just don't know if it was specifically in 2016.
17      Q.  Do you remember when she began working
18  for Mr. Musk, to your recollection, about that?
19      A.  It was probably in the '16/'17 time
20  frame.
21      Q.  How often did you communicate with
22  Mr. Clark about matters relating to OpenAI?
23      A.  I frankly don't recall his -- you know,
24  as needed.
25      Q.  Okay.  And if you needed information

Page 71

1  about OpenAI, he would be the person you'd call?
2      A.  Typically, yes.
3      Q.  And he would provide the information
4  that you requested; correct?
5      A.  Yes.
6      Q.  Okay.  And I think you mentioned that
7  included updates on OpenAI's finances; correct?
8      A.  That's right.
9      Q.  And we talked about the building
10  already.
11          Anything else you remember discussing
12  with Mr. Clark in terms of OpenAI's operations,
13  finances?
14      A.  I don't have a clear recollection of all
15  the things that were discussed, no.
16      Q.  In 2016, did you have any reason to
17  believe that Mr. Musk's donations to OpenAI were
18  being used for anything other than OpenAI's
19  general charitable purposes?
20          ATTORNEY KRY:  Objection to form.
21          You can answer that if you understand
22  the question.
23      A.  I don't think so, no.
24  BY ATTORNEY CULLERTON:
25      Q.  All right.  And do you have any reason

Page 72

1  to believe, in 2016, that Mr. Musk's donations
2  were being used by OpenAI for anything other than
3  pursuing its charitable mission?
4      A.  No, though my information was limited.
5  I was not the person going to meetings at the
6  company and whatnot.  And so I had a limited
7  purview of the things that were happening.
8      Q.  Okay.  You had access to OpenAI
9  financial information; correct?
10          ATTORNEY KRY:  Objection to form.
11      A.  Periodically, I did, yes.
12  BY ATTORNEY CULLERTON:
13      Q.  And I think you had access to OpenAI's
14  tax filings, correct, or form 990s.
15      A.  Correct.
16      Q.  And you communicated with Mr. Clark on
17  a regular basis; correct?
18      A.  Semi-regular, yes.
19      Q.  So based on those interactions and the
20  information you had access to in 2016, you had no
21  basis to believe that OpenAI was misusing or
22  misspending any of Mr. Musk's charitable
23  contributions; correct?
24          ATTORNEY KRY:  Objection; foundation.
25      A.  Yeah, based on my information -- I

Elon Musk v.                              FINAL                    September 10, 2025
Samuel Altman                      [CONFIDENTIAL]                       Jared Birchall

---

Page 73

1   wouldn't have had -- I wasn't doing an analysis
2   based on that -- with that objective; but -- and
3   so for me to reflect back and think, was there
4   misuse of funds happening?  I don't think I --
5   there was an analysis being done with that
6   specific objective in mind.
7        And Elon would have had better
8   information than I would have on that.
9        But I did correspond with Chris and
10  periodically asked for financial information.  And
11  I didn't have information to be able to conclude
12  one way or another whether, you know, there was
13  any -- anything happening with funds that wasn't
14  directly in line with the mission of the company.
15  BY ATTORNEY CULLERTON:
16       Q.  Okay.  And is the same true for 2017?
17       ATTORNEY KRY:  Same objection.
18       A.  Again, I don't -- I don't have a clear
19  recollection of that, having been many years ago.
20  BY ATTORNEY CULLERTON:
21       Q.  Well, at any time that you were
22  involved with OpenAI, did you have any reason to
23  believe that funds donated by Mr. Musk were being
24  misused by OpenAI?
25       ATTORNEY KRY:  Same objection.

Page 74

1        A.  I don't believe so, though the
2   definition of "misuse" could -- within the
3   definition of "misuse," you could -- I could see
4   someone else potentially answering it differently.
5   But I didn't have information to suggest that
6   there was misuse of funds.
7   BY ATTORNEY CULLERTON:
8        Q.  Okay.  Did you have any -- zeroing in
9   on your answer there, did you have any
10  conversations with anyone else in which they
11  suggested that there had been any misuse of funds
12  at OpenAI?
13       A.  I don't recall.
14       Q.  Okay.  And as to contributions that
15  were intended by Mr. Musk to be used for rent
16  payments by OpenAI, did you ever have any
17  indication that that's -- that the money was used
18  for anything other than paying the rent at the
19  Pioneer Building?
20       A.  I don't believe so.  I think that was
21  used to pay rent and/or security expenses and/or
22  office-related expenses.
23       Q.  And OpenAI never missed a rent payment;
24  right?
25       ATTORNEY KRY:  Objection; foundation.

Page 75

1        A.  I don't believe so.
2        ATTORNEY CULLERTON:  We'll mark Tab 3,
3   please.
4            (Whereupon, Birchall Exhibit Number 5
5            was marked for identification and is
6            attached hereto.)
7   BY ATTORNEY CULLERTON:
8        Q.  So I've marked as Exhibit 5,
9   Mr. Birchall, an email from Teresa Holland to
10  you, cc'ing Ronald Gong and others, dated
11  May 23rd, 2016.  And it's got a Bates number
12  BMO_00000133.
13       Who is Teresa Holland?
14       A.  Teresa is Ron Gong's partner.
15       Q.  Okay.  Flip down to the first email in
16  the chain, which is an email from Mr. Musk or
17  exchange between Mr. Musk and Sam Altman.  It's
18  at page 139 from February 25th.
19       Do you see that?
20       Let me know when you're there.
21       A.  The first one in the entire document; is
22  that what you're saying?
23       Q.  Correct.  All the way at the back of
24  the document I handed you.  It's the
25  February 25th email starting from Sam Altman to

Page 76

1   Mr. Musk.
2        A.  Yeah.  Would you like me to read it
3   here?
4        Q.  No.  That's fine.  I just want to make
5   sure we're on the same page.
6        A.  Yeah, we're on the same page.
7        Q.  Can you see down below you see that
8   Mr. Altman writes to Mr. Musk:
9            "Can you do 20 million a year for
10           each of the next three years?"
11       Do you see that?
12       A.  I do see that.
13       Q.  And Mr. Musk responds, agreed, yes.
14       Do you see that?
15       A.  Let's see.
16       Q.  Right above.
17       A.  Yes.
18       Q.  Okay.  Then it looks like he forwards
19  the chain to Mr. Gong; right?  Right above that.
20       A.  Yes, I see that.
21       Q.  And he says.
22           "Ron, we need to wire 5 million per
23           quarter to OpenAI starting April 1st.
24           This is a nonprofit."
25       Do you see that?

---

JANE ROSE REPORTING                          California Firm No. 254
1-800-825-3341                       janerose@janerosereporting.com

**EXCERPTED**

Elon Musk v.           FINAL          September 10, 2025
Samuel Altman      [CONFIDENTIAL]          Jared Birchall

---

**Page 185**

ACKNOWLEDGMENT OF THE DEPONENT

1
2
3
4     I, Jared Birchall, do hereby certify that
5  I have read the foregoing pages and that the same
6  is a correct transcription of the answers given
7  by me to the questions therein propounded, except
8  for the corrections or changes in form or substance,
9  if any, noted in the attached Errata Sheet.
10
11     _____  _____
12     (DATE)     Jared Birchall
13
14
15     Signed and subscribed to before me this
16     _____ day of _____, 2025.
17
18     _____
19          Notary Public
20
21
22
23
24
25

---

**Page 187**

CERTIFICATE OF SHORTHAND REPORTER

1
2
3
4     I, Gail Inghram, Registered Diplomate
5  Reporter, Certified Realtime Reporter, Realtime
6  Systems Administrator, CA-Certified Shorthand
7  Reporter No. 8635, and Notary Public, the officer
8  before whom the foregoing proceedings were taken,
9  do hereby certify that the foregoing transcript
10  is a true and correct record of the proceedings;
11  that said proceedings were taken by me
12  stenographically and thereafter reduced to
13  typewriting under my supervision; and that I am
14  neither counsel for, related to, nor employed by
15  any of the parties to this case and have no
16  interest, financial or otherwise, in its outcome.
17
18
19     _____
20
21  Gail Inghram,
22  BA, RDR, CRR, RSA, CA-CSR No. 8635
23
24
25

---

**Page 186**

| | PAGE | LINE | CHANGE | REASON |
|---|---|---|---|---|
| 1 | | | | |
| 2 | ___ / ___ / _____ / _____ |
| 3 | ___ / ___ / _____ / _____ |
| 4 | ___ / ___ / _____ / _____ |
| 5 | ___ / ___ / _____ / _____ |
| 6 | ___ / ___ / _____ / _____ |
| 7 | ___ / ___ / _____ / _____ |
| 8 | ___ / ___ / _____ / _____ |
| 9 | ___ / ___ / _____ / _____ |
| 10 | ___ / ___ / _____ / _____ |
| 11 | ___ / ___ / _____ / _____ |
| 12 | ___ / ___ / _____ / _____ |
| 13 | ___ / ___ / _____ / _____ |
| 14 | ___ / ___ / _____ / _____ |
| 15 | ___ / ___ / _____ / _____ |
| 16 | ___ / ___ / _____ / _____ |
| 17 | ___ / ___ / _____ / _____ |
| 18 | ___ / ___ / _____ / _____ |
| 19 | ___ / ___ / _____ / _____ |
| 20 | ___ / ___ / _____ / _____ |
| 21 | ___ / ___ / _____ / _____ |
| 22 | ___ / ___ / _____ / _____ |
| 23 | ___ / ___ / _____ / _____ |
| 24 | ___ / ___ / _____ / _____ |
| 25 | ___ / ___ / _____ / _____ |

---

**Page 188**

E X H I B I T S
JARED BIRCHALL

BIRCHALL             PAGE

1
2
3
4
5  Exhibit 1    Email communication dated ............32
6              8/4/2020 with attached Musk
7              Foundation Grant Summaries
8              (EXMF-0003841 through 3845)
9
10  Exhibit 2    Email communication dated ............51
11              8/29/2017 to 9/8/2017
12              (OPENAI_MUSK00008795 through
13              8796)
14
15  Exhibit 3    Email communication dated ............62
16              7/1/2016, with attached lease
17              (SPX-002475 through 2525)
18
19  Exhibit 4    Email communication dated ............64
20              6/9/2016 to 6/22/2016 with
21              attached Tenancy-at-Will
22              agreement (OEPNAI_MUSK00017240
23              through 7242)
24
25

---

JANE ROSE REPORTING          California Firm No. 254
1-800-825-3341          janerose@janerosereporting.com

**EXCERPTED**