EXHIBIT 25

**In the Matter Of:**

*MUSK v*

*ALTMAN*

---

*ROBERT WU*

*October 03, 2025*

---



1

1              UNITED STATES DISTRICT COURT

2               NORTHERN OF CALIFORNIA

3                 OAKLAND DIVISION
    _____
4   ELON MUSK, et al.,              )
                                    )
5            Plaintiffs,            )
                                    )
6   v.                              )   Case No. 4:24-cv-04722-YGR
                                    )
7   SAMUEL ALTMAN, et al.,          )
                                    )
8            Defendants.            )
    _____)
9

10

11

12      ** CONTAINS HIGHLY CONFIDENTIAL AND HIGHLY

13     CONFIDENTIAL BUSINESS STRATEGY INFORMATION **

14          VIDEOTAPED DEPOSITION of OPENAI

15      by and through its corporate designees

16              San Francisco, California

17              Friday, October 3, 2025

18

19

20

21

22

23            Reported Stenographically by

24      Michael P. Hensley, RDR, CSR No. 14114

25

2

1              UNITED STATES DISTRICT COURT

2               NORTHERN OF CALIFORNIA

3                 OAKLAND DIVISION
    _____
4   ELON MUSK, et al.,            )
                                  )
5           Plaintiffs,           )
                                  )
6   v.                            )    Case No. 4:24-cv-04722-YGR
                                  )
7   SAMUEL ALTMAN, et al.,        )
                                  )
8           Defendants.           )
    _____)
9

10

11      Videotaped Deposition of OPENAI, commencing at

12   the hour of 9:08 AM and concluding at the hour of

13   6:32 PM on Friday, October 3, 2025, at the location

14   of Morrison & Foerster LLP, 425 Market Street,

15   San Francisco, California 94105, before Michael

16   Hensley, Registered Diplomate Reporter, Certified

17   Shorthand Reporter No. 14114, in and for the State

18   of California.

19

20

21

22

23

24

25

3

1    APPEARANCES:

2    For Plaintiffs:

3            MOLOLAMKEN LLP
             BY:  ALEX EYNON, ESQ.
4            430 Park Avenue
             New York, New York 10022
5            212.607.8174
             aeynon@mololamken.com

6

7            MOLOLAMKEN LLP
             BY:  ROBERT K. KRY, ESQ.
8            600 New Hampshire Avenue, N.W.
             Washington, D.C. 20037
9            202.553.2011
             rkry@mololamken.com

10

     For Defendant Microsoft Corporation:
11           DECHERT LLP
             BY:  JAY JURATA , ESQ.
12           1900 K Street, NW
             Washington, D.C. 20006
13           202.261.3440
             jay.jurata@dechert.com

14

15           DECHERT LLP
             BY:  HANNAH LEONE, ESQ.
16           45 Fremont Street, 26th Floor
             San Francisco, California 94105
17           415.262.4543
             hannah.leone@dechert.com

18

19   For Defendant OpenAI:

20           WACHTELL, LIPTON, ROSEN & KATZ
             BY:  STEVEN P. WINTER, ESQ.
21               ZACHARY M. DAVID, ESQ.
                 EMILY P. ROSS, ESQ.
22           51 West 52nd Street
             New York, New YOrk 10019
23           212.403.1116
             swinter@wlrk.com
24           zmdavid@wlrk.com
             epross@wlrk.com

25

4

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant OpenAI:

 3              MORRISON & FOERSTER, LLP
              BY:  CAMILA A. TAPERNOUX, ESQ.
 4              425 Market Street
              San Francisco, California 94105
 5              415.268.6273
              ctapernoux@mofo.com
 6

 7    Also Present:

 8              RENNY HWANG, ESQ.

 9              ALEJANDRO ZAMORA RUIZ, Videographer

10

11    Present Remotely:

12              ROBERT CASTILLO, AV Monitor

13              BRADLEY WILSON, ESQ.

14              NATE CULLERTON, ESQ.

15              JENNIFER SCHUBERT, ESQ.

16              STEVEN MOLO, ESQ.

17              SARA TOFIGHBAKHSH, ESQ.

18

19

20

21

22

23

24

25
```

5

```
 1                              INDEX

 2

 3                          EXAMINATIONS

 4                                                       Page

 5   WITNESS:  ROBERT WU

 6        BY ATTORNEY EYNON                              12

 7   WITNESS:  NORA PUCKETT

 8        BY ATTORNEY EYNON                              252

 9        BY ATTORNEY WINTER                             280

10

11                           EXHIBITS

12   No.                Description                      Page

13   1       OpenAI, Inc.'s Responses and               13
             Objections to Plaintiff's Notice of
14           Deposition Pursuant to Fed. R. Civ.
             P. 30(b)(6)
15
     2       Bates Number 2024MUSK-0003115 -            21
16           0003133:  Initial Registration for
             OpenAI, Inc.
17
     3       Bates Number OPENAI_MUSK00000419 -         23
18           00000421:  Amended and Restated
             Certificate of Incorporation of
19           OpenAI, Inc. A Nonprofit non-Stock
             Corporation
20
     4       Bates Number 2024MUSK- 0003112 -          32
21           0003114:  Initial Registration Form
             State of California
22
     5       Bates Number 2024MUSK-0011569 -           41
23           0011571:  OpenAI Charter

24

25
```

11

```
 1                San Francisco, California

 2                 Friday, October 3, 2025

 3                    9:08 AM - 6:32 PM

 4                          -oOo-

 5          THE VIDEOGRAPHER:  We are now on the

 6   record.  My name is Alejandro Zamora Ruiz, and I am

 7   the videographer representing Lexitas.

 8              This is the video deposition for the

 9   United States District Court, Northern District of

10   California.  Today's date is October 3rd, 2025, and

11   the time is 9:08 AM Pacific Time.

12              This deposition is being held at the

13   offices of Morrison Foerster LLP at

14   425 Market Street, San Francisco, California 94105

15   in the matter of Elon Musk, et al., versus Samuel

16   Altman, et al., Case Number 4:24-cv-04722-YGR.

17              The deponent is Robert Wu as a 30(b)(6)

18   witness for OpenAI Incorporated.

19              Would all counsel please identify

20   themselves.

21              ATTORNEY EYNON:  Alex Eynon at MoloLamken

22   LLP for plaintiffs, and I'm joined by my colleague

23   Robert Kry.

24              ATTORNEY WINTER:  Steven Winter, Wachtell,

25   Lipton, Rosen & Katz, for the OpenAI defendants and
```

12

1  the witness, joined by my colleagues Zachary David

2  and Emily Ross.

3          ATTORNEY JURATA:  Jay Jurata from Dechert

4  LLP for defendant Microsoft Corporation.  With me is

5  Hannah Leone from Dechert LLP.

6          ATTORNEY TAPERNOUX:  Camila Tapernoux of

7  Morrison Foerster for the OpenAI defendants.

8          THE VIDEOGRAPHER:  The court reporter will

9  now introduce himself and swear in the witness.

10          THE COURT REPORTER:  Good morning.  My

11  name is Mike Hensley.  I am a California Certified

12  Shorthand Reporter, CSR #14114.  Today's proceedings

13  are being captured by stenographic means.

14                      ROBERT WU,

15  having been first duly sworn, was examined and

16  testified as follows:

17                     EXAMINATION

18  BY ATTORNEY EYNON:

19      Q.   Good morning, Mr. Wu.

20      A.   Good morning.

21      Q.   Throughout the deposition today, I'm going

22  to ask you a number of questions about OpenAI.  When

23  I say "OpenAI," I'm referring to the OpenAI group of

24  entities generally.  If I'm asking you about a

25  specific entity, like the nonprofit OpenAI, Inc., or

MUSK v
ALTMAN
30(b)(6), Highly Confidential

Robert Wu
October 03, 2025

51

```
 1              ATTORNEY WINTER:  Objection.  Outside the
 2    scope.
 3              You can answer if you can.
 4              THE WITNESS:  No.  These were attendees at
 5    the meeting.  The actual members are listed in the
 6    second paragraph.
 7    BY ATTORNEY EYNON:
 8       Q.   Okay.
 9              On the second page, about the second
10    sentence in that top paragraph, the minutes state:
11              [As Read]  Altman and Brockman also
12              commented on the rationale for the
13              existing capped-profit structure which, in
14              their view, was predicated on certain
15              outdated assumptions related to the
16              development of and realization of value
17              from AGI and noted certain ongoing
18              challenges the profit cap presented to
19              achieving the mission, including capital
20              raising and employment -- employee
21              recruitment and retention.
22              What were the outdated assumptions related
23    to the development of and realization of the value
24    from AGI that Mr. Altman and Mr. Brockman discussed?
25              ATTORNEY WINTER:  So I'm just going to
```

52

1    object to this line of questioning as outside the

2    scope of the topic that the witness was prepared to

3    address and agreed to with counsel.

4              You can answer counsel's question if you

5    can, but I'm going to lodge that objection to this

6    line of questioning.

7              ATTORNEY EYNON:  In my view, this falls

8    under -- would full under multiple topics.  One, the

9    topic about changes or potential changes to the

10   official mission statement and/or nonprofit status

11   and any discussion by the OpenAI, Inc., board -- oh,

12   sorry.  That's referring to Musk.

13             And it also would fall under topic 14,

14   "OpenAI will produce a witness to testify about

15   OpenAI's fixed maximum return and capped profit

16   structures."

17             ATTORNEY WINTER:  I disagree with the --

18   those are covered by those topics.  I don't want to

19   belabor it for the record.

20             But subject to my objection, you can

21   answer counsel's question if you can based on your

22   own knowledge, and don't reveal any privileged legal

23   advice.

24             THE WITNESS:  Okay.

25             I mean, based on my recollection of this

1   meeting, the -- the committee was always focused on

2   ensuring that the board was informed or was

3   discussing the ways that were necessary to kind of

4   advance the mission.  A lot of topics were covered,

5   including ensuring that the governing structure

6   remained mission aligned and ensuring that the

7   company was set up to maintain technical leadership

8   and viability.

9               And that included a number of elements,

10  including the ability to raise capital, the ability

11  to purchase compute needed to advance the

12  technology.  It included other areas such as the

13  ability to attract and retain the best talent out

14  there in the world.

15              And so the specific discussion always

16  revolved around that and getting inputs as to how

17  the cap profit played into that.

18              And so the cap profit -- speaking about

19  the existing cap profit structure really spoke to a

20  number of elements as to whether the company would

21  be able to raise capital and attract talent in order

22  to advance the mission, because that was critical in

23  order to do so.

24  BY ATTORNEY EYNON:

25      Q.   Okay.

1          And I think you may have touched on this

2     in your previous answer, but what were the ongoing

3     challenges the profit cap presented to achieving the

4     mission?

5          A.   Based on my recollection, there are a

6     number of challenges.  There are a lot of

7     competitors out there to OpenAI putting out

8     technology that did not have this bespoke structure.

9     Most of them -- in fact, almost all of them -- are

10    just normal corporations, not mission bound or with

11    a unique, I would guess, one-of-a-kind capped profit

12    structure.

13              And so investors and others that the

14    company would've engaged with in order to kind of

15    raise capital, there were always challenges with

16    respect to the explaining the structure.

17              Obviously investors would find investing

18    in a company that had a capped profit or had a cap

19    on their profit and returns would, in isolation, be

20    less attractive than, for example, a company that

21    had an uncapped return, which is to say most normal

22    corporations.

23         Q.   Okay.

24              Under the heading, let's see, "Structure

25    Options," which is going to be on the next page of

```
 1              THE WITNESS:  I don't know.

 2    BY ATTORNEY EYNON:

 3         Q.   After this deal, did OpenAI seek another

 4    deal with Microsoft for compute?

 5         A.   I don't know all of the discussions that

 6    may have occurred between OpenAI and Microsoft with

 7    respect to compute purchases.  I do know that there

 8    were subsequent agreements entered into between

 9    OpenAI, Inc.'s for-profit subsidiary to purchase

10    compute from, I believe, 2019 onwards.

11         Q.   Okay.

12              Do you know whether Microsoft expressed

13    that it would require more commercially favorable

14    terms for a subsequent compute deal?

15         A.   I -- I don't know the specifics of the

16    negotiations that occurred between OpenAI and

17    Microsoft.  My understanding is that it was a

18    negotiation across a number of terms through those

19    agreements at arm's length and those were the deals

20    that were signed.

21              ATTORNEY EYNON:  I'll now mark Exhibit 11.

22              (Exhibit 11 was marked for

23              identification.)

24    BY ATTORNEY EYNON:

25         Q.   This is an exhibit with -- a document with
```

1    necessary to advance the mission.

2            ATTORNEY EYNON:  I would like to mark

3    Exhibit 15.

4            (Exhibit 15 was marked for

5            identification.)

6    BY ATTORNEY EYNON:

7        Q.   This is a -- this document has beginning

8    Bates stamp 2024MUSK-0011200, and it is a post from

9    OpenAI's website dated March 11th, 2019.

10           Mr. Wu, is this OpenAI's public

11   announcement that it created OpenAI LP?

12       A.   My understanding is, yes, this was the

13   first public blog post about the for-profit

14   subsidiary.

15       Q.   Would you please turn to the

16   second-to-last page of the document with the Bates

17   stamp ending 11202.

18           At the bottom of this page, there's a

19   header that says "Who's Involved?"  And then there's

20   a third bullet there that states:

21           [As Read]  Our investors include Reid

22           Hoffman's charitable foundation and Khosla

23           Ventures, among others.

24           When did Reid Hoffman invest in OpenAI LP?

25           ATTORNEY WINTER:  Objection to form.

126

1           You can answer, if you can.

2           THE WITNESS:  If any change in the

3   structure falls under the definition, as defined in

4   this contract, taking into consideration all of the

5   provisos and everything that's laid out in here, if

6   it does trigger that, then, yes, the majority of the

7   capital commitments of the limited partners would be

8   needed to approve that decision at this particular

9   point in time in 2019.  Microsoft would've

10  constituted that majority.

11          ATTORNEY EYNON:  We can go off the record.

12          THE VIDEOGRAPHER:  Going off the record at

13  12:12 PM Pacific Time.

14          (A break was taken.)

15          THE VIDEOGRAPHER:  We're back on the

16  record at 12:32 PM Pacific Time.

17          ATTORNEY EYNON:  I'll now mark Exhibit 15.

18          THE COURT REPORTER:  17 next in order.

19          ATTORNEY EYNON:  I'll now mark Exhibit 17.

20          (Exhibit 17 was marked for

21          identification.)

22  BY ATTORNEY EYNON:

23      Q.   Mr. Wu, along with the LP agreement that

24  we just looked at, did Microsoft also enter into a

25  joint development and collaboration agreement or a

127

1    JDCA with OpenAI in 2019?

2        A.    Yes.    They entered into a JDCA with both

3    OpenAI Inc. and OpenAI LP.

4        Q.    Is Exhibit 17 a copy of that JDCA?

5        A.    Yes.

6        Q.    And just for the record, the beginning

7    Bates stamp on this document is MSFT_MUSK000018513.

8              Were the OpenAI LP agreement and the JDCA

9    executed at the same time?

10       A.    I don't know if they were executed

11   together, but they were dated on the same date; so,

12   yes, they were executed on the same day.

13       Q.    Did OpenAI's board vote on the JDCA?

14       A.    My understanding is, yes, the board

15   approved the JDCA and the LPA.

16       Q.    Which OpenAI board members voted to

17   approve the JDCA?

18       A.    I don't recall.

19       Q.    Do you recall whether it was the whole

20   board or a subpart of the board?

21       A.    I don't recall.

22       Q.    Directing you to a section titled "General

23   Terms" on the page ending in 18516 of this document.

24   And in particular to the term "collaboration."

25             Is it your understanding that, under this

136

1          Q.    Under this agreement, did Microsoft agree

2     to invest an additional $2 billion into OpenAI?

3          A.    Yes.   I believe this is the agreement

4     that -- or the amendment to the LP that was entered

5     into in connection with Microsoft's investment in

6     2021.

7          Q.    Did the OpenAI board vote to approve this

8     deal?

9          A.    I believe, yes, OpenAI's board -- OpenAI,

10    Inc.'s board voted to approve this deal.

11         Q.    Did the entire board vote to approve it or

12    just certain members of OpenAI, Inc.'s board?

13         A.    I don't recall.

14         Q.    Would you please turn to Schedule A, which

15    begins on page 64658.

16              Does this schedule reflect the capital

17    commitments and the target redemption amounts for

18    the limited partners?

19         A.    Yes.

20         Q.    On the second page of Schedule A, does

21    this agreement show both of Microsoft's capital

22    commitments?

23         A.    Yes.

24         Q.    At this point had Microsoft already

25    contributed all of its $1 billion initial capital

1    mission.

2            And through the course of many months and

3    many discussions with financial advisors, legal

4    advisors, the committee had discussed potential

5    structures to convert the for-profit subsidiary into

6    different structures, but there was never any

7    discussion or consideration at the board level of

8    converting the actual nonprofit into a for-profit.

9    BY ATTORNEY EYNON:

10       Q.   Was -- around this time in September 2024,

11   was OpenAI's board considering converting the

12   for-profit subsidiary into an uncapped for-profit

13   structure?

14           ATTORNEY WINTER:  Objection to form.

15           THE WITNESS:  In September 2024 or around

16   that time, there were discussions with the board's

17   independent financial advisors and legal advisors on

18   potential structures and different considerations to

19   put the for-profit entity in the best position to

20   kind of advance the mission, and that includes

21   putting itself in the best position to maintain

22   technical leadership, to attract investors again to

23   raise the capital needed to purchase compute and

24   attract talent and retain talent -- all while

25   ensuring that the mission and the governing

211

1    structure remained aligned with the mission.

2              And so one of those potential

3    considerations was converting the capital structure

4    of the for-profit subsidiary, which is an LLC, as

5    you know, into a more traditional corporate

6    structure that was not a bespoked capped profit

7    structure but more of a traditional stock

8    corporation.

9    BY ATTORNEY EYNON:

10        Q.   And was the new for-profit structure that

11   the board was considering a structure that would not

12   have any cap on its profits?

13              ATTORNEY WINTER:  Objection to the form.

14              THE WITNESS:  One of the considerations

15   was converting the LLC waterfall into a more

16   traditional corporate stock ownership capital

17   structure, and in that structure, stock that

18   investors, employees, or others hold would not be

19   subject to a particular cap on profit distributions.

20   BY ATTORNEY EYNON:

21        Q.   When did OpenAI's board first begin

22   considering a plan to convert the LLC entity into a

23   more traditional corporate stock structure?

24        A.   I don't have the exact date on when this

25   was discussed, but as kind of mentioned -- excuse

212

1    me -- in April '24, or perhaps it was May '24, when

2    the mission and strategy committee was first formed,

3    one of the areas they worked with advisors on was

4    examining the structure and making sure that OpenAI,

5    as an enterprise, was best set up for success to

6    advance the mission.

7              I think through many meetings and the

8    course of many discussions with those advisors and

9    others, over time one of the options became under

10   consideration was converting that LLC for-profit

11   waterfall into a traditional corporate stock OpenAI

12   structure.  I would say sometime in 2024.

13        Q.   Did the board first consider converting

14   the LLC into a for-profit -- into a traditional

15   corporate stock structure in May 2024?

16             ATTORNEY WINTER:  Objection.  Asked and

17   answered.

18             THE WITNESS:  Yeah, I don't -- again, I

19   don't recall the exact date at which this first

20   discussed but -- yeah.

21   BY ATTORNEY EYNON:

22        Q.   Do you know whether it would've been in

23   the summer of 2024?

24             ATTORNEY WINTER:  Objection.

25             THE WITNESS:  I think there were many

MUSK v
ALTMAN

30(b)(6), Highly Confidential

Robert Wu
October 03, 2025

213

```
 1    discussions at the mission and strategy committee
 2    level talking about the potential governance and
 3    capital structure.  I don't recall the exact date or
 4    time period.
 5    BY ATTORNEY EYNON:
 6        Q.   On the second page of this article, maybe
 7    two-thirds of the way down the page, there is a
 8    paragraph that states:
 9             [As Read]  There would continue to be
10             a nonprofit arm of OpenAI that would
11             pursue charitable goals and own a stake in
12             the for-profit company.  It couldn't be
13             determined what the nonprofit separate
14             mission will be.
15             At this time in September 2024, was OpenAI
16    planning to convert into a structure where the
17    nonprofit would have only an economic interest in
18    the for-profit entity?
19        A.   There was a lot of discussion, I think,
20    through the whole back half of 2024 as to potential
21    governance and capital structures.  And discussed at
22    the committee level was, kind of, the governance
23    rights that the nonprofit might have in the
24    recapitalized for-profit company.
25             And so there were a lot of discussions.
```

Case 4:24-cv-04722-YGR    Document 379-50    Filed 01/06/26    Page 23 of 25
MUSK v
ALTMAN                          30(b)(6), Highly Confidential

Robert Wu
October 03, 2025

214

1   There was no formal decision as to what the proposed

2   path would necessarily be, and so there were a lot

3   of considerations on the table.

4        Q.   Under the -- as part of the proposed

5   restructuring, was the nonprofit going to have a

6   separate mission from the new for-profit entity?

7            ATTORNEY WINTER:   Objection to form.

8   Lacks foundation.

9            You could answer if you can.

10           THE WITNESS:   My understanding was that

11  the focus of the board's discussion or, should I

12  say, the mission strategy committee's discussion was

13  not around changing the nonprofit's mission.

14  BY ATTORNEY EYNON:

15       Q.   Did OpenAI's board take any steps towards

16  forming a public benefit corporation in 2024?

17       A.   Sorry, can you clarify "steps" just --

18       Q.   Did they make any filings or make any

19  other preparations to convert to a public benefit

20  corporation structure?

21           ATTORNEY WINTER:   Objection to the form.

22  Vague.

23           You can answer, if you can.

24           THE WITNESS:   There's no formal legal

25  action, to my knowledge, of taking affirmative steps

232

```
 1          And that also means -- that means the

 2   for-profit maintaining technical leadership, raising

 3   capital, retaining talent, buying compute, and all

 4   of that, but also setting up the nonprofit in the

 5   best position to succeed.  And that included

 6   potential enhanced path to liquidity, arming it with

 7   the resources that it needs to go out and carry out

 8   it's charitable purpose.

 9          And I think that that is what this third

10   bullet is referring to when it says "Nonprofit will

11   have even better and enhanced resources to carry out

12   the mission."

13   BY ATTORNEY EYNON:

14      Q.   Was anyone at Microsoft involved in

15   developing this updated plan?

16      A.   I'm not aware of Microsoft being involved

17   in the governance structure.  There were discussions

18   around ownership allocations over time and the

19   economics, but not to my knowledge, specifically

20   around the governance itself.

21      Q.   On the next page of this blog post, there

22   is a section titled "Sam's Letter to Employees."

23          At the very bottom of the page, there's a

24   bullet, and it states.

25              [As Read]  We want to be able to
```

282

1              CERTIFICATE OF SHORTHAND REPORTER

2

3          I, Michael P. Hensley, Registered Diplomate

4    Reporter for the State of California, CSR No. 14114,

5    the officer before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing

7    transcript is a true and correct record of the

8    testimony given; that said testimony was taken by me

9    stenographically and thereafter reduced to

10   typewriting under my direction; that reading and

11   signing was not requested; and that I am neither

12   counsel for, related to, nor employed by any of the

13   parties to this case and have no interest, financial

14   or otherwise, in its outcome.

15

16

17

18   _____

19              Michael P. Hensley, CSR, RDR

20

21

22

23

24

25