# EXHIBIT 14

## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
----------------------------------------
ELON MUSK, et al.,
    Plaintiffs,
v.
SAMUEL ALTMAN, et al.,
    Defendants.

Case No. 4:24-cv-04722-YGR
----------------------------------------

VIDEO DEPOSITION OF
Jared Birchall
September 10, 2025
San Francisco, California
Lead: Nathaniel Cullerton, Esquire
Firm: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING - 1-800-825-3341

## Page 2

APPEARANCES

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
  ROBERT KRY, ESQUIRE
  rkry@mololamken.com
  WALTER HAWES IV, ESQUIRE
  whawes@mololamken.com
  MOLOLAMKEN LLP
    600 New Hampshire Avenue, NW, Suite 660
    Washington, D.C. 20037
    202.556.2011

  -and-

  MARC TOBEROFF, ESQUIRE
  mtoberoff@toberoffandassociates.com
  JAYMIE PARKKINEN, ESQUIRE (Via Zoom)
  jparkkinen@toberoffandassociates.com
  TOBEROFF & ASSOCIATES PC
    23823 Malibu Road, Suite 50-363
    Malibu, California 90265
    310.246.3333

## Page 3

APPEARANCES (Cont'd)

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:
  NATHANIEL CULLERTON, ESQUIRE
  ndcullerton@wlrk.com
  WILLIAM SAVITT, ESQUIRE
  wdsavitt@wlrk.com
  HAYLEY SMITH, ESQUIRE
  hbsmith@wlrk.com
  EMILY ROSS, ESQUIRE
  epross@wlrk.com
  WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
    New York, New York 10019
    212.403.1329

  -and

  WILLIAM FRENTZEN, ESQUIRE  (Via Zoom)
  wfrentzen@mofo.com
  MORRISON & FOERSTER LLP
    425 Market Street
    San Francisco, California 94105
    415.268.6413

## Page 4

APPEARANCES (Cont'd)

ATTORNEY(S) FOR DEFENDANT MICROSOFT:
  NISHA PATEL GUPTA, ESQUIRE
  nisha.patelgupta@dechert.com
  HANNAH LEONE, ESQUIRE
  hannah.leone@dechert.com
  DECHERT LLP
    US Bank Tower
    633 West 5th Street, Suite 4900
    Los Angeles, California 90071
    213.808.5735

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    Gail L. Inghram, Court Reporter
    BA, CRR, CLR, RDR, CSR-CA (No. 8635)
    Vinny Bezerra, Videographer
    CALIFORNIA FIRM CERT 254

Page 5

## TABLE OF CONTENTS

EXAMINATION OF                                 PAGE
JARED BIRCHALL
    By Attorney Cullerton ............7
    By Attorney Patel ..............162
    By Attorney Kry ................169
    By Attorney Cullerton ..........176

Instructions to Read and Sign ........ Page 184
Reporter Certificate ................. Page 187
Index of Exhibits .................... Page 188

Page 6

1         Wednesday, September 10, 2025
2            San Francisco, California
3                     - - -
4         THE VIDEOGRAPHER: Good morning. This
5   is the beginning of Volume 1, Media Number 1, in
6   the deposition of Jared Birchall in the matter of
7   Elon Musk versus Samuel Altman, filed in the
8   United States District Court, Northern District of
9   California, Oakland Division. The case number is
10  4:24-cv-04722-YGR.
11        Today's date is September 10th of
12  2025. The time is approximately 9:11 a.m.
13        The video operator today is Vinny
14  Bezerra contracted by Jane Rose Reporting. This
15  video deposition is taking place at 755 Sansome
16  Street in San Francisco, California.
17        All attending will be noticed by the
18  stenographic record.
19        Will the court reporter please introduce
20  yourself and swear in the witness.
21        THE COURT REPORTER: Yes, per AB 3252
22  amending California Business and Professions Code
23  8016, all reporters need to state the following to
24  ensure you have a stenographic reporter covering
25  your proceedings.

Page 7

1         My name is Gail Inghram. I'm a
2   California Certified Stenographic Shorthand
3   Reporter, Number 8635. I will be handling the
4   transcript per California code today.
5         And would you raise your right hand to
6   be sworn, please.
7   WHEREUPON,
8              JARED BIRCHALL,
9   being first duly sworn or affirmed to testify to the
10  truth, the whole truth, and nothing but the truth,
11  was examined and testified as follows:
12
13              EXAMINATION
14  BY ATTORNEY CULLERTON:
15     Q. Good morning, Mr. Birchall.
16        Did you do anything to prepare for your
17  deposition today?
18     A. I did.
19     Q. What did you do to prepare?
20     A. I met with the legal team yesterday.
21     Q. Okay. About how long was that meeting?
22     A. Approximately 5 hours.
23     Q. And when you refer to the legal team,
24  who do you mean?
25     A. The gentlemen sitting here at the table.

Page 8

1      Q. Anybody else meet with you?
2      A. No.
3      Q. Okay. Did you review any documents in
4   preparing for your deposition?
5      A. Yes.
6      Q. And have you talked to anybody else
7   about your deposition today, other than your
8   legal team?
9      A. No.
10     Q. Have you been deposed before?
11     A. I have.
12     Q. How many times?
13     A. Approximately 10.
14     Q. Have you given testimony at a trial
15  before?
16     A. I have.
17     Q. And what were the trials in which
18  you've given trial testimony?
19     A. There was a defamation case, which is
20  the only one at trial that I've given testimony
21  on.
22     Q. Is that for the defamation case against
23  Mr. Musk?
24     A. That's correct.
25     Q. So apart from that, you've never given

Elon Musk v.　　　　　　　　　　　FINAL　　　　　　　　　　　September 10, 2025
Samuel Altman　　　　　　　　　[CONFIDENTIAL]　　　　　　　　　Jared Birchall

Page 49

1   determine that 5 percent that, again, I'm not an
2   expert on that.
3        ATTORNEY CULLERTON:  Can we take five
4   minutes here?
5        ATTORNEY KRY:  Yeah, sure.
6        ATTORNEY CULLERTON:  Thanks.
7        THE VIDEOGRAPHER:  This is the end of
8   Media Number 1.  We are off the record
9   at 10:07 a.m.
10       (Recess taken from 10:07 a.m. to
11       10:20 a.m.)
12       THE VIDEOGRAPHER:  This is the beginning
13  of Media Number 2.  We are back on the record at
14  10:20 a.m.
15  BY ATTORNEY CULLERTON:
16      Q.   Mr. Birchall, let's stick on Exhibit 1
17  here for another moment.
18       I'm now looking at the last attachment,
19  which ends in 3848.
20      A.   Yes.
21      Q.   And the header on the document is "Elon
22  Musk Personal Tax Return Contribution Summary."
23       Do you see that?
24      A.   I do.
25      Q.   Do you know what this document is

Page 50

1   intended to reflect?
2       A.   As I recall, it was meant to reflect
3   charitable donations that were made directly from
4   Elon's personal trust.
5       Q.   Okay.  And you'll see on the back page
6   of this, there are some rows that are not
7   redacted.
8        Do you see the first row identifies cash
9   contribution to YC org of 500,000.
10       Do you see that?
11      A.   I do.
12      Q.   So is it your understanding that in
13  terms of cash contributions directly from
14  Mr. Musk's trust, this contribution to YC org was
15  the only contribution relating to OpenAI?
16      A.   I believe that is the case.
17      Q.   Okay.  And you see further down, it has
18  "noncash contributions."
19       Do you see that?
20      A.   I do.
21      Q.   That identifies OpenAI, Inc., four
22  Tesla Model 3.
23       Do you see that?
24      A.   Yes.
25      Q.   Okay.  And then there's an additional

Page 51

1   row a little further down, additional payment for
2   one Tesla Model 3, $14,105.
3        Do you see that?
4       A.   I do.
5       Q.   ==Do you recall Mr. Musk giving four==
6   ==Teslas to certain employees at OpenAI, Inc.?==
7       A.   ==I do.==
8       Q.   ==The intent of that donation was to==
9   ==serve as bonus compensation for those employees;==
10  ==correct?==
11       ==ATTORNEY KRY:  Objection; foundation.==
12      A.   ==You'd have to ask him specifically the==
13  ==intent.  I know he was giving those to -- for the==
14  ==use of OpenAI employees based on -- yeah, his==
15  ==feelings about the work they were doing.==
16  BY ATTORNEY CULLERTON:
17      Q.   Let's look at a document.  Maybe that
18  will help refresh your recollection.  Why don't
19  we look at Tab 68.
20       ATTORNEY CULLERTON:  This will be
21  Exhibit 2.
22       (Whereupon, Birchall Exhibit Number 2
23       was marked for identification and is
24       attached hereto.)
25  ///

Page 52

1   BY ATTORNEY CULLERTON:
2       Q.   I'm marking as Exhibit 2 an email from
3   Chris Clark to Jared Birchall, dated
4   September 8th, 2017.  Bates number- is
5   OPENAI_MUSK00008795.
6        Do you recognize this, Mr. Birchall?
7       A.   Yes, generally.
8       Q.   All right.  And you see there's a --
9   about middle way down, there's a September 7th
10  email from you to Mr. Clark where you write:
11       "We need to circle back on how to
12       properly account for these vehicles.
13       Elon's intent was to provide them as
14       bonuses for the team's great work."
15       Do you see that?
16      A.   I do.
17      Q.   Does that refresh your recollection
18  that Mr. Musk's intent was to provide the Teslas
19  as bonuses for certain OpenAI, Inc., employees?
20       ATTORNEY KRY:  Objection; form.
21      A.   Yes.
22  BY ATTORNEY CULLERTON:
23      Q.   Do you have a recollection of having
24  that conversation with Mr. Musk and learning that
25  that was his intent?

Page 57

```
1     Q.  Okay.  Are you aware of any
2   communications by Fidelity to OpenAI directing
3   that any of their grants to OpenAI be used for
4   any specific purpose other than general support?
5     A.  I don't believe I'm aware of any such
6   communications.
7     Q.  Are you aware of any such
8   communications by anyone at Vanguard
9   communicating to anyone at OpenAI directing that
10  grants from Vanguard be used for a specific
11  purpose?
12    A.  I'm not aware of any such communication.
13    Q.  Are you aware of anyone having
14  communicated to anyone at Fidelity that grants
15  from Fidelity to OpenAI should be used for a
16  specific purpose?
17        ATTORNEY KRY:  Objection to form.
18    A.  I'm not aware of --
19  BY ATTORNEY CULLERTON:
20    Q.  And are you aware of any -- anyone
21  other than you having communicated with anyone at
22  Vanguard to tell them that grants from Vanguard
23  to OpenAI should be used for a specific purpose?
24        ATTORNEY KRY:  Objection; foundation.
25    A.  I'm not aware, no.
```

Page 58

```
1   BY ATTORNEY CULLERTON:
2     Q.  Again, setting aside the lease payments
3   that you mentioned earlier, did you ever have any
4   communications that you can recall with Mr. Musk
5   in which he directed that the -- that donations
6   to OpenAI should be used for any purpose more
7   specific than general support?
8     A.  I don't recall.
9     Q.  We talked about YC org a little while
10  ago.
11        Are you aware of any agreement between
12  YC org and Mr. Musk regarding his donations to
13  YC org?
14        ATTORNEY KRY:  Objection to form.
15    A.  I know there was communication
16  indicating that they would -- I don't know if the
17  proper language is sponsor OpenAI and be the
18  conduit to funnel any donation that Elon were to
19  make to YC org to ensure it made it to OpenAI.
20  BY ATTORNEY CULLERTON:
21    Q.  But you're not aware of any agreement
22  between YC org -- written agreement between or
23  any other type of agreement between YC org and
24  Mr. Musk?
25        ATTORNEY KRY:  Objection; compound.
```

Page 59

```
1   BY ATTORNEY CULLERTON:
2     Q.  Fair enough.  You're not aware of any
3   written agreement between Mr. Musk and YC org
4   governing how his donations would be used by
5   YC org; correct?
6     A.  If you're asking about a contractual
7   agreement, I can't recall a contractual agreement.
8         I do recall some form of written
9   correspondence where it was made clear that that
10  was what would happen.
11    Q.  Okay.  And other than what you just
12  said, which is that your understanding was that
13  YC org was serving as the fiscal sponsor and that
14  the money would ultimately go through OpenAI, are
15  you aware of any communications --
16        ATTORNEY KRY:  Objection; misstates the
17  testimony.
18  BY ATTORNEY CULLERTON:
19    Q.  Are you aware of any agreements --
20  sorry.  Strike that.  Let me start over.
21        Other than that the money should go
22  from YC org to OpenAI, are you -- did you ever
23  communicate to anyone at YC org that the grants
24  should be used for a specific purpose by OpenAI?
25    A.  Not that I can recall.
```

Page 60

```
1     Q.  Okay.  And are you aware of any such
2   communications by Mr. Musk to anyone at YC org
3   instructing them that the money should be used by
4   OpenAI for a specific purpose?
5     A.  I was not privy to any discussions of
6   that nature.
7     Q.  Okay.  So the correspondence you were
8   referencing a moment ago would have been
9   correspondence relating to the idea that YC org
10  would accept donations and that those donations
11  would ultimately make their way to OpenAI;
12  correct?
13    A.  Yes.
14    Q.  Okay.  Do you have an understanding
15  that if Mr. Musk donates or contributes to a
16  donor-advised fund, he can take a charitable
17  deduction for tax purposes at that time?
18        ATTORNEY KRY:  Objection; calls for a
19  legal conclusion.
20        But you can answer.
21    A.  If he does so directly in his personal
22  capacity, yes.  If he's doing so from the
23  Musk Foundation, he would have already taken the
24  deduction.
25  ///
```

Page 73

1  wouldn't have had -- I wasn't doing an analysis
2  based on that -- with that objective; but -- and
3  so for me to reflect back and think, was there
4  misuse of funds happening?  I don't think I --
5  there was an analysis being done with that
6  specific objective in mind.
7      And Elon would have had better
8  information than I would have on that.
9      But I did correspond with Chris and
10 periodically asked for financial information.  And
11 I didn't have information to be able to conclude
12 one way or another whether, you know, there was
13 any -- anything happening with funds that wasn't
14 directly in line with the mission of the company.
15 BY ATTORNEY CULLERTON:
16    Q.  Okay.  And is the same true for 2017?
17        ATTORNEY KRY:  Same objection.
18    A.  Again, I don't -- I don't have a clear
19 recollection of that, having been many years ago.
20 BY ATTORNEY CULLERTON:
21    Q.  Well, at any time that you were
22 involved with OpenAI, did you have any reason to
23 believe that funds donated by Mr. Musk were being
24 misused by OpenAI?
25        ATTORNEY KRY:  Same objection.

Page 74

1     A.  I don't believe so, though the
2  definition of "misuse" could -- within the
3  definition of "misuse," you could -- I could see
4  someone else potentially answering it differently.
5  But I didn't have information to suggest that
6  there was misuse of funds.
7  BY ATTORNEY CULLERTON:
8     Q.  Okay.  Did you have any -- zeroing in
9  on your answer there, did you have any
10 conversations with anyone else in which they
11 suggested that there had been any misuse of funds
12 at OpenAI?
13    A.  I don't recall.
14    Q.  Okay.  And as to contributions that
15 were intended by Mr. Musk to be used for rent
16 payments by OpenAI, did you ever have any
17 indication that that's -- that the money was used
18 for anything other than paying the rent at the
19 Pioneer Building?
20    A.  I don't believe so.  I think that was
21 used to pay rent and/or security expenses and/or
22 office-related expenses.
23    Q.  And OpenAI never missed a rent payment;
24 right?
25        ATTORNEY KRY:  Objection; foundation.

Page 75

1     A.  I don't believe so.
2         ATTORNEY CULLERTON:  We'll mark Tab 3,
3  please.
4         (Whereupon, Birchall Exhibit Number 5
5         was marked for identification and is
6         attached hereto.)
7  BY ATTORNEY CULLERTON:
8     Q.  So I've marked as Exhibit 5,
9  Mr. Birchall, an email from Teresa Holland to
10 you, cc'ing Ronald Gong and others, dated
11 May 23rd, 2016.  And it's got a Bates number
12 BMO_00000133.
13       Who is Teresa Holland?
14    A.  Teresa is Ron Gong's partner.
15    Q.  Okay.  Flip down to the first email in
16 the chain, which is an email from Mr. Musk or
17 exchange between Mr. Musk and Sam Altman.  It's
18 at page 139 from February 25th.
19       Do you see that?
20       Let me know when you're there.
21    A.  The first one in the entire document; is
22 that what you're saying?
23    Q.  Correct.  All the way at the back of
24 the document I handed you.  It's the
25 February 25th email starting from Sam Altman to

Page 76

1  Mr. Musk.
2     A.  Yeah.  Would you like me to read it
3  here?
4     Q.  No.  That's fine.  I just want to make
5  sure we're on the same page.
6     A.  Yeah, we're on the same page.
7     Q.  Can you see down below you see that
8  Mr. Altman writes to Mr. Musk:
9         "Can you do 20 million a year for
10 each of the next three years?"
11       Do you see that?
12    A.  I do see that.
13    Q.  And Mr. Musk responds, agreed, yes.
14       Do you see that?
15    A.  Let's see.
16    Q.  Right above.
17    A.  Yes.
18    Q.  Okay.  Then it looks like he forwards
19 the chain to Mr. Gong; right?  Right above that.
20    A.  Yes, I see that.
21    Q.  And he says.
22       "Ron, we need to wire 5 million per
23 quarter to OpenAI starting April 1st.
24 This is a nonprofit."
25       Do you see that?

Page 77

1  A. Yes.
2  Q. Do you have a recollection that
3  Mr. Musk committed to donate $20 million a year
4  to OpenAI?
5  A. This predated my employment, but --
6  Q. Okay.
7  A. -- I do have a vague recollection of
8  that having been --
9  Q. If you flip up to the front, you'll --
10 you eventually get added to the chain.
11 A. Yes.
12 Q. So if you look at the first page of the
13 document ending in 133, you'll see an email from
14 yourself to Teresa and Ronald.
15 A. Yep.
16 Q. And at the bottom you say:
17    "Can you please remind me what the
18 remaining OpenAI commitment is and
19 when."
20    And Teresa responds:
21    "The overall gifting expected is
22 20 million a year for three years."
23    Does that --
24 A. Yes.
25 Q. Is that consistent with your

Page 78

1  understanding of the commitment that Mr. Musk
2  made?
3  A. Yes.
4  Q. Okay. And do you recall that these
5  donations were made in quarterly installments of
6  5 million per quarter? Does that sound right?
7     ATTORNEY KRY: Objection to form.
8  A. Yes, I think that was the intent, to
9  make them each quarter.
10 BY ATTORNEY KRY:
11 Q. Okay. And -- and separate donations
12 were being made monthly to cover the rent
13 payments; correct?
14 A. Yes.
15 Q. Okay. So the commitment from Mr. Musk,
16 as you recall it, was to provide $5 million a
17 quarter to OpenAI for their general operations;
18 correct?
19 A. I don't know if the wording was used for
20 their general operations; but, yes, he was going
21 to provide 5 million quarterly and -- for the
22 mission of the -- you know, of the foundation.
23    ATTORNEY KRY: Pardon me. Objection to
24 form.
25 ///

Page 79

1  BY ATTORNEY KRY:
2  Q. And then there was an additional
3  commitment to make monthly grants that would be
4  used to cover rent and related expenses at the
5  Pioneer Building; correct?
6  A. Yes.
7  Q. Okay. And did there come a time around
8  the middle of 2017 where Mr. Musk and the other
9  OpenAI founders began negotiating about
10 potentially converting the not-for-profit into a
11 for-profit entity?
12    ATTORNEY KRY: Objection to form.
13 A. I wouldn't characterize it the way you
14 just said it.
15 BY ATTORNEY KRY:
16 Q. Okay. How would you characterize it?
17 A. They began looking at the possibility of
18 adding a nonprofit extension to the non --
19 sorry -- a for-profit extension to the nonprofit
20 to accelerate the mission of the nonprofit.
21 Q. And so your understanding of the
22 discussions was that Mr. Musk and OpenAI's
23 founders were discussing creating a structure
24 that would have a -- that would maintain the
25 nonprofit but also have a for-profit entity

Page 80

1  affiliated with it?
2  A. They were exploring that as an option.
3  Yes.
4  Q. Okay. And did -- and Mr. Musk was
5  supportive of that option?
6     ATTORNEY KRY: Objection to form.
7  Vague.
8  A. I was not in the room for those
9  discussions. As I recall, he ebbed and flowed in
10 his support and enthusiasm for that option.
11 BY ATTORNEY KRY:
12 Q. Did you have any conversations with
13 Mr. Musk about it -- about this option that you
14 described?
15 A. Not that I specifically recall.
16    ATTORNEY CULLERTON: Let me mark Tab 50.
17    (Whereupon, Birchall Exhibit Number 6
18    was marked for identification and is
19    attached hereto.)
20 BY ATTORNEY KRY:
21 Q. Do you have a recollection that Mr. --
22 before we get to this exhibit, we'll talk about
23 it in a second.
24    Do you have a recollection that Mr. Musk
25 wanted control over whatever for-profit entity

Page 153

1    And, you know, if we held to the mission
2 of doing things the way we wanted them done, it
3 didn't matter whether we had a B Corp. or a
4 C Corp.  Investors didn't understand B Corps. as
5 much as they understood C Corps. as we thought
6 about the future of fundraising and -- yeah, those
7 were the main reasons.
8 BY ATTORNEY CULLERTON:
9    Q.  And when you say investors didn't
10 understand the B Corp. as opposed to a C Corp.,
11 was it a concern that it was harder to raise
12 investment as a B Corp. as opposed to a C Corp.?
13    A.  Partially, yeah.  I mean, it was -- case
14 law is based on mainly C Corps., and this is a
15 newer concept.
16    Q.  Did you have any conversations with any
17 investors or potential investors in xAI in which
18 they expressed that they would rather have it be
19 a C Corp. as opposed to a B Corp.?
20    A.  I don't believe so.
21    Q.  Are you aware that xAI announced its
22 Series B funding round on May 26th, 2024?
23    A.  That sounds right.
24    Q.  Okay.  And in that round, it raised
25 $6 billion.

Page 154

1    Does that sound right?
2    A.  It does.
3    Q.  And did you have any conversations with
4 any investors in the Series B round about xAI
5 status as a B Corp. or C Corp.?
6    A.  Not that I can recall.  Again, this was
7 in motion before we launched the round.
8    Q.  And you're aware -- you reference
9 administrative burden.  One of the administrative
10 burdens you were referring to, the requirement
11 that PBCs file an annual report to shareholders
12 about how they're pursuing the mission stated in
13 their certificate?
14    A.  Yeah, that's I believe, one of the
15 issues that is brought up to us.
16    Q.  And did xAI ever file a report during
17 the time -- the required report during the time
18 that it was a PBC, or did it convert to a C Corp.
19 before needing to file the report?
20    A.  I don't recall the details on that.
21    Q.  You're not aware of it ever having
22 filed the PBC report required by statute?
23        ATTORNEY KRY:  Objection; foundation.
24    A.  I don't recall whether one was filed or
25 not.

Page 155

1 BY ATTORNEY CULLERTON:
2    Q.  What other administrative burdens were
3 you referring to?
4    A.  I don't remember all the details of what
5 it required, but it was just beyond what a
6 standard C Corp. was requiring.
7    Q.  Do you know whether Mr. Musk was
8 contemplating forming xAI at the time that he was
9 acquiring Twitter?
10        ATTORNEY KRY:  Objection; foundation.
11    A.  I wouldn't be able to tell you -- not
12 that I was aware of, whether or not he was
13 contemplating that, no.
14 BY ATTORNEY CULLERTON:
15    Q.  You never had any conversations with
16 him during the process of the Twitter acquisition
17 about potentially forming xAI?
18    A.  No.
19        ATTORNEY CULLERTON:  Do Tab 112.
20 Actually --
21        (Whereupon, Birchall Exhibit Number
22        21 was marked for identification and
23        is attached hereto.)
24 BY ATTORNEY CULLERTON:
25    Q.  Exhibit 21 is a text message chain

Page 156

1 dated May 1st, 2023, with Mr. Altman, Alex Spiro,
2 Mr. Musk and yourself, Mr. Birchall.
3    Do you recognize this document?
4    A.  I do.
5    Q.  And what's going on here?  What is this
6 document about?
7    A.  Elon initially sending Alex Spiro and me
8 to gather information; ended up being more of an
9 Alex thing than me, but he was wanting to get
10 formation documents and things like that.
11    Q.  Do you know why he was looking for
12 those documents?
13    A.  I don't -- he didn't specifically say
14 the rationale behind gathering that.  But it was
15 based on his concern of furthering the mission of
16 the nonprofit that he had funded.
17    Q.  And as of this time, May 1st, 2023,
18 xAI had been incorporated; correct?
19    A.  I believe it was right around this time.
20    Q.  Was Mr. Musk looking for evidence to
21 support a potential lawsuit against OpenAI?
22        ATTORNEY KRY:  Objection; calls for
23 speculation and foundation.
24    A.  Yeah, there was no mention of a lawsuit.
25 But I don't -- I don't know that to be the case.

Page 157

1  BY ATTORNEY CULLERTON:
2      Q.  Did you -- well, what sort of documents
3  did you receive in connection with this?
4      A.  As mentioned, I didn't receive any.
5  I -- it was Alex who pursued the -- I guess the
6  request from Elon to gather documents.  And so I
7  don't know the extent of everything that was
8  received and reviewed at that time.
9      Q.  Okay.  So you didn't yourself go to
10 OpenAI to review the documents or obtain any of
11 the documents?
12     A.  I did not.
13     Q.  And none of those documents were
14 provided to you after Mr. Spiro went and got
15 them?
16     A.  No.
17         ATTORNEY CULLERTON:  Let me take five
18 minutes, make sure I have nothing else, but I
19 think I'm just about done.
20         THE VIDEOGRAPHER:  This is the end of
21 Media Number 5.  And we are off the record
22 at 2:42 p.m.
23         (Recess taken from 2:42 p.m. to
24         2:49 p.m.)
25         (Whereupon, Birchall Exhibit Number

Page 158

1         22 was marked for identification and
2         is attached hereto.)
3         THE VIDEOGRAPHER:  This is the beginning
4  of Media Number 6.  We are back on the record at
5  2:49 p.m.
6  BY ATTORNEY CULLERTON:
7      Q.  Mr. Birchall, I've marked as Exhibit 22
8  an email from you to Ms. Zilis, dated
9  August 31st, 2018, with the subject "OpenAI
10 Term Sheet."
11         If you look at the bottom email, it's
12 from Mr. Altman to Mr. Musk, Mr. Teller and
13 Ms. Zilis.
14         Do you see that?
15     A.  I do see this, yes.
16     Q.  Okay.  And Mr. Altman writes:
17         "Elon please see attached.  Look
18     forward to feedback."
19         Do you see that?
20     A.  Yes.
21     Q.  And you understand this to be a
22 reference to the OpenAI, L.P., term sheet we were
23 discussing earlier today?
24     A.  I believe so, yeah.
25     Q.  Okay.  And Ms. Zilis forwards it to you

Page 159

1  as an FYI.
2         And you respond to her:
3         "Pretty vanilla for-profit
4     structure, so kind of hard to push a
5     narrative that doesn't involve investors
6     being very focused on ROI."
7         ROI is return on investment; correct?
8      A.  Correct.
9      Q.  What did you mean when you said it was
10 a "pretty vanilla for-profit structure"?
11         ATTORNEY KRY:  Objection to misreading
12 the sentence.
13 BY ATTORNEY CULLERTON:
14     Q.  Okay.  What did you mean when you said
15 it was a "pretty plain vanilla for-profit
16 structure"?
17     A.  I think what I meant was it was pretty
18 clear-cut that it is a for-profit structure.
19     Q.  And what did you mean when you write --
20 wrote:
21         "So kind of hard to push a
22     narrative that doesn't involve investors
23     being very focused on ROI"?
24     A.  Because I think there was a lot of
25 posturing and virtue signaling about it not being

Page 160

1  an actual for-profit structure where investors
2  would care about ROI and be able to monetize their
3  investment.
4      Q.  And so your view was that the L.P. that
5  was being proposed, investors in that L.P. would
6  care about return on investment?
7      A.  Not specific to this L.P. in that just
8  investors in general care about ROI; and they were
9  suggesting that this might be a structure where
10 they wouldn't.  And that was hard to imagine.
11     Q.  What was your understanding of what the
12 investors would be investing in, in this proposed
13 structure?
14     A.  I don't think I understood it, to be
15 honest.
16     Q.  You reviewed the L.P. term sheet;
17 correct?
18     A.  Yeah, I must have looked at it.
19     Q.  Okay.  And we were talking earlier
20 about the IP at the not-for-profit; correct?
21     A.  Yes.
22     Q.  Did you understand that the IP from the
23 not-for-profit would be used by or transferred to
24 the L.P. in this structure?
25     A.  Again, I don't think I fully understood

Elon Musk v. Samuel Altman                    FINAL [CONFIDENTIAL]                    September 10, 2025
Jared Birchall

**Page 169**

1  you been tasked with evaluating the strategic
2  benefits of partnerships between companies?
3       ATTORNEY KRY:  Objection; vague.
4    A.   Partnerships between companies.
5       Not in my specific financial analyst
6  role in my prior work, no.
7  BY ATTORNEY PATEL:
8    Q.   Would you say that it's common for
9  for-profit companies to collaborate with
10 nonprofit companies?
11      ATTORNEY KRY:  Objection; vague.
12   A.   I wouldn't know to answer that one way
13 or another.
14      ATTORNEY PATEL:  All right.  I pass the
15 witness.
16      ATTORNEY KRY:  Okay.  Does anyone need a
17 break?  Otherwise, we're ready to ask a few
18 questions.
19      Mr. Birchall, as you know -- I'll let
20 the counsel switch back.
21
22              EXAMINATION
23 BY ATTORNEY KRY:
24   Q.   All right.  As you know, my name is
25 Robert Kry.  I represent you as well as the

**Page 170**

1  plaintiffs in this case.
2       Do you recall testifying earlier today
3  that, of the contributions that were made to
4  OpenAI, some of them were made by Mr. Musk
5  personally and some of them were made by the Musk
6  Foundation?
7    A.   Yes.
8    Q.   For the contributions that were made by
9  the Musk Foundation, who made the decision to
10 make the contributions?
11   A.   Elon Musk.
12   Q.   And what would the process have been
13 for implementing those decisions?
14   A.   Elon would have told me that he wanted
15 to make a donation, and I would have executed.
16   Q.   What would you have done to execute it?
17   A.   I would have consulted with our -- the
18 previously mentioned tax advisors and decided
19 which vehicle was the right vehicle to make a
20 given donation.  And we would then engage directly
21 with the -- in the case of a donor-advised fund,
22 engage with UBS to execute the donation to the
23 intended recipient.
24   Q.   Where did the money in the Musk
25 Foundation come from?

**Page 171**

1    A.   It was all donated by Elon.
2    Q.   During your entire time with the Musk
3  family office, was there ever an instance where
4  Mr. Musk directed that a donation be made from
5  the foundation and the foundation refused to do
6  so?
7    A.   No.
8    Q.   Throughout the entire time you've been
9  there, was there ever an incident when the
10 foundation made a donation to OpenAI that hadn't
11 been previously authorized one way or another or
12 previously directed by Mr. Musk?
13   A.   No.
14   Q.   You also testified earlier today, and
15 just mentioned now, that certain donations were
16 contributed through donor-advised funds and other
17 ones were contributed directly.
18      With respect to the contributions that
19 were contributed through donor-advised funds, who
20 was it that decided that those contributions would
21 be made?
22   A.   Elon.
23   Q.   And when Elon made that decision, what
24 was the process that was followed to effect those
25 contributions?

**Page 172**

1    A.   He would say that a donation needed to
2  be made.  As mentioned, we would then consult on
3  the best vehicle through which to make the
4  donation, and we would give the mandate to execute
5  the donation.
6    Q.   Where did the money that was held in
7  the donor-advised funds come from?
8    A.   Either from the Musk Foundation or from
9  Elon directly.
10   Q.   During the entire time you've been
11 working for the Musk family office, was there
12 ever a situation where Mr. Musk decided that a
13 contribution should be made through a
14 donor-advised fund to the -- to OpenAI and the
15 donor-advised fund refused to make that
16 contribution?
17   A.   Never.
18   Q.   Was there ever a situation where one of
19 the donor-advised funds decided to make a
20 contribution to OpenAI without prior
21 authorization or direction from Mr. Musk?
22   A.   No.
23   Q.   Was there ever a situation where
24 Mr. Musk directed that a contribution be made,
25 but the donor-advised fund did not at that time

Page 173

1  have sufficient funds to make the directed
2  contribution?
3       A.  I believe so, yes.
4       Q.  In those circumstances, what was done
5  in order to effect the instruction for Mr. Musk?
6       A.  Either additional funds would be
7  transferred from the Musk Foundation -- well, that
8  typically is what would happen.  Additional funds
9  would be transferred from the Musk Foundation.
10      Q.  And then focusing more broadly, just
11 not on -- not just on contributions to OpenAI,
12 but contributions to any charity, was there --
13 was there ever an instance in the past 10 years
14 where Mr. Musk directed that a contribution be
15 made but the donor-advised fund did not carry out
16 the contribution?
17      A.  I can think of one.
18      Q.  And what were the circumstance of that
19 one example?
20      A.  It actually wasn't -- when they -- when
21 we give them the directive, they then verify that
22 we're actually giving to a fully legitimate
23 501(c)(3); and, in this case, they were able to
24 determine that it wasn't actually a 501(c)(3).
25      Q.  And in the circumstances of that

Page 174

1  contribution, to your knowledge, was the intent
2  to contribute funds -- charitable funds to an
3  entity that wasn't a charity or was that some
4  sort of oversight?
5       A.  No.  It was always the intent to give it
6  to a charity, and we were given incorrect
7  information about it being a charity.
8          I'm just going to note that this
9  computer has just died.  I don't know if that
10 matters for whoever is supposed to be listening.
11      Q.  That's all right.  We'll finish.
12      A.  Okay.
13      Q.  Other than that one instance, can you
14 think of any other incident where Mr. Musk made a
15 direction to contribute funds to a donor-advised
16 fund and they weren't carried out?
17      A.  No.
18      Q.  And approximately over -- I mean,
19 ballpark estimate, over the nine years or so that
20 you've been working for the Musk family office,
21 how many contributions would you say have been
22 processed through one or the other of the
23 donor-advised funds?
24      A.  A hundred or more.
25      Q.  And do you recall testifying earlier

Page 175

1  today about YC org?
2       A.  I do.
3       Q.  To your understanding, what was the
4  reason why certain -- well, do you recall you
5  testifying earlier today that Mr. Musk or the
6  Musk Foundation contributed certain funds to
7  YC org that were intended as contributions to
8  OpenAI?
9       A.  Yes.
10      Q.  What was your understanding of the
11 reason why those funds were contributed to YC org
12 rather than to OpenAI directly?
13      A.  OpenAI had not yet received nonprofit
14 status, and YC org had agreed to specifically
15 serve as a sponsor for OpenAI.
16      Q.  And what was your understanding of what
17 was going to happen to the funds after they were
18 contributed to YC org?
19      A.  They were going to be directly given to
20 OpenAI for their use.
21      Q.  What was the basis for that
22 understanding?
23      A.  I mean, we had email exchanges
24 confirming that this is exactly what the
25 arrangement was going to be from Chris Clark and

Page 176

1  others.
2       Q.  And to the best of your knowledge, was
3  there ever an instance where Mr. Musk or the Musk
4  Foundation made a contribution to YC org that was
5  intended for OpenAI but was not, in fact,
6  transferred on to OpenAI?
7       A.  No.
8          ATTORNEY KRY:  I -- let us just go off
9  the record for a couple minutes, and then we'll
10 come back and that might be all.
11         THE VIDEOGRAPHER:  This is the end of
12 Media Number 7.  We are off the record
13 at 3:13 p.m.
14         (Recess taken from 3:13 p.m. to
15         3:20 p.m.)
16         THE VIDEOGRAPHER:  This is the beginning
17 of Media Number 8.  We are back on the record at
18 3:20 p.m.
19
20              FURTHER EXAMINATION
21 BY ATTORNEY CULLERTON:
22      Q.  Mr. Birchall, you can't say that the
23 donor-advised funds that you were just discussing
24 earlier are legally required to follow
25 recommendations from yourself or from Mr. Musk;

| Elon Musk v.<br>Samuel Altman | FINAL<br>[CONFIDENTIAL] | September 10, 2025<br>Jared Birchall |

Page 177

1  correct?
2       ATTORNEY KRY:  Objection; calls for a
3  legal conclusion.
4       A.  Yeah, I don't know what legal
5  obligations they do or don't have.  I just know
6  they wouldn't have a business if they didn't
7  actually adhere to a donor's request.
8  BY ATTORNEY CULLERTON:
9       Q.  So you can't say, sitting here today,
10 whether they have a legal obligation to follow a
11 donor recommendation; correct?
12      A.  I don't know --
13      ATTORNEY KRY:  Same objections; asked
14 and answered.
15      A.  Yeah, I don't know of legal
16 requirements.
17 BY ATTORNEY CULLERTON:
18      Q.  So the answer to my question is "no"?
19      ATTORNEY KRY:  Same objection for a
20 third time; asked and answered and then asked and
21 answered again.
22      ATTORNEY CULLERTON:  It wasn't actually.
23 BY ATTORNEY CULLERTON:
24      Q.  But you can answer.
25      A.  I'm not aware of the legal requirements

Page 178

1  to be able to --
2       Q.  And you can't say that it never happens
3  that a DAF refuses to follow a recommendation
4  from a donor; correct?
5       ATTORNEY KRY:  Objection; foundation.
6       A.  I can only speak to my experience where
7  that has never happened.
8  BY ATTORNEY CULLERTON:
9       Q.  In fact, it's happened once.  You just
10 testified that at least in one instance with
11 Mr. Musk, the donor-advised fund did not follow
12 through on the recommendation made by Mr. Musk;
13 correct?
14      A.  Because it wasn't actually a charitable
15 entity.
16      Q.  Okay.  But they do not follow through
17 on the recommendation; correct?  Yes or no.
18      A.  They followed through on every
19 charitable organization that we've asked to
20 donate to.
21      Q.  Okay.  And I think we talked about this
22 earlier today:  Mr. Musk, to the extent he's
23 contributing to a donor-advised fund, there's a
24 tax benefit to him; correct?
25      ATTORNEY KRY:  Objection; calls for a

Page 179

1  legal conclusion.
2  BY ATTORNEY CULLERTON:
3       Q.  You can answer.
4       A.  Depending through which entity he were
5  to make that donation.
6       Q.  So if Mr. Musk is personally or through
7  his trust funding the DAF, he gets a tax
8  deduction; correct?
9       ATTORNEY KRY:  Same objection.
10      A.  I believe so, yeah, if he -- yeah.
11 BY ATTORNEY CULLERTON:
12      Q.  And if he -- he gets to take that tax
13 deduction for the entire contribution to the DAF;
14 correct?
15      ATTORNEY KRY:  Same objection.
16      A.  For the entire amount of the
17 contribution -- I mean, again, I -- the amount
18 that is contributed, there is a tax benefit
19 associated with that amount.  If that's what
20 you're asking, yes.
21 BY ATTORNEY CULLERTON:
22      Q.  So there's a tax benefit to Mr. Musk in
23 connection with the amount that he's donating to
24 the donor-advised fund; correct?
25      ATTORNEY KRY:  Objection; calls for a

Page 180

1  legal conclusion.  Objection; asked and answered
2  multiple times.  And in addition, objection;
3  beyond the scope of the examination.  You already
4  covered this in your initial exam.
5       ATTORNEY CULLERTON:  It's certainly not
6  beyond the scope of the examination.  It's
7  following up exactly on the questions that you
8  just asked.
9  BY ATTORNEY CULLERTON:
10      Q.  So you can answer, Mr. Birchall.
11      A.  There is a tax deduction that is given
12 for donations by taxable entities to a
13 donor-advised fund.
14      Q.  Now, you can't say that if the
15 donor-advised fund had refused to follow a
16 recommendation from Mr. Musk through the Musk
17 Foundation that you would have had any legal
18 recourse; correct?
19      ATTORNEY KRY:  Objection; calls for a
20 legal conclusion and also calls for speculation.
21      A.  Again, I don't know what legal recourse
22 or legal consequence there would be to something
23 like that.
24 BY ATTORNEY CULLERTON:
25      Q.  So you don't have any basis to believe