# EXHIBIT 15

◆   **THE PIONEER BUILDING**   ◆
**3180 18ᵀᴴ STREET**

**OFFICE LEASE AGREEMENT**

between

**BRIDGETON PIONEER PROPERTY LLC,**
**a Delaware limited liability company**

**As Landlord**

and

**MUSK INDUSTRIES LLC, a California limited liability company**

**As Tenant**

**DATED AS OF**

**June 17, 2016**

Confidential                                                                    SPX-002477

## OFFICE LEASE AGREEMENT

This Office Lease Agreement (this "***Lease***") is entered into as of June <u>17</u>, 2016, by and between the Landlord and the Tenant hereinafter named.

## BASIC LEASE INFORMATION

| | |
|---|---|
| Landlord: | BRIDGETON PIONEER PROPERTY LLC, a Delaware limited liability company ("***Landlord***") |
| Tenant: | MUSK INDUSTRIES LLC, a California limited liability company ("***Tenant***") |
| Premises: | The entire rentable space containing approximately 37,104 rentable square feet (the "***Premises***"), in the building commonly known as The Pioneer Building (the "***Building***"), and whose street address is 3180 18th Street, San Francisco, California 94110. The first floor of the Premises is outlined on <u>Exhibit A of the Lease</u>. The term "***Project***" shall collectively refer to the Building, the land on which the Building is located (the "***Land***"), and the driveways, parking lot, sidewalks and similar improvements and easements associated with the foregoing or the operation thereof. |
| Term: | 10 years, commencing on the Commencement Date and ending at 5:00 p.m. local time on the last day of the 120th full calendar month following the Commencement Date, which date is August 15, 2016, subject to adjustment and earlier termination as provided in the Lease. |
| Commencement Date: | August 15, 2016. The parties hereto acknowledge that Landlord will not be performing any work in the Premises and that the Delivery Condition (as defined in <u>Section 3(a)</u> below) has been satisfied. |
| Base Rent: | Base Rent shall be the following amounts for the following periods of time: |

| <u>Months</u> | <u>Monthly Base Rent $ Amount</u> | <u>Total Base Rent $ Amount</u> |
|---|---|---|
| 1-6 | $141,666.67 | $850,000.00 |
| 7-12 | $175,000.00 | $1,050,000.00 |
| 13-18 | $208,333.33 | $1,250,000.00 |
| 19-24 | $241,666.67 | $1,450,000.00 |
| 25-36 | $231,750.00 | $2,781,000.00 |
| 37-48 | $238,702.50 | $2,864,430.00 |
| 49-60 | $245,863.58 | $2,950,362.90 |
| 61-72 | $253,239.48 | $3,038,873.79 |
| 73-84 | $260,836.67 | $3,130,040.00 |
| 85-96 | $268,661.77 | $3,223,941.20 |
| 97-108 | $276,721.62 | $3,320,659.44 |
| 109-120 | $285,023.27 | $3,420,279.22 |

i

Confidential

As used herein, the term "***Lease Month***" shall mean each calendar month during the Term.

| | |
|---|---|
| Security Deposit | $400,000.00, in the form of cash or a letter of credit acceptable to Landlord.  See Section 6. |
| Rent: | Base Rent and Additional Rent and any other sums that Tenant may owe to Landlord or otherwise be required to pay under this Lease. |
| Guarantor | Elon Musk |
| Permitted Use: | General office use |
| Operating Costs Base Year: | Calendar year 2016; see Section 4. |
| Real Property Taxes Base Year: | Calendar year 2016; see Section 4. |
| Parking: | Up to Twenty-three (23) spaces, on a month-to-month basis,  at an initial rate of $275.00 per month per parking space, subject to availability.  See Section 25(f). |

| | | |
|---|---|---|
| Tenant's Address for Notices: | Prior to Commencement Date:<br>c/o Musk Industries LLC<br>1 Rocket Road<br>Hawthorn, CA 90250<br>Attention: Elon Musk | Following Commencement Date:<br>3180 18th Street, Suite 1<br>San Francisco, CA  94110<br>Attention: Elon Musk |
| Landlord's Address for Notices: | Bridgeton Management LLC<br>220 Fifth Avenue<br>19th Floor<br>New York, NY  10001<br>Attention:       Property Management<br>Telephone:      212-218-2712 | |

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

ii

Confidential

The following exhibits are attached hereto and incorporated herein by this reference:

| | | |
|---|---|---|
| Exhibit A | – | Diagram of Premises |
| Exhibit B | – | Standards for Services and Utilities |
| Exhibit C | – | Building Rules and Regulations |
| Exhibit D | – | Parking Rules and Regulations |
| Exhibit E | – | Form of Commencement Date Memorandum |
| Exhibit F | – | Form of Tenant Estoppel Certificate |
| Exhibit G | – | Form of Guaranty |

The foregoing Basic Lease Information is incorporated into and made a part of this Lease. If any conflict exists between any Basic Lease Information and the following provisions of the Lease, then the Basic Lease Information shall control.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

iii

Confidential                                                                      SPX-002480

# TABLE OF CONTENTS

**Page**

1.   DEFINITIONS AND BASIC PROVISIONS ................................................................................. 1

2.   LEASE GRANT .......................................................................................................................... 1

3.   PREMISES .................................................................................................................................. 1

4.   RENT .......................................................................................................................................... 2

5.   DELINQUENT PAYMENT; HANDLING CHARGES ............................................................. 5

6.   SECURITY DEPOSIT ................................................................................................................ 5

7.   SERVICES AND UTILITIES; ................................................................................................... 6

8.   ALTERATIONS; REPAIRS; MAINTENANCE; SIGNS .......................................................... 6

9.   USE ............................................................................................................................................. 9

10.  ASSIGNMENT AND SUBLETTING ...................................................................................... 10

11.  INSURANCE; SUBROGATION; INDEMNITY ..................................................................... 13

12.  SUBORDINATION; ATTORNMENT; NOTICE TO LANDLORD'S MORTGAGEE ............ 14

13.  RULES AND REGULATIONS ................................................................................................. 15

14.  CONDEMNATION ................................................................................................................... 15

15.  FIRE OR OTHER CASUALTY ................................................................................................ 16

16.  PERSONAL PROPERTY TAXES ............................................................................................ 16

17.  EVENTS OF DEFAULT ........................................................................................................... 17

18.  REMEDIES ............................................................................................................................... 17

19.  LANDLORD DEFAULTS; LANDLORD'S LIABILITY .......................................................... 19

20.  HOLDING OVER ..................................................................................................................... 19

21.  SURRENDER OF PREMISES .................................................................................................. 20

22.  CERTAIN RIGHTS RESERVED BY LANDLORD ................................................................. 20

23.  INTENTIONALLY OMITTED ................................................................................................. 21

24.  HAZARDOUS MATERIALS ................................................................................................... 21

25.  MISCELLANEOUS .................................................................................................................. 21

--

Confidential                    SPX-002481

**LEASE PROVISIONS**

**Section 1.**       **Definitions and Basic Provisions.**  The definitions and basic provisions set forth in the foregoing Basic Lease Information (the "*Basic Lease Information*") are incorporated herein by reference for all purposes.  Additionally, the following terms shall have the following meanings when used in this Lease:

"*Affiliate*" means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the party in question.

"*Building's Structure*" means the Building's exterior walls, roof, elevator shaft, footings, foundations, structural portions of load-bearing walls, structural floors and subfloors, and structural columns and beams.

"*Building's Systems*" shall mean any plant, machinery, elevators, transformers, duct work, cable, wires, and other equipment, facilities, and systems designed to supply heat, ventilation, air conditioning and humidity or any other services or utilities, or comprising or serving as any component or portion of the electrical, gas, steam, plumbing, sprinkler, communications, alarm, security, or fire/life safety systems or equipment, or any other mechanical, electrical, electronic, computer or other systems or equipment which serve the Building.

"*Business Day(s)*" means Monday through Friday of each week, exclusive of Holidays.

"*Holidays*" means New Year's Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day, and any other nationally, regionally or city-wide recognized holiday.

"*including*" means including, without limitation.

"*Laws*" means all federal, state and local laws, ordinances, rules and regulations, all court orders, governmental directives and governmental orders and all interpretations of the foregoing, and "*Law*" shall mean any of the foregoing.

"*Normal Business Hours*" means 8:30 a.m. to 5:00 p.m. on Business Days, exclusive of Holidays.

"*Tenant Party*" means any of the following persons:  Tenant; any assignees claiming by, through or under Tenant; any subtenants claiming by, through or under Tenant; and any of their respective agents, contractors, employees and invitees.

**Section 2.**       **Lease Grant.**  Subject to the terms of this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises.

**Section 3.**       **Premises.**

(a)  **"AS IS" Condition**.  Tenant acknowledges that:  (i) it has been advised by Landlord to satisfy itself with respect to the condition of the Premises (including the Building's Systems located therein, and the security and environmental aspects thereof) and the present and future suitability of the Premises for Tenant's intended use; (ii) Tenant has made such inspection and investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to Tenant's occupancy of the Premises; and (iii) neither Landlord nor any of Landlord's agents has made any oral or written representations or warranties with respect to the condition, suitability or fitness of the Premises other than as may be specifically set forth in this Lease.  By occupying the Premises, Tenant shall be deemed to have accepted the Premises in its then **"AS IS"** condition, subject to all applicable Laws.  Tenant further acknowledges that Landlord shall have no obligation to provide or to fund any tenant improvements to the Premises except as is specifically set forth in this lease.  Landlord and Tenant stipulate that the

1

Confidential

number of rentable square feet in the Premises and in the Building set forth in the Basic Lease Information is conclusive as to the square footage in existence on the date of this Lease and shall be binding upon them and shall not be subject to change; provided, however, Landlord represents that the Premises and the Building are measured in accordance with the most recent BOMA standards of measurement.

(b) **Estimated Delivery Date; Delay in Delivery**. Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant in the condition required by this Lease on August 15, 2016 (the "***Estimated Delivery Date***"). If Landlord is unable to tender possession of the Premises in such condition to Tenant by the Estimated Delivery Date, then: (1) the validity of this Lease shall not be affected or impaired thereby; (2) Landlord shall not be in default hereunder or be liable for damages therefor; (3) Tenant shall accept possession of the Premises when Landlord tenders possession thereof to Tenant; and (4) Rent shall abate until the date of actual delivery of the Premises to Tenant.

(c) **Commencement Date Memorandum**. Promptly following Landlord's request, Tenant shall execute and deliver to Landlord a letter substantially in the form of Exhibit E hereto confirming: (1) the Commencement Date and the expiration date of the Term; and (2) that Tenant has accepted the Premises; provided, however, that the failure of the parties to execute such letter shall not defer the Commencement Date or otherwise invalidate this Lease. Tenant's failure to execute such document within ten (10) Business Days of receipt thereof from Landlord shall be deemed to constitute Tenant's agreement to the contents of such document.

**Section 4.     Rent.**

(a) **Base Rent**. Tenant shall timely pay to Landlord Rent without notice, demand, deduction or set-off (except as otherwise expressly provided herein), by good and sufficient check, to Landlord c/o Bridgeton Management LLC, 220 Fifth Avenue, 19th Floor, New York, NY 10001, or to such other address as may be specified by Landlord in writing from time to time, and shall be accompanied by all applicable state and local sales or use taxes. The obligations of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Base Rent, adjusted as herein provided, shall be payable monthly in advance. The first (1st) monthly installment of Base Rent (applicable to the first (1st) Lease Month) shall be payable contemporaneously with the execution of this Lease by Tenant; thereafter, Base Rent shall be payable on the first (1st) day of each month beginning on the first (1st) day of the second (2nd) Lease Month of the Term. The monthly Base Rent for any partial month at the beginning or end of the Term shall be prorated based on the actual number of days in the partial month and shall be payable in advance.

(b) **Payment of Operating Costs**. Tenant shall pay to Landlord: (i) the annual Operating Costs (defined below) for the Project in excess of the Operating Costs for the Project for the Operating Costs Base Year, (ii) the annual Real Property Taxes (defined below) for the Project in excess of the Real Property Taxes for the Project for the Real Property Taxes Base Year, (iii) the Utilities Costs (defined below) and (iv) the Building's Systems maintenance, repair and replacement costs; provided, however, with respect to replacement costs, such costs shall be amortized using a commercially reasonable interest rate over the useful life of the improvement as reasonably determined by Landlord unless such replacement costs are caused by a Tenant Party, in which event such costs shall not be amortized(collectively, "***Additional Rent***"). Landlord shall make a good faith estimate of the Additional Rent to be due by Tenant for any calendar year or part thereof during the Term following the Operating Costs Base Year and the Real Property Taxes Base Year, as applicable; provided, however, that with respect to the Utilities Costs and Building's Systems maintenance, repair and replacement costs, Landlord shall make such estimate promptly following

2

the Commencement Date and on or about each January 1 thereafter. During each calendar year or partial calendar year of the Term following such Base Year(s), Tenant shall pay to Landlord, in advance, concurrently with each monthly installment of Base Rent, an amount equal to the estimated Additional Rent for such calendar year or part thereof divided by the number of months Tenant is in occupancy during said calendar year; provided, however, that with respect to the Utilities Costs and Building's Systems maintenance, repair and replacement costs, Tenant shall pay to Landlord, in advance, concurrently with each monthly installment of Base Rent, an amount equal to the estimated Utilities Costs and Building's Systems maintenance, repair and replacement costs for such calendar year or part thereof divided by the number of months Tenant is in occupancy during said calendar year. From time to time, Landlord may estimate and re-estimate the Additional Rent to be due by Tenant and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of Additional Rent payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the Additional Rent as estimated by Landlord. Any amounts paid based on such an estimate shall be subject to adjustment as herein provided when actual Operating Costs, Real Property Taxes and Utilities Costs are available for each calendar year.

(c) **Definition of Operating Costs**. The term "*Operating Costs*" shall mean all costs and disbursements that Landlord incurs in connection with the ownership and operation of the Project determined in accordance with sound accounting principles consistently applied, including premiums for property, liability and other coverages carried by Landlord, including deductibles and an allocation of a portion of the cost of blanket insurance policies maintained by Landlord and/or its Affiliates; property management fees; management office expenses; service and maintenance contracts; wages and salaries of all on-site employees, as well as taxes, insurance and benefits relating thereto; repair and maintenance costs; telecom expenses; license fees; sidewalk maintenance and repair costs; parking lot and driveways maintenance and repair costs;; trash collection (twice a week); pest control charges; supplies; administrative costs; and the costs for capital improvements made to the Project (i) to comply with applicable Laws hereafter promulgated by any governmental authority or any interpretation hereafter rendered with respect to any existing Laws, (ii) to reduce operating expenses, or (iii) to improve the health, safety and welfare of the Building and its tenants, in each case amortized using a commercially reasonable interest rate over the useful life of the improvement as reasonably determined by Landlord. Operating Costs shall not include costs for: (1) repair, replacements and general maintenance paid by proceeds of insurance or by Tenant or other third parties; (2) interest, amortization or other payments on loans to Landlord; (3) leasing commissions; (4) advertising expenses; (5) legal expenses for services, other than those that benefit the Building generally (e.g., tax disputes); (6) ) depreciation; (7) salaries of officers and executives of Landlord; (8) any costs included in Operating Costs representing an amount paid to a corporation related to Landlord which is in excess of the amount which would have been paid in the absence of such relationship; (9) interest and penalties due to late payment of amounts owed by Landlord; (10) costs related to the maintenance of Landlord as a legal entity; (11) utilities paid directly to the service provider by Tenant; (12) any capital improvement costs or expenses except as specifically set forth and amortized above; (13) management fees to the extent such management fees exceed market standard; (14) Real Property Taxes; (15) repair and maintenance costs for the Premises and (16) the Building's Systems maintenance, repair and replacement costs.

(d) **Definition of Utilities Costs**. The term "*Utilities Costs*" shall mean the cost of all utilities not directly metered to individual tenants.

(e) **Intentionally Omitted**.

(f) **Definition of Real Property Taxes**. The term "*Real Property Taxes*" shall mean all real property taxes, assessments, levies and impositions of any kind (whether general, special, ordinary or

3

extraordinary) that are paid or incurred by Landlord for the Project (without regard to any different fiscal year used by any governmental or municipal authority) as well as transit impact fees levied by local authorities, the costs of consultants engaged to lower or dispute real property taxes and assessments, and personal property taxes imposed on the fixtures, equipment and other personal property of Landlord used in connection with the Project. Real Property Taxes shall <u>not</u> include (i) federal or state income taxes imposed on or measured by the income of Landlord from the operation of the Project; (ii) all excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, and transfer taxes; (iii) any items included as Operating Costs; (iv) any taxes imposed on land and improvements other than the Project; (v) any taxes resulting from the improvement of any of the Building for the sole use of Landlord or other occupants; and (vi) a penalty fee imposed as a result of Landlord's failure to pay Real Property Taxes when due.

(g) **Operating Costs Reconciliation Statement**. By May 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Operating Costs for the previous year (the "***Operating Costs Reconciliation Statement***"). If Tenant's estimated payments of Operating Costs under this <u>Section 4</u> for the year covered by the Operating Costs Reconciliation Statement exceed Tenant's share of such items as indicated in the Operating Costs Reconciliation Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Operating Costs under this <u>Section 4</u> for such year are less than Tenant's share of such items as indicated in the Operating Costs Reconciliation Statement, then Tenant shall promptly pay Landlord such deficiency within thirty (30) days of receipt of the Operating Costs Reconciliation Statement, in either case notwithstanding that the Term has expired and Tenant has vacated the Premises. Landlord shall have the same remedies for a default in the payment of Operating Costs as for a default in the payment of Base Rent.

(h) **Real Property Taxes Reconciliation Statement**. By May 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Real Property Taxes for the previous year (the "***Real Property Taxes Reconciliation Statement***"). If Tenant's estimated payments of Real Property Taxes under this <u>Section 4</u> for the year covered by the Real Property Taxes Reconciliation Statement exceed Tenant's share of such items as indicated in the Real Property Taxes Reconciliation Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Real Property Taxes under this <u>Section 4</u> for such year are less than Tenant's share of such items as indicated in the Real Property Taxes Reconciliation Statement, then Tenant shall promptly pay Landlord such deficiency within thirty (30) days of receipt of the Real Property Taxes Reconciliation Statement, in either case notwithstanding that the Term has expired and Tenant has vacated the Premises. Landlord shall have the same remedies for a default in the payment of Real Property Taxes as for a default in the payment of Base Rent.

(i) **Utilities Costs Reconciliation Statement**. By May 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Utilities Costs for the previous year (the "***Utilities Costs Reconciliation Statement***"). If Tenant's estimated payments of Utilities Costs under this <u>Section 4</u> for the year covered by the Utilities Costs Reconciliation Statement exceed Tenant's share of such items as indicated in the Utilities Costs Reconciliation Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Utilities Costs under this <u>Section 4</u> for such year are less than Tenant's share of such items as indicated in the Utilities Costs Reconciliation Statement, then Tenant shall promptly pay Landlord such deficiency within thirty (30) days of receipt of the Utilities Costs Reconciliation Statement, in either case notwithstanding that the Term has expired and Tenant has vacated the Premises. Landlord shall have the same remedies for a default in the payment of Utilities Costs as for a default in the payment of Base Rent.

4

SPX-002485

(j) **Building Systems Costs Reconciliation Statement**.  By May 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Building Systems repairs, maintenance, and replacement costs for the previous year (the "***Building Systems Costs Reconciliation Statement***").  If Tenant's estimated payments of Building Systems repairs, maintenance and replacement costs under this Section 4 for the year covered by the Building Systems Costs Reconciliation Statement exceed Tenant's share of such items as indicated in the Building Systems Costs Reconciliation Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Building Systems repairs, maintenance and replacement costs under this Section 4 for such year are less than Tenant's share of such items as indicated in the Building Systems Costs Reconciliation Statement, then Tenant shall promptly pay Landlord such deficiency within thirty (30) days of receipt of the Building Systems Costs Reconciliation Statement, in either case notwithstanding that the Term has expired and Tenant has vacated the Premises.  Landlord shall have the same remedies for a default in the payment of Building Systems repairs, maintenance and replacement costs as for a default in the payment of Base Rent.

**Section 5.     Delinquent Payment; Handling Charges.**  All past due payments (other than late charges) required of Tenant hereunder shall bear interest from the date due until paid at the lesser of ten percent (10%) per annum or the maximum lawful rate of interest (such lesser amount is referred to herein as the "***Default Rate***"); additionally, Landlord, in addition to all other rights and remedies available to it, may charge Tenant a fee equal to five percent (5%) of the delinquent payment to reimburse Landlord for its cost and inconvenience incurred as a consequence of Tenant's delinquency.  Notwithstanding the foregoing, the late fee referenced above shall not be charged unless and until Landlord has notified Tenant in writing with respect to the first occurrence in any twelve (12) month period, and the late charge for the first occurrence shall not be charged unless Tenant fails to make payment within three (3) days after Landlord delivers written notice of such delinquency to Tenant.  No further notices shall be required before charging a late charge thereafter in the following twelve (12) month period.  Any such late charge and interest payment shall constitute additional Rent under this Lease, shall not be considered a waiver by Landlord of any default by Tenant hereunder, and shall be payable immediately on demand.  In no event, however, shall the charges permitted under this Section 5 or elsewhere in this Lease, to the extent they are considered to be interest under applicable Law, exceed the maximum lawful rate of interest.

**Section 6.     Security Deposit**.  Contemporaneously with the execution of this Lease by Tenant, Tenant shall pay to Landlord the Security Deposit, which shall be held by Landlord throughout the Term to secure Tenant's performance of its obligations under this Lease.  The Security Deposit is not an advance payment of Rent or a measure or limit of Landlord's damages upon an Event of Default (as defined in Section 17).  Landlord may, at Landlord's discretion, from time to time following an Event of Default and without prejudice to any other remedy, use all or a part of the Security Deposit to perform any obligation Tenant fails to perform hereunder or in connection with Landlord's remedies under this Lease.  Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount.  Unless required otherwise by applicable Law, the Security Deposit may be commingled with other funds, and no interest shall be paid thereon.   Landlord and Tenant agree that such deductions shall include all damages and losses that Landlord has suffered or that Landlord reasonably estimates that it will suffer as a result of any breach of this Lease by Tenant. Tenant shall have the right to provide to Landlord a standby letter of credit in the amount of the Security Deposit in lieu of a cash Security Deposit, and in such an event and upon Landlord's receipt of such letter of credit, Landlord shall return to Tenant within ten (10) business days the Security Deposit.  In such event, as security for the performance by Tenant of Tenant's obligations hereunder, Tenant shall cause to be delivered to Landlord an original irrevocable standby letter of credit (the " **Letter of Credit")** in the amount specified above naming Landlord as beneficiary, which Landlord may draw upon (i) to perform any obligation Tenant fails to perform hereunder or in connection with Landlord's remedies under this Lease or (ii) to compensate

5

Confidential

Landlord for any actual damage Landlord incurs directly and solely as a result of Tenant's failure to perform any of its obligations hereunder. Any such draw on the Letter of Credit shall not constitute a waiver of any other rights of Landlord with respect to such default or failure to perform. The Letter of Credit shall be issued by a major commercial bank acceptable to Landlord, with a San Francisco Bay Area, California, service and claim point for the Letter of Credit, have an expiration date not earlier than the sixtieth (60th) day after the expiration of the Lease (or, in the alternative, have a term of not less than one (1) year and be automatically renewable for an additional one (1) year period unless notice of non-renewal is given by the issuer to Landlord not later than thirty (30) days prior to the expiration thereof) and shall provide that Landlord may make partial and multiple draws thereunder, up to the face amount thereof. In addition, the Letter of Credit shall provide that, in the event of Landlord's assignment or other transfer of its interest in this Lease, the Letter of Credit shall be freely transferable by Landlord, without charge and without recourse, to the assignee or transferee of such interest and the bank shall confirm the same to Landlord and such assignee or transferee. The Letter of Credit shall provide for payment to Landlord upon the issuer's receipt of a sight draft from Landlord together with Landlord's certificate certifying that Landlord is entitled to such payment pursuant to the provisions of this Lease, and with no other conditions, and otherwise be in form and content satisfactory to Landlord. If the Letter of Credit has an expiration date earlier than the expiration of the Lease, then throughout the term hereof Tenant shall provide evidence of renewal of the Letter of Credit to Landlord at least thirty (30) days prior to the date the Letter of Credit expires. Tenant's failure to deliver any replacement or extension of the Letter of Credit, or evidence of renewal of the Letter of Credit, with in the time specified under this Lease shall entitle Landlord to draw upon the Letter of Credit then in effect and, at Landlord's election, constitute an Event of Default under this Lease. If Landlord liquidates the Letter of Credit as provided in the preceding sentence, Landlord shall hold the funds received from the Letter of Credit as security for Tenant's performance under this Lease, and Landlord shall not be required to segregate such security deposit from its other funds and no interest shall accrue or be payable to Tenant with respect thereto. No holder of a superior interest, nor any purchaser at any judicial or private foreclosure sale of the Project or any portion thereof, shall be responsible to Tenant for such security deposit unless and only to the extent such holder or purchaser shall have actually received the same. If Tenant is not in default at the expiration or termination of this Lease, subject to the requirements of, and conditions imposed by, Laws applicable to security deposits under commercial leases Landlord shall return to Tenant the Letter of Credit or the balance of the Security Deposit then held by Landlord, as applicable; provided, however, that in no event shall any such return be construed as an admission by Landlord that Tenant has performed all of its covenants and obligations hereunder. Tenant hereby waives the protections of Section 1950.7(c) of the California Civil Code, as it may hereafter be amended, or similar laws of like import.

   **Section 7.**  **Services and Utilities; Janitorial Service.** Tenant shall contract with and pay the utility provider directly for the Project's electricity service. Subject to the foregoing, Landlord shall use all reasonable efforts to furnish or cause to be furnished to the Premises the utilities and services described in the Standards for Services and Utilities, attached hereto as Exhibit B, subject to the conditions and in accordance with the standards set forth therein. Landlord's obligation to furnish services pursuant to Exhibit B shall be subject to the rules and regulations of the supplier of such services and governmental rules and regulations. Tenant shall be responsible for contracting with the supplier of utility services and for paying all deposits for, and costs relating to, such service. Tenant at its sole cost will arrange for regular janitorial service for the Premises with a janitorial company reasonably acceptable to Landlord. In the event that, in Landlord's reasonable determination, any approved janitorial company is not performing its duties satisfactorily, Tenant shall arrange for a new janitorial company suggested by Landlord.

   **Section 8.**  **Alterations; Repairs; Maintenance; Signs.**

  (a) **Alterations**. Tenant shall not make any alterations, additions or improvements to the Premises (collectively, "*__Alterations__*") without the prior written consent of Landlord, which consent shall not be unreasonably withheld, except for the installation of unattached, movable trade fixtures which

6

may be installed without drilling, cutting or otherwise defacing the Premises. Tenant shall furnish complete plans and specifications to Landlord for its approval at the time Tenant requests Landlord's consent to any Alterations. Subsequent to obtaining Landlord's consent and prior to commencement of the Alterations, Tenant shall deliver to Landlord any building permit required by applicable Law and a copy of the executed construction contract(s). Tenant shall give written notice to Landlord at least ten (10) days prior to beginning any construction, and Landlord may post on and about the Premises or the Project notices of non-responsibility pursuant to applicable Laws. Tenant shall reimburse Landlord within thirty (30) days after the rendition of a bill for all of Landlord's actual out-of-pocket costs incurred in connection with any Alterations, including all management, engineering, outside consulting and construction fees incurred by or on behalf of Landlord for the review and approval of Tenant's plans and specifications and for the monitoring of construction of the Alterations, plus a Alterations Management Fee of 5% of the job costs of such work performed. As used herein, "job costs" shall mean the cost of labor and materials involved in the physical construction or improvement, including subcontracts for the various trades involved. Tenant shall pay the Alterations Management Fee to Landlord for a particular project within fifteen (15) days after substantial completion of the project. If Landlord consents to the making of any Alteration, such Alteration shall be made by Tenant at Tenant's sole cost and expense by a contractor reasonably approved in writing by Landlord. Tenant shall require its contractor(s) to maintain insurance in such amounts and in such form as Landlord may reasonably require. Tenant shall provide Landlord with insurance certificates which name Landlord and its Property Manager as additional insureds for such contractors prior to commencement of any work. If the Alterations which Tenant causes to be constructed result in Landlord being required to make any alterations and/or improvements to other portions of the Project in order to comply with any applicable Laws, then Tenant shall reimburse Landlord upon demand for all costs and expenses incurred by Landlord in making such alterations and/or improvements. Any Alterations made by Tenant shall become the property of Landlord upon installation and shall remain on and be surrendered with the Premises upon the expiration or sooner termination of this Lease, unless Landlord requires the removal of such Alterations. Notwithstanding the foregoing, upon Tenant's written request at the time it seeks Landlord's consent to an Alteration, Landlord agrees to indicate in writing whether it will require such Alteration to be removed upon the expiration or earlier termination of the Lease. If Landlord requires the removal of such Alterations, Tenant shall at its sole cost and expense, prior to the expiration date or earlier termination of this Lease, remove all or any portion of any Alterations made by Tenant which are designated by Landlord to be removed and repair and restore the Premises in a good and workmanlike manner to their original condition, reasonable wear and tear, Casualty and Taking excepted. All construction work done by Tenant within the Premises shall be performed in a good and workmanlike manner with new materials of first-class quality, lien-free and in compliance with all Laws, and in such manner as to cause a minimum of interference with the transaction of business in the Building. All work which may affect the Building's Structure or the Building's Systems, at Landlord's election, must be performed by Landlord's usual contractor for such work. All work affecting the roof of the Building must be performed by Landlord's roofing contractor and no such work will be permitted if it would void or reduce the warranty on the roof. Tenant agrees to indemnify, defend and hold Landlord, its Affiliates, and Landlord's Property Manager, and their respective officers, directors, partners, members, shareholders, employees and agents (collectively, the "***Indemnitees***") harmless against any loss, liability or damage resulting from such work, and Tenant shall, if requested by Landlord, furnish a bond or other security satisfactory to Landlord against any such loss, liability or damage. The foregoing indemnity shall survive the expiration or earlier termination of this Lease. Landlord's consent to or approval of any Alterations (or the plans therefor) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance. All voice, data, video, audio and other low voltage control transport system cabling and/or cable bundles installed in the Building by Tenant or its contractor shall be (i) plenum rated and/or have a composition make-up

7

suited for its environmental use in accordance with NFPA 70/National Electrical Code; (ii) labeled every 3 meters with Tenant's name and origination and destination points; (iii) installed in accordance with all EIA/TIA standards and the National Electric Code; and (iv) installed and routed in accordance with a routing plan showing "as built" or "as installed" configurations of cable pathways, outlet identification numbers, locations of all wall, ceiling and floor penetrations, riser cable routing and conduit routing (if applicable), and such other information as Landlord may request. The routing plan shall be available to Landlord and its agents at the Building upon request.

(b)  **Repairs; Maintenance**.

(i)  **By Landlord**. Landlord shall, subject to reimbursement as set forth in Section 4, keep and maintain in good repair and working order and make repairs to and perform maintenance upon: (1) the Building's Structure; (2) the Premises air conditioning system; (3) standard mechanical, electrical, heating, plumbing and fire/life safety systems serving the Building generally; (4)  the roof of the Building (except as otherwise state herein); (5) exterior windows of the Building; and (6) the elevator serving the Building. Landlord shall not be liable for any failure to make any such repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after written notice of the need for such repairs or maintenance is given to Landlord by Tenant. If any of the foregoing maintenance or repair is necessitated due to the acts or omissions of any Tenant Party, Tenant shall pay the costs of such repairs or maintenance to Landlord within thirty (30) days after receipt of an invoice, together with an administrative charge in an amount equal to ten percent (10%) of the cost of the repairs. Landlord shall not be liable to Tenant for any interruption of Tenant's business or inconvenience caused due to any work performed in the Premises or in the Project pursuant to Landlord's rights and obligations under the Lease. To the extent allowed by law, Tenant waives the right to make repairs at Landlord's expense under Sections 1941 and 1942 of the California Civil Code, and the right to terminate the Lease under Section 1932(1) of the California Civil Code, and any other laws, statutes or ordinances now or hereafter in effect of like import.

(i)  **By Tenant**. Tenant shall, at its sole cost and expense, promptly perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease, and shall keep the Premises in the same condition and repair as received on the Access Date, ordinary wear and tear, Casualty and Taking excepted. Tenant's repair obligations include repairs to: (1) floor coverings and/or raised flooring; (2) interior partitions; (3) doors; (4) the interior side of demising walls; (5) electronic, phone and data cabling and related equipment that is installed by or for the benefit of Tenant and located in the Premises or other portions of the Building; (6)  any kitchen equipment or similar facilities serving Tenant exclusively (if applicable); (7) phone rooms used exclusively by Tenant; (8) Alterations performed by contractors retained by or on behalf of Tenant; and (9) all furnishings, trade fixtures, equipment and personal property within the Premises. Landlord reserves the right to perform any of the foregoing maintenance or repair obligations or require that such obligations be performed by a contractor reasonably approved by Landlord, all at Tenant's expense. All work shall be performed in accordance with the rules and procedures described in Section 8(a). If Tenant fails to make any repairs to the Premises for more than fifteen (15) days after notice from Landlord (although notice shall not be required if there is an emergency, or if the area to be repaired is visible from the exterior of the Building), Landlord may, in addition to any other remedy available to Landlord,  make the repairs, and Tenant shall pay the reasonable cost of the repairs to Landlord within thirty (30) days after receipt of an invoice, together with an administrative charge in an amount equal to ten percent (10%) of the cost of the repairs. At the expiration of this Lease, Tenant shall surrender the Premises in the same condition and repair as received on the Access Date, excepting reasonable wear and tear, Casualty and Taking. All personal property of Tenant, including goods, wares, merchandise, inventory, trade fixtures and other personal property of Tenant, shall be stored at the sole risk of Tenant. Except to the extent caused by the gross negligence or willful

8

misconduct of Landlord or its agents, Landlord and its agents shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the Project or from the pipes, appliances or plumbing works therein or from the roof, street, sidewalks or subsurface or from any other places resulting from dampness or any other cause whatsoever, or from the act or negligence of any other tenant or any officer, agent, employee, contractor or invitee of any such tenant. It is generally understood that mold spores are present essentially everywhere and that mold can grow in most any moist location. Emphasis is properly placed on prevention of moisture and on good housekeeping, ventilation and moisture control practices. Tenant shall promptly report any maintenance problems involving water, moist conditions (including leaks) or mold to the property manager for the Premises (the "***Property Manager***"), and shall conduct its activities in the Building in a manner that prevents unusual moisture conditions or mold growth. In signing this Lease, Tenant has first inspected the Premises and certifies that it has not observed mold, mildew or moisture within the Premises. Tenant relieves Landlord from any liability for any bodily injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the Premises.

(c) **Mechanic's Liens**. All work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party shall be deemed authorized and ordered by Tenant only, and Tenant shall not permit any mechanic's liens to be filed against the Premises or the Project in connection therewith. Upon completion of any such work, Tenant shall deliver to Landlord final lien waivers from all contractors, subcontractors and materialmen who performed such work. If such a lien is filed, then Tenant shall, within ten (10) days after Landlord has delivered notice of the filing thereof to Tenant, either: (1) pay the amount of the lien and cause the lien to be released of record; or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord. If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within thirty (30) days after Landlord has invoiced Tenant therefor. Tenant shall indemnify, defend and hold harmless the Indemnitees from and against all claims, demands, causes of action, suits, judgments, damages and expenses (including attorneys' fees) in any way arising from or relating to the failure by any Tenant Party to pay for any work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party. The foregoing indemnity shall survive the expiration or earlier termination of this Lease.

(d) **Signs**. Tenant shall not place or permit to be placed any signs, placards, pictures, advertisements or notices upon any area visible from the exterior of the Premises without Landlord's prior written consent. Notwithstanding the foregoing, Tenant shall retain exclusive exterior signage rights as long as Tenant continues to occupy at least 60% of the Building. Upon request of Landlord, Tenant shall immediately remove any sign, advertising material or lettering which Tenant has placed or permitted to be placed upon the exterior or interior surface of any door or window or at any point inside the Premises, which in Landlord's reasonable opinion, is of such a nature as to not be in keeping with the standards of the Building, and if Tenant fails to do so, Landlord may without liability remove the same at Tenant's expense.

**Section 9.**    **Use.**  Tenant shall use the Premises only for the Permitted Use and shall comply with all Laws relating to the use, condition, access to, and occupancy of the Premises and will not commit waste, overload the Building's Structure or the Building's Systems or subject the Premises to any use that would damage the Premises. Tenant, at its sole cost and expense, shall obtain and keep in effect during the Term, all permits and licenses necessary to permit Tenant to use and occupy the Premises for the Permitted Use in accordance with applicable Law. Notwithstanding anything in this Lease to the contrary, as between Landlord and Tenant: (i) Tenant shall bear the risk of complying with Title III of the Americans With Disabilities Act of 1990, any state laws governing handicapped access or architectural barriers, and all rules, regulations and guidelines promulgated under such laws, as amended from time to time (the "Disabilities Acts") in the Premises;

9

provided, however, that Landlord represents that as of the Access Date, the Premises are in compliance with the Disabilities Acts; and (ii) Landlord shall bear the risk of complying with the Disabilities Acts in the Project (subject to reimbursement as an Operating Cost), other than compliance that is necessitated by the use of the Premises for other than the Permitted Use or as a result of any Alterations made by Tenant (which risk and responsibility shall be borne by Tenant). If Tenant's initial use of the Premises is not a "place of public accommodation" within the meaning of the Disabilities Acts, then Tenant may not thereafter change the use to cause the Premises to become a "place of public accommodation". In addition, the Premises shall not be used for any purpose which creates strong or offensive odors, fumes, dust or vapors; which emits noise or sounds that are objectionable due to intermittence, beat, frequency, shrillness or loudness; or which is associated with indecent or pornographic matters. Tenant shall conduct its business and control each other Tenant Party so as not to create any nuisance or unreasonably interfere with other tenants or Landlord in its management of the Building. Tenant shall not knowingly conduct or permit to be conducted in the Premises any activity, or place any equipment in or about the Premises or the Building, which will invalidate the insurance coverage in effect or increase the rate of fire insurance or other insurance on the Premises or the Building. If any invalidation of coverage or increase in the rate of fire insurance or other insurance occurs or is threatened by any insurance company due to activity conducted from the Premises, such statement or threat shall be conclusive evidence that the increase in such rate is due to such activity of Tenant and, as a result thereof, Tenant shall be liable for the payment of such increase as additional Rent. In no event shall Tenant introduce or permit to be kept on the Premises or brought into the Building any dangerous, noxious, radioactive or explosive substance.

### Section 10.    Assignment and Subletting.

(a) **Transfers**. Subject to the terms of Section 10(h) below, Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, (1) assign, transfer or encumber this Lease or any estate or interest herein, whether directly or by operation of law; (2) permit any other entity to become Tenant hereunder by merger, consolidation or other reorganization; (3) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current control of Tenant; provided, that the initial public offering of Tenant's stock shall not be deemed to constitute a change in the control of Tenant; (4) sublet any portion of the Premises; (5) grant any license, concession or other right of occupancy of any portion of the Premises; or (6) permit the use of the Premises by any parties other than Tenant (any of the events listed in Section 10(a)(1) through Section 10(a)(6) being a "***Transfer***").

(b) **Consent Standards**. Landlord shall not unreasonably withhold its consent to any assignment or subletting of the Premises provided that Tenant is not then in default under the Lease and the proposed transferee: (1) is creditworthy; (2) has a good reputation in the business community; (3) will use the Premises for the Permitted Use and will not use the Premises for a purpose that would violate any exclusive use or other similar agreement entered into by Landlord with any other tenant of the Building; (4) will not use the Premises in a manner that would materially increase the pedestrian traffic to the Premises or the Project; (5) is not a governmental entity, or subdivision or agency thereof; (6) is not another occupant of the Building, unless Landlord does not then have reasonably comparable space available in the Building to lease to such occupant; and (7) is not a person or entity with whom Landlord is then, or has been within the three-month period prior to the time Tenant seeks to enter into such assignment or subletting, negotiating to lease space in the Building, or any Affiliate of any such person or entity, unless Landlord does not then have reasonably comparable space available in the Building to lease to such person or entity (all of the foregoing Section 10(b)(1) through Section 10(b)(7) being deemed reasonable bases for withholding consent). Landlord shall have no obligation to consent to any requested Transfer if Tenant is then in default under this Lease.

10

SPX-002491

(c) **Request for Consent**. If Tenant requests Landlord's consent to a Transfer, then, at least fifteen (15) days prior to the effective date of the proposed Transfer, Tenant shall provide Landlord with a written description of all terms and conditions of the proposed Transfer, copies of the proposed pertinent documentation, and the following information about the proposed transferee: name and address; reasonably satisfactory information about its business and business history; its proposed use of the Premises; banking, financial and other credit information; and general references sufficient to enable Landlord to determine the proposed transferee's creditworthiness and character. Concurrently with Tenant's notice of any request for consent to a Transfer, Tenant shall pay to Landlord a fee of $5,000 to defray Landlord's expenses in reviewing such request, and Tenant shall also reimburse Landlord within thirty (30) days of request for Landlord's reasonable attorneys' fees incurred in connection with considering any request for consent to a Transfer.

(d) **Conditions to Consent**. If Landlord consents to a proposed Transfer, then the proposed transferee shall deliver to Landlord a written agreement whereby it expressly assumes Tenant's obligations hereunder; however, any transferee of less than all of the space in the Premises shall be liable only for obligations under this Lease that are properly allocable to the space subject to the Transfer for the period of the Transfer. No Transfer shall release Tenant from its obligations under this Lease, but rather Tenant and its transferee shall be jointly and severally liable therefor. Landlord's consent to any Transfer shall not be deemed consent to any subsequent Transfers. If an Event of Default occurs while the Premises or any part thereof are subject to a Transfer, then Landlord, in addition to its other remedies, may collect directly from such transferee all rents becoming due to Tenant and apply such rents against Rent. Tenant authorizes its transferees to make payments of rent directly to Landlord upon receipt of notice from Landlord to do so following the occurrence of an Event of Default hereunder.

(e) **Cancellation**. Landlord may, within fifteen (15) days after submission of Tenant's written request for Landlord's consent to an assignment or to the subletting of more than fifty percent (50%) of the Premises, cancel this Lease as to the portion of the Premises proposed to be sublet or assigned as of the date the proposed Transfer is to be effective. If Landlord cancels this Lease as to any portion of the Premises, then this Lease shall cease for such portion of the Premises, Tenant shall pay to Landlord all Rent accrued through the cancellation date relating to the portion of the Premises covered by the proposed Transfer, and Rent shall be reduced proportionately based on the remaining square footage in the Premises. Thereafter, Landlord may lease such portion of the Premises to the prospective transferee (or to any other person) without liability to Tenant.

(f) **Additional Compensation**. Tenant shall pay to Landlord, immediately upon receipt thereof, fifty percent (50%) of the excess of all compensation received by Tenant for a Transfer over the Rent allocable to the portion of the Premises covered thereby, after first deducting the following costs and expenses for such Transfer: (i) brokerage commissions (not to exceed commissions typically paid in the market at the time of such Transfer); (ii) reasonable attorneys' fees; and (iii) the actual costs paid in making any improvements in the Premises required by any Transfer.

(g) **Attornment by Subtenants**. Each sublease by Tenant hereunder shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, either terminate the sublease or take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be: (i) liable for any previous act or omission of Tenant under such sublease; (ii) subject to any counterclaim, offset or defense that such subtenant might have against Tenant; (iii) bound by any previous modification of such sublease or by any rent or additional rent or advance rent which such subtenant might have paid for more than the

11

current month to Tenant, and all such rent shall remain due and owing, notwithstanding such advance payment; (iv) bound by any security or advance rental deposit made by such subtenant which is not delivered or paid over to Landlord and with respect to which such subtenant shall look solely to Tenant for refund or reimbursement; or (v) obligated to perform any work in the subleased space or to prepare it for occupancy, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment.  Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by the terms and conditions set forth in this <u>Section 10(g)</u>.  The provisions of this <u>Section 10(g)</u> shall be self-operative, and no further instrument shall be required to give effect to this provision.

(h)   **Permitted Transfers**.  Notwithstanding anything to the contrary in <u>Section 10(a)</u>, Tenant may Transfer its interest in this Lease (a "***Permitted Transfer***") to the following types of entities (a "***Permitted Transferee***") without the written consent of Landlord:

    (1)   an Affiliate of Tenant;

    (2)   any corporation, limited partnership, limited liability partnership, limited liability company or other business entity in which or with which Tenant is merged or consolidated, in accordance with applicable statutory provisions governing merger and consolidation of business entities, so long as (A) Tenant's obligations hereunder are assumed by the entity surviving such merger or created by such consolidation; and (B) the Tangible Net Worth of the surviving or created entity is not less than the Tangible Net Worth of Tenant as of the date immediately preceding the date of the Transfer;

    (3)   any corporation, limited partnership, limited liability partnership, limited liability company or other business entity acquiring all or substantially all of Tenant's assets or stock if such entity's Tangible Net Worth after such acquisition is not less than the Tangible Net Worth of Tenant as of the date immediately preceding the date of the Transfer; or

    (4)   a change in control of Tenant so long as the Tangible Net Worth of Tenant after such change in control is not less than the Tangible Net Worth of Tenant as of the date immediately preceding the date of such change in control.

Tenant shall promptly notify Landlord of any such Permitted Transfer.  Tenant shall remain liable for the performance of all of the obligations of Tenant hereunder, or if Tenant no longer exists because of a merger, consolidation or acquisition, the surviving or acquiring entity shall expressly assume in writing the obligations of Tenant hereunder.  Additionally, the Permitted Transferee shall comply with all of the terms and conditions of this Lease, including the Permitted Use, and the use of the Premises by the Permitted Transferee may not violate any other agreements affecting the Building, Landlord or other tenants of the Building.  No later than five (5) Business Days prior to the effective date of any Permitted Transfer, Tenant agrees to furnish Landlord with (A) a copy of the instrument effecting such Permitted Transfer, (B) documentation establishing Tenant's satisfaction of the requirements set forth above applicable to any such Transfer, including, without limitation, other than with respect to a Transfer to an Affiliate pursuant to clause (i) above, satisfactory evidence that the Tangible Net Worth test described above has been met, and (C) evidence of insurance as required under this Lease with respect to the Permitted Transferee; provided, however, if Tenant is prohibited by applicable Law or a confidentiality agreement from furnishing such information prior to the effective date of a Permitted Transfer, then Tenant shall provide such information within five (5) Business Days following the Permitted Transfer.  The occurrence of a Permitted Transfer shall not waive Landlord's rights as to any subsequent Transfers.  "***Tangible Net Worth***" means the

12

excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**_GAAP_**"), excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, copyrights and franchises.  Any subsequent Transfer by a Permitted Transferee shall be subject to the terms of this Section 10.

Section 11.    **Insurance; Subrogation; Indemnity.**

(a)    **Tenant's Insurance Coverages**.  Effective as of the earlier of:  (i) the date Tenant enters or occupies the Premises; or (ii) the Commencement Date, and continuing throughout the Term, Tenant shall maintain the following insurance policies: (A) commercial general liability insurance of not less than $3,000,000 per occurrence, with an annual aggregate limit of not less than $5,000,000 which shall apply on a per location basis, insuring Tenant, Landlord and the Property Manager against all liability for injury to or death of a person or persons or damage to property arising from the use and occupancy of the Premises, with an additional insured endorsement in form CG 2026 07/04 (or another equivalent form approved in writing by Landlord); (B) Automobile Liability covering any owned, non-owned, leased, rented or borrowed vehicles of Tenant with limits no less than $1,000,000 combined single limit for property damage and bodily injury; (C) Special Risk Property insurance covering the full value of all furniture, trade fixtures and personal property in the Premises; (D) contractual liability insurance sufficient to cover Tenant's indemnity obligations hereunder (but only if such contractual liability insurance is not already included in Tenant's commercial general liability insurance policy); (E) worker's compensation insurance in amounts not less than statutorily required, and Employers' Liability insurance with limits of not less than $1,000,000; (F) business interruption insurance in an amount that will reimburse Tenant for all direct or indirect loss of income attributable to all perils insured against by Tenant's property insurance coverage, including the prevention of use of or access to the Premises; (G) in the event Tenant performs any Alterations in, on, or to the Premises, Builder's Risk Insurance on a Special Risk basis for the full replacement value covering all work incorporated in the Building and all materials and equipment in or about the Premises (at Landlord's request, such endorsement shall be in form CG 2037 07/04); and (H) such other insurance or any changes or endorsements to the insurance required herein, including increased limits of coverage, as Landlord, or any mortgagee of Landlord, may reasonably require from time to time.  Tenant's insurance shall provide primary coverage to Landlord and shall not require contribution by any insurance maintained by Landlord, when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy.  Tenant shall furnish to Landlord certificates of such insurance, with an additional insured endorsement in form CG 2026 07/04 (or another equivalent form approved in writing by Landlord), and such other evidence satisfactory to Landlord of the maintenance of all insurance coverages required hereunder at least ten (10) days prior to the earlier of the Commencement Date or the date Tenant enters or occupies the Premises, and at least ten (10) days prior to each renewal of said insurance, and Tenant shall obtain a written obligation on the part of each insurance company to endeavor to notify Landlord at least thirty (30) days before cancellation or a material change of any such insurance policies.  All such insurance policies shall be in form reasonably satisfactory to Landlord, and issued by companies licensed to do business in the State of California and with a Best's rating of A-:VII or better.  If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord the certificates or evidence of coverage required herein, Landlord, in addition to any other remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord, within thirty (30) days of receipt of an invoice, the premium costs thereof, plus an administrative fee of fifteen percent (15%) of such cost.  It is expressly understood and agreed that the foregoing minimum limits of insurance coverage shall not limit the liability of Tenant for its acts or omissions as provided in this Lease.

13

Confidential

(b) **Landlord's Insurance Coverages**. Throughout the Term of this Lease, Landlord shall maintain, as a minimum, the following insurance policies: (1) property insurance for the Building's replacement value, less a commercially reasonable deductible if Landlord so chooses; and (2) commercial general liability insurance in an amount of not less than $3,000,000 per occurrence, $5,000,000 annual aggregate. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including protection against loss or damage from earthquakes. Tenant shall pay the cost of all insurance carried by Landlord with respect to the Project as part of Operating Costs. The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

(c) **No Subrogation**. Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against under any insurance policy that covers the Building, the Premises, Landlord's or Tenant's fixtures, personal property or business, or is required to be insured against under the terms hereof, regardless of whether the negligence of the other party caused such loss, damage or destruction. Landlord and Tenant each hereby waives any right of subrogation and right of recovery or cause of action for injury including death or disease to respective employees of either as covered by worker's compensation (or which would have been covered if Tenant or Landlord as the case may be, was carrying the insurance as required by this Lease). Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party.

(d) **Indemnity**. Subject to Section 11(c), Tenant shall indemnify, defend (with counsel reasonably satisfactory to Landlord) and hold harmless the Indemnitees from and against all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses (including reasonable attorneys' fees) and all losses and damages arising from: (1) any injury to or death of any person or the damage to or theft, destruction, loss or loss of use of any property or inconvenience arising from any occurrence in the Premises by any Tenant Party; or (2) Tenant's failure to perform its obligations under this Lease, except to the extent any loss or damage is caused or alleged to be caused by the gross negligence or willful misconduct of Landlord or its agents. This indemnity shall survive the expiration or earlier termination of this Lease.

### Section 12.    Subordination; Attornment; Notice to Landlord's Mortgagee.

(a) **Subordination**. This Lease shall be subject and subordinate to any deed of trust, mortgage or other security instrument (each, as renewed, modified and/or extended from time to time, a "***Mortgage***"), or any ground lease, master lease, or primary lease (each, as renewed, modified and/or extended from time to time, a "***Primary Lease***"), that hereafter covers all or any part of the Premises (the mortgagee under any such Mortgage, beneficiary under any such deed of trust, or the lessor under any such Primary Lease is referred to herein as a "***Landlord's Mortgagee***"). Any Landlord's Mortgagee may elect at any time, unilaterally, to make this Lease superior to its Mortgage, Primary Lease, or other interest in the Premises by so notifying Tenant in writing. The provisions of this Section 12 shall be self-operative and no further instrument of subordination shall be required; however, in confirmation of such subordination, Tenant shall execute and return to Landlord (or such other party designated by Landlord) within ten (10) Business Days after written request therefor such documentation, in recordable form if required, as a Landlord's Mortgagee may reasonably request to evidence the subordination of this Lease to such Landlord's Mortgagee's Mortgage or Primary Lease (including a subordination, non-disturbance and attornment agreement) or, if the Landlord's Mortgagee so elects, the subordination of such Landlord's Mortgagee's Mortgage or Primary Lease to this Lease. Notwithstanding any such subordination, Tenant's right to possession

14

of the Premises shall not be disturbed so long as Tenant is not in default under the terms of this Lease.

(b)  **Attornment**.  Tenant shall attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, upon such party's request, and shall execute such agreements confirming such attornment as such party may reasonably request.

(c)  **Notice to Landlord's Mortgagee**.  Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail, to any Landlord's Mortgagee whose address has been given to Tenant, and affording such Landlord's Mortgagee a reasonable opportunity to perform Landlord's obligations hereunder.

(d)  **Landlord's Mortgagee's Protection Provisions**.  If Landlord's Mortgagee shall succeed to the interest of Landlord under this Lease, Landlord's Mortgagee shall not be:  (1) liable for any act or omission of any prior lessor (including Landlord); (2) bound by any rent or additional rent or advance rent which Tenant might have paid for more than one (1) month in advance to any prior lessor (including Landlord), and all such rent shall remain due and owing, notwithstanding such advance payment; (3) bound by any security or advance rental deposit made by Tenant which is not delivered or paid over to Landlord's Mortgagee and with respect to which Tenant shall look solely to Landlord for refund or reimbursement; (4) bound by any termination, amendment or modification of this Lease made without Landlord's Mortgagee's consent and written approval, except for those terminations, amendments and modifications permitted to be made by Landlord without Landlord's Mortgagee's consent pursuant to the terms of the loan documents between Landlord and Landlord's Mortgagee; (5) subject to the defenses which Tenant might have against any prior lessor (including Landlord); and (6) subject to the offsets which Tenant might have against any prior lessor (including Landlord) except for those offset rights which (A) are expressly provided in this Lease, (B) relate to periods of time following the acquisition of the Project by Landlord's Mortgagee, and (C) Tenant has provided written notice to Landlord's Mortgagee and provided Landlord's Mortgagee a reasonable opportunity to cure the event giving rise to such offset event.  Landlord's Mortgagee shall have no liability or responsibility under or pursuant to the terms of this Lease or otherwise after it ceases to own an interest in the Project.  Nothing in this Lease shall be construed to require Landlord's Mortgagee to see to the application of the proceeds of any loan, and Tenant's agreements set forth herein shall not be impaired on account of any modification of the documents evidencing and securing any loan.

Section 13.    **Rules and Regulations.**  Tenant shall comply with the rules and regulations of the Building which are attached hereto as Exhibit C.  Landlord may, from time to time, change such rules and regulations for the safety, care or cleanliness of the Project, provided that such changes are applicable to all tenants of the Building, will not unreasonably interfere with Tenant's use of the Premises and are enforced by Landlord in a non-discriminatory manner.  Tenant shall comply with all modifications to the rules and regulations upon receipt of notice thereof.  Tenant shall be responsible for the compliance with such rules and regulations by each Tenant Party.

Section 14.    **Condemnation.**  If the entire Building or Premises are taken by right of eminent domain or conveyed in lieu thereof (a "***Taking***"), this Lease shall terminate as of the date of the Taking.  If any material portion, but less than all, of the Building becomes subject to a Taking, then Landlord may terminate this Lease by delivering written notice thereof to Tenant within thirty (30) days after such Taking, and Rent shall be apportioned as of the date of such Taking.  If Landlord does not so terminate this Lease, then this Lease will continue, but if any portion of the Premises has been taken, then Rent shall be abated on a reasonable basis as to that portion of the Premises rendered untenantable by the Taking.  If any Taking occurs, then Landlord shall receive the entire award or other compensation for the Building, the Land, and any other

15

improvements taken; however, Tenant may separately pursue a claim (to the extent it will not reduce Landlord's award) against the condemnor for the value of Tenant's personal property which Tenant is entitled to remove under this Lease, moving costs, loss of business, and other claims it may have.  If the Lease is not terminated, Landlord shall proceed with reasonable diligence to restore the remaining part of the Premises and the Building substantially to their former condition to the extent feasible to constitute a complete and tenantable Premises and Building; provided, however, that Landlord shall only be required to reconstruct building standard leasehold improvements existing in the Premises as of the date of the Taking, and Tenant shall be required to pay the cost for restoring any other leasehold improvements.  In no event shall Landlord be required to spend more than the condemnation proceeds received by Landlord for such repair.  The rights contained in this <u>Section 14</u> shall be Tenant's sole and exclusive remedy in the event of a taking or condemnation.  Landlord and Tenant each waives the provisions of Sections 1265.130 and 1265.150 of the California Code of Civil Procedure and the provisions of any successor or other law of like import.

   **Section 15.** **<u>Fire or Other Casualty</u>**.  If the Premises or the Building are damaged by fire or other casualty (a "**_Casualty_**"), Landlord shall use commercially reasonable efforts to deliver to Tenant within sixty (60) days after such Casualty a good faith estimate (the "**_Damage Notice_**") of the time needed to repair the damage caused by such Casualty.  If a material portion of the Premises is damaged by Casualty such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Casualty and Landlord estimates that the damage caused thereby cannot be repaired within two hundred seventy (270) days after the Casualty (the "**_Repair Period_**"), then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within thirty (30) days after the Damage Notice has been delivered to Tenant.  In addition, if the Premises are materially damaged by a Casualty occurring during the last six (6) months of the Term, then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within thirty (30) days after the date of the Casualty.  If a Casualty damages the Premises or a material portion of the Building and (a) Landlord estimates that the damage to the Premises cannot be repaired within the Repair Period; (b) the damage occurs during the last twelve (12) months of the Term; (c) regardless of the extent of damage to the Premises, Landlord makes a good faith determination that restoring the Building would be uneconomical; or (d) Landlord is required to pay any insurance proceeds arising out of the Casualty to a Landlord's Mortgagee, then Landlord may terminate this Lease by giving written notice of its election to terminate within thirty (30) days after the Damage Notice has been delivered to Tenant. If neither party elects to terminate this Lease following a Casualty, then Landlord shall, within a reasonable time after such Casualty, begin to repair the Premises and shall proceed with reasonable diligence to restore the Premises to substantially the same condition as they existed immediately before such Casualty; however, other than building standard leasehold improvements, Landlord shall not be required to repair or replace any Alterations within the Premises (which shall be promptly and with due diligence repaired and restored by Tenant at Tenant's sole cost and expense) or any furniture, equipment, trade fixtures or personal property of Tenant or others in the Premises or the Building, and Landlord's obligation to repair or restore the Premises shall be limited to the extent of the insurance proceeds actually received by Landlord for the Casualty in question, plus any applicable deductible amounts. If the Premises are damaged by Casualty, Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of Landlord's repairs (or until the date of termination of this Lease by Landlord or Tenant as provided above, as the case may be), unless a Tenant Party caused such damage, in which case, such abatement shall be limited to the amount of insurance received by Landlord for loss of Rent.  The rights contained in this Section 15 shall be Tenant's sole and exclusive remedy in the event of a Casualty.  Tenant hereby waives the provisions of Sections 1932(2) and 1933(4) of the California Civil Code and the provisions of any successor or other law of like import.

**Section 16.** **<u>Personal Property Taxes</u>**.  Tenant shall be liable for all taxes levied or assessed against personal property, furniture or fixtures placed by Tenant in the Premises.  If any taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of such personal property, furniture or fixtures and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord, within

16

thirty (30) days following written request therefor, the part of such taxes for which Tenant is primarily liable hereunder.

**Section 17.**    **Events of Default**.    Each of the following occurrences shall be an "***Event of Default***":

(a)    **Payment Default**.  Tenant's failure to pay Rent within three (3) Business Days after Tenant's receipt of Landlord's written notice that the same is due; provided, however, Landlord shall not be obligated to provide written notice of monetary default more than once in any calendar year, and each subsequent monetary default shall be an Event of Default if not received within three (3) Business Days after the same is due; provided further, such notice shall be in lieu of, and not in addition to, any notice required under Section 1161 et seq. of the California Code of Civil Procedure;

(b)    **Abandonment**.  Tenant abandons the Premises;

(c)    **Insurance**.  Tenant fails to procure, maintain and deliver to Landlord evidence of the insurance policies and coverages as required under Section 11(a) and such failure continues for five (5) Business Days after written notice to Tenant of such failure;

(d)    **Estoppel; Financial Statement**.  Tenant fails to provide: (i) any estoppel certificate after Landlord's written request therefor pursuant to Section 25(d) or (ii) any financial statement after Landlord's written request therefor pursuant to Section 25(e), and in each case such failure shall continue for five (5) calendar days after Landlord's second (2nd) written notice thereof to Tenant;

(e)    **Mechanic's Liens**.  Tenant fails to pay and release of record, or diligently contest and bond around, any mechanic's lien filed against the Premises or the Project for any work performed, materials furnished, or obligation incurred by or at the request of Tenant, within the time and in the manner required by Section 8(c);

(f)    **Other Defaults**.  Tenant's failure to perform, comply with, or observe any other agreement or obligation of Tenant under this Lease and the continuance of such failure for a period of thirty (30) days or more after Landlord has delivered to Tenant written notice thereof, which notice shall be in lieu of, and not in addition to, any notice required under Section 1161 et seq. of the California Code of Civil Procedure; provided, however, if such default is of the type which cannot reasonably be cured within thirty (30) days, then Tenant shall have such longer time as is reasonably necessary provided Tenant commences to cure within thirty (30) days after receipt of written notice from Landlord and diligently prosecutes such cure to completion within sixty (60) days of such notice; and

(g)    **Insolvency**.  The filing of a petition by or against Tenant or any guarantor hereunder:  (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; or (4) for the reorganization or modification of Tenant's capital structure; however, if such a petition is filed against Tenant or any such guarantor, then such filing shall not be an Event of Default unless Tenant (or such guarantor) fails to have the proceedings initiated by such petition dismissed within sixty (60) days after the filing thereof.

**Section 18.**    **Remedies.**  Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take any one or more of the following actions:

(a)    **Termination of Lease**.  Terminate this Lease by giving Tenant written notice thereof, in which event Tenant shall immediately surrender the Premises to Landlord and Landlord may recover from Tenant:  (i) the worth at the time of award of any unpaid Rent which had been earned at the time of

17

such termination; plus (ii) the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such Rent loss Tenant proves reasonably could have been avoided; plus (iii) the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rent loss that Tenant proves reasonably could be avoided; plus (iv) any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course would be likely to result therefrom; plus (v) at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable California law.  As used in clauses (i) and (ii) above, the "worth at the time of award" is computed by allowing interest at the Default Rate.  As used in clause (iii) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).  Forbearance by Landlord to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of such default.  Tenant hereby waives for Tenant and for all those claiming under Tenant all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.  If Landlord elects to proceed under this Section 18(a), Landlord may remove all of Tenant's property from the Premises (which shall be deemed abandoned by Tenant) and store the same in a public warehouse or elsewhere at the cost of, and for the account of, Tenant, without becoming liable for any loss or damage which may be occasioned thereby.  If and to the extent required by applicable Law, Landlord shall use commercially reasonable efforts to relet the Premises on such terms as Landlord in its sole discretion may determine (including a term different from the Term, rental concessions, and alterations to, and improvement of, the Premises); however, Landlord shall not be obligated to expend funds in connection with reletting the Premises, nor to relet the Premises before leasing other portions of the Building, and Landlord shall not be obligated to accept any prospective tenant proposed by Tenant unless such proposed tenant meets all of Landlord's leasing criteria.  Tenant shall not be entitled to the excess of any consideration obtained by reletting over the Rent due hereunder.

(b) **Continue Lease in Effect**.  In addition to all other rights and remedies provided Landlord in this Lease and by Law, Landlord shall have the remedy described in California Civil Code Section 1951.4 (Landlord may continue the Lease in effect after Tenant's breach and abandonment and recover Rents as they become due if Tenant has the right to sublet or assign the Lease, subject to reasonable limitations).

(c) **Perform Acts on Behalf of Tenant**.  Perform any act Tenant is obligated to perform under the terms of this Lease (and enter upon the Premises in connection therewith if necessary) in Tenant's name and on Tenant's behalf, without being liable for any claim for damages therefor, and Tenant shall reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease (including, but not limited to, collection costs and legal expenses), plus interest thereon at the Default Rate.

(d) **Cumulative Remedies**.  Any and all remedies set forth in this Lease: (1) shall be in addition to any and all other remedies Landlord may have at law or in equity; (2) shall be cumulative; and (3) may be pursued successively or concurrently as Landlord may elect.  The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

(e) **No Waiver**.  Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default.  No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such term.  Landlord's acceptance of any partial payment of Rent shall not waive

18

Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

(f)  **Payment by Tenant**.  Upon any Event of Default, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses incurred) in:  (1) obtaining possession of the Premises; (2) removing and storing Tenant's or any other occupant's property; (3) repairing, restoring, altering or otherwise putting the Premises into condition acceptable for leasing to prospective tenants; (4) if Tenant is dispossessed of the Premises and this Lease is not terminated, reletting all or any part of the Premises (including brokerage commissions, cost of tenant finish work, and other costs incidental to such reletting); (5) performing Tenant's obligations which Tenant failed to perform; and (6) enforcing, or advising Landlord of, its rights, remedies and recourses arising out of the Event of Default.

(g)  **Attorneys' Fees**.  If either Landlord or Tenant brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, or appeal thereon, shall be entitled to its reasonable attorneys' fees and court costs to be paid by the losing party as fixed by the court in the same or separate suit, and whether or not such action is pursued to decision or judgment. Landlord shall be entitled to reasonable attorneys' fees and costs incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default.

(h)  **Waiver of Trial by Jury**.  Landlord and Tenant each knowingly, voluntarily and intentionally waive the right to a trial by jury with respect to any litigation arising out of this Lease.

**Section 19.    Landlord Defaults; Landlord's Liability.**  Landlord shall not be in default under this Lease unless Landlord has failed to begin and pursue with reasonable diligence the cure of any failure of Landlord to meet its obligations under this Lease within thirty (30) days of the receipt by Landlord of written notice from Tenant specifying Landlord's alleged failure to perform (and an additional reasonable time after such receipt if (i) such failure cannot be cured within such thirty (30)-day period, and (ii) Landlord commences curing such failure within such thirty (30)-day period and thereafter diligently pursues the curing of such failure). In no event shall Tenant have the right to terminate or rescind this Lease as a result of Landlord's default. Tenant waives such remedies of termination or rescission and agrees that Tenant's remedies for default under this Lease and for breach of any promise or inducement are limited to a suit for damages and/or injunction. In addition, Tenant shall, prior to the exercise of any such remedies, provide each Landlord's Mortgagee (in each instance, only as to those entities of which Tenant has notice of their interest) with written notice and reasonable time to cure any default by Landlord.  The liability of Landlord (and its partners, shareholders or members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Project shall be limited to Tenant's actual direct, but not consequential (or other speculative) damages therefor and shall be recoverable only from the interest of Landlord in the Project, and Landlord and its partners, shareholders or members shall not be personally liable for any deficiency.

**Section 20.    Holding Over.**  If Tenant fails to vacate the Premises at the end of the Term, then Tenant shall be a tenant at sufferance and, in addition to all other damages and remedies to which Landlord may be entitled for such holding over:  (a) Tenant shall pay, in addition to the other Rent, Base Rent equal to the greater of (i) one hundred fifty percent (150%) of the Base Rent payable during the last month of the Term or (ii) one hundred fifty percent (150%) of the prevailing rental rate in the Building for similar space; and (b) Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease.  The provisions of this Section 20 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at Law.  If Tenant fails to surrender the Premises upon the termination or expiration of this

19

Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits to Landlord resulting therefrom. Notwithstanding the foregoing, if Tenant holds over with Landlord's express written consent, then Tenant shall be a month-to-month tenant and Tenant shall pay, in addition to the other Rent, Base Rent equal to one hundred twenty-five percent (125%) of the Base Rent payable during the last month of the Term.

Section 21.    **Surrender of Premises.**    No act by Landlord shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord. At the expiration or earlier termination of this Lease, Tenant shall: (i) deliver the Premises to Landlord with all improvements located therein in the same repair and condition as received on the Access Date, broom-clean, free of hazardous materials placed on the Premises during the Term, reasonable wear and tear (and condemnation and Casualty damage, as to which Section 14 and Section 15 shall control) excepted, (ii) remove any Alterations installed in the Premises in accordance with the provisions of Section 8(a) above, (iii) remove all unattached trade fixtures, furniture and personal property placed in the Premises by Tenant, and (iv) deliver to Landlord all keys (including electronic card keys) to the Premises and the Building. Tenant may not remove any wiring or cabling unless Landlord requires such removal, in which case Tenant, at Tenant's sole expense, shall remove the designated wiring and cabling to the main point of entry, provided that Tenant installed such wiring and/or cabling. Tenant shall repair all damage caused by such removal. All items not so removed shall, at Landlord's option, be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord at Tenant's cost without notice to Tenant and without any obligation to account for such items. The provisions of this Section 21 shall survive the expiration or earlier termination of the Lease.

Section 22.    **Certain Rights Reserved by Landlord.**    Landlord shall have the following rights: (i) to perform maintenance and repairs, and to make inspections, alterations, additions, changes or improvements, whether structural or otherwise, in and about the Project, or any part thereof; (ii) to enter upon the Premises (after giving Tenant reasonable notice thereof, which may be oral notice, except in cases of real or apparent emergency, in which case no notice shall be required) for any of the foregoing purposes and, during the performance of any such work therein, to temporarily close doors, lobbies, corridors and hallways in the Building; (iii) to interrupt or temporarily suspend Building services and facilities as reasonably necessary; (iv) to change the arrangement and location of entrances or passageways, doors and doorways, corridors, restrooms, stairs, elevator and/or other public parts of the Building; (v) to take such reasonable access control measures as Landlord deems advisable; provided, however, that any such access control measures are for Landlord's own protection, and Tenant acknowledges that Landlord is not a guarantor of the security or safety of any Tenant Party or of Tenant's personal property, and that all such security matters are the sole responsibility of Tenant; (vi) to require the evacuation of the Building for cause, suspected cause, or for drill purposes; (vii) to temporarily deny access to the Building and to close the Building after Normal Business Hours and on Saturdays, Sundays and Holidays, subject, however, to Tenant's right to enter when the Building is closed after Normal Business Hours pursuant to such reasonable rules and regulations as Landlord may prescribe from time to time; (viii) to enter the Premises at all reasonable hours to perform Landlord's repair and maintenance obligations under this Lease or to perform environmental testing; (ix) to enter the Premises at all reasonable hours to show the Premises to prospective purchasers or lenders; (x) at any time during the last six (6) months of the Term or at any time following the occurrence of an Event of Default, to enter the Premises at all reasonable hours to show the Premises to prospective tenants; and (xi) to change the name and/or street address of the Building. With respect to all of the foregoing, Landlord shall retain a key for all of the doors for the Premises, excluding Tenant's vaults, safes and files. Landlord shall have the right to use any and all means to open the doors to the Premises in an emergency in order to obtain entry thereto without liability to Tenant therefor. Any entry to the Premises by Landlord by any of the foregoing means, or otherwise, shall not be construed or deemed to be a forcible or unlawful entry into or a detainer of the Premises, or an eviction, partial eviction or constructive

20

eviction of Tenant from the Premises or any portion thereof, and shall not relieve Tenant of its obligations hereunder.

> **Section 23.** **Intentionally Omitted.**

> **Section 24.** **Hazardous Materials**.  Tenant shall not generate, use, treat, store, handle, release or dispose of, or permit the generation, use, treatment, storage, handling, release or disposal of, hazardous materials or hazardous substances (as such terms are commonly defined) on the Premises, or the Project, or transport or permit the transportation of hazardous materials or hazardous substances to or from the Premises or the Project except for limited quantities of household cleaning products and office supplies used or stored at the Premises and required in connection with the routine operation and maintenance of the Premises, and used and stored in compliance with applicable Laws.  Tenant will immediately advise Landlord in writing of any condition or occurrence on the Premises or the Project that results in noncompliance by Tenant with any applicable environmental Law.  Tenant shall be solely liable for the costs of remediation of any hazardous materials or hazardous substances brought onto the Premises or the Project by Tenant or by any Tenant Party. Tenant shall indemnify, defend and hold harmless the Indemnitees from and against all obligations (including removal and remedial actions), losses, claims, suits, judgments, liabilities, penalties, damages (including consequential and punitive damages), costs and expenses (including reasonable attorneys' and consultants' fees and expenses) of any kind or nature whatsoever that may at any time be incurred by, imposed on or asserted against such Indemnitees directly or indirectly based on, or arising or resulting from (a) the actual or alleged presence of hazardous materials or hazardous substances on the Project which is caused or permitted by Tenant or a Tenant Party and (b) any environmental claim relating in any way to Tenant's operation or use of the Premises.  The provisions of this Section 24 shall survive the expiration or sooner termination of this Lease.

> **Section 25.** **Miscellaneous**.

(a) **Landlord Transfer**.  Landlord may transfer any portion of the Project and any of its rights under this Lease.  If Landlord transfers its interest in the Lease, Landlord may assign the Security Deposit to the transferee and, upon such transfer (and the delivery to Tenant of an acknowledgment of the transferee's responsibility for the Security Deposit if required by Law), Landlord thereafter shall have no further liability for the return of the Security Deposit.  Furthermore, if Landlord assigns its rights under this Lease, then Landlord shall thereby be released from any further obligations hereunder arising after the date of transfer, provided that the assignee assumes Landlord's obligations hereunder in writing.

(b) **Brokerage**.  Landlord shall pay commissions to its broker pursuant to a separate written agreement. Tenant shall indemnify, defend and hold Landlord harmless from and against all costs, expenses, attorneys' fees, liens and other liability for commissions or other compensation claimed by any other broker or agent claiming the same by, through or under Tenant.  The foregoing indemnity shall survive the expiration or earlier termination of the Lease.

(c) **Force Majeure**.  Other than for Tenant's obligations under this Lease that can be performed by the payment of money (e.g., payment of Rent and maintenance of insurance), whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, acts of terrorism, governmental laws, regulations, or restrictions, or any other causes of any kind whatsoever which are beyond the reasonable control of such party.

(d) **Estoppel Certificates**.  From time to time, Tenant shall furnish to any party designated by Landlord, within ten (10) Business Days after Landlord has made a request therefor, a certificate in form determined by Landlord signed by Tenant confirming and containing such factual certifications and

Confidential

representations as to this Lease as Landlord may reasonably request. Unless otherwise required by Landlord's Mortgagee or a prospective purchaser or mortgagee of the Project, the initial form of estoppel certificate to be signed by Tenant shall be in the form attached hereto as <u>Exhibit F</u>. Tenant's failure to execute and deliver such certificate within ten (10) Business Days of Landlord's request shall be conclusive upon Tenant that this Lease is in full force and effect and has not been modified except as may be represented in the certificate.

(e)    **Financial Statements**. Within fifteen (15) days after Landlord's request, Tenant will furnish Tenant's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's internally prepared financial statements. If Tenant is a publicly traded corporation, Tenant may satisfy its obligations hereunder by providing to Landlord Tenant's most recent annual and quarterly reports. Landlord will not disclose any aspect of Tenant's financial statements that Tenant designates to Landlord as confidential except: (1) to Landlord's Mortgagee or prospective mortgagees or purchasers of the Building; (2) to Landlord's advisors and consultants; (3) in litigation between Landlord and Tenant; and (4) if required by court order. Tenant shall not be required to deliver the financial statements required under this <u>Section 25(e)</u> more than once in any twelve (12)-month period unless requested by Landlord's Mortgagee or a prospective buyer or lender of the Building or an Event of Default occurs.

(f)    **Parking**. Tenant may use of up to twenty-three (23) reserved parking spaces in the Building's gated parking lot on a month-to-month basis, subject to the terms of this Section 25(f). At least thirty (30) days prior to the Lease Commencement Date, Tenant shall notify Landlord of the number of reserved parking spaces it would like to use as of the Lease Commencement Date. Landlord will designate the specific parking spaces allocated to Tenant. Thereafter, Tenant shall keep Landlord apprised of its parking space requirements from time to time and if Tenant needs to increase the number of parking spaces it uses, Landlord shall, within forty-five (45) days of receipt of Tenant's written notice requesting additional parking spaces, provide Tenant with the requested number of spaces, up to the maximum number set forth above (Tenant acknowledging that such delay is a function of Landlord leasing such unused parking spaces to others on a month-to-month basis). Tenant's use of such parking spaces and the parking lot shall be subject to compliance with Landlord's rules and regulations in effect from time to time, including those attached hereto as Exhibit D-1. Tenant shall not use any parking space not assigned to it pursuant to this Lease. Tenant's use of the reserved parking spaces shall be on a month-to-month basis and shall be subject to a monthly fee as set forth in the Basic Lease Information, which may be adjusted annually by Landlord. Such monthly fee shall be considered additional Rent under this Lease. Landlord reserves the right to change the size and/or configuration of the Building parking lot from time to time without incurring any liability to Tenant and without abatement of Rent under this Lease, provided that no such change reduces the number of parking spaces allocated to Tenant under this Lease (unless a reduction in the number of parking spaces available at the Project is required by the City and County of San Francisco or any governmental agency thereof).

(g)    **Notices**. All notices and other communications given pursuant to this Lease shall be in writing, shall be addressed to the parties hereto at the respective addresses specified in the Basic Lease Information, and shall be: (i) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested; (ii) hand delivered; or (iii) sent by a nationally recognized overnight courier service. All notices shall be effective upon the earlier to occur of actual receipt, one (1) Business Day following deposit with a nationally recognized overnight courier service, or three (3) days following deposit in the United States mail. The parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

22

Confidential

(h) **OFAC**.  Tenant warrants and represents to Landlord that (i) Tenant is not on an SDN List (defined below), nor is it directly or indirectly owned or controlled by an SDN (defined below); and (ii) Tenant's lease of the Premises pursuant to this Lease will not violate any country sanctions program administered and enforced by the Office of Foreign Assets Control ("***OFAC***") of the U.S. Department of the Treasury.  For the purposes hereof, an "***SDN List***" is defined as one of the lists of specially designated nationals published by OFAC of individuals and companies owned or controlled by, or acting for or on behalf of, OFAC targeted countries, as well as individuals, groups and entities, such as terrorists and narcotics traffickers, designated under OFAC programs that are not country-specific, and an "***SDN***" is one of the individuals or companies listed on an SDN List.

(i) **Notification for Commercial Property Constructed Before 1979**.  Tenant acknowledges that Landlord has advised Tenant that due to the Building's age, it is possible that the Building contains asbestos-containing materials ("***ACM's***").  If Tenant undertakes any Alterations to the Premises as provided in Section 8, Tenant shall coordinate with Landlord to ensure that no known ACM's (if any) are thereby disturbed.

(j) **Landlord's Fees**.  Whenever Tenant requests Landlord to take any action not required of it hereunder or give any consent required or permitted under this Lease, Tenant will reimburse Landlord for Landlord's reasonable, out-of-pocket costs payable to third parties and incurred by Landlord in reviewing the proposed action or consent, including reasonable attorneys', engineers' or architects' fees, within thirty (30) days after Landlord's delivery to Tenant of a statement of such costs.  Tenant will be obligated to make such reimbursement without regard to whether Landlord consents to any such proposed action.

(k) **Separability**.  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby and in lieu of such clause or provision, there shall be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(l) **Amendments; Binding Effect**.  This Lease may not be amended except by instrument in writing signed by Landlord and Tenant.  No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord, and no custom or practice which may evolve between the parties in the administration of the terms hereof shall waive or diminish the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms hereof.  The terms and conditions contained in this Lease shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns.

(m) **Quiet Enjoyment**.  Provided Tenant has performed all of its obligations hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through or under Landlord, subject to the terms and conditions of this Lease.

(n) **Governing Law**.  This Lease shall be governed by and construed in accordance with the laws of the State of California.  Venue for all legal proceedings concerning this Lease shall be with the state and federal courts located in the county in which the Project is located.

(o) **No Recording**.  Tenant shall not record this Lease or any memorandum of this Lease.

(p) **Time of Essence**.  Time is of the essence with respect to each provision of this Lease.

(q) **Joint and Several Liability**.  If Tenant is comprised of more than one (1) party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease.  All unperformed obligations

23

Confidential

SPX-002504

of Tenant hereunder not fully performed at the end of the Term shall survive the end of the Term, including payment obligations with respect to Rent and all obligations concerning the condition and repair of the Premises.

(r) **Confidentiality**. Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent; provided, however, that Tenant shall have the right to disclose the terms and conditions of this Lease to Tenant's attorneys and brokers, any investors or potential investors, or any prospective subtenants or assignees, or as otherwise required by applicable Law. The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure.

(s) **Authority**. Tenant (if a corporation, partnership or other business entity) hereby represents and warrants to Landlord that Tenant is a duly formed and existing entity qualified to do business in the State of California, that Tenant has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Tenant is authorized to do so.

(t) **Renovation of Project**. Tenant acknowledges that Landlord has the right to renovate or remodel the Project or any portion thereof, and in such event portions of the Project may from time to time be under construction following Tenant's occupancy of the Premises; Tenant acknowledges that any such construction may result in levels of noise, dust and obstruction of access which are in excess of that present in a fully-constructed project. In connection with such construction, Landlord may, among other things, erect scaffolding or other necessary structures at the Project. Tenant hereby waives any and all Rent offsets or claims of constructive eviction or damage to or interference with Tenant's business or inconvenience or annoyance which may arise in connection with such construction, provided that Landlord shall take commercially reasonable measures to minimize interference with or disruption to Tenant's use of the Premises during such renovations or remodeling.

(u) **Disclaimers**. Landlord and Tenant expressly disclaim any implied warranty that the Premises are suitable for Tenant's intended commercial purpose, and Tenant's obligation to pay Rent hereunder is not dependent upon the condition of the Premises or the performance by Landlord of its obligations hereunder, and, except as otherwise expressly provided herein, Tenant shall continue to pay the Rent, without abatement, demand, setoff or deduction, notwithstanding any breach by Landlord of its duties or obligations hereunder, whether express or implied. Furthermore, Tenant does not rely on, nor does Landlord make any representation regarding any specific tenant or number of tenants occupying space in the Building at any time.

(v) **Entire Agreement**. This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto. Except for those set forth in this Lease, no representations, warranties or agreements have been made by Landlord or Tenant to the other with respect to this Lease or the obligations of Landlord or Tenant in connection therewith. The normal rule of construction that any ambiguities be resolved against the drafting party shall not apply to the interpretation of this Lease or any exhibits or amendments hereto.

(w) **No Offer**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

(x) **Civil Code Section 1938 Advisory**. Landlord hereby advises Tenant that the Project has not been inspected by a Certified Access Specialist.

24

Confidential

(y) **Tenant Guaranty; OpenAI, Inc.**  Tenant and Elon Musk hereby represent that Tenant is (i) wholly-owned by Elon Musk and (ii) in good standing in the State of California.  By signing below, Elon Musk agrees and covenants to Landlord that (i) he shall maintain sole ownership of Tenant at all times during the term of the Lease, (ii)  he absolutely, unconditionally  and irrevocably  guarantees to Landlord, and agrees fully to pay, perform,  satisfy and discharge, as and when payment, performance, satisfaction and discharge are due, all  of the indebtedness,  agreements, obligations  and liabilities of Tenant under this Lease and all amendments, modifications,  renewals, extensions,  supplements, substitutions  and replacements  of the Lease as if he were a Tenant under this Lease (and Landlord may proceed directly against Elon Musk with respect thereto) and (iii) he will derive or expects to derive financial and other advantage and benefit, directly or indirectly, from the Lease. For the avoidance of doubt, Elon Musk acknowledges that Landlord shall not be required to pursue any remedies (including any actions against Tenant) before invoking the benefits of this Section 25(y) and Elon Musk fully and forever waives and relinquishes all rights, remedies and defenses of a guarantor or a surety that may otherwise exist or become available.   Without limiting the foregoing, Guarantor waives all rights and defenses that are or may become available to Guarantor by reason of California Civil Code sections 2819, 2815, 2787 to 2855, inclusive. Upon the death or bankruptcy of Elon Musk, the liability of Elon Musk shall continue against its assets as to all obligations under this Lease. At any time during the term of the Lease, Tenant may allow OpenAI, Inc., a California nonprofit public benefit corporation, to use all or any part of the Premises for general office use; provided, however, at any time that OpenAI, Inc. uses the Premises, Tenant shall remain responsible for compliance with this Lease in all respects. For any period in which OpenAI, Inc. uses and occupies the Premises, Landlord shall accept payment of Rent and other charges set forth in Section 4 of the Lease directly from OpenAI, Inc., and all other costs and charges payable by Tenant   under the Lease; provided, however, Tenant shall be solely responsible for such obligations under all circumstances. The obligations of Elon Musk under this Section 25(y) shall be absolute, unconditional and irrevocable and shall continue and remain in full force and effect until all of the Tenant's obligations have been fully paid, performed, satisfied and discharged.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

25

Confidential

SPX-002506

This Lease is executed on the respective dates set forth below, but for reference purposes, this Lease shall be dated as of the date first above written.  If the execution date is left blank, this Lease shall be deemed executed as of the date first written above.

LANDLORD:   BRIDGETON PIONEER PROPERTY LLC,
          a Delaware limited liability company

          By:_____
          Name:_____
              Atit Jariwala
          Title:_____
              Authorized Signatory

          Execution Date:  __July 1__, 2016

TENANT:     MUSK INDUSTRIES LLC
          a California limited liability company

          By:_____
          Name: Elon Musk
          Title:_____

          Execution Date:  __June 17__, 2016

Acknowledged and Agreed solely for
purposes of Section 25(y)


_____
Elon Musk
Execution Date: __June 17__, 2016

26

Confidential

SPX-002507

**EXHIBIT A**

**DIAGRAM OF PREMISES**

**Building Outline (First Floor)**



A-1

Confidential

## EXHIBIT B

## STANDARDS FOR SERVICES AND UTILITIES

The following Standards for Services and Utilities are in effect. Landlord reserves the right to adopt nondiscriminatory modifications and additions hereto. Landlord shall:

(a)     Replace standard light bulbs and fluorescent tubes in the Premises, provided that Landlord's standard charge for such bulbs and tubes shall be paid by Tenant.

(b)     Provide reasonable lighting to the Building elevator lobbies, stairwells, corridors and hallways and restrooms at all times.

(c)     Furnish water to the public areas for drinking and lavatory purposes only.

(d)     Provide non-attended automatic elevator at all times.

(e)     During Normal Business Hours, furnish heat on such days and hours when, in the reasonable judgment of Landlord, it may be required for the comfortable occupancy of the Premises. Tenant agrees to cooperate with Landlord with respect to, and to abide by all reasonable regulations and requirements which Landlord may prescribe for, the proper functioning and protection of the Building heating system. Tenant agrees that neither Tenant nor any Tenant Party shall at any time enter mechanical installations or facilities of the Building or adjust, tamper with, touch or otherwise in any manner affect said installations or facilities.

The Premises are separately metered for electricity and Tenant shall pay the utility provider directly for Tenant's electricity service. Tenant shall not install any electrical equipment requiring special wiring or requiring voltage in excess of 110 volts unless approved in advance by Landlord, which approval shall not be unreasonably withheld, but may be conditioned upon Tenant's payment of additional charges to address the impact on the Building of such excess usage. At all times Tenant's use of electric current shall never exceed the capacity of the feeders to the Building or the risers or wiring installation and Tenant shall not install or use or permit the installation or use of any computer larger than personal computers or electronic data processing equipment in the Premises, without the prior written consent of Landlord. Any risers or wiring required to meet Tenant's excess electrical requirements shall, upon Tenant's written request, be installed by Landlord, at Tenant's cost, if, in Landlord's judgment, the same are necessary and shall not cause permanent damage to the Building or the Premises, cause or create a dangerous or hazardous condition, entail excessive or unreasonable alterations, repairs or expenses, or interfere with or disturb other tenants of the Building.

Landlord reserves the right to stop service of the elevator, plumbing, heating, electric or any of the other Building's Systems, when necessary, by reason of accident or emergency or for repairs, alterations or improvements, until said repairs, alterations or improvements shall have been completed, and shall further have no responsibility or liability for failure to supply elevator facilities, plumbing, heating, electric or any other Building service, when prevented from so doing by strike or accident or by any cause beyond Landlord's reasonable control, or by laws, rules, orders, ordinances, regulations or requirements of any federal, state, county or municipal authority or failure of electricity, gas, oil or other suitable fuel supply or inability by exercise of reasonable diligence to obtain electricity, gas, oil or other suitable fuel. It is expressly understood and agreed that any covenants on Landlord's part to furnish any service pursuant to any of the terms, covenants, conditions, provisions or agreements of this Lease, or to perform any act or thing for the benefit of Tenant, shall not be deemed breached if Landlord is unable to furnish or perform the same by virtue of a strike or labor trouble or any other cause whatsoever beyond Landlord's reasonable control.

B-1

Confidential

**EXHIBIT C**

**BUILDING RULES AND REGULATIONS**

The following rules and regulations shall apply to the Building:

1.      Tenant shall not obstruct any sidewalks, corridors, hallways, exits, entrances, stairways or the elevator of the Building.  The corridors, hallways, exits, entrances, stairways and elevator of the Building are not open to the general public, but are open, subject to reasonable regulation, to Tenant's business invitees.  Landlord shall in all cases retain the right to control and prevent access thereto of all persons whose presence in the judgment of Landlord would be prejudicial to the safety, character, reputation and interest of the Building and its tenants; provided, however, that nothing herein contained shall be construed to prevent such access to persons with whom any tenant normally deals in the ordinary course of its business, unless such persons are engaged in illegal or unlawful activities.

2.      Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or deposited therein.  Damage resulting to any such fixtures or appliances from misuse by a tenant or its agents, employees or invitees, shall be paid by such tenant.

3.      Landlord shall provide all door locks in the Premises, at Tenant's cost, and Tenant shall not place any additional door locks in the Premises or otherwise alter the door locks without Landlord's prior written consent.  Landlord shall furnish to Tenant a reasonable number of keys (and/or electronic card keys or access cards) to the Premises, at Tenant's cost, and Tenant shall not make duplicates thereof.  Landlord may require non-refundable deposits for the keys, card keys or access cards as Landlord may determine from time to time.

4.      The Building elevator shall be available for use by all tenants in the Building for ingress and egress to the upper floors of the Building.  Tenants may also use the elevator to move furniture and equipment, subject to (i) Landlord's rules and regulations applicable to the movement of furniture and equipment in effect from time to time and (ii) such reasonable scheduling as Landlord, in its discretion, shall deem appropriate.  Tenant's initial move-in and subsequent deliveries of bulky items, such as furniture, safes and similar items shall, unless otherwise agreed in writing by Landlord, be made during the hours of 6:00 p.m. to 8:00 a.m. or on Saturday or Sunday.  Deliveries during normal office hours shall be limited to normal office supplies, routine package deliveries, drinking water and other small items.  No deliveries shall be made which impede or interfere with other tenants or the operation of the Building.

5.      Tenant shall not place a load upon any floor of the Premises which exceeds the load per square foot which such floor was designed to carry.  Landlord shall have the right to prescribe the weight, size and position of all equipment, materials, furniture or other property brought into the Building.  Heavy objects shall, if considered necessary by Landlord, stand on such platforms as determined by Landlord to be necessary to properly distribute the weight, which platforms shall be provided at Tenant's expense.  Business machines and mechanical equipment belonging to Tenant, which cause noise or vibration that may be transmitted to the structure of the Premises or to any space therein to such a degree to be objectionable to Landlord or to any tenants in the Building, shall be placed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to eliminate noise or vibration.  The persons employed to move such equipment in or out of the Premises must be acceptable to Landlord.  Landlord will not be responsible for loss of, or damage to, any such equipment or other property from any cause, and all damage done to the Premises or the Building by maintaining or moving such equipment or other property shall be repaired at the expense of Tenant.

C- 1

Confidential

6.      Tenant shall not make or permit any vibration or improper, objectionable or unpleasant noises or odors in the Building or otherwise interfere in any way with other tenants or persons having business with them.  Tenant shall not use or keep on the Premises or the Building any kerosene, gasoline or inflammable or combustible fluid or material, or use any heating or air conditioning other than that supplied, or approved in advance in writing, by Landlord.

7.      No Tenant and no employee or invitee of Tenant shall go upon the roof of the Building for any reason.

8.      Corridor doors, when not in use, shall be kept closed.

9.      No portion of the Premises shall at any time be used or occupied as sleeping or lodging quarters.

10.     No birds or animals (other than guide animals or therapy animals) shall be brought into or kept in, on or about the Premises.  Notwithstanding the foregoing, Tenant's employee's dogs may be brought to and kept at the Premises when such dog's owner is present in the Building, provided that (i) Tenant shall first obtain Landlord's written consent for each dog, which consent shall not be unreasonably withheld; (ii) no more than eight (8) dogs may be brought to the Building by Tenant's employees at any given time provided however that no more than three (3) dogs weighing more than 25 pounds each shall be permitted in the Premises at any one time and all dogs must be spayed or neutered; (iii) such arrangement shall be subject to such supplemental rules and regulations regarding the dogs as shall be established by Landlord from time to time; (iv) all dogs must be restrained on a leash at all times and under no circumstances are they to be allowed to run free in the Building; and (v) Tenant shall be liable for any and all damage or injury caused by any such dogs in and around the Building, and Tenant's indemnity set forth in Section 11(d) of the Lease shall expressly apply to damage or injury caused by any such dogs.  All dogs shall be curbed off the Project (i.e., no dogs may be permitted to eliminate on any portion of the Project including the parking lots and or any area immediately adjacent to the Project, including the sidewalks adjacent to the Building). The hallways, stairwells, elevators, patios, decks, balconies, courtyards, sidewalks, parking lots and landscaping beds shall not be used for relieving of dogs' bodily functions.  Any accidental urination or defecation must immediately be removed and disposed of by the pet's owner and the area cleaned and sanitized.  The cost of cleaning and deodorizing any part of the Project due to dog "accidents" is the dog owner's obligation (however, if such cleaning is insufficient, in Landlord's reasonable judgment, then Landlord may perform cleaning and charge Tenant for the cost thereof). Within five (5) Business Days following Tenant's receipt of Landlord's written request therefor, Tenant shall provide Landlord with reasonable satisfactory evidence showing that all current vaccinations have been received by each of the dogs within the Premises.  No dogs shall be brought into the Building if any such dog is ill or contracts a disease that could potentially threaten the health or wellbeing of any tenant or occupant of the Building.  Dog owners are responsible for controlling the noise of their dogs.  Dog owners are responsible for any personal injury or property damage caused by their dogs.  Dogs shall not be left unattended in the Premises at any time, or in any area of the Building.

11.     No cooking shall be done or permitted on the Premises without Landlord's consent, except that use by Tenant of Underwriter's Laboratory approved equipment for brewing coffee, tea, hot chocolate and similar beverages or use of microwave ovens for employee use shall be permitted, provided that such equipment and use is in accordance with all applicable Laws.

12.     No vending or dispensing machines of any kind may be maintained in the Premises without the prior written consent of Landlord, other than those used solely for Tenant's employees.

13.     Without Landlord's prior written consent, which shall not be unreasonably withheld, the Premises shall not be used for the storage of merchandise held for sale to the general public.  The Premises

C- 2

Confidential

shall not be used for manufacturing of any kind, nor shall the Premises be used for any improper, immoral or objectionable purpose.

14.     Tenant shall not conduct any activity on or about the Premises or the Building that is disreputable or which may draw pickets, demonstrators, or the like.

15.     Canvassing, soliciting or peddling in or about the Project is prohibited and Tenant shall cooperate to prevent same.

16.     Tenant may use the basement area for storage at no additional charge. Storage areas must be kept organized and clean with proper means of egress.

17.     Tenant shall not conduct nor allow to be conducted any auction on the Premises or the Project.

18.     All incoming mail shall be received at the area in the Building designated by Landlord for such purposes and distributed through means established by Landlord from time to time.

19.     Tenant shall store all its trash and garbage within its Premises or in other facilities provided by Landlord. Tenant shall not place in any trash box or receptacle any material which cannot be disposed of in the ordinary and customary manner of trash and garbage disposal. All garbage and refuse disposal shall be made in accordance with directions issued from time to time by Landlord. Tenant shall comply with the Building's recycling program in effect from time to time.

20.     If Landlord objects to any curtains, blinds, shades, screens or hanging plants or other similar objects attached to or used in connection with any window or door of the Premises, or placed on any windowsill, which is visible from the exterior of the Premises, Tenant shall immediately discontinue such use. Tenant shall not place anything against or near glass partitions or doors or windows which may appear unsightly from outside the Premises.

21.     Tenant shall not permit its employees, invitees or guests to smoke in the Premises or in the lobbies, hallways, stairways, restrooms, elevator or other portions of the Building. Nor shall Tenant permit its employees, invitees or guests to loiter at the Building entrances for the purposes of smoking.

22.     Tenant shall not mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof, except in accordance with the provisions of the Lease pertaining to Alterations; provided, however, that Tenant shall be permitted to hang pictures and wall plaques on the Premises walls in the ordinary course of business. Landlord reserves the right to direct electricians as to where and how telephone wires are to be introduced to the Premises. Tenant shall not cut or bore holes for wires. Tenant shall not affix any floor covering to the floor of the Premises in any manner except as approved by Landlord. Tenant shall repair any damage resulting from noncompliance with this rule.

23.     Tenant shall not use in the Premises or the Building any hand truck except those equipped with rubber tires and side guards or such other material-handling equipment as Landlord may approve. Tenant shall not bring any other vehicles of any kind into the Building; provided, however, Tenant may allow a reasonable amount of bicycles on the Premises and may utilize the bike racks located in the parking lot.

24.     Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency from time to time.

C- 3

Confidential

25.     The ground floor directory of the Building will be provided exclusively for the display of the name and location of tenants only, and Landlord reserves the right to exclude any other names therefrom.

26.     Tenant, at Tenant's sole cost and expense, shall have the right to install mutually agreeable satellite dish(es), antennae, supplemental JVAC on the roof of the Building, along with the accompanying chase rights at no additional charge, subject to Landlord's consent, which consent shall not be unreasonably withheld; provided; however, Tenant will be responsible for the installation, maintenance and removal of all equipment, and such work shall be subject to the terms of the Lease with respect to alterations and repairs.

27.     Tenant and its telecommunications companies, including local exchange telecommunications companies and alternative access vendor services companies, shall have no right of access to and within the Building for the installation and operation of telecommunications systems, including voice, video, data, Internet and any other services provided over wire, fiber optic, microwave, wireless and any other transmission systems for part or all of Tenant's telecommunications within the Building and from the Building to any other location without Landlord's prior written consent.  All providers of any such telecommunications services shall be required to comply with the rules and regulations of the Building, applicable Laws and Landlord's policies and practices for the Building.  Tenant acknowledges that Landlord shall not be required to provide or arrange for any telecommunications services and that Landlord shall have no liability to any Tenant Party in connection with the installation, operation or maintenance of telecommunications services or any equipment or facilities relating thereto.  Tenant, at its cost and for its own account, shall be solely responsible for obtaining all telecommunications services.

28.     Tenant shall ensure that the doors of the Premises are closed and securely locked before leaving the Building and must observe strict care and caution that all water faucets or water apparatus utilized by Tenant are entirely shut off before Tenant leaves the Building, and that all electricity shall likewise be carefully shut off, so as to prevent waste or damage.

29.     Landlord will not be responsible for lost or stolen personal property, money or jewelry from the Premises or public or common areas of the Building or the Project regardless of whether such loss occurs when the area is locked against entry or not.

30.     During non-Normal Business Hours, or such other hours as may be established from time to time by Landlord, and on Saturdays, Sundays and Holidays, Tenant shall use its keys (and/or electronic card keys or access cards) for access to the Building.  Tenant shall be responsible for all persons for whom it requests keys, card keys and/or access cards, and shall be liable to Landlord for all acts of such persons. Landlord reserves the right to exclude or expel from the Building any person who, in Landlord's judgment, does not have proper identification for Building entry, is intoxicated or under the influence of liquor or drugs, or who is in violation of any of the rules and regulations of the Project.  Landlord shall not be liable for damages for any error with regard to the admission to or exclusion from the Building of any person.  Landlord reserves the right to prevent access to the Building in case of invasion, mob, riot, public excitement or other commotion by closing the doors or by other appropriate action.

31.     Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Building. Tenant assumes all responsibility for the protection of Tenant, its employees, agents, contractors and invitees and the property of Tenant and of Tenant's employees, agents, contractors and invitees from acts of third parties.  Nothing herein contained shall prevent Landlord, at Landlord's sole option, from providing security protection or security programs for the Project or any part thereof, in which event the cost thereof shall be included within the definition of Operating Costs, as set forth elsewhere in the Lease.  Landlord may implement such security programs and/or modifications thereto as Landlord deems reasonably necessary in connection with the protection of Landlord's property, and Tenant shall comply therewith.  Any such security provided by Landlord

Confidential                    SPX-002513

is for the sole purpose of access control and/or emergency preparedness and is intended to protect Landlord's property, and is not intended to provide security for Tenant's property and/or personnel in or about the Premises. In no event shall implementation of any security procedures or programs by Landlord constitute any warranty of safety or expose Landlord to any liability whatsoever regardless of whether the same are claimed to have been either insufficient or overly stringent, nor shall Tenant have the right to rely thereon. In no event shall Landlord be responsible, in any capacity or to any extent, for the entry of any person on or about the Project or for any resulting criminal or terrorist activity.

32.     Tenant, its employees, agents, contractors and invitees shall not tamper with or disable any security cameras or any Building systems in any way, including propping open doors, altering locking mechanisms or any act that might interfere with the proper operation of any doors.

33.     Tenant's requirements will be attended to only upon appropriate application to the Property Manager by an authorized individual. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord, and no employee of Landlord will admit any person (Tenant or otherwise) to any office without specific instructions from Landlord.

34.     Landlord may waive any one or more of these rules and regulations for the benefit of Tenant or any other tenant, but no such waiver by Landlord shall be construed as an ongoing waiver of such rules and regulations in favor of Tenant or any other tenant, nor prevent Landlord from thereafter enforcing any such rules and regulations against any or all of the tenants of the Building.

35.     These rules and regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of Tenant's Lease of its Premises in the Building.

36.     Landlord reserves the right to make such other and reasonable rules and regulations as, in its judgment, may from time to time be needed for safety and security, for care and cleanliness of the Building and for the preservation of good order therein. Tenant agrees to abide by all such rules and regulations hereinabove stated and any additional rules and regulations which are adopted.

37.     Tenant shall be responsible for the observance of all of the foregoing rules and regulations by Tenant's employees, agents, clients, customers, invitees and guests.

38.     Landlord shall not be responsible for the non-performance of these rules and regulations by other tenants or occupants of the Building.

C- 5

Confidential

**EXHIBIT D**

**PARKING RULES AND REGULATIONS**

The following rules and regulations shall apply to the parking lot appurtenant to the Building:

1.      Use of the parking lot is limited to tenants of the Building and their respective employees.  Tenant and its employees shall only park in their designated reserved parking spaces.

2.      Tenant shall not park or permit the parking of any vehicle under its control in any parking areas designated by Landlord as areas for parking by visitors to the Building (if any areas should be so designated by Landlord) or in areas reserved for use by other tenants of the Building.  Tenant shall not leave vehicles in the parking areas overnight, nor park any vehicles in the parking areas other than automobiles, motorcycles, motor driven or non-motor driven bicycles or four-wheeled trucks.  No overnight or extended term storage of vehicles shall be permitted.  Each vehicle must be parked entirely within the painted stall lines of a single parking stall.

3.      Parking is prohibited: (i) in areas not striped for parking; (ii) in drive aisles; (iii) where "no parking" signs are posted; (iv) in cross hatched areas; and (v) in such other areas as may be designated by Landlord from time to time.

4.      Every parker is required to park and lock his or her own vehicle.  All responsibility for damage to vehicles is assumed solely by the parker.  Landlord is not responsible for criminal activity in the parking lot and will not be providing security guards or other forms of security for the vehicles parked in the parking lot.  Furthermore, Landlord is not responsible for damage by water, fire or defective brakes, or for the acts or omissions of other tenants, their employees, agents or invitees, or for articles left in the vehicle.

5.      Tenant shall be solely responsible for having unauthorized vehicles towed from its assigned parking spaces.

6.      Costs of repairing any damage caused by Tenant or its employees to the parking lot and its associated fixtures shall be the sole responsibility of Tenant.  Costs of oil leak clean-up will be billed to the applicable tenant.

7.      The speed limit within the parking lot shall be 5 miles per hour.

8.      The gate to the parking shall be kept closed at all times other than for purposes of ingress and egress.  Tenant shall be provided with one (1) parking gate transmitter for each parking space leased by Tenant.  Parking gate transmitters or any other device providing access to the parking lot supplied by Landlord as a condition of use of the parking lot shall remain the property of Landlord.  Transmitters are not transferable and any transmitter in the possession of an unauthorized holder will be subject to rescission.  Loss or theft of parking gate transmitters from automobiles must be reported immediately, and a lost or stolen report must be filed by Tenant at that time.

9.      Washing, waxing, cleaning or servicing of any vehicle in the parking lot is prohibited.

10.     Landlord reserves the right to modify and/or adopt such other reasonable and non-discriminatory rules and regulations for the parking lot as it reasonably deems necessary.  Landlord may refuse to permit any person who violates these rules to park in the parking lot, and any violation of the rules shall subject the car to removal.

Confidential                    SPX-002515

11.    Vehicles parked in violation of these rules and regulations may be towed by Landlord without notice and the costs for towing shall be reimbursed to Landlord by the tenant whose employees, agents or guests violated these rules and regulations.

Confidential    SPX-002516

## EXHIBIT E

## FORM OF COMMENCEMENT DATE MEMORANDUM

_____, 201_

_____
_____
_____
_____

Re:    Office Lease Agreement (the "***Lease***") dated as of [Date], between [BRIDGETON PIONEER PROPERTY] LLC, a Delaware limited liability company ("***Landlord***"), and [NAME OF TENANT], a [Name of State] [Type of Entity] ("***Tenant***").  Capitalized terms used herein but not defined shall be given the meanings assigned to them in the Lease.

Ladies and Gentlemen:

      1.    **Condition of Premises**.  Tenant has accepted possession of the Premises pursuant to the Lease.  Furthermore, Tenant acknowledges that the Premises are suitable for the Permitted Use.

      2.    **Commencement Date**.  The Commencement Date of the Lease is [Date].

      3.    **Expiration Date**.  The Term is scheduled to expire on the last day of the [number] (#) full calendar month of the Term, which date is [Date].

      4.    **Contact Person**.  Tenant's contact person in the Premises is:

         _____
         _____
         _____
         Attention: _____
         Telephone: _____
         Facsimile: _____
         Email Address: _____

      5.    **Ratification**.  Tenant hereby ratifies and confirms its obligations under the Lease. Additionally, Tenant further confirms and ratifies that, as of the date hereof, (a) the Lease is and remains in good standing and in full force and effect, and (b) Tenant has no claims, counterclaims, set-offs or defenses against Landlord arising out of the Lease or in any way relating thereto or arising out of any other transaction between Landlord and Tenant.

      6.    **Binding Effect; Governing Law**.  Except as modified hereby, the Lease shall remain in full force and effect and this letter shall be binding upon Landlord and Tenant and their respective successors and assigns.  If any inconsistency exists or arises between the terms of this letter and the terms of the Lease, the terms of this letter shall prevail.  This letter shall be governed by the laws of the State of California.

      Please indicate your agreement to the above matters by signing this letter in the space indicated below and returning an executed original to us.

      Sincerely,

E-1

Confidential

BRIDGETON PIONEER PROPERTY LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

Agreed and accepted:

[NAME OF TENANT],
a [Name of State] [Type of Entity]

By:_____
Name:_____
Title:_____

E-2

SPX-002518

**EXHIBIT F**

**FORM OF TENANT ESTOPPEL CERTIFICATE**

The undersigned is the Tenant under the Lease (defined below) between [BRIDGETON PIONEER PROPERTY] LLC, a Delaware limited liability company, as Landlord, and the undersigned, as Tenant, for the premises commonly known as [INSERT SUITE #] (the "*Premises*") located on the [INSERT FLOOR #] floor of the office building commonly known as The Pioneer Building located at 3180 18th Street, San Francisco, California, and hereby certifies as follows:

1.    The Lease consists of the original Office Lease Agreement dated as of [Date] between Tenant and Landlord and the following amendments or modifications thereto (if none, please state "none"):

_____

_____.

The documents listed above are herein collectively referred to as the "*Lease*" and represent the entire agreement between the parties with respect to the Premises. All capitalized terms used herein but not defined shall be given the meaning assigned to them in the Lease.

2.    The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as provided in Section 1 above.

3.    The Term commenced on [Date], and the Term expires, excluding any renewal options, on [Date], and Tenant has no option to purchase all or any part of the Premises or the Building or, except as expressly set forth in the Lease, any option to terminate or cancel the Lease.

4.    Tenant currently occupies the Premises described in the Lease and Tenant has not transferred, assigned or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto except as follows (if none, please state "none"): _____.

5.    All monthly installments of Base Rent and Additional Rent have been paid when due through _____, 201\_\_\_. The current monthly installment of Base Rent is $_____.

6.    Tenant currently rents _____ (\_\_\_) parking spaces in the building's parking lot at a rate of $_____ per space per month.

7.    To Tenant's knowledge, all conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder. In addition, Tenant has not delivered any notice to Landlord regarding a default by Landlord thereunder.

8.    As of the date hereof, there are no existing defenses or offsets, or, to the undersigned's knowledge, claims or any basis for a claim, that the undersigned has against Landlord and no event has occurred and no condition exists, which, with the giving of notice or the passage of time, or both, will constitute a default under the Lease.

9.    No rental has been paid more than thirty (30) days in advance and no security deposit has been delivered to Landlord except as provided in the Lease.

10.    If Tenant is a corporation, partnership or other business entity, each individual executing this Estoppel Certificate on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in the State of California and that Tenant has full right and

F-1

Confidential

authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

          11.      There are no actions pending against Tenant under any bankruptcy or similar laws of the United States or any state.

          12.      Other than as approved by Landlord in writing and used in compliance with all applicable laws and incidental to the ordinary course of the use of the Premises, the undersigned has not used or stored any hazardous materials or hazardous substances in the Premises.

          13.      All tenant improvement work to be performed by Landlord under the Lease has been completed in accordance with the Lease and has been accepted by the undersigned and all reimbursements and allowances due to the undersigned under the Lease in connection with any tenant improvement work have been paid in full.

Tenant acknowledges that this Estoppel Certificate may be delivered to Landlord, Landlord's Mortgagee or to a prospective mortgagee or prospective purchaser, and their respective successors and assigns, and acknowledges that Landlord, Landlord's Mortgagee and/or such prospective mortgagee or prospective purchaser will be relying upon the statements contained herein in disbursing loan advances or making a new loan or acquiring the property of which the Premises are a part and that receipt by it of this certificate is a condition of disbursing loan advances or making such loan or acquiring such property.

Executed as of _____, 201__.

                  TENANT:     [NAME OF TENANT],
                              a [Name of State] [Type of Entity]

                              By: _____
                              Name:_____
                              Title: _____

Confidential

Exhibit G

Form of Guaranty

### GUARANTY OF LEASE

THIS GUARANTY OF LEASE, made as of June __, 2016 (the **"Effective Date"),** by ELON MUSK **("Guarantor"),** to BRIDGETON PIONEER PROPERTY LLC, a Delaware limited liability company **("Landlord").**

1.        For valuable consideration, receipt of which is acknowledged, and to induce Landlord to enter into that certain Lease Agreement dated as of June __, 2016 (the **"Lease")** herewith with Musk Industries LLC (the **"Tenant"),** Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Landlord, and agrees fully to pay, perform, satisfy and discharge, as and when payment, performance, satisfaction and discharge are due, all of the indebtedness, agreements, obligations and liabilities of the Tenant under the Lease and all amendments, modifications, renewals, extensions, supplements, substitutions and replacements of the Lease (collectively the **"Guaranteed Obligations").**  The obligations of Guarantor under this Guaranty shall be absolute, unconditional and irrevocable and shall continue and remain in full force and effect until all of the Guaranteed Obligations have been fully paid, performed, satisfied and discharged.  Guarantor acknowledges that Landlord would not enter into the Guaranteed Obligations without this Guaranty and that Landlord is relying on this Guaranty.

2.        The obligations of Guarantor under this Guaranty shall not be affected, modified or impaired by the occurrence of any of the following events, whether or not with notice to, or the consent of, Guarantor:  (a) the waiver, surrender, compromise, settlement, release or termination of any or all of the Guaranteed Obligations; (b) the failure to give notice to Guarantor of the occurrence of any breach, default or event of default under the Guaranteed Obligations; (c) the extension of the time for the payment, performance, satisfaction or discharge of any or all of the Guaranteed Obligations; (d) the amendment or modification (whether material or otherwise) of the Guaranteed Obligations in any respect; (e) any failure, omission, delay or lack on the part of Landlord to enforce, assert or exercise any right, power or remedy conferred on Landlord under the Guaranteed Obligations; (f) the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or adjustment of debts, or other similar proceedings affecting the Tenant or Guarantor or any of the assets of either of them; (g) the release or discharge by operation of law of the Tenant from the payment, performance, satisfaction or discharge of any or all of the Guaranteed Obligations; or (h) the invalidity or unenforceability of any or all of the Guaranteed Obligations due to a deficiency attributable to Tenant.

3.        The obligations of Guarantor under this Guaranty are independent of the Guaranteed Obligations.  Guarantor agrees that Landlord shall have the right to proceed against Guarantor directly and independently of the Tenant.  A separate action may be brought and prosecuted against Guarantor whether or not an action is brought against the Tenant or the Tenant is joined in any such action. Guarantor authorizes Landlord and the Tenant, without notice to, demand of, or consent from Guarantor and without releasing or affecting Guarantor's liability under this Guaranty, from time to time to amend, modify, renew, extend, supplement or replace the Guaranteed Obligations or otherwise change the terms of the Guaranteed Obligations, to take and hold collateral or security for the Guaranteed Obligations, and to enforce, waive, surrender, impair, compromise or release any such

SPX-002521

collateral or security or any or all of the Guaranteed Obligations or any person or entity liable for any or all of the Guaranteed Obligations. Guarantor shall be and remain bound under this Guaranty notwithstanding any such act or omission by the Tenant or Landlord.

4.      Guarantor fully and forever waives and relinquishes all rights, remedies and defenses of a guarantor or a surety that may otherwise exist or become available. Without limiting the foregoing, Guarantor waives all rights and defenses that are or may become available to Guarantor by reason of California Civil Code sections 2787 to 2855, inclusive.

5.      If the Tenant becomes insolvent or is adjudicated bankrupt or files a petition for reorganization, arrangement, composition or similar relief under any present or future provision of the federal Bankruptcy Code, or if such a petition is filed against the Tenant, or if the Tenant makes a general assignment for the benefit of creditors, and in any such action or proceeding any or all of the Guaranteed Obligations are terminated or rejected or any or all of the Guaranteed Obligations are modified or abrogated, then Guarantor agrees that Guarantor's liability under this Guaranty shall not thereby be affected or modified and such liability shall continue in full force and effect as if no such action or proceeding had occurred. This Guaranty shall continue to be effective or be reinstated, as the case may be, if any payment of the Guaranteed Obligations must be returned by Landlord upon the insolvency, bankruptcy or reorganization of the Tenant or Guarantor, or otherwise, as though such payment had not been made.

6.      Guarantor assumes the responsibility for being and keeping Guarantor informed of the financial condition of the Tenant and of all other circumstances bearing upon the risk of failure to pay, perform, satisfy or discharge any of the Guaranteed Obligations which diligent inquiry would reveal, and Guarantor agrees that Landlord has no duty to advise Guarantor of information known to Landlord regarding such condition or any such circumstance. Guarantor acknowledges that repeated and successive demands may be made and payments or performance required under this Guaranty in response to such demands as and when, from time to time, the Tenant defaults in the payment, performance, satisfaction or discharge of the Guaranteed Obligations. Notwithstanding any such payments and performance hereunder, this Guaranty shall remain in full force and effect and shall apply to any and all subsequent defaults by the Tenant. It is not necessary for Landlord to inquire into the capacity, authority or powers of the Tenant or the partners, directors, officers, employees, agents or representatives acting or purporting to act on behalf of the Tenant, and all of the Guaranteed Obligations made or created in reliance upon the purported exercise of such powers shall be guaranteed under this Guaranty. Guarantor hereby absolutely, unconditionally and irrevocably subordinates all indebtedness of the Tenant to Guarantor now or hereafter held by Guarantor to all indebtedness of the Tenant to Landlord. If requested by Landlord, Guarantor shall collect, enforce and receive all such indebtedness of the Tenant to Guarantor as trustee for Landlord and Guarantor shall pay such indebtedness to Landlord on account of the indebtedness of the Tenant to Landlord, but without otherwise reducing or affecting in any manner the liability of Guarantor under this Guaranty. No payment or performance by Guarantor pursuant to this Guaranty shall give Guarantor any right of subrogation to any rights or remedies of Landlord against the Tenant or any collateral or security for any or all of the Guaranteed Obligations until such time as the Guaranteed Obligations are fully satisfied. Prior to the full satisfaction of the Guaranteed Obligations, Guarantor waives all rights of subrogation to any rights or remedies of Landlord against the Tenant or any collateral or security for any or all of the Guaranteed Obligations. Guarantor waives all other rights of subrogation or reimbursement with respect to the Tenant that might otherwise arise from the performance of this Guaranty by Guarantor.

Confidential

7.    Guarantor represents and warrants to Landlord as of the date of this Guaranty as follows:

(a)    The annual financial statements of Guarantor for the year ended December 31, 2015, heretofore furnished to Landlord are true and correct in all material respects and fully and fairly present the financial condition of Guarantor as of the date thereof, and no material adverse changes have occurred in the financial condition or operations of Guarantor since the date of such financial statements other than as disclosed in writing.

(b)    Guarantor has received reasonably equivalent value in exchange for the execution, delivery and performance of this Guaranty. Guarantor is solvent and will not become insolvent as a result of the execution, delivery or performance of this Guaranty.

(c)    This Guaranty is a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms.

8.    All notices under this Guaranty shall be properly given only if made in writing and either mailed by certified mail, postage prepaid, return receipt requested, or delivered by hand (including messenger or nationally recognized courier or air express service, which regularly maintains records of items delivered) to the party at the address set forth in this paragraph or such other address as such party may designate by notice to the other party. Notices shall be effective on the date of delivery at the address of the receiving party. If any notice is not received or cannot be delivered because the receiving party changed the address of the receiving party and did not previously give notice of such change to the sending party or due to a refusal to accept such notice by the receiving party, such notice shall be effective on the date delivery is attempted. Any notice under this Guaranty may be given on behalf of a party by the attorney for such party.

(a)    The address of Guarantor is:

Elon Musk,
c/o Musk Industries
1 Rocket Road
Hawthorn CA 90250

(b)    The address of Landlord is c/o Bridgeton Holdings, 220 Fifth Avenue, New York, NY 10001, Attention Atit Jariwala.

9.    If the Tenant and Guarantor fail to pay, perform, satisfy and discharge, as and when payment, performance, satisfaction and discharge are due, all of the Guaranteed Obligations, Landlord shall have the right, but no obligation, and without releasing the Tenant or Guarantor from any of the Guaranteed Obligations, to pay, perform, satisfy and discharge any or all of the Guaranteed Obligations on behalf of the Tenant and Guarantor. Subject to the Maximum Liability set forth in Paragraph 11, Guarantor shall, on demand, pay to Landlord all sums expended by Landlord in the payment, performance, satisfaction or discharge of any of the Guaranteed Obligations, together with interest on all such sums from the date of expenditure to the date all such sums are paid by the Tenant or Guarantor to Landlord at the lessor of (i) an

Confidential

annual interest rate of ten percent (10%) or (ii) the maximum per annum rate of interest permitted from time to time under applicable law. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty. Guarantor agrees to pay all costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, which are incurred by Landlord in the enforcement of this Guaranty. As used in this Guaranty, the singular shall include the plural. If Guarantor comprises more than one person or entity, all obligations of Guarantor under this Guaranty shall be the joint and several obligations of each such person or entity. Time is of the essence of this Guaranty. This Guaranty shall bind and inure to the benefit of Guarantor and Landlord and their respective transferees, personal representatives, heirs, successors and assigns. This Guaranty shall be governed by and construed in accordance with the laws of the State of California. If any provision of this Guaranty is held to be invalid or unenforceable, the validity or enforceability of the other provisions of this Guaranty shall not be affected. Guarantor irrevocably and unconditionally accepts and consents to jurisdiction in the State of California in any action or proceeding relating to this Guaranty, agrees to the venue of any such action or proceeding in any state court in the City and County of San Francisco or in any federal court whose district includes the City and County of San Francisco, and waives any objection to any such venue on the basis of inconvenient forum. Guarantor consents to service of process in any such action or proceeding by any means permitted by California law. Guarantor waives all right to trial by jury in any such action or proceeding.

      10.    This Guaranty may not be amended or modified in any respect except by a written agreement signed by Guarantor and Landlord. There are no oral agreements between Guarantor and Landlord relating to this Guaranty. Upon the death or bankruptcy of Guarantor, the liability of Guarantor shall continue against its assets as to all Guaranteed Obligations which shall have been incurred by Tenant. This Guaranty constitutes the entire and integrated agreement between Guarantor and Landlord relating to this Guaranty and supersedes all prior agreements, understandings, offers and negotiations, oral or written, with respect to this Guaranty. If at any time Landlord so requests, Guarantor shall reaffirm its obligations under this Guaranty and any obligations that may arise under the Lease or any amendment thereto. Landlord shall consent to any reasonable modifications to this Guaranty with respect to Landlord's rights to enforce this Guaranty.

[SIGNATURE PAGE TO FOLLOW]

Confidential

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the Effective Date.

                  _____

                  ELON MUSK

Confidential