# EXHIBIT 51

**In the Matter Of:**

*MUSK v*

*ALTMAN*

*ROBERT WU*

*October 03, 2025*



```
                                                               1
 1              UNITED STATES DISTRICT COURT
 2                NORTHERN OF CALIFORNIA
 3                   OAKLAND DIVISION
    _____
 4  ELON MUSK, et al.,            )
                                  )
 5          Plaintiffs,           )
                                  )
 6  v.                            )  Case No. 4:24-cv-04722-YGR
                                  )
 7  SAMUEL ALTMAN, et al.,        )
                                  )
 8          Defendants.           )
    _____)
 9


        ** CONTAINS HIGHLY CONFIDENTIAL AND HIGHLY
       CONFIDENTIAL BUSINESS STRATEGY INFORMATION **
            VIDEOTAPED DEPOSITION of OPENAI
          by and through its corporate designees
                  San Francisco, California
                   Friday, October 3, 2025




                  Reported Stenographically by
            Michael P. Hensley, RDR, CSR No. 14114
```

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2                 NORTHERN OF CALIFORNIA
 3                    OAKLAND DIVISION
   _____
 4 ELON MUSK, et al.,        )
                             )
 5          Plaintiffs,      )
                             )
 6 v.                        )  Case No. 4:24-cv-04722-YGR
                             )
 7 SAMUEL ALTMAN, et al.,    )
                             )
 8          Defendants.      )
   _____)
 9
10
11       Videotaped Deposition of OPENAI, commencing at
12 the hour of 9:08 AM and concluding at the hour of
13 6:32 PM on Friday, October 3, 2025, at the location
14 of Morrison & Foerster LLP, 425 Market Street,
15 San Francisco, California 94105, before Michael
16 Hensley, Registered Diplomate Reporter, Certified
17 Shorthand Reporter No. 14114, in and for the State
18 of California.
```

## Page 3

```
 1 APPEARANCES:
 2 For Plaintiffs:
 3        MOLOLAMKEN LLP
          BY:  ALEX EYNON, ESQ.
 4        430 Park Avenue
          New York, New York 10022
 5        212.607.8174
          aeynon@mololamken.com
 6
 7        MOLOLAMKEN LLP
          BY:  ROBERT K. KRY, ESQ.
 8        600 New Hampshire Avenue, N.W.
          Washington, D.C. 20037
 9        202.553.2011
          rkry@mololamken.com
10
   For Defendant Microsoft Corporation:
11        DECHERT LLP
          BY:  JAY JURATA , ESQ.
12        1900 K Street, NW
          Washington, D.C. 20006
13        202.261.3440
          jay.jurata@dechert.com
14
15        DECHERT LLP
          BY:  HANNAH LEONE, ESQ.
16        45 Fremont Street, 26th Floor
          San Francisco, California 94105
17        415.262.4543
          hannah.leone@dechert.com
18
19 For Defendant OpenAI:
20        WACHTELL, LIPTON, ROSEN & KATZ
          BY:  STEVEN P. WINTER, ESQ.
21             ZACHARY M. DAVID, ESQ.
               EMILY P. ROSS, ESQ.
22        51 West 52nd Street
          New York, New YOrk 10019
23        212.403.1116
          swinter@wlrk.com
24        zmdavid@wlrk.com
          epross@wlrk.com
25
```

## Page 4

```
 1 APPEARANCES (CONTINUED):
 2 For Defendant OpenAI:
 3        MORRISON & FOERSTER, LLP
          BY:  CAMILA A. TAPERNOUX, ESQ.
 4        425 Market Street
          San Francisco, California 94105
 5        415.268.6273
          ctapernoux@mofo.com
 6
 7 Also Present:
 8        RENNY HWANG, ESQ.
 9        ALEJANDRO ZAMORA RUIZ, Videographer
10
11 Present Remotely:
12        ROBERT CASTILLO, AV Monitor
13        BRADLEY WILSON, ESQ.
14        NATE CULLERTON, ESQ.
15        JENNIFER SCHUBERT, ESQ.
16        STEVEN MOLO, ESQ.
17        SARA TOFIGHBAKHSH, ESQ.
```

## Page 5

```
 1                        INDEX
 2
 3                    EXAMINATIONS
 4                                              Page
 5 WITNESS:  ROBERT WU
 6    BY ATTORNEY EYNON                          12
 7 WITNESS:  NORA PUCKETT
 8    BY ATTORNEY EYNON                         252
 9    BY ATTORNEY WINTER                        280
10
11                      EXHIBITS
12 No.            Description                   Page
13 1    OpenAI, Inc.'s Responses and             13
      Objections to Plaintiff's Notice of
14    Deposition Pursuant to Fed. R. Civ.
      P. 30(b)(6)
15
   2    Bates Number 2024MUSK-0003115 -          21
16    0003133:  Initial Registration for
      OpenAI, Inc.
17
   3    Bates Number OPENAI_MUSK00000419 -       23
18    00000421:  Amended and Restated
      Certificate of Incorporation of
19    OpenAI, Inc. A Nonprofit non-Stock
      Corporation
20
   4    Bates Number 2024MUSK- 0003112 -         32
21    0003114:  Initial Registration Form
      State of California
22
   5    Bates Number 2024MUSK-0011569 -          41
23    0011571:  OpenAI Charter
```

Page 98

1   THE WITNESS: My understanding is that the
2   agreement, as laid out in the investment agreements,
3   was that the FCLP interest would have a capped TRA
4   multiple of 100X.
5       ATTORNEY EYNON: Okay.
6       May I have Tab 14, please.
7       You can set that aside.
8       Before I hand over what will be
9   Exhibit 16, I should ask you did you review a
10  structure chart for OpenAI LP to prepare for your
11  deposition today?
12      THE WITNESS: I did.
13  BY ATTORNEY EYNON:
14  Q.  You did?
15  A.  Yes.
16  Q.  Has that chart been produced in this
17  litigation?
18  A.  Yes.
19      ATTORNEY EYNON: Okay.
20      This is Exhibit 16.
21      (Exhibit 16 was marked for
22      identification.)
23  BY ATTORNEY EYNON:
24  Q.  This -- is this the structure chart that
25  you reviewed?

Page 99

1   A.  No. I reviewed another structure chart
2   showing the entities in the OpenAI enterprise.
3   Q.  Is the structure -- sorry. Go ahead.
4   A.  No, no. Go ahead.
5   Q.  Is the structure chart you reviewed the
6   one that's at Tab 5 of your --
7       ATTORNEY WINTER: I think it's Tab 4.
8       THE WITNESS: I think it's Tab 4 for us.
9   BY ATTORNEY EYNON:
10  Q.  Tab 4?
11  A.  Yes.
12  Q.  Okay.
13      So you did not review a structure chart
14  of -- that included OpenAI LP?
15      ATTORNEY WINTER: Objection to form.
16      THE WITNESS: Well, the structure chart in
17  Tab 4 does include OpenAI LP, which became OpenAI
18  OpCo LLC. But, no, I have not reviewed what you
19  have handed over in Exhibit 16.
20  BY ATTORNEY EYNON:
21  Q.  Thank you.
22      I will represent to you that the
23  production data for this chart that was just handed
24  up to you shows a date of -- in March 2019.
25  A.  Okay.

Page 100

1       ATTORNEY WINTER: Is there -- Counsel, is
2   there -- is that just the metadata, or is there any
3   email attachments or anything like this?
4       ATTORNEY EYNON: It's the metadata.
5       ATTORNEY WINTER: Okay.
6   BY ATTORNEY EYNON:
7   Q.  Is this a structure chart for OpenAI LP?
8       ATTORNEY WINTER: Objection to form.
9       THE WITNESS: Based on my preparation,
10  this appears, generally, to present, at a high
11  level, the overall structuring of OpenAI LP and
12  OpenAI, Inc., and certain other entities in the
13  OpenAI enterprise.
14  BY ATTORNEY EYNON:
15  Q.  Is there anything about this chart that is
16  inaccurate?
17      ATTORNEY WINTER: Objection to form.
18      THE WITNESS: I can't say whether there --
19  every arrow and detail in this chart is accurate,
20  but it generally seems to represent the structure at
21  that time.
22  BY ATTORNEY EYNON:
23  Q.  Was the OpenAI LP entity in the middle
24  managed by OpenAI GP LLC?
25  A.  My understanding is, yes, OpenAI GP LLC,

Page 101

1   was the member manager of OpenAI LP.
2   Q.  Was that general partner controlled by the
3   board of directors of OpenAI, Inc., the nonprofit?
4   A.  Correct in that OpenAI, Inc., was the
5   single member manager of OpenAI GP LLC, and the
6   board of directors is the governing body of OpenAI,
7   Inc.
8   Q.  The chart has an arrow that shows --
9   that -- it has an arrow coming from OpenAI, Inc.,
10  and the text over the arrow says "assets."
11      Does that reflect that assets were
12  transferred from OpenAI, Inc., to OpenAI LP?
13  A.  I can't speak to this specific chart
14  because this is the first time I've reviewed it.
15  But my -- if you're asking for my view, my -- I
16  would guess that this represents OpenAI, Inc.'s
17  contribution into OpenAI LP in exchange for an FCLP
18  interest or a limited partner interest in OpenAI LP.
19  Q.  Okay.
20      And that is, in fact, what happened;
21  correct?
22      ATTORNEY WINTER: Objection to form.
23      THE WITNESS: OpenAI, Inc., did contribute
24  certain assets in 2019 open -- into OpenAI LP, and
25  in exchange it received economic interest in OpenAI

Page 102

1  LP, both through its first closed limited
2  partnership interest and what we refer to as the
3  "residual interest."
4  BY ATTORNEY EYNON:
5      Q.  What assets did OpenAI, Inc., transfer to
6  OpenAI LP in 2019?
7      A.  OpenAI, Inc., primarily contributed IP
8  into OpenAI LP in exchange for the FCLP interest in
9  residual, and, also, most employees, I believe, at
10 that time, had moved over into OpenAI LP at some
11 point in 2019.
12     Q.  Which intellectual property did OpenAI,
13 Inc., transfer to OpenAI LP in 2019?
14     A.  My understanding is that was substantially
15 all of the IP that was developed at the nonprofit at
16 that point in time was contributed down to OpenAI
17 LP.
18     Q.  Okay.
19         Did OpenAI, Inc., transfer any other
20 assets to OpenAI LP?
21         ATTORNEY WINTER:  Objection to form.
22         THE WITNESS:  I can't recall specifically
23 if other assets were contributed down, but my
24 understanding is that substantially -- what
25 compromised the -- substantially, all of the assets

Page 103

1  that went down were IP and employees.
2  BY ATTORNEY EYNON:
3      Q.  Okay.
4          What assets were left in OpenAI, Inc., if
5  any?
6          ATTORNEY WINTER:  Objection to form.
7          You can answer, if you can.
8          THE WITNESS:  I don't remember -- or I
9  don't recall specifics.  I think certain employees
10 remained at OpenAI, Inc.  I think it retained
11 certain IP, including, for example, trademarks to
12 OpenAI and perhaps there were other assets.
13 BY ATTORNEY EYNON:
14     Q.  Is there anything else you can think of,
15 sitting here right now?
16     A.  I can't recall, sitting here right now,
17 any other assets that were specifically retained.
18     Q.  You mentioned that employees were
19 transferred from the nonprofit to OpenAI LP.
20         How many employees moved over?
21     A.  I don't recall the specific number.  If
22 you are asking me based on kind of just my general
23 knowledge and preparation, I would guess 100 to 200
24 at that time.  I don't recall the size of OpenAI LP,
25 at that point.

Page 104

1      Q.  You also mentioned that --
2          (Sotto voce discussion.)
3  BY ATTORNEY EYNON:
4      Q.  You also mentioned that some of the
5  employees were left in the nonprofit.
6          Which employees remained with the
7  nonprofit?
8      A.  I don't recall off the top of my head.  I
9  think it was a -- yeah, I can't -- I don't recall.
10     Q.  Okay.
11         Do you recall how many employees were left
12 with the nonprofit?
13     A.  I don't recall specifics, but I believe
14 most of the researchers and the like had transferred
15 over to OpenAI LP.
16     Q.  Do you know why some employees were left
17 in the nonprofit?
18     A.  I don't want to speculate.  There were, I
19 think -- there were activities at the nonprofit
20 level in terms of nonprofit activities, in terms of
21 initiatives and programs that they had in place that
22 may have been appropriate to stay at the nonprofit.
23 And I think there were also employees that had to
24 support administrative functions and operational
25 kind of activities there.

Page 105

1      Q.  Besides OpenAI, Inc., and OpenAI LP, did
2  any other entities shown in this chart have any
3  employees?
4      A.  In this chart?
5      Q.  Yeah.
6      A.  I don't believe OpenAI GP had any
7  employees.  I do not believe OpenAI Holdings LP
8  employed any employees.  Investors, I don't -- I
9  think that is just referring to investors generally;
10 so, no, I don't think any other entities on here had
11 OpenAI employees.
12     Q.  Besides the nonprofit OpenAI, Inc., did
13 any other entities shown in this chart have a board
14 of directors?
15     A.  OpenAI GP LLC, OpenAI LP, and OpenAI
16 Holdings LP, to my understanding, do not have a
17 board of directors.
18     Q.  Thank you.  You can set that aside, and
19 now I would like you to turn back to Exhibit 13.
20         Okay.
21         This is the document we looked at very
22 briefly earlier that's titled "Amended and Restated
23 Limit Partnership Agreement of OpenAI LP."  And it's
24 dated July 2nd, 2019.
25         Take a moment to look at this document, if

## Page 118

1  ATTORNEY WINTER: Objection to form.
2  THE WITNESS: With respect to its FCLP
3  interest specifically?
4  BY ATTORNEY EYNON:
5  Q. Yes.
6  A. I believe after Step 2A, which they
7  receive their capital commitments, then the next
8  step in the waterfall would be that payouts are
9  distributed 25 percent pro rata to the first closed
10 limited partners, which would include the nonprofit
11 and the employee vehicle. And then 75 percent of
12 all payments would go to the second closed limited
13 partner -- well, until they receive -- the second
14 closed limited partner receives its capital
15 commitment.
16  And then Step 3, finally, is that the
17 first closed limited partners, including the
18 nonprofit and the employee vehicle and the second
19 closing -- second closed limited partner, receive
20 pro rata -- or participate pro rata based on their
21 TRAs in any distributions until their respective
22 target redemption amounts are hit.
23  Q. After it receives its capital contribution
24 and its target redemption amount, is the nonprofit
25 entitled to receive any further distributions under

## Page 119

1  this agreement before all the -- all of the limited
2  partners receive their full target redemption
3  amounts?
4  ATTORNEY WINTER: Objection to form.
5  THE WITNESS: Based on my review of this
6  agreement in front of me right now, the nonprofit
7  only participates in its residual after the other
8  limited partners receive their TRAs.
9  BY ATTORNEY EYNON:
10 Q. Okay.
11  Turning to the next page of the agreement,
12 there's a section 6 point -- there's Section 6,
13 "Administration," and then Section 6.2, "Management
14 By the General Partner."
15  This provision states:
16  [As Read] Notwithstanding any other
17  provisions of this agreement to the
18  contrary, the general partner shall not,
19  in the exercise of its general control and
20  decision making authority, as more
21  particularly described in this Section 6,
22  take or cause the partnership to take any
23  of the actions described as a major
24  decision without in each instance first
25  obtaining the approval of a majority in

## Page 120

1  interest of the limited partners based on
2  their capital contributions.
3  Under this provision, did anything defined
4  in this agreement as a major decision require an
5  approval of the majority of limited partners as
6  measured by their capital contributions?
7  ATTORNEY WINTER: Objection to form.
8  You can answer, if you can.
9  THE WITNESS: Are you asking whether there
10 was ever a major decision, like, vote held? Or,
11 sorry --
12 BY ATTORNEY EYNON:
13 Q. Sorry. Go ahead.
14 A. No, I was just -- maybe if you could reask
15 the question.
16 Q. I'm just asking whether this provision
17 means that OpenAI needs the approval of a majority
18 of the limited partners to undertake anything that
19 this agreement defines as a major decision?
20  ATTORNEY WINTER: Objection to form.
21 Misstates the provision.
22  You can answer if you can.
23  THE WITNESS: Having not read the entire
24 provision right now --
25  ATTORNEY WINTER: To be clear, if you need

## Page 121

1  to read the provision, you can read the provision to
2  answer counsel's question.
3  THE WITNESS: Well, maybe I'll take some
4  time to read this actual provision, then.
5  Okay. So based on my review of 6.2A,
6  correct that a majority in interest of the limited
7  partners based on their capital contributions that
8  would need -- we need approval from that group.
9  OpenAI would need approval from that group before it
10 could take any actions which are listed as major
11 decisions, as defined.
12 BY ATTORNEY EYNON:
13 Q. Was Microsoft's capital commitment of
14 1 billion much bigger than the capital commitments
15 of all of the other limited partners combined?
16  ATTORNEY WINTER: Objection to form.
17  THE WITNESS: The capital commitment of
18 1 billion is larger than the capital invested by the
19 other first closed limited partners.
20 BY ATTORNEY EYNON:
21 Q. Yeah. I think earlier you said that the
22 capital commitment of the other first closed limited
23 partners was something like 190 million?
24 A. Yeah. I mean, we could add it up in
25 Schedule A; but, yes, I think it roughly comes out

Page 122

```
 1   to 198 million.
 2        Q.   And 1 billion is significantly larger --
 3        A.   Yes.
 4        Q.   -- than 190 million?
 5        A.   Correct.
 6        Q.   Under this 6.2 provision, would Microsoft,
 7   therefore, have the majority of the voting share as
 8   measured by its capital contribution?
 9        A.   At this particular time, if the limited
10   partners did not change, yes, Microsoft would have
11   the majority --
12        Q.   Okay.
13        A.   -- in any limited partner vote.
14        Q.   Only a few more questions, and then we can
15   take a break.
16             Do you know whether this provision,
17   including the major decisions provision, was in the
18   original limited partnership agreement we looked at
19   earlier?
20        A.   I don't recall off the top of my head.
21   The -- are you referring to the 2018?
22        Q.   Yes.  So it would be under Section 6.2 in
23   that agreement.
24        A.   Yeah.  It doesn't appear that there's any
25   major decisions defined term in here.
```

Page 123

```
 1        Q.   Okay.
 2             Do you know whether Microsoft asked for
 3   this major decisions provision in the July 2019 --
 4   to be added to the July 2019 limited partnership
 5   agreement?
 6             ATTORNEY WINTER:  Objection.
 7             THE WITNESS:  I don't know.
 8   BY ATTORNEY EYNON:
 9        Q.   Okay.
10             If you would turn to the page stamped
11   59963, there's a defined term here for major
12   decisions.
13             It says "major decisions shall include the
14   following," and a list of -- a list follows.
15             Item 7 in the list says:
16             [As Read]  Effect or permit a merger
17             division or consolidation of the
18             partnership with or into another person
19             that would have a material adverse effect
20             on the partnership or result in a
21             conversion, division, transfer, or
22             domestication of the partnership to
23             another form or jurisdiction or knowingly
24             take or permit any other action to occur
25             that would adversely affect or otherwise
```

Page 124

```
 1   alter the structure of the partnership.
 2             Are changes to the structure of OpenAI one
 3   of the situations that falls under this definition
 4   of major decisions?
 5             ATTORNEY WINTER:  Objection to form.
 6   Document speaks for itself.
 7             You could answer, if you can.
 8             THE WITNESS:  Yeah, I don't think any
 9   change to the structure would necessarily trigger
10   romanette 7 of major decisions.  I think -- again
11   it's kind of laid out in the definition certain
12   types of changes to the structure that would have
13   material adverse affect on the partnership or result
14   in a conversion, et cetera, et cetera, would trip
15   the major decision definition.
16   BY ATTORNEY EYNON:
17        Q.   I read it to say that would affect or
18   permit a merger division or consolidation of the
19   partnership, et cetera, et cetera, that would have a
20   material adverse affect on the partnership or result
21   in a conversion, division, transfer, or
22   domestication of the partnership to another form or
23   jurisdiction or knowingly take or permit any other
24   action to occur that would adversely affect or
25   otherwise alter the structure of the partnership?
```

Page 125

```
 1             ATTORNEY WINTER:  Objection.  Is that a
 2   question?
 3   BY ATTORNEY EYNON:
 4        Q.   Do you -- so let me ask you again.
 5             Does this provision require the limited
 6   partners to approve any change in the structure of
 7   OpenAI LP?
 8             ATTORNEY WINTER:  Objection to form.
 9   Asked and answered.  Document speaks for itself.
10             And I'll also instruct the witness not to
11   reveal any privileged legal advice in connection
12   with this provision or any other aspect of the
13   agreement.
14             THE WITNESS:  I think what you just laid
15   out is the actual definition of the term; so I'm not
16   going to disagree with that.  There is a proviso
17   coming after that, but yeah.
18   BY ATTORNEY EYNON:
19        Q.   Okay.
20             Does this provision -- does the -- does
21   this provision effectively require that Microsoft
22   approve any change to the structure of the limited
23   partnership?
24             ATTORNEY WINTER:  Objection.  Misstates
25   his testimony.
```

Page 134

1 Under this provision, did the nonprofit
2 and the limited partnership retain final
3 decision-making authority over whether models were
4 safe enough to release?
5     ATTORNEY WINTER:  Objection to form.
6     THE WITNESS:  Won't speak to the details
7 of this whole safety review process, but I do -- my
8 understanding is that there was a joint safety
9 review process as part of the JDCA where both
10 Microsoft and OpenAI would review any major large
11 model deployments for safety and other criteria and
12 would jointly decide on whether that criteria had
13 been met.
14     I don't know whether, to the level of
15 specificity, if there was a deadlock or -- or other
16 kind of situation, who ultimately retained control
17 or how that would play out.
18 BY ATTORNEY EYNON:
19   Q.  Thank you.
20     Looking at the provision -- the safety
21 review provision in this agreement, does it provide
22 that LP and OpenAI will make a final decision on
23 safety review?
24     ATTORNEY WINTER:  Objection to form.
25     THE WITNESS:  I won't speak for the whole

Page 135

1 contract as to whether there are other kind of
2 provisions that might apply in any kind of dispute
3 resolution.
4     I think the language you are quoting
5 specifically kind of speaks for itself.  LP and
6 OpenAI will make a final decision on safety review.
7 BY ATTORNEY EYNON:
8   Q.  Do you know whether the joint safety board
9 was created under later versions of this JDCA
10 agreement?
11     ATTORNEY WINTER:  Objection to form.
12     THE WITNESS:  I don't recall.
13     ATTORNEY EYNON:  Okay.
14     You can set this aside.
15     And I will now mark Exhibit 18.
16     (Exhibit 18 was marked for
17     identification.)
18 BY ATTORNEY EYNON:
19   Q.  This -- this document has beginning Bates
20 stamp MSFT_MUSK000064573.
21     Mr. Wu, what is this document?
22   A.  This appears to be the second amended and
23 restated limited partnership agreement of OpenAI LP.
24   Q.  And what's the date on the document?
25   A.  March 6th, 2021.

Page 136

1   Q.  Under this agreement, did Microsoft agree
2 to invest an additional $2 billion into OpenAI?
3   A.  Yes.  I believe this is the agreement
4 that -- or the amendment to the LP that was entered
5 into in connection with Microsoft's investment in
6 2021.
7   Q.  Did the OpenAI board vote to approve this
8 deal?
9   A.  I believe, yes, OpenAI's board -- OpenAI,
10 Inc.'s board voted to approve this deal.
11   Q.  Did the entire board vote to approve it or
12 just certain members of OpenAI, Inc.'s board?
13   A.  I don't recall.
14   Q.  Would you please turn to Schedule A, which
15 begins on page 64658.
16     Does this schedule reflect the capital
17 commitments and the target redemption amounts for
18 the limited partners?
19   A.  Yes.
20   Q.  On the second page of Schedule A, does
21 this agreement show both of Microsoft's capital
22 commitments?
23   A.  Yes.
24   Q.  At this point had Microsoft already
25 contributed all of its $1 billion initial capital

Page 137

1 commitment to OpenAI LP?
2   A.  I don't know.
3   Q.  Do you know when Microsoft contributed its
4 second $2 billion capital commitment?
5   A.  I don't know.  There is a contribution,
6 and then part of that is also credited against
7 compute build-out.
8   Q.  The target redemption amount for
9 Microsoft's second $2 billion commitment is set at
10 $12 billion.
11     That's a six-times return multiple; right?
12   A.  Correct.
13   Q.  How did OpenAI arrive at that multiple?
14   A.  I don't know how the board and Microsoft
15 arrived at that specific multiple.  Again, all of
16 these investments, I think, were a balancing of
17 ensuring that the nonprofit received good terms but
18 also balanced the need to attract top investors and
19 bring in the capital needed to advance the mission.
20   Q.  Why was the multiple for this second
21 capital commitment lower than the 20X multiple for
22 Microsoft's first-round investment?
23   A.  I don't know specifically why it was lower
24 or why it was set at 2X.  Again, I think years had
25 passed at that point, and given -- taking into

MUSK v.
ALTMAN
Case 4:24-cv-04722-YGR   Document 379-82   Filed 01/06/26   Page 10 of 20
30(b)(6), Highly Confidential
Robert Wu
October 03, 2025

Page 142

1  the agreement?
2      A.  Sorry, the provision was 6.2?
3      Q.  6.2A.
4      A.  6.2A does state that any major -- before
5  any major decision can be taken, the approval of the
6  majority and interest of limited partners is
7  required.
8      Q.  At this point, did Microsoft still have
9  the vast majority of the voting shares under this
10 provision as determined by capital contributions?
11     ATTORNEY WINTER:  Objection to form.
12     THE WITNESS:  Microsoft did hold a
13 majority of the capital contributions made by
14 limited partners at this time in March 2021.
15 BY ATTORNEY EYNON:
16     Q.  And under this agreement, did major
17 decisions still include restructuring decisions?
18         And if you can turn to page -- the page
19 ending 64587.
20     ATTORNEY WINTER:  Objection to the form.
21     THE WITNESS:  In this particular agreement
22 major decisions, if you're referring to romanette 7,
23 do cover certain actions, including merger division
24 or consolidation or actions that would adversely
25 affect or otherwise alter the structure of the

Page 143

1  partnership.
2      ATTORNEY EYNON:  Thank you.  You can set
3  that aside.  And I will now mark Exhibit 19.
4         (Exhibit 19 was marked for
5         identification.)
6  BY ATTORNEY EYNON:
7      Q.  In connection with -- well, first, let me
8  state for the record that Exhibit 17 is a document
9  with beginning Bates stamp --
10     ATTORNEY WINTER:  I think we're on 19.
11     ATTORNEY EYNON:  Oh, Exhibit 19 is a
12 document with beginning Bates stamp
13 OPENAI_MUSK0010268.
14 BY ATTORNEY EYNON:
15     Q.  Mr. Wu, what is this document?
16     A.  This appears to be the amended and
17 restated draft of the joint development and
18 collaboration agreement that was entered into
19 effective March 5th, 2021.
20     Q.  Okay.
21         And what -- oh, great.
22         In connection with Microsoft's -- did
23 Microsoft enter into this agreement in connection
24 with its additional $2 billion investment?
25     ATTORNEY WINTER:  Objection to form.

Page 144

1      THE WITNESS:  Microsoft did enter into
2  this amended and restated JDCA at around the same
3  time as it entered into the limited partnership
4  agreement on March 6th, 2021.
5  BY ATTORNEY EYNON:
6      Q.  On the first page of the terms and
7  conditions in this agreement, there is a term "AGI"
8  or artificial general intelligence that's -- that
9  states:
10         [As Read]  AGI or artificial general
11         intelligence means a highly autonomous
12         system that outperforms humans at most
13         economically valuable work.
14         How did OpenAI come up with that
15 definition of AGI?
16     ATTORNEY WINTER:  Objection to form.
17     THE WITNESS:  I don't know.
18 BY ATTORNEY EYNON:
19     Q.  Does this term reflect what OpenAI
20 understood AGI to be at the time it executed this
21 agreement?
22     ATTORNEY WINTER:  Object as outside the
23 scope.
24         You can answer if you can.
25     THE WITNESS:  I don't know.

Page 145

1  BY ATTORNEY EYNON:
2      Q.  Directing you to -- if you turn the page,
3  on the page with Bates stamp ending in 10272,
4  there's a term "Licensed IP."
5         Did Microsoft license additional OpenAI IP
6  under this agreement?
7      ATTORNEY WINTER:  Objection to the form.
8      THE WITNESS:  Based on my understanding,
9  the second -- or, sorry, the amended and the
10 restated JDCA, Microsoft did get a license to
11 certain IP that was not defined as licensed IP in
12 the JDCA of 2019.
13 BY ATTORNEY EYNON:
14     Q.  What additional IP did OpenAI license to
15 Microsoft under this agreement?
16     A.  I can't speak to that with any level of
17 specificity.  I can't speak to the technical details
18 of everything that is laid out in licensed IP, but I
19 do know that Microsoft did receive a license to
20 certain of OpenAI's IP at that time that this was
21 entered into.
22     Q.  This provision states that:
23         [As Read]  Licensed IP means all (i)
24         trained models of LP, OpenAI, or both (or
25         of any of their respective affiliates)

Page 146

```
 1          developed at any time during the term,
 2          (ii), GPT-3, and (iii) the Odyssey Period
 3          Models, in each case, in object code form.
 4          For clarity, Licensed IP excludes:  (x)
 5          any research; (y) all related IP; and
 6          (z) AGI.
 7          What are trained models?
 8          ATTORNEY WINTER:  Objection to the form.
 9          THE WITNESS:  I don't know if I can speak
10   to that with any technical detail.  We can look at
11   the definition.  It looks like it's a model for
12   which the parameters and model weights perhaps have
13   been fixed and completed.
14   BY ATTORNEY EYNON:
15       Q.   What is GPT-3?
16       A.   That is the name of one of OpenAI's models
17   that, I believe, was in development or perhaps
18   launched around this time in 2021.
19       Q.   What are the Odyssey period models
20   referred to in this provision?
21       A.   I don't know.
22       Q.   On the following page, there's a
23   definition of Odyssey period models.  It says:
24          [As Read]  Odyssey period models means
25          trained models other than GPT3 developed
```

Page 147

```
 1          by LP or OpenAI before the effective date
 2          during the period commencing on July 2nd,
 3          2019.
 4          So is an Odyssey period model a trained
 5   model developed after the first JDCA but before the
 6   effective date of this agreement?
 7       A.   Based on my view of this definition, yes,
 8   it appears that it's trained models as defined other
 9   than GPT-3 developed by OpenAI --
10       Q.   Okay.
11       A.   -- between July 2nd, 2019, and March 5th,
12   2021.
13       Q.   Okay.
14          Was AGI excluded from the licensed IP
15   under this agreement?
16       A.   Based on my review now, it looks like AGI
17   was excluded from the defined term "licensed IP."
18       Q.   Why was AGI excluded?
19          ATTORNEY WINTER:  Object to the form.
20          THE WITNESS:  I don't know.
21   BY ATTORNEY EYNON:
22       Q.   Other than -- well, directing you, first,
23   to page 10283, there's a provision here titled
24   "Commercialization of Licensed IP and Related IP."
25          Did this give -- did this agreement give
```

Page 148

```
 1   Microsoft the right to commercialize OpenAI's IP in
 2   its own products?
 3       A.   My understanding is that Microsoft did
 4   receive a license to commercialize certain licensed
 5   IP pursuant to this agreement.  I can't speak to the
 6   specifics of exactly all of the licensed IP that was
 7   permitted to be commercialized but --
 8          Yeah.
 9       Q.   Do you know -- do you know what specific
10   product -- Microsoft products used OpenAI's
11   intellectual property under this 2021 JDCA?
12       A.   I don't.
13       Q.   Romanette 3 on this page is
14   "Commercialization Revenue."  That provision states:
15          [As Read]  Microsoft and it's
16          affiliates will receive all revenue
17          generated by any party during the term and
18          by Microsoft or its affiliates after the
19          term through commercialization of licensed
20          IP, related IP, or foreground IP.
21          Does this provision entitle Microsoft to
22   revenues net of production costs for products
23   developed jointly by OpenAI -- with OpenAI?
24          ATTORNEY WINTER:  Objection to the form.
25          THE WITNESS:  I can't speak to whether --
```

Page 149

```
 1   the exact definition of revenue and whether it was
 2   net production costs; but based on my review of this
 3   and my understanding of general framework, Microsoft
 4   did receive a right to certain revenue generated by
 5   certain IP under this agreement.
 6   BY ATTORNEY EYNON:
 7       Q.   Looking at the second sentence, it says:
 8          [As Read]  For licensed products
 9          jointly developed between Microsoft and
10          LP, OpenAI, or both, or developed
11          independently or otherwise independently
12          commercialized by LP, OpenAI, or both,
13          Microsoft will receive such net revenue
14          net of any reasonable, actual, and
15          documented direct production costs
16          incurred by LP, OpenAI, or both.
17          Under this provision, was Microsoft
18   entitled to the revenues net of production costs for
19   products developed jointly with OpenAI?
20          ATTORNEY WINTER:  Objection to the form.
21          THE WITNESS:  For licensed products
22   jointly developed, as defined in this agreement
23   between Microsoft and OpenAI, yes, it appears
24   Microsoft would receive revenue net of any
25   reasonable, actual, and documented direct production
```

Page 150

1  costs.
2  BY ATTORNEY EYNON:
3      Q.  Does this provision entitle Microsoft to
4  revenues net of production costs for products
5  developed by OpenAI, Inc., or OpenAI LP independent
6  of Microsoft?
7      A.  I can't speak to the entire agreement, but
8  based on this particular sentence for licensed
9  products jointly developed, as defined between
10 Microsoft and LP, OpenAI, or both, or developed
11 independently, yes, Microsoft would receive revenue
12 net of any reasonable actual and documented
13 production costs.
14     Q.  Did OpenAI pay any such revenues to
15 Microsoft?
16         ATTORNEY WINTER:  Objection to the form.
17         Also register an objection that's outside
18 the scope to the extent it's beyond the terms of the
19 agreement.
20         But you can answer if you can.
21         THE WITNESS:  I don't know.
22 BY ATTORNEY EYNON:
23     Q.  Was the intellectual property license
24 under this agreement exclusive to only OpenAI and
25 Microsoft?

Page 151

1          ATTORNEY WINTER:  Objection.
2          THE WITNESS:  I don't know.
3  BY ATTORNEY EYNON:
4      Q.  Are you -- oh, go ahead.
5      A.  Oh, if you're asking about this agreement,
6  my understanding is, yes, this agreement just
7  covered a license between Microsoft and OpenAI
8  directly.  It didn't contemplate other third
9  parties, to my knowledge.
10     Q.  Are you aware of whether OpenAI licensed
11 the intellectual property covered by this agreement
12 to any third party?
13     A.  I --
14         ATTORNEY WINTER:  Objection to the form.
15 Outside the scope.
16         You can answer if you can.
17         THE WITNESS:  I don't know.
18 BY ATTORNEY EYNON:
19     Q.  Okay.
20         Turning to the page with Bates stamp
21 ending in 10286, there is a provision F, "Onsite
22 Engineers."
23         Does this provision give Microsoft the
24 right to embed ten engineers with OpenAI?
25     A.  I think subject to this whole agreement,

Page 152

1  which looks like there are a lot of conditions and
2  all of that, generally there was a framework where
3  up to a limited amount of Microsoft engineers could
4  be on site at OpenAI.
5      Q.  Did Microsoft, in fact, embed engineers
6  with OpenAI?
7      A.  My understanding is, yes, there had been,
8  through time, Microsoft engineers on site.
9      Q.  Do you know how many engineers Microsoft
10 embedded with OpenAI after this agreement was
11 executed in March 2021?
12         ATTORNEY WINTER:  I'll object as outside
13 the scope.
14         You can answer if you can.
15         THE WITNESS:  I don't know.
16 BY ATTORNEY EYNON:
17     Q.  Beyond what we've discussed, was Microsoft
18 entitled to any additional intellectual property
19 rights under this agreement?
20     A.  I don't know.
21     Q.  Okay.
22         Turning to the page -- oh, well, turning
23 to the bottom of this page, there's a provision G,
24 "Safety Review."
25         The provision begins:

Page 153

1          [As Read]  Microsoft, LP, and OpenAI
2          collectively commit to treat the
3          development of all artificial intelligence
4          systems that both implement licensed IP,
5          related IP, or AGI and involve neural
6          network models above the safety-critical
7          thresholds as being safety critical and
8          requiring formal life-cycle management of
9          safety, including management of security
10         and ethics impacts and concerns.
11         The provision goes on to say:
12         [As Read]  The parties also recognize
13         that Microsoft's intent in entering into
14         this agreement is to obtain access to the
15         licensed IP and related IP primarily for
16         commercial use and implementation in
17         license products of Microsoft or its
18         affiliates.
19         Did OpenAI, in fact, recognize that
20 Microsoft was entering into the agreement with the
21 intent to commercialize OpenAi's LP?
22         ATTORNEY WINTER:  Objection to the form.
23         THE WITNESS:  I think the contract kind of
24 speaks for itself that Microsoft was licensed IP
25 with the ability to commercialize that IP.

Page 154

1  BY ATTORNEY EYNON:
2      Q.   Did OpenAI understand that releasing new
3  products was important to achieving Microsoft's
4  goals for the agreement?
5           ATTORNEY WINTER:  Objection.
6           THE WITNESS:  Sorry.  Can you repeat that
7  question.
8  BY ATTORNEY EYNON:
9      Q.   Did OpenAI understand that releasing new
10 products was important to achieving Microsoft's
11 goals for this agreement?
12          ATTORNEY WINTER:  Objection.
13          ATTORNEY JURATA:  Objection.  Form.
14          THE WITNESS:  I can't speak to exactly
15 what people back then recognized.  My understanding
16 is that this agreement itself covers certain terms,
17 including Microsoft's ability to commercialize
18 products -- or commercialize IP.
19 BY ATTORNEY EYNON:
20     Q.   Turning to the next page, there's a
21 provision "Deployment Safety Board."
22          Does this provision require Microsoft and
23 OpenAI to form a joint Deployment Safety Board?
24          ATTORNEY WINTER:  Objection to form.
25          THE WITNESS:  This provision does seem to

Page 155

1  contemplate forming a joint new body -- or, sorry, I
2  take that back.
3           Will form a new body to adjudicate matters
4  related to deploying advanced AI models.
5  BY ATTORNEY EYNON:
6      Q.   Is the process described here different
7  from how the safety review process worked under the
8  2019 JDCA we looked at previously?
9      A.   I can't speak to that level of
10 specificity.  I know that in both the 2019 version
11 and the 2021 version of the JDCA, safety was a
12 critical component of the arrangement and very
13 important for both parties that were entering into
14 this.  And I think both parties recognized that.
15          But I don't think I'm qualified to get
16 into the specifics of all of the processes.
17     Q.   Does the 2019 JDCA provide for a joint
18 Deployment Safety Board?
19     A.   I don't recall.
20          I don't recall.
21     Q.   Directing you to page 10307, Exhibit --
22 which is Exhibit E to this agreement.
23          Does this exhibit set out the provisions
24 governing the Deployment Safety Board?
25     A.   Having not read this entire Exhibit E in

Page 156

1  detail, and all of the cross-references and other
2  information that may be in it, it does appear to lay
3  out a framework for the Deployment Safety Board.
4      Q.   Mm-hmm.
5           Table E1 lists the DSB members.
6           Are those the members of the Deployment
7  Safety Board?
8           ATTORNEY WINTER:  Objection to the form.
9           THE WITNESS:  It appears, at least at the
10 time this contract was entered into, it was
11 contemplated that these individuals would be the
12 initial members of the DSB.
13 BY ATTORNEY EYNON:
14     Q.   Okay.
15          There are three Deployment Safety Board
16 members from OpenAI, including Sam Altman, and there
17 are three members from Microsoft, including Kevin
18 Scott.
19          Who decided what individuals would be
20 members of this Deployment Safety Board?
21     A.   I don't know.
22     Q.   Turning to page -- still in Exhibit E,
23 page 10309, there's a Section 4, "Decisions."
24          (Court reporter clarification.)
25                    ///

Page 157

1  BY ATTORNEY EYNON:
2      Q.   Beginning with the second sentence, this
3  reads:
4           [As Read]  A decision to improve a
5           potential deployment in response to a
6           request for deployment safety review
7           requires a simple majority decision of
8           those members of the DSB present.
9           The next sentence says:
10          [As Read]  If a deployment safety
11          review vote is tied, the vote will be
12          decided in OpenAI and LP's favor.
13          Under this provision, if Sam Altman, plus
14 the three Microsoft safety board members, decided
15 that a product was safe to release, would the
16 product be released even if the other two OpenAI
17 members voted against it?
18          ATTORNEY WINTER:  Objection to the form.
19          Also outside the scope to the extent it
20 raises matters outside the terms of this agreement.
21          You can answer if you know.
22          THE WITNESS:  Based on my review right
23 now, Section 4, if four out of six members of -- of
24 the DSB are present and they approve, that would --
25 that would approve a deployment even if there were

Page 158

1  two voting against.
2  BY ATTORNEY EYNON:
3     Q.  Do you know whether any OpenAI board
4  members raised concerns about that arrangement?
5         ATTORNEY WINTER:  Objection to the form.
6  Lacks foundation.
7         You can answer if you can.
8         THE WITNESS:  I don't know.
9         ATTORNEY EYNON:  Okay.  I'd like to mark
10 Exhibit 20.
11        And then after that would probably be a
12 good time to break for lunch.
13        ATTORNEY WINTER:  Sure.
14        ATTORNEY EYNON:  If that works for you
15 all.
16        ATTORNEY WINTER:  Sure.
17        (Exhibit 20 was marked for
18        identification.)
19 BY ATTORNEY EYNON:
20    Q.  This document has a beginning Bates stamp
21 OPENAI_MUSK00030220.
22        And it's an email from Chris Clark to some
23 OpenAI recipients on December 15th, 2020.
24        Does this email request approval from the
25 board to allow Sam Altman, Tasha McCauley, and

Page 159

1  Shivon Zilis to act as authorized independent
2  directors to finalize/approve deal terms with
3  Microsoft?
4         ATTORNEY WINTER:  Objection to the form.
5  I think this is outside the scope.
6         You can answer if you can.
7         THE WITNESS:  Reviewing this email for the
8  first time, it appears that it is seeking -- we're
9  on bcc.  Okay -- board approval for Sam, Tasha and
10 Shivon to finalize and negotiate the deal terms with
11 Microsoft, subject to them being reasonably within
12 the parameters described in a attached term sheet,
13 which is not included in this email.
14 BY ATTORNEY EYNON:
15    Q.  Why did OpenAI appoint a committee to
16 finalize the deal with Microsoft?
17        ATTORNEY WINTER:  Objection to the form.
18 Lacks foundation.  Outside the scope.
19        You can answer, if you can.
20        THE WITNESS:  I don't know.
21 BY ATTORNEY EYNON:
22    Q.  Do you know how these three people were
23 selected to approve the Microsoft deal?
24        ATTORNEY WINTER:  Same objections.
25        THE WITNESS:  I don't know.

Page 160

1  BY ATTORNEY EYNON:
2     Q.  Do you know why Sam Altman was considered
3  an independent director for the purposes of the
4  Microsoft deal?
5         ATTORNEY WINTER:  Same objections.
6         THE WITNESS:  I don't know.
7         ATTORNEY EYNON:  Okay.
8         This is a good time to break for lunch.
9         THE VIDEOGRAPHER:  We're going off the
10 record at 1:32 PM Pacific Time.
11        (A break was taken.)
12        THE VIDEOGRAPHER:  We're back on the
13 record at 2:27 PM, Pacific Time.
14        ATTORNEY EYNON:  I will now mark
15 Exhibit 20 -- 21, thank you.
16        (Exhibit 21 was marked for
17        identification.)
18        ATTORNEY EYNON:  This is a document with
19 beginning Bates stamp MSFT_MUSK000035611.  It is an
20 email chain from February 2022 with some Microsoft
21 employees, Sam Altman, Jason Kwon, and Brad Lightcap
22 at OpenAI; and the subject is "OpenAI Restructure."
23        If you would turn to the second page.  In
24 the bottom email, Sam Altman wrote:
25        [As Read]  We are working on a

Page 161

1         restructure to OpenAI to address some of
2         the challenges we faced with our unusual
3         structure, a nonprofit being in control of
4         a LLC, as we become a more commercial
5         effort.
6  BY ATTORNEY EYNON:
7     Q.  Was Mr. Altman the CEO of OpenAI at this
8  point?
9     A.  Yes.  Mr. Altman was the CEO of OpenAI.
10    Q.  Was Mr. Altman a member of OpenAI's board
11 of directors at this time?
12    A.  Yes.
13    Q.  In your understanding, was Mr. Altman's
14 email consistent with the view of OpenAI's board?
15    A.  Are you referring --
16        ATTORNEY WINTER:  Hold on.  Objection to
17 the form.
18        You can answer, if you can.
19        THE WITNESS:  I'm not -- I don't know
20 whether the specific email from Mr. Altman on
21 February 5th, 2022, was something specifically
22 discussed or approved at the board level at that
23 point.
24 BY ATTORNEY EYNON:
25    Q.  In 2022, was the board discussing

Page 166

1  scope.
2          You can answer, if you know.
3          THE WITNESS:  I don't know.
4  BY ATTORNEY EYNON:
5      Q.   Do you know whether these slides were
6  prepared by OpenAI?
7      A.   I don't know.
8      Q.   These slides were -- you can tell from the
9  Bates number on the bottom, these slides were
10 produced by Microsoft, but they were not produced to
11 us by OpenAI in this litigation.
12         Do you know why that is?
13         ATTORNEY WINTER:  Objection to form.
14 Lacks foundation.
15         You can answer, if you know.
16         THE WITNESS:  I don't know.
17 BY ATTORNEY EYNON:
18     Q.   Okay.
19         Turning to the first page -- the second
20 page, this is a slide with a "Title OpenAI
21 Restructure Objectives."
22         The second bullet here says:
23             [As Read]  Remove nonprofit from
24             formal control to mitigate private benefit
25             risk.

Page 167

1          At this time in February 2022, was OpenAI
2  contemplating removing the nonprofit's control over
3  the for-profit entity?
4      A.   I don't know.
5      Q.   When did OpenAI's board first contemplate
6  a restructuring that removed nonprofit control over
7  the for-profit entity?
8          ATTORNEY WINTER:  Objection to form.
9  Lacks foundation.
10         THE WITNESS:  The board, from time to
11 time, in '24 -- sorry, in 2024 with the mission and
12 strategy committee had discussed potential
13 modifications to the structure always with the
14 intent of ensuring that the structure was best set
15 up to ensure that the nonprofit could advance the
16 mission.
17         I'm not aware of any formal proposal for
18 consideration or approval by the board with respect
19 to the nonprofit -- removing the nonprofit from
20 formal control.
21 BY ATTORNEY EYNON:
22     Q.   Do you know what it means to mitigate
23 private benefit risk?
24         ATTORNEY WINTER:  Objection.  Outside the
25 scope.

Page 168

1          I'll also instruct you not to answer to
2  the extent it would require you to reveal any
3  privileged legal advice.
4          Subject to that instruction, you can
5  answer, if you can.
6          THE WITNESS:  Just as a general matter, I
7  believe private benefit risk relates to nonprofit
8  tax law, but I won't, I think, go into privileged
9  information there.
10 BY ATTORNEY EYNON:
11     Q.   Would you turn to the last page of this
12 document which has Bates number ending 54865.
13         Looking at the second line -- sorry.
14         Looking at the third line, the -- it --
15 the commentary box says:
16             [As Read]  The OpenAI nonprofit would
17             transform from GP control to a set of
18             control rights related to the OAI mission,
19             all of which it has today.
20         Did OpenAI's board consider a
21 restructuring under which the OpenAI nonprofit would
22 transition from general partner control to a set of
23 rights related to the mission?
24         ATTORNEY WINTER:  Objection to form.
25         THE WITNESS:  I'm not aware of any formal

Page 169

1  proposal for the board to approve the OpenAI
2  nonprofit transitioning to a set of control rights
3  related to the OpenAI mission.
4  BY ATTORNEY EYNON:
5      Q.   Okay.
6          Directing you to the box with -- the row
7  that has the box "MS Ownership and Profit Cap" in
8  this.  The commentary in this box said:
9              [As Read]  No targeted changes to MS's
10             ownership, preference, or profit cap
11             amounts.  However, transitioning the
12             nonprofit from GP control to control
13             rights may require the nonprofit to
14             receive some value.  This may impact the
15             profit waterfall, but we do not expect it
16             to be significant.  MS plus OAI to
17             discuss.
18         At this time, was OpenAI's board
19 considering a restructure under which the nonprofit
20 received some value in exchange for giving up its
21 control rights?
22         ATTORNEY WINTER:  Objection.
23         THE WITNESS:  Based on this document, it
24 appears that this was being discussed between Brad
25 and members of Microsoft.  I'm not aware of any

Page 170

1  formal proposal presented to the board where the
2  nonprofit would transition to certain control rights
3  and receiving value in return.
4  BY ATTORNEY EYNON:
5      Q.  Has OpenAI's board ever considered a
6  restructuring under which the nonprofit would give
7  up control rights in -- without receiving value in
8  return or compensation in return?
9      A.  I'm not aware of any discussions at -- or
10 any proposals at the board level where the nonprofit
11 would give up control rights and not receive value
12 in exchange.
13         ATTORNEY EYNON:  Okay.
14         I'd now like -- you can set that aside,
15 and I'd like to mark Exhibit 23.
16         (Exhibit 23 was marked for
17         identification.)
18 BY ATTORNEY EYNON:
19     Q.  This document has beginning Bates number
20 MSFT_MUSK000055001.
21         Mr. Wu, what is this document?
22     A.  This appears to be the amended and
23 restated LLC agreement of OpenAI Global, LLC, dated
24 January 23rd, 2023.
25     Q.  Okay.

Page 171

1          Under this agreement, was the for-profit
2  entity in OpenAI's structure now an LLC?
3      A.  I don't recall the exact timing of the
4  steps, but my understanding is that OpenAI Global,
5  which is an LLC, became the holding company for the
6  capped-profit subsidiary.
7      Q.  Turning to Schedule A, which is -- starts
8  on the page with Bates ending 55085.
9          Does this schedule list the capital
10 commitments, capital contributions, and target
11 redemption amounts for members of the LLC?
12     A.  Yes.
13     Q.  Okay.
14         The first entity listed here is Aestas LP?
15         What is that entity?
16     A.  My understanding is that that was the
17 entity that was formerly known as OpenAI Holdings LP
18 and changed its name to Aestas LP.
19     Q.  Under this -- on this schedule, did
20 OpenAI, Inc.'s capital commitment, capital
21 contribution, and target redemption amounts remain
22 the same as in the prior LP agreement?  The 2021?
23     A.  I believe that's correct.  The capital
24 commitment and TRA remain unchanged from the 2021 LP
25 agreement.

Page 172

1      Q.  Okay.
2          On the following page -- actually, the
3  next, next page, 55087, there, Microsoft's second
4  capital commitment of $2 billion is listed.
5          Does this schedule reflect that, at this
6  point, Microsoft had only contributed 1 billion of
7  that $2 billion commitment?
8      A.  I believe that's correct, although there's
9  a footnote that says inclusive of funds in the
10 escrow account, which I think gets into a level of
11 detail I -- I'm not going to speak to at this point.
12     Q.  Did Microsoft subsequently contribute
13 the -- the full $2 billion capital commitment?
14     A.  My understanding is they have committed --
15 or contributed the full 2 billion.  Although,
16 there's -- again, some of that is, I believe,
17 without getting into all of the technical details,
18 credit for compute spend and all of that.
19     Q.  Under the -- the next entry in this
20 schedule reflects that Microsoft made a capital
21 commitment of $10 billion.
22         Is this a new -- under this agreement, had
23 Microsoft agreed to contribute an additional
24 $10 billion to OpenAI?
25     A.  Under this agreement, Microsoft did make

Page 173

1  an additional capital commitment of $10 billion.
2  Again, I think similar to prior -- prior versions of
3  this partnership, a portion of that was actual cash
4  contributed, and a portion of that was for compute.
5      Q.  The target redemption amount for
6  Microsoft's $10 billion investment is $60 billion.
7          That -- is that a six-times return on
8  investment?
9      A.  Correct.
10     Q.  What did the OpenAI board do to determine
11 whether that 6X return was reasonable and fair to
12 the nonprofit?
13         ATTORNEY WINTER:  Objection to form.
14         THE WITNESS:  I think similar to prior
15 investments made by Microsoft and prior investments
16 made by other investors, the board took into
17 consideration, first and foremost, what was in the
18 best interests of the nonprofit's mission.
19         And then taking into consideration that,
20 the timing, the partnership with Microsoft,
21 including the commercial agreement, and balancing
22 things like investability, made the determination
23 that a 6X return -- or a 6X target redemption amount
24 on capital committed was in the best interests of
25 the mission.

Page 174

1  BY ATTORNEY EYNON:
2       Q.   Did the board do any quantitative analysis
3  to determine whether this 6X return was appropriate?
4       A.   I -- I don't know.
5       Q.   Did the board do any financial modeling to
6  determine whether the 6X return was appropriate?
7       A.   I don't know about specific financial
8  modeling.
9       Q.   Do you understand that your counsel agreed
10 that you would testify about OpenAI's fixed maximum
11 return and capped-profit structures, including the
12 process by which OpenAI determined the profit
13 maximums or caps for those structures?
14      A.   I do.
15      Q.   But you can't tell me whether the board
16 performed any quantitative analysis at all to
17 determine whether this -- this cap was appropriate?
18           ATTORNEY WINTER:   Objection.
19           I'll just note for the record that the
20 witness has answered the question about the process
21 that was used to determine the matter specified in
22 the topic.
23           And subject to that -- that notation, you
24 can answer if you can.
25           THE WITNESS:   Yeah.

Page 175

1       I mean, I can speak to the board having
2  met with management and the team that was
3  negotiating this deal with Microsoft.
4            And they did review the terms, including
5  all of the terms beyond just the investment, as
6  well, taking into consideration the compute that was
7  necessary, talent, the state of the company and the
8  industry at that point, and made a determination
9  that this deal was fair and in the best interests of
10 the mission.
11           I can't speak to specific financial
12 modeling or analysis that was done.
13 BY ATTORNEY EYNON:
14      Q.   And you don't know whether any of that was
15 done?
16      A.   I don't.
17      Q.   Okay.
18           Do you know whether the OpenAI board did
19 anything to determine whether it would be able to
20 pay Microsoft the 6X return it had promised?
21           ATTORNEY WINTER:   Objection to form.
22           THE WITNESS:   Again, I think the board
23 took into consideration the investment, the capital
24 that it was receiving, the commercial terms, and the
25 partnership that it was entering into with Microsoft

Page 176

1  and determined that this was in the best interests
2  of the mission.
3            I don't know if it specifically did an
4  analysis on the payback to Microsoft of the target
5  redemption amount.
6  BY ATTORNEY EYNON:
7       Q.   Okay.
8            You don't know if it did any modeling to
9  determine whether it would have sufficient profits
10 to pay Microsoft back?
11           ATTORNEY WINTER:   Objection.
12           THE WITNESS:   My understanding is that the
13 board would've considered the state of the business
14 at that point, and I think that would've considered
15 the financials and the commercial operations of the
16 for-profit subsidiary and other operational and
17 financial metrics.
18           I'm not aware of the specific financial
19 analysis, and I probably can't speak to that level
20 of specificity.
21 BY ATTORNEY EYNON:
22      Q.   Well, and -- okay.
23           Under this agreement, based on the target
24 redemption amounts in this schedule, how much would
25 the limited partners have to be paid before the

Page 177

1  nonprofit received any residual proceeds?
2       A.   Based on my kind of back-of-the-napkin
3  math here, appears that the total target redemption
4  amounts for all of the limited partners, including
5  the nonprofit and Microsoft, amounted to north of
6  250 billion.
7            And the residual, the nonprofit-specific
8  residual interest, would not be paid until those
9  target redemption amounts were paid out.
10      Q.   Okay.
11           Directing you to page 55041, this is
12 Section 6.2A again.
13           Under this agreement, did the LLC members
14 retain control over major decisions?
15           ATTORNEY WINTER:   Objection to form.
16           THE WITNESS:   Based only on review of
17 Section 6.2A, I would agree that the approval of a
18 majority in interest of the limited partners or
19 members here, based on their capital contributions,
20 is required for the company to take any actions that
21 would constitute a major decision, as defined.
22 BY ATTORNEY EYNON:
23      Q.   Because Microsoft had the largest
24 investment in economic terms, did it also have, by
25 far, the greatest voting share for major decisions

Page 182

1  further amendment to the JDCA?
2        ATTORNEY WINTER: Objection to form.
3        THE WITNESS: My understanding is that
4  both the global -- or sorry -- the global amended
5  and restated LLC agreement of OpenAI Global and this
6  second amended and restated joint development and
7  collaboration agreement were entered into on the
8  same day.
9  BY ATTORNEY EYNON:
10    Q. Turning to the page with Bates stamp
11  ending 10534, there's a term "Licensed IP."
12        This says:
13            [As Read] Licensed IP means all of
14        OpenAI's and OpCo's background IP, 2,
15        foreground IP including OpCo's and
16        OpenAI's interest in any jointly developed
17        foreground IP and, 3, improvements to
18        OpCo's and OpenAI's and OpCo's background
19        IP in each -- in each case of the
20        foregoing clauses.
21        The last sentence in this provision says:
22            [As Read] For clarity, licensed IP
23        explicitly includes all IP and technology
24        of OpenAI, OpCo, or both, excluding only
25        AGI.

Page 183

1        Under this agreement, did OpenAI give
2  Microsoft a license to all of OpenAI's intellectual
3  property except AGI?
4        ATTORNEY WINTER: Objection to form.
5        THE WITNESS: Based kind of on a review of
6  this definition of "licensed IP" and the definitions
7  of "IP" and "technology" in this agreement, it does
8  appear that OpenAI, Inc., OpCo, licensed all IP and
9  technology as defined in this agreement, excluding
10  only AGI.
11  BY ATTORNEY EYNON:
12    Q. Did OpenAI own any intellectual property
13  at this point -- OpenAI, Inc.?
14        ATTORNEY WINTER: Objection to the form.
15  Outside the scope.
16        You can answer, if you know, or can.
17        THE WITNESS: I don't know specifically
18  what IP if any that the nonprofit held at this
19  specific time.
20  BY ATTORNEY EYNON:
21    Q. Does the -- does this agreement provide
22  for a broader IP license than the intellectual
23  property license Microsoft had under the 2021 JDCA
24  that we reviewed?
25        ATTORNEY WINTER: Objection to form.

Page 184

1        THE WITNESS: I can't speak to the
2  specifics of the IP that was included. I think if
3  you look at the definition of licensed IP and
4  compare it to the definition of licensed IP in the
5  prior iteration of the JDCA, there are -- you know,
6  subject to kind of me understanding all of the
7  specific defined terms, it does appear that it is
8  broader.
9  BY ATTORNEY EYNON:
10    Q. Did the prior JDCA provide for license to
11  all of OpenAI's intellectual property?
12        ATTORNEY WINTER: Objection to form.
13        THE WITNESS: I don't believe it did.
14  BY ATTORNEY EYNON:
15    Q. Was one of the purposes of this agreement
16  to allow Microsoft to commercialize OpenAI's
17  intellectual property?
18        ATTORNEY JURATA: Objection. Form.
19        THE WITNESS: I won't speak to the
20  purposes, but my understanding is that the second
21  amended and restated JDCA does permit Microsoft to
22  commercialize licensed IP.
23  BY ATTORNEY EYNON:
24    Q. Okay.
25        On page 10543, there is a term "Commercial

Page 185

1  Use Model Training."
2        It says:
3            [As Read] The primary purpose of this
4        agreement is to provide for the commercial
5        use of license products powered by
6        licensed IP.
7        Was the primary purpose of this agreement
8  to permit Microsoft to commercialize licensed
9  products powered by licensed IP?
10        ATTORNEY WINTER: Objection.
11        THE WITNESS: I think there's a very
12  specific definition of "commercial use" and licensed
13  products licensed IP. I think that provision you
14  just read kind of speaks for itself.
15        The primary purpose is to provide for the
16  commercial use as defined of -- licensed products as
17  defined, powered by licensed IP as defined.
18  BY ATTORNEY EYNON:
19    Q. Okay.
20        What licensed IP did OpenAI and Microsoft
21  commercialize under this agreement?
22    A. I don't know the specifics of what
23  Microsoft commercialized using licensed IP.
24    Q. Turning to page 10549, there is a
25  provision -- romanette 3 is "Commercialization

**Page 194**

1  with Bates stamp OPENAI_MUSK00037714.
2      Does this organizational chart reflect the
3  structure that OpenAI, Inc., and its related
4  entities had in 2023?
5      A.   I believe this reflects the organizational
6  chart of OpenAI, Inc., and its related entities as
7  of 2024.
8      Q.   Okay.
9      Does this reflect the structure of OpenAI,
10  Inc., and its related entities today?
11     A.   My understanding is that there have been
12  some additional entities added, for example, foreign
13  international subsidiaries underneath OpenAI LLC;
14  but I think, materially, things have been the same
15  as of -- as today as compared to 2024.
16     Q.   Is there anything about this organization
17  chart that is inaccurate?
18         ATTORNEY WINTER:  Objection to form.
19         THE WITNESS:  I -- again, I think there
20  have been certain changes with respect to
21  international subsidiaries and an acquisition that
22  was done; but I think, with respect to OpenAI, Inc.,
23  down to OpenAI Global and Aestas, it is -- it has
24  stayed the same.
25              ///

**Page 195**

1  BY ATTORNEY EYNON:
2      Q.   During the restructuring that brought
3  about the structure in this organizational chart,
4  did the nonprofit OpenAI, Inc., transfer any
5  additional assets to any for-profit entity?
6          ATTORNEY WINTER:  Objection to form.
7          THE WITNESS:  During the restructuring of
8  the for-profit subsidiaries back in April -- I think
9  April or May of '23, I'm not aware of any
10  contribution of assets from Inc. downwards.
11  BY ATTORNEY EYNON:
12     Q.   Does OpenAI, Inc., still have employees
13  today?
14     A.   I don't believe it has any full-time
15  employees.  It has a board of directors, and Sam is
16  the CEO.
17     Q.   Is he employed by OpenAI, Inc., the
18  nonprofit?
19     A.   I don't believe he is actually a --
20         ATTORNEY WINTER:  Sorry.  I'm going to
21  object as outside the scope, I think.
22         But you can answer if you can.
23         THE WITNESS:  I don't know technically if
24  he is an employee in terms of on payroll sort of
25  stuff.

**Page 196**

1  BY ATTORNEY EYNON:
2      Q.   Do any entities besides -- well, which
3  entity employs the majority of OpenAI's employees?
4      A.   I believe the -- the majority of employees
5  are employed by OpenAI OpCo LLC, OpenAI LLC, or
6  the -- in the case of international employees,
7  international subsidiaries underneath OpenAI.
8      Q.   Okay.
9          Are those -- are the four entities listed
10  at the bottom of this chart international
11  subsidiaries of OpenAI?
12     A.   Correct.
13     Q.   Okay.
14         And which of those four entities have
15  employees?
16     A.   I don't know the specifics.  My
17  understanding is that each of those has employees
18  based in those specific countries.
19     Q.   Beyond OpenAI OpCo LLC, OpenAI LLC, and
20  the four entities listed at the bottom of this
21  chart -- OpenAI Japan Ltd., OpenAI UK Ltd.,
22  Summerlight Technologies Ltd., and OpenAI Ireland
23  Ltd. -- do any other entities shown on this chart
24  have employees?
25         ATTORNEY WINTER:  Is this time-bound as of

**Page 197**

1  a certain date?
2          I believe the witness testified there may
3  have been changes to the international structure
4  since the chart, and I want to just make sure record
5  is clear on that.
6          THE WITNESS:  Well, let me ask both
7  questions.
8  BY ATTORNEY EYNON:
9      Q.   Do any -- does any other entities beyond
10  those listed that I just listed out have any
11  employees today?
12     A.   I don't know the specifics.  My
13  understanding that, as of today, we do have -- or
14  OpenAI LLC and the entities underneath, there are
15  additional international subsidiaries which likely
16  employ local employees in those particular
17  countries.
18     Q.   Does any other entity shown in this chart
19  beyond those that I just listed have employees as of
20  today?
21     A.   Sorry.  Other than the entities listed?
22     Q.   Other than the list I just went through;
23  so OpenAI OpCo LLC, OpenAI LLC, and then the four
24  international entities at the bottom of the chart.
25         Does any other entity shown in the chart

Page 202

1  Besides OpenAI, Inc., the nonprofit, do
2  any of the entities shown on this chart have a board
3  of directors?
4  ATTORNEY WINTER: If there's a document
5  that's helpful for you to refer to in your binder,
6  please feel free to do that in answering counsel's
7  question.
8  THE WITNESS: Is this another -- oh.
9  Yeah. I believe, other than OpenAI, Inc.,
10  OpenAI -- or, sorry, OAI corporation is a
11  corporation with a board of directors, and then a
12  number of the international subsidiaries have a
13  board of directors as well.
14  BY ATTORNEY EYNON:
15  Q. Who is on the board of OpenAI corporation?
16  A. Adam D'Angelo, Larry Summers, and Brett
17  Taylor are the directors for OAI corporation.
18  Q. Okay.
19  And you are looking at Tab 5 in your
20  binder now?
21  Okay.
22  A. Correct.
23  ATTORNEY EYNON: I'd like to mark that as
24  Exhibit 26.
25  ///

Page 203

1  (Exhibit 26 was marked for
2  identification.)
3  BY ATTORNEY EYNON:
4  Q. Mr. Wu, did you review this document to
5  prepare for your deposition today? Exhibit --
6  A. This one?
7  Q. Yes.
8  A. Yes, I did.
9  Q. What is this document?
10  A. I -- this is a list of directors for the
11  for-profit affiliated entities and then past members
12  of OpenAI LP, OpenAI GP LLC, and OpenAI Holdings LP.
13  Q. Is the information contained in this
14  document accurate?
15  A. I believe so.
16  Q. Does this accurately list the board
17  members for OpenAI, Inc., and related entities?
18  A. I believe so, yes.
19  Q. Okay. Thank you. You can set that aside.
20  We've now walked through a series of
21  agreements today between OpenAI and Microsoft, and
22  I'd like to ask you a few questions about those
23  agreements.
24  A. Okay.
25  ATTORNEY WINTER: So just -- we've been

Page 204

1  about an hour and 15 minutes. Do you have a sense
2  of how long this segment is or is this a good point
3  to take a break?
4  ATTORNEY EYNON: I think -- let me ask my
5  next few questions and then that would be a great --
6  with no document -- and then we can take a break.
7  ATTORNEY WINTER: All right. I'll take
8  that under advisement.
9  ATTORNEY EYNON: Thank you.
10  BY ATTORNEY EYNON:
11  Q. Between 2019 and 2023, did Microsoft's
12  rights in OpenAI's intellectual property increase?
13  A. I believe between 2019 and 2023, through
14  amendments of the JDCA, there were modifications to
15  their IP rights which kind of evolved over time.
16  Again, I won't get into the specificity of
17  all of the IP, but if you look at the defined terms
18  in the JDCA, there did appear to be broader
19  categories of IP that were licensed.
20  Q. Between 2019 and 2023, did Microsoft's
21  decision-making authority about which products were
22  safe to release increase?
23  ATTORNEY WINTER: Objection to form.
24  Outside the scope to the extent it also calls for
25  testimony in respect of safety matters beyond the

Page 205

1  terms of the agreements referenced. To the extent
2  you can answer, please do.
3  ATTORNEY EYNON: I'm just asking about the
4  terms of the agreements.
5  ATTORNEY WINTER: Your question was
6  broader than that, that's why I lodged my objection
7  and instruction.
8  THE WITNESS: I don't know. I can't speak
9  to whether their rights to safety actually expanded.
10  BY ATTORNEY EYNON:
11  Q. Do you recall that under the 2019 JDCA
12  that we looked at, OpenAI, Inc., and the LP had
13  final decision-making authority over which products
14  were released?
15  ATTORNEY WINTER: Objection.
16  THE WITNESS: I do recall that sentence
17  you pointed out that specifically said OpenAI LP
18  and, Inc. had review. Again, I can't speak to the
19  broader contractual language and whether there were
20  other terms and other agreements that related to
21  launching products.
22  BY ATTORNEY EYNON:
23  Q. Do you recall that in the 2021 and 2023
24  JDCA agreements, there was a joint development --
25  Deployment Safety Board that had representatives