MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA  90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
WALTER H HAWES IV (*pro hac vice*)
ALEXANDRA C. EYNON (*pro hac vice*)
SARA TOFIGHBAKHSH (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al.,<br><br>              Plaintiffs,<br><br>       v.<br><br>SAMUEL ALTMAN et al.,<br><br>              Defendants. | Case No. 4:24-cv-04722-YGR<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MICROSOFT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  January 7, 2026<br>Time:  2:00 PM<br>Courtroom:  1 – 4th Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether there is a genuine dispute of material fact over Musk's aiding and abetting breach of fiduciary duty claim against Microsoft.

2.     Whether there is a genuine dispute of material fact over Musk's unjust enrichment claim.

3.     Whether Musk's unjust enrichment claim against Microsoft may be dismissed merely because it is allegedly based on the same conduct and seeks the same relief as his tort claim.

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 1

    A.   Microsoft Knew About OpenAI's Nonprofit Commitments from the Beginning ................................................................................................. 1

    B.   Microsoft Invests in a For-Profit OpenAI ................................................. 3

        1.    OpenAI's Capped For-Profit ........................................................ 4

        2.    2019 JDCA and Investment Agreement .................................... 5

    C.   Microsoft Pushes OpenAI to Commercialize ........................................ 6

        1.    2021 Amended JDCA and $2 Billion Investment ...................... 7

        2.    2023 Second Amended JDCA, $10 Billion Investment, and Another Corporate Restructuring ................................................. 8

    D.   Microsoft and Altman Consolidate Control ........................................... 9

    E.   Microsoft Aids OpenAI's Conversion to an Uncapped For-Profit ........ 11

ARGUMENT ..................................................................................................... 12

I.   SUBSTANTIAL EVIDENCE SUPPORTS MUSK'S AIDING AND ABETTING BREACH OF CHARITABLE TRUST CLAIM CREATING, AT MINIMUM, A GENUINE ISSUE OF MATERIAL FACT ........................................................ 13

    A.   Microsoft Knew OpenAI Was a Charitable Trust Funded by Musk and Knew OpenAI's Charitable Purpose ..................................................... 13

    B.   Microsoft Knew Altman, Brockman, and OpenAI Would Be Acting in Violation of OpenAI's Charitable Purpose by Engaging in the Type of Commercial Activity It Undertook ........................................................ 14

    C.   Microsoft Substantially Assisted Altman, Brockman, and OpenAI in Their Breach of Charitable Trust ................................................................... 17

    D.   Microsoft's Evidence Fails To Meet the Standard for Summary Judgment and, At Most, Demonstrates a Genuine Issue of Material Fact ............... 18

II.  SUBSTANTIAL EVIDENCE SUPPORTS MUSK'S UNJUST ENRICHMENT CLAIM CREATING, AT MINIMUM, A GENUINE ISSUE OF MATERIAL FACT .................................................................................................... 20

    A.   Microsoft Had Reason to Know the Circumstances Giving Rise to Unjust Enrichment .......................................................................................... 20

    B.   Musk Need Not Elect Between His Unjust Enrichment and Tort Claims ............. 21

ii

CONCLUSION ........................................................................................................................... 23

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
  225 Cal. App. 4th 1451 (2014)................................................................................. 13, 21

4

5

*AngioScore, Inc. v. TriReme Med., LLC*,
  70 F. Supp. 3d 951 (N.D. Cal. 2014) ............................................................................. 13

6

*Astiana v. Hain Celestial Grp., Inc.*,
  783 F.3d 753 (9th Cir. 2015)........................................................................................... 21

7

8

*Bank of New York v. Fremont Gen. Corp.*,
  523 F.3d 902 (9th Cir. 2008)........................................................................................... 19

9

*Casey v. U.S. Bank Nat'l Ass'n*,
  127 Cal. App. 4th 1138 (2005).......................................................................... 15, 16, 17

10

11

*Consol. Elec. Co. v. U.S. for Use & Benefit of Gough Indus., Inc.*,
  355 F.2d 437 (9th Cir. 1966)........................................................................................... 12

12

*DeArmey v. Hawaiian Isles Kona Coffee Co., Ltd*,
  No. SACV 19-432 JVS, 2019 WL 6723413 (C.D. Cal. July 22, 2019).................................. 21

13

14

*Famet, Inc. v. NLRB*,
  490 F.2d 293 (9th Cir. 1973)........................................................................................... 13

15

*In re First All. Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006)..................................................................................... 15, 17

16

17

*First Nationwide Sav. v. Perry*,
  11 Cal. App. 4th 1657 (1992).......................................................................................... 20

18

19

*Gen. Star Indem. Co. v. First Am. Title Ins. Co. of Napa*,
  No. 20-cv-3210-TSH, 2021 WL 916850 (N.D. Cal. Mar. 10, 2021).................................... 20

20

*Jogani v. Superior Ct.*,
  165 Cal. App. 4th 901 (2008).......................................................................................... 22

21

22

*Martinez v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
  82 Cal. App. 4th 883 (2000).................................................................................... 13, 15

23

24

*Neilson v. Union Bank of California, N.A.*,
  290 F. Supp. 2d 1101 (C.D. Cal. 2003).................................................................... 15, 16

25

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000)......................................................................................... 12

26

27

28

iv

*O'Connor v. Boeing N. Am., Inc.*,
    311 F.3d 1139 (9th Cir. 2002)..................................................................................12

*Oakley, Inc. v. Nike, Inc.*,
    988 F. Supp. 2d 1130 (C.D. Cal. 2013)......................................................................19

*PMC, Inc. v. Kadisha*,
    78 Cal. App. 4th 1368 (2000)....................................................................................19

*Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*,
    29 Cal. App. 5th 230 (2018)................................................................................20, 21

*Quelimane Co. v. Stewart Title Guar. Co.*,
    960 P.2d 513 (Cal. 1998) ...........................................................................................18

*In re Radnor Holdings Corp.*,
    353 B.R. 820 (Bankr. D. Del. 2006) ..........................................................................19

*Reza v. Pearce*,
    806 F.3d 497 (9th Cir. 2015)......................................................................................12

*River Colony Ests. General P'ship v. Bayview Fin. Trading Grp., Inc.*,
    287 F. Supp. 2d 1213 (S.D. Cal. 2003) ......................................................................18

*Sepanossian v. Nat'l Ready Mixed Concrete Co.*,
    97 Cal. App. 5th 192 (2023)......................................................................................22

*Simi Mgmt. Corp. v. Bank of Am., N.A.*,
    930 F. Supp. 2d 1082 (N.D. Cal. 2013) .....................................................................16

*Sonner v. Premier Nutrition Corp.*,
    49 F.4th 1300 (9th Cir. 2022)....................................................................................22

*Stapleton v. JPMorgan Chase Bank, N.A.*,
    779 F. Supp. 3d 1059 (N.D. Cal. 2025) .....................................................................22

*Tanforan v. Tanforan*,
    173 Cal. 270 (1916)...................................................................................................23

*Upasani v. State Farm Gen. Ins. Co.*,
    227 Cal. App. 4th 509 (2014)....................................................................................17

*Welborne v. Ryman-Carroll Found.*,
    22 Cal. App. 5th 719 (2018)......................................................................................21

*Wells Fargo Bank Nw., N.A. v. Polaris Holding Co.*,
    No. C-04-1535 EMC, 2005 WL 1889385 (N.D. Cal. Aug. 9, 2005)...........................12

*Zetwick v. Cnty. of Yolo*,
    850 F.3d 436 (9th Cir. 2017)......................................................................................12

v

**RULES AND STATUTES**

Cal. Bus. & Prof. Code § 17510.8 ................................................................. 13

Fed. R. Civ. P. 56(a) ...................................................................................... 12


**OTHER AUTHORITIES**

Judicial Council of California Civil Jury Instructions No. 375 (2025 ed.) ................................... 20

Restatement (Third) of Restitution § 69(3) (2011) ........................................ 20

Restatement (Third) of Trusts § 93 (2012) .................................................... 13

4 Witkin, California Procedure: Pleading § 418 (6th ed. 2025) .................... 23

World Bank Group, GDP (current US$) New Zealand,
   https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=NZ ............................... 9

PLAINTIFF'S OPPOSITION TO MICROSOFT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: 4:24-cv-04722-YGR

# INTRODUCTION

> *"I wonder if the big OpenAI donors are aware of these plans? Ideologically, I can't imagine that they funded an open effort to concentrate [machine learning] talent so that they could then go build a closed, for profit thing on its back."*

> — Microsoft CTO Kevin Scott email to CEO Satya Nadella dated March 7, 2018.  Ex. 1.

Microsoft and OpenAI have converted a nonprofit organization founded to "benefit humanity as a whole, unconstrained by a need to generate financial return" — and funded by Plaintiff Elon Musk for that exclusive purpose — into a private company valued at as much as $1 trillion.  Microsoft — with a stake in OpenAI it says was recently valued at $135 billion — disavows its role in OpenAI's conversion into a commercial enterprise and disclaims knowledge of OpenAI's duties to its early charitable donors.  But there is ample evidence from which a reasonable jury could infer that Microsoft was well aware of OpenAI's breach of its duty to its donors, including Musk, to use their funds for charitable purposes and that it aided and abetted that breach and unjustly enriched itself.

Musk's claims are not duplicative. He has alleged distinct theories of liability: (i) that Microsoft knowingly aided and abetted OpenAI's breach of its fiduciary duty to its donors; and (ii) that Microsoft has benefited from Musk's donations to OpenAI under circumstances that would make its retention of those benefits unjust.  Both claims should go to trial.

# BACKGROUND

### A.    Microsoft Knew About OpenAI's Nonprofit Commitments from the Beginning

In December 2015, Elon Musk, Sam Altman, Greg Brockman, and Ilya Sutskever co-founded OpenAI as a nonprofit artificial intelligence research lab with a mission to benefit humanity.  Ex. 2; Ex. 3 (Sutskever Tr.) at 345:9-18; Ex. 4 (Musk Tr.) at 22:5-23:3.  Musk started OpenAI as a nonprofit because of his longstanding concern that concentrated control of artificial intelligence by closed, for-profit companies posed an existential threat to humanity.  Ex. 4 (Musk Tr.) at 22:5-23:3, 28:23-30:7.  As its primary funder, he also insisted OpenAI *remain* a nonprofit to ensure it did not become corrupted by profit motives.  Ex. 4 (Musk Tr.) at 23:9-26:16, 50:23-52:23; Ex. 5; Ex. 6 at -5439.  His co-founders agreed, and OpenAI announced those commitments in its

introductory blog post highlighting its mission to safely advance artificial intelligence in a way "most likely to benefit humanity as a whole, unconstrained by a need to generate financial return." Ex. 2; Ex. 7 (MSFT Tr.) at 38:6-39:20.

OpenAI's launch immediately caught the attention of Microsoft CEO Satya Nadella. Ex. 8; Ex. 9 (Nadella Tr.) at 36:19-37:23. Nadella knew that Musk was a co-founder and an initial backer of the nonprofit. Ex. 9 (Nadella Tr.) at 40:25-41:8, 92:16-25; Ex. 10 at 2; Ex. 71 at -1493. To Nadella, Musk and Altman's association with OpenAI "meant a lot," garnering it a near-instant reputation as a "high-profile AI research lab." Ex. 9 (Nadella Tr.) 56:8-57:16. The day after OpenAI posted its announcement, Nadella emailed the announcement to Microsoft research executives, asking if Microsoft had been "called to participate." Ex. 8; Ex. 9 (Nadella Tr.) at 36:19-37:23. Nadella also understood that OpenAI was a nonprofit "and so they were subject to all the nonprofit obligations." Ex. 9 (Nadella Tr.) at 128:5-15. But Nadella did not consider the nonprofit obligations to be Microsoft's concern. He felt that it was the "responsibility of the OpenAI board" to act "in the interest of their mission." Ex. 9 (Nadella Tr.) at 104:23-105:6.

The tech world moves fast. By 2015, Microsoft — which was built on software sales — risked being left behind if it did not move into new growth businesses like artificial intelligence and cloud computing. Ex. 9 (Nadella Tr.) at 12:17-13:4, 19:24-21:19, 24:6-16. In 2016, Nadella contacted OpenAI, and Microsoft agreed to provide deeply discounted computing power ("compute"), which had previously been sourced through Microsoft's cloud computing competitor Amazon. Ex. 10 at 2, 3, 6; *see id.* at 2 (internal Microsoft presentation noting "OpenAI is a non-profit artificial intelligence research company" whose "goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return"). In exchange for its discount, Microsoft sought to be named an OpenAI "sponsor," in place of Amazon. Ex. 9 (Nadella Tr.) at 56:8-20. Microsoft recognized there were "[n]ot many deals or opportunities like this" "[u]nique opportunity for [Microsoft] to attach and support [a] high profile, non profit organization driving innovation in the AI segment," Ex. 10 at 3, and hoped it would open a path to convert sponsored research into commercial gains, Ex. 1 at 44184; *see* Ex. 9 (Nadella Tr.) at 55:1-9.

In 2017, OpenAI needed even more compute so it could participate in a one-on-one challenge involving the videogame "Dota 2" in which OpenAI's AI bot would attempt to beat a human at the game, demonstrating the power of AI. *See* Ex. 11; Ex. 9 (Nadella Tr.) at 58:2-59:11; Ex. 4 (Musk Tr.) at 59:15-22. Musk contacted Nadella directly and asked if Microsoft would provide an additional donation of heavily discounted compute to meet OpenAI's need. Ex. 9 (Nadella Tr.) at 27:17-28:6; Ex. 11. Nadella agreed, Microsoft provided the compute, and OpenAI went on to win the Dota challenge. Ex. 9 (Nadella Tr.) at 273:1-8, 59:22-24; Ex. 12.

Following that victory, in 2018, OpenAI asked Nadella to extend its compute discount, but Nadella believed another donation was not justifiable because OpenAI's research at the time did not serve "Microsoft's business goals." Ex. 13 at -156-57; Ex. 9 (Nadella Tr.) at 67:12-68:6. He could not justify making what would be effectively another $150 million donation. Ex. 9 (Nadella Tr.) at 67:12-18; Ex. 13 at -156.

### B. Microsoft Invests in a For-Profit OpenAI

The landscape shifted in 2018, when OpenAI created its first Generative Pre-trained Transformer ("GPT"), a large language model ("LLM") and the predecessor to its AI chatbot, ChatGPT. Ex. 3 (Sutskever Tr.) at 60:1-7. Around the same time, Musk resigned from OpenAI's board after the OpenAI co-founders failed to reach agreement about its corporate governance structure moving forward. Ex. 14; Ex. 15.

Within weeks of Musk's resignation, Altman shared with Microsoft his plans to "launch a new commercial venture," *i.e.*, a for-profit arm of OpenAI in which Microsoft could invest. Ex. 1 at -44184. Nadella shared the proposal internally at Microsoft. CTO Kevin Scott replied, cutting straight to the heart of the matter:

> Satya, one of the big questions I would have for [Altman] is whether or not [OpenAI] intend[s] to make the hardware and software open source in the original spirit of OpenAI. [In my opinion] that would be good competitive insurance and something that might be worth funding. ***I wonder if the big OpenAI donors are aware of these plans? Ideologically, I can't imagine that they funded an open effort to concentrate [machine learning] talent so that they could then go build a closed, for profit thing on its back.***

Ex. 1 at -44183 (emphasis added).

1              1.     *OpenAI's Capped For-Profit*

2          Despite Kevin Scott calling out the unjust violation of OpenAI's commitments to its "big [ ]

3    donors" — who Microsoft knew included Musk — Microsoft proceeded to help OpenAI build a

4    "closed, for profit thing" on the back of the nonprofit.  Ex. 1; *see* Ex. 9 (Nadella Tr.) at 40:25-41:8,

5    92:16-25.  In March 2019, OpenAI announced the creation of a "capped-profit" subsidiary, OpenAI

6    L.P.  Ex. 16.  The for-profit entity was initially capitalized by transferring "substantially all" of the

7    intellectual property out of the nonprofit.  Ex. 17 (OpenAI Tr.) at 102:12-17; *see also* Ex. 7 (MSFT

8    Tr.) at 156:19-159:9; Ex. 9 (Nadella Tr.) at 120:13-122:13.

9          Microsoft's investment in the for-profit entity, with the potential for huge gains, was

10   negotiated before the announcement.  So was the investment of Microsoft board member Reid

11   Hoffman.  Foreshadowing Hoffman's eventual role as a contemporaneous board member for ***both***

12   Microsoft ***and*** OpenAI, Altman confided in Hoffman, "we have absolute trust in you . . . and we

13   know that if we've gotten something unforeseen wrong in this [for-profit] structure and need to

14   make a change, you'll vote to do it."  Ex. 18.  In March 2018, as Microsoft was "figuring out the

15   terms of a partnership" with OpenAI, it looked to Hoffman as a conduit for information between the

16   two companies.  Ex. 19 (Microsoft CTO doing "non-trivial bit of note-comparing with Reid

17   Hoffman" in March 2018).

18         In November 2018, after dinner with Altman, Scott told Nadella that OpenAI's new

19   corporate structure offered both "a commercial vehicle for monetizing Open AI IP" and investment

20   returns "capped at $500B."  Ex. 20.  Altman claimed the nonprofit would eventually benefit because

21   — though OpenAI had yet to make a single dollar in returns — "[i]f [OpenAI] ever [does] get to

22   ***$500B*** in returns, the balance over that goes directly to the 501(c)3."  Ex. 20 (emphasis added).

23         But Microsoft knew that this supposed return to the nonprofit was purely theoretical.

24   Though Nadella declared any return, let alone a ***$500 billion*** return, "far-fetched," Ex. 9 (Nadella

25   Tr.) at 101:13-21, this was Microsoft's chance to gain ground in the artificial intelligence race.  So

26   Nadella got "comfortable" with investing in OpenAI's purportedly "capped profit" structure,

27   terming it the "foundational piece that allowed us to even do our deal."  Ex. 9 (Nadella Tr.) at 93:14-

28   19; 99:16-100:2; *see also id.* at 96:8-97:2; Ex. 7 (MSFT Tr.) at 235:20-236:6 (investment "different"

                                            4

1  from Microsoft's usual investments).

2      Microsoft conducted careful and extensive due diligence on its contractual counterparty.

3  Ex. 7 (MSFT Tr.) at 124:5-18, 124:24-126:10; Ex. 21 (Murati Tr.) at 50:9-51:2, 57:4-24; Ex. 22.

4  That included reviewing OpenAI's IRS application for a 501(c)(3) tax-exemption as a charitable

5  corporation.  Ex. 7 (MSFT Tr.) at 124:24-126:10, 127:1-128-11, 130:1-8.  The application

6  represented OpenAI "does not plan to play any role in developing commercial products or

7  equipment" — rather, it intended to "make its research freely available to the public on a

8  nondiscriminatory basis."  Ex. 24 at -36556.  The Delaware Certificate of Incorporation, included

9  in the application, states OpenAI's mission is to "provide funding for research, development and

10  distribution of technology related to artificial intelligence," that "[t]he resulting technology will

11  benefit the public," and that "[t]he corporation is not organized for the private gain of any person."

12  Ex. 24 at -36539.  It also states that OpenAI's property is "irrevocably dedicated to the[se]

13  purposes," and "no part of the net income or assets of th[e] corporation shall ever inure . . . to the

14  benefit of any private person."  *Id.*

15                  2.    *2019 JDCA and Investment Agreement*

16      Microsoft's board initially approved a capital investment of $2 billion.  But ultimately, it

17  decided to limit its initial investment to $1 billion in the hopes that a smaller investment would

18  "press OpenAI to commercialize," in direct contravention of the nonprofit's stated founding

19  principles.  Ex. 23; *see also* Ex. 22.  In exchange for its investment, Microsoft received a convertible

20  limited partnership interest and rights to OpenAI's profits, with returns ***"capped" at 2000%*** of its

21  $1 billion investment.  Ex. 25 at -60024-25.

22      Microsoft's CFO noted in an internal email that the "cap is actually larger than 90% of public

23  companies," and the limit on Microsoft's profits ***is not "terribly constraining nor terribly***

24  ***altruistic."***  Ex. 26 at -1083 (emphasis added).  It was, in fact, "a good investment."  *Id*.  At

25  Microsoft's request, OpenAI agreed to keep any mention of Microsoft's promised 2000% return on

26  its investment out of its public announcement.  Ex. 27 at -244-45.

27      Under the parties' agreement, the nonprofit entity ("OpenAI, Inc.") was also entitled to

28  receive an initial return of $4.7 billion on the value of the intellectual property it transferred to

1   OpenAI L.P.  Ex. 25 at -60024.   But outside investors would receive their full promised returns —

2   including $20 billion to Microsoft — before **any** residual profits flowed back to the nonprofit.  *Id.*

3   at -59980-81.  Microsoft also protected its financial position by securing approval rights over certain

4   "Major Decisions" of OpenAI Inc.'s board, such as "alter[ing] the structure" of the for-profit entity.

5   *Id.* at -59963-64 (subsection (vii)).[1]   Additionally, Microsoft board member Reid Hoffman formally

6   joined OpenAI's nonprofit board in March 2019 just prior to the finalized deal.  Dkt. 287 ("Corr.

7   Hoffman Decl.") ¶ 4.  Though Mr. Hoffman previously declared in a sworn affidavit in this litigation

8   that he had "abstained from voting on any proposal relating to Microsoft's investment in OpenAI

9   on either the OpenAI or Microsoft boards," he filed an amended declaration admitting that while he

10  was seated on both boards, he did in fact vote to advance Microsoft's deals with OpenAI in his

11  capacity as an OpenAI board member.  *Id*. ¶ 7.

12      In connection with the $1 billion investment, Microsoft, OpenAI, Inc., and OpenAI L.P. also

13  executed a Joint Development and Collaboration Agreement ("JDCA"), with three main elements.

14  Ex. 28.    First, Microsoft committed to building a supercomputer for OpenAI.

15  *Id.* at -55174-75, -55177.   Second, Microsoft would be the exclusive supplier of (discounted)

16  compute for OpenAI.   *Id.* at -55178, -55183-84.   Third, Microsoft obtained a license to

17  commercialize one of OpenAI's GPT models.  *Id.* at -55181-82.[2]  Microsoft's license was exclusive

18  for one year, during which OpenAI could not open source the GPT model — ensuring that Microsoft

19  would enjoy the full commercial value of its license.  *See id.* at -55178.

20      **C.    Microsoft Pushes OpenAI to Commercialize**

21      Now flush with Microsoft's cash, OpenAI knew it was "very important" for their partnership

22  with Microsoft to be successful and that it was, in fact, OpenAI's "***responsibilit[y]***" to make

23  Microsoft commercially successful.  Ex. 21 (Murati Tr.) at 68:2-8, 69:8-11 (emphasis added); *see*

24  

25  [1] Under the 2019 JDCA, Microsoft could also terminate the agreement if there was a "change in the Chief Executive Officer of OpenAI."  Ex. 28 at -55188.  That clause was removed in 2021.

26  [2] Microsoft also obtained a right of first negotiation to license future technology except artificial

27  general intelligence ("AGI," defined as "a highly autonomous system that outperforms humans at most economically valuable work") if OpenAI managed to create it during the term of their contract.

28  Ex. 28 at -55172, -55182-83.   The term generally refers to a type of human-level artificial intelligence that will be smarter than humans across essentially all cognitive tasks.

1   *also id.* at 60:11-61:5; Ex. 30 at -68284-85.  Upon securing Microsoft's investment, OpenAI devoted

2   an entire division to product development and developed more products with commercial potential,

3   like LLMs.  *See* Ex. 3 (Sutskever Tr.) at 62:12-13, 62:23-63:14; Ex. 21 (Murati Tr.) at 62:20-63:3.

4       OpenAI also stopped open sourcing its models so that Microsoft "could have the benefit of

5   getting a head start on . . . commercializing."  Ex. 7 (MSFT Tr.) at 188:22-189:22; Ex. 21 (Murati

6   Tr.) at 54:14-19.[3]  In September 2020, reacting to reporting that Microsoft had exclusively licensed

7   GPT-3, Musk — who lacked visibility into all that was going on at OpenAI — responded that "[t]his

8   does seem like the opposite of open.  OpenAI is essentially captured by Microsoft."  Ex. 31.  Nadella

9   — who knew what was going on — raised Musk's "closed openai" comment in a Microsoft meeting

10  to discuss whether it was legal to "effectively own[ ]" OpenAI considering its corporate structure

11  and "the public good."  Ex. 32 at 30-31 (noting Microsoft should "think this through").

12              1.   *2021 Amended JDCA and $2 Billion Investment*

13      Microsoft forged ahead.  It wanted to compete with Google, which was investing

14  "ferocious[ly]" in artificial intelligence.  Ex. 33 at -56524.  So, in March 2021, Microsoft quietly

15  invested another $2 billion in OpenAI.  Ex. 34 at -64659.  Neither OpenAI nor Microsoft publicly

16  announced the investment, which was subject to a lower 6x return multiple.  Ex. 7 (MSFT Tr.) at

17  187:6-188:4; Ex. 34 at -64659.

18      Microsoft and OpenAI also amended the JDCA to expand Microsoft's rights ("2021

19  JDCA").  Ex. 35.  While still serving on both Microsoft's board and OpenAI's board, Reid Hoffman

20  voted in his capacity as OpenAI board member to "authorize" other OpenAI directors to "finalize

21  and execute the terms" of the 2021 JDCA.  Corr. Hoffman Decl. ¶ 7.  In place of its 2019 license to

22  a single OpenAI model, Microsoft secured rights to commercialize ***any*** OpenAI model developed

23  during the term of the agreement (except AGI).  Ex. 35 at -64513, -64519.  To protect its commercial

24  exclusivity, Microsoft gained approval power over OpenAI's decisions to open source its

25

26  _____

27  [3] OpenAI made GPT-2 open source in 2019.  It made no other GPT model open source until two
    GPT-4 models this year.  Ex. 7 (MSFT Tr.) at 189:7-22.  Microsoft and OpenAI discussed the 2025
28  release and considered "what this means for [Microsoft's]/[OpenAI's] exclusivity."  Ex. 29
    at -85749.

technology.  *Compare* Ex. 28 at -55178, *with* Ex. 35 at 64522.  Facilitating its commercial use of OpenAI's IP, Microsoft was permitted to embed up to ten of its employees on-site at OpenAI.  Ex. 35 at -64527.  Anticipating increased product commercialization, Microsoft and OpenAI agreed to share any resulting revenue.  *Id.* at -64534.  Finally, ensuring its products would be deemed safe enough to release to market, Microsoft ensured its participation, along with OpenAI, on a "Deployment Safety Board" ("DSB") that would determine whether certain artificial intelligence models were safe to release publicly.  *Id.* at -64528, -64548-51.

Just three months later, in June 2021, Microsoft released GitHub CoPilot — its first product incorporating OpenAI's technology.  Ex. 7 (MSFT Tr.) at 202:8-18, 203:11-23.  Prodding OpenAI to accelerate its own product development, Microsoft told Altman that OpenAI needed to generate $100 million in revenues to secure the next $10 billion commitment from Microsoft.  Ex. 21 (Murati Tr.) at 111:12-112:11; Ex. 3 (Sutskever Tr.) at 125:19-126:5; Ex. 32 at 50-51.  To meet that goal, OpenAI expanded the team responsible for taking products to market and tried to expand its "enterprise business."  Ex. 21 (Murati Tr.) at 112:14-19.

Altman did not stop there, and neither did Microsoft.  In 2022, Altman privately disclosed to Microsoft that OpenAI was again working to restructure "as we become a more commercial effort."  Ex. 36 at -54861.  One of the objectives was removing the nonprofit "from formal control" to mitigate "private benefit risk" — in other words, the risk that commercialization would violate the nonprofit's founding commitment that benefits must never "inure to the benefit" of "any private person."  Ex. 37 at -54863, -54865; Ex. 24 at -36539; *see also* Ex. 7 (MSFT Tr.) at 210:6-20, 213:23-214:4; Ex. 17 (OpenAI Tr.) at 167:22-170:3.

### 2.    *2023 Second Amended JDCA, $10 Billion Investment, and Another Corporate Restructuring*

In the summer of 2022, OpenAI began negotiating with Microsoft a new $10 billion investment.  Ex. 33 at -56524-25.  That November, OpenAI released ChatGPT.  Ex. 7 (MSFT Tr.) at 279:6-8.  It was an instant hit.  Nadella urged Altman to release a paid version and persistently checked on the progress of its commercialization.  Exs. 38, 39, 40.[4]

---

[4] In another unexpected consequence, ChatGPT's release exposed how OpenAI had been scraping

Over the next several months, OpenAI secured Microsoft's $10 billion investment, and the parties again amended the JDCA ("2023 JDCA"). OpenAI also changed its corporate structure. Ex. 41 at -1168-71; Ex. 33 at -56524-25. While still serving on both Microsoft's board and OpenAI's board, Reid Hoffman voted in his capacity as OpenAI board member to approve the 2023 JDCA. Corr. Hoffman Decl. ¶7. The 2023 agreement "cap[ped]" Microsoft's return on this investment at 600%, or $60 billion to start, but increased Microsoft's profit "cap" by *20% per year*. Ex. 42 at -55021-22, -55087; Ex. 41 at -1169. Microsoft would receive *49%* of OpenAI's profits, while the OpenAI nonprofit entity would recover just 2% of OpenAI's profits — at least until all outside investors were paid out their investment returns, valued in total at *$261 billion*.[5] Ex. 41 at -1169.

Underscoring the profit-focused aim of the partnership, the 2023 JDCA was specifically structured to "remove the impediments in commercialization." *See* Ex. 21 (Murati Tr.) at 79:9-81:9. Microsoft negotiated expanded IP rights to include all OpenAI IP developed *before or during* the term of the agreement (excluding AGI), and the right to embed up to 20 employees at OpenAI. Ex. 43 at -55105, -55111; Ex. 17 (OpenAI Tr.) at 204:11-19 (between 2019 and 2023, Microsoft licensed "broader categories of IP" from OpenAI). Finally, Microsoft and OpenAI established an 80%-20% revenue share. Ex. 43 at -55120.

**D.      Microsoft and Altman Consolidate Control**

Microsoft consolidated its control over the partnership in 2023, in the wake of the nonprofit board's firing of Altman as CEO and the removal of Altman and Brockman from the board.

The board fired Altman on Friday, November 17, 2023, and issued a statement that Altman had not been "consistently candid in his communications with the board." Ex. 45 at -14151. In fact, Altman had lied to the board on multiple occasions and failed to inform the members when OpenAI

---

Twitter to amass vast amounts of data to train its LLMs. In December, Musk, having newly acquired Twitter, cut off OpenAI's access and tweeted that "OpenAI was started as open-source & non-profit. Neither are still true." Ex. 44. Nadella emailed the tweet to his senior executives, requesting they "find out more." *Id.*

[5] For perspective, $261 billion is approximately the GDP of New Zealand. *See* World Bank Group, GDP (current US$) New Zealand, https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=NZ.

1    cut corners on safety review processes.  *See* Ex. 3 (Sutskever Tr.) at 137:5-140:22; 140:24-143:9;

2    Ex. 46 (Toner Tr.) at 46:5-61:17; 321:7-17; Ex. 47 (McCauley Tr.) at 33:22-35:9; 76:18-80:24.

3    Those incidents led the independent board members to conclude that Altman was threatening their

4    ability to govern the capped-profit's commercial activities.  *See* Ex. 47 (McCauley Tr.) at 60:17-

5    61:23, 89:6-91:7; Ex. 46 (Toner Tr.) at 104:25-106:11, 170:9-171:9, 250:21-251:12.  Their decision

6    to fire Altman was also influenced by the extreme pressure by investors — i.e., Microsoft—to

7    "prioritize public product releases over well-thought-through determinations of how given decisions

8    affected" the nonprofit's mission.  Ex. 46 (Toner Tr.) at 250:21-251:12; *see also* Ex. 47 (McCauley

9    Tr.) at 60:17-61:24; 89:6-91:7.

10       The board appointed OpenAI CTO Mira Murati as Interim CEO.  When the board informed

11   Murati of its decision, she immediately asked whether the board had told Microsoft about Altman's

12   firing.  Ex. 21 (Murati Tr.) at 129:18-25.  Murati thought it was "critical" to keep Microsoft "up to

13   date with what was going on" because "Microsoft was a very important partner to OpenAI."  *Id.* at

14   134:18-25.  She did not involve any other stakeholders during that period because she could not

15   "think of any that would have been appropriate to involve."  *Id.* at 135:16-19.

16       Murati immediately reached out to both Nadella and Scott and remained in frequent

17   communication with both.  Ex. 21 (Murati Tr.) at 129:18-25, 130:12-131:5; *see also* Ex. 48; Ex. 49.

18   Upon learning the news, Microsoft moved quickly to subvert the board's decision.  Nadella

19   coordinated directly with Altman and remained in close contact throughout the weekend.  *See* Ex. 9

20   (Nadella Tr.) at 227:25-229:10, 230:19-231:4, 236:23-238:9.  To protect Microsoft's investment

21   and prevent OpenAI's researchers from fleeing to a competitor, Nadella quietly supported Altman's

22   demand that the board resign.  Ex. 9 (Nadella Tr.) at 231:5-18.  Behind the scenes, Microsoft helped

23   Altman negotiate with the board to restore him and Brockman.  *See* Ex. 21 (Murati Tr.) at 133:5-

24   135:19; Ex. 50 at -54870-71; Ex. 51 at -27434-36.  Nadella and others at Microsoft compiled names

25   of replacement board members who would be loyal to Altman and drafted statements from OpenAI

26   leadership to its employees.  *See* Ex. 50 at -54870-71; Ex. 52 at -27479-27483; Ex. 53 at -27424;

27   Ex. 9 (Nadella Tr.) at 231:5-233:10.  To exert leverage over the nonprofit board, Microsoft also

28   facilitated Altman's plan to have Microsoft hire him and Brockman if they were not restored by

1   Monday.  *See* Ex. 54 at -27414; Ex. 21 (Murati Tr.) at 135:21-136:4.  By Saturday, Microsoft

2   completed the paperwork to set up a Microsoft subsidiary to absorb Altman, Brockman, and OpenAI

3   employees.  *See* Ex. 54 at -27414; Ex. 9 (Nadella Tr.) at 237:20-238:9; Ex. 21 (Murati Tr.) at 135:21-

4   136:4.

5       When the board did not reinstate Altman by Sunday night, Nadella announced publicly that

6   Microsoft would hire Altman and Brockman.  Ex. 55.  Microsoft also assured OpenAI's employees

7   that if they quit, it would not only hire them but also match their compensation.  *See* Ex. 48.[6]  With

8   Microsoft employment secured, nearly all of OpenAI's employees signed a petition, threatening to

9   quit if the board did not resign.  Ex. 57.[7]  Nadella went on a press tour, emphasizing Microsoft's

10  control over OpenAI by proclaiming that Microsoft is "in there. We are below them, above them,

11  around them."  Ex. 58 at -13914.

12      The nonprofit board succumbed to the pressure.  Altman was reinstated as CEO and the

13  board resigned, replaced by directors without AI safety expertise.  *See* Ex. 46 (Toner Tr.) at 149:4-

14  21, 150:7-22.

15      The crisis paved the way for Microsoft and Altman to consolidate their control.  Microsoft

16  installed a board observer at OpenAI.  Ex. 60.  Altman rejoined the nonprofit board in March 2024

17  and set about stacking the board with friendly directors.  Ex. 61 at -27800, -27804-05; Ex. 62.

18      **E.     Microsoft Aids OpenAI's Conversion to an Uncapped For-Profit**

19      After Altman regained his board seat, OpenAI worked with Microsoft to help it remove any

20  remaining limits on commercialization by converting the OpenAI for-profit to an uncapped public

21  benefit corporation (PBC), in which the nonprofit entity would only have a minority economic stake.

22  *See* Ex. 63 at -83533; Ex. 64 at -92446.  As the conversion plan took shape, Microsoft waived its

23  Major Decisions right to allow OpenAI to enter third-party investment agreements worth ***hundreds***

24  

25  [6] The cost of doing so was enormous; OpenAI's COO estimated that OpenAI's employee vehicle
    would cost $25 billion to acquire.  Ex. 59 at 27460-61; *see* Ex. 9 (Nadella Tr.) at 238:10-239:7.

26  [7] Though he had been the board member who initiated the board's firing of Altman, Sutskever signed
    the petition because the situation now threatened the existence of the company, even though he

27  continued to believe that terminating Altman was the correct action.  Ex. 3 (Sutskever Tr.). at
    172:10-173:23.  Murati also signed the petition for the same reason, even though her negative views

28  of Altman persisted.  Ex. 21 (Murati Tr.) at 135:21-136:4, 137:3-24.

*of billions of dollars*.  *See* Ex. 7 (MSFT Tr.) at 237:7-10.  Microsoft, however, withheld approval for OpenAI's conversion until Microsoft received more equity and a license to AGI.  Ex. 65 at -84086.  OpenAI acceded, and in September 2025, reached an agreement in principle.  *See* Exs. 66, 64.

The conversion is complete.  During briefing of this motion, OpenAI officially became OpenAI PBC; OpenAI, Inc., converted into the OpenAI Foundation holding a 26% stake in OpenAI PBC; and Microsoft received a 27% stake worth *$135 billion*.[8]  OpenAI PBC has apparently begun "laying the groundwork" to go public at a projected value *up to $1 trillion*.  Ex. 70.

The closing of this latest transaction has no impact on Plaintiffs' monetary claims and does not preclude the Court from awarding appropriate injunctive relief.

## ARGUMENT

Summary judgment may be granted only when the moving party demonstrates that there is no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a).  The moving party has the "initial burden of production and the ultimate burden of persuasion."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "[W]hat is required to defeat summary judgment is simply evidence 'such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor.'"  *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015)).  "When the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial."  *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).  When a dispositive issue requires "determination of state of mind, it is unusual that disposition may be made by summary judgment."  *Consol. Elec. Co. v. U.S. for Use & Benefit of Gough Indus., Inc.*, 355 F.2d 437, 438-39 (9th Cir. 1966); *see also Wells Fargo Bank Nw., N.A. v. Polaris Holding Co.*, No. C-04-1535 EMC, 2005 WL 1889385, at *11 (N.D. Cal. Aug. 9, 2005) ("[M]uch depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate

---

[8] The value of Microsoft's stake is based on an implied valuation of OpenAI, now OpenAI PBC, of $500 billion.  *See* Ex. 67 (Altman Tr.) at 342:23-344:2; Ex. 68 (Brockman Tr.) at 298:15-302:25; *see also* Ex. 69.

1  matter best left to the fact finder . . . .").

2  **I.      SUBSTANTIAL EVIDENCE SUPPORTS MUSK'S AIDING AND ABETTING
          BREACH OF CHARITABLE TRUST CLAIM CREATING, AT MINIMUM, A
3          GENUINE ISSUE OF MATERIAL FACT**

4          Microsoft claims it lacked actual knowledge of OpenAI's breach of charitable trust and so

5  could not have intended to aid and abet OpenAI in that breach.  Substantial evidence refutes that

6  claim.

7          Under California law, "[t]he acceptance of charitable contributions by a charity . . .

8  establishes a charitable trust *and a duty on the part of the charity and the person soliciting on*

9  *behalf of the charity to use those charitable contributions for the declared charitable purposes*

10 *for which they are sought*."  Cal. Bus. & Prof. Code § 17510.8 (emphasis added); *see* Restatement

11 (Third) of Trusts § 93 (2012) (breach of charitable trust when trustee fails "to comply with any duty

12 that the trustee owes, as trustee . . .  to further the charitable purpose[ ] of the trust").  To prove

13 Microsoft aided and abetted OpenAI's breach of charitable trust, Plaintiff must prove that Microsoft

14 (i) knew that Altman, Brockman, or OpenAI were breaching their fiduciary duty to OpenAI's

15 charitable donors by misusing donations and profiting from them; and (ii) provided substantial

16 assistance.  *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1475

17 (2014).  A jury could readily infer that Microsoft did both those things.

18
19         **A.      Microsoft Knew OpenAI Was a Charitable Trust Funded by Musk and Knew
                  OpenAI's Charitable Purpose**

20         Microsoft claims it lacked knowledge that OpenAI owed any charitable duties to Musk

21 because there is no direct evidence that OpenAI ever informed Microsoft that OpenAI owed duties

22 to its nonprofit donors.  Dkt. 329 ("Mot.").  But the alleged absence of direct evidence of knowledge

23 would not foreclose a finding in Plaintiff's favor.

24         Actual knowledge can be, and most often is, proven "*through inference or circumstantial*

25 *evidence*."  *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 957 (N.D. Cal. 2014)

26 (Gonzalez Rogers, J.) (emphasis added); *see also Famet, Inc. v. NLRB*, 490 F.2d 293, 295 (9th Cir.

27 1973) ("[D]irect evidence of one's actual knowledge is not always available.").  Circumstantial

28 evidence may include "evidence that the [defendant] *must* have known" the relevant fact.  *Martinez*

13

*v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 82 Cal. App. 4th 883, 891 (2000) (emphasis added).  There is a mountain of undisputed circumstantial — as well as direct — evidence proving that Microsoft knew or must have known that OpenAI was a charitable trust funded by Musk and that Microsoft knew or must have known about OpenAI's charitable purpose.

On December 11, 2015, OpenAI posted a blog announcement that described its nonprofit mission and listed Musk as a major financial backer.  Ex. 2.  Just one day later, Microsoft's CEO shared a copy of that blog post internally within the company.  *See* Ex. 8; Ex. 9 (Nadella Tr.) at 36:19-37:23.

Soon after, in 2016, Microsoft donated compute to the nonprofit.  In its own internal presentation about the donation, Microsoft described OpenAI as a "non-profit [AI] research company" co-founded by Elon Musk with the mission to "benefit humanity as a whole, ***unconstrained by a need to generate financial return***."  Ex. 10 (emphasis added).  Microsoft's CEO acknowledged that he knew Musk was one of OpenAI's major donors from 2015 until at least 2018. Ex. 9 (Nadella Tr.) at 92:16-25.

In 2019, before making its $1 billion investment in OpenAI, Microsoft studied OpenAI's tax exemption application and Certificate of Incorporation, which identified OpenAI's mission and stated that "[t]he corporation is not organized for the private gain of any person" and that "no part of the net income or assets of [OpenAI] shall ever inure . . . to the benefit of any private person." Ex. 24 at -36539; Ex. 7 (Microsoft Tr.) at 124:24-126:10, 127:1-128:11.  Microsoft's CEO admitted that it was "clear to [him] that, instead of profits, OpenAI's duty was to its stated mission."  Ex. 9 (Nadella Tr.) at 44:1-45:9.  A jury could readily infer from this evidence that Microsoft knew that OpenAI had a duty to use its charitable donations to further its mission — not to pursue profit.

### B.    Microsoft Knew Altman, Brockman, and OpenAI Would Be Acting in Violation of OpenAI's Charitable Purpose by Engaging in the Type of Commercial Activity It Undertook

Microsoft argues that it also lacked knowledge that the OpenAI Defendants were breaching their charitable duties when they engaged in commercial deals with Microsoft.  But the evidence supports a finding of knowledge on that issue too.

To prove aiding and abetting, evidence that a defendant "must have known" about the

14

primary wrongdoer's breach of fiduciary duty is enough to support actual knowledge of that breach. *Martinez*, 82 Cal. App. 4th at 890 (emphasis omitted). Microsoft need not have known all the specifics of OpenAI's commitments to Musk — or even that OpenAI owed a fiduciary duty specifically to Musk at all. Instead, knowledge that the nonprofit was breaching the obligations it owed to *all* its charitable donors is sufficient.

In *In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006), for example, Lehman Brothers was found to have aided and abetted a lender's fraudulent practices simply because it knew of the lender's fraudulent practices, even though there was no showing that Lehman knew the identities of each defrauded member of the numerous plaintiff class. *Id.* at 994. And in *Casey v. U.S. Bank National Association*, 127 Cal. App. 4th 1138 (2005), the court explained that "plaintiffs clearly alleged the defendants' actual knowledge of the underlying wrong they substantially assisted" where they alleged that a third party knew that another party was "running a Ponzi scheme and was thereby defrauding investors and violating his fiduciary duties to these investors," even without a showing that the third party knew any further details of the scheme. *Id.* at 1148 (summarizing *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003)).

Microsoft argues that Plaintiff has raised only "a vague suspicion of wrongdoing." Mot. at 15 (citing *AngioScore*, 70 F. Supp. 3d at 957). That is incorrect. There is ample evidence, including a smoking gun email and a series of atypical transactions, from which a jury could infer that Microsoft — one of the world's most sophisticated corporations — must have known OpenAI was breaching its duties of charitable trust to its donors.

In fact, Microsoft knew that OpenAI was breaching its charitable obligations from the moment that OpenAI shared its plans to create a for-profit entity in 2018. On March 7, 2018 — mere *weeks* after Musk resigned from the board of OpenAI — Altman presented a plan to Microsoft to launch a commercial venture. Ex. 1. Microsoft's CTO immediately recognized that Altman's plan would be a breach of OpenAI's duties. He emailed the CEO of Microsoft, and others, with a shockingly prescient question: **"*I wonder if the big OpenAI donors are aware of these plans? Ideologically, I can't imagine that they funded an open effort to concentrate [machine learning] talent so that they could then go build a closed, for profit thing on its back.*"** *Id.* (emphasis added).

1    That alone is enough to sustain Plaintiff's claim.

2        But there's much more.  Microsoft's other executives acknowledged that Microsoft's deals

3    with OpenAI subverted the company's obligations to the charity.  For example, Microsoft's CFO

4    noted that OpenAI's profit "cap is actually larger than 90% of public companies" and that the limit

5    on Microsoft's profits thus was *not "terribly altruistic."*  Ex. 26 (emphasis added); *see also* Ex. 9

6    (Nadella Tr.) at 101:13-21 (declaring any profit return "far-fetched," even though the nonprofit

7    would receive its residual share only after OpenAI reached that cap).

8        That evidence bears no resemblance to the record in *Casey*.  The court in *Casey* dismissed

9    an aiding and abetting claim because the plaintiff was only able to allege the bank knew that certain

10   customers were doing "*something* fishy" generally, without any more specific allegations of

11   knowledge.  127 Cal. App. 4th at 1152.  The evidence against Microsoft shows far more than a

12   general suspicion of wrongdoing.  It clearly establishes that Microsoft knew OpenAI was breaching

13   its obligations to its donors to use their funds for the good of humanity, not for financial gain.

14       Suspicious and atypical transactions can also raise triable questions of knowledge.  *See Simi*

15   *Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1099 (N.D. Cal. 2013) (extensive

16   suspicious financial activity at defendant bank raised triable question of knowledge); *Neilson*, 290

17   F. Supp. 2d at 1120 ("atypical banking procedures" could support inference that alleged aider and

18   abettor knew of Ponzi scheme).  Suspicious and atypical terms abound in Microsoft's deals with

19   OpenAI.

20       In 2019, for example, OpenAI created an unprecedented governance structure in which

21   Microsoft could invest.  Microsoft's CEO acknowledged that this atypical structure was the

22   "foundational piece that allowed [Microsoft] to even do our deal." Ex. 9 (Nadella Tr.) at 93:14-19.

23   And in 2021, when Microsoft made an additional *$2 billion* dollar investment in OpenAI, *neither*

24   *company publicly announced* it—a highly unusual decision in light of OpenAI's "open" mission

25   and Microsoft's status as a public company.  In 2023, OpenAI converted its L.P. into a brand-new

26   suite of LLCs into which it asked Microsoft to invest.  After Microsoft "approved" that restructuring

27   and invested an additional *$10 billion*, it was promised an astounding return of 600%, to increase

28   by *20% per year*.  Meanwhile, the nonprofit entity was required to wait until investors were paid

16

1  over $261 billion before it would receive any of its residual interest.   Ex. 42 at -55021-22, -55085-

2  87; Ex. 41 at -1169.   Reid Hoffman, seated on *both* the Microsoft board *and* the OpenAI board,

3  voted, in his capacity as OpenAI director, to approve *both* the 2021 and 2023 deals. *See* pp. 4, 6

4  *supra*.

5      Everything about Microsoft's and OpenAI's effort to convert OpenAI into a commercial

6  enterprise was irregular for an organization that purported to be organized to "benefit the public"

7  rather than "the private gain of any person."   Ex. 24 at -36539.   That irregularity evidences their

8  close connection.   They developed a deep relationship — starting at the highest levels of both

9  companies — with the common goal of making previously unheard of sums of money.   As Nadella

10  openly boasted, "We are in there.   We are below them, above them, around them."   Ex. 58 at -13914.

11  A jury could readily infer Microsoft knew that the Open AI Defendants breached their charitable

12  duties.

13
14  **C.    Microsoft Substantially Assisted Altman, Brockman, and OpenAI in Their Breach of Charitable Trust**

15      Microsoft next asserts it cannot be held liable for aiding and abetting unless it also ***intended***

16  to assist OpenAI's violation of its fiduciary duties.  Mot. at 18.  That is not the law.

17      "[A]iding and abetting liability under California law, as applied by the California state

18  courts, requires a finding of actual knowledge, ***not specific intent***."   *In re First All. Mortg. Co.*, 471

19  F.3d 977, 993 (9th Cir. 2006) (emphasis added).   Aiding and abetting requires intent only in the

20  sense that it distinguishes an "accidental participant" from a "defendant who acts with actual

21  knowledge of the intentional wrong to be committed ***and provides substantial assistance*** to the

22  primary wrongdoer."   *Upasani v. State Farm Gen. Ins. Co.*, 227 Cal. App. 4th 509, 519 (2014)

23  (emphasis added); *see also In re First All. Mortg. Co.*, 471 F.3d at 1005 ("[T]o the extent that aiding

24  and abetting is an 'intentional tort,' it is only intentional in the sense that the aider and abettor intends

25  to take the actions that aid and abet, not that the tortfeasor specifically intends for his actions to

26  result in the fraudulent harm.").[9]

27  ─────────────────

28  [9] *Casey* is not to the contrary.  Mot. at 18.  In reviewing courts' many different articulations of aiding and abetting standards, *Casey* addressed only the "***knowledge*** element."  127 Cal. App. 4th at 1145

1    Microsoft was not an accidental participant.  It intended to take the actions that aided and

2    abetted OpenAI and it substantially assisted OpenAI in its violation of charitable duties.  Microsoft's

3    financial commitment, itself, demonstrates substantial assistance.  Contending the carefully

4    considered investment of a total of $13 billion ***doesn't*** constitute substantial assistance fails the

5    straight-face test, as well as the legal test.

6    To ensure returns on that enormous financial commitment, Microsoft also purposefully

7    pushed OpenAI to direct its assets toward generating enormous future profits for private gain.  *See*

8    pp. 6-8, *supra.*  Microsoft told OpenAI it needed to generate $100 million in revenues to secure the

9    next $10 billion commitment from Microsoft.  Ex. 21 (Murati Tr.) at 111:12-112:11; Ex. 3

10   (Sutskever Tr.) at 125:19-126:5; Ex. 32 at 50-51.  And Microsoft urged OpenAI to take additional

11   steps to commercialize products, produce revenue, and generate returns on Microsoft's investment.

12   *See* pp. 8-9, *supra.*   That conscious assistance is more than sufficient to satisfy any intent

13   requirement for aiding and abetting.  *See, e.g.*, *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d

14   513, 531 (Cal. 1998) (defendant's knowledge that breach would be a "necessary consequence" of

15   its actions sufficient to establish intent).

16   **D.    Microsoft's Evidence Fails To Meet the Standard for Summary Judgment
         and, At Most, Demonstrates a Genuine Issue of Material Fact**

17   Microsoft argues that because OpenAI made a boilerplate representation that its agreements

18   with Microsoft would not violate any third-party rights, Microsoft could not have known that those

19   agreements violated OpenAI's duties to Musk as a charitable donor.  Mot. at 19-20.  It asks the

20   Court to find the absence of a necessary element (knowledge) based on a single piece of evidence

21   — a boilerplate disclaimer issued by a co-defendant — notwithstanding lots of contrary evidence.

22   That argument ignores basic summary judgment principles and is contrary to Circuit law.

23   Courts have denied summary judgment on aiding and abetting claims where a transaction

24   document says one thing, but other evidence points in the opposite direction.  In *River Colony*

25   *Estates General Partnership v. Bayview Financial Trading Group, Inc.*, 287 F. Supp. 2d 1213 (S.D.

27   (emphasis added).  Applying those standards, *Casey* dismissed an aiding and abetting claim for
28   failing to allege knowledge of the "primary wrong" without also conducting any separate analysis
     of intent.  *Id.* at 1152-53.

1    Cal. 2003), the court found a triable issue of fact as to whether mortgage brokers aided and abetted

2    a fraud when an "officer's certificate" supposedly confirmed there was investor approval, but

3    "plaintiffs present[ed] evidence that suggest[ed] that there was no reasonable basis for [the

4    defendant] to rely on the officer's certificate and that [the mortgage brokers] may have known that

5    the officer's certificate was false." *Id.* at 1226. Here, too, the evidence shows that Microsoft had

6    ample reason not to rely on OpenAI's false representations.

7          Microsoft incorrectly relies on *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del.

8    2006), to argue that a fiduciary may "negate[ ]" a counterparty's knowledge of its breach by making

9    certain representations in a contract. Mot. at 18-20. That is not what *Radnor* held. In that case,

10   Radnor had provided solvency certificates to a counterparty, and the counterparty relied on them in

11   issuing loans. The court found, after trial, that Radnor had no reason to doubt the certificates and

12   so was reasonable in relying on them. *In re Radnor Holdings Corp.*, 353 B.R. at 830, 832-33. Here,

13   by contrast, Microsoft had substantial reason to doubt OpenAI's representations — including the

14   information Microsoft uncovered in its own due diligence process and flagged in its own internal

15   correspondence. *See* pp. 1-3, 5, *supra*. It was not reasonable for Microsoft to rely on OpenAI's

16   generic deal representations in those circumstances.[10]

17         There is, at least, a genuine issue of fact as to whether Microsoft knew about OpenAI's

18   breach, notwithstanding OpenAI's self-serving contractual representations. *See PMC, Inc. v.*

19   *Kadisha*, 78 Cal. App. 4th 1368, 1387 (2000) (denying summary judgment because, even though

20   "an investigation . . . found no ongoing use of . . . trade secrets," there was also "evidence sufficient

21   to raise a triable issue whether the claimed reliance was clearly unreasonable under the

22   circumstances known to defendants at the time"). That dispute of fact should be resolved by the

23   factfinder.

24

25   _____

     [10] For the same reason, Microsoft's reliance on tortious interference cases is unavailing. Mot. at 19.

26   *Oakley, Inc. v. Nike, Inc.*, 988 F. Supp. 2d 1130 (C.D. Cal. 2013), suggests only that a truly ignorant
     person may rely on a contractual counterparty's factual, not legal, representations. *Id.* at 1137. And

27   even in that context, a "jury may infer culpable intent from conduct substantially certain to interfere
     with the contract." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 911 (9th Cir. 2008)

28   (internal quotation marks and citation omitted).

1

## II.    SUBSTANTIAL EVIDENCE SUPPORTS MUSK'S UNJUST ENRICHMENT CLAIM CREATING, AT MINIMUM, A GENUINE ISSUE OF MATERIAL FACT

2

3    Again claiming it lacked knowledge of any wrongdoing, Microsoft argues that it is entitled

4  to summary judgment on Musk's unjust enrichment claim as well.  Mot. at 22-23.  That assertion

5  ignores the standard for knowledge on an unjust enrichment claim.  Microsoft's additional argument

6  that Musk's claims are duplicative misreads the law.

7    ### A.    Microsoft Had Reason to Know the Circumstances Giving Rise to Unjust Enrichment

8

9    To prove unjust enrichment, Musk must show that Microsoft received a benefit and unjustly

10  retained it at the expense of another.  *Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc*., 29 Cal.

11  App. 5th 230, 238 (2018).  Musk is not required to show actual knowledge.  To the contrary,

    California courts have repeatedly affirmed that plaintiffs need only show that the defendant "knew

12  ***or had reason to know*** *the circumstances giving rise* to unjust enrichment.  *Id.* at 233 (emphasis

13  added) (reversing dismissal where "complaint states sufficient facts that defendants knew or had

14  reason to know of plaintiff's right and interest"); *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th

15  1657, 1670-71 (1992) (situation where defendant "knew or should have known it did not own all of

16  the property" but still kept the proceeds from its sale was "a classic case of unjust enrichment");

17  *Gen. Star Indem. Co. v. First Am. Title Ins. Co. of Napa*, No. 20-cv-3210-TSH, 2021 WL 916850,

18  at *4 (N.D. Cal. Mar. 10, 2021).[11]  "A person has reason to know a fact if . . . other facts known to

19  the person would make it reasonable to infer the existence of the fact, or prudent to conduct further

20  inquiry that would reveal it."  Restatement (Third) of Restitution § 69(3) (2011).[12]

21    There is ample evidence that Microsoft knew OpenAI was subverting its charitable

22  donations for private financial gain.  *See* pp. 13-17, *supra*.  That same evidence also easily

23  establishes that Microsoft ***should have known*** about OpenAI's misconduct.  *See Pro. Tax Appeal*,

24

25  _____

[11] *See also* Judicial Council of California Civil Jury Instructions No. 375 (2025 ed.)  (Plaintiff "is

26  entitled to restitution if [he] proves that [the defendant] knew or had reason to know" of the circumstances rendering its retention of a benefit unjust).

27  [12] Here too, Microsoft quibbles over whether it knew of specific duties OpenAI owed to Musk.  Mot.

28  at 22.  Microsoft knew OpenAI was a charity that had been funded by donors — including Musk — for public benefit.  That is sufficient notice to make Microsoft's enrichment unjust.

20

29 Cal. App. 5th at 239 (sophisticated investors who would have discovered facts in ordinary due diligence charged with notice of unjust enrichment); *Welborne v. Ryman-Carroll Found.*, 22 Cal. App. 5th 719, 727 (2018) (evidence that defendant was aware of investment advisor's prior wrongdoing sufficient to give rise to duty to inquire). The concerns that Microsoft's CTO expressed about whether "the big OpenAI donors are aware of these plans" and his observation that he "can't imagine that they funded an open effort to concentrate [machine learning] talent so that they could then go build a closed, for profit thing on its back" are sufficient on their own to raise a triable issue as to Microsoft's constructive knowledge. Ex. 1 at -44183.

### B.      Musk Need Not Elect Between His Unjust Enrichment and Tort Claims

Microsoft argues that Musk's unjust enrichment claim is duplicative because it is based on the same facts and seeks the same relief as his aiding and abetting claim. That argument misreads both the law and the substance of Musk's claims.

California law permits unjust enrichment claims even when they are allegedly "duplicative of or superfluous to [a plaintiff's] other claims." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *see also DeArmey v. Hawaiian Isles Kona Coffee Co., Ltd*, No. SACV 19-432 JVS, 2019 WL 6723413, at *6 (C.D. Cal. July 22, 2019) ("DeArmey's unjust enrichment claim does not fail [merely] because it may be duplicative of his statutory claims."). Microsoft's arguments thus would not be grounds for dismissal even if they were accurate descriptions of Musk's claims.

Regardless, Musk's claims are not duplicative. The claims have different elements and are governed by different legal standards. Aiding and abetting requires that the defendant "knows [that another party's] conduct constitutes a breach of duty" and "gives substantial assistance or encouragement to the other to so act." *Am. Master Lease LLC*, 225 Cal. App. 4th at 1475. By contrast, "[t]he elements of a cause of action for unjust enrichment are simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of another.'" *Pro. Tax Appeal*, 29 Cal. App. 5th at 238 (citation omitted). Those standards are different. A jury could potentially find, for example, that Microsoft's retention of benefits from Musk's contributions to OpenAI is "unjust" even if the jury was not persuaded that OpenAI breached a fiduciary duty to Musk, that Microsoft knew about that breach, or that Microsoft gave substantial assistance or encouragement to the

21

breach.

Microsoft urges that both claims arise out of the same "facts."  Mot. at 21.  But none of Microsoft's cases stand for the proposition that mere factual overlap is grounds for dismissal. Regardless, Musk's claims do **not** arise out of the same facts because the aiding and abetting claim requires Musk to establish several additional facts that the unjust enrichment claim does not — namely, OpenAI's breach of a fiduciary duty to Musk, Microsoft's knowledge of that breach, and Microsoft's substantial assistance.  Because Musk must prove several additional facts to establish aiding and abetting, the jury could potentially find for Musk on his unjust enrichment claim even while finding against him on his aiding and abetting claim.

Microsoft also argues that Musk's unjust enrichment claim should be dismissed because it seeks the **same relief** as his aiding and abetting claim.  Mot. at 21-22.  But Microsoft misreads the case law it relies on.  In *Sonner v. Premier Nutrition Corp.*, 49 F.4th 1300 (9th Cir. 2022), the plaintiff sought both "equitable restitution" and "damages" as remedies for the **same claim**.  *Id.* at 1302-03.  The court's holding that a plaintiff must show that it has no adequate remedy at law in order to seek equitable remedies **on the same claim** does not mean that a plaintiff must show that it has no adequate remedies at law in order to bring **separate** claims for tort and unjust enrichment.[13]

Microsoft's remaining cases involved situations where the unjust enrichment claim was expressly premised on the same facts underlying another claim.  *See Sepanossian v. Nat'l Ready Mixed Concrete Co.*, 97 Cal. App. 5th 192, 208 (2023) ("The unjust enrichment claim merely incorporates the allegations, derivative of the UCL claim[.]"); *Stapleton v. JPMorgan Chase Bank, N.A.*, 779 F. Supp. 3d 1059, 1076 (N.D. Cal. 2025) ("[T]he unjust enrichment claim merely incorporates the allegations for aiding and abetting[.]").  Neither of those cases suggests that the mere fact that two claims seek the **same relief** is a sufficient reason to dismiss one of them.

Nor would that rule make any sense.  Where different claims have different elements, a plaintiff is entitled to present multiple claims to the jury, so that the jury can decide which claims,

---

[13]  Moreover, Microsoft wrongly assumes that Musk's claims are necessarily equitable. "[R]estitution can be a legal, as opposed to equitable, remedy." *Jogani v. Superior Ct.*, 165 Cal. App. 4th 901, 910 (2008).

if any, are supported by the evidence.  *See Tanforan v. Tanforan*, 173 Cal. 270, 274 (1916) ("[A court may not] force upon the plaintiff an election between those causes which he has a right to plead.  Plaintiff is entitled to introduce his evidence upon each and all of these causes of action, and the election . . . [is] a matter for the judge or the jury."); 4 Witkin, California Procedure: Pleading § 418 (6th ed. 2025).  The fact that two claims seek the same relief does not mean they will stand or fall together.  Dismissing certain claims merely because they seek the same relief as other claims arbitrarily deprives plaintiffs of their opportunity to present otherwise valid claims to the jury — claims that could make the difference between a recovery and no recovery at all, depending on which claims the jury accepts.  None of Microsoft's cases supports that irrational result.

## CONCLUSION

Microsoft's motion should be denied.

Dated:  November 7, 2025                    MOLOLAMKEN LLP


                                           By:      /s/ Steven F. Molo
                                                    Steven F. Molo (*pro hac vice*)

                                                    Marc Toberoff (CA SBN 188547)
                                                    MToberoff@toberoffandassociates.com
                                                    TOBEROFF & ASSOCIATES, P.C.
                                                    23823 Malibu Road, Suite 50-363
                                                    Malibu, CA  90265
                                                    Telephone: (310) 246-3333

                                                    Robert K. Kry (*pro hac vice*)
                                                    Jennifer M. Schubert (*pro hac vice*)
                                                    Walter H Hawes IV (*pro hac vice*)
                                                    Alexandra C. Eynon (*pro hac vice*)
                                                    Sara Tofighbakhsh (*pro hac vice*)
                                                    MOLOLAMKEN LLP
                                                    430 Park Avenue
                                                    New York, NY  10022
                                                    Telephone: (212) 607-8160

                                                    *Attorneys for Plaintiffs Elon Musk*
                                                    *and X.AI Corp.*