# EXHIBIT 3

```
                                                                    1

 1                 UNITED STATES DISTRICT COURT

 2                   NORTHERN OF CALIFORNIA

 3                      OAKLAND DIVISION
     _____
 4   ELON MUSK, et al.,            )
                                   )
 5            Plaintiffs,          )
                                   )
 6   v.                            )   Case No. 4:24-cv-04722-YGR
                                   )
 7   SAMUEL ALTMAN, et al.,        )
                                   )
 8            Defendants.          )
     _____)
 9

10

11

12               ** HIGHLY CONFIDENTIAL **

13         Videotaped Deposition of ILYA SUTSKEVER

14                San Francisco, California

15               Wednesday, October 1, 2025

16

17

18

19

20

21

22

23            Reported Stenographically by

24       Michael P. Hensley, RDR, CSR No. 14114

25
```

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2                 NORTHERN OF CALIFORNIA
 3                    OAKLAND DIVISION
    _____
 4  ELON MUSK, et al.,         )
                               )
 5         Plaintiffs,         )
                               )
 6  v.                         )  Case No. 4:24-cv-04722-YGR
                               )
 7  SAMUEL ALTMAN, et al.,     )
                               )
 8         Defendants.         )
    _____)
 9
10
11      Videotaped Deposition of ILYA SUTSKEVER,
12  commencing at the hour of 10:19 AM and concluding at
13  the hour of 8:07 PM on Wednesday, October 1, 2025,
14  at the location of Cooley, LLP,
15  3 Embarcadero Center, 20th Floor, San Francisco,
16  California 94111, before Michael Hensley, Registered
17  Diplomate Reporter, Certified Shorthand Reporter
18  No. 14114, in and for the State of California.
19
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2  For Plaintiffs:
 3       MOLOLAMKEN LLP
         BY:  STEVEN F. MOLO, ESQ.
 4            JENNIFER SCHUBERT, ESQ.
              SARA TOFIGHBAKHSH, ESQ.
 5       430 Park Avenue
         New York, New York 10022
 6       212.607.8170
         smolo@mololamken.com
 7       jschubert@mololamken.com
         stofighbakhsh@mololamken.com
 8
 9  For Defendant Microsoft Corporation:
10       DECHERT LLP
         BY:  RUSSELL P. COHEN , ESQ.
11            YOSEF WEITZMAN, ESQ.
         45 Fremont Street, 26th Floor
12       San Francisco, California 94105
         415.262.4506
13       russ.cohen@dechert.com
         yosi.weitzman@dechert.com
14
15  For Defendant OpenAI:
16       WACHTELL, LIPTON, ROSEN & KATZ
         BY:  SARAH K. EDDY, ESQ.
17            KELSEY BORENZWEIG, ESQ.
              WILLIAM SAVITT, ESQ.
18       51 West 52nd Street
         New York, New York 10019
19       212.403.1219
         skeddy@wlrk.com
20       kaborenzweig@wlrk.com
         wdsavitt@wlrk.com
21
22
23
24
25
```

Page 4

```
 1  APPEARANCES (CONTINUED):
 2  For Deponent Ilya Sutskever:
 3       COOLEY LLP
         BY:  SIMONA AGNOLUCCI, ESQ.
 4            EDUARDO SANTACANA, ESQ.
              ANIKA HOLLAND, ESQ.
 5            REMY CARREIRO, ESQ.
         3 Embarcadero Center, 20th Floor
 6       San Francisco, CA 94111
         415.693.2535
 7       sagnolucci@cooley.com
         esantacana@cooley.com
 8       anika.holland@cooley.com
         rcarreiro@cooley.com
 9
10  Also Present:
11       MIGUEL CONCEPCION, Videographer
12
13  Present Remotely:
14       ELIZABETH PRADO, AV Monitor
15       JAYMIE PARKKINEN, ESQ.
16       IANNI DRIVAS, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                        INDEX
 2
 3                     EXAMINATIONS
 4  WITNESS:  ILYA SUTSKEVER                      Page
 5  BY ATTORNEY MOLO                                12
 6  BY ATTORNEY COHEN                              327
 7  BY ATTORNEY MOLO                               339
 8
 9                      EXHIBITS
10  No.          Description                      Page
11  1    (Confidential) Bates Number                19
         OPENAI_MUSK00016785:  Email
12       exchange, top message from Sam
         Altman 7/15/25
13
     2   (Confidential) Bates Number                24
14       OPENAI_MUSK00016833 - 00016844:
         Email exchange, top message from Sam
15       Altman 8/16/15
16   3   (Confidential) Bates Number                28
         2024MUSK-0005305:  Email exchange,
17       top message from Elon Musk 11/19/15
18   4   (Confidential) Bates Number                32
         2024MUSK-0004484:  Email exchange,
19       top message from Elon Musk 12/10/15
20   5   (Confidential) Bates Number                32
         2024MUSK-0005266:  Email from Elon
21       Musk 11/20/15
22   6   (Confidential) Bates Number                36
         2024MUSK-0009787:  Email from Elon
23       Musk 12/11/15
24
25
```

MUSK
ALTMAN
Case 4:24-cv-04722-YGR   Document 379-92   Filed 01/06/26   Page 4 of 14
Highly Confidential
Ilya Sutskever
October 01, 2025

Page 58

1   Q.   Okay.
2        He made you better at your job?
3   A.   In various -- in many -- in many various
4   ways.
5   Q.   And did you observe him making other
6   people at OpenAI better at their jobs?
7        ATTORNEY EDDY:  Objection.  Vague.
8        (Court reporter clarification.)
9        ATTORNEY MOLO:  Could you read the
10  question back, please.
11       (Court reporter readback.)
12       THE WITNESS:  Yes.
13  BY ATTORNEY MOLO:
14  Q.   You cc'd Greg Brockman on this email to
15  Mr. Musk.
16       Was it your view that Greg Brockman shared
17  your views about Mr. Musk at the time you wrote the
18  email?
19       ATTORNEY AGNOLUCCI:  Objection.  Calls for
20  speculation.
21  BY ATTORNEY MOLO:
22  Q.   I'm asking about your view.
23       ATTORNEY AGNOLUCCI:  I know that that's
24  how you phrased it, but it's not what you're really
25  asking.

Page 59

1        ATTORNEY EDDY:  I'll join in the objection
2   and --
3        ATTORNEY MOLO:  The transcript reflects
4   what I'm asking.
5        THE WITNESS:  I mean, it's conceivable.
6   BY ATTORNEY MOLO:
7   Q.   Okay.
8        ATTORNEY EDDY:  Just for the -- for the
9   ease of transcript and so on, can we have an
10  agreement that anytime counsel for the witness
11  objects, I also join in that objection.
12       ATTORNEY MOLO:  Sounds great.
13       ATTORNEY COHEN:  And Microsoft as well,
14  please.
15       ATTORNEY MOLO:  Even better.
16  BY ATTORNEY MOLO:
17  Q.   So at the beginning of OpenAI, when the
18  work really began, you had many exploratory research
19  projects.
20       Is that fair?
21  A.   Yes.
22  Q.   Okay.
23       Language models were only part of that;
24  correct?
25  A.   Yes.

Page 60

1   Q.   GPT-1 was not created until 2018; correct?
2   A.   I don't remember the exact dates.
3   Q.   Okay.
4        It was your insight into transformers that
5   led OpenAI's natural language breakthroughs; is that
6   correct?
7   A.   Yes.
8   Q.   Okay.
9        Around 2020, OpenAI began devoting more
10  resources to researching large language models; is
11  that right?
12  A.   I don't remember the dates.
13  Q.   Okay.
14       Do you think it may have been around 2020?
15  A.   It's plausible.
16  Q.   Okay.
17       The first deal with Microsoft happened in
18  2019; is that correct?
19  A.   I don't remember the exact dates.
20  Q.   Okay.
21       Did the resources being devoted to
22  researching large language models increase after the
23  first Microsoft transaction?
24       ATTORNEY AGNOLUCCI:  Objection.  Vague.
25  Foundation.

Page 61

1        THE WITNESS:  I don't remember precisely
2   enough.
3   BY ATTORNEY MOLO:
4   Q.   Okay.
5   A.   Plausible.
6   Q.   I'm sorry.
7        Do you remember the sequence of events,
8   though, that, after the first Microsoft transaction,
9   more resources were devoted to large language model
10  research?
11       ATTORNEY AGNOLUCCI:  Same objections.
12  Foundation.  Vague.
13       THE WITNESS:  Which -- which --
14       I actually would say "No."
15  BY ATTORNEY MOLO:
16  Q.   Okay.
17       And why not?
18  A.   The first Microsoft transaction, the
19  resources were primarily -- primarily allocated to
20  reinforcement learning on games.
21       (Court reporter clarification.)
22  BY ATTORNEY MOLO:
23  Q.   So that was, you're saying, after the
24  first Microsoft transaction?  Reinforcement learning
25  in games?

MUSK
ALTMAN
Case 4:24-cv-04722-YGR   Document 379-92   Filed 01/06/26   Page 5 of 14
Highly Confidential
Ilya Sutskever
October 01, 2025

Page 62

1    A.   So there was -- what -- so what -- when
2 you say, "the first Microsoft transaction," what do
3 you mean?
4    Q.   Not the compute -- the initial acquisition
5 of the compute but the financial investment that
6 they made.
7    A.   Which -- what -- what quantity?
8    Q.   That was that one --
9        Yeah.
10       $1 billion.
11   A.   Yeah.
12       Then after this investment, research into
13 large language models has increased.
14   Q.   Okay.  Thank you.
15       And then sometime in 2020, OpenAI split
16 into these two groups, one dealing with applied and
17 the other dealing with research; is that right?
18   A.   I don't have an exact recollection.
19   Q.   But did that split occur?
20   A.   I don't feel confident enough to -- to
21 answer with a "Yes."
22   Q.   Okay.
23       Did Mira Murati come to lead one group
24 within OpenAI?
25   A.   I have a vague recollection of "Yes."

Page 63

1    Q.   Okay.
2       And the group that she was leading dealt
3 with a product development for applied AI; is that
4 right?
5       ATTORNEY AGNOLUCCI:  Objection.  Form.
6 Foundation.
7       THE WITNESS:  It sounds plausible.  I
8 don't remember precisely what she was leading.
9 BY ATTORNEY MOLO:
10   Q.   Okay.
11       You led a group that -- that -- that was
12 doing research and was more exploratory and
13 experimenting at the time; right?
14   A.   Yes.
15   Q.   All right.
16       And on July 5th of 2023, you and Jan Leike
17 started what was called the Superalignment team;
18 correct?
19   A.   I don't remember the dates.
20   Q.   Okay.
21       Was it around July 5th of 2023?
22   A.   It's plausible.
23       ATTORNEY MOLO:  Okay.
24       I'm going to show you Exhibit 12.
25               ///

Page 64

1       (Exhibit 12 was marked for
2       identification.)
3 BY ATTORNEY MOLO:
4    Q.   Okay.
5       This is a document dated July 5th of 2023
6 that says "introducing Superalignment."
7       You recall that this was a document that
8 was issued by OpenAI?
9    A.   I recall a document like this.
10   Q.   Okay.
11       And if you go to the third page, which is
12 actually the -- I think it's the fifth page, but, I
13 mean, it's -- because these are double-sided,
14 printed.  It actually says the authors there.
15       You see that?
16   A.   Yes.
17   Q.   And it says authors are Jan Leike and you;
18 correct?
19   A.   Yes.
20   Q.   All right.
21       Do you recall writing this?
22   A.   I don't, but I'm sure I wrote it.
23   Q.   Okay.
24       And on the very first paragraph, you
25 state:

Page 65

1       [As Read]  We need scientific and
2       technical breakthroughs to steer and
3       control AI systems much smarter than us.
4       To solve this problem within four years,
5       we're starting a new team co-led by you,
6       Ilya Sutskever, and Jan Leike and
7       dedicating 20 percent of the compute we've
8       secured to date to this effort.
9       And then it goes on.  And then in the
10 second paragraph, the second sentence, it says that,
11 therefore, you -- for your convenience:
12       [As Read]  But the vast power of
13       superintelligence could also be very
14       dangerous and could lead to the
15       disempowerment of humanity or even human
16       extinction.
17       And then on the second page, if you turn
18 it over, it states:
19       [As Read]  How do we ensure AI systems
20       much smarter than humans follow human
21       intent?
22       It says:
23       [As Read]  Currently, we don't have a
24       solution for steering or controlling a
25       potentially superintelligent AI and

## Page 122

1  page?
2      A.  Yes.
3      Q.  And so what -- what did you understand
4  happened there for you to include this in your memo?
5          ATTORNEY AGNOLUCCI:  Object to form.
6          THE WITNESS:  My understanding is as
7  described in the paragraph that precedes the
8  screenshots.
9  BY ATTORNEY MOLO:
10     Q.  Okay.
11         And what is that?
12     A.  It is that -- I should also add a bit of
13 context that it's been two years ago, which is less
14 than the other events; but they've been tumultuous,
15 and so I don't remember them very precisely.
16         My recollection is literally what these
17 five lines, this paragraph, says.
18     Q.  And which five lines are those?
19     A.  Sam told Mira that Jason told him that
20 OpenAI does not need to invoke the DSB for GPT-4
21 Turbo.
22     Q.  Okay.
23         And do you believe that that was an
24 instance of Sam Altman lying?
25     A.  You know, I believed it to be an instance

## Page 123

1  of -- of an -- you know, significant imprecision.
2  And whether you describe -- they choose to describe
3  the adjective to this or not, I think it's up to
4  one's discretion.
5      Q.  Okay.
6          It appears -- at page 531 of your
7  document, it appears that under a heading called
8  "Lying"?
9      A.  Yes.
10     Q.  So, at the time, you believed that that
11 was an incident of Sam Altman lying?
12     A.  Yes.
13         ATTORNEY AGNOLUCCI:  Object to form.
14 BY ATTORNEY MOLO:
15     Q.  Okay.
16         I'm going to direct your attention to
17 pages with the -- to the page with the Bates number
18 565.
19     A.  565.
20     Q.  556 of Exhibit 19.
21     A.  Okay.  Let's see.
22         565.
23     Q.  Yes.
24         ATTORNEY AGNOLUCCI:  Oh.
25         THE WITNESS:  So that's quite a bit later?

## Page 124

1  BY ATTORNEY MOLO:
2      Q.  It looks like this.
3      A.  Okay.  Let's see.
4          ATTORNEY AGNOLUCCI:  And while you're
5  looking through it, Ilya --
6          THE WITNESS:  Yeah, I see.
7          ATTORNEY AGNOLUCCI:  -- remember to give
8  me a minute to object --
9          THE WITNESS:  Okay.
10         ATTORNEY AGNOLUCCI:  -- before you answer.
11         THE WITNESS:  Thank you.
12         ATTORNEY AGNOLUCCI:  Thank you.
13         THE WITNESS:  Yes.
14 BY ATTORNEY MOLO:
15     Q.  This -- I think you really will find that
16 it's easier if you do use that, if you like.
17     A.  Thank you.
18     Q.  You're welcome.
19     A.  What do you need me to do?
20     Q.  So if -- these are screenshots of Mira
21 Murati's feedback to Sam Altman that you included in
22 your memo; is that right?
23     A.  Correct.
24     Q.  And images are hard to read, but directing
25 your -- to the first picture at the top of the page.

## Page 125

1      A.  Yes.
2      Q.  It says "focus on users."  And there's a
3  paragraph number 2 there.
4          Do you see that?
5      A.  Yes.
6      Q.  It says:
7              [As Read]  This year the most cited
8          goal to the company has been $100 million
9          revenue goal.  You said that Kevin and
10         Satya said this was needed to raise the
11         next 10 billion.  It didn't matter how we
12         got to this number; we needed to get
13         there.  We pressured the GTM team to do
14         big, quick contracts instead of carrying
15         out a cohesive strategy around the
16         platform.
17         You see where it says that?
18     A.  Yes.
19     Q.  In 2022, had you understood that the
20 company's goal was to raise $100 million in revenue
21 in order to receive the next round of funding from
22 Microsoft?
23         ATTORNEY AGNOLUCCI:  Objection.
24 Foundation.
25         THE WITNESS:  It's -- I had a vague

Page 126

1  understanding of it, but not a crisp understanding.
2  BY ATTORNEY MOLO:
3      Q.   Okay.
4           And had you heard this from Sam?
5      A.   It is extremely possible.
6      Q.   Okay.
7           Did you hear it from anybody else?
8      A.   It's possible that it was discussed by
9  other people.
10     Q.   Okay.
11          Now, directing your attention to the
12 second of those black screens on page 565, Bates
13 565, under the heading title "Safety Policies and
14 Risk Management," the first paragraph under the
15 heading says:
16          [As Read]  Our culture on safety was
17          set in the early founding days, cemented
18          with GPT-2 release later, and incremental
19          pushes are not sufficient to make the
20          changes we need on reasonable safety and
21          risk management.  We need a complete
22          overhaul here where the company
23          understands the approach and, most
24          importantly, trusts the leaders to make
25          the call.

Page 127

1           In 2022 and '23, did you agree that OpenAI
2  needed a complete overhaul on its culture of safety?
3           ATTORNEY EDDY:  Objection.
4           THE WITNESS:  You know, I --
5           In '22, I wasn't close enough to product
6  discussions to have a strong view or to have a
7  strong view on this.  I know there have been lots of
8  discussions in OpenAI between the different people
9  about how to do different things and how to approach
10 various questions related to the safety of the
11 product.
12 BY ATTORNEY MOLO:
13     Q.   Okay.
14          You credited these two -- let me ask you a
15 different question.
16          You -- you took these two allegations by
17 Murati that are reflected on page 566, that we just
18 reviewed, seriously, didn't you?
19          ATTORNEY EDDY:  Objection to
20 characterizing them as allegations.
21          THE WITNESS:  So I would need to spend
22 more time reading this to remember exactly how I
23 felt about those particular documents.
24 BY ATTORNEY MOLO:
25     Q.   Okay.

Page 128

1           Well, you put -- you put these two
2  screenshots in your memo; correct?
3      A.   Yes.
4      Q.   All right.
5           And then you sent your 52-page memo,
6  Exhibit 19, to the independent directors of the
7  board; correct?
8      A.   Correct.
9      Q.   All right.
10          Why didn't you send it to the entire
11 board?
12     A.   Because we were having the discussions
13 with the independent directors only.
14     Q.   Okay.
15          And what -- why didn't you send it to Sam
16 Altman?
17     A.   Because I felt that, had he become aware
18 of these discussions, he would just find a way to
19 make them disappear.
20     Q.   Okay.
21          Were you careful about what you included
22 in this document?
23          ATTORNEY AGNOLUCCI:  Object to form.
24          THE WITNESS:  So the way I wrote this
25 document was to -- the context for this document is

Page 129

1  that the independent board members asked me to
2  prepare it.  And I did.
3           And I was pretty careful.  Most of the
4  screenshots that I have that I -- most or all, I
5  don't remember.  I get them from Mira Murati.
6           It made sense to include them in order to
7  paint a picture from a large number of small pieces
8  of evidence or items.
9  BY ATTORNEY MOLO:
10     Q.   Okay.
11          And which independent directors asked you
12 to prepare your memo Exhibit 19?
13     A.   It was most likely Adam D'Angelo.
14     Q.   Okay.
15          And did you recall when he asked you to do
16 that?
17     A.   No.
18     Q.   Okay.
19          Do you recall what it was that he said to
20 you that caused you to prepare this memo?
21     A.   I don't remember what he said exactly.
22     Q.   What's your best recollection of what he
23 said?
24     A.   He said something like -- he ask me if I
25 have screenshots.

MUSK
ALTMAN
Case 4:24-cv-04722-YGR   Document 379-92   Filed 01/06/26   Page 8 of 14
Highly Confidential
Ilya Sutskever
October 01, 2025

Page 134

1  BY ATTORNEY MOLO:
2      Q.  Okay.
3          Did you provide your lawyers with a copy
4  of the Brockman memo?
5      A.  I don't remember exactly how -- the manner
6  through which I gave it to them.
7      Q.  Okay.
8          Do you know of any other copies that exist
9  anywhere?
10         ATTORNEY AGNOLUCCI:  Same objections and
11 instructions.
12         THE WITNESS:  And I'm not sure I should
13 answer.
14 BY ATTORNEY MOLO:
15     Q.  I'm sorry.  You're not sure you should
16 answer or --
17         ATTORNEY AGNOLUCCI:  I'm instructing you
18 not to.
19         ATTORNEY MOLO:  Let him.
20 BY ATTORNEY MOLO:
21     Q.  Are you saying you -- you're saying you're
22 not sure you should answer?
23     A.  Yes.
24     Q.  Okay.
25         And your lawyer's instructing you not to

Page 135

1  answer?
2      A.  That's what I'm hearing.
3          ATTORNEY MOLO:  Okay.
4          ATTORNEY AGNOLUCCI:  And I think there's
5  some ambiguity about -- in his mind what's
6  privileged and so.
7          ATTORNEY MOLO:  He knows what's in his
8  mind.
9          ATTORNEY AGNOLUCCI:  I'm happy to meet and
10 confer further, but I think we need to move on.
11         ATTORNEY MOLO:  I'm going to show you
12 Exhibit 20.
13         (Exhibit 20 was marked for
14         identification.)
15 BY ATTORNEY MOLO:
16     Q.  This is an article from "The Wall Street
17 Journal" dated March 28th of 2025; byline by
18 Keith -- excuse me -- Hagey; headline "The Secrets
19 of Misdirection Behind Sam Altman's Firing From
20 OpenAI."
21         You're familiar with this article?
22     A.  No.
23     Q.  Okay.
24         At page 440, at the bottom of the article,
25 if you look at the third line, there's a sentence

Page 136

1  that starts:
2          [As Read]  During one meeting in the
3          winter of 2020, as the board weighed how
4          to release three somewhat controversial
5          enhancements to GPT-4, Altman claimed all
6          three had been approved by the joint
7          safety board.  Toner asked for proof and
8          found that only one had actually been
9          approved.
10         Okay.
11         Do you recall board discussions to that
12 effect?
13     A.  It's possible.  My recollection is murky.
14     Q.  You were on the board at the time;
15 correct?
16     A.  I -- yes.
17     Q.  All right.
18         Do you recall any board discussions that
19 related to an improper release of a version of
20 ChatGPT 4?
21     A.  It's possible.  I don't have a direct
22 recollection.
23     Q.  Okay.
24         What's your general recollection?
25     A.  My general recollection is that we were

Page 137

1  discussing a lot of different things.
2      Q.  Okay.
3          Does -- what would be the consequences of
4  a unauthorized release of GPT-4?
5      A.  My opinion is that an unauthorized release
6  of GPT-4 would not be harmful on its own.
7      Q.  Okay.
8      A.  But it would set a bad process precedent.
9      Q.  How so?
10         ATTORNEY AGNOLUCCI:  Objection.  Form.
11         THE WITNESS:  It's not unlike the GPT-2
12 situation where the GPT -- if you recall our
13 discussion about the release of GPT 2, the staged
14 release.
15 BY ATTORNEY MOLO:
16     Q.  Yes.
17     A.  The idea with the staged release was to
18 set a good precedent for the future.  And that was
19 the intention behind it.
20         This is similarly to how I see the -- how
21 I saw the consequence of the machinery described in
22 the highlighted paragraph.  And you asked me about
23 the consequences.  The consequences is not that it
24 is bad to release GPT-4.  I did not think so.  But I
25 thought it is good to keep turning the machinery.

Page 138

1  Q. Well, the allegation was that it was
2  released without having been properly reviewed by a
3  dual safety board; correct?
4      ATTORNEY AGNOLUCCI: Objection to form.
5      THE WITNESS: This is consistent with what
6  the paragraph says.
7  BY ATTORNEY MOLO:
8  Q. About the deployment safety board?
9      ATTORNEY AGNOLUCCI: Same objection.
10     THE WITNESS: So I'm not sure what -- if
11 what -- so the paragraph says "joint safety board."
12 BY ATTORNEY MOLO:
13 Q. Correct.
14 A. I remember the deployment safety board as
15 a thing that existed. I have less of a recollection
16 of a joint safety board. It's possible that the
17 paragraph is referring to the deployment safety
18 board.
19 Q. Okay.
20    And what was the deployment safety board's
21 job while you were there?
22 A. My -- so I should clarify that I was
23 not -- it had to do with the product aspect of the
24 company, which I was not paying as close attention
25 to.

Page 139

1  Q. Right.
2     But as a --
3  A. My --
4  Q. I'm sorry. Go ahead.
5  A. My recollection of the joint safety board
6  is some kind of an entity -- deployment safety
7  board. But I think now that the word "joint safety
8  board" is appropriate because it was dual OpenAI and
9  Microsoft. That's my recollection.
10    And the idea is that they would approve
11 the release of increasingly more powerful models as
12 products, the idea being that in the future, when AI
13 becomes very increasingly powerful, this board will
14 have been a machinery, a process, that will be a
15 check on the release of very powerful models.
16 Q. Okay.
17 A. Very powerful AI.
18 Q. And what purpose did it serve, then? To
19 ensure safety?
20     ATTORNEY COHEN: Object to form.
21     ATTORNEY AGNOLUCCI: Objection to form.
22     (Court reporter clarification.)
23     THE WITNESS: My understanding of the
24 deployment safety board, that it was meant to ensure
25 safety in the long term.

Page 140

1  BY ATTORNEY MOLO:
2  Q. Okay.
3  A. The idea being that today -- today '22 or
4  whatever the year was -- the deployment safety board
5  is discussing the release of something like GPT-4,
6  and they are looking at some kind of information
7  that's presented to them to make this decision and
8  take responsibility for it.
9     The case of GPT-4 itself is not that
10 important because the GPT-4 model was not that
11 powerful. So, then, what is the purpose of a
12 deployment safety board for the not-as-powerful
13 GPT-4 model? To create the mechanism that will be
14 then with us in -- steady in time, and if you keep
15 approving future systems.
16    And then in three years, in five years,
17 maybe in ten years, when the AI systems will
18 actually become very powerful, the deployment safety
19 board could play a useful role; but to enable it to
20 play a useful role, it will have been very helpful
21 that it has already been in existence and was in the
22 habit of approving lesser AI systems.
23 Q. Okay.
24    And then if you turn to the next page of
25 the article, which has the Bates stamp 1441, at the

Page 141

1  top it says:
2         [As Read] Around the same time,
3      Microsoft launched a test of the still
4      unreleased GPT-4 in India, the first
5      instance of the revolutionary code being
6      released in the wild without approval from
7      the joint safety board.
8      Do you recall that being discussed?
9  A. I have a very faint recollection of it.
10 Q. Okay.
11    What is your recollection?
12 A. Something to the effect of that Microsoft
13 had a copy of GPT-4 and they released it to some
14 users without a discussion with OpenAI.
15 Q. Okay.
16    And the allegation also was that no one
17 had bothered to inform OpenAI's board that the
18 safety approval had been skipped.
19    Do you recall that?
20    ATTORNEY AGNOLUCCI: Object to form.
21    THE WITNESS: Very faintly. Very faintly.
22 BY ATTORNEY MOLO:
23 Q. Okay.
24    What do you recall?
25 A. The thing which I do recall is the

### Page 142

```
 1   discussion around -- or I recall the existence of a
 2   discussion around the fact that Microsoft released a
 3   version of GPT-4 to some users in India and that was
 4   some kind of not in accordance to the agreed-upon
 5   process.
 6       Q.   Okay.
 7            Did that concern you?
 8            ATTORNEY AGNOLUCCI:  Object to form.
 9            THE WITNESS:  I thought that this was --
10            So let me see.  Can you repeat the
11   question.  Which -- what concerned me exactly?
12   BY ATTORNEY MOLO:
13       Q.   Did it concern you that there was an
14   allegation being made that Microsoft had launched a
15   test of the still-unreleased GPT-4 in India, the
16   first instance of the revolutionary code being
17   released in the wild without approval from the joint
18   safety board, and no one had bothered to inform
19   OpenAI's board that the safety approval had been
20   skipped?
21            ATTORNEY EDDY:  Objection.
22            THE WITNESS:  I remember discussions
23   around the model GPT-4 being released by Microsoft
24   to some users in India.  I don't remember or I -- my
25   recollection is much fainter about -- yeah.
```

### Page 143

```
 1            Okay.  I do remember.  Do I -- I might
 2   remember that there were also discussions about the
 3   deployment safety board review has been skipped.
 4            I saw it as an issue of working with a
 5   large organization like Microsoft that it will
 6   take -- my view is that it would've taken Microsoft
 7   time before such a large organization can really get
 8   accustomed to a particular process.  That was my
 9   view.
10   BY ATTORNEY MOLO:
11       Q.   Okay.
12            Did you believe Sam Altman was being
13   deceptive in any way in connection with the release
14   of GPT-4 without approval from the joint safety
15   board?
16            ATTORNEY AGNOLUCCI:  Object to form.
17            THE WITNESS:  The information that I have
18   specifically is around what was presented in the
19   screenshot by Mira Murati about what he told her.
20   BY ATTORNEY MOLO:
21       Q.   Okay.
22       A.   So in that particular connection, it would
23   be affirmative.
24       Q.   It would be affirmative that Sam Altman
25   was being deceptive?
```

### Page 144

```
 1            ATTORNEY AGNOLUCCI:  Same objection.
 2            THE WITNESS:  In connection to what he
 3   said to Mira Murati about what Jason Kwon said to
 4   him.
 5   BY ATTORNEY MOLO:
 6       Q.   Okay.
 7            And that's what we referred to just -- so
 8   you're referring to back in Exhibit 19, the
 9   screenshots from Slack that were at pages 530 -- 532
10   and 533; correct?
11       A.   Correct.
12       Q.   All right.
13            Do you know anything about the OpenAI
14   start-up fund?
15       A.   I know that it existed.  I know that its
16   purpose was to invent [sic] in startups that would
17   use the OpenAI API in order to try and find real-use
18   cases for these new models.
19       Q.   Did you have any visibility into that --
20   finances of that fund?
21       A.   I may have had some visibility, but I was
22   very uncurious about it.
23       Q.   Okay.
24            Did you have any concerns ever about Sam
25   Altman being deceptive in connection with that fund
```

### Page 145

```
 1   in any way?
 2       A.   While I was at -- my recollection is that
 3   sometimes -- while I was at -- while I was actively
 4   involved with OpenAI, I wasn't paying enough
 5   attention to the start-up fund.  At least that's my
 6   recollection.
 7            I later learned from articles or external
 8   press that there were some irregularity about who
 9   owned it or whose name it was under or something to
10   this effect, but that's all really I can say.
11       Q.   Was it irregularity in connection with Sam
12   Altman's behavior?
13            ATTORNEY EDDY:  Objection.
14            THE WITNESS:  It was in connection -- here
15   I can allude to news articles that I read that there
16   was some kind of a surprise or an issue that the
17   start-up fund was under Sam's -- Altman's names --
18   name and not under OpenAI's name and that there were
19   some issues around that.  That's my recollection.
20            I am pretty sure I learned about this
21   after I was no longer actively involved with OpenAI.
22   BY ATTORNEY MOLO:
23       Q.   Who first proposed firing Sam Altman as
24   CEO?
25            ATTORNEY AGNOLUCCI:  Object to form.
```

Page 154

1　BY ATTORNEY MOLO:
2　　Q.　Okay.
3　　　　This is a blog post by OpenAI; is that
4　right?
5　　A.　Yes.
6　　Q.　Okay.
7　　　　And the board posted this announcement --
8　excuse me -- after firing Sam Altman; is that right?
9　　A.　Looks like it, yes.
10　Q.　Okay.
11　　　　If you turn to the second page, paragraph
12　in the middle --
13　A.　Yes.
14　Q.　-- it says:
15　　　　[As Read]　Mr. Altman's departure
16　　　　follows a deliberative review process by
17　　　　the board, which concluded that he was not
18　　　　consistently candid in his communications
19　　　　with the board, hindering its ability to
20　　　　exercise its responsibility.　The board no
21　　　　longer has confidence in his ability to
22　　　　continue leading OpenAI.
23　　　　Did you agree with those statements at the
24　time this was published on the blog?
25　A.　Yes.

Page 155

1　　Q.　And was the board careful in choosing the
2　words that it used for that announcement?
3　　A.　Yes.
4　　Q.　Okay.
5　　　　After the statement was posted, did Greg
6　Brockman resign from the board as well?
7　　A.　Yes.
8　　Q.　Did he resign from the company?
9　　A.　Yes, shortly after.
10　Q.　Who else resigned that day?
11　A.　A bunch of people.
12　Q.　Okay.
13　　　　And so did you have an all hands meeting
14　with the employees at that point in time?
15　A.　Yes.
16　Q.　Was Mira Murati there as well?
17　A.　Yes.
18　Q.　How would you say the meeting went?
19　A.　Tense.
20　Q.　Okay.　Tense.
21　　　　And was it tense because the employees
22　were expressing concern over Sam's dismissal?
23　A.　It's been tense for many different
24　reasons, including this one.
25　Q.　Okay.

Page 156

1　　　　What -- what other reasons that you can
2　think of?
3　　A.　In general, it was quite scary.　It was --
4　there was a lot of uncertainty.
5　　Q.　Was there anxiety expressed by people?
6　　A.　It's extremely plausible.
7　　Q.　Okay.
8　　　　Was Jason Kwon there?
9　　A.　I -- my -- in that all hands, my
10　recollection or my understanding, rather -- my
11　understanding that the entire company was listening.
12　Q.　Okay.
13　　　　And at that meeting, did the board provide
14　the employees who were assembled the details of Sam
15　Altman's pattern of lying?
16　A.　At that meeting, only I was present on the
17　board --
18　Q.　Okay.
19　A.　-- in the all-hands.
20　Q.　And did you provide the details of Sam
21　Altman's lying?
22　A.　No.
23　Q.　Okay.
24　　　　And was there some concern about revealing
25　Mira Murati as a whistle-blower --

Page 157

1　　　　ATTORNEY AGNOLUCCI:　Object to form.
2　BY ATTORNEY MOLO:
3　　Q.　-- expressed by the board?
4　　　　ATTORNEY AGNOLUCCI:　Vague.
5　　　　THE WITNESS:　I don't recall such
6　conversations.
7　BY ATTORNEY MOLO:
8　　Q.　Okay.
9　　　　Did -- to your knowledge, did any board
10　member speak with anyone at Microsoft at that point
11　in time?
12　A.　I believe I had a quick call with Satya
13　Nadella.
14　Q.　Okay.
15　　　　And what did you say to him, and what he
16　did he say to you?
17　A.　I don't remember exactly.　Some kind of
18　positive words.
19　Q.　Okay.
20　　　　Well -- did you -- were you calling him?
21　A.　I don't remember who called who.
22　Q.　Okay.
23　　　　What was the purpose of the call?
24　　　　ATTORNEY COHEN:　Objection to form.
25　　　　THE WITNESS:　I can say what -- I can

Page 158

1  describe to you the content of the form -- of the
2  call.
3  BY ATTORNEY MOLO:
4      Q.  Please.
5      A.  And the purpose could be inferred.
6          The content was something like this
7  changes nothing.  We are still committed.  Something
8  to this effect is my recollection.
9      Q.  So were you calling -- did you -- on that
10 call, break the news to Nadella that Altman had been
11 fired?
12     A.  I don't believe it was I -- I don't think
13 so.
14     Q.  Okay.
15         Was somebody else on the call with you?
16     A.  I don't recall.  I don't think so.
17     Q.  Okay.
18         Do you know how Nadella learned of Altman
19 being fired?
20         ATTORNEY COHEN:  Objection to form.
21         THE WITNESS:  I don't know exactly.
22 Either -- either me or Murati called him, or he read
23 the blog post.
24 BY ATTORNEY MOLO:
25     Q.  Okay.

Page 159

1          Did Adam D'Angelo tell that you Nadella
2  contacted him?
3      A.  Oh, yeah, it's possible.  I have some
4  recollection of that.
5      Q.  Okay.
6          What's your recollection?
7      A.  That he told me that.
8      Q.  Okay.
9          Did you also have a call with Mikhail
10 Parakhin?
11     A.  I have a recollection.
12     Q.  Okay.  And did you call him or he call
13 you?
14     A.  He called me.
15     Q.  What was said on that phone call?
16     A.  I don't remember.
17     Q.  Did you -- did -- in that -- at that time,
18 did Microsoft pressure you to restore Sam Altman as
19 CEO?
20         ATTORNEY COHEN:  Object to form.
21         THE WITNESS:  When exactly?
22 BY ATTORNEY MOLO:
23     Q.  On the Friday in which he was fired?
24         ATTORNEY COHEN:  Object to form.
25         ATTORNEY AGNOLUCCI:  Same objection.

Page 160

1          THE WITNESS:  No -- no -- no pressure.
2  BY ATTORNEY MOLO:
3      Q.  Okay.
4          Did -- did you speak with Sam Altman or
5  Greg Brockman that day after the firing?
6      A.  No.
7      Q.  Okay.
8          Did you speak with Mira Murati?
9      A.  Yes.
10     Q.  Okay.
11         Did she say anything to you about Altman
12 attempting to convince OpenAI employees to quit?
13     A.  It is possible.
14     Q.  Okay.
15         Did she -- did she say anything to you
16 about Altman telling OpenAI employees that it was
17 you who had gotten him fired?
18         ATTORNEY AGNOLUCCI:  Object to form.
19         THE WITNESS:  I do not recall Mira Murati
20 telling me such things.
21 BY ATTORNEY MOLO:
22     Q.  Okay.
23         On Friday, the day he was fired, did
24 Murati demand that the board resign and restore Sam
25 to his job?

Page 161

1      A.  It's consistent in my recollection.
2      Q.  Okay.
3          And were you concerned that -- you sure
4  that that might not have happened later?  Or --
5          ATTORNEY EDDY:  Objection.
6          THE WITNESS:  I'm not sure.  But I -- I
7  have a recollection that on Friday evening --
8  BY ATTORNEY MOLO:
9      Q.  Okay.
10     A.  -- the entire executive team, together
11 with Mira Murati, has already expressed strong
12 preference that the board resigns and that Sam is
13 reinstated.
14     Q.  Okay.
15         And did they give you reasons for that?
16     A.  They had a variety of reasons.
17     Q.  What were those, the best you can recall?
18     A.  I don't remember.
19     Q.  Was there a concern over the -- whether
20 OpenAI could continue on as an ongoing entity?
21         ATTORNEY AGNOLUCCI:  Object to form.
22         THE WITNESS:  It's plausible.
23 BY ATTORNEY MOLO:
24     Q.  Was that expressed to you in any way?
25         ATTORNEY AGNOLUCCI:  Object to form.

Page 170

1  A. So I am unable to answer on behalf of the
2  board for the following reasons. After I announced
3  my -- after I withdrew my support from Sam Altman's
4  firing, the board stopped communicating with me.
5  Q. Okay. And why did you withdraw your
6  support for Sam Altman being fired?
7  A. Because I thought that OpenAI would be
8  destroyed.
9  Q. Okay.
10    And how did you think it would be
11 destroyed?
12 A. I -- I don't know exactly.
13 Q. Okay.
14    On Sunday, there were a number of proposed
15 replacements for board members being discussed.
16    Do you recall whether Sam accepted any of
17 the board's proposals for replacements?
18 A. I don't remember what Sam's -- I don't
19 remember.
20 Q. Do you recall the board having discussions
21 with Nadella on Sunday?
22    ATTORNEY COHEN: Object to form.
23    THE WITNESS: It is highly plausible. I
24 don't recall.
25        ///

Page 171

1  BY ATTORNEY MOLO:
2  Q. Okay.
3    Do you recall on Sunday that Nadella had
4  made a post in which he said Microsoft would hire
5  Sam Altman and Greg Brockman?
6    ATTORNEY COHEN: Objection to form.
7    THE WITNESS: I have heard of such a post,
8  but I did not read it.
9  BY ATTORNEY MOLO:
10 Q. Okay.
11    Did you hear it discussed among employees
12 at the time?
13 A. I was not in contact with any employees at
14 the time.
15 Q. Did you hear it discussed among board
16 members at the time?
17 A. It is possible, but I don't have an
18 affirmative recollection.
19 Q. Do you recall that Microsoft had said it
20 would hire anyone else from OpenAI that wanted to
21 join Microsoft?
22 A. It is consistent with what people have
23 told me, but I have been avoiding all internet
24 during that time; so I don't have -- I have not read
25 these posts -- these communications directly myself.

Page 172

1  Q. Before any offer of employment was made to
2  Altman or Brockman, was the board told by Microsoft,
3  anyone at Microsoft, that might happen?
4    ATTORNEY COHEN: Objection to form.
5    ATTORNEY EDDY: Objection to form.
6    ATTORNEY AGNOLUCCI: Object to form.
7    THE WITNESS: I really don't recall.
8  BY ATTORNEY MOLO:
9  Q. Okay.
10    Did Mira Murati reach out to you
11 individually after Nadella's statement about
12 Brockman and Altman joining Microsoft?
13    ATTORNEY COHEN: Objection to form.
14    THE WITNESS: I recall Mira Murati
15 reaching out to me at various times, however,
16 because I was not checking with her or the news of
17 any kind, I don't know if it was before or after
18 this announcement.
19 BY ATTORNEY MOLO:
20 Q. Did she tell you she was circulating an
21 employee petition calling for the board to resign?
22 A. I recall a petition. I don't recall if
23 she was the one who told me about it.
24 Q. Okay.
25    Did you know who drafted the petition?

Page 173

1  A. No.
2  Q. You decided to sign the petition?
3  A. Yes.
4  Q. And why?
5  A. Because I felt that if we were to go down
6  the path where Sam would not return, then OpenAI
7  would be destroyed. And I really didn't want that.
8  Q. Okay.
9    You made a blog post following your
10 signature -- putting your signature on a petition
11 that said:
12    [As Read] I deeply regret my
13    participation in the board's actions. I
14    never intended to harm OpenAI. I love
15    everything we built together, and I will
16    do everything I can to reunite the
17    company.
18    Why did you make that post?
19 A. Because I decided that I no longer wanted
20 to continue with the course of action that the
21 board, together with me, has initially set out on.
22 Q. And was that because you thought that that
23 course of action could destroy OpenAI?
24 A. Yes.
25 Q. The board and Altman came to an agreement

Page 342

1    Q.   Okay.
2         And you believed that at the time that you
3    left the company?
4    A.   I'd say it's a fairly accurate statement.
5    Q.   Thank you.
6         In the fall of 2017, did you think you
7    would be a better CEO of OpenAI than Elon Musk?
8    A.   No.
9    Q.   Okay.
10        And did you think Greg Brockman would be a
11   better CEO than Elon Musk?
12        ATTORNEY AGNOLUCCI:  Object to form.
13        THE WITNESS:  So I'm less -- I'm less sure
14   about that one.
15   BY ATTORNEY MOLO:
16   Q.   Had Greg Brockman been the CEO of any tech
17   companies?
18   A.   No.
19   Q.   Okay.
20        Had he scaled companies the way Elon Musk
21   had?
22        ATTORNEY AGNOLUCCI:  Object to form.
23        THE WITNESS:  He had scaled some
24   companies.  Like, a company but not in the same way.
25                        ///

Page 343

1    BY ATTORNEY MOLO:
2    Q.   Okay.
3         He was not nearly as successful as Elon
4    Musk?
5    A.   Correct.
6         ATTORNEY AGNOLUCCI:  Object to form.
7         THE WITNESS:  I think it's hard to find
8    people as successful as Elon Musk.
9    BY ATTORNEY MOLO:
10   Q.   Okay.
11        When McCauley, Toner, and you resigned
12   from the board, you were replaced by three other
13   people; is that right?
14   A.   I -- I -- it's extremely plausible.  I
15   don't have an affirmative recollection.
16   Q.   Okay.
17        Do you recall?  Were there any of the
18   people who joined the board after you left had any
19   history of professional experience in AI safety?
20        ATTORNEY EDDY:  Objection.
21        THE WITNESS:  I actually don't know who
22   joined the board after I left.
23   BY ATTORNEY MOLO:
24   Q.   Okay.
25        Did you understand that Mr. Musk's

Page 344

1    financial contributions to OpenAI -- well, strike
2    that.
3         I'll ask a different question here.
4         At the time you worked at OpenAI, was it
5    your understanding that Mr. Musk's contributions to
6    OpenAI were made to create a nonprofit dedicated to
7    the development of open source AI safely for the
8    good of humankind?
9         ATTORNEY EDDY:  Objection.
10        ATTORNEY AGNOLUCCI:  Object to form.
11        THE WITNESS:  I would characterize it
12   differently.
13   BY ATTORNEY MOLO:
14   Q.   Okay.
15   A.   There was --
16        My understanding was -- let's see.
17        Apologies.  I'm a little tired.
18        My understanding was that Elon Musk's --
19   first of all, clarification.  Are you talking about
20   the financial contributions?
21   Q.   I'm talking about his contributions
22   overall, including financial contributions.
23   A.   So I understand Elon -- my understanding
24   of his contributions overall as contributions to
25   project.  I don't believe -- I did not see the

Page 345

1    project as necessarily being tied into a nonprofit,
2    especially after the for-profit discussions started
3    to exist.  I also did not -- I did not understand
4    Elon Musk's contributions as being -- like, they
5    were for the nonprofit, but spiritually they were
6    for the project.
7    Q.   For the project?
8    A.   Yes.
9    Q.   And how do you define "the project"?
10   A.   The project of OpenAI.
11   Q.   Okay.
12   A.   The project is to build AGI that benefits
13   humanity.
14   Q.   To benefit humanity safely; correct?
15   A.   Well --
16   Q.   I mean, that's implicit?
17   A.   How else do you benefit humanity?
18   Q.   Yeah.
19        To your knowledge, did Sam Altman ever
20   have any financial ownership stake in OpenAI?
21        ATTORNEY AGNOLUCCI:  Object to form.
22        THE WITNESS:  Not to my knowledge.
23   BY ATTORNEY MOLO:
24   Q.   Okay.
25        To your knowledge, did Sam Altman derive