# EXHIBIT 17

```
                                                          1

 1              UNITED STATES DISTRICT COURT

 2               NORTHERN OF CALIFORNIA

 3                  OAKLAND DIVISION
    _____
 4  ELON MUSK, et al.,          )
                                )
 5            Plaintiffs,       )
                                )
 6  v.                          )  Case No. 4:24-cv-04722-YGR
                                )
 7  SAMUEL ALTMAN, et al.,      )
                                )
 8            Defendants.       )
    _____)
 9

10

11

12     ** CONTAINS HIGHLY CONFIDENTIAL AND HIGHLY

13    CONFIDENTIAL BUSINESS STRATEGY INFORMATION **

14         VIDEOTAPED DEPOSITION of OPENAI

15      by and through its corporate designees

16            San Francisco, California

17             Friday, October 3, 2025

18

19

20

21

22

23          Reported Stenographically by

24     Michael P. Hensley, RDR, CSR No. 14114

25
```

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2                  NORTHERN OF CALIFORNIA
 3                     OAKLAND DIVISION
   _____
 4 ELON MUSK, et al.,          )
                               )
 5         Plaintiffs,         )
                               )
 6 v.                          )  Case No. 4:24-cv-04722-YGR
                               )
 7 SAMUEL ALTMAN, et al.,      )
                               )
 8         Defendants.         )
   _____)
 9
10
11      Videotaped Deposition of OPENAI, commencing at
12 the hour of 9:08 AM and concluding at the hour of
13 6:32 PM on Friday, October 3, 2025, at the location
14 of Morrison & Foerster LLP, 425 Market Street,
15 San Francisco, California 94105, before Michael
16 Hensley, Registered Diplomate Reporter, Certified
17 Shorthand Reporter No. 14114, in and for the State
18 of California.
19
20
21
22
23
24
25
```

## Page 3

```
 1 APPEARANCES:
 2 For Plaintiffs:
 3         MOLOLAMKEN LLP
         BY:   ALEX EYNON, ESQ.
 4         430 Park Avenue
         New York, New York 10022
 5         212.607.8174
         aeynon@mololamken.com
 6
 7         MOLOLAMKEN LLP
         BY:   ROBERT K. KRY, ESQ.
 8         600 New Hampshire Avenue, N.W.
         Washington, D.C. 20037
 9         202.553.2011
         rkry@mololamken.com
10
   For Defendant Microsoft Corporation:
11         DECHERT LLP
         BY:   JAY JURATA , ESQ.
12         1900 K Street, NW
         Washington, D.C. 20006
13         202.261.3440
         jay.jurata@dechert.com
14
15         DECHERT LLP
         BY:   HANNAH LEONE, ESQ.
16         45 Fremont Street, 26th Floor
         San Francisco, California 94105
17         415.262.4543
         hannah.leone@dechert.com
18
19 For Defendant OpenAI:
20         WACHTELL, LIPTON, ROSEN & KATZ
         BY:   STEVEN P. WINTER, ESQ.
21               ZACHARY M. DAVID, ESQ.
               EMILY P. ROSS, ESQ.
22         51 West 52nd Street
         New York, New YOrk 10019
23         212.403.1116
         swinter@wlrk.com
24         zmdavid@wlrk.com
         epross@wlrk.com
25
```

## Page 4

```
 1 APPEARANCES (CONTINUED):
 2 For Defendant OpenAI:
 3         MORRISON & FOERSTER, LLP
         BY:   CAMILA A. TAPERNOUX, ESQ.
 4         425 Market Street
         San Francisco, California 94105
 5         415.268.6273
         ctapernoux@mofo.com
 6
 7 Also Present:
 8         RENNY HWANG, ESQ.
 9         ALEJANDRO ZAMORA RUIZ, Videographer
10
11 Present Remotely:
12         ROBERT CASTILLO, AV Monitor
13         BRADLEY WILSON, ESQ.
14         NATE CULLERTON, ESQ.
15         JENNIFER SCHUBERT, ESQ.
16         STEVEN MOLO, ESQ.
17         SARA TOFIGHBAKHSH, ESQ.
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                       INDEX
 2
 3                    EXAMINATIONS
 4                                                    Page
 5 WITNESS:  ROBERT WU
 6    BY ATTORNEY EYNON                                 12
 7 WITNESS:  NORA PUCKETT
 8    BY ATTORNEY EYNON                                252
 9    BY ATTORNEY WINTER                               280
10
11                     EXHIBITS
12 No.          Description                           Page
13 1    OpenAI, Inc.'s Responses and                    13
      Objections to Plaintiff's Notice of
14    Deposition Pursuant to Fed. R. Civ.
      P. 30(b)(6)
15
   2    Bates Number 2024MUSK-0003115 -                 21
16      0003133:  Initial Registration for
        OpenAI, Inc.
17
   3    Bates Number OPENAI_MUSK00000419 -              23
18      00000421:  Amended and Restated
        Certificate of Incorporation of
19      OpenAI, Inc. A Nonprofit non-Stock
        Corporation
20
   4    Bates Number 2024MUSK- 0003112 -                32
21      0003114:  Initial Registration Form
        State of California
22
   5    Bates Number 2024MUSK-0011569 -                 41
23      0011571:  OpenAI Charter
24
25
```

MUSK
ALTMAN
Case 4:24-cv-04722-YGR   Document 379-93   Filed 01/06/26   Page 4 of 7
30(b)(6), Highly Confidential
Robert Wu
October 03, 2025

Page 102

1  LP, both through its first closed limited
2  partnership interest and what we refer to as the
3  "residual interest."
4  BY ATTORNEY EYNON:
5      Q.  What assets did OpenAI, Inc., transfer to
6  OpenAI LP in 2019?
7      A.  OpenAI, Inc., primarily contributed IP
8  into OpenAI LP in exchange for the FCLP interest in
9  residual, and, also, most employees, I believe, at
10 that time, had moved over into OpenAI LP at some
11 point in 2019.
12     Q.  Which intellectual property did OpenAI,
13 Inc., transfer to OpenAI LP in 2019?
14     A.  My understanding is that was substantially
15 all of the IP that was developed at the nonprofit at
16 that point in time was contributed down to OpenAI
17 LP.
18     Q.  Okay.
19         Did OpenAI, Inc., transfer any other
20 assets to OpenAI LP?
21             ATTORNEY WINTER:  Objection to form.
22             THE WITNESS:  I can't recall specifically
23 if other assets were contributed down, but my
24 understanding is that substantially -- what
25 compromised the -- substantially, all of the assets

Page 103

1  that went down were IP and employees.
2  BY ATTORNEY EYNON:
3      Q.  Okay.
4          What assets were left in OpenAI, Inc., if
5  any?
6              ATTORNEY WINTER:  Objection to form.
7              You can answer, if you can.
8              THE WITNESS:  I don't remember -- or I
9  don't recall specifics.  I think certain employees
10 remained at OpenAI, Inc.  I think it retained
11 certain IP, including, for example, trademarks to
12 OpenAI and perhaps there were other assets.
13 BY ATTORNEY EYNON:
14     Q.  Is there anything else you can think of,
15 sitting here right now?
16     A.  I can't recall, sitting here right now,
17 any other assets that were specifically retained.
18     Q.  You mentioned that employees were
19 transferred from the nonprofit to OpenAI LP.
20         How many employees moved over?
21     A.  I don't recall the specific number.  If
22 you are asking me based on kind of just my general
23 knowledge and preparation, I would guess 100 to 200
24 at that time.  I don't recall the size of OpenAI LP,
25 at that point.

Page 104

1      Q.  You also mentioned that --
2              (Sotto voce discussion.)
3  BY ATTORNEY EYNON:
4      Q.  You also mentioned that some of the
5  employees were left in the nonprofit.
6          Which employees remained with the
7  nonprofit?
8      A.  I don't recall off the top of my head.  I
9  think it was a -- yeah, I can't -- I don't recall.
10     Q.  Okay.
11         Do you recall how many employees were left
12 with the nonprofit?
13     A.  I don't recall specifics, but I believe
14 most of the researchers and the like had transferred
15 over to OpenAI LP.
16     Q.  Do you know why some employees were left
17 in the nonprofit?
18     A.  I don't want to speculate.  There were, I
19 think -- there were activities at the nonprofit
20 level in terms of nonprofit activities, in terms of
21 initiatives and programs that they had in place that
22 may have been appropriate to stay at the nonprofit.
23 And I think there were also employees that had to
24 support administrative functions and operational
25 kind of activities there.

Page 105

1      Q.  Besides OpenAI, Inc., and OpenAI LP, did
2  any other entities shown in this chart have any
3  employees?
4      A.  In this chart?
5      Q.  Yeah.
6      A.  I don't believe OpenAI GP had any
7  employees.  I do not believe OpenAI Holdings LP
8  employed any employees.  Investors, I don't -- I
9  think that is just referring to investors generally;
10 so, no, I don't think any other entities on here had
11 OpenAI employees.
12     Q.  Besides the nonprofit OpenAI, Inc., did
13 any other entities shown in this chart have a board
14 of directors?
15     A.  OpenAI GP LLC, OpenAI LP, and OpenAI
16 Holdings LP, to my understanding, do not have a
17 board of directors.
18     Q.  Thank you.  You can set that aside, and
19 now I would like you to turn back to Exhibit 13.
20         Okay.
21         This is the document we looked at very
22 briefly earlier that's titled "Amended and Restated
23 Limit Partnership Agreement of OpenAI LP."  And it's
24 dated July 2nd, 2019.
25         Take a moment to look at this document, if

Page 166

```
 1   scope.
 2            You can answer, if you know.
 3            THE WITNESS:  I don't know.
 4   BY ATTORNEY EYNON:
 5       Q.   Do you know whether these slides were
 6   prepared by OpenAI?
 7       A.   I don't know.
 8       Q.   These slides were -- you can tell from the
 9   Bates number on the bottom, these slides were
10   produced by Microsoft, but they were not produced to
11   us by OpenAI in this litigation.
12            Do you know why that is?
13            ATTORNEY WINTER:  Objection to form.
14   Lacks foundation.
15            You can answer, if you know.
16            THE WITNESS:  I don't know.
17   BY ATTORNEY EYNON:
18       Q.   Okay.
19            Turning to the first page -- the second
20   page, this is a slide with a "Title OpenAI
21   Restructure Objectives."
22            The second bullet here says:
23                 [As Read]  Remove nonprofit from
24                 formal control to mitigate private benefit
25                 risk.
```

Page 167

```
 1            At this time in February 2022, was OpenAI
 2   contemplating removing the nonprofit's control over
 3   the for-profit entity?
 4       A.   I don't know.
 5       Q.   When did OpenAI's board first contemplate
 6   a restructuring that removed nonprofit control over
 7   the for-profit entity?
 8            ATTORNEY WINTER:  Objection to form.
 9   Lacks foundation.
10            THE WITNESS:  The board, from time to
11   time, in '24 -- sorry, in 2024 with the mission and
12   strategy committee had discussed potential
13   modifications to the structure always with the
14   intent of ensuring that the structure was best set
15   up to ensure that the nonprofit could advance the
16   mission.
17            I'm not aware of any formal proposal for
18   consideration or approval by the board with respect
19   to the nonprofit -- removing the nonprofit from
20   formal control.
21   BY ATTORNEY EYNON:
22       Q.   Do you know what it means to mitigate
23   private benefit risk?
24            ATTORNEY WINTER:  Objection.  Outside the
25   scope.
```

Page 168

```
 1            I'll also instruct you not to answer to
 2   the extent it would require you to reveal any
 3   privileged legal advice.
 4            Subject to that instruction, you can
 5   answer, if you can.
 6            THE WITNESS:  Just as a general matter, I
 7   believe private benefit risk relates to nonprofit
 8   tax law, but I won't, I think, go into privileged
 9   information there.
10   BY ATTORNEY EYNON:
11       Q.   Would you turn to the last page of this
12   document which has Bates number ending 54865.
13            Looking at the second line -- sorry.
14            Looking at the third line, the -- it --
15   the commentary box says:
16                 [As Read]  The OpenAI nonprofit would
17                 transform from GP control to a set of
18                 control rights related to the OAI mission,
19                 all of which it has today.
20            Did OpenAI's board consider a
21   restructuring under which the OpenAI nonprofit would
22   transition from general partner control to a set of
23   rights related to the mission?
24            ATTORNEY WINTER:  Objection to form.
25            THE WITNESS:  I'm not aware of any formal
```

Page 169

```
 1   proposal for the board to approve the OpenAI
 2   nonprofit transitioning to a set of control rights
 3   related to the OpenAI mission.
 4   BY ATTORNEY EYNON:
 5       Q.   Okay.
 6            Directing you to the box with -- the row
 7   that has the box "MS Ownership and Profit Cap" in
 8   this.  The commentary in this box said:
 9                 [As Read]  No targeted changes to MS's
10                 ownership, preference, or profit cap
11                 amounts.  However, transitioning the
12                 nonprofit from GP control to control
13                 rights may require the nonprofit to
14                 receive some value.  This may impact the
15                 profit waterfall, but we do not expect it
16                 to be significant.  MS plus OAI to
17                 discuss.
18            At this time, was OpenAI's board
19   considering a restructure under which the nonprofit
20   received some value in exchange for giving up its
21   control rights?
22            ATTORNEY WINTER:  Objection.
23            THE WITNESS:  Based on this document, it
24   appears that this was being discussed between Brad
25   and members of Microsoft.  I'm not aware of any
```

MUSK
ALTMAN
Case 4:24-cv-04722-YGR   Document 379-93   Filed 01/06/26   Page 6 of 7
30(b)(6), Highly Confidential
Robert Wu
October 03, 2025

Page 170

1  formal proposal presented to the board where the
2  nonprofit would transition to certain control rights
3  and receiving value in return.
4  BY ATTORNEY EYNON:
5      Q.   Has OpenAI's board ever considered a
6  restructuring under which the nonprofit would give
7  up control rights in -- without receiving value in
8  return or compensation in return?
9      A.   I'm not aware of any discussions at -- or
10 any proposals at the board level where the nonprofit
11 would give up control rights and not receive value
12 in exchange.
13          ATTORNEY EYNON:  Okay.
14          I'd now like -- you can set that aside,
15 and I'd like to mark Exhibit 23.
16          (Exhibit 23 was marked for
17          identification.)
18 BY ATTORNEY EYNON:
19     Q.   This document has beginning Bates number
20 MSFT_MUSK000055001.
21          Mr. Wu, what is this document?
22     A.   This appears to be the amended and
23 restated LLC agreement of OpenAI Global, LLC, dated
24 January 23rd, 2023.
25     Q.   Okay.

Page 171

1           Under this agreement, was the for-profit
2  entity in OpenAI's structure now an LLC?
3      A.   I don't recall the exact timing of the
4  steps, but my understanding is that OpenAI Global,
5  which is an LLC, became the holding company for the
6  capped-profit subsidiary.
7      Q.   Turning to Schedule A, which is -- starts
8  on the page with Bates ending 55085.
9           Does this schedule list the capital
10 commitments, capital contributions, and target
11 redemption amounts for members of the LLC?
12     A.   Yes.
13     Q.   Okay.
14          The first entity listed here is Aestas LP?
15          What is that entity?
16     A.   My understanding is that that was the
17 entity that was formerly known as OpenAI Holdings LP
18 and changed its name to Aestas LP.
19     Q.   Under this -- on this schedule, did
20 OpenAI, Inc.'s capital commitment, capital
21 contribution, and target redemption amounts remain
22 the same as in the prior LP agreement?  The 2021?
23     A.   I believe that's correct.  The capital
24 commitment and TRA remain unchanged from the 2021 LP
25 agreement.

Page 172

1      Q.   Okay.
2           On the following page -- actually, the
3  next, next page, 55087, there, Microsoft's second
4  capital commitment of $2 billion is listed.
5           Does this schedule reflect that, at this
6  point, Microsoft had only contributed 1 billion of
7  that $2 billion commitment?
8      A.   I believe that's correct, although there's
9  a footnote that says inclusive of funds in the
10 escrow account, which I think gets into a level of
11 detail I -- I'm not going to speak to at this point.
12     Q.   Did Microsoft subsequently contribute
13 the -- the full $2 billion capital commitment?
14     A.   My understanding is they have committed --
15 or contributed the full 2 billion.  Although,
16 there's -- again, some of that is, I believe,
17 without getting into all of the technical details,
18 credit for compute spend and all of that.
19     Q.   Under the -- the next entry in this
20 schedule reflects that Microsoft made a capital
21 commitment of $10 billion.
22          Is this a new -- under this agreement, had
23 Microsoft agreed to contribute an additional
24 $10 billion to OpenAI?
25     A.   Under this agreement, Microsoft did make

Page 173

1  an additional capital commitment of $10 billion.
2  Again, I think similar to prior -- prior versions of
3  this partnership, a portion of that was actual cash
4  contributed, and a portion of that was for compute.
5      Q.   The target redemption amount for
6  Microsoft's $10 billion investment is $60 billion.
7           That -- is that a six-times return on
8  investment?
9      A.   Correct.
10     Q.   What did the OpenAI board do to determine
11 whether that 6X return was reasonable and fair to
12 the nonprofit?
13          ATTORNEY WINTER:  Objection to form.
14          THE WITNESS:  I think similar to prior
15 investments made by Microsoft and prior investments
16 made by other investors, the board took into
17 consideration, first and foremost, what was in the
18 best interests of the nonprofit's mission.
19          And then taking into consideration that,
20 the timing, the partnership with Microsoft,
21 including the commercial agreement, and balancing
22 things like investability, made the determination
23 that a 6X return -- or a 6X target redemption amount
24 on capital committed was in the best interests of
25 the mission.

Page 202

1  Besides OpenAI, Inc., the nonprofit, do
2  any of the entities shown on this chart have a board
3  of directors?
4  ATTORNEY WINTER: If there's a document
5  that's helpful for you to refer to in your binder,
6  please feel free to do that in answering counsel's
7  question.
8  THE WITNESS: Is this another -- oh.
9  Yeah. I believe, other than OpenAI, Inc.,
10 OpenAI -- or, sorry, OAI corporation is a
11 corporation with a board of directors, and then a
12 number of the international subsidiaries have a
13 board of directors as well.
14 BY ATTORNEY EYNON:
15 Q. Who is on the board of OpenAI corporation?
16 A. Adam D'Angelo, Larry Summers, and Brett
17 Taylor are the directors for OAI corporation.
18 Q. Okay.
19 And you are looking at Tab 5 in your
20 binder now?
21 Okay.
22 A. Correct.
23 ATTORNEY EYNON: I'd like to mark that as
24 Exhibit 26.
25 ///

Page 203

1  (Exhibit 26 was marked for
2  identification.)
3  BY ATTORNEY EYNON:
4  Q. Mr. Wu, did you review this document to
5  prepare for your deposition today? Exhibit --
6  A. This one?
7  Q. Yes.
8  A. Yes, I did.
9  Q. What is this document?
10 A. I -- this is a list of directors for the
11 for-profit affiliated entities and then past members
12 of OpenAI LP, OpenAI GP LLC, and OpenAI Holdings LP.
13 Q. Is the information contained in this
14 document accurate?
15 A. I believe so.
16 Q. Does this accurately list the board
17 members for OpenAI, Inc., and related entities?
18 A. I believe so, yes.
19 Q. Okay. Thank you. You can set that aside.
20 We've now walked through a series of
21 agreements today between OpenAI and Microsoft, and
22 I'd like to ask you a few questions about those
23 agreements.
24 A. Okay.
25 ATTORNEY WINTER: So just -- we've been

Page 204

1  about an hour and 15 minutes. Do you have a sense
2  of how long this segment is or is this a good point
3  to take a break?
4  ATTORNEY EYNON: I think -- let me ask my
5  next few questions and then that would be a great --
6  with no document -- and then we can take a break.
7  ATTORNEY WINTER: All right. I'll take
8  that under advisement.
9  ATTORNEY EYNON: Thank you.
10 BY ATTORNEY EYNON:
11 Q. Between 2019 and 2023, did Microsoft's
12 rights in OpenAI's intellectual property increase?
13 A. I believe between 2019 and 2023, through
14 amendments of the JDCA, there were modifications to
15 their IP rights which kind of evolved over time.
16 Again, I won't get into the specificity of
17 all of the IP, but if you look at the defined terms
18 in the JDCA, there did appear to be broader
19 categories of IP that were licensed.
20 Q. Between 2019 and 2023, did Microsoft's
21 decision-making authority about which products were
22 safe to release increase?
23 ATTORNEY WINTER: Objection to form.
24 Outside the scope to the extent it also calls for
25 testimony in respect of safety matters beyond the

Page 205

1  terms of the agreements referenced. To the extent
2  you can answer, please do.
3  ATTORNEY EYNON: I'm just asking about the
4  terms of the agreements.
5  ATTORNEY WINTER: Your question was
6  broader than that, that's why I lodged my objection
7  and instruction.
8  THE WITNESS: I don't know. I can't speak
9  to whether their rights to safety actually expanded.
10 BY ATTORNEY EYNON:
11 Q. Do you recall that under the 2019 JDCA
12 that we looked at, OpenAI, Inc., and the LP had
13 final decision-making authority over which products
14 were released?
15 ATTORNEY WINTER: Objection.
16 THE WITNESS: I do recall that sentence
17 you pointed out that specifically said OpenAI LP
18 and, Inc. had review. Again, I can't speak to the
19 broader contractual language and whether there were
20 other terms and other agreements that related to
21 launching products.
22 BY ATTORNEY EYNON:
23 Q. Do you recall that in the 2021 and 2023
24 JDCA agreements, there was a joint development --
25 Deployment Safety Board that had representatives