# EXHIBIT 46

```
                                                                    1
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                         - - -

 4
         ELON MUSK, et al.,          :   CASE NO.
 5                                   :   4:24-CV-04722-
                     Plaintiffs      :   YGR
 6                                   :
            v.                       :
 7                                   :
         SAMUEL ALTMAN, et al.,      :
 8                                   :
                     Defendants.     :
 9

10              - HIGHLY CONFIDENTIAL -

11              - ATTORNEYS' EYES ONLY -

12                         - - -

13                    October 8, 2025

14                         - - -

15

16              Videotaped hybrid deposition of

17   HELEN TONER, taken pursuant to notice, was held at

18   the law offices of 600 New Hampshire Avenue, NW,

19   Washington, D.C., beginning at 11:11 a.m., on the

20   above date, before Michelle L. Ridgway,  a

21   Registered Professional Reporter, Certified Court

22   Reporter (NJ-CCR # XI02126), Certified Realtime

23   Reporter, Certified Shorthand Reporter (CA-CSR

24   # 14592), and Notary Public.

25
```

## Page 2

```
 1    APPEARANCES:
 2
 3          MOLOLAMKEN LLP
            BY:  ROBERT K. KRY, ESQ.
 4          BY:  WALTER H. HAWES IV, ESQ.
            (In person)
 5          600 New Hampshire Avenue, N.W.
            Washington, D.C.  20037
 6          202.556.2000
            rkry@mololamken.com
 7          whawes@mololamken.com
 8            - and -
 9          MOLOLAMKEN LLP
            BY:  JENNIFER SCHUBERT, ESQ.
10          (Zoom)
            BY:  SARA TOFIGHBAKHSH, ESQ.
11          (Zoom)
            430 Park Avenue
12          New York, New York 10022
            212.607.8160
13          jschubert@mololamken.com
            stofighbakhsh@mololamken.com
14          Representing the Plaintiffs,
            Elon Musk and xAI
15
16          DECHERT LLP
            BY:  JOHN (JAY) JURATA, JR., ESQ.
17          (In person)
            1900 K Street, NW
18          Washington, D.C.  20006
            202.261.3300
19          jay.jurata@dechert.com
20            - and -
21          DECHERT LLP
            BY:  ELISA BENEZE, ESQ.
22          (In person)
            Cira Centre, 2929 Arch Street
23          Philadelphia, Pennsylvania  19104
            215.994.4000
24          elisa.beneze@dechert.com
            Representing the Defendant, Microsoft
25          Corporation
```

## Page 3

```
 1    APPEARANCES:  (Cont'd.)
 2
      WACHTELL, LIPTON, ROSEN & KATZ
 3    BY:  NATHANIEL D. CULLERTON, ESQ.
      BY:  ADAM P. TANNE, ESQ.
 4    BY:  ETHAN Z. COHEN, ESQ.
      (In person)
 5    51 West 52nd Street
      New York, New York  10019
 6    212.403.1000
      ndcullerton@wlrk.com
 7    aptanne@wlrk.com
      ezcohen@wlrk.com
 8
        - and -
 9
      MORRISON & FOERSTER
10    BY:  CAMILA A. TAPERNOUX, ESQ.
      (Zoom)
11    425 Market Street
      San Francisco, California 94105
12    415.268.7000
      ctapernoux@mofo.com
13    Representing the Defendant, Samuel Altman
      and OpenAI
14
15    ELLIS GEORGE LLP
      BY:  KATHERINE A. PETTI, ESQ.
16    BY:  CHRIS BERG, ESQ.
      (Via zoom)
17    2121 Avenue of the Stars
      Suite 3000
18    Los Angeles, California  90067
      310.274.7100
19    kpetti@ellisgeorge.com
      cberg@ellisgeorge.com
20    Representing the witness, Helen Toner
21
      COOLEY LLP
22    BY:  ANIKA HOLLAND, ESQ.
      (Zoom)
23    3 Embarcadero Center
      San Francisco, California 94111
24    415.693.2000
      Anika.holland@cooley.com
25    Representing Ilya Sutskever
```

## Page 4

```
 1    APPEARANCES:  (Cont'd.)
 2
      VIDEOTAPE TECHNICIAN:
 3
        Jonathan Perry - Lexitas
 4
 5    ALSO PRESENT:
 6
      Jacob Figueroa - Document Tech/Zoom
 7      (Lexitas)
 8
 9              - - -
```

## Page 5

```
 1                    - - -
 2                  I N D E X
 3                    - - -
 4
      Testimony of:
 5
                                  HELEN TONER
 6
 7        By Mr. Kry              12, 316, 344
 8        By Mr. Cullerton        173, 319
 9        By Ms. Beneze           331
10
11                    - - -
```

**46**

1  practices?
2      A.     Yes.
3      Q.     And we'll get into specifics
4  momentarily.
5             But in general terms, did you feel
6  that Mr. Altman provided candid and complete
7  information to you about OpenAI's safety practices?
8      A.     No.
9      Q.     Do you recall an incident when
10 Mr. Altman told the OpenAI Board of Directors that
11 the joint safety board had approved three
12 enhancements to GPT-4 for release, when, in fact,
13 only one of the three had been approved?
14            MR. CULLERTON:  Object to
15   the form.  Leading.
16            THE WITNESS:  I would amend
17   the question to say "three different ways
18   of releasing GPT-4."  But otherwise, yes.
19 BY MR. KRY:
20     Q.     When did that incident occur?
21     A.     To the best of my recollection,
22 that was December of 2022.
23     Q.     When you talk about three different
24 ways of releasing GPT-4, can you describe in more
25 detail what you mean?

**47**

1      A.     To the best of my recollection, the
2  three under consideration were the API, what they
3  called "super assistant," and fine tuning.
4             So an API release would be
5  comparable to how they had released many of their
6  previous models, GPT-3, GPT-3.5, where there is
7  a -- yeah, an API, application programming
8  interface, that other programmers can use to access
9  the model and build tools with it.  That would be
10 the most straightforward option.
11            As I understand it, the idea of
12 "super assistant," I believe that essentially they
13 referred to something like ChatGPT as a product, so
14 a consumer-facing product.  They may have meant
15 something more elaborate.  I'm not 100 percent
16 sure.
17            And then fine-tuning would be
18 releasing the model in a way that allows outside
19 actors to fine-tune it.  So that's technical jargon
20 for, essentially, sort of slightly modifying the
21 model to be more well suited to some tasks than
22 others.  And at the time there was significant
23 uncertainty, from a safety perspective, about the
24 potential risks of, in particular, releasing the
25 fine-tuning capability.

**48**

1             Because the safety case, the
2  argument for why it was safe to release, relied on
3  test results about things that the model could and
4  could not do.  And once you can fine-tune a model,
5  that changes what it -- what it can and cannot do.
6      Q.     What did Mr. Altman tell the board
7  about the approval status of those three products
8  by the -- by the deployment safety board?
9             MR. CULLERTON:  Object to
10   form.
11            THE WITNESS:  To the best of
12   my recollection, he either directly said or
13   strongly implied that all three types of
14   release had been approved by the DSB.
15 BY MR. KRY:
16     Q.     In what context did Mr. Altman
17 communicate that information?
18     A.     At a in-person board meeting.  We
19 called it an onsite.  It was an all-day board
20 meeting at their offices.
21     Q.     When did that board meeting occur?
22     A.     To the best of my recollection, in
23 December 2022.
24     Q.     Did you take steps to verify the
25 information that Mr. Altman had provided to the

**49**

1  board?
2      A.     Yes.  I asked for the deployment
3  safety board materials to review what had been
4  approved and on what basis.
5      Q.     To whom did you make that request?
6      A.     I don't recall.
7      Q.     Was it to Mr. Altman or was it to
8  somebody else in the company?
9      A.     It would have been -- it would have
10 been either during the board meeting or in a
11 follow-up e-mail.  And with the awareness -- with
12 Sam's awareness but perhaps for follow-up by Chris
13 Clark or another person who could carry out that
14 sort of simple task of sending some materials.
15     Q.     Did you receive the materials you
16 had asked for?
17     A.     Yes.
18     Q.     What did those materials show about
19 the approval stratus -- status of the three
20 variants?
21     A.     To the best of my recollection, I
22 received materials showing that the API release had
23 been submitted to the deployment safety board and
24 approved.
25            I don't recall -- to the best of my

**50**

1  recollection, I don't believe I received any
2  materials about the other two, which -- and I drew
3  the conclusion that they had not -- they had been
4  neither submitted nor approved.
5       Q.     Based on what happened in that
6  board meeting and the materials you received in
7  response to your inquiry, were you concerned that
8  Mr. Altman had falsely represented the approval
9  status of those three variants to the board?
10          MR. CULLERTON:  Object to
11     form.  Leading.
12          THE WITNESS:  Yes.
13  BY MR. KRY:
14       Q.     Did that incident cause you to
15  question Mr. Altman's truthfulness and candor to
16  the board?
17          MR. CULLERTON:  Object to
18     form.
19          THE WITNESS:  I would say
20     that incident was -- was one case that
21     contributed to my sense that Sam was not
22     interested in the board being closely
23     informed about the company's activities.
24  BY MR. KRY:
25       Q.     Did that incident make it more

**51**

1  difficult for the board to manage OpenAI safety
2  risks?
3          MR. CULLERTON:  Object to
4     form.
5          THE WITNESS:  Yes.
6  BY MR. KRY:
7       Q.     And did that incident cause you
8  concerns about the effectiveness of OpenAI's safety
9  processes?
10          MR. CULLERTON:  Object to
11     form.
12          THE WITNESS:  Yes.
13  BY MR. KRY:
14       Q.     Do you recall another incident in
15  which Microsoft launched a test of GPT-4 in India
16  without deployment safety board approval?
17          MR. CULLERTON:  Object to
18     form.
19          THE WITNESS:  Yes.
20  BY MR. KRY:
21       Q.     When did that incident occur?
22       A.     I'm not sure.  I believe it was
23  toward the end of 2022.  I don't know the exact
24  date.
25       Q.     Do you know whether it was before

**52**

1  or after the first incident you just described?
2       A.     It must have been before, because
3  we -- the release must have been before, because we
4  found out about it the same day that the
5  representations to us about DSB approvals were
6  made.
7       Q.     Do you know how long before that
8  board meeting the Microsoft test launch occurred?
9       A.     No.  I'm not sure.
10      Q.     Would you describe -- well, strike
11  that.
12           How did you first learn about the
13  fact that this launch of a test of GPT-4 by
14  Microsoft had occurred?
15      A.     We had adjourned for the day the
16  meeting.  I was in a break room, and Tasha McCauley
17  came and found me in the break room and told me
18  that she had had a conversation with an employee
19  who had informed her about this release or who
20  had -- I believe she had asked her if she knew
21  about it, or asked her what she thought about it,
22  something along those lines, and we did not know
23  about it before then.
24      Q.     Had Mr. Altman raised that topic
25  with you at all during the board meeting that had

**53**

1  just concluded?
2       A.     No.  Despite the fact that we had
3  very actively discussed at the board meeting that
4  oversight of the DSB and ensuring that it was
5  functioning well was a core board responsibility.
6       Q.     Can you describe in any more detail
7  what Ms. McCauley said she had learned from this
8  other employee about what had happened?
9       A.     I don't recall the details.  To the
10  best of my recollection, she said that Microsoft
11  had released a test version without DSB approval,
12  when they should have had it.  Or something along
13  those lines.
14      Q.     Was it your understanding when
15  Ms. McCauley communicated this information to you
16  that Mr. Altman would have been aware of it?
17      A.     Yes.
18           MR. CULLERTON:  Object to
19     form.
20  BY MR. KRY:
21      Q.     What's the -- what was the basis
22  for that understanding?
23      A.     To the best of my recollection, it
24  sounded, from her description, like the employee
25  who had informed her was assuming that we already

**Page 54**

1  knew and was treating it as a pretty big deal that
2  the company leadership knew about.
3        Q.    Did you confront Mr. Altman about
4  his failure to disclose that information?
5              MR. CULLERTON:  Object to
6    form.
7              THE WITNESS:  No.
8  BY MR. KRY:
9        Q.    Did Mr. Altman, at any subsequent
10 point in time, disclose that information to you?
11       A.    Not directly.
12       Q.    Did Microsoft's release of a test
13 product without joint safety board approval cause
14 you concerns about OpenAI's safety processes?
15             MR. CULLERTON:  Objection.
16             THE WITNESS:  Yes.  It
17   caused me concern about how well those
18   processes were working.  Yes.
19 BY MR. KRY:
20       Q.    Did Mr. Altman's failure to inform
21 you about that safety breach cause you to question
22 Mr. Altman's truthfulness and candor to the board?
23             MR. CULLERTON:  Object to
24   the form.
25             THE WITNESS:  I would say it

**Page 55**

1    further led me to believe that he was not
2    interested in the board being closely
3    informed about the company's activities and
4    able to perform an oversight role.
5  BY MR. KRY:
6        Q.    And did the incident cause you
7  concerns about the effectiveness of OpenAI's safety
8  processes?
9        A.    I think that's essentially the same
10 as your previous question, but yes.
11       Q.    And just to round out the record,
12 how long was the board meeting that Mr. Altman did
13 not disclose the safety breach?
14             MR. CULLERTON:  Object to
15   form.
16             THE WITNESS:  All day.
17   Multiple hours.
18 BY MR. KRY:
19       Q.    And Mr. Altman was there for the
20 entire meeting?
21       A.    To my recollection, yes.
22       Q.    And you were there for that entire
23 meeting?
24       A.    To my recollection, yes.
25       Q.    And was Ms. McCauley there for the

**Page 56**

1  entire meeting?
2        A.    To my recollection, yes.
3        Q.    When OpenAI released ChatGPT in
4  November '22, did it provide any advance notice to
5  the OpenAI board?
6        A.    No.
7        Q.    How did you learn about ChatGPT?
8        A.    We started -- or I started seeing
9  screen shots on Twitter.
10       Q.    And was that because you were
11 looking for it specifically, or you just chanced to
12 come across it?
13       A.    No, I have a -- my Twitter feed is
14 AI heavy, I would say.  So when there's AI news,
15 usually it lands there.
16       Q.    Do you remember what the first
17 Twitter post you saw concerning ChatGPT was?
18       A.    No.  There were lots.
19       Q.    Was it a beneficial OpenAI
20 publication or was it some secondary source?
21       A.    I don't recall.
22       Q.    When you saw that on Twitter, were
23 you surprised that no one at OpenAI had given you
24 any advanced notice about ChatGPT's release?
25             MR. CULLERTON:  Object to

**Page 57**

1    form.
2              THE WITNESS:  No, I was not
3    surprised, because I was used to the board
4    not being very informed about things.
5  BY MR. KRY:
6        Q.    Okay.  Did you think it was okay
7  that no one at OpenAI had given you advanced notice
8  about the release of this product?
9              MR. CULLERTON:  Object to
10   form.
11             THE WITNESS:  I did not
12   think it indicated that the board was
13   functioning as it should be.
14 BY MR. KRY:
15       Q.    And is the reason that it indicated
16 that to you that it illustrated the failure of the
17 company to provide the board with important
18 information?
19             MR. CULLERTON:  Object to
20   the form.  Leading.
21             THE WITNESS:  I thought that
22   it indicated that the board was often not
23   looped in on things it should have been
24   looped in on.
25             I thought it also indicated

**58**

```
 1    that the company's process for making --
 2    processes for making decisions that could
 3    have material impact on the mission were
 4    inadequate.
 5  BY MR. KRY:
 6         Q.      Did you believe at the time that
 7  Mr. Altman should have given you advanced notice
 8  that the company was launching ChatGPT before it
 9  did so?
10         A.      Yes.
11         Q.      Did this incident cause you to
12  question Mr. Altman's candor to the board?
13         A.      Again, I will say it caused me to
14  believe that he was not motivated to help the board
15  perform the oversight role.
16         Q.      Did this incident make it more
17  difficult for the board to manage OpenAI safety
18  risks?
19         A.      It contributed to that, yes.
20         Q.      Did you learn about another
21  incident in which Mr. Altman made a false statement
22  about whether GPT-4 Turbo had to go through joint
23  safety board review?
24                 MR. CULLERTON:  Objection to
25    the form.
```

**59**

```
 1                 THE WITNESS:  Yes.
 2  BY MR. KRY:
 3         Q.      When did that incident occur?
 4         A.      I'm not sure.  I believe at some
 5  point during 2023.
 6         Q.      How did you learn about the
 7  incident?
 8         A.      I forget whether it was Ilya
 9  Sutskever or Mira Murati who first described it to
10  me, but it was one of the two of them.
11         Q.      What did he or she describe to you?
12         A.      Actually, it's also possible that I
13  heard about it secondhand from them via Adam
14  D'Angelo or Tasha McCauley.
15                 I'm sorry.  What was the question?
16         Q.      What was communicated to you about
17  what had happened?
18                 MS. BENEZE:  Object to form.
19                 THE WITNESS:  That Sam had
20    claimed that Jason Kwon said that GPT-4
21    Turbo did not need DSB review.  And that --
22    Sam claimed to Mira that Jason said it
23    didn't need DSB review.
24                 Mira then later checked with
25    Jason and found that he had not said that,
```

**60**

```
 1    and Mira felt that Sam had -- had either
 2    misled her or lied to her.
 3  BY MR. KRY:
 4         Q.      And at the time you learned about
 5  this incident, did you review any documentary
 6  record that reported on the issue?
 7         A.      Within a few weeks -- I forget the
 8  exact sequencing -- but yes.  In the period where
 9  we learned about this, we were -- we had -- we were
10  given access to screen shots of a Slack exchange
11  between Mira and Jason.
12         Q.      And what do you recall that Slack
13  exchange showing?
14         A.      That Mira asked Jason if he had, in
15  fact, said that GPT-4 Turbo didn't need DSB review,
16  and Jason said he had said something different and
17  also said he was confused how Sam got that
18  impression.
19         Q.      And during what period of time did
20  you learn about this incident and see these screen
21  shots?
22         A.      This was in the fall of 2023.
23         Q.      Did Mr. Altman's false statement to
24  Ms. Murati cause you to question Mr. Altman's
25  truthfulness and candor?
```

**61**

```
 1         A.      Yes.
 2                 MS. BENEZE:  Object.
 3                 MR. CULLERTON:  Objection to
 4    the form.  Misstates testimony.  Assumes
 5    facts.
 6  BY MR. KRY:
 7         Q.      Did this incident cause you
 8  concerns about the effectiveness of OpenAI's safety
 9  processes?
10         A.      Yes.
11         Q.      Do you recall some long-running
12  discussions on the board about whether to appoint
13  another independent board member focused on AI
14  safety?
15                 MR. CULLERTON:  Object to
16    the form.  Leading.
17                 THE WITNESS:  Yes.
18  BY MR. KRY:
19         Q.      Over what time period did those
20  discussions unfold?
21         A.      I would say much of 2023.
22         Q.      Did you favor adding another
23  independent board member focused on AI safety?
24         A.      Yes.
25         Q.      Did you propose candidates?
```

**102**

1  board for as long as possible and to return after
2  he was done with his campaign.  And Sam also
3  suggested that he wanted to make a large, I
4  believe, several-hundred-thousand-dollar campaign
5  contribution to Will, while still expecting him to
6  come back onto the board.
7        He did not go ahead with this
8  donation because Tasha, Adam, and I all said it
9  seemed very inappropriate.  But to me, the fact
10 that he was considering that, the fact that he
11 might have discussed it with Will in advance, the
12 fact it was an option was just a sign of total
13 disregard for the board's independence or ability
14 to provide meaningful oversight of the company and
15 the CEO.
16     Q.    And that
17 several-hundred-thousand-dollar campaign
18 contribution, was it -- did Mr. Altman discuss that
19 that was going to come from him personally?
20     A.    Yes, to the best of my
21 recollection.
22        (Document marked for identification
23         as Toner Exhibit 4.)
24 BY MR. KRY:
25     Q.    So marking as Exhibit 4 the

**103**

1  document Bates-stamped OPENAI_MUSK00027400.
2         THE WITNESS:  Do you have
3    it, Katherine?
4         MR. KRY:  Please let us know
5    when that shows up.
6         MS. PETTI:  When Jacob gets
7    the Bates, he can upload that Bates to the
8    screen share.
9         THE WITNESS:  It's the board
10   resolution removing Sam.
11        MS. PETTI:  I have it.
12        MR. KRY:  Great.
13 BY MR. KRY:
14     Q.    This is a November 16, 2023,
15 unanimous written consent signed by you and three
16 other directors.  And at -- as the witness noted,
17 at the bottom of Page 1, the document states:
18 "Now, therefore, be it resolved, that the Board
19 hereby, effective immediately, terminates
20 Mr. Altman's employment with the Corporation."
21        Ms. Toner, is this the resolution
22 by which the board formally removed Mr. Altman as
23 CEO and board member of OpenAI?
24     A.    Yes.
25     Q.    Were you one of the board members

**104**

1  who voted to remove Mr. Altman?
2     A.    Yes.
3     Q.    For how long before November 16,
4  2023, had the board members been discussing the
5  prospect of removing Mr. Altman?
6     A.    Several weeks.
7     Q.    Do you recall approximately when
8  those discussions began?
9     A.    It's hard to say exactly what --
10 what the starting point was.  Early to mid-October.
11     Q.    How did those discussions of
12 potentially removing Mr. Altman originate?
13     A.    I would say the starting point was
14 Ilya Sutskever reaching out to me to ask to talk.
15 We then had a first conversation which was very
16 circuitous and confusing to me.  Very clearly, Ilya
17 had some very significant concern but told me that
18 he couldn't tell me what his concern was,
19 essentially.
20        I would put that as the -- the
21 starting point.
22     Q.    And did you subsequently have
23 discussions with the other board members?
24     A.    Yes.
25     Q.    And over the course of those

**105**

1  discussions, what were the grounds for removing
2  Mr. Altman that the board members discussed?
3     A.    It was a number of things.  A --
4  the phrase we used was "a pattern of behavior."  So
5  no one single cause.
6        The pattern of behavior related to
7  his honesty and candor, his resistance of board
8  oversight, as well as the concerns that two of his
9  senior management team, Ilya Sutskever and Mira
10 Murati, raised to the board about his management
11 practices, his manipulation of board processes.  A
12 range of concerns in that vicinity.
13     Q.    So when you refer to his pattern of
14 behavior related to honesty and candor, does that
15 include all the incidents that we've discussed
16 during your testimony this morning?
17     A.    Yes.  I will say during the
18 discussions -- I'll leave that.
19        Yes.
20     Q.    Did those -- did those incidents
21 reflecting negatively on Mr. Altman's honesty and
22 candor also cause you to believe that Mr. Altman
23 was not providing the board with the information it
24 needed to manage OpenAI's AI safety processes?
25        MR. CULLERTON:  Object to

**106**

1      the form.  Leading.
2              THE WITNESS:  Yes.
3   BY MR. KRY:
4       Q.      And the -- did you feel, as a
5   result of those incidents we've discussed this
6   morning, that Mr. Altman's conduct had made it more
7   difficult for you as a board member to manage
8   OpenAI's AI safety processes?
9              MR. CULLERTON:  Object to
10    the form.
11             THE WITNESS:  Yes.
12  BY MR. KRY:
13      Q.      Without disclosing any
14  attorney-client privileged communications, during
15  these several weeks when you were discussing
16  removing Mr. Altman, did you communicate with legal
17  counsel?
18      A.      We did.
19      Q.      Approximately how many times?
20      A.      I don't remember.  A lot.
21      Q.      What was the law firm?
22      A.      Am I okay to name the firm?
23              My mind is going entirely blank.
24  Wow.
25      Q.      Was it Arnold & Porter?

**107**

1       A.      It was Arnold & Porter.  Thank you.
2       Q.      At one point during those
3   discussions, did Mr. Sutskever send the other board
4   members a self-destructing e-mail that catalogued
5   examples of Mr. Altman's misconduct?
6              MR. CULLERTON:  Object to
7     form.
8              THE WITNESS:  Yes.
9   BY MR. KRY:
10      Q.      And approximately when did
11  Mr. Sutskever send you that e-mail?
12      A.      I believe early November.
13      Q.      So that would have been how far
14  through the overall multi-week process of these
15  discussions?
16      A.      Roughly halfway.  Maybe towards the
17  end a little.
18      Q.      Did you review the contents of that
19  e-mail?
20      A.      Yes.
21      Q.      Did it, in fact, self-destruct
22  after you read it?
23      A.      I believe it was on a timer.  Maybe
24  24 hours.
25      Q.      So you no longer have a copy of it?

**108**

1       A.      Correct.
2       Q.      What types of misconduct did that
3   e-mail describe?
4              MR. CULLERTON:  Object to
5     the form.
6              THE WITNESS:  It
7   described -- I haven't seen it in two
8   years.
9              So to the best of my
10  recollection, it had various instances of
11  Sam making conflicting promises to team
12  members in ways that seemed very
13  misleading.  Putting words in other
14  people's mouth.
15             So, for example, the GPT-4
16  Turbo DSB review with Mira and Jason was in
17  there.  The Slack exchange between Mira and
18  Jason.
19             Yeah.  Examples of -- many
20  examples, most of which were not glaring or
21  egregious on their own but which were
22  intended to, again, illustrate a pattern of
23  behavior.
24  BY MR. KRY:
25      Q.      And did the contents of that e-mail

**109**

1   include -- include multiple examples of the issues
2   that you testified about this morning?
3              MR. CULLERTON:  Object to
4     the form of the question.
5              THE WITNESS:  I would say
6   that Ilya's gloss on what types of behavior
7   Sam was exhibiting was somewhat different
8   to what we have discussed so far and would
9   relate -- yeah -- would cover some of the
10  same ground but also, perhaps, relate more
11  to making conflicting promises, talking out
12  both sides of his mouth, pitting team
13  members against each other.  So not -- not
14  exactly the same as the conduct we've
15  discussed so far.
16  BY MR. KRY:
17      Q.      Did Mr. Sutskever also send the
18  board members a second self-destructing e-mail that
19  concerned allegations about Mr. Brockman?
20      A.      Yes.
21      Q.      Did you read that second
22  self-destructing e-mail?
23      A.      Yes.
24      Q.      And did that e-mail, in fact,
25  destruct itself?

**146**

1  reflect your views at the time?
2      A.   I would say it is an accurate
3  statement and, again, is an incomplete
4  summarization that is for the purpose of this
5  message.
6      Q.   And the behavior and lack of
7  transparency you're referencing there, is that the
8  same pattern of conduct that we discussed earlier
9  today?
10     A.   Yes.
11     Q.   Did the OpenAI board ultimately
12 decide to reinstate Mr. Altman as a board member?
13     A.   As CEO, but not as a board member.
14 But -- and then later, much later, the board
15 decided to reinstate him, yes.  A different board.
16     Q.   Correct.  I'm sorry.
17          So the board --
18          Okay.  When did the board decide to
19 reinstate Mr. Altman as CEO?
20     A.   Tuesday night, the 21st of
21 November.
22     Q.   How did that come about?
23     A.   There had been, over the course of
24 the weekend, a lot of back-and-forth over different
25 possible futures of the company, with a recurring

**147**

1  theme being employees threatening to leave if
2  certain demands were not met.
3          Over the course of the few days
4  following our firing, those demands became
5  gradually more reasonable and the threat of mass
6  resignations continued.
7      Q.   Who were the demands being made by?
8      A.   Some combination of Sam, Greg, the
9  executive team, typically conveyed to us via Mira.
10 And employees directly.
11     Q.   And did you observe that Microsoft
12 was involved in those discussions at all?
13     A.   Microsoft became clearly involved
14 on Sunday night when, after we announced that
15 Emmett would be interim CEO, Microsoft announced
16 that Sam and Greg would be joining Microsoft.  And
17 over the subsequent hours -- I don't recall how I
18 came to learn this -- but over the subsequent hours
19 I came to the understanding that Microsoft was
20 offering to hire away the entire OpenAI team and
21 would have jobs for anyone who wanted them at
22 Microsoft.
23     Q.   So what impact did Microsoft's
24 announcement that it was hiring Mr. Altman and
25 Mr. Brockman, an open offer to hire anyone from

**148**

1  OpenAI that wanted to come over, impact the board's
2  ability to carry out its duties as the board of
3  OpenAI?
4          MS. BENEZE:  Object to form.
5          THE WITNESS:  It -- it
6  created a threat of Microsoft destroying
7  the company in a way that changed the
8  calculus for us about what the best way to
9  pursue the nonprofit mission was.
10 BY MR. KRY:
11     Q.   In what sense?
12     A.   In the sense that it significantly
13 increased the credibility of employees' threats
14 that they would leave en masse and gave Sam
15 significantly more leverage to demand his own
16 reinstatement to avoid the company falling apart.
17     Q.   What did the board do in response
18 to this change to the circumstances?
19     A.   In response to the totality of the
20 circumstances on Tuesday, which includes
21 Microsoft's involvement, as well as other factors,
22 we were able to reach an agreement on Tuesday that
23 was amenable to all sides, which involved Sam being
24 reinstated as CEO but not reappointed to the board;
25 most of the existing board members resigning, but

**149**

1  not all; and a thorough, independent investigation
2  being carried out into Sam's conduct in the events
3  of the previous few days.
4      Q.   Were you one of the board members
5  that was removed as part of this deal?
6          MR. CULLERTON:  Object to
7  the form.
8          THE WITNESS:  Yes.
9          MR. CULLERTON:  Removed.
10         THE WITNESS:  Yes.
11 BY MR. KRY:
12     Q.   And was Ms. McCauley one of the
13 board members that was removed pursuant to this
14 compromise?
15         MR. CULLERTON:  Same
16 objection.
17         THE WITNESS:  Yes.
18 BY MR. KRY:
19     Q.   Did Mr. D'Angelo stay on the board
20 after this agreement?
21     A.   Yes.
22     Q.   Was an interim board appointed in
23 connection with this agreement?
24         MR. CULLERTON:  Object to
25 the form and characterization, on board.

150

1    THE WITNESS:  I would not
2  describe it as an interim board.  I would
3  say a -- two new board appointments were
4  made, with the intention of making
5  additional appointments in the future.
6  BY MR. KRY:
7    Q.   Who were the two new appointments
8  that were made?
9    A.   Larry Summers and Bret -- my mind
10 is blank --
11   Q.   Taylor?
12   A.   Thank you.  Bret Taylor.
13   Q.   What was your role in selecting
14 Mr. Summers and Mr. Taylor for the board?
15   A.   There were many rounds of
16 back-and-forth over the previous few days with
17 potential names for a new board, attempting to find
18 names that were acceptable both to Sam and to the
19 existing board.
20       And I was in close communication
21 with Tasha and Adam about which names were
22 acceptable to us as the existing board.
23   Q.   Who originally had proposed them,
24 if you know?
25   A.   I don't know.

151

1    Q.   Do you know if Microsoft was
2  involved in proposing those individuals as board
3  members for OpenAI?
4    A.   I don't know.
5    Q.   Do you know whether Microsoft
6  approved the slate of board members that were being
7  put up as part of this deal?
8    A.   Implicitly, I believe they did,
9  yes.  I don't know what -- what exact approval
10 process was involved.
11   Q.   Did WilmerHale ultimately conduct
12 the investigation into the circumstances of
13 Mr. Altman's removal?
14   A.   Yes.
15   Q.   Did you read OpenAI's summary of
16 the results of that investigation?
17   A.   I did.
18   Q.   Did you agree with it?
19   A.   I'm not sure how to answer that
20 question.
21   Q.   What do you understand OpenAI
22 concluded?
23       MR. CULLERTON:  Object to
24    the form.
25 BY MR. KRY:

152

1    Q.   Yeah.  So strike that.
2        What do you -- what did Open -- how
3  did OpenAI describe WilmerHale's conclusion?
4    A.   I recall that they said something
5  along the lines of the board acted its -- in its
6  best judgment, but Sam's conduct did not mandate
7  removal, or something along those lines.
8    Q.   What was your reaction to the first
9  half of that?
10   A.   I agree that the board acted
11 according to its best judgment.
12   Q.   And what was your reaction to the
13 second half?
14   A.   I think the standard of mandating
15 removal is a strange one, and I didn't know how to
16 interpret it, unless it meant that his conduct was
17 not illegal.  In which case I agree that, as far as
18 I know, his conduct was not illegal, but that
19 didn't seem like the right question.
20   Q.   In your judgment, did Mr. Altman's
21 conduct warrant his removal as a board member of
22 OpenAI?
23   A.   Yes.
24      (Document marked for identification
25    as Toner Exhibit 9.)

153

1  BY MR. KRY:
2    Q.   This is a -- marked as Exhibit 9,
3  document stamped MSFT_MUSK 85635.  It's a post on
4  X, I gather, from you, that's captioned, "A
5  statement from Helen Toner and Tasha McCauley."
6        Do you remember publishing this
7  post?
8    A.   Yes.
9    Q.   Did you co-author this post with
10 Ms. McCauley?
11   A.   Yes.
12   Q.   Why did you decide to publish the
13 post?
14   A.   We -- so this post was published
15 shortly after, maybe the same day, maybe the day
16 after, the OpenAI announcement of the findings of
17 the WilmerHale investigation.  And -- I believe it
18 was the same day.
19       And we wanted to -- we considered
20 many potential things that we might say publicly in
21 reaction to the OpenAI announcement, and this short
22 statement is what we were able to agree on quickly.
23   Q.   The second paragraph, last
24 sentence, you say:  "As we told the investigators,
25 deception, manipulation, and resistance to thorough

**170**

1  'summoning the demon.'"
2      Do you agree with Mr. Thiel's
3  prediction that AI safety people would destroy
4  OpenAI?
5          MR. CULLERTON: Object to
6      form. No foundation.
7          THE WITNESS: No.
8  BY MR. KRY:
9      Q.   And do you think many AI safety
10 people raised legitimate concerns about AI safety?
11     A.   Yes.
12     Q.   Do you think that you raised
13 legitimate AI concerns about AI safety while you
14 were at OpenAI?
15     A.   Yes, though most of my concerns
16 were more about governance than about AI safety,
17 per se.
18     Q.   What was the connection between the
19 governance concerns you raised and AI safety?
20         MR. CULLERTON: Object to
21     the form.
22         THE WITNESS: The -- it was
23     important that the company be governed well
24     in order to be able to manage increasingly
25     severe AI safety risks over time.

**171**

1  BY MR. KRY:
2      Q.   Do you believe that Mr. Altman
3  tried to remove you from the OpenAI board based, at
4  least in part, on your views related to AI safety?
5          MR. CULLERTON: Object to
6      the form. Basis of her knowledge, no
7      foundation.
8          THE WITNESS: Yes, to the
9      best of my understanding.
10 BY MR. KRY:
11     Q.   To your knowledge, has Elon Musk
12 raised concerns about AI safety?
13     A.   Yes.
14     Q.   What concerns has Mr. Musk raised
15 that you're aware of?
16     A.   He has referred to it as "summoning
17 the demon."
18     Q.   Were you aware of that before you
19 read this article?
20     A.   Yes.
21     Q.   When did he make that statement?
22     A.   Somewhere in the 2015 to 2017
23 timeframe.
24     Q.   How did that statement strike you
25 at the time?

**172**

1      A.   Seemed unhelpfully extreme.
2      Q.   Was there a kernel of truth to it?
3      A.   I believed it was gesturing in a
4  direction that seemed right to me but phrased in a
5  way that would get a lot of people offside.
6      Q.   Do you think it is a -- important
7  for warnings about AI safety be -- to be expressed
8  publicly by people that are in a position to
9  express them?
10     A.   Yes.
11     Q.   Do you think it's a positive
12 development for OpenAI that -- and AI safety that
13 Mr. Altman got rid of Elon?
14         MR. CULLERTON: Object to
15     the form. No foundation.
16         THE WITNESS: I don't know.
17         MR. KRY: We have no further
18     questions at this time, but we'll reserve
19     the balance for redirect.
20         MR. CULLERTON: Let's take
21     five minutes here.
22         THE VIDEOGRAPHER: Off the
23     record at 3:10.
24     (Short break.)
25         THE VIDEOGRAPHER: On the

**173**

1  record at 3:26.
2          - - -
3          EXAMINATION
4          - - -
5  BY MR. CULLERTON:
6      Q.   All right. Good afternoon,
7  Ms. Toner.
8          Since Mr. Altman was reinstated as
9  CEO, you have spoken to the press a number of times
10 about the events leading up to his termination,
11 correct?
12     A.   Yes.
13     Q.   Okay. You recall you did an
14 interview with the Wall Street Journal at the end
15 of December 2023?
16     A.   Yes.
17     Q.   Okay. And you wrote a piece in The
18 Economist with Ms. McCauley that we just looked at,
19 correct?
20     A.   Yes.
21     Q.   And you provided an interview on
22 the TED AI show -- or TED AI podcast that we looked
23 at briefly, correct?
24     A.   Yes.
25     Q.   And you spoke with Ms. Hagey for

**250**

because we were freaked out about the pace of AI development.

But that is a more specific thing than to say that the decision had nothing to do with the pace of development.

BY MR. CULLERTON:

Q. Okay. But fair, then, that Mr. Altman was not removed because the board wanted to slow down the pace of AI development, right?

A. Correct.

Q. Okay. And Mr. Altman was not terminated because the board wanted to slow down OpenAI's pace of development, correct?

A. Correct.

Q. Did the board make any findings of any financial impropriety in advance of terminating Mr. Altman?

A. I don't believe so, depending on what exactly counsel's financial -- to the best of my understanding, no.

Q. And is it true that Mr. Altman's removal as CEO also was not about OpenAI's relationship with any of its investors?

MR. KRY: Objection to form.

THE WITNESS: I would say

**251**

that the issues that we were concerned about -- some of the issues that contributed to our decision to fire Sam were exacerbated by relationships with investors.

BY MR. CULLERTON:

Q. In what way?

A. Primarily, the extreme pressure for the company to release products rapidly and to prioritize public product releases over well-thought-through determinations of how given decisions affected the mission.

Q. Okay. But to be very clear, and I believe you testified to this earlier, you don't believe, ultimately, that any of the products that had been released as of the date of this e-mail were unsafe to the public?

A. Not in ways that give me significant concern, no.

Q. You testified earlier about the hiring of Emmett Shear.

Do you recall that?

A. Yes.

Q. Okay. And did you know Mr. Shear before hiring him?

**252**

A. I had had conversations with him before hiring him.

Q. Did you trust his judgment?

A. I believe he was the best candidate for interim CEO that we had available.

Q. Did you trust his judgment?

A. I don't really know what that means.

Q. Did you trust -- did you believe him to be a person of integrity?

A. To my best judgment, based on limited interactions, yes.

MR. CULLERTON: Tab 43.

(Document marked for identification as Toner Exhibit 15.)

BY MR. CULLERTON:

Q. I'm showing you what's been marked as Exhibit 15, the document Bates-numbered 2024MUSK0014175, which is a tweet from Mr. Shear, posted on November 20, 2023.

Do you recognize this, Ms. Toner?

A. Yes.

Q. Okay. And this was a tweet from Mr. Shear the day -- on his first day as interim CEO of OpenAI, right?

**253**

A. I believe so.

Q. And this was the first public statement that Mr. Shear made as OpenAI's new interim CEO?

A. I believe so.

Q. And if you look down at Paragraph 2, he writes, "OpenAI's employees are extremely impressive, as you might have guessed, and mission-driven in the extreme."

Do you see that?

A. Yes.

Q. Do you agree with Mr. Shear's characterization of OpenAI's employees?

A. There are a large number of employees. It's difficult to characterize all of them at once.

Q. Okay. He goes on to write: "It's clear that the process and communications around Sam's removal has been handled very badly, which has seriously damaged our trust."

Do you see that?

A. Yes.

Q. And did you understand Mr. Shear to be referring to the process by which the board had removed Mr. Altman?

318

1  significant concerns about the safety review
2  processes at OpenAI and how they were being
3  handled?
4          A.      I would say that it primarily
5  served to me as a further example cementing the
6  perception that we discussed at the board level,
7  that Sam had a habit of putting words in other
8  people's mouths to get people where he wanted them
9  to go, which was of concern for many reasons,
10 including the integrity of OpenAI's safety review
11 processes but also more generally.
12         Q.      And I think you testified earlier
13 that you took some screen shots of these particular
14 screen shots in the document?
15         A.      That's right.
16         Q.      Why was that?
17         A.      This seemed like a particularly
18 important and clear example of a pattern we were
19 concerned about.
20                 MR. KRY:  Great.  I don't
21     have any further questions on this
22     document.
23                 MR. CULLERTON:  Just
24     following up on that.  And, Anika -- well,
25     one second.

319

1                    - - -
2                  EXAMINATION
3                    - - -
4  BY MR. CULLERTON:
5          Q.      I think we already established
6  this, but you didn't ask Mr. Altman what had
7  happened in this interaction with Mr. Kwon and Ms.
8  Murati, correct?
9          A.      Correct.
10                 MR. CULLERTON:  I think
11     that's it.
12                 You could -- Anika, thank
13     you.
14                 THE WITNESS:  I'm going to
15     take this home and get it framed.  Famous
16     document.
17                 MR. KRY:  Pretty sure that's
18     not allowed in the stipulation.
19                 THE WITNESS:  I know.  I
20     know.
21 BY MR. CULLERTON:
22         Q.      So turning back to your
23 interactions with Mr. Musk.
24                 Are you aware -- and I know you
25 testified that you couldn't recall any other

320

1  communications with him other than what was
2  reflected in the text message.
3                  Are you aware of anyone else on the
4  board having any communications with Mr. Musk
5  during the time period in which -- you know, these
6  events that we've been discussing?
7          A.      I'm pretty sure Ilya did.  I'm not
8  sure about others.
9          Q.      Okay.  Did Ilya ever tell you what
10 he and Mr. Musk discussed?
11         A.      I don't recall.
12         Q.      Okay.  So other than the
13 communication or the conversation that you think
14 Ilya may have had with Mr. Musk, you are not aware
15 of any other communications or conversations
16 involving anyone else on the board and Mr. Musk; is
17 that correct?
18         A.      Not that I recall.
19         Q.      Do you recall anyone suggesting
20 that Mr. Musk was trying to become CEO of OpenAI
21 during that time?
22         A.      That sounds vaguely familiar.
23         Q.      Do you recall where you heard that
24 suggestion?
25         A.      No.

321

1          Q.      It's not something you discussed
2  with Mr. Musk?
3          A.      No.
4          Q.      Are you aware of whether anyone on
5  the board discussed that with Mr. Musk?
6          A.      I'm not sure.
7          Q.      Okay.  We were talking about the
8  DSB review process relating to the test release of
9  GPT-4 in India.
10                 Do you recall that?
11                 And I believe that you testified
12 that Tasha had found out about that from an
13 employee following a board meeting.
14                 Do I have that correct?
15         A.      Yes.
16         Q.      Okay.  Who was that employee?
17         A.      Jan Leike.
18         Q.      Okay.  You also testified earlier
19 regarding the board service and ultimate departure
20 from the board of Shivon Zilis.
21                 You remember that?
22         A.      Yes.
23         Q.      And I think you said that
24 statements that Mr. Altman had made during the
25 deliberations around whether Ms. Zilis should leave