# EXHIBIT 47

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                      OAKLAND DIVISION

 4

 5   IN RE MATTER OF:              )
                                   )
 6   ELON MUSK, et al.,            )
                                   )
 7             Plaintiffs,         )
                                   )
 8        vs.                      )   CASE NO.
                                   )   4:24-CV-04722-YGR
 9   SAMUEL ALTMAN, et al.,        )
                                   )
10             Defendants.         )
                                   )
11

12                   ** CONFIDENTIAL **

13       VIDEOTAPED DEPOSITION OF TASHA McCAULEY

14                LOS ANGELES, CALIFORNIA

15              Tuesday, September 30, 2025

16

17

18

19

20

21   Stenographically Reported by:

22   HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
     Realtime Systems Administrator
23   California CSR License #11600
     Oregon CSR License #21-0005
24   Washington License #21009491
     Texas CSR License #10725
25
```

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
 5    IN RE MATTER OF:          )
                                )
 6    ELON MUSK, et al.,        )
                                )
 7           Plaintiffs,        )
                                )
 8      vs.                     )  CASE NO.
                                )  4:24-CV-04722-YGR
 9    SAMUEL ALTMAN, et al.,    )
                                )
10           Defendants.        )
                                )
11
12
13
14
15         VIDEOTAPED DEPOSITION of TASHA McCAULEY, taken
16    before Heather J. Bautista, CSR No. 11600, a Certified
17    Shorthand Reporter for the state of California, with
18    principal office in the county of Santa Clara,
19    commencing on Tuesday, September 30, 2025, 9:17 a.m., at
20    2121 Avenue of the Stars, Los Angeles, California 90067.
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES OF COUNSEL:
 2
 3      For Plaintiffs:
 4         MoloLamken
           BY:  WALTER HAWES, ESQ.
 5              ROBERT KRY, ESQ.
           600 New Hampshire Avenue, N.W.
 6         Washington, D.C. 20037
           Phone:  (202) 556-2013
 7         whawes@mololamken.com
           rkry@mololamken.com
 8
 9      For OpenAI Defendants:
10         Wachtell Lipton Rosen & Katz
           BY:  WILLIAM SAVITT, ESQ.
11              NATHANIEL CULLERTON, ESQ.
                ADAM TANNE, ESQ.
12         51 West 52nd Street
           New York, New York 10019
13         Phone:  (212) 403-1000
           wdsavitt@wlrk.com
14         ndcullerton@wlrk.com
           aptanne@wlrk.com
15
16      For Defendant Microsoft Corporation:
17         Dechert LLP
           BY:  NISHA PATEL, ESQ.
18         633 W. 5th Street, Suite 4900
           Los Angeles, California 90071
19         Phone:  (213) 808-5735
           nisha.patelgupta@dechert.com
20
21      For TASHA McCAULEY:
22         Ellis George LLP
           BY:  KATHERINE PETTI, ESQ.
23         2121 Avenue of the Stars, 30th Floor
           Los Angeles, California 90067
24         Phone:  (310) 274-7100
           kpetti@ellisgeorge.com
25
```

## Page 4

```
 1   APPEARANCES OF COUNSEL (CONTINUED):
 2         MARC TOBEROFF, ESQ.
     (Remote) JENNIFER SCHUBERT, ESQ. - MoloLamken
 3   (Remote) SARA TOFIGHBAKHSH, ESQ. - MoloLamken
     (Remote) ETHAN COHEN, ESQ. - Wachtell Lipton Rosen &
 4                                 Katz
     (Remote) DANIEL CONTRERAS, ESQ. - Ellis George
 5   (Remote) CHRISTOPHER BERG, ESQ. - Ellis George
 6
 7   ALSO PRESENT:  Kevin Crowly, Videographer
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                  INDEX OF EXAMINATION
 2                                                  PAGE
 3   TASHA McCAULEY
 4      EXAMINATION BY MR. HAWES                     10
 5      EXAMINATION BY MR. SAVITT                   143
 6      EXAMINATION BY MS. PATEL                    278
 7      EXAMINATION BY MR. HAWES                    286
 8      EXAMINATION BY MR. SAVITT                   291
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ELON MUSK, et al.
SAMUEL ALTMAN

Case 4:24-cv-04722-YGR   Document 379-101   Filed 01/06/26   Page 4 of 14

Confidential

Tasha McCauley
September 30, 2025

Page 30

1  that I was there, I got to witness different --
2  different processes being developed to ensure safety.
3     Q.  (By Mr. Hawes)  You mentioned employees leaving
4  to join Anthropic.  When did that happen?
5     A.  I think the beginning of that -- or maybe, you
6  know, not sure over what time frame it happened, I want
7  to say late 2020.  I believe Anthropic was, to the best
8  of my recollection, started up in -- sometime in the
9  first half of 2021, and I believe some employees were
10 leaving by late 2020.
11    Q.  And you discussed headcount dedicated to AI
12 safety when you started.  How did that change over time?
13          MR. SAVITT:  Objection.  Form.
14          THE WITNESS:  Well, I -- I do believe, if I
15 understand and remember correctly, that the total -- you
16 know, the percentage of people dedicated to that
17 relative to the size of the company was -- you know, did
18 decrease, but the company grew quite a lot in the time
19 that I was there.
20          And I don't think anybody -- you know, I don't
21 know that anybody anticipated that the percentage
22 would -- would remain quite that high, but so -- so I
23 think as a proportionate -- again, I -- I feel hesitant
24 to say any specific numbers or percentages, though, on
25 that.  I don't know.

Page 31

1     Q.  (By Mr. Hawes)  Your approximate understanding
2  is fine.
3     A.  Yeah, sure.
4     Q.  How about the -- the funding dedicated to AI
5  safety?  How did that change over time?
6     A.  I mean, that's -- it's also -- you know, this
7  is a tricky thing, because there's no -- I don't -- I
8  don't think of it as a clear line between what's safety
9  and what's capabilities.  I mean, there's -- all of --
10 you know, there was -- you know, there was a period
11 in -- in the history of AI development where, you know,
12 a certain amount of safety work, you know, was perhaps
13 bottlenecked by capability.  So, I mean, as capabilities
14 got more advanced, safety work could happen more
15 effectively.
16          So I don't know that it's possible to kind of
17 say that -- and also to say that capabilities work that
18 was being done, for example, not specifically on the
19 safety team, you know, wasn't done towards AI safety.  I
20 do think there was a lot of cooperation and
21 collaboration and kind of joint work between the teams,
22 so I -- I can't say that there was a really clear line
23 on that.
24    Q.  How about the degree to which the board was
25 kept informed?

Page 32

1     A.  So I think, you know, the board was kept
2  informed about many things pertaining to, you know, safe
3  AI development.  I think -- I can't say with perfect
4  confidence whether it -- I think there was discussion of
5  this type, discussion of -- of -- you know, centered on
6  AI safety standardly important things, so it was
7  definitely -- you know, continued to be an area of
8  focus.
9           You know, there were processes we had put in
10 place, as I mentioned before, to kind of ensure safe
11 development.  I -- I will say there were times where we,
12 I think, were not sufficiently informed about different
13 occurrences pertaining to those processes.
14          So I think, as a general approach, you know, if
15 you're talking about what -- what got presented to the
16 board at meetings, AI safety was, you know, a focus; a
17 component, at least.
18          And -- and I think I also had concerns about --
19 about what we were able to see, what we were being kept
20 informed about, whether we were getting complete and
21 accurate information.
22    Q.  What -- what specific concerns did you have
23 about receiving complete and accurate information
24 related to AI safety?
25    A.  Well, I think a few occurrences gave us

Page 33

1  concern.  Some examples I think that come to mind are:
2  There was a safety protocols breach that occurred when,
3  you know, we were scheduled to have -- we had an
4  all-day -- all-day board meeting.  Occasionally -- you
5  know, I think typical board meetings are of a normal
6  length of, you know, couple hours or something like
7  that, and this was meant to be kind of an all-day board
8  meeting, possibly six hours or something like that, and
9  there had been a safety -- a safety protocols breach
10 actually by the -- you know, I think on the part of the
11 partner, Microsoft, and I was discouraged that over the
12 course of a full day of meeting, this -- this breach
13 wasn't disclosed to us, and I actually learned about it
14 from an employee as I was on my way out of the building;
15 so that kind of thing.
16          I think there were -- maybe in that same
17 meeting, there was another item that was mentioned to us
18 that I think Sam said that a few different -- a few
19 different things had gone through the deployment safety
20 board review -- or had gone through, sort of like, a
21 safety review; and after the fact, it turned out that
22 only one of the three things he mentioned had actually
23 gone through that review.
24          So I think, you know, examples like that gave
25 us concern that we either weren't getting correct

Page 34

1  information about how the safety processes were being
2  used or that we were not being told about potential
3  breaches or that -- that kind of thing.
4      Q.   We'll circle back to those specific
5  incidents --
6      A.   Sure.
7      Q.   -- but why was that concerning to you as a
8  board member of OpenAI?
9      A.   Yeah.  I would say it was concerning to me,
10 because we had a really -- the structure of OpenAI
11 is unusual.  We had a mission, and then a -- an
12 interesting non-standard structure put in place to -- to
13 support that mission.  And it was a non-profit board,
14 and the only board of the company is a non-profit board,
15 and the non-profit -- the board of the non-profit is
16 meant to oversee the activities of the for-profit, so --
17 and the purpose of that is so that the -- the non-profit
18 can, in a disinterested way, uphold the mission -- the
19 mission of the non-profit in the face of potential
20 profit pressures that might -- might come into play
21 as -- as the for-profit does it work.
22          And the primary lens that the board -- that the
23 non-profit board has for seeing into the for-profit
24 activities of the company is, you know, the CEO and what
25 the CEO chooses to convey to us and the materials we are

Page 35

1  given to -- to do our analysis and make our decisions.
2          And when we would encounter instances like this
3  where breaches -- you know, where, like, a breach wasn't
4  disclosed or a process wasn't -- you know, or we got,
5  you know, inaccurate information about whether a process
6  had been followed that was put in place, it was very
7  concerning to us, because we felt that it went against
8  our ability to do our job and make our -- our decisions
9  and oversee the for-profit entity effectively.
10     Q.   You mentioned that at some point OpenAI created
11 a for-profit entity, the LP entity.
12     A.   Um-hum.
13     Q.   Did the creation of that entity create any risk
14 for OpenAI's continued focus on AI safety?
15          MR. SAVITT:  Objection.  Form.
16          THE WITNESS:  Well, so I mentioned before, you
17 know, the company had a mission, and this non-standard
18 structure was put in place to empower that mission in
19 the face of -- of the immense pressures -- you know,
20 this is a company that was going to be raising tens,
21 hundreds of billions of dollars, so it was very clear
22 that the -- that the profit incentive was going to, you
23 know, create some -- some challenges for being able to
24 uphold the mission if the mission did not align with the
25 interests of the investors.

Page 36

1          So I think the structure that was put in place
2  made sense.  There are a few ingredients here.  You have
3  a mission.  You have this non-standard structure to
4  empower the mission, and then you also have leadership.
5  And I think that full leadership buy-in to that
6  structure is necessary; otherwise, I do think the
7  structure sort of sets the stage for internal
8  misalignment, because if the leadership is not working
9  to support that structure, it's non-functional.
10         So I think -- I was optimistic that -- I did
11 hear the reasoning and understand that it made sense
12 that in order to bring in the kind of money that it was
13 going to take to develop the technology we were
14 developing, it would require, you know, incentive for
15 investors.  Non-profits don't typically raise on that
16 scale.
17         And I think the structure, had we had kind of
18 the necessary ingredients required, showed promise for
19 being able to support the mission properly to protect
20 the non-profit's interests.
21         So I think going into it, I was -- I was
22 cautiously optimistic that that might -- that that might
23 work.
24     Q.   (By Mr. Hawes)  You mentioned that you think
25 full leadership buy-in to the structure is necessary.

Page 37

1      A.   Yeah.
2      Q.   What specifically did you mean by that?
3      A.   I mean that the -- the leadership needs to be
4  able to cooperate with the requirements of that, which
5  means, you know, sometimes it's tempting to move very
6  quickly.  That might mean -- and this is an example,
7  but, you know, that might mean that if the safety
8  processes, you know, has a chance of slowing you down or
9  inhibiting your ability to, you know, compete in the
10 short-term, a leader might need to be able to make that
11 choice and -- and, in any case, be very forthcoming and
12 honest with the board about the -- you know, if there
13 are trade-offs where you're making a choice that might
14 be more in favor of, you know, moving quickly and --
15 and, you know, wanting to reduce a process that --
16 that -- you know, some kind of safety process that the
17 board -- that the CEO can be forthcoming and clear with
18 the -- with the board about that.
19         So I think the fact that we had experiences
20 that were counter to that gave the board a good amount
21 of concern.
22     Q.   You said that you had experiences that are
23 counter to that.  Did you see that leadership buy-in
24 during your tenure as an OpenAI board member?
25         MR. SAVITT:  Objection.  Form.

### Page 58

1  myself, and likely --
2       (Stenographer clarification.)
3       THE WITNESS:  -- likely enough Will, although I
4  don't specifically recall what -- what month this
5  discussion took place, so I can't be 100 percent sure.
6     Q.   (By Mr. Hawes)  Okay.
7       We've discussed concerns about Mr. Altman.  Did
8  you have similar concerns regarding Mr. Brockman?
9     A.   I did not.
10    Q.   When you say "similar concerns," concerns about
11 undisclosed activities or investments that might have --
12 could you clarify your question.  Sorry.
13    Q.   Did you have concerns regarding whether
14 Mr. Brockman had undisclosed interests in companies that
15 might affect his conduct on OpenAI's board?
16    A.   Not in particular.  I don't think that's -- I
17 don't recall having that concern.
18    Q.   Okay.
19         I'm going to show you what will be marked as
20 Exhibit 2.
21         (Exhibit 2 was marked for identification.)
22    Q.   (By Mr. Hawes)  And this, as it says on the
23 top, is a Unanimous Written Consent of the Board of
24 Directors of OpenAI dated November 16th, 2023, and it's
25 signed by you and the directors.

### Page 59

1       Do you see at the bottom of Page 1 where it
2  reads "Now, therefore, be it resolved" --
3     A.   Yes.
4     Q.   -- "that the board hereby, effective
5  immediately" --
6     A.   Yes.
7     Q.   -- "terminates Mr. Altman's employment with the
8  corporation and OpenAI GP, removes Mr. Altman from any
9  position in which he serves for the corporation or for
10 OpenAI GP."
11    A.   Yes.
12    Q.   Did the board, in fact, fire Mr. Altman from
13 his position as board member and CEO of OpenAI, Inc.,?
14 on November 16th, 2023?
15    A.   Yes.
16    Q.   Were you one of the board members who voted to
17 remove Mr. Altman?
18    A.   I was.
19    Q.   And the paragraph right above the paragraph
20 that I just read --
21    A.   Yes.
22    Q.   -- do you see where it states, "Whereas the
23 board has lost trust in Sam Altman's ability to be
24 candid and forthright in his communications with the
25 board" --

### Page 60

1     A.   Yes.
2     Q.   -- "and employees of the corporation and OpenAI
3  Global, LLC" --
4     A.   Um-hum.
5     Q.   -- "and is concerned about the resulting impact
6  of his actions on the corporation's mission and as a
7  result, the board desires to terminate Mr. Altman's
8  employment with the corporation and OpenAI GP."
9     A.   Yes.
10    Q.   Had you, in fact, lost trust in Sam Altman's
11 ability to be candid and forthright in his
12 communications with the board?
13    A.   We had.
14    Q.   In general terms, what caused you to lose
15 trust --
16         (Stenographer clarification.)
17    Q.   (By Mr. Hawes)  What caused you to lose trust
18 in Mr. Altman's ability to be candid and forthright?
19         MR. SAVITT:  Objection.  Form.
20    Q.   (By Mr. Hawes)  You can answer.
21    A.   We -- the board members had a number of
22 experiences where we felt that Sam, you know, wasn't
23 forthright and wasn't honest with the board and other,
24 you know, members of the company, senior leaders, and it
25 led to an erosion of trust, a loss of trust.

### Page 61

1     Q.   And were you, in fact, concerned about the
2  resulting impact of Mr. Altman's actions on OpenAI's
3  mission?
4     A.   Yes, absolutely.  Yeah.
5     Q.   How did Sam's conduct affect OpenAI's mission?
6     A.   Well, given that the mission of the company is
7  to ensure that, you know, artificial general
8  intelligence benefits all of humanity, we were -- we
9  needed to be careful that the public's interest, the
10 public good was -- was being considered in each of the
11 decisions; and that was the primary role of the
12 non-profit there, was to say, you know, in any given
13 moment, are the decisions we're making likely to present
14 some considerable risk to the public or not?
15         And the fact that I think a number of instances
16 made us feel that we could not trust that what we
17 were -- the information we were receiving from the
18 for-profit -- about the for-profit -- about the
19 for-profit's activities via Sam made us concerned
20 that -- you know, in particular, as the technology was
21 accelerating, as stakes were getting higher and higher
22 over time, that we would not be able to sufficiently
23 oversee and to -- to make the decisions we needed to
24 make.
25         MR. HAWES:  Okay.

ELON MUSK v.
SAMUEL ALTMAN

Case 4:24-cv-04722-YGR   Document 379-101   Filed 01/06/26   Page 7 of 14

Confidential

Tasha McCauley
September 30, 2025

Page 74

1 place.
2   Q.   And I think you mentioned this incident
3 previously.
4   A.   Yes.
5   Q.   Were you there personally when those assurances
6 were made?
7   A.   Yes.
8   Q.   And then at some point, did you become aware
9 that only one of the three enhancements had actually
10 been --
11   A.   Yes.
12   Q.   -- approved?
13   A.   I believe -- yes -- yes, I did become aware.
14   Q.   Do you remember how you became aware?
15   A.   Yeah.  I was just trying to think.  I believe
16 there was, not too long after the board meeting, another
17 board member surfaced that concern via e-mail, if I
18 recall correctly.
19   Q.   Okay.
20        And you -- you touched on this, but as an
21 OpenAI board member, was it important to you that
22 enhancements to OpenAI's products be approved by the
23 joint safety board?
24   A.   Yes.
25   Q.   Why was that important?

Page 75

1   A.   As I said -- I mean, I think the -- in general,
2 this is because there are unintended consequences that
3 can come from very complex AI systems that, you know,
4 can have damaging effects on society, potentially, so
5 having a process in place to prevent those is -- is
6 critical.
7        I would say, in the case of these earlier
8 products, I don't think we were -- you know, I don't
9 think we thought that these particular products were
10 going to have specific negative effects; it was that we
11 needed assurance in these early days that the processes
12 we were putting in place were functional.
13        So the evidence we were getting that these
14 processes were not functional was very concerning to us.
15 And even if the processes themselves were running
16 properly, the fact that we weren't being informed about
17 the results of them, you know, made them -- made them
18 dysfunctional.  So -- yeah.
19   Q.   Was this situation one of the factors that you
20 considered in dismissing Altman?
21   A.   Yes.
22   Q.   If you flip to the next page.  In the first
23 paragraph, the article states, "Around the same time,
24 Microsoft launched a test of the still unreleased GPT-4
25 in India, the first instance of the revolutionary code

Page 76

1 being released in the wild."
2   A.   So sorry.  I'm actually -- tell me where you
3 are, which paragraph.
4   Q.   I think if you flip back one page.
5   A.   Oh.  I'm sorry.
6   Q.   The top part.
7   A.   Yeah.  Okay.
8   Q.   "Around the same time, Microsoft launched a
9 test of the still unreleased GPT-4 in India" --
10   A.   Um-hum.
11   Q.   -- "the first instance of the revolutionary
12 code being released in the wild" --
13   A.   Um-hum.
14   Q.   -- "without approval from the joint safety
15 board, and nobody had bothered to inform OpenAI's board
16 that the safety approval had been skipped."
17   A.   Yes.
18   Q.   "The Independent board members found out when
19 one of them was stopped by an OpenAI employee in the
20 hallway on the way out of a six-hour board meeting;
21 never once in that meeting had Altman or Brockman
22 mentioned the breach."
23        Is that description accurate, to the best of
24 your knowledge?
25   A.   Yes.

Page 77

1   Q.   Is that one of the incidents you described
2 previously in your testimony?
3   A.   Yes.
4   Q.   Around what time did that incident occur?
5   A.   What time of day?  I'm sorry.  What time --
6 sorry.
7   Q.   Around what date?
8   A.   Apologies.
9        This would have been in the -- in December --
10 early December of 2022 after this day-long board
11 meeting, yes.
12   Q.   And what -- strike that.
13        Were you the independent board member who was
14 stopped by an OpenAI employee in the hallway?
15   A.   Yes.
16   Q.   So is that how you found out that the code had
17 been released?
18   A.   That's how I found out, yeah, walking --
19 leaving the board meeting, I found out, you know, in
20 a -- you know, in what I consider a pretty happenstance
21 way; I ran into an employee in the hallway and had a
22 discussion, and it was mentioned.
23   Q.   Did they mention that it had specifically been
24 released without approval from the joint safety board?
25   A.   I -- that was at least the implication --

ELON MUSK vs.
SAMUEL ALTMAN

Case 4:24-cv-04722-YGR   Document 379-101   Filed 01/06/26   Page 8 of 14
Confidential

Tasha McCauley
September 30, 2025

Page 78

1         MS. PATEL:  Objection.  Form.
2         Sorry.
3         Objection.  Form.
4         THE WITNESS:  Apologies.  Yeah.
5         I -- I'm trying to recall the specific, you
6    know, wording, whether it was just described as -- as
7    a -- I don't recall the specific wording, but that was
8    the, you know, understanding I had; that was certainly,
9    at the very least, the implication.  I actually --
10   sorry.  I don't want to speculate.  I don't know.
11        Q.   (By Mr. Hawes)  That's fine.
12             At some point, did you find out that it had
13   been approved for release without the joint safety
14   board's approval?
15        A.   Yes.
16        Q.   What do you recall about how you found that
17   out?
18        MR. SAVITT:  I'm sorry.  Could you --
19        (Stenographer clarification.)
20        MR. SAVITT:  I don't mean to interrupt your
21   question.  I just want to make sure I knew what the "it"
22   was in your question you just asked.
23        THE WITNESS:  Are you asking -- sorry.
24        MR. HAWES:  I'll -- I'll rephrase.
25        THE WITNESS:  Okay.  Yes.

Page 79

1         MR. SAVITT:  Thank you.
2         I apologize.
3         THE WITNESS:  Sorry.
4         Q.   (By Mr. Hawes)  What do you recall about how
5    you found out that the still unreleased GPT-4 had been
6    released in India without joint safety board approval?
7         A.   Yes.  I recall that I did not know about this
8    breach, and when I exited a six-or-so-hour board
9    meeting, I ran into an employee on the way out of the
10   company, and that employee and I had a conversation.
11   The employee mentioned the breach.
12             I do believe -- I mean, the understanding that
13   I had was that it was without the -- you know, that it
14   was against --
15        (Stenographer clarification.)
16        THE WITNESS:  That it was going against DSB
17   approval, because this particular employee I was
18   speaking to was on the deployment safety board and was
19   talking about this as a breach pertaining to that.  So
20   that -- you know, that was my understanding.
21        Q.   (By Mr. Hawes)  All right.
22             And did Mr. Altman's failure to inform you of
23   that cause you concerns?
24        A.   Yes.
25        Q.   Okay.

Page 80

1    Would the release of unapproved models by
2    OpenAI present an AI safety risk?
3         A.   Yes, it potentially could.  You know, I think,
4    as I said before, we didn't know of any specific --
5    specific risks with these particular models, but
6    there's absolutely the risk that models can -- can
7    contain -- you know, that models can present risks; that
8    they can have unintended consequences, so for that
9    reason, having these processes in place was -- was very
10   crucial in the eyes of, you know, the board; at least
11   myself, I'll say.
12        Q.   So was that one of the reasons that it caused
13   you concern?
14        A.   Yes.  Yes.
15        Q.   Okay.
16             If you flip to the next page --
17        A.   Yep.
18        Q.   -- Page 6.
19        A.   Um-hum.
20        Q.   Was Mr. Altman's handling of the -- of the
21   release of GPT-4 in India without joint safety board
22   approval one of the factors you considered when you
23   decided to dismiss him?
24        A.   Yes.  Yes.  It -- sorry.  I -- it was one of
25   the factors we considered.

Page 81

1         Q.   Okay.
2              Now, if you flip to the next page.  This is
3    Page 6 of 9.
4         A.   Okay.
5         Q.   In the second full paragraph, do you see where
6    it reads, "To the independent board members, the
7    administrative oversight defied belief and cast previous
8    oversights as part of a possible pattern of deliberate
9    deception.  For instance, they also hadn't been alerted
10   to the previous fall when OpenAI released ChatGPT, at
11   the time considered a research preview that used
12   existing technology that ended up taking the world by
13   storm."
14             Is that description accurate, to the best of
15   your knowledge?
16        A.   Um-hum.  Yes.
17        Q.   Was Mr. Altman's handling of that situation
18   also one of the factors that you considered in
19   dismissing him?
20        A.   Yes.
21        Q.   Flip to the next page.  Right under the
22   photograph, it says, "Toner had published a paper in
23   October that repeated criticisms of OpenAI's approach to
24   safety.  Altman was livid.  He told Sutskever and
25   McCauley" -- apologies.

ELON MUSK vs.                                                    Tasha McCauley
SAMUEL ALTMAN                    Confidential                September 30, 2025

Page 86

1  whether there was sort of resistance to oversight.
2      There were -- there were concerns about, you
3  know, lies, honesty, you know.
4      There were concerns about, you know, the senior
5  leaders and what they -- what we were hearing that they
6  were perceiving as kind of a lot of chaos, a lot of what
7  they -- I think what, perhaps, Mira described as kind of
8  repeated crisis events.  I think maybe what she said
9  was, like, every few months or something like that, they
10 were kind of having these crisis events and that it was
11 mostly stemming from Sam's behavior.
12     So -- so the e-mail that -- that Ilya sent
13 included a very lengthy -- well, you know, lengthy
14 document -- I don't recall exactly how long it was, but
15 dozens of pages of examples of different chaotic events
16 that had occurred from -- from Sam's behavior or lies he
17 had told.
18     Q.  And the conduct you just described, the
19 problematic behavior, the lies and the crisis events,
20 those were attributed to Mr. Altman's behavior?
21     A.  Yes.  Yes.
22     Q.  Is the information in the e-mail Mr. Sutskever
23 sent consistent with this article?
24     A.  Let me just read what it says about him.
25 Sorry.

Page 87

1      "Dozens of examples" -- okay.  Yes.
2      Q.  Maybe this is an easier way to do it.
3      So if you look at the next paragraph there, it
4  states, "The Altman document consisted of dozen of
5  examples of his alleged lies and other toxic behavior
6  largely backed up by screenshots from Murati's Slack
7  channel.  In one of them, Altman had told Murati that
8  the company's legal department had said that GPT-4 Turbo
9  didn't need to go through the joint safety board
10 review."
11     A.  Yes.
12     Q.  "When Murati checked with the company's top
13 lawyer, he said he had not said that."
14     A.  Yes.  Yes, there was a screenshot --
15     Q.  To the best of your knowledge -- apologies.
16     To the best of your knowledge, was the
17 information in Mr. Sutskever's e-mail consistent with
18 that description?
19     A.  Yes, it was consistent with that description,
20 and it -- and it included screenshots.
21     Q.  And is that description accurate, to the best
22 of your knowledge?
23     A.  According to the experience that, you know, I
24 spoke to -- I mean, I think according to the evidence
25 that I saw, it appeared to be accurate and according to

Page 88

1  the account I heard.
2      Q.  As an OpenAI board member, was it important to
3  you that models, products like GPT Turbo, be approved by
4  the joint safety board?
5      A.  Yes.
6      Q.  And would the release of unapproved models pose
7  AI safety risks?
8      A.  It -- it could.
9      Q.  Did Mr. Altman's misstatement about whether the
10 company's legal department had told him that GPT-4 Turbo
11 didn't need to go through the joint safety board, did
12 that cause you concerns?
13     MR. SAVITT:  Object to the form.  Foundation.
14     THE WITNESS:  It did definitely cause me
15 concerns, yes.
16     Q.  (By Mr. Hawes)  Was Mr. --
17     A.  I think, in particular, because this is, you
18 know, a couple of senior leaders with a large amount of
19 context, you know, surfacing these screenshots, that the
20 degree of concern, you know, in their minds that would
21 have caused them to want to surface screenshots of this
22 to the board with, you know, their expertise and
23 knowledge of the processes day to day, you know, was a
24 very big piece of -- a very big component of that as
25 well, not just the screenshots on their own.

Page 89

1      Q.  Understood.
2      Was your understanding of Mr. Altman's handling
3  of the GPT-4 Turbo situation one of the factors you
4  considered in dismissing him?
5      A.  Yes.
6      Q.  Apart from the conduct described in this
7  article, did Mr. Altman engage in any other conduct that
8  contributed to your decision to dismiss him?
9      MR. SAVITT:  Objection.
10     THE WITNESS:  So I think what -- I would say
11 yes.  I would say there -- well, I think it's -- it's
12 pointed out in this article, but I think there were, you
13 know, in the course of being on the board, you know,
14 many -- many smaller interactions that gave me real --
15 real doubt as to whether I could trust what the CEO was
16 telling us, and I know that in my discussions with other
17 board members, they had the same kind of concerns.
18     Employees from inside the company were, over
19 the course of, you know, years had surfaced similar
20 concerns that -- that Sam's -- that a pattern of
21 dishonesty was a very difficult component of -- of Sam's
22 leadership.
23     And, you know, when I think about some of the
24 other things that I was hearing from the senior leaders,
25 you know, right in the immediate, you know, weeks

ELON MUSK
SAMUEL ALTMAN
Case 4:24-cv-04722-YGR   Document 379-101   Filed 01/06/26   Page 10 of 14
Confidential
Tasha McCauley
September 30, 2025

Page 90

1  preceding Sam's firing, you know, descriptions of what
2  was, you know, kind of a -- a toxic culture from lying
3  and this kind of thing, that was leading to these --
4  these kinds of crisis events.
5          Or another concern that I had was -- was, you
6  know, because of this pattern of lying, that a lot of
7  people in the company, you know -- as was being reported
8  to me, people in the company were copying that behavior,
9  and there was kind of a culture of lying and a culture
10 of, you know, yeah, deceit.  And I think for us, as a
11 board, this -- this was just extremely concerning.
12         I mean, again, I think this is concerning in
13 any company, any regular for-profit company; that's just
14 extremely concerning behavior.  But in particular for
15 this company, because we were a non-profit board and our
16 mandate was to be able to effectively oversee the
17 company -- a for-profit company that was underneath us,
18 and our primary way of doing that was very much being
19 called into question, because we weren't -- we did not
20 have a high degree of confidence at all that we would be
21 able to trust that the information being conveyed to us
22 was sufficient to let us make decisions in an informed
23 way and -- and that -- that's, you know, very
24 fundamental to -- to the reasoning we had.
25         I think I had mentioned before, you know, we

Page 91

1  knew that stakes were going to get a lot higher going
2  forward.  Stakes were, as they were at the time, which
3  was, you know, reasonably high as it was, but when we
4  thought about being able to oversee the kinds of complex
5  decisions that would be presented to us years down the
6  line, it became very, very concerning to us that we
7  would be able to.
8      Q.  (By Mr. Hawes)  Later on Page 7, the same one
9  that you're on --
10     A.  Yes.
11     Q.  -- it states, "If they were going to act,
12 Sutskever warned that they had to act quickly" --
13     A.  Yes.
14     Q.  -- "and so on the afternoon of Thursday,
15 November 16, 2023, he and the three independent board
16 members logged into a video call and voted to fire
17 Altman."
18         Do you see that?
19     A.  I do.
20     Q.  Is that description accurate?
21     A.  Yes.  Wait.  Let me -- I'm sorry.  I'm actually
22 just trying to make sure that the exact details are --
23 are correct, as far as I recall.
24         Yes.  Yeah.  That's right.  That was -- I think
25 it was that date, yes.

Page 92

1      Q.  Okay.
2          And how did the -- the board inform Altman of
3  the decision?
4      A.  So, this is -- okay.
5          This is referring to the vote, and then the --
6  the board informed Altman of the decision the subsequent
7  day also via -- via video call.
8      Q.  And were you on that call?
9      A.  I was.
10     Q.  To the extent you know, where was Mr. Altman at
11 the time of that video call where he was dismissed?
12     A.  I heard that he was at -- I think he was
13 attending -- I believe I heard he was attending, maybe,
14 a Formula 1, like, race.  He was at a car race.
15     Q.  And besides you and Mr. Altman, who else was on
16 that video call?
17     A.  It was the -- it was Ilya, Adam -- Ilya
18 Sutskever, Adam D'Angelo, Helen Toner, and myself.
19     Q.  What did you personally tell Mr. Altman on that
20 call?
21     A.  I believe Ilya did most of the talking on that
22 call.  He conveyed our decision and, I think, conveyed
23 that the board had very substantially lost trust in Sam,
24 trust that he would tell us the truth and -- yeah, that
25 was -- that was the general summary of what Ilya

Page 93

1  conveyed to him.
2      Q.  Did any board members provide any additional
3  explanation on the call about the reasons why the board
4  was dismissing Mr. Altman?
5      A.  I don't believe there was much discussion of
6  additional reasoning.  I do -- there were a few back and
7  forths, I think, where Sam was trying to understand -- I
8  think he asked if Adam supported the decision, like kind
9  of just trying to figure out a bit more about how we got
10 there and -- but I don't believe there was much
11 discussion about the specific reasons.
12     Q.  Okay.
13         Separate from the video call, did the board
14 also attempt to inform Mr. Altman by e-mail?
15     A.  I do not believe that there was an e-mail.
16     Q.  Why don't we look at this.
17     A.  You know, I just don't recall, but there may
18 be.  I just --
19     Q.  It's totally fine.
20         I'm passing you what will be marked as Exhibit
21 4.
22         (Exhibit 4 was marked for identification.)
23         THE WITNESS:  Okay.  Sorry.
24     Q.  (By Mr. Hawes)  This is Bates stamped
25 SUTSKEVER_MUSKSUB_527.  It's a Friday, November 17th,

Page 98

1  Q. (By Mr. Hawes) If you look at the second
2  page -- I apologize.
3      MR. HAWES: Exhibit 5 is Bates stamped
4  2024MUSK-14150. And it's a November 17, 2023, post from
5  OpenAI's website titled "OpenAI announces leadership
6  transition."
7      THE WITNESS: Yes.
8  Q. (By Mr. Hawes) If you look on the second page,
9  in the second paragraph, it states, "Mr. Altman's
10 departure follows a deliberative review process by the
11 board which concluded that he was not consistently
12 candid in his communications with the board, hindering
13 its ability to exercise its responsibilities. The board
14 no longer has confidence in his ability to continue
15 leading OpenAI."
16     Is this document the public statement that
17 OpenAI released about the reasons for firing Mr. Altman?
18 A. Yes.
19 Q. Did you participate in drafting this document?
20 A. I -- I have, I apologize, a question.
21     MS. PETTI: Give us one sec.
22     MR. HAWES: No worries.
23     THE VIDEOGRAPHER: Off the record? Are we
24 going off the record?
25     MR. HAWES: Yes, let's go off the record.

Page 99

1      THE VIDEOGRAPHER: We're off the record. The
2  time is 12:30 p.m.
3      (Recess taken from 12:30 p.m. to 12:31 p.m.)
4      THE VIDEOGRAPHER: Back on the record. The
5  time is 12:31 p.m.
6  Q. (By Mr. Hawes) Ms. McCauley, did you
7  participate in drafting this document that's been marked
8  as Exhibit 5?
9  A. Yes, I did.
10 Q. And did you, as a director, approve it before
11 it was published?
12 A. Yes.
13 Q. Does the document accurately summarize the
14 reasons for firing Mr. Altman?
15 A. Yes.
16 Q. And was it true that Mr. Altman was not
17 consistently candid in his communications with the
18 board, hindering its ability to exercise its
19 responsibilities, as stated in this document?
20 A. Yes, that's true.
21     MR. SAVITT: Object to the form.
22 Q. (By Mr. Hawes) And was it true that you no
23 longer had confidence in Mr. Altman's ability to
24 continue leading OpenAI, as stated in the document?
25 A. That's true.

Page 100

1  Q. Okay.
2      You can set that aside.
3      After the board announced that it was firing
4  Mr. Altman on Friday, November 17th, what happened next?
5  A. It's hard to summarize the following five days,
6  but I'll say what happened next was we immediately began
7  working with Mira on the transition. She communicated,
8  I think, right away -- actually, I believe, if I recall
9  correctly, you know, before the actual moment where we
10 told Sam; again, communicating with Microsoft, you know,
11 sort of managing the different effects from the
12 announcement of the transition.
13     Apologies.
14     And I -- in the first number of hours following
15 the announcement, actually by her reports -- reporting
16 to us, things seemed to be going quite well and the
17 transition from her perspective, I think, was happening
18 in a -- in a pretty smooth way.
19     Later, things started to change. Mira got in
20 touch with us and said that there was some tension
21 happening because -- by her -- by the way she said it to
22 us was that Sam and Ilya are calling everybody saying
23 that there's been an evil coup by -- or a coup by
24 Ilya -- I think later described, maybe, as an evil coup;
25 I'm not sure -- and that this sparked a bunch of fear

Page 101

1  and -- and upset in the company, you know, so I think
2  the fallout from that was something we had to contend
3  with for the next period of time, and that was -- that
4  was definitely destabilizing to the process.
5  Q. Okay.
6      You mentioned that you were communicating with
7  Microsoft. Who were you communicating with at
8  Microsoft?
9  A. Mira was communicating directly with Microsoft.
10 I don't recall offhand who was on the initial call that
11 she had that day, but she was, you know, frequently in
12 touch with Microsoft and was -- was kind of the
13 administrator of that -- of that communication and -- on
14 behalf of the board --
15     (Stenographer clarification.)
16     THE WITNESS: -- during that process.
17 Q. (By Mr. Hawes) Were you personally
18 communicating with anyone from Microsoft?
19 A. Not on -- not at that time. Not on that day.
20 Q. Did you later communicate with anyone from
21 Microsoft?
22 A. Satya -- Satya spoke with us at a later point.
23 Q. And who is Satya?
24 A. Satya Nadella, the CEO of Microsoft.
25 Q. When did you first speak with Satya?

Page 102

```
 1      A.   I believe -- again, the time frame is not
 2  totally crystal clear on my end in the aftermath of
 3  that.  I wasn't keeping a log of the time, but I think
 4  it may have been on Sunday, if I'm -- the Sunday, a few
 5  days later.
 6      Q.   Okay.
 7           So if Mr. Altman was fired on Friday --
 8      A.   Yeah.
 9      Q.   -- the Sunday after he was fired?
10      A.   Yes, I believe so.
11      Q.   To the best of your recollection?
12      A.   To the best of my recollection.
13      Q.   And you mentioned that "He spoke with us."  Who
14  are you referring to when you say "us"?
15      A.    It was, by the best of my recollection,
16  myself, Adam, Helen -- Adam D'Angelo, Helen Toner, and
17  Ilya Sutskever.
18      Q.   How often did you and those other directors
19  speak with Mr. Nadella over the next few days after
20  Mr. Altman's firing?
21      A.   That's the only conversation that I recall
22  participating in.  I believe it's -- I don't want to
23  speculate.  I think it's possible other directors may
24  have spoken to him further, but I didn't that I recall;
25  or at least I don't recall having any further
```

Page 103

```
 1  conversations with Satya.
 2      Q.   So in that one conversation that you remember
 3  on the Sunday following Mr. Altman's dismissal --
 4      A.   Um-hum.
 5      Q.   -- what do you recall being discussed?
 6      A.   I recall -- to the best of my recollection,
 7  Satya wanted to restore things to as they had been.  I
 8  think he was asking if -- if we would consider
 9  reinstating Sam.  You know, I don't remember the
10  specific words.  I remember that being kind of the --
11  the basic objective of the conversation, I think, and we
12  did not agree that that was the right step for us to
13  take.
14      Q.   Do you recall anything else being discussed in
15  that call?
16      A.   It -- I don't believe it was a very long call.
17  I believe it was -- it was -- that was pretty much the
18  point of the call, as far as I recall.
19      Q.   Okay.
20           I'm showing you what will be marked as Exhibit
21  6.
22           (Exhibit 6 was marked for identification.)
23           MR. HAWES:  This document is Bates stamped
24  OPENAI_MUSK27423.  It's a November 19th, 2023, text
25  message.
```

Page 104

```
 1           THE WITNESS:  Oh, I apologize.  Just to
 2  clarify, I thought you meant spoken discussions with
 3  Satya.  Is that what you're asking about, additional
 4  calls?  I just want to make sure I clarify.
 5      Q.   (By Mr. Hawes)  That's fine.
 6      A.   Yeah.
 7      Q.   Outside of spoken discussions, do you remember
 8  communicating with Mr. Nadella in any other way?
 9      A.   I do remember that after -- in the process
10  where we were -- it was looking like we were going to
11  participate in a negotiation towards, you know,
12  reinstating Sam, several different messaging groups were
13  created with different -- different members to discuss
14  different parts of that negotiation, so -- and I --
15  yeah.  I believe -- I believe we had one with Satya and
16  one with -- well, I apologize.
17           I just don't remember when each of these were
18  created and who was part of each, so maybe I won't
19  speculate on that.  But the only call that I remember
20  having with Satya was the one call we had all together,
21  you know, with the board members.
22      Q.   Okay.
23      A.   Yes.
24      Q.   What do you recall about the different
25  messaging groups that were set up?
```

Page 105

```
 1      A.   I remember that different groups were set up to
 2  kind of handle different parts of the negotiation.  You
 3  know, we had a couple of different groups that had --
 4  you know, there were larger groups and then subsets; so,
 5  I mean, we did a number of back-and-forth negotiations,
 6  for example, with -- you know, that Mira was part of.
 7  She was handling a lot of the negotiation.
 8           I don't recall offhand kind of who was part of
 9  each group, so I don't want to try to speculate who was
10  in which, but much of the negotiation conversation was
11  conducted through these group chats where we were trying
12  to make decisions and pass information back and forth.
13      Q.   What do you recall Mr. Nadella or others from
14  Microsoft communicating in those text message groups?
15      A.   I mean, obviously, you've just handed me
16  something here, but --
17      Q.   We can take a look at this.
18      A.   Yeah.
19      Q.   This is a November -- what's been marked as
20  Exhibit 6 is a November 19th, 2023, text thread among
21  Bret Taylor, Mr. Altman, Adam D'Angelo, Satya Nadella --
22      A.   Yep.
23      Q.   -- and it is listed on the front of this
24  document Tasha McCulley [sic].
25      A.   Um-hum.
```

### Page 106

1  Q.  I understand that's not how you spell your
2  name, but do you recognize the number associated with
3  that?
4  A.  Yes.  Yes, that's my number.
5  Q.  And so in the first paragraph, Mr. Altman
6  writes Bret, Satya, Tasha, and Adam here.  Bret and
7  Satya and I just texted.  We need stability right now
8  for this temporary board configuration and don't think
9  adding someone new we don't know makes sense."
10  A.  Um-hum.
11  Q.  "Tino does sound great, and we would be excited
12  to consider him for a future addition."
13  A.  Um-hum.
14  Q.  Mr. Nadella responds, "I believe that is the
15  right."
16  Does this text thread reflect a discussion
17  between Mr. Altman, Mr. Nadella, and others about who
18  should be on OpenAI's board of directors?
19  A.  Yes.
20  Q.  What's your understanding about why Mr. Nadella
21  was involved in picking directors for OpenAI?
22  MS. PATEL:  Objection to form.
23  THE WITNESS:  Well, Microsoft, I think, you
24  know, Satya saw that there was a big risk to -- to
25  Microsoft if OpenAI did, in fact, you know,

### Page 107

1  significantly destabilize or fall apart.
2  And I think Microsoft was also seeing that
3  they -- probably determining that they wanted to have a
4  sufficient degree of confidence that the new board
5  coming in wouldn't perhaps -- I can't really speculate
6  as to what he was thinking, but I -- but I could -- I
7  could imagine that this event made them want to have a
8  hand in -- in how the governance was done.
9  Q.  (By Mr. Hawes)  Okay.
10  Did Microsoft's participation in picking board
11  members for OpenAI cause you any concern?
12  MR. SAVITT:  Objection.  Foundation.
13  THE WITNESS:  You know, I wouldn't say -- you
14  know, I wouldn't describe this as picking board members
15  exactly.  I mean, the board -- we were -- we were the --
16  you know, we -- we knew that we had a final
17  determination on what -- I mean, what the new board
18  composition would be, you know, subject to it being
19  amenable to, you know, the others involved, but I
20  think -- I think we were careful.
21  I won't say that -- that Satya's participation
22  here gave me any particular degree of concern.  It
23  seemed -- I would have expected that he would have tried
24  to participate, so --
25  Q.  (By Mr. Hawes)  Did you understand the new

### Page 108

1  board members needing to be amenable to the others
2  involved in this text chain?
3  A.  Sorry.  Could you -- could you repeat the
4  question.
5  Q.  Did you understand that the new board members
6  that were being discussed needing to be amenable --
7  A.  Um-hum.
8  Q.  -- to the others on this text chain, including
9  Mr. Nadella?
10  MS. PATEL:  Objection.  Form.
11  THE WITNESS:  Yes.  I mean, we were -- I think,
12  from our perspective, we were trying to find a
13  configuration where there would be sufficient governance
14  over Sam and also, you know, maintain, kind of, the --
15  the knowledge and context and history of what our -- our
16  board had experienced with Sam.  So our objective was to
17  find a combination where we felt that we could achieve
18  that, where we could achieve an appropriate degree of
19  governance, an appropriate degree of historical context
20  and something that was, you know, suitable for the
21  company, you know, in the eyes of the -- the members of
22  the company.
23  Q.  (By Mr. Hawes)  Looking back, do you think
24  Microsoft's involvement in discussing potential new
25  board members risked giving it undue influence over

### Page 109

1  OpenAI's board?
2  MS. PATEL:  Objection.  Form.
3  THE WITNESS:  I don't know about undue
4  influence.  I think it's -- I think, to be honest,
5  the -- we were -- we were very concerned about, you
6  know, Sam's influence over choosing the board.  The
7  person whose behavior we were very concerned about in
8  this particular situation was -- was Sam.
9  And, you know, I -- I think from our
10  perspective, I was -- I could have, you know, imagined
11  that Microsoft had some concerns and wanted to -- again,
12  I want to avoid speculating, but I -- but I -- yeah, I
13  think I won't speculate as to their reasons, but I did
14  understand that we were all part of finding a -- an
15  agreed-upon board that was amenable to a number of
16  different parties.
17  Q.  (By Mr. Hawes)  Okay.
18  And so was the focus more on Mr. Altman's
19  potential influence?
20  A.  I think that was -- you know, there was a lot
21  of discussion around that that I recall, just a lot of
22  discussion around us feeling that there -- there needed
23  to be sufficient checks and balances over his -- you
24  know, over the issues that we had seen as problematic
25  when he -- when we were at the company; and that

Case 3:24-cv-04722-YGR   Document 379-101   Filed 01/06/26   Page 14 of 14

ELON MUSK vs
SAMUEL ALTMAN

Confidential

Tasha McCauley
September 30, 2025

### Page 278

```
 1                EXAMINATION
 2   BY MS. PATEL:
 3      Q.  Hi, Ms. McCauley.
 4      A.  Hi.
 5      Q.  My name is Nisha Patel.  I represent Microsoft,
 6   and I just have a few questions.
 7      A.  Okay.
 8      Q.  I know it's been a long day, so I appreciate
 9   you being here.
10      A.  Thank you.
11      Q.  I think you testified earlier that during your
12   time on the OpenAI board, you were aware that Mr. Musk
13   had financially contributed to OpenAI; is that right?
14      A.  That is.
15      Q.  Okay.
16          Did you ever tell anyone at Microsoft that
17   there were any restrictions associated with Mr. Musk's
18   financial contributions to OpenAI?
19      A.  I did not.
20      Q.  And is that because you're not aware of any
21   such restrictions?
22      A.  I didn't have much direct communication with
23   Microsoft at all.  I didn't have -- yeah.
24          I'm trying to think if I had any direct
25   communication with Microsoft.  So I did not have
```

### Page 279

```
 1   communication like that with Microsoft.
 2      Q.  Okay.
 3          Are you aware of any documents that discuss any
 4   restrictions associated with Mr. Musk's financial
 5   contributions to OpenAI?
 6      A.  I am not; no -- no documents that occur to me.
 7      Q.  Okay.
 8          So fair to say, then, that you have not shared
 9   any such documents with anyone at Microsoft?
10      A.  I have not, no.
11      Q.  Did you ever tell anyone at Microsoft that
12   there was any agreement between OpenAI and Mr. Musk?
13      A.  Oh, actually, apologies.  Just to clarify an
14   earlier statement I made.  I -- I did know people at
15   Microsoft in a totally, like, different context.
16          So I have communicated with people at
17   Microsoft.  I'm just talking about as far as board
18   matters pertaining to, you know, OpenAI's relationship
19   to Microsoft, I was not a person who was in
20   communication with Microsoft about those, so just to
21   clarify.
22      Q.  Understood.  And thank you for that
23   clarification.
24      A.  Um-hum.
25      Q.  So in any of the communications you've ever had
```

### Page 280

```
 1   with anyone at Microsoft --
 2      A.  Yes.
 3      Q.  -- have you ever told anyone at Microsoft that
 4   there was any agreement between OpenAI and Mr. Musk?
 5      A.  I have not.
 6      Q.  Are you aware of any communication involving
 7   anyone at Microsoft relating to any agreement between
 8   OpenAI and Mr. Musk?
 9      A.  Not to the best of my knowledge.
10      Q.  Did you ever tell anyone at Microsoft that
11   OpenAI owed any obligation to Mr. Musk?
12      A.  Did I ever tell anyone at OpenAI that -- I'm
13   sorry.  Could you repeat the question, please.
14      Q.  I'll repeat the question.  No problem.
15          Did you ever tell anyone at Microsoft that
16   OpenAI owed any obligations to Mr. Musk?
17      A.  I -- I did not.
18      Q.  Are you aware of any communications involving
19   anyone at Microsoft about any obligations OpenAI owed to
20   Mr. Musk?
21      A.  I'm not aware.
22      Q.  Are you aware of any documents that discuss
23   obligations OpenAI owed to Mr. Musk?
24      A.  Can you repeat the question.
25      Q.  Are you aware of any documents that discuss
```

### Page 281

```
 1   obligations OpenAI owed to Mr. Musk?
 2      A.  I -- I do have a question about potential
 3   privilege implication, but --
 4      Q.  Let me ask you another question.
 5      A.  Yeah, sure.
 6      Q.  Have you ever shared any documents with anyone
 7   at Microsoft that discuss obligations OpenAI owed to
 8   Mr. Musk?
 9      A.  I have not.
10      Q.  Okay.
11          Sitting here today, can you identify anyone at
12   Microsoft who's aware of any obligations OpenAI owed to
13   Mr. Musk?
14      A.  Not to the best of my knowledge.
15      Q.  Thank you.
16          Did you ever tell anyone at Microsoft that
17   there was any agreement between Mr. Altman and Mr. Musk?
18      A.  No, not to my recollection.
19      Q.  Are you aware of any communications involving
20   anyone at Microsoft relating to any agreement between
21   OpenAI and Mr. Altman?
22      A.  Not to my knowledge.
23      Q.  I'm sorry.  Let me strike that and say that
24   again.
25      A.  Sorry.  Sorry.  Apologies.
```