# CORRECTED EXHIBIT 57

**In the Matter Of:**

*Musk, et al. vs*

*Altman, et al.*

---

*HELEN TONER*

*October 08, 2025*

---



1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                          -   -   -

4
         ELON MUSK, et al.,          :    CASE NO.
5                                    :    4:24-CV-04722-
                      Plaintiffs     :    YGR
6                                    :
              v.                     :
7                                    :
         SAMUEL ALTMAN, et al.,      :
8                                    :
                      Defendants.    :
9

10                  - HIGHLY CONFIDENTIAL -

11                  - ATTORNEYS' EYES ONLY -

12                          -   -   -

13                      October 8, 2025

14                          -   -   -

15

16                  Videotaped hybrid deposition of

17  HELEN TONER, taken pursuant to notice, was held at

18  the law offices of 600 New Hampshire Avenue, NW,

19  Washington, D.C., beginning at 11:11 a.m., on the

20  above date, before Michelle L. Ridgway,  a

21  Registered Professional Reporter, Certified Court

22  Reporter (NJ-CCR # XI02126), Certified Realtime

23  Reporter, Certified Shorthand Reporter (CA-CSR

24  # 14592), and Notary Public.

25

2

```
1   APPEARANCES:
2
3           MOLOLAMKEN LLP
            BY:  ROBERT K. KRY, ESQ.
4           BY:  WALTER H. HAWES IV, ESQ.
            (In person)
5           600 New Hampshire Avenue, N.W.
            Washington, D.C.  20037
6           202.556.2000
            rkry@mololamken.com
7           whawes@mololamken.com
8               - and -
9           MOLOLAMKEN LLP
            BY:  JENNIFER SCHUBERT, ESQ.
10          (Zoom)
            BY:  SARA TOFIGHBAKHSH, ESQ.
11          (Zoom)
            430 Park Avenue
12          New York, New York 10022
            212.607.8160
13          jschubert@mololamken.com
            stofighbakhsh@mololamken.com
14          Representing the Plaintiffs,
            Elon Musk and xAI
15
16          DECHERT LLP
            BY:  JOHN (JAY) JURATA, JR., ESQ.
17          (In person)
            1900 K Street, NW
18          Washington, D.C.  20006
            202.261.3300
19          jay.jurata@dechert.com
20              - and -
21          DECHERT LLP
            BY:  ELISA BENEZE, ESQ.
22          (In person)
            Cira Centre, 2929 Arch Street
23          Philadelphia, Pennsylvania  19104
            215.994.4000
24          elisa.beneze@dechert.com
            Representing the Defendant, Microsoft
25          Corporation
```

3

```
1   APPEARANCES:  (Cont'd.)
2
    WACHTELL, LIPTON, ROSEN & KATZ
3   BY:  NATHANIEL D. CULLERTON, ESQ.
    BY:  ADAM P. TANNE, ESQ.
4   BY:  ETHAN Z. COHEN, ESQ.
    (In person)
5   51 West 52nd Street
    New York, New York  10019
6   212.403.1000
    ndcullerton@wlrk.com
7   aptanne@wlrk.com
    ezcohen@wlrk.com
8
       - and -
9
    MORRISON & FOERSTER
10  BY:  CAMILA A. TAPERNOUX, ESQ.
    (Zoom)
11  425 Market Street
    San Francisco, California 94105
12  415.268.7000
    ctapernoux@mofo.com
13  Representing the Defendant, Samuel Altman
    and OpenAI
14
15  ELLIS GEORGE LLP
    BY:  KATHERINE A. PETTI, ESQ.
16  BY:  CHRIS BERG, ESQ.
    (Via zoom)
17  2121 Avenue of the Stars
    Suite 3000
18  Los Angeles, California  90067
    310.274.7100
19  kpetti@ellisgeorge.com
    cberg@ellisgeorge.com
20  Representing the witness, Helen Toner
21
    COOLEY LLP
22  BY:  ANIKA HOLLAND, ESQ.
    (Zoom)
23  3 Embarcadero Center
    San Francisco, California 94111
24  415.693.2000
    Anika.holland@cooley.com
25  Representing Ilya Sutskever
```

4

```
1   APPEARANCES:  (Cont'd.)
2
    VIDEOTAPE TECHNICIAN:
3
       Jonathan Perry - Lexitas
4
5   ALSO PRESENT:
6
       Jacob Figueroa - Document Tech/Zoom
7       (Lexitas)
8
9               -  -  -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
1               -  -  -
2             I N D E X
3               -  -  -
4
    Testimony of:
5
                            HELEN TONER
6
7   By Mr. Kry               12, 316, 344
8       By Mr. Cullerton          173, 319
9       By Ms. Beneze                  331
10
11              -  -  -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

22

1  because I was pretty sure it would be more basic
2  than I needed.
3        Q.       In 2019, did you help set up
4  Georgetown's Center for Security and Emerging
5  Technology?
6        A.       Yes.
7        Q.       How did that project come about?
8        A.       I had been, yeah, working on AI
9  policy on governance issues starting in 2016, as we
10 discussed.  And within that broad set of topics,
11 was particularly interested in AI and national
12 security, because I think that, clearly, questions
13 around national security will play a huge role in
14 how AI is developed and deployed, including how
15 very advanced AI systems are developed and
16 deployed.
17               I had come to know a man named
18 Jason Matheny while working at Open Philanthropy,
19 who, at that point, was working for the U.S.
20 government.  And then in 2018, while I was living
21 in Beijing, Jason got in touch to say that he was
22 looking to start a new center in Washington, D.C.,
23 focused on AI and national security policy, or
24 emerging technology and national security policy,
25 and asked if I would be interested in being part of

23

1  the project.  And because I had a lot of respect
2  for Jason, and because it was a set of topics I was
3  very interested in, I said yes.
4        Q.       Who else was among the founding
5  group of people that set up that organization?
6        A.       It was a relatively large group, so
7  I won't claim that I will say every name.  But some
8  people included Dewey Murdick, Bill Hannas, Ben
9  Buchanan.  Remco Zwetsloot was involved relatively
10 early.  Carrick Flynn was relatively early.  And
11 Tessa.  Yeah.  Others.
12       Q.       What is the -- you touched on this
13 earlier, but what is the scope of the mandate that
14 the issues that the center addresses?
15       A.       We do nonpartisan, rigorous,
16 evidence-driven analysis of the security
17 implications of emerging technology.  So what does
18 progress in particular technologies mean for
19 national security issues and national security
20 decisionmakers.
21       Q.       And is artificial intelligence one
22 of those issues?
23       A.       Yes.  That has been our primary --
24 one of our -- that was our sole focus initially and
25 has remained a heavy focus of the center.

24

1        Q.       Is it a primary focus of your work
2  at the center?
3        A.       Yes.
4        Q.       What portion of your work for the
5  center relates to artificial intelligence?
6        A.       Depending how you count, roughly,
7  all of it.  These days my role is leading the whole
8  center, so a lot of my work is management
9  administrative.  But, substantively, I would say
10 roughly all of my work relates to AI.
11       Q.       And on that topic, can you just
12 walk us through the positions you've held at the
13 center?
14       A.       Yes.  I started -- when I started,
15 I was director of strategy.  So that was -- I've
16 been on the leadership team since the beginning of
17 the center.
18               In 2022 I took on an additional
19 role directing a program called Foundational
20 Research Grants.  Retained my other hat as director
21 of strategy.
22               And then last month my boss, the
23 executive director, moved on to other things, and
24 so I'm now serving as interim executive director.
25       Q.       As a result of your educational and

25

1  professional work, do you consider yourself an
2  expert on artificial intelligence policy issues?
3        A.       Inasmuch as anyone is an expert, I
4  would say yes.
5        Q.       Are one of the topics that you've
6  given a lot of thought to the risks of AI
7  technology?
8        A.       Yes.
9        Q.       What risks does AI technology pose,
10 in your view?
11       A.       How long do we have?
12               I think -- so AI is a
13 general-purpose technology that can be used in many
14 ways and, therefore, poses many risks.  I would say
15 a focus of my work has been risks associated with
16 what is now called frontier AI, meaning -- so the
17 most advanced general-purpose AI systems that we
18 have.
19               And, in particular, some of the
20 more extreme potential risks associated with the
21 development of frontier AI towards artificial
22 general intelligence or super intelligence,
23 including risks from -- well, one breakdown that I
24 like is three parts risk from misuse.  So bad
25 actors deliberately using advanced AI systems in

42

1    advanced AI systems in a beneficial way.
2            So I just -- in all of my work that
3    touched on those themes, this was a -- this was a
4    recurring theme.  So whether that's at conferences,
5    in -- you know, working on papers, in looking at
6    potential grants to make, that had been woven --
7    woven through.
8        Q.        While you were at OpenAI, did
9    OpenAI -- or, rather, had OpenAI and Microsoft set
10   up a joint safety board to review the safety of new
11   AI models for products that OpenAI was planning to
12   make public?
13       A.        I don't recall exactly when that
14   got set up, whether it was before I joined or
15   thereafter.  But, yes, while I was on the board,
16   they had a -- I always heard it referred to as a
17   deployment safety board, or DSB.
18       Q.        And to your knowledge, what
19   procedures did the deployment safety board follow
20   when evaluating whether to release a model or
21   product?
22       A.        I believe that the procedures
23   changed during the course -- or, you know, evolved
24   during the course of my time on the board, because,
25   initially, it was brand-new, and they were

43

1    essentially making things up as they went along.
2            My understanding was that the DSB
3    had three members from Microsoft, three members
4    from OpenAI, and needed a majority vote -- well,
5    they made decisions about whether to deploy some
6    kinds of AI systems.  They had some criteria for
7    which systems they should review.
8            I believe they would typically
9    review some materials regarding a given system
10   around whether it was safe to deploy or not and
11   then would take a vote on whether to approve the
12   deployment.
13           My understanding is, in the event
14   of a tie, the OpenAI members held sway.
15       Q.        Was Mr. Altman one of the three
16   OpenAI members on the deployment safety board?
17       A.        I believe so, yes.
18       Q.        And so if Mr. Altman and the three
19   Microsoft members voted in favor of deployment, the
20   product would be cleared for release even if the
21   other two OpenAI members dissented?
22       A.        To the best of my understanding,
23   yes.
24       Q.        Did the practical ways in which the
25   deployment safety board carry out its

44

1    responsibilities evolve over time?
2            MR. CULLERTON:  Object to
3    form.
4            THE WITNESS:  I believe so.
5    BY MR. KRY:
6        Q.        In what respects?
7        A.        I am not that familiar with the
8    details.  I think the board should have been more
9    familiar with the details.
10           My impression is that the processes
11   by which they produced and reviewed materials
12   relevant to their decisions got more mature over
13   time.
14       Q.        What do you mean by "mature"?
15       A.        I mean, building these AI systems
16   is not a science.  It is -- some AI researchers
17   refer to it as more like alchemy than, like,
18   chemistry.  So you throw some things together and
19   see what works.
20           And so if you're trying to
21   determine if a new model is safe, we don't actually
22   have any scientific standards or clear principled
23   ways to make that determination.  And so, instead,
24   the companies building the models are making it up
25   as they go along, in terms of what risks should

45

1    they test for, how should they test for those
2    risks, what results -- what test results are
3    acceptable versus unacceptable.
4            And so my impression is that, over
5    the time that the DSB existed -- perhaps it still
6    exists.  I'm not sure.  The approach that they use
7    to selecting what tests to run and evaluating the
8    test results became somewhat less slapdash.  But,
9    again, I'm less familiar with the details than I
10   would have liked to be.
11       Q.        As a board member of the nonprofit,
12   did you rely on OpenAI's officers to provide you
13   with candid and complete information about OpenAI's
14   safety practices?
15       A.        I would have liked to rely on them
16   for that.
17           In practice, I also had
18   relationships with some OpenAI staff who I would
19   have informal conversations with and sometimes
20   learn things from those informal conversations that
21   were not conveyed to us through official channels.
22       Q.        As a board member of the nonprofit,
23   did you feel that you should have been able to rely
24   on Mr. Altman to provide you with candid and
25   complete information about OpenAI's safety

46

1  practices?
2      A.      Yes.
3      Q.      And we'll get into specifics
4  momentarily.
5              But in general terms, did you feel
6  that Mr. Altman provided candid and complete
7  information to you about OpenAI's safety practices?
8      A.      No.
9      Q.      Do you recall an incident when
10 Mr. Altman told the OpenAI Board of Directors that
11 the joint safety board had approved three
12 enhancements to GPT-4 for release, when, in fact,
13 only one of the three had been approved?
14             MR. CULLERTON:  Object to
15 the form.  Leading.
16             THE WITNESS:  I would amend
17 the question to say "three different ways
18 of releasing GPT-4."  But otherwise, yes.
19 BY MR. KRY:
20     Q.      When did that incident occur?
21     A.      To the best of my recollection,
22 that was December of 2022.
23     Q.      When you talk about three different
24 ways of releasing GPT-4, can you describe in more
25 detail what you mean?

47

1      A.      To the best of my recollection, the
2  three under consideration were the API, what they
3  called "super assistant," and fine tuning.
4              So an API release would be
5  comparable to how they had released many of their
6  previous models, GPT-3, GPT-3.5, where there is
7  a -- yeah, an API, application programming
8  interface, that other programmers can use to access
9  the model and build tools with it.  That would be
10 the most straightforward option.
11             As I understand it, the idea of
12 "super assistant," I believe that essentially they
13 referred to something like ChatGPT as a product, so
14 a consumer-facing product.  They may have meant
15 something more elaborate.  I'm not 100 percent
16 sure.
17             And then fine-tuning would be
18 releasing the model in a way that allows outside
19 actors to fine-tune it.  So that's technical jargon
20 for, essentially, sort of slightly modifying the
21 model to be more well suited to some tasks than
22 others.  And at the time there was significant
23 uncertainty, from a safety perspective, about the
24 potential risks of, in particular, releasing the
25 fine-tuning capability.

48

1              Because the safety case, the
2  argument for why it was safe to release, relied on
3  test results about things that the model could and
4  could not do.  And once you can fine-tune a model,
5  that changes what it -- what it can and cannot do.
6      Q.      What did Mr. Altman tell the board
7  about the approval status of those three products
8  by the -- by the deployment safety board?
9              MR. CULLERTON:  Object to
10 form.
11             THE WITNESS:  To the best of
12 my recollection, he either directly said or
13 strongly implied that all three types of
14 release had been approved by the DSB.
15 BY MR. KRY:
16     Q.      In what context did Mr. Altman
17 communicate that information?
18     A.      At a in-person board meeting.  We
19 called it an onsite.  It was an all-day board
20 meeting at their offices.
21     Q.      When did that board meeting occur?
22     A.      To the best of my recollection, in
23 December 2022.
24     Q.      Did you take steps to verify the
25 information that Mr. Altman had provided to the

49

1  board?
2      A.      Yes.  I asked for the deployment
3  safety board materials to review what had been
4  approved and on what basis.
5      Q.      To whom did you make that request?
6      A.      I don't recall.
7      Q.      Was it to Mr. Altman or was it to
8  somebody else in the company?
9      A.      It would have been -- it would have
10 been either during the board meeting or in a
11 follow-up e-mail.  And with the awareness -- with
12 Sam's awareness but perhaps for follow-up by Chris
13 Clark or another person who could carry out that
14 sort of simple task of sending some materials.
15     Q.      Did you receive the materials you
16 had asked for?
17     A.      Yes.
18     Q.      What did those materials show about
19 the approval stratus -- status of the three
20 variants?
21     A.      To the best of my recollection, I
22 received materials showing that the API release had
23 been submitted to the deployment safety board and
24 approved.
25             I don't recall -- to the best of my

---

**50**

1  recollection, I don't believe I received any
2  materials about the other two, which -- and I drew
3  the conclusion that they had not -- they had been
4  neither submitted nor approved.
5       Q.       Based on what happened in that
6  board meeting and the materials you received in
7  response to your inquiry, were you concerned that
8  Mr. Altman had falsely represented the approval
9  status of those three variants to the board?
10               MR. CULLERTON:  Object to
11  form.  Leading.
12               THE WITNESS:  Yes.
13  BY MR. KRY:
14       Q.       Did that incident cause you to
15  question Mr. Altman's truthfulness and candor to
16  the board?
17               MR. CULLERTON:  Object to
18  form.
19               THE WITNESS:  I would say
20  that incident was -- was one case that
21  contributed to my sense that Sam was not
22  interested in the board being closely
23  informed about the company's activities.
24  BY MR. KRY:
25       Q.       Did that incident make it more

---

**51**

1  difficult for the board to manage OpenAI safety
2  risks?
3               MR. CULLERTON:  Object to
4  form.
5               THE WITNESS:  Yes.
6  BY MR. KRY:
7       Q.       And did that incident cause you to
8  concerns about the effectiveness of OpenAI's safety
9  processes?
10               MR. CULLERTON:  Object to
11  form.
12               THE WITNESS:  Yes.
13  BY MR. KRY:
14       Q.       Do you recall another incident in
15  which Microsoft launched a test of GPT-4 in India
16  without deployment safety board approval?
17               MR. CULLERTON:  Object to
18  form.
19               THE WITNESS:  Yes.
20  BY MR. KRY:
21       Q.       When did that incident occur?
22       A.       I'm not sure.  I believe it was
23  toward the end of 2022.  I don't know the exact
24  date.
25       Q.       Do you know whether it was before

---

**52**

1  or after the first incident you just described?
2       A.       It must have been before, because
3  we -- the release must have been before, because we
4  found out about it the same day that the
5  representations to us about DSB approvals were
6  made.
7       Q.       Do you know how long before that
8  board meeting the Microsoft test launch occurred?
9       A.       No.  I'm not sure.
10       Q.       Would you describe -- well, strike
11  that.
12               How did you first learn about the
13  fact that this launch of a test of GPT-4 by
14  Microsoft had occurred?
15       A.       We had adjourned for the day the
16  meeting.  I was in a break room, and Tasha McCauley
17  came and found me in the break room and told me
18  that she had had a conversation with an employee
19  who had informed her about this release or who
20  had -- I believe she had asked her if she knew
21  about it, or asked her what she thought about it,
22  something along those lines, and we did not know
23  about it before then.
24       Q.       Had Mr. Altman raised that topic
25  with you at all during the board meeting that had

---

**53**

1  just concluded?
2       A.       No.  Despite the fact that we had
3  very actively discussed at the board meeting that
4  oversight of the DSB and ensuring that it was
5  functioning well was a core board responsibility.
6       Q.       Can you describe in any more detail
7  what Ms. McCauley said she had learned from this
8  other employee about what had happened?
9       A.       I don't recall the details.  To the
10  best of my recollection, she said that Microsoft
11  had released a test version without DSB approval,
12  when they should have had it.  Or something along
13  those lines.
14       Q.       Was it your understanding when
15  Ms. McCauley communicated this information to you
16  that Mr. Altman would have been aware of it?
17       A.       Yes.
18               MR. CULLERTON:  Object to
19  form.
20  BY MR. KRY:
21       Q.       What's the -- what was the basis
22  for that understanding?
23       A.       To the best of my recollection, it
24  sounded, from her description, like the employee
25  who had informed her was assuming that we already

---

54

1 knew and was treating it as a pretty big deal that
2 the company leadership knew about.
3        Q.        Did you confront Mr. Altman about
4 his failure to disclose that information?
5                 MR. CULLERTON:  Object to
6    form.
7                 THE WITNESS:  No.
8 BY MR. KRY:
9        Q.        Did Mr. Altman, at any subsequent
10 point in time, disclose that information to you?
11       A.        Not directly.
12       Q.        Did Microsoft's release of a test
13 product without joint safety board approval cause
14 you concerns about OpenAI's safety processes?
15                MR. CULLERTON:  Objection.
16                THE WITNESS:  Yes.  It
17    caused me concern about how well those
18    processes were working.  Yes.
19 BY MR. KRY:
20       Q.        Did Mr. Altman's failure to inform
21 you about that safety breach cause you to question
22 Mr. Altman's truthfulness and candor to the board?
23                MR. CULLERTON:  Object to
24    the form.
25                THE WITNESS:  I would say it

55

1    further led me to believe that he was not
2    interested in the board being closely
3    informed about the company's activities and
4    able to perform an oversight role.
5 BY MR. KRY:
6        Q.        And did the incident cause you
7 concerns about the effectiveness of OpenAI's safety
8 processes?
9        A.        I think that's essentially the same
10 as your previous question, but yes.
11       Q.        And just to round out the record,
12 how long was the board meeting that Mr. Altman did
13 not disclose the safety breach?
14                MR. CULLERTON:  Object to
15    form.
16                THE WITNESS:  All day.
17    Multiple hours.
18 BY MR. KRY:
19       Q.        And Mr. Altman was there for the
20 entire meeting?
21       A.        To my recollection, yes.
22       Q.        And you were there for that entire
23 meeting?
24       A.        To my recollection, yes.
25       Q.        And was Ms. McCauley there for the

56

1 entire meeting?
2        A.        To my recollection, yes.
3        Q.        When OpenAI released ChatGPT in
4 November '22, did it provide any advance notice to
5 the OpenAI board?
6        A.        No.
7        Q.        How did you learn about ChatGPT?
8        A.        We started -- or I started seeing
9 screen shots on Twitter.
10       Q.        And was that because you were
11 looking for it specifically, or you just chanced to
12 come across it?
13       A.        No, I have a -- my Twitter feed is
14 AI heavy, I would say.  So when there's AI news,
15 usually it lands there.
16       Q.        Do you remember what the first
17 Twitter post you saw concerning ChatGPT was?
18       A.        No.  There were lots.
19       Q.        Was it a beneficial OpenAI
20 publication or was it some secondary source?
21       A.        I don't recall.
22       Q.        When you saw that on Twitter, were
23 you surprised that no one at OpenAI had given you
24 any advanced notice about ChatGPT's release?
25                MR. CULLERTON:  Object to

57

1    form.
2                 THE WITNESS:  No, I was not
3    surprised, because I was used to the board
4    not being very informed about things.
5 BY MR. KRY:
6        Q.        Okay.  Did you think it was okay
7 that no one at OpenAI had given you advanced notice
8 about the release of this product?
9                 MR. CULLERTON:  Object to
10    form.
11                THE WITNESS:  I did not
12    think it indicated that the board was
13    functioning as it should be.
14 BY MR. KRY:
15       Q.        And is the reason that it indicated
16 that to you that it illustrated the failure of the
17 company to provide the board with important
18 information?
19                MR. CULLERTON:  Object to
20    the form.  Leading.
21                THE WITNESS:  I thought that
22    it indicated that the board was often not
23    looped in on things it should have been
24    looped in on.
25                I thought it also indicated

Attorneys Eyes Only
Helen Toner - October 08, 2025

58

1  that the company's process for making --
2  processes for making decisions that could
3  have material impact on the mission were
4  inadequate.
5  BY MR. KRY:
6        Q.      Did you believe at the time that
7  Mr. Altman should have given you advanced notice
8  that the company was launching ChatGPT before it
9  did so?
10       A.      Yes.
11       Q.      Did this incident cause you to
12 question Mr. Altman's candor to the board?
13       A.      Again, I will say it caused me to
14 believe that he was not motivated to help the board
15 perform the oversight role.
16       Q.      Did this incident make it more
17 difficult for the board to manage OpenAI safety
18 risks?
19       A.      It contributed to that, yes.
20       Q.      Did you learn about another
21 incident in which Mr. Altman made a false statement
22 about whether GPT-4 Turbo had to go through joint
23 safety board review?
24              MR. CULLERTON:  Objection to
25  the form.

59

1              THE WITNESS:  Yes.
2  BY MR. KRY:
3        Q.      When did that incident occur?
4        A.      I'm not sure.  I believe at some
5  point during 2023.
6        Q.      How did you learn about the
7  incident?
8        A.      I forget whether it was Ilya
9  Sutskever or Mira Murati who first described it to
10 me, but it was one of the two of them.
11       Q.      What did he or she describe to you?
12       A.      Actually, it's also possible that I
13 heard about it secondhand from them via Adam
14 D'Angelo or Tasha McCauley.
15              I'm sorry.  What was the question?
16       Q.      What was communicated to you about
17 what had happened?
18              MS. BENEZE:  Object to form.
19              THE WITNESS:  That Sam had
20  claimed that Jason Kwon said that GPT-4
21  Turbo did not need DSB review.  And that --
22  Sam claimed to Mira that Jason said it
23  didn't need DSB review.
24              Mira then later checked with
25  Jason and found that he had not said that,

60

1  and Mira felt that Sam had -- had either
2  misled her or lied to her.
3  BY MR. KRY:
4        Q.      And at the time you learned about
5  this incident, did you review any documentary
6  record that reported on the issue?
7        A.      Within a few weeks -- I forget the
8  exact sequencing -- but yes.  In the period where
9  we learned about this, we were -- we had -- we were
10 given access to screen shots of a Slack exchange
11 between Mira and Jason.
12       Q.      And what do you recall that Slack
13 exchange showing?
14       A.      That Mira asked Jason if he had, in
15 fact, said that GPT-4 Turbo didn't need DSB review,
16 and Jason said he had said something different and
17 also said he was confused how Sam got that
18 impression.
19       Q.      And during what period of time did
20 you learn about this incident and see these screen
21 shots?
22       A.      This was in the fall of 2023.
23       Q.      Did Mr. Altman's false statement to
24 Ms. Murati cause you to question Mr. Altman's
25 truthfulness and candor?

61

1        A.      Yes.
2              MS. BENEZE:  Object.
3              MR. CULLERTON:  Objection to
4  the form.  Misstates testimony.  Assumes
5  facts.
6  BY MR. KRY:
7        Q.      Did this incident cause you
8  concerns about the effectiveness of OpenAI's safety
9  processes?
10       A.      Yes.
11       Q.      Do you recall some long-running
12 discussions on the board about whether to appoint
13 another independent board member focused on AI
14 safety?
15              MR. CULLERTON:  Object to
16  the form.  Leading.
17              THE WITNESS:  Yes.
18 BY MR. KRY:
19       Q.      Over what time period did those
20 discussions unfold?
21       A.      I would say much of 2023.
22       Q.      Did you favor adding another
23 independent board member focused on AI safety?
24       A.      Yes.
25       Q.      Did you propose candidates?

62

1    A.        I believe so.  I forget exactly
2  where the list of names came from.
3    Q.        Do you recall any of the candidates
4  that you either proposed or advocated for?
5    A.        We considered many names, and we
6  got a lot of input on names to consider.  I recall
7  that we came down to four names that we were
8  seriously considering.  I don't know if I can say
9  all of them off the top of my head.  They included
10  Dan Hendrycks, Paul Christiano, Jacob Steinhardt,
11  and Ajeya Cotra.
12    Q.        And were all four of those
13  individuals AI safety experts?
14    A.        For various definitions of that
15  term, yes.
16    Q.        During these discussions, how did
17  Mr. Altman react to your proposals to add another
18  AI safety expert to the board?
19            MR. CULLERTON:  Object to
20    form.
21            THE WITNESS:  I would say he
22    was generally -- he generally seemed
23    supportive.
24  BY MR. KRY:
25    Q.        Did those discussions result in the

63

1  appointment of another AI safety expert to the
2  board?
3    A.        No.
4    Q.        To the best of your recollection,
5  why not?
6    A.        There were long, drawn-out
7  conversations about what attributes made for a
8  strong board candidate.
9            There was particular concern from
10  Greg Brockman about whether AI safety would be
11  used -- concerns about the power that someone on
12  the board with AI safety expertise might have to
13  change decisions that the company would make or to
14  claim that a certain decision was not a good
15  decision for AI safety reasons.  He seemed very
16  worried about the potential power that would give a
17  board member.
18            It's kind of funny, given that
19  board members are supposed to, in this case, help
20  make decisions on the basis of risks and safety.
21            And then there was -- so he was the
22  primary voice raising hesitation.  And then there
23  was sufficient hesitation from Ilya Sutskever and
24  Sam Altman that we were not able to move forward
25  with a new candidate.

64

1    Q.        Was it your impression that
2  Mr. Altman was dragging his feet in these
3  discussions?
4    A.        Yes.  I think that's a fair
5  description.
6    Q.        Did Mr. Altman's actions result in
7  the board being deadlocked over any proposal to add
8  an additional AI safety board member?
9            MR. CULLERTON:  Object to
10    form.
11            THE WITNESS:  I'd say he
12    contributed to us significantly being
13    deadlocked, yes.
14  BY MR. KRY:
15    Q.        Did Mr. Altman propose different
16  candidates to the board?
17    A.        Yes.
18    Q.        Were Mr. Altman's alternative
19  candidates also AI safety experts or did they have
20  different backgrounds?
21    A.        To the best of my recollection, he
22  generally proposed candidates with more of a
23  commercial startup background.
24    Q.        Did Mr. Altman's conduct in these
25  discussions cause you to question whether he was

65

1  prioritizing commercial incentives over AI safety?
2            MR. CULLERTON:  Object to
3    form.  Leading.
4            THE WITNESS:  I'm not sure.
5    I would say his conduct in these
6    discussions strengthened my impression that
7    he wanted a board that would largely go
8    along with him as opposed to providing
9    pushback.
10            MR. KRY:  This is a good
11    time for a break.  Would that work for you?
12            THE WITNESS:  Sure.
13            MR. KRY:  Great.
14            Ms. Toner, how long would
15    you like to break for?
16            THE VIDEOGRAPHER:  Going off
17    the record, 12:15.
18            (Short break.)
19            THE VIDEOGRAPHER:  On the
20    record at 12:30.
21  BY MR. KRY:
22    Q.        Ms. Toner, I'm going to mark as
23  Exhibit 2 a document Bates-stamped 2024MUSK 14031.
24            This is an October 2023 academic
25  paper published by the Center for Security and

---

66

1  Emerging Technology, titled "Decoding Intentions:
2  Artificial Intelligence and Costly Signals."
3          (Document marked for identification
4            as Toner Exhibit 2.)
5  BY MR. KRY:
6      Q.      Were you one of the co-authors of
7  this academic paper?
8          MR. CULLERTON:  Objection to
9  the characterization as an academic paper.
10         THE WITNESS:  Yes.  I was
11 going to say I would not describe this as
12 an academic paper.  It's not published in
13 an academic journal.
14         But, yes, I was the author
15 of this policy white paper.
16 BY MR. KRY:
17     Q.      Did this white paper relate to your
18 work at Georgetown's Center for Security and
19 Emerging Technology?
20     A.      Yes.
21     Q.      Why did you publish this white
22 paper?
23     A.      The lead author -- ooh, fluffy dog.
24 Sorry.  I wasn't expecting a white fluffy dog.
25         The lead author, whose name is

---

67

1  Andrew Imbrie, and I had had some conversations
2  over the years about the concept of costly signals
3  from the discipline of international relations or
4  political science and whether there was anything
5  interesting to say about how costly signals might
6  be useful for, or relevant to, AI policy and
7  governance questions.
8          And Andrew pursued that idea, and I
9  collaborated with him a little as he was writing it
10 up.
11     Q.      What do you mean by the term
12 "costly signal"?
13     A.      Essentially, an action which is
14 intended to convey something and which is made more
15 credible by the fact that it has a cost to the
16 party conveying it.
17     Q.      And what is the overall thesis of
18 this white paper with respect to costly signals in
19 the artificial intelligence field?
20     A.      To the best of my recollection, the
21 overall thesis is that there are ways that costly
22 signals could be helpful in the development of AI
23 and in conveying information.
24     Q.      If I can direct you to Page 28 of
25 the article.

---

68

1          So in the last full paragraph,
2  about halfway through, this starts, "From a
3  signaling perspective, however, the most
4  interesting part of the GPT-4 release was not the
5  technical report detailing its capabilities, but
6  the 60-page so-called 'system card' laying out
7  safety challenges posed by the model and mitigation
8  strategies that OpenAI had implemented prior to the
9  release."
10         The next paragraph then continues:
11         "The system card provides evidence
12 of several kinds of costs that OpenAI was willing
13 to bear in order to release GPT-4 safely.  These
14 include the time and financial cost of producing
15 the system card as well as the possible
16 reputational cost of disclosing that the company is
17 aware of the many undesirable behaviors of its
18 model."
19         How did the OpenAI system card that
20 you describe in these paragraphs relate to your
21 overall thesis about costly signaling?
22     A.      In the way that those paragraphs
23 attempt to -- or those sentences attempt to
24 describe, that it was -- it was a signal, and it
25 was -- it incurred some cost to the company.  So it

---

69

1  was an example of a type of costly signaling that a
2  private company could do.
3      Q.      In this passage, were you
4  essentially praising OpenAI's safety practices with
5  respect to this particular aspect of their model
6  release?
7      A.      My intent with -- my involvement in
8  this paper was not to praise or criticize the
9  company but simply to comment on their ability to
10 affect external perceptions and understandings of
11 their practices.
12     Q.      On the next page, the second
13 paragraph, second full paragraph, reads:
14         "While the system card itself has
15 been well received among researchers interested in
16 understanding GPT-4's risk profile, it appears to
17 have been less successful as a broader signal of
18 OpenAI's commitment to safety.  The reason for this
19 unintended outcome is that the company took other
20 actions that overshadowed the import of the system
21 card: most notably, the blockbuster release of
22 ChatGPT four months later" -- pardon me -- "four
23 months earlier."
24         What -- what point were you
25 attempting to illustrate by bringing up the

---

70

1 circumstances of OpenAI's release of ChatGPT?
2       A.        The broader point here is about one
3 of the limitations of using costly signals, which
4 is that you may not always be able to signal what
5 you intend or other signals you're sending
6 unintentionally may overshadow the one that you
7 intended to send.
8       Q.        And in what respect did OpenAI's
9 release of ChatGPT bear on those issues?
10      A.        So the thesis being described in
11 these paragraphs is that while creating and
12 releasing the system card was, in part, a signal of
13 OpenAI's willingness to bear time and reputational
14 costs -- well, time, financial, and reputational
15 costs.  In order to release their system safely,
16 that signal was, perhaps, overshadowed by -- by
17 other actions that led competitors to prioritize
18 safety less highly.
19                So the overall point is that it is
20 not always straightforward to send the signals that
21 you intend to send.
22      Q.        At the very bottom of this page,
23 you write, "A different approach to signaling in
24 the private sector columns from Anthropic, one of
25 OpenAI's primary competitors.  Anthropic's desire

71

1 to be perceived as a company that values safety
2 shines through across its communications, beginning
3 from its tagline: "an AI safety and research
4 company."  A careful look at the company's
5 decision-making reveals that this commitment goes
6 beyond words.  A March 2023 strategy document
7 published on Anthropic's website revealed that the
8 release of Anthropic's chatbot Claude, a competitor
9 to ChatGPT, had been deliberately delayed in order
10 to avoid 'advanc[ing] the rate of AI capabilities
11 progress.'"
12                Who founded Anthropic?
13      A.        They have a group of cofounders.  I
14 can't name them all.  They include Dario Amodei,
15 Daniela Amodei, Jack Clark, Jared Kaplan, Tom
16 Brown.  Some others.
17      Q.        And how many of those individuals
18 were formally at OpenAI?
19      A.        I believe all of them.
20      Q.        When did they leave OpenAI to set
21 up Anthropic?
22      A.        I don't recall.
23      Q.        Did you have any advance notice
24 that they were leaving OpenAI?
25      A.        I don't recall exactly when I

72

1 learned.  I certainly knew that they were leaving
2 around the time that they decided to.
3      Q.        Did Anthropic's founders ever
4 provide any explanation about why they were leaving
5 OpenAI to set up their own company?
6                MR. CULLERTON:  Object to
7   form.
8                THE WITNESS:  I was not on
9   the board at the time, so I don't recall
10  having conversations with them about that.
11 BY MR. KRY:
12      Q.        Did you ever speak to Dario Amodei
13 or Daniela Amodei after they set up Anthropic but
14 before you joined the OpenAI board?
15      A.        I don't believe so.
16      Q.        In public reporting, do you recall
17 any coverage regarding the reasons for leaving
18 OpenAI to set up Anthropic?
19      A.        I don't recall.
20      Q.        What were you intending to
21 communicate in this white paper when you were
22 describing Anthropic's practices surrounding the
23 release of its own chatbot and the timing of that?
24      A.        The intention here was to give
25 another example of a signal that was perhaps not

73

1 received in the way it was intended.
2                So if you read on, it continues
3 that while they did take this costly action, it
4 maybe wasn't actually that effective as a signal
5 because they were so quiet about it.  So it was
6 another example of signaling that was not
7 necessarily very effective.
8      Q.        After this white paper was
9 published, did you come to learn that Mr. Altman
10 had become aware of it?
11      A.        Yes.
12      Q.        How did you become aware of that?
13      A.        I don't remember the exact
14 sequence.  He asked to talk, I believe, via Signal
15 message.  We set up a time, maybe the following day
16 or two days later, maybe the same day, set up a
17 time within a couple of days.
18                I think I didn't know before the
19 call what the topic would be, so I think I found
20 out when we began our phone call.
21      Q.        What did he tell you on that phone
22 call?
23      A.        He said that he was concerned about
24 the content of the paper.  He was concerned about
25 board member criticizing or being seen to criticize

---

74

1  the company.  He was concerned about the
2  implications for the ongoing -- at that time,
3  ongoing FTC investigation into OpenAI.  And he was
4  concerned that this reflected -- what's the way to
5  put it?  That this meant we were not on the same
6  page about the company's decisionmaking, or
7  something along those lines.
8       Q.     What did you say in response to
9  Mr. Altman?
10      A.     I described to him that this was
11 not a paper about safety practices or the adequacy
12 of OpenAI's safety practices.  That it was a paper
13 about external perceptions thereof.
14             That the description of the ChatGPT
15 release here did not reflect my on-balance
16 assessment of the cost and benefits of releasing,
17 as it had been released.
18             That I was happy to -- if there was
19 anything I could do to help mitigate effects he was
20 concerned about from the paper, I was happy to
21 discuss those.  That's what I recall.
22      Q.     And did Mr. Altman say anything in
23 reply to that response?
24      A.     I think he said -- to the best of
25 my recollection, I think he said he would follow up

---

75

1  if there was -- if there were things I could do
2  that would be helpful, for example, saying
3  something publicly or...
4       Q.     At the time you published this
5  white paper in October 2023, did you think you were
6  violating your fiduciary duties as an OpenAI board
7  member?
8       A.     No.
9       Q.     Did you subsequently learn that
10 Mr. Altman had made a statement to Ilya Sutskever
11 about something that one of your colleagues had
12 allegedly told him?
13      A.     Yes.
14      Q.     What happened?
15      A.     At the time, when we were -- when
16 Sam wanted to talk about this paper, four of the
17 board members were already having conversations
18 about our serious concerns about Sam continuing to
19 serve as CEO.  And because of that, Tasha, Adam,
20 Ilya, and I were in much closer touch than we
21 otherwise would have been and that we normally were
22 during our tenure on the board.
23             And I forget the exact sequence of
24 events, but because we were having conversations
25 multiple times a week, which was much higher than

---

76

1  usual, we discovered that Sam had told Ilya -- Sam
2  had talked to Ilya about his concerns about this
3  paper and had also had a conversation with Tasha,
4  and he told Ilya that Tasha thought I had to leave
5  the board because of the fact that I had written
6  this paper, which Tasha had not said.
7       Q.     How did you know that Ms. McCauley
8  had not said that?
9       A.     Because she said she hadn't.
10      Q.     To you?
11      A.     Yes.
12      Q.     And how did you feel about the fact
13 that Mr. Altman had made a -- strike that.
14             Did Mr. Altman's statement to
15 Mr. Sutskever about what Ms. McCauley had said
16 cause you to question Mr. Altman's truthfulness?
17             MR. CULLERTON:  Objection.
18             THE WITNESS:  Yes.
19 BY MR. KRY:
20      Q.     Did this incident cause you to
21 question whether Mr. Altman was trying to have you
22 removed from the board?
23             MR. CULLERTON:  Object to
24   the form.
25             THE WITNESS:  I would say

---

77

1  this incident -- this incident, and broader
2  conversations with my fellow board members
3  around this time, led me to conclude that
4  Sam was trying to remove me from the board.
5  BY MR. KRY:
6       Q.     What other incidents around this
7  time concluded to -- or contributed to that
8  conclusion?
9       A.     Just hearing from Tasha, Adam, and
10 Ilya, how Sam was talking about the paper with
11 them.
12      Q.     What understanding did you --
13 strike that.
14             And do you remember anything more
15 specifically about what you heard from
16 Ms. McCauley, Mr. D'Angelo, or Mr. Sutskever about
17 you that led you to conclude that Sam was trying to
18 have you removed from the board?
19      A.     What I remember is thinking that it
20 seemed like a repeat of something that had happened
21 in April that year where, as I would describe it,
22 Sam had tried to manufacture a consensus that Adam
23 needed to leave the board, when, in fact, there was
24 no such consensus.  And it sounded to me like Sam
25 was, in this case, trying to manufacture a

---

78

1  consensus that I needed to leave the board, when,
2  in fact, there was no such consensus.
3          Q.        What were the circumstances
4  involving Mr. D'Angelo in April of that year?
5          A.        Adam runs a company called Quora,
6  which has a product called Poe, which uses large
7  language models, including those of OpenAI and some
8  of its competitors.
9          After -- the way I perceived it was
10 after GPT-4 was demoed to the board in summer 2022,
11 Adam began taking his responsibilities as a board
12 member more seriously, because the technology
13 seemed to be advancing, and he became a more
14 engaged board member.
15         In the lead-up to -- between that
16 time in summer 2022 and April 2023, we had had
17 several conversations as a board about what kinds
18 of conflict of interest were acceptable or
19 unacceptable on the board, because many potential
20 board members, and current board members, had
21 various involvements with various AI companies.
22         So we had fairly detailed
23 discussions about what was an unacceptable conflict
24 of interest and had decided that being closely
25 involved with a company that was training its own

79

1  large language models, you know, highly advanced
2  frontier language models that would compete with
3  OpenAI's, was the bar for excessive conflict of
4  interest.
5          So it was surprising to me when Sam
6  e-mailed the board in April 2023 saying that Adam's
7  conflict of interest had grown too large and seemed
8  like he needed to step off the board, and did we
9  agree.  Because Adam's company produced a product
10 that used others' LLMs, they didn't -- they weren't
11 training their own.  So clearly it didn't meet the
12 conflict of interest criteria we had all discussed.
13         When I said as much via e-mail,
14 Greg Brockman chimed in with a different reason to
15 remove Adam, namely that his position as both a
16 customer and a board member was creating
17 communication difficulties internally.  I forget
18 who exactly said what on the e-mail chain, but
19 other board members raised questions about that or
20 wanted to know more about that.
21         Ultimately, I spoke to Sam on the
22 phone, and we sort of -- at my urging, we agreed
23 that, surely, the step before just removing Adam
24 from the board, if the problem was how he was
25 communicating inside the company, surely, the next

80

1  step would be to discuss that with him and see if
2  we can improve the situation.  Sam said he would do
3  that, he would have a conversation with Adam, to
4  try and improve how he was communicating inside the
5  company.  And then the situation seemed to go away.
6          I later found out that Sam had
7  never had that conversation with Adam, or that he
8  had talked with him but had never actually tried to
9  solve that problem, but, instead, had just said the
10 only thing that he, Sam, didn't like about Adam's
11 product Poe was that it used Anthropic models,
12 because Anthropic was a competitor.
13         So, all in all, the situation
14 seemed to me like there wasn't actually a clear,
15 concrete reason to ask Adam to move off the board,
16 but that Sam and Greg were sort of searching for an
17 excuse because -- because he had been providing
18 more active governance of the company.
19         Q.        Did that episode with Mr. D'Angelo
20 cause you to question Mr. Altman's candor to the
21 board?
22                   MR. CULLERTON:  Objection.
23                   THE WITNESS:  Yes.
24 BY MR. KRY:
25         Q.        Did that episode with Mr. D'Angelo

81

1  cause you to question whether Mr. Altman was more
2  concerned with looking out for his own interest
3  than ensuring meaningful board oversight?
4                   MR. CULLERTON:  Object to
5      the form.  Leading.
6                   THE WITNESS:  Yes.
7  BY MR. KRY:
8          Q.        Flipping back forward to this
9  episode from October of 2023, did this episode with
10 Mr. Altman attributing a statement to your
11 colleague about whether you should leave the board
12 cause you to question Mr. Altman's candor?
13                   MR. CULLERTON:  Object to
14     the form.
15                   THE WITNESS:  Yes.
16 BY MR. KRY:
17         Q.        Did this episode cause you to
18 question whether Mr. Altman was more concerned with
19 his own interests than with ensuring meaningful
20 board oversight?
21                   MR. CULLERTON:  Object to
22     the form.
23                   THE WITNESS:  Yes.
24 BY MR. KRY:
25         Q.        I'm going to show you another

82

```
 1   exhibit.
 2                    (Document marked for identification
 3            as Toner Exhibit 3.)
 4   BY MR. KRY:
 5        Q.       I have marked as Exhibit 3 a
 6   Securities and Exchange Commission Form D, which
 7   has the Bates Number 2024MUSK 11596.
 8                And it's an SEC Form D for an
 9   entity called OpenAI Startup Fund that's dated
10   May 4, 2023.
11                Ms. Toner, have you previously
12   heard of an entity called the OpenAI Startup Fund?
13        A.       Yes.
14        Q.       According to the first page of this
15   document, when was the OpenAI Startup Fund
16   incorporated?
17        A.       The date I see is 2021.  I'm not
18   familiar with this form.  So I -- perhaps 2021.
19        Q.       And the -- in the bottom section of
20   the first page, who is listed as a related person
21   for the --
22        A.       Sam Altman.
23        Q.       And if you look at the last page,
24   who signed this form on behalf of the OpenAI
25   Startup Fund?
```

83

```
 1        A.       Sam Altman.
 2        Q.       In what capacity?
 3        A.       Manager of the general partner.
 4        Q.       When did you first hear about the
 5   OpenAI Startup Fund?
 6        A.       I don't recall.  I believe shortly
 7   after it was announced publicly.
 8        Q.       When was that?
 9        A.       I don't recall.
10        Q.       What did you understand about -- at
11   the time that you first learned about it, what did
12   you understand about what OpenAI Startup Fund does?
13        A.       I understood it to be investing in
14   companies that could use OpenAI products.
15        Q.       What did you understand at that
16   time what Mr. Altman's role, if any, was in OpenAI
17   Startup Fund?
18        A.       I did not have any particular --
19   any particular impression of his role.
20        Q.       Did Mr. Altman ever disclose to the
21   board that he was the manager of the general
22   partner of OpenAI Startup Fund?
23        A.       No.
24        Q.       Did Mr. Altman ever disclose to the
25   board that he had any ownership interest in the
```

84

```
 1   OpenAI Startup Fund?
 2        A.       No.
 3        Q.       Did you subsequently learn that
 4   Mr. Altman had previously undisclosed connections
 5   to this fund?
 6        A.       Yes.
 7        Q.       What were the circumstances in
 8   which you learned that?
 9        A.       Adam D'Angelo was at a dinner with
10   some other -- I forget what the word is --
11   founders, investors, startup people, who were
12   asking him about the structure of the startup fund
13   and potential conflicts of interest between the
14   startup fund and OpenAI's investors more generally.
15                And after that conversation, Adam
16   e-mailed the board, including Sam, perhaps a couple
17   of other OpenAI executives, to understand the
18   structure better.
19                And in the resulting
20   back-and-forth, we learned that Sam was the -- as I
21   understand it, the owner of the fund.
22        Q.       You mentioned that Mr. D'Angelo had
23   been discussing potential conflicts of interest
24   arising out of this startup fund.
25                What do you know about the nature
```

85

```
 1   of the conflicts of interest that Mr. D'Angelo was
 2   discussing?
 3        A.       So the initial conversation was
 4   around whether it was fair for OpenAI's investors
 5   that OpenAI was sort of contributing to this other
 6   fund and was also contributing sort of engineering
 7   expertise and time to portfolio companies in the
 8   startup fund in ways that may not -- where the
 9   benefit may not accrue back to OpenAI investors.
10                After we learned that Sam was --
11   had a financial stake in the fund, we also had
12   concerns about the fact that he had not disclosed
13   that, given that his position on the board was one
14   of an -- one of a supposedly independent board
15   director, meaning one with no financial interest in
16   OpenAI.
17                And so while his financial -- the
18   potential financial gain from his interest in the
19   startup fund was small, from the perspective of
20   process and disclosure, it was a notable oversight
21   that he had not informed the board.
22        Q.       You referred to Mr. Altman having a
23   position as an independent board member on the
24   board that didn't have a financial interest in
25   OpenAI.
```

86

```
1              What was the significance of
2   Mr. Altman being an independent board member?
3              MR. CULLERTON:  Object to
4   form.
5              THE WITNESS:  The board was
6   supposed to be majority independent.  And
7   so while he was -- for example, in the
8   period in 2023, when we had three board
9   members, because he counted as independent,
10  or claimed to be independent, that meant
11  that there were four out of six independent
12  board members; whereas if he had not
13  counted as independent, we would have much
14  more urgently needed to add an additional
15  independent member.
16  BY MR. KRY:
17      Q.      In addition to OpenAI Startup Fund,
18  to your knowledge, has Mr. Altman ever owned,
19  directly or indirectly, any other stake in any
20  OpenAI entity?
21              MR. CULLERTON:  Object to
22  form and the characterization of the
23  startup fund as an OpenAI entity.
24              THE WITNESS:  My -- I
25  believe that it is publicly disclosed on
```

87

```
1   their website that he has a small stake in
2   OpenAI through some Y Combinator fund that
3   he has interest in.
4   BY MR. KRY:
5       Q.      Was that indirect interest through
6   a Y Combinator fund disclosed to the board?
7       A.      Yes.
8       Q.      When was it first disclosed?
9       A.      I don't recall.  It was public on
10  their website for as long as I can remember.
11      Q.      Was Mr. Altman considered an
12  independent director on the board despite that
13  stake through Y Combinator?
14      A.      Yes.
15      Q.      And why -- why was that stake not
16  disqualifying?
17              MR. CULLERTON:  Object to
18  the form.  Calls for a legal conclusion.
19              THE WITNESS:  I don't know.
20  I found it strange that he was considered
21  an independent board director regardless of
22  that stake, given his position as CEO.
23  BY MR. KRY:
24      Q.      Did you ever receive an adequate
25  explanation for that?
```

88

```
1       A.      Merely, that was defined as not
2   holding an equity stake in the company.
3       Q.      Defined by who?
4       A.      I don't recall.
5       Q.      Not by you?
6       A.      No.
7       Q.      Do you know whether Mr. Altman ever
8   owned an equity stake in OpenAI through an
9   investment vehicle other than the Y Combinator
10  entity you just referenced?
11      A.      I don't know.
12      Q.      Did Mr. Altman ever disclose to the
13  board that he owned an equity stake in any OpenAI
14  entity through an investment vehicle other than the
15  Y Combinator fund you just mentioned?
16      A.      I don't believe so.
17      Q.      And to your knowledge, has OpenAI's
18  website ever revealed that Mr. Altman owned an
19  indirect equity stake in an OpenAI entity through
20  an investment vehicle other than the one you just
21  mentioned?
22              MR. CULLERTON:  Object to
23  form.
24              THE WITNESS:  I don't
25  believe so.
```

89

```
1   BY MR. KRY:
2       Q.      With respect to the OpenAI Startup
3   Fund in particular, did you raise the concerns you
4   identified with Mr. Altman?
5              MR. CULLERTON:  Sorry.
6   Object to form.  Misstates testimony.
7              THE WITNESS:  No, because
8   Adam was actively raising them.
9   BY MR. KRY:
10      Q.      What did -- with Mr. Altman?
11      A.      On a group e-mail thread that
12  Mr. Altman was on, yes.
13      Q.      And what did -- what was the
14  substance of what Mr. D'Angelo communicated on that
15  thread?
16      A.      I don't recall the details.
17  Wanting to understand the structure.  Wanting to
18  understand -- the company claimed that they were
19  planning to -- that had been intended as a
20  temporary solution.  Just wanting to understand how
21  temporary it was and what actions they were taking
22  to change it.
23              I don't recall details beyond that.
24      Q.      Was Mr. Altman the one who claimed
25  that this setup has been -- had been intended as
```

90

1    a -- I'm sorry.
2              **Is it your recollection that what**
3    **Mr. Altman said was that his role in the startup**
4    **fund was a temporary solution, or that you were**
5    **discussing a temporary solution, for the fact that**
6    **that arrangement was there?**
7              MR. CULLERTON: Object to
8        form.  There's no testimony that Mr. Altman
9        said anything.
10             THE WITNESS: As I recall,
11       either Sam or Jason Kwon said that Sam's
12       position in the fund, when they set it up,
13       had been intended to be temporary, but at
14       the time of this e-mail chain in 2023,
15       continued to be in place.
16   BY MR. KRY:
17             **Q.       And as we saw a minute ago, that**
18   **was two years after the fund was set up?**
19             A.       That sounds right.
20             **Q.       Did Mr. Altman give any explanation**
21   **for why this temporary setup was still in place for**
22   **two years and counting?**
23             A.       I don't recall if it was Sam or
24   Jason.  One of them basically said that there were
25   complicated legal -- this might implicate

91

1    privilege.  I'm not sure.
2              **Q.       You can just give a yes-or-no**
3    **answer to the question.**
4              A.       What was the question again?
5              MS. PETTI: Obviously, if
6        you want to weigh in on behalf of OpenAI,
7        it's your privilege.  But, Helen, I'd
8        advise you not to answer any of Mr. Kry's
9        questions in a way that would reveal
10       communications you had with counsel, either
11       your own counsel or counsel for OpenAI.
12             And, Nate, you're welcome,
13       if you want to add to on top of that.
14             MR. CULLERTON: Yeah, I join
15       the instruction as well.
16             MS. PETTI: Okay.
17   BY MR. KRY:
18             **Q.       And so the question was did**
19   **Mr. Altman give any explanation as to why this**
20   **temporary setup was still in place for two years**
21   **and counting?**
22             A.       I don't recall.
23             **Q.       Did you think that Mr. Altman's**
24   **role in the OpenAI Startup Fund presented a**
25   **potential conflict of interest?**

92

1              A.       I thought it presented a potential
2    conflict of interest.  I primarily thought it was
3    clearly something that the board should be aware
4    of.
5              **Q.       Did Mr. Altman's failure to**
6    **disclose that to the board cause you concerns about**
7    **Mr. Altman's truthfulness and candor to the board?**
8              MR. CULLERTON: Object to
9        form.
10             THE WITNESS: Yes.
11   BY MR. KRY:
12             **Q.       Did those events cause you concerns**
13   **about whether Mr. Altman was truthful and candor to**
14   **the board about conflicts of interest,**
15   **specifically?**
16             MR. CULLERTON: Object to
17       the form.
18             THE WITNESS: Yes.  It
19       contributed to my sense that he was not
20       very proactive about raising conflicts of
21       interest.
22   BY MR. KRY:
23             **Q.       Did those events cause you concerns**
24   **about the effectiveness of OpenAI's conflicts of**
25   **interest policies?**

93

1              MR. CULLERTON: Object to
2        the form.
3              THE WITNESS: Yes.
4    BY MR. KRY:
5              **Q.       Did Mr. Altman ever engage in any**
6    **other conduct that caused you to question whether**
7    **he was fully complying with the firm's conflicts of**
8    **interest policies?**
9              MR. CULLERTON: Object to
10       the form.
11             THE WITNESS: I don't recall
12       specifics.
13   BY MR. KRY:
14             **Q.       Do you recall whether Mr. Altman**
15   **ever caused OpenAI to do business with other**
16   **companies in which he had financial interests?**
17             A.       I believe he did, yes.
18             **Q.       Do you recall ever having concerns**
19   **about the conflicts of interest that arose out of**
20   **those transactions?**
21             MR. CULLERTON: Object to
22       the form.
23             THE WITNESS: Some concern,
24       yes.
25   BY MR. KRY:

102

1   board for as long as possible and to return after
2   he was done with his campaign.  And Sam also
3   suggested that he wanted to make a large, I
4   believe, several-hundred-thousand-dollar campaign
5   contribution to Will, while still expecting him to
6   come back onto the board.
7            He did not go ahead with this
8   donation because Tasha, Adam, and I all said it
9   seemed very inappropriate.  But to me, the fact
10  that he was considering that, the fact that he
11  might have discussed it with Will in advance, the
12  fact it was an option was just a sign of total
13  disregard for the board's independence or ability
14  to provide meaningful oversight of the company and
15  the CEO.
16       Q.       And that
17  several-hundred-thousand-dollar campaign
18  contribution, was it -- did Mr. Altman discuss that
19  that was going to come from him personally?
20       A.       Yes, to the best of my
21  recollection.
22                (Document marked for identification
23            as Toner Exhibit 4.)
24  BY MR. KRY:
25       Q.       So marking as Exhibit 4 the

103

1   document Bates-stamped OPENAI_MUSK00027400.
2                THE WITNESS:  Do you have
3   it, Katherine?
4                MR. KRY:  Please let us know
5   when that shows up.
6                MS. PETTI:  When Jacob gets
7   the Bates, he can upload that Bates to the
8   screen share.
9                THE WITNESS:  It's the board
10  resolution removing Sam.
11                MS. PETTI:  I have it.
12                MR. KRY:  Great.
13  BY MR. KRY:
14       Q.       This is a November 16, 2023,
15  unanimous written consent signed by you and three
16  other directors.  And at -- as the witness noted,
17  at the bottom of Page 1, the document states:
18  "Now, therefore, be it resolved, that the Board
19  hereby, effective immediately, terminates
20  Mr. Altman's employment with the Corporation."
21                Ms. Toner, is this the resolution
22  by which the board formally removed Mr. Altman as
23  CEO and board member of OpenAI?
24       A.       Yes.
25       Q.       Were you one of the board members

104

1   who voted to remove Mr. Altman?
2       A.       Yes.
3       Q.       For how long before November 16,
4   2023, had the board members been discussing the
5   prospect of removing Mr. Altman?
6       A.       Several weeks.
7       Q.       Do you recall approximately when
8   those discussions began?
9       A.       It's hard to say exactly what --
10  what the starting point was.  Early to mid-October.
11       Q.       How did those discussions of
12  potentially removing Mr. Altman originate?
13       A.       I would say the starting point was
14  Ilya Sutskever reaching out to me to ask to talk.
15  We then had a first conversation which was very
16  circuitous and confusing to me.  Very clearly, Ilya
17  had some very significant concern but told me that
18  he couldn't tell me what his concern was,
19  essentially.
20                I would put that as the -- the
21  starting point.
22       Q.       And did you subsequently have
23  discussions with the other board members?
24       A.       Yes.
25       Q.       And over the course of those

105

1   discussions, what were the grounds for removing
2   Mr. Altman that the board members discussed?
3       A.       It was a number of things.  A --
4   the phrase we used was "a pattern of behavior."  So
5   no one single cause.
6                The pattern of behavior related to
7   his honesty and candor, his resistance of board
8   oversight, as well as the concerns that two of his
9   senior management team, Ilya Sutskever and Mira
10  Murati, raised to the board about his management
11  practices, his manipulation of board processes.  A
12  range of concerns in that vicinity.
13       Q.       So when you refer to his pattern of
14  behavior related to honesty and candor, does that
15  include all the incidents that we've discussed
16  during your testimony this morning?
17       A.       Yes.  I will say during the
18  discussions -- I'll leave that.
19                Yes.
20       Q.       Did those -- did those incidents
21  reflecting negatively on Mr. Altman's honesty and
22  candor also cause you to believe that Mr. Altman
23  was not providing the board with the information it
24  needed to manage OpenAI's AI safety processes?
25                MR. CULLERTON:  Object to

106

1    the form.  Leading.
2                    THE WITNESS:  Yes.
3    BY MR. KRY:
4          Q.        And the -- did you feel, as a
5    result of those incidents we've discussed this
6    morning, that Mr. Altman's conduct had made it more
7    difficult for you as a board member to manage
8    OpenAI's AI safety processes?
9                    MR. CULLERTON:  Object to
10   the form.
11                   THE WITNESS:  Yes.
12   BY MR. KRY:
13         Q.        Without disclosing any
14   attorney-client privileged communications, during
15   these several weeks when you were discussing
16   removing Mr. Altman, did you communicate with legal
17   counsel?
18         A.        We did.
19         Q.        Approximately how many times?
20         A.        I don't remember.  A lot.
21         Q.        What was the law firm?
22         A.        Am I okay to name the firm?
23                   My mind is going entirely blank.
24   Wow.
25         Q.        Was it Arnold & Porter?

107

1          A.        It was Arnold & Porter.  Thank you.
2          Q.        At one point during those
3    discussions, did Mr. Sutskever send the other board
4    members a self-destructing e-mail that catalogued
5    examples of Mr. Altman's misconduct?
6                    MR. CULLERTON:  Object to
7    form.
8                    THE WITNESS:  Yes.
9    BY MR. KRY:
10         Q.        And approximately when did
11   Mr. Sutskever send you that e-mail?
12         A.        I believe early November.
13         Q.        So that would have been how far
14   through the overall multi-week process of these
15   discussions?
16         A.        Roughly halfway.  Maybe towards the
17   end a little.
18         Q.        Did you review the contents of that
19   e-mail?
20         A.        Yes.
21         Q.        Did it, in fact, self-destruct
22   after you read it?
23         A.        I believe it was on a timer.  Maybe
24   24 hours.
25         Q.        So you no longer have a copy of it?

108

1          A.        Correct.
2          Q.        What types of misconduct did that
3    e-mail describe?
4                    MR. CULLERTON:  Object to
5    the form.
6                    THE WITNESS:  It
7    described -- I haven't seen it in two
8    years.
9                    So to the best of my
10   recollection, it had various instances of
11   Sam making conflicting promises to team
12   members in ways that seemed very
13   misleading.  Putting words in other
14   people's mouth.
15                   So, for example, the GPT-4
16   Turbo DSB review with Mira and Jason was in
17   there.  The Slack exchange between Mira and
18   Jason.
19                   Yeah.  Examples of -- many
20   examples, most of which were not glaring or
21   egregious on their own but which were
22   intended to, again, illustrate a pattern of
23   behavior.
24   BY MR. KRY:
25         Q.        And did the contents of that e-mail

109

1    include -- include multiple examples of the issues
2    that you testified about this morning?
3                    MR. CULLERTON:  Object to
4    the form of the question.
5                    THE WITNESS:  I would say
6    that Ilya's gloss on what types of behavior
7    Sam was exhibiting was somewhat different
8    to what we have discussed so far and would
9    relate -- yeah -- would cover some of the
10   same ground but also, perhaps, relate more
11   to making conflicting promises, talking out
12   both sides of his mouth, pitting team
13   members against each other.  So not -- not
14   exactly the same as the conduct we've
15   discussed so far.
16   BY MR. KRY:
17         Q.        Did Mr. Sutskever also send the
18   board members a second self-destructing e-mail that
19   concerned allegations about Mr. Brockman?
20         A.        Yes.
21         Q.        Did you read that second
22   self-destructing e-mail?
23         A.        Yes.
24         Q.        And did that e-mail, in fact,
25   destruct itself?

146

1  reflect your views at the time?
2      A.      I would say it is an accurate
3  statement and, again, is an incomplete
4  summarization that is for the purpose of this
5  message.
6      Q.      And the behavior and lack of
7  transparency you're referencing there, is that the
8  same pattern of conduct that we discussed earlier
9  today?
10     A.      Yes.
11     Q.      Did the OpenAI board ultimately
12 decide to reinstate Mr. Altman as a board member?
13     A.      As CEO, but not as a board member.
14 But -- and then later, much later, the board
15 decided to reinstate him, yes.  A different board.
16     Q.      Correct.  I'm sorry.
17             So the board --
18             Okay.  When did the board decide to
19 reinstate Mr. Altman as CEO?
20     A.      Tuesday night, the 21st of
21 November.
22     Q.      How did that come about?
23     A.      There had been, over the course of
24 the weekend, a lot of back-and-forth over different
25 possible futures of the company, with a recurring

147

1  theme being employees threatening to leave if
2  certain demands were not met.
3              Over the course of the few days
4  following our firing, those demands became
5  gradually more reasonable and the threat of mass
6  resignations continued.
7      Q.      Who were the demands being made by?
8      A.      Some combination of Sam, Greg, the
9  executive team, typically conveyed to us via Mira.
10 And employees directly.
11     Q.      And did you observe that Microsoft
12 was involved in those discussions at all?
13     A.      Microsoft became clearly involved
14 on Sunday night when, after we announced that
15 Emmett would be interim CEO, Microsoft announced
16 that Sam and Greg would be joining Microsoft.  And
17 over the subsequent hours -- I don't recall how I
18 came to learn this -- but over the subsequent hours
19 I came to the understanding that Microsoft was
20 offering to hire away the entire OpenAI team and
21 would have jobs for anyone who wanted them at
22 Microsoft.
23     Q.      So what impact did Microsoft's
24 announcement that it was hiring Mr. Altman and
25 Mr. Brockman, an open offer to hire anyone from

148

1  OpenAI that wanted to come over, impact the board's
2  ability to carry out its duties as the board of
3  OpenAI?
4              MS. BENEZE:  Object to form.
5              THE WITNESS:  It -- it
6  created a threat of Microsoft destroying
7  the company in a way that changed the
8  calculus for us about what the best way to
9  pursue the nonprofit mission was.
10 BY MR. KRY:
11     Q.      In what sense?
12     A.      In the sense that it significantly
13 increased the credibility of employees' threats
14 that they would leave en masse and gave Sam
15 significantly more leverage to demand his own
16 reinstatement to avoid the company falling apart.
17     Q.      What did the board do in response
18 to this change to the circumstances?
19     A.      In response to the totality of the
20 circumstances on Tuesday, which includes
21 Microsoft's involvement, as well as other factors,
22 we were able to reach an agreement on Tuesday that
23 was amenable to all sides, which involved Sam being
24 reinstated as CEO but not reappointed to the board;
25 most of the existing board members resigning, but

149

1  not all; and a thorough, independent investigation
2  being carried out into Sam's conduct in the events
3  of the previous few days.
4      Q.      Were you one of the board members
5  that was removed as part of this deal?
6              MR. CULLERTON:  Object to
7    the form.
8              THE WITNESS:  Yes.
9              MR. CULLERTON:  Removed.
10             THE WITNESS:  Yes.
11 BY MR. KRY:
12     Q.      And was Ms. McCauley one of the
13 board members that was removed pursuant to this
14 compromise?
15             MR. CULLERTON:  Same
16   objection.
17             THE WITNESS:  Yes.
18 BY MR. KRY:
19     Q.      Did Mr. D'Angelo stay on the board
20 after this agreement?
21     A.      Yes.
22     Q.      Was an interim board appointed in
23 connection with this agreement?
24             MR. CULLERTON:  Object to
25   the form and characterization, on board.

154

1  oversight should be unacceptable."
2              Is that an accurate statement of
3  what you told WilmerHale?
4      A.      Yes.
5      Q.      And is the reference to deception,
6  manipulation, and resistance to thorough oversight
7  your description of the conduct that Mr. Altman
8  engaged in?
9              MR. CULLERTON:  Object to
10     form.
11             THE WITNESS:  Yes.
12             (Document marked for identification
13             as Toner Exhibit 10.)
14 BY MR. KRY:
15     Q.      So I've marked as Exhibit 10 a
16 document stamped MSFT_MUSK 56581.  This is a May
17 26, 2024, article from The Economist, published
18 by -- or authored by you and Ms. McCauley, with the
19 title "AI firms mustn't govern themselves, say
20 ex-members of OpenAI's board."
21             Ms. Toner, did you co-author this
22 article with Ms. McCauley?
23     A.      Yes.
24     Q.      Why did you decide to publish the
25 article?

155

1      A.      We believed that there were
2  important aspects of the board's decision to fire
3  Sam that had not been made clear publicly, and we
4  wanted to share them.
5      Q.      So on the second page of this
6  article, the second sentence, it says, "When we
7  were recruited to the board of OpenAI - Tasha in
8  2018 and Helen in 2021 - we were cautiously
9  optimistic that the company's innovative approach
10 to self-governance could offer a blueprint for
11 responsible AI development.  But based on our
12 experience, we believe that self-governance cannot
13 reliably withstand the pressure of profit
14 incentives."
15             What about your experience at
16 OpenAI led you to believe that self-governance
17 cannot reliably withstand the pressure of profit
18 incentives?
19     A.      Several things.
20             Partly, some relevant factors
21 included the role that we perceived expected
22 profits to have played in the pushback to our
23 decision to fire Sam.
24             I think the profit incentives is
25 maybe an incomplete phrase here.  I think profit

156

1  and personal gain is maybe a more complete way to
2  put it, because I think my judgment of Sam's
3  resistance to board oversight was not purely about
4  the financial incentives at play for him but also
5  about the enormous amount of power that he would
6  wield if OpenAI was successful in developing
7  extremely advanced AI systems.  So that was one
8  element.
9              Profit played a more direct part in
10 what we perceived to be Microsoft's role in the
11 aftermath of firing Sam and also in the reaction of
12 some employees who were concerned about their
13 equity stakes and the potential loss of an upcoming
14 stock sale, tender deal.
15             All of which we believed played
16 significant roles in what turned out to be the
17 nonprofit's ability to perform one of its most
18 basic duties, which is to hire and fire the CEO.
19     Q.      Did you perceive that profit
20 incentives also played a role in the various
21 episodes where AI safety breaches either occurred
22 or were not promptly disclosed to the board?
23             MR. CULLERTON:  Object to
24     form.
25             THE WITNESS:  Yes.  I

157

1  generally believed that being part of to
2  move fast and be ahead of competitors and
3  earn market share were significant factors
4  in the ways in which mission-critical
5  information was and wasn't communicated to
6  the board.
7  BY MR. KRY:
8      Q.      Does that include the failures to
9  communicate information that you testified about
10 earlier today?
11             MR. CULLERTON:  Object to
12     form.
13             THE WITNESS:  Yes.
14             (Document marked for identification
15             as Toner Exhibit 11.)
16 BY MR. KRY:
17     Q.      I have marked as Exhibit 11 a
18 document stamped MSFT_MUSK 56588.
19             This is a transcript of a podcast
20 you appeared on called the TED AI Show, on May 28,
21 2024.  The episode was entitled, "What Really Went
22 Down at OpenAI and the Future of Regulation with
23 Helen Toner."
24             Do you remember appearing on this
25 podcast?

314

[redacted]

BY MR. CULLERTON:

    Q.      Did the board consider whether a
dispute over -- over a job title could have
motivated Mr. Sutskever to want Mr. Altman to leave
the company?

            MR. KRY:  Objection.  Form.

            THE WITNESS:  We did

    consider that, yes.

BY MR. CULLERTON:

    Q.      Okay.  And what did the board

315

determine about that?

    A.      The board determined that the fact
that this dispute was ongoing was not -- did not
contradict the other reasons that we determined
that Mr. Altman was unsuitable to continue in his
role.

    Q.      Did Mr. Sutskever, in this
document, raise any concerns about the safety of
OpenAI's products?

            MR. KRY:  Objection.  Form.

            THE WITNESS:  I don't

    recall.  I'd have to re-review the

    document.

BY MR. CULLERTON:

    Q.      We were talking about interactions
you may have had with Mr. Musk earlier, right?

            MR. KRY:  Nate, are we done

    with that document?

            MR. CULLERTON:  Yes.  You

    can set that aside -- document aside.

            MR. KRY:  Okay.  One

    question for you.

            MR. CULLERTON:  Oh, sorry.

    Yeah.  We need to let Anika go --

            MR. KRY:  But before Anika

316

goes, on redirect, I'm going to -- I would
like to have two or three minutes on this
question.  Do you have any objection if we
do that now so that then Anika can go?

            MR. CULLERTON:  I do not
have any objection to that so we can let
Anika go.  And I can do any follow-up right
now, to the extent I have any.  That's
fine.

            MR. KRY:  Great.

            MS. HOLLAND:  Thank you all.
I appreciate it.

                -  -  -

                EXAMINATION

                -  -  -

BY MR. KRY:

    Q.      Ms. Toner, could you turn to Page
532 of that document.

    A.      Mm-hmm.

    Q.      Do you recognize these as the
screen shots you were sent recounting an exchange
between Mira Murati and Jason Kwon?

    A.      Yes.

    Q.      And on this first page, do you see
where Mira Murati states in this screen-shotted

317

conversation, "On Turbo, going through DSB, I don't
really want to argue with people, and it takes no
real extra effort to put together the review docs
for it.  But Sam told me that you had said it
doesn't need to, per legal.  Is this correct?"
            And then Mr. Kwon responds, "Ugh"?

    A.      Yes.

    Q.      And then if you turn over one page.
You see that Mr. Kwon states in this screen shot,
"On Turbo, I actually said something different,
which was, one, that people were saying it needed
DSB, but that it also didn't seem like that much
work and that it would be handled.  And, two, we
should, going forward, not let anyone just decide
something goes through DSB but instead have a
lawyer, it doesn't have to be me, probably prefer
it that way, maybe Shay (ph) be the one to make
the determination, since it's a question of
interpretation of the contract."
            Do you see that response from
Mr. Kwon there?

    A.      Yes.

    Q.      Even without further investigating
this interest -- this exchange and speaking with
Mr. Kwon directly, did these screen shots cause you

318

```
 1   significant concerns about the safety review
 2   processes at OpenAI and how they were being
 3   handled?
 4        A.        I would say that it primarily
 5   served to me as a further example cementing the
 6   perception that we discussed at the board level,
 7   that Sam had a habit of putting words in other
 8   people's mouths to get people where he wanted them
 9   to go, which was of concern for many reasons,
10   including the integrity of OpenAI's safety review
11   processes but also more generally.
12        Q.        And I think you testified earlier
13   that you took some screen shots of these particular
14   screen shots in the document?
15        A.        That's right.
16        Q.        Why was that?
17        A.        This seemed like a particularly
18   important and clear example of a pattern we were
19   concerned about.
20             MR. KRY:  Great.  I don't
21   have any further questions on this
22   document.
23             MR. CULLERTON:  Just
24   following up on that.  And, Anika -- well,
25   one second.
```

319

```
 1                  - - -
 2                EXAMINATION
 3                  - - -
 4   BY MR. CULLERTON:
 5        Q.        I think we already established
 6   this, but you didn't ask Mr. Altman what had
 7   happened in this interaction with Mr. Kwon and Ms.
 8   Murati, correct?
 9        A.        Correct.
10             MR. CULLERTON:  I think
11   that's it.
12             You could -- Anika, thank
13   you.
14             THE WITNESS:  I'm going to
15   take this home and get it framed.  Famous
16   document.
17             MR. KRY:  Pretty sure that's
18   not allowed in the stipulation.
19             THE WITNESS:  I know.  I
20   know.
21   BY MR. CULLERTON:
22        Q.        So turning back to your
23   interactions with Mr. Musk.
24             Are you aware -- and I know you
25   testified that you couldn't recall any other
```

320

```
 1   communications with him other than what was
 2   reflected in the text message.
 3        Q.        Are you aware of anyone else on the
 4   board having any communications with Mr. Musk
 5   during the time period in which -- you know, these
 6   events that we've been discussing?
 7        A.        I'm pretty sure Ilya did.  I'm not
 8   sure about others.
 9        Q.        Okay.  Did Ilya ever tell you what
10   he and Mr. Musk discussed?
11        A.        I don't recall.
12        Q.        Okay.  So other than the
13   communication or the conversation that you think
14   Ilya may have had with Mr. Musk, you are not aware
15   of any other communications or conversations
16   involving anyone else on the board and Mr. Musk; is
17   that correct?
18        A.        Not that I recall.
19        Q.        Do you recall anyone suggesting
20   that Mr. Musk was trying to become CEO of OpenAI
21   during that time?
22        A.        That sounds vaguely familiar.
23        Q.        Do you recall where you heard that
24   suggestion?
25        A.        No.
```

321

```
 1        Q.        It's not something you discussed
 2   with Mr. Musk?
 3        A.        No.
 4        Q.        Are you aware of whether anyone on
 5   the board discussed that with Mr. Musk?
 6        A.        I'm not sure.
 7        Q.        Okay.  We were talking about the
 8   DSB review process relating to the test release of
 9   GPT-4 in India.
10             Do you recall that?
11             And I believe that you testified
12   that Tasha had found out about that from an
13   employee following a board meeting.
14             Do I have that correct?
15        A.        Yes.
16        Q.        Okay.  Who was that employee?
17        A.        Jan Leike.
18        Q.        Okay.  You also testified earlier
19   regarding the board service and ultimate departure
20   from the board of Shivon Zilis.
21             You remember that?
22        A.        Yes.
23        Q.        And I think you said that
24   statements that Mr. Altman had made during the
25   deliberations around whether Ms. Zilis should leave
```