**Pages 1 - 65**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

ELON MUSK, et al.,                     )
                                       )
         Plaintiffs,                   )
                                       )
  VS.                                  )     **NO. C 24-04722 YGR**
                                       )
SAMUEL ALTMAN, et al.,                 )
                                       )
         Defendants.                   )
_____    )

                    Oakland, California
               Wednesday, January 7, 2026

              **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    TOBEROFF AND ASSOCIATES, P.C.
                    23823 Malibu Road - Suite 50-363
                    Malibu, California  90265
               BY:  **MARC TOBEROFF, ATTORNEY AT LAW**

                    MOLOLAMKEN LLP
                    430 Park Avenue - 6th Floor
                    New York, New York  10022
               BY:  **JENNIFER SCHUBERT, ATTORNEY AT LAW**
                    **ALEXANDRA C. EYNON, ATTORNEY AT LAW**
                    **SARA TOFIGHBAKHSH, ATTORNEY AT LAW**
                    **STEVEN F. MOLO, ATTORNEY AT LAW**

                    MOLOLAMKEN LLP
                    600 New Hampshire Avenue - Suite 500
                    Washington, D.C.  20037
               BY:  **WALTER H. HAWES, IV, ATTORNEY AT LAW**
                    **ROBERT KRY, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                U.S. District Court - Official Reporter

**APPEARANCES:**  (continued)


For Defendant:

                    MORRISON & FOERSTER LLP
                    425 Market Street
                    San Francisco, California  94105
               BY:  **WILLIAM FRENTZEN, ATTORNEY AT LAW**
                    **JORDAN ETH, ATTORNEY AT LAW**

                    WACHTELL LIPTON ROSEN & KATZ
                    51 West 52nd Street
                    New York, New York  10019
               BY:  **SARA K. EDDY, ATTORNEY AT LAW**
                    **WILLIAM SAVITT, ATTORNEY AT LAW**
                    **STEVEN P. WINTER, ATTORNEY AT LAW**

                    DECHERT, LLP
                    45 Fremont Street - 26th Floor
                    San Francisco, California  94105
               BY:  **RUSSELL P. COHEN, ATTORNEY AT LAW**
                    **HOWARD M. ULLMAN, ATTORNEY AT LAW**
                    **HANNAH LEONE, ATTORNEY AT LAW**

                    DECHERT, LLP
                    633 West 5th Street - Suite 4900
                    Los Angeles, California  90071
               BY:  **NISHA PATEL, ATTORNEY AT LAW**

                    DECHERT, LLP
                    1900 K Street, N.W.
                    Washington, D.C,  20006
               BY:  **JOHN A. JURATA, JR., ATTORNEY AT LAW**

**Wednesday - January 7, 2026**                    **12:27 p.m.**

                         **P R O C E E D I N G S**

                              **---000---**

        THE COURT:  Good afternoon, everyone.  Happy New Year.

        THE CLERK:  Thank you.  Please be seated.

                    (Pause in proceedings.)

        THE CLERK:  Good afternoon.  These proceedings are being court reported by this court.  Any other recording of this proceeding -- either by video, audio, including screenshots or other copying of the hearing -- is strictly prohibited.

     Your Honor, now calling the civil matter 24-CV-4722-YGR, Musk versus Altman, et al.  Today's appearances have been recorded and will be added in the minutes posted.

     Thank you.

        THE COURT:  Okay.  As you all know, we are here on the Defendant's motions for summary judgment.  What I would like to know is whether you have divided up argument on the various issues.  Who is lead for Plaintiff?

        MR. MOLO:  I am, Your Honor, Steven Molo --

        THE COURT:  To the microphone, please, to this microphone up here; and then I'm going to want someone from the Defense.  Our court reporter is remote.  She cannot hear you unless you are speaking into these microphones which are connected by Zoom to her feed.  So, your name, sir.

**MR. MOLO:** Steven Molo on behalf of the Plaintiff, Your Honor.

**THE COURT:** Okay. And you are lead?

**MR. MOLO:** I am.

**THE COURT:** Are you also lead trial counsel?

**MR. MOLO:** I am.

**THE COURT:** How have you, if at all, divided up the argument?

**MR. MOLO:** Mr. Kry -- my partner Robert Kry is going to address the standing issues primarily.

**THE COURT:** Okay.

**MR. MOLO:** And I will address the other issues, any questions that the Court has. There may be something that Mr. Kry may add, but that is the plan for this afternoon.

**THE COURT:** Okay, thank you.

**MR. MOLO:** Thank you very much.

**THE COURT:** Thank you. On the Defense, let's start with OpenAI Counsel to the mic, please.

**MR. SAVITT:** Good afternoon, Your Honor, excuse me, William Savitt from Wachtell Lipton for the OpenAI Defendants.

**THE COURT:** Okay. And are you lead trial counsel?

**MR. SAVITT:** Yes, Your Honor.

**THE COURT:** How have you divided up argument, if at all?

**MR. SAVITT:** In respect of the matters pertinent to

the OpenAI motion, I will be presenting all the arguments subject to whatever notes and advice I may get from my team but I expect to be at the podium for all of those issues.

THE COURT:  Okay, thank you.  Microsoft.

MR. COHEN:  Good afternoon, Your Honor, Russell Cohen from the Dechert firm on behalf of the Defendant Microsoft.

THE COURT:  Okay.  And are you lead trial counsel?

MR. COHEN:  I am, Your Honor.

THE COURT:  Okay.

MR. COHEN:  And I will be handling Microsoft's motion for summary judgment today.

THE COURT:  All right.  So, you have not divided up either?

MR. COHEN:  I have not.

THE COURT:  All right.  A lot of lawyers in this room for not dividing up issues but that's fine.

All right.  Let's have both Mr. Cohen and Mr. Savitt at the microphones since you will be there the entire time.  And then let's start with you, Mr. Kry, on standing.

(Pause in proceedings.)

THE COURT:  For those who are listening and are not lawyers, there is pending motions for summary judgment. Summary judgment seeks to have judgment made on behalf of the Defendants without a trial as a matter of law.

There are four cases -- or four claims -- well, three

plus, I would say given unjust enrichment -- against the OpenAI Defendants; breach of charitable trust, constructive fraud, fraud and then unjust enrichment, which is actually a restitutionary remedy -- a lot of confusion about how it operates but it's there -- and then against Microsoft, really just two because tortious interference, it appears that that's in many ways conceded.  Would that be right?

**MR. KRY:**  In light of the election that Your Honor required, we are not pursuing that claim.

**THE COURT:**  Yes.  So, motion is granted to Microsoft on tortious interference.  It's in a footnote in the papers and there's nothing there.

And then there is two remaining; aiding and abetting for breach of fiduciary duty and unjust enrichment.

So, we will -- you know, actually, Mr. Cohen, you can sit down for now if you want.  We are going to focus on the OpenAI claims.  First, a breach of charitable trust standing, there are two basic arguments.  One that there is no standing -- either common law standing or Article III standing, and then the second argument under this claim is that there is no evidence of a trust purpose.  Do I understand the arguments, Mr. Savitt?

**MR. SAVITT:**  I think that's fair, yes, Your Honor.

**THE COURT:**  Okay.  We are going to start with you.  On the first issue of standing relative to the application of the

Restatement of Torts Third in California and common law, I have already decided this issue. It's really a motion for reconsideration. I have no reason to change my mind. I think you lose on this issue. What do you have to say?

MR. SAVITT: Thank you, Your Honor.

And leaving to the side for the moment the Article III issue, if I'm understanding Your Honor's question --

THE COURT: Correct, this is for common law.

MR. SAVITT: For the common law. We, of course, read with care Your Honor's ruling on the preliminary injunction. Our take on the Court's ruling was that for purposes of that motion, it was going to allow the claim to proceed but evidence needed to be accumulated in respect of it.

And while we do appreciate the Court's view as to the direction of trust law in California in light of the Restatement (Third) of Trusts, our motion today is predicated on the view that there are some important additional evidentiary bases for a motion that are appropriate in the summary judgment posture and not --

THE COURT: Do you believe at this point that the Restatement of Third controls -- Restatement of Trust Third, do you agree that it controls or not?

MR. SAVITT: No, we don't agree that it controls.

THE COURT: Okay. So, we disagree on that point. Just as a matter of law.

**MR. SAVITT:**  Yes, Your Honor.

**THE COURT:**  This has nothing to do with facts.  This has to do with an interpretation of law.  So, to the extent your arguments are based upon that distinction that I should be following the Restatement (Second) as opposed to (Third), those arguments are preserved for appeal but they are denied.

I don't have a lot of time.  I'm not going to waste it on things I have already decided and considered.  What else do you have on common law standing?

**MR. SAVITT:**  I think -- and thank you for that.  I think that ruling, Your Honor, puts to the side the arguments we made with respect to the lack of a reversionary interest.  So, I will leave them where they sit.

There is a further and significant argument that we raised in our papers and has to do with the matter of special -- of the specific purpose of the donation because under --

**THE COURT:**  That's a second argument.  That's not a standing argument in my view.  There are two elements in order to prove breach of charitable trust.  So -- correct, are we agreed on that?

And I have, by the way, I can quote the elements that you gave to me when I asked you-all for them, but there are two elements.

One of those elements is whether there is an articulation of the trust purpose.  That's an element.  That doesn't have to

do with standing.  So, I was trying to focus on standing.

MR. SAVITT:  Fair enough, Your Honor, and we spent a lot of time -- head hurting time trying to sort this exact point and I take Your Honor's point.

The issue I was seeking to raise in respect of the specific purpose of the donation might well be better articulated as a failure of the creation of a trust to begin with rather than one of standing.  So, I'm happy to approach it on those grounds, Your Honor, if that's -- if that makes sense to you.

THE COURT:  Okay.  Well, let's -- I think that that's an issue of evidence and whether there is proof of an element. That's separate and apart from whether there is standing. There is the issue I thought raised of Article III standing in light of the use of the donor assisted funds.  Do you want to argue that standing point?

MR. SAVITT:  Yes, Your Honor, thank you.  As the Court saw in the papers, there was $37 million, excuse me, in cash that Mr. Musk says he donated to OpenAI.

THE COURT:  I thought it was 38.

MR. SAVITT:  $38 million dollars -- I think it was 37 and change but 38, that's fine.

THE COURT:  Thirty-eight plus ongoing payments of rent, et cetera, which were in the millions.

MR. KRY:  Your Honor, it is 38.2 million according to

Plaintiffs and 37.8 million according to the Defendants.

**MR. SAVITT:**  And I think that includes the rent payments, Your Honor, however.  I think that's the all in number.

**THE COURT:**  All right.

**MR. SAVITT:**  But of that amount, excuse me, about 16 million -- 16 million and change came through a Vanguard -- DAF a Vanguard donor advised fund --

**THE COURT:**  Correct.

**MR. SAVITT:**  -- 11 million from a Fidelity donor advised fund and about 10 million from YC Org, a financial sponsor.  Those are the entities that donated to OpenAI. Mr. Musk donated to those entities.  They in turn donated to OpenAI.  So, every one of those $38 million that are claimed to have been donated to OpenAI were, in fact, irrevocably donated to a different charitable organization before they were donated to OpenAI.

**THE COURT:**  So, and this is based on *Pinkert*.  This is your *Pinkert* argument.

**MR. SAVITT:**  *Pinkert* is our leading case, but in some sense, Your Honor, it is based on the Federal Rules and Regulations on which *Pinkert* relied, which drove the result of that, which provide that a donation to an organization such as the sponsor or the DAF necessarily entail the irrevocable and unconditional surrender of legal title and interest in the

assets.

So, those assets, which are the assets that ultimately comprise the alleged trust, were not donated legally to the -- to OpenAI or any OpenAI entity.  They were through a separate entity that had complete dominion over those assets.

**THE COURT:**  Okay.  So, you are now repeating -- pretty much repeating what's in your briefs.  And, again, I think in this sense you take *Pinkert* too far.  I will hear from Plaintiffs on this point.

**MR. KRY:**  Your Honor, thank you.

It is important to read *Pinkert* in light of how Your Honor has already construed California charitable trust law.  The -- as Your Honor recognized, California does follow the Third Restatement, and the Third Restatement recognizes that a settlor has standing to bring a cause of action to enforce a charitable trust when the trust funds are being used for an unauthorized purpose.

And so, this is a situation where Article III standing follows from the standing that Your Honor has already recognized is provided by California law.

Now, Article III does place some limitations on the extent to which states can create new causes of action and parties can enforce them in federal court, but this comes nowhere near those boundaries as a matter of Article III standing.

California has adopted what is a -- not a novel theory but

a theory Your Honor recognized as reflected in the Third Restatement that gives the settlor who parted with his money the right to enforce restrictions on the donations of those funds.

Now, contrary to what Mr. Savitt said, there -- it is nothing in the fact that these funds were contributed through YC Org or through the DAFs that in any way undermines that Article III standing.

And for that reason *Pinkert* doesn't govern this case either.  I think it is helpful just to recap some of the important facts about the contributions that were made through YC Org and the DAFs.  And if I can ask my colleague to pull up the slide number 4 to start with --

(Pause in proceedings.)

**MR. KRY:**  So, this is the testimony about YC Org. This is the --

**THE COURT:**  Hold on.  Mr. Cuenco, you can turn on the evidence monitors.  There are people in the courtroom.  That's fine.  Go ahead.

Mr. Frentzen, can you hit the power button on that one?

(Pause in proceedings.)

**THE COURT:**  Okay.  Go ahead.  Mr. Kry, go ahead.

**MR. KRY:**  So, this discusses YC Org.  Separate and apart from the DAFs, there were ten-and-a-half million dollars that were contributed through YC Org, and that was an entity

that was set up because at the very beginning of OpenAI it did not have its own 501(c)(3) registration.

And so, what OpenAI told donors like Mr. Musk was: Look, we have this other entity sitting around. It already has a registration. Give the money to that entity and that entity will hand it over to OpenAI as soon as its registration comes through. So, for example, Mr. Birchall testified, Question --

THE COURT: Now, I don't need you to read your PowerPoint to me. Look, the question -- the legal question is whether or not in some way these organizations have denied the settlor the ability to bring a suit. My reading of the law is that they do not. That is an issue of law. Again, it is preserved for purposes of appeal, but I don't think that your reading is accurate.

MR. KRY: Thank you, Your Honor.

THE COURT: All right. So, now let's --

MR. KRY: I'm sorry. Was that our reading was inaccurate or --

THE COURT: Their reading is inaccurate.

MR. KRY: Thank you.

THE COURT: So, Defendant's reading is inaccurate.

All right. And I would think then that the fact that, you know, they don't -- I guess they don't understand how -- whether or not the donations were made in the context of a year really matters one way or the other. That is, they either are

entitled under the law to have standing to make sure that their funds have gone where they told the donor associated fund to do it or they don't.  The issue of timing seems irrelevant to me.

**MR. SAVITT:**  If Your Honor has determined that the fact of irrevocably donating the money onto a DAF is irrelevant to the question whether the donor to the DAF has standing to enforce a charitable trust allegedly created when the DAF exercising its sovereign ability to donate gives an onward donation -- if that's Your Honor's determination, then I agree with you.  I just wanted to make -- to answer your questions as directly as possible.  With those assumptions and view, I do agree with you, Your Honor.

**THE COURT:**  All right.  Okay.  Next with respect to the trust purpose.  Here, as I understand the argument, you don't believe that there is evidence that he actually articulated a trust purpose.  I disagree.  I don't think that -- I'm not granting them judgment on that topic, but I think that there's enough in the record to suggest that he, in fact, made that clear.  Go ahead.

**MR. SAVITT:**  Well, thank you, Your Honor.  I appreciate the chance to speak to it notwithstanding your preliminary view.

This is an argument rooted as we talked about just a moment ago in the Restatement (Third) of Trusts.  And while it does -- the Restatement (Third) -- relax some of the rules in

respect of standing, as we have talked about, it is quite clear on the point that there are two sorts of ways to donate.

You can make a charitable donation or you can create a charitable trust.  And to give money for purposes that are essentially congruent with the purposes of the charity does not cite a charitable trust.

Comment -- Section 28, Comment C I think is very clear on that point, and it distinguishes a circumstance where a donation is made more or less incongruent with the terms of the charity's purpose, not a charitable trust, and something more specific than that on the other.

A good example of this is the *L.B. Research* case, which we have talked about a bunch and we will more because there you had a donation to UCLA, but it was for a specific purpose much narrower than the overall purposes of UCLA to create a chair in cardiothoracic surgery.  And when you have something that is narrow and specific and articulated as specific, you have a charitable trust.  When you don't, you don't.

And I want to really -- and I appreciate the opportunity to just speak to this point because there are a few things that really emerge clear, we think, in the evidence and it's why we are here on a motion for summary judgment.

Mr. Musk and through his advisor, Mr. Birchall, made -- caused these donations to be made to the DAF and then advised that they go thence to OpenAI.

In his interrogatory responses Mr. Musk could identify no conditions to that gift that were any different than OpenAI's public commitments in its certificate and charter.  That's our Exhibit 13.

Mr. Musk admits in his papers that the donations track the purposes set forth in OpenAI's founding documents.  Mr. Musk testified very clearly that his -- the terms of his donations were no different than the donations to the public, and he identified no specific terms attached to his donation that didn't map what was the purpose of the organization generally.

And there are two -- there are two interesting -- what we think are tails -- on this point, Your Honor.  I wanted to make sure to bring them to the Court's attention before you reach a final point of view on it.  There are aspects of the argument that are in front of you from my friend on the other side that are difficult to square with the legal framework.

One is the argument based on Restatement -- on Section 28 of the Restatement because the Court may have noticed in the papers that the Plaintiff here tries to suggest that the Restatement recognizes a charitable trust for general purposes -- things like establishing a home for the poor or maintaining public libraries -- but they are slight of hand in that, Your Honor, and we think it works a real concession.

The examples that Mr. Musk cites to establish that are gifts for charitable purposes -- yes, under Section 28 -- but

that do not create a charitable trust.  He relies in his papers, Mr. Musk does, in examples of gifts that when you trace it through, what the Restatement is saying are charitable gifts but ones that do not create a charitable trust.

To create a charitable trust -- and Section 28 is clear on this, Your Honor -- a gift has to be more specific relative to the purpose of the organization; something like supporting research on a particular disease or creating a scholarship in a particular field of study.  And if you have an organization like OpenAI, it would be something narrower than its purpose. The Restatement is really clear on this and Mr. Musk doesn't satisfy it.

THE COURT:  All right.  A response.

MR. KRY:  Your Honor, if I can call up slide 10.

THE COURT:  Okay.

(Pause in proceedings.)

MR. KRY:  While that's coming up, Section 28 of the Restatement does require a specific purpose.  That requirement is easily met here.  Musk and Altman spent six months exchanging e-mails over the conditions on which Musk was going to fund this new charitable venture.

For example, over the summer in 2015, Mr. Altman wrote: The mission would be to create the first General AI and use it for individual empowerment; i.e., the distributed version of the future that seems the safest.  Mr. Musk responded:  Agree

on all.

Shortly after -- at Exhibit 6, ECF 351-9 -- Musk wrote: Doing this as an independent pure play 501(c)(3) but with a crystal clear focus on the positive advent of strong AI distributed widely to humanity does seem to make the most sense to me.

When you compare that degree of specificity with what Section 28 said is sufficient, it's not even close, Your Honor. Section 28 lists things like a purpose to establish or maintain a home for the poor, to establish and maintain public libraries, museums or other facilities, to provide care for stray animals.  Those are all far vaguer than what Mr. Altman and Mr. Musk agreed on here.

Now, Mr. Savitt says that we are guilty of slight of hand, which would certainly not ever be our intent, Your Honor.  They say what I just quoted to you just says that those are adequate charitable purposes, not sufficient to create a charitable trust; but that's just flat out wrong.

If Your Honor reads Section 28, Comment G, the Restatement says flat out:  A trust for the relief of poverty generally with no specification of the means to be employed is valid as a charitable trust.  So, that's not just about purpose.  That's saying that is good enough to create a trust.

Comment H says:  A trust to promote knowledge or education generally without specifying the method to be employed is valid

as a charitable trust.

There again, it is not just talking about what purposes count as charitable.  It is saying that that's specific enough to create a trust.

Now, Mr. Savitt argued that none of these specific purposes Mr. Musk and Mr. Altman identified should count because they are the same as the purposes that were identified in OpenAI's founding documents.

The thing that ignores, Your Honor, is that Mr. Musk was the one responsible for the mission that was laid out in those founding documents.  Mr. Musk and Mr. Altman over the course of six months agreed on exactly what this entity was going to do, exactly what the conditions for Musk's funding were going to be; and then they wrote that up in the founding documents, the certificate of incorporation and the charitable registration.

So, the idea that having been responsible for those conditions of his funding this entity at its founding, Mr. Musk was inquired to imbue some additional more narrow degree of specificity every time he wrote a check to the organization, there is nothing in the Restatement that supports that, Your Honor.

THE COURT:  Okay.  Last statement on that.

MR. SAVITT:  Thank you, Your Honor, a couple of points quickly on this issue.  One is to simply and with respect to refer the Court to Comment C of the Restatement in Section 28,

which we think addresses the point -- addresses it in just the manner that we describe.

As to slide 10, we are skeptical that does much help to the Plaintiffs.  It is notable that these purposes are things that were articulated long before OpenAI even existed and that the grant letters and every donation ever made specified no purpose.

Again, to reemphasize, Mr. Musk asked under oath whether there was any purpose different than the general purpose of the company said no, Your Honor.

And I even perceive a change in position here because I believe when one looks at the papers in opposition to the motion, what the Court will see is that Plaintiff's position wasn't that there was a specific purpose.  It was that you didn't need a specific purpose when you are the founder, and a version of that argument has just been sponsored.  That argument has no support for anyone anywhere.

**THE COURT:**  So, you have not referenced comment G or comment H.  Do you wish to do so?  And, Mr. Kry, you did not mention comment C.  Do you wish to do so?

**MR. KRY:**  I do.  I think it is actually comment A is what he is quoting from.  He can correct me if I'm mistaken about that.

**THE COURT:**  Well, he keeps saying C.

**MR. KRY:**  Yeah, the language I'm looking at is an

outright devisee or devisor donation to a non-proprietary hospital, university or other charitable institution or expressly or impliedly to be used for its general purposes is charitable but does not create a trust as that term is used in the Restatement.  Is that what you are referring to, Mr. Savitt?

THE COURT:  You are not talking to him in my courtroom, are you?

MR. KRY:  My apologies, Your Honor.

THE COURT:  Is it C or A?

MR. SAVITT:  I was focused on C, Your Honor.  A, we believe, is relevant as well but we think C is the provision that --

THE COURT:  Do you want to comment on G or H?

(Pause in proceedings.)

MR. SAVITT:  Comment G, Your Honor, I apologize --

THE COURT:  He is arguing that Comments G and H control.  Do you want to comment or not?

MR. SAVITT:  I don't have them here in my papers.  I cannot --

THE COURT:  Do you want to comment on Comment C?

MR. KRY:  I will, Your Honor.  If I am correctly understanding what he is referring to, that comment refers to situations where somebody makes a donation -- a general purpose donation to an existing trust that they had no role in

founding.  The difference here is that we are not saying when you are a founder, you don't have to meet the specificity requirement.  Of course you do.  But when you are a founder, you can look to the founding conditions that you opposed as a condition of setting up the trust as part of the specificity analysis.

So, it is very different for somebody to walk into the United Way and then hand over a check for that entity's general purposes when they had nothing to do with setting up the entity.

Here, Mr. Musk set up the entity.  And so, those founding conditions become part and parcel of the specificity he attached to his contributions.  That's our position.

**THE COURT:**  Okay.  Let's move on to the next claim.

The claim for constructive fraud, it seems to me, really relates and hinges on the first; that is, the arguments are effectively the same.  So, it rises and falls with the first.  Agreed?

**MR. SAVITT:**  Yes, Your Honor.

**MR. KRY:**  Agreed.

**THE COURT:**  So, then let's move to three, which is fraud.  Here there are five elements.  And as I understand the arguments from the Defense, they challenge -- well, they challenge two elements plus statute of limitations.

One is the argument that the misrepresentations at issue

or the representations at issue are not actionable as a matter of law; two, that there is no reliance as a matter of law; and that, three, the claim in any event fails for statute of limitations grounds.  Is that correct?

**MR. SAVITT:**  Yes, Your Honor.

**THE COURT:**  Okay.  Go ahead.  Let's start -- focus on whether or not the representations at issue are actionable.

**MR. SAVITT:**  Okay, thank you, Your Honor.  Excuse me, I think I will maybe -- with Mr. Molo's permission -- ask you to take a look at his slide because it helps isolate the matters that are stated.

**THE COURT:**  That's fine.  What page do you want to go to?

**MR. SAVITT:**  Let's begin with slide 12.

**THE COURT:**  All right.  Could you all bring up 12, please.

**MR. SAVITT:**  This slide is styled fraud, Altman's false promises.  And Plaintiffs have identified two alleged false promises from the 21st and 22nd of September attributable to Mr. Altman.

The first is an e-mail disembodied from the rest of the chain that says, "I remain enthusiastic about the nonprofit structure."

And the second -- you wouldn't know this from looking at it -- but this is not an e-mail that Mr. Altman sent or

received.  It was an e-mail sent by Ms. Zilis to Mr. Musk purporting to recite something that Mr. Altman purportedly said to her.  Structure great with keeping nonprofit and continuing to support.

Now, you will see, Your Honor, the caption is about false promises.  To begin, we would submit that it is manifest just from the words on the page that there are no promises here.  Saying "I remain enthusiastic about the nonprofit structure" does not constitute a promise.  And having someone say that you said you were great with keeping nonprofit and continuing to support it does not constitute a promise either.

THE COURT:  I'm focusing on the second; that Zilis is going to testify as to the promise.  I mean, these -- PowerPoints are not evidence.  Am I wrong about the evidence?

MR. MOLO:  No, you are not wrong about the evidence, Your Honor.

THE COURT:  Okay.  So, let's focus on the evidence, not on just the PowerPoint.  I'm assuming Zilis is going to testify that Altman told her -- told him that.

MR. SAVITT:  Yes, Your Honor, I apologize.  I assume as well that Ms. Zilis will be testifying and we look forward to examining her.  I wasn't trying to make it evidentiary.  I apologize.  I was simply saying that these statements -- even accepting them and putting that matter to the side -- do not constitute promises.  No one is saying what they are going to

do.  No one is making a representation about what they are going to do in the future, and we think that these statements do not reassure Musk that OpenAI would remain a nonprofit and open source, which is the argument that he advances in his papers.

They are statements that express enthusiasm for the nonprofit structure in September 2017.  The evidence in the record -- and the Court has, of course, seen it -- is clear; that before this period, there have been weeks upon months of conversation as amongst the parties involved about whether the company should develop a for-profit arm.  Mr. Musk was heavily involved in those discussions.

This was at a point in those discussions where they had reached a head.  And Altman said, "I remain enthusiastic about the nonprofit structure" and is purported to have said "great with keeping the nonprofit, continuing to support it."

What Musk doesn't produce is a statement where anyone ever assures Mr. Musk that OpenAI will not have or ever have a nonprofit arm.  That statement was never made.  It couldn't have been made.  Musk was a part of the very discussions that anticipated such a nonprofit arm.

THE COURT:  Okay.  So, what evidence are you going to submit?  Give me your opening statement in a minute with respect to the evidence on this topic.

MR. MOLO:  Your Honor, in 2017 leading up to the

representations that are cited in the slide, Musk, on the one hand, Altman and Brockman, on the other hand, had been having these discussions about how to fund the charity.

And Altman and Brockman made false statements to Elon Musk to get him to continue funding the operation.

**THE COURT:**  What are the statements?

**MR. MOLO:**  The statements were -- well, leading up to the statements on the slide in Exhibit 41, which is not on a slide, was an e-mail from Mr. Mr. Musk where he says, "I have had it.  I'm not going to give you free capital, start-up capital and fund you myself."

And immediately following that, Altman sends an e-mail where he says, "I remain enthusiastic about the non-for-profit" and then he has the conversation or the e-mail to Zilis -- who is representing or working with Musk on this as an advisor to him -- and says what he says there; that it is great with keeping the non-for-profit status and continuing to support it.

And then Brockman -- shortly thereafter on September 22nd -- has a meeting with Zilis.  And in there he says that they would like to continue -- he and Sutskever -- another -- not a party to the case but another key player -- say they would like to continue with a non-for-profit structure.

Then a couple of months later Brockman directly e-mails Musk and says that we must try our best to remain a

non-for-profit.  Now, it turns out that those representations at the time they made were false.  Now, it's not common in a fraud case that you would have this kind of evidence; but we have extraordinary evidence of the falsity in the diary of Mr. Brockman, which is at slide 14, if we can bring that up.

While these statements were being made to Mr. Musk and while these assurances were given and while they continued to take his money, Brockman is writing to himself in his diary "what will take me to one billion?  It would be nice to make the billions.  We should just flip for profit."

**THE COURT:**  Okay.  I'm going to stop you.

**MR. MOLO:**  So, he is making these -- and at the same time --

**THE COURT:**  So, Mr. Molo, when I say I'm going to stop you, I am trying to be nice as opposed to --

**MR. MOLO:**  Take yes as an answer.

**THE COURT:**  Yeah.  I think there is plenty of evidence.  It is circumstantial but that's how these cases work.  As I look at it, I have a huge number of exhibits on this topic that outline the back-and-forth.  And certainly there's an argument to be made that in these conversations there were assurances made and promises made that this structure was going to be maintained especially Exhibit 40 which is directly responsive to Exhibit 41 where, you know -- Counsel just articulated what Musk said and Altman's

response -- and then you have got Exhibits 42, 46, 24, 43. You have many exhibits.

Now, a jury might find that that wasn't there, but that's not for me to decide. Given all of this evidence and especially what Brockman himself wrote, I'm not going to find as a matter of law that there aren't actionable misrepresentations. There is sufficient evidence there. So, that motion will be denied on that front.

Next, we issue -- we go to the issue of reliance and those -- the issues of reliance, you know, are typically jury issues. Again, this is all circumstantial.

The question is what does a jury believe in terms of whether or not it was appropriate to rely on the back-and-forth, and they get to decide those issues. I don't think that I can find as a matter of law that there was no appropriate reliance. But you can argue if you would like.

**MR. SAVITT:** Your Honor, I, of course, won't always agree with you but you are the Judge and I entirely respect your judgment. So, thank you for that.

In respect to the reliance issue, there is one subsidiary point that I wanted to bring to your attention in the thought that it might operate as a differentiating factor.

All of the alleged misrepresentations -- and I have heard your ruling on -- clear on that, Your Honor -- all of them occurred in September 2017 or later, all of them.

Mr. Musk stopped making his quarterly donations in May of 2017, months earlier. He made some rent payments thereafter; but the great, great bulk of what he contributed was before the claim -- the alleged misrepresentation.

THE COURT: Doesn't that go -- doesn't the issue of timing and the amount goes to the issue, either statute of limitations -- we haven't gotten there yet -- and damages. I understand that the bulk of what was paid, was paid quite a long time ago. But that goes to damages. That doesn't go to whether or not he can make the case.

MR. SAVITT: And I was asking the Court whether it might consider a partial summary judgment order in respect of damages or actions that preceded the --

THE COURT: You didn't bring one on damages.

MR. SAVITT: Yes, Your Honor, I'm suggesting something that's not -- it's not a damages point so much as it is that the claim cannot stand except in respect of donations that were made from the time of the alleged misstatement or thereafter to try to narrow some of the aspects of the case. Because, to state the obvious, he couldn't have given money in May based on a misrepresentation that happened six months later. And on that, I expect we can all find common ground.

THE COURT: Right. Well, but that's -- I will let you respond. It's -- it's certainly -- and I will say at this point when we are done here -- and we aren't going to spend

forever.  I do want to talk to trial counsel off the record in the jury room.  You get to bring one person with you so you can think about that -- because this case is going to trial.  And I'm thinking about the manner in which it needs to be tried or should be tried.

And there's something to what you are saying on this issue and I don't -- I'm not exactly sure how it is -- how it is going to end up but I have got some ideas.

That's not the motion you brought.  All right.  How is it that you can prove reliance given that all the payments were made prior to the alleged misrepresentation?

**MR. MOLO:**  Well, actually, Your Honor, the payments continue for three years.  It's ten-and-a-half --

**THE COURT:**  At a substantially reduced amount.

**MR. MOLO:**  Well, it is a lesser amount than had been paid before but it is ten-and-a-half million dollars.  It is more than a quarter of the amount of the total contributions.  So, my friend Mr. Savitt isn't quite correct when he says it is the great, great bulk.  In fact, it is around 75 -- it is actually less than 75 percent.

**THE COURT:**  Stop paying September of 2023?

**MR. MOLO:**  I'm sorry, yeah, they stopped in September of 2020.  There is nothing in the record that clearly states that.

**THE COURT:**  Do you not know the answer to that

question?  Was that not asked?

**MR. SAVITT:**  Yes, it was.  There's a lot in the record on that in fact.

**THE COURT:**  Why --

**MR. SAVITT:**  Mr. Musk claims that the reason is because finally at that point -- having been on notice of every single Microsoft deal for five years -- that's when he decided that he didn't want to contribute anymore, and it was earlier than 2023, Your Honor.  It was in 2020, I believe.

**MR. MOLO:**  2020, yes, September of 2020.

**MR. SAVITT:**  But that's what the record says on this, and there is a great deal of countervailing out of it.

**THE COURT:**  Well, let's move to statute of limitations.  The reason that I ask the question is clearly if the statute starts running no later than September of 2020, then --

(Pause in proceedings.)

**THE COURT:**  With respect to the statute of limitations, you make two arguments.  One, that it should have been done in 2017.  Two -- or it started to run in 2017 and the second as to 2019.  If it starts to run in 2020, when he stopped making payments, then your statute of limitations doesn't -- argument fails, right, or no?

**MR. SAVITT:**  Your Honor, was that a question directed to me?

**THE COURT:** It was.

**MR. SAVITT:** I'm sorry.  The statute of limitations is it's three years for fraud -- if we are still talking about fraud and I believe we are.  So, 2020 I think they would be out of luck with the limitations period in that case.

**THE COURT:** You didn't argue that.

**MR. SAVITT:** I think we did, Your Honor.

**THE COURT:** You argued 2017 and 2019.

**MR. SAVITT:** We argued that -- we argued that given Mr. Musk's acknowledgment, that he didn't believe anything that was being said in 2017, that created the suspicion necessary to start the clock for the statements made in 2017 citing the *Vera* case.  We believe there's a 2018 statement that Plaintiffs say was false --

**THE COURT:** The reason --

**MR. SAVITT:** I'm sorry?

**THE COURT:** The reason there is a dispute of fact is because he continues to make payments.

**MR. SAVITT:** Yes, Your Honor, but the question for the accrual of the fraud claim is not the making of the payments. It is when he was on notice the cause of action on the --

**THE COURT:** My point is that that's -- that is fundamentally a jury question; right?  If it was so clear or he should have known, you know, there are plenty of arguments that given everything that was said and done, he didn't, in fact,

know.  And much of what was done, was done in secret and not open and not advised to him.  And there was no way, in fact, for him to get the information in any event or at least that's the argument that can be made.

MR. SAVITT:  Respectfully, Your Honor, I think the evidentiary record is a little different on that point.

THE COURT:  Go ahead.

MR. SAVITT:  Very little was done in secret relative to Mr. Musk.  He was advised in advance of each deal that was done with Microsoft directly and through Ms. Zilis.

He was given full notice of the terms of the initial -- in Exhibit 63, Altman sent to Musk the term sheet saying "here is what we are going to do.  It is going to be a $10 billion plus raise."  It says exactly what OpenAI was going to do and then did.  This is long after Mr. Musk testified that he didn't want to be associated with Altman and Brockman; long after he said that he didn't trust them; long after he was on notice clear -- in our view consistent with the cases of inquiry notice, which is what sets the clock running.

He was also -- in Exhibit 64 in March of 2019 -- given a blog post that announced the intention to make -- fund raise of billions and billions of dollars.  Over and over again, Altman directly and through Zilis -- and the record is clear on this and I hope we have adduced it properly in the papers, Your Honor.

**THE COURT:** All right. Your response then, Mr. Molo.

**MR. MOLO:** Your Honor, it was done in secret and it was done deceptively. In August 2018, there's a draft term sheet sent for the for-profit raise. It says in it, "It would be wise to view any investment in OpenAI LP in the spirit of a donation."

Now, Musk -- Mr. Musk says he didn't even read it, but this is what we were doing. They were intentionally deceiving in writing language like that. In March of 2019 he sent a draft blog post for the non-for-profit raise; and in it Altman said, "We did this in a way where all investors are clear. They should never expect a profit."

In 2019 they don't disclose the target return that Microsoft was going to get. And in 2021, they don't even disclose the $2 billion investment. That's kept completely secret.

So, they went out of their way to not inform Mr. Musk of what was going on and, in fact, to mislead him as to what was going on. And as Mr. Musk testified, this is something that revealed itself in degrees; and it was when that $10 billion investment by Microsoft was made and was announced that he went and hired a lawyer who went and looked into this. And shortly thereafter, in 2024, they filed this -- what became this lawsuit.

**MR. SAVITT:** Your Honor, if I might, Exhibit 6 --

**MR. MOLO:**  May I, just one more thing?

**MR. SAVITT:**  Of course.

**MR. MOLO:**  Obviously this is a question of the Plaintiff's notice.  And the Ninth Circuit case law is quite clear on this -- the *SEC versus Seaboard* case at 677 F.2d 1301 -- talks about it being an extremely difficult burden to show that there is no issue of fact on notice, and case law says that summary judgment is appropriate only when it irrefutably -- is irrefutably demonstrated that the plaintiff had knowledge.  So, this is a classic jury question and one on which I feel confident we are going to prevail.

**THE COURT:**  So, on the statute of limitations, my view is that it is a jury question; that it is in dispute.  But I also think that there are strong arguments that the Defense has on the topic.  My view would be -- my current view -- is that I would bifurcate the case at trial, and we would decide statute of limitations first and/or liability before we ever get to damages -- and I have got reasons for that -- but I think the jury is going to get to decide.

You don't -- there's lots of information that was not shared that would have made it clear much earlier what the Defendants were doing that was -- at least according to Musk's view -- the antithesis of what he had given the Defendants that money to do.

So, anyway, I'm not convinced given the caveats of

Altman's language, et cetera -- like people should not expect a profit and then you see the caps and the level of the caps and how illusory the argument is that they are.  I won't say those numbers.  That specific number will be sealed.  I don't think there is an agreement, right, to have that number open?

MR. MOLO:  Which number?

THE COURT:  Come on forward.

MR. KRY:  Your Honor, actually the parties -- all parties have agreed that it is going to be made public.

MR. MOLO:  It is going to be.  I don't think you have entered the order yet.

THE COURT:  Okay, yeah, I wasn't focused on that.  I thought that that number was -- that that number was going to be sealed.  So, all of the caps, all the rights to redeem, all of those numbers are now open and public?  Yes?

MR. KRY:  They will be.

(Pause in proceedings.)

THE COURT:  I'm not saying anything until I know for certain.

MR. KRY:  So, Your Honor, as you may recall, you entered an order the other week that said that for documents where -- no, I'm sorry.  The caps are actually mentioned in the briefs.  Those were publicly filed yesterday, so that is already public, the multipliers for each of the TRAs, that's already in the public record.

**THE COURT:** Okay, great. So, in any event, the -- the argument that it was -- that the way they formulated this and the caps -- those caps were illusory and none of that was ever disclosed -- I think is all of the circumstantial evidence about whether or not it was secret or not secret as to when he should have been on notice as to the statute running, but you -- you know, this did happen a long time ago. And so, you do have good arguments, which is why my view is that, you know, the jury will be asked to decide the statute -- when the statute of limitations run. We will get an answer. And if the jury says he is too late and the whole thing is thrown out, then the rest of the trial doesn't happen.

So, let's move on to unjust enrichment. And here, the claim for unjust enrichment is alleged against both Microsoft and the OpenAI Defendants. So, Mr. Cohen, you can come to a microphone.

The reason that -- and I shouldn't have even called it a claim. I did that myself. It's not a standalone claim. It is a restitutionary remedy that -- I still think there's lots of confusion about this remedy, but it is quasi contract. And in terms of whether or not -- and there are a couple of elements -- whether or not there was unjust enrichment, the issue of unjustment or it being unjust is a reflection of whether there was some kind of mistake or coercion or duress or fraud but that goes to the element of unjustness.

The claim, nevertheless, is quasi contract.  And while I believe that that exists in terms of the OpenAI Defendants and the Plaintiffs, I don't think that there is any relationship with Microsoft.  I don't think that the Plaintiffs have any quasi contract relationship with Microsoft.  There is nothing there.  There is no evidence of a receipt of a benefit by Microsoft from Musk, which there needs to be.

So, I don't know -- and I want to start there -- how that claim can be sustained against Microsoft.  Plus, the evidence that the Plaintiff has adduced against Microsoft is all the same evidence for aiding and abetting and breach of fiduciary duty.  There is no difference and there is -- so, I don't understand how you can assert that claim against Microsoft.

**MR. MOLO:**  Well, it is a different claim.  The elements are different.  And if I may, Your Honor --

**THE COURT:**  It's not a standalone claim.

**MR. MOLO:**  I appreciate your view.

**THE COURT:**  It is not my view.  I'm quoting the Ninth Circuit.

**MR. MOLO:**  Well, there is California case law and California -- a Judicial Council of California Civil Jury Instruction, number 375, there is a note to that; and it has a specific instruction.  It is talking about for a, quote, claim for unjust enrichment.  This is California Council on -- Judicial Council of California Civil Jury Instructions that

said that.  And then on slide 20, if we can bring that up, there is --

THE COURT:  Do you agree that there is no quasi contract relationship with Microsoft?

MR. MOLO:  Well, I agree that Microsoft -- Microsoft received --

THE COURT:  That wasn't my question.

MR. MOLO:  -- money --

THE COURT:  Answer my question.

MR. MOLO:  The quasi contract claim is with OpenAI; correct.

THE COURT:  So, there is no quasi contract claim with Microsoft?

MR. MOLO:  But it received -- it meets the elements.  Correct, I agree.  It meets the elements.  I mean, I guess you could say there is somehow an implied contract to the extent they were working with OpenAI.

THE COURT:  There is no implied contract, and you have no claim for an implied contract because you dismissed that claim.

MR. MOLO:  Correct.

THE COURT:  Because there is none.

MR. MOLO:  But the elements for unjust enrichment, nonetheless, are met.  California law says that you have got to receive something unjustly.  We can put the --

**THE COURT:** But they didn't receive anything from Plaintiff.

**MR. MOLO:** They certainly -- they received the ill-gotten gains of the appreciation of OpenAI.

**THE COURT:** From OpenAI, not from Plaintiff.

**MR. MOLO:** No. But they received the appreciation of OpenAI and the ill-gotten gains that occurred as a result or from the benefit of Mr. Musk's contributions. And as a result of that, they are -- they are accountable. They should have never received -- they have a stake that's worth over a hundred billion dollars.

**THE COURT:** Stop.

**MR. MOLO:** I'm sorry.

**THE COURT:** How is your evidence on this claim any different from the evidence of aiding and abetting on breach of fiduciary duty?

**MR. MOLO:** It is the same. The aiding and abetting evidence proves that there was unjust enrichment, but the claims are distinct. There are different elements in the claims.

**THE COURT:** What is the remedy? How is the remedy different?

**MR. MOLO:** Well, the remedy will be the same. It will be disgorgement but -- can we put up the slide that shows the difference in the two claims as to Microsoft?

(Pause in proceedings.)

**MR. MOLO:**  This is -- I'm sorry.  It is the Microsoft one.

(Pause in proceedings.)

**MR. MOLO:**  So, the aiding and abetting claim really is a claim that sounds more in tort, and the unjust enrichment claim does sound more as a quasi contract claim.  I agree with what you are saying.  There is no direct contractual relationship with Microsoft in the sense that there would be with OpenAI in terms of a quasi contract, but they still benefit as a result of that; and all that needs to be shown is constructive knowledge of the ill-gotten gain and the retained benefit.

Whereas for the aiding and abetting, we have to show actual knowledge of the primary wrong and then substantial assistance.

So, the claims are different even though the evidence may be the same.  The evidence can support two different claims.

**THE COURT:**  Right, but you don't have a quasi contract restitutionary relationship with Microsoft.  Let me hear from Microsoft, Mr. Cohen.

**MR. COHEN:**  Thank you, Your Honor.  We agree.  We agree that there is no such claim against us.  And as Mr. Molo just described, the elements may be different but the gravamen is the same and the remedy they are seeking is the same.

We are in federal court.  Federal common law applies to this claim and under federal common law, they cannot bring an unjust enrichment claim unless they show they don't have an adequate remedy at law and they clearly do under their aiding and abetting claim.  We will talk, I'm sure, about why that claim should go away.  But under both *Sonner* and under the recent *Stapleton* case from Judge Breyer --

THE COURT:  Yeah, I actually don't think *Sonner* applies here but go ahead.

MR. COHEN:  Well, let me --

THE COURT:  I mean, something specifically about CRLA claims in California and all of the progeny of *Sonner* dealt with that.

MR. COHEN:  Well, there is a recent case, Your Honor, that we cited -- the *Potosi and HP* case.  That was a case that involved a fraud claim and an unjust enrichment claim.  And what was held was that because you could have sought that remedy for the fraud claim, your unjust enrichment claim cannot proceed in federal court.

But I would refer you to the *Stapleton* case, Judge Breyer's decision from late last year, where he looked at a situation where there was an aiding and abetting claim and an unjust enrichment claim.  And what he said was:  Courts will dismiss the claim for unjust enrichment so a plaintiff can pursue it as an equitable remedy rather than as a separate

cause of action.

And as Mr. Molo said, they are looking for restitution. Under the aiding and abetting claim, they can get restitution. They can seek the same relief. So, there is no basis to keep it alive as a separate independent claim.

**MR. MOLO:** We are not actually looking for restitution. We are looking for disgorgement of the ill-gotten gains, which is different from pure restitution. It is not non-restitutionary --

**THE COURT:** Right. You have already conceded that the remedy that you seek under both claims is identical.

**MR. MOLO:** The damages that we seek, yes.

**THE COURT:** Well, the damages.

**MR. MOLO:** The disgorgement, yes.

**THE COURT:** So, there is no difference there. It's not clear to me that *Sonner* applies but address *Sonner*.

**MR. MOLO:** I don't believe that *Sonner* does apply, Your Honor, because in *Sonner* the unjust enrichment claim was -- was equitable and our claim here really is legal in nature.

Unjust enrichment is a bit of an odd duck, I guess, in legal in that sometimes it is considered in the law and sometimes it is considered legal. Sometimes it is considered equitable in nature. But we are seeking money, not the return of a specific piece of property; and that makes the claim legal

in nature under the Restatement of restitution section 4 and also under the *Great Western Life* case decided by the Supreme Court.

**THE COURT:** Did you cite those in your brief?

**MR. MOLO:** They are.  And *Sonner* also doesn't apply because we don't really have an adequate --

**THE COURT:** Well, yes, you do.

**MR. MOLO:** -- remedy.

**THE COURT:** You can't say that.  You just conceded that the remedy was identical.

**MR. MOLO:** The remedy is identical.  The way we deal with those issues -- the damages maybe -- well, remedy -- the disgorgement -- the amounts being sought in disgorgement will be identical.  We can deal with that -- California is pretty clear on that -- through jury instructions.  The jury can be instructed.  But the Court can't allow duplicative remedies, but certainly that's something we deal with, with the jury instructions or with post-judgment briefing; but we are entitled -- if we put the evidence in that supports our claim, we are entitled to let the jury decide that claim.

**THE COURT:** I don't understand how you can say in the same sentence you do not have an adequate remedy, and then you say that the remedy is identical for both causes of action.

**MR. MOLO:** Well, I mean --

**THE COURT:** I assuming -- well, for both unjust

enrichment and aiding and abetting.  I don't see how you can make that argument.  It is not nonsensical to me.

**MR. MOLO:**  Well, Your Honor, California law says that it's a standalone claim.

**THE COURT:**  What does it mean to have an adequate remedy at law?

**MR. MOLO:**  To have an adequate remedy at law means that you can be adequately compensated generally through money damages although there may be ongoing activity, ongoing conduct, that requires injunctive relief.

**THE COURT:**  And you can obtain that through the aiding and abetting claim; right?

**MR. MOLO:**  We can obtain disgorgement through the aiding and abetting claim -- disgorgement of money, yes.

**THE COURT:**  Okay.  So, you don't need this claim to do that.  You don't need unjust enrichment to obtain that remedy.

**MR. MOLO:**  I believe, Your Honor, the issue is not whether we need.  It is whether the law says we are entitled to at least present the evidence to a jury and ask them to conclude on that because for our purposes, very clearly, it is an easier claim to prove than the aiding and abetting claim. We believe the knowledge and the substantial assistance of the evidence is overwhelming; but, nonetheless, the elements are less exacting on Plaintiff.

**THE COURT:**  Yeah, but I don't think the reasoning of

*Sonner* cares about that. *Sonner* goes back and talks about federal common law and whether or not there are adequate remedies and says -- and the reason in *Sonner* that the plaintiffs could not pursue the UCL was because -- or they couldn't pursue the UCL is because they had an adequate remedy under the CRLA, and they chose to dismiss it.

So, we weren't talking about elements. We weren't talking about whether it was easier. The question was: Did you have an adequate remedy or an adequate cause of action to obtain your remedy? And if you did, you weren't entitled under federal common law to pursue something else unless I'm misremembering. Am I or --

**MR. COHEN:** I don't believe so, Your Honor.

**THE COURT:** So, you have an adequate remedy. You have conceded because you can get what you need under aiding and abetting.

**MR. MOLO:** Correct. But the elements are different. And, as I say, even the Council on Judicial Instructions sets up a separate instruction --

**THE COURT:** But that's not the point. The elements are different between a UCL and a CLRA too. So what? That's not the point.

**MR. MOLO:** There is a separate claim -- and we are in disagreement on this. You obviously --

**THE COURT:** Okay.

**MR. MOLO:**  -- have concluded that there is no separate claim, and we cite the case law that says there is.

**THE COURT:**  Even if there was -- and I'm looking at 375 CACI -- even if there was -- and I will go back and look at *Sonner*.  Even if there was, it doesn't matter.  In *Sonner* there were clearly two different claims, the UCL and the CLRA.

**MR. MOLO:**  Right.

**THE COURT:**  And the court found emphatically that they could not pursue the UCL because the CLRA was an adequate remedy at law; right?

**MR. COHEN:**  That's right.

**THE COURT:**  That was the rule.  It's not about elements.  It's not about is it easier.  The rule is that's the rule.  Now, because this doesn't map identical, I will go back and I will look; but there are cases out there that also say -- and you didn't cite them -- but there are cases out there where district judges are saying, Look, if you don't have a quasi contract against the defendant, you can't pursue this claim. And that makes sense to me because it is a restitutionary based claim.

 You didn't cite those cases, but they are out there as well.  So, I think there are numerous grounds upon which it is not clear to me you can pursue this claim against Microsoft.

**MR. MOLO:**  Well, again, Your Honor, we focus on the fact that the gravamen of the claim is the receipt of the

benefit and that it's being unjustly retained.

THE COURT:  Right --

MR. MOLO:  That's the gravamen of the claim.

THE COURT:  From someone else, not from the Plaintiff.

MR. MOLO:  But they are doing it as a result -- there's something --

THE COURT:  It is not that I don't understand.

MR. MOLO:  Okay.

THE COURT:  I understand.

MR. MOLO:  All right.

THE COURT:  They are -- your claim is that Microsoft is unjustly enriched because they are getting a benefit from OpenAI which your client funded.

MR. MOLO:  Correct.

THE COURT:  I understand that.

MR. MOLO:  All right.

THE COURT:  I just don't agree that --

MR. MOLO:  We are not in agreement.  We are in understanding but not in agreement.

THE COURT:  I think it fits within the context of unjust enrichment, and there is no harm because you have an adequate remedy.

MR. MOLO:  Well, it is a remedy that requires additional elements and --

THE COURT:  I understand.

**MR. MOLO:** It's is a -- as I say, the evidence is there but it is more difficult to prove.

**THE COURT:** You are going to have to -- if you are going try to case here, you are really going to have to stop talking when I start.

**MR. MOLO:** Sorry.

**THE COURT:** I understand that the unjust enrichment is easier but that's not the point from a matter of law, I don't think. Okay.

Moving to the unjust enrichment claim against OpenAI, totally different unless there is something else you want to say. I'm sorry, Mr. Cohen.

**MR. COHEN:** Nothing else, Your Honor.

(Pause in proceedings.)

**THE COURT:** So, here, I think that they do have enough to pursue the unjust enrichment claim against OpenAI by contrast to Microsoft. Again, it looks like we will go back. There is a statute of limitations argument that you are making. Now, I guess the question is whether the *Sonner* arguments apply here too. Let's hear from you on that.

**MR. SAVITT:** Thank you, Your Honor. We had three arguments respecting unjust enrichment. One of them clearly falls away by virtue of what Your Honor said about the fraud claim because of the question of the actionable wrong rises or falls with it.

We do think that the unjust enrichment, as you have been just discussing your colloquy with my colleagues, is it's a claim for restitution on a quasi contract theory; and there is ample law that says a plaintiff may sue in tort or choose to seek restitution in quasi contract but you can't do both.  You can't do both.

And some of the reasoning is similar to the issues you were discussing with Mr. Cohen and Mr. Molo, and it appears that the unjust enrichment claim -- as it is now being advanced -- is not tethered to an allegation of any kind of contractual breach or a request theory or a quantum meruit theory.  That appears to have fallen away.  It is based on fraud.

So, the actionable wrong is fraud and there was unjust enrichment in connection with that.  The question is:  Why do you need an unjust enrichment theory when you have a fraud theory against the backdrop of a considerable basis in the case law in the modern setting starting with the *McBride* case in 2004 that says, as I say, you can choose but you can't do both.  And we think you can choose but you can't do both.

And having advanced the fraud claim and pursuing it to trial -- the unjust enrichment claim ought to fall away -- there is here, as there is in another context, an entirely adequate remedy available, and there is a good and sound basis in both modern and ancient precedent for not permitting the

unjust enrichment theory.  It is not a claim as Your Honor points out.

THE COURT:  So, here I disagree with you.  I think they have a fraud claim, which we have discussed, but they asserted an implied contract.  I told them that you could either have the implied contract -- and there is case law to this effect.  You either have the implied contract or the unjust enrichment.  They elected the unjust enrichment, which is quasi contract and not fraud based.  That is, you could have fraud -- and I started this -- that's where I started, which is the issue of unjustness could be lots of things.  It could be duress.  It could be coercion.  It could be mistake or it could be fraud, but that's an issue of what the issue of unjust means.

The relationship between OpenAI and the Plaintiffs -- while it doesn't fit within the confines of a contract -- one might argue -- and I think they are entitled to argue -- that there was this quasi contract relationship there and because of that they should be able to pursue both avenues against OpenAI.

MR. SAVITT:  If I may, Your Honor.

THE COURT:  You may.

MR. SAVITT:  A couple of things.  One is having a look at -- without alleging in the complaint -- there are only two theories of unjustness that appear in the Plaintiff's complaint.  One of them is request and one of them is fraud.

That's it.

Request is essentially a circumstance where the Plaintiff was asked to do something and did it.  It's a theory in quantum meruit.  The law is rock solid on that.  A request theory is a quantum meruit theory.  Quantum meruit requires evidence that there was an expectation that the Plaintiff would receive compensation for his or her services.

The evidentiary record in this case, as we speak this afternoon, is 100 percent certain that there was no such expectation.  It was conceded at Mr. Musk's deposition.  There was no conceivable way that Plaintiffs can meet a burden of persuasion on this point.  That has to fall away for that reason, we submit, Your Honor.

That leaves fraud.  And as to fraud, the considerations that you have been discussing with my colleagues at the bar obtains, it is an entirely duplicative remedy.  It falls within the *McBride* rule.  There is no reason to have it because in respect of it, a remedy at law is available.  And, therefore, a restitutionary remedy is not only unnecessary but not proper, which at bottom is the reasoning of *McBride* and many of the indications following it.

**THE COURT:**  Okay.  Response.

**MR. MOLO:**  Well, first of all, there is no quantum meruit requirement because Your Honor pointed out, there is a whole variety of bases for the --

**THE COURT:** Well, let me get some clarification because I have been making an assumption. And that is, my assumption has been that you are proceeding on this restitutionary based claim on a restitutionary basis; that is, a quasi contract basis. Are you doing that or not?

**MR. MOLO:** No. We are seeking non-restitutionary disgorgement of their ill-gotten gains.

**THE COURT:** I'm talking about your theory.

**MR. MOLO:** It is --

**THE COURT:** Is your theory a quasi contract or not?

**MR. MOLO:** So, the theory would be quasi contract, correct, for purposes of the unjust enrichment, yes.

**THE COURT:** So, you proceed then on a fraud theory; that is, you already have -- I have been assuming that this isn't duplicative because you are proceeding on quasi contract.

**MR. MOLO:** Correct.

**THE COURT:** So, a fraud theory would, in fact, be duplicative. Agreed?

**MR. MOLO:** I suppose it could be if the elements are different. Again, I would argue that you are entitled to go to the jury on both; but here we are proceeding on a quasi contract claim and --

**THE COURT:** So, at least for purposes of narrowing, then they can't proceed on a fraud theory as a matter of law. I can issue that in the order and we won't have any

instructions on that because I will hold that you can't do that.  You are proceeding on quasi contract.

**MR. MOLO:**  Correct.

**THE COURT:**  Okay.  So, now the argument is:  If you are proceeding on quasi contract, can you get something other than quantum meruit?  The argument -- his argument is there was no expectation -- no evidence of an expectation to recover anything.

**MR. MOLO:**  That there be no expectation of -- I'm sorry?

**THE COURT:**  I thought I heard the argument was that there is no evidence that Musk ever expected to receive anything, so there is nothing to recover.

**MR. MOLO:**  It is not a question of whether he expected to receive something.  It is a question of whether the Defendants received a benefit and unjustly retained that at the expense of Musk.

The unjust element of this arises because he gave the money believing it was going to be put to a charitable purpose. And, in fact, they used the money to turn it into an incredibly, incredibly wealthy and valuable for-profit enterprise.

And so, in light of that -- in light of the fact that it was not used for that charitable purpose, we are entitled to the ill-gotten gains, which is the difference between -- I

mean, you know, we define that.  And that's what California law says that we can get.  It says that wrongful gains -- disgorgement of wrongful gains is appropriate for recovery for unjust enrichment, and that's what we are asking for.

THE COURT:  Okay.  Any response on that?

MR. SAVITT:  Yes, Your Honor, thank you.  I think what Mr. Molo has described in more florid language is a fraud claim.  Unjust enrichment is not some free-floating cause of action, as the Court observed.  It has to be tied to an actionable wrong.  Two actionable wrongs are pleaded.

One is request.  Request is quantum meruit.  And to make out that claim, there needs to be evidence -- got to have it -- that Mr. Musk expected to be compensated.  We asked him in his deposition.  He said "I didn't."

THE COURT:  What is your best case on that?  On that -- and I would say on that articulation?  And I say it that way because cases are all over the board on unjust enrichment.

MR. SAVITT:  Yes, Your Honor.

THE COURT:  It is almost like patent law.  I can find any case for any position in patent law.  Unjust enrichment is almost the same.

MR. SAVITT:  The -- for the proposition that -- there are a couple of propositions I was talking about, Your Honor.  I want to get you the right one.  For the idea that you need

the expectation of compensation?

THE COURT:  Yes.

MR. SAVITT:  Okay.

(Pause in proceedings.)

MR. SAVITT:  I think we think the best case is the *Taylor* case cited at page 22 of our moving brief, Ninth Circuit decision, 2024 Westlaw 837044.  There are a couple of other cases with the same effect.  And the idea -- I mean, it sort of stands to reason because quantum meruit, as I know the Court knows, is a theory that says you did something and you should have gotten paid for it.  So, you had to have had that expectation.  That can't be this case.  So, that means request falls away.

And the only thing that's left is fraud.  And what Mr. Molo was describing was Mr. Musk heard they were going to do this and he gave them money and it turned out to be something else.  That's his fraud claim.  They are the same claim.  There is nothing left to the unjust enrichment claim but fraud and they are duplicative.  And under all the authorities we have been talking about, it should fall away.

THE COURT:  All right.

MR. MOLO:  Your Honor, may I just direct you to one point in our brief?

THE COURT:  Sure.

MR. MOLO:  Because the Restatement takes a very

different position than from what was articulated by my friend, Mr. Savitt. If you look at the bottom of page 20 and the top of 21, we cite to the Restatement and cite case law where it is quite clear that the emphasis is on the receipt of the benefit and then the unjust retention at the expense of another.

And they give an example. For example, they give an example where there was a property conveyance; and it was conveyed with the belief it was for one purpose. It turns out to be a more limited purpose, and the party was unjustly enriched by having property that -- at a much broader use than what was intended.

**THE COURT:** You want to respond on the Restatement?

**MR. SAVITT:** Very briefly. I think the authorities that Mr. Molo is citing are not authorities that are tied to the issue that we are talking about, which is the one of unjust enrichment claim based on request and, therefore, quantum meruit. So, it's -- in that context, we think the law is real clear for the reasons I just said, Your Honor. It makes sense out of the quantum meruit doctrine.

**THE COURT:** All right. Then the only thing that's left -- as I indicated, I'm granting summary judgment on tortious interference with contract.

On the aiding and abetting claim, Microsoft argues that they had no actual knowledge. But my view is under California law, defendants can prove actual knowledge through inference

and circumstantial evidence, and that circumstantial evidence includes this notion that they must have known.

So, the notion or the argument that there's no specific -- there is no smoking gun is not dispositive.  There may not be a smoking gun, but it doesn't matter because under California law, you can prove it circumstantially.

And based upon what the evidence have adduced including the CTO's e-mails, their notes from 2020 meeting regarding what Nadella thought, their evidence of the knowledge of the mission of Musk, of the commercial restructuring, et cetera, all of which are material facts that creates a dispute.  Go ahead.

MR. COHEN:  Your Honor, I think we are in agreement on California law.  They can prove actual knowledge with either direct evidence or circumstantial evidence.  They cannot prove it with constructive knowledge.  Constructive knowledge is not enough.  Constructive knowledge, you should have known, is not enough.

You must have known is circumstantial evidence where you can draw appropriate inferences from it, but what is it that you have to have actual knowledge of?  So, the *Casey* case says you have to have actual knowledge of the specific wrongful act that constituted the breach of fiduciary duty it purportedly aided and abetted.  It's 127 Cal.App.4th at 1147.  It says, suspicion and surmise do not constitute actual knowledge.

And as this Court said in the *NG Score* case, actual

knowledge of the specific primary wrong is not demonstrated by a vague suspicion of wrongdoing or a hunch that something fishy was going on.

And in our brief we also cite very clear Delaware authority, the *Columbia Pipeline* case and the *MindBody* case, where they talk about actual knowledge being among the hardest things to prove. And there is a good reason for that, Your Honor, because the nature of this claim is trying to hold a third party responsible for the actions of another.

And if that party did not know, then there is no basis to hold them liable. And I understand if there is evidence in the record from which you find disputed facts, you don't grant summary judgment; but I would urge the Court to look at the evidence that they have put forward. It is scattershot. It is not even breadcrumbs, Your Honor. I mean, we have a CTO --

**THE COURT:** You should also know that hyperbole doesn't work well with me.

**MR. COHEN:** I appreciate that, Your Honor. But I do want to talk about the CTO's e-mail because what he says in March of 2018 is he says: I wonder -- I wonder what those donors would think? And so, he didn't know. He doesn't have actual knowledge. It is not circumstantial evidence of actual knowledge. In fact, it is circumstantial evidence of the opposite. If he knew, he wouldn't say "I wonder what they think." He would say, "I know Mr. Musk, blah, blah, blah."

And it doesn't even mention Mr. Musk.  So, that's point one.

THE COURT:  Response -- response on the facts.

MR. MOLO:  The evidence is really overwhelming.  It breaks down into three categories.  First, are the statements by and to the Microsoft people.  Second, are the very deals that Microsoft did with OpenAI.  And, third, are concealment. I can -- if it is helpful, Your Honor, I can show you these on these slides if that's all right.

THE COURT:  Just don't read them to me.

MR. MOLO:  Sorry.  It would be slide 23 -- starting with slide 23, please.  So, in 2015 when OpenAI is announced, Nadella circulates an OpenAI blog post to some important people at Microsoft naming Musk and stating its mission.

In 2016 when OpenAI approached Microsoft about doing business, Microsoft -- there is a Microsoft deck -- an internal Microsoft document -- that calls OpenAI a non-for-profit with a mission to benefit humanity unconstrained by a need to generate financial return.

Musk in 2017 comes to Nadella and asks for a donation of compute -- computing power so OpenAI can compete in a contest to prove its technical capability competing against other AI companies.

In 2018 when Microsoft is considering its initial investment, a Microsoft director Reid Hoffman, who is also an investor in OpenAI, has what the Microsoft e-mails describes as

a, quote, non-trivial note comparing session with Microsoft before Microsoft makes its investment decision.

In 2019, Microsoft does extraordinary diligence -- due diligence -- and there is all kinds of deposition testimony we cite to as well as documents -- talking about the diligence that was done.  And then --

**THE COURT:**  So, you don't need to go any further. What's your second point?

**MR. COHEN:**  My second point, Your Honor, is you have to look at Microsoft's knowledge not at a single point in time. I mean, there is no question that Microsoft understood that OpenAI was formed as a not-for-profit; that Mr. Musk was one of the original founders.  There is no question about that.

But what the cases require is that Microsoft understood, had actual knowledge of the fact that engaging in that transaction in 2019 and beyond would amount to a breach of fiduciary duty; and in none of the things that Mr. Molo just put up on the screen suggests an agreement with Mr. Musk or commitments to Mr. Musk, the terms of those commitments or that anything would amount to a breach.

Now, let's look at what happened after that point in time. After Mr. Scott's e-mail wondering in March of 2018, he has a subsequent conversation with Mr. Altman -- that's Plaintiff's Exhibit 20 -- and Mr. Altman explains to Mr. Scott:  Here are the facts.  The board has created a for-profit entity.  It is

to take investment.  We need to raise more funds, as you know, to get the compute and the capital that we need to proceed.

And then the discussions with Microsoft start.  As Mr. Nadella testified, "I needed to know there was a structure that we could invest in before we moved forward."

And so, Microsoft's knowledge was the board created the for-profit.  There were discussions regarding how Microsoft could collaborate and invest, and then there were agreements.  And those agreements were authorized by the OpenAI board, and they contained representations and warranties from OpenAI to Microsoft.

THE COURT:  You haven't sued them, though, have you?

MR. COHEN:  We have not sued them.

THE COURT:  And do you have any agreements regarding indemnity?

MR. COHEN:  Not that I'm aware of, Your Honor.  The point being, Your Honor, that Microsoft proceeded with knowledge that the OpenAI board was acting consistent with its own authority to create the for-profit.

THE COURT:  Didn't the board fire Altman for failing to be forthright allegedly and not maintaining the nonprofit vision and didn't Microsoft get quite involved in those discussions and how would they have not known what the board -- the early board was doing given what they did?

MR. COHEN:  Well, to be clear, Your Honor, those board

members who fired Mr. Altman were the very same board members who approved the Microsoft agreement because they viewed it as consistent with the mission.  So, those are the same board members.

THE COURT:  Okay.

MR. COHEN:  And Microsoft's involvement, as the record is clear, was simply to help stabilize OpenAI, which was an important partner; but there is nothing even in those efforts to engage with OpenAI at the time of Mr. Altman's firing that suggest that Microsoft had knowledge of commitments made to Mr. Musk and that those were being breached.  There is nothing to suggest that.  There is no evidence and --

THE COURT:  Well, perhaps then I will do a directed verdict when I hear and -- you know, part of this too is whether or not a jury believes the people on the stand and whether their claims are credible, and there have been plenty of people who have testified in court who are not credible.

MR. COHEN:  I appreciate, Your Honor, but here on summary judgment, we brought a no evidence motion.  The burden is on the Plaintiff to come forward with evidence.

THE COURT:  I understand that.  There is a significant amount of evidence that the Plaintiffs have provided to me to suggest the contrary.  And all inferences, inferences -- not facts but all inferences --

MR. COHEN:  Your Honor --

**THE COURT:** -- go to the Plaintiff.

**MR. COHEN:** Sorry. I don't mean to interrupt. I would just urge the Court to take a look at the cases in which the Court has denied summary judgment. So the *Simi* case, which is cited in our papers --

**THE COURT:** Denied or granted?

**MR. COHEN:** Denied. I mean, that was a case in which there were hundreds of examples of checks being written by a business to Neiman Marcus and Mercedes Benz --

**THE COURT:** Was summary judgment reversed?

**MR. COHEN:** It was not reversed. I'm flagging a case in which the circumstantial evidence rose to the level where the Court said: We won't grant summary judgment because there are disputed issues. There are cases in which the Court has granted summary judgment --

**THE COURT:** Mr. Cohen --

**MR. COHEN:** -- the *Chance Trading* [sic] case.

**THE COURT:** -- when federal judges deny summary judgment, they say "denied" because they try the case. Just because there is one case out there that lists all of the evidence and then they happen to deny it does not mean that that's a reflection of how summary judgments get denied.

In fact, we tend -- the order that I will probably issue here is probably twice the length of any order I would typically do in a denial case. We don't like to have the facts

out there in our orders because we try the case.

**MR. COHEN:**  If I'm not being clear, Your Honor, it's on me.  What I'm trying to communicate to the Court is that where courts find circumstantial evidence creates triable issues of fact, there are many red flags.  Where courts grant summary judgment, it is because even -- even if there was some speculation or surmise, it is not enough because in this context --

**THE COURT:**  I have to tell you, there is plenty in here that concerns me; and that's why my inclination is to deny it.  There's plenty that concerns me, but I will go back and look.

**MR. COHEN:**  I appreciate that, Your Honor.

**THE COURT:**  Okay.  That's all I have in terms of a necessity for argument on these motions.  At this point I will take it under submission.  You will receive a written order.  The Court will go into recess.  As I mentioned, I do want to talk to the trial lawyers plus one.  We will not be going back on the record.  We are adjourned.  Okay.  Thank you.

**MR. KRY:**  Thank you.

**MR. SAVITT:**  Thank you, Your Honor.

**MR. COHEN:**  Thank you, Your Honor.

**THE CLERK:**  Court is adjourned.

(Proceedings adjourned at 2:00 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   January 8, 2026

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter