# EXHIBIT 12

# PUBLIC REDACTED VERSION

Elon Musk v.                          FINAL                      September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
-----------------------------------------
ELON MUSK, et al.,
     Plaintiffs,
v.
SAMUEL ALTMAN, et al.,
     Defendants.

Case No. 4:24-cv-04722-YGR
-----------------------------------------

VIDEO DEPOSITION OF
Elon Musk
September 26, 2025
San Francisco, California
LEAD: William Savitt, Esquire
FIRM: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING - 1-800-825-3341

Page 2

APPEARANCES:

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
   STEVEN F. MOLO, ESQ.
   smolo@mololamken.com
   ROBERT K. KRY, ESQ.
   rkry@mololamken.com
   WALTER HAWES, ESQ.
   whawes@mololamken.com
   JENNIFER SCHUBERT, ESQ.
   jschubert@mololamken.com
   SARA TOFIGHBAKHSH, ESQ. (Via Zoom)
   stofighbakhsh@mololamken.com
   ALEXANDRA EYNON, ESQ. (Via Zoom)
   aeynon@mololamken.com
     MOLOLAMKEN LLP
     600 New Hampshire Avenue, NW, Suite 660
     Washington, D.C. 20037
     202.556.2011

Page 3

APPEARANCES (Cont'd):

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
   MARC TOBEROFF, ESQ.
   mtoberoff@toberoffandassociates.com
   JAYMIE PARKKINEN, ESQ.
   jparkkinen@toberoffandassociates.com
   TOBEROFF & ASSOCIATES PC
   23823 Malibu Road, Suite 50-36
   Malibu, California 90265
   310.246.3333

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:
   WILLIAM FRENTZEN, ESQ.
   wfrentzen@mofo.com
     MORRISON & FOERSTER LLP
     425 Market Street
     San Francisco, California 94105
     415.268.6413

Page 4

APPEARANCES (Cont'd):

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:

   WILLIAM S. SAVITT, ESQ.
   wdsavitt@wlrk.com
   NATHANIEL D. CULLERTON, ESQ.
   ndcullerton@wlrk.com
   IOANNIS DRIVAS, ESQ.
   iddrives@wlrk.com
   SARAH EDDY, ESQ.
   skeddy@wlrk.com
   BRADLEY R. WILSON, ESQ.  (Via Zoom)
   brwilson@wlrk.com
     WACHTELL, LIPTON, ROSEN & KATZ
     51 West 52nd Street
     New York, New York 10019
     212.403.1329

Elon Musk v.                         FINAL                      September 26, 2025
Samuel Altman                   [CONFIDENTIAL]                       Elon Musk

---

Page 5

APPEARANCES (Cont'd):
ATTORNEY(S) FOR DEFENDANT MICROSOFT:
  RUSSELL P. COHEN, ESQ.
  russ.cohen@dechert.com
  HOWARD ULLMAN, ESQ.  (Via Zoom)
  howard.ullman@dechert.com
    DECHERT LP
    45 Fremont Street, 26th Floor
    San Francisco, California 94105
    415.262.4506

  NISHA PATEL GUPTA, ESQ. (Via Zoom)
  nisha.patelgupta@dechert.com
    DECHERT LLP
    US Bank Tower
    633 West 5th Street, Suite 4900
    Los Angeles, California 90071-2032
    213.808.5735

  JOHN A. JURATA, JR., ESQ.
  jay.jurata@dechert.com
    DECHERT
    1775 Eye Street, Northwest
    Washington, D.C.  20006
    202.261.3326

---

Page 7

TABLE OF CONTENTS

EXAMINATION OF:                          PAGE
ELON MUSK
        By Attorney Savitt ..............10
        By Attorney Cohen ..............343
        By Attorney Molo ..............359




Reporter Certificate ................. Page 364
Notice to Read and Sign ............. Page 366
Index of Exhibits ................... Page 368

---

Page 6

APPEARANCES (Cont'd):

  YOSEF WEITZMAN, ESQ. (Via Zoom)
  yosi.weitzman@dechert.com
    DECHERT
    CIRA Center 2929 Arch Street
    Philadelphia, Pennsylvania 19104
    215.994.4000




JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    GAIL L. INGHRAM, Court Reporter
    BA, CRR, CLR, RDR, CSR-CA (No. 8635)
    JASON BUTKO, Videographer

---

Page 8

```
 1              Friday, September 26, 2025
 2              San Francisco, California
 3                    -  -  -
 4         THE VIDEOGRAPHER:  This is the start of
 5  Media Number 1 in the deposition of Elon Musk in
 6  the matter of Elon Musk v. Samuel Altman in the
 7  court of the United States District Court for the
 8  Northern District of California; Case Number
 9  4:24-cv-04722-YGR.
10         This deposition is being taken at 755
11  Sansome Street in San Francisco, California, on
12  September 26th, 2025, at approximately 9:53 a.m.
13         My name is Jason Butko with Jane Rose
14  Reporting, here with our court reporter,
15  Gail Inghram, with Jane Rose Reporting.
16         Counsel can you please identify yourself
17  and who you represent, starting with the
18  questioning attorney.
19         ATTORNEY SAVITT:  William Savitt,
20  Wachtell Lipton Rosen & Katz, for the OpenAI
21  defendants.  With me are my colleagues Sarah Eddy,
22  Ionnis Drivas, and Nate Cullerton.
23         ATTORNEY COHEN:  Good morning.  Russell
24  Cohen for Microsoft.  With me is Jay Jurata from
25  the Dechert LLP firm.
```

---

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 9

1    ATTORNEY FRENTZEN:  Morning.  William
2 Frentzen here for the OpenAI defendants.
3    ATTORNEY MOLO:  Steven Molo from
4 MoloLamken on behalf of Mr. Musk and the
5 plaintiffs.
6    ATTORNEY TOBEROFF:  Marc Toberoff,
7 Toberoff & Associates, on behalf of Mr. Musk, the
8 plaintiff.
9    ATTORNEY KRY:  Robert Kry from
10 MoloLamken on behalf of Mr. Musk.
11    ATTORNEY HAWES:  Walter Hawes from
12 MoloLamken on behalf of Mr. Musk.
13    ATTORNEY PARKKINEN:  Jaymie Parkkinen,
14 Toberoff & Associates, on behalf of Mr. Musk.
15    THE VIDEOGRAPHER:  Will the court
16 reporter please swear in the witness.
17
18 WHEREUPON,
19    ELON MUSK,
20 being first duly sworn or affirmed to testify to the
21 truth, the whole truth, and nothing but the truth,
22 was examined and testified as follows:
23 ///
24 ///
25 ///

Page 10

1    EXAMINATION
2 BY ATTORNEY SAVITT:
3    Q.  Good morning, Mr. Musk.
4    A.  Good morning.
5    Q.  Thank you for being here.
6    You're the CEO of xAI?
7    A.  Yes.
8    Q.  xAI was once incorporated as a public
9 benefit corporation; is that right?
10    A.  I think so.
11    Q.  In November 2024, you filed an amended
12 complaint in this case.
13    Do you know that?
14    A.  I don't recall exactly.
15    Q.  Do you recall that you filed an amended
16 complaint in this case?
17    A.  I don't recall.
18    Q.  One way or another?
19    A.  I don't recall.
20    Q.  Do you recall swearing the truth of the
21 complaint under penalty of perjury?
22    A.  I don't recall the specifics of this
23 complaint.
24    Q.  And you don't recall signing complaints
25 in this action under penalty of perjury?

Page 11

1    A.  I'm sure I signed a complaint, but if
2 you're asking me to recall specific details, I
3 don't recall.
4    Q.  So you don't recall either that you a
5 affirmed in the complaint that you swore under
6 penalty of perjury that xAI was a public
7 benefit corporation.
8    Do I have that right?
9    A.  I don't recall.
10    Q.  You don't know.
11    And you don't know -- or do you recall
12 that you said that xAI was organized as a public
13 benefit corporation because AGI is an existential
14 threat?
15    A.  I don't recall.
16    Q.  Do you think AGI is an existential
17 threat?
18    A.  It has a risk.
19    Q.  Do you know whether xAI was registered
20 as a PBC in November 2024?
21    A.  I don't recall.
22    Q.  Do you know whether xAI is still a PBC?
23    A.  I believe it is not currently.
24    Q.  Yeah, it is not currently.
25    A.  Yeah.

Page 12

1    Q.  So you don't know whether you
2 truthfully told the Court that xAI was a public
3 benefit corporation?
4    ATTORNEY MOLO:  Objection; form of the
5 question.
6    You can go ahead and answer.
7    A.  I don't recall.
8 BY QUESTIONER:
9    Q.  You don't know one way or the other
10 whether you told the truth in that pleading?
11    ATTORNEY MOLO:  Object to the form of
12 the question.
13    A.  I don't recall.
14 BY QUESTIONER:
15    Q.  Now, in the past, you've told -- in the
16 past, you've tweeted on X, and previously what
17 was called Twitter, that you donated $100 million
18 to OpenAI.
19    Do you remember that?
20    A.  Yes.  I guess my estimates were higher
21 than I thought.
22    Q.  It wasn't true that you had donated
23 $100 million to OpenAI, was it?
24    A.  I was mistaken.
25    Q.  You were mistaken.

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman                [CONFIDENTIAL]                        Elon Musk

Page 13

1        And the most you even claimed you have
2 donated to OpenAI in this lawsuit is less than
3 $40 million; isn't that right?
4        A.  I'm told it's roughly $40 million, yeah.
5        Q.  Did you just forget how much money you
6 had given to open OpenAI?
7        A.  Yes.
8        Q.  So your recollection about your
9 donations was mistaken?
10        A.  Correct, yes.
11        Q.  Two days ago, Mr. Musk, you tweeted on
12 X that you never said that the probability of
13 OpenAI beating Google was zero.
14        Do you recall that tweet?
15        A.  Yes.
16        Q.  Was that true?
17        A.  Yes.
18        Q.  So do you recall, in 2018, emailing
19 Sam Altman that your probability assessment of
20 OpenAI being relevant to DeepMind Google without
21 a dramatic change in execution resource is
22 zero percent, not 1 percent?
23        A.  Yes, that's why I said that there's a
24 conditional that needs to be -- the company needs
25 to execute better.

Page 14

1        Q.  Do you believe that after you left
2 OpenAI there was a dramatic change in execution
3 resources?
4        A.  The company has executed well.
5        Q.  It's executed well since you left;
6 right?
7        A.  Well, without me, it wouldn't exist, I
8 think.
9        Q.  That wasn't my question.  My question
10 was whether, since you left, has the company
11 executed well.
12        A.  It was executing well before and after I
13 left, I think.
14        Q.  But at the time you left, you said,
15 without a dramatic change in execution, the
16 chances of it beating Google -- strike that.
17        You said at the time that you left that
18 the chances of OpenAI being relevant to Google
19 were zero percent absent a dramatic change in
20 execution; right?
21        A.  Yeah.
22        Q.  So would you agree with me that after
23 you left there was a dramatic change in
24 execution?
25        A.  There's been ups and downs in the

Page 15

1 execution of the company.  And in order to
2 emphasize the difficulty of competing with Google,
3 I need to be emphatic that outstanding execution
4 is needed for a small company to be a large
5 company.
6        Q.  Do you recall that earlier this year
7 OpenAI announced a Stargate UAE initiative?
8        A.  Yes.
9        Q.  What's your understanding of that
10 initiative, sir?
11        A.  I don't know the details.
12        Q.  You don't know?
13        A.  No.
14        Q.  Do you remember that the initiative was
15 to be announced on a presidential trip?
16        A.  Something to that effect.
17        Q.  When did you learn that Stargate was
18 going to be announced, Mr. Musk?
19        A.  I don't recall.
20

Page 16



11        ATTORNEY MOLO:  So I object.  You're
12 asking questions that go to Phase II of the case.
13 If you want to describe how they go to Phase I
14 that's fine; but --
15        ATTORNEY SAVITT:  Are you instructing
16 the witness not to answer?
17        ATTORNEY MOLO:  I'm objecting, and
18 telling you that your questions are addressing
19 issues that relate to the competition part of the
20 case, which the judge has designated, quote,
21 Phase II claims.
22        ATTORNEY SAVITT:  Mr. Molo, I'm aware of
23 that.  Are you objecting?
24        ATTORNEY MOLO:  So you are aware that
25 you're asking Phase II claims?

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 17

1      ATTORNEY SAVITT:  I don't think that is
2  right.  If you have a relevance objection and you
3  wish to say --
4      ATTORNEY MOLO:  That is a relevant
5  objection.
6      ATTORNEY SAVITT:  Then state it and let
7  the witness answer the question.  And if you want
8  to instruct him not to answer, we'll see about
9  that.
10      ATTORNEY MOLO:  If you're going to go
11  down this line -- I've let you ask a few
12  questions.  If you're going to go down this line,
13  we can get on the phone with the magistrate judge
14  and sort this out now, and it will make the day
15  much shorter for all of us.  But we're not going
16  to go into Phase II claims in this deposition.
17      ATTORNEY SAVITT:  So I'm going to ask my
18  questions, and you can keep your speeches for
19  yourself.  And if you want to call the judge, you
20  can be my guest.
21      ATTORNEY MOLO:  Okay.
22  BY ATTORNEY SAVITT:
23

Page 18

1     Q.  So I'm asking you to answer the
2  question.  You're obligated to do so, absent an
3  instruction not to answer.
4     A.  Well, should we ask the judge, given
5  that the judge's instructions not to -- postpone
6  this to Phase II?
7      ATTORNEY MOLO:  If you want to explain
8  how this relates to Phase I --
9      ATTORNEY SAVITT:  I'm not explaining
10  anything to you, Mr. Molo.  I'm asking my
11  questions.
12      ATTORNEY MOLO:  Okay.  All right.
13      ATTORNEY SAVITT:  Do you understand
14  that?
15      ATTORNEY MOLO:  Let's just go ahead and
16  get the magistrate judge on the phone, and
17  we'll --
18      THE WITNESS:  Let's call the judge.
19      ATTORNEY SAVITT:  Perfect.  We can go
20  off the record.
21      ATTORNEY MOLO:  Sure.
22      THE VIDEOGRAPHER:  We're off the record
23  at 10:02 a.m.
24      (Recess taken from 10:02 a.m. to
25      10:22 a.m.)

Page 19

1      THE VIDEOGRAPHER:  This is the beginning
2  of Media Number 2.  We're back on the record at
3  10:22 a.m.
4      ATTORNEY SAVITT:  Are you going to make
5  an objection to --
6      ATTORNEY MOLO:  So that's the
7  question -- okay.  Objection.  The question goes
8  to issues that are outside of Phase I, consistent
9  with the Court's orders in Dockets Number 237,
10  228, 199, 200 and 201.
11      So I instruct the witness not to answer.
12  BY ATTORNEY SAVITT:
13    Q.  And, Mr. Musk, are you going to follow
14  your lawyer's instruction?
15    A.  Yes.
16    Q.  All right.
17      ATTORNEY SAVITT:  Well, we certainly
18  disagree with your contention.  We'll take this
19  matter up with the Court at a convenient time.
20  Naturally, we reserve our right to re-examine
21  Mr. Musk in respect to this and any other such
22  matter as you may choose to block on relevance
23  grounds.
24  BY ATTORNEY SAVITT:
25

Page 20

1



15      ATTORNEY MOLO:  Objection.  These
16  questions go to Phase II of the case pursuant to
17  orders 237, 228, 199, 200 and 201.
18      And I'm instructing the witness not to
19  answer consistent with the conversations that we
20  had off the record with defense counsel.
21      If it's okay with you, rather than cite
22  the docket numbers each time I make this
23  objection, if I can just say "the Court's orders,"
24  do we have an understanding --
25      ATTORNEY SAVITT:  We do.

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman              [CONFIDENTIAL]                    Elon Musk

| Page 21 | Page 23 |
|---|---|
| 1   ATTORNEY MOLO:  -- that that's what I'm<br>2  referring to?<br>3   ATTORNEY SAVITT:  Thank you.  We do.<br>4  Thank you.<br>5   ATTORNEY MOLO:  Okay.<br>6  BY ATTORNEY SAVITT:<br>7   Q.   And, Mr. Musk, are you going to follow<br>8  your counsel's instructions?<br>9   A.   Yes.<br>10   Q.   Okay.<br>11   ATTORNEY SAVITT:  We reserve, of course,<br>12  our objections to those instructions.<br>13  BY ATTORNEY SAVITT:<br>14  ██████████████████████████████████<br>  ██████████████████████████████████<br>  ██████████████████████████████████<br>18   ATTORNEY MOLO:  Objection.  This is a<br>19  question that goes to Phase II of the case, and<br>20  consistent with the Court's orders, I'm<br>21  instructing the witness not to answer.<br>22  BY ATTORNEY FRENTZEN:<br>23   Q.   Are you going to follow your counsel's<br>24  instruction?<br>25   A.   Yes. | 1  counterbalance -- direct counterbalance seems to<br>2  me would be to have an open source nonprofit as<br>3  a -- to be the opposite of Google.<br>4   Q.   Thank you.<br>5   Is it your -- is it your point of view<br>6  that the idea for creating the AI lab that became<br>7  OpenAI was your idea?<br>8   A.   Yes.<br>9   ATTORNEY SAVITT:  Let's take a look and<br>10  mark what's been premarked as Exhibit 1, please.<br>11   Give a copy to the witness.<br>12   (Whereupon, Musk Exhibit Number 1 was<br>13   marked for identification.)<br>14  BY ATTORNEY SAVITT:<br>15   Q.   That's for you, sir.<br>16   Mr. Musk this is a June 24, 2015, email<br>17  exchange.  Do you see that?<br>18   A.   Yes.<br>19   Q.   Subject line:  "AI lab," and it's<br>20  between you and Sam Altman; right?<br>21   A.   Uh-huh.<br>22   Q.   What was the context, if you recall, of<br>23  this email exchange?<br>24   A.   I think this probably references a<br>25  number of conversations that I had with Sam and |

| Page 22 | Page 24 |
|---|---|
| 1   Q.   All right.  Have you consulted with<br>2  Alex Spiro in connection with your deposition<br>3  today?<br>4   A.   No.<br>5   Q.   Whose idea was it to form the AI lab<br>6  that became OpenAI?<br>7   A.   I think -- well, my perspective is that<br>8  the origin of OpenAI, the reason it exists and I<br>9  don't think it would exist otherwise, is that I<br>10  was increasingly concerned about the danger of<br>11  Google being a monopoly in AI.  And my<br>12  conversations with Larry Page were alarming in<br>13  that he did not seem to be taking AI safety<br>14  seriously.<br>15   So I felt there needed to be a<br>16  counterbalance to Google, given that Larry Page<br>17  did not seem to be taking AI safety seriously.<br>18   At one point, he called me a speciesist<br>19  for favoring humanity, which I felt was odd<br>20  because what side is he on?  Clearly, not<br>21  humanity's side, it would seem.<br>22   That's led me to conclude that we really<br>23  need to have some counterbalance to Google's AI<br>24  power.  The opposite of what Google was -- Google<br>25  is a for-profit, closed source company.  The | 1  many others regarding creating an AI<br>2  counterbalance to Google.<br>3   Q.   And you see in the first paragraph,<br>4  Altman writes to you:<br>5   "The mission would be to create the<br>6   first general AI and use it for<br>7   individual empowerment; i.e., the<br>8   distributive version of the future that<br>9   seems to save us."<br>10   Do you see that?<br>11   A.   Yes.<br>12   Q.   Do you understand what Altman meant by<br>13  that?<br>14   A.   He's recapping conversations that we<br>15  had.<br>16   Q.   I see.  So thank you for that.<br>17   Your testimony is that you and Altman<br>18  had had conversations, and this was summarizing<br>19  some of the things you all had talked about?<br>20   A.   Yes.<br>21   Q.   What did you think about this proposed<br>22  mission set out in this email?<br>23   A.   It was the mission that I proposed.<br>24   Q.   I see.  So the whole idea was yours,<br>25  that's your testimony? |

Elon Musk v.                  FINAL                      September 26, 2025
Samuel Altman              [CONFIDENTIAL]                            Elon Musk

Page 25

1    A.  No, not the whole idea was mine.  But
2  the idea of creating counterbalance to Google
3  stemmed directly from conversations that I had
4  with Larry Page.
5    And I then had a series of meetings with
6  and dinners with many people in Silicon Valley,
7  Sam included -- I didn't really know Sam at the
8  time -- saying that we need to have some
9  counterbalance to Google.
10   But this -- this idea that we needed to
11  have a counterbalance to Google, this idea I had
12  before I even know who Sam Altman was.
13   Q.  And you say after this -- you see that
14  Altman writes:  "Safety should be a first-class
15  requirement."
16   Do you see that?
17   A.  That's what I said.
18   Q.  I see.
19   And you'll allow that this was what
20  Altman wrote to you in an email to you?
21   A.  He's literally recapping our
22  conversations and what I've been telling people
23  for months before this.
24   Q.  I see.  So is your testimony that
25  everything in this email is simply Altman saying

Page 26

1  back to you things that you had said to him?
2    ATTORNEY MOLO:  Objection to the form of
3  the question.
4    Go ahead and answer.
5    A.  No, not everything.
6  BY ATTORNEY SAVITT:
7    Q.  Okay.  What isn't?
8    A.  Some of the things he's proposing here
9  are his ideas, like the five people who would be
10  on the board --
11   The first thing -- the first thing, the
12  overall idea of mission to create a general AI
13  maximizing safety was my idea.  It's possible Sam
14  may have independently had that idea but he
15  certainly didn't suggest it to me.  That was my
16  idea.
17   Obviously, a start-up is going to start
18  with a small number of people.  That's point 2
19  here.
20   Point 3 is something, yeah, that he did
21  come up with.  That's clearly Sam writing things
22  here because he's suggesting five people on the
23  board, which I wouldn't -- some of whom I wouldn't
24  agree should be on the board.
25   So that's his idea in line -- point 3.

Page 27

1    And he's -- point 4 is just some
2  speculation about governance.
3    And point 5 is just something about
4  regulatory stuff.
5    But -- the, you know -- the -- the
6  necessity of creating a counterbalance to Google
7  came as a result of my conversations with Larry
8  Page, not Sam Altman.  And I came to the -- based
9  on Larry Page not taking AI seriously and Google
10  essentially having a monopoly on AI, left me
11  extremely concerned that we needed to create some
12  counterbalance.
13   That forced me to talk to many other
14  people.  Sam was merely one of -- I don't know,
15  100 people I talked to.  And said we need to have
16  a safety-focused counterbalance to Google.
17   I didn't even understand what it was
18  when I came up with this idea.  It's an idea.
19  It's just they need to do something about safety.
20   Q.  Other than Mr. Page, who did you have
21  these conversations with?
22   A.  Everyone who would basically listen.  It
23  got to the point where I would talk about AI
24  safety so much that my brother asked that, in the
25  future, if we're at a party, that we could not

Page 28

1  talk about AI safety because it's such a buzzkill.
2    And so that's how much I was talking
3  about AI safety.  Everyone that I met and talked
4  to, nonstop for months, expressing my extreme
5  concern about AI safety.
6    I even funded an AI safety research
7  group run by Max Tegmark, of the Future of Life
8  Institute, that funded -- directly funded dozens
9  of AI safety research projects, which Larry Page
10  yelled at me about.
11   And I personally spoke -- was very
12  outspoken about AI safety.  Since you're an avid
13  reader of my posts, I'm sure you realize that.
14   Q.  Thank you for that.
15   You said that you were focused on this
16  and speaking with many, many people over a period
17  of months.
18   A.  Everyone.  And my mom.
19   Q.  And your mom.
20   Was this in the period around June 2015
21  that you were --
22   A.  Well, before this.
23   Q.  And starting when?  I'm sorry.
24   A.  I was talking about AI safety probably
25  as far back as 10 years before this.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 29

1    Q.  10 years before this?
2    A.  And even in college, when I thought
3 about things that would affect the future of the
4 world, and then I wanted to be involved in things
5 that would affect the future of the world; and one
6 of the things that I thought would affect the
7 future was artificial intelligence.
8        The reason I didn't initially go into
9 artificial intelligence was because I wasn't sure
10 whether the double-edged sword of AI would do more
11 harm or more good.  So the other areas that I
12 thought were more of a single-edged sword were
13 sustainable energy, hence Tesla; just the internet
14 in general, which that's why I did two internet
15 startups as my first companies; and machine
16 interfaces, which is why I did Neuralink, making
17 life multi-planetary to ensure the long-term
18 existence of consciousness, which is why SpaceX.
19        The thing I didn't execute on
20 intentionally, because even from -- in college, in
21 the early '90s, I thought the AI -- the danger of
22 an apocalypse was too great to focus -- for me to
23 personally focus on AI.
24        Now, in retrospect, that was naive,
25 because even if I don't focus on AI, others will.

Page 30

1 And so -- but I didn't expect the -- I didn't
2 expect Larry Page and Google to be so focused on
3 AI that it would -- that they want to pursue it,
4 even if it came at the expense of danger to
5 humanity.
6        So how long have I been worried about AI
7 safety?  My entire adult life.
8    Q.  Thank you for that.
9        Let me ask you this specific question,
10 if I might.
11        You've told me that you spoke to a lot
12 of people about this, and I'm sure that's true.
13    A.  Correct.
14    Q.  Here's my question:
15        In 2015, can you give me the names of
16 persons that you recall having discussed AI safety
17 with?
18    A.  I mean, you want the list of -- we can
19 prepare a list of people that you want to talk to.
20 Is it --
21    Q.  I'd be delighted if counsel is prepared
22 to undertake to give us a written list of that.
23 That would simplify that.  But that is the
24 question I'm asking.
25    A.  Yeah, it's a long list.

Page 31

1    Q.  We'd love to see it.
2    A.  Yeah.
3        ATTORNEY SAVITT:  Is that acceptable?
4        ATTORNEY MOLO:  That's acceptable.
5 BY ATTORNEY SAVITT:
6    Q.  Okay.  And would you have, Mr. Musk,
7 expressed your concerns about AI safety in 2015
8 in written communications?
9    A.  Probably, yes.  I think so.
10    Q.  So the concerns about AI safety would
11 appear in your texts and email messages from that
12 period?
13    A.  Possibly.  But, yeah, when I attended AI
14 safety conferences, as I said, I funded -- I think
15 I spent -- I think I spent more to fund AI safety
16 research than maybe anyone else on Earth, so,
17 yeah.
18    Q.  Thank you.
19        And so given this focus, we should
20 expect to see a lot of communication, a lot of
21 written communication about AI and AI safety in
22 the period of 2015 --
23        (Indiscernible cross-talk.)
24        ATTORNEY MOLO:  Object to the form of
25 the question.

Page 32

1 BY ATTORNEY SAVITT:
2    Q.  You can answer.
3    A.  I don't know how much was written or
4 verbal; but it was unequivocally a long-standing
5 concern of mine.
6    Q.  Okay.  And going back to this Exhibit 1
7 in front of you, Mr. Musk, in the third
8 paragraph, you see that Altman wrote to you.  I'm
9 on the second sentence of the third point.  He
10 writes:
11        "The technology would be owned by
12    the foundation and used for the good of
13    the world."
14        Do you see that?
15    A.  Yes.
16    Q.  What did you understand Mr. Altman to
17 mean by "the foundation" in this sentence?
18    A.  The foundation, the nonprofit, the --
19 the reason it's called OpenAI is because it's
20 meant to be open source, as the name was my
21 suggestion.
22    Q.  Yeah, we'll get to that.
23        Is "the foundation" the AI lab that is
24 in the subject line of the email here, do you
25 think?

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman            [CONFIDENTIAL]                        Elon Musk

Page 33

1    A.  Yeah.
2    Q.  Okay.  But I think you told me that
3  some of this stuff in the third paragraph here,
4  you didn't really agree with; is that correct?
5    A.  Well, I don't think we should have --
6  yeah, I don't think it would have been a good idea
7  to have Bill Gates on the board.  I'm just not his
8  biggest fan.
9    Q.  You see in the fourth paragraph, Altman
10  asks you:
11      "Will you be involved somehow in
12      addition to just governance?"
13      Do you see that, Mr. Musk?
14    A.  Yes.
15    Q.  Do you remember answering that question
16  after Altman posed it to you?
17    A.  I mean, of course, I'd be involved in
18  the governance.
19    Q.  Say again.
20    A.  Of course, I would be involved in the
21  governance.
22    Q.  But his question was:
23      "Will you be involved in addition
24      to just governance?"
25      Do you see that, Mr. Musk?

Page 34

1    A.  Yeah, yeah.
2    Q.  So did you respond to that question?
3    A.  That email, I assume you'd have the
4  email, if I did respond.  I'm just saying I
5  don't --
6    Q.  But you didn't agree with everything in
7  this; isn't that right?
8    A.  I mean, on the substance of issues, the
9  details of, like, who is going to be on the board,
10  that's -- well, substantively, yes.
11    Q.  Directionally, you thought most of what
12  was in here made sense; is that fair?
13    A.  Yeah.
14    Q.  And is that what you meant when you
15  said, "Agree on all"?
16    A.  Yeah.
17    Q.  And I'm sorry to keep -- I just want to
18  make sure I've got your best recollection on this
19  narrow of a question.
20      Do you remember telling Altman, in email
21  or orally, however, what the answer was whether
22  you planned to be involved in addition to just
23  governance?  Do you remember having an answer to
24  that question for Altman?
25    A.  I believe I said I would be -- well, I

Page 35

1  was involved, and I taught them everything I knew
2  about how to create a start-up so it was a
3  successful start-up.
4    Q.  Your claim is that you taught them
5  everything they knew --
6    A.  No, no, everything I know.
7    Q.  I'm sorry.  Thank you.  I
8  misunderstood.
9      You taught them everything that you know
10  about creating successful start-ups; is that your
11  testimony?
12    A.  Yes.  Yes.
13    Q.  Thank you.
14      Now, about a month later, in July 2015,
15  do you recall attending a dinner with Altman at
16  the Rosewood in Menlo Park?
17    A.  Well, that was 10 years ago, but
18  vaguely.
19    Q.  Do you remember who attended that
20  dinner?
21    A.  No.
22    Q.  Do you remember what was discussed at
23  the dinner at the Rosewood?
24    A.  My guess is AI.
25    Q.  Well, thank you, and I appreciate it

Page 36

1  was 10 years ago, but I'm looking for your best
2  recollection.  Anything you can tell me about --
3    A.  I don't recall the details of a dinner
4  10 years ago.
5    Q.  We understand, and I say this in the
6  hope that it might jog your memory, Mr. Musk,
7  but, Daniel Amodei, Ilya Sutskever, Sam Altman,
8  Greg Brockman, and maybe some others attended.
9      Does that sound right to you?
10    A.  That sounds like it might be right.
11    Q.  Here again, I just want to make sure I
12  get your best recollection:  Anything you can
13  tell me about what was discussed at that dinner,
14  as we talk this morning?
15    A.  AI safety.
16    Q.  Anything else?
17    A.  I don't recall the details, so I'd be
18  speculating.
19    Q.  Other than your sense that you
20  discussed AI safety --
21    A.  I'm forming an organization to achieve
22  that.
23    Q.  Okay.  Anything further that you can
24  tell me about what was discussed, besides those
25  two things?

Elon Musk v.                         FINAL                  September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                       Elon Musk

Page 37

1        A.   I would be speculating if I ...
2        Q.   Okay.  Thank you.
3             This might pick up one of the threads,
4   Mr. Musk, that you were unspooling.
5             Who is Demis Hassabis?
6        A.   Dennis created DeepMind and is
7   currently, I believe, the head of AI for Google as
8   a whole.
9        Q.   And DeepMind is affiliated with Google;
10  right?
11       A.   It's owned by Google.
12       Q.   And in 2015 -- I think you told me
13  this -- you viewed DeepMind as way ahead in the
14  artificial intelligence business; fair?
15       A.   In 2015?
16       Q.   Yeah.
17       A.   These were still the early days of AI,
18  so it's ahead in a very early-day sense; but I'd
19  say DeepMind and Google were the two -- Google
20  Brain and DeepMind were the two leading
21  organizations for AI.
22       Q.   You thought no one was effectively
23  competing with Google and DeepMind at the time?
24       A.   Correct.
25       Q.   And did you believe that allowing Demis

Page 38

1   to control AGI would be dangerous?
2        A.   Yes.
3        Q.   You viewed him as a person who could be
4   a threatening character with his capacity to
5   develop the technology?
6        A.   Well, I was generally against there
7   being a unipolar world where any one person would
8   control AI.
9        Q.   And to follow up on that, was your
10  concern that Hassabis and Google DeepMind might
11  be in the position to do that?
12       A.   Yes.
13       Q.   OpenAI was founded as a not-for-profit
14  corporation in December 2015.
15            Does that sound right?
16       A.   Sounds about right.
17       Q.   You weren't convinced, though, were
18  you, that a nonprofit was the right structure to
19  effectively compete with DeepMind; correct?
20       A.   No, I -- I was the one who said it
21  should be an open-source nonprofit.  And that's
22  how I funded it, obviously.
23       Q.   But you thought at first that a
24  standard C Corp. in parallel with a nonprofit
25  would probably be better, didn't you?

Page 39

1        A.   Not that I recall.
2            ATTORNEY SAVITT:  Let's take a look at
3   the next exhibit.
4            What exhibit number is it?  2?
5            We have a little bit of some odd
6   numbering on our exhibit.
7            This is going to be Exhibit 15 for the
8   witness.
9            Thank you.
10           (Whereupon, Musk Exhibit Number 15
11           was marked for identification and is
12           attached hereto.)
13  BY ATTORNEY SAVITT:
14       Q.   We've marked as Exhibit 15 an email
15  exchange, Mr. Musk, between you and Mr. Altman
16  dated the 20th of November 2015.  For the
17  record, the legend in the bottom ends with 9963.
18            You'll see that you write, in the second
19  paragraph to Mr. Altman:
20            "Also, in respect of AI docs, the
21            structure doesn't seem optimal.  In
22            particular, the YC stock, along with the
23            salary from the nonprofit, muddies the
24            alignment of incentives.  Probably
25            better to have a standard C Corp. with a

Page 40

1            parallel nonprofit."
2            Do you see that?
3        A.   Yes.
4        Q.   That is what you wrote to Mr. Altman on
5   the 20th of November 2015; right?
6        A.   That's what the email says.
7        Q.   Yeah.  And that reflected your view at
8   the time?
9        A.   Yeah.  I mean, I'm just simply saying
10  the structure doesn't seem like it -- that it
11  shouldn't be some subsidiary of YC.
12       Q.   But fair to say, at the time, your view
13  was that it would probably be better to have a
14  standing C Corp. with a parallel nonprofit?
15       A.   I'm just sort of batting around ideas
16  here.
17       Q.   Okay.
18       A.   But, you know, fundamentally, whether or
19  not I'd ever met Sam Altman, I would have created
20  an open-source nonprofit.  So because I -- I felt
21  that was the right structure to counterbalance
22  Google as a closed-source for-profit.
23       Q.   I understand that, sir.
24            But I just was trying to establish the
25  really self-evident point that you wrote in

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 41

1    November 2015 that it would probably be better to
2    have a standard C Corp. with a parallel nonprofit
3    in respect to the AI docs that are the subject of
4    this email; right?
5        A.   I'm just saying that it would be better
6    than being a subsidiary of YC.  I didn't say we
7    should do that.  I'm just saying it's better than
8    being a subsidiary of YC.
9        Q.   Yeah.  And in 2016, with the benefit of
10   hindsight, you believed that setting up OpenAI as
11   a nonprofit might have been the wrong move; isn't
12   that true?
13       A.   At various times, I did -- I always like
14   to reflect upon actions and say maybe they're
15   right; maybe they're wrong.
16       Q.   Fair enough.
17           And I understand the impulse.
18           But is it fair, then, to say that
19   whether setting the thing up as a nonprofit as
20   opposed to a C Corp. with a parallel structure
21   were points respecting which your views changed
22   over time as you reflected upon them?
23       A.   Just because ideas are discussed doesn't
24   mean that there's been a fundamental change in
25   direction.

Page 42

1        Q.   You've mentioned this already.  You
2    claim that you made donations to OpenAI in its
3    early years, yeah?
4        A.   As you know, I definitely did.
5        Q.   Yeah.  And who's Jared Birchall?
6        A.   He's my -- manages my personal office.
7        Q.   And you trust Mr. Birchall?
8        A.   Yes, I think he's a trustworthy
9    individual.
10       Q.   And he helps you -- you get reports
11   about your businesses from him.  You rely on the
12   information that he gives you.
13           Is that all fair?
14       A.   Yes.
15       Q.   And you don't have any reason to think
16   that Mr. Birchall wouldn't have testified
17   truthfully about the work he did on your behalf
18   regarding OpenAI, do you?
19       A.   I think he would have testified to the
20   best of his recollection.
21       Q.   Did you ever discuss with anyone at
22   OpenAI the possibility of retaining the right to
23   reclaim your donations?
24       A.   I don't recall.
25       Q.   No recollection of what was discussed

Page 43

1    as we're sitting here this morning?
2        A.   I don't recall.
3        Q.   Did you ever discuss with anyone at all
4    a right to direct that your donations be
5    transferred to another party?
6        A.   I don't think so.  What other party?
7        Q.   I'm asking you.
8        A.   I'm not sure what you're referring to.
9        Q.   But you have no recollection of a
10   discussion like that?
11       A.   No.
12       Q.   Do you have any recollection of a
13   discussion with anybody respecting the
14   possibility of what you say you gave to OpenAI
15   one day reverting to you?
16       A.   No, I don't recall that.
17       Q.   Apart from the cash donations you say
18   you made to OpenAI, did you provide any support
19   for the organization?
20       A.   Yes, I provided -- I taught them
21   everything I knew about creating a successful
22   start-up.  And I helped recruit key individuals.
23   And I helped get the rights of Azure computer
24   products, which was instrumental to their growth.
25           I did a lot of things.

Page 44

1        Q.   And I appreciate that.
2           Just so that I have the complete
3    recollection as we're chatting this morning,
4    anything else other than what you just mentioned
5    that you contributed to OpenAI, other than the
6    cash donations you say you made?
7        A.   No, I mean, apart from funding them,
8    recruiting key people, providing essential
9    business advice, and getting them essential
10   computer products, nothing.
11       Q.   Okay.  As to recruiting, who all did
12   you recruit?
13       A.   Probably quite a few other things.
14   Besides that, nothing.
15       Q.   Okay.  That's very funny.
16           That's what I want to know, is, besides
17   that, is there anything else?
18           I just want to -- and I mean all the
19   respect in the world.  I just want to get your
20   full recollection of this.
21       A.   That's a lot.
22       Q.   I'm not saying it's not.  I just want
23   to make sure that I've got your complete answer.
24       A.   I mean, lending my name to the company
25   gave them immense credibility as well.

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman                [CONFIDENTIAL]              Elon Musk

Page 45

1    Q.  Anything else?
2    A.  That's a lot.
3    Q.  Okay.  Recruiting.  Who did you recruit
4  to OpenAI?
5    A.  I talked to dozens and people over the
6  years.  But I think the most crucial recruit was
7  Ilya Sutskever.  In fact, the recruitment of Ilya
8  was what actually caused Larry Page to stop being
9  friends with me.
10       So Ilya went back and forth multiple
11  times saying he would join OpenAI or stay at
12  Google, and ultimately agreed to join; and Larry
13  Page and Sergey and Demis Hassabis did everything
14  they could to keep Ilya.  When Ilya finally
15  decided to join OpenAI, that's what ended the
16  friendship with Larry Page.  He didn't talk to me
17  after that.
18    Q.  Is he still giving you the silent
19  treatment?
20    A.  Yes.
21    Q.  And just so the record is clear on
22  this, Sutskever was at Google and came from there
23  to OpenAI, and that's why the folks at Google
24  were annoyed; fair?
25    A.  They were very upset about that.

Page 46

1    Q.  And you say that you recruited Ilya to
2  OpenAI?
3    A.  Obviously, many others participated in
4  this.  But without me, he would not have joined.
5    Q.  Who else participated in the
6  recruitment of Mr. Sutskever to OpenAI?
7    A.  Sam and Greg.
8    Q.  Do you think he would have gone to
9  OpenAI without Sam and Greg?
10    A.  I don't know, but he certainly would not
11  have joined without me.
12    Q.  No, I got your view on that.
13       Anyone other than Mr. Sutskever that you
14  say you recruited to OpenAI?
15    A.  I'd have to go back and look, but I was
16  talking to every candidate in the beginning.
17    Q.  As we talk this morning, can you think
18  of the names of any other persons that you
19  recruited to OpenAI besides Mr. Sutskever?
20    A.  I helped recruit, I think, almost
21  everyone in the initial team.
22    Q.  But can you give me any names of the
23  persons that you claim to have helped recruit?
24    A.  Wojceich, like for example.
25  ///

Page 47

1       (Interruption by the court reporter
2       to clarify the record.)
3    A.  But I talked to -- I think I talked to
4  almost everyone in the beginning.
5    Q.  And here again, I just -- with
6  apologies for being insistent, any other names
7  you can give me as we're talking this morning?
8    A.  Not offhand, but I can certainly give
9  you a list later, if you'd like.
10    Q.  So how did you actually do the
11  recruiting that you said you did?
12    A.  I would talk to them and meet with them.
13  How else do you recruit anyone?
14    Q.  I'm just asking a question, sir.
15    A.  You have to communicate somehow.
16    Q.  Right.  And did you communicate in
17  writing as well as orally?
18    A.  I think these were almost entirely oral,
19  in person.
20    Q.  Did you communicate with Altman,
21  Brockman and others at OpenAI about who you were
22  recruiting?
23    A.  Yes.
24    Q.  How did you do that?
25    A.  In calls.  I talked to them.  That would

Page 48

1  be the -- in meetings or verbally.
2    Q.  And all those communications you say
3  were done orally but not in any written form.
4  Fair?
5    A.  There may have been some in written
6  form, but recruitment is just generally done
7  orally.
8    Q.  Yeah.  But I was asking here not about
9  the recruiting, but about your communications
10  with your colleagues about how the recruiting was
11  going and who you were recruiting.  That would
12  have been done in writing or orally?
13    A.  Orally.  I mean, we can certainly get
14  the list of people, and then we can just ask them
15  did I play a significant role in recruiting.  I'm
16  sure that they would say yes.
17       I mean that's how you build companies,
18  you recruit people.
19    Q.  If you had to estimate --
20    A.  I'm very good at building companies.  My
21  track record speaks for itself.
22    Q.  If you had to estimate, how much time
23  did you spend working at OpenAI a week in 2016?
24    A.  I don't recall the exact amount, but it
25  fluctuated.  And there are times when I would

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 49

1  spend much of the week on OpenAI, and there are
2  some weeks where there was very little.
3      Q.  Could you hazard an estimate about what
4  your average weekly hourly commitment to OpenAI
5  was in 2016?
6      A.  I don't recall.
7      Q.  Same for 2017?
8      A.  Yeah.
9      Q.  At some point, you gave a few OpenAI
10  employees Teslas; is that right?
11      A.  Yes.
12      Q.  Who got the Teslas?
13      A.  I think Ilya.  Maybe Greg.  I'm not
14  sure.
15      Q.  You don't recall who else might have
16  gotten a Tesla?
17      A.  No.
18      Q.  Why did you give these people Teslas?
19      A.  Seemed like a nice thing to do.
20      Q.  Any other reason?
21      A.  Sort of a perk of the company.  I mean I
22  was providing, essentially, all the capital of the
23  company so why not throw in a few Teslas.
24      Q.  Do you believe you have a contract with
25  the OpenAI not-for-profit corporation?

Page 50

1      A.  A contract?
2      Q.  Yeah.
3      A.  I mean, there are many documents that
4  have been signed.
5      Q.  But I'm asking a different question.
6          Do you think you have a binding
7  agreement, a contract, with OpenAI, Inc., the
8  nonprofit?
9      A.  For what?
10      Q.  Of any kind.
11      A.  I think so, but -- you know, I -- yeah.
12      Q.  You think so?
13      A.  I think so.
14      Q.  And do you have a contract with -- in
15  your opinion, with any other OpenAI entity?
16      A.  I'm -- not familiar with the crazy
17  corporate shell game of companies associated with
18  OpenAI.  So, no, I don't think so.
19      Q.  Okay.  Do you believe you have a
20  contract with Sam Altman?
21      A.  I'm not sure what you mean by a
22  contract.
23      Q.  I'm asking you whether you believe you
24  have a binding agreement of some sort,
25  enforceable binding agreement with Sam Altman.

Page 51

1      A.  I guess in a sense, yes, in that the
2  deal was to create a nonprofit open source
3  organization; and that contract -- that deal was
4  fundamentally -- that promise was broken
5  egregiously.
6      Q.  So you think that your understandings
7  with Mr. Altman rise to the level of a contract
8  between you and him?
9      A.  I think so.  And -- because the clear
10  understanding was this would be a nonprofit, open
11  source.  And now, in fact, OpenAI, the name is,
12  is -- itself is a lie.  It is, in fact -- it
13  should be called "closed-for-maximum-profit
14  AI.com."  And I was thinking of gifting them that
15  as a URL.
16          "Closed-for-maximum-profit AI" should be
17  the name of OpenAI.  And that is directly contrary
18  to the reason that it was given.
19          They stole the charity.  That's wrong.
20      Q.  So what are the terms of the contract
21  that you think you have with Mr. Altman?
22      A.  The money was donated to create an
23  open-source nonprofit.  And now it has been turned
24  into a de facto closed-source profit maximizing
25  entity, directly contrary to the reason the money

Page 52

1  was given.  They broke the deal.
2          And I would liken this to if you donate
3  money to a company that is intended to preserve
4  the Amazon Rainforest, but instead they chop down
5  the trees, turn it into a lumber company and sell
6  the wood for profit, you'd be rather upset,
7  wouldn't you?
8      Q.  No, I've seen that, and you can recycle
9  as much as you like.  My question was a little
10  different.
11          My question is:  What were the terms --
12  what are the terms of the agreement that you say
13  you have with Mr. Altman?
14      A.  It's very simple.  The money was given
15  to create a nonprofit open-source organization.
16      Q.  That's it?
17      A.  And -- yeah, that's what the money was
18  given for.  That's what my time was given for.
19  Not just money but time and credibility.
20      Q.  And what constitutes the terms of the
21  agreement you say you have with Altman; fair?
22      A.  I think that's -- those are the major
23  parts of it.  It's not super complicated.
24      Q.  I'm not saying it is.  I just want to
25  get --

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 53

1    A.  Okay.
2    Q.  -- I just want to understand fully your
3  view, sir.  That's the only reason I'm pushing.
4    A.  My view is money was given, time was
5  given, credibility was given, recruiting help was
6  given, advice was given.  Basically, everything
7  you could do to make an organization successful is
8  what I gave for the purpose of creating a
9  nonprofit open-source organization.  And they've
10  egregiously violated those promises in the worst
11  way possible and created a profit-maximizing,
12  defective, closed-source organization to enrich
13  themselves.  And that is wrong.  That is wrong.
14    Q.  And that constitutes the contract you
15  had with Altman, yes?
16    It's a yes-or-no question.
17    A.  I mean, I don't know if this is some
18  loaded legal term or not.  But it is clearly a
19  broken promise.
20    Q.  Okay.  And is that the same contract
21  you think you have with OpenAI, Inc.?
22    A.  I think you're trying to sort of connect
23  this to some sort of legal argument.  I'm just
24  saying that this is -- that anyone with a shred of
25  common sense can see that the deal was broken.

Page 54

1  They stole the charity and enriched themselves.
2    Q.  Any other terms of the contract you can
3  identify that you say you had with OpenAI, Inc.?
4    A.  No.
5    Q.  Okay.  Before you filed your lawsuit in
6  2024, Mr. Musk, had you ever communicated to
7  Altman that you thought he had made a contractual
8  obligation to you?
9    A.  I mean, I expressed at various times
10  that the mission of AI, the reason money was
11  given, the reason my time, my credibility, my
12  recruiting help was given was to create a
13  nonprofit, open-source organization; and they were
14  step-by-step going in the diametrically opposed
15  direction.
16    Q.  How long do you think that OpenAI was
17  obligated to follow what you say are the terms of
18  the agreement you had with it and Mr. Altman?
19    A.  My feeling is that there's no statute of
20  limitations on stealing money from a charity,
21  which is what they did.
22    Q.  So forever?
23    A.  Yeah.
24    Q.  And Mr. Altman has, likewise, obligated
25  to follow the terms of what you say is the

Page 55

1  agreement forever; correct?
2    A.  I'm saying you can't steal a charity.
3    Q.  Yeah, but that wasn't my question.  My
4  question was whether you think Mr. Altman is
5  obligated to follow the terms of what you say --
6    A.  Yeah, I don't think you should steal --
7  I don't think Sam Altman should steal a charity,
8  that's wrong.
9    Q.  Right.
10    You visited with Brockman and Altman
11  before filing your lawsuit in 2023, didn't you?
12    A.  I don't recall.
13    Q.  You proposed to them that OpenAI merge
14  with xAI; isn't that true?
15    A.  I don't recall.
16    Q.  You don't recall one way or another?
17    A.  No.
18    Q.  Okay.  You know it's true that you
19  proposed that xAI and OpenAI open merge, don't
20  you?
21    ATTORNEY MOLO:  Object to the form of
22  the question.
23    A.  I don't recall.
24  BY ATTORNEY SAVITT:
25    Q.  Okay.  You certainly can't say it

Page 56

1  didn't happen; right?
2    ATTORNEY MOLO:  Object to the form of
3  the question.
4    A.  I don't recall.
5  BY ATTORNEY SAVITT:
6    Q.  You don't recall.
7    You don't recall.  So you don't recall
8  one way or another whether you made that proposal?
9    ATTORNEY MOLO:  Asked and answered.
10  Objection.
11  BY ATTORNEY SAVITT:
12    Q.  You can answer.
13    ATTORNEY MOLO:  Don't answer the
14  question.
15    ATTORNEY SAVITT:  You're instructing him
16  not to answer?
17    ATTORNEY MOLO:  I'm instructing him not
18  to answer the question that he's answered three
19  times already.  Correct.
20  ███████████████████████████

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk



Page 57

Page 59

1    Q.   You think -- is your testimony that you
2 were opposed to a for-profit structure for OpenAI
3 at that time?
4    A.  I certainly don't think OpenAI should
5 turn into a for-profit organization.
6    Q.   My question was a little different.  It
7 was whether you were open to OpenAI having a
8 for-profit venture or arm and had discussions
9 about that question in the summer of 2017.
10    A.  I don't recall.
11    Q.   You just don't know one way or the
12 other?
13    A.  I would be speculating.
14    Q.   We don't want you to do that.
15        You recall the Dota one-against-one
16 meeting that OpenAI had in August 2017?
17    A.  Yes.
18    Q.   You viewed that as a trigger event,
19 didn't you?
20    A.  Yes.  I believe I raised the probability
21 of OpenAI succeeding from 1 percent to 10 percent
22 after Dota 2.
23    Q.   Right.
24        Do you know whether the technology
25 associated with the Dota 1 was open sourced?

Page 58

Page 60

8    Q.   In the summer of 2017,
9 August/September, actually, even starting in
10 June, you and Altman and Brockman and Sutskever
11 began discussing a potential conversion of OpenAI
12 into a for-profit organization; is that correct?
13    A.  We had various discussions.  I don't
14 recall the exact details.
15    Q.   Those discussions concerned, in
16 substantial part, didn't they, the possibility of
17 OpenAI having a for-profit arm?
18    A.  I don't recall.
19    Q.   You don't recall one way or the other?
20 Is that what you're saying?
21    A.  Yeah.
22    Q.   You were open to a for-profit structure
23 for OpenAI at the time, in the summer of 2017;
24 right?
25    A.  I don't think so.

1    A.  In the earlier days of open OpenAI, I
2 think almost everything was open sourced.
3    Q.   So you don't recall that that
4 technology was not open source?
5    A.  I don't.
6    Q.   And you don't recall that everyone knew
7 it was not open source?
8    A.  I don't.
9    Q.   And do you recall that there was
10 criticism of OpenAI because it wasn't open
11 source?
12    A.  I don't recall.
13    Q.   And you didn't say anything about why
14 it should be open sourced, even though it was
15 well-known that it was not; right?
16    A.  I don't recall.
17    Q.   You don't recall.
18        How did the Dota 1 play into your
19 thinking about a potential for-profit organization
20 under the OpenAI umbrella?
21    A.  I don't think that was a factor.
22    Q.   So here's the question I was going to
23 ask you.  Maybe it's a bad question now.
24        What were the reasons you were
25 considering creating a for-profit OpenAI entity in

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 61

1   2017?
2       A.   I don't recall that.
3       Q.   Did you discuss the creation of an
4   OpenAI B Corp.?
5       A.   I don't recall.
6       Q.   Do you know when a B Corp. is?
7       A.   I'm not sure I know what a B Corp. is.
8       Q.   So you're not aware that a B Corp. is
9   substantially analogous to a PBC?
10      A.   I don't know the details of what a
11  B Corp. is.
12      Q.   Do you know what a C Corp. is?
13      A.   Yes.
14      Q.   Did you direct Jared Birchall to create
15  an OpenAI B Corp. in the summer of 2017?
16      A.   I don't think so.
17      Q.   And do you recall discussing the
18  creation of an OpenAI C Corp. in 2017?
19      A.   I don't think so.
20      Q.   Do you recall directing Jared Birchall
21  to create an OpenAI C Corp. in 2017?
22      A.   I don't think so.
23      Q.   Do you -- are you aware -- do you know
24  whether Mr. Birchall created an OpenAI B and
25  C Corp. in the summer of 2017?

Page 62

1       A.   I don't think so.
2       Q.   Can you think of a reason why
3   Mr. Birchall would have created an OpenAI B and
4   C Corp. without you asking him to do so?
5       A.   Are you saying he did?
6       Q.   I'm asking you a different question.
7       A.   I don't recall him doing so.
8       Q.   But he wouldn't have done it without
9   your instruction, would he?
10      A.   No, he does some things without my
11  instruction.
12      Q.   Would he do things like create an
13  OpenAI B and C Corp. without your instruction
14  without telling you?
15      A.   It's possible.
16      Q.   Unlikely, though; right?
17      A.   Well, unless major funds are being
18  transferred, you know, it's just filing
19  corporation papers.  It's not a big deal.
20      Q.   I see.
21           Did you tell Mr. Birchall to file a
22  C Corp. on August 15th, 2015; yes or no?
23      A.   I don't recall.
24      Q.   Might have; right?
25      A.   I don't recall.

Page 63

1       Q.   And a C Corp. is a for-profit
2   corporation, isn't it?
3       A.   Yes.
4       Q.   And a public benefit corporation is
5   also a for-profit corporation; right?
6       A.   I don't know that much about public
7   benefit corporations.
8       Q.   Until recently, you were the CEO of
9   one, weren't you?
10      A.   I don't know that much about public
11  benefit corporations.
12      Q.   When you were the CEO of xAI, when it
13  was a benefit corporation, did you think it was a
14  for-profit organization?
15      A.   My understanding is it is largely a
16  for-profit corporation.
17      Q.   Right.
18           Did you discuss in 2017 a merger with
19  Tesla and OpenAI?
20      A.   It was one of the ideas bounced around.
21      Q.   Did you discuss an acquisition of
22  OpenAI by Tesla?
23      A.   Not exactly, no.  It was -- I don't
24  think OpenAI can be acquired, because it's a
25  nonprofit.  But, potentially, people could leave

Page 64

1   OpenAI, or those who wanted to could leave OpenAI
2   to join Tesla.
3       Q.   So --
4       A.   Tesla can't acquire a nonprofit.  That's
5   not a thing.
6       Q.   You think that a for-profit corporation
7   cannot acquire a not-for-profit corporation?
8       A.   Maybe I'm wrong, but I don't think so.
9       Q.   Didn't xAI make a bid to buy OpenAI
10  in the past year?
11      A.   I think that was more about the
12  intellectual property.
13      Q.   I see.
14           Well, so help them, then.  What do you
15  understand your idea to have been about Tesla
16  acquiring assets of OpenAI as a solution to
17  OpenAI's situation in 2017?
18      A.   There were many ideas that were
19  discussed.  But, I mean, just -- there -- we were
20  just spitballing.  There was just ideas being
21  passed around, not --
22      Q.   Okay.  I don't want to interrupt you,
23  sir, so my apologies.
24           But what ideas did you have for Tesla
25  being involved in advancing OpenAI and OpenAI's

Elon Musk v.                           FINAL                     September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 65

1    work in 2017?
2         A.   I don't recall.
3         Q.   Did you suggest in 2017 to Altman or
4    Brockman or Sutskever that converting OpenAI to a
5    for-profit could violate a legal duty that was
6    owed to you?
7         A.   I don't recall.
8         Q.   You don't recall or you don't know?
9         A.   (Nods head.)
10        Q.   Did you ever say in 2017, in discussing
11   a potential for-profit arm for OpenAI, that such
12   a for-profit arm would break a promise to you?
13        A.   I don't recall.
14        Q.   Did you ever tell anyone in 2017 that
15   converting OpenAI to a for-profit could violate a
16   duty of any kind owed to you?
17        A.   My back just hurts.
18             I don't recall.
19        Q.   You don't recall one way or the other?
20        A.   (Nods head.)
21             ATTORNEY MOLO:  Let's -- go ahead.
22             ATTORNEY SAVITT:  Please.
23             ATTORNEY MOLO:  I was going to say take
24   a short break.
25             ATTORNEY SAVITT:  Let me ask one more

Page 66

1    question.
2             I should say, Mr. Musk, this is not a
3    hostage situation, in terms of if you want a
4    break, we'll get it for you.
5             THE WITNESS:  Thank you.
6    BY ATTORNEY SAVITT:
7         Q.   It's just a follow-up:
8             Did you ever express in any way, in
9    writing or orally, that converting OpenAI to a
10   for-profit organization could violate the terms of
11   any agreement in the period 2017 to 2018?
12        A.   I don't recall.
13             ATTORNEY SAVITT:  Okay.  Off the record.
14             ATTORNEY MOLO:  Thank you.
15             THE VIDEOGRAPHER:  We're off the record
16   at 11:15 a.m.
17             (Recess taken from 11:15 a.m. to
18             11:28 a.m.)
19             THE VIDEOGRAPHER:  This is the beginning
20   of Media Number 3.  We're back on the record at
21   11:28 a.m.
22   BY ATTORNEY SAVITT:
23        Q.   So I think, Mr. Musk, you told me that
24   you didn't recall discussions about creating a
25   for-profit venture related to OpenAI in 2017; is

Page 67

1    that right?
2         A.   I think there were a range of ideas
3    discussed, but I don't recall the details of that.
4         Q.   So did Mr. Altman mislead you in
5    connection with discussions about an OpenAI
6    for-profit in 2017?
7         A.   I think he has -- I don't know
8    specifically on that date.  But do I feel that
9    I've been misled?  Yes, absolutely.  This -- I
10   donated money, time, reputation, recruiting to
11   create a nonprofit, open-sourced corporation; not
12   to massively enrich Brockman, Altman and others.
13        Q.   And I know you want to say that, and
14   that's fine.  I'm asking a specific question.
15   And it has to do with whether you contend that
16   Altman misled you in connection with discussions
17   in 2017 about the creation of a for-profit arm of
18   OpenAI.
19        A.   I'd have to look at specific documents
20   or -- that was eight years ago so ...
21        Q.   I appreciate that.  And if the answer
22   is you don't recall, that's fine.  I just want to
23   know what recollection you have as we're talking
24   this morning.
25        A.   I don't recall details offhand.

Page 68

1         Q.   Did Mr. Brockman mislead you in
2    connection with discussions about a for-profit
3    OpenAI in 2017?
4         A.   I feel like overall I've been misled by
5    Sam Altman, because the intent was to create a
6    nonprofit, open-source organization; not to create
7    a closed, for-maximum-profit organization that
8    enriches Altman, Brockman and others, which is
9    what has happened.
10        Q.   Okay.  So you don't recall discussions
11   in 2017 about creating a for-profit arm of
12   OpenAI; right?
13             ATTORNEY MOLO:  Objection; that's not
14   the witness' testimony.  Object to the form of the
15   question.  He said just the opposite.
16        A.   I recall having a wide range of
17   conversations where ideas were discussed.  These
18   were not agreements or anything else.  But a
19   variety of ideas were discussed.  That doesn't
20   mean anything was agreed to, but a lot of ideas
21   were discussed.
22   BY ATTORNEY SAVITT:
23        Q.   Akin to the discussions you had in 2015
24   when you were getting together with Altman and
25   Brockman; right?

Elon Musk v.                            FINAL                        September 26, 2025
Samuel Altman                      [CONFIDENTIAL]                              Elon Musk

Page 69

1          ATTORNEY MOLO:  Object to the form of
2    the question.
3    BY ATTORNEY SAVITT:
4        Q.  You can answer.
5        A.  I mean I'd be supportive of any action
6    that provided funding to the nonprofit entity,
7    provided it -- it wasn't used to unjustly enrich
8    people; and that it stayed true to its mission.
9        Q.  And that was the idea in 2015, and it
10   was the idea in 2017; right?
11       A.  Yes.
12       Q.  And, Mr. Musk, as we're talking this
13   morning, can you identify for me anything that
14   Mr. Altman said or did in 2017 that you think was
15   misleading you?
16       A.  I don't recall offhand what exactly
17   happened in 2017.  It was eight years ago.
18       Q.  I understand.  So you can't recall
19   anything as we're speaking today in 2017 that he
20   did to mislead you; fair?
21       A.  I can't recall with precision exactly
22   what happened eight years ago.
23       Q.  I understand.
24       A.  Yeah.
25       Q.  And same with Mr. Brockman, you can't

Page 70

1    recall as we're sitting here, respecting, as I
2    acknowledge events that what happened eight years
3    ago, anything that he did to mislead you in 2017;
4    is that fair?
5        A.  I don't recall -- yes, that's fair.
6        Q.  Did you rely on Mr. Brockman and
7    Mr. Altman in the course of the discussions in
8    2017 about a potential for-profit arm for OpenAI?
9        A.  I don't recall.
10       Q.  Did you make it known that if OpenAI
11   were to convert to a for-profit company you would
12   expect your fair share of equity in proportion to
13   the financial contributions that you made to
14   OpenAI since its founding?
15       A.  I don't recall.
16       Q.  You may have done that, you just don't
17   remember; right?
18       A.  It's possible.
19       Q.  You believe that you should receive, at
20   least, a majority equity stake in the OpenAI
21   for-profit that was being batted about; right?
22       A.  There were many things that were
23   discussed in the sense of spitballing ideas.  But
24   nothing came to fruition.
25       Q.  Did you believe that were a for-profit

Page 71

1    option to be pursued in 2017 you should receive a
2    majority equity stake?
3        A.  My recollection, just acknowledging that
4    this is eight years ago, was that they could be a
5    new company formed, potentially, that would be --
6    a new company that would be funded in a
7    traditional manner.
8        Q.  It would be a new company that would be
9    related to OpenAI in what way?
10       A.  We didn't get that far.
11       Q.  Would it involve the personnel and
12   intellectual property of OpenAI?
13       A.  I was in favor of anything that would
14   result in the nonprofit receiving funding and
15   supporting the nonprofit's mission.
16       Q.  And if there were to be a new company
17   formed, you would insist that you would have a
18   majority equity stake; correct?
19       A.  There were many ideas discussed.  If --
20   if a new traditional start-up was created and I
21   provided the majority of the funding, or maybe all
22   the funding, and was principal cofounder, then in
23   the situation like that, it would be typical to,
24   at least at first, have a majority of the company.
25       Q.  So are you saying that the 2017

Page 72

1    discussions assumed that the not-for-profit would
2    remain in place?
3        A.  These discussions were -- there were
4    many ideas discussed; but none of them were
5    pursued in-depth.
6        Q.  You -- in the context of the 2017
7    discussions that we've been talking about, you
8    wanted to control any potential for-profit OpenAI
9    organization; is that right?
10       A.  Many ideas were discussed.  None came to
11   fruition.  None were discussed in detail.
12          But if a new company was formed at
13   first, if I was providing, essentially, all the
14   money and was principal cofounder, then at first I
15   would have majority control, but not over time.
16       Q.  And having majority control at the
17   launch of a for-profit organization was a
18   nonnegotiable point for you; correct?
19       A.  Well, it -- you have to say where does
20   the equity go if -- if I were to provide the most
21   of the funding, if not all the funding, and be one
22   of the principal cofounders, then in the short
23   term I would have majority control, but not in the
24   long term.
25       Q.  What details did you get into

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman                [CONFIDENTIAL]                    Elon Musk

Page 73

1  respecting the creation of such an organization
2  in 2017?
3      A.  We did not get into much detail.
4          (Incidental comments made off the
5          stenographic record.)
6  BY ATTORNEY SAVITT:
7      Q.  Okay.  Do you recall in the context of
8  the 2017 discussions with Altman and Brockman and
9  Sutskever that you suggested you would step down
10  as CEO of Tesla?
11     A.  I don't recall.
12     Q.  You recall telling Brockman and Altman
13  that you were thinking -- planning to step down
14  as CEO of Tesla, and you'd have more time to
15  devote to OpenAI.  Do you remember saying that?
16     A.  I don't recall.
17     Q.  You don't recall one way or another?
18     A.  No.
19     Q.  But you recognize that it would be
20  important to devote more time to OpenAI were you
21  to have the control that you felt was so
22  important?
23     A.  Yes.
24     Q.  And did you undertake with Altman and
25  Brockman and others that you would spend more

Page 74

1  time in that circumstance?
2      A.  If that were to happen, I would spend
3  more time, yes.
4      Q.  Because up until, then you hadn't been
5  spending that much time; right?
6      A.  There were -- the time allocation to
7  OpenAI varied from heavy to light, depending on
8  the needs of the company.
9      Q.  Do you recall that in 2016 you
10  committed to providing quarterly grants of
11  $5 million to OpenAI?
12     A.  I do vaguely recall that, yeah.
13     Q.  And you remember that you covered the
14  rent and related expenses for OpenAI's use of the
15  Pioneer Building?
16     A.  Yes.
17     Q.  And in the midst of these discussions
18  about the creation of a for-profit in 2017, you
19  suspended your $5 million quarterly grant, didn't
20  you?
21     A.  Yes, I -- I think at that point I became
22  concerned that OpenAI veering from its mission.
23     Q.  Is that why you suspended the quarterly
24  grant?
25     A.  I -- I felt I couldn't trust Sam and

Page 75

1  Greg.
2      Q.  What caused you to believe that you
3  couldn't trust Sam and Greg?
4      A.  They seemed to be heading in a direction
5  that would result in self-enrichment; and, indeed,
6  that is what happened.
7      Q.  What did Sam or Greg do in 2017 that
8  caused you to think that they were heading in a
9  direction of self-enrichment?
10     A.  They seemed to be wanting to prioritize
11  a closed-source, for-profit approach as opposed to
12  a nonprofit, open-source approach.
13     Q.  Your testimony is that the question of
14  open sourcing was a relevant subject of
15  discussion in the 2017 discussions regarding a
16  potential for-profit arm?
17         ATTORNEY MOLO:  Object to the form of
18  the question.
19  BY ATTORNEY SAVITT:
20     Q.  You can answer.
21     A.  It was one of the things, yeah.
22     Q.  And your testimony is that you were
23  advocating that open source should remain a
24  principal objective, and Brockman and Altman were
25  veering the other way; is that right?

Page 76

1          ATTORNEY MOLO:  Object to the form of
2  the question.
3      A.  Yeah, literally, the name of the company
4  is meant to -- is based on open source.  That's
5  why I named the company OpenAI after open source.
6  BY ATTORNEY SAVITT:
7      Q.  Is there anything you can tell me other
8  than what you've already told me respecting what
9  Brockman or Altman did tell you in 2017 regarding
10  open sourcing?
11     A.  I don't have -- I don't have anything
12  more to add.
13     Q.  Just remember them being less committed
14  to open sourcing, and that's all you have; right?
15     A.  Yes.
16     Q.  Was the decision to stop funding OpenAI
17  with the quarterly grants related to open
18  sourcing?
19     A.  It was a factor.
20     Q.  And the other factor was your concern
21  that Altman and Brockman seemed to be interested
22  in a for-profit organization?
23     A.  Yes.  They -- I started to feel like I
24  was being swindled.
25     Q.  In 2017?

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman               [CONFIDENTIAL]                        Elon Musk

Page 77

1    A.  Yeah, at least I started to suspect that
2  I was being swindled and that they were
3  essentially taking money that was donated to a
4  nonprofit and would ultimately use that to enrich
5  themselves, which is exactly what they did.
6    Q.  Right, I heard that.
7    A.  Yes.  You'll hear it a few times more.
8    Q.  I'm sure.
9        But my question is a little more -- it's
10 a little narrower.  Let me try it this way,
11 Mr. Musk:
12       Did you ever communicate, in the course
13 of 2017, to Brockman or Altman that you were
14 concerned about their commitment to open sourcing?
15    A.  I probably did.
16    Q.  Do you remember doing so?
17    A.  I think I did.
18    Q.  Did you send them a text or an email on
19 this subject?
20    A.  I don't recall.
21    Q.  Do you remember what you said?
22    A.  What I would have said was OpenAI needs
23 to stay true to its mission of being an
24 open-source nonprofit.
25    Q.  You would've said that or you did say

Page 78

1  that?
2    A.  I'm pretty sure I said it probably
3  multiple times.
4    Q.  What did they tell you in response?
5    A.  They were, as I recall, evasive on those
6  questions.
7    Q.  They were evasive?
8    A.  Uh-huh.
9    Q.  Can you say anything more than that?
10    A.  They wouldn't commit to that.
11    Q.  So you're saying that Altman and
12 Brockman refused to commit to maintaining the
13 level of open sourcing that the company had had
14 in the course of your discussions in 2017?
15    A.  That's my recollection.
16    Q.  That's your recollection.
17    A.  And, in fact, that's what happened.
18    Q.  Right, that's what you say.
19       You, though, Mr. Musk, were also
20 discussing many different options for a for-profit
21 future for OpenAI in 2017; isn't that right?
22    A.  We were discussing many ways to fund the
23 nonprofit.
24    Q.  Right.
25       And everyone knew the nonprofit needed

Page 79

1  more funding if it was to be able to compete;
2  correct?
3    A.  It did need more funding, yes.
4    Q.  And you don't disagree that OpenAI
5  needed to find a way to raise a lot more capital
6  if it was going to be reasonably competitive from
7  the perspective of 2017?
8    A.  Yes, it needed to raise capital.
9    Q.  Yeah.
10       You never reached an agreement in the
11 course of 2017 regarding the creation of an OpenAI
12 for-profit.
13       Do I have that right?
14    A.  I think so; correct, yes.
15    Q.  Do you remember that Brockman and
16 Sutskever wouldn't agree to give you control in a
17 potential for-profit structure?
18    A.  I do recall that, yeah.
19    Q.  And as a result of Brockman and
20 Sutskever not wanting to give you control, the
21 discussions broke down; is that right?
22    A.  Yeah, in the -- we're just batting
23 around ideas here.  But if a for-profit entity was
24 created as a means to fund the nonprofit, that, in
25 the short term, I would -- if I'm providing all or

Page 80

1  most of the capital, and my time, representation,
2  and everything else, that in the short term I
3  would have majority control, but over time, I
4  would not.
5    Q.  And did you make clear that your plan
6  was to have control at the beginning and then
7  relinquish control in time?
8    A.  Yes.
9    Q.  Did you make that clear in any
10 document, that you're aware of?
11    A.  I think it's in, probably, some of the
12 emails.
13    Q.  You think it's in the some of the
14 emails?
15    A.  Yeah.
16       ATTORNEY SAVITT:  Okay.  Why don't we
17 take a look at what's been marked as Exhibit 3.
18       (Whereupon, Musk Exhibit Number 3 was
19       marked for identification and is
20       attached hereto.)
21 BY ATTORNEY SAVITT:
22    Q.  Exhibit 3 is an email exchange dated
23 September 20th, 2017.
24       Do you see that, sir?
25    A.  Yes.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

---

Page 81

1      Q.   And it's among you and Mr. Sutskever,
2  Mr. Altman, Mr. Brockman.  Mr. Teller and
3  Ms. Zilis were also copied on the email.
4          Do you see that?
5      A.   (Nods head.)
6      Q.   And you know that you attached this
7  document to your complaint in this action?
8      A.   Yes.
9      Q.   Did you review your complaint in the
10 action in anticipation of your testimony today?
11     A.   I did read it.
12     Q.   Yeah.
13         So the bottom email, at 2:08, is a long
14 one.  It's from Greg and Ilya.
15         Do you see that?
16     A.   (Nods head.)
17         ATTORNEY MOLO:  When you say the bottom
18 one, do you mean the first page?
19         ATTORNEY SAVITT:  Yeah -- well, I'm
20 sorry.
21         ATTORNEY MOLO:  It's about a quarter
22 down.  Is that the one you're talking about?
23         ATTORNEY SAVITT:  Yeah, that's the one
24 I'm -- yes, it's the first of two emails in this
25 chain.

---

Page 82

1          ATTORNEY MOLO:  Okay.
2      A.   (Witness reviews document.)
3          So what are you asking?
4  BY ATTORNEY SAVITT:
5      Q.   I just wanted to give you a chance to
6  look at the document.
7          Here's what I wanted to know:
8          You see that --
9          ATTORNEY MOLO:  Give him a moment to
10 read it.
11         ATTORNEY SAVITT:  I'd just given him a
12 moment.  He asked me if I had a question, so ...
13     A.   Go ahead.
14 BY ATTORNEY SAVITT:
15     Q.   Thank you.
16         You see that Sutskever and Brockman, in
17 their email to you at 2:08, discuss some concerns
18 about the current structure of governance in the
19 first bullet point at the bottom of the page?
20     A.   Of page 1?
21     Q.   Yes.  Yes.
22     A.   I see that they write this point.
23     Q.   Yeah.
24         And you see what else they said -- and I
25 just wanted you to have this, as Mr. Molo was

---

Page 83

1  saying, so that you understood the context of the
2  email.
3      A.   Yes.
4      Q.   So the -- Ilya and Greg expressed some
5  concerns about the governance structure that
6  you've suggested.
7          And then you respond at 2:17 p.m.,
8  Mr. Musk.  Do you see?
9      A.   Uh-huh.
10     Q.   And you say:
11         "Guys, I've had enough.  This is
12 the final straw.  Either go do something
13 on your own or continue with OpenAI as a
14 nonprofit.  I will no longer fund OpenAI
15 until you have made a firm commitment to
16 stay, or I'm just being a fool who's
17 essentially providing free funding to
18 you to create a start-up.  Discussions
19 are over."
20     A.   Yes.
21     Q.   And you meant discussion of a
22 for-profit conversion were over; correct?
23     A.   There were many discussions.
24     Q.   Well, what discussions were over?
25     A.   There were a wide range of discussions.

---

Page 84

1      Q.   What discussions were you saying were
2  over?
3      A.   Discussions on the future of open OpenAI
4  were over because I felt that I was being deceived
5  by Sam and Greg; that they were self-dealing and
6  that they were -- this entire thing, that they --
7  my conclusion was that I was being swindled.
8      Q.   I see.
9      A.   That what they were saying was not
10 honest.  And that really they just intended to
11 create a for-profit entity to enrich themselves as
12 much as possible, at the expense of the nonprofit
13 charity.
14     Q.   I see.
15         So when you said, "Discussions are
16 over," you were conveying the sentiment that you
17 were determined that Brockman and Altman weren't
18 being straightforward; they were trying to turn
19 the thing into a for-profit for their own benefit,
20 and you'd had it with OpenAI; fair?
21     A.   I felt I was being tricked.  I felt that
22 I was being -- that they were being deceptive;
23 that their real goal was to create a closed-source
24 maximum-profit entity for their own benefit.  And
25 that is, in fact, what happened.

---

Elon Musk v.                  FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                     Elon Musk

Page 85

1    So my suspicions were valid.
2    Q.   I understand that's your view.
3    But because of the reasons you just
4  said, on September 20th, 2017, when you said
5  discussions were over, you were saying, "I've had
6  it with you guys and --"
7    A.   "I don't trust you anymore."  That's
8  what I was saying.
9    Q.   And discussions about OpenAI, when you
10  say, "Discussions are over," they were
11  discussions about the future of OpenAI that were
12  over?
13    A.   I'm saying, I don't want to continue to
14  have discussions where I think they're being
15  dishonest.
16    Q.   And when you say, "Go do something" --
17  and can you tell me exactly what was said to you
18  that you thought was dishonest in the course of
19  these discussions?
20    A.   I summarize it here, which is that
21  they -- my opinion was that they were using --
22  that they were essentially using the money donated
23  to the nonprofit to create intellectual property
24  to create a valuable for-profit that they would
25  benefit from; and, indeed, that's what happened.

Page 86

1    Q.   But what you say here is that you won't
2  fund until you have made a firm commitment to
3  stay.
4    Do you see that?
5    A.   Uh-huh.
6    Q.   Were you prepared to continue to fund
7  if Sutskever and Brockman made a firm commitment
8  to stay?
9    A.   I think they would need to make a firm
10  commitment to stay, and I would need to understand
11  what the forward structure is to make sure that
12  the fundamental mission of being a nonprofit
13  open-source company continued.
14    Q.   Would you agree that these discussions
15  about the for-profit structure in 2017 were
16  principally between you on the one hand and
17  Sutskever and Brockman on the other hand?
18    A.   No, it was discussion -- I was talking
19  to Sam, Ilya, and Greg.
20    Q.   So your recollection is that Altman was
21  as heavily involved in those discussions as
22  Brockman and Sutskever?
23    A.   Yes; and, in fact, I think Altman was --
24  I would call Altman the chief swindler in this
25  situation, the swindler in chief.  And --

Page 87

1    Q.   You --
2    A.   The swindler in chief.  So I called him
3  Scam Altman, as you may have read.
4    That he had essentially duped Ilya into
5  thinking that -- Sam had duped Ilya into thinking
6  he could be trusted.  And, in fact, he had duped
7  Ilya into thinking that he could be trusted.  It
8  took Ilya several more years to figure out that,
9  indeed, Sam could not be trusted.  That's why Ilya
10  fired Sam from the board.
11    Q.   And you --
12    A.   But at the time, he -- at the time, Ilya
13  thought he could trust Sam.  He only later
14  realized that Sam was being deceptive and lying.
15    Q.   And you had realized all of this --
16  excuse me.  Sorry.
17    You had realized -- I'm sorry -- all of
18  this as of September 2017, about Mr. Altman?
19    A.   My suspicions were sufficient to -- that
20  I no longer trusted them.
21    Q.   And that's Altman, or Altman and
22  Brockman, or Altman and Brockman and Sutskever?
23    A.   Well, mostly -- really -- I actually
24  always thought Ilya was honest and had a strong
25  moral compass.  Sam did not.  And Greg, I'm not

Page 88

1  sure.  But since Greg has essentially acted as a
2  co-swindler with Sam, I must -- I did lump the two
3  together.  And so Sam and Greg are swindlers; Ilya
4  is -- I guess, in my opinion, largely innocent.
5  He was just tricked.
6    Q.   And you think that you, too, were
7  tricked by Altman and Brockman?
8    A.   Yes, I was tricked.
9    Q.   You say here -- you say --
10    A.   I'm not that easy to trick, you know,
11  but I was tricked.  I was fooled.
12    Q.   When you say, here, Mr. Musk, that
13  either -- you see that you say "Either go do
14  something on your own."
15    Do you see that?
16    A.   Yes.
17    Q.   What did you mean by that?
18    A.   I mean that they're always free to leave
19  a company and start a new company.  We're, for at
20  least -- we live in a free country, and it's their
21  right to leave an organization and start a new one
22  if they want.
23    Q.   Had they ever -- had Ilya or Greg ever
24  suggested they might do that?
25    A.   They may have.

Elon Musk v.                          FINAL                     September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                            Elon Musk

Page 89

1     Q.   Just don't remember as we're speaking
2  this morning?
3     A.   I don't know for sure.  That may have --
4  there were many ideas discussed, and that may have
5  been one of the things that they mentioned.
6        ATTORNEY SAVITT:  Okay.  Let me ask you
7  to have a look at the next exhibit, which is
8  Exhibit 4.
9        (Whereupon, Musk Exhibit Number 4 was
10        marked for identification and is
11        attached hereto.)
12 BY ATTORNEY SAVITT:
13    Q.   This is -- Mr. Musk, Exhibit 4 is --
14 it's really just a slightly different branch of
15 the same email we're looking at.  So if I could
16 direct you to the second email, the one that you
17 wrote at 3:08 p.m.
18    A.   The second email?
19    Q.   The second email in the chain.  The
20 first one is from Altman, and the second one --
21    A.   Oh, yeah.  Okay.
22    Q.   And this is a -- you had responded by
23 saying the discussions are over, email that we
24 looked at just a moment ago, but this is a
25 separate response to the same email, sir, if you

Page 90

1  see what I mean.
2     A.   Yeah.
3     Q.   And here you write:
4        "To be clear, this is not an
5        ultimatum to accept what was discussed
6        before.  That is no longer on the
7        table."
8        Do you see that?
9     A.   Yeah.
10    Q.   What was discussed before but was now
11 off the table?
12    A.   I mean there are many discussions about
13 what to do to fund the nonprofit, the -- the
14 OpenAI nonprofit.  But at this point in the
15 discussions, I had lost confidence in Sam and
16 Greg; and I no longer trusted them.
17    Q.   I understand that.
18        But I'm asking you, if you remember what
19 was -- what did you mean when you say it was not
20 about accepting what was discussed before, which
21 is off the table?
22        What were you referring to?
23    A.   There are many things that were
24 discussed.  So, basically, what I was saying here
25 is that I didn't want to be associated with them

Page 91

1  in any way going forward.
2     Q.   "Them" being Altman and Brockman?
3     A.   Correct.
4     Q.   Okay.  And you were saying you didn't
5  want to be associated with Altman or Brockman,
6  period, going forward.  That was the sentiment
7  here?
8     A.   I felt they were being deceptive,
9  tricking me, and I don't like to work with people
10 who are deceptive and tricking me.
11    Q.   Got it.
12        And then Altman -- and you had
13 reached -- this was the conclusion you had reached
14 on the basis of these discussions, you were kind
15 of done with Altman and Brockman?
16    A.   Yes.
17    Q.   All right.  And then the next day,
18 Altman says:  "I remain enthusiastic about the
19 nonprofit structure."
20        Do you see that?
21    A.   Yes.  Clearly, that's a huge lie.
22    Q.   What did you understand Altman to mean
23 by that?
24    A.   Well, he wrote the words that he remains
25 enthusiastic about the nonprofit structure.  But

Page 92

1  as things have turned out, really it's become a
2  maximum -- a profit-maximizing entity, not a
3  nonprofit.  It's become the polar opposite of what
4  was intended.
5     Q.   But you had already concluded you
6  couldn't trust him anyway; right?
7     A.   Yes.
8     Q.   Do you remember Brockman's reactions to
9  Exhibits 3 and 4?
10    A.   No.
11    Q.   Do you remember Sutskever's reactions
12 to Exhibits 3 and 4?
13    A.   No.
14    Q.   How about Altman?  Do you remember if
15 he had any reactions to either of these exhibits?
16    A.   Not that I recall.
17    Q.   Okay.  Thank you.
18        After negotiations regarding an OpenAI
19 for-profit broke down, did you continue to have
20 discussions with Altman and Brockman and Sutskever
21 about the path for OpenAI?
22    A.   There was some interaction in later
23 years.
24    Q.   You see in Exhibit 3 that you mentioned
25 the firm commitment to stay.

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

Page 93

1        Do you recall whether you had a view as
2 to what commitment would be necessary to satisfy
3 you from Sutskever and Brockman?
4        A.  Well, I would have wanted them to commit
5 to stay for many years and stay true to the
6 mission of OpenAI being an open-sourced nonprofit.
7        Q.  Do you recall demanding three more
8 board seats on the nonprofit OpenAI as a
9 condition of remaining associated with it?
10       A.  There were many things discussed.  That
11 may have been one of them.
12       Q.  You don't recall one way or the other?
13       A.  It does -- that -- I think it may have
14 been one of the things discussed.
15       Q.  So it rings a bell?
16       A.  It rings a bell, yeah.
17       Q.  Okay.  Do you recall asking Brockman
18 and Sutskever for a 12-month nonsolicit
19 agreement?
20       A.  I don't specifically recall that.
21       Q.  Could have happened, you just don't
22 remember; fair?
23       A.  Yeah.
24       Q.  Can you recall any other requirements
25 for you to resume funding of OpenAI?

Page 94

1        A.  No.
2        Q.  Did Brockman and Sutskever ever accede
3 to your requirements?
4        A.  No.
5        Q.  And you never resumed funding OpenAI,
6 did you?
7        A.  I -- I think I continued to pay -- well,
8 I'm not sure.  I think I may have paid for the
9 building to some degree.  But after I lost trust
10 in what they were doing, I declined to provide
11 significant further funding.
12       Q.  Did you own the Pioneer Building?
13       A.  No.
14       Q.  You rented the whole thing?
15       A.  Uh-huh.
16       Q.  And some other organizations that you
17 controlled were also in there; is that right?
18       A.  Well, Neuralink was a tenant for
19 part-time.
20       Q.  So after these 2017 discussions broke
21 down, did you remain involved with OpenAI?
22       A.  We had some interaction over the years.
23       Q.  Other than maybe the building, do you
24 recall any other financial support that you
25 provided to OpenAI after 2017?

Page 95

1        A.  I don't recall.
2        Q.  Did you give any other support of any
3 kind to OpenAI other than providing the rent
4 after these discussions broke down in 2017?
5        A.  I don't recall.
6        Q.  You don't recall one way or the other?
7        A.  (Nods head.)
8        Q.  Do you recall considering the
9 possibility that OpenAI should merge into Tesla
10 after these discussions broke down in 2017?
11       A.  There were many ideas that were
12 discussed in 2017.  Some association with Tesla
13 would have been one of the possibilities, although
14 I don't think you can merge OpenAI into Tesla.
15 But perhaps some -- people at OpenAI could -- who
16 wanted to move to Tesla could move to Tesla.
17       Q.  And Tesla could acquire the
18 intellectual property of OpenAI?
19       A.  Perhaps license it.  I don't know.
20 Yeah.  Or I don't know.  Yeah.  These discussions
21 didn't go very far.
22       ATTORNEY SAVITT:  Let's take a look at
23 what we've marked as Exhibit 5.
24 ///
25 ///

Page 96

1            (Whereupon, Musk Exhibit Number 5 was
2            marked for identification and is
3            attached hereto.)
4 BY ATTORNEY SAVITT:
5        Q.  I'm going to give you a minute to run
6 your eyes over this, Mr. Musk, before I ask you
7 any question.
8        A.  You want me to read the whole thing?
9        Q.  No, I just want -- let me ask you a
10 question, and then you can tell me if you need
11 more time.  I don't want to --
12       A.  Okay.
13       Q.  -- waste your time, but I don't want
14 you to feel rushed.
15            So do you recall this email --
16       A.  I mean, I -- now, that you put it in
17 front of me, it's -- refreshes my memory with
18 respect to the email.
19       Q.  So let me ask you to look at the second
20 page of it, if I might.  And this is -- actually,
21 take a look, if I might just to orient you, at
22 the very last page, the very back page.  It's not
23 even that one.  There's a tiny bit of text on the
24 page behind it.  Yeah.
25            Do you see there Mr. Karpathy says:

Elon Musk v.                          FINAL                   September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                         Elon Musk

Page 97

1    "Long story short, Google is dominating with
2    83 paper submissions."
3          Do you see that?
4    A.   Yes.
5    Q.   And he provides some data in the course
6    of his email.  And now I wanted to ask you about
7    your email back to him on the second page.
8    A.   Okay.
9    Q.   Thank you.
10         So you write here:
11         "OpenAI is on a path to certain
12    failure relative to Google.  There
13    obviously needs to be immediate and
14    dramatic action, or everyone except for
15    Google would be consigned to
16    irrelevance.  I've considered the ICO
17    approach and will not support it."
18         Do you see that?
19    A.   I consider what?
20    Q.   "I have considered the ICO approach and
21    will not support it."
22    A.   The ICO?
23    Q.   It's in your second -- I'm sorry.  It's
24    right in the second -- it's the first sentence in
25    the second paragraph of your email.

Page 98

1    A.   You mind if I take a look?
2    Q.   You're in the wrong place.  I'm sorry.
3    Turn the page.  Yeah, that one.  It's your email
4    at 2:02 on the 31st.  I'm sorry.
5    A.   Okay.
6    Q.   Do you see --
7    A.   This one?
8    Q.   Yes, thank you.
9         And you see that's the -- the chain
10    involves you, that's Brockman, it's Ilya, it's
11    Altman and --
12    A.   Yeah.
13    Q.   -- Ms. Zilis and Mr. Teller.
14         Are you with me?
15    A.   Yes.
16    Q.   Thank you.
17         You write:
18         "OpenAI is on a path of certain
19    failure relative to Google."
20         Do you see that?
21    A.   Yes.
22    Q.   Thank you.
23         "There obviously needs to be
24    immediate dramatic action, or everyone
25    except for Google will be consigned to

Page 99

1    irrelevance."
2         And then you say:
3         "I have considered the ICO approach
4    and I will not support it."
5         With me?
6    A.   Yes.
7    Q.   Why did you believe open OpenAI was on
8    a path to certain failure?
9    A.   Well, the execution of the company and
10    the capital available to the company were not
11    currently tracking to compete with Google at that
12    time.
13    Q.   Do you know what the "ICO approach"
14    was?
15    A.   Actually, I don't recall what the
16    acronym stands for.
17    Q.   I think it may be "initial coin
18    offering."
19    A.   Oh, my God.
20    Q.   Does that sound right?
21    A.   You mean a crypto coin.
22    Q.   Well, I'm asking you what your
23    recollection --
24    A.   Yeah, yeah, yeah, I guess that's what I
25    would say it stands for in this context is issuing

Page 100

1    a crypto coin.
2    Q.   What was the approach, and why did you
3    not support it?
4    A.   I felt that would basically be
5    perceived -- and really be a scam cryptocurrency;
6    it would be perceived as such, and it would
7    destroy the credibility of the company.
8    Q.   And does it remain your view that
9    that's true?
10    A.   Yeah, I'm not a big believer in scam
11    cryptocurrencies.
12    Q.   Are you a big believer in other
13    cryptocurrencies?
14    A.   I think Bitcoin has merit.
15    Q.   And then further down, you say -- and
16    I'm in the next paragraph, Mr. Musk:
17         "The only paths I can think of are
18    major expansion of OpenAI and a major
19    expansion of Tesla AI."
20         Do you see that?
21    A.   Yeah.
22    Q.   Now, you see we're in January 2018.
23         What was Tesla AI?
24    A.   Tesla AI was the team working on making
25    the car achieve self-driving.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 101

1      Q.   It was a unit within Tesla.
2      A.   Yeah, we call it the Autopilot team.
3      Q.   And it was up and running as of
4  January 2018?
5      A.   Yes.
6      Q.   And what were your ambitions for
7  Tesla AI at the time?
8      A.   At the time, to make the car drive
9  itself using AI.
10     Q.   Did Tesla AI ever get off the ground?
11     A.   Yes.
12     Q.   And is it still functioning with that
13  same objective?
14     A.   Yes.  I mean, the objectives are now --
15  they have now expanded to enable the humanoid
16  robot to -- so it's vehicle AI and -- and humanoid
17  robot AI, essentially real-world with AI.
18     Q.   You then write:
19         "As for the major expansion of
20     OpenAI," you say, "the -- and Tesla AI,"
21     you say, "the former" -- which I believe
22     is referring to an expansion of
23     OpenAI -- "would require major increase
24     in funds donated and highlight credible
25     people joining the board."

Page 102

1              That was your view of what needed to
2  happen in OpenAI?
3      A.   Could you repeat that.
4      Q.   I'm sorry.
5          You see that you write:
6         "The former would require a major
7      increase in funds donated and highly
8      credible people joining our board."
9      A.   Yes.
10     Q.   And that's what -- that was your
11  prescription for the major expansion of OpenAI;
12  correct?
13     A.   Yeah.
14     Q.   All right.  I just wanted to make sure
15  I have the sentence right.  Thank you.
16          And then further down you write -- now
17  I'm three sentences into the next paragraph,
18  Mr. Musk.
19          You write.
20         "Either we fix things and my
21      engagement increases a lot, or we don't
22      and I will drop to near zero near and
23      publicly reduce my association."
24          Do you see that?
25     A.   Yeah.

Page 103

1      Q.   Your engagement did not increase a lot
2  after this; right?
3      A.   Yes.
4      Q.   It reduced to near zero; is that right?
5      A.   Very little, yes.
6      Q.   You stepped off the board of OpenAI in
7  2018, didn't you?
8      A.   Yes.
9      Q.   In February?
10     A.   I don't recall exact month.
11     Q.   And is one of the reasons you stepped
12  off the board that you wanted to advance the work
13  of Tesla AI?
14     A.   No.  The reason I stepped off the board
15  was that I no longer trusted Sam and Greg.
16     Q.   Did you ever tell anyone that you had
17  lost trust in Sam and Greg in 2017 and 2018?
18     A.   Well, I probably said this to Shivon and
19  Sam.  I'm just guessing.  I probably would have
20  mentioned it to some people.  But only in
21  confidence.
22     Q.   But you would have expected that you
23  would have said, orally or in writing to
24  Mr. Teller or Ms. Zilis, that as of 2017 you had
25  lost trust in Altman and Brockman and thought

Page 104

1  that they were swindling?
2          ATTORNEY MOLO:  Object to the form of
3  the question.
4  BY ATTORNEY SAVITT:
5      Q.   You can go ahead and answer it.
6      A.   I don't recall.
7      Q.   Do you recall, yes or no, whether you
8  told anyone in 2017/2018 that you had lost trust
9  in Altman and Brockman because you thought they
10  were dishonest?
11         ATTORNEY MOLO:  Object to the form of
12  the question.
13     A.   I don't recall.
14  BY ATTORNEY SAVITT:
15     Q.   So it's possible you may not have ever
16  said a word of that to anyone in 2017 or 2018?
17         ATTORNEY MOLO:  Object to the form of
18  the question.
19     A.   It's unlikely.  I probably would have
20  mentioned it.
21  BY ATTORNEY SAVITT:
22     Q.   And if you were going to mention it, it
23  would have been to Keller or Zilis?
24     A.   Probably.
25     Q.   Yeah.

Elon Musk v.                           FINAL                      September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                             Elon Musk

Page 105

1    Was one of the reasons you stepped off
2  the board because you were concerned that Tesla AI
3  and OpenAI would be competing for the same talent?
4    A.  That may been a contributing factor.
5    Q.  Was one of the reasons you stepped off
6  the board because you were going to try to
7  attempt AI through Tesla rather than through
8  OpenAI?
9    A.  Well, Tesla needed to solve -- these are
10 different types of AI.  So Tesla needed to solve
11 real-world AI for self-driving.  OpenAI was trying
12 to solve artificial general intelligence.  Those
13 are different types of AI.  They are not directly
14 competitive.
15    Q.  Is one of the reasons you stepped off
16 the board because you had concluded that OpenAI
17 couldn't muster the resources to be an effective
18 counterweight to Google DeepMind?
19    A.  The primary reason I stepped off the
20 board was a loss of trust in Sam and Greg.
21 That -- in fact, that was the necessary and
22 sufficient condition.  In fact, that was -- yeah,
23 once I lose trust in people, I don't want to be --
24 I don't want to work with them.
25    Q.  And that happened during these

Page 106

1  discussions about a for-profit pivot in 2017;
2  right?
3    A.  Yes.
4    Q.  Sticking for just a second with the
5  document we were just looking at, if I could ask
6  you to look at the first page of it, Mr. Musk.
7    And you see four paragraphs in,
8  Mr. Karpathy writes:
9    "A for-profit pivot might create a
10 more sustainable revenue stream over
11 time."
12    Do you see that?
13    A.  Yeah.
14    Q.  And then he writes:
15    "The most promising option I can
16 think of, as I mentioned here, would be
17 for OpenAI to attach to Tesla as its
18 cash cow."
19    Do you see that?
20    ATTORNEY MOLO:  I'm sorry.  Where is
21 that?  That's the next paragraph?
22    ATTORNEY SAVITT:  Yes, thank you,
23 Mr. Molo.
24    A.  Yeah, I see he writes that.
25 ///

Page 107

1  BY ATTORNEY SAVITT:
2    Q.  And you respond that Mr. Karpathy is
3  exactly right, don't you?
4    A.  Yes.
5    Q.  You say.
6    "We may wish it otherwise, but in
7  my and Andrej's opinion, Tesla is the
8  only path that could even hope to hold a
9  candle to Google.  Even then the
10 probability of being a counterweight to
11 Google is small; it's just not zero --
12 It just isn't zero."
13    That's what you said; right?
14    A.  That's what I thought in this email,
15 yes.
16    Q.  So the probability that you assigned
17 for OpenAI to hold a candle to Google without
18 Tesla was zero; right?
19    A.  I guess, in that moment, I did, yes.
20    Q.  And you agreed with Mr. Karpathy that
21 OpenAI needed to attach to Tesla to have any
22 chance of being a counterweight to Google;
23 correct?
24    A.  In that moment, yes.
25    Q.  And, now, on the scenario where OpenAI

Page 108

1  would use Tesla as a cash cow, it would no longer
2  be a not-for-profit corporation; right?
3    A.  Not necessarily.
4    Q.  I'm sorry.  When you say "not
5  necessarily," you mean that it might still be a
6  not-for-profit corporation?
7    A.  Yeah, I think the core institution of
8  OpenAI would continue, supported by Tesla.
9    Q.  So your theory was that Tesla would
10 provide cash to OpenAI, which would be a
11 not-for-profit?
12    A.  Yeah.  A nonprofit can still engage in
13 transactions, you know.  It's -- a nonprofit does
14 not mean it does not make revenue.  It just means
15 that it doesn't -- that that revenue and cash flow
16 does not accrue to the value of individuals; it's
17 accrues to the value of the nonprofit.
18    Q.  So the revenue wouldn't accrue to the
19 benefit of Tesla in this scenario?
20    A.  The -- well -- if OpenAI provided
21 services to Tesla, Tesla would pay OpenAI for the
22 those services or for that intellectual property.
23    Just -- it is normal for nonprofits to
24 engage in business transactions and to earn
25 revenue.  It's just that they don't disburse the

Elon Musk v.                        FINAL                    September 26, 2025
Samuel Altman                 [CONFIDENTIAL]                        Elon Musk

Page 109

1    profits to shareholders.
2        Q.  So the theory was Tesla would invest
3    the billions that were necessary to create
4    OpenAI -- to create artificial intelligence
5    through OpenAI?
6        A.  No, you're using the wrong word because
7    invest implies a shareholder return.
8        Q.  Thank you.  You're right, and I
9    misspoke.
10           Your hypothesis was that Tesla would
11   contribute billions to OpenAI and would not expect
12   a return in exchange --
13       A.  No, that's -- no, that's false.
14       Q.  So tell me how it was going to work.
15       A.  Yeah.  So you would -- a nonprofit,
16   obviously, can engage -- can sell goods and
17   services.
18       Q.  Yeah.
19       A.  And if Tesla were to essentially pay
20   OpenAI for AI services and intellectual property,
21   then that would benefit Tesla AI.
22           And it's normal, actually, for --
23   obviously, for nonprofits to sell products and
24   services.  It just -- what's not normal is to,
25   then, enrich individuals.

Page 110

1        Q.  If OpenAI using Tesla as a cash cow
2    were to achieve AGI, to whose benefit would the
3    ensuing economic opportunity have accrued?
4            ATTORNEY MOLO:  Object to the form of
5    the question, because this is all hypothetical as
6    to what this situation would be.  It never
7    happened.
8    BY ATTORNEY SAVITT:
9        Q.  You can answer.
10       A.  Well, it would accrue to the nonprofit
11   of OpenAI.  But Tesla would -- would benefit by
12   accelerating self-driving AI.
13           So it would be as sort of -- a normal
14   and reasonable transaction where Tesla would fund
15   OpenAI in exchange for OpenAI helping solve the
16   self-driving mission of Tesla.
17       Q.  So is the cash cow idea one in which it
18   would essentially be a services type agreement
19   between Tesla and the not-for-profit?
20       A.  Yeah.
21           ATTORNEY MOLO:  I don't want to break
22   for lunch yet because we got a late start, but
23   could we take another 10-minute break now?
24           ATTORNEY SAVITT:  Yeah, that's fine.
25           THE VIDEOGRAPHER:  Okay.  We're off the

Page 111

1    record at 12:19 p.m.
2            (Recess taken from 12:19 p.m. to
3    12:38 p.m.)
4            THE VIDEOGRAPHER:  This the beginning of
5    Media Number 4.  We're back on the record at
6    12:38 p.m.
7            ATTORNEY MOLO:  I'd like to make one
8    correction.  When I was citing docket numbers for
9    the order of July 9 of 2025, I said 199, 200 and
10   201.  I meant to say 203, not 201.  So that
11   corrects that.  Thank you.
12           ATTORNEY SAVITT:  Thank you, Mr. Molo.
13   BY ATTORNEY SAVITT:
14       Q.  Mr. Musk, you testified a little bit
15   earlier that discussions about an OpenAI
16   for-profit in 2017 were about a for-profit as a
17   means to fund the nonprofit.
18           Do you recall that testimony?
19       A.  There were many discussions, and I think
20   that was one of them.
21       Q.  That was one of them.
22           Is it your testimony that all the
23   for-profit structures that were discussed in 2017
24   would have involved keeping the nonprofit in
25   place?

Page 112

1        A.  I think so.
2        Q.  So there was no contemplation that the
3    nonprofit would be converted; is that your
4    testimony?
5        A.  I don't recall -- I don't recall
6    seriously entertaining -- I don't know how you
7    convert a nonprofit.
8        Q.  No contemplation of creating a
9    for-profit organization, B Corp. or a C Corp,
10   that would become the successor to OpenAI; is
11   that your testimony?
12       A.  I mean there are many ideas that were
13   discussed.  Yeah, none were pursued to my --
14       Q.  I understand.  And I appreciate none
15   why pursued.  I'm wanting to make sure I
16   understand the scope of discussions.
17           Is it your recollection that the
18   discussions included structures in which the
19   for-profit would fund the nonprofit and that the
20   not-for-profit would become the successor to the
21           ATTORNEY MOLO:  Object to the form of
22   the question.
23       A.  There are many discussions that may have
24   been among the many discussions.
25   ///

JANE ROSE REPORTING                      California Firm No. 254
1-800-825-3341                      janerose@janerosereporting.com

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman              [CONFIDENTIAL]                     Elon Musk

Page 113

1    BY ATTORNEY SAVITT:
2       Q.  I see.  So fair to say that you don't
3    recall whether the discussions included scenarios
4    in which the nonprofit would be converted into a
5    for-profit organization?
6           ATTORNEY MOLO:  Objection; asked and
7    answered.
8       A.  I don't know how you could convert a
9    nonprofit into a for-profit.
10   BY ATTORNEY SAVITT:
11      Q.  But my question was whether that
12   possibility was discussed and whether you recall
13   such discussions.
14      A.  I don't recall.
15      Q.  So it might have happened, it might not
16   have, you don't know?  Is that fair?
17      A.  There were many ideas batted around.
18      Q.  I think -- maybe I misunderstood here.
19          I'd understood your description of
20   Tesla AI to be the unit within Tesla that was
21   building autonomous or self-driving cars; is that
22   right?
23      A.  That would be the team responsible for
24   the software that would -- the AI software in the
25   cars.

Page 114

1       Q.  Is it your testimony that Tesla AI, as
2    it was conceived of in 2018, for example, did not
3    have the aspiration to be a full-on AI research
4    lab?
5           ATTORNEY MOLO:  Object to the form of
6    the question.
7       A.  Well, it -- I don't like the word
8    "research lab."  I think -- but in terms of AI
9    engineering, the Tesla AI team was responsible for
10   engineering the AI -- the real-world AI to drive
11   the car.
12   BY ATTORNEY SAVITT:
13      Q.  Was Tesla AI conceived of as a
14   potential counterweight to Google DeepMind?
15      A.  Long-term, perhaps; but the focus,
16   obviously, needed to be and has been achieving
17   real-world AI with the cars.
18          ATTORNEY SAVITT:  Let's take a look at
19   our Tab 140, which is Exhibit -- well, 169.
20          (Incidental comments made off the
21          stenographic record.)
22          ATTORNEY SAVITT:  This needs to be
23   marked as Exhibit 16.
24   ///
25   ///

Page 115

1           (Whereupon, Musk Exhibit Number 16
2           was marked for identification and is
3           attached hereto.)
4    BY ATTORNEY SAVITT:
5       Q.  Mr. Musk, Exhibit 16 is an email
6    exchange between you and Gabe Newell from
7    November 2018.
8           Do you see that?
9       A.  Yeah.
10      Q.  Who is Gabe Newell?
11      A.  He is the creator and CEO of Valve
12   software.
13      Q.  And you see that in his email to you at
14   4:17 p.m. he makes reference to introducing
15   people to -- the people at OpenAI.
16          Do you see that?
17          It's in Item Number 1 of his email to
18   you, sir.
19          ATTORNEY MOLO:  Take your time to read
20   it.
21          (Witness reviews document.)
22      A.  Yes.
23   BY ATTORNEY SAVITT:
24      Q.  And in response to that part of
25   Mr. Newel's query, you say in the final email of

Page 116

1    your response, "Regarding open OpenAI."
2           Do you see that, sir?
3       A.  Uh-huh.
4       Q.  "My involvement is very limited at
5    this point.  I still provide some
6    financial support and get verbal and
7    email updates every few weeks from
8    Sam Altman.  But I don't spend time
9    there."
10          Was that true?
11      A.  Yeah, I think that's true.
12      Q.  Then you say:
13          "I lost confidence that OpenAI
14   could muster the resources to serve as
15   an effective counterweight to Google
16   DeepMind."
17          "Let me stop there.  Was that true?
18      A.  Yes.
19      Q.  And then you say:
20          "And decided to attempt that
21   through Tesla instead."
22          Do you see that?
23      A.  Yes.
24      Q.  And was that true?
25      A.  Well, the Tesla focus needed to be on

Elon Musk v.                         FINAL                     September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                          Elon Musk

---

Page 117

1    real-world AI. So -- which proved to be much more
2    difficult than we anticipated so ...
3       Q. But did Tesla -- did Tesla AI have
4    ambition to serve as an effective counterweight
5    to Google DeepMind in 2018?
6       A. Ambition, yes. Realized, no.
7       ATTORNEY SAVITT: Let's take a look at
8    the next exhibit, which is Exhibit 17. I think
9    it's going to be; right?
10       (Whereupon, Musk Exhibit Number 17
11       was marked for identification and is
12       attached hereto.)
13    BY ATTORNEY SAVITT:
14       Q. I wanted to ask you a couple of
15    questions, Mr. Musk, about the paragraphs after
16    "the event" on the first page of this email.
17       Do you see that?
18       A. Yes.
19       Q. And you see this email is from
20    Ms. Zilis to Mr. Teller and others.
21       A. Uh-huh.
22       Q. And she writes, Ms. Zilis does:
23       "The purpose of this event is to
24       share that Tesla is building a
25       world-leading artificial intelligence

---

Page 118

1       lab" -- with a question mark after it --
2       "which will rival the likes of Google,
3       DeepMind and Facebook AI research."
4       Do you see that?
5       A. Uh-huh.
6       Q. Does that refresh your recollection
7    that Tesla was planning to build a world-leading
8    artificial intelligence lab to rival the likes of
9    Google DeepMind?
10       A. Well, I'm not on this email.
11       Q. That's true.
12       A. My primary concern at that -- in 2017
13    was solving real-world AI. That was the priority,
14    that does remain the priority. And has proven
15    much harder than we expected.
16       Q. Along those lines, this email goes on
17    to say, at the first paragraph after "why share
18    this message" -- or I should say, sir, the first
19    sentence after "why share this message":
20       "Tesla is currently known for its
21       work in AI, but its AI street cred is
22       entirely within the realms of applied AI
23       for autonomous vehicles."
24       Do you see that?
25       A. Yes.

---

Page 119

1       Q. And was that true at the time?
2       A. Yes.
3       Q. But then in the last sentence of this
4    paragraph, it's written -- Ms. Zilis writes:
5       "Those who want to work on a
6       large-scale AI research don't currently
7       think of Tesla, and Elon wants to change
8       that by announcing his intention to
9       create a world-class AI lab."
10       Was Ms. Zilis's report accurate?
11       A. It's not exactly how I'd characterized
12    it.
13       Q. Yeah.
14       A. I would say the important thing, we
15    needed to be -- we needed to solve real-world AI.
16    That was the priority, and that remained the
17    priority.
18       Q. Was it Tesla AI's objective to -- now
19    I'm quoting from the beginning of the next
20    paragraph, Mr. Musk -- "convince the top AI
21    researchers and engineers that generally apply to
22    Google Brain, Facebook, AI Research, and DeepMind
23    that they should apply to Tesla as well"?
24       Do you see that?
25       A. Yes.

---

Page 120

1       Q. And was that something Tesla was trying
2    to achieve?
3       ATTORNEY MOLO: I object to the form of
4    the question. The witness has testified he's not
5    on the email. He didn't author it. He didn't
6    receive it.
7       ATTORNEY SAVITT: That's a completely
8    inappropriate objection. I was asking him whether
9    it was accurate.
10    BY ATTORNEY SAVITT:
11       Q. You can answer the question.
12       ATTORNEY SAVITT: Mr. Molo, you might
13    want to reserve your objections to things that are
14    in the realm of the plausible.
15       A. You're asking me to speculate on
16    somebody else's email here, so ...
17    BY ATTORNEY SAVITT:
18       Q. I'm actually not at all asking you to
19    speculate on someone else's email.
20       A. Okay.
21       Q. So listen to my question.
22       My question is: Is it right that it was
23    Tesla AI's objective to convince the top AI
24    researchers and engineers that generally apply to
25    Google Brain and others to apply to Tesla as well?

---

Elon Musk v.                           FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 121

1          ATTORNEY MOLO:  Object to the form of
2     the question.
3          A.    We needed to solve real-world AI, and so
4     it was important to recruit top engineering talent
5     to do that.
6     BY ATTORNEY SAVITT:
7          Q.    Including people who were going to be
8     applying to AI research labs like DeepMind;
9     right?
10         A.    It's not an exact overlap, because we
11    needed to solve real-world AI.
12         Q.    Is it true that Tesla AI's goal was to
13    bring about the best possible AI future?
14         A.    Tesla's goal is to accelerate
15    sustainable energy; and regarding -- somewhat
16    beyond that to achieve sustainable abundance with
17    real-world AI in the form of autonomous cars and
18    robots.
19         Q.    Take a look at the next page, please,
20    of the document.
21         In response to the question "What is
22    Tesla AI?"  Ms. Zilis writes:
23         "Tesla AI's goal is to bring about
24         the best possible AI future."
25         Do you see that?

Page 122

1          A.    Yes.
2          Q.    Was Ms. Zilis's characterization of
3     Tesla AI's goal accurate from your point of view?
4          ATTORNEY MOLO:  Object to the form of
5     the question.
6          A.    I mean, of course, we were trying to
7     achieve a good AI future.  So -- why wouldn't you?
8     BY ATTORNEY SAVITT:
9          Q.    And that was -- to achieve that, you
10    were going to have to find a way to be a
11    counterweight to Google DeepMind; isn't that
12    right?
13         A.    No.
14         Q.    No.
15         So you were no longer worried that
16    Google DeepMind would overwhelm the artificial
17    intelligence industry?
18         ATTORNEY MOLO:  Object to the form of
19    the question.  You're misstating the witness's
20    testimony.
21         A.    Well, you're conflating two problems;
22    which is, I said Tesla needed to solve real-world
23    AI for self-driving.  And, separately, there
24    needed to be a counterweight for AGI or sort of
25    deep super intelligence in the -- you know, in the

Page 123

1     cloud for -- as a counterweight to those are two
2     separate things.
3     BY ATTORNEY SAVITT:
4          Q.    And you see it says "who," about, I
5     don't know, five categories down.
6          A.    Yeah.
7          Q.    It says Jim Teller, Andrej Karpathy,
8     Elon Musk, and Sam Altman.
9          Do you see that?
10         A.    Yes.
11         Q.    Any understanding of what that lineup
12    of persons that Ms. Zilis mentioned were going to
13    be trying to do?
14         ATTORNEY MOLO:  Object to the form of
15    the question.  You're asking the witness to
16    speculate.
17         A.    No, I never saw this email.
18    BY ATTORNEY SAVITT:
19         Q.    I'm not asking you to speculate,
20    Mr. Musk.  Your lawyer can say as much as he
21    wants.  He can try to -- he can't answer if you
22    can't answer the questions on your own.  I'm
23    asking whether you had any idea.  That's not
24    speculation.
25         Do you have any knowledge?

Page 124

1          A.    There's no need to get angry.
2          Q.    I'm not.
3          A.    You sound like it.  You do sound angry.
4     And you're being rude and angry.
5          ATTORNEY MOLO:  You are.
6     BY ATTORNEY SAVITT:
7          Q.    I don't think --
8          A.    You are.
9          Q.    Are you going to answer the questions?
10         A.    Are you going to stop being rude and
11    angry?
12         Q.    I'm not.
13         Are you going to answer the questions?
14         ATTORNEY MOLO:  There's no reason to be
15    rude.
16         ATTORNEY SAVITT:  Mr. Molo, I'm not
17    being rude.  Your objection is inappropriate.
18    BY ATTORNEY SAVITT:
19         Q.    Are you going to answer the question?
20         ATTORNEY MOLO:  You're asking the
21    witness to speculate.
22         A.    Is it too much to ask that you behave in
23    a professional manner?
24    BY ATTORNEY SAVITT:
25         Q.    Are you going to answer the question?

Elon Musk v.                              FINAL                    September 26, 2025
Samuel Altman                        [CONFIDENTIAL]                         Elon Musk

Page 125

1    A.  What's the question?
2    Q.  The question --
3        ATTORNEY SAVITT:  Can we read back the
4    question, please.
5        (The record was read back by the
6        court reporter as requested.)
7    A.  No.
8    BY ATTORNEY SAVITT:
9    Q.  Is one of the reasons you resigned from
10   the OpenAI board that you were trying, without
11   success, to bring concerns to the OpenAI board?
12   A.  Bring concerns to the OpenAI board?
13   Q.  Yeah.
14   A.  I'm not sure what you mean.
15   Q.  Did you leave the board after bringing
16   to the attention of the OpenAI board concerns
17   about defendant's conduct in this action?
18   A.  I don't recall.
19   Q.  So you don't recall bringing any
20   concerns to the attention of the OpenAI board
21   about Altman or Brockman?
22   A.  I don't recall.
23   Q.  You don't recall the board addressing
24   any concerns that you brought to their attention
25   regarding Brockman or Altman's conduct; right?

Page 126

1    A.  I don't recall.
2    Q.  You don't recall one way or another?
3    A.  I don't recall.
4    Q.  Now, in the end, there was no
5    transaction between OpenAI and Tesla; isn't that
6    right?
7    A.  Correct.
8    Q.  Why?
9    A.  I don't know.
10       ATTORNEY SAVITT:  Let's take a look at
11   Exhibit -- which one is this?  Exhibit 6.
12       (Whereupon, Musk Exhibit Number 6 was
13       marked for identification and is
14       attached hereto.)
15       THE WITNESS:  Thank you.
16   BY ATTORNEY SAVITT:
17   Q.  Exhibit 6 is an email exchange between
18   you and Ms. Zilis and Mr. Teller.
19       Do you see that?
20   A.  Yeah.
21   Q.  And she writes, Ms. Zilis does:
22       "OpenAI hasn't fully decided
23       anything, but quick update on their
24       thinking.  Greg, Ilya and Altman seem to
25       be leaning towards continuing OpenAI."

Page 127

1        Do you see that?
2    A.  Yes.
3    Q.  "If they do stick with the current
4    structure, they will try to
5    significantly ramp up fundraising.
6    They're still not sure whether they'll
7    stay a nonprofit and focus on donations,
8    figure out a structure for equity
9    fundraiser, do a private version of the
10   token offering you guys had discussed
11   before."
12       Do you see that, sir?
13   A.  Yes.
14   Q.  And you say:  "I should talk to them
15   this week."
16   A.  Yes.
17   Q.  And this was after you had talked about
18   OpenAI looking to Tesla as a cash cow; right?
19   A.  I don't recall.
20   Q.  And this is after you had -- had
21   rejected the for-profit arms and decided that
22   Altman and Brockman were swindlers; right?
23       ATTORNEY MOLO:  Object to the form of
24   the question.
25   ///

Page 128

1    BY ATTORNEY SAVITT:
2    Q.  You can answer.
3    A.  Well, I had my -- I had, obviously,
4    begun to lose trust in Sam and Greg just -- over
5    this period of time, I was losing trust in them.
6    So, you know, my interest in working with them
7    declined as a function of time as I lost trust in
8    them.
9    Q.  Did you talk with them this week as you
10   said that you should?
11   A.  I don't recall.
12   Q.  No recollection of discussing potential
13   paths forward for OpenAI with them in
14   February 2018 or thereabouts?
15   A.  I don't recall what happened in
16   February, seven years ago.
17   Q.  I understand.
18       But did you remind Sutskever and
19   Brockman and Altman in February 2018 that they had
20   committed to the not-for-profit?
21   A.  I don't recall.
22   Q.  Just don't know?
23   A.  I don't want to speculate.
24   Q.  Yeah.  Did you tell them that pursuing
25   a different path would break a promise to you in

JANE ROSE REPORTING                              California Firm No. 254
1-800-825-3341                            janerose@janerosereporting.com

Elon Musk v.                                    FINAL                        September 26, 2025
Samuel Altman                            [CONFIDENTIAL]                              Elon Musk

Page 129

1   February 2018?
2        A.   I don't recall.
3        Q.   Did you complain that they had
4   defrauded you in February of 2018?
5        A.   I don't think so.
6        Q.   After you stepped off the OpenAI board
7   to pursue Tesla AI, you had only very limited
8   involvement in OpenAI; is that correct?
9        A.   Yes.
10       Q.   You were relatively disassociated from
11  OpenAI?
12       A.   Yes.
13       Q.   And you did seek to convince OpenAI
14  employees and bring them to Tesla; isn't that
15  fair?
16       A.   The -- the only person I recall who
17  joined Tesla was Andrej Karpathy, who had told me
18  that he was going to leave OpenAI anyway.
19       Q.   Did you try to recruit any persons
20  other than Mr. Karpathy from OpenAI?
21       A.   I think there was one guy who was doing
22  work for both OpenAI and Tesla -- I think Gray?  I
23  think I may have said, like, does he want to work
24  at OpenAI or Tesla, but he should probably pick
25  one.

Page 130

1        Q.   Do you remember who that was?
2        A.   Gray -- I -- it was someone that he was
3   doing consulting work for both companies.
4        Q.   Did you try to recruit Wojceich
5   Zaremba?
6        A.   Who?
7        Q.   Wojceich -- I may have the
8   pronunciation --
9        A.   Wojceich?
10       Q.   -- Zaremba.
11       A.   I don't recall.
12       Q.   No.  You don't remember -- you don't
13  remember one way or the other?
14       A.   No.
15       Q.   Do you recall any OpenAI employees
16  leaving OpenAI because they weren't comfortable
17  working with you?
18       A.   No.
19            ATTORNEY SAVITT:  Let's take a look at
20  Exhibit 7, please.
21            (Whereupon, Musk Exhibit Number 7 was
22            marked for identification and is
23            attached hereto.)
24  BY ATTORNEY SAVITT:
25       Q.   I'll hand this to you.  This is a text

Page 131

1   chain, February 16th, 2018, between you,
2   Mr. Musk, and Ms. Zilis.
3        Do you know whether you were on the
4   board of OpenAI at this time?
5        A.   I don't recall.
6        Q.   You see that Ms. Zilis -- you see that
7   Ms. Zilis asks you whether she should -- at the
8   very first part of this thread -- whether she
9   should stay close and friendly to OpenAI to keep
10  info flowing or begin to disassociate.
11       Do you see that?
12       A.   Yeah.
13       Q.   And you say, "Stay close and friendly";
14  right?
15       A.   Yeah.
16       Q.   Why did you want Zilis to stay close
17  with OpenAI after you were disassociating from
18  it?
19       A.   I felt it was -- it would be good for
20  Ms. Zilis to just keep an eye on OpenAI and make
21  sure that they don't deviate from the mission.
22

Page 132

12       Q.   And then a little bit farther in that
13  same chain, the second one, you say:
14            "We're going to actively try to
15       move three or four people from OpenAI to
16       Tesla."
17       Do you see that?
18       A.   Yeah.
19       Q.   Who were the three to four people that
20  you had in mind in this text chain?
21       A.   I don't recall.
22       Q.   But you'll agree that this reflects
23  that you were going to try to actively recruit
24  some OpenAI folks over to Tesla?
25            ATTORNEY MOLO:  Object to the form of

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman                [CONFIDENTIAL]                        Elon Musk

Page 133

1    the question.
2    BY ATTORNEY SAVITT:
3        Q.  You can answer.
4            ATTORNEY MOLO:  Document says what it
5    says.
6        A.  Yeah, I mean -- yeah, I mean it just --
7    I guess this is probably accurate, which is try to
8    bring a few people to Tesla, which is not a big
9    deal.
10   BY ATTORNEY SAVITT:
11       Q.  Have you told -- when you say it's not
12   a big deal, what do you mean?
13       A.  It's not a wide-scale recruiting
14   campaign.
15       Q.  And you say, "More than that will join
16   over time."
17           Do you see that?
18       A.  Yes.
19       Q.  What caused you to say that?
20       A.  That some may choose to join over time.
21       Q.  You think it wasn't a big deal because
22   it wasn't a large-scale recruiting campaign?
23       A.  Yeah, just a few people.
24       Q.  You say you don't know whether you were
25   on the OpenAI board at the time; right?

Page 134

1        A.  I don't recall the exact timing.
2        Q.  Is it okay -- would it be okay for you,
3    as a member of the OpenAI board, to recruit its
4    employees to go to another entity of which you're
5    the CEO?
6            ATTORNEY MOLO:  Object to the form of
7    the question.
8        A.  I'm not sure.
9    BY ATTORNEY SAVITT:
10       Q.  Did you consider whether you might have
11   duties to OpenAI that would prohibit you from
12   trying to poach its talent?
13       A.  I'm not certain.
14       Q.  You're not certain.
15           Did you tell anyone around this time at
16   OpenAI that you were going to seek to recruit
17   OpenAI talent for Tesla?
18       A.  I don't recall.
19       Q.  Once you left the OpenAI board, you had
20   no further management or board oversight of
21   OpenAI; correct?
22           ATTORNEY MOLO:  Object to the form of
23   the question.
24       A.  Once I left the board?
25   ///

Page 135

1    BY ATTORNEY SAVITT:
2        Q.  Yes, once you left the OpenAI board, is
3    it correct that you had no further management or
4    board oversight of OpenAI?
5            ATTORNEY MOLO:  Object to the form of
6    the question.  The witness didn't testify about
7    management oversight.
8            ATTORNEY SAVITT:  I'm not asking about
9    what he testified.  I'm asking him a question.
10   Please stop.
11           ATTORNEY MOLO:  There's no evidentiary
12   record that he had management oversight at OpenAI.
13           ATTORNEY SAVITT:  Are you done?
14           ATTORNEY MOLO:  I am done with the
15   objection, yes.
16           ATTORNEY SAVITT:  Can you read the
17   question back?
18           Would you please answer it.
19           (The record was read back by the
20           court reporter as requested.)
21       A.  Yeah, I don't know what I think about
22   management oversight to begin with; and I think I
23   stopped attending board meetings before I
24   resigned.  I was de facto not associated with the
25   company for some period of time before officially

Page 136

1    resigning.
2    BY ATTORNEY SAVITT:
3        Q.  So you tweeted on February 17th,
4    2019:
5            "To clarify, I've not been involved
6            closely with OpenAI for over a year and
7            don't have management or board
8            oversight."
9        A.  Okay.
10       Q.  Is that true?
11       A.  I guess so.
12       Q.  You have no ownership or control of
13   OpenAI; correct?
14       A.  Yes.
15       Q.  You gave up all your governance rights
16   in OpenAI when you left the board; right?
17       A.  Yes.
18       Q.  After you resigned from the board, did
19   you provide -- strike that question.
20           You were aware, weren't you, Mr. Musk,
21   that in 2018 OpenAI began considering the
22   formation of a capped-profit subsidiary?
23       A.  I don't recall.
24       Q.  You don't remember whether you came to
25   be aware of that in 2018; is that right?

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman                [CONFIDENTIAL]                    Elon Musk

Page 137

1    A.  Yeah.
2    Q.  You don't remember whether anyone
3  brought the 2018 proposal to your attention?
4    A.  I don't recall.
5        ATTORNEY SAVITT:  Let's take a look at
6  this document.
7        (Whereupon, Musk Exhibit Number 18
8        was marked for identification and is
9        attached hereto.)
10        ATTORNEY SAVITT:  That will be
11  Exhibit 18.
12  BY ATTORNEY SAVITT:
13    Q.  Exhibit 18 is an email exchange between
14  Musk, Ms. Zilis, and Mr. Teller dated 23rd of
15  April 2018.
16        Mr. Musk, the email chain begins with an
17  email from Ms. Zilis to you on March 25th.
18        Do you see that at the bottom of the
19  page?
20    A.  Yes.
21    Q.  And she writes to you:
22        "Altman is thinking through an
23        instrument where the four or five large
24        corporates who are interested can invest
25        with a capped return of 50x if OpenAI

Page 138

1        does get to some semblance of
2        money-making AGI."
3        Do you see that?
4    A.  Yes.
5    Q.  And on the turnover page, Mr. Musk, she
6  reports to you, Ms. Zilis does, on the next page
7  that, Karpathy has --
8        "Respecting Tesla AI, Karpathy has
9        three candidates in the pipeline.  May
10        have one or two coming to meet you."
11    A.  Yes.
12    Q.  And she reports that it's going to
13  follow the full stack of AI lab angle we talked
14  about; right?
15        Just out of curiosity, do you recall who
16  the one to two people may have been?
17    A.  No.
18    Q.  Okay.  So -- and then Zilis gives you a
19  little more information and says:
20        "Updated per a conversation with
21        Altman.  You're tentatively set to speak
22        with him on Tuesday."
23        Do you see that?
24        ATTORNEY MOLO:  I'm sorry, where is that
25  that you're --

Page 139

1        ATTORNEY SAVITT:  It's the second email
2  on the chain, Mr. Molo.
3        ATTORNEY MOLO:  Oh, okay.  It's on the
4  first --
5        ATTORNEY SAVITT:  Yes.  Oh, I'm sorry.
6  Yes.
7    A.  Yeah.
8        Sorry, what's the question?
9  BY ATTORNEY SAVITT:
10    Q.  I just want to -- and you say:
11        "Okay by me."
12        Right?
13    A.  Yes.
14    Q.  So you saw here that Altman was
15  thinking about return -- a capped 50 times
16  involvement structure for four to five large
17  corporate companies; right?
18    A.  That's in the email.
19    Q.  Yes.
20    A.  I'm not approving everything in this
21  email.  I'm just saying this was a --
22    Q.  So when you say, "Okay by me," you're
23  not approving everything in the email; right?
24    A.  Yeah.  Just essentially -- I think I was
25  responding to I'm due to speak to him on Tuesday,

Page 140

1  "Okay by me."
2    Q.  You see here that it was reported to
3  you that OpenAI was contemplating creating a
4  for-profit subsidiary; right?
5        ATTORNEY MOLO:  Is there some specific
6  point of the email that you're directing the
7  witness to?  You say, "You see here?"  Where is
8  "here"?
9        ATTORNEY SAVITT:  I'm asking whether
10  Mr. Musk understood that what was contemplated was
11  an instrument where corporates would invest in a
12  separate entity with a returned capped 50 times
13  investment if money is made.
14        That's what I'm talking about.
15    A.  I don't recall.
16  BY ATTORNEY SAVITT:
17    Q.  You don't recall.
18        But you do see -- and I apologize for
19  this, which is a little idiotic, I grant you.
20        You see that it was reported to you that
21  they were contemplating a capped-return structure?
22    A.  I mean, I see that's in this email.  I
23  don't recall if I actually even read the whole
24  email.
25    Q.  I see.

Elon Musk v.                          FINAL                        September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 141

1    When you learned of the formation of
2  OpenAI's capped profit structure, did you think
3  that that would reach any commitment owed to you
4  by Altman or OpenAI?
5    A.  I mean, I did learn about, at some
6  point, this capped profit structure, which gave me
7  some reason for concern; but at least the fact
8  that it was capped profit gave me some comfort. I
9  would say I was discomforted by it, but given that
10 the profit would be capped, and things would
11 revert to the nonprofit, then that gave me some
12 comfort. So I was partly uncomfortable, partly --
13 I was uncomfortable, but it was not a showstopper.
14    Q.  Would I be interpreting, Mr. Musk,
15 correctly your testimony to be that when you did
16 come to learn about the capped profit structure,
17 you had some misgivings about it, but you didn't
18 view it as violating a basic commitment or
19 agreement?
20    ATTORNEY MOLO:  Object to the form of
21 the question.  The witness's testimony is the
22 witness's testimony.  When you ask, "Is this your
23 testimony?" or, "Would it be fair?"  Just ask him
24 the question.
25 ///

Page 142

1  BY ATTORNEY SAVITT:
2    Q.  You can answer.
3    A.  Yeah, I mean, I was -- I was
4  uncomfortable with a for-profit entity, but that
5  discomfort was by mitigated by the profit cap.
6    Q.  Well, Mr. Molo wants me to ask you
7  questions; I'll ask you questions.  Let's see if
8  I can get an answer.
9    ATTORNEY MOLO:  We really don't need
10 that.
11    ATTORNEY SAVITT:  Mr. Molo, you --
12    ATTORNEY MOLO:  We really do not need
13 the external comments.
14    ATTORNEY SAVITT:  Your objection --
15    ATTORNEY MOLO:  Ask your question.
16 BY ATTORNEY SAVITT:
17    Q.  When you learned that OpenAI had formed
18 a capped-profit subsidiary, did you believe that
19 that breached a commitment owed to you by OpenAI
20 or Altman?
21    A.  I was uncomfortable with that, but it
22 didn't seem like a showstopper, because the profit
23 was capped.
24 BY ATTORNEY SAVITT:
25    Q.  And when you say it wasn't a

Page 143

1  showstopper, do you mean that that structure, at
2  least, didn't seem to you to constitute an
3  abrogation of a commitment or agreement that had
4  been made to you?
5    A.  It felt like a step in the wrong
6  direction; but because it was mitigated by the
7  profit cap, it made me uncomfortable, but not --
8  it wasn't a showstopper at that time.
9    Q.  And Altman sent you a term sheet in
10 connection with the proposed capped-profit
11 restructuring, didn't he?
12    A.  I don't recall.
13    ATTORNEY SAVITT:  Let's take a look at
14 Exhibit 8.
15    (Whereupon, Musk Exhibit Number 8 was
16    marked for identification and is
17    attached hereto.)
18    (Incidental comments made off the
19    stenographic record.)
20    A.  Yes.
21 BY ATTORNEY SAVITT:
22    Q.  So you see that this document was sent
23 to you on August 31st, Mr. Musk?
24    A.  Yes.
25    Q.  Of 2018?

Page 144

1    A.  Yes.
2    Q.  If I could ask you to look at the
3  Funding and Revenue section on the first page of
4  the term sheet.
5    ATTORNEY MOLO:  Funding and Revenue is
6  the last box.
7  BY ATTORNEY SAVITT:
8    Q.  Do you see that?
9    A.  Yes.
10    Q.  And it's written there:
11    "Initial capitalization.  OpenAI
12    L.P. will initially be capitalized by a
13    contribution of assets from the
14    nonprofit.  The nonprofit will get an
15    interest equivalent to that of a limited
16    partner in the initial raise that is
17    consistent with the value of its capital
18    contribution."
19    Do you see that?
20    A.  Yes.
21    Q.  What assets did OpenAI, Inc., the
22 nonprofit, have as of 2018?
23    A.  I don't recall.
24    Q.  You were on the board of directors; you
25 don't remember what assets --

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                   [CONFIDENTIAL]                         Elon Musk

Page 145

1          (Indiscernible cross-talk.)
2      A.   I don't recall.
3      Q.   Can you think of anything -- any assets
4  it would have had, other than IP?
5      A.   People.
6      Q.   Can you think of any assets, other than
7  IP and people, that it might have had?
8      A.   Compute.  I don't know.
9      Q.   Did OpenAI have compute in 2018?
10     A.   Had some compute.
11     Q.   Anything else?
12     A.   I can't think of anything.
13     Q.   So did you understand -- what did you
14  understand the nonprofit's IP would transfer to
15  the for-profit as an initial capitalization when
16  you reviewed this term sheet?
17     A.   I don't recall.
18     Q.   Could it have referred to anything
19  other than IP and potentially compute?
20     A.   I don't recall.
21     Q.   Can you think of anything it might have
22  referred to other than those things?
23     A.   No.
24     Q.   Okay.  What assets did you understand
25  that the OpenAI for-profit would have after the

Page 146

1  transaction contemplated by this term sheet
2  occurred?
3      A.   I did not look closely at this term
4  sheet.
5      Q.   But you wouldn't expect that the
6  for-profit investors would invest into a shell
7  company with no assets, would you?
8      A.   Probably not.
9      Q.   Probably not.
10         Now, do you think that OpenAI breached
11  its commitments to you by causing less than all of
12  OpenAI's technology to be owned by OpenAI, Inc.?
13         ATTORNEY MOLO:  Object to the form of
14  the question.
15  BY ATTORNEY SAVITT:
16     Q.   That's funny.
17         You say in the amended -- in your
18  complaint that OpenAI breached its commitments to
19  you by causing less than all of OpenAI, Inc.'s
20  technology to be owned by OpenAI, Inc.,
21  paragraph 254A.
22     A.   Okay.
23     Q.   Do you think that's true?
24     A.   Well, you can have dual ownership.  You
25  can have -- you can license things.

Page 147

1      Q.   So you wouldn't be certain or confident
2  that OpenAI breached its commitments to you by
3  causing less than all of OpenAI's, Inc.'s
4  technology to be owned by OpenAI, Inc.; right?
5      A.   Well, technology can be owned by two
6  entities.
7      Q.   I understand that.  But what I'm trying
8  to understand is, given that, doesn't it follow
9  that OpenAI, Inc. didn't breach its commitments
10  to you by causing less than all of OpenAI's
11  technology to be owned by OpenAI, Inc.?
12     A.   I'm not sure.
13     Q.   You're not sure one way or the other?
14     A.   I'm not -- the way you phrased the
15  question, I -- I'm not sure.
16     Q.   I mean I was quoting your complaint.
17     A.   Yeah.
18     Q.   You're not sure whether that is true or
19  not?
20         ATTORNEY MOLO:  Object to the form of
21  the question.  That's not what the witness said.
22  You're misstating his testimony.
23         Ask a question, please.
24  BY ATTORNEY SAVITT:
25     Q.   Was the formation of the capped profit

Page 148

1  a breach?
2          ATTORNEY MOLO:  Objection.  You're
3  asking the witness to speculate and give legal
4  opinions.
5      A.   I would not want to speculate.
6          ATTORNEY SAVITT:  My question wasn't
7  even finished, if I could -- Mr. Molo, if I could
8  finish my question before you introduce your
9  speaking objection.
10  BY ATTORNEY SAVITT:
11     Q.   Was the formation of the capped profit
12  a breach of contract or duty in your view?
13         ATTORNEY MOLO:  Object to form of the
14  question.  You're asking the witness to provide a
15  legal opinion.  He's not a lawyer.
16     A.   I don't feel comfortable providing a
17  legal opinion.
18  BY ATTORNEY SAVITT:
19     Q.   I'm not asking for your legal opinion.
20  I'm asking whether you think that some duty owed
21  to you was violated by that.
22         ATTORNEY MOLO:  Object to the form of
23  the question.  If there's a specific duty you want
24  to phrase, that's fine.  But he's not a lawyer.
25  ///

JANE ROSE REPORTING                        California Firm No. 254
1-800-825-3341                          janerose@janerosereporting.com

Elon Musk v.                    FINAL                  September 26, 2025
Samuel Altman                [CONFIDENTIAL]                    Elon Musk

Page 149

1  BY ATTORNEY SAVITT:
2      Q.  You can answer the question.
3      A.  I'm not uncertain.
4      Q.  Did you raise any objection to the
5  proposed transaction at the time that you saw the
6  summary term sheet?
7      A.  I don't recall.
8      Q.  Did you tell Altman that you thought it
9  was a violation of some duty that he owed to you
10  when he sent you the term sheet?
11      A.  I don't recall.
12      Q.  Did you tell anyone that you thought
13  that the transaction contemplated by the term
14  sheet represented a violation of any duty or
15  obligation owed to you?
16      A.  I believe I expressed discomfort to a
17  lot of people.  I felt like OpenAI was moving away
18  from its core mission.  As I said earlier, my --
19  this -- this was a -- I would say, another
20  stepping stone in the journey of losing trust in
21  Altman.
22      Q.  So my question was whether you
23  expressed to anyone the view that the transaction
24  contemplated by this agreement worked a violation
25  of any obligation owed to you.

Page 150

1          Is there anyone that you can identify
2  for me to whom you expressed that after you
3  received the summary term sheet?
4      A.  Not that I recall.
5      Q.  You can't think of anyone; right?
6      A.  I can't recall what happened seven years
7  ago.
8      Q.  Right.  And you can't identify for me
9  any writing in which you expressed the view that
10  the transaction contemplated by the summary term
11  sheet constituted a violation of any agreement or
12  duty owed to you; correct?
13      A.  I don't recall.
14      Q.  You see on page 3 of the term sheet --
15  it's the page ending in 1645.
16          That the term sheet discusses
17  significant revenue generation through
18  commercializing OpenAI's technology.  I'm in
19  the -- I don't know, it's probably the third
20  paragraph of page 3.
21      A.  I'm not sure I actually read this term
22  sheet.
23      Q.  You don't dispute that it was sent to
24  you?
25      A.  It was clearly sent to me.

Page 151

1      Q.  Thank you.
2          So you see that -- you do see, though,
3  that it discusses significant revenue generation
4  through commercializing of OpenAI's technology,
5  don't you, sir?
6      A.  That's what it says here, yes.
7      Q.  Do you think that OpenAI breached the
8  duty that was owed to you by allowing the
9  for-profit entities to reap financial benefits
10  from commercial activities?
11          ATTORNEY MOLO:  Object to the form of
12  the question, and you're asking the witness to
13  provide legal opinions.
14      A.  I am uncertain.
15  BY ATTORNEY SAVITT:
16      Q.  You don't know one way or the other?
17      A.  I'm uncertain.
18      Q.  Did you think that the proposed
19  transaction reflected here was a breach of
20  OpenAI's commitments to you?
21          ATTORNEY MOLO:  Object to the form of
22  the question.
23      A.  I don't think I read this term sheet.
24  BY ATTORNEY SAVITT:
25      Q.  So you didn't raise any objection to

Page 152

1  the term sheet once it was sent to you?
2          ATTORNEY MOLO:  Objection; asked and
3  answered.
4      A.  I don't recall doing so.
5  BY ATTORNEY SAVITT:
6      Q.  So -- and maybe you've answered all
7  these questions because you say you're not sure
8  you looked at this.  But take a look, if you
9  would, at the last box here, "Employee Comp"?
10      A.  Yeah.
11      Q.  It's written here that:  "Employees
12  will be granted profit interests in an employee
13  holding vehicle."
14          Do you see that?
15      A.  Yeah.
16      Q.  Is your view of your agreement with
17  OpenAI that OpenAI couldn't provide personnel
18  with compensation in the form of equity?
19          ATTORNEY MOLO:  Objection to the form of
20  the question.
21      A.  I don't -- I'm uncertain.
22  BY ATTORNEY SAVITT:
23      Q.  Because I'm just trying to understand
24  what you thought --
25      A.  I don't think I actually read this term

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 153

1    sheet so ...
2        Q.  Well, so my question for just this very
3    instant, Mr. Musk, is a little different.  I'm
4    asking whether you think that the agreement that
5    you had with OpenAI prohibited OpenAI from
6    providing its personnel with compensation in the
7    form of equity.
8        A.  I'm uncertain.
9        Q.  You don't know whether that violated an
10   agreement to you or not?
11       A.  It doesn't feel right.
12       Q.  But do you think it violated an
13   agreement to you?
14       A.  I'm not certain.
15       Q.  You're not certain.
16       Can you think of conduct that OpenAI has
17   undertaken since the date of this document, which
18   is -- let me get this right -- in August 2018,
19   conduct -- things that have happened since then
20   that have constituted, in your view, a violation
21   of the agreement that you had with OpenAI or the
22   term of your donations to it?
23       ATTORNEY MOLO:  Objection to the form of
24   the question.  You're asking the witness to
25   speculate about what OpenAI has undertaken.

Page 154

1        A.  Sorry.  Are you talking about in the
2    entirety of up until present day?
3    BY ATTORNEY SAVITT:
4        Q.  I'll ask you a different question.
5        Can you identify anything that OpenAI
6    has done since August 2018 that constitutes a
7    violation of the agreement that you think you had
8    with OpenAI or the term of your donations to
9    OpenAI?
10       A.  Yeah.  The -- by degrees, inverted the
11   entire of the mission of the company, gone from a
12   nonprofit open source to a closed
13   for-maximum-profit company by degrees.  And now
14   are seeking to completely remove the nonprofit and
15   end up with something diametrically opposed to the
16   original intent and what I founded.
17       Q.  Anything else?
18       A.  That's pretty big.
19       Q.  I know you feel that way.  I just want
20   to make sure I have everything that -- if there's
21   anything in addition to that, I just want to make
22   sure I've got your full account.
23       A.  That's what it comes down to, that you
24   can't steal a charity.
25       Q.  And --

Page 155

1        A.  Scam Altman is trying to steal a
2    charity, and that's not -- that's just not okay.
3        Q.  Anything else?
4        A.  That's a very big deal.
5        Q.  Anything else?
6        A.  That's the main thing.
7        Q.  Nothing else?
8        A.  Stealing a charity.
9        Q.  But there's nothing else?
10       ATTORNEY MOLO:  Object to the form of
11   the question.  You've asked the witness a question
12   four times now.  Please ask another question.
13       ATTORNEY SAVITT:  The question has been
14   asked, but it hasn't been answered.
15       ATTORNEY MOLO:  It's been answered.
16       ATTORNEY SAVITT:  Mr. Molo, we're
17   obviously going to be going to be talking with the
18   judge about --
19       ATTORNEY MOLO:  Not today, apparently.
20       ATTORNEY SAVITT:  Please stop suggesting
21   answers.
22       ATTORNEY MOLO:  I'm not suggesting
23   answers.
24       ATTORNEY SAVITT:  I think you are, and
25   the record is going to reflect it.  Please stop.

Page 156

1        ATTORNEY MOLO:  The record reflects what
2    it reflects.
3    BY ATTORNEY SAVITT:
4        Q.  I want to know whether you've now
5    given -- is there anything you can add to what
6    you think has happened at OpenAI since
7    August 2018 that constitutes a breach of some
8    obligation to you?
9        Is there anything that you haven't told
10   me in the last answer?
11       A.  I mean, there might be things that I
12   can't think of right now.  There probably are
13   things I can't think of right now.
14       Q.  Nothing you can think of -- nothing you
15   can testify about as we speak this afternoon?
16       A.  Nothing I can think of right this
17   minute.
18       Q.  Okay.  You were offered equity in the
19   capped-profit subsidiary when Altman proposed the
20   transaction in 2018, weren't you?
21       A.  At various times -- I'm not sure of the
22   exact dates -- Scam Altman has offered me shares.
23       Q.  But you've declined?
24       A.  Yes.
25       Q.  Why?

Elon Musk v.                              FINAL                    September 26, 2025
Samuel Altman                      [CONFIDENTIAL]                         Elon Musk

Page 157

1    A.  I felt it would be improper.  It seemed
2   like -- it seemed like a scammy situation.
3        Q.  Any other reason for your having
4   declined?
5        A.  I thought what -- I thought receiving
6   shares in a scammy operation would be potentially
7   illegal.
8        Q.  And I apologize if I've asked this
9   question.  I may have.  I can't remember.  But
10  it's an important one, so I get your full
11  recollection.
12       Can you identify any written
13  communication of any kind in 2018 or 2019
14  indicating that you objected to the capped-profit
15  subsidiary structure that OpenAI pursued?
16       A.  Not that I recall.
17       Q.  Is it accurate that you were supportive
18  of OpenAI at the time it formed the capped-profit
19  subsidiary?
20       ATTORNEY MOLO:  Object to the form of
21  the question.
22       A.  I don't think I would say I was
23  supportive.
24       ATTORNEY SAVITT:  Let's take a look at
25  the next exhibit, which is -- yeah.  It's

Page 158

1   Exhibit 19.
2        (Whereupon, Musk Exhibit Number 19
3         was marked for identification and is
4         attached hereto.)
5   BY ATTORNEY SAVITT:
6        Q.  Mr. Musk, I'm going to direct your
7   attention to the other notes -- notation at the
8   bottom of the page.
9        Exhibit 19 is an email exchange, and
10  you're not on it.  Ms. Zilis is communicating with
11  Reyna Ortiz and others.
12  ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
17       Q.  Okay.  But Ms. Zilis was a close
18  business colleague of yours; correct?
19       A.  Yes.
20       Q.  Okay.  She writes here -- and I'm in
21  the second bullet point under Other Notes,
22  Mr. Musk:
23       "Just for awareness, Elon does not
24       need to do the recall, because he's
25       decided to be supportive in spirit of

Page 159

1   OpenAI but not participate in the new
2   instrument."
3        Do you see that?
4        A.  Yes.
5        ATTORNEY MOLO:  Is Mr. Musk on this
6   email?
7        ATTORNEY SAVITT:  Mr. Molo, I already
8   said that he wasn't.
9        ATTORNEY MOLO:  I'm asking a question.
10       ATTORNEY SAVITT:  I told him that he
11  wasn't.  Would you please stop interfering with my
12  examination.  It's really unseemly.
13       ATTORNEY MOLO:  I'm sorry you feel that
14  way.
15       ATTORNEY SAVITT:  I mean, I already told
16  him that.  Are you just trying to supply the
17  answers?
18       ATTORNEY MOLO:  All right.  All right.
19  All right.  It's my mistake.
20  BY ATTORNEY SAVITT:
21       Q.  So my question was whether Ms. Zilis's
22  report here was accurate when she said that
23  you've decided to be supportive in support of
24  OpenAI, but not participate in the new
25  instrument.

Page 160

1        A.  I think that's correct.
2        Q.  You think Ms. Zilis's report here is
3   inaccurate?
4        A.  Yes.
5        Q.  Okay.  Did you review the draft blog
6   post in March 2019 that outlined key points
7   regarding OpenAI's capped-profit launch?
8        A.  I don't recall.
9        Q.  You don't recall.
10       Do you recall discussing the
11  capped-profit launch with Mr. Altman before it
12  went forward?
13       A.  We may have had a conversation or two
14  about it.
15       Q.  Please tell me everything you can
16  recall about those conversations, if there's
17  anything you can.
18       A.  I would have to speculate, so ...
19       Q.  So you can't -- as we're talking this
20  afternoon, you just don't remember anything that
21  may have been said in those conversations?
22       A.  Not with certainty, no.
23       Q.  Okay.  Do you have an educated guess?
24  I don't want you into speculate.
25       A.  I don't want to speculate.

Elon Musk v.                          FINAL                     September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                        Elon Musk

Page 161

1      Q.   Okay.
2           Do you recall telling Altman that you
3    had no objection to the transaction and no
4    proposed edits to the blog post?
5      A.   I don't recall that, no.
6      Q.   Is it possible you may have said that?
7      A.   It sounds unlikely.
8      Q.   Do you recall giving Mr. Altman your
9    approval to proceed with the transaction?
10     A.   I don't.
11     Q.   Did you think you had any right to veto
12   the capped-profit restructuring transaction?
13     A.   I don't think -- I didn't have any legal
14   veto rights.
15     Q.   Did you think you had the right to
16   demand changes to the proposed transaction?
17     A.   I didn't think I had any power to do --
18   to demand changes.
19          ATTORNEY SAVITT:  Can we go off the
20   record for one second.
21          ATTORNEY MOLO:  Sure.
22          THE VIDEOGRAPHER:  We're off the record
23   at 1:32 p.m.
24          (At  1:32 p.m. a luncheon recess was
25          taken until  2:23 p.m.)

Page 162

1           THE VIDEOGRAPHER:  This is beginning
2    Media Number 5.  We're back on the record at
3    2:37 p.m.
4           ATTORNEY SAVITT:  Thank you.
5    BY ATTORNEY SAVITT:
6           Mr. Musk, in 2019, you learned that
7    Microsoft had made a $1 billion investment in
8    OpenAI's for-profit entity; correct?
9      A.   Yes.
10     Q.   Did you review the announcement that
11   made public the $1 billion investment?
12     A.   I read the news.
13     Q.   You didn't read the announcement before
14   it was made?
15     A.   I don't recall.
16     Q.   Did you think that the deal was
17   impressive?
18     A.   I don't recall.
19          ATTORNEY SAVITT:  Let's take a look at
20   Exhibit 20.
21          (Whereupon, Musk Exhibit Number 20
22          was marked for identification and is
23          attached hereto.)
24   BY ATTORNEY SAVITT:
25     Q.   Exhibit 20 is a text message exchange

Page 163

1    between Mr. Altman and Ms. Zilis.  You're not --
2    you aren't a party to this exchange.
3           In it, you see in the -- one, two --
4    third down, Ms. Zilis says:
5           "Congrats.  I'm sure you're in
6      touch with him too, but when I pinged E
7      the blog post he mentioned he thought it
8      was an impressive deal by you guys."
9           Do you see that?
10     A.   Yes.
11     Q.   Does that refresh your recollection
12   that you thought that the OpenAI-Microsoft deal
13   was impressive?
14     A.   This is a text exchange that doesn't
15   include me, so, no, I wouldn't say it refreshed my
16   recollection.  I don't recall thinking it was
17   impressive.
18     Q.   Do you recall mentioning to Ms. Zilis
19   that you thought it was an impressive deal by the
20   OpenAI guys?
21     A.   I don't recall doing so.
22     Q.   I see.
23          Were you in touch with Altman too, as
24   Ms. Zilis surmised that you were?
25     A.   There were occasionally exchanges of

Page 164

1    communication -- of text and voice.
2      Q.   Did you discuss the Microsoft deal
3    before it was announced with Mr. Altman?
4      A.   I don't recall.
5      Q.   Do you recall raising any concerns with
6    Mr. Altman when the deal was announced with it?
7      A.   I don't recall.
8      Q.   Do you recall, at the time you learned
9    of the Microsoft deal in 2019, telling anyone
10   that it broke a promise that had been made to you
11   by OpenAI?
12     A.   I don't recall.  No, I don't think so.
13     Q.   And at the time you learned of the 2019
14   Microsoft deal, did you believe that it did
15   violate a commitment that had been made to you by
16   OpenAI?
17     A.   What I do recall, just the best of my
18   recollection, the -- I felt uneasy about the deal;
19   but I think the -- you know, the capped profit and
20   that kind of thing, it seemed like this was
21   simply -- that, ultimately, things would revert to
22   the nonprofit.  So -- you know, as long as things
23   reverted to the nonprofit that would be okay.
24     Q.   And I think I know what you mean,
25   Mr. Altman -- Mr. Musk, I'm sorry.  But I want to

Elon Musk v.
Samuel Altman
FINAL
[CONFIDENTIAL]
September 26, 2025
Elon Musk

Page 165

1  make sure I do.
2      When you say "revert to the nonprofit,"
3  do you mean that once the caps were satisfied, the
4  residual profits would flow to the nonprofit?  Is
5  that what you mean by that?
6      A.  Yeah.
7      Q.  Thank you -- excuse me.
8      Did you have an understanding as to what
9  Microsoft would be investing its capital in?
10     A.  My rough impression -- I wouldn't say
11  it's detailed understanding -- was that Microsoft
12  would be providing server resources like GPU
13  resources.
14     Q.  To OpenAI?
15     A.  Yeah.
16     Q.  And did you have any understanding as
17  to what entity -- what the -- what the assets of
18  the entity that Microsoft was investing in would
19  be?
20     A.  No.
21     Q.  You didn't have any knowledge of that?
22     A.  No.
23     Q.  All right.  Since the Microsoft
24  transaction was announced in 2019, have you
25  learned anything about it that causes you to

Page 166

1  believe that it broke a promise that was made to
2  you by OpenAI or by Mr. Altman?
3      A.  Sorry.  You're referring to that
4  specific deal or any deal?
5      Q.  I'll try again because last thing I
6  want to be is confusing.
7      Since the Microsoft deal was made
8  apparent to you in 2019, have you learned anything
9  about it, the Microsoft deal, that caused you to
10  believe that it constituted a broken promise to
11  you by OpenAI or Mr. Altman?
12     A.  No, I don't think so.  Well, like I
13  said, I felt uneasy about it.  But so long as
14  there was a profit cap in place and the -- you
15  know, the -- in a reasonable period of time, the
16  profits would return to the -- basically, the
17  nonprofit would -- any sort of financial benefits
18  would accrue to the nonprofit, I think that's sort
19  of uneasy.  But it seems like, okay, ultimately,
20  things will revert to the nonprofit so that's
21  probably okay.  Albeit it makes me uneasy.
22     Q.  Was it your understanding that the
23  revenue would revert to the nonprofit even if the
24  nonprofit didn't exceed the ability to satisfy
25  the capped return?

Page 167

1      A.  My understanding of the deal is very
2  proximate.  I didn't, you know, study the minutia
3  of the deal.  So I can't say that I -- I can't
4  speak with certainty here.  But, broadly, so long
5  as the things ended up back at the nonprofit, I
6  would be uneasy but probably ultimately okay with
7  that as long as the nonprofit benefited in the
8  long term.
9      Q.  And when you say "things returned to
10  the nonprofit," Mr. Musk, do you mean the revenue
11  that exceeded the capped profit returns?
12     A.  The revenue and then ownership of the
13  AI, like the control of the AI would be with the
14  nonprofit.  Not the for-profit.
15     And the for-profit -- my
16  understanding -- my understanding, very broad
17  understanding, like not a precise understanding,
18  is that, effectively, the for-profit would --
19  perhaps my understanding is wrong.
20     But that the for-profit would revert --
21  that the for-profit would effectively dissolve
22  past a certain profit number; and then we'd be
23  back to just having the nonprofit.
24     Q.  So your understanding was that the --
25  or you're -- recognizing that you've made caveats

Page 168

1  about the degree of your understanding, your
2  understanding was that after the capped profits
3  were satisfied, the for-profit entity would
4  essentially go away and everything that it owned
5  would revert to the not-for-profit.  Is that your
6  understanding?
7      A.  Yes.  Essentially, control of the AI
8  would -- and the revenue would revert to the
9  nonprofit.
10     Q.  And by control of the AI, you mean the
11  intellectual property associated with the --
12     A.  Not just the intellectual property, but
13  who is in charge of the AI.  Like who decides what
14  the AI does or doesn't do.
15     Q.  And given that structure, while you
16  were somewhat uncomfortable with it, it seemed
17  like it was not so bad.  Is that fair?
18     ATTORNEY MOLO:  Objection to the form of
19  the question.
20     A.  Can you say that again?
21  BY ATTORNEY SAVITT:
22     Q.  Yeah.  I said given that structure,
23  even though you had some discomfort with it, the
24  arrangement didn't seem that bad to you at the
25  time?

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                        Elon Musk

Page 169

1    A.  I was uneasy, it made me a little
2  uncomfortable.  But it sounded like that it would
3  be, ultimately, a happy ending with the control
4  and the cash flow reverting to the nonprofit.
5  That's -- the profit cap thing.
6    Q.  Was it critical to you that,
7  ultimately, control would -- ultimately, it would
8  rest with the not-for-profit?  Was that
9  critically important to you?
10    A.  Yeah, it was one of the major factors,
11  sure.
12    Q.  Did you become aware in 2020 or earlier
13  that Microsoft had obtained an exclusive license
14  to GPT-3?
15    A.  What time?  What date?
16    Q.  By 2020.
17    A.  Well, it I can't be exclusive -- I guess
18  as -- because OpenAI would -- both OpenAI and
19  Microsoft would have it.
20    Q.  Yes.  I'm sorry.  Yes.
21    A.  So I don't recall it being exclusive,
22  but -- yeah.
23    Q.  Do you recall around this time tweeting
24  that the arrangement in 2020 seemed like the
25  opposite of open?

Page 170

1    A.  Now that you mention it, yes.
2    Q.  On or around September 24th, 2020, do
3  you recall saying, "This does not seem like the
4  opposite of open.  OpenAI is essentially captured
5  by Microsoft"?
6        Does that ring a bell?
7    A.  I do recall posting that, yeah.  I post
8  a lot of things on X.
9    Q.  Yeah.
10    A.  Probably know my posts better than I do.
11    Q.  I doubt that's true, but ...
12        In this lawsuit, Mr. Musk, you've
13  claimed that OpenAI broke a promise to you about
14  open sourcing its technology; right?
15    A.  Yes, that's one of the things.
16    Q.  And did you think when you made this
17  post that the license with Microsoft breached the
18  same promise?
19    A.  It does sound like it's not open source.
20    Q.  Yeah.  So you -- in this -- you were
21  expressing in this post and around this time that
22  the open sourcing promise had been broken?
23    A.  It seemed like -- yeah, one theory, they
24  could always, you know, make amends for that in
25  the future by open sourcing.  But at least that

Page 171

1  moment, it seemed like the -- they were
2  significantly moving away from the core mission of
3  being open source, which I think is accurate.
4        So -- and I think part of my motivation
5  in posting that was to push them to open source.
6    Q.  To push them to?
7    A.  To criticize the fact that they were
8  being hypocritical and to get back on track and be
9  open source.
10    Q.  You wanted to push them to get back on
11  track.  Those are your words?  And to --
12    A.  Yeah.
13    Q.  Yeah.
14    A.  Yeah.
15    Q.  To do what they promised to do?
16    A.  Correct.
17    Q.  You allege -- do you think Microsoft
18  asserts undue influence over OpenAI?
19    A.  Yes.  Too much influence, yes.  Yes.
20    Q.  Do you think Microsoft's influence over
21  OpenAI violates obligations that are owed to you?
22        ATTORNEY MOLO:  Object to the form of
23  the question.
24    A.  I suppose I do.  That's a -- there are
25  two fundamental things -- open source and

Page 172

1  nonprofit.  And so something that either is -- if
2  something moves contrary to open source or
3  contrary to nonprofit, it's directionally -- it's
4  certainly in the direction of a broken promise.
5  BY ATTORNEY SAVITT:
6    Q.  And you would -- was that your
7  sentiment with respect to Microsoft's influence
8  when you posted this in September 2020?
9    A.  Yes.  I was worried about Microsoft's
10  influence on OpenAI.  Their motivation is
11  obviously not that of an open-source nonprofit.
12    Q.  And, similarly, did you think that at
13  the time you learned of and posted about the
14  Microsoft exclusive license arrangement, did you
15  think that that was contrary to the commitment
16  that was owed to you by OpenAI and by Altman?
17    A.  It seemed like the wrong direction, yes.
18    Q.  I guess I'm wanting to know whether it
19  felt like more than the wrong direction, but that
20  they were really just not keeping -- keeping
21  their promise to you.
22    A.  I didn't know the full details, but
23  it's -- it's -- it sure doesn't sound like open
24  source.
25    Q.  And open source is one of the things

Elon Musk v.                                    FINAL                    September 26, 2025
Samuel Altman                          [CONFIDENTIAL]                              Elon Musk

Page 173

1    that they had undertaken to assure OpenAI remain
2    committed to Brockman --
3            ATTORNEY MOLO:  Object --
4    Q.   -- I mean?
5        (Interruption by the court reporter
6        to clarify the record.)
7            ATTORNEY SAVITT:  Yes.  Actually, why
8    don't I strike it, and I'll try again.
9    BY ATTORNEY SAVITT:
10   Q.   Was open sourcing one of the things
11   that you believe that Brockman and Altman had
12   undertaken to commit to in creating OpenAI?
13   A.   Absolutely, of course.  It's in the --
14   the initial charter of the organization.  It's on
15   the website and --
16   Q.   And so moving away from it and coming
17   under Microsoft's influence here in 2020
18   constituted a violation of that undertaking?
19           ATTORNEY MOLO:  Object to the form of
20   the question.
21   A.   It seemed like a step in the wrong
22   direction.
23   BY ATTORNEY SAVITT:
24   Q.   Yeah.  Have you learned anything since
25   September of 2020 that has caused you to believe

Page 174

1    that the Microsoft licensing arrangement was
2    contrary to any commitment owed to you by OpenAI
3    or by Sam Altman?
4    A.   Well, it does seem like it's contrary to
5    the open-source goal of the company.
6    Q.   Did you do any investigation, Mr. Musk,
7    into the Microsoft arrangement and whether that
8    constituted a broken promise to you?
9    A.   Investigation?  I'm not sure what
10   "investigation" would mean.
11   Q.   Did you make inquiry?  Did you look
12   into it or cause your agents to look into it?
13   A.   I took it at face value that this was,
14   you know, something that was in the wrong
15   direction.
16   Q.   Are you aware that Microsoft invested
17   an additional $2 billion into OpenAI in 2021?
18   A.   I don't recall.
19   Q.   Ms. Zilis was on the OpenAI board in
20   2021; right?
21   A.   I think so.
22   Q.   Did you discuss a Microsoft transaction
23   with Ms. Zilis in 2021?
24   A.   I don't recall.
25   Q.   You don't recall one way or another?

Page 175

1    A.   I don't recall.
2    Q.   And do you recall discussing a
3    Microsoft 2021 transaction with Mr. Altman?
4    A.   I may have, but I don't recall the
5    details.
6    Q.   Yeah.
7        Do you think you did have a
8    conversation, but you don't remember the details;
9    or you don't even know whether --
10   A.   I'm not sure.
11   Q.   Okay.  Did you -- are you aware that
12   the OpenAI board in 2020 created a special
13   committee in connection with a Microsoft
14   transaction?
15   A.   I don't -- I don't think so.
16   Q.   And as of 2021, did you believe that
17   the incremental investment by Microsoft was
18   contrary to a commitment that had been made to
19   you by OpenAI or Sam Altman?
20           ATTORNEY MOLO:  Object to the form of
21   the question.
22   A.   Can you say that again.
23   BY ATTORNEY SAVITT:
24   Q.   Yeah.
25       As of 2021, did you believe that the

Page 176

1    incremental investment that Microsoft was making
2    was contrary to a commitment that had been made to
3    you by OpenAI or by Altman?
4            ATTORNEY MOLO:  Again, I object to the
5    form of the question.
6    A.   I don't -- I don't recall specifics
7    about the incremental investment.
8    BY ATTORNEY SAVITT:
9    Q.   And fair to say, then, that you don't
10   recall whether you had a view -- you don't recall
11   any view about whether it violated any -- broke
12   any promise that had been made to you by Altman
13   or OpenAI?
14           ATTORNEY MOLO:  Object to the form of
15   the question.
16   A.   It seemed like perhaps another step in
17   the wrong direction.  But I don't have anything
18   more to say about it than that.
19   BY ATTORNEY SAVITT:
20   Q.   Do you think Ms. Zilis would have
21   approved the transaction that constituted a
22   broken promise to you?
23           ATTORNEY MOLO:  Objection; calls for
24   speculation.
25   A.   I don't -- I don't -- I don't know.  I

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 177

1  don't know -- she would have a fiduciary duty to
2  the board.  She did not discuss the board
3  deliberations with me.
4  BY ATTORNEY SAVITT:
5  ███████████████████████████
   ███████████████████████████
   ███████████████████████████
   ███████████████████████████
9      Q.  And did you and Ms. Zilis discuss her
10 work with OpenAI in 2021 or thereabouts?
11     A.  There was not much discussion of OpenAI.
12     Q.  Between you and Ms. Zilis?
13     A.  Yeah.
14     Q.  Do you -- is it your belief that
15 Ms. Zilis was a responsible open AI board member?
16         ATTORNEY MOLO:  Object to the form of
17 the question.
18     A.  I'm sure she would try to be a
19 responsible board member.
20 BY ATTORNEY SAVITT:
21     Q.  And would it be your impression that
22 Ms. Zilis is someone who would take her fiduciary
23 duties as a director seriously?
24         ATTORNEY MOLO:  Object to the form of
25 the question.  Calls for speculation.

Page 178

1      A.  I mean, my speculation is yes.
2  BY ATTORNEY SAVITT:
3      Q.  Well, you know Ms. Zilis quite well;
4  right?
5      A.  Yeah.  I think she has high integrity.
6      Q.  That's really what I'm asking.
7      A.  Yeah, yes.
8      Q.  So you have no reason to think that she
9  wouldn't do her best to do her duty in the
10 context of being a board member?
11     A.  Yes, she most likely would.
12     Q.  So two years hence, in 2023, are you
13 aware that Microsoft invested an additional
14 $10 billion into OpenAI?
15     A.  Yes.
16     Q.  And you know that OpenAI --
17         ATTORNEY MOLO:  B; right?  That's
18 what -- I thought you said million.
19         ATTORNEY SAVITT:  I apologize.  I
20 certainly meant to say billion.
21     A.  These days, it could be 10 trillion.
22 I'm waiting for the next announcement.  This is
23 going to be 10 trillion, probably.
24 BY ATTORNEY SAVITT:
25     Q.  You know, don't you, that the

Page 179

1  development of artificial intelligence requires
2  enormous access to compute?
3      A.  Yeah.
4      Q.  And that it -- and you appreciate that
5  it's very expensive, I'm sure.
6      A.  Yes.
7      Q.  And you understand that Microsoft's
8  investment was designed to fund the compute
9  available that was necessary to push the AGI
10 project along at OpenAI?
11     A.  I'm not sure I agree that it was
12 necessary.  I think there may have been other ways
13 to achieve that besides Microsoft gaining what may
14 be de facto control over OpenAI.
15     Q.  Given that you weren't funding it, and
16 that there were a limited number of sources of
17 this kind of capital in compute, what -- what are
18 the other ways that OpenAI could have developed
19 the capital compute necessary?
20         ATTORNEY MOLO:  Objection; calls for
21 speculation.  The witness has been gone from
22 OpenAI for -- since, what, 2018.
23         ATTORNEY SAVITT:  Yeah, I get -- I
24 will --
25 ///

Page 180

1  BY ATTORNEY SAVITT:
2      Q.  Mr. Musk, the question came to mind
3  because you said you thought there might be
4  others, in response to my last question, so
5  that's why I'm asking you.
6      A.  Yeah.  One could try to get debt.  One
7  could lease the GPUs.  In fact, my understanding
8  is that there was recently an announcement to this
9  effect with Nvidia, as a supplier to OpenAI,
10 providing financing of various kinds.
11     Q.  Anything else that comes to mind as
12 alternative ways of raising the capital necessary
13 to access this compute?
14     A.  I think debt, leasing, cap return type
15 of thing, maybe.
16     Q.  Debt, leasing -- I'm sorry.  I didn't
17 mean --
18     A.  You're asking for speculation here.  I
19 mean, I'm not sure -- it's -- there's debt.
20 There's supplier financing, like Nvidia provides
21 supplier financing, which I believe they are
22 doing.
23     Q.  And I should say, I'm not -- I don't
24 mean to ask for speculation.  I'm asking you
25 because you're one of the most accomplished

Elon Musk v.                         FINAL                         September 26, 2025
Samuel Altman                   [CONFIDENTIAL]                              Elon Musk

Page 181

1  businessman in history, and you've thought about
2  these things.
3          And I think you said -- I just want to
4  make sure I've got the things that have come to
5  mind.  You said debt, leasing, capped equity,
6  supplier financing.
7          Did I miss anything?
8      A.  I'm just speculating here.
9      Q.  Yeah.
10         Is there anything else that comes to
11 mind?
12         ATTORNEY MOLO:  Object to the form of
13 the question.
14     A.  Not right now.
15 BY ATTORNEY SAVITT:
16     Q.  Okay.  And Ms. Zilis was a member of
17 the OpenAI board at the time of the $10 billion
18 2023 investment as well; is that right?
19     A.  I'm not sure.

24     Q.  Did you discuss the $10 billion 2023
25 Microsoft investment with Ms. Zilis anytime in

Page 182

1  2023?
2      A.  I think I did.
3      Q.  Tell me everything you can recall about
4  your discussions with Ms. Zilis on that subject.
5      A.  The 2023?
6      Q.  Yeah.
7      A.  To the best of my recollection, which is
8  going to be imprecise, I felt this had gone too
9  far.  This was essentially the final straw.  And
10 for an investment of this scale, my perception was
11 that, at this point, there had been a breach of
12 promises; that, really, this was -- that
13 Microsoft -- or OpenAI would be beholden to
14 Microsoft at such a scale that they would be
15 unable to be a nonprofit or open source.
16     Q.  And your recollection is you conveyed
17 that message in sum or substance to Ms. Zilis?
18     A.  I believe I did.
19     Q.  Did you discuss the transaction with
20 Mr. Altman?
21     A.  I didn't -- I probably said that
22 publicly too.  Did I not say it publicly?  You
23 probably know my posts better than I do, but --
24     Q.  I'm doing my best.  If I knew of
25 something, I would tell you.

Page 183

1      A.  I probably -- if -- I think I expressed
2  some dismay on Twitter, or X, at that time.
3      Q.  Did -- but returning to your
4  discussions with Ms. Zilis on the subject, do you
5  recall what she said?
6      A.  No.  I just -- I think I would have --
7  it's likely that I would have expressed my concern
8  and exasperation that this is really -- they've
9  gone too far.
10     Q.  Do you recall anything Ms. Zilis said
11 about the transaction, as far as she saw it?
12     A.  I don't.
13     Q.  No recollection of what she might have
14 said?
15     A.  Nothing specific.
16     Q.  Do you recall whether Ms. Zilis
17 supported the 2023 Microsoft investment?
18     A.  I don't recall.
19     Q.  Did you discuss that transaction with
20 Mr. Altman, as far as you recall?
21     A.  I don't recall.
22     Q.  What was it about the 2023 transaction
23 that caused it to be a broken promise as compared
24 to the 2021 or 2019 transaction?
25     A.  Well, I felt like OpenAI had by degrees,

Page 184

1  sort of one step at a time, gradually changed its
2  mission from being a nonprofit open source to
3  being a for-profit closed-source, kind of one step
4  at a time, until, finally, I'm looking at this,
5  and it's like the -- I finally came to the
6  conclusion they are in a fundamental violation of
7  their charter -- of the reason for its existence,
8  being open source and nonprofit, that they had now
9  become closed-for-maximum-profit AI.
10     Q.  And when did you come to that -- when
11 did you come to that conclusion?
12     A.  2023, approximately.
13     Q.  Were the -- were the promises that were
14 made to you in connection with OpenAI any
15 different than the promises that were made to the
16 public in respect of OpenAI?
17         ATTORNEY MOLO:  Object to the form of
18 the question.
19 BY ATTORNEY SAVITT:
20     Q.  You can answer.
21     A.  Well, the -- the promise of it being a
22 nonprofit and open source, I guess, was, you know,
23 consistent publicly and privately in the
24 beginning.  The website described the company as
25 an open-source, nonprofit.  That was certainly my

Elon Musk v.                         FINAL                        September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                            Elon Musk

Page 185

1  understanding, that was why I donated the money at
2  the time, the credibility, the help with
3  recruiting and the knowledge.
4          But by 2023, I felt I had no choice but
5  to conclude that those promises were broken.  As I
6  think any sane, reasonable, honest person would
7  also conclude.
8      Q.  But the -- and I understand and thank
9  you.
10         If I understand what you're saying, the
11 promises that were made to you and to the public
12 were, in your view, manifestly broken by 2023.  Is
13 that a fair summary of what you're saying?
14     A.  Yes.
15     Q.  Different sort of question now about, I
16 wanted to ask if you know who the members are of
17 OpenAI's board of directors today.
18     A.  I don't know who all the members are.
19     Q.  Do you -- let me name them for you, if
20 that's okay.  Bret Taylor, Adam D'Angelo, Sue
21 Desmond-Hellmann, Zico Kolter, Paul Nakasone,
22 Adebayo Ogunlesi; Nicole Seligman, Larry Summers
23 and Altman.
24     A.  Okay.
25     Q.  Putting -- as to the outside directors,

Page 186

1  the independent directors, leaving Altman to the
2  side, do you have any reason to doubt the
3  credibility of these people?
4          ATTORNEY MOLO:  Object to the form of
5  the question.
6      A.  I mean I don't know.
7  BY ATTORNEY SAVITT:
8      Q.  And do you have any reason to question
9  the integrity of those individuals, the
10 independent directors of OpenAI?
11         ATTORNEY MOLO:  Object to the form of
12 the question.
13     A.  I don't know them well enough to make
14 a -- reach a conclusion.
15 BY ATTORNEY SAVITT:
16     Q.  Do you have any reason to doubt the
17 independence of these people?
18         ATTORNEY MOLO:  Object to the form of
19 the question.  This is --
20     A.  Well, I mean, if they are receiving --
21 if they have a financial interest in the
22 for-profit -- in OpenAI becoming a for-profit,
23 then they would seem like a conflict with the
24 nonprofit.
25     ///

Page 187

1  BY ATTORNEY SAVITT:
2      Q.  But if they are not receiving any
3  equity in any for-profit interest, then that
4  would not be the case; right?
5          ATTORNEY MOLO:  Objection; calls for
6  speculation.
7      A.  Yes, if they're not receiving -- if
8  there's no financial interest tied to OpenAI
9  becoming a for-profit, then that would -- that
10 would then -- that would -- they would not possess
11 that conflict.
12 BY ATTORNEY SAVITT:
13     Q.  Do you know of any other conflict that
14 those outside directors might possess?
15     A.  No.
16     Q.  Do you know of any basis to conclude
17 that those directors are captured?
18         ATTORNEY MOLO:  Objection.
19     A.  Yes.
20 BY ATTORNEY SAVITT:
21     Q.  What is that basis?
22     A.  After Sam, or scam, Altman was fired by
23 Ilya and the prior board for deceptive practices
24 and a pattern of lying, he's going to pick board
25 members that he is confident in the future will

Page 188

1  not fire him, obviously.
2      Q.  So you think that --
3      A.  Yes.  Obviously.
4      Q.  So you think these directors do lack
5  integrity; right?
6      A.  I don't know them.  But I do know that
7  Sam, after being fired by Ilya and the prior board
8  for a pattern of lying and deception, is going to
9  pick board members that he is confident in the
10 future will not fire him even if he engages in
11 lies and deception.
12     Q.  And do you know how these board members
13 are selected?
14     A.  I don't.
15     Q.  Do you have any idea how the board
16 members were picked?
17     A.  I'm sure Sam swindled something.
18     Q.  I see.  But other than -- other than
19 that --
20     A.  He just -- lookit.  Scam Altman was
21 literally fired by the prior board and Ilya for
22 lying and deceiving at length.  Not just once, but
23 many times.  So what are the odds that he's going
24 to change his behavior?  He's not.
25     Q.  But my --

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                         Elon Musk

Page 189

1      A.   He's obviously going to pretend that the
2   board is independent, but it isn't.  He's going to
3   make sure, one meet by one meet, sort of directly
4   or indirectly, that the board are his pawns,
5   obviously.
6      Q.   I see.  So you, therefore, think that
7   these outside directors are not independent of
8   Mr. Altman, do I have that; right?
9      A.   Yes, I think there is, but it's a puppet
10  board.
11     Q.   A puppet board?
12     A.   Yes.
13     Q.   I see.  And the reason you think that
14  is because Altman was fired by the previous
15  board?
16     A.   Yes.  The reason I think that is because
17  Altman was fired for a deception -- for being a
18  liar and a manipulative liar.  He was fired by
19  Ilya and the prior board.  And then he's going to
20  make sure in the future that the board will appear
21  to be independent, but will actually not be, and
22  they will just be his puppets.  Because that's his
23  nature.
24     Q.   Yeah.  And -- how do you know -- what's
25  your basis for opining on Mr. Altman's nature?

Page 190

1      A.   Well, see, the prior board fired Scam
2   Altman.  Why did they fire him?  Deception, lying,
3   over an extended period of time.  And he's going
4   to keep doing that.
5      Q.   How do you know why the prior board
6   fired Mr. Altman?
7      A.   I've read what is reported.
8      Q.   What did you read?
9      A.   That Scam Altman was fired for lying and
10  deception.
11     Q.   Where did you read that?
12     A.   About a dozen different -- I mean it was
13  all over the news.
14     Q.   Did you talk to any of those board
15  members about their reasons for seeking to remove
16  Mr. Altman?
17     A.   I tried to, but they didn't respond.
18     Q.   Which ones?
19     A.   I tried to reach Adam D'Angelo.  I tried
20  to reach out to some of the board members.  But
21  there's a reason he was fired.
22     Q.   Did you ever --
23     A.   Obviously.
24     Q.   At any time, have you spoken to any
25  member of the OpenAI board about the reasons

Page 191

1   behind their attempt to remove Mr. Altman?
2      A.   They did remove him.
3           (Interruption by the court reporter
4           to clarify the record.)
5      A.   They did remove him.  They fired him.
6      Q.   But have you ever discussed the reasons
7   for that with any member of the OpenAI board?
8      A.   No.
9      Q.   Never had a discussion with any member
10  of the board on the subject of the removal of
11  Altman; right?
12          ATTORNEY MOLO:  Objection; asked and
13  answered.
14     A.   I mean to the best of my knowledge, no.
15  BY ATTORNEY SAVITT:
16     Q.   Right.  It is true that during the
17  period that they removed Altman, you wanted to
18  become the CEO of OpenAI, isn't it?
19     A.   Not really.
20     Q.   It's true that you had conversations
21  with many people about possibly becoming the CEO
22  of OpenAI; isn't that right?
23     A.   I don't recall.
24     Q.   But you may well have; isn't that
25  right?

Page 192

1           ATTORNEY MOLO:  Object to the form of
2   the question.
3      A.   I don't recall.
4   BY ATTORNEY SAVITT:
5      Q.   And that's why you wanted to get ahold
6   of D'Angelo so much is so you could try to
7   promote your candidacy to be CEO; isn't that
8   right?
9      A.   No.
10     Q.   You're aware that an independent law
11  firm conducted an extensive investigation of the
12  reasons behind Altman's removal and
13  reinstatement?
14     A.   I don't know the details of that.
15     Q.   Do you know anything about it?
16     A.   No.
17     Q.   Did you know it happened?
18     A.   Very vaguely.
19     Q.   You have no idea what their findings
20  were, do you?
21     A.   I'm sure Scam Altman arranged for some
22  fake investigation.
23     Q.   I see.  So the directors --
24     A.   You're representing a crook.
25     Q.   The directors and the independent

Elon Musk v.                              FINAL                    September 26, 2025
Samuel Altman                        [CONFIDENTIAL]                         Elon Musk

Page 193

1    lawyers are all --
2         A.   Shame on you.
3         Q.   -- under Mr. Altman's sway; is that
4    right?
5              ATTORNEY MOLO:  Object to the form of
6    the question.
7    BY ATTORNEY SAVITT:
8         Q.   Is that right?
9         A.   I think so.
10        Q.   Yeah.  He's swindling everybody?
11             ATTORNEY MOLO:  Object to the form of
12   the question.  We don't have to do this, this way.
13   Please ask a polite question.
14   BY ATTORNEY SAVITT:
15        Q.   He's swindling everybody; right?
16        A.   He's a swindley guy, yes.  That's why I
17   call him Scam Altman.
18        Q.   I know.  I understand.
19        A.   Shame on you for representing a crook.
20        Q.   So the board that fired him, you think
21   they did the right thing?
22        A.   Yes.
23        Q.   Do you know who was on that board?
24        A.   I don't know everyone.
25        Q.   Well, because we were talking about the

Page 194

1    present board, that board had Mr. D'Angelo on it?
2         A.   Yeah.
3         Q.   Do you have any reason to doubt his
4    independence from Mr. Altman?
5         A.   I don't think -- I don't think he would
6    be kept on the board if he was a risk, Sam
7    wouldn't keep him on the board.
8         Q.   And he didn't return your phone calls
9    when you were trying to see if there was an
10   opportunity here for you; isn't that right?
11        A.   I was not trying to see if there was an
12   opportunity here for me.
13        Q.   Okay.  And Helen Toner, do you know who
14   that is?
15        A.   I've heard her name.
16        Q.   Never spoken with her?
17        A.   I don't think I've spoken to her, no.
18        Q.   Do you have any reason to doubt her
19   integrity as a director?
20        A.   I don't know her.
21        Q.   You have no reason to doubt it?
22        A.   I don't know her.
23        Q.   You have no opinion one way or the
24   other?
25        A.   I don't know her.

Page 195

1         Q.   Do you think she did the right thing by
2    voting to get rid of Altman?
3         A.   Yes.
4         Q.   Do you know of any decision she took
5    that you think were wrong decisions?
6         A.   I don't know.
7         Q.   Do you know who Tasha McCauley is?
8         A.   I've heard the name.
9         Q.   Ever spoke with her?
10        A.   I don't think so.
11        Q.   Do you have any reason to doubt her
12   integrity as a director?
13        A.   I don't know her.
14        Q.   I appreciate that you don't know her.
15             My question is:  As we're talking this
16   afternoon, do you have any reason to question her
17   independence or integrity as a director?
18        A.   I don't know her.
19        Q.   Do you think she lacks independence and
20   integrity?
21             ATTORNEY MOLO:  Objection; asked and
22   answered.
23        A.   I don't know her.
24   BY ATTORNEY SAVITT:
25        Q.   You know Mr. D'Angelo?

Page 196

1         A.   We've had a few conversations.  I don't
2    know him well.
3         Q.   Why were you interested in being the
4    CEO of OpenAI in the period when Altman was --
5              ATTORNEY MOLO:  Objection; that is --
6    you're misstating the witness's testimony.
7         A.   I'm not interested in being the CEO of
8    OpenAI.
9    BY ATTORNEY SAVITT:
10        Q.   But you were, weren't you?
11        A.   Not really, no.
12        Q.   Not really?
13        A.   No.
14        Q.   You did have conversations about
15   wanting to be the CEO during this period,
16   Mr. Musk; right?
17        A.   With who?
18        Q.   With very influential leaders in the
19   artificial intelligence community.
20        A.   Not that I recall.
21        Q.   Yeah.
22             With people who have organized and
23   generated tremendous returns for their companies?
24             ATTORNEY MOLO:  Object to the form of
25   the question.

Elon Musk v.                     FINAL                September 26, 2025
Samuel Altman               [CONFIDENTIAL]                    Elon Musk

Page 197

1      A.  Not that I recall.
2  BY ATTORNEY SAVITT:
3      Q.  Not that you can recall.
4          And Mr. Sutskever, he was on the board
5  at the time Altman was removed too; right?
6      A.  Yes, he participated in firing Altman.
7      Q.  Yeah.
8          Did you ever speak with Mr. Sutskever
9  about the events surrounding Mr. Altman's removal
10 and return?
11     A.  I tried to speak to Ilya about those
12 events, but, unfortunately, he has some very
13 binding confidentiality agreement.
14     Q.  Are you saying that Mr. Sutskever
15 indicated he wanted to speak with you, but he
16 couldn't?
17         ATTORNEY MOLO:  Object to the form of
18 the question.  That's not what he testified to.
19     A.  I've now spoke to Ilya a few times, but
20 he doesn't want to talk about why he fired Sam.
21 BY ATTORNEY SAVITT:
22     Q.  When you spoke with Mr. Sutskever, did
23 he indicate that the reason he didn't want to
24 talk about it was because of any contractual
25 restrictions on his ability to speak?

Page 198

1      A.  No.
2      Q.  Thank you.
3          Did you seek to recruit Mr. Sutskever
4  to xAI?
5      A.  No.
6      Q.  Why not?
7      A.  He started a company.
8          ATTORNEY SAVITT:  Let's take a look at
9  Exhibit 9, which has been premarked.
10         (Whereupon, Musk Exhibit Number 9 was
11         marked for identification and is
12         attached hereto.)
13 BY ATTORNEY SAVITT:
14     Q.  Excuse me, sir.
15         This is an excerpt from interrogatory
16 responses that you have served in this action.
17     A.  Okay.
18     Q.  Have you seen this document before?
19     A.  I think I read it once.
20     Q.  Okay.  And have you recently signed any
21 documents -- have you signed any interrogatories
22 in this case?
23         ATTORNEY MOLO:  I object to the
24 question, in that you've got two pages here, three
25 pages, I guess -- are you representing that this

Page 199

1  is part of a full document?
2          ATTORNEY SAVITT:  That's what I'm
3  representing it as.  It's page, 8, 9, and 10 of
4  the interrogatory responses that you had recently
5  served on us.
6      A.  I'm not sure what you're asking.
7  BY ATTORNEY SAVITT:
8      Q.  I wanted to know whether you've signed
9  any interrogatory responses recently.
10     A.  What's "recently"?
11     Q.  The past 72 hours.
12     A.  I think I signed something yesterday.
13 I'm not sure if that was ...
14         ATTORNEY MOLO:  If you have a document
15 that he signed, show him the document, please.
16 This is kind of an odd way to examine a witness,
17 showing him two pages and saying, "Did you sign
18 something?" and there's no signature on it.
19         ATTORNEY SAVITT:  Thank you, Mr. Molo.
20 I appreciate the counsel.
21 BY ATTORNEY SAVITT:
22     Q.  My question was:  You signed a document
23 within the past 72 hours; is that right?
24     A.  Yes.
25     Q.  Do you know what it was that you

Page 200

1  signed?
2      A.  Some -- I signed some legal documents, I
3  think; I think, yesterday.
4      Q.  How many?
5      A.  I believe two.
6      Q.  Do you know what they were?
7      A.  What do you mean "what they were"?
8      Q.  What documents did you sign?
9      A.  I can't remember the details, but they
10 were some documents related to this case.
11     Q.  Did you read them?
12     A.  I scanned through them, yeah.
13     Q.  Did you see this -- these three pages
14 in the documents that you read yesterday?
15         ATTORNEY MOLO:  Objection.  This is
16 totally inappropriate to be putting this in front
17 of him.  If you've got the whole document, can we
18 show him the whole document, please.
19         ATTORNEY SAVITT:  Yeah, we'll show him
20 the whole document.
21         I'm not going to mark this as a whole
22 because -- you can have it.  We've got copies --
23 we can go ahead and mark it.  You want to mark it,
24 let's go ahead and mark it.
25         What exhibit is it?

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 201

1    THE VIDEOGRAPHER:  21.
2    ATTORNEY SAVITT:  21.
3    I apologize, that was my screwup.
4    ATTORNEY MOLO:  They'll put a sticky on
5  it for you, and they'll give it back to you.
6    THE WITNESS:  All right.
7    (Whereupon, Musk Exhibit Number 21
8    was marked for identification and is
9    attached hereto.)
10  BY ATTORNEY SAVITT:
11    Q.  So I just have one question for you
12  about that document, Exhibit 21, is:  Did you
13  sign it?
14    A.  This document?
15    Q.  Yeah.
16    A.  I think I did.
17    Q.  And when did you sign it?
18    A.  I think in the last few days.  9/25.
19    Q.  Okay.  So recently?
20    A.  Well, it says --
21    Q.  Yeah.
22    And you read --
23    A.  I had a lot going on.
24    Q.  Believe me, sir, I appreciate that.
25    Did you read it before you signed it?

Page 202

1    A.  Yeah.
2    Q.  Okay.  And please turn to page 8 of
3  this document.  Do you see it says Interrogatory
4  Number 15 there?
5    A.  Yes.
6    Q.  Okay.  And the document that we marked
7  as Exhibit 9 is just these pages from that.
8    A.  Okay.
9    Q.  Which I just wanted to make it easier
10  to go through it, because I wanted to ask you a
11  number questions about this; but you can look at
12  either one of these.
13    You see here, Mr. Musk, that on page 8
14  you were asked to describe in detail the terms of
15  the purported implied contract.
16    Do you see that?
17    A.  Yes.
18    Q.  Including by identifying the dates on
19  which you on the one hand and Altman and OpenAI
20  on the other reached agreement on the material
21  terms of the purported implied contract; and
22  consideration that you contend you provide it
23  pursuant to the purported implied contract, and
24  the dates on which you provided each component
25  for such consideration.

Page 203

1    Do you see that?
2    I know that's a lot of lawyer words.
3    A.  Yes.
4    Q.  Okay.  And here are the answers that
5  you supplied.  They're on page 9, and they're a
6  whole bunch of bullet points.  I was going to ask
7  you about them, if I might.
8    A.  Okay.
9    Q.  Okay.  Thank you.
10    So looking at the first one, you say
11  here that OpenAI and Altman reached agreement with
12  you in a contract which provided open OpenAI shall
13  be a Section 501(c)(3) nonprofit.
14    Do you see that?
15    A.  Yes.
16    Q.  Was the agreement that OpenAI, Inc.
17  shall be a Section 501(c)(3) nonprofit a material
18  term of the contract that you say you've entered
19  into?
20    A.  I think so.
21    Q.  And you say there was an agreement on
22  this term on or about December 8th, 2015.
23    Do you see that?
24    A.  Yes.
25    Q.  What happened on that day that gave

Page 204

1  rise to an agreement respecting OpenAI being a
2  Section 501(c)(3) nonprofit?
3    A.  I don't recall the exact details for
4  something that happened 10 years ago.
5    Q.  So you don't know what happened on
6  December 8th that gave rise to this material
7  term of this contract you say exists?
8    A.  It's very plain language here that it
9  will be a nonprofit.
10    Q.  Yeah.
11    A.  It's a lot more complicated than that.
12    Q.  And that language, as it appears here,
13  is the basis for your belief that you reached
14  agreement on this term on December 8th, 2015?
15    A.  Yeah, OpenAI would be an open-source
16  nonprofit.  That was the deal.
17    Q.  And how was that deal -- how was that
18  deal entered into by you on the one hand and
19  OpenAI and Altman on the other?
20    A.  That's what we agreed to.
21    Q.  Mr. Musk, your complaint attaches two
22  documents from that date.  One a blog post
23  entitled "Introducing OpenAI" and another is a
24  certificate of incorporation filed with the
25  Delaware Secretary of State.

Elon Musk v.                     FINAL                September 26, 2025
Samuel Altman              [CONFIDENTIAL]                    Elon Musk

Page 205

1        Are you familiar with either of those
2   documents as we're sitting here this afternoon?
3        A.   I'm familiar with what a Delaware
4   corporation document looks.
5        Q.   I'm going to show them to you.  I was
6   just wondering if you had any independent
7   recollection before we looked at them.
8        A.   Not really.
9        ATTORNEY SAVITT:  Let's take a look at
10  Exhibits 10 and 11, please, which have been
11  premarked.
12       This is Exhibit 10, Mr. Musk.
13       (Whereupon, Musk Exhibit Number 10
14       was marked for identification and is
15       attached hereto.)
16  BY ATTORNEY SAVITT:
17       Q.   Mr. Musk, are either of these documents
18  related to the 501(c)(3) contract term that you
19  say was reached on December 8th, 2015?
20       ATTORNEY MOLO:  Take a minute to read
21  them.
22       A.   I mean, it says 501(c)(3) corporation.
23  BY ATTORNEY SAVITT:
24       Q.   And it's -- where does it say that,
25  sir?

Page 206

1        A.   The paragraph, "This corporation shall
2   be a nonprofit organized exclusively for
3   charitable, for educational purposes within the
4   meaning of Section 501(c)(3)."
5        Q.   I see.  So that's paragraph 3rd, sir,
6   of the document?
7        A.   Yes.
8        Q.   And it's -- this is, you'd agree, the
9   certificate of incorporation for OpenAI, Inc.?
10       A.   Yes.
11       Q.   And did you review this document before
12  it was filed?
13       ATTORNEY MOLO:  Which document?  I'm
14  sorry.  Which document?
15  BY ATTORNEY SAVITT:
16       Q.   Fair question.  Did you review
17  Exhibit 11 -- Exhibit 10, I should say, before it
18  was filed with the Secretary of State?
19       A.   No.
20       Q.   When did you first see Exhibit 10?
21       A.   I don't recall.
22       Q.   Have you seen it before today?
23       A.   Probably.
24       Q.   You're not sure one way or the other?
25  You're not sure one way or another?

Page 207

1        A.   No, I was -- no.
2        Q.   And let's take a look at Exhibit 11.
3        (Whereupon, Musk Exhibit Number 11
4        was marked for identification and is
5        attached hereto.)
6        ATTORNEY MOLO:  11 is this email?
7        ATTORNEY SAVITT:  Yes.
8        ATTORNEY MOLO:  It's this one.  Do you
9   have it?
10       ATTORNEY SAVITT:  That's it I think.
11       Thank you, Mr. Molo.
12  BY ATTORNEY SAVITT:
13       Q.   This is an email dated December 8th,
14  2015, from Mr. -- an email exchange between you
15  and Mr. Altman.
16       Do you see that?
17       A.   I'm just reading it, yeah.
18       What about it?
19       Q.   Does this document reflect your
20  agreement that OpenAI shall be a 501(c)(3)
21  not-for-profit?
22       A.   I mean, it clearly states that "OpenAI
23  is a nonprofit AI research company to benefit
24  humanity, unencumbered by an obligation to
25  generate financial returns."

Page 208

1        Q.   So with whom did you reach agreement,
2   Mr. Musk, on the term -- the 501(c)(3) term of
3   the contract you say exists?
4        A.   With -- with Sam Altman.
5        Q.   Anyone else?
6        A.   Greg Brockman.
7        Q.   Anyone else?
8        A.   I think those two primarily.
9        Q.   Was the term negotiated?
10       A.   It was fundamental to me providing
11  funding and support.
12       Q.   Do you know who filed the certificate
13  of incorporation?
14       A.   No.
15       Q.   Do you think that the filing of the
16  certificate of incorporation with the Delaware
17  Secretary of State constituted an agreement
18  between you and Altman and OpenAI to maintain
19  OpenAI as a 501(c)(3) not-for-profit?
20       ATTORNEY MOLO:  Object to the form of
21  the question.
22       A.   Does the -- the deal was to create an
23  open-source nonprofit.  To do that, you do a
24  501(c)(3).  Doesn't matter who files it.  That's a
25  clerical function.

Elon Musk v.                            FINAL                        September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                              Elon Musk

Page 209

1    That is the basis on which I provided my
2 financial support and other support.
3 BY ATTORNEY SAVITT:
4    Q.  Do you recall any negotiation on this
5 contract term?
6    A.  I recall this is what we agreed to.  I'm
7 not sure what you mean by negotiation.  There
8 wasn't any disagreement.
9    Q.  I see.  And you've negotiated a million
10 contracts, I expect, so, ultimately --
11    ATTORNEY MOLO:  Object to the form to
12 the form of the question.
13    ATTORNEY SAVITT:  I haven't even asked a
14 question.
15 BY ATTORNEY SAVITT:
16    Q.  My question was whether there was
17 negotiation that led up to the agreement.
18    A.  There wasn't -- what do you mean by
19 negotiation?  There was no disagreement.  So when
20 there's no disagreement, there's simply agreement,
21 not negotiation.
22    Q.  Great.  Thank you.
23    And for how long do you think Altman and
24 OpenAI are obligated to maintain OpenAI, Inc. as a
25 501(c)(3) not-for-profit?

Page 210

1    A.  I think that obligation never lapses.
2    Q.  It lasts forever?
3    A.  Yes.
4    Q.  Do you believe that OpenAI, Inc. has
5 ceased being a 501(c)(3) nonprofit?
6    A.  It is attempting to cease being a
7 nonprofit.
8    Q.  You believe that OpenAI, Inc. is
9 attempting to cease to be a 501(c)(3) nonprofit?
10    ATTORNEY MOLO:  Objection; asked and
11 answered.
12 BY ATTORNEY SAVITT:
13    Q.  You can answer.
14    A.  They're fundamentally trying to turn an
15 open-source nonprofit into, essentially, a profit
16 maximizing, closed-source organization.  The
17 complete opposite of what it was agreed to.
18 Obviously, anyone with a shred of common sense can
19 see that.
20    Q.  But if OpenAI, Inc. remains a 501(c)(3)
21 not-for-profit corporation, then this contract
22 term will not have been violated; correct?
23    A.  It can remain -- if they extract
24 all the value from the nonprofit and they
25 technically keep it as a de facto shell

Page 211

1 corporation or a very negligible corporation --
2 basically, steal all the stuff -- steal all the
3 IP, steal all the people, technically keep it as a
4 501(c)(3) organization, have secured some minimal
5 funding and pretend that it's real, that would be
6 a scam.
7    Q.  I understand that's what you think.  So
8 even if OpenAI, Inc. remains a 501(c)(3)
9 organization, you believe that the agreement that
10 OpenAI shall be a Section 501(c)(3) nonprofit
11 will have been violated, under some
12 circumstances; is that right?
13    ATTORNEY MOLO:  Object to the form of
14 the question.  You're asking him about violations
15 of 501(c)(3) in a way -- well, object to the form
16 of the question.
17    ATTORNEY SAVITT:  Thank you.
18 BY ATTORNEY SAVITT:
19    Q.  You can answer.
20    A.  My guess is what Scam Altman would do is
21 keep it -- OpenAI technically as -- the nonprofit
22 will technically exist.  He will just take all the
23 value out of it and leave it as a hollow shell.
24    Q.  I see.  If the not-for-profit continues
25 to have significant assets and resources,

Page 212

1 however, then this contract term would not be
2 violated; correct?
3    ATTORNEY MOLO:  Object to the form of
4 the question.  You're asking the witness to
5 speculate.
6    A.  It really should have the vast majority,
7 if not all, of the value in the nonprofit.
8 BY ATTORNEY SAVITT:
9    Q.  That's what you think this contract
10 term means?
11    A.  Yeah.
12    Q.  When was this contract term breached,
13 in your opinion?
14    A.  The -- I think 2023 was when I first
15 felt like they had gone too far.  That's when I
16 engaged legal counsel.  And now, obviously, OpenAI
17 is trying to, really for all intents and purposes,
18 destroy the nonprofit, steal the charity; yeah.
19    Q.  Which counsel did you engage in 2003?
20    A.  It was Alex Spiro, I believe.
21    Q.  From the Quinn Emanuel firm?
22    A.  Yeah.
23    Q.  And he represented you in connection
24 with -- is he still -- strike that question,
25 Mr. Musk.

Elon Musk v.                        FINAL                September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                   Elon Musk

Page 213

1        Is Quinn Emanuel still representing you
2   in connection with your engagement with OpenAI?
3        A.  I don't think so.
4        Q.  When did they cease to represent you in
5   connection with OpenAI matters?
6        A.  I'm not sure.
7        Q.  Have you been damaged by OpenAI's
8   alleged breach of the 501(c)(3) term of this
9   contract?
10       A.  Yeah, I think I've been damaged.
11       Q.  Tell me how.
12       A.  Well, the fundamental promise has been
13  broken.  They still own a charity and made it
14  closed-source.
15       Q.  Any other way that you've been damaged
16  by the violation of this Section 501(c)(3) term
17  of the contract you say exists?
18       A.  The main thing is that they're still a
19  charity and perverted its original purpose.
20       Q.  Any other damage that you've suffered
21  than that?
22       A.  That's my primary concern, is that
23  they -- it shouldn't be okay to steal charities.
24       Q.  I understand.  I just want to make sure
25  that there aren't any other injuries or damages

Page 214

1   that you say you've suffered by virtue of the
2   violation of this contract term.
3        ATTORNEY MOLO:  Object to the form of
4   the question.
5   BY ATTORNEY SAVITT:
6        Q.  You can answer.
7        A.  I'm not sure if this is some sort of
8   legalistic trick question.
9        Q.  It's not.
10       A.  But -- my main concern is that you can't
11  steal a charity and pervert its mission.
12       Q.  I understand.
13       And as we're sitting here today, you
14  can't identify any other way you've been injured
15  by the violation of this term?
16       ATTORNEY MOLO:  Object to the form of
17  the question.  That's not true at all.
18       A.  I would view that as a great injury.
19  BY ATTORNEY SAVITT:
20       Q.  I'm not saying it's not.  I just want
21  to make sure I've got your entire point of view,
22  sir.
23       A.  It sounds like a legal trickery
24  question.
25       But this is fundamentally my concern, is

Page 215

1   this is a -- this is doing something diametrically
2   opposed to the original agreement.  It couldn't be
3   more diametrically opposed than it is, going from
4   an open-source nonprofit to a closed-source
5   profit-maximizing entity.  It couldn't be worse.
6        Q.  If I could direct your attention back
7   to the Exhibit --
8        ATTORNEY SAVITT:  Which one --16?  The
9   interrogatory response.
10  BY ATTORNEY SAVITT:
11       Q.  Oh, I'm sorry, it's the larger document
12  that's in front of you.
13       A.  Okay.
14       Q.  Yeah.  And you can set the other
15  document aside, Mr. Musk.
16       The second bullet point -- the second
17  bullet point --
18       A.  Yeah, okay.
19       Q.  The second bullet point in your
20  interrogatory response contends that you have a
21  contract with OpenAI, Inc., and Altman that says
22  OpenAI, Inc., is a nonprofit.
23       Do you see that?
24       A.  Yes.
25       Q.  And you indicate here that this

Page 216

1   contract term was agreed on or about
2   August 28th, 2017.
3        Do you see that?
4        A.  Yeah.
5        Q.  And you'll recall that's essentially
6   the same time that you directed Mr. Birchall to
7   stop paying the $5 million quarterly contribution
8   to OpenAI?
9        A.  I'm not sure of the exact timing.
10       Q.  So you don't -- you don't remember when
11  you told Birchall not to --
12       A.  I don't remember the precise date, no.
13       Q.  You recall -- and we spent some time
14  discussing this -- that in August of 2017 and
15  before and after, there were discussions about a
16  potential for-profit structure; correct?
17       A.  They were wide -- there was a wide range
18  of discussions.
19       Q.  And some of them involved the potential
20  for-profit structure, Mr. Musk; right?
21       A.  Some of them did, yes.
22       Q.  But those for-profit discussions never
23  led anywhere; right?  They fell apart?
24       A.  Well, yeah, they -- nothing materialized
25  there.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 217

1     Q.   And after they fell apart, you never
2   made another quarterly contribution to OpenAI,
3   Inc., did you?
4          ATTORNEY MOLO:  Object to the form of
5   the question.  It's contrary to your own exhibit.
6          ATTORNEY SAVITT:  Mr. Molo, it's really
7   important that you stop telling the witness how to
8   testify.
9          ATTORNEY MOLO:  I'm not telling the
10  witness anything.  I'm asking you to ask a
11  question.  You asked a question that has no basis,
12  in fact.
13     A.   I'm not sure -- according to this
14  interrogatory, I continued to send money until
15  2020.
16          What is -- what are you referring to?
17  BY ATTORNEY SAVITT:
18     Q.   Then just say no.  I'm just asking you
19  your best --
20     A.   Why are you asking something, when you
21  already know the answer?
22     Q.   I do know the answer, and I don't think
23  you're right about it.  But you could just answer
24  my question.  It's actually your job today.
25          ATTORNEY SAVITT:  And your job,

Page 218

1   Mr. Molo, is to stop coaching the witness.
2          ATTORNEY MOLO:  I am not coaching the
3   witness.  You are asking an improper question.
4     A.   It is an improper question.
5   BY ATTORNEY SAVITT:
6     Q.   Okay.  Can you answer it?  Are you
7   incapable of doing so?
8          ATTORNEY MOLO:  I think he answered your
9   question, and -- even though it's improper, so can
10  we move on, please.
11  BY ATTORNEY SAVITT:
12     Q.   I ask you to look at the second bullet
13  point in the document in front of you.  When did
14  you stop making quarterly contributions to
15  OpenAI?
16     A.   Well, according to this, I continued
17  making contributions through 2020.
18     Q.   Yeah.  How much was the last
19  contribution?
20     A.   $290,000.
21     Q.   But your quarterly contributions were
22  $5 million, weren't they?
23     A.   I'm unsure what you mean.
24     Q.   You recall -- we discussed this -- you
25  testified that you were making $5 million

Page 219

1   quarterly contributions?
2          Do you remember that?
3     A.   Yes.
4     Q.   And you stopped doing that, didn't you,
5   Mr. Musk?
6     A.   We stopped giving as much money, is what
7   you're saying?
8     Q.   You stopped making $5 million quarterly
9   contributions, didn't you?
10     A.   Technically, there were some -- let's
11  see.  The last $5 million contribution was --
12  yeah, May 2017.
13     Q.   May 2017.
14          So --
15     A.   There was actually one in August of
16  2016, which was essentially $4.5 million.
17  Basically, the same amount.
18     Q.   But after that, you stopped doing it,
19  didn't you?
20     A.   Let's see.  No, in 2016 --
21     Q.   That was before 2017, Mr. Musk, wasn't
22  it?
23          So all of your lessons about the
24  question, and Mr. Molo was preaching --
25          ATTORNEY MOLO:  I object to that.  If

Page 220

1   you want to ask the witness a question, ask him a
2   question.  Do not attack me.  Do not attack me.
3   We can go to the judge -- well, the --
4          ATTORNEY SAVITT:  You have, in addition
5   to improperly blocked questions, you've now told
6   the witness improper information, caused him to
7   evade a few questions, and I'm going to object to
8   your --
9          ATTORNEY MOLO:  You are asking questions
10  that are clearly -- they're not based on fact.  In
11  fact, they're misleading.
12          So ask a question.  Ask a proper
13  question, please.
14  BY ATTORNEY SAVITT:
15     Q.   When did you stop giving $5 million
16  quarterly contributions?
17     A.   The amount dropped below $5 million, it
18  looks like in -- sometime in 2017.
19     Q.   Yeah, why don't you take a look at
20  Exhibit 2 in your stack.
21     A.   Contributions continued all the way
22  through 2020.
23     Q.   Yeah, but my question was about the
24  $5 million quarterly contributions, wasn't it,
25  Mr. Musk?

Elon Musk v.                        FINAL                  September 26, 2025
Samuel Altman                 [CONFIDENTIAL]                        Elon Musk

Page 221

1     A.  Yes.  So what's the point?
2     Q.  Okay.  The point was that they stopped
3  in August '17, didn't they?
4     A.  The amount decreased from 5 million to a
5  smaller amount in 2017.
6        ATTORNEY SAVITT:  Let me actually
7  mark -- I'll give you Exhibit 2.  It's been
8  premarked.
9        (Whereupon, Musk Exhibit Number 2 was
10       marked for identification and is
11       attached hereto.)
12 BY ATTORNEY SAVITT:
13    Q.  You see here that Mr. Birchall asks you
14 whether you want to continue to hold the
15 $5 million contribution?
16    A.  Yes.
17    Q.  And you say yes?
18    A.  Yes.
19    Q.  And you never gave another one after
20 that, did you?
21    A.  I continued to donate, but --
22    Q.  Yeah.
23        Did you ever give another $5 million
24 quarterly contribution after that?
25    A.  Not as much, no.

Page 222

1     Q.  Did you ever give another $5 million
2  quarterly contribution after this?
3     A.  No.
4     Q.  Thank you.
5        And you stopped making the $5 million
6  quarterly contributions just around the same time
7  that this term, this "OpenAI, Inc., as a
8  nonprofit" term, was entered into; right?
9        That was August 28th, 2017, right
10 around the same time.
11    A.  Yeah.
12    Q.  Remember we were talking for a while
13 about the 501(c)(3) term, Mr. Musk?
14    A.  Uh-huh.
15    Q.  Is the requirement that OpenAI, Inc. is
16 a nonprofit, as it appears in the second bullet
17 point, the same as the term that "OpenAI shall be
18 a Section 501(c)(3) nonprofit"?
19    A.  Very similar.
20    Q.  Can you identify any difference between
21 them as we're chatting this afternoon?
22    A.  There may be some legal difference, but,
23 to me, these are essentially the same thing, I
24 think.  But there may be some, like, nuanced legal
25 difference; but nonprofit and 501(c)(3) nonprofit

Page 223

1  seem to be very similar things.
2     Q.  Fair enough.
3        And from your perspective, and
4  appreciating that you're not a lawyer, do you
5  recognize any difference as we're speaking this
6  afternoon as between the first and second items
7  that are said to be part of this contract?
8     A.  To me, this is -- I just interpret this
9  as perhaps some legalistic reason to do this.
10 But, to me, there are pretty much the same thing.
11    Q.  Does the promise that OpenAI, Inc. is a
12 nonprofit last forever, in your opinion?
13    A.  Yes.
14    Q.  Are the alleged -- are the breaches
15 that you say Altman and OpenAI committed to this
16 the same as we talked about in respect of the
17 501(c)(3) a few minutes ago?
18    A.  I'm not sure what you mean.
19    Q.  I'm sorry, it was a bad question.
20        We talked about why you believe that
21 there had been a breach of the 501(c)(3) term a
22 few minutes ago.
23        Do you recall that, Mr. Musk?
24    A.  I mean, legalistic language aside, it's
25 just -- fundamentally, the deal was this is an

Page 224

1  open-source nonprofit.  That was the deal.
2     Q.  And I was just trying to save us some
3  time to see whether the same things constituted
4  your view of the breach of both of them.  That's
5  why I was asking the question.
6     A.  There might be some legalistic reason
7  for the difference, but, to me, at least, in terms
8  of the intent, the intent is that OpenAI is a
9  nonprofit open source.
10    Q.  Have you been damaged by the alleged
11 breach of the "OpenAI as a nonprofit" term in any
12 way that you haven't already described in this
13 deposition?
14        ATTORNEY MOLO:  Object to the form of
15 the question to the extent you're asking him for
16 his legal opinion.
17    A.  I just don't know what you mean.
18 BY ATTORNEY SAVITT:
19    Q.  Have you suffered any injury by virtue
20 of this breach?
21        ATTORNEY MOLO:  Object to the form of
22 the question.
23    A.  Well, I feel like there's been a broken
24 promise here.  That is a very big deal.
25 ///

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                      Elon Musk

Page 225

1    BY ATTORNEY SAVITT:
2        Q.  Oh, I understand.
3            Anything else that has injured you apart
4    from the breach of the "OpenAI as a nonprofit"
5    term?
6        A.  Not that I can think of right now.
7        Q.  If I could ask you to look at the third
8    bullet point in this document, Mr. Musk.
9            You contend here that it's a term of
10   your contract that "All of OpenAI, Inc.'s AI/AGI
11   technology would be owned by the foundation."
12           Do you see that?
13       A.  Yes.
14       Q.  And it says that that term was agreed
15   on or about June 24th, 2015?
16       A.  Yes.
17       Q.  You agree to that with OpenAI, Inc. and
18   Mr. Altman?
19       A.  Yes.
20       Q.  OpenAI didn't even exist at the time.
21   Do you know that?
22       A.  I -- are you saying that they did an
23   incorporation slightly different or something?
24       Q.  Yeah.  We looked at that a little bit
25   ago, and it was -- it was December 8th, 2015,

Page 226

1    that OpenAI was incorporated.  So ...
2        A.  Okay.  Well, maybe a slight error in
3    this --
4        Q.  Because you'll agree you can't --
5        A.  Perhaps this should be amended slightly.
6    It says, "Dated on or about."
7        Q.  Yeah.  Well, what happened on or about
8    June 24th, 2015, that gave rise to the "owned
9    by the foundation" term that you say in here is
10   in your contract?
11       A.  The entire founding premise of the
12   company, I would say it's like -- these dates that
13   say "on or about," but there should be -- there's
14   no question -- there's no question that the deal
15   was that this be a nonprofit open source.  It was
16   unequivocal deal, and there was no -- there was no
17   sunset provision that at some point it becomes
18   some profit-maximizing closed-source.
19       Q.  And that's -- and so the term continues
20   forever, in your view?
21       A.  Of course.
22       Q.  Yeah.  Please take a look -- I think we
23   looked at this one together before, at Exhibit 1.
24   I think it's in your pile over there, Mr. Musk.
25           ATTORNEY MOLO:  Exhibit 1.

Page 227

1            What is it?
2            ATTORNEY SAVITT:  Exhibit 1.  Exhibit 1
3    is an email between Mr. Musk and Mr. Altman dated
4    June 8th-- I'm sorry.  I think it was June 24th,
5    2015.
6            ATTORNEY MOLO:  It looks like this.
7            (Incidental comments made off the
8            stenographic record.)
9    BY ATTORNEY SAVITT:
10       Q.  This document was attached to your
11   complaint.  We talked about this earlier today,
12   Mr. Musk, so I don't want to retread old ground.
13   Life is short.
14           Other than this document, did anything
15   else happen respecting your alleged agreement with
16   OpenAI that you can recall on or around
17   June 24th, 2015?
18       A.  I don't recall at this point.
19       Q.  Can't remember anything other than this
20   email?
21       A.  It was 10 years ago.
22       Q.  I understand.  I just went to make sure
23   you don't remember anything.
24       A.  Not right now.
25       Q.  This document doesn't refer to

Page 228

1    nonprofit, does it?
2        A.  It says the technology would be owned by
3    the foundation.  The foundation is nonprofit.
4        Q.  Does it say the foundation will be a
5    nonprofit?
6        A.  The foundation is a nonprofit.
7        Q.  All foundations are nonprofits?
8        A.  That's my understanding.
9        Q.  Are you aware of anything in OpenAI,
10   Inc.'s charter or bylaws or other corporate
11   documents that indicate that OpenAI, Inc. must
12   retain ownership of its AI and AGI technology?
13       A.  I'm sure there's some documents -- I
14   mean this is like the -- that seems like a crazy
15   question.  Of course, any organization retains its
16   IP and its intellectual property and anything else
17   of value.
18       Q.  Well, are you aware of anything in
19   OpenAI's charter or bylaws or corporate documents
20   saying that OpenAI, Inc. cannot sell or transfer
21   any of its AI or AGI technology?
22           ATTORNEY MOLO:  Object to the form of
23   the question.
24       A.  You can certainly sell products and
25   services.

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 229

1  BY ATTORNEY SAVITT:
2      Q.  But are you aware of anything in
3  OpenAI's corporate documents that restrict its
4  ability to sell its AI or AGI technology?
5          ATTORNEY MOLO:  Object to the form of
6  the question.  You used the term "corporate
7  documents."
8      A.  I believe it's inherent to any
9  organization whether it's a 501(c)(3) -- if it's a
10  C Corp., any kind of company, has inherent rights
11  to the value it creates.
12         ATTORNEY MOLO:  We've gone about an hour
13  and a half.
14     A.  There would be no point in incorporating
15  something if it didn't.
16         ATTORNEY SAVITT:  Maybe let me finish
17  this bullet point quickly.  Unless you really want
18  to go now.
19         ATTORNEY MOLO:  No, that's --
20         ATTORNEY SAVITT:  It just makes more
21  sense.
22         ATTORNEY MOLO:  That's all right.  Go
23  ahead.
24         ATTORNEY SAVITT:  Thanks.
25  ///

Page 230

1  BY ATTORNEY SAVITT:
2      Q.  But, Mr. Musk, you wouldn't disagree
3  that nonprofits have the right to transfer their
4  assets for fair value if their directors think
5  it's prudent, would you?
6      A.  It depends on the directors.  If the
7  directors are honest and getting correct value,
8  then -- for and there's not some self-dealing,
9  then they can certainly engage in transactions.
10     Q.  And that would be true with respect to,
11  among other things, their intellectual property;
12  right?
13         ATTORNEY MOLO:  Object to the form of
14  the question, causing the witness to speculate.
15     A.  Look, you can obviously -- you can
16  obviously engage in normal transactions.  You just
17  can't loot the treasury.
18  BY ATTORNEY SAVITT:
19     Q.  Because that would be a breach of duty;
20  right?
21     A.  Yes.
22     Q.  What is your basis for asserting here
23  that OpenAI, Inc. and Altman promised you that
24  the nonprofit would always retain all its AI/AGI
25  technology?

Page 231

1      A.  I believe this is implicit in any
2  organization, whether it's a nonprofit or
3  for-profit, that if you bought intellectual
4  property and value, that organization retains it.
5  That's -- what would be the point of incorporating
6  if you didn't do that?
7      Q.  Though, you allow that, absent what you
8  call looting an organization, a not-for-profit
9  can sell its technology; right?
10         ATTORNEY MOLO:  Objection; calls for
11  speculation on the part of the witness, and it
12  calls for the witness to make legal conclusions
13  when he's not a lawyer.
14  BY ATTORNEY SAVITT:
15     Q.  You can answer.
16     A.  Obviously, a nonprofit can sell goods
17  and services.  It just can't sell the crown
18  jewels.  It just can't be looted.  It can't be
19  stolen.
20         And so what you're trying to do is
21  say -- is trick me into saying like can a
22  nonprofit engage in transactions.  That sounds
23  very reasonable.  But, actually, the -- if the --
24  if transactions are fair and reasonable
25  transactions, that's obviously fine.  But if it

Page 232

1  is, in fact, a massive transfer of value to a
2  for-profit entity, then that would not be
3  appropriate.  That would be stealing the charity.
4          ATTORNEY MOLO:  Can we take a break now?
5          ATTORNEY SAVITT:  Let me finish this.
6  I'm really sorry.
7          ATTORNEY MOLO:  That's all right.
8  BY ATTORNEY SAVITT:
9      Q.  Really, I regret that you think I'm
10  trying to trick you.  I'm not trying to trick
11  you.  I'm trying --
12     A.  I think you are.
13     Q.  I'm not.  I'm trying to -- I just want
14  to make sure I really get your position.  And let
15  me say what I think you said back and you can
16  tell me if I've got it.
17         Because I think what you're saying is a
18  nonprofit can sell its assets if it's a reasonable
19  transaction; but it can't if it's an unreasonable
20  or looting transaction?
21         ATTORNEY MOLO:  Object to the form of
22  the question.  And you're asking the witness to
23  speculate and asking him a legal question.  He's
24  not a lawyer.
25     A.  Well, I'm not a lawyer obviously.  But,

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

Page 233

1  obviously, it's sort of somewhat tautological that
2  if -- that organizations can engage in reasonable
3  and legal transactions.
4  BY ATTORNEY SAVITT:
5      Q.  Yeah.  That's okay.  And they're
6  unreasonable, they're not okay?
7      A.  Yes.  Yes.
8      Q.  I understand.
9          And when is the first time, Mr. Musk,
10  that you say that Altman or OpenAI, Inc. breached
11  the technology ownership term, in that third
12  bullet point in front of you?
13     A.  Well, my concerns grew over the years;
14  and, finally, in 2023, I concluded that I had to
15  take action.  So I felt I could -- that they'd
16  gone too far by 2023.
17     Q.  So -- and what happened in 2023 that
18  you think caused a violation of the contract
19  terms set out in this third bullet point?
20     A.  The $10 billion deal with Microsoft.
21     Q.  And you think that constituted
22  technology ownership transfer that rose to the
23  level of a breach of contract?
24     A.  That was -- that was -- that was my
25  perception, yes.

Page 234

1      Q.  How have you, Mr. Musk, been injured by
2  the breach of this technology ownership term?
3      A.  Well, I provided, obviously, a lot of
4  money, a lot of time, my reputation, help in
5  recruiting, teaching them everything I know about
6  creating a successful company.  And I could have
7  done all of that as a for-profit but I didn't.  I
8  could have done it to enrich myself, but I didn't.
9  Think that about.  Think about that for a second,
10  let that sink in.
11     Q.  I appreciate that.  Are there any other
12  ways that you have been --
13     A.  That's a big way.
14     Q.  I'm not disputing it, sir.  But beyond
15  that big way that you've identified, is there
16  anything else you can identify that are ways that
17  you've been damaged by the breach of this
18  technology ownership term?
19         ATTORNEY MOLO:  Object to the form of
20  the question.
21     A.  Not that I can think of right now.
22         ATTORNEY SAVITT:  Okay.  Want to go off
23  the record?
24         ATTORNEY MOLO:  Yeah, let's take a
25  break.

Page 235

1          THE VIDEOGRAPHER:  Off the record
2  at 4:01 p.m.
3          (Recess taken from 4:01 p.m. to
4          4:24 p.m.).
5          THE VIDEOGRAPHER:  This is the beginning
6  of Media Number 6.  We're back on the record at
7  4:24 p.m.
8  BY ATTORNEY SAVITT:
9      Q.  Mr. Musk, if I could return to
10  Exhibit 9.  It's this piece of paper with all the
11  bullet points.
12         I think it might be the second one in
13  your pile there.  Yes, that's the one.
14         If I could -- skipping a few for now,
15  but if I could ask you to take a look page 10 of
16  this document.
17         Another one of the terms that you say is
18  part of the contract is that "OpenAI will seek to
19  open-source technology for the public benefit."
20         Do you see that, sir?
21     A.  Yes.
22     Q.  And your interrogatory states that this
23  term was agreed on or about December 8th, 2015;
24  right?
25     A.  Yes.

Page 236

1      Q.  With whom did you reach agreement on
2  this term?
3      A.  With Sam Altman, primarily.  It was
4  agreed upon with everyone who created the company
5  that this was the agreed-upon goal.  This is --
6  this is, I believe, taken from the company
7  charter.  Yeah.
8      Q.  Yeah, I think you're right.
9          And I think you have Exhibit 10 in front
10  of you.  That is the company charter, I think.
11     A.  Yeah.
12     Q.  So this is the charter, Mr. Musk, that
13  you had in mind?
14     A.  Yeah.
15     Q.  Thank you.
16         And you see, don't you, that the
17  language you're talking about is in that paragraph
18  third; correct?
19     A.  Yeah.
20     Q.  And it says here -- is this the
21  sentence that you're -- is the passage that
22  you're focused on, sir:
23         "The resulting technology will
24         benefit the public, and the corporation
25         will seek to open-source technology for

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 237

1    the public benefit when applicable"?
2        A.   That seems to be what you're asking
3    about.
4        Q.   Well, I guess my question is whether
5    this reflects the term of the agreement that's
6    referenced in this 11th bullet point, where it
7    says that "OpenAI will seek to open-source
8    technology for the public benefit."
9        A.   It looks like it's quoting that, yeah.
10       Q.   Would you agree, though, that the
11   phrase "where applicable" is also part of the
12   contract term -- I'm sorry, let me strike that.
13            Would you agree that the phrase "when
14   applicable" is also part of the contract term?
15       A.   That's in the sentence, yeah.
16       Q.   Yeah.
17            But it's not in your bullet point on
18   page 10; right?
19       A.   No.
20       Q.   Those words dropped out of your
21   interrogatory response; correct?
22       A.   That is correct.
23       Q.   But isn't it right that the contract
24   term, to the extent it is a contract term, should
25   include "where applicable" -- "when applicable"?

Page 238

1            ATTORNEY MOLO:  Object to the form of
2    the question.
3        A.   I guess you could argue that it should
4    include that.
5    BY ATTORNEY SAVITT:
6        Q.   Was there a reason that you didn't
7    include the words "when applicable" when you were
8    describing what you say the open-source contract
9    term was?
10       A.   I think that what the salient element
11   here is that the technology will be open source
12   for the public benefit.  There's perhaps -- the
13   caveat would be that if the technology could be
14   used to create a nuclear bomb or some very
15   dangerous weapon, then it wouldn't be in the
16   benefit of the public; but it fundamentally is to
17   benefit the public.  And that's it.
18       Q.   But the words of the charter, at any
19   rate, say that the company will seek to
20   open-source technology for the public benefit,
21   when applicable; right?
22       A.   Yes.
23       Q.   Is it your --
24       A.   When applicable to the public benefit,
25   yeah.

Page 239

1        Q.   Well, it -- it -- we can all read the
2    words on the page; right?
3        A.   Right.
4        Q.   Okay.  And would you -- do you think it
5    would be -- it would correctly state your view to
6    add the words "when applicable" after "for the
7    public benefit" in this bullet point on page 10?
8            ATTORNEY MOLO:  Object to the form of
9    the question.
10       A.   I think that's the -- the primary point
11   is that this is going to be an open source, and
12   that the -- it really would be very unusual
13   circumstances where the technology is not open
14   sourced.
15   BY ATTORNEY SAVITT:
16       Q.   Was that your position during the
17   period that you were associated with OpenAI?
18       A.   Yeah.  In the beginning, OpenAI did
19   adhere to this.
20       Q.   Do you think OpenAI owes you an
21   obligation to open source all of its technology?
22       A.   Yes, with the caveat that if the
23   technology is -- could be used for creating
24   weapons of mass destruction or some dangerous --
25   could be used in a dangerous way, then we would

Page 240

1    not open source them.
2        Q.   But does OpenAI owe an obligation to --
3    to you, to open source every model that it
4    creates?
5        A.   Provided it is not -- it does not
6    constitute a danger to the public, yes.
7        Q.   Does OpenAI owe an obligation to you to
8    open source every revision or tweak to every
9    model that it makes?
10       A.   I mean, if it's something de minumus
11   change, then I guess that's not important; but if
12   it's substantial, then it does -- then it is
13   required to do so.  It's currently being called
14   OpenAI, which refers to open source.  It's living
15   a lie.  Its very name is a lie.
16       Q.   Is OpenAI obligated to you to open
17   source the underlying training data it uses to
18   create its models?
19       A.   Arguably, yes.
20       Q.   Arguably yes.
21       A.   I'd say probably, yes.
22       Q.   Probably, yes.
23       A.   Probably, yes.
24       Q.   And I think you've already answered
25   this question, but you would agree that open

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                         Elon Musk

Page 241

1  source could in some circumstances create safety
2  and security concerns?
3      A.  Yeah.  The only reason not to open
4  source would be if it -- it if open sourcing would
5  constitute a danger to the public.  Otherwise, it
6  should be open sourced.  That was my
7  understanding.
8      Q.  Do you agree that when safety requires
9  that a model be kept closed source, that's
10  appropriate under the terms of what you say is
11  the agreement?
12      A.  Yeah.  For safety reasons, yeah.
13      Q.  And would you agree that when safety
14  requires that a model be kept closed source,
15  could be the subject of reasonable disagreement?
16      A.  It's possible.
17      Q.  The certificate of incorporation that
18  you're looking at, Mr. Musk, is for OpenAI, Inc.;
19  right?
20      A.  That's what it says.
21      Q.  Yeah.
22      But the tone of your contract in this
23  bullet point on page 10 says OpenAI will seek to
24  open-source technology for the public benefit;
25  right?

Page 242

1      A.  These seem to be, like, legal nuances
2  that I am not sure what you're getting at, but
3  they don't affect the substance of the claims.
4      Q.  Well, I just want to make sure that --
5  do you -- the charter is for OpenAI, Inc.
6      Is there a reason you didn't say OpenAI,
7  Inc. in what you said was the contract that was
8  violated?
9      ATTORNEY MOLO:  Object to the form of
10  the question.
11      A.  They sound like the same thing to me,
12  absent some legalistic definition; but this sounds
13  like the same thing to me.
14  BY ATTORNEY SAVITT:
15      Q.  Was there a point at which Altman or
16  OpenAI, Inc. undertook to you to open source the
17  technology of OpenAI entities other than OpenAI,
18  Inc.?
19      A.  This sounds like some sort of trickery
20  thing.
21      There was only one OpenAI.  There
22  wasn't, like, a whole bunch of OpenAIs.  There was
23  just one.
24      Q.  When you say "there was only one
25  OpenAI," when are you talking about?

Page 243

1      A.  When the company was created, there was
2  only one OpenAI.  There wasn't -- you can't go
3  create some second OpenAI that somehow can --
4  has -- gains the benefit of what OpenAI, Inc. did.
5  You can't engage in some corporate-shell game
6  where you transfer value illegally, which seems
7  like what's been done here.
8      Q.  But you can engage in transactions that
9  transfer value legally and reasonably; right?
10      ATTORNEY MOLO:  Object to the form of
11  the question.  And you're asking the witness to
12  speculate.
13      A.  Well, legal -- I mean, obviously, it is
14  legal to do legal things.
15  BY ATTORNEY SAVITT:
16      Q.  Do you know -- did you know that the
17  certificate of incorporation of OpenAI was
18  amended in January of 2020?
19      A.  I don't recall.
20      Q.  Do you know that the amendment to the
21  certificate of incorporation of OpenAI in 2020
22  removed references to open sourcing?
23      A.  I don't recall.
24      Q.  Did you raise any objection to anyone,
25  that you can recall, about the revision to the

Page 244

1  certificate of incorporation of OpenAI in 2020?
2      ATTORNEY MOLO:  Objection.  There's no
3  evidence that the witness was aware of that.  In
4  fact, the evidence is just the opposite.
5      ATTORNEY SAVITT:  Thank you for your
6  testimony, Mr. Molo.
7  BY ATTORNEY SAVITT:
8      Q.  You can answer my question.
9      A.  I -- I don't think I was -- I don't
10  recall being made aware of that.  But as my public
11  statements show, as soon as I became aware of
12  OpenAI making things closed source, I voiced
13  public objections.
14      Q.  Without actually knowing what the
15  certificate of incorporation said at the time;
16  correct?
17      A.  As soon as I become aware of some
18  violation of the deal being open source, I voiced
19  objections; and I voiced objections many times.
20      Q.  When did OpenAI, Inc. or Altman first
21  breach this open-sourcing term you say in here is
22  in your contract?
23      A.  Well, it seems to have been breached by
24  degrees, really.  So it starts just -- just -- the
25  whole thing has been turned around sort of one

Elon Musk v.                        FINAL                     September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                         Elon Musk

Page 245

1    step at a time.  Like a -- the frog in the boiling
2    water:  The temperature just got hotter and hotter
3    until eventually you're boiling; until eventually
4    the entire premise of OpenAI being a nonprofit
5    open source had been perverted completely into a
6    profit-maximizing closed-source company, the polar
7    opposite of what was agreed to.
8        Q.  My question, though, sir, was a little
9    bit narrower.  It was:  When did OpenAI or Altman
10   first breach the open-sourcing term that is the
11   top bullet on page 10 of this document?
12       A.  Well, what I was trying to convey is
13   that it was breached one bit at a time.
14          The final straw was 2023, and that's
15   when I -- that's when I initiated legal action.
16       Q.  What happened in 2023 that caused a
17   breach of the open-sourcing term that you say
18   resides in this bullet point?
19       A.  The $10 billion deal with Microsoft.
20       Q.  What's the first technology that you
21   say OpenAI should have open sourced but did not?
22       A.  I don't recall exactly, but I think it
23   might have been GPT-4, or GPT-3.5.
24       Q.  When did that happen?
25       A.  I don't recall exactly.

Page 246

1        Q.  But you allow that, before those
2    models, other of OpenAI's technology had not been
3    open sourced?
4        A.  I was aware that the -- they were delays
5    in open sourcing, not that it would not be open
6    sourced.  That there were delays in open sourcing;
7    that there was concern about weaponization of
8    GPT-3.  I think it's around GPT-3 that it seemed
9    like it could be dangerous.
10          But so long as it would ultimately be
11   open sourced, yeah, that would be okay.
12       Q.  And a delay in open source is different
13   than a decision not to open source; is that
14   right?
15       A.  Yes.
16       Q.  How long can the delay be before you
17   think it works a violation of what you say is
18   your contract?
19          ATTORNEY MOLO:  Object to the form of
20   the question.
21          Go ahead.
22       A.  As soon it's determined that the model
23   does not present a danger to the public, it should
24   be open sourced.  So that really should be shortly
25   after the model is trained, it should be open

Page 247

1    sourced and released.
2    BY ATTORNEY SAVITT:
3        Q.  Do you agree that whether something --
4    whether technology should be open sourced should
5    be determined by reference to whether open
6    sourcing is consistent with the overall mission
7    of OpenAI?
8        A.  It should be open sourced if there's
9    no -- if there's -- once the model has been
10   checked for public safety, that there's no danger
11   of it developing nuclear weapons or something,
12   then it should be open sourced.  That's the deal.
13       Q.  Even if open sourcing under those
14   circumstances makes it less likely that OpenAI
15   will achieve the objective of creating AGI for
16   the benefit of humanity; is that right?
17          ATTORNEY MOLO:  Object to the form of
18   the question, and also objection that it calls for
19   speculation on the part of the witness.
20   BY ATTORNEY SAVITT:
21       Q.  Go ahead and answer.
22       A.  It should be open sourced so long as
23   it's not a danger to the public.
24       Q.  Take a look at Exhibit 1.  It's
25   probably the first thing in your pile.  It's the

Page 248

1    2015 email with Mr. Altman.
2          You see that respecting open sourcing,
3    Altman says you had an ongoing conversation on the
4    subject?
5          ATTORNEY MOLO:  Which paragraph are you
6    looking at?
7    BY ATTORNEY SAVITT:
8        Q.  I'm sorry.  It's in the third bullet
9    point, towards the bottom.  "We'd have Altman
10   write."  It's an ongoing conversation about what
11   work should be open sourced and what shouldn't.
12          Do you see that?
13       A.  Yeah.
14       Q.  And you said, this email you said,
15   "Agree on all"; right?
16       A.  Yeah.
17       Q.  And did you agree that what should
18   happen is an ongoing conversation about what work
19   should be open sourced and what shouldn't?
20       A.  The context of such of that would be
21   everything is open sourced unless it's a danger to
22   the public.
23       Q.  Well, but did you agree that what
24   should happen is an ongoing conversation among
25   the people running the organization about what

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman              [CONFIDENTIAL]                    Elon Musk

Page 249

1    work should be open sourced and what shouldn't?
2        A.    That's what the words here on -- in this
3    email say.  But the agreement was that things are
4    open sourced unless they're a danger to the
5    public.  That was the deal.
6        Q.    Was that written down anywhere?
7        A.    That was my understanding of the deal.
8        Q.    Was it written down anywhere as near as
9    you know?
10       A.    It might be.
11       Q.    As near as you know, sir, was it
12   written down anywhere that open sourcing was
13   mandatory except where there was a public safety
14   benefit?
15       A.    I recall having many conversations about
16   this, and that was the only constraint.
17       Q.    I see.  I'm just -- and I appreciate
18   that.
19       A.    I don't know if it was written down
20   somewhere or not.
21       Q.    Okay.  Thank you.
22            ATTORNEY SAVITT:  Let's take a look at
23   Exhibit 14.
24   ///
25   ///

Page 250

1            (Whereupon, Musk Exhibit Number 14
2            was marked for identification and is
3            attached hereto.)
4    BY ATTORNEY SAVITT:
5        Q.    This is an email exchange from
6    January 2016, Mr. Musk, including you,
7    Ms. Sutskever, Mr. Altman, Mr. Brockman.
8            Do you see that?
9        A.    Yes.
10       Q.    The second email in the chain is from
11   Mr. Sutskever to the group.
12           Do you see that?
13       A.    Yes.
14       Q.    And Mr. Sutskever writes:
15           "As we get closer to building AI,
16       it will make sense to start being less
17       open.  The 'open' in OpenAI means that
18       everybody should benefit from the fruits
19       of AI after it's built, but it's totally
20       okay to not share the science even
21       though sharing everything is definitely
22       the right strategy in the short and
23       possibly medium term."
24           Do you see that?
25       A.    Yes.

Page 251

1        Q.    And you responded to that email; right?
2        A.    Yes.
3        Q.    You said, "Yup."
4        A.    Yeah.  I'm referring to the fact that I
5    agree that we should not open source an unsafe
6    model.
7        Q.    Were you agreeing with the idea that
8    "as we get closer to building AI, it will make
9    sense to start being less open"?
10       A.    Only for safety reasons.  That's the
11   preceding sentence, the preceding paragraph is
12   that everything is open sourced unless it is
13   unsafe.
14       Q.    And did you agree that the "open" in
15   OpenAI means that everyone should benefit from
16   the fruits of AI after it's built?
17       A.    No, of course not.  The "open" in
18   OpenAI -- and I named it -- was open source.
19       Q.    So you didn't agree with that?
20       A.    No, you're -- you're trying to read the
21   second paragraph without taking the first
22   paragraph into account.
23           Everything is open source unless it's
24   unsafe.  That's what open means, open source.
25   Open and OpenAI means open source.

Page 252

1        Q.    I understand that's your view.
2        A.    That is the fact.  And everyone knew it.
3        Q.    But Mr. Sutskever writes:
4            "The 'open' in OpenAI means that
5        everyone should benefit from the fruits
6        of AI after it's built."
7            Do you see that?
8        A.    Yes.
9        Q.    Do you agree that that's -- do you
10   agree with Mr. Sutskever?
11       A.    I agree, but you have to look at the --
12   at everything he says here, which is that the only
13   reason that it wouldn't be open sourced is if it's
14   unsafe.  That's it.  There's not some other
15   circumstance.  It's not -- what -- you can't make
16   open source for monetary gain of individuals,
17   which is what they're doing.
18           That's the reason they're not open
19   sourcing it:  For personal monetary gain.
20       Q.    So you're --
21       A.    It's not for safety.
22       Q.    I understand that's your view.
23       A.    That's a fact.
24       Q.    You say here that "The open is OpenAI
25   means that everyone should benefit from the

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

Page 253

1    fruits of AI after it's built."  And you're
2    saying that that sentence -- that utterance
3    actually means that all -- all OpenAI technology
4    should be open source, that's what you're telling
5    me?
6              ATTORNEY MOLO:  Object to the form of
7    the question.  The witness didn't write this
8    passage in this email.
9              ATTORNEY SAVITT:  You can answer the
10   question.
11             ATTORNEY MOLO:  The question says "you
12   say here."  It's not him saying it.  It's
13   Sutskever saying it.
14   BY ATTORNEY SAVITT:
15        Q.   You agree with everything Sutskever
16   wrote; right?
17        A.   I agree that we should not open source
18   AI if it is dangerous, but otherwise it should be
19   open sourced.  I certainly would in no way, shape
20   or form agree that it should not be open sourced
21   simply for the financial benefit of people at
22   OpenAI.
23        Q.   Well, when you said "yep" here, were
24   you agreeing with the full contents of
25   Mr. Sutskever's email to you?

Page 254

1        A.   I was agreeing that we should not open
2    source dangerous AI.  That's it.
3        Q.   And to the extent he was saying
4    anything else, you didn't agree with it?
5        A.   That's my interpretation of what he
6    said, which had always been the agreement.  We
7    would not open source AI if it was dangerous.
8             At no point was there any discussion or
9    implication that the failure to open source OpenAI
10   would be simply to maximize the financial gain of
11   people at OpenAI at all, ever.
12        Q.   I know that's what you think.
13        A.   That's a fact.
14        Q.   I know that you think it's a fact.
15        A.   It is.
16        Q.   But with respect to this email, when
17   you said, "yep," you were agreeing with
18   Sutskever's email below, because you think it
19   meant that everything needed to be open source
20   except for safety reasons?
21        A.   Yes.
22        Q.   Thank you.
23        A.   Everything open source unless unsafe.
24        Q.   You think that's what Sutskever is
25   saying here?

Page 255

1        A.   Yep.
2             ATTORNEY MOLO:  Objection; asked and
3    answered.
4    BY ATTORNEY SAVITT:
5        Q.   Now, the next bullet -- bullet -- I
6    think it's the 12th, says that OpenAI --
7             ATTORNEY MOLO:  This is back to the --
8             ATTORNEY SAVITT:  Yes, I'm sorry.
9    Mr. Molo is correct.  It's the document that's
10   second in your pile.
11   BY ATTORNEY SAVITT:
12        Q.   "OpenAI would openly share its plans
13   and capabilities along the way" --
14             ATTORNEY SAVITT:  It's the second one on
15   that page.
16             ATTORNEY MOLO:  This one here.
17             ATTORNEY SAVITT:  Thank you.
18   BY ATTORNEY SAVITT:
19        Q.   You see here that you're -- your
20   interrogatory here states that another term of
21   the contract you say exists is that:
22             "OpenAI, Inc. would openly share
23        its plans and capabilities along the way
24        except where its technology can be
25        dangerous causing genuine safety and

Page 256

1    security concerns."
2             Do you see that?
3        A.   Yes.
4        Q.   Is this term that you say exists in the
5    contract, Mr. Musk, different from the open
6    sourcing term you and I were just discussing?
7        A.   I mean it sounds pretty similar.
8        Q.   Yeah.  Do you think OpenAI, Inc. is
9    required to share all of its plans publicly?
10       A.   Not all of its plans, just the -- that
11   it needs to be open source.
12        Q.   I see.  So it doesn't need to disclose
13   its financial plans, for example?
14        A.   No.
15        Q.   It doesn't need to disclose its
16   business plans?
17        A.   No.
18        Q.   Or even its operational plans?
19        A.   I mean only as they relate to open
20   source and being for the public like a open-source
21   nonprofit.
22        Q.   Would it be right to say that your view
23   is the contract requires OpenAI to open source
24   all of its technology except for safety reasons,
25   and that's the -- that's the scope of what you

Elon Musk v.                          FINAL                        September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                         Elon Musk

Page 257

1  think the open-sourcing obligation is?
2      A.  Yes.
3      Q.  What technology did OpenAI open source
4  when you were with the organization?  Do you
5  know?
6      A.  I believe it open sourced pretty much
7  everything.  I think up through GPT-2, if I recall
8  correctly, maybe 2.5, and then moved to sort of a
9  closed source thereafter.
10     Q.  When was this "Open Plans and
11  Capabilities" term first breached?
12     A.  Well, it was breached --
13         ATTORNEY MOLO:  Object to the form of
14  the question to the extent you're asking for a
15  legal conclusion.  He's not a lawyer.
16  BY ATTORNEY SAVITT:
17     Q.  You can answer.
18     A.  Well, the -- it started with not a
19  refusal to open source, but a delay.
20         And then the delay got longer and
21  longer; and the refusal to open source got larger
22  and larger.  And then finally got to the point in
23  2023 where it was clear at that they're not going
24  to open source.  They would give lip service to
25  open source, but they would not actually do it.

Page 258

1      Q.  And that moment to you was the
2  Microsoft 2023 investment; correct?
3      A.  Yes.
4      Q.  And that investment included provisions
5  that would render -- let me strike that question.
6         The Microsoft investment, it included
7  provisions that tended to further restrict open
8  sourcing and OpenAI; is that right?
9      A.  That's my understanding.
10     Q.  And what is it about that agreement
11  that caused that, in your view?
12     A.  What I recall reading was that this
13  would not be open sourced.
14     Q.  Anything else?
15     A.  And OpenAI didn't -- in fact, did not
16  open source.
17     Q.  You read that around the time of the
18  agreement?
19     A.  Yes.
20     Q.  How have you been damaged by the
21  violation of the "open source" and "open plans"
22  terms of the contract you say exist?
23         ATTORNEY MOLO:  Object to the form of
24  the question to extent it it's calling for a legal
25  conclusion on the part of this witness -- excuse

Page 259

1  me.
2      A.  It was a fundamental premise of why I
3  contributed money, time, my reputation,
4  recruiting, and teaching them everything I knew
5  how to -- about how to create a successful
6  start-up was to have an open-source nonprofit.  I
7  could have created this as a for-profit, but I
8  decided not to; and instead donated time, money,
9  everything else, in order to create something that
10  was an open-source nonprofit.
11         And I could have done it as a
12  for-profit, but I thought, no, let's not do that.
13  Let's do something that's -- where I actually
14  don't get financial benefit; and that -- that deal
15  was broken.  That promise was broken.
16  BY ATTORNEY SAVITT:
17     Q.  Besides that, in any other ways that
18  have you been damaged by the breach of what you
19  say are the open-source terms?
20         ATTORNEY MOLO:  Object to the form of
21  the question.
22     A.  Just really two things, which is that it
23  needs to be an open-source nonprofit.  I've said
24  it probably a million times.  That it needs to be
25  an open-source nonprofit.  That was the deal.  And

Page 260

1  they broke the deal.  Plain and simple.  It's not
2  complicated.  It's not like a -- some complex
3  legalese.  It's plain and simple.
4  BY ATTORNEY SAVITT:
5      Q.  Looking at the next bullet here in your
6  interrogatory, Mr. Musk, you write that it was a
7  further term of your implied contract that
8  "safety should be a first-class requirement of
9  OpenAI Inc.'s research and development of AI."
10         Do you see that, sir?
11     A.  Yes.
12     Q.  That was dated on or about June 24th,
13  2015; right?
14     A.  Yeah.
15     Q.  What was the source of this contract
16  term, so far as you know?
17     A.  I don't recall the exact origin of it.
18  These points are essentially all -- they're -- you
19  can sum up all these points as simply is it going
20  to be an open-source nonprofit or not.
21         And the deal was that it would be an
22  open-source nonprofit.  They broke those two --
23  those two fundamental requirements; and, thus, now
24  seeking to break them in their entirety.  Just
25  utterly, utterly the opposite of what was agreed

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman               [CONFIDENTIAL]                    Elon Musk

Page 261

1    to.
2        Q.   Do you think that OpenAI no longer
3    views safety as a first-class requirement?
4        A.   I certainly don't trust them.  I don't
5    trust them to view safety as a first-class
6    requirement.
7        Q.   What causes you to think that OpenAI
8    does not view safety as a first-class
9    requirement?
10       A.   I think Sam Altman is -- just wants to
11   maximize profits at all costs.  That's my opinion.
12   And that's what seems to be the case.
13       Q.   Is there anything you can point to in
14   the safety functions and research of OpenAI that
15   you think causes it to be something other than a
16   first-class safety commitment?
17       A.   Just that the priority seemed to be
18   profit maximization.
19       Q.   Anything other than that?
20       A.   No, but that's obviously a great deal of
21   their putting profit before safety.
22       Q.   But the reason you're thinking they put
23   property before safety is simply because the
24   incentive structure that you think exists; right?
25       A.   Yeah, they've gotten greedy.

Page 262

1        Q.   And, I'm sorry, I don't mean to chase
2    you on this, but is there anything else you can
3    point to that's going on that you know of or
4    believe going on at OpenAI that you think
5    represents something other than first-class
6    safety?
7             That's the question I just want make
8    sure I get the full answer to, sir.
9        A.   It does not seem to be the priority.
10   The priority seems to be profit maximization and
11   valuation maximization, so -- yeah
12       Q.   Do you have any technical or scientific
13   critiques of OpenAI's safety protocols?
14       A.   I'm not aware of any -- well, I guess
15   there was -- you know, I did read that --
16   allegedly, Chat GPT convinced some kid to commit
17   suicide.  That sounds pretty bad.  That sounds
18   like they are cavalier about safety, if that is
19   true.
20       Q.   Anything else?
21       A.   Well, I think if it's convincing people
22   to commit suicide, that's pretty bad.
23       Q.   I understand that.
24            But you're not actually aware of the
25   circumstance of that situation, are you?

Page 263

1        A.   I -- I just know what I read.  I said,
2    if that's accurate, that's pretty bad.
3        Q.   You don't believe everything you read
4    in the New York Times, do you, Mr. Musk?
5        A.   No.
6        Q.   No.
7             Would you agree that reasonable minds
8    can and do disagree with respect to the best
9    approaches to AI safety?
10       A.   I'm sure there's not complete agreement.
11       Q.   Is there a particular approach to AI
12   safety that you believe this contract term
13   required OpenAI to adopt?
14       A.   Safety should come before profits.
15       Q.   Anything else?
16       A.   Not that I can think of.
17       Q.   When did OpenAI, Inc. or Altman first
18   breach this first-class safety requirement?
19       A.   I guess I first became very concerned
20   about it in the 2023 Microsoft deal, where it
21   seemed like they were really chasing
22   profitability; just chasing money.
23       Q.   Do you say that the Altman and OpenAI,
24   Inc. broke the promise to make safety a
25   first-class requirement when they entered into

Page 264

1    the Microsoft deal in 2023?
2        A.   My perception was that they were putting
3    profits over safety.
4        Q.   Did anything about the terms of the
5    Microsoft deal in 2023 indicate a reduced
6    commitment to OpenAI safety, that you can
7    remember for me today?
8             ATTORNEY MOLO:  Object to the form of
9    the question.  To the extent -- and have complete
10   visibility into the terms of the deal.
11       A.   I don't know the full extent.  But -- I
12   don't know what they're doing with regard to
13   safety.  But they do appear to be prioritizing
14   profits over safety.
15   BY ATTORNEY SAVITT:
16       Q.   But my question was -- it was a narrow
17   one.
18            Is there anything -- do you know of
19   anything about the Microsoft deal in 2023 that
20   tended to suggest that OpenAI or Microsoft were
21   devaluing AI safety?
22       A.   I don't know of anything specific.  I
23   just know that -- it just -- I'm just saying like
24   it seemed as though they were prioritizing growth
25   and profit over safety.  That was -- that's the

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                        Elon Musk

Page 265

1    impression I got.
2        Q.   If an AI model hallucinates, is it
3    unsafe?
4        A.   In some cases.
5        Q.   But not always?
6        A.   Yeah.
7        Q.   Are you familiar with an OpenAI product
8    called Whisper?
9        A.   I've heard of it.
10       Q.   Did its release breach any commitment
11   between you and OpenAI or Altman?
12       A.   Its release?
13       Q.   Yeah.
14       A.   I don't know.
15       Q.   Did the release of GPT-4o breach your
16   safety term?
17       A.   Not that I'm aware of.
18       Q.   Did the release of OpenAI's o1 model
19   breach your safety term?
20       A.   Not that I'm aware of.  I don't know.
21   If it convinced that kid to commit suicide, I
22   suppose it would.
23       Q.   Are AI products that interact with
24   minors in an inappropriate or suggestive way
25   unsafe, in your opinion?

Page 266

1        A.   I mean, it depends on the situation or
2    the -- it depends on what harm -- if -- if
3    something causes harm to minors then, yeah, of
4    course, it's dangerous.
5        Q.   Are AI products that advocate genocide
6    unsafe, in your opinion?
7        A.   That seems like a bad thing to advocate.
8        Q.   From a safety perspective.
9        A.   Yeah.  I'm not aware of -- well,
10   there's -- I think there was like at one point
11   Chat GPT, if I recall correctly, favored global
12   thermonuclear war over misgendering Caitlyn
13   Jenner.  That seems like an -- and even Caitlyn
14   Jenner disagreed with that.
15       Q.   How have you been damaged by the
16   alleged breach of the first-class safety term of
17   the agreement you say exists?
18       A.   It was a premise of the contribution of
19   time, money, and everything else.  Obviously, I
20   would only do so if they're maximizing safety.
21       Q.   Any other way that you've been damaged
22   by the breach of what you say is the safety term
23   of the contract --
24            ATTORNEY MOLO:  Object --
25       Q.   -- with OpenAI?

Page 267

1            ATTORNEY MOLO:  Object to the form of
2    the question.  The witness is not a lawyer.  And
3    to the extent that the term "damage" is being used
4    is a legal term, it's not appropriate question.
5    BY ATTORNEY SAVITT:
6        Q.   Mr. Musk, you can answer the question.
7            ATTORNEY SAVITT:  Mr. Molo, you can stop
8    coaching the witness.
9        A.   Obviously, I would only -- I only made
10   this donation of time -- time and resources and --
11   if I thought it would be beneficial to humanity.
12   So if -- if they were not putting safety first,
13   that would -- that would be -- that would be a
14   breach of breaking the deal.
15   BY ATTORNEY SAVITT:
16       Q.   Any other injury you can recall having
17   suffered by virtue of this alleged term breach?
18            ATTORNEY MOLO:  Object to the form of
19   the question and use of the word "injury" to the
20   extent it's a legal term.  The witness is not a
21   lawyer.
22       A.   No, I'm just -- I'm -- I'm only going to
23   donate money and resources if I think it's going
24   to benefit humanity, not if it's going to harm
25   humanity.

Page 268

1    BY ATTORNEY SAVITT:
2        Q.   Understood.  But nothing other than
3    that.  And it's a big thing.  I'm not saying it's
4    not.
5        A.   It was quite a bit.
6        Q.   I don't mean to minimize your answers
7    when I say that, sir.  I just want to make sure
8    there's nothing else.  That's why I'm asking you
9    those questions, and --
10       A.   I don't think this is a
11   super-complicated case.
12       Q.   No, I understand.
13       A.   It's just a -- yeah, it's a pretty
14   straightforward situation.
15       Q.   Now, the next bullet point I have here
16   says -- and this is -- this is from your
17   interrogatory response, sir.  You write that a
18   further term of the contract that you say is --
19   exists was breached is that:
20            "OpenAI's researchers would have
21            significant financial upside but would
22            be uncorrelated to what they build,
23            which should eliminate some of the
24            conflict (will pay them a competitive
25            salary and give them Y combinator equity

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 269

1     for the upside)."
2          And you say this is dated about
3     June 24th 2015; right?
4          A.  Yes.  There were discussions of
5     different ways to compensate people who joined.
6          Q.  And -- but this -- according to your
7     interrogatory, this was a term of your contract;
8     right?
9          A.  Yeah.
10         Q.  So your contract with OpenAI, Inc. and
11    Altman require that researchers would be paid in
12    YC equity; right?
13         A.  I mean, that was -- that was in the
14    email.
15         Q.  I appreciate it was in the email.  But
16    it's also in the interrogatory that you swore
17    out.  So you say that's part of your contract;
18    right?
19         A.  Yes.
20         Q.  Okay.  How did YC equity --
21         A.  It's not a very important part of the
22    contract, but it's in the email.
23              Yeah, I -- I don't think this is -- this
24    is a super important point.
25         Q.  How did YC equity provide upside for

Page 270

1     researchers?
2          A.  It's just another form of compensation.
3          Q.  Do you say that Open AI, Inc. and
4     Altman promised you that no OpenAI employee would
5     ever receive equity in any OpenAI entity?
6          A.  If was there only one OpenAI entity that
7     in discussion, you can't just go clone it and say
8     that -- I mean this is what's trying to --
9              What's going on here is a corporate
10    shell game, essentially stealing the value of the
11    charity, moving it to another corporate shell,
12    calling that OpenAI, and tricking -- basically
13    pulling a fast one and stealing the charity,
14    using -- a corporate shell game.  That's what's
15    going on here.
16         Q.  When was this contract term first
17    breached, in your opinion?
18         A.  I think the -- the sort of final
19    straw -- I mean there was, like, my concern grew
20    over time.  But the final straw was the 2023
21    Microsoft deal.  That's when I engaged legal
22    counsel.  I would have engaged legal counsel
23    earlier if I -- if my concerns had risen to the
24    boiling point, but my concerns rose to the
25    boiling point in '23.

Page 271

1          Q.  But you were aware in 2019 that OpenAI
2     had created a capped profit -- capped return
3     for-profit arm; right?
4          A.  Yeah, I was -- that bothered me.  But it
5     has kept capped profit.  So capped profit, at
6     which point, things to would revert to the
7     nonprofit.  So I was like, well, there's a limit
8     to this, and this will end up being the value will
9     accrue to the nonprofit.  So that maybe ends up,
10    you know, being okay.
11         Q.  You were aware, though, that employees
12    received equity in the capped profit vehicle that
13    was created in 2019, weren't you?
14         A.  Yes.
15              ATTORNEY MOLO:  Object to the form of
16    the question.
17    BY ATTORNEY SAVITT:
18         Q.  And that was a breach of this contract
19    term; right?
20              ATTORNEY MOLO:  Object to the form of
21    the question, asking the witness for a legal
22    conclusion.
23         A.  I think it's certainly a gray area.
24              It's a gray area, but -- and -- and at
25    this point, I don't know if, looking back, Altman

Page 272

1     really always intended to turn this into a
2     for-profit and steal the charity; but that's what
3     he's attempting to do now.
4              So some equity compensation along the
5     way, yeah, that could work.  Everything ultimately
6     reverts back to the nonprofit, while making me
7     uneasy, is not a showstopper.  Once it became
8     clear, from my perspective, that this was not
9     going to be an open-source situation, that this
10    was not going to be a nonprofit, that's -- which
11    really became obvious to me in '23 and has only
12    become more obvious since then, since they're
13    explicitly trying to convert to a for-profit; then
14    that's -- that's when I came to the conclusion
15    this is all -- this is a great scam.
16    BY ATTORNEY SAVITT:
17         Q.  When you talk about the determination
18    to convert to a for-profit, you're talking about
19    the transaction that you think is presently under
20    contemplation; right?
21              ATTORNEY MOLO:  Objection; form of the
22    question.  When you say "the transaction," what
23    transaction are you referring to?
24         A.  You're talking about the attempt
25    currently to turn --

Elon Musk v.                              FINAL                          September 26, 2025
Samuel Altman                      [CONFIDENTIAL]                              Elon Musk

Page 273

1    BY ATTORNEY SAVITT:
2        Q.   Yeah.  Is that what you meant when you
3    were talking about a for-profit?
4        A.   Yes.  My understanding is that the goal
5    is to turn OpenAI into a for-profit and,
6    essentially, have the nonprofit be de minimis.
7        Q.   I see.  And that's the transaction you
8    were talking about in your last --
9        A.   The --
10       Q.   The conversion transaction in your last
11   answer?
12       A.   Yeah, that's --
13       Q.   Thank you.
14            The contract term that begins at line 14
15   of this document on page 10, it's the next one in
16   line, it says, here, in your interrogatory that it
17   was:
18            "A further term of the contract
19       that OpenAI would always assiduously act
20       to minimize conflicts of interest among
21       our employees and stakeholders that
22       could compromise the nonprofit's
23       mission."
24            Do you see that?
25       A.   Yes.

Page 274

1        Q.   With whom did you discuss this alleged
2    contract term?
3        A.   Well, I guess with Sam Altman.
4        Q.   Did you discuss it -- were these oral
5    conversations in which you discussed it with
6    Altman?
7        A.   Yeah.
8        Q.   Yeah?
9            Do you recall any of those discussions?
10       A.   I mean, I don't recall the specifics.
11       Q.   Do you know what policies OpenAI has in
12   place to address conflicts of interest?
13       A.   I don't know what all the policies are.
14       Q.   Do you know have -- do you believe that
15   OpenAI has not assiduously acted to minimize
16   conflicts of interest?
17       A.   I -- based on the fact that OpenAI is
18   bad, it's -- in my opinion, it's violated its
19   obligation to open source, violated its obligation
20   to remain a nonprofit, it is highly likely they
21   will violate other things.
22       Q.   I see.  The next item says -- you
23   contend here -- the next item you contend that
24   the term of contract is that "OpenAI, Inc. would
25   continue with blank as a nonprofit."

Page 275

1            Do you see that?
2        A.   Yeah.
3        Q.   Continue with what as a nonprofit?
4        A.   I'm not sure -- just continue its
5    operations as a nonprofit.
6        Q.   Is this any different than the terms we
7    talked about earlier, about remaining a 501(c)(3)
8    organization?
9        A.   No, I think some of these things are
10   somewhat repetitive, and that the legalistic
11   repetition is my interpretation of this.
12       Q.   Okay.  But -- and here again, I'm
13   just -- this is the same thing?
14       A.   Yeah.  Yeah, I'm relying on the advice
15   of my lawyers here on what should be done from a
16   legal standpoint.  I'm just -- from a commonsense
17   standpoint, you know, as I've said a few times,
18   more than a few times, the deal was open-source
19   nonprofit; both of those terms have been violated.
20   They broke the deal.
21       Q.   And the last bullet point here, it
22   says -- it says here that you view it's a term of
23   your contract that -- and now I'm quoting --
24            "Any for-profit entity used to
25       support Open AI, Inc. if subsequently

Page 276

1        agreed to by the parties which agreement
2        never materialized, would have a
3        fixed-maximum return structure and be
4        organized in a way all investors are
5        clear that they should never expect a
6        profit."
7            Do you see that?
8        A.   Yes.
9        Q.   When did you agree on this term,
10   Mr. Musk?
11       A.   I guess on the -- on the -- dates
12   mentioned there.
13       Q.   With whom did you agree on this term?
14       A.   With Sam Altman and OpenAI.
15       Q.   Tell me the communications that
16   constitute the agreement to this term.
17       A.   This is coming from -- I guess we can
18   pull the exhibit or -- I don't know.
19            ATTORNEY MOLO:  These are quotes from
20   documents you have.
21       A.   Do you want us to search for the
22   exhibit?
23   BY ATTORNEY SAVITT:
24       Q.   Well, I just wanted to know if you
25   remember any conversations or discussions that

Elon Musk v.                        FINAL                        September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                         Elon Musk

Page 277

1    constituted the basis for what you say here was a
2    contract term.
3          A.   I'm re-quoting from documents.  So do
4    you want us to produce the document?
5          Q.   No, we have the documents.
6          A.   Okay.  Then why are you asking me the
7    question?
8          Q.   Because I'm asking you about things
9    like conversations or discussions about them.
10         A.   Well, conversations reflect the
11   understanding -- the -- these terms match the
12   conversations that were had.
13         Q.   Maybe you can save us all a little bit
14   of brain damage here.
15         A.   Yeah.
16         Q.   Is it fair, then, to say that
17   everything that you know that constitutes this
18   contract term is included in those documents?
19              ATTORNEY MOLO:  Objection.
20         A.   Probably, no.  Therefore, it wouldn't be
21   fair.
22   BY ATTORNEY SAVITT:
23         Q.   That's why I'm trying to ask you, what
24   else is there?
25         A.   I mean, I don't know everything, but

Page 278

1    there's -- I can't recall everything in this
2    instant.  But there are many conversations and
3    many text exchanges, emails, that reflect this
4    understanding repeatedly.
5          Q.   This contract term was entered into
6    after you left the board of OpenAI?
7          A.   This particular item mentions the date.
8    I guess that is after the -- after I left the
9    board.  You're talking about the 2018 date?
10         Q.   That's right.
11         A.   Yeah, that's after I left the board.
12         Q.   So you entered into this contract term
13   after you were off the board; right?  That's your
14   testimony?
15         A.   Yeah.
16         Q.   I'm sorry, I want to go back to just
17   one or two more of these.  Back on page 9, the
18   sixth bullet point.  It cuts in around line 19,
19   Mr. Musk.
20              You say here that "a term of the
21   contract is that OpenAI's technology would not be
22   used for the private gain of any person."
23              Do you see that?
24         A.   Yes.
25         Q.   This "no private gain" term was agreed

Page 279

1    as of the date of OpenAI's certificate,
2    December 8th; right?
3          A.   Yes.
4          Q.   Who agreed to that term?
5          A.   Sam Altman and OpenAI, Inc.
6          Q.   Would you take a look at Exhibit 10.
7    It's the certificate.
8          A.   Yes.
9          Q.   So you see this -- this document says
10   that -- the last sentence of the paragraph third
11   we were looking at -- I'm sorry.
12              So the second-to-last sentence, says:
13              "The corporation is not organized
14         for the private gain any of person."
15              Do you see that?
16         A.   Yes.
17         Q.   That's different than what you say is
18   the contract term, isn't it?
19         A.   Sorry, which contract term?
20         Q.   I'm sorry.  It's the one beginning at
21   line --
22         A.   19?
23         Q.   19, that's right, thank you.
24         A.   "Would not be used for the private
25   gain" -- what am I missing here?

Page 280

1          Q.   Well, the difference is that you say
2    the contract was that OpenAI's technology would
3    not be used for the private gain of any --
4          A.   I guess one could change the wording
5    here to just "OpenAI."
6          Q.   So this says the corporation is not
7    organized for the private gain of any person.
8              Do you see that?
9          A.   If you're suggesting that we make some
10   edits to the document, I guess we could do so.
11         Q.   Oh, no, I'm not suggesting that.
12   You're, of course, welcome to seek to do that.  I
13   just wanted to make sure that I understood
14   whether you were saying that this was a different
15   agreement than the language that appears in the
16   certificate of incorporation.
17         A.   No, I think this is the language that's
18   in the corporate -- in this.
19         Q.   The right to say that the certificate
20   of incorporation supplies the basis for this
21   contract term regarding no private gain?
22         A.   Yeah.
23         Q.   When Microsoft invested in OpenAI in
24   2019, did it violate this contract term?
25         A.   I don't know.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 281

1    Q.  It was -- that transaction was one in
2  which Microsoft was investing and hoped to
3  achieve private gain, wouldn't you agree?
4        ATTORNEY MOLO:  Object to the form of
5  the question.  You're asking the witness to
6  speculate about what Microsoft hoped.
7  BY ATTORNEY SAVITT:
8    Q.  You can answer the question.
9    A.  I don't know.
10    Q.  If a party invested in OpenAI in 2019,
11  in circumstances that could lead to a return on
12  investment, would that constitute a violation of
13  this so-called contract term?
14        ATTORNEY MOLO:  Object to the form of
15  the question.  You're asking the witness to
16  speculate.
17    A.  I don't know.
18  BY ATTORNEY SAVITT:
19    Q.  And then the next item -- bullet point,
20  the seventh bullet here, it's line 21, you
21  contend it's a term of your contract that "no
22  property, net income, or assets of OpenAI would
23  ever inure to the benefit of any director,
24  officer, or member thereof, or to the benefit of
25  any private person"; right?

Page 282

1    A.  Yes.
2    Q.  That term was also agreed as of
3  December 8th, 2015?
4    A.  Yes.
5    Q.  Is that term written down anywhere?
6    A.  What do you mean?  It's in the
7  certificate of incorporation.
8    Q.  Okay.  But the -- it's the terms of the
9  certificate of incorporation that constitute the
10  basis for this alleged contract term; correct?
11    A.  Yeah.
12    Q.  And if this is a misleading quotation
13  of the certificate of incorporation, then that
14  would undermine your claim that this was a fair
15  contract term; right?
16        ATTORNEY MOLO:  Objection to the form of
17  the question.  It's argumentative.
18  BY ATTORNEY SAVITT:
19    Q.  You can answer.
20    A.  Yeah, I'm not sure I understand your
21  question.
22    Q.  No, no, you don't.
23    So --
24        ATTORNEY MOLO:  Now, you're speculating.
25        ATTORNEY SAVITT:  I don't think I am.  I

Page 283

1  was just repeating the witness's testimony.
2  BY ATTORNEY SAVITT:
3    Q.  Do you know what it means to inure?
4    A.  Do you mean to ensure?
5    Q.  Inure.  You wrote it in here.
6    Do you see that?
7    A.  Inure, yes.  There's one that says
8  ensure as well.
9    Well, my understanding of the word is
10  that it would be given to -- or, yeah, that -- I'm
11  not sure what an appropriate synonym would be, but
12  it would be -- what this is saying is that it
13  would have effectively been given to --
14    Q.  Do you contend that assets of OpenAI
15  have inured to a private party's benefit?
16    A.  Effectively, yes.  With a -- if there's
17  stock that's being given that is based off of
18  OpenAI technology and services, that is for the
19  benefit of directors, officers, et cetera --
20  private persons.  And, for example, is that Greg
21  Brockman has like $20 million.  That sounds like a
22  lot, and in direct violation of this term.
23    Q.  What's your basis for thinking Greg
24  Brockman has $20 million?
25    A.  That's what I've heard.

Page 284

1    Q.  Where did you hear it?
2    A.  Rumor.  Rumor has it, on the internet.
3  Maybe I'm wrong.  You tell me am I wrong.
4    Q.  The question is -- I'm not
5  interested -- I'm interested in knowing where you
6  learned that.
7    A.  That's what rumor -- that's what -- I
8  think that's what they say on X.  7 percent of
9  3 -- 300 billion.  That's what I read.
10    Q.  Did your lawyers tell you that?
11        ATTORNEY MOLO:  Objection to the form of
12  the question.  You're asking for privileged
13  communications.
14  BY ATTORNEY SAVITT:
15    Q.  Did your lawyers tell you that?
16        ATTORNEY MOLO:  Objection; I'm
17  instructing the witness not to answer what his
18  lawyers told him.
19    A.  I read that on X.
20  BY ATTORNEY SAVITT:
21    Q.  It also talks about the inuring of net
22  assets.
23    A.  You can tell me if it's true or not.
24    Q.  Do you see it talks about income
25  inuring to --

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                          Elon Musk

Page 285

1    A.  Is it true?  I bet it is true.
2    Q.  Are you going to answer my question?
3    I'll talk to you -- after my time is
4  over, I'm happy to chat.  Let me try to get
5  through my questions.
6         Has any net income inured to the Benefit
7  in OpenAI inured to the benefits of a private
8  person?
9    A.  That seems to be the case.
10    Q.  Do you know whether OpenAI has any net
11  income?
12    A.  I can't remember what the financials
13  look like.
14    Q.  In your complaint, you allege that
15  OpenAI violated the terms of your donations and,
16  therefore, breached a charitable trust.
17         Do you recall that, sir?
18    A.  Yes.
19    Q.  I just want to get your whole position
20  here.  Are the contractual terms that we just
21  spent a long time talking about any different
22  than the terms that were attached to your
23  donations?
24         ATTORNEY MOLO:  Object to the form of
25  the question.

Page 286

1    A.   From my perspective, there are really
2  just -- they're two fundamental things that were
3  agreed to.  That would be open source and a
4  nonprofit.
5         That's why I donated the money.  That's
6  why I donated the time, reputation, everything
7  else.  And -- and instead of it being an
8  open-source nonprofit, it is now become and --
9  it's now become substantially a closed-source
10  profit-maximizing entity directly contrary to what
11  was agreed to.
12         Now, that -- that may just boil down to
13  the series of legal points.  I leave that up to my
14  lawyers to say what -- what specific -- how this
15  should be characterized from -- in a legal
16  document.
17         But if you say, like, just common sense,
18  what was the fundamental problem -- what are the
19  fundamental promises that have been broken, and
20  that is that it was meant to be an open-source,
21  nonprofit, and it is become, by degrees, a
22  closed-source for-profit, and they are attempting
23  to, essentially, make it fully a profit-maximizing
24  corporation.
25  ///

Page 287

1  BY ATTORNEY SAVITT:
2    Q.  Did these -- did the things you have
3  just described happen after you stopped being
4  involved in OpenAI?
5    A.  The process -- seems like the process
6  began several years ago.  Just like the water
7  heating up reaching a boiling point, it doesn't
8  get to boiling point immediately.  The water heats
9  up and, eventually, it gets to a boiling point.
10    Q.  And that all happened after you left
11  OpenAI; right?
12    A.  The boiling point was the $10 billion
13  deal with Microsoft.  For me, that was my
14  perception.
15    Q.  Were you obligated -- did you ever have
16  an obligation to contribute money to OpenAI?
17    A.  An obligation?
18    Q.  Yeah.
19    A.  I agreed to donate money, and I did.
20    Q.  You promised to contribute $20 million
21  in quarterly grants, didn't you?
22    A.  So long as the -- yeah, I did.
23    Q.  And you promised to donate up to a
24  billion dollars to OpenAI to the extent that
25  amount could not be raised from other sources.

Page 288

1         Do you recall that?
2    A.  I did.
3    Q.  But you stopped making the $20 million
4  payments, didn't you?  The $5 million quarterly
5  payments, didn't you?
6    A.  When my discomfort became too high, I
7  was like this is getting -- the company is moving
8  too much in the direction of being a closed-source
9  profit-seeking company.  At that point, I didn't
10  feel comfortable continuing to send money.
11    Q.  But that was long before 2023?
12         ATTORNEY MOLO:  Objection.  That's not
13  the testimony of the witness.
14    A.  Like I said, I became uncomfortable by
15  degrees.
16         I became uncomfortable enough to stop
17  sending money, I guess, in 2020.  And then
18  uncomfortable enough to file -- to take legal
19  action in '23.
20  BY ATTORNEY SAVITT:
21    Q.  And you never followed through on your
22  commitment to fund up to a billion dollars, did
23  you?
24    A.  Because the -- because, my opinion, they
25  broke the deal.

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                      Elon Musk

Page 289

1    Q.  Did you promise to contribute rent to
2  OpenAI at the Pioneer Building?
3    A.  Yes.
4    Q.  Did you promise to do that forever?
5    A.  I don't own the building so I can't do
6  it forever.
7    Q.  Was it important to you in connection
8  with donating rent that you retained control over
9  the building that housed OpenAI?
10    A.  I didn't have control in any meaningful
11  sense of that building.
12    Q.  Would failure to donate to OpenAI with
13  respect to any of your commitments constitute a
14  breach on your part?
15        ATTORNEY MOLO:  Object to the form of
16  the question.  It calls for a legal conclusion on
17  the part of the witness.
18  BY ATTORNEY SAVITT:
19    Q.  You can answer.
20    A.  As long as they were keeping their side
21  of the deal, then it would make sense for me to
22  keep my side of the deal.  But when they start
23  breaking their side of the deal, it -- then the --
24  my obligation, in my opinion, came to an end when
25  I lost confidence that they were going to be a

Page 290

1  nonprofit, open-source.
2    Q.  So do I understand, Mr. Musk, your
3  testimony to be that you allow that you had an
4  obligation to satisfy these funding commitments
5  but those obligations fell away when you
6  concluded that OpenAI wasn't following through on
7  its obligations?
8        ATTORNEY MOLO:  Objection to the form of
9  the question.  That's not the witness' testimony.
10  He said this is something that happened over time.
11  It was degrees.
12    A.  Yeah, as I said, the -- as my confidence
13  diminished in OpenAI's commitment to be a
14  nonprofit, open-source, I started losing
15  confidence in that.  So I reduced my donations,
16  and then I stopped the donations.  But I didn't
17  feel that things had gotten so far that I should
18  actually file legal action until 2023.
19  BY ATTORNEY SAVITT:
20    Q.  What I want to make sure I understand
21  is, I think I do, but I want to make sure I get
22  it, is -- is it your view that the obligations
23  you had to continue funding OpenAI came to an end
24  by virtue of open OpenAI's conduct?
25    A.  I lost confidence that they were going

Page 291

1  to -- that they were going to hold to their
2  commitment.
3    Q.  And because of that loss of confidence,
4  you thought it was appropriate to suspend your
5  contributions?
6    A.  Yes.
7        ATTORNEY SAVITT:  Steve, can we go off
8  the record for a second?
9        ATTORNEY MOLO:  Yeah, I was just going
10  to say this would be a good time for a break.
11        THE VIDEOGRAPHER:  We're off the record
12  at 5:31 p.m.
13        (Recess taken from 5:31 p.m. to
14        5:49 p.m.)
15        THE VIDEOGRAPHER:  This the beginning of
16  Media Number 7.  We're back on the record at
17  5:49 p.m.
18  BY ATTORNEY SAVITT:
19    Q.  Mr. Musk, do you contend that you
20  suffered economic injury resulting from OpenAI's
21  conduct?
22        ATTORNEY MOLO:  Object to the form of
23  the question, calls for a legal conclusion.
24    A.  Yes.
25  ///

Page 292

1  BY ATTORNEY SAVITT:
2    Q.  What economic injuries have you
3  suffered by virtue of OpenAI's conduct?
4        ATTORNEY MOLO:  Object to the form of
5  the question.
6    A.  I think I need to leave that up to the
7  legal system to decide.
8  BY ATTORNEY SAVITT:
9    Q.  So you can't identify for me in
10  layman's terms how you think that you have
11  suffered economic injury by virtue of Open AI's
12  conduct?
13        ATTORNEY MOLO:  Objection to the form of
14  the question.
15    A.  I guess in layman's terms, but this
16  is -- I don't want to step on some legal landmine
17  here, but I guess I'll --
18        ATTORNEY MOLO:  Then don't.
19    A.  Okay.  I guess as far as damages are
20  concerned, I'll leave that up to the legal system
21  to figure out.
22  BY ATTORNEY SAVITT:
23    Q.  Well, have you personally suffered any
24  lost profits by virtue of OpenAI's conduct?
25        ATTORNEY MOLO:  Object to the form of

Elon Musk v.                                    FINAL                        September 26, 2025
Samuel Altman                            [CONFIDENTIAL]                              Elon Musk

Page 293

1 the question.
2      A.  Have I suffered economic loss?  I think
3 I have.  But as to the magnitude of the damages, I
4 will leave that up to the legal system.
5 BY ATTORNEY SAVITT:
6      Q.  Can you describe for me in what ways
7 you have lost profits by virtue of OpenAI's
8 conduct?
9           ATTORNEY MOLO:  Object to the form of
10 the question.
11      A.  It's not that I've lost profits.  Is
12 there economic gain I could have achieved
13 otherwise?  I think so.  But that decision is up
14 to the legal system.
15 BY ATTORNEY SAVITT:
16      Q.  But it's not left to the legal system,
17 Mr. Musk.  Can you describe for me what economic
18 opportunities you believe you have foregone by
19 virtue of OpenAI's conduct?
20           ATTORNEY MOLO:  Object to the form of
21 the question.
22      A.  I leave that up to the legal system.
23 BY ATTORNEY SAVITT:
24      Q.  Are you refusing to -- is there
25 anything you can identify that constitutes

Page 294

1 profits that you or your businesses have lost by
2 virtue of OpenAI's conduct?
3           ATTORNEY MOLO:  Object to the form of
4 the question.
5      A.  I will leave that up to the legal
6 system.
7 BY ATTORNEY SAVITT:
8      Q.  My -- if you were not leaving up to the
9 legal system, could you identify anything for me
10 that you have lost?
11           ATTORNEY MOLO:  Object to the form of
12 the question.
13      A.  I need to leave it up to the legal
14 system.
15 BY ATTORNEY SAVITT:
16      Q.  You're a sophisticated businessman;
17 right?
18      A.  I'm an engineer, I think.
19      Q.  But you would know if you had lost
20 business opportunities by virtue of someone's
21 conduct, wouldn't you?
22           ATTORNEY MOLO:  Object to the form of
23 the question.
24      A.  I could speculate, but I would prefer
25 not to speculate.

Page 295

1 BY ATTORNEY SAVITT:
2      Q.  Are all of the injuries that you
3 perceive that you may have suffered speculative
4 in character?
5           ATTORNEY MOLO:  Object to the form of
6 the question.
7      A.  I'll leave that up to the legal system.
8 BY ATTORNEY SAVITT:
9      Q.  My question was whether all the
10 injuries you think you've received are
11 speculative in character.
12           ATTORNEY MOLO:  Object to the form of
13 the question.
14      A.  I leave that up to the legal system.
15 BY ATTORNEY SAVITT:
16      Q.  So I want to -- and you know that you
17 submitted interrogatory responses in which you
18 said that you have suffered economic injuries
19 resulting from the OpenAI's conduct?
20           ATTORNEY MOLO:  Object to the form of
21 the question.  If you want to ask him about the
22 interrogatories, show him the interrogatories.
23      A.  I leave any question of damages up to
24 the legal system.
25 ///

Page 296

1 BY ATTORNEY SAVITT:
2      Q.  Did you discuss your answer to
3 questions about damages with counsel during the
4 course of the deposition today?
5           ATTORNEY MOLO:  Object to the form of
6 the question.  You're asking him about a
7 privileged conversation.
8           ATTORNEY SAVITT:  Are you instructing
9 not to answer?
10           ATTORNEY MOLO:  I'm instructing him not
11 to disclose privileged conversations.
12 BY ATTORNEY SAVITT:
13      Q.  Sir, it's a yes-or-no question.  Did
14 you discuss your answers to questions about
15 damages?
16           ATTORNEY MOLO:  If it will reveal an
17 attorney-client communication, I am instructing
18 the witness not to answer the question.
19 BY ATTORNEY SAVITT:
20      Q.  And you're going to take that advice?
21      A.  Yes.
22      Q.  And you also -- if I ask you any
23 question about economic injury that you suffered
24 by virtue of OpenAI's conduct, will your answer
25 be "I have to leave that to the legal system"?

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman                [CONFIDENTIAL]                Elon Musk

Page 297

1    A.  Yes.
2    Q.  Is it fair to say that other than
3  saying, "I have to leave it to the legal system,"
4  you're going to decline to tell me anything about
5  economic injury that you've suffered by virtue of
6  OpenAI's conduct?
7    A.  I'll have to leave that to the legal
8  system.
9    Q.  Are you claiming, Mr. Musk, the value
10  of all intellectual property developed using your
11  contributions as estimated to exceed
12  $200 billion?
13    ATTORNEY MOLO:  Object to the form of
14  the question.
15    A.  I leave that up to the legal system.
16  BY ATTORNEY SAVITT:
17    Q.  But are you claiming that as damages?
18    ATTORNEY MOLO:  Object to the form of
19  the question.
20    A.  I leave that up to the legal system.
21  BY ATTORNEY SAVITT:
22    Q.  Did you say that in your
23  interrogatories?
24    ATTORNEY MOLO:  If you have a
25  question --

Page 298

1    ATTORNEY SAVITT:  I'm not giving him the
2  interrogatories.  You know I don't have to do
3  that, Steve.  Stop coaching the witness.
4    ATTORNEY MOLO:  I'm not coaching the
5  witness.  I'm just asking you to be polite and
6  show it to him.
7    ATTORNEY SAVITT:  It's so sad, for God's
8  sake.
9  BY ATTORNEY SAVITT:
10    Q.  Did you say in your interrogatories, if
11  you remember, that --
12    A.  Do you want to show it to me?
13    Q.  I don't want to show it to you.  I'm
14  asking whether you know whether you are seeking
15  the value of all intellectual property developed
16  using your contributions.
17    A.  Well, I would want to check the
18  interrogatory if you're going to ask me about
19  interrogatories
20    Q.  Okay.  So you're not going to answer
21  the question, whether you remember.
22    ATTORNEY MOLO:  You know, you can be
23  polite to the witness.  No reason to be rude.
24    ATTORNEY SAVITT:  Mr. Molo, I think I'm
25  being polite, and I think your constant

Page 299

1  interjections are bordering on unethical.  It's
2  disgraceful.
3  BY ATTORNEY SAVITT:
4    Q.  Are you claiming for yourself revenues
5  derived from the commercialization of technology
6  that should have been open source for the public
7  benefit?
8    A.  I leave that up to the legal system.
9    Q.  Can you think of a reason why, if
10  OpenAI, Inc. has been harmed, you should get a
11  benefit from it?
12    A.  I leave that up to the legal system.
13    Q.  Can you provide me a single fact that
14  would support the conclusion that you have lost a
15  business opportunity by virtue of OpenAI's
16  conduct?
17    A.  I leave that up to the legal system.
18    Q.  Can you supply a single fact that
19  suggests that you've suffered lost profits
20  because of OpenAI's conduct?
21    ATTORNEY MOLO:  Object to the form of
22  the question.
23    A.  I leave that up to the legal system.
24  BY ATTORNEY SAVITT:
25    Q.  And you won't answer that question

Page 300

1  other than to say you leave it to the legal
2  system?
3    A.  I leave that up to the legal system to
4  the legal system.
5    Q.  And can you identify a single fact that
6  shows that you suffered economic injuries
7  resulting from OpenAI's conduct?
8    ATTORNEY MOLO:  Object to the form of
9  the question.  He's not a lawyer.
10    A.  I leave that up to the legal system.
11  BY ATTORNEY SAVITT:
12    Q.  Can you identify a single fact, leaving
13  legal issues to the side, Mr. Musk, a legal
14  single fact that would explain how you have been
15  harmed economically by OpenAI's conduct?
16    ATTORNEY MOLO:  Object to the form of
17  the question.
18    A.  I leave that up to the legal system.
19  BY ATTORNEY SAVITT:
20    Q.  I'm not asking you about damages or
21  anything like that.  I'm asking you a single fact
22  from a businessman's perspective that would
23  indicate how you've been economically harmed by
24  OpenAI's conduct.
25    A.  I leave that up to the legal system.

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                   [CONFIDENTIAL]                        Elon Musk

Page 301

1      Q.   And the only answer you'll give me is
2   you'll leave it up to the system?
3      A.   I leave that up to the legal system.
4      Q.   You incorporated a new AI development
5   company called xAI in March 2023, didn't you?
6      A.   Yes.
7      Q.   When did you first start contemplating
8   forming xAI?
9      A.   I don't recall.
10     Q.   Were you contemplating forming xAI
11  when you purchased Twitter?
12     A.   I don't recall.
13     Q.   You don't know one way or another?
14     A.   I don't think so.  I don't think so.
15     Q.   When you incorporated xAI in March of
16  2023, you didn't publicly announce that you had
17  done so, did you?
18     A.   I don't recall.
19     Q.   Did you issue a press release or a blog
20  post respecting the formation of xAI?
21     A.   At some point, we did.
22     Q.   Do you know when that was?
23     A.   I don't recall the date.
24     Q.   It was a long time thereafter, wasn't
25  it?

Page 302

1      A.   I don't know.
2      Q.   It was in July 2023 that you publicly
3   announced the formation of xAI; isn't that
4   right, sir?
5      A.   Yeah, probably.
6      Q.   And you recruited heavily from OpenAI
7   in seeking to launch the xAI venture, didn't
8   you?
9      A.   I wouldn't say we recruited heavily.
10     Q.   In March 2023, you signed a public
11  letter calling for AI Labs to immediately pause
12  for at least six months to train its AI systems
13  more powerful than GPT-4.
14          Do you remember doing that?
15     A.   Yes.
16     Q.   Okay.  Why did you sign that letter?
17     A.   I was worried about AI safety.
18     Q.   That's why?
19     A.   Yeah.
20     Q.   And you signed it in your capacity as
21  the CEO of SpaceX, Twitter, and Tesla; is that
22  right?
23     A.   I don't recall how -- in what capacity I
24  signed it, but I was asked to, you know, sign the
25  thing about AI safety, and it seemed like a good

Page 303

1   idea.
2      Q.   Did you disclose that you were -- had
3   just incorporated an AI company that was seeking
4   to develop advanced AI yourself?
5      A.   No, I just signed a -- I signed it, as
6   many people did, to urge caution with AI
7   development.
8      Q.   So you wanted the leaders in the -- in
9   the AI business to slow down, didn't you?
10     A.   I just wanted to -- AI safety to be
11  prioritized.
12     Q.   And you prioritize AI safety at xAI?
13     A.   I think we do.
14          Nobody has committed suicide because of
15  Grok, but apparently they have because of
16  Chat GPT.
17          ATTORNEY SAVITT:  Let's take a look at
18  Tab 254.
19          Please mark this as Exhibit 22.
20          (Whereupon, Musk Exhibit Number 22
21          was marked for identification and is
22          attached hereto.)
23  BY ATTORNEY SAVITT:
24     Q.   I've marked -- Exhibit 22, Mr. Musk, is
25  a text exchange between you and Helen Toner;

Page 304

1   isn't that right?
2      A.   That's what it looks like, yeah.
3      Q.   And you sent this text on the 19th of
4   November 2023; right?
5      A.   Yes.
6      Q.   Did you initiate this text chain?
7      A.   Yeah, it looks like I did.
8      Q.   And you initiated it by saying:
9          "Elon here.  Happy to talk if it
10  would be helpful."
11     A.   Yeah.
12     Q.   Why did you send this email to
13  Ms. Toner?
14     A.   Well, I was just -- like it literally
15  says, I'm happy to talk if, it will be helpful.
16     Q.   And she responded to you, saying:
17          "Now might be a good time to text
18  Ilya how X has made it through losing a
19  ton of people and done great."
20          Do you see that?
21     A.   Yes.
22     Q.   And you said, "Okay"?
23     A.   "Okay," yeah.
24     Q.   And did you text Ilya in response to
25  Ms. Toner's suggestion?

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

Page 305

1    A.  I did try to text Ilya.  At least I
2  think I did.  But he didn't respond.
3    Q.   Did you have any further conversations
4  with Ms. Toner?
5    A.  I don't think we spoke.
6    Q.  Have you ever spoken with her?
7    A.  I'm not sure.  I don't think so.
8    Q.  How did you get her phone number?
9    A.  I think Shivon may have given it to me.
10   Q.   And you say you weren't focusing on
11 potentially becoming the CEO of OpenAI at this
12 time?
13   A.  No.  I have too many CEO jobs.
14   Q.   Have you discussed the circumstances
15 surrounding Altman's removal with Ms. Zilis?
16   A.   Yeah, I mean, we had -- I was trying --
17 I think we were both trying to figure out what
18 were the exact circumstances.  But Shivon didn't
19 know, and so we're just speculating.
20   Q.   Had Ms. Zilis discussed the
21 circumstance of Altman's removal with Ms. Toner,
22 to your knowledge?
23   A.  I don't know.
24   Q.   She never said anything along those
25 lines?

Page 306

1    A.  I don't recall.
2    Q.   When you sent Ms. Toner this email, you
3  understood that she and her colleagues on the
4  OpenAI board had removed Altman; right?
5    A.  Yes.
6    Q.  You wanted to be helpful?
7    A.  Yeah.
8    Q.  How were you going to be helpful?
9    A.  I don't know.  That was just up to Helen
10 to decide.
11   Q.  Helen take you up on your offer to be
12 helpful?
13   A.  I don't think we spoke.
14       ATTORNEY SAVITT:  Let's take a look at
15 255.
16       Marking the next exhibit as 23.
17       (Whereupon, Musk Exhibit Number 23
18       was marked for identification and is
19       attached hereto.)
20 BY ATTORNEY SAVITT:
21   Q.   Mr. Musk, I've given you a page with
22 some Twitter messages from November 2023.
23       Do you see that?
24   A.  Yes.
25   Q.   And at the top, you see:

Page 307

1        "This letter about OpenAI was just
2   sent to me."
3    A.  Yeah.
4    Q.   And you wrote about it:
5        "These seem like concerns worth
6   investigating."
7        Right?
8    A.  Yeah.
9    Q.   Do you recall the letter that you
10 thought constituted concerns worth investigating?
11   A.  I don't recall right now.
12   Q.   Do you know who sent that letter to
13 you, Mr. Musk?
14   A.  I don't recall.
15   Q.   Do you know how the letter was sent to
16 you?
17   A.  I don't recall.
18   Q.   How did you know about the letter?
19   A.  I don't recall.
20   Q.   Did you ever learn anything about it
21 afterwards?
22   A.   Can we look at the letter?  Which letter
23 are you referring to?
24   Q.   The letter that -- well, you can tell
25 me.

Page 308

1    A.  I don't know.  Can we look at it?
2    Q.   Unfortunately, we can't.  I would love
3  to because I don't think it's available.
4    A.   It says it's available here on the web
5  archive.
6    Q.   We've been unable to find it.  If you
7  have a copy of it, we'd love to see it.
8    A.   Let's see.
9        I see this Grok summary.  It says:  "The
10 former employees call on the board to take a stand
11 against unethical practices and launch an
12 independent investigation into Sam and Greg's
13 conduct."
14   Q.   Does that remind you of -- was that, in
15 the sum and substance, the letter that you were
16 referring to, sir?
17   A.   Yeah, it sounds like it.
18   Q.   Yeah.  And do you know who wrote the
19 letter?
20   A.  I don't recall.
21   Q.   When we were talking earlier and you
22 said that Altman was removed for deceiving the
23 board and you read about it, was this one of the
24 things that you read about?
25   A.  I think so.

Elon Musk v.                       FINAL                  September 26, 2025
Samuel Altman                 [CONFIDENTIAL]                      Elon Musk

| Page 309 | Page 311 |
|---|---|
| 1    Q.  Anything else other than this that you | 1    your bid? |
| 2  recall reading about that formed your view about | 2        ATTORNEY MOLO:  Objection; same |
| 3  the circumstances of Altman's removal? | 3  objection. |
| 4    A.  There were a lot of posts on X about it. | 4        And directing the witness not to answer |
| 5    Q.  Anything else you recall specifically? | 5  that. |
| 6    A.  No. | 6  BY ATTORNEY SAVITT: |
| 7    Q.  On February 10th, 2025, you purported | 7    Q.  You're going to take -- you're not |
| 8  to make a bid to purchase the assets of OpenAI, | 8  going to answer my question? |
| 9  didn't you? | 9    A.  Yes. |
| 10    A.  I think so. | 10    Q.  What did you discuss with |
| 11    Q.  xAI joined that mid, Mr. Musk? | 11  Mr. Zuckerberg? |
| 12    A.  I don't recall. | 12        ATTORNEY MOLO:  Objection.  The same |
| 13    Q.  Were there a number of other private | 13  objection that this is Phase II discovery. |
| 14  investors with you as well? | 14        And I'm directing the witness not to |
| 15        ATTORNEY MOLO:  Object.  I'm going to | 15  answer questions relating to Phase II discovery. |
| 16  object here.  I didn't know where you're going. | 16  BY ATTORNEY SAVITT: |
| 17  But the judge has clearly ruled that this is | 17    Q.  Are you focused on trying to slow |
| 18  Phase II -- the bid was Phase II. | 18  OpenAI down? |
| 19        ATTORNEY SAVITT:  Are you instructing | 19        ATTORNEY MOLO:  Objection; this is |
| 20  the witness not to answer? | 20  Phase II discovery. |
| 21        ATTORNEY MOLO:  No.  I'm raising this to | 21        I'm instructing the witness not to |
| 22  you to say to you that this is supposed to be | 22  answer questions in Phase II discovery. |
| 23  discovery that would occur in Phase II of the | 23        ATTORNEY SAVITT:  You're saying that the |
| 24  case.  The case has been bifurcated in that way. | 24  question whether the witness is trying to slow |
| 25        The witness is not obligated to answer. | 25  OpenAI down is Phase II discovery? |

| Page 310 | Page 312 |
|---|---|
| 1  And, no, you should not answer questions about | 1        ATTORNEY MOLO:  Correct. |
| 2  Phase II issues. | 2        ATTORNEY SAVITT:  Okay.  That's great. |
| 3        ATTORNEY SAVITT:  Okay.  So why don't we | 3  BY ATTORNEY SAVITT: |
| 4  just make a good record, and I'll ask my question. | 4    Q.  So are you doing -- are you working to |
| 5  You can instruct the witness not to answer.  Is | 5  try to slow OpenAI down, Mr. Musk? |
| 6  that okay? | 6        ATTORNEY MOLO:  Objection.  This is |
| 7        ATTORNEY MOLO:  Okay. | 7  Phase II discovery. |
| 8  BY ATTORNEY SAVITT: | 8        And I'm directing the witness not to |
| 9    Q.  Did xAI join your bid that you made | 9  answer Phase II discovery questions. |
| 10  on February 10th, 2025, to purchase the assets | 10  BY ATTORNEY SAVITT: |
| 11  of OpenAI? | 11    Q.  Are you going to follow that |
| 12    A.  I don't recall. | 12  instruction? |
| 13    Q.  Do you recall seeking to enlist private | 13    A.  I don't think I'm trying to slow OpenAI |
| 14  investors to join you in your bid for OpenAI on | 14  down. |
| 15  February 10th, 2025? | 15    Q.  It's right, isn't it, that xAI is |
| 16        ATTORNEY MOLO:  I object to the | 16  offering a special bonus to departing employees |
| 17  question.  This is discovery into Phase II of the | 17  that they receive if they go anywhere but OpenAI? |
| 18  case.  The Court's orders in Dockets Number 237, | 18        ATTORNEY MOLO:  Objection; this is |
| 19  228, 199, 200, 203 prohibit that.  And I'm | 19  Phase II discovery. |
| 20  instructing you not to answer those. | 20        And I'm directing the witness not to |
| 21  BY ATTORNEY SAVITT: | 21  answer questions that are Phase II discovery. |
| 22    Q.  And you're going to follow that | 22    A.  Well, in this case, that's -- |
| 23  instruction, Mr. Musk? | 23        ATTORNEY MOLO:  You don't have to answer |
| 24    A.  Yes. | 24  the question. |
| 25    Q.  You contacted Mark Zuckerberg about | 25    A.  Okay.  Well -- I don't think so. |

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman               [CONFIDENTIAL]                    Elon Musk

Page 313

1    BY ATTORNEY SAVITT:
2        Q.  I'm sorry.  Are you answering the
3    question, Mr. Musk?
4        A.  Yeah.  I think I can answer that
5    question because I think -- I think -- that's not
6    happening, to the best of my knowledge.
7        Q.  So are you answering questions when the
8    answer is "no" but not answering when the answer
9    is "yes" in response to Mr. Molo's --
10       ATTORNEY MOLO:  Objection; that is
11   really --
12       A.  I can just not answer if you'd prefer.
13   BY ATTORNEY SAVITT:
14       Q.  I don't prefer.  I'm just trying to
15   understand whether your basis for ignoring your
16   counsel's instruction was the substance of your
17   answer.
18       ATTORNEY MOLO:  Object to the form of
19   the question.
20       A.  Going forward, I'll just adhere to
21   counsel's advice.
22   BY ATTORNEY SAVITT:
23       Q.  All right.  You caused GPT-5 to be
24   deboosted on X, didn't you?
25       ATTORNEY MOLO:  Objection to the form of

Page 314

1    the question.  This is Phase II discovery.  We've
2    raised this issue.  We can take up the rest of the
3    deposition doing this but he's not going to answer
4    Phase II questions --
5        ATTORNEY SAVITT:  Just state your
6    objection.  Just tell him not to answer, and he'll
7    either listen or not.  It's fine.  Just do it.
8    That's all.  I'm going to ask my questions.  You
9    note your objections.
10       That's what we do, okay?
11   BY ATTORNEY SAVITT:
12       Q.  You cancelled OpenAI's contract with X,
13   didn't you?
14       ATTORNEY MOLO:  Object to the form of
15   the question.
16       This is Phase II discovery, and I'm
17   instructing the witness not to answer questions
18   that are Phase II discovery.
19   BY ATTORNEY SAVITT:
20       Q.  Are you going to follow that
21   instruction?
22       A.  Yes.
23       Q.  You've contacted the Attorney General
24   of Delaware about OpenAI's potential
25   restructuring, haven't you?

Page 315

1        ATTORNEY MOLO:  Object to the form of
2    the question.
3        This is Phase II discovery, and I'm
4    directing the witness not to answer questions that
5    are Phase II discovery.
6    BY ATTORNEY SAVITT:
7        Q.  Are you going to follow that
8    instruction, Mr. Musk?
9        A.  Yes.
10       Q.  Will you tell me with whom you met at
11   the Attorney General of Delaware?
12       ATTORNEY MOLO:  Objection.
13       This is Phase II discovery, and I am not
14   going to allow the witness to answer questions
15   that are Phase II discovery.
16   BY ATTORNEY SAVITT:
17       Q.  You've also contacted the Office of the
18   Attorney General of California about OpenAI's
19   potential --
20       ATTORNEY MOLO:  Excuse me one second.
21       Can we take a very short break?  I mean
22   very short break.
23       ATTORNEY SAVITT:  Yeah.
24       THE VIDEOGRAPHER:  We're off the record
25   at 6:11 p.m.

Page 316

1        (Recess taken from 6:11 p.m. to
2    6:17 p.m.)
3        THE VIDEOGRAPHER:  This is the beginning
4    of Media Number 8.  We're back on the record at
5    6:17 p.m.
6        ATTORNEY MOLO:  Okay.  Just for the
7    record, I objected to a question.  The question
8    was:  "You contacted the Attorney General of
9    Delaware about OpenAI's potential restructuring,
10   haven't you?"
11       And you also were asked a question:
12   "You also contacted the office of the Attorney
13   General of California by" -- it says "by OpenAI's
14   potential" -- and I withdraw my objections to
15   those questions.
16       So you can go ahead and ask the
17   questions again if you'd like or, however,
18   Mr. Musk will answer them.
19       ATTORNEY SAVITT:  Thank you.  And I take
20   it, however, you stand on all the other
21   objections.
22       ATTORNEY MOLO:  Yes.
23   BY ATTORNEY SAVITT:
24       Q.  So you've contacted the Attorney
25   General of Delaware about OpenAI's potential

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 317

1    restructuring, haven't you?
2        A.   My counsel contacted.
3        Q.   Which counsel?
4        A.   I believe Mr. Toberoff.
5        Q.   And anyone else?
6        A.   Not that I'm aware of.
7        Q.   Do you know how many times your counsel
8    contacted the Delaware Attorney General?
9        A.   No.
10       Q.   Do you know anything about those
11   contacts?
12       A.   Not much.
13       Q.   Did you instruct Mr. Toberoff to
14   contact the Delaware Attorney General?
15           ATTORNEY MOLO:   Object to the form of
16   the question -- object to the question that it
17   calls for an attorney-client-privileged
18   conversation.
19       A.   Yeah, privileged conversation.
20   BY ATTORNEY SAVITT:
21       Q.   Did Mr. Toberoff contact the Delaware
22   Attorney General with your knowledge?
23           THE WITNESS:   Is that privileged?
24           ATTORNEY MOLO:   To the extent that it
25   requires a conversation or would disclose a

Page 318

1    conversation or communication between you and your
2    counsel, I'm instructing you not to answer.
3            THE WITNESS:   Okay.  Seems like it might
4    be privileged.
5    BY ATTORNEY SAVITT:
6        Q.   Might be privileged, so you're not
7    going to answer?
8        A.   Yeah.
9        Q.   Did you know that Mr. Toberoff was
10   going to contact the Delaware Attorney General?
11           ATTORNEY MOLO:   Same objection that
12   it -- to the extent that it calls for a
13   confidential communication between you and your
14   lawyer, I'm directing you not to answer.
15       A.   Privileged conversation.
16   BY ATTORNEY SAVITT:
17       Q.   And you're not going to answer?
18       A.   Yes.
19       Q.   And to your knowledge, what did
20   Mr. Toberoff tell the Delaware Attorney General?
21           ATTORNEY MOLO:   To the extent that the
22   conversation -- that the question calls for you to
23   disclose a confidential communication between you
24   and Mr. Toberoff, I'm directing you not to answer.
25   ///

Page 319

1    BY ATTORNEY SAVITT:
2        Q.   And you're not going to answer?
3        A.   Correct.
4        Q.   So let me just make sure my question is
5    really clear.  I'm asking you to tell me what you
6    know of what Mr. Toberoff said to the Delaware
7    Attorney General.  Can you please answer that.
8            ATTORNEY MOLO:   And to the extent that
9    the question calls for you to disclose a
10   confidential attorney-client communication, I'm
11   directing you not to answer.
12       A.   Then I will not answer.
13   BY ATTORNEY SAVITT:
14       Q.   Okay.  And you also contacted the
15   Office of the Attorney General of California
16   about OpenAI's potential restructuring; right?
17       A.   I think that was Mr. Toberoff.
18       Q.   Anyone other than Mr. Toberoff contact
19   the California Attorney General's office?
20       A.   Not that I know of.
21       Q.   There was -- how many times did
22   Mr. Toberoff contact the California Attorney
23   General's office, to your knowledge?
24           ATTORNEY MOLO:   To the extent that that
25   calls for you to disclose a confidential

Page 320

1    attorney-client communication, I'm directing you
2    not to answer.
3        A.   I will not answer that.
4    BY ATTORNEY SAVITT:
5        Q.   Do you know what constitutes a
6    confidential attorney-client communication?
7            ATTORNEY MOLO:   You didn't have to
8    answer that question.  A confidential
9    communication between you and your lawyer for
10   purposes of rendering legal advice.
11           THE WITNESS:   Yeah.
12   BY ATTORNEY SAVITT:
13       Q.   Yeah.  So you're not going to tell me
14   how many times time Mr. Toberoff contacted the
15   California Attorney General, to your knowledge?
16           ATTORNEY MOLO:   To the extent that that
17   question calls for you to disclose a confidential
18   communication between you and your lawyer, I'm
19   directing you not to answer the question.
20   BY ATTORNEY SAVITT:
21       Q.   You're not going to answer?
22       A.   I will not answer.
23       Q.   And to your knowledge, what did
24   Mr. Toberoff communicate to the Office of the
25   Attorney General of California?

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman                [CONFIDENTIAL]                    Elon Musk

Page 321

1      ATTORNEY MOLO:  To the extent that the
2  question calls for you to disclose a confidential
3  communication between you and your lawyer, for
4  purposes of rendering legal advice, I'm directing
5  you not to answer the question.
6  BY ATTORNEY SAVITT:
7      Q.  Will you answer the question?
8      A.  I'll decline to answer in that case.
9      Q.  And here again, just so it's real
10  clear:  I'm asking for your recitation of what
11  was communicated between Mr. Toberoff and the
12  California Attorney General's office, and you're
13  declining to answer my question; correct?
14      ATTORNEY MOLO:  Objection.  My objection
15  is to the extent that the question calls for you
16  to disclose a confidential communication between
17  you and your lawyer, I'm directing you not to
18  answer the question on the basis that it's
19  privileged.
20      A.  I guess I will not answer.
21  BY ATTORNEY SAVITT:
22      Q.  Because you think that what
23  Mr. Toberoff said to the California Attorney
24  General is a confidential attorney-client
25  communication?

Page 322

1      ATTORNEY MOLO:  Wait.  I'm sorry.
2  BY ATTORNEY SAVITT:
3      Q.  Is that right?
4      ATTORNEY MOLO:  Wait.  If we could
5  just --
6      (Pause.)
7      ATTORNEY MOLO:  And that's not -- that
8  misstates the objection.  It misstates the
9  evidence.  I've objected to the extent that your
10  question calls for Mr. Musk to disclose a
11  confidential communication between --
12      ATTORNEY SAVITT:  I know what your
13  objection was.  I know.
14      ATTORNEY MOLO:  Let me finish.  We can't
15  talk at the same time.
16      ATTORNEY SAVITT:  We can, but you've
17  already wasted a lot of my time with objections
18  you've had.  Just make your objection, make your
19  instruction, and I will move on.
20      ATTORNEY MOLO:  Okay.
21      ATTORNEY SAVITT:  So stop with the
22  speeches.
23      ATTORNEY MOLO:  I'm not making speeches.
24  I'm making an objection, and I would have had it
25  out but for your speech.

Page 323

1      To the extent your question calls for
2  confidential communication between Mr. Toberoff
3  and Mr. Musk, that is a privileged conversation;
4  and I'm directing the witness not to answer to
5  that extent.
6      ATTORNEY SAVITT:  Okay.  Thank you.
7  That's very, very helpful.
8  BY ATTORNEY SAVITT:
9      Q.  And here's my question, Mr. Musk:  Will
10  you tell me what you know of what Mr. Toberoff
11  said to the Office of the Attorney General of the
12  state of California?
13      ATTORNEY MOLO:  To the extent that it
14  calls for you to disclose a confidential
15  communication between you and your lawyer, I
16  direct you not to answer.
17      A.  I feel like we're stuck in an infinite
18  loop here.
19      Yeah, I can't disclose confidential
20  information -- discussions with my legal counsel.
21  BY ATTORNEY SAVITT:
22      Q.  And my question implicates only
23  confidential discussions?
24      A.  That's my assumption, yes.
25      Q.  Okay.  You know that -- have you --

Page 324

1  have you directly or through your agents
2  contacted other government offices with respect
3  to OpenAI's potential restructuring?
4      A.  I do not recall.
5      Q.  You may have; you may have not; you
6  don't know?  Is that your testimony?
7      A.  I -- I don't know.
8      Q.  You know that OpenAI is considering a
9  potential restructuring transaction?
10      A.  That's what I've read.
11      Q.  What do you understand that
12  restructuring transaction to involve?
13      A.  My impression is that it involves a
14  complete breaking of the deal and turning OpenAI
15  into "closed for maximum profit" AI.  And I was
16  thinking of like just getting the URL
17  closedformaximumprofitai.com and sending it to
18  them as a gift, you know, to comfort them through
19  this difficult time.
20      Q.  Other than what you just said, do you
21  have any further understanding of the terms of
22  the potential restructuring transaction?
23      A.  It sounds likely they're trying to steal a
24  charity.  That's my impression, and that's what
25  most people think.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 325

1    Q.   Other than what you've said, do you
2  have any other knowledge as to the terms of the
3  proposed restructuring transaction?
4    A.   Not just -- they're just trying to steal
5  a charity obviously.
6    Q.   Anything else?
7    A.   I think stealing charities is bad.
8    Q.   I understand.
9    A.   Yeah.
10   Q.   But is there anything else?
11   A.   No.
12   Q.   That's -- we've now exhausted your
13  knowledge of the proposed restructuring
14  transaction; correct?
15   A.   That -- where they try to steal a
16  charity?  Yeah.
17   Q.   Okay.
18   A.   I don't think -- that's really bad, to
19  steal a charity.
20   Q.   How is it that water -- that the
21  proposed restructuring transaction differs from
22  the existing capped-profit structure for purposes
23  of your claim of breach of contract?
24        ATTORNEY MOLO:  Object to the form of
25  the question.  You're asking the witness a legal

Page 326

1  opinion.
2  BY ATTORNEY SAVITT:
3    Q.   You can answer.
4        ATTORNEY MOLO:  He's not a lawyer.
5    A.   I respect the advice of my counsel.
6  BY ATTORNEY SAVITT:
7    Q.   I don't think he's structuring you not
8  to answer.
9        THE WITNESS:  Should I not answer?
10        ATTORNEY MOLO:  If you can answer, it's
11  a legal opinion they're asking for.
12   A.   I'm not a lawyer.
13  BY ATTORNEY SAVITT:
14   Q.   So you're not going to answer?
15   A.   I'm not going to answer a legal opinion.
16   Q.   No one is asking for a legal opinion.
17   A.   My sort of, I guess, common-sense
18  opinion is that they're obviously trying to steal
19  a charity, and that's not okay.
20   Q.   Is it your view that up until now they
21  haven't stolen a charity?
22   A.   I think they've moved there by degrees,
23  and now they're trying to complete the -- if -- to
24  finish it off, steal the whole thing.  That's my
25  impression --

Page 327

1    Q.   Thank you.
2    A.   -- or most of it anyway.
3    Q.   What I'm trying to understand is what's
4  different in the proposed restructuring that
5  causes you to think, in your words, they're
6  finishing it off.
7    A.   My understanding is they're trying to
8  turn a nonprofit into a for-profit.  And that's
9  like stealing the charity essentially.
10   Q.   They're trying to turn OpenAI, Inc.,
11  into a for-profit company.  That's your
12  understanding?
13   A.   Yeah.  Is that not correct?
14   Q.   And that's why --
15   A.   Sounds like it.
16   Q.   And a couple of sort of cleanup-type
17  questions, Mr. Musk, and I'll give the witness to
18  my colleagues.
19        Ms. Zilis, how long has she worked for
20  you?
21   A.   Peaceful.
22        I'm not sure of the exact time frame.
23   Q.   10 years?
24   A.   Well, I mean, she doesn't work for me
25  right now.

Page 328

1    Q.   She worked for you for some number of
2  years; is that fair?
3    A.   Yes.
4    Q.   In what organizations did she work for
5  you?
6    A.   SpaceX and Tesla.
7    Q.   Neuralink?
8    A.   Yeah, Neuralink too.
9    Q.   And she also worked for you in
10  OpenAI-related matters?
11   A.   A little bit.
12   Q.   Did she report to you in her various
13  functions?
14   A.   Yeah.
15   Q.   Did she report to anyone else?
16   A.   Oh, Sam Teller.  She reported to Sam
17  Teller.
18   Q.   She reported to Sam Teller?
19   A.   Yeah, yeah.
20   Q.   And Teller reported to you?
21   A.   Yeah, yeah.
22   Q.   Did Ms. Zilis help facilitate
23  communication between you and Brockman and Altman
24  in connection with OpenAI matters?
25   A.   You mean like several years ago?

Elon Musk v.                        FINAL                       September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                          Elon Musk

Page 329

1    Q.   Yes.  I'm sorry.  During the period
2  when she was associated with OpenAI.
3    A.   Yes.
4    Q.   Thank you.
5       Did you think that you could rely on the
6  information Zilis provided to you without OpenAI
7  during that period?
8    A.   At the time I did.
9    Q.   Did you trust the accuracy of her
10  report?
11    A.   At the time I did; but, you know, upon
12  reflection, I think she was being tricked by Sam
13  and Greg.
14    Q.   Being?
15    A.   Tricked.  I don't think Sam was fully
16  candid with Shivon.
17    Q.   But she was reporting candidly to you?
18    A.   Yeah.  I don't think she was holding
19  anything back that -- you know.  Yeah.
20    Q.   And I appreciate that.  I think your
21  testimony is that, in retrospect, you think
22  Altman might not have been honest with Zilis?
23    A.   Yeah.
24       ATTORNEY MOLO:  Objection.
25    A.   I think he wasn't.

Page 330

1  BY ATTORNEY SAVITT:
2    Q.   But you're not saying you don't think
3  Zilis was candidly reporting to you?
4    A.   I don't think she was -- I think she was
5  reporting honestly to me, yeah.
6    Q.   How did you communicate with Zilis
7  other than in person between 2016 and 2018?
8    A.   How did I communicate?
9    Q.   Yeah.  What means of electronic
10  communication did you use with Ms. Zilis?
11    A.   Text, email, and phone and in person.
12    Q.   How frequently did you text and email
13  and otherwise electronically communicate with
14  Ms. Zilis in, say, 2016 to 2018?
15    A.   I don't know the exact frequency.  I did
16  see like a count of like total texts.  And I was
17  like, Wow, this is a large number.  It was like
18  10,000 or something.
19    Q.   Texts between you --
20    A.   10,000 -- more than 10,000.
21    Q.   -- between you and Ms. Zilis?
22    A.   Yeah, yeah.
23    Q.   Yeah.  So you communicated frequently
24  with her by text?
25    A.   Yeah.  I saw like a text count.  And I

Page 331

1  was like, Wow, there's 10,000 texts -- or not more
2  than that even.  And I was like, that's a lot.
3    Q.   Now, after you stepped down from
4  OpenAI's board, Ms. Zilis stayed on an as advisor
5  to OpenAI; right?
6    A.   Wasn't she on the board?
7    Q.   She -- I'm not -- here again, I'm --  I
8  think she -- later she joined the board, I think
9  the sequence is, but I don't want to put words in
10  your mouth.
11    A.   Sure.
12       ATTORNEY MOLO:  Could you just ask the
13  question.
14    A.   I think I -- yeah.
15  BY ATTORNEY SAVITT:
16    Q.   Yeah.  My question was:  After you
17  stepped down from OpenAI's board, Zilis stayed on
18  as an advisor to OpenAI?
19       ATTORNEY MOLO:  Stayed on?
20       ATTORNEY SAVITT:  Yeah.
21       ATTORNEY MOLO:  Okay.
22    A.   I don't want to -- I guess.  I guess she
23  was an advisor, but I'm not sure what that -- I
24  don't think there is any formal title of advisor.
25  She may have been giving them advice and,

Page 332

1  therefore, would be an advisor.  But I don't think
2  she was sort of formally employed by them or
3  something like that.
4  BY ATTORNEY SAVITT:
5    Q.   Do you think that part of her function
6  was to facilitate communication between the
7  company on the one hand and you on the other?
8    A.   Yeah, probably.
9    Q.   And then later she became a director,
10  as you had anticipated; right?
11    A.   Yeah.
12    Q.   And does '20 to 2023 sound right as the
13  period when Ms. Zilis was on the OpenAI board, as
14  far as you know?
15    A.   That sounds about right.
16    Q.   Jared Birchall, what's he do for you?
17    A.   Runs my family office.
18    Q.   He reports to you?
19    A.   Yes.
20    Q.   You communicate with him by same sorts
21  of means of communications as with Ms. Zilis?
22    A.   Yeah.
23    Q.   Between, say, 2015 to 2020, how did you
24  communicate -- how often would you communicate
25  via text with Mr. Birchall?  Multiple times a

Elon Musk v.                     FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

Page 333

1    day, would you say?
2        A.   No, not every day.
3        Q.   Give me a sense of how you'd estimate
4    that.
5        A.   I don't know.  Several times a week.
6    I'm not sure the exact number.  But it would vary,
7    depending upon whether there was something
8    important to discuss or not.
9        Q.   Who is Sam Teller?
10       A.   I give up.
11            He was my, I guess -- I don't like the
12   title, but I guess he would be kind of like my
13   chief of staff.  I don't -- yeah.
14       Q.   For what period did he serve in that
15   role, Mr. Musk?
16       A.   I'm not sure the exact dates, but for
17   several years.
18       Q.   He reported to you?
19       A.   Yes.
20       Q.   And was he housed in multiple of your
21   organizations?
22       A.   Yes.
23       Q.   Did he facilitate communications
24   between you and other people as part of his job?
25       A.   Yes.

Page 334

1        Q.   Did you trust the accuracy of his
2    reports to you?
3        A.   I think Sam is a trustworthy, honest
4    person.
5        Q.   How did you communicate generally with
6    Mr. --
7        A.   My Sam?
8        Q.   -- Mr. Teller?  With Mr. Teller?
9        A.   Quite frequently, yeah, like, most days.
10       Q.   Yeah.  And that was true during the
11   duration of his employment with you, Mr. Musk?
12       A.   Yeah.
13       Q.   Yeah.
14            ATTORNEY SAVITT:  And, Steve, could we
15   go off the record for one minute.
16            ATTORNEY MOLO:  Sure.
17            THE VIDEOGRAPHER:  We're off the record
18   as of 6:34 p.m.
19            (Recess taken from 6:34 p.m. to
20            6:49 p.m.)
21            THE VIDEOGRAPHER:  This is the beginning
22   of Media Number 9.  We're back on the record at
23   6:49 p.m.
24   BY ATTORNEY SAVITT:
25       Q.   Mr. Musk, today what -- how do you

Page 335

1    communicate in electronic form about business
2    matters?
3        A.   Text and -- you mean like right now
4    or --
5        Q.   No.  I mean text -- I'm asking text,
6    email, that sort.  What do you use?
7        A.   Yeah, text and email and phone calls and
8    meetings.
9        Q.   Do you use X DMs?
10       A.   Not -- I mean, not really for business
11   matters.
12       Q.   Not often for business matters?  Is
13   that what you said?
14       A.   Not -- not -- I mean, technically, I do
15   use X DMs for X-related stuff --
16       Q.   But not --
17       A.   -- which make sense, you know.
18       Q.   Okay.  How about WhatsApp?
19       A.   I don't have WhatsApp.
20       Q.   Do you use Signal?
21       A.   I have Signal, but I don't use it much.
22       Q.   Have you ever used Signal much?
23       A.   Just for some occasional personal
24   matters.
25       Q.   Do you know what your retention Signals

Page 336

1    are -- retention settings are on Signal at this
2    time?
3        A.   No.
4        Q.   Do you know retention settings you have
5    on your other forms of messaging?
6        A.   I don't use a lot of forms of messaging.
7        Q.   Do you know, though, what your
8    retention settings are on them?
9        A.   I mean, I primarily use iMessage and
10   email, and there's no deletion function.
11       Q.   What -- is your Signal disappearing?
12       A.   You know, I just don't use Signal very
13   much, so ...
14       Q.   I appreciate that.  But to the extent
15   you do use it, do you use the "disappearing
16   message" function?
17       A.   Not that I recall.
18       Q.   Do you understand that your Signal
19   messages are saved?
20       A.   I'm not sure what you mean.
21       Q.   Well, when you send or receive a Signal
22   message, does it disappear?
23       A.   Yeah, I don't -- you know, I don't
24   believe in using Signal.
25       Q.   But you use it from time to time?

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

| Page 337 | Page 339 |
|---|---|
| 1    A.   Some people insist on using it for | 1        ATTORNEY MOLO:  Object to the form of |
| 2 personal stuff, but I don't like using it. | 2 the question to the extent it calls for the |
| 3    Q.   Do you know, though, whether you have | 3 witness to provide a legal conclusion.  He's not a |
| 4 it set on "save" or "disappearing"? | 4 lawyer. |
| 5    A.   I don't recall. | 5    A.   I listen to advice -- I'll listen to the |
| 6    Q.   You don't know one way or the other? | 6 advice of counsel. |
| 7    A.   (No audible response.) | 7 BY ATTORNEY SAVITT: |
| 8    Q.   Do you have a cellphone? | 8    Q.   So you're not going to tell me whether |
| 9    A.   Yeah. | 9 you've been a party to an implied contract before |
| 10    Q.   How many? | 10 this controversy? |
| 11    A.   One. | 11        ATTORNEY MOLO:  Object to the form of |
| 12    Q.   Do you have an iPad? | 12 the question. |
| 13    A.   No. | 13    A.   I mean, you know, if I make promises, I |
| 14    Q.   Do you have a laptop? | 14 believe they should be kept, if that's what you |
| 15    A.   Yeah. | 15 mean.  I'm not sure what you mean. |
| 16    Q.   How many? | 16 BY ATTORNEY SAVITT: |
| 17    A.   Just one. | 17    Q.   No, that's not what I mean. |
| 18    Q.   Do you use it at work? | 18        Have you ever sought to enforce against |
| 19    A.   No. | 19 any party, other than this lawsuit, an implied |
| 20    Q.   You use a desktop at work? | 20 contract? |
| 21    A.   I just use the laptop for like video | 21        ATTORNEY MOLO:  Do you mean in a lawsuit |
| 22 games and browsing the internet. | 22 when you say "enforce"? |
| 23    Q.   Do you have a desktop at work? | 23        ATTORNEY SAVITT:  No, not necessarily. |
| 24    A.   Yeah. | 24        ATTORNEY MOLO:  Then I object to the |
| 25    Q.   Are all of your portable devices Apple | 25 form of the question. |

| Page 338 | Page 340 |
|---|---|
| 1 devices? | 1    A.   Well, I don't think I've filed a legal |
| 2    A.   Yeah. | 2 action in that regard. |
| 3    Q.   Are they all synced? | 3 BY ATTORNEY SAVITT: |
| 4    A.   I only have one. | 4    Q.   Do you ever recall saying to someone, |
| 5    Q.   I see.  Just the one phone? | 5 well, we had a contract and it wasn't written |
| 6    A.   Yeah. | 6 down, but you should honor it nevertheless? |
| 7    Q.   I see. | 7    A.   I believe people should keep their word. |
| 8        And is your laptop an Apple laptop? | 8    Q.   But I'm asking whether you've had that |
| 9    A.   No, it's a PC gaming laptop. | 9 experience before. |
| 10    Q.   I see.  And did you use these same | 10    A.   Yeah, I mean, I've -- yeah, had |
| 11 means of communication in 2015 to 2018? | 11 situations where, like, not nothing is a written |
| 12    A.   Yeah. | 12 contract, most things are not.  But if people |
| 13    Q.   Do you still have devices that you used | 13 promise something or if there's an agreed upon -- |
| 14 in those years? | 14 if there's a deal that's made, that deal should be |
| 15    A.   No. | 15 honored. |
| 16    Q.   When you switch phones, do you retain | 16    Q.   Well -- |
| 17 the data? | 17    A.   I mean the reason -- what's the -- the |
| 18    A.   Well, it's backed up with Apple. | 18 reason that I can attract capital very easily is |
| 19    Q.   I see.  So it would be backed up on -- | 19 because those have known me for a long time, you |
| 20    A.   Yeah. | 20 know, like -- let's take Steve Jurvetson, for |
| 21    Q.   -- the iCloud? | 21 example.  He's pretty much the first venture |
| 22    A.   Yeah, yeah, yeah. | 22 capitalist I met in Silicon Valley in '96, January |
| 23    Q.   Okay.  Putting aside this -- the | 23 of '96.  And Steve will tell you, in the entire |
| 24 controversy you're having presently with OpenAI, | 24 time that he's known me -- almost 30 years now I |
| 25 have you ever been party to an implied contract? | 25 guess -- in that entire time, I've never broken my |

Elon Musk v.                     FINAL                September 26, 2025
Samuel Altman              [CONFIDENTIAL]                    Elon Musk

Page 341

1    word. And that's why people trust me and that's
2    why I can raise money easily.
3         Q.   No, I appreciate that, and what I'm
4    just trying to understand is whether you found
5    yourself ever before in a dispute involving, for
6    example, an oral contract before this situation.
7         A.   I've not been in a legal dispute, yeah.
8         Q.   Have you ever found yourself in a
9    dispute before this situation regarding a
10   contract that was said to be implied?
11              ATTORNEY MOLO:  Object to the form of
12   the question.  You're asking him a legal opinion.
13   The man is not a lawyer.
14        A.   Yeah, I'm not I lawyer.  So I can't
15   just -- I can't give legal opinions or things that
16   could be construed as legal opinions.
17   BY ATTORNEY SAVITT:
18        Q.   I see.  And I'm not asking you for
19   that, sir.  I just want to know whether -- have
20   you ever previously consulted a lawyer respecting
21   a contract that was said to be implied?
22              ATTORNEY MOLO:  Directing you not to
23   disclose any confidential communication between
24   your lawyer.  Otherwise, you can answer the
25   question.

Page 342

1    BY ATTORNEY SAVITT:
2         Q.   You can answer yes or no.
3         A.   Decline to answer on advice of counsel.
4         Q.   I don't think he's telling you not to
5    answer.
6         A.   Okay.
7         Q.   I think you can answer it yes or no.
8         A.   I've not had a legal battle.  But beyond
9    that, I'm not sure what you mean.
10        Q.   I guess I'm asking whether you have
11   ever had before this situation a dispute that you
12   discussed with a lawyer involving what was said
13   to be an implied contract.  You can answer is it
14   yes or no.
15        A.   I don't think so.
16              ATTORNEY SAVITT:  Okay.  I'm going to
17   pass the witness to my co-counsel.
18              ATTORNEY COHEN:  Can we go off the
19   record while we change?
20              THE VIDEOGRAPHER:  We're off the record
21   at 6:57.
22         (Recess taken from 6:57 p.m. to
23         7:03 p.m.)
24         (Pause.)
25              THE VIDEOGRAPHER:  Here, begins Media

Page 343

1    Number 10.  We're back on the record at 7:03 p.m.
2
3              EXAMINATION
4    BY ATTORNEY COHEN:
5         Q.   Good evening, Mr. Musk.
6         A.   Good evening.
7         Q.   My name is Russell Cohen.  I represent
8    Microsoft in this case.  And I have some
9    questions for you about their role.
10        A.   Okay.
11        Q.   What is it that you believe that
12   Microsoft did wrong?  Why is it in this lawsuit?
13        A.   Well, I've absolutely no desire to be in
14   litigation with Microsoft.  That's not my
15   preference.  But just seems as though Microsoft is
16   collaborating with OpenAI to turn a charity into a
17   profit-maximizing entity, and it's going to have a
18   substantial financial benefit as a result.
19        Q.   So what exactly is it that you say that
20   Microsoft is doing?
21        A.   My understanding -- correct me if I'm
22   wrong -- is that Microsoft has some massive
23   natural upside in turning OpenAI from a charity
24   into a for-profit organization.  Is that wrong or
25   am I mistaken?

Page 344

1         Q.   Well, let's --
2         A.   That's what I read.
3         Q.   Let's talk about private gain for a
4    moment.
5              Do you believe that it's wrong for
6    Microsoft to earn Azure fees for providing
7    services?
8         A.   No.
9         Q.   Okay.  Do you believe that it's --
10        A.   Yeah, yeah.
11        Q.   Do you have anything more to say?
12        A.   I think I made the original call to ask
13   if Satya, if he would donate some Azure credits to
14   OpenAI.
15        Q.   Right.  And your preference was to deal
16   with Microsoft rather than Amazon at the time;
17   right?
18        A.   Well, I didn't call Jeff, because, you
19   know, he's a bit of a -- I'm not sure he's likes
20   me to be favorable because he's got a rocket
21   company that competes with mine.
22        Q.   And I think the word you used at the
23   time was Jeff was a tool.
24        A.   Yeah.  He can be, you know.
25        Q.   Now --

Elon Musk v.                          FINAL                    September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                           Elon Musk

Page 345

1    A.  There's a redemption arc for all of us.
2    Q.  You said earlier that nonprofits can
3  contract with other companies for services;
4  right?
5    A.  Yes.
6    Q.  And I take it the flip side is true,
7  that for-profits can contract with nonprofits for
8  services as well?
9    A.  Yes.
10    Q.  And do you understand what services
11  Microsoft provided to OpenAI after 2019?
12    A.  I don't know all of the services, but,
13  primarily, it was GPUs.
14    Q.  You have a general understanding of
15  what it costs to provide the kinds of GPUs that
16  are needed to train the kinds of models that
17  OpenAI was training; right?
18    A.  Yeah, it's very expensive.
19    Q.  Right.  I mean as the CEO of xAI,
20  you've built Colossus.  You understand the costs
21  that's associated with that?
22    A.  Yes.
23    Q.  And do you have any understanding of
24  exactly how much that cost was for Microsoft?
25  What its investment was?

Page 346

1    A.  In 2019?
2        ATTORNEY MOLO:  At what time, yeah.
3  BY ATTORNEY SAVITT:
4    Q.  Let's start with 2019.
5    A.  What I read was 10 billion.
6    Q.  To build the supercomputers?
7    A.  Yeah.
8    Q.  Is that what you're referring to?
9    A.  I think so.
10    Q.  And how do you think that a company
11  like Microsoft in provided those supercomputers
12  to OpenAI should be able to generate a return
13  from that?
14    A.  Well, there could be like a revenue
15  share.  Could be leased.  I guess there's a lot of
16  ways to pay for the servers.
17    Q.  And do you understand -- strike that.
18        Is there anything, in your view, that is
19  wrong with providing that capital in exchange for
20  a future interest in profits, if any?
21    A.  Well, I think some profit-sharing
22  arrangement might make sense, yeah.
23    Q.  Right.  And so what is it, in your
24  view, that doesn't make sense here?
25    A.  Well, if there's -- if there's sort of

Page 347

1  some uncapped interest in the Microsoft
2  financial -- basically, if Microsoft makes a large
3  financial gain from the de facto conversion of a
4  nonprofit into a for-profit, that -- that seems
5  wrong.
6    Q.  Do you know whether Microsoft stands to
7  gain from the conversion of a not-for-profit into
8  for profit?
9    A.  That's what I read.
10    Q.  That's what you read.  But you don't
11  have any understanding of how the transaction is
12  structured or will be structured?
13    A.  I have not seen the deal that was
14  signed.
15    Q.  Do you have any understanding as to
16  whether the compute that Microsoft provided to
17  OpenAI helped contribute to OpenAI's innovation?
18    A.  I'm sure it did.
19    Q.  Would you agree that without the
20  compute that Microsoft provided, that OpenAI
21  would not have continued to exist?
22    A.  No, it would have continued to exist.  I
23  guess it would have advanced more slowly.
24    Q.  Well, how much more slowly?
25    A.  It's hard to say.  That would be

Page 348

1  speculation.
2    Q.  I mean, you recognized in 2016 that
3  Microsoft required Azure in order to continue --
4  that OpenAI required Azure in order to continue
5  to improve its models; correct?
6    A.  2016?
7    Q.  Yes, in 2016.
8    A.  I don't recall exactly which year that
9  was.
10    Q.  Do you recall Mr. Altman negotiating an
11  agreement -- do you recall Mr. Altman negotiating
12  an agreement for discount compute for Microsoft
13  in September of 2016?
14    A.  I don't recall.
15    Q.  Do you recall going to Microsoft to
16  obtain more compute in 2017 as you were working
17  on the Dota 1v1 project?
18    A.  I don't think -- I vaguely recall that.
19    Q.  And do you recall Mr. Altman seeking to
20  get more compute from Microsoft in 2018 as OpenAI
21  was working on the Dota 5v5 project?
22    A.  I do vaguely recall that, yeah.
23    Q.  And so you understand that by the time
24  you get to 2018 and then to 2019, the appetite
25  for compute was increasing significantly?

Elon Musk v.                          FINAL                     September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                        Elon Musk

Page 349

1      A.  Yes.
2      Q.  I heard you mention a few times today
3  "de facto control."
4         Do you recall saying that?
5      A.  Yeah.
6      Q.  And you said that Microsoft had
7  de facto control over OpenAI.
8      A.  Well, rights to all the source code.  My
9  understanding, there are a lot of constraints on
10 what OpenAI can do in the future.  The ability to
11 withdraw compute, as you mentioned.  The compute
12 to -- it's very important.  So at any point
13 Microsoft could threaten to withdraw the compute,
14 which seems like that would be somewhat of a gun
15 to the head of OpenAI.
16     Q.  You say the rights to the source code.
17 You're not saying Microsoft has it, to the
18 exclusion of OpenAI; right?
19     A.  No.  I think -- it's -- I think that --
20 my understanding is that Microsoft and OpenAI --
21 Microsoft has the rights to OpenAI source code,
22 and so does OpenAI.
23     Q.  And Microsoft requires access to that
24 source code in order to build commercial
25 products; right?

Page 350

1      A.  That's up to Microsoft.  I don't know
2  why, but it's -- but my understanding is that
3  Microsoft does have the rights to the source code.
4  You know, does Microsoft need the rights to the
5  source code?  That's a debatable proposition.  But
6  my understanding is that it does.
7      Q.  When you say "source code," to what are
8  you referring?  Source code to the training,
9  source code to the model, source code to what?
10     A.  My understanding, which could be wrong,
11 is it's the model, the weights.  Basically, the
12 ability to re-create GPT-4, GPT-5.
13     Q.  And I asked you whether, in order to
14 create products from the models, whether you
15 believe that Microsoft would require access to
16 that information.
17     A.  It wouldn't require the source code to
18 develop products from the models, no.
19     Q.  You don't think it would?
20     A.  No.
21     Q.  Okay.
22     A.  Because it can use the API, as others
23 do.
24     Q.  Do you believe that Microsoft has any
25 de facto control over the board of OpenAI?

Page 351

1      A.  Not the board; but like I said, the --
2  the ability to withdraw compute, which, as you
3  mentioned, is very important, does give Microsoft,
4  at least right now, I'd say, de facto over OpenAI.
5      Q.  Do you know whether OpenAI has access
6  to compute from any other provider other than
7  Microsoft at present?
8      A.  My understanding is that most of the
9  compute is coming from Microsoft.
10     Q.  Do you understand whether they have
11 access to compute from anybody else?
12     A.  My understanding is they could not --
13 that there is not compute available elsewhere that
14 they could transfer to.
15     Q.  Do you understand whether they have
16 contracted with Oracle?
17     A.  They are contracted.  So there may be a
18 point in the future where they are not dependent
19 on Microsoft.  But I think, for practical purposes
20 right now, any reasonable person would conclude
21 that they are dependent on Microsoft.
22     Q.  And what mechanism do you say Microsoft
23 exercises through that compute to control the
24 OpenAI board?  How does that work?
25     A.  You don't need to control the board.

Page 352

1  You can just basically threaten the company with
2  withdrawing -- withholding compute.
3      Q.  Is there a reason why Microsoft would
4  want to withhold that compute?
5      A.  I can't -- I mean, they might be.  I
6  don't know.  It's just -- if the -- possession in
7  this case more than 9/10ths of the law.  It's
8  going to be like 99 percent.  The reality is
9  Microsoft can threaten OpenAI with -- by saying
10 they could withdraw the compute, and that that
11 would be existential or severely harm OpenAI until
12 such time as they can independently secure
13 compute, which at some point in the future, with
14 the Stargate thing or some other thing -- it looks
15 like OpenAI is trying to achieve independence from
16 Microsoft, but that -- they've not yet achieved
17 it.
18     Q.  Do you know whether Microsoft has
19 actually ever threatened to withhold compute from
20 OpenAI?
21     A.  I'm not aware of such a thing.
22     Q.  And do you know whether, or if,
23 Microsoft has ever declined a request for a
24 waiver from OpenAI for additional compute?
25     A.  I don't know.

Elon Musk v.                         FINAL                    September 26, 2025
Samuel Altman                   [CONFIDENTIAL]                          Elon Musk

Page 353

1    Q.  You don't know.  Okay.
2        Do you believe that Microsoft has any
3    undue influence on the board of OpenAI?
4    A.  It has influence right now, as I said,
5    on the well-being of OpenAI because Microsoft has
6    so much compute.  Therefore, indirectly, the board
7    would feel, you know, that Microsoft could pose a
8    threat and could -- you know, it's not like --
9    control the board?  It's just, if Microsoft has
10   the power to withdraw significant compute from
11   OpenAI, that's something that would apply
12   substantial pressure to the board, obviously.
13   Q.  But as you've said, you don't know of
14   any situation in which Microsoft has made that
15   threat?
16   A.  I don't.  It may have happened; it may
17   not have happened.  You know.
18   Q.  You know, in this lawsuit, one of the
19   things that is asserted is that Reid Hoffman was
20   the means by which Microsoft influenced the
21   OpenAI board.
22       Do you understand that?
23   A.  Yeah, I mean, that seems like a --
24   highly likely.
25   Q.  You recall that you supported adding

Page 354

1    Mr. Hoffman to the OpenAI board?
2    A.  Early on.
3    Q.  Right.
4        Mr. Brockman had suggested Reid Hoffman
5    and Mr. D'Angelo and Mr. Newel to you?
6        Do you recall that?
7    A.  I think that was quite early on, yeah.
8    Q.  In 2018?
9    A.  Yeah.
10   Q.  Yeah.
11       And you were two-thumbs-up on all three
12   of them; correct?
13   A.  I -- I may have been.  I don't recall.
14   Q.  Okay.  You knew that Mr. Hoffman was on
15   the Microsoft board at that time in 2018;
16   correct?
17   A.  I knew -- I think so, because -- the
18   LinkedIn acquisition, essentially.
19   Q.  Are you aware of any facts that show
20   that Microsoft obtained competitively sensitive
21   information about OpenAI as a result of
22   Mr. Hoffman's service on the OpenAI board?
23   A.  I don't know of anything explicit, no.
24   Q.  Do you know who Dee Templeton is?
25   A.  Dee?

Page 355

1    Q.  Dee Templeton?
2    A.  Is that an initial?
3    Q.  Deannah.  Do you know who that is?
4    A.  Name doesn't ring a bell.
5    Q.  You sued her in this case.
6    A.  I did?
7    Q.  Yes, you did.
8        Ms. Templeton is a Microsoft executive
9    who served as a board observer at OpenAI for a
10   period of about six months.  Does that refresh
11   your recollection as to who she is?
12   A.  I think that -- she's just, you know,
13   somewhat of an accidental party to the lawsuit
14   because she was a Microsoft observer.  Nothing
15   against Ms. Templeton.
16   Q.  I'm sure she'll appreciate hearing
17   that.
18       Are you aware of any facts --
19   A.  Caught in the crossfire, you know.
20   Q.  Are you aware of any facts that show
21   that Microsoft obtained any competitively
22   sensitive information as a result of
23   Ms. Templeton's time as a board observer at
24   OpenAI?
25   A.  I don't.

Page 356

1    Q.  Do you believe that OpenAI is going to
2    eat Microsoft alive?
3    A.  Yes.
4    Q.  Do you think that's happening now?
5    A.  They're just nibbling.
6    Q.  They're nibbling.
7        You tweeted that recently; right?
8    A.  Yeah, that's what gave it away.
9    Q.  Has anything changed in your mind since
10   you filed this case against Microsoft in November
11   of 2024 that leads to you think that OpenAI is,
12   in fact, nibbling and, as you say, is going to
13   eat them?
14   A.  Well, I've heard that they are going to
15   create a competitor to LinkedIn and a competitor
16   to Microsoft Office.  And I suspect they will, you
17   know.  And just in general, AI is going to eat
18   away at conventional software.
19       So that would affect Microsoft's core
20   business.
21   Q.  So notwithstanding what you say is
22   de facto control by Microsoft, you still think
23   they're being nibbled and are about to be eaten?
24   A.  It's a question of time frame.
25   Q.  Okay.

Elon Musk v.                      FINAL                      September 26, 2025
Samuel Altman              [CONFIDENTIAL]                              Elon Musk

Page 357

1    A.   Right now, you know, it's just a little
2  nibble, but I think that the teeth will get bigger
3  over time.
4    Q.   I want to show you another one of your
5  posts on X.  Maybe it was a tweet on Twitter at
6  the time.
7      ATTORNEY COHEN:  It is Tab 16, which I
8  think is Exhibit 24.
9      (Whereupon, Musk Exhibit Number 24
10      was marked for identification and is
11      attached hereto.)
12 BY ATTORNEY COHEN:
13   Q.   I think Mr. Savitt asked you about
14 this.
15      Do you see that?
16      And why are you laughing, Mr. Musk?
17   A.   Just somebody replies "Exclusive
18 license," in quotes.  "Might as well have renamed
19 it closed AI."
20      That wasn't me.  It was somebody else.
21   Q.   Right.  So the initial post was an
22 article that reported that Microsoft gets
23 exclusive license for OpenAI's GPT-3 language
24 model; is that correct?
25   A.   Yeah.

Page 358

1    Q.   And that was September 24th, 2020?
2    A.   Yeah.
3    Q.   Somebody tagged you.  And what they
4  wrote was: "I thought OpenAI was supposed to
5  democratize this tech, not give Microsoft an
6  exclusive license; correct?
7    A.   Yeah.
8    Q.   And when you saw that, did you believe
9  that it was inconsistent with the commitment to
10 open source?
11   A.   I mean, it did sort of ring some alarm
12 bells.
13   Q.   Right.  And in response, you posted:
14 "This does seem like the opposite of open.
15 OpenAI is essentially captured by Microsoft."
16      Right?
17   A.   That's what I posted.
18   Q.   So on September 24th, 2020, you
19 thought Microsoft had captured OpenAI; right?
20   A.   That's what it seemed like.
21      But, yeah, I do predict the tables will
22 turn and ultimately --
23      ATTORNEY MOLO:  Wait until he asks you a
24 question.
25   A.   Yeah.  Sorry.  Fair enough.

Page 359

1      ATTORNEY COHEN:  Can we take a short
2  break.
3      THE VIDEOGRAPHER:  Okay.  We're off the
4  record at 7:22 p.m.
5      (Recess taken from 7:22 p.m. to
6      7:26 p.m.)
7      THE VIDEOGRAPHER:  This is the beginning
8  of Media Number 11.  We're back on the record at
9  7:26 p.m.
10      ATTORNEY COHEN:  Thank you, Mr. Musk.
11 I pass the witness.
12      ATTORNEY MOLO:  I have just a couple of
13 questions.  I'm going to sit over there to ask him
14 so that we don't see your handsome profile; we see
15 your face straight on if I sit across from you.
16      THE WITNESS:  Sounds good.
17      (Incidental comments made off the
18      stenographic record.)
19
20         EXAMINATION
21 BY ATTORNEY MOLO:
22   Q.   You can't handle the truth.
23      (Incidental comments made off the
24      stenographic record.)
25 ///

Page 360

1  BY ATTORNEY MOLO:
2    Q.   Good.  We're still on the record.
3  Okay.
4      You didn't sue the defendants here in
5  2019; correct?
6    A.   Yeah.
7    Q.   And in 2019, did the mere fact that
8  OpenAI planned to have outside investors mean to
9  you that OpenAI had for certain broken its
10 promises to you?
11   A.   No.
12   Q.   Okay.  Did you read the information
13 that Mr. Altman had emailed about a transaction
14 in 2019 closely?
15   A.   No.
16   Q.   Did you know how much each investor
17 planned to invest in the 2019 transaction?
18   A.   No.
19      ATTORNEY SAVITT:  Objection.
20      You can answer.
21      The tables are turned.  I get to object
22 now.
23      THE WITNESS:  Okay.  Does that mean I do
24 anything or not doing anything?
25      ATTORNEY SAVITT:  You should answer your

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

---

Page 361

1  lawyer's question.
2       THE WITNESS:  Okay.  Okay.
3  BY ATTORNEY MOLO:
4       Q.  Did you know how much each investor
5  planned to invest in this 2019 deal?
6       ATTORNEY SAVITT:  Objection;
7  speculation.
8       A.  No.
9  BY ATTORNEY MOLO:
10      Q.  Did you know how much each investor
11  stood to gain in the 2019 deal?
12      ATTORNEY SAVITT:  Objection.
13      A.  No.
14  BY ATTORNEY MOLO:
15      Q.  Did you understand all the details of
16  the 2019 OpenAI investment offering at that time?
17      A.  No.
18      Q.  What made you decide to sue in 2024 and
19  not in 2019?
20      A.  Well, the -- I finally came to the
21  conclusion after the 2023 deal was announced that
22  OpenAI was really going to become a closed-source,
23  for-profit -- a profit-maximizing, closed-source
24  organization.  And something needed to be done
25  about that.

---

Page 362

1  So I consulted lawyers in 2023 and filed
2  suit in '24.
3       ATTORNEY MOLO:  Thank you very much.
4       THE WITNESS:  You're welcome.
5       ATTORNEY MOLO:  That's it.
6       ATTORNEY SAVITT:  Let's go off the
7  record for just a second.
8       THE VIDEOGRAPHER:  Okay.  We're off the
9  record at 7:30 p.m.
10      (Recess taken from 7:30 p.m. to
11       7:32 p.m.)
12      THE VIDEOGRAPHER:  This is the beginning
13  of Media Number 12.  We're back on the record at
14  7:32 p.m.
15      ATTORNEY SAVITT:  Thank you.
16      The OpenAI defendants have no more
17  questions.  Mr. Musk, we thank you for your time
18  and patience.
19      We -- it is our position that the
20  deposition remains open pending the resolution of
21  some of our ongoing discovery matters.
22      We pass the witness to Microsoft.
23      ATTORNEY COHEN:  Microsoft has no
24  further questions, but we join in OpenAI's
25  position that the deposition remains open.

---

Page 363

1       ATTORNEY KRY:  We designate the
2  transcript confidential under the protective
3  order.
4       ATTORNEY MOLO:  And we disagree about
5  the deposition being open and hope everyone has a
6  good weekend.
7       THE VIDEOGRAPHER:  This concludes the
8  deposition on September 26th, 2025.  We're off
9  the record at 7:33 p.m.  Master media will be held
10  by Jane Rose Reporting.
11      (Witness excused.)
12      (Deposition adjourned 7:33 p.m. )

---

Page 364

1       CERTIFICATE OF SHORTHAND REPORTER
2
3       I, Gail Inghram, Registered Diplomate
4  Reporter, Certified Realtime Reporter,
5  CA-Certified Shorthand Reporter Number 8635, and
6  Notary Public, the officer before whom the
7  foregoing proceedings were taken, do hereby
8  certify that the foregoing transcript is a true
9  and correct record of the proceedings; that said
10  proceedings were taken by me stenographically and
11  thereafter reduced to typewriting under my
12  supervision; and that I am neither counsel for,
13  related to, nor employed by any of the parties to
14  this case and have no interest, financial or
15  otherwise, in its outcome.
16
17
18
19  _____

    Gail Inghram, RDR, CRR, CSR
20  CA-CSR No. 8635
21
22
23
24
25

---

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

---

Page 365

INSTRUCTIONS FOR ERRATA

1
2
3
4  NOTARY PUBLIC SIGNATURE
5  Not required unless agreed upon by counsel
6  that notary public signature is required.
7
8
9
10  Please return a copy of the signed errata within 30 days of
11  receipt, unless otherwise agreed upon by counsel.  Once we
12  receive the signed errata, we will distribute an electronic
13  copy to all parties.
14
15  RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
16       FAX:  1-800-825-9055
17       EMAIL: janerose@janerosereporting.com
18
19       Jane Rose Reporting
20       Administrative Offices
21       PO Box 542
22       Luck, WI 54853
23
24
25

---

Page 367

ERRATA SHEET
PAGE/LINE/  CHANGE OR CORRECTION AND REASON
3  ----/----/---------/----------------------
4  ----/----/---------/----------------------
5  ----/----/---------/----------------------
6  ----/----/---------/----------------------
7  ----/----/---------/----------------------
8  ----/----/---------/----------------------
9  ----/----/---------/----------------------
10  ----/----/---------/----------------------
11  ----/----/---------/----------------------
12  ----/----/---------/----------------------
13  ----/----/---------/----------------------
14  ----/----/---------/----------------------
15  ----/----/---------/----------------------
16  ----/----/---------/----------------------
17  ----/----/---------/----------------------
18  ----/----/---------/----------------------
19  ----/----/---------/----------------------
20  ----/----/---------/----------------------
21  ----/----/---------/----------------------
22  ----/----/---------/----------------------
23  ----/----/---------/----------------------
24  ----/----/---------/----------------------
25

---

Page 366

NOTICE TO READ & SIGN

This transcript was electronically distributed to Molo
Lamken to forward to witness.

ACKNOWLEDGMENT OF DEPONENT
     I, ELON MUSK, do hereby certify that I
have read the foregoing pages and that the same
is a correct transcription of the answers given
by me to the questions therein propounded, except
for the corrections or change in form or
substance, if any, noted in the attached Errata
Sheet.

_____    _____
(Date)

Signed and subscribed to before me this ____ day of
_____, 2025.

_____
(Notary Public)

---

Page 368

I N D E X  O F  E X H I B I T S

MUSK       DESCRIPTION          PAGE
Exhibit 1    Email communication dated ...........23
     6/24/2015
     (2024MUSK-0001230 through 1231)

Exhibit 2    Email communication dated ...........221
     8/29/2017 (2024MUSK-0009625)

Exhibit 3    Email communication dated ...........80
     9/20/2017
     (2024MUSK-0000224 through 226)

Exhibit 4    Email communication dated ...........89
     9/21/2017
     (2024MUSK-0000218 through 220)

Exhibit 5    Email communication dated ...........96
     2/01/2018
     (2024MUSK-0005444 through 5447)

Exhibit 6    Email communication dated ...........126
     2/11/2018 (2024MUSK-0004497)

---

Elon Musk v.                          FINAL                          September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                         Elon Musk

Page 369

| MUSK | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | Text communication dated | 130 |
| | 2/16/2018 | |
| | (ZILIS-0002324 through 2326) | |
| Exhibit 8 | Email communication dated | 143 |
| | 8/31/2018 with attached PDF | |
| | (SPX-001642 through 1647) | |
| Exhibit 9 | Pages excerpted from Exhibit 21 | 198 |
| | (4 pages) | |
| Exhibit 10 | Certificate of Incorporated filed | 205 |
| | with the State of Delaware dated | |
| | 12-8-2015 | |
| | (EXMF-0003254 through 3256) | |
| Exhibit 11 | Email communication dated | 207 |
| | 12/08/2015 (2024MUSK-0000366) | |
| Exhibit 12 | (Neither identified nor marked.) | |
| Exhibit 13 | (Neither identified nor marked.) | |

Page 370

| MUSK | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Email communication dated | 250 |
| | 01/02/2016 (2024MUSK-0005755) | |
| Exhibit 15 | Email communication dated | 39 |
| | 11/20/2015 (2024MUSK-0009963) | |
| Exhibit 16 | Email communication dated | 115 |
| | 11/02/2018 (2024MUSK-0009544) | |
| Exhibit 17 | Email communication dated | 117 |
| | 11/27/2017 | |
| | (TESLA 000002586 through 2588) | |
| Exhibit 18 | Email communication dated | 137 |
| | 4/23/2018 | |
| | (2024MUSK-0005604 through 5605) | |
| Exhibit 19 | Email communication dated | 158 |
| | 9/11/2018 (TESLA 000003416) | |
| Exhibit 20 | Text communication dated | 162 |
| | 7/22/2019 (OPENAI_MUSK00018000 | |
| | through 18001) | |

Page 371

| MUSK | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 21 | Plaintiff Musk's Supplemental | 201 |
| | Responses and Objections to | |
| | OpenAI Defendants' Second Set of | |
| | Interrogatories dated 9/25/2025 | |
| | (21 pages) | |
| Exhibit 22 | Text communication dated | 303 |
| | 11/19/2023 | |
| | (2024MUSK-0010950 through 10951) | |
| Exhibit 23 | Capture URL: | 306 |
| | https://x.com/elonmusk/status/172 | |
| | 7096607752282485 | |
| | (OPENAI_MUSK00037262 through | |
| | 37264) | |
| Exhibit 24 | Screenshot of internet posts | 357 |
| | (MSFT_MUSK000085666) | |

**Index Omitted**