# EXHIBIT 1

# PUBLIC REDACTED VERSION

## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
-----------------------------------------
ELON MUSK, et al.,
      Plaintiffs,
v.
SAMUEL ALTMAN, et al.,
      Defendants.

Case No. 4:24-cv-04722-YGR
-----------------------------------------

VIDEO DEPOSITION OF
Elon Musk
September 26, 2025
San Francisco, California
LEAD: William Savitt, Esquire
FIRM: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING - 1-800-825-3341

## Page 3

APPEARANCES (Cont'd):

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
  MARC TOBEROFF, ESQ.
  mtoberoff@toberoffandassociates.com
  JAYMIE PARKKINEN, ESQ.
  jparkkinen@toberoffandassociates.com
  TOBEROFF & ASSOCIATES PC
  23823 Malibu Road, Suite 50-36
  Malibu, California 90265
  310.246.3333

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:
  WILLIAM FRENTZEN, ESQ.
  wfrentzen@mofo.com
  MORRISON & FOERSTER LLP
  425 Market Street
  San Francisco, California 94105
  415.268.6413

## Page 2

APPEARANCES:

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
  STEVEN F. MOLO, ESQ.
  smolo@mololamken.com
  ROBERT K. KRY, ESQ.
  rkry@mololamken.com
  WALTER HAWES, ESQ.
  whawes@mololamken.com
  JENNIFER SCHUBERT, ESQ.
  jschubert@mololamken.com
  SARA TOFIGHBAKHSH, ESQ. (Via Zoom)
  stofighbakhsh@mololamken.com
  ALEXANDRA EYNON, ESQ. (Via Zoom)
  aeynon@mololamken.com
    MOLOLAMKEN LLP
    600 New Hampshire Avenue, NW, Suite 660
    Washington, D.C. 20037
    202.556.2011

## Page 4

APPEARANCES (Cont'd):

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:

  WILLIAM S. SAVITT, ESQ.
  wdsavitt@wlrk.com
  NATHANIEL D. CULLERTON, ESQ.
  ndcullerton@wlrk.com
  IOANNIS DRIVAS, ESQ.
  iddrives@wlrk.com
  SARAH EDDY, ESQ.
  skeddy@wlrk.com
  BRADLEY R. WILSON, ESQ.  (Via Zoom)
  brwilson@wlrk.com
    WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
    New York, New York 10019
    212.403.1329

Elon Musk v.             FINAL             September 26, 2025
Samuel Altman        [CONFIDENTIAL]            Elon Musk

---

Page 5

APPEARANCES (Cont'd):
ATTORNEY(S) FOR DEFENDANT MICROSOFT:
  RUSSELL P. COHEN, ESQ.
  russ.cohen@dechert.com
  HOWARD ULLMAN, ESQ.  (Via Zoom)
  howard.ullman@dechert.com
    DECHERT LP
    45 Fremont Street, 26th Floor
    San Francisco, California 94105
    415.262.4506

  NISHA PATEL GUPTA, ESQ. (Via Zoom)
  nisha.patelgupta@dechert.com
    DECHERT LLP
    US Bank Tower
    633 West 5th Street, Suite 4900
    Los Angeles, California 90071-2032
    213.808.5735

  JOHN A. JURATA, JR., ESQ.
  jay.jurata@dechert.com
    DECHERT
    1775 Eye Street, Northwest
    Washington, D.C.  20006
    202.261.3326

---

Page 6

APPEARANCES (Cont'd):

  YOSEF WEITZMAN, ESQ. (Via Zoom)
  yosi.weitzman@dechert.com
    DECHERT
    CIRA Center 2929 Arch Street
    Philadelphia, Pennsylvania 19104
    215.994.4000

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    GAIL L. INGHRAM, Court Reporter
    BA, CRR, CLR, RDR, CSR-CA (No. 8635)
    JASON BUTKO, Videographer

---

Page 7

TABLE OF CONTENTS

EXAMINATION OF:             PAGE
ELON MUSK
      By Attorney Savitt ..............10
      By Attorney Cohen ..............343
      By Attorney Molo ..............359

Reporter Certificate ................. Page 364
Notice to Read and Sign ............. Page 366
Index of Exhibits ................... Page 368

---

Page 8

1          Friday, September 26, 2025
2          San Francisco, California
3          - - -
4      THE VIDEOGRAPHER:  This is the start of
5 Media Number 1 in the deposition of Elon Musk in
6 the matter of Elon Musk v. Samuel Altman in the
7 court of the United States District Court for the
8 Northern District of California; Case Number
9 4:24-cv-04722-YGR.
10      This deposition is being taken at 755
11 Sansome Street in San Francisco, California, on
12 September 26th, 2025, at approximately 9:53 a.m.
13      My name is Jason Butko with Jane Rose
14 Reporting, here with our court reporter,
15 Gail Inghram, with Jane Rose Reporting.
16      Counsel can you please identify yourself
17 and who you represent, starting with the
18 questioning attorney.
19      ATTORNEY SAVITT:  William Savitt,
20 Wachtell Lipton Rosen & Katz, for the OpenAI
21 defendants.  With me are my colleagues Sarah Eddy,
22 Ionnis Drivas, and Nate Cullerton.
23      ATTORNEY COHEN:  Good morning.  Russell
24 Cohen for Microsoft.  With me is Jay Jurata from
25 the Dechert LLP firm.

---

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 21

1    ATTORNEY MOLO:  -- that that's what I'm
2    referring to?
3    ATTORNEY SAVITT:  Thank you.  We do.
4    Thank you.
5    ATTORNEY MOLO:  Okay.
6    BY ATTORNEY SAVITT:
7    Q.   And, Mr. Musk, are you going to follow
8    your counsel's instructions?
9    A.   Yes.
10   Q.   Okay.
11   ATTORNEY SAVITT:  We reserve, of course,
12   our objections to those instructions.
13   BY ATTORNEY SAVITT:
14   ████████████████████████████████
     ████████████████████████████████
18   ATTORNEY MOLO:  Objection.  This is a
19   question that goes to Phase II of the case, and
20   consistent with the Court's orders, I'm
21   instructing the witness not to answer.
22   BY ATTORNEY FRENTZEN:
23   Q.   Are you going to follow your counsel's
24   instruction?
25   A.   Yes.

Page 22

1    Q.   All right.  Have you consulted with
2    Alex Spiro in connection with your deposition
3    today?
4    A.   No.
5    Q.   Whose idea was it to form the AI lab
6    that became OpenAI?
7    A.   I think -- well, my perspective is that
8    the origin of OpenAI, the reason it exists and I
9    don't think it would exist otherwise, is that I
10   was increasingly concerned about the danger of
11   Google being a monopoly in AI.  And my
12   conversations with Larry Page were alarming in
13   that he did not seem to be taking AI safety
14   seriously.
15   So I felt there needed to be a
16   counterbalance to Google, given that Larry Page
17   did not seem to be taking AI safety seriously.
18   At one point, he called me a specieist
19   for favoring humanity, which I felt was odd
20   because what side is he on?  Clearly, not
21   humanity's side, it would seem.
22   That's led me to conclude that we really
23   need to have some counterbalance to Google's AI
24   power.  The opposite of what Google was -- Google
25   is a for-profit, closed source company.  The

Page 23

1    counterbalance -- direct counterbalance seems to
2    we would be to have an open source nonprofit as
3    a -- to be the opposite of Google.
4    Q.   Thank you.
5    Is it your -- is it your point of view
6    that the idea for creating the AI lab that became
7    OpenAI was your idea?
8    A.   Yes.
9    ATTORNEY SAVITT:  Let's take a look and
10   mark what's been premarked as Exhibit 1, please.
11   Give a copy to the witness.
12   (Whereupon, Musk Exhibit Number 1 was
13   marked for identification.)
14   BY ATTORNEY SAVITT:
15   Q.   That's for you, sir.
16   Mr. Musk this is a June 24, 2015, email
17   exchange.  Do you see that?
18   A.   Yes.
19   Q.   Subject line:  "AI lab," and it's
20   between you and Sam Altman; right?
21   A.   Uh-huh.
22   Q.   What was the context, if you recall, of
23   this email exchange?
24   A.   I think this probably references a
25   number of conversations that I had with Sam and

Page 24

1    many others regarding creating an AI
2    counterbalance to Google.
3    Q.   And you see in the first paragraph,
4    Altman writes to you:
5    "The mission would be to create the
6    first general AI and use it for
7    individual empowerment; i.e., the
8    distributive version of the future that
9    seems to save us."
10   Do you see that?
11   A.   Yes.
12   Q.   Do you understand what Altman meant by
13   that?
14   A.   He's recapping conversations that we
15   had.
16   Q.   I see.  So thank you for that.
17   Your testimony is that you and Altman
18   had had conversations, and this was summarizing
19   some of the things you all had talked about?
20   A.   Yes.
21   Q.   What did you think about this proposed
22   mission set out in this email?
23   A.   It was the mission that I proposed.
24   Q.   I see.  So the whole idea was yours,
25   that's your testimony?

Elon Musk v.                         FINAL                         September 26, 2025
Samuel Altman                  [CONFIDENTIAL]                           Elon Musk

Page 25

1    A.  No, not the whole idea was mine.  But
2  the idea of creating counterbalance to Google
3  stemmed directly from conversations that I had
4  with Larry Page.
5    And I then had a series of meetings with
6  and dinners with many people in Silicon Valley,
7  Sam included -- I didn't really know Sam at the
8  time -- saying that we need to have some
9  counterbalance to Google.
10   But this -- this idea that we needed to
11  have a counterbalance to Google, this idea I had
12  before I even know who Sam Altman was.
13   Q.  And you say after this -- you see that
14  Altman writes:  "Safety should be a first-class
15  requirement."
16   Do you see that?
17   A.  That's what I said.
18   Q.  I see.
19   And you'll allow that this was what
20  Altman wrote to you in an email to you?
21   A.  He's literally recapping our
22  conversations and what I've been telling people
23  for months before this.
24   Q.  I see.  So is your testimony that
25  everything in this email is simply Altman saying

Page 26

1  back to you things that you had said to him?
2   ATTORNEY MOLO:  Objection to the form of
3  the question.
4   Go ahead and answer.
5   A.  No, not everything.
6  BY ATTORNEY SAVITT:
7   Q.  Okay.  What isn't?
8   A.  Some of the things he's proposing here
9  are his ideas, like the five people who would be
10  on the board --
11   The first thing -- the first thing, the
12  overall idea of mission to create a general AI
13  maximizing safety was my idea.  It's possible Sam
14  may have independently had that idea but he
15  certainly didn't suggest it to me.  That was my
16  idea.
17   Obviously, a start-up is going to start
18  with a small number of people.  That's point 2
19  here.
20   Point 3 is something, yeah, that he did
21  come up with.  That's clearly Sam writing things
22  here because he's suggesting five people on the
23  board, which I wouldn't -- some of whom I wouldn't
24  agree should be on the board.
25   So that's his idea in line -- point 3.

Page 27

1   And he's -- point 4 is just some
2  speculation about governance.
3   And point 5 is just something about
4  regulatory stuff.
5   But -- the, you know -- the -- the
6  necessity of creating a counterbalance to Google
7  came as a result of my conversations with Larry
8  Page, not Sam Altman.  And I came to the -- based
9  on Larry Page not taking AI seriously and Google
10  essentially having a monopoly on AI, left me
11  extremely concerned that we needed to create some
12  counterbalance.
13   That forced me to talk to many other
14  people.  Sam was merely one of -- I don't know,
15  100 people I talked to.  And said we need to have
16  a safety-focused counterbalance to Google.
17   I didn't even understand what it was
18  when I came up with this idea.  It's an idea.
19  It's just they need to do something about safety.
20   Q.  Other than Mr. Page, who did you have
21  these conversations with?
22   A.  Everyone who would basically listen.  It
23  got to the point where I would talk about AI
24  safety so much that my brother asked that, in the
25  future, if we're at a party, that we could not

Page 28

1  talk about AI safety because it's such a buzzkill.
2   And so that's how much I was talking
3  about AI safety.  Everyone that I met and talked
4  to, nonstop for months, expressing my extreme
5  concern about AI safety.
6   I even funded an AI safety research
7  group run by Max Tegmark, of the Future of Life
8  Institute, that funded -- directly funded dozens
9  of AI safety research projects, which Larry Page
10  yelled at me about.
11   And I personally spoke -- was very
12  outspoken about AI safety.  Since you're an avid
13  reader of my posts, I'm sure you realize that.
14   Q.  Thank you for that.
15   You said that you were focused on this
16  and speaking with many, many people over a period
17  of months.
18   A.  Everyone.  And my mom.
19   Q.  And your mom.
20   Was this in the period around June 2015
21  that you were --
22   A.  Well, before this.
23   Q.  And starting when?  I'm sorry.
24   A.  I was talking about AI safety probably
25  as far back as 10 years before this.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 41

1   November 2015 that it would probably be better to
2   have a standard C Corp. with a parallel nonprofit
3   in respect to the AI docs that are the subject of
4   this email; right?
5       A.  I'm just saying that it would be better
6   than being a subsidiary of YC.  I didn't say we
7   should do that.  I'm just saying it's better than
8   being a subsidiary of YC.
9       Q.  Yeah.  And in 2016, with the benefit of
10  hindsight, you believed that setting up OpenAI as
11  a nonprofit might have been the wrong move; isn't
12  that true?
13      A.  At various times, I did -- I always like
14  to reflect upon actions and say maybe they're
15  right; maybe they're wrong.
16      Q.  Fair enough.
17          And I understand the impulse.
18          But is it fair, then, to say that
19  whether setting the thing up as a nonprofit as
20  opposed to a C Corp. with a parallel structure
21  were points respecting which your views changed
22  over time as you reflected upon them?
23      A.  Just because ideas are discussed doesn't
24  mean that there's been a fundamental change in
25  direction.

Page 42

1       Q.  You've mentioned this already.  You
2   claim that you made donations to OpenAI in its
3   early years, yeah?
4       A.  As you know, I definitely did.
5       Q.  Yeah.  And who's Jared Birchall?
6       A.  He's my -- manages my personal office.
7       Q.  And you trust Mr. Birchall?
8       A.  Yes, I think he's a trustworthy
9   individual.
10      Q.  And he helps you -- you get reports
11  about your businesses from him.  You rely on the
12  information that he gives you.
13          Is that all fair?
14      A.  Yes.
15      Q.  And you don't have any reason to think
16  that Mr. Birchall wouldn't have testified
17  truthfully about the work he did on your behalf
18  regarding OpenAI, do you?
19      A.  I think he would have testified to the
20  best of his recollection.
21      Q.  Did you ever discuss with anyone at
22  OpenAI the possibility of retaining the right to
23  reclaim your donations?
24      A.  I don't recall.
25      Q.  No recollection of what was discussed

Page 43

1   as we're sitting here this morning?
2       A.  I don't recall.
3       Q.  Did you ever discuss with anyone at all
4   a right to direct that your donations be
5   transferred to another party?
6       A.  I don't think so.  What other party?
7       Q.  I'm asking you.
8       A.  I'm not sure what you're referring to.
9       Q.  But you have no recollection of a
10  discussion like that?
11      A.  No.
12      Q.  Do you have any recollection of a
13  discussion with anybody respecting the
14  possibility of what you say you gave to OpenAI
15  one day reverting to you?
16      A.  No, I don't recall that.
17      Q.  Apart from the cash donations you say
18  you made to OpenAI, did you provide any support
19  for the organization?
20      A.  Yes, I provided -- I taught them
21  everything I knew about creating a successful
22  start-up.  And I helped recruit key individuals.
23  And I helped get the rights of Azure computer
24  products, which was instrumental to their growth.
25          I did a lot of things.

Page 44

1       Q.  And I appreciate that.
2           Just so that I have the complete
3   recollection as we're chatting this morning,
4   anything else other than what you just mentioned
5   that you contributed to OpenAI, other than the
6   cash donations you say you made?
7       A.  No, I mean, apart from funding them,
8   recruiting key people, providing essential
9   business advice, and getting them essential
10  computer products, nothing.
11      Q.  Okay.  As to recruiting, who all did
12  you recruit?
13      A.  Probably quite a few other things.
14  Besides that, nothing.
15      Q.  Okay.  That's very funny.
16          That's what I want to know, is, besides
17  that, is there anything else?
18          I just want to -- and I mean all the
19  respect in the world.  I just want to get your
20  full recollection of this.
21      A.  That's a lot.
22      Q.  I'm not saying it's not.  I just want
23  to make sure that I've got your complete answer.
24      A.  I mean, lending my name to the company
25  gave them immense credibility as well.

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 45

1    Q.   Anything else?
2    A.   That's a lot.
3    Q.   Okay.  Recruiting.  Who did you recruit
4 to OpenAI?
5    A.   I talked to dozens and people over the
6 years.  But I think the most crucial recruit was
7 Ilya Sutskever.  In fact, the recruitment of Ilya
8 was what actually caused Larry Page to stop being
9 friends with me.
10       So Ilya went back and forth multiple
11 times saying he would join OpenAI or stay at
12 Google, and ultimately agreed to join; and Larry
13 Page and Sergey and Demis Hassabis did everything
14 they could to keep Ilya.  When Ilya finally
15 decided to join OpenAI, that's what ended the
16 friendship with Larry Page.  He didn't talk to me
17 after that.
18    Q.   Is he still giving you the silent
19 treatment?
20    A.   Yes.
21    Q.   And just so the record is clear on
22 this, Sutskever was at Google and came from there
23 to OpenAI, and that's why the folks at Google
24 were annoyed; fair?
25    A.   They were very upset about that.

Page 46

1    Q.   And you say that you recruited Ilya to
2 OpenAI?
3    A.   Obviously, many others participated in
4 this.  But without me, he would not have joined.
5    Q.   Who else participated in the
6 recruitment of Mr. Sutskever to OpenAI?
7    A.   Sam and Greg.
8    Q.   Do you think he would have gone to
9 OpenAI without Sam and Greg?
10    A.   I don't know, but he certainly would not
11 have joined without me.
12    Q.   No, I got your view on that.
13       Anyone other than Mr. Sutskever that you
14 say you recruited to OpenAI?
15    A.   I'd have to go back and look, but I was
16 talking to every candidate in the beginning.
17    Q.   As we talk this morning, can you think
18 of the names of any other persons that you
19 recruited to OpenAI besides Mr. Sutskever?
20    A.   I helped recruit, I think, almost
21 everyone in the initial team.
22    Q.   But can you give me any names of the
23 persons that you claim to have helped recruit?
24    A.   Wojceich, like for example.
25    ///

Page 47

1       (Interruption by the court reporter
2       to clarify the record.)
3    A.   But I talked to -- I think I talked to
4 almost everyone in the beginning.
5    Q.   And here again, I just -- with
6 apologies for being insistent, any other names
7 you can give me as we're talking this morning?
8    A.   Not offhand, but I can certainly give
9 you a list later, if you'd like.
10    Q.   So how did you actually do the
11 recruiting that you said you did?
12    A.   I would talk to them and meet with them.
13 How else do you recruit anyone?
14    Q.   I'm just asking a question, sir.
15    A.   You have to communicate somehow.
16    Q.   Right.  And did you communicate in
17 writing as well as orally?
18    A.   I think these were almost entirely oral,
19 in person.
20    Q.   Did you communicate with Altman,
21 Brockman and others at OpenAI about who you were
22 recruiting?
23    A.   Yes.
24    Q.   How did you do that?
25    A.   In calls.  I talked to them.  That would

Page 48

1 be the -- in meetings or verbally.
2    Q.   And all those communications you say
3 were done orally but not in any written form.
4 Fair?
5    A.   There may have been some in written
6 form, but recruitment is just generally done
7 orally.
8    Q.   Yeah.  But I was asking here not about
9 the recruiting, but about your communications
10 with your colleagues about how the recruiting was
11 going and who you were recruiting.  That would
12 have been done in writing or orally?
13    A.   Orally.  I mean, we can certainly get
14 the list of people, and then we can just ask them
15 did I play a significant role in recruiting.  I'm
16 sure that they would say yes.
17       I mean that's how you build companies,
18 you recruit people.
19    Q.   If you had to estimate --
20    A.   I'm very good at building companies.  My
21 track record speaks for itself.
22    Q.   If you had to estimate, how much time
23 did you spend working at OpenAI a week in 2016?
24    A.   I don't recall the exact amount, but it
25 fluctuated.  And there are times when I would

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 49

1  spend much of the week on OpenAI, and there are
2  some weeks where there was very little.
3      Q.   Could you hazard an estimate about what
4  your average weekly hourly commitment to OpenAI
5  was in 2016?
6      A.   I don't recall.
7      Q.   Same for 2017?
8      A.   Yeah.
9      Q.   At some point, you gave a few OpenAI
10  employees Teslas; is that right?
11      A.   Yes.
12      Q.   Who got the Teslas?
13      A.   I think Ilya.  Maybe Greg.  I'm not
14  sure.
15      Q.   You don't recall who else might have
16  gotten a Tesla?
17      A.   No.
18      Q.   Why did you give these people Teslas?
19      A.   Seemed like a nice thing to do.
20      Q.   Any other reason?
21      A.   Sort of a perk of the company.  I mean I
22  was providing, essentially, all the capital of the
23  company so why not throw in a few Teslas.
24      Q.   Do you believe you have a contract with
25  the OpenAI not-for-profit corporation?

Page 50

1      A.   A contract?
2      Q.   Yeah.
3      A.   I mean, there are many documents that
4  have been signed.
5      Q.   But I'm asking a different question.
6          Do you think you have a binding
7  agreement, a contract, with OpenAI, Inc., the
8  nonprofit?
9      A.   For what?
10      Q.   Of any kind.
11      A.   I think so, but -- you know, I -- yeah.
12      Q.   You think so?
13      A.   I think so.
14      Q.   And do you have a contract with -- in
15  your opinion, with any other OpenAI entity?
16      A.   I'm -- not familiar with the crazy
17  corporate shell game of companies associated with
18  OpenAI.  So, no, I don't think so.
19      Q.   Okay.  Do you believe you have a
20  contract with Sam Altman?
21      A.   I'm not sure what you mean by a
22  contract.
23      Q.   I'm asking you whether you believe you
24  have a binding agreement of some sort,
25  enforceable binding agreement with Sam Altman.

Page 51

1      A.   I guess in a sense, yes, in that the
2  deal was to create a nonprofit open source
3  organization; and that contract -- that deal was
4  fundamentally -- that promise was broken
5  egregiously.
6      Q.   So you think that your understandings
7  with Mr. Altman rise to the level of a contract
8  between you and him?
9      A.   I think so.  And -- because the clear
10  understanding was this would be a nonprofit, open
11  source.  And now, in fact, OpenAI, the name is,
12  is -- itself is a lie.  It is, in fact -- it
13  should be called "closed-for-maximum-profit
14  AI.com."  And I was thinking of gifting them that
15  as a URL.
16          "Closed-for-maximum-profit AI" should be
17  the name of OpenAI.  And that is directly contrary
18  to the reason that it was given.
19          They stole the charity.  That's wrong.
20      Q.   So what are the terms of the contract
21  that you think you have with Mr. Altman?
22      A.   The money was donated to create an
23  open-source nonprofit.  And now it has been turned
24  into a de facto closed-source profit maximizing
25  entity, directly contrary to the reason the money

Page 52

1  was given.  They broke the deal.
2          And I would liken this to if you donate
3  money to a company that is intended to preserve
4  the Amazon Rainforest, but instead they chop down
5  the trees, turn it into a lumber company and sell
6  the wood for profit, you'd be rather upset,
7  wouldn't you?
8      Q.   No, I've seen that, and you can recycle
9  as much as you like.  My question was a little
10  different.
11          My question is:  What were the terms --
12  what are the terms of the agreement that you say
13  you have with Mr. Altman?
14      A.   It's very simple.  The money was given
15  to create a nonprofit open-source organization.
16      Q.   That's it?
17      A.   And -- yeah, that's what the money was
18  given for.  That's what my time was given for.
19  Not just money but time and credibility.
20      Q.   And that constitutes the terms of the
21  agreement you say you have with Altman; fair?
22      A.   I think that's -- those are the major
23  parts of it.  It's not super complicated.
24      Q.   I'm not saying it is.  I just want to
25  get --

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

---

Page 53

1    A.  Okay.
2    Q.   -- I just want to understand fully your
3  view, sir.  That's the only reason I'm pushing.
4    A.   My view is money was given, time was
5  given, credibility was given, recruiting help was
6  given, advice was given.  Basically, everything
7  you could do to make an organization successful is
8  what I gave for the purpose of creating a
9  nonprofit open-source organization.  And they've
10  egregiously violated those promises in the worst
11  way possible and created a profit-maximizing,
12  defective, closed-source organization to enrich
13  themselves.  And that is wrong.  That is wrong.
14    Q.   And that constitutes the contract you
15  had with Altman, yes?
16       It's a yes-or-no question.
17    A.  I mean, I don't know if this is some
18  loaded legal term or not.  But it is clearly a
19  broken promise.
20    Q.   Okay.  And is that the same contract
21  you think you have with OpenAI, Inc.?
22    A.  I think you're trying to sort of connect
23  this to some sort of legal argument.  I'm just
24  saying that this is -- that anyone with a shred of
25  common sense can see that the deal was broken.

---

Page 54

1  They stole the charity and enriched themselves.
2    Q.   Any other terms of the contract you can
3  identify that you say you had with OpenAI, Inc.?
4    A.  No.
5    Q.   Okay.  Before you filed your lawsuit in
6  2024, Mr. Musk, had you ever communicated to
7  Altman that you thought he had made a contractual
8  obligation to you?
9    A.   I mean, I expressed at various times
10  that the mission of AI, the reason money was
11  given, the reason my time, my credibility, my
12  recruiting help was given was to create a
13  nonprofit, open-source organization; and they were
14  step-by-step going in the diametrically opposed
15  direction.
16    Q.   How long do you think that OpenAI was
17  obligated to follow what you say are the terms of
18  the agreement you had with it and Mr. Altman?
19    A.   My feeling is that there's no statute of
20  limitations on stealing money from a charity,
21  which is what they did.
22    Q.  So forever?
23    A.  Yeah.
24    Q.   And Mr. Altman has, likewise, obligated
25  to follow the terms of what you say is the

---

Page 55

1  agreement forever; correct?
2    A.  I'm saying you can't steal a charity.
3    Q.   Yeah, but that wasn't my question.  My
4  question was whether you think Mr. Altman is
5  obligated to follow the terms of what you say --
6    A.   Yeah, I don't think you should steal --
7  I don't think Sam Altman should steal a charity,
8  that's wrong.
9    Q.  Right.
10       You visited with Brockman and Altman
11  before filing your lawsuit in 2023, didn't you?
12    A.  I don't recall.
13    Q.   You proposed to them that OpenAI merge
14  with xAI; isn't that true?
15    A.  I don't recall.
16    Q.   You don't recall one way or another?
17    A.  No.
18    Q.   Okay.  You know it's true that you
19  proposed that xAI and OpenAI open merge, don't
20  you?
21       ATTORNEY MOLO:  Object to the form of
22  the question.
23    A.  I don't recall.
24  BY ATTORNEY SAVITT:
25    Q.   Okay.  You certainly can't say it

---

Page 56

1  didn't happen; right?
2       ATTORNEY MOLO:  Object to the form of
3  the question.
4    A.  I don't recall.
5  BY ATTORNEY SAVITT:
6    Q.   You don't recall.
7       You don't recall.  So you don't recall
8  one way or another whether you made that proposal?
9       ATTORNEY MOLO:  Asked and answered.
10  Objection.
11  BY ATTORNEY SAVITT:
12    Q.   You can answer.
13       ATTORNEY MOLO:  Don't answer the
14  question.
15       ATTORNEY SAVITT:  You're instructing him
16  not to answer?
17       ATTORNEY MOLO:  I'm instructing him not
18  to answer the question that he's answered three
19  times already.  Correct.
20  BY ATTORNEY SAVITT:
21

---

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                      Elon Musk

Page 69

1          ATTORNEY MOLO:  Object to the form of
2    the question.
3    BY ATTORNEY SAVITT:
4          Q.   You can answer.
5          A.   I mean I'd be supportive of any action
6    that provided funding to the nonprofit entity,
7    provided it -- it wasn't used to unjustly enrich
8    people; and that it stayed true to its mission.
9          Q.   And that was the idea in 2015, and it
10   was the idea in 2017; right?
11         A.   Yes.
12         Q.   And, Mr. Musk, as we're talking this
13   morning, can you identify for me anything that
14   Mr. Altman said or did in 2017 that you think was
15   misleading you?
16         A.   I don't recall offhand what exactly
17   happened in 2017.  It was eight years ago.
18         Q.   I understand.  So you can't recall
19   anything as we're speaking today in 2017 that he
20   did to mislead you; fair?
21         A.   I can't recall with precision exactly
22   what happened eight years ago.
23         Q.   I understand.
24         A.   Yeah.
25         Q.   And same with Mr. Brockman, you can't

Page 70

1    recall as we're sitting here, respecting, as I
2    acknowledge events that what happened eight years
3    ago, anything that he did to mislead you in 2017;
4    is that fair?
5          A.   I don't recall -- yes, that's fair.
6          Q.   Did you rely on Mr. Brockman and
7    Mr. Altman in the course of the discussions in
8    2017 about a potential for-profit arm for OpenAI?
9          A.   I don't recall.
10         Q.   Did you make it known that if OpenAI
11   were to convert to a for-profit company you would
12   expect your fair share of equity in proportion to
13   the financial contributions that you made to
14   OpenAI since its founding?
15         A.   I don't recall.
16         Q.   You may have done that, you just don't
17   remember; right?
18         A.   It's possible.
19         Q.   You believe that you should receive, at
20   least, a majority equity stake in the OpenAI
21   for-profit that was being batted about; right?
22         A.   There were many things that were
23   discussed in the sense of spitballing ideas.  But
24   nothing came to fruition.
25         Q.   Did you believe that were a for-profit

Page 71

1    option to be pursued in 2017 you should receive a
2    majority equity stake?
3          A.   My recollection, just acknowledging that
4    this is eight years ago, was that they could be a
5    new company formed, potentially, that would be --
6    a new company that would be funded in a
7    traditional manner.
8          Q.   It would be a new company that would be
9    related to OpenAI in what way?
10         A.   We didn't get that far.
11         Q.   Would it involve the personnel and
12   intellectual property of OpenAI?
13         A.   I was in favor of anything that would
14   result in the nonprofit receiving funding and
15   supporting the nonprofit's mission.
16         Q.   And if there were to be a new company
17   formed, you would insist that you would have a
18   majority equity stake; correct?
19         A.   There were many ideas discussed.  If --
20   if a new traditional start-up was created and I
21   provided the majority of the funding, or maybe all
22   the funding, and was principal cofounder, then in
23   the situation like that, it would be typical to,
24   at least at first, have a majority of the company.
25         Q.   So are you saying that the 2017

Page 72

1    discussions assumed that the not-for-profit would
2    remain in place?
3          A.   These discussions were -- there were
4    many ideas discussed; but none of them were
5    pursued in-depth.
6          Q.   You -- in the context of the 2017
7    discussions that we've been talking about, you
8    wanted to control any potential for-profit OpenAI
9    organization; is that right?
10         A.   Many ideas were discussed.  None came to
11   fruition.  None were discussed in detail.
12              But if a new company was formed at
13   first, if I was providing, essentially, all the
14   money and was principal cofounder, then at first I
15   would have majority control, but not over time.
16         Q.   And having majority control at the
17   launch of a for-profit organization was a
18   nonnegotiable point for you; correct?
19         A.   Well, it -- you have to say where does
20   the equity go if -- if I were to provide the most
21   of the funding, if not all the funding, and be one
22   of the principal cofounders, then in the short
23   term I would have majority control, but not in the
24   long term.
25         Q.   What details did you get into

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

Page 73

1  respecting the creation of such an organization
2  in 2017?
3      A.  We did not get into much detail.
4          (Incidental comments made off the
5          stenographic record.)
6  BY ATTORNEY SAVITT:
7      Q.  Okay.  Do you recall in the context of
8  the 2017 discussions with Altman and Brockman and
9  Sutskever that you suggested you would step down
10 as CEO of Tesla?
11     A.  I don't recall.
12     Q.  You recall telling Brockman and Altman
13 that you were thinking -- planning to step down
14 as CEO of Tesla, and you'd have more time to
15 devote to OpenAI.  Do you remember saying that?
16     A.  I don't recall.
17     Q.  You don't recall one way or another?
18     A.  No.
19     Q.  But you recognize that it would be
20 important to devote more time to OpenAI were you
21 to have the control that you felt was so
22 important?
23     A.  Yes.
24     Q.  And did you undertake with Altman and
25 Brockman and others that you would spend more

Page 74

1  time in that circumstance?
2      A.  If that were to happen, I would spend
3  more time, yes.
4      Q.  Because up until, then you hadn't been
5  spending that much time; right?
6      A.  There were -- the time allocation to
7  OpenAI varied from heavy to light, depending on
8  the needs of the company.
9      Q.  Do you recall that in 2016 you
10 committed to providing quarterly grants of
11 $5 million to OpenAI?
12     A.  I do vaguely recall that, yeah.
13     Q.  And you remember that you covered the
14 rent and related expenses for OpenAI's use of the
15 Pioneer Building?
16     A.  Yes.
17     Q.  And in the midst of these discussions
18 about the creation of a for-profit in 2017, you
19 suspended your $5 million quarterly grant, didn't
20 you?
21     A.  Yes, I -- I think at that point I became
22 concerned that OpenAI veering from its mission.
23     Q.  Is that why you suspended the quarterly
24 grant?
25     A.  I -- I felt I couldn't trust Sam and

Page 75

1  Greg.
2      Q.  What caused you to believe that you
3  couldn't trust Sam and Greg?
4      A.  They seemed to be heading in a direction
5  that would result in self-enrichment; and, indeed,
6  that is what happened.
7      Q.  What did Sam or Greg do in 2017 that
8  caused you to think that they were heading in a
9  direction of self-enrichment?
10     A.  They seemed to be wanting to prioritize
11 a closed-source, for-profit approach as opposed to
12 a nonprofit, open-source approach.
13     Q.  Your testimony is that the question of
14 open sourcing was a relevant subject of
15 discussion in the 2017 discussions regarding a
16 potential for-profit arm?
17         ATTORNEY MOLO:  Object to the form of
18 the question.
19 BY ATTORNEY SAVITT:
20     Q.  You can answer.
21     A.  It was one of the things, yeah.
22     Q.  And your testimony is that you were
23 advocating that open source should remain a
24 principal objective, and Brockman and Altman were
25 veering the other way; is that right?

Page 76

1          ATTORNEY MOLO:  Object to the form of
2  the question.
3      A.  Yeah, literally, the name of the company
4  is meant to -- is based on open source.  That's
5  why I named the company OpenAI after open source.
6  BY ATTORNEY SAVITT:
7      Q.  Is there anything you can tell me other
8  than what you've already told me respecting what
9  Brockman or Altman did tell you in 2017 regarding
10 open sourcing?
11     A.  I don't have -- I don't have anything
12 more to add.
13     Q.  Just remember them being less committed
14 to open sourcing, and that's all you have; right?
15     A.  Yes.
16     Q.  Was the decision to stop funding OpenAI
17 with the quarterly grants related to open
18 sourcing?
19     A.  It was a factor.
20     Q.  And the other factor was your concern
21 that Altman and Brockman seemed to be interested
22 in a for-profit organization?
23     A.  Yes.  They -- I started to feel like I
24 was being swindled.
25     Q.  In 2017?

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 77

1        A.  Yeah, at least I started to suspect that
2    I was being swindled and that they were
3    essentially taking money that was donated to a
4    nonprofit and would ultimately use that to enrich
5    themselves, which is exactly what they did.
6        Q.  Right, I heard that.
7        A.  Yes.  You'll hear it a few times more.
8        Q.  I'm sure.
9            But my question is a little more -- it's
10   a little narrower.  Let me try it this way,
11   Mr. Musk:
12            Did you ever communicate, in the course
13   of 2017, to Brockman or Altman that you were
14   concerned about their commitment to open sourcing?
15       A.  I probably did.
16       Q.  Do you remember doing so?
17       A.  I think I did.
18       Q.  Did you send them a text or an email on
19   this subject?
20       A.  I don't recall.
21       Q.  Do you remember what you said?
22       A.  What I would have said was OpenAI needs
23   to stay true to its mission of being an
24   open-source nonprofit.
25       Q.  You would've said that or you did say

Page 78

1    that?
2        A.  I'm pretty sure I said it probably
3    multiple times.
4        Q.  What did they tell you in response?
5        A.  They were, as I recall, evasive on those
6    questions.
7        Q.  They were evasive?
8        A.  Uh-huh.
9        Q.  Can you say anything more than that?
10       A.  They wouldn't commit to that.
11       Q.  So you're saying that Altman and
12   Brockman refused to commit to maintaining the
13   level of open sourcing that the company had had
14   in the course of your discussions in 2017?
15       A.  That's my recollection.
16       Q.  That's your recollection.
17       A.  And, in fact, that's what happened.
18       Q.  Right, that's what you say.
19            You, though, Mr. Musk, were also
20   discussing many different options for a for-profit
21   future for OpenAI in 2017; isn't that right?
22       A.  We were discussing many ways to fund the
23   nonprofit.
24       Q.  Right.
25            And everyone knew the nonprofit needed

Page 79

1    more funding if it was to be able to compete;
2    correct?
3        A.  It did need more funding, yes.
4        Q.  And you don't disagree that OpenAI
5    needed to find a way to raise a lot more capital
6    if it was going to be reasonably competitive from
7    the perspective of 2017?
8        A.  Yes, it needed to raise capital.
9        Q.  Yeah.
10           You never reached an agreement in the
11   course of 2017 regarding the creation of an OpenAI
12   for-profit.
13           Do I have that right?
14       A.  I think so; correct, yes.
15       Q.  Do you remember that Brockman and
16   Sutskever wouldn't agree to give you control in a
17   potential for-profit structure?
18       A.  I do recall that, yeah.
19       Q.  And as a result of Brockman and
20   Sutskever not wanting to give you control, the
21   discussions broke down; is that right?
22       A.  Yeah, in the -- we're just batting
23   around ideas here.  But if a for-profit entity was
24   created as a means to fund the nonprofit, that, in
25   the short term, I would -- if I'm providing all or

Page 80

1    most of the capital, and my time, representation,
2    and everything else, that in the short term I
3    would have majority control, but over time, I
4    would not.
5        Q.  And did you make clear that your plan
6    was to have control at the beginning and then
7    relinquish control in time?
8        A.  Yes.
9        Q.  Did you make that clear in any
10   document, that you're aware of?
11       A.  I think it's in, probably, some of the
12   emails.
13       Q.  You think it's in the some of the
14   emails?
15       A.  Yeah.
16           ATTORNEY SAVITT:  Okay.  Why don't we
17   take a look at what's been marked as Exhibit 3.
18           (Whereupon, Musk Exhibit Number 3 was
19           marked for identification and is
20           attached hereto.)
21   BY ATTORNEY SAVITT:
22       Q.  Exhibit 3 is an email exchange dated
23   September 20th, 2017.
24           Do you see that, sir?
25       A.  Yes.

Elon Musk v.                          FINAL                  September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                      Elon Musk

Page 81

1    Q.   And it's among you and Mr. Sutskever,
2  Mr. Altman, Mr. Brockman.  Mr. Teller and
3  Ms. Zilis were also copied on the email.
4       Do you see that?
5    A.   (Nods head.)
6    Q.   And you know that you attached this
7  document to your complaint in this action?
8    A.   Yes.
9    Q.   Did you review your complaint in the
10 action in anticipation of your testimony today?
11   A.   I did read it.
12   Q.   Yeah.
13      So the bottom email, at 2:08, is a long
14 one.  It's from Greg and Ilya.
15      Do you see that?
16   A.   (Nods head.)
17      ATTORNEY MOLO:  When you say the bottom
18 one, do you mean the first page?
19      ATTORNEY SAVITT:  Yeah -- well, I'm
20 sorry.
21      ATTORNEY MOLO:  It's about a quarter
22 down.  Is that the one you're talking about?
23      ATTORNEY SAVITT:  Yeah, that's the one
24 I'm -- yes, it's the first of two emails in this
25 chain.

Page 82

1       ATTORNEY MOLO:  Okay.
2    A.   (Witness reviews document.)
3       So what are you asking?
4  BY ATTORNEY SAVITT:
5    Q.   I just wanted to give you a chance to
6  look at the document.
7       Here's what I wanted to know:
8       You see that --
9       ATTORNEY MOLO:  Give him a moment to
10 read it.
11      ATTORNEY SAVITT:  I'd just given him a
12 moment.  He asked me if I had a question, so ...
13   A.   Go ahead.
14 BY ATTORNEY SAVITT:
15   Q.   Thank you.
16      You see that Sutskever and Brockman, in
17 their email to you at 2:08, discuss some concerns
18 about the current structure of governance in the
19 first bullet point at the bottom of the page?
20   A.   Of page 1?
21   Q.   Yes.  Yes.
22   A.   I see that they write this point.
23   Q.   Yeah.
24      And you see what else they said -- and I
25 just wanted you to have this, as Mr. Molo was

Page 83

1  saying, so that you understood the context of the
2  email.
3    A.   Yes.
4    Q.   So the -- Ilya and Greg expressed some
5  concerns about the governance structure that
6  you've suggested.
7       And then you respond at 2:17 p.m.,
8  Mr. Musk.  Do you see?
9    A.   Uh-huh.
10   Q.   And you say:
11      "Guys, I've had enough.  This is
12 the final straw.  Either go do something
13 on your own or continue with OpenAI as a
14 nonprofit.  I will no longer fund OpenAI
15 until you have made a firm commitment to
16 stay, or I'm just being a fool who's
17 essentially providing free funding to
18 you to create a start-up.  Discussions
19 are over."
20   A.   Yes.
21   Q.   And you meant discussion of a
22 for-profit conversion were over; correct?
23   A.   There were many discussions.
24   Q.   Well, what discussions were over?
25   A.   There were a wide range of discussions.

Page 84

1    Q.   What discussions were you saying were
2  over?
3    A.   Discussions on the future of open OpenAI
4  were over because I felt that I was being deceived
5  by Sam and Greg; that they were self-dealing and
6  that they were -- this entire thing, that they --
7  my conclusion was that I was being swindled.
8    Q.   I see.
9    A.   That what they were saying was not
10 honest.  And that really they just intended to
11 create a for-profit entity to enrich themselves as
12 much as possible, at the expense of the nonprofit
13 charity.
14   Q.   I see.
15      So when you said, "Discussions are
16 over," you were conveying the sentiment that you
17 were determined that Brockman and Altman weren't
18 being straightforward; they were trying to turn
19 the thing into a for-profit for their own benefit,
20 and you'd had it with OpenAI; fair?
21   A.   I felt I was being tricked.  I felt that
22 I was being -- that they were being deceptive;
23 that their real goal was to create a closed-source
24 maximum-profit entity for their own benefit.  And
25 that is, in fact, what happened.

Page 85

1        So my suspicions were valid.
2        Q.   I understand that's your view.
3        But because of the reasons you just
4   said, on September 20th, 2017, when you said
5   discussions were over, you were saying, "I've had
6   it with you guys and --"
7        A.   "I don't trust you anymore."  That's
8   what I was saying.
9        Q.   And discussions about OpenAI, when you
10  say, "Discussions are over," they were
11  discussions about the future of OpenAI that were
12  over?
13       A.   I'm saying, I don't want to continue to
14  have discussions where I think they're being
15  dishonest.
16       Q.   And when you say, "Go do something" --
17  and can you tell me exactly what was said to you
18  that you thought was dishonest in the course of
19  these discussions?
20       A.   I summarize it here, which is that
21  they -- my opinion was that they were using --
22  that they were essentially using the money donated
23  to the nonprofit to create intellectual property
24  to create a valuable for-profit that they would
25  benefit from; and, indeed, that's what happened.

Page 86

1        Q.   But what you say here is that you won't
2   fund until you have made a firm commitment to
3   stay.
4        Do you see that?
5        A.   Uh-huh.
6        Q.   Were you prepared to continue to fund
7   if Sutskever and Brockman made a firm commitment
8   to stay?
9        A.   I think they would need to make a firm
10  commitment to stay, and I would need to understand
11  what the forward structure is to make sure that
12  the fundamental mission of being a nonprofit
13  open-source company continued.
14       Q.   Would you agree that these discussions
15  about the for-profit structure in 2017 were
16  principally between you on the one hand and
17  Sutskever and Brockman on the other hand?
18       A.   No, it was discussion -- I was talking
19  to Sam, Ilya, and Greg.
20       Q.   So your recollection is that Altman was
21  as heavily involved in those discussions as
22  Brockman and Sutskever?
23       A.   Yes; and, in fact, I think Altman was --
24  I would call Altman the chief swindler in this
25  situation, the swindler in chief.  And --

Page 87

1        Q.   You --
2        A.   The swindler in chief.  So I called him
3   Scam Altman, as you may have read.
4        That he had essentially duped Ilya into
5   thinking that -- Sam had duped Ilya into thinking
6   he could be trusted.  And, in fact, he had duped
7   Ilya into thinking that he could be trusted.  It
8   took Ilya several more years to figure out that,
9   indeed, Sam could not be trusted.  That's why Ilya
10  fired Sam from the board.
11       Q.   And you --
12       A.   But at the time, he -- at the time, Ilya
13  thought he could trust Sam.  He only later
14  realized that Sam was being deceptive and lying.
15       Q.   And you had realized all of this --
16  excuse me.  Sorry.
17       You had realized -- I'm sorry -- all of
18  this as of September 2017, about Mr. Altman?
19       A.   My suspicions were sufficient to -- that
20  I no longer trusted them.
21       Q.   And that's Altman, or Altman and
22  Brockman, or Altman and Brockman and Sutskever?
23       A.   Well, mostly -- really -- I actually
24  always thought Ilya was honest and had a strong
25  moral compass.  Sam did not.  And Greg, I'm not

Page 88

1   sure.  But since Greg has essentially acted as a
2   co-swindler with Sam, I must -- I did lump the two
3   together.  And so Sam and Greg are swindlers; Ilya
4   is -- I guess, in my opinion, largely innocent.
5   He was just tricked.
6        Q.   And you think that you, too, were
7   tricked by Altman and Brockman?
8        A.   Yes, I was tricked.
9        Q.   You say here -- you say --
10       A.   I'm not that easy to trick, you know,
11  but I was tricked.  I was fooled.
12       Q.   When you say, here, Mr. Musk, that
13  either -- you see that you say "Either go do
14  something on your own."
15       Do you see that?
16       A.   Yes.
17       Q.   What did you mean by that?
18       A.   I mean that they're always free to leave
19  a company and start a new company.  We're, for at
20  least -- we live in a free country, and it's their
21  right to leave an organization and start a new one
22  if they want.
23       Q.   Had they ever -- had Ilya or Greg ever
24  suggested they might do that?
25       A.   They may have.

Elon Musk v.                     FINAL                  September 26, 2025
Samuel Altman              [CONFIDENTIAL]                        Elon Musk

Page 89

1      Q.   Just don't remember as we're speaking
2  this morning?
3      A.   I don't know for sure.  That may have --
4  there were many ideas discussed, and that may have
5  been one of the things that they mentioned.
6          ATTORNEY SAVITT:  Okay.  Let me ask you
7  to have a look at the next exhibit, which is
8  Exhibit 4.
9          (Whereupon, Musk Exhibit Number 4 was
10         marked for identification and is
11         attached hereto.)
12 BY ATTORNEY SAVITT:
13     Q.   This is -- Mr. Musk, Exhibit 4 is --
14 it's really just a slightly different branch of
15 the same email we're looking at.  So if I could
16 direct you to the second email, the one that you
17 wrote at 3:08 p.m.
18     A.   The second email?
19     Q.   The second email in the chain.  The
20 first one is from Altman, and the second one --
21     A.   Oh, yeah.  Okay.
22     Q.   And this is a -- you had responded by
23 saying the discussions are over, email that we
24 looked at just a moment ago, but this is a
25 separate response to the same email, sir, if you

Page 90

1  see what I mean.
2      A.   Yeah.
3      Q.   And here you write:
4          "To be clear, this is not an
5      ultimatum to accept what was discussed
6      before.  That is no longer on the
7      table."
8          Do you see that?
9      A.   Yeah.
10     Q.   What was discussed before but was now
11 off the table?
12     A.   I mean there are many discussions about
13 what to do to fund the nonprofit, the -- the
14 OpenAI nonprofit.  But at this point in the
15 discussions, I had lost confidence in Sam and
16 Greg; and I no longer trusted them.
17     Q.   I understand that.
18         But I'm asking you, if you remember what
19 was -- what did you mean when you say it was not
20 about accepting what was discussed before, which
21 is off the table?
22         What were you referring to?
23     A.   There are many things that were
24 discussed.  So, basically, what I was saying here
25 is that I didn't want to be associated with them

Page 91

1  in any way going forward.
2      Q.   "Them" being Altman and Brockman?
3      A.   Correct.
4      Q.   Okay.  And you were saying you didn't
5  want to be associated with Altman or Brockman,
6  period, going forward.  That was the sentiment
7  here?
8      A.   I felt they were being deceptive,
9  tricking me, and I don't like to work with people
10 who are deceptive and tricking me.
11     Q.   Got it.
12         And then Altman -- and you had
13 reached -- this was the conclusion you had reached
14 on the basis of these discussions, you were kind
15 of done with Altman and Brockman?
16     A.   Yes.
17     Q.   All right.  And then the next day,
18 Altman says:  "I remain enthusiastic about the
19 nonprofit structure."
20         Do you see that?
21     A.   Yes.  Clearly, that's a huge lie.
22     Q.   What did you understand Altman to mean
23 by that?
24     A.   Well, he wrote the words that he remains
25 enthusiastic about the nonprofit structure.  But

Page 92

1  as things have turned out, really it's become a
2  maximum -- a profit-maximizing entity, not a
3  nonprofit.  It's become the polar opposite of what
4  was intended.
5      Q.   But you had already concluded you
6  couldn't trust him anyway; right?
7      A.   Yes.
8      Q.   Do you remember Brockman's reactions to
9  Exhibits 3 and 4?
10     A.   No.
11     Q.   Do you remember Sutskever's reactions
12 to Exhibits 3 and 4?
13     A.   No.
14     Q.   How about Altman?  Do you remember if
15 he had any reactions to either of these exhibits?
16     A.   Not that I recall.
17     Q.   Okay.  Thank you.
18         After negotiations regarding an OpenAI
19 for-profit broke down, did you continue to have
20 discussions with Altman and Brockman and Sutskever
21 about the path for OpenAI?
22     A.   There was some interaction in later
23 years.
24     Q.   You see in Exhibit 3 that you mentioned
25 the firm commitment to stay.

Elon Musk v.                           FINAL                      September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 93

1       Do you recall whether you had a view as
2   to what commitment would be necessary to satisfy
3   you from Sutskever and Brockman?
4       A.  Well, I would have wanted them to commit
5   to stay for many years and stay true to the
6   mission of OpenAI being an open-sourced nonprofit.
7       Q.  Do you recall demanding three more
8   board seats on the nonprofit OpenAI as a
9   condition of remaining associated with it?
10      A.  There were many things discussed.  That
11  may have been one of them.
12      Q.  You don't recall one way or the other?
13      A.  It does -- that -- I think it may have
14  been one of the things discussed.
15      Q.  So it rings a bell?
16      A.  It rings a bell, yeah.
17      Q.  Okay.  Do you recall asking Brockman
18  and Sutskever for a 12-month nonsolicit
19  agreement?
20      A.  I don't specifically recall that.
21      Q.  Could have happened, you just don't
22  remember; fair?
23      A.  Yeah.
24      Q.  Can you recall any other requirements
25  for you to resume funding OpenAI?

Page 94

1       A.  No.
2       Q.  Did Brockman and Sutskever ever accede
3   to your requirements?
4       A.  No.
5       Q.  And you never resumed funding OpenAI,
6   did you?
7       A.  I -- I think I continued to pay -- well,
8   I'm not sure.  I think I may have paid for the
9   building to some degree.  But after I lost trust
10  in what they were doing, I declined to provide
11  significant further funding.
12      Q.  Did you own the Pioneer Building?
13      A.  No.
14      Q.  You rented the whole thing?
15      A.  Uh-huh.
16      Q.  And some other organizations that you
17  controlled were also in there; is that right?
18      A.  Well, Neuralink was a tenant for
19  part-time.
20      Q.  So after these 2017 discussions broke
21  down, did you remain involved with OpenAI?
22      A.  We had some interaction over the years.
23      Q.  Other than maybe the building, do you
24  recall any other financial support that you
25  provided to OpenAI after 2017?

Page 95

1       A.  I don't recall.
2       Q.  Did you give any other support of any
3   kind to OpenAI other than providing the rent
4   after these discussions broke down in 2017?
5       A.  I don't recall.
6       Q.  You don't recall one way or the other?
7       A.  (Nods head.)
8       Q.  Do you recall considering the
9   possibility that OpenAI should merge into Tesla
10  after these discussions broke down in 2017?
11      A.  There were many ideas that were
12  discussed in 2017.  Some association with Tesla
13  would have been one of the possibilities, although
14  I don't think you can merge OpenAI into Tesla.
15  But perhaps some -- people at OpenAI could -- who
16  wanted to move to Tesla could move to Tesla.
17      Q.  And Tesla could acquire the
18  intellectual property of OpenAI?
19      A.  Perhaps license it.  I don't know.
20  Yeah.  Or I don't know.  Yeah.  These discussions
21  didn't go very far.
22      ATTORNEY SAVITT:  Let's take a look at
23  what we've marked as Exhibit 5.
24  ///
25  ///

Page 96

1       (Whereupon, Musk Exhibit Number 5 was
2       marked for identification and is
3       attached hereto.)
4   BY ATTORNEY SAVITT:
5       Q.  I'm going to give you a minute to run
6   your eyes over this, Mr. Musk, before I ask you
7   any question.
8       A.  You want me to read the whole thing?
9       Q.  No, I just want -- let me ask you a
10  question, and then you can tell me if you need
11  more time.  I don't want to --
12      A.  Okay.
13      Q.  -- waste your time, but I don't want
14  you to feel rushed.
15      So do you recall this email --
16      A.  I mean, I -- now, that you put it in
17  front of me, it's -- refreshes my memory with
18  respect to the email.
19      Q.  So let me ask you to look at the second
20  page of it, if I might.  And this is -- actually,
21  take a look, if I might just to orient you, at
22  the very last page, the very back page.  It's not
23  even that one.  There's a tiny bit of text on the
24  page behind it.  Yeah.
25      Do you see there Mr. Karpathy says:

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman               [CONFIDENTIAL]                  Elon Musk

Page 141

1    When you learned of the formation of
2   OpenAI's capped profit structure, did you think
3   that that would reach any commitment owed to you
4   by Altman or OpenAI?
5    A.  I mean, I did learn about, at some
6   point, this capped profit structure, which gave me
7   some reason for concern; but at least the fact
8   that it was capped profit gave me some comfort.  I
9   would say I was discomforted by it, but given that
10  the profit would be capped, and things would
11  revert to the nonprofit, then that gave me some
12  comfort.  So I was partly uncomfortable, partly --
13  I was uncomfortable, but it was not a showstopper.
14   Q.  Would I be interpreting, Mr. Musk,
15  correctly your testimony to be that when you did
16  come to learn about the capped profit structure,
17  you had some misgivings about it, but you didn't
18  view it as violating a basic commitment or
19  agreement?
20   ATTORNEY MOLO:  Object to the form of
21  the question.  The witness's testimony is the
22  witness's testimony.  When you ask, "Is this your
23  testimony?" or, "Would it be fair?"  Just ask him
24  the question.
25  ///

Page 142

1   BY ATTORNEY SAVITT:
2    Q.  You can answer.
3    A.  Yeah, I mean, I was -- I was
4   uncomfortable with a for-profit entity, but that
5   discomfort was by mitigated by the profit cap.
6    Q.  Well, Mr. Molo wants me to ask you
7   questions; I'll ask you questions.  Let's see if
8   I can get an answer.
9    ATTORNEY MOLO:  We really don't need
10  that.
11   ATTORNEY SAVITT:  Mr. Molo, you --
12   ATTORNEY MOLO:  We really do not need
13  the external comments.
14   ATTORNEY SAVITT:  Your objection --
15   ATTORNEY MOLO:  Ask your question.
16  BY ATTORNEY SAVITT:
17   Q.  When you learned that OpenAI had formed
18  a capped-profit subsidiary, did you believe that
19  that breached a commitment owed to you by OpenAI
20  or Altman?
21   A.  I was uncomfortable with that, but it
22  didn't seem like a showstopper, because the profit
23  was capped.
24  BY ATTORNEY SAVITT:
25   Q.  And when you say it wasn't a

Page 143

1   showstopper, do you mean that that structure, at
2   least, didn't seem to you to constitute an
3   abrogation of a commitment or agreement that had
4   been made to you?
5    A.  It felt like a step in the wrong
6   direction; but because it was mitigated by the
7   profit cap, it made me uncomfortable, but not --
8   it wasn't a showstopper at that time.
9    Q.  And Altman sent you a term sheet in
10  connection with the proposed capped-profit
11  restructuring, didn't he?
12   A.  I don't recall.
13   ATTORNEY SAVITT:  Let's take a look at
14  Exhibit 8.
15   (Whereupon, Musk Exhibit Number 8 was
16  marked for identification and is
17  attached hereto.)
18   (Incidental comments made off the
19  stenographic record.)
20   A.  Yes.
21  BY ATTORNEY SAVITT:
22   Q.  So you see that this document was sent
23  to you on August 31st, Mr. Musk?
24   A.  Yes.
25   Q.  Of 2018?

Page 144

1    A.  Yes.
2    Q.  If I could ask you to look at the
3   Funding and Revenue section on the first page of
4   the term sheet.
5    ATTORNEY MOLO:  Funding and Revenue is
6   the last box.
7   BY ATTORNEY SAVITT:
8    Q.  Do you see that?
9    A.  Yes.
10   Q.  And it's written there:
11   "Initial capitalization.  OpenAI
12  L.P. will initially be capitalized by a
13  contribution of assets from the
14  nonprofit.  The nonprofit will get an
15  interest equivalent to that of a limited
16  partner in the initial raise that is
17  consistent with the value of its capital
18  contribution."
19   Do you see that?
20   A.  Yes.
21   Q.  What assets did OpenAI, Inc., the
22  nonprofit, have as of 2018?
23   A.  I don't recall.
24   Q.  You were on the board of directors; you
25  don't remember what assets --

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman              [CONFIDENTIAL]                    Elon Musk

Page 149

1  BY ATTORNEY SAVITT:
2      Q.  You can answer the question.
3      A.  I'm not uncertain.
4      Q.  Did you raise any objection to the
5  proposed transaction at the time that you saw the
6  summary term sheet?
7      A.  I don't recall.
8      Q.  Did you tell Altman that you thought it
9  was a violation of some duty that he owed to you
10  when he sent you the term sheet?
11      A.  I don't recall.
12      Q.  Did you tell anyone that you thought
13  that the transaction contemplated by the term
14  sheet represented a violation of any duty or
15  obligation owed to you?
16      A.  I believe I expressed discomfort to a
17  lot of people.  I felt like OpenAI was moving away
18  from its core mission.  As I said earlier, my --
19  this -- this was a -- I would say, another
20  stepping stone in the journey of losing trust in
21  Altman.
22      Q.  So my question was whether you
23  expressed to anyone the view that the transaction
24  contemplated by this agreement worked a violation
25  of any obligation owed to you.

Page 150

1          Is there anyone that you can identify
2  for me to whom you expressed that after you
3  received the summary term sheet?
4      A.  Not that I recall.
5      Q.  You can't think of anyone; right?
6      A.  I can't recall what happened seven years
7  ago.
8      Q.  Right.  And you can't identify for me
9  any writing in which you expressed the view that
10  the transaction contemplated by the summary term
11  sheet constituted a violation of any agreement or
12  duty owed to you; correct?
13      A.  I don't recall.
14      Q.  You see on page 3 of the term sheet --
15  it's the page ending in 1645.
16          That the term sheet discusses
17  significant revenue generation through
18  commercializing OpenAI's technology.  I'm in
19  the -- I don't know, it's probably the third
20  paragraph of page 3.
21      A.  I'm not sure I actually read this term
22  sheet.
23      Q.  You don't dispute that it was sent to
24  you?
25      A.  It was clearly sent to me.

Page 151

1      Q.  Thank you.
2          So you see that -- you do see, though,
3  that it discusses significant revenue generation
4  through commercializing of OpenAI's technology,
5  don't you, sir?
6      A.  That's what it says here, yes.
7      Q.  Do you think that OpenAI breached the
8  duty that was owed to you by allowing the
9  for-profit entities to reap financial benefits
10  from commercial activities?
11          ATTORNEY MOLO:  Object to the form of
12  the question, and you're asking the witness to
13  provide legal opinions.
14      A.  I am uncertain.
15  BY ATTORNEY SAVITT:
16      Q.  You don't know one way or the other?
17      A.  I'm uncertain.
18      Q.  Did you think that the proposed
19  transaction reflected here was a breach of
20  OpenAI's commitments to you?
21          ATTORNEY MOLO:  Object to the form of
22  the question.
23      A.  I don't think I read this term sheet.
24  BY ATTORNEY SAVITT:
25      Q.  So you didn't raise any objection to

Page 152

1  the term sheet once it was sent to you?
2          ATTORNEY MOLO:  Objection; asked and
3  answered.
4      A.  I don't recall doing so.
5  BY ATTORNEY SAVITT:
6      Q.  So -- and maybe you've answered all
7  these questions because you say you're not sure
8  you looked at this.  But take a look, if you
9  would, at the last box here, "Employee Comp"?
10      A.  Yeah.
11      Q.  It's written here that:  "Employees
12  will be granted profit interests in an employee
13  holding vehicle."
14          Do you see that?
15      A.  Yeah.
16      Q.  Is your view of your agreement with
17  OpenAI that OpenAI couldn't provide personnel
18  with compensation in the form of equity?
19          ATTORNEY MOLO:  Objection to the form of
20  the question.
21      A.  I don't -- I'm uncertain.
22  BY ATTORNEY SAVITT:
23      Q.  Because I'm just trying to understand
24  what you thought --
25      A.  I don't think I actually read this term

Elon Musk v.                                      FINAL                    September 26, 2025
Samuel Altman                              [CONFIDENTIAL]                              Elon Musk

Page 153

1  sheet so ...
2     Q.  Well, so my question for just this very
3  instant, Mr. Musk, is a little different.  I'm
4  asking whether you think that the agreement that
5  you had with OpenAI prohibited OpenAI from
6  providing its personnel with compensation in the
7  form of equity.
8     A.  I'm uncertain.
9     Q.  You don't know whether that violated an
10 agreement to you or not?
11    A.  It doesn't feel right.
12    Q.  But do you think it violated an
13 agreement to you?
14    A.  I'm not certain.
15    Q.  You're not certain.
16       Can you think of conduct that OpenAI has
17 undertaken since the date of this document, which
18 is -- let me get this right -- in August 2018,
19 conduct -- things that have happened since then
20 that have constituted, in your view, a violation
21 of the agreement that you had with OpenAI or the
22 term of your donations to it?
23       ATTORNEY MOLO:  Objection to the form of
24 the question.  You're asking the witness to
25 speculate about what OpenAI has undertaken.

Page 154

1     A.  Sorry.  Are you talking about in the
2  entirety of up until present day?
3  BY ATTORNEY SAVITT:
4     Q.  I'll ask you a different question.
5        Can you identify anything that OpenAI
6  has done since August 2018 that constitutes a
7  violation of the agreement that you think you had
8  with OpenAI or the term of your donations to
9  OpenAI?
10    A.  Yeah.  The -- by degrees, inverted the
11 entire of the mission of the company, gone from a
12 nonprofit open source to a closed
13 for-maximum-profit company by degrees.  And now
14 are seeking to completely remove the nonprofit and
15 end up with something diametrically opposed to the
16 original intent and what I founded.
17    Q.  Anything else?
18    A.  That's pretty big.
19    Q.  I know you feel that way.  I just want
20 to make sure I have everything that -- if there's
21 anything in addition to that, I just want to make
22 sure I've got your full account.
23    A.  That's what it comes down to, that you
24 can't steal a charity.
25    Q.  And --

Page 155

1     A.  Scam Altman is trying to steal a
2  charity, and that's not -- that's just not okay.
3     Q.  Anything else?
4     A.  That's a very big deal.
5     Q.  Anything else?
6     A.  That's the main thing.
7     Q.  Nothing else?
8     A.  Stealing a charity.
9     Q.  But there's nothing else?
10       ATTORNEY MOLO:  Object to the form of
11 the question.  You've asked the witness a question
12 four times now.  Please ask another question.
13       ATTORNEY SAVITT:  The question has been
14 asked, but it hasn't been answered.
15       ATTORNEY MOLO:  It's been answered.
16       ATTORNEY SAVITT:  Mr. Molo, we're
17 obviously going to be going to be talking with the
18 judge about --
19       ATTORNEY MOLO:  Not today, apparently.
20       ATTORNEY SAVITT:  Please stop suggesting
21 answers.
22       ATTORNEY MOLO:  I'm not suggesting
23 answers.
24       ATTORNEY SAVITT:  I think you are, and
25 the record is going to reflect it.  Please stop.

Page 156

1        ATTORNEY MOLO:  The record reflects what
2  it reflects.
3  BY ATTORNEY SAVITT:
4     Q.  I want to know whether you've now
5  given -- is there anything you can add to what
6  you think has happened at OpenAI since
7  August 2018 that constitutes a breach of some
8  obligation to you?
9        Is there anything that you haven't told
10 me in the last answer?
11    A.  I mean, there might be things that I
12 can't think of right now.  There probably are
13 things I can't think of right now.
14    Q.  Nothing you can think of -- nothing you
15 can testify about as we speak this afternoon?
16    A.  Nothing I can think of right this
17 minute.
18    Q.  Okay.  You were offered equity in the
19 capped-profit subsidiary when Altman proposed the
20 transaction in 2018, weren't you?
21    A.  At various times -- I'm not sure of the
22 exact dates -- Scam Altman has offered me shares.
23    Q.  But you've declined?
24    A.  Yes.
25    Q.  Why?

Elon Musk v.                       FINAL                  September 26, 2025
Samuel Altman               [CONFIDENTIAL]                          Elon Musk

Page 157

1    A.  I felt it would be improper.  It seemed
2 like -- it seemed like a scammy situation.
3    Q.  Any other reason for your having
4 declined?
5    A.  I thought what -- I thought receiving
6 shares in a scammy operation would be potentially
7 illegal.
8    Q.  And I apologize if I've asked this
9 question.  I may have.  I can't remember.  But
10 it's an important one, so I get your full
11 recollection.
12        Can you identify any written
13 communication of any kind in 2018 or 2019
14 indicating that you objected to the capped-profit
15 subsidiary structure that OpenAI pursued?
16    A.  Not that I recall.
17    Q.  Is it accurate that you were supportive
18 of OpenAI at the time it formed the capped-profit
19 subsidiary?
20        ATTORNEY MOLO:  Object to the form of
21 the question.
22    A.  I don't think I would say I was
23 supportive.
24        ATTORNEY SAVITT:  Let's take a look at
25 the next exhibit, which is -- yeah.  It's

Page 158

1 Exhibit 19.
2        (Whereupon, Musk Exhibit Number 19
3        was marked for identification and is
4        attached hereto.)
5 BY ATTORNEY SAVITT:
6    Q.  Mr. Musk, I'm going to direct your
7 attention to the other notes -- notation at the
8 bottom of the page.
9        Exhibit 19 is an email exchange, and
10 you're not on it.  Ms. Zilis is communicating with
11 Reyna Ortiz and others.
17    Q.  Okay.  But Ms. Zilis was a close
18 business colleague of yours; correct?
19    A.  Yes.
20    Q.  Okay.  She writes here -- and I'm in
21 the second bullet point under Other Notes,
22 Mr. Musk:
23        "Just for awareness, Elon does not
24        need to do the recall, because he's
25        decided to be supportive in spirit of

Page 159

1 OpenAI but not participate in the new
2 instrument."
3        Do you see that?
4    A.  Yes.
5        ATTORNEY MOLO:  Is Mr. Musk on this
6 email?
7        ATTORNEY SAVITT:  Mr. Molo, I already
8 said that he wasn't.
9        ATTORNEY MOLO:  I'm asking a question.
10        ATTORNEY SAVITT:  I told him that he
11 wasn't.  Would you please stop interfering with my
12 examination.  It's really unseemly.
13        ATTORNEY MOLO:  I'm sorry you feel that
14 way.
15        ATTORNEY SAVITT:  I mean, I already told
16 him that.  Are you just trying to supply the
17 answers?
18        ATTORNEY MOLO:  All right.  All right.
19 All right.  It's my mistake.
20 BY ATTORNEY SAVITT:
21    Q.  So my question was whether Ms. Zilis's
22 report here was accurate when she said that
23 you've decided to be supportive in support of
24 OpenAI, but not participate in the new
25 instrument.

Page 160

1    A.  I think that's correct.
2    Q.  You think Ms. Zilis's report here is
3 inaccurate?
4    A.  Yes.
5    Q.  Okay.  Did you review the draft blog
6 post in March 2019 that outlined key points
7 regarding OpenAI's capped-profit launch?
8    A.  I don't recall.
9    Q.  You don't recall.
10        Do you recall discussing the
11 capped-profit launch with Mr. Altman before it
12 went forward?
13    A.  We may have had a conversation or two
14 about it.
15    Q.  Please tell me everything you can
16 recall about those conversations, if there's
17 anything you can.
18    A.  I would have to speculate, so ...
19    Q.  So you can't -- as we're talking this
20 afternoon, you just don't remember anything that
21 may have been said in those conversations?
22    A.  Not with certainty, no.
23    Q.  Okay.  Do you have an educated guess?
24 I don't want you into speculate.
25    A.  I don't want to speculate.

Elon Musk v.                              FINAL                September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                      Elon Musk

Page 161

1    Q.  Okay.
2        Do you recall telling Altman that you
3    had no objection to the transaction and no
4    proposed edits to the blog post?
5    A.  I don't recall that, no.
6    Q.  Is it possible you may have said that?
7    A.  It sounds unlikely.
8    Q.  Do you recall giving Mr. Altman your
9    approval to proceed with the transaction?
10   A.  I don't.
11   Q.  Did you think you had any right to veto
12   the capped-profit restructuring transaction?
13   A.  I don't think -- I didn't have any legal
14   veto rights.
15   Q.  Did you think you had the right to
16   demand changes to the proposed transaction?
17   A.  I didn't think I had any power to do --
18   to demand changes.
19       ATTORNEY SAVITT:  Can we go off the
20   record for one second.
21       ATTORNEY MOLO:  Sure.
22       THE VIDEOGRAPHER:  We're off the record
23   at 1:32 p.m.
24       (At 1:32 p.m. a luncheon recess was
25       taken until 2:23 p.m.)

Page 162

1        THE VIDEOGRAPHER:  This is beginning
2    Media Number 5.  We're back on the record at
3    2:37 p.m.
4        ATTORNEY SAVITT:  Thank you.
5    BY ATTORNEY SAVITT:
6        Mr. Musk, in 2019, you learned that
7    Microsoft had made a $1 billion investment in
8    OpenAI's for-profit entity; correct?
9    A.  Yes.
10   Q.  Did you review the announcement that
11   made public the $1 billion investment?
12   A.  I read the news.
13   Q.  You didn't read the announcement before
14   it was made?
15   A.  I don't recall.
16   Q.  Did you think that the deal was
17   impressive?
18   A.  I don't recall.
19       ATTORNEY SAVITT:  Let's take a look at
20   Exhibit 20.
21       (Whereupon, Musk Exhibit Number 20
22       was marked for identification and is
23       attached hereto.)
24   BY ATTORNEY SAVITT:
25   Q.  Exhibit 20 is a text message exchange

Page 163

1    between Mr. Altman and Ms. Zilis.  You're not --
2    you aren't a party to this exchange.
3        In it, you see in the -- one, two --
4    third down, Ms. Zilis says:
5        "Congrats.  I'm sure you're in
6    touch with him too, but when I pinged E
7    the blog post he mentioned he thought it
8    was an impressive deal by you guys."
9        Do you see that?
10   A.  Yes.
11   Q.  Does that refresh your recollection
12   that you thought that the OpenAI-Microsoft deal
13   was impressive?
14   A.  This is a text exchange that doesn't
15   include me, so, no, I wouldn't say it refreshed my
16   recollection.  I don't recall thinking it was
17   impressive.
18   Q.  Do you recall mentioning to Ms. Zilis
19   that you thought it was an impressive deal by the
20   OpenAI guys?
21   A.  I don't recall doing so.
22   Q.  I see.
23       Were you in touch with Altman too, as
24   Ms. Zilis surmised that you were?
25   A.  There were occasionally exchanges of

Page 164

1    communication -- of text and voice.
2    Q.  Did you discuss the Microsoft deal
3    before it was announced with Mr. Altman?
4    A.  I don't recall.
5    Q.  Do you recall raising any concerns with
6    Mr. Altman when the deal was announced with it?
7    A.  I don't recall.
8    Q.  Do you recall, at the time you learned
9    of the Microsoft deal in 2019, telling anyone
10   that it broke a promise that had been made to you
11   by OpenAI?
12   A.  I don't recall.  No, I don't think so.
13   Q.  And at the time you learned of the 2019
14   Microsoft deal, did you believe that it did
15   violate a commitment that had been made to you by
16   OpenAI?
17   A.  What I do recall, just the best of my
18   recollection, the -- I felt uneasy about the deal;
19   but I think the -- you know, the capped profit and
20   that kind of thing, it seemed like this was
21   simply -- that, ultimately, things would revert to
22   the nonprofit.  So -- you know, as long as things
23   reverted to the nonprofit that would be okay.
24   Q.  And I think I know what you mean,
25   Mr. Altman -- Mr. Musk, I'm sorry.  But I want to

Elon Musk v.                                    FINAL                       September 26, 2025
Samuel Altman                          [CONFIDENTIAL]                              Elon Musk

Page 181

1  businessman in history, and you've thought about
2  these things.
3        And I think you said -- I just want to
4  make sure I've got the things that have come to
5  mind.  You said debt, leasing, capped equity,
6  supplier financing.
7        Did I miss anything?
8     A.  I'm just speculating here.
9     Q.  Yeah.
10       Is there anything else that comes to
11 mind?
12       ATTORNEY MOLO:  Object to the form of
13 the question.
14    A.  Not right now.
15 BY ATTORNEY SAVITT:
16    Q.  Okay.  And Ms. Zilis was a member of
17 the OpenAI board at the time of the $10 billion
18 2023 investment as well; is that right?
19    A.  I'm not sure.

24    Q.  Did you discuss the $10 billion 2023
25 Microsoft investment with Ms. Zilis anytime in

Page 182

1  2023?
2     A.  I think I did.
3     Q.  Tell me everything you can recall about
4  your discussions with Ms. Zilis on that subject.
5     A.  The 2023?
6     Q.  Yeah.
7     A.  To the best of my recollection, which is
8  going to be imprecise, I felt this had gone too
9  far.  This was essentially the final straw.  And
10 for an investment of this scale, my perception was
11 that, at this point, there had been a breach of
12 promises; that, really, this was -- that
13 Microsoft -- or OpenAI would be beholden to
14 Microsoft at such a scale that they would be
15 unable to be a nonprofit or open source.
16    Q.  And your recollection is you conveyed
17 that message in sum or substance to Ms. Zilis?
18    A.  I believe I did.
19    Q.  Did you discuss the transaction with
20 Mr. Altman?
21    A.  I didn't -- I probably said that
22 publicly too.  Did I not say it publicly?  You
23 probably know my posts better than I do, but --
24    Q.  I'm doing my best.  If I knew of
25 something, I would tell you.

Page 183

1     A.  I probably -- if -- I think I expressed
2  some dismay on Twitter, or X, at that time.
3     Q.  Did -- but returning to your
4  discussions with Ms. Zilis on the subject, do you
5  recall what she said?
6     A.  No.  I just -- I think I would have --
7  it's likely that I would have expressed my concern
8  and exasperation that this is really -- they've
9  gone too far.
10    Q.  Do you recall anything Ms. Zilis said
11 about the transaction, as far as she saw it?
12    A.  I don't.
13    Q.  No recollection of what she might have
14 said?
15    A.  Nothing specific.
16    Q.  Do you recall whether Ms. Zilis
17 supported the 2023 Microsoft investment?
18    A.  I don't recall.
19    Q.  Did you discuss that transaction with
20 Mr. Altman, as far as you recall?
21    A.  I don't recall.
22    Q.  What was it about the 2023 transaction
23 that caused it to be a broken promise as compared
24 to the 2021 or 2019 transaction?
25    A.  Well, I felt like OpenAI had by degrees,

Page 184

1  sort of one step at a time, gradually changed its
2  mission from being a nonprofit open source to
3  being a for-profit closed-source, kind of one step
4  at a time, until, finally, I'm looking at this,
5  and it's like the -- I finally came to the
6  conclusion they are in a fundamental violation of
7  their charter -- of the reason for its existence,
8  being open source and nonprofit, that they had now
9  become closed-for-maximum-profit AI.
10    Q.  And when did you come to that -- when
11 did you come to that conclusion?
12    A.  2023, approximately.
13    Q.  Were the -- were the promises that were
14 made to you in connection with OpenAI any
15 different than the promises that were made to the
16 public in respect of OpenAI?
17       ATTORNEY MOLO:  Object to the form of
18 the question.
19 BY ATTORNEY SAVITT:
20    Q.  You can answer.
21    A.  Well, the -- the promise of it being a
22 nonprofit and open source, I guess, was, you know,
23 consistent publicly and privately in the
24 beginning.  The website described the company as
25 an open-source, nonprofit.  That was certainly my

Page 217

1    Q.   And after they fell apart, you never
2  made another quarterly contribution to OpenAI,
3  Inc., did you?
4         ATTORNEY MOLO:  Object to the form of
5  the question.  It's contrary to your own exhibit.
6         ATTORNEY SAVITT:  Mr. Molo, it's really
7  important that you stop telling the witness how to
8  testify.
9         ATTORNEY MOLO:  I'm not telling the
10  witness anything.  I'm asking you to ask a
11  question.  You asked a question that has no basis,
12  in fact.
13    A.   I'm not sure -- according to this
14  interrogatory, I continued to send money until
15  2020.
16         What is -- what are you referring to?
17  BY ATTORNEY SAVITT:
18    Q.   Then just say no.  I'm just asking you
19  your best --
20    A.   Why are you asking something, when you
21  already know the answer?
22    Q.   I do know the answer, and I don't think
23  you're right about it.  But you could just answer
24  my question.  It's actually your job today.
25         ATTORNEY SAVITT:  And your job,

Page 218

1  Mr. Molo, is to stop coaching the witness.
2         ATTORNEY MOLO:  I am not coaching the
3  witness.  You are asking an improper question.
4    A.   It is an improper question.
5  BY ATTORNEY SAVITT:
6    Q.   Okay.  Can you answer it?  Are you
7  incapable of doing so?
8         ATTORNEY MOLO:  I think he answered your
9  question, and -- even though it's improper, so can
10  we move on, please.
11  BY ATTORNEY SAVITT:
12    Q.   I ask you to look at the second bullet
13  point in the document in front of you.  When did
14  you stop making quarterly contributions to
15  OpenAI?
16    A.   Well, according to this, I continued
17  making contributions through 2020.
18    Q.   Yeah.  How much was the last
19  contribution?
20    A.   $290,000.
21    Q.   But your quarterly contributions were
22  $5 million, weren't they?
23    A.   I'm unsure what you mean.
24    Q.   You recall -- we discussed this -- you
25  testified that you were making $5 million

Page 219

1  quarterly contributions?
2         Do you remember that?
3    A.   Yes.
4    Q.   And you stopped doing that, didn't you,
5  Mr. Musk?
6    A.   We stopped giving as much money, is what
7  you're saying?
8    Q.   You stopped making $5 million quarterly
9  contributions, didn't you?
10    A.   Technically, there were some -- let's
11  see.  The last $5 million contribution was --
12  yeah, May 2017.
13    Q.   May 2017.
14         So --
15    A.   There was actually one in August of
16  2016, which was essentially $4.5 million.
17  Basically, the same amount.
18    Q.   But after that, you stopped doing it,
19  didn't you?
20    A.   Let's see.  No, in 2016 --
21    Q.   That was before 2017, Mr. Musk, wasn't
22  it?
23         So all of your lessons about the
24  question, and Mr. Molo was preaching --
25         ATTORNEY MOLO:  I object to that.  If

Page 220

1  you want to ask the witness a question, ask him a
2  question.  Do not attack me.  Do not attack me.
3  We can go to the judge -- well, the --
4         ATTORNEY SAVITT:  You have, in addition
5  to improperly blocked questions, you've now told
6  the witness improper information, caused him to
7  evade a few questions, and I'm going to object to
8  your --
9         ATTORNEY MOLO:  You are asking questions
10  that are clearly -- they're not based on fact.  In
11  fact, they're misleading.
12         So ask a question.  Ask a proper
13  question, please.
14  BY ATTORNEY SAVITT:
15    Q.   When did you stop giving $5 million
16  quarterly contributions?
17    A.   The amount dropped below $5 million, it
18  looks like in -- sometime in 2017.
19    Q.   Yeah, why don't you take a look at
20  Exhibit 2 in your stack.
21    A.   Contributions continued all the way
22  through 2020.
23    Q.   Yeah, but my question was about the
24  $5 million quarterly contributions, wasn't it,
25  Mr. Musk?

Elon Musk v.
Samuel Altman

FINAL
[CONFIDENTIAL]

September 26, 2025
Elon Musk

Page 229

1  BY ATTORNEY SAVITT:
2      Q.  But are you aware of anything in
3  OpenAI's corporate documents that restrict its
4  ability to sell its AI or AGI technology?
5          ATTORNEY MOLO:  Object to the form of
6  the question.  You used the term "corporate
7  documents."
8      A.  I believe it's inherent to any
9  organization whether it's a 501(c)(3) -- if it's a
10  C Corp., any kind of company, has inherent rights
11  to the value it creates.
12          ATTORNEY MOLO:  We've gone about an hour
13  and a half.
14      A.  There would be no point in incorporating
15  something if it didn't.
16          ATTORNEY SAVITT:  Maybe let me finish
17  this bullet point quickly.  Unless you really want
18  to go now.
19          ATTORNEY MOLO:  No, that's --
20          ATTORNEY SAVITT:  It just makes more
21  sense.
22          ATTORNEY MOLO:  That's all right.  Go
23  ahead.
24          ATTORNEY SAVITT:  Thanks.
25  ///

Page 230

1  BY ATTORNEY SAVITT:
2      Q.  But, Mr. Musk, you wouldn't disagree
3  that nonprofits have the right to transfer their
4  assets for fair value if their directors think
5  it's prudent, would you?
6      A.  It depends on the directors.  If the
7  directors are honest and getting correct value,
8  then -- for and there's not some self-dealing,
9  then they can certainly engage in transactions.
10      Q.  And that would be true with respect to,
11  among other things, their intellectual property;
12  right?
13          ATTORNEY MOLO:  Object to the form of
14  the question, causing the witness to speculate.
15      A.  Look, you can obviously -- you can
16  obviously engage in normal transactions.  You just
17  can't loot the treasury.
18  BY ATTORNEY SAVITT:
19      Q.  Because that would be a breach of duty;
20  right?
21      A.  Yes.
22      Q.  What is your basis for asserting here
23  that OpenAI, Inc. and Altman promised you that
24  the nonprofit would always retain all its AI/AGI
25  technology?

Page 231

1      A.  I believe this is implicit in any
2  organization, whether it's a nonprofit or
3  for-profit, that if you bought intellectual
4  property and value, that organization retains it.
5  That's -- what would be the point of incorporating
6  if you didn't do that?
7      Q.  Though, you allow that, absent what you
8  call looting an organization, a not-for-profit
9  can sell its technology; right?
10          ATTORNEY MOLO:  Objection; calls for
11  speculation on the part of the witness, and it
12  calls for the witness to make legal conclusions
13  when he's not a lawyer.
14  BY ATTORNEY SAVITT:
15      Q.  You can answer.
16      A.  Obviously, a nonprofit can sell goods
17  and services.  It just can't sell the crown
18  jewels.  It just can't be looted.  It can't be
19  stolen.
20          And so what you're trying to do is
21  say -- is trick me into saying like can a
22  nonprofit engage in transactions.  That sounds
23  very reasonable.  But, actually, the -- if the --
24  if transactions are fair and reasonable
25  transactions, that's obviously fine.  But if it

Page 232

1  is, in fact, a massive transfer of value to a
2  for-profit entity, then that would not be
3  appropriate.  That would be stealing the charity.
4          ATTORNEY MOLO:  Can we take a break now?
5          ATTORNEY SAVITT:  Let me finish this.
6  I'm really sorry.
7          ATTORNEY MOLO:  That's all right.
8  BY ATTORNEY SAVITT:
9      Q.  Really, I regret that you think I'm
10  trying to trick you.  I'm not trying to trick
11  you.  I'm trying --
12      A.  I think you are.
13      Q.  I'm not.  I'm trying to -- I just want
14  to make sure I really get your position.  And let
15  me say what I think you said back and you can
16  tell me if I've got it.
17          Because I think what you're saying is a
18  nonprofit can sell its assets if it's a reasonable
19  transaction; but it can't if it's an unreasonable
20  or looting transaction?
21          ATTORNEY MOLO:  Object to the form of
22  the question.  And you're asking the witness to
23  speculate and asking him a legal question.  He's
24  not a lawyer.
25      A.  Well, I'm not a lawyer obviously.  But,

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman            [CONFIDENTIAL]                        Elon Musk

Page 233

1  obviously, it's sort of somewhat tautological that
2  if -- that organizations can engage in reasonable
3  and legal transactions.
4  BY ATTORNEY SAVITT:
5      Q.  Yeah.  That's okay.  And they're
6  unreasonable, they're not okay?
7      A.  Yes.  Yes.
8      Q.  I understand.
9          And when is the first time, Mr. Musk,
10  that you say that Altman or OpenAI, Inc. breached
11  the technology ownership term, in that third
12  bullet point in front of you?
13     A.  Well, my concerns grew over the years;
14  and, finally, in 2023, I concluded that I had to
15  take action.  So I felt I could -- that they'd
16  gone too far by 2023.
17     Q.  So -- and what happened in 2023 that
18  you think caused a violation of the contract
19  terms set out in this third bullet point?
20     A.  The $10 billion deal with Microsoft.
21     Q.  And you think that constituted
22  technology ownership transfer that rose to the
23  level of a breach of contract?
24     A.  That was -- that was -- that was my
25  perception, yes.

Page 234

1      Q.  How have you, Mr. Musk, been injured by
2  the breach of this technology ownership term?
3      A.  Well, I provided, obviously, a lot of
4  money, a lot of time, my reputation, help in
5  recruiting, teaching them everything I know about
6  creating a successful company.  And I could have
7  done all of that as a for-profit but I didn't.  I
8  could have done it to enrich myself, but I didn't.
9  Think that about.  Think about that for a second,
10  let that sink in.
11     Q.  I appreciate that.  Are there any other
12  ways that you have been --
13     A.  That's a big way.
14     Q.  I'm not disputing it, sir.  But beyond
15  that big way that you've identified, is there
16  anything else you can identify that are ways that
17  you've been damaged by the breach of this
18  technology ownership term?
19         ATTORNEY MOLO:  Object to the form of
20  the question.
21     A.  Not that I can think of right now.
22         ATTORNEY SAVITT:  Okay.  Want to go off
23  the record?
24         ATTORNEY MOLO:  Yeah, let's take a
25  break.

Page 235

1          THE VIDEOGRAPHER:  Off the record
2  at 4:01 p.m.
3          (Recess taken from 4:01 p.m. to
4          4:24 p.m.).
5          THE VIDEOGRAPHER:  This is the beginning
6  of Media Number 6.  We're back on the record at
7  4:24 p.m.
8  BY ATTORNEY SAVITT:
9      Q.  Mr. Musk, if I could return to
10  Exhibit 9.  It's this piece of paper with all the
11  bullet points.
12         I think it might be the second one in
13  your pile there.  Yes, that's the one.
14         If I could -- skipping a few for now,
15  but if I could ask you to take a look page 10 of
16  this document.
17         Another one of the terms that you say is
18  part of the contract is that "OpenAI will seek to
19  open-source technology for the public benefit."
20         Do you see that, sir?
21     A.  Yes.
22     Q.  And your interrogatory states that this
23  term was agreed on or about December 8th, 2015;
24  right?
25     A.  Yes.

Page 236

1      Q.  With whom did you reach agreement on
2  this term?
3      A.  With Sam Altman, primarily.  It was
4  agreed upon with everyone who created the company
5  that this was the agreed-upon goal.  This is --
6  this is, I believe, taken from the company
7  charter.  Yeah.
8      Q.  Yeah, I think you're right.
9          And I think you have Exhibit 10 in front
10  of you.  That is the company charter, I think.
11     A.  Yeah.
12     Q.  So this is the charter, Mr. Musk, that
13  you had in mind?
14     A.  Yeah.
15     Q.  Thank you.
16         And you see, don't you, that the
17  language you're talking about is in that paragraph
18  third; correct?
19     A.  Yeah.
20     Q.  And it says here -- is this the
21  sentence that you're -- is the passage that
22  you're focused on, sir:
23         "The resulting technology will
24         benefit the public, and the corporation
25         will seek to open-source technology for

Elon Musk v.                    FINAL                    September 26, 2025
Samuel Altman              [CONFIDENTIAL]                      Elon Musk

Page 265

1  impression I got.
2      Q.  If an AI model hallucinates, is it
3  unsafe?
4      A.  In some cases.
5      Q.  But not always?
6      A.  Yeah.
7      Q.  Are you familiar with an OpenAI product
8  called Whisper?
9      A.  I've heard of it.
10     Q.  Did its release breach any commitment
11  between you and OpenAI or Altman?
12     A.  Its release?
13     Q.  Yeah.
14     A.  I don't know.
15     Q.  Did the release of GPT-4o breach your
16  safety term?
17     A.  Not that I'm aware of.
18     Q.  Did the release of OpenAI's o1 model
19  breach your safety term?
20     A.  Not that I'm aware of.  I don't know.
21  If it convinced that kid to commit suicide, I
22  suppose it would.
23     Q.  Are AI products that interact with
24  minors in an inappropriate or suggestive way
25  unsafe, in your opinion?

Page 266

1      A.  I mean, it depends on the situation or
2  the -- it depends on what harm -- if -- if
3  something causes harm to minors then, yeah, of
4  course, it's dangerous.
5      Q.  Are AI products that advocate genocide
6  unsafe, in your opinion?
7      A.  That seems like a bad thing to advocate.
8      Q.  From a safety perspective.
9      A.  Yeah.  I'm not aware of -- well,
10  there's -- I think there was like at one point
11  Chat GPT, if I recall correctly, favored global
12  thermonuclear war over misgendering Caitlyn
13  Jenner.  That seems like an -- and even Caitlyn
14  Jenner disagreed with that.
15     Q.  ==How have you been damaged by the==
16  ==alleged breach of the first-class safety term of==
17  ==the agreement you say exists?==
18     A.  ==It was a premise of the contribution of==
19  ==time, money, and everything else.  Obviously, I==
20  ==would only do so if they're maximizing safety.==
21     Q.  Any other way that you've been damaged
22  by the breach of what you say is the safety term
23  of the contract --
24         ATTORNEY MOLO:  Object --
25     Q.  -- with OpenAI?

Page 267

1         ATTORNEY MOLO:  Object to the form of
2  the question.  The witness is not a lawyer.  And
3  to the extent that the term "damage" is being used
4  is a legal term, it's not appropriate question.
5  BY ATTORNEY SAVITT:
6      Q.  Mr. Musk, you can answer the question.
7         ATTORNEY SAVITT:  Mr. Molo, you can stop
8  coaching the witness.
9      A.  Obviously, I would only -- I only made
10  this donation of time -- time and resources and --
11  if I thought it would be beneficial to humanity.
12  So if -- if they were not putting safety first,
13  that would -- that would be -- that would be a
14  breach of breaking the deal.
15  BY ATTORNEY SAVITT:
16     Q.  Any other injury you can recall having
17  suffered by virtue of this alleged term breach?
18         ATTORNEY MOLO:  Object to the form of
19  the question and use of the word "injury" to the
20  extent it's a legal term.  The witness is not a
21  lawyer.
22     A.  No, I'm just -- I'm -- I'm only going to
23  donate money and resources if I think it's going
24  to benefit humanity, not if it's going to harm
25  humanity.

Page 268

1  BY ATTORNEY SAVITT:
2      Q.  Understood.  But nothing other than
3  that.  And it's a big thing.  I'm not saying it's
4  not.
5      A.  It was quite a bit.
6      Q.  I don't mean to minimize your answers
7  when I say that, sir.  I just want to make sure
8  there's nothing else.  That's why I'm asking you
9  those questions, and --
10     A.  I don't think this is a
11  super-complicated case.
12     Q.  No, I understand.
13     A.  It's just a -- yeah, it's a pretty
14  straightforward situation.
15     Q.  Now, the next bullet point I have here
16  says -- and this is -- this is from your
17  interrogatory response, sir.  You write that a
18  further term of the contract that you say is --
19  exists was breached is that:
20         "OpenAI's researchers would have
21         significant financial upside but would
22         be uncorrelated to what they build,
23         which should eliminate some of the
24         conflict (will pay them a competitive
25         salary and give them Y combinator equity

Page 281

1    Q.   It was -- that transaction was one in
2  which Microsoft was investing and hoped to
3  achieve private gain, wouldn't you agree?
4        ATTORNEY MOLO:  Object to the form of
5  the question.  You're asking the witness to
6  speculate about what Microsoft hoped.
7  BY ATTORNEY SAVITT:
8    Q.   You can answer the question.
9    A.   I don't know.
10   Q.   If a party invested in OpenAI in 2019,
11 in circumstances that could lead to a return on
12 investment, would that constitute a violation of
13 this so-called contract term?
14       ATTORNEY MOLO:  Object to the form of
15 the question.  You're asking the witness to
16 speculate.
17   A.   I don't know.
18 BY ATTORNEY SAVITT:
19   Q.   And then the next item -- bullet point,
20 the seventh bullet here, it's line 21, you
21 contend it's a term of your contract that "no
22 property, net income, or assets of OpenAI would
23 ever inure to the benefit of any director,
24 officer, or member thereof, or to the benefit of
25 any private person"; right?

Page 282

1    A.   Yes.
2    Q.   That term was also agreed as of
3  December 8th, 2015?
4    A.   Yes.
5    Q.   Is that term written down anywhere?
6    A.   What do you mean?  It's in the
7  certificate of incorporation.
8    Q.   Okay.  But the -- it's the terms of the
9  certificate of incorporation that constitute the
10 basis for this alleged contract term; correct?
11   A.   Yeah.
12   Q.   And if this is a misleading quotation
13 of the certificate of incorporation, then that
14 would undermine your claim that this was a fair
15 contract term; right?
16       ATTORNEY MOLO:  Objection to the form of
17 the question.  It's argumentative.
18 BY ATTORNEY SAVITT:
19   Q.   You can answer.
20   A.   Yeah, I'm not sure I understand your
21 question.
22   Q.   No, no, you don't.
23   So --
24       ATTORNEY MOLO:  Now, you're speculating.
25       ATTORNEY SAVITT:  I don't think I am.  I

Page 283

1  was just repeating the witness's testimony.
2  BY ATTORNEY SAVITT:
3    Q.   Do you know what it means to inure?
4    A.   Do you mean to ensure?
5    Q.   Inure.  You wrote it in here.
6    Do you see that?
7    A.   Inure, yes.  There's one that says
8  ensure as well.
9        Well, my understanding of the word is
10 that it would be given to -- or, yeah, that -- I'm
11 not sure what an appropriate synonym would be, but
12 it would be -- what this is saying is that it
13 would have effectively be given to --
14   Q.   Do you contend that assets of OpenAI
15 have inured to a private party's benefit?
16   A.   Effectively, yes.  With a -- if there's
17 stock that's being given that is based off of
18 OpenAI technology and services, that is for the
19 benefit of directors, officers, et cetera --
20 private persons.  And, for example, is that Greg
21 Brockman has like $20 million.  That sounds like a
22 lot, and in direct violation of this term.
23   Q.   What's your basis for thinking Greg
24 Brockman has $20 million?
25   A.   That's what I've heard.

Page 284

1    Q.   Where did you hear it?
2    A.   Rumor.  Rumor has it, on the internet.
3  Maybe I'm wrong.  You tell me am I wrong.
4    Q.   The question is -- I'm not
5  interested -- I'm interested in knowing where you
6  learned that.
7    A.   That's what rumor -- that's what -- I
8  think that's what they say on X.  7 percent of
9  3 -- 300 billion.  That's what I read.
10   Q.   Did your lawyers tell you that?
11       ATTORNEY MOLO:  Objection to the form of
12 the question.  You're asking for privileged
13 communications.
14 BY ATTORNEY SAVITT:
15   Q.   Did your lawyers tell you that?
16       ATTORNEY MOLO:  Objection; I'm
17 instructing the witness not to answer what his
18 lawyers told him.
19   A.   I read that on X.
20 BY ATTORNEY SAVITT:
21   Q.   It also talks about the inuring of net
22 assets.
23   A.   You can tell me if it's true or not.
24   Q.   Do you see it talks about income
25 inuring to --

Elon Musk v.                  FINAL                    September 26, 2025
Samuel Altman               [CONFIDENTIAL]                      Elon Musk

Page 285

1      A.  Is it true?  I bet it is true.
2      Q.  Are you going to answer my question?
3      I'll talk to you -- after my time is
4  over, I'm happy to chat.  Let me try to get
5  through my questions.
6          Has any net income inured to the Benefit
7  in OpenAI inured to the benefits of a private
8  person?
9      A.  That seems to be the case.
10     Q.  Do you know whether OpenAI has any net
11 income?
12     A.  I can't remember what the financials
13 look like.
14     Q.  In your complaint, you allege that
15 OpenAI violated the terms of your donations and,
16 therefore, breached a charitable trust.
17        Do you recall that, sir?
18     A.  Yes.
19     Q.  I just want to get your whole position
20 here.  Are the contractual terms that we just
21 spent a long time talking about any different
22 than the terms that were attached to your
23 donations?
24        ATTORNEY MOLO:  Object to the form of
25 the question.

Page 286

1      A.  From my perspective, there are really
2  just -- they're two fundamental things that were
3  agreed to.  That would be open source and a
4  nonprofit.
5          That's why I donated the money.  That's
6  why I donated the time, reputation, everything
7  else.  And -- and instead of it being an
8  open-source nonprofit, it is now become and --
9  it's now become substantially a closed-source
10 profit-maximizing entity directly contrary to what
11 was agreed to.
12        Now, that -- that may just boil down to
13 the series of legal points.  I leave that up to my
14 lawyers to say what -- what specific -- how this
15 should be characterized from -- in a legal
16 document.
17        But if you say, like, just common sense,
18 what was the fundamental problem -- what are the
19 fundamental promises that have been broken, and
20 that is that it was meant to be an open-source,
21 nonprofit, and it is become, by degrees, a
22 closed-source for-profit, and they are attempting
23 to, essentially, make it fully a profit-maximizing
24 corporation.
25 ///

Page 287

1  BY ATTORNEY SAVITT:
2      Q.  Did these -- did the things you have
3  just described happen after you stopped being
4  involved in OpenAI?
5      A.  The process -- seems like the process
6  began several years ago.  Just like the water
7  heating up reaching a boiling point, it doesn't
8  get to boiling point immediately.  The water heats
9  up and, eventually, it gets to a boiling point.
10     Q.  And that all happened after you left
11 OpenAI; right?
12     A.  The boiling point was the $10 billion
13 deal with Microsoft.  For me, that was my
14 perception.
15     Q.  Were you obligated -- did you ever have
16 an obligation to contribute money to OpenAI?
17     A.  An obligation?
18     Q.  Yeah.
19     A.  I agreed to donate money, and I did.
20     Q.  You promised to contribute $20 million
21 in quarterly grants, didn't you?
22     A.  So long as the -- yeah, I did.
23     Q.  And you promised to donate up to a
24 billion dollars to OpenAI to the extent that
25 amount could not be raised from other sources.

Page 288

1      Do you recall that?
2      A.  I did.
3      Q.  But you stopped making the $20 million
4  payments, didn't you?  The $5 million quarterly
5  payments, didn't you?
6      A.  When my discomfort became too high, I
7  was like this is getting -- the company is moving
8  too much in the direction of being a closed-source
9  profit-seeking company.  At that point, I didn't
10 feel comfortable continuing to send money.
11     Q.  But that was long before 2023?
12        ATTORNEY MOLO:  Objection.  That's not
13 the testimony of the witness.
14     A.  Like I said, I became uncomfortable by
15 degrees.
16        I became uncomfortable enough to stop
17 sending money, I guess, in 2020.  And then
18 uncomfortable enough to file -- to take legal
19 action in '23.
20 BY ATTORNEY SAVITT:
21     Q.  And you never followed through on your
22 commitment to fund up to a billion dollars, did
23 you?
24     A.  Because the -- because, my opinion, they
25 broke the deal.

Elon Musk v.                           FINAL                    September 26, 2025
Samuel Altman                    [CONFIDENTIAL]                          Elon Musk

Page 341

1  word.  And that's why people trust me and that's
2  why I can raise money easily.
3        Q.  No, I appreciate that, and what I'm
4  just trying to understand is whether you found
5  yourself ever before in a dispute involving, for
6  example, an oral contract before this situation.
7        A.  I've not been in a legal dispute, yeah.
8        Q.  Have you ever found yourself in a
9  dispute before this situation regarding a
10 contract that was said to be implied?
11       ATTORNEY MOLO:  Object to the form of
12 the question.  You're asking him a legal opinion.
13 The man is not a lawyer.
14       A.  Yeah, I'm not I lawyer.  So I can't
15 just -- I can't give legal opinions or things that
16 could be construed as legal opinions.
17 BY ATTORNEY SAVITT:
18       Q.  I see.  And I'm not asking you for
19 that, sir.  I just want to know whether -- have
20 you ever previously consulted a lawyer respecting
21 a contract that was said to be implied?
22       ATTORNEY MOLO:  Directing you not to
23 disclose any confidential communication between
24 your lawyer.  Otherwise, you can answer the
25 question.

Page 342

1  BY ATTORNEY SAVITT:
2        Q.  You can answer yes or no.
3        A.  Decline to answer on advice of counsel.
4        Q.  I don't think he's telling you not to
5  answer.
6        A.  Okay.
7        Q.  I think you can answer it yes or no.
8        A.  I've not had a legal battle.  But beyond
9  that, I'm not sure what you mean.
10       Q.  I guess I'm asking whether you have
11 ever had this situation a dispute that you
12 discussed with a lawyer involving what was said
13 to be an implied contract.  You can answer is it
14 yes or no.
15       A.  I don't think so.
16       ATTORNEY SAVITT:  Okay.  I'm going to
17 pass the witness to my co-counsel.
18       ATTORNEY COHEN:  Can we go off the
19 record while we change?
20       THE VIDEOGRAPHER:  We're off the record
21 at 6:57.
22       (Recess taken from 6:57 p.m. to
23       7:03 p.m.)
24       (Pause.)
25       THE VIDEOGRAPHER:  Here, begins Media

Page 343

1  Number 10.  We're back on the record at 7:03 p.m.
2
3        EXAMINATION
4  BY ATTORNEY COHEN:
5        Q.  Good evening, Mr. Musk.
6        A.  Good evening.
7        Q.  My name is Russell Cohen.  I represent
8  Microsoft in this case.  And I have some
9  questions for you about their role.
10       A.  Okay.
11       Q.  What is it that you believe that
12 Microsoft did wrong?  Why is it in this lawsuit?
13       A.  Well, I've absolutely no desire to be in
14 litigation with Microsoft.  That's not my
15 preference.  But just seems as though Microsoft is
16 collaborating with OpenAI to turn a charity into a
17 profit-maximizing entity, and it's going to have a
18 substantial financial benefit as a result.
19       Q.  So what exactly is it that you say that
20 Microsoft is doing?
21       A.  My understanding -- correct me if I'm
22 wrong -- is that Microsoft has some massive
23 natural upside in turning OpenAI from a charity
24 into a for-profit organization.  Is that wrong or
25 am I mistaken?

Page 344

1        Q.  Well, let's --
2        A.  That's what I read.
3        Q.  Let's talk about private gain for a
4  moment.
5        Do you believe that it's wrong for
6  Microsoft to earn Azure fees for providing
7  services?
8        A.  No.
9        Q.  Okay.  Do you believe that it's --
10       A.  Yeah, yeah.
11       Q.  Do you have anything more to say?
12       A.  I think I made the original call to ask
13 if Satya, if he would donate some Azure credits to
14 OpenAI.
15       Q.  Right.  And your preference was to deal
16 with Microsoft rather than Amazon at the time;
17 right?
18       A.  Well, I didn't call Jeff, because, you
19 know, he's a bit of a -- I'm not sure he's likes
20 me to be favorable because he's got a rocket
21 company that competes with mine.
22       Q.  And I think the word you used at the
23 time was Jeff was a tool.
24       A.  Yeah.  He can be, you know.
25       Q.  Now --

Page 357

1    A.   Right now, you know, it's just a little
2  nibble, but I think that the teeth will get bigger
3  over time.
4    Q.   I want to show you another one of your
5  posts on X.  Maybe it was a tweet on Twitter at
6  the time.
7        ATTORNEY COHEN:  It is Tab 16, which I
8  think is Exhibit 24.
9        (Whereupon, Musk Exhibit Number 24
10            was marked for identification and is
11            attached hereto.)
12 BY ATTORNEY COHEN:
13   Q.   I think Mr. Savitt asked you about
14 this.
15       Do you see that?
16       And why are you laughing, Mr. Musk?
17   A.   Just somebody replies "Exclusive
18 license," in quotes.  "Might as well have renamed
19 it closed AI."
20       That wasn't me.  It was somebody else.
21   Q.   Right.  So the initial post was an
22 article that reported that Microsoft gets
23 exclusive license for OpenAI's GPT-3 language
24 model; is that correct?
25   A.   Yeah.

Page 358

1    Q.   And that was September 24th, 2020?
2    A.   Yeah.
3    Q.   Somebody tagged you.  And what they
4  wrote was:  "I thought OpenAI was supposed to
5  democratize this tech, not give Microsoft an
6  exclusive license; correct?
7    A.   Yeah.
8    Q.   And when you saw that, did you believe
9  that it was inconsistent with the commitment to
10 open source?
11   A.   I mean, it did sort of ring some alarm
12 bells.
13   Q.   Right.  And in response, you posted:
14 "This does seem like the opposite of open.
15 OpenAI is essentially captured by Microsoft."
16       Right?
17   A.   That's what I posted.
18   Q.   So on September 24th, 2020, you
19 thought Microsoft had captured OpenAI; right?
20   A.   That's what it seemed like.
21       But, yeah, I do predict the tables will
22 turn and ultimately --
23       ATTORNEY MOLO:  Wait until he asks you a
24 question.
25   A.   Yeah.  Sorry.  Fair enough.

Page 359

1        ATTORNEY COHEN:  Can we take a short
2  break.
3        THE VIDEOGRAPHER:  Okay.  We're off the
4  record at 7:22 p.m.
5        (Recess taken from 7:22 p.m. to
6            7:26 p.m.)
7        THE VIDEOGRAPHER:  This is the beginning
8  of Media Number 11.  We're back on the record at
9  7:26 p.m.
10       ATTORNEY COHEN:  Thank you, Mr. Musk.
11 I pass the witness.
12       ATTORNEY MOLO:  I have just a couple of
13 questions.  I'm going to sit over there to ask him
14 so that we don't see your handsome profile; we see
15 your face straight on if I sit across from you.
16       THE WITNESS:  Sounds good.
17       (Incidental comments made off the
18            stenographic record.)
19
20            EXAMINATION
21 BY ATTORNEY MOLO:
22   Q.   You can't handle the truth.
23       (Incidental comments made off the
24            stenographic record.)
25 ///

Page 360

1  BY ATTORNEY MOLO:
2    Q.   Good.  We're still on the record.
3  Okay.
4        You didn't sue the defendants here in
5  2019; correct?
6    A.   Yeah.
7    Q.   And in 2019, did the mere fact that
8  OpenAI planned to have outside investors mean to
9  you that OpenAI had for certain broken its
10 promises to you?
11   A.   No.
12   Q.   Okay.  Did you read the information
13 that Mr. Altman had emailed about a transaction
14 in 2019 closely?
15   A.   No.
16   Q.   Did you know how much each investor
17 planned to invest in the 2019 transaction?
18   A.   No.
19       ATTORNEY SAVITT:  Objection.
20 You can answer.
21 The tables are turned.  I get to object
22 now.
23       THE WITNESS:  Okay.  Does that mean I do
24 anything or not doing anything?
25       ATTORNEY SAVITT:  You should answer your

Elon Musk v.                    FINAL                September 26, 2025
Samuel Altman              [CONFIDENTIAL]                   Elon Musk

Page 361

1    lawyer's question.
2         THE WITNESS:  Okay.  Okay.
3    BY ATTORNEY MOLO:
4         Q.   Did you know how much each investor
5    planned to invest in this 2019 deal?
6         ATTORNEY SAVITT:  Objection;
7    speculation.
8         A.   No.
9    BY ATTORNEY MOLO:
10        Q.   Did you know how much each investor
11   stood to gain in the 2019 deal?
12        ATTORNEY SAVITT:  Objection.
13        A.   No.
14   BY ATTORNEY MOLO:
15        Q.   Did you understand all the details of
16   the 2019 OpenAI investment offering at that time?
17        A.   No.
18        Q.   What made you decide to sue in 2024 and
19   not in 2019?
20        A.   Well, the -- I finally came to the
21   conclusion after the 2023 deal was announced that
22   OpenAI was really going to become a closed-source,
23   for-profit -- a profit-maximizing, closed-source
24   organization.  And something needed to be done
25   about that.

Page 362

1    So I consulted lawyers in 2023 and filed
2    suit in '24.
3         ATTORNEY MOLO:  Thank you very much.
4         THE WITNESS:  You're welcome.
5         ATTORNEY MOLO:  That's it.
6         ATTORNEY SAVITT:  Let's go off the
7    record for just a second.
8         THE VIDEOGRAPHER:  Okay.  We're off the
9    record at 7:30 p.m.
10        (Recess taken from 7:30 p.m. to
11        7:32 p.m.)
12        THE VIDEOGRAPHER:  This is the beginning
13   of Media Number 12.  We're back on the record at
14   7:32 p.m.
15        ATTORNEY SAVITT:  Thank you.
16        The OpenAI defendants have no more
17   questions.  Mr. Musk, we thank you for your time
18   and patience.
19        We -- it is our position that the
20   deposition remains open pending the resolution of
21   some of our ongoing discovery matters.
22        We pass the witness to Microsoft.
23        ATTORNEY COHEN:  Microsoft has no
24   further questions, but we join in OpenAI's
25   position that the deposition remains open.

Page 363

1         ATTORNEY KRY:  We designate the
2    transcript confidential under the protective
3    order.
4         ATTORNEY MOLO:  And we disagree about
5    the deposition being open and hope everyone has a
6    good weekend.
7         THE VIDEOGRAPHER:  This concludes the
8    deposition on September 26th, 2025.  We're off
9    the record at 7:33 p.m.  Master media will be held
10   by Jane Rose Reporting.
11        (Witness excused.)
12        (Deposition adjourned 7:33 p.m. )
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

1         CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram, Registered Diplomate
4    Reporter, Certified Realtime Reporter,
5    CA-Certified Shorthand Reporter Number 8635, and
6    Notary Public, the officer before whom the
7    foregoing proceedings were taken, do hereby
8    certify that the foregoing transcript is a true
9    and correct record of the proceedings; that said
10   proceedings were taken by me stenographically and
11   thereafter reduced to typewriting under my
12   supervision; and that I am neither counsel for,
13   related to, nor employed by any of the parties to
14   this case and have no interest, financial or
15   otherwise, in its outcome.
16
17
18
19   _____
     Gail Inghram, RDR, CRR, CSR
20   CA-CSR No. 8635
21
22
23
24
25