# EXHIBIT 53
# PUBLIC REDACTED VERSION

1  MARC TOBEROFF (CA SBN 188547)
   MToberoff@toberoffandassociates.com
2  TOBEROFF & ASSOCIATES, P.C.
   23823 Malibu Road, Suite 50-363
3  Malibu, CA  90265
   Telephone: (310) 246-3333
4
5  STEVEN F. MOLO (*pro hac vice*)
   ROBERT K. KRY (*pro hac vice*)
6  JENNIFER M. SCHUBERT (*pro hac vice*)
   MOLOLAMKEN LLP
7  430 Park Avenue
   New York, NY  10022
8  Telephone: (212) 607-8160

9  *Attorneys for Plaintiffs Elon Musk*
   *and X.AI Corp.*

10

11              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
12

13  ELON MUSK, et al.,                    Case No. 4:24-cv-04722-YGR (TSH)

14                Plaintiffs,

15        v.                              **DECLARATION OF**
                                          **DAVID M. SCHIZER**
16  SAMUEL ALTMAN, et al.,

17                Defendants.

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION</u>

I, David M. Schizer, declare as follows:

1.      I am the Dean Emeritus of Columbia Law School.  I am over the age of 18, have personal knowledge of the facts stated herein, and if called as a witness could and would testify competently thereto.

2.      I have been retained by Plaintiff Elon Musk to provide expert testimony in this matter on customs and practices of nonprofits, and the OpenAI Defendants' conduct in relation thereto.

3.      Attached is a true and correct copy of my expert report dated October 29, 2025. That report contains a true and correct statement of my opinions in this matter to which I may testify if called as an expert witness at trial.

4.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on November 7, 2025

New York, New York.

_____

David M. Schizer

**Highly Confidential**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

_____

**ELON MUSK, et al., Plaintiffs, v. SAMUEL ALTMAN, et al., Defendants.**

**Case No. 4:24-cv-04722-YGR**

**Highly Confidential: Subject to Stipulated Protective Order Filed 5/28/25**

**<u>Expert Report of Professor David M. Schizer</u>**

**Highly Confidential**

# TABLE OF CONTENTS

Page

Background .................................................................................................. 1

I.     Summary of Opinions ........................................................................... 1

II.    My Background and Experience .......................................................... 3

III.   Materials Relied Upon ......................................................................... 7

Opinions ...................................................................................................... 7

I.     Use of For-Profit Affiliates ................................................................. 7

       A.     Solving Tax Problems ............................................................... 7

              1.     Political Activity.............................................................. 8

              2.     Commerciality ................................................................ 8

              3.     Using Tax Benefits Most Efficiently ............................... 9

       B.     Limiting Liability ....................................................................... 9

       C.     Avoiding Disclosure Requirements ........................................... 9

       D.     Managing Regulated Activity..................................................... 9

       E.     Accessing Capital .................................................................... 10

       F.     Compensating Employees ....................................................... 10

II.    Customary Practice of Protecting a Nonprofit's Mission ..................... 10

       A.     Prioritizing Mission Over Profit in For-Profit Affiliates ..............11

              1.     Centrality of the Mission................................................11

              2.     For-Profit Affiliates Should Advance the Mission, Not Divert
                     the Nonprofit From It .................................................... 12

       B.     OpenAI's Mission: Wide Distribution of AI's Benefits, Safety, and
              Cooperation ............................................................................ 14

              1.     Initial Certificate of Incorporation.................................. 15

                                                                                                    i

**Highly Confidential**

2.    2016 Form 990 ........................................................................ 16

3.    California Registration Form ................................................ 16

4.    Charter on OpenAI's Website ............................................... 17

5.    Rollout of For-Profit Affiliates ........................................... 18

C.    Backtracking from Wide Distribution, Safety, and Cooperation:
Changing Descriptions of OpenAI's Mission ............................................ 19

1.    Change in 2018 Form 990 ........................................... 19

2.    Change in Delaware Certificate of Incorporation ........................... 19

3.    Deposition of Robert Wu ................................................ 20

D.    Backtracking from Wide Distribution, Safety, and Cooperation:
Changing Policies ................................................................................ 21

1.    Including Microsoft in Safety Reviews ............................ 21

2.    Departure of Safety Experts and Reduced Share of
Budget for Safety ........................................................... 25

3.    Errors About Need for Safety Review ............................ 27

4.    Changed Position on Regulation ................................... 29

III.    Customary Practice of Protecting the Nonprofit's Assets ................................... 30

A.    Customary Practice Requires a Nonprofit to Use Arms-Length
Terms When Transacting with For-Profit Affiliates .................................... 31

1.    No Diversion of Value From Nonprofit to For-Profit Affiliates ......... 32

2.    Respect for Separate Legal Identities of Nonprofit and For-
Profit Affiliates ............................................................... 32

3.    Fair-Market Value Terms ............................................... 32

4.    Protecting the Nonprofit's Economic Interest in Employee
Compensation Plans ...................................................... 33

B.    OpenAI's "Capped Return" Structure Did Not Protect the Nonprofit's
Economic Interests: Caps Were Extremely High ....................................... 33

**Highly Confidential**

1.    A Four-Step Waterfall ................................................................ 34

2.    A Moving Target: Inflation and 20% Annual Increase ................... 36

3.    A Residual That Arguably Does Not Reflect the Nonprofit's
      Economic Contribution ................................................................ 37

C.    OpenAI's "Capped Return" Structure Did Not Protect the Nonprofit's
      Economic Interests: Caps Were Set Without Rigorous Financial
      Analysis ............................................................................................ 37

      1.    Absence of Comparable Transactions and Financial
            Modeling ................................................................................ 38

      2.    OpenAI's Failure to Follow Customary Practice ........................ 42

D.    In OpenAI's "Capped Return" Structure, For-Profit Investment
      Dwarfed Philanthropic Support .......................................................... 44

E.    Sharing of Intellectual Property and Decision-making Authority With
      a For-Profit Partner Raises Serious Questions About Whether the
      Nonprofit's Economic Interests Have Been Adequately Protected .......... 45

F.    OpenAI's Mission and Economic Interests Have Not Been
      Protected by Contractual Provisions That Are Supposed to Prioritize
      the Mission ........................................................................................ 47

IV.   Customary Practice Is To Rely on the Board To Protect the Nonprofit's
      Mission and Economic Interests by Discharging Their Fiduciary Duties ........... 50

A.    Customary Practice Requires Nonprofit Boards To Discharge Their
      Fiduciary Duties .................................................................................. 52

      1.    Duty of Care ........................................................................... 52

      2.    Duty of Obedience ................................................................... 53

      3.    Duty of Loyalty ....................................................................... 54

B.    The Board Clashed With the CEO in Seeking More Information ............ 55

      1.    Information About Safety .......................................................... 55

      2.    Information About Potential Conflicts of Interest ........................ 57

      3.    Information About OpenAI's Operations and Board ..................... 58

**Highly Confidential**

4.  A Culture of Deceit.................................................................. 61

5.  Lack of Reliable Information Kept the Board From Doing Its Job ....... 62

C.  The Board Clashed With the CEO In Seeking Greater
Independence ........................................................................ 63

1.  Disagreements About Independent Legal Advisors ............................ 63

2.  Disagreements About New Independent Directors............................. 64

3.  Campaign Contribution to a Director ................................................ 65

D.  The Board Tried and Failed to Dismiss Mr. Altman ................................. 65

E.  There are Serious Concerns About Whether the Reconstituted
Board Is Able to Protect the Nonprofit's Mission and Economic
Interests ............................................................................... 69

V.  Efforts to Restructure OpenAI Offer Further Evidence That the Nonprofit's
Mission and Economic Interests Have Not Been Protected .............................. 72

A.  Early Efforts to End the Nonprofit's Control Over the For-Profit
Affiliate and Residual Interest ................................................... 73

1.  Aborted Effort to Replace Control With Control Rights ...................... 73

2.  Insufficient Compensation for Loss of Control ................................. 74

B.  September 2025 Restructuring ................................................... 75

1.  Weakening the Nonprofit's Already Questionable Control ................. 76

2.  Replacing Residual With Percentage of Equity ................................. 79

VI.  Conclusion........................................................................... 80

**Highly Confidential**

## Background

1.      I have spent over twenty-seven years working in nonprofits and have worked in leadership positions in thirteen of those years. I served as the CEO of a leading New York-based humanitarian nonprofit with a global footprint for three years and served as the Dean of Columbia Law School for a decade.  I also study, write, and teach about nonprofits and have advised numerous nonprofits on governance and management best practices, compliance, and other issues.

2.      I have been asked to provide expert testimony concerning usual and customary practices for nonprofit organizations, with a particular focus on nonprofits' use of for-profit affiliates.  I have also been asked to opine on whether OpenAI has complied with those usual and customary practices.

## I.    Summary of Opinions

3.      My opinions in this report include the following ten conclusions:

- **Opinion # 1:** It is customary practice for nonprofits to use for-profit affiliates for a range of purposes, including to raise capital and to offer equity compensation to employees.

- **Opinion # 2:** In forming and operating for-profit affiliates, customary practice is that nonprofits need to protect their mission. OpenAI failed to follow this practice when it included a for-profit partner in safety reviews, failed to retain key safety experts, made errors in determining whether safety review was required, and significantly changed its position on the need for government regulation of AI.

- **Opinion # 3:** It is customary practice for nonprofits to use arm's length terms to protect their assets and economic interests. Failing to follow this practice, OpenAI accepted exceedingly high thresholds before its residual interest would yield a return, without engaging in a sophisticated economic analysis of these thresholds before agreeing to them.

- **Opinion # 4:** It is customary practice for nonprofits to protect their assets, but there are serious questions about whether OpenAI conformed to this practice when it agreed to share significant (and expanding) intellectual property, decision-making authority, and access to its facilities with a for-profit partner.

1

**Highly Confidential**

- **Opinion # 5:** It is customary practice for nonprofits to include contractual provisions to protect their mission and economic interests when forming and operating for-profit affiliates, but OpenAI's contractual protections have not been effective.

- **Opinion # 6:** It is customary practice to rely on a nonprofit's directors to protect the nonprofit's mission and economic interests by discharging their fiduciary duties, but OpenAI failed to follow this practice because the CEO and senior management did not provide independent members of the nonprofit's board with adequate information to oversee the for-profit affiliates.

- **Opinion # 7:** It is customary practice for a nonprofit to have independent directors with the expertise and authority to protect the nonprofit's mission and economic interests, but OpenAI diverged from this practice by not giving these directors independent legal advice or adequate opportunity to increase their numbers.

- **Opinion # 8:** It is customary practice for the board to dismiss the CEO when it has concerns that the CEO is withholding information, providing misleading information, or not protecting the nonprofit's mission and economic interests, but OpenAI failed to conform to this practice. When the board attempted to dismiss the CEO, this effort failed because of resistance from employees (influenced in part by the prospect of lucrative equity compensation) and OpenAI's principal for-profit investor, leading instead to the dismissal of three of the four board members who attempted to dismiss the CEO.

- **Opinion # 9:** It is customary practice for nonprofits to pick their own board members, without answering to for-profit partners in this process, but OpenAI gave Microsoft the opportunity to vet and veto candidates, as well as a non-voting observer on the board.

- **Opinion # 10:** It is customary practice during a restructuring for a nonprofit to protect its mission and economic interests, but OpenAI did not conform to this practice when it considered taking control away from the nonprofit without an adequate control premium, when it significantly weakened the board's influence by requiring a ⅔ vote to dismiss the CEO, when it exposed directors to the risk of shareholder suits from for-profit investors who might not support the mission, and when it further weakened the nonprofit's already questionable control over its for-profit affiliates in other ways as well.

2

**Highly Confidential**

## II.    My Background and Experience

4.    I served as Dean of Columbia Law School, a nonprofit educational institution, from 2004 to 2014, after having joined the Columbia faculty in 1998. Appointed at the age of thirty-five, I was the youngest dean in the school's history. At the time, I was the youngest of my contemporaries at a major law school (and, to the best of my knowledge, the youngest at any law school). I am the longest-serving dean at Columbia Law School since 1971, when the school enacted a ten-year term limit.

5.    As Dean, I managed a $150 million annual budget and over 400 employees. I worked with the faculty to hire 43 new faculty members and reduced the student-faculty ratio to the lowest level in the school's history. To recruit these new faculty members, I launched a new faculty housing program and also raised an unprecedented amount of money, more than doubling the school's fundraising by completing a $300 million capital campaign with a total of $353 million. I also forged a new partnership with Columbia Business School, including a JD-MBA program that can be completed in three years.

6.    I took a three-year leave from Columbia to serve as CEO of the American Jewish Joint Distribution Committee ("JDC") from January 1, 2017 to December 31, 2019. Founded in 1914, JDC is an international nonprofit humanitarian organization that provides sustenance and care to vulnerable populations and strengthens community in over seventy countries across the globe. As CEO, I worked with professionals and the board to redesign the planning process, allocating the $360 million annual budget more strategically. To increase the percentage of the budget dedicated to client care, we significantly lightened the infrastructure and developed more cost-effective methods of providing care. Under my leadership, we relied more on data and other insights from the business world, including the value of disclosing our strategy and results annually in a publicly-available report. We also increased and diversified philanthropic support for the organization and raised its public profile.

7.    I drew on these experiences, as well as on interviews with twenty-five other nonprofit leaders, to write a book on nonprofit management, *How to Save the World in Six (Not So Easy) Steps: Bringing Out the Best in Nonprofits* (Post Hill 2023). The book uses insights from the business world to help nonprofits advance their missions more effectively. The description on Amazon is:

> A must-read for anyone who loves nonprofits but worries about inefficiency, infighting, and inertia, *How to Save the World in Six (Not So Easy) Steps* is the definitive guide to advancing the mission effectively and mobilizing support.

**Highly Confidential**

The US has over 1.5 million nonprofits, which touch our lives in countless ways. The finest are inspiring, but unfortunately, too many let us down. Luckily, there's a solution. *How to Save the World in Six (Not So Easy) Steps* by expert scholar and nonprofit leader David M. Schizer is the ultimate management book for nonprofit professionals, board members, and donors.

Since the goal of nonprofits is to advance their mission—not to make money—performance can be difficult to assess. Schizer explains how this fundamental challenge makes it harder to expose unwise and self-interested choices, resolve conflicts, and evolve with the times.

In response, nonprofits need to do two challenging things really well: figure out the best way to advance the mission, and then build support for it. With entertaining anecdotes from his many years leading Columbia Law School and international humanitarian organization JDC, as well as interviews with an all-star cast of nonprofit leaders, Schizer explains how to accomplish these twin goals with the "six Ps":

- **Plan:** Run a rigorous planning process
- **Persevere:** Line up internal support
- **Prioritize:** Set priorities by asking three key questions
- **Pivot:** Test innovations
- **Publicize:** Share ideas and hold yourself accountable
- **Partner:** Raise more money by involving donors in the work

By chronicling the good, the bad, and the ugly at nonprofits and explaining how to get more out of them, this book shows how we can "save the world" together with the "six Ps."

8.    I've also studied nonprofits through my academic research, including their investment policies, the value of disclosure and other methods of promoting efficiency, and the strengths and weaknesses of U.S. tax subsidies for nonprofits. Those topics have been the focus of numerous academic publications that I authored or co-authored.

9.    Every year, I teach a class on nonprofit law, taxation, and management at Columbia. In addition to covering legal issues, the class introduces students to a range of customary practices and management strategies.

10.   I have covered these themes in lectures on nonprofits at many universities across the globe, including Yale University, Harvard University, University of Pennsylvania, New York University, Columbia Business School, Boston University, University of San Diego, Georgetown University, Cardozo Law School, University of

**Highly Confidential**

Virginia, Duke University, George Mason University, University of Oxford, University of British Columbia, Venice International University, Hebrew University, and University of Padua.

11.   I have also given lectures and training sessions on nonprofits at numerous nonprofit and for-profit institutions, including law firms (Sullivan & Cromwell, Wachtell Lipton, Paul Weiss, Clifford Chance, Latham & Watkins), financial institutions (JP Morgan), consulting firms (McKinsey), legal nonprofits (New York State Bar Association, New York City Bar Association, Wall Street Tax Association, Federalist Society, Brandeis Law Society), educational institutions (e.g., Tax Economists Forum, Kushner Academy, Koheleth, Columbia Barnard Hillel), advocacy organizations (American Jewish Committee, Academic Exchange, Orthodox Union), humanitarian organizations (Hadassah, UJA, Jewish Federation of Metrowest), media organizations (Sapir), foundations (Paul E. Singer Foundation, Tikvah Fund), and houses of worship (Park Avenue Synagogue, Kehilath Jeshurun, Shearith Israel, Congregation Ramath Orah).

12.   I have been asked to advise nonprofits when they navigate crises or undergo significant changes. For example, I have served for the last two years as co-chair of Columbia University's Task Force on Antisemitism, where I have given advice to the Board of Trustees and senior professional leadership to diagnose challenges and propose solutions, including in two published reports (with one more to come), as well as a survey commissioned from an outside firm.  In that role, I represented Columbia in testifying before Congress on issues related to Columbia's efforts to combat campus antisemitism.

13.   After 92NY (formerly called "the 92nd Street Y") dismissed its CEO because of a corruption scandal, I was recruited to the board and served as co-chair of 92NY's newly-formed governance committee for five years. Our committee rewrote 92NY's governing documents, enhanced its internal controls, and took other steps to protect and enhance 92NY's mission and assets.

14.   In an article, I proposed that news organizations facing economic challenges should become nonprofits so they can receive tax-deductible contributions. Gerry Lenfest, a Columbia Law School graduate who had purchased the *Philadelphia Inquirer* to ensure that Philadelphia would continue to have a local newspaper, read my article and retained me to help him implement this idea. We formed a nonprofit holding company, Institute for Journalism in New Media, which held the *Inquirer* and other publications in for-profit affiliates so it could continue to endorse political candidates. The nonprofit could receive tax-deductible donations and make grants to fund special initiatives at the for-profit affiliates, as well as at other media outlets. The nonprofit and

5

**Highly Confidential**

the for-profit affiliates had separate boards. Gerry Lenfest and I were the only ones to serve on both boards.

15.   I also have advised a nonprofit about how to broaden the geographic scope of its work. The Tikvah Fund promotes education about Jewish, Western, and American thought by funding and running various educational institutions and programs. I spent a year as a fellow and senior advisor at this New-York-based institution, spearheading an effort to upgrade its operations in Israel.

16.   I acquired additional experience about governance by serving on the board and as chair of the audit committee of a public company (Seacor Holdings), on the board of a SPAC (Sapphire), on the board of three privately-owned companies (Q-Comm, Feil Properties, *Philadelphia Inquirer*), and on the advisory board of another (Legal Zoom).

17.   I have enhanced my expertise on nonprofit governance by serving on several nonprofit boards. I am currently the Secretary of the NY State Bar Association Tax Section, which has a "ladder system" in which the Secretary then serves two years as Vice Chair before becoming Chair; I will assume this responsibility in 2028. I serve on the board and have chaired the audit committee of Ramaz, a Jewish school with students from early childhood through high school. I am a member of the Board of Visitors of the Federalist Society, and served for many years on the board of the *Columbia Law Review*. I served as chair of the board of Voices of America in Israel, as well as on the board of other nonprofits.

18.   I am being compensated at the rate of $1,500/hour for my work in this case.

19.   I have not been deposed or testified in court as an expert witness in the past four years. My CV, attached as Appendix A, includes additional information about my qualifications and background as well as, to the best of my knowledge, a list of all publications I have authored in the past ten years.

Highly Confidential

### III.    Materials Relied Upon

20.    A list of the materials I relied upon and the case documents I considered in forming my opinions is attached as Appendix B.

### Opinions

### I.    Use of For-Profit Affiliates

● **Opinion # 1:** It is customary practice for nonprofits to use for-profit affiliates for a range of purposes, including to raise capital and to offer equity compensation to employees.

21.    A nonprofit's goal should always be to advance its mission, not to generate a profit. Sometimes an effective way to advance the mission is to form and partner with a for-profit affiliate.[1] For example, the College Board uses for-profit subsidiaries to offer the service of filling out financial aid forms, the PGA Tour uses a for-profit subsidiary to operate golf courses,[2] universities often hold real estate in for-profit subsidiaries, and hospitals often house some of their operations in for-profit affiliates.[3]

22.    It is customary practice for nonprofits to use for-profit affiliates for a range of purposes, including the following:

#### A.  Solving Tax Problems

23.    A for-profit affiliate can engage in activities that are not permissible or feasible for a nonprofit.

---

[1] Internal Revenue Serv., Publication 1986 EO CPE, E. For-Profit Subsidiaries of Tax-Exempt Organizations 1 (1986), https://www.irs.gov/pub/irs-tege/eotopice86.pdf ("Taxable for-profit subsidiaries of organizations exempt under IRC 501(c) are not a new phenomenon. The formation of such organizations, however, has increased markedly in recent years."); Peter Molk, Reforming Nonprofit Exemption Requirements, 17 Fordham J. Corp. & Fin. L. 475 (2012) ("Nonprofits have been increasingly utilizing for-profit subsidiaries."); Cheng-chi Chang & Yilin Lu, Balancing Mission and Market: OpenAI's Struggle with Profit vs. Purpose, Corp. & Bus. L. J., at 6 (2025) ("hospitals, universities, and research institutions, often establish for-profit subsidiaries to perform services or engage in commercial activities that are related to their exempt purposes"); Steven Rathgeb Smith, Hybridization and Nonprofit Organizations: The Governance Challenge, 29 Pol'y & Society 219 (2010), https://doi.org/10.1016/j.polsoc.2010.06.003 at 219: ("the universe of nonprofit organizations comprises an increasingly diverse set of organizations with hybrid structures including for-profit and nonprofit subsidiary operations").

[2] Molk, supra, at 505-06.

[3] Smith, supra, at 223; Molk, supra, at 506.

**Highly Confidential**

### 1. *Political Activity*

24.  For example, nonprofits are limited in their ability to lobby for legislation, and they generally are not allowed to endorse or campaign for political candidates in elections.[4] When I was advising the *Philadelphia Inquirer* about how to become a nonprofit as a way to tap tax deductible donations,[5] we created a nonprofit parent company and dropped the newspaper into a for-profit subsidiary. Our purpose was to enable the *Inquirer* to continue to endorse political candidates, a function the management team considered essential.

### 2. *Commerciality*

25.  In addition, a nonprofit is not permitted to engage in too much for-profit activity, or it puts its tax exemption at risk under the so-called "commerciality" doctrine.[6] To avoid this risk, nonprofits sometimes hive off for-profit activities in a separate subsidiary.[7]

---

[4] See 26 U.S.C. § 501(c)(3) (organizations are eligible provided that, among other requirements, "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office").

[5] See David Schizer, How to Save the World in Six (Not So Easy) Steps: Bringing Out the Best in Nonprofits, at 22-24 (Post Hill: 2025).

[6] See Treas. Reg. § 1.501(c)(3)-1(c) ("An organization will be regarded as *operated exclusively* for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.").

[7] See Better Bus. Bureau of Washington, D.C. v. United States, 326 U.S. 279 (1945) (even if an organization engages in some exempt activities, it must ensure that these activities are the organization's exclusive focus); David Avrum Levitt and Stephen Richard Chiodini, Taking Care of Business: Use of a For-Profit Subsidiary by a Nonprofit Organization, Business Law Today 1 (June 22, 2014); Molk, supra, at 493 ("If activities are too substantial, and are not charitable in their own right or are not sufficiently related to something that is, the organization loses its exemption on all activities, not merely those in question."); Michelle H. Yetman & Robert J. Yetman, Why Do Nonprofits Have Taxable Subsidiaries?, 61 NAT'L TAX J. 675, 677 (2008) (finding empirically that exempt organizations are more likely to use taxable subsidiaries for nonexempt activity when the activity provides a greater threat to the parent's exemption); Molk, supra, at 478 ("Tax guidance for situations when for-profit activities threaten a nonprofit's exemption is vague, and the stakes are high. A nonprofit may only engage in a certain amount of nonexempt taxable behavior before losing its exemption, and how much is too much is determined by the IRS on an unpredictable case-by-case basis."); id. at 511-12 ("the uncertain tax treatment from conducting these ventures directly has pushed hospitals to use for-profit subsidiaries, decreasing the frequency with which desirable joint ventures will occur").

**Highly Confidential**

### 3. Using Tax Benefits Most Efficiently

26.    When a nonprofit engages in activity that is especially effective at generating tax deductions or credits, it cannot use them itself because it generally is not subject to tax. Forming a for-profit affiliate can enable a taxable partner to use these tax benefits.[8]

### B. Limiting Liability

27.    Like any enterprise, nonprofits also sometimes use subsidiaries–both for-profits and nonprofits–to limit liability. Instead of conducting all activities through the parent company, they separate them into different subsidiaries so that, if an activity generates liability, it does not put other assets at risk.[9]

### C. Avoiding Disclosure Requirements

28.    Nonprofits are required to disclose a range of information, for instance, about their finances and compensation, whether in their federal tax returns on Form 990 or in filings with state regulators. But when activities are conducted through for-profit subsidiaries, less disclosure is required.[10]

### D. Managing Regulated Activity

29.    When some of a nonprofit's activities are regulated, while others are not, nonprofits often operate these activities in separate entities.[11] Again, these can be either for-profit or nonprofit subsidiaries.

---

[8] See Molk, supra, at 502 n. 146 ("For profit subsidiaries may also allow nonprofits to shift deductible costs to the for-profit and revenues to the exempt nonprofit, a potential problem the IRS has recognized."); Smith, supra, at 224 (noting that nonprofits sometimes form limited partnerships with taxpayers who supply capital and claim tax credit).

[9] Levitt & Chiodini, supra, at 1; Eugene Steuerle, When Nonprofits Conduct Exempt Activities as Taxable Enterprises, The Urban Institute, at 4 ("By separating activities into different corporations, a nonprofit can sometimes take advantage of the limited liability laws that apply to individual corporations.").

[10] Molk, supra, at 501, n. 146 ("Nondisclosing for-profit subsidiaries thus offer an opportunity to hide compensation, making the nonprofit more acceptable in the public eye while it pays nonprofit officers through its for-profit subsidiary."); Steuerle, supra, at 4: ("Unlike compensation paid to top officers and board members of the nonprofit, compensation paid by the for-profit subsidiary is not disclosed to the public.").

[11] Molk, supra, at 502 n. 146 ("some activities performed by exempt organizations may be subjected to state regulation, leading the exempt organization to isolate these activities within a subsidiary"); Nina J. Crimm, Evolutionary Forces: Changes in For-Profit and Not-For-Profit Health Care Delivery Structures; A Regeneration of Tax Exemption Standards, 37 B.C. L. Rev. 1, 85 (1995) (noting regulatory reasons why hospitals in some states cannot directly own physician practices).

**Highly Confidential**

### E. Accessing Capital

30.    The defining feature of nonprofits is that they cannot distribute profits to their owners. This "nondistribution constraint" means that nonprofits generally cannot raise capital by selling equity.[12] As an alternative, they sometimes form for-profit subsidiaries, joint ventures, or other affiliates and raise capital by offering equity in these affiliates.[13]

### F. Compensating Employees

31.    Just as nonprofits cannot distribute profits or offer equity to *owners*, they also cannot do so to *employees*. So, although nonprofits can provide bonuses based on mission-related criteria, they cannot offer high-powered incentives such as stock options and restricted stock,[14] which are commonly offered in high-tech startups.[15]  Another function of for-profit affiliates is to offer this sort of compensation to employees.[16]

## II.    Customary Practice of Protecting a Nonprofit's Mission

- **Opinion # 2**: In forming and operating for-profit affiliates, customary practice is that nonprofits need to protect their mission. OpenAI failed to follow this practice when it included a for-profit partner in safety reviews, failed to retain key safety experts, made errors in determining whether safety review was required, and significantly changed its position on the need for government regulation of AI.

---

[12] Henry Hansmann, The Rationale for Exempting Nonprofit Organizations from Corporate Income Taxation, 91 Yale L. J. 54 (1981).

[13] Levitt & Chiodini, supra, at 2 ("When contributions and other sources of revenue are insufficient to sustain or grow an activity, additional capital may be necessary. The for-profit vehicle expands access to capital by attracting investors who are motivated by receiving a return, in addition to funders who are willing to donate to the nonprofit parent."); *id.* at 4 ("attracting outside investment and scaling a business beyond what might be possible if conducted inside the nonprofit parent."); Steuerle, supra, at 2-3 ("For enterprises that require a great deal of start-up risk capital, a nonprofit may want to lay off the cost of developing programs to a for-profit partner in exchange for giving up a share of the resulting revenues. By creating or partnering with a for-profit entity, a nonprofit can allocate shares of ownership relatively easily."); cf. also Smith, supra, at 222 ("Organizations faced with resource challenges seek new opportunities for raising revenue which often entail new and more complicated structures. These strategies are then disseminated widely through professional networks and conferences.").

[14] Schizer, How to Save the World, at 29.

[15] See Ronald J. Gilson & David M. Schizer, Understanding Venture Capital Structure: A Tax Explanation for Convertible Preferred Stock, 116 Harv. L. Rev. 874 (2003) (discussing use of equity compensation in high-tech startups).

[16] Steuerle, supra, at 1 ("the taxable form appears desirable when a nonprofit would like to . . . provide certain forms of incentive compensation to nonprofit executives or other key employees"); Levitt & Chiodini, supra, at 2 ("A for-profit entity can offer equity compensation to employees and other profit-sharing opportunities that a nonprofit organization cannot. This flexibility may be important for attracting talent, especially when competing with for-profit employers.").

**Highly Confidential**

32.    The lodestar of every nonprofit is its mission. The goal is not to get rich, but to make the world better. The same is true when nonprofits have for-profit affiliates. In forming and operating these affiliates, the customary practice is that nonprofits need to protect their mission. For-profit affiliates should advance–not divert the nonprofit from–the mission.

### A. Prioritizing Mission Over Profit in For-Profit Affiliates

33.    The specifics of the mission may vary–whether it is education, religion, social services, health, research, or some other benefit to society–but the goal of benefiting the public does not.

#### 1. Centrality of the Mission

34.    This imperative affects not only *what* a nonprofit does, but also *how* it does it. Nonprofits are supposed to benefit society as a whole.[17] It is customary practice for nonprofits to serve the community, not a narrow class of individuals.

35.    For example, even though hospitals can be structured as either nonprofits or for-profit organizations–so providing health care does not inherently render an organization a nonprofit–these categories of hospitals are run quite differently. Nonprofit hospitals generally offer emergency rooms that are open to the public, treat patients who cannot afford care, and are governed by boards that represent the community, not the private interests of particular doctors or other owners.[18]

36.    Customary practice is that nonprofits must not serve only nonprofit insiders or a narrowly-defined group. The law reflects (and reinforces) this practice with the doctrines of inurement and private benefits, respectively. IRS regulations reflect this traditional understanding:

> An organization . . . [must] serv[e] a public rather than a private interest. Thus . . . it is necessary for an organization to establish that it is not organized or operated

---

[17] See Douglas M. Mancino, Monetizing Intellectual Property: Colleges, Universities, and the Tax Treatment of Research and IP Revenue, National Center on Philanthropy and the Law Working Paper, at 14 (https://ncpl.law.nyu.edu/wp-content/uploads/resources/Mancino-FinalPaper_000.pdf) ("exempt status is not based on the intrinsic nature of the activities but on the performance of activities in a manner resulting in a public benefit to a charitable class.").

[18] See Rev. Rul. 69-545, 1969-2 C.B. 117 (serving indigent is not required, as long as hospital has board representing community interests, emergency room, and inclusive medical privileges); Rev. Rul. 56-185, 1956-1 C.B. 202 (hospital "must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay").

Highly Confidential

for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.[19]

37.    For example, nonprofit research organizations don't conduct research just for the benefit of insiders. Rather, they generally make their research available to the public on a nondiscriminatory basis.[20]

38.    Whatever its mission may be, a nonprofit needs to stay true to it. Since it generally needs government approval to operate as a nonprofit–and, indeed, to be exempt from taxes–a nonprofit needs to honor the commitments it makes to secure this privileged status.[21] If a nonprofit significantly changes its mission, it may need new approval.[22] Nor can the leaders of a nonprofit simply change their minds and decide to start operating as a for-profit. Once assets are committed to benefit the public in this way, regulatory approval is needed to release them. Usually, the assets must be purchased for fair market value, with the proceeds going to another charity to continue the mission.

### 2.  *For-Profit Affiliates Should Advance the Mission, Not Divert the Nonprofit from It*

39.    These expectations and constraints shape the customary practice for nonprofits to engage in for-profit activities. This activity needs to advance the mission, not to

---

[19] Treas. Reg. 1.501(c)(3)-1(d)(ii).

[20] 1.501(c)(3)-1(d)(5)(iv); see also Treas. Reg. 1.501(c)(3)-1(d)(5)(ii) ("[s]cientific research does not include activities of a type ordinarily carried on as an incident to commercial or industrial operations, as, for example, the ordinary testing or inspection of materials or products or the designing or construction of equipment, buildings, etc."); Universal Oil Products Co. v. Campbell, 181 F.2d 451 (7th Cir. 1950) (tax exempt status denied to organization conducting research on petroleum because major oil companies received results without charge and this research gave them substantial business advantage); Underwriters' Labs., Inc. v. Comm'r, 135 F.2d 371, 373 (7th Cir. 1943) (primary purpose of the organization's tests, experiments, and investigations was to serve the private interests of member insurance companies); id. ("An institution that operates primarily for the benefit of private parties and only incidentally for the public is not a charitable institution in fact or within the meaning of the statute under consideration."); Rev. Rul. 65-1, 1965-1 C.B. 226 (an organization making grants to public agencies or firms to develop agricultural machinery is commercial, not scientific, if the organization licenses patents on an exclusive or nonexclusive basis to selected manufacturers, thus benefiting manufacturers); Washington Research Found. v. Comm'r, 50 TCM 1457 (1985) (finding substantial nonexempt purposes of licensing patents and facilitating commercial development of scientific research for private industry so as to maximize license fees for the research sponsors).

[21] See Treas. Reg. § 601.201(n)(3)(ii); Treas. Reg. § 1.501(a); IRS Rev. Proc. 2023-5, Section 11.

[22] Benjamin Takis, Can a Nonprofit Change its Mission Without IRS Approval?, Sustainability Educ. 4 Nonprofits (Feb. 14, 2023), https://perma.cc/QMB2-9A7U.

**Highly Confidential**

become a goal in and of itself.[23] This need for mission alignment is emphasized in a distillation of best practices by *Independent Sector*, a national organization that engages in research and advocacy about the nonprofit sector:

> When [a non-profit] organization considers taking on a new business or earned income opportunity, the board and staff should examine whether and how that activity will further the organization's mission and how it will fit in with the organization's overall revenue mix and staffing allocations. . . . It is important to weigh the potential financial returns from a new business venture against the time and resources it may draw away from the organization's primary program and management functions.[24]

40.     The same is true when a nonprofit engages in these activities through an affiliate. The affiliate's purpose should be not only (or even primarily) to make a profit, but to advance the nonprofit's mission. In some cases, the for-profit affiliate advances the mission by engaging in mission-related activities. In other cases, its activities are unrelated, but it generates revenue that funds the mission. Either way, the mission should shape the choices and activities of for-profit affiliates.

41.     Unfortunately, this sometimes is a challenge. Tensions can arise because of differences in organizational goals, culture, compensation, and employee incentives. This tension is exacerbated when the for-profit affiliate is a joint venture with a for-profit partner, which may have very different priorities and, indeed, may not share the nonprofit's commitment to its mission.[25] In these situations, there can be considerable pressure to stray from the mission.[26]

---

[23] See Internal Revenue Serv., Exempt Organizations Technical Guide TG 3-3: Exempt Purposes–Charitable I.R.C. Section 501(C)(3) (2024), https://www.irs.gov/pub/irs-pdf/p5781.pdf (for-profit activity must be incidental to achieving exempt purpose, not primary purpose in and of itself).

[24] Independent Sector, Principles for Good Governance and Ethical Practice 30 (2015 2d ed.) (19th principle).

[25] See Herman, et al., Managing Risk in Nonprofit Organizations: A Comprehensive Guide 227 (2004) ("Collaborations are fraught with risk. Collaborations may be inherently risky; in fact, they are riskier than other activities undertaken by a nonprofit.  This may be true because each collaborator exercises little control over the actions of the other collaborator. Unlike an activity in which the nonprofit exercises control and can direct its staff members to do and not to do certain things, collaboration requires a heightened level of trust in the other party to do what it has promised to do.").

[26] Steuerle, supra, at 3 ("In joint ventures between exempt and taxable participants, an important IRS concern is that impermissible private benefit might result. Accordingly, the IRS carefully screens such joint ventures and looks for evidence that the exempt participant controls the enterprise in a way that protects its primary exempt purpose. In some transactions, before giving clearance the IRS calls upon the exempt organization to make a guarantee, such as meeting an environmental condition or dedicating a percentage of revenues to services to low-income individuals.").

Highly Confidential

42.   To head off these problems, customary practice is for nonprofits to have a clear understanding with for-profit partners that the mission comes first. Nonprofits also should control the for-profit venture and ensure that the mission remains front and center.[27] This is especially important when the nonprofit does not have significant activities of its own, and instead is mainly pursuing its mission through the for-profit affiliate. If this affiliate is not advancing the mission, there may be no other mechanism to advance it.

### B. OpenAI's Mission: Wide Distribution of AI's Benefits, Safety, and Cooperation

43.   OpenAI, Inc., the nonprofit parent organization ("the nonprofit"), evidently no longer engages in any significant activities directly. It contributed substantially all of its intellectual property to its for-profit affiliate in 2019.[28] Although the nonprofit still has a board and a CEO, it currently has no other full-time employees.[29]

44.   So instead of engaging in significant activities on its own, the nonprofit mainly works through its for-profit affiliates. It has an operating entity, which initially was called OpenAI LP. After a recapitalization,[30] the new structure that emerged had a limited liability company ("LLC") called "OpenAI OpCo, LLC" that holds intellectual property and has most of OpenAI's employees, as well as another LLC with outside investors called "OpenAI Global, LLC," which is owned by other entities (e.g., OAI Corporation, which in turn is owned by Holdings).[31]  (Nevertheless, for the sake of simplicity and consistency, this report generally refers to the main operating entity as "OpenAI LP.") There also is an entity, OpenAI, GP, which controls OpenAI LP and is in turn controlled by the nonprofit.  Collectively, this report refers to these entities as "for-profit affiliates." The report uses the phrase "OpenAI" to describe the entire group of companies, including

---

[27] See, e.g., Rev. Rul. 2004-51, 2004-1 C.B. 974 (in joint venture between university and for-profit partner, the IRS considered it vital that LLC's governing documents gave the university the sole right to approve the curriculum, the training materials, the instructors, and the standards for completing courses); St. David's Health Care Systems v. United States, 349 F.3d 232, 238 (5th Cir. 2003) (emphasizing that nonprofit retained control over activities in partnership with for-profit); see also Redlands Surgical Services v. Comm'r, 113 T.C. 47, 92-93 (1999), aff'd, 242 F.3d 904 (9th Cir. 2001); Rev. Rul. 98-15, 1998-1 C.B. 718.

[28] Deposition of Robert Wu, at 102 ("substantially all of the IP that was developed at the nonprofit at that point in time was contributed down to OpenAI LP").

[29] Wu Deposition, at 195. ("I don't believe it [the nonprofit] has any full-time employees. It has a board of directors, and Sam is the CEO).

[30] Amended and Restated Limited Liability Company Agreement of OpenAI Global, LLC, Jan. 23, 2023, MSFT_MUSK000055001 [hereinafter "January 2023 LLC Agreement"].

[31] Second Amended and Restated Limited Liability Company Agreement of OpenAI Global, LLC, Apr. 10, 2023, MSFT_MUSK000063039 [hereinafter, "April 2023 LLC Agreement"].

**Highly Confidential**

the nonprofit and its for-profit affiliates. The phrase "the nonprofit" refers to OpenAI, Inc., the nonprofit parent company.

45.    A key question is whether the for-profit affiliates are pursuing the nonprofit's mission. Unfortunately, there is significant evidence that they have strayed from that mission.

### 1. Initial Certificate of Incorporation

46.    To see how the for-profit affiliates have diverged from the mission, we begin with descriptions of the original mission. When the nonprofit was founded, its initial certificate of incorporation, as filed in Delaware on December 8, 2015, described its mission in Article 3 as follows:

> The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person.[32]

47.    Notably, this language commits to "benefit the public," and not to promote "the private gain of any person."[33]

48.    Article 5 also gives assurance that the nonprofit's assets are "irrevocably dedicated" to the purposes described in Article 3:

> The property of this corporation is irrevocably dedicated to the purposes in Article THREE hereof and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person.[34]

---

[32] Certificate of Incorporation of a Non-Stock Corporation OpenAI, Inc., Dec. 8, 2015, Wu Deposition, Exhibit 2, 2024Musk-0003115.

[33] Article 5 further affirms the ban on private gain: "The property of this corporation is irrevocably dedicated to the purposes in Article THREE hereof and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person."

[34] 2024Musk-0003115.

**Highly Confidential**

### 2. 2016 Form 990

49.    The nonprofit gave similar assurances in another legally operative document, the first tax return the nonprofit filed with the IRS for 2016. Under penalties of perjury,[35] OpenAI described its mission as follows:

> OpenAI's goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. We think that artificial intelligence technology will help shape the 21st century, and we want to help the world build safe AI technology and ensure that AI's benefits are as widely and evenly distributed as possible. We're trying to build AI as part of a larger community, and we want to openly share our plans and capabilities along the way.

50.    Again, along with forswearing private benefit–giving assurances that OpenAI was "unconstrained by a need to generate financial return"–this filing emphasized the goal of "benefit[ting] humanity," prioritized safety, and sought to "ensure that AI's benefits are as widely and evenly distributed as possible."

### 3. California Registration Form

51.    The nonprofit included similar language when it registered to engage in nonprofit activities in California on August 28, 2017.

> OpenAI, Inc. ("OpenAI") is a nonprofit artificial intelligence ("AI") scientific research organization. Its goal is to engage in research activities that advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. AI technology will help shape the 21st century, and OpenAI wants to help the world build safe AI technology and ensure that AI's benefits are as widely and evenly distributed as possible. To that end, OpenAI hopes to build AI as part of a larger community, and wants to openly share its plans and capabilities along the way.[36]

52.    In this public filing, the nonprofit again represented to a regulator, as well as to potential donors and users of its technology, that it was "unconstrained by a need to generate financial return" and "wants to openly share its plans and capabilities."

---

[35] The tax return is signed by Chris Clark, who is listed as director and COO.

[36] Initial Registration Form State of California Office of the Attorney General Registry of Charitable Trusts, Wu Deposition, Exhibit 4, 2024MUSK0003113.

**Highly Confidential**

### 4. Charter on OpenAI's Website

53.   OpenAI sounded the same themes in a document posted on its website, which is labeled a "charter."[37] Along with "Technical Leadership," it commits to and elaborates on three other principles: "Long-term safety," "Broadly distributed benefits," and "Cooperative orientation":

> OpenAI's mission is to ensure that artificial general intelligence (AGI)–by which we mean highly autonomous systems that outperform humans at most economically valuable work–benefits all of humanity. We will attempt to directly build safe and beneficial AGI, but will also consider our mission fulfilled if our work aids others to achieve this outcome. To that end, we commit to the following principles:

> **Broadly distributed benefits** We commit to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all, and to avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power. Our primary fiduciary duty is to humanity. We anticipate needing to marshal substantial resources to fulfill our mission, but will always diligently act to minimize conflicts of interest among our employees and stakeholders that could compromise broad benefit.

> **Long-term safety** We are committed to doing the research required to make AGI safe, and to driving the broad adoption of such research across the AI community. We are concerned about late-stage AGI development becoming a competitive race without time for adequate safety precautions. Therefore, if a value-aligned, safety-conscious project comes close to building AGI before we do, we commit to stop competing with and start assisting this project. We will work out specifics in case-by-case agreements, but a typical triggering condition might be "a better-than-even chance of success in the next two years."

> **Technical leadership** To be effective at addressing AGI's impact on society, OpenAI must be on the cutting edge of AI capabilities–policy and safety advocacy alone would be insufficient. We believe that AI will have broad societal impact before AGI, and we'll strive to lead in those areas that are directly aligned with our mission and expertise.

---

[37] In a deposition, Robert Wu, a member of OpenAI's legal team, indicated that OpenAI's board was aware of the contents of this charter. Wu Deposition, at 42-43.

**Cooperative orientation** We will actively cooperate with other research and policy institutions; we seek to create a global community working together to address AGI's global challenges. We are committed to providing public goods that help society navigate the path to AGI. Today this includes publishing most of our AI research, but we expect that safety and security concerns will reduce our traditional publishing in the future, while increasing the importance of sharing safety, policy, and standards research.

### 5. Rollout of For-Profit Affiliates

54.    When OpenAI publicly announced the formation of its for-profit affiliates, it posted an explanation on its website from two senior managers who have served on the board of the nonprofit, Greg Brockman (Chairman & CTO) and Ilya Sutskever (Chief Scientist). They started with a description of the mission, which highlighted the same themes of widely-distributed benefits, safety, and cooperation:

Our mission is to ensure that artificial general intelligence (AGI) benefits all of humanity, primarily by attempting to build safe AGI and share the benefits with the world.[38]

55.    To explain the purpose of the new for-profit subsidiary, they said: "We want to increase our ability to raise capital *while still serving our mission.*" (Emphasis added). Under the heading, "The Mission Comes First," they were explicit that "[w]e've designed OpenAI LP to put our overall mission—ensuring the creation and adoption of safe and beneficial AGI—ahead of generating returns for investors."

56.    Claiming that "Our day-to-day work is not changing," they reiterated the importance of safety to OpenAI's mission, invoking the charter quoted above in Part II.B.4:

We are excited by the potential for AGI to help solve planetary-scale problems in areas where humanity is failing and there is no obvious solution today. However, we are also concerned about AGI's potential to cause rapid change, whether through machines pursuing goals misspecified by their operator, malicious humans subverting deployed systems, or an out-of-control economy that grows without resulting in improvements to human lives. As described in our Charter, we are willing to merge with a value-aligned organization (even if it means

---

[38] https://openai.com/index/openai-lp/ (posted March 11, 2019) (2024MUSK-0011200).

reduced or zero payouts to investors) to avoid a competitive race which would make it hard to prioritize safety.

### C. Backtracking from Wide Distribution, Safety, and Cooperation: Changing Descriptions of OpenAI's Mission

57.    Although OpenAI repeatedly represented in regulatory filings and on its website that it is committed to a wide distribution of benefits, safety, and a cooperative orientation, as noted above, there is substantial evidence that OpenAI is no longer as committed to these principles. Starting in filings for 2018, the nonprofit began to change the way it described its mission.

#### 1. Change in 2018 Form 990

58.    The description of the nonprofit's mission, quoted above, remained the same in the Form 990s OpenAI filed for 2016 and 2017. But in the one filed for 2018, the nonprofit dropped the following sentence: "We're trying to build AI as part of a larger community, and we want to openly share our plans and capabilities along the way." Evidently, "openly sharing our plans and capabilities" with "a larger community" was no longer part of the mission. Notably, the Form 990 with this change was the first to disclose that the nonprofit had formed for-profit affiliates.

#### 2. Change in Delaware Certificate of Incorporation

59.    On January 14, 2020, the nonprofit modified its Delaware Certificate of Incorporation, changing the language in Article 3 describing its corporate purpose. The new language is as follows:

> The specific purpose of this corporation is to ensure that artificial general intelligence benefits all of humanity, including by conducting and/or funding artificial intelligence research. The corporation may also research and/or otherwise support efforts to safely develop and distribute such technology and its associated benefits, including analyzing the societal impacts of the technology and supporting related educational, economic, and safety policy research and initiatives. The resulting technology will benefit the public and the corporation will seek to distribute it for the public benefit when applicable. The corporation is not organized for the private gain of any person.[39]

---

[39] Amended and Restated Certificate of Incorporation of OpenAI, Inc., a Nonprofit Non-Stock Corporation, Wu Deposition, Exhibit 3, OPENAI_MUSK00000420.

**Highly Confidential**

60.    Notably, this language deletes any reference to seeking to open source its technology. The original certificate included the following sentence: "The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable."[40] The new charter rewrites this sentence as follows: "The resulting technology will benefit the public and the corporation will seek to distribute it for the public benefit when applicable." In other words, OpenAI will still distribute AI as a product, but it no longer will necessarily disclose or share its coding. This seems to be a retreat from its earlier commitment to cooperate with the rest of the industry.

### 3. Deposition of Robert Wu

61.    In a deposition on October 3, 2025, Robert Wu, a member of OpenAI's inhouse legal team who was tasked with discussing OpenAI's mission and status,[41] acknowledged various changes in the way OpenAI was describing its mission. For example, when asked whether language in the California registration about being "unconstrained by a need to generate financial return" was still part of OpenAI's mission, Mr. Wu indicated that it was not. "That is not the mission stated in the 2020 Delaware certificate of incorporation . . . ," he said. "[T]he mission as stated in the [corporate] charter does not state that it is unconstrained by a need to generate financial return."[42]

62.    Similarly, when asked whether the charter on the website was accurate in "commit[ting] to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all and to avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power," Mr. Wu indicated that "That is not the actual mission as reflected in the [corporate] charter."[43]

---

[40] Certificate of Incorporation of a Non-Stock Corporation OpenAI, Inc., Dec. 8, 2015, Deposition of Robert Wu, Oct. 3, 2025, Exhibit 2, 2024MUSK-0003115.

[41] Wu Deposition, at 14.

[42] Id. at 37-38.

[43] Id. at 44-45.

**Highly Confidential**

### D. *Backtracking From Wide Distribution, Safety, and Cooperation: Changing Policies*

63.   After forming its for-profit affiliate, OpenAI made changes not only in the way it *described* its mission, but–more importantly–in the way it *implemented* it. OpenAI made a number of decisions that deemphasized cooperation and safety.[44]

64.   Funding from investors, instead of donors, poses predictable risks. Helen Toner, an expert on AI safety who served as an independent director from 2021 to 2023, commented on these pressures in her deposition:

> [I]n the community of researchers who had . . . been thinking about AGI governance and risks from AGI, a concern for years had been how commercial incentives, including incentives to move fast, could come into conflict with a desire to develop AI in a way that would benefit all of humanity. And so, the shift from being purely a nonprofit, which needed to satisfy donors, to being a -- or to having the capital come in through a for-profit, which needed to satisfy investors, moved OpenAI, clearly, into a situation where those commercial incentives might come into conflict with its mission.[45]

65.   Tasha McCauley, another independent director of OpenAI who served from 2018 to 2023, also expressed concern that the pressure to be profitable was diverting OpenAI from its mission. "[T]here were many players who stood to get a return from the company, and . . . there was potential for those . . . stakeholders to apply pressure . . . ," she recalled in a deposition. "[T]his is at the heart of the issue we're talking about. In my experience, we were concerned that, you know, decisions were being made that we didn't see as prioritizing the mission that the company was oriented around. And in our experience, that seemed to have potentially been motivated by profit interests."[46]

#### 1.  *Including Microsoft in Safety Reviews*

66.   In her deposition, Ms. Toner drew on her work on AI safety to emphasize the importance of "testing models for different kinds of risks before releasing them and also

---

[44] See Deepa Seetharaman, Berber Jin & Tom Dotan, Open AI to Become For-Profit Company, WSJ, Sept 25, 2024 ("Employees, including some who had been there from the early days, started to complain that the company was prioritizing shipping products over its original mission to build safe AI systems.").

[45] Deposition of Helen Toner, at 40-41.

[46] Deposition of Tasha McCauley, at 132.

**Highly Confidential**

after releasing them."[47] Given the importance of testing, it is significant that in 2021 OpenAI changed its process for assessing the safety of its products.

67.    Instead of making this judgment internally, OpenAI agreed to make these decisions jointly with Microsoft, the largest investor in its for-profit affiliates.[48] In her deposition, Tasha McCauley confirmed that the creation of this Deployment Safety Board gave Microsoft a role it had not had before.[49]

68.    By including a for-profit partner in safety reviews, OpenAI cast doubt on its charitable mission, which is supposed to emphasize safety. Indeed, a key reason to develop AI in a nonprofit is to prioritize safety, even at the expense of profitability. This choice is not as easy for a for-profit firm like Microsoft, which is supposed to maximize profits for shareholders. So, although OpenAI's mission allows it to accept investments from for-profit partners and offer them a reasonable return, its mission does not allow it to subordinate its commitment to safety.

69.    Therefore, it is concerning that the contractual provision creating the Development Safety Board–and, therefore, including Microsoft in safety decisions–specifically acknowledges Microsoft's commercial motives:

Section 5(g): Purpose and Intent.



[50]

---

[47] Toner Deposition, at 27-28.

[48] See Amended and Restated Joint Development and Collaboration Agreement, March 5, 2021, Sec. 5(g)(ii) & Exhibit E, at MSFT_MUSK000064528, MSFT_MUSK000064548.

[49] McCauley Deposition, at 40.

[50] Amended and Restated Joint Development and Collaboration Agreement, March 5, 2021, at  pp. 17-18, MSFT_MUSK000064527-28.

**Highly Confidential**

70.    In other words, even as Microsoft is asked to commit to developing AI in ways that are "████████████████████████████████████████," the next sentence undercuts this commitment, providing that the ████████████████████████████████████████████" In effect, ████████████████████████████████████████. This is an unfortunate addition to a provision whose purpose is to create a safety board. This language certainly weakens–and arguably contradicts–the assurances the parties are supposed to give that they will "████████████████████████████████████████" Notably, this safety commitment ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

This caveated pledge is a regrettable departure from the nonprofit's mission, which unequivocally prioritized safety, and it is not consistent with the customary practice of prioritizing the mission in operating for-profit affiliates.

71.    This reference to Microsoft's commercial intent is all the more troubling because it was added to the 2021 JDCA. This language did not appear in the 2019 JDCA. Under this earlier agreement, OpenAI alone conducted the safety review and Microsoft's role was considerably more limited: when OpenAI developed safety criteria, Microsoft could participate in reviewing those criteria.[51] But reviewing *criteria* is different from reviewing *decisions* about actual products; the latter were conducted by OpenAI *alone* under the 2019 agreement,[52] but became a joint responsibility under the 2021 agreement, as noted above.

72.    In regulating safety criteria, the 2019 agreement nodded–but only in a limited way–to Microsoft's commercial goals, providing that safety criteria ████████████████████████" that the technology "████████████████████████████

████████████████████████████████████████[53] So although the safety criteria had to be "r████████████████████████████████████

████████████ In addition, under the 2019 agreement, ███████████████████████

---

[51] Joint Development and Collaboration Agreement, July 2, 2019, Sec. 6(c), at 16, MSFT_MUSK000055185 ("Such Safety Criteria will be subject to review and input by the Governing Board during the development of such criteria,"). Microsoft was represented on the governing board. Id. at Sec. 6(a), at 16, MSFT_MUSK000055185 (noting that OpenAI and Microsoft would be equally represented on the governing board).

[52] Id. at Sec. 6(c) ("LP and OpenAI will make a final decision on safety review.").

[53] Id.

Highly Confidential

███████████████████████████████████████████████████████.
While this language assured Microsoft safety criteria that were not *more rigorous* than
those for OpenAI's products, this language presumably also meant that safety criteria
for Microsoft could not be *less rigorous*. Like much else about safety reviews, this parity
requirement did not appear in the language added in 2021. This change from 2019 to
2021 is a step away from the customary practice of protecting the mission in operating
for-profit affiliates.

73.   The structure of the newly-created safety board also raises concerns. Microsoft
and OpenAI each name three members. Although ties are decided in OpenAI's favor,[54]
Microsoft's views can prevail if all three of its representatives agree and they are joined
by one of the three members named by OpenAI. In a situation in which Microsoft
chooses to prioritize profit, they can carry the day if they have an ally from OpenAI on
the safety board.

74.   In this regard, it is unfortunate that one of OpenAI's three members is the CEO
(at least as the board was initially constituted). This is a questionable choice, since the
CEO might be less focused on safety than others within the organization, such as
members of the safety and legal teams, whose responsibilities require them to prioritize
safety.

75.   As a former nonprofit CEO, I know that CEOs bear the ultimate responsibility to
secure funding for the organization. At OpenAI, this responsibility presumably includes
maintaining a close relationship with Microsoft. As a result, the CEO of OpenAI
inevitably will feel pressure to prioritize revenue over safety. This issue arguably can
arise with any CEO, but it seems particularly acute with Mr. Altman. As discussed
further below, the fact that safety-focused board members fired him, but that he was
then reinstated with a newly constituted board, significantly magnified this risk.[55]

76.   An expert in AI safety as well as an independent board member, Ms. Toner did
not have confidence in the effectiveness of the safety board.  "I would consider the
deployment safety board," she said, "to be one example of an internal guardrail that
turned out to be fragile."[56] This is not consistent with the customary practice of
safeguarding the mission when operating a for-profit affiliate.

---

[54] JCDA March 5, 2021, Exhibit E Section 4, at MSFT_MUSK000064550 ("If a Deployment Safety Review
vote is tied, the vote will be decided in OpenAI's and LP's favor.").

[55] See infra Part IV.D & E. In her deposition, Ms. Toner expressed concern that the board was constituted
in a way that Mr. Altman and the three Microsoft representatives could overrule the two other OpenAI
representatives, though she did "not have any definitive knowledge of votes going that way." Toner
Deposition, at 332.

[56] Toner Deposition, at 164.

Highly Confidential

## 2. *Departure of Safety Experts and Reduced Share of Budget for Safety*

77.   OpenAI also deemphasized safety in personnel and budgetary decisions. Given the centrality of safety to the nonprofit's mission, this erosion in OpenAI's focus on safety diverges from customary practice, which, again, is to protect the mission while operating for-profit affiliates.

78.   Ms. McCauley estimated that approximately 25% to 30% of OpenAI's workforce worked on safety issues when she joined the board in 2018.[57] She noted also that the head of safety regularly interacted with the board[58] and that the safety team had the funding it needed.[59]  But over time, "the percentage of people dedicated to" safety "did decrease," she noted, although "the company grew quite a lot."[60] In addition, key members of the safety team started leaving in 2020 to start Anthropic, a new AI development firm, which Ms. McCauley deemed "a fairly significant change."[61]

79.   Although OpenAI formed a new "superalignment team" in July of 2023 to focus on safety, they disbanded it less than a year later with the departure of the team's leaders, Ilya Sutskever (an OpenAI cofounder and board member who had tried unsuccessfully to dismiss Mr. Altman) and Jan Leicke.[62] In a series of posts on X, Mr. Leicke indicated that he left because "safety culture and processes" at OpenAI "have taken a backseat to shiny products":

> I joined because I thought OpenAI would be the best place in the world to do this [safety] research. However, I have been disagreeing with OpenAI leadership about the company's core priorities for quite some time, until we finally reached a breaking point. I believe much more of our bandwidth should be spent getting ready for the next generations of models, on security, monitoring, preparedness, safety, adversarial robustness, (super)alignment, confidentiality, societal impact, and related topics. These problems are quite hard to get right, and I am concerned we aren't on a trajectory to get there. Over the past few months my team has been sailing against the wind. Sometimes we were struggling for

---

[57] McCauley Deposition, at 26.

[58] Id. at 27.

[59] Id. at 28.

[60] Id. at 30.

[61] Id. at 29 ("there was a fairly significant change that took place when -- when a number of members left OpenAI to go start a new organization, to start . . . Anthropic, which is a different AI lab").

[62] Will Knight, OpenAI's Long-Term AI Risk Team Has Disbanded, Wired, May 17, 2024, https://www.wired.com/story/openai-superalignment-team-disbanded/

**Highly Confidential**

compute and it was getting harder and harder to get this crucial research done. Building smarter-than-human machines is an inherently dangerous endeavor. OpenAI is shouldering an enormous responsibility on behalf of all of humanity. But over the past years, safety culture and processes have taken a backseat to shiny products.[63]

80.    Although OpenAI created a new safety committee on its board,[64] one commentator has dismissed this as a publicity effort, warning that the board did not have adequate expertise about AI safety.[65] Indeed, the three board members who left after unsuccessfully attempting to dismiss Mr. Altman all had a strong commitment to AI safety: Ilya Sutskever was a senior computer scientist at OpenAI who worked on AI safety issues, as noted above;[66] Helen Toner was director of strategy at the Georgetown Center for Security and Emerging Technology, who had worked on AI policy and AI national security at Open Philanthropy and has been affiliated with the Oxford Centre for the Governance of AI;[67] and Tasha McCauley was active in the Effective Altruism movement, which has taken a strong interest in AI safety.[68]

81.    One of the sources of tension between these board members and Mr. Altman was their interest in adding another AI safety expert to the board. According to the *Wall Street Journal*, "the process stalled, largely due to foot-dragging by Altman and his co-founder Greg Brockman, who was also on the board."[69] In her deposition, Ms. McCauley expressed the same view, faulting Mr. Altman for complicating this process.[70]

---

[63] See Letter From Robert Weissman to Attorney General Rob Bonta and Deputy Attorney General Christopher Lamerdin, June 6, 2024, at 2 https://www.citizen.org/wp-content/uploads/california-ag-openai-nonprofit-status-letter-3.pdf (quoting Jan Leicke's X posts).

[64] "OpenAI Board Forms Safety and Security Committee," OpenAI, May 28, 2024. https://openai.com/index/openai-board-forms-safety-and-security-committee/.

[65] Weiss Letter of June 6, 2024, supra ("It is hard to see this as anything more than a PR effort. The new committee consists of members of OpenAI's board, who do not bring the same AI safety and ethics expertise as the departed experts, plus CEO Sam Altman, and some internal staff. By contrast, prior to the November 2023 board shake-up, the board included experts on AI safety and ethics").

[66] Deposition of Samuel Altman, at 11.

[67] Toner Deposition, at 15-25.

[68] Altman Deposition, at 16-17 ("I mean, obviously, she cared about it a great deal and how we were going to mitigate how we have gone on to mitigate the potential safety concerns that people had at the time, new ones that have developed since.").

[69] Keach Hagey, The Secrets and Misdirection Behind Sam Altman's Firing From OpenAI, WSJ, March 28, 2025.

[70] McCauley Deposition, at 64-65.

**Highly Confidential**

### 3. Errors About Need for Safety Review

82.    Questions about OpenAI's commitment to safety–and, thus, about its adherence to the customary practice of protecting the mission–are raised also by errors about whether products required safety review. Mr. Altman is alleged to have provided incorrect information on this issue to board members and senior managers.

83.    When the board was considering three different ways to release GPT-4 in December 2022–API, superassistant, and fine-tuning–the board "received Sam's assurance that all three of those had passed DSB review."[71] Yet this claim surprised Ms. Toner. In her deposition, she observed that from a conversation with a member of the DSB, she knew that "there were heated discussions happening internally about, in particular, fine-tuning and whether to approve that."[72] She asked for documentation and eventually learned that only one of the three methods of releasing GPT-4 had passed safety review.[73]

84.    This interaction left the board concerned that Mr. Altman was "using what appear to be dishonest means," Ms. McCauley observed, "to see that a model doesn't go through a required safety review."[74] This raised the "broader concern," Ms. McCauley noted, "that we might not be able to trust that the processes were working."[75] Ms. Toner agreed. "I would say that incident was -- was one case that contributed to my sense," she said, "that Sam was not interested in the board being closely informed about the company's activities."[76]

85.    In his deposition, Mr. Altman did not acknowledge a mistake or otherwise explain this incident; instead, he claimed to have no recollection of it.[77]

86.    Further doubt was cast on OpenAI's safety protocols when Microsoft launched a test of GPT-3 in India without approval from the safety board. In her deposition, Ms. McCauley indicated that Mr. Altman had not shared this information with the board, and that she found out by "happenstance"; while leaving a long board meeting, which had afforded management ample time to share this information, she "ran into an employee

---

[71] McCauley Deposition, at 266-67; Toner Deposition, at 46-48 ("To the best of my recollection, he either directly said or strongly implied that all three types of release had been approved by the DSB.").

[72] Toner Deposition, at 201.

[73] Toner Deposition, at 47-50; McCauley Deposition, at 266-67.

[74] McCauley Deposition, at 268.

[75] Id. at 73-74.

[76] Toner Deposition at 50.

[77] Altman Deposition, at 36.

**Highly Confidential**

in the hallway and had a discussion, and it was mentioned."[78] Ms. Toner had the same recollection, reporting that the Board had not been told of this mistake–"[d]espite the fact that we had very actively discussed at the board meeting that oversight of the DSB and ensuring that it was functioning well was a core board responsibility"–and that Ms. McCauley then told her that she had learned of this incident from an employee.[79]

87.    In his deposition, Mr. Altman dismissed this breach of safety protocols as "a legitimate and small mistake" by Microsoft which was "certainly not intentional, not a serious issue." He claimed not to remember whether he had told the board, but said that he "do[es] recall thinking this was not a significant issue."[80]

88.    This effort to minimize this incident is troubling. Ms. Toner said this incident "caused me concern about how well those [safety] processes were working."[81] Ms. McCauley drew the same conclusion:

> I think that was a particular, you know, point of concern; that the, you know, purely commercial partner was able to release a--a limited version of the product to an unapproved audience after the joint DSB, the joint deployment safety board, had not determined that that was appropriate to do, and we were not informed about it. That was, yes, definitely concerning.[82]

89.    In another problematic incident, Mr. Altman told Mira Murati, OpenAI's Chief Technology Officer, that Jason Kwon, a member of the legal team, had advised him that GPT Turbo did not require safety review. Yet when Ms. Murati checked with Mr. Kwon, she learned that he had never given this advice, so "Mira felt that Sam had -- had either misled her or lied to her."[83]  Ms. Murati documented this misinformation with screenshots and eventually shared them with board members.[84]

90.    In his deposition, Mr. Altman acknowledged that "I do recall internal misalignment on that. I think I had a misunderstanding of it."[85] He claimed that

---

[78] McCauley Deposition, at 77; Ms. Toner confirmed that the board meeting was "All day. Multiple hours." Toner Deposition, at 55.

[79] Toner Deposition, at 52-53.

[80] Altman Deposition, at 38-39.

[81] Toner Deposition, at 54.

[82] McCauley Deposition, at 265.

[83] Toner Deposition, at 59-60.

[84] Id. at 60; McCauley Deposition, at 87.

[85] Altman Deposition, at 47.

**Highly Confidential**

"[s]omeone at the company told me" that there was no need for safety review, but he could not recall who it was or whether it was a lawyer.[86]

91.    In Ms. Toner's view, problems in the safety review process and in keeping the board informed were symptoms of a deeper problem: "the extreme pressure for the company to release products rapidly and to prioritize public product releases over well-thought-through determinations of how given decisions affected the mission."[87] These incidents show that, unfortunately, OpenAI was not conforming to customary practice: the nonprofit was not successfully protecting its mission in overseeing the activities of the for-profit affiliate.

### 4.  Changed Position on Regulation

92.    This lack of attention to safety is evident also in OpenAI's changing position on regulation. In March 2023, Mr. Altman testified in Congress that he favored government regulation of AI. "OpenAI believes that regulation of AI is essential," he said, "and we're eager to help policymakers as they determine how to facilitate regulation that balances incentivizing safety while ensuring that people are able to access the technology's benefits."[88]

93.    Yet OpenAI has changed its position. In a comment to the Office of Science and Technology Policy, Christopher Lehane, OpenAI's Vice President, Global Affairs, pushed for self-regulation, asking the federal government to preempt state regulation:

> We propose creating a tightly-scoped framework for voluntary partnership between the federal government and the private sector to protect and strengthen American national security. This framework would extend the tradition of government receiving learnings and access, where appropriate, in exchange for providing the private sector relief from the 781 and counting proposed AI-related bills already introduced this year in US states.[89]

---

[86] Id. at 49.

[87] Toner Deposition, at 251.

[88] Testimony of Sam Altman before the Senate Committee on the Judiciary, Subcommittee on Privacy, Technology, and the Law, May 16, 2023, https://www.judiciary.senate.gov/committee-activity/hearings/oversight-of-ai-rules-for-artificial-intelligence.

[89] Comment from Christopher Lehane to the Office of Science and Technology Policy, March 13, 2025.

Highly Confidential

94.  As one critic put it, OpenAI's "180-degree-turn to an anti-regulatory posture can only reasonably be understood as reflecting a commitment to the profit-seeking mission of the for-profit."[90]

95.  To sum up, when a nonprofit has for-profit affiliates, customary practice is to take effective steps to protect its mission. For OpenAI, this means ensuring that it continues to prioritize safety over profits. But unfortunately, there is substantial evidence that this is not happening. OpenAI has changed the way it describes its mission. It also has made a number of decisions that seem to prioritize profits over the mission, including representation of a for-profit partner in safety reviews, departures of safety experts from OpenAI's professional ranks and board, errors about whether safety review was required, and a lobbying effort to preempt state regulation of AI.

96.  This evidence supports a concern that Ms. McCauley expressed in her deposition. "I think the structure that was put in place wasn't sufficient to -- well, I would say the -- the combination of the structure and the behavior of -- of the company's CEO, Sam, resulted in a number of instances that I think I would characterize, as I said before, the mission was not being prioritized."[91] This is not customary practice.

## III.    Customary Practice of Protecting the Nonprofit's Assets

- **Opinion # 3:** It is customary practice for nonprofits to use arm's length terms to protect their assets and economic interests. Failing to follow this practice, OpenAI accepted exceedingly high thresholds before its residual interest would yield a return, without engaging in a sophisticated economic analysis of these thresholds before agreeing to them.

- **Opinion # 4:** It is customary practice for nonprofits to protect their assets, but there are serious questions about whether OpenAI conformed to this practice when it agreed to share significant (and expanding) intellectual property, decision-making authority, and access to its facilities with a for-profit partner.

- **Opinion # 5:** It is customary practice for nonprofits to include contractual provisions to protect their mission and economic interests when forming and operating for-profit affiliates, but OpenAI's contractual protections have not been effective.

---

[90] Robert Weissman, Letter to Attorney Generals Rob Bonta and Kathy Jennings, Sept. 12, 2025, https://www.citizen.org/wp-content/uploads/OpenAI-Letter-6-final.pdf.

[91] McCauley Deposition, at 136.

Highly Confidential

97.   When nonprofits have for-profit affiliates, the customary practice is to protect not only the mission, as discussed above, but also the nonprofit's assets. Just as affiliates must not be allowed to divert a nonprofit from its mission, they also must not be allowed to drain value from the nonprofit or to profit at its expense.

98.   Unfortunately, OpenAI has not lived up to this customary practice. The "capped return" structure has failed to protect the nonprofit's economic interests and was adopted without a sophisticated economic analysis of its consequences for the nonprofit, even as for-profit investment has dwarfed philanthropic support for the nonprofit. The sharing of intellectual property and decision rights with a for-profit partner also raises questions about whether the nonprofit's interests were adequately protected. Nor has the inclusion of hollow commitments to the mission protected the nonprofit. As this Part shows, OpenAI's failure to protect its economic interests is a divergence from customary practice.

## A.  Customary Practice Requires a Nonprofit to Use Arms-Length Terms When Transacting With For-Profit Affiliates

99.   As noted above, the defining feature of nonprofits is that their profits must be reinvested in the mission, not distributed to owners. This "nondistribution constraint" prevents a nonprofit from having residual claimants, who own whatever value is left over after the nonprofit covers its expenses.[92] That surplus must be irrevocably committed to the mission.

100.  This mission must benefit a charitable class, not the nonprofit's insiders or a narrow group of individuals. Consistent with this customary practice, a nonprofit's tax exemption depends on the absence of inurement and private benefit, as noted above.[93] As a result, for-profit affiliates (and their for-profit investors) are not (and, indeed, cannot be) subsidized at the nonprofit's expense. Rather, when nonprofits form and operate for-profit affiliates, customary practice is that nonprofits must be vigilant to protect their assets, human capital, and surplus.[94]

---

[92] Hansmann, supra.

[93] Treas. Reg. §1.501(c)(3)-1(d)(ii).

[94] See Steuerle, supra, at 5 ("All charities have some obligation to ensure that assets and human capital within the organization are not diverted toward noncharitable purposes. In addition to legal and tax consequences, nonprofits are governed by other fiduciary obligations to the public and to past donors.").

**Highly Confidential**

### 1. *No Diversion of Value From Nonprofit to For-Profit Affiliates*

101. Once assets have been committed to a nonprofit's mission, customary practice is for them to remain dedicated to this mission, unless they are purchased for fair market value. As the California Attorney General's office has explained:

> One critical restriction is that the assets of a public benefit corporation are considered irrevocably dedicated to charitable purposes, and cannot be distributed for private gain. If the corporation's board of directors later decides they do not wish to operate the corporation as a charity, they may dissolve the corporation, but cannot take back its assets. Legally, those assets must be used for the charitable purposes for which they were raised, and must be transferred to another nonprofit that has the same or similar purposes.[95]

### 2. *Respect for Separate Legal Identities of Nonprofit and For-Profit Affiliates*

102. To protect the nonprofit's assets, customary practice requires a nonprofit to treat for-profit affiliates as legally separate. They cannot treat their assets and liabilities as "all in the family," with each using what the other has. On the contrary, their formal separation must be respected.[96] The nonprofit and its for-profit affiliates must have distinct assets, liabilities, workforces, and legal identities. When they share employees or assets, they must conclude formal understandings about how to divide them and compensate each other.[97]

### 3. *Fair-Market Value Terms*

103. In these understandings, customary practice is to set the terms at arm's length.[98] When the nonprofit provides value to for-profit affiliates, whether in the form of services or the ownership or use of intellectual property, facilities, or other assets, customary practice requires the nonprofit to receive the same compensation that an unrelated third party would charge.[99]

---

[95] California Department of Justice Charitable Trusts Section, Attorney General's Guide for Charities 7.

[96] Levitt & Chiodini, supra, at 2 (nonprofits and for-profit affiliates "should maintain an arm's length relationship").

[97] Id. at 3 ("written resource-sharing, services, or licencing agreements" are needed).

[98] Id. at 2-3.

[99] See, e.g., Rev. Rul. 2004-51, 2004-1 C.B. 974 (noting that all contracts and transactions would be at arm's length and fair market value); Priv. Ltr. Rul. 9604019 (Jan. 26, 1996) (approving cost sharing agreement allowing for-profit affiliate to use nonprofit's employees and to reimburse nonprofit for cost of organizing affiliate); id. at 11 (when expenses are divided based on actual usage, sharing of employees, facilities and other assets with for-profit subsidiary isn't inurement and doesn't undermine nonprofit's tax-

**Highly Confidential**

104. This is a critical issue when nonprofits partner with for-profit investors. "A charity must make sure that it receives adequate value in return for its contribution, and it must avoid using charitable assets to subsidize for-profit investors," David Levitt and Stephen Chiodini have emphasized. "The charity therefore should receive an equity interest that reflects the fair market value of whatever it has contributed."[100]

4. *Protecting the Nonprofit's Economic Interest in Employee Compensation Plans*

105. The same principles apply when nonprofits compensate their employees. As noted above, nonprofits sometimes form for-profit affiliates to provide equity compensation to employees. These arrangements must be structured with care to protect the nonprofit's assets and economic interests. Even as a nonprofit offers managers equity in for-profit affiliates, it must ensure that its capital contribution is returned, along with a reasonable return on its investment.[101]

**B. OpenAI's "Capped Return" Structure Did Not Protect the Nonprofit's Economic Interests: Caps Were Extremely High**

106. Unfortunately, OpenAI has not followed the customary practices described above in structuring the nonprofit's relationship with its for-profit affiliates and for-profit investors. OpenAI adopted an unusual arrangement, which Ms. Toner called "pretty strange" and "completely novel" in her deposition.[102]

107. This structure offered capped interests to a number of investors (including the nonprofit), with the vast majority of these capped interests going to Microsoft. The nonprofit kept the residual, sharing in profits only after these capped interests have been paid off.

108. Notably, these caps are extremely high, so the nonprofit's residual interest yields a return only if the for-profit affiliate is exceptionally profitable. By paying for-profit

---

exempt status); Priv. Ltr. Rul. 200326035 (June 27, 2003) (when licensing IP, for-profit subsidiary keeps 50% royalty).

[100] Levitt & Chiodini, supra, at 5.

[101] Mancino, supra, at 57 (managers can share in profits, but only after nonprofit's capital is returned with adequate economic return); see also Priv. Ltr. Rul. 200601030 (approving bonus program for senior managers that would, in part, be measured by the performance of a for-profit because there was a compensation committee and there were mechanisms to return nonprofit's capital and provide reasonable return).

[102] Toner Deposition, at 30-31.

**Highly Confidential**

investors first (aside from the nonprofit's own capped interest), this structure has created a significant possibility that the nonprofit's residual interest would yield little or no return. This does not conform to customary practice, which requires the nonprofit to be adequately compensated in dealings with for-profit affiliates and investors.

### 1. A Four-Step Waterfall

109. In the January 2023 and April 2023 LLC agreements, Section 5.1.B[103] specifies the order in which nonliquidating distributions would be paid to the nonprofit and for-profit affiliates' investors.[104] To be clear, no such distributions have been paid to date.[105]

110. First, the capital of the "First Close Limited Partners" would be returned.[106] The nonprofit is part of this group, since it provided intellectual property and other assets to the for-profit affiliate. The nonprofit's contribution was initially valued at approximately $47 million, and then was revised to approximately $60.8 million.[107] This is less than one-third of the total provided by First Close Limited Partners, which was approximately $193.8 million.[108]

111. Second, the next dollars would start to fund the target redemption amounts of the First Close Limited Partners, employee compensation, and the return of Microsoft's $13 billion capital contribution, with 25% shared by the First Close Limited Partners and employees, and 75% going to Microsoft.[109]  The total target redemption amount of the

---

[103] See Amended and Restated Limited Liability Company Agreement of OpenAI Global, LLC, a Delaware Limited Liability Company, January 23, 2023, Sec. 5.1(b), at 33-34, MSFT_MUSK000055039-40.

[104] These payments would be triggered, for instance, when OpenAI has achieved its goal of producing artificial generative intelligence ("AGI"). See Wu Deposition, at 116.

[105] See Wu Deposition, at 113-14.

[106] January 2023 LLC Agreement, Sec. 5.1(b)(i) ("First, to the First Close Members (including the Non-Profit with respect to its Non-Profit Investment Interest) until each such Member has received aggregate distributions pursuant to this Section 5.1(b)(i) equal to its Capital Contributions."). The allocation is the same in the April 2023 LLC Agreement, except that it is provided on a "look through" basis because OAI Corporation has been added.  April 2023 LLC Agreement, Sec. 5.1(b)(i).

[107] Wu Deposition, at 138-39 ("[B]etween July 2019, when the first amended and restated LP agreement was signed, and this second amended and restated LP agreement, I believe the board had entered into or had engaged an accounting firm, Hemming Morse, to value the contribution of assets that OpenAI, Inc., made into LP. And at that point, based on -- based on the latest set -- or the latest characteristics of what was contributed, they came to the determination that the fair value of that had actually increased from, I think, 47 million, which was reflected in the earlier version, and 60 million or 60.8 million, which is reflected in this version of the agreement").

[108] See January 2023 LLC Agreement, supra, at Schedule A.  The allocations have not changed in the April 2023 LLC agreement, except that they "look through" OAI Corporation.  See April 2023 LLC Agreement, supra, at Schedule A.

[109] See January 2023 LLC Agreement, supra, at Sec. 5.1(b)(ii) ("Next, any remaining items of cash or property comprising such distribution shall be apportioned and distributed (1) 25 percent, in proportion to

---

**Highly Confidential**

FCLPs is $19.38 billion (including approximately $6.08 billion for the nonprofit), which is one hundred times their capital contribution.[110] In addition, an allocation of up to $150 billion can be made to employees.[111]

112. Third, the next dollars would fund the rest of the FCLP's $6.08 billion target redemption amounts, further allocations to employees, and Microsoft's $92 billion target redemption amount (which is the sum of twenty times the first $1 billion it invested and six times the other $12 billion it invested). At this stage, 51% would go to the FCLPs and employees, while 49% would go to Microsoft.[112]

113. Fourth, only after the capital and target redemption amounts and employee awards have been paid, the nonprofit would start to receive the residual.[113]

114. The nonprofit does not fare well under this waterfall. It would not be first in line to recover its capital contribution; instead, it would be paid alongside the other FCLPs. Although its redemption amount is 100 times its capital contribution, this $6.08 billion would be paid–not just alongside the other FCLPs–but also as employees receive their redemption amounts and as Microsoft's capital is returned. Even worse, Microsoft would receive especially favorable treatment at this stage (step #2 in the waterfall), getting

---

their respective Target Redemption Amounts, to the First Close Members (including the Non-Profit with respect to its Non-Profit Investment Interest) and the Employee Vehicle; and (2) 75 percent, in proportion to their respective amounts remaining to be distributed pursuant to this Section 5.1(b)(ii), to the Second/Third/Fourth Close Members, until each such Second/Third/Fourth Close Member has received aggregate distributions pursuant to this Section 5.1(b)(ii) equal to its Capital Contributions."). Again, the allocations have not changed in the April 2023 LLC agreement, except that they "look through" OAI Corporation. See April 2023 LLC Agreement, Sec. 5.1(b)(ii).

[110] January 2023 LLC Agreement, supra, at Schedule A. The allocations have not changed in the April 2023 LLC Agreement, except that they "look through" OAI Corporation. See April 2023 LLC Agreement, at Schedule A.

[111] January 2023 LLC Agreement, supra, at Schedule A. The allocations have not changed in the April 2023 LLC Agreement, except that they "look through" OAI Corporation. See April 2023 LLC Agreement, at Schedule A.

[112] See January 2023 LLC Agreement, supra, at Sec. 5.1(b)(iii) ("Next, any remaining items of cash or property comprising such distribution shall be apportioned and distributed (1) 51 percent, in proportion to their respective Target Redemption Amounts, to the First Close Members (including the Non-Profit with respect to its Non-Profit Investment Interest) and the Employee Vehicle, and (2) 49 percent, in proportion to their respective Target Redemption Amounts, to the Second/Third/Fourth Close Members, in the case of each of clauses (1) and (2), until the time that the applicable Member has received aggregate distributions pursuant to Section 5.1(b)(ii)(1) and this Section 5.1(b)(iii) equal to its respective Target Redemption Amount."). The allocations have not changed in the April 2023 LLC Agreement, except that they "look through" OAI Corporation. See April 2023 LLC Agreement, at Sec. 5.1(b)(iii).

[113] See January 2023 LLC Agreement, supra, at Sec. 5.1(b)(iv) ("Next, the remaining items of cash and property not distributed pursuant to Sections 5.1(b)(i) through (iii) shall be distributed pursuant to this Section 5.1(b)(iv) to the Non-Profit."). The allocations have not changed in the April 2023 LLC Agreement, except that they "look through OAI Corporation. See April 2023 LLC Agreement, at Sec. 5.1(b)(iv).

**Highly Confidential**

75% of any distribution (even though its capital contribution of $13 billion is smaller than the total $19.38 billion redemption amount of the FCLPs, so that a pro rata distribution would have provided Microsoft with only 40.1%–and less if there was an award to employees).

115. Nor is the prospect of a residual payment reassuring. Under the waterfall, even in the unlikely event that nothing is allocated to employees, the business would still have to generate $124.573 billion before the residual payment would begin. The nonprofit would get $6.141 billion of this amount (which would include its $60.08 million capital contribution and its $6.08 billion redemption amount). This would represent only 4.93% of the first $124.573 billion. By contrast, Microsoft would receive $105 billion of the first $124.573 billion, or about 84.3%.

116. The numbers would become even less favorable as equity was allocated to employees. Under the January and April 2023 LLC Agreements, employees could receive as much as $150 billion. If they received this full allocation, the nonprofit would receive only $6.141 billion of the first $274.573 billion, representing only 2.24% of the total. Microsoft would be diluted as well, but it would still receive 38.24%.

117. As a result, this waterfall gives the nonprofit only a very modest percentage of the cash flow generated by the business, at least until the business's profits cross an extremely high threshold, which would be somewhere between $124.573 billion (with no allocation to employees) and $274.573 billion (with the maximum employee allocation). The nonprofit's real payday–its residual allocation–would not begin unless and until OpenAI generated exceedingly high profits. Without this home run, the nonprofit's payout is dwarfed by the payouts to Microsoft, employees, and the other FCLPs.

### 2. *A Moving Target: Inflation and 20% Annual Increase*

118. In fact, the terms are even less favorable than that. Starting in 2025, the target redemption amounts are increased annually by 20% plus inflation.[114] This new term, which was added in the 2023 revision of the agreement,[115] means the thresholds before the nonprofit receives its residual–$124.573 billion without any employee awards and as much as $274.573 billion with employee awards–increase by more than 20% each year.

---

[114] This term is in the definition of "target redemption amount." See January 2023 LLC Agreement, at 15-16, MSFT_MUSK000055021-22.  The same term appears in the April 2023 LLC Agreement.

[115] Wu Deposition, at 180 ("I believe this was not included in the 2021 LP agreement; so, yes, this was a new provision in the--in the waterfall.").

**Highly Confidential**

119. In other words, the profits of the business must not only increase to this high level but must keep growing by more than 20% annually in order for the nonprofit to receive anything for its residual interest. Not only does OpenAI have to hit a home run, but it has to hit a home run as the outfield wall keeps getting farther and farther away.

### 3. A Residual That Arguably Does Not Reflect the Nonprofit's Economic Contribution

120. It is not clear why the nonprofit's share of the profits should be so modest. This pricing implies that Microsoft is adding vastly more value than the nonprofit. Otherwise, why would it receive 84.3% to the nonprofit's 4.93% of the first $124.573 billion (assuming no allocation to employees)? No doubt, Microsoft's contributions of capital and computing power are significant, but are they really *that much more* significant than the nonprofit's contribution?

121. This seems implausible. Otherwise, why didn't Microsoft just choose to develop AI on its own? The fact that Microsoft opted instead to partner with OpenAI suggests that OpenAI must be contributing significant value. But this value has not been adequately reflected in the waterfall, as customary practice requires.

122. If the answer is, "just wait, the nonprofit will get its payday through the residual," then that raises the obvious question: how likely is this residual to materialize? The climb is even steeper now that the target redemption amounts are increasing by 20% plus inflation every year. It is not clear why the nonprofit's chances of a large payout should be so remote. More fundamentally, why were the cash flows carved up in this way?

### C. OpenAI's "Capped Return" Structure Did Not Protect the Nonprofit's Economic Interests: Caps Were Set Without Rigorous Financial Analysis

123. It is customary practice for large and sophisticated nonprofits to have a well-considered answer to this question. As noted above, the terms with for-profit affiliates and their investors must be set at fair market value. These terms should not be pulled out of the air. They should be based on comparable transactions in the market or well-accepted financial models, such as a Black Scholes valuation. This level of sophistication seems especially important when over one hundred million and then billions of dollars of investment are being negotiated, as was the case with OpenAI.

**Highly Confidential**

### 1. Absence of Comparable Transactions and Financial Modeling

124. Unfortunately, this sort of sophisticated analysis was not commissioned for the investment rounds between 2019 and 2023. There were no analyses of comparable transactions or Black Scholes valuations when approving the return multiples for private investors.

125. This stands in stark contrast to the 2024 negotiation between OpenAI and Microsoft. OpenAI retained Goldman Sachs, which engaged in a financial analysis for "Project Watershed," and produced an "advocacy response" to Microsoft's position in an effort to get more favorable terms.[116]

126. But in the negotiations leading to earlier investments, the terms were developed in a less rigorous way. A sobering picture emerges from the deposition of Mr. Wu, as well as from his subsequent declaration.

127. Mr. Wu was shown an email from April 2018 in which Mr. Altman initially proposed a redemption target of 50 times the contributed capital. When asked how Mr. Altman came up with the 50 X multiple, Mr. Wu answered with vague generalities about "the best interest of the mission" and the capital, compute, and talent that were needed, but shared nothing about comparable transactions, Black Scholes values, or other sophisticated financial modeling:

> There were discussions around that time period around ensuring that any future structure, including one with a capped profit type of return, was in the best interest of the mission. And what I mean by that is balancing a number of considerations, including the investibility [sic], the ability to track the capital needed to bring on the compute, and talent needed. And I think there was discussion, generally, about what kind of capped return multiple or other terms may be necessary in order to achieve that mission.[117]

128. Similarly, Mr. Wu was asked more generally how multiples were set. Again, his answer in his deposition was vague, offering no hint that rigorous quantitative analysis had been performed, even though billions of dollars were invested and potential payouts of well more than one hundred billion were being set. Instead, Mr. Wu offered platitudes like "setting the nonprofit up for success," "the right terms," and "undue risk":

---

[116] See Goldman Sachs, Project Watershed: Microsoft Analysis Response (Sept. 2024), OPENAIMUSK00037265.

[117] Wu Deposition, at 79-80.

**Highly Confidential**

> The board, at that time, my understanding, has always been focused on balancing a number of considerations -- right? -- ensuring that they were setting the nonprofit up for success, and ensuring that they were getting good terms, ensuring that this was an investable entity attractive to top tier investors who would be willing to put in capital at the right terms, that did not kind of put the nonprofit or OpenAI at undue risk, and, ultimately, through the course of negotiations, through the course of discussions with investors, ultimately landed at this particular capped-profit structure and particular multiple.[118]

129. The picture did not become any clearer when Mr. Wu was asked in his deposition how the parties set the multiple for the first close at 100 X. "My understanding," he responded, "is that this time they were trying to determine, again, what would -- what structure would put the nonprofit in the best position to raise the capital it needed on desirable terms and -- and ultimately landed at 100 times based on negotiations and other discussions."[119]  When asked why the multiple was twice the 50 X that Mr. Altman had initially floated, Mr. Wu replied, "I do not know."[120]

130. When asked why the multiple for Microsoft's first investment (of $1 billion) was 20 X, Mr. Wu's deposition shed no meaningful light on the substance of the terms or the process that produced them:

> Again, I wouldn't say that OpenAI specifically arrived at the 20X. I -- my understanding is that this was a negotiation with Microsoft in terms of a broader deal, which included investment and commercial terms, and kind of an arm's-length negotiation. And taking into consideration all of those terms, the parties agreed on a 20X multiple.[121]

131. Pressed to provide more detail on how the 20 X number was determined, Mr. Wu again offered no evidence that any rigorous financial analysis had been done:

> Yeah, I won't speak to the specifics. I would say my understanding is that the board took into consideration, as always, what was in the best interests of the mission. And in taking into consideration all of that, kind of the need for capital to purchase compute and attract talent, ultimately took into effect -- into account all

---

[118] Id. at 82-83.

[119] Id. at 89.

[120] Id. at 89.

[121] Id. at 111.

**Highly Confidential**

of those considerations and made a determination that this was a fair and -- fair deal that was in the best interests of the mission.[122]

132. Mr. Wu's deposition was no more illuminating when he was asked about the 6 X multiple used for Microsoft's later investments of $12 billion:

> I don't know how the board and Microsoft arrived at that specific multiple. Again, all of these investments, I think, were a balancing of ensuring that the nonprofit received good terms but also balanced the need to attract top investors and bring in the capital needed to advance the mission.[123]

133. Nor did Mr. Wu's deposition explain why a lower multiple (6 X) was used instead of the previous multiple (20 X):

> I don't know specifically why it was lower or why it was set at 2X [sic]. Again, I think years had passed at that point, and given -- taking into consideration kind of the size of the company, or the for-profit at that point, and other elements of the investment, the parties negotiated and landed on a 6X multiple.[124]

134. The net effect of all this, as noted above, was that the nonprofit's residual payment would not commence until an exceedingly high threshold was reached. In agreeing to this, OpenAI should have analyzed different scenarios, considering the circumstances that could give rise to profitability above this threshold and the likelihood of these favorable scenarios. Yet it does not seem as if OpenAI engaged in this sort of analysis.

135. When Mr. Wu was asked in his deposition, "Did OpenAI's board make a determination about the probability that the investors would be paid out such that OpenAI, Inc., would receive residual amounts under this agreement?," he answered, "I don't know if they specifically came up with a calculation as to the probability of TRA payouts."[125]

136. Similarly, when asked if quantitative modeling was done (in calculating the 6 X multiple for later Microsoft investments), he answered "I don't know" and "I don't know

---

[122] Id. at 112.

[123] Id. at 137.

[124] Id. at 137-38.

[125] Id. at 141.

Highly Confidential

about specific financial modeling."[126] Pressed further, he resorted again to vague generalities:

> I mean, I can speak to the board having met with management and the team that was negotiating this deal with Microsoft. And they did review the terms, including all of the terms beyond just the investment, as well, taking into consideration the compute that was necessary, talent, the state of the company and the industry at that point, and made a determination that this deal was fair and in the best interests of the mission. I can't speak to specific financial modeling or analysis that was done.[127]

137. In a declaration after his deposition, Mr. Wu offered more platitudes. For example, he said that OpenAI's "management team was responsible for negotiating the terms," and that "[t]hese negotiations occurred at arm's length" and were "subject to oversight and ultimate approval by" the board, which was "responsible for reviewing the proposed terms" and "determining whether those terms were in the best interest" of the nonprofit.[128]

138. The declaration then describes the "variety of factors" the board considered, which are only a bit different from the generalities Mr. Wu offered in his deposition. These factors included:

> the extent to which additional capital was necessary for OpenAI, Inc. to accomplish its mission; the Board's desire to maintain, to the greatest extent possible, the value of OpenAI, Inc.'s residual economic interest in OpenAI's for-profit subsidiary; and information regarding the terms on which potential investors in OpenAI's for-profit subsidiary would be willing to invest at the relevant time.[129]

139. The new information Mr. Wu's declaration adds is that "[w]hen negotiating and evaluating TRAs [target redemption amounts] and other proposed terms," management and the board "had access to the periodic valuation reports that OpenAI received from PricewaterhouseCoopers and Andersen Consulting in the ordinary course of OpenAI's business,"[130] and that:

---

[126] Id. at 174.

[127] Id. at 175.

[128] Declaration of Robert Wu ¶¶3-4 (Oct. 17, 2025) ("Wu Decl.").

[129] Id. at ¶ 4.

[130] Id. at ¶ 5.

These reports used multiple methodologies to estimate the fair value of the equity and other economic interests in OpenAI's for-profit subsidiary, taking into account, among other things, (a) the OpenAI management team's forecasts of future business operations; and (b) the terms of any economic interests in the for-profit subsidiary that existed on the relevant valuation date, including the applicable TRAs and the mechanics of the profit distribution waterfall.[131]

140. While this declaration indicates that management and the board "had access" to these valuations, it does not say how (or even whether) they actually used them in setting the target redemption amounts. Indeed, if management and the board had *actually used* this material, the declaration presumably would have said so. Instead, the phrase "had access" seems like an implicit admission that these materials were not actually used, but were merely stored in a file cabinet somewhere.

141. The declaration is unsatisfying in another way as well. Its references to "multiple methodologies" and "terms of any economic interests . . . that existed" are quite vague. For example, did OpenAI estimate the probability that the target redemption amounts would be exceeded, and thus that the nonprofit's residual interest would actually generate value? The implication is that they did not do these calculations.

142. Indeed, the declaration concedes that no experts were hired to assess the target redemption amounts, even though hundreds of millions and then billions of dollars were being negotiated. "The OpenAI, Inc. Board did not consider any financial or quantitative analysis specifically prepared by a third-party financial advisor to assess any proposed TRAs."[132] Given the stakes, this is a problematic divergence from customary practice.

## 2.  OpenAI's Failure to Follow Customary Practice

143. OpenAI did not undertake the level of analysis I would expect in large transactions at sophisticated nonprofits. In my experience, this sort of casual process is more common at small nonprofits. Less is expected of organizations staffed solely or primarily by volunteers, which have modest budgets and minimal assets. But obviously, a low-budget publication, advocacy organization, or congregation is not negotiating multi-billion dollar investments with a for-profit partner that is one of the world's largest, most valuable, and most sophisticated companies.

---

[131] Id. at ¶ 5.

[132] Id. at ¶ 6.

**Highly Confidential**

144. The right comparators for OpenAI are large, sophisticated nonprofits. In my experience, they engage in analysis that is much more rigorous and data-driven, even in transactions involving much lower dollar amounts than the investments in OpenAI's for-profit affiliate. In my experience, sophisticated nonprofits regularly look to comparable transactions and use financial modeling.

145. For example, when I gave advice about structuring a newly-formed nonprofit to become the owner of a for-profit regional newspaper, as noted above, the owner who was donating the newspaper and his advisors spent months poring over and refining the details of this transaction. Although the transaction was somewhat unique at the time, we invested significant resources and effort in learning as much as possible about other transactions converting news organizations to (or founding them as) nonprofits, as well as other for-profit businesses owned by nonprofit parent companies.

146. Likewise, when a humanitarian organization I was leading entered into a multi-year office lease in Manhattan, a team of professionals and board members compiled detailed data about comparable transactions and pressed potential landlords for better terms. Over the months involved in analyzing and finalizing this transaction, we also restructured the deal to attain favorable state and local tax treatment.

147. When the same humanitarian organization sold buildings in Russia and Israel, the nonprofit's professionals and board were meticulous in ascertaining the pricing in comparable transactions. We hired experts to advise about the local context and details of those markets, carefully vetted potential buyers, and engaged in detailed and protracted negotiations.

148. In my experience, large nonprofits generally also are quite rigorous when investing endowment funds. Experts on the board work with consultants or in-house professionals to compare alternatives, seek reductions in fees, and otherwise press for better terms. At the nonprofit I led, we regularly used financial modeling, as well as market benchmarks rooted in comparable transactions.

149. The same often is true when a large nonprofit (like the one I led) sets CEO pay. The board's compensation committee seeks granular information about what comparable nonprofits pay, drawing either on publicly-available data from Form 990 filings or from the data sets and expertise of compensation consultants.

150. To sum up, the customary practice for large and sophisticated nonprofits is to use comparable transactions and financial modeling when negotiating major

Highly Confidential

transactions. Unfortunately, the investments in OpenAI's for-profit affiliates between 2019 and 2023 diverged from this practice.

### D. In OpenAI's "Capped Return" Structure, For-Profit Investment Dwarfed Philanthropic Support

151. The lack of rigor at OpenAI in evaluating and negotiating the terms of investments in the for-profit affiliate is especially surprising because these investments loomed very large in OpenAI's budget. This was not a situation where a nonprofit had ample philanthropic support and revenue from its mission, so the for-profit investment represented a very modest share of its budget.

152. On the contrary, these for-profit investments dwarfed OpenAI's philanthropic support. As noted above, OpenAI attracted $13 billion from Microsoft and $133 million from FCLPs (other than the nonprofit).

153. In contrast, the philanthropic support reported on the nonprofit's publicly-available Form 990s (as of October 10, 2025) totals only $138,200,286. The annual amounts were as follows:

| Year | Amount |
|---|---|
| 2016 | $13,784,637 |
| 2017 | $33,228,555 |
| 2018 | $49,917,797 |
| 2019 | $33,580,000 |
| 2020 | $2,661,461 |
| 2021 | $3,066 |
| 2022 | $1,611 |
| 2023 | $5,023,159 |
| **Total** | **$138,200,286** |

154. While OpenAI generates meaningful revenue from its products, its expenses are much higher, so it has multi-billion dollar operating losses.[133] To fill this gap, OpenAI is largely relying on for-profit investment, not philanthropy.

---

[133] Memo from Microsoft Management to the Microsoft Board, Sept. 9, 2024, at 3, MSFT_MUSK000040992 ("OpenAI expects to generate $3.7 billion revenue (261% growth) in calendar

Highly Confidential

155. The contrast between OpenAI's philanthropic support and for-profit investment is striking. Microsoft's $13 billion investment is nearly 100 times larger than the total giving to OpenAI. This imbalance is further evidence that the for-profit affiliates loom very large at OpenAI, reinforcing the concern that the for-profit tail is wagging the nonprofit dog.

### E. Sharing of Intellectual Property and Decision-making Authority With a For-Profit Partner Raises Serious Questions About Whether the Nonprofit's Economic Interests Have Been Adequately Protected

156. It is customary practice for nonprofits to protect their assets not just in their capital structure, but also in their operations. Although it is customary practice for nonprofits to hire for-profit entities to perform specific functions or to form a joint venture with them, these arrangements can't "give away the store." The terms must be based on fair market value, and nonprofits need to retain discretion to prioritize their mission.

157. There are reasons to question whether OpenAI has conformed with this customary practice in its agreements with Microsoft. OpenAI has given its for-profit partner extremely broad (and increasing) access to its intellectual property and facilities, while also giving Microsoft the right to participate in important decisions.

158. In principle, when OpenAI formed for-profit affiliates, it could have kept its intellectual property in the nonprofit and licensed this IP to the for-profit affiliates. But instead, the nonprofit contributed this intellectual property to a for-profit affiliate.[134] Likewise, newly-created intellectual property is housed in for-profit affiliates, not in the nonprofit. This is especially important because the financial value at OpenAI presumably lies in its intellectual property and workforce.

159. Microsoft has the right to use OpenAI's intellectual property, and the scope of this right has expanded over time.[135] In 2019, Microsoft could choose a single language

---

year 2024 and anticipates revenue will grow to $11.6 billion (212% growth) in 2025."); id. ("The company expects high compute costs and stock-based compensation to weigh on margins throughout the forecast. As such, the company expects an operating loss of ($8.3 billion) in 2024 and ($17.7 billion) in 2025.").

[134] Wu Deposition, at 102 ("My understanding is that was substantially all of the IP that was developed at the nonprofit at that point in time was contributed down to OpenAI LP.").

[135] Wu Deposition, at 204 ("I believe between 2019 and 2023, through amendments of the JDCA, there were modifications to their IP rights which kind of evolved over time. Again, I won't get into the specificity of all of the IP, but if you look at the defined terms in the JDCA, there did appear to be broader categories of IP that were licensed.").

**Highly Confidential**

model and claim an exclusive license to it.[136] In 2021, Microsoft received an exclusive license to several broad categories of OpenAI's intellectual property.[137] In 2023, Microsoft's rights expanded to cover any IP (other than AGI).[138] Under the 2025 term sheet, Microsoft would receive access to AGI as well, with a carveout for AGI research.[139]

160. Although OpenAI used to have discretion to decide whether it had produced models that met the definition of AGI, the 2025 term sheet creates a new process in which an expert panel, appointed jointly with Microsoft, would make this determination.[140] This is significant because a number of Microsoft's rights expire and other terms of the arrangement change at the point when OpenAI successfully develops AGI.

161. Meanwhile, since 2019, OpenAI has given Microsoft the right to sign off on "major decisions."[141] As defined in the 2019 limited partnership agreement, this includes mergers, liquidations, borrowing above a threshold, expanding employee compensation above $150 billion, and other important decisions.[142] Indeed, any effort to reorganize OpenAI itself requires Microsoft's approval.[143]

---

[136] See Joint Development and Collaboration Agreement ("JDCA") of July 2, 2019, Sec. 3(g), at 12, MSFT MUSK000018525 (granting Microsoft a license to "a specific, state of the art language model").

[137] JDCA of March 5, 2021, Sec. 1(r), at 3, MSFT_MUSK000064513 ("'Licensed IP' means all (i) Trained Models of LP, OpenAI, or both (or of any of their respective Affiliates) developed at any time during the Term, (ii) GPT-3, and (iii) the Odyssey Period Models, in each case, in object code form. For clarity, Licensed IP excludes: (x) any Research; (y) all Related IP; and (z) AGI."); Wu Deposition, at 149-50 ("For licensed products jointly developed, as defined in this agreement between Microsoft and OpenAI, yes, it appears Microsoft would receive revenue net of any reasonable, actual, and documented direct production costs.").

[138] JCDA of Jan. 23, 2023, Sec. 1(v), at 6, MSFT_MUSK000055105 ("Licensed IP" means all (i) of OpenAI's and OpCo's Background IP, (II) Foreground IP (including OpCo's and OpenAI's interest in any Jointly Developed Foreground IP), and (iii) Improvements to OpCo's and OpenAI's and OpCo's Background IP, in each case of the foregoing clauses (i) - (iii), whether developed at any time during the Term or at any time before the Effective Date. For clarity. Licensed IP expressly includes all IP and Technology of OpenAI, OpCo, or both, excluding only AGI. For clarity, licensed IP 23 explicitly includes all IP and technology of OpenAI, OpCo, or both, excluding only AGI."); see also Wu Deposition at 184 ("it does appear that it [the scope of Microsoft's rights to IP] is broader").

[139] Argos 3 Term Sheet, at 6, OPENAI_MUSK00037454 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " (emphasis added); Wu Deposition, at 244-45 (confirms new rights to AGI IP).

[140] Argos 3, at 1-4, OPENAI_MUSK00037449-52.

[141] Sec. 6.2(a) of 2019 Limited Partnership Agreement, at 27, MSFT_MUSK000059982 (requiring approval of majority of limited partners for major decisions).

[142] See id. at 8-9, MSFT_MUSK000059963-64.

[143] Wu Deposition, at 125-26. The 2019 Limited Partnership Agreement defines "major decisions," which require Microsoft's approval, to include "approve any transaction, pay any amounts or transfer any assets between the Partnership and a GP Related Person except as expressly contemplated by this

Highly Confidential

162. Microsoft also has the right to have engineers on site at OpenAI,[144] which it has used.[145] Embedding engineers in OpenAI's operations presumably makes it even easier for Microsoft to exploit OpenAI's intellectual property.

### F. OpenAI's Mission and Economic Interests Have Not Been Protected by Contractual Provisions That Are Supposed to Prioritize the Mission

163. So far, this report has identified significant evidence that the nonprofit has not followed customary practice in protecting its mission and economic interests. As noted above, the nonprofit changed the way it describes its mission, made a series of decisions that deemphasized safety, was saddled with an exceedingly high threshold before it received value under its residual interest, and provided decision-making authority and broad access to intellectual property to a for-profit partner.

164. This evidence reveals the pressure that has been exerted on contractual and structural terms that are supposed to protect the nonprofit's mission and economic interests. This Section surveys some of these contractual terms. Unfortunately, it seems as if they have not been up to the task.

165. OpenAI has included legends on contracts with investors, putting them on notice that they are contracting with a nonprofit, whose mission is supposed to come first. For example, the cover page of its limited partnership agreements with Microsoft contains the following language in a highlighted box:

> Investing in OpenAI, L.P. is a *high-risk investment*\*\*
>
> \*\*Investors could lose their capital contribution and not see any return\*\*
>
> \*\*It would be wise to view any investment in OpenAI, L.P. in the spirit of a donation, with the understanding that it may be difficult to know what role money will play in a post-AGI world\*\*

---

Agreement," as well as any effort to "dissolve, liquidate, or otherwise terminate the Partnership," to "effect or permit a merger, division, or consolidation of the Partnership with or into another Person that would have a material adverse effect on the Partnership," or to "otherwise alter the structure of the Partnership." 2019 Limited Partnership Agreement, at 8, MSFT_MUSK000059963; see id. at. Sec. 6(2)(a), at 27, MSFT_MUSK000059982 (requiring approval for major decisions).

[144] JDCA of March 5, 2021, Section 5(f), MSFT_MUSK000064627 (giving Microsoft right to post up to ten engineers at OpenAI).

[145] Wu Deposition, at 152 (Microsoft has embedded engineers on site).

Highly Confidential

The Partnership exists to advance OpenAI Inc.'s mission of ensuring that safe artificial general intelligence is developed and benefits all of humanity. The General Partner's duty to this mission and the principles advanced in the OpenAI, Inc. Charter take precedence over any obligation to generate a profit. The Partnership may never make a profit, and the General Partner is under no obligation to do so. The General Partner is free to re-invest any or all of the Partnership's cash flow into research and development activities and/or related expenses without any obligation to the Limited Partners. See Section 6.4 for additional details.

166. Setting aside some overheated rhetoric (such as "it may be difficult to know what role money will play in a post-AGI world"), this legend accurately states the customary practice in forming and capitalizing a for-profit affiliate: prioritizing the nonprofit's mission. The legend cautions that the "partnership may never make a profit, and the General Partner is under no obligation to do so." Indeed, it goes so far as to say that investors "would be wise to view" the investment "in the spirit of a donation."

167. In addition, Section 6.4(a) of the January and April 2023 LLC agreements also explicitly "subordinat[es] company and member interests to [the] core mission" and "modifi[es] fiduciary duties" accordingly:

SUBJECT TO THE PROVISIONS OF THIS AGREEMENT, THE MEMBERS ACKNOWLEDGE AND AGREE THAT AS DETERMINED BY THE MANAGER IN ITS SOLE DISCRETION, THE INTERESTS OF THE COMPANY AND THE MEMBERS SHALL BE SUBORDINATE TO THE CORE MISSION; PROVIDED THAT THE MANAGER AND THE MANAGER RELATED PERSONS SHALL NOT CONSIDER THEIR OWN ECONOMIC INTERESTS BEFORE THE INTERESTS OF THE COMPANY. SUBJECT TO THE PROVISO IN THE FOREGOING SENTENCE, UNDER NO CIRCUMSTANCES SHALL THE MANAGER OR THE MANAGER RELATED PERSONS BE LIABLE TO THE COMPANY OR THE MEMBERS IN CONSEQUENCE OF HAVING TAKEN ANY ACTION WITHOUT MATERIAL MISCONDUCT INTENDED TO FURTHER THE CORE MISSION, EVEN IF SUCH ACTION CONFLICTS WITH THE INTERESTS OF OR, ACTUALLY RESULTS IN ADVERSE CONSEQUENCES TO, THE COMPANY OR THE MEMBERS. CORRESPONDINGLY, UNDER NO CIRCUMSTANCES SHALL THE MANAGER OR THE MANAGER RELATED PERSONS BE LIABLE TO THE COMPANY OR THE MEMBERS IN CONSEQUENCE OF FAILING OR DECLINING TO TAKE ACTION FOR THE BENEFIT OF THE COMPANY OR THE MEMBERS IF SUCH LACK OF ACTION WAS WITHOUT MATERIAL MISCONDUCT AND WAS INTENDED TO

Highly Confidential

FURTHER THE CORE MISSION, EVEN IF THE COMPANY OR THE
MEMBERS SUFFER ADVERSE CONSEQUENCES IN CONNECTION
THEREWITH. SUBJECT TO THE PROVISIONS OF THIS AGREEMENT, THE
DUTIES AND OBLIGATIONS OF THE MANAGER OR THE MANAGER
RELATED PERSONS ARISING UNDER THIS AGREEMENT OR OTHERWISE
IN ITS CAPACITY AS SUCH SHALL BE SUBORDINATE TO THE EFFORTS OF
THE MANAGER OR THE MANAGER RELATED PERSONS TO FULFILL THE
CORE MISSION. SUBJECT TO THE PROVISIONS OF THIS AGREEMENT,
NONE OF THE MANAGER, ANY MANAGER RELATED PERSON, OR ANY
AFFILIATE OR ASSOCIATE OF ANY OF THE FOREGOING, SHALL BE
DEEMED TO HAVE VIOLATED ANY FIDUCIARY OR OTHER DUTY TO ANY
PERSON IN CONSEQUENCE OF HAVING PLACED THE CORE MISSION
AHEAD OF THE INTERESTS OF THE COMPANY OR THE MEMBERS;
PROVIDED THAT, THE MANAGER AND THE MANAGER RELATED
PERSONS SHALL NOT CONSIDER THEIR OWN ECONOMIC INTERESTS OR
THE INTERESTS OF ANY OTHER PERSON BEFORE THE INTERESTS OF
THE COMPANY AND THE MEMBERS (IN THEIR CAPACITY AS
MEMBERS).[146]

168. In my view, the content of this language is consistent with the customary
practice of nonprofits. But unfortunately, OpenAI does not seem to have actually
followed this language. Instead of "subordinating the interests" of for-profit affiliates and
their investors "to the core mission," OpenAI has made a range of decisions that
prioritize profit over safety, as noted above, by including a for-profit partner in safety
decisions, allowing an exodus of safety experts, committing errors about the need for
safety review, and changing its position on regulation. Likewise, instead of allowing
"adverse consequences" for the for-profit affiliate and its investors–as it is obligated to
do when the mission so requires–OpenAI has failed to protect the nonprofit's economic
interests, as explained above, by agreeing to a residual interest that is subject to an
exceptionally high threshold, by not retaining third-party experts to assess these
thresholds, and by allowing a for-profit partner generous (and expanding) access to its

---

[146] MSFT_MUSK000055042-43; see also OpenAI 2021 Form 990, Schedule O,
OPENAI_MUSK00005698 (partnership agreement requires partnership "to give priority to exempt
purposes over maximizing profits for the other participants, preventing the Partnership from engaging in
activities that would jeopardize the organization's exemption, and requiring all contracts entered into with
the organization to be on terms that are at arm's length or more favorable to the organization"); OpenAI
2019 Form 990, OPENAI_MUSK00005499 ("The organization does not have a written joint venture policy
but took extensive steps to safeguard its exempt status, including maintaining control of the Partnership
(through control of its general partner) to ensure that the Partnership furthers the organization's exempt
purposes, requiring the Partnership to have terms in its partnership agreement to give priority to exempt
purposes over maximizing profits for the other participants, preventing the Partnership from engaging in
activities that would jeopardize the organization's exemption, and requiring all contracts entered into with
the organization to be on terms that are at arm's length or more favorable to the organization.").

Highly Confidential

intellectual property and facilities. So, although the contractual language may be consistent with customary practice, the results are not.

## IV. Customary Practice Is To Rely on the Board To Protect the Nonprofit's Mission and Economic Interests by Discharging Their Fiduciary Duties

- **Opinion # 6:** It is customary practice to rely on a nonprofit's directors to protect the nonprofit's mission and economic interests by discharging their fiduciary duties, but OpenAI failed to follow this practice because the CEO and senior management did not provide independent members of the nonprofit's board with adequate information to oversee the for-profit affiliates.

- **Opinion # 7:** It is customary practice for a nonprofit to have independent directors with the expertise and authority to protect the nonprofit's mission and economic interests, but OpenAI diverged from this practice by not giving these directors independent legal advice or adequate opportunity to increase their numbers.

- **Opinion # 8:** It is customary practice for the board to dismiss the CEO when it has concerns that the CEO is withholding information, providing misleading information, or not protecting the nonprofit's mission and economic interests, but OpenAI failed to conform to this practice. When the board attempted to dismiss the CEO, this effort failed because of resistance from employees (influenced in part by the prospect of lucrative equity compensation) and OpenAI's principal for-profit investor, leading instead to the dismissal of three of the four board members who attempted to dismiss the CEO.

- **Opinion # 9:** It is customary practice for nonprofits to pick their own board members, without answering to for-profit partners in this process, but OpenAI gave Microsoft the opportunity to vet and veto candidates, as well as a non-voting observer on the board.

169. When a nonprofit has for-profit affiliates–particularly affiliates with outside investors–it faces pressure to prioritize profits over its mission. To counter this pressure, the customary practice is to empower the nonprofit's board and officers to protect the mission.

170. OpenAI's board retained significant formal control over its for-profit affiliates on paper. The main for-profit vehicle, OpenAI LP, is governed by limited partnership agreements and, after a recapitalization, a limited liability company agreement. Under

**Highly Confidential**

Section 6.2 of the January and April 2023 LLC Agreements, "The Company"–that is, the main for-profit affiliate (which originally was "OpenAI LP" and was replaced by LLCs in a recapitalization, as noted above)–"shall be a manager-managed limited liability company, managed by the Manager." The January and April 2023 LLC Agreements' definitions sections specify that the "Manager" is a different entity, OpenAI GP, L.L.C., which is an entity controlled by the nonprofit. In theory, this structure gives the nonprofit significant control over the for-profit.

171. But this control actually is less robust than it seems at first blush. First, the LLC Agreements and other contracts limit the nonprofit's control in a range of ways, including by requiring approval by investors (most notably, Microsoft) on major decisions, by including Microsoft on the joint safety board, by allowing Microsoft to name half the members of a panel that determines whether AGI has been achieved, and by giving Microsoft broad access to the for-profit affiliates' IP and facilities, as noted above.

172. More fundamentally, the control that remains after these carve-outs is meaningful only to the extent that the nonprofit is willing and able to use it effectively. If the nonprofit's CEO and board of directors are aligned in prioritizing the mission and in protecting the nonprofit's economic interests, they have some authority, as a formal matter, to pursue these goals.  But for this to happen, the nonprofit's officers and board must be aligned and they must act vigorously. This is what their fiduciary duties require.[147]  In short, having power *in theory* is not enough. The board needs to *actually use* this power.

173. Unfortunately, the track record at OpenAI is quite troubling. Four directors tried to protect the mission–and, indeed, they tried to dismiss the CEO–but they ended up reinstating him and (with one exception) being dismissed themselves. This history, and the dysfunctional dynamics that gave rise to it, raise serious questions about whether their successors on the nonprofit board have the capacity and motivation to prioritize the nonprofit's mission.

---

[147] Ellen P. Aprill, Rose Chan Loui & Jill R. Horwitz, Board Control of a Charity's Subsidiaries: The Saga of OpenAI, 182 Tax Notes 289, 293 (Jan. 8, 2024) ("unless the members of the board fulfill their fiduciary duties, which run to the nonprofit entity in light of its charitable purposes, even the most carefully thought-out structures are for naught.").

Highly Confidential

### A. *Customary Practice Requires Nonprofit Boards To Discharge Their Fiduciary Duties*

174. It is customary practice (and, indeed, a legal requirement) for nonprofit board members to discharge three fiduciary duties.

#### 1. *Duty of Care*

175. First, the duty of care "refers to the responsibility of conducting the affairs of an organization with competence."[148] This duty "concerns the standard of conduct applied to directors in the discharge of their oversight responsibilities."[149] Directors do not have to make perfect decisions, but they need to "act in good faith and with a certain degree of diligence, care, and skill."[150]

176. To comply with this duty, directors need adequate information about the nonprofit's management, activities, policies, and finances. They cannot ensure that the organization is being run competently unless they have access to the information needed to make an informed judgment.

177. Armed with this information, board members "have an obligation to ensure that the organization uses its resources as effectively as possible to advance its charitable mission."[151] Customary practice is for the board to "protect the assets of the organization and provide oversight to ensure that its financial, human, and material resources are used appropriately to further its mission and to establish a level of risk tolerance appropriate for its operations."[152]

178. At Open AI, there is significant evidence, noted above, that the board has failed to protect OpenAI's economic interests in a range of ways, including in the terms given to investors in for-profit affiliates and in the access granted to a for-profit partner to its intellectual property and facilities. This evidence raises questions under the duty of care.

---

[148] Herman et al., supra, at 167.

[149] James J. Fishman, Stephen Schwarz & Lloyd Hitoshi Mayer, Nonprofit Organizations: Cases and Materials 137 (6th ed. 2021); see also American Law Institute, Restatement of Charitable Nonprofit Organizations Sec. 2.03(a) ("A fiduciary of a charity has a duty to act in good faith with the care a person of ordinary prudence in a like position would exercise under similar circumstances.").

[150] Id. Under the "best judgment" rule (which is the nonprofit analog to the "business judgment rule"), their decisions generally are upheld in court if they have no conflicts of interest, are reasonably informed, and reasonably believe that the decision is in the nonprofit's best interests in light of its charitable purposes. See American Law Institute, Restatement of Charitable Nonprofit Organizations Sec. 2.03(b).

[151] Independent Sector, Principles for Good Governance and Ethical Practice A Guide for Charities and Foundations 29 (2d ed. 2015).

[152] Id. at 21.

**Highly Confidential**

As noted below, the board also has not had access to adequate information in overseeing management, which also is an issue under the duty of care.

### 2. Duty of Obedience

179. Second, the duty of obedience requires board members to "ensure the organization is faithfully carrying out its charitable mission."[153] To protect the mission, customary practice requires "[d]ecision-making and the crafting of policy . . . to be consistent with the mission and values of the organization."[154]

180. This obligation applies not only to the nonprofit itself, but also to its for-profit affiliates. This is especially challenging, as noted above, because for-profit investors (and, therefore, for-profit affiliates) typically have the incentive to prioritize profit over the mission. In response, the board needs to "se[t] policies and procedures to ensure that the activities and operations of any affiliates, chapters, or branches subject to its direct or indirect control are consistent with the organization's values and mission."[155]

181. The board cannot simply choose to stop pursuing the mission, and to prioritize profitability instead. Charitable assets are irrevocably committed to charitable purposes. Any change requires regulatory approval.[156] Instead, the nonprofits usually would have to be sold for fair market value, with the proceeds committed to charitable purposes.

182. Once again, the board can discharge this obligation only if it has adequate information. The board "carries the responsibility of remaining informed about all the

---

[153] Cal. Att'y Gen. Guide for Charities, supra, at 48.

[154] Herman, et al., supra, at 169.

[155] Independent Sector, Principles for Good Governance and Ethical Practice A Guide for Charities and Foundations 21 (2d ed. 2015).

[156] See Aprill, Loui & Horwitz, supra, at 294 ("There is Delaware case law . . . that considers a charity's general charitable assets to be devoted to that charity's purposes."); Denckla v. Independence Foundation, 193 A.2d 538, 541 (Del. 1963) (distinguishing an "absolute gift to be used by the corporation for one or more of its corporate purposes" from a gift technically held in trust and stating that in the case of the former "the resulting duty on the part of the corporation [is] to use the property solely for its corporate purposes and not to do an ultra vires act. . . . The corporation is only under a duty not to divert the property to anything other than one or more of the charitable purposes for which the corporation is organized."). California has a similar rule. See Pac. Home v. L.A. Cnty., 264 P.2d 539, 543 (Cal. 1953) (charitable assets must be held in trust for declared purpose "as effectively as though the assets had been accepted from a [donor] who had expressly provided in the instrument evidencing the gift that it was to be held in trust solely for such charitable purposes"). So does federal law. IRS, "Charity – Required Provisions for Organizing Documents," Aug. 19, 2024, https://www.irs.gov/charities-non-profits/charitable-organizations/charity-required-provisions-for-organizing-documents ("[A]n organization's assets must be permanently dedicated to an exempt purpose. This means that if an organization dissolves, its assets must be distributed for an exempt purpose described in section 501(c)(3), or to the federal government or to a state or local government for a public purpose.").

**Highly Confidential**

organization's programs, new initiatives, and collaboration with other nonprofits or with public- or private-sector organizations."[157]

183. At OpenAI, there is significant evidence, noted above, that the board has failed to protect OpenAI's mission by deemphasizing safety, cooperation, and the broad distribution of benefits from AI. This evidence raises questions under the duty of obedience. As noted below, the board also has not received adequate information from management, which raises issues under the duty of obedience as well.

### 3. Duty of Loyalty

184. Third, the duty of loyalty requires board members to put the nonprofit's interests first, "act[ing] in good faith and in a manner the fiduciary reasonably believes to be in the best interests of the charity in light of its purposes."[158]

185. The duty of loyalty requires board members to avoid conflicts of interest. They need to "address reasonably situations that involve the potential for self-dealing in which the interests of a fiduciary or related person may conflict with the interests of the charity."[159] This includes disclosure of conflicts and recusal,[160] so independent directors can determine whether the relevant decision is in the interests of the nonprofit.[161]

---

[157] Herman et al., supra, at 169.

[158] American Law Institute, Restatement of the Law: Charitable Nonprofit Organizations, section 2.02(a); see also Herman, et al., at 168-69 ("The duty of loyalty requires that board members put the interests of the organization they are serving above their personal interests while rendering decisions and taking actions on the nonprofit's behalf."); Cal. Att'y Gen. Guide for Charities, supra ("officers cannot use their positions to further their private interests, or otherwise secure any personal advantage against the corporation").

[159] American Law Institute, supra, Sec. 202(b).

[160] Independent Sector, Principles for Good Governance and Ethical Practice A Guide for Charities and Foundations 12 (2d ed. 2015) ("A charitable organization should adopt and implement policies and procedures to ensure that all conflicts of interest (real and potential), or the appearance thereof, within the organization and the governing board are appropriately managed through disclosure, recusal, or other means."); Herman, et al., supra, at 169 ("the board member must recuse himself or herself from discussion or voting on any topic related to this potential conflict").

[161] Dane P Blevins, Roberto Ragozzino & Rory Eckardt, "Corporate governance" and performance in nonprofit organizations, 20 Strategic Organizations 293, 297 (2022) ("[I]ndependent directors are thought to be less deferential to management's actions, which may be self-interested or short-sighted. Likewise, independent directors are considered to have more freedom with being critical of actions of managers, since they do not receive material benefits, or have conflicting relationships with executives (e.g. a spouse, sibling, child etc.");  Cal. Att'y Gen. Guide for Charities, supra, at 55-56 ("the board must approve the transaction by a majority of directors then in office without counting the director subject to the conflict of interest").

Highly Confidential

186. In this spirit, board members also must ensure that the mission is prioritized over the interests of for-profit investors. "The duty of loyalty also requires fiduciaries to ensure continued contemporaneous application of charitable assets to public purposes."[162]

### B. The Board Clashed With the CEO in Seeking More Information

187. To discharge its fiduciary duties, the board needs adequate information, as noted above. This is a basic customary practice. Yet independent board members worried that Mr. Altman was not sharing information they needed to supervise him and to protect the nonprofit's mission and assets. "We -- the board members had a number of experiences where we felt that Sam, you know, wasn't forthright and wasn't honest with the board and other, you know, members of the company, senior leaders," Ms. McCauley recalled in her deposition, "and it led to an erosion of trust, a loss of trust."[163]

188. As Ms. Toner put it, she came to "believe that he [Mr. Altman] was not motivated to help the board perform the oversight role."[164] She warned of a further challenge as well. "Sam is very good at causing people to believe things that are false," she observed, "while giving himself plausible deniability about whether he said them or not."[165]

#### 1. Information About Safety

189. Customary practice is for senior managers to provide the board with information it needs to supervise the organization and to ensure that the mission is followed. For OpenAI, this meant that the board needed adequate information about safety.

190. Inadequate information about safety–and, indeed, poor governance more generally–is especially troubling in the development of AI, given the safety risks this technology poses, which are increasing over time.[166] "[I]t was important that the company be governed well," Ms. Toner observed, "in order to be able to manage increasingly severe AI safety risks over time."[167] Before joining the board, she had been

---

[162] American Law Institute, supra, Sec. 202 comment a.

[163] McCauley Deposition, at 60.

[164] Toner Deposition, at 58.

[165] Id. at 202.

[166] Id. at 204 ("I believe that the safety risks associated with their technology are growing over time, and the importance of the board functioning well and governing the company effectively is growing over time.").

[167] Id. at 170.

**Highly Confidential**

warned of the risk that, as an AI expert, she would be merely a "safety fig leaf,"[168] and she wanted to play a meaningful role in ensuring that OpenAI's products were safe. Yet she and other independent directors were concerned that they were not getting full information about safety reviews, as noted above.[169]

191. Indeed, when Ms. Toner was asked about details of safety reviews in her deposition, she responded: "I am not that familiar with the details. I think the board should have been more familiar with the details."[170] She expressed the same concern in a podcast. "On multiple occasions, he [Mr. Altman] gave us inaccurate information about the small number of formal safety processes that the company did have in place," she observed, "meaning that it is basically impossible for the board to know how well those safety processes were working or what might need to change."[171] In Ms. Toner's view, this failure to share information derived from pressure to "move fast and be ahead of competitors and earn market share"[172]—that is, the impulse to prioritize profit over the mission, which, again, is not customary practice when nonprofits have for-profit affiliates.

192. Ms. McCauley expressed the same concern in her deposition. "[T]he board of the non-profit is meant to oversee the activities of the for-profit, so -- and the purpose of that is so that the -- the non-profit can, in a disinterested way, uphold the mission . . . in the face of potential profit pressures that might -- might come into play as -- as the for-profit does it[s] work," she observed. "And the primary lens that the board -- that the non-profit board has for seeing into the for-profit activities of the company is, you know, the CEO and what the CEO chooses to convey to us and the materials we are given to -- to do our analysis and make our decisions."[173] So when the board would learn that they were receiving "inaccurate information about whether a process had been followed that was put in place, it was very concerning to us," she emphasized, "because we felt that it went against our ability to do our job and make our -- our decisions and oversee the for-profit entity effectively."[174]

---

[168] Id. at 184.

[169] See supra Part II.D.3.

[170] Toner Deposition, at 44.

[171] What Really Went Down at OpenAI and the Future of Regulation w/ Helen Toner, The TED AI Show, May 2024, https://www.ted.com/talks/the_ted_ai_show_what_really_went_down_at_openai_and_the_future_of_regulation_w_helen_toner.

[172] Toner Deposition, at 157.

[173] McCauley Deposition, at 32-33.

[174] Id.

**Highly Confidential**

193. In my experience, when nonprofit boards want information, nonprofit professionals get it to them. This is standard practice, which recognizes the board's oversight role. Obviously, the directors cannot fulfill their role if they don't know what is going on. It is not customary practice–indeed, in my experience, it is quite unusual–for boards to face the kinds of challenges that confronted OpenAI's nonprofit board in getting clear and reliable information about safety.

### 2. Information About Potential Conflicts of Interest

194. Independent directors worried also that they did not have complete information about potential conflicts of interest,[175] even though it is a familiar practice to provide this information.

195. For example, independent directors say Mr. Altman never disclosed that he owned "OpenAI Startup Fund," an entity that would invest in companies that could use OpenAI products.[176] One of the independent directors, Adam D'Angelo, learned about this when "[s]ome questions about the fund had been surfaced . . . , I think, at a dinner party . . ." The independent directors were understandably concerned about the "happenstance way, a board member had to kind of encounter those questions."[177] In my experience, it is not customary practice to have to stumble on relevant information in this way, instead of having a well-functioning channel that routinely provides it.

196. Helen Toner emphasized the governance problem this lack of disclosure posed. "After we learned that Sam was -- had a financial stake in the fund, we also had concerns about the fact that he had not disclosed that, given that his position on the board was one of an -- one of a supposedly independent board director, meaning one with no financial interest in OpenAI," she explained in her deposition. "And so while his financial -- the potential financial gain from his interest in the startup fund was small, from the perspective of process and disclosure, it was a notable oversight that he had not informed the board."[178]

---

[175] Toner Deposition, at 95 (when asked whether she "develop[ed] an impression that the board was not being given all the information it needed to assess conflicts of interest issues," Ms. Toner responded that "I did develop that impression, yes").

[176] Toner Deposition, at 83-84.

[177] McCauley Deposition, at 50-51; Toner Deposition at 84 ("Adam D'Angelo was at a dinner with some other -- I forget what the word is -- founders, investors, startup people, who were asking him about the structure of the startup fund and potential conflicts of interest between the startup fund and OpenAI's investors more generally. And after that conversation, Adam e-mailed the board, including Sam, perhaps a couple of other OpenAI executives, to understand the structure better. And in the resulting back-and-forth, we learned that Sam was the -- as I understand it, the owner of the fund.").

[178] Toner Deposition, at 85.

**Highly Confidential**

197. Tasha McCauley shared this concern that Mr. Altman "might have . . . either investments or activities that he might have been gaining from without the board knowing," she explained, "that . . . could have impacted . . . his consideration as a board member of OpenAI."[179] Because of these concerns "about Sam in particular,"[180] the independent directors felt they needed "a more robust process for conflict disclosures."[181]

198. It is certainly customary practice to have a robust process. Nonprofits do not want to encounter issues under the duty of loyalty, as noted above, so it is routine–even for relatively small nonprofits–to require regular disclosure, which is shared with a point-person on the board (usually a chair of the audit or governance committee) for review. I personally have supervised this sort of process many times. Overbroad questions are asked to ensure that every conceivable conflict is disclosed. Yet unfortunately, OpenAI seems not to have conformed to this customary practice.

### 3. Information About OpenAI's Operations and Board

199. Independent directors worried also about not receiving important information about OpenAI's operations, even though it is customary practice for such information to be available. A notable example was that "when ChatGPT came out, November 2022, the board was not informed in advance about that," Ms. Toner complained. "We learned about ChatGPT on Twitter."[182]

200. Ms. McCauley echoed this concern. "[T]he fact that a very major release could happen, you know, ChatGPT being one of the biggest consumer releases ever in the history of OpenAI, that the board had not even heard -- heard about that, learned about it on Twitter," she said, "was extremely concerning."[183]

201. Although concerning, it was, sadly, not surprising. "I wasn't surprised that we weren't told about ChatGPT," Ms. Toner said, "because we were barely told about anything."[184] In her view, this incident was symptomatic of a broader problem. "I thought it indicated that the board was often not looped in on things it should have been looped

---

[179] McCauley Deposition, at 46.

[180] Id. at 46.

[181] McCauley Deposition, at 42; see also Toner Deposition, at 92-93 (incidents involving Mr. Altman created concerns about effectiveness of OpenAI's conflict of interest policy).

[182] What really went down at OpenAI and the future of regulation w/ Helen Toner, The TED AI Show, May 2024, MSFT_MUSK00056590, https://www.ted.com/talks/the_ted_ai_show_what_really_went _down_at_openai_and_the_future_of_regulation_w_ helen_toner; see also Toner Deposition, at 56.

[183] McCauley Deposition, at 268-69.

[184] Toner Deposition, at 217.

**Highly Confidential**

in on," she explained. "I thought it also indicated that the company's . . . processes for making decisions that could have material impact on the mission were inadequate."[185]

202. When asked about this failure to tell the board about the release of ChatGPT, Mr. Altman said the board should have been generally aware that "we were going to build a chat product" because they "had been talking for months in board meetings," and he dismissed the release as just "a research preview."[186] Yet Ms. Toner has a different recollection. "I believe the possibility [of developing a chat-based product] had been discussed with the board," she said. "I don't believe that I thought that was a done deal."[187] In any event, Mr. Altman would not (quite) concede that he never told the board, though. "I'm not sure if I, like sent the board the email the day before or not saying this is going to go out, you know, right now," he said. "I suspect I did not."[188]

203. Again, this is not customary practice–quite the opposite. It is utterly standard, at a minimum, to give the board advance notice of important developments, including the launch of new services. In my experience, this is second nature to nonprofit professionals. Not only do they want to respect the board's oversight role, but they also want board members to feel invested in a new initiative, so the board will support it. In my experience, letting the board find out about the launch of a major new initiative on social media, like everyone else, is certainly not customary practice.

204. It is customary practice for boards not only to receive information, but also to discuss strategically important issues, and OpenAI's independent directors had concerns on this dimension as well. For example, "after ChatGPT had been released and had become very popular, Adam, multiple times, attempt[ed] to have board-level conversations about the effects of that release and that popularity was having on the company's mission and the company's structure," Ms. Toner recalled, "and there [was] . . . repeated redirection away from the board having a serious conversation about the ways that ChatGPT was changing the company's approach to its mission. But we never had that serious conversation, despite Adam pushing for it several times."[189]

205. In my experience, it is customary practice for boards to add items to the agenda that are of interest to them. If they want to discuss something, nonprofit professionals accommodate them–again out of respect for their oversight role and in an effort to

---

[185] Toner Deposition, at 57-58.

[186] Altman Deposition, at 41-42.

[187] Toner Deposition, at 217.

[188] Altman Deposition, at 42-43.

[189] Toner Deposition, at 218.

Highly Confidential

maintain the board's support. The "repeated redirection" described by Ms. Toner is not customary practice.

206. She and the other independent directors complained that Mr. Altman was not just uncommunicative, but also misleading. They claimed he was mischaracterizing the views of board members when speaking with other board members. For example, when Ms. Toner published a paper about the way safety issues are perceived, Mr. Altman reportedly was unhappy with what she had said about OpenAI.[190] He allegedly told Mr. Sutskever that Ms. McCauley had said, "Helen [Toner]'s obviously got to go," even though she had never said that.[191]

207. "I was very displeased," Ms. McCauley said in her deposition. "This was absolutely not reflective of something I said or thought in any way. I think Helen was a -- a good independent board member. . . . I called some other board members. I called Adam, I called Helen, and we discussed the fact that there was an untrue thing being said, it seemed with the intention of -- of pushing Helen off the board."[192] (In his deposition, Mr. Altman claimed he had been misquoted, and that he had said only that Ms. McCauley had "serious concerns" about the article.)[193]

208. Ms. Toner and Ms. McCauley both recalled a similar incident involving Mr. D'Angelo. "Sam had tried to manufacture a consensus that Adam needed to leave the board," Ms. Toner reported, "when, in fact, there was no such consensus."[194] Mr. Altman proposed to other board members that Mr. D'Angelo should resign. He and Mr. Brockman proposed different rationales, but ultimately Ms. Toner thought that Mr. Altman was "searching for an excuse [to remove Mr. D'Angelo from the board] because -- because he [Mr. D'Angelo] had been providing more active governance of the company."[195]

209. Notably, though, when he spoke with Mr. D'Angelo, Mr. Altman implied that the idea for him to leave the board had come from other people. When "Adam explained [to Ms. Toner] what he had heard from Sam . . . ," Ms. McCauley recounted, "Helen kind of

---

[190] Toner Deposition, at 73-74 ("He was concerned about board member criticizing or being seen to criticize the company.").

[191] Id. at 76 (Mr. Altman "told Ilya that Tasha thought I had to leave the board because of the fact that I had written this paper, which Tasha had not said"); McCauley Deposition, at 84.

[192] McCauley Deposition, at 84; see also Toner Deposition, at 77 ("this incident, and broader conversations with my fellow board members around this time, led me to conclude that Sam was trying to remove me from the board").

[193] Altman Deposition, at 45.

[194] Toner Deposition, at 77.

[195] Id. at 80.

Highly Confidential

laughed when he said that, because it was very different from the actual discussion that we had had."[196] In other words, "Sam was trying to convey that he wasn't part of that discussion," she explained, "although by our understanding, he was kind of initiating that discussion."[197]

210. Unfortunately, Ms. McCauley described this as "common behavior that I heard reported from -- from numerous people."[198] These "were two examples of him [Mr. Altman] having preferences for how the board would be composed, making efforts towards having the board be recomposed in some way, either Adam leaving the board or Helen leaving the board," Ms. McCauley noted, "by lying to board members about what -- what certain board members thought."[199]

211. While this may have been "common behavior" for Mr. Altman, it is not customary practice at nonprofits. Again, board members are supposed to receive accurate information.

### 4. A Culture of Deceit

212. According to Ms. McCauley, board members were not alone in mistrusting Mr. Altman. Independent directors learned that two senior managers–Ilya Sutskever (who was also on the board) and Mira Murati–shared their concerns, so much so that they had compiled "a very lengthy . . . document" of "dozens of pages of examples of different chaotic events that had occurred from -- from Sam's behavior or lies he had told."[200]

213. As Ms. Toner recalled, his document chronicled Mr. Altman "making conflicting promises, talking out both sides of his mouth, pitting team members against each other."[201] There was a "pattern" in which Mr. Altman "would misleadingly relay other people's opinion in a way that manipulated the listener."[202]

---

[196] McCauley Deposition, at 234.

[197] Id. at 235.

[198] Id. at 234.

[199] Id. at 235.

[200] Id. at 86; Toner Deposition, at 107-08 (confirming that Dr. Sutskever sent a self-destructing email cataloging examples of Mr. Altman's misconduct).

[201] Toner Deposition, at 109; see also id. at 184 ("I spoke with a couple of other former employees who described to me that they did not believe that Sam was honest").

[202] Id. at 296.

Highly Confidential

214. In Ms. McCauley's view, the fact that Dr. Sutskever and Ms. Murati felt the need to document these incidents, keep screen shots, and share this information with the board was a strong statement in and of itself.[203] Ms. Toner expressed a similar view.[204]

215. Ms. McCauley was also concerned that others were following Mr. Altman's example. "[P]eople in the company were copying that behavior, and there was kind of a culture of lying and a culture of, you know, yeah, deceit," she cautioned. "And I think for us, as a board, this -- this was just extremely concerning."[205]

### 5.  Lack of Reliable Information Kept the Board From Doing Its Job

216. Although it is a common customary practice to provide boards with accurate information about the nonprofit's operations, board, and potential conflicts, OpenAI's independent directors reported a very different experience. As Helen Toner put it:

> [W]e had, over the course of months to years, had -- we, being the independent directors, Adam, Tasha and I -- had each -- while I don't want to speak for others, my impression is that all three of us, certainly myself, had had growing concern over months and years about the board's independence from the company, the board's ability to perform its legally mandated role, the board's ability to understand the company's activities enough to -- to perform that role. And some concerns about the CEO's involvement in those limitations of the board's ability to perform its duties. The way that I experienced it was that we had significant concerns at the board level about the board's ability to do its job.[206]

217. Accurate information is especially important when a nonprofit has a "non-standard structure to empower the mission . . . ," Ms. McCauley reflected. "[F]ull leadership buy-in to that structure is necessary; otherwise, I do think the structure sort of sets the stage for internal misalignment, because if the leadership is not working to support that structure, it's non-functional."[207]

---

[203] McCauley Deposition, at 88 (noting "the degree of concern, you know, in their minds that would have caused them to want to surface screenshots of this to the board"); see also Toner Deposition, at 112 ("My impression throughout was that Ilya and Mira were in communication about wanting to remove Sam from his position.").

[204] Toner Deposition, at 303-04 ("even the fact, for example, that Ilya and Mira appeared to have collaborated on a 60-page PDF that they sent as an exploding document to the board, that was sort of -- that fact, more than sort of any one individual instance in this document, was important for my understanding of the situation").

[205] McCauley Deposition, at 90.

[206] Toner Deposition, at 306.

[207] McCauley Deposition, at 36.

**Highly Confidential**

218. Without the right information, the board could not protect the mission. "[G]iven that the mission of the company is to ensure that, you know, artificial general intelligence benefits all of humanity, we . . . needed to be careful that the public's interest . . . was being considered in each of the decisions . . . ," Ms. McCauley cautioned. Yet "a number of instances made us feel that we could not trust . . . the information we were receiving . . . about the for-profit's activities via Sam." Board members were "concerned that . . . as the technology was accelerating, as stakes were getting higher and higher over time," they "would not be able to sufficiently oversee and to -- to make the decisions we needed to make."[208]

219. This evidence suggests that there was a fundamental governance problem at OpenAI, which diverged starkly and in problematic ways from customary practice. "[O]ne of our, you know, primary duties as board members was to oversee the activities of the non-profit and ensure that the activities were happening in accordance with the non-profit's mission," Ms. McCauley explained. "Since we determined that we couldn't rely on information we were receiving, we didn't think we could do that."[209]

### C. The Board Clashed With the CEO In Seeking Greater Independence

220. To discharge their fiduciary duties, boards need more than information. They also need independent members, who do not face conflicts of interest or mixed incentives in protecting the nonprofit's mission and economic interests.

221. This is especially important when a nonprofit has for-profit affiliates. Negotiations with for-profit investors and decisions that can affect the affiliates' profitability must be made by disinterested directors who do not personally share in these profits. This customary practice prevents breaches of fiduciary duties.

### 1. Disagreements About Independent Legal Advisors

222. To protect their independence, independent directors at OpenAI wanted to work with outside counsel in evaluating transactions. "[W]e had been working to improve oversight of different transactions . . . [to] get more legal support from an independent non-profit outside counsel," Ms. McCauley noted, "for example, trying to improve the extent to which we could involve our independent outside lawyers in -- in review of different transactions and whatnot."[210]

---

[208] Id. at 61.

[209] Id. at 134.

[210] Id. at 116.

223. Yet "in some instances, there was resistance to us doing this," Ms. McCauley recounted.[211] Although Mr. Altman said he was open to this idea, the general counsel reached out to resist it. Ms. McCauley thought the general counsel was acting at Mr. Altman's request. "Sam tends to kind of work through proxies; sort of like be agreeable to you directly," she reported, "but then maybe work against whatever the agreement might have been."[212]

### 2. Disagreements About New Independent Directors

224. The independent directors also wanted to increase their ranks. "I think the independent board members and I were -- were particularly interested in taking steps to increase independence on the board," Ms. McCauley reported, "ideally with a board member who also had an eye to AI safety."[213]

225. Yet there was no consensus about a candidate.[214] The independent directors believed Mr. Altman was resisting candidates who would not support him personally. "His conduct in these discussions strengthened my impression," Ms. Toner observed, "that he wanted a board that would largely go along with him as opposed to providing pushback."[215]

226. Ms. McCauley had the same impression. "I think a concern that was spoken amongst, you know, the independent board members at the time was that we were worried that Sam didn't want to lose control of the board," Ms. McCauley observed. "So I think -- I don't know about whether it was specifically about an AI safety board member or not. I think it was more a question of whoever we brought on, whether they were going to be favorable to, kind of, Sam's wishes or -- or not."[216] They had reservations about the candidates he suggested. "Our concern," she said, "was that these would tend to be people who would be favorable to him."[217]

---

[211] Id.

[212] Id. at 117-18.

[213] Id. at 66; Toner Deposition, at 61 (confirming long-running effort, which she supported, to appoint another independent director with AI safety expertise).

[214] Toner Deposition, at 63.

[215] Id. at 65.

[216] McCauley Deposition, at 68.

[217] Id. at 69.

**Highly Confidential**

### 3. Campaign Contribution to a Director

227. Independent directors suspected that Mr. Altman also was trying to win over directors with financial inducements.  "I worried that some of Sam's actions may have biased the directors in his favor," Ms. McCauley reported. "For example, maybe like offering to make a significant political contribution to Will Hurd's campaign or something like that, where it didn't feel appropriate to me to kind of create an incentive like that when it was intended to be an independent."[218]

228. According to Ms. Toner, the contemplated political contribution would have been several hundred thousand dollars, and this was problematic because Mr. Altman expected Mr. Hurd to return to the board after his presidential campaign:

> He did not go ahead with this donation because Tasha, Adam, and I all said it seemed very inappropriate.  But to me, the fact that he was considering that, the fact that he might have discussed it with Will in advance, the fact it was an option was just a sign of total disregard for the board's independence or ability to provide meaningful oversight of the company and the CEO.[219]

### D. The Board Tried and Failed to Dismiss Mr. Altman

229. The concerns discussed in the last two Sections prompted four directors (Adam D'Angelo, Tasha McCauley, Ilya Sutskever, and Helen Toner) to fire Mr. Altman on November 17, 2023. The reason was a "pattern of behavior related to his honesty and candor, his resistance of board oversight," Ms. Toner explained in her deposition, "as well as the concerns that two of his senior management team, Ilya Sutskever and Mira Murati, raised to the board about his management practices, his manipulation of board processes."[220] To explain this decision to the public, the four directors issued a statement:

> Mr. Altman's departure follows a deliberative review process by the board, which concluded that he was not consistently candid in his communications with the board, hindering its ability to exercise its responsibilities.[221]

---

[218] Id. at 160.

[219] Toner Deposition, at 102.

[220] Id. at 105.

[221] OpenAI Announces Leadership Transition, OPENAI (Nov. 17, 2023), 2024MUSK-0011572, https://openai.com/index/openai-announces-leadership-transition/.

**Highly Confidential**

230. Yet they had to reverse this decision a few days later, and three of these four directors were themselves forced out. Hiring and firing the CEO arguably is the board's most important source of authority. But OpenAI's board did not have the independence or influence to take this step, raising grave questions about governance at OpenAI. "[T]here was a guardrail around the nonprofit being able to make certain decisions," Ms. Toner cautioned, "and then it turned out that, in practice, those decisions could be reversed."[222]

231. A key reason was the clout wielded by Microsoft. Immediately after Mr. Altman was terminated, he was in touch with Microsoft's CEO, Satya Nadella, and other senior executives there.[223] Two days later, Mr. Nadella reached out to Mr. D'Angelo, urging the independent directors to reverse their decision.[224] "There was a coalition of different people pushing for Sam's reappointment," Ms. Toner recounted, "and my understanding was that Microsoft was part of that."[225]

232. Even more importantly, at Mr. Altman's suggestion, Microsoft hired him to run an AI initiative.[226] Microsoft also hired Greg Brockman, a cofounder of OpenAI (whom the directors had removed from the board on the same day they terminated Mr. Altman). In addition, "Microsoft was offering to hire away the entire OpenAI team," Ms. Toner recalled, "and would have jobs for anyone who wanted them at Microsoft."[227]

233. Microsoft's open offer triggered "a very strong disintegration of support from within the company . . . ," Ms. McCauley recalled. "I think the claim was that the employees would go over and move to Microsoft."[228] In a letter to the independent directors, 751 employees threatened to do so unless "all current board members resign," noting that "Microsoft has assured us that there are positions for all OpenAI

[222] Toner Deposition, at 166.

[223] Altman Deposition, at 52-54 ("Over the weekend, I certainly had a lot of calls" with Mr. Nadella).

[224] McCauley Deposition, at 103 ("Satya wanted to restore things to as they had been. I think he was asking if -- if we would consider reinstating Sam."); Toner Deposition, at 124 (noting that Mr. Nadella was not in touch with her and that she believed he was not in touch with Ms. McCauley, and that "I believe that Satya was in communication with Adam on and off."); see id. at 336-37 ("The only direct interaction I had with Satya was one where he did not express the support that we were seeking, which was on Sunday night. . . . That was before we announced Emmett Shear as interim CEO, and we were looking for signoff to include a statement that Microsoft was in full support of the decision, or in full support, or something along those lines, and he declined to authorize that.").

[225] Toner Deposition, at 134.

[226] Altman Deposition, at 52 (responding to question about when Mr. Nadella first proposed that he should come work at Microsoft, Mr. Altman said, "I believe it was my idea first, but I'm not certain on that.").

[227] Toner Deposition, at 147. In Ms. Toner's deposition, OpenAI's counsel suggested that Meta and Google were also seeking to poach OpenAI's employees. See id. at 273.

[228] McCauley Deposition, at 112; Toner Deposition, at 141 ("many employees were threatening to quit").

Highly Confidential

employees at this subsidiary should we choose to join."[229] There was a real possibility, as Mr. Altman put it, that "OpenAI was just going to fall apart and scatter to the wind."[230]

234. This "threat of Microsoft destroying the company . . . ," Ms. Toner explained, "changed the calculus for us about what the best way to pursue the nonprofit mission was."[231] With this offer, Microsoft "significantly increased the credibility of employees' threats that they would leave en masse," Ms. Toner continued, "and gave Sam significantly more leverage to demand his own reinstatement to avoid the company falling apart."[232] In short, by threatening to replace OpenAI's for-profit affiliate with a Microsoft subsidiary, Microsoft's offer severely limited the nonprofit's options.

235. The allure of profits created another source of pressure on the board: OpenAI's employees were about to sell billions of dollars of their stock in the for-profit affiliate.[233] "I believe that the prospect of imminently cashing out on some of their equity stake," Ms. Toner said, "played a role in their opposition to Sam being fired."[234]

236. These financial stakes may have rendered employees more inclined to believe critiques of the board's intentions and legitimacy. "Sam and his associates were sharing propaganda," Ms. Toner recalled, "that this was a coup by AI safety conspiracists"[235] and "that he was fired because the board was scared of how fast things were going," which she deemed "inaccurate."[236]

237. In response to this stick and carrot–the risk that OpenAI might shut its doors and the large payout if OpenAI remained under Mr. Altman–OpenAI's employees lobbied for his reinstatement. They were joined by Ilya Sutskever, one of the four board members who dismissed Mr. Altman, and Mira Murati, who had initially agreed to serve as interim CEO.[237] Dr. Sutskever and Ms. Murati's about-face was especially telling,

---

[229] Letter to the Board of Directors at OpenAI, OPENAI_MUSK00037737.

[230] Altman Deposition, at 56.

[231] Toner Deposition, at 148.

[232] Id. at 148.

[233] McCauley Deposition, at 123 ("there was also, you know, a tender offer out to the employees").

[234] Toner Deposition, at 325.

[235] Id. at 246.

[236] Id. at 248.

[237] Id. at 112 ("I interpreted her as being supportive of our decision and up for the -- yeah, up for -- being up for it, to being interim CEO"); id. at 127 (noting that after Mr. Altman was terminated, "Mira strikingly unsupportive during these conversations" between the board and the executive team).

**Highly Confidential**

since they had shared documentation about "chaotic events" caused by Mr. Altman's "behavior or lies he had told,"[238] as noted above.

238. Dr. Sutskever's defection speaks volumes because he played such a key role in terminating Mr. Altman. According to Ms. Toner, the "starting point" was a "circuitous and confusing" conversation she had with Dr. Sutskever, who "had some very significant concern but told me that he couldn't tell me what his concern was, essentially."[239] Yet days after helping to terminate Mr. Altman, Dr. Sutskever "publicly posted that he regretted his decision to contribute to removing Sam" because, as Ms. Toner put it, he "was pretty freaked out about whether OpenAI would survive."[240]

239. Similarly, Ms. Murati indicated that she would not continue as interim CEO "unless the board was able to -- the word I remember her using is 'legitimize' the decision."  Ms. Toner reported, "I think she did not seem to understand, either wilfully or not, that she had a pivotal role in legitimizing the decision herself." Or, at least, she did not want this role to be public. "I think she was not willing to stick her neck out and say that she had told the board about severe concerns she had about Sam," Ms. Toner said, "because she was, in my interpretation, concerned about retaliation that might lead to or -- or blowback for her career."[241]

240. This resistance from employees left the independent directors with an unappealing choice: either they had to bring back Mr. Altman or there would be a "significant destabilization or a breaking of the company."[242] Faced with this choice, "[t]he other directors and I agreed that of the options available to us at the moment . . . ," Ms. McCauley explained, reinstating Mr. Altman was "the option that was most consistent with the mission, because we thought if the alternative truly was that OpenAI would disintegrate, that would not best serve the mission."[243]

241. Reflecting on this effort to dismiss Mr. Altman and, more generally, on their experience as independent board members, Ms. Toner and Ms. McCauley concluded that for-profit incentives had overwhelmed the effort to keep OpenAI focused on its mission. "[B]ased on our experience, we believe that self-governance cannot reliably withstand the pressure of profit incentives," they wrote in *The Economist*. "If any company could have successfully governed itself while safely and ethically developing

---

[238] McCauley Deposition, at 86.

[239] Toner Deposition, at 104.

[240] Id. at 141.

[241] Id. at 129.

[242] McCauley Deposition, at 124.

[243] Id. at 254.

**Highly Confidential**

advanced AI systems, it would have been OpenAI" because of its "unusual structure," which was supposed to "protect the company's ability to stick to its original mission," but "[u]nfortunately it didn't work." After confirming that they "stand by" their decision to dismiss Mr. Altman, they drew a sobering conclusion:

> Our particular story offers the broader lesson that society must not let the roll-out of AI be controlled solely by private tech companies. . . . [E]ven with the best of intentions, without external oversight, this kind of self-regulation will end up unenforceable, especially under the pressure of immense profit incentives.[244]

### E. There are Serious Concerns About Whether the Reconstituted Board Is Able to Protect the Nonprofit's Mission and Economic Interests

242. In the wake of this unsuccessful effort to dismiss Mr. Altman, there are significant risks that the board no longer has the independence to protect the nonprofit's mission and economic interests, a reality that is not consistent with customary practice. There are a number of reasons to worry that the board has been compromised, causing commentators to question whether it is up to the task of protecting the nonprofit's mission.[245]

243. First, a sobering precedent has been set. The board tried and failed to replace Mr. Altman and, more generally, to prioritize the mission over profits. "[T]he nonprofit board's ability to fire the CEO, which, on paper, was clearly a guardrail that was legally very solid . . . ," Ms. Toner observed, "in practice turned out to not actually be that solid."[246] New board members considering a similar effort are likely to be chastened by this experience, worrying that the same dynamic–driven by Microsoft's influence and the

---

[244] Helen Toner & Tasha McCauley, AI Firms Mustn't Govern Themselves, Say Ex-Members of OpenAI's Board, Economist, May 26, 2024, MSFT_MUSK000056582-83, https://www.economist.com/by-invitation/2024/05/26/ai-firms-mustnt-govern-themselves-say-ex-members-of-openais-board.

[245] See, e.g., Aprill, Loui & Horwitz, supra, at 294 ("Given the history, it's unclear whether the reconstituted board can or will want to advance the company's charitable purposes."); Chang & Lu, supra, at 18 ("The subsequent replacement of these board members for attempting to fulfill their fundamental obligations suggests that the non-profit entity may now play a secondary role in the overall partnership."); Robert Weissman, Letter to California Attorney General on OpenAI's Nonprofit Status, Public Citizen (Jan. 9, 2024), https://www.citizen.org/wp-content/uploads/public-citizen-ca-ag-letter-re-openai-status.pdf ("after the dismissal, there was effectively a fight between the non-profit entity and the for-profit entity and its stakeholders (or at least the forces in the OpenAI ecosystem prioritizing profit-making), and the for-profit won—even though the law and the governance structure of the entities require that the non-profit be superior"); id. ("the publicly available facts at a minimum raise profound questions about whether the non-profit entity operates independently and controls the for-profit, or whether the for-profit entity is now effectively controlling the nonprofit (or, relatedly, if the nonprofit now sees profit-making as its primary purpose).")

[246] Toner Deposition, at 164-65.

Highly Confidential

financial interests of employees–would play out again. Ms. Toner's diagnosis was that the mission had been overwhelmed by the allure of power and profit:

> [M]y judgment of Sam's resistance to board oversight was not purely about the financial incentives at play for him but also about the enormous amount of power that he would wield if OpenAI was successful in developing extremely advanced AI systems. . . . Profit played a more direct part in what we perceived to be Microsoft's role in the aftermath of firing Sam and also in the reaction of some employees who were concerned about their equity stakes and the potential loss of an upcoming stock sale, tender deal.[247]

244. Second, the board members who made this attempt were not only thwarted, but also removed from the board. From the first moment when Mr. Altman was approached to return, this was one of his conditions. "I believe I said something like, 'Maybe I would consider it if you all left the board,'" Mr. Altman recalled in his deposition.[248] As the conversation continued, "I was very clear," he recounted, "'[g]iven that this happened, if I was to come back, I needed a very different board and different governance.' They agreed with that. And we then started talking about who the new board members would be in that conversation."[249]

245. Third, Mr. Altman had significant influence over who the new board members would be. In agreeing to leave, Ms. Toner and Ms. McCauley tried to set the condition that there would be independent members on the new board. They pushed to keep one of the directors who had fired Mr. Altman (Mr. D'Angelo),[250] and to remove Mr. Altman from the board.[251] In return, they had to compromise on who the new board members would be.[252] "There were many rounds of back-and-forth over the previous few days with potential names for a new board," Ms. Toner recounted, "attempting to find names that were acceptable both to Sam and to the existing board."[253] Ms. McCauley worried that Bret Taylor was too close to Mr. Altman–indeed, they had opted not to add him at an earlier point when Mr. Altman had suggested him–but now they felt compelled to

---

[247] Toner Deposition, at 156.

[248] Altman Deposition, at 26.

[249] Id. at 27-28.

[250] McCauley Deposition, at 256.

[251] Id. at 123-24 (one of their "stipulations" was "that Sam would not be on this restructured board").

[252] Id. at 256 ("the other members being chosen had to be, you know, pretty amenable to the folks negotiating on the other side")

[253] Toner Deposition, at 150.

**Highly Confidential**

agree.[254] Notably, although Mr. Altman did leave the board in November of 2023, he rejoined in March 2024 when other members were added.[255]

246. Fourth, the nonprofit's for-profit partner Microsoft actively participated in decisions about who would be on the nonprofit's board. Mr. Altman engaged in a text exchange with Mr. Nadella and other senior executives at Microsoft. They brainstormed about possible candidates, and Microsoft nixed one of them. When Mr. Altman asked, "Would ████████ be okay with you?," Mr. Nadella responded, "no." Kevin Scott, another senior executive then wrote, "████████████████████ strong no–a strong, strong no. ████████ is great."[256] Mr. Nadella liked "strong, strong no" and offered another candidate, ████████████████.[257] Mr. Nadella then added Mr. Taylor to the text exchange "so that he also sees all the names."[258] Consistent with the active role he was playing, Mr. Nadella also asked whether "*we* get this done tonight" (emphasis added) and whether he should "ping" Mr. D'Angelo.[259] Mr. Nadella then asked for the phone number of another candidate for the board, Larry Summers, presumably so he could form a view about him.[260] In a different exchange, Mr. Nadella also suggested that Microsoft should have an observer on the board,[261] and this request was granted a few days later.[262] When asked whether Microsoft approved the new board members, Ms. Toner answered; "Implicitly, I believe they did, yes. I don't know what -- what exact approval process was involved."[263]

247. It is not customary practice–and, indeed, it is quite troubling–for a nonprofit's for-profit partner to be given the ability to influence (and even veto) candidates for the nonprofit's board. This is especially concerning at OpenAI because the board is charged with protecting the mission, even at the expense of the for-profit partner's financial interests. Since the board is supposed to constrain the influence of Microsoft and other

---

[254] McCauley Deposition, at 256-57 ("I had concerns about his [Taylor's] ability to . . . make disinterested decisions in a way that wasn't partial to Sam" and at an earlier point "Bret may have expressed concern . . . around the -- the conflicts. I think that he had said he had known Sam for a very long time and had a lot of connections to Sam and whatnot").

[255] OpenAI Announces New Members to Board of Directors, OpenAI, March 8, 2024, https://openai.com/index/openai-announces-new-members-to-board-of-directors/.

[256] Altman Deposition, at 67.

[257] MSFT–MUSK000057809.

[258] MSFT–MUSK000057811.

[259] MSFT–MUSK000057806.

[260] Altman Deposition, at 74.

[261] Id. at 62 (suggesting Amy Hood).

[262] Alex Heath, "Microsoft Joins OpenAI's Board With Sam Altman Officially Back as CEO," The Verge, Nov. 29, 2023 (noting that the identity of Microsoft's nonvoting observer had not been disclosed).

[263] Toner Deposition, at 151.

Highly Confidential

for-profit investors, it is problematic for Microsoft to help determine the composition of the board.

248. In his deposition, Mr. Altman denied that he gave Microsoft a substantive role in choosing board members, claiming instead that he was just asking "very wise people" for advice. "I don't think we, like, have to–I don't–we certainly wouldn't–had to have had to take their counsel on who to pick."[264]

249. But this claim rings hollow, given the tone of the conversation, including how open and unconstrained Microsoft executives were in nixing a candidate ("strong, strong no"), offering to reach out to move the negotiations along ("ping[ing]" Mr. D'Angelo), interviewing a candidate (Mr. Summers), and asking when "we" would get this done. This seems like much more than just friendly advice. The way Mr. Altman ended the text exchange was also telling.  "[T]hank you, guys, for the partnership and trust," he wrote. "[E]xcited to get this all sorted to a long-term configuration you can really depend on." Mr. Altman was treating Microsoft as a "partner" in picking board members to ensure that Microsoft could "really depend on" the result. Mr. Nadella "loved" this text.[265]

## V. Efforts to Restructure OpenAI Offer Further Evidence That the Nonprofit's Mission and Economic Interests Have Not Been Protected

- **Opinion # 10:** It is customary practice during a restructuring for a nonprofit to protect its mission and economic interests, but OpenAI did not conform to this practice when it considered taking control away from the nonprofit without an adequate control premium, when it significantly weakened the board's influence by requiring a ⅔ vote to dismiss the CEO, when it exposed directors to the risk of shareholder suits from for-profit investors who might not support the mission, and when it further weakened the nonprofit's already questionable control over its for-profit affiliates in other ways as well.

250. In recent years, OpenAI has explored various alternatives to reorganize, finally announcing a plan in September 2025. These efforts reinforce concerns that the nonprofit's mission and economic interests have not been protected which, again, is an important divergence from customary practice.

---

[264] Altman Deposition, at 69.

[265] MSFT_MUSK000057807.

**Highly Confidential**

### A. Early Efforts to End the Nonprofit's Control Over the For-Profit Affiliate and Residual Interest

251. For several years, OpenAI has been considering ways to restructure the allocation of control and cash flows among the nonprofit and its investors. Indeed, OpenAI reportedly committed to a restructuring by the end of 2025 as a condition of its latest funding round; media reports indicate that without this restructuring, the funding would be cut by billions of dollars.[266]

### 1. Aborted Effort to Replace Control With Control Rights

252. An early proposal, which was not implemented, would have eliminated the nonprofit's formal control over the for-profit affiliates. A version of this approach was described in a PowerPoint presentation shared with Microsoft in February 2022. As one of the plan's objectives, the PowerPoint listed: "Remove Nonprofit from formal control to mitigate private benefit risk."[267] To implement this, the PowerPoint says: "The OAI Nonprofit would transition from GP control to a set of control rights related to the OAI mission, all of which it has today.[268] The slide deck mentions that "the Nonprofit retain[s] hire/fire power [over the CEO] and other veto rights."[269]

253. In arranging a meeting for Microsoft to be briefed about this plan, Mr. Altman explained the motivation for this plan in a problematic manner. "We are working on a restructure to OpenAI to address some of the challenges we've faced with our unusual structure (a nonprofit being in control of an LLC)," he wrote in an email to two senior Microsoft executives, "as we become a more commercial effort."[270] Unfortunately, this characterization–that OpenAI is "becom[ing] a more commercial effort"–is consistent with OpenAI's many decisions, detailed above, to prioritize profit over the nonprofit's mission.

254. Over two years later, a memo from Microsoft's management to its board referenced an even more extreme reduction in the nonprofit's control over the for-profit affiliates. "████████████████████████████████████████████

---

[266] Berber Jin & Deepa Seetharaman, OpenAI's Latest Funding Round Comes With a $20 Billion Catch, Wall St. J., March 28, 2025, https://www.wsj.com/tech/ai/openais-latest-funding-round-comes-with-a-20-billion-catch-1e47d27d; Hayden Field & Kate Rooney, OpenAI Funding Round Could Be Cut by $10 Billion if For-Profit Conversion Doesn't Occur by Year-End, CNBC, March 31, 2025, https://www.cnbc.com/2025/03/31/openai-funding-could-be-cut-by-10-billion-if-for-profit-move-lags.html.

[267] OpenAI PowerPoint, Feb. 2022, slide 2, MSFT_MUSK000054863.

[268] Id. at slide 4, MSFT_MUSK000054865.

[269] Id.

[270] Email From Sam Altman to Kevin Scott & Chris Young, Feb. 5, 2022, MSFT_MUSK000035612.

**Highly Confidential**


"271

255. Proposals to take away the nonprofit's control, and potentially leaving it with only rights over particular issues, raised understandable concerns for the nonprofit directors. Ms. McCauley alluded to these concerns in her deposition, as well as to further concerns that the board had gotten inaccurate information about proposed reorganizations, although she felt limited in what she could share because of attorney client privilege:

> [W]e had sought -- sought assurances earlier in the year in the process of doing the restructuring . . . .  [O]ne of our primary considerations . . . was whether the powers of the non-profit were going to being affected. We did receive assurances that the powers of the non-profit, you know, would not be affected and that -- and then this may implicate -- I -- I will keep some specific discussions that may implicate privilege out of this, but I think we were concerned about particular mechanisms that might have disempowered the non-profit and concern that we may have gotten inaccurate information about some of those mechanisms.[272]

256. Although this version of a reorganization was not implemented, the mere fact that it was seriously considered for an extended period of time raises troubling questions. How is the nonprofit supposed to pursue its mission without full control over the for-profit? This question is all the more important because the nonprofit has no significant activities of its own, and instead has pursued its mission through the activities of its for-profit affiliates. Perhaps Mr. Altman (and presumably others as well) were not especially concerned about preserving the nonprofit's mission, since they evidently were trying to make OpenAI a "more commercial effort."

### 2. Insufficient Compensation for Loss of Control

257. This (aborted) reorganization raises another troubling question as well: was OpenAI going to be adequately compensated for giving up control? The answer seems to be "no." Although the plan ultimately was not implemented, the possibility of reorganizing without adequately compensating the nonprofit raises further questions about the nonprofit's ability to protect its economic interests.

---

[271] Microsoft Memo from Satya Nadella, Kevin Scott, Amy Hood, & Brad Smith to the Board of Directors, Sept. 9, 2024, at 6, MSFT_MUSK000040995.

[272] McCauley Deposition, at 270-71.

Highly Confidential

258. Notably, the slide deck shared with Microsoft acknowledges, but minimizes, the need to compensate OpenAI for loss of control. "[T]ransitioning the Nonprofit from GP control to control rights may require the Nonprofit to receive some value," the presentation indicated. "[T]his may impact the profit waterfall, but we do not expect it to be significant."[273]

259. But how could the "impact on the profit waterfall" not be "significant"? It is well understood that control is valuable. Indeed, it is customary practice for buyers to pay a control premium when acquiring control of a company. Premiums typically range between 20% and 30% of the value of the entire enterprise.[274] It is hard to see how 20% to 30% of the for-profit affiliate's value would not be "significant."

260. As a commentator has observed, there are reasons why, if anything, a control premium at OpenAI should be higher than average:

> [H]ere the change in control involves not just the power of the new control agents to make different management decisions but the ability to re-orient the business enterprise to the pursuit of profit. In the current arrangement, investors are literally warned to treat their investments as if they were donations. . . . After conversion, this restriction would no longer be in place (or, if it remained, could be revised at any time, and it would be reasonable to expect for-profit investors to do so). This change may dramatically increase the valuation of the for-profit company.[275]

261. To sum up, OpenAI considered a restructuring plan that would have replaced the nonprofit's control over its for-profit affiliate with more limited control rights, while seemingly not offering the nonprofit adequate compensation for this loss of control. Although this plan was not implemented, the fact that it was considered raises questions about OpenAI's commitment to protecting the nonprofit's mission and economic interests.

### B.  September 2025 Restructuring

262. On September 11, 2025, OpenAI announced a restructuring in which the for-profit affiliate, OpenAI Global, LLC, would be converted to a public benefit corporation

---

[273] OpenAI PowerPoint, supra, at slide 4, MSFT_MUSK000054865.

[274] P.J. Patel, Bulls vs. Bears vs. a Pandemic: How do Control Premiums Change? https://www.valuationresearch.com/insights/stock-market-downturn-control-premium-impact/ (finding median control premiums between 20 to 30 percent from 1996 to 2019).

[275] Weissman, Letter of Jan. 9, 2024, supra, at 6.

**Highly Confidential**

("PBC").[276] In addition, the nonprofit would exchange its residual interest for a more traditional equity interest. Unfortunately, this restructuring further reinforces doubts about the nonprofit's ability to protect its mission and economic interests.

### 1. Weakening the Nonprofit's Already Questionable Control

263. As a formal matter, the new structure gives the nonprofit some mechanisms to control the new PBC. The PBC will specify a mission identical to the nonprofit's mission,[277] and the nonprofit will have preapproval rights regarding whether to change the mission or to sell for-profit affiliates.[278]

264. Yet instead of having *direct* control over operations, as under the prior structure, the nonprofit will have only *indirect* control via the power to select the PBC's board. Specifically, the nonprofit no will longer control the main for-profit affiliate (OpenAI LP and then OpenAI Global, LLC) by owning and controlling its general partner. Instead, once OpenAI Global is converted to a PBC, the nonprofit will have special "Class N" shares in the PBC, entitling it to cast 100% of the votes in electing PBC's directors.[279] The PBC is authorized to issue Class B shares, which would also carry a vote in these elections, but the nonprofit's Class N shares would always cast at least ⅔ of the votes in director elections.[280]

265. While this formal control is fine as far as it goes, its practical significance is unclear. Much depends on the way the nonprofit board members interpret the mission. In addition, how willing will they be to block changes favored by other stakeholders? Assuming they are willing, how effective will they be?

266. Unfortunately, there is a real possibility that this formal authority will prove to be mere window dressing. As noted above, the board's failed attempt to dismiss Mr. Altman raises doubts about the board's motivation and effectiveness, as does the

---

[276] Media coverage reported that this transaction was finalized on October 28, 2025.  See, e.g., Cade Metz, OpenAI Restructures to Become a More Traditional For-Profit Company, N.Y. Times, Oct. 28, 2025, https://www.nytimes.com/2025/10/28/technology/openai-restructure-for-profit-company.html.  The analysis here is based on the September 11 term sheet, which was produced in discovery.  As far as I am aware, neither OpenAI nor Microsoft has produced documents about the finalized transaction as of October 28, 2025, when this report was finalized. I reserve the right to amend or supplement this report based on further information.

[277] Memorandum of Understanding Between Open AI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 8, OPENAI_MUSK00037476.

[278] Id. at 5, OPENAI_MUSK00037473.

[279] Id. at 3, OPENAI_MUSK00037471.

[280] Id.

Highly Confidential

influence that Mr. Altman and Microsoft had in shaping the composition of the reconstituted nonprofit board.[281]

267. In addition, there are new hurdles that did not exist under the prior structure. Arguably, the board's most significant power is to hire and fire the CEO, but the new structure makes an important change. Under the old structure, only a majority was needed to terminate the CEO.[282] But under the memorandum of understanding, a ⅔ supermajority of the PBC board is needed to fire the CEO.[283]

268. This is not customary practice. Indeed, in my experience, a supermajority requirement for removing a nonprofit CEO is extremely unusual, and for good reason. It is a very significant limit on the board's authority. Since the CEO handles the day-to-day affairs of an organization—whether it is a for-profit firm or a nonprofit—a CEO that cannot easily be dismissed has extraordinary power, leaving the board much diminished in its influence. For example, if a nonprofit CEO wants to prioritize profits over the mission and the CEO has this sort of job security—needing only the support of just over ⅓ of the board to remain in office—the board, as a practical matter, is quite limited in its ability to resist the CEO's preferred direction.

269. As if that wasn't enough, the new structure gives the PBC a staggered board, which is a familiar way to entrench management.[284] The nonprofit can replace only ⅓ of the PBC's directors in a given year—less than a majority and only half the ⅔ vote needed to fire the CEO.[285] If members of the PBC board are failing to prioritize the mission, the nonprofit can only replace some of them at a time (assuming the PBC and nonprofit boards have different members). This is more sand in the gears, further complicating any effort by the nonprofit to influence the PBC's priorities and policies.

270. To add to the challenges of keeping OpenAI on mission, the Memorandum of Understanding introduces a new tension, which reflects the hybrid nature of public benefit corporations. It provides: "The NFP [nonprofit] directors, in their capacity as

---

[281] See supra Part IV.

[282] See Amended & Restated Bylaws of OpenAI, Inc. (Jan. 10, 2024), Art. VI, Sec. 3, at 7, OPENAI_MUSK00000446 ("any officer may be removed, with or without cause, by the Board of Directors"); see also id. at Art. VI Sec. 10, at 4, OPENAI_MUSK00000443 ("A majority of the total number of directors then in office shall constitute a quorum of the Board" and generally "the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board").

[283] Memorandum of Understanding Between Open AI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 9, OPENAI-MUSK00037477.

[284] See, e.g., Lucian Arye Bebchuk, John C. Coates IV & Guhan Subramanian, The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy, 55 Stan. L. Rev. 887 (2002).

[285] Memorandum of Understanding Between Open AI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 8, OPENAI-MUSK00037476.

**Highly Confidential**

such, remain duty bound to the NFP's mission of ensuring that AGI benefits all humanity."[286] But the directors of the PBC–whether they are the same people or different people–have a hybrid mission, which could easily become internally inconsistent. As the Memorandum states:

> As required by Delaware law under the public benefit corporation statute, PBC directors, in their capacity as such, will have a duty to take into account (a) the mission, (b) the best interests of those materially affected by the PBC's conduct, and (c) the stockholders' financial interests.[287]

271. This means the PBC board is duty-bound to serve two masters–both the nonprofit's mission and the stockholders' financial interests.

272. This is a change from the existing structure. As a formal matter, the nonprofit controlled the General Partner, which had formal discretion to override for-profit investors' interests (except to the extent that it had to consult them on major decisions). Hence, the old structure included legends with caveats, warning that the for-profit affiliate "may never make a profit" and "is under no obligation to do so," as detailed above.[288]

273. However ineffective this formal clarity may have been, it is absent from the Memorandum of Understanding and the new PBC structure it announces. When PBC board members face questions about whether to prioritize profitability, on the one hand, or cooperation, the wide distribution of benefits, and safety, on the other, they are pulled in competing directions. They are legally obligated to take account of both "the mission" and "the stockholders' financial interests." Which should take precedence? The Memorandum of Understanding leaves this question unanswered.

274. The Memorandum of Understanding gestures in the direction of safety with the following provision: "Members of the SSC [the PBC Board's Safety and Security Committee] will solely consider the mission and not the interests of stockholders and other stakeholders of the PBC in serving on the SSC." Note, though, that this directive applies only "in serving on the SSC." In other words, when directors make decisions within the SSC, they should prioritize the mission. But what is the SSC's jurisdiction?

---

[286] Id. at 8, OPENAI-MUSK00037476.

[287] Id. at 8, OPENAI-MUSK00037476; see also 8 Del. § 365 ("The board of directors shall manage or direct the business and affairs of the public benefit corporation in a manner that balances the pecuniary interests of the stockholders, the best interests of those materially affected by the corporation's conduct, and the specific public benefit or public benefits identified in its certificate of incorporation.").

[288] See Part III.F.1.

**Highly Confidential**

What decisions (if any) can it make without being overruled by the full board? Since the safety priority seems to apply only "in serving on the SCC," even board members who serve on the SCC presumably would need to rethink their analysis when voting on board-level–as opposed to committee-level–decisions. Oddly, they might even have to vote differently on *the same issue*.

275. This tension–and the ambiguity with which the new structure approaches it–is not just a theoretical problem. Past experience has already raised serious questions about the nonprofit board's ability to keep OpenAI on mission. But now, the directors of the PBC will face a new source of pressure to prioritize profits, which was not present in the prior structure: the prospect of a derivative suit by for-profit shareholders. The relevant rule requires the plaintiff to own at least 2% of the shares (or $2 million, if OpenAI becomes a public company), a threshold that Microsoft certainly exceeds, and others may as well.[289] Given that the nonprofit board already has faced headwinds in trying to protect the nonprofit's mission and assets, the prospect of being sued by for-profit investors will only intensify those headwinds.

### 2. Replacing Residual With Percentage of Equity

276. Another change in the September 2025 reorganization is that the nonprofit will lose its residual interest, and instead will have traditional equity. Under the prior structure, it had a redemption amount of about $6.08 billion plus its $60.8 million capital contribution, and also a residual interest giving it 100% of the return above a threshold (which was extremely high, as noted above). In the reorganization, these two interests will be replaced by traditional equity.

277. Again, there is a question whether the nonprofit's new equity appropriately reflects the nonprofit's economic contribution. The nonprofit's share is 31.5% of the PBC plus warrants.[290] Notably, this percentage does not reflect the dilution from Softbank and other investors. According to Mr. Wu, the nonprofit's share would be between 20% and 30% (not including the warrants).[291] In any event, the nonprofit's undiluted 31.5% (not

---

[289] See 8 Del. Code § 367 ("Any action to enforce the balancing requirement of § 365(a) of this title, including any individual, derivative or any other type of action, may not be brought unless the plaintiffs in such action own individually or collectively, as of the date of instituting such action, at least 2% of the corporation's outstanding shares or, in the case of a corporation with shares listed on a national securities exchange, the lesser of such percentage or shares of the corporation with a market value of at least $2,000,000 as of the date the action is instituted. This section shall not relieve the plaintiffs from complying with any other conditions applicable to filing a derivative action including § 327 of this title and any rules of the court in which the action is filed.").

[290] Memorandum of Understanding Between OpenAI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at Annex A, OpenAI-Musk00037482.

[291] Wu Deposition, at 241-2.

Highly Confidential

including warrants) compares unfavorably to the undiluted share allocated to Microsoft (32.5%) and the employee vehicle (33%).

## VI.    Conclusion

278. In conclusion, it is customary practice for nonprofits to use for-profit affiliates for a range or purposes, including to advance their mission by attracting capital and offering equity compensation to employees.

279. It also is customary practice to ensure that the nonprofit's mission and economic interests are protected. Yet at OpenAI, a series of decisions were made which seemed to prioritize profitability over the mission, including the representation of Microsoft on the joint safety board, the exodus of a number of safety experts, and a 180-degree change in OpenAI's position on regulation.

280. OpenAI also fell short in protecting the nonprofit's economic interests, including by agreeing to extremely high thresholds before the nonprofit collects on its residual interest, not hiring third-party financial experts to analyze these thresholds, and giving a for-profit partner very liberal (and expanding) access to OpenAI's intellectual property and facilities.

281. Although it is customary practice for the nonprofit to have formal control over the for-profit affiliate, formal control has proved hollow at OpenAI. Independent directors claim that the CEO was not sharing adequate information, making it impossible for them to do their job of overseeing him and the for-profit entity. Yet when the board tried to replace Mr. Altman, this effort foundered on the opposition of OpenAI's largest for-profit partner, as well as on resistance from employees (who may have been influenced by the prospect of an imminent equity offering). Instead, three of the four independent board members were forced out, and the CEO and the for-profit partner played a prominent role in shaping the reconstituted board. All of this raises grave questions about this board's ability to protect the mission.

282. These questions have grown even more stark with the announcement of a restructuring, which has introduced a ⅔ requirement to dismiss the CEO, conflicting legal duties to promote profitability as well as the mission, and the potential of shareholder lawsuits to pressure directors to prioritize profits. Unfortunately, the likelihood that OpenAI will favor its mission over profitability seems increasingly remote.

*   *   *

**Highly Confidential**

Executed on this 29th day of October, 2025.
New York, NY