# EXHIBIT 4
# PUBLIC REDACTED VERSION

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
----------------------------------------
ELON MUSK, et al.,
    Plaintiffs,
v.
SAMUEL ALTMAN, et al.,
    Defendants.

Case No. 4:24-cv-04722-YGR
----------------------------------------

VIDEO DEPOSITION OF
Elon Musk
September 26, 2025
San Francisco, California
LEAD: William Savitt, Esquire
FIRM: Wachtell Lipton Rosen & Katz

FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING - 1-800-825-3341

Page 2

APPEARANCES:

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
  STEVEN F. MOLO, ESQ.
  smolo@mololamken.com
  ROBERT K. KRY, ESQ.
  rkry@mololamken.com
  WALTER HAWES, ESQ.
  whawes@mololamken.com
  JENNIFER SCHUBERT, ESQ.
  jschubert@mololamken.com
  SARA TOFIGHBAKHSH, ESQ. (Via Zoom)
  stofighbakhsh@mololamken.com
  ALEXANDRA EYNON, ESQ. (Via Zoom)
  aeynon@mololamken.com
    MOLOLAMKEN LLP
    600 New Hampshire Avenue, NW, Suite 660
    Washington, D.C. 20037
    202.556.2011

Page 3

APPEARANCES (Cont'd):

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:
  MARC TOBEROFF, ESQ.
  mtoberoff@toberoffandassociates.com
  JAYMIE PARKKINEN, ESQ.
  jparkkinen@toberoffandassociates.com
    TOBEROFF & ASSOCIATES PC
    23823 Malibu Road, Suite 50-36
    Malibu, California 90265
    310.246.3333

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:
  WILLIAM FRENTZEN, ESQ.
  wfrentzen@mofo.com
    MORRISON & FOERSTER LLP
    425 Market Street
    San Francisco, California 94105
    415.268.6413

Page 4

APPEARANCES (Cont'd):

ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:

  WILLIAM S. SAVITT, ESQ.
  wdsavitt@wlrk.com
  NATHANIEL D. CULLERTON, ESQ.
  ndcullerton@wlrk.com
  IOANNIS DRIVAS, ESQ.
  iddrives@wlrk.com
  SARAH EDDY, ESQ.
  skeddy@wlrk.com
  BRADLEY R. WILSON, ESQ. (Via Zoom)
  brwilson@wlrk.com
    WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
    New York, New York 10019
    212.403.1329

Page 5

APPEARANCES (Cont'd):
ATTORNEY(S) FOR DEFENDANT MICROSOFT:
  RUSSELL P. COHEN, ESQ.
  russ.cohen@dechert.com
  HOWARD ULLMAN, ESQ.  (Via Zoom)
  howard.ullman@dechert.com
    DECHERT LP
    45 Fremont Street, 26th Floor
    San Francisco, California 94105
    415.262.4506

  NISHA PATEL GUPTA, ESQ. (Via Zoom)
  nisha.patelgupta@dechert.com
    DECHERT LLP
    US Bank Tower
    633 West 5th Street, Suite 4900
    Los Angeles, California 90071-2032
    213.808.5735

  JOHN A. JURATA, JR., ESQ.
  jay.jurata@dechert.com
    DECHERT
    1775 Eye Street, Northwest
    Washington, D.C.  20006
    202.261.3326

Page 6

APPEARANCES (Cont'd):

  YOSEF WEITZMAN, ESQ. (Via Zoom)
  yosi.weitzman@dechert.com
    DECHERT
    CIRA Center 2929 Arch Street
    Philadelphia, Pennsylvania 19104
    215.994.4000

JANE ROSE REPORTING
    74 Fifth Avenue
    New York, New York 10011
    1-800-825-3341
    GAIL L. INGHRAM, Court Reporter
    BA, CRR, CLR, RDR, CSR-CA (No. 8635)
    JASON BUTKO, Videographer

Page 7

TABLE OF CONTENTS

EXAMINATION OF:                           PAGE
ELON MUSK
        By Attorney Savitt ..............10
        By Attorney Cohen ..............343
        By Attorney Molo ...............359

Reporter Certificate .................. Page 364
Notice to Read and Sign .............. Page 366
Index of Exhibits .................... Page 368

Page 8

1              Friday, September 26, 2025
2                San Francisco, California
3                       - - -
4           THE VIDEOGRAPHER:  This is the start of
5    Media Number 1 in the deposition of Elon Musk in
6    the matter of Elon Musk v. Samuel Altman in the
7    court of the United States District Court for the
8    Northern District of California; Case Number
9    4:24-cv-04722-YGR.
10           This deposition is being taken at 755
11   Sansome Street in San Francisco, California, on
12   September 26th, 2025, at approximately 9:53 a.m.
13           My name is Jason Butko with Jane Rose
14   Reporting, here with our court reporter,
15   Gail Inghram, with Jane Rose Reporting.
16           Counsel can you please identify yourself
17   and who you represent, starting with the
18   questioning attorney.
19           ATTORNEY SAVITT:  William Savitt,
20   Wachtell Lipton Rosen & Katz, for the OpenAI
21   defendants.  With me are my colleagues Sarah Eddy,
22   Ionnis Drivas, and Nate Cullerton.
23           ATTORNEY COHEN:  Good morning.  Russell
24   Cohen for Microsoft.  With me is Jay Jurata from
25   the Dechert LLP firm.

Page 9

1     ATTORNEY FRENTZEN: Morning. William
2  Frentzen here for the OpenAI defendants.
3     ATTORNEY MOLO: Steven Molo from
4  MoloLamken on behalf of Mr. Musk and the
5  plaintiffs.
6     ATTORNEY TOBEROFF: Marc Toberoff,
7  Toberoff & Associates, on behalf of Mr. Musk, the
8  plaintiff.
9     ATTORNEY KRY: Robert Kry from
10 MoloLamken on behalf of Mr. Musk.
11    ATTORNEY HAWES: Walter Hawes from
12 MoloLamken on behalf of Mr. Musk.
13    ATTORNEY PARKKINEN: Jaymie Parkkinen,
14 Toberoff & Associates, on behalf of Mr. Musk.
15    THE VIDEOGRAPHER: Will the court
16 reporter please swear in the witness.
17
18 WHEREUPON,
19          ELON MUSK,
20 being first duly sworn or affirmed to testify to the
21 truth, the whole truth, and nothing but the truth,
22 was examined and testified as follows:
23 ///
24 ///
25 ///

Page 10

1          EXAMINATION
2  BY ATTORNEY SAVITT:
3   Q.  Good morning, Mr. Musk.
4   A.  Good morning.
5   Q.  Thank you for being here.
6       You're the CEO of xAI?
7   A.  Yes.
8   Q.  xAI was once incorporated as a public
9  benefit corporation; is that right?
10  A.  I think so.
11  Q.  In November 2024, you filed an amended
12 complaint in this case.
13      Do you know that?
14  A.  I don't recall exactly.
15  Q.  Do you recall that you filed an amended
16 complaint in this case?
17  A.  I don't recall.
18  Q.  One way or another?
19  A.  I don't recall.
20  Q.  Do you recall swearing the truth of the
21 complaint under penalty of perjury?
22  A.  I don't recall the specifics of this
23 complaint.
24  Q.  And you don't recall signing complaints
25 in this action under penalty of perjury?

Page 11

1   A.  I'm sure I signed a complaint, but if
2  you're asking me to recall specific details, I
3  don't recall.
4   Q.  So you don't recall either that you a
5  affirmed in the complaint that you swore under
6  penalty of perjury that xAI was a public
7  benefit corporation.
8       Do I have that right?
9   A.  I don't recall.
10  Q.  You don't know.
11      And you don't know -- or do you recall
12 that you said that xAI was organized as a public
13 benefit corporation because AGI is an existential
14 threat?
15  A.  I don't recall.
16  Q.  Do you think AGI is an existential
17 threat?
18  A.  It has a risk.
19  Q.  Do you know whether xAI was registered
20 as a PBC in November 2024?
21  A.  I don't recall.
22  Q.  Do you know whether xAI is still a PBC?
23  A.  I believe it is not currently.
24  Q.  Yeah, it is not currently.
25  A.  Yeah.

Page 12

1   Q.  So you don't know whether you
2  truthfully told the Court that xAI was a public
3  benefit corporation?
4       ATTORNEY MOLO: Objection; form of the
5  question.
6       You can go ahead and answer.
7   A.  I don't recall.
8  BY QUESTIONER:
9   Q.  You don't know one way or the other
10 whether you told the truth in that pleading?
11      ATTORNEY MOLO: Object to the form of
12 the question.
13  A.  I don't recall.
14 BY QUESTIONER:
15  Q.  Now, in the past, you've told -- in the
16 past, you've tweeted on X, and previously what
17 was called Twitter, that you donated $100 million
18 to OpenAI.
19      Do you remember that?
20  A.  Yes. I guess my estimates were higher
21 than I thought.
22  Q.  It wasn't true that you had donated
23 $100 million to OpenAI, was it?
24  A.  I was mistaken.
25  Q.  You were mistaken.

Elon Musk v. Samuel Altman  
FINAL [CONFIDENTIAL]  
September 26, 2025  
Elon Musk

Page 21

1   ATTORNEY MOLO: -- that that's what I'm
2  referring to?
3   ATTORNEY SAVITT: Thank you. We do.
4  Thank you.
5   ATTORNEY MOLO: Okay.
6  BY ATTORNEY SAVITT:
7   Q. And, Mr. Musk, are you going to follow
8  your counsel's instructions?
9   A. Yes.
10   Q. Okay.
11   ATTORNEY SAVITT: We reserve, of course,
12  our objections to those instructions.
13  BY ATTORNEY SAVITT:
14  [REDACTED]
18   ATTORNEY MOLO: Objection. This is a
19  question that goes to Phase II of the case, and
20  consistent with the Court's orders, I'm
21  instructing the witness not to answer.
22  BY ATTORNEY FRENTZEN:
23   Q. Are you going to follow your counsel's
24  instruction?
25   A. Yes.

Page 22

1   Q. All right. Have you consulted with
2  Alex Spiro in connection with your deposition
3  today?
4   A. No.
5   Q. Whose idea was it to form the AI lab
6  that became OpenAI?
7   A. I think -- well, my perspective is that
8  the origin of OpenAI, the reason it exists and I
9  don't think it would exist otherwise, is that I
10  was increasingly concerned about the danger of
11  Google being a monopoly in AI. And my
12  conversations with Larry Page were alarming in
13  that he did not seem to be taking AI safety
14  seriously.
15   So I felt there needed to be a
16  counterbalance to Google, given that Larry Page
17  did not seem to be taking AI safety seriously.
18   At one point, he called me a specieist
19  for favoring humanity, which I felt was odd
20  because what side is he on? Clearly, not
21  humanity's side, it would seem.
22   That's led me to conclude that we really
23  need to have some counterbalance to Google's AI
24  power. The opposite of what Google was -- Google
25  is a for-profit, closed source company. The

Page 23

1  counterbalance -- direct counterbalance seems to
2  me would be to have an open source nonprofit as
3  a -- to be the opposite of Google.
4   Q. Thank you.
5   Is it your -- is it your point of view
6  that the idea for creating the AI lab that became
7  OpenAI was your idea?
8   A. Yes.
9   ATTORNEY SAVITT: Let's take a look and
10  mark what's been premarked as Exhibit 1, please.
11   Give a copy to the witness.
12   (Whereupon, Musk Exhibit Number 1 was
13   marked for identification.)
14  BY ATTORNEY SAVITT:
15   Q. That's for you, sir.
16   Mr. Musk this is a June 24, 2015, email
17  exchange. Do you see that?
18   A. Yes.
19   Q. Subject line: "AI lab," and it's
20  between you and Sam Altman; right?
21   A. Uh-huh.
22   Q. What was the context, if you recall, of
23  this email exchange?
24   A. I think this probably references a
25  number of conversations that I had with Sam and

Page 24

1  many others regarding creating an AI
2  counterbalance to Google.
3   Q. And you see in the first paragraph,
4  Altman writes to you:
5   "The mission would be to create the
6   first general AI and use it for
7   individual empowerment; i.e., the
8   distributive version of the future that
9   seems to save us."
10   Do you see that?
11   A. Yes.
12   Q. Do you understand what Altman meant by
13  that?
14   A. He's recapping conversations that we
15  had.
16   Q. I see. So thank you for that.
17   Your testimony is that you and Altman
18  had had conversations, and this was summarizing
19  some of the things you all had talked about?
20   A. Yes.
21   Q. What did you think about this proposed
22  mission set out in this email?
23   A. It was the mission that I proposed.
24   Q. I see. So the whole idea was yours,
25  that's your testimony?

Page 25

1  A.  No, not the whole idea was mine.  But
2  the idea of creating counterbalance to Google
3  stemmed directly from conversations that I had
4  with Larry Page.
5       And I then had a series of meetings with
6  and dinners with many people in Silicon Valley,
7  Sam included -- I didn't really know Sam at the
8  time -- saying that we need to have some
9  counterbalance to Google.
10      But this -- this idea that we needed to
11 have a counterbalance to Google, this idea I had
12 before I even know who Sam Altman was.
13      Q.  And you say after this -- you see that
14 Altman writes:  "Safety should be a first-class
15 requirement."
16      Do you see that?
17      A.  That's what I said.
18      Q.  I see.
19      And you'll allow that this was what
20 Altman wrote to you in an email to you?
21      A.  He's literally recapping our
22 conversations and what I've been telling people
23 for months before this.
24      Q.  I see.  So is your testimony that
25 everything in this email is simply Altman saying

Page 26

1  back to you things that you had said to him?
2       ATTORNEY MOLO:  Objection to the form of
3  the question.
4       Go ahead and answer.
5       A.  No, not everything.
6  BY ATTORNEY SAVITT:
7       Q.  Okay.  What isn't?
8       A.  Some of the things he's proposing here
9  are his ideas, like the five people who would be
10 on the board --
11      The first thing -- the first thing, the
12 overall idea of mission to create a general AI
13 maximizing safety was my idea.  It's possible Sam
14 may have independently had that idea but he
15 certainly didn't suggest it to me.  That was my
16 idea.
17      Obviously, a start-up is going to start
18 with a small number of people.  That's point 2
19 here.
20      Point 3 is something, yeah, that he did
21 come up with.  That's clearly Sam writing things
22 here because he's suggesting five people on the
23 board, which I wouldn't -- some of whom I wouldn't
24 agree should be on the board.
25      So that's his idea in line -- point 3.

Page 27

1  And he's -- point 4 is just some
2  speculation about governance.
3       And point 5 is just something about
4  regulatory stuff.
5       But -- the, you know -- the -- the
6  necessity of creating a counterbalance to Google
7  came as a result of my conversations with Larry
8  Page, not Sam Altman.  And I came to the -- based
9  on Larry Page not taking AI seriously and Google
10 essentially having a monopoly on AI, left me
11 extremely concerned that we needed to create some
12 counterbalance.
13      That forced me to talk to many other
14 people.  Sam was merely one of -- I don't know,
15 100 people I talked to.  And said we need to have
16 a safety-focused counterbalance to Google.
17      I didn't even understand what it was
18 when I came up with this idea.  It's an idea.
19 It's just they need to do something about safety.
20      Q.  Other than Mr. Page, who did you have
21 these conversations with?
22      A.  Everyone who would basically listen.  It
23 got to the point where I would talk about AI
24 safety so much that my brother asked that, in the
25 future, if we're at a party, that we could not

Page 28

1  talk about AI safety because it's such a buzzkill.
2       And so that's how much I was talking
3  about AI safety.  Everyone that I met and talked
4  to, nonstop for months, expressing my extreme
5  concern about AI safety.
6       I even funded an AI safety research
7  group run by Max Tegmark, of the Future of Life
8  Institute, that funded -- directly funded dozens
9  of AI safety research projects, which Larry Page
10 yelled at me about.
11      And I personally spoke -- was very
12 outspoken about AI safety.  Since you're an avid
13 reader of my posts, I'm sure you realize that.
14      Q.  Thank you for that.
15      You said that you were focused on this
16 and speaking with many, many people over a period
17 of months.
18      A.  Everyone.  And my mom.
19      Q.  And your mom.
20      Was this in the period around June 2015
21 that you were --
22      A.  Well, before this.
23      Q.  And starting when?  I'm sorry.
24      A.  I was talking about AI safety probably
25 as far back as 10 years before this.

Page 29

1  Q. 10 years before this?
2  A. And even in college, when I thought
3 about things that would affect the future of the
4 world, and then I wanted to be involved in things
5 that would affect the future of the world; and one
6 of the things that I thought would affect the
7 future was artificial intelligence.
8       The reason I didn't initially go into
9 artificial intelligence was because I wasn't sure
10 whether the double-edged sword of AI would do more
11 harm or more good. So the other areas that I
12 thought were more of a single-edged sword were
13 sustainable energy, hence Tesla; just the internet
14 in general, which that's why I did two internet
15 startups as my first companies; and machine
16 interfaces, which is why I did Neuralink, making
17 life multi-planetary to ensure the long-term
18 existence of consciousness, which is why SpaceX.
19       The thing I didn't execute on
20 intentionally, because even from -- in college, in
21 the early '90s, I thought the AI -- the danger of
22 an apocalypse was too great to focus -- for me to
23 personally focus on AI.
24       Now, in retrospect, that was naive,
25 because even if I don't focus on AI, others will.

Page 30

1 And so -- but I didn't expect the -- I didn't
2 expect Larry Page and Google to be so focused on
3 AI that it would -- that they want to pursue it,
4 even if it came at the expense of danger to
5 humanity.
6       So how long have I been worried about AI
7 safety? My entire adult life.
8  Q. Thank you for that.
9       Let me ask you this specific question,
10 if I might.
11       You've told me that you spoke to a lot
12 of people about this, and I'm sure that's true.
13  A. Correct.
14  Q. Here's my question:
15       In 2015, can you give me the names of
16 persons that you recall having discussed AI safety
17 with?
18  A. I mean, you want the list of -- we can
19 prepare a list of people that you want to talk to.
20 Is it --
21  Q. I'd be delighted if counsel is prepared
22 to undertake to give us a written list of that.
23 That would simplify that. But that is the
24 question I'm asking.
25  A. Yeah, it's a long list.

Page 31

1  Q. We'd love to see it.
2  A. Yeah.
3       ATTORNEY SAVITT: Is that acceptable?
4       ATTORNEY MOLO: That's acceptable.
5 BY ATTORNEY SAVITT:
6  Q. Okay. And would you have, Mr. Musk,
7 expressed your concerns about AI safety in 2015
8 in written communications?
9  A. Probably, yes. I think so.
10  Q. So the concerns about AI safety would
11 appear in your texts and email messages from that
12 period?
13  A. Possibly. But, yeah, when I attended AI
14 safety conferences, as I said, I funded -- I think
15 I spent -- I think I spent more to fund AI safety
16 research than maybe anyone else on Earth, so,
17 yeah.
18  Q. Thank you.
19       And so given this focus, we should
20 expect to see a lot of communication, a lot of
21 written communication about AI and AI safety in
22 the period of 2015 --
23       (Indiscernible cross-talk.)
24       ATTORNEY MOLO: Object to the form of
25 the question.

Page 32

1 BY ATTORNEY SAVITT:
2  Q. You can answer.
3  A. I don't know how much was written or
4 verbal; but it was unequivocally a long-standing
5 concern of mine.
6  Q. Okay. And going back to this Exhibit 1
7 in front of you, Mr. Musk, in the third
8 paragraph, you see that Altman wrote to you. I'm
9 on the second sentence of the third point. He
10 writes:
11       "The technology would be owned by
12    the foundation and used for the good of
13    the world."
14       Do you see that?
15  A. Yes.
16  Q. What did you understand Mr. Altman to
17 mean by "the foundation" in this sentence?
18  A. The foundation, the nonprofit, the --
19 the reason it's called OpenAI is because it's
20 meant to be open source, as the name was my
21 suggestion.
22  Q. Yeah, we'll get to that.
23       Is "the foundation" the AI lab that is
24 in the subject line of the email here, do you
25 think?

Page 49

1  spend much of the week on OpenAI, and there are
2  some weeks where there was very little.
3      Q.  Could you hazard an estimate about what
4  your average weekly hourly commitment to OpenAI
5  was in 2016?
6      A.  I don't recall.
7      Q.  Same for 2017?
8      A.  Yeah.
9      Q.  At some point, you gave a few OpenAI
10 employees Teslas; is that right?
11     A.  Yes.
12     Q.  Who got the Teslas?
13     A.  I think Ilya.  Maybe Greg.  I'm not
14 sure.
15     Q.  You don't recall who else might have
16 gotten a Tesla?
17     A.  No.
18     Q.  Why did you give these people Teslas?
19     A.  Seemed like a nice thing to do.
20     Q.  Any other reason?
21     A.  Sort of a perk of the company.  I mean I
22 was providing, essentially, all the capital of the
23 company so why not throw in a few Teslas.
24     Q.  Do you believe you have a contract with
25 the OpenAI not-for-profit corporation?

Page 50

1      A.  A contract?
2      Q.  Yeah.
3      A.  I mean, there are many documents that
4  have been signed.
5      Q.  But I'm asking a different question.
6          Do you think you have a binding
7  agreement, a contract, with OpenAI, Inc., the
8  nonprofit?
9      A.  For what?
10     Q.  Of any kind.
11     A.  I think so, but -- you know, I -- yeah.
12     Q.  You think so?
13     A.  I think so.
14     Q.  And do you have a contract with -- in
15 your opinion, with any other OpenAI entity?
16     A.  I'm -- not familiar with the crazy
17 corporate shell game of companies associated with
18 OpenAI.  So, no, I don't think so.
19     Q.  Okay.  Do you believe you have a
20 contract with Sam Altman?
21     A.  I'm not sure what you mean by a
22 contract.
23     Q.  I'm asking you whether you believe you
24 have a binding agreement of some sort,
25 enforceable binding agreement with Sam Altman.

Page 51

1      A.  I guess in a sense, yes, in that the
2  deal was to create a nonprofit open source
3  organization; and that contract -- that deal was
4  fundamentally -- that promise was broken
5  egregiously.
6      Q.  So you think that your understandings
7  with Mr. Altman rise to the level of a contract
8  between you and him?
9      A.  I think so.  And -- because the clear
10 understanding was this would be a nonprofit, open
11 source.  And now, in fact, OpenAI, the name is,
12 is -- itself is a lie.  It is, in fact -- it
13 should be called "closed-for-maximum-profit
14 AI.com."  And I was thinking of gifting them that
15 as a URL.
16         "Closed-for-maximum-profit AI" should be
17 the name of OpenAI.  And that is directly contrary
18 to the reason that it was given.
19         They stole the charity.  That's wrong.
20     Q.  So what are the terms of the contract
21 that you think you have with Mr. Altman?
22     A.  The money was donated to create an
23 open-source nonprofit.  And now it has been turned
24 into a de facto closed-source profit maximizing
25 entity, directly contrary to the reason the money

Page 52

1  was given.  They broke the deal.
2          And I would liken this to if you donate
3  money to a company that is intended to preserve
4  the Amazon Rainforest, but instead they chop down
5  the trees, turn it into a lumber company and sell
6  the wood for profit, you'd be rather upset,
7  wouldn't you?
8      Q.  No, I've seen that, and you can recycle
9  as much as you like.  My question was a little
10 different.
11         My question is:  What were the terms --
12 what are the terms of the agreement that you say
13 you have with Mr. Altman?
14     A.  It's very simple.  The money was given
15 to create a nonprofit open-source organization.
16     Q.  That's it?
17     A.  And -- yeah, that's what the money was
18 given for.  That's what my time was given for.
19 Not just money but time and credibility.
20     Q.  And that constitutes the terms of the
21 agreement you say you have with Altman; fair?
22     A.  I think that's -- those are the major
23 parts of it.  It's not super complicated.
24     Q.  I'm not saying it is.  I just want to
25 get --

Elon Musk v. Samuel Altman     FINAL [CONFIDENTIAL]     September 26, 2025 Elon Musk

Page 57

[text redacted]

Page 58

8   Q. In the summer of 2017,
9   August/September, actually, even starting in
10  June, you and Altman and Brockman and Sutskever
11  began discussing a potential conversion of OpenAI
12  into a for-profit organization; is that correct?
13  A. We had various discussions. I don't
14  recall the exact details.
15  Q. Those discussions concerned, in
16  substantial part, didn't they, the possibility of
17  OpenAI having a for-profit arm?
18  A. I don't recall.
19  Q. You don't recall one way or the other?
20  Is that what you're saying?
21  A. Yeah.
22  Q. You were open to a for-profit structure
23  for OpenAI at the time, in the summer of 2017;
24  right?
25  A. I don't think so.

Page 59

1   Q. You think -- is your testimony that you
2   were opposed to a for-profit structure for OpenAI
3   at that time?
4   A. I certainly don't think OpenAI should
5   turn into a for-profit organization.
6   Q. My question was a little different. It
7   was whether you were open to OpenAI having a
8   for-profit venture or arm and had discussions
9   about that question in the summer of 2017.
10  A. I don't recall.
11  Q. You just don't know one way or the
12  other?
13  A. I would be speculating.
14  Q. We don't want you to do that.
15     You recall the Dota one-against-one
16  meeting that OpenAI had in August 2017?
17  A. Yes.
18  Q. You viewed that as a trigger event,
19  didn't you?
20  A. Yes. I believe I raised the probability
21  of OpenAI succeeding from 1 percent to 10 percent
22  after Dota 2.
23  Q. Right.
24     Do you know whether the technology
25  associated with the Dota 1 was open sourced?

Page 60

1   A. In the earlier days of open OpenAI, I
2   think almost everything was open sourced.
3   Q. So you don't recall that that
4   technology was not open source?
5   A. I don't.
6   Q. And you don't recall that everyone knew
7   it was not open source?
8   A. I don't.
9   Q. And do you recall that there was
10  criticism of OpenAI because it wasn't open
11  source?
12  A. I don't recall.
13  Q. And you didn't say anything about why
14  it should be open sourced, even though it was
15  well-known that it was not; right?
16  A. I don't recall.
17  Q. You don't recall.
18     How did the Dota 1 play into your
19  thinking about a potential for-profit organization
20  under the OpenAI umbrella?
21  A. I don't think that was a factor.
22  Q. So here's the question I was going to
23  ask you. Maybe it's a bad question now.
24     What were the reasons you were
25  considering creating a for-profit OpenAI entity in

JANE ROSE REPORTING
1-800-825-3341
California Firm No. 254
janerose@janerosereporting.com

Page 149

1  BY ATTORNEY SAVITT:
2      Q.  You can answer the question.
3      A.  I'm not uncertain.
4      Q.  Did you raise any objection to the
5  proposed transaction at the time that you saw the
6  summary term sheet?
7      A.  I don't recall.
8      Q.  Did you tell Altman that you thought it
9  was a violation of some duty that he owed to you
10 when he sent you the term sheet?
11     A.  I don't recall.
12     Q.  Did you tell anyone that you thought
13 that the transaction contemplated by the term
14 sheet represented a violation of any duty or
15 obligation owed to you?
16     A.  I believe I expressed discomfort to a
17 lot of people.  I felt like OpenAI was moving away
18 from its core mission.  As I said earlier, my --
19 this -- this was a -- I would say, another
20 stepping stone in the journey of losing trust in
21 Altman.
22     Q.  So my question was whether you
23 expressed to anyone the view that the transaction
24 contemplated by this agreement worked a violation
25 of any obligation owed to you.

Page 150

1         Is there anyone that you can identify
2  for me to whom you expressed that after you
3  received the summary term sheet?
4      A.  Not that I recall.
5      Q.  You can't think of anyone; right?
6      A.  I can't recall what happened seven years
7  ago.
8      Q.  Right.  And you can't identify for me
9  any writing in which you expressed the view that
10 the transaction contemplated by the summary term
11 sheet constituted a violation of any agreement or
12 duty owed to you; correct?
13     A.  I don't recall.
14     Q.  You see on page 3 of the term sheet --
15 it's the page ending in 1645.
16        That the term sheet discusses
17 significant revenue generation through
18 commercializing OpenAI's technology.  I'm in
19 the -- I don't know, it's probably the third
20 paragraph of page 3.
21     A.  I'm not sure I actually read this term
22 sheet.
23     Q.  You don't dispute that it was sent to
24 you?
25     A.  It was clearly sent to me.

Page 151

1      Q.  Thank you.
2         So you see that -- you do see, though,
3  that it discusses significant revenue generation
4  through commercializing of OpenAI's technology,
5  don't you, sir?
6      A.  That's what it says here, yes.
7      Q.  Do you think that OpenAI breached the
8  duty that was owed to you by allowing the
9  for-profit entities to reap financial benefits
10 from commercial activities?
11        ATTORNEY MOLO:  Object to the form of
12 the question, and you're asking the witness to
13 provide legal opinions.
14     A.  I am uncertain.
15 BY ATTORNEY SAVITT:
16     Q.  You don't know one way or the other?
17     A.  I'm uncertain.
18     Q.  Did you think that the proposed
19 transaction reflected here was a breach of
20 OpenAI's commitments to you?
21        ATTORNEY MOLO:  Object to the form of
22 the question.
23     A.  I don't think I read this term sheet.
24 BY ATTORNEY SAVITT:
25     Q.  So you didn't raise any objection to

Page 152

1  the term sheet once it was sent to you?
2         ATTORNEY MOLO:  Objection; asked and
3  answered.
4      A.  I don't recall doing so.
5  BY ATTORNEY SAVITT:
6      Q.  So -- and maybe you've answered all
7  these questions because you say you're not sure
8  you looked at this.  But take a look, if you
9  would, at the last box here, "Employee Comp"?
10     A.  Yeah.
11     Q.  It's written here that:  "Employees
12 will be granted profit interests in an employee
13 holding vehicle."
14        Do you see that?
15     A.  Yeah.
16     Q.  Is your view of your agreement with
17 OpenAI that OpenAI couldn't provide personnel
18 with compensation in the form of equity?
19        ATTORNEY MOLO:  Objection to the form of
20 the question.
21     A.  I don't -- I'm uncertain.
22 BY ATTORNEY SAVITT:
23     Q.  Because I'm just trying to understand
24 what you thought --
25     A.  I don't think I actually read this term

Page 165

1  make sure I do.
2      When you say "revert to the nonprofit,"
3  do you mean that once the caps were satisfied, the
4  residual profits would flow to the nonprofit?  Is
5  that what you mean by that?
6      A.  Yeah.
7      Q.  Thank you -- excuse me.
8      Did you have an understanding as to what
9  Microsoft would be investing its capital in?
10     A.  My rough impression -- I wouldn't say
11 it's detailed understanding -- was that Microsoft
12 would be providing server resources like GPU
13 resources.
14     Q.  To OpenAI?
15     A.  Yeah.
16     Q.  And did you have any understanding as
17 to what entity -- what the -- what the assets of
18 the entity that Microsoft was investing in would
19 be?
20     A.  No.
21     Q.  You didn't have any knowledge of that?
22     A.  No.
23     Q.  All right.  Since the Microsoft
24 transaction was announced in 2019, have you
25 learned anything about it that causes you to

Page 166

1  believe that it broke a promise that was made to
2  you by OpenAI or by Mr. Altman?
3      A.  Sorry.  You're referring to that
4  specific deal or any deal?
5      Q.  I'll try again because last thing I
6  want to be is confusing.
7      Since the Microsoft deal was made
8  apparent to you in 2019, have you learned anything
9  about it, the Microsoft deal, that caused you to
10 believe that it constituted a broken promise to
11 you by OpenAI or Mr. Altman?
12     A.  No, I don't think so.  Well, like I
13 said, I felt uneasy about it.  But so long as
14 there was a profit cap in place and the -- you
15 know, the -- in a reasonable period of time, the
16 profits would return to the -- basically, the
17 nonprofit would -- any sort of financial benefits
18 would accrue to the nonprofit, I think that's sort
19 of uneasy.  But it seems like, okay, ultimately,
20 things will revert to the nonprofit so that's
21 probably okay.  Albeit it makes me uneasy.
22     Q.  Was it your understanding that the
23 revenue would revert to the nonprofit even if the
24 nonprofit didn't exceed the ability to satisfy
25 the capped return?

Page 167

1      A.  My understanding of the deal is very
2  proximate.  I didn't, you know, study the minutia
3  of the deal.  So I can't say that I -- I can't
4  speak with certainty here.  But, broadly, so long
5  as the things ended up back at the nonprofit, I
6  would be uneasy but probably ultimately okay with
7  that as long as the nonprofit benefited in the
8  long term.
9      Q.  And when you say "things returned to
10 the nonprofit," Mr. Musk, do you mean the revenue
11 that exceeded the capped profit returns?
12     A.  The revenue and then ownership of the
13 AI, like the control of the AI would be with the
14 nonprofit.  Not the for-profit.
15     And the for-profit -- my
16 understanding -- my understanding, very broad
17 understanding, like not a precise understanding,
18 is that, effectively, the for-profit would --
19 perhaps my understanding is wrong.
20     But that the for-profit would revert --
21 that the for-profit would effectively dissolve
22 past a certain profit number; and then we'd be
23 back to just having the nonprofit.
24     Q.  So your understanding was that the --
25 or you're -- recognizing that you've made caveats

Page 168

1  about the degree of your understanding, your
2  understanding was that after the capped profits
3  were satisfied, the for-profit entity would
4  essentially go away and everything that it owned
5  would revert to the not-for-profit.  Is that your
6  understanding?
7      A.  Yes.  Essentially, control of the AI
8  would -- and the revenue would revert to the
9  nonprofit.
10     Q.  And by control of the AI, you mean the
11 intellectual property associated with the --
12     A.  Not just the intellectual property, but
13 who is in charge of the AI.  Like who decides what
14 the AI does or doesn't do.
15     Q.  And given that structure, while you
16 were somewhat uncomfortable with it, it seemed
17 like it was not so bad.  Is that fair?
18     ATTORNEY MOLO:  Objection to the form of
19 the question.
20     A.  Can you say that again?
21 BY ATTORNEY SAVITT:
22     Q.  Yeah.  I said given that structure,
23 even though you had some discomfort with it, the
24 arrangement didn't seem that bad to you at the
25 time?

Elon Musk v.　　　　　　　　　　　　FINAL　　　　　　　　　　　　September 26, 2025
Samuel Altman　　　　　　　　　[CONFIDENTIAL]　　　　　　　　　　　Elon Musk

Page 181

1  businessman in history, and you've thought about
2  these things.
3  　　　And I think you said -- I just want to
4  make sure I've got the things that have come to
5  mind. You said debt, leasing, capped equity,
6  supplier financing.
7  　　　Did I miss anything?
8  　A.  I'm just speculating here.
9  　Q.  Yeah.
10 　　　Is there anything else that comes to
11 mind?
12 　　　ATTORNEY MOLO: Object to the form of
13 the question.
14 　A.  Not right now.
15 BY ATTORNEY SAVITT:
16 　Q.  Okay. And Ms. Zilis was a member of
17 the OpenAI board at the time of the $10 billion
18 2023 investment as well; is that right?
19 　A.  I'm not sure.
20 [REDACTED]
24 　Q.  Did you discuss the $10 billion 2023
25 Microsoft investment with Ms. Zilis anytime in

Page 182

1  2023?
2  　A.  I think I did.
3  　Q.  Tell me everything you can recall about
4  your discussions with Ms. Zilis on that subject.
5  　A.  The 2023?
6  　Q.  Yeah.
7  　A.  To the best of my recollection, which is
8  going to be imprecise, I felt this had gone too
9  far. This was essentially the final straw. And
10 for an investment of this scale, my perception was
11 that, at this point, there had been a breach of
12 promises; that, really, this was -- that
13 Microsoft -- or OpenAI would be beholden to
14 Microsoft at such a scale that they would be
15 unable to be a nonprofit or open source.
16 　Q.  And your recollection is you conveyed
17 that message in sum or substance to Ms. Zilis?
18 　A.  I believe I did.
19 　Q.  Did you discuss the transaction with
20 Mr. Altman?
21 　A.  I didn't -- I probably said that
22 publicly too. Did I not say it publicly? You
23 probably know my posts better than I do, but --
24 　Q.  I'm doing my best. If I knew of
25 something, I would tell you.

Page 183

1  　A.  I probably -- if -- I think I expressed
2  some dismay on Twitter, or X, at that time.
3  　Q.  Did -- but returning to your
4  discussions with Ms. Zilis on the subject, do you
5  recall what she said?
6  　A.  No. I just -- I think I would have --
7  it's likely that I would have expressed my concern
8  and exasperation that this is really -- they've
9  gone too far.
10 　Q.  Do you recall anything Ms. Zilis said
11 about the transaction, as far as she saw it?
12 　A.  I don't.
13 　Q.  No recollection of what she might have
14 said?
15 　A.  Nothing specific.
16 　Q.  Do you recall whether Ms. Zilis
17 supported the 2023 Microsoft investment?
18 　A.  I don't recall.
19 　Q.  Did you discuss that transaction with
20 Mr. Altman, as far as you recall?
21 　A.  I don't recall.
22 　Q.  What was it about the 2023 transaction
23 that caused it to be a broken promise as compared
24 to the 2021 or 2019 transaction?
25 　A.  Well, I felt like OpenAI had by degrees,

Page 184

1  sort of one step at a time, gradually changed its
2  mission from being a nonprofit open source to
3  being a for-profit closed-source, kind of one step
4  at a time, until, finally, I'm looking at this,
5  and it's like the -- I finally came to the
6  conclusion they are in a fundamental violation of
7  their charter -- of the reason for its existence,
8  being open source and nonprofit, that they had now
9  become closed-for-maximum-profit AI.
10 　Q.  And when did you come to that -- when
11 did you come to that conclusion?
12 　A.  2023, approximately.
13 　Q.  Were the -- were the promises that were
14 made to you in connection with OpenAI any
15 different than the promises that were made to the
16 public in respect of OpenAI?
17 　　　ATTORNEY MOLO: Object to the form of
18 the question.
19 BY ATTORNEY SAVITT:
20 　Q.  You can answer.
21 　A.  Well, the -- the promise of it being a
22 nonprofit and open source, I guess, was, you know,
23 consistent publicly and privately in the
24 beginning. The website described the company as
25 an open-source, nonprofit. That was certainly my

Page 361

1  lawyer's question.
2      THE WITNESS:  Okay.  Okay.
3  BY ATTORNEY MOLO:
4      Q.  Did you know how much each investor
5  planned to invest in this 2019 deal?
6      ATTORNEY SAVITT:  Objection;
7  speculation.
8      A.  No.
9  BY ATTORNEY MOLO:
10     Q.  Did you know how much each investor
11 stood to gain in the 2019 deal?
12     ATTORNEY SAVITT:  Objection.
13     A.  No.
14 BY ATTORNEY MOLO:
15     Q.  Did you understand all the details of
16 the 2019 OpenAI investment offering at that time?
17     A.  No.
18     Q.  What made you decide to sue in 2024 and
19 not in 2019?
20     A.  Well, the -- I finally came to the
21 conclusion after the 2023 deal was announced that
22 OpenAI was really going to become a closed-source,
23 for-profit -- a profit-maximizing, closed-source
24 organization.  And something needed to be done
25 about that.

Page 362

1  So I consulted lawyers in 2023 and filed
2  suit in '24.
3      ATTORNEY MOLO:  Thank you very much.
4      THE WITNESS:  You're welcome.
5      ATTORNEY MOLO:  That's it.
6      ATTORNEY SAVITT:  Let's go off the
7  record for just a second.
8      THE VIDEOGRAPHER:  Okay.  We're off the
9  record at 7:30 p.m.
10     (Recess taken from 7:30 p.m. to
11     7:32 p.m.)
12     THE VIDEOGRAPHER:  This is the beginning
13 of Media Number 12.  We're back on the record at
14 7:32 p.m.
15     ATTORNEY SAVITT:  Thank you.
16     The OpenAI defendants have no more
17 questions.  Mr. Musk, we thank you for your time
18 and patience.
19     We -- it is our position that the
20 deposition remains open pending the resolution of
21 some of our ongoing discovery matters.
22     We pass the witness to Microsoft.
23     ATTORNEY COHEN:  Microsoft has no
24 further questions, but we join in OpenAI's
25 position that the deposition remains open.

Page 363

1      ATTORNEY KRY:  We designate the
2  transcript confidential under the protective
3  order.
4      ATTORNEY MOLO:  And we disagree about
5  the deposition being open and hope everyone has a
6  good weekend.
7      THE VIDEOGRAPHER:  This concludes the
8  deposition on September 26th, 2025.  We're off
9  the record at 7:33 p.m.  Master media will be held
10 by Jane Rose Reporting.
11     (Witness excused.)
12     (Deposition adjourned 7:33 p.m. )

Page 364

1  CERTIFICATE OF SHORTHAND REPORTER
2
3      I, Gail Inghram, Registered Diplomate
4  Reporter, Certified Realtime Reporter,
5  CA-Certified Shorthand Reporter Number 8635, and
6  Notary Public, the officer before whom the
7  foregoing proceedings were taken, do hereby
8  certify that the foregoing transcript is a true
9  and correct record of the proceedings; that said
10 proceedings were taken by me stenographically and
11 thereafter reduced to typewriting under my
12 supervision; and that I am neither counsel for,
13 related to, nor employed by any of the parties to
14 this case and have no interest, financial or
15 otherwise, in its outcome.
16
17
18
19 _____
    Gail Inghram, RDR, CRR, CSR
20  CA-CSR No. 8635