1  JORDAN ETH (CA SBN 121617)
   JEth@mofo.com
2  WILLIAM FRENTZEN (CA SBN 343918)
   WFrentzen@mofo.com
3  DAVID J. WIENER (CA SBN 291659)
   DWiener@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, CA  94105
   Telephone:    (415) 268-7000
6  Facsimile:    (415) 268-7522

7  WILLIAM SAVITT (admitted *pro hac vice*)
   WDSavitt@wlrk.com
8  BRADLEY R. WILSON (admitted *pro hac vice*)
   BRWilson@wlrk.com
9  SARAH K. EDDY (admitted *pro hac vice*)
   SKEddy@wlrk.com
10 STEVEN WINTER (admitted *pro hac vice*)
   SWinter@wlrk.com
11 NATHANIEL CULLERTON (admitted *pro hac vice*)
   NDCullerton@wlrk.com
12 WACHTELL, LIPTON, ROSEN & KATZ
   51 West 52nd Street
13 New York, NY  10019
   Telephone:    (212) 403-1000
14 Facsimile:    (212) 403-2000

15 *Attorneys for Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI*
   *L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global,*
16 *LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund*
   *Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I,*
17 *L.P., OpenAI Startup Fund SPV I, L.L.C., OpenAI Startup Fund SPV GP II,*
   *L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV,*
18 *L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,*
   *OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,*
19 *Aestas Management Company, LLC, and Aestas LLC*

20 (Additional party and counsel on the next page)

21                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
22                      OAKLAND DIVISION

23 ELON MUSK, et al.,                    Case No. 4:24-cv-04722-YGR

24         Plaintiffs,                   **DEFENDANTS' NOTICE OF MOTION
                                         AND MOTION TO EXCLUDE
25     v.                                OPINIONS 3 THROUGH 6 OF DR. C.
                                         PAUL WAZZAN; MEMORANDUM OF
26 SAMUEL ALTMAN, et al.,                POINTS AND AUTHORITIES**

27         Defendants.                   Date:  March 3, 2026
                                         Time:  2:00 p.m.
28                                       Courtroom:  1 – 4th Floor
                                         Judge:  Hon. Yvonne Gonzalez Rogers

RUSSELL P. COHEN (SBN 213105)
Russ.cohen@dechert.com
HOWARD M. ULLMAN (SBN 206760)
Howard.ullman@dechert.com
DECHERT LLP
45 Fremont Street, 26th Floor
San Francisco, CA  94105
Telephone:      (415) 262-4500
Facsimile:       (415) 262-45555

ANDREW J. LEVANDER (admitted *pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036
Telephone:      (212) 698-3500
Facsimile:       (212) 698-3599

NISHA PATEL (SBN 281628)
Nisha.patelgupta@dechert.com
DECHERT LLP
633 West 5th Street, Suite 4900
Los Angeles, CA  90071
Telephone:      (213) 808-5700
Facsimile:       (213) 808-5760

JOHN (JAY) JURATA, JR. (admitted *pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP
1900 K Street, N.W.
Washington, DC  20006
Telephone:      (202) 261-3300
Facsimile:       (202) 261-3333

*Attorneys for Defendant Microsoft Corporation*

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL: Please take notice that on March 3, 2026 at 2:00 p.m., or at such other time as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers, in Courtroom 1 of the U.S. District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC (the "OpenAI Defendants"), and Defendant Microsoft Corporation will, and hereby do, move the Court to exclude testimony regarding certain opinions offered by Dr. C. Paul Wazzan, an expert witness for Plaintiff Elon Musk.

Defendants move pursuant to Federal Rule of Evidence 702 and the cases applying it, including *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on the grounds that certain opinions that Wazzan proposes to offer do not meet the standards of reliability that govern the admissibility of expert testimony. The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and the supporting exhibits attached to the Declaration of William Frentzen in Support of Defendants' Motion to Exclude Opinions 3 Through 6 of Dr. C. Paul Wazzan, as well as the records in this action and such further evidence and argument that may be presented at any hearing on this Motion and that the Court may consider.

Defendants specifically request that the Court enter an order excluding Plaintiff from introducing testimony at trial regarding the third, fourth, fifth, and sixth opinions set forth in the Expert Report of C. Paul Wazzan, Ph.D., dated October 29, 2025 (the "Opening Report"); reaffirmed in the Supplemental Expert Report of C. Paul Wazzan, Ph.D., dated December 2, 2025 (the "Supplemental Report"); and summarized in the summary of opinions Plaintiff filed with the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Court on January 6, 2026. This request encompasses paragraphs 71-116 of the Opening Report, paragraph five of the Supplemental Report, and all exhibits, charts, and tables incorporated therein.

1

## STATEMENT OF ISSUE TO BE DECIDED

2

Whether Wazzan's third, fourth, fifth, and sixth opinions purporting to quantify the "share"

3

of the current value of OpenAI, Inc. (the nonprofit now called OpenAI Foundation) that is

4

attributable to Musk's alleged contributions should be excluded for failing to satisfy the standards

5

for admissibility set forth in Federal Rule of Evidence 702 and the cases applying it, including

6

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND .................................................................................................... 3

ARGUMENT ......................................................................................................... 6

I.    WAZZAN'S METHODOLOGY IS UNRELIABLE. ...................................... 7

    A.    Wazzan does not explain why he selected the four factors he used to
        estimate Musk's relative contribution to the nonprofit's value. .............. 7

    B.    Wazzan does not explain how he assessed those factors, so his calculations
        cannot be replicated or tested. .................................................... 9

    C.    Wazzan adopts a one-size-fits-all approach, so his opinions do not account
        for different outcomes at trial. .................................................. 11

    D.    Wazzan's methodology does not tie the purported enrichment to the alleged
        wrongdoing as opposed to unchallenged conduct. ................................ 11

II.   WAZZAN FAILS TO RELIABLY APPLY HIS METHODOLOGY. ............................ 13

III.  WAZZAN'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA. .. 15

    A.    Wazzan relies on a purported agreement among OpenAI cofounders that
        was never reached and that has no bearing on Musk's relative contributions
        to the OpenAI nonprofit in any event. .......................................... 15

    B.    Wazzan relies on insufficient "facts" regarding Musk's stake in xAI. ............. 16

IV.   THE COURT SHOULD EXCLUDE WAZZAN'S OPINIONS RELATED
      SPECIFICALLY TO MICROSOFT'S "WRONGFUL GAINS" BECAUSE HE
      PROVIDES NO BASIS TO ASSIGN TO MUSK ANY OF MICROSOFT'S
      INTEREST IN THE FOR-PROFIT ENTITY. .............................................. 17

CONCLUSION ..................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Booksellers Ass'n, Inc.* v. *Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ................................................................. 12

*EcoFactor, Inc.* v. *Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025)............................................................................. 17

*Engilis* v. *Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025)......................................................................... 4, 6, 7

*GPNE Corp.* v. *Apple, Inc.*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ................................................. 10, 11

*In re Apple iPhone Antitrust Litig.*,
2025 WL 3124160 (N.D. Cal. Oct. 27, 2025)......................................................... 10

*Kumho Tire Co.* v. *Carmichael*,
526 U.S. 137 (1999)............................................................................................ 9, 19

*Mariscal* v. *Graco, Inc.*,
2014 WL 4245949 (N.D. Cal. Aug. 27, 2014)....................................................... 18

*McGlinchy* v. *Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988)........................................................................... 13, 20

*NetFuel, Inc.* v. *Cisco Sys.*,
2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ...................................................... 11

*Nanometrics, Inc.* v. *Optical Sols. Inc.*,
2023 WL 8101885 (N.D. Cal. Oct. 30, 2023)........................................................ 11

*Young* v. *Cree Inc.*,
2021 WL 292549 (N.D. Cal. Jan. 28, 2021) .......................................................... 13

**Statutes and Rules**

Fed. R. Evid. 702 ............................................................................................. *passim*

Fed. R. Evid. 702(b)......................................................................................... *passim*

Fed. R. Evid. 702(c) ................................................................................... 1, 7, 8, 9

Fed. R. Evid. 702(d)......................................................................................... *passim*

**Other Authorities**

Restatement (Third) of Torts: Liab. for Econ. Harm § 28 cmt. e (2020)) ................... 12

v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vi

### INTRODUCTION

Relying on the opinions of Dr. C. Paul Wazzan, Elon Musk seeks to recover between $65.50 billion and $109.43 billion from the *nonprofit* OpenAI Foundation plus an additional $13.30 billion to $25.06 billion from Microsoft. Wazzan opines that Musk is entitled to be paid these amounts—up to $135 billion total—because he *donated* approximately $38 million to the OpenAI nonprofit and made certain nonmonetary contributions to the organization in its early years. Wazzan's methodology is made up; his results unverifiable; his approach admittedly unprecedented; and his proposed outcome—the transfer of billions of dollars from a nonprofit corporation to a donor-turned competitor—implausible on its face.

Wazzan's analysis begins in familiar territory, with proffered valuations of the OpenAI for-profit organization (step one) and of the nonprofit's controlling stake in that organization (step two). But then it departs from reliable expertise and deploys a "methodology" that Wazzan invented for this case to justify the conclusion that the OpenAI nonprofit has been unjustly enriched by an amount 1700x to 2900x greater than the total amount of Musk's charitable donations, and that Musk should receive that value instead.

Wazzan's approach to unjust enrichment proceeds from the incoherent assumption that if Musk prevails on any of his claims, he should be compensated as if he had an "economic interest"—an equity stake—in the nonprofit. It is legally impossible for private individuals to hold economic interests in nonprofits, and Wazzan conceded at deposition that he had no reason to believe Musk "expected a financial return when he donated . . . to OpenAI nonprofit." Ex. 4 (Wazzan Dep. Tr.) at 75:1-9.[1] Wazzan's opinions about Musk's purported "economic interest" therefore flunk the Rule 702(a) requirement that expert testimony "help the trier of fact . . . determine a fact in issue."

But even setting that overarching problem aside for purposes of this motion,[2] the four opinions that comprise step three of Wazzan's analysis are also inadmissible for lack of reliability under each of subsections (b), (c), and (d) of that Rule:

---

[1] "Ex." refers to the exhibits attached to the transmittal declaration of William Frentzen, filed herewith.

[2] Defendants reserve the right to seek exclusion of Wazzan's and Musk's other experts' opinions

(1) Wazzan fails to articulate any "reliable principles and methods" to support his conclusion that Musk is responsible for generating 50% to 75% of the OpenAI nonprofit's current value, *see* Fed. R. Evid. 702(c)—a conclusion that provides the foundation for every opinion that follows. The conclusion is grounded in a methodology that Wazzan, who has been hired as an expert more than 100 times, has never used before and conjured for this case: Wazzan starts by selecting four factors to consider, but without justifying their selection (or the exclusion of other factors). He then makes calculations based on the factors, but without explaining how any given factor influenced his calculations. Wazzan cannot point to any precedent or academic literature to support this approach. He simply feeds his arbitrarily chosen inputs through a black box to generate an untestable and unverifiable result. His methodology cannot be independently tested by anyone— not by Wazzan's peers, and certainly not by Defendants, their respective experts, this Court, or a jury. It is therefore not a reliable methodology, as courts have consistently held. *See* Parts I.A & I.B, *infra*. Wazzan's methodology is also unreliable because it cannot be applied on a claim-by-claim or donation-by-donation basis (Part I.C) and because it fails to address causation (Part I.D).

(2) Independent of the methodology's inherent unreliability, Wazzan's opinions are also not "a reliable application of the [stated] principles and methods to the facts of the case." Fed. R. Evid. 702(d). Wazzan describes his process as selecting factors, then weighing them in an undisclosed manner supposedly to measure a "relative share[]." Ex. 1 (Opening Rep.) ¶ 71. Though Wazzan acknowledges that a relative assessment requires comparing one contribution to another, he does not discuss—much less quantify—the contributions of anyone other than Musk. Not OpenAI's other cofounders; not the employees or the scientists who invented ChatGPT or the technology behind it; and not any of the third parties, including Microsoft, that invested billions of dollars into OpenAI's for-profit affiliate in the years after Musk quit. All of these inconvenient facts are simply ignored. Wazzan never explains how he can set aside all others' contributions and still claim to have conducted a "relative" analysis, which is the core of his stated project. *See* Part II, *infra*.

(3) Wazzan's opinions also are not "based on sufficient facts or data," as Rule 702(b) requires. Wazzan relies without justification on failed negotiations between the OpenAI cofounders

---

on grounds of "fit," consistent with the Court's Standing Order Re: Pretrial Instructions in Civil Cases 4(c).

in 2017 regarding the terms on which they would invest in a for-profit entity that was never created, and on Musk's stake in a different artificial intelligence company (xAI) about which Wazzan admits he knows nothing. *See* Part III, *infra*.

(4) Finally, Wazzan's opinions are inadmissible specifically as to Microsoft's alleged "wrongful gains" because his calculations of those gains are based on an unsupported assumption that some portion of Microsoft's stake in the OpenAI for-profit entity should flow back to the OpenAI nonprofit. Wazzan then asserts, without any explanation, that the amount that flows back should equal the nonprofit's stake in the for-profit entity. His methodology results in double-counting value to the nonprofit, and thus to Musk. Wazzan's failure to offer any contractual, governance, economic, or other rationale for reallocating Microsoft's negotiated interest to the nonprofit (and thus to Musk) renders his opinions as to the resulting wrongful gains unreliable and inadmissible. *See* Part IV, *infra*.

The above-summarized flaws render Wazzan's Opinions 3 through 6 unreliable. They are precisely the type of "expert" opinions that risk confusing the jury and unfairly prejudicing opposing parties. As the Ninth Circuit recently reaffirmed, defects like the ones here are not issues of credibility or weight that can be tested on cross-examination or through rebuttal experts: "Only if the proposed testimony meets the thresholds of relevance and reliability is its proponent entitled to have the jury decide upon its credibility." *Engilis* v. *Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) (citation modified). Musk has not carried that burden.

## BACKGROUND

The assignment Musk's counsel gave Wazzan was to assume liability and calculate the extent to which the OpenAI nonprofit and Microsoft purportedly "wrongfully profited or were unjustly enriched by operating OpenAI as a commercial venture." Ex. 1 ¶ 8. Wazzan confirmed at deposition that he only modeled a single "predicate act," which is "the creation of the for-profit entity in 2019." Ex. 4 at 53:17-54:4. Wazzan also confirmed that it is "immaterial to [his] methodology what claims Mr. Musk prevails on" (*id.* at 57:11-15) and that it "doesn't matter" whether Musk was "only misled at a time when he made some, but not all of his contributions or donations" (*id.* at 59:15-60:4). Per Wazzan, Musk's "contributions, whether he was misled or not,

3

are his contributions," and the relevant question is, "What are [Musk's] contributions worth?" *Id.*
at 59:22-60:4.

All of Wazzan's analyses and opinions rest on the foundational assumption that Musk
"should have an economic interest in the nonprofit, but he doesn't." *Id.* at 83:7-15. As he testified:

> What's going on is that [Musk] contributed to a nonprofit. The nonprofit then
> created a for-profit operation, leading to, in this case, the unjust enrichment. The
> unjust enrichment is now flowing back to the nonprofit as the residual claimant. And
> the question is, based on Musk's original monetary and non-monetary contributions,
> what would he be entitled to of that amount.

*Id.* at 75:15-22. Wazzan adopted this construct despite recognizing that "[a] person can't have an
economic interest in a nonprofit," that "[d]onors to a nonprofit do not expect a financial return,"
and that he lacked any information to support the conclusion that "Musk expected a financial return
when he donated money and time" to the OpenAI nonprofit. *Id.* at 74:10-75:9.

Wazzan purports to calculate the value of Musk's hypothetical economic interest in the
OpenAI nonprofit using a three-step methodology. At step one, Wazzan seeks to estimate the value
of the OpenAI for-profit entity, based in part on a discounted cash flow analysis. Ex. 1 ¶¶ 31-51. At
step two, Wazzan seeks to allocate the value of the for-profit entity among its various stakeholders,
including the nonprofit, based in part on Black-Scholes modeling. *Id.* ¶¶ 52-70. Defendants are not
challenging as unreliable under Rule 702 Wazzan's methodologies or his opinions at step one or
step two, which comprise the bulk of his Opening Report and simply present valuations of the
OpenAI for-profit and of the nonprofit's stake in the for-profit—points not at issue in this case.

Defendants challenge the third step of Wazzan's analysis, which begins at paragraph 71 of
the Opening Report, purports to "allocate the value of OpenAI Nonprofit among Mr. Musk and
other contributors," and comprises four opinions:

> <u>Opinion 3</u>. A reasonable estimate for the share of the OpenAI nonprofit's value
> attributable to Musk's contributions is **50% to 75%**. (Ex. 1 ¶¶ 71-98.)

1  <u>Opinion 4</u>. The amount of the nonprofit's wrongful gains attributable to Musk's
2  contributions is between **$65.50 billion and $109.43 billion**. (Ex. 1 ¶¶ 99-101;
   Ex. 2 (Suppl. Rep.) ¶ 5.)

3  <u>Opinion 5</u>. The amount of Microsoft's wrongful gains attributable to Musk's
4  contributions is between **$13.30 billion and $25.06 billion**. (Ex. 1 ¶¶ 102-06;
   Ex. 2 ¶ 5 & Suppl. Rep. Ex. 20.)

5  <u>Opinion 6</u>. The amount of OpenAI's and Microsoft's wrongful gains attributable to
   Mr. Musk's contributions may be apportioned across various time periods. (Ex. 1
6  ¶¶ 107-12.)

7  *See* Ex. 3 (Wazzan Summ. of Assignment & Ops.) at 1-2 (emphasis added).

8      Opinion 3 is the key opinion in Wazzan's third step—the opinions that follow all depend

9  on it. To calculate the share of the nonprofit's value that is attributable to Musk's contributions,

10 Wazzan purports to consider some combination of (i) Musk's monetary donations to the nonprofit;

11 (ii) Musk's alleged nonmonetary contributions; (iii) proposed equity stakes in a for-profit entity

12 discussed among the nonprofit's cofounders in 2017 (but never formed); and (iv) an estimate of

13 Musk's equity stake in an entirely different company, xAI, as of October 2025. *See* Ex. 3 at 1;

14 Ex. 1 ¶¶ 71-98. Wazzan does not explain why he selected these four factors or why he did not

15

16 consider others.

17      Wazzan's Opening Report acknowledges that "Sam Altman and other parties also made

18 certain contributions" to the nonprofit and states that it is "necessary to estimate those relative

19 shares" to "determine the share of OpenAI's wrongful gains attributable to Mr. Musk." Ex. 1 ¶ 71.

20

21 But Wazzan admitted at deposition that he did not in fact "parse out" the "percentage of the OpenAI

22 nonprofit's value" attributable to the contributions of Altman, or of anyone else. Ex. 4 at 142:7-

23 143:7. When questioned at deposition, Wazzan could not explain how his assessment could

24 nonetheless be considered "relative" in any meaningful sense, and was not able even to identify all

25 of the individuals and entities (other than Musk) who contributed to the nonprofit's value. *Id.*

26

27 146:15-147:11. According to Wazzan, "I don't need to know all the other people." *Id.* at 147:3-11.

28

**ARGUMENT**

Rule 702 requires district courts to serve a "gatekeeping role" to ensure that expert opinion testimony offered to a jury is reliable. *Engilis* v. *Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). The Rule was amended in December 2023 "to expressly require a proponent of expert testimony to 'demonstrate[] to the court that it is more likely than not that' . . . four admissibility requirements are satisfied." *Id.* (quoting Rule 702, as amended). Under the Rule, Wazzan's opinions are inadmissible unless Musk establishes by a preponderance not only that Wazzan's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" (generally a matter of "fit" to be considered under this Court's rules at the motion *in limine* phase), but also that:

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702(b)-(d). As set forth below, Wazzan's Opinions 3 through 6 fail all these prongs. Musk has not met his burden, and the opinions are inadmissible even assuming Rule 702(a) is met.

The problem is not merely a technical one. Allowing Musk to "cloak [Wazzan] with the mantle of expert" as to these unreliable opinions would prejudice Defendants in just the way Rule 702 is designed to guard against, because expert testimony tends to "carry special weight with the jury." *T. Jinro Am. Inc.* v. *Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001). The law recognizes that this kind of prejudice cannot be addressed through cross-examination or rebuttal expert testimony, which is why "[t]here is no presumption in favor of admission." *Engilis*, 151 F.4th at 1049. As the Ninth Circuit recently clarified, "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology," are questions of admissibility, not weight. *Id.* at 1049. "Only if the proposed testimony meets the threshold[] of . . . reliability is its proponent entitled to have the jury decide upon its credibility." *Id.* (citation modified); *see also id.* at 1050 ("The district court cannot

abdicate its role as gatekeeper, nor delegate that role to the jury." (citation modified)). That threshold is not met here.

## I.    WAZZAN'S METHODOLOGY IS UNRELIABLE.

The methodology that underlies Wazzan's Opinions 3 through 6—which finds no grounding in precedent, academic literature, or even Wazzan's own experience—is not reliable. *First*, Wazzan does not explain why he selected the four factors he used to calculate Musk's relative contribution to the nonprofit's value, nor why he excluded all other potential factors. *Second*, because Wazzan does not disclose how each of those factors weighed in his assessment of Musk's relative contributions, his methodology amounts to an impermissible "black box" that cannot be replicated or tested. *Third*, Wazzan's methodology does not differentiate among Musk's many causes of action or claimed contributions, so it cannot be used to determine the amount of unjust enrichment if the jury finds that only some of the challenged conduct was wrongful. *Fourth*, Wazzan's methodology neglects to address causation.

Each of these limitations independently renders Wazzan's challenged opinions unreliable and therefore inadmissible under Rule 702(c).

### A.    Wazzan does not explain why he selected the four factors he used to estimate Musk's relative contribution to the nonprofit's value.

Wazzan identifies four factors in deriving his estimate that Musk's contributions generated 50% to 75% of the nonprofit's current value: (1) "Musk's share of total financial contributions to OpenAI prior to his departure at the start of 2018"; (2) "Musk's proposed equity stake in the 2017 pro forma cap table and alternative scenarios"; (3) "Musk's current equity stake in x.AI"; and (4) "qualitative accounts of [] Musk's non-monetary contributions to OpenAI." *See* Ex. 3 at 1-2. But Wazzan never explains *why* he chose these factors or *why* he excluded others.

This is a glaring omission, because Wazzan was not applying an accepted methodology— or even an existing one. Wazzan testified that he has *never* used this methodology before, in any context, and he acknowledged that the "fact pattern[]" here is "pretty unique." Ex. 4 at 43:24-44:10. While Wazzan claimed that steps one and two of his analysis could be found in finance textbooks (*id.* at 44:11-45:6), he did not say the same about step three. Wazzan instead admitted that his

approach to "determining the portion of OpenAI nonprofit stake that should be attributable to Mr. Musk's contributions" is something "you wouldn't find . . . in a textbook." Ex. 4 at 45:10-16.

Because Wazzan never explains why he selected his factors, the Court has no basis to decide whether using those factors results in a reliable methodology—as opposed to a methodology designed to generate a desired conclusion. Wazzan never explains why Musk's proposed (and rejected) equity stake in a for-profit entity that OpenAI never formed, or Musk's equity stake in an entirely unrelated company (whether xAI or any other Musk-affiliated company), bears any relation at all to the value that Musk's contributions created for the OpenAI nonprofit. *See* Part III, *infra*. And even within those factors, Wazzan does not explain his choices. For example, he offers no justification for considering the size of Musk's stake in xAI, which Wazzan estimates at around 53%, instead of Musk's stake in Tesla, which was only about 20.3% as of October 2025.[3] By all appearances, what Wazzan has done is cherry-pick convenient factors that correspond roughly to the size of the "economic interest" Musk wants to claim, and declare that those factors support Musk's claim. That is not a methodology in any coherent sense of the term, and certainly not a reliable one.

"An expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Young* v. *Cree Inc.*, 2021 WL 292549, at *9 (YGR) (N.D. Cal. Jan. 28, 2021) (citation modified) (quoting *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999)). Where, as here, an expert purports to rely "solely or primarily on experience," he must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note 2000 amendment. Wazzan has done none of those things. He has not even identified the rationale for selecting the inputs to his methodology, much less explained how that rationale is grounded in his valuation experience.

---

[3] *See* Elon R. Musk, Sched. 13G/A, https://perma.cc/UK3K-3UXJ (filed Nov. 10, 2025) (last visited Jan. 16, 2026).

### B. Wazzan does not explain how he assessed those factors, so his calculations cannot be replicated or tested.

Wazzan also fails to explain *how* his chosen factors add up to his estimate that Musk's contributions were responsible for 50% to 75% of the OpenAI nonprofit's value. He offers no breakdown of how much of that value—up to $100 billion or more—is attributable to Musk's $38 million in donations (including rent payments) versus his nonmonetary contributions. Nor does he offer any estimated "valuation" of the nonmonetary contributions. He articulates no framework for comparing distinct categories of contributions. And he provides no explanation as to how the purported "agreement in principle" he modeled or Musk's stake in xAI affects his analysis. It is therefore impossible to determine whether Wazzan's estimate is primarily driven by Musk's charitable donations, his nonmonetary contributions, a combination of the two, or something else entirely.

Wazzan does not say whether Musk's monetary donations account for most of the billions of dollars of value-creation he attributes to him, a small fraction of it, or something in between. Nor does Wazzan identify whether Musk's alleged nonmonetary contributions are worth (in his opinion) thousands, millions, or even billions of dollars. When asked to clarify at his deposition, Wazzan testified that he did not "parse [] out" how much of his estimate is attributable to monetary versus nonmonetary contributions. Ex. 4 at 137:15-25, 312:15-20. He also admitted that he did not assign any specific quantitative values to Musk's alleged nonmonetary contributions. *Id.* at 158:2-6. And he could not say how valuable any of the specific nonmonetary contributions he analyzed were to the nonprofit on a standalone basis. *Id.* 243:23-246:19. Yet without identifying any value for these contributions, Wazzan nonetheless converts them—using an undisclosed methodology—into a supposed unjust enrichment figure.

Wazzan's failure to disclose the relative weight of his inputs and explain how those inputs were assessed renders his ultimate estimate unreliable—it reveals that estimate to be pulled from the air, and unfairly untestable. As this Court has explained in rejecting an expert's conclusions on reliability grounds, "[e]xperts must follow some discernable methodology, [which] may not be a 'black box into which data is fed at one end and from which an answer emerges at the other.'" *In re*

9

*Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *7 (N.D. Cal. Oct. 27, 2025) (YGR) (citation modified) (quoting *GPNE Corp.* v. *Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014)). The expert must "record, or explain, his entire methodology such that it can be replicated." *Id.* at *8.

Similar defects doomed a damages expert's opinions in *GPNE Corp.* There, the expert relied on a series of "qualitative factors" to support his conclusions, but admitted that there was no "mathematical calculation" underlying them. 2014 WL 1494247, at *2, *4. The court ruled that such a methodology amounted to "an impermissible black box without sound economic and factual predicates," and explained that the resulting "analytical gap" between the inputs and damages was "simply too great." *Id.* at *5.

Likewise, in *NetFuel, Inc.* v. *Cisco Systems, Inc.*, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020), the court excluded the opinions of a damages expert on the basis that the expert "never explain[ed] how [certain evidence] weighed in his . . . evaluation"—an omission the court found "fatal." *Id.* In the court's view, "without explaining *how* he arrived at [his evaluation], the figure appears to have been plucked out of thin air based on vague qualitative notions of the relative importance of [certain factors]." *Id.* (citation modified). The expert's method was thus another "impermissible black box without sound economic and factual predicates." *Id.* (citation modified).

The same problem exists here. By failing to explain his methodology or otherwise show his work, Wazzan effectively forecloses any meaningful assessment of its reliability, either by the Court as gatekeeper or by counsel on cross-examination. *See Nanometrics, Inc.* v. *Optical Sols., Inc.*, 2023 WL 7169549, at *2 (N.D. Cal. Oct. 30, 2023) ("Without a description of [the expert's] methodology, the Court cannot determine whether his opinions are the product of 'reliable principles and methods' or whether he 'reliably applied the principles and methods to the facts of the case.'"; *GPNE Corp.*, 2014 WL 1494247, at *6 ("Without a methodology, an explicit apportionment analysis, or an explanation of why apportionment is inappropriate, cross-examination is futile.")). Musk accordingly cannot meet his burden to demonstrate admissibility under Rule 702, and the Court should exercise its gatekeeping powers to exclude the subject opinions.

**C.      Wazzan adopts a one-size-fits-all approach, so his opinions do not account for different outcomes at trial.**

Wazzan's analysis assumes that Musk is entitled to 50% to 75% of the nonprofit's current value so long as the jury finds for Musk on at least one of his claims. Wazzan agreed at deposition that it was "immaterial to [his] methodology what claims Mr. Musk prevails on . . . as long as he prevails on at least one." Ex. 4 at 57:11-15. He also acknowledged that "it doesn't matter" whether "Musk was only misled at a time when he made some, but not all of his contributions or donations." *Id.* at 59:15-60:4. Wazzan therefore performed no analysis to "portion out" alleged unjust enrichment "by contribution date." *Id.* at 64:15-19, 240:17-241:15. The amounts he calculates are "all or nothing" and do not change based on whether Defendants are found "liable for one of the alleged acts of wrongful conduct or all of the alleged wrongful acts." *Id.* at 232:10-16.

The Notice of Remedies Musk filed today shines a spotlight on this flaw in Wazzan's analysis. Musk concedes in that filing that if he prevails on his fraud claim, it will be necessary for the jury to "award wrongful gains . . . with respect to the portion of contributions that Mr. Musk was induced to make following the date of the fraud." Dkt. 392 at 3. But that is not possible using Wazzan's methodology. Since he does not quantify the value of any of Musk's contributions, there is no way for the jury to determine what portion of the purported unjust enrichment arises from particular contributions.

Because Wazzan's analysis fails to distinguish alleged "wrongful gains" on a claim-by-claim or contribution-by-contribution basis, his methodology is unreliable. If the jury returns a verdict for Musk on some, but not all, of his claims, it will not be possible for the jury to disaggregate gains that are "wrongful" from gains that are not. *See Am. Booksellers Ass'n, Inc.* v. *Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1040-42 (N.D. Cal. 2001) (holding expert report inadmissible where expert failed to analyze what damages were tied to unlawful versus lawful conduct, rendering it "completely speculative").

**D.      Wazzan's methodology does not tie the purported enrichment to the alleged**

11

**wrongdoing as opposed to unchallenged conduct.**

In a similar way, because Wazzan's analysis only purports to measure total "enrichment"— *i.e.*, value increase—over the life of the for-profit enterprise before allocating a portion back to Musk, it is untethered to any specific wrongful conduct allegedly committed by any specific Defendant. The lack of any such causal analysis is fatal.

Consider Musk's fraud claim, which is predicated on alleged misstatements in late 2017 and early 2018. *See* Dkt. 390 at 18. It is undisputed that these alleged misstatements were made months after Musk stopped his quarterly donations and after Musk had provided most (if not all) of his alleged nonmonetary contributions. But Wazzan never explains how the statements Musk challenges could have caused any unjust enrichment of the OpenAI nonprofit attributable to donations and nonmonetary contributions Musk had already made.

There is a similar problem with the one remaining claim against Microsoft for aiding and abetting. The Restatement of Torts makes clear that an aiding and abetting defendant can be accountable "only for harm to which the aiding and abetting made a contribution." Restatement (Third) of Torts: Liab. for Econ. Harm § 28 cmt. e (2020). Wazzan admitted that he does not "have a strong understanding" of the conduct that Microsoft is alleged to have wrongfully engaged in. Ex. 4 at. 228:14-22. Unsurprisingly, his calculations do not tie any purported enrichment to specific Microsoft acts, much less analyze the timing and incremental impact (if any) of such acts. Ex. 1 ¶¶ 102-05. A similar flaw prompted the Ninth Circuit to affirm exclusion of an expert in *McGlinchy* v. *Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988). There, the expert "could not recall any specific acts by . . . defendants," and thus "did not relate [damages] to specific acts." *Id.* at 806.

The same holds true here: Wazzan's failure to associate the unjust enrichment with specific acts taken by particular Defendants creates "a great danger of confusing the fact and cause of damages with the amount of damages." *Id.* Allowing a jury to hear a disgorgement number— particularly one that is untethered to specific alleged wrongful conduct and results in Musk being paid amounts thousands of times greater than his actual donations—risks misleading the jury as to what relief is recoverable and renders the challenged opinions inadmissible.

## II.    WAZZAN FAILS TO RELIABLY APPLY HIS METHODOLOGY.

As discussed above, Wazzan's failure to articulate his methodology forecloses any meaningful assessment of reliability both by the Court and by counsel on cross-examination. However, even assuming that Wazzan's opaque analytical process could qualify as reliable in the abstract, Opinions 3 through 6 are inadmissible for the independent reason that they do not "reflect[] a reliable application of [Wazzan's stated] principles and methods to the facts of the case." Fed. R. Evid. 702(d).

Wazzan made clear in his Opening Report that his methodology requires comparing Musk's contributions to the contributions of others. He acknowledged there that "Sam Altman and other parties also made certain contributions" to the nonprofit and that it was therefore "necessary to estimate [the] relative shares" of their contributions. Ex. 1 ¶ 71. At deposition, Wazzan reaffirmed that Altman "contributed some value" to the nonprofit, along with "Brockman," "Sutskever," and "[s]ome of the other donors." Ex. 4 at 138:11-139:1, 172:23-173:4. Wazzan also acknowledged the existence of "other contributors," citing the example that "[t]he employees get a share, et cetera." *Id.* at 77:7-16. Step three of Wazzan's analysis is accordingly titled "Allocating OpenAI Nonprofit's Value Among Mr. Musk and Other Contributors." *Id.*

But Wazzan never actually considered the value of the contributions made by anyone other than Musk. Neither his Opening Report nor his Supplemental Report evaluates anyone else's monetary or nonmonetary contributions or compares their value to the value of Musk's contributions. When asked at deposition "[w]hat percentage of the OpenAI nonprofit's value [he] would attribute to [Sam] Altman's contributions," Wazzan responded that he hadn't "parsed that out specifically for him." Ex. 4 at 142:15-18. He likewise testified that he hadn't "parsed out" the contributions attributable to OpenAI's two other cofounders, Greg Brockman or Ilya Sutskever. *Id.* at 142:19-24. Wazzan gave similar answers for every other contributor or group of contributors about whom he was asked, including Reid Hoffman, other donors, and OpenAI employees. *Id.* at 147:23-148:6.

When Wazzan was asked about his failure to quantify the contributions of OpenAI's employees, he contradicted his own report as well as he earlier testimony by claiming that such an analysis was unnecessary. The reason why? Because employees get paid salaries:

A:      I mean, I guess give me an example, a programmer – are we talking about one programmer?

Q:      Sure, a programmer.

A:      He gets paid a salary, so his contributions are recognized through his income.

Q:      I understand that's how the company recognizes this programmer's contributions, but how does your analysis recognize them?

A:      It doesn't need to.

Ex. 4 at 105:23-106:6. Thus, in Wazzan's application of his own invented methodology, the scientists and programmers who are responsible for developing ChatGPT and OpenAI's other key technologies are deemed to have contributed *zero percent* of the nonprofit's current value.

Wazzan's failures go farther still. Despite emphasizing the need to make a "relative assessment," Wazzan could not even identify all of the people and parties who had contributed to the nonprofit's value, whether through monetary donations or nonmonetary contributions. When asked about his ability to make a "list of the people who contributed to the value of OpenAI nonprofit," Wazzan testified, "I don't think I'm in a position to tell you who would be on the list." *Id.* at 146:17-23. He elaborated: "I don't need to know all the other people. . . . They all have their piece; they're in the other – they're in the other piece of the pie." *Id.* at 147:3-11.

Wazzan's deposition testimony makes it abundantly clear that he failed to do the very thing he claimed was necessary: "estimate th[e] relative shares" of contributions made by Musk and others. Ex. 1 ¶ 71. This is fatal under Rule 702(d).[4]

---

[4] Wazzan also failed to apply his method reliably for the additional reason that he never *quantified* Musk's nonmonetary contributions. For example, though his Opening Report cites Musk's early efforts to recruit employees as valuable to the OpenAI nonprofit (Ex. 1 ¶¶ 9, 82-86), Wazzan admitted that he took no steps to quantify the value of those efforts. Ex. 4 at 160:11-161:7, 243:23-244:1. Wazzan similarly cites Musk's times spent advising OpenAI's key personnel as valuable (Ex. 1 ¶¶ 9, 87-89), but he admitted when questioned that he did not know how much time Musk spent with such personnel. Ex. 4 at164:11-165:17. Wazzan also cited Musk's "industry connections and prestige" as valuable for attracting business partners and donors (Ex. 1 ¶¶ 9, 90) but

## III.    WAZZAN'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA.

Wazzan's opinions should also be excluded because they are not grounded in sufficient facts or data, as Rule 702(b) requires.

### A.    Wazzan relies on a purported agreement among OpenAI cofounders that was never reached and that has no bearing on Musk's relative contributions to the OpenAI nonprofit in any event.

In purporting to allocate the OpenAI nonprofit's value among Musk and other contributors, Wazzan relies on proposed "equity stakes" discussed among OpenAI's confounders during their 2017 negotiations about a potential for-profit entity. According to Wazzan, these proposals are a "reflection of the parties' own assessments of their relative contributions." Ex. 1 ¶ 71.

Wazzan specifically relies on a purported "agreement in principle" in which Musk would receive a 52.41% stake in the new entity and Altman, Sutskever, and Brockman would each receive a 10.5% stake. *Id.* ¶¶ 96-97. But it is undisputed that there was no "agreement in principle"—the 2017 negotiations failed—and Wazzan conceded as much at deposition. As he testified, the 2017 restructuring discussions "did not result in an agreement." Ex. 4 at 183:23-25. Wazzan explained why in his Opening report: Discussions "unraveled when Messrs. Brockman and Sutskever expressed continued concern about Mr. Musk's control of and equity in the for profit entity." Ex. 1 ¶ 96.

Wazzan cites no basis for his assertion that the cofounders' 2017 discussions provided "important insights" into how the founding team valued their respective contributions to the OpenAI nonprofit. *Id.* ¶ 97. That's no surprise. Wazzan admitted at deposition that the materials he relied on reflected that the cofounders each had a "different perspective" regarding the contributions Musk had made relative to others in the nonprofit. *Id.* at 200:19-24.

The 2017 negotiations that led nowhere involved discussion of a number of conditions, including (i) Musk's then-contemplated $100 million *future* contribution and (ii) Musk's commitment to spend more time at OpenAI. Wazzan knows about these conditions; he conceded

---

acknowledged that he did not attempt to quantify that value. Ex. 4 at 161:10-162:5, 166:22-167:4, 169:4-14. In the end, Wazzan conceded that he did not even try to quantify how Musk's alleged nonmonetary contributions impacted the value of the nonprofit and that he made only "qualitative assessments." *Id.* at 157:12-158:6, 164:7-10.

as much at deposition. *See* Ex. 4 at 203:25-204:9 ("Q: it was contemplated that Mr. Musk would receive a 51.2 percent interest in the new for-profit entity, in exchange for at least contributing $100 million of new capital; is that correct?"; "A: Yes."), 208:25-209-7 ("Q: [Y]ou didn't mention in your report that it was contemplated that Mr. Musk, in exchange for his 50 or more percent stake in the for-profit venture, would increase his commitment of time? You didn't mention that?"; "A: It's not necessary."). Neither of those things occurred: Musk's post-2017 contributions to OpenAI were limited to charitable rent payments, and Musk publicly separated from OpenAI in early 2018. For these additional reasons, the rejected proposals from 2017 that Wazzan cites provide no basis for his proffered opinions.

Wazzan's opinions thus rest on his counterfactual view that all OpenAI cofounders agreed on a potential equity stake for Musk during the failed negotiations. That defect alone compels exclusion of the opinions. In *EcoFactor, Inc.* v. *Google LLC*, 137 F.4th 1333, 1340-43 (Fed. Cir. 2025) (en banc), the Federal Circuit held that the district court abused its discretion by permitting a damages expert in an infringement case to testify based on a "hypothetical negotiation"— specifically, the royalty to which the litigants would have agreed had they successfully negotiated an agreement before the challenged infringement—where the evidentiary record could only support what *one* party may have been willing to accept. Here, Wazzan commits the same error: he treats failed negotiations as probative not only of the equity stake Musk might have accepted, but also of what *all* cofounders would have agreed to, without evidentiary support.

**B.    Wazzan relies on insufficient "facts" regarding Musk's stake in xAI.**

Wazzan also fails to identify sufficient facts regarding Musk's ownership stake in xAI to justify his reliance on that purported comparable to support his opinions. *See* Ex. 1 ¶¶ 93, 98.

As an initial matter, Wazzan does not explain why the size of Musk's ownership interest in xAI—a for-profit company that Musk formed years after the events at issue in this case to compete with OpenAI—has any bearing on how much value Musk purportedly contributed to the OpenAI nonprofit. Wazzan knows almost nothing about xAI's capital and organizational structure. He conceded at deposition that he does not how much capital Musk personally invested in xAI; what percentage of xAI's total investment capital came from Musk; whether Musk holds an executive

role at xAI; how much time Musk spends working there; or whether Musk's involvement in xAI is comparable in any respect to his past involvement with OpenAI. Ex. 4 at 213:3-20. Given this testimony, Wazzan cannot credibly claim that the circumstances of Musk's involvement in xAI and the OpenAI nonprofit are remotely parallel.

Wazzan does not even provide a sufficient basis for his claim that Musk owns 53% of xAI's equity. Despite having been retained by counsel for Musk in a case in which xAI is also a named plaintiff, Wazzan cites no evidentiary basis for this proposition. He relies instead on a *Forbes* article from October 2025 that *estimated* the size of Musk's stake. Ex. 1 ¶ 93 & n.192. This is not a sufficient basis for Wazzan's opinions under Rule 702(b). *See, e.g.*, *Mariscal* v. *Graco, Inc.*, 2014 WL 4245949, at *7 (N.D. Cal. Aug. 27, 2014) ("The absence of any substantial factual basis for [an expert's] testimony is immediately dispositive" and makes the expert "unqualified to testify.").

## IV.    THE COURT SHOULD EXCLUDE WAZZAN'S OPINIONS RELATED SPECIFICALLY TO MICROSOFT'S "WRONGFUL GAINS" BECAUSE HE PROVIDES NO BASIS TO ASSIGN TO MUSK ANY OF MICROSOFT'S INTEREST IN THE FOR-PROFIT ENTITY.

The section of Wazzan's report addressing Microsoft's purported wrongful gains spans just five paragraphs. Ex. 1 ¶¶ 102-06. As noted above, if the jury were to find Microsoft liable for aiding and abetting, Wazzan calculates the resulting unjust enrichment to be $13.30 billion to $25.06 billion. Wazzan opines that range reflects the portion of Microsoft's interest in the for-profit entity resulting from Musk's $38 million financial contribution and unquantified nonmonetary contributions to the OpenAI nonprofit. *Id.* ¶ 104.

To reach those figures, Wazzan assumes the nonprofit should have a percentage interest in Microsoft's negotiated stake in the OpenAI for-profit entity and then attributes the substantial majority of that interest to Musk. Specifically, after determining in step two of his analysis that Microsoft should be allocated 22.9% of the for-profit entity's value, Wazzan then: (a) applies an *additional* 26.2% "flow back" from Microsoft's interest in the OAI for-profit entity to the nonprofit; and (b) further accredits 50-75% of that amount to Musk. *Id.* ¶ 105.

17

1    Wazzan offers no rationale—contractual, governance, economic, or otherwise—for

2   reallocating any portion of Microsoft's negotiated interest to the nonprofit.[5] *Id.* ¶¶ 52, 104. At

3   deposition, he asserted only that "some portion of this is going to flow back to OpenAI," and "some

4   portion of Microsoft's piece has to go back to the nonprofit." Ex. 4 at 271:9-25; 272:24-273:5. That

5   is the very definition of *ipse dixit*, which Rule 702 does not permit. *Kumho Tire*, 526 U.S. at 157

6   ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

7   opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

8    Nor does Wazzan justify selecting 26.2% as the "flow back" percentage other than that it

9   equals the nonprofit's current ownership interest in the OAI for-profit entity. Ex. 1 ¶ 105; Ex. 4 at

10   270:2-14; 276:6-13. But that ownership interest, which already reflects arm's-length negotiations

11   between the nonprofit and other investors like Microsoft, has nothing to do with the "the portion of

12   Microsoft's gains that wrongfully derive from Mr. Musk's contributions." Ex. 1 ¶ 104.

13    Courts exclude opinions built on such unsupported assumptions. For example, in the

14   *McGlinchy* case discussed above, the Ninth Circuit affirmed the exclusion of a second expert who,

15   like Wazzan, merely asserted that certain percentages and numbers were appropriate for use in his

16   calculations, but "documented little of the basis for his conclusions" and rested on "unsupported

17   assumptions." 845 F.2d at 807; *see also* Fed. R. Evid. 702(b) (expert testimony must be "based on

18   sufficient facts or data"). Here, Wazzan relies on similar unsupported assumptions that result in

19   double-counting value to the nonprofit (and thus to Musk). Wazzan's analysis specific to Microsoft

20   is inadmissible as a result.

**CONCLUSION**

22    For the reasons stated herein, this Court should grant this Motion and preclude Plaintiff

23   from eliciting testimony at trial related to Wazzan's third, fourth, fifth, and sixth opinions.

---

[5] In his report, Wazzan simply states "I multiply Microsoft's Economic Interest by OpenAI Nonprofit's share and, as outlined in previous sections, Mr. Musk's share of either 50% or 75% in OpenAI Nonprofit", Ex. 1 ¶ 105, before moving along to the next step.

18

1  Date:  January 16, 2026                    MORRISON & FOERSTER LLP

2

3                                             /s/ Jordan Eth
                                              JORDAN ETH (CA SBN 121617)
                                              JEth@mofo.com
4                                             WILLIAM FRENTZEN (CA SBN 343918)
                                              WFrentzen@mofo.com
5                                             DAVID J. WIENER (CA SBN 291659)
                                              DWiener@mofo.com
6                                             MORRISON & FOERSTER LLP
                                              425 Market Street
7                                             San Francisco, CA  94105
                                              Telephone:    (415) 268-7000
8                                             Facsimile:    (415) 268-7522

9                                             WILLIAM SAVITT (admitted *pro hac vice*)
                                              WDSavitt@wlrk.com
10                                            BRADLEY R. WILSON (admitted *pro hac vice*)
                                              BRWilson@wlrk.com
11                                            SARAH K. EDDY (admitted *pro hac vice*)
                                              SKEddy@wlrk.com
12                                            STEVEN WINTER (admitted *pro hac vice*)
                                              SWinter@wlrk.com
13                                            NATHANIEL CULLERTON (admitted *pro hac vice*)
                                              NDCullerton@wlrk.com
14                                            WACHTELL, LIPTON, ROSEN & KATZ
                                              51 West 52nd Street
15                                            New York, NY  10019
                                              Telephone:    (212) 403-1000
16                                            Facsimile:    (212) 403-2000

17                                            *Attorneys for the OpenAI Defendants*

18                                            (Additional party and counsel on the next page)

19

20

21

22

23

24

25

26

27

28

1

2

3
                                      /s/ Russel P. Cohen
                                      RUSSELL P. COHEN (SBN 213105)
                                      Russ.cohen@dechert.com
4                                     HOWARD M. ULLMAN (SBN 206760)
                                      Howard.ullman@dechert.com
5                                     45 Fremont Street, 26th Floor
                                      San Francisco, CA  94105
6                                     Telephone:     (415) 262-4500
                                      Facsimile:     (415) 262-45555
7
                                      NISHA PATEL (SBN 281628)
8                                     Nisha.patelgupta@dechert.com
                                      DECHERT LLP
9                                     633 West 5th Street, Suite 4900
                                      Los Angeles, CA  90071
10                                    Telephone:    (213) 808-5700
                                      Facsimile:    (213) 808-5760
11
                                      ANDREW J. LEVANDER (admitted *pro hac vice*)
12                                    Andrew.levander@dechert.com
                                      DECHERT LLP
13                                    Three Bryant Park
                                      1095 Avenue of the Americas
14                                    New York, NY  10036
                                      Telephone:    (212) 698-3500
15                                    Facsimile:    (212) 698-3599

16                                    JOHN (JAY) JURATA, JR. (admitted *pro hac vice*)
                                      Jay.jurata@dechert.com
17                                    DECHERT LLP1900 K Street, N.W.
                                      Washington, DC  20006
18                                    Telephone:    (202) 261-3300
                                      Facsimile:    (202) 261-3333
19
                                      *Attorneys for Defendant Microsoft Corporation*
20

21

22

23

24

25

26

27

28