# EXHIBIT 4

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

----------------------------------------

ELON MUSK, et al.,

        Plaintiffs,

v.

SAMUEL ALTMAN, et al.,

        Defendants.


Case No. 4:24-cv-04722-YGR

----------------------------------------


VIDEO DEPOSITION OF

Paul Wazzan, Ph.D.

December 5, 2025

New York, New York

LEAD: Bradley Wilson, Esquire

FIRM: Wachtell Lipton Rosen & Katz




FINAL COPY - HIGHLY CONFIDENTIAL

JANE ROSE REPORTING - 1-800-825-3341

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 2

A P P E A R A N C E S:


MOLOLAMKEN LLP
            Attorneys for Plaintiff
            600 New Hampshire Avenue, N.W.
            Washington, D.C. 20037

    BY:     ROBERT KRY, ESQ.
            JOSH BLOOM, ESQ.



WACHTELL LIPTON ROSEN & KATZ
            Attorneys for OpenAI Defendants
            51 West 52nd Street
            New York, NY 10019

    BY:     BRADLEY WILSON, ESQ.
            IOANNIS DRIVAS, ESQ.
            NATHANIEL CULLERTON,ESQ. Via Zoom



DECHERT LLP
            Attorneys for Microsoft Defendant
            1900 K Street, NW
            Washington, DC 20006

    BY:     JOHN "JAY" JURATA, ESQ.
            YOSEF WEITZMAN, ESQ. Via Zoom


JANE ROSE REPORTING              California Firm No. 254
1-800-825-3341             janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 3

ALSO PRESENT:


KEVIN CHRISTENSEN- BRG Via Zoom


LAUREL VAN ALLEN- Coherent Economics



JANE ROSE REPORTING
          74 Fifth Avenue
          New York, New York  10011
          1-800-825-3341
          Brooke Perry, Court Reporter
          Jonathan Popham, Videographer

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 4

INDEX

WITNESS: Paul Wazzan, Ph.D.

EXAMINATION BY                          PAGE
Bradley Wilson.....................6;307
John Jurata.......................220;315
Robert Kry........................294

Reporter Certificate...............320

Index of Exhibits..................321

Notice to Read and Sign............322

Elon Musk v.                      FINAL                   December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

                                                           Page 5

1                    THE VIDEOGRAPHER:  Please stand by.

2          Good morning.  Here begins Media 1 in the

3          deposition of Paul Wazzan in the matter of Elon

4          Musk et al., versus Samuel Altman et al.

5          Today's date is December 5, 2025, and the time

6          is 9:03 a.m.

7                    This deposition is being taken at the

8          offices of MoloLamken, 430 Park Avenue, New

9          York, New York, and was made at the request of

10         defendant.

11                   I'm Jonathan Popham, the videographer,

12         and the court reporter is Brooke Perry from

13         Jane Rose Reporting, New York, New York.

14                   Counsel, please identify yourselves and

15         state whom you represent, and please speak

16         slowly for the court reporter.

17                   MR. WILSON:  Bradley Wilson from

18         Wachtell, Lipton, Rosen & Katz on behalf of the

19         OpenAI defendants.  I'm joined by my colleague

20         Ioannis Drivas.

21                   MR. JURATA:  John "Jay" Jurata, Jr. on

22         behalf of defendant Microsoft Corporation, and

23         with me is Laurel Van Allen.

24                   MR. KRY:  Robert Kry with MoloLamken

25         for the plaintiffs, and with me is my colleague

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL           Paul Wazzan, Ph.D.

Page 6

```
 1          Josh Bloom.
 2                    THE VIDEOGRAPHER:  Will the court
 3          reporter please swear in the witness.
 4     P A U L   W A Z Z A N,  the witness herein, having been
 5     first duly sworn by a Notary Public of the State of New
 6     York, was examined and testified as follows:
 7                    THE REPORTER:  Please state your name
 8          for the record.
 9                    THE WITNESS:  Christopher Paul Wazzan.
10                    THE REPORTER:  Please state your
11          address for the record.
12                    THE WITNESS:  1888 Century Park East,
13          Suite 1400, Los Angeles, California 90067.
14     EXAMINATION BY
15     MR. WILSON:
16     Q.     Good morning, Dr. Wazzan.
17     A.     Good morning.
18     Q.     As you may have just heard, my name is Bradley
19     Wilson.  I'm here today on behalf of the OpenAI
20     defendants, and that includes Mr. Altman and
21     Mr. Brockman.  Mr. Jurata here is representing the
22     Microsoft defendant, and he'll be asking you some
23     questions after I finish.
24          Do you understand that you're under oath today,
25     sir?
```

Elon Musk v.        FINAL        December 5, 2025
Samuel Altman    HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

---

Page 7

```
 1        A.      Yes.
 2        Q.      Is there any reason you can't provide truthful
 3    testimony today?
 4        A.      No.
 5        Q.      Are you taking any medication that might impair
 6    your ability to answer my questions fully?
 7        A.      No.
 8        Q.      Is there any other reason why your testimony
 9    might be impaired today?
10        A.      No.
11        Q.      You're a seasoned testifier, correct?
12        A.      Yes.
13        Q.      You've been retained as an expert witness in
14    more than 100 prior cases; is that right?
15        A.      Yes.
16        Q.      Do you know the exact number?
17        A.      It's in my vitae, but I think it's like 103.
18        Q.      The CV that you provided as an exhibit to your
19    report, that contains all the prior cases that you can
20    recall that you provided expert testimony in; is that
21    correct?
22        A.      Yes.
23        Q.      When was the first time were you retained as an
24    expert witness?
25        A.      Well, again, it's in my CV, we can look it up,
```

---

Elon Musk v.                          FINAL                  December 5, 2025
Samuel Altman              HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 8

1          but I think it was around 1999.

2          Q.      More than 25 years ago; is that fair?

3          A.      Yes.

4          Q.      And other than serving as an expert witness in

5          cases like this one, what other sources of income do you

6          have?

7          A.      So at BRG and in my previous employment at

8          other firms, I don't just do litigation support.  I do a

9          lot of other things as well, public policy work,

10         economic impact studies, valuation work, things like

11         that.

12                 I've also taught at the graduate level at USC

13         and at Cal State, LA.  I run a small venture capital

14         company that provides C-level financing to technology

15         startups.  That probably is everything.

16         Q.      And so you received a salary from BRG; is that

17         correct?

18         A.      Sort of.  It's not really a salary, it's more

19         of a -- it's comp based on revenue generation and things

20         like that.

21         Q.      Can you explain how the comp works?

22         A.      It's a formula based on revenue generation.

23         Q.      Revenue generated by whom?

24         A.      By me or if I'm sharing credit with others for

25         matters brought in.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 9

1      Q.      And other than litigation matters, what kind of
2      matters do you bring into BRG?
3      A.      Mostly public policy.  So, for example, I just
4      issued a paper in California on behalf of ride share
5      companies, trying to get some laws changed.  And I
6      believe a law was just changed a few weeks ago based on
7      that work.
8              We also do valuation work, general business
9      consulting, you know, projects that are not litigation
10     related.
11     Q.      Got it.  And so in addition to the $900 an hour
12     that you're being paid as an expert witness in this
13     case, you will receive some share of the fees that are
14     paid to BRG; is that correct?
15                      MR. KRY:  Objection to form.
16     A.      So I don't get the $900.  That all goes to BRG
17     and then I get paid based on a formula.
18     Q.      Okay.  Okay.  Fair enough.  You've provided
19     testimony in cases involving a wide range of industries;
20     is that right?
21     A.      Yes.
22     Q.      The automotive industry?
23     A.      Yes.
24     Q.      Mining?
25     A.      Yes.

Elon Musk v.          FINAL         December 5, 2025
Samuel Altman   HIGHLY CONFIDENTIAL   Paul Wazzan, Ph.D.

Page 10

1    Q.    Oil and gas?

2    A.    Yes.

3    Q.    Steel?

4    A.    Yes.

5    Q.    Food processing and distribution?

6    A.    Yes.

7    Q.    Okay.  Aircrafts and avionics?

8    A.    Yes.

9    Q.    Semiconductors?

10    A.    Yes.

11    Q.    Digital signal processors?

12    A.    Yes.

13    Q.    Computer peripherals?

14    A.    Yes.

15    Q.    What are computer peripherals?

16    A.    All the things that are added on to computers.

17    They could be monitors; they could be keyboards; they

18    could be game devices.

19    Q.    Okay.  Like a mouse, for example?

20    A.    A mouse, yes.

21    Q.    Real estate, you've been an expert in a real

22    estate case?

23    A.    Yes.

24    Q.    Banking?

25    A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 11

```
 1      Q.      Metals trading?
 2      A.      Yes.
 3      Q.      Retail?
 4      A.      Yes.
 5      Q.      Pharmaceuticals?
 6      A.      Yes.
 7      Q.      Have you ever been retained as an expert
 8      witness in a case involving the artificial intelligence
 9      industry?
10      A.      No.
11      Q.      Have you ever been retained as an expert
12      witness in a case involving a technology startup?
13      A.      Yes.
14      Q.      What case was that, or which cases were those?
15      A.      Can I see my CV?
16      Q.      Would that help?
17      A.      That would help a lot.
18              MR. WILSON:  Sure, happy to -- we'll
19      mark your CV.  It's part of the report, right.
20      I suspect we were going to get there soon
21      anyways.
22              (Whereupon, the Expert Report of C.
23      Paul Wazzan, Ph.D., was marked as Wazzan
24      Exhibit 1, for identification, as of this
25      date.)
```

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

---

Page 12

```
 1        BY MR. WILSON:

 2        Q.      So Mr. Wazzan, we're going to mark as Exhibit 1

 3        a copy of your initial report in this case, and I

 4        believe your CV is Appendix A to that report.

 5                Do you have the document?

 6        A.      Yes.

 7        Q.      Okay.  So you're going to review your CV and

 8        let us know which case or cases you list here in which

 9        it involved a technology startup, right?

10        A.      Yes.

11        Q.      Okay.  So let us know when you've done that.

12        A.      Number 31 on page 9.

13        Q.      That's the Gamevice matter?

14        A.      Yes.

15        Q.      Okay.  Any others?

16        A.      Yeah.  Number 35.

17        Q.      Certain Portable Gaming Consoles matter?

18        A.      Yes.

19        Q.      Okay.

20        A.      39.

21        Q.      Blast Motion v. Zepp Labs, correct?

22        A.      Yes.  57.

23        Q.      United Surface Technology?

24        A.      Yes.

25        Q.      Okay.
```

---

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 13

1      A.      70.

2      Q.      In the matter of certain video game systems,

3      okay.

4      A.      Yes.

5      Q.      I guess I include 80.  It's a pharmaceutical

6      startup?

7      Q.      The FemPharm matter?

8      A.      Yes.

9      Q.      What was the issue in that case?

10     A.      FemPharm had developed some technology related

11     to hormone treatments and had licensed the technology to

12     Vivus.  Vivus was supposed to commercialize the

13     technology, make some additional investments, get the

14     drugs through Phases 2 and 3 clinical trials, and then

15     commercialize the product.

16             Vivus did not meet various milestones and so

17     they were sued by FemPharm, which is the startup.

18     Q.      Got it.  Don't want to prevent you from going

19     through the last 20 or so entries, so let me know if it

20     there are any others.

21     A.      98.

22     Q.      Foundstone, right?

23     A.      Yes.

24     Q.      Okay.

25     A.      I think I got them.

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 14

1      Q.      Okay.  Were you asked to conduct a valuation
2      analysis of any of the startups in the cases that you
3      just listed?
4      A.      Well, I guess, without going back through
5      again, I think most of the time I do do valuation in
6      those matters.  They were patent infringement cases,
7      they were breach of contract cases.
8              So the valuation was -- yeah, I would say yes.
9      Q.      So just to be clear, my question isn't whether
10     you conducted a valuation analysis of any kind, but
11     rather whether you valued the startup itself in any of
12     those matters?
13     A.      Yes.
14     Q.      And your testimony is you did?
15     A.      Yes.
16     Q.      In all of them?
17     A.      We would have to go back through them again.
18     Q.      And several is your testimony?
19     A.      Yes.
20     Q.      Have you ever provided an expert opinion on the
21     amount of unjust enrichment?
22     A.      Yes.
23     Q.      Which cases did you do that in?
24     A.      2, 3, 4, 7, 9, 10, 13, 57, 72.  I don't know.
25     After that, my memory is very fuzzy, it's pretty far

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

```
                                                      Page 15

  1     back.

  2     Q.      You've done very well, so thank you for that.

  3     I want to ask you about number 57, if you could, which I

  4     think is the only matter you listed in response to both

  5     of my questions.  I'm referring to the united -- excuse

  6     me, the Universal Surface Technology matter?

  7     A.      Yes.

  8     Q.      You represented the defendants in that case?

  9     A.      Yes.

 10     Q.      You were an expert witness for the defendants

 11     in that case, correct?

 12     A.      Yes.

 13     Q.      Okay.  What was the issue in that case?

 14     A.      It was an alleged theft of trade secrets matter

 15     where they had allegedly stolen technology that was used

 16     to print images on fabric for, like, T-shirts and things

 17     like that.

 18     Q.      Okay. And the startup was Universal Surface

 19     Technology?

 20     A.      Yes.

 21     Q.      Okay.  And so you were responding to a report

 22     from an expert sponsored by the plaintiffs regarding the

 23     amount of unjust enrichment?

 24     A.      Yes.

 25     Q.      Okay.  How many hours have you spent working on
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 16

1       this matter so far?

2       A.      I don't know.  I would have to look at the

3       bill.  I spent probably somewhere around 100.

4       Q.      And how many of those did you spend reviewing

5       materials?

6       A.      I couldn't say.

7       Q.      Okay.  Do you know how many hours you spent

8       working on your first report?

9       A.      I couldn't say.

10      Q.      Okay.  Do you know how many hours you spent

11      working on your second report?

12      A.      Just a few.

13      Q.      Okay.  How many hours have you spent preparing

14      for this deposition today?

15      A.      I don't know.  20.

16      Q.      Okay.  What did you do to prepare for the

17      deposition today?

18      A.      Reviewed my reports, reviewed some of the case

19      materials.

20      Q.      Did you meet with counsel?

21      A.      Yes.

22      Q.      When did you meet with counsel?

23      A.      Yesterday.

24      Q.      And how long did that meeting last?

25      A.      Around five or six hours.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                                    Page 17
   1     Q.      And was anyone present in that meeting other
   2     than the two gentlemen seated to my left?
   3             Sorry, go ahead.
   4     A.      Kevin Christensen.
   5     Q.      He works for BRG?
   6     A.      Yes.
   7     Q.      He's on the Zoom right now?
   8     A.      Yes.
   9     Q.      Okay.  So anyone else?
  10     A.      I'm sorry?
  11     Q.      Anyone else?
  12     A.      No.
  13     Q.      Okay.  Do you know how large BRG's accrual is
  14     on this matter to this point?
  15     A.      No.
  16     Q.      Has a court arbitrator or other adjudicatory
  17     body ever disqualified you as an expert?
  18     A.      So no, I've had portions of reports struck, but
  19     I've never been excluded as an expert.
  20     Q.      Okay.  When you say you've had portions of
  21     reports struck, do you mean that certain opinions that
  22     you were planning to offer, the Court did not allow you
  23     to offer?
  24     A.      Yes.
  25     Q.      Okay.  What case or cases did that happen in?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 18

1    A.      So the first one is In Re: AutoZone.

2    Q.      Okay.

3    A.      Do you want to -- well, so In Re: AutoZone --

4    Q.      Why don't you tell me all the cases and then

5    we'll go through.

6    A.      Pearson's v. Chicago, University of Chicago.

7            SEC versus McGinnis.

8            Those are the three.

9    Q.      What was the opinion that you were planning to

10   offer In Re: AutoZone, that the Court didn't allow you

11   to offer?

12   A.      So that was a wage and hour case.  I issued a

13   survey to former AutoZone employees.  We sent out

14   thousands of surveys.  We got -- we sent out 20,000

15   surveys and we got a couple thousand back.  So we got a

16   low response rate.

17           As a statistician, I don't care because I just

18   have a wider confidence interval.  And I defaulted to

19   the lower bound of the confidence interval, which is

20   conservative vis- -vis the defendant.

21           So the math was all correct, but the Court

22   ruled that the response rate was too low.  And so that

23   portion of the report was struck.

24   Q.      Do I have it right that because, in the Court's

25   view, the responsiveness rate was too low, the Court

Elon Musk v.                      FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 19

1      felt that your findings or opinions were unreliable?

2      A.      Yes.

3      Q.      What about the Pearsons v. University of

4      Chicago case?  What was the opinion that you were

5      planning to offer in that case, that the Court didn't

6      allow you to offer?

7      A.      So that's a matter where the Pearsons are a

8      family.  They wanted to establish a foundation, a

9      research foundation at the University of Chicago with

10     $100 million grant.

11            And after they made the first installment

12     payment, parties got into a dispute as to whether the

13     university was contributing what they had contracted to

14     contribute to this foundation.  So they were supposed to

15     provide faculty and a building and some other stuff.

16            And the issue was whether the 100 million would

17     be enough to endow the institute in perpetuity if the

18     institute was not meeting its obligations.

19            So I did a forensic accounting and an economic

20     analysis of sort of the entire setup.  At the end of the

21     report, I included some hypotheticals as to when the

22     foundation would run out of money, under certain

23     assumptions.

24            So for example, if the endowment return was 5

25     percent annually versus 7 percent annually, or if the

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 20

1      university contributed two faculty instead of four
2      faculty, things like that.  So there was a series of
3      examples.  The Court ruled that the illustrative
4      examples were speculative, and so that portion was
5      struck.
6      Q.      And then the last matter you mentioned I think
7      was SEC versus McGinnis?
8      A.      Yeah.  So the SEC alleged that McGinnis was
9      insider trading.  He was an employee of Green Mountain,
10     the Keurig Coffee Company.  So we obtained blue sheet
11     data from the SEC.  And using the blue sheet data, I was
12     able to replicate their transactions for people that
13     were non insiders.
14             And so it turns out that thousands of other
15     people were doing the exact same types of transactions.
16     So in my report, I said it's a common practice.  The
17     Court took exception with the word "common" and struck
18     the word "common."
19             So at trial, I said hundreds of other people
20     were doing the same thing.  And that was it.
21     Q.      Got it.  Do you recall whether the Court
22     narrowed your opinions in any way in the case that you
23     recently handled in the Northern District of New York
24     for the Clover Group?
25     A.      Not that I recall.

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

                                                            Page 21

1          Q.      To make sure we're talking about the same case,

2      it's item 15 on your CV.  So your testimony is that the

3      Court did not limit your opinions in that case, to the

4      best of your recollection?

5          A.      Yeah, I'm not aware of that.

6          Q.      Do you consider yourself to be an expert on the

7      artificial intelligence industry?

8          A.      That's too broad of a question.  I think I've

9      educated myself on the artificial intelligence industry,

10     you know, through sort of a basic understanding of what

11     it is, but also through the valuation work that I've did

12     in this case.

13         Q.      Why is the question too broad?

14         A.      Well, because am I a technical expert?  Can I

15     code a large language model, no, I can't.  But am I a

16     financial expert, vis- -vis AI, yes, I am.

17         Q.      Were you a financial expert vis- -vis AI before

18     you were retained by Mr. Musk in this case?

19         A.      I'd say yes.  I mean, I could point to the

20     textbooks on my shelf where it says a project is a black

21     box.  The valuation techniques and models are the same

22     across industry.

23         Q.      Just so -- and I'm certainly not intending to

24     argue with you.  I wanted just to make sure I understand

25     that -- your testimony.  Your testimony is that you're

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 22

1        an expert on valuing artificial intelligence companies

2        in the same way that you're an expert on valuing

3        companies in other industries; is that right?

4        A.      Yes.

5        Q.      But as to the technology of the artifical

6        intelligence industry, you acknowledge that you're not

7        an expert in that area?

8        A.      I would agree with that.

9        Q.      Have you ever published an academic paper on

10       valuation in the artificial intelligence industry?

11       A.      No.

12       Q.      Have you ever published an academic paper on

13       financial issues related to technology startups?

14       A.      I guess I'd say yes.

15       Q.      Okay.  And what paper are you referring to?

16       A.      So the one that comes to mind is number seven

17       under my publications on page 2, "Capital Structure."

18       Q.      What page are you looking at?  I seem to

19       have -- oh, I'm in the wrong exhibit, that's why.  Bear

20       with me.  Page 2, you said?

21       A.      Yes.

22       Q.      "The Use of Blue Sheet Data in Insider Trading

23       Actions"?

24       A.      I'm sorry, number 7 on page 2.

25       Q.      Okay.  "Capital Structure"?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 23

1     A.      Yes.

2     Q.      Any others?

3     A.      I'd say that's primarily the one.

4     Q.      Do you consider yourself to be an expert on

5     venture capital investments?

6     A.      Yes.

7     Q.      What's the basis for that expertise?

8     A.      That's my educational background including a

9     Ph.D. in finance, and it's also the fact that I actually

10    run a small venture capital company.

11    Q.      Have you ever published an academic paper on

12    venture capital investment?

13    A.      No.

14    Q.      Have you ever taught a college or higher level

15    course on venture capital investment?

16    A.      Not a specific class, but as part of corporate

17    finance, I have.

18    Q.      Other than a general class on corporate

19    finance, any courses you taught on venture capital

20    investment?

21    A.      Not specifically.

22    Q.      You said that you run a small venture capital

23    company.  Are you referring to Wazzan & Co.?

24    A.      Yes.

25    Q.      When was Wazzan & Co. formed?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 24

1      A.      That's a good question.  I think around 2000.

2      Q.      Were you the person who established it?

3      A.      Yes.

4      Q.      And it's still operating today?

5      A.      Sort of.  We're still holding one investment,

6      but we're not taking on any new investments.

7      Q.      What investment is that?

8      A.      GeneFluidics.

9      Q.      How long has GeneFluidics been the only

10     investment at Wazzan & Co.?

11     A.      It's been four or five years.

12     Q.      Four or five years.  Is Wazzan & Co. licensed

13     to do business in any US states?

14             MR. KRY:  Objection to form.

15     A.      I don't know what that means.  It was

16     incorporated in California.

17     Q.      I'll ask a different question.  Has Wazzan &

18     Co. been incorporated to do business in any state other

19     than California?

20             MR. KRY:  Objection to form.

21     A.      I don't know.  I don't know what that means.

22     Q.      You recall filing a statement of information on

23     behalf of the Wazzan & Co. in California in 2014?

24     A.      I don't recall that.

25     Q.      Okay.  Do you know what a statement of

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 25

1       information is?

2       A.      No.

3                       MR. WILSON:  All right.  Let's see if

4               we can refresh your recollection.  So this will

5               be Exhibit 2.

6                       (Whereupon, Wazzan & Co. Statement of

7               Information was marked as Wazzan Exhibit 2, for

8               identification, as of this date.)

9       BY MR. WILSON:

10      Q.      So, Mr. Wazzan, I marked as Exhibit 2 to your

11      deposition a State of California Secretary of State form

12      entitled "Statement of Information."

13              Do you see that?

14      A.      Yes.

15      Q.      And it relates a limited liability company,

16      Wazzan & Co. Investment LLC.

17              Do you see that?

18      A.      Yes.

19      Q.      Do you know what this is?

20      A.      Statement of Information.

21      Q.      Do you know what purpose it serves?

22      A.      I don't recall.

23      Q.      You signed it on February 10, 2014.

24              Do you see that?

25      A.      Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

                                                              Page 26

1        Q.      Are you aware that on the California Secretary

2        of State website it indicates that Wazzan & Co. has been

3        suspended by the Secretary of State?

4        A.      Yes.

5        Q.      What's the cause of that suspension?

6        A.      Well, it's because we're holding just the one

7        asset, GeneFluidics, and -- so I haven't bothered to

8        file the annual statements.

9        Q.      When you say you haven't bothered, is there a

10       requirement that you file the annual statements as far

11       as you're aware?

12               MR. KRY:  Objection to the form.  Legal

13               opinion.

14       A.      Yeah, so you have to file each year and pay,

15       like, $800 in taxes.  But until GeneFluidics gets

16       resolved, I'm just not concerned with it.

17       Q.      Do you have any relationship to GeneFluidics

18       other than holding an investment in it through Wazzan &

19       Co.?

20       A.      No.

21       Q.      Have you or any member of your family ever been

22       involved in the management of GeneFluidics?

23       A.      No.

24       Q.      When was the last time that Wazzan & Co. made a

25       new investment?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 27

1          A.      Yeah, so I think it's been like five -- five,

2      six years.

3          Q.      How many investments did Wazzan & Co. make

4      before that?

5          A.      I think six or seven.

6          Q.      You said in your report that Wazzan & Co. has

7      invested in semiconductor companies, correct?

8          A.      Yes.

9          Q.      Which semiconductor companies has Wazzan & Co.

10     invested in?

11         A.      Let's see.  Gplus was one; they were acquired

12     by SSTI.  Cognet was one, that was acquired by Intel.

13     Those are the two.

14         Q.      What was the size of the Gplus investment?

15         A.      I think it was on the order of 6 million.

16         Q.      Okay.  How about the Cognet investment, what

17     was the size of that?

18         A.      I think similar.

19         Q.      And Wazzan & Co. has disposed of its interest

20     in Gplus; is that correct?

21         A.      It was distributed out to the limited partners.

22         Q.      How many limited partners did Wazzan & Co. have

23     or does it have?

24         A.      So it depended on each -- each transaction was

25     subscribed individually or separately, so I'd have to go

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 28

1          back and look at the files, but I think Gplus was
2          probably somewhere between 10 and 20.
3          Q.      Does Wazzan & Co. or did Wazzan & Co. raise
4          different buckets of capital for every investment that
5          it sponsored?
6          A.      Yes.
7          Q.      Did you personally invest in all of the
8          investments?
9          A.      Yes.
10         Q.      What percentage, if you could ballpark it, of
11         the capital invested in the various Wazzan & Co.
12         investments was your personal investment?
13         A.      I couldn't say.  I don't recall.  But it
14         depended on each deal.
15         Q.      What's the aggregate size, to the best of your
16         recollection, of all the investments that Wazzan & Co.
17         made over the years?
18         A.      I'd have to go back and look, somewhere around
19         40, 50 million.
20         Q.      And how much ballpark total distributions were
21         paid out to the limited partners in the various
22         investments?
23         A.      I'd have to go back and look.  Significant
24         amounts because Cognet was acquired at a pretty
25         significant return as was SSTI.  Valens failed;

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 29

1    GeneFluidics is still active.  I'd have to go back.  I
2    think the returns were pretty good.
3    Q.    What was Valens, what kind of company?
4    A.    Valens was another semiconductor company.
5    Q.    So three semiconductor companies.  Were there
6    any optical networking companies you invested in through
7    Wazzan & Co.?
8    A.    Numatics.  We were an early investor in
9    Broadcom but that was kind of a silent -- it's a little
10   bit different, because I wouldn't call them a C-level
11   investment.
12   Q.    And your report also mentions biomechanical
13   companies.  What biomechanical companies did Wazzan &
14   Co. invest in?
15   A.    So MannKind was inhalable insulin; they went
16   public.
17   Q.    Got it.  Day-to-day, over the last three years,
18   what has been your workload at Wazzan & Co.?
19   A.    Very low.
20   Q.    Are you planning to make future investments?
21   A.    Hard to say.  The impetus for the firm was that
22   my dad was the Dean of school of engineering, so he had
23   access to what the faculty were developing the labs, and
24   they would come to him if they had ideas they wanted to
25   commercialize.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                  Page 30
 1              He since passed, but he had retired five or six
 2       years ago, so --
 3       Q.      Got it.  That makes sense.  Okay.  You can put
 4       that away.
 5              Your plan to provide testimony in this case on
 6       behalf of the plaintiff, Elon Musk; is that correct?
 7       A.      Yes.
 8       Q.      Have you ever provided expert testimony for
 9       Mr. Musk in any other lawsuit?
10       A.      No.
11       Q.      In any other arbitration?
12       A.      No.
13       Q.      In any other legal proceeding of any kind?
14       A.      No.
15       Q.      Are you familiar with a company called xAI?
16       A.      Yes.
17       Q.      Have you ever provided expert testimony for xAI
18       in any legal proceedings?
19       A.      No.
20       Q.      Have you ever provided testimony for Tesla?
21       A.      No.
22       Q.      SpaceX?
23       A.      No.
24       Q.      Twitter/X Corp?
25       A.      No.
```

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 31

1       Q.      Any other company affiliated with Mr. Musk, to

2       the best of your recollection, have you ever provided

3       expert testimony?

4       A.      No.

5       Q.      When were you retained as an expert witness for

6       Mr. Musk?

7       A.      Probably like three months ago.

8       Q.      How did you first come to be involved in the

9       case?

10      A.      I think counsel contacted somebody within BRG

11      and then sort of the call was routed to me and we had an

12      initial conversation.

13      Q.      And that was three months ago, approximately?

14      A.      Yes.

15      Q.      Did you learn in that call that the other side

16      of the case was OpenAI?

17      A.      Yes.

18      Q.      Did you know about OpenAI before that initial

19      contact?

20      A.      Yes.

21      Q.      What did you know OpenAI before then?

22      A.      That they make ChatGPT, that it's Sam Altman.

23      I mean, sort of the general things that were known in

24      the public.

25      Q.      Anything else that you can recall knowing

Elon Musk v.                      FINAL                December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                                    Page 32
  1        before your first contact in connection with this case?
  2        A.      Not that I recall.
  3        Q.      Did you know about this lawsuit before you were
  4        contacted about being an expert witness?
  5        A.      No.
  6        Q.      Since you were retained as an expert for
  7        Mr. Musk, have you discussed this case with anyone other
  8        than counsel or your colleagues at BRG?
  9        A.      No.
 10        Q.      So I've already marked as Exhibit 1 to your
 11        deposition, your report.  And just for the record, could
 12        you turn to page 59 of that report.
 13        A.      (Witness complies.)
 14        Q.      That's your signature, correct, sir?
 15        A.      Yes.
 16        Q.      Okay.  And you signed this report on October
 17        29, 2025?
 18        A.      Yes.
 19        Q.      Who asked you to provide this report?
 20        A.      Counsel.
 21        Q.      And when did counsel ask you to provide it?
 22        A.      Well, I think in our initial conversation or
 23        shortly thereafter, you know, the idea is, you're going
 24        to file an expert report.  And he gave me the deadlines.
 25        Q.      Did counsel give you a particular assignment?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                                   Page 33
  1        A.      Yes.

  2        Q.      Okay.  What was that assignment?

  3        A.      It's listed in my report here.  I was asked to

  4    determine --

  5        Q.      You don't have to read it, sir.

  6                So your testimony is that it's as set forth in

  7    paragraphs 8 and 9 in your report; is that correct?

  8        A.      Yes.

  9        Q.      I don't mean to be rude, but we're trying to

 10    get you out of here as quickly as possibly.  No gloss to

 11    add on top of paragraphs 8 and 9.  That's your

 12    assignment?

 13        A.      Yes.

 14        Q.      Were you asked to make any assumptions when you

 15    prepared this report?

 16        A.      Yes.

 17        Q.      What assumptions were you asked to make?

 18        A.      To assume that liability was established.

 19        Q.      Any others that you can recall?

 20        A.      Not as I sit here.  But if there are others,

 21    they would be cited in the report.

 22        Q.      So there are no other assumptions that you can

 23    recall, sitting here today?  And if there are, they

 24    would be set forth in your report?

 25        A.      Yes.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 34

1      Q.      Did you write this report?

2      A.      Yes.

3      Q.      By yourself?

4      A.      Yes.

5      Q.      And I think you testified earlier that you

6      don't recall exactly how long you spent doing that; is

7      that right?

8      A.      No, I don't.  Because the way I work is I read

9      materials, I start a draft.  I read more materials, I

10     start a draft.  I talk to the guys working for me, and

11     eventually it comes together.  I don't keep track of

12     each task.

13             MR. WILSON:  All right.  Hold on to

14             that one.  Guessing I'll have more questions

15             about it.  But let's mark the supplemental

16             report.  So Mr. Wazzan, this will be Exhibit 3

17             to your deposition.

18             (Whereupon, the Supplemental Expert

19             Report of C. Paul Wazzan, Ph.D., was marked as

20             Wazzan Exhibit 3, for identification, as of

21             this date.)

22     BY MR. WILSON:

23     Q.      And if you could flip to page 5 of this

24     document.  Well, before we do that, this is the

25     supplemental report that you served in this case earlier

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 35

1       this week, correct?

2       A.      Yes.

3       Q.      Just turn to page 5.  And if you wouldn't mind

4       confirming for me that that is your signature.

5       A.      Yes.

6       Q.      And you signed this on Tuesday of this week,

7       correct?

8       A.      Yes.

9       Q.      Okay.  You also submitted an errata at the same

10      time.  Do you recall doing that?

11      A.      Yes.

12      Q.      Are the changes reflected in that errata

13      responses to criticisms of your initial report from

14      anyone?

15                  MR. KRY:  I'm sorry, criticisms of

16              the --

17                  MR. WILSON:  Initial report.

18      A.      I believe so, yes.

19      Q.      And do you recall what those criticisms were?

20      A.      Well, just in a couple of the exhibits, there

21      was -- there was an error in two of the calculations.  I

22      had forgotten to apply the percentage.

23      Q.      Okay.  And those were calculations pertaining

24      to your assessment of Microsoft's wrongful gains; is

25      that correct?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

---

Page 36

```
 1        A.      Yes.

 2        Q.      Are there any other areas that you've

 3        identified in either of your reports that are not

 4        reflected in that errata?

 5        A.      No.

 6        Q.      Who asked you to provide the supplemental

 7        report?

 8        A.      Counsel.

 9        Q.      And when did they ask you to do that?

10                        MR. KRY:  Objection to form.

11        Q.      And when did counsel ask you to do that?

12        A.      Well, I think it was --

13                        MR. KRY:  I'm still going to object to

14                the form as vague.

15                        MR. WILSON:  Okay.  I didn't think

16                that was your objection, but I was trying to

17                clear it up.  I'm going to ask the question

18                again because I've now muddied up the record.

19        Q.      When did counsel ask you to draft the

20        supplemental report?

21                        MR. KRY:  I'm still going to object to

22                form.

23                        MR. WILSON:  That's fine, you can

24                object.

25        A.      I want to say it was like last week.  Sometime
```

---

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 37

1          last week, early last week.

2          Q.      And were you given a particular assignment?

3          A.      Yeah.  I mean, basically, you know, a deal was

4          announced between -- the OpenAI and Microsoft deal that

5          went public literally the day my first report was due,

6          or the day before.  But then some additional information

7          was provided regarding dilution and things like that.

8          And so counsel decided we should probably submit a

9          supplemental incorporating that new information.

10          Q.      You referenced a deal between OpenAI and

11          Microsoft.  What deal are you referring to?

12          A.      That was the announcement that came out on, I

13          think October 28th regarding the public benefit

14          corporation.

15          Q.      The creation of the public benefit corporation?

16          A.      Yes.

17          Q.      Have you heard that transaction referred to as

18          a recapitalization?

19          A.      Not specifically.

20          Q.      Okay.  Well, if I reference a recapitalization

21          during the day, that's going to be the transaction I'm

22          talking about.  Is that fair?

23          A.      Yes.

24          Q.      Were you asked to make any assumptions in this

25          report?

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 38

1      A.      No.  No new assumptions.

2      Q.      Okay.  And you wrote this one alone as well?

3      A.      Yes.

4      Q.      Is that typically what you do?  You write the

5      reports by yourself?

6      A.      I write the reports, yes.  I have staff help

7      with exhibits and research and calculations.

8      Q.      Do the two reports which are Exhibits 1 and 3

9      to your deposition contain a complete statement of all

10     the opinions you intend to offer in this case?

11     A.      Yes.

12     Q.      And do the two reports contain all of the bases

13     for the opinions you intend to offer in this case?

14     A.      Yes.

15     Q.      And I may have asked this already.  If so, I

16     apologize.

17             Sitting here today, do you have any corrections

18     you wish to make to either report?

19     A.      No.

20     Q.      Professor Ilya Strebulaev submitted a rebuttal

21     report in this case, responding to your original report.

22             Are you aware of that?

23     A.      Yes.

24     Q.      Are you reviewed that rebuttal report?

25     A.      Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 39

1      Q.      Do have you any responses to the opinions that
2      Professor Strebulaev submitted in his report?
3                      MR. KRY:  Objection to form.
4      A.      I'm not sure what you mean.  I mean, I reviewed
5      his report.  I didn't find his criticisms to be -- I
6      don't know what the right word is.  I thought most of
7      his criticisms were besides the point.
8      Q.      Okay.  Professor Jonathan Arnold also submitted
9      a rebuttal report, responding to your original report?
10     A.      Yes.
11     Q.      Did you also find Professor Arnold's criticisms
12     to be beside the point?
13     A.      For the most part.  I think some of his stuff
14     is supportive of my points.
15     Q.      What did Professor Arnold say that's supportive
16     of your points?
17     A.      Can you give me a copy?
18     Q.      Mr. Jurata may show it to you later, but I'm
19     just curious if you can remember any of the things he
20     said that prompted you to make that comment?
21                     MR. KRY:  Objection to asking the
22              witness to answer when he asked for a copy of
23              the document.
24     A.      So I just want to be -- I'm not trying to play
25     games with you -- sorry.  I want to be very precise with

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

                                                          Page 40
    1        it.  So when he gives me the copy, then I'll --
    2        Q.      Fair enough.  Fair enough.
    3                Professor Strebulaev also submitted an opening
    4        report in this case.  Are you aware of that?
    5        A.      I have not seen it.
    6        Q.      So you haven't seen Professor Strebulaev's
    7        opening report, correct?
    8        A.      Correct.
    9        Q.      Until I just said that it existed, were you
   10        aware of its existence?
   11        A.      No.
   12        Q.      So let's go back to Exhibit 1, which is your
   13        opening report.  And I'd ask you to go back to paragraph
   14        10, please.  You write in this paragraph that:
   15                    "The specific materials that I have
   16                    considered in forming my opinions are listed in
   17                    Appendix B of the footnotes of this report."
   18                    Do you see that?
   19        A.      Yes.
   20        Q.      Does Exhibit B -- excuse me, does Appendix B
   21        contain a comprehensive list of the materials you
   22        considered in forming your opinions?
   23        A.      Yes.
   24        Q.      So is it correct that there are no materials
   25        cited in the footnotes of your report that are not

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                       Page 41

1        included in Appendix B?

2                        MR. KRY:  Objection.

3        Q.      Let me ask a different question:  Was it your

4        intent to include all of the materials that you cited in

5        the footnotes in the appendix?

6        A.      Yes.  And usually, to avoid this problem, I

7        usually included a sentence at the end of Appendix B

8        that says:  "Including all materials cited,"

9        specifically in footnotes.

10       Q.      Fair enough.

11       A.      But the idea was to give you the whole set.

12       Q.      Who selected the materials that you considered

13       in forming your opinions?

14                        MR. KRY:  Objection.  Foundation.

15       A.      So ultimately me, but counsel provided access

16       to the documents.  They certainly pointed us to, you

17       know, you guys should look at this, you should look at

18       that.  But ultimately, you know, me and my staff

19       selected the materials.

20       Q.      Did you have access to the complete discovery

21       record in this case?

22                        MR. KRY:  Objection to form.

23       A.      I believe so.

24                        MR. KRY:  And also objection,

25             foundation.

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 42

1      Q.      Are there materials that you reviewed in
2      connection with this assignment that you did not
3      ultimately consider in forming your opinions?
4                      MR. KRY:  Objection to form.
5      A.      Could you read that again?
6      Q.      Sure, I'll ask it a slightly different way.
7      Were there any materials that you looked at, in
8      connection with your assignment, that you ultimately did
9      not cite in this report?
10                     MR. KRY:  Objection to form.
11     A.      I don't think so, no.
12     Q.      Okay.  Did you personally review all of the
13     documents listed in Appendix B?
14     A.      No.
15     Q.      Okay.  And you would have relied on BRG staff
16     to do that for you for some of the documents?
17     A.      Yes.
18     Q.      Do you remember which documents you personally
19     reviewed?
20     A.      Not as I sit here.
21     Q.      Okay.  Did you give anyone instructions on what
22     documents to include in Appendix B?
23                     MR. KRY:  Objection.
24                     You can answer that question.
25     A.      It was everything that we looked at.

Elon Musk v.　　　　　　　FINAL　　　　　　December 5, 2025
Samuel Altman　　　　HIGHLY CONFIDENTIAL　　　Paul Wazzan, Ph.D.

Page 43

1　　Q.　　Okay.  Did you give anyone instructions on what

2　　documents they should look at?

3　　　　　　　　　MR. KRY:  Objection to form.

4　　A.　　Well, yes.  I mean, as we go through the

5　　project, you know cap tables were important, for

6　　example, so I told the guys, go find the cap tables.  So

7　　I do give instructions.

8　　Q.　　What do you mean by "cap tables"?

9　　A.　　So cap tables, for example, lays out ownership

10　　structure or who's contributed what into various

11　　entities.  That was an important issue.

12　　Q.　　Okay.  I guess my question is, you testified

13　　that you and BRG had access to the complete discovery

14　　record, but you obviously have included a subset of the

15　　discovery record in your appendix, and I'm trying to

16　　understand whether you gave BRG any instructions as to

17　　how to narrow the set down?

18　　　　　　　　　MR. KRY:  Objection.  I objected to the

19　　　　　　　　earlier question you referenced there, so I

20　　　　　　　　reiterate that, and I also object to the form

21　　　　　　　　of this question.

22　　A.　　It's the same answer I just gave you, I gave

23　　them instructions on various topics to research.

24　　Q.　　Okay.  You described a three-step methodology

25　　in this report, included in paragraph 29; is that right?

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 44

1      A.      Yes.

2      Q.      Have you ever used that three-step methodology

3      in a different case?

4      A.      I'd say no.

5      Q.      Have you ever used that methodology before in

6      any other context?

7      A.      No, because each -- each case is usually unique

8      and has certain fact patterns and so we tailor the

9      analysis to each case.  You know they're always pretty

10     unique.

11     Q.      Did you read about the methodology used in a

12     finance textbook?

13             MR. KRY:  Objection to form.  And just

14             to clarify, you mean the three steps or...

15             MR. WILSON:  The three-step methodology

16             that's described in paragraph 29.

17     A.      Well, you know, the first step is to calculate

18     the current value of OpenAI and so to calculate the

19     current value, I go through various things.  There's the

20     discounted cash flow; there's the waterfall analysis;

21     there's the reference to publicly available information.

22     Those are standard approaches and I would have read

23     those in textbooks, certainly have used all those

24     methods to value other companies, so with respect to

25     step 1, the answer is yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 45

```
 1              And then calculate the portion as value that
 2         should be attributed to OpenAI, and so apportioning
 3         value relative to a cap table, for instance, or
 4         ownership stakes, for instance, is also something that I
 5         would have read in a textbook or papers and have done in
 6         the past, so that's a yes.
 7              Let's see.  I used a similar methodology to
 8         determine the portion of Microsoft gains, that's the
 9         same issue.  So I guess the answer is yes.
10         Q.    Okay.  So you read in a textbook, for example,
11         that a step of your analysis should be determining the
12         portion of OpenAI nonprofit stake that should be
13         attributable to Mr. Musk's contributions?
14                   MR. KRY:  Objection.  Misstates the
15              testimony.
16         A.    No, you wouldn't find that in a textbook.
17         Q.    Where did you come up with that idea?
18         A.    Like I said, the first step was the valuation;
19         that is textbook.  The second step is apportionment
20         based on contribution; that is textbook.
21              So no, I can't point you to textbook, where it
22         specifically says "open OpenAI," but these are basic
23         finance concepts.
24         Q.    Do you have any knowledge of the remedies
25         Mr. Musk is claiming in this case?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

```
                                                      Page 46
  1        A.       I'm not sure what you mean by that.
  2        Q.       You don't know what that means?
  3                     MR. KRY:  Objection.  Asked and
  4                answered.
  5        A.       I'm not sure what you mean by that.
  6        Q.       You say in paragraph 8 of your report that you
  7        were asked to determine the amount by which the OpenAI
  8        defendants and Microsoft wrongfully profited or were
  9        unjustly enriched by operating OpenAI as a commercial
 10        venture despite having received charitable contributions
 11        from Elon Musk.
 12                Do you see that?
 13        A.       Yes.
 14        Q.       Your report uses terms like "wrongful profits"
 15        and "unjust enrichment," right?
 16        A.       Yes.
 17        Q.       Your report also uses the term "damages," does
 18        it not?
 19        A.       Yes.
 20        Q.       In fact, you have an entire section in your
 21        report that's entitled "Overview of Damages
 22        Methodology," that's Section 3?
 23        A.       Yes.
 24        Q.       Did you conduct an analysis of unjust
 25        enrichment or damages or both?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 47

1                          MR. KRY:  Objection to form.

2          A.      I don't view those as different.

3          Q.      So they're interchangeable concepts in your

4          mind?

5          A.      In this context, yes.

6          Q.      Okay.  Is there any other context in which

7          unjust enrichment and damages would not being

8          interchangeable concepts?

9                          MR. KRY:  Objection.  Foundation.

10                 Calls for speculation, basically.

11         A.      Yeah, I couldn't say.

12         Q.      In your opinion, did Mr. Musk suffer a loss as

13         a result of the alleged wrongful conduct?

14                         MR. KRY:  Objection to form.

15         A.      I haven't considered that.  The analysis here

16         is a disgorgement of the unlawful gains that the

17         defendants have obtained.  I haven't looked at it from

18         the perspective of Mr. Musk's loss.

19         Q.      So you can't say one way or the other, sitting

20         here today, whether Mr. Musk suffered a loss?

21         A.      I haven't been asked to consider that.  Maybe

22         they're one and the same; I just haven't thought about

23         it.

24                         MR. KRY:  We've been going about an

25                 hour.  Do you want to break?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 48

```
 1                    MR. WILSON:  Sure.  We can break right
 2              now.
 3                    THE VIDEOGRAPHER:  We're going off the
 4              record at 10:00 a.m.  This marks the end of
 5              Media 1.
 6               (Whereupon, a short break was taken.)
 7                    THE VIDEOGRAPHER:  Please stand by.
 8              We're back on the record at 10:11 a.m.  This
 9              marks the beginning of Media 2.
10    BY MR. WILSON:
11        Q.    Mr. Wazzan, your counsel just told me there's
12    something you like to clarify in your prior testimony.
13    What is that?
14        A.    Yes.  When you asked me who else I met with
15    yesterday, when I said I met with counsel, they had a
16    financial consultant present as well, Mark Simonen
17    [phonetic].
18        Q.    He's a financial consultant for whom?
19        A.    For the attorneys.
20        Q.    Do you know if he's employed by MoloLamken?
21                    MR. KRY:  Objection.
22        A.    I don't think he's an employee, no.
23        Q.    Okay.  Was he present for the entire meeting?
24        A.    Yes.
25        Q.    That's all you wanted to clarify?
```

Elon Musk v.                          FINAL                    December 5, 2025
Samuel Altman              HIGHLY CONFIDENTIAL            Paul Wazzan, Ph.D.

Page 49

1     A.      Yes.

2     Q.      Great.  Dr. Wazzan, in all of your years as an

3     expert witness, have you been asked to measure

4     compensatory damages?  Probably a few times, right?

5     A.      Yeah, I mean, that's a legal term, so any time

6     you give me a legal term, I need a little more context.

7     Q.      Let me ask a different question.  In your

8     experience, is it typical when assessing damages to

9     consider the difference between the actual world and the

10    but-for world?

11            MR. KRY:  Objection to form.

12    A.      That is sometimes the case on a case-specific

13    basis.  I would say that's not typically the case in a

14    disgorgement matter.

15    Q.      Why is it not typically the case in a

16    disgorgement matter?

17            MR. KRY:  Objection to form.

18    A.      Because disgorgement is simply the disgorgement

19    of the ill-gotten gains after the predicate act.  It

20    doesn't require a determination of a but-for world.

21    Q.      And that's a principle of economics?

22            MR. KRY:  Objection to form.

23            You can answer if you can.

24    A.      Yeah, I'd say it's -- I'm not sure.  It's a

25    combination, I guess, of economics, law, finance.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 50

1      Q.      You used the term "disgorgement" a few times

2      now.  How does that term and your understanding relate

3      to the term "unjust enrichment"?

4      A.      So I think it's two sides of the same coin.  In

5      this case, it's the unjust enrichment gained by the

6      defendants, which they will now disgorge.

7      Q.      Okay.  So the amount of unjust enrichment, at

8      least in this case in your opinion, is equal to the

9      amount that should be disgorged?

10     A.      Yes.

11     Q.      Are there other cases where the amount of

12     unjust enrichment and the amount of disgorgement are

13     different?

14             MR. KRY:  Objection to form.

15     A.      I mean, there may be.  I don't know.

16     Q.      Is disgorgement likewise the same, from your

17     perspective, as damages?

18             MR. KRY:  Objection to form.

19     A.      Well, it can be, yes.

20     Q.      Is the amount that Mr. Musk was harmed in this

21     case equal to the amount by which the defendants were

22     unjustly enriched, in your opinion?

23             MR. KRY:  Objection to form.

24     A.      Yes.  Sort of on his percentage, yes.

25     Q.      Percentage of what?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 51

1        A.      So you start with an overall pie and there's an

2        unjust enrichment component to that pie, and Musk -- so

3        then that unjust enrichment transfers to the nonprofit,

4        and Mr. Musk gets a portion of that piece.

5        Q.      So when you referred to his percentage, meaning

6        Mr. Musk's percentage, were you referring to a

7        percentage of the nonprofit?

8        A.      His economic interest, yes.

9                        MR. KRY:  Objection to form to the last

10                question.

11       Q.      Focus on paragraph 8 of your report, if you

12       could, please.  This is your assignment, and I may have

13       read this before, but just to sort of reset the context,

14       you say here that you were asked to determine the amount

15       by which the OpenAI defendants and Microsoft wrongfully

16       profited or were unjustly enriched by operating OpenAI

17       as a commercial venture despite having received

18       charitable contributions from Elon Musk.

19              Do you see that?

20       A.      Yes.

21       Q.      Does your methodology distinguish between

22       wrongful profits and unjust enrichment?

23       A.      If -- no.  I think in this context, it's the

24       same thing.

25       Q.      So in this case, at least, from your

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 52

1        perspective, "wrongful profits" and "unjust enrichment"

2        are interchangeable concepts?

3        A.      Yeah, I think so.  You know, maybe to be a

4        little bit more precise, further down in the paragraph,

5        I say:

6                        "I further understand that 'profit' or

7                'enrichment' for these purposes includes not

8                only realized profits, but also unrealized

9                gains in the form of increases in valuation."

10                       So you could, I suppose, draw a fine

11               line between the two, but ultimately in this

12               case, in my analysis, it's the -- I'm focused

13               on the then-realized gains in the form of

14               increases in valuation.

15                       And so when you add that sort of

16               additional definition, it's one and the same.

17       Q.      Okay.  And that's, in this case, because you

18       assumed -- or at least in part, because you assumed that

19       wrongful profits or unjust enrichment would include

20       unrealized gains through valuation increases.  Correct?

21       A.      I'm not sure how to answer that, other than I

22       understand that profit enrichment for these purposes

23       includes not only realized profits, but also unrealized

24       gains.

25       Q.      Okay.  The sentence that you read, where you

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 53

1      write:

2                   "I further understand that profits or

3            enrichment for these purposes includes not only

4            realized profits but also unrealized gains."

5                   And then it goes on.

6      A.      Yes.

7      Q.      Is that an assumption that you made in the

8      context of this report?

9                   MR. KRY:  Objection to form.

10     Q.      Let me ask a different question.  Are you

11     opining as a matter of economics that profit or

12     enrichment for these purposes should include unrealized

13     gains?

14     A.      No.  I think my understanding comes from

15     counsel on this.

16     Q.      Okay.  Thank you.

17             Were you asked to determine the amount of

18     wrongful profits attributable to any particular acts?

19     A.      Again, I'm not sure how to answer that.  The

20     task is, as I've laid it out in my assignment, the

21     conversion, or I guess the creation of the for-profit

22     entity is the predicate act.

23             And then the -- the equity value -- or not the

24     equity value, but the economic value that then accrued

25     to the defendants is the piece that has to be disgorged.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 54

```
 1        Q.     So the only predicate act that you modeled was
 2        the creation of the for-profit entity in 2019; is that
 3        correct?
 4        A.     Yes.
 5                      MR. KRY:  Objection to form.
 6        Q.     And that was something that counsel instructed
 7        you to do?
 8        A.     Yes.
 9                      MR. KRY:  Objection to form.
10        Q.     We'll come back to that.
11               Just to make sure that I understand your
12        testimony, in paragraph 8, you refer to:
13                      "The OpenAI defendants and Microsoft
14               wrongfully profiting or being unjustly enriched
15               by operating OpenAI as a commercial venture."
16                      And that's a reference to the formation
17               of the for-profit entity?
18                      MR. KRY:  Objection.  Misstates the
19               document.
20                      MR. WILSON:  I'm happy to read the
21               document verbatim if that would be helpful,
22               Robert.
23        Q.     You say in paragraph 8:
24                      "I have been asked to determine the
25               amount by which the OpenAI defendants and
```

Elon Musk v.                        FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 55

1          Microsoft wrongfully profited or were unjustly

2          enriched by operating OpenAI as a commercial

3          venture."

4                    Do you see that?

5     A.     Yes.

6     Q.     Okay.  And when you refer to operating OpenAI

7     as a commercial venture in that sentence, you are

8     referring to the formation of the for-profit entity in

9     2019, correct?

10                   MR. KRY:  Objection to form.  It

11          misstates the document again.

12                   MR. WILSON:  Your objection is noted.

13    Q.     You can answer.

14    A.     I guess that's right, yes.  As a commercial

15    venture, based on the creation of the for-profit.

16    Q.     Do you know which of Mr. Musk's claims against

17    the OpenAI defendants are part of Phase 1 of this case?

18    A.     No.

19    Q.     Does your analysis assume that Mr. Musk

20    prevails on all of his claims?

21                   MR. KRY:  Objection.

22                   MR. WILSON:  What's the objection?

23                   MR. KRY:  Foundation as to what the

24          claims are.

25                   MR. WILSON:  Well, he doesn't know.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 56

1              So, we've established that he doesn't know.
2                    MR. KRY:  That's the objection.
3      BY MR. WILSON:
4      Q.    Well, regardless of what the claims are, does
5      your analysis attempt to differentiate between which
6      claims Mr. Musk prevails on and which he doesn't?
7                    MR. KRY:  Same objection.  Lack of
8              foundation.
9      A.    So my recollection from the complaint is that
10     there are a number of claims in the complaint.  My
11     understanding from counsel is that the analysis that
12     I've done, which is the disgorgement analysis, basically
13     applies to each and every claim.
14            So they don't have to be -- it doesn't have to
15     be all the claims.  It could just be any one of the
16     claims.
17     Q.    Okay.  Are you aware of that Mr. Musk has a
18     fraud claim?
19     A.    I don't recall exactly which -- what the claims
20     are from memory.
21     Q.    I'm happy to represent to you that Mr. Musk
22     has, among other claims, a claim for fraud and a claim
23     for breach of charitable trust.
24            Do you accept that representation?
25     A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 57

1    Q.    So it's your testimony that if, for example,

2    Mr. Musk prevails on the fraud claim but not the

3    charitable trust claim, his damages for unjust

4    enrichment would be the same as if in a scenario where

5    he prevailed on the charitable trust claim, but not the

6    fraud claim?

7              MR. KRY:  Objection.  That question is

8              calling for a legal conclusion.

9    A.    So I don't have a legal opinion, but that's my

10   general understanding.

11   Q.    As an economic matter, it's immaterial to your

12   methodology what claims Mr. Musk prevails on, correct,

13   as long as he prevails on at least one?

14   A.    That's my understanding from discussions with

15   counsel.

16   Q.    Okay.  Turn to paragraph 14 of your first

17   report.  You say here that Mr. Musk alleges he was

18   misled into being a donor to a nonprofit.

19         Do you see that?

20   A.    I understand that Mr. Musks alleges his

21   contributions were made with the understanding that

22   OpenAI would act in "good faith as a charity committed

23   to safety and transparency above profit."

24   Q.    Fair enough.  I'm focusing on the final

25   sentence of this paragraph.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 58

1      A.      Sorry.

2      Q.      That's fine.  You were just quoting from

3      Mr. Musk's complaint, right?

4      A.      I'm sorry.

5      Q.      No, no.  That's okay.  So the final sentence of

6      paragraph 14, you say:

7                      "In short, Mr. Musk alleges he was

8              misled into being a donor to a non-profit, and

9              that his significant monetary and non-monetary

10             contributions were later repurposed to support

11             a startup with transformational technology."

12                     Do you see that?

13     A.      Yes.

14     Q.      When you conducted your analysis, did you

15     assume that Mr. Musk was being misled at the time when

16     he made all of his donations and non-monetary

17     contributions to OpenAI?

18                     MR. KRY:  Objection -- no, withdraw the

19             objection.

20                     MR. WILSON:  Could you read the

21             question back, please.

22             (Whereupon, the record was read by the

23     reporter.)

24     A.      No, I don't make that assumption.

25     Q.      Okay.  So am I correct in understanding, then,

Elon Musk v.                     FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 59

1      that your report differentiates between donations that

2      Mr. Musk made, or contributions that Mr. Musk made at a

3      time when he was being misled and donations or

4      contributions that he made at a time when he was not?

5                    MR. KRY:  Objection.  Sorry.  When you

6              say correcting your understanding, is that a

7              reference to the report or something else?

8                    MR. WILSON:  I'm trying to understand

9              the witness's testimony.  He's testified that

10             he did not assume that Mr. Musk was misled at

11             the time he made all of his contributions --

12                   MR. KRY:  In that case, I object on the

13             ground that it misstates the testimony.

14     BY MR. WILSON:

15     Q.     Well, let me ask you this, Dr. Wazzan:  How

16     would your analysis account for the possibility that

17     Mr. Musk was only misled at a time when he made some,

18     but not all of his contributions or donations?

19                   MR. KRY:  Objection to the form of the

20             question.

21     A.     It doesn't matter.

22     Q.     Why doesn't it matter?

23     A.     Because his contributions, whether he was

24     misled or not, are his contributions.  They are what

25     they are.  The conversion of the -- or the creation of

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 60

```
1          the for-profit occurs afterwards.
2                 The question is then:  What are his
3          contributions worth?  Whether they were misled or not
4          misled is not material to the analysis.
5          Q.    Okay.  Fair enough.  So for example, if
6          Mr. Musk made a donation or a contribution after the
7          conversion had happened and been publicly disclosed, he
8          should still get credit for that in your analysis?
9          A.    I understand there are some additional
10         contributions that were made after the disclosure, but
11         it's not clear to me that he had full information, and
12         it's a legal issue, so I'm not -- I don't have an
13         opinion on that.
14         Q.    But your analysis does not break out the unjust
15         enrichment or wrongful profits based on when
16         contributions or donations were made, correct?
17         A.    No.
18         Q.    Okay.  Are you aware that Mr. Musk testified
19         that by September 2017, he had already concluded that
20         Mr. Altman and Mr. Brockman were being deceptive, and
21         that their real goal was to create a closed-source
22         maximum-profit entity for their own benefit?
23                     MR. KRY:  Objection.  Misstates the
24                prior testimony of another witness.
25         A.    I don't recall that, as I sit here.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 61

1      Q.      You did review Mr. Musk's deposition transcript

2      in this case, did you not?

3      A.      Yes.

4      Q.      Did you read the whole thing?

5      A.      Yes.

6                      MR. WILSON:  Let's look at tab 8.  This

7              will be Exhibit 4 to your deposition.

8                      (Whereupon, the Deposition Transcript

9              of Elon Musk 9/26/25 was marked as Wazzan

10             Exhibit 4, for identification, as of this

11             date.)

12     BY MR. WILSON:

13     Q.      I'm certainly not going to ask you to read the

14     whole document, Mr. Wazzan, but this is -- the document

15     I've put in front of you as Exhibit 4 is the transcript

16     from Elon Musk's deposition in this case.

17                     And I direct you to page 84, if you could,

18     please.  And I'm looking at the question and answer that

19     begins on line 15.

20                     "QUESTION:  So when you said

21             discussions were over, you weren't conveying

22             the sentiment that you were determined that

23             Brockman and Altman weren't being

24             straightforward.  They were trying to turn the

25             thing into a for-profit for their own benefit

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 62

1          and you'd had it with OpenAI.  Fair?

2               "ANSWER:  I felt that I was being

3          tricked.  I felt that I was being -- that they

4          were being deceptive, that their real goal was

5          to create a closed-source maximum-profit entity

6          for their own benefit.  And that is, in fact,

7          what happened."

8               And the next page, answer continues:

9               "So my suspicions were valid."

10              Do you see that?

11    A.     Yes.

12    Q.     And then there's a reference in the next

13    question to the date of September 20, 2017, which is the

14    date of the e-mail exchange that's being discussed here.

15              Do you see that?

16    A.     Yes.

17    Q.     Okay.  Did you review this testimony when you

18    reviewed Mr. Musk's deposition transcript?

19    A.     I mean, I don't recall specifically, but I

20    reviewed the transcript, so I must have at the time.

21    Q.     Okay.  Does this testimony impact your

22    methodology or conclusions in any way?

23               MR. KRY:  Objection to the use of,

24          like, one tiny snippet of testimony.

25               MR. WILSON:  If you can just object.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

```
                                                    Page 63
   1                You don't have to get a speaking objection.  I
   2                think we all know the rules.
   3                        MR. KRY:  Objection to incomplete
   4                quotation of testimony.
   5                        MR. WILSON:  You can just object to
   6                form.
   7                        You can answer the question,
   8                Dr. Wazzan.
   9                        MR. KRY:  Object to form.
  10                        THE WITNESS:  Can you read the actual
  11                question back?
  12                  (Whereupon, the record was read by the
  13                reporter.)
  14                A.      No.
  15                BY MR. WILSON:
  16                Q.      Okay.  And why not?
  17                A.      It just doesn't.  I don't see how or why it
  18                would.
  19                Q.      Setting the testimony aside, if the finder of
  20                fact in this case were to conclude that, by September
  21                2017, Mr. Musk knew that OpenAI was going to form a
  22                for-profit venture, would your analysis need to take
  23                account of that fact?
  24                        MR. KRY:  Objection to form.
  25                A.      If the Court specifically ruled that any -- I
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 64

1      guess any monetary and nonmonetary contributions made by

2      Mr. Musk after a particular date, any date, should not

3      be counted, then my methodology is adaptable to that and

4      it can be adjusted.

5          Q.      And how would you adjust it?

6          A.      Well, I'd go back, right, so there's a section

7      on the financial contributions, that could be adjusted

8      and the percentages would change, and then we could look

9      at the qualitative affect and see what effect it would

10     have on that.

11         Q.      But as it stands, there's nothing in your

12     report that would allow that to be done, that

13     methodology to be adjusted?

14                     MR. KRY:   Objection.

15         Q.      Let me ask the question differently.  As it

16     stands, you have not conducted that analysis to portion

17     out by contribution date?

18         A.      No, I haven't, but the methodology is there,

19     the tables are there; they're easily adaptable to that.

20         Q.      Sitting here today, do you know what

21     contributions Mr. Musk made to OpenAI nonprofit after

22     September 2017?

23         A.      So I'm looking at page 36 of my report where I

24     sort of go through Mr. Musk's monetary contributions.

25     Starting on paragraph 72 -- I'm just trying to see if I

JANE ROSE REPORTING                 California Firm No. 254
1-800-825-3341                      janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

                                                        Page 65

1       can back out what comes after 2017.  Ten million in

2       2016.  Eighteen million in 2017, including plus some

3       Teslas.  And then in paragraph 73, despite his public

4       departure in February 2018, Mr. Musk continued to

5       contribute monetarily, though more modestly, through

6       September 2020.  And I cite to some documents, plus I

7       think if we looked at the IRS filings, we could figure

8       out exactly what the number is, but I don't have it here

9       specifically.

10      Q.     I asked you a few minutes ago whether the

11      snippet of testimony that I read from Mr. Musk's

12      deposition impacted your methodology or conclusions.

13             Do you recall me asking you that question?

14      A.     Yes.

15      Q.     And you testified that it did not and I asked

16      why did it not, and you said it just doesn't; I don't

17      see how or why it would.

18             Could you explain a little bit more why the

19      testimony does not -- that I read to you does not impact

20      your methodology or conclusions?

21                   MR. KRY:  Objection to form.  Asked and

22             answered.

23      A.     It's a legal issue.  It's tangled up.  What

24      Mr. Musk's intentions were are tangled up in sort of his

25      legal claims.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 66

1    Q.    And you're not here to resolve legal issues,
2    correct?
3    A.    I'm not, exactly.
4    Q.    And you're not here to resolve factual
5    disputes?
6    A.    No.
7    Q.    You're not here to weigh evidence?
8    A.    Well, I am weighing evidence.
9    Q.    How are you weighing evidence?
10   A.    Evidence, there's facts strewn throughout this
11   report that I'm evaluating.
12   Q.    If there's a difference of opinion or a
13   difference of position between one side or the other,
14   it's not your job, as you understand it, to decide who's
15   right?
16            MR. KRY:  Objection to form.
17   A.    Right, which is why I said if the Court ruled,
18   for example, that contributions after a particular date
19   should be set aside, then I would adapt my model to that
20   ruling.
21   Q.    Turn to page 29 of your report, please.  Not
22   page 29, paragraph 29.  And this is the paragraph that
23   you describe your three-step methodology, correct?
24   A.    Yes.
25   Q.    You say here, a couple of lines down:  "Using

Elon Musk v.                          FINAL                 December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 67

1        this methodology, I estimate OpenAI's wrongful gains to

2        be between 83.03 billion and 212.59 billion."

3                Do you see that?

4        A.      Yes.

5        Q.      What does OpenAI refer to in the context of

6        that sentence?

7        A.      That is OpenAI's share of the for-profit.

8        Q.      When you say "OpenAI's share," what does that

9        mean exactly?

10       A.      So the parties set up a for-profit, and the --

11       sort of the benefit or the economic interest in that

12       for-profit is allocated to the different parties, and

13       roughly, you know, I have the specific numbers,

14       especially in my supplemental report, but let's say

15       it's 30 percent to Microsoft, 30 percent to OpenAI and

16       then there's, you know, additional percentages for

17       the --

18                (Reporter clarification.)

19       A.      -- first call limited partners.

20       Q.      When you say that OpenAI had wrongful gains,

21       can you identify the specific persons or entities

22       affiliated with OpenAI that gained wrongfully?

23       A.      I think it would be the defendants in the case.

24       Q.      And who are the defendants that you're

25       referring to?

Elon Musk v.                          FINAL                    December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 68

1        A.      They would be all the defendants listed.

2        Q.      Okay.  Sitting here today, do you know who the

3    OpenAI defendants are?

4        A.      Well, it's Sam Altman -- no, we'd have to go

5    back and look at the complaint.

6        Q.      Do you know whether the OpenAI nonprofit is a

7    defendant in this case?

8        A.      I'm not sure.

9        Q.      Sitting here today, do you have an opinion one

10   way or the other as to whether or not the OpenAI

11   nonprofit has wrongfully benefitted?

12       A.      Yeah, I mean, they -- the nonprofit has

13   benefitted -- the nonprofit is the residual claimant, so

14   they have benefitted from the creation of the

15   for-profit.

16       Q.      Has the OpenAI nonprofit benefitted wrongfully?

17               MR. KRY:  Objection to form.

18       A.      I believe so, yes.

19       Q.      Okay.  So according to your analysis, if

20   Mr. Musk prevails and the Court adopts your analysis,

21   OpenAI nonprofit should be paying back some of the

22   wrongful gains that you analyze; is that correct?

23       A.      Some portion of their economic interests would

24   transfer to Musk, yes.

25       Q.      What portion, if you know?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 69

1        A.        Yeah, the percentage is laid out in my tables.

2        Q.        So OpenAI nonprofit would pay back between 50

3        and 75 percent of its value to Mr. Musk under your

4        analysis?

5        A.        I don't think it's quite that much.

6        Q.        Well, what percentages were you referring to?

7        And if you need to reference your report, by all means.

8        A.        So if you look at in Exhibit 14, on page 52...

9        Q.        Mm-hmm.

10       A.        That table is entitled "Apportionment of

11       OpenAI's Wrongful Gains Across Time Periods" -- sorry,

12       that's not the table I want.

13       Q.        Well, maybe I can help you.  You submitted a

14       supplemental exhibit in your supplemental report, so

15       take out Exhibit 3 to your deposition and if you go to

16       page 4, there's a revised Exhibit 19, which is a chart

17       that's titled "OpenAI's Wrongful Gains Based on PBC

18       Restructure Announcement."

19       A.        Yes.

20       Q.        So does that help you to answer my question?

21       A.        Yes.

22       Q.        So what was the percentage that you were just

23       referring to?

24       A.        So the percentage is, you start with the total

25       valuation of 500 billion, and then you apply OpenAI's

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 70

1          nonprofit share, which is either 29.2 percent or 26.2

2          percent based on some dilution, and you make that

3          multiplication and that gives you OpenAI's for-profit

4          piece, which ranges from 145.9 to 131, and then you

5          apply Mr. Musk's economic interest in OpenAI, which is

6          50 or 75 percent, so ultimately you get a range of 65

7          billion to a high of 109 billion.

8          Q.      Okay.  So let's use that range, 65.5 billion to

9          109.43 billion?

10         A.      Yes.

11         Q.      The midpoint is around 87 billion, correct?

12         A.      Yes.

13         Q.      Just for purposes of discussion, let's use the

14         87 billion.

15         A.      Okay.

16         Q.      According to your analysis, what portion of

17         that $87 billion wrongful gain is a gain by OpenAI

18         nonprofit?

19         A.      I'm sorry, say that again.

20         Q.      According to your analysis, what portion of

21         that $87 billion wrongful gain is a gain by the OpenAI

22         nonprofit?

23         A.      All of it.

24         Q.      All of it.  Okay.  This revised estimate of

25         wrongful gains, Exhibit 19, we were just talking about,

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 71

1          this reflects the closing of the recapitalization, or

2          what you call the OpenAI Microsoft transaction, correct?

3          A.      Yes.

4          Q.      Is this exhibit now your current opinion as to

5          OpenAI's wrongful gains in this case?

6          A.      Yes.

7          Q.      Okay.  So you're no longer taking the -- or

8          expressing the opinion that it would be appropriate to

9          value the nonprofit's interest in OpenAI for-profit

10         using Black-Scholes model, correct?

11         A.      Well, it is appropriate.  I mean, you sort of

12         need history of it, right, before the transaction was

13         announced, the day before my report was due, we had a

14         variety of methods to get it to value.  And so one was

15         to look at publicly available information, one was to

16         use the Black-Scholes, and one was a discounted

17         cash-flow analysis.  They're all valid; they're still

18         good.  We now have a very contemporaneous transaction

19         between the parties where they lay out the percentages,

20         so I don't have to do the Black-Scholes anymore, and

21         then they have starting value, 500 billion, so I don't

22         have to do that anymore, but that's because we're

23         contemporaneous.

24              If trial stretched out for a year, or the

25         decision has to be updated and there's no proximate

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 72

1        transaction of this nature, then I would have to go back
2        to my methodology and redo it.
3        Q.      Got it.  But assume there's no transaction that
4        changes the share percentage allocations between the
5        varies parties that have an interest in the PBC, the
6        percentage is listed here in Exhibit -- revised
7        Exhibit 19, that reflects your current opinion?
8        A.      Yes.
9        Q.      And as to the valuation, the same is true,
10       that's your current belief as to what the correct
11       valuation is?
12       A.      Yes.
13       Q.      And I understand that could change if
14       circumstances change between now and trial, but if the
15       trial were today, that would be the number?
16       A.      Yes.
17       Q.      There's a reference on revised Exhibit 19 to
18       Mr. Musk's economic interest in OpenAI -- actually, let
19       me lay the foundation for the question.  Keep that
20       Exhibit 3 handy, but look back at Exhibit 1,
21       paragraph 29.  So there's written in this paragraph, the
22       final sentence says:
23                       "The ranges are a result of different
24               estimates of OpenAI for-profits value and the
25               size of Mr. Musk's attributed stake in OpenAI

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 73

```
 1              nonprofit."
 2                       Do you see that?
 3        A.      Yes.
 4        Q.      And the ranges that you're referring to in that
 5        sentence are the ranges you calculated for OpenAI and
 6        Microsoft's wrongful gains, correct?
 7        A.      Yes.
 8        Q.      All right.  So now get out revised Exhibit 19
 9        from your supplemental report, and there's a row here
10        that's entitled:  "Mr. Musk's Economic Interest
11        Percentage in OpenAI Nonprofit."
12                       Do you see that?
13        A.      Yes.
14        Q.      Is Mr. Musk's economic interest in OpenAI
15        nonprofit the same as his attributed stake in OpenAI
16        nonprofit?
17        A.      Say that one more time.
18        Q.      Sure.  Is -- and I'm -- the phrase "attributed
19        stake," I'm taking from paragraph 29 of your opening
20        report.  I'm not making that up, so I'm not trying to
21        trick you.
22                  I'm just trying to clarify whether Mr. Musk's
23        attributed stake in OpenAI nonprofit, which is the
24        terminology you used in your initial report, is the same
25        as Mr. Musk's economic interest in OpenAI nonprofit?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 74

1        A.      Yes.

2        Q.      Okay.  Thank you.  Now, Mr. Musk doesn't have a

3    stake in OpenAI nonprofit, does he?

4        A.      Not actually.

5        Q.      And he never had one, correct?

6        A.      No.

7        Q.      Mr. Musk never had any economic interest in any

8    kind of OpenAI nonprofit, correct?

9        A.      I guess that's right.

10        Q.      A person can't have an economic interest in a

11    nonprofit, right?

12        A.      Right.

13        Q.      And you would agree that donors to a nonprofit

14    contribute funds altruistically with no expectation of a

15    return, correct?

16                    MR. KRY:  Objection.  Foundation.

17        A.      I mean, as a general concept, I think people

18    donate to nonprofits, yes.

19        Q.      Trying to suss out your counsel's objections,

20    but let me just ask a different question.  Donors to a

21    nonprofit do not expect a financial return, correct?

22                    MR. KRY:  Objection.

23        A.      I think as a general matter, no.

24        Q.      And Mr. Musk was not an exception to that

25    general principle in this case, as far as you know?

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 75

1                    MR. KRY:  Objection.  Foundation.
2       Q.     Sitting here today, do you have any reason to
3    believe that Mr. Musk expected a financial return when
4    he donated money and time to OpenAI nonprofit?
5       A.     I have no opinion on that.
6       Q.     Setting aside whether you have an opinion, are
7    you aware of any information that would support such an
8    opinion?
9       A.     No.
10      Q.     Is the premise of your methodology that
11   Mr. Musk's alleged donations and charitable
12   contributions to the nonprofit should be treated as
13   for-profit investments?
14      A.     Well, that's not exactly what's going on here.
15   What's going on is that he contributed to a nonprofit.
16   The nonprofit then created a for-profit operation,
17   leading to, in this case, the unjust enrichment.
18            The unjust enrichment is now flowing back to
19   the nonprofit as the residual claimant.  And the
20   question is, based on Musk's original monetary and
21   nonmonetary contributions, what would he be entitled to
22   of that amount.  So it's not -- I mean, that's it.
23   That's the definition.
24      Q.     You're trying to calculate what Mr. Musk's
25   hypothetical equity interest in the nonprofit would have

Elon Musk v.                  FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 76

1        been under a different set of circumstances, correct?

2                     MR. KRY:  Objection.  Misstates the

3               testimony.

4        A.      It's not really an equity interest.  It's an

5        economic interest.

6        Q.      So you're trying to calculate what his

7        hypothetical economic interest would have been if OpenAI

8        nonprofit not been a nonprofit from the beginning.

9                     MR. KRY:  Objection.  Misstates the

10              testimony.

11       Q.      I'm not trying to misstate the testimony.  I'm

12       trying to clarify it.

13              Do you disagree with what I just said?

14       A.      I think you -- I think I go back to my original

15       answer.

16       Q.      Okay.  So sitting here today, you can't say, or

17       you wouldn't agree, that what you're trying to calculate

18       is what Mr. Musk's economic interest would have been in

19       OpenAI nonprofit if it had been a for-profit from the

20       beginning?  That's not correct?

21       A.      That's not correct.

22       Q.      What's wrong about that?

23       A.      That's not the objective of the exercise here.

24       Like I said, you're starting out with the creation of

25       the for-profit, and the nonprofit being the residual

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 77

1        claimant has benefitted from that creation of the

2        for-profit.  We're calling that unjust enrichment.

3               The question is:  How much of that unjust

4        enrichment should be allocated to Musk?

5               I'm not going back and creating a but-for

6        world.

7        Q.     But you are trying to ascertain the value, the

8        relative value of Mr. Musk's financial and nonfinancial

9        contributions, correct?

10       A.     Yes.

11       Q.     And why is that a salient consideration?  What

12       makes that relevant?

13       A.     I can't just allocate all the unjust enrichment

14       to Musk.  There were other presented parties.  There's

15       other contributors. The employees get a share, et

16       cetera.

17       Q.     What I'm trying to understand is, are you

18       making a subjective judgment about the relative

19       contribution that Mr. Musk provided?  Or are you trying

20       to objectively determine what reasonable people, looking

21       at this, would have decided was the relative value of

22       this contribution?

23                     MR. KRY:  Objection to form.

24       A.     I'm not sure how to characterize my analysis as

25       to your -- into your question as subjective or

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 78

1    objective.  What I've done is I've looked at his

2    monetary contributions, and you can calculate a

3    percentage relative to other monetary contributions.

4          I've also then assessed the nonquantitative

5    elements that he contributed.  Founder, visionary,

6    leadership, et cetera.  Ability to attract employees,

7    ability to recruit, things like that.  And I've

8    determined what I think is the right division.

9    Q.     Are you finished with your answer?

10   A.     Yes.

11   Q.     Okay.  Your revised Exhibit 19 also refers to

12   Mr. Musk's economic interest in OpenAI for-profit.  Do

13   you see that?  It's the final row?

14   A.     Yes.

15   Q.     What is that referring to?

16   A.     Well, just that -- the economic interest in

17   OpenAI for-profit.  In the first column, he gets 72

18   million -- sorry, he gets 72 billion of the total value

19   of 500 billion.

20   Q.     How, if at all, in your methodology, does

21   Mr. Musk's economic interest in OpenAI nonprofit differ

22   from Mr. Musk's economic interest in OpenAI for-profit?

23   A.     They're related.

24   Q.     What's the relationship?

25   A.     The relationship is that the nonprofit is the

JANE ROSE REPORTING              California Firm No. 254
1-800-825-3341              janerose@janerosereporting.com

Elon Musk v.                    FINAL                   December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 79

1          residual claimant of the for-profit.

2          Q.     The amounts you calculate for Mr. Musk's

3          economic interest in the nonprofit and the for-profit

4          are identical, aren't they?

5                      MR. KRY:  Objection.  Misstates the

6                 document.

7          Q.     The amounts of the economic interest that

8          Mr. Musk has in OpenAI nonprofit and OpenAI for-profit,

9          according to your analysis, they're identical?

10                     MR. KRY:  Objection.  Misstates the

11                document.

12         A.     No, I don't see that.

13         Q.     It says that Mr. Musk's economic interests --

14         let's just focus on Estimate 1.

15                     "Mr. Musk's economic interest for

16                OpenAI nonprofit is 50 percent."

17                     Do you see that?

18         A.     Yes.

19         Q.     50 percent of what?

20         A.     50 percent of the 145.

21         Q.     What is 50 percent of 145.9?

22         A.     72.95.

23         Q.     So you're notwithstanding that math, saying

24         that I'm wrong to ask you to equate the value of the

25         economic interest in the nonprofit and the economic

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 80

1          interest in the for-profit?

2                    MR. KRY:  Objection.  Misstates the

3                    document and also object to the form.

4          A.     I guess you've lost me with your questioning.

5          Q.     You're not disputing that 50 percent of 145.9

6          equals 72.95, are you?

7          A.     No.

8          Q.     But you are disputing that Mr. Musk's economic

9          interest in OpenAI nonprofit equals Mr. Musk's economic

10         interest in OpenAI for-profit.

11                  Do I have that right?

12         A.     Well, I think -- I don't know.  Maybe you're

13         misunderstanding the table.  The -- you start with 500

14         billion.

15         Q.     Mm-hmm?

16         A.     That's the total pie.  What then is OpenAI's

17         nonprofit share of that 500 billion?  It's 29.2 percent.

18         29.2 percent times the 500 billion, gets you at 145.

19         That's OpenAI's nonprofit economic interest in OpenAI's

20         for-profit.  145.

21                  The question then becomes:  How much of the 145

22         that is owned by the nonprofit is going to be

23         attributable to Mr. Musk?  It's 50 percent.  So there's

24         further reduction.

25                  And then his total amount is 72.95 billion.

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                          Page 81

1        Q.      I'm just truly trying to understand.  If you

2        imagine that the total AI for-profit was a big circle?

3        A.      Yes.

4        Q.      And that the total value of the OpenAI was a

5        smaller circle that was concentric to the first one.

6                Are you with me so far?

7        A.      Okay.

8        Q.      Does "okay" mean yes?

9        A.      Well, I wouldn't do it that way.

10                       MR. KRY:  That's a pretty fun pie

11               chart.

12       A.      Yeah, I would make it more of a pie chart.  I

13       wouldn't make it concentric circles.

14       Q.      Well, I'm going somewhere with this.  You got

15       to stay with me.

16       A.      Okay.  Should I draw it out?

17       Q.      Yeah, sure.  Draw it out.

18                       MR. WILSON:  Is this a big enough piece

19               of paper?

20                       MR. KRY:  No, let me --

21       Q.      Draw a big circle.  So that is 500.

22       A.      Okay.  Right in the middle?

23       Q.      Sure, concentric.  Yes.  That's what it means.

24       My geometry teacher from elementary school would be

25       proud of me right now.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                    Page 82
     1         A.      Okay.

     2         Q.      Okay.  And so in the Estimate 1, the value of

     3      that is 145.9, correct?

     4         A.      Yes.

     5         Q.      And I'm just trying to understand.  Mr. Musk's

     6      72.95 is inside of that smaller circle, right?

     7         A.      Yes.  Here's Musk.

     8         Q.      Okay.  Great.  So what I was trying to get at

     9      is that when you talk about Mr. Musk's economic interest

    10      in OpenAI nonprofit, that's that little triangle that

    11      you just drew?

    12         A.      Yes.

    13         Q.      And that's a slice of the pie?

    14         A.      Yes.

    15         Q.      And that same number also happens to be

    16      Mr. Musk's share of the OpenAI for profit.  It's just

    17      inside the bigger circle, when you look at it from that

    18      perspective.

    19         A.      Yeah.  If you are, you can take 72 and divide

    20      it by 500.  And that would be his interest in the total

    21      pie.

    22                 MR. WILSON:  Okay.  All right.  Let's

    23              mark that as an Exhibit.  I think that's a

    24              useful thing to have done.  So is that going to

    25              be Exhibit 5?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

```
                                                     Page 83
 1                      (Whereupon, Witness Notes was marked as
 2                 Wazzan Exhibit 5, for identification, as of
 3                 this date.)
 4                      MR. WILSON:  I think I get it now.
 5                 Thank you, Dr. Wazzan.
 6        BY MR. WILSON:
 7        Q.    So your analysis assumes that Mr. Musk's
 8        economic interest in OpenAI nonprofit is held by the
 9        nonprofit itself?
10        A.    Yes.
11        Q.    Okay.  Got it.  In other words, he should have
12        an economic interest in the nonprofit, but he doesn't,
13        in your analysis?
14                      MR. KRY:  Objection to form.
15        A.    Yes.
16        Q.    Let's take a look at paragraph 52 of your
17        report.  Here you say that your assignment was to
18        allocate the current value of OpenAI for-profit, among
19        its various stakeholders, including OpenAI nonprofit.
20             Do you see that?
21        A.    Yes.
22        Q.    And who are the various stakeholders in OpenAI
23        for-profit?
24        A.    It's the first-call limited partners:
25        Microsoft, OpenAI nonprofit and Aestas.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 84

1                        MR. KRY:   Objection to the time period.

2        Q.      That's a fair objection.  Just to be clear, I'm

3        asking as of today.

4        A.      Well, then there's some additional --

5        Q.      Okay.  So as of today -- and it's not a memory

6        test, but do your best -- who are the various

7        stakeholders in OpenAI for-profit today?

8        A.      Well, it says the PBC cap table identifies the

9        post-conversion shareholdings of the OpenAI nonprofit,

10       Microsoft and other shareholders under three scenarios,

11       pre warrant is diluted for the present value of the

12       warrants and full dilution, so...

13       Q.      I'll tell you what, Dr. Wazzan, we can come

14       back to that.

15               If your assignment was to calculate

16       Mr. Musk's  --

17       A.      Sorry.

18       Q.      Go ahead.

19       A.      So it's the parties I named plus the EV, SP,

20       EIP.

21       Q.      We can come back and I'll show the cap table

22       that you referenced in your supplemental report and we

23       can go over this again later.

24               Let me ask you this, if you were trying to

25       calculate Mr. Musk's economic interest in OpenAI

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 85

1          for-profit, why would it not have been appropriate to

2          examine the percentage of the OpenAI for-profit's value

3          that is attributable to Mr. Musk's contributions?

4                    MR. KRY:  Objection to form.

5          A.      Well, ultimately, that's the percentage we

6          calculate, right, it's 72 divided by 500, but he was not

7          a party to the for-profit.  He's not listed in the cap

8          table.  He doesn't have an economic interest as laid out

9          by the parties in the transaction.  His contributions

10         were made to the nonprofit, so I think it's appropriate

11         to view his contributions through that lens, they came

12         in through the nonprofit.

13         Q.      You would agree with me, wouldn't you, that

14         Mr. Musk's relative contribution to the for-profit's

15         value is substantially less than 50 to 75 percent,

16         wouldn't you?

17         A.      It's a different analysis and one which I

18         haven't done, but his original contributions, if you

19         carry those forward to the for-profit, could be very

20         valuable, right?  The early money is more valuable than

21         the later money.

22         Q.      Is that always true?

23         A.      No, it's not a law.

24         Q.      You haven't calculated Mr. Musk's relative

25         contribution to the value of the for-profit?

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

```
                                                   Page 86
    1                 MR. KRY:  Okay.  Misstates the
    2            documents.
    3       A.      Sorry, say that again.
    4       Q.      Well, have you calculated Mr. Musk's relative
    5            contribution to the for-profits value?
    6       A.      No.
    7       Q.      Okay.  If you had to calculate that relative
    8            contribution, what additional facts would you have
    9            considered?
   10       A.      I can't say, as I sit here.
   11       Q.      Would you have considered the outside
   12            investments, for-profit investments that OpenAI
   13            for-profit has received over the last several years?
   14       A.      Maybe.
   15       Q.      Okay.  So you maybe would have considered the
   16            billions of dollars in outside money that came into
   17            OpenAI after Mr. Musk left, correct?
   18       A.      I'm not sure.  It's a different analysis, and
   19            it's one that I haven't done, right.
   20       Q.      Okay.  Would you have considered all of the
   21            work done by OpenAI's employees since March 2019?
   22       A.      I couldn't say.
   23       Q.      Okay.  Would you have considered the many
   24            technological advances that OpenAI has made since
   25            March 2019?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 87

1       A.      I couldn't say.

2       Q.      Just haven't thought about it?

3       A.      I have not.

4       Q.      And you weren't asked to?

5       A.      No.

6       Q.      Is it your opinion that the value of the

7       nonprofit stake in the PBC is directly correlated to the

8       nonprofit's relative contribution to the for-profit's

9       value?

10      A.      I need that one more time.

11      Q.      Sure.  Is it, under your methodology, or is it

12      your opinion that the value of the nonprofit's stake in

13      the PBC is directly correlated to the nonprofit's

14      relative contribution to the value of OpenAI for-profit?

15      A.      I think the answer is yes.  That's quite a long

16      sentence.

17      Q.      Okay.  Maybe I'll make it more concrete.  Under

18      estimates 3 and 4 from your Exhibit 19, you conclude

19      that the OpenAI nonprofit's fully diluted share of the

20      PBC is 26.2 percent; is that right?

21      A.      Yes.

22      Q.      In your opinion, does that mean that the

23      nonprofit is responsible for having generated 26.2

24      percent of the current value of the PBC?

25      A.      I haven't done that analysis.

Elon Musk v.                      FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 88

1    Q.    Do you have an opinion on that question sitting
2    here today?
3    A.    No.
4    Q.    Okay.
5    A.    I mean, look, at the extreme, in the limit, the
6    OpenAI nonprofit contribution could be 100 percent under
7    the question you're asking, because if they don't start
8    the nonprofit, maybe there's never an OpenAI to begin
9    with.  So there's no way to really do that.
10   Q.    Okay.  I just want to be clear, you're not
11   expressing an opinion one way or the other as to whether
12   or not the fact that OpenAI nonprofit has a 26.2 percent
13   means that OpenAI nonprofit contributed 26.2 percent of
14   the value?
15   A.    I don't know what that means.  I mean, the
16   parties agreed that their interest would be 26.2, so
17   that's not coming out of thin air.  I mean --
18   Q.    Have you studied the negotiations around this?
19         (Reporter admonition.)
20         MR. WILSON:  I'm sorry, I thought he
21   was done.
22   A.    I mean, it's the parties to the PBC
23   recapitalization, so like I said, I haven't done the
24   analysis as to what their contribution should be and if
25   that's different than what their 26.2 figure is.

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman              HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 89

1       Q.      Have you analyzed or were you asked to analyze

2       the negotiations around the cap table for the PBC?

3       A.      I don't know that I was asked to, but I did.  I

4       reviewed all those watershed documents which showed --

5       and I don't have this exactly straight in my mind, my

6       memory, but both sides had their own reports, there were

7       investment bankers on both sides, and they were trying

8       to get at what the right allocation of equity should be

9       for the for-profit, and they were doing that based on

10      the Black-Scholes models and they had different

11      estimates as to the inputs.

12              The numbers that were then publicly announced

13      as part of the PBC restructure agreement are very

14      similar, or at least along the same lines as what I was

15      looking at in the watershed documents, so I have looked

16      at those documents and those were negotiations that

17      probably led to these figures.

18      Q.      Based on the documents you looked at about the

19      watershed, as you called it, negotiations, was it your

20      understanding that the parties were trying to figure out

21      who contributed what percentage of the value to OpenAI

22      for-profit?

23      A.      I don't recall specifically.  I mean, OpenAI

24      contributed, you know, IP and employees and all their

25      stuff.  We'd have to go back and look at the documents.

Elon Musk v.                      FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                                        Page 90
 1                    MR. KRY:  We're about an hour in at
 2            this point.
 3                    MR. WILSON:  Yeah, I was just going to
 4            suggest a break so let's do it.
 5                    THE VIDEOGRAPHER:  Going off at
 6            11:09 a.m.  This marks the end of Media 2.
 7            (Whereupon, a short break was taken.)
 8                    THE VIDEOGRAPHER:  Please stand by.  We
 9            are back on the record at 11:25 a.m.  This
10            marks the beginning of Media 3.
11     BY MR. WILSON:
12     Q.    Dr. Wazzan, you write in your report that
13     generative AI models are expensive to develop and
14     maintain; is that right?
15     A.    I think that's right.  Can you point me to the
16     paragraph?
17     Q.    It's in paragraph 16.
18     A.    Yes.
19     Q.    What makes developing generative AI so
20     expensive?
21     A.    I think it's a combination of the need --
22     pretty much what I write down here, they leverage
23     sophisticated machine-learning algorithms written by
24     programmers, data scientists, computer scientists and
25     other specialists.  The models also leverage computer
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 91

1          hardware that can quickly process substantial amounts of

2          data, compute costs that are estimated to be in excess

3          of 5 billion annually at OpenAI alone.

4                  So it's labor, it's compute costs, hardware

5          costs, everything.

6          Q.      Companies like OpenAI and xAI, they spend

7          billions of dollars a year to compute, right?

8          A.      Yes.

9          Q.      They offset -- you offset to pay the people to

10         do the research and develop the technology, right?

11         A.      Yes.

12         Q.      Can you say here that some people are getting

13         paid more than $100 million a year?

14         A.      Yes.

15         Q.      That's a lot of money.

16         A.      Yes.

17         Q.      Do have you an opinion on whether the OpenAI

18         nonprofit could have developed OpenAI's current

19         technology if it had never formed the for-profit?

20         A.      I don't have an opinion on that.

21         Q.      Okay.  That's not something you considered?

22         A.      No, and I'm not sure it's relevant, right, so

23         take Amazon, for example.  The creation of Amazon by

24         Bezos in a garage was not very costly.

25                 Today, Amazon probably spends billions, I'm

Elon Musk v.                      FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 92

1    sure they do spend tens of billions on labor cost,
2    compute costs, et cetera.  That doesn't mean that Bezos
3    doesn't deserve or doesn't own $300 billion worth of
4    Amazon, right?  It's not an apples to apples analysis.
5    Q.    To be clear, you mentioned Amazon; I didn't.
6    So I'm not sure what the "apples to apples" comment
7    means.
8           But you weren't asked to consider whether
9    OpenAI nonprofit could have raised the funds sufficient
10   to develop its current technology through donations
11   alone, were you?
12   A.    No.
13   Q.    Okay.  Do you know what Mr. Musk's perspective
14   was on that question?
15   A.    From memory, I remember seeing some
16   correspondence between the parties where he thought they
17   probably needed to form a for-profit entity.
18   Q.    Mm-hmm.  Mr. Musk thought that OpenAI needed
19   additional resources to develop all their artificial
20   general intelligence, didn't he?
21   A.    Yes.
22   Q.    And as you just alluded to, that's why he and
23   the other cofounders were discussing alternative
24   structures?
25              MR. KRY:  Objection.  Form.

Elon Musk v.                        FINAL                    December 5, 2025
Samuel Altman              HIGHLY CONFIDENTIAL              Paul Wazzan, Ph.D.

Page 93

1    A.      Based on my memory, yes.

2    Q.      One of the things they discussed was forming a

3    for-profit entity, right?

4    A.      I believe so.

5    Q.      And then they also talked about the possibility

6    of merging OpenAI with Tesla, correct?

7    A.      Yes.

8    Q.      How long, by the way, did Jeff Bezos work at

9    Amazon?

10   A.      I have no idea.

11   Q.      Longer than Mr. Musk was at OpenAI?

12   A.      Probably.

13   Q.      Do you know how much of his personal capital

14   Jeff Bezos invested into Amazon?

15   A.      No.

16   Q.      Okay.  Paragraph 14 of your report, you

17   characterize Mr. Musk's allegations as follows.  You

18   say:

19              "Mr. Musk alleges Mr. Altman and others

20              have established an opaque web of for-profit

21              OpenAI affiliates, the only value of which came

22              from looting OpenAI of the intellectual

23              property, employees and relationships developed

24              by exploiting Mr. Musk's name and

25              contributions, the charities tax status, and

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 94

1              the goodwill generated by its supposed

2              philanthropic commitment."

3                   Do you see that?

4       A.     I'm sorry, what paragraph --

5       Q.     Paragraph 14.  I believe I just read the second

6       sentence.

7       A.     Yes, I'm with you.

8       Q.     So in that sentence, Mr. Musk, in his

9       complaint, uses the word "looting."

10                  Do you see that?

11      A.     Yes.

12      Q.     Are you expressing any opinion on whether any

13      looting of the OpenAI nonprofit has occurred?

14      A.     No.

15      Q.     Okay.  So you don't have any opinion, one way

16      or the other, on whether the nonprofit received fair

17      value in the March 2019 transfer of assets that's

18      referenced in your report?

19      A.     Read it again, please.

20      Q.     Sure.  In paragraph 26 of your report, you

21      refer to a March 2019 transfer of assets from OpenAI

22      nonprofit to OpenAI for-profit.

23                  Do you remember talking about that?

24                  Feel free to look at paragraph 26.

25      A.     Okay.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 95

1        Q.      And my question is whether you have any
2        opinion, one way or the other, on whether the nonprofit
3        received fair value in connection with that asset
4        transfer.
5        A.      I have no opinion on that.
6        Q.      Okay.  Do you have any opinion on whether the
7        nonprofit received fair value in the July 2019
8        transaction with Microsoft that's referenced in
9        paragraph 22 of your report?
10       A.      I have no opinion on that.
11       Q.      Okay.  Do you have any opinion on whether
12       OpenAI nonprofit received fair value in the March 2021
13       transaction with Microsoft that's referenced in
14       paragraph 23 of your report?
15       A.      Don't really have an opinion on that.
16       Q.      Okay.  Do you have any opinion on whether the
17       nonprofit received fair value in the January 2023
18       Microsoft transaction that's referenced in paragraph 24
19       of your report?
20       A.      I mean, I hadn't really thought about it, but I
21       guess now that I'm thinking about it, it's two
22       sophisticated parties in an arm's length transaction,
23       both operating for-profit.
24               So what strikes me is that the transactions are
25       probably fair, but I haven't really thought about it in

Elon Musk v.                         FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 96

1         any detail.
2         Q.      Okay.  Do you have any reason to believe that
3         the March 2019 asset transfer was not at arm's length?
4                        MR. KRY:  Sorry, the -- which March
5                   2019 asset transfer?
6         Q.      The one that's referenced in paragraph 26 that
7         we just talked about.
8                        MR. KRY:  Between the nonprofit and the
9                   for-profit?
10                       MR. WILSON:  That's the one I'm talking
11                  about.  It's in paragraph 26.  I think the
12                  witness knows which transfer I'm talking about.
13        A.      Can you ask the question again.
14        Q.      Well, you referenced the fact that the January
15        2023 transaction with Microsoft was arm's length.  And I
16        just want to make sure that your testimony is clear.
17                Sitting here today, do you have any reason to
18        believe that the March 2019 transfer of assets from the
19        nonprofit to the for-profit, was anything other than an
20        arm's length transaction?
21        A.      I see.  I don't have an opinion on that one.
22        What I was referencing earlier is if OpenAI for-profit
23        is negotiating with Microsoft, those are two arm's
24        length transactions.  Probably efficient.
25                But the transfer of assets from the OpenAI

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 97

```
1        nonprofit to OpenAI for-profit is sort of an
2        interrelated transaction, so I haven't -- I haven't
3        thought about it.  The rules don't quite apply.
4        Q.     What rules are you referring to?
5        A.     It's not arm's length by two independent
6        parties.  It's two related parties.
7        Q.     And are you expressing an opinion as to whether
8        or not OpenAI nonprofit received fair value in that
9        transaction?  I just want to be very clear.
10       A.     No, I'm not.
11       Q.     Are you aware of the fact that the nonprofit
12       received a third-party valuation in connection with the
13       March 2019 asset transfer?
14       A.     I believe there were some third-party
15       valuations.
16       Q.     Okay.  Have you reviewed those valuations?
17       A.     In like Hemming Morse and PwC, yes.
18       Q.     I'm referring specifically to the Hemming Morse
19       valuation.
20       A.     Yes.
21       Q.     You reviewed it?
22       A.     Yes.
23       Q.     And do you have any basis to dispute the
24       valuation they came up with?
25                   MR. KRY:  Objection to form.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 98

1      Q.      Let me ask a different question.  Do you have

2      any opinion as to whether or not that was a reasonable

3      value that Hemming Morse ascribed to those assets?

4      A.      I haven't studied it in depth.

5      Q.      One last question, and I'll move off this:  Are

6      you expressing any opinion in this case as to whether

7      the nonprofit received fair value in the recently

8      completed recapitalization that resulted in the

9      formation of the PBC?

10     A.      No.

11     Q.      You say in paragraph 26 that, just to clarify

12     one issue, that the valuation of Hemming Morse -- well,

13     you don't quite say that.  You refer to the fact that in

14     the March 2019 transaction, the OpenAI nonprofit

15     transferred a majority of its assets.  And then you say:

16     "Valued at 47.8 million."

17             Do you see that?

18     A.      Yes.

19     Q.      Do you know if that was, in fact, the valuation

20     that Hemming Morse attached to those assets at that

21     time?

22             MR. KRY:  Sorry.  "At that time," you

23             mean the date of the Hemming Morse report or

24             the date of the transaction?

25     Q.      You're aware of the fact that there are

Elon Musk v.        FINAL        December 5, 2025
Samuel Altman     HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 99

1   multiple Hemming Morse reports related to the 2019

2   transaction?

3   A.    Yes.

4   Q.    Did you know what the final valuation was that

5   Hemming Morse calculated?

6   A.    I mean, from memory, was it -- I don't know,

7   was it, like, 61 million?

8   A.    Close enough.  So you are aware of that.

9   A.    Yes.

10   Q.    Okay.  And you have no opinion one way or the

11   other as to whether that was the right value?

12   A.    I didn't really study it in depth.

13   Q.    Okay.  The nonprofit's assets today are valued

14   at around, give or take, 130 billion, according to your

15   analysis; is that right?

16   A.    Yes.

17   Q.    Are you able to calculate the increase in value

18   from March 2019, when the assets were transferred, to

19   today?

20   A.    Not sure I follow.  If you want to just

21   subtract 47 million from 131 billion -- is that what

22   you're asking?

23   Q.    You can use 47.  I was going to use 61, which

24   is the number that you used.  But it's over 129 billion,

25   correct?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 100

1        A.      Yes.

2        Q.      And it's roughly 2000 times increase in value?

3        A.      Yes.

4        Q.      Fair enough?

5                Based on your analysis, what was the total

6        value of Mr. Musk's monetary and nonmonetary

7        contributions to the nonprofit?

8                        MR. KRY:  Objection to the time period.

9                Specifically do you mean total value then or

10               total value today?

11                       MR. WILSON:  I'm asking whether he

12               analyzed the total value of Mr. Musk's monetary

13               and nonmonetary contributions.  If he wants to

14               specify time periods, he can do that.

15       A.      I think the value of his contributions, if you

16       measure it today, is somewhere between 65 billion and

17       109 billion.

18       Q.      Okay.  So you do think that Mr. Musk

19       contributed something up to $100 billion in value to

20       OpenAI?

21       A.      Yes.

22       Q.      And that's your opinion, notwithstanding the

23       fact that the entire, or virtually the entire bundle of

24       assets that OpenAI nonprofit owned as of March 2019 was

25       valued at $60 million; is that right?

Elon Musk v.                    FINAL               December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

```
                                                      Page 101
  1                     MR. KRY:  Objection to form.
  2          A.     Yes.
  3          Q.     Okay.  Is it your opinion that Mr. Musk is
  4     responsible for the increase in value of OpenAI
  5     nonprofits assets by approximately 2,000 times from
  6     March 2019 to today?
  7          A.     In part, yes.
  8          Q.     Okay.  And to what extent is Mr. Musk
  9     responsible for that valuation increase?
 10          A.     He's responsible for his allocated economic
 11     interest, between 65 and 109 billion.
 12          Q.     What did Mr. Musk do, if anything, after March
 13     2019 to contribute to the value of the nonprofit?
 14          A.     What did he do afterwards?  Nothing.  He was
 15     instrumental in the formation of it.
 16          Q.     Okay.  Are you claiming that anything that he
 17     did prior to March 2019 is the cause of OpenAI's
 18     nonprofits assets increasing by 2,000 times over the
 19     last six and a half years?
 20                     MR. KRY:  Objection to form.  By
 21            "claiming" do you mean "opining"?
 22                     MR. WILSON:  Opining.
 23          A.     So I'm not, again -- I'll go back to the
 24     original premise is I'm doing a disgorgement analysis of
 25     the unjust enrichment.  I don't have to tie that to his
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 102

1          monetary investment.

2                  He's entitled to an economic interest in the

3          nonprofit.  That's what I've calculated.  And then the

4          nonprofit holds an interest in the for-profit and he

5          gets his allocated share.

6          Q.      And when you say he's entitled to an economic

7          interest in the nonprofit, is that your opinion or is

8          that something that you were instructed to assume?

9          A.      Yeah, I assume that.

10         Q.      And that's based on instruction from counsel?

11         A.      Yes.

12         Q.      So Mr. Musk has contributed somewhere between

13         65, I think you said, and 100-and-something billion

14         dollars to the value of OpenAI nonprofit.

15                 Have you analyzed the contributions of others

16         to the value of OpenAI for-profit since March 2019?

17         A.      Yes.

18         Q.      Okay.  Whose contributions have you analyzed

19         over that time period?

20         A.      Everybody -- all the contributions lead to

21         today's valuation.  So in some sense, when you've got a

22         500 billion valuation, and there's various allocations

23         of shares or -- not shares, but economic interests in

24         the for-profit, I've analyzed everybody who's in there.

25         Q.      So what was Microsoft's contribution to the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 103

1        value of the OpenAI for-profit as it stands today?

2        A.      It's somewhere between 22.9 percent and 25.5

3        percent.

4        Q.      Of 500 billion?

5        A.      Yes.

6        Q.      And what was Mr. Altman's contribution to that

7        $500 billion valuation?

8        A.      I don't have that specifically.

9        Q.      You didn't analyze that?

10       A.      Well, he falls into the -- he would fall under

11       two parts.  Under the Aestas part, and he would also

12       fall under the portion of the nonprofit that is not

13       allocated to Musk.  So there is somewhere between 25

14       percent and 50 percent of the nonprofit that I'm not

15       allocating.  And those would reside with -- you know, I

16       guess Altman would have a claim on it, or others.

17       Q.      So it's your understanding that Mr. Altman is

18       an investor in Aestas?

19       A.      Not an investor.  I think that's the employee

20       pool.

21       Q.      Your understanding is that he has an interest

22       in the employee pool?

23       A.      Yes.

24       Q.      If he didn't have an interest in the employee

25       pool, how would that change your assessment of his

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 104

1      relative contribution?

2      A.      It wouldn't.  He would still reside in the

3      portion of the nonprofit.

4      Q.      So he would get credit, as I understand it, for

5      any contributions that he made prior to March 2019; is

6      that right?

7      A.      He could, yeah.

8      Q.      How, under your analysis, is Mr. Altman getting

9      credit for contributing to OpenAI for-profits value for

10     things that he did after March 2019?

11     A.      Well, he's not a claimant to this litigation,

12     so I'm not concerned about Altman, but if he was a

13     claimant, he would reside in the 50 to 25 percent of the

14     nonprofit.

15     Q.      You haven't considered anywhere in your

16     analysis the work that Mr. Altman has done as the CEO of

17     OpenAI from March 2019 to the present day, you haven't

18     consider how that's contributed to the $500 billion

19     valuation; is that right?

20     A.      Again, I don't have to.

21     Q.      And you don't have to because Mr. Altman is not

22     a claimant?

23     A.      I guess it doesn't matter if he's a claimant or

24     not.  He does reside within the 50 to 25 percent of the

25     nonprofit.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 105

1      Q.      What about employees who did not work at the
2      nonprofit but have joined OpenAI since March 2019, where
3      do you account for their contribution to the for-profit?
4      A.      I guess they get paid their salaries.
5      Q.      I understand they may get paid salaries, but
6      how does that factor into your allocation of relative
7      contributions to the for-profits value?
8      A.      In the for-profit, they would show up in the
9      cap table, I guess, if they had shares or interests.
10     Q.      So under your analysis, everyone's contribution
11     is determined by what percentage of the cap table they
12     have; is that right?
13     A.      No.
14     Q.      What's wrong about that?
15     A.      Well, for instance, for Musk there's monetary
16     contributions and nonmonetary contributions, and he's
17     not in the cap table.
18     Q.      Excluding what you call the nonprofit economic
19     interests, for everyone else who's not included in the
20     nonprofit economic analysis, under your analysis, their
21     contribution to the for-profit is as its reflected in
22     the cap table; is that right?
23     A.      I mean, I guess give me an example, a
24     programmer -- are we talking about one programmer?
25     Q.      Sure, a programmer.

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 106

1       A.      He gets paid a salary, so his contributions are

2       recognized through his income.

3       Q.      I understand that's how the company recognizes

4       this programmer's contributions, but how does your

5       analysis recognize them?

6       A.      It doesn't need to.

7       Q.      And what was Mr. Brockman's contribution in

8       your analysis to the current $500 billion valuation of

9       the for-profit?

10      A.      The same.  I mean, his contributions and Musk's

11      contributions and Altman's contributions are considered

12      in my determination that Musk would have 50 to 75

13      percent of the nonprofit.  The other guys would reside

14      in the piece that's left over.

15      Q.      Okay.  Imagine that tomorrow Amazon makes a $50

16      billion investment in OpenAI and they get in exchange

17      for that a 10-percent stake in the company, okay?

18      A.      Okay.

19      Q.      Would you say, at that point, that Amazon has

20      contributed 10 percent of the value of OpenAI

21      for-profit?

22              MR. KRY:  Objection.  Form.

23      A.      No.

24      Q.      And why not?

25      A.      Well, they've bought a piece.  I guess I don't

Elon Musk v.                     FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
1        know what that means "contributed to the value."
2        They've bought a piece of the company.
3        Q.      What's Thrive's contribution to OpenAI
4        for-profit's value?
5        A.      Thrive?
6        Q.      Yes.
7        A.      I couldn't say.
8        Q.      You understand that Thrive is an investor?
9        A.      Yes.
10       Q.      How about SoftBank, what's their relative
11       contribution to OpenAI for-profit's current value?
12       A.      I haven't focused on that.
13       Q.      How would you calculate that contribution if
14       were you to endeavor to do so?
15       A.      Well, I guess I would use the same methodology,
16       what -- were those investments made into the nonprofit?
17       Q.      SoftBank is an investor in the for-profit.
18       A.      In the for-profit, then they would show up in
19       the cap table.
20       Q.      So you would look to their relative allocation
21       of shares in the cap table and that's how you would
22       determine the relative contribution to the current $500
23       billion valuation, correct?
24       A.      Those are two different concepts; their
25       investment is not their contribution.
```

JANE ROSE REPORTING                  California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 108

1    Q.    So then how would you calculate Thrive's

2    relative contribution, if you were asked to do so?

3    A.    Relative to what?

4    Q.    Relative to the overall pot of contributions

5    that have been made in OpenAI's history?

6    A.    I -- I guess I would -- I would look at their

7    dollar contribution at the time of their investment and

8    try to ascertain what else they had contributed to the

9    creation of OpenAI.

10         You know, just the mere fact of investment down

11   the road is not necessarily a contributor to anything,

12   right.  They've bought a piece of a company that's

13   existing.  I don't know that that's a contribution to

14   the value.

15   Q.    Okay.  Have you been asked to analyze the

16   wrongful gains by Sam Altman in connection with this

17   lawsuit?

18   A.    Not specifically.

19   Q.    Okay.  Have you been asked to analyze the

20   wrongful gains by Greg Brockman in connection with this

21   lawsuit?

22   A.    No.

23   Q.    You talk in your report about the distribution

24   waterfall at OpenAI.

25         Do you recall that?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 109

1      A.     Yes.

2      Q.     And that was the waterfall that determined how

3      returns would be paid out to investors at the time

4      before the PBC was created; is that right?

5      A.     Yes.

6      Q.     Is it correct that while the distribution

7      waterfall was in place, the value of OpenAI nonprofit's

8      stake was contingent on the performance and value of the

9      for-profit?

10     A.     Yes.

11     Q.     And that's also true now after the

12     recapitalization, correct?

13                    MR. KRY:  Objection.  Form.

14     A.     Yes.

15     Q.     Does OpenAI nonprofit have any assets other

16     than its assets in OpenAI for-profit?  Sorry, I

17     misspoke.  Does OpenAI nonprofit have any assets other

18     than its interest in OpenAI for-profit?

19     A.     I don't know.

20     Q.     You weren't asked to look at that?

21     A.     No.

22     Q.     Would you agree that since March 2019, the

23     value of OpenAI nonprofit has been almost entirely tied

24     to the performance of OpenAI for-profit?

25     A.     Read it one more time.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 110

1    Q.    Would you agree that since March 2019, the
2    value of OpenAI nonprofit has been almost entirely tied
3    to the performance of OpenAI for-profit?
4    A.    I would agree to that.
5    Q.    Okay.  Do you know if any individuals were
6    given an economic interest in OpenAI for-profit in 2019?
7    A.    Not as I sit here.
8    Q.    You mentioned the first close limited partners
9    earlier?
10    A.    Yes.
11    Q.    Did that include individuals and entities who
12    made investments in OpenAI for-profit, to the best of
13    your knowledge?
14    A.    Yes.
15    Q.    And was that in connection with the 2019
16    transaction?
17    A.    Yes.
18    Q.    Is it your understanding that all the first
19    close limited partners made capital contributions to the
20    for-profit in exchange for their interests?
21    A.    I would expect so, but I don't know as I sit
22    here.
23    Q.    I should be fair to you, I think that's not
24    true of the OpenAI employees who were going to be
25    working for the venture going forward.

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 111

1          Have you considered the terms on which those

2      employees receive their interests in OpenAI for-profit?

3      A.    No.

4      Q.    As far as you know, did any of the OpenAI

5      nonprofit's donors receive a economic interest in the

6      for-profit that was attributable to their donations?

7      A.    Not that I'm aware of.

8              MR. WILSON:  Sorry, do you mean the

9              same person or on account of the same interest?

10             MR. WILSON:  I mean on account of the

11             donative interest.

12     Q.    Does that change your answer?

13     A.    No.

14     Q.    As far as you know, did anyone who worked for

15     OpenAI nonprofit prior to 2019 receive an economic

16     interest in OpenAI for-profit that was attributable to

17     their pre-2019 work?

18     A.    I couldn't say.

19     Q.    It's not something you looked at?

20     A.    No.

21     Q.    Mr. Musk never made a contribution to OpenAI

22     for-profit, did he?

23     A.    Not that I'm aware of.

24     Q.    Are you aware that in December 2018, Mr. Musk

25     thought that OpenAI had a zero percent chance of being

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                                    Page 112
  1      relevant?
  2                      MR. KRY:  Objection.  Misstates the
  3               record.
  4      A.       I saw a document that sounds something like
  5      that.
  6      Q.       Okay.  He wrote in the document that I'm
  7      referring to:
  8                      "My probability assessment of OpenAI
  9               being relevant to DeepMind/Google without a
 10               dramatic change in execution and resources is 0
 11               percent, not 1 percent."
 12                      Do you recall seeing that document?
 13      A.       Yes.
 14      Q.       Mr. Musk made that statement nine months after
 15      he left the OpenAI nonprofit board; is that right?
 16      A.       I think the timing is right.
 17                      MR. WILSON:  Let me show you the
 18               document.
 19                      (Whereupon, OPENAI_MUSK00021096-097 was
 20               marked as Wazzan Exhibit 6, for identification,
 21               as of this date.)
 22      BY MR. WILSON:
 23      Q.       So it's an e-mail chain from December 26
 24      through December 31st of 2018.
 25                      Do you see that?
```

JANE ROSE REPORTING                   California Firm No. 254
1-800-825-3341                        janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 113

1        A.      Yes.

2        Q.      And I'm focusing on the e-mail that Mr. Musk

3    sent on December 26, where he says:

4                        "My probability assessment of OpenAI

5                being relevant to DeepMind/Google without a

6                dramatic change in execution and resources is

7                zero percent, not 1 percent.  I wish it were

8                otherwise."

9                        Do you see that?

10       A.      Yes.

11       Q.      This document isn't cited in your Appendix B,

12   is it?

13       A.      I don't know.

14       Q.      Okay.  I can represent to you that it isn't,

15   but you were aware of this document when you wrote your

16   report?

17       A.      I believe I saw this, yes.

18       Q.      And you took it into consideration when you

19   formed your opinions?

20                       MR. KRY:  And just the prior

21               representation, you're representing that

22               nothing in this e-mail chain at all was in the

23               appendix --

24                       MR. WILSON:  As far as I know.

25                       THE WITNESS:  But I think I saw this as

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 114

1              an exhibit to a deposition.
2                      MR. WILSON:  It's possible that it's an
3              exhibit to a deposition.
4                      THE WITNESS:  So it may not be listed.
5                      MR. WILSON:  I'll withdraw my
6              representation.
7      BY MR. WILSON:
8      Q.     Let me ask you this:  Looking at this now, does
9      this affect your analysis in any way?
10     A.     No.
11     Q.     Now Mr. Musk made the statement I just focused
12     you on nine months after he left the OpenAI nonprofit
13     board, correct?
14     A.     Yes.
15     Q.     And are you aware that at a point in time,
16     Mr. Musk stopped making his quarterly $5 million-dollar
17     distributions -- donations, rather to OpenAI nonprofit?
18     A.     Yes.
19     Q.     Do you know when that happened?
20     A.     Not exactly.
21     Q.     It was more than a year before the date of this
22     e-mail, wasn't it?
23     A.     I think so, yes.
24     Q.     Okay.  Would you agree with me that as of the
25     date of this e-mail, Mr. Musk was pessimistic about

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 115

1        OpenAI's future prospects?

2                    MR. KRY:  Objection.  Misstates the

3               document.

4        A.      It say what it says.

5        Q.      So you can't express a view one way or the

6        other as to whether Mr. Musk was optimistic or

7        pessimistic at this time about OpenAI's future

8        prospects; is that right?

9        A.      No, I can't.

10        Q.      Okay.  If you received this e-mail from an

11        executive at one of the companies that Wazzan & Co. was

12        invested in, would you be optimistic about this

13        investment?

14                    MR. KRY:  Objection.  Calls for

15               speculation.

16        A.      So I wouldn't be thrilled, but I would need to

17        know more -- what's the context?  Is he trying to get

18        more funding out of me, is he trying to get something --

19        what's going on?  It's very -- I'd say you have to be

20        very careful interpreting just a single document like

21        this without additional context.

22                    MR. WILSON:  Let's look at another

23               document.

24                    (Whereupon, 2024MUSK0005444-447 was

25               marked as Wazzan Exhibit 7, for identification,

Elon Musk v.                 FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 116

```
 1              as of this date.)
 2    BY MR. WILSON:
 3    Q.     So this is an e-mail chain from January and
 4    February of 2018 that includes Mr. Musk and others.  I
 5    want to just focus you, if I could, Dr. Wazzan, on
 6    Mr. Musk's e-mail.  The first one in the chain, from --
 7    not the first one.  The second one in the chain from
 8    January 31st.  It's on page 2.
 9              And I can represent to you that this is an
10    e-mail Mr. Musk sent to Greg Brockman, Ilya Sutskever,
11    Sam Altman and others on that date.
12              And he says in the first paragraph:
13                  "OpenAI is on a path of certain failure
14              relative to Google.  There obviously needs to
15              be immediate and dramatic action or everyone
16              except for Google will be consigned to
17              irrelevance."
18                  This is an e-mail Mr. Musk sent just
19              before he left OpenAI's board, right?
20    A.     Looks like it, yes.
21    Q.     Did you consider this document when you
22    conducted your analysis?
23    A.     I believe so, yes.
24    Q.     Did it impact your analysis?
25    A.     No.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 117

1    Q.    Why not?

2    A.    Because it doesn't matter.  This goes to

3    liability.  I've assumed liability and I'm doing a

4    disgorgement analysis.  So this is not -- this doesn't

5    matter.

6    Q.    You don't think it matters to your analysis

7    that Mr. Musk thought, in January 2018, after he had

8    stopped his quarterly donations, that OpenAI was on a

9    path of certain failure?

10   A.    It doesn't matter.

11   Q.    Okay.  So the value that Mr. Musk --

12              MR. KRY:  Misstates the document.

13   Q.    So the value that Mr. Musk contributed to

14   OpenAI nonprofit, in your opinion, does not change,

15   based on how successful OpenAI is, as a result of

16   Mr. Musk's contributions?

17   A.    Say that again?

18              MR. WILSON:  Read the question back,

19         please.

20         (Whereupon, the record was read by the

21   reporter.)

22   A.    Correct.  Does not change.

23   Q.    So in your opinion, even if the success came

24   much later for OpenAI, Mr. Musk should get credit for

25   it?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 118

1        A.      He should get his allocated percentage, yes.

2        Q.      And the allocated percentage you're referring

3    to is the hypothetical allocated percentage that you've

4    come up with in your analysis, correct?

5                MR. KRY:  Objection to form.

6        Q.      Well, what are you referring to?  What

7    allocated percentage?

8        A.      Yeah.  A 50 to 75 percent of the nonprofit.

9        Q.      Okay.  We're going to get to that, but I just

10   wanted to make sure I understood your testimony.

11               Did you analyze how the OpenAI nonprofit used

12   Mr. Musk's donations?

13       A.      No.

14       Q.      Did you examine the specific impact of

15   Mr. Musk's alleged non-monetary contributions?

16       A.      I'm not sure what you mean by specific impact.

17   I look at the various non-monetary contributions that he

18   made and I evaluate them.

19       Q.      Did you attempt to assign any value to any of

20   the non-monetary contributions Mr. Musk made?

21       A.      Not to any particular one specifically.

22       Q.      Okay.  Do you know what contributions Mr. Musk

23   made to OpenAI after March 2019?

24       A.      I don't believe there were any monetary

25   contributions.

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 119

1          Q.      Are you aware that he made contributions of

2      rent payments after March 2019?

3          A.      Yes.

4          Q.      Okay.  Approximately $6 million in rent

5      payments?

6          A.      Yes.  Sorry.

7          Q.      Do you -- did you conduct any analysis as to

8      the benefit that OpenAI received from those rent

9      payments?

10         A.      Not specifically.

11         Q.      Did you conduct any analysis that would suggest

12     that those rent payments were responsible for creating

13     billions of dollars in value after March 2019?

14         A.      All his contributions, monetary and

15     non-monetary, go into the valuation of what his economic

16     interest in the nonprofit should be.  If it turns out to

17     be valuable afterwards because there's a $500 billion

18     valuation, then that's fine.  If that 500 billion was

19     100 billion, he would have the same percentage of a

20     smaller amount.

21         Q.      Imagine that Mr. Musk donated $38 million to

22     OpenAI, and OpenAI spent all of it on a crypto security

23     that lost all of its value within six months.

24              Would you say, nevertheless, in that situation,

25     that Mr. Musk was responsible for creating billions of

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                     janerose@janerosereporting.com

Elon Musk v.                    FINAL               December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 120

1          dollars in value for OpenAI?

2          A.      Yes.

3          Q.      So it truly doesn't matter what the money is

4          used for, under your analysis?

5          A.      It does not.

6          Q.      And it doesn't matter whether what it's used

7          for turns out to be successful or not?

8          A.      No.  All the money was used to further OpenAI's

9          venture.

10         Q.      Okay.  Have you conducted any analysis of the

11         progression of OpenAI's IP over time?

12         A.      No.

13         Q.      Did you examine the extent to which any of

14         OpenAI's current technology can be traced to the

15         intellectual property that OpenAI had developed by any

16         particular point in time?

17         A.      No.

18         Q.      Would you have been qualified to offer opinions

19         on those questions?

20         A.      Potentially.

21         Q.      Okay.  When you say "potentially" do you mean

22         if it was strictly a valuation exercise?

23         A.      Well, not necessarily just valuation, because I

24         have evaluated IP separately in patent cases, for

25         example.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

1      Q.      Okay.  But from a technological perspective, of

2      comparing one IP at a particular point in time to

3      another IP at another point in time, are you qualified

4      to opine on the extent to which those particular forms

5      of technology are related?

6      A.      I could be, yes.

7      Q.      What sort of training do you have that would

8      qualify you to do that?

9      A.      Ph.D. in finance.  I've published a number of

10     papers in the IP space, 30 years of experience in patent

11     cases.

12     Q.      You ever studied AI models or algorithms?

13     A.      Not specifically.

14     Q.      Do you know whether OpenAI was working on

15     generative AI as of the date when Mr. Musk stopped

16     making his quarterly distributions?

17     A.      So let's be precise.  There's -- as I

18     understand it, there's two forms of AI.  There's general

19     artificial intelligence, GAI, and then artificial

20     intelligence, which sort of related to the large

21     language models.  Which one are you asking me about?

22     Q.      Your report talks about generative AI, so I'm

23     asking about generative AI for the moment.

24     A.      And what paragraph?

25     Q.      Sure.  Just bear with me a second, and I will

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

```
                                                    Page 122
 1          get that for you.  Paragraph 16.
 2          A.     Yes.
 3          Q.     Yes, OpenAI was working on generative AI, to
 4          your understanding, in mid 2017?
 5          A.     Yes.
 6          Q.     And that's based on what, Dr. Wazzan?
 7          A.     Generative AI is basically like ChatGPT.  So
 8          that's what they're working on.
 9                         MR. KRY:  You directed the witness to
10                 paragraph 16.  He should feel free to read
11                 paragraph 15, too, on this.
12                         MR. WILSON:  I should have said this at
13                 the outset, but if at any point you want to
14                 consult any part of your report, you should
15                 feel free to do that.
16          A.     Also, in paragraph 15, I say:
17                         "OpenAI's ChatGPT is an example of
18                 generative AI."
19          Q.     Right.  Do you know when OpenAI started working
20          on GPT?
21          A.     Not specifically.
22          Q.     So that's not something that you thought you
23          needed to analyze, for the purposes of rendering your
24          opinions in this case?
25          A.     No.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 123

1    Q.    Do you recall writing in your report that

2    OpenAI had a gaming emphasis in 2017?

3    A.    Yes, that rings a bell.

4    Q.    What does that mean, a gaming emphasis?

5    A.    Can you point me to the paragraph?

6    Q.    Sure.  It's paragraph 19.

7    A.    Yeah.  So I just say:

8              "In 2017, the gaming emphasis began to

9         garner results, as OpenAI started deploying

10        models able to defeat some of the world's top

11        players in 1-V-1 Dota 2 matches."

12   Q.    Is it your understanding that the models that

13   OpenAI was deploying to win Dota matches is the same

14   model that is now backing ChatGPT?

15   A.    No.

16   Q.    Your understanding is that it is not, correct?

17   A.    Correct.

18   Q.    But that's not something you took into account

19   in your analysis?

20   A.    It all builds on itself.

21   Q.    When you say "it all builds on itself," you're

22   saying AI builds on itself?

23   A.    I'm saying the various iterations and advances

24   that are occurring are sequential and build on

25   themselves.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 124

1        Q.      Okay.  That's your opinion?

2        A.      Yes.

3        Q.      Okay.  You conducted an allocation analysis in

4        this case?

5        A.      Yes.

6        Q.      You concluded that the majority of Mr. Musk's

7        economic interests in OpenAI nonprofit originates

8        between January 2023 and October 2025, correct?

9        A.      Yes.

10       Q.      And that's a period that began nearly five

11       years after Mr. Musk left the OpenAI board?

12       A.      Yes.

13       Q.      And it's more than five years after he stopped

14       his quarterly $5 million donations?

15       A.      Yes.

16       Q.      And more than two years after he stopped paying

17       OpenAI's rent, correct?

18       A.      Yes.

19       Q.      Is that conclusion that I just referenced about

20       your allocation analysis, does that seem plausible to

21       you?

22       A.      It's very plausible.  I'll give you an example.

23       I'm still holding an investment in GeneFluidics that was

24       made five, six years ago.  If they have a -- and we

25       haven't invested anything since; I haven't contributed

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 125

1          anything since.  If they have an IPO next week, I stand

2          to gain quite a bit.  So the concept you're alluding to

3          I don't think makes sense.

4          Q.      You stand to benefit why?

5          A.      Because I hold shares, right.

6          Q.      Mr. Musk doesn't hold shares in OpenAI

7          nonprofit, does he?

8          A.      He holds an economic interest in the nonprofit

9          based on his previous contributions.

10         Q.      That's not a legal interest, is it?

11                      MR. KRY:  Objection.

12         Q.      That's a hypothetical interest?

13         A.      So as to whether it's a legal interest, that's

14         not for me to say.  That's for the court to decide.

15         I've assumed liability.

16         Q.      But your assumption is that he has a

17         hypothetical economic interest, a stake of some kind in

18         OpenAI nonprofit?

19                      MR. KRY:  Objection.  Compound.  And

20                  also objection, misstates the prior testimony.

21         A.      So I want to be very precise.

22         Q.      Yeah, I'd like you to be precise.  I think this

23         is important.

24         A.      It's really just what I say in my assignment.

25         I've been asked to determine the amount by which the

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                        FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 126

```
 1        OpenAI defendants and Microsoft wrongly profited or were
 2        unjustly enriched by operating OpenAI as a commercial
 3        venture despite having received charitable contributions
 4        from Elon Musk on the understanding that OpenAI would
 5        remain a nonprofit dedicated to the public good.
 6             My analysis assumes that Mr. Musk has
 7        established defense liability on his claims and merely
 8        seeks to quantify the portion of defendants' profits or
 9        enrichment that may be -- that may fairly be attributed
10        to Mr. Musk's contributions.
11        Q.    Okay.  And you're quoting Mr. Musk's
12        contributions to this economic interest that you're
13        describing?
14        A.    It's -- so to determine the amount -- so to
15        determine the amount that may be fairly attributed to
16        Mr. Musk's contributions, I look at it as monetary and
17        nonmonetary contributions at the inception of OpenAI
18        nonprofit.
19        Q.    Mm-hmm.  You were talking earlier about Jeff
20        Bezos starting Amazon in his garage, right?
21        A.    Yes.
22        Q.    So imagine I was his neighbor and he starts
23        Amazon in his garage, and he says:
24                  "Brad, you've been a good neighbor.
25             I'm going to give you a number of shares and
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 127

```
 1                I'll always make sure that you have at least
 2                half as many shares as I do in Amazon," and
 3                then I never did another single thing for
 4                Amazon but I still had those shares today.
 5                They'd be worth quite a bit of money, wouldn't
 6                they?
 7       A.       Yes.
 8       Q.       Would you say in that situation that I
 9       contributed an equivalent amount of value to Amazon?
10       A.       I don't think you contributed anything.
11       Q.       Let's say that I paid for the shares when I got
12       them.  Let's say I gave Jeff Bezos $10,000 for the
13       shares, and he said, "I'm going to make sure you're
14       taken care of."  So I have a substantial block of Amazon
15       stock that's worth billions of dollars but I never
16       lifted a finger to work for the company.
17                Would you still say that I contributed to the
18       extent of my equity ownership?
19       A.       Did you contribute -- did you pay Jeff directly
20       or did you pay it into the company?
21       Q.       I paid into the company.
22       A.       Yes.
23       Q.       Okay.  I have another hypothetical for you.
24       Imagine there's a startup that receives three rounds of
25       venture capital financing:  There's a series A, series
```

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 128

1        B, and series C.

2        A.      Okay.

3        Q.      And then it completes an IPO at a price that's

4        substantially in excess of the post money valuation of

5        the series C?

6        A.      Okay.

7        Q.      Okay?  Imagine that the value of the series A

8        investor stake increase by five times between the series

9        C financing and the IPO.

10       A.      Okay.

11       Q.      Okay.  Would it be reasonable to assume that

12       the increase was solely attributable to the series A

13       investment?

14                    MR. KRY:  Objection to form.

15       A.      I'm not sure I follow, if the Bs and Cs would

16       also have benefitted.  Everybody would have benefitted

17       according to their economic interest.

18       Q.      I'm not asking who benefitted.  I'm asking who

19       should be responsible, who should be attributed

20       responsibility for having generated the value?

21       A.      Everybody gets attributed according to their

22       economic interest.

23       Q.      So you don't think it would be more reasonable

24       to assume that the increase in value between the series

25       C financing and the IPO was due largely to the later

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 129

1       investments?

2       A.      No.

3       Q.      Is that a principle that is supported by the

4       academic literature, as far as you know?

5       A.      Yeah, I think when there's an IPO, everybody

6       gets to cash out at their value.  You know --

7       Q.      I understand the need to cash out --

8       A.      The As don't suffer a discount because the

9       gains came later in the game.  In fact, it's the

10      opposite, right?  The early money typically benefits

11      more.

12      Q.      But in those situations, you're talking about

13      who gets to benefit based on the terms and whatever

14      investment they made?

15      A.      Well, there's the related concepts.  They got

16      in earlier when the valuations were lower.  They haven't

17      contributed anything since, and yet they could be the

18      majority beneficiaries.

19      Q.      They could be the majority beneficiaries, but

20      does that mean that they were the majority contributors

21      is really the distinction I'm asking you to focus on?

22      A.      They contributed -- they got paid for their

23      contributions.

24      Q.      I'm not asking whether they got paid for their

25      contributions.  I'm asking you did they contribute more

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 130

1        value at the time when they were putting in the money or
2        did they contribute more money later when multiple other
3        rounds had occurred?
4                    MR. KRY:  Objection to form.  And also
5                I think you misstated the witness's answer.
6        A.        They contributed at the time that they
7        contributed and they received shares in exchange.
8        Q.        Okay.  And those shares, you think, for all
9        time reflect a fixed contribution to the enterprise?
10       A.        To my knowledge, the shares are not discounted
11       because the IPO comes a year later or 10 years later
12       after multiple rounds have occurred.
13                    MR. WILSON:  Okay.  I'm at a natural
14                spot to take a break, so why don't we take a
15                short break.
16                    MR. KRY:  Do you want to break for
17                lunch?  Or do you want to break --
18                    MR. WILSON:  I'm fine with whatever the
19                witness prefers.
20                    THE WITNESS:  I'm good.
21                    MR. WILSON:  All right.  Let's just
22                keep going with another session and then we'll
23                see where we're at.
24                    THE VIDEOGRAPHER:  We're going off the
25                record at 12:18 p.m.  This marks the end

Elon Musk v.                  FINAL               December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 131

```
 1              Media 3.
 2                  (Whereupon, a short break was taken.)
 3                      THE VIDEOGRAPHER:  Please stand by.
 4              We're back on the record at 12:33 p.m.  This
 5              marks the beginning of Media 4.
 6      BY MR. WILSON:
 7      Q.      Dr. Wazzan, is it your understanding that Elon
 8      Musk was responsible for attracting any for-profit
 9      investments in OpenAI for-profit?
10      A.      I don't have an opinion on that.
11      Q.      So you're not able to identify any for-profit
12      investors that Mr. Musk convinced to invest?
13      A.      No.
14      Q.      You talk in your report about signalling
15      theory, correct?
16      A.      Yes.
17                      MR. KRY:  Before we go on, I've lost
18              the realtime feed.
19                      THE VIDEOGRAPHER:  Going off the record
20              at 12:34 p.m.
21                  (Whereupon, a short break was taken.)
22                      THE VIDEOGRAPHER:  Please stand by.
23              We're back on the record at 12:37 p.m.
24      BY MR. WILSON:
25      Q.      So, Dr. Wazzan, I was starting to ask you about
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 132

1    signalling theory.  You say in paragraph 77 of your

2    report that signalling theory provides a framework for

3    understanding why investor reputation matters in early

4    stage financing; is that right?

5    A.    Yes.

6    Q.    Mr. Musk wasn't an investor at OpenAI, was he?

7    A.    No, but it's the same concept.

8    Q.    Okay.  Do any of the articles you cite in your

9    report talk about signalling theory in the context of

10    donors?

11    A.    No.

12    Q.    Mr. Musk had left OpenAI's board before it

13    formed the for-profit, correct?

14    A.    Yes.

15    Q.    And that was announced in a public press

16    release?

17    A.    Yes.

18    Q.    So by the time that OpenAI received its first

19    for-profit investment, Mr. Musk was no longer publicly

20    connected to the company, correct?

21    A.    Yes.

22    Q.    Is it your opinion that Mr. Musk's past

23    involvement with OpenAI nonprofit nevertheless provided

24    a signalling advantage to OpenAI's potential for-profit

25    investors?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 133

1      A.      Yes.

2      Q.      And what do you base that opinion on?

3      A.      It's based on the sections that I've written

4      here from basically 75 through 85.

5      Q.      Do any of the articles you cite in those

6      paragraphs talk about signalling theory in the context

7      of individuals who had separated from the organization

8      in question?

9      A.      No.

10     Q.      Given your opinions in your report about the

11     strength of Mr. Musk's public reputation, do you think

12     that his public separation from OpenAI would have been

13     detrimental to OpenAI's ability to attract for-profit

14     investors?

15     A.      Well, I guess it's theoretically possible, but

16     it turns out that's not the case, right, because they

17     did obtain, in very short order, significant amounts of

18     investment into the for-profit.

19     Q.      And did you analyze whether Mr. Musk's public

20     separation from the company had detracted any potential

21     investors from investing?

22     A.      I didn't look at that, but it doesn't seem like

23     it did.

24     Q.      When you say it doesn't seem like it did, is

25     that simply because some people did invest?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 134

1    A.    Yes.

2    Q.    You don't know, sitting here today, whether

3    there are some people that would have invested that

4    decided not to?

5    A.    No, I can't point to anybody.

6    Q.    It stands to reason, doesn't it, that if

7    Mr. Musk's reputation is helpful when he's attached to

8    the organization, that some people would say Mr. Musk

9    separating was a bad sign for OpenAI?

10          MR. KRY:  Objection to form.

11   A.    I guess it's a matter of timing.  It's critical

12   at inception to create OpenAI nonprofit, attract in the

13   talent, attract in Altman, et cetera.  Some years go by,

14   they've raised quite a bit of money through donations,

15   including his own.  And it's sort of a -- you know,

16   they're a more fully formed operating entity by then.

17   Q.    It was the inception of the for-profit

18   enterprise in 2019, wasn't it?

19   A.    I'm -- that is the inception of the nonprofit.

20   Q.    I'm talking about the inception of the

21   for-profit.  That occurred in 2019, right?

22   A.    Yes.

23   Q.    So at the time when the for-profit was at its

24   inception, Mr. Musk had publicly separated from the

25   company, correct?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 135

1        A.      Yes.

2        Q.      Reid Hoffman was also a donor to the nonprofit,

3    wasn't he?

4        A.      That's my understanding.

5        Q.      Okay.  And he invested in the for-profit as

6    well, correct?

7        A.      I think I saw that, yes.

8        Q.      Okay.  Mr. Hoffman is a well-connected serial

9    entrepreneur, isn't he?

10       A.      Yes.

11       Q.      He represents a new generation of wealth and

12   power in Silicon Valley?  Would you agree with that?

13                       MR. KRY:  Objection to form.

14       A.      Yes.

15       Q.      In fact, you said those words, not me, right,

16   Dr. Wazzan?

17       A.      Yes.

18       Q.      What affected the participation of other donors

19   and investors such as Mr. Hoffman had in terms of a

20   signaling effect?

21       A.      I think they would be helping.

22       Q.      How helpful were they relative to Mr. Musk's

23   signaling contributions?

24       A.      I haven't done that analysis.

25       Q.      You weren't asked to do that analysis?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 136

1          A.       It's not necessary.

2          Q.       Why isn't it necessary?

3          A.       Because again, let's go back to the -- the

4          initial exercise is to determine the value of OpenAI for

5          profit, the whole pie, then to determine what percentage

6          is allocated to the nonprofit.  And we have that from

7          the Public Benefit Corporation documents.

8          Q.       Right.

9          A.       So the nonprofit is holding 30 percent of the

10         for-profit.  And then the question is how much of that

11         should be allocated to Musk, based on his contributions.

12         Q.       But Mr. Hoffman, for example, was also a donor,

13         right?

14         A.       Yes.

15         Q.       And he's very high public stature; would you

16         agree?

17         A.       Yes.

18         Q.       And my question is:  Did you attempt to

19         calculate the relative contribution of Mr. Hoffman's

20         public stature to OpenAI nonprofit in the early years?

21         A.       So implicitly, I've considered all these things

22         in my allocations of the 50 to 75 percent to Musk.

23         Specifically to Hoffman, he would reside in -- if he

24         brought a similar claim, he would reside in the 25 to 50

25         percent economic interest that's left over in the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 137

```
1        nonprofit.
2        Q.      Okay.  So you didn't think that you needed to
3        quantify in some way Mr. Hoffman's signaling
4        contribution relative to Mr. Musk; is that right?
5        A.      No.
6        Q.      And you didn't do that for any of OpenAI's
7        other donors?
8        A.      No.
9        Q.      Do you know who OpenAI's other donors were?
10       A.      No.  As I sit here, I remember seeing them in
11       the IRS tax filings.
12       Q.      Were any of them relatively high-profile
13       investors -- or donors, excuse me?
14       A.      I think some were, some weren't.
15       Q.      So let's talk for a few minutes about this
16       range that you've calculated, the 50 to 75 percent.
17       What portion of that 50 to 75 percent range do you
18       attribute to Mr. Musk's donations?
19       A.      All of it.
20       Q.      So none of it is attributed to his non-monetary
21       contributions?
22       A.      All of it is attributed to all of it.  I
23       haven't parsed it out.
24       Q.      So you haven't parsed it out?
25       A.      I have not.
```

Elon Musk v.                      FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 138

1      Q.      So you can't say, sitting here today, taking

2      the 50 percent end of the range, what component of that

3      50 percent is charitable contributions and what

4      component is non-monetary, is that right?

5      A.      Correct.

6      Q.      And you didn't think you needed to do that to

7      conduct your analysis?

8      A.      Correct.

9      Q.      And nobody asked you to do it?

10     A.      Nobody asked me to do that.

11     Q.      What other persons or entities do you believe

12     contributed to OpenAI nonprofit's value?

13     A.      Sorry.  In the abstract?

14     Q.      What do you mean, "in the abstract"?

15     A.      Well, I haven't looked at, like, for example,

16     Altman; I haven't tried to assess his economic interest

17     in the nonprofit.

18     Q.      Okay.

19     A.      But I would concede that he contributed some

20     value.

21     Q.      Okay.  Who else did?  So we have Mr. Musk

22     contributed some value to the nonprofit, Mr. Altman

23     contributed some value to the nonprofit.  Who else is on

24     that list?

25     A.      I'd say Brockman.  I'd say Sutskever.  Some of

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 139

```
 1      the other donors.

 2      Q.      Anyone else?

 3      A.      Not as I sit here.

 4      Q.      Any other specific employees that you think

 5      contributed to the value?

 6      A.      Not as I sit here.

 7      Q.      Do you know who Durk Kingma is?

 8      A.      No.

 9      Q.      Okay.  You say in your report that Mr. Musk was

10      instrumental in recruiting Durk Kingma to OpenAI

11      nonprofit.  So was that recruitment or alleged

12      recruitment factored into your calculus of 50 to 75

13      percent?

14      A.      Yeah.  Where is that?

15      Q.      I'm happy to find it for you.

16                      MR. KRY:  Paragraph 86.

17                      MR. WILSON:  Pardon me?

18                      MR. KRY:  Paragraph 86.

19                      MR. WILSON:  Let's see if Robert's got

20      it right.  I'm suspecting that he does.

21      Q.      Yes.

22              "He's a world-class research engineer,

23      Mr. Kingma."

24              That's what you wrote?

25      A.      Yes.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                  Page 140
 1        Q.      So do you think Mr. Kingma contributed to
 2     OpenAI's nonprofit's value?
 3        A.      Yes.
 4        Q.      So we have Mr. Musk, Mr. Altman, Mr. Brockman,
 5     Mr. Sutskever, Mr. Kingma.  Did Reid Hoffman contribute
 6     to its value?
 7        A.      Yes.
 8        Q.      How about Gabe Newell?
 9        A.      I mean, that name doesn't ring a bell.
10        Q.      How about Silicon Valley Community Foundation?
11     Did Silicon Valley Community Foundation contribute to
12     OpenAI nonprofit's value?
13        A.      I believe they were a donor.
14        Q.      So is the answer to my question yes?
15        A.      Yes.
16        Q.      How about Dustin Moskovitz and the Good
17     Ventures Foundation?  Is that a contributor to OpenAI
18     nonprofit's value?
19        A.      I believe so.
20        Q.      How about the First Close Limited Partners?  Do
21     they contribute to OpenAI nonprofit's value?
22                      MR. KRY:  And objection.  Do you mean
23                the same people or on account of the same
24                contributions/investments?
25                      MR. WILSON:  The contributions that
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 141

1          made up the First Close Limited Partner

2          investments.

3                   MR. KRY:  And also objection to the use

4          of the word "contributions" there.

5                   MR. WILSON:  Let me ask a new question.

6          I think Robert has sufficiently muddled the

7          record here.

8    Q.    I'm trying to figure out who contributed value

9    to the OpenAI nonprofit.  And my question is whether the

10   investors who put in capital as part of the First Close,

11   sometimes referred to the First Close Limited Partners,

12   when those individuals made those investments, did those

13   investments contribute to the value of OpenAI nonprofit?

14   A.    In an indirect way, yes.

15   Q.    What do you mean, in an indirect way?

16   A.    So if they contributed to the for-profit, that

17   generates value for the non -- for the for-profit, and

18   the nonprofit holds an economic interest in the

19   for-profit.  So yes.

20   Q.    Has Microsoft contributed to the value of the

21   OpenAI nonprofit?

22   A.    Yes.

23   Q.    What about SoftBank?

24   A.    Yes.

25   Q.    Thrive Capital?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 142

1       A.      Yes.

2       Q.      Okay.  The Golden Gate investors?

3       A.      Just from memory, I don't -- I don't recall

4       now, if they're --

5       Q.      Okay.  There's an entry on the cap table you

6       reviewed in connection with your supplemental report

7       that refers to the Golden Gate investors.

8               Do you recall that?

9       A.      Not as I sit here.

10      Q.      Would you agree that all of the investors that

11      are listed on that cap table for the PBC contributed in

12      some way to the value of the OpenAI nonprofit?

13      A.      Yes.

14      Q.      Now, I think I know your answer to this

15      question from Mr. Altman, but I'll ask it anyway.  What

16      percentage of the OpenAI nonprofit's value would you

17      attribute to Mr. Altman's contributions?

18      A.      I haven't parsed it out specifically for him.

19      Q.      Have you parsed it out for Mr. Brockman?

20      A.      No.

21      Q.      Is it likewise the case that you haven't parsed

22      out Mr. Sutskever's contributions to the OpenAI

23      nonprofit?

24      A.      Correct.

25      Q.      And is that true for Mr. Kingma?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 143

1      A.      Yes.

2      Q.      Mr. Hoffman?

3      A.      Yes.

4      Q.      Mr. Moskovitz?

5      A.      Yes.

6      Q.      Mr. Newell?

7      A.      Yes.

8      Q.      Okay.  You haven't parsed out the contributions

9      of the First Close Limited Partners?

10             MR. KRY:  Objection to form.

11     A.      Well, I think there's a distinction between

12     donors and then investors.  So the investors are

13     allocated their shares on the for-profit.  So -- so that

14     can be ascertained.

15     Q.      Okay.  We're talking right now about the value

16     of the OpenAI nonprofit, and who contributed what to

17     that value.  Now you've testified that the First Close

18     Limited Partners, Microsoft, SoftBank, et cetera,

19     contributed some value to the OpenAI nonprofit.  I'm

20     trying to figure out if you attempted to quantify that?

21     A.      Well, I don't think the First Close Limited

22     Partners would have a claim on the portion held by the

23     nonprofit.  They have their own stakes.

24     Q.      I'm not asking whether they have a claim.  I'm

25     asking whether they contributed value -- contributed to

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 144

1    the value of the OpenAI nonprofit.  Now you've testified
2    that they did.  Are you now saying that they didn't?
3    A.    Well, I said they contributed in an indirect
4    fashion.
5    Q.    I see.
6    A.    They've contributed to the for-profit and they
7    retained an equity stake or a percentage stake, and to
8    the extent that the for-profit increases in value, the
9    nonprofit's piece of the for-profit increases.
10   Q.    Have you excluded from -- so you said Mr. Musk
11   has 50 to 75 percent of the contribution credit,
12   correct?
13   A.    He holds 50 to 75 percent -- he holds an
14   economic interest equal to 50 to 75 percent of the
15   nonprofit's stake in the for-profit.
16   Q.    I understand that's your opinion.  But I'm
17   asking a different question.  Am I correct, when I read
18   your report, that you are opining that Mr. Musk is
19   responsible for creating 50 to 75 percent of the value
20   of the OpenAI nonprofit?
21   A.    No, I'm not saying that.
22   Q.    Okay.  Do you have an opinion on what
23   percentage of the value of the OpenAI nonprofit Mr. Musk
24   contributed to?
25   A.    You're -- you're asking me questions that are

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 145

```
1        not consistent with my analysis.  It's not his

2        contribution to the for-profit or how much that

3        translates into value.

4        Q.      I didn't -- just to be clear, I asked about the

5        nonprofit, not the for-profit.

6        A.      Even.

7        Q.      Okay.

8        A.      Because like I said, what I've done is I've

9        taken the value for the for-profit, the nonprofit has a

10       piece of that.

11       Q.      Mm-hmm.

12       A.      And Musk has a piece of that.  His

13       contributions don't map through to the for-profit, or

14       don't -- I mean, they can't artificially mathematically,

15       but that's not part of my damage -- it's not part of my

16       disgorgement analysis.

17       Q.      I want to make sure I understand this.  Bear

18       with me one second.

19              All right.  So in paragraph 8 of your report,

20       Dr. Wazzan, you say that one of the steps of your

21       analysis was determining the share of the nonprofit's

22       value that is attributable to Mr. Musk's contributions

23       as opposed to contributions from other parties?

24       A.      Yes.

25       Q.      Okay.  Is it your opinion that the share of the
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 146

```
 1        nonprofit's value that is attributable to Mr. Musk's

 2        contribution, as opposed to contributions from other

 3        parties, is 50 to 75 percent?

 4        A.      Exactly.

 5        Q.      Okay.

 6        A.      Which leaves 25 to 50 percent --

 7        Q.      25 to 50 percent --

 8        A.      For the other --

 9                (Reporter admonition.)

10        Q.      Sorry.  So I'm trying to figure out who else

11        gets credit under your model, who is in the 25 to 50

12        percent?

13        A.      It's everybody else that would have a claim to

14        an economic interest in the nonprofit.

15        Q.      I understand that's your terminology.  I'm not

16        sure that I accept it or fully understand it.  So let me

17        put it in terms that I do understand.  Under your

18        methodology, if we were to make a list of the people who

19        contributed to the value of OpenAI nonprofit, Mr. Musk

20        would be on the list, Mr. Altman would be on the list,

21        correct?

22        A.      Well, I wouldn't -- I don't think I'm in a

23        position to tell you who would be on the list.  It's a

24        matter of if they have a claim and if we assume that

25        their claim is -- you know, we assume liability, for
```

Elon Musk v.          FINAL          December 5, 2025
Samuel Altman    HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 147

1    example, then they could be on the list.  But I'm not
2    telling you who is on the list and who's not.
3    Q.    So you're comfortable opining that Mr. Musk is
4    responsible to 50 to 75 percent of the value creation
5    even though you don't know all of the people who
6    contributed to the value?
7    A.    I don't need to know all the other people.  I
8    agree, you know, it's in my report, that there's
9    Hoffman, there's Sutskever, there's Altman.  They all
10   have their piece; they're in the other -- they're in the
11   other piece of the pie.
12   Q.    So what's Mr. Altman's piece of the pie?
13   A.    I haven't parsed it out.
14   Q.    Now that we've got on the same page, I'm going
15   to ask the same questions again, just to make sure that
16   I understand.
17         And you don't know Mr. Brockman's piece of the
18   pie, correct?
19   A.    Correct.
20   Q.    You don't know Mr. Sutskever's piece of the
21   pie?
22   A.    Correct.
23   Q.    You don't know Mr. Hoffman's piece of the pie?
24   A.    Correct, I don't.  But we also -- you're
25   assuming that they have a claim, right, that's --

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 148

1    Q.    You don't know any other donors piece of the
2    pie, to use your words?
3    A.    No.
4    Q.    And you don't know any other employees' piece
5    of the pie?
6    A.    No.
7    Q.    Okay.  At paragraph 72 of your report, you
8    observe that before he left OpenAI, Mr. Musk was
9    responsible for approximately 60 percent of all
10   financial contributions; is that right?
11   A.    Yes.
12   Q.    But you acknowledge that when all of the
13   donations to OpenAI nonprofit are taken into account,
14   Mr. Musk was responsible for less than 30 percent of the
15   total donations, correct?
16   A.    Yes.
17   Q.    Okay.  And do you also acknowledge that
18   Mr. Musk's $38 million in donations represent less than
19   0.1 percent of all monetary contributions that OpenAI
20   has received to date?
21   A.    Yes.
22   Q.    Now you opine in your report that the
23   contributions that Mr. Musk made in the early years of
24   OpenAI were more -- much more important to OpenAI's
25   success than amounts contributed later once OpenAI was

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 149

1        established.

2                Do I have that right?

3        A.      Yes.

4        Q.      What do you mean by "established"?

5        A.      Well, founded, brought in Altman, brought in

6        Sutskever, brought in Brockman, started developing

7        technologies, emphasis on the gaming systems first,

8        morphing later in the ChatGPT.

9                You know, they started from an idea, and by the

10       time he left, they were operating.

11       Q.      Is there a particular point in time that you

12       would say OpenAI was established?

13       A.      Well, established, you know, sort of a

14       continuum, right.  They're established on day one when

15       they start -- when they get the game together and then

16       they're more established as time goes on.

17       Q.      Okay.  So it's a continuum?

18       A.      I would say so.

19       Q.      Okay.  Are you confident that OpenAI was

20       established -- fully established by the time Mr. Musk

21       left the board?

22                      MR. KRY:  Objection.  Compound.

23       A.      What's the definition of "fully established"?

24       Q.      What factors make a startup an established

25       startup?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

```
                                              Page 150
 1                    MR. KRY:  Objection.  Form.
 2        A.     I couldn't say.  It could be any number of
 3        things.  In this case, they were established enough to
 4        attract massive investments from Microsoft within a few
 5        months, so I would say that's --
 6        Q.     Within a few months of what?
 7        A.     Within a few months of creating a non --
 8        converting to a for-profit.
 9        Q.     The conversion to a for-profit happened more
10        than a year after Mr. Musk left, isn't that true?
11        A.     That's not a very long period of time.
12        Q.     How long was Mr. Musk at OpenAI, affiliated
13        with OpenAI?
14        A.     Several years.
15        Q.     A little more than two years, right?
16                    MR. KRY:  Objection.
17        A.     Yeah, that sounds right.
18        Q.     So just to be clear, one year is not a lot of
19        time, but two years is a lot of time?
20        A.       It's the inception --
21                    MR. KRY:  Note my objection to the
22        question.
23        A.     You start from nothing, you create OpenAI, you
24        get donors to bring in, you've recruited people, high
25        profile peoples, technical people, and you start
```

Elon Musk v.                          FINAL                  December 5, 2025
Samuel Altman              HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 151

1         building technology and patents and all kinds of other
2         stuff.  So they accomplished quite a lot in the first
3         two years, and then he leaves, and within a year,
4         they're bringing in massive amounts of investment.
5         Q.      Then Mr. Musk said in December 2018 that OpenAI
6         had a zero percent chance of success without a dramatic
7         change in execution and resources.  Was OpenAI
8         established by that point?
9         A.      Yeah, I would say so.
10        Q.      And that's true even though at the same time
11        Mr. Musk thought the company needed billions of dollars
12        immediately or forget it, in his words?
13        A.      Yes.
14        Q.      Okay.  So in your mind, a company is
15        established once it's hired employees?
16                      MR. KRY:  Objection.  Misstates the
17                testimony.
18        A.      It could be any --
19        Q.      Let me ask -- it's a fair objection.  I want to
20        make sure I understand your testimony.
21                What are the factors that you consider when
22        you're deciding whether a company or opining on whether
23        a company is established?
24        A.      Like I said, it's a continuum.  It's from
25        inception, maybe it's just the idea, through

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 152

1           incorporation, through hiring of people, through

2           developing technology.  It's a continuum.

3           Q.      So the factors that I heard you mention are

4           whether it's been incorporated, whether it's hired

5           people, and whether it's developed technology.  Are

6           those all factors that you would consider in deciding

7           whether a startup is established?

8           A.      Possibly.

9           Q.      Are there other factors that you would

10          consider?

11          A.      There could be.

12          Q.      Can you name any sitting here today?

13          A.      Having a workable product, making sales,

14          receiving donations or investments.  There's any number

15          of factors.  I haven't thought about it.

16          Q.      Does it matter how well capitalized the

17          organization is?

18          A.      Depends.

19          Q.      Could matter?

20          A.      It might and might not.

21          Q.      Have you relied on any specific studies in

22          analyzing whether or not OpenAI was established as of

23          the time when Mr. Musk departed the board?

24          A.      No.

25          Q.      Have you ever offered an opinion in another

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 153

1        case about whether a company was sufficiently

2        established at any particular point in time?

3        A.       Yes.

4        Q.       And which case was that?

5        A.       So in the ITC cases, for example, you have to

6        establish, if you're the plaintiff, whether they've done

7        enough to satisfy the economic prong of the domestic

8        industry requirement.  So in that case, you do go

9        through some steps to see have they done enough.  And

10       there's basic variables:  Do they have employees?  How

11       much have they spent on R&D?  How much have they spent

12       on facilities?  Do they have workable products?

13              These are things that economists look at.

14       Q.       The ITC is the International Trade Commission?

15       A.       Yes.  So I've done at least a couple of those,

16       but I -- I'd have to go back again through my vitae to

17       see if there are other instances where I've

18       determined -- you know, Femme Farm, had the defendant

19       done enough to commercialize the technology?  It's

20       analogous.

21       Q.       Is it important to your analysis that OpenAI

22       had been established by the time Mr. Musk departed?

23       A.       Well, again, establish is a continuum.  It's

24       important to realize that his contributions occur early

25       on in the process, so he's the early money in; he's the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                                     Page 154
 1          luminary who attracted the talent.  And by the time he
 2          left, they were in much better shape than, you know,
 3          before they started.
 4          Q.     So that's a yes, it's important to your
 5          analysis that OpenAI had been established by the time
 6          Musk separated from the organization?
 7                      MR. KRY:  Objection.  Misstates the
 8                 response.
 9          A.     It's a factor.
10          Q.     Now, you talk in your report about the fact
11          that Mr. Musk allegedly donated approximately $38
12          million to OpenAI nonprofit, right?
13          A.     Yes.
14          Q.     And that $38 million includes cash
15          contributions, it includes rent payments, and it
16          includes the three Teslas or four Teslas, correct?
17          A.     Yes.
18          Q.     Have you done an analysis of which -- how much
19          of that 38 million fell into each of the three buckets?
20          A.     Which buckets?
21          Q.     Cash, rent, Teslas?
22          A.     No.
23                      MR. KRY:  Also objection to the
24                 question.  Rent is also cash, as you're aware.
25          Q.     When I say "cash," what I mean is a donation of
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 155

1      money that's not identified or earmarked for a

2      particular expenditure?

3      A.      I have not, but cash is fungible.  You've got

4      to pay the rent.

5      Q.      Is it your understanding that Mr. Musk paid the

6      money to OpenAI for the rent?

7      A.      Paid it to OpenAI who then paid the rent, no, I

8      don't know.

9      Q.      Professor Strebulaev says that, in his rebuttal

10     report, that 0.7 percent of $38 million was related to

11     the value of the Teslas.

12             Does that sound accurate to you?

13     A.      Yes.

14     Q.      Was each dollar that Mr. Musk donated equal in

15     terms of its role in contributing to the increase in

16     OpenAI's value?

17             MR. KRY:  I'm sorry, objection.  0.03

18     percent of what?

19             THE WITNESS:  Of the 38 million, I

20     think he said.

21             MR. KRY:  Sorry.

22             MR. WILSON:  I think I said 0.7

23     percent.

24             MR. KRY:  That sounds right.

25     A.      But I was referring to the 38 million as the

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 156

1       denominator.  That's what I understood.

2       Q.      Okay.  So let me ask the question that was

3       pending again.

4               Was each dollar that Mr. Musk donated, in your

5       opinion, equal in terms of its contribution to OpenAI

6       nonprofit's value?

7       A.      In effect, yes.  But I haven't parsed it.

8       Q.      So does that mean, then, that using the top end

9       of your revised range for OpenAI's wrongful gains which

10      is around $109 billion, that it's your opinion that the

11      Teslas generated $776 million of value for OpenAI

12      nonprofit?

13      A.      That's not my opinion.

14      Q.      Okay.  Do you think the Teslas generated

15      substantial value for OpenAI nonprofit?

16      A.      I think his contributions, taken as a whole,

17      contributed to the success, and all his contributions,

18      monetary and non-monetary, including the Teslas, result

19      in a range of 50 to 75 percent of the nonprofit.

20      Q.      So if, for one reason or another, the Court

21      were to say that the Teslas don't count as a donation,

22      would you be able to modify your calculations

23      accordingly?

24      A.      Yeah, I think so.

25      Q.      How would you do that?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

---

                                                      Page 157

1      A.      I mean, I haven't thought about it, but I would

2      probably go back and maybe shave a percentage point off

3      or something.  It's doable.

4      Q.      On what basis would you shave a percentage

5      point?

6      A.      Reduction of the overall monetary

7      contributions.

8      Q.      I understand that.  But I'm saying:  Why one

9      percentage point as opposed to 10 or half?

10     A.      Yeah, so I don't know.  I haven't even thought

11     about it.

12     Q.      What would you consider if you were confronted

13     with that question?

14     A.      I'd have to think about it.

15     Q.      In paragraph 9 of your report, you say that you

16     were asked to consider that Mr. Musk's involvement with

17     OpenAI included not only financial contributions, but

18     also highly valuable nonmonetary benefits to OpenAI?

19     A.      Yes.

20     Q.      Did you conduct an analysis to satisfy yourself

21     that Mr. Musk's nonmonetary contributions were, in fact,

22     highly valuable to OpenAI?

23     A.      Yes.

24     Q.      What was the analysis?

25     A.      It's the analysis laid out in paragraphs 75

---

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 158

1      through 92.
2      Q.      Okay.  If I were to look at paragraph 75 to 92
3      of your report, would I see quantification of the value
4      of the nonmonetary contributions that Mr. Musk made to
5      OpenAI nonprofit?
6      A.      These are qualitative assessments.
7      Q.      So let's look at some of the examples that you
8      provide in paragraph 9.  The first example that you
9      provide is recruiting and attracting talent, right?
10     A.      Yes.
11     Q.      What talent did Mr. Musk recruit?
12     A.      So I think without Musk's involvement starting
13     on page -- paragraph 84.  I think really, without Musk,
14     there is no OpenAI.  So there would be no Sam Altman.
15     Later --
16     Q.      Let's take it one at a time.  What's your basis
17     for saying that there would be no OpenAI without
18     Mr. Musk?
19     A.      So I think there's the e-mail chain.  Can you
20     donate 30 million over the next five years?  Without the
21     30 million initial investment or initial contribution,
22     right, there is no OpenAI.  So without that, there's no
23     Altman.
24     Q.      And you're confident in saying that -- or
25     opining that there was no other alternative source of

Elon Musk v.                      FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 159

1          donations that was available to OpenAI?

2          A.      Yeah.

3          Q.      And what's your basis for saying that?

4          A.      Well, I think that was my understanding, based

5          on some of the materials I looked at.

6          Q.      Anything specific other than this document

7          you're referencing in paragraph 85?

8          A.      Not as I sit here.

9          Q.      Do you know if Mr. Musk, in fact, donated $30

10         million over the next five years, after October 2015?

11         A.      Might have to go back and look at when the

12         various moneys came in.  I mean it totals more than --

13         I'd have to go back and look.

14         Q.      I think you also said:  Without that, there's

15         no Altman.  Were you testifying that if it wasn't for

16         Mr. Musk, Mr. Altman wouldn't have joined OpenAI?

17         A.      Right.

18         Q.      What's your basis for that testimony?

19         A.      Because there would be no OpenAI in the first

20         place.

21         Q.      I see.  So it's the same conversation we just

22         had.

23                 MR. KRY:  Objection to form.

24         Q.      So then my first question is about specific

25         individuals.  So it sounds like one of the individuals

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

```
                                                    Page 160
   1        you think Mr. Musk convinced to join OpenAI was
   2        Mr. Altman; is that right?
   3        A.      That's one.  And then in paragraph 86, I say:
   4                        "Mr. Musk also supported OpenAI through
   5                recruiting."
   6                        And I cite to some documents:
   7                        "He helped recruit Mr. Sutskever away
   8                from Google.  Mr. Musk was also active in
   9                recruiting Mr. Diederik (Durk) Kingma, a world
  10                class research engineer."
  11        Q.      Let's focus on Mr. Sutskever for a second.
  12        A.      Yes.
  13        Q.      Did you attempt to quantify the value to OpenAI
  14        of Mr. Musk recruiting Mr. Sutskever?
  15        A.      Not specifically.
  16        Q.      Did you attempt to quantify the value to OpenAI
  17        nonprofit of the work that Mr. Sutskever did in the
  18        period leading up to March 2019?
  19        A.      Not specifically.
  20        Q.      Do you have an opinion on whether Mr. Musk's
  21        recruitment of Sutskever or Mr. Sutskever's work was
  22        more valuable to OpenAI?
  23        A.      No.
  24        Q.      You didn't look at that?
  25        A.      No.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 161

1      Q.      Did you think you needed to look at that?

2      A.      No.

3      Q.      Okay.  So you've identified a few people.

4      Anyone else you haven't mentioned that Mr. Musk

5      recruited, as far as you know?

6              All right.  Let's move on.  If it's in the your

7      report, it will be in the record.

8              Mr. Kry can you ask you about it later.

9      A.      Okay.

10     Q.      The second category was attracting additional

11     investors.  I'm returning now to paragraph 9.  I take

12     that reference to mean attracting additional donors, not

13     investors.  Do I have that right?

14     A.      Yes.

15     Q.      Which donors did Mr. Musk attract?

16             I can tell you, Dr. Wazzan, that I read your

17     report.  I don't see a reference to any specific

18     investors, so you may need to do this one from memory.

19     A.      Yeah, I don't see it in there either.  I can't

20     do it from memory.

21     Q.      So I take it you didn't attempt to quantify the

22     value of the monetary benefit of attracting additional

23     donors; correct?

24     A.      No, not specifically.

25     Q.      That's not something you were asked to do?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 162

```
 1         A.      Not specifically -- well, I'm taking the
 2     quantitative -- sorry, I'm taking the qualitative
 3     assessments as a whole.  I'm not parsing value to each
 4     individual one.
 5         Q.      I understand.
 6                 Third example is attracting business partners.
 7     And I'll help you out here a little bit.  You mention in
 8     your report, obtaining some early GPUs from Nvidia?
 9         A.      Yes.
10         Q.      And you also mentioned Mr. Musk's role in
11     getting Azure credits from Microsoft.
12         A.      Yes.
13         Q.      Were there any other business partners that
14     Mr. Musk attracted that factored into your opinions?
15         A.      I'd have to go back and look at the documents.
16         Q.      Okay.  And I take it once again, you didn't
17     parse out or quantify the specific benefit to OpenAI of
18     Mr. Musk's attracting those GPUs or those Azure credits.
19         A.      Correct.
20         Q.      Example 4 in your report, paragraph 9, is:
21                     "Teaching and contributing business
22                 building skills."
23                     What business skills are you referring
24                 to?
25         A.      Well, it's clear he had a lot of success with
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 163

1      early stage startups and making them a success, and I go

2      through sort of his history -- PayPal, SpaceX, Tesla,

3      SolarCity.

4      Q.      Was Mr. Musk the only OpenAI cofounder who had

5      experience with starting -- beginning startups?

6      A.      No.

7      Q.      Mr. Altman also had a substantial amount of

8      experience in that regard, would you agree?

9                      MR. KRY:  Objection to form.

10     A.      Yes, but it's clear that Mr. Musk's involvement

11     was important, right, because Altman asks him:

12                      "Will you be involved somehow in

13                 addition to just governance?  I think that will

14                 would be really helpful for getting work

15                 pointed in the right direction, getting the

16                 best people to be part of it."

17                      He went onto say:

18                      "Even if you can't really spend time on

19                 it, but be publicly supportive, that would

20                 still probably be really helpful for

21                 recruiting."

22                      So all these things are taking place.

23     Q.      What was the date of the document that you were

24     just reading from?

25     A.      It's paragraph 84 of my report.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

---

Page 164

1      Q.      That's an e-mail from June 2015; is that

2      correct?

3      A.      Yeah.

4      Q.      It was before OpenAI was even formed?

5      A.      These are the things that are going to matter

6      going down the road.

7      Q.      So accepting that they matter, to some degree,

8      you're not able to quantify how much they matter,

9      correct?

10     A.      I haven't tried to parse it out that way.

11     Q.      Do you know how many hours per week Mr. Musk

12     spent focused on OpenAI while he was affiliated with the

13     company?

14     A.      Not specifically, no.

15     Q.      It's not something you looked at?

16     A.      No.

17     Q.      Was it your understanding that Mr. Musk was

18     working at OpenAI full-time?

19     A.      No.

20     Q.      Was it your understanding that he was working

21     at OpenAI more than one day per week?

22              MR. KRY:   Objection to the time period.

23     A.      I don't have a specific --

24     Q.      Was there ever a point in time, as far as you

25     know, Dr. Wazzan, where Mr. Musk came to the office at

---

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 165

1          OpenAI at least once a week?

2          A.      I cannot say that.

3          Q.      Do you know how many hours per week

4     Mr. Brockman spent focused on OpenAI?

5          A.      No.

6          Q.      Do you know if this was his full-time job?

7          A.      I couldn't say.

8          Q.      How about Mr. Sutskever?  Was OpenAI his

9     full-time job in the period 2015 to 2019?

10         A.      I think it was, but I couldn't say.

11         Q.      Do you know how many hours per week

12    Mr. Sutskever worked on OpenAI matters?

13         A.      No.

14         Q.      How about Mr. Altman?  Do you know how much

15    time he devoted to OpenAI in the 2015 to 2019 time

16    period?

17         A.      No.

18         Q.      So if you don't know that, you nevertheless

19    felt that you were in a position to opine on their

20    relative contributions of those individuals to OpenAI?

21                       MR. KRY:  Objection to form.

22         A.      Yes.

23         Q.      And why is that?

24         A.      Based on what I've laid out in my report.

25         Q.      You were comfortable just coming up with one

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                              Page 166
  1        bottom line number and not any more granular analysis

  2        than that, correct?

  3                    MR. KRY:  Objection to form.

  4        A.      Well, that's why I gave a range, right.  So the

  5        bottom end of the range is sort of predicated on his

  6        monetary contributions, and then I've outlined a bunch

  7        of additional stuff that he does and I've cited to

  8        documents where parties in this litigation are saying

  9        it's really important, we need you, we need your

 10        training, we need your ability to recruit, et cetera,

 11        and so based on all that, I've provided a range above

 12        and beyond the 50 percent.

 13        Q.      But you're confident in opining that it's at

 14        least 50 percent?

 15        A.      Yes.

 16        Q.      Do you think the fact that you need to present

 17        such a broad range undermines the reliability of your

 18        analysis?

 19                    MR. KRY:  Objection.

 20        A.      I don't think so.  I'm trying to be fair based

 21        on the evidence I have.

 22        Q.      Did you attempt -- another one of the examples

 23        you give is that Mr. Musk went prestige within the tech

 24        community.

 25                    Do you remember that?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 167

1       A.      Yes.

2       Q.      You didn't attempt to quantify Mr. Musk's

3    contribution of prestige, did you?

4       A.      No.

5       Q.      When, in your opinion, did OpenAI stop

6    benefitting from Mr. Musk's prestige?

7       A.      Never.

8       Q.      Never?  So OpenAI is still benefitting from it

9    today?

10      A.      Yes.

11      Q.      Even though he's suing the company?

12      A.      Yes.

13      Q.      Explain how that works?

14      A.      His prestige allowed the thing to get off the

15   ground in the first place.  Attracted initial -- made

16   the initial contributions, attracted, you know, the key

17   personnel, was involved in recruiting, was involved in

18   getting business deals done.  All that stuff

19   contributed, at the time, and that's what moved the

20   nonprofit forward.

21      Q.      Are you aware that Mr. Musk has made negative

22   comments about OpenAI publicly?

23      A.      Yes.

24      Q.      Are you aware of the fact that he's made

25   negative comments about Mr. Altman publicly?

Elon Musk v.                FINAL               December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 168

1     A.     Yes.

2     Q.     Do you think that commentary publicly from a

3     high profile figure such as Mr. Musk helps or hurts

4     OpenAI's value?

5     A.     It's hard to say.  We'd have to go back and

6     look at specifically what he's saying.  I mean, it's

7     clear the market thinks it's highly valuable, right.

8     We've got a $500 billion figure.  So whatever comments

9     he's making don't seem to be having a very large impact.

10    Q.     Have you analyzed the impact of his negative

11    comments from a financial perspective?

12    A.     I have not.

13    Q.     Have you analyzed the financial impact of

14    Mr. Musk's public litigation against OpenAI?

15    A.     I have not.

16    Q.     It's possible that if you did analyze that, you

17    would find that it had a negative impact, isn't that

18    possible?

19           MR. KRY:  Objection.  Speculation.

20    A.     Yeah, it's possible, but in that case, right,

21    the pie would shrink, in which case his stake would be

22    less, so it's actually, if it is having a negative

23    effect, it's working in the defendant's favor.

24    Q.     But you didn't consider that negative effect in

25    calculating a 50 to 75 percent, did you?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 169

```
1        A.      No, but like I just said, it's working in your
2        favor.
3        Q.      Well, I'm not sure I agree about that.
4                You also mention the fact that Mr. Musk
5        attracted media attention to OpenAI?
6        A.      Yes.
7        Q.      And you cite a number of magazine articles that
8        he was featured in, guess starring on episodes of
9        television programs and movies.
10               Do you recall that?
11       A.      Yes.
12       Q.      Did you attempt to quantify the effect of those
13       various media appearances on OpenAI's value?
14       A.      No.
15       Q.      Have you seen the movie Machete Kills?
16       A.      No.
17       Q.      Have you seen the cameo that Mr. Musk had in
18       that case -- or in that movie?
19       A.      No.
20       Q.      I recommend it to you.  It's amusing.
21                       MR. WILSON:  Why don't we take a break
22               quickly for lunch now?  I'm getting towards the
23               end of this.
24                       MR. KRY:  When do you want to
25               reconvene?
```

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 170

```
 1                    MR. WILSON:  I'm happy to take as short
 2            of a lunch as possible.  I do need to eat
 3            something, but 15 minutes would be fine for me
 4            or 20.
 5                    THE VIDEOGRAPHER:  Go off the record?
 6                    MR. WILSON:  I'm happy to go longer.
 7            It's whatever -- it's up to these guys.
 8                    MR. KRY:  If we can do 30 just because
 9            I need to field one other thing.
10                    MR. WILSON:  Let's do 30 minutes.
11                    MR. KRY:  Great.
12                    THE VIDEOGRAPHER:  Going off the
13            record, 1:27 p.m.  This marks the end of
14            Media 4.
15                    (Whereupon, a luncheon recess was taken
16            from 1:27 p.m. to 2:08 p.m.)
17                    THE VIDEOGRAPHER:  Please stand by.
18            We're back on the record at 2:08 p.m.  This
19            marks the beginning of Media 5.
20    BY MR. WILSON:
21    Q.    Dr. Wazzan, just a couple of follow-ups on some
22    stuff we talked about before the lunch break.  We talked
23    earlier about how it's your opinion that Mr. Musk's
24    association with OpenAI helped OpenAI to attract and
25    recruit talent.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 171

1           Do you recall talking about that?

2      A.      Yes.

3      Q.      Did Mr. Musk continue, in your opinion, to play

4      a role in helping to attract talent after he separated

5      from OpenAI?

6      A.      Not specifically.

7      Q.      And did Mr. Musk, after he separated from

8      OpenAI, in your opinion, continue to help attract

9      business partners for the venture?

10     A.      I mean, it's hard to draw a bright line,

11     because the nonprofit is already established because of

12     Musk, and so his -- the fact that he started it and

13     recruited the early guys and contributed money has now

14     created the entity which, as it moves forward, can

15     attract business partners and can attract other talent

16     even though he's no longer there.

17           So it's sort of like, you know, the first --

18     it's like the first building block in a larger building.

19     It's still contributing.

20     Q.      I'm just trying to assess whether that's

21     because of anything Mr. Musk was doing in your opinion

22     or whether it's because there was an existing enterprise

23     already there?

24     A.      It's because he was fundamental to establishing

25     the enterprise that then continues to exist after he has

Elon Musk v.                          FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 172

1      left.

2      Q.      So in your opinion, it's just a perpetual

3      influence over the organization?

4      A.      Yes.

5      Q.      Okay.  We also talked about who contributed

6      value to the nonprofit, in your opinion.

7              Do you recall discussing that before the lunch

8      break?

9      A.      Yes.

10     Q.      Is it your opinion that only individuals or

11     entities that donated money to OpenAI nonprofit

12     contributed to its value?

13     A.      No.

14     Q.      Okay.  Who are the non-donors that, in your

15     opinion, contributed some value to OpenAI nonprofit?

16     A.      I guess, it depends again, how you want to

17     define "contributed."  So investors contribute and they

18     get an equity stake in the for-profit.  Employees

19     contribute with their hard work and they get paid.

20     Q.      So I want to talk about the employees because

21     that's one of the group that I had in mind when I asked

22     that question.

23              Focusing on employees who worked at OpenAI

24     between when it was founded in late 2015 and when

25     Mr. Musk -- excuse me, when the for-profit enterprise

Elon Musk v.                        FINAL                    December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 173

```
 1          was created in March 2019, did those employees, in your
 2          opinion, contribute to OpenAI nonprofit's value in that
 3          time period?
 4          A.      In some fashion, yes.
 5          Q.      And so under your methodology, should they be
 6          allocated some percentage of the contribution to the
 7          value of OpenAI nonprofit?
 8          A.      It depends if they are claimants.  If they're
 9          similarly situated to Musk and have claims, then maybe
10          they should be considered.
11          Q.      Who could potentially be similarly situated to
12          Musk, in your opinion?
13          A.      I couldn't say.
14          Q.      What characteristics would that person or those
15          persons need to have to be similarly situated?
16          A.      I couldn't say.
17          Q.      That's what I was trying to get at.  Because
18          Mr. Musk is, of course, a donor or was a donor to
19          OpenAI, so you're not saying that they had to have been
20          a donor to be a claimant under your methodology?
21          A.      I'm not identifying any additional claimants.
22          You're the one who's trying to ask me if these employees
23          or this person or that person.  I don't know; it's a
24          legal issue.
25                  In this particular case, I have been asked to
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 174

1          assume that liability is established and Musk has a
2          claim.  I don't know that for all these other people.
3          Q.      Isn't it possible that someone could contribute
4          to the value of OpenAI nonprofit without having a claim
5          to an economic interest in OpenAI nonprofit?
6          A.      Maybe.
7          Q.      You don't think employees would fit into that
8          category?
9          A.      I don't know.
10         Q.      So the researchers who were working every day
11         at OpenAI between December 2015 and March 2019, you
12         can't say definitively that they contributed to the
13         value of OpenAI nonprofit?
14         A.      They could contribute and not have a claim.
15         They contributed and got paid.
16         Q.      So the fact that they got paid means that they
17         don't get allocated a percentage of the contributions,
18         the relative contributions to nonprofit under your
19         model?
20         A.      Not in my model.  But if there's any discussion
21         of them being allocated economic interest in the
22         nonprofit, we should see that.  Or if they got economic
23         interests through Aestas, for example, right?
24                 I don't know.
25         Q.      Did Aestas exist prior to March 2019?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 175

1       A.      No.

2       Q.      Was there ever any discussion of Mr. Musk

3       getting an allocated interest in the nonprofit?

4       A.      No.

5       Q.      But yet, under your model, he is a claimant,

6       correct?

7       A.      Yes.

8       Q.      So how could it be a fact that there wasn't --

9       or if there was not for a particular employee a

10      discussion of getting an allocated interest -- how could

11      that disqualify them from being a claimant?

12      A.      Well, we at least have documents indicating

13      that he was -- there was a discussion allocating him an

14      economic interest in the for-profit.  I haven't seen any

15      similar documents for anybody else.

16      Q.      Okay.  Well, we'll come back to that.  But

17      setting aside whether there's documentation, I'm just

18      trying to understand, methodologically, whether it's

19      your testimony that an employee, even if you acknowledge

20      that they contributed value, should be disqualified for

21      being considered in the calculation of a percentage

22      contribution if they receive a salary and did not

23      receive an allocation?

24      A.      I don't have an opinion on that.  It's a legal

25      issue.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 176

1      Q.      Do you think that the decision by the nonprofit
2      board to create a for-profit affiliate created value for
3      the nonprofit?
4      A.      Yes.
5      Q.      Okay.  And did you attempt to quantify the
6      value that that decision created for the nonprofit?
7      A.      Yes.
8      Q.      How did you quantify it?
9      A.      Through the various methods:  The discounted
10     cash flow, Black-Scholes method, reference to the
11     publicly traded -- or publicly referenced information,
12     plus the final step was the formation of the public
13     benefit corporation.
14     Q.      Those sound like ways of calculating whether
15     there was value created for the for-profit.  I'm trying
16     to ask whether there was value created for the
17     not-for-profit.
18     A.      There was value created for the not-for-profit
19     in the sense of their stake in the for-profit.
20     Q.      I see.  So you would characterize the board's
21     contribution, the non-for-profit board's contribution to
22     the nonprofit's value as an indirect contribution?
23     A.      I think we're talking at cross-purposes again.
24     Q.      Okay.
25     A.      The board, under your question, green lights

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 177

1          the formation of a for-profit entity.  That for-profit
2          entity is worth $500 billion.  The nonprofit owns a
3          piece of that.
4          Q.      Imagine the non-for-profit -- not-for-profit
5          was a for-profit enterprise and that there were
6          investors and Mr. Musk was one of the investors.
7                  So in early 2019, this entity exists.  And it
8          has the IP that it has, the assets that it has.
9                  And for whatever reason, the current board and
10         management don't think that they're able to maximize the
11         value of those assets.  So the board goes out and finds
12         a partner, and there's a transaction where the original
13         company is acquired by a much larger company.  And the
14         investors, the original investors in the original OpenAI
15         get stock in the new corporation.  Are you with me so
16         far?
17         A.      Mm-hmm.
18         Q.      And then the new corporation explodes in value,
19         increases by thousands of times.  Much like what
20         happened with OpenAI for a profit after the 2019
21         transaction.  Is that fair?
22         A.      Yes.
23         Q.      Okay.  Do you think that the decision of the
24         original company board to cease to be a standalone
25         company in this hypothetical, and partner with the

Elon Musk v.                          FINAL                    December 5, 2025
Samuel Altman              HIGHLY CONFIDENTIAL           Paul Wazzan, Ph.D.

Page 178

```
 1          larger company contributed value to the original
 2          investors in the original company I described?
 3          A.      In your scenario, yes.
 4          Q.      And so does it follow from that that the
 5          decision by the OpenAI nonprofit board to partner with
 6          the for-profit affiliate created value for the OpenAI
 7          nonprofit?
 8          A.      Yes, it did create value.
 9          Q.      For the nonprofit?
10          A.      Yeah.  They hold a stake in the for-profit.
11          Q.      The value of their original investment
12          increases by virtue of the board's decision.  Would you
13          agree with that?
14          A.      Yes.
15          Q.      Okay.  I guess what I'm trying to ask is when
16          you were calculating and concluding that Mr. Musk
17          contributed 50 to 75 percent of the value to the
18          nonprofit, did you include in that 25 to 50 percent
19          leftover value the contribution by the nonprofit board?
20          A.      I didn't explicitly set out to do that.  What I
21          set out to do was to determine what is the disgorgement
22          figure.  And that's what I did, right?  So the
23          creation -- Musk challenges the creation of the
24          for-profit.
25          Q.      Mm-hmm.
```

Elon Musk v.                         FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 179

1       A.      But they do it anyways.  It creates

2       $500 billion.  They now have to disgorge some portion of

3       that.  How much of that flows back to Musk?

4       Q.      Right.  And you're saying it should be 50 to 75

5       percent of the value of the not-for-profit?

6       A.      That's right.  And it does leave 25 to 50

7       percent for whoever else may have a claim.  And I don't

8       have an opinion on who those people may be.

9       Q.      You keep using the phrase "may have a claim."

10      And I'm very sorry to do this, but I do not understand

11      what you mean by that.

12              Do you mean an economic interest?  Do you mean

13      something else?  What do you mean?

14      A.      I think it's a legal claim, right?  So here

15      I've assumed liability.  So Musk has a claim, a legal

16      claim.

17      Q.      I'm happy to assume with you that he has -- for

18      purpose of this discussion, that he has a legal claim,

19      and that there is liability.  I understand that's a

20      fundamental premise of your report, and you're not here,

21      as you said before, to argue the facts and the law.

22              So we'll assume Mr. Musk has liability.

23              I do think, though, that your assignment,

24      according to you, was figuring out what percentage of

25      the value of OpenAI nonprofit is attributable to

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 180

1          Mr. Musk's contributions.  That was your assignment.

2          A.      Yes.

3          Q.      Okay.  And you're saying it's 50 to 75 percent?

4          A.      Yes.

5          Q.      So some other group of people, by definition,

6          in your mind, are responsible for 25 to 50 percent of

7          the valuation creation?

8          A.      Yes.

9          Q.      You keep describing the people in that category

10         as claimants.  And I'm trying to understand what you

11         mean by that.

12         A.      Well, it's a nonprofit, right, so nobody has

13         a -- they don't have an equity stake.  So they would

14         have to -- we'd have to figure out if they are

15         claimants, legally, what would the -- what would their

16         allocation -- what would their allocation be.

17         Q.      What if there were no other claimants, does

18         Mr. Musk then get 100 percent?

19         A.      No.  I think it would just reside with the

20         nonprofit.

21         Q.      So the question that I keep trying to ask, and

22         I'm going to try it one more time -- and if it's just

23         not something that you can understand, then we'll move

24         on -- is, setting aside whether the other people who

25         contributed to the value creation of the not-for-profit

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 181

1     are claimants or not, can you identify who the other

2     people are who contributed to the value of the

3     nonprofit?

4     A.      Not specifically, no.

5     Q.      So you can't rule out the possibility, for

6     example, that the directors who approved the partnership

7     with the for-profit affiliate, you can't rule out the

8     possibility that decision contributed to the nonprofit's

9     value?

10    A.      I would not rule that out.

11    Q.      Okay.  And I just -- one other -- this is going

12    back a couple of sessions but I was going over my notes

13    and I had meant to ask this earlier.  Other than the

14    nonprofit, which is -- well, it was OpenAI, Inc., and

15    now it's the foundation -- you're not presenting any

16    analysis of unjust enrichment by any other OpenAI

17    defendant; is that correct?

18              MR. KRY:  Objection.

19    A.      I'm sorry, could you read it one more time?

20    Q.      Sure.  Other than the nonprofit, you are not

21    presenting an analysis of unjust enrichment for any

22    other OpenAI defendant?

23              MR. KRY:  Are you including the OpenAI

24         for-profit in that question?

25              MR. WILSON:  I'm asking him a question.

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 182

1        A.      Yeah, I don't follow.

2        Q.      Okay.  Well, I asked you earlier, we were

3     talking about the mid point of your analysis, and

4     $87 billion being the mid point of your wrongful gain

5     analysis.

6                    And I said:  "What portion of that

7                 wrongful gain is a wrongful gain by the

8                 nonprofit?"

9                    And you said:  "All of it."

10                   Do you remember that?

11       A.      Yes.

12       Q.      Okay.  So my question is:  Is there any

13    analysis anywhere, in either of your reports, that would

14    allow me to see the extent to which defendants -- OpenAI

15    defendants other than the nonprofit wrongfully profited

16    by the alleged misconduct in this litigation?

17       A.      I'm sorry.  I just don't follow the question.

18       Q.      Well we talked earlier.  You haven't analyzed,

19    for example, how much Mr. Altman wrongfully profited by

20    the conduct that's alleged in the lawsuit, right?

21       A.      Not specifically.

22       Q.      And you haven't undertaken that kind of

23    analysis for Mr. Brockman, have you?

24       A.      No.

25       Q.      And you haven't undertaken that kind of

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                      Page 183
 1          analysis for the employee vehicle, Aestas, correct?
 2          A.      Correct.
 3          Q.      Is there any other OpenAI defendant that you're
 4          aware of, sitting here today, for which you have
 5          undertaken an analysis of wrongful profits?
 6                      MR. KRY:  Same objection I made before.
 7          A.      Not specifically.
 8          Q.      Can you direct yourself to paragraph 71 of your
 9          report, please?
10                  And here you say that you found -- in
11          conducting your analysis, you found it particularly
12          relevant the equity stakes that the parties themselves
13          proposed during restructuring discussions in 2017?
14                  Do you see that?
15          A.      Yes.
16          Q.      And you say that those discussions and proposed
17          equity stakes can be:
18                      "Taken as a reflection of the parties'
19                      own assessments and their relative
20                      contributions."
21                      Do you see that?
22          A.      Yes.
23          Q.      Now, the discussions that you're referring to
24          did not result in an agreement, correct?
25          A.      Correct.
```

Elon Musk v.                  FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

```
                                                    Page 184
 1        Q.      In fact, the discussions broke down because the
 2    parties could not agree on equity share and board
 3    control; is that right?
 4        A.      My understanding is that --
 5                    MR. KRY:  Objection --
 6        Q.      I'll withdraw the question.
 7                Is one of the reasons those discussion broke
 8    down, that the parties could not agree on control of the
 9    board?
10        A.      Yes.
11        Q.      Is another one of the reasons that those
12    discussion broke down, that the parties could not agree
13    on equity share?
14        A.      I don't recall that.  As I recall, the
15    defendants in this case actually proposed the equity
16    percentages to Musk and he seemed okay with it.  But it
17    broke down on the control of the board.
18        Q.      Take a look at paragraph 20 of your report.
19    Third sentence.  Let me know when you're there.
20        A.      Okay.
21        Q.      (Reading.)
22                    "By fall 2017, discussions broke down
23                as the parties could not agree on equity share
24                and control of the board of directors of the
25                proposed for-profit entity?"
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 185

1                      Do you see that?

2          A.      Yes.

3          Q.      And that's your report?

4          A.      Yes.

5          Q.      So does that refresh your recollection as to

6     whether one of the reasons why the discussions broke

7     down was that the parties could not agree on equity

8     share?

9          A.      No.  I think ultimately the defendant parties

10    did agree to a cap table that gave him 50 percent.

11         Q.      Is it possible in an -- well, let me ask you

12    this:  Why did you write what you wrote here, if that's

13    your understanding?

14         A.      Well, because I think it's fluid.  There's

15    discussion going back and forth, and I think ultimately

16    by the end they did agree.  I mean, there's no

17    agreement.  They don't actually agree in the end.  But I

18    think the defendants here did propose a division of

19    equity that left him, Musk, with 50 percent.  But then

20    they seemed to have not been able to agree on control of

21    the board.

22         Q.      Mm-hmm.

23                 Is it your understanding that when parties are

24    negotiating an agreement with multiple deal points, that

25    there's no agreement until all deal points have been

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 186

1         resolved?

2                     MR. KRY:  Objection to form.

3         A.      Yeah, but it's still illustrative, and it's

4         still helpful.  It's the data point that we have here,

5         where one side says:  "Here.  We agreed to this equity

6         division."  And then they couldn't agree on the board

7         control.

8         Q.      Mm-hmm.  So if you and I are in a negotiation,

9         and there are two terms -- and let's say you're selling

10        your house.  And I say:

11                     "I'll pay 100,000 for your house if you

12              also give me your Jaguar?"

13                     And you say:

14                     "Well, $100,000 sounds pretty good, but

15              I'm not giving you the Jaguar"?

16        A.      You can't have my Jaguar.

17        Q.      I'm not sure if you're a Jaguar guy or not.

18        A.      I have an FTR.

19        Q.      Did I really guess it correctly?  That's pretty

20        wild.

21        A.      I have a 2005 convertible.

22        Q.      Well, I think I'm ready to go home now.

23                     All right.  So the Jaguar, and you say, "Look,

24        100,000, that's fair, but you're not having the Jaguar."

25                     Do you think we're agreed $100,000 is a fair

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 187

 1        price for the house?

 2                      MR. KRY:  Objection.

 3        A.      Yeah, no.  But it doesn't matter, I'm not

 4        sticking to this like with that level of precision.

 5                The point is that they're talking about equity

 6        stakes that reflect their thinking at the time on how

 7        they would divide this thing up.

 8        Q.      What were they talking about equity stakes of?

 9        A.      The for-profit.

10        Q.      A new entity, correct?

11        A.      Yes.

12        Q.      What evidence have you seen that suggests that

13        that discussion was premised on the idea of our relative

14        contributions or the founders' relative contributions to

15        the not-for-profit?

16        A.      Well, I mean, there's -- there's the documents

17        that I'm citing to here.  So I say Mr. Musk insisted he

18        should have no less than a 50-percent equity stake at

19        the outset subject to later dilution and half of the

20        seats on the board in part because he contributed

21        two-thirds of OpenAI's funding, and that was true at the

22        time.  And Brockman and Sutskever claimed they're

23        uncomfortable with this condition and stated inasmuch in

24        the e-mail to Mr. Musk.  But that e-mail back to them

25        says they seem to be okay with the equity split, but

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 188

1        they weren't okay with the division of the board seats.

2        Q.      Are you aware of any document where

3        Mr. Brockman or Mr. Sutskever or anyone else said that

4        they were okay with the 50-percent equity stake to

5        Mr. Musk because he contributed two-thirds of OpenAI's

6        donated funds?

7        A.      I don't think it specifically says that.

8        Q.      You say -- you just read the sentence that

9        follows the one that I read and you say here that

10       Mr. Musk was insisting on no less than a 50-percent

11       equity stake, and then you say -- I'm going to skip a

12       few words -- in part because he contributed two-thirds

13       of OpenAI's funding.

14               Do you see that?

15       A.      Yes.

16       Q.      What were the other reasons that you recall

17       Mr. Musk giving when he was advocating for a larger than

18       50-percent equity stake in the new for-profit venture?

19       A.      We'd have to pull up the document.

20       Q.      Okay.  Well, maybe we'll do that.

21               Have you ever, in conducting an economic

22       analysis, relied on terms that are proposed but never

23       agreed on as economic evidence?

24       A.      Yes.

25       Q.      What case did you do that in?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 189

1     A.      I have to go back.  At least some of the patent

2     cases under a Georgia-Pacific analysis where you're

3     trying to determine what a reasonable royalty should be,

4     there can be negotiations between parties that don't

5     ultimately result in a license, but the terms that are

6     reflected in those negotiations, even though they're not

7     signed, are still indicative as to what the parties are

8     thinking.  So they may not agree ultimately, but it's

9     absolutely a data point that's meaningful.

10    Q.      Do you recall giving an opinion in a case

11    called Keto5 v. Bariatrix Nutrition?

12    A.      Yes.

13    Q.      Do you remember criticizing the other side's

14    expert in that case for relying on a price quote in

15    their model?

16    A.      Not specifically.

17              MR. WILSON:  Well, let's see if I can

18              refresh your recollection.

19              (Whereupon, Exhibit 1 Redacted Version

20              of Document Proposed to be Filed Under Sealed,

21              Case # 2:23-cv-07936-JLS-AS was marked as

22              Wazzan Exhibit 8, for identification, as of

23              this date.)

24              THE VIDEOGRAPHER:  And Nate Cullerton

25              has joined the Zoom.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                   Page 190
     1                     MR. KRY:  Thank you.

     2                     MR. WILSON:  I object.

     3          BY MR. WILSON:

     4          Q.     So, Dr. Wazzan, this is a report of yours from

     5          a case that was pending or may still be pending, I don't

     6          know, in the Central District of California called

     7          Keto5.

     8                 Do you recall giving this report, providing

     9          this report?

    10          A.     Yes.

    11          Q.     It's dated October 18, 2024?

    12          A.     Yes.

    13          Q.     Do you remember this case?

    14          A.     Sort of.

    15          Q.     Do you remember the analysis that you were

    16          responding to, the expert analysis?

    17          A.     No.

    18          Q.     Take a look at paragraph 11 in this report.

    19          This is the summary of opinions.  You say:

    20          "Mr. Fuller" -- Mr. Fuller is the other side's expert in

    21          this case?

    22          A.     Yes.

    23          Q.     "Mr. Fuller's estimation of lost profits

    24          critically depends on an estimation of costs that is

    25          deficient and incomplete.  He essentially relies on a
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 191

1         price quote from a third party that never resulted in an
2         executed agreement to produce the Bariatrix formulation
3         of XOGenius for Keto5."
4              Do you see that?
5         A.    Yes.
6         Q.    Does that refresh your recollection that in
7         this case you criticized the other side's expert for
8         relying on a price quote for their evidentiary -- for
9         their financial model?
10        A.    Sort of.  I mean it's one piece.  I also say:
11                  "Moreover that estimate of costs
12                  ignores other costs, such as staff, R&D,
13                  storage costs that Keto5 would have incurred."
14                  So the whole thing was an incomplete
15                  analysis that he had proposed.  It's not just
16                  the fact that he relies on a price quote and --
17        Q.    I understand that, but that was a factor that
18        you considered relevant to the opinion you offered to
19        this particular court, correct?
20        A.    Yeah, but these are -- so we'd have to go back
21        and look at the documents in this particular case.
22        These are all case specific.  I don't remember the
23        context of that price quote.  Was it meaningful?  Was it
24        for the right volume?  I just don't recall.
25        Q.    You told the court in this case that because

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 192

1          the price quote that Mr. Fuller was using was never

2          formalized in an executed agreement, relying on it for

3          his expert analysis was speculative and not grounded in

4          the facts; isn't that right?

5          A.      Where do I say that?

6          Q.      You say it in paragraph 37.  You list several

7          problems with Mr. Fuller's reliance on the LaCore quote

8          as a source of manufacturing costs, right?

9          A.      Yes.

10         Q.      And the first one that you list is that the

11         manufacturing price quote is speculative and not

12         grounded in actual costs incurred by Keto5?

13                 Do you see that?

14         A.      Yes.

15         Q.      And the reason that you give for saying that

16         the price quote is speculative and not grounded in

17         actual costs is that the costs quoted by LaCore were

18         never formalized in an executive agreement.

19                 Do you see that?

20         A.      Yes.

21         Q.      Why isn't that same reasoning applicable here,

22         sir?

23                       MR. KRY:  Objection to form.

24         A.      It's not the same thing at all.  And I'm

25         pointing out there's several problems with Mr. Fuller's

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 193

 1          reliance on the LaCore quote.  So one is what you just
 2          said.  Second is the manufacturing price quote is
 3          incomplete.  It includes packing and micro testing costs
 4          only, right.  So Mr. Fuller does not account for any
 5          other costs, such as shipping costs, marketing costs,
 6          other soft costs.
 7                  So you can't just take that quote as-is because
 8          you need additional context.  There's way more costs
 9          that had to go into that, and he ignores that.
10          Q.      Mm-hmm.  So there were other terms in the price
11          quote that were not complete, is that what you're
12          saying?
13          A.      It's a price quote, but it's a meaningless
14          price quote because it's not complete.
15          Q.      So did you say in this report that the fact
16          that the agreement was unsigned is only significant
17          because the price quote is incomplete?
18          A.      I don't think so.
19          Q.      You didn't say that, did you?  You say it was
20          speculative and not grounded and the reason that you
21          said that was it wasn't formalized in an executed
22          agreement; isn't that right?
23          A.      Where do I say that?
24          Q.      Paragraph 37.
25          A.      It says:

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 194

```
 1                     "There are several problems with
 2              Mr. Fuller's reliance on the LaCore quote as
 3              the source of manufacturing costs.  First, the
 4              manufacturing price quote is speculative and
 5              not grounded," and then I go onto second,
 6              third, and maybe some others.
 7      Q.      Were the proposals that you relied on in your
 8      report in this case, did they contain all of the terms
 9      of the investment in the new for-profit enterprise?
10      A.      Couldn't say, but the primary focus seemed to
11      be on the equity division as well as the board seats.
12      Q.      I see.  So unexecuted agreements can be
13      reliable sometimes and unreliable other times; is that
14      your testimony?
15                     MR. KRY:  Objection.  Misstates the
16              testimony.
17      A.      It's not what I said, and it depends on the
18      context and how they're used.
19      Q.      So sometimes they're reliable and sometimes
20      they're not?
21      A.      It depend on the context.
22      Q.      So you're saying yes to my question?
23      A.      I'm saying it depends on the context.
24      Q.      My question is whether you agree that
25      unexecuted agreements can be reliable sometimes and not
```

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 195

1        other times?

2        A.      I think it depends on the context.

3        Q.      So you can't answer that question "yes" or

4        "no"?

5        A.      No.

6        Q.      Okay.  Turn to paragraph 94 of your report in

7        this case.  So in this paragraph, you are citing -- and

8        you should check me, but I'm referring to footnote

9        193 -- you're citing to Exhibit 16 from Mr. Sutskever's

10       deposition.

11               Do you see that?

12               You're actually quoting that exhibit?

13       A.      In part, yes.

14       Q.      So you write here that Mr. Musk's substantial

15       monetary contributions to OpenAI were part of his

16       rationale for owning the majority of the for-profit

17       company that he and Messrs. Brockman and Sutskever

18       discussed but did not create in late 2017.

19               Do you see that?

20       A.      Yes.

21       Q.      Did you review that entire exhibit?

22       A.      I believe so.

23       Q.      Let's see.

24               (Whereupon,

25               SUTSKEVER_MUSKSUB_00000430-432 was marked as

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                              Page 196
  1                  Wazzan Exhibit 9, for identification, as of
  2                  this date.)
  3      BY MR. WILSON:
  4      Q.     So, Dr. Wazzan, the document in front of that
  5      you've just received is Exhibit 9 to your deposition
  6      that was previously Exhibit 16 to the Sutskever
  7      deposition.
  8             Do you see this document?
  9      A.     Yes.
 10      Q.     Do you know what this is?  Let me see if I can
 11      refresh your recollection.  Look at footnote 193 to your
 12      report.  You characterize this document as Ilya
 13      Sutskever notes on restructuring meetings.
 14             Do you see that?
 15      A.     Yes.
 16      Q.     So does that refresh your recollection that at
 17      least in part, this document contains Mr. Sutskever's
 18      notes of a meeting that he had with Mr. Musk --
 19      A.     Yes.
 20      Q.     -- during the restructuring discussions?
 21      A.     Yes, thank you.
 22      Q.     You're welcome.  On the first page of the
 23      document, there's a highlighted "From Ilya."
 24             Do you see that?
 25      A.     Yes.
```

Elon Musk v.                FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 197

```
 1        Q.      And the portion that you rely on from the next
 2        page, which is Bates 4 -- I guess it's 432.
 3                        MR. WILSON:  Where is the quote?  I've
 4                lost it now.
 5                        MR. KRY:  It's the paragraph after the
 6                highlighted one.
 7                        MR. WILSON:  Ah, yes.  Thank you.
 8        Q.      On the top of the page, the third page, which
 9        is 432, you quote the line that says -- and this
10        attributed to Mr. Musk:
11                        "I put the majority of the funds.  I
12                should have the majority of the equity."
13                        Do you see that?
14                        Top of the page 432.  There's a
15                paragraph that begins:
16                        "We then had a meeting with Elon."
17        A.      Yes.
18        Q.      (Reading.)
19                        "Sam, Greg and I, where we decided to
20                talk about equity."
21                        Right?
22        A.      Yes.
23        Q.      Then a couple of lines down, Mr. Sutskever's
24        note say:
25                        "And Elon was like, no, it should be
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 198

```
 1                proportional in some way.  I came up with the
 2                idea for OpenAI.  It's not like Greg and Ilya
 3                came to him and Sam and said that they should
 4                do an OpenAI.  I put the majority of the
 5                funds."
 6                        And it's that last -- oh, "I should --
 7                I put the majority of the funds.  I should have
 8                a majority of equity."
 9                        Do you see that?
10        A.      Yes.
11        Q.      And it's that last piece that you reference in
12        your report.
13        A.      Yes.
14        Q.      I'd like to direct you to the next paragraph.
15        Mr. Sutskever here is talking about another call that he
16        had with Mr. Musk after the one he was just discussing.
17                        And a few lines down in Mr. Sutskever's notes
18        refer to him having said to Mr. Musk:
19                        "I don't think his contributions to
20                OpenAI were larger than ours if you include the
21                opportunity costs.  We cannot accept anything
22                except equal equity."
23                        Do you see that?
24        A.      Yes.
25        Q.      And then Mr. Musk replied to that:
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 199

```
 1                      "Look, guys.  I'm not going to force
 2              you to do anything that you think is unfair.
 3              Good luck with your AI startup."
 4                      Do you see that?
 5      A.      Yes.
 6      Q.      You didn't reference these entries that I just
 7      read in your report, did you?
 8      A.      No.
 9      Q.      Would you agree with me that these entries
10      undercut your suggestion that the founding team had
11      agreed that Mr. Musk would be entitled to a majority of
12      the equity?
13      A.      Not really, because then it says -- after he
14      says, "Good luck with your startup," and he hangs up,
15      Ilya then says, "I was scared.  Couldn't sleep.  Woke up
16      after throwing up."
17              So he seems very worried that if Musk with
18      walks away, they have nothing.
19      Q.      You think that's your call to make,
20      respectfully, sir, weighing these particular entries and
21      deciding which one is the right articulation of the
22      facts?
23                      MR. KRY:  Objection to form.
24      Q.      You cited this document, did you not, for the
25      proposition that the rationale for Mr. Musk getting the
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 200

1          majority equity is that he put in the majority of the

2          funds, right?

3          A.      Yes.

4          Q.      Do you think that it's reasonable to not also

5          mention the fact in your report that the other founders

6          felt that they should get an equal share of the equity

7          because they had opportunity costs, as Mr. Sutskever put

8          it, for having spent time working on OpenAI?

9                         MR. KRY:  Objection to form.

10         A.      Yeah, I mean the document speaks for itself,

11         but he's clearly worried that if Elon walks away from

12         it, then they have nothing.

13                 I think there's documents that come after this

14         one, where the defendants are proposing the various

15         equity splits where Musk retains 50 percent.

16         Q.      And those are the proposals that were never

17         accepted, ultimately, correct?

18         A.      Yes.

19         Q.      I guess what I'm asking is do you acknowledge

20         that there was a back and forth on this issue, and that

21         each side had a different perspective, perhaps, as to

22         the level of contribution that Mr. Musk had made

23         relative to others in the nonprofit?

24         A.      Yes.

25         Q.      In paragraph 60 of your report, again, you

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 201

1          refer to Mr. Musk's equity stake in a potential

2          for-profit.  Actually, I'm going to direct you to a

3          different paragraph, Dr. Wazzan, in the interest of

4          moving this along.

5                  Go to paragraph 95.  You say here that, in the

6          last sentence:  "Mr. Musk's shares were only based on

7          his financial contributions, not on granted shares."

8                  Do you see that?

9      A.      Yes.

10     Q.      What did you mean by that?

11                  Well, you're got to step back a

12             sentence:

13             "The amount of the grant and the contribution

14             varied depending on the capitalization table

15             proposed.  Mr. Musk's shares were only based on

16             his financial contributions, not on grant

17             shares."

18                  So they were going to have sort of a

19             pro -- I believe what they were discussing is

20             that Musk would have shared based on his

21             financial contributions.  The other guys would

22             receive grants.  He wouldn't be receiving a

23             grant.

24     Q.      What financial contributions are you referring

25         to in that sentence?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 202

1      A.      The money that Mr. Musk has contributed to the

2      nonprofit.

3      Q.      I see.  So your understanding was that Mr. Musk

4      had -- sorry, I didn't mean --

5      A.      -- plus the go-forward contributions.

6      Q.      What go-forward contributions were contemplated

7      for Mr. Musk, as far as you understood?

8      A.      I think from memory, he was going to contribute

9      another 100 million over some period of time.

10     Q.      And so it's not your testimony that the

11     reference to financial contributions is a reference to

12     that 100 million?

13     A.      Yes, in part.  It's partly referencing that.

14     Q.      What is a granted share in the context of this

15     sentence, as you understand it?

16     A.      I think there were going to be granted shares

17     to the other parties that were not tied directly to

18     financial investments.

19     Q.      And when you say not tied to financial

20     investments, you're talking about not tied to future

21     financial investments?

22     A.      Yes.

23                    MR. WILSON:  Okay.  All right.  Let's

24             look at the next document, Tab 14.

25                    (Whereupon, EXMF-0003257-258 was marked

Elon Musk v.                 FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 203

1          as Wazzan Exhibit 10, for identification, as of
2          this date.)
3     BY MR. WILSON:
4          Q.    All right.  So this is one of the documents
5     that you rely on in your report as evidence of the
6     discussions that were happening about potential share
7     allocations in the new for-profit entity, correct?
8          A.    Yes.
9          Q.    And I want to focus your attention on the cap
10    table, which is on the second page behind the slip
11    sheet.
12         A.    Yes.
13         Q.    This document says that there's going to be an
14    Elon investment with initial shares, 100 million, and a
15    percentage of 51.2 percent.
16         A.    Yes.
17         Q.    "Investment" in this document is used as an
18    alternative to "grant," correct?
19         A.    Yes.  There's both, right?  There's investments
20    and grants on the table.
21         Q.    Correct.  And Mr. Musk has only allocated an
22    investment.  He doesn't have any grants under this
23    document, correct?
24         A.    Correct.
25         Q.    This document means that it was contemplated

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

                                                    Page 204

1          that Mr. Musk would receive a 51.2 percent interest in

2          the new for-profit entity, in exchange for at least

3          contributing $100 million of new capital; is that

4          correct?

5                          MR. KRY:  Objection to form and

6                  foundation.

7          A.      Yes.

8          Q.      Is that your understanding?

9          A.      Yes.

10         Q.      Do you see any indication on this document that

11         Mr. Musk was going to receive that 51.2 percent stake in

12         exchange for past contributions to the nonprofit?

13         A.      Not specifically.

14         Q.      Okay.  Is it fair to say that it was

15         contemplated that Mr. Musk would be buying his equity in

16         the new for-profit with a capital investment?

17         A.      Yes.

18         Q.      Okay.  Subsequent to the date of this document,

19         did Mr. Musk ever make a capital investment in OpenAI

20         for-profit?

21         A.      I don't believe so.

22         Q.      Is it your understanding that under the

23         proposal that was being contemplated around the time of

24         this cap table, September 2017, is it your understanding

25         that the cofounders understood that in addition to

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 205

1        making a large capital investment, Mr. Musk would

2        increase his level of involvement day-to-day at OpenAI?

3                        MR. KRY:  Objection.  Foundation.

4        Q.      Do you have any understanding at all about

5        that?

6        A.      I don't recall that as I sit here.

7        Q.      Did you review Mr. Musk's testimony on that

8        question in his deposition?

9        A.      I just don't recall as I sit here.

10       Q.      All right.  Let's look at it.

11                       MR. WILSON:  See if you can find

12               Exhibit 4, please, which is Mr. Musk's

13               deposition transcript.  Oh, thanks.  It's much

14               cleaner.

15       Q.      And if you could direct yourself to page 73,

16       Dr. Wazzan.

17       A.      Okay.

18       Q.      Just for context, if you look up at line 7,

19       there's a question:

20                       "Do you recall, in the context of the

21               2017 discussions with Altman and Brockman and

22               Sutskever that you suggested you would step

23               down as CEO of Tesla?

24                       "ANSWER:  I don't recall."

25                       Do you see that?

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 206

```
 1      A.      Yes.

 2      Q.      So this line of questioning is about the 2017

 3      restructuring discussions.  So a few lines down at line

 4      19:

 5                      "QUESTION:  But you recognize that it

 6              would be important to devote more time to

 7              OpenAI where you'd have the control that you

 8              felt was so important."

 9                      Mr. Musk answered:  "Yes."

10                      Do you see that?

11      A.      Yes.

12      Q.      And then Mr. Musk -- the next question:

13                      "And did you undertake with Altman and

14              Brockman and others that you would spend more

15              time in that circumstance?

16                      "ANSWER:  If that were to happen, I

17              would spend more time, yes."

18                      Do you recall reviewing that testimony

19              from Mr. Musk at his deposition?

20      A.      Yes.

21      Q.      And did you understand, when you read it, that

22      Mr. Musk acknowledged that if he, indeed, had continued

23      to be associated with OpenAI in the for-profit, that in

24      addition to making a substantial capital investment he

25      would increase his time commitment to the venture?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 207

1        A.      That's what it says.

2        Q.      Okay.  If Mr. Musk -- well, given that Mr. Musk

3    was contemplated to be making a substantial investment

4    in the new for-profit entity, and given that he had

5    committed to increase his time devotion to OpenAI going

6    forward, if the for-profit had come together, how can

7    you opine that the proposed 51.2 percent allocation is

8    an assessment of Mr. Musk's relative contribution to the

9    nonprofit?

10               MR. KRY:  Objection to form and also

11               misstates the document.

12       A.      It's only one indication.  I've gone through a

13   whole slew of indications of what his holdings were,

14   what his contributions were.  He contributes two-thirds

15   of the starting capital, and that's higher than the 51

16   percent that's he's contemplated to get here.

17               So in some sense, the 50 percent is a

18   conservative figure.

19       Q.      So is the discussions around the for-profit

20   conversion and the 51.2 percent, were those significant

21   factors in your analysis, in your conclusion?

22       A.      Yes.

23       Q.      I think you said in your report that you found

24   them particularly important?

25       A.      Yes.

Elon Musk v.                      FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                        Page 208
     1        Q.      Was that the most important factor?
     2        A.      I couldn't say that any one particular factor
     3     is the most important.
     4        Q.      Okay.  And just help me understand:  What is
     5     the significance, from your perspective, of the fact
     6     that there was discussion about Mr. Musk having 51.2
     7     percent in the for-profit venture?
     8        A.      They're recognizing that he is -- has
     9     contributed a ton.  He's, you know, the important -- the
    10     most important person.  He, himself, was adamant that he
    11     retain 50 percent and control.
    12            And then after that, they're just discussing
    13     what the terms would be.
    14        Q.      So you think it's a recognition of past
    15     contributions?
    16        A.      In part, yeah.
    17        Q.      How much does that part relate to the fact that
    18     he was going to put $100 million of capital into the
    19     venture?
    20        A.      I couldn't give you a precise number.
    21        Q.      You didn't mention the $100 million capital
    22     investment in your report, did you?
    23                    MR. KRY:  Objection.
    24        A.      No.
    25        Q.      And you didn't mention in your report that it
```

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                   janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 209

 1        was contemplated that Mr. Musk, in exchange for his 50
 2        or more percent stake in the for-profit venture, would
 3        increase his commitment of time?  You didn't mention
 4        that?
 5        A.      It's not necessary.
 6        Q.      Doesn't change your calculations or analysis?
 7        A.      Does not.
 8        Q.      Okay.  Your report also provides or addresses,
 9        I should say, several alternative scenarios for
10        allocating shares?
11        A.      Yes.
12        Q.      Okay.  The first of those attempts to put
13        Mr. Musk and Mr. Brockman and Altman and Sutskever on
14        equal footing by ignoring grants provided?
15        A.      Yes.
16        Q.      What basis do you have to think that sort of
17        arrangement was considered by the cofounders?
18                        MR. KRY:  Objection.  Lack of
19                foundation.
20                        MR. WILSON:  I agree there's a lack of
21                foundation.  I'm not sure that I'm the source
22                of it.
23                        MR. KRY:  Sorry.  To put a finer point
24                on it, the objection is that the exhibit you're
25                looking -- I'm not seeing the representation in

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 210

1              the report that this was considered by the

2              cofounders.

3                        MR. WILSON:  I'm asking the witness.

4       BY MR. WILSON:

5       Q.     Do you have any reason to believe that the

6       cofounders considered this alternative allocation that

7       you're discussing in paragraph 97?

8       A.     Yeah.

9       Q.     And what is it?

10      A.     It's basically what I say in paragraph 97:

11                   "The proposed calculation tables

12              provide important insights into the values that

13              the founding team themselves ascribed in their

14              relative contributions to OpenAI."

15      Q.     And that's what we just talked about?

16      A.     Yep.  Exhibit 9 also includes three alternative

17      scenarios for allocating shares.  The first scenario

18      attempts to put Mr. Musk and Messrs. Altman, Brockman,

19      Sutskever on equal footing by ignoring any grants

20      provided.  Under the scenario, Mr. Musk would achieve a

21      78.13 percent share.

22                   Second scenario provides Mr. Musk with a grant

23      of 10 million shares, the same as was provided to

24      Messrs. Altman and Brockman.  Under this scenario,

25      Mr. Musk would achieve a 54.78 percent share; however --

JANE ROSE REPORTING                California Firm No. 254
1-800-825-3341                     janerose@janerosereporting.com

Elon Musk v.                      FINAL                    December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 211

1       Q.      I've read the report, sir.  I'm trying to
2       understand -- I'm focusing on the first scenario, and my
3       question is, are you representing that the scenario that
4       you've described here of putting Musk, Altman, Brockman,
5       and Sutskever on equal footing by ignoring grants is a
6       scenario that was ever discussed by those individuals?
7                       MR. KRY:  Objection to form.
8       A.      No.  These are hypotheticals.
9       Q.      So all three of these are hypothetical
10      scenarios?
11      A.      Well, I mean, I'm trying to get at what his
12      economic interest is in the nonprofit.  I don't have --
13      there's not a document that you can point to anywhere,
14      so I'm trying to get at it by looking at the e-mails, by
15      looking at the cap tables, by looking at various things,
16      and so I put together some hypotheticals here which
17      yield different results, and those are going to feed
18      into my range ultimately.
19      Q.      In what respect would your first scenario of
20      ignoring grants put the parties on equal footing?  How
21      would that work?
22      A.      Just in the sense that none of them get grants;
23      they all get their dollar contributions.
24      Q.      Do you know why this cap table gave grants to,
25      among other people, Mr. Altman -- and by this cap table,

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 212

1          I'm referring to virtual Exhibit 12, which we just
2     looked at -- why under that cap table, if you know, was
3     it contemplated that Mr. Altman, Mr. Sutskever, and
4     Mr. Brockman would receive grants, among other people?
5          A.     Not specifically.
6          Q.     Do you know if it was based on the work that
7     they had previously done for OpenAI, the nonprofit?
8          A.     Could be.
9          Q.     By removing the granted shares, aren't you
10    taking out of the calculation an allocation based on
11    nonmonetary contributions?
12                     MR. KRY:  Objection to form.
13         A.     Yes.
14         Q.     Your second and third scenarios are based on an
15    assumption that Mr. Musk would receive granted shares in
16    addition to investment shares?
17         A.     Yes.
18         Q.     Do you have any basis to believe the parties
19    considered that possibility?
20         A.     No.
21         Q.     Okay.  You opine in your report, at
22    paragraph 98, that assigning to Mr. Musk the ranges that
23    you've provided in terms of his relative contribution is
24    consistent with the equity stake that Mr. Musk currently
25    has in xAI.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 213

1              Do you remember saying that?

2      A.      Yes.

3      Q.      How much capital has Mr. Musk personally

4      invested in xAI?

5      A.      I don't know.

6      Q.      Do you know what percentage of xAI's total

7      investment capital has come from Mr. Musk, directly or

8      indirectly?

9      A.      No.

10     Q.      Does Mr. Musk have an executive position at

11     xAI?

12     A.      I'm not sure.

13     Q.      Do you know how much time Mr. Musk has spent

14     working on xAI since it was formed?

15     A.      No.

16     Q.      Do you think that Mr. Musk's level of

17     involvement with xAI is comparable to his level of

18     involvement with OpenAI?

19              MR. KRY:  Objection to the timeframe.

20     A.      Couldn't say.

21     Q.      You note that Mr. Musk, in your report in

22     paragraph 93, that Mr. Musk owned 36.6 percent of Tesla

23     at the time of its IPO.

24              Do you recall?

25     A.      Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 214

1      Q.      Do you know how much personal capital Mr. Musk

2      invested in Tesla?

3      A.      No.

4      Q.      Do you know what percentage of Tesla's total

5      capital came from Mr. Musk, direct or indirectly?

6      A.      No.

7      Q.      Do you know if Mr. Musk has or has ever had an

8      executive position at Tesla?

9      A.      I think he's a CEO.

10     Q.      Do you know how much time Mr. Musk has

11     allocated to Tesla matters over the last number of

12     years?

13     A.      No.

14     Q.      Do you have any basis to claim that Mr. Musk's

15     involvement with Tesla is comparable to his involvement

16     with xAI -- with OpenAI, excuse me?

17                     MR. KRY:  Objection to timeframe.

18     A.      No.

19     Q.      Do you know anything about Mr. Musk's capital

20     contributions to SpaceX, SolarCity, or PayPal?

21     A.      No.

22     Q.      Do you know anything about Mr. Musk's level of

23     attention or work spent at SpaceX, SolarCity, or PayPal?

24     A.      No.

25     Q.      Do you have any basis to claim that Mr. Musk's

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 215

1          involvement with SpaceX is comparable to his

2          investment -- his involvement with OpenAI?

3          A.      No, I don't.  But it doesn't matter.

4          Q.      Why doesn't it matter?

5          A.      Because again, the damage model I'm proposing

6          here is a disgorgement model.  It's not predicated on

7          how much time Musk spends on the for-profit.

8          Q.      Well, if it doesn't matter, sir, I'm just

9          trying to understand why you mentioned in paragraph 98,

10         as you do, that Mr. Musk currently has an equity stake

11         of 53 percent in xAI.

12         A.      Why does it matter?

13         Q.      Yes, and you're saying it doesn't matter, but

14         yet it's in your report, so I'm trying to understand.

15         A.      Yeah, the amount of time that he spends at xAI

16         doesn't matter.  The amount of effort he puts in at xAI

17         doesn't matter.  He holds an equity stake at xAI.  What

18         we're trying to get at is what would his economic

19         interest in the nonprofit be, and so there's data points

20         available where there is -- he owns 53 percent of xAI,

21         he owns, you know, 35 percent of Tesla pre IPO, he owns

22         his total financial contributions to OpenAI prior to his

23         departure at the start of '20 were 60 percent.

24              I'm trying to triangulate into what his

25         economic interest is.  The amount of time that he spends

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 216

1         at xAI is not relevant.

2         Q.      So is it your testimony that the reason why

3         Mr. Musk has 53 percent of xAI has nothing to do with

4         the amount of time he spent there?

5         A.      I don't have an opinion on that one way or the

6         other.

7         Q.      It has nothing to do, in your opinion, with the

8         amount of capital Mr. Musk has invested in xAI?

9         A.      It might.

10        Q.      Do you know whether Mr. Musk was ever offered

11        an equity allocation in the for-profit venture at

12        OpenAI?

13        A.      I haven't seen such a document.

14        Q.      If Mr. Musk had been offered such an equity

15        stake, would that have changed your analysis in any way?

16                        MR. KRY:  Objection to form.

17        A.      I guess I'd need to see it.  I don't know.

18        Q.      Okay.  Can you pull up your supplemental

19        report, please?  Bear with me.  I found it.  Okay.  So

20        I'm focusing again on revised Exhibit 19.

21        A.      With you.

22        Q.      So here you are opining that OpenAI nonprofit

23        share of the OpenAI for-profit is either 29.2 percent or

24        26.2 percent; is that right?

25        A.      Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 217

1          Q.      The 29.2 percent calculation, as I understand

2          it, reflects dilution for the present value of the

3          warrants that the nonprofit has; is that correct?

4          A.      Yes.

5          Q.      And the 26.2 percent calculation reflects what

6          you call "full dilution"?

7          A.      Yes.

8          Q.      And that's dilution for the present value of

9          the warrants plus allocations to an employee vehicle

10         sponsor pool and an employee incentive plan; is that

11         right?

12         A.      Yes.

13         Q.      Under what circumstances would a warrants-only

14         dilution be appropriate rather than full dilution?

15         A.      It would depend on the timing.  You know, it's

16         not necessarily true that those other -- that the

17         EV-sponsored pool or the EIP dilution would actually

18         take place.

19         Q.      So if I understand your testimony -- I'm trying

20         to read your testimony.

21         A.      As I understand it, there's a pool that they

22         would use in the future to fund --

23         Q.      I see.  So you're saying it's possible, it

24         hasn't been allocated out or the like?

25         A.      Yes.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

                                                        Page 218

     1      Q.     But if those pools are fully spoken for, so to

     2      speak, you think full dilution would be appropriate?

     3      A.     Yes.

     4                  MR. WILSON:  Can we take just two

     5              minutes?  I may be done, but I just want to

     6              take two seconds to look at my notes.  Thanks.

     7                  THE VIDEOGRAPHER:  Okay.  We're going

     8              off the record, 3:05 p.m.

     9          (Whereupon, a short break was taken.)

    10                  THE VIDEOGRAPHER:  Please stand by.

    11              We're back on the record at 3:14 p.m.  This

    12              marks the beginning of Media 6.

    13      BY MR. WILSON:

    14      Q.     Dr. Wazzan, I just have a handful of final

    15      questions.  Can you get Exhibit 10 back, please?

    16      A.     Yeah.

    17      Q.     Okay.  Great.  So we're focusing on the cap

    18      table again.  Do you know whether Mr. Brockman or

    19      Mr. Sutskever donated money to OpenAI nonprofit?

    20      A.     I don't recall, as I sit here.

    21      Q.     Okay.  Well, I can represent to you that

    22      neither of them did.  If that's the case, does that

    23      suggest to you that the references on this document to

    24      investment are to future capital contributions?

    25      A.     Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 219

1      Q.      Okay.  In revised Exhibits 19 and 20 to your
2      supplemental report, my reading of that is that it's
3      your opinion that Mr. Musk could be entitled to up to
4      $109 billion of recovery from OpenAI, and that he could
5      be entitled to up to $25 billion of recovery from
6      Microsoft; is that right?
7      A.      Yes.
8      Q.      That's the total of a little bit over $134
9      billion if he gets a full recovery under your analysis;
10     is that correct?
11     A.      Yes.
12     Q.      That would be 26.8 percent of the entire value
13     of OpenAI for profit; correct?
14     A.      Sounds right.
15     Q.      And that's your opinion, that Mr. Musk is
16     entitled to up to 26.8 percent of the value of the
17     entire enterprise?
18     A.      As of today.
19     Q.      And that's based on Mr. Musk's $38 million of
20     donations a number of years ago and non-monetary
21     contributions, correct?
22     A.      Well, it's -- yeah.  It's basically everything
23     I laid out in my report.
24              MR. WILSON:  Okay.  No further
25              questions.  Thank you.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 220

1                        Pass the witness.
2                        THE VIDEOGRAPHER:  Going off the record
3               3:17 p.m.
4           (Whereupon, a short break was taken.)
5                        THE VIDEOGRAPHER:  Please stand by.
6               We're back on the record at 3:18 p.m.
7       EXAMINATION BY
8       MR. JURATA:
9       Q.      Dr. Wazzan, I'm Jay Jurata.  I represent
10      Microsoft Corporation.  Thank you for your time today.
11              I wanted to start off going to -- do you recall
12      earlier to you were testifying regarding what you did to
13      prepare for today's deposition?
14      A.      Yes.
15      Q.      And I believe you said you've reviewed some
16      documents?
17      A.      Yes.
18      Q.      Do you remember which documents you reviewed?
19                       MR. KRY:  Hang on.  You can answer the
20              question with respect to any documents that
21              were reviewed on your own.  With respect to
22              documents that were reviewed during your prep
23              session with counsel yesterday, we assert that
24              those are work product, so you shouldn't answer
25              that.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 221

```
 1                    MR. JURATA:  Okay.
 2       A.      Yeah, so I guess I took your question to mean
 3       what I reviewed when I was working on my own preparing,
 4       I don't recall specifically.
 5                    MR. JURATA:  And Robert, you're willing
 6               to stipulate to that work product for both
 7               sides of the case, correct?
 8                    MR. KRY:  So, my usual practice is that
 9               an open-ended question about what documents did
10               you review is impermissibly asking for work
11               product.
12                    If you have a specific document, then
13               you ask the witness if he has seen it before,
14               and the answer is I saw it during depo prep
15               yesterday.
16                    In my view, that's okay.
17                    MR. JURATA:  Okay.
18       Q.      All right.  And you recall earlier today you
19       were talking about Professor Arnold's report?
20       A.      Yes.
21       Q.      Okay.  And I believe -- is it accurate to say
22       that you testified that Professor Arnold supports some
23       of the points that you make in your analysis?
24       A.      Yes.
25                    MR. JURATA:  Why don't we talk about
```

Elon Musk v.                   FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 222

```
 1              that for a little bit.  If we can mark this as
 2              an Exhibit.
 3                      (Whereupon, the Rebuttal Expert Report
 4              of Jonathan I. Arnold, Ph.D., was marked as
 5              Wazzan Exhibit 11, for identification, as of
 6              this date.)
 7                      MR. JURATA:  What number are we up to
 8              for exhibits?
 9                      THE REPORTER:  11.
10      BY MR. WILSON:
11      Q.      So I'll represent to you, Dr. Wazzan, that
12      Exhibit 11 is an accurate copy of Professor Arnold's
13      report in this case.
14      A.      Okay.
15      Q.      Now that you have the benefit of Professor
16      Arnold's report, can you identify the points that he
17      states that you say support the analysis that you did?
18      A.      Let's see if I can find it.
19                      MR. KRY:  And I'm sorry.  I need to add
20              one more thing.  It's also fair game to ask if
21              he reviewed any questions during depo prep that
22              were not on this list of documents considered.
23                      MR. WILSON:  What I'm saying is that
24              I'm going to take under advisement the protocol
25              that Mr. Kry has described.  I don't want there
```

Elon Musk v.                FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

---

                                                    Page 223

1              to be any suggestion that we've somehow agreed

2              on behalf of OpenAI that --

3                   MR. JURATA:  Microsoft will take it

4              under advisement as well.

5    A.        Well, yeah, so I'd have to go through this

6    again, pretty carefully.  But one of the things I was

7    thinking was on page 32, he says, paragraph 54:

8                   "Dr. Wazzan's framework models that

9              Mr. Musk ought to have a 50 to 75 percent

10             economic interest in nonprofit OAI seven years

11             after his departure is at odds both with

12             Mr. Musk's own concession that he would have

13             been diluted in the but-for world, in OpenAI's

14             massive capital and compute demands."

15                  And then if you look down at footnote

16             92, he says, see also -- or I guess, Mr. Musk

17             states:

18                  "This is just to go over the board

19             stuff.  You may have other things you want to

20             work intended to reflect the principle, year to

21             18 months that would erode to not have control,

22             over time dropping me to 25 percent," which is

23             what he has at Tesla.

24                  And so one of the last questions that

25             we just answered, actually, with respect to the

---

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 224

1               supplemental report, was I think that we
2               calculated that at the high end, Musk would
3               have sort of 26 percent of the 500 billion pie.
4               That's consistent with the 25 percent figure in
5               that quote on paragraph 54.
6       Q.      Thank you for explaining that.  And without
7       going through the rest of his report paragraph by
8       paragraph, at a high level, is there anything else in
9       Professor Arnold's report that you recall, sitting here
10      today, that supports your analysis?
11      A.      I thought there were some other points at the
12      time when I read it.  I don't have them now.  I haven't
13      prepared a written response.
14      Q.      It's not a memory test.
15              And I believe you testified earlier today that
16      you corrected two exhibits, Exhibits 15 and 17, in your
17      report as a result of criticism in Professor Arnold's
18      report, correct?
19      A.      Yes.
20      Q.      And then aside from correcting those Exhibits,
21      is there anything in Professor Arnold's report that
22      causes you to reconsider any of the opinions in your
23      report?
24      A.      No.
25      Q.      Why don't we go back to Exhibit 1, which is

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 225

1        your report, and I want to turn to Appendix A of that,

2        which contains the list of cases that you previously

3        have testified in.

4        A.      Yes.

5        Q.      And specifically, I want to turn your attention

6        to page 18.

7        A.      Okay.

8        Q.      Okay.  Do you recall, earlier today, talking

9        about cases in which your opinions were excluded in

10       whole or in part?

11       A.      Yes.

12       Q.      Okay.  And you provided a list of those cases?

13       A.      Yes.

14       Q.      You did not provide, in that list, Case Number

15       87, which is United States of America versus Schiff.

16               Do you know whether or not your opinion was

17       excluded under Federal Rule of Evidence 702 in that

18       case?

19       A.      I believe it was not.  There's a long, tortured

20       history, and I've read most of those documents.

21               So I was retained by the State's Attorney in

22       New Jersey.  I performed an analysis of stock loss drop

23       so I did a causation analysis.  Ultimately, VAG said

24       they didn't need to prove loss causation, so we took

25       that out of my report before it was filed.

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 226

1           We then filed the report.  The Court then later

2      decided that, no, no, no, no, you do have to show loss

3      causation.  VAG tried to circle back in and say:  "Well,

4      Wazzan did actually do that analysis, and we have it,"

5      and they wanted me to testify to it.  But it wasn't in

6      the report.

7           So the court said no.

8           But as I understand it, everything that was in

9      the report itself was admitted.

10     Q.    All right.  Let's start at your assignment in

11     this case, which I believe is set forth in paragraph 8

12     of Exhibit 1.

13     A.    Yes.

14     Q.    And I believe you said earlier today that your

15     assignment starts off by saying you were asked to:

16              "Determine the amount by which the

17              OpenAI defendants and Microsoft were profited

18              or were unjustly enriched by operating OpenAI

19              as a commercial venture, despite having

20              received charitable contributions from Elon

21              Musk on the understanding that OpenAI would

22              remain a nonprofit dedicated to the public

23              good."

24              Did I read that correctly?

25     A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 227

```
 1          Q.      What are the legal claims remaining against
 2     Microsoft in Phase 1 of this case?
 3                        MR. KRY:  Objection.
 4          A.      I couldn't say.
 5          Q.      Did you -- did you look at what those claims
 6     were, at all, in preparing your report?
 7                        MR. KRY:  Objection.  Foundation.
 8          A.      No.
 9          Q.      And is that because you were -- you were
10     instructed to assume liability?
11          A.      Yes.
12          Q.      And in -- is it your opinion, then, that the
13     nature of the claims against Microsoft are irrelevant in
14     determining the extent to which Microsoft was unjustly
15     enriched?
16                        MR. KRY:  Objection to form.
17          A.      That's right.
18          Q.      Why don't we jump ahead to paragraph 16 of your
19     report.  And earlier today, do you recall being
20     questioned by Mr. Wilson regarding the cost that was
21     required to purchase compute necessary for generative AI
22     research?
23          A.      Yes.
24          Q.      As part of your analysis, did you consider what
25     OpenAI's value would be today absent its strategic
```

Elon Musk v.                    FINAL            December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 228

1        partnership with Microsoft?

2        A.      No, that's not a necessary element of the

3        disgorgement analysis.

4        Q.      And why not?

5        A.      Because, as I understand it, the creation of

6        the for-profit is the challenged action here.  Any

7        profits that are generated therefrom, are subject to

8        disgorgement.  That's it.

9        Q.      So you assume that OpenAI would have the same

10       valuation as it has today in your counter factual?

11       A.      No, I don't.  There is no counter factual.

12       It's just the disgorgement of the profits that were

13       generated from the creation of the for-profit.

14       Q.      And is it your opinion that -- well, actually,

15       let me -- we'll come back to that.  What is your

16       understanding of the conduct that Microsoft engaged in

17       that is alleged to be wrongful in this case?

18       A.      I don't have a strong understanding of that,

19       other than I've assumed they're found to be liable, I've

20       assumed liability.  So whatever their conduct is -- and

21       my understanding is that -- from counsel that the remedy

22       for their actions is disgorgement.

23       Q.      Do you know whether Microsoft's 2019 investment

24       and commercial arrangement with OpenAI's for-profit

25       subsidiary is alleged to be wrongful?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 229

1       A.      It's a legal issue.  I don't have an

2       understanding of that.  I've assumed liability.

3       Q.      So you did not factor into your analysis, one

4       way or the other, Microsoft's 2019 investment into

5       OpenAI other than what you back out of its capital on in

6       the tables, which I believe is Exhibit 19 of your

7       supplemental report.

8                       MR. KRY:  Objection.  Misstates the

9               testimony.

10      A.      So what I'm trying to get at is the unjust

11      enrichment from their participation in the for-profit.

12      I calculate that amount.  Or actually -- ultimately, it

13      comes out of the recapitalization announcement, and then

14      I do back out their investment to get the final number

15      of their unjust enrichment.

16      Q.      I understand, sir, that you calculate the

17      amount in which you claim Microsoft was unlawfully

18      enriched, but how was -- my question is how was

19      Microsoft unlawfully enriched?  What is your

20      understanding of that?

21                      MR. WILSON:  Objection to form.

22      A.      I think they're unlawfully enriched by having

23      an economic interest in the for-profit.

24      Q.      You reviewed Mr. Musk's deposition testimony in

25      this case; you testified to that earlier today, correct?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 230

1      A.      Yes.

2      Q.      Do you know whether Mr. Musk believes that

3      Microsoft's 2019 investment into OpenAI was wrongful?

4      A.      I couldn't say.

5      Q.      Do you know whether Mr. Musk believes that

6      Microsoft's 2021 investment in the OpenAI for-profit

7      subsidiary was wrongful?

8                      MR. KRY:  Objection to the timeframe

9              with respect to when Mr. Musk had the belief.

10     A.      I cannot say.  Those are legal issues.

11     Q.      And you didn't think that his belief as to

12     whether or not he was wronged by Microsoft's conduct was

13     relevant to your unjust enrichment analysis?

14     A.      No.

15     Q.      Are you aware that one of the actions that

16     plaintiff alleges Microsoft did wrongfully here was

17     putting pressure on OpenAI to commercialize its

18     technology?

19     A.      I don't have a specific understanding.  I've

20     assumed liability.  These are all liability issues.

21     Q.      So you didn't -- you didn't factor in that one

22     of the things that Microsoft was alleged of doing

23     wrongfully was participating in safety decisions

24     regarding OpenAI models?

25     A.      I've assumed liability.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 231

1        Q.      And you didn't consider what role Microsoft may

2        or may not have played in the reinstatement of Sam

3        Altman to the OpenAI board?

4        A.      Assumed liability.

5        Q.      And you didn't factor in what role Microsoft

6        played, if any, in the restructuring of the for-profit

7        subsidiary into a public benefit corporation?

8        A.      Again, assumed liability.  But by the way, I'll

9        just say, all those things that you've just discussed,

10       all of those would have been encapsulated and captured

11       in the $500 billion valuation.

12       Q.      And that's what I want to get to.  Let's say

13       the court or the jury determines that one of the things

14       that we -- let me take that back and ask you a better

15       question.

16               So if, for example, the court or the jury

17       determines that Microsoft's 2021 investment into the

18       OpenAI for-profit subsidiary was not wrongful, how does

19       your model account for that in calculating damages, and

20       does the unjust enrichment change in any way?

21       A.      I'd have to think about it.  Not sure I can

22       answer that as I sit here.  But I think the model is

23       sufficiently robust, that it can be adapted to that

24       hypothetical.  You know, again, you can't produce a

25       model that accounts for every single permutation that

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 232

1     might arise.  But I think the model is adaptable in that
2     instance.
3          Q.     But as your report is currently written, a jury
4     could not make that calculation itself?
5                     MR. KRY:  Objection to form and also
6                foundation.
7          A.     No, the jury could not, but under that
8     instruction from the court, I think the model could be
9     modified in short order.
10          Q.     And for the purpose of the analysis contained
11     in Exhibit 1, it doesn't matter if Microsoft is liable
12     for one of the alleged acts of wrongful conduct or all
13     of the alleged wrongful acts, correct?
14          A.     Correct.
15          Q.     So it's all or nothing?
16          A.     Yes.
17          Q.     I'd like to turn to paragraph 20 in your
18     report, and I just want to let you know that to the
19     extent that you need to review, you know, any part of
20     your report in order to answer my questions, you should
21     certainly take the time to do that.
22                So am I correct, Dr. Wazzan, that you agree
23     that OpenAI needed to raise substantial funds in order
24     to continue its research back in the 2017 time period?
25                     MR. KRY:  Objection.  Form.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

```
                                                      Page 233
 1      A.      That's not my opinion.  That's what they
 2   seem -- the parties themselves seem to have stated.
 3      Q.      And you felt that that was reliable enough for
 4   including in your report?
 5      A.      Yes.
 6      Q.      And that apparently led to the discussion in
 7   2017 between the founders that you and Mr. Bradley
 8   were -- I mean, you and Mr. Wilson were talking about
 9   earlier today?
10      A.      Yes.
11      Q.      And Mr. Musk obviously was part of those
12   discussions?
13      A.      Yes.
14      Q.      And as part of those discussions, they were
15   talking about converting the nonprofit into a for-profit
16   entity, correct?
17      A.      Yes.
18      Q.      Okay.  Why is it appropriate to say that
19   Microsoft's profits from its investments in the OpenAI
20   subsidiary are unjust if Mr. Musk himself was
21   envisioning potentially converting the nonprofit into a
22   for-profit entity?
23              MR. KRY:  Objection to form.  Liability
24          issue.
25      A.      I don't have an opinion on that.  It's a
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 234

1          liability issue, which I've been asked to assume.

2          Q.      And you've been asked to assume that the

3          wrongful -- you've been asked to assume that the liable

4          conduct was the conversion of -- I'm sorry, let me take

5          that back.

6                  You've assumed that the wrongful conduct or the

7          conduct which is liable was the creation of the OpenAI

8          for-profit subsidiary, correct?

9          A.      In effect, yes.

10         Q.      And that's something which happened before

11         Microsoft invested in the for-profit subsidiary,

12         correct?

13         A.      That's my understanding.

14         Q.      And you haven't seen anything which indicates

15         in your -- let me take that back.

16                 Nothing in your report indicates that Microsoft

17         was involved in the decision to create the OpenAI

18         for-profit subsidiary, correct?

19                        MR. KRY:  Objection to form.

20         A.      I don't -- I just don't know as I sit here.  I

21         haven't focused on the liability issues.

22         Q.      I want to turn to the overview of your damages

23         methodology -- actually, no.  I'm not going to do that.

24         We've already discussed that today.  Trying to get you

25         out of here early, Dr. Wazzan.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 235

1      A.      Great.

2      Q.      So we talked about this a little bit earlier,

3      but I just want to -- I just want to make clear.  So you

4      were -- you were asked to make the assumption that

5      OpenAI would have the same valuation for the purpose of

6      your unjust enrichment analysis as it has in the actual

7      world?

8                      MR. KRY:  Objection to form.

9      A.      Are you in a particular paragraph in my report?

10     Q.      It's not really driven by a particular

11     paragraph in your report, but if you want to, I'm

12     looking at page 27.

13     A.      Okay.  Just ask the question again, please.

14     Q.      Okay.  Were you instructed to make the

15     assumption that OpenAI would have the same valuation as

16     it has in the actual world in determining your unjust

17     enrichment analysis?

18     A.      No.

19     Q.      Okay.  And so why did you believe that was

20     appropriate?

21     A.      To not make that assumption?

22     Q.      To assume that it would have the same value?

23     A.      I have not assumed that.

24     Q.      Can you explain what you mean by that?

25     A.      This isn't a sort of lost profits or a but-for

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

                                                        Page 236

1          scenario.  It's literally take what actually happened,
2          take the values as-is and determine the disgorgement.
3          There is no alternate but-for world.
4          Q.     So it's your testimony, it is your belief that
5          there was no requirement for you to consider what a
6          counterfactual world would be in doing your unjust
7          enrichment analysis?
8          A.     That's my understanding of how disgorgement
9          works.
10         Q.     Do you have a view as to whether Microsoft
11         would have made the same investments that it did in the
12         actual world if it was not going to have the possibility
13         of receiving the returns that it negotiated for in its
14         various investment agreements?
15         A.     I mean I couldn't say.  Probably not, but I
16         couldn't say.
17         Q.     Are you aware that one of the -- one of the
18         things that plaintiffs claim is wrongful is that
19         Microsoft got to benefit from the technology that OpenAI
20         developed over time?
21         A.     I do have that understanding.
22         Q.     Do you believe that Microsoft would have
23         invested $13 billion into OpenAI if it was not going to
24         receive those intellectual property rights?
25                    MR. KRY:  Objection.

Elon Musk v.               FINAL             December 5, 2025
Samuel Altman     HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

```
                                              Page 237
  1         A.      I couldn't say.
  2         Q.      Would it be economically rational for someone
  3    to make the same investment that they made in the actual
  4    world if they were not going to receive the intellectual
  5    property rights that were negotiated for in an arm's
  6    length agreement?
  7                 MR. KRY:  Objection.  Beyond the scope
  8         of his opinion.
  9         A.      Yeah, I don't know.  I mean, as a hypothetical,
 10    probably not, but I can't say.  In some circumstances,
 11    it may be worth it to Microsoft to incorporate ChatGPT
 12    into Copilot so that they can keep up with Google, for
 13    example.  I just -- it's not for me to say.
 14         Q.      Now, you did not attempt to quantify any unjust
 15    enrichment that results from the incorporation of
 16    OpenAI's technology into Microsoft's products, correct?
 17         A.      No, I haven't -- I mention it.  I talk about it
 18    in my report.  I haven't seen any documents that would
 19    have allowed me to do that.
 20         Q.      And you're providing no opinion on a damages --
 21    I'm going to take that back and start over.
 22                 You're providing no opinion as to an amount
 23    that Microsoft was unjustly enriched by as a result of
 24    incorporation of OpenAI's technology into its products?
 25         A.      Right.  I don't have any visibility into their
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 238

1    costs or revenues associated with incorporating the

2    OpenAI technology into their own products.  I imagine

3    it's significant.  Microsoft is a profit-maximizing

4    firm.  They're doing this for a reason, but I can't --

5    there's been no documentation on that.

6    Q.      Sitting here, you actually don't know for a

7    fact whether Microsoft has made any return as of today

8    through the incorporation of OpenAI's technology into

9    Microsoft products, correct?

10   A.      Separate and aside from their in their economic

11   interests and OpenAI for-profit?

12   Q.      Correct, separate and aside from that.

13   A.      Okay.  No, I have not seen any such

14   documentation.

15   Q.      And you will not be put being forth an opinion

16   at trial on any amount that Microsoft may or may not

17   have been unjustly enriched by as the result of

18   incorporating OpenAI's technology into Microsoft's

19   products?

20              MR. KRY:  Objection.

21              You can respond as to your current

22         intentions.

23   A.      So I haven't seen any documents that would

24   allow me to do that at this time.  I suppose if I asked

25   or was given documents and asked to do such a thing, I

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 239

1      would do it.  I haven't -- I haven't been asked.

2      Q.     You -- your analysis -- take that back, start

3      over.

4             Earlier today, do you recall questioning by

5      Mr. Wilson regarding potential future investments by --

6      take that back.

7             I want to be clear on the terminology, so

8      Robert doesn't object.

9             Earlier today, you testified regarding

10     potential future contributions that Mr. Musk would make

11     in the for-profit entity that was under discussion in

12     2017, correct?

13     A.     Yes.

14     Q.     And to be clear, your model assumes that there

15     were no further contributions by Mr. Musk, correct?

16     A.     Yes.

17            MR. KRY:  Objection to form.

18     Q.     Were you asked to assume that?

19     A.     No.

20            MR. KRY:  Same objection.  And I'm

21            sorry, the potential future contributions you

22            are referring to there, is that the -- are you

23            talking about on the pro forma cap table?

24            MR. JURATA:  Correct.

25            MR. KRY:  So the things that were

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                    Page 240
 1              labeled as investments?
 2                      MR. JURATA:  I'm sorry?
 3                      MR. KRY:  The things that were labeled
 4              as investments.
 5                      MR. JURATA:  Yes.
 6                      MR. KRY:  Did you understand that?
 7                      THE WITNESS:  That was my
 8              understanding, yeah, 100 million.
 9      BY MR. JURATA:
10      Q.      Why don't we jump ahead to paragraph 74 of your
11      report.  Do you recall testifying earlier today that you
12      thought there might be a way to adjust your model if the
13      Court found that certain financial contributions by
14      Mr. Musk could not be a basis for claiming unjust
15      enrichment?
16      A.      Yes.
17      Q.      And again, to be clear, the way to adjust your
18      model, there's nothing in your report that would show
19      how to adjust your model.  That would require additional
20      work by you, correct?
21                      MR. KRY:  Objection to form.  And also,
22              I think that question requires speculation,
23              based on what the court says.
24      A.      Yeah, so I mean, in the -- the question you're
25      asking can be illustrated in Exhibit 10 on page 47.
```

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 241

1    What you're saying is, if some of Mr. Musk's

2    contributions, monetary contributions are required by

3    the Court to be set aside, that might change the

4    allocation in Row D of the 50 to 75 percent.

5         There is no table -- I don't have a table, for

6    example, somewhere in my report where it says on a

7    dollar-for-dollar basis, and on a, you know -- on a

8    non-monetary contributions, dollar-for-dollar or item by

9    item, where you would get these range and how it might

10    change if you took one of them out.

11         I think that could be done, you know, not as I

12    sit here, but, you know, back in the office with some

13    work, we could probably make that work pretty easily.

14    And then it would just feed right in to changing one of

15    those numbers.

16    Q.    But you elected not to do that type of a

17    granular analysis in preparing your report?

18              MR. KRY:  Objection to form.

19    A.    Well, I mean, there's almost an infinite number

20    of permutations to what you're suggesting, so I don't

21    think it's feasible unless we actually have a court

22    order that says:  "Take this out, take that out."

23         Otherwise, you know, there's too many

24    combinations.

25    Q.    Did you consider whether including any

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 242

1      combination?

2      A.      No, I mean, I think --

3                    MR. KRY:  Hang on.  I -- I think the

4              expert's consideration of draft -- no, it's

5              fine.  I'll let you answer.  Withdrawn.

6      A.      So I may have this wrong, but let's say there's

7      10 variables.  The combination of variables, is, like,

8      10 factorial.  It's a really big number, right?  How

9      many permutations can you generate from 10 variables.

10     It would be thousands.  I don't have an ability to do

11     that.  Nobody could do that.  So it would take a very

12     specific instruction from the court to say take this

13     out, take that out, take this out, take that out.  Then

14     it could be done.

15     Q.      I want to turn to the nonmonetary contributions

16     by Mr. Musk.  If the jury concludes that Mr. Musk's

17     nonmonetary contributions were not valuable, the

18     analysis in your report would have to be modified,

19     correct?

20     A.      I think you would then --

21                   MR. KRY:  Objection to form.

22     A.      Sorry.  I think you would then land on a lower

23     amount, the 50 percent number.

24     Q.      And how does your model account for the

25     scenario where the jury finds that only some of

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 243

1          Mr. Musk's nonfinancial contributions were actually

2     valuable?

3     A.       Then you would land somewhere in between.

4     Q.       And again, that would require adjusting the 50

5     to 75 percent figure that you came up with?

6                    MR. KRY:  Objection.

7     A.       Yeah, but I think the jury can do that.  You

8     know, I've give them a range.  They can now determine

9     what they think is right.

10    Q.       Do you recall testifying earlier today --

11    actually before I go there, your analysis though, does

12    not give the jury a basis for deciding what adjustments

13    to those percentages should be made should they

14    conclude, for example, that some of the Mr. Musk's

15    nonfinancial contributions were not valuable?

16                   MR. KRY:  Objection.

17    A.       So I think I've laid out the qualitative

18    arguments in my report, and I've overlaid those on top

19    of the quantitative figures that I've calculated, and I

20    ultimately produce a range of 50 to 75 percent.  I think

21    a jury could land somewhere within the range based on

22    the hypothetical you just described.

23    Q.       But you did testify earlier today that you made

24    no attempt to quantify what those qualitative

25    contributions were, correct?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 244

1       A.      Not on a variable-by-variable basis.

2       Q.      So the jury would not have the benefit of that

3    analysis in adjusting the ranges in your report,

4    correct?

5       A.      Again, I think they would have to look at sort

6    of the relative benefits of having a luminary founder

7    who attracted talent versus, say, his ability to produce

8    deals like with the Nvidia chip.  They might be able to

9    land somewhere in the middle of the range.

10      Q.      Were you asked by counsel to quantify

11   Mr. Musk's nonfinancial contributions?

12              MR. KRY:  Hang on.  That's work

13          product, so I'm going to instruct the witness

14          not to answer.

15      Q.      Why did you not attempt to quantify Mr. Musk's

16   nonfinancial contributions?

17              MR. KRY:  I'll instruct the witness

18          that you can answer that only if you can

19          provide an answer without referencing any

20          discussions with counsel.

21              MR. JURATA:  I disagree with that

22          entirely.  He testified multiple times today

23          that he was told to assume certain things by

24          counsel or he was instructed by counsel to do

25          certain things, and if he was instructed by

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                    Page 245
 1              counsel to try to do something that he did not
 2              do, that's relevant.
 3                      MR. KRY:  So the first of those things,
 4              obviously if he was instructed to assume
 5              certain things, you can inquire into that.
 6              That's in the rule, I don't they that's what
 7              we're talking about.  Your last question was
 8              were you asked by counsel to quantify
 9              intangible contributions, and I don't think
10              there's anything in the rule that -- sorry,
11              that's a communication by counsel -- between
12              counsel and the expert.  And under the rule,
13              that's not subject to disclosure, and it
14              doesn't fall in any exception.  You know, I
15              don't think discussions about potential
16              analyses that don't ultimately show up in the
17              report is disclosable.  That's work product
18              under the rule.
19                      MR. JURATA:  We will respectfully
20              disagree with that, and we can perhaps come
21              back to that at a later time.
22         BY MR. JURATA:
23         Q.    But Mr. Wazzan, why don't you answer my
24         question excluding any instructions you were given by
25         counsel?
```

Elon Musk v.                          FINAL                    December 5, 2025
Samuel Altman             HIGHLY CONFIDENTIAL           Paul Wazzan, Ph.D.

Page 246

1                    MR. KRY:  Or any communications with
2           counsel.
3       A.      It's hard to parse these things out, but -- so
4    I go to great lengths in this section on the qualitative
5    contributions, and I cite to the academic literature
6    throughout.  It's very clear in the literature that the
7    nonquantitative impacts are valuable.  Very valuable.
8    And I cite to the literature.  Okay.  What the
9    literature does not do, is it doesn't tell you it's a
10   five percent adjustment for the ability to recruit top
11   end talent, it's two percent adjustment for the ability
12   to structure deals in advance of other people getting,
13   you know, advanced microprocessors.  So you can't use
14   the literature for that.  So what you do is, you have
15   qualitative arguments.  And I've laid all the ones out
16   that I can, I'd cited to the literature, it's clear
17   they're valuable, I don't know how valuable specifically
18   on a variable-by-variable basis, so I created a range
19   from 50 to 75 percent.
20      Q.      You said that you were not aware of a value on
21   a variable-by-variable basis.  Did you make any attempt
22   to quantify collectively Mr. Musk's nonfinancial
23   contributions?
24      A.      Yeah.  I think that's how you get from 50 to 75
25   percent.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 247

1       Q.      But there's no table or formula in your report
2       that attributes what percentage of the 50 to 75 percent
3       are Mr. Musk's financial contributions, and what
4       percentage are Mr. Musk's nonfinancial contributions,
5       correct?
6       A.      Well, the financial contributions, I think set
7       a lower bound and identify a 30 percent number and a 50
8       percent number based on financial contributions, so I
9       think those are somewhat more anchored, but then, for
10      the qualitative arguments there is no empirical
11      literature to point to, so I recognize they're valuable,
12      the academic literature says they are.  You know, I
13      looked at what his holdings are in other companies, and
14      you come up with a range that is, you know, economically
15      reasonable.
16              It's not unlike the Georgia-Pacific analysis in
17      the patent case.  You look at the 14 factors, you don't
18      assign a value to each factor, you sort of them as a
19      whole, and you say, you know, this five percent royalty
20      is reasonable.  That's an similar analysis to here.
21      Q.      Do you recall testifying earlier today that
22      Microsoft entered into its first investment with
23      OpenAI's for-profit subsidiary about one year after
24      Mr. Musk left?
25      A.      Yes.

JANE ROSE REPORTING              California Firm No. 254
1-800-825-3341                   janerose@janerosereporting.com

Elon Musk v.                        FINAL                    December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 248

1      Q.      Have you analyzed what role Mr. Musk had in
2      Microsoft's 2019 investment?
3      A.      No.  Again, I've assumed liability.
4      Q.      So you're not aware of Mr. Musk playing any
5      role in Microsoft's 2019 investment, sitting here today?
6      A.      Not as I recall.
7      Q.      Continuing with Mr. Musk's nonfinancial
8      contributions, you did testify earlier today that there
9      were other individuals, besides Mr. Musk that
10     contributed to the value of the nonprofit entity,
11     correct?
12     A.      Yes.
13     Q.      Now one of the things in your report that you
14     attribute to Mr. Musk was an early compute agreement for
15     Azure that the nonprofit entered into with Microsoft,
16     correct?
17     A.      Yes.
18     Q.      Do you know what the terms were for that
19     compute agreement?
20     A.      Not as I sit here.
21     Q.      Do you know whether Microsoft provided that
22     compute at a discount?
23     A.      I don't recall as I sit here, but -- so in some
24     sense, all of Microsoft's contributions, as I see them,
25     are at some sort of a discount, right, including their

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 249

```
 1        investment, so if they invest, say, 10 billion, but they
 2        require that ███████ come back as a purchase of
 3        compute power or cloud services, their actual cost is
 4        not the 10 billion, it's actually what the cost of
 5        providing the services is.  And so it's -- it's not
 6        really 10 billion, it's something less.
 7        Q.    But I'm not talking about Microsoft's
 8        investments here.  I want to be very clear.  This was --
 9        this was discounted compute provided to the nonprofit,
10        so let's -- just want to make sure we're talking about
11        the same thing?
12        A.    Yeah, no, I agree with that.  When you say
13        discount, it's not sort of like discount from retail
14        price.  What should be looked at is their actual cost
15        for providing those services.
16        Q.    Now, that was -- that was very much a discount
17        from OpenAI's perspective, though, correct?
18        A.    Possibly.
19        Q.    It was -- in fact, you go out of your way in
20        your report to talk about Mr. Musk's role is procuring
21        that investment?
22        A.    Yes.
23        Q.    And so you attributed that as to one of the
24        significant nonfinancial contributions that he did?
25        A.    Yes.
```

Elon Musk v.                     FINAL                 December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                      Page 250
     1      Q.      Do you know what the value of that discount was
     2   to OpenAI?
     3      A.      Not specifically.
     4      Q.      I'm going to represent to you, Mr. Wazzan, that
     5   that compute was provided at a ████████ discount?
     6      A.      From list or from cost?
     7      Q.      From list.
     8      A.      Okay.
     9      Q.      You would agree with me that that ████████
    10   would be a contribution to the nonprofit?
    11                  MR. KRY:  Objection to form.
    12                  MR. JURATA:  Actually, I can ask that
    13           better.
    14      Q.      You would agree with me that saving ████████
    15   in purchasing compute is something that contributes
    16   value to the nonprofit, correct?
    17                  MR. KRY:  Objection to the form.
    18      A.      What was the timing on that?  Can you point me
    19   to my paragraph, please?
    20      Q.      Sure.  We're talking about paragraph 90 of your
    21   report.
    22      A.      Yeah.  What I'm trying to get at is if that
    23   contribution was made to the -- was prior to the --
    24   prior to the creation of the for-profit.
    25      Q.      Correct.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 251

1    A.     And okay, let's assume it's ███████ --

2    although I would say you have to look at it versus cost,

3    not list -- I would consider that a contribution.

4    Q.     Okay.  Did your analysis factor in that ████

5    ████████ contribution to the nonprofit in trying to

6    determine the relative contributions of Mr. Musk to --

7    compared to others?

8                    MR. KRY:  Objection to form.  The

9                witness just said it's not ████████.

10   A.     Let's just call it the discount, but the

11   discount is a qualitative factor contributing to

12   Mr. Musk's contributions.

13   Q.     I understand that, but you do understand that

14   Microsoft is a defendant in this case?

15   A.     Yes.

16   Q.     And you do understand that plaintiffs are

17   alleging that Microsoft was unjustly enriched?

18   A.     Yes.

19   Q.     But in determining the amount in which

20   Microsoft is unjustly enriched, your analysis does do --

21   does not take into consideration the benefit that

22   Microsoft conveyed to OpenAI as a result of providing

23   discount on a substantially discounted basis?

24   A.     Correct.  I'm not giving Microsoft credit for

25   whatever the discount is because it occurs prior to the

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 252

1       creation of the for-profit.

2       Q.      Now, that discount has an economic value,

3       correct?

4       A.      Yes.

5       Q.      Just like you conclude that Mr. Musk had an

6       economic value in the similar donations that he provided

7       to the nonprofit?

8       A.      Yes.

9       Q.      So it would be possible to fact -- to determine

10      the economic value of that discounted compute that

11      Microsoft provided prior to investing in the OpenAI

12      for-profit subsidiary?

13      A.      Yes.

14      Q.      Okay.  And you just didn't do it in your

15      report?

16      A.      But it's not necessary, it's not meaningful in

17      my analysis, right.  It occurs before the creation of

18      the for-profit.  I don't know if Microsoft is alleging

19      that that contribution should entitle them to a claim of

20      the nonprofit, right, in the same way that Musk is.

21              I haven't been asked to assume liability in

22      that fashion for Microsoft, right.  You're actually

23      putting Microsoft in the position of a plaintiff against

24      itself.  So I don't -- I don't have an answer for that.

25      Q.      Did you consider reducing the unjust enrichment

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 253

```
1      that you calculated for Microsoft to back out the
2      economic value that it provided to the nonprofit entity?
3      A.      No, because again, the predicate act is the
4      creation of the for-profit, and that discount occurs
5      prior to the creation of the for-profit.
6      Q.      You would agree with me that Microsoft has no
7      economic value as of today in the OpenAI for-profit
8      subsidiary as a result of the discounted compute that it
9      donated to the nonprofit?
10                 MR. KRY:  Objection.
11     A.      I'm not sure how to answer that.  It's a little
12     bit circular.  I mean, their contribution of the compute
13     at a discount contributed to the overall value of -- or
14     the progress, I guess, of OpenAI prior to the creation
15     of the for-profit.  So I would concede that the
16     Microsoft discount is a benefit to OpenAI.
17                 It's not clear to me that that discount should
18     be credited against their disgorgement of their unjust
19     enrichment in the for-profit.  That's where the link, I
20     think, breaks.
21     Q.      I want to turn to Section 8 of your report,
22     which start on page 48.  Am I correct, Dr. Wazzan, that
23     the unjust enrichment that you calculate to the benefit
24     of Microsoft is additive to the unjust enrichment that
25     you calculate to the benefit of OpenAI?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 254

1      A.      Yes.

2      Q.      Did you do anything in your analysis,

3      Dr. Wazzan, to analyze the relative contributions by

4      Microsoft as part of the strategic partnership -- strike

5      that.  Let me try again.

6              As part of your analysis in determining

7      Microsoft's unjust enrichment, did you do anything to

8      assess the effect of contributions that are not

9      challenged in this case as unlawful relative to

10     contributions which are challenged as unlawful?

11     A.      No.

12     Q.      Why not?

13     A.      Well, as I understand the assignment, it's not

14     necessary.  I was asked to assume liability.  I was

15     asked to assume that the creation of the for-profit is

16     the predicate act.

17             Microsoft has benefitted from their investment

18     in the for-profit, and that is the amount that they are

19     enriched by in which I'm calculating their disgorgement

20     and their percentage disgorgement.

21     Q.      But you don't know here today whether

22     Microsoft's contributions to OpenAI came 90 percent from

23     lawful conduct as opposed to, say, 10 percent from the

24     conduct which is alleged to be unlawful, do you?

25                     MR. KRY:  Objection to form.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 255

1      A.      Can you repeat that?

2                    MR. JURATA:  Can we read that back,

3              please?

4              (Whereupon, the record was read by the

5      reporter.)

6      A.      I'm not sure how to answer that.  I've assumed

7      that the creation of the for-profit is a predicate

8      problem, and their investment in enrichment from their

9      investment in the for-profit is the amount that counsel

10     has asked me to compute.

11     Q.      You're aware that Microsoft has built, for

12     example, custom supercomputers for OpenAI to train its

13     models, correct?

14     A.      I have a general understanding of that, yes.

15     Q.      And that's -- that's a rather large

16     undertaking, these supercomputers for training

17     generative AI models, correct?

18     A.      Yes.

19     Q.      And you haven't done anything that would

20     indicate what the ratio of the benefit would be from

21     OpenAI's use of those supercomputers to train models

22     relative to Microsoft's various investments into the

23     for-profit subsidiary, correct?

24                    MR. KRY:  Objection to form.

25     A.      Correct, it's not necessary.  I've done it --

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 256

```
 1        it's a disgorgement analysis.  It's not a lost profits

 2        analysis in a but-for world.

 3        Q.     Don't you think it would be relevant to

 4        understand what benefits were attributed to OpenAI

 5        resulting from conduct which is not challenged to be

 6        unlawful as opposed to conduct which is challenged to be

 7        unlawful?

 8                    MR. KRY:  Objection to form.

 9        A.     It's a legal issue.  I've assumed liability.

10        Q.     How do you know, Dr. Wazzan, that under the

11        analysis that you've done that you are not disgorging

12        from Microsoft value which was created from legitimate

13        activity not challenged to be unlawful?

14                    MR. KRY:  Objection to form.

15        A.     Because the totality of their disgorgement

16        resides within the for-profit and their investment in

17        the for-profit.

18        Q.     So -- but again, that's an analysis which was

19        done without looking at the benefits that came from

20        conduct not challenged to be unlawful?

21        A.     It's a legal issue.  I've assumed liability.

22        Q.     Don't you have an obligation as an expert

23        calculating unjust enrichment to separate the gains that

24        were lawful from the gains that are alleged to be

25        unlawful?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 257

1              MR. KRY:  Objection.  Calls for a legal

2         conclusion.

3              MR. JURATA:  You can answer.

4    A.      I suppose it would depend on case by case, but

5    my understanding here is that all gains from their

6    investments in the for-profit are appropriate for

7    disgorgement.

8    Q.      And that was something you were told to assume

9    by counsel?

10   A.      Yes.

11   Q.      And if the jury were to conclude that a

12   substantial contribution to OpenAI's valuation came from

13   Microsoft's lawful conduct, there is no way for them to

14   use your report in order to adjust unjust enrichment

15   accordingly, correct?

16              MR. KRY:  Objection to form.

17   A.      I suppose it would take the -- we would need to

18   understand what the lawful versus unlawful conduct is.

19   Now I've assumed liability, so I haven't done this

20   analysis.  You're now asking me to assume that they're

21   liable for some things and not for others.

22   Q.      Actually, that wasn't -- I'm sorry, I didn't

23   mean to.

24   A.      So under that scenario, we would have to lay

25   them out and -- I don't know.  As I sit here, I don't

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 258

1          know.

2          Q.     I'm not asking you, though, Dr. Wazzan, to

3     assess whether certain of the conduct which is alleged

4     to be unlawful is going to be adjudicated as lawful at

5     the end of the day.

6                 I'm asking you whether or not you did anything

7     to separate out contributions by Microsoft that are not

8     challenged at all in this case from the contributions by

9     Microsoft which are being challenged as unlawful?

10                     MR. KRY:  Objection to form.

11         A.     So I guess what I'm struggling with is I

12    can't -- I'm having a hard time envisioning what that

13    is.  Maybe you can give me an example of a lawful in

14    your reports, something that Microsoft did that is okay.

15         Q.     You reviewed Mr. Musk's deposition in this

16    case, correct?

17         A.     Yes.

18         Q.     And Mr. Musk testified, I believe that he

19    believed that the strategic partnership with Microsoft

20    was a substantial -- was a substantial factor in

21    OpenAI's success, correct?

22                     MR. KRY:  Objection.  Misstates the

23                testimony.

24         A.     I mean, generally I think that's consistent

25    with what I wrote in my report, that based on his

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 259

```
1      personal relationships, he was able to obtain access to
2      Microsoft's Azure services, a critical resource for
3      OpenAI's computer needs.  So I would agree with that
4      statement.  That occurred prior to the formation of the
5      for-profit.  So again, I don't see how that -- I don't
6      see why that matters.
7                     MR. JURATA:  Okay.  This would be a
8              good time for a break.
9                     THE VIDEOGRAPHER:  We're going off the
10             record at 4:22 p.m.  This marks the end of
11             media 6.
12         (Whereupon, a short break was taken.)
13                    THE VIDEOGRAPHER:  Please stand by.  We
14             are back on the record at 4:39 p.m.  This marks
15             the beginning of media 7.
16     BY MR. JURATA:
17     Q.     Dr. Wazzan, I want to pick up where we left
18     off.  Do you recall that we were talking about the
19     contributions of the Microsoft partnership to OpenAI's
20     success?
21     A.     Yes.
22     Q.     And you were referring to the discounted Azure
23     compute which was donated to the nonprofit, correct?
24     A.     Yes.
25     Q.     I want you to go back to Mr. Musk's deposition
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 260

1       in this case, which is Exhibit 4.  I want you to turn to

2       page 347 of that deposition.

3       A.      Okay.

4       Q.      Feel free to review that.

5       A.      Okay.

6       Q.      So going back to Mr. Musk's deposition

7       testimony, do you believe the testimony that he is

8       providing here on page 347 of his deposition regarding

9       the value of Microsoft's compute, is he referring to the

10      pre-20 -- strike that.

11          Let me try again.  On page 347 of Mr. Musk's

12      deposition, he provides testimony on the value of the

13      compute that Microsoft provided to OpenAI, correct?

14      A.      Yes.

15      Q.      And in fact, he testifies that he believes that

16      OpenAI would have advanced more slowly without the

17      compute that was provided by Microsoft, correct?

18      A.      Yes.

19      Q.      Is it your understanding that this -- the

20      compute that he's referring to is the compute that is

21      provided under the strategic partnership?

22              MR. KRY:  Objection.  Foundation.

23      A.      Not -- no.  I think he goes on, he said I mean,

24      you recognize in 2016 that Microsoft required Azure in

25      order to continue -- and OpenAI required Azure in order

JANE ROSE REPORTING                California Firm No. 254
1-800-825-3341                     janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

                                                        Page 261

1          to continue to improve its models.  2016, do you recall

2          going to Microsoft to obtain more compute in 2017?  He

3          says -- Musk says:  "I vaguely recall that."  So I think

4          this is prior -- it's discounted compute power provided

5          prior to the formation of the for-profit.

6                    MR. KRY:  And I just object to the term

7               strategic partnership as vague and confusing.

8          Q.    I want you to assume for a moment, Dr. Wazzan,

9          that the compute that Mr. Musk is referring to here is

10         the compute that was provided by Microsoft following

11         2019.

12         A.    Okay.

13         Q.    Okay.  Would it be relevant in determining

14         Microsoft's unjust enrichment to separate out the

15         benefits as a result of that compute as opposed to the

16         benefits to OpenAI's valuation resulting from the

17         alleged unlawful acts?

18                    MR. KRY:  Objection.

19                    MR. JURATA:  You can answer.

20         A.    Only if necessary.  That's not my understanding

21         of how disgorgement works.  I would agree that

22         Microsoft's contribution have probably enhanced the

23         value of the for-profit.  But that's not the relevant

24         question.  For my purposes it's to determine, you know,

25         assume liability and then compute their unjust

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 262

1        enrichment from their participation in the for-profit.

2        Q.      And that's because Microsoft, under your model,

3        you're measuring the unjust -- the unjust enrichment

4        that results from the fact that Microsoft has an

5        economic interest in the for-profit?

6        A.      Yes.

7        Q.      Okay.  Under that view, does that mean that

8        every entity that has an economic interest in the

9        for-profit has been unjustly enriched?

10                       MR. KRY:  Objection to form.

11                       THE WITNESS:  Could you read that back,

12               please?

13               (Whereupon, the record was read by the

14       reporter.)

15                       MR. KRY:  Objection to form and also

16               objection as beyond the scope of his opinions.

17       A.      I don't have an opinion on that.

18       Q.      Well, if you're measuring Microsoft's opinions

19       by the fact that it has an economic interest in the

20       for-profit, wouldn't that mean that any entity with an

21       economic interest in the for-profit is similarly

22       unjustly enriched?

23                       MR. KRY:  Objection to form.  Again,

24               beyond the scope of his opinion, which does not

25               include liability.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 263

1      A.      Yeah, I don't have an been on that, but it's
2      not necessarily true, because I've been asked to assume
3      liability with respect to Microsoft.  I haven't been
4      asked to assume liability with respect to whatever
5      parties you're referring to.
6      Q.      So let's say, for example, that you understand
7      that SoftBank is one of the entities that currently has
8      an economic interest in the public benefit corporation,
9      correct?
10     A.      Yes.
11     Q.      If were you instructed to assume that SoftBank
12     was unjustly enriched, you would perform a calculation
13     of their unjust enrichment that follows the same
14     methodology that you did for OpenAI and Microsoft,
15     correct?
16     A.      You could, yes.
17     Q.      And you could do that calculation regardless of
18     the size of any of those investors' contributions,
19     correct?
20     A.      Theoretically, yes.
21     Q.      I want to go back to the topic of the
22     discounted compute that Microsoft donated to the
23     nonprofit.  And again I'm going to represent to you,
24     Dr. Wazzan, that OpenAI procured that compute for █████
25     ███████ less than it would have to pay for that compute

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 264

1        at market rates.

2        A.     Okay.

3        Q.     Okay.  Now if you turn to paragraph 72 of your

4        report, I want to direct your attention to the last

5        sentence, which says:

6                     "All told, before he left OpenAI,

7               Mr. Musk was responsible for approximately 60

8               percent of all financial contributions."

9                     That's one of the conclusions that you

10              have in your report, correct?

11       A.     Yes.

12       Q.     Okay.  Now, that 60 percent figure does not

13       account for the ███████ donation that OpenAI

14       received as a result of discounting computing from

15       Microsoft, correct?

16                     MR. KRY:  Objection.  The witness has

17              already testified it's not a ███████

18              discount.

19                     MR. JURATA:  That's a speaking

20              objection.

21                     MR. KRY:  I'll just withdraw it, and

22              objection to form.

23       A.     So there's a discount.  I accept that the

24       compute power was provided at a discount.  Should we

25       characterize that as a financial contribution or should

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 265

1           we characterize it as sort of a contribution in kind,

2           which is why I think the cost basis is the more

3           meaningful number, but even so, no, I haven't factored

4           it in here.

5           Q.      And if you did factor in that amount, that

6           means that the 60 percent figure attributed to Mr. Musk

7           would be lower, correct?

8           A.      It might be.  Again, it would, you know, under

9           your hypothetical, yes, but it's, again, we'd have to

10          assume that that -- is that contribution prior to the

11          formation of the for-profit or after?

12          Q.      I believe your report addresses this, that it

13          was prior.

14          A.      Right, so if it's prior, just because you had

15          told me let's assume, earlier in my questioning, but --

16          Q.      Understood.

17          A.      So if it's prior, if Microsoft -- yeah, so I

18          guess it would count.  It would be -- if they were a

19          claimant, based on that investment, they would reside in

20          the 25 to 50 percent left over on the nonprofit.  So in

21          effect, they would be a plaintiff against themselves.

22          Q.      That wasn't actually my question, Dr. Wazzan.

23          My question was, that if you would have accounted for

24          the value of the discounted compute, then at the time

25          that Mr. Musk left OpenAI, he would be responsible for

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 266

1       an amount that would be lower than 60 percent of all

2       financial contributions, correct?

3       A.      If you -- yeah, if you calculated in that

4       fashion, if you calculated it as ████████  and you

5       applied it against, in the same way that these other

6       numbers are contributed, they would reduce that number.

7       Q.      And turning to the -- Nvidia also donated --

8       Nvidia also provided chips to OpenAI at a substantial

9       discount, correct?

10      A.      Yes.

11      Q.      And that was before Mr. Musk left OpenAI,

12      correct?

13      A.      Yes.

14      Q.      You talk about that in your report?

15      A.      Yes.

16      Q.      Okay.  And in accounting for the contributions

17      of Mr. Musk relative to others at the time that he left

18      OpenAI, that 60 percent figure does not account for the

19      value of the discounted Nvidia chips, correct?

20                      MR. KRY:  Objection to form.

21      A.      It does not.

22      Q.      And if you would account for the financial

23      value of that donation, it would reduce the 60 percent

24      number that you calculated even further, correct?

25      A.      If you applied it in that fashion, that's what

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 267

1          the math would be.
2                    MR. KRY:  And I would just object to
3               leading.  I don't think any foundation was laid
4               for the fact that the Nvidia chips were
5               provided at a discount.
6          Q.    One of the things that you testify was a
7      benefit that Mr. Musk provided in a nonfinancial fashion
8      was securing first of their kind DDX1 processing units
9      that offered a faster path to AI, correct?
10         A.    Yes.
11         Q.    Did the procurement of those
12     first-of-their-kind chips provide value to the
13     nonprofit?
14         A.    Yes.
15         Q.    Okay.  And again, when accounting for the 60
16     percent figure in paragraph 72 of your report, that does
17     not attempt to factor in the value of the contributions
18     from obtaining the Nvidia chips?
19         A.    It does not.
20         Q.    And if it did, your 60 percent figure would be
21     lower in some fashion?
22                    MR. KRY:  Objection to form.
23         A.    I mean theoretically yes, but we don't know,
24     right, whether they provided any discount, was it just
25     early.  I -- it's unclear.

JANE ROSE REPORTING                 California Firm No. 254
1-800-825-3341                 janerose@janerosereporting.com

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

                                                    Page 268

1         Q.      And the reason it's unclear is you just didn't
2     analyze that?
3         A.      No, I didn't.
4         Q.      Why don't we go back to appendix A of your
5     report?  Do you recall earlier today when you identified
6     the prior cases in which you have testified in that
7     involved the calculation of unjust enrichment?
8         A.      Yes.
9         Q.      And do you recall identifying -- and it's
10    number 9 on your list of testimony -- the Keto5 case as
11    one of those cases in which you had to calculate unjust
12    enrichment?
13        A.      Yes.
14        Q.      Okay.  And if you turn to Exhibit 8 from today,
15    that is your expert report from the Keto5 case, correct?
16        A.      Yes.
17        Q.      Can you point to the portion of your expert
18    report that analyzes unjust enrichment in that case?
19        A.      Yeah, I don't see it.  I misremembered that
20    case.
21        Q.      Okay.  That's understandable.  It's not a
22    memory test.  I just wanted to make sure I wasn't
23    missing something.  So turning back to your calculation
24    of the section of your report entitled "Microsoft's
25    Wrongful Gains," would it be accurate to say that you

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 269

```
1          followed the same methodology for calculating
2          Microsoft's alleged unlawful gains that you followed to
3          calculate OpenAI's alleged unlawful gains?
4          A.      Yes.
5          Q.      Okay.  And why did you do that?
6          A.      Because their unjust enrichment flows back to
7          the nonprofit, and then Musk gets a portion of that.
8          Q.      Again, you're not aware of any role that
9          Microsoft played in the creation of the OpenAI
10         for-profit, correct?
11         A.      Correct.  But I've assumed liability.
12         Q.      So if you turn to the third sentence of
13         paragraph 104, you say:  "In either case," and by
14         "either case," you're referring to just the specific
15         basis for valuing the relative ownership allocations of
16         the for-profit that you do.  You say that:
17                         "In either case, the resulting
18                  increases in value from Microsoft's investment
19                  are discounted to account for OpenAI's
20                  nonprofit stake in OpenAI for-profit and
21                  Mr. Musk's share of contributions to OpenAI
22                  nonprofit in order to determine the portion of
23                  Microsoft's gains that wrongfully derive from
24                  Mr. Musk's contributions."
25                         Did I read that correctly?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 270

1        A.      Yes.

2        Q.      Why is it appropriate to reduce Microsoft's

3        equity stake to the same proportion that you use to

4        reduce OpenAI nonprofits for equity stake?

5        A.      Because all of it flows back to the nonprofit.

6        Microsoft's share flows back to the nonprofit.  So 30

7        percent -- we should probably use -- at least in the

8        report in Exhibit 12, 30.4 percent of 510 yields you the

9        155, and then you subtract out the investments made by

10       Microsoft of 13 billion.  That leaves 142.  Then you

11       have to figure out what the nonprofit's share is of

12       that -- of Microsoft's piece, so you apply the 35.9

13       percent, and then you have to apply a further percentage

14       for Musk's share of the nonprofit.

15       Q.      But in calculating the nonprofit's -- let me

16       take that back.

17               In calculating the relative economic interests

18       of the for-profit, in determining the nonprofit share,

19       you do that already accounting for Microsoft's share,

20       correct?

21       A.      OpenAI has a piece, that piece flows back to

22       the nonprofit and then Musk gets a piece of that.

23       Microsoft has a piece, separate piece, it flows back to

24       the nonprofit, and then Musk has a piece of the

25       nonprofit.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 271

1    Q.    But in calculating the nonprofit's piece of the

2    for-profit, don't you already factor in, in that

3    calculation, Microsoft's economic interest in the

4    for-profit?

5    A.    No.  Think about it as a --

6    Q.    I'll give you a piece of paper so you can --

7          (Whereupon, a discussion was held off

8          the record.)

9    A.    You've got -- this is 500 billion, okay, the

10   total pie.  You've got Microsoft, you've got the

11   nonprofit, and you've got everybody else.  Okay.  And

12   the percentages are predicated on the public benefit

13   corporation.  So -- let's be precise, because you guys

14   are going to pull this up at trial.  And I'm going to

15   predicate it on just the warrants-only dilution,

16   estimate 1, okay.

17         So for OpenAI -- sorry, this is the for-profit.

18         Okay.  So how much of this for-profit, OpenAI

19   for-profit goes to Musk, right?  Well, they get 29.2

20   percent of the 500 billion, that's their slice, and then

21   Musk gets a piece of that.  So this is Musk here.  Okay?

22         Then you've got Microsoft, and they've got 25.5

23   percent.  Now some portion of this is going to flow back

24   to OpenAI, okay?  So this piece now belongs to OpenAI,

25   nonprofit.  And some piece of that belongs to Musk.

Elon Musk v.                     FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 272

1          Those do not overlap.

2          Q.     Why is it appropriate to use -- to reduce

3     Microsoft's share by the same percentage that you

4     reduced the nonprofit's share in the OpenAI for-profit?

5                     MR. KRY:  Objection to the extent

6                that's calling for a legal conclusion.

7          A.     I'm not sure I follow.

8          Q.     Well, you reduced the nonprofit's -- let me

9     take this -- let me try this again.

10                In reducing Microsoft's share of its piece of

11     the pie, you used the same nonprofit ownership

12     percentage that you use for determining the nonprofit's

13     percentage ownership of the for-profit, correct?

14          A.     Mm-hmm.

15          Q.     And in doing that original calculation that --

16     Microsoft's ownership interest was part of -- was one of

17     the inputs that you used to determine the nonprofit's

18     equity stake, correct?

19          A.     Yes.

20          Q.     So my question is, why is it then appropriate

21     to reduce Microsoft's equity interest by the percentage

22     amount of the nonprofit's ownership interest in the

23     for-profit?  Why did you use that percentage?

24          A.     Because as I understand it, the piece -- the --

25     the totality of Microsoft's unjust enrichment flows back

Elon Musk v.                          FINAL                     December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 273

1          to the nonprofit.  And so how much of that pie -- how

2          much of that pie should -- sorry, not the totality of

3          Microsoft, but some portion of Microsoft's piece has to

4          go back to the nonprofit, and that percentage is the

5          29.2 percent.  That's why.

6          Q.     But why not a higher percentage or a lower

7          percentage?  Why the 29.2 percentage?

8          A.     Because that's the nonprofit's share --

9          percentage share of the total.  So I'm applying the same

10         percentage I use of the total to their piece.

11         Q.     And you've already testified that you haven't

12         analyzed the Microsoft conduct which is alleged to be

13         wrongful in this case?

14         A.     I've assumed liability.

15         Q.     And you've also done no comparison of the

16         conduct by OpenAI which has been alleged to be unlawful,

17         and the conduct by Microsoft that is alleged to be

18         unlawful, correct?

19         A.     I've assumed liability.

20         Q.     Yet even though you haven't done any relative

21         analysis, you decided to return the same percentage of

22         Microsoft's stake to the nonprofit that you did of

23         OpenAI's stake.

24                       MR. KRY:  Objection to form.

25         Q.     Correct?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 274

1    A.      Yeah, because as I understand it, the unjust
2    enrichment flows back through the nonprofit.
3    Q.      I understand that, but why -- why assume --
4    strike that.
5            Why use the same percentage clawback to the
6    nonprofit for Microsoft that you used for OpenAI?
7    A.      I mean, again, because it's flown back to the
8    nonprofit and that's their percentage ownership of the
9    for-profit.  So they get two haircuts.
10   Q.      And you did no analysis to determine what the
11   size of the haircut should be for Microsoft relative to
12   the size of the haircut to OpenAI?
13                MR. KRY:  Objection to form.
14   A.      Correct.
15   Q.      Is it your understanding that the wrongful
16   conduct allegations for Microsoft are the same as the
17   wrongful conduct allegations for OpenAI?
18                MR. KRY:  Objection.
19   A.      That's not my understanding, and it's not
20   necessary.  Again, I've assumed liability, and that
21   disgorgement is an appropriate remedy.
22   Q.      So if you would have -- if you would have
23   concluded that the nonprofit should have 75 percent
24   ownership in the OpenAI for-profit, you would similarly
25   take a 75 percent slice out of Microsoft's remaining

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 275

1      equity stake, correct?

2      A.      Yes.

3      Q.      Explain to me why, from an economic

4      perspective, that's a proper thing to do?

5      A.      I can't be -- I don't have a different answer.

6      It's because it flows back through the nonprofit, and

7      the nonprofit -- and the nonprofit's allocation is given

8      by their percentage from the public benefit corporation

9      percentage.

10     Q.      You understand that Microsoft's equity stake in

11     the public benefit corporation was the result of an

12     arm's length negotiation?

13     A.      Yes.

14     Q.      That was your testimony from earlier today?

15     A.      Yes.

16     Q.      Which means that the OpenAI stake of the public

17     benefit corporation reflects the value that OpenAI has

18     contributed?

19     A.      In some sense.

20     Q.      It's a -- it's a fair value assessment,

21     relative to contributions of others?

22     A.      That's what the parties agreed on, yes.

23     Q.      Do you think the parties would have agreed to

24     something which did not reflect their belief that the

25     resulting stake was fair value?

Elon Musk v.                      FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

1     A.      No.

2     Q.      You have no reason to believe, based on the

3     record, that those stakes don't represent the fair

4     value?

5     A.      I do not.

6     Q.      Why is it then appropriate to reduce the fair

7     value of Microsoft's stake to the same percentage that

8     you reviewed -- that you reduced the value of the

9     for-profit stake?

10                   MR. KRY:  Objection.  Asked and

11                   answered at this point.

12    A.      Because the Microsoft's piece flows back

13    through the nonprofit, and that's their equity stake.

14    Q.      And that equity stake that gets passed back,

15    what is that designed -- what are the wrongful assets

16    that that is designed to represent?

17                   MR. KRY:  Objection to form.

18    A.      Again, I haven't parsed it that way.  I have

19    assumed liability and that disgorgement is appropriate

20    remedy.

21    Q.      And it's your professional opinion that it's

22    appropriate to do that disgorgement without looking at

23    the actual relative allegations between Microsoft and

24    OpenAI?

25                   MR. JURATA:  No, that's a bad question.

Elon Musk v.                      FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

                                                            Page 277

    1              Let me try that again.
    2         Q.    It's your professional opinion that it was
    3    appropriate to reduce both slices by the same percentage
    4    even though you have not analyzed the relative
    5    conduct -- the conduct allegations against Microsoft
    6    relative to the conduct allegations against OpenAI?
    7              MR. KRY:  Objection to form.
    8         A.    It's not necessary.  It's predicated on their
    9    ownership percentage and that flows directly back to
   10    them.
   11         Q.    And would it be correct to say that the
   12    non-wrongful conduct by Microsoft that led to an
   13    increase in the valuation of OpenAI is represented by
   14    the remainder, which is the residual of your analysis?
   15              MR. KRY:  Objection to form.
   16         A.    You could characterize it that way.
   17         Q.    I'm moving onto -- we're getting close to the
   18    end.
   19              I want to turn to section 9 of your report.  At
   20    a high level, can you explain for me what you were
   21    trying to do in this section?
   22         A.    Yeah.  It's pretty straightforward.  Counsel
   23    asked me to apportion the unjust enrichment gains that
   24    I've calculated in the earlier sections based on some
   25    dates, and as I understand it, the dates are consistent

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 278

```
 1          with different deals and investments that took place,
 2          and there are issues related to Statutes of Limitations,
 3          I think, so I only have a very high level understanding
 4          of that, but I took the dates as given, and apportioned
 5          across those dates.
 6          Q.      So would it be fair to say that in paragraph
 7          107, when you look at little numerals 1, 2, and 3, they
 8          are meant to be a rough proxy for the 2019 Microsoft
 9          agreements, the 2021 Microsoft agreements and the 2023
10          Microsoft agreements?
11          A.      Yes.
12          Q.      Now, when looking and calculating the valuation
13          of the OpenAI for-profit during these periods, you
14          didn't do an analysis of the contributions of any other
15          entity that isn't OpenAI or Microsoft, correct?
16          A.      Correct.
17          Q.      And again, you didn't try to apportion the
18          contributions by Microsoft that are alleged to be
19          lawful -- I'm sorry, let me state that again.  I'll try
20          again.
21              You didn't try to apportion the contributions
22          by Microsoft that are not alleged to be wrongful from
23          the contributions by Microsoft which are alleged to be
24          wrongful?
25          A.      I assumed liability and looked at a
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 279

1        disgorgement analysis.

2        Q.      Can you explain to me what Exhibit 15 is trying

3        to demonstrate?

4        A.      Yes.  So you have to match it up with --

5                        MR. KRY:  Let me just object.  Exhibit

6                15 was one of the ones that was replaced.  Do

7                you want to re-mark --

8                        MR. JURATA:  Yes, that's a fair --

9                thank you.  Let's turn to your supplemental

10               expert report which is Wazzan Exhibit 3 and

11               walk through that Exhibit.

12                       Actually the errata report.  Have we

13               entered the errata report into evidence?

14                       MR. KRY:  I don't recall that we have.

15                       MR. WILSON:  We have not.

16                       MR. JURATA:  Why don't we go ahead and

17               take a break.

18                       THE VIDEOGRAPHER:  We're off the record

19               at 5:21 p.m.

20                  (Whereupon, a short break was taken.)

21                       THE VIDEOGRAPHER:  Please stand by,

22               we're back on the record at 5:21 p.m.

23       BY MR. JURATA:

24       Q.      Dr. Wazzan, I just marked on the picture that

25       you were drawing on the paper as Wazzan Exhibit 12.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 280

1              Can you just confirm that this is an accurate

2        depiction of the testimony and drawing that you just

3        did?

4        A.     Yes.

5                      (Whereupon, Dr. Wazzan's Drawing was

6                 marked as Wazzan Exhibit 12, for

7                 identification, as of this date.)

8                      MR. JURATA:  Let's introduce Exhibit

9                 13.

10                     (Whereupon, the Errata to October, 29,

11                2025 Expert Report of C. Paul Wazzan, Ph.D.,

12                was marked as Wazzan Exhibit 13, for

13                identification, as of this date.)

14       BY MR. JURATA:

15       Q.     Dr. Wazzan, Exhibit 13, is, I believe, the

16       errata that you submitted to your expert report.  Is

17       this the same errata you were referring to earlier

18       today?

19       A.     Yes.

20       Q.     And it's correcting Exhibits 15 and 17 from

21       your original report?

22       A.     Yes.

23       Q.     I want to talk about Exhibit 15.  Can you

24       explain to me what this Exhibit is designed to

25       represent?

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 281

1     A.     Yeah.  So the idea is that I've calculated the
2     unjust enrichment, but there are various time periods
3     from 2019 to October 2025 which is when I filed the
4     report, and I was asked to apportion the unjust
5     enrichment over those three time periods based on
6     essentially legal issues.  So that's what I did, and to
7     do that, I predicated it on some documents that were in
8     the record that tracked value over time so that I could
9     divide it up in three.
10    Q.     Is it correct to say that other than the
11    valuations being different from the three time periods
12    that the methodology that you followed is similar to
13    the -- is the same methodology that you did for
14    calculating unjust enrichment in its entirety?
15    A.     Yes.
16    Q.     I'd like to focus in -- so the only difference
17    is the valuation at that particular time?
18    A.     Yes.
19    Q.     And the valuation being the valuation of the
20    OpenAI for-profit?
21    A.     Yes.
22    Q.     I want to focus on the date range from March
23    21st to January 23.
24    A.     Yes.
25    Q.     I notice that the numbers for Microsoft there

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 282

```
 1      are negative?

 2      A.      Yes.

 3      Q.      So is -- is the conclusion from that that for

 4      the period of March 21st to January 2023, that your

 5      conclusion is Microsoft has not been unjustly enriched

 6      during that period?

 7      A.      Sort of.  They've been unjustly enriched, but

 8      they contributed 13 billion which offset the gains

 9      there, so you get a negative in that one period.

10      Q.      So does that mean that if that's the period

11      that is the only period in which the fact finder

12      concludes liability, does this mean that Microsoft would

13      be owed money?

14      A.      Well, I guess I would zero it out, but yes.

15      Q.      And does it seem in your professional opinion

16      that the methodology that shows unjust enrichment during

17      one period but no unjust enrichment during another

18      period, followed by a much larger unjust enrichment in

19      another period, is that a reliable methodology for

20      calculating unjust enrichment?

21                      MR. KRY:  Objection to form.

22      A.      Totally.  Yes.

23      Q.      And why?

24      A.      Because you've calculated the unjust enrichment

25      as of today, and now I'm going to superimpose on that a
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 283

1          requirement to apportion it over a lengthy time period,

2          from 2019 to 2025.  The only way to do that is

3          predicated on a consistent set of documents that give

4          values at each point in time for the for-profit.  So

5          that's what I've done.  You know, the math turns out

6          however it turns out.  The negative are because I'm

7          giving credits to Microsoft for its investments.

8          Q.     So the focus on the date range of January 2023

9          to October 2025, do the figures that you calculate on

10         there, do they account for the earlier capital

11         contributions made by Microsoft?

12         A.     Yes.

13         Q.     And where -- if I wanted to validate your

14         statement, where would I go to confirm that what you

15         just said is accurate?

16                MR. KRY:  Objection to form.

17         A.     Where would you go -- well, in fact, I mean you

18         could see it there.  There's a negative in the second

19         period.  And that's because its being credited, but I

20         guess you could go to the exhibit itself and look at the

21         calculations in the Excel spreadsheet.

22         Q.     What I mean is, does the valuation for the

23         January '23 to October 2025, does that calculation of

24         Microsoft's unjust enrichment, does that factor in the

25         earlier contributions made by Microsoft in the earlier

JANE ROSE REPORTING              California Firm No. 254
1-800-825-3341               janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 284

1    time periods?

2    A.    I believe so, yes.

3    Q.    And if, again, if I wanted to confirm what you

4    said is correct, where in your backup materials should

5    I look?

6    A.    I think you would look at the native Excel file

7    and see where the 13 billion was subtracted.

8    Q.    I'm going to turn now back to your supplemental

9    expert report.  Let me take a look at Exhibit 19 and

10   Exhibit 20 -- well, revised Exhibit 19 and revised

11   Exhibit 20.

12         So Mr. Musk alleges that he made

13   contributions -- financial contributions in the amount

14   of $38 million and additional nonfinancial contributions

15   to the nonprofit on top of that, correct?

16   A.    Yes.

17   Q.    Okay.  To which you equated into an economic

18   value that Mr. Musk should have in the nonprofit,

19   correct?

20   A.    Yes.

21              MR. KRY:  Objection to form.

22   Q.    And if you look at estimates three and four on

23   Exhibit 19, which you testified earlier today as of

24   today is the most accurate way of looking at dilution,

25   it indicates that Mr. Musk should have a stake in the

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 285

1          OpenAI for-profit coming from the OpenAI nonprofit

2          between 65 and $98 billion, correct?

3                       MR. KRY:  Objection.  That misstated

4                the prior testimony.

5          A.        Roughly, yes.

6          Q.        What was incorrect about that?

7          A.        I think he's -- I think Mr. Kry is concerned

8          about your categorization of the most accurate versus

9          the dilution.  I think where we left off on that was, if

10         you assume that all those elements have been allocated,

11         then you would look at three and four.  If they had not

12         all been allocated, you would look at one and two.

13         Q.        Okay.  Thank you for that clarification.  And

14         if we look at estimates three and four in Exhibit 20 for

15         Microsoft, Mr. Musk would be entitled to an additional

16         13 to 20 billion dollars, correct?

17         A.        Yes.

18         Q.        Now you agree with me that Microsoft has made

19         financial investments in the OpenAI for-profit of $13

20         billion, correct?

21         A.        Yes.

22         Q.        And --

23         A.        Well, sort of.  We talked about it, they made

24         the contribution, but some of that or most of it has to

25         come back into Microsoft for purchasing compute

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 286

1    services.  And so really the right number is not -- it's

2    I give you 10, ▬▬▬▬ comes back, but what was my cost

3    of ▬▬▬▬ or what's my cost of ▬▬▬▬ so I can get to

4    ▬▬▬▬, but it's really, what is my -- if I'm at

5    capacity constraint, for example, then the cost is zero,

6    right.

7    Q.    Do you believe that the cost to Microsoft of

8    its investment, it's various investments in OpenAI is

9    zero?

10    A.    For the portion that comes back, if Microsoft

11    is not capacity constrained, it could be zero.

12    Q.    Now, you understand that a substantial amount

13    of Microsoft's investments were used to build custom

14    supercomputers that only can be used by OpenAI, correct?

15              MR. KRY:  Objection.  Foundation.

16    A.    I don't -- I don't have that understanding.

17    Q.    Because you haven't looked at the actual

18    underlying liability claims?

19              MR. KRY:  Objection.

20    A.    It wasn't necessary.

21    Q.    Would you agree with me that if money that

22    Microsoft spent building supercomputers, they're

23    customized only for OpenAI's use, then the opportunity

24    cost for Microsoft from that investment is not zero,

25    right?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 287

1      A.      Yeah, and I'm giving Microsoft full credit for

2      their 13 billion.

3      Q.      Okay.  That's what I wanted to make clear.

4      Now, and if you -- after Microsoft's $13 billion

5      investment, if you subtract out the portion of that debt

6      your analysis claws back and provides to Mr. Musk, under

7      estimates three or four, Microsoft's investment would be

8      worth between 82 and $88 billion today, correct?

9                    MR. KRY:  Objection to form.

10     A.      I'm sorry.  Where are you looking?

11     Q.      Okay.  What I'm basically asking you to do is

12     to determine what is the value of Microsoft's investment

13     after a portion of that gets clawed back and

14     redistributed to Mr. Musk under your unjust enrichment

15     analysis.  And I believe, using estimates three and four

16     you can come up with a number there.

17     A.      I see.  So you want to subtract K from C?

18     Q.      No.  I want to subtract K from H.

19     A.      Okay.  Yeah, you can do that.

20                   MR. KRY:  Objection to form.

21     Q.      Would that be the appropriate way to measure

22     the value of Microsoft's interest in the OpenAI

23     for-profit after removing the funds that you allege were

24     obtained by unjust enrichment and providing those to

25     Mr. Musk?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

---

Page 288

1                    MR. KRY:  Objection to form.

2         A.      If you subtract K from H, what's left over is

3         Microsoft's piece.

4         Q.      Okay.  Um, and am I correct that if you

5         subtract K from H, Microsoft's equity as of today would,

6         under estimates three and four, range between 82 and 88

7         billion dollars?

8         A.      Yes.

9         Q.      Okay.  I'm not good with math, Dr. Wazzan, but

10        thankfully, you are.  What is the return that

11        Microsoft -- actually, let me go back.

12                What is the return that -- if Mr. Musk's award

13        of unjust enrichment is between 78 and 118 billion

14        dollars, as your estimates three and four suggest, what

15        is the level of Mr. Musk's return on his $38 million

16        financial investment?

17        A.      It's a very big number.

18        Q.      Would 300,000 percent sound about right to you?

19                    MR. KRY:  Object to form.

20                    Answer it only if you can do the math.

21        A.      I can't do the math.

22        Q.      If I give you a calculator, could you do the

23        math?

24        A.      Yes.  I'm willing to take your representation,

25        though.

---

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 289

```
1      Q.      I don't want you to answer my representation.
2                      MR. JURATA:  For the record, I'm
3              handing the witness a calculator.
4                      MR. KRY:  And just for the record, the
5              78 and 118 billion figures are coming from
6              where?  The sum of the OpenAI and Microsoft
7              numbers?
8                      MR. JURATA:  Correct, yeah.
9                      MR. KRY:  Thank you.
10     A.      So 65 and 13 is 78.  What do you want to
11     measure that against?
12     Q.      Against Mr. Musk's $38 million financial
13     contribution.
14                     MR. JURATA:  For the record, I used
15             ChatGPT for my calculation, but that's why you
16             should confirm it.
17     A.      I did it backwards.  Yeah, it's like 2,000
18     percent.
19     Q.      2,000 percent?
20     A.      Or 20,000 percent.
21     Q.      20,000 percent.  Thank you.  Can you similarly
22     calculate the return that your analysis indicates that
23     Microsoft should earn?
24     A.      I'm going to use my mine.
25     Q.      Okay.  That's fine.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 290

1          Can you calculate the return that Microsoft
2     earns as a result of your analysis, after accounting for
3     unjust enrichment, on the basis of the $13 billion
4     investments that you note in your report?
5     A.     I'm sorry.  Ask it again?
6     Q.     I'm asking you to do the same calculation that
7     you did for Musk on his return from 38 million to
8     Microsoft's return -- what is Microsoft's return --
9     A.     Oh, of 13 billion?
10    Q.     -- of its 13 billion?
11    A.     Okay.  So let's agree that the numerator is
12    84 -- 94, 94 billion.
13    Q.     And how are you calculating 94 billion?
14    A.     I'm going H minus K.
15              MR. KRY:  For which column?
16    Q.     Yeah, I don't think that's 94.
17    A.     101.  All right.  101 minus 13, 88.  All right.
18    88 billion divided by 13 billion, 6.76, and I did it
19    backwards.
20    Q.     So if we were to do it in apples to apples to
21    what you calculated for Mr. Musk?
22    A.     Yeah, stand by.  This is why you don't do stuff
23    without Excel spreadsheet on the fly in a deposition.
24    Q.     My client does appreciate your use of Microsoft
25    Excel.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

```
                                                    Page 291
 1      A.      13 billion.  Let's go 13 million this time
 2      divided by 88.  14,000 percent versus 20,000 percent.
 3                      MR. KRY:  Objection to the math.
 4                      MR. WILSON:  I have an objection to the
 5              math here.  That can't be right.
 6                      THE WITNESS:  I'm struggling.  Give me
 7              the number.
 8                      MR. JURATA:  Why don't we take a break?
 9                      THE WITNESS:  I'll calculate it and
10              we'll come back.
11                      MR. JURATA:  Okay.  Great.
12                      THE VIDEOGRAPHER:  We're going off the
13              record at 5:52 p.m.
14          (Whereupon, a short break was taken.)
15                      THE VIDEOGRAPHER:  Please stand by.
16              We're back on the record at 6:02 p.m.  This
17              marks the beginning of Media 8.
18      BY MR. JURATA:
19      Q.      Dr. Wazzan, I asked you, using revised
20      Exhibits 19 and 20, to calculate the respective rates of
21      return for both Mr. Musk and Microsoft under your unjust
22      enrichment analysis using the warrants EV-sponsored pool
23      and EIP dilution estimates, correct?
24      A.      Yes.
25      Q.      And have you had a chance to do those
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 292

1      calculations?

2      A.      I did it for estimate 3 in both instances.

3      Q.      Okay.

4      A.      So the Musk rate of return is 207,700 percent,

5      and the Microsoft rate of return is 680 percent.

6      Q.      And would you agree with me, without doing the

7      calculations, that the numbers would be even higher

8      under your estimate for analysis -- actually, let me

9      take that back.

10             Would you agree with me that Mr. Musk's return

11     on investment would be higher than those figures under

12     your estimate 4 analysis?

13     A.      Yes.

14                     MR. KRY:  Objection.

15     Q.      And would you agree with me that Microsoft's

16     rate of return would be less than those figures under

17     your estimate 4 analysis?

18                     MR. KRY:  Objection.

19     A.      Yes.

20     Q.      Okay.  If you can turn to revised Exhibit 18 --

21     actually.

22                     MR. KRY:  Just for clarity of the

23                  record, what he gave you were the estimate 3

24                  column, not the estimate 4 column.

25                     MR. JURATA:  Correct.  Correct.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 293

1      Q.      And then I believe, Dr. Wazzan, you testified

2      that under estimate 4, Musk's return would be higher and

3      Microsoft's return would be less?

4                      MR. KRY:  I object to the math on that.

5      A.      Yes.  Correct.

6                      MR. JURATA:  Can we go ahead and mark

7                  that piece of paper that Dr. Wazzan brought in

8                  as an exhibit?  I just want to mark that as an

9                  exhibit.

10                     (Whereupon, Dr. Wazzan's Calculations

11                 were marked as Wazzan Exhibit 14, for

12                 identification, as of this date.)

13                     MR. KRY:  Yeah, and I just withdrew the

14                 objections.

15     BY MR. JURATA:

16     Q.      Dr. Wazzan, turning back to Exhibit 18, is it

17     correct to say that under both of your post-dilution

18     calculations that the nonprofit has a higher ownership

19     percentage than Microsoft in the OpenAI for-profit?

20     A.      Yes.

21     Q.      Okay.

22                     MR. JURATA:  I have no further

23                 questions.  Thank you, sir, for your time.

24                     MR. WILSON:  How much time do the

25                 defendants have left on the record?

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 294

1                    THE VIDEOGRAPHER:  We're at 6:51 right

2            now.

3                    (Whereupon, a discussion was held off

4            the record.)

5                    THE VIDEOGRAPHER:  Going off the

6            record, 6:06 p.m.

7            (Whereupon, a short break was taken.)

8                    THE VIDEOGRAPHER:  Please stand by.

9            We're back on the record at 6:06 p.m.

10    EXAMINATION BY

11    MR. KRY:

12    Q.    Dr. Wazzan, as you know, I'm plaintiff's

13    counsel and I just have a few follow-up questions for

14    you.  Do you recall being questioned by Microsoft's

15    counsel about whether you had improperly failed to

16    account for Microsoft's supposed donation of discounted

17    compute to OpenAI in the 2016 to 2018 timeframe?

18    A.    Yes.

19    Q.    Did you review any internal documents from

20    Microsoft that discussed Microsoft's rationale for

21    entering into that transaction with OpenAI?

22    A.    I just don't recall.

23    Q.    And so you don't know whether Microsoft entered

24    into that transaction because it proceeded as a

25    commercial opportunity to get into the OpenAI, rather

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
                                                   Page 295
 1        the artificial intelligence space?
 2                    MR. WILSON:  Object to the form.
 3        A.    I don't recall.
 4        Q.    And you don't know whether -- well, do you know
 5        whether Microsoft imposed contractual obligations on
 6        OpenAI to evangelize Microsoft's products in connection
 7        with that transaction?
 8        A.    I don't recall.
 9        Q.    Did you review OpenAI's Form 990 tax records
10        listing its donors?
11        A.    Yes.
12        Q.    Do you recall ever seeing any records of OpenAI
13        ever recognizing an in-kind donation from Microsoft for
14        discounted compute?
15        A.    No, I never saw that.
16        Q.    If the jury --
17        A.    Sorry, I'll clarify that.  It's not that I
18        didn't see it; it's not in there.
19        Q.    Thank you.  If the jury concludes that
20        Microsoft entered into a transaction with OpenAI for
21        compute on commercial arm's length terms, would there be
22        any reason why any adjustments should be made to the
23        contributions to the nonprofit?
24                    MR. WILSON:  Object to the form of the
25        question.
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 296

1      A.      I don't think so, no.

2      Q.      So in the event that the jury concludes that

3      this was an arm's length transaction on commercial

4      terms, would the analysis in your report provide the

5      jury with a sufficient basis for computing wrongful

6      gains?

7                      MR. WILSON:  Object to the form of the

8              question.  Vague.  Calls for a legal

9              conclusion.

10     A.      Yes.

11     Q.      And then turning to Nvidia, do you recall being

12     questioned today about whether Nvidia should be

13     accounted as a contributor because of the GPUs that they

14     provided to OpenAI when it was still a nonprofit?

15     A.      Yes.

16     Q.      Do you know one way or the other whether those

17     were even discounted to begin with?

18     A.      I do not.

19     Q.      When you reviewed OpenAI's tax forms, did you

20     see any records of Nvidia having provided first of its

21     kind GPUs on some sort of charitable philanthropic basis

22     to OpenAI?

23     A.      No.  They're not in there.

24     Q.      And if the jury concludes that this was a

25     commercial transaction between Nvidia and OpenAI, would

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

```
                                                   Page 297
    1         there be any reason why your contribution analysis would
    2         have to be adjusted on account of that transaction?
    3                         MR. WILSON:  Objection.  Vague.  Calls
    4              for a legal conclusion.
    5         A.    No.
    6         Q.    So if the event that the jury concludes that
    7         that was a commercial transaction, does your analysis
    8         provide the jury with a sufficient basis to compute
    9         wrongful gains?
   10                         MR. WILSON:  Same objections.
   11         A.    Yes.
   12         Q.    Do you recall being questioned a bit earlier
   13         today about your alleged failure to consider
   14         contributions that OpenAI employees made to the
   15         nonprofit and/or the for-profit in your analysis?
   16         A.    Yes.
   17         Q.    If I can get you to turn to your expert report,
   18         Exhibit 1.  And in particular, Exhibit 9 in the pro
   19         forma cap table?
   20         A.    Page?
   21         Q.    Page 46.
   22         A.    Okay.
   23         Q.    You see on left-hand side after listing the
   24         four founders there's lines for Schulman Grant, Zaremba
   25         Grant, Employees and Pools?
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 298

1      A.      Yes.

2      Q.      So those employee grants have been allocated

3      part of the perspective ownership in this pro forma cap

4      table?

5                      MR. WILSON:  Object to the form.

6      A.      Yes.

7      Q.      And did you consider this chart in formulating

8      your opinion about the -- Musk's effective stake in the

9      nonprofit?

10     A.      Yes.

11     Q.      So based on those lines in the cap table,

12     employees of OpenAI would have been counted among the 25

13     to 50 percent stake that was not Musk's?

14                     MR. WILSON:  Object to the form of the

15                     question.

16     A.      That's correct.

17     Q.      When in 2019 OpenAI nonprofit formed its

18     for-profit entity, where did the employees that formerly

19     worked for the nonprofit go?

20     A.      They went to the for-profit.

21     Q.      And then in the years after 2019, are you aware

22     that an employee vehicle was formed to hold equity

23     grants for the employees that now work for the

24     for-profit?

25     A.      Yes.

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 299

1                    MR. KRY:  I'm going to mark as

2        Exhibit -- what are we up to 14?

3                    THE REPORTER:  No 15.

4                    (Whereupon, OpenAI Summary

5        Post-Recapitalization Cap Table was marked as

6        Wazzan Exhibit 15, for identification, as of

7        this date.)

8                    MR. KRY:  I've marked as Exhibit 15 a

9        document that is blown up from a larger

10       document, just because it's an excerpt --

11                   THE REPORTER:  One second.

12                   MR. WILSON:  While that's printing,

13       Robert, do you know what the Bates number for

14       the document this is blown up from.

15                   MR. KRY:  Yeah.  I'm just about to read

16       that into the record.

17                   MR. WILSON:  Thank you.

18                   MR. KRY:  Are we sure we're on 15 and

19       not 14?

20                   MR. WILSON:  I'm not the person to ask.

21       I've lost count.

22                   THE REPORTER:  This 14 (showing).

23                   MR. KRY:  Yeah, this is 14.

24                   THE REPORTER:  No, this is 14

25       (showing.)

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 300

1              MR. KRY:  Oh right, right.  That's the

2         one I forgot.

3              MR. WILSON:  I was just going to say,

4         I'm sure Brooke knows.

5              MR. KRY:  So Exhibit 15 is blown up

6         from a document that was produced to us as

7         OPENAI_MUSK00038352 and this is the post-PBC

8         cap table.

9    BY MR. KRY:

10        Q.    Do you recognize this document?

11        A.    Yes.

12        Q.    On the -- did you consider this document when

13   you were preparing the analysis in your supplemental

14   report?

15        A.    Yes.

16        Q.    On the left-hand side, do you see there's a

17   line there for EV outstanding?

18        A.    Yes.

19        Q.    And that has a diluted for warrants stake of

20   25.3 percent and a so-called fully diluted stake of 22.7

21   percent?

22        A.    Yes.

23        Q.    And is that line the same vehicle that was --

24   formerly existed as an entity called Aestas?

25        A.    That's my understanding.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 301

```
1       Q.      And that stake holds all the employee interests
2       in the for-profit vehicle since inception?
3       A.      Yes.
4       Q.      And in the course of allocating stakes in the
5       for-profit entity among the nonprofit and the other
6       holders, was one of the other stakes that was not
7       attributed to the nonprofit this 26 or 22 percent stake
8       in the employee vehicle?
9       A.      Yes.
10      Q.      And so to that extent, did you consider the
11      various employee interests in the for-profit?
12      A.      Yes.
13      Q.      And beyond that, you also see a line for the
14      EV-sponsored pool at 0.5 percent and the employee
15      incentive plan at 9.6 percent?
16      A.      Yes.
17      Q.      And in your alternative, so-called fully
18      diluted analysis, did you also effectively carve out
19      those stakes in determining how much of the value of
20      OpenAI was attributable to Musk?
21                      MR. WILSON:  Object to form.
22      A.      Yes, I did.
23      Q.      And is that another respect in which you
24      considered the interest of employees in the for-profit
25      vehicle?
```

Elon Musk v.                         FINAL                  December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 302

1        A.      Yes.

2        Q.      Turn back to your report.  And specifically

3        paragraph 98.  Are you there?

4        A.      Yes.

5        Q.      So this is the paragraph that lists several

6        things you considered in formulating your opinion that

7        Mr. Musk's attributed stake in the nonprofit was between

8        50 and 75 percent.  Was one of the things listed here

9        the 52 to 78 percent range from the pro forma cap table?

10       A.      Yes.

11       Q.      Is another thing the xAI stake of 53 percent?

12                       MR. WILSON:  Object to the prior

13               question.  Go ahead.

14                       MR. KRY:  On -- just for failure to

15               read the decimal places or for something else?

16                       MR. WILSON:  No, I think the question

17               was ambiguous.  The pro forma cap table is

18               column as agreed according to Dr. Wazzan, the

19               scenarios 1, 2 and 3, he already testified are

20               hypothetical, and you read the 78.1 percent as

21               if that were part of the cap table, so I'm

22               objecting.

23                       MR. KRY:  That's fair.  I'll rephrase

24               the question.

25       BY MR. KRY:

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 303

1     Q.      Is one of the four things you considered, the

2     52.41 percent to 78.13 percent stakes that come from the

3     pro forma cap table and the alternative scenarios to

4     that cap table that you reported?

5     A.      Yes.

6     Q.      Is one of them the 53 percent stake that

7     Mr. Musk has in xAI?

8     A.      Yes.

9     Q.      And is one of them the 60 percent share of

10    contributions that Mr. Musk had through his departure

11    date?

12    A.      Yes.

13    Q.      And was one of them the qualitative analysis of

14    Mr. Musk's non-monetary contributions that you

15    undertook?

16    A.      Yes.

17    Q.      So I just want to ask some questions about the

18    relationships between those four things.

19            If for some reason the court rules that the pro

20    forma cap table and the alternative scenarios should not

21    be considered in this case, would the remaining

22    considerations you relied on in this paragraph still

23    lead you to conclude that the value of Musk's attributed

24    stake is at least 50 percent?

25    A.      Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 304

1    Q.    And if the court rules that the xAI ownership

2    share should not be considered in your analysis, would

3    the remaining points in this paragraph still lead you to

4    conclude that the size of Musk's attributed stake should

5    be at least 50 percent?

6              MR. WILSON:  Object to the form.

7    A.    Yes.

8    Q.    And if the court rules that both the pro forma

9    cap table and the xAI stake should not be considered in

10   the case, would the remaining two considerations, namely

11   your analysis of the financial contributions and your

12   analysis of the non-monetary contributions still lead

13   you to conclude that the size of Musk's attributed stake

14   should be at least 50 percent?

15   A.    Yes.

16   Q.    And in your opinion, does your report set forth

17   an adequate basis for the jury to accept your

18   conclusions on those issues?

19             MR. WILSON:  Object to the form.

20   A.    Yes.

21   Q.    Now right at the beginning of the day, you made

22   a statement in one of your responses to the effect that

23   the only predicate act that you modelled in this case

24   was the creation of the for-profit entity in 2019.

25             Do you recall that testimony?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 305

1    A.    Yes.

2    Q.    If the jury concludes that the defendants, one

3    or both of them, committed acts that warrant

4    disgorgement of wrongful profits, included not only that

5    initial creation of the for-profit entity in 2019, but

6    also the subsequent transaction in 2021, the subsequent

7    transaction 2023 and the recapitalization in 2025, would

8    that finding have any impact on the -- of those

9    additional wrongful predicate acts, have any finding on

10   the amount of wrongful gains that you computed in this

11   case?

12              MR. WILSON:  Object to the form of the

13              question.  Compound.  Ambiguous.

14   A.    No.  You get to the same number.

15   Q.    Okay.  And just for the sake of resolving the

16   compound objection, if the jury finds that -- well, no,

17   I'll stand on the question.

18              If the jury finds that the 2019 transaction was

19   not a predicate act but that the 2021, 2023, and 2025

20   transactions are predicate acts, does your report in

21   this case set forth a basis from which the jury could

22   determine the amount of wrongful gains for the period

23   covered by those transaction?

24              MR. WILSON:  I want to explain my

25              objection.  I think it will be helpful.  Are

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 306

1              you, when you talk about the 2019 transaction

2              talking about the Microsoft investment or the

3              2019 formation of the for-profit?

4                    MR. KRY:  Thank you.  Let's take those

5              one at a time.

6     BY MR. WILSON:

7     Q.     If the jury finds that the formation of the

8     OpenAI LP is not a predicate act, but the later in 2019

9     investment of Microsoft is a predicate act and the 2021,

10    2023 and 2025 transactions are all predicate acts, does

11    your opinion set forth a basis on which the jury can

12    find wrongful gains from that configuration?

13                   MR. WILSON:  Object to the form.

14    A.     Yes, you can look at the exhibit that has the

15    apportionment by the various dates.

16    Q.     Yeah, and if the jury finds that neither of the

17    but 2029 [sic] dates is the predicate act, but the 2021

18    sorry, transaction, the 2023 transaction, and the 2025

19    transaction are predicate dates, does your report set

20    forth a basis for finding wrongful gains from those

21    acts?

22                   MR. WILSON:  Object to the form.

23    A.     Yes.

24    Q.     And if the jury finds that only the 2023, $10

25    billion investment, and the 2025 recapitalization are

JANE ROSE REPORTING                  California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

```
 1        predicate acts, does your report set forth a basis for
 2        which a jury can find wrongful gains from that?
 3                    MR. WILSON:  Same objections.
 4        A.     Yes.
 5                    MR. KRY:  All right, those are the
 6        questions I have.
 7        CONTINUED EXAMINATION BY
 8        MR. WILSON:
 9        Q.     All right, Dr. Wazzan a couple of questions.
10               Do you think -- in your opinion, did the
11        formation of the for-profit in 2019 create value for
12        OpenAI?
13        A.     Yes.
14        Q.     Okay.  How much value?
15                    MR. KRY:  Objection to form.
16        A.     500 billion.
17        Q.     So the entire 500 billion is attributable to
18        the 2019 for-profit formation?
19                    MR. KRY:  Objection to form.
20        A.     I mean without the creation of the for-profit,
21        you don't have -- I don't know.  I'm not sure how to
22        answer it.
23        Q.     Okay.  It's not something you analyzed?
24        A.     I think it's the full amount.  I mean, the way
25        I see it and the way I've been asked to analyze this is
```

Elon Musk v.                FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 308

1          to assume liability predicated on the formation of the

2          nonprofit.  The nonprofit -- sorry, the for-profit.  The

3          for-profit is worth 500 billion, and I've been asked to

4          calculate the disgorgement amount that flows back to

5          Mr. Musk.  So I think it's the whole amount.

6          Q.    Okay.  But you've never undertook to separate

7          the value that was created in any of the follow-on

8          Microsoft transactions that Mr. Kry just described,

9          correct?

10                        MR. KRY:  Objection to form.

11         A.    So I've tried to apportion them over the time

12         period based on the table I have.

13         Q.    You've apportioned the alleged wrongful gains

14         by team period, but you have not, at least so far as I

15         can tell, attempted to apportion the wrongful gains by a

16         specific transaction, and my question is whether I'm

17         correctly reading your report?

18                        MR. KRY:  Objection to form.

19         A.    Well, the time periods are based on the

20         transactions, so aren't they one and the same?

21         Q.    That's for someone else to decide.  My

22         question, though, is whether you ever broke down the

23         wrongful gains based on transactions?

24                        MR. KRY:  Objection to form.

25         A.    I think it's one and the same.

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL           Paul Wazzan, Ph.D.

Page 309

1    Q.      Okay.  But the only analysis you can point to

2    is the apportionment analysis in the report, correct?

3    A.      Yes.

4    Q.      Okay.  Very quick question about Exhibit 9,

5    which Mr. Kry just asked you about.  Referred to the

6    fact that there's a 7.6 percent -- at least in the first

7    column -- allocation in this particular chart to

8    employees.

9            Do you remember just being asked about that?

10   A.      Yes.

11   Q.      Okay.  Do you have any basis to believe that

12   that 7.6 percent allocation is based on work that OpenAI

13   employees did for the nonprofit before the for-profit

14   was formed?

15                   MR. KRY:  Objection to form.

16   A.      No.

17   Q.      Can we get out Exhibit 12, which is your second

18   of three doodles of the day?

19           On the right-hand side, right around three

20   o'clock, four o'clock, in that slice of the pie, you

21   crossed out "nonprofit" and wrote "for-profit?"

22   A.      Yes.

23   Q.      Is that accurate?

24   A.      Sorry, no.  Oh, entire pie was the for-profit.

25   And what I meant to get at here was the nonprofit's

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 310

1        piece of the pie.

2        Q.      So that piece that's somewhere between

3        2 o'clock and 4 o'clock, that is, in fact, the

4        nonprofit's piece?

5        A.      Yes.

6        Q.      Okay.  Take out your supplemental report,

7        please.

8        A.      Yeah, okay.

9        Q.      I'm going to ask you to do very quick math,

10       much more simply than what Mr. Jurata was asking.  I

11       just want to make sure that I understand.  Just for the

12       sake of keeping this simple, let's focus on estimate 3.

13       A.      All right.

14       Q.      Okay.  According to your analysis under

15       estimate 3, the current allocation of economic interest

16       to the not-for-profit is 131 billion, correct?

17       A.      Yes.

18       Q.      The current allocation of economic value to or

19       economic interest of Microsoft is 114.5 billion,

20       correct?

21       A.      Yes.

22       Q.      And so I did a little math, and I think that

23       means that everyone else has an economic interest of

24       $254.5 billion.

25              Do I have that right?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 311

```
 1      A.      Yes.

 2      Q.      And so if your analysis is accepted by the

 3      court, I want to explore with you briefly how those

 4      numbers will change to make sure that I understand your

 5      analysis.  Okay?

 6      A.      Okay.

 7      Q.      I think, tell me if I'm wrong, that the value

 8      of the interest held by everyone else will not change;

 9      it will be 254.5 billion afterwards just the same as it

10      is now; is that right?

11      A.      I think that's right.

12      Q.      Okay.  And leaving to the side the nature of

13      whether he's getting paid out in cash or whether he's

14      getting some sort of an economic interest in the

15      vehicle, Mr. Musk's total recoupment under both of your

16      analysis would be 65.5 billion plus 13.3 billion and

17      that's 78.8 billion, correct?

18      A.      Yes.

19      Q.      So we have 254.5 for everyone else and 78.8 for

20      Mr. Musk so far.

21              Are you with me?

22      A.      Yes.

23      Q.      Okay.  The not-for-profit's interest is cut in

24      half under estimate 3 and it goes to 65.5 billion; is

25      that right?
```

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 312

1      A.      Yes.

2      Q.      And Microsoft's interest is reduced by

3      13.3 billion under your estimate 3 and, therefore,

4      declines to 101.2 billion; is that correct?

5      A.      101.5.

6      Q.      It's 114.5 minus 13.3; isn't that right?

7      A.      Yes.

8      Q.      So 101.2?

9      A.      Yes.

10     Q.      Okay.  Great.  So summing it up, we have

11     254.5 billion for everyone else, 78.8 billion for

12     Mr. Musk, 65.5 billion for the nonprofit, and 101.2 for

13     Microsoft under your estimate 3 approach; is that right?

14     A.      Sounds right.

15     Q.      Okay.  You testified earlier today when I was

16     questioning you that you had not undertaken to apportion

17     your 50 to 75 percent range between monetary and

18     nonmonetary contributions.

19             Do you recall giving that testimony?

20     A.      Yes.

21     Q.      And then when Mr. Jurata was questioning you

22     about the possibility that the jury or the judge would

23     find that the nonmonetary contributions should be

24     disregarded, you said, in words or substance, that,

25     well, the outcome of that would be you would be at

Elon Musk v.                  FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 313

1          bottom of the range, 50 percent.

2                  Do you recall giving that testimony?

3     A.     Yes.

4     Q.     Are you, therefore, saying that under your

5     analysis, one-third, or 25 percent, of the 50 to 75

6     percent range that you calculated is attributable to

7     nonmonetary contributions?

8                  MR. KRY:  Objection.  Misstates the

9                  testimony.

10    Q.     What's wrong with what I just said?

11    A.     Well, my analysis took all of it as a whole.  I

12    had the monetary and the nonmonetary, and I came up with

13    a range between 50 and 75 percent.

14                 You're now asking me for on the fly to do a

15    different analysis, which is to ignore all the

16    qualitative events, so, in that instance, I think I

17    would default to the 50 percent.

18    Q.     Okay.  So a rough guide for you is of the --

19    the 50 to 75, 25 of that is nonmonetary contributions?

20                 MR. KRY:  Objection.  I think it still

21                 misstates the testimony.

22    A.     It's not really how I did it.

23    Q.     Okay.  Well, I understood your testimony

24    earlier when you said you didn't do it, but then when

25    Mr. Jurata was questioning you, it sounded like you had

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 314

1    a number in mind so I'm just trying to make sure your

2    testimony is clear for the jury.

3    A.      So the testimony is, predicated on the monetary

4    and nonmonetary events, I came up with a range of 50 to

5    75 percent.  If we start taking bits and pieces out,

6    including all the nonquantitative, I think I would

7    default to the 50 percent level.

8            I don't think that's consistent with saying

9    that I've allocated the 25 percent to the qualitative.

10   Q.      What does it mean that you would default to the

11   50 percent level?

12   A.      Well, in the report I lay out his monetary

13   contributions prior to his leaving and his requirement

14   based in the various e-mails that he would have control

15   and 50 percent and he's got, you know, 50 percent of xAI

16   and I go through all the different things indicating

17   where he'd have at least 50 percent, so I think I would

18   land on the 50 percent number even in the absence of the

19   qualitative factors.

20   Q.      Okay.  Fair enough.  One final question or

21   maybe two.  Mr. Kry just asked you some follow-on

22   questions about the Microsoft compute arrangement that

23   Mr. Musk, you say, had a role in securing and also the

24   Nvidia GPUs that you say Mr. Musk has a role in

25   procuring.

Elon Musk v.                          FINAL                 December 5, 2025
Samuel Altman            HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                                  Page 315
 1              Do you recall those questions you were just
 2         asked?
 3         A.      Yes.
 4         Q.      You're not disputing, are you, that the
 5         Microsoft compute arrangement that was entered into
 6         before the for-profit was formed was valuable for the
 7         nonprofit, are you?
 8         A.      No, I'm not.
 9         Q.      And you're likewise not disputing that getting
10         access to those Nvidia chips in the time before the
11         for-profit was formed was valuable for the nonprofit;
12         you're not disputing that?
13         A.      No.
14                      MR. WILSON:  I have no further
15                 questions.
16                      MR. KRY:  Anything else?
17                      MR. JURATA:  I just have one minute's
18                 worth.
19         CONTINUED EXAMINATION BY
20         MR. JURATA:
21         Q.      Dr. Wazzan, I'd like you to go back to the
22         errata to your expert report, Exhibit 15.
23         A.      15?
24         Q.      Yes.  It's Exhibit 15 contained in the errata
25         to your expert report.
```

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 316

```
 1       A.      Yeah, Exhibit 13?

 2       Q.      Yes, Exhibit 13.  Thank you.

 3               Just looking at the row "January 13 to October

 4       25," am I correct that that's designed to represent the

 5       wrongful gains by acts in that time period?

 6       A.      Yes.

 7       Q.      Okay.  And the wrongful gains during that time

 8       period include both the 2023 Microsoft agreements and

 9       the 2025 PBC recapitalization, correct?

10       A.      Yes.

11       Q.      Okay.  And is that row designed to show the

12       unjust enrichment from both of those -- from both of

13       those alleged wrongful gains -- or wrongful acts, should

14       I say?

15       A.      It could.  I mean, again, I've calculated the

16       unjust enrichment as the total value of the for-profit,

17       and then allocated it over these time periods per

18       counsel's request based on valuations that I could

19       obtain for the for-profit that spanned the time period.

20       That's really where it stops.  Counsel has to figure out

21       how it fits into those pieces.

22       Q.      Okay.  So if the jury only finds the 2023

23       Microsoft agreements to be unlawful but not the PBC

24       recapitalization, would the numbers in that row still be

25       an accurate estimate of the unlawful enrichment?
```

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

                                                        Page 317

1                         MR. KRY:  Objection to form.

2         A.      Possibly.

3         Q.      That means it's possibly not, too, correct?

4         A.      Well, there's too many -- there's too many

5         variables to the hypothetical.  I guess it would depend

6         on when you stop figuring out what the disgorgement is,

7         right.  So do you get to the 500 billion or do you get

8         to some smaller number in an earlier time period, and if

9         you get to that earlier time period, what is the value,

10        and then do you then apportion it over those earlier two

11        periods?  I don't -- I haven't done this analysis.

12                        MR. JURATA:  I have no further

13                questions, thank you.

14                        MR. KRY:  I have a few questions in

15                response to this.

16        BY MR. KRY:

17        Q.      Dr. Wazzan, just staying with this exhibit, the

18        building block of all your analyses was the value of

19        OpenAI, that was first step in each of them, correct?

20        A.      Yes.

21        Q.      And what was the value of OpenAI in your

22        original report even before you took into account the

23        MOU or the PBC transaction?

24        A.      It was like 510 billion.

25        Q.      And has that gone up or down in this latest

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 318

1          supplement?

2          A.       It's gone down.

3          Q.       And then you made some additional adjustments

4          for dilution for various other shareholders through the

5          MOU and the PBC; is that correct?

6          A.       Yes.

7          Q.       And did those adjustments cause your damages

8          calculation to go up or down?

9          A.       Down.

10         Q.       And so to the extent the jury finds

11         hypothetically that the 2023 transaction was the only

12         breach and for some reason finds that the PBC

13         transaction is not a breach, if they relied on the

14         analysis in your supplemental report, would that

15         effectively be a more conservative estimate of what the

16         damages just attributable to that one breach would be?

17                       MR. WILSON:  Object to the form.

18         A.       Yes.

19         Q.       And so if anyone benefits from that

20         imprecision, it's the defendants?

21                       MR. JURATA:  Object to form.

22         A.       Yes.

23                       MR. KRY:  All right.  I don't have any

24                  other questions.

25                       We'll designate the transcript

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 319

1              confidential subject to further review.

2                      MR. WILSON:  Let's designate it highly

3              confidential, and I'll get back to you guys.

4                      MR. KRY:  That's fine.

5                      THE VIDEOGRAPHER:  This concludes

6              today's testimony of Paul Wazzan.  We're going

7              off the record at 9:37 p.m. -- excuse me,

8              6:37 p.m.  This also concludes Media 8.

9                      (Time Noted:  6:37 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 320

```
 1          C E R T I F I C A T E
 2     STATE OF NEW YORK    )
 3                          ) ss.:
 4     COUNTY OF QUEENS )
 5
 6              I, BROOKE E. PERRY, a Notary Public
 7          within and for the State of New York, do hereby
 8          certify:
 9              That PAUL WAZZAN, the witness whose
10          deposition is hereinbefore set forth, was duly
11          sworn by me and that such deposition is a true
12          record of the testimony given by such witness.
13              I further certify that I am not related
14          to any of the parties to this action by blood
15          or marriage; and that I am in no way interested
16          in the outcome of this matter.
17              IN WITNESS WHEREOF, I have hereunto set
18          my hand this 5th day of December, 2025.
19
20
21          -------------------------
22          BROOKE E. PERRY
23
24
25
```

JANE ROSE REPORTING              California Firm No. 254
1-800-825-3341                   janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 321

| | EXHIBITS | | |
|---|---|---|---|
| | WAZZAN | DESCRIPTION | PAGE |
| 3 | 1 | Expert Report of C. Paul Wazzan, Ph.D. | 11 |
| 5 | 2 | Wazzan & Co. Statement of Information | 25 |
| 7 | 3 | Supplemental Expert Report of C. Paul Wazzan, Ph.D. | 34 |
| 9 | 4 | Deposition Transcript of Elon Musk 9/26/25 | 61 |
| | 5 | Witness Notes | 83 |
| 11 | 6 | OPENAI_Musk00021096-097 | 112 |
| 12 | 7 | 2024Musk0005444-447 | 115 |
| | 8 | Exhibit 1 Redacted Version of Document Proposed to Be Filed Under Sealed, Case # 2:23-Cv-07936-Jls-As | 189 |
| | 9 | Sutskever_MUSKSUB_00000430-432 | 195 |
| 16 | 10 | Exmf-0003257-258 | 202 |
| 17 | 11 | Rebuttal Expert Report of Jonathan I. Arnold, Ph.D. | 222 |
| 19 | 12 | Dr. Wazzan's Drawing | 280 |
| | 13 | Errata to October, 29, 2025 Expert Report of C. Paul Wazzan, Ph.D., | 280 |
| 22 | 14 | Dr. Wazzan's Calculations | 293 |
| 23 | 15 | OpenAI Summary Post-Recapitalization Cap Table | 299 |

(Exhibits retained by Reporter.)

JANE ROSE REPORTING              California Firm No. 254
1-800-825-3341                   janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

```
                                                   Page 322
 1                 INSTRUCTIONS FOR ERRATA

 2

 3                 NOTARY PUBLIC SIGNATURE

 4      Not required unless agreed upon by counsel

 5      that notary public signature is required.

 6

 7

 8          Please return a copy of the signed errata within

 9      30 days of receipt, unless otherwise agreed upon

10      by counsel.  Once we receive one signed errata, we

11      will distribute an electronic copy to all parties.

12

13

14      RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:

15          FAX: 1-800-825-9055

16          EMAIL: janerose@janerosereporting.com

17

18               Jane Rose Reporting

19               Administrative Offices

20               PO Box 542

21               Luck, WI  54853

22

23

24

25
```

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 323

```
 1                ACKNOWLEDGMENT OF THE DEPONENT

 2

 3

 4       I, Paul Wazzan, do hereby certify that

 5  I have read the foregoing pages and that the same

 6  is a correct transcription of the answers given

 7  by me to the questions therein propounded, except

 8  for the corrections or changes in form or substance,

 9  if any, noted in the attached Errata Sheet.

10

11       _____    _____

12       (DATE)         Paul Wazzan

13

14

15       Signed and subscribed to before me this

16       _____ day of _____, 2025.

17

18            _____

19                   Notary Public

20

21

22

23

24

25
```

JANE ROSE REPORTING                 California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

```
                                              Page 324
  1    PAGE      LINE      CHANGE              REASON
  2    _____ / _____/ _____ / _____
  3    _____ / _____/ _____ / _____
  4    _____ / _____/ _____ / _____
  5    _____ / _____/ _____ / _____
  6    _____ / _____/ _____ / _____
  7    _____ / _____/ _____ / _____
  8    _____ / _____/ _____ / _____
  9    _____ / _____/ _____ / _____
 10    _____ / _____/ _____ / _____
 11    _____ / _____/ _____ / _____
 12    _____ / _____/ _____ / _____
 13    _____ / _____/ _____ / _____
 14    _____ / _____/ _____ / _____
 15    _____ / _____/ _____ / _____
 16    _____ / _____/ _____ / _____
 17    _____ / _____/ _____ / _____
 18    _____ / _____/ _____ / _____
 19    _____ / _____/ _____ / _____
 20    _____ / _____/ _____ / _____
 21    _____ / _____/ _____ / _____
 22    _____ / _____/ _____ / _____
 23    _____ / _____/ _____ / _____
 24    _____ / _____/ _____ / _____
 25
```