MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA  90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS 3 THROUGH 6 OF DR. C. PAUL WAZZAN** |
| v. | |
| SAMUEL ALTMAN et al., | Date:  March 3, 2026 Time:  2:00 PM |
| Defendants. | Courtroom:  1 – 4th Floor Judge:  Hon. Yvonne Gonzalez Rogers |

## <u>STATEMENT OF ISSUES TO BE DECIDED</u>

1.     Whether Dr. Wazzan's opinion estimating that the share of OpenAI nonprofit's value that is attributable to Mr. Musk's contributions is between 50% and 75% complies with the requirements of Federal Rule of Evidence 702.

2.     Whether Dr. Wazzan's opinion estimating Microsoft's wrongful gains should be excluded because it supposedly assigns Mr. Musk an interest in the for-profit entity.

3.     Whether Defendants seek relief broader than necessary to address their challenges.

4.     Whether the Court should defer ruling on the motion until trial.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

      A.    Dr. Wazzan's Expert Testimony ................................................................. 2

      B.    Dr. Wazzan's Three-Step Method for Estimating Wrongful Gains ......................... 2

      C.    Dr. Wazzan's Analysis at Step 3 ........................................................... 3

ARGUMENT ......................................................................................................................... 5

I.    Dr. Wazzan's Methodology at Step 3 Is Reliable .................................................. 6

      A.    Dr. Wazzan Adequately Explains Why He Selected His Four Factors ................... 6

      B.    Dr. Wazzan Adequately Explains How the Four Factors Produce His 50% to 75% Estimate ..................................................................... 9

      C.    Dr. Wazzan Was Not Required To Present a Claim-by-Claim or Contribution-by-Contribution Analysis ............................................. 11

      D.    Dr. Wazzan Does Not Ignore Causation Principles ................................. 12

II.    Dr. Wazzan Reliably Applies His Methodology by Considering Mr. Musk's Comparative Contributions ..................................................................... 13

III.    Dr. Wazzan Relies on Sufficient Facts and Data ............................................. 15

      A.    Dr. Wazzan Reasonably Relies on the 2017 Pro Forma Cap Table ................... 15

      B.    Dr. Wazzan Reasonably Relies on Mr. Musk's xAI Stake ................................. 16

IV.    Dr. Wazzan Properly Estimates Microsoft's Wrongful Gains ........................... 17

V.    Defendants Seek Overbroad Relief .................................................................... 18

VI.    The Court Should Defer Ruling Until Trial ....................................................... 19

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013)...................................................................................6, 16

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
225 Cal. App. 4th 1451 (2014).................................................................................2, 13

*AngioScore, Inc. v. TriReme Med., Inc.*,
No. 4:12-cv-03393-YGR, 2015 WL 5258786 (N.D. Cal. Sept. 8, 2015) ...................9

*In re Apple iPhone Antitrust Litig.*,
No. 4:11-cv-06714-YGR, 2025 WL 3124160 (N.D. Cal. Oct. 27, 2025)....................10

*Blockchain Innovation, LLC v. Franklin Res., Inc.*,
No. 3:21-cv-08787, 2024 WL 5483606 (N.D. Cal. Oct. 22, 2024) ...........................16

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014)...................................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .........................................................................................*passim*

*DSPT Int'l, Inc. v. Nahum*,
624 F.3d 1213 (9th Cir. 2010) ...................................................................................19

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025)................................................................................16

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022)................................................................................6, 15

*In re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001)...................................................................................11

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)......................................................................................2

*GPNE Corp. v. Apple, Inc.*,
No. 5:12-cv-02885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2015) ...........................10

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021).....................................................................................13

*Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*,
No. 2:10-cv-02414, 2023 WL 4564748 (E.D. Cal. July 17, 2023) ...........................19

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002)....................................................................................8

*Hyer v. City & Cnty. of Honolulu*,
118 F.4th 1044 (9th Cir. 2024)..............................................................................6, 18

iii

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .................................................................................... 9

*Lin v. Solta Med., Inc.*,
    No. 4:21-cv-05062, 2024 WL 5199905 (N.D. Cal. Dec. 23, 2024) ....................................... 12

*Messick v. Novartis Pharms. Corp.*,
    747 F.3d 1193 (9th Cir. 2014) .................................................................................... 6

*NetFuel, Inc. v. Cisco Sys., Inc.*,
    No. 5:18-cv-02352, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ....................................... 10

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) ...................................................................................... 7

*Rodriguez v. Google LLC*,
    No. 3:20-cv-04688, 2024 WL 38302 (N.D. Cal. Jan. 3, 2024) ............................................ 12

*SEC v. Teo*,
    746 F.3d 90 (3d Cir. 2014) ........................................................................................ 12

*Skydive Ariz., Inc. v. Quattrocchi*,
    673 F.3d 1105 (9th Cir. 2012) .................................................................................... 19

*Tucker v. Wright Med. Tech., Inc.*,
    No. 3:11-cv-03086-YGR, 2013 WL 1149717 (N.D. Cal. Mar. 19, 2013) ............................... 19

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
    52 F.4th 1054 (9th Cir. 2022) .................................................................................... 19

*United States v. 14.38 Acres of Land*,
    80 F.3d 1074 (5th Cir. 1996) ...................................................................................... 9

*United States v. Holguin*,
    51 F.4th 841 (9th Cir. 2022) ...................................................................................... 19

*Uzyel v. Kadisha*,
    188 Cal. App. 4th 866 (2010) .................................................................................... 12

*Ward v. Taggart*,
    51 Cal. 2d 736 (1959) .............................................................................................. 2

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) .................................................................................... 6

### RULES

Fed. R. Evid. 702 ............................................................................................... 5, 6

Fed. R. Evid. 702(b) ........................................................................................ 5, 15

Fed. R. Evid. 702(c) ..................................................................................... 5, 6, 15

Fed. R. Evid. 702(d) ................................................................................. 5, 13, 14, 15

iv

Fed. R. Evid. 702 adv. comm. n. (2000) ..................................................... 19

Fed. R. Evid. 702 adv. comm. n. (2023) ..................................................... 13

**OTHER AUTHORITIES**

Shannon P. Pratt, *The Market Approach to Valuing Businesses* (2d ed. 2005) ............................ 16

Restatement (Third) of Restitution § 51(1) (2011) ........................................... 9

Restatement (Third) of Restitution § 51(2) (2011) ........................................... 2

Restatement (Third) of Restitution § 51(4) (2011) ...................................... 2, 12

Restatement (Third) of Restitution § 51(5) (2011) .......................................... 12

Restatement (Third) of Restitution § 51 cmt. a (2011) ...................................... 9

Restatement (Third) of Restitution § 51 cmt. e (2011) ...................................... 2

Restatement (Third) of Restitution § 51 cmt. f (2011) ..................................... 12

Restatement (Third) of Restitution § 51 illus. 2 (2011) ..................................... 2

Matt Rosoff, *Jeff Bezos Told What May Be the Best Startup Investment Story Ever*,
    Business Insider, Oct. 20, 2016 ............................................................... 1

1

**INTRODUCTION**

2       Plaintiff Elon Musk seeks to recover the wrongful gains that OpenAI and Microsoft reaped

3   from their unauthorized commercial use of his charitable contributions.  Plaintiff's expert Dr. C.

4   Paul Wazzan offers the jury tools they could use to estimate those wrongful gains.  Dr. Wazzan's

5   analysis proceeds in three steps.  ***First***, he estimates the current value of the OpenAI for-profit entity

6   ($500 billion).  ***Second***, he determines the portion of that value that is attributable to the nonprofit

7   (26.2% to 29.2%).  ***Third***, he estimates the portion of the nonprofit's value that is attributable to Mr.

8   Musk's contributions (50% to 75%).  Multiplying those three figures together yields his estimate of

9   OpenAI's wrongful gains.

10       That number is indisputably large.  But that's because of OpenAI's tremendous commercial

11   success based on Mr. Musk's initial contributions.  There would be no OpenAI but for Elon Musk.

12   These sorts of returns are not unheard of in Silicon Valley:  Amazon's earliest investors could have

13   earned as much as 70,000 times their initial investments.  *See* Matt Rosoff, *Jeff Bezos Told What*

14   *May Be the Best Startup Investment Story Ever*, Business Insider, Oct. 20, 2016.

15       Defendants lodge only a narrow challenge to Dr. Wazzan's analysis.  They do not take issue

16   with Dr. Wazzan's overall three-step framework or the first two steps of his analysis.  Instead, they

17   dispute only the specific 50% to 75% range Dr. Wazzan estimates at Step 3.  And while Microsoft

18   briefly takes issue with Dr. Wazzan's framework for estimating ***Microsoft's*** wrongful gains, its

19   arguments rest on mischaracterizations of his analysis and seek to exclude opinions he never offers.

20       All of those challenges are meritless.  Dr. Wazzan conducts a thorough analysis of Mr.

21   Musk's monetary and non-monetary contributions at Step 3.  He carefully separates out the

22   contributions made by other donors, founders, and employees.  The factors that Dr. Wazzan

23   evaluates lead him to conclude that Mr. Musk contributed between 50% and 75% of the nonprofit's

24   value.  Defendants' attempts to flyspeck that analysis invade the province of the jury and seek to

25   elevate this Court from gatekeeper to the trier of fact.

26

27

28

1

# BACKGROUND

## A.    Dr. Wazzan's Expert Testimony

Under California law, disgorgement of wrongful gains is available for each of the claims Plaintiff asserts.  *See* Restatement (Third) of Restitution § 51(2), (4) (2011); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020); *Ward v. Taggart*, 51 Cal. 2d 736, 741-42 (1959); *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1483 (2014). Wrongful gains include unrealized appreciation in value, such as the increased value of OpenAI and the increased value of Microsoft's investments in OpenAI.  *See* Restatement (Third) of Restitution § 51 cmt. e & illus. 2; *Am. Master Lease*, 225 Cal. App. 4th at 1486.

Plaintiff engaged Dr. C. Paul Wazzan to estimate the amount of wrongful gains that OpenAI and Microsoft derived from Mr. Musk's charitable contributions.  Dr. Wazzan holds a Ph.D. in Finance from the University of California.  Defs. Ex. 1 ("Report") ¶1.  He has taught business, economics, and finance at multiple universities and has published articles in peer-reviewed journals and law reviews.  *Id.* ¶¶2-4.  He also manages his own venture capital firm that has invested $40 to $50 million of seed-level funding in technology startups.  *Id.* ¶3; Defs. Ex. 4 ("Dep.") at 23:22-30:4. Dr. Wazzan has provided expert opinions in over 100 cases and has never been disqualified.  Report app. A at 5-21; Dep. at 17:16-21:5.

## B.    Dr. Wazzan's Three-Step Method for Estimating Wrongful Gains

Dr. Wazzan estimates the amount that OpenAI and Microsoft wrongfully gained from OpenAI's commercial operations after Mr. Musk made contributions to OpenAI on the understanding that it would remain a nonprofit dedicated to the public good.  Report ¶8.  Like most damages experts, Dr. Wazzan assumes liability.  *Id.*  He thus assumes that ***all*** of OpenAI for-profit's commercial operations were unauthorized and determines only the portion of the resulting gains that are attributable to Mr. Musk's contributions.  To do so, he performs a three-step analysis.

***First***, Dr. Wazzan estimates the current value of the for-profit affiliate that OpenAI nonprofit launched to carry out its commercial operations.  Report ¶¶31-51.  In his opening report, Dr. Wazzan considered several factors, including the Softbank tender offer, over-the-counter trading prices, a discounted cash flow analysis, and third-party valuations.  *Id.*  Dr. Wazzan opined that a reasonable

2

estimate for OpenAI for-profit's value was $510 billion. *Id.* ¶51. After OpenAI completed its conversion into a public benefit corporation on October 28, 2025, Dr. Wazzan analyzed new information and revised his estimate slightly to $500 billion. Defs. Ex. 2 ("Supp. Report") ¶¶4-5.

**Second**, Dr. Wazzan estimates the portion of OpenAI for-profit's value that is held by OpenAI nonprofit. Report ¶¶52-70. This step is necessary because OpenAI nonprofit (the entity to which Mr. Musk contributed) is only one of several stakeholders in OpenAI for-profit. Investors like Microsoft as well as OpenAI employees (who hold stakes through a vehicle known as Aestas) also contributed value to the for-profit over the years. *Id.* ¶¶52-53. In his opening report, Dr. Wazzan used two approaches to estimate the nonprofit's share: a 2025 proposed cap table and an independent Black-Scholes analysis. *Id.* ¶¶52-70. Those analyses yielded stakes between 32.6% and 55.6%. *Id.* ¶70. After Dr. Wazzan analyzed new information following the public benefit corporation conversion, he revised that range to 26.2% to 29.2%. Supp. Report ¶¶4-5.

**Third**, Dr. Wazzan estimates the portion of OpenAI nonprofit's value that is attributable to Mr. Musk's contributions as opposed to contributions from other donors, founders, and employees. Report ¶¶71-98. Considering several factors, he estimates that range as 50% to 75%. *Id.* ¶98. That estimate – the focus of this *Daubert* motion – is described more fully below.

Dr. Wazzan multiplies those three outputs to estimate the portion of OpenAI for-profit's value that is attributable to Mr. Musk's contributions. The low end of his range is $65.5 billion ($500 billion × 26.2% × 50%). Supp. Report ¶5. The high end is $109.4 billion ($500 billion × 29.2% × 75%). *Id.*

Dr. Wazzan's approach to estimating Microsoft's wrongful gains is similar. Report ¶¶102-106. Dr. Wazzan measures the increase in value of Microsoft's investments in OpenAI and then determines the portion of that increase that is attributable to Mr. Musk's contributions. *Id.* ¶¶104-105. The result is between $13.30 billion and $25.06 billion. Supp. Report ¶5.

## C.  Dr. Wazzan's Analysis at Step 3

Defendants focus on Step 3 of Dr. Wazzan's analysis: his estimate that the portion of OpenAI nonprofit's value attributable to Mr. Musk's contributions is 50% to 75%. Report ¶¶71-98. Dr. Wazzan derives that estimate from four factors, each reinforcing the others. *Id.* ¶98.

1    ***First***, Dr. Wazzan analyzes Mr. Musk's monetary contributions compared to the amounts

2    other donors contributed.  Report ¶¶ 72-74.  Mr. Musk contributed a total of $38 million to OpenAI.

3    *Id.* ¶ 73.  His contributions represented about 60% of OpenAI's funding by the time he left the board

4    in February 2018.  *Id.* ¶ 72.  Dr. Wazzan acknowledges that Mr. Musk's share of contributions

5    dropped in later years.  *Id.* ¶ 73.  But he concludes that 60% is the most relevant figure because it

6    represents OpenAI's critical initial seed funding.  *Id.* ¶ 74.  Dr. Wazzan notes that Mr. Musk's $38

7    million in contributions dwarfs the amounts his co-founders contributed:  Altman contributed only

8    $3.8 million, while Brockman and Sutskever made no financial contributions at all.  *Id.*

9    ***Second***, Dr. Wazzan conducts a qualitative analysis of Mr. Musk's non-monetary

10    contributions.  Report ¶¶ 75-92.  Chief among them was the prestige and industry prominence that

11    Mr. Musk brought to OpenAI.  *Id.* ¶ 75.  Canvassing the finance literature, Dr. Wazzan notes that

12    high-profile investors play a critical role in mitigating the challenges new ventures face.  *Id.* ¶¶ 76-

13    81.  The record in this case bears out that literature:  "Mr. Musk's mere involvement in the project

14    would have substantial non-monetary benefits for OpenAI."  *Id.* ¶¶ 82-85.

15    Mr. Musk helped recruit key personnel to OpenAI.  Chief Scientist Ilya Sutskever joined

16    OpenAI because he was "incredibly in awe [and] impressed with Elon Musk's involvement," while

17    another early employee, Durk Kingma, thought "Elon's involvement [was] awesome."  Report ¶ 86.

18    Mr. Musk also taught his co-founders everything he knew about how to run a successful startup.

19    Sutskever testified that he was "the most overwhelmingly competent person in the world" and that

20    he "made other employees better at their jobs."  *Id.* ¶¶ 87-89.  Finally, Mr. Musk used his industry

21    connections to open doors with business partners, obtaining discounted compute from Microsoft

22    and first-of-their-kind processing units from Nvidia.  *Id.* ¶ 90.

23    ***Third***, Dr. Wazzan examines a pro forma cap table that the founders created in late 2017

24    when considering a possible for-profit structure.  Report ¶¶ 93-97.  That cap table shows that Mr.

25    Musk would have had a 52.4% share of the new entity while the other founders and employees

26    would have had smaller shares.  *Id.* ¶ 97.  In alternative hypothetical scenarios, Mr. Musk would

27    have had as much as 78.13%.  *Id.*  Those stakes provide insights into the values the founding team

28    ascribed to their relative contributions.  For example, Mr. Musk reasoned:  "I put [in] the majority

4

1    of the funds, I should have a majority of the equity." *Id.* ¶94.

2        **Fourth**, Dr. Wazzan considers Mr. Musk's 53% equity stake in xAI. Report ¶¶93, 98. He

3    observes that Mr. Musk has been involved with numerous publicly held ventures and tends to own

4    large shares of the companies he helps found, even many years later. *Id.* ¶93.

5        Analyzing those four factors, Dr. Wazzan estimates that the share of OpenAI nonprofit's

6    value that is attributable to Mr. Musk's contributions is in the range of 50% to 75%. Report ¶98.

7    That range is consistent with the three quantitative factors Dr. Wazzan considers: Mr. Musk's share

8    of early monetary contributions (60%); Mr. Musk's stake in the pro forma cap table and alternative

9    scenarios (52.41% to 78.13%); and Mr. Musk's stake in xAI (53%). *Id.* That range is also consistent

10   with Dr. Wazzan's qualitative assessment of Mr. Musk's non-monetary contributions. *Id.*

11       Defendants now move to exclude a portion of Dr. Wazzan's opinions under Federal Rule of

12   Evidence 702(b), (c), and (d). Defendants do not dispute Dr. Wazzan's overall three-step framework

13   for estimating OpenAI's wrongful gains or the first two steps of that analysis (Opinions 1 and 2).

14   Instead, Defendants challenge only the specific 50% to 75% range that Dr. Wazzan estimates at Step

15   3 (Opinion 3). Defs. Mem. (Dkt. 394-2) at 7-17. OpenAI also challenges Dr. Wazzan's Opinions

16   4, 5, and 6, but those opinions merely summarize the results of his three-step analysis – OpenAI

17   does not challenge them on any ground independent from its complaints about the 50% to 75%

18   range. *Id.* Finally, Microsoft briefly challenges Dr. Wazzan's methodology on the theory that it

19   supposedly assigns Mr. Musk a portion of "Microsoft's interest in the for-profit entity." *Id.* at 17-18.

20                                    <u>**ARGUMENT**</u>

21       Federal Rule of Evidence 702 permits expert testimony so long as "the proponent

22   demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or

23   other specialized knowledge will help the trier of fact to understand the evidence or to determine a

24   fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

25   of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the

26   principles and methods to the facts of the case." Fed. R. Evid. 702. That rule reflects "the 'liberal

27   thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to

28   "opinion" testimony.' " *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).

1    Consistent with that approach, "Rule 702 should be applied with a 'liberal thrust' favoring

2    admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). "The court

3    is 'a gatekeeper, not a fact finder.'" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir.

4    2022). "If the proposed testimony meets the thresholds of relevance and reliability, its proponent is

5    'entitled to have the jury decide upon [its] credibility, rather than the judge.'" *Id.* "Where . . . the

6    experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice

7    favor leaving difficult issues in the hands of the jury." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d

8    1227, 1237 (9th Cir. 2017); *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d

9    960, 969 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense

10    opinions, but not exclude opinions merely because they are impeachable.").

11    Dr. Wazzan's comprehensive analysis easily satisfies those standards. Defendants show no

12    basis for excluding any of his opinions.

## I.    DR. WAZZAN'S METHODOLOGY AT STEP 3 IS RELIABLE

14    Dr. Wazzan's analysis satisfies Rule 702(c) because it is "the product of reliable principles

15    and methods." Fed. R. Evid. 702(c). Expert testimony is reliable if it has "a reliable basis in the

16    knowledge and experience of the relevant discipline." *Alaska Rent-A-Car*, 738 F.3d at 969. "This

17    assessment is flexible and can be molded to fit 'the particular circumstances of the particular case.'"

18    *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1058 (9th Cir. 2024). Dr. Wazzan explains in

19    detail how the four factors he considers reliably support his opinions.

### A.    Dr. Wazzan Adequately Explains Why He Selected His Four Factors

21    Defendants fault Dr. Wazzan for "not applying an accepted methodology" and "never

22    explain[ing] **why** he chose [the four] factors or **why** he excluded others." Defs. Mem. at 7. The first

23    criticism is irrelevant, and the second ignores Dr. Wazzan's detailed explanations.

24    *Daubert* itself held that a "general acceptance" standard is "incompatible with[ ] the Federal

25    Rules of Evidence" and "should not be applied in federal trials." 509 U.S. at 589. A general

26    acceptance requirement is particularly inapt when an expert confronts novel or unique facts.

27    "Experts working in specialized, scientific, and uncertain fields regularly 'extrapolate from existing

28    data' and generate novel hypotheses about complex issues." *Elosu*, 26 F.4th at 1026; *see also*

*Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010) (reversing exclusion of expert testimony for lack of published support because "the phenomenon is so extraordinary that the specialists who publish articles do not see it in their practices").  OpenAI's evolution from a nonprofit research lab into a \$500 billion commercial behemoth is unique by any measure.  OpenAI converted into a public benefit corporation precisely because its capped-profit structure was so novel and confusing to investors.  *See* Declaration of Robert K. Kry ("Kry Decl.") Ex. A.

In any event, Defendants misstate the novelty of Dr. Wazzan's analysis.  While Defendants accuse Dr. Wazzan of admitting that "you wouldn't find [his analysis] in a textbook," Defs. Mem. at 8, Dr. Wazzan in fact testified:  "I can't point you to [a] textbook, where it specifically says . . . 'OpenAI,' but ***these are basic finance concepts***."  Dep. at 45:10-23 (emphasis added).  And while Defendants claim that Dr. Wazzan "acknowledged that the 'fact pattern[ ]' here is 'pretty unique,' " Defs. Mem. at 7, what Dr. Wazzan actually testified was:  "***[E]ach case*** is usually unique and has certain fact patterns and so ***we tailor the analysis to each case***.  You know they're always pretty unique."  Dep. at 44:5-10 (emphasis added).  Dr. Wazzan thus applied well-accepted finance principles in a manner that was appropriately tailored to the unique facts of this case.

Dr. Wazzan clearly explains why he considers each of the four factors he analyzes.  With respect to Mr. Musk's financial contributions, Dr. Wazzan considers multiple metrics, including both the 60% of contributions that Mr. Musk made during OpenAI's early years as well as the lower figure that includes donations OpenAI received in later years.  Report ¶¶ 72-74.  Dr. Wazzan gives multiple reasons for focusing on the 60% figure, principally that "[t]he 60% of contributions that Mr. Musk made in OpenAI's early years represented OpenAI's initial seed funding and were much more important to OpenAI's success than amounts contributed later, once OpenAI was established."  *Id.* ¶ 74.  And of course it is self-evident that Mr. Musk's ***financial*** contributions are relevant to how much Mr. Musk contributed to OpenAI.

Dr. Wazzan also explains his approach to Mr. Musk's non-monetary contributions.  Report ¶¶ 75-92.  "To appreciate how important Mr. Musk's prestige and industry prominence were to OpenAI's successful launch," Dr. Wazzan "review[s] the finance literature examining a closely analogous context: prominent investor participation in start-up companies."  *Id.* ¶ 75.  Dr. Wazzan

1   canvasses a number of scholarly articles that study "[e]mpirical evidence" and document how high-

2   profile investors "add value through expertise, networks, and mentorship, amplifying these effects

3   through their social capital." *Id.* ¶¶76-81.  Dr. Wazzan then examines the record evidence showing

4   that Mr. Musk delivered those benefits here, lending his prestige and reputation, recruiting key

5   talent, providing guidance and mentorship, and using industry connections to open doors with

6   business partners.  *Id.* ¶¶82-90.  Dr. Wazzan's focus on those areas reflects not just their obvious

7   relevance to OpenAI's success but also his own professional experience as a venture capital investor

8   in technology startups.  *Id.* ¶3; Dep. at 23:22-30:4.  That real-world professional experience makes

9   Dr. Wazzan particularly well-suited to assess what non-monetary contributions promote a new

10  venture's prospects of success.

11      Dr. Wazzan also explains why he relies on the 2017 pro forma cap table.  "The proposed

12  capitalization tables provide important insights into the values that the founding team themselves

13  ascribed to their relative contributions to OpenAI."  Report ¶97.  Mr. Musk justified his stake on

14  that basis:  "I put [in] the majority of the funds, I should have a majority of the equity."  *Id.* ¶94.

15      Finally, Dr. Wazzan explains why he relies on Mr. Musk's stake in xAI.  "Mr. Musk tends

16  to own a large share of companies to which he is an active and founding investor, even after the

17  company has existed for many years and dilution from adding new investors."  Report ¶93.

18  Although Defendants fault Dr. Wazzan for relying on Mr. Musk's 53% stake in xAI rather than his

19  current 20.3% stake in Tesla (Defs. Mem. at 8), Mr. Musk's role as the founder of an ***AI startup*** is

20  clearly more relevant than his role at an electric vehicle company that went public 15 years ago.

21      Defendants complain that Dr. Wazzan "never explains . . . why he excluded ***other*** [factors]."

22  Defs. Mem. at 7 (emphasis altered).  But Defendants never identify a single other factor that Dr.

23  Wazzan should have considered – much less show that the other factor is more probative than the

24  four factors he ***did*** consider.  In any event, an expert's alleged "fail[ure] to account for all variables

25  . . . go[es] to the weight of the evidence rather than its admissibility."  *Hemmings v. Tidyman's Inc.*,

26  285 F.3d 1174, 1188 (9th Cir. 2002).  Defendants can pursue these arguments in cross-examination,

27

28

1    but they are not grounds for excluding Dr. Wazzan's testimony.[1]

2
3    **B.    Dr. Wazzan Adequately Explains How the Four Factors Produce His 50% to 75% Estimate**

4           Defendants urge that Dr. Wazzan "fails to explain how his chosen factors ***add up***" to his
5    50% to 75% estimate and "articulates no framework for ***comparing distinct categories*** of
6    contributions." Defs. Mem. at 9 (emphasis altered).  That argument too ignores clear explanations.

7           The four factors Dr. Wazzan considers are all ***mutually reinforcing and confirmatory***
8    because they all produce results in the same 50% to 75% range.  The financial contributions show
9    that Mr. Musk was responsible for 60% of OpenAI nonprofit's value.  Report ¶ 98.  The pro forma
10   cap table shows that he was responsible for 52.41% to 78.13%.  *Id.*  Mr. Musk's 53% stake in xAI
11   is consistent with those figures.  *Id.*  Finally, after reviewing the finance literature and relying on his
12   own professional experience, Dr. Wazzan finds that Mr. Musk's non-monetary contributions
13   support that same range too.  *Id.*  Because each factor supports the same 50% to 75% range, there
14   was no need to determine how much weight to assign to each factor.  The four factors all confirm
15   each other and point to the same result.

16          Defendants complain that Dr. Wazzan's analysis of non-monetary contributions is
17   qualitative rather than quantitative.  But experts routinely rely on qualitative considerations even
18   when their ultimate opinions are quantitative.  *See, e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d
19   831, 853-54 (Fed. Cir. 2010) (approving expert's "adjust[ment] [of] the baseline royalty rate" to
20   account for various qualitative factors); *AngioScore, Inc. v. TriReme Med., Inc.*, No. 4:12-cv-03393-
21   YGR, 2015 WL 5258786, at *6-7 (N.D. Cal. Sept. 8, 2015) (similar).  Valuation experts in particular
22   routinely rely on qualitative considerations.  *See, e.g.*, *United States v. 14.38 Acres of Land*, 80 F.3d

23

24          [1] Defendants take issue with Dr. Wazzan's occasional use of the term "economic interest"
25   to describe Mr. Musk's contributions.  Defs. Mem. at 1.  Dr. Wazzan makes clear throughout his
     report that what he is measuring is the share of OpenAI nonprofit's value that is attributable to Mr.
26   Musk's contributions – not an ownership interest in the nonprofit.  *See, e.g.*, Report ¶¶ 8, 29, 71, 99.
     The term "economic interest" is merely Dr. Wazzan's shorthand for the value attributable to Mr.
27   Musk's contributions for purposes of disgorgement – a remedy that clearly does not require that the
     plaintiff have an equity interest.  *See* Restatement (Third) of Restitution § 51(1) & cmt. a (2011).  In
28   any event, if the term is confusing, Plaintiff has no objection to using a different term at trial.

9

1    1074, 1078-79 (5th Cir. 1996) (admitting valuation opinion that included downward adjustment for

2    increased flooding risk despite "inability to predict the extent of flooding").

3        Tellingly, neither of Defendants' rebuttal experts could identify any quantitative method for

4    analyzing non-monetary contributions.  OpenAI's expert suggested that Dr. Wazzan should have

5    listed the contributions on a chart, but he could not identify any quantitative method for analyzing

6    them.  Kry Decl. Ex. B (Strebulaev Dep.) at 268:2-17 ("[Q.] [A]re you aware of some particular

7    quantitative method that would enable Dr. Wazzan to [measure non-monetary contributions]? . . .

8    [A.] Counsel, I have not – I haven't thought about how I would – if my retaining counsel were to

9    ask me whether – what is the contribution of Mr. Musk to OpenAI, I would have given some thought,

10   whether I'm able to answer that question affirmatively.").  Microsoft's expert had no suggestions

11   either.  Kry Decl. Ex. C (Arnold Dep.) at 100:25-101:4 ("Q. Is it your opinion that analytical

12   methods exist that would permit quantification of Mr. Musk's nonmonetary contributions to

13   OpenAI?  A. I don't have a view one way or the other.  I have not made a determination.").

14   Defendants' insistence on quantitative methods thus seems to have more to do with denying Mr.

15   Musk any remedy for his non-monetary contributions than with ensuring reliable analysis.

16       The cases Defendants cite are readily distinguishable.  In *In re Apple iPhone Antitrust*

17   *Litigation*, No. 4:11-cv-06714-YGR, 2025 WL 3124160 (N.D. Cal. Oct. 27, 2025), this Court

18   excluded a "black box" opinion where the expert did not retain the computer code he used to analyze

19   data – he "admitted that his code was not in 'deliverable' form and could not be run without

20   [undefined] modifications." *Id.* at *8.  In *GPNE Corp. v. Apple, Inc.*, No. 5:12-cv-02885, 2014 WL

21   1494247 (N.D. Cal. Apr. 16, 2015), the expert sought to justify a $1-per-unit royalty without ***any***

22   explanation of why various qualitative factors supported that figure.  *Id.* at *4.  And in *NetFuel, Inc.*

23   *v. Cisco Systems, Inc.*, No. 5:18-cv-02352, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020), the court

24   excluded an opinion due to a "complete lack of economic analysis." *Id.* at *7.

25       Unlike a true "black box" where outputs cannot be traced to inputs, Dr. Wazzan's report

26   explicitly discloses each of the four factors he considers, explains each factor's relevance, sets forth

27   his analysis of each factor in detail, and demonstrates that the factors converge on the same 50% to

28   75% range.  Report ¶¶ 71-98.  Even for the factor that relies on qualitative inputs, Dr. Wazzan

1 carefully explains all the evidence he considers and its relevance to his opinions.  *Id.* ¶¶ 75-92.

2 Defendants can retrace his path.  They can therefore test his methodology through cross-examination

3 and testimony from their own experts.  That Dr. Wazzan exercises judgment in performing his expert

4 financial analysis does not make his opinions an impenetrable "black box."

### C.    Dr. Wazzan Was Not Required To Present a Claim-by-Claim or Contribution-by-Contribution Analysis

7        Defendants complain that Dr. Wazzan does not analyze wrongful gains on a "claim-by-claim

8 or contribution-by-contribution basis."  Defs. Mem. at 11.  But with only one exception, they offer

9 no reason why that analysis would even be relevant.  Dr. Wazzan **assumes** liability.  Report ¶ 8.  He

10 therefore assumes that Mr. Musk made **all** his contributions for charitable purposes and that OpenAI

11 wrongfully operated as a for-profit venture instead.  If the jury agrees, Mr. Musk can recover the

12 for-profit's gains derived from **all** his contributions.  That remedy does not vary by claim.

13        The only exception Defendants assert is the fraud claim:  They argue that Mr. Musk should

14 recover only for wrongful gains derived from **fraudulently induced** contributions.  Defs. Mem. at

15 11.  Even indulging that premise, there is no reason to limit Dr. Wazzan's testimony.  Altman made

16 commitments to Mr. Musk about OpenAI's nonprofit status and mission even before Mr. Musk

17 made his earliest contributions.  *See, e.g.*, Kry Decl. Exs. D, E.  Ultimately, the jury will decide

18 whether those representations were fraudulent when made or whether Altman changed his mind.

19        Even if the jury must apportion gains by contribution for the fraud claim, Dr. Wazzan's

20 opinions would still be helpful and reliable.  "Reasonable jurors need not accept the views of one

21 side's expert or the other's, but may make their own reasonable judgment on the evidence, accepting

22 part, all, or none of any witness's testimony."  *In re Exxon Valdez*, 270 F.3d 1215, 1248 (9th Cir.

23 2001).  The jury will have ample evidence of Mr. Musk's contributions.  Kry Decl. Ex. F.  They can

24 readily see, for example, that Mr. Musk made more than one-quarter of his contributions after

25 Altman and Brockman's egregious 2017 misrepresentations refuted by Brockman's diary entries.

26 *Id.*  The jury could rely on that evidence to adjust Dr. Wazzan's estimates as they consider

27 appropriate for the fraud claim, while adopting his estimates wholesale for the remaining claims.

28 Regardless, Defendants' arguments about the fraud claim cannot justify excluding Dr. Wazzan's

1    opinion with respect to every ***other*** claim.

2        **D.**    **Dr. Wazzan Does Not Ignore Causation Principles**

3        Defendants finally object to Dr. Wazzan's purported failure to perform a "causal analysis."

4    Defs. Mem. at 12.  That argument ignores the governing legal standards.

5        Disgorgement requires only a modest showing of causation.  Wrongful gains include any

6    "net profit attributable to the underlying wrong" that is "identifiable and measurable and not unduly

7    remote."  Restatement (Third) of Restitution § 51(4)-(5) (2011); *see also Uzyel v. Kadisha*, 188 Cal.

8    App. 4th 866, 894 (2010) (quoting Restatement).  "Absence of but-for causation does not necessarily

9    exonerate the wrongdoer, because a finding that the defendant would have realized the profit in any

10   event does not compel the conclusion that the defendant, under the circumstances, has not been

11   unjustly enriched."  Restatement (Third) of Restitution § 51 cmt. f.  "To take an obvious example, a

12   trustee who makes a profit from the personal use of trust assets could not escape liability in

13   restitution by proving that he could have (and would have) made the same profit legitimately,

14   supposing that his access to the trust assets had been hindered in some way."  *Id.*; *see also Uzyel*,

15   188 Cal. App. 4th at 894 (similar); *SEC v. Teo*, 746 F.3d 90, 108 (3d Cir. 2014); *Rodriguez v. Google*

16   *LLC*, No. 3:20-cv-04688, 2024 WL 38302, at *12 (N.D. Cal. Jan. 3, 2024).

17       Thus, it does not matter whether OpenAI could have earned some or even all of its gains

18   through its former nonprofit structure or through some less offensive for-profit structure.  So long

19   as OpenAI's for-profit structure violated its obligations, Mr. Musk is entitled to recover the share of

20   ***all*** of the for-profit's gains that is attributable to his contributions.  Dr. Wazzan's analysis is

21   consistent with those causation principles because every increase in OpenAI for-profit's value

22   necessarily derives from that entity's existence and operation.  If there were any doubt, the Court

23   could submit the causation issue to the jury to resolve.  *See Lin v. Solta Med., Inc.*, No. 4:21-cv-

24   05062, 2024 WL 5199905, at *5 (N.D. Cal. Dec. 23, 2024) ("Proof of causation often comes from

25   fact witnesses, and it is appropriate for expert witnesses to assume causation will be established and

26   then proceed to calculate the damages.").

27       Microsoft's arguments on aiding and abetting similarly fail.  Defs. Mem. at 12.  Aiding and

28   abetting is a secondary liability claim, so the defendant is liable for disgorgement of wrongful gains

derived from the **primary violator's** misconduct.  *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1481-83 (2014).  *All* of Microsoft's gains on its investments in OpenAI for-profit derive from that entity's unauthorized commercial operations.  Dr. Wazzan will opine on what portion of those gains is attributable to Mr. Musk's contributions.  The specific liability requirements for aiding and abetting are not relevant to that analysis.

## II.    DR. WAZZAN RELIABLY APPLIES HIS METHODOLOGY BY CONSIDERING MR. MUSK'S COMPARATIVE CONTRIBUTIONS

Dr. Wazzan's opinions comply with Rule 702(d) because they reflect "a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(d).  While that rule precludes "claims that are unsupported by the expert's basis and methodology," it does not envision "nitpick[ing] an expert's opinion in order to reach a perfect expression of what the basis and methodology can support."  Fed. R. Evid. 702 adv. comm. n. (2023).  " '[A] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method' does not render expert testimony inadmissible."  *Hardeman v. Monsanto Co.*, 997 F.3d 941, 962 (9th Cir. 2021).

Defendants argue that Dr. Wazzan's opinion fails this standard on a single ground: that Dr. Wazzan allegedly does not conduct a comparative analysis that contrasts Mr. Musk's contributions with other parties' contributions.  Defs. Mem. at 13-14.  That's wrong.

For example, in analyzing monetary contributions, Dr. Wazzan expressly compares Mr. Musk's contributions to those of other donors as shown on OpenAI's tax filings.  Report ¶¶ 72-73.  That analysis reveals that Mr. Musk supplied 60% of OpenAI's crucial early funding and 30% overall – inherently comparative statistics.  *Id.*  Dr. Wazzan also compares Mr. Musk's contributions to his co-founders' measly contributions:  "While Mr. Musk contributed $38 million to OpenAI, his co-founder Sam Altman contributed only $3.8 million, and the other two co-founders, Greg Brockman and Ilya Sutskever, never contributed anything financially at all."  *Id.* ¶ 74.

Dr. Wazzan also conducts a comparative analysis on the 2017 pro forma cap table.  Report ¶ 97 & Ex. 9  That table shows Mr. Musk with a 52.4% stake, and then lists separate stakes for Altman, Brockman, and Sutskever, as well as two other key OpenAI employees and broader categories of "Employees" and "Pools."  *Id.*  Dr. Wazzan's reliance on Mr. Musk's 52.4% stake is

13

1  thus inherently comparative because it excludes the stakes assigned to everyone else.  *Id.*; *see also*

2  Dep. at 297:12-298:16 (explaining this point).

3       Dr. Wazzan's assessment of non-monetary contributions also includes comparative analysis.

4  For example, after recounting Mr. Musk's long history as a tech icon who brought unique prestige

5  and reputation to OpenAI, Dr. Wazzan discusses how "Mr. Altman . . . recognized that Mr. Musk's

6  mere involvement in the project would have substantial non-monetary benefits for OpenAI" and

7  quotes Altman's emails encouraging Mr. Musk to take on a public role.  Report ¶¶ 82-85.  The

8  obvious implication is that Mr. Musk brought prestige to the project that Altman and others did not.

9  Similarly, Dr. Wazzan analyzes Brockman and Sutskever's efforts to set up meetings with Mr. Musk

10 so they could learn from his "lessons and experience."  *Id.* ¶ 87.  No one suggested that ***Mr. Musk***

11 would learn anything from those meetings.  *Id.*  Finally, Sutskever identified Mr. Musk as "the most

12 overwhelmingly competent person in the world."  *Id.* ¶ 9.  He didn't say Mr. Musk was tied for first

13 place with Sam Altman or anyone else.

14      Dr. Wazzan also performs a comparative analysis on the amounts that Microsoft and other

15 investors contributed.  Because investors contributed those funds to the for-profit rather than the

16 nonprofit, Dr. Wazzan accounts for them at Step 2 of his analysis, when he compares the nonprofit's

17 stake in the for-profit with the stakes of Microsoft and other investors.  Report ¶¶ 61-62; Supp.

18 Report ¶ 4.  Dr. Wazzan analyzes the contributions of OpenAI employees similarly:  After 2019,

19 employees held their stakes in the for-profit through the Aestas employee vehicle, so Dr. Wazzan

20 accounts for them at Step 2.  Dep. at 298:17-302:1; Kry Decl. Ex. G.  Those analyses are all

21 inherently comparative because Dr. Wazzan compares the nonprofit's stake in the for-profit with

22 the stakes of investors and employees.  Report ¶¶ 61-62; Supp. Report ¶ 4.[2]

23      Defendants' Rule 702(d) arguments thus lack any factual basis.  Their claims that Dr. Wazzan

24 "never actually considered the value of the contributions made by anyone other than Musk" and

25 ascribed a "***zero percent***" value to other contributors are objectively false.  Defs. Mem. at 13-14.

26

27      [2] Dr. Wazzan considered and rejected Defendants' theory that he should have included
   Microsoft and Nvidia among OpenAI nonprofit's contributors on the ground that they provided
28 discounted services or equipment during the nonprofit's early years.  Dep. at 294:12-297:11.

1  Dr. Wazzan conducted plenty of comparative analysis, both at Step 2 (for employees and investors

2  in the for-profit) and at Step 3 (for donors, founders, and other early contributors to the nonprofit).

3  Defendants' argument that Dr. Wazzan should have done ***even more*** comparative analysis may be

4  grounds for cross-examination or competing evidence at trial, but it does not justify exclusion.[3]

5  ### III.    DR. WAZZAN RELIES ON SUFFICIENT FACTS AND DATA

6      Dr. Wazzan's opinions satisfy Rule 702(b) because they are "based on sufficient facts or

7  data." Fed. R. Evid. 702(b).  Rule 702(b) "requires foundation, not corroboration." *Elosu*, 26 F.4th

8  at 1025.  It "does not license a court to engage in freeform factfinding, to select between competing

9  versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility

10  stage." *Id.* at 1026.  "A factual dispute is best settled by a battle of the experts before the fact finder,

11  not by judicial fiat." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).

12      Defendants challenge only two of Dr. Wazzan's four factors.  Both challenges lack merit.

13  ### A.    Dr. Wazzan Reasonably Relies on the 2017 Pro Forma Cap Table

14      Defendants argue that Dr. Wazzan should not have relied on the 2017 pro forma cap table

15  because it reflects "failed" negotiations that "led nowhere." Defs. Mem. at 15.  That argument

16  misunderstands the document's significance.  The pro forma cap table was a proposal by Brockman

17  and Sutskever – Mr. Musk's ***counterparties***, not Mr. Musk himself.  Kry Decl. Exs. H, I.  It reflects

18  how Mr. Musk's co-founders – who had every incentive to maximize their own stakes – viewed Mr.

19  Musk's contributions.   The negotiations ultimately failed because Brockman and Sutskever

20  reconsidered their position on Mr. Musk's control rights and management role – not the proposed

21  equity stakes.  Kry Decl. Ex. J.

22      Defendants urge that the proposed cap table contemplated that Mr. Musk would make

23  additional investments and devote more time to OpenAI.  Defs. Mem. at 15-16.  But the cap table

24  envisioned future investments by Altman, Brockman, and Sutskever too.  Kry Decl. Exs. H, I.  These

---

[3] In a footnote, Defendants argue that Dr. Wazzan violates Rule 702(d) by conducting a qualitative rather than quantitative analysis of Mr. Musk's non-monetary contributions.  Defs. Mem. at 14-15 n.4.  That argument is better addressed under Rule 702(c) because it concerns Dr. Wazzan's selected methodology, not his application of that methodology.  Either way, the argument fails for the reasons stated earlier.  *See* pp. 9-10, *supra*.

15

nuances are grounds for cross-examination, not exclusion.

Defendant's sole authority, *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333 (Fed. Cir. 2025), is off point.  In that case, the court rejected an expert's reliance on three supposedly comparable license agreements because they merely recited what the ***plaintiff*** believed to be a reasonable royalty rate for its own patents, without obligating the counterparty to pay that rate.  *Id.* at 1340-43.  Here, ***Brockman and Sutskever*** proposed the equity stakes, and Mr. Musk agreed with them.  Kry Decl. Exs. H, I.  Even OpenAI's own authorities acknowledge that unconsummated transactions may be relevant in some circumstances.  *See* Shannon P. Pratt, *The Market Approach to Valuing Businesses* 46 (2d ed. 2005) (Kry Decl. Ex. K) (noting that "offer[s] to buy could be handled in the same way [as] past transactions" when certain criteria are met).  Dr. Wazzan reasonably considered Brockman and Sutskever's proposal here.

### B.    Dr. Wazzan Reasonably Relies on Mr. Musk's xAI Stake

Defendants next complain about Dr. Wazzan's reliance on Mr. Musk's 53% stake in xAI.  Defs. Mem. at 16-17.  But as Dr. Wazzan explains, that stake is consistent with the evidence that "Mr. Musk tends to own a large share of companies to which he is an active and founding investor, even after the company has existed for many years and dilution from adding new investors."  Report ¶93.  Dr. Wazzan reasonably concludes that those outsized equity stakes reflect Mr. Musk's profound contributions to the companies he founds.  xAI is a highly relevant data point, operating in the same industry at the same early stage of development.

Defendants urge that Dr. Wazzan fails to consider certain differences between OpenAI and xAI.  Defs. Mem. at 16-17.  But an expert's choice of comparators goes to weight, not admissibility.  *See, e.g.*, *Alaska Rent-A-Car*, 738 F.3d at 970 (decision to use "Alamo as the comparator" went to "the weight of the testimony and its credibility, not its admissibility"); *Blockchain Innovation, LLC v. Franklin Res., Inc.*, No. 3:21-cv-08787, 2024 WL 5483606, at *4 (N.D. Cal. Oct. 22, 2024) (selection of comparators was "a question of persuasive weight for the jury to consider").  Defendants' complaint about Dr. Wazzan's data source likewise is not grounds for exclusion, especially as Defendants have not questioned the source's accuracy.  *See Blockchain*, 2024 WL 5483606, at *5 (rejecting challenge to expert's reliance on Pitchbook data absent "evidence that

Pitchbook itself is unreliable"). Mr. Musk's xAI stake merely confirms a range Dr. Wazzan derives from three other factors.

## IV.    DR. WAZZAN PROPERLY ESTIMATES MICROSOFT'S WRONGFUL GAINS

Defendants conclude with a tacked-on argument challenging the framework Dr. Wazzan uses to calculate Microsoft's wrongful gains. Defs. Mem. at 17-18. They rely on inaccurate descriptions of Dr. Wazzan's methodology and seek to rebut opinions he never offers.

Dr. Wazzan calculates Microsoft's wrongful gains similarly to how he calculates OpenAI's gains, with two exceptions. *First*, while the starting point for OpenAI's wrongful gains is the increased value of OpenAI for-profit, the starting point for Microsoft's wrongful gains is the increased value of ***Microsoft's investments*** in OpenAI for-profit. Report ¶¶ 104-105. That equals the total value of OpenAI for-profit multiplied by Microsoft's ownership percentage. *Id.*

*Second*, while OpenAI for-profit's costs are already reflected in its valuation, the same is not true for Microsoft. Microsoft spent $13 billion investing in OpenAI, so Dr. Wazzan deducts those costs from the value of Microsoft's investments. Report ¶ 105.

From there, the analysis tracks Dr. Wazzan's OpenAI analysis. Because Microsoft derived its wrongful gains from its stake in OpenAI for-profit, Dr. Wazzan determines the portion attributable to Mr. Musk's contributions by calculating the share of the for-profit's value held by the nonprofit, and the share of the nonprofit's value attributable to Mr. Musk's contributions. Report ¶¶ 104-105. That is the same Step 2 and Step 3 as in his OpenAI analysis. The calculation yields wrongful gains ranging from $13.30 billion (($500 billion × 22.9% – $13 billion) × 26.2% × 50%) to $25.06 billion (($500 billion × 25.5% – $13 billion) × 29.2% × 75%). Supp. Report ¶ 5.

Defendants have no coherent response. They accuse Dr. Wazzan of "assign[ing] to Musk . . . Microsoft's interest in the for-profit entity" and "reallocating [a] portion of Microsoft's negotiated interest to the nonprofit." Defs. Mem. at 17-18. But Dr. Wazzan never does that. He merely relies on Microsoft's ownership stake in OpenAI for-profit to help determine how much ***Microsoft itself*** wrongfully gained from its investments in an entity that engaged in unauthorized commercial operations. Report ¶¶ 104-105. Nor does Dr. Wazzan "double-count[] value to the nonprofit (and thus to Musk)." Defs. Mem. at 18. Dr. Wazzan never double-counts anything. His

17

1   analysis is a straightforward application of the same three-step framework he uses to calculate

2   OpenAI's wrongful gains, modified to account for the two distinct features of Microsoft's situation

3   (modifications that both *reduce* the amount Microsoft owes).

4         Dr. Wazzan explains that methodology in his report.  Report ¶¶ 102-106.  He explained it at

5   his deposition.  Dep. at 268:21-277:16.  Yet Microsoft persists in mischaracterizing Dr. Wazzan's

6   analysis and then seeking to rebut opinions that Dr. Wazzan never offers.

7   **V.   DEFENDANTS SEEK OVERBROAD RELIEF**

8         The Court should deny Defendants' *Daubert* motion in its entirety.  But if the Court grants

9   any relief, it should reject Defendants' requests to exclude more of Dr. Wazzan's opinions than

10  necessary to address their concerns.  The Ninth Circuit has made clear that, "even if [a] portion of

11  [an expert's] opinion ha[s] been properly excluded, it would not justify excluding his remaining

12  conclusions" that do not depend on that portion.  *Hyer*, 118 F.4th at 1059.  That principle matters

13  here for multiple reasons.

14        ***First***, Dr. Wazzan made clear that, even without the pro forma cap table or the xAI stake, he

15  would still conclude that at least 50% of OpenAI nonprofit's value was attributable to Mr. Musk's

16  contributions based on the remaining two factors alone.  *See* Dep. at 302:2-304:20 ("[Q.] [I]f the

17  court rules that both the pro forma cap table and the xAI stake should not be considered in the case,

18  would the remaining two considerations, namely your analysis of the financial contributions and

19  your analysis of the non-monetary contributions[,] still lead you to conclude that the size of Musk's

20  attributed stake should be at least 50 percent?  A. Yes.").  Accordingly, if the Court sustains

21  Defendants' objections to the pro forma cap table, the xAI stake, or both, it should still allow Dr.

22  Wazzan to testify to his 50% estimate (the lower bound of his range) as the portion of OpenAI

23  nonprofit's value attributable to Mr. Musk's contributions.

24        ***Second***, even if the Court excludes Dr. Wazzan's 50% to 75% estimate entirely, it should

25  still permit the undisputed portions of his opinions.  Defendants do not challenge Dr. Wazzan's

26  opinions at Step 1 or Step 2 (the valuation of OpenAI for-profit and OpenAI nonprofit's stake in the

27  for-profit).  Nor do Defendants challenge Dr. Wazzan's overall three-step approach to calculating

28  wrongful gains.  The jury can draw its own conclusions about Mr. Musk's share of contributions to

OpenAI nonprofit. *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1075 n.9 (9th Cir. 2022) (jury "was not lacking in some evidentiary foundation" for disgorgement award); *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012); *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010); *Tucker v. Wright Med. Tech., Inc.*, No. 3:11-cv-03086-YGR, 2013 WL 1149717, at \*16-\*17 (N.D. Cal. Mar. 19, 2013). Dr. Wazzan should be permitted to explain to the jury his overall three-step methodology so the jury knows how to use Mr. Musk's share to assign a dollar value to Defendants' wrongful gains. *See* Fed. R. Evid. 702 adv. comm. n. (2000) (endorsing "venerable practice" of having expert "educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case").

## VI.    THE COURT SHOULD DEFER RULING UNTIL TRIAL

Finally, if the Court has any concerns about Dr. Wazzan's opinions, it should defer ruling on them until trial. Courts may resolve *Daubert* challenges at trial through voir dire before the expert testifies. *See, e.g.*, *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, No. 2:10-cv-02414, 2023 WL 4564748, at \*4 (E.D. Cal. July 17, 2023) ("Although the court is inclined to think Howard's expert testimony passes *Daubert* based on the information currently in the record, the court defers ruling on this motion. The court grants the County's request for a *Daubert* hearing . . . prior to Howard's taking the stand to testify."); *see also United States v. Holguin*, 51 F.4th 841, 853 (9th Cir. 2022) (recommending "a *Daubert* hearing or voir dire of proffered expert testimony").

That approach makes particular sense here. Defendants' *Daubert* arguments relate primarily to how Dr. Wazzan analyzes Mr. Musk's monetary and non-monetary contributions in relation to contributions from other founders, donors, employees, and investors. Those contributions will be explored at length during the first stage of the Court's proposed bifurcated trial. The Court will be much better positioned to assess Defendants' fact-specific reliability arguments concerning those contributions after hearing that evidence first-hand. Because Dr. Wazzan would not testify until the second stage of trial, there will be ample opportunity to conduct oral argument or voir dire before he testifies. Although Plaintiff maintains that the current record is sufficient to deny Defendants' motion, if the Court has any doubts, trial is the more appropriate time to resolve them.

1

2

## CONCLUSION

Dr. Wazzan's report reliably measures the enormous amount of wrongful gains that Defendants reaped from their unauthorized use of Mr. Musk's financial and other contributions. Defendants' motion to exclude his opinions should be denied.

Dated: January 30, 2026                              MOLOLAMKEN LLP

By:    _/s/ Steven F. Molo_____
Steven F. Molo (*pro hac vice*)

Marc Toberoff (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA  90265
Telephone: (310) 246-3333

Robert K. Kry (*pro hac vice*)
Jennifer M. Schubert (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*