| | |
|---|---|
| 1 | JORDAN ETH (CA SBN 121617) |
|   | JEth@mofo.com |
| 2 | WILLIAM FRENTZEN (CA SBN 343918) |
|   | WFrentzen@mofo.com |
| 3 | DAVID J. WIENER (CA SBN 291659) |
|   | DWiener@mofo.com |
| 4 | MORRISON & FOERSTER LLP |
|   | 425 Market Street |
| 5 | San Francisco, CA 94105 |
|   | Telephone: (415) 268-7000 |
| 6 | Facsimile: (415) 268-7522 |
| 7 | WILLIAM SAVITT (admitted *pro hac vice*) |
|   | WDSavitt@wlrk.com |
| 8 | BRADLEY R. WILSON (admitted *pro hac vice*) |
|   | BRWilson@wlrk.com |
| 9 | SARAH K. EDDY (admitted *pro hac vice*) |
|   | SKEddy@wlrk.com |
| 10 | STEVEN WINTER (admitted *pro hac vice*) |
|   | SWinter@wlrk.com |
| 11 | NATHANIEL CULLERTON (admitted *pro hac vice*) |
|   | NDCullerton@wlrk.com |
| 12 | WACHTELL, LIPTON, ROSEN & KATZ |
|   | 51 West 52nd Street |
| 13 | New York, NY 10019 |
|   | Telephone: (212) 403-1000 |
| 14 | Facsimile: (212) 403-2000 |

*Attorneys for Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC*

(Additional party and counsel on the next page)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE OPINIONS 3 THROUGH 6 OF DR. C. PAUL WAZZAN** |
| v. | |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date: March 3, 2026 |
| | Time: 2:00 p.m. |
| | Courtroom: 1 – 4th Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |

| | |
|---|---|
| RUSSELL P. COHEN (SBN 213105) | ANDREW J. LEVANDER (admitted pro hac vice) |
| Russ.cohen@dechert.com | Andrew.levander@dechert.com |
| HOWARD M. ULLMAN (SBN 206760) | DECHERT LLP |
| Howard.ullman@dechert.com | Three Bryant Park |
| DECHERT LLP | 1095 Avenue of the Americas |
| 45 Fremont Street, 26th Floor | New York, NY 10036 |
| San Francisco, CA 94105 | Telephone: (212) 698-3500 |
| Telephone: (415) 262-4500 | Facsimile: (212) 698-3599 |
| Facsimile: (415) 262-45555 | |
| | |
| NISHA PATEL (SBN 281628) | JOHN (JAY) JURATA, JR. (admitted pro hac vice) |
| Nisha.patelgupta@dechert.com | Jay.jurata@dechert.com |
| DECHERT LLP | DECHERT LLP |
| 633 West 5th Street, Suite 4900 | 1900 K Street, N.W. |
| Los Angeles, CA 90071 | Washington, DC 20006 |
| Telephone: (213) 808-5700 | Telephone: (202) 261-3300 |
| Facsimile: (213) 808-5760 | Facsimile: (202) 261-3333 |

*Attorneys for Defendant Microsoft Corporation*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................. 1

    I.    MUSK INVOKES A NONEXISTENT PRESUMPTION OF ADMISSIBILITY. ............................................................................................................ 1

    II.    WAZZAN'S METHODOLOGY IS UNRELIABLE. ............................................. 2

        A.    Wazzan does not explain how he selected the factors he considered. ......... 2

        B.    Wazzan's calculations cannot be replicated or tested. ............................... 4

        C.    Wazzan's one-size-fits-all approach is unreliable. ..................................... 6

        D.    Wazzan's methodology ignores causation. ................................................. 6

    III.    WAZZAN DOES NOT RELIABLY APPLY HIS OWN METHODOLOGY ................................................................................................... 7

    IV.    WAZZAN'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA. ................................................................................................................ 8

    V.    WAZZAN'S OPINIONS CONCERNING MICROSOFT ARE INADMISSIBLE. ............................................................................................... 9

    VI.    DEFENDANTS' REQUESTED RELIEF IS APPROPRIATELY TAILORED. ..................................................................................................... 10

CONCLUSION ............................................................................................................................ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Master Lease LLC* v. *Idanta Partners, Ltd.*,
   225 Cal. App. 4th 1451 (2014) ............................................................................................. 6

*Apple, Inc.* v. *Samsung Elecs. Co.*,
   2012 WL 2571332 (N.D. Cal. June 30, 2012) ....................................................................... 7

*Blockchain Innovation, LLC* v. *Franklin Res., Inc.*,
   2024 WL 5483606 (N.D. Cal. Oct. 22, 2024) ........................................................................ 5

*Daubert* v. *Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ............................................................................................... 10

*Engilis* v. *Monsanto Co.*,
   151 F.4th 1040 (9th Cir. 2025) ............................................................................... 1, 2, 4, 10

*GPNE Corp.* v. *Apple, Inc.*,
   2014 WL 1494247 (N.D. Cal. Apr. 16, 2015) ................................................................... 4, 5

*Hemmings* v. *Tidyman's Inc.*,
   285 F.3d 1174 (9th Cir. 2002) ............................................................................................... 4

*In re Apple iPhone Antitrust Litig.*,
   2025 WL 3124160 (N.D. Cal. Oct. 27, 2025) ....................................................................... 4

*In re Apple iPhone Antitrust Litig.*,
   2022 WL 1284104 (Mar. 29, 2022) ....................................................................................... 3

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................................................ 4

*Kumho Tire Co.* v. *Carmichael*,
   526 U.S. 137 (1999) .............................................................................................................. 9

*Messick* v. *Novartis Pharms. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) ............................................................................................... 1

*NetFuel, Inc.* v. *Cisco Sys., Inc.*,
   2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ...................................................................... 4

**Statutes and Rules**

Fed. R. Evid. 702 ....................................................................................................................*passim*

**Other Authorities**

Restatement (Third) of Torts: Liab. for Econ. Harm § 28 ............................................................. 6

## INTRODUCTION

Musk's damages expert, Dr. C. Paul Wazzan, purports to estimate the "economic interest" that Elon Musk does not have, but would like to have, in the OpenAI nonprofit. Relying on Wazzan, Musk proposes to transform his charitable contributions into a $100 billion-plus equity stake and to raid the nonprofit's assets to cash out that imaginary interest. This approach is legally incoherent and inconsistent with Musk's claims, but those are issues for another day. This motion asks the Court to exclude Wazzan's Opinions 3 through 6, and Musk's opposition confirms that it should. Wazzan's opinions rest on an unreliable methodology; are the product of an unreliable application of that methodology; and are not supported by sufficient facts. *See* Fed. R. Evid. 702(b)-(d).

Seeking to salvage Wazzan's opinions, Musk repeatedly attempts to shift his burden onto Defendants. He invokes superseded case law and argues that the Court should apply Rule 702's requirements liberally, with a heavy thumb on the scale in favor of admissibility. But the Ninth Circuit squarely rejected Musk's argument last summer: there is no presumption of admission. Musk also invites the Court to defer ruling on this motion and either let the jury decide whether Wazzan's methods are sound or address the admissibility of Wazzan's opinions during the trial. But the Court has a non-delegable duty under Rule 702 to allow only reliable expert testimony, and the issue is ripe for decision: Wazzan has served two reports; he sat for a full-day deposition; and the parties have now made two rounds of submissions addressing the admissibility of his opinions. The Court should act now so the parties have clarity as they prepare for the fast-approaching trial.

## ARGUMENT

### I. MUSK INVOKES A NONEXISTENT PRESUMPTION OF ADMISSIBILITY.

Musk contends that the threshold reliability requirements in Rule 702 "should be applied with a 'liberal thrust' favoring admission." Pl. Mem. 6 (quoting *Messick* v. *Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)). But the Ninth Circuit has specifically disapproved of the standard Musk advocates. As the Ninth Circuit held last year, Rule 702 "did not establish a categorical preference for admitting expert testimony," and prior cases—including *Messick* in particular—should not be read to do so. *Engilis* v. *Monsanto Co.*, 151 F.4th 1040, 1049-50 (9th Cir.

2025). *Engilis* was crystal clear: "Our caselaw should not be understood to suggest a presumption of admission. There is no such presumption[.]" *Id.* at 1050.

Musk does not even acknowledge *Engilis*, let alone reconcile his position with it, even though Defendants cited it multiple times. Defs. Mem. 3, 6. He ignores the Ninth Circuit's holding that "a proponent of expert testimony" has the burden of establishing "each of the requirements of Rule 702 by a preponderance of the evidence," 151 F.4th at 1050, and urges this Court to allow Wazzan to present his challenged opinions to the jury[1] unless it finds they are "junk science" or "nonsense opinions." Pl. Mem. 6. But *Engilis* rejected that approach, reaffirming that the "district court cannot abdicate its role as gatekeeper, nor delegate that role to the jury" by requiring opposing litigants to "rely[] on the safeguards of the adversary system" when the proponent of expert testimony fails to "satisf[y] the threshold requirements established by Rule 702." 151 F.4th at 1050. That is the situation here.

## II. WAZZAN'S METHODOLOGY IS UNRELIABLE.

### A. Wazzan does not explain how he selected the factors he considered.

Wazzan's Opinion 3 (upon which his subsequent opinions are based) is that the share of the OpenAI nonprofit's value attributable to Musk's contributions is 50% to 75%. Ex. 1 ¶ 98.[2] Wazzan says he considered four factors in forming this opinion, Ex. 3 at 1-2, but he does not explain how he selected those factors or justify his decision to exclude other potential factors. Defs. Mem. 6-9.

To be admissible, an "expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702 advisory committee note to the 2000 amendment. Wazzan's methodology is grounded in nothing: He cited neither experience, nor any literature, nor any accepted practices when selecting the four factors used to quantify the value of Musk's contributions to the nonprofit.

---

[1] In his Notice of Remedies (Dkt. 392 at 3-4) and opposition (Pl. Mem. 1, 11, 19) Musk assumes he is entitled to have a jury decide his request for disgorgement. That issue is the subject of meet-and-confer discussions, and Defendants reserve all rights. Nevertheless, in light of Musk's position and the possibility that the Court would seek an advisory verdict in any case, Defendants assume for purposes of this motion that a jury would be asked to render a verdict on disgorgement.

[2] "Ex." refers to the exhibits to the attorney declaration filed in support of this motion. Dkt. 393-1.

Defs. Mem. 7-8. Musk now claims that Wazzan selected his four factors using "well-accepted finance principles," Pl. Mem. 7, but Wazzan identifies no such principles, and he admitted at deposition that his third step is something "you wouldn't find . . . in a textbook." Ex. 4 at 45:10-16.

The Court's initial decision denying class certification in *In re Apple iPhone Antitrust Litigation* illustrates how groundless methodologies like Wazzan's should be treated under Rule 702. There, the Court excluded testimony from an econometric expert who attempted to estimate the commission rate Apple would have charged app developers but for its alleged monopolistic practices. 2022 WL 1284104, at *3-5 (Mar. 29, 2022) (YGR). It did so because the expert had "cherry-picked from a few data points" to reach a numerical estimate unsupported by any "equation or analysis," while other data was "conveniently dismissed." *Id.* at *3.

Wazzan has done the same thing. For example, he offers no rationale for considering Musk's equity stake in xAI, but not in Tesla or any other company. Musk argues his "role as the founder of an AI startup" is "more relevant than his role at an [EV] company" (Pl. Mem. 8), but that hardly justifies *excluding* Tesla, and regardless, it is not an explanation that *Wazzan* provided. Wazzan observes that Musk "tends to own a large share of companies in which he is an active and founding investor" and cites Musk's ownership stake at five of them. Ex. 1 ¶ 93. But he then considers only the largest stake, xAI, while ignoring smaller ones. *Id.* ¶ 98. Classic cherry-picking.

Wazzan likewise fails to justify his decision to treat donations predating Musk's resignation from the OpenAI board as categorically more valuable than later donations. Wazzan merely asserts that donations from this period served as "seed funding" that was "more important to OpenAI's success" than amounts contributed once it was "established." *Id.* ¶¶ 73, 74. But Wazzan cites nothing to support that critical conclusion—no academic study, no article, and no evidence. When pressed to specify when the nonprofit became sufficiently "established" to reduce the relative importance of later donations, all Wazzan could muster was the evasive refrain that "established, you know, [is] sort of a continuum." Ex. 4 at 149:11-18. As a result, neither the Court nor Defendants can determine whether Wazzan's selection of factors was grounded in his knowledge, training, experience, or education, or whether the selection was instead dictated by Musk's desired outcome.

3
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE OPINIONS 3 THROUGH 6 OF DR. C. PAUL WAZZAN
CASE NO. 4:24-CV-04722-YGR

Musk's reliance on *Hemmings* v. *Tidyman's Inc.* hurts, not helps, his position. There, the defendants challenged the variables an expert used in a regression analysis, "a common statistical tool" regularly used by experts in discrimination cases. 285 F.3d 1174, 1183-86 & n.9 (9th Cir. 2002). Here, by contrast, Wazzan employs a one-off methodology built on factors he "plucked out of thin air," *NetFuel, Inc.* v. *Cisco Sys., Inc.*, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020), with no explanation for why he chose those factors and not others. That does not suffice. *See, e.g.*, *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1184 (N.D. Cal. 2007) (excluding expert who "ignore[d] all the evidence that contradict[ed] her litigation-created conclusion" and based her opinion on "cherry-picked" data).

Finally, Musk complains that Defendants should have identified other factors that Wazzan "should have considered." Pl. Mem. 8. But as the proponent of Wazzan's testimony, it is *Musk's* burden to establish that he used a reliable methodology. *Engilis*, 151 F.4th at 1049-50. No case (certainly none Musk cites) suggests that the resolution of that question turns on whether Defendants have identified a superior methodology.

### B. Wazzan's calculations cannot be replicated or tested.

Wazzan's methodology is also unreliable because he does not explain how his chosen factors combine to yield the conclusion that Musk's contributions account for 50% to 75% of the nonprofit's value. Wazzan's failure to provide this information means that his "judgment calls" cannot be "tested and analyzed," and his "methodology . . . cannot be tested or replicated." *In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *7-8 (N.D. Cal. Oct. 27, 2025) (YGR). Wazzan offers quantitative conclusions based on an assessment of "qualitative factors" untethered to any "mathematical calculation." *GPNE Corp.* v. *Apple, Inc.*, 2014 WL 1494247, at *2, *4 (N.D. Cal. Apr. 16, 2015). The conclusions are merely outputs of an "impermissible black box." *Id.* at *5.

Musk says the "black box" cases Defendants cited in the opening brief are "distinguishable" because Wazzan supposedly "sets forth his analysis of each factor in detail." Pl. Mem. 10. But that is demonstrably not the case. Wazzan never allocates nonmonetary contributions to the nonprofit among Musk and others. *See* pp. 7-8, *infra*. Nor does Wazzan disclose the relative significance of Musk's monetary and nonmonetary contributions—a crucial step given Wazzan's

acknowledgement that nonmonetary contributions are "[v]ery valuable" and must be considered. Ex. 4 at 246:6-7. Per his own testimony, Wazzan never did the work to "parse[] . . . out" monetary and nonmonetary contributions: "Q: What portion of that 50 to 75 percent range do you attribute to Mr. Musk's donations? A: All of it. Q: So none of it is attributed to his non-monetary contributions? A: All of it is attributed to all of it. I haven't parsed it out." *Id.* at 137:17-25.

Musk also argues that Wazzan need not show his work because his four factors are supposedly distinct but "mutually reinforcing." Pl. Mem. 9. But that argument contradicts Wazzan's testimony: He first asserted, "[M]y analysis took all of it as a whole. I had the monetary and the nonmonetary, and I came up with a range." Ex. 4 at 313:4-17. When asked what portion of that range was "attributable to nonmonetary contributions," Wazzan said that was a "different analysis" that he could not reliably undertake "on the fly." *Id.* Given Wazzan's inability to explain how he combines monetary and nonmonetary contributions to come up with his 50% to 75% total, it is not possible for Musk's nonmonetary contributions to "reinforce" anything. Are nonmonetary contributions more important? Less? Are the two categories equally weighted? Wazzan never says.

Unable to backfill Wazzan's defective methodology, Musk tries once again to pass off his burden under Rule 702, this time by criticizing Defendants' rebuttal experts for failing to identify a "quantitative method for analyzing [Musk's] non-monetary contributions." Pl. Mem. 10. But that is not their job. It is Wazzan who must develop a reliable methodology for determining the relative value of nonmonetary contributions if he is to present his opinions about Musk's contributions to the jury. He may not "cloak[] his lack of a methodology in a list of considerations that relate to the value of [nonmonetary contributions] generally." *GPNE*, 2014 WL 149247, at *5.

Musk's own case, *Blockchain Innovation, LLC* v. *Franklin Res., Inc.* (Pl. Mem. 16), underscores the inadmissibility of Wazzan's opinions. In *Blockchain*, the court excluded the opinions of a valuation expert who assessed the value of certain "qualitative factors" without identifying the "basis for any inputs or weighting in his valuation." 2024 WL 5483606, at *11 (N.D. Cal. Oct. 22, 2024). As the court explained, the expert's "genuine conviction" was no substitute for a disclosed methodology because "subjective belief and unsupported speculation do not provide a reliable basis for [an expert's] opinions." *Id.* (citation modified). Likewise here,

Wazzan never discloses how his inputs were weighted or how his qualitative assessments were translated into a numerical estimate. Those failures render his opinions unreliable.

### C. Wazzan's one-size-fits-all approach is unreliable.

Defendants previously showed that Wazzan's methodology is also unreliable because his estimates of wrongful gains cannot be allocated among claims or contributions. Defs. Mem. 11. Musk concedes that Wazzan provides no framework for apportioning gains but asserts that Wazzan's opinions "would still be helpful" to an apportionment exercise as there is supposedly "ample evidence of Mr. Musk's contributions." Pl. Mem. 11. Musk's reference to the record misses the point. Under Wazzan's approach, not all contributions are created equal: earlier donations are purportedly more valuable, Ex. 1 ¶ 74, though he never quantifies how much. Moreover, while Wazzan says Musk's nonmonetary contributions are "[v]ery valuable," Ex. 4 at 246:3-7, he never quantifies that value or explains how they factor into his calculations. This gives jurors no reliable basis to weigh the value allegedly created by those contributions if warranted by the verdict.

### D. Wazzan's methodology ignores causation.

Musk says that wrongful gains should include only "net profit attributable to the underlying wrong." Pl. Mem. 12. But Wazzan conducts no analysis to determine what portions of Defendants' stakes of the OpenAI for-profit affiliate are allegedly attributable to the underlying wrong rather than to other causes. He simply assumes all gains realized by Defendants after the entity's "wrongful" creation are also wrongful and thus subject to disgorgement, without linking those gains to any alleged wrongful acts.

Wazzan's treatment of Microsoft illustrates this flaw. Musk claims that Microsoft is "liable for disgorgement of wrongful gains derived from the primary violator's misconduct." Pl. Mem. 12-13. That is incorrect. An aiding-and-abetting defendant is liable "only for harm to which the aiding and abetting made a contribution." Restatement (Third) of Torts: Liab. for Econ. Harm § 28 cmt. e (2020). Musk's own authority confirms this point: an aiding-and-abetting defendant is an "independent wrongdoer" required to disgorge only "the net increase in assets of the wrongdoer, *to the extent that this increase is attributable to the underlying wrong*." *Am. Master Lease LLC* v. *Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1486 (2014) (emphasis added) (citation omitted).

Yet Musk admits that Wazzan measures Microsoft's disgorgement solely in reference to OpenAI's conduct and asserts he need not examine Microsoft's own conduct. Pl. Mem. 12-13. The failure to consider *Microsoft's* conduct in his analysis renders Wazzan's calculations of wrongful gains "contrary to law" and thus "unreliable under FRE 702 and *Daubert*." *Apple, Inc.* v. *Samsung Elecs. Co.*, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012).[3]

### III. WAZZAN DOES NOT RELIABLY APPLY HIS OWN METHODOLOGY.

Wazzan opined that it was "necessary" to compare Musk's contributions to the contributions of others to determine Musk's "relative share[]" of the alleged wrongful gains. Ex. 1 ¶ 71. But Wazzan never conducted that analysis: his reports do not list a contribution percentage for anyone but Musk, and Wazzan admitted that he had not "parsed . . . out" the contributions of Altman (Ex. 4 at 142:14-18), Brockman (142:19-20), or Sutskever (142:21-24), nor anyone else, such as the nonprofit's other donors (148:1-3) or its employees (148:4-6). According to Wazzan, "[t]he other guys would reside in the piece that's left over," *id.* 106:7-14, but when asked, he could not even name all the people who had contributed to the nonprofit's value, *id.* at 147:3-11.[4]

Musk pretends that Wazzan's deposition did not occur and claims that Wazzan did in fact "conduct a comparative analysis." Pl Mem. 13. But Musk never explains how Wazzan possibly could have done that when he admitted, under oath, that he (1) never made a comprehensive list of the "other guys" who contributed to the nonprofit; and (2) did not calculate the value of anyone else's contributions. If Musk's claim were correct, then he would have directed the Court to a chart in Wazzan's report listing all contributors to the OpenAI nonprofit and their respective contribution percentages. But Musk did not do that, because Wazzan never did the work.

---

[3] Wazzan's analysis is also flawed as to Microsoft in light of the Court's dismissal of the unjust enrichment claim against Microsoft, as the Court found no quasi-contract between Musk and Microsoft or evidence that Microsoft obtained any direct benefit from him. Dkt. 390 at 27. Accordingly, Wazzan's opinions as to Microsoft—untethered from Musk's aiding-and-abetting claim and instead reliant on Microsoft's purported "unauthorized commercial use" of his donations (Pl. Mem. 1)—will not assist the trier of fact, is unreliable, and risks misleading and confusing the jury. As such, Microsoft intends to move to exclude Wazzan's opinions for lack of "fit."

[4] Musk claims that Wazzan "accounts for" OpenAI employees "at Step 2," when he measures the value of the employee investment vehicle's interest in OpenAI's for-profit affiliate. Pl. Mem. 14. Not so. Wazzan testified that employees "contribute[d] to OpenAI nonprofit's value" *before* the for-profit's creation in 2019. Ex. 4 at 172:20-173:4. But Wazzan has not calculated that value.

Seeking to shift the focus away from this fundamental problem with Wazzan's analysis, Musk emphasizes the monetary-contributions component, which he calls "inherently comparative." Pl. Mem. 13. Even if that were true, it would not save Wazzan's opinions. Wazzan's 50% to 75% range is based on a combination of monetary and nonmonetary contributions, Ex. 4 at 156:16-19, 313:11-13, and Wazzan does not assign a percentage to anyone's nonmonetary contributions. That would have required Wazzan to assess the nonmonetary contributions of each of OpenAI's founders and employees and determine their relative value to the nonprofit—which he never did.

Illustrating the problem, Wazzan credits Musk with recruiting "key personnel" to the nonprofit, including Ilya Sutskever and Durk Kingma. Pl. Mem. 4 (citing Ex. 1 ¶ 86). Wazzan admitted that he made no effort to assess the relative value of either person's contributions, Ex. 4 at 142:14-143:1, and he could not say whether Sutskever's work, or Musk's recruitment of him, was "more valuable to OpenAI." *Id.* at 160:20-23. Worse still, when asked at deposition, Wazzan confessed that he did not even know who Kingma was. *Id.* at 139:7-8. Nor does Wazzan consider whether any other persons helped recruit these individuals and should thus share credit with Musk.

## IV. WAZZAN'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA.

As previously shown (Defs. Mem. 15-17), exclusion is independently required under Rule 702(b) because Wazzan's Opinions 3 through 6 are based on insufficient facts or data.

***Purported 2017 agreement-in-principle.*** Musk doesn't dispute that OpenAI's cofounders never reached agreement on an equity allocation for the for-profit entity they discussed in 2017. Musk nonetheless argues that Wazzan could rely on the "pro forma cap table" (Dkt. 396-9) because it was supposedly a "proposal by Brockman and Sutskever." Pl. Mem. 15. But even if that were true, the document offers no insight into how all other "co-founders . . . viewed Musk's contributions," *id.*, including because Musk offers no evidence that *Altman* agreed with its contents. Indeed, Wazzan conceded at deposition that each cofounder held a "different perspective" of Musk's relative contribution to the nonprofit. Ex. 4 at 200:19-24.

More fundamentally, it is undisputed that (i) the proposed cap table related to a new for-profit entity then under discussion—not the OpenAI nonprofit from whom Musk seeks to recover; and (ii) the referenced equity allocations were predicated on Musk making a $100 million

investment into that entity and substantially increasing his involvement with OpenAI, which concededly never happened. Wazzan's cap table is therefore based on counterfactual relative financial contributions and cannot possibly constitute evidence of the cofounders' assessment of their relative contributions. Musk's only answer is to observe that the "cap table envisioned future investments by Altman, Brockman, and Sutskever too," Pl. Mem. 15, but that is precisely the point: The cap table contemplated that Altman, Brockman, and Sutskever would receive smaller equity allocations in the new entity because they were putting in less capital. The percentages in the cap table were thus driven by imaginary future contributions that never happened, not past ones.

*Musk's xAI stake.* Musk does not explain why it is relevant that he supposedly "tends to own a large share of companies in which he is an active and founding investor[.]" Pl. Mem. 16 (quoting Ex. 1 ¶ 93). Wazzan purported to calculate the value of Musk's charitable contributions to the OpenAI nonprofit, not the size of the equity stake that Musk might have received if OpenAI had hypothetically been formed as a for-profit. Musk asserts that his large equity stake in xAI reflects his "profound contributions," Pl. Mem. 16, but there is nothing in Wazzan's reports or testimony to support that claim. Wazzan knows next to nothing about Musk's involvement in xAI: He had no idea how much capital Musk has invested in xAI (in absolute or relative terms) and could not even say whether Musk has an executive role at the company. Ex. 4 at 213:3-12.

## V. WAZZAN'S OPINIONS CONCERNING MICROSOFT ARE INADMISSIBLE.

Musk agrees that Wazzan's three-step analysis "estimates the amount that OpenAI *and Microsoft* wrongfully gained from OpenAI's commercialization operations . . . [and] determines only the portion of the resulting gains that are attributable to Mr. Musk's contributions." *Id.* at 2 (emphasis added). Wazzan's analysis thus estimates the total amount of "wrongful gains" that could be disgorged under his theory. Any amount allegedly owed on top of that is double-counting. Nonetheless, Wazzan tacks on another 26.2% of Microsoft's share of the for-profit's value when calculating Microsoft's purported wrongful gains. While Musk claims that Wazzan explained the basis for this allocation in his report and deposition (Pl. Mem. at 18), Wazzan never does more than simply state that he made the allocation. Ex. 1 ¶¶ 52, 104; Ex. 4 at 271:9-25; 272:24-273:5. This *ipse dixit* has no place in front of a jury. *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 157 (1999).

Nor does Musk meaningfully engage with Microsoft's critique that Wazzan provides no rationale for his methodology. Defs. Mem. 17-18. Musk's allegations in this case do not suggest that either the nonprofit's stake in the for-profit entity, or Musk's percentage of contribution to the nonprofit, have any bearing on what portion of *Microsoft's* gains were the result of alleged aiding and abetting breach of fiduciary duty. Yet Wazzan applies those percentages to Microsoft, despite never analyzing how *Microsoft's* conduct led to its allegedly wrongful gains because "[i]t's not necessary" and he "assumed liability." Ex. 4 at 273:11-274:21; 277:2-10. This unreliable methodology renders Wazzan's opinions as to Microsoft inadmissible. Fed. R. Evid. 702.

## VI. DEFENDANTS' REQUESTED RELIEF IS APPROPRIATELY TAILORED.

There is no merit to Musk's argument (Pl. Mem. 18-19) that Defendants seek overbroad relief. Defendants have focused this challenge on the four opinions that do not satisfy Rule 702's reliability requirements—the third step of Wazzan's analysis—just as the Court's rules require.[5] Unless the Court concludes that Wazzan Opinions 3 through 6 satisfy the reliability standards in subsections (b), (c), and (d), Wazzan should not be permitted to provide testimony at trial that relates to those opinions. That is what the law requires, as "expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading.'" *Daubert* v. *Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995) (citation omitted).

Musk proposes that Wazzan be allowed to testify about the value of his contributions even if the Court agrees that the cap table and Musk's xAI stake do not pass muster under Rule 702(b). Pl. Mem. 18-19. But expert testimony must satisfy all of the Rule's reliability requirements, *Engilis*, 151 F.4th at 1050, and Wazzan's opinions satisfy none. Revising those opinions as Musk suggests makes things worse: Wazzan's supposed methodology depends on all four cherry-picked factors, among which the cap table's "equity stakes" were evidently "particularly relevant." Ex. 1 ¶ 71.

## CONCLUSION

The Court should grant Defendants' Motion to exclude Wazzan Opinions 3 through 6.

---

[5] Musk's claim that Defendants do not object to Wazzan's "overall . . . framework" (Pl. Mem. 5) is baseless. Defendants previously made clear their position that Wazzan's overall methodology is "made up," "unverifiable," "unprecedented," and "implausible on its face," and reserved the right to challenge it on "fit" grounds at the appropriate time. Defs. Mem. 1 & 2 n.2.

| | | |
|---|---|---|
| 1 | Date: February 6, 2026 | MORRISON & FOERSTER LLP |
| 2 | | |
| 3 | | */s/ Jordan Eth*<br>JORDAN ETH (CA SBN 121617) |
| 4 | | JEth@mofo.com<br>WILLIAM FRENTZEN (CA SBN 343918) |
| 5 | | WFrentzen@mofo.com<br>DAVID J. WIENER (CA SBN 291659) |
| 6 | | DWiener@mofo.com<br>MORRISON & FOERSTER LLP |
| 7 | | 425 Market Street<br>San Francisco, CA 94105 |
| 8 | | Telephone: (415) 268-7000<br>Facsimile: (415) 268-7522 |
| 9 | | WILLIAM SAVITT (admitted *pro hac vice*) |
| 10 | | WDSavitt@wlrk.com<br>BRADLEY R. WILSON (admitted *pro hac vice*) |
| 11 | | BRWilson@wlrk.com<br>SARAH K. EDDY (admitted *pro hac vice*) |
| 12 | | SKEddy@wlrk.com<br>STEVEN WINTER (admitted *pro hac vice*) |
| 13 | | SWinter@wlrk.com<br>NATHANIEL CULLERTON (admitted *pro hac vice*) |
| 14 | | NDCullerton@wlrk.com<br>WACHTELL, LIPTON, ROSEN & KATZ |
| 15 | | 51 West 52nd Street<br>New York, NY 10019 |
| 16 | | Telephone: (212) 403-1000<br>Facsimile: (212) 403-2000 |
| 17 | | *Attorneys for the OpenAI Defendants* |
| 18 | | (Additional party and counsel on the next page) |

|   |   |
|---|---|
| 1 | |
| 2 | */s/ Russell P. Cohen* |
| 3 | RUSSELL P. COHEN (SBN 213105)<br>Russ.cohen@dechert.com |
| 4 | HOWARD M. ULLMAN (SBN 206760)<br>Howard.ullman@dechert.com |
| 5 | 45 Fremont Street, 26th Floor<br>San Francisco, CA 94105 |
| 6 | Telephone: (415) 262-4500<br>Facsimile: (415) 262-45555 |
| 7 | NISHA PATEL (SBN 281628) |
| 8 | Nisha.patelgupta@dechert.com<br>DECHERT LLP |
| 9 | 633 West 5th Street, Suite 4900<br>Los Angeles, CA 90071 |
| 10 | Telephone: (213) 808-5700<br>Facsimile: (213) 808-5760 |
| 11 | ANDREW J. LEVANDER (admitted *pro hac vice*) |
| 12 | Andrew.levander@dechert.com<br>DECHERT LLP |
| 13 | Three Bryant Park<br>1095 Avenue of the Americas |
| 14 | New York, NY 10036<br>Telephone: (212) 698-3500 |
| 15 | Facsimile: (212) 698-3599 |
| 16 | JOHN (JAY) JURATA, JR. (admitted *pro hac vice*)<br>Jay.jurata@dechert.com |
| 17 | DECHERT LLP1900 K Street, N.W.<br>Washington, DC 20006 |
| 18 | Telephone: (202) 261-3300<br>Facsimile: (202) 261-3333 |
| 19 | *Attorneys for Defendant Microsoft Corporation* |