# EXHIBIT B

```
IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
-----------------------------------------
ELON MUSK, et al.,
     Plaintiffs,
v.
SAMUEL ALTMAN, et al.,
     Defendants.


Case No. 4:24-cv-04722-YGR
-----------------------------------------


VIDEO DEPOSITION OF
Elon Musk
September 26, 2025
San Francisco, California
LEAD: William Savitt, Esquire
FIRM: Wachtell Lipton Rosen & Katz




FINAL COPY - CONFIDENTIAL
JANE ROSE REPORTING - 1-800-825-3341
```

APPEARANCES:

ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:

   STEVEN F. MOLO, ESQ.

   smolo@mololamken.com

   ROBERT K. KRY, ESQ.

   rkry@mololamken.com

   WALTER HAWES, ESQ.

   whawes@mololamken.com

   JENNIFER SCHUBERT, ESQ.

   jschubert@mololamken.com

   SARA TOFIGHBAKHSH, ESQ. (Via Zoom)

   stofighbakhsh@mololamken.com

   ALEXANDRA EYNON, ESQ.  (Via Zoom)

   aeynon@mololamken.com

     MOLOLAMKEN LLP

     600 New Hampshire Avenue, NW, Suite 660

     Washington, D.C. 20037

     202.556.2011

```
APPEARANCES (Cont'd):


ATTORNEY(S) FOR PLAINTIFFS AND THE WITNESS:

   MARC TOBEROFF, ESQ.

   mtoberoff@toberoffandassociates.com

   JAYMIE PARKKINEN, ESQ.

   jparkkinen@toberoffandassociates.com

       TOBEROFF & ASSOCIATES PC

       23823 Malibu Road, Suite 50-36

       Malibu, California 90265

       310.246.3333


ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:

   WILLIAM FRENTZEN, ESQ.

   wfrentzen@mofo.com

       MORRISON & FOERSTER LLP

       425 Market Street

       San Francisco, California 94105

       415.268.6413
```

```
APPEARANCES (Cont'd):


ATTORNEY(S) FOR ALL DEFENDANTS EXCEPT MICROSOFT:


   WILLIAM S. SAVITT, ESQ.

   wdsavitt@wlrk.com

   NATHANIEL D. CULLERTON, ESQ.

   ndcullerton@wlrk.com

   IOANNIS DRIVAS, ESQ.

   iddrives@wlrk.com

   SARAH EDDY, ESQ.

   skeddy@wlrk.com

   BRADLEY R. WILSON, ESQ.   (Via Zoom)

   brwilson@wlrk.com
      WACHTELL, LIPTON, ROSEN & KATZ
      51 West 52nd Street
      New York, New York 10019
      212.403.1329
```

```
APPEARANCES (Cont'd):
ATTORNEY(S) FOR DEFENDANT MICROSOFT:
    RUSSELL P. COHEN, ESQ.
    russ.cohen@dechert.com
    HOWARD ULLMAN, ESQ.  (Via Zoom)
    howard.ullman@dechert.com
        DECHERT LP
        45 Fremont Street, 26th Floor
        San Francisco, California 94105
        415.262.4506


    NISHA PATEL GUPTA, ESQ. (Via Zoom)
    nisha.patelgupta@dechert.com
        DECHERT LLP
        US Bank Tower
        633 West 5th Street, Suite 4900
        Los Angeles, California 90071-2032
        213.808.5735


    JOHN A. JURATA, JR., ESQ.
    jay.jurata@dechert.com
        DECHERT
        1775 Eye Street, Northwest
        Washington, D.C.  20006
        202.261.3326
```

```
APPEARANCES (Cont'd):


   YOSEF WEITZMAN, ESQ. (Via Zoom)
   yosi.weitzman@dechert.com
       DECHERT
       CIRA Center 2929 Arch Street
       Philadelphia, Pennsylvania 19104
       215.994.4000




JANE ROSE REPORTING
           74 Fifth Avenue
           New York, New York 10011
           1-800-825-3341
           GAIL L. INGHRAM, Court Reporter
           BA, CRR, CLR, RDR, CSR-CA (No. 8635)
           JASON BUTKO, Videographer
```

TABLE OF CONTENTS

EXAMINATION OF:                                    PAGE

ELON MUSK

    By Attorney Savitt ..............10

    By Attorney Cohen ..............343

    By Attorney Molo ..............359

Reporter Certificate ................. Page 364

Notice to Read and Sign ............. Page 366

Index of Exhibits ................... Page 368

Page 49

1  spend much of the week on OpenAI, and there are
2  some weeks where there was very little.
3      Q.  Could you hazard an estimate about what
4  your average weekly hourly commitment to OpenAI
5  was in 2016?
6      A.  I don't recall.
7      Q.  Same for 2017?
8      A.  Yeah.
9      Q.  At some point, you gave a few OpenAI
10 employees Teslas; is that right?
11     A.  Yes.
12     Q.  Who got the Teslas?
13     A.  I think Ilya.  Maybe Greg.  I'm not
14 sure.
15     Q.  You don't recall who else might have
16 gotten a Tesla?
17     A.  No.
18     Q.  Why did you give these people Teslas?
19     A.  Seemed like a nice thing to do.
20     Q.  Any other reason?
21     A.  Sort of a perk of the company.  I mean I
22 was providing, essentially, all the capital of the
23 company so why not throw in a few Teslas.
24     Q.  Do you believe you have a contract with
25 the OpenAI not-for-profit corporation?

Page 50

1    A.  A contract?
2    Q.  Yeah.
3    A.  I mean, there are many documents that
4    have been signed.
5    Q.  But I'm asking a different question.
6         Do you think you have a binding
7    agreement, a contract, with OpenAI, Inc., the
8    nonprofit?
9    A.  For what?
10   Q.  Of any kind.
11   A.  I think so, but -- you know, I -- yeah.
12   Q.  You think so?
13   A.  I think so.
14   Q.  And do you have a contract with -- in
15   your opinion, with any other OpenAI entity?
16   A.  I'm -- not familiar with the crazy
17   corporate shell game of companies associated with
18   OpenAI.  So, no, I don't think so.
19   Q.  Okay.  Do you believe you have a
20   contract with Sam Altman?
21   A.  I'm not sure what you mean by a
22   contract.
23   Q.  I'm asking you whether you believe you
24   have a binding agreement of some sort,
25   enforceable binding agreement with Sam Altman.

1    A.  I guess in a sense, yes, in that the
2    deal was to create a nonprofit open source
3    organization; and that contract -- that deal was
4    fundamentally -- that promise was broken
5    egregiously.
6    Q.  So you think that your understandings
7    with Mr. Altman rise to the level of a contract
8    between you and him?
9    A.  I think so.  And -- because the clear
10   understanding was this would be a nonprofit, open
11   source.  And now, in fact, OpenAI, the name is,
12   is -- itself is a lie.  It is, in fact -- it
13   should be called "closed-for-maximum-profit
14   AI.com."  And I was thinking of gifting them that
15   as a URL.
16         "Closed-for-maximum-profit AI" should be
17   the name of OpenAI.  And that is directly contrary
18   to the reason that it was given.
19         They stole the charity.  That's wrong.
20   Q.  So what are the terms of the contract
21   that you think you have with Mr. Altman?
22   A.  The money was donated to create an
23   open-source nonprofit.  And now it has been turned
24   into a de facto closed-source profit maximizing
25   entity, directly contrary to the reason the money

1     was given.  They broke the deal.
2            And I would liken this to if you donate
3     money to a company that is intended to preserve
4     the Amazon Rainforest, but instead they chop down
5     the trees, turn it into a lumber company and sell
6     the wood for profit, you'd be rather upset,
7     wouldn't you?
8         Q.  No, I've seen that, and you can recycle
9     as much as you like.  My question was a little
10    different.
11           My question is:  What were the terms --
12    what are the terms of the agreement that you say
13    you have with Mr. Altman?
14        A.  It's very simple.  The money was given
15    to create a nonprofit open-source organization.
16        Q.  That's it?
17        A.  And -- yeah, that's what the money was
18    given for.  That's what my time was given for.
19    Not just money but time and credibility.
20        Q.  And that constitutes the terms of the
21    agreement you say you have with Altman; fair?
22        A.  I think that's -- those are the major
23    parts of it.  It's not super complicated.
24        Q.  I'm not saying it is.  I just want to
25    get --

Page 53

1    A.  Okay.
2    Q.  -- I just want to understand fully your
3    view, sir.  That's the only reason I'm pushing.
4    A.  My view is money was given, time was
5    given, credibility was given, recruiting help was
6    given, advice was given.  Basically, everything
7    you could do to make an organization successful is
8    what I gave for the purpose of creating a
9    nonprofit open-source organization.  And they've
10   egregiously violated those promises in the worst
11   way possible and created a profit-maximizing,
12   defective, closed-source organization to enrich
13   themselves.  And that is wrong.  That is wrong.
14   Q.  And that constitutes the contract you
15   had with Altman, yes?
16       It's a yes-or-no question.
17   A.  I mean, I don't know if this is some
18   loaded legal term or not.  But it is clearly a
19   broken promise.
20   Q.  Okay.  And is that the same contract
21   you think you have with OpenAI, Inc.?
22   A.  I think you're trying to sort of connect
23   this to some sort of legal argument.  I'm just
24   saying that this is -- that anyone with a shred of
25   common sense can see that the deal was broken.

1  to.

2      Q.  Do you think that OpenAI no longer

3  views safety as a first-class requirement?

4      A.  I certainly don't trust them.  I don't

5  trust them to view safety as a first-class

6  requirement.

7      Q.  What causes you to think that OpenAI

8  does not view safety as a first-class

9  requirement?

10     A.  I think Sam Altman is -- just wants to

11  maximize profits at all costs.  That's my opinion.

12  And that's what seems to be the case.

13     Q.  Is there anything you can point to in

14  the safety functions and research of OpenAI that

15  you think causes it to be something other than a

16  first-class safety commitment?

17     A.  Just that the priority seemed to be

18  profit maximization.

19     Q.  Anything other than that?

20     A.  No, but that's obviously a great deal of

21  their putting profit before safety.

22     Q.  But the reason you're thinking they put

23  property before safety is simply because the

24  incentive structure that you think exists; right?

25     A.  Yeah, they've gotten greedy.

1    Q.  And, I'm sorry, I don't mean to chase
2    you on this, but is there anything else you can
3    point to that's going on that you know of or
4    believe going on at OpenAI that you think
5    represents something other than first-class
6    safety?
7         That's the question I just want make
8    sure I get the full answer to, sir.
9        A.  It does not seem to be the priority.
10   The priority seems to be profit maximization and
11   valuation maximization, so -- yeah
12       Q.  Do you have any technical or scientific
13   critiques of OpenAI's safety protocols?
14       A.  I'm not aware of any -- well, I guess
15   there was -- you know, I did read that --
16   allegedly, Chat GPT convinced some kid to commit
17   suicide.  That sounds pretty bad.  That sounds
18   like they are cavalier about safety, if that is
19   true.
20       Q.  Anything else?
21       A.  Well, I think if it's convincing people
22   to commit suicide, that's pretty bad.
23       Q.  I understand that.
24          But you're not actually aware of the
25   circumstance of that situation, are you?

Page 263

1  A. I -- I just know what I read. I said,
2  if that's accurate, that's pretty bad.
3  Q. You don't believe everything you read
4  in the New York Times, do you, Mr. Musk?
5  A. No.
6  Q. No.
7      Would you agree that reasonable minds
8  can and do disagree with respect to the best
9  approaches to AI safety?
10  A. I'm sure there's not complete agreement.
11  Q. Is there a particular approach to AI
12  safety that you believe this contract term
13  required OpenAI to adopt?
14  A. Safety should come before profits.
15  Q. Anything else?
16  A. Not that I can think of.
17  Q. When did OpenAI, Inc. or Altman first
18  breach this first-class safety requirement?
19  A. I guess I first became very concerned
20  about it in the 2023 Microsoft deal, where it
21  seemed like they were really chasing
22  profitability; just chasing money.
23  Q. Do you say that the Altman and OpenAI,
24  Inc. broke the promise to make safety a
25  first-class requirement when they entered into

Page 264

1    the Microsoft deal in 2023?
2       A.  My perception was that they were putting
3    profits over safety.
4       Q.  Did anything about the terms of the
5    Microsoft deal in 2023 indicate a reduced
6    commitment to OpenAI safety, that you can
7    remember for me today?
8          ATTORNEY MOLO:  Object to the form of
9    the question.  To the extent -- and have complete
10   visibility into the terms of the deal.
11      A.  I don't know the full extent.  But -- I
12   don't know what they're doing with regard to
13   safety.  But they do appear to be prioritizing
14   profits over safety.
15   BY ATTORNEY SAVITT:
16      Q.  But my question was -- it was a narrow
17   one.
18          Is there anything -- do you know of
19   anything about the Microsoft deal in 2023 that
20   tended to suggest that OpenAI or Microsoft were
21   devaluing AI safety?
22      A.  I don't know of anything specific.  I
23   just know that -- it just -- I'm just saying like
24   it seemed as though they were prioritizing growth
25   and profit over safety.  That was -- that's the

Page 265

1  impression I got.
2      Q.  If an AI model hallucinates, is it
3  unsafe?
4      A.  In some cases.
5      Q.  But not always?
6      A.  Yeah.
7      Q.  Are you familiar with an OpenAI product
8  called Whisper?
9      A.  I've heard of it.
10     Q.  Did its release breach any commitment
11 between you and OpenAI or Altman?
12     A.  Its release?
13     Q.  Yeah.
14     A.  I don't know.
15     Q.  Did the release of GPT-4o breach your
16 safety term?
17     A.  Not that I'm aware of.
18     Q.  Did the release of OpenAI's o1 model
19 breach your safety term?
20     A.  Not that I'm aware of.  I don't know.
21 If it convinced that kid to commit suicide, I
22 suppose it would.
23     Q.  Are AI products that interact with
24 minors in an inappropriate or suggestive way
25 unsafe, in your opinion?