EXHIBIT D

# LITIGATION SERVICES HANDBOOK

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# LITIGATION SERVICES HANDBOOK
## *The Role of the Financial Expert*

### SIXTH EDITION

*Edited by*
Roman L. Weil
Daniel G. Lentz
Elizabeth A. Evans



Cover design: Wiley

Copyright © 2017 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the Web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley publishes in a variety of print and electronic formats and by print-on-demand. Some material included with standard print versions of this book may not be included in e-books or in print-on-demand. If this book refers to media such as a CD or DVD that is not included in the version you purchased, you may download this material at http://booksupport.wiley.com. For more information about Wiley products, visit www.wiley.com.

*Library of Congress Cataloging-in-Publication Data:*

ISBN 978-1-119-16632-0 (Hardcover)
ISBN 978-1-119-36316-3 (ePDF)
ISBN 978-1-119-36318-7 (ePub)

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Litigation Services Handbook: The Role of the Financial Expert, Sixth Edition*
Edited by Roman L. Weil, Daniel G. Lentz and Elizabeth A. Evans
Copyright © 2017 by John Wiley & Sons, Inc.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# CHAPTER 4

# DAMAGES THEORIES AND CAUSATION ISSUES*

## Elizabeth A. Evans
## Phil J. Innes
## Daniel G. Lentz

### CONTENTS

4.1 Introduction   4.2
4.2 Fundamentals of Causation   4.3
  (a) Introduction to Causation   4.3
  (b) Causation Fundamentals   4.4
  (c) Negligence   4.4
  (d) Common Law Fraud   4.7
4.3 Other Legal Standards   4.8
  (a) Reasonable Certainty   4.9
  (b) Economic Loss Doctrine   4.9
  (c) Proximate Cause   4.10
  (d) Foreseeability   4.11
  (e) Duty to Mitigate   4.11
4.4 Damages Theory   4.11
  (a) Compensatory (Expectation and Reliance) and Restitution Damages   4.12
  (b) Comparing Benefit of the Bargain (Expectation), Reliance, and Restitution Approaches   4.15
  (c) Punitive Damages   4.18
  (d) Rescission or Rectification (or Reformation)   4.18
  (e) Other Considerations   4.19
4.5 Modeling Considerations   4.21
  (a) Use of Averages and Indexes   4.21
  (b) Use of Ranges   4.22
  (c) Lost Profits versus Lost Business Value   4.22
  (d) Time Considerations   4.24
  (e) Causation   4.25

  (f) Regression Analysis with Confidence Interval   4.25
  (g) Monte Carlo Simulation   4.26
  (h) Discounting   4.27
  (i) Prejudgment Interest   4.27
  (j) Damages for Different Types of Cases   4.28
4.6 Developing an Effective Damages Claim   4.28
  (a) Learn the Background   4.28
  (b) Understand Causation and Its Effect   4.29
  (c) Identify the Damages Theory   4.29
  (d) Select the Damages Model   4.30
  (e) Build the Damages Model—Lost Profits Scenario   4.30
4.7 Practical Aspects of Expert Testimony on Damage Causation   4.38
  (a) Admissibility of Expert Testimony   4.38
  (b) Expert Testimony versus Fact Testimony   4.39
  (c) Expert Sensitivity to Alternative Outcomes   4.40
4.8 Conclusion   4.41

NOTES   4.41

LIST OF CASES   4.48

REFERENCES   4.52

---

* The authors acknowledge Joseph J. Galanti, who coauthored this chapter in the fifth edition. They also acknowledge Randy C. Joshi, Catherine F. Madrid, and Lee-Anne V. Mulholland, who coauthored a chapter on causation in the fifth edition. This chapter retains much of their work.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4** • **2**   **DAMAGES THEORIES AND CAUSATION ISSUES**

## 4.1   INTRODUCTION

This book describes approaches, issues, and nuances associated with damages claims of many types—intellectual property, antitrust, government contracts, and accountant liability, to name a few—and provides guidance to practitioners involved in those types of cases. To set the context for a deeper understanding of these areas, this chapter provides an overview of the fundamentals of causation and other legal standards, a general framework for selecting a damages theory, and guidance on developing a model to calculate damages. It also summarizes the most commonly accepted damages theories and models, describes accepted methods and elements that practitioners use in measuring damages claims, and discusses the practical aspects of expert testimony related to damage causation issues.

Accepted damages theories and elements can differ widely between state and federal court systems, in different jurisdictions, and for various types of matters. We cannot discuss all potential differences in this chapter. Practitioners should discuss the appropriate standards and elements of damages with counsel before investing time and effort on a wrong approach. Accordingly, this chapter provides a general framework to prepare an effective analysis and will help practitioners identify relevant questions when they begin to assess damages.

Historically, based on the English court system, two types of civil courts existed in the United States: courts of law and courts of equity. Courts of law made their judgments in accordance with federal or state law and awarded monetary damages as their remedy. Courts of equity, on the other hand, used a set of principles based on fairness, equality, moral rights, and natural law, rather than a strict interpretation of the law. In a court of equity, relief came in the form of an action, rather than the payment of money.[1] The wide variety of equitable remedies includes:[2]

- **Rescission:** undoing (or reversing) the actions taken under a contract;
- **Reformation (or rectification):** restructuring the terms of a contract to prevent an inequitable outcome;
- **Specific performance:** requiring performance of the contract according to its terms;
- **Injunction:** requiring a party to refrain from certain acts;
- **Subrogation:** providing that one party can assume the rights of another;
- **Account of profits:** assessing profits improperly gained by a fiduciary that breached its duty; and
- **Declaratory relief:** seeking a preemptive court ruling as a common mechanism of relief in divorce and certain contract matters. For example, in insurance coverage disputes, a party can preemptively seek the court's decision as to whether an insurance policy provides coverage for certain types of losses.

In the United States, most states have merged their law and equity courts. As a result, courts now administer both legal and equitable remedies and often consider a combination of the two depending on the matter at hand. While this chapter focuses on the legal remedy of damages, it will address several equitable remedies because they commonly involve expert services and often relate to damages claims.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Whether the plaintiff seeks legal, equitable, or both types of remedy, legal standards exist that affect the determination of culpability and the veracity of a claim before one considers a remedy. Sections 4.2 and 4.3 address these legal standards.

## 4.2  FUNDAMENTALS OF CAUSATION

### (a) Introduction to Causation

Causation is a simple concept: Did the defendant's wrongful conduct produce the damages suffered by the plaintiff? Proof that a defendant's wrongful conduct *caused* a plaintiff's alleged damages is a key concept in the determination of culpability in civil litigation. Testimony of a qualified expert can help the trier of fact (the jury, or the judge in a nonjury trial) to decide whether the plaintiff has proved this causal link.

Some situations have obvious causation, such as when a gunshot fired by the defendant hits the plaintiff. In others, however, such clarity does not exist. Does a public company's announcement that it will miss quarterly earnings projections cause its share price to drop (as plaintiffs in a shareholder class action lawsuit might claim), or is some other factor at work (such as bad news about the economy that made the entire securities market plummet the same day)?

The law follows logic. It requires that the plaintiff prove more than correlation to establish causation.[3] Accordingly, courts reject expert testimony on causation that identifies merely a correlation between two variables.

Courts similarly refuse to find causation when an expert neglects to consider other factors that could have caused—or at least contributed to—the plaintiff's damages, even when the defendant has indisputably engaged in legally actionable misconduct. This refusal makes clear that to ensure the credibility and sometimes even admissibility of their testimony, expert witnesses must understand both the applicable causation standards and the relevant facts regarding causation.

The legal standard for establishing causation varies, depending on both the nature of the legal claim (e.g., negligence, common law fraud) and the law of the relevant jurisdiction. All courts, however, require that the defendant's wrongful conduct *cause* the damages allegedly suffered by the plaintiff. An expert retained to measure damages must therefore understand and be prepared to explain the following:

- The defendant's wrongful conduct;
- How the plaintiff alleges the defendant's wrongful conduct caused damages to the plaintiff and how the defendant alleges that it did not cause damages;
- The logic that connects the defendant's alleged wrongful conduct and the plaintiff's damages;
- Other factors that could have caused or exacerbated the plaintiff's damages; and
- Whether the plaintiff's damages were reasonably expected to result from the defendant's alleged wrongful conduct.

The first half of this section focuses on the legal standards for establishing causation in the cases where experts most often testify. The second half explains why experts need to account for causation in their analyses and assessments.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 • 4    DAMAGES THEORIES AND CAUSATION ISSUES**



**Exhibit 4-1.    Actual versus Legal Cause**

**(b) Causation Fundamentals**

Exhibit 4-1 illustrates the two components of causation required regardless of the legal claim asserted: (1) actual cause and (2) legal cause. We will first discuss whether (or how) these components are present in the cases that experts are most often involved in or provide testimony in.

---

**Components of Causation**

*Actual Cause + Legal Cause = Liability*

*Actual cause:*   *The defendant's conduct actually causes the plaintiff's damages.*
*Legal cause:*   *The defendant's conduct gives rise to legal liability for the plaintiff's damages.*

---

**(c) Negligence**

Causation plays a central role in establishing the defendant's liability in negligence cases, including those that involve alleged malpractice by professionals.[4] Plaintiffs bear the burden of proving negligence by a preponderance of evidence[5] (i.e., by showing that their allegations are more likely than not to be true).[6] For example, suppose a radiologist failed to diagnose a cancerous tumor visible on an x-ray when it could have been treated successfully and led to full recovery. Instead, the cancer went untreated and the person died as a result. In such a case, the failure to diagnose the early-stage tumor when it was visible on the x-ray constitutes negligence within the professional medical field of radiology, and this negligence was the cause of the wrongful death.

*(i) Actual Cause*   Although courts lack consensus on a standard for actual causation in negligence cases, "the focus [always] remains on the fundamental and sometimes metaphysical inquiry into the nexus between the defendant's negligent act and the resultant harm to the plaintiff."[7] Regardless of the standard, the plaintiff can use either direct or circumstantial evidence to prove actual cause.[8]

Some courts cast actual cause in negligence cases in terms of a but-for or *sine qua non* (literally, "without which not") test: "The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event if the event would have occurred without it."[9]

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Other courts consider whether the defendant's conduct is a substantial factor in bringing about the plaintiff's damages.[10] Following § 433 of the *Restatement (Second) of Torts*, those courts have identified the following considerations as relevant in deciding whether the defendant's conduct meets the standard, generally referred to as the substantial factor test:

- The number of other factors that contribute in producing the harm and the extent of the effect that they have in producing it;
- Whether the actor's conduct has (1) created a force or series of forces that are in continuous and active operation up to the time of the harm or (2) has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and
- Lapse of time.[11]

These three elements address the concern in situations where two independent causes, each by a different defendant, bring about the plaintiff's damages and, when either cause by itself would have resulted in the same damages, courts would absolve both defendants of liability for negligence to the plaintiff's detriment.[12] The test also helps resolve those cases where "a similar, but not identical result would have followed without the defendant's act . . . [or] one defendant has made a clearly proved but quite insignificant contribution to the result, [such] as where he throws a lighted match into a forest fire."[13]

Aside from these two situations, the but-for and substantial factor tests should produce the same legal conclusion.[14] This congruence follows from the fact that "the substantial factor test subsumes the but-for test. If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries."[15]

---

**Standards for Actual Cause in Negligence Cases**

Sine qua non *(but-for test): But for the defendant's conduct, the plaintiff would not have suffered damages.*

*Substantial factor test:     Even though it was not the only cause, the defendant's conduct was a substantial factor causing the plaintiff's damages.*

---

*(ii) Legal Cause*   Proof of actual cause is alone insufficient to establish the defendant's liability for negligence; the plaintiff must show that the defendant's conduct is also the legal cause of the damages.[16] Legal cause "tempers the expansive view of causation [in fact]."[17] As one court has explained:

The law does not undertake to charge a person with all the *possible* consequences of a wrongful act, but only with its probable and natural result; otherwise, the punishment would often be entirely disproportioned to the wrong, thereby impeding commerce and the ordinary business of life, and rendering the rule [of causation] impracticable.[18]

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 • 6   DAMAGES THEORIES AND CAUSATION ISSUES**

Thus, one can best understand legal cause as demarcating a certain point beyond which "the law arbitrarily declines to trace a series of events."[19] The determination of this point is not a matter of "logic" but instead of "practical politics," reflecting considerations "of convenience, of public policy, [and] of a rough sense of justice."[20]

- **Foreseeability.** Courts generally define legal cause in negligence cases in terms of foreseeability,[21] which they consider to be an issue of fact.[22] Courts do, however, vary somewhat in how they apply this concept. Some courts consider whether the plaintiff's injury is a "natural and probable consequence" of the defendant's conduct.[23] Others focus on whether a "reasonable person" would have foreseen the conduct causing the plaintiff's injury.[24] Finally, others (albeit a small number of courts) assess whether the plaintiff's injury is the natural and probable consequence of a negligent act *and* could have been reasonably foreseen in light of all the circumstances.[25] This divergence underscores the importance to the expert witness of understanding the applicable law concerning causation in the jurisdiction of the specific case.
- **Intervening causes.** As Exhibit 4-2 illustrates, legal cause fails to materialize when an independent act of another party intervenes subsequent to the defendant's conduct and produces the plaintiff's damages.[26] In this situation, the independent intervening act supersedes the defendant's conduct as the legal cause, thereby freeing the defendant of liability to the plaintiff.[27] Some courts characterize the occasion of an intervening cause as triggering "a legal metamorphosis [of the defendant's conduct] into a remote cause or 'mere condition.'"[28] To the same effect, other courts provide that "a remote condition or conduct which furnishes only the occasion for someone else's supervening negligence is not a proximate cause of the result of the subsequent negligence."[29] More important, a foreseeable intervening cause will not absolve the defendant of liability for the defendant's prior conduct.[30]

*Ventricelli v. Kinney System Rent A Car, Inc.* provides an example of how the intervening cause doctrine works. In that case, Joseph Ventricelli rented a car from Kinney System Rent A Car, Inc.[31] The car had a defective trunk lid that did not close satisfactorily. This problem persisted even after Ventricelli returned the car for repair. When the trunk lid later popped open again, Ventricelli parked the car along the street curb, got out, and attempted to shut the lid. While Ventricelli was trying to shut the lid, the car of Antonio Maldonado, which was parked behind where Ventricelli was standing, lurched forward and struck Ventricelli, severely injuring him.



**Exhibit 4-2.   Intervening Cause**

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The Court of Appeals of New York overturned the jury's verdict that Kinney was primarily at fault for Ventricelli's injuries. This reversal rested on the following reasoning:

> The immediately effective cause of plaintiff's injuries was the negligence of Maldonado, the driver of the second car, in striking plaintiff while he was standing behind his parked automobile. That Kinney's negligence in providing an automobile with a defective trunk lid would result in plaintiff's repeated attempts to close the lid was reasonably foreseeable. Not "foreseeable," however, was the collision between vehicles both parked a brief interval before the accident. Plaintiff was standing in a relatively "safe" place, a parking space, not in an actively travelled lane. He might well have been there independent of any negligence of Kinney, as, for example, if he were loading or unloading the trunk. Under these circumstances, to hold the accident a foreseeable consequence of Kinney's negligence is to stretch the concept of foreseeability beyond applicable limits.[32]

This case illustrates how the unforeseeable intervening conduct of another party can render the defendant's conduct *not* the legal cause of the plaintiff's injuries, thereby absolving the defendant of liability to the plaintiff for negligence.

### (d) Common Law Fraud

Common law fraud, also known as actual or intentional misrepresentation, arises when, among other things:

- The defendant's material misrepresentation causes the plaintiff to act in reliance of it; and
- This reliance causes the plaintiff to suffer damages.[33]

Many courts require the plaintiff to provide clear and convincing evidence to prove common law fraud.[34] Courts recognize clear and convincing evidence as the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the existence of the fact in question.[35] As Exhibit 4-3 illustrates, this requires an evidentiary showing greater than that necessary to prove a fact by a preponderance of the evidence yet less than that necessary to prove a fact beyond a reasonable doubt, which is the standard of proof in all criminal cases (including those that allege fraud).[36]



**Exhibit 4-3.   Standards of Proof from Least to Most Onerous**

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2021]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Some courts, by contrast, allow the plaintiff to prove common law fraud by a preponderance of evidence.[37] A few other courts require clear and convincing evidence to establish all the elements of fraud except for damages, which may be proved by a preponderance of the evidence.[38]

*(i) Actual Cause*   Reliance equates with actual cause in the context of common law fraud.[39] No consensus prevails on the test for determining actual cause. As with other torts, some courts apply a but-for test, which requires the plaintiffs to show that "but for the alleged misrepresentation . . . , [they] would not have entered the transaction."[40] Others favor a substantial factor test, which provides that

> it is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.[41]

Most courts do not permit that reliance be presumed in common law fraud cases.[42] For example, some have refused to extend the rebuttable presumptions of reliance recognized in federal securities fraud law  to common law fraud.[43]

*(ii) Legal Cause*   Courts generally equate legal causation with foreseeability in the context of common law fraud. They differ, however, in how they characterize foreseeability.

Some courts follow the definition of legal cause set forth in Section 548A of the *Restatement (Second) of Torts*, which provides that "a fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."[44] Other courts frame the issue as whether the plaintiff's injury "is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud."[45] Yet another court focuses on whether "in an appreciable sense . . . the damage flowed from the fraud as the proximate and not the remote cause, and the damage . . . is the natural and probable consequence of the fraud."[46]

This divergence in definitions underscores the importance to the expert witness of understanding the applicable law concerning causation in the jurisdiction in which a fraud case is pending.

---

**Causation Elements of Common Law Fraud**

*Actual Cause = Reliance*

*Legal Cause = Foreseeability*

---

## 4.3    OTHER LEGAL STANDARDS

The judge or jury should award damages in cases where the harm:

1. Will occur or has occurred with reasonable certainty;
2. Can be measured by the appropriate contract or tort (referred to as *economic loss doctrine*) standard;

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**3.** Is the proximate cause of the damage; and

**4.** Was foreseeable.

In addition, for damages to be awarded:

**5.** The harmed party must have made reasonable efforts to mitigate the damages.

This section explains these five legal concepts.

#### (a) Reasonable Certainty

Section 352 of the *Restatement (Second) of Contracts* (1981) states, "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[47] Yet while all courts require reasonable certainty for the award of damages, no single measure of reasonable certainty exists. Individual states and federal courts have all issued their own opinions as to the nature of reasonable certainty.[48]

Most cases concur on certain points:[49]

- The court must be certain that some injury to the plaintiff occurred.
- The defendant must not benefit from its wrongful actions, and courts generally resolve doubts in favor of the plaintiff.
- The defendant's intentional or willful action can result in a court requiring a lesser degree of certainty from the plaintiff.
- The plaintiff can estimate the amount of damages, but the court should have confidence in the accuracy of the estimate.
- For a well-established business, past performance reasonably predicts the future.
- For a new or speculative business, parties can establish the measure of damages with reasonable certainty by the use of expert testimony, business records, economic and financial data, and other verifiable data.
- The plaintiff must use the best available evidence.

Most important, the court must balance its judgment: it cannot favor the defendants to a contract by requiring too high level of proof that would encourage unscrupulous actions on their part, nor should the court favor the plaintiff by requiring too little proof, which would encourage the parties to undertake costly actions to avoid loss to plaintiffs who might file a lawsuit in the future.

#### (b) Economic Loss Doctrine

The economic loss doctrine sets out the extent of loss that the plaintiff can recover in a tort case. When the facts of a case could result in a damages award either under a contract or under a tort, practitioners should know the distinctions between the two. We will first discuss the basic difference between contract law and tort law in order to set the place for a discussion of their differing damages measures.

Under the common law of contracts, the seller and buyer decide between themselves the nature of their respective rights and duties. If the buyer believes that the seller has breached his or her duty or responsibilities under the contract, the buyer can bring suit against the seller. Similarly, the seller can sue the buyer for the

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

breach of the buyer's duties under the contract. In addition, one can find another source of contract law in the Uniform Commercial Code (UCC), which discusses the rights and responsibilities of parties to a contract among its nine articles.[50] This chapter refers to both of these sources (the contract and the UCC) as contract law.

A tort involves the breach of a civil duty (not a contractual duty). Some define a tort as a personal injury. Torts include (but are not limited to) such wrongs as assault, battery, false imprisonment, defamation of character, interference with business, unfair competition, interference with contract, trespass, and negligence. Under tort law, an injured party can bring a civil lawsuit to seek compensation for a wrong done to the party or to the party's property.[51]

In many cases, the line between a contract issue and a tort problem appears nebulous. Judge Richard Posner, of the Seventh Circuit Court of Appeals, notes that "almost any tort problem can be solved as a contract problem, by asking what the people involved in an accident would have agreed on in advance with regards to safety measures if transaction costs had not been prohibitive."[52] He goes on to say, "Equally, almost any contract problem can be solved as a tort problem by asking what sanction is necessary to prevent the performing or paying party from engaging in socially wasteful conduct, such as taking advantage of the vulnerability of a party who performs his side of the bargain first."[53]

For a breach of contract that is also a tortious injury, what amount of damages should the injured party claim? Suppose a buyer in a contract receives and uses a defective machine, resulting in nonsalable goods, but none of the buyer's other machines or property receives harm due to the use of the defective machine. Should the buyer bring a product liability suit (tort) or bring a lawsuit for breach of contract? Most states and federal jurisdictions hold that a party cannot recover in tort for economic loss damages when physical property damage did not occur. Where the harm causes damage only to the product itself (the defective machine in our example), the buyer should have protected itself under contract law. We refer to this majority view as the *economic loss doctrine*.[54] On the other hand, a minority of states and federal jurisdictions hold that a party can recover additional losses related to negligence without the presence of damage to other physical property.[55] An intermediate position has also evolved where courts permit a products liability action under certain circumstances even when the product harms only itself. The Supreme Court in *East River v. Transamerican DeLaval Inc.*[56] summarizes the intermediate position, as well as the majority and minority views.[57]

While the attorney will choose whether to bring suit under the contract or in tort, the practitioner should understand the distinctions of each and ensure that the damages analysis matches the type of lawsuit filed.

### (c) Proximate Cause

Even though the plaintiff's harm would not have occurred but for the defendant's actions, courts nonetheless limit the plaintiff's ability to recover under the concept of proximate cause. That is, recoverable harm from the chain of events caused by the defendant's actions does not continue indefinitely.

At the point in which the court finds that the actions of the defendant did not proximately cause harm to the plaintiff, damages cease. Section 4.2(b) of this

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

chapter focuses on the two components of causation, actual (but-for) cause and proximate (or legal) cause, and discusses proximate cause in greater detail. Courts decide proximate cause on a case-by-case basis.

### (d) Foreseeability

One can test for proximate causation in several ways, but the most basic test involves foreseeability. If one cannot reasonably foresee the consequences resulting from the defendant's actions, the plaintiff cannot recover for the harm related to those actions. For example, if the defendant throws a rock at Person A but hits Person B standing next to Person A, a court would find that the harm to Person B was reasonably foreseeable. Hence, the defendant, by throwing the rock, proximately caused the harm to Person B, even if the defendant did not intend to hit Person B.

As with proximate cause, courts decide whether one can reasonably foresee the consequences of an action on a case-by-case basis.

### (e) Duty to Mitigate

A victim to a breach of contract has a duty to mitigate the actions caused by the other party's harm. That is, the plaintiff must take reasonable actions to avoid or reduce the damages. For example, assume that the defendant signed a contract for the purchase of 1,000 widgets from the plaintiff. The defendant breaches the contract and informs the plaintiff of the contract's termination before the plaintiff obtains a source for the material needed to manufacture these 1,000 widgets. The plaintiff should sue for the loss of the profits on the breached contract, but should not sue for the cost of the material that it has not yet obtained at the time the defendant terminated the contract. The cost of the material is an avoidable cost. Alternatively, assume that the defendant breaches the contract after the plaintiff manufactures the widgets. If reasonably possible, the plaintiff must sell the widgets to another party; by selling the widgets to another party, the plaintiff can reduce the damages to the difference between the defendant's price and the new party's price plus the additional costs required to find the new purchaser.[58]

## 4.4  DAMAGES THEORY

Parties to a lawsuit employ various theories of damage and related models in the legal remedy of damages, depending on the court and the nature of the case. This section describes damages theories that underlie models used to calculate damages. Exhibit 4-4 defines some categories of damages.

These categorizations are often interrelated. For instance, courts often remedy actual and consequential damages with compensatory or restitution payments from the defendant to the plaintiff. Courts may award punitive damages in addition to compensatory or restitution damages. In addition, statutes and case law often specify the type of damages attached to specific offenses or actions. We discuss these measures in more detail in subsequent sections of this chapter.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4  •  12    DAMAGES THEORIES AND CAUSATION ISSUES**

---

1. Measures related to the extent of damages
   - **Actual (but-for) damages**: caused directly by the defendant's improper actions
   - **Consequential damages**: a natural and foreseeable, but indirect, consequence of the improper actions

2. Damages measures focused on plaintiff
   - **Compensatory damages**: either expectation damages or reliance damages
     - **Expectation damages**: the difference between the amount which the plaintiff reasonably expected to receive and the actual amount received; also known as benefit of the bargain (BOB) damages
     - **Reliance damages (**RD**)**: an amount the plaintiff lost because it relied on false representations from the defendant

3. Damages measure focused on defendant
   - **Restitution (or disgorgement) damages (**RR**)**: the amount that the defendant foreseeably gained at the plaintiff's expense

4. Other damages measures
   - **Punitive damages**: intended to punish or dissuade the objectionable behavior; not directly tied to the plaintiff's loss or defendant's gains

---

**Exhibit 4-4.   Damages Categories**

### (a) Compensatory (Expectation and Reliance) and Restitution Damages

Compensatory damages involve either expectation damages or reliance damages.

Expectation damages, as the term connotes, compensate an aggrieved party for the loss of the bargain for which it negotiated.[59] Courts sometimes refer to expectation damages as "benefit of the bargain" (BOB) damages. Expectation damages seek to make a plaintiff whole as if the defendant had performed the contract in full.[60]

Reliance damages seek to compensate the plaintiff for losses resulting from its reliance on the contract.[61] Under reliance damages (RD) the plaintiff would receive only the amount it invested plus any out-of-pocket expenses as a damages award, less any benefits received if there was partial performance. Thus, an RD remedy would essentially unwind the transaction, rather than awarding what the nonbreaching party expected to realize had the transaction been completed as planned. As a result, RD are usually less than BOB damages because RD do not include any lost profits from the breached contract. Many courts award RD only when the court cannot measure BOB (expectation) damages.[62]

In contrast, where the nonbreaching party has not only acted in reliance upon the contract, but that action also conferred a benefit on the breaching party, courts sometimes award a remedy of restitution (RR).[63] Accordingly, RR measures damages based on the defendant's ill-gotten gains rather than the plaintiff's loss and seeks to return to the plaintiff the benefit conferred on the defendant by the breach.

For example, assume that the buyer made a down payment on the purchase of widgets and the seller used that down payment to make a profit by depositing the money in the bank and earning interest on the down payment. If the seller then breached the contract, its profits from interest on the buyer's down payment would be the RR. RR requires the offending party to give up the profits it earned

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

through its misdeeds and turn them over to the aggrieved party. Many jurisdictions consider losses suffered as a result of misrepresentations made by the defendant, or on the contract itself, a part of the RR damages measure. Although RR sometimes equals BOB or RD, RR will often be smaller because it does not include the plaintiff's lost profits (BOB) and it does not include the plaintiff's expenditures made in reliance on the contract (RD).[64] On the other hand, ill-gotten gains made by the defendant (RR) may exceed profits made by the plaintiff (BOB) if the defendant enjoyed certain manufacture or distribution efficiencies that the plaintiff did not have. Some courts hold that RR damages are not limited by the extent of BOB damages, as are RD damages by many courts.[65]

Using an analysis suggested by Professor Eyal Zamir,[66] we summarize these concepts in the following table.

|  | Damages Measured by Effect on Injured Party | Damages Measured by Effect on Party in Breach | Undoes the Effect of the |
| --- | --- | --- | --- |
| Backward Looking | Reliance | Restitution | Contract |
| Forward Looking | BOB (Expectation) | Disgorgement | Breach |

We compare damages measurements from these concepts later in this chapter. While damages can derive from a wide range of actions under statutory, tort, and contract law, the remainder of this chapter will focus on damages related to contract law.

We next describe some subsets of the compensatory and restitution damages remedies.

*(i) Out-of-Pocket Damages*   Expectation, reliance, and restitution damages can overlap with each other to the extent that the damaged party incurred costs in connection with a breached contract. For example, if the nonbreaching party contracts with another to purchase a product and pays advance or tooling costs, or incurs marketing and promotional costs, or undertakes other efforts requiring monetary or nonmonetary outlay, the court can award the buyer compensatory or restitution damages for these various costs.

In addition, the remedy of rescission can also involve out-of-pocket damages claims and recoveries. In all instances, the courts will see that the defendant makes whole the plaintiff for costs incurred as a direct result of the breached contract.

*(ii) Repair Costs*   To return a defective product or do without the product or services due under the contract is not always feasible or practical, even where the deliverable provided represented a breach. Accordingly, the buyer that elects to repair or mitigate the deficiencies will incur costs associated with this effort. Costs incurred to remedy the breach can be the subject of a compensatory damages claim. These claims can include legal, technical, and financial cost elements. Repair cost damages affirm the underlying transaction but compensate the aggrieved party for the cost of setting things right owing to the defendant's (or nonperforming party's) failures.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 • 14    DAMAGES THEORIES AND CAUSATION ISSUES**

*(iii) Operating Losses and Expenses*    A breach of contract can have serious deleterious effects on the nonbreaching party, including reduced operating performance, higher expenses, and loss of revenue. Even where a company has a history of operating losses, the breach can cause higher expenses or result in unabsorbed fixed expenses. The practitioner, however, must recognize that operating losses that would have been incurred regardless of the defendant's actions should be offset against potential lost profit damages in other periods. For example, if the plaintiff would have an operating profit in year 3, but operating losses in years 1 and 2, the plaintiff should add all three years together, assuming that the plaintiff would not have profits in year 3 without operating the business in years 1 and 2 also. Similarly, future expenses that the plaintiff avoids because of the breach represent cost savings that the analysis should discount to present values as an offset to potential damages. Careful analysis of expense patterns can identify inefficiencies that result from a breach, causing the plaintiff to experience higher levels of expense than normal; a compensatory damages claim should include these excess expenses.

*(iv) Lost Profits*    Definitions for the various types of damages measures run for more than three full pages in *Black's Law Dictionary*, tenth edition, and many of them fall within the realm of compensatory damages (e.g., reliance, benefit of the bargain [BOB] damages, continuing damages, discretionary damages, expectation damages, hedonic damages, and liquidated damages). In breach of contract cases, however, the most commonly sought damages measure relates to lost profits. Lost profits represent the difference between the plaintiff's actual profits and the profits that the plaintiff would have realized but for the defendant's actions. A thorough discussion of this type of damages follows in Section 4.5 of this chapter.

*(v) Consequential Damages*    In addition to the direct damages owed to the plaintiff, consequential (or special) damages can also occur. As connoted by the name, courts award consequential damages to compensate a plaintiff in a civil action for a harm that is not a direct result of an illegal act, but instead a consequence to that act. In a breach of contract case, the parties can reasonably foresee or contemplate consequential damages at the time they entered into the contract.[67]

- **Example 1.** Consider a builder of a hotel that completed construction on time but turned over the property with plumbing issues that the owner had to correct before opening. Direct damages equal repair costs to rectify the plumbing issues, while consequential damages equal the lost revenue less saved costs related to the delay in opening the hotel.
- **Example 2.** Suppose a buyer breaches a contract to purchase Product A, which is jointly produced with Product B, and the breach thereby causes the plaintiff to alter its production of both products. In this case, the breach could also cause consequential damages related to Product B.
- **Example 3.** Consequential damages can also arise when a breach affecting the sales of a complicated machine also affects the subsequent sales of replacement parts or maintenance service for the machine.

    If damages awards purport to restore the plaintiff to the position it would have been in but for the defendant's actions, the damages claim must encompass every phase of the plaintiff's business affected by the defendant's actions. To ascertain whether consequential damages have occurred when the plaintiff has an integrated

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2021]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

facility may require that the practitioner or other consultant conduct a market definition and market structure analysis not only for any primary product, but also for the joint products or co-products. The presence of joint products or co-products in the analysis will also have implications for mitigation. Minimizing the losses for one product and minimizing a division's losses can result in two different sets of actions.

*(vi) Liquidated Damages*   In certain types of contracts, particularly in the construction industry, the parties sometimes agree to liquidated damages as a term of the contract. In these cases, the parties agree to the amount of compensatory damages associated with particular types of breaches (such as delays in performance) and make them a part of the contract itself. To be enforceable, however, the actual damages must be difficult or impracticable to measure and the liquidated damages amount must be reasonable. If the liquidated damages claim does not meet these standards, it is considered a penalty and is unenforceable.

*(vii) Return of Price*   Sometimes restitution awards can include the return of the price (consideration) paid by the buyer. Some contracts, particularly in specialized manufacturing or research and development, require significant advance payments by the buyer in order for the seller to begin work under the contract. Assume that the seller fails to perform on the contract owing to the emergence of a more immediate and profitable opportunity with another customer. As a result, the buyer must procure the required goods or services through an alternative provider at a higher cost. This breach could result in a restitution damages award that would cover the return of the advance payments made, as well as compensatory claims for the additional cost of the alternative contract. The restitution damages relate to the payments made under the contract for which the buyer received no value. The price could include costs of delivery, handling, freight, warehousing, fees, taxes, insurances, and any other costs associated with the purchase of the product.

*(viii) Disgorgement*   Disgorgement requires the surrender of profits earned by the breaching party through illegal or unethical means. Courts can order wrongdoers to turn over such profits to the aggrieved party, with interest, to prevent unjust enrichment. Disgorgement is analogous to the equitable remedies of specific performance and injunctive relief.[68] Courts can award disgorgement in addition to compensatory and other damages, but only to the extent that the disgorgement does not duplicate other damages measures. Disgorgement damages depend on the facts of the case, as well as the jurisdiction. For example, disgorgement is a frequent remedy in intellectual property cases because of the nature of the harm caused. Courts have recently awarded disgorgement in areas such as antitrust, where the defendant remitted disgorged profits to the U.S. Treasury.[69] Damages in copyright, trademark, and trade secret cases permit disgorgement of the infringer's profit to the extent that the lost profits calculation does not include this amount. (See Chapter 19.)

**(b) Comparing Benefit of the Bargain (Expectation), Reliance, and Restitution Approaches**

This section presents a hypothetical fact situation and the damages computations associated with the benefit of the bargain (BOB), reliance (RD), and remedy of restitution (RR) damages measures.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 • 16    DAMAGES THEORIES AND CAUSATION ISSUES**

**Hypothetical facts:**

- Buyer purchased ePad Co. for $800 million and expected to earn a 12.5 percent annual return.
- Buyer expected to sell ePad Co. after five years for $1.5 billion.
- ePad's weighted average cost of capital (WACC) is 20 percent. As a result, the first year's cash flow will have a present value factor (PVF) of 0.83 (1/1.20).[70]
- Seller fraudulently induced buyer to enter into a deal by representing that no one else had ePad technology even though the seller secretly helped a friend introduce a competing product in year 2.
- Buyer achieved expected cash flows of $100 million in its first year of ownership.
- The new competing project came onto the market in the beginning of year 2. Buyer closed ePad Co. at the end of year 2 to mitigate ongoing losses, suffering $100 million of losses and costs of shutdown during year 2; the company was deemed worthless at that time.

Exhibit 4-5 represents the relevant cash flows from the ePad example.

**Calculations of damages:**

- **Benefit-of-the-bargain damages (BOB or expectation damages):** Based on the assumptions and cash flows enumerated, BOB damages would provide the plaintiff with the return it expected from the deal had the seller's representations been true. Thus, the difference between but-for versus actual cash flows from the time of purchase ($t = 0$) to the time of expected sale ($t = 5$) provides the appropriate measure of BOB damages. As calculated in Exhibit 4-5, discounting future cash flows to $t = 0$ at the weighted average cost of capital of 20 percent equals BOB damages of $884 million.
- **Reliance damages (RD):** RD-based undiscounted damages, which compensate the plaintiff for losses from reliance on the contract, would consist of the $800 million initial investment, less the $100 million return in year 1, plus the $100 million loss in year 2. Applying the appropriate present value factors (PVFs) to adjust for the time value of the cash flows, RD-based damages would equal $786 million (= $800 − $83 + $69).
- **Remedy of restitution damages (RR):** For restitution damages, the practitioner must look at this situation from the viewpoint of the defendant and calculate its ill-gotten gains. Assuming the seller joined the competing company that benefited by this breach and they were codefendants, the damages would include the profits earned by the defendant using the competing technology.

    In calculating RR damages, due consideration of the buyer's plans to sell the company in year 5 may affect RR calculations. For example, if the buyer continued to operate the business beyond the fifth year, it may have difficulty establishing harm beyond the year that it planned to sell the business in any event and an appropriate terminal value would be required. In this case, RR damages would normally be substantially less than either RD or BOB damages, unless the defendant enjoyed various efficiencies in manufacture or distribution that the plaintiff did not possess.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

| Year | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| But-for Cash Flows (a) | $(800M) | + $100M | + $100M | + $100M | + $100M | $100 M + $1.5 B |
| PVF (b) | 1 | 0.83 | 0.69 | 0.58 | 0.48 | 0.4 |
| But-for NPV Cash Flows (a x b) = c | $(800M) | +$ 83M | +$ 69M | +$ 58M | +$ 48M | +$ 640M |
| Total But-for Cash Flow NPV (years 0 to 5) (d) | +$98M | | | | | |
| Actual Cash Flows (e) | $(800M) | + $100M | ($100M) | 0 | 0 | 0 |
| PVF (f) | 1 | 0.83 | 0.69 | 0.58 | 0.48 | 0.4 |
| NPV of Actual Cash Flows (e) x (f) = g | $(800M) | +$ 83M | ($ 69M) | 0 | 0 | 0 |
| Total Actual Cash Flow NPV (years 0 to 5) (h) | ($786M) | | | | | |
| Difference in Cash Flows (a – e) = (i) | 0 | 0 | +$200M | +$100M | +$100M | $100 M + $1.5 B |
| PVF (j) | 0 | 0 | 0.69 | 0.58 | 0.48 | 0.4 |
| NPV of Difference in Cash Flows (i) × (j) = (k) | 0 | 0 | +$ 138M | +$ 58M | +$ 48M | +$ 640M |
| Total NPV of Damages (d) – (h) or sum of (k) | $884M | | | | | |
| PVF = Present value factor | | | | | | |
| NPV = Net present value | | | | | | |

**Exhibit 4-5.   Cash Flows**

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 • 18    DAMAGES THEORIES AND CAUSATION ISSUES**

When courts allow more than one method of computing damages, practitioners have many considerations that affect the choice among BOB, RD, and RR. One can decide based on case-specific, jurisdictional, and governing law factors. Other factors that lead to a particular choice relate to the difficulty of measurement, including the following situations:

- Negative NPV venture
- Complex estimations:
  - New business with no operating history
  - Business in volatile industry
  - Few guideline companies
  - Complex business model
- Potential changes in market conditions, such as Porter's Five Forces:[71]
  1. Increased bargaining power of buyers
  2. Increased bargaining power of suppliers
  3. Reduced barriers to entry
  4. Increased competition
  5. Increased threat of substitutes

As noted previously, practitioners should obtain from counsel the form(s) of damages that the law prescribes. They should then evaluate and build their analysis with an eye to which available measure best fits the facts of the case and captures all of the damages consistent with applicable law.

**(c) Punitive Damages**

*Punitive* damages (also called *exemplary*, *vindictive*, *presumptive*, and *added* damages) are special damages awarded in addition to actual damages. They function to penalize the wrongdoer or deter others from engaging in similar wrongful acts. Courts often award them when the defendant exhibited malicious, deceitful, or particularly reckless or reprehensible conduct. Courts do not award punitive damages in breach of contract matters.[72]

The court decides on the amount of punitive damages pursuant to Supreme Court guidance. (Chapter 17 discusses the reasons for awarding punitive damages and the reasonableness of amounts awarded.) In some litigation, including willful patent infringement or antitrust violations, the court can award treble damages under statute as a particular type of punitive damages. Judge Richard Posner suggests that one should consider the difficulty of concealment when awarding punitive damages. For example, if the probability of discovery of a tort equals 10 percent and the optimal damages award equals $60, the amount of punitive damages should equal $600 (= $60/0.10).[73] Where liquidated damages provided in a contract exceed the actual damages likely to be caused by a breach, the court has discretion to treat some of the damages as punitive damages.

**(d) Rescission or Rectification (or Reformation)**

Certain equitable remedies under the law give rise to damages claims. *Rescission* of a contract means that the contract should be undone, the agreement unwound,

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

and the parties returned to their pre-contract position.[74] *Rectification* (or *reformation*) of a contract involves modifying its terms to reflect what the parties intended to say or "should have said" to avoid an egregious inequity in the outcome.[75] Neither rescission nor rectification are themselves damages theories, but both commonly set the stage for damages claims. See "reformation" of the contract in Section 37A.3(d) of Chapter 37, Covenant Not to Compete.

Reasons for undoing or reforming the terms of a contract include (1) poorly drafted contracts and (2) fraud. First, sometimes the complexity of a transaction results in a poorly or inadequately written contract. That is, the drafted contract fails to reflect the bargain contemplated by the parties. Second, when one of the parties to a contract alleges fraud, that party often seeks rescission. For example, suppose false information in an insurance policy application induces an insurer to write a policy that it would not have issued under its underwriting standards had the policyholder provided all of the accurate facts. Thus, the policyholder induced the insurer to contract with the policyholder under false pretenses. When the insurer establishes this fact situation, the court often awards rescission of the insurance contract, relieving the insurer from any obligations under the contract. Parties to the case retain forensic accountants to help establish the facts or veracity of information in the contracting process, or to show financial harm to a party that relied on the fraudulent information used to induce agreement to the contract. This in turn can form the basis for a damages claim in addition to the equitable remedy of rescission.

### (e) Other Considerations

*(i) Anticipatory Breach*   Anticipatory breach occurs when either the buyer or seller to a contract informs the other party that it will not perform its duties under the contract. Either the breaching party informs the nonbreaching party or the non-breaching party assumes that a breach has occurred because of the behavior of the breaching party. The nonbreaching party can sue when the anticipatory breach occurs; it does not need to wait until the time when the breaching party would have performed its duties under the contract.[76]

An anticipatory breach can result in an efficient result. Assume that Seller A and Buyer B have contracted for 1,000 widgets at 10 cents per widget (or $100). Seller A expects a profit of 2 cents per widget (or $20). Buyer B finds Seller C, who will sell it the widgets for 6 cents (or $60). Buyer B is better off with an anticipatory breach with Seller A and completing the contract with Seller C. Instead of paying Seller A $100, Buyer B pays Seller A its lost profits of $20 and pays Seller C $60 for the performance of the contract, for a total of $80. Buyer B is $20 better off because of its anticipatory breach. In our example we knew Seller A's lost profits beforehand. Because Seller A's lost profits must meet the reasonable certainty standard, complications can ensue where the contract in question is long-term and the market for the product in question is thin.[77]

*(ii) Effects of Competitive Markets*   The competitiveness of the market involved in the litigation determines whether actual sales during the period of breach represented additional sales that would have occurred anyway or replaced the lost sales attributable to the breach. For example, with a perfectly competitive market

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

for the plaintiff, the expert should assume that the plaintiff sells at the level justified by cost considerations and capacity. (Even plaintiffs who could sell more would not unless they were willing to use higher cost capacity or to invest in extra capacity, a consideration we ignore for now.) In other words, the seller can find all the customers it wants. Now a customer breaches the contract. In a perfectly competitive market, the expert should assume that the seller could find another customer to take the breaching buyer's amount. The only compensation owed the plaintiff would equal the difference in the two buyers' prices, if any such difference existed.[78]

On the other hand, assume that the market has long-term contracts and few buyers and the seller has extra capacity. Now one of the plaintiff's buyers breaches, and subsequently the plaintiff makes sales to a new buyer (or additional sales to a present buyer). Here one can argue that the new sales do not replace the breached amount and that the court should consider the full amount of the breached contract as lost sales.[79] Thus, experts who do not first analyze the plaintiff's market and capacity can find their conclusions vulnerable to attack on examination.

Suppose a buyer breaches the contract before, or shortly after, the seller has begun performance. Should the seller receive its expected lost profits (expectation damages, or BOB) or only the costs it incurred in reliance on the buyer's performance (reliance damages)? The answer depends on the situation. A contract formed in a competitive market with symmetrical information between the buyer and seller can call for expectation damages. Otherwise one may find that, although expectation damages present a solution to the problem of inefficient breach (i.e., when the costs related to the breach exceed its benefits), reliance damages present a solution to inefficient purchase (i.e., when high-cost customers buy more than the efficient quantity and low-cost customers buy less than the efficient quantity).[80]

*(iii)* Ex Ante *versus* Ex Post    As noted earlier, a damages award should restore the plaintiff to the position it would have been in but for the defendant's actions. But complications can occur when one considers the goal of deterrence and the passage of time. What if the plaintiff's economic damages are less than the defendant's ill-gotten gains? For example, suppose the defendant steals a $1 lottery ticket that has the possibility of paying out $20 million. One week later the holder of that lottery ticket wins and receives $20 million. Are the damages of the theft $1 (the value of the lottery ticket at the time of the theft) or $20 million (the value of the lottery ticket later in time)?

*Ex ante* damages describe the compensation that the plaintiff should receive to place it in the position it would have been in before the defendant's actions. *Ex ante* damages use only information known or knowable before the date of the action in question and ignore what happens afterward. One computes damages as of the date of the act in question. *Ex ante* damages would equal $1 in the case of the lottery ticket. *Ex post* damages instead would use all available information and would measure damages as of the time of the analysis. *Ex post* damages would equal $20 million for the stolen lottery ticket. Chapter 5 discusses these issues in greater detail.

*(iv) Newly Established Business*    An expert can experience difficulty in measuring the lost sales or revenues for a newly established or never-established business.[81] Courts now hold that such businesses can recover damages, provided they have

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2021]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

been proved with "reasonable certainty."[82] As a result, the expert needs to ascertain the plaintiff's market structure. If the plaintiff's market contained many small firms or a few large ones, an expert should know where a firm of the plaintiff's expected size would fit along this spectrum. If the plaintiff would have been a small competitor in a market composed chiefly of large competitors, the plaintiff's expert has to prove that the plaintiff still could have competed in such a market. Experts also need to consider ease of entry and the stability of existing firms in the industry. If the plaintiff asserts that its firm would have had an advantage over other competitors because of a patent or other new process but for the defendant's actions, the expert must make some reasonable assumption regarding how long the benefits conferred by the patent or new process would last.[83] Regardless of the method used to estimate the plaintiff's lost sales, the expert should have some economic underpinning for the assumptions.

*(v) Damages for Fraud*   The prevailing approaches for damages in fraud claims are BOB (expectation) and out-of-pocket damages. In these matters, the plaintiff can, but need not, ask the court to proceed as though the plaintiff wishes to carry out the contract. That is, the plaintiff can ask the court to remedy the damage done by the fraudulent activities or, in the alternative, unwind the transaction and rescind the contract. If the court calculates damages based on the assumption that the plaintiff would carry out the contract, BOB damages provide the usual remedy; reliance damages apply in the rescission scenario. A minority of jurisdictions recognize other possible techniques for evaluating damages; practitioners should confirm the allowable techniques with counsel.

## 4.5   MODELING CONSIDERATIONS

This section identifies various modeling techniques used for damages claims. Many of the specific methods of calculating damages use these techniques. This section will note those that have limited application to certain types of cases; others have broadly accepted application across case types, jurisdictions, and court systems.

### (a) Use of Averages and Indexes

The use of an average (or the mean) is a basic, but sometimes necessary, technique used in damages claims. Practitioners employ averages when they cannot obtain sufficient evidential matter that provides a more accurate or reliable mechanism for estimating a value. For example, average revenue growth over a historical period could offer the only reasonable means of estimating revenues during a but-for period where the resources needed to provide insight into market trends and the likely impacts of the adverse event are unavailable. Similarly, if useful data regarding cost trends are unavailable, practitioners can analyze averages across time, across an industry, or across operating units.

In some instances, such as litigation of insurance claims, convention employs the use of averages because experts who develop and adjust insurance claims often use unsophisticated or expedient estimation techniques in developing the underlying covered loss claim. Consequently, counsel and clients often do not

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

want to develop another, more sophisticated damages model for use in litigation, absent other driving factors. This mindset reflects cost consciousness on one hand: the likely difference that could result from more sophisticated techniques often does not justify the added cost and complexity of using them. On the other hand, this mindset could result in loss of a damages award when the opposing party can demonstrate a disconnect between the use of an average and the circumstances of the plaintiff claiming damages. Practitioners also use averages when analyzing stable, mature businesses with predictable growth patterns in revenue and cost.

The use of averages can often mislead the analysis (as further discussed in Section 4.5(g)),[84] especially when used as a benchmark in but-for comparisons. For example, suppose a practitioner draws a trendline average based on a large number of disparate data points and then attributes damages to a breach because sales fell below the trendline average. The opposing practitioner could easily refute this claim if most data points fell below the trendline but were offset by a few skewed data points that fell well above the trendline (see the Monte Carlo simulation discussion in Section 4.5(g)).[85] In such instances, the use of averages will present significant risk to validity of the practitioner's analysis.

Some analysts seek to mitigate this risk by using indexes and other broader-based averaging techniques that can provide further corroboration for the use of a company-specific average figure. For example, some practitioners compare a company's financial performance and share price to a stock market index, such as the Standard & Poor's (S&P) 500, to establish the relative effect of broader market variables for all market participants versus the subject company's results. But the practitioner needs to justify the use of these indices as an appropriate mechanism of comparison or they will be no more defensible than basic averages in proving damages.

### (b) Use of Ranges

Some courts allow or prefer the presentation of damages as a range of results. Because damages claims often use but-for scenarios based on analysis of events that might have occurred but for an alleged wrong, they are inherently uncertain. Some courts find the presentation of a single damages figure objectionable when a certainty of knowledge of what would have occurred is usually impossible. In these cases, practitioners often modify key assumptions to generate a range of likely outcomes based on the probabilities of various assumptions coming to pass. This also allows practitioners some flexibility in explaining how they developed their damages conclusions. They should discuss with counsel the court's conventions and preferences when deciding whether to use ranges versus specific damages figures.

### (c) Lost Profits versus Lost Business Value

Commercial disputes involve claims of lost income or lost business value,[86] or both. Sometimes the claims include loss of future earnings or lost goodwill. How do practitioners differentiate among these damages elements, and when should each be used? The courts have not provided consistency in distinguishing among these remedies. Some courts have ruled that they are redundant or overlapping;

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

others have allowed claims and awarded damages under more than one of these theories. Federal and state laws provide different remedies depending on the substantive issues in the case and the types of claims brought by plaintiffs. This section will clarify the proper theoretical application of these measures, but practitioners should confirm with counsel the local court history and perspective on damages before deciding which method to use.

As previously described, we define lost profits as the difference in profits between (1) what the plaintiff would have earned but for the defendant's actions and (2) the actual profits made by the plaintiff. In this context, lost profits usually refer to lost cash flows but the practitioner must match the measure to the damage suffered. Lost business value addresses the negative impact of the impaired earnings (cash flows) on the overall value of the business. The period over which the practitioner measures the lost profits, as well as the portion of the plaintiff's business affected by the defendant's actions, can result in different computations for lost profits and lost business value. However, if the defendant's actions caused the plaintiff to lose 100 percent of its cash flows, then the damages from the lost profits analysis, the lost cash flow analysis, and the lost business value should equal each other, *ceteris paribus* (all else being equal).

Practitioners usually derive revenues for a lost profits analysis using one of four approaches:

1. **Before-and-after approach.** Comparing the performance of the company before and after the alleged harmful acts.
2. **Forecast approach.** Using sales forecasts of expected performance for the business or industry to evaluate the probable effect of the harmful acts.
3. **Yardstick approach.** Comparing the harmed business to comparable but unharmed businesses or locations to assess but-for results.
4. **Market share approach.** Comparing the plaintiff's market share during the period prior to the harm to that of the firm afterward.

From these revenues, the practitioner subtracts the appropriate amount of costs. Several of the remaining sections of this chapter as well as Chapters 8 and 9 of this handbook discuss cost estimation.

Similarly, practitioners usually measure business value by comparing the before-and-after values of the business using one of three approaches:

1. **Discounted cash flow approach—**measures the present value of future earnings that the owners of the business would receive.
2. **Market approach—**evaluates what informed capital market investors would pay for shares in the company (generally, the market capitalization for publicly traded companies).
3. **Comparable company transaction approach—**refers to transactions involving the purchase or sale of comparable companies within a reasonably recent period of time.

The terms *loss of future earnings* and *lost goodwill* refer to the same measure of damages as loss of business value because the various valuation approaches account for the effect of the defendant's actions on the cash flows and thus the

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

value of the business. A loss of goodwill will lead to reduced cash flows, which factor into the valuation.

*Lost profits* and *lost business value* can be redundant terms because the business value equals the discounted value of the stream of anticipated future earnings. However, the practitioner must ensure that a damages analysis does not inadvertently make duplicate claims: the law does not allow for double recovery of damages. For example, lost profits and lost business value should not cover the same time periods.

Lost business value measures of damages are the appropriate measure when the defendant's injurious acts have destroyed a business. Lost profits measures are appropriate when the defendant's actions have negatively affected, but not destroyed, a business or when damages occur over a finite period. For example, the breach of a five-year supply contract after the first year would define the damages period for lost profits analysis as the ensuing four years. This may in turn result in subsequent consequential damages, but they are not a part of the contractual lost profits analysis. Some cases involve a period of impairment followed by a complete cessation of the business. Damages analysis for these cases can include both lost profits and lost business value elements, with the date of business demise serving as the dividing line. Note that claims for so-called diminution of the value of a business are lost profit claims—lost business value claims apply only to the destruction of a business. The practitioner must avoid overlap of these periods in the calculations to avoid duplicate claims.

### (d) Time Considerations

Time is a critical component of damages calculations: inception and duration of the damages influence both underlying data and risk factors that affect cash flows and discount rates. Damages have no universally accepted valuation date. Accountants and economists often disagree whether to measure damages at the date of violation, the date the violation ceased, the date of trial, the date of recovery, or some other date.[87] We show the effects of these differences next.

Assume that the date of contract breach is January 2, 2010, the date of trial is May 15, 2012, and the date of the final judgment is April 20, 2013. Also assume that the damages measurement involves five years of cash flows (2010–2014).

- **Damages calculations as of the date of violation.** The practitioner should discount the five years of net cash flows (2010–2014) to January 2, 2010. Then the practitioner should bring the damages amount forward using a prejudgment interest rate to the time of trial (May 15, 2012).[88]
- **Damages calculations as of the time of trial.** Lost profits calculations performed as of the date of trial will not require prejudgment interest. The practitioner should bring the cash flows for periods prior to trial (January 2, 2010, through May 15, 2012) forward to the time of trial and the cash flows for period post-trial (May 16, 2012, through 2014) backward to the time of trial.
- **Damages calculations as of the final judgment or recovery.** Where a great deal of time passes between trial and the issuance of the final verdict, some courts permit the parties to recalculate the final judgment as of the date that the court rendered that judgment—that is, the amount calculated at trial

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

increased to reflect that the plaintiff did not have use of the recovery between the time of trial and the time the court rendered its final judgment.

The risk factors relevant to different measurement dates will also bear on the valuation of both lost profits and lost business value measures. The practitioner can account for differing risk factors (such as market changes and economic conditions) either through adjustments to the anticipated cash flow streams or through adjustments to the discount rate, but not both.[89] The practitioner should avoid adjustments to both cash flows and discount rates to prevent redundant consideration (double counting) of a risk factor.

**(e) Causation**

Courts often find that damages analyses do not adequately address the issue of causation. Many times, counsel instructs the practitioner to rely on the analysis and opinions of others. This instruction can put the practitioner, and the case at large, on thin ice. A damages analysis that does not clarify the proximate cause link between the defendant's acts and the plaintiff's damages will fail court scrutiny. The court will often label the damages estimates as speculative, and in such cases would likely bar the damages measurement from evidence. The damages claim must consider all other material factors that could have affected the plaintiff's financial results, and must develop sufficient evidential support for the nexus between the claimed damages and the defendant's wrongdoings.

Practitioners can use several tools to establish and measure relations among the variables that affect revenues and costs, and thus establish the causal link and measure the negative impact on profits. Sections 4.5(f) through (j) discuss important analyses used in developing damages claims that appropriately consider these factors.

**(f) Regression Analysis with Confidence Interval**

Regression analysis applies a statistical technique to develop an equation depicting the relation among variables and then uses that equation for prediction.[90] For example, an expert who needs to predict the sales that a firm would have made but for the defendant's actions could use a regression analysis that models the relation between the firm's sales and other relevant factors (e.g., total industry sales) over a control period preceding the defendant's actions to predict but-for sales in the absence of those actions. Similarly, an expert who needs to estimate how a share would have performed but for some event can predict this by performing a regression analysis. This regression analysis might relate an investment in the firm's shares to an investment of the same size in a portfolio of shares in the same industry or in the market.

The regression analysis also provides other relevant information such as the statistical significance of the relation among the variables, the degree of explanation afforded by the equation, and the ability to construct confidence intervals around the estimate. Hence, the technique not only provides predictions but also explicitly describes the strength or stability of the predictions.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Assume that an expert has constructed an equation that models the sales of Firm A as a function of total industry sales. Now the expert would like to know whether the sales of Firm A relate to the total industry sales—that is, whether this variable helps explain the movement of the firm's sales. The *t*-statistic generated by the regression analysis will help the expert assess whether the variable has significant explanatory power. The expert can also check the coefficient of determination (often called the *R*-squared) to measure the amount of the change in the firm's sales explained by the total industry sales.

Although regression analysis produces an unbiased estimate, certain data relations can occur that obscure or overemphasize the estimates. See Chapters 8 and 9 for more discussion on regression analysis.

### (g) Monte Carlo Simulation

Assume that the two parties in litigation need to value a mine. Both sides agree that the mining operation can recover one million tons of the mineral and that the incremental cost of mining the material equals $10 per ton. Both sides also agree that the mineral has an uncertain future price, ranging between $4 and $20 per ton, with an average of $12 (that is, the mean of the two extremes). The defense argues that the court should base the value of the mine on the average price of $12, leading to a valuation of $2 million [= 1,000,000 × ($12 − $10)]. However, the average value of the property exceeds this because if the mineral price drops below $10, the mine has the option to shut down, limiting costs when the low price precludes extraction. In other words, if the price drops to $8, the mine would not operate at a loss (−$2 = $8 − $10), but would cease operating until the price rose above $10. On the other hand, if the price rises, no such limitation exists on the upside. At any price above $10, the mine would operate. This example illustrates the principle that evaluating formulas using average values of uncertain inputs does not result in the average value of the formula. Mathematicians refer to this result as Jensen's inequality; Sam Savage also pioneered much of the work in this field.[91]

Monte Carlo simulation is a well-accepted valuation technique that avoids this *flaw of averages* (a term coined by Sam Savage). The mathematician Stanislaw Ulam developed the Monte Carlo approach while working on the Manhattan Project. As the name implies, the approach resembles testing a gambling strategy by repeating thousands of rolls of dice and recording the results. Suppose that a damages calculation depends on several uncertain variables—an interest rate that ranges between 2 percent and 28 percent, a price that ranges between $10 and $40, and a cost that ranges between $1 and $12—but each uncertain variable has its own pattern of probabilities. That is, certain interest rates will more likely occur than others, and the pattern of probabilities for interest rates differs from the patterns for prices and costs. A Monte Carlo simulation can easily calculate multiple scenarios of a model by repeatedly sampling values from the probability distributions for each of the uncertain variables. The simulations can consist of as many trials (or scenarios) as the expert wants—hundreds, or even millions. During a single trial, the model randomly selects a value from the defined possibilities (the range and shape of the distribution) for each uncertain variable and then recalculates the value. The average of these outcomes would equal expected damages. The method offers, as a side benefit, measures of dispersion of the average estimate.[92]

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

#### (h) Discounting

Many empirical studies on discounting require consideration of capital market risk.[93] For example, in a present value analysis, the practitioner discounts cash flows to a specific date, and the discount factor the practitioner uses should reflect in some cases the market and industry effects of each period. Experts can estimate the appropriate discount rate.

Practitioners often use the capital asset pricing model (CAPM) to estimate the appropriate discount rate (see Chapter 10). CAPM defines the return of a firm as the risk-free rate of return (usually measured by the return on short-term U.S. Treasury bills) plus the difference between the return on the market and the risk-free rate of return (otherwise known as the risk premium) times the firm's beta (the measure of the firm's market risk).[94] A practitioner using the CAPM could develop a discount factor for the present value analysis that would incorporate not only the effects of cash flows occurring in different time periods but also the return that the market and the specific firm experienced. Hence, an expert could more precisely measure what an expected cash flow occurring in Period 6 would equal in Period 0.

Practitioners must also deal with the effect of leverage (or debt). The presence of debt that a company must pay before the shareholders receive any return makes the shareholders' investment riskier. The discount factor for a firm's assets will therefore differ from the discount factor for the firm's equity by the amount of risk represented by debt.[95] If the practitioner measures lost cash flows after deducting interest, the practitioner should use the firm's equity beta in developing the correct discount rate. In contrast, if the practitioner measures lost cash flows before deducting interest, the practitioner should use the firm's asset beta in developing the correct discount rate (or use the firm's weighted average cost of capital).

#### (i) Prejudgment Interest

A practitioner who has used a discounted cash flow analysis to evaluate the plaintiff's lost profits will need an interest rate to bring those cash flows forward to the time of the trial from the base point of the analysis—and if enough time passes between the trial and recovery, to the time of the final judgment. (This assumes that the jurisdiction or particular cause of action permits prejudgment interest—see Chapter 16.) At the very least, this interest rate should reflect the value that the plaintiff's funds have lost owing to inflation. This measure, however, will not compensate the plaintiff for the opportunity costs of the use of its funds.[96]

Some experts suggest using the defendant's debt rate[97] while others invoking a similar theory prefer the risk-free rate[98] to measure prejudgment interest. Others suggest using the plaintiff's cost of capital—that is, a measure of the opportunity cost to the plaintiff (of course, at this point the defendant can argue that by doing so the plaintiff seeks consequential damages). The defendant's borrowing rate offers another measure because it regards the plaintiff's claim as an investment (albeit an involuntary one) in the defendant.[99]

Because confusion still abounds in the courts as to the meaning and proper application of lost profits, lost business value, appropriate valuation dates, discount rates, and risk factors, practitioners should address these issues early in the

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

process through discussion with counsel to ensure proper consideration of jurisdictional nuances and accepted approaches for the type of matter at issue.

### (j) Damages for Different Types of Cases

Certain types of cases have developed a body of case law and have established precedents for methods of calculating damages that nearly all practitioners use and nearly all courts recognize as the most appropriate means of measuring damages. Examples include royalty rate calculations in patent matters, market share analyses in antitrust matters, trendline analysis in business interruption insurance cases, and event studies in securities cases. The courts broadly (or even universally) apply some of these precedents; other precedents are jurisdictional or even specific to a judge. We advise discussion with counsel to discern or confirm these differences.

We also note that while some damages methods have academic support (for example, see Chapter 27 for a discussion of the use of event studies in securities cases), other damages measurement methods do not. Damages measurement methods lacking an economic basis or support within the academic community carry additional risk. In *Uniloc USA Inc. v. Microsoft*,[100] the Federal Circuit unanimously struck down the use of the 25 percent rule in patent damages cases (see discussion in Section 20.6(m) of Chapter 20). Although the court noted that this measurement method had general acceptance, the court also stated that this measure of damages was unrelated to the facts in the case and was inadmissible under the *Daubert* guidelines.

## 4.6  DEVELOPING AN EFFECTIVE DAMAGES CLAIM

Experts have no prescribed or universally accepted model for developing a damages claim, but those with experience employ methods that will improve the efficiency and effectiveness of the process and the results.

### (a) Learn the Background

Experts should first understand the facts of the case and the liability issues related to causation of the alleged damages. They should review the relevant pleadings in the case that address damages (including the complaint and answer) and discovery-related documents such as interrogatories, depositions, and requests for admissions. Counsel often amends complaints and answers, so experts should review the most current pleadings. In addition, they should discuss the case background and liability assumptions with counsel to confirm the basis giving rise to the claim. For some matters, the expert will find media coverage in either mainstream or industry-specific sources. A search of the Internet can also yield useful background information for some matters.

With the participation of counsel, the expert can obtain relevant background factual information from representatives of the company for whom the expert performs the analysis. However, one should scrutinize with professional skepticism any information obtained from a party to the litigation to avoid accepting potential bias in that information. Industry research and company-specific research often

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2021]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

yield a wealth of information that provides insight into the substantive issues of the case; this can also prove useful when the expert develops assumptions for the damages analysis. The benefits of learning the case background extend beyond the obvious need to understand the firm's operations and the effect thereon of the events in question; they also help the expert identify other potential factors that affected the operations and incorporate them in the analysis.

### (b) Understand Causation and Its Effect

The harmful acts identified in the complaint will likely provide a framework to begin understanding causation and effects of the harm. However, most complaints and pleadings lack substantive proofs of cause and effect; these are the requirements of trial and often the province of the expert to prove. The expert should use the knowledge gained in learning the background of the case to begin associating the defendant's injurious acts with the plaintiff's damages. Other experts in the case (economists, industry experts, engineering and other technical experts, and medical professionals) often establish causation. Nevertheless, the expert should not blindly accept the conclusions of others without exercising due professional skepticism in applying these conclusions to the facts of the case and observed effects on the business. This becomes less complex when experts can establish causation through their own work, but is nearly always a necessary step. Triers of fact will look for a nexus between the actions of the defendant and the damages to the plaintiff and will expect experts to establish that connection based on their own work or through that of other experts. Practitioners can accomplish this through a combination of applying logic to the facts, using targeted analytics, and rebutting other possible explanations. Knowledge of company practices, industry conventions, technical methods, competitive behavior, accounting requirements, and economic principles are all important in analyzing potential effects and building the foundation for causation arguments.

### (c) Identify the Damages Theory

As discussed throughout the chapter, many facets of damages analysis depend on the applicable law of specific jurisdictions or the circumstances of each case. Accordingly, we iterate that experts should work with counsel to ensure that the damages categories in the model comport with those pled and with the law from both a liability and a quantum perspective. For example, the expert should discuss and understand whether the plaintiff is seeking rescission of the contract, or affirmation of the contract with correction of the breach, or recovery of costs, or some other remedy. Ascertaining the objectives of the legal action will shed light on the available remedies and in turn the damages theories that can underpin a damages claim. Sometimes the plaintiff seeks a combination of equitable remedies and other legal remedies, such as damages. The plaintiff could have suffered losses for which it seeks compensation or could have lost opportunities for which it seeks restitution. Some cases have claims for both, which may be recovered so long as there is no duplication of the losses. Understanding the damages theory will allow the expert to identify appropriate models for an informed discussion with counsel.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 • 30    DAMAGES THEORIES AND CAUSATION ISSUES**

**(d) Select the Damages Model**

Several factors affect the selection of an appropriate damages model:

- An understanding of the background of the case;
- Knowledge of the causation of damages and the effect on the company of the defendant's injurious actions;
- Verification of acceptable damages theories for the jurisdiction and matter at hand;
- Practices accepted by professional peers and academics;
- Consistency with the damages suffered; and
- Avoidance of redundancy (if using multiple models).

For example, a royalty rate model is both commonly accepted and well suited to assessing patent infringement damages because it applies an appropriate valuation of the patented technology to the effect of lost sales usurped by the infringing party. Once experts identify the appropriate model and confirm its use with counsel, they should begin to build the damages claim.

**(e) Build the Damages Model—Lost Profits Scenario**

A discussion of all the various methods of preparing damages claims could fill an entire book. Other chapters in this book provide guidance on particular types of litigation and the claims that naturally ensue in those matters. Thus, we limit this discussion to the development of a lost profits claim, although most of the steps identified (if not the specific procedures described) pertain to most damages analyses. Our scenario presents the steps from the viewpoint of the plaintiff, but the same activities occur regardless of which side of the litigation the expert represents. One develops knowledge about important factors and considerations—for example, background facts, contract terms, causation, damages theory (including recovery objectives), and ramifications of the breach—before building the damages model, which concerns the quantum of loss claimed.

*(i) Identify the Damage Period*    While the attorneys will likely have already identified the key dates relevant to the damage period, the length of this period has important implications for revenue and cost measurements; the expert should critically review the attorney's assumptions. For example, over a long-enough period, almost all costs vary, and over a short-enough period, almost all costs remain fixed. With a shorter period, experts will subtract fewer indirect cost items from the lost sales revenues to estimate lost profits. In any event, experts who ignore this issue can arrive at the wrong answer even though they have correctly made all the other assumptions in the analysis. At a minimum, the expert must ascertain whether the lost profits apply only to the period of the contract term or have ramifications beyond the contract that the expert will express as an ongoing detrimental impact to the business. Identifying this period will define one of the most important parameters of the damages claim.

*(ii) Identify Assumptions and Estimates Needed for the Particular Case*    Experts who calculate lost profits damages must understand how to create a but-for world because such claims require assessing what would have happened to a business had the

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

defendant's injurious acts not occurred. When experts need to make conjectures, they develop and rely on supportable assumptions and estimates that must hold up under the counterparty's scrutiny. Thus, experts should identify the elements of a damages analysis as:

- Undisputed facts, or
- Estimates (and the estimation process), or
- Assumptions (and the support for those assumptions).

An overabundance of estimates and assumptions can lead to a damages claim that experts will find difficult to defend.

Experts frequently ground undisputed facts in lost profits claims in either the contract terms or certain verifiable key metrics (for example, actual sales volumes, revenues, and fixed-cost items). They obtain this information through data that are readily available or subject to independent confirmation. Experts sometimes need to make estimates concerning many key financial components of the model (for example, levels of sales returns, bad debts, purchase volumes and discounts available, and ramp-up rates on new product introductions). They base these on analyses of historical results achieved, regression analysis of relevant variables, or other analytical procedures. Assumptions usually involve broader parameters of the but-for world (e.g., inflation rates, price and demand elasticity, relevant market size and share, and interest rate trends). Some experts do not recognize any practical distinction between estimates and assumptions and use the term *assumptions* in referring to all subjective factors in the analysis.

*(iii) Build the Foundation for the Damages Claim*   The process of building the foundation for the damages claim is partly defensive and partly practical, but is always necessary. Without sufficient foundation, the expert cannot establish the defendant's injurious acts as the proximate cause of the claimed losses; this omission can render the damages claim speculative and inadmissible. Even assuming another expert established causation, an inadequately researched, documented, and supported claim can fail to meet professional standards, survive a *Daubert* challenge,[101] or prevail against the counterparty's arguments. A proper foundation will include supporting documentation, corroborative evidence, use of methods accepted by professional peers, and conformance to the law and precedent in the jurisdiction.

Experts must address many considerations in a lost profits analysis. Some of them are conducive to analysis using sophisticated modeling, including regression analysis and game theory.[102] However, adequate or reliable data are not always available for these models. Nevertheless, experts would be remiss in not adequately considering the factors described next, even if they cannot employ preferred modeling techniques.

- **Company knowledge.** Experts gather significant information for the lost profits model during earlier activities in the process of evaluating the damages claim. In this step, they synthesize this diversity of knowledge and organize it to help develop and support the lost profits analysis. The expert should understand the company's operations, markets, and management practices; these factors help explain the negative impact on the company's profits. They

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

also help the expert account for other factors that could play a role in the company's financial performance and explain the nature and duration of any negative effects caused by factors other than the breach. Hence, the expert gathers this body of knowledge for application to the damages claim model.

- **Pre-breach budgets and forecasts.** Experts can review pre-breach budgets and forecasts to help them understand the company's expectations before the defendant's injurious acts occurred. These documents can provide a wealth of corroborative information about management's expectations concerning the operations of the business, its revenue plans, cost structure, and investment plans. Most lost profits models will employ more sophisticated analyses to establish lost revenues and cost ramifications of a breach. (Section 4.5(f) and Chapters 8 and 9 include discussions on regression analysis that we will not repeat here.)

  Certain matters involve loss models that derive from the underlying contract, such as business interruption insurance claims. In these cases, experts may use pre-breach budgets or forecasts as a basis for estimating but-for revenues and costs. To test and gain comfort on the forecasting accuracy previously achieved, an analyst could use a pre-loss budget as the basis for cost estimates by performing regression analysis of historical budgeted costs and actual results for the corresponding period. Aside from these relatively limited applications, budgets and forecasts are largely beneficial only as corroborating evidence; the expert will need to explain where they differ significantly from modeled lost profits.

- **Analysis of historical performance.** Most experts consider the historical financial performance of the subject company in validating estimates of but-for performance, regardless of the method used to develop that but-for estimate. Failure to do so will expose experts to criticism if their pro forma estimates materially diverge from actual past performance unless, of course, the parties intended the breached contract to have a material beneficial impact on that performance and the damages estimate reflects this gap. For example, suppose that the plaintiff sold 26,000 widgets per year for the two years preceding the damages period but the but-for analysis assumes that the plaintiff sells 25 percent more. The plaintiff's expert should explain why a 25 percent increase in sales was a reasonable assumption in the but-for world. The analysis of historical performance should include a comparison to other comparable market participants and to the industry at large. Trends in historical performance can also be corroborative or identify other factors that the expert must address in showing causal links. In short, an expert will find it perilous to prepare a damages claim in a vacuum, isolating the claimed losses from what the company accomplished in the past.

- **Industry research/guideline company analysis.** Another foundation of a damages claim is an analysis of the relative performance of guideline companies or industry averages. This approach is particularly useful for new entities lacking historical track records, but experts broadly use this approach to establish corroborating evidence, to challenge assumptions and estimates, or to establish the reasonableness of loss estimates for the subject company. While no specific requirements exist for guideline company selection, valuation literature contains widely accepted practices.[103] Such

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

guidance helps to ensure that the analysis includes appropriate companies and excludes inappropriate companies. For example, if the subject company's labor costs as a percentage of revenue were 10 percent higher than its competitors for each of the past five years and the company reasonably expected this relationship to continue, then the expert could estimate costs for the subject company by using the guideline company's actual results plus 10 percent. Such an approach could remove the macroeconomic factors affecting performance (assuming these factors would affect the guideline companies in a similar manner) by isolating relative performance of the subject company.

- **General economic conditions.** Any approach used to estimate but-for profits should account for the general market and economic conditions that could affect future results in the absence of other intervening factors. Such conditions are as diverse as changes in the core economic indicators (e.g., housing starts for a real estate company damages claim), financial health of suppliers and buyers, substitute or complementary product introductions, pricing trends, inflation, legal and regulatory issues, and globalization of markets. In addition, the expert should consider ongoing or anticipated trends in these conditions or factors that will alter the prospects of the subject company or business.

- **Changes in competitive landscape.** Other effects fall closer to home than broad economic indicators. For example, in markets with high barriers to entry for new competition, a breach of contract may eliminate a competitive advantage and allow new entrants to enter an otherwise exclusive or restricted market, permanently impairing the profits of the victim of the breach. Outside influences can also alter the competitive landscape. Consider the effect of a hurricane on a broad geographic area. A breach of a supply contract suffered by a roofing contractor, absent the hurricane, could have a seriously detrimental effect on that contractor's profits. Assume the intervening hurricane damaged the property of the contractor and all local competitors, enabling out-of-state contractors to enter the market and win market share. Given these circumstances, a lost profits claim that relates all of the detrimental impact on this contractor to the contract breach is likely fatally flawed.

- **Potential company-specific factors.** Additional company-specific factors can affect the performance of the company, and the expert should consider them in developing the lost profits analysis and, in some cases, establishing proximate cause of the plaintiff's damages. These factors that are often specific to the individual subject company include the following:

  - **Impairment of goodwill.** Plaintiffs sometimes assert lost profits claims based on impairment of goodwill. These claims usually stem from actions that damage the reputation of the business (for example, the effects of counterfeit goods). This damage to reputation can result in reduced revenues and profits. Establishing that the damage to the reputation (1) was caused by the counterfeit goods, (2) resulted in lost sales and profits, and (3) was the only cause of the lost sales and profits can present a number of challenges to the expert. The expert must avoid separate claims in this regard—for example, claiming both lost profits and lost value of the intangible

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 • 34     DAMAGES THEORIES AND CAUSATION ISSUES**

(goodwill) asset—as this reputation damage should manifest in lost profits and be recovered on that basis. In any event, supporting these claims can be challenging and will require ample documentation and a well-constructed analysis to prevail.

- **Management changes.** Experts should also consider the possible effects of normal changes in management as well as those that may have resulted from the acts of others. The expert should have gathered enough information about the company to establish critical management positions, personnel, and responsibilities that affect operating performance. For example, if the chief scientist on a key new product in development left the company, damages claims are appropriate if he was improperly recruited away by a competitor developing a similar product, but would not usually be expected if he went to teach in academia.
- **Other market issues.** A number of other market factors will bear on the performance of a specific company. These include the following:
  - Changes related to buyers and suppliers;
  - Changes in business lines and the market conditions that affect them;
  - The introduction of new products by the subject company and its competitors; and
  - The legal and regulatory environment in which the company operates.

Accounting for all other factors that can reduce profits for a company would be overwhelming. Few cases require such rigor. Experts can simplify the process by looking for the factors that *materially* affect business performance and focusing on those material factors where changes occurred or are anticipated. An expert who fails to explore key factors affecting company performance will be ill-equipped to assure the court that the defendant's actions have caused the damages suffered, thus weakening the causation argument and the damages case.

We next present a detailed analysis of constructing the revenues the plaintiff should have received but for the actions of the defendant, and the costs that an expert should apply to those revenues.

*(iv) Revenue Analysis*  In a lost profits study, the expert must first compute the amount of lost revenues or sales units that the defendant's actions have caused. Experts use four common approaches to measure this amount:

1. **Before and after.** This approach compares the plaintiff's sales level before the defendant's wrongdoing with the plaintiff's sales level after the defendant's wrongdoing; the difference between the two levels represents the lost sales. This approach assumes that only the defendant's wrongdoing affected the plaintiff's business volume. It can underestimate lost sales for a plaintiff whose sales were increasing prior to the defendant's actions and overestimate lost sales if a plaintiff's business was in decline prior to the defendant's actions. To use such an approach effectively, experts often include a market analysis in the lost profits study. For example, if the target company's market is mature and stable during the period under question, the plaintiff's sales level probably would have remained unchanged but for the defendant's actions.

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

2. **Statistical forecast.** The expert forecasts but-for sales by using a variety of tools such as regression (or other statistical) analysis and then subtracting the actual sales to estimate the lost sales. With this approach, the expert's model (or equation) must adequately predict the sales and use a control period (over which the equation is estimated) that does not contain events that would bias the results; also, the regression equation must not contain biases such as heteroscedasticity, autocorrelation, or other similar factors (see Chapters 8 and 9). The model should also consider all important industry factors that affect the sales of the plaintiff's products. For example, the price of oil can affect the sale of products used in the construction of oil rigs. The omission of a significant factor can invalidate the expert's results or make these results seem less credible to a judge and jury. The expert should ensure that the damages study considers all relevant factors and that the model includes the significant ones.[104]

3. **Yardstick.** The expert identifies an index of firms similar to the plaintiff's firm and compares the plaintiff's performance with the index's performance. This approach assumes that, but for the defendant's actions, the plaintiff would have performed the same, relative to the index, as it had in the past. Underlying biases in the data, however, can invalidate this index approach. A plaintiff firm that is smaller or larger relative to the index firms can lead to inaccurate results. For example, if a large plaintiff firm lost market share because of the defendant's wrongful conduct, small firms that acquired those shares could appear to be growing even if the market size remained constant.

4. **Market share.** Experts consider the plaintiff's market share during the period prior to the defendant's wrongdoing. In addition to defining the relevant market, the expert must also ensure that the market remained somewhat stable during the relevant time period. Numerous entrances or exits of competitors could undermine the use of this measure. Also, the analysis should examine the trend of the plaintiff's market share, because if the plaintiff's market share varied greatly over the period before the defendant's actions, this measure can yield unreliable results.

*(v) Cost Analysis*   After estimating the amount of lost sales, the expert must subtract the costs the firm would have incurred to achieve these revenues. Such an analysis will consider many different cost measures, depending on the nature of the harm:[105]

- *Marginal cost* is the cost of producing one additional unit.
- *Incremental cost* refers to the cost of an unspecified number of additional units or of a new product line.
- *Average cost* equals the total cost divided by the number of units produced.
- *Variable costs* change as the activity (or production) level changes.
- *Direct costs* are the costs of the direct material and direct labor incurred in producing a product.

The expert must decide which cost measure pertains to the particular case. For example, a variable cost estimate will apply only over a certain range of production (called the relevant range). If the estimated lost sales units would increase

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

the production level outside the relevant range, then the use of the variable cost estimate can be incorrect.

The relevant cost measure can vary, of course, depending on whether the business is expanding or contracting. If the business is expanding and the amount of lost sales units would take production beyond the plaintiff firm's present capacity, the expert should consider including the capital costs of investment in new capacity or new equipment as a cost in the lost profits analysis. The expert using incremental costs should include such costs and should also make reasonable assumptions concerning the timing of the investments.

An expert estimating costs for a firm that would have sold more units but for the defendant's actions should consider the possibility of economies (or diseconomies) of scale.[106] If the model projects a large number of lost units, the plaintiff could achieve large cost savings at that production level. A study using only current costs could underestimate the plaintiff's damages. Similarly, learning curve effects would lead to a higher cost structure in a start-up firm than in a firm in business for some time. Finally, although average variable cost analysis can be appropriate for a firm already in the market, it can be inappropriate for a new entrant that will have to engage in promotional pricing to gain customer loyalty, a capital asset that a longtime competitor already possesses.

Even when the expert has decided on the relevant cost measure, important aspects of the analysis remain. For example, if claims relate to a single division (or product) of a multidivision (multiproduct) firm, the expert needs to consider joint costs.[107] The time frame over which the expert analyzes the firm's costs as fixed or variable becomes important: the shorter the period, the fewer the variable costs. The expert should consider whether to analyze costs that vary as production rises and falls within some output range or whether to measure costs that vary as production falls to zero (going-concern versus shutdown analysis). For a firm that has large costs associated with producing one unit that do not increase with the production level (zero-one costs), the level over which one measures costs as variable could determine the outcome of the case.[108]

*(vi) Subtract Actual Results from the But-For Amount to Ascertain Lost Profits Damages*   This step is basic arithmetic and does not require much discussion. Exhibit 4-5 illustrates the basic format for calculating the amount of damages from the but-for and actual balances. The expert only needs to match up but-for and actual cash flows so the expert can properly adjust for the time value of money.

*(vii) Adjustment for Time Value of Money*   As noted in Section 4.5(d), courts differ on the dates for evaluating a lost profits analysis. Regardless of whether a court decides that the appropriate date is the date of the breach, the date of the trial, or some other date, the expert must value the lost profits occurring in multiple periods to a single period. That is, the expert must adjust lost profits for the time value of money.

Experts use a variety of discount rates (see Section 4.5(h)), but they use these discount rates to express the lost profits occurring in multiple years as if they occurred in a single year. For example, proper discounting allows the expert to appropriately offset the negative cash flows required in some years with positive cash flows that result in others because of those investments. Recall that lost profits

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2021]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

are usually expressed as lost cash flows in this analysis. Sometimes the facts warrant an expert using profit measures instead of cash flows. Regardless of what measure the expert uses, the discount rate must correspond to the cash flow being discounted.

Although the cash flows at issue can occur during the course of a year, most experts do not conduct a monthly or daily discounted lost profits analysis. Instead they present an annual amount and discount that amount based on a midyear convention. With a midyear convention, the expert assumes that the annual cash flow occurs on June 30. Assume that the expert wants to discount all cash flows to December 31, 2008. Using the midyear convention, the January 15, 2009, cash flow would be discounted too much whereas the December 15, 2009, cash flow would be discounted too little. On average, the cash flows would be discounted the proper amount. The expert, however, should check to ensure that no factors exist that would cause the midyear convention to bias the results.

If experts discount the lost profits to a date that is not the trial date, they should adjust the net discounted lost profits result to the date of the trial using prejudgment interest. Many states have statutes governing the rate to use for prejudgment interest. Chapter 16 examines the principles and mechanics of prejudgment interest.

*(viii) Tax Considerations*   In many litigation analyses, the expert must consider the effects of income taxes. This includes the average tax rate, the marginal tax rate, the effective tax rate, or even the marginal effective tax rate.[109] For example, a firm's weighted average cost of capital calculation includes the marginal corporate tax rate, whereas a firm's adjusted present value uses the effective tax rate.[110]

In addition, when experts complete their lost profits calculations, they should decide whether to calculate the damages on a pretax or after-tax basis. Because the government taxes a lost profits award, some experts prefer to calculate the award on a pretax basis. This advice, however, can lead to an over- or underestimation of damages by its failure to recognize changes in tax rates. Alternatively, one could calculate the award on an after-tax basis and then gross up the damages amount by the current tax rate (i.e., divide the after-tax damages by one minus the current tax rate). For example, suppose the plaintiff would have made $100 on a pretax basis during year one and, had it generated those funds in year one, it would have paid $46 in federal income taxes. (This example ignores present value and state tax issues.) Thus, the plaintiff would have had $54 more but for the defendant's wrongdoing. The plaintiff's case goes to trial in year seven, after the marginal corporate federal income tax rate has dropped to 34 percent. On one hand, if the court awards the plaintiff the pretax $100 in year seven, it will pay only $34 in federal taxes and on an after-tax basis will have $66, $12 more than the amount needed to make it whole. On the other hand, had the court awarded the grossed-up amount of the plaintiff's lost profits on an after-tax basis, the plaintiff would have received $82 [= $54/(1 − 0.34)], paid $28 in taxes, and have $54 left. In this example, the plaintiff would have benefited had the damages award been paid on a pretax basis. The results go in the opposite direction if the tax rate increased. (Chapter 18 discusses the tax treatment of damages awards.)

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

4 • 38    DAMAGES THEORIES AND CAUSATION ISSUES

## 4.7    PRACTICAL ASPECTS OF EXPERT TESTIMONY ON DAMAGE CAUSATION

Lawyers sometimes ask liability experts to evaluate whether the defendant has engaged in wrongful conduct without regard to whatever harm has flowed from the conduct. Likewise, they frequently instruct damages experts to assume causation.

These practices, when pursued without proper consideration, can lead to mismatches between the expert evidence and the facts of the case. For example, expert testimony quantifying the amount of damages lacks relevance unless one can show that the damages resulted from the defendant's wrongful acts. Similarly, proof that an audit conducted pursuant to generally accepted auditing standards (GAAS) would have detected a misstatement in a company's financial statements is irrelevant unless the misstatement caused the plaintiff's injury.

As these examples illustrate, cases involving financial matters often require expert testimony to resolve whether the defendant's wrongful conduct caused the plaintiff's damages. Such expert testimony is frequently challenged on the following grounds:

- Causation is a fact question that depends on the testimony of fact witnesses rather than experts.
- Causation is a legal issue, on which experts should not offer an opinion.

The following discussion addresses these issues. Each case it reviews arises under Federal Rule of Evidence 702, which provides that a court can admit expert testimony relating to scientific, technical, or other specialized knowledge to assist the trier of fact in understanding the evidence or determining a fact in issue so long as it complies with the following requirements:

- The testimony is based on sufficient facts or data.
- The testimony is the product of reliable principles and methods.
- The witness has applied the principles and methods reliably to the facts of the case.

These requirements ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand."[111] They apply to all witnesses offered as experts.[112]

### (a) Admissibility of Expert Testimony

The failure to properly consider causation jeopardizes the admissibility of expert testimony on damages. In evaluating the admissibility of expert testimony under Rule 702, a trial court must consider whether the "expert testimony . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[113] Damages experts who fail to consider causation risk a ruling that their testimony lacks this essential tie to the facts of the case.

For example, in *Concord Boat Corp. v. Brunswick Corp.*,[114] the U.S. Court of Appeals for the Eighth Circuit overturned a $133 million antitrust judgment based in part on the conclusion that the trial court should have excluded the damages-related testimony of the plaintiff's financial expert. The court found that the expert's damages model "was not grounded in the economic reality of the . . . [relevant] market,

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

for it ignored inconvenient evidence."[115] Among other things, the damages model "failed to account for market events that both sides agreed were not related to any anticompetitive conduct."[116] Based on this and other "deficiencies in the foundation of the opinion," the court held that the expert's conclusions were speculative and unhelpful to the trier of fact.[117]

*Concord Boat* teaches that an expert cannot ignore whether the plaintiff's calculated damages flow from the defendant's conduct or other events. Indeed, even if the court had not excluded the expert's testimony there, the damages calculation would still have been vulnerable to attack as the expert would presumably have been hard-pressed to calculate on the witness stand the extent to which his damages calculation would have changed in response to changes in the facts.

### (b) Expert Testimony versus Fact Testimony

Expert testimony on causation can prove more reliable than fact testimony in financial cases. A breach of contract case in the U.S. Court of Appeals for the Federal Circuit illustrates this situation.

*California Federal Bank v. United States*[118] is one of a series of so-called *Winstar* cases in which banks that purchased failing thrifts during the savings and loan crisis of the late 1980s and early 1990s sought to recover for damages caused by the passage of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) in 1989. This act effectively negated beneficial financial statement and regulatory capital provisions of banks' earlier contracts with the federal government to acquire failing thrifts. In *California Federal*, the plaintiff bank, CalFed, alleged that the enactment of FIRREA forced it to sell certain assets, including a large number of adjustable-rate mortgages (ARMs), to meet the act's new regulatory capital requirements.[119]

The court held that the government breached its contract with the bank, thus establishing liability. CalFed sought lost profits as damages for this breach, arguing that, but for FIRREA's enactment, it would have retained more ARMs, which would have yielded substantial profits. The government countered that FIRREA did not cause the sale of ARMs, which shrunk the size of the bank, and that other factors existed that would have caused the sale irrespective of the changes in regulatory capital requirements effected by the act.

The government sought to debunk the plaintiff's lost profits claim through a financial expert who testified about the economics of the relevant market and presented an analysis of the operations and financial performance of CalFed. Among other considerations, the expert explained a principle familiar to most financial experts: one would expect the sale of the ARMs to have produced the same amount of profit as retaining them because, in a liquid market, the fair value of the ARMs at the time of their sale would have included the present value of the future cash flow if CalFed had retained them.

The trial court relied on the government's expert in finding that "it was the recession in the California real estate market in the early 1990s that 'caused CalFed to shrink the bank,' not the changes in regulatory requirements that resulted from the enactment of FIRREA."[120] On appeal, CalFed argued that "it was improper for the [trial] court to rely on the testimony of the government's experts rather than the testimony of CalFed's fact witnesses, who testified about their own intentions

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4 ● 40   DAMAGES THEORIES AND CAUSATION ISSUES**

[i.e., but for FIRREA, they would have retained the ARMs]."[121] The Federal Circuit rejected this argument, explaining that

> the court, sitting as finder of fact, was entitled to weigh the credibility of CalFed's fact witnesses, taking into account their interest in the outcome of the litigation. At the same time, the court was entitled to consider the government's expert testimony to the extent that it shed light on the economics of finance and banking and thus helped explain why CalFed sold the ARMs following FIRREA's enactment.
>
> The expert testimony on which the court relied in this case provided an explanation of why a bank such as CalFed might well have chosen to dispose of the ARMs, even in the absence of a breach . . . , and why the sale of the ARMs did not necessarily result in a loss to CalFed. The expert testimony thus satisfied the requirement of Rule 702 of the Federal Rules of Evidence, which permits expert testimony to be admitted "to assist the trier of fact to understand the evidence or to determine a fact in issue."[122]

Accordingly, the court held that "the inability to prove by a preponderance of the evidence that profits would have been made but for the breach" barred the bank from recovering lost profits.[123]

*CalFed* demonstrates not only how a financial expert can properly present evidence to support or undercut a causation theory but also that such evidence can prove even more useful and credible than fact testimony that appears self-serving to the finder of fact under the circumstances.

### (c) Expert Sensitivity to Alternative Outcomes

In cases in which but-for causation becomes an issue, the expert must prepare to address alternative outcomes. For example, suppose a former client brings a claim against a law firm for improper representation in a bankruptcy proceeding. The plaintiff/debtor contends that, but for the defendant law firm's bad advice, the bankruptcy judge would have confirmed a different plan that provided a superior outcome to either historical equity interests or creditors. The plaintiff's contention hinges on proving that the alternative plan would have:

- Been approved for a creditor vote;
- Won approval of the impaired creditors in number and dollar amount;
- Prevailed over any competing topping bids that would have been made at a confirmation hearing; and
- Been held by the bankruptcy court to be in the best interests of creditors, feasible, and not likely to be followed by liquidation of the entity.

To carry this burden, the plaintiff would need to show that the required number and amount of creditor interests would have confirmed the alternative plan. Such a showing would necessarily rest on evidence in the bankruptcy regarding (1) the relative value of the alternative plan compared with the confirmed plan, (2) the positions of important interested parties regarding the alternative plan, and (3) whether the alternative plan would serve the highest and best interests of the creditors compared with any other proposed or alternative plans. Given the many financial and bankruptcy issues involved in making this showing, the plaintiff would almost certainly need an expert witness to explain such evidence and its relevance.

This example illustrates why the trier of fact often finds expert testimony helpful and necessary to understand whether the defendant's wrongful conduct has

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

caused the damages claimed by the plaintiff. Even if damages experts do not provide testimony regarding causation, they must nevertheless understand the plaintiff's theory of causation, connect their opinions on causation to facts of the case, and be ready to opine on both alternative outcomes and alternative causes.

## 4.8   CONCLUSION

Damages claims present some of the most interesting challenges and complex issues addressed by experts. An expert's effectiveness requires an understanding of the law, familiarity with various damages models and their appropriate usage, attention to detail and thoroughness in analysis, and close coordination with legal counsel to assure the appropriateness of the models and methods used. Courts vary widely in their level of sophistication in assessing damages, and in many cases the expert will fulfill the traditional role of providing specialized knowledge to the triers of fact to help them understand these complex issues.

Damages presentations are often the culminating events in a trial. They incorporate many of the key factual and expert presentations that establish the basis for damages and claims, and represent the means of righting the wrongs established during trial. Consequently, experts often play a defining role in the success of litigation.

## NOTES

1. Henry R. Cheeseman, *Business Law*, 5th ed. (Upper Saddle River, NJ: Pearson Education, 2004), p. 200.

2. *Ibid.*, pp. 311–13.

3. See, e.g., *Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 312 (Mich. 2004); *Schafersman v. Agland Coop*, 631 N.W.2d 862, 871 (Neb. 2001).

4. See, e.g., *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 770 P.2d 278, 281 (Cal. 1989); *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 242–43 (Colo. 1987) (*en banc*); *Johnson v. Am. Nat'l Red Cross*, 578 S.E.2d 106, 108 (Ga. 2003); *Clampitt v. D.J. Spencer Sales*, 786 So. 2d 570, 573 (Fla. 2001) (quoting *Jefferies v. Amery Leasing, Inc.*, 698 So. 2d 368, 370 (Fla. Dist. Ct. App. 1997)); *Bajwa v. Metro. Life Ins. Co.*, 804 N.E.2d 519, 526 (Ill. 2004); *Ulwick v. DeChristopher*, 582 N.E.2d 954, 958 (Mass. 1991); *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000); *Whaley v. CSX Transp.*, 609 S.E.2d 286, 298 (S.C. 2005) (FELA case); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

5. See, e.g., *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 242–43 (Colo. 1987) (*en banc*); *Canonico v. Beechmont Bus Serv., Inc.*, 790 N.Y.S.2d 36, 37 (App. Div. 2005); *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 251 (Tex. 1974).

6. See, e.g., *Sargent v. Mass. Accident Co.*, 29 N.E.2d 825, 827 (Mass. 1940); *Commonwealth v. $6,425.00 Seized from Esquilin*, 880 A.2d 523, 529 (Pa. 2005); *Cobb v. W. Va. Human Rights Comm'n*, 619 S.E.2d 274, 290 n.26 (W. Va. 2005).

   The causation standards for negligence extend to the tort of strict products liability, which does not require proof of fault or breach of a duty but does require a showing that the plaintiff was injured as a result of the product's defective condition. See, e.g., *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 900 (Cal. 1963); *Hiigel v. Gen. Motors Corp.*, 544 P.2d 983, 987 (Colo. 1975) (citing Restatement (Second) of Torts § 402A (1965)); *Hunt v. Blasius*, 384 N.E.2d 368, 372 (Ill. 1978); *Endresen v. Scheels Hardware*

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*& Sports Shop, Inc.*, 560 N.W.2d 225, 229 (N.D. 1997); *Houston Lighting & Power Co. v. Reynolds*, 765 S.W.2d 784, 785 (Tex. 1988) (citing Restatement (Second) of Torts § 402A (1965)). The plaintiff must prove the claim by a preponderance of the evidence and can carry this burden by relying upon either direct or circumstantial evidence. See, e.g., *Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 360 (Kan. 1983); *Waite v. Am. Creosote Works, Inc.*, 204 N.W.2d 410, 291 (Minn. 1973); *Kudlacek v. Fiat S.p.A.*, 509 N.W.2d 603, 610 (Neb. 1994); *Endresen v. Scheels Hardware & Sports Shop, Inc.*, 560 N.W.2d 225, 229 (N.D. 1997).

7. *Yonce v. SmithKline Beecham Clinical Labs., Inc.*, 680 A.2d 569, 576 (Md. Ct. Spec. App. 1996).

8. See, e.g., *Henderson v. Cominco Am., Inc.*, 518 P.2d 873, 879 (Idaho 1974); *Mort v. Walter*, 457 N.E.2d 18, 21 (Ill. 1983); *Skinner v. Square D Co.*, 516 N.W.2d 475, 480 (Mich. 1994); *Simmons v. John L. Roper Lumber Co.*, 93 S.E. 736, 738 (N.C. 1917).

9. See, e.g., *Dick v. Lewis*, 506 F. Supp. 799, 805 (D.N.D. 1980) (applying North Dakota law) (citing W. Page Keeton, et al., *Prosser and Keeton on Torts § 41* (4th ed. 1971)); *Gercey v. United States*, 409 F. Supp. 946, 954 (D. R.I. 1976) (Suits in Admiralty Act case) (citing W. Page Keeton et al., *Prosser and Keeton on Torts § 41* (4th ed. 1971)); *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991) (same); *Anderson v. St. Francis–St. George Hosp., Inc.*, 671 N.E.2d 225, 227 (Ohio 1996) (same).

10. See, e.g., *Lestico v. Kuehner*, 283 N.W. 122, 127 (Minn. 1938); *Toston v. Pardon*, 874 So. 2d 791, 799 (La. 2004); *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995); *Morden v. Cont'l AG*, 611 N.W.2d 659, 676 (Wis. 2000).

11. See, e.g., *Tennyson v. Brower*, 823 F. Supp. 421, 423–24 (E.D. Ky. 1993) (applying Kentucky law); *Thompson v. Better-Bilt Aluminum Prods. Inc.*, 832 P.2d 203, 207 n.6 (Ariz. 1992); *Yonce v. SmithKline Beecham Clinical Labs.*, 680 A.2d 569, 576 (Md. Ct. Spec. App. 1996); *Mack v. Altmans Stage Lighting Co.*, 470 N.Y.S.2d 664, 667 (N.Y. App. Div. 1984); *Mulder v. Tague*, 186 N.W.2d 884, 887 (S.D. 1971).

For discussion of the situation in which an actor's negligence has merely created a situation harmless unless acted upon by other forces for which the actor is not responsible, see *infra* footnote 27 and accompanying text.

12. *Mitchell v. Gonzales*, 819 P.2d 872, 876 (Cal. 1991); *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991); *Yonce v. SmithKline Beecham Clinical Labs.*, 680 A.2d 569, 575–76 (Md. Ct. Spec. App. 1996); *Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1072 (N.J. 1996); *Daubert v. Pappas*, 704 P.2d 600, 605–06 (Wash. 1985) (*en banc*).

13. *Mitchell v. Gonzales*, 819 P.2d 872, 878–79 (Cal. 1991) (internal quotations and citation omitted); *Daubert v. Pappas*, 704 P.2d 600, 605–06 (Wash. 1985) (*en banc*) (same).

14. *Mitchell v. Gonzales*, 819 P.2d 872, 879 (Cal. 1991); *Fehling v. Levitan*, 382 N.W.2d 901, 904 (Minn. Ct. App. 1986).

15. *Mitchell v. Gonzales*, 819 P.2d 872, 878 (Cal. 1991) (internal quotations and citation mitted).

16. See, e.g., *Gercey v. United States*, 409 F. Supp. 946, 954 (D.R.I. 1976) (Suits in Admiralty Act case); *Aetna Cas. & Sur. Co. v. Leo A. Daly Co.*, 870 F. Supp. 925, 936 (S.D. Iowa 1994) (applying Iowa law); *Yonce v. SmithKline Beecham Clinical Labs.*, 680 A.2d 569, 576 (Md. Ct. Spec. App. 1996); *Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 309 (Mich. 2004); *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994).

17. *Paige v. Saint Andrew's Roman Catholic Church Corp.*, 734 A.2d 85, 91 (Conn. 1999) (alterations in original) (internal quotations and citation omitted).

18. *Smith v. W. Union Tel. Co.*, 83 Ky. 104 (Ct. App. 1885) (emphasis in original); see also *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 181 (Tenn. 1992) ("The consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. Any attempt to impose responsibility upon such a basis would result in infinite liability.") (alteration in original) (internal quotations and citation omitted); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 729–55 (1975).

Case 4:24-cv-04722-YGR    Document 415-5    Filed 02/24/26    Page 47 of 57

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

19. *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting).

20. *Id.*

21. See, e.g., *Ballard v. Uribe*, 715 P.2d 624, 628 n.6 (Cal. 1986); *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503–04 (Fla. 1992); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004); *Wankel v. A&B Contractors, Inc.*, 732 A.2d 333, 349 (Md. Ct. Spec. App. 1999); *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994); *Hurd v. Williamsburg Cnty.*, 611 S.E.2d 488, 492 (S.C. 2005).

22. See, e.g., *Heatherly v. Alexander*, 421 F.3d 638, 642 (8th Cir. 2005) (applying Nebraska law); *Ballard v. Uribe*, 715 P.2d 624, 628 n.6 (Cal. 1986); *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 504 (Fla. 1992); *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980); *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 422 S.E.2d 128, 131 (S.C. 1992).

23. See *Heatherly v. Alexander*, 421 F.3d 638, 642 (8th Cir. 2005) (applying Nebraska law); *Doe v. Sisters of the Holy Cross*, 895 P.2d 1229, 1234 (Idaho Ct. App. 1995); *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. 1993) (*en banc*); *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 422 S.E.2d 128, 131 (S.C. 1992).

24. *City of Jacksonville v. Raulerson*, 415 So. 2d 1303, 1305 (Fla. Dist. Ct. App. 1982) (*per curiam*); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004); *Kuhns v. Standard Oil*, 478 P.2d 396, 402 (Or. 1970); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) (identifying "person of ordinary intelligence" as point of comparison).

25. *Lane v. St. Joseph's Reg'l Med. Ctr.*, 817 N.E.2d 266, 273 (Ind. Ct. App. 2004); *Anderson v. Theisen*, 43 N.W.2d 272, 273 (Minn. 1950); *Mudrich v. Standard Oil Co.*, 90 N.E.2d 859, 863 (Ohio 1950).

26. See, e.g., *Riordan v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 416 F.3d 825, 832 (8th Cir. 2005) (applying Missouri law); *Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 867 (D. Vt. 2004) (applying Vermont law); *Robertson v. Sixpence Inns of Am.*, 789 P.2d 1040, 1047 (Ariz. 1990); *McAuley v. Wills*, 303 S.E.2d 258, 260–61 (Ga. 1983); *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054–55 (Ind. 2003); *McMillian v. Vliet*, 374 N.W.2d 679, 681–82 (Mich. 1985); *Delaware v. Valls*, 409 N.W.2d 621, 624 (Neb. 1987); *Maheshwari v. City of New York*, 810 N.E.2d 894, 898 (N.Y. 2004); *Adams v. Mills*, 322 S.E.2d 164, 172–73 (N.C. 1984); *Miller v. Diamond Res., Inc.*, 703 N.W.2d 316, 321 (N.D. 2005); *Thompson v. Presbyterian Hosp.*, 652 P.2d 260, 264 (Okla. 1982); *Cramer v. Dep't of Highways*, 870 P.2d 999, 1001 (Wash. Ct. App. 1994).

27. See, e.g., *Riordan v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 416 F.3d 825, 832 (8th Cir. 2005) (applying Missouri law); *Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 867 (D. Vt. 2004) (applying Vermont law); *Robertson v. Sixpence Inns of Am.*, 789 P.2d 1040, 1047 (Ariz. 1990); *McAuley v. Wills*, 303 S.E.2d 258, 260–61 (Ga. 1983); *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054–55 (Ind. 2003); *McMillian v. Vliet*, 374 N.W.2d 679, 681–82 (Mich. 1985); *Delaware v. Valls*, 409 N.W.2d 621, 624 (Neb. 1987); *Maheshwari v. City of New York*, 810 N.E.2d 894, 898 (N.Y. 2004); *Adams v. Mills*, 322 S.E.2d 164, 172–73 (N.C. 1984); *Miller v. Diamond Res., Inc.*, 703 N.W.2d 316, 321 (N.D. 2005); *Thompson v. Presbyterian Hosp.*, 652 P.2d 260, 264 (Okla. 1982); 870 P.2d 999, 1001 (Wash. Ct. App. 1994).

28. *Thompson v. Presbyterian Hosp.*, 652 P.2d 260, 264 (Okla. 1982) (citation omitted); see also *Adams v. Mills*, 322 S.E.2d 164, 173 (N.C. 1984); *cf. Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003) (characterizing the superseding or intervening act as being "so remote in time" with respect to the plaintiff's conduct "that it breaks the chain of causation" between the plaintiff's conduct and the defendant's injury).

29. *St. Fort ex rel. St. Fort v. Post, Buckley, Schuh & Jernigan*, 902 So. 2d 244, 250 (Fla. Dist. Ct. App. 2005) (internal quotations and citation omitted); see also *Johnson v. Rice*, 440 S.E.2d 81, 82 (Ga. Ct. App. 1994) (quoting *Logan v. Cincinnati & C.R. Co.*, 129 S.W. 575, 577 (Ky. Ct. App. 1910)).

30. See, e.g., *Riordan v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 416 F.3d 825, 832 (8th Cir. 2005) (applying Missouri law); *Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 867 (D. Vt. 2004) (applying Vermont law); *Robertson*

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*v. Sixpence Inns of Am.*, 789 P.2d 1040, 1047 (Ariz. 1990); *McAuley v. Wills*, 303 S.E.2d 258, 260 (Ga. 1983); *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054–55 (Ind. 2003); *McMillian v. Vliet*, 374 N.W.2d 679, 681–82 (Mich. 1985); *Delaware v. Valls*, 409 N.W.2d 621, 624 (Neb. 1987); *Maheshwari v. City of New York*, 810 N.E.2d 894, 898 (N.Y. 2004); *Adams v. Mills*, 322 S.E.2d 164, 172–73 (N.C. 1984); *Miller v. Diamond Res., Inc.*, 7.3 N. E.2d 316, 321 (N.D. 2005); *Thompson v. Presbyterian Hosp.*, 652 P.2d 260, 264 (Okla. 1982); *Cramer v. Dep't of Highways*, 870 P.2d 999, 1001 (Wash. Ct. App. 1994).

31. *Ventricelli v. Kinney System Rent A Car, Inc.*, 399 N.Y. Supp. 2d 237, 237 (App. Div. 1977).

32. *Id*. at 1150.

33. See, e.g., *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 186–87 (2d Cir. 2004) (applying New York law); *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996); *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986); *Spragins v. SunBurst Bank*, 605 So. 2d 777, 780 (Miss. 1992); *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997); *Conzelmann v. N.W. Poultry & Dairy Prods. Co.*, 225 P.2d 757, 764–65 (Or. 1950); *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999); *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S. E.2d 344, 346 (Va. 1998).

34. See, e.g., *Racine Fuel Co. v. Rawlins*, 36 N.E.2d 710, 712–13 (Ill. 1941); *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *Spragins v. SunBurst Bank*, 605 So. 2d 777 (Miss. 1992); *Albright v. Burns*, 503 A.2d 386, 391 (N.J. Super. Ct. App. Div. 1986); *Heart River Partners v. Goetzfried*, 703 N.W.2d 330, 339 (N.D. 2005); *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 346 (Va. 1998).

35. See, e.g., *Ullom v. Ark. Dep't of Human Servs.*, 12 S.W.3d, 204, 208 (Ark. 2000); *In re Interest of Michael B.*, 604 N.W.2d 405, 410 (Neb. 2000); *State v. Schiebel*, 564 N.E.2d 54, 60 (Ohio 1990); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (*per curiam*); *Oberbroeckling v. Lyle*, 362 S.E.2d 682, 685 (Va. 1987).

36. See, e.g., *State v. Schiebel*, 564 N.E.2d 54, 60 (Ohio 1990); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (*per curiam*); *Oberbroeckling v. Lyle*, 362 S.E.2d 682, 685 (Va. 1987).

37. *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 388–89 (D. Del. 2005) (applying Delaware law); *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1564 (S.D. Fla. 1990) (applying Florida law); *Barrett v. Holland & Hart*, 845 P.2d 714, 717 (Mont. 1992).

38. *Kilduff v. Adams, Inc.*, 593 A.2d 478, 487 (Conn. 1991); *Dizick v. Umpqua Cmty. Coll.*, 599 P.2d 444, 448 (Or. 1979).

39. See, e.g., *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003) (citing Restatement (Second) of Torts § 546 (1965)).

40. *Humana, Inc. v. Castillo*, 728 So. 2d 261, 265 (Fla. Dist. Ct. App. 1999); see also *Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.*, 390 So. 2d 601, 607 (Ala. 1980).

41. *Engalla v. Permanente Med. Group, Inc.*, 938 P.2d 903, 919 (Cal. 1997) (alterations in original) (internal quotations omitted) (quoting Restatement (Second) of Torts § 546 cmt. b (1965)); see also *Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1068–69 (Mass. App. Ct. 2003) (quoting Restatement (Second) of Torts § 546 (1965)); *Nails v. S & R, Inc.*, 639 A.2d 660, 669–70 (Md. 1994) (quoting Restatement (Second) of Torts § 546 (1965) and rejecting the position that the misrepresentation be the sole reason for the plaintiff's actions).

42. *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221–22 (E.D. La. 1998) (citing cases).

43. See, e.g., *Secs. Inv. Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 72–73 (2d Cir. 2000) (citing cases); *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 37–38 (E.D. Pa. 1985) (applying Pennsylvania law); *Walco Inv., Inc. v. Thenen*, 168 F.R.D. 315, 335 (S.D. Fla. 1996) (applying Florida law); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1031, 1059–60 (N.D. Ill. 1995) (applying Illinois law); *Mirkin v. Wasserman*, 858 P.2d 568, 570–84 (Cal. 1993); *Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1070–72 (Mass. App. Ct. 2003); *Kaufman v. I-Stat Corp.*, 754 A.2d 1188, 1192–1201 (N.J. 2000).

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

44. *Sedco Int'l, S.A. v. Cory*, 683 F.2d 1201, 1210 n.8 (8th Cir. 1982) (quoting Restatement (Second) of Torts § 5488 (1965)) (internal quotations omitted) (applying Iowa law).

45. *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986) (applying New York law).

46. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443–44 (Mo. 1988) (*en banc*); see also *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 746 (Ill. 1994); *Brackett v. Griswold*, 20 N.E. 376, 380 (N.Y. 1889).

   By contrast, a few courts consider foreseeability irrelevant and apply the following test to determine legal cause in common law fraud cases:

   > If, weighing the moral fault of a defendant and applying the rules of causation liberally, the consequences have some reasonably close connection with the defendant's conduct and the harm threatened, and in themselves, using hindsight, are not deemed preposterous or far-fetched, defendant should be held liable. Concepts of policy, fairness and justice are entitled to great weight.

   > *Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.*, 390 So. 2d 601, 611–12 (Ala. 1980) (internal quotations omitted) (quoting *Seidel v. Greenberg*, 260 A.2d 863, 875 (N.J. Super. 1969)).

47. The American Law Institute first compiled the Restatement of the Law of Contracts in 1932. Attorneys and courts often cite the Restatement (now in its second edition), but it is not law. Cheeseman, *Business Law*, p. 193.

48. For a listing of cases by state, see Robert L. Dunn, *Recovery of Damages for Lost Profits*, 4th ed. (Westport, CT: Lawpress Corporation, 1992), Section 1.2.

49. Restatement (Second) of Contracts, Section 352(a) and (b) (1981); Robert M. Lloyd, "The Reasonable Certainty Requirement in Lost Profits Litigation: What It Really Means," *Tennessee Journal of Business Law* 12 (2010): 11, http://trace.tennessee.edu/transactions/vol12/iss1/2.

50. Cheeseman, *Business Law*, pp. 192–93.

51. *Ibid.*, pp. 74–81.

52. Richard Posner, *Economic Analysis of Law*, 5th ed. (New York: Aspen Law & Business, 1998), p. 272.

53. *Ibid.*, p. 273.

54. See *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145 (1965), and *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280 (CA3 1980).

55. See, for example, *Sharon Steel Corp. v. Lakeshore, Inc.*, 753 F.3d 851 (10th Cir. 1985).

56. *East River v. Transamerican DeLaval Inc.*, 476 U.S. 858, 868–75 (1986).

57. For a listing of cases under the majority and minority positions, see Dunn, *Recovery of Damages for Lost Profits*, Section 3.16.

58. See Restatement (Second) of Contracts, Section 347 and comments to that section; Posner, *Economic Analysis of Law*, p. 131.

59. Restatement (Second) of Contracts, Section 344(a).

60. Under expectation damages in some jurisdictions, the analyst may be able to calculate damages associated with related product sales or other financial benefits stemming from the project (like service contracts stemming from product sales), so long as these damages were not speculative.

61. Restatement (Second) of Contracts, Section 344 (b).

62. Jeffrey T. Ferriell, *Understanding Contracts*, 2nd ed. (LexisNexis, 2009), www.lexis-nexis.com/lawschool/study/outlines/html/contracts/contracts16.htm, §16.01

63. Restatement (Second) of Contracts, Section 344(c).

64. *Ibid.*, Section 344(c) and comments to that section; Cheeseman, *Business Law*, pp. 305, 310.

65. Ferriell, *Understanding Contracts*, www.lexisnexis.com/lawschool/study/outlines/html/contracts/contracts16.htm, §16.01 Types of Remedies [2].

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

66. Eyal Zamir, "The Missing Interest: Restoration of the Contractual Equivalence," *Virginia Law Review* 93 (2007): 59.

67. Cheeseman, *Business Law*, p. 306.

68. Caprice L. Roberts, "Restitutionary Disgorgement for Opportunistic Breach of Contract and Mitigation of Damages," *Loyola of Los Angeles Law Review* 42 (2008): 131–44.

69. See *U.S. v. KeySpan Corp.*, No. 10-cv-1415 (S.D.N.Y. filed Feb. 22, 2010).

70. An investor should value a project using the project's weighted average cost of capital. Using a company's cost of capital is incorrect unless the new venture has the same risk as the company. Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 8th ed. (New York: McGraw-Hill, 2006), p. 216.

71. See M. E. Porter, "How Competitive Forces Shape Strategy," *Harvard Business Review*, March/April 1979. In 1979, Professor Michael Porter of Harvard Business School developed a framework to analyze a company's industry in order to develop its business strategy. A worsening of industry conditions could result in values less than originally expected at the onset of the transaction that could cause RD damages to exceed BOB damages.

72. Cheeseman, *Business Law*, pp. 94–95.

73. Posner, *Economic Analysis of Law*, pp. 240–41.

74. Cheeseman, *Business Law*, p. 310.

75. *Ibid.*, p. 312.

76. Uniform Commercial Code, Section 2-610; Restatement (Second) of Contracts, Section 253.

77. See Matthew Milikowsky, "A Not Intractable Problem: Reasonable Certainty, *Tractebel*, and the Problem of Damages for Anticipatory Breach of a Long-Term Contract in a Thin Market," *Columbia Law Review* 108 (2008): 452.

78. Charles H. Goetz and Robert E. Scott, "Measuring Sellers' Damages: The Lost-Profits Puzzle," *Stanford Law Review* 31 (1979): 323.

79. Goetz and Scott, 1979.

80. Friedman, 1989.

81. See Chapter 11 of the fourth edition of the *Litigation Services Handbook*.

82. Robert L. Dunn, *Recovery of Damages for Lost Profits*, 4th ed., vol. 1 (Westport, CT: Lawpress Corporation, 1992), p. 345.

83. Most patents have a legal life of 17 years. Their effective life, however, may be less if the market has frequent technological changes or one can easily design around the patent.

84. See also Chapter 10 of the fourth edition of the *Litigation Services Handbook*, "The Flaw of Averages in Law and Accounting" by Sam L. Savage and Marc Van Allen.

85. *Ibid.*

86. The term *business value* is inadequately descriptive, as there are many potential measures, including fair value, fair market value, enterprise value, and value in use, to name a few. All are different measures and will yield different values. Chapter 11 provides further information on this topic. For this discussion, business value will be construed to mean fair market value of the business, which is representative of what a willing buyer and seller, neither under compulsion to transact, would be willing to exchange for the business.

87. Our time consideration discussion differs from *ex ante/ex post* considerations. The former relates to the time of the damages measurement, while the latter relate to the information considered available to make the damages measurement.

88. Chapter 16 discusses prejudgment interest.

89. We discuss discounting in Section 4.5(h) of this chapter as well as in Chapter 10 of this book. Beta is one of the discount formula variables that addresses risk; selection of

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

and adjustment to beta risk is an important element in correctly discounting damages more fully addressed in Chapter 10.

90. We forgo a detailed explanation and direct the readers to Chapters 8 and 9 in this book for more discussion regarding regression analysis in litigation.

91. See Sam L. Savage, *The Flaw of Averages: Why We Underestimate Risk in the Face of Uncertainty* (Hoboken, NJ: John Wiley & Sons, 2009). See also Chapter 10 in the fourth edition of the *Litigation Services Handbook*.

92. Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 9th ed. (New York: McGraw-Hill, 2006), pp. 279–83.

93. Capital market risk results from economy-wide factors that generally benefit or threaten all businesses.

94. Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, 6th ed. (New York: McGraw-Hill, 2000), p. 195.

95. *Ibid.*, pp. 231–32.

96. Opportunity cost refers to the fact that had the plaintiff not been denied the use of the damages amount, it would have invested it in some enterprise (perhaps in shares, perhaps in the performance of the plaintiff firm) and would have received a return on this amount.

97. James M. Patell, Roman L. Weil, and Mark A. Wolfson, "Accumulating Damages in Litigation: The Roles of Uncertainty and Interest Rates," *Journal of Legal Studies* 11 (1982): 341–64.

98. Fisher and Romaine, 1990.

99. See Patell et al., 1982. Note that the defendant's interest rates used to bring the damages to present value should be the effective after-tax rate to reflect the realities of the plaintiff's alternative uses of cash. To do otherwise would have investments in damages claims grow more rapidly than real investments of similar risk. The final amount, of course, should be grossed up by the plaintiff's tax rate, as discussed previously.

100. No. 2010-1035, 2010-1055 (Fed. Cir. Jan. 4, 2011).

101. See Chapter 3.

102. See Chapter 19, Section 19.3(f) for further discussion of game theory.

103. See Shannon P. Pratt and Alina V. Niculita, *Valuing a Business*, 5th ed. (New York: McGraw-Hill, 2007).

104. In certain situations, experts use the plaintiff's budgets and forecasts as a basis for developing but-for sales, making adjustments as appropriate for factors such as industry trends and historical budgeting prowess.

105. These definitions are taken from the glossary of financial terms found in the fourth edition of the *Litigation Services Handbook*.

106. With economies of scale (i.e., increasing returns to scale), a firm can increase productivity or lower average costs of production by increasing production. For example, if a firm increases inputs by 10 percent and total output increases by more than 10 percent, the firm is better off with the higher production (assuming that price does not fall). With economies of scope, a firm can achieve lower costs by producing multiple goods together. For example, a firm that produced both clocks and watches might be more efficient than two firms, one of which made clocks and the other of which made watches, because the first firm could share industry-specific knowledge and machinery across both product lines (P. Samuelson and W. D. Nordhaus, *Economics*, 14th ed., New York: McGraw-Hill, 1991, p. 735).

107. In *Marsann Co. v. Brammal, Inc.*, 788 F.2d 611 (9th Cir. 1986), the Ninth Circuit held that the relevant average variable cost is that of the items sold at the challenged price, rather than that associated with the production of the total output.

108. Remarks about cost estimation made previously in this chapter also apply here.

109. The average tax rate is the rate found by dividing income tax expense by net income before taxes. The marginal tax rate is the tax rate imposed on the next dollar of taxable

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

income generated. The effective tax rate is the rate that includes the effects of tax shields. The effective marginal tax rate is the marginal tax rate that includes the effects of tax shields.

110. Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, 6th ed. (New York: McGraw-Hill, 2000), pp. 544, 558.

111. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

112. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999).

113. *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985).

114. *Concord Boat Corp. v. Brunswick Corp.*, 207 F. 3d 1039 (8th Cir. 2000).

115. *Id.* at 1056.

116. *Id.*

117. *Id.* at 1057.

118. *Cal. Fed. Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005).

119. *Id.* at 1266.

120. *Id.* at 1268.

121. *Id.* at 1270.

122. *Id.*

123. *Id.* at 1268.

## LIST OF CASES

*Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2005 WL 88973, at *1 (N.D. Ill. Jan. 13, 2005)

*Adams v. Mills*, 322 S.E.2d 164, 173 (N.C. 1984)

*Aetna Cas. & Sur. Co. v. Leo A. Daly Co.*, 870 F. Supp. 925, 936 (S.D. Iowa 1994)

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972)

*Albright v. Burns*, 503 A.2d 386, 391 (N.J. Super. Ct. App. Div. 1986)

*Anderson v. St. Francis–St. George Hosp., Inc.*, 671 N.E.2d 225, 227 (Ohio 1996)

*Anderson v. Theisen*, 43 N.W.2d 272, 273 (Minn. 1950)

*Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1327 (8th Cir. 1991)

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000)

*Bajwa v. Metro. Life Ins. Co.*, 804 N.E.2d 519, 526 (Ill. 2004)

*Ballard v. Uribe*, 715 P.2d 624, 628 n.6 (Cal. 1986)

*Barrett v. Holland & Hart*, 845 P.2d 714, 717 (Mont. 1992)

*Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)

*Bay Gen. Indus. v. Johnson*, 418 A.2d 1050, 1057 n.19 (D.C. 1980)

*Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 242–43 (Colo. 1987)

*Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005)

*Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999)

*Bird v. St. Paul Fire & Marine Ins. Co.*, 120 N.E. 86, 88–89 (N.Y. 1918)

*Blackie v. Barrack*, 524 F.2d 891, 905–06 (9th Cir. 1975)

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 729–55 (1975)

*Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999)

*Brackett v. Griswold*, 20 N.E. 376, 380 (N.Y. 1889)

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 277 Cal. Rptr. 2d 40, 48 (Cal. Ct. App. 1990)

*Bruckman v. Parliament Escrow Corp.*, 235 Cal. Rptr. 813, 820 (Cal. Ct. App. 1987)

*Cal. Fed. Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005)

Case 4:24-cv-04722-YGR    Document 415-5    Filed 02/24/26    Page 53 of 57

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University/ Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. 1983) (*en banc*)

*Canonico v. Beechmont Bus Serv., Inc.*, 790 N.Y.S.2d 36, 37 (App. Div. 2005)

*Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000)

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004)

*City of Jacksonville v. Raulerson*, 415 So. 2d 1303, 1305 (Fla. Dist. Ct. App. 1982)

*Clampitt v. D.J. Spencer Sales*, 786 So. 2d 570, 573 (Fla. 2001)

*Cobb v. W. Va. Human Rights Comm'n*, 619 S.E.2d 274, 290 n.26 (W. Va. 2005)

*Commonwealth v. $6,425.00 Seized from Esquilin*, 880 A.2d 523, 529 (Pa. 2005)

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)

*Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1072 (N.J. 1996)

*Conzelmann v. N.W. Poultry & Dairy Prods. Co.*, 225 P.2d 757, 764–65 (Or. 1950)

*Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 309 (Mich. 2004)

*Cramer v. Dep't of Highways*, 870 P.2d 999, 1001 (Wash. Ct. App. 1994)

*Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991)

*Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986)

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)

*Daugert v. Pappas*, 704 P.2d 600, 605–06 (Wash. 1985) (*en banc*)

*Delaware v. Valls*, 409 N.W.2d 621, 624 (Neb. 1987)

*Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980)

*Dick v. Lewis*, 506 F. Supp. 799, 805 (D.N.D. 1980)

*Dizick v. Umpqua Cmty. Coll.*, 599 P.2d 444, 448 (Or. 1979)

*Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)

*Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 181 (Tenn. 1992)

*Doe v. Sisters of Holy Cross*, 895 P.2d 1229, 1234 (Idaho Ct. App. 1995)

*duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987)

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)

*East River v. Transamerican DeLaval Inc.*, 476 U.S. 858, 868–75 (1986)

*Endresen v. Scheels Hardware & Sports Shop, Inc.*, 560 N.W.2d 225, 229 (N.D. 1997)

*Engalla v. Permanente Med. Group, Inc.*, 938 P.2d 903, 919 (Cal. 1997)

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 186–87 (2d Cir. 2004)

*Fehling v. Levitan*, 382 N.W.2d 901, 904 (Minn. Ct. App. 1986)

*Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 302 (10th Cir. 1987)

*Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221–22 (E.D. La. 1998)

*Fort Washington Res., Inc. v. Tannen*, 901 F. Supp. 932, 943 (E.D. Pa. 1995)

*Fowler v. Campbell*, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993)

*Frost Nat'l Bank v. Heafner*, 12 S.W.3d 104, 111 n.5 (Tex. App. 1999)

*Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)

*Gercey v. United States*, 409 F. Supp. 946, 954 (D. R.I. 1976)

*Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 900 (Cal. 1963)

*Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)

*Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978)

*Havens Steel Co. v. Randolph Eng'g Co.*, 613 F. Supp. 514, 533 (W.D. Mo. 1985)

*Heart River Partners v. Goetzfried*, 703 N.W.2d 330, 339 (N.D. 2005)

*Heatherly v. Alexander*, 421 F.3d 638, 642 (8th Cir. 2005)

*Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443–44 (Mo. 1988)

*Henderson v. Cominco Am., Inc.*, 518 P.2d 873, 879 (Idaho 1974)

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 387–91 (1983)

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Hiigel v. Gen. Motors Corp.*, 544 P.2d 983, 987 (Colo. 1975)

*Homes By Calkins, Inc. v. Fisher*, 634 N.E.2d 1039, 1042 (Ohio Ct. App. 1993)

*Houston Lighting & Power Co. v. Reynolds*, 765 S.W.2d 784, 785 (Tex. 1988)

*Humana, Inc. v. Castillo*, 728 So. 2d 261, 265 (Fla. Dist. Ct. App. 1999)

*Hunt v. Blasius*, 384 N.E.2d 368, 372 (Ill. 1978)

*Hurd v. Williamsburg Cnty.*, 611 S.E.2d 488, 492 (S.C. 2005)

*Interest of Michael B.*, 604 N.W.2d 405, 410 (Neb. 2000)

*Jefferies v. Amery Leasing, Inc.*, 698 So. 2d 368, 370 (Fla. Dist. Ct. App. 1997)

*Johnson v. Am. Nat'l Red Cross*, 578 S.E.2d 106, 108 (Ga. 2003)

*Johnson v. Rice*, 440 S.E.2d 81, 82 (Ga. Ct. App. 1994)

*Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280 (CA3 1980)

*Kaufman v. I-Stat Corp.*, 754 A.2d 1188, 1192–1201 (N.J. 2000)

*Kilduff v. Adams, Inc.*, 593 A.2d 478, 487 (Conn. 1991)

*Krauss v. Greenbarg*, 137 F.2d 569, 570–71 (3d Cir. 1943) (applying Pennsylvania law)

*Kudlacek v. Fiat S.p.A.*, 509 N.W.2d 603, 610 (Neb. 1994)

*Kuhns v. Standard Oil*, 478 P.2d 396, 402 (Or. 1970)

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999)

*Lane v. St. Joseph's Reg'l Med. Ctr.*, 817 N.E.2d 266, 273 (Ind. Ct. App. 2004)

*Lawrence v. Will Darrah & Assocs.*, 516 N.W.2d 43, 45 (Mich. 1994)

*Lestico v. Kuehner*, 283 N.W. 122, 127 (Minn. 1938)

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 261–62 (Cal. 2004)

*Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 867 (D. Vt. 2004)

*Mack v. Altmans Stage Lighting Co.*, 470 N.Y.S.2d 664, 667 (N.Y. App. Div. 1984)

*Maheshwari v. City of New York*, 810 N.E.2d 894, 898 (N.Y. 2004)

*Mannion v. Stallings & Co.*, 561 N.E.2d 1134, 1137–38 (Ill. App. Ct. 1990)

*Marjan Int'l Corp. v. V.K. Putnam, Inc.*, No. 92 Civ. 8531 (BN), 1993 WL 541204, at *11 (S.D.N.Y. Dec. 28, 1993)

*Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 770 P.2d 278, 281 (Cal. 1989)

*Marsann Co. v. Brammal, Inc.*, 788 F.2d 611 (9th Cir. 1986)

*Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 746 (Ill. 1994)

*Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 360 (Kan. 1983)

*McAuley v. Wills*, 303 S.E.2d 258, 260–61 (Ga. 1983)

*McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503–04 (Fla. 1992)

*McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 37–38 (E.D. Pa. 1985)

*McMillian v. Vliet*, 374 N.W.2d 679, 681–82 (Mich. 1985)

*Miller v. Asensio & Co.*, 364 F.3d 223 (4th Cir. 2004)

*Miller v. Diamond Res., Inc.*, 703 N.W.2d 316, 321 (N.D. 2005)

*Mirkin v. Wasserman*, 858 P.2d 568, 570–84 (Cal. 1993)

*Mitchell v. Gonzales*, 819 P.2d 872, 876 (Cal. 1991)

*MIVA, Inc. Sec. Litig.*, No. 2:05-cv-201-FtM-29DNF, 2009 WL 3821146 (M.D. Fla. Nov. 16, 2009)

*Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 251 (Tex. 1974)

*Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 919 (6th Cir. 1991)

*Morden v. Cont'l AG*, 611 N.W.2d 659, 676 (Wis. 2000)

*Mort v. Walter*, 457 N.E.2d 18, 21 (Ill. 1983)

*Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 763 (7th Cir. 1998)

*Mudrich v. Standard Oil Co.*, 90 N.E.2d 859, 863 (Ohio 1950)

*Mulder v. Tague*, 186 N.W.2d 884, 887 (S.D. 1971)

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*Nails v. S & R, Inc.*, 639 A.2d 660, 669–70 (Md. 1994)

*Nathenson v. Zonagen Inc.*, 267 F.3d 400, 413 (5th Cir. 2001)

*Nelson v. Data Terminal Sys., Inc.*, 762 S.W.2d 744, 748 (Tex. App. 1989)

*Nelson v. Lake Canal Co.*, 644 P.2d 55, 59 (Colo. Ct. App. 1981)

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)

*Oberbroeckling v. Lyle*, 362 S.E.2d 682, 685 (Va. 1987)

*Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 422 S.E.2d 128, 131 (S.C. 1992)

*Pac. Coast Title Ins. Co. v. Hartford Accident & Indem. Co.*, 325 P.2d 906, 907 (Utah 1958)

*Paige v. Saint Andrew's Roman Catholic Church Corp.*, 734 A.2d 85, 91 (Conn. 1999)

*Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 103 (N.Y. 1928)

*Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054–55 (Ind. 2003)

*Pen O Tex Oil & Leasehold Co. v. Fairchild*, 252 S.W. 847, 848 (Tex. Civ. App. 1923)

*Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 341–44 (S.D.N.Y. 2002)

*Racine Fuel Co. v. Rawlins*, 36 N.E.2d 710, 712–13 (Ill. 1941)

*Reiman Assocs., Inc. v. R/A Adver., Inc.*, 306 N.W.2d 292, 301 n.11 (Wis. Ct. App.1981)

*Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1068–69 (Mass. App. Ct. 2003)

*REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010)

*Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996)

*Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 346 (Va. 1998)

*Rifkin v. Crow*, 574 F.2d 256, 262 (5th Cir. 1978)

*Rinaldi & Sons, Inc. v. Wells Fargo Alarm Serv., Inc.*, 347 N.E.2d 618, 618 (N.Y. 1976)

*Riordan v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 416 F.3d 825, 832 (8th Cir. 2005)

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)

*Robertson v. Sixpence Inns of Am.*, 789 P.2d 1040, 1047 (Ariz. 1990)

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003)

*Sargent v. Mass. Accident Co.*, 29 N.E.2d 825, 827 (Mass. 1940)

*Schafersman v. Agland Coop*, 631 N.W.2d 862, 871 (Neb. 2001)

*Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1974)

*Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000)

*Secs. Inv. Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 72–73 (2d Cir. 2000)

*Sedco Int'l, S.A. v. Cory*, 683 F.2d 1201, 1210 n.8 (8th Cir. 1982)

*Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145 (1965)

*Seidel v. Greenberg*, 260 A.2d 863, 875 (N.J. Super. 1969)

*Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.*, 390 So. 2d 601, 607 (Ala. 1980)

*Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 69 (8th Cir. 1980)

*Sharon Steel Corp. v. Lakeshore, Inc.*, 753 F.3d 851 (10th Cir. 1985)

*Simmons v. John L. Roper Lumber Co.*, 93 S.E. 736, 738 (N.C. 1917)

*Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994)

*Smith v. W. Union Tel. Co.*, 83 Ky. 104 (Ct. App. 1885)

*Soybean Futures Litig.*, 892 F. Supp. 1025, 1031, 1059–60 (N.D. Ill. 1995)

*Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)

*Spragins v. SunBurst Bank*, 605 So. 2d 777, 780 (Miss. 1992)

*St. Fort ex rel. St. Fort v. Post, Buckley, Schuh & Jernigan*, 902 So. 2d 244, 250 (Fla. Dist. Ct. App. 2005)

*State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)

*State v. Schiebel*, 564 N.E.2d 54, 60 (Ohio 1990)

*Tennyson v. Brower*, 823 F. Supp. 421, 423–24 (E.D. Ky. 1993)

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**4** • 52    **DAMAGES THEORIES AND CAUSATION ISSUES**

*Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1564 (S.D. Fla. 1990)
*Thompson v. Better-Bilt Aluminum Prods. Inc.*, 832 P.2d 203, 207 n.6 (Ariz. 1992)
*Thompson v. Presbyterian Hosp.*, 652 P.2d 260, 264 (Okla. 1982)
*Thor Elec., Inc. v. Oberle & Assocs., Inc.*, 741 N.E.2d 373, 381 (Ind. Ct. App. 2000)
*Toston v. Pardon*, 874 So. 2d 791, 799 (La. 2004)
*Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 388–89 (D. Del. 2005)
*Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)
*Tuttle/White Constrs., Inc. v. Montgomery Elevator Co.*, 385 So. 2d 98, 100 (Fla. Dist. Ct. App. 1980)
*Ullom v. Ark. Dep't of Human Servs.*, 12 S.W.3d, 204, 208 (Ark. 2000)
*Ulwick v. DeChristopher*, 582 N.E.2d 954, 958 (Mass. 1991)
*Ungerv. Amedisys, Inc.*, 401 F.3d 316, 323 (5th Cir. 2005)
*Uniloc USA Inc. v. Microsoft*, No. 2010-1035, 2010-1055 (Fed. Cir. January 4, 2011)
*United States v. Berger*, 587 F.3d 1038, 1044 (9th Cir. 2009)
*United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)
*United States v. KeySpan Corp.*, No. 10-cv-1415 (S.D.N.Y. filed Feb. 22, 2010)
*United States v. Nacchio*, 573 F.3d 1062, 1078–79 (10th Cir. 2009)
*United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005)
*United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007)
*UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)
*Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 870 (Colo. 2002) (*en banc*)
*Ventricelli v. Kinney System Rent A Car, Inc.*, 399 N.Y. Supp. 2d 237, 237 (App. Div. 1977)
*Vesper Constr. Co. v. Rain for Rent, Inc.*, 602 F.2d 238, 243 (10th Cir. 1979)
*Virginia Bancshares, Inc. v. Sandberg*, 501 U.S. 1083, 1100 (1991)
*Waite v. Am. Creosote Works, Inc.*, 204 N.W.2d 410, 291 (Minn. 1973)
*Walco Inv., Inc. v. Thenen*, 168 F.R.D. 315, 335 (S.D. Fla. 1996) (applying Florida law)
*Wankel v. A&B Contractors, Inc.*, 732 A.2d 333, 349 (Md. Ct. Spec. App. 1999)
*Whaley v. CSX Transp.*, 609 S.E.2d 286, 298 (S.C. 2005)
*Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009)
*Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1266 (N.D. Okla. 2007)
*Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 92 (2d Cir. 1981)
*Yonce v. SmithKline Beecham Clinical Labs.*, 680 A.2d 569, 575–76 (Md. Ct. Spec. App. 1996)
*Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 967 (N.D. Cal. 2005)

## REFERENCES

Brealey, Richard A., and Stewart C. Myers. *Principles of Corporate Finance*, 6th ed. New York: McGraw-Hill, 2000.
Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance*, 8th ed. New York: McGraw-Hill, 2006, p. 216.
Cheeseman, Henry R. *Business Law*, 5th ed. Upper Saddle River, NJ: Pearson Education, 2004.
Dunn, Robert L. *Recovery of Damages for Lost Profits*, 4th ed. Westport, CT: Lawpress Corporation, 1992.
———. *Recovery of Damages for Lost Profits*, 5th ed. Westport, CT: Lawpress Corporation, 1998, Vol. 1, p. 345.
Ferriell, Jeffrey T. *Understanding Contracts*, 2nd ed. LexisNexis, 2009. www.lexisnexis.com/lawschool/study/outlines/html/contracts/contracts16.htm, §16.01 Types of Remedies [2].

Case 4:24-cv-04722-YGR    Document 415-5    Filed 02/24/26    Page 57 of 57

Downloaded from https://onlinelibrary.wiley.com/doi/ by Loyola University Health Sciences Library, Wiley Online Library on [16/02/2023]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Fisher, Franklin M. "Multiple Regression in Legal Proceedings." *Columbia Law Review* 80 (1980): 702.

Fisher, Franklin M., and R. Craig Romaine. "Janis Joplin's Yearbook and the Theory of Damages." *Journal of Accounting, Auditing and Finance* 145 (New Series 1990): 145–57.

Friedman, D. D. "An Economic Analysis of Alternative Damage Rules for Breach of Contract." *Journal of Law and Economics* 32 (1989): 281.

Goetz, Charles H., and Robert E. Scott. "Measuring Sellers' Damages: The Lost-Profits Puzzle." *Stanford Law Review* 31 (1979): 323.

Lloyd, Robert M. "The Reasonable Certainty Requirement in Lost Profits Litigation: What It Really Means." *Tennessee Journal of Business Law* 12 (2010): 11.

Milikowsky, Matthew. "A Not Intractable Problem: Reasonable Certainty, *Tractebel*, and the Problem of Damages for Anticipatory Breach of a Long-Term Contract in a Thin Market." *Columbia Law Review* 108 (2008): 452.

Patell, James M., Roman L. Weil, and Mark A. Wolfson. "Accumulating Damages in Litigation: The Roles of Uncertainty and Interest Rates." *Journal of Legal Studies* 11 (June 1982).

Porter, M. E. "How Competitive Forces Shape Strategy." *Harvard Business Review*, March/April 1979.

Posner, Richard. *Economic Analysis of Law*, 5th ed. New York: Aspen Law & Business, 1998.

Pratt, Shannon P., and Alina V. Niculita. *Valuing a Business*, 5th ed. New York: McGraw-Hill, 2007.

*Prosser and Keeton on Torts Section 41* (4th ed. 1971).

Restatement (Second) of Contracts Section 352 (1981).

Restatement (Second) of Torts Section 402A (1965).

Roberts, Caprice L. "Restitutionary Disgorgement for Opportunistic Breach of Contract and Mitigation of Damages." *Loyola of Los Angeles Law Review* 42 (2008): 131–44.

Samuelson, P., and W. D. Nordhaus. *Economics*, 14th ed. New York: McGraw-Hill, 1991, p. 735.

Savage, Sam L. *The Flaw of Averages: Why We Underestimate Risk in the Face of Uncertainty.* Hoboken, NJ: John Wiley & Sons, 2009.

Zamir, Eyal. "The Missing Interest: Restoration of the Contractual Equivalence." *Virginia Law Review* 93 (2007): 59.