# Exhibit 1

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    -  -  -

4

5    ELON MUSK, et al.,          :   CASE NO.
                                 :   4:24-CV-04722-
6                Plaintiffs      :   YGR
                                 :
7         v.                     :
                                 :
8    SAMUEL ALTMAN, et al.,      :
                                 :
9                Defendants.     :

10              - HIGHLY CONFIDENTIAL -

11              - ATTORNEYS' EYES ONLY -

12                    -  -  -

13              October 8, 2025

14                    -  -  -

15

16              Videotaped hybrid deposition of

17   HELEN TONER, taken pursuant to notice, was held at

18   the law offices of 600 New Hampshire Avenue, NW,

19   Washington, D.C., beginning at 11:11 a.m., on the

20   above date, before Michelle L. Ridgway,  a

21   Registered Professional Reporter, Certified Court

22   Reporter (NJ-CCR # XI02126), Certified Realtime

23   Reporter, Certified Shorthand Reporter (CA-CSR

24   # 14592), and Notary Public.

25

45

1   they test for, how should they test for those

2   risks, what results -- what test results are

3   acceptable versus unacceptable.

4              And so my impression is that, over

5   the time that the DSB existed -- perhaps it still

6   exists.  I'm not sure.  The approach that they use

7   to selecting what tests to run and evaluating the

8   test results became somewhat less slapdash.  But,

9   again, I'm less familiar with the details than I

10  would have liked to be.

11      Q.      As a board member of the nonprofit,

12  did you rely on OpenAI's officers to provide you

13  with candid and complete information about OpenAI's

14  safety practices?

15      A.      I would have liked to rely on them

16  for that.

17              In practice, I also had

18  relationships with some OpenAI staff who I would

19  have informal conversations with and sometimes

20  learn things from those informal conversations that

21  were not conveyed to us through official channels.

22      Q.      As a board member of the nonprofit,

23  did you feel that you should have been able to rely

24  on Mr. Altman to provide you with candid and

25  complete information about OpenAI's safety

46

1    practices?

2          A.        Yes.

3          Q.        And we'll get into specifics

4    momentarily.

5                    But in general terms, did you feel

6    that Mr. Altman provided candid and complete

7    information to you about OpenAI's safety practices?

8          A.        No.

9          Q.        Do you recall an incident when

10   Mr. Altman told the OpenAI Board of Directors that

11   the joint safety board had approved three

12   enhancements to GPT-4 for release, when, in fact,

13   only one of the three had been approved?

14                   MR. CULLERTON:  Object to

15       the form.  Leading.

16                   THE WITNESS:  I would amend

17       the question to say "three different ways

18       of releasing GPT-4."  But otherwise, yes.

19   BY MR. KRY:

20         Q.        When did that incident occur?

21         A.        To the best of my recollection,

22   that was December of 2022.

23         Q.        When you talk about three different

24   ways of releasing GPT-4, can you describe in more

25   detail what you mean?

47

1      A.          To the best of my recollection, the

2    three under consideration were the API, what they

3    called "super assistant," and fine tuning.

4                So an API release would be

5    comparable to how they had released many of their

6    previous models, GPT-3, GPT-3.5, where there is

7    a -- yeah, an API, application programming

8    interface, that other programmers can use to access

9    the model and build tools with it.  That would be

10   the most straightforward option.

11               As I understand it, the idea of

12   "super assistant," I believe that essentially they

13   referred to something like ChatGPT as a product, so

14   a consumer-facing product.  They may have meant

15   something more elaborate.  I'm not 100 percent

16   sure.

17               And then fine-tuning would be

18   releasing the model in a way that allows outside

19   actors to fine-tune it.  So that's technical jargon

20   for, essentially, sort of slightly modifying the

21   model to be more well suited to some tasks than

22   others.  And at the time there was significant

23   uncertainty, from a safety perspective, about the

24   potential risks of, in particular, releasing the

25   fine-tuning capability.

48

1              Because the safety case, the

2    argument for why it was safe to release, relied on

3    test results about things that the model could and

4    could not do.  And once you can fine-tune a model,

5    that changes what it -- what it can and cannot do.

6         Q.        What did Mr. Altman tell the board

7    about the approval status of those three products

8    by the -- by the deployment safety board?

9                   MR. CULLERTON:  Object to

10     form.

11                  THE WITNESS:  To the best of

12       my recollection, he either directly said or

13       strongly implied that all three types of

14       release had been approved by the DSB.

15   BY MR. KRY:

16        Q.        In what context did Mr. Altman

17   communicate that information?

18        A.        At a in-person board meeting.  We

19   called it an onsite.  It was an all-day board

20   meeting at their offices.

21        Q.        When did that board meeting occur?

22        A.        To the best of my recollection, in

23   December 2022.

24        Q.        Did you take steps to verify the

25   information that Mr. Altman had provided to the

49

1    board?

2           A.          Yes.  I asked for the deployment

3    safety board materials to review what had been

4    approved and on what basis.

5           Q.          To whom did you make that request?

6           A.          I don't recall.

7           Q.          Was it to Mr. Altman or was it to

8    somebody else in the company?

9           A.          It would have been -- it would have

10   been either during the board meeting or in a

11   follow-up e-mail.  And with the awareness -- with

12   Sam's awareness but perhaps for follow-up by Chris

13   Clark or another person who could carry out that

14   sort of simple task of sending some materials.

15          Q.          Did you receive the materials you

16   had asked for?

17          A.          Yes.

18          Q.          What did those materials show about

19   the approval stratus -- status of the three

20   variants?

21          A.          To the best of my recollection, I

22   received materials showing that the API release had

23   been submitted to the deployment safety board and

24   approved.

25                      I don't recall -- to the best of my

Attorneys Eyes Only            Helen Toner - October 08, 2025

50

1  recollection, I don't believe I received any

2  materials about the other two, which -- and I drew

3  the conclusion that they had not -- they had been

4  neither submitted nor approved.

5            Q.       Based on what happened in that

6  board meeting and the materials you received in

7  response to your inquiry, were you concerned that

8  Mr. Altman had falsely represented the approval

9  status of those three variants to the board?

10                   MR. CULLERTON:  Object to

11    form.  Leading.

12                   THE WITNESS:  Yes.

13  BY MR. KRY:

14            Q.       Did that incident cause you to

15  question Mr. Altman's truthfulness and candor to

16  the board?

17                   MR. CULLERTON:  Object to

18    form.

19                   THE WITNESS:  I would say

20    that incident was -- was one case that

21    contributed to my sense that Sam was not

22    interested in the board being closely

23    informed about the company's activities.

24  BY MR. KRY:

25            Q.       Did that incident make it more

51

1    difficult for the board to manage OpenAI safety

2    risks?

3                        MR. CULLERTON:  Object to

4      form.

5                        THE WITNESS:  Yes.

6    BY MR. KRY:

7         Q.        And did that incident cause you

8    concerns about the effectiveness of OpenAI's safety

9    processes?

10                       MR. CULLERTON:  Object to

11     form.

12                       THE WITNESS:  Yes.

13   BY MR. KRY:

14        Q.        Do you recall another incident in

15   which Microsoft launched a test of GPT-4 in India

16   without deployment safety board approval?

17                       MR. CULLERTON:  Object to

18     form.

19                       THE WITNESS:  Yes.

20   BY MR. KRY:

21        Q.        When did that incident occur?

22        A.        I'm not sure.  I believe it was

23   toward the end of 2022.  I don't know the exact

24   date.

25        Q.        Do you know whether it was before

52

1  or after the first incident you just described?

2          A.          It must have been before, because

3  we -- the release must have been before, because we

4  found out about it the same day that the

5  representations to us about DSB approvals were

6  made.

7          Q.          Do you know how long before that

8  board meeting the Microsoft test launch occurred?

9          A.          No.  I'm not sure.

10          Q.          Would you describe -- well, strike

11  that.

12                      How did you first learn about the

13  fact that this launch of a test of GPT-4 by

14  Microsoft had occurred?

15          A.          We had adjourned for the day the

16  meeting.  I was in a break room, and Tasha McCauley

17  came and found me in the break room and told me

18  that she had had a conversation with an employee

19  who had informed her about this release or who

20  had -- I believe she had asked her if she knew

21  about it, or asked her what she thought about it,

22  something along those lines, and we did not know

23  about it before then.

24          Q.          Had Mr. Altman raised that topic

25  with you at all during the board meeting that had

53

1   just concluded?

2        A.        No.  Despite the fact that we had

3   very actively discussed at the board meeting that

4   oversight of the DSB and ensuring that it was

5   functioning well was a core board responsibility.

6        Q.        Can you describe in any more detail

7   what Ms. McCauley said she had learned from this

8   other employee about what had happened?

9        A.        I don't recall the details.  To the

10  best of my recollection, she said that Microsoft

11  had released a test version without DSB approval,

12  when they should have had it.  Or something along

13  those lines.

14       Q.        Was it your understanding when

15  Ms. McCauley communicated this information to you

16  that Mr. Altman would have been aware of it?

17       A.        Yes.

18                 MR. CULLERTON:  Object to

19    form.

20  BY MR. KRY:

21       Q.        What's the -- what was the basis

22  for that understanding?

23       A.        To the best of my recollection, it

24  sounded, from her description, like the employee

25  who had informed her was assuming that we already

Case 4:24-cv-04722-YGR    Document 418-1    Filed 02/25/26    Page 12 of 34

Attorneys Eyes Only

Helen Toner - October 08, 2025

54

1   knew and was treating it as a pretty big deal that

2   the company leadership knew about.

3        Q.        Did you confront Mr. Altman about

4   his failure to disclose that information?

5                    MR. CULLERTON:  Object to

6     form.

7                    THE WITNESS:  No.

8   BY MR. KRY:

9        Q.        Did Mr. Altman, at any subsequent

10  point in time, disclose that information to you?

11       A.        Not directly.

12       Q.        Did Microsoft's release of a test

13  product without joint safety board approval cause

14  you concerns about OpenAI's safety processes?

15                   MR. CULLERTON:  Objection.

16                   THE WITNESS:  Yes.  It

17    caused me concern about how well those

18    processes were working.  Yes.

19  BY MR. KRY:

20       Q.        Did Mr. Altman's failure to inform

21  you about that safety breach cause you to question

22  Mr. Altman's truthfulness and candor to the board?

23                   MR. CULLERTON:  Object to

24    the form.

25                   THE WITNESS:  I would say it

www.LexitasLegal.com/Premier    Lexitas    888-267-1200

Attorneys Eyes Only                    Helen Toner - October 08, 2025

55

1    further led me to believe that he was not

2    interested in the board being closely

3    informed about the company's activities and

4    able to perform an oversight role.

5  BY MR. KRY:

6         Q.        And did the incident cause you

7  concerns about the effectiveness of OpenAI's safety

8  processes?

9         A.        I think that's essentially the same

10  as your previous question, but yes.

11         Q.        And just to round out the record,

12  how long was the board meeting that Mr. Altman did

13  not disclose the safety breach?

14                   MR. CULLERTON:  Object to

15    form.

16                   THE WITNESS:  All day.

17    Multiple hours.

18  BY MR. KRY:

19         Q.        And Mr. Altman was there for the

20  entire meeting?

21         A.        To my recollection, yes.

22         Q.        And you were there for that entire

23  meeting?

24         A.        To my recollection, yes.

25         Q.        And was Ms. McCauley there for the

56

1   entire meeting?

2         A.          To my recollection, yes.

3         Q.          When OpenAI released ChatGPT in

4   November '22, did it provide any advance notice to

5   the OpenAI board?

6         A.          No.

7         Q.          How did you learn about ChatGPT?

8         A.          We started -- or I started seeing

9   screen shots on Twitter.

10        Q.          And was that because you were

11  looking for it specifically, or you just chanced to

12  come across it?

13        A.          No, I have a -- my Twitter feed is

14  AI heavy, I would say.  So when there's AI news,

15  usually it lands there.

16        Q.          Do you remember what the first

17  Twitter post you saw concerning ChatGPT was?

18        A.          No.  There were lots.

19        Q.          Was it a beneficial OpenAI

20  publication or was it some secondary source?

21        A.          I don't recall.

22        Q.          When you saw that on Twitter, were

23  you surprised that no one at OpenAI had given you

24  any advanced notice about ChatGPT's release?

25                    MR. CULLERTON:  Object to

Attorneys Eyes Only                    Helen Toner - October 08, 2025

57

1    form.

2                    THE WITNESS:  No, I was not

3       surprised, because I was used to the board

4       not being very informed about things.

5    BY MR. KRY:

6       Q.        Okay.  Did you think it was okay

7    that no one at OpenAI had given you advanced notice

8    about the release of this product?

9                    MR. CULLERTON:  Object to

10      form.

11                   THE WITNESS:  I did not

12      think it indicated that the board was

13      functioning as it should be.

14   BY MR. KRY:

15      Q.        And is the reason that it indicated

16   that to you that it illustrated the failure of the

17   company to provide the board with important

18   information?

19                   MR. CULLERTON:  Object to

20      the form.  Leading.

21                   THE WITNESS:  I thought that

22      it indicated that the board was often not

23      looped in on things it should have been

24      looped in on.

25                   I thought it also indicated

58

1    that the company's process for making --

2    processes for making decisions that could

3    have material impact on the mission were

4    inadequate.

5  BY MR. KRY:

6         Q.        Did you believe at the time that

7  Mr. Altman should have given you advanced notice

8  that the company was launching ChatGPT before it

9  did so?

10        A.        Yes.

11        Q.        Did this incident cause you to

12 question Mr. Altman's candor to the board?

13        A.        Again, I will say it caused me to

14 believe that he was not motivated to help the board

15 perform the oversight role.

16        Q.        Did this incident make it more

17 difficult for the board to manage OpenAI safety

18 risks?

19        A.        It contributed to that, yes.

20        Q.        Did you learn about another

21 incident in which Mr. Altman made a false statement

22 about whether GPT-4 Turbo had to go through joint

23 safety board review?

24                  MR. CULLERTON:  Objection to

25   the form.

59

```
 1                      THE WITNESS:  Yes.
 2   BY MR. KRY:
 3        Q.        When did that incident occur?
 4        A.        I'm not sure.  I believe at some
 5   point during 2023.
 6        Q.        How did you learn about the
 7   incident?
 8        A.        I forget whether it was Ilya
 9   Sutskever or Mira Murati who first described it to
10   me, but it was one of the two of them.
11        Q.        What did he or she describe to you?
12        A.        Actually, it's also possible that I
13   heard about it secondhand from them via Adam
14   D'Angelo or Tasha McCauley.
15                  I'm sorry.  What was the question?
16        Q.        What was communicated to you about
17   what had happened?
18                  MS. BENEZE:  Object to form.
19                  THE WITNESS:  That Sam had
20     claimed that Jason Kwon said that GPT-4
21     Turbo did not need DSB review.  And that --
22     Sam claimed to Mira that Jason said it
23     didn't need DSB review.
24                  Mira then later checked with
25     Jason and found that he had not said that,
```

60

1      and Mira felt that Sam had -- had either

2      misled her or lied to her.

3   BY MR. KRY:

4          Q.        And at the time you learned about

5   this incident, did you review any documentary

6   record that reported on the issue?

7          A.        Within a few weeks -- I forget the

8   exact sequencing -- but yes.  In the period where

9   we learned about this, we were -- we had -- we were

10  given access to screen shots of a Slack exchange

11  between Mira and Jason.

12         Q.        And what do you recall that Slack

13  exchange showing?

14         A.        That Mira asked Jason if he had, in

15  fact, said that GPT-4 Turbo didn't need DSB review,

16  and Jason said he had said something different and

17  also said he was confused how Sam got that

18  impression.

19         Q.        And during what period of time did

20  you learn about this incident and see these screen

21  shots?

22         A.        This was in the fall of 2023.

23         Q.        Did Mr. Altman's false statement to

24  Ms. Murati cause you to question Mr. Altman's

25  truthfulness and candor?

Attorneys Eyes Only                Helen Toner - October 08, 2025

61
1          A.          Yes.

2                      MS. BENEZE:   Object.

3                      MR. CULLERTON:   Objection to

4      the form.   Misstates testimony.   Assumes

5      facts.

6   BY MR. KRY:

7          Q.          Did this incident cause you

8   concerns about the effectiveness of OpenAI's safety

9   processes?

10         A.          Yes.

11         Q.          Do you recall some long-running

12  discussions on the board about whether to appoint

13  another independent board member focused on AI

14  safety?

15                     MR. CULLERTON:   Object to

16     the form.   Leading.

17                     THE WITNESS:   Yes.

18  BY MR. KRY:

19         Q.          Over what time period did those

20  discussions unfold?

21         A.          I would say much of 2023.

22         Q.          Did you favor adding another

23  independent board member focused on AI safety?

24         A.          Yes.

25         Q.          Did you propose candidates?

62

1          A.          I believe so.  I forget exactly

2    where the list of names came from.

3          Q.          Do you recall any of the candidates

4    that you either proposed or advocated for?

5          A.          We considered many names, and we

6    got a lot of input on names to consider.  I recall

7    that we came down to four names that we were

8    seriously considering.  I don't know if I can say

9    all of them off the top of my head.  They included

10   Dan Hendrycks, Paul Christiano, Jacob Steinhardt,

11   and Ajeya Cotra.

12         Q.          And were all four of those

13   individuals AI safety experts?

14         A.          For various definitions of that

15   term, yes.

16         Q.          During these discussions, how did

17   Mr. Altman react to your proposals to add another

18   AI safety expert to the board?

19                     MR. CULLERTON:  Object to

20     form.

21                     THE WITNESS:  I would say he

22     was generally -- he generally seemed

23     supportive.

24   BY MR. KRY:

25         Q.          Did those discussions result in the

63

1  appointment of another AI safety expert to the

2  board?

3       A.        No.

4       Q.        To the best of your recollection,

5  why not?

6       A.        There were long, drawn-out

7  conversations about what attributes made for a

8  strong board candidate.

9                 There was particular concern from

10 Greg Brockman about whether AI safety would be

11 used -- concerns about the power that someone on

12 the board with AI safety expertise might have to

13 change decisions that the company would make or to

14 claim that a certain decision was not a good

15 decision for AI safety reasons.  He seemed very

16 worried about the potential power that would give a

17 board member.

18                 It's kind of funny, given that

19 board members are supposed to, in this case, help

20 make decisions on the basis of risks and safety.

21                 And then there was -- so he was the

22 primary voice raising hesitation.  And then there

23 was sufficient hesitation from Ilya Sutskever and

24 Sam Altman that we were not able to move forward

25 with a new candidate.

64

1          Q.          Was it your impression that

2    Mr. Altman was dragging his feet in these

3    discussions?

4          A.          Yes.  I think that's a fair

5    description.

6          Q.          Did Mr. Altman's actions result in

7    the board being deadlocked over any proposal to add

8    an additional AI safety board member?

9                      MR. CULLERTON:  Object to

10     form.

11                     THE WITNESS:  I'd say he

12       contributed to us significantly being

13       deadlocked, yes.

14   BY MR. KRY:

15         Q.          Did Mr. Altman propose different

16   candidates to the board?

17         A.          Yes.

18         Q.          Were Mr. Altman's alternative

19   candidates also AI safety experts or did they have

20   different backgrounds?

21         A.          To the best of my recollection, he

22   generally proposed candidates with more of a

23   commercial startup background.

24         Q.          Did Mr. Altman's conduct in these

25   discussions cause you to question whether he was

65

1    prioritizing commercial incentives over AI safety?

2                    MR. CULLERTON:  Object to

3       form.  Leading.

4                    THE WITNESS:  I'm not sure.

5       I would say his conduct in these

6       discussions strengthened my impression that

7       he wanted a board that would largely go

8       along with him as opposed to providing

9       pushback.

10                   MR. KRY:  This is a good

11      time for a break.  Would that work for you?

12                   THE WITNESS:  Sure.

13                   MR. KRY:  Great.

14                   Ms. Toner, how long would

15      you like to break for?

16                   THE VIDEOGRAPHER:  Going off

17      the record, 12:15.

18                   (Short break.)

19                   THE VIDEOGRAPHER:  On the

20      record at 12:30.

21   BY MR. KRY:

22       Q.      Ms. Toner, I'm going to mark as

23   Exhibit 2 a document Bates-stamped 2024MUSK 14031.

24                   This is an October 2023 academic

25   paper published by the Center for Security and

102

1    board for as long as possible and to return after

2    he was done with his campaign.  And Sam also

3    suggested that he wanted to make a large, I

4    believe, several-hundred-thousand-dollar campaign

5    contribution to Will, while still expecting him to

6    come back onto the board.

7                        He did not go ahead with this

8    donation because Tasha, Adam, and I all said it

9    seemed very inappropriate.  But to me, the fact

10   that he was considering that, the fact that he

11   might have discussed it with Will in advance, the

12   fact it was an option was just a sign of total

13   disregard for the board's independence or ability

14   to provide meaningful oversight of the company and

15   the CEO.

16        Q.        And that

17   several-hundred-thousand-dollar campaign

18   contribution, was it -- did Mr. Altman discuss that

19   that was going to come from him personally?

20        A.        Yes, to the best of my

21   recollection.

22                        (Document marked for identification

23            as Toner Exhibit 4.)

24   BY MR. KRY:

25        Q.        So marking as Exhibit 4 the

103

1    document Bates-stamped OPENAI_MUSK00027400.

2                         THE WITNESS:  Do you have

3        it, Katherine?

4                         MR. KRY:  Please let us know

5        when that shows up.

6                         MS. PETTI:  When Jacob gets

7        the Bates, he can upload that Bates to the

8        screen share.

9                         THE WITNESS:  It's the board

10       resolution removing Sam.

11                        MS. PETTI:  I have it.

12                        MR. KRY:  Great.

13   BY MR. KRY:

14        Q.        This is a November 16, 2023,

15   unanimous written consent signed by you and three

16   other directors.  And at -- as the witness noted,

17   at the bottom of Page 1, the document states:

18   "Now, therefore, be it resolved, that the Board

19   hereby, effective immediately, terminates

20   Mr. Altman's employment with the Corporation."

21                        Ms. Toner, is this the resolution

22   by which the board formally removed Mr. Altman as

23   CEO and board member of OpenAI?

24        A.        Yes.

25        Q.        Were you one of the board members

104

1    who voted to remove Mr. Altman?

2          A.          Yes.

3          Q.          For how long before November 16,

4    2023, had the board members been discussing the

5    prospect of removing Mr. Altman?

6          A.          Several weeks.

7          Q.          Do you recall approximately when

8    those discussions began?

9          A.          It's hard to say exactly what --

10   what the starting point was.  Early to mid-October.

11         Q.          How did those discussions of

12   potentially removing Mr. Altman originate?

13         A.          I would say the starting point was

14   Ilya Sutskever reaching out to me to ask to talk.

15   We then had a first conversation which was very

16   circuitous and confusing to me.  Very clearly, Ilya

17   had some very significant concern but told me that

18   he couldn't tell me what his concern was,

19   essentially.

20                      I would put that as the -- the

21   starting point.

22         Q.          And did you subsequently have

23   discussions with the other board members?

24         A.          Yes.

25         Q.          And over the course of those

105

1    discussions, what were the grounds for removing

2    Mr. Altman that the board members discussed?

3            A.          It was a number of things.  A --

4    the phrase we used was "a pattern of behavior."  So

5    no one single cause.

6                        The pattern of behavior related to

7    his honesty and candor, his resistance of board

8    oversight, as well as the concerns that two of his

9    senior management team, Ilya Sutskever and Mira

10   Murati, raised to the board about his management

11   practices, his manipulation of board processes.  A

12   range of concerns in that vicinity.

13           Q.          So when you refer to his pattern of

14   behavior related to honesty and candor, does that

15   include all the incidents that we've discussed

16   during your testimony this morning?

17           A.          Yes.  I will say during the

18   discussions -- I'll leave that.

19                        Yes.

20           Q.          Did those -- did those incidents

21   reflecting negatively on Mr. Altman's honesty and

22   candor also cause you to believe that Mr. Altman

23   was not providing the board with the information it

24   needed to manage OpenAI's AI safety processes?

25                        MR. CULLERTON:  Object to

106

1    the form.  Leading.

2                    THE WITNESS:  Yes.

3    BY MR. KRY:

4         Q.        And the -- did you feel, as a

5    result of those incidents we've discussed this

6    morning, that Mr. Altman's conduct had made it more

7    difficult for you as a board member to manage

8    OpenAI's AI safety processes?

9                    MR. CULLERTON:  Object to

10     the form.

11                    THE WITNESS:  Yes.

12    BY MR. KRY:

13         Q.        Without disclosing any

14    attorney-client privileged communications, during

15    these several weeks when you were discussing

16    removing Mr. Altman, did you communicate with legal

17    counsel?

18         A.        We did.

19         Q.        Approximately how many times?

20         A.        I don't remember.  A lot.

21         Q.        What was the law firm?

22         A.        Am I okay to name the firm?

23                    My mind is going entirely blank.

24    Wow.

25         Q.        Was it Arnold & Porter?

146

1    reflect your views at the time?

2        A.        I would say it is an accurate

3    statement and, again, is an incomplete

4    summarization that is for the purpose of this

5    message.

6        Q.        And the behavior and lack of

7    transparency you're referencing there, is that the

8    same pattern of conduct that we discussed earlier

9    today?

10       A.        Yes.

11       Q.        Did the OpenAI board ultimately

12   decide to reinstate Mr. Altman as a board member?

13       A.        As CEO, but not as a board member.

14   But -- and then later, much later, the board

15   decided to reinstate him, yes.  A different board.

16       Q.        Correct.  I'm sorry.

17                 So the board --

18                 Okay.  When did the board decide to

19   reinstate Mr. Altman as CEO?

20       A.        Tuesday night, the 21st of

21   November.

22       Q.        How did that come about?

23       A.        There had been, over the course of

24   the weekend, a lot of back-and-forth over different

25   possible futures of the company, with a recurring

147

1  theme being employees threatening to leave if

2  certain demands were not met.

3              Over the course of the few days

4  following our firing, those demands became

5  gradually more reasonable and the threat of mass

6  resignations continued.

7        Q.      Who were the demands being made by?

8        A.      Some combination of Sam, Greg, the

9  executive team, typically conveyed to us via Mira.

10 And employees directly.

11       Q.      And did you observe that Microsoft

12 was involved in those discussions at all?

13       A.      Microsoft became clearly involved

14 on Sunday night when, after we announced that

15 Emmett would be interim CEO, Microsoft announced

16 that Sam and Greg would be joining Microsoft.  And

17 over the subsequent hours -- I don't recall how I

18 came to learn this -- but over the subsequent hours

19 I came to the understanding that Microsoft was

20 offering to hire away the entire OpenAI team and

21 would have jobs for anyone who wanted them at

22 Microsoft.

23       Q.      So what impact did Microsoft's

24 announcement that it was hiring Mr. Altman and

25 Mr. Brockman, an open offer to hire anyone from

148

1   OpenAI that wanted to come over, impact the board's

2   ability to carry out its duties as the board of

3   OpenAI?

4                    MS. BENEZE:  Object to form.

5                    THE WITNESS:  It -- it

6      created a threat of Microsoft destroying

7      the company in a way that changed the

8      calculus for us about what the best way to

9      pursue the nonprofit mission was.

10  BY MR. KRY:

11          Q.        In what sense?

12          A.        In the sense that it significantly

13  increased the credibility of employees' threats

14  that they would leave en masse and gave Sam

15  significantly more leverage to demand his own

16  reinstatement to avoid the company falling apart.

17          Q.        What did the board do in response

18  to this change to the circumstances?

19          A.        In response to the totality of the

20  circumstances on Tuesday, which includes

21  Microsoft's involvement, as well as other factors,

22  we were able to reach an agreement on Tuesday that

23  was amenable to all sides, which involved Sam being

24  reinstated as CEO but not reappointed to the board;

25  most of the existing board members resigning, but

149

1    not all; and a thorough, independent investigation

2    being carried out into Sam's conduct in the events

3    of the previous few days.

4          Q.        Were you one of the board members

5    that was removed as part of this deal?

6                    MR. CULLERTON:  Object to

7       the form.

8                    THE WITNESS:  Yes.

9                    MR. CULLERTON:  Removed.

10                    THE WITNESS:  Yes.

11   BY MR. KRY:

12         Q.        And was Ms. McCauley one of the

13   board members that was removed pursuant to this

14   compromise?

15                    MR. CULLERTON:  Same

16       objection.

17                    THE WITNESS:  Yes.

18   BY MR. KRY:

19         Q.        Did Mr. D'Angelo stay on the board

20   after this agreement?

21         A.        Yes.

22         Q.        Was an interim board appointed in

23   connection with this agreement?

24                    MR. CULLERTON:  Object to

25       the form and characterization, on board.

156

1    and personal gain is maybe a more complete way to

2    put it, because I think my judgment of Sam's

3    resistance to board oversight was not purely about

4    the financial incentives at play for him but also

5    about the enormous amount of power that he would

6    wield if OpenAI was successful in developing

7    extremely advanced AI systems.  So that was one

8    element.

9                    Profit played a more direct part in

10   what we perceived to be Microsoft's role in the

11   aftermath of firing Sam and also in the reaction of

12   some employees who were concerned about their

13   equity stakes and the potential loss of an upcoming

14   stock sale, tender deal.

15                    All of which we believed played

16   significant roles in what turned out to be the

17   nonprofit's ability to perform one of its most

18   basic duties, which is to hire and fire the CEO.

19        Q.        Did you perceive that profit

20   incentives also played a role in the various

21   episodes where AI safety breaches either occurred

22   or were not promptly disclosed to the board?

23                    MR. CULLERTON:  Object to

24      form.

25                    THE WITNESS:  Yes.  I

157

1    generally believed that being part of to

2    move fast and be ahead of competitors and

3    earn market share were significant factors

4    in the ways in which mission-critical

5    information was and wasn't communicated to

6    the board.

7   BY MR. KRY:

8        Q.        Does that include the failures to

9   communicate information that you testified about

10  earlier today?

11                 MR. CULLERTON:  Object to

12    form.

13                 THE WITNESS:  Yes.

14                 (Document marked for identification

15        as Toner Exhibit 11.)

16  BY MR. KRY:

17       Q.        I have marked as Exhibit 11 a

18  document stamped MSFT_MUSK 56588.

19                 This is a transcript of a podcast

20  you appeared on called the TED AI Show, on May 28,

21  2024.  The episode was entitled, "What Really Went

22  Down at OpenAI and the Future of Regulation with

23  Helen Toner."

24                 Do you remember appearing on this

25  podcast?