# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE MATTER OF:                    )
                                    )
ELON MUSK, et al.,                  )
                                    )
        Plaintiffs,                 )
                                    )
    vs.                             )  CASE NO.
                                    )  4:24-CV-04722-YGR
SAMUEL ALTMAN, et al.,              )
                                    )
        Defendants.                 )
                                    )

\*\* CONFIDENTIAL \*\*

VIDEOTAPED DEPOSITION OF TASHA McCAULEY

LOS ANGELES, CALIFORNIA

Tuesday, September 30, 2025

Stenographically Reported by:
HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
Realtime Systems Administrator
California CSR License #11600
Oregon CSR License #21-0005

```
 Washington License #21009491
Texas CSR License #10725
```

```
                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
                      OAKLAND DIVISION


IN RE MATTER OF:                )
                                )
ELON MUSK, et al.,              )
                                )
        Plaintiffs,             )
                                )
    vs.                         )   CASE NO.
                                )   4:24-CV-04722-YGR
SAMUEL ALTMAN, et al.,          )
                                )
        Defendants.             )
                                )
```

        VIDEOTAPED DEPOSITION of TASHA McCAULEY, taken before Heather J. Bautista, CSR No. 11600, a Certified Shorthand Reporter for the state of California, with principal office in the county of Santa Clara, commencing on Tuesday, September 30, 2025, 9:17 a.m., at 2121 Avenue of the Stars, Los Angeles, California 90067.

APPEARANCES OF COUNSEL:

    For Plaintiffs:
        MoloLamken
       BY:   WALTER HAWES, ESQ.
           ROBERT KRY, ESQ.
       600 New Hampshire Avenue, N.W.
        Washington, D.C. 20037
       Phone:   (202) 556-2013
        whawes@mololamken.com
       rkry@mololamken.com

    For OpenAI Defendants:
        Wachtell Lipton Rosen & Katz
       BY:   WILLIAM SAVITT, ESQ.
           NATHANIEL CULLERTON, ESQ.
          ADAM TANNE, ESQ.
        51 West 52nd Street
       New York, New York 10019
        Phone:   (212) 403-1000
       wdsavitt@wlrk.com
        ndcullerton@wlrk.com
       aptanne@wlrk.com

    For Defendant Microsoft Corporation:
        Dechert LLP
       BY:   NISHA PATEL, ESQ.
        633 W. 5th Street, Suite 4900
       Los Angeles, California 90071
        Phone:   (213) 808-5735
       nisha.patelgupta@dechert.com

For TASHA McCAULEY:

    Ellis George LLP

  BY:  KATHERINE PETTI, ESQ.

   2121 Avenue of the Stars, 30th Floor

  Los Angeles, California 90067

   Phone:  (310) 274-7100

  kpetti@ellisgeorge.com

APPEARANCES OF COUNSEL (CONTINUED):

      MARC TOBEROFF, ESQ.

(Remote) JENNIFER SCHUBERT, ESQ. - MoloLamken

(Remote) SARA TOFIGHBAKHSH, ESQ. - MoloLamken

(Remote) ETHAN COHEN, ESQ. - Wachtell Lipton Rosen &
                Katz

(Remote) DANIEL CONTRERAS, ESQ. - Ellis George

(Remote) CHRISTOPHER BERG, ESQ. - Ellis George


ALSO PRESENT:  Kevin Crowly, Videographer

Page 122

1  A. The board did, yeah.
2  Q. What was your role in that decision?
3  A. Sorry?
4  Q. What was your role in that decision?
5  A. I was one of the board members who was involved
6  in the -- the many, many, many discussions over the
7  course of the following days, the days following the
8  firing.
9  Q. And you mentioned Mr. Nadella. Was Mr. Nadella
10 involved in that decision?
11  A. I don't recall -- I'm -- I'm trying to recall
12 if I had direct communication -- apologies.
13     There were actually just many, many chats, and
14 I'm trying to remember who was on each of these, but
15 there were a lot of people involved in talking about
16 this decision, so I don't certainly know -- kind of,
17 like, no further one-on-one conversations that I recall
18 with -- with Mr. Nadella that I -- that I recall, but he
19 may have been involved in some of the chats where we
20 were talking about particulars.
21  Q. Okay.
22  A. Possibly. I don't specifically recall --
23  Q. I'm sorry.
24  A. Yeah. That's okay.
25  Q. Outside of Mr. Nadella, to your knowledge, was

Page 123

1   anyone else from Microsoft involved?
2           MS. PATEL:  Objection.  Form.
3           THE WITNESS:  I don't recall.
4       Q.  (By Mr. Hawes)  After Mr. Altman was
5   reinstated, did you resign from the board?
6       A.  I did, yes.
7       Q.  Why did you resign?
8       A.  Well, a piece of what happened in the aftermath
9   of the firing, I think an important piece, is -- first
10  of all, I think there was confusion about what was --
11  what was going on; and there was also, you know, a
12  tender offer out to the employees.  So this combination
13  of things, I think, made it very difficult for the
14  employees to -- and also, we -- we felt that we
15  couldn't -- we weren't -- we didn't really have an
16  effective mechanism to accurately convey the set of
17  things that had motivated us as a board for a number of
18  reasons.  And so the -- the employees of the company, I
19  think, had -- didn't have confidence in keeping the
20  board as it was; so we made the decision to restructure
21  the board and, as I said before, keep one of the
22  existing members going forward and bring on a couple of
23  additional members.
24          I think the decision and -- and some of the
25  stipulations we had in making that decision were that

Page 124

1  Sam would not be on this restructured board; that there
2  would be a very thorough independent investigation to
3  look into some of the behaviors and, you know, to -- I
4  think the whole process, but from our perspective in
5  particular, some of the behaviors that we were concerned
6  with.
7       We also had discussed a few different
8  governance mechanisms that we thought would be important
9  to carry forward and discussed those with the board
10  members that were going to be on the newly composed
11  board.
12       So with those different mechanisms, we felt
13  that we reached an agreeable point where we felt that
14  there was a chance for a thorough investigation, some
15  new oversight mechanisms, you know, some board members
16  who, you know, we had at least, you know, I think,
17  some -- some hope that -- that they could provide
18  sufficient corporate governance.
19       And -- and I think the alternative that we were
20  seeing where, you know, if there was significant
21  destabilization or a breaking of the company, we did not
22  feel would best serve OpenAI's mission.
23    Q.  With respect to the new oversight mechanisms
24  that you mentioned, what specific oversight mechanisms
25  were there?

1   A. We talked about putting some policies in place,
2   you know; for example, you know --
3        (Stenographer clarification.)
4        THE WITNESS: I think I'm -- the one I
5   mentioned just now was whistleblower policy, I believe,
6   and I think we wanted to feel confident that in our
7   discussions with the board members who were coming on,
8   the two -- the new board members, that they would be
9   able to -- in the case that something happened again
10  with respect to Sam's behavior, that they were
11  concerned, you know, with a pattern that was similar to
12  the one we had observed, that they would be strong
13  enough to make a decision that was -- you know, went
14  against Sam. We had various conversations to that
15  effect with the potential board members coming in.
16       And we also felt that -- we were hopeful that
17  the results of a thorough independent investigation
18  would provide the new in-coming board with the
19  information they needed to be able to build structures
20  against what -- what we had experienced in terms of
21  Sam's behavior.
22   Q. (By Mr. Hawes) Okay.
23       And is that investigation the Wilmer Hale
24  investigation?
25   A. That is, yes.