MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA  90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk*
*and X.AI Corp.*

(Additional counsel listed on the next page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **PRETRIAL CONFERENCE STATEMENT** |
| v. | Date:  March 13, 2026<br>Time:  9:00 AM |
| SAMUEL ALTMAN et al., | Courtroom:  1 – 4th Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |
| Defendants. | |

 1 | JORDAN ETH (CA SBN 121617)
JEth@mofo.com
 2 | WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
 3 | DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
 4 | MORRISON & FOERSTER LLP
425 Market Street
 5 | San Francisco, CA 94105
Telephone: (415) 268-7000
 6 | Facsimile: (415) 268-7522
 7 | WILLIAM SAVITT (*pro hac vice*)
WDSavitt@wlrk.com
 8 | BRADLEY R. WILSON (*pro hac vice*)
BRWilson@wlrk.com
 9 | SARAH K. EDDY (*pro hac vice*)
SKEddy@wlrk.com
10 | STEVEN WINTER (*pro hac vice*)
SWinter@wlrk.com
11 | NATHANIEL CULLERTON (*pro hac vice*)
NDCullerton@wlrk.com
12 | WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
13 | New York, NY 10019
Telephone: (212) 403-1000
14 | Facsimile: (212) 403-2000

15 | *Attorneys for the OpenAI Defendants*

RUSSELL P. COHEN (SBN 213105)
Russ.cohen@dechert.com
HOWARD M. ULLMAN (SBN 206760)
Howard.ullman@dechert.com
DECHERT LLP
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4500
Facsimile: (415) 262-4555

NISHA PATEL (SBN 281628)
Nisha.patelgupta@dechert.com
DECHERT LLP
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700
Facsimile: (213) 808-5760

ANDREW J. LEVANDER (*pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

JAY JURATA (*pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

*Attorneys for Defendant Microsoft Corporation*

Pursuant to the Court's Standing Order re: Pretrial Instructions in Civil Cases (last updated March 17, 2025), and in advance of the Pretrial Conference set for March 13, 2026, Plaintiff Elon Musk and Defendants Samuel Altman, Gregory Brockman, OpenAI, Inc., OpenAI, L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P., OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C., OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C., OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P., OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P., Aestas Management Company, LLC, and Aestas LLC (collectively, the "OpenAI Defendants"), and Microsoft Corporation ("Microsoft," and collectively, "Defendants") hereby submit the following Joint Pretrial Conference Statement.

## I.    THE ACTION

### A.    Substance of the Action

Plaintiff Elon Musk asserts claims against Sam Altman, Greg Brockman, the OpenAI nonprofit, and other OpenAI entities for breach of charitable trust, unjust enrichment, fraud, and constructive fraud; and against Microsoft for aiding and abetting breach of charitable trust. The claims arise out of charitable contributions Musk caused to be made to the OpenAI nonprofit from 2016 to 2020, and the OpenAI nonprofit's creation and operation of a for-profit affiliate.

In 2015, Musk, Altman, Brockman, and Ilya Sutskever founded a nonprofit organization called OpenAI, Inc. (now called The OpenAI Foundation) with the purpose of ensuring that artificial general intelligence benefits all of humanity. Musk provided approximately $38 million in financial support to the OpenAI nonprofit and also provided various forms of non-monetary support. Musk resigned from the OpenAI nonprofit's board in February 2018.

In September 2018, the OpenAI nonprofit created a for-profit subsidiary to which it later transferred substantially all of its intellectual property in return for an interest in the for-profit entity. Most of the individuals who had been employed by the nonprofit became employees of the for-profit subsidiary. Investors in the for-profit entity, including the OpenAI nonprofit, were entitled to earn returns up to specified profit "caps." The OpenAI nonprofit also received an uncapped residual

interest entitling it to the profits exceeding those caps.  Microsoft  invested $1 billion in the for-profit in 2019, $2 billion in 2021, and $10 billion in 2023.  Microsoft also entered into commercial agreements with OpenAI that granted it rights relating to OpenAI's intellectual property in exchange for Microsoft's provision of resources such as compute to power OpenAI's research and development efforts.  In October 2025, OpenAI's for-profit subsidiary was recapitalized into a public benefit corporation.  The OpenAI nonprofit, Microsoft, and other investors all hold equity in the public benefit corporation.  At the time of the recapitalization, the for-profit was valued at an estimated $500 billion.

Plaintiff asserts that Altman, Brockman, and the OpenAI nonprofit are liable for breach of charitable trust because Musk made contributions to the OpenAI nonprofit for charitable purposes, but the OpenAI nonprofit then used the contributions for unauthorized commercial purposes. Plaintiff claims that Altman, Brockman, the OpenAI nonprofit, and the other OpenAI entities named as defendants are liable for unjust enrichment for similar reasons.  Plaintiff further claims that Altman, Brockman, and the OpenAI nonprofit are liable for fraud and constructive fraud because they made false statements to Musk about whether they intended for OpenAI to remain a nonprofit and thereby misled Musk into continuing to contribute to the nonprofit.  Finally, Plaintiff asserts that Microsoft aided and abetted OpenAI's breach of charitable trust by knowingly providing substantial assistance to OpenAI's alleged breach of charitable trust.

The OpenAI Defendants deny Musk's claims.  As for the charitable trust claim, the OpenAI Defendants dispute that any of Musk's contributions created an enforceable charitable trust, and they further dispute that they used Musk's contributions for any unauthorized purpose.  As for the fraud and constructive fraud claims, the OpenAI Defendants dispute that any OpenAI Defendant made any actionable statement, that any statement Musk has identified was false or misleading, or that Musk actually or reasonably relied on any such statement.  As for Musk's unjust enrichment claim, the OpenAI Defendants dispute that any OpenAI Defendant unjustly retained any benefit at Musk's expense, and they also dispute the existence and terms of any implied agreement that could support quasi-contract relief.  In addition, as affirmative defenses, the OpenAI Defendants contend that Musk's claims are barred in whole or in substantial part by the applicable statutes of limitations

and (where applicable) laches and that Musk's requested equitable relief is barred by unclean hands.

Microsoft asserts that it did not aid and abet any breach by any of the OpenAI Defendants. Microsoft denies any underlying breach of charitable trust and that Musk was harmed.  It further denies (i) that Microsoft knew that Musk made his donations for specific charitable purposes, and that the OpenAI Defendants allegedly committed a breach of charitable trust by using the donations for other inconsistent purposes; (ii) that Microsoft intended to assist any breach of charitable trust; (iii) that Microsoft provided substantial assistance or encouragement to the OpenAI Defendants in allegedly breaching the charitable trust created by Musk; and (iv) that Microsoft's conduct was a substantial factor in causing any harm to Musk.  In addition, as affirmative defenses, Microsoft contends that Musk's claim against Microsoft is time-barred in whole by the applicable statute of limitations and joins the OpenAI Defendants in asserting the affirmative defenses of laches and unclean hands.

The parties' separate statements of elements of proof and summaries of evidence are attached.

### B.    Relief Prayed

Plaintiff principally seeks disgorgement of $65.50 billion to $109.43 billion from the OpenAI Defendants and $13.30 billion to $25.06 billion from Microsoft.  Plaintiff also seeks an award of punitive damages.  Finally, Plaintiff seeks equitable relief, including an injunction, to be addressed by the Court after trial.

Defendants dispute that Musk is entitled to any relief, and seek entry of judgment in their favor and against Musk with respect to all of Musk's claims.

## II.    FACTUAL BASIS OF THE ACTION

### A.    Undisputed Facts[1]

1.    Plaintiff Elon Musk is an individual and a resident of Texas.

2.    Defendant Sam Altman is an individual and a resident of California.

---

[1] The Parties provide this section for background and context for the Court but do not stipulate to reading the statements into the record during trial.

3.      Defendant Greg Brockman is an individual and a resident of California.

4.      Defendant OpenAI, Inc., now known as The OpenAI Foundation, is a nonprofit corporation incorporated under the laws of Delaware, with its headquarters in California. OpenAI, Inc. is registered as an out-of-state nonprofit corporation with the California Secretary of State. OpenAI, Inc. is registered as a tax-exempt nonprofit organization under federal and California tax laws.

5.      Defendant OpenAI, L.P. was a limited partnership formed under the laws of Delaware on September 19, 2018 and was registered as an out-of-state limited partnership with the California Secretary of State, with its headquarters in California. OpenAI, L.P. was an affiliate of OpenAI, Inc.

6.      OpenAI Group PBC is a public benefit corporation incorporated under the laws of Delaware and formed in connection with the recapitalization of the OpenAI for-profit enterprise on October 28, 2025.

7.      Defendant OpenAI OpCo, LLC is a limited liability company incorporated under the laws of Delaware on January 23, 2023. OpenAI OpCo, LLC succeeded OpenAI, L.P. and is an affiliate of OpenAI Group PBC.

8.      OpenAI Global, LLC is a limited liability company incorporated under the laws of Delaware on December 28, 2022. Investors' interests in OpenAI, L.P. were transferred to OpenAI Global, LLC on or around that same date.

9.      Defendants OpenAI, LLC, OpenAI GP, LLC, OAI Corporation, OpenAI Holdings LLC, OpenAI Startup Fund Management, LLC, OpenAI Startup Fund GP I, LLC, OpenAI Startup Fund I, LP, OpenAI Startup Fund SPV GP I, LLC, OpenAI Startup Fund SPV GP II, LLC, OpenAI Startup Fund SPV GP III, LLC, OpenAI Startup Fund SPV GP IV, LLC, OpenAI Startup Fund SPV I, LP, OpenAI Startup Fund SPV II, LP, OpenAI Startup Fund SPV III, LP, OpenAI Startup Fund SPV IV, LP, Aestas Management Company, LLC, and Aestas, LLC are or were limited liability companies, corporations, or limited partnerships formed and incorporated under the laws of Delaware.

10.     Defendant Microsoft Corporation is a corporation formed under the laws of

4

Washington with its principal place of business in Washington.

11.     Elon Musk, Sam Altman, Greg Brockman, and Ilya Sutskever were each co-founders of OpenAI.

12.     OpenAI, Inc. was incorporated as a nonprofit, nonstock corporation in December 2015.

13.     OpenAI, Inc. filed its original certificate of incorporation with the Delaware Secretary of State on December 8, 2015.

14.     The following individuals have served on OpenAI, Inc.'s board:

| Individual | Dates of Service on Board |
|---|---|
| Sam Altman | 1/3/2016 to 11/16/2023; 3/8/2024 to Present |
| Greg Brockman | 6/30/2017 to 11/16/2023 |
| Chris Clark | 1/3/2016 to 9/1/2017 |
| Adam D'Angelo | 9/21/2018 to Present |
| Sue Desmond-Hellmann | 3/8/2024 to Present |
| Reid Hoffman | 3/11/2019 to 2/6/2023 |
| Will Hurd | 4/30/2021 to 5/31/2023 |
| Holden Karnofsky | 6/30/2017 to 6/30/2021 |
| Zico Kolter | 8/8/2024 to Present |
| Tasha McCauley | 11/30/2018 to 11/29/2023 |
| Elon Musk | 1/3/2016 to 2/21/2018 |
| Paul Nakasone | 6/13/2024 to Present |
| Adebayo Ogunlesi | 1/14/2025 to Present |
| Patrick Scaglia | 1/3/2016 to 6/30/2017 |
| Nicole Seligman | 3/8/2024 to Present |
| Lawrence Summers | 11/29/2023 to 11/19/2025 |

| Fidji Simo | 3/8/2024 to 5/9/2025 |
| Ilya Sutskever | 6/30/2017 to 11/29/2023 |
| Bret Taylor | 11/29/2023 to Present |
| Helen Toner | 7/9/2021 to 11/29/2023 |
| Sue Yoon | 9/21/2018 to 9/30/2019 |
| Shivon Zilis | 1/10/2020 to 2/25/2023 |

15.     From 2016 through September 14, 2020, Musk was the original source of between $37,799,400 (OpenAI Defendants' figure) and $38,191,066 (Plaintiff's figure) in cash and in-kind contributions to OpenAI, Inc.  Of those amounts, (i) $10,500,000 of the cash contributions were paid by Elon Musk or the Musk Foundation to OpenAI's fiscal sponsor, YC.org ("YC Org"), and thereafter paid by YC Org to OpenAI, Inc.; (ii) $11,510,000 of the cash contributions were paid to OpenAI, Inc. following Musk's recommendations by the Vanguard Charitable Endowment Program ("Vanguard DAF") or the Fidelity Investments Charitable Gift Fund ("Fidelity DAF"); and (iii) $15,527,000 of the cash contributions were paid to YC Org following Musk's recommendations by Vanguard DAF, and thereafter paid to OpenAI, Inc.  YC Org served as OpenAI, Inc.'s fiscal sponsor to receive tax-exempt charitable contributions before OpenAI, Inc.'s own tax-exempt status was approved.  The in-kind contributions in the form of four Tesla vehicles were made directly by Elon Musk to OpenAI, Inc.

16.     The following chart lists cash contributions for which Musk was the original funding source and OpenAI, Inc., was the ultimate recipient:

| Approx. Date | Payor | Payee | Amount |
|---|---|---|---|
| 5/27/2016 | Elon Musk | YC Org | $500,000.00 |
| 6/3/2016 | Vanguard DAF | YC Org | $5,000,000.00 |
| 8/22/2016 | Vanguard DAF | YC Org | $4,500,000.00 |
| 9/23/2016 | Vanguard DAF | YC Org | $142,000.00 |
| 10/18/2016 | Vanguard DAF | YC Org | $142,000.00 |

6

| Approx. Date | Payor | Payee | Amount |
|---|---|---|---|
| 11/14/2016 | Vanguard DAF | YC Org | $750,000.00 |
| 11/16/2016 | Vanguard DAF | YC Org | $142,000.00 |
| 12/1/2016 | Vanguard DAF | YC Org | $4,250,000.00 |
| 12/16/2016 | Vanguard DAF | YC Org | $142,000.00 |
| 1/18/2017 | Vanguard DAF | YC Org | $142,000.00 |
| 2/16/2017 | Vanguard DAF | YC Org | $142,000.00 |
| 2/27/2017 | Musk Foundation | YC Org | $5,000,000.00 |
| 3/17/2017 | Vanguard DAF | YC Org | $175,000.00 |
| 4/19/2017 | Vanguard DAF | OpenAI, Inc. | $175,000.00 |
| 5/16/2017 | Vanguard DAF | OpenAI, Inc. | $175,000.00 |
| 5/26/2017 | Musk Foundation | YC Org | $5,000,000.00 |
| 6/16/2017 | Vanguard DAF | OpenAI, Inc. | $175,000.00 |
| 7/18/2017 | Fidelity DAF | OpenAI, Inc. | $175,000.00 |
| 8/14/2017 | Fidelity DAF | OpenAI, Inc. | $175,000.00 |
| 9/15/2017 | Fidelity DAF | OpenAI, Inc. | $175,000.00 |
| 9/29/2017 | Fidelity DAF | OpenAI, Inc. | $85,000.00 |
| 10/16/2017 | Fidelity DAF | OpenAI, Inc. | $235,000.00 |
| 11/14/2017 | Fidelity DAF | OpenAI, Inc. | $235,000.00 |
| 12/14/2017 | Fidelity DAF | OpenAI, Inc. | $235,000.00 |
| 1/18/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 2/20/2018 | Fidelity DAF | OpenAI, Inc. | $390,000.00 |
| 3/14/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 4/16/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 5/15/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 6/14/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 7/16/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |

| Approx. Date | Payor | Payee | Amount |
|---|---|---|---|
| 8/14/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 9/18/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 10/17/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 11/14/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 12/17/2018 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 1/16/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 2/14/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 3/22/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 4/16/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 5/14/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 6/14/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 7/17/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 8/14/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 9/16/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 10/17/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 11/15/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 12/17/2019 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 1/14/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 2/14/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 3/16/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 4/13/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 5/13/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 6/15/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 7/14/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 8/17/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |
| 9/14/2020 | Fidelity DAF | OpenAI, Inc. | $290,000.00 |

17.     The following chart lists in-kind contributions from Musk to OpenAI, Inc., consisting of four Tesla vehicles and vehicle upgrades:

| Approx. Date | Sender | Recipient | Amount |
|---|---|---|---|
| 10/2/2017 | Elon Musk | OpenAI, Inc. | $248,295 |
| 1/24/2018 | Elon Musk | OpenAI, Inc. | $14,105 |

18.     From 2016 to 2020, OpenAI, Inc. received the following charitable contributions from donors other than Musk: (i) in 2016, $3,784,637 from Sam Altman; (ii) in 2017, $5 million from Aphorism Foundation, $100,000 from a donor's trust DAF, and $10 million from Good Ventures Foundation; (iii) in 2018, $500,000 from Alameda Research, $600,000 from Amazon Web Services ("AWS"), $5 million from Aphorism Foundation, $10,000 from BLTE, LLC, $50,000 from Fidelity Charitable, $20,008,279 from Gabe Newell, and $20 million from Good Ventures Foundation; and (iv) in 2019, $100,000 from AWS and $30 million from Silicon Valley Community Foundation. OpenAI, Inc. received $5 million from the Schwab Fund for Charitable Giving in 2023.

19.     In or around June 2016, Musk Industries LLC ("Musk Industries") and Bridgeton Pioneer Property LLC ("Landlord") executed a lease for the Pioneer Building for a period of 10 years. Around the same time, Musk Industries and OpenAI, Inc. entered into a tenancy at will agreement.

20.     As an artificial intelligence company, OpenAI, Inc. required computer processing resources, known as "compute," to perform artificial intelligence training and research.

21.     In 2016, Microsoft and OpenAI, Inc. negotiated, executed, and subsequently announced publicly an agreement under which OpenAI, Inc. paid Microsoft a substantially discounted price for cloud computing services for artificial intelligence research and development.

22.     On August 11, 2017, OpenAI's technology defeated the world's top-ranked human player in a one-versus-one tournament of the Dota 2 video game.

23.     On August 28, 2017, OpenAI, Inc. filed an initial registration form with the California Attorney General's office to register as a foreign nonprofit corporation doing business in the state of California.

24.    On February 21, 2018, Musk resigned from OpenAI, Inc.'s board of directors.

25.    On April 9, 2018, OpenAI, Inc. posted a "Charter" on its website.

26.    OpenAI released GPT-1 on June 8, 2018.

27.    On September 19, 2018, OpenAI, L.P., originally called SummerSafe, L.P., was formed as a limited partnership under Delaware law.  OpenAI, L.P. was initially governed by the Limited Partnership Agreement dated October 10, 2018.  Investors in OpenAI, L.P. received limited partnership interests that entitled them each to receive a target redemption amount equal to a multiple of their investment.  OpenAI, Inc. also received an uncapped residual equity interest in the partnership that entitled it to receive all profits after the limited partners' target redemption amounts were satisfied.

28.    On March 11, 2019, OpenAI publicly announced the launch of OpenAI, L.P.

29.    At or around the same time, OpenAI, Inc. transferred substantially all of its intellectual property to OpenAI, L.P., and most of the individuals who had been employed by OpenAI, Inc. became employees of OpenAI, L.P.  OpenAI, Inc. received a limited partnership interest based on the appraised value of OpenAI, Inc.'s asset contribution to OpenAI, L.P.  The target redemption amount applicable to OpenAI, Inc.'s asset contribution was ultimately set at $6,082,908,300, reflecting a target redemption multiple of 100 times the value of OpenAI, Inc.'s asset contribution.

30.    In its first fundraising round, which completed on March 1, 2019, OpenAI, L.P. received $133 million in capital commitments from outside investors, referred to as First Close Limited Partners ("FCLP").  The target redemption amount applicable to all FCLP capital commitments was $13.3 billion, reflecting a target redemption multiple of 100 times each FCLP's capital commitment.

31.    In April 2019, Altman became CEO of OpenAI.

32.    On July 2, 2019, Microsoft committed $1 billion in capital to OpenAI, L.P.  The target redemption amount applicable to Microsoft's 2019 capital commitment was $20 billion, reflecting a target redemption multiple of 20 times Microsoft's capital commitment.

33.     On July 2, 2019, Microsoft, OpenAI, Inc. and OpenAI, L.P. executed a Joint Development and Collaboration Agreement ("JDCA") to govern their commercial partnership.

34.     OpenAI, Inc.'s board approved Microsoft's 2019 capital commitment and the 2019 JDCA.

35.     Prior to entering into a commercial relationship with OpenAI, Inc. and OpenAI, L.P., Microsoft conducted due diligence, including a review by Microsoft's outside counsel of documents provided by OpenAI related to OpenAI, Inc.'s and OpenAI, L.P.'s governance, structure, capitalization, and tax status.

36.     On July 22, 2019, both OpenAI and Microsoft issued public statements announcing their commercial partnership.

37.     OpenAI released the full GPT-2 model on November 5, 2019.

38.     On April 23, 2020, OpenAI, Inc. filed an amended certificate of incorporation with the Delaware Secretary of State.

39.     OpenAI released GPT-3 on May 28, 2020.

40.     On March 6, 2021, Microsoft agreed to provide an additional $2 billion worth of capital commitments to OpenAI, L.P., including credits for OpenAI's compute spend.  Microsoft's target redemption amount for that capital commitment was $12 billion, reflecting a target redemption multiple of 6 times Microsoft's capital commitment.  The target redemption multiple for all other limited partners remained 100 times their capital commitments.

41.     On March 5, 2021, Microsoft, OpenAI, Inc., and OpenAI, L.P. executed an Amended and Restated Joint Development and Collaboration Agreement.

42.     OpenAI, Inc.'s nonprofit board approved Microsoft's 2021 capital commitment and the 2021 JDCA, at the recommendation of a committee formed to review the transaction.

43.     Brockman became President of OpenAI on or around May 5, 2022.

44.     OpenAI released ChatGPT on November 30, 2022.

45.     On January 23, 2023, OpenAI's employee vehicle, Aestas, L.P. (now known as Aestas, LLC), became a member of OpenAI Global, LLC, and received a membership interest entitling it to receive a target redemption amount of $150 billion.

46.    On January 23, 2023, Microsoft agreed to provide an additional $10 billion worth of capital commitments to OpenAI Global, LLC, including credit for OpenAI's compute spend. Microsoft's target redemption amount for that investment was $60 billion, reflecting a target redemption multiple of 6 times Microsoft's capital commitment.

47.    On January 23, 2023, Microsoft, OpenAI, Inc., and OpenAI OpCo, LLC executed a Second Amended and Restated Joint Development and Collaboration Agreement to amend the terms of their commercial relationship.

48.    On or around January 20, 2023, OpenAI, Inc.'s nonprofit board unanimously approved Microsoft's 2023 capital commitment and the 2023 JDCA.

49.    OpenAI released GPT-4 on March 14, 2023.

50.    On April 10, 2023, OpenAI and Microsoft executed a Second Amended and Restated Limited Liability Company Agreement of OpenAI Global, LLC that further reflects Microsoft's 2023 capital commitment.

51.    On August 5, 2024, Plaintiff filed this lawsuit against several OpenAI entities, Altman, and Brockman.

52.    On November 14, 2024, Plaintiff filed an amended complaint adding, among other things, claims against Microsoft.

53.    OpenAI released GPT-4.5 on February 27, 2025.

54.    Plaintiff filed the operative second amended complaint on May 22, 2025.

55.    On October 28, 2025, OpenAI, Inc. recapitalized its for-profit subsidiaries into a public benefit corporation, OpenAI Group PBC, incorporated under Delaware law.  Investors in the for-profit LLC entities received equity stakes in OpenAI Group PBC.

56.    OpenAI released GPT-5.2 on December 11, 2025.

**B.    Disputed Factual Issues[2]**

1.    As to each alleged donation to OpenAI, Inc. on which Musk's claims are based:

---

[2] The following facts have been identified as disputed by one or more parties to the case.  No party concedes the relevance of or evidentiary support for any of these facts.

a.   Whether Musk created a charitable trust with respect to the donated money or property.

b.   Whether a charitable trust existed with respect to the donated money or property at the time of the alleged breach.

c.   Whether the donated money or property continued to exist and was not exhausted at the time of the alleged breach.

d.   Whether Musk owned a definite interest in the money or property at the time it was donated to OpenAI, Inc.

e.   Whether any of Musk's alleged non-financial contributions constitutes trust property.

f.   Whether the donation was made to OpenAI, Inc. for a specific charitable purpose.

g.   Whether Musk manifested to OpenAI, Inc. an intention to require it to use the donation for the specific charitable purpose.

h.   Whether Altman, Brockman, or OpenAI, Inc. used the donation for a purpose other than the specific charitable purpose for which it was donated.

i.   Whether Musk gave informed consent to the manner in which the donation was used.

2.   Whether the claimed breach of charitable trust occurred before August 5, 2021.

3.   Whether before August 5, 2021, Musk (i) discovered, (ii) had reason to discover, or (iii) with reasonable diligence could have discovered the claimed breach of charitable trust and/or facts that would have caused a reasonable person to suspect the claimed breach of charitable trust.

4.   Whether Altman, Brockman, or OpenAI, Inc. was under a continuing or recurring obligation and continued to engage in breaches of charitable trust after August 5, 2021.

5.   As to each alleged donation to OpenAI, Inc. on which Musk's claims are based:

a.   Whether Altman, Brockman, or OpenAI, Inc. solicited and accepted it on behalf of OpenAI, Inc.

b.   Whether it was solicited at a place other than on the regular occupied premises of OpenAI, Inc.

c.  Whether it was solicited at a time when Musk was not a member of OpenAI, Inc.

d.  Whether Altman, Brockman, or OpenAI, Inc. knew, or should have known, that it would not be used for the charitable purposes for which it was sought.

e.  Whether Altman, Brockman, or OpenAI, Inc. misled Musk by providing him with information that was inaccurate or incomplete with respect to whether the donation would be used for the charitable purposes for which it was sought.

f.  Whether Musk actually relied on the allegedly inaccurate or incomplete information.

g.  Whether any reliance by Musk on the allegedly inaccurate or incomplete information was reasonable.

h.  Whether Altman, Brockman, or OpenAI, Inc.'s conduct was a substantial factor in causing any alleged harm to Musk.

6.  Whether the claimed constructive fraud occurred before August 5, 2021.

7.  Whether before August 5, 2021, Musk (i) discovered, (ii) had reason to discover, or (iii) with reasonable diligence could have discovered the claimed constructive fraud and/or facts that would have caused a reasonable person to suspect the claimed constructive fraud.

8.  Whether each of the following alleged statements constitutes a promise to Musk:

a.  Altman's statement, "i remain enthusiastic about the non-profit structure," in a September 21, 2017 email from Altman to Musk and others.

b.  Altman's alleged statement, "Great with keeping non-profit and continuing to support it," in a September 22, 2017 email from Zilis to Musk and Teller.

c.  Brockman's alleged statement, "would like to continue with the non-profit structure," in a September 22, 2017 email from Zilis to Musk and Teller.

d.  Brockman's statement, "we want to get more results in the non-profit and to fundraise there," as reflected in Brockman's personal files from November 6, 2017.

e.  Brockman's statement, "we must: - Try our best to remain a non-profit," in a January 31, 2018 email from Brockman to Musk and others.

14

9.      Whether any other statement proven at trial about OpenAI's nonprofit mission or structure may be found to constitute a promise to Musk.

10.     As to each such alleged promise:

    a.   Whether the alleged promisor did not intend to perform the promise at the time it was made.

    b.   Whether the alleged promisor intended that Musk rely on the promise.

    c.   Whether Musk actually relied on the promise.

    d.   Whether any reliance by Musk on the promise was reasonable.

    e.   Whether the alleged promisor performed the promised act.

    f.   Whether Musk was harmed.

    g.   Whether Musk's reliance on the promise was a substantial factor in causing his alleged harm.

11.     Whether the claimed fraud occurred before August 5, 2021.

12.     Whether before August 5, 2021, Musk (i) discovered, (ii) had reason to discover, or (iii) with reasonable diligence could have discovered the claimed fraud and/or facts that would have caused a reasonable person to suspect the claimed fraud.

13.     Whether any OpenAI Defendant other than OpenAI, Inc. received a benefit from Musk's alleged contributions to OpenAI, Inc.

14.     Whether any OpenAI Defendant unjustly retained any such benefit at Musk's expense.

15.     Whether Musk contributed money or property to OpenAI, Inc. pursuant to an implied agreement with Altman and OpenAI, Inc. that the money or property would be used for an agreed-upon charitable purpose.

16.     Whether Altman and OpenAI, Inc. failed to comply with the alleged implied agreement's terms by using the money or property for a purpose other than the agreed-upon charitable purpose.

17.     Whether any OpenAI Defendant knew, or had reason to know, that Musk contributed money or property to OpenAI, Inc. pursuant to an implied agreement with Altman and OpenAI, Inc.

and knew, or had reason to know, that they failed to comply with the agreement's terms.

18.    Whether the claimed unjust enrichment occurred before August 5, 2022.

19.    Whether before August 5, 2022, Musk (i) discovered, (ii) had reason to discover, or (iii) with reasonable diligence could have discovered the claimed unjust enrichment and/or facts that would have caused a reasonable person to suspect the claimed unjust enrichment.

20.    Whether the OpenAI Defendants were under a continuing or recurring obligation and continued to unjustly retain the benefit of Musk's contributions after August 5, 2022.

21.    Whether Musk unreasonably delayed in bringing this lawsuit and whether such delay resulted in prejudice to any OpenAI Defendant.

22.    Whether Musk engaged in conduct that was unconscionable and/or not in good faith, that directly and/or intimately related to his claims, and that resulted in such prejudice to any OpenAI Defendant that it would be unfair to allow Musk to assert his claims.

23.    Whether each OpenAI Defendant is a conscious wrongdoer or defaulting fiduciary.

24.    Whether and to what extent each OpenAI Defendant's alleged wrongful gain is attributable to the alleged underlying wrong.

25.    Whether and to what extent each OpenAI Defendant's alleged wrongful gain is identifiable, measurable, and not unduly remote.

26.    Whether and to what extent each OpenAI Defendant's alleged wrongful gain is offset by money expended in acquiring or preserving the property or in carrying on the business that is the source of any profit subject to disgorgement.

27.    Whether Altman, Brockman, or OpenAI, Inc. acted with the malice, oppression, or fraud necessary to award punitive damages and, if so, the appropriate amount of punitive damages (if any).

Disputed Factual Issues Relating to Plaintiff's Claim Against Microsoft

Assuming all predicate factual disputes (*e.g.*, the creation of a charitable trust and breach by OpenAI, Altman, and/or Brockman) have been resolved in favor of Musk:

28.    Whether Microsoft actually knew that Musk made his donation(s) for specific charitable purposes, and that OpenAI, Inc., Altman, or Brockman committed a breach of charitable

1   trust by using the donation(s) for other inconsistent purposes.

2       29.     Whether Microsoft knew that OpenAI owed a duty to its donors, including Musk, to

3   use their charitable donations for charitable purposes.

4       30.     Whether Microsoft knew there was a breach of OpenAI's duty to its donors,

5   including Musk.

6       31.     Whether Microsoft intended to assist the breach of OpenAI's duties owed to its

7   donors, including Musk.

8       32.     Whether Microsoft intended to assist the breach of a charitable trust.

9       33.     Whether Microsoft gave substantial assistance or encouragement to OpenAI, Inc.,

10  Altman, and/or Brockman in breaching the charitable trust created by Musk.

11      34.     Whether Microsoft gave substantial assistance or encouragement to OpenAI,

12  Altman, and/or Brockman to breach duties owed to OpenAI's donors, including Musk.

13      35.     Whether Microsoft's conduct was a substantial factor in causing harm to Musk.

14      36.     Whether any of Musk's claimed harm from Microsoft's conduct occurred before

15  November 14, 2021.

16      37.     Whether before November 14, 2021, Musk discovered, or with reasonable diligence

17  could have discovered, that Microsoft participated in causing his harm and/or facts that would have

18  caused a reasonable person to suspect that Microsoft participated in causing his harm.

19      38.     Whether Microsoft was under a continuing or recurring obligation and continued to

20  engage in aiding and abetting breaches of charitable trust after November 14, 2021.

21      39.     Whether Musk failed to bring this lawsuit for a period of time that amounts to an

22  unreasonable delay that resulted in prejudice to Microsoft.

23      40.     Whether Musk engaged in conduct that was unconscionable and/or not in good faith,

24  was directly and/or intimately related to his claims, and resulted in such prejudice to Microsoft that

25  it would be unfair to allow Musk to assert his claim.

26      41.     Whether and to what extent Microsoft's alleged wrongful gain is attributable to

27  Microsoft's alleged wrong.

28

42.    Whether and to what extent Microsoft's alleged wrongful gain is identifiable, measurable, and not unduly remote.

43.    Whether Microsoft acted with the malice, oppression, or fraud necessary to award punitive damages and, if so, the appropriate amount of punitive damages (if any).

**C.    Agreed Statement**

The parties do not believe that all or any part of this action should be presented upon an agreed statement of facts.

**D.    Stipulations**

The parties do not propose any substantive stipulations for pretrial or trial purposes. The parties are, however, submitting with the trial readiness binders a set of proposed trial conduct stipulations to govern trial procedures in the case.

**III.    DISPUTED LEGAL ISSUES[3]**

The Parties raise below the following disputed legal issues for the Court's determination:

> (1) Whether Plaintiff can obtain disgorgement of profits and if he has an adequate remedy at law.
>
> (2) Whether Plaintiff has a right to a jury trial as to disgorgement of profits.
>
> (3) Whether Plaintiff has a right to a jury trial as to liability on his claims or as to punitive damages.
>
> (4) Whether Plaintiff may seek disgorgement from the individual defendants.
>
> (5) Whether Plaintiff is entitled to a "continuous accrual" jury instruction.

---

[3] The Parties' disputes regarding specific jury instructions and verdict forms are addressed separately in the Proposed Jury Instructions and Proposed Verdict Forms and are not repeated in this Disputed Legal Issues section. The parties also do not raise here, and reserve all rights with respect to, any legal issues that the Court has already decided in this case, including that settlors, as such, have standing to sue for a breach of charitable trust. *See* Dkt. 390.

1

2     **1.**     **Plaintiff cannot obtain disgorgement of profits because he has an adequate remedy at law.[4]**

3     a.  Defendants' Position:

4 According to Plaintiff, the "primary monetary remedy" he seeks is "disgorgement of

5 wrongful gains," including "the increased value of OpenAI and the increased value of Microsoft's

6 investments in OpenAI." Dkt. 392 ("Notice of Remedies") at 1-2; Dkt. 170 (Second Amended

7 Complaint ("SAC")) at 89 (seeking, among other remedies, "non-restitutionary disgorgement"). But

8 Plaintiff cannot obtain the disgorgement of profits sought in this case as a matter of law.

9 It is settled law that federal courts sitting in diversity are "precluded from awarding equitable

10 relief" in cases "where an adequate legal remedy exists." *Key* v. *Qualcomm Inc.*, 129 F.4th 1129,

11 1142 (9th Cir. 2025) (citing *Sonner* v. *Premier Nutrition Corp.*, 971 F.3d 834, 842-44 (9th Cir.

12 2020)); *see also Dairy Queen, Inc.* v. *Wood*, 369 U.S. 469, 478 (1962) ("The necessary prerequisite

13 to the right to maintain a suit for . . . equitable remedies[] is . . . the absence of an adequate remedy

14 at law."). "That a state may authorize its courts to give equitable relief unhampered by the restriction

15 that an adequate remedy at law be unavailable cannot remove that fetter from the federal courts."

16 *Sonner*, 971 F.3d at 843-44 (citation modified) (quoting *Guaranty Trust Co. of N.Y.* v. *York*, 326

17 U.S. 99, 105-06 (1945)); *see also id.* at 841 ("It has been a fundamental principle for well over a

18 century that state law cannot expand or limit a federal court's equitable authority."). "This rule is

19 jurisdictional." *Key*, 129 F.4th at 1142. And it applies here because (i) Plaintiff's requested relief is

20 equitable in nature, and (ii) Plaintiff cannot demonstrate that he lacks an adequate remedy at law.

21 (i) The Supreme Court, Ninth Circuit, and Northern District of California have repeatedly

22 recognized that "disgorgement of profits" is an equitable remedy. *E.g.*, *Liu* v. *SEC*, 591 U.S. 71, 80

23 (2020) (explaining that "disgorgement of improper profits" was "traditionally considered an

24 equitable remedy" and sits "squarely within the heartland of equity"); *Rearden, LLC* v. *Walt Disney*

25

26     [4] According to Plaintiff, "if the jury finds either Defendant liable, Plaintiff plans to seek

27 appropriate equitable relief from the Court, including an injunction," which "would be addressed by the Court after trial." Dkt. 392 at 4. Defendants expressly reserve their right to dispute the

28 availability of such potential equitable remedies if those issues become ripe.

*Pictures*, 152 F.4th 1058, 1074 (9th Cir. 2025) ("disgorgement of profits" is "a form of equitable relief"); *SEC* v. *Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) ("actions for disgorgement of improper profits are equitable in nature" because "the court is not awarding damages to which plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment"); *Rodriguez* v. *Google*, 2026 WL 252570, at *5 (N.D. Cal. Jan. 30, 2026) ("[Plaintiffs'] request for disgorgement of profits is equitable."); *see also City of Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999) (contrasting "monetary remedies available in equity" tied to "what . . . the taker [has] gained" with legal relief tied to "what . . . the owner [has] lost").

Relying on the Supreme Court's decision in *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U.S. 204, 213 (2002), Plaintiff argues that the disgorgement he seeks is a legal remedy because he does "not assert title or right to possession of particular property," but instead seeks a judgment "imposing a merely personal liability upon the defendant to pay a sum of money." Plaintiff's Position Pt. 1 *infra*. Plaintiff's argument is wrong for two independent reasons:

First, Plaintiff ignores that the passage he relies on from *Great-West Life* expressly did *not* apply to an "accounting of profits," *see* 534 U.S. at 214 n.2—which is another name for the disgorgement of profits remedy he seeks. *See Liu*, 591 U.S. at 79 ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profits.'" (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a (2010)); *SEC* v. *Sripetch*, 154 F.4th 980, 982 (9th Cir. 2025) ("Restitution remedies that pursue this object [to eliminate profit from wrongdoing] are often called 'disgorgement' or 'accounting.'"); *SCA Hygiene Prods. Aktiebolag* v. *First Quality Baby Prods., LLC*, 580 U.S. 328, 341 (2017) (equating "[t]he equitable remedy of an accounting" with "disgorgement of ill-gotten profits"). And two decades after *Great-West Life*, the Supreme Court confirmed that "a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts." *Liu*, 591 U.S. at 80; *see also Osborn* v. *Griffin*, 865 F.3d 417, 462 (6th Cir. 2017) ("[*Great-West Life*] does not cast doubt on the wealth of authority holding that disgorgement is an equitable remedy."). Thus, while Plaintiff is correct that disgorgement "'may be deemed either legal or equitable' depending on the circumstances," Plaintiff's Position Pt. 1 (citing *Sripetch*, 154 F.4th at

20

983 n.1), a disgorgement remedy tethered to a "wrongdoer's net profits caused by the wrongdoing" is an equitable remedy that "doesn't require identification of particular property in the defendant's possession." *United States* v. *ERR, LLC*, 35 F.4th 405, 413 (5th Cir. 2022) (discussing *Liu* and *Great-West Life*).

Second, in any event, Plaintiff *is* asserting a right to "particular funds or property in the defendants' possession." 534 U.S. at 213. To calculate "disgorgement of wrongful gains," Plaintiff asked his damages expert, Paul Wazzan, to "quantify the portion of Defendants' profits or enrichment that may fairly be attributed to Mr. Musk's contributions." Wazzan Report ¶ 8; Notice of Remedies at 1-2. According to Wazzan himself: (i) his analysis purports to quantify Musk's "attributed" "equity interest" in, or "share of," OpenAI based on those contributions, and (ii) "if Mr. Musk prevails and the Court adopts [his] analysis" a "portion of [the OpenAI nonprofit's] economic interests would transfer to Musk." Wazzan Report ¶¶ 95, 105; Wazzan Dep. 73:22-74:1.[5] That Plaintiff is seeking to be paid that particular portion of the OpenAI nonprofit's stake in the form of a money judgment does not transform his disgorgement remedy into a legal one. *See, e.g.*, *Rind*, 991 F.2d at 1493 ("[T]he fact that disgorgement involves a claim for money does not detract from its equitable nature[.]"); *Chauffeurs, Teamsters, and Helpers, Local No. 391* v. *Terry* , 494 U.S. 558, 570 (1990) ("This Court has not, however, held that any award of monetary relief must *necessarily* be legal relief . . . [and has] characterize[d] damages as equitable . . . in actions for disgorgement of improper profits[.]" (emphasis in original)); Restatement (Third) of Restitution § 4 cmt. d ("This does not mean that any remedy by which the defendant is required to pay money is necessarily legal rather than equitable.").[6]

---

[5] Further confirming the equitable nature of Plaintiff's request for disgorgement, Plaintiff pled in his complaint that he was seeking "nonrestitutionary disgorgement" through "the imposition of a constructive trust over Defendants and their ill-gotten gains." SAC ¶¶ 279 (unjust enrichment), 298 (constructive fraud), 314 (fraud), 402 (breach of charitable trust), 416 (aiding and abetting).

[6] Plaintiff's assertion that his request for disgorgement must be legal because "[c]ourts routinely submit disgorgement claims to the jury" (Plaintiff's Position Pt. 1) runs afoul of the Ninth Circuit's admonition that the "[t]he fact that courts have sent the profits question to juries in the past does not mean that parties are entitled to a jury trial on this issue." *Rearden*, 152 F.4th at 1076; *see also Navarro* v. *Procter & Gamble Co.*, 529 F. Supp. 3d 742, 753 (S.D. Ohio 2021) (explaining that the "sheer number of cases that have treated disgorgement as a jury question" is unconvincing

21

1    The court's decisions in *Rodriguez* v. *Google*, 2025 WL 2237720 (N.D. Cal. Aug. 6, 2025)

2    and 2026 WL 252570 (N.D. Cal. Jan. 30, 2026)—on which Plaintiff also relies—confirm that the

3    disgorgement Plaintiff seeks is "an equitable, not a legal, remedy." 2025 WL 2237720 at *6. The

4    plaintiffs in *Rodriguez* sought disgorgement of the portion of Google's profits that were "traceable

5    to the particular data that [Google] allegedly" misappropriated from them. *Id.* at *6. Here too,

6    Plaintiff seeks disgorgement of "the portion of Defendants' profits or enrichment that may fairly be

7    attributed to Mr. Musk's contributions." Wazzan Report ¶ 8; *see also* Plaintiff's Supplemental

8    Responses and Objections to OpenAI Defendants' Second Set of Interrogatories No. 17 (seeking

9    "[a]ny and all ownership interests in any OpenAI entity traceable to Musk's efforts and/or

10   contributions"). And it made no difference in *Rodriguez*—and should make no difference here—that

11   the judgment sought is a "sum of money" (*see* Plaintiff's Position Pt. 1 *infra*), calculated based on

12   the portion of the Defendants' profits attributable to the misappropriated data (as in *Rodriguez*) or

13   Musk's allegedly misappropriated donations (as Plaintiff claims here). The court in *Rodriguez* was

14   as clear as could be: "Plaintiffs do not need to trace the collection of their data to precise dollars

15   sitting somewhere in a Google bank account" for "their request for disgorgement of profits" to be

16   "equitable." 2026 WL 252570, at *5.[7]

17       (ii) Because the disgorgement of profits Plaintiff seeks is an equitable remedy, Plaintiff must

18   demonstrate that he lacks an adequate legal remedy for the Court to exercise its equitable

19   jurisdiction. *See Sonner*, 971 F.3d at 842-44. He cannot do so.

20       A plaintiff has an adequate remedy at law so long as one is available to redress the harm he

21   suffered. *Rodriguez*, 2026 WL 252570, at *6. "[T]he failure to pursue, or to successfully pursue, an

22   _____

23   because "that practice matters only if it occurred over an objection to a jury determination").

24       [7] For that same reason, that the Defendants expect to prove that Musk's donations were spent
     long ago, and therefore cannot serve as the basis for a charitable trust claim today, *see* Plaintiff's
25   Position Pt. 1; Proposed Jury Instructions at 19-D, does not mean that the disgorgement remedy
     Plaintiff seeks is legal. *See also, e.g.*, *SEC* v. *Camarco*, 2021 WL 5985058, at *13-*14 (10th Cir.
26   Dec. 16, 2021) (observing that disgorgement "is an equitable remedy" and explaining that "nothing
     in the Supreme Court's description of disgorgement suggests the party ordered to disgorge money
27   must still possess the specific ill-gotten funds at the time of the disgorgement action"); *Edmonson*
     v. *Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 419-20 (3d Cir. 2013) ("The disgorgement remedy is
28   equitable even though [defendant] no longer has possession of the retained assets[.]").

adequate remedy at law does not make that remedy inadequate." *King* v. *Nat'l Gen. Ins. Co.*, 2025 WL 2494366, at *7 (N.D. Cal. Aug. 29, 2025). Nor are legal remedies inadequate merely because they "would be calculated differently" than equitable remedies or "result in different recoveries." *Ketayi* v. *Health Enrollment Grp.*, 2021 WL 2864481, at *10 (S.D. Cal. July 8, 2021); *see also* James Buchwalter & John Kimpflen, 30A C.J.S. § 23 (2025) ("It is not necessary . . . that the relief afforded be the same kind of relief that a court of equity could give.").

In his complaint, Plaintiff sought compensatory damages and legal restitution on each of his remaining claims, and those remedies would, if awarded, compensate him for the harm he claims to have suffered. *See* SAC ¶¶ 279-80, 298-99, 314-15, 402, 404, 417 (seeking compensatory damages and restitution on each claim); Dkt 390 ("Summary Judgment Order") at 21 (explaining that Plaintiff's unjust enrichment claim sounds in "restitutionary, contract-based principles"). At bottom, Plaintiff alleges that he was harmed when the OpenAI Defendants used his approximately $38 million of charitable donations for purposes other than those he intended. Recovery of those donated sums—whether in the form of compensatory damages or legal restitution—would redress that alleged injury. Because Plaintiff has such adequate remedies at law, the Court lacks equitable jurisdiction to award disgorgement of profits. *See Key*, 129 F.4th at 1142; *see also Rodriguez*, 2026 WL 252570, at *6 (declining to award equitable remedy of disgorgement of profits because legal remedy of compensatory damages was an adequate remedy at law).

Plaintiff argues that he lacks an adequate legal remedy for three reasons. None is persuasive.

First, he contends that "compensatory damages" would not compensate him for the "distinct harm he suffered from Defendants' unauthorized use of his charitable contributions." But courts have already rejected that argument: "That Defendants earned profits in the process of inflicting . . . harm renders neither damages for the harm a *per se* inadequate legal remedy **nor the earning of those profits a distinct harm for which Plaintiffs may also recover**." *Hubbard* v. *Google LLC*, 2024 WL 3302066, at *6 (N.D. Cal. July 1, 2024) (emphasis added).

Second, Plaintiff argues that Defendants' position "would mean that plaintiffs could virtually never seek disgorgement of wrongful gains." Not so. Plaintiffs may seek and obtain equitable remedies whenever an adequate remedy at law is not available. *Rodriguez*, 2026 WL 252570, at *6.

23

1    Indeed, courts have recognized that plaintiffs may lack adequate remedies at law under myriad

2    circumstances, none of which are present here. *E.g.*, *Woulfe* v. *Univ. City Studios LLC*, 2022 WL

3    18216089, at *9-11 (C.D. Cal. Dec. 20, 2022) (legal remedies unavailable for false advertising

4    claim); *Murphy* v. *Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1129 (N.D. Cal. 2023) (same for

5    consumer protection violation); *Metro-Goldwyn-Mayer Studios, Inc.* v. *Grokster, Ltd.*, 518 F. Supp.

6    2d 1197, 1219-20 (C.D. Cal. Oct. 16, 2007) ("Damages are no remedy at all if they cannot be

7    collected.").[8]

8         Third, Plaintiff claims that compensatory damages or restitution would provide "incomplete

9    or ineffective relief." But this argument merely restates the first. Compensatory damages or legal

10   restitution in the amount of Plaintiff's charitable donations is sufficient to redress Plaintiff's claimed

11   injury. That Defendants allegedly obtained a benefit from those donations does not render Plaintiff's

12   legal remedy incomplete or inadequate. *See Hubbard*, 2024 WL 3302066, at *6; *see also id.* at *5

13   (rejecting attempt to "conflate[] the <u>amount</u> of any legal remedy with the <u>adequacy</u> of that remedy"

14   (emphasis in original)). Plaintiff has not otherwise demonstrated that such compensatory damages

15   and restitution are less "prompt, certain, or efficient" than non-restitutionary disgorgement. *Sonner*,

16   971 F.3d at 844 n.8. And as *Sonner* itself teaches, Plaintiff's tactical decision to abandon his requests

17   for compensatory damages and restitution—and to instead only instruct the jury on the equitable

18   remedy of disgorgement, *see infra* Disputed Legal Issue #3—does not render those legal remedies

19   inadequate. *Id.* at 844-45.

20        For the foregoing reasons, Plaintiff cannot pursue at trial his request for non-restitutionary

21   disgorgement of profits as to any of his remaining claims.

22

23

24

25        [8] That federal statutes such as the Copyright Act and Securities Exchange Act may allow for

26   the recovery of both legal and equitable remedies (*see* Plaintiff's Position Pt. 1) is beside the point,
     as Congress can displace federal common law as it sees fit. *See Bishop Paiute Tribe* v. *Inyo Cnty.*,

27   863 F.3d 1144, 1152 (9th Cir. 2017). Plaintiff is not proceeding under a federal statute, and as *Sonner*
     and its progeny make clear, federal courts sitting in diversity remain "precluded from awarding

28   equitable relief" in cases "where an adequate legal remedy exists." *Key*, 129 F.4th at 1142.

b.  Plaintiff's Position:

Defendants' argument that Musk cannot seek disgorgement in equity because he has an adequate remedy at law is wrong for two reasons.  The disgorgement that Musk seeks is legal, not equitable.  And even if it were equitable, Defendants fail to show that Musk's legal remedies are adequate in this case.

(i) Ninth Circuit law is clear that "the restitution remedy of disgorgement – stripping defendant's gain or profits – may be deemed *either legal or equitable*" depending on the circumstances.  *SEC v. Sripetch*, 154 F.4th 980, 983 n.1 (9th Cir. 2025) (quoting Dan Dobbs & Caprice Roberts, Law of Remedies: Damages, Equity, Restitution § 4.1(1) (3d ed. 2017)) (emphasis added), *cert. granted on other grounds*, 2026 WL 73091 (2026); *see also* Restatement (Third) of Restitution § 4 (2011) ("Restitution May Be Legal or Equitable or Both"); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2310 (4th ed. 2025) ("Historically, an action for an accounting was available in the common law courts from the earliest times . . . .").

A key distinction is whether the plaintiff seeks to recover specific identifiable property or only a sum of money.  "In cases in which the plaintiff 'could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him,' the plaintiff had a right to restitution *at law* . . . ."  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (quoting 1 Dobbs § 4.1(2)).  "In such cases, the plaintiff's claim was considered legal because he sought 'to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money.' "  *Id.*  "In contrast, a plaintiff could seek restitution *in equity* . . . where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.*; *see also* Restatement (Third) of Restitution § 4 cmt. a (contrasting " 'Restitution Via Money Judgment' [which] describes the standard remedy available in actions at law" with " 'Restitution Via Rights in Identifiable Property' [which] presents what would once have been recognized as the 'equitable remedies' "); *id.* § 51 cmt. b (disgorgement of wrongful gains enforceable through "simple money judgment" without any "claim to particular assets . . . [or] requirement of tracing"); *Korea Supply Co. v. Lockheed Martin*

25

1  *Corp.*, 29 Cal. 4th 1134, 1145, 1150-51 (2003) (noting that "disgorgement of profits unjustly earned

2  . . . closely resembles a claim for damages").

3      Defendants argue that, under *Great-West*, profits-based remedies like disgorgement are

4  always equitable.  Defendants' Position Pt. 1, *supra* (citing 534 U.S. at 214 n.2).  But the footnote

5  they cite states only that an "accounting for profits" is equitable when "a plaintiff is entitled to a

6  constructive trust on ***particular property*** held by the defendant" and also seeks to "recover profits

7  produced by the defendant's use of ***that property***."  534 U.S. at 214 n.2 (emphasis added).  That

8  footnote confirms that disgorgement is equitable only when the plaintiff seeks to recover profits

9  from specifically identifiable property.  In *Rodriguez v. Google*, No. 20-cv-04688, 2026 WL 252570

10 (N.D. Cal. Jan. 30, 2026), for example, the court applied *Great-West*'s framework to conclude that

11 the disgorgement sought in that case was equitable because the case involved misappropriation of

12 "***particular data*** that Google allegedly collected" and "***particular funds*** . . . traceable to the

13 particular data."  *Id.* at *4 (emphasis added).

14     Courts routinely submit disgorgement claims to the jury.  *See, e.g.*, *Unicolors, Inc. v. H&M

15 Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1086-87 (9th Cir. 2022) (reversing remittitur of jury's

16 disgorgement award); *MSC Software Corp. v. Heroux-Devtek Inc.*, No. 19-cv-01987, 2021 WL

17 9696752, at *2 (C.D. Cal. Sept. 16, 2021) (disgorgement was "in the form of monetary damages"

18 and thus "legal in nature"); *MGA Ent. Inc. v. Harris*, No. 20-cv-11548, 2025 WL 2087583, at *13

19 (C.D. Cal. Jul. 8, 2025) (jury verdict for "disgorgement of unjustly earned profits"); *Meister v.

20 Mensinger*, 230 Cal. App. 4th 381, 398-99 (2014) (distinguishing "[d]isgorgement" awarded by the

21 jury from "a constructive trust," which was "an equitable issue"); *Am. Master Lease LLC v. Idanta

22 Partners, Ltd.*, 225 Cal. App. 4th 1451, 1484 (2014) (similar).  In *Sid & Marty Krofft Television

23 Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977), *overruled in part on other

24 grounds*, *Skidmore v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020), the Ninth Circuit held that "[a]n

25 accounting for profits, although a creature of equity, . . . is basically a money claim for damages" as

26 to which a plaintiff "ha[s] a right to a jury trial."  *Id.* at 1175.  Those cases make sense only if

27 disgorgement may be sought as a legal remedy.

28

1      Defendants rely on the Supreme Court's statement in *Liu v. SEC*, 591 U.S. 71 (2020), that

2  "a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay

3  of equity courts." *Id.* at 80.  But that statement means only that disgorgement ***may*** be sought in

4  equity, not that it may ***only*** be sought in equity.  *Sripetch* makes that point clear.  *See* 154 F.4th at

5  983 n.1 (*Liu* "did not attempt to classify disgorgement as either 'equitable' or 'legal' in nature");

6  *see also SEC v. Hallam*, 42 F.4th 316, 338 (5th Cir. 2022) (noting that post-*Liu* amendments

7  "authorize[ ] disgorgement in a legal – not equitable – sense").[9]

8      Defendants finally argue that Musk ***is*** seeking return of specific property rather than a money

9  judgment because he sought "imposition of a constructive trust" in the complaint.  Defendants'

10  Position Pt. 1 n.5, *supra*.  That Musk mentioned an additional, equitable remedy in the complaint

11  does not prove that the disgorgement remedy he seeks is equitable.  Musk separately sought

12  "restitution" and "nonrestitutionary disgorgement."  SAC ¶¶279, 298, 314, 402, 416.  Defendants

13  urge that Musk's expert seeks to "quantify the portion of Defendants' profits or enrichment that may

14  fairly be attributed to Mr. Musk's contributions."  Defendants' Position Pt. 1, *supra*.  But that does

15  not make the claim equitable either.  The mere fact that Dr. Wazzan apportions contributions when

16  measuring wrongful gains does not establish that Musk is seeking to recover specific property.

17  *Compare* Restatement (Third) of Restitution § 51 cmt. b (discussing the "tracing" required for

18  "claim[s] to particular assets"), *with id.* cmt. e (discussing issues of "attribution" required when

19  determining the amount of a money judgment for disgorgement).  Indeed, one of Defendants'

20  experts opines that Musk cannot recover anything because "Musk's . . . financial contributions . . .

21  were spent."  Dudney Report ¶17.  That OpenAI no longer has the property Musk contributed

22  confirms that Musk is not seeking an equitable remedy tethered to specific property.

23

24  ───────────────

25      [9] The statement in *SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993), that "the fact that
   disgorgement involves a claim for money does not detract from its equitable nature," is irrelevant
26  for the same reason.  *Id.* at 1493.  There, as in *Liu*, the SEC was proceeding under a statutory grant
   of authority to seek equitable relief, so the court had no reason to address whether disgorgement
27  could be a legal remedy too.  *Id.*  And in *Rearden, LLC* v. *Walt Disney Pictures*, 152 F.4th 1058
   (9th Cir. 2025), the plaintiff "d[id] not challenge [on appeal] the district court's ruling that
28  disgorgement of profits" was an "equitable remedy."  *Id.* at 1072.

(ii)  Even if Musk's disgorgement remedy were equitable, Defendants' argument would still fail because Musk does not have an adequate remedy at law.  Defendants point to Plaintiff's demand for compensatory damages in the complaint.  Defendants' Position Pt. 1, *supra*.  But compensatory damages would not compensate Musk for the distinct harm he suffered from Defendants' unauthorized use of his charitable contributions to enrich themselves.  "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss."  *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (9th Cir. 2020); *see also Sripetch*, 154 F.4th at 987 (noting the "fundamental distinction between compensatory damages, which are designed to compensate the victim for her losses, and [disgorgement], which is designed to deprive the wrongdoer of his ill-gotten gains").  Even if Musk could theoretically recover for some out-of-pocket loss (Defendants never identify what that loss might be), that remedy would not redress the **separate** harm Musk suffered from Defendants' wrongful exploitation of his charitable contributions.

Defendants' argument proves too much because it would mean that plaintiffs could virtually never seek disgorgement of wrongful gains.  Longstanding practices refute any such rule.  The Copyright Act, for example, permits plaintiffs to recover **both** "actual damages" **and** "any profits of the infringer."  *Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058, 1072-73 (9th Cir. 2025) (quoting 17 U.S.C. § 504(b)).  And the SEC routinely seeks disgorgement **alongside** "civil penalties."  *Liu*, 591 U.S. at 75.  Those practices reflect the common-sense principle that disgorgement redresses a different harm from compensatory remedies that focus on the plaintiff's out-of-pocket loss.  The adequacy of remedies to address that latter harm has no bearing on whether disgorgement is necessary to remedy the former harm.[10]

Defendants also ignore case law holding that legal remedies are not an adequate alternative when they would provide only incomplete or ineffective relief.  *Sonner* itself acknowledged

---

[10] Defendants argue that these examples are different because of the presence of a federal statute.  But "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity."  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024).  Defendants cite no case suggesting that Congress abrogated that understanding in the Copyright Act or Exchange Act.

Supreme Court authority holding that "[a] remedy at law does not exclude one in equity unless it is equally prompt and certain and in other ways efficient." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 n.8 (9th Cir. 2020) (quoting *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)). Other authorities make similar points. *See, e.g.*, 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2944 (3d ed. 2025) (alternative remedy must "provide full compensation"). And in *Playboy Enterprises v. Baccarat Clothing Co.*, 692 F.2d 1272 (9th Cir. 1982), the Ninth Circuit held that an award of compensatory damages was "inadequate" where the defendant's wrongful gains dwarfed the plaintiff's actual damages. *Id.* at 1275 (holding that district court abused its discretion by awarding $12,750 in compensatory damages rather than $120,000 in wrongfully earned profits because the former remedy "results in the defendants being unjustly enriched"). Here, Defendants have not identified ***any*** compensatory remedy, much less one that would meaningfully enforce Musk's right to prevent Defendants from profiting at his expense. Musk does not have an adequate remedy at law.

### 2. Even if Plaintiff could seek disgorgement of profits in this case, he does not have a right to a jury trial on that issue.

#### a. Defendants' Position:

In his Notice of Remedies, Plaintiff expressed his view that disgorgement should be determined by the jury. Dkt. 392 at 3, 4 (asserting that "the jury should be instructed" on several aspects of any disgorgement calculation). But even if Plaintiff could seek disgorgement of profits in this case, he does not have a right to a jury determination on that issue.

The Seventh Amendment guarantees the right to a jury trial in "[s]uits at common law." U.S. Const. amend. VII; *see also* Fed. R. Civ. P. 38(a). "To determine whether an action is one at common law, or otherwise, courts consider whether the action is akin to an action that would have traditionally been brought before a court of law or a court of equity and whether the remedies sought are legal or equitable in nature." *NLRB* v. *N. Mountain Foothills Apartments*, 157 F.4th 1089, 1098 (9th Cir. 2025). "[T]he primary nature of the remedy is the 'more important consideration.'" *Id.* (quoting *SEC* v. *Jarkesy*, 603 U.S. 109, 123 (2024)).

As discussed above, the disgorgement remedy sought by Plaintiff is an equitable remedy. *Supra* Pt. 1. Moreover, the equitable nature of the remedy is "transsubstantive," *Liu*, 591 U.S. at 81, meaning that no jury right attaches to a disgorgement remedy, regardless of the legal or equitable nature of the underlying claim. *See Fifty-Six Hope Rd. Music, Ltd.* v. *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) ("[E]ven if the claim were legal, the specific issue of profit determination cannot be said to be traditionally tried to a jury."). The Ninth Circuit therefore has repeatedly held that "disgorgement of profits is not an issue triable of right by a jury." *Rearden*, 152 F.4th at 1076; *see also, e.g.*, *SEC* v. *Jasper*, 678 F.3d 1116, 1130 (9th Cir. 2012); *Rind*, 991 F.2d at 1493; *Proofpoint, Inc.* v. *Vade USA, Inc.*, 2024 WL 4003096, at *1 (9th Cir. Aug. 30, 2024).[11] Accordingly, Plaintiff does not have a right to a jury determination on his request for disgorgement.

If the Court determines that Plaintiff is allowed to pursue the equitable remedy of disgorgement of profits (*but see supra* Pt. 1), Defendants do not object to the jury issuing an advisory verdict on that issue, subject to the Court's ultimate determination on the question. *See* Fed. R. Civ. P. 39(c)(1) & 52(a)(1); *Traxler* v. *Multnomah Cnty.*, 596 F.3d 1007, 1013 (9th Cir. 2010).

      b.  <u>Plaintiff's Position:</u>

Musk's claim for disgorgement is legal, not equitable.  As explained in Point 1 above, "the restitution remedy of disgorgement – stripping defendant's gain or profits – may be deemed ***either legal or equitable***" depending on the circumstances.  *Sripetch*, 154 F.4th at 983 n.1 (emphasis added); *see also* Restatement (Third) of Restitution § 4 ("Restitution May Be Legal or Equitable or Both").  Musk's claim is legal because he seeks a money judgment based on the amount of Defendants' wrongful gains, not a remedy tied to specific property.  *Great-West*, 534 U.S. at 213. Because Musk seeks disgorgement as a legal remedy rather than an equitable one, the Seventh Amendment entitles him to a jury trial.  *See SEC v. Jarkesy*, 603 U.S. 109, 122 (2024) (Seventh

---

[11] Courts have also been clear that disgorgement of profits specifically for aiding and abetting a breach of fiduciary duty is an issue for the court, not the jury. *Overwell Harvest Ltd.* v. *Widerhorn*, 662 F. Supp. 3d 801, 803 (N.D. Ill. 2022) ("Because Overwell seeks disgorgement as a result of Trading Technologies allegedly aiding and abetting a breach of fiduciary duty, the Court, and not a jury, will hear this case.").

1    Amendment "[e]mbraces all suits which are not of equity or admiralty jurisdiction, whatever may

2    be the peculiar form they may assume").

3        *Fifty-Six Hope Road Music, Ltd.* v. *A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015), does not

4    suggest otherwise.  That case merely held that disgorgement in trademark cases constitutes an

5    equitable remedy whether or not "pre-1791, trademark-like cases" were viewed as equitable, a point

6    as to which it expressed some doubt.  *Id.* at 1075-76.  The Court never held that the Seventh

7    Amendment excludes disgorgement even when disgorgement operates as a legal remedy.  To the

8    contrary, the Ninth Circuit has held that the Seventh Amendment confers a jury trial right for

9    disgorgement in copyright cases.  *See Sid & Marty Krofft Tel. Prods., Inc. v. McDonald's Corp.*,

10   562 F.2d 1157, 1175 (9th Cir. 1977) (an "accounting for profits, although a creature of equity, . . .

11   is basically a money claim for damages" as to which plaintiffs "had a right to a jury trial"), *overruled

12   in part on other grounds*, *Skidmore v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020)

13       At a minimum, Musk agrees that disgorgement should be submitted to the jury on at least

14   an advisory basis in light of the Seventh Amendment issues.

15
16   **3.    Plaintiff does not have a right to a jury trial as to liability on his claims or as to punitive damages.**

17       a.  <u>Defendants' Position</u>:

18       (i) In his proposed jury instructions, Plaintiff disclosed for the first time in this case that he

19   is not seeking compensatory damages; the only monetary remedies he seeks are disgorgement of

20   allegedly wrongful gains and exemplary damages. But the law is clear that "exemplary damages"

21   are unavailable absent a "predicate" monetary award. *California* v. *Altus Finance S.A.*, 540 F.3d

22   992, 1000-01 (9th Cir. 2008) (quoting *Mother Cobb's Chicken Turnovers, Inc.* v. *Fox*, 10 Cal.2d

23   203, 205 (1937)). And, as shown, disgorgement of wrongful gains is quintessentially equitable

24   relief. *See* Pt. 1, *supra*. Thus, while exemplary damages are typically legal in nature, the Ninth

25   Circuit has held that exemplary damages constitute "an equitable remedy" where, as is the case here,

26   they necessarily "rest[] on disgorgement of the defendant's profits." *Proofpoint*, 2024 WL 4003096,

27   at *1 (affirming denial of jury trial on exemplary damages because predicate disgorgement remedy

28

1  was equitable); *see also Liu*, 591 U.S. at 80 ("[A] remedy tethered to a wrongdoer's net unlawful

2  profits, whatever the name, has been a mainstay of equity courts.").

3        As a result, Plaintiff is seeking only equitable remedies in this case. But no jury right attaches

4  to a claim for which only equitable relief is sought. *E.g.*, *Adams* v. *Johns-Manville Corp.*, 876 F.2d

5  702, 709 (9th Cir. 1989) (breach of contract claim "for specific performance without a claim for

6  damages is purely equitable and historically has always been tried to the court"); *Carpenters Local*

7  *Union 721* v. *Limon*, 2018 WL 5905946, at *1-*2 (C.D. Cal. May 29, 2018) (no jury right where

8  plaintiff sought equitable relief but no compensatory damages).

9        Plaintiff's attempt to resist the Ninth Circuit's holding in *Proofpoint* is unpersuasive. He

10  relies on cases (*see* Plaintiff's Position Pt. 3 *infra*), where exemplary damages were *not* predicated

11  solely on an equitable remedy like disgorgement, and involved either (i) actual or money damages

12  alongside punitive damages, *see In re Tsay JBR LLC*, 136 F.4th 1176, 1180 (9th Cir. 2025) ("actual

13  damages"); *Teutscher* v. *Woodson*, 835 F.3d 936, 943 (9th Cir. 2016) ("actual and punitive

14  damages"); *Rogers* v. *NationsCredit Fin. Servs. Corp.*, 2000 WL 1499354, at *8 (N.D. Cal. Aug. 7,

15  2000) ("money damages, including punitive damages"); *Edmark Auto, Inc.* v. *Zurich Am. Ins. Co.*,

16  2022 WL 822121, at *1 (9th Cir. Mar. 17, 2022) ("damages for breach of contract, disgorgement,

17  and punitive damages"), or (ii) statutes authorizing punitive damages without a predicate damages

18  award, *see Lebow* v. *Am. Trans Air, Inc.*, 86 F.3d 661, 670 (7th Cir. 1996) (punitive damages under

19  statute); *SEC* v. *Jarkesy*, 603 U.S. 109, 124 (2024) (civil penalties under statute).

20        And while Plaintiff relies on a September 2025 district court ruling in *MGA Entertainment*

21  v. *Harris* as purportedly undermining *Proofpoint*'s reach, 2025 WL 3691978, at *2 (C.D. Cal. Sept.

22  23, 2025), he ignores that—just two months *after* that decision—the same court in the same case

23  certified the same ruling for interlocutory appeal, noting that "*Proofpoint* specifically addressed

24  remedies tethered to disgorgement, while *In re Tsay* did not." *MGA Ent. Inc.* v. *Harris*, 2025 WL

25  3691978, at *2 (C.D. Cal. Nov. 20, 2025).

26

27

28

Because Plaintiff's request for exemplary damages would solely "rest[] on disgorgement of the defendant's profits, it is an equitable remedy." *Proofpoint*, 2024 WL 4003096, at *1. Plaintiff accordingly has no right to a jury trial as to liability on any of his claims or as to punitive damages.[12]

(ii) Even if disgorgement and exemplary damages are deemed legal remedies in this case, Plaintiff still does not have a right to a jury trial as to liability on his claim for breach of charitable trust because it is an equitable cause of action for which no federal jury right attaches. *See, e.g.*, *supra* Pt. 2; *CIGNA Corp.* v. *Amara*, 563 U.S. 421, 439-40 (2011) ("Trusts are, and have always been, the bailiwick of the courts of equity."). Plaintiff's own authority recognizes that breach of trust actions "were within the exclusive jurisdiction of courts of equity." *Chauffeurs, Teamsters & Helpers, Local No. 391* v. *Terry*, 494 U.S. 558, 567 (1990).[13]

None of Plaintiff's authorities supports a jury right for his breach of charitable trust claim. *Chauffeurs* found a claim for breach of a collective-bargaining agreement under federal labor law—not a breach of trust claim—to be "comparable to a breach of contract claim." *Id.* at 570. The Restatement counsels only that a "beneficiary is allowed to bring an action at law against [a] trustee," not that a beneficiary's *breach of trust* claim is an action at law. Restatement (Third) of Trusts § 95 cmt. a (2012). And as for Plaintiff's "arguable quasi-contractual interest," Dkt. 390 at 13 n.10, whether a quasi-contract claim might be legal in other circumstances, a breach of trust claim is not. Restatement (Third) of Trusts § 95 cmt. a (2012) ("Even a trustee's express agreement to perform the duties of the trusteeship does not make those duties enforceable in an action at law.").

Finally, Defendants did not forfeit the argument that no jury right attaches to the breach of charitable trust claim. The Court denied the OpenAI Defendants' summary judgment motion, ruling

---

[12] Plaintiff does not seek exemplary damages in connection with his unjust enrichment claim. Thus, Plaintiff seeks only equitable remedies for that claim—and no jury right attaches—even if the Court rules that exemplary damages in this case are a legal remedy. That unjust enrichment "is grounded in equitable principles of restitution, rather than breach of a legal duty," *Calise* v. *Meta Platforms, Inc.*, 103 F.4th 732, 743 (9th Cir. 2024), further confirms that Plaintiff has no right to a jury trial on that claim. *See also Hendricks* v. *StarKist Co.*, 30 F. Supp. 3d 917, 933 n.9 (N.D. Cal. 2014) (unjust enrichment is an "equitable theory").

[13] Courts have also recognized that "aiding and abetting a breach of fiduciary duty . . . was historically an equitable claim." *Overwell Harvest*, 662 F. Supp. 3d at 803.

1   that Plaintiff has standing to proceed to trial on the claim, only last month. The OpenAI Defendants

2   pressed the argument promptly in the pretrial vehicle that the Court has designated for raising

3   disputed legal issues. Further, Plaintiff cannot show prejudice here, particularly where Defendants

4   consent to an advisory jury. *Rearden*, 152 F.4th at 1077 (affirming mid-trial order to strike jury

5   demand where party "failed to demonstrate any prejudice" given use of advisory jury).

6       Defendants do not object to the jury issuing an advisory verdict as to liability on Plaintiff's

7   claims or as to punitive damages, subject to the Court's ultimate determination on that question. *See*

8   *supra* Pt. 2.

9       b.   Plaintiff's Position:

10      (i)  Defendants argue that Musk lacks a jury-trial right ***even on liability*** because, in their

11   view, the disgorgement remedy that Musk seeks is equitable.  Defendants' premise is wrong – as

12   explained above, the disgorgement remedy Musk seeks is legal, not equitable, so the Seventh

13   Amendment entitles Musk to a jury trial.  Even if that were not the case, Musk would still be entitled

14   to a jury trial on liability and punitive damages.

15      Defendants do not dispute that California law entitles Musk to recover punitive damages on

16   his breach of charitable trust, fraud, constructive fraud, and aiding and abetting claims.  Cal. Civ.

17   Code § 3294.  "[P]unitive damages . . . for [a plaintiff's] state law claims are indisputably legal

18   remedies because such damages are 'the traditional forms of relief offered in the courts of law.'"

19   *Teutscher v. Woodson*, 835 F.3d 936, 943 (9th Cir. 2016) (alterations omitted).  Because a plaintiff

20   must prove liability to recover punitive damages and because punitive damages are a legal remedy,

21   Musk is entitled to a jury trial on ***both*** liability ***and*** punitive damages regardless of this Court's

22   treatment of disgorgement.  *See Lebow v. Am. Trans Air, Inc.*, 86 F.3d 661, 672 (7th Cir. 1996)

23   (plaintiff "ha[d] the right to seek punitive damages, which the Supreme Court has characterized as

24   a legal remedy," notwithstanding failure to seek legal relief); *Rogers v. NationsCredit Fin. Servs.

25   Corp.,* No. C-98-2680 SC, 2000 WL 1499354, at *8 (N.D. Cal. Aug. 7, 2000) ("[B]ecause Plaintiff

26   seeks punitive damages for the violation of section 524, she is entitled to a jury trial.").  The Supreme

27   Court and the Ninth Circuit have repeatedly confirmed that "monetary relief . . . designed to punish

28   or deter the wrongdoer" is almost always legal.  *SEC v. Jarkesy*, 603 U.S. 109, 123 (2024); *see In*

34

1    *re Tsay JBR LLC*, 136 F.4th 1176, 1180-81 (9th Cir. 2025) (a "penalty that advances punitive and

2    deterrent purposes" like " 'punitive damages' " is "a legal remedy").

3          Defendants cite the Ninth Circuit's unreported decision in *Proofpoint, Inc. v. Vade USA,*

4    *Inc.*, No. 23-16085, 2024 WL 4003096 (9th Cir. Aug. 30, 2024), for the proposition that a claim for

5    punitive damages is not legal when the only other relief sought is equitable. *Id.* at *1.  That reading

6    of *Proofpoint* contradicts the Ninth Circuit's treatment of punitive damages in *Teutscher*, 835 F.3d

7    at 943, and the Seventh Circuit's explicit holding in *Lebow* that punitive damages unaccompanied

8    by other legal relief remain legal, 86 F.3d at 672.  It also contradicts the Ninth Circuit's more recent

9    precedential decision in *Tsay* stating that monetary relief that "advances punitive and deterrent

10   purposes" that could be "described as 'penalties,' ***as 'punitive damages***, [or] as an 'exemplary

11   award' " is legal under the Seventh Amendment.  136 F.4th at 1180 (citations omitted, emphasis

12   added).  Courts thus treat demands for punitive damages as legal even when coupled with requests

13   for equitable relief.  *See, e.g.*, *MGA Ent. Inc. v. Harris*, No. 20-cv-11548, 2025 WL 3751215, at *2

14   (C.D. Cal. Sept. 23, 2025) (concluding that, notwithstanding *Proofpoint*, "any award [of punitive

15   damages] granted under [Cal. Civ. Code § 3294] is a legal remedy, not an equitable one"); *Edmark*

16   *Auto, Inc. v. Zurich Am. Ins. Co.*, No. 21-35231, 2022 WL 822121, at *2 (9th Cir. Mar. 17, 2022)

17   (upholding "jury's award of punitive damages" coupled with disgorgement award).

18         (ii)  As to Defendants' argument that Musk lacks a jury-trial right on his claim for breach of

19   charitable trust, Defendants forfeited this argument by raising it too late in the litigation.  *See Ruiz*

20   *v. Bradford Exch., Ltd.*, 153 F.4th 907, 915-16 (9th Cir. 2025) (holding that equitable jurisdiction

21   objections are waivable).  This Court previously decided that "[w]e are going to have one jury who

22   are going to decide all of these facts which relate to all of these claims, whichever ones survive."

23   4/4/25 Hr'g Tr. 14-15 (Dkt. 144).  The Court explicitly observed that "[t]here was a note in [the

24   party's prehearing] filing about reserving on judge versus jury," but it rejected that reservation in

25   clear terms:  "***This is a jury trial***.  The only thing that is required . . . to be resolved by the Court is

26   the UCL [claim]."  *Id.* at 30 (emphasis added).  Defendants never sought reconsideration of that

27   ruling.  *Cf.* N.D. Cal. L.R. 7-9(b) (requiring party seeking reconsideration to "specifically show

28   reasonable diligence in bringing the motion").  The parties conducted months of discovery and

summary judgment on the assumption that the charitable trust claim would be tried to a jury.  It is too late for Defendants to change course now.

In any case, Defendants fail to show that this claim is equitable.  They cite authority explaining that trust law ***arose*** in equity, but they ignore authority that a "beneficiary can maintain an action at law against the trustee to enforce payment" when the trustee is "under a duty to pay money immediately and unconditionally."  Restatement (Second) of Trusts § 198 (1959); *see also* Restatement (Third) of Trusts § 95 cmt. a (similar).  This Court has also recognized that one basis for Musk's standing is his "quasi-contractual interest" in the trust – exactly the kind of interest that was historically enforceable at law.  Dkt. 390 at 13 n.10; *see also Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 569-70 (1990) ("When viewed in isolation, [plaintiff's claim] is analogous to a claim against a trustee for breach of fiduciary duty," but the specific issue was more "comparable to a breach of contract claim – a legal issue.").  Moreover, the remedy that Musk seeks is an important factor.  *See Chauffeurs*, 494 U.S. at 570-72 (holding that jury trial right applied to "duty of fair representation" action based largely on nature of remedy sought).  Musk's claim for disgorgement is legal for all the reasons explained above.

Finally, because the punitive damages claim requires a jury trial, all liability issues must be tried to the jury.  "So long as a case involves a legal claim, the right to a jury trial attaches, even if the case also seeks equitable relief."  *Tsay*, 136 F.4th at 1179.  At a minimum, Musk agrees that the breach of charitable trust claim should be submitted to the jury on at least an advisory basis in light of the Seventh Amendment issues.

### 4. Plaintiff should be foreclosed from seeking disgorgement against Mr. Altman and Mr. Brockman.

a.  Defendants' Position:

Plaintiff's proposed verdict form asks the jury to assign an amount of "wrongful gains" to Mr. Altman and Mr. Brockman. The verdict form should not include those questions.

For months, the parties have litigated this case on the understanding that Plaintiff was seeking monetary remedies from only two defendants: the OpenAI nonprofit and Microsoft. Plaintiff's lone damages expert (Wazzan) served two expert reports—an October opening report

and a December supplemental report—each of which purported to calculate "wrongful gains" for OpenAI and Microsoft only, with no mention or proposed calculation of wrongful gains by Altman or Brockman. Wazzan then confirmed at deposition that under his analyses, *all* of the wrongful gains by the OpenAI Defendants were gains by the nonprofit: "Q: According to your analysis, what portion of that [illustrative] $87 billion wrongful gain is a gain by the OpenAI nonprofit?  A:  All of it."  Wazzan Tr. at 70:8-23. Wazzan also acknowledged under oath that he had not been "asked to analyze the wrongful gains" of Altman or Brockman. *Id.* at 108:15-22.

On January 16, pursuant to the Court's instruction, Plaintiff filed his Notice of Remedies. That filing identified only two monetary remedies that Plaintiff would seek at trial: (1) "disgorgement of wrongful gains" from OpenAI and Microsoft, based on Wazzan's analyses; and (2) "punitive damages." Dkt. 392 at 1, 4. Although the Notice referenced the possibility that Plaintiff would "seek other monetary remedies at trial," *id.* at 4, it identified no such remedies, and when the OpenAI Defendants asked Plaintiff to specify what other monetary remedies he had in mind, Plaintiff refused to provide that information.

As a consequence, until Plaintiff provided his initial draft proposed jury instructions and verdict form in February, the OpenAI Defendants had no reason to believe that Plaintiff intended to seek monetary remedies from Altman or Brockman. Plaintiff has never articulated any framework or methodology for calculating the amount of Altman's or Brockman's purported wrongful gains— whether through proposed expert testimony or otherwise. Now, however, with fact and expert discovery closed, Plaintiff says that he is entitled to ask the jury to just pick a number for these individuals. That is not permissible. *See Cal. Diesel & Equip., Inc.* v. *Sun Exploration & Prod. Co.*, 1990 WL 171594, at *3 (9th Cir. Nov. 7, 1990) (overturning damages award that was "clearly unsupported by the evidence"); *Elia* v. *Roberts*, 2019 WL 7048762, at *2 (C.D. Cal. Dec. 23, 2019) ("A damage award . . . cannot stand if it could only have been based on speculation or guesswork." (quoting *Blanton* v. *Mobil Oil Corp.*, 721 F.2d 1207, 1216 (9th Cir. 1983)).

Plaintiff's last-minute change of position threatens to significantly prejudice Altman, Brockman, and the other OpenAI Defendants. For example, while Plaintiff concedes (as he must) that Wazzan never analyzed any purported "wrongful gains" by Altman or Brockman, he argues

1   below that the jury could still "rely on the methods [Wazzan] teaches" to calculate those gains on

2   their own. This is a thinly veiled effort to introduce new expert opinions, long after the court-ordered

3   deadline for doing so, and it is manifestly improper. The OpenAI Defendants never had the

4   opportunity to ask Wazzan whether his "teachings" and "methods" could reliably be used in the way

5   Plaintiff now suggests; never had the opportunity to raise that issue in their pending *Daubert*

6   challenge; and never had the opportunity to present a rebuttal expert on the point. The Court should

7   strike Plaintiff's proposed references on the verdict form to "wrongful gains" by these individuals.

8       Plaintiff's proposed verdict form substantially amplifies the risk of prejudice by including

9   the questions about Altman and Brockman immediately after the (independently improper) specific

10  questions based on Wazzan's methodology.[14] To reiterate, by his own admission, Wazzan was not

11  asked, and did not try, to calculate Altman's or Brockman's wrongful gains. Plaintiff's proposed

12  verdict form nevertheless creates the misleading impression that the jury could apportion the

13  OpenAI nonprofit's alleged gains and assign them (in part) to Altman or Brockman. Nothing in

14  Wazzan's reports suggests that such an apportionment is warranted.

15          b.   Plaintiff's Position:

16      Defendants seek a preemptive ruling that Plaintiff cannot obtain disgorgement against

17  Altman or Brockman because, they predict, that remedy will not be "supported by [an] evidentiary

18  record" at trial. Defendant's Position Pt. 4, *supra*. That request is a procedurally improper attempt

19  to convert a pretrial conference statement into a Rule 50 motion for judgment as a matter of law.

20  The Court should reject the argument on that basis alone.

21      In any event, Defendants' predictions lack merit. Defendants urge that Plaintiff's damages

22  expert, Dr. Wazzan, expressed no opinion on the amount of Brockman or Altman's wrongful gains.

23  But a jury does not require expert testimony to award disgorgement or other remedies. "[M]any

24  sources can provide the requisite information upon which a reasonable jury may calculate damages."

25  *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012); *see also Cassino v.*

26

27  ───────────────────

28      [14] The Parties have submitted competing proposed verdict forms and their positions
    regarding the language and sequencing of those forms are addressed therein.

1  *Reichhold Chems., Inc.*, 817 F.2d 1338, 1348 (9th Cir. 1987) ("[E]xpert testimony is not required to

2  prove what the plaintiff would receive in future earnings and raises."); *Tucker v. Wright Med. Tech.,*

3  *Inc.*, No. 11-CV-03086-YGR, 2013 WL 1149717, at *16-*17 (N.D. Cal. Mar. 19, 2013) ("[E]xpert

4  testimony is not necessary to determine Mrs. Tucker's damages.").

5       Plaintiff expects there to be substantial evidence at trial on which the jury could base a

6  disgorgement award.  For example, Brockman owns a large equity stake in OpenAI's for-profit

7  entity, the value of which will be proven at trial.  The jury could rely on that evidence to award

8  disgorgement against Brockman.  Similarly, there will be evidence about profits Altman reaped

9  from his stakes in other companies that engaged in conflicted transactions with OpenAI that Altman

10  helped arrange.  Those gains would also support a disgorgement award.

11       That Dr. Wazzan does not opine on Brockman or Altman's wrongful gains, moreover, does

12  not mean that a jury cannot rely on the methods he teaches to determine the portions of Altman and

13  Brockman's gains that are attributable to Musk's contributions.  Brockman, for example, is an

14  investor in the OpenAI for-profit, just like Microsoft.  A jury could thus apply Dr. Wazzan's

15  teachings on Microsoft's wrongful gains to calculate Brockman's wrongful gains too.  It is

16  premature to predict whether the evidence will support an award before the trial has even begun.[15]

17       **5.       Plaintiff is not entitled to a "continuous accrual" jury instruction.**

18            a.   Defendants' Position:

19       In his proposed jury instruction on the statute of limitations (and in his objections to the

20  Defendants' proposed statute of limitations jury instructions), Plaintiff seeks to apply the continuous

21  accrual theory to this case by instructing the jury that his claims were timely if "the Defendants were

22  under a continuing or recurring obligation and continued to engage in the wrongful acts after the

23  applicable date." Plaintiff's Proposed Jury Instruction 30-P. The instruction should not be given. No

24  CACI model instruction on a statute of limitations includes language regarding continuous accrual.

25

26

27       [15] Defendants complain that Musk's notice of remedies did not mention his disgorgement
      claims against Altman or Brockman.  But that notice identified only "[t]he **primary** monetary
28  remedy that Plaintiff seeks."  Dkt. 392 at 1 (emphasis added).

1    And the facts of this case do not support application of the continuous accrual theory under

2    controlling California law.

3        The continuous accrual doctrine applies only when a defendant's obligations are "severed

4    into intervals." *Lamont* v. *Time Warner, Inc.*, 586 F. App'x 357, 357 (9th Cir. 2014) (quoting

5    *Armstrong Petroleum Corp.* v. *Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1388 (2004));

6    *see also Honey Baked Ham, Inc.* v. *Honey Baked Ham Co.*, 2021 WL 5990164, at *8 (C.D. Cal.

7    Nov. 4, 2021) (continuous accrual requires "a series of severable obligations"). Examples of such

8    severable obligations include "installment contracts, . . . leases with periodic rental payments, and

9    contracts calling for periodic, pension-like payments." *Armstrong Petroleum*, 116 Cal. App. 4th at

10   1388. Furthermore, the continuous accrual doctrine applies only if "each new breach of such an

11   obligation provides all the elements of a claim—wrongdoing, harm, and causation." *Aryeh* v. *Canon*

12   *Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1199 (2013). Thus, only when there are such "separate, recurring

13   invasions" of a "severable, recurring obligation" may each separate violation "be treated as an

14   independently actionable wrong with its own time limit for recovery." *Id.* at 1198-1200. The mere

15   fact that a "breach or other wrong . . . has continuing impact" is not enough. *Armstrong Petroleum*,

16   116 Cal. App. 4th at 1389.

17       The facts of this case plainly do not meet these requirements. Plaintiff claims that OpenAI,

18   Inc. was required to "be open source and a nonprofit" "forever." Musk Tr. 54:15-23, 285:19-286:24.

19   But there is no evidence that the duties allegedly owed by the OpenAI Defendants were divided into

20   periodic intervals or constituted severable obligations, and Musk does not claim they were. As courts

21   have "repeatedly" held, "when an alleged duty bears little relation to the monthly payments or

22   monthly bills that California courts have found to be periodic, recurring obligations, applying the

23   continuous accrual doctrine is unwarranted." *Brodsky* v. *Apple Inc.*, 445 F. Supp. 3d 110, 136-37

24   (N.D. Cal. 2020); *see also Hamilton* v. *U.S. Bank Nat'l Ass'n*, 2022 WL 1736 8815, at *7 (C.D. Cal.

25   Oct. 14, 2022) (deed of trust not "divisible or severable"); *Phoenix Techs. Ltd.* v. *VMware, Inc.*,

26   2017 WL 1289863, at *6 (N.D. Cal. Jan. 6, 2017) (perpetual license "not severable").[16]

27   _____

28   [16] For all the same reasons and more, the continuous accrual doctrine has no application to
     Microsoft. Aiding-and-abetting law imposes no obligation on third parties to act or refrain from

40

Plaintiff does not dispute—and thus concedes—that any obligation allegedly owed by the OpenAI Defendants was not divided into intervals. He instead contends, relying on the California Supreme Court's 2013 decision in *Aryeh*, that the continuous accrual doctrine applies even if the obligation at issue is not so severed, as long as it is "continuing or recurring." While *Aryeh* used that phrase to describe the doctrine "[g]enerally speaking," 55 Cal. 4th at 1199, it does not bear the weight of Plaintiff's argument. The Court repeatedly referred approvingly to application of the doctrine to "severable" or "periodic" obligations. *Id*. at 1200-01. Moreover, the obligation at issue in *Aryeh* was itself a severable, periodic one: the plaintiff claimed repeated violations of a statutory "duty not to impose unfair charges in monthly bills" under an equipment lease. *Id.* at 1200. The periodic "nature of the obligation" in *Aryeh* is what made it "susceptible to recurring breaches" and thus appropriate for the continuous accrual doctrine. *Id.*; *see J. Edwards Jewelry Distrib., LLC* v. *Wells Fargo & Co.*, 2019 WL 2329248, at *4 n.3 (N.D. Cal. May 31, 2019) (recognizing that *Aryeh* applied the continuous accrual doctrine "because pursuant to the applicable rental agreement between the parties the defendant, Canon, billed plaintiff Aryeh on a recurring monthly basis").

Courts post-*Aryeh* therefore continue to "confine[] the application of the continuing accrual theory to a limited category of cases, including installment contracts, leases with periodic rental payments, and other types of periodic contracts." *Factory Direct Wholesale, LLC* v. *iTouchless Housewares & Prods., Inc.*, 411 F. Supp. 3d 905, 917 (N.D. Cal. 2019) (so holding even while

---

acting, let alone a severable, recurring one. *Cf.* Proposed Jury Instructions 26-P and 26-D (both acknowledging that failure to prevent a breach of charitable trust does not constitute aiding and abetting); *Fiol* v. *Doellstedt*, 50 Cal. App. 4th 1318, 1326 (1996); *Gottex Fund Mgmt. Ltd.* v. *MKA Real Est. Opportunity Fund I, LLC*, 2013 WL 12137878, at *5 (C.D. Cal. Dec. 23, 2013) (explaining that "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting" and that "[a]s a general rule, one owes no duty to control the conduct of another."). Plaintiff's challenge to Microsoft's partnership with OpenAI, which began in 2019, does not involve any separate, periodic, recurring activity that could support a continuous accrual instruction, *see supra* at 39.

Moreover, while Plaintiff says that his breach of charitable trust claim "accrued every time Defendants used the fruits of his contributions," and that the analysis is the "same" for the aiding-and-abetting claim against Microsoft, *see infra* at 44-45, that is wrong on its face. The aiding-and-abetting claim against Microsoft is **not** rooted in any quasi-contractual relationship with Musk, *see* ECF No. 390 at 27, and thus Plaintiff's theory of accrual does not apply. That is another reason why continuous accrual does not apply to any aiding-and-abetting claim against Microsoft.

1   acknowledging *Aryeh*'s "continuing or recurring" language); *see also Brodsky*, 445 F. Supp. 3d at

2   136 (even after *Aryeh*, continuous accrual "unwarranted" absent "periodic, recurring obligations");

3   *Ryan* v. *Microsoft Corp.*, 147 F. Supp. 3d 868, 895 (N.D. Cal. 2015) (even after *Aryeh*, continuous

4   accrual doctrine limited to "disputes regarding monthly" and other "periodic" obligations).

5        Nor do Plaintiff's other authorities support his attempt to expand the continuous accrual

6   doctrine beyond severable, periodic duties. Several are cases similar to *Aryeh* in that they involved

7   obligations to make payments or deliveries on a periodic basis. *Gilkyson* v. *Disney Enters., Inc.*, 244

8   Cal. App. 4th 1336, 1343 (2016) (defendant "issued quarterly royalty statements," reflecting

9   "obligation to pay periodic royalties" under a licensing agreement); *J.B. Painting & Waterproofing,*

10  *Inc.* v. *RGP Holdings, LLC*, 650 F. App'x 450, 453-54 (9th Cir. 2016) ("each delivery of [a product]

11  in a series of orders placed" under a contract was severable); *POGA Mgmt. Partners LLC* v. *Medfiler*

12  *LLC*, 2014 WL 3963854, at *2, *11 (N.D. Cal. Aug. 12, 2014) (defendants' obligation to provide

13  recordkeeping services to clients on behalf of partnership was tied to "quarterly fee" paid by clients

14  and "quarterly distributions" owed to partner). And another case, *Water Audit Cal.* v. *Merced*

15  *Irrigation Dist.*, 111 Cal. App. 5th 1147, 1192 (2025), involved a statutory obligation (to keep a

16  waterway unobstructed) that was made severable by the statute itself, which explicitly provided that

17  "[e]ach day" the violation continued "*shall constitute a separate violation.*" *Id.* (emphasis added).

18  None of Plaintiff's cases applied the continuous accrual theory to an obligation that was merely

19  continuing—as the obligations here allegedly were—but not severable into periodic intervals.[17]

20       Plaintiff's argument has no bounds. He insists that "even if OpenAI initially breached its

21  charitable trust obligation by forming its for-profit subsidiary in 2019," the continuous accrual

22  doctrine permits him to sue the OpenAI Defendants for "continuing to operate its for-profit

23  subsidiary" on a "daily basis" and for "continu[ing] to derive benefits" from his contributions "for

24  years." By Plaintiff's own logic, his claims will continue to accrue, in perpetuity, for as long as the

---

[17] Whether a copyright infringement claim would be timely under the "separate-accrual rule" of federal copyright law, *Petrella* v. *Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014), is entirely irrelevant to whether California's distinct continuous accrual doctrine applies to obligations that are not severed into intervals.

for-profit entity exists. But the continuous accrual doctrine does not apply merely because a breach has "continuing impact." *Armstrong Petroleum*, 116 Cal. App. 4th at 1389; *see State ex. rel. Metz* v. *CCC Info. Servs., Inc.*, 149 Cal. App. 4th 402, 418 (2007) (claim "does not involve a recurring" or "periodic" obligation where effects "arose out of" earlier transaction). Instead, as discussed, that doctrine is limited to obligations that are severed into intervals. And for good reason: without these limits, statutes of limitations "would lack meaning," as plaintiffs could file suit "at any time." *Sierra R.R. Co.* v. *Comcast Cable Commc'ns, LLC*, 2026 WL 25461, at *6 (E.D. Cal. Jan. 5, 2026).

Finally, the statute of limitations instruction given in *Washington* v. *CVS Pharmacy, Inc.*, does not support Plaintiff's proposed continuous accrual instruction. Unlike the alleged obligations here, the contractual duty in *CVS* was severable into daily intervals. *Corcoran* v. *CVS Health*, No. 4:15-cv-03504, 2017 WL 3873709, at *16 (N.D. Cal. Sept. 5, 2017) (obligation to offer pharmacy benefit managers and insurance providers the "usual and customary" price for patients' prescriptions, defined as the lowest price for a prescription on a "particular day"), *rev'd on other grounds*, 779 F. App'x 431 (9th Cir. 2019). Thus, it is unsurprising that the parties jointly proposed to instruct the jury that prescription purchases made in the last three years were timely. *Washington v. CVS Pharmacy, Inc.*, No. 4:15-cv-03504, Dkt. 580, at 31 (N.D. Cal. June 12, 2021). Plaintiff has cited no case—including *Washington*—where the court submitted to the jury the question of whether "the Defendants were under a continuing or recurring obligation and continued to engage in the wrongful acts after the applicable date," as Plaintiff's proposed instruction seeks here. Plaintiff's Proposed Jury Instruction 30-P.

Accordingly, the Court should reject Plaintiff's proposal to instruct the jury on the continuous accrual theory.[18]

    b.  Plaintiff's Position:

Defendants' arguments against the continuous accrual doctrine ignore well-established California law.  "[C]ontinuous accrual applies whenever there is a ***continuing or recurring***

---

[18] Plaintiff does not advance—and thus has waived—any argument that his claims are timely under the distinct "continuing violation" doctrine. *See Aryeh*, 55 Cal. 4th at 1198.

obligation:  'When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period.'  Because each new breach of such an obligation provides all the elements of a claim – wrongdoing, harm, and causation – each may be treated as an independently actionable wrong with its own time limit for recovery.' "  *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1199 (2013) (citations omitted, emphasis added); *see also Water Audit Cal. v. Merced Irrig. Dist.*, 111 Cal. App. 5th 1147, 1191-92 (2025) (continuous accrual doctrine applies where "a continuing duty is breached on a recurring or ongoing basis"); *Gilkyson v. Disney Enters.*, 244 Cal. App. 4th 1336, 1341-42 (2016) ("Under the continuous accrual doctrine each breach of a recurring obligation is independently actionable."); *J.B. Painting & Waterproofing, Inc. v. RGP Holdings, LLC*, 650 Fed. App'x 450, 453-54 (9th Cir. 2016) (under the continuous accrual doctrine, "each delivery . . . in a series of orders . . . triggers its own limitations period").

A copyright plaintiff, for example, may sue for infringement within the past three years, even when the defendant has been continuously infringing the work for decades.  "[W]hen a defendant commits successive violations, the statute of limitations runs separately from each violation. . . .  [E]ach infringing act starts a new limitations period."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014).  The reason for that rule is obvious:  "[P]arties engaged in long-standing misfeasance [should not] obtain immunity in perpetuity from suit even for recent and ongoing misfeasance."  *Aryeh*, 55 Cal. 4th at 1198.

Those principles apply squarely here.  Musk's claim for breach of charitable trust, for example, accrued every time Defendants used the fruits of Musk's contributions to pursue purposes other than the charitable purposes for which those contributions were given.  *See* Restatement (Third) of Trusts § 93 (2012) ("A breach of trust is a failure by the trustee to comply with any duty that the trustee owes, as trustee, . . . to further the charitable purpose, of the trust.").  Thus, even if OpenAI initially breached its charitable trust obligations by forming its for-profit subsidiary in 2019, it breached those obligations many times thereafter as well.  OpenAI committed another breach of charitable trust in January 2023 when it granted Microsoft a substantially increased equity stake in return for a massive $10 billion investment.  And OpenAI committed more breaches on a daily basis

44

1  by continuing to operate its for-profit subsidiary for private gain.  Claims over those more recent

2  breaches are indisputably timely, even if the older ones are outside the limitations period.

3      The same analysis applies to the claim against Microsoft for aiding and abetting breaches of

4  charitable trust.  And the same analysis applies to Plaintiff's unjust enrichment claim too.  "The

5  elements for a claim of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit

6  at the expense of another.'" *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105,

7  1132 (2014).  OpenAI continued to derive benefits at the expense of Musk's contributions for years.

8  Each instance of unjust enrichment was a separate breach.  Moreover, Plaintiff's damages expert

9  will provide a framework the jury can use to exclude disgorgement for wrongful gains that accrued

10 outside the limitations period.

11     Courts have applied the continuous accrual doctrine to analogous claims.  In *POGA*

12 *Management Partners LLC v. Medfiler LLC*, No. C 12-06087 SBA, 2014 WL 3963854 (N.D. Cal.

13 Aug. 12, 2014), the court applied the doctrine to a breach of fiduciary duty claim:  "The Court finds

14 that the continuous accrual theory applies.  POGA has alleged a wrongful course of conduct

15 consisting of individual acts, each of which was independently actionable, at least one of which

16 allegedly occurred within three years of the filing of the complaint.  Specifically, POGA alleges that

17 Defendants breached their fiduciary duty of loyalty when they created a competing business

18 platform . . . ."  *Id.* at *11.  The same reasoning applies here.  Moreover, contrary to Defendants'

19 claim that courts never instruct juries on continuous accrual, ***this Court*** gave such an instruction in

20 *Washington v. CVS Pharmacy, Inc.*, No. 4:15-cv-03504 (N.D. Cal. June 24, 2021) (Gonzalez

21 Rogers, J.):  "Under California law, the statute of limitations is three years from the time that a class

22 member's harm occurred.  Therefore, all claims by California class members for prescription

23 purchases on or after July 30, 2012, are timely.  For prescription purchases before July 30, 2012,

24 Plaintiffs have the burden to prove that . . . a reasonable and diligent investigation would not have

25 revealed [the] harms . . . ."  *Id.* Dkt. 610.

26     Defendants argue that the continuous accrual doctrine applies only when a defendant's duties

27 are severable into discrete intervals like periodic rent payments.  Defendants' Position Pt. 5, *supra*.

28 But *Aryeh* held expressly that the doctrine applies "whenever there is a ***continuing or recurring***

45

1  obligation." 55 Cal. 4th at 1199 (emphasis added). Accordingly, "[t]he question *is not* whether a

2  duty periodically arises, but whether a continuing duty is breached on a *recurring or ongoing* basis."

3  *Water Audit Cal.*, 11 Cal. App. 5th at 1192 (emphasis added). In *Water Audit*, for example, the

4  defendant unlawfully obstructed a waterway continuously *for decades* after initially blocking it. *Id.*

5  at 1192-93. That conduct was not in any sense severable into periods, but the court applied the

6  continuous accrual doctrine nonetheless because the case involved a "continuing duty . . . breached

7  on a recurring or ongoing basis." *Id.*; *see also Gilkyson*, 244 Cal. App. 4th at 1343 (applying

8  continuous accrual doctrine because obligation was "unquestionably a continuing one"). The very

9  fact that the *name* of the doctrine is the "*continuous* accrual doctrine" makes it rather implausible

10 that the doctrine applies only when the breaches are *not* continuous.

11      Defendants' principal authority is *Lamont v. Time Warner, Inc.*, 586 F. App'x 357 (9th Cir.

12 2014), which they cite for the proposition that the continuous accrual doctrine is "applicable to

13 contracts 'where performance of contractual obligations is severed into intervals.'" *Id.* at 357.

14 *Lamont* is an unreported disposition in a *pro se* appeal. Neither the appellant nor the court cited the

15 California Supreme Court's governing decision in *Aryeh*, decided just a year earlier. The decision

16 is neither binding nor persuasive.[19]

17 **IV.  DISCOVERY OR MOTIONS**

18      The parties have met and conferred over whether to enter into a stipulation substituting the

19 new for-profit entity that OpenAI formed in its recent October 2025 post-recapitalization, OpenAI

20 Group PBC, for one or more of the for-profit entities named in the operative complaint. If the parties

21 are not able to resolve this matter by stipulation, Plaintiff anticipates filing a motion for relief from

22 the Court.

23      The parties have also met and conferred on Plaintiff's hearsay objections to many of

24

25      [19] Defendants argue that Plaintiff waived any argument under the separate "continuing
    violation" doctrine. Defendants' Position Pt. 5 n.18, *supra*. *Aryeh* addressed both the "continuous
26  accrual" doctrine and the "continuing violation" doctrine. 55 Cal. 4th at 1197-1202. For several
    reasons, the continuous accrual doctrine is the better fit for the facts of this case. But this Court can
27  and should grant the relief sought under whichever theory it considers appropriate. *See Prods.
    & Ventures Int'l v. Axus Stationary (Shanghai) Ltd.*, No. 16-cv-00669, 2017 WL 3284177, at *4 &
28  n.3 (N.D. Cal. Aug. 2, 2017) (Gonzalez Rogers, J.).

1  Defendants' proposed trial exhibits, including objections to communications that trial witnesses

2  Jared Birchall, Sam Teller, and Shivon Zilis sent on matters related to OpenAI.  Defendants' position

3  is that these communications are admissible, among other reasons, as non-hearsay statements of a

4  party-opponent's agent or employee, made within the scope of the employee/agent relationship

5  while it existed, and/or that Plaintiff authorized Birchall, Teller, and Zilis to make many of the

6  statements at issue. *See* Fed. R. Evid. 801(d)(2)(C)-(D). Some of the communications convey

7  statements of non-party-opponent declarants, but in all but a handful of cases (as to which

8  Defendants believe relevant hearsay exceptions apply) those statements are not being offered for

9  their truth.  Plaintiff has agreed to re-review all those documents in light of the grounds for

10  overcoming the hearsay objection that Defendants raise, but the timing has not allowed that process

11  to be completed before the deadline for this filing.  Plaintiff will complete that review promptly and

12  anticipates that a substantial portion of the objections can be resolved without the Court's

13  involvement.  If the parties are unable to resolve their differences respecting these documents,

14  Defendants anticipate raising this issue with the Court at the pretrial conference and, if necessary,

15  seeking leave to file a short motion for relief.  Should discussion at the pretrial conference become

16  necessary, the parties will supplement the trial readiness binders with the subject exhibits or a

17  representative sample thereof.

18      Microsoft seeks the Court's guidance on a process for sealing limited competitively or

19  personally sensitive details in trial exhibits that would not affect the public's understanding of the

20  case.  Consistent with prior N.D. Cal. sealing procedures, Microsoft proposes either agreeing to:

21  (1) a set of limited redacted trial exhibits that can be used in the public trial; and/or (2) a tiered

22  publication process that allows sensitive information to be published to witnesses and the jury but

23  not on public-facing monitors. *See, e.g.*, *AngioScore v. TriReme*, 4:12-cv-03393-YGR, Dkt. No.

24  743 at 42:11-44:2 (Aug. 21, 2015); *see also Waymo v. Uber*, 3:17-cv-00939-WHA, Dkt. No. 2659

25  at 542:4-14 (Feb. 6, 2018).  Microsoft has raised this concern with the other parties and will continue

26  to meet and confer on this process but would appreciate the Court's guidance on the timeline and

27  procedure for resolving any sealing disputes the parties cannot resolve.  Plaintiff believes that the

28  trial should be conducted in open court and that Microsoft has not made a sufficient showing to

justify withholding evidence from the public or restricting how the parties may present their evidence at trial. Plaintiff can elaborate on its concerns with Microsoft's proposals at the pretrial conference.

## V.    ESTIMATE OF TRIAL TIME

The parties have a dispute over the number of court days (defined as 8:30 a.m. to 1:40 p.m., with two 20-minute breaks per day) they anticipate requiring for Stage 1 (*i.e.*, liability and affirmative defenses). Plaintiff believes that each side should be allocated 20 hours, and Defendants believe that each side should be allocated 27 hours—in each case exclusive of time for opening statements and closing arguments. Accordingly, while Plaintiff believes the trial of Stage 1 will require approximately 10 court days, Defendants believe it will require approximately 14 days. The parties agree that presentation of evidence in any Stage 2 monetary remedies trial would take approximately 1.5 court days.

The parties plan to present their respective positions at the pretrial conference for resolution. The parties' trial conduct stipulation will address various matters concerning how to attribute time for witness examinations.

## VI.    LIST OF MOTIONS IN LIMINE[20]

The parties have filed the following motions in limine:

- Plaintiff's Motion in Limine No. 1 To Exclude Evidence of Attorney General Decisions (Dkt. 402)

- Plaintiff's Motion in Limine No. 2 To Exclude WilmerHale's Investigation and Findings Concerning Altman's Dismissal (Dkt. 403)

- Plaintiff's Motion in Limine No. 3 To Exclude Evidence Relating to X.AI Corp.'s Business and Competitive Practices (Dkt. 404)

- Plaintiff's Motion in Limine No. 4 To Exclude Irrelevant Information About Plaintiff Elon Musk (Dkts. 405 & 406)

- Plaintiff's Motion in Limine No. 5 To Exclude Cumulative Expert Testimony (Dkt. 407)

- OpenAI Defendants' Motion in Limine No. 1 To Exclude Expert Testimony of Dr. Stuart

---

[20] Following the filing of motions in limine on February 24, 2025, the OpenAI Defendants and Microsoft served new trial exhibit lists that changed the numbering of most of their trial exhibits. Consequently, the trial exhibit numbers referenced in Plaintiff's motions in limine do not match the numbers on Defendants' most recent trial exhibit lists.

1        Russell (Dkt. 409)

2    •    OpenAI Defendants' Motion In Limine No. 2 To Exclude News Articles and Related
         Hearsay (Dkt. 410)
3
4    •    Microsoft Corporation's Motion in Limine No. 1 To Preclude Mentions of Dr. Arnold's
         Personal Litigations (Dkts. 412 & 413)

5    •    Microsoft Corporation's Motion in Limine No. 2 To Exclude Professor David Schizer's
         Testimony Related to Microsoft Conduct (Dkt. 414)
6
7    •    Microsoft Corporation's Motion in Limine No. 3 To Exclude Expert Testimony of Dr.
         Paul Wazzan (Dkt. 415)

8    **VII.    JUROR QUESTIONNAIRE**

9        The parties plan to submit additional juror questionnaire questions by email pursuant to the

10   directions in the Court's Standing Order.

11   **VIII.    TRIAL ALTERNATIVES AND OPTIONS**

12       **A.    Settlement Discussions**

13       The parties are mindful of the Court's suggestion that they consider mediation and plan to

14   meet and confer.  No settlement discussions are currently planned.

15       **B.    Consent to Trial Before a Magistrate Judge**

16       The parties do not consent to trial before a magistrate judge.

17       **C.    Amendments, Dismissals**

18       As noted above, the parties have met and conferred over the potential substitution of OpenAI

19   Group PBC for one or more of the for-profit entities named in the pleadings.

20       **D.    Bifurcation or Separate Trial of Issues**

21       The Court previously indicated that it would bifurcate the trial into two stages: Stage 1

22   (liability and affirmative defenses) and Stage 2 (remedies).  The parties have been planning their

23   cases accordingly.

24       The Court also proposed to submit the statute of limitations defense to the jury for

25   deliberation prior to submitting liability.  Plaintiff respectfully requests permission to respond to

26   that proposal at the pretrial conference.   Defendants agree with the Court's proposed approach and

27   observe that Plaintiff raised no objection to it when the matter was raised on January 7, 2026.

28

1   Dated: February 26, 2026                    MOLOLAMKEN LLP

2
                                       By:      /s/ Steven F. Molo
3                                               Steven F. Molo (*pro hac vice*)

4                                               *Attorneys for Plaintiffs Elon Musk*
                                                *and X.AI Corp.*
5

6   Dated: February 26, 2026                    WACHTELL, LIPTON, ROSEN & KATZ

7
                                       By:      /s/ William Savitt
8                                               William Savitt (*pro hac vice*)

9
                                                MORRISON & FOERSTER LLP
10

11                                     By:      /s/ William Frentzen
                                                William Frentzen (CA SBN 343918)
12
                                                *Attorneys for the OpenAI Defendants*
13

14  Dated:  February 26, 2026                   DECHERT LLP

15
                                       By:      /s/ Russell P. Cohen
16                                              Russell P. Cohen (SBN 213105)

17                                              *Attorneys for Defendant Microsoft*
                                                *Corporation*
18

19

20

21

22

23

24

25

26

27

28

1

## **SIGNATURE ATTESTATION**

2    I hereby attest that the signatories listed above, on whose behalf this document is submitted,

3  concur in the filing's content and have authorized the filing.

4

5  Dated:  February 26, 2026                    _/s/ Steven F. Molo_____
                                              Steven F. Molo (*pro hac vice*)
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28