**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ELON MUSK, ET AL.,** | Case No.: 4:24-cv-04722-YGR |
| Plaintiffs, | |
| vs. | **PRETRIAL ORDER NO. 3 RE: DISPUTED LEGAL ISSUES (REMEDIES; STATUTE OF LIMITATIONS)** |
| **SAMUEL ALTMAN, ET AL.,** | |
| Defendants. | |

The parties submitted a pretrial conference statement that identified several disputed legal issues. (Dkt. No. 427.) The Court addresses the issues raised at the pretrial conference on March 13, 2026 in this Order.

# I.    REMEDIES

### A.    DISGORGEMENT OF PROFITS

The parties dispute whether Musk's asserted remedy—up to $134 billion from OpenAI and Microsoft to disgorge their ill-gotten gains—is an equitable or legal remedy. The distinction matters. If the remedy is legal, Musk is entitled to a jury to determine any disgorgement award. If the remedy is equitable, the Court will decide. Musk argues for the former, while OpenAI and Microsoft argue for the latter.

Whether disgorgement[1] "is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). Restitution at law involves "cases in which the plaintiff

---

[1] Disgorgement is a type of restitution. *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 79 (2020) ("Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names."); Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt a (2011) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profits.'").

could not assert title or right to possession of particular property, but in which nevertheless [the plaintiff] might be able to show just grounds for recovering money to pay for some benefit the defendant had received from [plaintiff]." *Id.* at 213. In cases involving legal restitution, a plaintiff seeks to impose personal liability on a defendant where the plaintiff is "contractually entitled to *some* funds for benefits that they conferred." *Id.* at 214 (emphasis in original). "Where liability is definite and damages may be calculated without an accounting, the action is legal." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal.App.4th 1451, 1484 (2014).

By contrast, restitution in equity involves "money or property identified as belonging in good conscience to the plaintiff [and that] could clearly be traced to *particular* funds or property in the defendant's possession." *Great-West*, 534 U.S. at 213 (emphasis supplied). The claim "generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* There, "a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts." *Liu*, 591 U.S. at 80. That is because restitution in equity is based on the premise that "[i]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong." *Id.* at 79–80. It does not seek to measure harm to the plaintiff.

Musk argues that his asserted remedy is legal because he does not request the return of specific property, but rather a money judgment for the amount of wrongfully derived profits. He argues that he does not, and cannot, seek the return of his $38 million donation because OpenAI has already spent those funds. Instead, Musk's expert, Dr. C. Paul Wazzan, uses the $38 million in donations as a basis to calculate Musk's percentage of the overall donations that OpenAI received in its early years. From this percentage, he calculates the proposed money judgment award.

Musk's attempt to distinguish Wazzan's analysis from an equitable tracing analysis does not persuade. Fundamentally, Wazzan analyzes the wrongful gains that OpenAI and Microsoft earned as a result of "Musk's critical contributions to OpenAI from the time that Mr. Musk helped found it"—i.e., the $38 million that Musk donated. (Dkt. No. 392 at 2.) Wazzan then expressly tethers Musk's remedy to those donations and any profit made from those donations, not the amount by which Musk was injured. That Musk's donations serve as the linchpin indicates

2

United States District Court
Northern District of California

equitable tracing. Nor is it a legal requirement, as Musk contends, that the same $38 million donated remain in OpenAI's possession. *Great-West*, 534 U.S. at 241 n.2 ("There is a limited exception for an accounting of profits, a form of equitable restitution that is not at issue in this case. If, for example, a plaintiff is entitled to a constructive trust on particular property held by the defendant, he may also recover profits produced by the defendant's use of that property, even if he cannot identify a particular res containing the profits sought to be recovered."); *Rodriguez v. Google LLC*, 2026 WL 252570, at *5 (N.D. Cal. Jan. 30, 2026) ("Plaintiffs do not need to trace the collection of their data to precise dollars sitting somewhere in a Google bank account, they must merely offer a reasonable approximation of profits causally connected to the violation.")

Musk's cited authorities do not compel a different result. Although *Great-West* concluded that the restitutionary remedy at issue in that case was legal, the Court explicitly stated that disgorgement related to net profits (i.e., an accounting for profits) was "not at issue." *Great-West*, 534 U.S. at 241 n.2. Moreover, in *Great-West*, the funds petitioner sought were not in the respondent's possession and the case itself was based on a contractual obligation to reimburse the petitioner. *Id.* at 214–15. Neither is true here. At the pretrial conference, Musk also cited *United States Securities & Exchange Commission v. Sripetch*, 154 F.4th 980 (9th Cir. 2025). That case stands for the unremarkable proposition that disgorgement may be equitable or legal in nature and explains that "[t]he status of restitution as belonging to law or to equity has been ambiguous from the outset." *Id.* at 983 n.1. The fact that disgorgement *may* be a legal remedy does not mean that it *is* a legal remedy in this case.

Accordingly, because Musk attempts to trace OpenAI's wrongful gains to his donations and seeks to restore identifiable property in OpenAI's possession (money), the Court finds that Musk's disgorgement remedy is equitable, not legal.[2]

**B.    ADEQUATE REMEDY AT LAW**

The parties next dispute whether Musk has an adequate remedy at law. If so, Musk cannot

---

[2] Although the Court has determined that the remedy Musk seeks is equitable, not legal, the Court is considering nonetheless submitting Musk's disgorgement remedy to the jury for an advisory decision.

seek an equitable remedy in federal court.

Musk argues that his legal remedy for compensatory damages (i.e., $38 million plus interest) is sufficiently different from his equitable remedy such that Musk lacks an adequate remedy at law. An equitable remedy permits Musk to recover ill-gotten gains from defendants OpenAI and Microsoft. Restatement (Third) of Restitution and Unjust Enrichment § 51. Unlike *Sonner*, where the plaintiff sought "the same sum" (or same relief) through equitable and legal remedies, here Musk seeks the disgorgement of any proceeds or profit that defendants received because of Musk's donations. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Should Musk prove that he is entitled to an equitable remedy, Musk's relief through compensatory damages alone would not be adequate or complete, as *Sonner* requires, because defendants would be permitted to retain the proceeds of their alleged misconduct. *Id.* The same is true for Musk's request for injunctive relief. *Id.*; *see also Linton v. Axcess Fin. Servs., Inc*, 2023 WL 4297568, at *3 (N.D. Cal. June 30, 2023) (holding that *Sonner* does not apply to claims for injunctive relief where defendants cannot avoid future harm, like continued elevated interest rates).

The Court finds that Musk lacks an adequate remedy at law[3] and thus may pursue equitable relief under *Sonner*. As a result, the Court also finds that it has equitable jurisdiction. *See also Guzman v. Polaris Indus. Inc*., 49 F.4th 1308, 1313 (9th Cir. 2022) ("[T]o entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy.").

### C.    PUNITIVE DAMAGES

A plaintiff is not entitled to punitive damages where only equitable relief is recoverable.

Here, because Musk relinquished his claim for compensatory damages, and only attempts to recover equitable disgorgement, Musk cannot seek punitive damages. *California v. Altus Fin. S.A.*, 540 F.3d 992, 1000–01 (2008) ("California Courts have long interpreted Section 3294 to require an award of compensatory damages, even if nominal, to recover punitive damages.");

---

[3] That counsel for Musk expressly confirmed that Musk was withdrawing any demand for compensatory damages while at the pretrial conference does not change the outcome.

*Mother Cobb's Chicken Turnovers, Inc. v. Fox*, 10 Cal.2d 203, 205 (1937) ("Actual damages must be found as a predicate for exemplary damages. This is the rule announced in many authorities."); *Proofpoint, Inc. v. Vade USA, Inc.*, 2024 WL 4003096, at \*1 (9th Cir. Aug. 30, 2024) ("Where, as here, an award for unjust enrichment rests on disgorgement of the defendant's profits, it is an equitable remedy . . . . Thus the Seventh Amendment extends to a statutory claim [on exemplary damages] only if that particular claim is legal in nature, which disgorgement is not. Accordingly, any error by the district court is harmless.").

### D.    CLARIFICATION ON BIFURCATION

The Court clarifies here that there shall be no bifurcation in this trial. First, the Court earlier rejected the parties' suggestion that *all damages* should be bifurcated. Second, the Court anticipated bifurcating *liability for punitive damages* from a jury decision on the amount of punitive damages itself. Now that the Court finds that punitive damages are not available, no need exists to bifurcate.

## II.    JURY INSTRUCTIONS

### A.    INSTRUCTION NO. 30-P: CONTINUOUS ACCRUAL

The parties dispute whether Musk is entitled to a "continuous accrual" jury instruction.[4] Musk seeks to instruct the jury that his claims were timely if the defendants were under a "continuing or recurring obligation and continued to engage in the wrongful acts after the applicable date." (Dkt. No. 433 at 73, Proposed Jury Instruction 30-P.) Musk argues that continuous accrual applies under *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal.4th 1185, 1198–99 (2013), because his claims "accrued every time Defendants used the fruits of Musk's contributions to pursue purposes other than the charitable purposes for which those contributions were given." (Dkt. No. 427 at 44.) Defendants disagree, arguing that continuous accrual is inapplicable because the doctrine applies to only alleged severable obligations. The Court agrees.

"Generally speaking, continuous accrual applies whenever there is a continuing or recurring obligation: 'When an obligation or liability arises on a recurring basis, a cause of action

---

[4] At the pretrial conference, Musk stated that he is not seeking a "continuous violation" instruction. As such, the Court does not reach the applicability of that doctrine.

accrues each time a wrongful act occurs, triggering a new limitations period.'" *Aryeh*, 55 Cal.4th at 1199 (quoting *Hogar Dulce Hogar v. Cmty. Dev. Comm'n*, 110 Cal.App.4th 1288, 1295 (2003)). "Because each new breach of such an obligation provides all the elements of a claim— wrongdoing, harm, and causation—each may be treated as an independently actionable wrong with its own time limit for recovery." *Id.* (citation omitted).

Courts routinely find that continuous accrual is inapplicable when the defendant's obligations are not "periodic," "recurring," or "severed into intervals." *See, e.g.*, *Lamont v. Time Warner, Inc.*, 586 F.App'x 357, 357 (9th Cir. 2014) (no continuous accrual "where performance of contractual obligations [was not] severed into intervals"); *Ryan v. Microsoft Corp.*, 147 F.Supp.3d 868, 896 (N.D. Cal. 2015) (no continuous accrual because defendant's "continuing obligation to avoid anticompetitive behavior [was] not a periodic, recurring obligation"); *State of California ex rel. Metz v. CCC Info. Servs., Inc.*, 149 Cal.App.4th 402, 418 (2007) (no continuous accrual where the alleged fraud did "not involve a recurring obligation or any such periodic payment obligations").

*Aryeh* is instructive. There, the defendant, a lessor of copy machines, was allegedly charging plaintiff for defendant's own test copies under the parties' monthly rent contract. The California Supreme Court held that continuous accrual applied because defendant's duty "not to impose unfair charges in monthly bills . . . was a continuing one, susceptible to recurring breaches. Accordingly, each alleged breach must be treated as triggering a new statute of limitations." *Aryeh*, 55 Cal.4th at 1200.

None of Musk's authorities apply continuous accrual outside the context of a recurring, severable obligation. *See Gilkyson v. Disney Enters., Inc.*, 244 Cal.App.4th 1336, 1343 (2016) (continuous accrual applied where defendant had "obligation to pay periodic royalties"); *J.B. Painting & Waterproofing, Inc. v. RGP Holdings, LLC*, 650 F.App'x 450, 453-54 (9th Cir. 2016) (continuous accrual applied for "each delivery . . . in a series of orders placed"); *POGA Mgmt. Partners LLC v. Medfiler LLC*, 2014 WL 3963854, at *1, *11 (N.D. Cal. Aug. 12, 2014) (continuous accrual applied where defendants were obligated "to make quarterly distributions of income" to plaintiff); *Water Audit Cal. v. Merced Irrigation Dist.*, 111 Cal.App.5th 1147, 1192

United States District Court
Northern District of California

(2025) (continuous accrual applied where the statute at issue set forth a violation as recurring "[e]ach day that a violation . . . occurs or continues"); *Washington v. CVS Pharmacy, Inc.*, No. 4:15-cv-03504-YGR, Dkt. No. 610 (issuing jury instruction that claims for purchases older than three years were time-barred where defendants were obliged to offer lowest price that provider would charge on a "particular day").

Here, Musk does not argue that defendants owed him recurring, severable obligations or duties. Rather, Musk argues that the jury should receive a continuous accrual instruction merely because OpenAI's obligation to Musk to stay open source and nonprofit remained ongoing. In Musk's view, OpenAI has breached that obligation "on a daily basis by continuing to operate its for-profit subsidiary for private gain." (Dkt. No. 427 at 44–45.) Under this theory, each such breach—and each of Microsoft's investments that allegedly aided and abetted the breach—would be subject to its own limitations period. However, continuous accrual does not apply just because the alleged wrong has "continuing impact." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal.App.4th 1375, 1389 (2004). Instructing otherwise would vitiate the statute and allow parties to "file suit at any time, as long as their injuries persisted." *Sierra R.R. Co. v. Comcast Cable Commc'ns, LLC*, 2026 WL 25461, at *6 (E.D. Cal. Jan. 5, 2026) (quoting *Vaca v. Wachovia Mortg. Corp.*, 198 Cal.App.4th 737, 745 (2011)). That is not the law.

Accordingly, the Court will not instruct the jury on continuous accrual.

IT IS SO ORDERED.

Dated: March 31, 2026

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

7