JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:     (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted *pro hac vice*)
BRWilson@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
RANDALL W. JACKSON (admitted *pro hac vice*)
RWJackson@wlrk.com
STEVEN WINTER (admitted *pro hac vice*)
SWinter@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:     (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman,
OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,
OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,
OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,
OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,
OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,
OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,
OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,
OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,
Aestas Management Company, LLC, and Aestas LLC*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al.,<br><br>             Plaintiffs,<br><br>      v.<br><br>SAMUEL ALTMAN, et al.,<br><br>             Defendants. | Case No. 4:24-cv-04722-YGR<br><br>**OPENAI DEFENDANTS' PROPOSED FINDINGS OF FACT**<br><br>Courtroom:  1 – 4th Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |

Pursuant to the Court's April 17, 2026 Order (Dkt. 477), the OpenAI Defendants respectfully submit the following proposed Findings of Fact as to liability.

Dated:    April 27, 2026                            Respectfully Submitted,


                                                   MORRISON & FOERSTER LLP


                                                   /s/ William Frentzen
                                                   JORDAN ETH (CA SBN 121617)
                                                   JEth@mofo.com
                                                   WILLIAM FRENTZEN (CA SBN 343918)
                                                   WFrentzen@mofo.com
                                                   DAVID J. WIENER (CA SBN 291659)
                                                   DWiener@mofo.com
                                                   MORRISON & FOERSTER LLP
                                                   425 Market Street
                                                   San Francisco, CA 94105
                                                   Telephone:    (415) 268-7000
                                                   Facsimile:    (415) 268-7522

                                                   WILLIAM SAVITT (admitted *pro hac vice*)
                                                   WDSavitt@wlrk.com
                                                   BRADLEY R. WILSON (admitted *pro hac vice*)
                                                   BRWilson@wlrk.com
                                                   SARAH K. EDDY (admitted *pro hac vice*)
                                                   SKEddy@wlrk.com
                                                   RANDALL W. JACKSON (admitted *pro hac vice*)
                                                   RWJackson@wlrk.com
                                                   STEVEN WINTER (admitted *pro hac vice*)
                                                   SWinter@wlrk.com
                                                   NATHANIEL CULLERTON (admitted *pro hac vice*)
                                                   NDCullerton@wlrk.com
                                                   WACHTELL, LIPTON, ROSEN & KATZ
                                                   51 West 52nd Street
                                                   New York, NY 10019
                                                   Telephone:    (212) 403-1000
                                                   Facsimile:    (212) 403-2000

                                                   *Attorneys for the OpenAI Defendants*

## I.      Introduction

1.      Plaintiff Elon Musk asserts claims against defendants Sam Altman, Greg Brockman, and OpenAI, Inc. (the OpenAI nonprofit) for breach of charitable trust.[1] Musk also asserts claims against those defendants and the OpenAI for-profit enterprise for unjust enrichment.

2.      Musk's claims are all predicated on claimed charitable contributions to the OpenAI nonprofit from 2016 to 2020 and alleged breaches of restrictions he claims to have imposed on those donations. After a [*]-day trial in which the Court and an advisory jury heard from [*] witnesses, the Court finds the following facts, which do not support Musk's claims and show that those claims are in any event barred by statutes of limitations.

## II.     Breach of Charitable Trust

3.      Musk alleges that his approximately $37.8 million in donations to OpenAI, Inc. formed a charitable trust requiring OpenAI, Inc. to remain a nonprofit and open-source organization forever. The evidence adduced at trial does not establish either that Musk manifested an intent to impose those restrictions, or that OpenAI, Inc. or Musk's co-founders accepted them. The evidence instead shows that Musk was at best indifferent to the nonprofit structure of OpenAI and that OpenAI's founders, including Musk, never intended to open-source all of OpenAI's technology, let alone in perpetuity. Section II.A, *infra*. Nor does the evidence establish that any of the OpenAI Defendants breached any of Musk's alleged restrictions, even if they existed. Section II.B, *infra*.

### A.      Musk's Alleged Charitable Trust Does Not Exist

#### i.      Musk's financial contributions were indirect and unrestricted.

4.      From May 2016 to September 2020, Musk was the original funding source of approximately $37.8 million in charitable contributions to OpenAI, Inc., made up of $37.5 million in cash contributions and four Tesla vehicles. Undisputed Facts Nos. 16, 17. Over the four-year period between 2016 and 2020, OpenAI, Inc. received a total of approximately $133 million in charitable contributions, with over $95 million from donors other than Musk. Undisputed Facts No. 18. None of those other donors have joined Musk in this lawsuit or claimed that OpenAI, Inc.,

---

[1] As noted below, OpenAI, Inc. is now known as the OpenAI Foundation following the October 2025 recapitalization.

1

Altman, and/or Brockman breached a charitable trust.

5.    In 2016, Musk committed to providing quarterly grants of $5 million to OpenAI, Inc. for three years. OpenAI, Inc. received the first installment in mid-2016. Four more installments followed for a total of $25 million. Musk suspended those grants in August 2017 and never resumed them. The last of those grants was dated May 26, 2017. Undisputed Facts No. 16.

6.    In September 2016, Musk began making monthly donations to cover rent and associated expenses in a building that Musk leased though one of his entities, Musk Industries LLC. That building also housed Neuralink, one of Musk's for-profit companies. OpenAI continued to receive those donations and pay the building's expenses with them on a regular basis until Musk terminated the payments in September 2020. The four years of building-related donations totaled approximately $12.5 million. Undisputed Facts No. 16.

7.    All of Musk's cash contributions—the quarterly grants and the rent contributions— were made indirectly through other entities, including donor-advised funds ("DAFs") associated with Vanguard and Fidelity and OpenAI, Inc.'s fiscal sponsor, YC Org. Undisputed Facts No. 16. Musk and his private foundation were able to claim tax benefits for charitable contributions to those entities. Pursuant to Musk's agreements with the DAFs and OpenAI, Inc.'s fiscal sponsorship agreement with YC Org., Musk relinquished ownership and control over the funds when he donated them to the DAFs and YC Org.

8.    Musk donated the four Tesla vehicles to OpenAI, Inc. in late 2017 and early 2018. Undisputed Facts No. 17.

9.    Musk was a member of OpenAI, Inc. from before the time of his first donation until February 21, 2018, when he resigned from the board. Undisputed Facts No. 14. Through at least July 2020, there is no evidence that the OpenAI Defendants solicited Musk for donations after he left the board and ceased being a member of OpenAI, Inc.

10.    In addition to these contributions of money and vehicles, Musk alleges several non-property contributions to OpenAI, Inc., including his company visits and his provision of advice. These non-property contributions are not trust property and accordingly cannot serve as the basis for a charitable trust claim.

11.     Musk never entered into a written grant agreement with OpenAI, Inc. This is unusual and merits emphasis. Musk, an accomplished and sophisticated businessman, understood that gifts are only as good as their terms and conditions. Yet he donated $37.8 million, allegedly with indefinite restrictions attached, without putting in writing any terms or conditions. Nor did Musk articulate the contours of his alleged restrictions in any contemporaneous communications.

12.     The written grant documentation that does exist indicates that Musk's donations instead were unrestricted charitable gifts, and designated for OpenAI, Inc.'s general purposes or, in a few cases, for rent payments.

13.     OpenAI, Inc. recorded zero donor-restricted assets in its annual tax filings each year that Musk donated. Musk did not object.

14.     Not a single witness besides Musk testified that any binding agreement or trust restriction existed, much less one that still exists and requires OpenAI, Inc. to remain a nonprofit and open-source organization in perpetuity.

    **ii. Evidence from the time of OpenAI's founding does not support the restrictions Musk alleges.**

15.     In May 2015, Altman discussed with Musk the prospect of a "Manhattan Project for AI," potentially to be structured as "some sort of nonprofit but the people working on it get startup-like compensation if it works." DX-0501.

16.     Musk's primary motivation in co-founding OpenAI was to compete with Google DeepMind and thereby mitigate the risk that DeepMind's CEO would unilaterally control advanced artificial intelligence. Musk insisted that, "to avoid sounding hopeless relative to what Google or Facebook are spending," OpenAI must announce that it was starting with a "$1B funding commitment," and Musk promised to "cover whatever anyone else doesn't provide." DX-0509.

17.     Musk and Altman also discussed that, for the organization to be able to attract top engineering talent, employees would need to receive "equity for the upside," and that the founders would "have an ongoing conversation about what work should be open-sourced and what shouldn't." DX-0502; DX-0509.

18. Over the next several months, OpenAI's founders—Altman, Musk, Brockman, and Ilya Sutskever—discussed the optimal corporate structure for the project. There is no evidence except Musk's testimony that OpenAI's founders were committed to keeping the same nonprofit structure forever, much less to never forming a for-profit arm. Musk himself said in late 2015 that a standard for-profit corporation ("C corp") "with a parallel nonprofit" would probably be a superior structure. DX-0507.

19. On December 8, 2015, OpenAI, Inc. was incorporated as a Delaware nonprofit organization. The company's original certificate of incorporation stated that the purpose of the organization was to "provide funding for research, development and distribution of technology related to artificial intelligence." DX-0511. It also stated that the "resulting technology will benefit the public," and that OpenAI would seek to open-source its technology "when applicable." DX-0511. The certificate did not state that OpenAI would never form a for-profit arm. DX-0511.

20. Post-founding conversations confirm that OpenAI's founders, including Musk, never supported a commitment to open-source all of OpenAI's technology. In early January 2016, for example, Sutskever noted that as OpenAI's technology advanced, it would "make sense to start being less open." DX-0516. "The Open in openAI," Sutskever explained, "means that everyone should benefit from the fruits of AI after its [sic] built, but it's totally OK to not share the science." DX-0516. Musk responded in one word: "Yup." DX-0516.

21. Musk was a party to similar conversations throughout OpenAI, Inc.'s first year. For example, in May 2016, days before Musk made his first donation, Brockman notified Musk by email that he planned to tell "Google's policy people" that OpenAI's "mission is to maximally benefit the world; and we don't have a problem with people keeping things proprietary." DX-0532. He wrote that "it's fine to make money off this stuff," and asked Musk to share if he had any alternative thoughts. DX-0532. Musk did not.

22. Post-founding events also confirm that Musk has never revered OpenAI's nonprofit structure.

23. In December 2016, Musk expressed concern that "[s]etting [OpenAI] up as a non-profit might, in hindsight, have been the wrong move." DX-0559.

24.     As discussed in Section IV below with respect to the statutes of limitations, Musk actively participated with his co-founders in intensive discussions throughout 2017 and 2018 about how OpenAI would evolve its corporate structure to obtain sufficient capital to pursue its mission. At no point during these discussions did Musk ever tell anyone that establishing a for-profit arm, or even converting the nonprofit to a for-profit, would violate any agreement or trust restriction. Musk instead advocated for courses of action, including a merger with his for-profit company Tesla, that would breach the supposed trust restrictions on which his lawsuit is predicated.

25.     Musk also, during his years as co-chair of the OpenAI nonprofit, used his position to leverage the nonprofit's resources and personnel to advance his own commercial enterprises and even poach the nonprofit's employees for the benefit of his for-profit companies. For example, in February 2017, Musk had OpenAI researchers seconded to Tesla to assist with its autopilot project. In June 2017, Musk secretly recruited Andrej Karpathy, one of OpenAI's top researchers, to join Tesla permanently. In October 2017, Musk told a Neuralink employee to hire "directly from OpenAI" and said he had "no problem" if the employee "pitch[ed] people at Open AI to work at Neuralink." DX-0719. And in February 2018, shortly before resigning from OpenAI's board, Musk told his associate to "stay close and friendly to OpenAI" as they "actively [tried] to move three or four people from OpenAI to Tesla." DX-0761.

26.     After leaving OpenAI in February 2018, Musk continued his attempts to poach key OpenAI employees for his for-profit companies, including Tesla, and later, xAI, which Musk launched in 2023 to directly compete with OpenAI and other companies pursuing advanced artificial intelligence.

27.     While this lawsuit was pending, Musk, and a consortium of private investors he and his counsel had helped put together, made an unsolicited offer to buy all of the OpenAI nonprofit's assets for approximately $97 billion. None of the bidders was a nonprofit entity; Musk himself signed the letter as a representative of his for-profit company, xAI. Had the bid succeeded, the OpenAI nonprofit's assets would have been transferred entirely to the control of for-profit interests.

**B.    Even If a Trust Were Created, There Was No Breach**

**i.    Musk's contributions were spent consistent with his intentions.**

28.    The record shows that all of Musk's contributions were spent on expenses consistent with Musk's intentions, with Musk's quarterly general-purpose donations having been fully spent by November 2017 and Musk's monthly rent-related donations having been fully spent by September 2020.

29.    OpenAI's expert, Louis Dudney, performed a financial tracing exercise to assess when Musk's financial contributions were fully spent.

30.    Starting with the $25 million in quarterly $5 million donations, Dudney used what is commonly referred to as the First In, First Out ("FIFO") tracing method. The FIFO method is a systematic approach to attribute outflows of funds assuming that funds deposited into the account are spent in the order they were received. Dudney testified that the FIFO method is appropriate in this case given the availability of detailed, chronological cash records and the character of OpenAI, Inc.'s cash flows in the relevant time periods.

31.    Dudney determined that, applying the FIFO method, Musk's quarterly $5 million donations were fully spent as of November 2017. He also determined that the funds were spent in support of the functional expenses of OpenAI, Inc., including to purchase compute and for employee wages and benefits—the intended uses for Musk's general-support donations.

32.    Neither Musk nor anyone on his team complained about how the funds were being spent. The funds were spent before OpenAI created a for-profit entity and before any of the conduct that Musk now alleges violated a charitable trust.

33.    Dudney separately analyzed the $12.5 million in rent contributions. He explained that this approach is appropriate because he was able to separately identify the rent-related donations and specifically tie them to rent-related expenditures. Dudney testified that Musk's rent contributions were spent as of September 2020, and that they were spent on rent and related costs.

**ii.    OpenAI, Inc. remains a nonprofit devoted to its original mission.**

34.    OpenAI, Inc.'s mission since its founding has been to ensure that artificial general intelligence benefits all of humanity.

35.    To pursue its mission, OpenAI, Inc. required more funding than could be raised through charitable donations alone.

36.    In 2018, OpenAI, Inc.'s nonprofit board formed a for-profit subsidiary, OpenAI L.P., to raise capital and attract talent in support of OpenAI, Inc.'s charitable mission.

37.    Expert testimony confirmed that using a hybrid nonprofit and for-profit structure is a customary way for a nonprofit to pursue a public-benefit mission at scale, especially if the mission requires a large amount of capital.

38.    The evidence demonstrates that had OpenAI, Inc. not formed a for-profit, it likely could not have advanced its mission.

39.    In 2019, OpenAI L.P. received its first capital infusions from outside investors. Undisputed Facts No. 30. The investment structure allowed investors to earn profits up to specified caps, with the OpenAI nonprofit retaining the residual interest (or everything above those caps). Undisputed Facts Nos. 27, 29, 30. In addition to its residual interest, the OpenAI nonprofit received a specified profits interest commensurate with the value of intellectual property assets it contributed to the OpenAI for-profit. The value of that interest was determined at the time by an independent accounting firm. Following the 2019 transaction, employees of the nonprofit became employees of the for-profit subsidiary.

40.    OpenAI's for-profit also received three major infusions of capital from Microsoft in 2019, 2021, and 2023, and entered into commercial agreements in connection with those investments. Undisputed Facts Nos. 32-34, 40-42, 46-48. Shivon Zilis, who was an OpenAI, Inc. board member at the time and also working for Musk (and, unbeknownst to OpenAI, romantically involved with Musk), approved the 2021 and 2023 Microsoft deals because they served the nonprofit's mission.

41.    In early 2024, OpenAI's nonprofit board formed a Mission & Strategy Committee to consider ways of addressing OpenAI's unwieldy capital structure in light of the rapidly expanding costs associated with developing artificial general intelligence ("AGI").

42.    In late 2025, after over a year of discussions with the Attorneys General of Delaware and California, and on the recommendation of the Mission & Strategy Committee, OpenAI's

7

nonprofit board voted to recapitalize the enterprise, reorganizing the then-existing for-profit subsidiary to a public benefit corporation, so that OpenAI would be better positioned to access capital and compete for talent. A public benefit corporation is a for-profit organization that also has a legal duty to pursue a social mission.

43.     As of October 2025, the OpenAI nonprofit is called The OpenAI Foundation (the "Foundation"), and the for-profit public benefit corporation is called OpenAI Group PBC (the "PBC"). The PBC's mission is the same as the nonprofit's mission. The PBC's charter specifies that the PBC's board may only consider the mission (and not any pecuniary or other interests) on matters relating to safety and security.

44.     As part of the recapitalization, the Foundation exchanged its interest in the prior for-profit for equity in the PBC, making the OpenAI nonprofit perhaps the best resourced nonprofit in history.

45.     The nonprofit has governance control over the PBC. The nonprofit has the sole authority to choose the directors of the PBC, and the nonprofit can remove PBC directors at its discretion. At least two-thirds of the directors of the PBC must also be directors of the Foundation, who in the latter role owe exclusive fiduciary duties to the mission.

## III.     Unjust Enrichment

46.     Musk's unjust enrichment claim is predicated on the alleged implied agreement between himself and the OpenAI Defendants that he claims the OpenAI Defendants violated by using his contributions for purposes different from the agreed-upon charitable purpose. As explained in Section II above, no such agreement existed, and the OpenAI Defendants used Musk's contributions in a manner consistent with his intentions.

## IV.     Statute of Limitations

47.     Musk filed this lawsuit on August 5, 2024.

### A.     Breach of Charitable Trust

48.     The money and property Musk contributed was received and expended by OpenAI, Inc. well before the applicable date under the statute of limitations for Musk's charitable trust claim, August 5, 2021.

49.     In any event, before August 5, 2021, Musk was aware of, or reasonably should have suspected, the harm he claims gave rise to his breach of charitable trust claim.

**i.      Musk's donations were received and expended before August 5, 2021.**

50.     Musk made his final quarterly donation on May 26, 2017. Undisputed Facts No. 16. Those funds were expended by November 2017.

51.     Musk made his final rent contribution on September 14, 2020. Undisputed Facts No. 16. OpenAI, Inc. used those funds to pay rent that same month.

52.     Musk did not make any contributions to OpenAI, Inc., directly or indirectly, after September 14, 2020. Undisputed Facts No. 16.

53.     Thus, all of Musk's contributions were received and expended by OpenAI, Inc. by September 2020, before the applicable statute of limitations period.

**ii.     Before August 5, 2021, Musk was aware, or reasonably should have suspected, that OpenAI would create and operate a for-profit entity.**

**1.      In 2017, Musk advocated for the creation of an OpenAI for-profit entity.**

54.     By 2017, it was clear that OpenAI needed more capital to advance its mission than could be raised through charitable donations alone. Over the course of several months, Musk, Altman, Brockman, and Sutskever discussed creating a for-profit entity. Musk encouraged those discussions and supported a for-profit pivot.

55.     On August 11, 2017, OpenAI announced that its technology had defeated the world's top-ranked human player in a one-versus-one tournament of the Dota 2 video game. Undisputed Facts No. 22. That victory served as powerful proof of concept and underscored the scale of compute required to make future advancements.

56.     The next day, Musk emailed that the Dota victory was a "triggering event" and that it was "[t]ime to make the next step for OpenAI." DX-0642.

57.     In the weeks that followed, Brockman, Sutskever, Altman, and Musk discussed the possibility of creating a for-profit entity. The discussions were extensive and substantive. Various organizational structures were considered, including proposals to convert OpenAI, Inc. to a for-

profit entity and to allocate equity of any converted entity or new for-profit subsidiary among the founders, employees, and investors.

58.    While the negotiations were underway, Musk directed his associate Jared Birchall to create two for-profit entities for OpenAI. On August 15, 2017, Musk instructed Birchall to file for an OpenAI C Corporation or "C Corp." A month later, on September 13, 2017, Musk instructed Birchall to file for an OpenAI B Corporation or "B Corp." A B Corp is a for-profit entity with a social mission, of which a Delaware public benefit corporation is a type. Birchall complied with both instructions.

59.    Throughout the negotiations, Musk sought to exercise control over any for-profit entity. He demanded that he hold a majority equity stake—as high as 60%. He also insisted that he have control over the board of directors and serve as the new company's CEO.

60.    Altman, Brockman, and Sutskever resisted Musk's terms, including due to their concerns that vesting control over the development of AGI in a single individual would be inconsistent with OpenAI, Inc.'s mission.

61.    To gain leverage over the negotiations, Musk began withholding the quarterly contributions he had promised. On August 28, 2017, an OpenAI employee, Chris Clark, emailed Birchall to check the status of an anticipated quarterly contribution. Birchall forwarded the email to Musk, saying "For now I have held off on the quarterly $5M. Continue to hold?" to which Musk answered "Yes." DX-0662. Birchall then suspended the payments, telling Clark: "This was ready to go out when I was told that Elon informed Greg and Ilya that the funding would be on pause until they came to terms on the right path moving forward." DX-0668. Musk did not make the quarterly payment.

62.    On September 20, 2017, Brockman and Sutskever emailed Musk to share their concerns about the for-profit structure he had proposed. They told Musk that his proposed structure "provide[d] [him] with a path where [he] end[ed] up with unilateral absolute control over AGI," that "[t]he goal of OpenAI is to make the future good and to avoid an AGI dictatorship," and that it was "a bad idea to create a structure where [Musk] could become a dictator if [he] chose to." DX-

0704. Musk responded that he "had enough," that their email was the "final straw," and that the "[d]iscussions [were] over." DX-0704.

63.    Musk never resumed his quarterly donations. His last quarterly contribution was dated May 26, 2017. Undisputed Facts No. 16.

**2.    In 2017, Musk sought to absorb OpenAI, Inc. into his for-profit company.**

64.    After Musk stated that the discussions were over, he proposed a new plan, whereby OpenAI, Inc. would be absorbed into an existing for-profit he already controlled: Tesla.

65.    Contemporaneous communications reflect that Musk believed that his proposal had two advantages. First, it would allow the OpenAI nonprofit to "attach to Tesla as its cash cow." DX-0748; DX-0749. Second, it would give OpenAI a "stealth advantage," whereby it could develop AGI in secret within a for-profit car company. DX-0715; DX-0716.

66.    Altman, Brockman, and Sutskever rejected Musk's proposal.

67.    On February 21, 2018, shortly after Musk's second attempt to wrest control of the nonprofit failed, he resigned from OpenAI, Inc.'s board of directors.

68.    Musk told his co-founders around the time of his resignation that, without funding support from Tesla, OpenAI would fail.

**3.    In 2018, Musk received advance notice of the creation of OpenAI's for-profit entity.**

69.    Shortly before Musk even left the board of OpenAI, Inc., Altman and Brockman advised him that they intended to create a for-profit OpenAI entity.

70.    After Musk resigned from the board, Altman continued to provide Musk and his associates with updates about OpenAI, Inc.'s fundraising, structure, technical progress, and future plans.

71.    As part of those communications, in April 2018, Musk was informed of OpenAI's plan to create a for-profit subsidiary that would allow investors to receive equity in exchange for a capped profit return.

72.    On August 18, 2018, Altman sent Musk an email with an attachment, labeled "OpenAI LP - Summary Term Sheet." DX-0827.

73.    The term sheet stated that OpenAI planned to create a "for-profit Delaware Limited Partnership" that would be "controlled by OpenAI, Inc." DX-0827. It explained that OpenAI L.P. would be "capitalized by a contribution of assets from the Nonprofit," that it could "generate significant revenue," and that its employees would "be granted profit interests." DX-0827. And it specified that OpenAI L.P. would have two fundraising rounds—the first for $500 million with a 100x profit cap and the second for at least $10 billion with a 15x profit cap. DX-0827.

74.    Altman invited Musk to provide feedback on the term sheet. Musk offered no feedback.

75.    Altman offered Musk the opportunity to acquire an equity interest in the for-profit entity. Musk declined, but did not object to the entity's creation.

76.    On September 19, 2018, OpenAI L.P. was formed under the laws of Delaware and registered as an out-of-state limited partnership with the California Secretary of State. Undisputed Facts No. 5. Its structure was consistent with what Altman had disclosed to Musk in the 2018 term sheet.

**4.    In 2019, Musk received advance notice of the public announcement of OpenAI's for-profit entity.**

77.    Altman continued to solicit Musk's input as OpenAI, Inc. prepared to publicly announce the creation of the for-profit entity.

78.    On March 6, 2019, Altman emailed OpenAI, Inc.'s draft announcement to Musk and asked him for feedback.

79.    When Musk did not respond, Altman followed up by text message on March 10, 2019, requesting a phone call.

80.    Musk agreed to speak with Altman later that evening and did not raise any objections to the creation of the for-profit entity. Instead, Musk told Altman to convey to the press that he remained supportive of OpenAI.

81.    The following day, OpenAI, Inc. announced the creation of OpenAI L.P. on its website.

### 5.    In 2019, Musk received advance notice of Microsoft's first investment in OpenAI.

82.    On July 2, 2019, Microsoft agreed to invest $1 billion in OpenAI L.P. at a 20x profit cap. Undisputed Facts No. 32.

83.    The transaction was consistent with the capped for-profit structure that Altman had previously disclosed to Musk in the 2018 term sheet.

84.    Musk was aware of the investment months before its completion. On March 5, 2019, while OpenAI, Inc. was preparing to publicly announce the creation of OpenAI L.P., Altman asked Zilis to convey to Musk that OpenAI, Inc. was nearing an investment agreement with Microsoft. Zilis confirmed that she had communicated that information to Musk. Musk did not convey any misgivings about the agreement.

85.    OpenAI announced the transaction on its website on July 22, 2019.

86.    Following that announcement, Musk did not express opposition to the transaction or contend that it was inconsistent with OpenAI, Inc.'s mission or structure. To the contrary, Musk told Zilis that he thought it was an "impressive deal." DX-0900.

### 6.    In 2020, Musk received advance notice of Microsoft's second investment in OpenAI.

87.    On March 6, 2021, Microsoft agreed to invest an additional $2 billion in OpenAI at a 6x profit cap. Undisputed Facts No. 40.

88.    Like the 2019 transaction, the 2021 transaction was consistent with the capped for-profit structure that Altman had previously disclosed to Musk in the 2018 term sheet.

89.    As with the 2019 transaction, Musk was aware of the 2021 transaction before its completion. On October 28, 2020, Altman sought Musk's advice on accepting a second investment from Microsoft. Musk agreed to speak with Altman on November 11, 2020. During the call, Musk told Altman that accepting a second investment from Microsoft was a good idea because it would be difficult to solicit a comparable investment from a new investor.

90.    Following the call, Musk expressed "a generally positive sentiment" about the prospective transaction to Zilis. DX-0928.

### 7.    Musk's contention that Microsoft's third investment in 2023 marked a breaking point is contrary to the evidence.

91.    On January 23, 2023, Microsoft agreed to invest an additional $10 billion in OpenAI at a 6x profit cap. Undisputed Facts No. 46.

92.    Like the 2019 and 2021 transactions, the 2023 transaction was consistent with the capped for-profit structure that Altman had previously disclosed to Musk in the 2018 term sheet. In fact, the 6x profit cap on Microsoft's $10 billion investment was substantially lower (*i.e.*, more favorable to the OpenAI nonprofit) than the 15x profit cap contemplated by the 2018 term sheet.

93.    As discussed below in Section VI, beginning in 2023, Musk initiated a campaign of harassment and threats of legal action against OpenAI. That campaign followed OpenAI's introduction of ChatGPT, which became a public sensation and the fastest-growing consumer application in history. It also followed the formation of xAI, Musk's rival AI company.

### iii.    Before August 5, 2021, Musk was aware, or reasonably should have suspected, that OpenAI would not open-source all of its technology.

94.    As discussed in Section II above, the record reflects that OpenAI's founders never committed to open-sourcing all of OpenAI's technology, either before or during Musk's tenure on the nonprofit board.

95.    On April 9, 2018, after Musk resigned from the board, OpenAI published a "Charter" on its website. Undisputed Facts Nos. 24, 25.

96.    The Charter stated that OpenAI is "committed to providing public goods that help society navigate the path to AGI," and that while "[t]oday this includes publishing most of our AI research," the company "expect[s] that safety and security concerns will reduce our traditional publishing in the future, while increasing the importance of sharing safety, policy, and standards research." DX-0805.

97.    Musk did not object to the Charter after it was posted.

98.     On April 23, 2020, OpenAI, Inc. filed an amended certificate of incorporation. Undisputed Facts No. 38; DX-0908. The amended certificate continued to emphasize that the nonprofit's "purpose" was to "ensure that artificial general intelligence benefits all of humanity." DX-0908. Consistent with the original certificate, which stated that the nonprofit would "seek to open source technology for the public benefit when applicable," DX-0511, the amended certificate stated that the corporation would "seek to distribute [its technology] for the public benefit when applicable." DX-0908.

99.     Musk also did not object to the amended certificate after it was publicly filed.

100.     On June 11, 2020, OpenAI announced publicly that, for safety, commercial, and other reasons, it was not open-sourcing all of its models.

101.     On September 24, 2020, in response to a public report regarding OpenAI's exclusive licensing arrangement with Microsoft, Musk posted on Twitter that the licensing arrangement "seem[ed] like the opposite of open," and that "OpenAI is essentially captured by Microsoft." DX-0922. As noted above, in September 2020, Musk also ceased his monthly rent-related donations. Undisputed Facts No. 16.

### B.     Unjust Enrichment

102.     The donations of money and property on which Musk's unjust enrichment claim is based were received and expended by OpenAI, Inc. before August 5, 2022. *See supra* Section IV.A.i.

103.     In any event, before August 5, 2022, Musk was aware of, or reasonably should have suspected, the claimed harm of his unjust enrichment claim. *See supra* Section IV.A.ii-iii.

## V.     Laches

104.     The Court finds that Musk failed to bring this lawsuit for a period of time that amounts to an unreasonable delay. As discussed in Section IV above with respect to the statutes of limitations, well before Musk filed suit, Musk was aware, or reasonably should have suspected, that OpenAI would create and operate a for-profit entity and would not open-source all its technology.

105.    Musk's delay has prejudiced Defendants in at least two ways. First, Defendants could not rely on evidence, including from Musk and his associates, that might have been available had Musk brought this suit promptly. Second, Defendants have taken actions that they might not have taken had Musk brought his suit with appropriate dispatch, including pursuing third-party investments and developing and distributing AI technology and products through OpenAI's for-profit structure long after Musk was on notice of his claims.

## VI.    Unclean Hands

106.    The Court finally finds that Musk has for years engaged in unconscionable conduct intimately related to his claims and that his conduct has resulted in prejudice to Defendants.

107.    As described at paragraphs 25-27, *supra*, Musk has over the years repeatedly sought to exploit the OpenAI nonprofit to further the interests of his for-profit ventures. He used nonprofit personnel to help Tesla, greenlighted poaching campaigns to move talented employees from OpenAI to his for-profit companies, and, while this lawsuit was pending, sought to purchase the nonprofit's assets for the benefit of his for-profit competitor, xAI.

108.    In addition, in early 2023, while Musk was building xAI, but before he announced its formation or that he was pursuing a competing AI venture, Musk invoked his status as a former OpenAI donor and board member to gain access to OpenAI's confidential information, including competitively sensitive contracts.

109.    At the same time, Musk also signed an open letter calling on "all AI labs to immediately pause for at least 6 months the training of AI systems more powerful than GPT-4," OpenAI's latest model. Musk did not disclose that he had formed a competitor company that would benefit from restraining OpenAI's progress toward realizing its mission.