MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **PLAINTIFF'S PROPOSED FINDINGS OF FACT** |
| v. | Date: April 27, 2026 |
| SAMUEL ALTMAN et al., | Time: 8:30 |
| Defendants. | Courtroom: 1 – 4th Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

Page

I.     BREACH OF CHARITABLE TRUST.................................................................................... 1

       A.     Existence of a Charitable Trust .................................................................... 1

       B.     Breach of Charitable Trust .......................................................................... 3

II.    UNJUST ENRICHMENT.................................................................................................. 10

       A.     Conferral of Benefits.................................................................................. 10

       B.     Unjust Retention of Benefits ...................................................................... 11

III.   AIDING AND ABETTING BREACH OF CHARITABLE TRUST............................... 12

       A.     Microsoft's Knowledge of the Breach of Charitable Obligations.......................... 12

       B.     Microsoft's Substantial Assistance ........................................................... 14

## I.    BREACH OF CHARITABLE TRUST

### A.    Existence of a Charitable Trust

1.    For many years, Elon Musk harbored deep concerns about the development of artificial intelligence ("AI").  He feared that for-profit companies developing AI – especially the industry leader, Google – would obtain unilateral control over the technology, creating grave risks for humanity.  Musk was concerned that those companies were not taking those risks seriously.

2.    In early 2015, Musk expressed his concerns about AI safety to Sam Altman, who professed to share Musk's fears.  Over the next several months, Musk, Altman, and Greg Brockman discussed how to develop artificial intelligence safely.

3.    Musk, Altman, and Brockman ultimately agreed to found a nonprofit organization dedicated to developing AI safely for the benefit of all humanity.  During their discussions, Altman repeatedly assured Musk that he agreed with Musk's priority of establishing a nonprofit that would open-source its technology, sharing it freely for others to use.

4.    In May 2015, Altman wrote Musk, proposing that they "structure [the entity] so that the tech belongs to the world via some sort of nonprofit."  PX003.  He later told Musk that the "technology would be owned by the foundation and used 'for the good of the world'" and that "safety should be a first-class requirement."  PX005.

5.    Musk agreed to be the nonprofit's primary donor.  Musk explicitly conditioned his funding on the organization being structured as a nonprofit committed to distributing its technology broadly for the benefit of humanity.  Altman agreed, writing to Musk that the charity's mission would be "to create the first general AI and use it for individual empowerment – ie, the distributed version of the future that seems the safest."  PX005.

6.    Musk reiterated the importance of those funding conditions throughout 2015.  He explained that "governance" was "critical" because he "d[id]n't want to fund something that goes in what turns out to be the wrong direction."  PX007.  Altman confirmed that an independent 501(c)(3) structure was "correct."  PX012.

1

7.    Based on those commitments, Musk, Altman, and Brockman founded OpenAI, Inc. as a nonprofit in December 2015.  OpenAI, Inc. filed its certificate of incorporation in Delaware on December 8, 2015.

8.    OpenAI's certificate of incorporation states:  "The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence.  The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable.  The corporation is not organized for the private gain of any person."  PX016.

10.    On December 11, 2015, OpenAI announced its launch in a blog post.  Musk, Altman, and Brockman drafted the announcement.  The first paragraph states: "OpenAI is a non-profit artificial intelligence research company.  Our goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return.  Since our research is free from financial obligations, we can better focus on a positive human impact."  PX017.

11.    From 2016 through September 2020, Musk contributed a total of $38,191,066 in cash and in-kind contributions to or for the benefit of OpenAI, Inc.

12.    In 2016 and 2017, Musk made five quarterly grants to OpenAI of $5 million each, for a total of $25 million.

13.    Between September 2016 and September 2020, Musk contributed approximately $12.7 million to fund OpenAI's rent and related expenses at the Pioneer building in San Francisco.

14.    Although most of those rent payments were made to OpenAI to fund its payments to the landlord, on one occasion in June 2016 Musk paid the first month's rent of $141,667 directly to the landlord through a company he controlled.

15.    In October 2017, Musk donated four Tesla vehicles to OpenAI to give to key employees in recognition of the work they had done.  Musk also paid to upgrade one of those vehicles in January 2018.

16.    In July 2017, Musk donated $250,000 to support a research project on universal basic income for the benefit of OpenAI.

2

17.     Musk's financial contributions to OpenAI represented approximately 60% of the nonprofit's funding during the critical first two years of its operations.

18.     Musk made some of his contributions to OpenAI, Inc. directly, and made others through an entity named YC Org. YC Org was a fiscal sponsor that received donations on OpenAI's behalf while OpenAI waited for its own nonprofit registration to be approved by the IRS. OpenAI informed Musk that the funds he contributed through YC Org would be turned over to OpenAI as soon as OpenAI's own charitable registration was approved. All the contributions that Musk made through YC Org that he intended to be paid to OpenAI were, in fact, turned over to OpenAI.

19.     Musk made some of his contributions through his personal account and others from the Musk Foundation, a private charitable foundation that Musk funds and controls. Musk also made contributions through two donor advised funds at the Vanguard Charitable Endowment Program and the Fidelity Investments Charitable Gift Fund. Donor advised funds permit donors to fund an account for charitable giving and then direct donations from the account at later dates. Musk provided all the funding in his two donor advised funds at Vanguard and Fidelity and directed all the contributions that were made from those funds. OpenAI described those contributions as coming from Musk on its tax forms, listing the donor as "Elon Musk Via Vanguard Charitable" or "Elon Musk granted via Fidelity." PX052 at 22.

20.     Musk conditioned his contributions on OpenAI remaining an open-source nonprofit dedicated to developing AI technology safely for the benefit of all humankind. Without those foundational commitments, Musk would not have contributed to OpenAI.

**B.      Breach of Charitable Trust**

21.     In 2017, OpenAI's founders became concerned that developing artificial general intelligence ("AGI") – advanced AI technology surpassing ordinary human intelligence – would require more resources than a nonprofit could raise through charitable donations. In particular, OpenAI needed vast amounts of computing power, or "compute," to develop and train its AI models.

22.     Musk, Altman, Brockman, and OpenAI's Chief Scientist Ilya Sutskever discussed various ways to obtain more funding. Among the ideas they considered were partnering with an existing for-profit company, forming a for-profit affiliate, or restructuring in some other manner.

3

23. Throughout those discussions, Musk made clear that he would only support proposals that furthered OpenAI's nonprofit mission.

24. After months of discussions, in September 2017, Musk grew frustrated with the state of discussions. His co-founders expected him to provide most of the seed capital for any new for-profit entity, but they made shifting demands for their own equity stakes and governance rights.

25. On September 20, 2017, Musk wrote: "Guys, I've had enough. This is the final straw. Either go do something on your own or continue with OpenAI as a nonprofit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding for you to create a startup." PX157.

26. Musk's co-founders quickly reassured him of their commitment to the nonprofit's mission. Altman wrote: "[I] remain enthusiastic about the non-profit structure!" PX158. Altman confirmed the next day that he was "[g]reat with keeping [the] non-profit and continuing to support it." PX159.

27. Brockman likewise communicated that he "would like to continue with the non-profit structure." PX159. Over the next several months, Altman and Brockman continued to reassure Musk about their commitment to pursuing the nonprofit's mission.

28. In fact, Brockman had different plans. Brockman admitted in his private journal: "[O]ur plan[:] . . . it would be nice to be making the billions . . . . we've been thinking that maybe we should just flip to a for profit. making the money for us sounds great and all." PX163.

29. Brockman also privately expressed misgivings about misleading Musk. In his journal, he admitted that he and Sutskever "cannot say that we are committed to the non-profit. don't wanna say that we're committed. if three months later we're doing b-corp then it was a lie." PX161 at 3. "[Musk's] story will correctly be that we weren't honest with him in the end about still wanting to do the for profit." *Id.* at 4. Brockman recognized that "it'd be wrong to steal the non-profit from [Musk]. to convert to a b-corp without him. that'd be pretty morally bankrupt." *Id.* at 10.

30.    Despite further discussions about ways to fund OpenAI, Musk and his co-founders were unable to agree on a plan.  On February 21, 2018, Musk resigned from OpenAI's board of directors.

31.    On April 9, 2018, OpenAI, Inc. published the "OpenAI Charter" on its website.  The Charter reaffirmed OpenAI's commitment to its founding mission:  "We anticipate needing to marshal substantial resources to fulfill our mission, but will always diligently act to minimize conflicts of interest among our employees and stakeholders that could compromise broad benefit."  PX024.

32.    On April 23, 2018, Altman informed Musk through Shivon Zilis that OpenAI was considering a for-profit structure in which investors could earn profits on their investments up to a specified cap.

33.    On August 31, 2018, Altman sent Musk a draft term sheet reflecting contemplated terms for the new for-profit entity, OpenAI, L.P.  Altman wrote in the cover email:  "my current thought is that I won't take any equity.  I'm not doing this for the money anyway, and I like the idea of being completely unconflicted and just focused on the best outcome for the world."  PX236.

34.    The front page of the draft term sheet stated in bold face:  "**It would be wise to view any investment in OpenAI LP in the spirit of a donation . . . **."  PX236.

35.    On September 19, 2018, the OpenAI, L.P. for-profit entity was formed as a limited partnership under Delaware law.  Under the Limited Partnership Agreement, investors were entitled to receive a target redemption amount equal to a multiple of their investment.  OpenAI, Inc. would receive an uncapped residual interest after all target redemption amounts were paid.

36.    In its first fundraising round completed on March 1, 2019, OpenAI, L.P. received $133 million in capital commitments from investors referred to as First Close Limited Partners.

37.    OpenAI, Inc. transferred substantially all of its intellectual property to OpenAI, L.P., and most of the employees who worked for OpenAI, Inc. became employees of OpenAI, L.P. OpenAI, Inc. received a limited partnership interest based on the appraised value of its asset contributions.

38.    Brockman received a substantial equity stake in OpenAI, L.P.

39. Altman was named CEO of OpenAI, L.P.

40. On July 2, 2019, Microsoft committed $1 billion in capital to OpenAI, L.P., with a target redemption amount of 20 times the capital commitment. OpenAI, Microsoft, and the First Close Limited Partners executed an Amended and Restated Limited Partnership Agreement of OpenAI, L.P., reflecting that investment.

41. The same day, Microsoft, OpenAI, Inc., and OpenAI, L.P. executed a Joint Development and Collaboration Agreement ("JDCA") to govern their commercial partnership. Under that agreement, Microsoft received a license to a single AI model, OpenAI alone determined whether it had achieved AGI and whether to open-source any AI model, and no Microsoft personnel worked directly at OpenAI.

42. On March 6, 2021, Microsoft made an additional $2 billion capital commitment to OpenAI, L.P. at a target redemption amount of 6 times its commitment. That investment was reflected in a Second Amended and Restatement Limited Partnership Agreement of OpenAI, L.P. OpenAI and Microsoft did not publicly announce this investment at the time.

43. One day earlier, Microsoft, OpenAI, Inc., and OpenAI, L.P. also executed an Amended and Restated Joint Development and Collaboration Agreement. In that agreement, Microsoft obtained a co-exclusive license to any OpenAI models developed during the agreement, the right to approve standards used to declare whether AGI has been reached, and the right to approve any decisions OpenAI made about open-sourcing its technology. Microsoft could also embed up to ten of its engineers at OpenAI.

44. Brockman became President of OpenAI, L.P. on or around May 5, 2022.

45. In October 2022, Musk learned from public news reports that Microsoft planned to make a further investment in OpenAI, and that OpenAI had been valued at $20 billion. Musk texted the article to Altman, expressing his concerns. Altman responded "I agree this feels bad" and offered Musk equity in the OpenAI for-profit entity, which Musk declined. PX296.

46. OpenAI released ChatGPT on November 30, 2022. Altman did not inform the OpenAI, Inc. nonprofit board about the release of ChatGPT before it occurred. Instead, the nonprofit board learned about the release from public reports on Twitter.

6

47. On January 23, 2023, Microsoft invested an additional $10 billion in capital commitments in the OpenAI for-profit entity. The for-profit was reorganized as a limited liability company, and the investment was reflected in an Amended and Restated Limited Liability Company Agreement of OpenAI Global, LLC. Microsoft's target redemption amount for the investment was $60 billion, or 6 times its capital commitment.

48. Under the 2023 agreement, the target redemption amounts included an automatic 20% increase each year starting in 2025, plus an increase for inflation. Microsoft held the largest target redemption amount by far and thus had the most to gain from that 20% annual increase.

49. The 2023 agreement set forth a three-tier waterfall for distributing OpenAI's profits to investors. Initially, the First Close investors (including the nonprofit) would recover their entire $193 million capital contributions. Next, profits would be divided, with 75% going to repay Microsoft's $13 billion capital contribution and 25% going to repay the target redemption amounts of the First Close investors. At the third step, 49% would be allocated to Microsoft's target redemption amount, while 51% would go to the target redemption amounts for the First Close investors and employees. Of that 51%, OpenAI, Inc. – the nonprofit – would receive just 2% of profits as a result of its First Close investor stake. Only after the target redemption amounts had been repaid would the OpenAI nonprofit receive its residual share.

50. For the OpenAI nonprofit to receive any portion of its residual share, the for-profit entity would have to generate between $124.6 billion and $274.6 billion in profits. By that point, Microsoft would have received about $105 billion on its capital return and target redemption amount.

51. The OpenAI nonprofit board conducted no quantitative analysis to determine whether the target redemption amounts in the 2023 investment agreement were fair to the nonprofit. The board engaged no financial advisors to analyze those investment terms or to determine the amounts that Microsoft and other for-profit investors would likely receive.

52. The same day OpenAI and Microsoft entered into the investment agreement, Microsoft, OpenAI, Inc., and OpenAI OpCo, LLC executed a Second Amended and Restated Joint Development and Collaboration Agreement. The 2023 JDCA further expanded Microsoft's

7

commercial rights and eliminated impediments to commercialization. Microsoft obtained rights to license virtually all of OpenAI's intellectual property, whether developed before or during the term of the agreement, excluding only AGI. Microsoft also gained the right to embed up to 20 of its employees at OpenAI.

53.     Under each of its investment agreements, Microsoft had the right to approve certain "major decisions" by OpenAI, including any restructuring.

54.     News outlets widely reported Microsoft's $10 billion investment in OpenAI, including details of the three-tier profit waterfall. Through his attorneys, Musk demanded to review OpenAI's governance documents, including its agreements with Microsoft.

55.     On November 17, 2023, OpenAI's nonprofit board removed Sam Altman and Greg Brockman as directors of the nonprofit and fired Sam Altman as OpenAI's CEO. The board issued a public statement explaining that they had fired Altman because he had not been "consistently candid in his communications with the board." PX305.

56.     Altman had lied to the board on multiple occasions and failed to inform the board about several lapses in OpenAI's safety review processes. Those incidents led OpenAI's independent board members to conclude that Altman had undermined their ability to govern the nonprofit and oversee the for-profit's commercial activities. The independent board members attributed those incidents in part to commercial pressures on OpenAI to release products quickly, at the expense of safety and the nonprofit's charitable mission.

57.     The board appointed Chief Technology Officer Mira Murati as interim CEO. Murati immediately contacted Microsoft and remained in frequent communication with Microsoft CEO Satya Nadella and CTO Kevin Scott throughout the days that followed.

58.     After learning of Altman's ouster, Nadella worked with Altman behind the scenes to generate pressure on the OpenAI board to reinstate Altman. Microsoft set up a new AI subsidiary and publicly invited Altman and Brockman to lead that new subsidiary. Microsoft then made an open offer to hire any OpenAI employee who wanted to come work at the new subsidiary and to match their OpenAI compensation, at a total cost of $25 billion. Murati actively collaborated with Nadella to plan and deliver that offer to OpenAI employees.

59.  Faced with the prospect that OpenAI's employees would leave en masse and that OpenAI would disintegrate, all but one of the OpenAI board members who had voted to remove Altman were forced to resign.  Nadella and Scott collaborated with Altman to select new board members to replace them.  Candidates were selected for the board only after Microsoft approved them.  And when Microsoft rejected others, they were not selected.  The board members whom Altman and Microsoft ultimately selected had no significant AI safety experience and were chosen primarily for their perceived loyalty to Altman.

60.  On October 28, 2025, the OpenAI for-profit was reorganized as a public benefit corporation under Delaware law named OpenAI Group PBC.

61.  Microsoft and other investors in the OpenAI for-profit entity received equity stakes in OpenAI Group PBC.  Those equity stakes were uncapped, meaning that there was no longer any limit on the amount of profits investors could earn from their investments.

62.  OpenAI, Inc. was renamed The OpenAI Foundation and received a minority equity stake in OpenAI Group PBC.

63.  The same day, Microsoft, OpenAI Group PBC, and OpenAI OpCo, LLC executed a Third Amended and Restated Joint Development and Collaboration Agreement.  Under that agreement, Microsoft received a co-exclusive license to virtually all of OpenAI's intellectual property, including for the first time post-AGI technology.  Microsoft also obtained a role in declaring when AGI had been achieved by appointing experts to a panel that would make that determination.  Microsoft's embedded employees were replaced by a dedicated team of at least 11 OpenAI employees committed to facilitating the transfer of intellectual property to Microsoft.

64.  At the time of the restructuring in October 2025, the OpenAI for-profit was valued at $500 billion.  Microsoft's 27% stake was valued at $135 billion.

65.  Following recent investment rounds, the OpenAI for-profit is currently valued at more than $850 billion.

66.  Brockman's equity stake in the OpenAI for-profit was worth $20 billion in September 2025 and is now worth substantially more, likely around $30 billion.

67.     Altman claims to own no direct equity stake in the OpenAI for-profit, bu he owns an indirect stake through his ownership in a Y Combinator fund that was one of the First Close investors.  Altman has stated on multiple occasions that he may take equity in OpenAI in the future.

68.     Altman holds substantial ownership stakes in several companies that have done business with OpenAI.  Many of those deals were consummated while Altman served as OpenAI's CEO.  Altman's net worth has increased substantially as a result of his ownership stakes in those other companies, which benefited from their commercial dealings with OpenAI.

69.     Altman continues to serve as CEO of both OpenAI, Inc. and OpenAI Group PBC.

70.     OpenAI Group PBC is currently planning an initial public offering that would value the company at $1 trillion.

71.     The OpenAI nonprofit has essentially no full-time employees, no intellectual property, and no substantial assets beyond its stake in the for-profit entity.

## II.     UNJUST ENRICHMENT

### A.     Conferral of Benefits

72.     Musk conferred extensive benefits on OpenAI by investing his money, prestige, strategic guidance, and business relationships to benefit the nonprofit.

73.     From 2016 through September 2020, Musk contributed a total of $38,191,066 in cash and in-kind contributions for the benefit of OpenAI, Inc.  Those contributions included $25 million in quarterly grants, $12.7 million to pay for OpenAI's rent, four Tesla vehicles, and $250,000 to fund a research project on universal basic income.  Musk's financial contributions represented approximately 60% of the nonprofit's funding during the critical first two years of its operations.

74.     Beyond those monetary contributions, Musk also made substantial nonmonetary contributions to OpenAI.  Musk lent his prestige and reputation in the tech community to the new venture, creating instant credibility and dramatically increasing OpenAI's profile among contributors, recruits, and business partners.

75.     Musk also brought his strategic guidance to the venture. Musk taught his co-founders everything he knew about running a startup.  Musk's co-founders pressed for weekly meetings with

Musk so they could learn from his knowledge and experience. Chief Scientist Ilya Sutskever described Musk as "the most overwhelmingly competent person in the world." PX098.

76. Musk also had a major impact on OpenAI's recruiting efforts. Musk's involvement convinced numerous recruits to join OpenAI, with one prominent candidate describing his involvement as "awesome." PX066. Musk had a particularly significant role in convincing Chief Scientist Ilya Sutskever to join, despite a lucrative competing offer from Google.

77. Microsoft repeatedly used his business connections to create opportunities for OpenAI. For example, Musk used his personal relationship with Nvidia CEO Jensen Huang to obtain a first-of-its-kind supercomputer for OpenAI. Musk also convinced Microsoft's Nadella to provide additional discounted compute to OpenAI in 2017.

78. Altman, Brockman, OpenAI, Inc., and the OpenAI for-profit entities all knew or should have known that Musk was providing those monetary and non-monetary contributions to OpenAI on the condition that they would be used for OpenAI's charitable nonprofit purpose to benefit humanity, not to enrich for-profit investors. Musk repeatedly made those conditions clear in his founding-era communications with Sam Altman, in OpenAI's formation documents, and in the other materials cited above.

## B. Unjust Retention of Benefits

79. Altman, Brockman, and OpenAI unjustly retained the benefits that Musk conferred on them by using the fruits of those benefits to build an unauthorized commercial enterprise that served primarily to enrich OpenAI's principals and for-profit investors rather than to support the nonprofit's charitable mission.

80. As explained above, Altman and Brockman leveraged the nonprofit platform that Musk's contributions had helped build to transform OpenAI into a commercial for-profit behemoth. The OpenAI for-profit's investments from Microsoft and other investors far exceed the amounts that OpenAI receives from philanthropic donations. OpenAI's revenues from sales and commercial operations dwarf whatever charitable activities the nonprofit still undertakes. Altman, Brockman, and OpenAI have transformed OpenAI into an enterprise valued at nearly a trillion dollars, while

the nonprofit has been stripped of essentially all of its employees, intellectual property, and research operations, and left with only its minority stake in the for-profit entity.

### III. AIDING AND ABETTING BREACH OF CHARITABLE TRUST

#### A. Microsoft's Knowledge of the Breach of Charitable Obligations

81. Microsoft CEO Satya Nadella knew about Musk's AI safety concerns even before OpenAI launched. In March 2015, Altman emailed Nadella to request his signature on an open letter calling for AI regulation, explaining that he and Musk were spearheading the effort.

82. Nine months later, OpenAI announced its launch with an introductory blog post declaring its mission to advance artificial intelligence in a way "most likely to benefit humanity as a whole, unconstrained by a need to generate financial return." PX017. The post identified Musk as a founding co-chair and donor. *Id.* Nadella emailed the announcement to his senior research executives the next day, asking if Microsoft had been "called to participate." PX221.

83. At the time, Microsoft's cloud computing service, Azure, lagged behind Amazon Web Services in market share. Google dominated AI. Nadella was interested in OpenAI's potential to help Microsoft compete in those areas.

84. In 2016, Microsoft agreed to provide deeply discounted compute to OpenAI in exchange for being named as OpenAI's sponsor in place of Amazon.

85. Prior to that deal, Microsoft's Azure team analyzed the costs and benefits of providing the discounted compute. They estimated that offering the discount would result in a significant loss to Microsoft. But they noted that "Elon Musk (founder of Tesla)" was a founder and co-chair of OpenAI and that the deal represented a "[u]nique opportunity for [Microsoft] to attach and support [a] high profile, non profit organization driving innovation in the AI segment." PX229.

86. Microsoft and OpenAI announced the compute deal in November 2016. Several technology and finance news outlets reported the deal with headlines referring to "Elon Musk's" OpenAI. PX227. Three of those headlines were included in a "Microsoft Daily News Digest," widely distributed within the company. *Id.*

87. In 2017, OpenAI needed even more compute to power its "Dota" project, in which OpenAI's AI bot would attempt to defeat a human Dota champion. Musk personally called Nadella to request additional discounted compute. Nadella agreed.

88. The day OpenAI won the Dota challenge on August 11, 2017, Nadella congratulated Musk, Altman, Brockman, and Sutskever by email. Musk replied: "Indeed, much appreciated. Will make sure people know about Microsoft's help." PX228.

89. A week later, Altman emailed Nadella to ask for an extension of the discounted compute deal. Deeming an extension too costly, Microsoft declined. Internally, Microsoft's senior executives and top researchers debated how Microsoft could extract commercial value from OpenAI while repeatedly invoking Musk's statements and interests in supporting the nonprofit.

90. Within weeks of Musk's February 2018 resignation from OpenAI's board, Altman scheduled a call with Nadella to discuss his plans to "launch a new commercial venture": a for-profit arm of OpenAI in which Microsoft could invest. PX230.

91. Nadella shared the proposal with his senior executives. CTO Kevin Scott replied:

> Satya, one of the big questions I would have for [Altman] is whether or not [OpenAI] intend[s] to make the hardware and software open source in the original spirit of OpenAI. [In my opinion] that would be good competitive insurance and something that might be worth funding. *I wonder if the big OpenAI donors are aware of these plans? Ideologically, I can't imagine that they funded an open effort to concentrate [machine learning] talent so that they could then go build a closed, for profit thing on its back.*

PX230 (emphasis added).

92. OpenAI created its "capped-profit" subsidiary in October 2018. The first page of the Limited Partnership Agreement – which Microsoft executed in 2019 – featured a prominent purple box advising investors that "[i]t would be wise to view any investment in OpenAI, L.P. in the spirit of a donation" and explaining that "[t]he Partnership exists to advance OpenAI, Inc.'s mission of ensuring that safe artificial general intelligence is developed and benefits all of humanity." PX200.

93. Throughout 2018, Microsoft obtained information about Altman and Brockman's plans for the capped for-profit subsidiary from Reid Hoffman, a Microsoft board member who became a significant donor to OpenAI.

13

94.    In November 2018, after a dinner with Altman, Scott informed Nadella that OpenAI's new corporate structure offered both "a commercial vehicle for monetizing Open AI IP" and investment returns "capped at $500B." PX237. Altman claimed the nonprofit would eventually benefit because "[i]f [OpenAI] ever [does] get to $500B in returns, the balance over that goes directly to the 501(c)3." *Id.* Scott also reported that OpenAI, Inc.'s board of directors would control the activities of OpenAI, L.P., and that Hoffman would join the nonprofit board.

95.    Microsoft conducted extensive due diligence on OpenAI, including by reviewing its 2016 IRS application for a 501(c)(3) tax exemption as a charity. That application included OpenAI's Delaware Certificate of Incorporation, which stated that "no part of the net income or assets of th[e] corporation shall ever inure . . . to the benefit of any private person." PX222. The application also declared that OpenAI "does not plan to play any role in developing commercial products or equipment" and that it "intends to make its research freely available to the public on a nondiscriminatory basis." *Id.*

96.    Microsoft thus knew that OpenAI, Inc. was a nonprofit organized for the purpose of developing AI for the benefit of all humanity, unconstrained by a need to generate financial return.

97.    Microsoft knew that OpenAI, Inc. was launched with the commitment to share its research openly for broad public benefit.

98.    Microsoft knew that OpenAI, Inc. was subject to all the customary obligations of a nonprofit charity, including the irrevocable commitment of its assets to the public good and a promise that its assets would never inure to the private gain of any person.

99.    Microsoft knew OpenAI, Inc., owed fiduciary duties to its donors to use its assets solely for the purpose of furthering the charitable mission, not to generate profits.

100.    Microsoft knew that Musk had co-founded OpenAI and was a major donor from its inception through 2020.

**B.    Microsoft's Substantial Assistance**

101.    Microsoft substantially assisted OpenAI's breach of charitable trust by encouraging and inducing OpenAI to use its charitable assets to enrich private investors.

102. Microsoft's 2019 and 2021 investments established the groundwork for its commercial partnership with OpenAI. Microsoft's $10 billion investment in 2023 far exceeded the amounts of those prior investments. That $10 billion investment, and the accompanying suite of expanded commercial rights, substantially assisted OpenAI's prioritization of its commercial operations over its charitable mission.

103. Microsoft encouraged OpenAI's commercialization despite knowing that doing so risked contravening OpenAI's nonprofit obligations. In February 2022, Altman emailed Microsoft to propose restructuring OpenAI "as we become a more commercial effort." PX258. One of the objectives of his proposal was to remove the nonprofit from "formal control" to mitigate "private benefit risk" – the risk that commercialization would violate the nonprofit's founding commitment that its assets must never inure to the benefit of any private person. *Id.*

104. In 2022, Microsoft told Altman that OpenAI needed to generate $100 million in revenues in order to secure the next $10 billion investment. OpenAI redirected resources toward its product development teams to meet that goal.

105. After OpenAI released ChatGPT in November 2022, Nadella repeatedly urged Altman in text messages to release a paid version of the product and checked in on OpenAI's progress toward commercialization.

106. In the 2023 JDCA, Microsoft obtained an expanded license to commercialize virtually all of OpenAI's intellectual property, excluding AGI, as well as the right to embed 20 engineers onsite at OpenAI, who would facilitate the transfer of intellectual property to Microsoft and encourage further commercialization.

107. In November 2023, Microsoft's intervention was instrumental in reinstating Altman as CEO of OpenAI after the independent board fired him for lack of candor. Overnight, Microsoft founded a new AI subsidiary and hired Altman and Brockman to lead it. Microsoft then made an open offer to hire away all OpenAI employees for the new venture, offering to match their OpenAI compensation. That offer created an overwhelming risk that OpenAI would simply disintegrate. Three of the four board members who had voted to remove Altman were compelled to resign.

Throughout that process, Microsoft collaborated with OpenAI's CTO and interim CEO Mira Murati to orchestrate the credible threat that OpenAI employees would leave en masse.

108.    Nadella, Scott, and another senior executive at Microsoft then collaborated with Altman to select replacements for the outgoing board members.  Microsoft expressed its opinions on Altman's proposals, and ultimately every candidate selected for the board was approved by Microsoft.  Conversely, when Microsoft vetoed a proposed candidate, that candidate was not selected for the board.  Microsoft's input resulted in a board stacked with Altman loyalists rather than AI safety experts.

109.    During a press interview as these events unfolded, Nadella emphasized Microsoft's control over OpenAI, proclaiming:  "We are in there.  We are below them, above them, around them."  PX322.

110.    After Altman's reinstatement, Microsoft further enhanced its influence over OpenAI by installing a board observer who could monitor OpenAI's operations.

111.    In 2015, when OpenAI sought to restructure into a public benefit corporation, Microsoft wielded its "major decisions" right to ensure favorable terms.

112.    When OpenAI completed the restructuring in October 2025, Microsoft emerged with a 27% stake in the public benefit corporation worth $135 billion.  Microsoft's stake is larger than the nonprofit's own minority stake and – unlike its prior stake – is uncapped:  There is no limit to the amount of profits Microsoft can now earn.  Microsoft's uncapped stake in the PBC gives Microsoft even greater influence over OpenAI's operations.

113.    Microsoft also received even greater commercial rights.  For the first time, Microsoft obtained rights to OpenAI's post-AGI technology.  Microsoft also obtained a role in determining whether OpenAI had achieved AGI.  Both those rights gave Microsoft significant influence over OpenAI's most prized technology, further undermining the nonprofit's mission.

PLAINTIFF'S PROPOSED FINDINGS OF FACT
CASE NO.: 4:24-CV-04722-YGR

Dated:  April 27, 2026

MOLOLAMKEN LLP

By:    /s/ Steven F. Molo
       Steven F. Molo (*pro hac vice*)

       Marc Toberoff (CA SBN 188547)
       MToberoff@toberoffandassociates.com
       TOBEROFF & ASSOCIATES, P.C.
       23823 Malibu Road, Suite 50-363
       Malibu, CA 90265
       Telephone: (310) 246-3333

       Robert K. Kry (*pro hac vice*)
       Jennifer M. Schubert (*pro hac vice*)
       MOLOLAMKEN LLP
       430 Park Avenue
       New York, NY  10022
       Telephone: (212) 607-8160

       *Attorneys for Plaintiffs Elon Musk
       and X.AI Corp.*

PLAINTIFF'S PROPOSED FINDINGS OF FACT
CASE NO.: 4:24-CV-04722-YGR