RUSSELL P. COHEN (SBN 213105)
Russ.cohen@dechert.com
HOWARD M. ULLMAN (SBN 206760)
Howard.ullman@dechert.com
DECHERT LLP
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4500
Facsimile: (415) 262-4555

NISHA PATEL (SBN 281628)
Nisha.patelgupta@dechert.com
DECHERT LLP
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700
Facsimile: (213) 808-5760

ANDREW J. LEVANDER (*admitted pro hac vice*)
Andrew.levander@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

JOHN (JAY) JURATA, JR. (*admitted pro hac vice*)
Jay.jurata@dechert.com
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333

*Attorneys for Defendant Microsoft
Corporation*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY** |
| v. | |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Date:          April 27, 2026<br>Action Filed: August 5, 2024<br>Trial Date:   April 27, 2026 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................................................................................. 1

AIDING AND ABETTING BREACH OF CHARITABLE TRUST ..................................... 4

I.    Microsoft Had No Knowledge of Either the OpenAI Defendants' Supposed Duties to Musk or the Purported Breach of Those Duties.................................................. 4

    A.    Microsoft Was Not Involved in OpenAI's Formation, Not Privy to Musk's Private Alleged Donation Conditions, and Not Involved in Musk's Separation from OpenAI.......................................................................................... 5

    B.    Microsoft Was Not Involved in the OpenAI Nonprofit Board's Independent Decision in Late 2018 to Create a For-Profit Subsidiary to Address OpenAI's Substantial Capital and Computation Needs............................................... 6

        1.    OpenAI Had Ever-Increasing Needs for Capital and Computing Power. .. 6

        2.    In Late 2018, the OpenAI Nonprofit Board Independently Decided to Create and Operationalize a For-Profit Subsidiary.. .................................. 8

    C.    Ahead of Its First Investment in July 2019, Microsoft's Diligence Did Not Reveal Musk's Alleged Donation Conditions........................................................ 8

    D.    No One Told Microsoft About Musk's Alleged Donation Conditions.................. 9

    E.    Microsoft Received Contractual Assurances from OpenAI that Each of Its Investments and Associated Commercial Partnerships Would Not Violate Any Third-Party Rights, and OpenAI's Nonprofit Board Approved Each Transaction with Microsoft............................................................................................. 10

    F.    Nothing Musk Points to as Evidence of Knowledge Shows that Microsoft Knew the OpenAI Defendants Owed or Breached Any Duties to Musk. ...................... 12

II.   Microsoft Did Not Substantially Assist or Encourage the OpenAI Defendants to Breach the Alleged Charitable Trust ..................................................................... 14

    A.    Microsoft Did Not Assist or Encourage the Alleged Breach. ............................. 14

    B.    Microsoft's Partnership Advanced OpenAI's Mission. ...................................... 15

III.  Microsoft's Conduct Was Not a Substantial Factor in Causing Musk's Alleged Harm... 18

STATUTE OF LIMITATIONS ......................................................................................... 19

I.    Musk's Claim Against Microsoft Accrued By 2021 .............................................. 19

    A.    Musk Was on Notice of OpenAI's For-Profit Pivot Even Before Microsoft Made Its First Investment........................................................................................ 20

    B.    Musk Knew About Microsoft's Investment in OpenAI in July 2019.................. 21

    C.    In September 2020, Musk Tweeted that Microsoft Controlled OpenAI.............. 21

    D.    Altman Told Musk in 2020 About Microsoft's Upcoming 2021 Investment....... 22

II.   Musk Waited More than Three Years to Sue Microsoft ....................................... 22

LACHES ............................................................................................................................. 23

I.    Musk Unreasonably Delayed Bringing His Claim Against Microsoft ............................. 23

II.   Musk's Unreasonable Delay Prejudiced Microsoft ........................................................ 24

UNCLEAN HANDS............................................................................................................. 24

I.    Musk Engaged in Unconscionable Conduct ................................................................... 25

II.    Musk's Unconscionable Conduct Was Intimately Related to His Claim .......................... 26

III.   Musk's Conduct Resulted in Prejudice to Microsoft Such that it Would Be Unfair to Allow Him to Assert His Claim ...................................................................................... 26

**INTRODUCTION**

1.     At the center of this case is a falling out between Elon Musk, Samuel Altman, and Greg Brockman over the future of OpenAI, Inc. ("OpenAI").  That is not Microsoft's dispute.

2.     Shortly after launching OpenAI, its founders all recognized that the company needed massive amounts of computing power and capital to continue OpenAI's mission of benefiting all humanity.  The founders, including Musk, understood that this meant they needed a new corporate structure for OpenAI that would enable it to attract investors, not just donors.  To this end, Musk and his co-founders proposed many for-profit configurations and collaborations.  Musk himself proposed converting OpenAI into a public benefit corporation or attaching it to his company Tesla.  But for all the structures Musk proposed, he also demanded control.  And when he did not get it, he ceased his donations and walked away from OpenAI.

3.     OpenAI's nonprofit board agreed with the founders that the company could not raise sufficient funds from donations alone.  So it decided to form a for-profit subsidiary to raise the capital and carry on the commercial activities that OpenAI needed to pursue its mission.

4.     OpenAI undertook this effort independent of Microsoft and before Microsoft's involvement.  In 2018, the OpenAI nonprofit board created a capped investment structure.  OpenAI reached out to many investors.  And OpenAI raised over $100 million from these other investors.

5.     Almost ten months later, in July 2019, Microsoft agreed to make an initial $1 billion investment and build the custom supercomputers that OpenAI needed for its artificial intelligence ("AI") research.  In return for taking all this risk in what was at the time an unproven research lab, Microsoft would have the right to eventually commercialize OpenAI's technology when it had products to commercialize.

6.     That partnership has been a huge success.  Microsoft's supercomputers and funding have enabled OpenAI to advance its research and widely distribute its technology, which hundreds of millions of people use every day.  And building on OpenAI's technology, Microsoft has developed leading AI development tools and services that thousands of AI developers and millions of Microsoft customers use to achieve more of their goals.

7.     Only one claim remains for trial against Microsoft.  Musk alleges that he and

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

OpenAI, Altman, and Brockman (the latter three together, the "OpenAI Defendants") created a charitable trust. Musk claims that the OpenAI Defendants breached the alleged charitable trust when they created OpenAI's for-profit subsidiary and closed-sourced some of OpenAI's technology. And Musk seeks to hold Microsoft liable for aiding and abetting that supposed breach. In particular, he says Microsoft aided and abetted this breach of charitable trust through its investments in and partnership with OpenAI's for-profit subsidiary.

8. But Musk faces several insurmountable hurdles on that claim—even if he can prevail on the underlying claim for breach of charitable trust.

9. The first is timeliness. Altman told Musk that OpenAI's nonprofit board created a for-profit subsidiary in 2018. Musk knew about Microsoft's investment and commercial partnership no later than July 2019. He openly criticized that partnership in a tweet in September 2020. And Altman informed Musk in advance of Microsoft's planned 2021 investment of that forthcoming investment. Still, Musk waited well over three years—until November 14, 2024—to name Microsoft as a defendant in his fight with OpenAI.

10. Musk's claim against Microsoft is therefore untimely. And even if it were not, his claim separately fails due to his laches. His unreasonable delay in filing suit has significantly prejudiced Microsoft. The company has steadily increased its collaborative efforts and investments in OpenAI while foregoing other opportunities in the global race to develop artificial general intelligence—all while Musk sat on his hands for years.

11. Musk fares no better on the elements of the claim itself. To prevail, Musk must show at least: (1) that Microsoft knew of the specific charitable purposes for which Musk made his donations, and that the OpenAI Defendants committed a breach of charitable trust by using the donations for other inconsistent purposes; (2) that Microsoft gave substantial assistance or encouragement to the OpenAI Defendants in breaching the charitable trust Musk alleges he created; and (3) that Microsoft's conduct was a substantial factor in causing harm to Musk. The evidence

will support none of those elements.[1]

12.    ***First***, Microsoft never learned about Musk's purported charitable trust or its breach and so did not have the required knowledge.  Microsoft was not involved with OpenAI at its founding, was not privy to any oral or written communications purportedly establishing Musk's charitable trust, was not involved in Musk's separation from OpenAI, and had nothing to do with the OpenAI nonprofit board's decision to create a for-profit entity.  OpenAI made all those decisions and took those actions, including conducting a first funding round via the for-profit entity, before Microsoft became involved.  Microsoft thus had no visibility into Musk's private alleged donation conditions—and no one ever told Microsoft about them.  Just the opposite.  When Microsoft learned about the OpenAI nonprofit board's commercial venture plans, it asked questions because it wanted to be sure OpenAI could pursue those plans.  And Microsoft did not stop there.  Microsoft also conducted due diligence before entering the OpenAI partnership.  It reviewed many documents during its diligence process.  It confirmed those documents were consistent with what OpenAI was telling Microsoft it was authorized to do.  It asked more questions about OpenAI's venture.  And it never found any evidence of Musk's purported conditions.  There was no document or writing containing them in all of Microsoft's due diligence.  Nor did anybody at OpenAI say anything to Microsoft about those (non-existent) conditions.  On the contrary, OpenAI's nonprofit board approved each of Microsoft's investments and associated commercial partnerships, and each time, Microsoft received specific written assurances from OpenAI that the deals would not violate any third party's rights.

13.    ***Second***, Microsoft did not substantially assist any breach of charitable trust.  The OpenAI nonprofit board's decision to create a for-profit subsidiary predated Microsoft's first investment by almost ten months.  Microsoft could not have possibly assisted conduct that predated its involvement.  What's more, the capital and computational resources that Microsoft later did provide advanced OpenAI's nonprofit mission.  That is why OpenAI's nonprofit board approved

---

[1] Microsoft maintains its position that Musk's aiding-and-abetting claim requires a further showing that Microsoft intended to assist the alleged breach of charitable trust.  But Musk's claim fails regardless of whether intent is a separate element.

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

each and every Microsoft investment and associated commercial partnership. For the 2021 and 2023 deals, that nonprofit board even included Shivon Zilis, Musk's co-parent and business partner, whom Musk himself viewed as his eyes and ears on the board. Zilis and the rest of the OpenAI nonprofit board recognized that the transactions with Microsoft furthered the nonprofit's mission of developing artificial general intelligence to benefit all of humanity.

14. ***Third***, Microsoft's conduct was not a substantial factor in causing any harm that Musk alleges. Again, the OpenAI nonprofit board independently decided to create a for-profit structure, independently raised capital from other investors, and independently made the governance and commercialization decisions that Musk now challenges. Microsoft was a downstream participant in a structure the OpenAI nonprofit board had already independently established—not a driver of the conduct at issue.

15. In any event, Musk has unclean hands. Musk himself proposed converting OpenAI to a public benefit corporation—*i.e.*, a for-profit corporate structure—and he attempted to attach OpenAI to his own for-profit company (Tesla). In both instances, he did so because he knew OpenAI required a different corporate structure to raise the funds it needed to pursue its mission. He also fueled the situation that led the OpenAI nonprofit board to form a for-profit subsidiary and seek out Microsoft as an investor by walking away from OpenAI when his co-founders refused to give him control. Musk left OpenAI to fail, and he waited until after ChatGPT took the world by storm in 2022 and until after he launched a direct OpenAI competitor (xAI) in 2023 to sue. It would be fundamentally unfair to allow Musk to recover in these circumstances, even if he could somehow satisfy the elements of his untimely equitable claim.

16. For all these reasons, Microsoft cannot be found liable.

### AIDING AND ABETTING BREACH OF CHARITABLE TRUST

**I. Microsoft Had No Knowledge of Either the OpenAI Defendants' Supposed Duties to Musk or the Purported Breach of Those Duties.**

17. Microsoft never learned about the OpenAI Defendants' purported breach of charitable trust. Nor did Microsoft even learn that the OpenAI Defendants owed the alleged duties to Musk in the first instance. After all, Microsoft: (1) was not involved in the formation of OpenAI

in late 2015 and was neither privy to Musk's private alleged donation conditions nor involved with Musk's separation from OpenAI in 2018; (2) was not involved in the OpenAI nonprofit board's decision to create a for-profit subsidiary in late 2018 and did not invest in OpenAI until July 2019, after the nonprofit board had already conducted an investment round with other investors; (3) asked questions and conducted due diligence before its first investment and found no evidence that Musk's donations came with the alleged strings attached; (4) was never informed by OpenAI or Musk, or anybody else for that matter, of Musk's supposed conditions; and (5) invested in 2019, 2021, and 2023 only after the OpenAI nonprofit board approved each of the transactions, and only after OpenAI repeatedly assured Microsoft that its investments and associated commercial partnerships would not violate any third party's rights.

**A.    Microsoft Was Not Involved in OpenAI's Formation, Not Privy to Musk's Private Alleged Donation Conditions, and Not Involved in Musk's Separation from OpenAI.**

18.    OpenAI was first publicly announced in December 2015.  DX-512.  Its founders described OpenAI as "a non-profit artificial intelligence research company," with a broad goal to "benefit humanity."  *Id.*  In this initial press release, OpenAI identified various well-known individuals associated with the effort, and it named Altman and Musk as "co-chairs."  *Id.*  The company also announced that Musk, along with five other individuals, Amazon Web Services, Infosys, and YC Research, were "donating to support OpenAI."  *Id.*  OpenAI did not specify any conditions for those donations—either for Musk or anyone else.  *See id.*

19.    Microsoft was not involved in OpenAI's formation in any way.  DX-512; PX-221; Altman; Brockman; Nadella.

20.    Nor was Microsoft privy to Musk's supposed donation conditions.  There is no dispute that Musk donated to OpenAI without creating or entering into a written charitable trust agreement.  Rather, Musk claims that the purported duties to him were created by *private* oral and email communications between him, OpenAI, and the company's co-founders.  No one from Microsoft is copied on any of these communications, and no evidence suggests that any of these private communications were later shared with Microsoft—because they were not.  *See* PX-003;

- 5 -

PX-007; PX-012; DX-502; Altman; Brockman.  These communications long predate Microsoft's investments in and collaboration with OpenAI.  *See infra* at ¶¶ 33-37.  And there is no single document showing that the OpenAI Defendants accepted Musk's donations with the conditions he now claims.

21.    Musk separated from OpenAI in February 2018.  Musk; DX-770.  Microsoft was not involved with Musk's separation, either.  Nadella; Scott.  This was still well before Microsoft's first investment in the OpenAI for-profit subsidiary in July 2019.  Nadella; Scott.  And Microsoft was not aware of any potential dispute between the parties.  Nadella; Scott.

**B.      Microsoft Was Not Involved in the OpenAI Nonprofit Board's Independent Decision in Late 2018 to Create a For-Profit Subsidiary to Address OpenAI's Substantial Capital and Computation Needs.**

22.    Microsoft had only limited dealings with OpenAI as it got off the ground.  For several years, OpenAI's leadership, including Musk, independently explored options to address the company's increasing needs for capital and computational power.  In 2018, the OpenAI nonprofit board decided to launch a for-profit subsidiary after Musk left OpenAI.  He left OpenAI after his proposals to convert the company into a for-profit structure under his control all failed.  Microsoft did not invest until nearly a year later.

**1.      OpenAI Had Ever-Increasing Needs for Capital and Computing Power.**

23.    OpenAI focused its early-stage research on reinforced machine learning.  Nadella Tr. at 61-62.  The company initially used Amazon's cloud computing resources to support this research.  Nadella Tr. at 38; DX-512.

24.    In 2016, Musk expressed his preference that OpenAI change its cloud services provider from Amazon to Microsoft.  Musk Tr. at 344; DX-556.  Musk then helped arrange for Microsoft's supply of Azure cloud computing services to OpenAI.  Musk Tr. at 344; Nadella Tr. at 27-28, 51; MDX-1509.  For the next year, the two companies had "a regular Azure marketing customer relationship."  Nadella Tr. at 197.  Nobody told Microsoft that the OpenAI Defendants had any duties to Musk during that time (or otherwise).  Nadella; Scott; Hood; Wetter.  And Microsoft never learned of any such duties.  Nadella; Scott; Hood; Wetter.

25.    In August 2017, OpenAI defeated a professional human player in the multiplayer, online Dota 2 video game using Microsoft's cloud computing services. MDX-1501; Nadella Tr. at 59-61. Musk thanked Satya Nadella of Microsoft for the role its cloud computing services played in that accomplishment. MDX-1501; MDX-1535.

26.    But OpenAI sought to do far more than beat humans at video games. OpenAI required vast amounts of resources to continue its research and grow, and its founders, including Musk, discussed the need to increase their computing power capabilities by almost tenfold "ASAP." MDX-1587. To that end, OpenAI approached Microsoft in late 2017, seeking a much larger allotment of discounted Azure compute resources. Nadella. Microsoft, however, struggled to justify the benefits of that arrangement, which it viewed as effectively asking it to donate "compute" without any strategic benefit. Nadella Tr. at 61-62. As a result, Microsoft declined and OpenAI contracted with Google for those services instead. Nadella Tr. at 61.

27.    But OpenAI's need for computing power only continued to grow. Brockman; Sutskever. OpenAI pivoted the focus of its AI research—without any input from Microsoft—from reinforced machine learning to building large language models ("LLMs"). Reinforced machine learning involves an AI agent learning to make decisions within a controlled, simulated environment—such as a video game or chess engine—where it receives rewards or penalties for its actions and iteratively refines its behavior to maximize cumulative reward. Musk, Nadella; Altman; Brockman. LLMs are systems trained on massive text datasets to predict the next word in a sequence and generate fluent text output. Nadella; Scott. Training LLMs at the scale that OpenAI envisioned would require custom supercomputers and large-scale clusters of sophisticated cloud computing resources. Altman; Brockman; Sutskever. This would require a massive hardware infrastructure build, as well as massive amounts of capital to finance that build. Altman; Brockman; Sutskever.

28.    The company's founders explored many ways to obtain the additional computing resources and capital that they needed, including converting OpenAI to a for-profit entity. Altman Tr. at 303; Brockman Tr. at 213-15; Sutskever Tr. at 241-43; Birchall. Microsoft was not involved in any of these discussions. Altman; Brockman.

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

29.    Musk himself previously recognized that OpenAI desperately and immediately "needed to raise capital"—to the tune of "billions per year." MDX-1570; Musk Tr. at 78-79. And he was "a go on [the] for profit" route. MDX-1578. Musk and one of his chief financial advisors, Jared Birchall, even formed a for-profit corporation for OpenAI to use. Birchall Tr. at 107.

**2.    In Late 2018, the OpenAI Nonprofit Board Independently Decided to Create and Operationalize a For-Profit Subsidiary.**

30.    The OpenAI nonprofit board then decided to create a for-profit subsidiary known as OpenAI, L.P. in late 2018. MDX-1531. Microsoft was not involved in that decision either. MDX-1531; Altman Tr. at 352; Zilis Tr. at 321.

31.    Nor did Microsoft have any involvement with the public announcement of OpenAI's for-profit subsidiary in March 2019. DX-865; Nadella.

32.    The OpenAI nonprofit board also independently decided to allow its for-profit subsidiary to use the company's intellectual property to carry out commercial operations in October 2018. MDX-1534. Once again, Microsoft was not involved in the decision. Altman; Nadella. Nor was it involved in the decision to transfer assets to the for-profit subsidiary. Altman; Nadella.

**C.    Ahead of Its First Investment in July 2019, Microsoft's Diligence Did Not Reveal Musk's Alleged Donation Conditions.**

33.    In July 2019, after the OpenAI nonprofit board had already conducted a fundraising round with other investors, Microsoft agreed to invest $1 billion in OpenAI's for-profit subsidiary. Altman Tr. at 332-33; MDX-1573. OpenAI's shift from reinforcement learning to developing LLMs happened to better align with Microsoft's own AI priorities. Nadella Tr. at 61-62. And, from Microsoft's perspective, the fact that the OpenAI nonprofit board had formed a "commercial" for-profit subsidiary was a "foundational piece that allowed [it] to even do [a] deal." Nadella Tr. at 93.

34.    Before agreeing to this billion-dollar investment, Microsoft conducted extensive due diligence. Scott; Wetter. To start, Microsoft's Chief Technology Officer Kevin Scott asked questions. MDX-1599; Scott. He did so because he wanted to be sure OpenAI could even do what it was proposing to do before Microsoft spent time considering it. Scott. Scott spoke with Altman

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

multiple times in 2018 about OpenAI and what it was trying to accomplish.  Scott.  He also spoke with Reid Hoffman, an early donor to OpenAI and a former colleague of Mr. Scott's from LinkedIn.  Scott; MDX-1598.  Scott even visited OpenAI in mid-2018 for a demonstration of OpenAI's technology and to learn more about it.  Scott.  Throughout these visits and conversations, and despite Scott's questions, nobody told Scott about Musk's purported conditions.  Scott.

35.    Microsoft also conducted extensive written due diligence prior to its investment.  The process included a review by Microsoft's bankers and outside counsel of documents OpenAI provided relating to both the nonprofit and its for-profit subsidiary's governance, structure, capitalization, tax status, actions, and policies.  Wetter.  That search revealed no conditions on Musk's donations to OpenAI either.  Wetter.  None of the documents noted conditions on Musk's donations or duties owed by the OpenAI Defendants to Musk.  Wetter.  Nor did any of the due diligence reveal that the OpenAI Defendants owed Musk any duties.  Wetter; Hood; Nadella.

36.    On the contrary, the evidence actually pointed the other way.  OpenAI's IRS Tax Exempt Application, for example, did not list any agreements with Musk in response to express questions by the government about agreements with officers, directors, trustees, and others.  MDX-1518; Microsoft 30(b)(6) Tr. at 124-26.  Microsoft also learned in November 2018 that OpenAI's nonprofit board had approved creating the for-profit subsidiary—and that OpenAI had already raised more than $100 million dollars in capital through this subsidiary from reputable investors.  MDX-1516; Scott.

37.    All that evidence supported Microsoft's understanding that it *could* invest without violating the rights of any third parties.  And after conducting further diligence, Microsoft verified that it could make such an investment and enter a partnership with OpenAI.  *See infra* at ¶¶ 43-51.

**D.    No One Told Microsoft About Musk's Alleged Donation Conditions.**

38.    Meanwhile, nobody told anyone at Microsoft that the OpenAI Defendants had any duties or obligations to Musk.  This fact is confirmed by one witness after another from all sides of this case.

39.    Three of Musk's closest associates—including Shivon Zilis, who was on the OpenAI nonprofit board when it approved two of Microsoft's investments and partnership

agreements—have testified that they could not recall any conditions on Musk's donations being agreed upon or established, let alone communicated to Microsoft.  Teller Tr. at 276-79; Zilis Tr. at 312-19; Birchall Tr. at 162-65.

40.    Musk did not tell Microsoft about the purported duties owed to him either—even though he knows how to communicate with Microsoft when he wants to.  Indeed, he "d[id]n't think" that he told anyone—much less Microsoft—that Microsoft's 2019 investment "broke a promise that had been made to [him] by OpenAI."  Musk Tr. at 164.

41.    The same goes for the witnesses from OpenAI.  Neither Altman, nor Brockman, nor Mira Murati, nor Ilya Sutskever, nor Tasha McCauley—nor anyone else from OpenAI or its nonprofit board—ever communicated with Microsoft about any purported agreement between Musk and the OpenAI Defendants relating to the use of Musk's donations.  Altman Tr. at 369-70; Brockman Tr. at 304-10; Murati Tr. at 226-28; Sutskever Tr. at 327-28; McCauley Tr. at 279-82.

42.    Microsoft's witnesses have all said the same thing.  Satya Nadella, Microsoft's CEO, was never told about Musk's alleged donation conditions.  Nadella Tr. at 273-77.  Neither was Michael Wetter, Microsoft's 30(b)(6) witness.  Wetter.  Other Microsoft employees will testify to the same effect at trial.  Scott; Hood.

**E.    Microsoft Received Contractual Assurances from OpenAI that Each of Its Investments and Associated Commercial Partnerships Would Not Violate Any Third-Party Rights, and OpenAI's Nonprofit Board Approved Each Transaction with Microsoft.**

43.    Not only was Microsoft never told about Musk's alleged donation conditions, and not only did Microsoft's diligence not reveal any such conditions, but Microsoft also received affirmative, contractual assurances from OpenAI that Microsoft's investments would *not* violate any third-party rights.  And Microsoft knew that the OpenAI nonprofit board approved each OpenAI deal with Microsoft.

44.    These agreements were heavily negotiated at arm's length.  Wetter; Murati Tr. at 158-59.  And the representations and warranties in those agreements were important parts of the deals. Wetter.

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

45.    As part of the 2019 Joint Development and Collaboration Agreement ("JDCA") between OpenAI and Microsoft, the OpenAI nonprofit and its for-profit subsidiary each "continuously" represented and warranted that "it ha[d] full power and authority to enter into, and perform its obligations under, and grant the rights granted pursuant to, th[e] Agreement."  MDX-1522.  OpenAI further warranted that "its (or its Affiliate's) performance of activities pursuant to th[e] Agreement will not violate any rights of third parties, any agreement or obligation between it and any third party, or any applicable Law."  MDX-1522; *see also* Altman Tr. 361-64.

46.    In the 2019 Subscription Agreement, the OpenAI nonprofit and its for-profit subsidiary similarly represented and warranted that each: "has all requisite power and authority to carry on its business and to execute, deliver and satisfy its obligations under this Subscription Agreement and the Partnership Agreement," and that "such actions will not cause it to be in breach or violation of any contractual, legal or regulatory duty or obligation."  MDX-1559; Altman Tr. at 353-58.

47.    The 2021 Amended JDCA repeated these assurances before Microsoft made a second investment in OpenAI of $2 billion.  MDX-1527; Microsoft 30(b)(6) Tr. at 201.  Again, the OpenAI nonprofit and its for-profit subsidiary each "continuously" represented and warranted that: "it ha[d] full power and authority to enter into, and perform its obligations under, and grant the rights granted pursuant to, th[e] Agreement," and "its (or its Affiliate's) performance of activities pursuant to th[e] Agreement will not violate any rights of third parties, any agreement or obligation between it (or its Affiliates) and any third party, or, to its knowledge, any applicable Law."  MDX-1527; *see also* MDX-1524 (2021 Subscription Agreement); Altman Tr. at 358-61, 365-66.

48.    Microsoft invested an additional $10 billion in OpenAI's for-profit subsidiary in 2023.  MDX-1542; Nadella.  And, as part of that deal, the Second Amended JDCA repeated OpenAI's assurances yet again.  The OpenAI nonprofit and its for-profit subsidiary "continuously" represented and warranted that: "it ha[d] full power and authority to enter into, perform its obligations under, and grant the rights granted pursuant to, th[e] Agreement," and "its (or its Affiliate's) performance of activities pursuant to th[e] Agreement will not violate any rights of third parties, any agreement or obligation between it (or its Affiliates) and any third party, or, to its

- 11 -

knowledge, any Law." MDX-1521; Altman Tr. at 366-67.

49. Over the course of these three investments, Microsoft relied upon and trusted OpenAI's nonprofit board to raise any issues and make decisions that advanced OpenAI's mission. Nadella Tr. at 277; Wetter; *see also* MDX-1528. After all, the nonprofit board was best positioned to tell Microsoft what OpenAI could or could not do.

50. The nonprofit board tellingly never raised any issues. On the contrary, OpenAI's nonprofit board specifically approved the 2019 Investment and the JDCA, with the representations and warranties language. OAI 30(b)(6) Tr. at 126-27. The nonprofit board then authorized a group of directors, including Musk's former co-Plaintiff Zilis, to review and approve the 2021 Investment and the Amended JDCA, which they did. OAI 30(b)(6) Tr. at 136; MDX-1572. Two years later, the nonprofit board, still including Zilis, unanimously approved the 2023 Investment and the Second Amended JDCA as well. MDX-1569.

51. All that only further reassured Microsoft. The representations and warranties were consistent with and reinforced Microsoft's own due diligence, which did not uncover any evidence of conditions on Musk's donations to OpenAI. The representations and warranties thus confirmed Microsoft's understanding that its partnership would not violate any third-party rights. And these contractual guarantees were only part of the broader picture that Microsoft saw. Before partnering with OpenAI, Microsoft asked appropriate questions. It got answers. It tested those answers for itself. And it got them in writing from OpenAI's nonprofit board—again, and again, and again. Microsoft never learned about Musk's alleged charitable trust.

**F.**     **Nothing Musk Points to as Evidence of Knowledge Shows that Microsoft Knew the OpenAI Defendants Owed or Breached Any Duties to Musk.**

52. Musk seeks to establish Microsoft's knowledge largely based on a single March 7, 2018 email from Microsoft's Chief Technology Officer, Kevin Scott. But that email only raised questions. It did not reflect that Microsoft knew or even suspected that the OpenAI Defendants owed any duties to Musk:

> Satya, *one of the big questions* I would have for him is *whether or not they intend*
> to make the hardware and software open source in the original spirit of OpenAI.

- 12 -

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

IMO that would be good competitive insurance and something that might be worth funding. *I wonder* if the big OpenAI donors are aware of these plans? Ideologically, I can't imagine that they funded an open effort to concentrate [machine learning] talent so that they could then go build a closed, for profit thing on its back."

PX-230 (emphasis added).

53.    Scott's speculation-riddled email said nothing about whether OpenAI's donations were conditioned on any promises. More importantly, it said nothing about whether *Musk* himself made his donations subject to conditions, or even what those conditions were. The email does not even mention Musk.

54.    And Scott will testify at trial—like every other Microsoft witness—that he did not know about Musk's purported charitable trust. Scott. In fact, Scott's email was the very first step in an involved, months-long effort to learn about what OpenAI was trying to accomplish, how it intended to proceed, and whether it could. Scott. At no point during Microsoft's diligence did anyone (or anything) suggest that there were conditions on Musk's donations, much less conditions that would prevent Microsoft from entering its partnership. Scott.

55.    Musk's other evidence likewise does not suggest that Microsoft had knowledge of the alleged charitable trust. Take OpenAI's introductory blog post. At most, it could establish notice that OpenAI was formed as a nonprofit and that Musk was one of OpenAI's donors. PX-17. But that is beside the point. The post contains no allusion to any *promises* made to donors, let alone to Musk in particular. *See id.* Nor do any of the smattering of tweets (or anything else) that Musk relies upon. PX-251; PX-257; PX-266.

56.    Musk has also emphasized that Reid Hoffman served on the OpenAI and Microsoft boards. But there is no evidence that Hoffman knew about duties owed to Musk or their breach— or, even if he somehow did, that he relayed that knowledge to Microsoft. Nadella. In fact, Hoffman recused himself from Microsoft's board discussions related to OpenAI. Nadella Tr. at 181-82.

57.    In the end, there is no evidence that anybody at Microsoft learned about either the OpenAI Defendants' supposed duties to Musk or the purported breach of those duties. That alone is fatal to Musk's claim.

- 13 -

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

**II.    Microsoft Did Not Substantially Assist or Encourage the OpenAI Defendants to Breach the Alleged Charitable Trust.**

58.    Musk's claim separately fails on the substantial assistance element. Microsoft did not assist or encourage the OpenAI Defendants to breach Musk's alleged charitable trust. Far from it. Microsoft advanced OpenAI's mission through a mutually beneficial partnership.[2]

**A.    Microsoft Did Not Assist or Encourage the Alleged Breach.**

59.    Again, Microsoft was not even involved in the contemplation or creation of OpenAI's for-profit entity. *See supra* ¶¶ 23-32. By 2017, OpenAI's leaders, including Musk before he left the organization, independently recognized that the company needed significantly more compute and capital to achieve its mission. Sutskever Tr. at 81; Brockman; MDX-1584. In 2018, OpenAI's nonprofit board independently determined that a capped for-profit subsidiary, nested under the control of the nonprofit parent, was the best way to achieve that goal. Altman; DX-858; MDX-1531. On September 19, 2018, OpenAI's nonprofit board independently formed the for-profit entity. MDX-1531; MDX-1601. And, on October 10, 2018, OpenAI's nonprofit board independently contracted with that entity to carry on any OpenAI commercial venture. MDX-1534.

60.    Microsoft played no role whatsoever in these decisions. Altman; Brockman; Nadella. Nor did Microsoft play any role in OpenAI's nonprofit board's independent decisions to allow its for-profit subsidiary to use the company's intellectual property and other assets. MDX-1534; Wetter.

61.    Nor did Microsoft substantially assist the OpenAI nonprofit board's decision to pursue a model in which not all technology would be open-sourced. OpenAI contemplated being and even expected to be "much less 'open'" as early as January 2016, when Musk was still involved and long before negotiating its licensing agreements with Microsoft. MDX-1588; Altman; Brockman; Sutskever. Microsoft could not substantially assist decisions or actions that predated its involvement.

62.    Moreover, Microsoft was not even the first investor in OpenAI's for-profit

---

[2] And regardless of whether intent is an element of the aiding-and-abetting claim, the same evidence shows that Microsoft did not intend to aid and abet any supposed breach of charitable trust.

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

subsidiary.  By the end of 2018, OpenAI had raised over $100 million in capital from other investors through OpenAI, L.P. under a capped structure that was, again, set up and agreed to independently by OpenAI's nonprofit board.  Altman; Brockman.  Microsoft did not invest until July 2019—nine months *after* OpenAI's nonprofit board formulated and carried out its own idea to establish a for-profit subsidiary, and *after* the nonprofit board approved capped investments from other investors.  Altman; Brockman.

63.    Microsoft thus did not substantially assist any purported breach of a charitable trust.  Long after that alleged breach, Microsoft designed and provided custom-built supercomputers for OpenAI and provided the funding necessary to utilize them.  And it did so only after it had been told and verified that its investment was nonprofit board-approved and did not violate any third-party interests.  *See supra* at ¶¶ 43-51.  Those are not the actions of a tortfeasor.  They are the actions of a responsible business.

**B.    Microsoft's Partnership Advanced OpenAI's Mission.**

64.    If anything, Microsoft helped OpenAI form a mutually beneficial partnership *that advanced the nonprofit's mission*.  Nadella; Altman.  OpenAI reached out to Microsoft and decided to partner with it for many reasons, including:

a.    Microsoft had advanced supercomputing technology that could fulfill OpenAI's need for significant "computational power."  MDX-1573; Altman; Nadella Tr. at 198-99.

b.    Microsoft could provide the vast amounts of capital that OpenAI needed to pursue its goal of achieving artificial general intelligence.  MDX-1573; Altman; Nadella Tr. at 198-99.

c.    Microsoft "shared" OpenAI's "value of empowering everyone" and ensuring that artificial general intelligence "is deployed safely and securely."  MDX-1573; Altman; Scott; Nadella.

d.    And Microsoft could help widely distribute OpenAI's technology.  Nadella; Altman.

65.    The resulting partnership was therefore a "win-win for both organizations."  Nadella

- 15 -

Tr. at 83; Altman.  While OpenAI received the capital and compute it needed to grow and develop its technology, Microsoft received the opportunity to license and commercialize OpenAI's models, which advanced Microsoft's own mission to empower every person and every organization on the planet to achieve more.  Nadella.  And the decision to ultimately commercialize its products was OpenAI's decision, independent of Microsoft.  Murati Tr. at 231.

66.    In short, the OpenAI-Microsoft arrangement furthered the nonprofit's mission. Nadella; Altman; Sutskever.  That is why the nonprofit board—which at different times included the independent board members Zilis, McCauley, Helen Toner, and Adam D'Angelo—approved every Microsoft investment in OpenAI and associated commercial partnership.  *See supra* at ¶ 50. The influx of compute and capital helped distribute OpenAI's models widely to "accomplish [OpenAI's] mission" of ensuring that artificial intelligence "benefits all of humanity."  MDX-1573; Altman.  And OpenAI's nonprofit always remained in control of the for-profit subsidiary.  Altman; Brockman; DX-865.

67.    No evidence is to the contrary.  Musk's contentions that Microsoft "embedded" engineers within the for-profit subsidiary—something it had the right to do under the JDCAs—are irrelevant to the question of whether Microsoft substantially assisted a breach of the alleged charitable trust owed to Musk.  The fact that a limited number of Microsoft engineers worked alongside OpenAI does not demonstrate control over OpenAI nor interference with the nonprofit's mission.  Indeed, this sort of employee collaboration is standard practice for the effective sharing of knowledge and know-how relating to IP.  Nadella.  And the collaboration was important, because all partnerships end at some point and Microsoft needed to ensure it could continue serving its customers in that eventuality.  Nadella.

68.    In the same vein, Microsoft's approval rights in connection with major decisions concerning the for-profit are not evidence of substantial assistance.  In addition to being standard investor protections, such approval rights highlight, rather than contradict, Microsoft's lack of control.  Hood; Wetter.  An entity that controlled OpenAI or its for-profit operations would not have needed to negotiate discrete approval rights over defined categories of decisions; it could have simply exercised that control directly.  Hood.  The existence of those commercially standard

- 16 -

negotiated rights reflects the position of a significant but minority commercial partner seeking reasonable contractual protection—precisely because it lacked operational authority.

69. The fact that Microsoft's contractual rights grew under each successive iteration of the JDCA does not support a finding of substantial assistance either. That merely reflects the natural and expected deepening of a mutually beneficial commercial technology partnership in which the parties jointly created the underlying IP. Nadella. Microsoft obtained greater access to the fruits of the parties' collaboration only because Microsoft was contributing greater resources to produce that work. Nadella.

70. Similarly, Altman's statement to Microsoft's Jonathan Tinter during the 2021 JDCA negotiations that OpenAI's "preference is to make you all a bunch of money as quickly as we can and for you to be enthusiastic about making this additional investment soon" is not evidence of substantial assistance. PX-253. At most, it shows Altman's desire for commercialization to be successful for OpenAI's strategic partner, which in turn would further OpenAI's research mission by increasing its partner's ability to invest in OpenAI. Altman. Nadella's asking OpenAI about subscriber numbers was similar. PX-272; Nadella; *see also* Murati Tr. at 106 ("I believe, in fact, commercialization is more consistent with the mission[.]"). That was one of the reasons Microsoft partnered with OpenAI, and that partnership helped to ensure that OpenAI's technology is widely accessible, including to developers through Microsoft's Application Programming Interface, and to Microsoft's customers across the globe. Nadella; Scott.

71. Musk also contends that Microsoft orchestrated the return of Altman when he was briefly fired and reinstated by the nonprofit board in November 2023. But this event likewise had nothing to do with the alleged obligations owed to Musk—and if anything, served to show Microsoft's lack of control. Microsoft had no advance knowledge of the firing, was "in shock," and was "just trying to figure out what happened." Altman Tr. at 51-52. The ensuing situation was chaotic. Virtually all of OpenAI's leadership and employees rejected the board's firing and threatened to leave. DX-1046; PX-306; Murati; Sutskever. And OpenAI's competitors (including Musk) tried to poach these employees away. DX-1044; PX-306; PX-313. Microsoft's offer to hire OpenAI employees served as a last resort in the event that the mission could not be preserved.

- 17 -

Nadella. And there was "[n]o pressure" from Microsoft to restore Altman as CEO, Sutskever Tr. at 160-61, even if it did ultimately support the OpenAI nonprofit board's decision to reverse course. Nadella.

72.     Finally, Musk is wrong to suggest that Microsoft "selected" the board members who joined OpenAI upon Altman's return in November 2023. Altman sought Microsoft's advice on potential new board members after the nonprofit board reinstated him. Altman; Murati; Nadella. But none of the candidates suggested by Microsoft were appointed to the newly constituted board. Altman; Nadella. That, too, only underscores Microsoft's lack of control over OpenAI.

73.     The same goes for the appointment of Microsoft employee Dee Templeton. She was briefly appointed as a nonprofit board *observer*, with no voting power, and she recused herself from any Microsoft-related-discussion. Wetter. What's more, the appointment ended just seven months later. Wetter.

74.     In sum, Microsoft acted throughout as a commercial partner committed to OpenAI's success, not as an entity directing or controlling its governance or mission. All of Microsoft's actions demonstrate that Microsoft did not substantially assist the alleged breach.

**III.    Microsoft's Conduct Was Not a Substantial Factor in Causing Musk's Alleged Harm.**

75.     In any case, Microsoft's actions were not a substantial factor in causing Musk's alleged harm. Rather, the OpenAI nonprofit board has been the driving force behind its commercial and governance decisions.

76.     As already explained, OpenAI required massive amounts of compute and capital. *See supra* at ¶¶ 26-29. In response to those needs, the OpenAI nonprofit board independently formed a for-profit subsidiary. *See supra* at ¶¶ 30-32. And the newly established entity independently raised over $100 million dollars from investors other than Microsoft by November 2018 through the for-profit. MDX-1516. It did all that more than seven months before Microsoft's first investment in July 2019. *See supra* at ¶ 33.

77.     If Microsoft did not provide additional capital, OpenAI could turn to other potential investors. After all, OpenAI had several other compute partners before Microsoft's investment. Altman. "They had relationships with all the hyperscale cloud providers," including tech

- 18 -

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

behemoths like Amazon.  Nadella Tr. at 38, 103; Altman; Brockman.  And OpenAI has since partnered with many other large companies to support its need for capital and compute, including Softbank and Oracle.  Altman; Brockman.

78.     As Musk recognized as early as 2016, OpenAI also had independent reasons not to open-source all models, such as financial realities and security concerns.  Murati; Altman; Brockman.  As CTO Mira Murati explained, "[i]t's very difficult to contain the harms and the misuse if you open source a technology."  Murati Tr. at 154-55.  Or, as Sutskever put it, "by openso[u]rcing everything, we make it easy for someone unscrupulous with access to [an] overwhelming amount of hardware to build an unsafe AI," so as OpenAI got "closer to building AI, it will make sense to start being less open."  MDX-1508.  "The Open in openAI means that everyone should benefit from the fruits of AI after its built, but it's totally OK to not share the science."  MDX- 1508; *see also* Sutskever Tr. at 77-80.  Musk agreed: "Yup."  MDX-1508.

79.     Accordingly, Microsoft's conduct was not a substantial factor in the alleged breach of charitable trust.  The OpenAI nonprofit board independently decided to create a for-profit structure, independently raised capital from other investors, and independently made the governance and commercialization decisions that Musk challenges.  Microsoft was merely a downstream participant in a structure that the OpenAI nonprofit board had already established.

80.     As a result, Musk's lone claim against Microsoft fails on the facts for every element of his cause of action.

## STATUTE OF LIMITATIONS

**I.      Musk's Claim Against Microsoft Accrued By 2021.**

81.     Musk waited too long to sue in any event.  His claimed harm is that he donated to OpenAI "to create a nonprofit open-source organization," and that OpenAI departed from that contemplated structure.  Musk Tr. at 52, 285-86.  But Musk "started to suspect he was being swindled" in this regard in 2017—long before Microsoft made its first investment.  Musk Tr. at 76-77; *see also* DX-704.  He then stopped providing donations (aside from rent) later that year.  Musk; DX-704. Musk not only knew about the OpenAI for-profit in 2018, MDX-1585; Musk Tr. at 142-43, he agreed that it was a necessary step for the nonprofit to take to gain the capital needed to

- 19 -

fulfill its mission.  And he knew about Microsoft's billion-dollar investment in OpenAI when the partnership was publicly announced in 2019.  Musk Tr. at 162-64; MSFT Trial Ex. 1511.  He also publicly stated in 2020 that he believed OpenAI was "essentially captured by Microsoft."  MDX-1537.  Nevertheless, Musk chose not to sue Microsoft until November 2024—only after the huge success of ChatGPT, only after he launched a competing for-profit AI company, xAI, and only after he twice sued OpenAI.

**A.    Musk Was on Notice of OpenAI's For-Profit Pivot Even Before Microsoft Made Its First Investment.**

82.    As explained in the OpenAI Defendants' Proposed Findings of Fact, Musk knew that OpenAI was contemplating a transition from its nonprofit roots long before Microsoft invested, and Musk himself was involved in and fully supportive of those discussions.  Indeed, Musk "gave the green light" to form a for-profit entity in 2017, at which point he thought it was "time to do so in order to gain access to more capital."  Sutskever Tr. at 85, 92; DX-691.

83.    After Musk's departure from OpenAI's nonprofit board in February 2018, OpenAI's remaining co-founders continued exploring ways to raise the capital necessary to achieve the company's mission.  And they kept Musk in the loop on these efforts.  *See* DX-757; DX-806.  They discussed the creation of a for-profit subsidiary that would remain controlled by the OpenAI nonprofit, while providing an opportunity to raise capital from investors.  Altman Tr. at 329-32; MDX-1579.  They consulted Musk about this proposal prior to its implementation.  MDX-1585; Musk Tr. 142-43.  Musk received a draft term sheet for a for-profit subsidiary in August 2018.  MDX-1575; MDX-1576; MDX-1579.  And then, in September 2018, OpenAI's nonprofit board followed through with the plans that OpenAI sent to Musk: the board formed OpenAI, L.P. as a for-profit subsidiary.  MDX-1560; MDX-1561.

84.    OpenAI publicly announced its for-profit subsidiary in March 2019.  DX-865.  The OpenAI nonprofit board structured this entity to allow investors to earn a return on their investment up to a certain multiple or cap.  MDX-1576.  And Musk received a draft press release announcing this capped-profit structure as well.  DX-862; DX-832.  With that structure in place, OpenAI reached out to cloud computing providers and others to consider investing in the endeavor.  Altman;

Nadella Tr. at 103.

**B.     Musk Knew About Microsoft's Investment in OpenAI in July 2019.**

85.     Around this time, Microsoft began discussing a potential strategic partnership with OpenAI. Altman; Wetter. Altman "plann[ed] to tell [Musk] about the potential msft investment," as it was "getting serious." DX-861. And OpenAI nonprofit board member Shivon Zilis "gave him a heads up" about that potential investment. *Id.*

86.     In July 2019, Microsoft invested $1 billion in OpenAI's for-profit subsidiary, as part of a broader commercial collaboration with OpenAI. Altman; Wetter.

87.     Musk knew about this too. Microsoft and OpenAI publicly announced their "exclusive computing partnership," along with Microsoft's $1 billion investment and the plan that Microsoft would become OpenAI's preferred commercialization partner. MDX-1511; MDX-1573. Shortly after the announcement, Musk mentioned to Zilis that "he thought it was an impressive deal." MDX-1563. Indeed, Musk admits that he learned about Microsoft's investment in 2019 and that he, at that point, "felt uneasy about the deal." Musk Tr. at 164. He expressed his belief that Microsoft's investment in OpenAI was a "b.s." way to promote Azure in a December 2019 text. MDX-1512. And he tweeted in February 2020 that "OpenAI should be more open imo." MDX-1503.

**C.     In September 2020, Musk Tweeted that Microsoft Controlled OpenAI.**

88.     Musk also knew that Microsoft had an exclusive license to OpenAI's GPT-3 model (meaning OpenAI was not open sourcing that then-cutting-edge model) by September 2020. Musk. This license was publicly announced in a blog post on September 20, 2020. MDX-1504. Musk learned of this arrangement and thought that it "r[a]ng some alarm bells." Musk Tr. at 358.

89.     On September 24, 2020, Musk tweeted in response to a post about Microsoft obtaining the exclusive license, saying that: "This does seem like the opposite of open. OpenAI is essentially captured by Microsoft." MDX-1537. This tweet alone shows that Musk believed— more than four years before he filed his case against Microsoft—that OpenAI was no longer sufficiently open-source and that it was controlled by a for-profit Microsoft. Those are exactly the allegations he now raises against Microsoft. Musk then texted Altman about this tweet, suggesting

- 21 -
DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

that Altman should "[a]t least change the name" of the company from OpenAI.  MDX-1506.

**D.      Altman Told Musk in 2020 About Microsoft's Upcoming 2021 Investment.**

90.      In October 2020, Altman texted Musk again, stating that he "would love to get [some] advice from [Musk] on the next Microsoft investment."  MDX-1507.  Musk responded: "Ok.  I can talk probably tomorrow or the next day." *Id.*

91.      The two had a "good call" shortly after.  MDX-1565; *see also* MDX-1564.  Musk therefore knew in the fall of 2020 of the prospect of further investments from Microsoft.

92.      Musk contends that Microsoft and OpenAI did not disclose the precise caps on investor returns in the for-profit entity and did not contemporaneously disclose the 2021 investment.  But that is immaterial.  By October 2020 at the latest, Musk was aware of the facts essential to his claim: that Microsoft had invested over $1 billion in OpenAI, that it had received an exclusive commercial license to OpenAI's technology, that Microsoft was planning a new investment in the for-profit subsidiary, and that these investments meant that, in Musk's view, OpenAI had been "captured" by Microsoft.  In other words, he knew that OpenAI was no longer open-sourcing all of its technology and that he believed Microsoft was controlling OpenAI.  The limitations period began to run at that point, if not well before.

93.      Musk has also pointed to Microsoft's 2023 investment as a basis for treating his claim as timely.  But that investment was a continuation of the existing Microsoft-OpenAI commercial partnership, not a new or independent transaction that gave rise to a new limitations period.  The facts essential to Musk's claim—Microsoft's substantial investment in the for-profit subsidiary and its exclusive commercial license—were known to Musk no later than the fall of 2020.

**II.      Musk Waited More than Three Years to Sue Microsoft.**

94.      In February 2024, Musk sued OpenAI and its subsidiaries in California state court. *See* DX-1294.  Microsoft was not named as a defendant in that action.

95.      Musk then brought this lawsuit against the OpenAI Defendants on August 5, 2024. *See* Undisputed Fact #51, Pretrial Conference Statement, ECF No. 427.  Again, Microsoft was not named as a defendant.

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

96.    Musk added Microsoft as a defendant for the first time in his Amended Complaint, filed November 14, 2024.  *See* Undisputed Fact #52, Pretrial Conference Statement, ECF No. 427.

97.    As a result, Musk waited more than three years from the time his claim accrued to sue Microsoft.  He plainly knew about—and at the very least should have reasonably known about—Microsoft's alleged wrongdoing before November 14, 2021.

## LACHES

98.    Even if Musk's aiding-and-abetting claim were not barred by the statute of limitations, it is nevertheless barred by the doctrine of laches.  Musk's delay in bringing his claim was both (1) unreasonable and (2) prejudiced Microsoft.

**I.    Musk Unreasonably Delayed Bringing His Claim Against Microsoft.**

99.    By 2018 at the latest, OpenAI consulted with Musk on the OpenAI nonprofit board's plan to create a for-profit entity and raise outside investments.  *See supra* at ¶ 83.  Musk believed then that creating a for-profit entity was "moving away" from OpenAI's core mission, but he did not file suit or notify potential investors of any purported duties or breaches.  Musk Tr. at 149-50.

100.    Musk also knew about Microsoft's $1 billion investment in July 2019.  *See supra* at ¶ 87.  Again, Musk did not file suit or notify Microsoft of any purported duties or breaches.

101.    Musk further knew that Microsoft had an exclusive license to OpenAI's GPT-3 model by September 2020.  *See supra* at ¶¶ 88-89.  Once again, Musk did not file suit or notify Microsoft of any purported duties or breaches.

102.    Musk then learned in 2020 of the possibility that Microsoft would invest more in OpenAI.  *See supra* at ¶¶ 90-91.  But Musk continued to sit on his hands.

103.    Microsoft did in fact invest $2 billion in 2021.  *See supra* at ¶ 47.  And Musk again failed to assert his supposed rights, even though Zilis was on the OpenAI nonprofit board and voted to approve the 2021 Microsoft transaction.

104.    Musk also knew that Microsoft invested an additional $10 billion into OpenAI in January 2023.  Musk.  Yet Musk still did not do anything until nearly two years later, when he blind-sided Microsoft with this lawsuit.  That was ***more than five years*** after Microsoft invested in OpenAI's for-profit subsidiary.  Musk's delay was manifestly unreasonable.

**II.     Musk's Unreasonable Delay Prejudiced Microsoft.**

105.    Microsoft significantly increased its investment in OpenAI from 2019 through the filing of Musk's lawsuit in November 2024.  Microsoft's investments in OpenAI now total nearly $14 billion, including the $10 billion investment Microsoft committed to in 2023.  MDX-1542; Nadella; Hood.

106.    Microsoft's partnership with OpenAI is a multi-faceted collaboration, which involved significant opportunity costs for Microsoft based on its commitments of computing capacity, employee time, and investment capital.  Nadella Tr. at 96, 149.  Microsoft's good-faith reliance on its partnership with OpenAI has motivated many of Microsoft's strategic decisions over the past several years regarding its internal AI development efforts and other outside investments, including building out data centers and incorporating OpenAI's technology in the products and services Microsoft provides to its customers.  Nadella; Scott.  Upending that partnership this late in the game would require Microsoft to undertake substantial engineering and development efforts. Nadella; Scott.  And it would significantly impact Microsoft's Azure OpenAI service and Copilot software, which are used by millions of people.  Nadella; Scott.

107.    Musk's unreasonable delay in filing suit thus caused significant prejudice to Microsoft.  If Musk had filed his claim earlier—or even notified Microsoft of the purported duty or breach—Microsoft would have had a chance to investigate and evaluate its continued investment and partnership with OpenAI.  Instead, Musk stayed silent as Microsoft poured more and more computing resources and billions of dollars in investments and employee time into its strategic partnership with OpenAI, at the expense of other internal efforts and external investments.  Nadella; Scott; Hood.  Laches bars Musk's claim.

### UNCLEAN HANDS

108.    As detailed in the OpenAI Defendants' Proposed Findings of Fact, Musk has unclean hands, which precludes recovery for his primary breach of charitable trust claim.  That defense extends to the secondary aiding-and-abetting claim as well.  And the conduct described below only strengthens the defense for Microsoft.  Musk engaged in unconscionable conduct intimately related to his aiding-and-abetting claim that unfairly prejudiced Microsoft.

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

**I.      Musk Engaged in Unconscionable Conduct.**

109.    Musk helped create the very situation that caused OpenAI to seek out Microsoft as a multi-billion-dollar investor.

110.    As explained above, Musk has long recognized that advancing OpenAI's mission would require raising additional capital through the creation of a for-profit entity.  MDX-1570; MDX-1513; Musk Tr at 78-79.  Yet, when it came to capitalizing a new for-profit entity, Musk was only willing to participate if he would "unequivocally have initial control of the company."  DX-686; MDX-1567; Zilis Tr. at 133-35.

111.    When OpenAI's other co-founders rejected Musk's terms in September 2017, Musk responded by halting most of his donations to OpenAI's nonprofit entity.  MDX-1510; Musk Tr. at 76-77.  Losing most of Musk's funding only exacerbated OpenAI's need for outside capital.  Altman; Brockman.

112.    By this time, Musk himself had initiated OpenAI's relationship with Microsoft.  MDX-1509; Musk Tr. at 344.  He made the original call to Microsoft's CEO to ask if Microsoft would donate Azure credits to OpenAI.  Musk Tr. at 344.  Microsoft answered that call and provided OpenAI with compute.  Musk; Altman.

113.    In early 2018, Musk made another attempt to exploit OpenAI's financial needs and gain control of OpenAI.  He advocated for OpenAI to "attach to Tesla as its cash cow."  MDX-1584; Musk Tr. at 106-07.  And Musk claimed that combining with Tesla—Musk's own for-profit company—was the "only path that could even hope to hold a candle to Google."  MDX-1584; Musk Tr. at 106-07.  This attempt also failed, and Musk left the OpenAI nonprofit board shortly thereafter.  DX-770; Musk.

114.    Musk then waited until after ChatGPT succeeded in 2022 and after he had formed his own AI competitor to bring this suit.  By July 2019, Musk learned that Microsoft had invested $1 billion in OpenAI.  Musk Tr. at 162-64.  By September 2020, he learned that Microsoft had an exclusive license to OpenAI's GPT-3 model.  MDX-1537; Musk Tr. at 358.  Yet neither of these events prompted Musk to file suit or even inform Microsoft of the alleged charitable trust duties owed to him.  While Musk said nothing, Microsoft deepened its financial commitment to nearly

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

$14 billion. Musk filed suit only after he launched xAI as a direct (for-profit) competitor to OpenAI. Musk; Birchall. xAI stands to benefit significantly if the Court enjoins OpenAI from continuing its strategic partnership with Microsoft. Musk.

115. In February 2025, while this lawsuit was pending, Musk made yet another attempt to acquire control of OpenAI through one of his for-profit companies. Acting in his capacity as CEO of xAI, Musk submitted a bid to "acquire all assets [] of OpenAI, Inc." for $97.375 billion. DX-1157. Once again, OpenAI rejected his takeover attempt.

## II.     Musk's Unconscionable Conduct Was Intimately Related to His Claim.

116. Musk's misconduct described above is intimately related to Musk's claim against Microsoft. At its core, Musk's claim is that Microsoft has knowingly partnered with OpenAI in a manner that subverts OpenAI's nonprofit, open-source commitments. Musk Tr. at 52, 343. But Musk's accusations against Microsoft are directly undermined by his own dealings.

117. Despite asserting that Microsoft has assisted OpenAI's conversion into a for-profit company, Musk himself recognized that OpenAI needed outside capital, Musk himself endorsed OpenAI's creation of a for-profit entity, and Musk himself tried to attach OpenAI to one of his own for-profit entities. MDX-1513; MDX-1584; DX-686; Musk Tr. at 78-79, 106-07.

118. Musk also complains of OpenAI abandoning its open-source commitments. But Musk formed xAI as a for-profit company with no commitment to open source its models. Musk. xAI consistently launches its new models as closed-source, including through Microsoft's Azure Foundry platform. Musk; Nadella; MDX-1549; MDX-1576. And Musk agreed as early as 2016 that OpenAI should transition away from a fully open-source model. *See supra* at ¶ 78.

119. Musk can hardly complain about Microsoft supporting a for-profit AI company when he has done just that himself.

## III.     Musk's Conduct Resulted in Prejudice to Microsoft Such that it Would Be Unfair to Allow Him to Assert His Claim.

120. Given Musk's course of inequitable conduct, it would be fundamentally unfair to allow him to assert his claim against Microsoft.

121. Microsoft has publicly partnered with OpenAI for years. MDX-1573. The

- 26 -

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

partnership has delivered significant benefits to Microsoft, OpenAI, and the public. Nadella; Altman; Scott. And that partnership has motivated many of Microsoft's strategic decisions concerning its AI development efforts and investments, with Microsoft deepening its financial commitment in OpenAI from $1 billion in 2019 to nearly $14 billion today. Nadella; Scott; Hood; MDX-1521; MDX-1522; MDX-1527.

122. Musk knew about Microsoft's alleged wrongdoing for years. Musk Tr. at 162-64, 358; MDX-1537. Despite this knowledge—and despite his prior dealings with Microsoft on OpenAI's behalf—Musk never informed Microsoft of the alleged charitable trust owed to him by the OpenAI Defendants before filing this suit. Musk; Nadella. Meanwhile, Musk created a for-profit AI company of his own. Musk.

123. It would be patently unfair to permit Musk to benefit from his attacks on Microsoft's good-faith partnership with OpenAI after he has engaged in a pattern of related bad-faith conduct to enrich himself.

* * *

124. The Court should find that Musk's claim against Microsoft fails several times over on the facts. Musk cannot satisfy a single element necessary to impose aiding-and-abetting liability. And even if he somehow could establish all these elements, Musk's claim would still be defeated by a trio of affirmative defenses. That claim cannot withstand the statute of limitations. It is barred by Musk's laches. And it is foreclosed by his unclean hands. For all these reasons, the Court should find that Microsoft is not liable.

DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY

Respectfully Submitted,

Dated: April 27, 2026                    DECHERT LLP


                                         */s/ Russell P. Cohen*
                                         RUSSELL P. COHEN (SBN 213105)
                                         Russ.cohen@dechert.com
                                         HOWARD M. ULLMAN (SBN 206760)
                                         Howard.ullman@dechert.com
                                         45 Fremont Street, 26th Floor
                                         San Francisco, CA 94105
                                         Telephone: (415) 262-4500
                                         Facsimile: (415) 262-4555

                                         NISHA PATEL (SBN 281628)
                                         Nisha.patelgupta@dechert.com
                                         DECHERT LLP
                                         633 West 5th Street, Suite 4900
                                         Los Angeles, CA 90071
                                         Telephone: (213) 808-5700
                                         Facsimile: (213) 808-5760

                                         ANDREW J. LEVANDER (admitted *pro hac vice*)
                                         Andrew.levander@dechert.com
                                         DECHERT LLP
                                         Three Bryant Park
                                         1095 Avenue of the Americas
                                         New York, NY 10036
                                         Telephone: (212) 698-3500
                                         Facsimile: (212) 698-3599

                                         JOHN (JAY) JURATA, JR. (admitted *pro hac vice*)
                                         Jay.jurata@dechert.com
                                         DECHERT LLP1900 K Street, N.W.
                                         Washington, DC 20006
                                         Telephone: (202) 261-3300
                                         Facsimile: (202) 261-3333

                                         *Attorneys for Defendant Microsoft Corporation*

- 28 -
DEFENDANT MICROSOFT CORPORATION'S PROPOSED FINDINGS OF FACT AS TO LIABILITY