# EXHIBIT A

**Volume 7**

**Pages 1337 - 1506**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GIUSEPPE PAMPENA, individually )
and on behalf of all others    )
similarly situated, et al.,    )
                               )
          Plaintiffs,          )
                               )
  VS.                          )  **NO. C 3:22-cv-05937-CRB**
                               )
ELON MUSK,                     )
                               )
          Defendant.           )
                               )

San Francisco, California
Monday, March 9, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

COTCHETT, PITRE & MCCARTHY LLP
840 Malcolm Road
Burlingame, California 94010
BY:  **JOSEPH W. COTCHETT, ATTORNEY AT LAW**
     **MARK C. MOLUMPHY, ATTORNEY AT LAW**
     **TYSON C. REDENBARGER, ATTORNEY AT LAW**
     **GIA JUNG, ATTORNEY AT LAW**
     **CAROLINE A. YUEN, ATTORNEY AT LAW**
     **ELLE D. LEWIS, ATTORNEY AT LAW**

BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue - Suite 102
La Jolla, California  92037
BY:  **FRANCIS A. BOTTINI, JR., ATTORNEY AT LAW**
     **AARON P. ARNZEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              CSR No. 12219, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

                        QUINN, EMANUEL, URQUHART
                         & SULLIVAN LLP
                        865 South Figueroa Street - 10th Floor
                        Los Angeles, California  90017
                    BY:  **STEPHEN A. BROOME, ATTORNEY AT LAW**
                         **M. ALEXANDER BERGJANS, ATTORNEY AT LAW**
                         **MICHAEL T. LIFRAK, ATTORNEY AT LAW**

                        QUINN, EMANUEL, URQUART
                           & SULLIVAN LLP
                        295 Fifth Avenue
                        New York, New York 10016
                    BY:  **ELLYDE R. THOMPSON, ATTORNEY AT LAW**
                         **JESSE A. BERNSTEIN, ATTORNEY AT LAW**
                         **PHILLIP JOBE, ATTORNEY AT LAW**
                         **STEPHANIE KELEMEN, ATTORNEY AT LAW**

                        QUINN EMANUEL URQUHART
                           & SULLIVAN, LLP
                        300 W 6th Street - Suite 2010
                        Austin, Texas 78701
                    BY:  **EMILY F. COUTURE, ATTORNEY AT LAW**

**Also present:**        **Richie DeMarco, Trial Tech**
                        **Raymond McLeod, Trial Tech**
                        **Carley Carter**

"Twitter has offered on multiple occasions to have Mr. Musk's experts in data science meet directly with Twitter personnel to understand more fully the process disclosed in Twitter's SEC filings about the manner in which the company estimates false or spam accounts as a percentage of mDAU.  To date, you have not taken Twitter up on that, but Twitter remains open to doing so."

Q.   And, again, Mr. Korman did Mr. Musk or his team ever take Twitter up on its offer to have the data scientists speak to each other?

A.   Not to my knowledge.

        MS. YUEN:   Thanks, Mr. DeMarco.  You can take that exhibit down.

BY MS. YUEN:

Q.   And jumping straight to July 8th.  That was a Friday.

    Do you recall receiving a letter from Mr. Ringler purportedly terminating the merger agreement?

A.   Yes.

Q.   And did Twitter file a lawsuit four days later seeking to enforce the deal?

A.   I believe on July 12th, yes.

Q.   And a few months after the lawsuit was filed, around September 2022, do you recall having discussions with Mr. Musk's lawyers about the Twitter deal?

**A.**   Yes.

**Q.**   And specifically, do you recall having a call with Mr. Spiro on or around September 11th?

**A.**   Mr. Spiro and others, yes.

**Q.**   And others.

And who was on that call?

**A.**   I believe Mr. Savitt from the Wachtell firm.  I believe Mr. Klein.  There may have been another Quinn lawyer, Rossman, but I'm not sure if he was on or not.

**Q.**   And could you describe what was said at that call.

**A.**   Mr. Spiro was inviting a renegotiation of the transaction so that the lawsuit could be dropped and that the parties could mutually agree to close the transaction.

**Q.**   And do you recall any specific language being used by Mr. Spiro?  Anything about what would happen if Mr. Musk were forced to through with the deal?

**A.**   Well, Mr. Spiro -- I'm not sure if it was on the 11th or the 12th, but I believe he said it would be in everyone's best interest to get it done in a settled way.

**Q.**   I'm sorry.  What was that, the last bit?

**A.**   To settle it out rather than to go to litigation.

**Q.**   To settle it out.

And was there any language that might have been viewed as threatening?

**A.**   He -- he said something to the effect of, you know, if

Musk ends up owning this thing, he'll have access to all of the company's records and he could look at everyone's e-mails and dig into whatever he wanted to dig into.

And I forget the verb, but that wouldn't be -- that might not be comfortable for the Twitter people and their heirs.

Q.   And there heirs, did you say?

A.   And their heirs.

Q.   And their heirs.  Okay.

And in that same vein, did you have another call, this time with Mr. Ringler, about the Twitter deal again around September?

A.   There were multiple calls with Quinn lawyers and with Mr. Ringler, sometimes both of them, sometimes one of them, all throughout September.

Q.   And specifically, do you recall having a call where Mr. Ringler said something about what would happen again if Mr. Musk were forced to go through with the deal?

A.   Yes.

Q.   And could you describe, to the best of your recollection, that conversation?

A.   Yes.  Towards the end of September, after some back-and-forth on negotiations and the negotiations seemed to be hitting a stalling point, Mr. Ringler called me up.

Q.   And what did Mr. Ringler say?

A.   He said:  I've been specifically told to convey a message

to you.

Q.   And what was that message?

A.   That if Mr. Musk were required to go through with the transaction after trial, it would be World War III until the end of time for real.  And he said it specifically with respect to the officers and directors.

Q.   And how do you recall -- how do you remember those words so clearly?

A.   It was a pretty vivid message, and he called saying that he was specifically delivering a message.  It wasn't in passing, but it was he was being told to deliver this message.

And so I said:  Mike, I mean, we've known each other for 20 -- a long time.  Let me repeat exactly what you said to me. And I said:  Did you just say to me that you've been specifically asked to convey that if this went forward through trial and Mr. Musk had to buy the company, it would be World War III till the end of time for real?

He said:  That's exactly what I told you.

And then I said:  Can I get -- can I conference in Mr. Klein?  I think he should hear this directly from you.

He said:  Go right ahead.

And I conferenced in Mr. Klein, and I said:  Alan, Mike's on the phone, and he just delivered a very specific message. And, Mike, is it okay if I say exactly what you said to me to Mr. Klein?

And he said:  Sure.

And so I repeated those words.  And I said:  Mike, is that what you just told me?

He said:  Yes.

I said:  Okay.

And we hung up.

Q.   And so it's fair to say that Mr. Musk was threatening Twitter in September 2022?

A.   I don't want to -- I'm just telling you what Mr. Ringler told me.

Q.   Fair enough.

And to your knowledge, did Mr. Musk ultimately agree to go through with the deal on the agreed-upon terms and price?

A.   Yes.

MS. YUEN:  Thank you, Mr. Korman.

No further questions.

THE COURT:  Okay.  Ladies and gentlemen, we're going to take our recess now.  We will be in recess until 11:00.

Remember the admonition given to you:  Don't discuss the case, allow anyone to discuss it with you, form or express any opinion.

And you can step down.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Okay.  Let the record reflect the jurors

matters:  His hiring of the data scientists, which he said he was not involved in hiring the data scientists; his communications with Mr. Musk on May 13th in which they claimed his communications were privileged; his efforts to renegotiate and threats, those were the subject of testimony today.  So that is a legitimate matter, I would imagine; and then his termination of officers in October '22, after the deal had been closed which the Court has excluded.

So I'm not sure, other than the threat area, what Mr. Spiro could testify about that's not in violation of your Court's order.

**MR. LIFRAK:**  Ms. Kelemen will address the scope and what we intend to present with Mr. Spiro.

**THE COURT:**  Okay.  Let me -- let's address it now so we don't have to interrupt anything tomorrow.

**MS. KELEMEN:**  Yes, Your Honor.  We intend to offer Mr. Spiro to speak about topics of the merger agreement, that Ms. Gadde spoke to.

**THE COURT:**  I'm sorry.  Let me get this down as you --

**MS. KELEMEN:**  Sure.

**THE COURT:**  Okay.  He's going to talk about what?

**MS. KELEMEN:**  Potentially some -- some topics that Ms. Gadde covered about what the merger agreement says on its face.  The prelitigation --

**THE COURT:**  Well, I think I have to have a better

idea.  In other words, I'm not talking about subject matter, because all sort of things have been mentioned in the case; right?  All sorts of issues have come up.

So the question is, as to Mr. Spiro, since he sat in a unique position in this case, he was, as I understand it -- and correct me if I'm wrong because I'm going off of this assumption -- both a lawyer, so providing legal advice to Mr. Musk, and a close -- I don't know how to -- if I use the word close personal friend that's probably the wrong word -- a counselor.  I don't know a -- one who's consulted on issues involving -- issues such as this.

So in other words, he -- he was not just the lawyer, he was also -- performing legal services, he was also the counselor and advisor of Mr. Musk during this period of time. That's, as I understand his role, that is to say.

Now is that correct or is that incorrect?

**MS. KELEMEN:**  That's right, Your Honor.  I believe plaintiffs themselves have described Mr. Spiro as quote, the -- at the epicenter of virtually every important decision relating to the Twitter acquisition.

**MR. MOLUMPHY:**  We did, and then Your Honor disagreed and said we could only depose on four matters.

He submitted a declaration saying, quote, I have no unique nonprivileged knowledge, information, or evidence to give in this case.  End quote.

That's Mr. Spiro in the sworn declaration.

THE COURT: So he's saying I don't have any -- he's not saying I don't have any knowledge of this case? *Au contraire*. He's saying I have no nonprivileged --

MR. MOLUMPHY: Nonprivileged.

THE COURT: Nonprivileged knowledge.

So my question to you is: What is he going to testify to which would not be of a nonprivileged manner either directly or indirectly? What is it?

MS. KELEMEN: Your Honor, Mr. Spiro was involved in communications with Twitter directly. Some of those were testified to today. Those are not privileged as they were communications with external parties, and I believe the important word in that sentence counsel just read out loud was "unique."

THE COURT: Pardon me?

MS. KELEMEN: Unique. Unique knowledge. This is going back to when plaintiffs attempted to disqualify Mr. Spiro claiming that he is an indispensable witness in this case. And they represented to us at some point after he was allowed to -- to be lead counsel in this case that they would be calling him in their case. And following that representation, he has taken a step back and is serving as a witness in this case. And now they've sort of come about face and are saying that he has no nonprivileged knowledge, which it was never our position.

**THE COURT:** I'm sorry. What did you -- what did Mr. Molumphy read from?

**MR. MOLUMPHY:** Mr. Spiro's declaration.

**THE COURT:** Well, so if they're saying what he said how is it their -- their statement? I obviously missed this. If -- if he said that, why are we saying that's what the plaintiffs say? It's not what the plaintiffs say. Whether they say it's privileged or not, it's not what the plaintiffs are saying; it's what your witness said.

**MS. KELEMEN:** I don't think what he just read out loud said he has no nonprivileged knowledge.

**THE COURT:** Okay. Let's find -- I want to move through this piece by piece to make sure that I don't miss something. Okay. So let's -- what are you reading from? Where is it? And let's see if we can agree as to what it is.

**MR. MOLUMPHY:** So this is a declaration from Alex Spiro, dated April 3rd, 2025, paragraph 8.

Quote [as read]:

"I have no unique, nonprivileged knowledge, information, or evidence to give in this case."

**THE COURT:** Okay. So is it your point that since he says it's not -- he doesn't have anything unique of a nonprivileged nature, that that makes him what exactly?

Like every other lawyer -- which, of course, I've ruled out that that can be admissible.

**MR. MOLUMPHY:** Right, with the exception --

**THE COURT:** By virtue -- with some exceptions.

**MR. MOLUMPHY:** Mr. Korman, for example.

**THE COURT:** With some exceptions. With some exceptions. And a typical exception is when lawyer representing Mr. Musk turns to lawyer representing Mr. Twitter -- representing Mr. Twitter -- representing Twitter and says: It's going to be World War III if we acquire this.

That's an exception. And it's an exception because it was a communication that Mr. Musk intended to have disclosed to -- to the lawyer on the other side to be communicated to the principal on the other side. And it's an -- it's -- it goes to one of the underlying issues of the case, which is one of the underlying issues of the case.

I'm -- I'm trying to focus on your -- on what I think you're assuming is the word "unique" somehow allows him to testify.

I think his position was unique. That was what was unique. And the problem is is that to the extent that would be developed, it has all sorts of credibility issues.

And by the way -- here is the problem at another level. For a lawyer to give testimony against his client is -- being called by his law firm to give testimony against his client, therefore he's not compelled other than it's the decision of the law firm to disclose it, really runs into an ethical