JORDAN ETH (CA SBN 121617)
JEth@mofo.com
WILLIAM FRENTZEN (CA SBN 343918)
WFrentzen@mofo.com
DAVID J. WIENER (CA SBN 291659)
DWiener@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

WILLIAM SAVITT (admitted *pro hac vice*)
WDSavitt@wlrk.com
BRADLEY R. WILSON (admitted *pro hac vice*)
BRWilson@wlrk.com
SARAH K. EDDY (admitted *pro hac vice*)
SKEddy@wlrk.com
RANDALL W. JACKSON (admitted *pro hac vice*)
RWJackson@wlrk.com
STEVEN WINTER (admitted *pro hac vice*)
SWinter@wlrk.com
NATHANIEL CULLERTON (admitted *pro hac vice*)
NDCullerton@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Telephone:    (212) 403-1000
Facsimile:    (212) 403-2000

*Attorneys for Defendants Samuel Altman, Gregory Brockman,
OpenAI, Inc., OpenAI L.P., OpenAI, L.L.C., OpenAI GP, L.L.C.,
OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC,
OpenAI Holdings, LLC, OpenAI Startup Fund Management, LLC,
OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,
OpenAI Startup Fund SPV GP I, L.L.C., OpenAI Startup Fund SPV GP II, L.L.C.,
OpenAI Startup Fund SPV GP III, L.L.C., OpenAI Startup Fund SPV GP IV, L.L.C.,
OpenAI Startup Fund SPV I, L.P., OpenAI Startup Fund SPV II, L.P.,
OpenAI Startup Fund SPV III, L.P., OpenAI Startup Fund SPV IV, L.P.,
Aestas Management Company, LLC, and Aestas LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **OPENAI DEFENDANTS' MOTION TO PRECLUDE AND FOR PARTIAL RECONSIDERATION OF PRETRIAL ORDER NO. 2** |
| v. | |
| SAMUEL ALTMAN, et al., | Judge:  Hon. Yvonne Gonzalez Rogers |
| Defendants. | |

The OpenAI Defendants submit this memorandum of law in support of their request for an order (1) precluding Plaintiff from arguing that OpenAI's 2025 recapitalization is a basis for the jury to find liability on any of Musk's claims; and (2) permitting OpenAI's witnesses to "testify as to the ultimate decision of . . . the [California and Delaware] Attorneys General," including certain relevant "specifics of those negotiations." Dkt. 452 (Pretrial Order No. 2) at 3.

## **INTRODUCTION**

At deposition, Musk refused to answer the question whether OpenAI's October 2025 recapitalization transaction affected his claim. After the transaction was announced in May 2025, Musk never amended his complaint to challenge it. Then, before trial, Musk moved to exclude evidence of OpenAI's engagement with the Attorneys General of California and Delaware in connection with its 2025 recapitalization transaction. In support of that motion, Musk's counsel told the Court that the recapitalization transaction would be a minor issue at trial and that he would only "raise the issue that that occurred" and not "get into a great deal of detail" about it. Dkt. 445 (Mar. 13 H'rg Tr.) at 82:10-13.

Having received those assurances, the Court issued an order limiting OpenAI's ability to present evidence of its negotiations and resulting agreement with the Attorneys General. As things stand, while OpenAI's witnesses may testify that the recapitalization "involved conversations and negotiations" with two of its primary regulators, "OpenAI witnesses may not testify as to the ultimate decision of, or any report from, the Attorneys General or the specifics of those negotiations." Dkt. 452 (Pretrial Order No. 2) at 3.

Musk has not tried this case consistent with his deposition testimony or his counsel's assurances. Rather than playing a minor role at trial, Musk has placed substantial emphasis on OpenAI's 2025 recapitalization transaction, pointing to the removal of profit caps on investors as an important aspect of his claim and contrasting that structure with prior capped-profit investments in 2019, 2021, and 2023. Musk, his counsel, and his nonprofit expert have repeatedly attacked the terms of the transaction, the value the OpenAI nonprofit received in the transaction, and the board process leading up to approval of the transaction, all in a clear attempt to sidestep the Court's rulings on OpenAI's statute of limitations defenses. Musk has repeatedly suggested that the transaction

breached obligations owed to him and contravened OpenAI's public mission, while portraying his challenge to the transaction as an attempt to vindicate the public interest. And the testimony of David Schizer has confirmed that Musk is adopting an in-trial litigating position inconsistent with his pre-trial pleadings and assurances.

By placing the 2025 transaction at the center of his case, Musk has opened the door to evidence concerning the substance of OpenAI's engagement with the California and Delaware Attorneys General and those regulators' ultimate non-objection to the transaction. The jury cannot fairly assess Musk's trial position regarding the 2025 recapitalization, its terms, or the board's deliberative process without also learning that the transaction was the product of iterative discussions with OpenAI's primary regulators, tasked with protecting the public interest that Musk now claims to represent.

That evidence can be presented through brief testimony from two of OpenAI's anticipated witnesses, Bret Taylor (the chairman of the nonprofit's board of directors) and Sam Altman. These witnesses should be permitted to explain that OpenAI's nonprofit board approved specific changes to the recapitalization transaction's terms and structure in part *because* the Attorneys General requested them. These witnesses should likewise be permitted to explain that the board only approved the transaction *after* the Attorneys General determined that they would not object to it.

The OpenAI Defendants thus request that their witnesses be permitted to testify (1) about the specific changes to the final structure and terms of the 2025 transaction made in consultation with the Attorneys General, and (2) that the Attorneys General did not object to the transaction that resulted from those discussions. OpenAI should likewise be permitted to introduce the resulting agreements reached with the Attorneys General (DX 1172; DX 1182), which memorialize the structure and terms of the very transaction Musk now challenges. *See also* Dkt. 422 (OpenAI Defs.' Opp'n to Pl.'s MIL No.1).[1]

## BACKGROUND

In November 2024, Musk moved to preliminarily enjoin an early proposal for OpenAI's

---

[1] OpenAI would not seek to admit—or elicit testimony about—the press releases from those Attorneys General, which the Court excluded in Pretrial Order No. 2. Dkt. 452 at 2.

OPENAI DEFENDANTS' MOTION TO PRECLUDE AND FOR PARTIAL RECONSIDERATION
CASE NO. 4:24-CV-04722-YGR

restructuring. Dkt. 46. Musk's objection to that version of the restructuring was that it would "ostensibly result in OpenAI's nonprofit board losing control of the company." Dkt. 32 (FAC) ¶ 194. Musk told the Court in his motion that OpenAI had "not received, and may never obtain, proper approvals from the California and Delaware Attorneys General." Dkt. 73 at 24-25. "***Absent such approval***," Musk argued, "the Court should enjoin OpenAI from further violating its obligations and abandoning its mission as a safety-first charitable organization." *Id*. at 25 (emphasis added). The Court denied Musk's motion. Dkt. 121.

In parallel, the California and Delaware Attorneys General, assisted by their own independent counsel and financial advisor and acting in the interest of the public, conducted an extensive review of the proposed restructuring, including its governance and valuation terms. In May 2025, OpenAI announced that it had significantly revised the terms of the potential transaction—based on, among other things, its ongoing engagement with the AGs. OpenAI stated that its board had decided that the transaction would, if completed, continue to *maintain* the nonprofit's control over a newly formed OpenAI public benefit corporation ("PBC") and replace the existing "complex capped-profit structure" used by OpenAI's existing for-profit arm with "a normal capital structure where everyone has stock" in the PBC. DX 1163 at 3. Musk did not seek to amend the allegations in his complaint to challenge the modified version of the proposed recapitalization or move to enjoin that transaction.

On September 11, 2025, OpenAI announced that the nonprofit would receive an equity stake in the new PBC then valued at more than $100 billion. DX 1168. Two days later, OpenAI produced discovery regarding the details of the proposed recapitalization, including a term sheet and memorandum of understanding that made clear to Musk that the recapitalization could close within 30 days. He still did not amend his complaint or otherwise seek injunctive relief.

At his deposition on September 26, 2025, Musk was asked point-blank how OpenAI's proposed recapitalization differed from the then-existing capped-profit structure for purposes of his contention that OpenAI had breached commitments made to him.[2] Musk did not provide a

---

[2] The question was framed in terms of breach of contract because that was Musk's principal claim at the time. The testimony is equally relevant to Musk's claim for breach of charitable trust.

3

substantive response. He instead echoed speaking objections from his counsel suggesting that the question called for a legal opinion before eventually providing a conclusory and uninformative answer:

**Mr. Savitt**: How is it that . . . the proposed restructuring transaction differs from the existing capped-profit structure for purposes of your claim of breach of contract?

**Mr. Molo**: Object to the form of the question. You're asking the witness a legal opinion.

**Mr. Savitt**: You can answer.

**Mr. Molo**: He's not a lawyer.

**The Witness**: I respect the advice of my counsel.

**Mr. Savitt**: I don't think he's instructing you not to answer.

**The Witness**: Should I not answer?

**Mr. Molo**: If you can answer, it's a legal opinion they're asking for.

**The Witness**: I'm not a lawyer.

**Mr. Savitt**: So you're not going to answer?

**The Witness**: I'm not going to answer a legal opinion.

**Mr. Savitt**: No one is asking for a legal opinion.

**The Witness**: My sort of, I guess, common-sense opinion is that they're obviously trying to steal a charity, and that's not okay.

Musk Dep. 325:20-326:19.[3] Thus, when asked how the for-profit structure contemplated by the recapitalization differed from the then-current for-profit structure for purposes of his claim, the only answer Musk supplied is the tagline he has repeated over and over in and outside of court.

Two months later, Musk's nonprofit expert, David Schizer, testified at his own deposition that his "concern is not this [2025] transaction itself," but rather "earlier" transactions in which

---

[3] Plaintiff's deposition was shot through with improper invocations of privilege and "legal opinion" objections to block questioning. *See* Musk Dep. 283:23-284:18; 296:1-21; 317:13-318:8; 318:9-18; 318:19-319:12; 319:21-320:3; 320:13-22; 320:23-323:7; 323:9-24.

OpenAI investors received capped returns. Schizer Dep. 143:15-22. That testimony was consistent with Schizer's report, which did not attack the 2025 recapitalization transaction but instead criticized the 2019, 2021 and 2023 Microsoft transactions exactly because they *did* include profit caps—caps that Schizer opined were too high such that the nonprofit's residual interest in the for-profit was unlikely to generate a sufficient return.

The recapitalization closed on October 28, 2025, following the OpenAI nonprofit's receipt of fairness opinions from two independent investment banks opining that the consideration the nonprofit stood to receive from the transaction was fair from a financial point of view to the nonprofit. DX 1175; DX 1176. The Attorneys General, with the assistance of their own financial advisor, likewise conducted valuation analyses of the consideration flowing to the non-profit in the transaction. The same day, the California and Delaware Attorneys General issued statements of non-objection. The OpenAI Defendants promptly produced to Musk the final transaction agreements as well as agreements with the AGs memorializing the governance structure that had been negotiated over the prior year. Musk did not attempt to amend his complaint to challenge the transaction or seek to unwind it.

Instead, at the pretrial conference held on March 13, 2026, Plaintiff assured the Court that the recapitalization would be a minor issue at trial. During the discussion of Plaintiff's Motion in Limine No. 1 (Dkt. 402), which sought to exclude evidence of the AGs' non-objection, the Court asked whether Musk intended to "raise the issue of the October 2025 recapitalization and the terms thereof" at trial. Dkt. 445 (Mar. 13 H'rg Tr.) at 82:10-11. Counsel responded that Musk would only "raise the issue that that occurred," would not "get into a great deal of detail," and would offer "[j]ust the basic document saying that there's a conversion." *Id.* at 82:12-16. The Court then granted Musk's motion in substantial part. Dkt. 452 at 2.

Musk took a very different position once trial started. During his opening statement, Musk's counsel argued that it was fine for OpenAI to accept for-profit investments with capped returns, telling jurors that "a key, key part" of Microsoft's investments in OpenAI's for-profit arm was that Microsoft's "investment return was capped" and "they couldn't make infinite profits as a result of this." Trial Tr. 242:11-20. Counsel then went on to contrast the capped-profit investments in 2019,

5

2021, and 2023 with the terms of the 2025 recapitalization, telling the jury: "Microsoft, it has this multibillion dollar equity stake in the for-profit that's supposed to be supporting the nonprofit. There are no profit caps on Microsoft's investments at this time. Remember how we talked about how it[s] capped investment, for-profit investment made it seem safe, how Elon is satisfied that they were still fulfilling the mission of OpenAI?" *Id.* at 249:21-250:1. Musk's counsel also highlighted that the nonprofit had received a minority stake in the PBC in the recapitalization, once again contrasting that arrangement with the prior capped structure. *Id.* at 249:5-10 ("And it has a minority stake, a minority stake. Now, remember, the for-profit is supposed to be supporting the nonprofit. It has got a minority stake that is smaller than the ownership of the for-profit.").

Musk's emphasis on the 2025 recapitalization continued when he took the stand. Early in the examination, Musk's counsel elicited testimony from Musk about how the difference between a capped-profit structure and the current structure of OpenAI's PBC played into his case theory:

> So there was discussion of creating a for-profit, but it was very much in the vein of it being a small adjunct to the nonprofit. So the nature of the for-profit would be that it would be – the profit would be capped. So it would have a maximum profit limit, and that when artificial general intelligence was figured out, that the – the for-profit would dissolve and cease to exist. ***But now the profit cap has been completely removed, and the clause that has the for-profit dissolving upon discovery of artificial general intelligence has also been removed, which is <u>a very big deal</u>***.

*Id.* at 369:2-16 (emphasis added).

Musk thus identified as "a very big deal" at trial something he refused to testify about at his deposition, and that his counsel assured the Court would *not* be the subject of a great deal of detail at trial. Musk then went on to emphasize the difference between capped and uncapped profits as a basis to circumvent the statute of limitations, testifying that "[i]f you've got a capped profit situation, it hasn't violated the nonprofit's goal. There was no basis for me to file a lawsuit." *Id.* at 444:17-22. Never mind that the recapitalization took place more than a year *after* Musk sued OpenAI.

This bait and switch continued during Schizer's trial testimony. Having previously

6

criticized the profit caps in the 2019, 2021, and 2023 transactions, while expressing no "concern" over the 2025 transaction, Schizer shifted to attacking (1) the removal of the profit caps in the 2025 transaction (Trial Tr. 1670:23-1672:9, 1676:19-1677:5); (2) the purported expansion of Microsoft's IP rights in the 2025 transaction (*id.* at 1672:24-1673:21, 1676:19-1677:5); and (3) the value of the equity stake the nonprofit received in the 2025 transaction (*id.* at 1697:19-23 ("I think it should have been more")). The thrust of Schizer's testimony was that the nonprofit board had not sufficiently protected the nonprofit's economic interests in the 2025 transaction. *See, e.g.*, *id.* at 1672:1-9 ("So the question is, was that – were they protecting [the nonprofit's] economic interest?"); *id.* at 1673:13-21 ("I think the question becomes was that really generous and was it consistent with the mission? And I have concerns about it…"). Schizer offered this testimony even though it was contrary to his deposition and disclosed in none of his reports.

Meanwhile, Musk's counsel has repeatedly argued that Musk is essentially stepping into the shoes of the AGs in this lawsuit by seeking to enforce OpenAI's broad "charitable mission" to the public, rather than specific promises owed to Musk. *E.g.*, Trial Tr. 1131:22-25 ("You said you don't know what you're being sued for, and I'm telling you you're being sued for breaching the charitable mission of OpenAI."). Musk likewise invoked the public interest to explain why he had chosen to sue: "[T]he consequences of this case go far beyond me or the particular people here[.] . . . If the verdict comes up that effectively makes it okay to loot a charity, the entire foundation of charitable giving in America will be destroyed." *Id.* at 317:6-9.

## REQUESTS FOR RELIEF

Musk should be precluded from arguing that the 2025 recapitalization breached commitments owed to him or the public, as that theory was not pleaded and was not developed in discovery. From the time it was filed until opening statements, this case proceeded on the theory that OpenAI breached specific promises to Musk by accepting investments from Microsoft and other investors (all of which had a capped return) in 2019, 2021, and 2023. Musk should not be permitted to argue a new liability theory at trial—shielded from rebuttal—merely because his old theory no longer suits him in light of the Court's rulings regarding Defendants' statute of limitations defenses.

At a minimum, now that Musk has chosen to place the 2025 recapitalization front and center at trial, fairness requires that the OpenAI Defendants be permitted to explain how and why the transaction was approved by the nonprofit's board of directors in its current form. The Court initially granted Plaintiff's Motion in Limine No. 1 in substantial part, precluding evidence regarding "the ultimate decision of, or any report from, the Attorneys General or the specifics of those negotiations." Dkt. 452 at 2. That ruling, however, followed assurances from Musk's counsel that the recapitalization would play only a bit part at trial. *See* Dkt 445 (Mar. 13 H'rg Tr.) at 82:10-16. Those assurances did not hold. Musk and his counsel have now sought to paint themselves as enforcers of OpenAI's charitable mission while suggesting in opening statements and through testimony that the 2025 recapitalization breached purported commitments to Musk and the public, was consummated at an unfair price, and was approved by nonprofit directors who weren't looking out for OpenAI's mission.

None of that is true, yet the OpenAI Defendants are presently precluded from setting the record straight with direct rebuttal evidence. Musk will no doubt invite the jury to conclude that OpenAI's directors failed to adhere to nonprofit "custom and practice" in approving the 2025 recapitalization, all while preventing OpenAI from introducing evidence that it coordinated with the very state officials whom Musk's nonprofit expert conceded have "regulatory authority" over the nonprofit's board. Trial Tr. 1710:9-12. The unfair prejudice to OpenAI's defense is plain.

OpenAI's witnesses should therefore be permitted to describe the specific steps the company took in response to the Attorneys' General feedback, including how that iterative engagement shaped the transaction's final terms. For example, Taylor and Altman must be able to explain that the board approved specific changes to the transaction's terms and structure in part *because* the Attorneys General requested them. They must likewise be able to explain that the board only approved the transaction *after* the Attorneys General determined that they would not object to it. OpenAI should likewise be permitted to introduce the resulting agreements reached with the Attorneys General (DX 1172; DX 1182), which memorialize the structure and terms of the very transaction Musk now challenges.

OPENAI DEFENDANTS' MOTION TO PRECLUDE AND FOR PARTIAL RECONSIDERATION
CASE NO. 4:24-CV-04722-YGR

Date: May 10, 2026                    MORRISON & FOERSTER LLP

                                      /s/ *William Frentzen*
                                      JORDAN ETH (CA SBN 121617)
                                      JEth@mofo.com
                                      WILLIAM FRENTZEN (CA SBN 343918)
                                      WFrentzen@mofo.com
                                      DAVID J. WIENER (CA SBN 291659)
                                      DWiener@mofo.com
                                      MORRISON & FOERSTER LLP
                                      425 Market Street
                                      San Francisco, CA 94105
                                      Telephone:    (415) 268-7000
                                      Facsimile:    (415) 268-7522

                                      WILLIAM SAVITT (admitted *pro hac vice*)
                                      WDSavitt@wlrk.com
                                      BRADLEY R. WILSON (admitted *pro hac vice)*
                                      BRWilson@wlrk.com
                                      SARAH K. EDDY (admitted *pro hac vice)*
                                      SKEddy@wlrk.com
                                      RANDALL W. JACKSON (admitted *pro hac vice*)
                                      RWJackson@wlrk.com
                                      STEVEN WINTER (admitted *pro hac vice*)
                                      SWinter@wlrk.com
                                      NATHANIEL CULLERTON (admitted *pro hac vice*)
                                      NDCullerton@wlrk.com
                                      WACHTELL, LIPTON, ROSEN & KATZ
                                      51 West 52nd Street
                                      New York, NY 10019
                                      Telephone:    (212) 403-1000
                                      Facsimile:    (212) 403-2000

                                      *Attorneys for the OpenAI Defendants*