# EXHIBIT A

Highly Confidential

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

_____

**ELON MUSK, et al., Plaintiffs, v. SAMUEL ALTMAN, et al., Defendants.**

**Case No. 4:24-cv-04722-YGR**


**Highly Confidential: Subject to Stipulated Protective Order Filed 5/28/25**


**<u>Expert Report of Professor David M. Schizer</u>**

**Highly Confidential**

258. Notably, the slide deck shared with Microsoft acknowledges, but minimizes, the need to compensate OpenAI for loss of control. "[T]ransitioning the Nonprofit from GP control to control rights may require the Nonprofit to receive some value," the presentation indicated. "[T]his may impact the profit waterfall, but we do not expect it to be significant."[273]

259. But how could the "impact on the profit waterfall" not be "significant"? It is well understood that control is valuable. Indeed, it is customary practice for buyers to pay a control premium when acquiring control of a company. Premiums typically range between 20% and 30% of the value of the entire enterprise.[274] It is hard to see how 20% to 30% of the for-profit affiliate's value would not be "significant."

260. As a commentator has observed, there are reasons why, if anything, a control premium at OpenAI should be higher than average:

> [H]ere the change in control involves not just the power of the new control agents to make different management decisions but the ability to re-orient the business enterprise to the pursuit of profit. In the current arrangement, investors are literally warned to treat their investments as if they were donations. . . . After conversion, this restriction would no longer be in place (or, if it remained, could be revised at any time, and it would be reasonable to expect for-profit investors to do so). This change may dramatically increase the valuation of the for-profit company.[275]

261. To sum up, OpenAI considered a restructuring plan that would have replaced the nonprofit's control over its for-profit affiliate with more limited control rights, while seemingly not offering the nonprofit adequate compensation for this loss of control. Although this plan was not implemented, the fact that it was considered raises questions about OpenAI's commitment to protecting the nonprofit's mission and economic interests.

### B. September 2025 Restructuring

262. On September 11, 2025, OpenAI announced a restructuring in which the for-profit affiliate, OpenAI Global, LLC, would be converted to a public benefit corporation

---

[273] OpenAI PowerPoint, supra, at slide 4, MSFT_MUSK000054865.

[274] P.J. Patel, Bulls vs. Bears vs. a Pandemic: How do Control Premiums Change? https://www.valuationresearch.com/insights/stock-market-downturn-control-premium-impact/ (finding median control premiums between 20 to 30 percent from 1996 to 2019).

[275] Weissman, Letter of Jan. 9, 2024, supra, at 6.

**Highly Confidential**

("PBC").[276] In addition, the nonprofit would exchange its residual interest for a more traditional equity interest. Unfortunately, this restructuring further reinforces doubts about the nonprofit's ability to protect its mission and economic interests.

### 1. Weakening the Nonprofit's Already Questionable Control

263. As a formal matter, the new structure gives the nonprofit some mechanisms to control the new PBC. The PBC will specify a mission identical to the nonprofit's mission,[277] and the nonprofit will have preapproval rights regarding whether to change the mission or to sell for-profit affiliates.[278]

264. Yet instead of having *direct* control over operations, as under the prior structure, the nonprofit will have only *indirect* control via the power to select the PBC's board. Specifically, the nonprofit no will longer control the main for-profit affiliate (OpenAI LP and then OpenAI Global, LLC) by owning and controlling its general partner. Instead, once OpenAI Global is converted to a PBC, the nonprofit will have special "Class N" shares in the PBC, entitling it to cast 100% of the votes in electing PBC's directors.[279] The PBC is authorized to issue Class B shares, which would also carry a vote in these elections, but the nonprofit's Class N shares would always cast at least ⅔ of the votes in director elections.[280]

265. While this formal control is fine as far as it goes, its practical significance is unclear. Much depends on the way the nonprofit board members interpret the mission. In addition, how willing will they be to block changes favored by other stakeholders? Assuming they are willing, how effective will they be?

266. Unfortunately, there is a real possibility that this formal authority will prove to be mere window dressing. As noted above, the board's failed attempt to dismiss Mr. Altman raises doubts about the board's motivation and effectiveness, as does the

---

[276] Media coverage reported that this transaction was finalized on October 28, 2025.  See, e.g., Cade Metz, OpenAI Restructures to Become a More Traditional For-Profit Company, N.Y. Times, Oct. 28, 2025, https://www.nytimes.com/2025/10/28/technology/openai-restructure-for-profit-company.html.  The analysis here is based on the September 11 term sheet, which was produced in discovery.  As far as I am aware, neither OpenAI nor Microsoft has produced documents about the finalized transaction as of October 28, 2025, when this report was finalized. I reserve the right to amend or supplement this report based on further information.

[277] Memorandum of Understanding Between Open AI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 8, OPENAI_MUSK00037476.

[278] Id. at 5, OPENAI_MUSK00037473.

[279] Id. at 3, OPENAI_MUSK00037471.

[280] Id.

**Highly Confidential**

influence that Mr. Altman and Microsoft had in shaping the composition of the reconstituted nonprofit board.[281]

267. In addition, there are new hurdles that did not exist under the prior structure. Arguably, the board's most significant power is to hire and fire the CEO, but the new structure makes an important change. Under the old structure, only a majority was needed to terminate the CEO.[282] But under the memorandum of understanding, a ⅔ supermajority of the PBC board is needed to fire the CEO.[283]

268. This is not customary practice. Indeed, in my experience, a supermajority requirement for removing a nonprofit CEO is extremely unusual, and for good reason. It is a very significant limit on the board's authority. Since the CEO handles the day-to-day affairs of an organization–whether it is a for-profit firm or a nonprofit–a CEO that cannot easily be dismissed has extraordinary power, leaving the board much diminished in its influence. For example, if a nonprofit CEO wants to prioritize profits over the mission and the CEO has this sort of job security–needing only the support of just over ⅓ of the board to remain in office–the board, as a practical matter, is quite limited in its ability to resist the CEO's preferred direction.

269. As if that wasn't enough, the new structure gives the PBC a staggered board, which is a familiar way to entrench management.[284] The nonprofit can replace only ⅓ of the PBC's directors in a given year–less than a majority and only half the ⅔ vote needed to fire the CEO.[285] If members of the PBC board are failing to prioritize the mission, the nonprofit can only replace some of them at a time (assuming the PBC and nonprofit boards have different members). This is more sand in the gears, further complicating any effort by the nonprofit to influence the PBC's priorities and policies.

270. To add to the challenges of keeping OpenAI on mission, the Memorandum of Understanding introduces a new tension, which reflects the hybrid nature of public benefit corporations. It provides: "The NFP [nonprofit] directors, in their capacity as

---

[281] See supra Part IV.

[282] See Amended & Restated Bylaws of OpenAI, Inc. (Jan. 10, 2024), Art. VI, Sec. 3, at 7, OPENAI_MUSK00000446 ("any officer may be removed, with or without cause, by the Board of Directors"); see also id. at Art. VI Sec. 10, at 4, OPENAI_MUSK00000443 ("A majority of the total number of directors then in office shall constitute a quorum of the Board" and generally "the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board").

[283] Memorandum of Understanding Between Open AI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 9, OPENAI-MUSK00037477.

[284] See, e.g., Lucian Arye Bebchuk, John C. Coates IV & Guhan Subramanian, The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy, 55 Stan. L. Rev. 887 (2002).

[285] Memorandum of Understanding Between Open AI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 8, OPENAI-MUSK00037476.

**Highly Confidential**

such, remain duty bound to the NFP's mission of ensuring that AGI benefits all humanity."[286] But the directors of the PBC–whether they are the same people or different people–have a hybrid mission, which could easily become internally inconsistent. As the Memorandum states:

> As required by Delaware law under the public benefit corporation statute, PBC directors, in their capacity as such, will have a duty to take into account (a) the mission, (b) the best interests of those materially affected by the PBC's conduct, and (c) the stockholders' financial interests.[287]

271. This means the PBC board is duty-bound to serve two masters–both the nonprofit's mission and the stockholders' financial interests.

272. This is a change from the existing structure. As a formal matter, the nonprofit controlled the General Partner, which had formal discretion to override for-profit investors' interests (except to the extent that it had to consult them on major decisions). Hence, the old structure included legends with caveats, warning that the for-profit affiliate "may never make a profit" and "is under no obligation to do so," as detailed above.[288]

273. However ineffective this formal clarity may have been, it is absent from the Memorandum of Understanding and the new PBC structure it announces. When PBC board members face questions about whether to prioritize profitability, on the one hand, or cooperation, the wide distribution of benefits, and safety, on the other, they are pulled in competing directions. They are legally obligated to take account of both "the mission" and "the stockholders' financial interests." Which should take precedence? The Memorandum of Understanding leaves this question unanswered.

274. The Memorandum of Understanding gestures in the direction of safety with the following provision: "Members of the SSC [the PBC Board's Safety and Security Committee] will solely consider the mission and not the interests of stockholders and other stakeholders of the PBC in serving on the SCC." Note, though, that this directive applies only "in serving on the SCC." In other words, when directors make decisions within the SCC, they should prioritize the mission. But what is the SCC's jurisdiction?

---

[286] Id. at 8, OPENAI-MUSK00037476.

[287] Id. at 8, OPENAI-MUSK00037476; see also 8 Del. § 365 ("The board of directors shall manage or direct the business and affairs of the public benefit corporation in a manner that balances the pecuniary interests of the stockholders, the best interests of those materially affected by the corporation's conduct, and the specific public benefit or public benefits identified in its certificate of incorporation.").

[288] See Part III.F.1.

**Highly Confidential**

What decisions (if any) can it make without being overruled by the full board? Since the safety priority seems to apply only "in serving on the SCC," even board members who serve on the SCC presumably would need to rethink their analysis when voting on board-level–as opposed to committee-level–decisions. Oddly, they might even have to vote differently on *the same issue*.

275. This tension–and the ambiguity with which the new structure approaches it–is not just a theoretical problem. Past experience has already raised serious questions about the nonprofit board's ability to keep OpenAI on mission. But now, the directors of the PBC will face a new source of pressure to prioritize profits, which was not present in the prior structure: the prospect of a derivative suit by for-profit shareholders. The relevant rule requires the plaintiff to own at least 2% of the shares (or $2 million, if OpenAI becomes a public company), a threshold that Microsoft certainly exceeds, and others may as well.[289] Given that the nonprofit board already has faced headwinds in trying to protect the nonprofit's mission and assets, the prospect of being sued by for-profit investors will only intensify those headwinds.

### 2. Replacing Residual With Percentage of Equity

276. Another change in the September 2025 reorganization is that the nonprofit will lose its residual interest, and instead will have traditional equity. Under the prior structure, it had a redemption amount of about $6.08 billion plus its $60.8 million capital contribution, and also a residual interest giving it 100% of the return above a threshold (which was extremely high, as noted above). In the reorganization, these two interests will be replaced by traditional equity.

277. Again, there is a question whether the nonprofit's new equity appropriately reflects the nonprofit's economic contribution. The nonprofit's share is 31.5% of the PBC plus warrants.[290] Notably, this percentage does not reflect the dilution from Softbank and other investors. According to Mr. Wu, the nonprofit's share would be between 20% and 30% (not including the warrants).[291] In any event, the nonprofit's undiluted 31.5% (not

---

[289] See 8 Del. Code § 367 ("Any action to enforce the balancing requirement of § 365(a) of this title, including any individual, derivative or any other type of action, may not be brought unless the plaintiffs in such action own individually or collectively, as of the date of instituting such action, at least 2% of the corporation's outstanding shares or, in the case of a corporation with shares listed on a national securities exchange, the lesser of such percentage or shares of the corporation with a market value of at least $2,000,000 as of the date the action is instituted. This section shall not relieve the plaintiffs from complying with any other conditions applicable to filing a derivative action including § 327 of this title and any rules of the court in which the action is filed.").

[290] Memorandum of Understanding Between OpenAI & Microsoft: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at Annex A, OpenAI-Musk00037482.

[291] Wu Deposition, at 241-2.

**Highly Confidential**

including warrants) compares unfavorably to the undiluted share allocated to Microsoft (32.5%) and the employee vehicle (33%).

## VI.    Conclusion

278. In conclusion, it is customary practice for nonprofits to use for-profit affiliates for a range or purposes, including to advance their mission by attracting capital and offering equity compensation to employees.

279. It also is customary practice to ensure that the nonprofit's mission and economic interests are protected. Yet at OpenAI, a series of decisions were made which seemed to prioritize profitability over the mission, including the representation of Microsoft on the joint safety board, the exodus of a number of safety experts, and a 180-degree change in OpenAI's position on regulation.

280. OpenAI also fell short in protecting the nonprofit's economic interests, including by agreeing to extremely high thresholds before the nonprofit collects on its residual interest, not hiring third-party financial experts to analyze these thresholds, and giving a for-profit partner very liberal (and expanding) access to OpenAI's intellectual property and facilities.

281. Although it is customary practice for the nonprofit to have formal control over the for-profit affiliate, formal control has proved hollow at OpenAI. Independent directors claim that the CEO was not sharing adequate information, making it impossible for them to do their job of overseeing him and the for-profit entity. Yet when the board tried to replace Mr. Altman, this effort foundered on the opposition of OpenAI's largest for-profit partner, as well as on resistance from employees (who may have been influenced by the prospect of an imminent equity offering). Instead, three of the four independent board members were forced out, and the CEO and the for-profit partner played a prominent role in shaping the reconstituted board. All of this raises grave questions about this board's ability to protect the mission.

282. These questions have grown even more stark with the announcement of a restructuring, which has introduced a ⅔ requirement to dismiss the CEO, conflicting legal duties to promote profitability as well as the mission, and the potential of shareholder lawsuits to pressure directors to prioritize profits. Unfortunately, the likelihood that OpenAI will favor its mission over profitability seems increasingly remote.

\* \* \*

**Highly Confidential**

Executed on this 29th day of October, 2025.
New York, NY