# EXHIBIT B

Highly Confidential

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

_____

**ELON MUSK, et al., Plaintiffs, v. SAMUEL ALTMAN, et al., Defendants.**

**Case No. 4:24-cv-04722-YGR**

**Highly Confidential: Subject to Stipulated Protective Order Filed 5/28/25**

<u>**Rebuttal Expert Report of Professor David M. Schizer**</u>

**Highly Confidential**

and compensated the university with royalties.[164] In another model, a nonprofit provided "R&D, data analysis, product development, program management, consulting, and laboratory services" in exchange for funding.[165] In still another type of deal, the nonprofit provided funding for a for-profit partner to provide research or other services.[166] These targeted exchanges were quite different from the expansive (and expanding) relationship between Microsoft and OpenAI.

123. To sum up, although it is customary practice for nonprofits to license intellectual property to for-profit partners, these transactions need to protect the nonprofit's economic interests. There are serious questions about whether Microsoft's expanding rights to use OpenAI's IP adequately protected the nonprofit's economic interests. When OpenAI formed for-profit affiliates, it could have simply licensed its IP to these affiliates; instead, it transferred substantially all of its IP and developed new IP in the affiliates, thereby sharing this IP with its for-profit investors. In addition, the rationale was not clear for the repeated increases in Microsoft's access, even as OpenAI developed a successful track record and became a less risky partner. What is even more unusual, moreover, was that Microsoft received not only this broad and expanding access to IP, but also equity entitling Microsoft to as much as 84.3% of the first $124.573 billion of OpenAI's profits.

124. These exceedingly generous terms for Microsoft distinguished its contracts with OpenAI from other examples invoked by Defendants' Experts. While those precedents confirm that nonprofits commonly license their IP to for-profit partners, their stark differences from Microsoft's contracts with OpenAI highlight ways in which the Microsoft-OpenAI arrangement diverged from customary practice.

## VIII.    The Restructuring of OpenAI Has Not Adequately Protected the Nonprofit's Mission and Interests

- **Rebuttal Opinion #10:** The restructuring of OpenAI did not adequately protect the nonprofit's mission and interests and thus did not accord with customary practice.

---

[164] See, e.g., Bethusiem at Appendix ¶ 14 (describing Emory-Gilead HIV Collaboration).

[165] Bethusiem at Appendix ¶ 3 (describing the services provided by Battelle); see also Battelle, Battelle for Business, https://www.battelle.org/who-we-serve/industry.

[166] Bethusiem at Appendix ¶ 11 (CFF provided funding to enable Aurora to pursue new treatments, and the two agreed to share revenue from these treatments).

**Highly Confidential**

125. Finally, Defendants' Experts conclude that the October 2025 restructuring was consistent with customary practice.[167] This restructuring transferred OpenAI's for-profit activities from an LLC to a public benefit corporation ("PBC").

126. In light of the details of OpenAI's experience and context–and, in particular, the challenges the nonprofit has faced in protecting its mission and economic interests–I do not agree with the conclusion that this restructuring accorded with customary practice. As I explained in my First Report, the restructuring weakened the nonprofit's already limited influence on the for-profit affiliate.[168]

### A. Defendants' Experts Focus on Form, Not Substance

127. In opining that this new structure aligned with customary practice, Defendants' Experts focus on form, not substance. Like in their analysis of the prior structure, Defendants' Experts emphasize control, as well as contractual protections for the mission.

128. First, they note that the nonprofit has a supermajority vote in appointing the PBC's directors. Like in their analysis of the prior structure, Defendants' Experts

---

[167] See Hemel at ¶ 3 (Opinion #5) ("OpenAI's current recapitalization and commercial partnership with Microsoft are similarly consistent with common practices of other large U.S. charitable organizations that have engaged with the for-profit sector."); see also id. at ¶ 104 ("The current recapitalization of the OpenAI For-Profits and updated commercial arrangements with Microsoft (as described in the September 2025 MOU and Argos III term sheet) are similarly consistent with approaches that other large charities have taken to engage with the for-profit sector, differing primarily only insofar as the MOU and Argos III term sheet envision extra measures beyond what is typical to ensure alignment with OpenAI Nonprofit's mission."); Frumkin at ¶ 4 ("**OpenAI's current recapitalization also aligns with industry-accepted nonprofit organizational models.** OpenAI's transition of its for-profit enterprise to be held under a public benefit corporation ("PBC") controlled by the Nonprofit similarly fits within the broader trend of nonprofits implementing different funding strategies through a variety of organizational models. A PBC is a broadly adopted for-profit organizational form of relatively recent vintage that allows organizations to simultaneously pursue social benefits and economic profits. OpenAI's transition of its for-profit enterprise to be held under a PBC controlled by the Nonprofit is consistent with the accepted practices of larger nonprofit organizations with broad and ambitious impact goals. Additionally, the considerations underlying OpenAI's recapitalization are consistent with those that would motivate a nonprofit to consider modifications to its organizational form." (emphasis in original)); Buthusiem at ¶ 81 ("Based on my review of the materials and my experience with nonprofit/for-profit collaborations, it is my opinion that the partnership between Microsoft and OAI is driven by customary objectives. . . . Moreover, . . . the 2025 recapitalization (as reflected in the September MOU) reflect[s] the evolving nature of the parties' relationship.").

[168] First Report at ¶ 3 (Opinion #10) ("It is customary practice during a restructuring for a nonprofit to protect its mission and economic interests, but OpenAI did not conform to this practice when it considered taking control away from the nonprofit without an adequate control premium, when it significantly weakened the board's influence by requiring a ⅔ vote to dismiss the CEO, when it exposed directors to the risk of shareholder suits from for-profit investors who might not support the mission, and when it further weakened the nonprofit's already questionable control over its for-profit affiliates in other ways as well.").

**Highly Confidential**

assume that by controlling the PBC board, the nonprofit can protect its mission and economic interests.[169]

129. Second, Mr. Hemel and Mr. Frumkin emphasize that the PBC has the same mission as the nonprofit,[170] and that the mission cannot be changed without the nonprofit's consent.[171] Defendants' Experts also observe that under Delaware law, the public benefit corporation has to balance the mission against "the best interests of those materially affected by the PBC's conduct" and "the stockholders' financial interests."[172]

---

[169] See Hemel at ¶ 106 ("Like the 2019 restructuring, the current recapitalization provides the OpenAI Nonprofit with effective control over the OpenAI for-profit enterprise. Specifically, the OpenAI Nonprofit retains two-thirds supermajority voting power in OpenAI PBC director elections and has pre-approval rights over any change to OpenAI PBC's mission, sale of control of the PBC, or any sale of material assets by the PBC."); id. at ¶ 39 ("The OpenAI PBC would continue to be controlled by the OpenAI Nonprofit. In addition to common PBC equity, the Nonprofit would be granted non-transferable shares of Class N Common Stock, which would be issued to the Nonprofit only. As long as the OpenAI Nonprofit retains at least one Class N share, it would control the appointment and removal of PBC directors (subject to limited exceptions as to removal). These Class N shares also grant the OpenAI Nonprofit consent rights over any changes to the PBC's mission, any sale of control of the PBC, and any sale of material assets by the PBC. The MOU also provides that at least a two-thirds supermajority of the OpenAI PBC directors must be constituted from members of the OpenAI Nonprofit board."); Frumkin at ¶ 18 ("Under the current recapitalization, the PBC will 'continue to be controlled by the [Nonprofit],' including through to-be-granted non-transferable shares of PBC equity (Class N Common Stock), which would be issued to the Nonprofit only."); Buthusiem at ¶ 79 (noting that PBC is "remaining under the control of the nonprofit"); id. at ¶ 85 ("I also understand that the terms of the restructuring—as reflected in the September 2025 MOU—contain similar governance restrictions that protect OAI's non-profit mission. For instance, . . . nominees for the PBC Board are selected exclusively by OAI NP. By granting OAI NP the exclusive right to nominate PBC Board members, the MOU ensures that decision-making remains consistent with OAI NP's objectives."); cf. Buthusiem at ¶ 92 ("the PBC structure contemplated by the parties under the Argos III term sheet and non-binding MOU inherently provides protections for OAI's nonprofit mission").

[170] Hemel at ¶ 36 ("The MOU anticipates that the OpenAI For-Profits will undergo a recapitalization. This recapitalization would result in the creation of a Delaware Public Benefit Corporation (the 'OpenAI PBC') with the same mission as OpenAI Nonprofit."); Frumkin at ¶ 18 ("OpenAI's current recapitalization, described in a non-binding Memorandum of Understanding of the Proposed Recapitalization of the OpenAI For-Profit Enterprise ('MOU') with Microsoft Corporation dated September 11, 2025, details that the OpenAI for-profit enterprise would be reorganized under a PBC with the same mission as the Nonprofit.").

[171] Hemel at ¶ 106 ("the OpenAI Nonprofit . . . has pre-approval rights over any change to OpenAI PBC's mission, sale of control of the PBC, or any sale of material assets by the PBC"); Frumkin at ¶ 18 (noting that nonprofit "will have a suite of veto rights over important PBC decisions: changes to the PBC's mission, any sale of control of the PBC, or any sale of material assets by the PBC").

[172] Hemel at ¶ 105 ("As discussed previously, a PBC is a for-profit corporation that is legally bound to pursue a mission separate from profit. . . . As required by Delaware law under the public benefit corporation statute, PBC directors, in their capacity as such, will have a duty to take into account (a) the mission, (b) the best interests of those materially affected by the PBC's conduct, and (c) the stockholders' financial interests."); see also Frumkin at ¶ 69 ("PBCs are for-profit entities that are committed to simultaneously pursuing social benefits and economic profits."); Buthusiem at ¶ 92 ("PBCs have legal latitude to consider both the profit motives of shareholders and their public benefit mission.").

**Highly Confidential**

### B. In Substance, the Restructuring Does Not Adequately Protect the Nonprofit's Mission and Interests

130. Before this restructuring, the nonprofit had formal control of the for-profit affiliates, as well as contractual protections for its mission, as noted above.[173] But formal protections are effective only if the board and other stakeholders have the motivation and capacity to use them. The track record at OpenAI has been problematic so far, as emphasized in my First Report and above.[174]

131. This track record is unlikely to improve with a PBC, where the mandate is less clear. At a nonprofit, the responsibility of directors and officers is unambiguous: they need to advance the mission. In contrast, Delaware law directs a PBC's board to balance the mission against two other factors. As the Memorandum of Understanding put it, they "will have a duty to take into account (a) the mission, (b) the best interests of those materially affected by the PBC's conduct, and (c) the stockholders' financial interests."[175] This multi-part mandate obliges the PBC board to serve two masters–not just the mission, but also the stockholders' financial interests.

132. As I noted in my First Report, the Memorandum of Understanding did not give clear guidance about how to balance these issues.[176] I have now reviewed the PBC's certificate of incorporation, which offers some guidance in providing that "the Board of directors of the corporation . . . must solely consider the Mission (and may not consider the pecuniary interests of stockholders or any other interest) in respect of safety and security."[177]

---

[173] See supra at Parts IV.A & V.A.

[174] See First Report at Part III.B-F, Part IV.B-E & Part V; see supra at Parts IV.B, V.B., VI.B & VII.A-C.

[175] Memorandum of Understanding: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 8, OPENAI_MUSK00037476; see also 8 Del. § 365 ("The board of directors shall manage or direct the business and affairs of the public benefit corporation in a manner that balances the pecuniary interests of the stockholders, the best interests of those materially affected by the corporation's conduct, and the specific public benefit or public benefits identified in its certificate of incorporation.").

[176] See First Report at Part V.B.1.

[177] Certificate of Incorporation of OpenAI Group PBC, Delaware Public Benefit Corporation, Oct. 28, 2025, Article III, OPENAI_MUSK00037953. The Memorandum of Understanding, at OPENAI_MUSK00037476, gestured in the direction of safety with the following provision: "Members of the SSC [the PBC Board's Safety and Security Committee] will solely consider the mission and not the interests of stockholders and other stakeholders of the PBC in serving on the SCC." Yet as I noted in my First Report, this directive seemed to apply only "in serving on the SCC," without specifying the SCC's jurisdiction. This ambiguous language implied that safety-promoting decisions at the SCC might be overruled by the full board. See First Report at ¶ 274. I have now reviewed the certificate of incorporation, which clarified that the instruction to prioritize safety applies not only "in serving on the SCC," but "in connection with all actions and decisions of the Board of Directors or any of the members of the Board of Directors in their capacities as such (or of any committee of the Board of Directors or any of the members of any such committee in

**Highly Confidential**

133. Yet the ability of this language to protect the mission should not be overstated. The most it can achieve is to replicate the clear mandate the nonprofit had before the October 2025 restructuring. But as experience has shown, even with this clear mandate, OpenAI's mission was not adequately protected, as noted above.[178]

134. Moreover, for two reasons, the language in the PBC's certificate of incorporation prioritizing safety will not be as effective in protecting the mission as the nonprofit form is supposed to be. First, in restating the mission, the PBC certificate of incorporation omits an important part of the mission. While the certificate repeated that the mission is to "ensure that artificial general intelligence benefits all of humanity, including by conducting and/or funding artificial intelligence research," it deletes the sentence from the nonprofit's certificate of incorporation providing that–like all Section 501(c)(3) organizations–"[t]he corporation is not organized for the private gain of any person."[179] Although this omission is disappointing, it is not surprising. After all, unlike a nonprofit, a PBC *actually is* organized for the private gain of a specified group: its shareholders.

135. Second, and relatedly, the instruction to prioritize the mission over "pecuniary interests" applies only to "safety and security" but not to the rest of OpenAI's mission. Since its founding, OpenAI has repeatedly claimed to focus not only on safety, but also on ensuring a broad distribution of the benefits of AI–a part of the mission that the PBC is not fully free to pursue. Instead, the PBC needs to balance this goal against shareholder profits.

136. Therefore, in prioritizing only "safety and security" over profitability, but not the rest of OpenAI's mission, the PBC structure fails to protect key elements of the mission: "broadly distributed benefits" and a "cooperative orientation." These goals feature prominently in the charter that OpenAI has posted online for many years–a document that is still posted to this day[180]–but are not prioritized under the PBC structure:

> OpenAI's mission is to ensure that artificial general intelligence (AGI)–by which we mean highly autonomous systems that outperform humans at most economically valuable work–benefits all of humanity. We will attempt to directly build safe and beneficial AGI, but will also consider our mission fulfilled if our

---

their capacities as such)." Certificate of Incorporation of OpenAI Group PBC, Article III, OPENAI_MUSK00037953.

[178] See supra at Parts IV.B, V.B., VI.B & VII.A-C.

[179] Certificate of Incorporation of a Non-Stock Corporation OpenAI, Inc., Dec. 8, 2015, Deposition of Robert Wu, Oct. 3, 2025, Exhibit 2, 2024Musk-0003115.

[180] See OpenAI, OpenAI Charter, https://openai.com/charter/ (last viewed on November 24, 2025).

41

**Highly Confidential**

work aids others to achieve this outcome. To that end, we commit to the following principles:

**Broadly distributed benefits** We commit to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all, and to avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power. Our primary fiduciary duty is to humanity. We anticipate needing to marshal substantial resources to fulfill our mission, but will always diligently act to minimize conflicts of interest among our employees and stakeholders that could compromise broad benefit. . . .

**Cooperative orientation** We will actively cooperate with other research and policy institutions; we seek to create a global community working together to address AGI's global challenges. We are committed to providing public goods that help society navigate the path to AGI. Today this includes publishing most of our AI research, but we expect that safety and security concerns will reduce our traditional publishing in the future, while increasing the importance of sharing safety, policy, and standards research.[181]

137. These goals of broad distribution of benefits for the public and cooperation featured also in the nonprofit's certificate of incorporation, and this language was included in the PBC charter as well:

The specific purpose of this corporation is to ensure that artificial general intelligence benefits all of humanity, including by conducting and/or funding artificial intelligence research. The corporation may also research and/or otherwise support efforts to safely develop and distribute such technology and its associated benefits, including analyzing the societal impacts of the technology and supporting related educational, economic, and safety policy research and initiatives. The resulting technology will benefit the public and the corporation will seek to distribute it for the public benefit when applicable.[182]

138. What if the PBC board is considering a way to make artificial intelligence more readily available to people without the means to pay for it? Alternatively, what if the PBC board is considering sharing information that could help other aspiring providers of AI to

---

[181] In a deposition, Robert Wu, a member of OpenAI's legal team, indicated that OpenAI's board was aware of the contents of this charter. Wu Deposition, at 42-43.

[182] Amended and Restated Certificate of Incorporation of OpenAI, Inc., a Nonprofit Non-Stock Corporation, Deposition of Robert Wu, Oct. 3, 2025, Exhibit 3, 2024MUSK-00000420; see also PBC Certificate of Incorporation, Article III. The nonprofit's original certificate of incorporation also committed to "seek to open source technology for the public benefit when applicable," but this language was later deleted and replaced by the language reproduced in the text immediately above. See Certificate of Incorporation of a Non-Stock Corporation OpenAI, Inc., Dec. 8, 2015, Wu Deposition, Exhibit 2, 2024Musk-0003115.

**Highly Confidential**

be more effective? Taking these steps would advance the mission, even if they are not about "safety and security." But in considering such proposals, the PBC board has not been instructed that it must "solely consider the mission." Rather, the board must balance these aspects of the mission against the stockholders' interests, but there is no guidance about which to prioritize. Obviously, this is quite different from the prior structure, in which the mission was always supposed to be the priority.

139. Indeed, at nonprofits, prioritizing the mission is a clear and long-standing principle. In contrast, the public benefit corporation is a relatively new form. Unlike with nonprofits, there is neither a longstanding customary practice nor a comprehensive body of judicial precedent to guide boards in balancing the competing imperatives of mission and profitability.[183]

140. In addition to this balancing, the restructuring included two other new features, detailed in my First Report, which make it even more challenging for the nonprofit to protect its mission and interests.[184] Defendants' Experts do not mention these new features or the fact that these terms are not customary practice when nonprofits have for-profit affiliates.

141. First, a board's most significant power arguably is to hire and fire the CEO. This power has already proved ineffective at OpenAI, as noted above,[185] but the restructuring made it weaker still. Under the old structure, only a majority was needed to terminate the CEO.[186] But under the new Bylaws, a ⅔ supermajority of the PBC's

---

[183] As the PBC directors try to strike this balance, they will face a new source of pressure to prioritize profits, which was not present in the prior structure: the prospect of a derivative suit by for-profit shareholders. This pressure does not arise for "safety and security issues" because the certificate of incorporation spares directors from balancing on these issues and clarifies that they have discharged their fiduciary duties by prioritizing the mission. See PBC Certificate of Incorporation, Article III, OPENAI_MUSK00037953 (instructing board to "solely consider the Mission . . . in respect of safety and security issues"); id. ("The members of the Board of Directors comply with their fiduciary duties by complying with the first sentence of this paragraph, and no member of the Board of Directors or any officer of the Corporation will have breached his or her fiduciary duty, or have any liability whatsoever, for complying or facilitating compliance with the first sentence of this paragraph."). However, if issues are not about "safety and security," this protection does not apply, so there is a prospect of shareholder litigation. The certificate of incorporation seeks to indemnify directors in litigation about the balance they strike between profitability and the mission. See id. at Article IX.1, OPENAI_MUSK00037977 ("In the absence of conflict of interest, no failure to satisfy the balancing requirement described in Subchapter XV of the DGCL shall, for purposes of this Article XI, constitute an act or omission not in good faith, or a breach of the duty of loyalty."). Yet indemnification does not protect directors from important costs of litigation, including the time and effort that must be devoted to it, adverse publicity, and the like. To avoid these costs of shareholder litigation, directors might opt to give undue weight to profitability.

[184] See First Report at Part V.B.1.

[185] See supra Part V.B.2.

[186] See Amended & Restated Bylaws of OpenAI, Inc., Jan. 10, 2024, Art. VI, Sec. 3, at 7, OPENAI_MUSK00000446 ("any officer may be removed, with or without cause, by the Board of

43

**Highly Confidential**

nonemployee directors is now needed to fire the CEO.[187] Defendants' Experts make no mention of this significant change that, as I explained in my First Report, is not customary practice.[188]

142. On the contrary, a supermajority requirement for removing a nonprofit CEO is extremely unusual, representing a very significant limit on the board's authority. For example, the situation is very different at Mozilla, a precedent that all three of Defendants' Experts discuss in their reports. At Mozilla, the nonprofit's board appoints its officers, who serve "at the pleasure of the Board of Directors, subject to the rights, if any, of an officer under a contract of employment."[189] Officers are generally removable by the Board, with or without cause.[190] In general, a majority of the present directors is sufficient for the Board to take action.[191] In other words, OpenAI's new structure gives its CEO special job security, which is not present at Mozilla and is not customary practice.

143. Second, OpenAI's new structure gives the PBC a staggered board,[192] which is a familiar way to entrench management.[193] As a result, the nonprofit can replace only ⅓

---

Directors"); see also id. at Art. IV, Sec. 10, at 4, OPENAI_MUSK00000443 ("A majority of the total number of directors then in office shall constitute a quorum of the Board" and generally "the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board").

[187] See Bylaws of OpenAI Group PBC § 3.8(b)(ii), at OPENAI_MUSK00037989. In general, "a whole number of directors equal to at least a majority of the Whole Board shall constitute a quorum." Bylaws § 3.8(a). However, "the approval of at least two-thirds (⅔) of the directors of the Whole Board shall be required to take any of the following actions," § 3.8(b), and this category includes an action to "terminate or otherwise remove the Chief Executive Officer from such position; provided, that for purposes of this Section 3.8(b)(ii) all references to the Whole board shall exclude employee directors for purposes of calculating what constitutes the 'Whole board.'" § 3.8(b)(ii). This supermajority provision was in the Memorandum of Understanding. See Memorandum of Understanding: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 9, OPENAI_MUSK00037477.

[188] See First Report at ¶ 268.

[189] Mozilla Foundation Bylaws § 4.2, https://static.mozilla.com/foundation/documents/mf-bylaws.pdf.

[190] Id. at § 4.5.

[191] Id. at § 3.13.

[192] See Bylaws of OpenAI Group PBC § 3.2, at OPENAI_MUSK00037988 ("The directors shall be classified, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as possible, with one class to be originally elected for a term expiring at the annual meeting of stockholders to be held in 2026 . . . , another class to be originally elected for a term expiring at the annual meeting of stockholders to be held in 2027 . . . , and another class to be originally elected for a term expiring at the annual meeting of stockholders to be held in 2028 . . . ."); see also Certificate of Incorporation of OpenAI Group PBC § V.2, at OPENAI_MUSK00037974.

[193] See, e.g., Lucian Arye Bebchuk, John C. Coates IV & Guhan Subramanian, The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy, 55 Stan. L. Rev. 887 (2002).

44

**Highly Confidential**

of the PBC's directors–and, notably, less than a majority–in a given year.[194] In other words, if members of the PBC board are giving insufficient weight to the mission, the nonprofit can replace only some of them at a time (assuming the nonprofit and PBC have different members).[195]

144. In short, the restructuring was a step backward in protecting the mission. It further weakened the (already ineffective) formal structures that were supposed to keep OpenAI focused on its mission, instead of on profitability.

145. Unfortunately, the restructuring also failed to reverse the harm to OpenAI's economic interests. As I emphasized in my First Report, OpenAI agreed to capped interests for its for-profit investors; aside from its own capped interest–which was modest compared to the capped interests of its for-profit investors–OpenAI would not earn an economic return unless and until OpenAI generated massive profits.[196]

146. Under the restructuring, the capped interests and OpenAI's residual were replaced with conventional equity. Going forward, OpenAI will receive a uniform slice of all of OpenAI's profits.[197]

147. But its share of these profits is notably modest–and, indeed, is below the level allocated to Microsoft and to OpenAI's employees. According to the post-recapitalization cap table that was produced in discovery, the nonprofit's fully diluted percentage is 22.2%, compared with 22.9% for Microsoft and 22.7% for the employee vehicle.[198] While OpenAI's warrants provide it with the potential to increase its ownership share (and are currently valued at 4%),[199] these pay off only if OpenAI's shares appreciate to above the exercise price on the warrants, which is ten times the share price on the closing date of the recapitalization.[200] If the shares do not appreciate above this very high level, the warrants presumably will expire worthless without increasing OpenAI's ownership percentage. These numbers reveal that OpenAI has allocated an enormous share of its value to for-profit investors and employees, keeping only a modest slice for the nonprofit.

---

[194] Memorandum of Understanding: Proposed Recapitalization of the OpenAI For-Profit Enterprise, September 11, 2025, at 8, OPENAI_MUSK00037476.

[195] See First Report at ¶ 269.

[196] See id. at Part III.B & C; see also supra at Part VI.B.

[197] See First Report at ¶ 276.

[198] OpenAI Summary Post-Recapitalization Cap Table, OPENAI_MUSK00038352.

[199] Id.

[200] Id. (note 6) ("NFP warrant exercise price calculated as 10x the Share Price at Recap Close").

**Highly Confidential**

148. To be clear, those numbers do not mean that the problem was the 2025 restructuring itself. OpenAI hired Goldman Sachs to make the case for a higher valuation for its residual interest and Goldman Sachs prepared valuations with Black Scholes models, as well as with revenue projections and multiples drawn from comparable companies.[201] This negotiation contrasted starkly with the process OpenAI used in agreeing to very high multiples for its for-profit investors. As I emphasized in my First Report, the absence of sophisticated valuations in those transactions diverged from customary practice.[202] But even though OpenAI used a more robust process in connection with the 2025 restructuring, it was stuck with the unfavorable economic position it had already accepted in its prior deals with Microsoft. Because the nonprofit had already parted with so much of the economic return, it could not get back what it had already lost.

## Conclusion

149. To sum up, I agree with Defendants' Experts that the use of for-profit affiliates to raise capital and compensate employees is customary practice. They acknowledge that it is customary practice for a nonprofit to protect its mission and economic interests when using for-profit affiliates.

150. However, unlike Defendants' Experts, I conclude that the nonprofit parent at OpenAI did not adequately protect its mission and economic interests, and thus did not accord with customary practice. I come to this conclusion for five reasons.

151. First, the contractual provisions protecting the mission, which Defendants' Experts invoke, were not effective and thus did not accord with customary practice.

152. Second, the control provisions purporting to enable the nonprofit to control its for-profit affiliates, which Defendants' Experts invoke, were not effective and thus did not accord with customary practice. In contrast, other nonprofits invoked by Defendants' Experts were more effective in protecting their mission and independence.

---

[201] See, e.g., Project Watershed Discussion Materials March 2025, at 17, OPENAI_MUSK00036566 (noting that "OpenAI's growth . . . outpaces annual adjustments for profit caps); id. at 19, OPENAI_MUSK00036568 (computing 11X multiple for peers); id. at 21, OPENAI_MUSK00036570 (computing $273 billion valuation by averaging valuations with different methodologies); id. at 25, OPENAI_MUSK00036574 (Black Scholes valuations using different assumptions); see also Project Watershed Discussion Materials April 2025, OPENAI_MUSK00036601 (analyzing market impact of different governance structures).

[202] See First Report at III.C.

**Highly Confidential**

153. Third, the "capped return" structure did not protect the nonprofit's economic interests and thus did not accord with customary practice. I draw the same conclusion about the process that set these caps, which did not use Black Scholes valuations or analyze comparable transactions. In contrast, the economic relationships between other nonprofits and their for-profit affiliates, which Defendants' Experts invoke, were different in material ways.

154. Fourth, Microsoft's access to OpenAI's intellectual property raised serious questions about whether the nonprofit's economic interests were adequately protected and thus whether this access accorded with customary practice. In contrast, the intellectual property transactions of other nonprofits, which Defendants' Experts invoke, were different in material ways.

155. Finally, the restructuring of OpenAI did not adequately protect the nonprofit's mission and interests and thus did not accord with customary practice.

* * *

Executed on this 24th day of November, 2025.
New York, NY

47