MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA  90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk
and X.AI Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **WRITTEN DIRECT TESTIMONY OF C. PAUL WAZZAN, PH.D.** |
| v. | |
| SAMUEL ALTMAN, et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

I.      Overview .......................................................................................................... 1

II.     Background and Experience............................................................................. 1

III.    Venture Capital ............................................................................................... 2

IV.     Overview of Methodology ............................................................................... 4

V.      Step 1: Valuation of OpenAI For-Profit....................................................... 5

VI.     Step 2: Allocating OpenAI For-Profit's Value to OpenAI Nonprofit......... 9

VII.    Step 3: Allocating OpenAI Nonprofit's Value to Musk ........................... 12

        A.      Financial Contributions ................................................................. 13

        B.      Non-Monetary Contributions ......................................................... 15

        C.      Pro Forma Cap Table ..................................................................... 17

VIII.   Calculation of OpenAI's Wrongful Gains ................................................. 21

IX.     Calculation of Microsoft's Wrongful Gains.............................................. 22

X.      Allocation Across Time Periods .................................................................. 24

XI.     Conclusion..................................................................................................... 26

C. PAUL WAZZAN, Ph.D., declares as follows pursuant to 28 U.S.C. § 1746:

## I.    OVERVIEW

1.      My name is C. Paul Wazzan.  Plaintiff Elon Musk engaged me to offer expert opinions in this case concerning the amount of wrongful gains that OpenAI and Microsoft derived from operating OpenAI as a commercial venture that are attributable to Mr. Musk's charitable contributions.  I am not offering any opinions about whether OpenAI or Microsoft is liable for Plaintiff's claims.

2.      In my opinion, the amount of wrongful gains that OpenAI derived from Mr. Musk's contributions is between **$65.5 billion** and **$109.4 billion**.  The amount of wrongful gains that Microsoft derived from Mr. Musk's contributions is between **$13.3 billion** and **$25.1 billion**.

## II.    BACKGROUND AND EXPERIENCE

3.      I received my B.A. in Economics from the University of California, Berkeley in 1989.  I received my Ph.D. in Finance from the Anderson Graduate School of Management at the University of California, Los Angeles in 1996.  I am a Managing Director with Berkeley Research Group ("BRG"), a firm that provides analysis and consulting in matters involving economics, finance, and statistics.

4.      I am also the President and CEO of Wazzan & Co. Investment LLC.  Wazzan & Co. is a venture capital firm that provides seed-level funding to technology startups in a variety of fields, including semiconductors, optical networking, bio-mechanical, bio-medical, and related technologies.

5.      Wazzan & Co. was founded in 2000.  The firm has invested a total of $40 to $50 million in 7 or 8 startups.  Wazzan & Co. has not made any new investments in the past five or six years, but still holds one remaining investment, in a company called Genefluidics.

6.      Several of Wazzan & Co.'s investments have been quite successful.  One company conducted an initial public offering in 2004.  Other companies were acquired by larger technology companies such as Intel, Silicon Storage Technology, and MagiNet.

7.      As President and CEO of Wazzan & Co., my responsibilities have included raising funds from limited partners, performing due diligence, and conducting financial modelling on

1

investments. I have participated in the company's investment decisions and invested some of my own personal funds in the company's investments. That experience has informed my understanding of what factors help a tech startup launch successfully.

8. In addition to my professional experience at Wazzan & Co., I also have academic experience teaching courses in economics and finance. I have been an Adjunct Assistant Professor of Business and Economics at California State University, Los Angeles. I have also taught option pricing classes at the University of Southern California, Marshall School of Business.

9. My research has been published in peer-reviewed economics journals and law reviews. I have published approximately 25 articles on a variety of topics related to finance and economics.

10. I have previously testified before legislative and other government bodies, including the California State Senate and State Assembly, the California Energy Commission, and the U.S. Copyright Royalty Judges at the Library of Congress.

11. I have extensive experience as an expert witness in litigation on finance and economics. I have served as an expert in over 100 cases. Courts have repeatedly found me qualified to offer expert testimony on matters relating to finance and economics. I have never been disqualified from testifying as an expert in any case.

12. In approximately eight cases, I offered expert testimony on the amount of a defendant's wrongful gains.

13. BRG is being compensated for my work in this case at the rate of $900 per hour. My compensation does not depend in any way on the opinions I give or the outcome of this litigation.

14. A copy of my CV is attached as **Exhibit A**. The information in the CV is true and correct.

III.    VENTURE CAPITAL

15. From my professional work, I have gained insights into what factors contribute to a startup venture's success.

16. The prominence and public reputation of a venture's founders or early financial backers play a very important role in a new tech venture's success. That topic has been the subject

2

of several academic studies. I reviewed that literature in forming my opinions in this case.

17. The finance literature reports that the involvement of high-profile founders or investors is important to a new technology startup's success because it reduces "information asymmetry" between the startup and prospective partners, employees, and investors. Information asymmetry is when one party to a transaction has more information than the other party.

18. The involvement of high-profile founders or investors reduces information asymmetry because, when a high-profile investor associates with a startup, that association sends a signal to others in the marketplace about the startup's legitimacy. Technology startups benefit from that signaling because it encourages investors, recruits, and business partners to engage with the startup. *See* Mojca Svetek, *Signaling in the Context of Early-Stage Equity Financing: Review and Directions*, 24 Venture Capital 71 (2022) (emphasizing that investor reputation acts as a strong signal of venture quality, reducing uncertainty and increasing the likelihood of attracting resources).

19. High-profile founders or investors can also provide know-how or strategic guidance to a new startup. That guidance is very important to a new venture's success. *See* J. Lange et al., *The Role of Business Angels in the Early-Stage Financing of Startups: A Systematic Literature Review*, 14 Admin. Scis. 1 (2024) (concluding that prominent investors add value through expertise, networks, and mentorship, amplifying these effects through their social capital).

20. A high-profile founder or investor's involvement in a startup can enhance the startup's ability to recruit talent. It can also promote the startup's ability to form relationships with other business partners. Recruiting and business relationships are both very important to a new venture's success.

21. Academic studies have shown that startups associated with top-tier investors receive significantly more interest. *See* S. Bernstein et al., *Do Startups Benefit from Their Investors' Reputation? Evidence from a Randomized Field Experiment* (Harvard Business School Working Paper No. 22-060, 2022) (finding from a randomized field experiment that startups receive "significantly more interest when information about top-tier investors is provided")

22. My own professional experience as a venture capital investor is consistent with those academic studies. Wazzan & Co.'s other principals included two deans of prominent engineering

3

schools. When they approved an investment from a technical perspective, their decision sent a clear signal to investors that the technology was expected to be viable. Their involvement played a critical role in our ability to raise funds.

23. The timing of a founder or investor's contributions is important to how valuable the contributions are to the new venture. All else equal, the earliest contributions tend to be the most important because they normally have the greatest impact on the company's success. Consistent with that phenomenon, early investors typically demand the highest rates of return on their investments. Those early investors demand the highest returns because they undertake greater risk at a time when those contributions are most critical to the new venture.

24. In Silicon Valley, founders and early investors in tech startups sometimes earn very large rates of returns. For example, Jeff Bezos started Amazon in his garage with $10,000. Today he is worth over $200 billion.

## IV. OVERVIEW OF METHODOLOGY

25. I was engaged to provide an opinion on the amount of wrongful gains that OpenAI and Microsoft derived from Mr. Musk's contributions.

26. Disgorgement of wrongful gains differs from other types of damages remedies because the focus is on what the defendants wrongfully gained, rather than what the plaintiff lost.

27. To calculate OpenAI's wrongful gains, I measured the increase in value of OpenAI's for-profit entity. I then determined what portion of that value was attributable to Mr. Musk's contributions.

28. To conduct that analysis, I used a three-step methodology:

- At Step 1, I determined the valuation of the OpenAI for-profit.
- At Step 2, I determined the portion of that value attributable to OpenAI nonprofit.
- At Step 3, I determined the portion of the nonprofit's value attributable to Mr. Musk's contributions.

29. My methodology includes separate steps for analyzing the nonprofit's share of the for-profit and Mr. Musk's share of the nonprofit because Mr. Musk contributed value to the nonprofit, and the nonprofit contributed value to the for-profit. Other investors and employees

4

contributed value to the for-profit, and other founders and donors contributed value to the nonprofit. My analysis separates out all those other factors to determine what portion of the for-profit's value is attributable to Mr. Musk's share.

30. My valuation method relies on accepted principles of finance and economics while tailoring those accepted principles to OpenAI's relatively unique structure.

## V. STEP 1: VALUATION OF OPENAI FOR-PROFIT

31. The first step of my three-step analysis is to determine the value of the OpenAI for-profit. I conducted that valuation analysis as of October 2025, the month the OpenAI for-profit converted into a public benefit corporation. My opinion is that, as of that date, the OpenAI for-profit was worth $500 billion.

32. I took several approaches to determine the value of the OpenAI for-profit as of October 2025, but my principal one was to analyze the terms of the transaction by which OpenAI and Microsoft converted the OpenAI for-profit into a public benefit corporation, or "PBC."

33. Before that transaction, the OpenAI for-profit was an LLC in which investors like Microsoft held "capped profit" stakes. In the PBC transaction, OpenAI eliminated those profit caps, and investors like Microsoft received ordinary equity stakes in the for-profit entity instead. The OpenAI nonprofit also received an ordinary equity stake in the for-profit.

34. OpenAI for-profit's value was relevant to the PBC conversion because OpenAI and Microsoft had to agree on how much the for-profit was worth to determine how many shares the nonprofit, Microsoft, and other investors would receive in the new PBC entity. I therefore reviewed documents that OpenAI produced from the transaction in conducting my valuation analysis.

WRITTEN DIRECT TESTIMONY OF C. PAUL WAZZAN, PH.D.
CASE NO.: 4:24-CV-04722-YGR

35.    **Plaintiff's Exhibit 286** contains a cap table for the PBC conversion that was produced by OpenAI in this litigation.  The exhibit includes the following chart:

| | |
|---|---|
| WholeCo Equity Value | $500,000,000,000 |
| Warrant Present Value | $22,400,000,000 |
| Warrant Present Value % of WholeCo | 4.48% |
| Outstanding Shares (Attributable to Non-Warrant Equity Holders \| Excl. Nova) | 1,034,506,896 |
| Warrant NPV Equivalent Dilutive Shares | 48,519,586 |
| Implied Outstanding Shares (Including Warrant NPV Equivalent Dilutive Shares \| Excl. Nova) | 1,083,026,482 |
| Per Unit Price (Adj. for Warrants) | $461.67 |

36.    That chart reflects that OpenAI and Microsoft assigned an overall equity value to the OpenAI for-profit of $500 billion.  I consider this valuation particularly reliable because OpenAI and Microsoft spent many months negotiating the terms of the PBC conversion and had opposite economic interests in the transaction.  Finance and economics professionals ordinarily consider this sort of transaction data highly relevant in conducting a valuation.

37.    In addition to the $500 billion valuation in the PBC conversion, I also looked at other data sources to confirm my estimate.

38.    *First*, I considered a recent OpenAI employee tender offer.  In September 2025, the OpenAI for-profit allowed current and former employees to sell their shares in the company to outside investors, chiefly SoftBank.  OpenAI, Softbank, and other purchasers had to agree on that value to determine the price at which the employee shares would be tendered.

39.    According to publicly reported terms of the tender offer, the parties agreed on a $500 billion valuation.  Both Altman and Brockman confirmed those terms at their depositions.  Altman Dep. 344:5-6; Brockman Dep. 301:17-25.  I consider the terms of the tender offer to be a reliable indicator of the OpenAI for-profit's value because the tender offer was a market transaction negotiated by sophisticated parties.  Finance and economics professionals would ordinarily consider this sort of transaction data relevant in conducting a valuation.

40.    *Second*, I considered over-the-counter trading records.  Although OpenAI is not listed on any public market (yet), its shares can be bought and sold privately in over-the-counter transactions.  Two information sources that provide data about those over-the-counter trades are

6

Notice, Inc., and Forge Global.

41.     **Plaintiff's Exhibit 370** is a screen capture from the Notice, Inc., website:



42.     The Notice screen capture shows the price of OpenAI for-profit shares from March 2023 to October 2025, based on over-the-counter trades.  The chart shows that OpenAI for-profit's share price has increased dramatically since 2023.  As of late October 2025, OpenAI for-profit's share price was approximately $500.  Multiplying by the number of shares, that share price corresponds to a total value of over $500 billion.

43.     Over-the-counter data from Forge Global is similar to data from Notice.  I consider both Notice and Forge to be reputable and relevant data sources for estimating OpenAI for-profit's value because they reflect data from market transactions.  Finance and economics professionals would ordinarily consider this sort of transaction data relevant in conducting a valuation.

44.     ***Third***, I considered valuations of OpenAI from other sources.  **Plaintiff's Exhibit 372** is a chart I created that summarizes the other sources I examined:

**Summary of Third Party Valuations and Implied Valuations**

| Source | Date | Valuation ($ billions) |
|---|---|---|
| **Project Watershed Valuations** | | |
| Goldman Sachs | 8/1/2024 | $159.0 |
| M. Klein & Company | 8/1/2024 | 170.0 |
| Morgan Stanley | 9/1/2024 | 123.0 - 159.0 |
| M. Klein & Company | 2/13/2025 | 308.0 |
| Goldman Sachs | 3/1/2025 | 353.0 |
| Morgan Stanley | 3/1/2025 | 122.0 - 177.0 |
| **Investment Term Sheets** | | |
| Thrive Capital | 8/8/2024 | 150.0 |
| Soft Bank | 1/20/2025 | 260.0 |
| **Industry and Media Reports** | | |
| Unknown investor | 1/13/2023 | 4.0 |
| Microsoft Investment | 1/23/2023 | 29.0 |
| Venture Capital Investment | 4/28/2023 | 27.0 - 29.0 |
| Thrive Capital Tender Offer | 2/16/2024 | 80.0 - 86.0 |
| Thrive Capital Led Funding Round | 10/2/2024 | 157.0 |
| SoftBank Tender Offer | 11/26/2024 | 157.0 |
| SoftBank Led Funding Round | 3/31/2025 | 300.0 |
| SoftBank Tender Offer | 10/3/2025 | 500.0 |

45.     This chart reflects valuations from several different categories of sources, including Project Watershed valuations, investment term sheets, and industry and media reports.  Finance and economics professionals would ordinarily consider those sorts of sources relevant in conducting a valuation.  Those sources show that the value of OpenAI for-profit increased rapidly over time and reached $500 billion by late 2025.

46.     ***Fourth***, I conducted a discounted cash flow ("DCF") analysis.  A DCF analysis is an estimate of a company's value based on projected earnings.  It is a standard financial method used to value companies.  My discounted cash flow analysis determined that OpenAI for-profit's value was about $506 billion.

47.     Considering all those different data points together, I concluded that the value of the OpenAI for-profit as of October 2025 was $500 billion.  I rely on that October 2025 valuation as the basis for my opinions in this case.

8

48.     The value of the OpenAI for-profit has continued to climb since October 2025.  For example, Greg Brockman testified at trial that OpenAI recently raised additional funds at a post-money valuation of $840 billion.  5/4 Tr. 1124:11-13.  According to public reports, OpenAI is now planning an initial public offering that would value the company at an even larger number.  Those higher valuations imply that the amount of wrongful gains that OpenAI has derived from Musk's contributions is substantially greater than what I estimated as of October 2025.

## VI.     STEP 2: ALLOCATING OPENAI FOR-PROFIT'S VALUE TO OPENAI NONPROFIT

49.     At Step 2 of my analysis, I estimated the portion of the OpenAI for-profit's value that is attributable to OpenAI nonprofit.

50.     The OpenAI nonprofit, to which Mr. Musk made his contributions, holds a minority stake in the for-profit.  Other entities also hold interests in the for-profit, including Microsoft and other investors, as well as employees who receive equity compensation.  Employees hold those equity shares in the for-profit through an employee vehicle known as Aestas.

51.     To estimate the portion of OpenAI for-profit's value that was attributable to Mr. Musk's contributions to the nonprofit, I separated out the nonprofit's contributions to the for-profit from the contributions of other stakeholders.  Investors like Microsoft contributed value to the for-profit.  OpenAI's employees contributed value to the for-profit.  My analysis therefore separates out those other contributions from the share attributable to the nonprofit.

52.     My opinion is that the portion of OpenAI for-profit's value that is attributable to OpenAI nonprofit, as opposed to investors or employees, is between 26.2% and 29.2%.

53.     In forming that opinion, I relied on the cap table that OpenAI created in connection with the PBC conversion in October 2025.

54.    **Plaintiff's Exhibit 286** contains the following cap table for the PBC:

## OpenAI Summary Post-Recapitalization Cap Table

| Holder | Shares | Outstanding % (Pre-Warrants) | Diluted For Warrant PV % | Fully Diluted % (for Warrant PV, EV-Sponsored Pool and EIP) |
|---|---|---|---|---|
| NFP (incl. NFP FCLP) | 267,272,727 | 25.8% | 24.7% | 22.2% |
| NFP Warrant Shares | 135,591,509 | | 4.5% | 4.0% |
| MSFT (ex-GG/Sakura) | 275,757,574 | 26.6% | 25.5% | 22.9% |
| FCLP (ex-NFP FCLP) | 25,454,542 | 2.5% | 2.3% | 2.1% |
| EV Outstanding | 273,729,340 | 26.4% | 25.3% | 22.7% |
| EV Sponsored Pool | 6,270,660 | | | 0.5% |
| Golden Gate | | | Redacted | |
| Sakura | | | | |
| M&A (Icon + Nova) | | | | |
| EIP (ex-EV Sponsored Pool) | 115,691,024 | | | 9.6% |
| **Total** | **1,292,501,755** | **100.0%** | **100.0%** | **100.0%** |
| *Memo: Total Shares Outstanding* | *1,034,948,562* | | | |

55.    This cap table shows the percentage that each shareholder owns in the PBC for-profit. I consider this document a reliable indicator of the parties' respective contributions to the for-profit because the PBC conversion was a negotiated transaction between two sophisticated parties, OpenAI and Microsoft.  The resulting equity stakes are a reasonable estimate of what OpenAI and Microsoft determined to be their respective contributions to the for-profit's value.

56.    The leftmost column is labeled "Holder," and the first row is labeled "NFP (incl. NFP FCLP)."  That row reflects the nonprofit's stake in the for-profit, including both its residual stake and its stake as a first close limited partner.

57.    The next row is "NFP Warrant Shares."  As part of the PBC conversion, in addition to its traditional equity stake, the nonprofit also received warrants in the for-profit, which are similar to stock options.  This row reflects the value of those warrants.

58.    The next row is "MSFT (ex-GG/Sakura)."  That row reflects Microsoft's share in the for-profit, excluding additional shares Microsoft acquired in the more recent Golden Gate and Sakura investment rounds.

59.    The next row is "FCLP (ex-NFP FCLP)."  That row reflects the share held by First Close Limited Partners, who were early investors in OpenAI back in 2019.

60.    The next row is "EV Outstanding."  That row corresponds to Aestas, the employee vehicle for OpenAI employees.

61.     There are three rows for "Golden Gate," "Sakura," and "M&A (Icon + Nova)." These represent other more recent investors.

62.     Finally, there are two other rows for "EV Sponsored Pool" and "EIP (ex-EV Sponsored Pool)." Those rows reflect potential future grants to OpenAI employees through the sponsored pool or incentive plan that were not yet issued as of the date of this cap table.

63.     The third column in the cap table is labeled "Outstanding % (Pre-Warrants)." That column shows the amount each holder owns before accounting for the nonprofit's warrants.

64.     The fourth column is labeled "Diluted For Warrant PV %." That column shows the amount that each holder owns after accounting for the nonprofit's warrants.

65.     The last column is labeled "Fully Diluted % (for Warrant PV, EV-Sponsored Pool and EIP)." That column shows the amount each holder owns after accounting for the nonprofit's warrants and future employee grants through the sponsored pool or incentive plan.

66.     Focusing on the "Diluted For Warrant PV %" column, the percentage of value attributed to the nonprofit is 24.7% for the nonprofit's shares plus 4.5% for the warrants. The total is 29.2%.

67.     Focusing on the "Fully Diluted % (for Warrant PV, EV Sponsored Pool and EIP)" column, the percentage of value attributed to the nonprofit is 22.2% for the nonprofit's shares plus 4.0% for the warrants. The total is 26.2%.

68.     Based on the foregoing figures, I conclude that the portion of the for-profit's value attributable to the nonprofit is between 26.2% and 29.2%. As explained above, the higher figure is based on the current shareholdings and warrant holdings. The lower figure accounts for additional employee grants that have not been funded yet. In my opinion, both numbers are reasonable estimates for the share of the for-profit's value that is attributable to the nonprofit.

69.     According to the Microsoft row, the portion of the for-profit's value attributable to Microsoft (excluding its Golden Gate and Sakura shares) is between 22.9% and 25.5%.

70.     According to the EV Outstanding row, the portion of the for-profit's value attributable to employees (through the Aestas employee vehicle) is between and 22.7% and 25.3%.

71. The following graphic shows the results of Step 2 of my analysis:



## VII. STEP 3: ALLOCATING OPENAI NONPROFIT'S VALUE TO MUSK

72. For the third and final step of my methodology, I estimated the portion of OpenAI nonprofit's value that is attributable to Mr. Musk's contributions.

73. Mr. Musk made several types of contributions to the OpenAI nonprofit. They included monetary contributions such as quarterly grants and payments to cover OpenAI's rent and related expenses at the Pioneer Building. They also included non-monetary contributions in the form of prestige, guidance, recruiting, and business connections.

74. Apart from Mr. Musk, other people also contributed value to the nonprofit. They included Musk's co-founders, Sam Altman, Greg Brockman, and Ilya Sutskever. They included other philanthropic donors. And they included early OpenAI employees who worked for the nonprofit before being transferred to the for-profit when it launched in 2019. Because my assignment was to estimate the portion of OpenAI for-profit's value attributable to Mr. Musk's contributions, I had to separate out the portion of the nonprofit's value attributable to Mr. Musk from the portion attributable to those other contributors.

75. My opinion is that the portion of OpenAI nonprofit's value that is attributable to Mr. Musk's contributions is between 50% and 75%.

76. Importantly, my opinion does not mean that Mr. Musk is responsible for 50% to 75% of OpenAI's overall $500 billion valuation. As explained above, OpenAI nonprofit's share of the

12

for-profit is only 26% to 29%. So Mr. Musk's portion is only 50% to 75% of that 26% to 29%. That works out to about 13% to 22% of the $500 billion total. The remaining 78% to 87% represents both the other stakeholders in the nonprofit (other founders, donors, and early employees) as well as other stakeholders in the for-profit (employees and investors).

77. I considered three different factors when arriving at my estimate of 50% to 75%. Those three factors were the following:

- financial contributions
- non-monetary contributions
- a pro forma cap table

I discuss each factor below.

**A.    Financial Contributions**

78. I obtained information about Mr. Musk's financial contributions to OpenAI by reviewing OpenAI's Form 990 filings with the Internal Revenue Service.

79. **Plaintiff's Exhibits 51 to 58** are OpenAI's Form 990s for the years 2016 to 2023. Schedule B in each filing reports the financial contributions that OpenAI received that year.

80. **Plaintiff's Exhibit 51** lists the following contributions for 2016:

| (a) Number | (b) Name, address, and ZIP + 4 | (c) Total contributions |
|---|---|---|
| 1 | Elon Musk granted via YC ORG<br>335 Pioneer Way<br>Mountain View, CA 94041 | $ 10,000,000. |

| (a) Number | (b) Name, address, and ZIP + 4 | (c) Total contributions |
|---|---|---|
| 2 | Sam Altman<br>3180 18th St., Suite 100<br>San Francisco, CA 94110 | $ 3,784,637. |

81. As this exhibit shows, Mr. Musk contributed $10 million that was received by OpenAI in 2016, while Altman contributed about $3.8 million.

82.    **Plaintiff's Exhibit 52** lists the following contributions for 2017:

| (a) Number | (b) Name, address, and ZIP + 4 | (c) Total contributions |
|---|---|---|
| 1 | Aphorism Foundation<br>314 Lytton Avenue #200<br>Palo Alto, CA 94301 | $ 5,000,000. |
| 2 | Elon Musk granted via Fidelity<br>200 Seaport Blvd NCW4B<br>Boston, MA 02210 | $ 1,140,000. |
| 3 | Good Ventures Foundation<br>2440 West El Camino Real #300<br>Mountain View, CA 94040 | $ 10,000,000. |
| 4 | Elon Musk Via Vanguard Charitable<br>2670 Warwick Avenue<br>Warwick, RI 02889 | $ 700,000. |
| 5 | Musk Foundation via YC_ORG<br>335 Pioneer Way<br>Mountain View, CA 94041 | $ 16,028,500. |
| 6 | Elon Musk<br>PO Box 10195 Dept 863<br>Palo Alto, CA 94303 | $ 248,295. |
| 7 | Donor's Trust DAF<br>1800 Diagonal Street Suite 280<br>Alexandria, VA 22314 | $ 100,000. |

83.    As this exhibit shows, Mr. Musk contributed about $18.1 million that was received by OpenAI in 2017, while other donors contributed about $15.1 million.

84.    Based on the foregoing schedules, the percentage of OpenAI's funding that came from Mr. Musk during the first two years was about 60%.

85.    After Mr. Musk resigned from the OpenAI board in February 2018, he continued making monetary contributions in 2018, 2019, and 2020, totaling approximately $10 million.

14

86.    In total, according to OpenAI's Form 990s, Mr. Musk contributed approximately $38 million to OpenAI.  Sam Altman contributed about $3.8 million.  Greg Brockman contributed zero dollars.

87.    The total amount of monetary contributions to OpenAI reflected on the Form 990s from 2016 to 2023 that came from sources other than Mr. Musk was about $100 million.

88.    Based on those figures, the overall portion of OpenAI's charitable funding that came from Mr. Musk over the entire history of the nonprofit was about 28%.

89.    As between the 60% of funding that Mr. Musk provided to OpenAI over the first two years, and the 28% of funding that Mr. Musk provided over the entire history of the charity, in my view the 60% figure is the more relevant one in gauging Mr. Musk's share of contributions.

90.    The first two years of donations represented OpenAI's initial seed funding that got the charity off the ground.  In venture capital, initial seed funding is typically the most critical funding for a startup.  The same is true for a new nonprofit like OpenAI.

91.    Accordingly, in my opinion, based on financial contributions, the share of OpenAI nonprofit's value that should be attributed to Mr. Musk is 60%.

**B.    Non-Monetary Contributions**

92.    The next factor I considered was Mr. Musk's share of non-monetary contributions to OpenAI.  To gauge the importance of Mr. Musk's non-monetary contributions, I reviewed relevant documentary evidence and deposition testimony from the record in this case as well as other public information.  I then assessed the significance of that evidence based on my expertise regarding what contributions are important to a new venture's success, drawing from both my review of the finance literature and my experience as a venture capital investor.

93.    As explained earlier, the finance literature reports that high-profile, prestigious investors are critical to the success of a new venture.  This is because the involvement of such investors has a signaling effect, communicating to other investors, employees, and business partners that the new venture is promising and likely to succeed.

94.    Based on a review of public information relating to Mr. Musk's background and business successes, I found that Mr. Musk was extremely well known and highly regarded in the

15

tech industry at the time he co-founded OpenAI in 2015. By that year, Mr. Musk had already achieved huge successes with startups PayPal, SpaceX, Tesla, and Solar City. He was also recognized in prominent publications including Time, Forbes, and the New Yorker. By contrast, Altman and Brockman had no similar track record of success or public profile in 2015.

95. Mr. Musk's prestige and high profile were a major contribution to OpenAI. The evidentiary record confirms the importance of that contribution. For example, in a June 24, 2015 email, Sam Altman wrote: "Will you be involved somehow in addition to just governance? . . . Even if you can't really spend time on it but can be publicly supportive, that would still probably be really helpful for recruiting." PX005. Mr. Altman thus recognized that Mr. Musk's mere involvement in the project would have substantial non-monetary benefits for OpenAI.

96. Similarly, in an October 18, 2015 email, Mr. Altman wrote: "Can we call you an 'advisor' but leave unspecified what you'll do in detail and figure it out as we go?" PX007. That email similarly recognized that Mr. Musk's mere public affiliation with the new venture would be very beneficial to the company.

97. Mr. Musk also made substantial non-monetary contributions by providing strategic guidance and sharing his know-how about how to build and run a new venture. Mr. Musk had already achieved huge successes with his other tech startups, PayPal, SpaceX, Tesla, and Solar City. Those experiences gave him knowledge and expertise that none of his co-founders could match.

98. The evidentiary record confirms those contributions too. On February 18, 2016, for example, Ilya Sutskever wrote to Sam Teller, Elon Musk, and Greg Brockman: "Greg and I think it will be useful for OpenAI's long term success if the two of us had a 30 minute meeting with Elon every two weeks. Elon has built incredible organizations before, and the more of his lessons and experience could be applied to OpenAI, the more effective we will be." DX521 at 3. Mr. Sutskever testified that Mr. Musk "ma[de] [him] better at [his] job" and "ma[de] other people better at their jobs." 5/11 Tr. 1861:16-25 (Sutskever).

99. In a January 1, 2018, email, Mr. Sutskever stated that he considered Mr. Musk to be "the most overwhelmingly competent person in the world." PX098. Greg Brockman sent a similar email the same day, stating that "in every meeting with you I continue to learn, grow, and see the

16

world in a new way." PX099; *see also* 4/28 Tr. 356:16-357:5 (Musk) (describing impact of regular meetings); 5/4 Tr. 1052:15-1054:15 (Brockman) (similar).

100.    Mr. Musk contributed to OpenAI's recruiting. He was a critical factor in convincing Mr. Sutskever to leave Google to join OpenAI. 5/11 Tr. 1861:7-15 (Sutskever) (describing Musk's role); 4/28 Tr. 358:1-22 (Musk) (same). Mr. Sutskever testified that he was "excited about working with [Mr. Musk]." 5/11 Tr. 1859:25-1860:4 (Sutskever). Mr. Musk also played a major role in recruiting Diederik "Durk" Kingma, another founding member of the research team. In his email accepting the job offer, Mr. Kingma specifically noted that "Elon's involvement is awesome." PX066; *see also* 4/28 Tr. 358:23-359:11 (Musk) (describing role in recruiting other engineers); 5/4 Tr. 1048:25-1052:11 (Brockman) (similar).

101.    Finally, Mr. Musk contributed to OpenAI by using his industry connections to open doors with business partners. Mr. Musk's personal involvement and intervention with Microsoft CEO Satya Nadella helped OpenAI obtain access to compute from Microsoft to meet OpenAI's computing needs. 4/28 Tr. 359:12-360:2 (Musk). Mr. Musk also used his personal connections to NVIDIA founder Jensen Huang to secure a first-of-its-kind DGX supercomputer for OpenAI. PX070; PX388; 4/28 Tr. 361:24-363:24 (Musk).

102.    Based on my professional venture capital experience and review of the finance literature, my opinion is that Mr. Musk's prestige, strategic guidance, recruiting, and business contacts constituted a very significant non-monetary contribution to OpenAI's success. I saw no evidence in the record indicating that any of Mr. Musk's co-founders or other OpenAI employees made similarly significant non-monetary contributions. Based on my judgment and experience, Mr. Musk's non-monetary contributions are consistent with a 50% to 75% share of the nonprofit's value.

C.    **Pro Forma Cap Table**

103.    The third factor I considered was a pro forma cap table that Brockman and Sutskever proposed to Mr. Musk in 2017. This proposal sheds important light on the parties' own assessment of their relative contributions to OpenAI.

104.    In the summer of 2017, the parties were discussing a potential for-profit entity. Brockman and Sutskever proposed a pro forma cap table showing how much each founder would

17

own in the proposed for-profit entity.

105.    **Plaintiff's Exhibit 153** is a September 11, 2017 email from Jared Birchall attaching a copy of the cap table that Brockman and Sutskever had proposed to Mr. Musk:

From:        Jared Birchall [jared@excession.com]
Sent:        9/11/2017 11:25:40 PM
To:          Elon Musk [erm@spacex.com]
Subject:     OpenAI Cap Table
Attachments: OpenAI Cap Table.xlsx

I've attached a more user friendly version of the cap table that Ilya and Greg are proposing.

| Shareholder | Initial Shares | % |
|---|---|---|
| *Elon Investment* | 100,000,000 | 51.20% |
| *Sam Investment* | 6,500,000 | 3.33% |
| Sam grant | 15,000,000 | 7.68% |
| *Ilya Investment* | 6,500,000 | 3.33% |
| Ilya grant | 15,000,000 | 7.68% |
| *Greg Investment* | 6,500,000 | 3.33% |
| Greg grant | 15,000,000 | 7.68% |
| John grant | 3,906,250 | 2.00% |
| Woj grant | 3,906,250 | 2.00% |
| Employees | 14,589,843 | 7.47% |
| Pool | 8,410,156 | 4.31% |
| Total | 195,312,499 | 100.00% |

106.    **Plaintiff's Exhibit 156** is an email exchange from the following day in which Mr. Sutskever reports slightly updated proposed figures:

> On Sep 12, 2017, at 11:44 PM, Ilya Sutskever ▮▮▮▮▮▮▮▮▮ wrote:
>
> Hi Elon,
>
> To summarize our understanding of the current state:
>
> On equity:
>
> Greg: 10M grant/10M investment
> Sam: 10M grant/10M investment
> Ilya: 12M grant/2.5M investment + 5.5M loan from Greg securitized by Ilya's YC vested stock, from his work at OpenAI

107.    Mr. Musk responds to that proposal: "Sounds good."  PX156.

108.    **Plaintiff's Exhibit 373** is a chart I created that sets forth the proposed equity stakes reflected in the preceding two exhibits:

| Description | As Agreed | | Scenario 1 | |
| --- | --- | --- | --- | --- |
| | Shares | Percent | Shares | Percent |
| Musk Investment | 100,000,000 | 52.4% | 100,000,000 | 78.1% |
| Musk Grant | - | 0.0% | - | 0.0% |
| Altman Investment | 10,000,000 | 5.2% | 10,000,000 | 7.8% |
| Altman Grant | 10,000,000 | 5.2% | - | 0.0% |
| Sutskever Investment | 8,000,000 | 4.2% | 8,000,000 | 6.3% |
| Sutskever Grant | 12,000,000 | 6.3% | - | 0.0% |
| Brockman Investment | 10,000,000 | 5.2% | 10,000,000 | 7.8% |
| Brockman Grant | 10,000,000 | 5.2% | - | 0.0% |
| Schulman Grant | 3,906,250 | 2.0% | - | 0.0% |
| Zaremba Grant | 3,906,250 | 2.0% | - | 0.0% |
| Employees | 14,589,843 | 7.6% | - | 0.0% |
| Pools | 8,410,156 | 4.4% | - | 0.0% |
| Total | 190,812,499 | 100.0% | 128,000,000 | 100.0% |
| *Musk Share* | *100,000,000* | *52.4%* | *100,000,000* | *78.1%* |
| *Altman Share* | *20,000,000* | *10.5%* | *10,000,000* | *7.8%* |
| *Sutskever Share* | *20,000,000* | *10.5%* | *8,000,000* | *6.3%* |
| *Brockman Share* | *20,000,000* | *10.5%* | *10,000,000* | *7.8%* |

109.    As reflected above, in the pro forma cap table, Mr. Musk's share of the for-profit would be 52.4%.  By contrast, Altman, Brockman, and Sutskever would each have 10.5%, partly on account of investments and partly on account of equity grants.  The remaining shares are attributed to employees or employee pools.  My chart above also includes a "Scenario 1," an alternative comparison that focuses only on the financial investments and not on the equity grants.  Under that scenario, Mr. Musk has a 78.1% share.

110.    I consider this pro forma cap table relevant to the founders' contributions to the OpenAI nonprofit because the founders would have considered their assessments of their relative contributions in determining the proposed ownership stakes.

111.    The founders did not end up forming the for-profit entity described in the pro forma cap table.  Instead, discussions fell apart after Brockman and Sutskever objected to Mr. Musk's demand for control rights.  PX157.

112.    Even though the transaction was not consummated, I still consider the pro forma cap table relevant to assessing the founders' relative contributions.  The pro forma cap table was proposed by Brockman and Sutskever, not Mr. Musk.  The proposal is therefore evidence of the

19

value that Brockman and Sutskever ascribed to Mr. Musk's contributions. Brockman and Sutskever were on the opposite side of the negotiating table from Mr. Musk in the proposed transaction and had no incentive to inflate Mr. Musk's share of the for-profit. The fact that Brockman and Sutskever ascribed a 52.4% stake to Mr. Musk is therefore relevant evidence of Musk's contributions. Finally, the contemporaneous documents indicate that the share percentages I used in my analysis were not the source of disagreement between the parties that scuttled the transaction. PX157.

113.    The following graphic summarizes the results of my three approaches:

## Musk's Contributions

| 3 Ways to Measure: | |
|---|---|
| Monetary Contributions | 60% |
| Non-Monetary Contributions | 50%-75% |
| Pro Forma Cap Table | 52.4%-78.1% |
| Conclusion | 50%-75% |

114.    Based on the three factors I considered, I conclude that the portion of OpenAI nonprofit's value that is attributable to Mr. Musk is in the range of 50% to 75%.

115.    The following graphic shows the results of this step:



20

## VIII.  CALCULATION OF OPENAI'S WRONGFUL GAINS

116.    I used the results of my three-step analysis above to estimate OpenAI's wrongful gains attributable to Mr. Musk's contributions.  Specifically, I estimated those wrongful gains as the product of three numbers: (1) the value of OpenAI for-profit; times (2) the portion of OpenAI for-profit's value attributable to the OpenAI nonprofit; times (3) the portion of OpenAI nonprofit's value attributable to Mr. Musk's contributions.

117.    Based on my three-step analysis above, the three components are as follows:

- OpenAI for-profit valuation = $500 billion
- OpenAI nonprofit's share of for-profit value = 26.2% to 29.2%
- Mr. Musk's share of nonprofit value = 50% to 75%

118.    Multiplying those three components together results in OpenAI wrongful gains attributable to Mr. Musk's contributions of **$65.5 billion to $109.4 billion**.

119.    **Plaintiff's Exhibit 378** is a chart I created showing the foregoing calculation:

### OpenAI's Wrongful Gains Based on PBC Restructure Announcement

| Description | | Warrants-Only Dilution | | Warrants, EV-Sponsored Pool and EIP Dilution | |
|---|---|---|---|---|---|
| | | Estimate 1 | Estimate 2 | Estimate 3 | Estimate 4 |
| Valuation of OpenAI For-Profit | [a] | $500.00 | $500.00 | $500.00 | $500.00 |
| OpenAI Nonprofit Share (%) | [b] | 29.2% | 29.2% | 26.2% | 26.2% |
| OpenAI Nonprofit Economic Interest ($) in OpenAI For-Profit | [c] = [a] × [b] | 145.90 | 145.90 | 131.00 | 131.00 |
| Mr. Musk's Economic Interest (%) in OpenAI Nonprofit | [d] | 50.0% | 75.0% | 50.0% | 75.0% |
| Mr. Musk's Economic Interest ($) in OpenAI For-Profit | [e] = [c] × [d] | 72.95 | 109.43 | 65.50 | 98.25 |

120.    My three-step analysis is flexible as to the three inputs that are used in the calculation.  For example, if the Court determines that Mr. Musk's share of contributions to the OpenAI nonprofit is something different from the 50% to 75% share that I estimated, the Court could still use my three-step approach to translate that percentage into an amount of wrongful gains attributable to Mr. Musk's contributions.  The Court would simply use its own number rather than my 50% to 75% estimate at the third step of the formula.

121.     My range of $65.5 billion to $109.4 billion represents the portion of the OpenAI *for-profit's* value that is attributable to Mr. Musk's contributions.  I express no opinion on whether those wrongful gains should be disgorged from the OpenAI for-profit or from the OpenAI nonprofit.  I also express no opinion on which person or entity those wrongful gains should be paid to.  My analysis of the amount of OpenAI's wrongful gains derived from Mr. Musk's contributions does not depend in any way on what person or entity those gains are transferred to.

**IX.     CALCULATION OF MICROSOFT'S WRONGFUL GAINS**

122.     I also prepared an estimate of Microsoft's wrongful gains attributable to Mr. Musk's contributions.

123.     To determine Microsoft's wrongful gains attributable to Mr. Musk's contributions, I used a three-step method similar to the one I used for OpenAI.  For Microsoft, however, the starting point for the analysis was the value of *Microsoft's investment* in the OpenAI for-profit, rather than the entire value of the OpenAI for-profit.

124.     To calculate the value of Microsoft's investment, I multiplied the $500 billion valuation of OpenAI for-profit by Microsoft's ownership share in the for-profit.  I determined that ownership stake by consulting **Plaintiff's Exhibit 286**, the PBC cap table:

## OpenAI Summary Post-Recapitalization Cap Table

| Holder | Shares | Outstanding % (Pre-Warrants) | Diluted For Warrant PV % | Fully Diluted % (for Warrant PV, EV-Sponsored Pool and EIP) |
|---|---|---|---|---|
| NFP (incl. NFP FCLP) | 267,272,727 | 25.8% | 24.7% | 22.2% |
| NFP Warrant Shares | 135,591,509 | | 4.5% | 4.0% |
| MSFT (ex-GG/Sakura) | 275,757,574 | 26.6% | 25.5% | 22.9% |
| FCLP (ex-NFP FCLP) | 25,454,542 | 2.5% | 2.3% | 2.1% |
| EV Outstanding | 273,729,340 | 26.4% | 25.3% | 22.7% |
| EV Sponsored Pool | 6,270,660 | | | 0.5% |
| Golden Gate | | | | |
| Sakura | | Redacted | | |
| M&A (Icon + Nova) | | | | |
| EIP (ex-EV Sponsored Pool) | 115,691,024 | | | 9.6% |
| **Total** | **1,292,501,755** | **100.0%** | **100.0%** | **100.0%** |
| Memo: Total Shares Outstanding | 1,034,948,562 | | | |

125.     The PBC cap table shows that Microsoft's ownership stake is 22.9% to 25.5%, depending on whether one includes the two additional employee pools for future grants to employees (EV Sponsored Pool and EIP).

126. Next, I deducted the $13 billion that Microsoft paid for its investments in OpenAI. This step yields the value of Microsoft's investment in the OpenAI for-profit, net of the cost of obtaining that investment.

127. Finally, I determined the portion of Microsoft's wrongful gains that is attributable to Mr. Musk's contributions. To determine that portion, I applied the same two factors I used above when computing OpenAI's wrongful gains: OpenAI nonprofit's share of the for-profit's value, and Mr. Musk's share of the nonprofit's value. These steps are the same as Steps 2 and 3 in my OpenAI analysis.

128. **Plaintiff's Exhibit 379** is a chart I created that shows the results of these calculations:

### Microsoft's Wrongful Gains Based on PBC Restructure Announcement

| Description | | Warrants-Only Dilution | | Warrants, EV-Sponsored Pool and EIP Dilution | |
|---|---|---|---|---|---|
| | | Estimate 1 | Estimate 2 | Estimate 3 | Estimate 4 |
| Valuation of OpenAI For-Profit | [a] | $500.00 | $500.00 | $500.00 | $500.00 |
| Microsoft's Share (%) | [b] | 25.5% | 25.5% | 22.9% | 22.9% |
| Microsoft's Economic Interest ($) in OpenAI For-Profit | [c] = [a] × [b] | 127.50 | 127.50 | 114.50 | 114.50 |
| Microsoft Investments | | | | | |
|   Microsoft Tranche I | [d] | 1.00 | 1.00 | 1.00 | 1.00 |
|   Microsoft Tranche II | [e] | 2.00 | 2.00 | 2.00 | 2.00 |
|   Microsoft Tranche III | [f] | 10.00 | 10.00 | 10.00 | 10.00 |
| Total | [g] = sum([d]:[f]) | 13.00 | 13.00 | 13.00 | 13.00 |
| Microsoft's Economic Interest ($) in OpenAI For-Profit, Net of Capital Contributions | [h] = [c] - [g] | 114.50 | 114.50 | 101.50 | 101.50 |
| OpenAI Nonprofit Share (%) | [i] | 29.2% | 29.2% | 26.2% | 26.2% |
| Mr. Musk's Economic Interest (%) in OpenAI Nonprofit | [j] | 50.0% | 75.0% | 50.0% | 75.0% |
| Mr. Musk's Economic Interest ($) in OpenAI For-Profit | [k] = [h] × [i] × [j] | 16.71 | 25.06 | 13.30 | 19.94 |

129. Based on the calculations reflected in this chart, I estimated Microsoft's wrongful gains attributable to Mr. Musk's contributions to be between **$13.3 billion** and **$25.1 billion**.

130. The foregoing wrongful gains include only the gains that Microsoft reaped from its investments in OpenAI. Microsoft also derived gains from its commercial relationship with OpenAI by incorporating OpenAI technology into its products. Those commercial gains are not included in

my analysis above. Therefore, my wrongful gains calculations for Microsoft should be considered conservative estimates.

## X. ALLOCATION ACROSS TIME PERIODS

131. Finally, I conducted an analysis of the different time periods during which OpenAI and Microsoft derived their wrongful gains. As part of that analysis, I determined the portion of wrongful gains that were derived from January 2023 to the present, as opposed to wrongful gains derived before that date. I used the January 2023 date as the dividing line because that is the date when Microsoft made its third and largest $10 billion investment in OpenAI.

132. To calculate the portion of wrongful gains derived after January 2023, I first determined the value of the OpenAI for-profit in January 2023. I determined that value by consulting an independent valuation report that OpenAI commissioned from Andersen Valuation Services, conducted as of December 31, 2022.

133. **Plaintiff's Exhibit 292** is a copy of the Andersen valuation report. Page 65 of the report includes the following table:

# OpenAI, L.P.

**Valuation of Certain Equity Classes of OpenAI, L.P.**
**As of December 31, 2022**
**Option Pricing Method - Argos II Backsolve - Summary of Values**

| Class | Total Value |
|---|---|
| First Close Limited Partners | $671,159,306 |
| Microsoft Tranche I | 1,788,483,498 |
| Microsoft Tranche II | 1,350,649,395 |
| **Microsoft Tranche III** | **6,250,000,479** |
| Non-Profit | 306,967,072 |
| Employee Vehicle | 7,114,462,382 |
| Non-Profit Incentive Interest | 5,153,260,660 |
| Total | $22,634,982,793 |

134. This table reports that the total value of OpenAI for-profit as of December 31, 2022 was about $22.6 billion. The table further reports that the value of the OpenAI nonprofit's stake in

the for-profit as of December 31, 2022 was about $5.5 billion (*i.e.*, $307 million for its first close stake and $5.15 billion for its residual, or "incentive," stake).

135.    By contrast, as determined in my Step 2 analysis above, the OpenAI nonprofit's value as of October 2025 is between 26.2% and 29.2% of $500 billion, or between $131 billion and $146 billion.

136.    Those figures imply that OpenAI derived the vast majority of its wrongful gains after January 2023 rather than before that date.  Specifically, comparing the $5.5 billion valuation as of January 2023 with the $131 to $146 billion valuation as of October 2025, OpenAI earned approximately 96% of its wrongful gains after January 2023 and only around 4% of its wrongful gains before that date. Those findings are consistent with the other evidence discussed above showing that OpenAI experienced meteoric gains in valuation primarily over the past few years.

137.    I conducted a similar time period analysis for Microsoft.

138.    Once again, I began with **Plaintiff's Exhibit 292**, the Andersen valuation report. Page 65 of that report lists the combined value of Microsoft's three investment tranches as $9.4 billion.  That amount is less than the $13 billion Microsoft paid for those three tranches.

139.    Those figures indicate that, as of January 2023, Andersen was ascribing a negative net value to Microsoft's investments:  The value of the holdings was less than what Microsoft had paid to acquire them.

140.    The implication is that Microsoft derived 100% of its wrongful gains after January 2023.  Only during that later period did Microsoft recover more than its initial investment (and then much more beyond that).

## XI.     CONCLUSION

141.     In my opinion, the amount of wrongful gains that OpenAI derived from Mr. Musk's contributions is between **$65.5 billion** and **$109.4 billion**.   The amount of wrongful gains that Microsoft derived from Mr. Musk's contributions is between **$13.3 billion** and **$25.1 billion**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  May 14, 2026
Los Angeles, California                                    C. Paul Wazzan, Ph.D.

# EXHIBIT A

**Curriculum Vitae**



### C. PAUL WAZZAN, PH.D.

Managing Director - Berkeley Research Group, LLC
1888 Century Park East, Suite 1400
Los Angeles, CA 90067
Cell: 310.210.6216
Direct: 310.499.4857
pwazzan@thinkbrg.com

## BIOGRAPHY

C. Paul Wazzan is an economist specializing in litigation matters and is a seasoned testifier having been deposed nearly 100 times and having testified at trial more than a dozen times.  Dr. Wazzan has been qualified as an expert in state, federal, bankruptcy, and claims courts, at the ITC, before the Copyright Royalty Judges, and has testified before legislative bodies.  Dr. Wazzan focuses on providing financial, economic, and statistical expertise in the areas of complex damages, finance (e.g., valuation, securities fraud/10b5, option valuation, commodities price manipulation, solvency analysis), intellectual property (e.g., patent, trademark and copyright infringement, theft of trade secrets), class certification, labor and employment (e.g., class certification, disparate impact, wage and hour), and public policy (e.g., economic impact studies, effects of proposed legislation). He also specializes in large-scale (i.e., millions of records) data analytics (e.g., data acquisition, database design and development, statistical/econometric analysis).

Dr. Wazzan's analyses have covered a wide range of industries, including, but not limited to, basic manufacturing (e.g., automotive, mining, oil and gas, steel, food processing and distribution), high-tech (e.g., aircraft and avionics, semiconductors, digital signal processors, computer peripherals), real estate (e.g., appropriate interest rates in bankruptcy settings, lending discrimination), financial services (e.g., banking, metals and other commodities trading, organized financial markets), retail (e.g., big box, specialty retailers, mall economics), and pharmaceuticals (e.g., pricing of proteins, drugs and the modeling of expected sales).

Dr. Wazzan has taught corporate finance and valuation at the graduate MBA level at USC and CSLA and his research has been published in peer-reviewed economics journals and law reviews. His testimony has been featured and relied upon in published judicial decisions.

Dr. Wazzan is President and CEO of Wazzan & Co. Investment LLC, a venture capital firm providing seed-level funding to firms specializing in semiconductor, optical networking, biomechanical, biomedical, and related technologies.

## EDUCATION

| | |
|---|---|
| PhD, Management (Finance) | University of California, Los Angeles (UCLA) |
| BA, Economics | University of California, Berkeley (UC Berkeley) |



## PREVIOUS ACADEMIC POSITIONS

California State University, Los Angeles (CSLA); Adjunct Assistant Professor of Business and Economics

University of Southern California (USC) Marshall School of Business; MBA Lecturer

## PROFESSIONAL AWARDS, RECOGNITION, AND PRIZES

*1.*     2023 Rossman Award - "The Use of Conjoint Analysis in High Stakes Litigation," *102 J. Pat. & Trademark Off. Soc'y 502 (2022).*
- "Awarded annually to the article that makes the greatest contribution to the field of patents, trademarks, or copyrights. Factors that are taken into consideration include accuracy, depth of research, originality, readability, timeliness of the subject, and potential for impact on the existing system."  Awarded by the United States Patent & Trademark Office Society.

*2.*     1999 Moskowitz Prize - "The Effect of Socially Activist Investment Policies on the Financial Markets," *Journal of Business. Vol. 72. No. 1. January 1999.*
- "The Premier Global Prize for Research in Sustainable Finance.  The Moskowitz Prize is awarded each year to the paper best representing outstanding research on sustainable and responsible investing and the financial implications of responsible business practices in capital markets."

## PUBLICATIONS

1.     "The Use of Conjoint Analysis in High Stakes Litigation: A Historical Review up to Navarro et. al., v. Procter and Gamble, Which Withstood a Rigorous Daubert Challenge," *102 J. Pat. & Trademark Off. Soc'y 502 (2022).*

2.     "The Use of Blue Sheet Data in Insider Trading Actions: A Case Study," *20 FLA. ST. U. BUS. REV. 97 (2021).*

3.     "COVID-19, Force Majeure, and Material Adverse Change Clauses - An Empirical Review of Recent SEC Filings," *FTI Journal*, July 2020.

4.     "Introduction to Comprehensive Tort Reform Through House Bill 4 (H.B. 4) by the Texas Legislature," *Texas Tech Law Review, Spring 2019, Volume 51, Number 3.*

5.     "Learning to Give and Take Depositions: A Case Study," *BRG Review, Spring 2017 (Vol. 6).*

6.     "Anti-Poaching Collusion in the Contemporary Labor Market: Evidence, Analysis and Implications," *Employee Relations Law Journal, 43:2, 2017.*

7.     "Capital Structure," *Palgrave Encyclopedia of Strategic Management, Eds. David Teece and Mie Augier, Palgrave Macmillan Publishers, December 2014.*



8.    "Public Policy by Settlement of Litigation: A Case Study," *California Journal of Politics and Policy, Vol. 6: Issue 4, January 2014*

9.    "Patent Exhaustion," *Palgrave Encyclopedia of Strategic Management, Eds. David Teece and Mie Augier, Palgrave Macmillan Publishers, October 2013.*

10.   "A Review of the 2011 and 2013 Digital Television Energy Efficiency Regulations Developed and Adopted by the California Energy Commission," *California Journal of Politics and Policy, Vol. 3: Issue 1, Article 22, 2011.*

11.   "Determining the Appropriate Interest Rate Under Till in a Bankruptcy Case," *Cal. Bankr. J. 31 (2), 595-606, 2011.*

12.   "Allocating Costs in Ninth Circuit Predatory Pricing Cases: Marsann Co. v. Brammall, Inc. and its Problematic Progeny, Inglis v. Continental Baking and Thales v. Matsushita," *Antitrust Bulletin, Volume 54, Number 3, Fall 2009.*

13.   "Predatory Pricing and the Allocation of Costs in the Ninth Circuit," *Antitrust Litigator, Antitrust Litigation Committee, Section of Litigation, American Bar Association. Summer 2008. Vol. 7 No. 3.*

14.   "The Effects of KSR v. Teleflex on Patent Licensing Costs," *UCLA Journal of Law and Technology, Volume 11, Issue 2, Spring 2007.*

15.   "Consideration of Design Around Solutions in Determining Patent Damages," *IP Remedies, Intellectual Property Litigation Newsletter, American Bar Association, Section of Litigation, November 2007.*

16.   "Junk Forecasts in the Courtroom? Assessing the "S" Curve Approach to Calculating Damages," *Journal of Forensic Economics, vol. 19:3, 2007.*

17.   "An Economic Analysis of the Impact of Pay-for-Performance Initiatives on Physicians, Patients and Insurance Providers," *Indiana Health Law Review, 2006. Volume Three, Issue 2, 2006.* University of Indiana School of Law.

18.   "An Economic Assessment of Damage Caps in Medical Malpractice Litigation Imposed by State Laws and the Implications for Federal Policy and Law," *Health Matrix: Journal of Law-Medicine, Volume 16, Issue 2, 2006.* Case Western Reserve University School of Law.

19.   "Controlling Medical Malpractice Insurance Costs – Congressional Act or Voter Proposition?" *Indiana Health Law Review, Volume Three, Issue 1, 2006.* University of Indiana School of Law.

20.   "Statistical Analysis and Interpretation of Data Commonly Used in Employment Litigation," *Duquesne Business Law Journal, Volume 8, Number 1, Spring 2006.* Duquesne University School of Law.

21.   "Simple Statistics for Employment Law Practitioners," *Employer-Employee Relations Committee Newsletter, Fall/Winter 2005, American Bar Association, Tort Trial and Insurance Practice Section.*

⫶⫶ BRG

22.   "Reasonable Royalty: Countering Claims of Non-Profitability*," Perspectives. Vol. 2, No. 1. January 2001.*

23.   "The Effect of Socially Activist Investment Policies on the Financial Markets," *Journal of Business. Vol. 72. No. 1. January 1999.*

24.   "The Correlation Between Market Liquidity and Information-Based Trading," *UCLA Department of Finance (1996).*

25.   "The Impact of Earnings Announcements on Market Liquidity and Price Discovery: An Intraday, Multi-Market Analysis," *UCLA Department of Finance (1996).*


## CONGRESSIONAL AND AGENCY POLICY TESTIMONY

1.   In the Matter of: Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III). **Before the United States Copyright Royalty Judges**, Washington, D.C. Docket No. 16-CRB-0001 SR/PSSR (2018-2022). Retained by SoundExchange, Inc. October 19, 2016. Report. May 2, 2017. Testimony. March 2017. Deposition. April 2017. Trial.

2.   "A Critique of the Regulations on Battery Charging Systems Proposed by the California Energy Commission." November 21, 2011. Study filed with the **California Energy Commission**.

3.   **California State Senate**, Before the Energy, Utilities and Communications Committee. On SB 1198; An act to amend Section 25213 of the Public Resources Code, relating to energy. April 20, 2010. Testimony.

4.   **California State Assembly**, Committee on Utilities and Commerce, Hearing regarding the California Energy Commission's Proposed Energy Efficiency Standards for Televisions. October 21, 2009. Testimony.

5.   **California Energy Commission**, Proposed Amendments to Appliance Efficiency Regulations, California Code of Regulations, Title 20, Sections 1601 through 1607, Docket Number 09-AAER-1C. October 13, 2009. Testimony.

6.   "A Review of the 'December 2008 Draft Efficiency Standards for Televisions' Proposed by the California Energy Commission" March 23, 2009. Study filed with the **California Energy Commission**.

7.   "A Review of Canadian Private-Sector Lawyer Income," Prepared for the Canadian Superior Courts Judges Association, and included in Submission of the Canadian Superior Courts Judges Association and the Canadian Judicial Council to the 2007. **Judicial Compensation and Benefits Commission**. December 13, 2007. Filed Study.



## LITIGATION EXPERT RETENTIONS (CLIENT UNDERLINED; TRIALS AND ARBS IN BOLD)

1. *Metropolitan Partners Group Administration, LLC.* et. al., v. Blue Apron Holdings
   Supreme Court of the State of New York, County of New York
   Case No. 655615/2023
   May 2026.  Report.

2. *Jasibel Canchola, et. al., v Allstate Insurance Co.*
   United States District Court, Central District of California
   Case No. 8:23-cv-00734-FWS-ADS
   April 2026.  Report.

3. *Elon Musk, X.AI Corp., v. Samuel Altman, et. al.*
   United States District Court, Northern District of California
   Case No. 4:24-cv-04722-YGR
   October 2025.  Report.
   December 2026.  Deposition.

4. *In re Wells Fargo Cash Sweep Litigation*
   Retained by Defendant Wells Fargo Clearing Services, LLC.
   United District Court, Northern District of California
   Case No. 3:24-cv-04616-VC
   October 2025.  Report.
   January 2026.  Deposition.

5. *Rehan S. Hashmi, Lykor Shack, Hashmi Enterprise, Co., Hashmi Oil Co., et. al. v. 7-Eleven, Inc.*
   United States District Court, Northern District of Illinois
   Case No. 1:23-cv-03776
   July 2025.  Report.

6. *Starcaster Holdings, LLC v Iconic Exchange Ltd., D/B/A Blue Guardian Capital, et. al.*
   American Arbitration Association
   Case No. 01-24-0005-4587
   May 2025.  Report.
   May 2025.  Deposition.
   **July 2025.  Arbitration.**

7. *Charis Engineering, LLC v. BCCK Engineering, Inc.*
   United States District Court, Western District of Texas, Midland-Odessa Division
   Case No. 7:23-cv-00084-DC-DTG
   May 2025.  Report.
   June 2025.  Report.
   June 2025.  Deposition.
   **February 2026.  Trial.**

8. *Knighted Pastures LLC, vs. Yangyang Li, et. al. and Allied Gaming Entertainment Inc.*
   Court of Chancery, State of Delaware
   Case No. 2024-1158-JTL



April 2025.  Report.
April 2025.  Deposition.

9.  *Manders Terrace LTD, v. <u>David Kelly</u>*
The High Court of Ireland, Commercial Division
Record No. 2021/5557P
February 2025.  Report.

10. *US Ecology Thermal Services, Inc., et. al. vs. <u>TD\*X Associates, LP</u>*
American Arbitration Association
Case No. 01-23-0005-6112
January, 2025.  Report.
March, 2025.  Report.
March, 2025.  Report.
**March, 2025.  Arbitration.**

11. *Saadia Square, LLC, v. <u>Always Pacific, LLC, et. al.</u>*
Superior Court of the State of California, County of Los Angeles
Case No. 21NWCV00133
May 17, 2023.  Filing Date.
November 2024.  Report.
November 2024.  Deposition.

12. *Keto5, Inc., v. <u>Bariatrix Nutrition Corporation</u>*
United States District Court, Central District of California
Case No. 2:23-CV-7936
September 22, 2023.  Filing Date.
October 18, 2024.  Report.
November 2024.  Deposition.

13. *<u>Jane Street Group, LLC</u>, v. Millenium Management LLC., et. al.*
United States District Court, Southern District of New York
Case No. 24-cv-2783
April 26, 2024. Filing Date
October 2024.  Declaration.

14. *<u>Global Health Care Product Solutions, LLC</u>, v. CPN Medical Supplies, LLC*
Signature Resolution Arbitration
Signature Resolution Case No. RZBNG
July 2024.  Deposition.
**July 2024.  Arbitration.**

15. *<u>Starcaster Holdings, LLC,</u> v. FTP London LTD*
American Arbitration Association
AAA Case No. 01-23-0004-1965
September 19, 2023.  Filing Date.
June 2024.  Report.



16. *Radiation Detection Company, v. Safeline Motors, LLC., et. al.*
United States District Court, Northern District of California
Case No. 3:22-cv-07784-TLT
October 12, 2022.  Filing Date.
May 2024.  Report.
July 2024.  Deposition.

17. *Sierra Woods, et. al., v. Waste Management, Inc., et., al.*
Second Judicial District Court, State of Nevada, Washoe County
Case No: CV19-00797
April 17, 2020.  Filing Date.
November 2023.  Report.
March 2024.  Declaration.
July 2024.  Court Hearing.
July 2024.  Declaration.

18. *CNY Fair Housing, Inc., et. al., v. Clover Group, Inc., et. al.*
United States District Court, Northern District of New York, Syracuse Division
Case No. 5:21-cv-361-BKS-ML
March 22, 2022. Filing Date.
July 2023. Report.
September 2023. Deposition.
November 2023.  Declaration.
March 2024.  Declaration.

19. *Austin Building Design, Inc., v. Ingredion Inc.*
United States District Court, Dakota County, Nebraska
Case No. 20-91
July 11, 2020.  Filing Date.
September 2023.  Report.
February 2024.  Report.
March 2024.  Deposition.

20. *ARF Dashnaktsutyun, Western USA, et.al., v. American Revolutionary Foundation WUSA, Inc., et.al.*
United States District Court, Central District of California, Western Division
Case No. 2:21-CV-05594-FWS-RAO
September 9, 2021. Filing Date.
July 2023. Report.
August 2023. Deposition.
September 2023. Declaration.

21. *Extreme Technologies, LLC and Hard Rock Solutions, LLC v. Stabil Drill Specialties, LLC.*
United States District Court, Southern District of Texas, Houston Division
Case No. 4:19-cv-01977
August 27, 2019. Filing Date.
May 2023. Report.
August 2023. Deposition.

22. *Alta Partners, LLC, v. Getty Images Holdings, Inc.*
    United States District Court, Southern District of New York
    Case 1:22-cv-08916-JSR
    January 21, 2023. Filing Date.
    May 2023. Report.
    June 2023. Report.
    August 2023. Deposition.
    September 2023. Declaration.

23. *James Melin, et. al., v. Farmers Group, Inc., et. al.*
    Superior Court of the State of California, County of Alameda
    Case No. RG19001677
    January 8, 2019. Filing Date.
    January 2023. Report.
    January 2023. Deposition.
    **April 2023. Jury Trial.**

24. *Mathew K. Black, et.al., v. United States of America*
    United States Court of Federal Claims
    Case No. 21-10
    May 4, 2022. Filing Date.
    November 2022. Report.
    January 2023. Deposition.

25. *Helen C. Wood LLC, et.al., v. United States of America*
    United States Court of Federal Claims
    Case No. 21-2143
    January 1, 2022. Filing Date.
    November 2022. Report.
    January 2023. Deposition.

26. *Irving Park Shops, LLC, et. al., v. United States of America*
    United States Court of Federal Claims
    Case No. 21-546
    June 11, 2021. Filing Date.
    November 2022. Report.
    January 2023. Deposition.

27. *Walter Michael Ennis, et. al., v. United States of America*
    United States Court of Federal Claims
    Case No. 21-87
    May 27, 2021. Filing Date.
    November 2022. Report.
    January 2023. Deposition.



28. *Chapman Spring Garden, LLC., v. United States of America*
United States Court of Federal Claims
Case No. 18-1942
April 30, 2020. Filing Date.
November 2022. Report.
January 2023. Deposition.

29. *Basil Agapian, et.al., v. United States of America*
United States Court of Federal Claims
Case No. 19-1596
January 9, 2020. Filing Date.
November 2022. Report.
January 2023. Deposition.

30. *Irene Parry, et. al., v. Farmers Insurance Exchange, et. al.*
Superior Court of the State of California, for the County of Los Angeles
Case No. BC683856
November 2017. Filing Date.
November 2021. Declaration.

31. *Elizabeth A. Kane, Trustee v. PaCap Aviation Finance, LLC et. al.*
*In re* Hawaiian Island Air, Inc.
United States Bankruptcy Court, District of Hawaii
Case No. 17-01078
October 2017. Filing Date.
October 2021. Report.
December 2021. Deposition.
**October 2023.  Jury Trial.**

32. *Martin J. Walsh (United States Secretary of Labor; United States Department of Labor), v. Reliance Trust Company, et. al.*
United States District Court, District of Arizona
Case No. 2:19-cv-03178-JJT
May 2019. Filing Date.
August 2021. Report.
December 2021. Deposition.
**January 2024.  Bench Trial.**

33. *The Thomas L. Pearson and The Pearson Family Members Foundation, et. al. v. The University of Chicago.*
United States District Court, Northern District of Oklahoma
Case No.: 18-CV-99-GKF-FHM
November 2019. Filing Date.
October 2020. Report.
December 2020. Deposition.



34. *Nintendo of America, Inc. v. Gamevice, Inc.*
United States District Court, Northern District of California
Case No. 3:18-cv-01942-RS
February 2020. Report.
February 2020. Deposition.

35. *Patrick Daugherty v. Highland Capital Management, L.P., et. al.*
Court of Chancery, State of Delaware
Case No. 2017-0488-MTZ
May 15, 2018. Filing Date.
July 2019. Report.
August 2019. Deposition.

36. *Steve Michaels Investment Group, Scratch Restaurants, LLC et. al. v. Douglas Maclean.*
American Arbitration Association
AAA Case No.: 01-18-0000-7750
August 2018. Filing Date.
February 2019. Report.
February 2019. Report.

37. *Turner Network Sales, Inc. v. Dish Network, L.L.C.*
United States District Court, Southern District of New York
Case No. 17-CV-7599 (RA)
October 4, 2017. Filing Date.
November 2018. Report.
January 2019. Deposition.
February 2019. Report.
April 2019. Deposition.

38. *In the Matter of Certain Portable Gaming Console Systems with Attachable Handheld Controllers and Components Thereof.*
United States International Trade Commission
Retained on behalf of Complainant Gamevice, LLC.
Investigation No. 337-TA-1111
March 30, 2018. Filing Date.
October 2018. Report.
October 2018. Deposition.

39. *Securities and Exchange Commission, v. Chad C. McGinnis, Sergey Pugach, et. al.*
United States District Court, District of Vermont
Case No. 5:14-cv-6 CR
January 7, 2014. Filing Date.
March 2018. Report.
April 2018. Deposition.
**March 2019. Jury Trial.**



40. *CRCH, LLC, v. Lakha Properties-Chino Hills; Wells Fargo Bank, N.A.; Citigroup Commercial Trust 2007-C6, et. al.*
Superior Court of the State of California, County of Los Angeles, Central District
Case No. BC 478341; ADRS NO.: 14-5687-JZ
February 3, 2012. Filing Date.
**December 2017. Bench Trial.**

41. *Gloria J. Jackson, et. al., v. United States of America.*
United States Court of Federal Claims
Case No. 14-397-MCW
May 9, 2014. Filing Date.
October 2017. Report.
October 2017. Deposition.

42. *Blast Motion, Inc., v. Zepp Labs, Inc.*
United States District Court, Southern District of California, San Diego Division
Case No.: 15-cv-0700-JLS-NLS
March 31. 2015. Filing Date.
June 2017. Report.
July 2017. Report.
August 2017. Deposition

43. *Julian A. Pollock, et. al. v. The Vanguard Group, Inc. et. al.*
United States District Court, Central District of California, Southern Division
Case No. 2:16-cv-06482-JLS
August 8, 2016. Filing Date.
May 2017. Report.
July 2017. Deposition.

44. *Cellular Communications Equipment, LLC. v. Apple Inc.*
United States District Court, Eastern District of Texas, Tyler Division
Case No. 2:15-cv-00576
April 30, 2015. Filing Date.
March 2017. Report.
May 2017. Report.
May 2017. Deposition.

45. *Johns Wu v. The Bank of New York Mellon, National Association.*
Superior Court of the State of California, Los Angeles County
Case No.: BC576382
March 23, 2015. Filing Date.
October 2016. Report.
October 2016. Deposition.



46. *In the Matter of: Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III).*
Before the United States Copyright Royalty Judges, Washington, D.C.
Docket No. 16-CRB-0001 SR/PSSR (2018-2022)
Retained by SoundExchange, Inc.
October 19, 2016. Report.
February 2017. Report.
March 2017. Deposition.
**April 2017. Bench Trial.**

47. *CoreLogic, Inc., et. al. v. Zurich American Insurance Company, et. al.*
United States District Court, Northern District of California, San Francisco Division
Case No. 15-3081
July 2, 2015. Filing Date.
October 2016. Report.
December 2016. Deposition.

48. *In Re: Celestica (USA) Inc v. The Crossbow Group.*
Judicial Arbitration and Mediation Services, Inc. (JAMS)
JAMS Ref. No. 1110018525
June 2016. Report.
**August 2016. Arbitration.**

49. *AON PLC, and AON GROUP, INC., v. Alliant Insurance Services, Inc. et. al.*
United States District Court, Northern District of Illinois, Eastern Division
Case No. 16 CV 1924
February 3, 2016. Filing Date.
April 2016. Report.

50. *In Re: AutoZone, Inc., Wage and Hour Employment Practices Litigation.*
United States District Court, Northern District of California.
Retained on behalf of plaintiff class.
Case No. 3:10-md-02159-CRB
June 15, 2010. Filing Date.
April 2016. Report.
June 2016. Deposition.

51. *Dunkin' Donuts Franchised Restaurants LLC et. al. v. Anton Nader et. al.*
United States District Court, District of Massachusetts, Boston Division.
Case No. 1:13-CV-13023-LTS
November 26, 2013. Filing Date.
December 2015. Report.
January 2016. Deposition.



52. *Craig Streit, et. al. v. <u>Farmers Group, Inc., et. al.</u>*
Superior Court of the State of California, Los Angeles County.
Case No. B231285
March 2, 2011. Filing Date.
November 2015. Report.

53. *<u>Cooner Sales Company, LLC</u>. v. New England Wire Technologies Corp.*
American Arbitration Association
Case No. 72-20-0900-0518
September 2015. Report.
September 2015. Report.
October 2015. Deposition.
October 2015. Report.
**October 2015. Arbitration.**
September 2017. Report.
**September 2017. Arbitration.**
October 2018. Report.
November 2018. Deposition.
**November 2018. Arbitration.**

54. *Ricardo Sasso, M.D., v. <u>Warsaw Orthopedic, Inc. (Medtronic PLC).</u>*
International Institute for Conflict Prevention & Resolution
Case No. 6-14-28
December 2014. Report.
January 2015. Deposition.
**February 2015. Arbitration.**

55. *Joseph P. Ausikaitis, derivatively on behalf of Masimo Corp., v. <u>Joe Kiani, Steven J. Barker, Robert Coleman, Jack Laserohn, Sanford Fitch, Jon Coleman, Mark P. DeRaad, Rick Fishel, Yongsam Lee and Anand Sampath, and Masimo Corp.</u>*
United States District Court, District of Delaware
Case No. 1:12-cv-01175-SLR
September 19, 2012. Filing Date.
September 2014. Report.
October 2014. Deposition.

56. *Federal Deposit Insurance Corporation, as Receiver for Pacific Coast National Bank v. <u>Michael S. Hahn, Colin M. Forkner, Michael V. Cummings, et al.</u>*
United States District Court, Central District of California
Case No. 8:12-CV-01938-AG
November 6, 2012. Filing Date.
August 2014. Report.
November 2014. Deposition.

57. *Starr International Company, Inc., et. al., v. United States of America.*
United States Court of Federal Claims
Case No. 1:11-CV-00779 (TCW)
November 21, 2011. Filing Date.
February 2014. Report.
April 2014. Report.
May 2014. Deposition.
**October 2014. Bench Trial.**

58. *VFS Financing, Inc. v. Stacey L. Gonfiantini, et al.*
United States District Court, District of Nevada
Case No. 3:13-CV-00109-RCJ-VPC
March 6, 2013. Filing Date.
September 2013. Report.
October 2013. Report.
November 2013. Deposition.

59. *Stryker Corporation, v. Joseph P. Errico, Thomas J. Errico, James D. Ralph, Warburg Pincus Private Equity VII, L.P. Vertical Fund I, L.P., Vertical Fund Physicians' Fellowship Partners, LLC.*
State of Michigan, Ninth Judicial Circuit, Kalamazoo County, Civil Division
Case No. 2011-0097-CK
August 2013. Report.
October 2013. Report.
November 2013. Deposition.

60. *Glovia Sociedad Anomina, v. Universal Surface Technology, et. al.*
Superior Court of the State of California, County of Los Angeles
Case No. BC4553618
January 25, 2011. Filing Date.
May 2013. Deposition.

61. *Kenneth Barton v. RPost International Ltd., et. al.*
Superior Court of the State of California, County of Los Angeles
Appointed by the Court as an independent expert pursuant to Evidence Code Section 730.
Case No. YC051312 and YC065259
July 7, 2005. Filing Date.
July 28, 2011. Filing Date.
March 2013. Report.
**April 2013. Bench Trial.**

62. *U.S. Bank National Association v. PHL Variable Insurance Company.*
United States District Court, Central District of California, Western Division
Case No. 12-3046-RGK (MRWx)
April 6, 2012. Filing Date.
February 2013. Report.

14



63. *In re: Desert Inn Management Company, Ltd.*
United States Bankruptcy Court for the District of Nevada
Retained by Debtor, Desert Inn Management Co. Ltd.
Case No.: BK-S-12-16719-LBR
June 5, 2012. Filing Date.
February 2013. Report.
February 2013. Deposition.

64. *Sonoma Tires, Inc. v. Big O Tires LLC.*
United States District Court, Northern District of California
Case No. C11-00818RS.
February 22, 2011. Filing Date.
January 2013. Report.

65. *Frontier Hot Oil, LLC. v. Parka Inc., et. al.*
United States District Court, Larimer County Colorado
Case Number: 2011CV2470
August 2012. Report.
October 2012. Report.
October 2012. Deposition.
**March 2013. Jury Trial.**

66. *Margaret McCarthy v. Goldline International, Inc.*
JAMS Arbitration, Santa Monica, CA.
JAMS Case No. 1220043397
August 2012. Deposition

67. *Ecotality, Inc v. California Public Utilities Commission, et. al.*
Court of Appeal for the State of California, First Appellate District, Division Two
Case No. A135524.
May 25, 2012. Filing Date.
May 2012. Declaration.
June 2012. Declaration.

68. *Stephen J. and Linda L. Rogers v. The United States.*
The United States Court of Federal Claims
Case No. 1:07-CV-00693-NBF
November 23, 2009. Filing Date.
January 2012. Declaration.

69. *Cable, LLC v. Petroleum Pressure Surveys, Inc.*
United States District Court, Logan County, Colorado
Case No. 2011CV26
March 2, 2011. Filing Date.
January 2012. Report.



70. *Dorothy L. Biery, et al., and Jerramy and Erin Pankratz, et al,* v. United States of America.
    The United States Court of Federal Claims
    Case Nos. 07-693L, 07-675L.
    September 26, 2007. Filing Date.
    December 2011. Declaration.
    February 2012. Report.
    March 2012. Deposition.
    May 2012. Report.

71. *Best Buy Stores, L.P.* v. Manteca Lifestyle Center, LLC.
    United States District Court, Eastern District of California, Sacramento Division
    Case No. 2:10-CV-00389-WBS-KJN
    February 12, 2010. Filing Date.
    August 2011. Report.
    October 2011. Deposition.

72. *In Re: The Preserve, LLC*
    United States Bankruptcy Court, Central District of California, Los Angeles Division.
    Retained by Lender/Plaintiff Point Center Financial, Inc.
    Case No. 2:10-BK-18429
    September 25, 2008. Filing Date.
    June 2011. Report.
    August 2011. Deposition.
    **August 2011. Bench Trial.**

73. *In the Matter of: Certain Video Game Systems and Controllers*
    United States International Trade Commission
    Retained by Complainant Motiva, LLC
    Investigation No. 337-TA-743
    October 1, 2010. Filing Date.
    May 2011. Report.
    June 2011. Deposition.
    **August 2011. Bench Trial.**

74. *PRU/SKS Brannan Associates, LLC*. v. CA, Inc., Computer Associates International, Inc., Platinum
    Technology Inc., Platinum Technology International, Inc.
    Superior Court of the State of California, for the County of San Francisco
    Case No. CGC-09-493239
    October 7, 2009. Filing Date.
    November 2010. Deposition.

75. *International Accessories Corporation* v. Biasia Francesco S.p.A.
    International Arbitration Association (Milan, Italy)
    October 2010. Report.



76. *Opal Jones, Claudia A. Caldwell, Kalina Thomas, Vincent Jones, and C. Renae Walker Jones, et.al., v. Wells Fargo Bank, N.A., Wells Fargo Home Mortgage Inc.*
Superior Court of the State of California, for the County of Los Angeles
Case No. BC337821
August 5, 2005. Filing Date.
May 2010. Report.

77. *Frontier Energy Holding Group, LLC v. John L. Suprock; PCS Business Brokers, LLC.*
United States District Court, District of New Mexico
Case No. 1:09-CV-00981-LFG
October 13, 2009. Filing Date.
March 2010. Report.
July 2010. Deposition.

78. *In Re: Caviata Attached Homes, LLC.*
United States Bankruptcy Court, District of Nevada
Retained by Debtor/Defendant Caviata Attached Homes, LLC.
Case No. 09-52786-GWZ
August 18, 2009. Filing Date.
February 2010. Report.
February 2010. Deposition.
**March 2010. Bench Trial.**

79. *Star News Building, LLC v. Glabman Furniture, Inc., et. al.*
Superior Court of the State of California, for the County of Los Angeles
Case No. BC408673
February 27, 2009. Filing Date.
February 2010. Report.
February 2010. Deposition.

80. *David Loera, et. al., v. Akal Security Inc.*
Superior Court of the State of California, in and for the County of Imperial
Case No. ECU03022
April 2006.  Filing Date.
November 2009. Deposition.

81. *Anna's Linen Overtime Cases.*
Superior Court of the State of California, for the County of Orange, Central Justice Center
Retained by Defendant Anna's Linen.
Case No. 2008-00044711
February 6, 2008. Filing Date.
November 2009. Report.
December 2009. Deposition.



82. *California National Bank v. 501 Grant Street Partners, LLC.*
Court of the Common Pleas of Allegheny County, Pennsylvania
Case No. GD-09-009187
May 13, 2009. Filing Date.
June 2009. Report.

83. *FemPharm Pty Ltd., vs. Vivus, Inc.*
JAMS Arbitration
Case No. 1100052964
**January 2009. Arbitration.**

84. *In Re Mortgages Ltd.*
United States Bankruptcy Court for the District of Arizona.
Retained by Creditors Rightpath Limited Development Group, LLC and Maryland Way Partners, LLC.
Case No. 2:08-BK-07465
June 20, 2008. Filing Date.
August 2008. Declaration.

85. *WKN Windkraft Nord USA, Inc. v. Wind Energy System Technology, LLC, et. al.*
Superior Court of the State of California, County of San Diego
Case No. 200700066952
May 18, 2007. Filing Date.
July 2008. Report.

86. *Stamps.com, Inc., v Endicia, Inc. and PSI Systems, Inc.*
United States District Court, Central District of California.
Case No. 2:06-CV-7499
November 22, 2006. Filing Date.
May 2008. Report.
December 2008. Deposition.

87. *Herman T. Guerrero and Jesus T. Guerrero, as Trustees of the Guerrero Family Trust, et. al. vs. Kinki Nippon Tourist Co., Ltd., Saipan Hotel Corporation, Pacific Development Inc., et. al.*
Superior Court for the Commonwealth of the Northern Mariana Islands.
Case No. 04-0574D
April 2008. Report.
July 2008. Deposition.

88. *Ruth Oates vs. City of Los Angeles, Board of Public Works.*
United States District Court, Central District of California.
Case No. 2:07-CV-2985
May 7, 2007. Filing Date
April 2008. Report.

18



89. *Nissani vs. Long Beach Motors et. al.*
Superior Court of the State of California, County of Los Angeles, Central District.
Case No. BC368666
March 28, 2007. Filing Date.
March 2008. Report.
April 2008. Deposition.

90. *United States of America v. Frederick S. Schiff.*
United States District Court, District of New Jersey
Case No. 2:05-CV-4132
August 22, 2005. Filing Date.
February 2008. Report.
March 2008. Court Hearing.

91. *First National Mortgage Company v. Federal Realty Investment Trust.*
United States District Court, Northern District of California.
Case No. 5:03-CV-2013
May 1, 2003. Filing Date.
January 2008. Report.

92. *United States of America v. Mark D. Lay.*
United States District Court, Northern District of Ohio, Eastern Division
Case No. 1:07-CR-339
June 14, 2007. Filing Date.
October 2007. Report.

93. *Edward D. Ekstrom and Juliet M. Ekstrom-Anderson v. Trend Micro Kabushiki Kaisha.*
Third District Judicial Court for Salt Lake County.
Case No. 050907533.
August 2007. Report.

94. *Karl Sapper & Son, Inc. v. Chalmers-Randolph, LLC.*
Superior Court of the State of California, County of Los Angeles, Central District.
Case No. BC342370
November 2, 2005. Filing Date.
February 2007. Report.
July 2007. Deposition.
**February 2008. Jury Trial.**

95. *James Vlahos and Nicholas Vlahos v. International Baking Company, Inc. and Sara Lee Fresh Inc.*
Superior Court of the State of California, for the County of San Mateo.
Case No. CIV429005
February 3, 2003. Filing Date.
December 2006. Deposition.

19



96. *In Re Copper Antitrust Litigation.*
United States District Court, Western District of Wisconsin.
Retained by Defendant J.P. Morgan Chase & Company, and Morgan Guaranty Trust Company of NY.
Case No. 3:00-CV-1303
March 3, 2006. Filing Date.
November 2006. Report.
December 2006. Deposition.

97. *Richard Cavanaugh, v. Unisource Worldwide Inc.*
United States District Court, Eastern District of California, Fresno Division.
Case No. 1:06-CV-119
February 2, 2006. Filing Date.
October 2006. Report.
January 2007. Deposition.

98. *VCode Holdings, Inc. and VData LLC, v. Adidas America Inc., Advanced Micro Devices, Inc., Boston Scientific Corp., Stamps.com Inc., Hitachi Global Storage Technologies (Thailand), Ltd., and Hitachi Global Storage Technologies, Inc.*
United States District Court, District of Minnesota
Case No. 0:04-CV-4583
October 25, 2004. Filing date.
March 2006. Report.

99. *Joseph C. Canouse v. True Religion Apparel, Inc.*
United States District Court, Central District of California – Western Division.
Case No. 2:05-CV-1978
March 18, 2005. Filing Date.
October, 2005. Report.
December 2005. Report.
February 2006. Deposition.

100. *Rita F. Oliai v. Coram Healthcare Corporation.*
United States District Court, Central District of California.
Case No. 2:99cv8032
August 6, 1999. Filing Date.
May 2005. Report.
August 2005. Deposition.
**October 2005. Jury Trial.**

101. *Foundstone Inc. v. Jassen Glaser; Eric Caso; Michael Morton and Dan Kuykendall.*
Superior Court, State of California, County of Orange, Central Justice Center
Case No. 02CC15350
October 2, 2002.  Filing Date.
February 2004. Report.



102.  *Scott William Curry, v. <u>AXT, Inc</u>.*
       United States District Court, Central District of California.
       Case No. 2:01-CV-6531
       July 30, 2001 Filing Date
       January 2004. Report.

103.  *Walter Brashier, et al. v. <u>KPMG LLP.</u>*
       Court of Common Pleas, State of South Carolina, County of Greenville.
       Case No. 03CP2303626
       May 28, 2003. Filing Date.
       September 2003. Report.

104.  *Joseph J. Jacoboni v. <u>KPMG LLP.</u>*
       The United States District Court, for the Middle District of Florida, Orlando Division.
       Case No. 6:02-CV-510
       April 29, 2002. Filing Date.
       August 2003. Report.

105.  *Scott E. Barmer v. <u>Lincoln Financial Advisors Corp.</u>*
       Superior Court of the State of California, County of San Francisco.
       Case No. CGC-01-402796
       December 24, 2001. Filing Date.
       January 2003. Report.

106.  *<u>Ernest H. Sponzilli</u> v. Regents of the University of California, et. al.*
       Superior Court of the State of California, County of Los Angeles.
       Case No. SC048907
       September 10, 1997. Filing Date.
       October 1998. Report.
       October 1998. Deposition.

## PAST AND PRESENT PROFESSIONAL AFFILIATIONS

- *BRG Review*, Founder and Editor in Chief. The *Review* presents original research and analysis on topics of interest to a variety of audiences including economists, accountants, legal scholars, and industry leaders.
- American Finance Association
- American Economic Association
- American Bar Association
- Venture Finance Institute, Claremont Graduate University; Referee

February 2026