Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

------------------------------------------

ELON MUSK, et al.,

　　　Plaintiffs,

v.

SAMUEL ALTMAN, et al.,

　　　Defendants.


Case No. 4:24-cv-04722-YGR

------------------------------------------


VIDEO DEPOSITION OF

Paul Wazzan, Ph.D.

December 5, 2025

New York, New York

LEAD: Bradley Wilson, Esquire

FIRM: Wachtell Lipton Rosen & Katz




FINAL COPY - HIGHLY CONFIDENTIAL

JANE ROSE REPORTING - 1-800-825-3341

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 2

A P P E A R A N C E S:

MOLOLAMKEN LLP
          Attorneys for Plaintiff
          600 New Hampshire Avenue, N.W.
          Washington, D.C. 20037

  BY:     ROBERT KRY, ESQ.
          JOSH BLOOM, ESQ.

WACHTELL LIPTON ROSEN & KATZ
          Attorneys for OpenAI Defendants
          51 West 52nd Street
          New York, NY 10019

  BY:     BRADLEY WILSON, ESQ.
          IOANNIS DRIVAS, ESQ.
          NATHANIEL CULLERTON,ESQ. Via Zoom

DECHERT LLP
          Attorneys for Microsoft Defendant
          1900 K Street, NW
          Washington, DC 20006

  BY:     JOHN "JAY" JURATA, ESQ.
          YOSEF WEITZMAN, ESQ. Via Zoom

Page 3

ALSO PRESENT:

KEVIN CHRISTENSEN- BRG Via Zoom

LAUREL VAN ALLEN- Coherent Economics

JANE ROSE REPORTING
        74 Fifth Avenue
        New York, New York  10011
        1-800-825-3341
        Brooke Perry, Court Reporter
        Jonathan Popham, Videographer

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 4

INDEX

WITNESS: Paul Wazzan, Ph.D.

EXAMINATION BY                          PAGE
Bradley Wilson....................6;307
John Jurata......................220;315
Robert Kry.......................294

Reporter Certificate...............320

Index of Exhibits.................321

Notice to Read and Sign...........322

JANE ROSE REPORTING                California Firm No. 254
1-800-825-3341           janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 5

THE VIDEOGRAPHER:  Please stand by. Good morning.  Here begins Media 1 in the deposition of Paul Wazzan in the matter of Elon Musk et al., versus Samuel Altman et al. Today's date is December 5, 2025, and the time is 9:03 a.m.

This deposition is being taken at the offices of MoloLamken, 430 Park Avenue, New York, New York, and was made at the request of defendant.

I'm Jonathan Popham, the videographer, and the court reporter is Brooke Perry from Jane Rose Reporting, New York, New York.

Counsel, please identify yourselves and state whom you represent, and please speak slowly for the court reporter.

MR. WILSON:  Bradley Wilson from Wachtell, Lipton, Rosen & Katz on behalf of the OpenAI defendants.  I'm joined by my colleague Ioannis Drivas.

MR. JURATA:  John "Jay" Jurata, Jr. on behalf of defendant Microsoft Corporation, and with me is Laurel Van Allen.

MR. KRY:  Robert Kry with MoloLamken for the plaintiffs, and with me is my colleague

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 6

Josh Bloom.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

P A U L   W A Z Z A N,  the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE REPORTER:  Please state your name for the record.

THE WITNESS:  Christopher Paul Wazzan.

THE REPORTER:  Please state your address for the record.

THE WITNESS:  1888 Century Park East, Suite 1400, Los Angeles, California 90067.

EXAMINATION BY

MR. WILSON:

Q.    Good morning, Dr. Wazzan.

A.    Good morning.

Q.    As you may have just heard, my name is Bradley Wilson.  I'm here today on behalf of the OpenAI defendants, and that includes Mr. Altman and Mr. Brockman.  Mr. Jurata here is representing the Microsoft defendant, and he'll be asking you some questions after I finish.

Do you understand that you're under oath today, sir?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 7

A.    Yes.

Q.    Is there any reason you can't provide truthful testimony today?

A.    No.

Q.    Are you taking any medication that might impair your ability to answer my questions fully?

A.    No.

Q.    Is there any other reason why your testimony might be impaired today?

A.    No.

Q.    You're a seasoned testifier, correct?

A.    Yes.

Q.    You've been retained as an expert witness in more than 100 prior cases; is that right?

A.    Yes.

Q.    Do you know the exact number?

A.    It's in my vitae, but I think it's like 103.

Q.    The CV that you provided as an exhibit to your report, that contains all the prior cases that you can recall that you provided expert testimony in; is that correct?

A.    Yes.

Q.    When was the first time were you retained as an expert witness?

A.    Well, again, it's in my CV, we can look it up,

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 8

but I think it was around 1999.

Q.    More than 25 years ago; is that fair?

A.    Yes.

Q.    And other than serving as an expert witness in cases like this one, what other sources of income do you have?

A.    So at BRG and in my previous employment at other firms, I don't just do litigation support.  I do a lot of other things as well, public policy work, economic impact studies, valuation work, things like that.

I've also taught at the graduate level at USC and at Cal State, LA.  I run a small venture capital company that provides C-level financing to technology startups.  That probably is everything.

Q.    And so you received a salary from BRG; is that correct?

A.    Sort of.  It's not really a salary, it's more of a -- it's comp based on revenue generation and things like that.

Q.    Can you explain how the comp works?

A.    It's a formula based on revenue generation.

Q.    Revenue generated by whom?

A.    By me or if I'm sharing credit with others for matters brought in.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 9

Q.      And other than litigation matters, what kind of matters do you bring into BRG?

A.      Mostly public policy.  So, for example, I just issued a paper in California on behalf of ride share companies, trying to get some laws changed.  And I believe a law was just changed a few weeks ago based on that work.

We also do valuation work, general business consulting, you know, projects that are not litigation related.

Q.      Got it.  And so in addition to the $900 an hour that you're being paid as an expert witness in this case, you will receive some share of the fees that are paid to BRG; is that correct?

MR. KRY:  Objection to form.

A.      So I don't get the $900.  That all goes to BRG and then I get paid based on a formula.

Q.      Okay.  Okay.  Fair enough.  You've provided testimony in cases involving a wide range of industries; is that right?

A.      Yes.

Q.      The automotive industry?

A.      Yes.

Q.      Mining?

A.      Yes.

Elon Musk v.                      FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 10

Q.    Oil and gas?

A.    Yes.

Q.    Steel?

A.    Yes.

Q.    Food processing and distribution?

A.    Yes.

Q.    Okay.  Aircrafts and avionics?

A.    Yes.

Q.    Semiconductors?

A.    Yes.

Q.    Digital signal processors?

A.    Yes.

Q.    Computer peripherals?

A.    Yes.

Q.    What are computer peripherals?

A.    All the things that are added on to computers.
They could be monitors; they could be keyboards; they
could be game devices.

Q.    Okay.  Like a mouse, for example?

A.    A mouse, yes.

Q.    Real estate, you've been an expert in a real
estate case?

A.    Yes.

Q.    Banking?

A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 11

Q.    Metals trading?

A.    Yes.

Q.    Retail?

A.    Yes.

Q.    Pharmaceuticals?

A.    Yes.

Q.    Have you ever been retained as an expert witness in a case involving the artificial intelligence industry?

A.    No.

Q.    Have you ever been retained as an expert witness in a case involving a technology startup?

A.    Yes.

Q.    What case was that, or which cases were those?

A.    Can I see my CV?

Q.    Would that help?

A.    That would help a lot.

        MR. WILSON:  Sure, happy to -- we'll mark your CV.  It's part of the report, right. I suspect we were going to get there soon anyways.

        (Whereupon, the Expert Report of C. Paul Wazzan, Ph.D., was marked as Wazzan Exhibit 1, for identification, as of this date.)

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 12

BY MR. WILSON:

Q.      So Mr. Wazzan, we're going to mark as Exhibit 1 a copy of your initial report in this case, and I believe your CV is Appendix A to that report.

Do you have the document?

A.      Yes.

Q.      Okay.  So you're going to review your CV and let us know which case or cases you list here in which it involved a technology startup, right?

A.      Yes.

Q.      Okay.  So let us know when you've done that.

A.      Number 31 on page 9.

Q.      That's the Gamevice matter?

A.      Yes.

Q.      Okay.  Any others?

A.      Yeah.  Number 35.

Q.      Certain Portable Gaming Consoles matter?

A.      Yes.

Q.      Okay.

A.      39.

Q.      Blast Motion v. Zepp Labs, correct?

A.      Yes.  57.

Q.      United Surface Technology?

A.      Yes.

Q.      Okay.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 13

A.    70.

Q.    In the matter of certain video game systems, okay.

A.    Yes.

Q.    I guess I include 80.  It's a pharmaceutical startup?

Q.    The FemPharm matter?

A.    Yes.

Q.    What was the issue in that case?

A.    FemPharm had developed some technology related to hormone treatments and had licensed the technology to Vivus.  Vivus was supposed to commercialize the technology, make some additional investments, get the drugs through Phases 2 and 3 clinical trials, and then commercialize the product.

Vivus did not meet various milestones and so they were sued by FemPharm, which is the startup.

Q.    Got it.  Don't want to prevent you from going through the last 20 or so entries, so let me know if it there are any others.

A.    98.

Q.    Foundstone, right?

A.    Yes.

Q.    Okay.

A.    I think I got them.

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 14

Q.    Okay.  Were you asked to conduct a valuation analysis of any of the startups in the cases that you just listed?

A.    Well, I guess, without going back through again, I think most of the time I do do valuation in those matters.  They were patent infringement cases, they were breach of contract cases.

So the valuation was -- yeah, I would say yes.

Q.    So just to be clear, my question isn't whether you conducted a valuation analysis of any kind, but rather whether you valued the startup itself in any of those matters?

A.    Yes.

Q.    And your testimony is you did?

A.    Yes.

Q.    In all of them?

A.    We would have to go back through them again.

Q.    And several is your testimony?

A.    Yes.

Q.    Have you ever provided an expert opinion on the amount of unjust enrichment?

A.    Yes.

Q.    Which cases did you do that in?

A.    2, 3, 4, 7, 9, 10, 13, 57, 72.  I don't know. After that, my memory is very fuzzy, it's pretty far

Elon Musk v.                 FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 15

back.

Q.     You've done very well, so thank you for that. I want to ask you about number 57, if you could, which I think is the only matter you listed in response to both of my questions.  I'm referring to the united -- excuse me, the Universal Surface Technology matter?

A.     Yes.

Q.     You represented the defendants in that case?

A.     Yes.

Q.     You were an expert witness for the defendants in that case, correct?

A.     Yes.

Q.     Okay.  What was the issue in that case?

A.     It was an alleged theft of trade secrets matter where they had allegedly stolen technology that was used to print images on fabric for, like, T-shirts and things like that.

Q.     Okay. And the startup was Universal Surface Technology?

A.     Yes.

Q.     Okay.  And so you were responding to a report from an expert sponsored by the plaintiffs regarding the amount of unjust enrichment?

A.     Yes.

Q.     Okay.  How many hours have you spent working on

JANE ROSE REPORTING                 California Firm No. 254
1-800-825-3341              janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 16

this matter so far?

A.    I don't know.  I would have to look at the bill.  I spent probably somewhere around 100.

Q.    And how many of those did you spend reviewing materials?

A.    I couldn't say.

Q.    Okay.  Do you know how many hours you spent working on your first report?

A.    I couldn't say.

Q.    Okay.  Do you know how many hours you spent working on your second report?

A.    Just a few.

Q.    Okay.  How many hours have you spent preparing for this deposition today?

A.    I don't know.  20.

Q.    Okay.  What did you do to prepare for the deposition today?

A.    Reviewed my reports, reviewed some of the case materials.

Q.    Did you meet with counsel?

A.    Yes.

Q.    When did you meet with counsel?

A.    Yesterday.

Q.    And how long did that meeting last?

A.    Around five or six hours.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 17

Q.    And was anyone present in that meeting other than the two gentlemen seated to my left?

Sorry, go ahead.

A.    Kevin Christensen.

Q.    He works for BRG?

A.    Yes.

Q.    He's on the Zoom right now?

A.    Yes.

Q.    Okay.  So anyone else?

A.    I'm sorry?

Q.    Anyone else?

A.    No.

Q.    Okay.  Do you know how large BRG's accrual is on this matter to this point?

A.    No.

Q.    Has a court arbitrator or other adjudicatory body ever disqualified you as an expert?

A.    So no, I've had portions of reports struck, but I've never been excluded as an expert.

Q.    Okay.  When you say you've had portions of reports struck, do you mean that certain opinions that you were planning to offer, the Court did not allow you to offer?

A.    Yes.

Q.    Okay.  What case or cases did that happen in?

Page 18

A.    So the first one is In Re: AutoZone.

Q.    Okay.

A.    Do you want to -- well, so In Re: AutoZone --

Q.    Why don't you tell me all the cases and then we'll go through.

A.    Pearson's v. Chicago, University of Chicago.

SEC versus McGinnis.

Those are the three.

Q.    What was the opinion that you were planning to offer In Re: AutoZone, that the Court didn't allow you to offer?

A.    So that was a wage and hour case.  I issued a survey to former AutoZone employees.  We sent out thousands of surveys.  We got -- we sent out 20,000 surveys and we got a couple thousand back.  So we got a low response rate.

As a statistician, I don't care because I just have a wider confidence interval.  And I defaulted to the lower bound of the confidence interval, which is conservative vis- -vis the defendant.

So the math was all correct, but the Court ruled that the response rate was too low.  And so that portion of the report was struck.

Q.    Do I have it right that because, in the Court's view, the responsiveness rate was too low, the Court

Page 19

felt that your findings or opinions were unreliable?

A.      Yes.

Q.      What about the Pearsons v. University of Chicago case?  What was the opinion that you were planning to offer in that case, that the Court didn't allow you to offer?

A.      So that's a matter where the Pearsons are a family.  They wanted to establish a foundation, a research foundation at the University of Chicago with $100 million grant.

And after they made the first installment payment, parties got into a dispute as to whether the university was contributing what they had contracted to contribute to this foundation.  So they were supposed to provide faculty and a building and some other stuff.

And the issue was whether the 100 million would be enough to endow the institute in perpetuity if the institute was not meeting its obligations.

So I did a forensic accounting and an economic analysis of sort of the entire setup.  At the end of the report, I included some hypotheticals as to when the foundation would run out of money, under certain assumptions.

So for example, if the endowment return was 5 percent annually versus 7 percent annually, or if the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 20

university contributed two faculty instead of four faculty, things like that.  So there was a series of examples.  The Court ruled that the illustrative examples were speculative, and so that portion was struck.

Q.    And then the last matter you mentioned I think was SEC versus McGinnis?

A.    Yeah.  So the SEC alleged that McGinnis was insider trading.  He was an employee of Green Mountain, the Keurig Coffee Company.  So we obtained blue sheet data from the SEC.  And using the blue sheet data, I was able to replicate their transactions for people that were non insiders.

And so it turns out that thousands of other people were doing the exact same types of transactions.  So in my report, I said it's a common practice.  The Court took exception with the word "common" and struck the word "common."

So at trial, I said hundreds of other people were doing the same thing.  And that was it.

Q.    Got it.  Do you recall whether the Court narrowed your opinions in any way in the case that you recently handled in the Northern District of New York for the Clover Group?

A.    Not that I recall.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 21

Q.      To make sure we're talking about the same case, it's item 15 on your CV.  So your testimony is that the Court did not limit your opinions in that case, to the best of your recollection?

A.      Yeah, I'm not aware of that.

Q.      Do you consider yourself to be an expert on the artificial intelligence industry?

A.      That's too broad of a question.  I think I've educated myself on the artificial intelligence industry, you know, through sort of a basic understanding of what it is, but also through the valuation work that I've did in this case.

Q.      Why is the question too broad?

A.      Well, because am I a technical expert?  Can I code a large language model, no, I can't.  But am I a financial expert, vis- -vis AI, yes, I am.

Q.      Were you a financial expert vis- -vis AI before you were retained by Mr. Musk in this case?

A.      I'd say yes.  I mean, I could point to the textbooks on my shelf where it says a project is a black box.  The valuation techniques and models are the same across industry.

Q.      Just so -- and I'm certainly not intending to argue with you.  I wanted just to make sure I understand that -- your testimony.  Your testimony is that you're

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 22

an expert on valuing artificial intelligence companies in the same way that you're an expert on valuing companies in other industries; is that right?

A.    Yes.

Q.    But as to the technology of the artifical intelligence industry, you acknowledge that you're not an expert in that area?

A.    I would agree with that.

Q.    Have you ever published an academic paper on valuation in the artificial intelligence industry?

A.    No.

Q.    Have you ever published an academic paper on financial issues related to technology startups?

A.    I guess I'd say yes.

Q.    Okay.  And what paper are you referring to?

A.    So the one that comes to mind is number seven under my publications on page 2, "Capital Structure."

Q.    What page are you looking at?  I seem to have -- oh, I'm in the wrong exhibit, that's why.  Bear with me.  Page 2, you said?

A.    Yes.

Q.    "The Use of Blue Sheet Data in Insider Trading Actions"?

A.    I'm sorry, number 7 on page 2.

Q.    Okay.  "Capital Structure"?

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 23

A.    Yes.

Q.    Any others?

A.    I'd say that's primarily the one.

Q.    Do you consider yourself to be an expert on venture capital investments?

A.    Yes.

Q.    What's the basis for that expertise?

A.    That's my educational background including a Ph.D. in finance, and it's also the fact that I actually run a small venture capital company.

Q.    Have you ever published an academic paper on venture capital investment?

A.    No.

Q.    Have you ever taught a college or higher level course on venture capital investment?

A.    Not a specific class, but as part of corporate finance, I have.

Q.    Other than a general class on corporate finance, any courses you taught on venture capital investment?

A.    Not specifically.

Q.    You said that you run a small venture capital company.  Are you referring to Wazzan & Co.?

A.    Yes.

Q.    When was Wazzan & Co. formed?

Page 24

A.      That's a good question.  I think around 2000.

Q.      Were you the person who established it?

A.      Yes.

Q.      And it's still operating today?

A.      Sort of.  We're still holding one investment, but we're not taking on any new investments.

Q.      What investment is that?

A.      GeneFluidics.

Q.      How long has GeneFluidics been the only investment at Wazzan & Co.?

A.      It's been four or five years.

Q.      Four or five years.  Is Wazzan & Co. licensed to do business in any US states?

                MR. KRY:  Objection to form.

A.      I don't know what that means.  It was incorporated in California.

Q.      I'll ask a different question.  Has Wazzan & Co. been incorporated to do business in any state other than California?

                MR. KRY:  Objection to form.

A.      I don't know.  I don't know what that means.

Q.      You recall filing a statement of information on behalf of the Wazzan & Co. in California in 2014?

A.      I don't recall that.

Q.      Okay.  Do you know what a statement of

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 25

information is?

A.    No.

MR. WILSON:  All right.  Let's see if we can refresh your recollection.  So this will be Exhibit 2.

(Whereupon, Wazzan & Co. Statement of Information was marked as Wazzan Exhibit 2, for identification, as of this date.)

BY MR. WILSON:

Q.    So, Mr. Wazzan, I marked as Exhibit 2 to your deposition a State of California Secretary of State form entitled "Statement of Information."

Do you see that?

A.    Yes.

Q.    And it relates a limited liability company, Wazzan & Co. Investment LLC.

Do you see that?

A.    Yes.

Q.    Do you know what this is?

A.    Statement of Information.

Q.    Do you know what purpose it serves?

A.    I don't recall.

Q.    You signed it on February 10, 2014.

Do you see that?

A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 26

Q.      Are you aware that on the California Secretary of State website it indicates that Wazzan & Co. has been suspended by the Secretary of State?

A.      Yes.

Q.      What's the cause of that suspension?

A.      Well, it's because we're holding just the one asset, GeneFluidics, and -- so I haven't bothered to file the annual statements.

Q.      When you say you haven't bothered, is there a requirement that you file the annual statements as far as you're aware?

MR. KRY:  Objection to the form.  Legal opinion.

A.      Yeah, so you have to file each year and pay, like, $800 in taxes.  But until GeneFluidics gets resolved, I'm just not concerned with it.

Q.      Do you have any relationship to GeneFluidics other than holding an investment in it through Wazzan & Co.?

A.      No.

Q.      Have you or any member of your family ever been involved in the management of GeneFluidics?

A.      No.

Q.      When was the last time that Wazzan & Co. made a new investment?

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 27

A.     Yeah, so I think it's been like five -- five, six years.

Q.     How many investments did Wazzan & Co. make before that?

A.     I think six or seven.

Q.     You said in your report that Wazzan & Co. has invested in semiconductor companies, correct?

A.     Yes.

Q.     Which semiconductor companies has Wazzan & Co. invested in?

A.     Let's see.  Gplus was one; they were acquired by SSTI.  Cognet was one, that was acquired by Intel.  Those are the two.

Q.     What was the size of the Gplus investment?

A.     I think it was on the order of 6 million.

Q.     Okay.  How about the Cognet investment, what was the size of that?

A.     I think similar.

Q.     And Wazzan & Co. has disposed of its interest in Gplus; is that correct?

A.     It was distributed out to the limited partners.

Q.     How many limited partners did Wazzan & Co. have or does it have?

A.     So it depended on each -- each transaction was subscribed individually or separately, so I'd have to go

Page 28

back and look at the files, but I think Gplus was probably somewhere between 10 and 20.

Q.    Does Wazzan & Co. or did Wazzan & Co. raise different buckets of capital for every investment that it sponsored?

A.    Yes.

Q.    Did you personally invest in all of the investments?

A.    Yes.

Q.    What percentage, if you could ballpark it, of the capital invested in the various Wazzan & Co. investments was your personal investment?

A.    I couldn't say.  I don't recall.  But it depended on each deal.

Q.    What's the aggregate size, to the best of your recollection, of all the investments that Wazzan & Co. made over the years?

A.    I'd have to go back and look, somewhere around 40, 50 million.

Q.    And how much ballpark total distributions were paid out to the limited partners in the various investments?

A.    I'd have to go back and look.  Significant amounts because Cognet was acquired at a pretty significant return as was SSTI.  Valens failed;

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 29

GeneFluidics is still active.  I'd have to go back.  I think the returns were pretty good.

Q.    What was Valens, what kind of company?

A.    Valens was another semiconductor company.

Q.    So three semiconductor companies.  Were there any optical networking companies you invested in through Wazzan & Co.?

A.    Numatics.  We were an early investor in Broadcom but that was kind of a silent -- it's a little bit different, because I wouldn't call them a C-level investment.

Q.    And your report also mentions biomechanical companies.  What biomechanical companies did Wazzan & Co. invest in?

A.    So MannKind was inhalable insulin; they went public.

Q.    Got it.  Day-to-day, over the last three years, what has been your workload at Wazzan & Co.?

A.    Very low.

Q.    Are you planning to make future investments?

A.    Hard to say.  The impetus for the firm was that my dad was the Dean of school of engineering, so he had access to what the faculty were developing the labs, and they would come to him if they had ideas they wanted to commercialize.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 30

He since passed, but he had retired five or six years ago, so --

Q.    Got it.  That makes sense.  Okay.  You can put that away.

Your plan to provide testimony in this case on behalf of the plaintiff, Elon Musk; is that correct?

A.    Yes.

Q.    Have you ever provided expert testimony for Mr. Musk in any other lawsuit?

A.    No.

Q.    In any other arbitration?

A.    No.

Q.    In any other legal proceeding of any kind?

A.    No.

Q.    Are you familiar with a company called xAI?

A.    Yes.

Q.    Have you ever provided expert testimony for xAI in any legal proceedings?

A.    No.

Q.    Have you ever provided testimony for Tesla?

A.    No.

Q.    SpaceX?

A.    No.

Q.    Twitter/X Corp?

A.    No.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 31

Q.      Any other company affiliated with Mr. Musk, to the best of your recollection, have you ever provided expert testimony?

A.      No.

Q.      When were you retained as an expert witness for Mr. Musk?

A.      Probably like three months ago.

Q.      How did you first come to be involved in the case?

A.      I think counsel contacted somebody within BRG and then sort of the call was routed to me and we had an initial conversation.

Q.      And that was three months ago, approximately?

A.      Yes.

Q.      Did you learn in that call that the other side of the case was OpenAI?

A.      Yes.

Q.      Did you know about OpenAI before that initial contact?

A.      Yes.

Q.      What did you know OpenAI before then?

A.      That they make ChatGPT, that it's Sam Altman. I mean, sort of the general things that were known in the public.

Q.      Anything else that you can recall knowing

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 32

before your first contact in connection with this case?

A.    Not that I recall.

Q.    Did you know about this lawsuit before you were contacted about being an expert witness?

A.    No.

Q.    Since you were retained as an expert for Mr. Musk, have you discussed this case with anyone other than counsel or your colleagues at BRG?

A.    No.

Q.    So I've already marked as Exhibit 1 to your deposition, your report.  And just for the record, could you turn to page 59 of that report.

A.    (Witness complies.)

Q.    That's your signature, correct, sir?

A.    Yes.

Q.    Okay.  And you signed this report on October 29, 2025?

A.    Yes.

Q.    Who asked you to provide this report?

A.    Counsel.

Q.    And when did counsel ask you to provide it?

A.    Well, I think in our initial conversation or shortly thereafter, you know, the idea is, you're going to file an expert report.  And he gave me the deadlines.

Q.    Did counsel give you a particular assignment?

Elon Musk v.                 FINAL                December 5, 2025
Samuel Altman       HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 33

A.    Yes.

Q.    Okay.  What was that assignment?

A.    It's listed in my report here.  I was asked to determine --

Q.    You don't have to read it, sir.

So your testimony is that it's as set forth in paragraphs 8 and 9 in your report; is that correct?

A.    Yes.

Q.    I don't mean to be rude, but we're trying to get you out of here as quickly as possibly.  No gloss to add on top of paragraphs 8 and 9.  That's your assignment?

A.    Yes.

Q.    Were you asked to make any assumptions when you prepared this report?

A.    Yes.

Q.    What assumptions were you asked to make?

A.    To assume that liability was established.

Q.    Any others that you can recall?

A.    Not as I sit here.  But if there are others, they would be cited in the report.

Q.    So there are no other assumptions that you can recall, sitting here today?  And if there are, they would be set forth in your report?

A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 34

Q.    Did you write this report?

A.    Yes.

Q.    By yourself?

A.    Yes.

Q.    And I think you testified earlier that you don't recall exactly how long you spent doing that; is that right?

A.    No, I don't.  Because the way I work is I read materials, I start a draft.  I read more materials, I start a draft.  I talk to the guys working for me, and eventually it comes together.  I don't keep track of each task.

            MR. WILSON:  All right.  Hold on to that one.  Guessing I'll have more questions about it.  But let's mark the supplemental report.  So Mr. Wazzan, this will be Exhibit 3 to your deposition.

            (Whereupon, the Supplemental Expert Report of C. Paul Wazzan, Ph.D., was marked as Wazzan Exhibit 3, for identification, as of this date.)

BY MR. WILSON:

Q.    And if you could flip to page 5 of this document.  Well, before we do that, this is the supplemental report that you served in this case earlier

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 35

this week, correct?

A.    Yes.

Q.    Just turn to page 5.  And if you wouldn't mind confirming for me that that is your signature.

A.    Yes.

Q.    And you signed this on Tuesday of this week, correct?

A.    Yes.

Q.    Okay.  You also submitted an errata at the same time.  Do you recall doing that?

A.    Yes.

Q.    Are the changes reflected in that errata responses to criticisms of your initial report from anyone?

        MR. KRY:  I'm sorry, criticisms of the --

        MR. WILSON:  Initial report.

A.    I believe so, yes.

Q.    And do you recall what those criticisms were?

A.    Well, just in a couple of the exhibits, there was -- there was an error in two of the calculations.  I had forgotten to apply the percentage.

Q.    Okay.  And those were calculations pertaining to your assessment of Microsoft's wrongful gains; is that correct?

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 36

A.    Yes.

Q.    Are there any other areas that you've identified in either of your reports that are not reflected in that errata?

A.    No.

Q.    Who asked you to provide the supplemental report?

A.    Counsel.

Q.    And when did they ask you to do that?

MR. KRY:  Objection to form.

Q.    And when did counsel ask you to do that?

A.    Well, I think it was --

MR. KRY:  I'm still going to object to the form as vague.

MR. WILSON:  Okay.  I didn't think that was your objection, but I was trying to clear it up.  I'm going to ask the question again because I've now muddied up the record.

Q.    When did counsel ask you to draft the supplemental report?

MR. KRY:  I'm still going to object to form.

MR. WILSON:  That's fine, you can object.

A.    I want to say it was like last week.  Sometime

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 37

last week, early last week.

Q.    And were you given a particular assignment?

A.    Yeah.  I mean, basically, you know, a deal was announced between -- the OpenAI and Microsoft deal that went public literally the day my first report was due, or the day before.  But then some additional information was provided regarding dilution and things like that. And so counsel decided we should probably submit a supplemental incorporating that new information.

Q.    You referenced a deal between OpenAI and Microsoft.  What deal are you referring to?

A.    That was the announcement that came out on, I think October 28th regarding the public benefit corporation.

Q.    The creation of the public benefit corporation?

A.    Yes.

Q.    Have you heard that transaction referred to as a recapitalization?

A.    Not specifically.

Q.    Okay.  Well, if I reference a recapitalization during the day, that's going to be the transaction I'm talking about.  Is that fair?

A.    Yes.

Q.    Were you asked to make any assumptions in this report?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 38

A.    No.  No new assumptions.

Q.    Okay.  And you wrote this one alone as well?

A.    Yes.

Q.    Is that typically what you do?  You write the reports by yourself?

A.    I write the reports, yes.  I have staff help with exhibits and research and calculations.

Q.    Do the two reports which are Exhibits 1 and 3 to your deposition contain a complete statement of all the opinions you intend to offer in this case?

A.    Yes.

Q.    And do the two reports contain all of the bases for the opinions you intend to offer in this case?

A.    Yes.

Q.    And I may have asked this already.  If so, I apologize.

Sitting here today, do you have any corrections you wish to make to either report?

A.    No.

Q.    Professor Ilya Strebulaev submitted a rebuttal report in this case, responding to your original report.

Are you aware of that?

A.    Yes.

Q.    Are you reviewed that rebuttal report?

A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 39

Q.     Do have you any responses to the opinions that Professor Strebulaev submitted in his report?

MR. KRY:  Objection to form.

A.     I'm not sure what you mean.  I mean, I reviewed his report.  I didn't find his criticisms to be -- I don't know what the right word is.  I thought most of his criticisms were besides the point.

Q.     Okay.  Professor Jonathan Arnold also submitted a rebuttal report, responding to your original report?

A.     Yes.

Q.     Did you also find Professor Arnold's criticisms to be beside the point?

A.     For the most part.  I think some of his stuff is supportive of my points.

Q.     What did Professor Arnold say that's supportive of your points?

A.     Can you give me a copy?

Q.     Mr. Jurata may show it to you later, but I'm just curious if you can remember any of the things he said that prompted you to make that comment?

MR. KRY:  Objection to asking the witness to answer when he asked for a copy of the document.

A.     So I just want to be -- I'm not trying to play games with you -- sorry.  I want to be very precise with

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 40

it.  So when he gives me the copy, then I'll --

Q.    Fair enough.  Fair enough.

Professor Strebulaev also submitted an opening report in this case.  Are you aware of that?

A.    I have not seen it.

Q.    So you haven't seen Professor Strebulaev's opening report, correct?

A.    Correct.

Q.    Until I just said that it existed, were you aware of its existence?

A.    No.

Q.    So let's go back to Exhibit 1, which is your opening report.  And I'd ask you to go back to paragraph 10, please.  You write in this paragraph that:

          "The specific materials that I have considered in forming my opinions are listed in Appendix B of the footnotes of this report."

          Do you see that?

A.    Yes.

Q.    Does Exhibit B -- excuse me, does Appendix B contain a comprehensive list of the materials you considered in forming your opinions?

A.    Yes.

Q.    So is it correct that there are no materials cited in the footnotes of your report that are not

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 41

included in Appendix B?

MR. KRY:  Objection.

Q.    Let me ask a different question:  Was it your intent to include all of the materials that you cited in the footnotes in the appendix?

A.    Yes.  And usually, to avoid this problem, I usually included a sentence at the end of Appendix B that says:  "Including all materials cited," specifically in footnotes.

Q.    Fair enough.

A.    But the idea was to give you the whole set.

Q.    Who selected the materials that you considered in forming your opinions?

MR. KRY:  Objection.  Foundation.

A.    So ultimately me, but counsel provided access to the documents.  They certainly pointed us to, you know, you guys should look at this, you should look at that.  But ultimately, you know, me and my staff selected the materials.

Q.    Did you have access to the complete discovery record in this case?

MR. KRY:  Objection to form.

A.    I believe so.

MR. KRY:  And also objection, foundation.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 42

Q.    Are there materials that you reviewed in connection with this assignment that you did not ultimately consider in forming your opinions?

MR. KRY:  Objection to form.

A.    Could you read that again?

Q.    Sure, I'll ask it a slightly different way. Were there any materials that you looked at, in connection with your assignment, that you ultimately did not cite in this report?

MR. KRY:  Objection to form.

A.    I don't think so, no.

Q.    Okay.  Did you personally review all of the documents listed in Appendix B?

A.    No.

Q.    Okay.  And you would have relied on BRG staff to do that for you for some of the documents?

A.    Yes.

Q.    Do you remember which documents you personally reviewed?

A.    Not as I sit here.

Q.    Okay.  Did you give anyone instructions on what documents to include in Appendix B?

MR. KRY:  Objection.

You can answer that question.

A.    It was everything that we looked at.

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 43

Q.    Okay.  Did you give anyone instructions on what documents they should look at?

MR. KRY:  Objection to form.

A.    Well, yes.  I mean, as we go through the project, you know cap tables were important, for example, so I told the guys, go find the cap tables.  So I do give instructions.

Q.    What do you mean by "cap tables"?

A.    So cap tables, for example, lays out ownership structure or who's contributed what into various entities.  That was an important issue.

Q.    Okay.  I guess my question is, you testified that you and BRG had access to the complete discovery record, but you obviously have included a subset of the discovery record in your appendix, and I'm trying to understand whether you gave BRG any instructions as to how to narrow the set down?

MR. KRY:  Objection.  I objected to the earlier question you referenced there, so I reiterate that, and I also object to the form of this question.

A.    It's the same answer I just gave you, I gave them instructions on various topics to research.

Q.    Okay.  You described a three-step methodology in this report, included in paragraph 29; is that right?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 44

A.    Yes.

Q.    Have you ever used that three-step methodology in a different case?

A.    I'd say no.

Q.    Have you ever used that methodology before in any other context?

A.    No, because each -- each case is usually unique and has certain fact patterns and so we tailor the analysis to each case.  You know they're always pretty unique.

Q.    Did you read about the methodology used in a finance textbook?

            MR. KRY:  Objection to form.  And just to clarify, you mean the three steps or...

            MR. WILSON:  The three-step methodology that's described in paragraph 29.

A.    Well, you know, the first step is to calculate the current value of OpenAI and so to calculate the current value, I go through various things.  There's the discounted cash flow; there's the waterfall analysis; there's the reference to publicly available information.  Those are standard approaches and I would have read those in textbooks, certainly have used all those methods to value other companies, so with respect to step 1, the answer is yes.

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 45

And then calculate the portion as value that should be attributed to OpenAI, and so apportioning value relative to a cap table, for instance, or ownership stakes, for instance, is also something that I would have read in a textbook or papers and have done in the past, so that's a yes.

Let's see.  I used a similar methodology to determine the portion of Microsoft gains, that's the same issue.  So I guess the answer is yes.

Q.    Okay.  So you read in a textbook, for example, that a step of your analysis should be determining the portion of OpenAI nonprofit stake that should be attributable to Mr. Musk's contributions?

MR. KRY:   Objection.  Misstates the testimony.

A.    No, you wouldn't find that in a textbook.

Q.    Where did you come up with that idea?

A.    Like I said, the first step was the valuation; that is textbook.  The second step is apportionment based on contribution; that is textbook.

So no, I can't point you to textbook, where it specifically says "open OpenAI," but these are basic finance concepts.

Q.    Do you have any knowledge of the remedies Mr. Musk is claiming in this case?

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 46

A.      I'm not sure what you mean by that.

Q.      You don't know what that means?

MR. KRY:  Objection.  Asked and answered.

A.      I'm not sure what you mean by that.

Q.      You say in paragraph 8 of your report that you were asked to determine the amount by which the OpenAI defendants and Microsoft wrongfully profited or were unjustly enriched by operating OpenAI as a commercial venture despite having received charitable contributions from Elon Musk.

Do you see that?

A.      Yes.

Q.      Your report uses terms like "wrongful profits" and "unjust enrichment," right?

A.      Yes.

Q.      Your report also uses the term "damages," does it not?

A.      Yes.

Q.      In fact, you have an entire section in your report that's entitled "Overview of Damages Methodology," that's Section 3?

A.      Yes.

Q.      Did you conduct an analysis of unjust enrichment or damages or both?

Page 47

MR. KRY:  Objection to form.

A.     I don't view those as different.

Q.     So they're interchangeable concepts in your mind?

A.     In this context, yes.

Q.     Okay.  Is there any other context in which unjust enrichment and damages would not being interchangeable concepts?

MR. KRY:  Objection.  Foundation. Calls for speculation, basically.

A.     Yeah, I couldn't say.

Q.     In your opinion, did Mr. Musk suffer a loss as a result of the alleged wrongful conduct?

MR. KRY:  Objection to form.

A.     I haven't considered that.  The analysis here is a disgorgement of the unlawful gains that the defendants have obtained.  I haven't looked at it from the perspective of Mr. Musk's loss.

Q.     So you can't say one way or the other, sitting here today, whether Mr. Musk suffered a loss?

A.     I haven't been asked to consider that.  Maybe they're one and the same; I just haven't thought about it.

MR. KRY:  We've been going about an hour.  Do you want to break?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 48

MR. WILSON:  Sure.  We can break right now.

THE VIDEOGRAPHER:  We're going off the record at 10:00 a.m.  This marks the end of Media 1.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by. We're back on the record at 10:11 a.m.  This marks the beginning of Media 2.

BY MR. WILSON:

Q.    Mr. Wazzan, your counsel just told me there's something you like to clarify in your prior testimony. What is that?

A.    Yes.  When you asked me who else I met with yesterday, when I said I met with counsel, they had a financial consultant present as well, Mark Simonen [phonetic].

Q.    He's a financial consultant for whom?

A.    For the attorneys.

Q.    Do you know if he's employed by MoloLamken?

MR. KRY:  Objection.

A.    I don't think he's an employee, no.

Q.    Okay.  Was he present for the entire meeting?

A.    Yes.

Q.    That's all you wanted to clarify?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 49

A.      Yes.

Q.      Great.  Dr. Wazzan, in all of your years as an expert witness, have you been asked to measure compensatory damages?  Probably a few times, right?

A.      Yeah, I mean, that's a legal term, so any time you give me a legal term, I need a little more context.

Q.      Let me ask a different question.  In your experience, is it typical when assessing damages to consider the difference between the actual world and the but-for world?

MR. KRY:  Objection to form.

A.      That is sometimes the case on a case-specific basis.  I would say that's not typically the case in a disgorgement matter.

Q.      Why is it not typically the case in a disgorgement matter?

MR. KRY:  Objection to form.

A.      Because disgorgement is simply the disgorgement of the ill-gotten gains after the predicate act.  It doesn't require a determination of a but-for world.

Q.      And that's a principle of economics?

MR. KRY:  Objection to form.

You can answer if you can.

A.      Yeah, I'd say it's -- I'm not sure.  It's a combination, I guess, of economics, law, finance.

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 50

Q.    You used the term "disgorgement" a few times now.  How does that term and your understanding relate to the term "unjust enrichment"?

A.    So I think it's two sides of the same coin.  In this case, it's the unjust enrichment gained by the defendants, which they will now disgorge.

Q.    Okay.  So the amount of unjust enrichment, at least in this case in your opinion, is equal to the amount that should be disgorged?

A.    Yes.

Q.    Are there other cases where the amount of unjust enrichment and the amount of disgorgement are different?

        MR. KRY:  Objection to form.

A.    I mean, there may be.  I don't know.

Q.    Is disgorgement likewise the same, from your perspective, as damages?

        MR. KRY:  Objection to form.

A.    Well, it can be, yes.

Q.    Is the amount that Mr. Musk was harmed in this case equal to the amount by which the defendants were unjustly enriched, in your opinion?

        MR. KRY:  Objection to form.

A.    Yes.  Sort of on his percentage, yes.

Q.    Percentage of what?

Page 51

A.    So you start with an overall pie and there's an unjust enrichment component to that pie, and Musk -- so then that unjust enrichment transfers to the nonprofit, and Mr. Musk gets a portion of that piece.

Q.    So when you referred to his percentage, meaning Mr. Musk's percentage, were you referring to a percentage of the nonprofit?

A.    His economic interest, yes.

MR. KRY:  Objection to form to the last question.

Q.    Focus on paragraph 8 of your report, if you could, please.  This is your assignment, and I may have read this before, but just to sort of reset the context, you say here that you were asked to determine the amount by which the OpenAI defendants and Microsoft wrongfully profited or were unjustly enriched by operating OpenAI as a commercial venture despite having received charitable contributions from Elon Musk.

Do you see that?

A.    Yes.

Q.    Does your methodology distinguish between wrongful profits and unjust enrichment?

A.    If -- no.  I think in this context, it's the same thing.

Q.    So in this case, at least, from your

Page 52

perspective, "wrongful profits" and "unjust enrichment" are interchangeable concepts?

A.    Yeah, I think so.  You know, maybe to be a little bit more precise, further down in the paragraph, I say:

              "I further understand that 'profit' or 'enrichment' for these purposes includes not only realized profits, but also unrealized gains in the form of increases in valuation."

              So you could, I suppose, draw a fine line between the two, but ultimately in this case, in my analysis, it's the -- I'm focused on the then-realized gains in the form of increases in valuation.

              And so when you add that sort of additional definition, it's one and the same.

Q.    Okay.  And that's, in this case, because you assumed -- or at least in part, because you assumed that wrongful profits or unjust enrichment would include unrealized gains through valuation increases.  Correct?

A.    I'm not sure how to answer that, other than I understand that profit enrichment for these purposes includes not only realized profits, but also unrealized gains.

Q.    Okay.  The sentence that you read, where you

Page 53

write:

"I further understand that profits or enrichment for these purposes includes not only realized profits but also unrealized gains."

And then it goes on.

A.    Yes.

Q.    Is that an assumption that you made in the context of this report?

MR. KRY:  Objection to form.

Q.    Let me ask a different question.  Are you opining as a matter of economics that profit or enrichment for these purposes should include unrealized gains?

A.    No.  I think my understanding comes from counsel on this.

Q.    Okay.  Thank you.

Were you asked to determine the amount of wrongful profits attributable to any particular acts?

A.    Again, I'm not sure how to answer that.  The task is, as I've laid it out in my assignment, the conversion, or I guess the creation of the for-profit entity is the predicate act.

And then the -- the equity value -- or not the equity value, but the economic value that then accrued to the defendants is the piece that has to be disgorged.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 54

Q.      So the only predicate act that you modeled was the creation of the for-profit entity in 2019; is that correct?

A.      Yes.

                MR. KRY:  Objection to form.

Q.      And that was something that counsel instructed you to do?

A.      Yes.

                MR. KRY:  Objection to form.

Q.      We'll come back to that.

        Just to make sure that I understand your testimony, in paragraph 8, you refer to:

                "The OpenAI defendants and Microsoft wrongfully profiting or being unjustly enriched by operating OpenAI as a commercial venture."

                And that's a reference to the formation of the for-profit entity?

                MR. KRY:  Objection.  Misstates the document.

                MR. WILSON:  I'm happy to read the document verbatim if that would be helpful, Robert.

Q.      You say in paragraph 8:

                "I have been asked to determine the amount by which the OpenAI defendants and

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 55

Microsoft wrongfully profited or were unjustly enriched by operating OpenAI as a commercial venture."

Do you see that?

A.    Yes.

Q.    Okay.  And when you refer to operating OpenAI as a commercial venture in that sentence, you are referring to the formation of the for-profit entity in 2019, correct?

MR. KRY:  Objection to form.  It misstates the document again.

MR. WILSON:  Your objection is noted.

Q.    You can answer.

A.    I guess that's right, yes.  As a commercial venture, based on the creation of the for-profit.

Q.    Do you know which of Mr. Musk's claims against the OpenAI defendants are part of Phase 1 of this case?

A.    No.

Q.    Does your analysis assume that Mr. Musk prevails on all of his claims?

MR. KRY:  Objection.

MR. WILSON:  What's the objection?

MR. KRY:  Foundation as to what the claims are.

MR. WILSON:  Well, he doesn't know.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 56

So, we've established that he doesn't know.

MR. KRY:  That's the objection.

BY MR. WILSON:

Q.    Well, regardless of what the claims are, does your analysis attempt to differentiate between which claims Mr. Musk prevails on and which he doesn't?

MR. KRY:  Same objection.  Lack of foundation.

A.    So my recollection from the complaint is that there are a number of claims in the complaint.  My understanding from counsel is that the analysis that I've done, which is the disgorgement analysis, basically applies to each and every claim.

So they don't have to be -- it doesn't have to be all the claims.  It could just be any one of the claims.

Q.    Okay.  Are you aware of that Mr. Musk has a fraud claim?

A.    I don't recall exactly which -- what the claims are from memory.

Q.    I'm happy to represent to you that Mr. Musk has, among other claims, a claim for fraud and a claim for breach of charitable trust.

Do you accept that representation?

A.    Yes.

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 57

Q.    So it's your testimony that if, for example, Mr. Musk prevails on the fraud claim but not the charitable trust claim, his damages for unjust enrichment would be the same as if in a scenario where he prevailed on the charitable trust claim, but not the fraud claim?

          MR. KRY:  Objection.  That question is calling for a legal conclusion.

A.    So I don't have a legal opinion, but that's my general understanding.

Q.    As an economic matter, it's immaterial to your methodology what claims Mr. Musk prevails on, correct, as long as he prevails on at least one?

A.    That's my understanding from discussions with counsel.

Q.    Okay.  Turn to paragraph 14 of your first report.  You say here that Mr. Musk alleges he was misled into being a donor to a nonprofit.

      Do you see that?

A.    I understand that Mr. Musks alleges his contributions were made with the understanding that OpenAI would act in "good faith as a charity committed to safety and transparency above profit."

Q.    Fair enough.  I'm focusing on the final sentence of this paragraph.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 58

A.      Sorry.

Q.      That's fine.  You were just quoting from Mr. Musk's complaint, right?

A.      I'm sorry.

Q.      No, no.  That's okay.  So the final sentence of paragraph 14, you say:

          "In short, Mr. Musk alleges he was misled into being a donor to a non-profit, and that his significant monetary and non-monetary contributions were later repurposed to support a startup with transformational technology."

          Do you see that?

A.      Yes.

Q.      When you conducted your analysis, did you assume that Mr. Musk was being misled at the time when he made all of his donations and non-monetary contributions to OpenAI?

          MR. KRY:  Objection -- no, withdraw the objection.

          MR. WILSON:  Could you read the question back, please.

          (Whereupon, the record was read by the reporter.)

A.      No, I don't make that assumption.

Q.      Okay.  So am I correct in understanding, then,

Page 59

that your report differentiates between donations that Mr. Musk made, or contributions that Mr. Musk made at a time when he was being misled and donations or contributions that he made at a time when he was not?

MR. KRY:  Objection.  Sorry.  When you say correcting your understanding, is that a reference to the report or something else?

MR. WILSON:  I'm trying to understand the witness's testimony.  He's testified that he did not assume that Mr. Musk was misled at the time he made all of his contributions --

MR. KRY:  In that case, I object on the ground that it misstates the testimony.

BY MR. WILSON:

Q.    Well, let me ask you this, Dr. Wazzan:  How would your analysis account for the possibility that Mr. Musk was only misled at a time when he made some, but not all of his contributions or donations?

MR. KRY:  Objection to the form of the question.

A.    It doesn't matter.

Q.    Why doesn't it matter?

A.    Because his contributions, whether he was misled or not, are his contributions.  They are what they are.  The conversion of the -- or the creation of

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 60

the for-profit occurs afterwards.

The question is then:  What are his contributions worth?  Whether they were misled or not misled is not material to the analysis.

Q.    Okay.  Fair enough.  So for example, if Mr. Musk made a donation or a contribution after the conversion had happened and been publicly disclosed, he should still get credit for that in your analysis?

A.    I understand there are some additional contributions that were made after the disclosure, but it's not clear to me that he had full information, and it's a legal issue, so I'm not -- I don't have an opinion on that.

Q.    But your analysis does not break out the unjust enrichment or wrongful profits based on when contributions or donations were made, correct?

A.    No.

Q.    Okay.  Are you aware that Mr. Musk testified that by September 2017, he had already concluded that Mr. Altman and Mr. Brockman were being deceptive, and that their real goal was to create a closed-source maximum-profit entity for their own benefit?

MR. KRY:  Objection.  Misstates the prior testimony of another witness.

A.    I don't recall that, as I sit here.

Elon Musk v.                  FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 61

Q.    You did review Mr. Musk's deposition transcript in this case, did you not?

A.    Yes.

Q.    Did you read the whole thing?

A.    Yes.

MR. WILSON:  Let's look at tab 8.  This will be Exhibit 4 to your deposition.

(Whereupon, the Deposition Transcript of Elon Musk 9/26/25 was marked as Wazzan Exhibit 4, for identification, as of this date.)

BY MR. WILSON:

Q.    I'm certainly not going to ask you to read the whole document, Mr. Wazzan, but this is -- the document I've put in front of you as Exhibit 4 is the transcript from Elon Musk's deposition in this case.

And I direct you to page 84, if you could, please.  And I'm looking at the question and answer that begins on line 15.

"QUESTION:  So when you said discussions were over, you weren't conveying the sentiment that you were determined that Brockman and Altman weren't being straightforward.  They were trying to turn the thing into a for-profit for their own benefit

Page 62

and you'd had it with OpenAI.  Fair?

"ANSWER:  I felt that I was being tricked.  I felt that I was being -- that they were being deceptive, that their real goal was to create a closed-source maximum-profit entity for their own benefit.  And that is, in fact, what happened."

And the next page, answer continues:

"So my suspicions were valid."

Do you see that?

A.    Yes.

Q.    And then there's a reference in the next question to the date of September 20, 2017, which is the date of the e-mail exchange that's being discussed here.

Do you see that?

A.    Yes.

Q.    Okay.  Did you review this testimony when you reviewed Mr. Musk's deposition transcript?

A.    I mean, I don't recall specifically, but I reviewed the transcript, so I must have at the time.

Q.    Okay.  Does this testimony impact your methodology or conclusions in any way?

MR. KRY:  Objection to the use of, like, one tiny snippet of testimony.

MR. WILSON:  If you can just object.

Elon Musk v.                  FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 63

You don't have to get a speaking objection.  I think we all know the rules.

MR. KRY:  Objection to incomplete quotation of testimony.

MR. WILSON:  You can just object to form.

You can answer the question, Dr. Wazzan.

MR. KRY:  Object to form.

THE WITNESS:  Can you read the actual question back?

(Whereupon, the record was read by the reporter.)

A.    No.

BY MR. WILSON:

Q.    Okay.  And why not?

A.    It just doesn't.  I don't see how or why it would.

Q.    Setting the testimony aside, if the finder of fact in this case were to conclude that, by September 2017, Mr. Musk knew that OpenAI was going to form a for-profit venture, would your analysis need to take account of that fact?

MR. KRY:  Objection to form.

A.    If the Court specifically ruled that any -- I

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 64

guess any monetary and nonmonetary contributions made by
Mr. Musk after a particular date, any date, should not
be counted, then my methodology is adaptable to that and
it can be adjusted.

Q.    And how would you adjust it?

A.    Well, I'd go back, right, so there's a section
on the financial contributions, that could be adjusted
and the percentages would change, and then we could look
at the qualitative affect and see what effect it would
have on that.

Q.    But as it stands, there's nothing in your
report that would allow that to be done, that
methodology to be adjusted?

                MR. KRY:  Objection.

Q.    Let me ask the question differently.  As it
stands, you have not conducted that analysis to portion
out by contribution date?

A.    No, I haven't, but the methodology is there,
the tables are there; they're easily adaptable to that.

Q.    Sitting here today, do you know what
contributions Mr. Musk made to OpenAI nonprofit after
September 2017?

A.    So I'm looking at page 36 of my report where I
sort of go through Mr. Musk's monetary contributions.
Starting on paragraph 72 -- I'm just trying to see if I

Page 65

can back out what comes after 2017.  Ten million in 2016.  Eighteen million in 2017, including plus some Teslas.  And then in paragraph 73, despite his public departure in February 2018, Mr. Musk continued to contribute monetarily, though more modestly, through September 2020.  And I cite to some documents, plus I think if we looked at the IRS filings, we could figure out exactly what the number is, but I don't have it here specifically.

Q.    I asked you a few minutes ago whether the snippet of testimony that I read from Mr. Musk's deposition impacted your methodology or conclusions.

Do you recall me asking you that question?

A.    Yes.

Q.    And you testified that it did not and I asked why did it not, and you said it just doesn't; I don't see how or why it would.

Could you explain a little bit more why the testimony does not -- that I read to you does not impact your methodology or conclusions?

MR. KRY:  Objection to form.  Asked and answered.

A.    It's a legal issue.  It's tangled up.  What Mr. Musk's intentions were are tangled up in sort of his legal claims.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 66

Q.      And you're not here to resolve legal issues, correct?

A.      I'm not, exactly.

Q.      And you're not here to resolve factual disputes?

A.      No.

Q.      You're not here to weigh evidence?

A.      Well, I am weighing evidence.

Q.      How are you weighing evidence?

A.      Evidence, there's facts strewn throughout this report that I'm evaluating.

Q.      If there's a difference of opinion or a difference of position between one side or the other, it's not your job, as you understand it, to decide who's right?

                MR. KRY:  Objection to form.

A.      Right, which is why I said if the Court ruled, for example, that contributions after a particular date should be set aside, then I would adapt my model to that ruling.

Q.      Turn to page 29 of your report, please.  Not page 29, paragraph 29.  And this is the paragraph that you describe your three-step methodology, correct?

A.      Yes.

Q.      You say here, a couple of lines down:  "Using

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 67

this methodology, I estimate OpenAI's wrongful gains to be between 83.03 billion and 212.59 billion."

Q.   Do you see that?

A.   Yes.

Q.   What does OpenAI refer to in the context of that sentence?

A.   That is OpenAI's share of the for-profit.

Q.   When you say "OpenAI's share," what does that mean exactly?

A.   So the parties set up a for-profit, and the -- sort of the benefit or the economic interest in that for-profit is allocated to the different parties, and roughly, you know, I have the specific numbers, especially in my supplemental report, but let's say it's 30 percent to Microsoft, 30 percent to OpenAI and then there's, you know, additional percentages for the --

(Reporter clarification.)

A.   -- first call limited partners.

Q.   When you say that OpenAI had wrongful gains, can you identify the specific persons or entities affiliated with OpenAI that gained wrongfully?

A.   I think it would be the defendants in the case.

Q.   And who are the defendants that you're referring to?

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 68

A.    They would be all the defendants listed.

Q.    Okay.  Sitting here today, do you know who the OpenAI defendants are?

A.    Well, it's Sam Altman -- no, we'd have to go back and look at the complaint.

Q.    Do you know whether the OpenAI nonprofit is a defendant in this case?

A.    I'm not sure.

Q.    Sitting here today, do you have an opinion one way or the other as to whether or not the OpenAI nonprofit has wrongfully benefitted?

A.    Yeah, I mean, they -- the nonprofit has benefitted -- the nonprofit is the residual claimant, so they have benefitted from the creation of the for-profit.

Q.    Has the OpenAI nonprofit benefitted wrongfully?

            MR. KRY:  Objection to form.

A.    I believe so, yes.

Q.    Okay.  So according to your analysis, if Mr. Musk prevails and the Court adopts your analysis, OpenAI nonprofit should be paying back some of the wrongful gains that you analyze; is that correct?

A.    Some portion of their economic interests would transfer to Musk, yes.

Q.    What portion, if you know?

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 69

A.      Yeah, the percentage is laid out in my tables.

Q.      So OpenAI nonprofit would pay back between 50 and 75 percent of its value to Mr. Musk under your analysis?

A.      I don't think it's quite that much.

Q.      Well, what percentages were you referring to? And if you need to reference your report, by all means.

A.      So if you look at in Exhibit 14, on page 52...

Q.      Mm-hmm.

A.      That table is entitled "Apportionment of OpenAI's Wrongful Gains Across Time Periods" -- sorry, that's not the table I want.

Q.      Well, maybe I can help you.  You submitted a supplemental exhibit in your supplemental report, so take out Exhibit 3 to your deposition and if you go to page 4, there's a revised Exhibit 19, which is a chart that's titled "OpenAI's Wrongful Gains Based on PBC Restructure Announcement."

A.      Yes.

Q.      So does that help you to answer my question?

A.      Yes.

Q.      So what was the percentage that you were just referring to?

A.      So the percentage is, you start with the total valuation of 500 billion, and then you apply OpenAI's

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 70

nonprofit share, which is either 29.2 percent or 26.2 percent based on some dilution, and you make that multiplication and that gives you OpenAI's for-profit piece, which ranges from 145.9 to 131, and then you apply Mr. Musk's economic interest in OpenAI, which is 50 or 75 percent, so ultimately you get a range of 65 billion to a high of 109 billion.

Q.    Okay.  So let's use that range, 65.5 billion to 109.43 billion?

A.    Yes.

Q.    The midpoint is around 87 billion, correct?

A.    Yes.

Q.    Just for purposes of discussion, let's use the 87 billion.

A.    Okay.

Q.    According to your analysis, what portion of that $87 billion wrongful gain is a gain by OpenAI nonprofit?

A.    I'm sorry, say that again.

Q.    According to your analysis, what portion of that $87 billion wrongful gain is a gain by the OpenAI nonprofit?

A.    All of it.

Q.    All of it.  Okay.  This revised estimate of wrongful gains, Exhibit 19, we were just talking about,

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 71

this reflects the closing of the recapitalization, or what you call the OpenAI Microsoft transaction, correct?

A.    Yes.

Q.    Is this exhibit now your current opinion as to OpenAI's wrongful gains in this case?

A.    Yes.

Q.    Okay.  So you're no longer taking the -- or expressing the opinion that it would be appropriate to value the nonprofit's interest in OpenAI for-profit using Black-Scholes model, correct?

A.    Well, it is appropriate.  I mean, you sort of need history of it, right, before the transaction was announced, the day before my report was due, we had a variety of methods to get it to value.  And so one was to look at publicly available information, one was to use the Black-Scholes, and one was a discounted cash-flow analysis.  They're all valid; they're still good.  We now have a very contemporaneous transaction between the parties where they lay out the percentages, so I don't have to do the Black-Scholes anymore, and then they have starting value, 500 billion, so I don't have to do that anymore, but that's because we're contemporaneous.

        If trial stretched out for a year, or the decision has to be updated and there's no proximate

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 72

transaction of this nature, then I would have to go back to my methodology and redo it.

Q.    Got it.  But assume there's no transaction that changes the share percentage allocations between the varies parties that have an interest in the PBC, the percentage is listed here in Exhibit -- revised Exhibit 19, that reflects your current opinion?

A.    Yes.

Q.    And as to the valuation, the same is true, that's your current belief as to what the correct valuation is?

A.    Yes.

Q.    And I understand that could change if circumstances change between now and trial, but if the trial were today, that would be the number?

A.    Yes.

Q.    There's a reference on revised Exhibit 19 to Mr. Musk's economic interest in OpenAI -- actually, let me lay the foundation for the question.  Keep that Exhibit 3 handy, but look back at Exhibit 1, paragraph 29.  So there's written in this paragraph, the final sentence says:

"The ranges are a result of different estimates of OpenAI for-profits value and the size of Mr. Musk's attributed stake in OpenAI

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 73

nonprofit."

Do you see that?

A.    Yes.

Q.    And the ranges that you're referring to in that sentence are the ranges you calculated for OpenAI and Microsoft's wrongful gains, correct?

A.    Yes.

Q.    All right.  So now get out revised Exhibit 19 from your supplemental report, and there's a row here that's entitled:  "Mr. Musk's Economic Interest Percentage in OpenAI Nonprofit."

Do you see that?

A.    Yes.

Q.    Is Mr. Musk's economic interest in OpenAI nonprofit the same as his attributed stake in OpenAI nonprofit?

A.    Say that one more time.

Q.    Sure.  Is -- and I'm -- the phrase "attributed stake," I'm taking from paragraph 29 of your opening report.  I'm not making that up, so I'm not trying to trick you.

I'm just trying to clarify whether Mr. Musk's attributed stake in OpenAI nonprofit, which is the terminology you used in your initial report, is the same as Mr. Musk's economic interest in OpenAI nonprofit?

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 74

A.     Yes.

Q.     Okay.  Thank you.  Now, Mr. Musk doesn't have a stake in OpenAI nonprofit, does he?

A.     Not actually.

Q.     And he never had one, correct?

A.     No.

Q.     Mr. Musk never had any economic interest in any kind of OpenAI nonprofit, correct?

A.     I guess that's right.

Q.     A person can't have an economic interest in a nonprofit, right?

A.     Right.

Q.     And you would agree that donors to a nonprofit contribute funds altruistically with no expectation of a return, correct?

                MR. KRY:  Objection.  Foundation.

A.     I mean, as a general concept, I think people donate to nonprofits, yes.

Q.     Trying to suss out your counsel's objections, but let me just ask a different question.  Donors to a nonprofit do not expect a financial return, correct?

                MR. KRY:  Objection.

A.     I think as a general matter, no.

Q.     And Mr. Musk was not an exception to that general principle in this case, as far as you know?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 75

MR. KRY:  Objection.  Foundation.

Q.    Sitting here today, do you have any reason to believe that Mr. Musk expected a financial return when he donated money and time to OpenAI nonprofit?

A.    I have no opinion on that.

Q.    Setting aside whether you have an opinion, are you aware of any information that would support such an opinion?

A.    No.

Q.    Is the premise of your methodology that Mr. Musk's alleged donations and charitable contributions to the nonprofit should be treated as for-profit investments?

A.    Well, that's not exactly what's going on here. What's going on is that he contributed to a nonprofit. The nonprofit then created a for-profit operation, leading to, in this case, the unjust enrichment.

The unjust enrichment is now flowing back to the nonprofit as the residual claimant.  And the question is, based on Musk's original monetary and nonmonetary contributions, what would he be entitled to of that amount.  So it's not -- I mean, that's it. That's the definition.

Q.    You're trying to calculate what Mr. Musk's hypothetical equity interest in the nonprofit would have

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 76

been under a different set of circumstances, correct?

MR. KRY:  Objection.  Misstates the testimony.

A.    It's not really an equity interest.  It's an economic interest.

Q.    So you're trying to calculate what his hypothetical economic interest would have been if OpenAI nonprofit not been a nonprofit from the beginning.

MR. KRY:  Objection.  Misstates the testimony.

Q.    I'm not trying to misstate the testimony.  I'm trying to clarify it.

Do you disagree with what I just said?

A.    I think you -- I think I go back to my original answer.

Q.    Okay.  So sitting here today, you can't say, or you wouldn't agree, that what you're trying to calculate is what Mr. Musk's economic interest would have been in OpenAI nonprofit if it had been a for-profit from the beginning?  That's not correct?

A.    That's not correct.

Q.    What's wrong about that?

A.    That's not the objective of the exercise here. Like I said, you're starting out with the creation of the for-profit, and the nonprofit being the residual

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 77

claimant has benefitted from that creation of the for-profit. We're calling that unjust enrichment.

The question is: How much of that unjust enrichment should be allocated to Musk?

I'm not going back and creating a but-for world.

Q. But you are trying to ascertain the value, the relative value of Mr. Musk's financial and nonfinancial contributions, correct?

A. Yes.

Q. And why is that a salient consideration? What makes that relevant?

A. I can't just allocate all the unjust enrichment to Musk. There were other presented parties. There's other contributors. The employees get a share, et cetera.

Q. What I'm trying to understand is, are you making a subjective judgment about the relative contribution that Mr. Musk provided? Or are you trying to objectively determine what reasonable people, looking at this, would have decided was the relative value of this contribution?

MR. KRY: Objection to form.

A. I'm not sure how to characterize my analysis as to your -- into your question as subjective or

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 78

objective.  What I've done is I've looked at his monetary contributions, and you can calculate a percentage relative to other monetary contributions.

I've also then assessed the nonquantitative elements that he contributed.  Founder, visionary, leadership, et cetera.  Ability to attract employees, ability to recruit, things like that.  And I've determined what I think is the right division.

Q.    Are you finished with your answer?

A.    Yes.

Q.    Okay.  Your revised Exhibit 19 also refers to Mr. Musk's economic interest in OpenAI for-profit.  Do you see that?  It's the final row?

A.    Yes.

Q.    What is that referring to?

A.    Well, just that -- the economic interest in OpenAI for-profit.  In the first column, he gets 72 million -- sorry, he gets 72 billion of the total value of 500 billion.

Q.    How, if at all, in your methodology, does Mr. Musk's economic interest in OpenAI nonprofit differ from Mr. Musk's economic interest in OpenAI for-profit?

A.    They're related.

Q.    What's the relationship?

A.    The relationship is that the nonprofit is the

Elon Musk v.                  FINAL                 December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 79

residual claimant of the for-profit.

Q.    The amounts you calculate for Mr. Musk's economic interest in the nonprofit and the for-profit are identical, aren't they?

MR. KRY:  Objection.  Misstates the document.

Q.    The amounts of the economic interest that Mr. Musk has in OpenAI nonprofit and OpenAI for-profit, according to your analysis, they're identical?

MR. KRY:  Objection.  Misstates the document.

A.    No, I don't see that.

Q.    It says that Mr. Musk's economic interests -- let's just focus on Estimate 1.

"Mr. Musk's economic interest for OpenAI nonprofit is 50 percent."

Do you see that?

A.    Yes.

Q.    50 percent of what?

A.    50 percent of the 145.

Q.    What is 50 percent of 145.9?

A.    72.95.

Q.    So you're notwithstanding that math, saying that I'm wrong to ask you to equate the value of the economic interest in the nonprofit and the economic

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 80

interest in the for-profit?

MR. KRY:  Objection.  Misstates the document and also object to the form.

A.    I guess you've lost me with your questioning.

Q.    You're not disputing that 50 percent of 145.9 equals 72.95, are you?

A.    No.

Q.    But you are disputing that Mr. Musk's economic interest in OpenAI nonprofit equals Mr. Musk's economic interest in OpenAI for-profit.

Do I have that right?

A.    Well, I think -- I don't know.  Maybe you're misunderstanding the table.  The -- you start with 500 billion.

Q.    Mm-hmm?

A.    That's the total pie.  What then is OpenAI's nonprofit share of that 500 billion?  It's 29.2 percent. 29.2 percent times the 500 billion, gets you at 145. That's OpenAI's nonprofit economic interest in OpenAI's for-profit.  145.

The question then becomes:  How much of the 145 that is owned by the nonprofit is going to be attributable to Mr. Musk?  It's 50 percent.  So there's further reduction.

And then his total amount is 72.95 billion.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 81

Q.    I'm just truly trying to understand.  If you imagine that the total AI for-profit was a big circle?

A.    Yes.

Q.    And that the total value of the OpenAI was a smaller circle that was concentric to the first one.

Are you with me so far?

A.    Okay.

Q.    Does "okay" mean yes?

A.    Well, I wouldn't do it that way.

MR. KRY:  That's a pretty fun pie chart.

A.    Yeah, I would make it more of a pie chart.  I wouldn't make it concentric circles.

Q.    Well, I'm going somewhere with this.  You got to stay with me.

A.    Okay.  Should I draw it out?

Q.    Yeah, sure.  Draw it out.

MR. WILSON:  Is this a big enough piece of paper?

MR. KRY:  No, let me --

Q.    Draw a big circle.  So that is 500.

A.    Okay.  Right in the middle?

Q.    Sure, concentric.  Yes.  That's what it means.  My geometry teacher from elementary school would be proud of me right now.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 82

A.      Okay.

Q.      Okay.  And so in the Estimate 1, the value of that is 145.9, correct?

A.      Yes.

Q.      And I'm just trying to understand.  Mr. Musk's 72.95 is inside of that smaller circle, right?

A.      Yes.  Here's Musk.

Q.      Okay.  Great.  So what I was trying to get at is that when you talk about Mr. Musk's economic interest in OpenAI nonprofit, that's that little triangle that you just drew?

A.      Yes.

Q.      And that's a slice of the pie?

A.      Yes.

Q.      And that same number also happens to be Mr. Musk's share of the OpenAI for profit.  It's just inside the bigger circle, when you look at it from that perspective.

A.      Yeah.  If you are, you can take 72 and divide it by 500.  And that would be his interest in the total pie.

                MR. WILSON:  Okay.  All right.  Let's mark that as an Exhibit.  I think that's a useful thing to have done.  So is that going to be Exhibit 5?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 83

(Whereupon, Witness Notes was marked as Wazzan Exhibit 5, for identification, as of this date.)

MR. WILSON:  I think I get it now.

Thank you, Dr. Wazzan.

BY MR. WILSON:

Q.    So your analysis assumes that Mr. Musk's economic interest in OpenAI nonprofit is held by the nonprofit itself?

A.    Yes.

Q.    Okay.  Got it.  In other words, he should have an economic interest in the nonprofit, but he doesn't, in your analysis?

MR. KRY:  Objection to form.

A.    Yes.

Q.    Let's take a look at paragraph 52 of your report.  Here you say that your assignment was to allocate the current value of OpenAI for-profit, among its various stakeholders, including OpenAI nonprofit.

Do you see that?

A.    Yes.

Q.    And who are the various stakeholders in OpenAI for-profit?

A.    It's the first-call limited partners: Microsoft, OpenAI nonprofit and Aestas.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 84

MR. KRY:  Objection to the time period.

Q.    That's a fair objection.  Just to be clear, I'm asking as of today.

A.    Well, then there's some additional --

Q.    Okay.  So as of today -- and it's not a memory test, but do your best -- who are the various stakeholders in OpenAI for-profit today?

A.    Well, it says the PBC cap table identifies the post-conversion shareholdings of the OpenAI nonprofit, Microsoft and other shareholders under three scenarios, pre warrant is diluted for the present value of the warrants and full dilution, so...

Q.    I'll tell you what, Dr. Wazzan, we can come back to that.

If your assignment was to calculate Mr. Musk's --

A.    Sorry.

Q.    Go ahead.

A.    So it's the parties I named plus the EV, SP, EIP.

Q.    We can come back and I'll show the cap table that you referenced in your supplemental report and we can go over this again later.

Let me ask you this, if you were trying to calculate Mr. Musk's economic interest in OpenAI

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 85

for-profit, why would it not have been appropriate to examine the percentage of the OpenAI for-profit's value that is attributable to Mr. Musk's contributions?

MR. KRY:  Objection to form.

A.     Well, ultimately, that's the percentage we calculate, right, it's 72 divided by 500, but he was not a party to the for-profit.  He's not listed in the cap table.  He doesn't have an economic interest as laid out by the parties in the transaction.  His contributions were made to the nonprofit, so I think it's appropriate to view his contributions through that lens, they came in through the nonprofit.

Q.     You would agree with me, wouldn't you, that Mr. Musk's relative contribution to the for-profit's value is substantially less than 50 to 75 percent, wouldn't you?

A.     It's a different analysis and one which I haven't done, but his original contributions, if you carry those forward to the for-profit, could be very valuable, right?  The early money is more valuable than the later money.

Q.     Is that always true?

A.     No, it's not a law.

Q.     You haven't calculated Mr. Musk's relative contribution to the value of the for-profit?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 86

MR. KRY:  Okay.  Misstates the documents.

A.   Sorry, say that again.

Q.   Well, have you calculated Mr. Musk's relative contribution to the for-profits value?

A.   No.

Q.   Okay.  If you had to calculate that relative contribution, what additional facts would you have considered?

A.   I can't say, as I sit here.

Q.   Would you have considered the outside investments, for-profit investments that OpenAI for-profit has received over the last several years?

A.   Maybe.

Q.   Okay.  So you maybe would have considered the billions of dollars in outside money that came into OpenAI after Mr. Musk left, correct?

A.   I'm not sure.  It's a different analysis, and it's one that I haven't done, right.

Q.   Okay.  Would you have considered all of the work done by OpenAI's employees since March 2019?

A.   I couldn't say.

Q.   Okay.  Would you have considered the many technological advances that OpenAI has made since March 2019?

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 87

A.    I couldn't say.

Q.    Just haven't thought about it?

A.    I have not.

Q.    And you weren't asked to?

A.    No.

Q.    Is it your opinion that the value of the nonprofit stake in the PBC is directly correlated to the nonprofit's relative contribution to the for-profit's value?

A.    I need that one more time.

Q.    Sure.  Is it, under your methodology, or is it your opinion that the value of the nonprofit's stake in the PBC is directly correlated to the nonprofit's relative contribution to the value of OpenAI for-profit?

A.    I think the answer is yes.  That's quite a long sentence.

Q.    Okay.  Maybe I'll make it more concrete.  Under estimates 3 and 4 from your Exhibit 19, you conclude that the OpenAI nonprofit's fully diluted share of the PBC is 26.2 percent; is that right?

A.    Yes.

Q.    In your opinion, does that mean that the nonprofit is responsible for having generated 26.2 percent of the current value of the PBC?

A.    I haven't done that analysis.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 88

Q.    Do you have an opinion on that question sitting here today?

A.    No.

Q.    Okay.

A.    I mean, look, at the extreme, in the limit, the OpenAI nonprofit contribution could be 100 percent under the question you're asking, because if they don't start the nonprofit, maybe there's never an OpenAI to begin with.  So there's no way to really do that.

Q.    Okay.  I just want to be clear, you're not expressing an opinion one way or the other as to whether or not the fact that OpenAI nonprofit has a 26.2 percent means that OpenAI nonprofit contributed 26.2 percent of the value?

A.    I don't know what that means.  I mean, the parties agreed that their interest would be 26.2, so that's not coming out of thin air.  I mean --

Q.    Have you studied the negotiations around this?

            (Reporter admonition.)

            MR. WILSON:  I'm sorry, I thought he was done.

A.    I mean, it's the parties to the PBC recapitalization, so like I said, I haven't done the analysis as to what their contribution should be and if that's different than what their 26.2 figure is.

Page 89

Q.      Have you analyzed or were you asked to analyze the negotiations around the cap table for the PBC?

A.      I don't know that I was asked to, but I did.  I reviewed all those watershed documents which showed -- and I don't have this exactly straight in my mind, my memory, but both sides had their own reports, there were investment bankers on both sides, and they were trying to get at what the right allocation of equity should be for the for-profit, and they were doing that based on the Black-Scholes models and they had different estimates as to the inputs.

The numbers that were then publicly announced as part of the PBC restructure agreement are very similar, or at least along the same lines as what I was looking at in the watershed documents, so I have looked at those documents and those were negotiations that probably led to these figures.

Q.      Based on the documents you looked at about the watershed, as you called it, negotiations, was it your understanding that the parties were trying to figure out who contributed what percentage of the value to OpenAI for-profit?

A.      I don't recall specifically.  I mean, OpenAI contributed, you know, IP and employees and all their stuff.  We'd have to go back and look at the documents.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 90

MR. KRY:  We're about an hour in at this point.

MR. WILSON:  Yeah, I was just going to suggest a break so let's do it.

THE VIDEOGRAPHER:  Going off at 11:09 a.m.  This marks the end of Media 2.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by.  We are back on the record at 11:25 a.m.  This marks the beginning of Media 3.

BY MR. WILSON:

Q.    Dr. Wazzan, you write in your report that generative AI models are expensive to develop and maintain; is that right?

A.    I think that's right.  Can you point me to the paragraph?

Q.    It's in paragraph 16.

A.    Yes.

Q.    What makes developing generative AI so expensive?

A.    I think it's a combination of the need -- pretty much what I write down here, they leverage sophisticated machine-learning algorithms written by programmers, data scientists, computer scientists and other specialists.  The models also leverage computer

Elon Musk v.                FINAL                December 5, 2025
Samuel Altman       HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 91

hardware that can quickly process substantial amounts of data, compute costs that are estimated to be in excess of 5 billion annually at OpenAI alone.

So it's labor, it's compute costs, hardware costs, everything.

Q.    Companies like OpenAI and xAI, they spend billions of dollars a year to compute, right?

A.    Yes.

Q.    They offset -- you offset to pay the people to do the research and develop the technology, right?

A.    Yes.

Q.    Can you say here that some people are getting paid more than $100 million a year?

A.    Yes.

Q.    That's a lot of money.

A.    Yes.

Q.    Do have you an opinion on whether the OpenAI nonprofit could have developed OpenAI's current technology if it had never formed the for-profit?

A.    I don't have an opinion on that.

Q.    Okay.  That's not something you considered?

A.    No, and I'm not sure it's relevant, right, so take Amazon, for example.  The creation of Amazon by Bezos in a garage was not very costly.

Today, Amazon probably spends billions, I'm

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341              janerose@janerosereporting.com

Page 92

sure they do spend tens of billions on labor cost, compute costs, et cetera. That doesn't mean that Bezos doesn't deserve or doesn't own $300 billion worth of Amazon, right? It's not an apples to apples analysis.

Q. To be clear, you mentioned Amazon; I didn't. So I'm not sure what the "apples to apples" comment means.

But you weren't asked to consider whether OpenAI nonprofit could have raised the funds sufficient to develop its current technology through donations alone, were you?

A. No.

Q. Okay. Do you know what Mr. Musk's perspective was on that question?

A. From memory, I remember seeing some correspondence between the parties where he thought they probably needed to form a for-profit entity.

Q. Mm-hmm. Mr. Musk thought that OpenAI needed additional resources to develop all their artificial general intelligence, didn't he?

A. Yes.

Q. And as you just alluded to, that's why he and the other cofounders were discussing alternative structures?

MR. KRY: Objection. Form.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 93

A.    Based on my memory, yes.

Q.    One of the things they discussed was forming a for-profit entity, right?

A.    I believe so.

Q.    And then they also talked about the possibility of merging OpenAI with Tesla, correct?

A.    Yes.

Q.    How long, by the way, did Jeff Bezos work at Amazon?

A.    I have no idea.

Q.    Longer than Mr. Musk was at OpenAI?

A.    Probably.

Q.    Do you know how much of his personal capital Jeff Bezos invested into Amazon?

A.    No.

Q.    Okay.  Paragraph 14 of your report, you characterize Mr. Musk's allegations as follows.  You say:

        "Mr. Musk alleges Mr. Altman and others have established an opaque web of for-profit OpenAI affiliates, the only value of which came from looting OpenAI of the intellectual property, employees and relationships developed by exploiting Mr. Musk's name and contributions, the charities tax status, and

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 94

the goodwill generated by its supposed philanthropic commitment."

Do you see that?

A.    I'm sorry, what paragraph --

Q.    Paragraph 14.  I believe I just read the second sentence.

A.    Yes, I'm with you.

Q.    So in that sentence, Mr. Musk, in his complaint, uses the word "looting."

Do you see that?

A.    Yes.

Q.    Are you expressing any opinion on whether any looting of the OpenAI nonprofit has occurred?

A.    No.

Q.    Okay.  So you don't have any opinion, one way or the other, on whether the nonprofit received fair value in the March 2019 transfer of assets that's referenced in your report?

A.    Read it again, please.

Q.    Sure.  In paragraph 26 of your report, you refer to a March 2019 transfer of assets from OpenAI nonprofit to OpenAI for-profit.

Do you remember talking about that?

Feel free to look at paragraph 26.

A.    Okay.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 95

Q.      And my question is whether you have any
opinion, one way or the other, on whether the nonprofit
received fair value in connection with that asset
transfer.

A.      I have no opinion on that.

Q.      Okay.  Do you have any opinion on whether the
nonprofit received fair value in the July 2019
transaction with Microsoft that's referenced in
paragraph 22 of your report?

A.      I have no opinion on that.

Q.      Okay.  Do you have any opinion on whether
OpenAI nonprofit received fair value in the March 2021
transaction with Microsoft that's referenced in
paragraph 23 of your report?

A.      Don't really have an opinion on that.

Q.      Okay.  Do you have any opinion on whether the
nonprofit received fair value in the January 2023
Microsoft transaction that's referenced in paragraph 24
of your report?

A.      I mean, I hadn't really thought about it, but I
guess now that I'm thinking about it, it's two
sophisticated parties in an arm's length transaction,
both operating for-profit.

        So what strikes me is that the transactions are
probably fair, but I haven't really thought about it in

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 96

any detail.

Q.    Okay.  Do you have any reason to believe that the March 2019 asset transfer was not at arm's length?

MR. KRY:  Sorry, the -- which March 2019 asset transfer?

Q.    The one that's referenced in paragraph 26 that we just talked about.

MR. KRY:  Between the nonprofit and the for-profit?

MR. WILSON:  That's the one I'm talking about.  It's in paragraph 26.  I think the witness knows which transfer I'm talking about.

A.    Can you ask the question again.

Q.    Well, you referenced the fact that the January 2023 transaction with Microsoft was arm's length.  And I just want to make sure that your testimony is clear.

Sitting here today, do you have any reason to believe that the March 2019 transfer of assets from the nonprofit to the for-profit, was anything other than an arm's length transaction?

A.    I see.  I don't have an opinion on that one. What I was referencing earlier is if OpenAI for-profit is negotiating with Microsoft, those are two arm's length transactions.  Probably efficient.

But the transfer of assets from the OpenAI

Page 97

nonprofit to OpenAI for-profit is sort of an interrelated transaction, so I haven't -- I haven't thought about it.  The rules don't quite apply.

Q.    What rules are you referring to?

A.    It's not arm's length by two independent parties.  It's two related parties.

Q.    And are you expressing an opinion as to whether or not OpenAI nonprofit received fair value in that transaction?  I just want to be very clear.

A.    No, I'm not.

Q.    Are you aware of the fact that the nonprofit received a third-party valuation in connection with the March 2019 asset transfer?

A.    I believe there were some third-party valuations.

Q.    Okay.  Have you reviewed those valuations?

A.    In like Hemming Morse and PwC, yes.

Q.    I'm referring specifically to the Hemming Morse valuation.

A.    Yes.

Q.    You reviewed it?

A.    Yes.

Q.    And do you have any basis to dispute the valuation they came up with?

MR. KRY:  Objection to form.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 98

Q.    Let me ask a different question.  Do you have any opinion as to whether or not that was a reasonable value that Hemming Morse ascribed to those assets?

A.    I haven't studied it in depth.

Q.    One last question, and I'll move off this:  Are you expressing any opinion in this case as to whether the nonprofit received fair value in the recently completed recapitalization that resulted in the formation of the PBC?

A.    No.

Q.    You say in paragraph 26 that, just to clarify one issue, that the valuation of Hemming Morse -- well, you don't quite say that.  You refer to the fact that in the March 2019 transaction, the OpenAI nonprofit transferred a majority of its assets.  And then you say: "Valued at 47.8 million."

Do you see that?

A.    Yes.

Q.    Do you know if that was, in fact, the valuation that Hemming Morse attached to those assets at that time?

MR. KRY:  Sorry.  "At that time," you mean the date of the Hemming Morse report or the date of the transaction?

Q.    You're aware of the fact that there are

Elon Musk v.                    FINAL            December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 99

multiple Hemming Morse reports related to the 2019 transaction?

A.    Yes.

Q.    Did you know what the final valuation was that Hemming Morse calculated?

A.    I mean, from memory, was it -- I don't know, was it, like, 61 million?

A.    Close enough.  So you are aware of that.

A.    Yes.

Q.    Okay.  And you have no opinion one way or the other as to whether that was the right value?

A.    I didn't really study it in depth.

Q.    Okay.  The nonprofit's assets today are valued at around, give or take, 130 billion, according to your analysis; is that right?

A.    Yes.

Q.    Are you able to calculate the increase in value from March 2019, when the assets were transferred, to today?

A.    Not sure I follow.  If you want to just subtract 47 million from 131 billion -- is that what you're asking?

Q.    You can use 47.  I was going to use 61, which is the number that you used.  But it's over 129 billion, correct?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 100

A.    Yes.

Q.    And it's roughly 2000 times increase in value?

A.    Yes.

Q.    Fair enough?

Based on your analysis, what was the total value of Mr. Musk's monetary and nonmonetary contributions to the nonprofit?

MR. KRY:  Objection to the time period. Specifically do you mean total value then or total value today?

MR. WILSON:  I'm asking whether he analyzed the total value of Mr. Musk's monetary and nonmonetary contributions.  If he wants to specify time periods, he can do that.

A.    I think the value of his contributions, if you measure it today, is somewhere between 65 billion and 109 billion.

Q.    Okay.  So you do think that Mr. Musk contributed something up to $100 billion in value to OpenAI?

A.    Yes.

Q.    And that's your opinion, notwithstanding the fact that the entire, or virtually the entire bundle of assets that OpenAI nonprofit owned as of March 2019 was valued at $60 million; is that right?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 101

MR. KRY: Objection to form.

A.    Yes.

Q.    Okay. Is it your opinion that Mr. Musk is responsible for the increase in value of OpenAI nonprofits assets by approximately 2,000 times from March 2019 to today?

A.    In part, yes.

Q.    Okay. And to what extent is Mr. Musk responsible for that valuation increase?

A.    He's responsible for his allocated economic interest, between 65 and 109 billion.

Q.    What did Mr. Musk do, if anything, after March 2019 to contribute to the value of the nonprofit?

A.    What did he do afterwards? Nothing. He was instrumental in the formation of it.

Q.    Okay. Are you claiming that anything that he did prior to March 2019 is the cause of OpenAI's nonprofits assets increasing by 2,000 times over the last six and a half years?

MR. KRY: Objection to form. By "claiming" do you mean "opining"?

MR. WILSON: Opining.

A.    So I'm not, again -- I'll go back to the original premise is I'm doing a disgorgement analysis of the unjust enrichment. I don't have to tie that to his

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 102

monetary investment.

He's entitled to an economic interest in the nonprofit.  That's what I've calculated.  And then the nonprofit holds an interest in the for-profit and he gets his allocated share.

Q.    And when you say he's entitled to an economic interest in the nonprofit, is that your opinion or is that something that you were instructed to assume?

A.    Yeah, I assume that.

Q.    And that's based on instruction from counsel?

A.    Yes.

Q.    So Mr. Musk has contributed somewhere between 65, I think you said, and 100-and-something billion dollars to the value of OpenAI nonprofit.

Have you analyzed the contributions of others to the value of OpenAI for-profit since March 2019?

A.    Yes.

Q.    Okay.  Whose contributions have you analyzed over that time period?

A.    Everybody -- all the contributions lead to today's valuation.  So in some sense, when you've got a 500 billion valuation, and there's various allocations of shares or -- not shares, but economic interests in the for-profit, I've analyzed everybody who's in there.

Q.    So what was Microsoft's contribution to the

Page 103

value of the OpenAI for-profit as it stands today?

A.     It's somewhere between 22.9 percent and 25.5 percent.

Q.     Of 500 billion?

A.     Yes.

Q.     And what was Mr. Altman's contribution to that $500 billion valuation?

A.     I don't have that specifically.

Q.     You didn't analyze that?

A.     Well, he falls into the -- he would fall under two parts.  Under the Aestas part, and he would also fall under the portion of the nonprofit that is not allocated to Musk.  So there is somewhere between 25 percent and 50 percent of the nonprofit that I'm not allocating.  And those would reside with -- you know, I guess Altman would have a claim on it, or others.

Q.     So it's your understanding that Mr. Altman is an investor in Aestas?

A.     Not an investor.  I think that's the employee pool.

Q.     Your understanding is that he has an interest in the employee pool?

A.     Yes.

Q.     If he didn't have an interest in the employee pool, how would that change your assessment of his

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 104

relative contribution?

A.      It wouldn't.  He would still reside in the portion of the nonprofit.

Q.      So he would get credit, as I understand it, for any contributions that he made prior to March 2019; is that right?

A.      He could, yeah.

Q.      How, under your analysis, is Mr. Altman getting credit for contributing to OpenAI for-profits value for things that he did after March 2019?

A.      Well, he's not a claimant to this litigation, so I'm not concerned about Altman, but if he was a claimant, he would reside in the 50 to 25 percent of the nonprofit.

Q.      You haven't considered anywhere in your analysis the work that Mr. Altman has done as the CEO of OpenAI from March 2019 to the present day, you haven't consider how that's contributed to the $500 billion valuation; is that right?

A.      Again, I don't have to.

Q.      And you don't have to because Mr. Altman is not a claimant?

A.      I guess it doesn't matter if he's a claimant or not.  He does reside within the 50 to 25 percent of the nonprofit.

Page 105

Q.    What about employees who did not work at the nonprofit but have joined OpenAI since March 2019, where do you account for their contribution to the for-profit?

A.    I guess they get paid their salaries.

Q.    I understand they may get paid salaries, but how does that factor into your allocation of relative contributions to the for-profits value?

A.    In the for-profit, they would show up in the cap table, I guess, if they had shares or interests.

Q.    So under your analysis, everyone's contribution is determined by what percentage of the cap table they have; is that right?

A.    No.

Q.    What's wrong about that?

A.    Well, for instance, for Musk there's monetary contributions and nonmonetary contributions, and he's not in the cap table.

Q.    Excluding what you call the nonprofit economic interests, for everyone else who's not included in the nonprofit economic analysis, under your analysis, their contribution to the for-profit is as its reflected in the cap table; is that right?

A.    I mean, I guess give me an example, a programmer -- are we talking about one programmer?

Q.    Sure, a programmer.

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 106

A.    He gets paid a salary, so his contributions are recognized through his income.

Q.    I understand that's how the company recognizes this programmer's contributions, but how does your analysis recognize them?

A.    It doesn't need to.

Q.    And what was Mr. Brockman's contribution in your analysis to the current $500 billion valuation of the for-profit?

A.    The same.  I mean, his contributions and Musk's contributions and Altman's contributions are considered in my determination that Musk would have 50 to 75 percent of the nonprofit.  The other guys would reside in the piece that's left over.

Q.    Okay.  Imagine that tomorrow Amazon makes a $50 billion investment in OpenAI and they get in exchange for that a 10-percent stake in the company, okay?

A.    Okay.

Q.    Would you say, at that point, that Amazon has contributed 10 percent of the value of OpenAI for-profit?

            MR. KRY:  Objection.  Form.

A.    No.

Q.    And why not?

A.    Well, they've bought a piece.  I guess I don't

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 107

know what that means "contributed to the value."
They've bought a piece of the company.

Q.    What's Thrive's contribution to OpenAI
for-profit's value?

A.    Thrive?

Q.    Yes.

A.    I couldn't say.

Q.    You understand that Thrive is an investor?

A.    Yes.

Q.    How about SoftBank, what's their relative
contribution to OpenAI for-profit's current value?

A.    I haven't focused on that.

Q.    How would you calculate that contribution if
were you to endeavor to do so?

A.    Well, I guess I would use the same methodology,
what -- were those investments made into the nonprofit?

Q.    SoftBank is an investor in the for-profit.

A.    In the for-profit, then they would show up in
the cap table.

Q.    So you would look to their relative allocation
of shares in the cap table and that's how you would
determine the relative contribution to the current $500
billion valuation, correct?

A.    Those are two different concepts; their
investment is not their contribution.

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com

Page 108

Q.    So then how would you calculate Thrive's relative contribution, if you were asked to do so?

A.    Relative to what?

Q.    Relative to the overall pot of contributions that have been made in OpenAI's history?

A.    I -- I guess I would -- I would look at their dollar contribution at the time of their investment and try to ascertain what else they had contributed to the creation of OpenAI.

You know, just the mere fact of investment down the road is not necessarily a contributor to anything, right.  They've bought a piece of a company that's existing.  I don't know that that's a contribution to the value.

Q.    Okay.  Have you been asked to analyze the wrongful gains by Sam Altman in connection with this lawsuit?

A.    Not specifically.

Q.    Okay.  Have you been asked to analyze the wrongful gains by Greg Brockman in connection with this lawsuit?

A.    No.

Q.    You talk in your report about the distribution waterfall at OpenAI.

Do you recall that?

Page 109

A.    Yes.

Q.    And that was the waterfall that determined how returns would be paid out to investors at the time before the PBC was created; is that right?

A.    Yes.

Q.    Is it correct that while the distribution waterfall was in place, the value of OpenAI nonprofit's stake was contingent on the performance and value of the for-profit?

A.    Yes.

Q.    And that's also true now after the recapitalization, correct?

MR. KRY:  Objection.  Form.

A.    Yes.

Q.    Does OpenAI nonprofit have any assets other than its assets in OpenAI for-profit?  Sorry, I misspoke.  Does OpenAI nonprofit have any assets other than its interest in OpenAI for-profit?

A.    I don't know.

Q.    You weren't asked to look at that?

A.    No.

Q.    Would you agree that since March 2019, the value of OpenAI nonprofit has been almost entirely tied to the performance of OpenAI for-profit?

A.    Read it one more time.

Page 110

Q.    Would you agree that since March 2019, the value of OpenAI nonprofit has been almost entirely tied to the performance of OpenAI for-profit?

A.    I would agree to that.

Q.    Okay.  Do you know if any individuals were given an economic interest in OpenAI for-profit in 2019?

A.    Not as I sit here.

Q.    You mentioned the first close limited partners earlier?

A.    Yes.

Q.    Did that include individuals and entities who made investments in OpenAI for-profit, to the best of your knowledge?

A.    Yes.

Q.    And was that in connection with the 2019 transaction?

A.    Yes.

Q.    Is it your understanding that all the first close limited partners made capital contributions to the for-profit in exchange for their interests?

A.    I would expect so, but I don't know as I sit here.

Q.    I should be fair to you, I think that's not true of the OpenAI employees who were going to be working for the venture going forward.

Page 111

Have you considered the terms on which those employees receive their interests in OpenAI for-profit?

A.    No.

Q.    As far as you know, did any of the OpenAI nonprofit's donors receive a economic interest in the for-profit that was attributable to their donations?

A.    Not that I'm aware of.

MR. WILSON:  Sorry, do you mean the same person or on account of the same interest?

MR. WILSON:  I mean on account of the donative interest.

Q.    Does that change your answer?

A.    No.

Q.    As far as you know, did anyone who worked for OpenAI nonprofit prior to 2019 receive an economic interest in OpenAI for-profit that was attributable to their pre-2019 work?

A.    I couldn't say.

Q.    It's not something you looked at?

A.    No.

Q.    Mr. Musk never made a contribution to OpenAI for-profit, did he?

A.    Not that I'm aware of.

Q.    Are you aware that in December 2018, Mr. Musk thought that OpenAI had a zero percent chance of being

Page 112

relevant?

MR. KRY:  Objection.  Misstates the record.

A.    I saw a document that sounds something like that.

Q.    Okay.  He wrote in the document that I'm referring to:

"My probability assessment of OpenAI being relevant to DeepMind/Google without a dramatic change in execution and resources is 0 percent, not 1 percent."

Do you recall seeing that document?

A.    Yes.

Q.    Mr. Musk made that statement nine months after he left the OpenAI nonprofit board; is that right?

A.    I think the timing is right.

MR. WILSON:  Let me show you the document.

(Whereupon, OPENAI_MUSK00021096-097 was marked as Wazzan Exhibit 6, for identification, as of this date.)

BY MR. WILSON:

Q.    So it's an e-mail chain from December 26 through December 31st of 2018.

Do you see that?

Elon Musk v.                      FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 113

A.      Yes.

Q.      And I'm focusing on the e-mail that Mr. Musk sent on December 26, where he says:

"My probability assessment of OpenAI being relevant to DeepMind/Google without a dramatic change in execution and resources is zero percent, not 1 percent.  I wish it were otherwise."

Do you see that?

A.      Yes.

Q.      This document isn't cited in your Appendix B, is it?

A.      I don't know.

Q.      Okay.  I can represent to you that it isn't, but you were aware of this document when you wrote your report?

A.      I believe I saw this, yes.

Q.      And you took it into consideration when you formed your opinions?

MR. KRY:  And just the prior representation, you're representing that nothing in this e-mail chain at all was in the appendix --

MR. WILSON:  As far as I know.

THE WITNESS:  But I think I saw this as

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 114

an exhibit to a deposition.

MR. WILSON:  It's possible that it's an exhibit to a deposition.

THE WITNESS:  So it may not be listed.

MR. WILSON:  I'll withdraw my representation.

BY MR. WILSON:

Q.   Let me ask you this:  Looking at this now, does this affect your analysis in any way?

A.   No.

Q.   Now Mr. Musk made the statement I just focused you on nine months after he left the OpenAI nonprofit board, correct?

A.   Yes.

Q.   And are you aware that at a point in time, Mr. Musk stopped making his quarterly $5 million-dollar distributions -- donations, rather to OpenAI nonprofit?

A.   Yes.

Q.   Do you know when that happened?

A.   Not exactly.

Q.   It was more than a year before the date of this e-mail, wasn't it?

A.   I think so, yes.

Q.   Okay.  Would you agree with me that as of the date of this e-mail, Mr. Musk was pessimistic about

Elon Musk v.                FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 115

OpenAI's future prospects?

MR. KRY:  Objection.  Misstates the document.

A.    It say what it says.

Q.    So you can't express a view one way or the other as to whether Mr. Musk was optimistic or pessimistic at this time about OpenAI's future prospects; is that right?

A.    No, I can't.

Q.    Okay.  If you received this e-mail from an executive at one of the companies that Wazzan & Co. was invested in, would you be optimistic about this investment?

MR. KRY:  Objection.  Calls for speculation.

A.    So I wouldn't be thrilled, but I would need to know more -- what's the context?  Is he trying to get more funding out of me, is he trying to get something -- what's going on?  It's very -- I'd say you have to be very careful interpreting just a single document like this without additional context.

MR. WILSON:  Let's look at another document.

(Whereupon, 2024MUSK0005444-447 was marked as Wazzan Exhibit 7, for identification,

Page 116

as of this date.)

BY MR. WILSON:

Q.    So this is an e-mail chain from January and February of 2018 that includes Mr. Musk and others.  I want to just focus you, if I could, Dr. Wazzan, on Mr. Musk's e-mail.  The first one in the chain, from -- not the first one.  The second one in the chain from January 31st.  It's on page 2.

And I can represent to you that this is an e-mail Mr. Musk sent to Greg Brockman, Ilya Sutskever, Sam Altman and others on that date.

And he says in the first paragraph:

"OpenAI is on a path of certain failure relative to Google.  There obviously needs to be immediate and dramatic action or everyone except for Google will be consigned to irrelevance."

This is an e-mail Mr. Musk sent just before he left OpenAI's board, right?

A.    Looks like it, yes.

Q.    Did you consider this document when you conducted your analysis?

A.    I believe so, yes.

Q.    Did it impact your analysis?

A.    No.

Elon Musk v.          FINAL          December 5, 2025
Samuel Altman    HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 117

Q.    Why not?

A.    Because it doesn't matter.  This goes to liability.  I've assumed liability and I'm doing a disgorgement analysis.  So this is not -- this doesn't matter.

Q.    You don't think it matters to your analysis that Mr. Musk thought, in January 2018, after he had stopped his quarterly donations, that OpenAI was on a path of certain failure?

A.    It doesn't matter.

Q.    Okay.  So the value that Mr. Musk --

MR. KRY:  Misstates the document.

Q.    So the value that Mr. Musk contributed to OpenAI nonprofit, in your opinion, does not change, based on how successful OpenAI is, as a result of Mr. Musk's contributions?

A.    Say that again?

MR. WILSON:  Read the question back, please.

(Whereupon, the record was read by the reporter.)

A.    Correct.  Does not change.

Q.    So in your opinion, even if the success came much later for OpenAI, Mr. Musk should get credit for it?

Elon Musk v.              FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 118

A.    He should get his allocated percentage, yes.

Q.    And the allocated percentage you're referring to is the hypothetical allocated percentage that you've come up with in your analysis, correct?

MR. KRY:  Objection to form.

Q.    Well, what are you referring to?  What allocated percentage?

A.    Yeah.  A 50 to 75 percent of the nonprofit.

Q.    Okay.  We're going to get to that, but I just wanted to make sure I understood your testimony.

Did you analyze how the OpenAI nonprofit used Mr. Musk's donations?

A.    No.

Q.    Did you examine the specific impact of Mr. Musk's alleged non-monetary contributions?

A.    I'm not sure what you mean by specific impact. I look at the various non-monetary contributions that he made and I evaluate them.

Q.    Did you attempt to assign any value to any of the non-monetary contributions Mr. Musk made?

A.    Not to any particular one specifically.

Q.    Okay.  Do you know what contributions Mr. Musk made to OpenAI after March 2019?

A.    I don't believe there were any monetary contributions.

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 119

Q.    Are you aware that he made contributions of rent payments after March 2019?

A.    Yes.

Q.    Okay.  Approximately $6 million in rent payments?

A.    Yes.  Sorry.

Q.    Do you -- did you conduct any analysis as to the benefit that OpenAI received from those rent payments?

A.    Not specifically.

Q.    Did you conduct any analysis that would suggest that those rent payments were responsible for creating billions of dollars in value after March 2019?

A.    All his contributions, monetary and non-monetary, go into the valuation of what his economic interest in the nonprofit should be.  If it turns out to be valuable afterwards because there's a $500 billion valuation, then that's fine.  If that 500 billion was 100 billion, he would have the same percentage of a smaller amount.

Q.    Imagine that Mr. Musk donated $38 million to OpenAI, and OpenAI spent all of it on a crypto security that lost all of its value within six months.

Would you say, nevertheless, in that situation, that Mr. Musk was responsible for creating billions of

Page 120

dollars in value for OpenAI?

A.    Yes.

Q.    So it truly doesn't matter what the money is used for, under your analysis?

A.    It does not.

Q.    And it doesn't matter whether what it's used for turns out to be successful or not?

A.    No.  All the money was used to further OpenAI's venture.

Q.    Okay.  Have you conducted any analysis of the progression of OpenAI's IP over time?

A.    No.

Q.    Did you examine the extent to which any of OpenAI's current technology can be traced to the intellectual property that OpenAI had developed by any particular point in time?

A.    No.

Q.    Would you have been qualified to offer opinions on those questions?

A.    Potentially.

Q.    Okay.  When you say "potentially" do you mean if it was strictly a valuation exercise?

A.    Well, not necessarily just valuation, because I have evaluated IP separately in patent cases, for example.

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 121

Q.      Okay.  But from a technological perspective, of comparing one IP at a particular point in time to another IP at another point in time, are you qualified to opine on the extent to which those particular forms of technology are related?

A.      I could be, yes.

Q.      What sort of training do you have that would qualify you to do that?

A.      Ph.D. in finance.  I've published a number of papers in the IP space, 30 years of experience in patent cases.

Q.      You ever studied AI models or algorithms?

A.      Not specifically.

Q.      Do you know whether OpenAI was working on generative AI as of the date when Mr. Musk stopped making his quarterly distributions?

A.      So let's be precise.  There's -- as I understand it, there's two forms of AI.  There's general artificial intelligence, GAI, and then artificial intelligence, which sort of related to the large language models.  Which one are you asking me about?

Q.      Your report talks about generative AI, so I'm asking about generative AI for the moment.

A.      And what paragraph?

Q.      Sure.  Just bear with me a second, and I will

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 122

get that for you.  Paragraph 16.

A.      Yes.

Q.      Yes, OpenAI was working on generative AI, to your understanding, in mid 2017?

A.      Yes.

Q.      And that's based on what, Dr. Wazzan?

A.      Generative AI is basically like ChatGPT.  So that's what they're working on.

MR. KRY:  You directed the witness to paragraph 16.  He should feel free to read paragraph 15, too, on this.

MR. WILSON:  I should have said this at the outset, but if at any point you want to consult any part of your report, you should feel free to do that.

A.      Also, in paragraph 15, I say:

"OpenAI's ChatGPT is an example of generative AI."

Q.      Right.  Do you know when OpenAI started working on GPT?

A.      Not specifically.

Q.      So that's not something that you thought you needed to analyze, for the purposes of rendering your opinions in this case?

A.      No.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 123

Q.      Do you recall writing in your report that
OpenAI had a gaming emphasis in 2017?

A.      Yes, that rings a bell.

Q.      What does that mean, a gaming emphasis?

A.      Can you point me to the paragraph?

Q.      Sure.  It's paragraph 19.

A.      Yeah.  So I just say:

                "In 2017, the gaming emphasis began to
        garner results, as OpenAI started deploying
        models able to defeat some of the world's top
        players in 1-V-1 Dota 2 matches."

Q.      Is it your understanding that the models that
OpenAI was deploying to win Dota matches is the same
model that is now backing ChatGPT?

A.      No.

Q.      Your understanding is that it is not, correct?

A.      Correct.

Q.      But that's not something you took into account
in your analysis?

A.      It all builds on itself.

Q.      When you say "it all builds on itself," you're
saying AI builds on itself?

A.      I'm saying the various iterations and advances
that are occurring are sequential and build on
themselves.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 124

Q.    Okay.  That's your opinion?

A.    Yes.

Q.    Okay.  You conducted an allocation analysis in this case?

A.    Yes.

Q.    You concluded that the majority of Mr. Musk's economic interests in OpenAI nonprofit originates between January 2023 and October 2025, correct?

A.    Yes.

Q.    And that's a period that began nearly five years after Mr. Musk left the OpenAI board?

A.    Yes.

Q.    And it's more than five years after he stopped his quarterly $5 million donations?

A.    Yes.

Q.    And more than two years after he stopped paying OpenAI's rent, correct?

A.    Yes.

Q.    Is that conclusion that I just referenced about your allocation analysis, does that seem plausible to you?

A.    It's very plausible.  I'll give you an example. I'm still holding an investment in GeneFluidics that was made five, six years ago.  If they have a -- and we haven't invested anything since; I haven't contributed

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 125

anything since.  If they have an IPO next week, I stand to gain quite a bit.  So the concept you're alluding to I don't think makes sense.

Q.    You stand to benefit why?

A.    Because I hold shares, right.

Q.    Mr. Musk doesn't hold shares in OpenAI nonprofit, does he?

A.    He holds an economic interest in the nonprofit based on his previous contributions.

Q.    That's not a legal interest, is it?

MR. KRY:  Objection.

Q.    That's a hypothetical interest?

A.    So as to whether it's a legal interest, that's not for me to say.  That's for the court to decide. I've assumed liability.

Q.    But your assumption is that he has a hypothetical economic interest, a stake of some kind in OpenAI nonprofit?

MR. KRY:  Objection.  Compound.  And also objection, misstates the prior testimony.

A.    So I want to be very precise.

Q.    Yeah, I'd like you to be precise.  I think this is important.

A.    It's really just what I say in my assignment. I've been asked to determine the amount by which the

Elon Musk v.               FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 126

OpenAI defendants and Microsoft wrongly profited or were unjustly enriched by operating OpenAI as a commercial venture despite having received charitable contributions from Elon Musk on the understanding that OpenAI would remain a nonprofit dedicated to the public good.

My analysis assumes that Mr. Musk has established defense liability on his claims and merely seeks to quantify the portion of defendants' profits or enrichment that may be -- that may fairly be attributed to Mr. Musk's contributions.

Q.    Okay.  And you're quoting Mr. Musk's contributions to this economic interest that you're describing?

A.    It's -- so to determine the amount -- so to determine the amount that may be fairly attributed to Mr. Musk's contributions, I look at it as monetary and nonmonetary contributions at the inception of OpenAI nonprofit.

Q.    Mm-hmm.  You were talking earlier about Jeff Bezos starting Amazon in his garage, right?

A.    Yes.

Q.    So imagine I was his neighbor and he starts Amazon in his garage, and he says:

"Brad, you've been a good neighbor.

I'm going to give you a number of shares and

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 127

I'll always make sure that you have at least half as many shares as I do in Amazon," and then I never did another single thing for Amazon but I still had those shares today. They'd be worth quite a bit of money, wouldn't they?

A.    Yes.

Q.    Would you say in that situation that I contributed an equivalent amount of value to Amazon?

A.    I don't think you contributed anything.

Q.    Let's say that I paid for the shares when I got them.  Let's say I gave Jeff Bezos $10,000 for the shares, and he said, "I'm going to make sure you're taken care of."  So I have a substantial block of Amazon stock that's worth billions of dollars but I never lifted a finger to work for the company.

Would you still say that I contributed to the extent of my equity ownership?

A.    Did you contribute -- did you pay Jeff directly or did you pay it into the company?

Q.    I paid into the company.

A.    Yes.

Q.    Okay.  I have another hypothetical for you. Imagine there's a startup that receives three rounds of venture capital financing:  There's a series A, series

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 128

B, and series C.

A.    Okay.

Q.    And then it completes an IPO at a price that's substantially in excess of the post money valuation of the series C?

A.    Okay.

Q.    Okay?  Imagine that the value of the series A investor stake increase by five times between the series C financing and the IPO.

A.    Okay.

Q.    Okay.  Would it be reasonable to assume that the increase was solely attributable to the series A investment?

MR. KRY:  Objection to form.

A.    I'm not sure I follow, if the Bs and Cs would also have benefitted.  Everybody would have benefitted according to their economic interest.

Q.    I'm not asking who benefitted.  I'm asking who should be responsible, who should be attributed responsibility for having generated the value?

A.    Everybody gets attributed according to their economic interest.

Q.    So you don't think it would be more reasonable to assume that the increase in value between the series C financing and the IPO was due largely to the later

Page 129

investments?

A.    No.

Q.    Is that a principle that is supported by the academic literature, as far as you know?

A.    Yeah, I think when there's an IPO, everybody gets to cash out at their value.  You know --

Q.    I understand the need to cash out --

A.    The As don't suffer a discount because the gains came later in the game.  In fact, it's the opposite, right?  The early money typically benefits more.

Q.    But in those situations, you're talking about who gets to benefit based on the terms and whatever investment they made?

A.    Well, there's the related concepts.  They got in earlier when the valuations were lower.  They haven't contributed anything since, and yet they could be the majority beneficiaries.

Q.    They could be the majority beneficiaries, but does that mean that they were the majority contributors is really the distinction I'm asking you to focus on?

A.    They contributed -- they got paid for their contributions.

Q.    I'm not asking whether they got paid for their contributions.  I'm asking you did they contribute more

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 130

value at the time when they were putting in the money or did they contribute more money later when multiple other rounds had occurred?

MR. KRY:  Objection to form.  And also I think you misstated the witness's answer.

A.    They contributed at the time that they contributed and they received shares in exchange.

Q.    Okay.  And those shares, you think, for all time reflect a fixed contribution to the enterprise?

A.    To my knowledge, the shares are not discounted because the IPO comes a year later or 10 years later after multiple rounds have occurred.

MR. WILSON:  Okay.  I'm at a natural spot to take a break, so why don't we take a short break.

MR. KRY:  Do you want to break for lunch?  Or do you want to break --

MR. WILSON:  I'm fine with whatever the witness prefers.

THE WITNESS:  I'm good.

MR. WILSON:  All right.  Let's just keep going with another session and then we'll see where we're at.

THE VIDEOGRAPHER:  We're going off the record at 12:18 p.m.  This marks the end

Page 131

Media 3.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by. We're back on the record at 12:33 p.m.  This marks the beginning of Media 4.

BY MR. WILSON:

Q.    Dr. Wazzan, is it your understanding that Elon Musk was responsible for attracting any for-profit investments in OpenAI for-profit?

A.    I don't have an opinion on that.

Q.    So you're not able to identify any for-profit investors that Mr. Musk convinced to invest?

A.    No.

Q.    You talk in your report about signalling theory, correct?

A.    Yes.

MR. KRY:  Before we go on, I've lost the realtime feed.

THE VIDEOGRAPHER:  Going off the record at 12:34 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by. We're back on the record at 12:37 p.m.

BY MR. WILSON:

Q.    So, Dr. Wazzan, I was starting to ask you about

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 132

signalling theory.  You say in paragraph 77 of your report that signalling theory provides a framework for understanding why investor reputation matters in early stage financing; is that right?

A.    Yes.

Q.    Mr. Musk wasn't an investor at OpenAI, was he?

A.    No, but it's the same concept.

Q.    Okay.  Do any of the articles you cite in your report talk about signalling theory in the context of donors?

A.    No.

Q.    Mr. Musk had left OpenAI's board before it formed the for-profit, correct?

A.    Yes.

Q.    And that was announced in a public press release?

A.    Yes.

Q.    So by the time that OpenAI received its first for-profit investment, Mr. Musk was no longer publicly connected to the company, correct?

A.    Yes.

Q.    Is it your opinion that Mr. Musk's past involvement with OpenAI nonprofit nevertheless provided a signalling advantage to OpenAI's potential for-profit investors?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 133

A.    Yes.

Q.    And what do you base that opinion on?

A.    It's based on the sections that I've written here from basically 75 through 85.

Q.    Do any of the articles you cite in those paragraphs talk about signalling theory in the context of individuals who had separated from the organization in question?

A.    No.

Q.    Given your opinions in your report about the strength of Mr. Musk's public reputation, do you think that his public separation from OpenAI would have been detrimental to OpenAI's ability to attract for-profit investors?

A.    Well, I guess it's theoretically possible, but it turns out that's not the case, right, because they did obtain, in very short order, significant amounts of investment into the for-profit.

Q.    And did you analyze whether Mr. Musk's public separation from the company had detracted any potential investors from investing?

A.    I didn't look at that, but it doesn't seem like it did.

Q.    When you say it doesn't seem like it did, is that simply because some people did invest?

Page 134

A.      Yes.

Q.      You don't know, sitting here today, whether there are some people that would have invested that decided not to?

A.      No, I can't point to anybody.

Q.      It stands to reason, doesn't it, that if Mr. Musk's reputation is helpful when he's attached to the organization, that some people would say Mr. Musk separating was a bad sign for OpenAI?

                MR. KRY:  Objection to form.

A.      I guess it's a matter of timing.  It's critical at inception to create OpenAI nonprofit, attract in the talent, attract in Altman, et cetera.  Some years go by, they've raised quite a bit of money through donations, including his own.  And it's sort of a -- you know, they're a more fully formed operating entity by then.

Q.      It was the inception of the for-profit enterprise in 2019, wasn't it?

A.      I'm -- that is the inception of the nonprofit.

Q.      I'm talking about the inception of the for-profit.  That occurred in 2019, right?

A.      Yes.

Q.      So at the time when the for-profit was at its inception, Mr. Musk had publicly separated from the company, correct?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 135

A.      Yes.

Q.      Reid Hoffman was also a donor to the nonprofit, wasn't he?

A.      That's my understanding.

Q.      Okay.  And he invested in the for-profit as well, correct?

A.      I think I saw that, yes.

Q.      Okay.  Mr. Hoffman is a well-connected serial entrepreneur, isn't he?

A.      Yes.

Q.      He represents a new generation of wealth and power in Silicon Valley?  Would you agree with that?

MR. KRY:  Objection to form.

A.      Yes.

Q.      In fact, you said those words, not me, right, Dr. Wazzan?

A.      Yes.

Q.      What affected the participation of other donors and investors such as Mr. Hoffman had in terms of a signaling effect?

A.      I think they would be helping.

Q.      How helpful were they relative to Mr. Musk's signaling contributions?

A.      I haven't done that analysis.

Q.      You weren't asked to do that analysis?

Page 136

A.    It's not necessary.

Q.    Why isn't it necessary?

A.    Because again, let's go back to the -- the initial exercise is to determine the value of OpenAI for profit, the whole pie, then to determine what percentage is allocated to the nonprofit.  And we have that from the Public Benefit Corporation documents.

Q.    Right.

A.    So the nonprofit is holding 30 percent of the for-profit.  And then the question is how much of that should be allocated to Musk, based on his contributions.

Q.    But Mr. Hoffman, for example, was also a donor, right?

A.    Yes.

Q.    And he's very high public stature; would you agree?

A.    Yes.

Q.    And my question is:  Did you attempt to calculate the relative contribution of Mr. Hoffman's public stature to OpenAI nonprofit in the early years?

A.    So implicitly, I've considered all these things in my allocations of the 50 to 75 percent to Musk. Specifically to Hoffman, he would reside in -- if he brought a similar claim, he would reside in the 25 to 50 percent economic interest that's left over in the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 137

nonprofit.

Q.    Okay.  So you didn't think that you needed to quantify in some way Mr. Hoffman's signaling contribution relative to Mr. Musk; is that right?

A.    No.

Q.    And you didn't do that for any of OpenAI's other donors?

A.    No.

Q.    Do you know who OpenAI's other donors were?

A.    No.  As I sit here, I remember seeing them in the IRS tax filings.

Q.    Were any of them relatively high-profile investors -- or donors, excuse me?

A.    I think some were, some weren't.

Q.    So let's talk for a few minutes about this range that you've calculated, the 50 to 75 percent. What portion of that 50 to 75 percent range do you attribute to Mr. Musk's donations?

A.    All of it.

Q.    So none of it is attributed to his non-monetary contributions?

A.    All of it is attributed to all of it.  I haven't parsed it out.

Q.    So you haven't parsed it out?

A.    I have not.

Page 138

Q.    So you can't say, sitting here today, taking the 50 percent end of the range, what component of that 50 percent is charitable contributions and what component is non-monetary, is that right?

A.    Correct.

Q.    And you didn't think you needed to do that to conduct your analysis?

A.    Correct.

Q.    And nobody asked you to do it?

A.    Nobody asked me to do that.

Q.    What other persons or entities do you believe contributed to OpenAI nonprofit's value?

A.    Sorry.  In the abstract?

Q.    What do you mean, "in the abstract"?

A.    Well, I haven't looked at, like, for example, Altman; I haven't tried to assess his economic interest in the nonprofit.

Q.    Okay.

A.    But I would concede that he contributed some value.

Q.    Okay.  Who else did?  So we have Mr. Musk contributed some value to the nonprofit, Mr. Altman contributed some value to the nonprofit.  Who else is on that list?

A.    I'd say Brockman.  I'd say Sutskever.  Some of

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 139

the other donors.

Q.    Anyone else?

A.    Not as I sit here.

Q.    Any other specific employees that you think contributed to the value?

A.    Not as I sit here.

Q.    Do you know who Durk Kingma is?

A.    No.

Q.    Okay.  You say in your report that Mr. Musk was instrumental in recruiting Durk Kingma to OpenAI nonprofit.  So was that recruitment or alleged recruitment factored into your calculus of 50 to 75 percent?

A.    Yeah.  Where is that?

Q.    I'm happy to find it for you.

          MR. KRY:  Paragraph 86.

          MR. WILSON:  Pardon me?

          MR. KRY:  Paragraph 86.

          MR. WILSON:  Let's see if Robert's got it right.  I'm suspecting that he does.

Q.    Yes.

      "He's a world-class research engineer, Mr. Kingma."

      That's what you wrote?

A.    Yes.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 140

Q.      So do you think Mr. Kingma contributed to OpenAI's nonprofit's value?

A.      Yes.

Q.      So we have Mr. Musk, Mr. Altman, Mr. Brockman, Mr. Sutskever, Mr. Kingma.  Did Reid Hoffman contribute to its value?

A.      Yes.

Q.      How about Gabe Newell?

A.      I mean, that name doesn't ring a bell.

Q.      How about Silicon Valley Community Foundation?  Did Silicon Valley Community Foundation contribute to OpenAI nonprofit's value?

A.      I believe they were a donor.

Q.      So is the answer to my question yes?

A.      Yes.

Q.      How about Dustin Moskovitz and the Good Ventures Foundation?  Is that a contributor to OpenAI nonprofit's value?

A.      I believe so.

Q.      How about the First Close Limited Partners?  Do they contribute to OpenAI nonprofit's value?

                MR. KRY:  And objection.  Do you mean the same people or on account of the same contributions/investments?

                MR. WILSON:  The contributions that

Page 141

made up the First Close Limited Partner investments.

MR. KRY:  And also objection to the use of the word "contributions" there.

MR. WILSON:  Let me ask a new question. I think Robert has sufficiently muddled the record here.

Q.    I'm trying to figure out who contributed value to the OpenAI nonprofit.  And my question is whether the investors who put in capital as part of the First Close, sometimes referred to the First Close Limited Partners, when those individuals made those investments, did those investments contribute to the value of OpenAI nonprofit?

A.    In an indirect way, yes.

Q.    What do you mean, in an indirect way?

A.    So if they contributed to the for-profit, that generates value for the non -- for the for-profit, and the nonprofit holds an economic interest in the for-profit.  So yes.

Q.    Has Microsoft contributed to the value of the OpenAI nonprofit?

A.    Yes.

Q.    What about SoftBank?

A.    Yes.

Q.    Thrive Capital?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 142

A.    Yes.

Q.    Okay.  The Golden Gate investors?

A.    Just from memory, I don't -- I don't recall now, if they're --

Q.    Okay.  There's an entry on the cap table you reviewed in connection with your supplemental report that refers to the Golden Gate investors.

Do you recall that?

A.    Not as I sit here.

Q.    Would you agree that all of the investors that are listed on that cap table for the PBC contributed in some way to the value of the OpenAI nonprofit?

A.    Yes.

Q.    Now, I think I know your answer to this question from Mr. Altman, but I'll ask it anyway.  What percentage of the OpenAI nonprofit's value would you attribute to Mr. Altman's contributions?

A.    I haven't parsed it out specifically for him.

Q.    Have you parsed it out for Mr. Brockman?

A.    No.

Q.    Is it likewise the case that you haven't parsed out Mr. Sutskever's contributions to the OpenAI nonprofit?

A.    Correct.

Q.    And is that true for Mr. Kingma?

Page 143

A.    Yes.

Q.    Mr. Hoffman?

A.    Yes.

Q.    Mr. Moskovitz?

A.    Yes.

Q.    Mr. Newell?

A.    Yes.

Q.    Okay.  You haven't parsed out the contributions of the First Close Limited Partners?

MR. KRY:  Objection to form.

A.    Well, I think there's a distinction between donors and then investors.  So the investors are allocated their shares on the for-profit.  So -- so that can be ascertained.

Q.    Okay.  We're talking right now about the value of the OpenAI nonprofit, and who contributed what to that value.  Now you've testified that the First Close Limited Partners, Microsoft, SoftBank, et cetera, contributed some value to the OpenAI nonprofit.  I'm trying to figure out if you attempted to quantify that?

A.    Well, I don't think the First Close Limited Partners would have a claim on the portion held by the nonprofit.  They have their own stakes.

Q.    I'm not asking whether they have a claim.  I'm asking whether they contributed value -- contributed to

Elon Musk v.                FINAL                  December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 144

the value of the OpenAI nonprofit.  Now you've testified that they did.  Are you now saying that they didn't?

A.     Well, I said they contributed in an indirect fashion.

Q.     I see.

A.     They've contributed to the for-profit and they retained an equity stake or a percentage stake, and to the extent that the for-profit increases in value, the nonprofit's piece of the for-profit increases.

Q.     Have you excluded from -- so you said Mr. Musk has 50 to 75 percent of the contribution credit, correct?

A.     He holds 50 to 75 percent -- he holds an economic interest equal to 50 to 75 percent of the nonprofit's stake in the for-profit.

Q.     I understand that's your opinion.  But I'm asking a different question.  Am I correct, when I read your report, that you are opining that Mr. Musk is responsible for creating 50 to 75 percent of the value of the OpenAI nonprofit?

A.     No, I'm not saying that.

Q.     Okay.  Do you have an opinion on what percentage of the value of the OpenAI nonprofit Mr. Musk contributed to?

A.     You're -- you're asking me questions that are

Page 145

not consistent with my analysis.  It's not his contribution to the for-profit or how much that translates into value.

Q.    I didn't -- just to be clear, I asked about the nonprofit, not the for-profit.

A.    Even.

Q.    Okay.

A.    Because like I said, what I've done is I've taken the value for the for-profit, the nonprofit has a piece of that.

Q.    Mm-hmm.

A.    And Musk has a piece of that.  His contributions don't map through to the for-profit, or don't -- I mean, they can't artificially mathematically, but that's not part of my damage -- it's not part of my disgorgement analysis.

Q.    I want to make sure I understand this.  Bear with me one second.

All right.  So in paragraph 8 of your report, Dr. Wazzan, you say that one of the steps of your analysis was determining the share of the nonprofit's value that is attributable to Mr. Musk's contributions as opposed to contributions from other parties?

A.    Yes.

Q.    Okay.  Is it your opinion that the share of the

Page 146

nonprofit's value that is attributable to Mr. Musk's contribution, as opposed to contributions from other parties, is 50 to 75 percent?

A.    Exactly.

Q.    Okay.

A.    Which leaves 25 to 50 percent --

Q.    25 to 50 percent --

A.    For the other --

(Reporter admonition.)

Q.    Sorry.  So I'm trying to figure out who else gets credit under your model, who is in the 25 to 50 percent?

A.    It's everybody else that would have a claim to an economic interest in the nonprofit.

Q.    I understand that's your terminology.  I'm not sure that I accept it or fully understand it.  So let me put it in terms that I do understand.  Under your methodology, if we were to make a list of the people who contributed to the value of OpenAI nonprofit, Mr. Musk would be on the list, Mr. Altman would be on the list, correct?

A.    Well, I wouldn't -- I don't think I'm in a position to tell you who would be on the list.  It's a matter of if they have a claim and if we assume that their claim is -- you know, we assume liability, for

Page 147

example, then they could be on the list.  But I'm not telling you who is on the list and who's not.

Q.    So you're comfortable opining that Mr. Musk is responsible to 50 to 75 percent of the value creation even though you don't know all of the people who contributed to the value?

A.    I don't need to know all the other people.  I agree, you know, it's in my report, that there's Hoffman, there's Sutskever, there's Altman.  They all have their piece; they're in the other -- they're in the other piece of the pie.

Q.    So what's Mr. Altman's piece of the pie?

A.    I haven't parsed it out.

Q.    Now that we've got on the same page, I'm going to ask the same questions again, just to make sure that I understand.

And you don't know Mr. Brockman's piece of the pie, correct?

A.    Correct.

Q.    You don't know Mr. Sutskever's piece of the pie?

A.    Correct.

Q.    You don't know Mr. Hoffman's piece of the pie?

A.    Correct, I don't.  But we also -- you're assuming that they have a claim, right, that's --

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 148

Q.    You don't know any other donors piece of the pie, to use your words?

A.    No.

Q.    And you don't know any other employees' piece of the pie?

A.    No.

Q.    Okay.  At paragraph 72 of your report, you observe that before he left OpenAI, Mr. Musk was responsible for approximately 60 percent of all financial contributions; is that right?

A.    Yes.

Q.    But you acknowledge that when all of the donations to OpenAI nonprofit are taken into account, Mr. Musk was responsible for less than 30 percent of the total donations, correct?

A.    Yes.

Q.    Okay.  And do you also acknowledge that Mr. Musk's $38 million in donations represent less than 0.1 percent of all monetary contributions that OpenAI has received to date?

A.    Yes.

Q.    Now you opine in your report that the contributions that Mr. Musk made in the early years of OpenAI were more -- much more important to OpenAI's success than amounts contributed later once OpenAI was

Elon Musk v.                 FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 149

established.

Do I have that right?

A.      Yes.

Q.      What do you mean by "established"?

A.      Well, founded, brought in Altman, brought in Sutskever, brought in Brockman, started developing technologies, emphasis on the gaming systems first, morphing later in the ChatGPT.

You know, they started from an idea, and by the time he left, they were operating.

Q.      Is there a particular point in time that you would say OpenAI was established?

A.      Well, established, you know, sort of a continuum, right.  They're established on day one when they start -- when they get the game together and then they're more established as time goes on.

Q.      Okay.  So it's a continuum?

A.      I would say so.

Q.      Okay.  Are you confident that OpenAI was established -- fully established by the time Mr. Musk left the board?

MR. KRY:  Objection.  Compound.

A.      What's the definition of "fully established"?

Q.      What factors make a startup an established startup?

Page 150

MR. KRY:  Objection.  Form.

A.    I couldn't say.  It could be any number of things.  In this case, they were established enough to attract massive investments from Microsoft within a few months, so I would say that's --

Q.    Within a few months of what?

A.    Within a few months of creating a non -- converting to a for-profit.

Q.    The conversion to a for-profit happened more than a year after Mr. Musk left, isn't that true?

A.    That's not a very long period of time.

Q.    How long was Mr. Musk at OpenAI, affiliated with OpenAI?

A.    Several years.

Q.    A little more than two years, right?

MR. KRY:  Objection.

A.    Yeah, that sounds right.

Q.    So just to be clear, one year is not a lot of time, but two years is a lot of time?

A.    It's the inception --

MR. KRY:  Note my objection to the question.

A.    You start from nothing, you create OpenAI, you get donors to bring in, you've recruited people, high profile peoples, technical people, and you start

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 151

building technology and patents and all kinds of other stuff. So they accomplished quite a lot in the first two years, and then he leaves, and within a year, they're bringing in massive amounts of investment.

Q. Then Mr. Musk said in December 2018 that OpenAI had a zero percent chance of success without a dramatic change in execution and resources. Was OpenAI established by that point?

A. Yeah, I would say so.

Q. And that's true even though at the same time Mr. Musk thought the company needed billions of dollars immediately or forget it, in his words?

A. Yes.

Q. Okay. So in your mind, a company is established once it's hired employees?

MR. KRY: Objection. Misstates the testimony.

A. It could be any --

Q. Let me ask -- it's a fair objection. I want to make sure I understand your testimony.

What are the factors that you consider when you're deciding whether a company or opining on whether a company is established?

A. Like I said, it's a continuum. It's from inception, maybe it's just the idea, through

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 152

incorporation, through hiring of people, through developing technology.  It's a continuum.

Q.      So the factors that I heard you mention are whether it's been incorporated, whether it's hired people, and whether it's developed technology.  Are those all factors that you would consider in deciding whether a startup is established?

A.      Possibly.

Q.      Are there other factors that you would consider?

A.      There could be.

Q.      Can you name any sitting here today?

A.      Having a workable product, making sales, receiving donations or investments.  There's any number of factors.  I haven't thought about it.

Q.      Does it matter how well capitalized the organization is?

A.      Depends.

Q.      Could matter?

A.      It might and might not.

Q.      Have you relied on any specific studies in analyzing whether or not OpenAI was established as of the time when Mr. Musk departed the board?

A.      No.

Q.      Have you ever offered an opinion in another

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 153

case about whether a company was sufficiently established at any particular point in time?

A.    Yes.

Q.    And which case was that?

A.    So in the ITC cases, for example, you have to establish, if you're the plaintiff, whether they've done enough to satisfy the economic prong of the domestic industry requirement.  So in that case, you do go through some steps to see have they done enough.  And there's basic variables:  Do they have employees?  How much have they spent on R&D?  How much have they spent on facilities?  Do they have workable products?

These are things that economists look at.

Q.    The ITC is the International Trade Commission?

A.    Yes.  So I've done at least a couple of those, but I -- I'd have to go back again through my vitae to see if there are other instances where I've determined -- you know, Femme Farm, had the defendant done enough to commercialize the technology?  It's analogous.

Q.    Is it important to your analysis that OpenAI had been established by the time Mr. Musk departed?

A.    Well, again, establish is a continuum.  It's important to realize that his contributions occur early on in the process, so he's the early money in; he's the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 154

luminary who attracted the talent.  And by the time he left, they were in much better shape than, you know, before they started.

Q.    So that's a yes, it's important to your analysis that OpenAI had been established by the time Musk separated from the organization?

MR. KRY:  Objection.  Misstates the response.

A.    It's a factor.

Q.    Now, you talk in your report about the fact that Mr. Musk allegedly donated approximately $38 million to OpenAI nonprofit, right?

A.    Yes.

Q.    And that $38 million includes cash contributions, it includes rent payments, and it includes the three Teslas or four Teslas, correct?

A.    Yes.

Q.    Have you done an analysis of which -- how much of that 38 million fell into each of the three buckets?

A.    Which buckets?

Q.    Cash, rent, Teslas?

A.    No.

MR. KRY:  Also objection to the question.  Rent is also cash, as you're aware.

Q.    When I say "cash," what I mean is a donation of

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 155

money that's not identified or earmarked for a particular expenditure?

A.    I have not, but cash is fungible.  You've got to pay the rent.

Q.    Is it your understanding that Mr. Musk paid the money to OpenAI for the rent?

A.    Paid it to OpenAI who then paid the rent, no, I don't know.

Q.    Professor Strebulaev says that, in his rebuttal report, that 0.7 percent of $38 million was related to the value of the Teslas.

Does that sound accurate to you?

A.    Yes.

Q.    Was each dollar that Mr. Musk donated equal in terms of its role in contributing to the increase in OpenAI's value?

MR. KRY:  I'm sorry, objection.  0.03 percent of what?

THE WITNESS:  Of the 38 million, I think he said.

MR. KRY:  Sorry.

MR. WILSON:  I think I said 0.7 percent.

MR. KRY:  That sounds right.

A.    But I was referring to the 38 million as the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 156

denominator.  That's what I understood.

Q.    Okay.  So let me ask the question that was pending again.

      Was each dollar that Mr. Musk donated, in your opinion, equal in terms of its contribution to OpenAI nonprofit's value?

A.    In effect, yes.  But I haven't parsed it.

Q.    So does that mean, then, that using the top end of your revised range for OpenAI's wrongful gains which is around $109 billion, that it's your opinion that the Teslas generated $776 million of value for OpenAI nonprofit?

A.    That's not my opinion.

Q.    Okay.  Do you think the Teslas generated substantial value for OpenAI nonprofit?

A.    I think his contributions, taken as a whole, contributed to the success, and all his contributions, monetary and non-monetary, including the Teslas, result in a range of 50 to 75 percent of the nonprofit.

Q.    So if, for one reason or another, the Court were to say that the Teslas don't count as a donation, would you be able to modify your calculations accordingly?

A.    Yeah, I think so.

Q.    How would you do that?

Elon Musk v.                      FINAL                    December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 157

A.      I mean, I haven't thought about it, but I would probably go back and maybe shave a percentage point off or something.  It's doable.

Q.      On what basis would you shave a percentage point?

A.      Reduction of the overall monetary contributions.

Q.      I understand that.  But I'm saying:  Why one percentage point as opposed to 10 or half?

A.      Yeah, so I don't know.  I haven't even thought about it.

Q.      What would you consider if you were confronted with that question?

A.      I'd have to think about it.

Q.      In paragraph 9 of your report, you say that you were asked to consider that Mr. Musk's involvement with OpenAI included not only financial contributions, but also highly valuable nonmonetary benefits to OpenAI?

A.      Yes.

Q.      Did you conduct an analysis to satisfy yourself that Mr. Musk's nonmonetary contributions were, in fact, highly valuable to OpenAI?

A.      Yes.

Q.      What was the analysis?

A.      It's the analysis laid out in paragraphs 75

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 158

through 92.

Q.    Okay.  If I were to look at paragraph 75 to 92 of your report, would I see quantification of the value of the nonmonetary contributions that Mr. Musk made to OpenAI nonprofit?

A.    These are qualitative assessments.

Q.    So let's look at some of the examples that you provide in paragraph 9.  The first example that you provide is recruiting and attracting talent, right?

A.    Yes.

Q.    What talent did Mr. Musk recruit?

A.    So I think without Musk's involvement starting on page -- paragraph 84.  I think really, without Musk, there is no OpenAI.  So there would be no Sam Altman.  Later --

Q.    Let's take it one at a time.  What's your basis for saying that there would be no OpenAI without Mr. Musk?

A.    So I think there's the e-mail chain.  Can you donate 30 million over the next five years?  Without the 30 million initial investment or initial contribution, right, there is no OpenAI.  So without that, there's no Altman.

Q.    And you're confident in saying that -- or opining that there was no other alternative source of

Elon Musk v.                 FINAL               December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 159

donations that was available to OpenAI?

A.    Yeah.

Q.    And what's your basis for saying that?

A.    Well, I think that was my understanding, based on some of the materials I looked at.

Q.    Anything specific other than this document you're referencing in paragraph 85?

A.    Not as I sit here.

Q.    Do you know if Mr. Musk, in fact, donated $30 million over the next five years, after October 2015?

A.    Might have to go back and look at when the various moneys came in.  I mean it totals more than -- I'd have to go back and look.

Q.    I think you also said:  Without that, there's no Altman.  Were you testifying that if it wasn't for Mr. Musk, Mr. Altman wouldn't have joined OpenAI?

A.    Right.

Q.    What's your basis for that testimony?

A.    Because there would be no OpenAI in the first place.

Q.    I see.  So it's the same conversation we just had.

          MR. KRY:  Objection to form.

Q.    So then my first question is about specific individuals.  So it sounds like one of the individuals

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 160

you think Mr. Musk convinced to join OpenAI was Mr. Altman; is that right?

A.    That's one.  And then in paragraph 86, I say:

      "Mr. Musk also supported OpenAI through recruiting."

      And I cite to some documents:

      "He helped recruit Mr. Sutskever away from Google.  Mr. Musk was also active in recruiting Mr. Diederik (Durk) Kingma, a world class research engineer."

Q.    Let's focus on Mr. Sutskever for a second.

A.    Yes.

Q.    Did you attempt to quantify the value to OpenAI of Mr. Musk recruiting Mr. Sutskever?

A.    Not specifically.

Q.    Did you attempt to quantify the value to OpenAI nonprofit of the work that Mr. Sutskever did in the period leading up to March 2019?

A.    Not specifically.

Q.    Do you have an opinion on whether Mr. Musk's recruitment of Sutskever or Mr. Sutskever's work was more valuable to OpenAI?

A.    No.

Q.    You didn't look at that?

A.    No.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 161

Q.    Did you think you needed to look at that?

A.    No.

Q.    Okay.  So you've identified a few people.
Anyone else you haven't mentioned that Mr. Musk
recruited, as far as you know?

      All right.  Let's move on.  If it's in the your
report, it will be in the record.

      Mr. Kry can you ask you about it later.

A.    Okay.

Q.    The second category was attracting additional
investors.  I'm returning now to paragraph 9.  I take
that reference to mean attracting additional donors, not
investors.  Do I have that right?

A.    Yes.

Q.    Which donors did Mr. Musk attract?

      I can tell you, Dr. Wazzan, that I read your
report.  I don't see a reference to any specific
investors, so you may need to do this one from memory.

A.    Yeah, I don't see it in there either.  I can't
do it from memory.

Q.    So I take it you didn't attempt to quantify the
value of the monetary benefit of attracting additional
donors; correct?

A.    No, not specifically.

Q.    That's not something you were asked to do?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 162

A.    Not specifically -- well, I'm taking the quantitative -- sorry, I'm taking the qualitative assessments as a whole.  I'm not parsing value to each individual one.

Q.    I understand.

Third example is attracting business partners.  And I'll help you out here a little bit.  You mention in your report, obtaining some early GPUs from Nvidia?

A.    Yes.

Q.    And you also mentioned Mr. Musk's role in getting Azure credits from Microsoft.

A.    Yes.

Q.    Were there any other business partners that Mr. Musk attracted that factored into your opinions?

A.    I'd have to go back and look at the documents.

Q.    Okay.  And I take it once again, you didn't parse out or quantify the specific benefit to OpenAI of Mr. Musk's attracting those GPUs or those Azure credits.

A.    Correct.

Q.    Example 4 in your report, paragraph 9, is:

"Teaching and contributing business building skills."

What business skills are you referring to?

A.    Well, it's clear he had a lot of success with

Page 163

early stage startups and making them a success, and I go through sort of his history -- PayPal, SpaceX, Tesla, SolarCity.

Q.    Was Mr. Musk the only OpenAI cofounder who had experience with starting -- beginning startups?

A.    No.

Q.    Mr. Altman also had a substantial amount of experience in that regard, would you agree?

MR. KRY:  Objection to form.

A.    Yes, but it's clear that Mr. Musk's involvement was important, right, because Altman asks him:

"Will you be involved somehow in addition to just governance?  I think that will would be really helpful for getting work pointed in the right direction, getting the best people to be part of it."

He went onto say:

"Even if you can't really spend time on it, but be publicly supportive, that would still probably be really helpful for recruiting."

So all these things are taking place.

Q.    What was the date of the document that you were just reading from?

A.    It's paragraph 84 of my report.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 164

Q.      That's an e-mail from June 2015; is that correct?

A.      Yeah.

Q.      It was before OpenAI was even formed?

A.      These are the things that are going to matter going down the road.

Q.      So accepting that they matter, to some degree, you're not able to quantify how much they matter, correct?

A.      I haven't tried to parse it out that way.

Q.      Do you know how many hours per week Mr. Musk spent focused on OpenAI while he was affiliated with the company?

A.      Not specifically, no.

Q.      It's not something you looked at?

A.      No.

Q.      Was it your understanding that Mr. Musk was working at OpenAI full-time?

A.      No.

Q.      Was it your understanding that he was working at OpenAI more than one day per week?

            MR. KRY:  Objection to the time period.

A.      I don't have a specific --

Q.      Was there ever a point in time, as far as you know, Dr. Wazzan, where Mr. Musk came to the office at

Page 165

OpenAI at least once a week?

A.      I cannot say that.

Q.      Do you know how many hours per week Mr. Brockman spent focused on OpenAI?

A.      No.

Q.      Do you know if this was his full-time job?

A.      I couldn't say.

Q.      How about Mr. Sutskever?  Was OpenAI his full-time job in the period 2015 to 2019?

A.      I think it was, but I couldn't say.

Q.      Do you know how many hours per week Mr. Sutskever worked on OpenAI matters?

A.      No.

Q.      How about Mr. Altman?  Do you know how much time he devoted to OpenAI in the 2015 to 2019 time period?

A.      No.

Q.      So if you don't know that, you nevertheless felt that you were in a position to opine on their relative contributions of those individuals to OpenAI?

            MR. KRY:  Objection to form.

A.      Yes.

Q.      And why is that?

A.      Based on what I've laid out in my report.

Q.      You were comfortable just coming up with one

Page 166

bottom line number and not any more granular analysis
than that, correct?

MR. KRY:  Objection to form.

A.    Well, that's why I gave a range, right.  So the
bottom end of the range is sort of predicated on his
monetary contributions, and then I've outlined a bunch
of additional stuff that he does and I've cited to
documents where parties in this litigation are saying
it's really important, we need you, we need your
training, we need your ability to recruit, et cetera,
and so based on all that, I've provided a range above
and beyond the 50 percent.

Q.    But you're confident in opining that it's at
least 50 percent?

A.    Yes.

Q.    Do you think the fact that you need to present
such a broad range undermines the reliability of your
analysis?

MR. KRY:  Objection.

A.    I don't think so.  I'm trying to be fair based
on the evidence I have.

Q.    Did you attempt -- another one of the examples
you give is that Mr. Musk went prestige within the tech
community.

Do you remember that?

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 167

A.    Yes.

Q.    You didn't attempt to quantify Mr. Musk's contribution of prestige, did you?

A.    No.

Q.    When, in your opinion, did OpenAI stop benefitting from Mr. Musk's prestige?

A.    Never.

Q.    Never?  So OpenAI is still benefitting from it today?

A.    Yes.

Q.    Even though he's suing the company?

A.    Yes.

Q.    Explain how that works?

A.    His prestige allowed the thing to get off the ground in the first place.  Attracted initial -- made the initial contributions, attracted, you know, the key personnel, was involved in recruiting, was involved in getting business deals done.  All that stuff contributed, at the time, and that's what moved the nonprofit forward.

Q.    Are you aware that Mr. Musk has made negative comments about OpenAI publicly?

A.    Yes.

Q.    Are you aware of the fact that he's made negative comments about Mr. Altman publicly?

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 168

A.      Yes.

Q.      Do you think that commentary publicly from a high profile figure such as Mr. Musk helps or hurts OpenAI's value?

A.      It's hard to say.  We'd have to go back and look at specifically what he's saying.  I mean, it's clear the market thinks it's highly valuable, right. We've got a $500 billion figure.  So whatever comments he's making don't seem to be having a very large impact.

Q.      Have you analyzed the impact of his negative comments from a financial perspective?

A.      I have not.

Q.      Have you analyzed the financial impact of Mr. Musk's public litigation against OpenAI?

A.      I have not.

Q.      It's possible that if you did analyze that, you would find that it had a negative impact, isn't that possible?

MR. KRY:  Objection.  Speculation.

A.      Yeah, it's possible, but in that case, right, the pie would shrink, in which case his stake would be less, so it's actually, if it is having a negative effect, it's working in the defendant's favor.

Q.      But you didn't consider that negative effect in calculating a 50 to 75 percent, did you?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 169

A.    No, but like I just said, it's working in your favor.

Q.    Well, I'm not sure I agree about that.

      You also mention the fact that Mr. Musk attracted media attention to OpenAI?

A.    Yes.

Q.    And you cite a number of magazine articles that he was featured in, guess starring on episodes of television programs and movies.

      Do you recall that?

A.    Yes.

Q.    Did you attempt to quantify the effect of those various media appearances on OpenAI's value?

A.    No.

Q.    Have you seen the movie Machete Kills?

A.    No.

Q.    Have you seen the cameo that Mr. Musk had in that case -- or in that movie?

A.    No.

Q.    I recommend it to you.  It's amusing.

          MR. WILSON:  Why don't we take a break quickly for lunch now?  I'm getting towards the end of this.

          MR. KRY:  When do you want to reconvene?

Page 170

MR. WILSON:  I'm happy to take as short of a lunch as possible.  I do need to eat something, but 15 minutes would be fine for me or 20.

THE VIDEOGRAPHER:  Go off the record?

MR. WILSON:  I'm happy to go longer.  It's whatever -- it's up to these guys.

MR. KRY:  If we can do 30 just because I need to field one other thing.

MR. WILSON:  Let's do 30 minutes.

MR. KRY:  Great.

THE VIDEOGRAPHER:  Going off the record, 1:27 p.m.  This marks the end of Media 4.

(Whereupon, a luncheon recess was taken from 1:27 p.m. to 2:08 p.m.)

THE VIDEOGRAPHER:  Please stand by.  We're back on the record at 2:08 p.m.  This marks the beginning of Media 5.

BY MR. WILSON:

Q.    Dr. Wazzan, just a couple of follow-ups on some stuff we talked about before the lunch break.  We talked earlier about how it's your opinion that Mr. Musk's association with OpenAI helped OpenAI to attract and recruit talent.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 171

Do you recall talking about that?

A.    Yes.

Q.    Did Mr. Musk continue, in your opinion, to play a role in helping to attract talent after he separated from OpenAI?

A.    Not specifically.

Q.    And did Mr. Musk, after he separated from OpenAI, in your opinion, continue to help attract business partners for the venture?

A.    I mean, it's hard to draw a bright line, because the nonprofit is already established because of Musk, and so his -- the fact that he started it and recruited the early guys and contributed money has now created the entity which, as it moves forward, can attract business partners and can attract other talent even though he's no longer there.

So it's sort of like, you know, the first -- it's like the first building block in a larger building. It's still contributing.

Q.    I'm just trying to assess whether that's because of anything Mr. Musk was doing in your opinion or whether it's because there was an existing enterprise already there?

A.    It's because he was fundamental to establishing the enterprise that then continues to exist after he has

Page 172

left.

Q.    So in your opinion, it's just a perpetual influence over the organization?

A.    Yes.

Q.    Okay.  We also talked about who contributed value to the nonprofit, in your opinion.

Do you recall discussing that before the lunch break?

A.    Yes.

Q.    Is it your opinion that only individuals or entities that donated money to OpenAI nonprofit contributed to its value?

A.    No.

Q.    Okay.  Who are the non-donors that, in your opinion, contributed some value to OpenAI nonprofit?

A.    I guess, it depends again, how you want to define "contributed."  So investors contribute and they get an equity stake in the for-profit.  Employees contribute with their hard work and they get paid.

Q.    So I want to talk about the employees because that's one of the group that I had in mind when I asked that question.

Focusing on employees who worked at OpenAI between when it was founded in late 2015 and when Mr. Musk -- excuse me, when the for-profit enterprise

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 173

was created in March 2019, did those employees, in your opinion, contribute to OpenAI nonprofit's value in that time period?

A.      In some fashion, yes.

Q.      And so under your methodology, should they be allocated some percentage of the contribution to the value of OpenAI nonprofit?

A.      It depends if they are claimants.  If they're similarly situated to Musk and have claims, then maybe they should be considered.

Q.      Who could potentially be similarly situated to Musk, in your opinion?

A.      I couldn't say.

Q.      What characteristics would that person or those persons need to have to be similarly situated?

A.      I couldn't say.

Q.      That's what I was trying to get at.  Because Mr. Musk is, of course, a donor or was a donor to OpenAI, so you're not saying that they had to have been a donor to be a claimant under your methodology?

A.      I'm not identifying any additional claimants. You're the one who's trying to ask me if these employees or this person or that person.  I don't know; it's a legal issue.

In this particular case, I have been asked to

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 174

assume that liability is established and Musk has a claim.  I don't know that for all these other people.

Q.    Isn't it possible that someone could contribute to the value of OpenAI nonprofit without having a claim to an economic interest in OpenAI nonprofit?

A.    Maybe.

Q.    You don't think employees would fit into that category?

A.    I don't know.

Q.    So the researchers who were working every day at OpenAI between December 2015 and March 2019, you can't say definitively that they contributed to the value of OpenAI nonprofit?

A.    They could contribute and not have a claim. They contributed and got paid.

Q.    So the fact that they got paid means that they don't get allocated a percentage of the contributions, the relative contributions to nonprofit under your model?

A.    Not in my model.  But if there's any discussion of them being allocated economic interest in the nonprofit, we should see that.  Or if they got economic interests through Aestas, for example, right?

I don't know.

Q.    Did Aestas exist prior to March 2019?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 175

A.    No.

Q.    Was there ever any discussion of Mr. Musk getting an allocated interest in the nonprofit?

A.    No.

Q.    But yet, under your model, he is a claimant, correct?

A.    Yes.

Q.    So how could it be a fact that there wasn't -- or if there was not for a particular employee a discussion of getting an allocated interest -- how could that disqualify them from being a claimant?

A.    Well, we at least have documents indicating that he was -- there was a discussion allocating him an economic interest in the for-profit.  I haven't seen any similar documents for anybody else.

Q.    Okay.  Well, we'll come back to that.  But setting aside whether there's documentation, I'm just trying to understand, methodologically, whether it's your testimony that an employee, even if you acknowledge that they contributed value, should be disqualified for being considered in the calculation of a percentage contribution if they receive a salary and did not receive an allocation?

A.    I don't have an opinion on that.  It's a legal issue.

Page 176

Q.      Do you think that the decision by the nonprofit board to create a for-profit affiliate created value for the nonprofit?

A.      Yes.

Q.      Okay.  And did you attempt to quantify the value that that decision created for the nonprofit?

A.      Yes.

Q.      How did you quantify it?

A.      Through the various methods:  The discounted cash flow, Black-Scholes method, reference to the publicly traded -- or publicly referenced information, plus the final step was the formation of the public benefit corporation.

Q.      Those sound like ways of calculating whether there was value created for the for-profit.  I'm trying to ask whether there was value created for the not-for-profit.

A.      There was value created for the not-for-profit in the sense of their stake in the for-profit.

Q.      I see.  So you would characterize the board's contribution, the non-for-profit board's contribution to the nonprofit's value as an indirect contribution?

A.      I think we're talking at cross-purposes again.

Q.      Okay.

A.      The board, under your question, green lights

Page 177

the formation of a for-profit entity.  That for-profit entity is worth $500 billion.  The nonprofit owns a piece of that.

Q.    Imagine the non-for-profit -- not-for-profit was a for-profit enterprise and that there were investors and Mr. Musk was one of the investors.

So in early 2019, this entity exists.  And it has the IP that it has, the assets that it has.

And for whatever reason, the current board and management don't think that they're able to maximize the value of those assets.  So the board goes out and finds a partner, and there's a transaction where the original company is acquired by a much larger company.  And the investors, the original investors in the original OpenAI get stock in the new corporation.  Are you with me so far?

A.    Mm-hmm.

Q.    And then the new corporation explodes in value, increases by thousands of times.  Much like what happened with OpenAI for a profit after the 2019 transaction.  Is that fair?

A.    Yes.

Q.    Okay.  Do you think that the decision of the original company board to cease to be a standalone company in this hypothetical, and partner with the

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 178

larger company contributed value to the original

investors in the original company I described?

A.      In your scenario, yes.

Q.      And so does it follow from that that the

decision by the OpenAI nonprofit board to partner with

the for-profit affiliate created value for the OpenAI

nonprofit?

A.      Yes, it did create value.

Q.      For the nonprofit?

A.      Yeah.  They hold a stake in the for-profit.

Q.      The value of their original investment

increases by virtue of the board's decision.  Would you

agree with that?

A.      Yes.

Q.      Okay.  I guess what I'm trying to ask is when

you were calculating and concluding that Mr. Musk

contributed 50 to 75 percent of the value to the

nonprofit, did you include in that 25 to 50 percent

leftover value the contribution by the nonprofit board?

A.      I didn't explicitly set out to do that.  What I

set out to do was to determine what is the disgorgement

figure.  And that's what I did, right?  So the

creation -- Musk challenges the creation of the

for-profit.

Q.      Mm-hmm.

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 179

A.      But they do it anyways.  It creates $500 billion.  They now have to disgorge some portion of that.  How much of that flows back to Musk?

Q.      Right.  And you're saying it should be 50 to 75 percent of the value of the not-for-profit?

A.      That's right.  And it does leave 25 to 50 percent for whoever else may have a claim.  And I don't have an opinion on who those people may be.

Q.      You keep using the phrase "may have a claim." And I'm very sorry to do this, but I do not understand what you mean by that.

        Do you mean an economic interest?  Do you mean something else?  What do you mean?

A.      I think it's a legal claim, right?  So here I've assumed liability.  So Musk has a claim, a legal claim.

Q.      I'm happy to assume with you that he has -- for purpose of this discussion, that he has a legal claim, and that there is liability.  I understand that's a fundamental premise of your report, and you're not here, as you said before, to argue the facts and the law.

        So we'll assume Mr. Musk has liability.

        I do think, though, that your assignment, according to you, was figuring out what percentage of the value of OpenAI nonprofit is attributable to

Page 180

Mr. Musk's contributions.  That was your assignment.

A.    Yes.

Q.    Okay.  And you're saying it's 50 to 75 percent?

A.    Yes.

Q.    So some other group of people, by definition, in your mind, are responsible for 25 to 50 percent of the valuation creation?

A.    Yes.

Q.    You keep describing the people in that category as claimants.  And I'm trying to understand what you mean by that.

A.    Well, it's a nonprofit, right, so nobody has a -- they don't have an equity stake.  So they would have to -- we'd have to figure out if they are claimants, legally, what would the -- what would their allocation -- what would their allocation be.

Q.    What if there were no other claimants, does Mr. Musk then get 100 percent?

A.    No.  I think it would just reside with the nonprofit.

Q.    So the question that I keep trying to ask, and I'm going to try it one more time -- and if it's just not something that you can understand, then we'll move on -- is, setting aside whether the other people who contributed to the value creation of the not-for-profit

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 181

are claimants or not, can you identify who the other people are who contributed to the value of the nonprofit?

A.      Not specifically, no.

Q.      So you can't rule out the possibility, for example, that the directors who approved the partnership with the for-profit affiliate, you can't rule out the possibility that decision contributed to the nonprofit's value?

A.      I would not rule that out.

Q.      Okay.  And I just -- one other -- this is going back a couple of sessions but I was going over my notes and I had meant to ask this earlier.  Other than the nonprofit, which is -- well, it was OpenAI, Inc., and now it's the foundation -- you're not presenting any analysis of unjust enrichment by any other OpenAI defendant; is that correct?

                MR. KRY:  Objection.

A.      I'm sorry, could you read it one more time?

Q.      Sure.  Other than the nonprofit, you are not presenting an analysis of unjust enrichment for any other OpenAI defendant?

                MR. KRY:  Are you including the OpenAI for-profit in that question?

                MR. WILSON:  I'm asking him a question.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 182

A.      Yeah, I don't follow.

Q.      Okay.  Well, I asked you earlier, we were talking about the mid point of your analysis, and $87 billion being the mid point of your wrongful gain analysis.

And I said:  "What portion of that wrongful gain is a wrongful gain by the nonprofit?"

And you said:  "All of it."

Do you remember that?

A.      Yes.

Q.      Okay.  So my question is:  Is there any analysis anywhere, in either of your reports, that would allow me to see the extent to which defendants -- OpenAI defendants other than the nonprofit wrongfully profited by the alleged misconduct in this litigation?

A.      I'm sorry.  I just don't follow the question.

Q.      Well we talked earlier.  You haven't analyzed, for example, how much Mr. Altman wrongfully profited by the conduct that's alleged in the lawsuit, right?

A.      Not specifically.

Q.      And you haven't undertaken that kind of analysis for Mr. Brockman, have you?

A.      No.

Q.      And you haven't undertaken that kind of

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 183

analysis for the employee vehicle, Aestas, correct?

A.    Correct.

Q.    Is there any other OpenAI defendant that you're aware of, sitting here today, for which you have undertaken an analysis of wrongful profits?

MR. KRY:  Same objection I made before.

A.    Not specifically.

Q.    Can you direct yourself to paragraph 71 of your report, please?

And here you say that you found -- in conducting your analysis, you found it particularly relevant the equity stakes that the parties themselves proposed during restructuring discussions in 2017?

Do you see that?

A.    Yes.

Q.    And you say that those discussions and proposed equity stakes can be:

"Taken as a reflection of the parties' own assessments and their relative contributions."

Do you see that?

A.    Yes.

Q.    Now, the discussions that you're referring to did not result in an agreement, correct?

A.    Correct.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 184

Q.      In fact, the discussions broke down because the parties could not agree on equity share and board control; is that right?

A.      My understanding is that --

MR. KRY:  Objection --

Q.      I'll withdraw the question.

Is one of the reasons those discussion broke down, that the parties could not agree on control of the board?

A.      Yes.

Q.      Is another one of the reasons that those discussion broke down, that the parties could not agree on equity share?

A.      I don't recall that.  As I recall, the defendants in this case actually proposed the equity percentages to Musk and he seemed okay with it.  But it broke down on the control of the board.

Q.      Take a look at paragraph 20 of your report. Third sentence.  Let me know when you're there.

A.      Okay.

Q.      (Reading.)

"By fall 2017, discussions broke down as the parties could not agree on equity share and control of the board of directors of the proposed for-profit entity?"

Do you see that?

A.    Yes.

Q.    And that's your report?

A.    Yes.

Q.    So does that refresh your recollection as to whether one of the reasons why the discussions broke down was that the parties could not agree on equity share?

A.    No.  I think ultimately the defendant parties did agree to a cap table that gave him 50 percent.

Q.    Is it possible in an -- well, let me ask you this:  Why did you write what you wrote here, if that's your understanding?

A.    Well, because I think it's fluid.  There's discussion going back and forth, and I think ultimately by the end they did agree.  I mean, there's no agreement.  They don't actually agree in the end.  But I think the defendants here did propose a division of equity that left him, Musk, with 50 percent.  But then they seemed to have not been able to agree on control of the board.

Q.    Mm-hmm.

Is it your understanding that when parties are negotiating an agreement with multiple deal points, that there's no agreement until all deal points have been

Page 186

resolved?

MR. KRY:  Objection to form.

A.    Yeah, but it's still illustrative, and it's still helpful.  It's the data point that we have here, where one side says:  "Here.  We agreed to this equity division."  And then they couldn't agree on the board control.

Q.    Mm-hmm.  So if you and I are in a negotiation, and there are two terms -- and let's say you're selling your house.  And I say:

"I'll pay 100,000 for your house if you also give me your Jaguar?"

And you say:

"Well, $100,000 sounds pretty good, but I'm not giving you the Jaguar"?

A.    You can't have my Jaguar.

Q.    I'm not sure if you're a Jaguar guy or not.

A.    I have an FTR.

Q.    Did I really guess it correctly?  That's pretty wild.

A.    I have a 2005 convertible.

Q.    Well, I think I'm ready to go home now.

All right.  So the Jaguar, and you say, "Look, 100,000, that's fair, but you're not having the Jaguar."

Do you think we're agreed $100,000 is a fair

Elon Musk v.                      FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 187

price for the house?

MR. KRY:  Objection.

A.      Yeah, no.  But it doesn't matter, I'm not sticking to this like with that level of precision.

The point is that they're talking about equity stakes that reflect their thinking at the time on how they would divide this thing up.

Q.      What were they talking about equity stakes of?

A.      The for-profit.

Q.      A new entity, correct?

A.      Yes.

Q.      What evidence have you seen that suggests that that discussion was premised on the idea of our relative contributions or the founders' relative contributions to the not-for-profit?

A.      Well, I mean, there's -- there's the documents that I'm citing to here.  So I say Mr. Musk insisted he should have no less than a 50-percent equity stake at the outset subject to later dilution and half of the seats on the board in part because he contributed two-thirds of OpenAI's funding, and that was true at the time.  And Brockman and Sutskever claimed they're uncomfortable with this condition and stated inasmuch in the e-mail to Mr. Musk.  But that e-mail back to them says they seem to be okay with the equity split, but

Page 188

they weren't okay with the division of the board seats.

Q.    Are you aware of any document where Mr. Brockman or Mr. Sutskever or anyone else said that they were okay with the 50-percent equity stake to Mr. Musk because he contributed two-thirds of OpenAI's donated funds?

A.    I don't think it specifically says that.

Q.    You say -- you just read the sentence that follows the one that I read and you say here that Mr. Musk was insisting on no less than a 50-percent equity stake, and then you say -- I'm going to skip a few words -- in part because he contributed two-thirds of OpenAI's funding.

Do you see that?

A.    Yes.

Q.    What were the other reasons that you recall Mr. Musk giving when he was advocating for a larger than 50-percent equity stake in the new for-profit venture?

A.    We'd have to pull up the document.

Q.    Okay.  Well, maybe we'll do that.

Have you ever, in conducting an economic analysis, relied on terms that are proposed but never agreed on as economic evidence?

A.    Yes.

Q.    What case did you do that in?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 189

A.       I have to go back.  At least some of the patent cases under a Georgia-Pacific analysis where you're trying to determine what a reasonable royalty should be, there can be negotiations between parties that don't ultimately result in a license, but the terms that are reflected in those negotiations, even though they're not signed, are still indicative as to what the parties are thinking.  So they may not agree ultimately, but it's absolutely a data point that's meaningful.

Q.       Do you recall giving an opinion in a case called Keto5 v. Bariatrix Nutrition?

A.       Yes.

Q.       Do you remember criticizing the other side's expert in that case for relying on a price quote in their model?

A.       Not specifically.

            MR. WILSON:  Well, let's see if I can refresh your recollection.

            (Whereupon, Exhibit 1 Redacted Version of Document Proposed to be Filed Under Sealed, Case # 2:23-cv-07936-JLS-AS was marked as Wazzan Exhibit 8, for identification, as of this date.)

            THE VIDEOGRAPHER:  And Nate Cullerton has joined the Zoom.

Elon Musk v.                       FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 190

MR. KRY:  Thank you.

MR. WILSON:  I object.

BY MR. WILSON:

Q.     So, Dr. Wazzan, this is a report of yours from a case that was pending or may still be pending, I don't know, in the Central District of California called Keto5.

Do you recall giving this report, providing this report?

A.     Yes.

Q.     It's dated October 18, 2024?

A.     Yes.

Q.     Do you remember this case?

A.     Sort of.

Q.     Do you remember the analysis that you were responding to, the expert analysis?

A.     No.

Q.     Take a look at paragraph 11 in this report. This is the summary of opinions.  You say: "Mr. Fuller" -- Mr. Fuller is the other side's expert in this case?

A.     Yes.

Q.     "Mr. Fuller's estimation of lost profits critically depends on an estimation of costs that is deficient and incomplete.  He essentially relies on a

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 191

price quote from a third party that never resulted in an executed agreement to produce the Bariatrix formulation of XOGenius for Keto5."

Q.    Do you see that?

A.    Yes.

Q.    Does that refresh your recollection that in this case you criticized the other side's expert for relying on a price quote for their evidentiary -- for their financial model?

A.    Sort of.  I mean it's one piece.  I also say:

        "Moreover that estimate of costs
        ignores other costs, such as staff, R&D,
        storage costs that Keto5 would have incurred."
        So the whole thing was an incomplete
        analysis that he had proposed.  It's not just
        the fact that he relies on a price quote and --

Q.    I understand that, but that was a factor that you considered relevant to the opinion you offered to this particular court, correct?

A.    Yeah, but these are -- so we'd have to go back and look at the documents in this particular case.  These are all case specific.  I don't remember the context of that price quote.  Was it meaningful?  Was it for the right volume?  I just don't recall.

Q.    You told the court in this case that because

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 192

the price quote that Mr. Fuller was using was never formalized in an executed agreement, relying on it for his expert analysis was speculative and not grounded in the facts; isn't that right?

A.    Where do I say that?

Q.    You say it in paragraph 37.  You list several problems with Mr. Fuller's reliance on the LaCore quote as a source of manufacturing costs, right?

A.    Yes.

Q.    And the first one that you list is that the manufacturing price quote is speculative and not grounded in actual costs incurred by Keto5?

      Do you see that?

A.    Yes.

Q.    And the reason that you give for saying that the price quote is speculative and not grounded in actual costs is that the costs quoted by LaCore were never formalized in an executive agreement.

      Do you see that?

A.    Yes.

Q.    Why isn't that same reasoning applicable here, sir?

            MR. KRY:  Objection to form.

A.    It's not the same thing at all.  And I'm pointing out there's several problems with Mr. Fuller's

Page 193

reliance on the LaCore quote.  So one is what you just said.  Second is the manufacturing price quote is incomplete.  It includes packing and micro testing costs only, right.  So Mr. Fuller does not account for any other costs, such as shipping costs, marketing costs, other soft costs.

So you can't just take that quote as-is because you need additional context.  There's way more costs that had to go into that, and he ignores that.

Q.    Mm-hmm.  So there were other terms in the price quote that were not complete, is that what you're saying?

A.    It's a price quote, but it's a meaningless price quote because it's not complete.

Q.    So did you say in this report that the fact that the agreement was unsigned is only significant because the price quote is incomplete?

A.    I don't think so.

Q.    You didn't say that, did you?  You say it was speculative and not grounded and the reason that you said that was it wasn't formalized in an executed agreement; isn't that right?

A.    Where do I say that?

Q.    Paragraph 37.

A.    It says:

Page 194

"There are several problems with Mr. Fuller's reliance on the LaCore quote as the source of manufacturing costs.  First, the manufacturing price quote is speculative and not grounded," and then I go onto second, third, and maybe some others.

Q.    Were the proposals that you relied on in your report in this case, did they contain all of the terms of the investment in the new for-profit enterprise?

A.    Couldn't say, but the primary focus seemed to be on the equity division as well as the board seats.

Q.    I see.  So unexecuted agreements can be reliable sometimes and unreliable other times; is that your testimony?

MR. KRY:  Objection.  Misstates the testimony.

A.    It's not what I said, and it depends on the context and how they're used.

Q.    So sometimes they're reliable and sometimes they're not?

A.    It depend on the context.

Q.    So you're saying yes to my question?

A.    I'm saying it depends on the context.

Q.    My question is whether you agree that unexecuted agreements can be reliable sometimes and not

Page 195

other times?

A.      I think it depends on the context.

Q.      So you can't answer that question "yes" or "no"?

A.      No.

Q.      Okay.  Turn to paragraph 94 of your report in this case.  So in this paragraph, you are citing -- and you should check me, but I'm referring to footnote 193 -- you're citing to Exhibit 16 from Mr. Sutskever's deposition.

        Do you see that?

        You're actually quoting that exhibit?

A.      In part, yes.

Q.      So you write here that Mr. Musk's substantial monetary contributions to OpenAI were part of his rationale for owning the majority of the for-profit company that he and Messrs. Brockman and Sutskever discussed but did not create in late 2017.

        Do you see that?

A.      Yes.

Q.      Did you review that entire exhibit?

A.      I believe so.

Q.      Let's see.

                (Whereupon,

                SUTSKEVER_MUSKSUB_00000430-432 was marked as

Elon Musk v.              FINAL              December 5, 2025
Samuel Altman      HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 196

Wazzan Exhibit 9, for identification, as of
this date.)

BY MR. WILSON:

Q.    So, Dr. Wazzan, the document in front of that
you've just received is Exhibit 9 to your deposition
that was previously Exhibit 16 to the Sutskever
deposition.

Do you see this document?

A.    Yes.

Q.    Do you know what this is?  Let me see if I can
refresh your recollection.  Look at footnote 193 to your
report.  You characterize this document as Ilya
Sutskever notes on restructuring meetings.

Do you see that?

A.    Yes.

Q.    So does that refresh your recollection that at
least in part, this document contains Mr. Sutskever's
notes of a meeting that he had with Mr. Musk --

A.    Yes.

Q.    -- during the restructuring discussions?

A.    Yes, thank you.

Q.    You're welcome.  On the first page of the
document, there's a highlighted "From Ilya."

Do you see that?

A.    Yes.

Elon Musk v.    FINAL    December 5, 2025
Samuel Altman  HIGHLY CONFIDENTIAL Paul Wazzan, Ph.D.

Page 197

Q. And the portion that you rely on from the next page, which is Bates 4 -- I guess it's 432.

  MR. WILSON:  Where is the quote?  I've lost it now.

  MR. KRY:  It's the paragraph after the highlighted one.

  MR. WILSON: Ah, yes.  Thank you.

Q. On the top of the page, the third page, which is 432, you quote the line that says -- and this attributed to Mr. Musk:

  "I put the majority of the funds.  I should have the majority of the equity."

  Do you see that?

  Top of the page 432.  There's a paragraph that begins:

  "We then had a meeting with Elon."

A. Yes.

Q. (Reading.)

  "Sam, Greg and I, where we decided to talk about equity."

  Right?

A. Yes.

Q. Then a couple of lines down, Mr. Sutskever's note say:

  "And Elon was like, no, it should be

Page 198

proportional in some way.  I came up with the idea for OpenAI.  It's not like Greg and Ilya came to him and Sam and said that they should do an OpenAI.  I put the majority of the funds."

And it's that last -- oh, "I should -- I put the majority of the funds.  I should have a majority of equity."

Do you see that?

A.    Yes.

Q.    And it's that last piece that you reference in your report.

A.    Yes.

Q.    I'd like to direct you to the next paragraph. Mr. Sutskever here is talking about another call that he had with Mr. Musk after the one he was just discussing.

And a few lines down in Mr. Sutskever's notes refer to him having said to Mr. Musk:

"I don't think his contributions to OpenAI were larger than ours if you include the opportunity costs.  We cannot accept anything except equal equity."

Do you see that?

A.    Yes.

Q.    And then Mr. Musk replied to that:

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 199

"Look, guys.  I'm not going to force you to do anything that you think is unfair.  Good luck with your AI startup."

Do you see that?

A.      Yes.

Q.      You didn't reference these entries that I just read in your report, did you?

A.      No.

Q.      Would you agree with me that these entries undercut your suggestion that the founding team had agreed that Mr. Musk would be entitled to a majority of the equity?

A.      Not really, because then it says -- after he says, "Good luck with your startup," and he hangs up, Ilya then says, "I was scared.  Couldn't sleep.  Woke up after throwing up."

So he seems very worried that if Musk with walks away, they have nothing.

Q.      You think that's your call to make, respectfully, sir, weighing these particular entries and deciding which one is the right articulation of the facts?

MR. KRY:  Objection to form.

Q.      You cited this document, did you not, for the proposition that the rationale for Mr. Musk getting the

Elon Musk v.                     FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 200

majority equity is that he put in the majority of the funds, right?

A.    Yes.

Q.    Do you think that it's reasonable to not also mention the fact in your report that the other founders felt that they should get an equal share of the equity because they had opportunity costs, as Mr. Sutskever put it, for having spent time working on OpenAI?

MR. KRY:  Objection to form.

A.    Yeah, I mean the document speaks for itself, but he's clearly worried that if Elon walks away from it, then they have nothing.

I think there's documents that come after this one, where the defendants are proposing the various equity splits where Musk retains 50 percent.

Q.    And those are the proposals that were never accepted, ultimately, correct?

A.    Yes.

Q.    I guess what I'm asking is do you acknowledge that there was a back and forth on this issue, and that each side had a different perspective, perhaps, as to the level of contribution that Mr. Musk had made relative to others in the nonprofit?

A.    Yes.

Q.    In paragraph 60 of your report, again, you

JANE ROSE REPORTING                      California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 201

refer to Mr. Musk's equity stake in a potential for-profit.  Actually, I'm going to direct you to a different paragraph, Dr. Wazzan, in the interest of moving this along.

Go to paragraph 95.  You say here that, in the last sentence:  "Mr. Musk's shares were only based on his financial contributions, not on granted shares."

Do you see that?

A.    Yes.

Q.    What did you mean by that?

Well, you're got to step back a sentence:

"The amount of the grant and the contribution varied depending on the capitalization table proposed.  Mr. Musk's shares were only based on his financial contributions, not on grant shares."

So they were going to have sort of a pro -- I believe what they were discussing is that Musk would have shared based on his financial contributions.  The other guys would receive grants.  He wouldn't be receiving a grant.

Q.    What financial contributions are you referring to in that sentence?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 202

A.      The money that Mr. Musk has contributed to the nonprofit.

Q.      I see.  So your understanding was that Mr. Musk had -- sorry, I didn't mean --

A.      -- plus the go-forward contributions.

Q.      What go-forward contributions were contemplated for Mr. Musk, as far as you understood?

A.      I think from memory, he was going to contribute another 100 million over some period of time.

Q.      And so it's not your testimony that the reference to financial contributions is a reference to that 100 million?

A.      Yes, in part.  It's partly referencing that.

Q.      What is a granted share in the context of this sentence, as you understand it?

A.      I think there were going to be granted shares to the other parties that were not tied directly to financial investments.

Q.      And when you say not tied to financial investments, you're talking about not tied to future financial investments?

A.      Yes.

            MR. WILSON:  Okay.  All right.  Let's look at the next document, Tab 14.

            (Whereupon, EXMF-0003257-258 was marked

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 203

as Wazzan Exhibit 10, for identification, as of this date.)

BY MR. WILSON:

Q.    All right.  So this is one of the documents that you rely on in your report as evidence of the discussions that were happening about potential share allocations in the new for-profit entity, correct?

A.    Yes.

Q.    And I want to focus your attention on the cap table, which is on the second page behind the slip sheet.

A.    Yes.

Q.    This document says that there's going to be an Elon investment with initial shares, 100 million, and a percentage of 51.2 percent.

A.    Yes.

Q.    "Investment" in this document is used as an alternative to "grant," correct?

A.    Yes.  There's both, right?  There's investments and grants on the table.

Q.    Correct.  And Mr. Musk has only allocated an investment.  He doesn't have any grants under this document, correct?

A.    Correct.

Q.    This document means that it was contemplated

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 204

that Mr. Musk would receive a 51.2 percent interest in the new for-profit entity, in exchange for at least contributing $100 million of new capital; is that correct?

MR. KRY:  Objection to form and foundation.

A.     Yes.

Q.     Is that your understanding?

A.     Yes.

Q.     Do you see any indication on this document that Mr. Musk was going to receive that 51.2 percent stake in exchange for past contributions to the nonprofit?

A.     Not specifically.

Q.     Okay.  Is it fair to say that it was contemplated that Mr. Musk would be buying his equity in the new for-profit with a capital investment?

A.     Yes.

Q.     Okay.  Subsequent to the date of this document, did Mr. Musk ever make a capital investment in OpenAI for-profit?

A.     I don't believe so.

Q.     Is it your understanding that under the proposal that was being contemplated around the time of this cap table, September 2017, is it your understanding that the cofounders understood that in addition to

Elon Musk v.                     FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 205

making a large capital investment, Mr. Musk would
increase his level of involvement day-to-day at OpenAI?

MR. KRY:  Objection.  Foundation.

Q.    Do you have any understanding at all about
that?

A.    I don't recall that as I sit here.

Q.    Did you review Mr. Musk's testimony on that
question in his deposition?

A.    I just don't recall as I sit here.

Q.    All right.  Let's look at it.

MR. WILSON:  See if you can find
Exhibit 4, please, which is Mr. Musk's
deposition transcript.  Oh, thanks.  It's much
cleaner.

Q.    And if you could direct yourself to page 73,
Dr. Wazzan.

A.    Okay.

Q.    Just for context, if you look up at line 7,
there's a question:

"Do you recall, in the context of the
2017 discussions with Altman and Brockman and
Sutskever that you suggested you would step
down as CEO of Tesla?

"ANSWER:  I don't recall."

Do you see that?

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                    janerose@janerosereporting.com

Page 206

A.    Yes.

Q.    So this line of questioning is about the 2017 restructuring discussions.  So a few lines down at line 19:

"QUESTION:  But you recognize that it would be important to devote more time to OpenAI where you'd have the control that you felt was so important."

Mr. Musk answered:  "Yes."

Do you see that?

A.    Yes.

Q.    And then Mr. Musk -- the next question:

"And did you undertake with Altman and Brockman and others that you would spend more time in that circumstance?

"ANSWER:  If that were to happen, I would spend more time, yes."

Do you recall reviewing that testimony from Mr. Musk at his deposition?

A.    Yes.

Q.    And did you understand, when you read it, that Mr. Musk acknowledged that if he, indeed, had continued to be associated with OpenAI in the for-profit, that in addition to making a substantial capital investment he would increase his time commitment to the venture?

Page 207

A.    That's what it says.

Q.    Okay.  If Mr. Musk -- well, given that Mr. Musk was contemplated to be making a substantial investment in the new for-profit entity, and given that he had committed to increase his time devotion to OpenAI going forward, if the for-profit had come together, how can you opine that the proposed 51.2 percent allocation is an assessment of Mr. Musk's relative contribution to the nonprofit?

MR. KRY:  Objection to form and also misstates the document.

A.    It's only one indication.  I've gone through a whole slew of indications of what his holdings were, what his contributions were.  He contributes two-thirds of the starting capital, and that's higher than the 51 percent that's he's contemplated to get here.

So in some sense, the 50 percent is a conservative figure.

Q.    So is the discussions around the for-profit conversion and the 51.2 percent, were those significant factors in your analysis, in your conclusion?

A.    Yes.

Q.    I think you said in your report that you found them particularly important?

A.    Yes.

Elon Musk v.                 FINAL               December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 208

Q.    Was that the most important factor?

A.    I couldn't say that any one particular factor is the most important.

Q.    Okay.  And just help me understand:  What is the significance, from your perspective, of the fact that there was discussion about Mr. Musk having 51.2 percent in the for-profit venture?

A.    They're recognizing that he is -- has contributed a ton.  He's, you know, the important -- the most important person.  He, himself, was adamant that he retain 50 percent and control.

      And then after that, they're just discussing what the terms would be.

Q.    So you think it's a recognition of past contributions?

A.    In part, yeah.

Q.    How much does that part relate to the fact that he was going to put $100 million of capital into the venture?

A.    I couldn't give you a precise number.

Q.    You didn't mention the $100 million capital investment in your report, did you?

           MR. KRY:  Objection.

A.    No.

Q.    And you didn't mention in your report that it

Page 209

was contemplated that Mr. Musk, in exchange for his 50 or more percent stake in the for-profit venture, would increase his commitment of time?  You didn't mention that?

A.      It's not necessary.

Q.      Doesn't change your calculations or analysis?

A.      Does not.

Q.      Okay.  Your report also provides or addresses, I should say, several alternative scenarios for allocating shares?

A.      Yes.

Q.      Okay.  The first of those attempts to put Mr. Musk and Mr. Brockman and Altman and Sutskever on equal footing by ignoring grants provided?

A.      Yes.

Q.      What basis do you have to think that sort of arrangement was considered by the cofounders?

MR. KRY:  Objection.  Lack of foundation.

MR. WILSON:  I agree there's a lack of foundation.  I'm not sure that I'm the source of it.

MR. KRY:  Sorry.  To put a finer point on it, the objection is that the exhibit you're looking -- I'm not seeing the representation in

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 210

the report that this was considered by the cofounders.

MR. WILSON:  I'm asking the witness.

BY MR. WILSON:

Q.    Do you have any reason to believe that the cofounders considered this alternative allocation that you're discussing in paragraph 97?

A.    Yeah.

Q.    And what is it?

A.    It's basically what I say in paragraph 97:

"The proposed calculation tables provide important insights into the values that the founding team themselves ascribed in their relative contributions to OpenAI."

Q.    And that's what we just talked about?

A.    Yep.  Exhibit 9 also includes three alternative scenarios for allocating shares.  The first scenario attempts to put Mr. Musk and Messrs. Altman, Brockman, Sutskever on equal footing by ignoring any grants provided.  Under the scenario, Mr. Musk would achieve a 78.13 percent share.

Second scenario provides Mr. Musk with a grant of 10 million shares, the same as was provided to Messrs. Altman and Brockman.  Under this scenario, Mr. Musk would achieve a 54.78 percent share; however --

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 211

Q.      I've read the report, sir.  I'm trying to
understand -- I'm focusing on the first scenario, and my
question is, are you representing that the scenario that
you've described here of putting Musk, Altman, Brockman,
and Sutskever on equal footing by ignoring grants is a
scenario that was ever discussed by those individuals?

MR. KRY:  Objection to form.

A.      No.  These are hypotheticals.

Q.      So all three of these are hypothetical
scenarios?

A.      Well, I mean, I'm trying to get at what his
economic interest is in the nonprofit.  I don't have --
there's not a document that you can point to anywhere,
so I'm trying to get at it by looking at the e-mails, by
looking at the cap tables, by looking at various things,
and so I put together some hypotheticals here which
yield different results, and those are going to feed
into my range ultimately.

Q.      In what respect would your first scenario of
ignoring grants put the parties on equal footing?  How
would that work?

A.      Just in the sense that none of them get grants;
they all get their dollar contributions.

Q.      Do you know why this cap table gave grants to,
among other people, Mr. Altman -- and by this cap table,

Page 212

I'm referring to virtual Exhibit 12, which we just looked at -- why under that cap table, if you know, was it contemplated that Mr. Altman, Mr. Sutskever, and Mr. Brockman would receive grants, among other people?

A.    Not specifically.

Q.    Do you know if it was based on the work that they had previously done for OpenAI, the nonprofit?

A.    Could be.

Q.    By removing the granted shares, aren't you taking out of the calculation an allocation based on nonmonetary contributions?

MR. KRY:  Objection to form.

A.    Yes.

Q.    Your second and third scenarios are based on an assumption that Mr. Musk would receive granted shares in addition to investment shares?

A.    Yes.

Q.    Do you have any basis to believe the parties considered that possibility?

A.    No.

Q.    Okay.  You opine in your report, at paragraph 98, that assigning to Mr. Musk the ranges that you've provided in terms of his relative contribution is consistent with the equity stake that Mr. Musk currently has in xAI.

Elon Musk v.                      FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 213

Do you remember saying that?

A.    Yes.

Q.    How much capital has Mr. Musk personally invested in xAI?

A.    I don't know.

Q.    Do you know what percentage of xAI's total investment capital has come from Mr. Musk, directly or indirectly?

A.    No.

Q.    Does Mr. Musk have an executive position at xAI?

A.    I'm not sure.

Q.    Do you know how much time Mr. Musk has spent working on xAI since it was formed?

A.    No.

Q.    Do you think that Mr. Musk's level of involvement with xAI is comparable to his level of involvement with OpenAI?

        MR. KRY:  Objection to the timeframe.

A.    Couldn't say.

Q.    You note that Mr. Musk, in your report in paragraph 93, that Mr. Musk owned 36.6 percent of Tesla at the time of its IPO.

Do you recall?

A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman       HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 214

Q.    Do you know how much personal capital Mr. Musk invested in Tesla?

A.    No.

Q.    Do you know what percentage of Tesla's total capital came from Mr. Musk, direct or indirectly?

A.    No.

Q.    Do you know if Mr. Musk has or has ever had an executive position at Tesla?

A.    I think he's a CEO.

Q.    Do you know how much time Mr. Musk has allocated to Tesla matters over the last number of years?

A.    No.

Q.    Do you have any basis to claim that Mr. Musk's involvement with Tesla is comparable to his involvement with xAI -- with OpenAI, excuse me?

            MR. KRY:  Objection to timeframe.

A.    No.

Q.    Do you know anything about Mr. Musk's capital contributions to SpaceX, SolarCity, or PayPal?

A.    No.

Q.    Do you know anything about Mr. Musk's level of attention or work spent at SpaceX, SolarCity, or PayPal?

A.    No.

Q.    Do you have any basis to claim that Mr. Musk's

Page 215

involvement with SpaceX is comparable to his

investment -- his involvement with OpenAI?

A.    No, I don't.  But it doesn't matter.

Q.    Why doesn't it matter?

A.    Because again, the damage model I'm proposing

here is a disgorgement model.  It's not predicated on

how much time Musk spends on the for-profit.

Q.    Well, if it doesn't matter, sir, I'm just

trying to understand why you mentioned in paragraph 98,

as you do, that Mr. Musk currently has an equity stake

of 53 percent in xAI.

A.    Why does it matter?

Q.    Yes, and you're saying it doesn't matter, but

yet it's in your report, so I'm trying to understand.

A.    Yeah, the amount of time that he spends at xAI

doesn't matter.  The amount of effort he puts in at xAI

doesn't matter.  He holds an equity stake at xAI.  What

we're trying to get at is what would his economic

interest in the nonprofit be, and so there's data points

available where there is -- he owns 53 percent of xAI,

he owns, you know, 35 percent of Tesla pre IPO, he owns

his total financial contributions to OpenAI prior to his

departure at the start of '20 were 60 percent.

I'm trying to triangulate into what his

economic interest is.  The amount of time that he spends

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 216

at xAI is not relevant.

Q.    So is it your testimony that the reason why Mr. Musk has 53 percent of xAI has nothing to do with the amount of time he spent there?

A.    I don't have an opinion on that one way or the other.

Q.    It has nothing to do, in your opinion, with the amount of capital Mr. Musk has invested in xAI?

A.    It might.

Q.    Do you know whether Mr. Musk was ever offered an equity allocation in the for-profit venture at OpenAI?

A.    I haven't seen such a document.

Q.    If Mr. Musk had been offered such an equity stake, would that have changed your analysis in any way?

              MR. KRY:  Objection to form.

A.    I guess I'd need to see it.  I don't know.

Q.    Okay.  Can you pull up your supplemental report, please?  Bear with me.  I found it.  Okay.  So I'm focusing again on revised Exhibit 19.

A.    With you.

Q.    So here you are opining that OpenAI nonprofit share of the OpenAI for-profit is either 29.2 percent or 26.2 percent; is that right?

A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 217

Q.      The 29.2 percent calculation, as I understand it, reflects dilution for the present value of the warrants that the nonprofit has; is that correct?

A.      Yes.

Q.      And the 26.2 percent calculation reflects what you call "full dilution"?

A.      Yes.

Q.      And that's dilution for the present value of the warrants plus allocations to an employee vehicle sponsor pool and an employee incentive plan; is that right?

A.      Yes.

Q.      Under what circumstances would a warrants-only dilution be appropriate rather than full dilution?

A.      It would depend on the timing.  You know, it's not necessarily true that those other -- that the EV-sponsored pool or the EIP dilution would actually take place.

Q.      So if I understand your testimony -- I'm trying to read your testimony.

A.      As I understand it, there's a pool that they would use in the future to fund --

Q.      I see.  So you're saying it's possible, it hasn't been allocated out or the like?

A.      Yes.

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 218

Q.    But if those pools are fully spoken for, so to speak, you think full dilution would be appropriate?

A.    Yes.

MR. WILSON:  Can we take just two minutes?  I may be done, but I just want to take two seconds to look at my notes.  Thanks.

THE VIDEOGRAPHER:  Okay.  We're going off the record, 3:05 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by. We're back on the record at 3:14 p.m.  This marks the beginning of Media 6.

BY MR. WILSON:

Q.    Dr. Wazzan, I just have a handful of final questions.  Can you get Exhibit 10 back, please?

A.    Yeah.

Q.    Okay.  Great.  So we're focusing on the cap table again.  Do you know whether Mr. Brockman or Mr. Sutskever donated money to OpenAI nonprofit?

A.    I don't recall, as I sit here.

Q.    Okay.  Well, I can represent to you that neither of them did.  If that's the case, does that suggest to you that the references on this document to investment are to future capital contributions?

A.    Yes.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 219

Q.    Okay.  In revised Exhibits 19 and 20 to your supplemental report, my reading of that is that it's your opinion that Mr. Musk could be entitled to up to $109 billion of recovery from OpenAI, and that he could be entitled to up to $25 billion of recovery from Microsoft; is that right?

A.    Yes.

Q.    That's the total of a little bit over $134 billion if he gets a full recovery under your analysis; is that correct?

A.    Yes.

Q.    That would be 26.8 percent of the entire value of OpenAI for profit; correct?

A.    Sounds right.

Q.    And that's your opinion, that Mr. Musk is entitled to up to 26.8 percent of the value of the entire enterprise?

A.    As of today.

Q.    And that's based on Mr. Musk's $38 million of donations a number of years ago and non-monetary contributions, correct?

A.    Well, it's -- yeah.  It's basically everything I laid out in my report.

          MR. WILSON:  Okay.  No further questions.  Thank you.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 220

Pass the witness.

THE VIDEOGRAPHER:  Going off the record 3:17 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by.

We're back on the record at 3:18 p.m.

EXAMINATION BY

MR. JURATA:

Q.    Dr. Wazzan, I'm Jay Jurata.  I represent Microsoft Corporation.  Thank you for your time today.

I wanted to start off going to -- do you recall earlier to you were testifying regarding what you did to prepare for today's deposition?

A.    Yes.

Q.    And I believe you said you've reviewed some documents?

A.    Yes.

Q.    Do you remember which documents you reviewed?

MR. KRY:  Hang on.  You can answer the question with respect to any documents that were reviewed on your own.  With respect to documents that were reviewed during your prep session with counsel yesterday, we assert that those are work product, so you shouldn't answer that.

Page 221

MR. JURATA:  Okay.

A.    Yeah, so I guess I took your question to mean what I reviewed when I was working on my own preparing, I don't recall specifically.

MR. JURATA:  And Robert, you're willing to stipulate to that work product for both sides of the case, correct?

MR. KRY:  So, my usual practice is that an open-ended question about what documents did you review is impermissibly asking for work product.

If you have a specific document, then you ask the witness if he has seen it before, and the answer is I saw it during depo prep yesterday.

In my view, that's okay.

MR. JURATA:  Okay.

Q.    All right.  And you recall earlier today you were talking about Professor Arnold's report?

A.    Yes.

Q.    Okay.  And I believe -- is it accurate to say that you testified that Professor Arnold supports some of the points that you make in your analysis?

A.    Yes.

MR. JURATA:  Why don't we talk about

Page 222

that for a little bit.  If we can mark this as an Exhibit.

(Whereupon, the Rebuttal Expert Report of Jonathan I. Arnold, Ph.D., was marked as Wazzan Exhibit 11, for identification, as of this date.)

MR. JURATA:  What number are we up to for exhibits?

THE REPORTER:  11.

BY MR. WILSON:

Q.    So I'll represent to you, Dr. Wazzan, that Exhibit 11 is an accurate copy of Professor Arnold's report in this case.

A.    Okay.

Q.    Now that you have the benefit of Professor Arnold's report, can you identify the points that he states that you say support the analysis that you did?

A.    Let's see if I can find it.

MR. KRY:  And I'm sorry.  I need to add one more thing.  It's also fair game to ask if he reviewed any questions during depo prep that were not on this list of documents considered.

MR. WILSON:  What I'm saying is that I'm going to take under advisement the protocol that Mr. Kry has described.  I don't want there

Page 223

to be any suggestion that we've somehow agreed on behalf of OpenAI that --

MR. JURATA:  Microsoft will take it under advisement as well.

A.    Well, yeah, so I'd have to go through this again, pretty carefully.  But one of the things I was thinking was on page 32, he says, paragraph 54:

"Dr. Wazzan's framework models that Mr. Musk ought to have a 50 to 75 percent economic interest in nonprofit OAI seven years after his departure is at odds both with Mr. Musk's own concession that he would have been diluted in the but-for world, in OpenAI's massive capital and compute demands."

And then if you look down at footnote 92, he says, see also -- or I guess, Mr. Musk states:

"This is just to go over the board stuff.  You may have other things you want to work intended to reflect the principle, year to 18 months that would erode to not have control, over time dropping me to 25 percent," which is what he has at Tesla.

And so one of the last questions that we just answered, actually, with respect to the

Page 224

supplemental report, was I think that we calculated that at the high end, Musk would have sort of 26 percent of the 500 billion pie. That's consistent with the 25 percent figure in that quote on paragraph 54.

Q.    Thank you for explaining that.  And without going through the rest of his report paragraph by paragraph, at a high level, is there anything else in Professor Arnold's report that you recall, sitting here today, that supports your analysis?

A.    I thought there were some other points at the time when I read it.  I don't have them now.  I haven't prepared a written response.

Q.    It's not a memory test.

And I believe you testified earlier today that you corrected two exhibits, Exhibits 15 and 17, in your report as a result of criticism in Professor Arnold's report, correct?

A.    Yes.

Q.    And then aside from correcting those Exhibits, is there anything in Professor Arnold's report that causes you to reconsider any of the opinions in your report?

A.    No.

Q.    Why don't we go back to Exhibit 1, which is

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 225

your report, and I want to turn to Appendix A of that, which contains the list of cases that you previously have testified in.

A.    Yes.

Q.    And specifically, I want to turn your attention to page 18.

A.    Okay.

Q.    Okay.  Do you recall, earlier today, talking about cases in which your opinions were excluded in whole or in part?

A.    Yes.

Q.    Okay.  And you provided a list of those cases?

A.    Yes.

Q.    You did not provide, in that list, Case Number 87, which is United States of America versus Schiff.

Do you know whether or not your opinion was excluded under Federal Rule of Evidence 702 in that case?

A.    I believe it was not.  There's a long, tortured history, and I've read most of those documents.

So I was retained by the State's Attorney in New Jersey.  I performed an analysis of stock loss drop so I did a causation analysis.  Ultimately, VAG said they didn't need to prove loss causation, so we took that out of my report before it was filed.

Page 226

We then filed the report.  The Court then later decided that, no, no, no, no, you do have to show loss causation.  VAG tried to circle back in and say:  "Well, Wazzan did actually do that analysis, and we have it," and they wanted me to testify to it.  But it wasn't in the report.

So the court said no.

But as I understand it, everything that was in the report itself was admitted.

Q.    All right.  Let's start at your assignment in this case, which I believe is set forth in paragraph 8 of Exhibit 1.

A.    Yes.

Q.    And I believe you said earlier today that your assignment starts off by saying you were asked to:

          "Determine the amount by which the OpenAI defendants and Microsoft were profited or were unjustly enriched by operating OpenAI as a commercial venture, despite having received charitable contributions from Elon Musk on the understanding that OpenAI would remain a nonprofit dedicated to the public good."

          Did I read that correctly?

A.    Yes.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 227

Q.     What are the legal claims remaining against Microsoft in Phase 1 of this case?

          MR. KRY:  Objection.

A.     I couldn't say.

Q.     Did you -- did you look at what those claims were, at all, in preparing your report?

          MR. KRY:  Objection.  Foundation.

A.     No.

Q.     And is that because you were -- you were instructed to assume liability?

A.     Yes.

Q.     And in -- is it your opinion, then, that the nature of the claims against Microsoft are irrelevant in determining the extent to which Microsoft was unjustly enriched?

          MR. KRY:  Objection to form.

A.     That's right.

Q.     Why don't we jump ahead to paragraph 16 of your report.  And earlier today, do you recall being questioned by Mr. Wilson regarding the cost that was required to purchase compute necessary for generative AI research?

A.     Yes.

Q.     As part of your analysis, did you consider what OpenAI's value would be today absent its strategic

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 228

partnership with Microsoft?

A.    No, that's not a necessary element of the disgorgement analysis.

Q.    And why not?

A.    Because, as I understand it, the creation of the for-profit is the challenged action here.  Any profits that are generated therefrom, are subject to disgorgement.  That's it.

Q.    So you assume that OpenAI would have the same valuation as it has today in your counter factual?

A.    No, I don't.  There is no counter factual. It's just the disgorgement of the profits that were generated from the creation of the for-profit.

Q.    And is it your opinion that -- well, actually, let me -- we'll come back to that.  What is your understanding of the conduct that Microsoft engaged in that is alleged to be wrongful in this case?

A.    I don't have a strong understanding of that, other than I've assumed they're found to be liable, I've assumed liability.  So whatever their conduct is -- and my understanding is that -- from counsel that the remedy for their actions is disgorgement.

Q.    Do you know whether Microsoft's 2019 investment and commercial arrangement with OpenAI's for-profit subsidiary is alleged to be wrongful?

Page 229

A.    It's a legal issue.  I don't have an understanding of that.  I've assumed liability.

Q.    So you did not factor into your analysis, one way or the other, Microsoft's 2019 investment into OpenAI other than what you back out of its capital on in the tables, which I believe is Exhibit 19 of your supplemental report.

MR. KRY:  Objection.  Misstates the testimony.

A.    So what I'm trying to get at is the unjust enrichment from their participation in the for-profit.  I calculate that amount.  Or actually -- ultimately, it comes out of the recapitalization announcement, and then I do back out their investment to get the final number of their unjust enrichment.

Q.    I understand, sir, that you calculate the amount in which you claim Microsoft was unlawfully enriched, but how was -- my question is how was Microsoft unlawfully enriched?  What is your understanding of that?

MR. WILSON:  Objection to form.

A.    I think they're unlawfully enriched by having an economic interest in the for-profit.

Q.    You reviewed Mr. Musk's deposition testimony in this case; you testified to that earlier today, correct?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 230

A.    Yes.

Q.    Do you know whether Mr. Musk believes that Microsoft's 2019 investment into OpenAI was wrongful?

A.    I couldn't say.

Q.    Do you know whether Mr. Musk believes that Microsoft's 2021 investment in the OpenAI for-profit subsidiary was wrongful?

MR. KRY:  Objection to the timeframe with respect to when Mr. Musk had the belief.

A.    I cannot say.  Those are legal issues.

Q.    And you didn't think that his belief as to whether or not he was wronged by Microsoft's conduct was relevant to your unjust enrichment analysis?

A.    No.

Q.    Are you aware that one of the actions that plaintiff alleges Microsoft did wrongfully here was putting pressure on OpenAI to commercialize its technology?

A.    I don't have a specific understanding.  I've assumed liability.  These are all liability issues.

Q.    So you didn't -- you didn't factor in that one of the things that Microsoft was alleged of doing wrongfully was participating in safety decisions regarding OpenAI models?

A.    I've assumed liability.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 231

Q.      And you didn't consider what role Microsoft may or may not have played in the reinstatement of Sam Altman to the OpenAI board?

A.      Assumed liability.

Q.      And you didn't factor in what role Microsoft played, if any, in the restructuring of the for-profit subsidiary into a public benefit corporation?

A.      Again, assumed liability.  But by the way, I'll just say, all those things that you've just discussed, all of those would have been encapsulated and captured in the $500 billion valuation.

Q.      And that's what I want to get to.  Let's say the court or the jury determines that one of the things that we -- let me take that back and ask you a better question.

So if, for example, the court or the jury determines that Microsoft's 2021 investment into the OpenAI for-profit subsidiary was not wrongful, how does your model account for that in calculating damages, and does the unjust enrichment change in any way?

A.      I'd have to think about it.  Not sure I can answer that as I sit here.  But I think the model is sufficiently robust, that it can be adapted to that hypothetical.  You know, again, you can't produce a model that accounts for every single permutation that

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 232

might arise.  But I think the model is adaptable in that instance.

Q.     But as your report is currently written, a jury could not make that calculation itself?

MR. KRY:  Objection to form and also foundation.

A.     No, the jury could not, but under that instruction from the court, I think the model could be modified in short order.

Q.     And for the purpose of the analysis contained in Exhibit 1, it doesn't matter if Microsoft is liable for one of the alleged acts of wrongful conduct or all of the alleged wrongful acts, correct?

A.     Correct.

Q.     So it's all or nothing?

A.     Yes.

Q.     I'd like to turn to paragraph 20 in your report, and I just want to let you know that to the extent that you need to review, you know, any part of your report in order to answer my questions, you should certainly take the time to do that.

So am I correct, Dr. Wazzan, that you agree that OpenAI needed to raise substantial funds in order to continue its research back in the 2017 time period?

MR. KRY:  Objection.  Form.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 233

A.      That's not my opinion.  That's what they seem -- the parties themselves seem to have stated.

Q.      And you felt that that was reliable enough for including in your report?

A.      Yes.

Q.      And that apparently led to the discussion in 2017 between the founders that you and Mr. Bradley were -- I mean, you and Mr. Wilson were talking about earlier today?

A.      Yes.

Q.      And Mr. Musk obviously was part of those discussions?

A.      Yes.

Q.      And as part of those discussions, they were talking about converting the nonprofit into a for-profit entity, correct?

A.      Yes.

Q.      Okay.  Why is it appropriate to say that Microsoft's profits from its investments in the OpenAI subsidiary are unjust if Mr. Musk himself was envisioning potentially converting the nonprofit into a for-profit entity?

                MR. KRY:  Objection to form.  Liability issue.

A.      I don't have an opinion on that.  It's a

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 234

liability issue, which I've been asked to assume.

Q.    And you've been asked to assume that the wrongful -- you've been asked to assume that the liable conduct was the conversion of -- I'm sorry, let me take that back.

You've assumed that the wrongful conduct or the conduct which is liable was the creation of the OpenAI for-profit subsidiary, correct?

A.    In effect, yes.

Q.    And that's something which happened before Microsoft invested in the for-profit subsidiary, correct?

A.    That's my understanding.

Q.    And you haven't seen anything which indicates in your -- let me take that back.

Nothing in your report indicates that Microsoft was involved in the decision to create the OpenAI for-profit subsidiary, correct?

MR. KRY:  Objection to form.

A.    I don't -- I just don't know as I sit here.  I haven't focused on the liability issues.

Q.    I want to turn to the overview of your damages methodology -- actually, no.  I'm not going to do that.  We've already discussed that today.  Trying to get you out of here early, Dr. Wazzan.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 235

A.      Great.

Q.      So we talked about this a little bit earlier, but I just want to -- I just want to make clear.  So you were -- you were asked to make the assumption that OpenAI would have the same valuation for the purpose of your unjust enrichment analysis as it has in the actual world?

MR. KRY:  Objection to form.

A.      Are you in a particular paragraph in my report?

Q.      It's not really driven by a particular paragraph in your report, but if you want to, I'm looking at page 27.

A.      Okay.  Just ask the question again, please.

Q.      Okay.  Were you instructed to make the assumption that OpenAI would have the same valuation as it has in the actual world in determining your unjust enrichment analysis?

A.      No.

Q.      Okay.  And so why did you believe that was appropriate?

A.      To not make that assumption?

Q.      To assume that it would have the same value?

A.      I have not assumed that.

Q.      Can you explain what you mean by that?

A.      This isn't a sort of lost profits or a but-for

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 236

scenario.  It's literally take what actually happened, take the values as-is and determine the disgorgement. There is no alternate but-for world.

Q.     So it's your testimony, it is your belief that there was no requirement for you to consider what a counterfactual world would be in doing your unjust enrichment analysis?

A.     That's my understanding of how disgorgement works.

Q.     Do you have a view as to whether Microsoft would have made the same investments that it did in the actual world if it was not going to have the possibility of receiving the returns that it negotiated for in its various investment agreements?

A.     I mean I couldn't say.  Probably not, but I couldn't say.

Q.     Are you aware that one of the -- one of the things that plaintiffs claim is wrongful is that Microsoft got to benefit from the technology that OpenAI developed over time?

A.     I do have that understanding.

Q.     Do you believe that Microsoft would have invested $13 billion into OpenAI if it was not going to receive those intellectual property rights?

                    MR. KRY:  Objection.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 237

A.      I couldn't say.

Q.      Would it be economically rational for someone to make the same investment that they made in the actual world if they were not going to receive the intellectual property rights that were negotiated for in an arm's length agreement?

MR. KRY:  Objection.  Beyond the scope of his opinion.

A.      Yeah, I don't know.  I mean, as a hypothetical, probably not, but I can't say.  In some circumstances, it may be worth it to Microsoft to incorporate ChatGPT into Copilot so that they can keep up with Google, for example.  I just -- it's not for me to say.

Q.      Now, you did not attempt to quantify any unjust enrichment that results from the incorporation of OpenAI's technology into Microsoft's products, correct?

A.      No, I haven't -- I mention it.  I talk about it in my report.  I haven't seen any documents that would have allowed me to do that.

Q.      And you're providing no opinion on a damages -- I'm going to take that back and start over.

You're providing no opinion as to an amount that Microsoft was unjustly enriched by as a result of incorporation of OpenAI's technology into its products?

A.      Right.  I don't have any visibility into their

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 238

costs or revenues associated with incorporating the OpenAI technology into their own products.  I imagine it's significant.  Microsoft is a profit-maximizing firm.  They're doing this for a reason, but I can't -- there's been no documentation on that.

Q.     Sitting here, you actually don't know for a fact whether Microsoft has made any return as of today through the incorporation of OpenAI's technology into Microsoft products, correct?

A.     Separate and aside from their in their economic interests and OpenAI for-profit?

Q.     Correct, separate and aside from that.

A.     Okay.  No, I have not seen any such documentation.

Q.     And you will not be put being forth an opinion at trial on any amount that Microsoft may or may not have been unjustly enriched by as the result of incorporating OpenAI's technology into Microsoft's products?

MR. KRY:  Objection.

You can respond as to your current intentions.

A.     So I haven't seen any documents that would allow me to do that at this time.  I suppose if I asked or was given documents and asked to do such a thing, I

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 239

would do it.  I haven't -- I haven't been asked.

Q.    You -- your analysis -- take that back, start over.

Earlier today, do you recall questioning by Mr. Wilson regarding potential future investments by -- take that back.

I want to be clear on the terminology, so Robert doesn't object.

Earlier today, you testified regarding potential future contributions that Mr. Musk would make in the for-profit entity that was under discussion in 2017, correct?

A.    Yes.

Q.    And to be clear, your model assumes that there were no further contributions by Mr. Musk, correct?

A.    Yes.

MR. KRY:  Objection to form.

Q.    Were you asked to assume that?

A.    No.

MR. KRY:  Same objection.  And I'm sorry, the potential future contributions you are referring to there, is that the -- are you talking about on the pro forma cap table?

MR. JURATA:  Correct.

MR. KRY:  So the things that were

Page 240

labeled as investments?

MR. JURATA:  I'm sorry?

MR. KRY:  The things that were labeled as investments.

MR. JURATA:  Yes.

MR. KRY:  Did you understand that?

THE WITNESS:  That was my understanding, yeah, 100 million.

BY MR. JURATA:

Q.    Why don't we jump ahead to paragraph 74 of your report.  Do you recall testifying earlier today that you thought there might be a way to adjust your model if the Court found that certain financial contributions by Mr. Musk could not be a basis for claiming unjust enrichment?

A.    Yes.

Q.    And again, to be clear, the way to adjust your model, there's nothing in your report that would show how to adjust your model.  That would require additional work by you, correct?

MR. KRY:  Objection to form.  And also, I think that question requires speculation, based on what the court says.

A.    Yeah, so I mean, in the -- the question you're asking can be illustrated in Exhibit 10 on page 47.

Page 241

What you're saying is, if some of Mr. Musk's contributions, monetary contributions are required by the Court to be set aside, that might change the allocation in Row D of the 50 to 75 percent.

There is no table -- I don't have a table, for example, somewhere in my report where it says on a dollar-for-dollar basis, and on a, you know -- on a non-monetary contributions, dollar-for-dollar or item by item, where you would get these range and how it might change if you took one of them out.

I think that could be done, you know, not as I sit here, but, you know, back in the office with some work, we could probably make that work pretty easily. And then it would just feed right in to changing one of those numbers.

Q.     But you elected not to do that type of a granular analysis in preparing your report?

MR. KRY:  Objection to form.

A.     Well, I mean, there's almost an infinite number of permutations to what you're suggesting, so I don't think it's feasible unless we actually have a court order that says:  "Take this out, take that out."

Otherwise, you know, there's too many combinations.

Q.     Did you consider whether including any

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 242

combination?

A.      No, I mean, I think --

        MR. KRY:  Hang on.  I -- I think the
expert's consideration of draft -- no, it's
fine.  I'll let you answer.  Withdrawn.

A.      So I may have this wrong, but let's say there's
10 variables.  The combination of variables, is, like,
10 factorial.  It's a really big number, right?  How
many permutations can you generate from 10 variables.
It would be thousands.  I don't have an ability to do
that.  Nobody could do that.  So it would take a very
specific instruction from the court to say take this
out, take that out, take this out, take that out.  Then
it could be done.

Q.      I want to turn to the nonmonetary contributions
by Mr. Musk.  If the jury concludes that Mr. Musk's
nonmonetary contributions were not valuable, the
analysis in your report would have to be modified,
correct?

A.      I think you would then --

        MR. KRY:  Objection to form.

A.      Sorry.  I think you would then land on a lower
amount, the 50 percent number.

Q.      And how does your model account for the
scenario where the jury finds that only some of

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 243

Mr. Musk's nonfinancial contributions were actually
valuable?

A.     Then you would land somewhere in between.

Q.     And again, that would require adjusting the 50
to 75 percent figure that you came up with?

            MR. KRY:  Objection.

A.     Yeah, but I think the jury can do that.  You
know, I've give them a range.  They can now determine
what they think is right.

Q.     Do you recall testifying earlier today --
actually before I go there, your analysis though, does
not give the jury a basis for deciding what adjustments
to those percentages should be made should they
conclude, for example, that some of the Mr. Musk's
nonfinancial contributions were not valuable?

            MR. KRY:  Objection.

A.     So I think I've laid out the qualitative
arguments in my report, and I've overlaid those on top
of the quantitative figures that I've calculated, and I
ultimately produce a range of 50 to 75 percent.  I think
a jury could land somewhere within the range based on
the hypothetical you just described.

Q.     But you did testify earlier today that you made
no attempt to quantify what those qualitative
contributions were, correct?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 244

A.      Not on a variable-by-variable basis.

Q.      So the jury would not have the benefit of that analysis in adjusting the ranges in your report, correct?

A.      Again, I think they would have to look at sort of the relative benefits of having a luminary founder who attracted talent versus, say, his ability to produce deals like with the Nvidia chip.  They might be able to land somewhere in the middle of the range.

Q.      Were you asked by counsel to quantify Mr. Musk's nonfinancial contributions?

MR. KRY:  Hang on.  That's work product, so I'm going to instruct the witness not to answer.

Q.      Why did you not attempt to quantify Mr. Musk's nonfinancial contributions?

MR. KRY:  I'll instruct the witness that you can answer that only if you can provide an answer without referencing any discussions with counsel.

MR. JURATA:  I disagree with that entirely.  He testified multiple times today that he was told to assume certain things by counsel or he was instructed by counsel to do certain things, and if he was instructed by

Elon Musk v.                FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 245

counsel to try to do something that he did not do, that's relevant.

MR. KRY:  So the first of those things, obviously if he was instructed to assume certain things, you can inquire into that. That's in the rule, I don't they that's what we're talking about.  Your last question was were you asked by counsel to quantify intangible contributions, and I don't think there's anything in the rule that -- sorry, that's a communication by counsel -- between counsel and the expert.  And under the rule, that's not subject to disclosure, and it doesn't fall in any exception.  You know, I don't think discussions about potential analyses that don't ultimately show up in the report is disclosable.  That's work product under the rule.

MR. JURATA:  We will respectfully disagree with that, and we can perhaps come back to that at a later time.

BY MR. JURATA:

Q.    But Mr. Wazzan, why don't you answer my question excluding any instructions you were given by counsel?

Page 246

MR. KRY:  Or any communications with counsel.

A.    It's hard to parse these things out, but -- so I go to great lengths in this section on the qualitative contributions, and I cite to the academic literature throughout.  It's very clear in the literature that the nonquantitative impacts are valuable.  Very valuable. And I cite to the literature.  Okay.  What the literature does not do, is it doesn't tell you it's a five percent adjustment for the ability to recruit top end talent, it's two percent adjustment for the ability to structure deals in advance of other people getting, you know, advanced microprocessors.  So you can't use the literature for that.  So what you do is, you have qualitative arguments.  And I've laid all the ones out that I can, I'd cited to the literature, it's clear they're valuable, I don't know how valuable specifically on a variable-by-variable basis, so I created a range from 50 to 75 percent.

Q.    You said that you were not aware of a value on a variable-by-variable basis.  Did you make any attempt to quantify collectively Mr. Musk's nonfinancial contributions?

A.    Yeah.  I think that's how you get from 50 to 75 percent.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 247

Q.    But there's no table or formula in your report that attributes what percentage of the 50 to 75 percent are Mr. Musk's financial contributions, and what percentage are Mr. Musk's nonfinancial contributions, correct?

A.    Well, the financial contributions, I think set a lower bound and identify a 30 percent number and a 50 percent number based on financial contributions, so I think those are somewhat more anchored, but then, for the qualitative arguments there is no empirical literature to point to, so I recognize they're valuable, the academic literature says they are.  You know, I looked at what his holdings are in other companies, and you come up with a range that is, you know, economically reasonable.

It's not unlike the Georgia-Pacific analysis in the patent case.  You look at the 14 factors, you don't assign a value to each factor, you sort of them as a whole, and you say, you know, this five percent royalty is reasonable.  That's an similar analysis to here.

Q.    Do you recall testifying earlier today that Microsoft entered into its first investment with OpenAI's for-profit subsidiary about one year after Mr. Musk left?

A.    Yes.

Elon Musk v.                    FINAL               December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 248

Q.    Have you analyzed what role Mr. Musk had in Microsoft's 2019 investment?

A.    No.  Again, I've assumed liability.

Q.    So you're not aware of Mr. Musk playing any role in Microsoft's 2019 investment, sitting here today?

A.    Not as I recall.

Q.    Continuing with Mr. Musk's nonfinancial contributions, you did testify earlier today that there were other individuals, besides Mr. Musk that contributed to the value of the nonprofit entity, correct?

A.    Yes.

Q.    Now one of the things in your report that you attribute to Mr. Musk was an early compute agreement for Azure that the nonprofit entered into with Microsoft, correct?

A.    Yes.

Q.    Do you know what the terms were for that compute agreement?

A.    Not as I sit here.

Q.    Do you know whether Microsoft provided that compute at a discount?

A.    I don't recall as I sit here, but -- so in some sense, all of Microsoft's contributions, as I see them, are at some sort of a discount, right, including their

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 249

investment, so if they invest, say, 10 billion, but they require that 8 billion come back as a purchase of compute power or cloud services, their actual cost is not the 10 billion, it's actually what the cost of providing the services is.  And so it's -- it's not really 10 billion, it's something less.

Q.    But I'm not talking about Microsoft's investments here.  I want to be very clear.  This was -- this was discounted compute provided to the nonprofit, so let's -- just want to make sure we're talking about the same thing?

A.    Yeah, no, I agree with that.  When you say discount, it's not sort of like discount from retail price.  What should be looked at is their actual cost for providing those services.

Q.    Now, that was -- that was very much a discount from OpenAI's perspective, though, correct?

A.    Possibly.

Q.    It was -- in fact, you go out of your way in your report to talk about Mr. Musk's role is procuring that investment?

A.    Yes.

Q.    And so you attributed that as to one of the significant nonfinancial contributions that he did?

A.    Yes.

Elon Musk v.        **FINAL**        December 5, 2025
Samuel Altman    HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 250

Q.      Do you know what the value of that discount was to OpenAI?

A.      Not specifically.

Q.      I'm going to represent to you, Mr. Wazzan, that that compute was provided at a $50 million discount?

A.      From list or from cost?

Q.      From list.

A.      Okay.

Q.      You would agree with me that that $50 million would be a contribution to the nonprofit?

MR. KRY:  Objection to form.

MR. JURATA:  Actually, I can ask that better.

Q.      You would agree with me that saving $50 million in purchasing compute is something that contributes value to the nonprofit, correct?

MR. KRY:  Objection to the form.

A.      What was the timing on that?  Can you point me to my paragraph, please?

Q.      Sure.  We're talking about paragraph 90 of your report.

A.      Yeah.  What I'm trying to get at is if that contribution was made to the -- was prior to the -- prior to the creation of the for-profit.

Q.      Correct.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 251

A.      And okay, let's assume it's 50 million --
although I would say you have to look at it versus cost,
not list -- I would consider that a contribution.

Q.      Okay.  Did your analysis factor in that $50
million contribution to the nonprofit in trying to
determine the relative contributions of Mr. Musk to --
compared to others?

MR. KRY:  Objection to form.  The
witness just said it's not 50 million.

A.      Let's just call it the discount, but the
discount is a qualitative factor contributing to
Mr. Musk's contributions.

Q.      I understand that, but you do understand that
Microsoft is a defendant in this case?

A.      Yes.

Q.      And you do understand that plaintiffs are
alleging that Microsoft was unjustly enriched?

A.      Yes.

Q.      But in determining the amount in which
Microsoft is unjustly enriched, your analysis does do --
does not take into consideration the benefit that
Microsoft conveyed to OpenAI as a result of providing
discount on a substantially discounted basis?

A.      Correct.  I'm not giving Microsoft credit for
whatever the discount is because it occurs prior to the

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL         Paul Wazzan, Ph.D.

Page 252

creation of the for-profit.

Q.    Now, that discount has an economic value, correct?

A.    Yes.

Q.    Just like you conclude that Mr. Musk had an economic value in the similar donations that he provided to the nonprofit?

A.    Yes.

Q.    So it would be possible to fact -- to determine the economic value of that discounted compute that Microsoft provided prior to investing in the OpenAI for-profit subsidiary?

A.    Yes.

Q.    Okay.  And you just didn't do it in your report?

A.    But it's not necessary, it's not meaningful in my analysis, right.  It occurs before the creation of the for-profit.  I don't know if Microsoft is alleging that that contribution should entitle them to a claim of the nonprofit, right, in the same way that Musk is.

I haven't been asked to assume liability in that fashion for Microsoft, right.  You're actually putting Microsoft in the position of a plaintiff against itself.  So I don't -- I don't have an answer for that.

Q.    Did you consider reducing the unjust enrichment

Page 253

that you calculated for Microsoft to back out the economic value that it provided to the nonprofit entity?

A.    No, because again, the predicate act is the creation of the for-profit, and that discount occurs prior to the creation of the for-profit.

Q.    You would agree with me that Microsoft has no economic value as of today in the OpenAI for-profit subsidiary as a result of the discounted compute that it donated to the nonprofit?

MR. KRY:   Objection.

A.    I'm not sure how to answer that.  It's a little bit circular.  I mean, their contribution of the compute at a discount contributed to the overall value of -- or the progress, I guess, of OpenAI prior to the creation of the for-profit.  So I would concede that the Microsoft discount is a benefit to OpenAI.

It's not clear to me that that discount should be credited against their disgorgement of their unjust enrichment in the for-profit.  That's where the link, I think, breaks.

Q.    I want to turn to Section 8 of your report, which start on page 48.  Am I correct, Dr. Wazzan, that the unjust enrichment that you calculate to the benefit of Microsoft is additive to the unjust enrichment that you calculate to the benefit of OpenAI?

Page 254

A.      Yes.

Q.      Did you do anything in your analysis, Dr. Wazzan, to analyze the relative contributions by Microsoft as part of the strategic partnership -- strike that.  Let me try again.

As part of your analysis in determining Microsoft's unjust enrichment, did you do anything to assess the effect of contributions that are not challenged in this case as unlawful relative to contributions which are challenged as unlawful?

A.      No.

Q.      Why not?

A.      Well, as I understand the assignment, it's not necessary.  I was asked to assume liability.  I was asked to assume that the creation of the for-profit is the predicate act.

Microsoft has benefitted from their investment in the for-profit, and that is the amount that they are enriched by in which I'm calculating their disgorgement and their percentage disgorgement.

Q.      But you don't know here today whether Microsoft's contributions to OpenAI came 90 percent from lawful conduct as opposed to, say, 10 percent from the conduct which is alleged to be unlawful, do you?

MR. KRY:  Objection to form.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 255

A.      Can you repeat that?

MR. JURATA:  Can we read that back, please?

(Whereupon, the record was read by the reporter.)

A.      I'm not sure how to answer that.  I've assumed that the creation of the for-profit is a predicate problem, and their investment in enrichment from their investment in the for-profit is the amount that counsel has asked me to compute.

Q.      You're aware that Microsoft has built, for example, custom supercomputers for OpenAI to train its models, correct?

A.      I have a general understanding of that, yes.

Q.      And that's -- that's a rather large undertaking, these supercomputers for training generative AI models, correct?

A.      Yes.

Q.      And you haven't done anything that would indicate what the ratio of the benefit would be from OpenAI's use of those supercomputers to train models relative to Microsoft's various investments into the for-profit subsidiary, correct?

MR. KRY:  Objection to form.

A.      Correct, it's not necessary.  I've done it --

Page 256

it's a disgorgement analysis.  It's not a lost profits analysis in a but-for world.

Q.    Don't you think it would be relevant to understand what benefits were attributed to OpenAI resulting from conduct which is not challenged to be unlawful as opposed to conduct which is challenged to be unlawful?

MR. KRY:  Objection to form.

A.    It's a legal issue.  I've assumed liability.

Q.    How do you know, Dr. Wazzan, that under the analysis that you've done that you are not disgorging from Microsoft value which was created from legitimate activity not challenged to be unlawful?

MR. KRY:  Objection to form.

A.    Because the totality of their disgorgement resides within the for-profit and their investment in the for-profit.

Q.    So -- but again, that's an analysis which was done without looking at the benefits that came from conduct not challenged to be unlawful?

A.    It's a legal issue.  I've assumed liability.

Q.    Don't you have an obligation as an expert calculating unjust enrichment to separate the gains that were lawful from the gains that are alleged to be unlawful?

Page 257

MR. KRY:  Objection.  Calls for a legal conclusion.

MR. JURATA:  You can answer.

A.     I suppose it would depend on case by case, but my understanding here is that all gains from their investments in the for-profit are appropriate for disgorgement.

Q.     And that was something you were told to assume by counsel?

A.     Yes.

Q.     And if the jury were to conclude that a substantial contribution to OpenAI's valuation came from Microsoft's lawful conduct, there is no way for them to use your report in order to adjust unjust enrichment accordingly, correct?

MR. KRY:  Objection to form.

A.     I suppose it would take the -- we would need to understand what the lawful versus unlawful conduct is. Now I've assumed liability, so I haven't done this analysis.  You're now asking me to assume that they're liable for some things and not for others.

Q.     Actually, that wasn't -- I'm sorry, I didn't mean to.

A.     So under that scenario, we would have to lay them out and -- I don't know.  As I sit here, I don't

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 258

know.

Q.     I'm not asking you, though, Dr. Wazzan, to assess whether certain of the conduct which is alleged to be unlawful is going to be adjudicated as lawful at the end of the day.

I'm asking you whether or not you did anything to separate out contributions by Microsoft that are not challenged at all in this case from the contributions by Microsoft which are being challenged as unlawful?

MR. KRY:  Objection to form.

A.     So I guess what I'm struggling with is I can't -- I'm having a hard time envisioning what that is.  Maybe you can give me an example of a lawful in your reports, something that Microsoft did that is okay.

Q.     You reviewed Mr. Musk's deposition in this case, correct?

A.     Yes.

Q.     And Mr. Musk testified, I believe that he believed that the strategic partnership with Microsoft was a substantial -- was a substantial factor in OpenAI's success, correct?

MR. KRY:  Objection.  Misstates the testimony.

A.     I mean, generally I think that's consistent with what I wrote in my report, that based on his

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 259

personal relationships, he was able to obtain access to Microsoft's Azure services, a critical resource for OpenAI's computer needs.  So I would agree with that statement.  That occurred prior to the formation of the for-profit.  So again, I don't see how that -- I don't see why that matters.

MR. JURATA:  Okay.  This would be a good time for a break.

THE VIDEOGRAPHER:  We're going off the record at 4:22 p.m.  This marks the end of media 6.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by.  We are back on the record at 4:39 p.m.  This marks the beginning of media 7.

BY MR. JURATA:

Q.    Dr. Wazzan, I want to pick up where we left off.  Do you recall that we were talking about the contributions of the Microsoft partnership to OpenAI's success?

A.    Yes.

Q.    And you were referring to the discounted Azure compute which was donated to the nonprofit, correct?

A.    Yes.

Q.    I want you to go back to Mr. Musk's deposition

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 260

in this case, which is Exhibit 4.  I want you to turn to page 347 of that deposition.

A.    Okay.

Q.    Feel free to review that.

A.    Okay.

Q.    So going back to Mr. Musk's deposition testimony, do you believe the testimony that he is providing here on page 347 of his deposition regarding the value of Microsoft's compute, is he referring to the pre-20 -- strike that.

Let me try again.  On page 347 of Mr. Musk's deposition, he provides testimony on the value of the compute that Microsoft provided to OpenAI, correct?

A.    Yes.

Q.    And in fact, he testifies that he believes that OpenAI would have advanced more slowly without the compute that was provided by Microsoft, correct?

A.    Yes.

Q.    Is it your understanding that this -- the compute that he's referring to is the compute that is provided under the strategic partnership?

MR. KRY:  Objection.  Foundation.

A.    Not -- no.  I think he goes on, he said I mean, you recognize in 2016 that Microsoft required Azure in order to continue -- and OpenAI required Azure in order

Page 261

to continue to improve its models.  2016, do you recall going to Microsoft to obtain more compute in 2017?  He says -- Musk says:  "I vaguely recall that."  So I think this is prior -- it's discounted compute power provided prior to the formation of the for-profit.

MR. KRY:  And I just object to the term strategic partnership as vague and confusing.

Q.    I want you to assume for a moment, Dr. Wazzan, that the compute that Mr. Musk is referring to here is the compute that was provided by Microsoft following 2019.

A.    Okay.

Q.    Okay.  Would it be relevant in determining Microsoft's unjust enrichment to separate out the benefits as a result of that compute as opposed to the benefits to OpenAI's valuation resulting from the alleged unlawful acts?

MR. KRY:  Objection.

MR. JURATA:  You can answer.

A.    Only if necessary.  That's not my understanding of how disgorgement works.  I would agree that Microsoft's contribution have probably enhanced the value of the for-profit.  But that's not the relevant question.  For my purposes it's to determine, you know, assume liability and then compute their unjust

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 262

enrichment from their participation in the for-profit.

Q.      And that's because Microsoft, under your model, you're measuring the unjust -- the unjust enrichment that results from the fact that Microsoft has an economic interest in the for-profit?

A.      Yes.

Q.      Okay.  Under that view, does that mean that every entity that has an economic interest in the for-profit has been unjustly enriched?

MR. KRY:  Objection to form.

THE WITNESS:  Could you read that back, please?

(Whereupon, the record was read by the reporter.)

MR. KRY:  Objection to form and also objection as beyond the scope of his opinions.

A.      I don't have an opinion on that.

Q.      Well, if you're measuring Microsoft's opinions by the fact that it has an economic interest in the for-profit, wouldn't that mean that any entity with an economic interest in the for-profit is similarly unjustly enriched?

MR. KRY:  Objection to form.  Again, beyond the scope of his opinion, which does not include liability.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 263

A.      Yeah, I don't have an been on that, but it's not necessarily true, because I've been asked to assume liability with respect to Microsoft.  I haven't been asked to assume liability with respect to whatever parties you're referring to.

Q.      So let's say, for example, that you understand that SoftBank is one of the entities that currently has an economic interest in the public benefit corporation, correct?

A.      Yes.

Q.      If were you instructed to assume that SoftBank was unjustly enriched, you would perform a calculation of their unjust enrichment that follows the same methodology that you did for OpenAI and Microsoft, correct?

A.      You could, yes.

Q.      And you could do that calculation regardless of the size of any of those investors' contributions, correct?

A.      Theoretically, yes.

Q.      I want to go back to the topic of the discounted compute that Microsoft donated to the nonprofit.  And again I'm going to represent to you, Dr. Wazzan, that OpenAI procured that compute for $50 million less than it would have to pay for that compute

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 264

at market rates.

A.    Okay.

Q.    Okay.  Now if you turn to paragraph 72 of your report, I want to direct your attention to the last sentence, which says:

              "All told, before he left OpenAI, Mr. Musk was responsible for approximately 60 percent of all financial contributions."

              That's one of the conclusions that you have in your report, correct?

A.    Yes.

Q.    Okay.  Now, that 60 percent figure does not account for the $50 million donation that OpenAI received as a result of discounting computing from Microsoft, correct?

              MR. KRY:  Objection.  The witness has already testified it's not a 50 million discount.

              MR. JURATA:  That's a speaking objection.

              MR. KRY:  I'll just withdraw it, and objection to form.

A.    So there's a discount.  I accept that the compute power was provided at a discount.  Should we characterize that as a financial contribution or should

Page 265

we characterize it as sort of a contribution in kind, which is why I think the cost basis is the more meaningful number, but even so, no, I haven't factored it in here.

Q.    And if you did factor in that amount, that means that the 60 percent figure attributed to Mr. Musk would be lower, correct?

A.    It might be.  Again, it would, you know, under your hypothetical, yes, but it's, again, we'd have to assume that that -- is that contribution prior to the formation of the for-profit or after?

Q.    I believe your report addresses this, that it was prior.

A.    Right, so if it's prior, just because you had told me let's assume, earlier in my questioning, but --

Q.    Understood.

A.    So if it's prior, if Microsoft -- yeah, so I guess it would count.  It would be -- if they were a claimant, based on that investment, they would reside in the 25 to 50 percent left over on the nonprofit.  So in effect, they would be a plaintiff against themselves.

Q.    That wasn't actually my question, Dr. Wazzan. My question was, that if you would have accounted for the value of the discounted compute, then at the time that Mr. Musk left OpenAI, he would be responsible for

Page 266

an amount that would be lower than 60 percent of all financial contributions, correct?

A.    If you -- yeah, if you calculated in that fashion, if you calculated it as 50 million and you applied it against, in the same way that these other numbers are contributed, they would reduce that number.

Q.    And turning to the -- Nvidia also donated -- Nvidia also provided chips to OpenAI at a substantial discount, correct?

A.    Yes.

Q.    And that was before Mr. Musk left OpenAI, correct?

A.    Yes.

Q.    You talk about that in your report?

A.    Yes.

Q.    Okay.  And in accounting for the contributions of Mr. Musk relative to others at the time that he left OpenAI, that 60 percent figure does not account for the value of the discounted Nvidia chips, correct?

            MR. KRY:  Objection to form.

A.    It does not.

Q.    And if you would account for the financial value of that donation, it would reduce the 60 percent number that you calculated even further, correct?

A.    If you applied it in that fashion, that's what

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 267

the math would be.

MR. KRY:  And I would just object to leading.  I don't think any foundation was laid for the fact that the Nvidia chips were provided at a discount.

Q.    One of the things that you testify was a benefit that Mr. Musk provided in a nonfinancial fashion was securing first of their kind DDX1 processing units that offered a faster path to AI, correct?

A.    Yes.

Q.    Did the procurement of those first-of-their-kind chips provide value to the nonprofit?

A.    Yes.

Q.    Okay.  And again, when accounting for the 60 percent figure in paragraph 72 of your report, that does not attempt to factor in the value of the contributions from obtaining the Nvidia chips?

A.    It does not.

Q.    And if it did, your 60 percent figure would be lower in some fashion?

MR. KRY:  Objection to form.

A.    I mean theoretically yes, but we don't know, right, whether they provided any discount, was it just early.  I -- it's unclear.

Elon Musk v.                   FINAL                   December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 268

Q.    And the reason it's unclear is you just didn't analyze that?

A.    No, I didn't.

Q.    Why don't we go back to appendix A of your report?  Do you recall earlier today when you identified the prior cases in which you have testified in that involved the calculation of unjust enrichment?

A.    Yes.

Q.    And do you recall identifying -- and it's number 9 on your list of testimony -- the Keto5 case as one of those cases in which you had to calculate unjust enrichment?

A.    Yes.

Q.    Okay.  And if you turn to Exhibit 8 from today, that is your expert report from the Keto5 case, correct?

A.    Yes.

Q.    Can you point to the portion of your expert report that analyzes unjust enrichment in that case?

A.    Yeah, I don't see it.  I misremembered that case.

Q.    Okay.  That's understandable.  It's not a memory test.  I just wanted to make sure I wasn't missing something.  So turning back to your calculation of the section of your report entitled "Microsoft's Wrongful Gains," would it be accurate to say that you

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 269

followed the same methodology for calculating Microsoft's alleged unlawful gains that you followed to calculate OpenAI's alleged unlawful gains?

A.      Yes.

Q.      Okay.  And why did you do that?

A.      Because their unjust enrichment flows back to the nonprofit, and then Musk gets a portion of that.

Q.      Again, you're not aware of any role that Microsoft played in the creation of the OpenAI for-profit, correct?

A.      Correct.  But I've assumed liability.

Q.      So if you turn to the third sentence of paragraph 104, you say:  "In either case," and by "either case," you're referring to just the specific basis for valuing the relative ownership allocations of the for-profit that you do.  You say that:

                "In either case, the resulting
        increases in value from Microsoft's investment
        are discounted to account for OpenAI's
        nonprofit stake in OpenAI for-profit and
        Mr. Musk's share of contributions to OpenAI
        nonprofit in order to determine the portion of
        Microsoft's gains that wrongfully derive from
        Mr. Musk's contributions."
                Did I read that correctly?

Elon Musk v.                  FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 270

A.    Yes.

Q.    Why is it appropriate to reduce Microsoft's equity stake to the same proportion that you use to reduce OpenAI nonprofits for equity stake?

A.    Because all of it flows back to the nonprofit. Microsoft's share flows back to the nonprofit. So 30 percent -- we should probably use -- at least in the report in Exhibit 12, 30.4 percent of 510 yields you the 155, and then you subtract out the investments made by Microsoft of 13 billion. That leaves 142. Then you have to figure out what the nonprofit's share is of that -- of Microsoft's piece, so you apply the 35.9 percent, and then you have to apply a further percentage for Musk's share of the nonprofit.

Q.    But in calculating the nonprofit's -- let me take that back.

In calculating the relative economic interests of the for-profit, in determining the nonprofit share, you do that already accounting for Microsoft's share, correct?

A.    OpenAI has a piece, that piece flows back to the nonprofit and then Musk gets a piece of that. Microsoft has a piece, separate piece, it flows back to the nonprofit, and then Musk has a piece of the nonprofit.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 271

Q.     But in calculating the nonprofit's piece of the for-profit, don't you already factor in, in that calculation, Microsoft's economic interest in the for-profit?

A.     No.  Think about it as a --

Q.     I'll give you a piece of paper so you can --

(Whereupon, a discussion was held off the record.)

A.     You've got -- this is 500 billion, okay, the total pie.  You've got Microsoft, you've got the nonprofit, and you've got everybody else.  Okay.  And the percentages are predicated on the public benefit corporation.  So -- let's be precise, because you guys are going to pull this up at trial.  And I'm going to predicate it on just the warrants-only dilution, estimate 1, okay.

So for OpenAI -- sorry, this is the for-profit.

Okay.  So how much of this for-profit, OpenAI for-profit goes to Musk, right?  Well, they get 29.2 percent of the 500 billion, that's their slice, and then Musk gets a piece of that.  So this is Musk here.  Okay?

Then you've got Microsoft, and they've got 25.5 percent.  Now some portion of this is going to flow back to OpenAI, okay?  So this piece now belongs to OpenAI, nonprofit.  And some piece of that belongs to Musk.

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 272

Those do not overlap.

Q.    Why is it appropriate to use -- to reduce Microsoft's share by the same percentage that you reduced the nonprofit's share in the OpenAI for-profit?

MR. KRY:  Objection to the extent that's calling for a legal conclusion.

A.    I'm not sure I follow.

Q.    Well, you reduced the nonprofit's -- let me take this -- let me try this again.

In reducing Microsoft's share of its piece of the pie, you used the same nonprofit ownership percentage that you use for determining the nonprofit's percentage ownership of the for-profit, correct?

A.    Mm-hmm.

Q.    And in doing that original calculation that -- Microsoft's ownership interest was part of -- was one of the inputs that you used to determine the nonprofit's equity stake, correct?

A.    Yes.

Q.    So my question is, why is it then appropriate to reduce Microsoft's equity interest by the percentage amount of the nonprofit's ownership interest in the for-profit?  Why did you use that percentage?

A.    Because as I understand it, the piece -- the -- the totality of Microsoft's unjust enrichment flows back

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 273

to the nonprofit.  And so how much of that pie -- how much of that pie should -- sorry, not the totality of Microsoft, but some portion of Microsoft's piece has to go back to the nonprofit, and that percentage is the 29.2 percent.  That's why.

Q.     But why not a higher percentage or a lower percentage?  Why the 29.2 percentage?

A.     Because that's the nonprofit's share -- percentage share of the total.  So I'm applying the same percentage I use of the total to their piece.

Q.     And you've already testified that you haven't analyzed the Microsoft conduct which is alleged to be wrongful in this case?

A.     I've assumed liability.

Q.     And you've also done no comparison of the conduct by OpenAI which has been alleged to be unlawful, and the conduct by Microsoft that is alleged to be unlawful, correct?

A.     I've assumed liability.

Q.     Yet even though you haven't done any relative analysis, you decided to return the same percentage of Microsoft's stake to the nonprofit that you did of OpenAI's stake.

            MR. KRY:  Objection to form.

Q.     Correct?

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 274

A.      Yeah, because as I understand it, the unjust enrichment flows back through the nonprofit.

Q.      I understand that, but why -- why assume -- strike that.

Why use the same percentage clawback to the nonprofit for Microsoft that you used for OpenAI?

A.      I mean, again, because it's flown back to the nonprofit and that's their percentage ownership of the for-profit.  So they get two haircuts.

Q.      And you did no analysis to determine what the size of the haircut should be for Microsoft relative to the size of the haircut to OpenAI?

MR. KRY:  Objection to form.

A.      Correct.

Q.      Is it your understanding that the wrongful conduct allegations for Microsoft are the same as the wrongful conduct allegations for OpenAI?

MR. KRY:  Objection.

A.      That's not my understanding, and it's not necessary.  Again, I've assumed liability, and that disgorgement is an appropriate remedy.

Q.      So if you would have -- if you would have concluded that the nonprofit should have 75 percent ownership in the OpenAI for-profit, you would similarly take a 75 percent slice out of Microsoft's remaining

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 275

equity stake, correct?

A.    Yes.

Q.    Explain to me why, from an economic perspective, that's a proper thing to do?

A.    I can't be -- I don't have a different answer. It's because it flows back through the nonprofit, and the nonprofit -- and the nonprofit's allocation is given by their percentage from the public benefit corporation percentage.

Q.    You understand that Microsoft's equity stake in the public benefit corporation was the result of an arm's length negotiation?

A.    Yes.

Q.    That was your testimony from earlier today?

A.    Yes.

Q.    Which means that the OpenAI stake of the public benefit corporation reflects the value that OpenAI has contributed?

A.    In some sense.

Q.    It's a -- it's a fair value assessment, relative to contributions of others?

A.    That's what the parties agreed on, yes.

Q.    Do you think the parties would have agreed to something which did not reflect their belief that the resulting stake was fair value?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 276

A.      No.

Q.      You have no reason to believe, based on the record, that those stakes don't represent the fair value?

A.      I do not.

Q.      Why is it then appropriate to reduce the fair value of Microsoft's stake to the same percentage that you reviewed -- that you reduced the value of the for-profit stake?

MR. KRY:  Objection.  Asked and answered at this point.

A.      Because the Microsoft's piece flows back through the nonprofit, and that's their equity stake.

Q.      And that equity stake that gets passed back, what is that designed -- what are the wrongful assets that that is designed to represent?

MR. KRY:  Objection to form.

A.      Again, I haven't parsed it that way.  I have assumed liability and that disgorgement is appropriate remedy.

Q.      And it's your professional opinion that it's appropriate to do that disgorgement without looking at the actual relative allegations between Microsoft and OpenAI?

MR. JURATA:  No, that's a bad question.

Elon Musk v.                  FINAL                 December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 277

Let me try that again.

Q.    It's your professional opinion that it was appropriate to reduce both slices by the same percentage even though you have not analyzed the relative conduct -- the conduct allegations against Microsoft relative to the conduct allegations against OpenAI?

MR. KRY:  Objection to form.

A.    It's not necessary.  It's predicated on their ownership percentage and that flows directly back to them.

Q.    And would it be correct to say that the non-wrongful conduct by Microsoft that led to an increase in the valuation of OpenAI is represented by the remainder, which is the residual of your analysis?

MR. KRY:  Objection to form.

A.    You could characterize it that way.

Q.    I'm moving onto -- we're getting close to the end.

I want to turn to section 9 of your report.  At a high level, can you explain for me what you were trying to do in this section?

A.    Yeah.  It's pretty straightforward.  Counsel asked me to apportion the unjust enrichment gains that I've calculated in the earlier sections based on some dates, and as I understand it, the dates are consistent

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 278

with different deals and investments that took place, and there are issues related to Statutes of Limitations, I think, so I only have a very high level understanding of that, but I took the dates as given, and apportioned across those dates.

Q.    So would it be fair to say that in paragraph 107, when you look at little numerals 1, 2, and 3, they are meant to be a rough proxy for the 2019 Microsoft agreements, the 2021 Microsoft agreements and the 2023 Microsoft agreements?

A.    Yes.

Q.    Now, when looking and calculating the valuation of the OpenAI for-profit during these periods, you didn't do an analysis of the contributions of any other entity that isn't OpenAI or Microsoft, correct?

A.    Correct.

Q.    And again, you didn't try to apportion the contributions by Microsoft that are alleged to be lawful -- I'm sorry, let me state that again.  I'll try again.

You didn't try to apportion the contributions by Microsoft that are not alleged to be wrongful from the contributions by Microsoft which are alleged to be wrongful?

A.    I assumed liability and looked at a

Page 279

disgorgement analysis.

Q.    Can you explain to me what Exhibit 15 is trying to demonstrate?

A.    Yes.  So you have to match it up with --

MR. KRY:  Let me just object.  Exhibit 15 was one of the ones that was replaced.  Do you want to re-mark --

MR. JURATA:  Yes, that's a fair -- thank you.  Let's turn to your supplemental expert report which is Wazzan Exhibit 3 and walk through that Exhibit.

Actually the errata report.  Have we entered the errata report into evidence?

MR. KRY:  I don't recall that we have.

MR. WILSON:  We have not.

MR. JURATA:  Why don't we go ahead and take a break.

THE VIDEOGRAPHER:  We're off the record at 5:21 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by, we're back on the record at 5:21 p.m.

BY MR. JURATA:

Q.    Dr. Wazzan, I just marked on the picture that you were drawing on the paper as Wazzan Exhibit 12.

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman           HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 280

Can you just confirm that this is an accurate depiction of the testimony and drawing that you just did?

A.    Yes.

(Whereupon, Dr. Wazzan's Drawing was marked as Wazzan Exhibit 12, for identification, as of this date.)

MR. JURATA:  Let's introduce Exhibit 13.

(Whereupon, the Errata to October, 29, 2025 Expert Report of C. Paul Wazzan, Ph.D., was marked as Wazzan Exhibit 13, for identification, as of this date.)

BY MR. JURATA:

Q.    Dr. Wazzan, Exhibit 13, is, I believe, the errata that you submitted to your expert report.  Is this the same errata you were referring to earlier today?

A.    Yes.

Q.    And it's correcting Exhibits 15 and 17 from your original report?

A.    Yes.

Q.    I want to talk about Exhibit 15.  Can you explain to me what this Exhibit is designed to represent?

Elon Musk v.                FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 281

A.      Yeah.  So the idea is that I've calculated the unjust enrichment, but there are various time periods from 2019 to October 2025 which is when I filed the report, and I was asked to apportion the unjust enrichment over those three time periods based on essentially legal issues.  So that's what I did, and to do that, I predicated it on some documents that were in the record that tracked value over time so that I could divide it up in three.

Q.      Is it correct to say that other than the valuations being different from the three time periods that the methodology that you followed is similar to the -- is the same methodology that you did for calculating unjust enrichment in its entirety?

A.      Yes.

Q.      I'd like to focus in -- so the only difference is the valuation at that particular time?

A.      Yes.

Q.      And the valuation being the valuation of the OpenAI for-profit?

A.      Yes.

Q.      I want to focus on the date range from March 21st to January 23.

A.      Yes.

Q.      I notice that the numbers for Microsoft there

JANE ROSE REPORTING                California Firm No. 254
1-800-825-3341              janerose@janerosereporting.com

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 282

are negative?

A.      Yes.

Q.      So is -- is the conclusion from that that for the period of March 21st to January 2023, that your conclusion is Microsoft has not been unjustly enriched during that period?

A.      Sort of.  They've been unjustly enriched, but they contributed 13 billion which offset the gains there, so you get a negative in that one period.

Q.      So does that mean that if that's the period that is the only period in which the fact finder concludes liability, does this mean that Microsoft would be owed money?

A.      Well, I guess I would zero it out, but yes.

Q.      And does it seem in your professional opinion that the methodology that shows unjust enrichment during one period but no unjust enrichment during another period, followed by a much larger unjust enrichment in another period, is that a reliable methodology for calculating unjust enrichment?

MR. KRY:  Objection to form.

A.      Totally.  Yes.

Q.      And why?

A.      Because you've calculated the unjust enrichment as of today, and now I'm going to superimpose on that a

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 283

requirement to apportion it over a lengthy time period, from 2019 to 2025.  The only way to do that is predicated on a consistent set of documents that give values at each point in time for the for-profit.  So that's what I've done.  You know, the math turns out however it turns out.  The negative are because I'm giving credits to Microsoft for its investments.

Q.    So the focus on the date range of January 2023 to October 2025, do the figures that you calculate on there, do they account for the earlier capital contributions made by Microsoft?

A.    Yes.

Q.    And where -- if I wanted to validate your statement, where would I go to confirm that what you just said is accurate?

MR. KRY:  Objection to form.

A.    Where would you go -- well, in fact, I mean you could see it there.  There's a negative in the second period.  And that's because its being credited, but I guess you could go to the exhibit itself and look at the calculations in the Excel spreadsheet.

Q.    What I mean is, does the valuation for the January '23 to October 2025, does that calculation of Microsoft's unjust enrichment, does that factor in the earlier contributions made by Microsoft in the earlier

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 284

time periods?

A.      I believe so, yes.

Q.      And if, again, if I wanted to confirm what you said is correct, where in your backup materials should I look?

A.      I think you would look at the native Excel file and see where the 13 billion was subtracted.

Q.      I'm going to turn now back to your supplemental expert report.  Let me take a look at Exhibit 19 and Exhibit 20 -- well, revised Exhibit 19 and revised Exhibit 20.

So Mr. Musk alleges that he made contributions -- financial contributions in the amount of $38 million and additional nonfinancial contributions to the nonprofit on top of that, correct?

A.      Yes.

Q.      Okay.  To which you equated into an economic value that Mr. Musk should have in the nonprofit, correct?

A.      Yes.

MR. KRY:  Objection to form.

Q.      And if you look at estimates three and four on Exhibit 19, which you testified earlier today as of today is the most accurate way of looking at dilution, it indicates that Mr. Musk should have a stake in the

Page 285

OpenAI for-profit coming from the OpenAI nonprofit
between 65 and $98 billion, correct?

MR. KRY:  Objection.  That misstated
the prior testimony.

A.    Roughly, yes.

Q.    What was incorrect about that?

A.    I think he's -- I think Mr. Kry is concerned
about your categorization of the most accurate versus
the dilution.  I think where we left off on that was, if
you assume that all those elements have been allocated,
then you would look at three and four.  If they had not
all been allocated, you would look at one and two.

Q.    Okay.  Thank you for that clarification.  And
if we look at estimates three and four in Exhibit 20 for
Microsoft, Mr. Musk would be entitled to an additional
13 to 20 billion dollars, correct?

A.    Yes.

Q.    Now you agree with me that Microsoft has made
financial investments in the OpenAI for-profit of $13
billion, correct?

A.    Yes.

Q.    And --

A.    Well, sort of.  We talked about it, they made
the contribution, but some of that or most of it has to
come back into Microsoft for purchasing compute

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 286

services.  And so really the right number is not -- it's I give you 10, 8 of it comes back, but what was my cost of the two or what's my cost of the 8 so I can get to the two, but it's really, what is my -- if I'm at capacity constraint, for example, then the cost is zero, right.

Q.     Do you believe that the cost to Microsoft of its investment, it's various investments in OpenAI is zero?

A.     For the portion that comes back, if Microsoft is not capacity constrained, it could be zero.

Q.     Now, you understand that a substantial amount of Microsoft's investments were used to build custom supercomputers that only can be used by OpenAI, correct?

MR. KRY:  Objection.  Foundation.

A.     I don't -- I don't have that understanding.

Q.     Because you haven't looked at the actual underlying liability claims?

MR. KRY:  Objection.

A.     It wasn't necessary.

Q.     Would you agree with me that if money that Microsoft spent building supercomputers, they're customized only for OpenAI's use, then the opportunity cost for Microsoft from that investment is not zero, right?

Page 287

A.    Yeah, and I'm giving Microsoft full credit for their 13 billion.

Q.    Okay.  That's what I wanted to make clear. Now, and if you -- after Microsoft's $13 billion investment, if you subtract out the portion of that debt your analysis claws back and provides to Mr. Musk, under estimates three or four, Microsoft's investment would be worth between 82 and $88 billion today, correct?

MR. KRY:  Objection to form.

A.    I'm sorry.  Where are you looking?

Q.    Okay.  What I'm basically asking you to do is to determine what is the value of Microsoft's investment after a portion of that gets clawed back and redistributed to Mr. Musk under your unjust enrichment analysis.  And I believe, using estimates three and four you can come up with a number there.

A.    I see.  So you want to subtract K from C?

Q.    No.  I want to subtract K from H.

A.    Okay.  Yeah, you can do that.

MR. KRY:  Objection to form.

Q.    Would that be the appropriate way to measure the value of Microsoft's interest in the OpenAI for-profit after removing the funds that you allege were obtained by unjust enrichment and providing those to Mr. Musk?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 288

MR. KRY:  Objection to form.

A.     If you subtract K from H, what's left over is Microsoft's piece.

Q.     Okay.  Um, and am I correct that if you subtract K from H, Microsoft's equity as of today would, under estimates three and four, range between 82 and 88 billion dollars?

A.     Yes.

Q.     Okay.  I'm not good with math, Dr. Wazzan, but thankfully, you are.  What is the return that Microsoft -- actually, let me go back.

What is the return that -- if Mr. Musk's award of unjust enrichment is between 78 and 118 billion dollars, as your estimates three and four suggest, what is the level of Mr. Musk's return on his $38 million financial investment?

A.     It's a very big number.

Q.     Would 300,000 percent sound about right to you?

MR. KRY:  Object to form.

Answer it only if you can do the math.

A.     I can't do the math.

Q.     If I give you a calculator, could you do the math?

A.     Yes.  I'm willing to take your representation, though.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 289

Q.    I don't want you to answer my representation.

MR. JURATA:  For the record, I'm handing the witness a calculator.

MR. KRY:  And just for the record, the 78 and 118 billion figures are coming from where?  The sum of the OpenAI and Microsoft numbers?

MR. JURATA:  Correct, yeah.

MR. KRY:  Thank you.

A.    So 65 and 13 is 78.  What do you want to measure that against?

Q.    Against Mr. Musk's $38 million financial contribution.

MR. JURATA:  For the record, I used ChatGPT for my calculation, but that's why you should confirm it.

A.    I did it backwards.  Yeah, it's like 2,000 percent.

Q.    2,000 percent?

A.    Or 20,000 percent.

Q.    20,000 percent.  Thank you.  Can you similarly calculate the return that your analysis indicates that Microsoft should earn?

A.    I'm going to use my mine.

Q.    Okay.  That's fine.

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 290

Can you calculate the return that Microsoft earns as a result of your analysis, after accounting for unjust enrichment, on the basis of the $13 billion investments that you note in your report?

A.    I'm sorry.  Ask it again?

Q.    I'm asking you to do the same calculation that you did for Musk on his return from 38 million to Microsoft's return -- what is Microsoft's return --

A.    Oh, of 13 billion?

Q.    -- of its 13 billion?

A.    Okay.  So let's agree that the numerator is 84 -- 94, 94 billion.

Q.    And how are you calculating 94 billion?

A.    I'm going H minus K.

        MR. KRY:  For which column?

Q.    Yeah, I don't think that's 94.

A.    101.  All right.  101 minus 13, 88.  All right. 88 billion divided by 13 billion, 6.76, and I did it backwards.

Q.    So if we were to do it in apples to apples to what you calculated for Mr. Musk?

A.    Yeah, stand by.  This is why you don't do stuff without Excel spreadsheet on the fly in a deposition.

Q.    My client does appreciate your use of Microsoft Excel.

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 291

A.      13 billion.  Let's go 13 million this time divided by 88.  14,000 percent versus 20,000 percent.

MR. KRY:  Objection to the math.

MR. WILSON:  I have an objection to the math here.  That can't be right.

THE WITNESS:  I'm struggling.  Give me the number.

MR. JURATA:  Why don't we take a break?

THE WITNESS:  I'll calculate it and we'll come back.

MR. JURATA:  Okay.  Great.

THE VIDEOGRAPHER:  We're going off the record at 5:52 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by. We're back on the record at 6:02 p.m.  This marks the beginning of Media 8.

BY MR. JURATA:

Q.      Dr. Wazzan, I asked you, using revised Exhibits 19 and 20, to calculate the respective rates of return for both Mr. Musk and Microsoft under your unjust enrichment analysis using the warrants EV-sponsored pool and EIP dilution estimates, correct?

A.      Yes.

Q.      And have you had a chance to do those

Elon Musk v.                    FINAL                 December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 292

calculations?

A.     I did it for estimate 3 in both instances.

Q.     Okay.

A.     So the Musk rate of return is 207,700 percent, and the Microsoft rate of return is 680 percent.

Q.     And would you agree with me, without doing the calculations, that the numbers would be even higher under your estimate for analysis -- actually, let me take that back.

Would you agree with me that Mr. Musk's return on investment would be higher than those figures under your estimate 4 analysis?

A.     Yes.

MR. KRY:  Objection.

Q.     And would you agree with me that Microsoft's rate of return would be less than those figures under your estimate 4 analysis?

MR. KRY:  Objection.

A.     Yes.

Q.     Okay.  If you can turn to revised Exhibit 18 -- actually.

MR. KRY:  Just for clarity of the record, what he gave you were the estimate 3 column, not the estimate 4 column.

MR. JURATA:  Correct.  Correct.

Elon Musk v.                   FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 293

Q.    And then I believe, Dr. Wazzan, you testified that under estimate 4, Musk's return would be higher and Microsoft's return would be less?

MR. KRY:  I object to the math on that.

A.    Yes.  Correct.

MR. JURATA:  Can we go ahead and mark that piece of paper that Dr. Wazzan brought in as an exhibit?  I just want to mark that as an exhibit.

(Whereupon, Dr. Wazzan's Calculations were marked as Wazzan Exhibit 14, for identification, as of this date.)

MR. KRY:  Yeah, and I just withdrew the objections.

BY MR. JURATA:

Q.    Dr. Wazzan, turning back to Exhibit 18, is it correct to say that under both of your post-dilution calculations that the nonprofit has a higher ownership percentage than Microsoft in the OpenAI for-profit?

A.    Yes.

Q.    Okay.

MR. JURATA:  I have no further questions.  Thank you, sir, for your time.

MR. WILSON:  How much time do the defendants have left on the record?

Page 294

THE VIDEOGRAPHER:  We're at 6:51 right now.

(Whereupon, a discussion was held off the record.)

THE VIDEOGRAPHER:  Going off the record, 6:06 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Please stand by. We're back on the record at 6:06 p.m.

EXAMINATION BY

MR. KRY:

Q.    Dr. Wazzan, as you know, I'm plaintiff's counsel and I just have a few follow-up questions for you.  Do you recall being questioned by Microsoft's counsel about whether you had improperly failed to account for Microsoft's supposed donation of discounted compute to OpenAI in the 2016 to 2018 timeframe?

A.    Yes.

Q.    Did you review any internal documents from Microsoft that discussed Microsoft's rationale for entering into that transaction with OpenAI?

A.    I just don't recall.

Q.    And so you don't know whether Microsoft entered into that transaction because it proceeded as a commercial opportunity to get into the OpenAI, rather

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL          Paul Wazzan, Ph.D.

Page 295

the artificial intelligence space?

MR. WILSON:  Object to the form.

A.     I don't recall.

Q.     And you don't know whether -- well, do you know whether Microsoft imposed contractual obligations on OpenAI to evangelize Microsoft's products in connection with that transaction?

A.     I don't recall.

Q.     Did you review OpenAI's Form 990 tax records listing its donors?

A.     Yes.

Q.     Do you recall ever seeing any records of OpenAI ever recognizing an in-kind donation from Microsoft for discounted compute?

A.     No, I never saw that.

Q.     If the jury --

A.     Sorry, I'll clarify that.  It's not that I didn't see it; it's not in there.

Q.     Thank you.  If the jury concludes that Microsoft entered into a transaction with OpenAI for compute on commercial arm's length terms, would there be any reason why any adjustments should be made to the contributions to the nonprofit?

MR. WILSON:  Object to the form of the question.

Elon Musk v.                   FINAL               December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 296

A.      I don't think so, no.

Q.      So in the event that the jury concludes that this was an arm's length transaction on commercial terms, would the analysis in your report provide the jury with a sufficient basis for computing wrongful gains?

MR. WILSON:  Object to the form of the question.  Vague.  Calls for a legal conclusion.

A.      Yes.

Q.      And then turning to Nvidia, do you recall being questioned today about whether Nvidia should be accounted as a contributor because of the GPUs that they provided to OpenAI when it was still a nonprofit?

A.      Yes.

Q.      Do you know one way or the other whether those were even discounted to begin with?

A.      I do not.

Q.      When you reviewed OpenAI's tax forms, did you see any records of Nvidia having provided first of its kind GPUs on some sort of charitable philanthropic basis to OpenAI?

A.      No.  They're not in there.

Q.      And if the jury concludes that this was a commercial transaction between Nvidia and OpenAI, would

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 297

there be any reason why your contribution analysis would have to be adjusted on account of that transaction?

MR. WILSON:  Objection.  Vague.  Calls for a legal conclusion.

A.    No.

Q.    So if the event that the jury concludes that that was a commercial transaction, does your analysis provide the jury with a sufficient basis to compute wrongful gains?

MR. WILSON:  Same objections.

A.    Yes.

Q.    Do you recall being questioned a bit earlier today about your alleged failure to consider contributions that OpenAI employees made to the nonprofit and/or the for-profit in your analysis?

A.    Yes.

Q.    If I can get you to turn to your expert report, Exhibit 1.  And in particular, Exhibit 9 in the pro forma cap table?

A.    Page?

Q.    Page 46.

A.    Okay.

Q.    You see on left-hand side after listing the four founders there's lines for Schulman Grant, Zaremba Grant, Employees and Pools?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 298

A.      Yes.

Q.      So those employee grants have been allocated part of the perspective ownership in this pro forma cap table?

MR. WILSON:  Object to the form.

A.      Yes.

Q.      And did you consider this chart in formulating your opinion about the -- Musk's effective stake in the nonprofit?

A.      Yes.

Q.      So based on those lines in the cap table, employees of OpenAI would have been counted among the 25 to 50 percent stake that was not Musk's?

MR. WILSON:  Object to the form of the question.

A.      That's correct.

Q.      When in 2019 OpenAI nonprofit formed its for-profit entity, where did the employees that formerly worked for the nonprofit go?

A.      They went to the for-profit.

Q.      And then in the years after 2019, are you aware that an employee vehicle was formed to hold equity grants for the employees that now work for the for-profit?

A.      Yes.

Page 299

MR. KRY:  I'm going to mark as Exhibit -- what are we up to 14?

THE REPORTER:  No 15.

(Whereupon, OpenAI Summary Post-Recapitalization Cap Table was marked as Wazzan Exhibit 15, for identification, as of this date.)

MR. KRY:  I've marked as Exhibit 15 a document that is blown up from a larger document, just because it's an excerpt --

THE REPORTER:  One second.

MR. WILSON:  While that's printing, Robert, do you know what the Bates number for the document this is blown up from.

MR. KRY:  Yeah.  I'm just about to read that into the record.

MR. WILSON:  Thank you.

MR. KRY:  Are we sure we're on 15 and not 14?

MR. WILSON:  I'm not the person to ask. I've lost count.

THE REPORTER:  This 14 (showing).

MR. KRY:  Yeah, this is 14.

THE REPORTER:  No, this is 14 (showing.)

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 300

MR. KRY:  Oh right, right.  That's the one I forgot.

MR. WILSON:  I was just going to say, I'm sure Brooke knows.

MR. KRY:  So Exhibit 15 is blown up from a document that was produced to us as OPENAI_MUSK00038352 and this is the post-PBC cap table.

BY MR. KRY:

Q.    Do you recognize this document?

A.    Yes.

Q.    On the -- did you consider this document when you were preparing the analysis in your supplemental report?

A.    Yes.

Q.    On the left-hand side, do you see there's a line there for EV outstanding?

A.    Yes.

Q.    And that has a diluted for warrants stake of 25.3 percent and a so-called fully diluted stake of 22.7 percent?

A.    Yes.

Q.    And is that line the same vehicle that was -- formerly existed as an entity called Aestas?

A.    That's my understanding.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 301

Q.     And that stake holds all the employee interests in the for-profit vehicle since inception?

A.     Yes.

Q.     And in the course of allocating stakes in the for-profit entity among the nonprofit and the other holders, was one of the other stakes that was not attributed to the nonprofit this 26 or 22 percent stake in the employee vehicle?

A.     Yes.

Q.     And so to that extent, did you consider the various employee interests in the for-profit?

A.     Yes.

Q.     And beyond that, you also see a line for the EV-sponsored pool at 0.5 percent and the employee incentive plan at 9.6 percent?

A.     Yes.

Q.     And in your alternative, so-called fully diluted analysis, did you also effectively carve out those stakes in determining how much of the value of OpenAI was attributable to Musk?

        MR. WILSON:  Object to form.

A.     Yes, I did.

Q.     And is that another respect in which you considered the interest of employees in the for-profit vehicle?

Elon Musk v.                    FINAL                  December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 302

A.      Yes.

Q.      Turn back to your report.  And specifically paragraph 98.  Are you there?

A.      Yes.

Q.      So this is the paragraph that lists several things you considered in formulating your opinion that Mr. Musk's attributed stake in the nonprofit was between 50 and 75 percent.  Was one of the things listed here the 52 to 78 percent range from the pro forma cap table?

A.      Yes.

Q.      Is another thing the xAI stake of 53 percent?

MR. WILSON:  Object to the prior question.  Go ahead.

MR. KRY:  On -- just for failure to read the decimal places or for something else?

MR. WILSON:  No, I think the question was ambiguous.  The pro forma cap table is column as agreed according to Dr. Wazzan, the scenarios 1, 2 and 3, he already testified are hypothetical, and you read the 78.1 percent as if that were part of the cap table, so I'm objecting.

MR. KRY:  That's fair.  I'll rephrase the question.

BY MR. KRY:

Elon Musk v.              FINAL           December 5, 2025
Samuel Altman    HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 303

Q.    Is one of the four things you considered, the 52.41 percent to 78.13 percent stakes that come from the pro forma cap table and the alternative scenarios to that cap table that you reported?

A.    Yes.

Q.    Is one of them the 53 percent stake that Mr. Musk has in xAI?

A.    Yes.

Q.    And is one of them the 60 percent share of contributions that Mr. Musk had through his departure date?

A.    Yes.

Q.    And was one of them the qualitative analysis of Mr. Musk's non-monetary contributions that you undertook?

A.    Yes.

Q.    So I just want to ask some questions about the relationships between those four things.

If for some reason the court rules that the pro forma cap table and the alternative scenarios should not be considered in this case, would the remaining considerations you relied on in this paragraph still lead you to conclude that the value of Musk's attributed stake is at least 50 percent?

A.    Yes.

Elon Musk v.                    FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 304

Q.      And if the court rules that the xAI ownership share should not be considered in your analysis, would the remaining points in this paragraph still lead you to conclude that the size of Musk's attributed stake should be at least 50 percent?

MR. WILSON:  Object to the form.

A.      Yes.

Q.      And if the court rules that both the pro forma cap table and the xAI stake should not be considered in the case, would the remaining two considerations, namely your analysis of the financial contributions and your analysis of the non-monetary contributions still lead you to conclude that the size of Musk's attributed stake should be at least 50 percent?

A.      Yes.

Q.      And in your opinion, does your report set forth an adequate basis for the jury to accept your conclusions on those issues?

MR. WILSON:  Object to the form.

A.      Yes.

Q.      Now right at the beginning of the day, you made a statement in one of your responses to the effect that the only predicate act that you modelled in this case was the creation of the for-profit entity in 2019.

Do you recall that testimony?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 305

A.      Yes.

Q.      If the jury concludes that the defendants, one or both of them, committed acts that warrant disgorgement of wrongful profits, included not only that initial creation of the for-profit entity in 2019, but also the subsequent transaction in 2021, the subsequent transaction 2023 and the recapitalization in 2025, would that finding have any impact on the -- of those additional wrongful predicate acts, have any finding on the amount of wrongful gains that you computed in this case?

MR. WILSON:  Object to the form of the question.  Compound.  Ambiguous.

A.      No.  You get to the same number.

Q.      Okay.  And just for the sake of resolving the compound objection, if the jury finds that -- well, no, I'll stand on the question.

If the jury finds that the 2019 transaction was not a predicate act but that the 2021, 2023, and 2025 transactions are predicate acts, does your report in this case set forth a basis from which the jury could determine the amount of wrongful gains for the period covered by those transaction?

MR. WILSON:  I want to explain my objection.  I think it will be helpful.  Are

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 306

you, when you talk about the 2019 transaction talking about the Microsoft investment or the 2019 formation of the for-profit?

                    MR. KRY:  Thank you.  Let's take those one at a time.

BY MR. WILSON:

Q.    If the jury finds that the formation of the OpenAI LP is not a predicate act, but the later in 2019 investment of Microsoft is a predicate act and the 2021, 2023 and 2025 transactions are all predicate acts, does your opinion set forth a basis on which the jury can find wrongful gains from that configuration?

                    MR. WILSON:  Object to the form.

A.    Yes, you can look at the exhibit that has the apportionment by the various dates.

Q.    Yeah, and if the jury finds that neither of the but 2029 [sic] dates is the predicate act, but the 2021 sorry, transaction, the 2023 transaction, and the 2025 transaction are predicate dates, does your report set forth a basis for finding wrongful gains from those acts?

                    MR. WILSON:  Object to the form.

A.    Yes.

Q.    And if the jury finds that only the 2023, $10 billion investment, and the 2025 recapitalization are

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 307

predicate acts, does your report set forth a basis for which a jury can find wrongful gains from that?

MR. WILSON:  Same objections.

A.    Yes.

MR. KRY:  All right, those are the questions I have.

CONTINUED EXAMINATION BY

MR. WILSON:

Q.    All right, Dr. Wazzan a couple of questions.

Do you think -- in your opinion, did the formation of the for-profit in 2019 create value for OpenAI?

A.    Yes.

Q.    Okay.  How much value?

MR. KRY:  Objection to form.

A.    500 billion.

Q.    So the entire 500 billion is attributable to the 2019 for-profit formation?

MR. KRY:  Objection to form.

A.    I mean without the creation of the for-profit, you don't have -- I don't know.  I'm not sure how to answer it.

Q.    Okay.  It's not something you analyzed?

A.    I think it's the full amount.  I mean, the way I see it and the way I've been asked to analyze this is

Elon Musk v.                  FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 308

to assume liability predicated on the formation of the nonprofit.  The nonprofit -- sorry, the for-profit.  The for-profit is worth 500 billion, and I've been asked to calculate the disgorgement amount that flows back to Mr. Musk.  So I think it's the whole amount.

Q.    Okay.  But you've never undertook to separate the value that was created in any of the follow-on Microsoft transactions that Mr. Kry just described, correct?

MR. KRY:  Objection to form.

A.    So I've tried to apportion them over the time period based on the table I have.

Q.    You've apportioned the alleged wrongful gains by team period, but you have not, at least so far as I can tell, attempted to apportion the wrongful gains by a specific transaction, and my question is whether I'm correctly reading your report?

MR. KRY:  Objection to form.

A.    Well, the time periods are based on the transactions, so aren't they one and the same?

Q.    That's for someone else to decide.  My question, though, is whether you ever broke down the wrongful gains based on transactions?

MR. KRY:  Objection to form.

A.    I think it's one and the same.

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341              janerose@janerosereporting.com

Elon Musk v.          FINAL         December 5, 2025
Samuel Altman    HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Case 4:24-cv-04722-YGR    Document 544-1    Filed 05/15/26    Page 309 of 324

Page 309

Q.   Okay.  But the only analysis you can point to is the apportionment analysis in the report, correct?

A.   Yes.

Q.   Okay.  Very quick question about Exhibit 9, which Mr. Kry just asked you about.  Referred to the fact that there's a 7.6 percent -- at least in the first column -- allocation in this particular chart to employees.

     Do you remember just being asked about that?

A.   Yes.

Q.   Okay.  Do you have any basis to believe that that 7.6 percent allocation is based on work that OpenAI employees did for the nonprofit before the for-profit was formed?

     MR. KRY:  Objection to form.

A.   No.

Q.   Can we get out Exhibit 12, which is your second of three doodles of the day?

     On the right-hand side, right around three o'clock, four o'clock, in that slice of the pie, you crossed out "nonprofit" and wrote "for-profit?"

A.   Yes.

Q.   Is that accurate?

A.   Sorry, no.  Oh, entire pie was the for-profit. And what I meant to get at here was the nonprofit's

Page 310

piece of the pie.

Q.    So that piece that's somewhere between 2 o'clock and 4 o'clock, that is, in fact, the nonprofit's piece?

A.    Yes.

Q.    Okay.  Take out your supplemental report, please.

A.    Yeah, okay.

Q.    I'm going to ask you to do very quick math, much more simply than what Mr. Jurata was asking.  I just want to make sure that I understand.  Just for the sake of keeping this simple, let's focus on estimate 3.

A.    All right.

Q.    Okay.  According to your analysis under estimate 3, the current allocation of economic interest to the not-for-profit is 131 billion, correct?

A.    Yes.

Q.    The current allocation of economic value to or economic interest of Microsoft is 114.5 billion, correct?

A.    Yes.

Q.    And so I did a little math, and I think that means that everyone else has an economic interest of $254.5 billion.

Do I have that right?

Elon Musk v.                    FINAL              December 5, 2025
Samuel Altman         HIGHLY CONFIDENTIAL    Paul Wazzan, Ph.D.

Page 311

A.      Yes.

Q.      And so if your analysis is accepted by the court, I want to explore with you briefly how those numbers will change to make sure that I understand your analysis.  Okay?

A.      Okay.

Q.      I think, tell me if I'm wrong, that the value of the interest held by everyone else will not change; it will be 254.5 billion afterwards just the same as it is now; is that right?

A.      I think that's right.

Q.      Okay.  And leaving to the side the nature of whether he's getting paid out in cash or whether he's getting some sort of an economic interest in the vehicle, Mr. Musk's total recoupment under both of your analysis would be 65.5 billion plus 13.3 billion and that's 78.8 billion, correct?

A.      Yes.

Q.      So we have 254.5 for everyone else and 78.8 for Mr. Musk so far.

        Are you with me?

A.      Yes.

Q.      Okay.  The not-for-profit's interest is cut in half under estimate 3 and it goes to 65.5 billion; is that right?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 312

A.      Yes.

Q.      And Microsoft's interest is reduced by 13.3 billion under your estimate 3 and, therefore, declines to 101.2 billion; is that correct?

A.      101.5.

Q.      It's 114.5 minus 13.3; isn't that right?

A.      Yes.

Q.      So 101.2?

A.      Yes.

Q.      Okay.  Great.  So summing it up, we have 254.5 billion for everyone else, 78.8 billion for Mr. Musk, 65.5 billion for the nonprofit, and 101.2 for Microsoft under your estimate 3 approach; is that right?

A.      Sounds right.

Q.      Okay.  You testified earlier today when I was questioning you that you had not undertaken to apportion your 50 to 75 percent range between monetary and nonmonetary contributions.

        Do you recall giving that testimony?

A.      Yes.

Q.      And then when Mr. Jurata was questioning you about the possibility that the jury or the judge would find that the nonmonetary contributions should be disregarded, you said, in words or substance, that, well, the outcome of that would be you would be at

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 313

bottom of the range, 50 percent.

Do you recall giving that testimony?

A.    Yes.

Q.    Are you, therefore, saying that under your analysis, one-third, or 25 percent, of the 50 to 75 percent range that you calculated is attributable to nonmonetary contributions?

MR. KRY:  Objection.  Misstates the testimony.

Q.    What's wrong with what I just said?

A.    Well, my analysis took all of it as a whole.  I had the monetary and the nonmonetary, and I came up with a range between 50 and 75 percent.

You're now asking me for on the fly to do a different analysis, which is to ignore all the qualitative events, so, in that instance, I think I would default to the 50 percent.

Q.    Okay.  So a rough guide for you is of the -- the 50 to 75, 25 of that is nonmonetary contributions?

MR. KRY:  Objection.  I think it still misstates the testimony.

A.    It's not really how I did it.

Q.    Okay.  Well, I understood your testimony earlier when you said you didn't do it, but then when Mr. Jurata was questioning you, it sounded like you had

Elon Musk v.                 FINAL                December 5, 2025
Samuel Altman        HIGHLY CONFIDENTIAL     Paul Wazzan, Ph.D.

Page 314

a number in mind so I'm just trying to make sure your testimony is clear for the jury.

A.    So the testimony is, predicated on the monetary and nonmonetary events, I came up with a range of 50 to 75 percent.  If we start taking bits and pieces out, including all the nonquantitative, I think I would default to the 50 percent level.

I don't think that's consistent with saying that I've allocated the 25 percent to the qualitative.

Q.    What does it mean that you would default to the 50 percent level?

A.    Well, in the report I lay out his monetary contributions prior to his leaving and his requirement based in the various e-mails that he would have control and 50 percent and he's got, you know, 50 percent of xAI and I go through all the different things indicating where he'd have at least 50 percent, so I think I would land on the 50 percent number even in the absence of the qualitative factors.

Q.    Okay.  Fair enough.  One final question or maybe two.  Mr. Kry just asked you some follow-on questions about the Microsoft compute arrangement that Mr. Musk, you say, had a role in securing and also the Nvidia GPUs that you say Mr. Musk has a role in procuring.

JANE ROSE REPORTING                California Firm No. 254
1-800-825-3341                janerose@janerosereporting.com

Page 315

Do you recall those questions you were just asked?

A.    Yes.

Q.    You're not disputing, are you, that the Microsoft compute arrangement that was entered into before the for-profit was formed was valuable for the nonprofit, are you?

A.    No, I'm not.

Q.    And you're likewise not disputing that getting access to those Nvidia chips in the time before the for-profit was formed was valuable for the nonprofit; you're not disputing that?

A.    No.

MR. WILSON:  I have no further questions.

MR. KRY:  Anything else?

MR. JURATA:  I just have one minute's worth.

CONTINUED EXAMINATION BY
MR. JURATA:

Q.    Dr. Wazzan, I'd like you to go back to the errata to your expert report, Exhibit 15.

A.    15?

Q.    Yes.  It's Exhibit 15 contained in the errata to your expert report.

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 316

A.    Yeah, Exhibit 13?

Q.    Yes, Exhibit 13.  Thank you.

Just looking at the row "January 13 to October 25," am I correct that that's designed to represent the wrongful gains by acts in that time period?

A.    Yes.

Q.    Okay.  And the wrongful gains during that time period include both the 2023 Microsoft agreements and the 2025 PBC recapitalization, correct?

A.    Yes.

Q.    Okay.  And is that row designed to show the unjust enrichment from both of those -- from both of those alleged wrongful gains -- or wrongful acts, should I say?

A.    It could.  I mean, again, I've calculated the unjust enrichment as the total value of the for-profit, and then allocated it over these time periods per counsel's request based on valuations that I could obtain for the for-profit that spanned the time period. That's really where it stops.  Counsel has to figure out how it fits into those pieces.

Q.    Okay.  So if the jury only finds the 2023 Microsoft agreements to be unlawful but not the PBC recapitalization, would the numbers in that row still be an accurate estimate of the unlawful enrichment?

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 317

MR. KRY:  Objection to form.

A.    Possibly.

Q.    That means it's possibly not, too, correct?

A.    Well, there's too many -- there's too many variables to the hypothetical.  I guess it would depend on when you stop figuring out what the disgorgement is, right.  So do you get to the 500 billion or do you get to some smaller number in an earlier time period, and if you get to that earlier time period, what is the value, and then do you then apportion it over those earlier two periods?  I don't -- I haven't done this analysis.

MR. JURATA:  I have no further questions, thank you.

MR. KRY:  I have a few questions in response to this.

BY MR. KRY:

Q.    Dr. Wazzan, just staying with this exhibit, the building block of all your analyses was the value of OpenAI, that was first step in each of them, correct?

A.    Yes.

Q.    And what was the value of OpenAI in your original report even before you took into account the MOU or the PBC transaction?

A.    It was like 510 billion.

Q.    And has that gone up or down in this latest

Page 318

supplement?

A.    It's gone down.

Q.    And then you made some additional adjustments for dilution for various other shareholders through the MOU and the PBC; is that correct?

A.    Yes.

Q.    And did those adjustments cause your damages calculation to go up or down?

A.    Down.

Q.    And so to the extent the jury finds hypothetically that the 2023 transaction was the only breach and for some reason finds that the PBC transaction is not a breach, if they relied on the analysis in your supplemental report, would that effectively be a more conservative estimate of what the damages just attributable to that one breach would be?

        MR. WILSON:  Object to the form.

A.    Yes.

Q.    And so if anyone benefits from that imprecision, it's the defendants?

        MR. JURATA:  Object to form.

A.    Yes.

        MR. KRY:  All right.  I don't have any other questions.

        We'll designate the transcript

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 319

confidential subject to further review.

MR. WILSON:  Let's designate it highly confidential, and I'll get back to you guys.

MR. KRY:  That's fine.

THE VIDEOGRAPHER:  This concludes today's testimony of Paul Wazzan.  We're going off the record at 9:37 p.m. -- excuse me, 6:37 p.m.  This also concludes Media 8.

(Time Noted:  6:37 p.m.)

Elon Musk v.                      FINAL                    December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 320

C E R T I F I C A T E

STATE OF NEW YORK      )

                                    ) ss.:

COUNTY OF QUEENS )


            I, BROOKE E. PERRY, a Notary Public

within and for the State of New York, do hereby

certify:

            That PAUL WAZZAN, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true

record of the testimony given by such witness.

            I further certify that I am not related

to any of the parties to this action by blood

or marriage; and that I am in no way interested

in the outcome of this matter.

            IN WITNESS WHEREOF, I have hereunto set

my hand this 5th day of December, 2025.


-------------------------

BROOKE E. PERRY


JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                 janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL        Paul Wazzan, Ph.D.

Page 321

EXHIBITS

| WAZZAN | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Expert Report of C. Paul Wazzan, Ph.D. | 11 |
| 2 | Wazzan & Co. Statement of Information | 25 |
| 3 | Supplemental Expert Report of C. Paul Wazzan, Ph.D. | 34 |
| 4 | Deposition Transcript of Elon Musk 9/26/25 | 61 |
| 5 | Witness Notes | 83 |
| 6 | OPENAI_Musk00021096-097 | 112 |
| 7 | 2024Musk0005444-447 | 115 |
| 8 | Exhibit 1 Redacted Version of Document Proposed to Be Filed Under Sealed, Case # 2:23-Cv-07936-Jls-As | 189 |
| 9 | Sutskever_MUSKSUB_00000430-432 | 195 |
| 10 | Exmf-0003257-258 | 202 |
| 11 | Rebuttal Expert Report of Jonathan I. Arnold, Ph.D. | 222 |
| 12 | Dr. Wazzan's Drawing | 280 |
| 13 | Errata to October, 29, 2025 Expert Report of C. Paul Wazzan, Ph.D., | 280 |
| 14 | Dr. Wazzan's Calculations | 293 |
| 15 | OpenAI Summary Post-Recapitalization Cap Table | 299 |

(Exhibits retained by Reporter.)

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL      Paul Wazzan, Ph.D.

Page 322

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel
that notary public signature is required.

     Please return a copy of the signed errata within
30 days of receipt, unless otherwise agreed upon
by counsel.  Once we receive one signed errata, we
will distribute an electronic copy to all parties.

RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
     FAX: 1-800-825-9055
     EMAIL: janerose@janerosereporting.com

            Jane Rose Reporting
            Administrative Offices
            PO Box 542
            Luck, WI  54853

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                 janerose@janerosereporting.com

Page 323

ACKNOWLEDGMENT OF THE DEPONENT


     I, Paul Wazzan, do hereby certify that
I have read the foregoing pages and that the same
is a correct transcription of the answers given
by me to the questions therein propounded, except
for the corrections or changes in form or substance,
if any, noted in the attached Errata Sheet.


     _____      _____
     (DATE)            Paul Wazzan


     Signed and subscribed to before me this
     _____ day of _____, 2025.


          _____
               Notary Public

JANE ROSE REPORTING                  California Firm No. 254
1-800-825-3341                janerose@janerosereporting.com

Elon Musk v.                    FINAL                December 5, 2025
Samuel Altman          HIGHLY CONFIDENTIAL       Paul Wazzan, Ph.D.

Page 324

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |
| _____ / | _____/ | _____ / | _____ |

JANE ROSE REPORTING                    California Firm No. 254
1-800-825-3341                  janerose@janerosereporting.com