**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **REBUTTAL WRITTEN DIRECT TESTIMONY OF JONATHAN I. ARNOLD, Ph.D.** |
| v. | |
| SAMUEL ALTMAN, et al., | |
| Defendants. | Trial: May 15, 2026 |

**TABLE OF CONTENTS**

I.      Qualifications and Assignment ............................................................................................1

II.     Dr. Wazzan's Model as to Microsoft ...................................................................................2

III.    Summary of Opinions ...........................................................................................................2

IV.     **Opinion 1:**  Dr. Wazzan's Estimate of Microsoft's Unjust Gains is Invalid and Unreliable Because it Fails to Separate Microsoft's Unjust Gains from Just Gains ...........4

        A.      *Dr. Wazzan's Model Provides No Linkage between Microsoft's Alleged Wrongdoing and Microsoft-Specific Unjust Gains* ............................................................ 5
        B.      *Dr. Wazzan Does Not Provide a Valid Approach to Allocating Microsoft's Unjust Gains Across Time Periods* ................................................................................ 10

V.      **Opinion 2:** Dr. Wazzan's Estimate of Microsoft's Unjust Gains is Invalid and Unreliable Because it Fails to Distinguish Between the Value and Use of Mr. Musk's Contributions and Those of Microsoft and Others ...............................................12

VI.     **Opinion 3:** Dr. Wazzan Double Counts Wrongful Gains Purportedly Attributable to Mr. Musk's Charitable Contributions in His Computation of Microsoft-Specific Unjust Gains ...........................................................................................................................16

VII.    Conclusion ............................................................................................................................21

## I.    Qualifications and Assignment

1.    My name is Jonathan Arnold.  I am the D. Gale Johnson Visiting Instructional Professor at the Kenneth C. Griffin Department of Economics and the College, University of Chicago.  In addition to my academic role, I am employed by Chicago Economics Corp. and am a Senior Affiliate to Coherent Economics, an economics consulting firm.  I am also a Certified Public Accountant.  I specialize in the application of economics to legal and regulatory issues and frequently analyze questions relating to economics, accounting, and economic loss.

2.    I earned my Ph.D. and M.B.A. from The University of Chicago's Graduate School of Business and my B.A. in economics from The University of Chicago.

3.    Prior to my current positions, I served as Chief Economist in the New York State Office of the Attorney General ("OAG").  In that role, I served as senior policymaker on economics questions for the Attorney General—covering Economic Justice, Criminal Justice and Social Justice.  I also oversaw economic analysis on key matters, retained and supervised outside expert witnesses, and worked to integrate economic analysis with legal analysis.  My work at the OAG spanned a range of areas, including antitrust, securities and investor protection, financial crime, labor, environmental disputes, and public integrity investigations.

4.    Over the course of my career, I have performed economic analyses on a wide range of valuation, economics, and accounting issues.  I have provided expert testimony—including live testimony on over forty occasions—in court and arbitration proceedings, as well as in depositions, expert reports, and affidavits.  My work regularly involves analyzing claims of business torts and corporate wrongdoing, including breaches of fiduciary duty, and calculating the resulting economic loss.

5.    I was asked by Microsoft to review and respond to the opinions of Plaintiff's expert Dr. Paul Wazzan ("Dr. Wazzan"), with emphasis on his opinions concerning Microsoft-specific alleged unjust gains.

6.       Coherent Economics staff have assisted me in my work in this matter.  My work is billed at my standard hourly rate of $1,450 per hour. My compensation is not contingent upon my opinions and conclusions, or upon the outcome of this matter.

## II.    Dr. Wazzan's Model as to Microsoft

7.       Dr. Wazzan claims to undertake three steps in his model to estimate Microsoft-specific unjust gains.

8.       First, he measures the total value of Microsoft's stake in For-Profit OpenAI as of October 2025, which he finds is 22.9 percent to 25.5 percent of For-Profit OpenAI's value net of Microsoft's $13 billion investment.

9.       Next, he attributes 26.2 percent and 29.2 percent of For-Profit OpenAI's value to Non-Profit OpenAI.  In addition, he claims that the same portion of Microsoft's stake in For-Profit OpenAI is attributable to the Non-Profit OpenAI.  He provides no basis for this assumption in his report.

10.      Third, he assumes that Mr. Musk is entitled to an interest in the Non-Profit OpenAI on the basis of Mr. Musk's tax-deductible contributions, which he additionally assumes entitles Mr. Musk to a portion of Microsoft's stake in For-Profit OpenAI.  He allocates to Mr. Musk 50 percent to 75 percent of the 26.2 percent and 29.2 percent value attributed to Non-Profit OpenAI to Mr. Musk.  He therefore reallocates 13.1 percent to 21.9 percent of Microsoft's stake in For-Profit OpenAI to Mr. Musk.  Based on this approach, he concludes that Microsoft's unjust gains are between $13.3 billion and $25.1 billion.

## III.    Summary of Opinions

11.      Before turning to the opinions set forth in my expert report, there are two important points to note.

12.      First, Dr. Wazzan's original and supplemental expert reports set forth the alleged unlawful gains by Microsoft that are owed to Mr. Musk.  I understand that, since the filing of the report, Mr. Musk has disclaimed his entitlement to those funds and believes that they should go

the Non-Profit OpenAI instead.  Putting aside the question of whether that is legally permissible, Dr. Wazzan provides no economic basis for why such a remedy is available as to the asserted wrongful gains attributed to Microsoft.

13.    Second, Dr. Wazzan's original and supplemental expert reports assumed—on the direction of counsel—that the predicate act for determining Microsoft's unlawful gains was the creation of the For-Profit OpenAI in 2018.[1]  However, at trial, Mr. Musk abandoned that position and now claims that the alleged breach of the charitable trust occurred no earlier than 2023.  Despite that change of position, the total amount that Dr. Wazzan claims Microsoft has been unjustly enriched remains unchanged from his earlier expert reports.[2]  As a result, Dr. Wazzan's approach is unsupported by the trial record in this matter, most of which I observed in person over the last three weeks.

14.    Notwithstanding the preceding points, I limit my critiques of Dr. Wazzan's model to those that I formed in my rebuttal expert report or stated at my deposition.[3]

15.    I have reached the following opinions concerning Dr. Wazzan's estimate of Microsoft-specific unjust gains:

- **Opinion 1:** Dr. Wazzan's estimate of Microsoft's unjust gains is invalid and unreliable because it does not separate Microsoft's unjust gains from its just gains.  Stated differently, it fails to show whether and how Microsoft's alleged misconduct caused

---

[1]   Wazzan Deposition, 51:16-52:3, which states "Q. Were you asked to determine the amount of wrongful profits attributable to any particular acts? A. Again, I'm not sure how to answer that. The task is, as I've laid out in my assignment, the conversion, or I guess the creation of the for-profit entity is the predicate act."

[2]   In my rebuttal report, I conveyed my understanding, based upon Mr. Musk's deposition testimony, that he did not appear to believe that the creation of a For-Profit subsidiary and Microsoft's 2019 and 2021 agreements with OpenAI constituted a broken promise to him.  See Arnold Rebuttal Report, ¶15.

[3]   All of the opinions I present in this written direct testimony correspond to analyses, opinions, or conclusions I previously disclosed in my expert report or that I stated at my deposition.  I reserve my right to more fully address the inconsistencies between trial testimony and Dr. Wazzan's assumptions in my oral testimony to the extent it would assist the Court.

Microsoft to obtain any benefit.  Indeed, the fact that the amount of Microsoft's alleged unjust enrichment remains the same despite a massive change in Plaintiff's theory of liability confirms that Dr. Wazzan has done no analysis to separate Microsoft's unjust gains from its just gains.

- **Opinion 2:** Dr. Wazzan's estimate of Microsoft-specific unjust gains is invalid and unreliable because it fails to distinguish between the value of Mr. Musk's contributions and those of Microsoft and others.

- **Opinion 3:** Dr. Wazzan double counts wrongful gains purportedly attributable to Mr. Musk's charitable contributions to Non-Profit OpenAI in his computation of Microsoft-specific unjust gains.  This double counting renders his conclusion invalid and unreliable.

16.     I understand that OpenAI's rebuttal expert, Dr. Ilya Strebulaev, is also providing written direct testimony concerning Dr. Wazzan's analysis and opinions as applied to OpenAI.  In the interest of brevity, I will not repeat the opinions from my expert report in which I critique Dr. Wazzan's framework for measuring wrongful gains contains methodological errors and speculative assumptions because they apply to both OpenAI and Microsoft.  Those errors include inputs in Dr. Wazzan's model that he used to compute Microsoft-specific and OpenAI-specific unjust gains, such as his assumption that Mr. Musk is entitled to a 50 to 75 percent undiluted economic interest in Non-Profit OpenAI.  I continue to hold the opinions laid out in my rebuttal report, including those that substantively overlap with Dr. Strebulaev's opinions.

## IV.    Opinion 1:  Dr. Wazzan's Estimate of Microsoft's Unjust Gains is Invalid and Unreliable Because it Fails to Separate Microsoft's Unjust Gains from Just Gains[4]

17.     Dr. Wazzan fails to address causation with respect to Microsoft—that is the causal link between Microsoft's alleged misconduct and any putative unjust enrichment (or wrongful gains).  Demonstrating a causal link is essential to any model that purports to calculate wrongful gains caused by alleged misconduct.  In its absence, a model using Dr. Wazzan's method provides an improper measure.  I explain these flaws in greater detail below.

---

[4]   Arnold Rebuttal Report, ¶86 and Section V.B.

### A. Dr. Wazzan's Model Provides No Linkage between Microsoft's Alleged Wrongdoing and Microsoft-Specific Unjust Gains

18.    The economic evidence demonstrates that Microsoft's investment in technological infrastructure contributed to OpenAI's innovation and value creation—including the value creation that accrues to Non-Profit OpenAI, both to date and into the future.  Under Dr. Wazzan's model, any value creation generated by Microsoft that increased the value of For-Profit OpenAI increases Microsoft's unjust gains.  Put differently, under Dr. Wazzan's approach, the greater Microsoft's contribution to OpenAI's accretion in value, the greater is Dr. Wazzan's measure of purportedly unjust enrichment.

19.    This, obviously, is backward.  Dr. Wazzan does not isolate or incorporate the effect of unchallenged conduct by Microsoft into his estimate of unjust enrichment to Microsoft.  Thus, Dr. Wazzan fails to establish a causal connection between Microsoft's alleged misconduct and his estimate of unjust gains.  Consequently, his conclusions are economically unreliable and should not be credited.

20.    Treatises on economic damages in the litigation context advise that experts ought to assess damages as gains exclusively attributable to the alleged misconduct and not those gains attributable to other factors.  For example, *The Comprehensive Guide to Economic Damages* states that "[t]he but-for analysis also involves apportioning the defendant's enrichment, limiting the remedy to the portion of the defendant's enrichment infringement alone caused."[5]

21.    I understand Dr. Wazzan will testify that he does not have a "strong understanding" of Microsoft's alleged misconduct and he did not consider what such claims are at all.[6]  Rather, Dr. Wazzan assumes that none of Microsoft's gains from its investment in For-Profit OpenAI arise from legitimate activities.  It is implausible that (i) Microsoft's investments in OpenAI prior to

---

[5]   Arnold Rebuttal Report, footnote 65.

[6]   Wazzan Deposition, 224:15-18 and 225:25-226:7, which states "Q. Did you – did you look at what those claims were, at all, in preparing your report?  A. No. … Q. What is your understanding of the conduct that Microsoft engaged in that is alleged to be wrongful in this case?  A. I don't have a strong understanding of that, other than I've assumed liability."

2023 result in "just gains" until 2023, followed by (ii) a triggering event in 2023 that converted all past and future gains into "unjust gains." This is the essence of Dr. Wazzan's model. In effect, Dr. Wazzan's model presupposes that all legitimate activities ceased in 2023 and there was no ongoing value-creation from Microsoft's contributions that predate the predicate act.

22.    Moreover, Dr. Wazzan's treatment of Microsoft's investments and attendant purportedly unjust gains is in fundamental contradiction with Dr. Wazzan's assumption that Mr. Musk's much earlier contributions continued—and continue through today—to generate astonishing value-creation.

23.    OpenAI formed For-Profit OpenAI in September 2018. Several months later, five entities invested $133 million in capital to For-Profit OpenAI as First Close Limited Partners ("FCLP").[7] Several months after that, in July 2019, Microsoft made its first investment. Microsoft partnered with OpenAI to provide the capital, infrastructure, and compute that OpenAI needed to fulfill its mission. These contributions in For-Profit OpenAI are the consequence—not the cause—of OpenAI's decision to form its for-profit subsidiary, which enabled subsequent investors, including Microsoft, to provide the capital necessary to fund OpenAI's massive compute requirements.

24.    I understand that Dr. Wazzan will testify that Microsoft's transactions with OpenAI were fair, arm's length transactions between sophisticated parties, and reflect Microsoft's own contributions, not Mr. Musk's. As a practical matter, this means Dr. Wazzan does not challenge that Microsoft invested in For-Profit OpenAI on commercially reasonable terms.

25.    Should the Court find that Microsoft's conduct before 2023 is lawful, Dr. Wazzan's model does not quantify the value of the lawful provisions in the 2019 and 2021. In particular, he does not quantify the value of Microsoft's lawful (i.e., just) contributions of compute and non-capital contributions (including institutional knowledge, talent, training through joint engineering efforts, and expertise in providing compute at a large scale), nor does he quantify the reputational

---

[7]  Trial Ex. No. 201 (MSFT_MUSK000059951 at -59971-59973 and -60024-25).

benefits to OpenAI arising from its partnership with Microsoft. These are all offsets to the total benefits Microsoft purportedly obtained from its commercial relationship with OpenAI. Dr. Wazzan should, therefore, quantify and deduct these amounts from the total purported enrichment to Microsoft.

26.    The parties recognized that OpenAI required intensive capital and infrastructure investment to achieve large-scale technological innovation. From an economic perspective, any commercial investor providing capital and infrastructure at the scale OpenAI required would demand to participate in the potential upside arising from those contributions. In the absence of these resources from Microsoft or an equivalent third-party investor, OpenAI would not have achieved such substantial growth. An implication of Dr. Wazzan's model is that Microsoft would have invested the exact same amounts in the same periods if the For-Profit OpenAI never existed. This, simply, is neither consistent with economic logic nor Microsoft's own representations.[8]

27.    Microsoft's investment has been and continues to be used in part to fund the development, creation, and maintenance of physical supercomputers that provide compute to OpenAI.[9]

28.    For example, Microsoft developed custom supercomputers providing OpenAI with powerful computational infrastructure designed specifically to train its AI models.[10]

29.    Figure 1 presents a timeline of Microsoft's investment in, creation of, and announcements regarding supercomputers built for OpenAI since 2019, For-Profit OpenAI's valuations over time, and the release dates of ChatGPT. This exhibit shows that the development and innovation surrounding ChatGPT coincides with Microsoft's supercomputer investments, supporting the proposition that Microsoft's infrastructure contributed to OpenAI's technological innovation. I summarize certain of these events in Figure 1 below:

---

[8]  Mr. Scott trial testimony, May 13th Trial Tr. at 2220:11-2221:23.

[9]  Trial Ex. No. 202, 2019 JDCA (MSFT_MUSK000055169), at -177.

[10]  Trial Ex. No. 202, 2019 JDCA (MSFT_MUSK000055169), at -177.

*Musk v. Altman*                                      Written Direct Testimony of
No. 4:24-cv-04722-YGR              7              Jonathan I. Arnold, Ph.D.

**Figure 1**
**Microsoft Investments Have Fueled OpenAI Innovations and For-Profit OpenAI Valuations[11]**



30.    Figure 1 further shows that development and innovation surrounding ChatGPT followed Microsoft's supercomputer investments (shown as grey bars), which led to innovation and value creation for OpenAI (shown as a green line).  Figure 1 also reflects Microsoft's funding commitment to OpenAI, which includes the following capital expenditures "for training capacity" on "[d]edicated training systems funded":[12]

- In July 2019, Microsoft committed $750 million of its $1.0 billion investment in OpenAI to capital expenditures for training capacity over a five-year period.[13]

---

[11]  Trial Ex. No. 202, 2019 JDCA (MSFT_MUSK000055169); Trial Ex. No. 204, 2021 Amended JDCA (OPENAI_MUSK00010268); Trial Ex. No. 206 (MSFT_MUSK000055001); Trial Ex. No. 207, 2023 Second Amended JDCA (OPENAI_MUSK00010528); PitchBook.

[12]  Trial Ex. No. 279 (MSFT_MUSK000040990) at -991.

[13]  Trial Ex. No. 279 (MSFT_MUSK000040990) at -991; Trial Ex. No. 202, 2019 JDCA (MSFT_MUSK000055169), at -183.

*Musk v. Altman*                                              Written Direct Testimony of
No. 4:24-cv-04722-YGR                     8                     Jonathan I. Arnold, Ph.D.

- In March 2021, Microsoft committed $1.6 billion of its $2.0 billion investment in OpenAI to capital expenditures for training capacity.[14]

- In January 2023, Microsoft committed $7.1 billion of its $10.0 billion investment in OpenAI to capital expenditures for training capacity.[15]

31.    In view of OpenAI's increasing compute requirements, I believe it is reasonable to conclude that, without Microsoft's (or an equivalent third-party investor's) supply of compute designed specifically to train OpenAI's AI models, OpenAI's pace of innovation would have been materially slower—and OpenAI may have failed entirely in the absence of Microsoft's funding and services.

32.    Based on the JDCA agreements, Microsoft historically provided compute (separate from the supercomputers) at a 55 to 60 percent discount to market rates.[16] Dr. Wazzan does nothing to isolate the benefit of that discounted compute on OpenAI's valuation or the opportunity cost to Microsoft of providing compute at below-market rates.

33.    I discussed in the Arnold Rebuttal Report that OpenAI's compute needs have grown so vast as to require additional suppliers beyond Microsoft.

34.    Together, this economic evidence demonstrates that Microsoft's investment in technological infrastructure contributed to OpenAI's innovation and value creation—including the value creation that accrues to Non-Profit OpenAI, both to date and into the future.

35.    These findings are consistent with the trial testimony that I observed in person over the course of the trial.

---

[14]  Trial Ex. No. 279 (MSFT_MUSK000040990), at -991; Trial Ex. No. 204, 2021 Amended JDCA (OPENAI_MUSK00010268), at -282.

[15]  Trial Ex. No. 279 (MSFT_MUSK000040990), at -991.

[16]  Trial Ex. No. 202, 2019 JDCA (MSFT_MUSK000055169), at -184; Trial Ex. No. 207, 2023 Second Amended JDCA (OPENAI_MUSK00010528).

36.     For example, Dr. Sutskever testified that the difference between OpenAI's technology when Mr. Musk left OpenAI in 2018 and present day is "like the difference between an ant and a cat" and that without the additional funding it obtained, OpenAI would not have had access to a computer large enough to train its models.[17]  As Mr. Altman testified, OpenAI's 2019 deal with Microsoft "was quite transformative" and the supercomputer that Microsoft built for OpenAI "allowed us to push our research to the next level and create the model family that we became known for."[18]  Because Microsoft made significant contributions during this time period that led to material innovation and value creation, OpenAI's value would likely be much lower—possibly worth nothing at all—in the absence of Microsoft's involvement.[19]  Yet Dr. Wazzan's methodology implies that Mr. Musk should receive a considerable portion of the value that Microsoft created because of the risk-return tradeoff that Microsoft—not Mr. Musk—bore.  In my opinion, this renders his conclusions invalid as a matter of economics.

### B.  Dr. Wazzan Does Not Provide a Valid Approach to Allocating Microsoft's Unjust Gains Across Time Periods[20]

37.     Dr. Wazzan's written direct testimony claims to measure Microsoft-specific wrongful gains beginning in January 2023 of $13.3 billion to $25.1 billion.[21]  His current quantification is identical to the amounts in his supplemental expert report, in which he claims the Microsoft-specific wrongful gains—assuming the predicate act occurred when For-Profit OpenAI was created in 2018—of $13.3 billion to $25.1 billion.[22]  This is also inconsistent with his claimed disaggregation analysis in his expert report, in which he claims that unjust gains are higher if the predicate act occurred no earlier than January 2023.[23]

---

[17]  Dr. Sutskever trial testimony, May 11th Trial Tr. at 1895:7-24.

[18]  Mr. Altman trial testimony, May 12th Trial Tr. at 2056:8-13.

[19]  Dr. Sutskever trial testimony, May 11th Trial Tr. at 1895:19-24.

[20]  Arnold Rebuttal Report, ¶¶48-49.

[21]  Wazzan Written Direct Testimony, ¶¶128-129, 140, 141.

[22]  Wazzan Supplemental Report, Revised Exhibit 20.

[23]  Wazzan Errata to Expert Report, Exhibit 15 (Corrected).

38.    Dr. Wazzan's erroneous modeling is fatal to his conclusions because he does nothing to analyze the effect of the incremental changes in Microsoft's rights in 2023 separate from the rights in the earlier agreements.  Because Mr. Musk now claims that the predicate act occurred in 2023 (not in 2019), it is incumbent on Dr. Wazzan to (i) isolate the incremental changes in 2023, (ii) determine the extent to which those changes do—and do not—encompass Mr. Musk's claims, and (iii) provide a reasonable measure of the unjust gains arising solely from the alleged wrongdoing.  Dr. Wazzan's model does not do that.[24]

39.    It is implausible that wrongful gains could be identical regardless of whether all three Microsoft agreements are determined to be wrongful or only the 2023 agreement.

40.    Apparently recognizing that problem, Dr. Wazzan now claims in his written direct testimony that he "conducted an analysis of allocation across different time periods during which OpenAI and Microsoft derived their wrongful gains."[25]  However, based on his new conclusion that "Microsoft derived 100% of its wrongful gains after January 2023" Dr. Wazzan reinterprets his model to claim that Microsoft's unjust gains are $13.3 billion to $25.1 billion, the very same figures that he calculated in his Supplemental Report for Microsoft's wrongful gains assuming that the predicate act occurred in 2018.  Both cannot be true.

41.    I conclude that Dr. Wazzan's model fails to establish a causal connection between Microsoft's alleged misconduct and his estimate of wrongful gains, which means his conclusions are economically unreliable and should not be credited.

42.     These findings are consistent with the trial testimony that I observed in person over the course of the trial.

43.    The parties—including Dr. Sutskever, Mr. Musk, and Mr. Nadella—testified at trial that OpenAI required intensive capital and infrastructure investment to achieve large-scale

---

[24]  Arnold Rebuttal Report, ¶15.

[25]  Wazzan Written Direct Testimony, ¶131.

technological innovation.[26]  This supports my conclusion concerning the need for capital to avoid certain failure of OpenAI.

**V.    Opinion 2: Dr. Wazzan's Estimate of Microsoft's Unjust Gains is Invalid and Unreliable Because it Fails to Distinguish Between the Value and Use of Mr. Musk's Contributions and Those of Microsoft and Others[27]**

44.    Dr. Wazzan is wrong to claim that "Microsoft's wrongful gains are attributable to Mr. Musk's contributions."[28] He is wrong because he fails to (i) assess or account for the form and use of Mr. Musk's contributions, (ii) identify the reasons underlying changes in the value of Non-Profit OpenAI, and (iii) incorporate the diminishing portion of value creation attributable to Mr. Musk's alleged contributions.

45.    Mr. Musk was not the only early donor to OpenAI.  Dr. Wazzan does not credit other donors of charitable contributions to Non-Profit OpenAI—including Microsoft's early compute contributions—in creating value for For-Profit OpenAI.  Setting aside the other flaws with his model, Dr. Wazzan attributes outsized value-creation to Mr. Musk's early charitable contributions while failing to assess whether the early contributions by other donors including Microsoft contributed similar value-creation.  Conflating the impact, if any, of all early contributions with Mr. Musk's contributions also renders Dr. Wazzan's model flawed and unreliable.

46.    Dr. Wazzan assumes Mr. Musk's contributions fueled For-Profit OpenAI's growth years after he ceased involvement with OpenAI and despite billions of dollars of investments by Microsoft and other entities in For-Profit OpenAI.  When Mr. Musk departed in 2018, he wrote that "OpenAI is on a path of certain failure relative to Google" requiring "immediate and dramatic action" and a "major increase in funds donated and highly credible people joining our board."[29]

---

[26]  Dr. Sutskever trial testimony, May 11th Trial Tr. at 1891:10-22; Mr. Musk trial testimony, April 29th Trial Tr. at 482:22-483:4; Mr. Nadella trial testimony, May 11th Trial Tr. at 1762:21-1763:3.

[27]  Arnold Rebuttal Report, ¶¶51, 73-74, 92.

[28]  Wazzan Written Direct Testimony, ¶122.

[29]  Trial Ex. No. 749 (2024MUSK-0005444).

He also stated he had "lost confidence that OpenAI could muster the resources to serve as an effective counterweight to Google/Deepmind and decided to attempt that through Tesla instead."[30] In the absence of vast amounts of additional capital, Mr. Musk viewed OpenAI's chance of success at zero percent.[31] In other words, Mr. Musk acknowledged that OpenAI required massive additional investment and technological infrastructure in order to succeed, and ultimately he did not provide those resources. Parties other than Mr. Musk—including Microsoft—provided the resources necessary to generate OpenAI's value-creation. Dr. Wazzan's model overstates the ongoing value to OpenAI of Mr. Musk's early charitable contributions.

47. For example, Dr. Wazzan assumes that assets transferred from Non-Profit OpenAI to For-Profit OpenAI in 2019 constitute the value attributable to Mr. Musk's contributions that has been alleged misused and therefore unjustly enriched Microsoft. Dr. Wazzan opines in his report that the majority of assets—primarily consisting of IP related to the Dota 2 game—were valued at approximately $47.8 million at the time of the transfer.[32] Those assets, however, did not serve as the basis for OpenAI's subsequent commercial success. Around the time of the asset transfer, OpenAI pivoted from research on reinforcement learning (manifested in its Dota 2 gaming competition win) to generative pretrained transformers ("GPT") and large language models ("LLM"). OpenAI's research and product pivot influenced Microsoft's investment decision in For-Profit OpenAI and enabled OpenAI to develop its commercially successful ChatGPT products. In a rapidly evolving field, it is not surprising that the IP and intangible assets developed during Mr. Musk's tenure depreciated and became obsolete quickly as OpenAI focused on other research and product efforts. Dr. Wazzan's model, therefore, incorrectly assumes that the IP transferred to For-Profit OpenAI in 2019 is both solely attributable to Mr. Musk's contributions and constitutes the basis for ongoing value-creation at OpenAI and beneficial to Microsoft. The findings of my analysis show that these assumptions are wrong.

---

[30] Trial Ex. No. 844 (2024MUSK-0010577).

[31] Trial Ex. No. 853 (2024MUSK-0009072).

[32] Wazzan Report, ¶26.

48.    Finally, Dr. Wazzan's model implicitly rewards Mr. Musk for capital investments by Microsoft, not Mr. Musk.  In Figure 2 below, I compare Mr. Musk's alleged capital contributions to Non-Profit OpenAI with Microsoft's investments in For-Profit OpenAI, as well as the rates of return implied by Dr. Wazzan's estimates.[33]  Figure 2 shows (i) Microsoft invested over 362 times Mr. Musk's $38 million in contributions, and (ii) Dr. Wazzan believes Microsoft's ownership stake should be just 3.6 to 7.6 times the value of Mr. Musk's purported economic interest in Microsoft's stake. Put differently, Dr. Wazzan's estimates imply a return for Mr. Musk of 347 to 655 times his donations, while Microsoft would generate a return of only 5.5 to 6.3 times its capital contributions.

**Figure 2**
**Dr. Wazzan's Model Rewards Capital That Was Never Contributed by Mr. Musk at a Rate Hundreds of Times Higher Than Capital That Actually Was by Microsoft[34]**

| | | Microsoft | Microsoft's Purported Wrongful Gains | | Microsoft *less* its Purported Wrongful Gains | | Ratio: Microsoft (excl. Mr. Musk) to Mr. Musk |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Low | High | Low | High | |
| Capital Provided | [A] | $13.85 B | $38.2 M | $38.2 M | $13.85 B | $13.85 B | 362.7x |
| Implied Value | [B] | $114.5 B | $13.30 B | $25.08 B | $89.44 B | $101.20 B | 3.6x to 7.6x |
| Rate on Multiple on Invested Capital | [C]= [B]/[A]-1 | 7.3x | 347.2x | 655.1x | 5.5x | 6.3x | |

49.    Dr. Wazzan's methodology gives no regard to the economic circumstances and industry characteristics of AI technological development between the time of Mr. Musk's contributions and the initial date of Microsoft's alleged misconduct.  As a result, he fails to

---

[33]  I used the phrase "alleged capital contributions" because Dr. Wazzan treats Mr. Musk's tax deductible contributions to Non-Profit OpenAI as if they were capital contributions to a for-profit entity.

[34]  Wazzan Written Direct Testimony, ¶86, 128; Trial Ex. No. 206 (MSFT_MUSK000055937) at Schedule A.

establish (i) the portion, if any, of value-creation attributable to non-Musk donors including Microsoft, (ii) the portion, if any, of IP and intangible assets developed during Mr. Musk's involvement that derived from Mr. Musk's contributions and subsequently created Microsoft's unjust gains, and (iii) the portion, if any, of value-creation from Mr. Musk's contributions to reinforcement learning even as For-Profit OpenAI's commercial success has been achieved through its research and product focus on GPT and LLMs (which should be excluded from any proper damages calculation).

50.    I conclude that Dr. Wazzan's model of Microsoft-specific unjust gains is invalid and unreliable because it fails to distinguish between the value and use of Mr. Musk's contributions and those of Microsoft and others.

51.    These findings are consistent with the trial testimony, which I observed in person over the course of the trial.

52.    For example, testimony at trial to date indicates that raising the required capital through donations alone was not feasible.[35]

53.    Moreover, trial testimony indicates that Mr. Musk's charitable contributions—including four Tesla cars and $12.5 million on rent—were used for the general purpose of OpenAI's operations in its pursuit of its mission.[36] Yet Dr. Wazzan treats the entirety of Mr. Musk's charitable contributions as subject to the claims.

---

[35] Mr. Altman trial testimony, May 12th Trial Tr., 2065:25-2066:4; Professor Hemel trial testimony, May 13th Trial Tr. at 2308:18-2309:5.

[36] Mr. Dudney trial testimony, May 13th Trial Tr. at 2351:8-18; Mr. Musk trial testimony, April 29th Trial Tr. at 485:20-486:1 and 525:3-8.

## VI.    Opinion 3: Dr. Wazzan Double Counts Wrongful Gains Purportedly Attributable to Mr. Musk's Charitable Contributions in His Computation of Microsoft-Specific Unjust Gains[37]

54.    As I explain in this section, Dr. Wazzan fails to provide a reasonable and reliable measure of Microsoft-specific unjust gains because he "double counts" wrongful gains purportedly attributable to Mr. Musk's charitable contributions in his computation of Microsoft-specific unjust gains.   Specifically, Dr. Wazzan models a mechanical, rather than analytical, approach to Microsoft-specific unjust gains.  As a consequence, his approach improperly reallocates a portion of Microsoft's stake in For-Profit OpenAI first to Non-Profit OpenAI and then to Mr. Musk.

55.    These steps use a speculative assumption divorced from economic logic. Further, Dr. Wazzan offers no explanation for how the same $38 million in charitable contributions to Non-Profit OpenAI both could have unjustly enriched OpenAI—including enriching Non-Profit OpenAI via its stake in For-Profit OpenAI—and separately unjustly enrich Microsoft.

56.    Dr. Wazzan does not dispute that Microsoft's stake was negotiated in an arms' length transaction.  Nor does he dispute that the Non-Profit OpenAI has an ownership stake in the For-Profit entity, and that Microsoft separately holds a stake in For-Profit OpenAI.  Yet he models a scenario in which he attributes a portion of Microsoft's ownership stake in For-Profit OpenAI to a hypothetical portion of the Non-Profit OpenAI informed by Mr. Musk's charitable contributions.

57.    This is implausible as a matter of economic logic because Microsoft's ownership stake is based on its own investments in the For-Profit OpenAI based on a negotiated agreement with OpenAI.  Mr. Musk never provided any charitable contributions to either For-Profit OpenAI or to the portion of Microsoft's investments in For-Profit OpenAI.

58.    Figure 3 below shows that Dr. Wazzan begins with the ownership stake of Non-Profit OpenAI (26.2 percent) and Microsoft (22.9 percent) in For-Profit OpenAI, shown respectively in green and blue.  Figure 3 also breaks out Dr. Wazzan's estimate of Mr. Musk's

---

[37]  Arnold Rebuttal Report, ¶¶78-84.

economic interest in Non-Profit OpenAI's stake in For-Profit OpenAI of up to 75 percent, shown in red:

**Figure 3**
**Ownership of For-Profit OpenAI[38]**



59.    Figure 4 shows how Dr. Wazzan's estimate of Mr. Musk's economic interest in Non-Profit OpenAI flows through to an implied economic interest in For-Profit OpenAI of 19.7 percent:

---

[38]  Wazzan Written Direct Testimony, ¶¶119, 124, 128.

**Figure 4**
**Dr. Wazzan Implies Mr. Musk has a 19.7 Percent Economic Interest in For-Profit OpenAI[39]**



60.      Dr. Wazzan also artificially maps Non-Profit OpenAI's stake in For-Profit OpenAI to Microsoft's stake in For-Profit OpenAI.[40] In other words, Dr. Wazzan's calculation applies Non-Profit OpenAI's 26.2 percent ownership percentage to both (i) its own direct stake, and (ii) separately to Microsoft's ownership interest in For-Profit OpenAI. There is no economic reason why Non-Profit OpenAI's 26.2 percent stake in For-Profit OpenAI should imply an identical 26.2 percent ownership of Microsoft's stake. Nor do Dr. Wazzan's expert reports, or his deposition, provide any basis for doing so.

61.      This artificial reallocation is shown in Figure 5 below:

---

[39]  Wazzan Written Direct Testimony, ¶¶119, 124, 128.

[40]  Wazzan Written Direct Testimony, ¶¶52, 127.

**Figure 5**
**Dr. Wazzan Artificially Reallocates Microsoft's Stake to Non-Profit OpenAI[41]**



62.     Dr. Wazzan then applies Mr. Musk's hypothetical economic interest of up to 75 percent in Non-Profit OpenAI a second time to the artificially reallocated Microsoft stake, resulting in the reallocation of 19.7 percent of Microsoft's stake in For-Profit OpenAI to Mr. Musk. As shown in Figure 6, the consequence of this reallocation is that Dr. Wazzan extends Mr. Musk's economic interest outside of what can be derived from Non-Profit OpenAI's stake in For-Profit OpenAI:

---

[41] Wazzan Written Direct Testimony, ¶¶119, 124, 128.

**Figure 6**
**Dr. Wazzan Artificially Reallocates Mr. Musk's Purported Economic Interest to Microsoft's Stake, Resulting in Double Counting[42]**



63.     Dr. Wazzan provides no economic rationale for the reallocation of Microsoft's stake to Mr. Musk or the resulting double counting, and no plausible basis exists.[43] Instead, Dr. Wazzan applies the identical methodology to Microsoft's stake in For-Profit OpenAI that he does for Non-Profit OpenAI's stake.  Together, these flaws highlight how Dr. Wazzan's estimate of unjust enrichment to Microsoft is untethered to the economic substance of Microsoft's alleged misconduct, rendering it unreliable.

64.     To sum, Microsoft's 22.9 percent stake in For-Profit OpenAI came from Microsoft's own $13.85 billion investment. Mr. Musk never contributed a dollar to Microsoft's stake.  Nor does he challenge the arms' length nature of Microsoft's negotiated stake.  Nonetheless,

---

[42]  Wazzan Written Direct Testimony, ¶¶119, 124, 128.

[43]  *See* Wazzan Deposition, 272: 4-8 ("Q. And you did no analysis to determine what the size of the haircut should be for Microsoft relative to the size of the haircut to OpenAI? A. Correct.")

Dr. Wazzan reallocates a portion of Microsoft's stake to Mr. Musk by applying the same percentage twice—once to the Non-Profit's stake (where Mr. Musk's contributions arguably flow) and a second time to Microsoft's separate stake (where they do not). These findings are consistent with the trial testimony, which I observed in person over the course of the trial.

## VII.    Conclusion

65.    For the reasons explained above, I find that Dr. Wazzan's model of Microsoft-specific unjust gains is flawed and unreliable and does not offer a reasonable estimate of Microsoft-specific unjust gains. It is my opinion that his model and its findings should be given no weight for the purpose of assessing Microsoft-specific unjust gains.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Respectfully submitted,


May 15, 2026

_____
Jonathan I. Arnold, Ph.D.