# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| ELON MUSK,<br><br>        Plaintiff,<br><br>   v.<br><br>SAMUEL ALTMAN, et al.,<br><br>        Defendants. | Case No. 4:24-cv-04722-YGR |

## Rebuttal Written Direct Testimony of Professor Ilya A. Strebulaev

**May 15, 2026**

**Table of Contents**

I.      Introduction ............................................................................................................. 1

II.     Assignment and Summary of Opinions ............................................................... 3

III.    Dr. Wazzan Fails to Provide a Reliable Estimate of Specific Wrongful Gains Attributable to Any Specific Alleged Wrongful Acts ........................................................................... 4

IV.     Dr. Wazzan's Methodology for Estimating Mr. Musk's Alleged Contributions to the Value of the OpenAI Nonprofit Is Conceptually Flawed and Unreliable and Yields Implausible Results ............................................................................................................. 5

        A.      Dr. Wazzan's Methodology is Conceptually Flawed and Therefore Unreliable.... 5

        B.      Dr. Wazzan's Methodology Yields an Implausibly Large Result Given Mr. Musk's Relatively Small Contributions ............................................................. 8

        C.      Dr. Wazzan's Apportionment Analysis Likewise Leads to the Implausible Conclusion that Mr. Musk was Responsible for a Larger Portion of OpenAI's Growth the More Time Passed After His Contributions ......................................... 9

V.      Dr. Wazzan Fails to Provide a Reliable Basis For His Claims About the Importance of Mr. Musk's Alleged Charitable Contributions ................................................... 11

VI.     Dr. Wazzan's Claims Regarding Mr. Musk's Hypothetical Equity Stake in the For-Profit Entity OpenAI's Cofounders Were Discussing in 2017 Are Baseless ............................. 17

VII.    Oath ...................................................................................................................... 18

## I.    Introduction

1.    I am the David S. Lobel Professor of Private Equity and Professor of Finance at the Stanford Graduate School of Business ("Stanford GSB"). I am also a Research Associate at the National Bureau of Economic Research. I received a Ph.D. in Finance from London Business School, an M.Phil. in Finance from London Business School, an M.A. in Economics from the New Economic School in Moscow, and a B.A. in Economics from Lomonosov Moscow State University.

2.    In addition to my general expertise in financial economics, I have extensive specific experience with the venture capital ("VC") industry and other sources of private capital. This experience includes academic research, teaching, consulting, and frequent interactions with venture capital and other private capital investors in Silicon Valley and elsewhere. For more than 12 years, I have taught a full-quarter MBA course on venture capital and early-stage company financing that I developed. In the course, I cover angel financing and venture capital practices on a large range of issues. Over the years of teaching and developing the course, I have interacted closely with hundreds of early-stage investors, early-stage companies, and other private-market participants and stakeholders. The course has been taken by more than 1,000 Stanford GSB students since 2013, many of whom have become founders of VC-backed companies and fund managers of VC funds. I continue to advise many of my former students formally and informally.

3.    I am the inaugural holder of the David S. Lobel Chaired Professorship in Private Equity, which was established at Stanford University in 2016 to promote research and teaching on private equity, including venture capital. I am also the founder and Faculty Director of the Stanford GSB Venture Capital Initiative that was founded in 2015 to bring together academic researchers, students, and practitioners to advance our knowledge of venture capital. I also founded and served as Faculty Director of the Stanford GSB program "The Emerging CFO: Strategic Financial Leadership Program," which has been attended by hundreds of senior financial leaders from around the world.

4.    During my career, I have actively participated in the venture capital industry as a consultant, which has involved work on a wide variety of operational and strategic issues. I have consulted for venture capital funds, corporate venture capital organizations, and limited partners on a broad set of issues related to early-stage investing, including contractual negotiations. I am also engaged

1

as a consultant for domestic and international companies and investors on various topics related to early-stage investing.

5.      I have published numerous articles in leading peer-reviewed finance and economics journals. My research includes studies on the activities of venture capitalists, how venture capitalists make decisions, and valuation of venture capital-backed companies. My research has been published in many academic journals, including the top three academic journals in finance: *Review of Financial Studies*, *Journal of Finance*, and *Journal of Financial Economics*. I have served on the Editorial Boards of two research publications*: Finance Research Letters*, and *Management Science*. My research has also been featured in a variety of public media, including *The New York Times* and *The Wall Street Journal*.

6.      One of my research papers (entitled "How do venture capitalists make decisions?") on the practices of venture capitalists, including those in Silicon Valley, has been awarded the Jensen First Prize for the best paper in the *Journal of Financial Economics* and the inaugural Doriot Award for the best private equity research paper. This paper has also been the most cited non-review academic paper on venture capital in the past five years, with more than 1,000 citations.

7.      I have been awarded a number of significant academic awards for my research, including the Jensen Prize (First Place) for the best paper in the area of corporate finance and organizations published in the *Journal of Financial Economics*, the Doriot Award for the best private equity research paper, the Brattle Group Prize in Corporate Finance (selected by the Associate Editors of the *Journal of Finance*), the Fama-DFA Prize (First Place) for the best asset pricing paper published in the *Journal of Financial Economics*, the Trefftzs Award by the Western Finance Association, and the Best Paper by the Private Equity Research Consortium.

8.      I have also received several awards for my teaching, including the Stanford MBA Distinguished Teaching Award and the Sloan Teaching Excellence Award, as well as the inaugural Masters in Management Best Teacher Award at London Business School.

9.      Although the vast majority of my professional efforts have been devoted to research, teaching, and consulting, I have also served as an expert witness in litigation matters, including in matters related to the venture capital industry. My full curriculum vitae is attached as **Appendix 1**.

## II.     Assignment and Summary of Opinions

10.     Dr. C. Paul Wazzan submitted reports on behalf of Plaintiff Elon Musk on October 29, 2025 and December 2, 2025 and submitted his written direct testimony on May 14, 2026.[1] Dr. Wazzan was asked "to offer expert opinions in this case concerning the amount of wrongful gains that OpenAI and Microsoft derived from operating OpenAI as a commercial venture that are attributable to Mr. Musk's charitable contributions."[2] His analysis assumes that Mr. Musk has established Defendants' liability on his claims. Dr. Wazzan also assumes that, if Mr. Musk proves that OpenAI and Microsoft are liable on his claims, Mr. Musk is entitled to recover the wrongful gains that OpenAI and Microsoft obtained by allegedly misusing the charitable contributions he made to The OpenAI Foundation, formerly known as OpenAI, Inc. ("OpenAI Nonprofit"), including any increases in the valuation of OpenAI Group PBC ("OpenAI For-Profit") or Microsoft's stake in OpenAI For-Profit that are attributable to Mr. Musk's contributions to the OpenAI Nonprofit.

11.     For the purposes of his assignment, Dr. Wazzan considers that Mr. Musk made both "monetary contributions such as quarterly grants and payments to cover OpenAI's rent and related expenses at the Pioneer Building" and "non-monetary contributions in the form of prestige, guidance, recruiting, and business connections."[3]

12.     Dr. Wazzan uses a three-step methodology to calculate "OpenAI's wrongful gains attributable to Mr. Musk's contributions."[4] First, Dr. Wazzan estimates the current value of the OpenAI For-Profit. Next, he estimates the current value of the OpenAI Nonprofit by examining the value of its equity interest in the OpenAI For-Profit. Finally, he purports to estimate the relative contributions of Mr. Musk and other contributors to the current value of the OpenAI Nonprofit. Using this approach, Dr. Wazzan estimates "OpenAI's wrongful gains" to be in the range of $65.5 billion to $109.4 billion, based on an estimated $500 billion valuation of OpenAI For-

---

[1]     Expert Report of C. Paul Wazzan, Ph.D., October 29, 2025 ("Wazzan Report"); Supplemental Expert Report of C. Paul Wazzan, Ph.D., December 2, 2025 ("Wazzan Supplement"); Written Direct Testimony of C. Paul Wazzan, Ph.D., May 14, 2026 ("Wazzan Direct Testimony").

[2]     Wazzan Direct Testimony, ¶ 1.

[3]     Wazzan Direct Testimony, ¶ 73.

[4]     Wazzan Direct Testimony, ¶ 116.

Profit.[5] Nowhere in Dr. Wazzan's testimony does he identify which OpenAI entity or entities hold these alleged wrongful gains.

13.   I have been asked to review, evaluate, and respond to Dr. Wazzan's opinions. Based on my review and analysis of his opinions, I conclude that Dr. Wazzan's methodology and analysis is fundamentally flawed, speculative, and unreliable in multiple respects. Specifically:

    a.   Dr. Wazzan fails to provide a reliable estimate of specific wrongful gains attributable to any specific alleged wrongful acts.

    b.   Dr. Wazzan's methodology for estimating Mr. Musk's alleged contributions to the value of the OpenAI Nonprofit is conceptually flawed and unreliable and yields implausible results.

    c.   Dr. Wazzan fails to provide a reliable basis for his claims about the importance of Mr. Musk's alleged charitable contributions.

    d.   Dr. Wazzan's claims regarding Mr. Musk's hypothetical equity stake in the for-profit entity OpenAI's cofounders were discussing in 2017 are baseless.

14.   All my opinions are those of a financial economist. I do not provide any legal opinions. For my work in this matter, I am being compensated at my standard expert witness hourly rate of $2,100. I also receive compensation based on the fees charged by Compass Lexecon for personnel who have assisted in my work in this matter. Neither my compensation nor that of Compass Lexecon is contingent upon the testimony I give or the outcome of this litigation.

## III.   Dr. Wazzan Fails to Provide a Reliable Estimate of Specific Wrongful Gains Attributable to Any Specific Alleged Wrongful Acts

15.   Dr. Wazzan states that his assignment was to measure wrongful gains. As a financial economist, I would expect any reliable expert analysis of wrongful gains to specify the alleged wrongful act or acts and estimate the specific wrongful gains that were caused by each act.

16.   Dr. Wazzan fails to perform this task. He purportedly seeks to quantify the portion of "OpenAI's wrongful gains" that may fairly be attributed to Mr. Musk's contributions, but

---

[5]   Wazzan Direct Testimony, ¶¶ 116-118.

Dr. Wazzan did not identify what wrongful acts he modeled, reference when they started and ended, or explain how each act relates to his calculations.

17. Dr. Wazzan's failure to perform his assignment is clearly demonstrated by the fact that he assumes Mr. Musk is entitled to the same recovery regardless of (a) which claims Mr. Musk prevails on, (b) which OpenAI Defendants are found to have engaged in wrongdoing, and (c) when that wrongdoing is determined to have occurred.

18. At his deposition in December 2025, Dr. Wazzan explained that, according to his analysis, it is the OpenAI Nonprofit that holds all the wrongful gains he estimated.[6] In his written testimony, however, Dr. Wazzan states that he is expressing "no opinion" on whether the wrongful gains he estimates "should be disgorged from the OpenAI for-profit or from the OpenAI nonprofit."[7] Dr. Wazzan therefore refers throughout his reports and written testimony to "OpenAI's wrongful gains" without identifying which OpenAI entity or affiliated person received those gains or could be required to return them.[8]

19. In sum, Dr. Wazzan's analysis fails to provide a reliable estimate of specific wrongful gains attributable to any of the alleged wrongful acts.

**IV.  Dr. Wazzan's Methodology for Estimating Mr. Musk's Alleged Contributions to the Value of the OpenAI Nonprofit Is Conceptually Flawed and Unreliable and Yields Implausible Results**

**A.  Dr. Wazzan's Methodology is Conceptually Flawed and Therefore Unreliable**

20. Dr. Wazzan opines that "OpenAI's wrongful gains" can be determined by calculating the portion of the OpenAI For-Profit's current value that is attributable to Mr. Musk's contributions to the OpenAI Nonprofit. One would thus expect Dr. Wazzan to examine all of the factors that contributed to the increase in the value of the For-Profit over time and then evaluate the extent to

---

[6]  *See* Wazzan Dep. at 68:9-24, 70:16-23.

[7]  Wazzan Direct Testimony, ¶ 121.

[8]  Dr. Wazzan's written testimony does not estimate any wrongful gains allegedly received by either Sam Altman or Greg Brockman.  Dr. Wazzan's reports likewise did not purport to estimate wrongful gains for Mr. Altman or Mr. Brockman, and Dr. Wazzan confirmed at his deposition that he was not asked to analyze, and did not analyze, wrongful gains for these individual defendants. *See* Wazzan Dep. at 182:18-24.

which Mr. Musk's donations and non-monetary contributions to the OpenAI Nonprofit in its early years were responsible for the increase in that valuation.

21.    However, Dr. Wazzan does not do that. He instead analyzes Mr. Musk's share of contributions to the OpenAI Nonprofit—relative to the contributions of others to the Nonprofit—and concludes that 50-75% of the Nonprofit's current value is attributable to Mr. Musk. In both of his expert reports, Dr. Wazzan referred to this portion as Mr. Musk's "economic interest" in the OpenAI Nonprofit.[9] This methodology is conceptually flawed.

22.    Fundamentally, Dr. Wazzan's purported calculation of Mr. Musk's "economic interest" in the OpenAI Nonprofit is meaningless because a nonprofit does not have owners. Unlike investors in a for-profit entity that seek a return on their investment, donors to a nonprofit contribute altruistically without the expectation that they will benefit financially from their donation (setting aside tax-related financial benefits).

23.    Ignoring that fact, Dr. Wazzan treats Mr. Musk's charitable contributions as if they were investments in OpenAI as an overall enterprise that includes both the OpenAI Nonprofit and the OpenAI For-Profit. But then, rather than analyze the extent to which Mr. Musk's monetary donations and non-monetary support contributed to the current value of OpenAI as a whole, Dr. Wazzan attempts to ascertain Mr. Musk's "economic interest" in the OpenAI Nonprofit as if Mr. Musk were an investor in that entity during its early years.

24.    This approach erroneously assumes that Mr. Musk's contribution to the increase in value of OpenAI as an overall enterprise can be measured by Mr. Musk's supposed "economic interest" in the OpenAI Nonprofit. In truth, the OpenAI Nonprofit's current value is not derived solely—if at all—from donations and other contributions to the OpenAI Nonprofit that predated the formation of the OpenAI For-Profit.

25.    The OpenAI Nonprofit's current economic value is derived exclusively from its stake in OpenAI For-Profit, and the value of that stake has increased by orders of magnitude in the years after Mr. Musk separated from the OpenAI Nonprofit and stopped his charitable contributions. Dr. Wazzan never explains why Mr. Musk's charitable contributions had anything to do with that

---

[9]    See e.g., Wazzan Report, ¶ 109 and Exhibits 10-11, 14, 16 & 19; Wazzan Supplement, Revised Exhibit 19.

increase in value and does not conduct any analysis to establish a causal linkage. He simply assumes that Mr. Musk's past contributions to the OpenAI Nonprofit are responsible for generating a fixed percentage of every dollar that is added to the OpenAI For-Profit's valuation. Dr. Wazzan's entire analysis rests on this assumption, but he offers no justification for it.

26.    Dr. Wazzan's methodology does not properly account for the significant monetary and non-monetary contributions to the OpenAI For-Profit (and hence, to the value of the OpenAI Nonprofit's stake in the For-Profit) that post-date its creation and that are unrelated to Mr. Musk. These include many billions of dollars in capital investment from Microsoft and others; extensive continued research and development by the OpenAI team; and resulting major technological breakthroughs, including OpenAI's development of LLMs predicated on transformer deep learning architecture that led to the commercial launch of ChatGPT in late 2022.[10] All these factors contributed to the increase in the OpenAI For-Profit's value, and thus the value of the OpenAI Nonprofit's assets, in the years after Mr. Musk stopped supporting OpenAI, but Dr. Wazzan does not attempt to quantify their impact on the OpenAI Nonprofit's current valuation relative to Mr. Musk's contributions in earlier years.

27.    Another major contribution to the current value of the OpenAI For-Profit that Dr. Wazzan ignores is the decision by the OpenAI, Inc. Board of Directors to approve the formation of a for-profit affiliate. The restructuring OpenAI announced in 2019 facilitated greater access to capital and talent than OpenAI was likely to achieve with a purely nonprofit structure. The 2019 restructuring allowed the OpenAI For-Profit to (a) raise $133 million from the FCLPs in its first funding round in March 2019, (b) expand its partnership with Microsoft and receive billions of dollars in capital commitments, including both cash and in-kind contributions of computational resources, and (c) provide equity-based compensation through the Employee Vehicle.

28.    The recapitalization that the OpenAI, Inc. Board of Directors approved in October 2025 has also allowed the OpenAI For-Profit to retain access to even more capital to continue its growth.

---

[10]    See e.g., "Improving language understanding with unsupervised learning," *OpenAI*, June 11, 2018, https://openai.com/index/language-unsupervised/; "Better language models and their implications," *OpenAI*, February 14, 2019, https://openai.com/index/better-language-models/; "OpenAI API," *OpenAI*, June 11, 2020 https://openai.com/index/openai-api/; "Introducing ChatGPT," *Open AI*, November 30, 2022, https://openai.com/index/chatgpt/; "GPT-4," *OpenAI*, March 14, 2023, https://openai.com/index/gpt-4-research/; "Hello GPT-4o," *OpenAI*, May 13, 2024, https://openai.com/index/hello-gpt-4o/; "Introducing GPT-5," *OpenAI*, August 7, 2025, https://openai.com/index/introducing-gpt-5/.

7

For example, as OpenAI's board chair, Bret Taylor, testified at trial, the "relatively traditional structure" of the newly created public benefit corporation allows the OpenAI For-Profit to "attract a broad range of investment," which "significantly derisks [its] ability to achieve [its] mission over time,"[11] whereas the old capped-profit structure made attracting investors "challenging because it was unusual."[12]

29.     Dr. Wazzan's failure to properly account for these substantial contributions to the OpenAI For-Profit's value between 2019 and the present day leads him to the erroneous and implausible conclusion that Mr. Musk is responsible for creating between 13% and 22% of OpenAI's current value as a whole.[13] Moreover, the inescapable logic of Dr. Wazzan's analysis is that Mr. Musk should be given credit for generating between 13% and 22% of every dollar that is added to the OpenAI For-Profit's total value in the years ahead.

**B.     Dr. Wazzan's Methodology Yields an Implausibly Large Result Given Mr. Musk's Relatively Small Contributions**

30.     Dr. Wazzan estimates that "OpenAI's wrongful gains" from Mr. Musk's $38 million in monetary contributions, plus his non-monetary contributions, to be between $65.5 billion and $109.4 billion. In addition to being based on a flawed methodology, Dr. Wazzan's conclusion is implausible.

31.     According to Dr. Wazzan's analysis: (i) the value of the OpenAI Nonprofit's stake in the OpenAI For-Profit jumped from approximately $230 million in March 2019 to somewhere between $131.0 billion and $145.9 billion (as of the time of the October 2025 recapitalization); and (ii) Mr. Musk's contributions were responsible for between 50% and 75% of that increase in value. As I understand it, Mr. Musk contributed at most $6.09 million to the OpenAI Nonprofit during this period (in the form of rent payments in 2019 and 2020).

32.     To the extent Dr. Wazzan is claiming that Mr. Musk was responsible for much of the increase in the OpenAI For-Profit's value after March 2019 because the contributions Mr. Musk made prior to March 2019 were used to develop the Nonprofit's early intellectual property,

---

[11]     Trial Tr., Vol. 11, 1923:6-12.

[12]     Trial Tr., Vol. 11, 1920:14-22.

[13]     Wazzan Direct Testimony, ¶ 76.

Dr. Wazzan fails to establish a reliable basis for his claim and ignores economic evidence that contradicts his position. Notably, the value of the intellectual property the OpenAI Nonprofit transferred to the OpenAI For-Profit in exchange for the Nonprofit's equity stake in the For-Profit was $60.8 million as of March 2019. *See* DX 876. The critical implication of that valuation is that Mr. Musk's donations (most of which predated March 2019) and non-monetary contributions (all of which predated March 2019) generated relatively little value.

33.    This appears to have been Mr. Musk's assessment at the time. For example, in December 2018, Mr. Musk sent an email to OpenAI's other cofounders stating: "My probability assessment of OpenAI being relevant to DeepMind/Google without a dramatic change in execution and resources is 0%. Not 1%. I wish it were otherwise." DX 853. Dr. Wazzan does not have a reliable basis to conclude that Mr. Musk was responsible for generating tens of billions of dollars in value for the OpenAI For-Profit or the OpenAI Nonprofit when Mr. Musk's contemporaneous view was that OpenAI was unlikely to successfully compete despite his contributions.

### C.    Dr. Wazzan's Apportionment Analysis Likewise Leads to the Implausible Conclusion that Mr. Musk was Responsible for a Larger Portion of OpenAI's Growth the More Time Passed After His Contributions

34.    Dr. Wazzan's attempt to apportion OpenAI's alleged wrongful gains across different time periods further highlights how his conceptually flawed and unreliable methodology generates implausible results.

35.    In his written testimony, Dr. Wazzan concludes that "OpenAI earned approximately 96% of its wrongful gains after January 2023 and only around 4% of its wrongful gains before that date."[14] However, Dr. Wazzan fails to consider whether this conclusion undermines his claims that Mr. Musk is responsible for such a large percentage of the increases in the OpenAI For-Profit's value. He simply opines that almost all of "OpenAI's wrongful gains" were earned in a period beginning almost five years after Mr. Musk separated from the organization, nearly three years after he made his last donation, and more than five years after Mr. Musk made his last quarterly donation.

36.    In his opening report, Dr. Wazzan conducted a more extensive apportionment analysis and purported to allocate "OpenAI's wrongful gains" among three different time periods:

---

[14]    Wazzan Direct Testimony, ¶ 136.

(i) March 2019 to March 2021; (ii) March 2021 to January 2023; and (iii) January 2023 to October 2025. Dr. Wazzan calculated the incremental change in the Nonprofit's value between the ending and beginning date of each period and multiplied that value by Mr. Musk's supposed "economic interest" in the Nonprofit (i.e., between 50% and 75%).[15]

37.     Dr. Wazzan's findings based on his prior apportionment analysis were not plausible either. Specifically, that analysis implied that in more recent periods, proportionally more of the increase in the OpenAI For-Profit's value could be attributed to Mr. Musk's Nonprofit contributions.

38.     As a general matter, one would expect Mr. Musk's contributions to be most relevant to OpenAI's growth in earlier years when he was responsible for a larger portion of funding and when he was still actively involved with the OpenAI Nonprofit. To illustrate why, consider the following simplified question. When would you expect a hypothetical startup's growth to be most attributable to its Series A investment: (a) in the period between the Series A and Series B financing rounds; (b) in the period between the Series B and Series C financing rounds; or (c) in the period between the Series C financing round and the startup's eventual IPO? The most logical answer is (a). That is, while the startup may still benefit from its Series A investment in the later periods, it will also benefit from the Series B and Series C investments in those periods. Thus, it is logical to assume that the Series A investment will be responsible for proportionally less of the startup's growth in later periods. Dr. Wazzan reaches the opposite conclusion, however, because, as discussed above, his purported calculation of Mr. Musk's supposed "economic interest" in the Nonprofit is not a reliable measure of Mr. Musk's contributions to the OpenAI For-Profit's value.

39.     As shown in **Exhibit A**, Dr. Wazzan's prior apportionment analysis attributed:

a.     Between 11.6% and 17.4% of the OpenAI For-Profit's valuation increase between December 2015 and March 2019 to Mr. Musk's Nonprofit contributions;

b.     Between 1.1% and 1.6% of the OpenAI For-Profit's valuation increase between March 2019 and March 2021 to Mr. Musk's Nonprofit contributions;

c.     Between 28.6% and 42.8% of the OpenAI For-Profit's valuation increase between March 2021 and January 2023 to Mr. Musk's Nonprofit contributions; and

---

[15]     Wazzan Report, ¶¶ 107-109 and Exhibits 14 & 16.

d.  Between 13.1% and 19.7% of the OpenAI For-Profit's valuation increase between January 2023 and October 2025 to Mr. Musk's Nonprofit contributions.

**Exhibit A**
**Dr. Wazzan's Implied Attribution of the OpenAI For-Profit's Valuation Increase Over Time**

**Panel A: Apportionment Analysis from Wazzan Report, Exhibits 14 & 16 (Modified)**

| Date Range | OpenAI Nonprofit Economic Interest ($) in OpenAI For-Profit | | Incremental | Mr. Musk's Economic Interest (%) in OpenAI Nonprofit | |
| | Beginning | Ending | Change | 50% | 75% |
| | [a] | [b] | [c] = [b] - [a] | [d] = [c] × 50% | [e] = [c] × 75% |
| December 2015 - March 2019 | $0.00 | $0.23 | $0.23 | $0.12 | $0.17 |
| March 2019 - March 2021 | 0.23 | 0.50 | 0.27 | 0.14 | 0.20 |
| March 2021 - January 2023 | 0.50 | 5.46 | 4.96 | 2.48 | 3.72 |
| January 2023 - October 2025 | 5.46 | 131.00 | 125.54 | 62.77 | 94.15 |
| Total | | | $131.00 | $65.50 | $98.25 |

**Panel B: Dr. Wazzan's Implied Attribution of OpenAI's Valuation Increase to Musk's NFP Contributions**

| Date Range | Total Value ($) of the OpenAI For-Profit | | Increase in | % of Increase Attributed to Musk's Nonprofit Contributions | |
| | Beginning | Ending | Valuation | Low Est. | High Est. |
| | [f] | [g] | [h] = [g] - [f] | [i] = [d] / [h] | [j] = [e] / [h] |
| December 2015 - March 2019 | $0.00 | $1.00 | $1.00 | **11.6%** | **17.4%** |
| March 2019 - March 2021 | 1.00 | 13.96 | 12.96 | **1.1%** | **1.6%** |
| March 2021 - January 2023 | 13.96 | 22.63 | 8.68 | **28.6%** | **42.8%** |
| January 2023 - October 2025 | 22.63 | 500.00 | 477.37 | **13.1%** | **19.7%** |
| Total | | | $500.00 | 13.1% | 19.7% |

Notes: $ in billions. Updated to reflect the Dr. Wazzan's latest estimates of the valuation of the OpenAI Nonprofit and the OpenAI For-Profit as of October 2025.

40.    Dr. Wazzan does not attempt to provide an explanation for his implicit finding that Mr. Musk's contributions were a larger contributor to the OpenAI For-Profit's valuation after March 2021 in circumstances where Mr. Musk had not been actively involved with OpenAI since early 2018 and where he made his last donation in 2020 (and his last non-rent-related cash donation in mid-2017).

## V.    Dr. Wazzan Fails to Provide a Reliable Basis For His Claims About the Importance of Mr. Musk's Alleged Charitable Contributions

41.    Dr. Wazzan's application of his methodology involves multiple subjective determinations for which Dr. Wazzan does not have a reliable basis. This makes Dr. Wazzan's conclusions even more unreliable. Specifically: (1) Dr. Wazzan assumes without basis that Mr. Musk's donations were more valuable than later capital contributions; (2) Dr. Wazzan fails to consider how Mr. Musk's donations were actually used and what value those contributions could have

11

generated; and (3) Dr. Wazzan offers no reliable basis for quantifying the value of Mr. Musk's non-monetary contributions and instead relies on his own subjective determination.

42.    Dr. Wazzan explains that "Mr. Musk contributed approximately $38 million to OpenAI" and also claims that "Mr. Musk's prestige, strategic guidance, recruiting, and business contacts constituted a very significant non-monetary contribution to OpenAI's success."[16] **Exhibit B** below summarizes the approximately $38 million of monetary donations that Mr. Musk allegedly made to the OpenAI Nonprofit between 2016 and 2020.

**Exhibit B**
**Summary of Mr. Musk's Alleged Monetary Donations to the Nonprofit**

| Year | Donation Type | | | Total |
| | Cash | Rent | Teslas | |
|---|---|---|---|---|
| 2016 | $15,000,000 | $709,667 | - | $15,709,667 |
| 2017 | 10,000,000 | 2,549,000 | 248,295 | 12,797,295 |
| 2018 | - | 3,580,000 | 14,105 | 3,594,105 |
| 2019 | - | 3,480,000 | - | 3,480,000 |
| 2020 | - | 2,610,000 | - | 2,610,000 |
| **Total** | **$25,000,000** | **$12,928,667** | **$262,400** | **$38,191,066** |

43.    Dr. Wazzan's analysis of these donations is flawed and unreliable in several respects.

44.    <u>First</u>, while Dr. Wazzan acknowledges that Mr. Musk was responsible for about 28% of monetary contributions to the OpenAI Nonprofit ($38 million / $138 million ≈ 27.5%), Dr. Wazzan claims this figure substantially understates the importance of Mr. Musk's financial contributions because Mr. Musk was responsible for approximately 60% of all financial contributions in the 2016-2017 period. As Dr. Wazzan explained this point in his opening report, Mr. Musk's early donations (in 2016 and 2017) "represented OpenAI's initial seed funding and were much more important to OpenAI's success than amounts contributed later, once OpenAI was established."[17] Dr. Wazzan, however, provides no credible basis for that assertion.

45.    Dr. Wazzan likewise fails to justify his seemingly arbitrary decision to downplay the significance of other donations to the OpenAI Nonprofit. Between 2016 and 2019, donors other

---

[16]    Wazzan Direct Testimony, ¶¶ 86, 102.

[17]    Wazzan Report, ¶ 74.

than Mr. Musk made over $95 million in contributions to OpenAI Nonprofit, as shown in **Exhibit C** below.

**Exhibit C**
**Other Donations Reflected on OpenAI, Inc.'s 2016-2019 Form 990s**

| | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|
| Good Ventures Foundation | - | $10,000,000 | $20,000,000 | - | $30,000,000 |
| Silicon Valley Community Foundation | - | - | - | 30,000,000 | 30,000,000 |
| Gabe Newell | - | - | 20,008,279 | - | 20,008,279 |
| Aphorism Foundation | - | 5,000,000 | 5,000,000 | - | 10,000,000 |
| Sam Altman | 3,784,637 | - | - | - | 3,784,637 |
| Amazon Web Services | - | - | 600,000 | 100,000 | 700,000 |
| Alameda Research | - | - | 500,000 | - | 500,000 |
| Donor's Trust DAF | - | 100,000 | - | - | 100,000 |
| BLTE, LLC | - | - | 10,000 | - | 10,000 |
| **Total** | **$3,784,637** | **$15,100,000** | **$46,118,279** | **$30,100,000** | **$95,102,916** |

Sources: PX 51-PX 54 (OpenAI's IRS Form 990s filed for years 2016 through 2019).

46.    I understand that Mr. Musk made his final monetary contribution to the OpenAI Nonprofit in May 2017 (excluding rent payments), after which he decided to suspend his quarterly donations of $5 million. Other sources of funding were thus needed to fill the gap and keep the Nonprofit operating until it completed its restructuring in March 2019. This contradicts Dr. Wazzan's claim that donations made after Mr. Musk stopped donating were relatively unimportant.

47.    If anything, the opposite is true. If Dr. Wazzan is going to (counterfactually) treat Mr. Musk's donations as if they were investments, then it is reasonable to analyze all of the donations that the OpenAI Nonprofit received from the perspective of VC financing. Hypothesizing that the donors who filled the funding gap at the Nonprofit after Mr. Musk stopped donating were VC investors, it is my opinion, based on my extensive knowledge of that industry, that those new "investors" would have demanded terms through which Mr. Musk and other earlier "investors" would be substantially—and disproportionately—diluted.

48.    This is so because the Nonprofit had a significant need for capital at that point in time, a consequence of which is that the new "investors" would have significant leverage to demand favorable terms. I would expect that to be especially true in this circumstance given that Mr. Musk was unwilling to put additional capital into the enterprise and evidently believed that it was unlikely to successfully compete absent major changes.

13

49. Dr. Wazzan also never addresses the fact that Mr. Musk's $38 million of donations represents less than one-tenth of one percentage point of all monetary contributions that OpenAI has received to date. For example, Mr. Musk's $38 million of donations accounted for approximately 0.06% of the more than $61 billion in monetary contributions the OpenAI Nonprofit and the OpenAI For-Profit had collectively received at the time of the recapitalization completed in 2025. As discussed above, the OpenAI For-Profit received billions of dollars in investments in the years after Mr. Musk's departure: capital infusions that played an essential role in creating OpenAI as it exists today.

50. As AI models have become larger and more complex over time, the amount of computational resources needed to develop innovative AI models has increased substantially. The OpenAI For-Profit was able to acquire computational resources through its partnership with Microsoft and other investments that would have been much more limited had OpenAI not undergone the restructuring announced in 2019 or the recapitalization completed in 2025. In other words, given the growth in computational resources necessary to develop AI, OpenAI's restructuring and recapitalization and the access to capital provided by those transactions contributed substantially to the development of the products and services that generate value for OpenAI today. Dr. Wazzan does not explain why he has ignored these contributions.

51. Second, Dr. Wazzan does not analyze how and when Mr. Musk's monetary donations to the OpenAI Nonprofit were spent. As a general matter, Dr. Wazzan should at least consider this information to evaluate the factual basis (if any) for his conclusion that a substantial portion of the current value of OpenAI (the overall enterprise) derives from Mr. Musk's contributions. I understand that Mr. Musk's final cash donation was made in May 2017, and that by late November 2017 all of his cash donations had been spent. I also understand that Mr. Musk's cash donations in 2016 and 2017 would have generally been used to pay employees, obtain computing resources, and cover other overhead expenses.

52. Despite claiming that Mr. Musk's donations in this period "were much more important to OpenAI's success than amounts contributed later,"[18] Dr. Wazzan does not attempt to analyze the value of the IP developed by the OpenAI Nonprofit in 2016 and 2017. That omission cannot be

---

[18]    Wazzan Report, ¶ 74.

14

easily dismissed, especially given that one of OpenAI's cofounders, Ilya Sutskever, testified earlier in this trial that the difference between OpenAI's technology in 2018 and today is "like the difference between an ant and a cat"—"a big difference."[19]

53.     The valuation report prepared for the OpenAI Nonprofit in 2019 by Hemming Morse LLP also contains information about the Nonprofit's actual direct expenditures on all "in-process IP development projects" in the 2016 to 2018 period. As shown in **Exhibit D** below, the Nonprofit spent around $23.6 million in total on IP development through November 2017 (when all Mr. Musk's quarterly cash donations had been spent) and then spent around $41.1 million more between December 2017 and December 2018. This demonstrates that the majority of the Nonprofit's IP development leading up to the formation of OpenAI For-Profit cannot have been funded by Mr. Musk's donations. This also shows that the majority of the Nonprofit's direct expenditures on IP development in 2016 and 2017 related to "DOTA" (a gaming-related project).

**Exhibit D**
**The OpenAI Nonprofit's Cumulative Direct Expenditures on**
**In-Process IP Development Projects from 2016 to 2018 ($ in Millions)**

Source: DX 876 (Hemming Morse July 2019 Valuation Report, Exhibits E.1-E.8).

_____

[19]    Trial Tr., Vol. 10, 1895:16-18.

54. Despite acknowledging that the OpenAI Nonprofit was focused on gaming models when Mr. Musk was more actively involved, Dr. Wazzan also does not attempt to explain or analyze how the IP developed by the OpenAI Nonprofit in 2016 and 2017 has contributed to the For-Profit's current value. For instance, OpenAI is presently most well-known for developing GPT models based on a transformer deep learning architecture. I understand that this "transformer architecture" was first described in a June 2017 research paper "Attention Is All You Need" authored by eight Google scientists. In other words, the majority of Mr. Musk's cash donations had been spent before OpenAI could even start to build models based on this technological breakthrough. I also understand that OpenAI did not launch its first GPT model until June 2018.

55. Third, although Dr. Wazzan states that "Mr. Musk's prestige, strategic guidance, recruiting, and business contacts constituted a very significant non-monetary contribution to OpenAI's success"[20] and spends pages of his reports and written testimony describing those contributions, Dr. Wazzan never attempts to quantify the value of these contributions. Instead, Dr. Wazzan provides his subjective, qualitative assessment of Mr. Musk's personal attributes and public reputation.

56. While reputable cofounders can provide value to a startup, it is not reasonable for Dr. Wazzan to simply assert that "Mr. Musk's non-monetary contributions are consistent with a 50% to 75% share of the nonprofit's value."[21] That claim simply isn't credible when Dr. Wazzan makes no attempt to quantify how much, if at all, Mr. Musk's activities led to ascertainable value for the OpenAI For-Profit and ignores all non-monetary contributions unrelated to Mr. Musk.

57. In fact, Dr. Wazzan fails to acknowledge or discuss any of the non-monetary contributions of the many other individual contributors who have been involved in OpenAI between its founding and today, including Messrs. Altman, Brockman, and Sutskever, as well as many others who were involved in developing the technology used in OpenAI's products—both before and after Mr. Musk cut ties with OpenAI.

58. For example, while Dr. Wazzan's discussion of Mr. Musk's non-monetary contributions implies that Mr. Musk's involvement was important to the OpenAI For-Profit's capital raising

---

[20]  Wazzan Direct Testimony, ¶ 102.

[21]  Wazzan Direct Testimony, ¶ 102.

efforts, Mr. Musk terminated his public association with OpenAI in February 2018—more than a year before the restructuring announced in 2019 that ultimately facilitated the For-Profit's access to substantial capital.

59.    Dr. Wazzan also mischaracterizes the trial testimony of Dr. Ilya Sutskever regarding the extent of Mr. Musk's role in recruiting him to join the OpenAI Nonprofit. Dr. Wazzan claims that Mr. Musk was a "critical factor in convincing Mr. Sutskever to leave Google to join OpenAI," [22] but when Dr. Sutskever listed at trial "all of the different OpenAI members" he had spoken with and who had played a role in "getting me over the line," Dr. Sutskever identified Mr. Brockman, Mr. Altman, and two other individuals—neither of whom was Mr. Musk.[23]

**VI.    Dr. Wazzan's Claims Regarding Mr. Musk's Hypothetical Equity Stake in the For-Profit Entity OpenAI's Cofounders Were Discussing in 2017 Are Baseless**

60.    Dr. Wazzan's reliance on Messrs. Brockman and Sutskever's proposed—but never agreed to—equity allocations to support his conclusion that 50% to 75% of the OpenAI Nonprofit's value is attributable to Mr. Musk's donations is also baseless and illogical for multiple reasons.

61.    First, the terms of the proposed for-profit entity were never agreed. I understand that the parties disagreed about important negotiating points, such as equity ownership, control rights, and executive leadership, as well as the monetary amounts each party would invest into the new entity. Dr. Wazzan acknowledges that discussions "fell apart" when the other cofounders did not agree to Mr. Musk's demands over these issues.[24] And I understand that Mr. Musk left the OpenAI, Inc. Board of Directors in February 2018. Dr. Wazzan does not have a reliable basis to rely on a rejected proposal as evidence of how the cofounders valued their relative contributions to the OpenAI Nonprofit.

62.    Second, I understand that the proposed equity stakes that Dr. Wazzan references were based on the expectation that Mr. Musk would contribute approximately $100 million in additional capital to the new for-profit entity. Mr. Musk admitted this at trial and testified that, during the 2017 negotiations, the equity allocations under discussion were based on an expectation that he

---

[22]    Wazzan Direct Testimony, ¶ 100.

[23]    Trial Tr., Vol. 10, 1888:19-1889:6.

[24]    Wazzan Direct Testimony, ¶ 111.

"would provide almost all of the money" for the new for-profit entity.[25] Mr. Brockman confirmed this at trial, testifying that, assuming agreement, Mr. Musk would have received the proposed equity stake "by not getting a founder grant" and instead "invest[ing] $100 million."[26] That did not occur. The proposed equity stakes were also based on the expectation that Mr. Musk would have much greater involvement in OpenAI going forward, devoting as much as 20 hours per week and serving as CEO or Executive Chairman of the new for-profit entity. Consistent with this, Mr. Brockman testified that the proposed equity split "wasn't really about work done to date," but rather "anticipated future work."[27] For Mr. Musk, that anticipated future work did not occur either.

63.    Therefore, contrary to one of Dr. Wazzan's core assumptions, the proposed capitalization tables do not "shed[] important light on the parties' own assessment of their relative contributions to OpenAI"[28] because they were predicated in large part on expectations about future investments of time and money that never materialized.

## VII.  Oath

I declare under penalty of perjury that the foregoing is true and correct.


Ilya A. Strebulaev
May 15, 2026

---

[25]    Trial Tr., Vol. 3, 421:20-25.

[26]    Trial Tr., Vol. 7, 1251:25.

[27]    Trial Tr., Vol. 6, 1073:14-15.

[28]    Wazzan Direct Testimony, ¶ 103.