UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK, ET AL., PLAINTIFFS, | 4:24-CV-04722 YGR |
| VS. | OAKLAND, CALIFORNIA |
| SAMUEL ALTMAN, ET AL., DEFENDANTS. | APRIL 28, 2026 |
| | VOLUME 2 |
| | PAGES 198-385 |

# TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
**BY: STEVEN F. MOLO**
**ALEXANDRA C. EYNON**
**JENNIFER SCHUBERT**
**SARA TOFIGHBAKHSH**

MOLOLAMKEN LLP
600 NEW HAMPSHIRE AVENUE
WASHINGTON, D.C. 20037
**BY: ROBERT K. KRY**
**WALTER HAWES, IV**

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER: IRENE L. RODRIGUEZ, CSR, CRR, RMR
CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)

FOR THE PLAINTIFFS: TOBEROFF AND ASSOCIATES, P.C.
23823 MALIBU ROAD, SUITE 50-363
MALIBU, CALIFORNIA 90265
**BY: MARC TOBEROFF**

FOR DEFENDANT OPENAI:
WACHTELL, LIPTON, ROSEN AND KATZ
51 WEST 52ND STREET
NEW YORK, NEW YORK 10019
**BY: WILLIAM SAVITT**
**SARAH K. EDDY**
**RANDALL JACKSON**
**NATHANIEL CULLERTON**
**BRADLEY WILSON**

MORRISON & FOERSTER LLP
425 MARKET STREET
SAN FRANCISCO, CALIFORNIA 94105
**BY: WILLIAM FRENTZEN**
**JORDAN ETH**

FOR DEFENDANT MICROSOFT:

DECHERT LLP
45 FREMONT STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
**BY: RUSSELL P. COHEN**
**HOWARD MARK ULLMAN**
**HANNAH LEONE**

DECHERT LLP
U.S. BANK TOWER
63 W. 5TH STREET, SUITE 4900
LOS ANGELES, CALIFORNIA 90071
**BY: NISHA PATEL GUPTA**

DECHERT LLP
1900 K. STREET, N.W.
WASHINGTON, D.C. 20006
**BY: JOHN A. JURATA**

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

A P P E A R A N C E S: (CONT'D)

DECHERT LLP
CIRA CENTRE
2929 ARCH STREET
PHILADELPHIA, PENNSYLVANIA 19104
**BY: YOSEF WEITZMAN**
**FORREST E. LOVETT**

ALSO PRESENT:

PERSUADIUS
**BY: JON WALTON, TRIAL TECHNICIAN**

DRC LEGAL
**BY: FRANS SCHIMPER, TRIAL TECHNICIAN**
**KEVIN DERITA, TRIAL TECHNICIAN**

IMPACT TRIAL
**BY: JESSE STEVENSON, TRIAL TECHNICIAN**

INDEX OF WITNESSES


| | PAGE | VOL |
|---|---|---|
| PLAINTIFFS' OPENING STATEMENT | 230 | 2 |
| DEFENDANT OPENAI'S OPENING STATEMENT | 256 | 2 |
| DEFENDANT MICROSOFT'S OPENING STATEMENT | 290 | 2 |
| **PLAINTIFFS'** | | |
| **ELON MUSK** | | |
| DIRECT EXAM BY MR. MOLO | 316 | 2 |

## INDEX OF EXHIBITS

| | MARKED | ADMITTED | VOL. |
|---|---|---|---|
| PLAINTIFFS' | | | |
| 5, 7, 12, 14, 16, 70, 152, 156, 157, 158, 159, 233, 236, 239, 251, 105, 252, 296, AND 295 | | 312 | 2 |
| 153 & 335 | | 313 | 2 |
| 388 | | 313 | 2 |
| DEFENDANT OPENAI'S | | | |
| DEFENDANT MICROSOFT'S: | | | |

OAKLAND, CALIFORNIA APRIL 28, 2026

P R O C E E D I N G S

(COURT CONVENED AT 8:06 A.M.)

(JURY OUT AT 8:06 A.M.)

**THE CLERK:** CALLING THE CIVIL MATTER 24-CV-04722 YGR, MUST VERSUS ALTMAN, ET AL.

PARTIES, PLEASE STATE YOUR APPEARANCES FOR THE RECORD, STARTING WITH THE PLAINTIFF.

**MR. MOLO:** GOOD MORNING, YOUR HONOR.

STEVEN MOLO FOR THE PLAINTIFF.

**THE COURT:** GOOD MORNING.

**MR. SAVITT:** GOOD MORNING, YOUR HONOR.

WILLIAM SAVITT FOR THE OPENAI DEFENDANTS.

**THE COURT:** GOOD MORNING.

**MR. COHEN:** GOOD MORNING, YOUR HONOR.

RUSSELL COHEN ON BEHALF OF THE MICROSOFT DEFENDANT.

**THE COURT:** GOOD MORNING.

OKAY. LET'S START AGAIN WITH OUR LIST.

MR. KRY, WE'LL START WITH YOU.

**MR. KRY:** YOUR HONOR, WE HAVE FIVE ITEMS THIS MORNING. THE FIRST ONE, WE JUST WANTED THE MOTION TO EXCLUDE FROM THE COURTROOM WITNESSES THAT ARE ON THE OTHER SIDE'S WITNESS LIST.

**THE COURT:** IF YOU READ MY STANDING ORDER, AND I

08:07:25 THINK IT WAS PRETRIAL ORDER 1, THAT WAS IN THERE.
08:07:28 IS THERE ANY PROBLEM WITH WHAT I HAD ALREADY ORDERED?
08:07:31 **MR. KRY:** THERE IS A DISPUTE BETWEEN THE PARTIES
08:07:33 BECAUSE ONE OF THE INDIVIDUALS THAT OPENAI IS PLANNING TO SEAT
08:07:36 IN THE COURTROOM IS SOMEONE THEY'RE CLAIMING TO BE A CORPORATE
08:07:39 REPRESENTATIVE OF OPENAI, AND OUR POSITION IS THAT THAT
08:07:42 WOULDN'T BE APPROPRIATE. THERE'S MANY DIFFERENT PEOPLE THEY
08:07:46 COULD HAVE MADE A CORPORATE REPRESENTATIVE, NOT SOMEONE ON THE
08:07:48 WITNESS LIST.
08:07:49 **THE COURT:** WELL, I DON'T KNOW THAT I AGREE WITH
08:07:51 THAT. WE'VE GOT DEFENDANTS WHO ARE IN THE COURTROOM, AND ALL
08:07:53 OF THEM WILL TESTIFY.
08:07:54 MR. FRENTZEN, WHAT IS THE ISSUE?
08:07:58 **MR. FRENTZEN:** I DON'T UNDERSTAND THE ISSUE,
08:08:00 YOUR HONOR.
08:08:00 **THE COURT:** OKAY.
08:08:01 **MR. FRENTZEN:** RULE 615 SPECIFICALLY --
08:08:03 **THE COURT:** HOLD ON.
08:08:04 WHO IS THE DESIGNEE?
08:08:06 **MR. KRY:** JOSHUA ACHIAM.
08:08:08 **THE COURT:** AND WHO IS JOSHUA ACHIAM?
08:08:11 **MR. FRENTZEN:** HE'S AN EMPLOYEE OF OPENAI. HE'S BEEN
08:08:13 THERE SINCE NEAR THE BEGINNING OF OPENAI'S EXISTENCE, AND HIS
08:08:18 JOB INVOLVES SAFETY AT OPENAI.
08:08:25 **THE COURT:** OKAY. AND HE'S GOING TO BE HERE FOR THE

ENTIRE TRIAL?

**MR. FRENTZEN:** HE'LL BE HERE FOR MOST OF THE TRIAL, YOUR HONOR. THERE MAY BE A FEW DAYS THAT HE MISSES, BUT HE'LL BE HERE REGULARLY.

**THE COURT:** ALL RIGHT. THE OBJECTION IS OVERRULED.

WHAT DO YOU HAVE NEXT?

**MR. FRENTZEN:** THANK YOU, YOUR HONOR.

**MR. KRY:** THE NEXT ITEM, YOUR HONOR, IS, WE MADE SOME PRODUCTION REQUESTS TO MICROSOFT AND OPENAI. I DON'T THINK THEY'RE DISPUTED, BUT WE JUST WANTED TO PUT THEM ON THE RECORD.

**THE COURT:** NOT YET.

WHAT IS YOUR THIRD ISSUE?

**MR. KRY:** THIRD ISSUE, YOUR HONOR, WE HAD AN ISSUE WITH OPENING STATEMENTS, AND WE WERE CONCERNED ABOUT ONE PARTICULAR --

**THE COURT:** OKAY. NUMBER FOUR.

**MR. KRY:** NUMBER FOUR IS THAT THERE -- THE PARTIES HAVE RESOLVED ACTUALLY ALL OF THE EXHIBIT ISSUES WITH THE WITNESS WHO IS GOING TO TESTIFY LIVE TODAY. THERE'S ONE ISSUE WHERE THE PARTIES AGREED THAT YOUR HONOR CAN GIVE A LIMITING INSTRUCTION, AND SO WE JUST WANTED TO ADVISE YOUR HONOR OF THAT.

**THE COURT:** ALL RIGHT. NUMBER FIVE.

**MR. KRY:** NUMBER FIVE IS, THERE'S ONE MINOR PROCEDURAL ISSUE WE WANTED YOUR HONOR'S CLARIFICATION ON WITH

08:09:22 RESPECT TO DEPOSITION VIDEOS.

08:09:24 **THE COURT:** OKAY. ISSUES FOR DEFENDANTS?

08:09:31 **MS. EDDY:** GOOD MORNING, YOUR HONOR.

08:09:33 SARAH EDDY FOR THE OPENAI DEFENDANTS.

08:09:35 WE HAD ONE ISSUE WE WANTED TO RAISE.

08:09:37 **THE COURT:** JUST GIVE ME THE HEADLINE.

08:09:39 **MS. EDDY:** THE HEADLINE IS, A TWEET STORM THAT
08:09:42 MR. MUSK WAS ENGAGED IN YESTERDAY DURING JURY SELECTION.

08:09:44 **THE COURT:** ANY ISSUES FOR MICROSOFT?

08:09:50 **MS. PATEL:** YES, YOUR HONOR. NISHA PATEL ON BEHALF
08:09:51 OF MICROSOFT.

08:09:53 WE JUST HAVE TWO MINOR OBJECTION LOGISTICS ISSUES WE
08:09:56 WANTED TO RAISE.

08:10:03 **THE COURT:** A LITTLE BIT MORE THAN THAT. WHAT DO YOU
08:10:06 MEAN?

08:10:06 **MS. PATEL:** SURE. FOR THE FIRST ONE WE WANTED TO
08:10:09 TALK ABOUT WHETHER, GIVEN THE NUMBER OF OVERLAPPING OBJECTIONS
08:10:12 THAT WILL LIKELY EXIST BETWEEN THE DEFENDANTS, WHETHER AN
08:10:15 OBJECTION FROM ONE DEFENDANT COULD BE TREATED AS AN OBJECTION
08:10:17 BY BOTH DEFENDANTS.

08:10:19 WE'VE ALL CONFERRED, AND I THINK WE AGREE, ASSUMING THE
08:10:22 COURT APPROVES.

08:10:23 **THE COURT:** THAT'S FINE.

08:10:24 AND THEN WHAT ELSE?

08:10:26 **MS. PATEL:** THERE ARE A FEW DOCUMENTS WHERE ONE OR

BOTH DEFENDANTS HAVE OBJECTED UNDER F.R.E. 105, BECAUSE THE DOCUMENT CAN COME IN AGAINST ONE PARTY BUT NOT THE OTHER, AND WE WANTED TO TALK ABOUT THE COURT'S PREFERENCE WITH REGARD TO LIMITING OBJECTIONS FOR THOSE -- THAT SUBSET OF DOCUMENTS.

**THE COURT:** OKAY. SO LET'S SEE. IN TERMS OF THE OPENINGS, I HAD YOU SUBMIT OBJECTIONS ON SUNDAY SO THAT I DEALT WITH THEM YESTERDAY, AND I DEALT WITH THEM YESTERDAY.

SO WHY HAVE I NOT ALREADY DEALT WITH ANY ISSUES?

**MR. KRY:** THIS IS NOT A DEMONSTRATIVE ISSUE, YOUR HONOR, AND IT ARISES FROM YOUR HONOR'S RULINGS YESTERDAY.

**THE COURT:** WHAT IS THE ISSUE?

**MR. KRY:** SO YOUR HONOR RULED YESTERDAY THAT IN OPENINGS, SPECIFIC DOLLAR AMOUNTS, LIKE MR. BROCKMAN'S EQUITY OR THE AMOUNT OF MICROSOFT'S STAKE CAN COME IN, AND JUST AS A RECIPROCAL MATTER, WE WOULD REQUEST AN ORDER THAT OPENAI CANNOT MAKE REFERENCE TO SOMETHING WHICH THEY'VE CLAIMED AT VARIOUS POINTS IN THE CASE, WHICH IS THAT OPENAI IS NOW THE BEST RESOURCE CHARITY IN THE WORLD, OR WORDS TO THAT EFFECT.

WE THINK IT RAISES THE SAME ISSUES.

**THE COURT:** OKAY. WHO IS DOING THE OPENING?

**MS. EDDY:** MR. SAVITT.

**THE COURT:** MR. SAVITT. I DON'T KNOW IF THIS IS AN ISSUE OR NOT. IS THIS AN ISSUE?

**MR. SAVITT:** I DO THINK, YOUR HONOR, WE WERE GOING TO MAKE REFERENCE TO THE CAPACITY OF THE OPENAI FOUNDATION TO MAKE

GRANTS AND DO WORK.

WE -- WE HADN'T HEARD THIS ISSUE BEFORE. I HADN'T HEARD THIS ISSUE BEFORE IT CAME OUT OF MR. KRY'S MOUTH RIGHT NOW, BUT IT IS CORRECT THAT OUR OPENING WOULD ANTICIPATE MAKING REMARKS OF THAT LEVEL OF GENERALITY.

**MR. KRY:** AND, YOUR HONOR, JUST TO BE CLEAR, I HAD RAISED THIS ISSUE WITH MS. EDDY EARLIER THIS MORNING.

**THE COURT:** OKAY. IT WAS IN THE SLIDE?

**MR. KRY:** NO, IT'S NOT -- IT'S NOT A CONCERN ABOUT A SLIDE.

**THE COURT:** HOW DID YOU KNOW THAT THIS -- I MEAN, HE DIDN'T GIVE YOU THE TEXT OF HIS OPENING, DID HE?

**MR. KRY:** NO. IT'S A COMMENT THAT THEY MADE ON NUMEROUS OCCASIONS THROUGHOUT THE CASE, AND SO WE DEVELOPED A --

**THE COURT:** OKAY. IT'S TOO LATE. TOO LATE. YOU SHOULD HAVE DONE IT EARLIER. THE OBJECTION IS OVERRULED.

ALL RIGHT. NOW WE HAVE -- ARE THERE ISSUES ABOUT EXHIBITS FOR TODAY?

**MR. KRY:** THE ONLY ISSUE I'M AWARE OF, YOUR HONOR, IS THAT THERE IS ONE ISSUE, WHICH IS A NEWS ARTICLE THAT WE EXPECT TO COME OUT IN THE WITNESS'S DIRECT EXAMINATION. AND THE PARTIES AGREE THAT YOUR HONOR CAN GIVE AN INSTRUCTION THAT IT'S NOT COMING IN FOR ITS TRUTH, AND WE DON'T OBJECT TO THAT.

**THE COURT:** OKAY. AND WHAT EXHIBIT NUMBER IS IT?

**MR. KRY:** 295.

**THE COURT:** OKAY. CAN ONE OF MY CLERKS GRAB ME 295, PLEASE.

ALL RIGHT. I'LL GIVE A LIMITING INSTRUCTION IF YOU WILL REMIND ME. WHOEVER IS GOING TO OFFER IT OR USE IT, IF YOU WILL PLEASE REMIND ME AT THAT TIME SO THAT I CAN DO THAT.

**MR. KRY:** THAT WILL BE MR. MOLO.

**THE COURT:** OKAY. LET'S SEE. WHAT ELSE DO WE HAVE IN TERMS OF ISSUES FOR TODAY?

**MR. KRY:** SO, YOUR HONOR, AS I MENTIONED, YESTERDAY IT WAS PUBLICLY REPORTED THAT THERE HAS BEEN A MAJOR DEVELOPMENT IN THE MICROSOFT/OPENAI RELATIONSHIP IN WHAT WE UNDERSTAND TO BE A NEW AND AMENDED VERSION OF THE CONTRACT BETWEEN THEM THAT MATERIALLY AFFECTS SOME OF THE ISSUES IN THE CASE.

LAST NIGHT, WE SENT THE DEMAND FOR PRODUCTION OF THAT AGREEMENT. MY UNDERSTANDING IS THAT OPENAI HAS CONSENTED TO PRODUCE IT TODAY. I JUST WANTED THAT REFLECTED ON THE RECORD.

**THE COURT:** OKAY. ALL RIGHT. SO REFLECTED.

WHAT'S NEXT?

**COURT REPORTER:** CAN YOU PLEASE STATE YOUR APPEARANCE, COUNSEL.

**MR. WILSON:** I WILL. BRADLEY WILSON FROM WACHTELL LIPTON.

MR. KRY IS CORRECT THAT WE HAVE AGREED TO PRODUCE THAT

DOCUMENT TODAY. AND WE ARE REVIEWING IT TO DETERMINE WHETHER THERE ARE ANY HIGHLY SENSITIVE MATERIALS THAT NEED TO BE REDACTED, AND WE WILL, OF COURSE, RAISE THAT ISSUE WITH MR. KRY AND PRESENT IT TO THE COURT IF THERE'S A DISPUTE.

**THE COURT:** ALL RIGHT. SO WHAT ELSE FOR TODAY?

**MR. KRY:** ONE LAST ISSUE, YOUR HONOR.

WHEN WE PLAY THE DEPOSITION VIDEOS, WOULD YOUR HONOR LIKE A WITNESS BINDER FOR THOSE?

**THE COURT:** I THINK IT WOULD BE HELPFUL BECAUSE -- YEAH, IT WOULD BE HELPFUL.

**MR. KRY:** WE'LL CERTAINLY DO THAT. THANK YOU.

**THE COURT:** OKAY. ARE THERE ISSUES FOR TODAY?

YOU HAD -- MS. EDDY, YOU HAD TWO LOGISTICAL ISSUES?

**MS. EDDY:** UM --

**THE COURT:** YOU SAID YOU HAD -- NO, I THINK YOU HAD TWO LOGISTICAL ISSUES.

**MS. PATEL:** I DID, YOUR HONOR. THANK YOU.

THE SECOND ONE WAS WITH REGARD TO CERTAIN DOCUMENTS THAT I THINK WE'RE ALL OKAY COMING IN, BUT THEY WOULD ONLY BE OFFERED AGAINST ONE PARTY AND NOT THE OTHER.

FOR EXAMPLE, INTERNAL OPENAI COMMUNICATIONS THAT DON'T INVOLVE ANY MICROSOFT PERSONNEL, WE'RE OKAY WITH THOSE COMING IN AGAINST OPENAI, BUT NOT AGAINST MICROSOFT.

AND I THINK THAT CAN BE RESOLVED WITH A LIMITING OBJECTION, BUT WE WANTED TO GET THE COURT'S GUIDANCE ON THAT.

08:15:58 **THE COURT:** THAT'S FINE. AND I THINK IT'S IMPORTANT THAT YOU -- YOU EITHER MAKE YOUR OBJECTION OR YOU-ALL -- IF YOU AGREE IN ADVANCE. SOMEONE JUST NEEDS TO LET ME KNOW TO GIVE THE LIMITING INSTRUCTION SO I CAN DO THAT.

08:16:16 **MR. KRY:** AND, YOUR HONOR, JUST SO WE CLARIFY, WE DON'T HAVE A CONCEPTUAL PROBLEM WITH THAT APPROACH, BUT I DO NOTE THAT SOME DOCUMENTS WILL COME IN FOR A NONHEARSAY PURPOSE AGAINST THE OTHER PARTY, AND SO I DO THINK WE SORT OF HAVE TO TAKE IT ON A DOCUMENT-BY-DOCUMENT BASIS.

08:16:32 **THE COURT:** WELL, IF THEY'RE COMING IN FOR A NONHEARSAY PURPOSE, AND IT'S -- IT'S AN ISSUE, THEN, AGAIN, YOU NEED TO LET ME KNOW SO THAT I CAN EXPLAIN THAT TO THE JURY. HAVING THE GENERIC INSTRUCTIONS AT THE END OF A THREE-WEEK TRIAL IS EFFECTIVELY USELESS. SO I HAVE TO BE ABLE TO GIVE IT TO THEM AT THE TIME THAT THE EVIDENCE IS COMING IN.

08:16:53 **MR. KRY:** THANK YOU, YOUR HONOR.

08:16:54 **THE COURT:** ALL RIGHT. LET'S SEE. YOU HAD -- ANY OTHER ISSUES?

08:17:06 **MS. EDDY:** YES, YOUR HONOR, WE HAVE THE ISSUE RESPECTING THE --

08:17:10 **THE COURT:** RIGHT, THE TWEETING. I'LL DO THAT LAST. WHAT ELSE? ANYTHING?

08:17:13 **MR. KRY:** YOU'VE COVERED EVERYTHING ON OUR LIST, YOUR HONOR. THANK YOU.

08:17:16 **THE COURT:** OKAY. AND I'VE GOT YOUR OBJECTIONS?

08:17:20 **MS. PATEL:** YES, YOUR HONOR.

08:17:21 **THE COURT:** OKAY. SO --

08:17:24 **MS. EDDY:** YOUR HONOR, THERE IS NO GAG ORDER IN PLACE IN THIS CASE. BOTH PARTIES HAVE SPOKEN PUBLICLY ABOUT THIS MATTER; BUT YESTERDAY, DURING THE COURSE OF JURY SELECTION, WHILE OUR CLIENTS WERE SITTING HERE, MR. MUSK WAS OUT INFLICTING A BARRAGE OF TWEETS. THEY FALL INTO TWO CATEGORIES: ONE IS ESSENTIALLY TWEETS MAKING HIS CASE IN THE PRESS WITH ALLEGATIONS THAT HE HAS BEEN PRECLUDED FROM MAKING IN THIS COURTROOM, AND THEN ALSO TWEETS RELATED TO A NUMBER OF INFLAMMATORY IRRELEVANT ISSUES ACCUSING OPENAI OF ALL SORTS OF MISCONDUCT.

08:18:09 THE CONCERN HERE IS THAT THIS -- GIVEN THE REACH OF MR. MUSK'S AUDIENCE, HE HAS 235 -- OR 239 MILLION FOLLOWERS, WE UNDERSTAND THERE'S BEEN SOME ALGORITHMIC BOOSTING OF THESE TWEETS, AND THAT IT IS EFFECTIVELY PAYING TO PROMOTE NASTY ARTICLES ABOUT OUR CLIENTS. AND I GUESS OUR FIRST REQUEST HERE IS THAT THE JURY BE REMINDED STRINGENTLY THAT -- THAT THEY SHOULD NOT BE LOOKING AT SOCIAL MEDIA.

08:18:48 AND WE WOULD ALSO JUST SEEK SOME RULES OF THE ROAD HERE, YOUR HONOR, WITH RESPECT TO THE PUBLIC STATEMENTS RESPECTING THE TRIAL DURING THE TRIAL.

08:19:02 **THE COURT:** WHAT ARE YOU ASKING FOR?

08:19:08 **MS. EDDY:** MY REQUEST --

08:19:09 **THE COURT:** AND THE FIRST ONE IS EASY, AND I WILL DO

THAT. ABSOLUTELY.

WITH RESPECT TO THE SECOND, WHAT ARE YOU ASKING ME TO DO?

**MS. EDDY:** WE'RE ASKING, YOUR HONOR, FOR SOME GUIDANCE ABOUT HOW TO APPROACH THIS, BECAUSE IF THESE KINDS OF ATTACKS ARE GOING TO CONTINUE IN THE PRESS, WE CAN'T SIT SILENT BY THEM.

ON THE OTHER HAND, IF THIS IS A SITUATION WHERE BOTH PARTIES CAN JUST STAND DOWN DURING THE COURSE OF THE LITIGATION, THEN WE WOULD BE VERY MUCH AMENABLE TO THAT.

**THE COURT:** MR. MUSK, I SEE YOU IN THE AUDIENCE. COULD YOU COME ON FORWARD, PLEASE.

COULD HE HAVE THE MIDDLE MIC, PLEASE.

**MS. PATEL:** ABSOLUTELY.

**THE COURT:** I'M JUST GOING TO ASK YOU DIRECTLY, SIR.

**MR. MUSK:** YES.

**THE COURT:** BECAUSE I KNOW THAT YOUR LAWYERS TAKE DIRECTION FROM ME.

DO YOU WANT THIS TO BE AN ISSUE? I DON'T WANT TO HAVE -- I NEVER HAD TO HAVE A GAG ORDER. I DON'T USE -- I DON'T USE SOCIAL MEDIA. I NEVER HAVE. IT'S NOT APPROPRIATE FOR JUDGES TO SIT THERE AND TWEET THINGS.

**MR. MUSK:** YES.

**THE COURT:** BUT I HAVE BEEN TOLD THAT THERE WERE LOTS OF TWEETS. SO I'M TRYING AS BEST I CAN --

**MR. MUSK:** YES.

**THE COURT:** -- TO GIVE YOU A FAIR TRIAL, TO GIVE MR. ALTMAN A FAIR TRIAL, OPENAI, EVERYBODY. AND IT REALLY DOESN'T HELP TO HAVE STUFF GOING ON OUTSIDE THE COURTROOM THAT JUST IS INFLAMMATORY. SO --

**MR. MUSK:** YES, I AGREE, YOUR HONOR.

**THE COURT:** SO HELP ME OUT HERE. HOW CAN WE GET THIS DONE WITHOUT YOU MAKING THINGS WORSE OUTSIDE OF THE COURTROOM?

**MR. MUSK:** YES. YES, I THINK IT'S IMPORTANT TO POINT OUT, WHICH THEY HAVE NOT MENTIONED, THAT OPENAI MADE A SERIES OF PUBLIC STATEMENTS ON THE X PLATFORM, AND ELSEWHERE.

I WAS RESPONDING TO THEIR COMMENTS. ONLY AFTER THEY POSTED VERY PUBLICLY ABOUT THIS CASE, ONLY THEN DID I RESPOND.

**THE COURT:** OKAY. SO WHY DON'T WE SAY THIS, CLEAN SLATE, BEGINNING TODAY. KEEP IT MINIMAL.

**MR. MUSK:** YES.

**THE COURT:** LET THE PROCESS WORK, JUST LET THE PROCESS WORK.

TRY TO CONTROL YOUR -- ALL OF YOU, TRY -- ALL OF YOU TRY TO CONTROL YOUR PROPENSITY TO USE SOCIAL MEDIA TO MAKE THINGS WORSE OUTSIDE THIS COURTROOM. LET'S LET THIS PLAY THROUGH.

**MR. MUSK:** YES, YOUR HONOR. ABSOLUTELY.

**THE COURT:** PERHAPS YOU HAVE NEVER DONE THAT BEFORE. PERHAPS LET'S SEE IF YOU COULD DO -- LIKE THIS WOULD BE A FIRST. WOULD YOU AGREE TO THAT?

**MR. MUSK:** YES, ABSOLUTELY, OF COURSE.

08:22:10 **THE COURT:** MR. ALTMAN, DO YOU AGREE TO THAT?
08:22:13 **MR. ALTMAN:** YES.
08:22:13 **THE COURT:** MR. BROCKMAN, DO YOU AGREE?
08:22:15 **MR. BROCKMAN:** YES.
08:22:16 **THE COURT:** I SEE A THUMBS UP.
08:22:17 LET'S JUST TRY IT, GENTLEMEN. LET'S JUST TRY IT, AND SEE
08:22:21 IF WE CAN MAKE THIS WORK.
08:22:22 **MR. MUSK:** ABSOLUTELY.
08:22:23 **THE COURT:** ALL RIGHT. HAVE A SEAT. THANK YOU.
08:22:33 OKAY. YES. SO WE WILL HAVE VIDEO ACCESS IN THE OVERFLOW
08:22:47 COURTROOM ONLY ON THE LAWYER AND THE WITNESS WHO IS ANSWERING
08:22:51 THE QUESTIONS. THEY WON'T HAVE IT -- YOU WON'T HAVE THE VIDEO
08:22:55 FOR THE OPENINGS BECAUSE THERE'S NO -- THERE'S NO CAMERA THERE.
08:22:59 **THE CLERK:** YES, YOUR HONOR.
08:23:02 **THE COURT:** ALL RIGHT. DO WE HAVE ALL OF OUR JURORS?
08:23:08 OKAY. ARE YOU-ALL READY TO GET STARTED A COUPLE MINUTES EARLY?
08:23:13 **MR. MOLO:** YEAH. MAYBE COULD WE TAKE A TWO-MINUTE
08:23:15 BREAK?
08:23:16 **THE COURT:** ALL RIGHT. WE'LL TAKE A TWO-MINUTE
08:23:18 BREAK.
08:23:18 AND I'M ASSUMING THAT THE THREE OF YOU WILL BE DOING THE
08:23:22 OPENINGS?
08:23:22 **MR. COHEN:** YES, YOUR HONOR.
08:23:24 **MR. SAVITT:** YES, YOUR HONOR.
08:23:24 **MR. MOLO:** YES, YOUR HONOR.

08:23:25 **THE COURT:** OKAY. ALL RIGHT. WE'LL STAND IN RECESS FOR A COUPLE MINUTES AND GET STARTED. I WILL STAY HERE. SO YOU MAY BE SEATED.

08:23:32 **THE CLERK:** COURT IS IN RECESS.

08:23:34 (RECESS FROM 8:23 A.M. UNTIL 8:36 A.M.)

08:36:18 (JURY IN AT 8:36 A.M.)

08:36:18 **THE COURT:** YOU'RE IN TWO ROWS. GO AHEAD AND HAVE A SEAT. HAVE A SEAT. AND YOU'RE GOING TO MOVE DOWN.

08:36:24 EVERYONE ELSE CAN BE SEATED.

08:36:35 OKAY. GOOD MORNING.

08:36:37 **JURORS:** GOOD MORNING.

08:36:37 **THE COURT:** GOOD MORNING. GOOD MORNING. WELCOME BACK. OKAY. IT'S A LITTLE BIT BUSY OUT THERE. ALL RIGHT. YEAH.

08:36:50 IS THAT WORKING FOR YOU? CAN YOU HEAR? GREAT.

08:36:56 I -- NOT THAT LONG AGO, I KEPT SAYING "WHAT?" AND MY DAUGHTER WAS GETTING UPSET WITH ME. SO I WENT TO -- YOU KNOW, I CALLED MY DOCTOR AND I SAID, LET ME GO AND GET A BASELINE, YOU KNOW, TO CHECK MY HEARING.

08:37:12 SO I GO IN. I GET THE BASELINE, AND THE DOCTOR SAYS "YEAH, YOU QUALIFY FOR HEARING AIDS." SO I WAS ACTUALLY NOT HEARING. I SIT IN COURT ALL DAY, I CAN'T HEAR, AND I SAY TURN UP THE MICS. ANYHOW. SO HOPEFULLY THAT WORKS. IF THEY HAVE ANY PROBLEMS, JUST LET US KNOW.

08:37:32 SO AS I WAS DRIVING TOWARDS THE BUILDING TODAY, I NOTICED

THERE WAS A LOT GOING ON ON THAT FRONT PATIO. I HAVE ONE OF OUR COURT OFFICERS --

COME ON FORWARD JUST SO THAT THEY CAN SEE YOU.

WHEN YOU GET TO THE COURTHOUSE, IF YOU SEE SOMEONE IN ONE OF THOSE JACKETS, OR ONE OF THE U.S. MARSHALS, AND YOU'RE AT ALL NERVOUS OR ANYTHING, JUST GO UP TO THEM AND SAY, "I'M A JUROR," AND THEY'LL WALK YOU STRAIGHT TO THE FRONT OF THE LINE, NO PROBLEMS.

NO ONE WANTS TO MAKE YOU NERVOUS, IT'S JUST THAT THERE'S A LOT OF PRESS, AND THEY DON'T KNOW WHO IS WHO.

I HAVE ORDERED THAT THEY STAY AWAY FROM YOU, BUT IT'S -- LIKE I SAID, NO ONE -- NO ONE REALLY WANTS TO MAKE YOU NERVOUS. SO LET'S TRY THAT. IF YOU HAVE ANY PROBLEMS, JUST GO UP TO ONE OF THOSE VERY FRIENDLY COURT SECURITY OFFICERS AND SAY, "I'M A JUROR," AND THEY WILL WALK YOU STRAIGHT TO THE FRONT. OKAY?

AND IF YOU HAVE ANY ISSUES, ANY ISSUES WHATSOEVER, PLEASE LET MR. CUENCO KNOW SO THAT I CAN MAKE SURE THAT YOU ARE FEELING OKAY. ALL RIGHT?

OKAY. SO WE WILL HAVE OPENING STATEMENTS THIS MORNING, BUT, FIRST, I'M GOING TO GIVE YOU SOME INSTRUCTIONS. I WILL GIVE THESE INSTRUCTIONS TO YOU AT THE END OF THE CASE, TOO. THERE'S NO NEED TO TAKE NOTES, BUT IT'S JUST TO GIVE YOU KIND OF AN OVERVIEW OF HOW YOU SHOULD THINK ABOUT A CASE AND TO BE A JUROR; RIGHT?

SO NOW THAT YOU ARE THE JURY IN THIS CASE, IT IS MY DUTY

TO INSTRUCT YOU ON THE LAW. IT IS YOUR DUTY TO FIND THE FACTS FROM THE EVIDENCE IN THIS CASE. AND TO THOSE FACTS, YOU WILL APPLY THE LAW AS I GIVE IT TO YOU. YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU, WHETHER YOU AGREE WITH IT OR NOT.

AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES, OR DISLIKES, OPINIONS, OR PREJUDICES, OR SYMPATHY. THAT MEANS THAT YOU MUST DECIDE THIS CASE SOLELY ON THE EVIDENCE PRESENTED TO YOU.

YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

AT THE END OF THE TRIAL, I WILL GIVE YOU THE FINAL INSTRUCTIONS. AND IT IS THOSE FINAL INSTRUCTIONS THAT WILL GOVERN YOUR DUTIES.

FOR THOSE INSTRUCTIONS, I ACTUALLY GIVE YOU A WRITTEN COPY OF THE INSTRUCTIONS SO THAT YOU DON'T HAVE TO MEMORIZE THEM OR ANYTHING.

PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING THAT I MAY SAY OR DO, THAT I MAY HAVE AN OPINION REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

PLAINTIFF ELON MUSK CLAIMS THAT HE PROVIDED HIS MONEY, REPUTATION, GUIDANCE, AND OTHER RESOURCES TO ENABLE OPENAI TO DEVELOP ARTIFICIAL INTELLIGENCE TECHNOLOGY ON A NONPROFIT BASIS FOR THE PUBLIC GOOD.

PLAINTIFF CLAIMS THAT SAM ALTMAN, GREG BROCKMAN, AND OPENAI BROKE THEIR PROMISES TO USE HIS CONTRIBUTIONS AND RESOURCES TO MAINTAIN OPENAI AS A NONPROFIT, AND INSTEAD,

OPERATED OPENAI AS A FOR-PROFIT VENTURE.

PLAINTIFF CONTENDS THAT THESE ACTIONS CONSTITUTED A BREACH OF CHARITABLE TRUST AND UNJUST ENRICHMENT.

PLAINTIFF ALLEGES THESE CLAIMS AGAINST MISTERS ALTMAN AND BROCKMAN AND OPENAI, NOW KNOWN -- WELL, OPENAI, INC., WHICH IS NOW KNOWN AS THE OPENAI FOUNDATION. AND I WILL SOMETIMES REFER TO THOSE DEFENDANTS TOGETHER AS THE OPENAI DEFENDANTS.

IN ADDITION, PLAINTIFF CONTENDS THAT MICROSOFT AIDED AND ABETTED OPENAI'S WRONGFUL CONDUCT BY KNOWINGLY PROVIDING SUBSTANTIAL ASSISTANCE TO ALTMAN, BROCKMAN, AND OPENAI'S BREACH OF CHARITABLE TRUST.

ALL OF THE DEFENDANTS DENY THESE CLAIMS.

THE OPENAI DEFENDANTS CONTEND THAT THEY MADE NO FALSE PROMISES TO MUSK; THAT MUSK'S CONTRIBUTIONS TO OPENAI DID NOT CARRY THE RESTRICTIONS THAT HE CLAIMS; AND THAT OPENAI HAS ALWAYS BEEN AND REMAINS, TO THIS DAY, A NONPROFIT ORGANIZATION.

MICROSOFT CONTENDS THAT IT DID NOT KNOW THAT MUSK MADE DONATIONS FOR SPECIFIC CHARITABLE PURPOSES, OR THAT OPENAI, MISTERS ALTMAN OR BROCKMAN, COMMITTED A BREACH OF CHARITABLE TRUST.

MICROSOFT ALSO CONTENDS THAT IT DID NOT INTEND TO ASSIST ANY BREACH OF CHARITABLE TRUST; THAT IT DID NOT GIVE SUBSTANTIAL ASSISTANCE TO OPENAI, ALTMAN AND BROCKMAN, IN BREACHING A CHARITABLE TRUST, AND THAT ITS ACTIONS WERE NOT A SUBSTANTIAL FACTOR IN CAUSING HARM TO MR. MUSK.

08:42:36 THE DEFENDANTS ALSO ASSERT AFFIRMATIVE DEFENSES, NAMELY, THAT EACH OF PLAINTIFFS' CLAIMS IS BARRED BY THE STATUTE OF LIMITATIONS; THAT PLAINTIFF UNREASONABLY DELAYED IN BRINGING HIS LAWSUIT; AND THAT MUSK'S OWN CONDUCT BARS HIS CLAIMS.

08:42:56 THE DEFENDANTS GENERALLY HAVE THE BURDEN OF PROOF ON THESE AFFIRMATIVE DEFENSES, BUT MUSK HAS THE BURDEN OF PROOF ON A PORTION OF THE STATUTE OF LIMITATIONS DEFENSE, AND I WILL GIVE YOU THAT INSTRUCTION LATER.

08:43:07 WHEN A PARTY HAS A BURDEN OF PROOF, AND IT'S A CLAIM THAT IS GOVERNED BY THE PREPONDERANCE OF THE EVIDENCE, THAT MEANS THAT YOU MUST BE PERSUADED THAT -- BY THE EVIDENCE, THAT THE CLAIM IS MORE PROBABLY TRUE THAN NOT.

08:43:27 WHEN A PARTY HAS THE BURDEN OF PROVING ANY CLAIM OR DEFENSE BY WHAT WE CALL CLEAR AND CONVINCING EVIDENCE, IT MEANS THAT THE PARTY MUST PRESENT EVIDENCE THAT LEAVES YOU WITH A FIRM BELIEF OR CONVICTION THAT IT IS HIGHLY PROBABLE THAT THE FACTUAL CONTENTIONS OF THE CLAIM OR DEFENSE ARE TRUE.

08:43:49 THIS IS A HIGHER STANDARD OF PROOF THAN A PREPONDERANCE OF THE EVIDENCE, BUT IT DOES NOT REQUIRE PROOF BEYOND A REASONABLE DOUBT. THAT'S IN CRIMINAL CASES. THIS IS A CIVIL CASE, NOT A CRIMINAL CASE.

08:44:05 YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE REGARDLESS OF WHICH PARTY PRESENTED IT.

08:44:14 SO WHAT IS EVIDENCE?

08:44:16 WELL, EVIDENCE THAT YOU CAN CONSIDER IN DECIDING WHAT THE

FACTS ARE CONSISTS OF THE SWORN TESTIMONY OF ANY WITNESS. BEYOND THAT WITNESS STAND, RIGHT? THAT'S WHY YOU HAVE THE BEST SEAT IN THE HOUSE. THAT'S EVIDENCE.

ANY EXHIBITS THAT ARE ADMITTED INTO EVIDENCE. ANYTHING THAT I ADMIT INTO EVIDENCE WILL BE SENT WITH YOU TO THE JURY ROOM. THAT'S EVIDENCE.

ANY FACTS TO WHICH THE PARTIES HAVE AGREED. SOMETIMES THEY'LL TELL YOU EXACTLY WHAT THEY ALREADY AGREED. SO THAT'S EVIDENCE.

AND FOR ANY FACTS THAT I INSTRUCT YOU TO JUST ACCEPT AS HAVING BEEN PROVED. SOMETIMES WE DO THAT TO SHORTEN THE TRIAL.

IN REACHING YOUR VERDICT, THAT IS WHAT YOU MAY CONSIDER.

CERTAIN THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE FACTS ARE, AND I'LL LIST THEM FOR YOU:

1. ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE. THE LAWYERS ARE NOT WITNESSES. WHAT THEY MAY SAY IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS, OR AT OTHER TIMES, THAT'S THERE TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.

IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS HAVE STATED THEM, IT IS YOUR MEMORY THAT CONTROLS, NOT A LAWYER'S.

2. QUESTIONS AND OBJECTIONS BY THE LAWYERS ARE NOT EVIDENCE. ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT

WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE, AND YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY THE COURT'S RULING ON IT.

3. TESTIMONY THAT IS STRICKEN OR EXCLUDED OR THAT YOU ARE INSTRUCTED TO DISREGARD IS NOT EVIDENCE AND MUST NOT BE CONSIDERED.

IN ADDITION, SOME EVIDENCE MAY BE RECEIVED ONLY FOR A LIMITED PURPOSE. AND WHEN THAT HAPPENS, I'LL INSTRUCT YOU AT THAT TIME WHAT THE LIMITED PURPOSE IS.

YOU CAN ONLY CONSIDER THAT EVIDENCE FOR THAT LIMITED PURPOSE, AND YOU MUST DO SO AND MAY NOT CONSIDER THE EVIDENCE FOR ANY OTHER PURPOSE.

HERE'S THE OTHER IMPORTANT ONE. ANYTHING YOU MAY SEE OR HEAR WHEN WE ARE NOT IN SESSION IS NOT EVIDENCE. THE ONLY EVIDENCE IS WHAT WE ALL SEE TOGETHER IN THIS COURTROOM. THAT'S THE EVIDENCE.

YOU ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED.

NOW, EVIDENCE CAN BE WHAT WE CALL DIRECT OR CIRCUMSTANTIAL. DIRECT EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS REGARDING WHAT THAT WITNESS PERSONALLY SAW, HEARD, OR DID.

CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM WHICH YOU MIGHT FIND ANOTHER FACT. AND YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE. THE LAW MAKES NO DISTINCTION BETWEEN

THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE. AND IT IS FOR THE JURY TO DECIDE HOW MUCH WEIGHT TO GIVE ANY EVIDENCE.

WELL, LET ME GIVE YOU AN EXAMPLE OF WHAT I MEAN BY THAT CIRCUMSTANTIAL EVIDENCE, BECAUSE IT'S A LITTLE BIT HARD, I THINK, THEORETICALLY.

IF YOU WAKE UP IN THE MORNING AND YOU SEE THAT YOUR SIDEWALK IS WET, YOU MIGHT FIND FROM THAT FACT THAT YOU SAW THE SIDEWALK WAS WET, THAT IT RAINED DURING THE NIGHT. ALL RIGHT. YOU DIDN'T SEE THE RAIN, BUT YOU SAW YOUR SIDEWALK WAS WET. SO YOU MIGHT FIND THAT IT RAINED THE PRIOR NIGHT.

HOWEVER, THERE COULD BE OTHER EVIDENCE, SUCH AS A TURNED ON GARDEN HOSE. THAT MIGHT PROVIDE A DIFFERENT EXPLANATION FOR WHY YOU SAW THAT THE SIDEWALK WAS WET. THEREFORE, BEFORE YOU DECIDE ANY FACT HAS BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE EVIDENCE IN LIGHT OF REASON AND EXPERIENCE AND COMMON SENSE.

THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT EVIDENCE IS RECEIVED INTO EVIDENCE, AND WHEN A LAWYER ASKS A QUESTION OR OFFERS AN EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER SIDE THINKS IT IS NOT PERMITTED BY THE RULES, THE LAWYER MAY OBJECT. IF I OVERRULE THE OBJECTION, THE QUESTION CAN BE ANSWERED, THE EXHIBIT RECEIVED.

IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE ANSWERED, AND THE EXHIBIT NOT RECEIVED.

08:49:09 WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST
08:49:14 IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT
08:49:17 HAVE BEEN.
08:49:18 SOMETIMES I MAY EVEN ORDER THAT EVIDENCE BE STRICKEN FROM
08:49:21 THE RECORD, AND THAT YOU DISREGARD IT. AND THAT MEANS WHEN
08:49:25 YOU'RE DECIDING THE CASE, YOU MUST NOT CONSIDER THAT EVIDENCE.
08:49:28 SOMETIMES WHEN I'M TAKING MY OWN NOTES, I JUST STRIKE
08:49:32 RIGHT THROUGH IT, SO IT REMINDS ME NOT TO CONSIDER THAT
08:49:35 EVIDENCE.
08:49:36 IMPORTANTLY IN THIS CASE, YOU MAY HAVE TO DECIDE WHAT
08:49:43 TESTIMONY TO BELIEVE AND WHAT TESTIMONY NOT TO BELIEVE. JURORS
08:49:49 MAY BELIEVE EVERYTHING A WITNESS SAYS OR JUST PART OF IT, OR
08:49:57 NONE OF IT. IT IS YOUR DECISION.
08:50:01 SO WHAT SHOULD YOU CONSIDER IN CONSIDERING THE TESTIMONY
08:50:05 OF WITNESSES? YOU MAY TAKE INTO ACCOUNT THE FOLLOWING FACTORS:
08:50:10 1. THE OPPORTUNITY AND ABILITY OF A WITNESS TO SEE, HEAR,
08:50:15 OR TO KNOW THE THINGS THAT THEY ARE TESTIFYING TO.
08:50:22 2. THE WITNESS'S MEMORY.
08:50:24 3. THE WITNESS'S MANNER WHILE THEY ARE TESTIFYING.
08:50:27 4. THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF
08:50:35 ANY.
08:50:36 5. THE WITNESS'S BIAS OR PREJUDICE.
08:50:39 6. WHETHER OTHER EVIDENCE CONTRADICTS THE WITNESS'S
08:50:44 TESTIMONY.
08:50:45 7. THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

OF ALL OF THE OTHER EVIDENCE.

AND 8. ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT CONSISTENT WITH SOMETHING ELSE THAT HE OR SHE SAID. SOMETIMES DIFFERENT WITNESSES MAY GIVE DIFFERENT VERSIONS OF WHAT HAPPENED.

PEOPLE OFTEN SAY THINGS OR MAKE MISTAKES IN WHAT THEY REMEMBER.

ALSO, TWO PEOPLE MAY SEE THE EXACT SAME EVENT, AND YET, REMEMBER IT DIFFERENTLY.

YOU MAY CONSIDER THESE DIFFERENCES, BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER TESTIMONY.

HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY TESTIFIED UNTRUTHFULLY ABOUT SOMETHING THAT IS IMPORTANT, YOU MAY CHOOSE NOT TO BELIEVE ANYTHING THAT THAT WITNESS SAYS.

ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND IGNORE THE REST.

THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY. WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE, AND HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

KEEP AN OPEN MIND THROUGHOUT THE TRIAL. DO NOT DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW JURORS

HAVE DELIBERATED AT THE END OF THE CASE.

BECAUSE YOU MUST DECIDE THIS CASE ONLY ON THE EVIDENCE RECEIVED AND MY INSTRUCTIONS ON THE LAW THAT APPLIES, I'LL REMIND YOU, YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE CASE OR THE ISSUES INVOLVED IN IT DURING THE COURSE OF YOUR JURY DUTY.

I WILL TOWARDS -- AT THE END OF THE DAY I'M GOING TO READ YOU THAT LONG INSTRUCTION THAT I GAVE YOU YESTERDAY. WE'RE GOING TO PASS ON THAT FOR NOW SO THAT WE CAN GET TO OPENING STATEMENTS.

BUT I'M GOING TO REMIND YOU A NUMBER OF TIMES, UNTIL I'M SURE IT'S SEARED IN YOUR BRAINS, NOT TO GET ANY INFORMATION OUTSIDE OF THIS COURTROOM.

I URGE YOU TO PAY CLOSE ATTENTION TO THE TRIAL TESTIMONY AS IT'S GIVEN. BECAUSE AS I MENTIONED YESTERDAY, DURING YOUR DELIBERATIONS, YOU WILL NOT HAVE A TRANSCRIPT OF THE TRIAL TESTIMONY.

I ALSO MENTIONED YOU'LL GET PICTURES OF THE WITNESSES, AND SO MAKE NOTES ABOUT WHETHER OR NOT, YOU KNOW, YOUR THOUGHTS ABOUT THEM AS YOU GO ALONG.

I'M SURE YOU DON'T REMEMBER WHAT I SAID AT THE BEGINNING OF THE DAY YESTERDAY, MAYBE YOU REMEMBER SOME THINGS, BUT YOU AREN'T GOING TO DELIBERATE FOR A FEW WEEKS HERE, SO YOU DO HAVE TO HAVE SOME THINGS TO REMIND YOU.

IF YOU WISH, TAKE NOTES TO HELP YOU REMEMBER THE EVIDENCE.

IF YOU TAKE NOTES, KEEP THEM TO YOURSELF UNTIL YOU GO TO THE JURY ROOM TO DECIDE THE CASE. DO NOT LET NOTE-TAKING DISTRACT YOU. WHEN YOU LEAVE, YOU MUST LEAVE YOUR NOTES IN THE JURY ROOM. NO ONE WILL READ YOUR NOTES. AND WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD ALWAYS RELY ON YOUR OWN MEMORY OF THE EVIDENCE. THE NOTES ARE THERE TO ASSIST YOU WITH YOUR OWN MEMORY. YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF OTHER JURORS.

NOW, IN YOUR NOTEBOOKS THAT I'VE GIVEN TO YOU, I DO ALLOW, IN CIVIL CASES ONLY, JURORS TO ASK QUESTIONS IF THEY WOULD LIKE. SO RIGHT IN THE POCKET THERE SHOULD BE A FORM, AND YOU CAN SUBMIT A FORM AND PROPOSE QUESTIONS IN ORDER TO CLARIFY TESTIMONY, BUT YOU ARE NOT TO EXPRESS ANY OPINION YOU HAVE ABOUT THE TESTIMONY, AND YOU'RE NOT TO ARGUE WITH ANY WITNESS IN PROPOSING ANY QUESTIONS.

REMEMBER, IF YOU PROPOSE QUESTIONS, IT IS YOUR ROLE TO BE A NEUTRAL FACT FINDER, NOT AN ADVOCATE. ULTIMATELY I WILL DECIDE WHETHER OR NOT TO ALLOW ANY QUESTIONS TO BE ASKED.

SO THAT IS AN OPTION. YOU DON'T HAVE TO DO IT, BUT IT IS AN OPTION.

I WILL REVIEW ANY QUESTIONS WITH THE LAWYERS TO DETERMINE IF THEY'RE LEGALLY PROPER. SOMETIMES PROPOSED QUESTIONS I DO NOT PERMIT. SOMETIMES I'LL CHANGE THE WORDING TO MAKE IT APPROPRIATE. THIS MIGHT HAPPEN EITHER DUE TO THE RULES OF EVIDENCE OR OTHER LEGAL QUESTIONS, AND SOMETIMES THE QUESTION

08:55:43 IS EXPECTED TO BE ANSWERED LATER IN THE TRIAL.

08:55:46 IF I DO NOT ASK THE PROPOSED QUESTION, OR IF I REPHRASE IT, DO NOT SPECULATE AS TO MY REASONS. DO NOT GIVE UNDUE WEIGHT TO ANY QUESTIONS THAT YOU OR YOUR FELLOW JURORS PROPOSE. YOU SHOULD EVALUATE THE ANSWERS TO THESE QUESTIONS IN THE SAME MANNER AS YOU EVALUATE ALL THE OTHER EVIDENCE.

08:56:08 AGAIN, BY GIVING YOU AN OPPORTUNITY TO PROPOSE QUESTIONS, I'M NOT REQUESTING OR SUGGESTING THAT YOU DO SO. IT WILL OFTEN BE THE CASE THAT A LAWYER HAS NOT ASKED A QUESTION BECAUSE IT'S LEGALLY OBJECTIONABLE, OR BECAUSE, AS I NOTED, IT MIGHT BE ADDRESSED LATER.

08:56:24 FROM TIME TO TIME, BUT VERY RARELY, IT MAY BECOME NECESSARY FOR ME TO TALK TO THE LAWYERS OUT OF THE HEARING OF YOUR PRESENCE. SO I MIGHT HAVE A QUICK CONFERENCE AT THE SIDEBAR HERE, OR I MIGHT HAVE TO CALL A RECESS. BUT I WORK WITH THE LAWYERS BEFORE YOU GET HERE AND AFTER YOU LEAVE TO KEEP ALL OF THAT TO A BARE MINIMUM.

08:56:45 PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE WORKING. THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP RELEVANT INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN EVIDENCE SHOULD BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID ANY CONFUSION AND ERROR.

08:57:01 PLEASE DO NOT CONSIDER MY GRANTING OR DENYING ANY REQUEST FOR A CONFERENCE AS AN INDICATION OF MY OPINION OF THE CASE OR WHAT YOUR VERDICT SHOULD BE.

NOW, TRIALS PROCEED IN THE FOLLOWING MANNER:

FIRST, EACH SIDE IS GOING TO MAKE AN OPENING STATEMENT.

AN OPENING STATEMENT IS NOT EVIDENCE. IT IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND WHAT THAT PARTY EXPECTS THE EVIDENCE WILL SHOW.

I LIKE TO THINK ABOUT IT THIS WAY -- I DON'T KNOW IF YOU LIKE JIGSAW PUZZLES, BUT I DO. THINK ABOUT A JIGSAW PUZZLE AS THE EVIDENCE, LITTLE BITS AND PIECES IN A BOX. AND YOU THROW ALL THE PIECES OUT ON YOUR TABLE, HOWEVER YOU DO IT, THERE'S A LOT OF DIFFERENT WAYS, BUT AN OPENING STATEMENT IS THAT THE LAWYERS ARE GOING TO TELL YOU WHAT THE COVER OF THE BOX LOOKS LIKE, FROM THEIR PERSPECTIVE.

SO THE TRIAL, THEN, IS WHEN WE GET ALL OF THE EVIDENCE, ALL THOSE PIECES OF THE PUZZLE.

THE PLAINTIFF WILL PRESENT THEIR EVIDENCE, COUNSEL FOR THE DEFENDANT MAY CROSS-EXAMINE. AND THEN THE DEFENDANT WILL PRESENT THEIR EVIDENCE, AND THE PLAINTIFFS' COUNSEL WILL CROSS-EXAMINE THAT.

AFTER THE EVIDENCE IS PRESENTED, I'LL INSTRUCT YOU ON THE LAW THAT APPLIES TO THE CASE, AND THE LAWYERS WILL MAKE THEIR CLOSING ARGUMENTS. AND THEY, AGAIN, WILL TELL YOU TO LOOK AT THAT EVIDENCE, AND THEY'RE GOING TO TELL YOU WHAT THAT PUZZLE BOX LOOKS LIKE. THAT'S THEIR ARGUMENT.

BUT, ULTIMATELY, IT IS THE JURY THAT TAKES ALL OF THOSE PIECES OF THE PUZZLE, AND YOU GO BACK INTO THE JURY ROOM, AND

08:58:42 YOU PUT IT TOGETHER IN A WAY THAT YOU BELIEVE IS THE MOST ACCURATE COLLECTIVELY. OKAY?

08:58:50 SO, AGAIN, I'LL HAVE MORE INSTRUCTIONS FOR YOU AS WE GO THROUGH THE CASE.

08:58:56 AT THIS TIME, I'M GOING TO INVITE THE LAWYERS TO GIVE THOSE OPENING STATEMENTS. I'LL REMIND YOU THEY'RE NOT EVIDENCE. AND THEN WE'LL GET STARTED. OKAY.

08:59:05 MR. MOLO, I BELIEVE YOU ARE FIRST, SIR.

08:59:10 **MR. MOLO:** THANK YOU, YOUR HONOR.

08:59:11 **(COUNSEL FOR PLAINTIFFS GAVE THEIR OPENING STATEMENT.)**

08:59:11 **MR. MOLO:** GOOD MORNING.

08:59:13 **JURORS:** GOOD MORNING.

08:59:14 **MR. MOLO:** FOR THE BENEFIT --

08:59:14 **THE COURT:** WE CAN'T HEAR YOU.

08:59:14 **MR. MOLO:** -- AS A WHOLE --

08:59:16 **THE COURT:** WE CANNOT HEAR YOU.

08:59:17 **MR. MOLO:** I'M SORRY?

08:59:18 **THE COURT:** HOLD ON. WE CAN'T HEAR YOU.

08:59:20 **MR. MOLO:** OKAY.

08:59:21 **THE COURT:** MAY I HAVE THAT MIC.

08:59:40 (PAUSE IN PROCEEDINGS.)

08:59:41 **MR. MOLO:** THERE WE GO. SORRY ABOUT THAT.

08:59:43 **THE COURT:** NO WORRIES. YOU MAY PROCEED.

08:59:45 **MR. MOLO:** GOOD MORNING, AGAIN.

08:59:47 **JURORS:** GOOD MORNING.

**MR. MOLO:** FOR THE BENEFIT OF MANKIND AS A WHOLE, UNCONSTRAINED BY THE NEED TO GENERATE A FINANCIAL RETURN. MANKIND AS A WHOLE, THE BENEFIT OF MANKIND AS A WHOLE. NOT THE BENEFIT OF SAM ALTMAN, NOT THE BENEFIT OF GREG BROCKMAN, AND NOT FOR THE BENEFIT OF MICROSOFT.

LADIES AND GENTLEMEN, WE'RE HERE TODAY BECAUSE THE DEFENDANTS IN THIS CASE STOLE A CHARITY, AND WE'RE GOING TO ASK YOU TO HOLD THEM ACCOUNTABLE.

IT'S NOT JUST ANY CHARITY, IT'S A CHARITY WHOSE MISSION WAS THE SAFE, OPEN DEVELOPMENT OF ARTIFICIAL INTELLIGENCE, WHICH IS A VERY, VERY POWERFUL TECHNOLOGY. ARTIFICIAL INTELLIGENCE HOLDS A GREAT DEAL OF PROMISE, BUT IT ALSO HOLDS A GREAT DEAL OF RISK.

AND YOU WILL HEAR THE EVIDENCE WE WILL BE SHOWING THROUGHOUT THIS TRIAL, AND YOU'LL HEAR ABOUT HOW ALL OF THIS UNFOLDED. NOW, AS YOU ALL SEE, I REPRESENT ELON MUSK. MR. MUSK IS IN COURT TODAY.

YOU CAN STAND UP, MR. MUSK.

YOU DIDN'T GET A CHANCE TO MEET HIM YESTERDAY, BUT HE'S HERE TODAY. WE TALKED ABOUT THIS A LOT YESTERDAY. EVERYBODY SEEMS TO KNOW MR. MUSK, AND EVERYBODY HAS AN OPINION ABOUT MR. MUSK. NOT EVERYBODY'S OPINION IS GOOD, BUT NOT EVERYBODY'S OPINION IS BAD. BUT YOU-ALL TOOK AN OATH TO PUT YOUR OPINIONS AND YOUR PERSONAL FEELINGS ASIDE AND TO DECIDE THIS CASE UPON THE LAW AND THE EVIDENCE THAT'S PRESENTED TO YOU. AND I KNOW

THAT YOU WILL HONOR THAT OATH, MR. MUSK KNOWS THAT YOU'LL HONOR THAT OATH, AND WE THANK YOU FOR THAT.

NOW, THE CASE ISN'T ABOUT ELON MUSK, IT'S ABOUT THE DEFENDANTS. IT'S ABOUT SAM ALTMAN AND GREG BROCKMAN, WHO HELPED MR. MUSK FOUND A NONPROFIT CHARITY CALLED OPENAI. AND IN THE COURSE OF DOING THAT, THEY ENRICHED THEMSELVES AND MADE THEMSELVES MORE POWERFUL, AND THEY BREACHED THE VERY BASIC PRINCIPLES UPON WHICH THE CHARITY IS FOUNDED.

NOW, I SAID THE CASE WASN'T ABOUT ELON, BUT I THINK IT'S USEFUL TO KNOW A BIT ABOUT HIM AS YOU UNDERSTAND THE ISSUES IN THIS CASE AND HOW THINGS WENT FORWARD.

SO YOU WILL HEAR THE WHOLE STORY, AND IT WILL START WITH ELON TODAY. HIS OWN PERSONAL STORY IS PRETTY COMPELLING. IT RELATES TO WHAT HAPPENED AT OPENAI. HE GREW UP IN SOUTH AFRICA. HE IMMIGRATED TO CANADA AS A YOUNG MAN. HE GOT THERE, AND HE WORKED SOME ODD JOBS. EVENTUALLY HE WENT TO THE UNIVERSITY OF CANADA FOR TWO YEARS, AND THEN HE TRANSFERRED TO THE UNIVERSITY OF PENNSYLVANIA HERE IN THE STATES, AND HE STUDIED ECONOMICS, AND HE STUDIED PHYSICS.

AND WHEN HE GRADUATED, HE HAD AN OPPORTUNITY TO GO TO STANFORD HERE FOR GRADUATE SCHOOL, A PH.D. PROGRAM THERE, BUT HE TURNED IT DOWN TO COME HERE TO THE BAY AREA TO START A BUSINESS. HE AND HIS BROTHER STARTED A TECH BUSINESS THAT BASICALLY CREATED CITY GUIDES ONLINE. AFTER A FEW YEARS, THEY SOLD THAT FOR $300 MILLION.

ELON TOOK THE PROCEEDS FROM THAT, AND HE INVESTED IN ANOTHER BUSINESS THAT WAS AN ONLINE PAYMENTS BUSINESS, AND THAT BUSINESS BECAME PAYPAL. AND THAT WAS SOLD FOR ONE AND A HALF BILLION DOLLARS.

AND FROM THERE, HE WENT ON TO FOUND A STREAM OF COMPANIES THAT HAVE BEEN TREMENDOUSLY SUCCESSFUL.

HE FOUNDED, FIRST, SPACEX. SPACEX HAS A MISSION TO REVOLUTIONIZE SPACE TECHNOLOGY, REDUCE SPACE TRANSPORTATION COSTS, AND MAKE LIFE INTERPLANETARY.

YOU MIGHT BE FAMILIAR WITH THE INTERNET SERVICE STARLINK, THAT'S A SPACEX PRODUCT.

TESLA HAS A MISSION OF BUILDING A WORLD OF AMAZING -- A WORLD OF AMAZING ABUNDANCE -- ABUNDANCE OF PEOPLE, BY ACCELERATING THE WORLD'S TRANSITION TO SUSTAINABLE ENERGY.

NEURALINK IS AN AMAZING COMPANY WHOSE MISSION IS TO ENHANCE THE WAY THE HUMAN BRAIN WORKS AND TO HELP PEOPLE WITH PARALYSIS AND A VARIETY OF DISORDERS TO AID IN THE CONTROL THEIR BODIES.

AND THE BORING COMPANY, WHOSE MISSION IS TO SOLVE TRAFFIC AND RAPID TRANSPORTATION AND TRANSFORM CITIES BY CREATING SAFE, FAST-TO-DIG, AND LOW-COST URBAN TUNNELS.

IT'S AN AMAZING STORY. HE'S, IN FACT, A LEGEND. LIKE HIM OR DISLIKE HIM, YOU CANNOT DISPUTE THE FACT THAT HE'S A LEGEND IN THE TECH WORLD.

NOW, SOMETHING CONCERNED ELON EVER SINCE HE WAS A YOUNG

09:05:23 MAN IN COLLEGE, AND THAT IS ARTIFICIAL INTELLIGENCE.

09:05:30 HE'S BEEN CONCERNED ABOUT WHAT HAPPENS WHEN YOU REACH THE 09:05:33 POINT WHERE COMPUTERS ARE SMARTER THAN PEOPLE. AND THERE ARE 09:05:39 PEOPLE IN THE WORLD TODAY THAT SAY THAT THAT'S NOT TOO FAR 09:05:42 AWAY, WHERE THE ARTIFICIAL INTELLIGENCE THAT WE'VE BEEN TALKING 09:05:44 ABOUT FOR THE LAST DAY ACTUALLY GETS TO A POINT WHERE COMPUTERS 09:05:48 EXCEED HUMAN INTELLIGENCE. AND THAT'S CALLED ARTIFICIAL 09:05:59 GENERAL INTELLIGENCE, OR AGI. AND YOU'LL HEAR THAT TERM 09:06:01 THROUGHOUT THE COURSE OF THE CASE.

09:06:02 YOU CAN IMAGINE A WORLD WHERE COMPUTERS MAKE OUR LIVES 09:06:05 BETTER. ALREADY AI, IT ALLOWS US TO DIAGNOSE DISEASES, IT CAN 09:06:11 HELP CHILDREN LEARN TO READ SOONER, AND IT CAN DO MANY OTHER 09:06:14 VERY POSITIVE THINGS.

09:06:15 BUT AI HAS A DARK SIDE, AND YOU'LL HEAR FROM A PROFESSOR 09:06:20 RIGHT HERE AT BERKELEY, STUART RUSSELL, WHO IS GOING TO TESTIFY 09:06:24 ABOUT SOME OF THE RISKS ASSOCIATED WITH AI. AND HE'S GOING TO 09:06:29 INFORM -- BASICALLY TALK ABOUT THOSE IN FOUR DIFFERENT 09:06:33 CATEGORIES.

09:06:33 THE FIRST IS INDIVIDUAL RISK. RISK THAT, YOU'VE READ 09:06:36 ABOUT THESE SITUATIONS, AND PERHAPS YOU KNOW SOMEONE WHO HAS 09:06:39 FORMED AN ATTACHMENT TO A BOT, AND RATHER THAN HAVING HUMAN 09:06:44 FRIENDS, THEIR FRIENDS ARE THIS BOT. SO YOU TAKE THEM TO -- 09:06:49 THEY PREFER WHEN PEOPLE USE A BOT FOR PSYCHOTHERAPY, WHEN, IN 09:06:53 FACT, THEY SHOULD BE TALKING TO A PSYCHOTHERAPIST. AND, IN 09:06:56 FACT, THAT SOMETIMES HAS NOT HAD GREAT RESULTS.

09:06:59 SECOND RISK HE'S GOING TO TALK ABOUT IS SYSTEMIC RISK. 09:07:03 SYSTEMIC RISK IS WHAT HAPPENS TO AI WHEN IT CAN DO THINGS LIKE 09:07:08 MANIPULATE THE FINANCIAL MARKETS, OR IT MIGHT CAUSE 09:07:10 MISINFORMATION, DISINFORMATION, USED PERHAPS IN ELECTIONS, BUT 09:07:16 IT CAN BE USED IN ALL SORTS OF WAYS.

09:07:19 AND THEN HE'S GOING TO TALK ABOUT MISALIGNMENT AND LOSS OF 09:07:27 CONTROL, AND VERY SERIOUS RISKS, RISKS FOR THINGS LIKE AI BEING 09:07:31 ABLE TO MANIPULATE THE CLIMATE AND AFFECT THE ATMOSPHERE, WHICH 09:07:38 COULD HAVE VERY SERIOUS CONSEQUENCES.

09:07:40 THE LAST RISK HE'S GOING TO TALK ABOUT IS CONCENTRATION 09:07:43 RISK. AND CONCENTRATION RISK IS THE RISK THAT THIS POWER OF 09:07:48 AI, OR AGI SPECIFICALLY, IS HELD BY ONE POWERFUL CORPORATION OR 09:07:55 MAYBE A SMALL GROUP, AND THAT THE REST OF US BECOME SUBSERVIENT 09:08:03 TO THAT CORPORATION OR GROUP.

09:08:05 NOW, AS AI BECAME MORE ADVANCED, ELON BECAME MORE WORRIED. 09:08:15 HE WAS VOCAL, AND HE DONATED TO CAUSES. HE ATTENDED SEMINARS. 09:08:22 HE WAS VERY VOCAL ABOUT THE NEED FOR GOVERNMENT REGULATION. IN 09:08:25 FACT, IN 2015, HE ACTUALLY WENT AND MET WITH PRESIDENT OBAMA TO 09:08:31 WARN HIM ABOUT THE DANGERS OF ARTIFICIAL INTELLIGENCE.

09:08:34 BUT THE GOVERNMENT WAS NOT STEPPING UP. AND I DON'T KNOW 09:08:43 WHETHER PEOPLE DIDN'T APPRECIATE THE TRUE NATURE, OR WHETHER 09:08:45 PEOPLE DIDN'T FEEL LIKE THIS WAS AN ISSUE THAT THEY HAD TO 09:08:48 SPEND TIME ON NOW BECAUSE IT WAS SOMEHOW IN THE FUTURE, BUT THE 09:08:52 FACT WAS THAT THEY WEREN'T STEPPING UP.

09:08:55 SO AT THE AGE OF 44, HAVING ACCOMPLISHED QUITE A BIT IN

HIS LIFE ALREADY, ELON FELT HE HAD TO DO SOMETHING. HE COULDN'T JUST COUNT ON THE GOVERNMENT.

AND SO HE NEEDED TO ACT. AND THE ACTION HE TOOK WAS HE, ALONG WITH SAM ALTMAN, WHO HE DID NOT KNOW VERY WELL, BUT ALSO WAS A PERSON OUT HERE IN SILICON VALLEY, THEY EVENTUALLY FORMED THE NONPROFIT -- 501(C)(3) MAY BE A TERM THAT YOU'RE FAMILIAR WITH, BUT THE NONPROFIT OPENAI. AND YOU ARE GOING TO HEAR THE WHOLE STORY OF HOW IT WAS BORN, BUT THE THING TO KNOW IS THE MISSION OF OPENAI.

THE MISSION OF OPENAI IS A NONPROFIT ARTIFICIAL INTELLIGENCE RESEARCH COMPANY. THE GOAL IS ADVANCING DIGITAL INTELLIGENCE IN A WAY MOST LIKELY TO BENEFIT HUMANITY AS A WHOLE, UNCONSTRAINED BY THE NEED TO GENERATE A FINANCIAL RETURN.

THIS IS WHAT THEY PUT ON THEIR WEBSITE WHEN THEY LAUNCHED IT. IT WAS FOUNDED TO DEVELOP AI SAFELY. NO PERSON, NO EMPLOYEE, NO DIRECTOR, NO INVESTOR WAS TO PERSONALLY PROFIT AS A RESULT OF THAT. YES, EMPLOYEES COULD BE PAID. YES, INVESTORS COULD GET MAYBE SOME RETURN, BUT IT WASN'T A VEHICLE FOR PEOPLE TO GET RICH.

AND THEY WANTED THE TECHNOLOGY TO BE OPEN. THIS WAS VERY IMPORTANT. OPEN SOURCE TECHNOLOGY IS TECHNOLOGY THAT OTHERS HAVE THE OPPORTUNITY TO ACCESS. IT'S NOT CLOSED, CLOSETED. AND THAT WAS IMPORTANT BECAUSE IT DIMINISHES SIGNIFICANTLY THE RISK, THE CONCENTRATION RISK THAT YOU'LL HEAR PROFESSOR RUSSELL

TALK ABOUT.

NOW, SAM ALTMAN AND GREG BROCKMAN WERE COFOUNDERS OF OPENAI. ALTMAN WAS 30 YEARS OLD AT THE TIME. HE STARTED A BUSINESS THROUGH AN ORGANIZATION IN SILICON VALLEY CALLED Y COMBINATOR. IT WAS A TECH BUSINESS LOOKING AT -- Y COMBINATOR HELPS OTHER BUSINESSES GET GOING AS FAR AS EARLY DEVELOPMENT. HE HAD A BUSINESS LIKE THAT. AFTER A FEW YEARS, HE SOLD IT TO AN INVESTMENT FUND THAT QUICKLY SHUT IT DOWN SHORTLY AFTER THEY ACQUIRED IT.

ALTMAN RETURNED TO Y COMBINATOR AND WAS WORKING THERE AT THE TIME THAT HE MET ELON.

GREG BROCKMAN, SITTING HERE, WHO YOU'VE ALL HAD A CHANCE TO MEET, WORKED AT A PAYMENTS COMPANY CALLED STRIPE. AND HE BASICALLY WAS WORKING AS A CODING ENGINEER THERE, WORKED HIS WAY UP. HE WORKED, EFFECTIVELY, AS CHIEF TECHNOLOGY OFFICER AT STRIPE. AND HE HAD LEFT STRIPE.

AND HE AND ALTMAN WERE FRIENDS. AND AT THE TIME THAT ELON, HE STARTED OPENAI, HE MET -- I BELIEVE, MET BROCKMAN, AND THAT'S HOW THE THREE OF THEM ENDED UP TOGETHER.

NOW, ELON WAS VERY BUSY WITH HIS OTHER BUSINESSES, THE ONES THAT I JUST TOLD YOU ABOUT, AND -- BUT HE WAS STILL VERY COMMITTED, VERY MUCH TO OPENAI, BECAUSE THIS WAS VERY IMPORTANT TO HIM. HE HAD THE VISION OF WHAT OPENAI COULD BE, THIS SAFE OPEN SOURCE DEVELOPMENT OF AI THROUGH A NONPROFIT. HE RECRUITED SOME OF THE TOP AI SCIENTISTS IN THE WORLD TO COME

09:12:32 WORK AT OPENAI.

09:12:33 ONE OF THEM, ILYA SUTSKEVER, WAS A VERY WELL-KNOWN AND 09:12:39 PROMINENT NAME IN THE BUSINESS. AND ILYA WAS WORKING AT 09:12:42 GOOGLE. ELON MET WITH HIM NUMEROUS TIMES AND CONVINCED HIM TO 09:12:47 COME TO OPENAI.

09:12:50 HE DEVELOPED A STRATEGY. HE TAUGHT THEM ALL HE KNOWS 09:12:54 ABOUT BUILDING A BUSINESS, AND HE REGULARLY MET WITH THE TEAM 09:12:59 AND GAVE THEM ADVICE, GAVE THEM DIRECTION.

09:13:04 IN JANUARY OF 2018, GREG BROCKMAN WROTE ELON AN EMAIL 09:13:13 PRAISING HIM AND TELLING ABOUT HOW WONDERFUL IT WAS TO WORK 09:13:17 WITH HIM. HE SAYS "IT'S AN HONOR TO WORK ALONGSIDE YOU. YOU 09:13:20 STICK TO WHAT'S RIGHT RATHER THAN WHAT'S EASY."

09:13:25 ILYA SUTSKEVER, WHO I JUST MENTIONED, WROTE AN EMAIL TO 09:13:34 HIM THE SAME DAY, AND SAID THAT HE "ENJOYED WORKING TOGETHER, 09:13:35 AND WITH TIME I GREW TO APPRECIATE THE VAST DEPTH OF YOUR 09:13:38 STRATEGIC INSIGHT, AND I CAN THINK OF MANY EXAMPLES. I'M 09:13:41 TRYING TO ACCOMPLISH A DIFFICULT TASK, BUT WITH EFFORT, WE MAY 09:13:45 BE ABLE TO DO IT. IT HELPS THAT WE HAVE THE MOST 09:13:47 OVERWHELMINGLY COMPETENT PERSON IN THE WORLD HELPING US."

09:13:55 IN ADDITION TO WORKING WITH THE TEAM, SO THE VISION, THE 09:14:03 STRATEGY, ELON USED HIS RELATIONSHIPS IN THE BUSINESS WORLD TO 09:14:06 BENEFIT OPENAI. HE REACHED OUT TO PEOPLE WHO WERE PROMINENT 09:14:11 AND RUNNING OTHER VERY WELL-KNOWN AND SUCCESSFUL TECH COMPANIES 09:14:15 AND ASKED THEM FOR FAVORS TO HELP OPENAI. THEY KNEW IT WAS A 09:14:22 NONPROFIT.

MICROSOFT WAS ACTUALLY ONE OF THOSE COMPANIES.

IT ISN'T UP.

IN ADDITION TO ALL OF THAT, ELON PROVIDED THE MAJORITY OF FUNDING FOR OPENAI TO GET UP AND RUNNING AND OFF THE GROUND. HE CONTRIBUTED $38 MILLION OVER THE COURSE OF FIVE YEARS. THAT'S WHAT WE WOULD CALL -- IN THE INVESTMENT WORLD, YOU MAY HAVE HEARD THE TERM "SEED FUNDING," AND THIS IS THE FUND THAT IS RISKIEST BECAUSE YOU'RE JUST BEGINNING, AND YOU CAN LOSE WHAT YOU INVEST IN, OR IN THIS CASE, DONATED.

WITHOUT ELON MUSK, THERE WOULD BE NO OPENAI. PURE AND SIMPLE.

NOW, OPENAI GOT OFF TO A STRONG START. BY THE MIDDLE OF 2017, THE FOUNDERS RECOGNIZED THAT THEY WERE GOING TO NEED ADDITIONAL FUNDING TO BE ABLE TO CARRY OUT THE NONPROFIT'S MISSION. AND THEY BRAINSTORMED. THEY KICKED AROUND IDEAS. THEY TALK ABOUT MAYBE WE'LL GET A GOVERNMENT CONTRACT THAT WILL PAY US A LOT OF MONEY. THEY TALKED ABOUT A POSSIBLE MERGER. THIS WAS PROPOSED BY MR. BROCKMAN AND MR. SUTSKEVER OF A COMPANY CALLED CEREBRAS WHICH MADE CHIPS FOR AI.

THEY TALKED ABOUT POSSIBLY WORKING WITH TESLA AND GETTING FUNDING FROM TESLA, AND THEY TALKED ABOUT ENHANCING THE FUNDRAISING, CHARITABLE FUNDRAISING.

BUT EVENTUALLY THEY SETTLED ON THE IDEA OF FORMING A FOR-PROFIT SUBSIDIARY THAT WOULD SUPPORT THE NONPROFIT.

NOW, THIS IS NOT UNCOMMON IN THE WORLD OF CHARITIES. BUT

THE FOR-PROFIT SUPPORTS THE NONPROFIT, NOT THE OTHER WAY AROUND.

EVERYONE HERE HAS PROBABLY BEEN TO A MUSEUM AT SOME POINT.

**THE COURT:** WE LOST YOU AGAIN. TRY AGAIN.

**MR. MOLO:** OKAY. IT WORKS.

EVERYONE HERE HAS PROBABLY BEEN TO A MUSEUM; RIGHT? AND SOMEWHERE, AT SOME POINT IN YOUR LIFE. AND WHAT DO WE SEE THE MOMENT YOU WALK IN TO A MUSEUM IS A MUSEUM STORE. AND NOW IT'S NOT JUST A PHYSICAL STORE, BUT THEY SELL THINGS ONLINE, THEY SELL ALL KINDS OF THINGS. AND IT'S FOR-PROFIT. THEY'RE NOT GIVING IT AWAY. THEY'RE NOT SELLING IT AT COST. THEY'RE MAKING A PROFIT. AND THAT PROFIT GOES TO FUND THE MUSEUM. OKAY?

BUT THE MUSEUM STORE CAN'T LOOT THE MUSEUM, SELL TO PICASSOS, AND POCKET THE PROFITS. IT'S GOT TO FUND THE NONPROFIT'S ISSUE.

SO THERE WAS A LOT OF DISCUSSION AMONG THE FOUR ABOUT HOW THEY WOULD GO ABOUT CREATING THIS FOR-PROFIT ENTITY. NONE OF THE OTHERS HAD ELON'S INCREDIBLE SUCCESS AND HIS INCREDIBLE ACUMEN IN BUILDING A BUSINESS, AND NONE OF THEM HAD FUNDED A BUSINESS THE WAY ELON HAD.

SO AS THEY TALKED ABOUT THIS, THE CONSEQUENCE THAT ELON WOULD HAVE A MAJORITY CONTROL OF THE FOR-PROFIT SUBSIDIARY, HE WOULD BE THE LARGEST SHAREHOLDER OF IT, OWNER OF IT, BUT EVENTUALLY, AND IN FACT PRETTY QUICKLY, THAT WOULD BE

09:18:11 DIMINISHED OVER TIME. SO IT WAS FAR LESS.

09:18:16 BUT HE FELT IT WAS IMPORTANT BECAUSE OF HIS EXPERIENCE, 09:18:19 AND HIS EXPERIENCES ELSEWHERE, AND THE TIME THAT HE HAD, AND 09:18:23 THERE WAS A LOT OF BACK AND FORTH. THERE WAS A LOT OF 09:18:26 JOCKEYING AROUND ON THIS.

09:18:28 THE OTHERS -- THE DEFENDANTS BEGAN -- TO ELON'S 09:18:34 ESTIMATION, WERE CONCERNED MORE ABOUT HOW THEY COULD MAKE MONEY 09:18:38 FROM THIS OR WHAT OFFICE THEY WOULD HAVE. SAM ALTMAN WAS 09:18:40 INSISTING ON BEING THE CEO OF THE COMPANY. AND THIS WENT ON 09:18:45 FOR A NUMBER OF MONTHS.

09:18:46 EVENTUALLY, ELON SAID THIS IS IT, I'VE HAD IT. IT'S TOO 09:18:52 MUCH. I HAVE OTHER THINGS GOING ON. HE BECAME FRUSTRATED, AND 09:18:56 HE FINALLY ENDED THE NEGOTIATIONS, AND HE SENT THIS EMAIL. 09:19:02 "EITHER GO DO SOMETHING ON YOUR OWN OR CONTINUE WITH OPENAI AS 09:19:05 A NONPROFIT."

09:19:07 "GO DO SOMETHING ON YOUR OWN OR CONTINUE WITH OPENAI AS A 09:19:12 NONPROFIT."

09:19:13 ABSOLUTELY.

09:19:19 THE VERY NEXT DAY SAM ALTMAN EMAILS HIM, "I REMAIN 09:19:24 ENTHUSIASTIC ABOUT THE NONPROFIT STRUCTURE."

09:19:27 GREG BROCKMAN RESPONDS SIMILARLY SOON AFTER THAT.

09:19:32 AND IT WAS REASONABLE FOR ELON TO RELY ON WHAT HE WAS 09:19:36 TALKING ABOUT. HE WAS A LITTLE SUSPICIOUS ABOUT IT AT THIS 09:19:39 TIME, A LITTLE DISTRUSTFUL, BUT THE OPENAI MISSION WAS WHAT IT 09:19:44 WAS. THEY SAID THEY WERE COMMITTED TO IT, AND HE CONTINUED

FUNDING IT FOR TWO YEARS AFTER THAT.

SO AS OPENAI WAS UP AND RUNNING, ELON, AT THAT TIME, HAD THINGS GOING ON AT HIS OTHER BUSINESSES. HE DECIDED TO STEP AWAY, STEP OFF THE BOARD, AND RESIGN FROM THE BOARD A FEW MONTHS LATER.

EVENTUALLY, EVENTUALLY SAM ALTMAN FOUND MICROSOFT, WHO ELON HAD ALREADY INTRODUCED OPENAI TO MICROSOFT, AND HE WAS SEEKING A FAVOR FROM THEM, THE GUYS WITH COMPUTING POWER, TO PARTICIPATE IN AN IMPORTANT CONTEST. SO THEY'RE FAMILIAR WITH EACH OTHER.

ALTMAN WENT TO MICROSOFT AND CONVINCED THEM TO INVEST A BILLION DOLLARS. THAT SOUNDS LIKE A LOT OF MONEY, AND IT IS A LOT OF MONEY, BUT IT WAS MONEY THAT WAS NEEDED TO RECRUIT TOP TALENT AND TO PAY FOR THE COMPUTING POWER AND THE HARDWARE THAT OPENAI NEEDED TO GET ITS BUSINESS.

AND A KEY, KEY PART OF THIS INVESTMENT BY MICROSOFT IS REALLY IMPORTANT. THE INVESTMENT RETURN WAS CAPPED, CAPPED. IT MEANT THAT THEY COULDN'T MAKE INFINITE PROFITS AS A RESULT OF THIS. IT WAS -- THEY INVESTED THE MONEY AND THEY WOULD GET A CAPPED RETURN.

NOW, ALTMAN OFFERED ELON AN OPPORTUNITY TO INVEST IN THE FOR-PROFIT SUBSIDIARY, AND HE SENT HIM WHAT IS CALLED A "TERM SHEET," WHICH IS BASICALLY THE KEY TERMS OF WHAT THE INVESTMENT WOULD BE.

ELON DIDN'T REALLY READ IT BECAUSE HE WASN'T INTERESTED IN

09:21:32 INVESTING, BUT HE DID READ, AT THE VERY BEGINNING, AND YOU'LL
09:21:35 SEE THE WHOLE THING, AT THE VERY BEGINNING, THIS TERM SHEET
09:21:39 THAT SAYS -- IT'S A DISCLAIMER, YOU KNOW, LIKE YOU SEE ON
09:21:45 MEDICINE OR WHATEVER IT MAY BE, IT'S A DISCLAIMER, "IT WOULD BE
09:21:49 WISE TO VIEW ANY INVESTMENT IN OPENAI IN THE SPIRIT OF A
09:21:53 DONATION."

09:21:55 AGAIN, THE NOT -- THE FOR-PROFIT SUBSIDIARY SUPPORTING THE
09:22:01 NONPROFIT.

09:22:06 HE SENT -- ALTMAN SENT ELON A DRAFT ANNOUNCEMENT ABOUT THE
09:22:15 NONPROFIT, AND IN THE DRAFT ANNOUNCEMENT, HE SAID, "WE'VE
09:22:18 CREATED A CAPPED-PROFIT COMPANY," AND "ALL INVESTORS SHOULD BE
09:22:31 CLEAR, THEY SHOULD NEVER EXPECT A PROFIT."

09:22:36 "NEVER EXPECT A PROFIT."

09:22:40 THERE WAS NOTHING THAT SIGNALLED TO ELON THAT THE
09:22:44 FOR-PROFIT WAS DOING ANYTHING OTHER THAN SUPPORTING THE
09:22:47 NONPROFIT, AND THAT OPENAI'S MISSION WAS BEING FULFILLED.

09:22:53 THERE WAS A LOT GOING ON IN HIS LIFE AT THE TIME. TESLA
09:22:57 WAS HAVING SERIOUS PRODUCTION ISSUES AT THAT TIME. THERE WERE
09:22:59 CHALLENGES AT SPACEX HE WAS DEALING WITH, AND THAT'S WHERE HIS
09:23:03 FOCUS WAS, UNDERSTANDABLY.

09:23:06 AND YOU SEE THAT OPENAI HAD CREATED THE MUSEUM STORE FOR
09:23:09 THE MUSEUM, IF YOU WILL. THEY HAD A FUNDING SOURCE. AND
09:23:14 MICROSOFT'S BILLION-DOLLAR INVESTMENT HELPED EARN THAT, RIGHT?

09:23:19 SO A COUPLE YEARS LATER, MICROSOFT MADE A SECOND
09:23:25 INVESTMENT, AND THIS INVESTMENT WAS FOR $2 BILLION.

NOW, ALTMAN TEXTED ELON AND SAID, HEY, I JUST WANT TO GIVE YOU A HEADS-UP ABOUT --

**THE CLERK:** IT'S STILL WITH PLAINTIFFS. LET ME RESET.

**MR. MOLO:** I WAS JUST GETTING TO THE GOOD PART.

IS THIS BETTER? OKAY. BACK AGAIN.

ALTMAN GAVE HIM A HEADS UP, BUT ELON NEVER SAW THE TERMS OF IT, NEVER UNDERSTOOD THE DEAL, NEVER DISCUSSED IT WITH ALTMAN.

AND AGAIN, THERE'S NOTHING WRONG WITH A NONPROFIT HAVING A FOR-PROFIT SUBSIDIARY. SO THERE WAS NOTHING ALARMING ABOUT THIS.

BUT THAT FOR-PROFIT HAS TO ADVANCE THE MISSION. AND THIS WAS A BUSINESS THAT TOOK WHAT THE CHARITY WAS DOING, IT DID TAKE RESOURCES. COMPUTE OR COMPUTING POWER THAT YOU WILL HEAR ABOUT IS VERY EXPENSIVE.

IN LATE 2022, NEWS SPREAD THAT OPENAI HAD DONE A DEAL WITH MICROSOFT. AND THIS WAS A HORSE OF A COMPLETELY DIFFERENT COLOR. IT WAS A $10 BILLION INVESTMENT BY MICROSOFT. THIS WAS A GAME CHANGER. THIS WAS NOT CONSISTENT WITH THE NONPROFIT MISSION. IT VIOLATED EVERY COMMITMENT THAT THEY MADE, NOT JUST TO ELON, BUT TO THE WORLD. WHAT YOU SAW ON THEIR WEBSITE, THAT'S WHAT THEY TOLD THE WORLD. IT WAS NO LONGER OPEN SOURCE.

MICROSOFT WAS GOING TO HAVE CONTROL THROUGH LICENSING OF MUCH OF THE INTELLECTUAL PROPERTY. IT WAS NO LONGER OPERATING

09:25:25 FOR THE GOOD OF HUMANITY AS A WHOLE. IT WAS A FOR-PROFIT OPERATING FOR THE GOOD OF THE DEFENDANTS.

09:25:34 SO ELON HIRED A LAWYER TO INVESTIGATE, AND THAT LAWYER PRODUCED SOME DOCUMENTS, GOT SOME INFORMATION, AND THAT LED EVENTUALLY TO THIS LAWSUIT.

09:25:46 NOW, YOU WILL HEAR TESTIMONY, AND YOU WILL SEE DOCUMENTS SHOWING YOU WHAT THE DEFENDANTS WERE UP TO DURING THAT PERIOD OF TIME, WHAT THEY WERE UP TO WITH THE MICROSOFT INVESTMENT OF $10 BILLION.

09:26:10 ESSENTIALLY ALL OF THE EMPLOYEES FROM THE NONPROFIT, THEY MOVED OVER TO THE FOR-PROFIT.

09:26:18 ESSENTIALLY ALL OF THE INTELLECTUAL PROPERTY, WHICH IS THE VALUABLE SCIENTIFIC RESEARCH IN THE NONPROFIT, HAD MOVED OVER TO THE FOR-PROFIT.

09:26:33 THE MUSEUM STORE SOLD THE PICASSOS, AND NOW THEY ARE LOCKED UP WHERE NO ONE CAN SEE THEM.

09:26:39 SOMETHING ELSE HAPPENED IN 2023. IN THE FALL, THE BOARD MEMBERS WERE CONCERNED ABOUT SAM ALTMAN'S INTEGRITY. THEY THOUGHT HE WAS LYING, AND THAT HE WAS LYING ABOUT IMPORTANT THINGS THAT RELATED TO AI'S SAFETY.

09:27:00 SO THEY DID THE RESPONSIBLE THING, AND THEY FIRED HIM.

09:27:06 WITHIN DAYS, WITHIN DAYS, MICROSOFT, PULLING THE STRINGS, GOT SAM ALTMAN REINSTATED AS CEO, AND TWO BOARD MEMBERS WHO WERE VERY FOCUSED ON SAFETY AND SUPPORTED THE FIRING --

09:27:20 **THE COURT:** WHAT CAN I TELL YOU? WE'RE FUNDED BY THE

FEDERAL GOVERNMENT.

**MR. MOLO:** I PAID MY TAXES. I SHOULD AT LEAST --

**THE COURT:** THEY ARE HAPPY TO TAKE MORE FUNDS. IT WILL COME BACK, I'M SURE.

IS IT BACK?

**MR. MOLO:** ARE WE BACK?

**THE CLERK:** I HAVE RESET IT, YOUR HONOR.

**THE COURT:** OKAY. GO AHEAD. IT'S NOT BACK.

**THE CLERK:** RESETTING AGAIN.

**THE COURT:** TRY AGAIN.

**MR. MOLO:** WHOOPS. DO WE HAVE IT?

**THE CLERK:** I'LL CHECK THE CONNECTION WITH THE CABLING.

**MR. MOLO:** THERE WE GO. HERE WE GO.

SO WE WERE JUST GETTING TO THE PART WHERE MICROSOFT -- IS THIS A MICROSOFT PRODUCT?

**THE COURT:** NOW, NOW, WE AREN'T GOING TO BE DOING THAT. NO POINTING OF FINGERS.

OKAY.

**MR. MOLO:** ARE WE BETTER? NOT YET.

**THE CLERK:** I HAVE RESET IT.

(PAUSE IN PROCEEDINGS.)

**THE COURT:** WE ARE TRYING, FOR THE FIRST TIME, TO STREAM TO A SECONDARY ROOM, AND I'M WONDERING IF THAT COULDN'T BE PART OF THE PROBLEM.

09:29:43 **MR. MOLO:** I UNDERSTAND.
09:29:44 SHALL I PROCEED? WE'RE WAITING.
09:29:45 **THE COURT:** I THINK YOU WANT TO BE HEARD.
09:29:47 **MR. MOLO:** YEAH, I AGREE.
09:29:50 **THE CLERK:** I'VE REACHED OUT TO I.T., YOUR HONOR.
09:29:52 **THE COURT:** DO WE HAVE HIS -- THE HAND MIC FROM
09:29:55 YESTERDAY?
09:29:56 **THE CLERK:** THAT MIC SHOULD BE WORKING, YOUR HONOR,
09:29:58 ON THE LECTERN.
09:29:59 **THE COURT:** USE THIS MIC HERE.
09:30:01 **MR. MOLO:** THIS ONE HERE?
09:30:02 **THE COURT:** YES.
09:30:03 **MR. MOLO:** OKAY. THAT ONE IS BETTER. MAYBE I'LL
09:30:07 MOVE THIS OVER HERE.
09:30:10 **THE COURT:** OR HOW ABOUT MOVING YOUR ACRYLIC --
09:30:15 (PAUSE IN PROCEEDINGS.)
09:30:31 **MR. MOLO:** I CAN STILL DO THIS OVER HERE. THAT WILL
09:30:33 AVOID THE POSSIBILITY OF IT GOING OFF.
09:30:57 (PAUSE IN PROCEEDINGS.)
09:30:57 **MR. MOLO:** SO WHILE THIS WAS GOING ON, WHILE
09:31:01 MICROSOFT WAS GETTING ALTMAN REINSTATED AS CEO, AND HANDPICKING
09:31:05 THE SUCCESSORS TO THE BOARD MEMBERS THAT WERE FORCED OUT -- BY
09:31:09 THE WAY, YOU'RE GOING TO HEAR TESTIMONY FROM TWO OF THOSE BOARD
09:31:12 MEMBERS. UNFORTUNATELY, THEY CAN'T BE IN PERSON, BUT YOU'RE
09:31:14 GOING TO HEAR DEPOSITION TESTIMONY, AND IT'S TREMENDOUSLY

ILLUMINATING, AND I'M GLAD YOU'RE GOING TO HEAR IT, BUT I'M SORRY THEY CAN'T BE HERE.

BUT WHILE THIS IS GOING ON, SATYA NADELLA, WHO IS THE CEO OF MICROSOFT -- THIS WAS DONE BY THE PEOPLE AT THE HIGHEST LEVELS OF MICROSOFT -- HE SAID TO A REPORTER, WHEN ASKED ABOUT HOW THIS IS GOING TO AFFECT THE OPENAI RELATIONSHIP WITH MICROSOFT, WITH THE ALTMAN COMING AND GOING, HE SAID, WE ARE IN THERE, WE ARE BELOW THEM, ABOVE THEM, AND AROUND THEM. AND I THINK THAT SAID IT ALL.

NOW, MICROSOFT PROVIDED SUBSTANTIAL HELP, SUBSTANTIAL ASSISTANCE TO BROCKMAN AND ALTMAN AS THEY MADE AN ABSOLUTE MOCKERY OF OPENAI'S CHARITABLE MISSION.

THEY INVESTED BILLIONS OF DOLLARS. THEY CONDITIONED -- THEY CONDITIONED THIS INVESTMENT ON OPENAI COMMERCIALIZING ITS PRODUCTS, AND THEY EVEN SET REVENUE GOALS.

THEY EMBEDDED ENGINEERS IN OPENAI. "EMBEDDING," MEANING ENGINEERS FROM MICROSOFT ACTUALLY WENT AND WORKED IN OPENAI'S OFFICES.

THEY PRESSED FOR A PAID VERSION OF CHATGPT RATHER THAN JUST A FREE VERSION.

THEY PUT SAM ALTMAN BACK AT HIS JOB AS CEO.

AND THEY HANDPICKED THE FOR-NONPROFIT -- NONPROFIT BOARD MEMBERS TO REPLACE THOSE THAT HAD BEEN FORCED OUT.

SO WHERE DOES THAT LEAVE US TODAY? WELL, IT LEAVES US IN THIS PLACE: THE CHARITY, OPENAI, THAT WAS FORMED, IT HAS NO

FULL-TIME EMPLOYEES. NO FULL-TIME EMPLOYEES. ESSENTIALLY NO INTELLECTUAL PROPERTY.

IT IS DOING NO ARTIFICIAL INTELLIGENCE RESEARCH.

THEY'VE GOT SAM ALTMAN AS THE CEO.

AND IT HAS A MINORITY STAKE, A MINORITY STAKE. NOW, REMEMBER, THE FOR-PROFIT SUBSIDIARY IS SUPPOSED TO BE SUPPORTING THE NONPROFIT. IT HAS GOT A MINORITY STAKE THAT IS SMALLER THAN THE OWNERSHIP OF THE FOR-PROFIT. IT HAS GOT A MINORITY STAKE THAT IS SMALLER THAN MICROSOFT'S SHARE OF OWNERSHIP OF THE FOR-PROFIT.

THE FOR-PROFIT, IT HAS A VALUATION OF $800-PLUS BILLION.

IT WAS CONVERTED TO SOMETHING CALLED A PBC, A PUBLIC BENEFIT CORPORATION. THE ONLY THING PUBLIC ABOUT IT IS THAT THEY'RE NOW GOING TO BE ABLE TO PULL -- THEY'RE GOING TO BE ABLE TO SELL STOCK ON THE PUBLIC STOCK EXCHANGES AND THE ONLY BENEFIT IS TO THE INSIDERS WHO STOLE THE CHARITY AND CREATED THIS FOR-PROFIT.

THEY'RE PLANNING A TRILLION DOLLAR INITIAL PUBLIC STOCK OFFERING, AND IT HOLDS VIRTUALLY ALL OF THE IP WHICH IT THEN LICENSES OUT TO MICROSOFT PRIMARILY.

MICROSOFT, IT HAS THIS MULTIBILLION DOLLAR EQUITY STAKE IN THE FOR-PROFIT THAT'S SUPPOSED TO BE SUPPORTING THE NONPROFIT. THERE ARE NO PROFIT CAPS ON MICROSOFT'S INVESTMENTS AT THIS TIME. REMEMBER HOW WE TALKED ABOUT HOW IT CAPPED INVESTMENT, FOR-PROFIT INVESTMENT MADE IT SEEM SAFE, HOW ELON IS SATISFIED

09:34:40 THAT THEY WERE STILL FULFILLING THE MISSION OF OPENAI?

09:34:44 AND MICROSOFT HAS THE RIGHTS TO VIRTUALLY ALL OF THE 09:34:49 OPENAI INTELLECTUAL PROPERTY.

09:34:54 SAM ALTMAN. SO SAM ALTMAN HAS SAID, AND HE'LL PROBABLY 09:35:03 EVEN TESTIFY, THAT HE DOESN'T HAVE ANY OWNERSHIP IN THIS 09:35:07 FOR-PROFIT ENTITY, AND -- BUT HE LEFT IT -- LEFT THE OPTION 09:35:12 OPEN. HE DID, IN AN EMAIL, TELL PEOPLE THAT, "MY CURRENT 09:35:15 THOUGHT IS THAT I WON'T TAKE EQUITY OWNERSHIP, BUT IF IT 09:35:19 APPEARS, AT SOME POINT, WE'RE GOING TO BUILD, THEN MAYBE I WANT 09:35:25 EQUITY AT SOME FUTURE POINT."

09:35:27 MAYBE THAT FUTURE POINT IS AFTER THIS TRIAL IS OVER, BUT 09:35:30 WE'LL FIND OUT.

09:35:31 WHAT HE HAS DONE, THOUGH, IS HE HAS ENRICHED HIMSELF 09:35:37 THROUGH WHAT ARE CALLED "RELATED PARTY CONFLICTED 09:35:42 TRANSACTIONS." OKAY?

09:35:43 AS THE CEO OF OPENAI, HE HAS HAD CONTRACTS WITH VARIOUS 09:35:49 VENDORS TO PROVIDE EVERYTHING FROM POWER TO INFORMATION THAT 09:35:54 HAS BEEN USED. AND THE COMPANIES THAT HE HAS DONE -- EXCUSE 09:35:58 ME -- THAT HAVE PROVIDED THESE SERVICES, THAT HE APPROVED THE 09:36:05 CONTRACTS FOR, ARE COMPANIES THAT SAM ALTMAN INVESTED IN AND 09:36:20 HAS AN OWNERSHIP INTEREST IN.

09:36:22 SO DURING THE TRIAL, YOU'RE GOING TO HEAR FROM THE PEOPLE 09:36:24 WHO WERE THERE. YOU'LL SEE THE DOCUMENTS. YOU'LL SEE EMAILS, 09:36:27 HEAR THE TESTIMONY. YOU'RE GOING TO HEAR FROM ELON. YOU'RE 09:36:30 GOING TO HEAR FROM GREG BROCKMAN. YOU'RE GOING TO HEAR FROM

SATYA NADELLA. SO THESE KEY PLAYERS ARE THERE.

YOU'RE ALSO GOING TO HEAR FROM TWO OTHER PEOPLE, WHO I THINK YOU'LL FIND INCREDIBLY INTERESTING AND HELPFUL IN REACHING YOUR DECISION. THE FIRST IS STUART RUSSELL. THAT'S THE MAN I MENTIONED A LITTLE BIT EARLIER.

STUART RUSSELL IS THE PROFESSOR RIGHT HERE AT THE UNIVERSITY OF CALIFORNIA, BERKELEY. HE'S ONE OF THE WORLD'S LEADING EXPERTS ON ARTIFICIAL INTELLIGENCE. TRULY WORLDWIDE. I MEAN, HE'S RECOGNIZED.

HE'S A COFOUNDER AND PRESIDENT OF A COMPANY THAT HAS FOCUSED ON AI SAFETY -- NOT A COMPANY. EXCUSE ME. AN ORGANIZATION FOCUSED -- THAT IS FOCUSED ON AI SAFETY. AND HE ADVISES GOVERNMENTS AROUND THE WORLD. NOT JUST THE U.S. GOVERNMENT, BUT HE ADVISES GOVERNMENTS AROUND THE WORLD ABOUT AI SAFETY.

YOU'RE ALSO GOING TO HEAR FROM DAVID SCHIZER. DAVID SCHIZER IS THE FORMER DEAN OF THE COLUMBIA LAW SCHOOL. DAVID HAS DEVOTED HIS PROFESSIONAL LIFE TO STUDYING, WRITING ABOUT, TEACHING ABOUT NONPROFITS AND HOW THEY SHOULD BE RUN. IN FACT, HE RAN A NONPROFIT. HE WAS THE CEO OF A NONPROFIT FOR A FEW YEARS HIMSELF. AND HE WILL TELL YOU THAT WHAT ALTMAN AND BROCKMAN DID IS WHOLLY INCONSISTENT WITH THE WAY A NONPROFIT CHARITY SHOULD BE RUN.

NOW, AT THE END OF THE CASE JUDGE GONZALEZ ROGERS IS GOING TO INSTRUCT YOU ON THE LAW AND DIRECT YOU TO ENTER A VERDICT.

09:38:07 JUDGE GONZALEZ ROGERS IS THE FIRST, SHE IS THE LAST, SHE IS THE ONLY WORD ON THE LAW IN THIS COURTROOM. WHAT SHE SAYS GOES.

09:38:20 THERE ARE THREE CLAIMS THAT WE ARE BRINGING.

09:38:24 THE FIRST IS BREACH OF CHARITABLE TRUST. YOU'LL HEAR MORE ABOUT THAT LATER.

09:38:29 THE SECOND IS UNJUST ENRICHMENT.

09:38:32 AND THE THIRD, I GUESS, MICROSOFT, FOR AIDING AND ABETTING THAT UNJUST ENRICHMENT.

09:38:41 NOW, THESE CLAIMS WERE BROUGHT IN TIME. YOU'RE GOING TO HEAR THE DEFENDANTS GET UP HERE IN A FEW MOMENTS AND THEY'RE GOING TO SAY, OH, THESE CLAIMS WERE BROUGHT TOO LATE. THEY'RE NOT. THEY WERE WITHIN WHAT IS CALLED THE "STATUTE OF LIMITATIONS," THE PERIOD OF TIME IN WHICH YOU CAN BRING A LAWSUIT IN WHICH YOU'VE BEEN -- BEEN WRONGED.

09:38:59 AND THEY'LL ARGUE THAT ELON SHOULD HAVE BROUGHT THIS CASE SOONER, BUT, IN FACT, DON'T BE FOOLED, HE BROUGHT IT WELL WITHIN THE STATUTE OF LIMITATIONS UPON LEARNING OF THAT $10 BILLION INVESTMENT FROM MICROSOFT.

09:39:12 AS YOU HEAR THE EVIDENCE, THOUGH, I WOULD LIKE YOU -- EVEN THOUGH JUDGE GONZALEZ ROGERS IS THE FINAL WORD ON THE LAW AND HOW YOU DECIDE IT, A NUMBER OF YOU ARE TAKING NOTES.

09:39:26 I HAVE THREE QUESTIONS THAT I'D LIKE YOU TO WRITE DOWN. AND THROUGHOUT THE TRIAL GO BACK AND ASK YOURSELVES, YOU KNOW, WHERE ARE WE ON THESE THINGS? AND MAYBE IT WILL HELP YOU GUIDE

09:39:39 YOUR DECISION. AGAIN, THAT DECISION IS CONTROLLED BY THE LAW,
09:39:42 BUT THESE ARE QUESTIONS.

09:39:43 THE FIRST: DID OPENAI HAVE A CHARITABLE MISSION TO
09:39:48 OPERATE AS A NONPROFIT TO DEVELOP SAFE AI, OPEN SOURCE, FOR THE
09:40:03 GOOD OF HUMANITY?

09:40:11 THE SECOND QUESTION -- IF I'M GOING TOO FAST, LET ME KNOW.
09:40:17 THE SECOND QUESTION IS SHORTER. DID ALTMAN AND BROCKMAN
09:40:28 VIOLATE THAT MISSION THROUGH WHAT THEY'VE DONE WITH THE
09:40:31 FOR-PROFIT BUSINESS? DID ALTMAN AND BROCKMAN VIOLATE THAT
09:40:41 MISSION THROUGH WHAT THEY'VE DONE WITH THE FOR-PROFIT BUSINESS?

09:40:44 AND THE THIRD IS: DID MICROSOFT KNOW ABOUT THE CHARITABLE
09:40:50 MISSION AND SUBSTANTIALLY ASSIST ALTMAN AND BROCKMAN IN DOING
09:41:08 THAT?

09:41:09 THOSE THREE QUESTIONS, I INVITE YOU TO GO BACK TO DURING
09:41:12 THE COURSE OF THE TRIAL, AT THE START OF YOUR DAY AND END OF
09:41:17 YOUR DAY AND IN THE MIDDLE OF THE DAY, BUT THOSE ARE THE THREE
09:41:20 QUESTIONS THAT YOU SHOULD BE ASKING.

09:41:21 YOU KNOW, NO ONE SHOULD BE ALLOWED TO STEAL A CHARITY.

09:41:27 AMERICA IS ONE OF THE MOST CHARITABLE NATIONS ON EARTH.
09:41:31 AMERICANS ARE CHARITABLE PEOPLE. TO STEAL A CHARITY IS
09:41:36 ABSOLUTELY WRONG.

09:41:41 I'D ASK YOU TO KEEP AN OPEN MIND. HEAR OUR EVIDENCE, LOOK
09:41:45 AT OUR DOCUMENTS THAT WE'RE GOING TO GIVE YOU, LISTEN TO OUR
09:41:48 WITNESSES.

09:41:48 BUT I ALSO WANT YOU TO HEAR THE EVIDENCE OF THE OTHER

SIDE. I WANT YOU TO PAY ATTENTION TO WHAT THEY'RE SAYING. LOOK AT THE DOCUMENTS THEY SHOW YOU. LOOK AT THE ANSWERS THEIR WITNESSES GIVE WHEN WE GET A CHANCE TO CROSS-EXAMINE THEM.

AT THE CONCLUSION OF THE CASE, JUDGE GONZALEZ ROGERS IS GOING TO GIVE ME THE OPPORTUNITY TO COME HERE AND TALK TO YOU AGAIN AND DISCUSS WHAT IT IS THAT THE CASE IS ABOUT IN LIGHT OF THE EVIDENCE THAT YOU'LL HAVE HEARD OVER THE PREVIOUS COUPLE OF WEEKS. OKAY?

WHEN I DO, WHEN I DO THAT, I WILL ASK YOU TO PUT AN END TO THIS OUTRAGEOUS CONDUCT THAT HAS OCCURRED AND TO RENDER A VERDICT AGAINST THE DEFENDANTS.

THANK YOU.

**THE COURT:** OKAY. THANK YOU.

SO AS I HAVE MENTIONED TO YOU, WE TAKE VERY, VERY DELIBERATE BREAKS DURING TRIAL. THE ONE EXCEPTION TO THAT IS THAT I DON'T LIKE TO INTERRUPT OPENINGS AND CLOSINGS AND THINGS OF THAT NATURE. SO WE WOULD TAKE A BREAK HERE IN 20 MINUTES, BUT WE'RE GOING TO GO AHEAD AND TAKE IT NOW, BECAUSE I'M ASSUMING THE DEFENDANTS HAVE MORE THAN 20 MINUTES TO SAY.

**MR. SAVITT:** YES.

**THE COURT:** YES, I WAS RIGHT IN THAT ASSUMPTION.

OKAY. SO WE'RE GOING TO GO AHEAD AND TAKE A 20-MINUTE BREAK. IT'S 9:43, SO WE'LL TAKE ABOUT 20 MINUTES.

IF EVERYONE CAN RISE FOR THE JURY, PLEASE.

**THE CLERK:** PLEASE RISE FOR THE JURY.

09:43:26 (JURY OUT AT 9:43 A.M.)

09:43:52 **THE CLERK:** THANK YOU. YOU MAY BE SEATED.

09:43:54 **THE COURT:** ALL RIGHT. WE'LL STAND IN RECESS FOR 20 MINUTES. THANK YOU.

09:43:57 (RECESS FROM 9:43 A.M. UNTIL 10:01 A.M.)

10:02:40 (JURY OUT AT 10:01 A.M.)

10:02:40 **THE COURT:** MR. MOLO, WOULD YOU GIVE -- GIVE ME THE NAME OF YOUR TECH PERSON, PLEASE.

10:02:43 **MR. MOLO:** THE TECH PERSON?

10:02:51 **THE COURT:** SIR, JUST YOUR LAST NAME. YOUR NAME?

10:02:52 **MR. WALTON:** JON, J-O-N, WALTON, W-A-L-T-O-N.

10:02:57 **THE COURT:** WALTON?

10:02:59 **MR. WALTON:** CORRECT.

10:03:00 **THE COURT:** OKAY. SO, MR. WALTON, I -- MY TECH PERSON SAYS THAT YOU -- ARE YOU ALIGNED? YOU'VE GOT TO NOT PUT EVERYTHING -- JUST FOCUS YOUR CONNECTION ON THE EVIDENCE PRESENTATION CONNECTION.

10:03:13 **MR. WALTON:** I HAVE A DIRECT CONNECTION NOW.

10:03:15 **THE COURT:** OKAY. PERFECT. HOPEFULLY -- HOPEFULLY THAT WILL RESOLVE THE ISSUES.

10:03:20 **MR. WALTON:** OKAY.

10:03:20 **THE COURT:** THANK YOU, SIR.

10:03:25 BEFORE THE JURY COMES IN, LET ME REMIND EVERYBODY IN THE OVERFLOW ROOM AND IN THIS ROOM, THERE IS NO RECORDING OF THIS TRIAL BASED UPON OUR GENERAL ORDER.

10:03:43 THERE WAS A RECORDING MADE BY SOMEONE, WHICH I JUST REVIEWED AND HAD DELETED OFF OF THAT PHONE.

10:03:50 THOSE OF YOU IN THE OVERFLOW ROOM, I KNOW YOU CAN HEAR ME, YOU NEED TO POLICE EACH OTHER OVER THERE, LET A CSO KNOW IF YOU'RE SEEING SOMETHING. IF I FIND OUT AGAIN THAT SOMEONE IS RECORDING, I -- IT IS IN MY DISCRETION TO SHUT DOWN THAT OVERFLOW ROOM. I DO NOT WANT TO DO THAT.

10:04:09 SO MAKE SURE THAT NO ONE IS RECORDING.

10:04:13 ALL RIGHT. LET'S BRING IN THE JURY.

10:04:16 **THE CLERK:** PLEASE RISE FOR THE JURY.

10:04:17 (JURY IN AT 10:04 A.M.)

10:04:50 **THE COURT:** ALL RIGHT. EVERYONE CAN BE SEATED.

10:04:56 AND SO THAT YOU KNOW, THEY STAND FOR YOU. NOT VICE VERSA. SO WHENEVER YOU GET TO YOUR SEAT, YOU CAN SIT DOWN, YOU DON'T HAVE TO STAY STANDING. OKAY?

10:05:06 ALL RIGHT. WE'LL MOVE TO THE NEXT OPENING.

10:05:10 COUNSEL. MR. SAVITT.

10:05:11 **MR. SAVITT:** THANK YOU, YOUR HONOR.

10:05:13 **(COUNSEL FOR DEFENDANT OPENAI GAVE THEIR OPENING STATEMENT.)**

10:05:14 **MR. SAVITT:** GOOD MORNING.

10:05:20 **JURORS:** GOOD MORNING.

10:05:21 **MR. SAVITT:** IT'S GREAT TO BE HERE. IT'S GREAT TO SEE YOU, AND WE'RE REALLY GRATEFUL FOR YOUR ATTENTION. THANK YOU FOR THAT.

10:05:28 I THOUGHT TO PICK UP JUDGE GONZALEZ ROGERS'S REALLY GOOD ANALOGY ABOUT PUTTING THE PIECES OF THE JIGSAW PUZZLE TOGETHER. AND WHAT I'M GOING TO TRY TO DO FOR YOU IN THE TIME WE HAVE JUST NOW THIS MORNING IS TO LET YOU KNOW HOW THE PIECES FIT FROM OUR PERSPECTIVE. AND WHEN I SAY FROM OUR PERSPECTIVE, I SAY IT WITH CONVICTION. BUT OUR PERSPECTIVE IS WHAT THE EVIDENCE WILL PROVE.

10:05:55 AND IT WON'T SURPRISE YOU TO LEARN THAT ONCE THE PIECES OF THE PUZZLE ARE PUT TOGETHER, THE COVER OF THAT BOX IS GOING TO LOOK A LOT DIFFERENT THAN WHAT WAS SUGGESTED BY MY OPPOSING COUNSEL.

10:06:05 MR. MUSK COMES TO THIS COURT CLAIMING THAT PROMISES WERE MADE TO HIM. PROMISES WERE MADE TO HIM, AND THEN BROKEN.

10:06:14 HE CALLS OTHERS TO ACCOUNT FOR AI SAFETY AND FOR FAILURE TO PURSUE PROPERLY THE MISSION.

10:06:22 BUT THAT'S NOT WHY WE ARE HERE, MEMBERS OF THE JURY. WE'RE HERE BECAUSE MR. MUSK DIDN'T GET HIS WAY AT OPENAI. WE'RE HERE BECAUSE MR. MUSK TURNED OUT TO BE VERY WRONG ABOUT OPENAI. HE MADE A MISTAKE. WE'RE HERE BECAUSE MR. MUSK NOW COMPETES WITH OPENAI WITH HIS OWN ARTIFICIAL INTELLIGENCE ORGANIZATION CALLED XAI, ABOUT WHICH YOU HEARD PRECISELY NOTHING FROM OPPOSING COUNSEL.

10:06:47 AND BECAUSE HE'S A COMPETITOR, MR. MUSK WILL DO ANYTHING HE CAN TO ATTACK OPENAI.

10:06:53 MEMBERS OF THE JURY, YOU'LL SEE THAT MR. MUSK'S LAWSUIT IS

10:06:57 A PAGEANT OF HYPOCRISY.

10:07:01 THE EVIDENCE THAT YOU WILL SEE AND HEAR OVER THE COMING 10:07:03 DAYS WILL PROVE THE FOLLOWING, IT WILL PROVE THE FOLLOWING:

10:07:07 IN 2015, WHEN OPENAI WAS FORMED, MR. MUSK BELIEVED THAT IT 10:07:12 SHOULD BE A FOR-PROFIT COMPANY. THE COMPANY WAS, NEVERTHELESS, 10:07:18 STARTED AS A NOT-FOR-PROFIT WITH THE MISSION OF CREATING 10:07:24 BENEFICIAL ARTIFICIAL INTELLIGENCE.

10:07:24 THE EVIDENCE WILL SHOW, MEMBERS OF THE JURY, THAT MR. MUSK 10:07:29 PROMISED TO FUND OPENAI TO THE TUNE OF $1 BILLION, BUT THAT HE 10:07:33 CAME NOWHERE NEAR KEEPING THAT PROMISE.

10:07:37 INSTEAD, THE EVIDENCE WILL SHOW THAT HE USED HIS FUNDING 10:07:41 COMMITMENT TO BULLY THE OTHER MEMBERS OF THE OPENAI FOUNDING 10:07:44 TEAM. THAT'S WHAT THE EVIDENCE WILL SHOW.

10:07:47 AND IT WILL SHOW THAT BY MID-2017, EVERYONE ASSOCIATED 10:07:52 WITH THIS ORGANIZATION UNDERSTOOD THAT TO PURSUE ITS MISSION, 10:07:55 IT WOULD REQUIRE FAR MORE MONEY THAN IT COULD POSSIBLY RAISE 10:07:59 FROM DONATIONS ALONE.

10:08:01 MR. MUSK, IN 2017, WANTED TO TURN OPENAI INTO A FULL-ON 10:08:07 FOR-PROFIT COMPANY AND TAKE ABSOLUTE CONTROL OF IT, BUT THE 10:08:10 OTHER FOUNDERS REFUSED TO TURN THE KEYS OF ARTIFICIAL 10:08:16 INTELLIGENCE OVER TO ONE PERSON.

10:08:17 THE EVIDENCE WILL SHOW THAT IN EARLY 2018, MR. MUSK SOUGHT 10:08:21 TO MERGE OPENAI INTO TESLA, BUT THE OTHER FOUNDERS REJECTED 10:08:26 THAT IDEA, TOO.

10:08:30 THEY WERE A MISSION-DRIVEN ARTIFICIAL INTELLIGENCE LAB.

10:08:33 THEY DIDN'T WANT TO BE PART OF A CAR COMPANY THAT MUSK CONTROLLED.

10:08:37 THE EVIDENCE WILL SHOW, MEMBERS OF THE JURY, THAT WHEN OPENAI REFUSED TO BE ABSORBED INTO MUSK'S EMPIRE, HE JUST PICKED UP HIS MARBLES AND WENT HOME DECLARING THAT OPENAI'S CHANCES OF SUCCESS WERE EXACTLY ZERO.

10:08:52 THE EVIDENCE WILL SHOW THAT EVEN THOUGH MUSK DITCHED THEM, THE OPENAI TEAM UPDATED HIM EVERY STEP OF THE WAY ON THEIR WORK, ON THEIR PLANS TO DEVELOP FINANCING.

10:09:03 THE EVIDENCE WILL SHOW THAT MUSK WAS FURIOUS WHEN OPENAI SUCCEEDED, NOTWITHSTANDING THAT HE HAD LEFT.

10:09:11 THEN HE STARTED HIS OWN COMPETING COMPANY, AND ONLY THEN, ONCE HE WAS A COMPETITOR, DID HE CLAIM THAT MR. ALTMAN AND MR. BROCKMAN AND OPENAI HAD BROKEN PROMISES TO HIM THAT HE WOULD PURSUE IN COURT.

10:09:23 THE EVIDENCE WILL SHOW THAT NO SUCH PROMISES WERE EVER MADE. THEY ARE REFLECTED IN NO DOCUMENT ANYWHERE.

10:09:32 THE ONLY PERSON WHO CLAIMS TO HAVE HEARD THESE PROMISES IS MR. MUSK HIMSELF.

10:09:39 THE EVIDENCE WILL SHOW THAT MR. MUSK KNEW EVERYTHING THAT HE SAYS BROKE A PROMISE TO HIM BY 2020 AT THE LATEST, WHICH MEANS THAT HE WAITED TOO LONG TO SUE.

10:09:52 AND WE'LL GET TO WHY.

10:09:54 THE EVIDENCE WILL SHOW IMPORTANTLY, AND CONTRARY TO WHAT YOU JUST HEARD, THAT OPENAI'S NONPROFIT FOUNDATION REMAINS IN

10:10:03 CONTROL OF THE ORGANIZATION. THAT FOUNDATION IS NOW AMONG THE
10:10:07 BEST FUNDED NOT-FOR-PROFITS IN THE WORLD. IT IS PUTTING THOSE
10:10:11 FUNDS TO WORK TO ENSURE POSITIVE ARTIFICIAL INTELLIGENCE
10:10:15 OUTCOME HERE IN THE BAY AREA, ACROSS THE COUNTRY, AROUND THE
10:10:19 WORLD. IT'S DOING LEADING-EDGE WORK TO CURE DISEASES, TO
10:10:25 PROMOTE ECONOMIC SECURITY.

10:10:26 THE FACT IS, AND THE EVIDENCE WILL SHOW, THAT MUSK NEVER
10:10:30 CARED ABOUT WHETHER OPENAI WAS A NOT-FOR-PROFIT. HE NEVER
10:10:34 CARED ABOUT OPEN SOURCING ITS CODE. HE NEVER CARED ABOUT
10:10:38 OPENAI'S SAFETY.

10:10:39 WHAT HE CARES ABOUT IS ELON MUSK BEING ON TOP, AND THAT'S
10:10:44 WHY WE'RE HERE, MEMBERS OF THE JURY.

10:10:47 THIS CASE ISN'T ABOUT WHETHER OPENAI COULD BE DOING
10:10:51 SOMETHING BETTER. WHAT IT'S ABOUT IS WHETHER OPENAI MADE
10:10:55 SPECIFIC PROMISES TO MUSK WHEN HE MADE HIS DONATIONS, AND THE
10:10:57 ANSWER TO THIS IS NO.

10:10:59 LET ME NOW PREVIEW FOR YOU THE EVIDENCE THAT WILL PROVE
10:11:04 ALL OF THAT, BEGINNING WITH OPENAI'S FOUNDING.

10:11:07 SAM ALTMAN AND GREG BROCKMAN WERE THE FIRST AT OPENAI. AS
10:11:13 YOU'LL HEAR, ALTMAN HAS BEEN THINKING AND WORRYING ABOUT
10:11:17 ARTIFICIAL INTELLIGENCE SINCE HE WAS A KID GROWING UP IN
10:11:20 ST. LOUIS.

10:11:20 BY 2015, HE WAS CONVINCED THAT ARTIFICIAL INTELLIGENCE WAS
10:11:25 COMING WHETHER WE LIKE IT OR NOT, AND THAT IT COULD BE GOOD, OR
10:11:28 BAD, OR BOTH, AND THAT IT WAS TIME TO START TRYING TO TILT THE

ODDS IN FAVOR OF THE GOOD.

GREG BROCKMAN SHARED MR. ALTMAN'S INTEREST. GREG GREW UP IN NORTH DAKOTA LEARNING CODE ON HIS OWN. AND LIKE SAM, HE CAME TO THE BAY AREA AFTER DROPPING OUT OF COLLEGE.

IN 2015, BROCKMAN HAD JUST LEFT THE JOB AT STRIPE, WHERE HE HAD BEEN A VERY SUCCESSFUL MEMBER OF THE STARTUP TEAM THERE, AND HE WAS THINKING HARD ABOUT WHAT TO DO NEXT. AND THE TOP OF HIS LIST WAS ARTIFICIAL INTELLIGENCE.

ALTMAN HAD HEARD THAT ELON MUSK WAS INTERESTED IN ARTIFICIAL INTELLIGENCE, TOO. ALTHOUGH, AS YOU'LL LEARN, MR. MUSK WAS FOCUSED PRIMARILY ON JUST BEATING GOOGLE'S DEEPMIND RESEARCH LAB IN THE ARTIFICIAL INTELLIGENCE RACE. AND THE GROUP ALSO RECRUITED ILYA SUTSKEVER, AS MY OPPOSING COUNSEL SAID, A TOP-FLIGHT ARTIFICIAL INTELLIGENCE RESEARCHER.

THE EVIDENCE WILL NOT SHOW THAT ANYONE BUT GREG BROCKMAN WAS THE MOST INSTRUMENTAL IN BRINGING HIM ON, HOWEVER.

THESE FOUR AGREED TO CREATE THE ARTIFICIAL INTELLIGENCE LAB THAT BECAME OPENAI IN LATE 2015, EARLY 2016. THEY TOOK THIS AS THEIR MISSION, TO ENSURE THAT AGI, ARTIFICIAL GENERAL INTELLIGENCE, LETTERS YOU'LL HEAR A LOT OVER THE NEXT WEEK OR TWO, WOULD BENEFIT ALL HUMANITY.

ACHIEVING THIS MISSION, MR. ALTMAN AND MR. BROCKMAN KNEW WOULD REQUIRE TECHNOLOGICAL LEADERSHIP. IF OPENAI FELL BEHIND ON THE TECHNOLOGY CURVE, THE FUTURE OF AI WOULD NECESSARILY FALL TO FOR-PROFIT COMPETITORS, LIKE GOOGLE AND META, WHO DO

NOT SHARE OPENAI'S MISSION, OR ANY MISSION AT ALL.

STAYING IN THE SCIENTIFIC LEAD WAS AND REMAINS A KEY TO MISSION SUCCESS FOR ANYONE IN THE ARTIFICIAL INTELLIGENCE SPACE.

BUT IT WASN'T CLEAR, AND THIS WAS PART OF THE PUZZLE THAT THESE GUYS WERE TRYING TO PUT TOGETHER, AT THE BEGINNING, WHAT CORPORATE FORUM WAS BEST FOR ACHIEVING THE MISSION? THE PROJECT HAD AN IMPORTANT SOCIAL COMPONENT, SO A NONPROFIT MADE SOME SENSE. BUT THE MISSION WOULDN'T SUCCEED WITHOUT THE BEST RESEARCH AND ENGINEERING TALENT, AND LOADS OF COMPUTING POWER, WHICH YOU'LL HEAR REFERRED TO AS COMPUTE OVER THE COMING DAYS. AND ALL OF THAT REQUIRES A LOT OF MONEY.

SO THE FOUNDERS WERE NOT SURE WHICH APPROACH TO TAKE.

FOR HIS PART, MR. MUSK WROTE AT THE TIME, IN 2015, THAT HE PREFERRED A FOR-PROFIT COMPANY WITH A NONPROFIT COMPONENT IN PARALLEL. YOU SEE HERE HE WRITES, IN CONTEMPORANEOUS DOCUMENTS, "PROBABLY BETTER TO HAVE A STANDARD C-CORP WITH A PARALLEL NONPROFIT."

A C-CORP IS A REGULAR FOR-PROFIT COMPANY LIKE TESLA.

AND MUSK RECOGNIZED FROM THE START THAT THERE WAS A BENEFIT TO ORGANIZING OPENAI AS A FOR-PROFIT. HE WANTED THE EMPLOYEES TO BE FINANCIALLY MOTIVATED TO MAKE THE COMPANY A SUCCESS, AND THAT'S HOW MR. MUSK RUNS ALL OF HIS BUSINESSES.

BUT ULTIMATELY ALTMAN AND BROCKMAN AND MUSK AND SUTSKEVER DECIDED TO START OFF WITH A NONPROFIT. EMPLOYEES WOULD BE

10:14:47 PAID, IN PART, WITH STOCK FROM ANOTHER COMPANY, Y COMBINATOR,
10:14:50 AND THAT WAS THE COMPANY, AS YOU HEARD, THAT SAM ALTMAN WAS
10:14:53 HEADING UP AT THE TIME.

10:14:54 NOW, I SHOULD SAY, NONE OF THE FOUNDERS WERE SURE THIS
10:14:58 STRUCTURE WOULD WORK, BUT THEY HAD TO START SOMEWHERE, AND
10:15:02 HERE'S WHERE THEY STARTED.

10:15:03 AND THEY WERE COMFORTED BY THIS: MR. MUSK CLAIMED TO GIVE
10:15:06 THE PROJECT FINANCIAL SECURITY BY MAKING A $1 BILLION PLEDGE TO
10:15:12 FUND OPENAI. YOU SEE HERE, HE WRITES, "I THINK WE SHOULD SAY
10:15:18 WE ARE STARTING WITH A $1 BILLION FUNDING COMMITMENT. THIS IS
10:15:21 REAL. I WILL COVER WHATEVER ANYONE ELSE DOESN'T PROVIDE."

10:15:29 AND WITH MUSK'S PLEDGE, OPENAI WOULDN'T NEED TO RAISE
10:15:33 MONEY, OR SO THE FOUNDERS THOUGHT, AT LEAST NOT FOR A GOOD LONG
10:15:36 WHILE.

10:15:37 IT TURNS OUT THE FUNDING COMMITMENT WAS NOT REAL. IT WAS
10:15:40 THE OPPOSITE OF REAL. MUSK NEVER CAME ANYWHERE NEAR HONORING
10:15:44 THIS COMMITMENT, AND HE PULLED THE PLUG ON FUNDING WHEN HE
10:15:47 DIDN'T GET CONTROL OF THE COMPANY.

10:15:48 BUT THAT'S HOW OPENAI STARTED, A NONPROFIT WITH A
10:15:51 $1 BILLION PROMISE FROM ELON MUSK, AND EQUITY SUPPLIED BY
10:15:57 SAM ALTMAN, AND A SOCIAL COMMITMENT.

10:15:59 NOW, FOR A YEAR AND A HALF, BROCKMAN, SUTSKEVER, AND THE
10:16:09 TEAM THAT THEY RECRUITED POURED THEIR LIVES INTO THIS COMPANY.
10:16:15 THIS IS A PICTURE AT GREG'S APARTMENT AT THE BEGINNING OF THE
10:16:17 PROJECT, THAT'S WHERE THE TEAM WORKED FROM. HERE'S A PICTURE

10:16:20 OF THE WORKING GROUP, THE FOLKS WHO WERE DOING THE WORK FOR
10:16:24 OPENAI IN EARLY 2016. YOU SEE DR. SUTSKEVER AT THE FAR LEFT OF
10:16:28 THE SCREEN.

10:16:29 ALTMAN IS IN THE BACK ON THE COUCH.

10:16:32 BROCKMAN TOOK THE PICTURE, SO HE'S NOT IN IT.

10:16:36 BUT THIS WAS HOW THEY GOT STARTED, AND THESE GUYS SUPPLIED
10:16:40 THE SWEAT EQUITY FOR THIS ORGANIZATION, WORKING DAY AND NIGHT.

10:16:44 ALTMAN WAS STILL THE PRESIDENT OF Y COMBINATOR, BUT HE WAS
10:16:48 THERE, TOO, WORKING WITH BROCKMAN AND SUTSKEVER DAILY.

10:16:52 MUSK SHOWED UP EVERY ONCE -- EVERY ONCE IN A WHILE, EVERY
10:16:56 FEW WEEKS, TO DISPENSE ADVICE, GET UPDATES, AND OCCASIONALLY
10:16:59 YELL AT PEOPLE FOR NOT MOVING FAST ENOUGH.

10:17:02 THROUGHOUT THIS PERIOD, MR. MUSK PROVIDED A LOT OF
10:17:05 OPENAI'S FUNDING, BUT NOT ALL OF IT. HE DOLED OUT THE
10:17:09 DONATIONS IN QUARTERLY DISTRIBUTIONS OF $5 MILLION EACH,
10:17:12 BEGINNING IN 2016. ALL TOLD, MR. MUSK DONATED $25 MILLION IN
10:17:17 THOSE QUARTERLY INSTALLMENTS, PLUS PAYMENTS TO COVER OPENAI'S
10:17:22 RENT, WHICH AMOUNTED TO ABOUT ANOTHER $12 AND A HALF MILLION.

10:17:25 THE EVIDENCE WILL SHOW, MEMBERS OF THE JURY, THAT EVERY
10:17:31 DOLLAR MUSK CONTRIBUTED WAS SPENT EXACTLY AS MUSK EXPECTED, ON
10:17:36 MISSION-DRIVEN FOCUSED EXPENSES.

10:17:38 AND HAVE IN MIND, MUSK RECEIVED A BENEFIT FROM HIS
10:17:41 CONTRIBUTIONS, FEDERAL TAX DEDUCTIONS WORTH MILLIONS OF
10:17:45 DOLLARS.

10:17:45 BY THE END OF -- BY THE SUMMER OF 2017 I SHOULD SAY, IT

WAS CLEAR THAT MUSK'S $5 MILLION PER QUARTER CONTRIBUTIONS JUST WOULDN'T BE ENOUGH. AND I THINK YOU HEARD THIS FROM MY ADVERSARY ALREADY THIS MORNING. COMPUTE, IT TURNED OUT, WAS FAR MORE EXPENSIVE AND FAR MORE IMPORTANT THAN INITIALLY BELIEVED.

BROCKMAN AND SUTSKEVER REALIZED THIS, IN DRAMATIC FASHION, WHEN THEIR TEAM WAS BUILDING AN AI MODEL IN MID-2017 TO COMPETE IN AN INTERNATIONAL DOTA TOURNAMENT.

I DIDN'T KNOW WHAT DOTA WAS UNTIL I GOT INVOLVED IN THIS CASE, BUT IT'S A MULTIPLAYER VIDEO GAME WHERE -- WHERE CONTESTANTS COMPETE WITH ONE ANOTHER IN REAL TIME AND UNPREDICTABLE WAYS.

AI ENGINEERS, IT TURNS OUT, OFTEN TEST THEIR MODELS IN VIDEO GAME CONTEXT. AND THE REASON FOR THAT IS, IN THAT CONTEXT, THEY CAN SEE HOW THEIR MODELS PERFORM AGAINST ACTUAL HUMAN BEINGS OPERATING IN REAL TIME.

DOTA PRESENTED A SPECIAL CHALLENGE BECAUSE IT HAS NO FIXED RULES. IT'S NOT A GAME LIKE CHESS. IT REQUIRES RESPONDING TO UNPREDICTABLE STRATEGY CHOICES OF OTHER HUMAN PLAYERS.

WHAT HAPPENED IN AUGUST 2017 IS, OPENAI'S MODEL BEAT THE BEST DOTA PLAYERS IN THE WORLD, AND THIS WAS IN A BIG INTERNATIONAL TOURNAMENT. NOTHING LIKE THIS HAD EVER HAPPENED.

THE REASON THEIR MODEL WON, BROCKMAN AND SUTSKEVER REALIZED, WAS COMPUTE. THE MORE COMPUTE, THE SMARTER THE MODEL. THIS WAS COMING NOW HOME VERY CLEARLY, MEMBERS OF THE

JURY.

AND WHAT THE OPENAI CREW REALIZED IS, THEY WERE GOING TO NEED A LOT MORE OF THIS COMPUTE.

THE DOTA WIN WAS A BIG DEAL. MR. MUSK KNEW IT. YOU WILL SEE IN THE EVIDENCE THAT HE CALLED IT THE TRIGGERING EVENT. AND YOU WILL SEE THAT NOW, ONCE THAT OPENAI WAS MAKING REAL PROGRESS, MUSK WANTED TO TURN IT INTO A FOR-PROFIT AND TO DO THAT RIGHT AWAY.

THE FOUNDERS, ACCORDINGLY, STARTED TALKING ABOUT WHAT TO DO NEXT. THEY KNEW THEY WOULD NEED A LOT MORE MONEY. THEY KNEW THEY WOULD NEED A LOT MORE CAPITAL. THEY'D NEED ALL OF THAT TO TAKE THE NEXT STEP. AND BY MID-AUGUST THEY HAD ALIGNED ON THE IDEA OF A NEW FOR-PROFIT COMPANY.

IN THE SIX WEEKS, FROM AUGUST 11TH TO SEPTEMBER 21ST, 2017, THE FOUNDERS HELD DOZENS OF MEETINGS, TALKING AMONGST THEMSELVES ABOUT HOW TO STRUCTURE AN OPENAI FOR-PROFIT.

YOU WILL SEE A NUMBER OF OTHER CHARACTERS INVOLVED IN THESE 2017 DISCUSSIONS, AND FROM TIME TO TIME THROUGHOUT THE REST OF THE EVIDENCE IN THE CASE. ALL OF THEM ARE ON TEAM MUSK, AND THEY ARE PICTURED HERE.

SAM TELLER WAS MUSK'S CHIEF OF STAFF.

JARED BIRCHALL MANAGED MUSK'S PERSONAL OFFICE. HE WAS MUSK'S BUSINESS MANAGER.

SHIVON ZILIS WAS MUSK'S AGENT AND VERY CLOSE ASSOCIATE. SHE WORKED FOR VARIOUS MUSK ORGANIZATIONS, BUT ALSO WAS

10:20:39 EMPLOYED BY OPENAI.

10:20:40 DURING THESE INTENSE DISCUSSIONS IN MID-2017, MR. MUSK
10:20:45 NEVER EXPRESSED THE VIEW THAT OPENAI HAD TO REMAIN PURELY
10:20:49 NONPROFIT, OR EVEN THAT HE THOUGHT IT SHOULD BE.

10:20:51 THE EXACT OPPOSITE, MEMBERS OF THE JURY, IS THE CASE.

10:20:58 THE WHOLE POINT OF THE DISCUSSIONS WAS TO HAVE A
10:21:01 FOR-PROFIT PIVOT, AND MUSK WAS RIGHT IN THE MIDDLE OF THEM.
10:21:03 MUSK EVEN HAD HIS BUSINESS MANAGER, MR. BIRCHALL, GO AND CREATE
10:21:09 OPENAI CORP, A FOR-PROFIT CORPORATION.

10:21:14 CONSIDER THAT. MUSK TOLD HIS BUSINESS MANAGER TO GO
10:21:18 CREATE OPENAI CORP, A FOR-PROFIT CORPORATION, AS EARLY AS THE
10:21:21 MIDDLE OF 2017.

10:21:22 AND WHAT BECAME CLEAR IN THESE CONVERSATIONS, MEMBERS OF
10:21:26 THE JURY, IS THAT MR. MUSK WOULD INSIST ON CONTROLLING THE
10:21:30 FOR-PROFIT, AND HE WOULD DEMAND TO OWN MOST OF IT.

10:21:33 THIS DOCUMENT, WHICH IS ONE YOU'LL SEE AS THE WITNESSES
10:21:37 TESTIFY, IS A CAP TABLE PREPARED BY MS. ZILIS AND MR. TELLER.
10:21:44 A CAP TABLE, AS YOU MAY KNOW, IS A DOCUMENT THAT SHOWS HOW MUCH
10:21:47 EQUITY, HOW MANY SHARE A COMPANY HOLD.

10:21:50 YOU NEVER HAVE A CAP TABLE IN A NONPROFIT BECAUSE THERE
10:21:55 ARE NO SHARES IN A NON-FOR-PROFIT. SO IT ASSUMES THAT THERE'S
10:21:57 GOING TO BE A FOR-PROFIT ORGANIZATION, AND THAT IS, INDEED,
10:22:02 WHAT MS. ZILIS AND MR. TELLER WAS ASSUMING.

10:22:05 THIS ONE HERE, IT SHOWS MUSK OWNING 55 PERCENT OF THE
10:22:09 PROPOSED OPENAI FOR-PROFIT, WITH THE OTHER COFOUNDERS REDUCED

10:22:13 TO JUST 7.5 PERCENT EACH.

10:22:17 AND IT'S JUST ONE OF THE MANY DOCUMENTS FROM THIS PERIOD 10:22:20 WHERE PEOPLE WORKING FOR MUSK HELPED HIM ANALYZE AND NEGOTIATE 10:22:27 PROPOSALS FOR TURNING OPENAI INTO A NONPROFIT.

10:22:29 COUNSEL FOR MR. MUSK TOLD YOU EARLIER THAT THE PARTIES 10:22:32 WERE CONSIDERING A NUMBER OF OPTIONS AROUND THIS TIME, AND 10:22:35 THAT'S RIGHT. YOU SAW A SLIDE WITH A LOT OF BUBBLES OR CLOUDS 10:22:38 THAT HAD THE VARIOUS IDEAS.

10:22:40 IT'S TRUE THAT OVER THE COURSE OF THIS TIME, A LOT OF 10:22:44 IDEAS WERE PITCHED BACK AND FORTH, BUT BY THE TIME OF THESE 10:22:47 DISCUSSIONS -- NOW WE'RE ON AUGUST 30TH, 2017, AS YOU CAN 10:22:51 SEE -- YOU CAN SEE RIGHT HERE IN THE EMAIL THAT THE TWO OPTIONS 10:22:55 MUSK'S TEAM WERE CONSIDERING WERE BOTH OPENAI FOR-PROFITS THAT 10:23:00 MR. MUSK HIMSELF CONTROLLED.

10:23:02 ONE OPTION SET OUT IN THIS DOCUMENT WAS AN OPENAI C-CORP. 10:23:07 THAT'S OPTION 2 IN MS. ZILIS'S EMAIL. AND THAT'S -- THAT'S 10:23:11 JUST A REGULAR FOR-PROFIT COMPANY, AS WE TALKED ABOUT ALREADY.

10:23:15 ANOTHER OPTION WAS TO CONVERT OPENAI ENTIRELY TO A 10:23:19 B-CORPORATION. AND -- AND THAT'S OPTION 1 IN THIS EMAIL. A 10:23:24 B-CORP, AND YOU'LL HEAR A BUNCH ABOUT THIS ABOUT THIS IN THE 10:23:29 COMING DAYS. A B-CORP IS SHORT FOR A PUBLIC BENEFIT 10:23:34 CORPORATION. IT'S A SPECIAL KIND OF COMPANY. LIKE A 10:23:36 NONPROFIT, IT HAS A SOCIAL MISSION. LIKE A NONPROFIT, A PUBLIC 10:23:40 BENEFIT CORPORATION IS LEGALLY OBLIGATED TO PURSUE A SOCIAL 10:23:44 MISSION, BUT IT ALSO CAN LOOK OUT FOR INVESTOR INTERESTS. AND

THAT'S WHAT A B-CORP IS, OR A PBC.

THESE DISCUSSIONS WERE ABOUT CREATING A FOR-PROFIT ENTITY THAT WERE -- WOULD BE UNDERTAKEN FOR THE PURPOSE OF RAISING HUNDREDS OF BILLIONS OF DOLLARS -- HUNDREDS OF MILLIONS OR EVEN BILLIONS OF DOLLARS IN INVESTMENT INCOME; THAT IS TO SAY, BRINGING IN INVESTMENTS TO FOR-PROFIT INVESTORS TO FUND THE MISSION. THAT'S THE CONVERSATION THAT WAS HAPPENING HERE.

THIS SITUATION, MAKE NO MISTAKE, BORE NO RESEMBLANCE TO A MUSEUM GIFT SHOP. AND YOU'LL LEARN THAT NONPROFITS OFTEN LAUNCH FOR-PROFIT AFFILIATES ON LARGE SCALES SOMETIMES, AS WELL AS SHORT, WHEN THEIR MISSION CALLS FOR MORE MONEY THAN DONATIONS ARE WILLING TO PROVIDE. AND YOU'LL SEE THAT THE EVIDENCE WILL BE CLEAR THAT THAT'S JUST WHAT HAPPENED HERE.

THERE WILL BE A LOT OF DOCUMENTS AND A LOT OF TESTIMONY ABOUT THESE DISCUSSIONS IN 2017. IT'S AN IMPORTANT MOMENT IN THE CASE. BUT THE COMMON THREAD RUNNING THROUGH ALL THAT EVIDENCE IS THAT MUSK WANTED TO FORM A FOR-PROFIT COMPANY, BUT TO OWN MORE THAN 50 PERCENT OF IT. HE DEMANDED CONTROL. HE DEMANDED THE ABILITY TO MAKE ALL THE DECISIONS WITHOUT REGARD TO THE CONTRARY VIEWS OF THE OTHER FOUNDERS.

AND THEN THE EVIDENCE WILL SHOW THAT RIGHT IN THE MIDDLE OF THESE DISCUSSIONS, AS MR. MUSK WAS TRYING TO LEVERAGE CONTROL FOR HIMSELF, HE PULLED THE PLUG ON HIS $5 MILLION QUARTERLY DONATIONS, PUTTING A FINANCIAL GUN TO THE HEAD OF HIS FELLOW FOUNDERS.

BUT ALTMAN AND BROCKMAN AND SUTSKEVER, THEY -- THEY JUST DIDN'T THINK THEY COULD HAND OPENAI OVER TO MUSK. THEY DIDN'T THINK IT WOULD BE THE RIGHT THING TO DO. YOU'LL LEARN THAT MUSK HADN'T BEEN MUCH INVOLVED IN THE DAY-TO-DAY OF OPENAI. HE DIDN'T REALLY UNDERSTAND ARTIFICIAL INTELLIGENCE VERY WELL. HE OFTEN ANTAGONIZED MANY OF OPENAI'S MOST EFFECTIVE RESEARCHERS. HE DIDN'T HAVE TIME. HE WAS FOCUSED ON TESLA'S UPCOMING MODEL 3 ROLLOUT.

BUT, MOST IMPORTANTLY, ONE PERSON HAVING CONTROL WASN'T CONSISTENT WITH OPENAI'S CORE MISSION. ITS GOAL WAS TO DEVELOP AGI FOR THE PUBLIC BENEFIT, AND IT WASN'T COMPATIBLE WITH JUST ONE GUY HAVING THE KEYS TO THE KINGDOM.

SO THEY SAID NO TO MUSK.

HERE'S AN EMAIL IN WHICH THAT WAS COMMUNICATED, SEPTEMBER 20 OF 2017, A FEW WEEKS AFTER THE LAST EMAIL WE LOOKED AT. BROCKMAN AND ALTMAN SAID TO MUSK, EXPLAINED -- SAYING THAT, "THE CURRENT STRUCTURE PROVIDES YOU WITH A PATH WHERE YOU END UP WITH UNILATERAL ABSOLUTE CONTROL OVER THE AGI. YOU STATED YOU DON'T WANT TO CONTROL THE FINAL AGI," THEY WROTE TO HIM, "BUT DURING THIS NEGOTIATION, YOU'VE SHOWN TO US THAT ABSOLUTE CONTROL IS EXTREMELY IMPORTANT TO YOU."

THE EMAIL CONVEYED THE IDEA THAT THESE GUYS WANTED TO WORK WITH MUSK, IF THEY COULD. THEY WANTED OPENAI TO SUCCEED, BUT THEY COULDN'T AND THEY WOULDN'T ACCEPT HIS DEMAND FOR ABSOLUTE CONTROL.

10:26:50 THIS INFURIATED MR. MUSK. AND AS YOU'LL HEAR, HE LITERALLY GRABBED HIS STUFF AND STORMED OUT OF THE DISCUSSIONS. BUT HE HAD A PLAN B. AFTER THE FOR-PROFIT NEGOTIATIONS COLLAPSED, MUSK FOCUSED ON MOVING OPENAI INTO TESLA. THAT WOULD ALLOW MUSK TO FUND -- PROVIDE BILLIONS OF DOLLARS IN FUNDING. NOT FROM MUSK, BUT FROM TESLA STOCKHOLDERS. TESLA WOULD BE A CASH COW, AS THE DOCUMENTS THAT YOU'LL SEE PUT IT.

10:27:19 THIS PROPOSAL WAS NO MORE ATTRACTIVE TO THE OTHER FOUNDERS THAN ELON'S CONTROL DEMAND. TESLA IS A CAR COMPANY. IT DIDN'T SHARE OPENAI'S MISSION, AND IT WAS OBVIOUSLY A BACKDOOR TO PUTTING MUSK IN CONTROL ONCE AGAIN.

10:27:41 REFLECTED IN ALL OF THESE DISCUSSIONS WAS THE CONCERN OF ALTMAN AND THE OTHERS ABOUT WHAT MR. MUSK MIGHT DO IF HE HAD CONTROL OF ARTIFICIAL GENERAL INTELLIGENCE.

10:27:50 THEY WERE CONCERNED WHETHER HE WOULD BE A RESPONSIBLE STEWARD OF IT, AND MUSK'S ACTIONS SINCE THEN HAVE ONLY CONFIRMED THAT THOSE CONCERNS WERE VERY WELL TAKEN.

10:28:03 SO THE OTHER FOUNDERS SAID, NO, WE'RE NOT GOING TO LET YOU HAVE ABSOLUTE CONTROL. WE WERE A TEAM, WE ARE A TEAM, WE CAN STAY THAT WAY.

10:28:13 THAT WASN'T ENOUGH FOR MR. MUSK. HE COULDN'T STAND THAT OUTCOME. YOU'LL SEE IT IN THE EVIDENCE. HE WROTE TO THE OTHER FOUNDERS IN FEBRUARY OF 2018 AND HE DECLARED THAT, "OPENAI WAS, QUOTE, 'ON A PATH TO CERTAIN FAILURE.'" YOU'LL SEE THAT HERE.

10:28:29 AND YOU'LL SEE THIS ONE, TOO. HERE, MUSK EXPLAINS THAT,

IF OPENAI DIDN'T HAVE A DRAMATIC CHANGE IN EXECUTION AND RESOURCES -- THAT IS, AS YOU WILL SEE, IF THEY DIDN'T LET HIM TAKE OVER THE COMPANY -- THEN OPENAI'S CHANCE OF SUCCESS WAS EXACTLY 0 PERCENT. NOT 1 PERCENT, HE EMPHASIZED WITH MATHEMATICAL PRECISION, 0 PERCENT.

AND THOSE WORDS, "YOU-ALL ARE ON A CERTAIN PATH TO FAILURE." THEY WERE MR. MUSK'S PARTING WORDS, AS IT TURNS OUT. SINCE HE COULDN'T CONTROL OPENAI, HE LEFT IT. HE LEFT IT, HE THOUGHT, FOR DEAD.

SO ON FEBRUARY 20TH OF 2018, MR. MUSK RESIGNED HIS BOARD SEAT AT OPENAI. THAT SAME DAY, HE GAVE A TALK TO OPENAI'S EMPLOYEES. YOU'LL HEAR THAT MR. MUSK WAS VERY, VERY DOWN ON OPENAI'S PROSPECTS, BUT VERY UP ON TESLA'S. THAT WHERE HE WAS GOING TO BUILD AGI, OR SO HE THOUGHT.

YOU'LL ALSO LEARN THAT MUSK DISMISSED THE PEOPLE AT AI -- AT OPENAI WHO WERE LASER-FOCUSED ON SAFETY. "JACKASSES" IS WHAT HE CALLED THEM AT THIS ALL-HANDS MEETING BEFORE HE WALKED OUT THE DOOR. JACKASSES. AND THE DOCUMENTS WILL SHOW THAT HE WAS SECRETLY PLANNING TO POACH OPENAI'S BEST EMPLOYEES TO COME WORK FOR HIM AT TESLA'S LAB.

BUT THERE'S SOMETHING THAT THE DOCUMENTS WON'T SHOW, AND SOMETIMES IN CASES LIKE THIS, WHAT YOU HEAR MATTERS A LOT, BUT WHAT YOU DON'T HEAR MATTERS A LOT. THE THINGS THAT WEREN'T SAID BUT YOU THINK SHOULD HAVE BEEN, THEY MATTER A LOT. AND WE'LL ASK YOU TO PAY A LOT OF ATTENTION TO THAT, THE DOG THAT

10:30:10 DOESN'T BARK.

10:30:11 HERE'S WHAT YOU WON'T SEE HERE: ANY EVIDENCE THAT THE 10:30:14 PROMISES THAT MR. MUSK CLAIMS WERE MADE TO HIM EVER WERE DONE 10:30:19 SO. HE SAYS HE WAS PROMISED OPENAI WOULD REMAIN ALWAYS AND 10:30:23 PURELY A FOR-PROFIT -- A NOT-FOR-PROFIT ORGANIZATION. HE 10:30:27 CLAIMS IT UNDERTOOK TO BE OPEN SOURCING AT ALL TIMES.

10:30:31 THERE'S NO RECORD OF THOSE PROMISES. THIS IS A DOG THAT 10:30:34 DOESN'T BARK. THERE ISN'T A SINGLE EMAIL OR A SINGLE TEXT 10:30:40 MESSAGE OR ANY OTHER DOCUMENT WHERE MR. MUSK CLAIMS THAT OPENAI 10:30:43 WAS OBLIGATED TO REMAIN A NONPROFIT. THERE'S NO EVIDENCE 10:30:46 SUPPORTING MUSK'S CLAIM THAT OPENAI PROMISED TO MAKE ITS 10:30:49 TECHNOLOGY OPEN SOURCE AT ALL TIMES.

10:30:52 YOU'LL SEE NO EVIDENCE OF THAT, MEMBERS OF THE JURY, 10:30:55 BECAUSE IT DIDN'T HAPPEN. NOT EVEN THE OPENAI DIRECTORS WHO 10:31:00 MR. MUSK IS GOING TO CALL IN HIS CASE WILL SAY THAT OPENAI EVER 10:31:04 PROMISED TO REMAIN A NONPROFIT IN THE WAY HE SAYS, OR TO OPEN 10:31:09 SOURCE EVERYTHING.

10:31:10 THEY'RE GOING TO SAY THE OPPOSITE. THEY'RE GOING TO SAY 10:31:12 THAT THEY VOTED TO APPROVE THE MICROSOFT TRANSACTIONS THAT 10:31:17 MR. MUSK SAYS VIOLATED THESE COMMITMENTS.

10:31:20 THE EVIDENCE IS GOING TO BE THAT MR. MUSK DIDN'T CARE 10:31:23 ABOUT THESE THINGS. WHAT HE CARED ABOUT FROM 2015 TO 2018, 10:31:26 WHEN HE LEFT, WAS WINNING, BUILDING AGI BEFORE GOOGLE'S 10:31:33 DEEPMIND BUILT AGI.

10:31:36 AND ON THAT, THE DOCUMENTS ARE VERY CLEAR. HERE'S AN

10:31:39 EMAIL FROM MUSK IN DECEMBER OF 2016.

10:31:44 HE WRITES ABOUT HOW GOOGLE'S DEEPMIND WAS MOVING VERY 10:31:47 FAST, AND HOW HE DIDN'T THINK OPENAI COULD CATCH UP. HE SAID, 10:31:51 "IT MIGHT HAVE BEEN A MISTAKE TO MAKE OPENAI A NONPROFIT."

10:31:56 SO IN FEBRUARY OF 2018, MUSK QUIT OPENAI TO PURSUE AGI AND 10:32:03 TESLA. AND FOR A LITTLE WHILE LONGER HE PAID -- HE COVERED THE 10:32:07 RENT AT OPENAI'S WORKSPACE, BUT THE $5 MILLION AND QUARTERLY 10:32:12 DONATIONS, THEY WERE GONE. THEY WERE CUT OFF FOR GOOD.

10:32:18 AS TO HIS BILLION-DOLLAR PLEDGE, MR. MUSK FELL $960 10:32:24 MILLION SHORT. HE ACTUALLY CONTRIBUTED LESS THAN 4 PERCENT OF 10:32:26 WHAT HE PROMISED THAT HE WOULD.

10:32:31 UNLIKE MR. MUSK, ALTMAN AND BROCKMAN AND SUTSKEVER, THEY 10:32:36 DIDN'T QUIT THE PROJECT, THEY STUCK WITH IT. NOW, THEIR FIRST 10:32:40 ORDER OF BUSINESS ONCE MR. MUSK LEFT WAS TO FIND A WAY TO FUND 10:32:43 THE MISSION NOW THAT MUSK HAD BAILED ON HIS FUNDING PLEDGE.

10:32:47 MR. MUSK'S COUNSEL SHOWED YOU AN EMAIL FROM MR. ALTMAN IN 10:32:52 WHICH HE SAID HE WAS STILL ENTHUSIASTIC ABOUT THE NONPROFIT 10:32:56 STRUCTURE. I EXPECT YOU RECALL THAT. THE EVIDENCE WILL SHOW 10:32:57 THAT THAT WASN'T A PROMISE, IT WAS JUST WHAT IT LOOKED LIKE, AN 10:33:01 EXPRESSION OF ENTHUSIASM AT THE TIME.

10:33:03 BUT THE EVIDENCE WILL ALSO SHOW THAT IT WAS ENTIRELY 10:33:05 ACCURATE. ALTMAN WAS FUNDRAISING LIKE MAD TO KEEP THE 10:33:10 NONPROFIT ALIVE. THAT'S WHAT WAS GOING ON AT THAT TIME. AND 10:33:17 HERE'S A PICTURE OF THE DONATIONS THAT WERE ACTUALLY MADE TO 10:33:20 THE OPENAI NONPROFIT. THANKS TO THE FUNDRAISING WORK OF ALTMAN

10:33:27 AND BROCKMAN AND OTHERS, OPENAI WAS ABLE TO FIND DONORS TO 10:33:31 REPLACE MUSK, DONORS WHO COLLECTIVELY CONTRIBUTED OVER 10:33:34 $90 MILLION.

10:33:35 THE DARK BLUE BARS HERE, THEY SHOW MR. MUSK'S DONATIONS. 10:33:39 THE LIGHT BLUE BARS ARE OTHER DONATIONS. AND YOU CAN SEE THAT 10:33:44 THEY FAR OUTWEIGH MUSK, MORE THAN -- MORE THAN TWO TIMES.

10:33:47 AND HERE'S ANOTHER THING YOU WON'T HEAR IN THE COMING 10:33:51 DAYS, ANY OF THESE OTHER DONORS WHO GAVE $90 MILLION-PLUS 10:33:55 BRINGING SUIT, OR CLAIMING THAT OPENAI BROKE SOME SORT OF 10:33:59 PROMISE. WHERE ARE THEY? THAT'S ANOTHER DOG THAT DOESN'T 10:34:05 BARK.

10:34:05 THESE CONTRIBUTIONS KEPT THE RESEARCH GOING AND THEY KEPT 10:34:10 THE LIGHTS ON, BUT IT WASN'T NEARLY ENOUGH TO STAY ON THE 10:34:13 TECHNOLOGICAL CUTTING EDGE, AND THAT WAS ESPECIALLY WITH GOOGLE 10:34:16 POURING BILLIONS MORE INTO ITS DEEPMIND PROJECT.

10:34:19 YOU HEARD EARLIER FROM -- THE SUGGESTION THAT OPENAI COULD 10:34:26 HAVE CONTINUED TO FUNCTION ON DONATIONS ALONE. THAT'S JUST 10:34:30 PLAIN WRONG. MR. MUSK SAID AS MUCH, AND HE WASN'T DOING THE 10:34:33 HARD WORK OF FUNDRAISING. MR. ALTMAN AND MR. BROCKMAN WERE 10:34:37 DOING THE HARD WORK OF FUNDRAISING. THEY WERE DOING A PRETTY 10:34:41 GOOD JOB OF IT. BUT YOU'LL HEAR FROM THEM, THERE WAS JUST NO 10:34:44 WAY THAT YOU COULD GO AND RAISE BILLIONS FROM DONORS, AND 10:34:48 THAT'S WHAT IT WAS GOING TO TAKE.

10:34:49 SO WHAT ALTMAN AND BROCKMAN AND SUTSKEVER DO, THE PEOPLE 10:34:55 WHO STUCK IT OUT, IS LOOKED FOR SUSTAINABLE WAYS OF RAISING THE

10:34:58 MONEY THAT WOULD BE NECESSARY TO BUILD THE TECHNOLOGY THAT
10:35:01 STOOD AND STILL STANDS AT THE HEART OF THE MISSION.

10:35:04 WHAT THEY DID FIRST IN 2018, IS THEY FORMED A FOR-PROFIT
10:35:08 SUBSIDIARY. THAT'S A COMPANY THAT IS CONTROLLED BY THE
10:35:11 NOT-FOR-PROFIT. AND AS YOU'LL SEE, THE NONPROFIT REMAINED IN
10:35:14 CONTROL OF -- OF THE FOR-PROFIT. THAT WAS REALLY IMPORTANT
10:35:17 THEN. IT'S REALLY IMPORTANT NOW. THE NOT-FOR-PROFIT OPENAI
10:35:24 CONTINUES TO GOVERN THE OPENAI COMPANY THAT YOU HAVE NOW HEARD
10:35:27 OF.

10:35:27 THE FOR-PROFIT ARM DID SOMETHING REALLY IMPORTANT FOR
10:35:30 OPENAI, THOUGH, AT A TIME OF ITS CRITICAL NEED. IT GAVE THE
10:35:34 COMPANY THE ABILITY TO ATTRACT INVESTMENT AND GRANT EMPLOYEES
10:35:38 EQUITY INTERESTS, MAKING IT EASIER TO HIRE THE BEST COMPUTER
10:35:41 SCIENTISTS.

10:35:42 AND TO BE CLEAR, YOU CAN'T BUILD WHAT OPENAI BUILT IF YOU
10:35:46 DON'T HAVE THE BEST COMPUTER SCIENTISTS. THEY WERE GETTING
10:35:49 OFFERS FROM META AND GOOGLE AND EVERYONE ELSE, AND YOU HAD TO
10:35:53 COMPETE WITH THEM IF YOU WERE GOING TO COMPETE IN THE SPACE,
10:35:56 AND THAT'S WHAT THEY DID.

10:35:56 AND -- AND AS MUSK -- AS MUCH AS MUSK MAY RAIL ABOUT IT,
10:36:02 THIS WAS NO DEVIATION FROM THE FUNDING PLAN. THE IDEA FROM THE
10:36:06 START WAS TO TRY TO PAY STARTUP COMPENSATION TO ITS TOP
10:36:10 ENGINEERS, NECESSARILY; OTHERWISE, THE MISSION WOULD FAIL FOR
10:36:13 WANT OF TOP TALENT.

10:36:18 AFTER THE FOR-PROFIT ARM WAS PUT IN PLACE IN 2018, OPENAI

WORKED OUT A DEAL WITH MICROSOFT TO BECOME AN ANCHOR INVESTOR.

WE HAVE A LITTLE TIMELINE HERE TO TRY AND ORIENT -- ORIENT YOU IN THE CHRONOLOGY. IN 2019, MICROSOFT MADE ITS FIRST SIGNIFICANT INVESTMENT. THAT WAS FOR A BILLION DOLLARS. THAT WAS PUT TO WORK IMMEDIATELY FOR THE COMPUTE THAT WAS REQUIRED TO BUILD SOME OF THE EARLY MODELS THAT POWERED OPENAI.

IN 2021, MICROSOFT INVESTED ANOTHER $2 BILLION.

AND IN JANUARY OF 2023, MICROSOFT INVESTED A FURTHER $10 MILLION.

ALL OF THESE INVESTMENTS RETAINED THE NOT FOR-PROFIT IN CONTROL OF OPENAI AND ITS TECHNOLOGY. ALL MAINTAINED SAFEGUARDS TO ENSURE THAT OPENAI'S TECHNOLOGY WAS BEING DEPLOYED WITHOUT SIGNIFICANT RISK TO SAFETY AND IN ACCORDANCE WITH THE MISSION.

THESE MICROSOFT DEALS, MEMBERS OF THE JURY, WERE APPROVED BY OPENAI'S NONPROFIT BOARD OF DIRECTORS, INCLUDING THE WITNESSES MR. MUSK IS GOING TO CALL, INCLUDING SHIVON ZILIS, THE VERY CLOSE PERSONAL ASSOCIATE OF MR. MUSK.

AND THE REASON THEY WERE APPROVED BY THESE INDEPENDENT DIRECTORS IS BECAUSE THEY WERE ESSENTIAL TO OPENAI'S MISSION. THEY NEEDED TO GET THE MONEY FROM SOMEWHERE OR ELSE THE PROJECT COLLAPSED. IT WAS AS SIMPLE AS THAT.

COUNSEL TO MR. MUSK MENTIONED EARLIER THAT INVESTORS WERE WARNED THAT THERE MIGHT BE NO PROFIT AT ALL THAT CAME OUT OF THIS. IT'S ONE OF THOSE WARNINGS THAT I'M SURE YOU'VE SEEN ON

10:37:58 ALL SORTS OF REALLY RISKY INVESTMENTS WHERE IT SAYS YOU COULD LOSE EVERYTHING HERE, AND IT SAID THAT YOU'RE CONTRIBUTING TO A COMPANY THAT IS CONTROLLED BY A NOT-FOR-PROFIT. BUT THAT DOESN'T MEAN THESE INVESTORS WEREN'T EXPECTING TO MAKE MONEY, OR AT LEAST HOPING.

PEOPLE DON'T THWART BILLIONS OF DOLLARS OVER AS AN INVESTMENT, NOT A DONATION, WITHOUT THE EXPECTATION OF A RETURN. THEY KNEW IT WAS RISKY, YOU COULD LOSE IT ALL. BUT WHAT HAPPENS WHEN YOU MAKE A RISKY INVESTMENT? YOU MAKE IT BECAUSE YOU MIGHT LOSE IT, BUT YOU COULD ALSO MAKE A LOT. AND THAT'S WHAT THESE FOLKS WERE INVESTING INTO. THEY KNEW THEY COULD LOSE EVERYTHING. OPENAI WENT OUT OF ITS WAY TO SAY YOU COULD LOSE EVERYTHING.

ONE OF THE REASONS YOU MIGHT LOSE EVERYTHING, OPENAI SAID, WAS AT THE END OF IT, THIS WHOLE ORGANIZATION THAT YOU'RE INVESTING INTO AND TRYING TO PROFIT FROM, IT'S CONTROLLED BY A NONPROFIT. THERE'S A NONPROFIT UPSTAIRS.

AND IF THERE'S A COLLISION BETWEEN YOUR INTERESTS AND THE NONPROFIT INTEREST, THAT'S ANOTHER REASON YOU MIGHT LOSE. THAT'S WHAT HAPPENED THERE.

BUT MAKE NO MISTAKE, THESE WERE FOR-PROFIT INVESTORS PUTTING BILLIONS IN, IN THE HOPES THAT THIS WOULD WORK.

MUSK, MEMBERS OF THE JURY, KNEW ALL ABOUT MICROSOFT AND OPENAI IN REAL TIME. THE EVIDENCE WILL SHOW THAT ALTMAN KEPT MUSK CLOSELY POSTED ON THE RELATIONSHIP WITH MICROSOFT AS IT

10:39:16 DEVELOPED.

10:39:17 AND IT WASN'T JUST ALTMAN WHO KEPT MUSK INFORMED. MUSK'S 10:39:21 COLLEAGUE AND ASSOCIATE, SHIVON ZILIS, FROM WHOM YOU'LL HEAR, 10:39:26 WAS AN ADVISOR AND OPENAI BOARD MEMBER. AS YOU'LL LEARN, SHE 10:39:30 HAD A PERSONAL RELATIONSHIP WITH MUSK THAT SHE KEPT SECRET FROM 10:39:35 OPENAI.

10:39:35 YOU'LL SEE THAT MUSK AND ZILIS DISCUSSED HOW SHE SHOULD 10:39:39 STAY CLOSE SO SHE COULD FUNNEL HIM INFORMATION ABOUT OPENAI 10:39:42 WHEN -- AFTER HE HAD LEFT THE BOARD. YOU'LL HEAR THAT FULL 10:39:45 STORY, MEMBERS OF THE JURY, AS IT COMES OUT IN THE COMING DAYS.

10:39:49 BUT THERE'S ONE DOCUMENT I WANT TO SHOW YOU NOW SO YOU CAN 10:39:52 SEE -- YOU CAN SEE HOW MUCH MUSK WAS TOLD ABOUT OPENAI'S PLANS.

10:39:54 AND ONE OF THE THINGS THAT'S FUNNY ABOUT IT, IT'S THE SAME 10:39:58 DOCUMENT THAT COUNSEL TO MR. MUSK SHOWED YOU EARLIER. IT'S 10:40:01 JUST WHAT WE THINK IS THE IMPORTANT PART.

10:40:07 ALTMAN SENT MR. MUSK A FUNDING PLAN THAT SPECIFICALLY 10:40:13 DISCUSSED A FIRST FUNDRAISING ROUND OF $500 MILLION. AND 10:40:17 YOU'LL SEE, WHEN THE EVIDENCE IS IN, THAT THIS IS PRETTY CLOSE 10:40:19 TO JUST WHAT HAPPENED IN THE FIRST INVESTMENTS ROUNDS THAT 10:40:21 ACTUALLY HAPPENED IN 2018 AND 2019.

10:40:23 THE TERM SHEET MR. ALTMAN SHARED IN AUGUST 2018, NOTE THE 10:40:31 DATE, ALSO PREVIEWED THAT THERE WOULD BE A LATER AND LARGER 10:40:34 ROUND OF FUNDRAISING FOR FOR-PROFIT INVESTORS; A ROUND OF 10:40:39 $10 BILLION. AND THAT'S EXACTLY WHAT HAPPENED IN THE FOLLOWING 10:40:42 INVESTMENT ROUNDS. THAT'S THE MICROSOFT DEAL. THAT'S THE

10:40:45 MICROSOFT DEAL. MUSK LEARNED ABOUT A POTENTIAL $10 BILLION CORPORATE INVESTMENT FOR-PROFIT IN 2018.

SO IT'S WORTH PAUSING ON THIS DOCUMENT.

MUSK CLAIMS HE WAS PROMISED OPENAI WOULD STAY A NONPROFIT FOREVER. AND MUSK'S LAWYER JUST MADE A VERY BIG DEAL ABOUT THE $10 BILLION MICROSOFT INVESTMENT IN 2023.

BUT IN THIS TERM SHEET, WHICH MR. ALTMAN, AS YOU CAN SEE, SENT DIRECTLY TO MR. MUSK, IT'S CLEAR AS CAN BE THAT OPENAI WAS GOING TO RAISE BILLIONS FROM CORPORATE INVESTORS TO FUND THE MISSION.

NOW, WHEN HE GOT THIS TERM SHEET, DID MR. MUSK SAY, WHAT'S GOING ON HERE? DID HE SAY, WHY ARE YOU SETTING UP A FOR-PROFIT THAT IS CONTEMPLATING RETURNS OF TENS OF BILLIONS OF DOLLARS FOR INVESTORS?

HE DOESN'T SAY ANYTHING LIKE THAT, MEMBERS OF THE JURY. AND THAT'S BECAUSE MUSK KNEW THAT OPENAI NEEDED TO DEVELOP A FOR-PROFIT COMPANY OR ELSE IT COULDN'T PURSUE ITS MISSION. HE KNEW THAT. HE KNEW HE HAD NO RIGHT TO STOP IT, AND YOU'LL SEE THE EVIDENCE OF THAT.

AND YOU WILL ALSO SEE THAT HE DIDN'T HAVE ANY INTEREST IN STOPPING IT AT THE TIME. HE EVEN KEPT PAYING OPENAI'S RENT FOR A LITTLE WHILE LONGER.

AND I SHOULD SAY, NOT ONLY WAS MUSK APPRISED OF AND AWARE OF OPENAI'S FOR-PROFIT PLANS IN GENERAL, HE KNEW ABOUT THE 2019 AND 2021 MICROSOFT INVESTMENTS IN PARTICULAR BEFORE THEY

HAPPENED. HE SPOKE WITH ALTMAN DIRECTLY ABOUT THEM. YOU'LL SEE THE EVIDENCE AND HEAR IT.

AND HE SAID THAT THEY WERE A GOOD IDEA. YOU'LL SEE THAT EVIDENCE, TOO.

AND AT THE TIME HE NEVER SAID THAT OPENAI COULDN'T OR SHOULDN'T DO A DEAL WITH MICROSOFT; HE NEVER SAID THEY SHOULDN'T TAKE MICROSOFT ON AS AN INVESTOR; AND THAT'S ANOTHER DOG THAT DIDN'T BARK.

IF IT WAS AN AFFRONT TO THE PROMISE THAT WAS MADE TO HIM TO HAVE MICROSOFT AS A MULTIBILLION DOLLAR INVESTOR, WHY DID HE SAY IT WAS A GOOD IDEA?

WHAT YOU'LL SEE IS THAT MR. MUSK DIDN'T START COMING UP WITH THESE CLAIMS UNTIL HE FOUND OUT THAT OPENAI MIGHT BE WORTH A LOT OF MONEY. THAT'S WHEN THE SOUR GRAPES KICK IN.

BECAUSE AS IT TURNED OUT, MR. MUSK'S CLAIM THAT OPENAI HAD ZERO CHANCE OF SUCCESS COULD NOT HAVE BEEN PROVEN MORE WRONG.

IN NOVEMBER OF 2022, THE COMPANY LAUNCHED THE CHATGPT MODEL, AND SUDDENLY OPENAI'S PRODUCT WAS A HOUSEHOLD NAME. THE EVIDENCE WILL SHOW THAT MR. MUSK DIDN'T LIKE THIS ONE LITTLE BIT.

A FEW MONTHS LATER, IN MARCH OF 2023, MR. MUSK CREATED XAI, HIS OWN RIVAL AI COMPANY, AND WITH THE GROK ARRIVAL, CHATBOT.

AND XAI, AS YOU PROBABLY KNOW, IS NOW A FULL-ON COMPETITOR OF OPENAI, AND YOU'LL SEE THE EVIDENCE OF THAT.

10:43:41 SOMETHING ELSE HAPPENED IN LATE 2023, AND I SHOULD PAUSE ON IT. AT THE END OF THIS, I THINK YOU'LL SEE, MEMBERS OF THE JURY, IT'S NOT RELEVANT TO THIS CASE, BUT THE PLAINTIFF TALKED A BUNCH ABOUT IT, MR. MUSK, SO I WANTED TO ADDRESS IT.

10:43:54 IN NOVEMBER OF 2023, FOUR MEMBERS OF THE OPENAI BOARD REMOVED, EXCUSE ME, ALTMAN AND BROCKMAN FROM THE BOARD OF DIRECTORS. THE EVIDENCE IS GOING TO SHOW THAT THIS EVENT HAD NOTHING TO DO WHATEVER WITH HOW AND THE EXTENT TO WHICH OPENAI WAS FOLLOWING ITS MISSION. YOU'LL SEE THE EVIDENCE ON THAT. IT'S CLEAR.

10:44:17 AFTER THE BOARD FIRED ALTMAN AND BROCKMAN, MOREOVER, IT BECAME JUST CRYSTAL CLEAR HOW IMPORTANT THEIR LEADERSHIP WAS. OVER 90 PERCENT, NEARLY ALL OF OPENAI'S EMPLOYEES, SIGNED A PETITION WITHIN 48 HOURS DEMANDING THAT BROCKMAN AND ALTMAN COME BACK, AND THAT THE BOARD RESIGN. BECAUSE THEY KNEW THERE WAS NO OPENAI WITHOUT THE LEADERSHIP OF THE PEOPLE WHO HAD BUILT IT FROM THE GROUND UP.

10:44:42 THIS EVENT WAS SERIOUS, AND IT CAUSED SOUL SEARCHING WITHIN THE COMPANY AND SOME POSITIVE OUTCOMES.

10:44:51 BUT THE EVENTS OF NOVEMBER 2023 WEREN'T ABOUT OPENAI VEERING OFF THE PATH OF ITS MISSION. THEY CERTAINLY WEREN'T ABOUT THE ISSUES IN THIS LAWSUIT, WHETHER MUSK WAS MADE A PROMISE THAT APPARENTLY ONLY HE EVER HEARD. THE EVIDENCE THERE WILL BE VERY CLEAR.

10:45:08 AND THAT BRINGS US TO OPENAI TODAY.

IN OCTOBER OF 2025, OPENAI UPDATED THE LEGAL STRUCTURE OF ITS FOR-PROFIT ARM. THE OPENAI NONPROFIT CALLED THE OPENAI FOUNDATION CREATED THE OPENAI PUBLIC BENEFIT CORPORATION. AS WE TALKED ABOUT, A PUBLIC BENEFIT CORPORATION, A PBC, IT'S A FOR-PROFIT COMPANY WITH A LEGALLY MANDATORY, LEGALLY REQUIRED PUBLIC INTEREST MISSION.

AND IMPORTANTLY, UNLIKE A REGULAR CORPORATION, THE PBC NOT ONLY CAN BUT IT MUST PURSUE ITS PUBLIC INTEREST MISSION EVEN WHILE IT TRIES TO LOOK OUT FOR INVESTOR INTERESTS.

IN THIS NEW STRUCTURE -- AND WE HAVE A PIE CHART HERE THAT I HOPE MAKES IT A LITTLE BIT CLEARER -- THE NONPROFIT RETAINS 100 PERCENT CONTROL OVER THE PBC'S MAJOR DECISIONS.

I SHOULD SAY THAT AGAIN SLOWLY. THE NONPROFIT RETAINS 100 PERCENT CONTROL OVER THE PBC'S MAJOR DECISIONS. THE NONPROFIT CONTINUES TO DRIVE THIS TRAIN.

BOTH THE NONPROFIT AND THE PBC ARE CONTROLLED BY AN INDEPENDENT BOARD OF DIRECTORS. THAT INDEPENDENT BOARD OF DIRECTORS SUPERVISES MANAGEMENT AT BOTH COMPANIES, INCLUDING MR. ALTMAN, INCLUDING MR. BROCKMAN.

YOU HEARD SOME FROM OPPOSING COUNSEL ABOUT MR. ALTMAN'S ALLEGED CONFLICTS, BUT YOU'LL SEE THAT EVERY TRANSACTION THAT MR. MUSK HAS COMPLAINED AND WILL COMPLAIN ABOUT WAS CONSIDERED AND APPROVED BY THE INDEPENDENT DIRECTORS. YOU KNOW WHY? IT'S BECAUSE THEY MADE SENSE FOR OPENAI IN THE PURSUIT OF ITS MISSION.

10:46:48 THE EVIDENCE WILL ALSO SHOW THAT THE OPENAI STRUCTURE WAS DESIGNED WITH THE INVOLVEMENT OF STATE REGULATORS, AND IT ENSURES THAT OPENAI WILL BE GOVERNED BY A MISSION-DRIVEN, NOT-FOR-PROFIT CORPORATION, WHO ANSWERS TO THE CALIFORNIA ATTORNEY GENERAL.

10:47:08 NO OTHER COMPANY IN THE ARTIFICIAL INTELLIGENCE SPACE HAS THOSE COMMITMENTS. ONLY OPENAI HAS THAT COMMITMENT TO REGULATORS. ONLY OPENAI HAS A NONPROFIT IN CONTROL. NONE OF THE OTHERS DO.

10:47:25 AT THE SAME TIME, HOWEVER, THIS STRUCTURE WAS THOUGHT ENOUGH TO PERMIT OPENAI THE ABILITY TO RAISE MONEY THAT IT WILL NEED TO PURSUE ITS MISSION.

10:47:32 IT ALSO MADE OPENAI ONE OF THE BEST RESOURCE NONPROFITS IN THE WORLD. YOU'LL HEAR THAT TODAY THE OPENAI NONPROFIT IS PURSUING IMPORTANT INITIATIVES LOCALLY AND NATIONALLY, DESIGNED TO ENSURE THAT OPENAI COMES IN AS SOCIALLY BENEFICIAL, WHICH IS A HARD PROBLEM AND IMPORTANT PROBLEM AND ONE THAT OPENAI IS LASER-FOCUSED ON.

10:47:56 THE FOUNDATION IS WORKING TO DEPLOY OPENAI TO CURE DISEASES LIKE ALZHEIMER'S. IT'S WORKING TO ENSURE ECONOMIC DEVELOPMENT AND PROSPERITY HERE AND ACROSS THE COUNTRY. IT'S PUTTING THOSE MASSIVE RESOURCES TO WORK FOR THE INTENTION OF MAKING IT AS LIKELY AS IT CAN BE THAT THE AI FUTURE IS GOING TO BE A GOOD ONE.

10:48:20 YOU SAW A SLIDE SUGGESTING THAT THE NONPROFIT HAD NO

10:48:25 EMPLOYEES AND WASN'T DOING ANYTHING. THAT'S JUST WRONG.
10:48:27 YOU'LL HEAR EVIDENCE, AND YOU'LL BE ABLE TO CREDIT IT BECAUSE
10:48:30 IT WILL BE INCONTROVERTIBLY TRUE.

10:48:39 THE EVIDENCE THAT YOU WILL SEE OVER THE COMING DAYS,
10:48:42 MEMBERS OF THE JURY, COULD BE SUMMARIZED AS A TALE OF TWO
10:48:44 ELONS. WHEN HE WAS APART OF OPENAI, MUSK UNDERSTOOD THAT IT
10:48:50 NEEDED TO DEVELOP A FOR-PROFIT ARM TO FUND ITS RESEARCH
10:48:52 MISSION. HE NEEDED A FOR-PROFIT ARM TO FUND ITS EMPLOYEE
10:48:56 NEEDS. HE SUPPORTED A FOR-PROFIT, SO LONG AS HE WAS IN
10:49:00 CONTROL.

10:49:01 HE ALSO UNDERSTOOD THAT OPENAI WOULD NOT OPEN SOURCE ALL
10:49:05 OF ITS TECHNOLOGY.

10:49:06 MUSK SAYS THAT THE "OPEN" IN OPENAI MEANS OPEN SOURCING,
10:49:12 BUT HE NEVER SAID THAT WHEN HE WAS THERE. NO ONE ELSE DID
10:49:15 EITHER.

10:49:15 THE DOCUMENTS SAY JUST THE OPPOSITE, AND YOU'LL HEAR THE
10:49:19 TESTIMONY.

10:49:19 AFTER MUSK FOUNDED XAI, HOWEVER, WELL, THAT'S WHEN HE
10:49:23 STARTED TELLING THE STORY THAT HE'S TELLING IN THIS CASE.

10:49:28 THIS IS THE SECOND ELON. HE'S NOW CLAIMING THAT OPENAI
10:49:32 WAS REQUIRED ALWAYS TO BE A NONPROFIT. HE'S NOW CLAIMING THAT
10:49:36 OPENAI WAS REQUIRED TO OPEN SOURCE ALL OF ITS TECHNOLOGY.

10:49:38 AS YOU LISTEN TO PLAINTIFFS' CASE, MEMBERS OF THE JURY, I
10:49:41 ASK YOU TO CONSIDER THE EVIDENCE HE PROFFERS TO SUPPORT THOSE
10:49:45 CLAIMS.

10:49:45 WHAT'S THE EVIDENCE THAT SUPPORTS THE RED ELON? MOST OR ALL OF THAT EVIDENCE WILL BE HIS OWN TESTIMONY, OR THE TESTIMONY OF PEOPLE WHO WORK FOR HIM.

10:50:02 THERE'S A FURTHER POINT, AND IT'S AN IMPORTANT ONE TO KEEP IN MIND AS YOU LISTEN TO THE EVIDENCE, AND THE COURT HAS MENTIONED IT, AND SO HAS MY ADVERSARY.

10:50:09 EVEN IF MUSK DID HAVE SOME RIGHT TO OBJECT TO OPENAI'S DECISION TO CREATE A NONPROFIT AFFILIATE, OR SOME RIGHT TO OBJECT TO THE PARTNERSHIP WITH MICROSOFT, THE TIME TO DO THAT HAS LONG SINCE PASSED.

10:50:26 HERE'S WHAT A STATUTE OF LIMITATIONS MEANS: IT MEANS IF YOU'VE GOT A LEGAL CLAIM AGAINST SOMEONE, YOU HAVE TO RAISE IT IN A REASONABLE TIME. YOU CAN'T SIT AROUND FOR FIVE YEARS OR TEN YEARS. AND THE REASON IS THAT BECAUSE AS TIME PASSES, EVIDENCE CAN BE LOST. PEOPLE FORGET, AS TIME GOES BY.

10:50:42 AS TIME GOES BY, IT'S TOO EASY TO MAKE STUFF UP ABOUT WHAT HAPPENED IN THE PAST. IT'S NOT FAIR TO BRING A LAWSUIT AGAINST SOMEONE, AND THEN SAY, WELL, IT WAS SO LONG AGO, I ACTUALLY DON'T REMEMBER THAT, AND I CAN'T RECALL THAT.

10:50:55 AND YOU'LL SEE A LOT OF THAT HAPPENING RIGHT HERE IN THIS CASE.

10:50:58 AND THAT'S WHY THERE'S A STATUTE OF LIMITATIONS. AND THE EVIDENCE HERE IS GOING TO SHOW THAT MR. MUSK SAT ON HIS CLAIMS FOR YEARS. IT WILL SHOW THAT MUSK KNEW THE DETAILS OF OPENAI'S FOR-PROFIT AND ITS DEALINGS WITH MICROSOFT IN REAL TIME IN 2018

10:51:12 AND 2019 AND 2020 AND 2021.

10:51:15 IT WILL SHOW THAT BEGINNING IN 2019, OPENAI WAS ACCEPTING 10:51:20 FOR-PROFIT INVESTMENTS FROM A FOR-PROFIT COMPANY IN BROAD 10:51:25 DAYLIGHT FOR ALL OF THE WORLD TO SEE.

10:51:27 THINK ABOUT IT. IF OPENAI'S AGREEMENT WITH MICROSOFT IN 10:51:32 2019 HAD ACTUALLY BROKEN SOME SORT OF PROMISE, MUSK WOULD HAVE 10:51:36 SUED THEN. HE'S NOT A MAN WHO IS SHY ABOUT BRINGING LAWSUITS. 10:51:40 BUT HE DIDN'T BRING A LAWSUIT THEN. HE ONLY BROUGHT IT WHEN HE 10:51:43 WAS A COMPETITOR YEARS LATER.

10:51:45 THE EVIDENCE WILL SHOW THAT HE DIDN'T SUE BECAUSE THERE 10:51:49 WAS NO BROKEN PROMISE. MUSK MAY CLAIM HE WAS DECEIVED, AND HE 10:51:54 DIDN'T REALLY KNOW WHAT WAS GOING ON IN 2019. YOU'LL GET TO 10:51:57 SEE THE EVIDENCE, AND YOU CAN EVALUATE THAT CLAIM IN LIGHT OF 10:52:01 THAT EVIDENCE, AS I KNOW YOU WILL.

10:52:03 BUT THE RECORD WILL LEAVE NO REAL QUESTION THAT MUSK 10:52:06 DIDN'T KNOW ENOUGH TO BRING THIS LAWSUIT BY SEPTEMBER OF 2020.

10:52:10 CONSIDER, MEMBERS OF THE JURY, THIS TWEET FROM 10:52:15 SEPTEMBER 24TH, 2020. HERE, IN RESPONSE TO OPENAI GRANTING 10:52:18 MICROSOFT A LICENSE, HE TWEETED THIS, "THIS DOES SEEM LIKE THE 10:52:22 OPPOSITE OF OPEN. OPENAI IS ESSENTIALLY CAPTURED BY 10:52:25 MICROSOFT."

10:52:27 OF COURSE MICROSOFT IS A FOR-PROFIT COMPANY.

10:52:29 HERE'S SOMETHING ELSE TO THINK ABOUT. IN SEPTEMBER OF 10:52:33 2020, MR. MUSK TWEETED THAT OPENAI'S FOR-PROFIT AGREEMENT WITH 10:52:38 MICROSOFT WAS A BETRAYAL OF ITS MISSION AND ITS COMMITMENTS.

10:52:41 THAT'S JUST WHAT HE'S CLAIMING IN THIS COURT TODAY. THE TWEET IS WRONG, NO ONE HAD CAPTURED ANYONE, BUT IT SHOWS THAT MUSK KNEW ENOUGH TO BRING THE LAWSUIT HE BRINGS TODAY IN 2020 AND THAT AT THE VERY LATEST.

10:53:03 TURNING TO A CHRONOLOGY AGAIN, MEMBERS OF THE JURY, THE TWEET WE JUST TALKED ABOUT IS MARKED BY THE BLACK FLAG IN THIS TIMELINE. AND YOU CAN SEE HERE THE SEQUENCE. MUSK HAS ALL THE RELEVANT INFORMATION BY SEPTEMBER 2020. YEARS GO BY. HE FORMS XAI IN MARCH 2023, AND THEN HE HIRES THE LAWYERS THAT OPPOSING COUNSEL STARTED TO TELL YOU ABOUT. HE BROUGHT A LAWSUIT AGAINST OPENAI IN FEBRUARY 2024. THEN HE DISMISSED THAT LAWSUIT, AND THEN HE BROUGHT THIS LAWSUIT IN THIS COURT IN AUGUST 2024.

10:53:33 AND THIS -- THE TWEET, THIS IS IMPORTANT, IT'S JUST THE TIP OF THE ICEBERG ON THE TIMING POINT. YOU WILL SEE A MOUNTAIN OF ADDITIONAL EVIDENCE OF PEOPLE TEXTING AND EMAILING MUSK IN 2018, IN 2019, AND 2020. EACH OF THE RED FLAGS ON THIS SLIDE, MEMBERS OF THE JURY, IS EVIDENCE EXPLAINING JUST HOW OPENAI WAS GOING TO INTRODUCE A FOR-PROFIT ELEMENT TO FUND ITS MISSION AND TO DO BUSINESS WITH MICROSOFT, A FOR-PROFIT COMPANY.

10:54:00 HE KNEW EVERYTHING THAT WAS HAPPENING AS IT WAS HAPPENING, AND HE WAITED TOO LONG TO SUE. IT'S TOO LATE NOW TO GIN UP SOMETHING TO HARM A COMPETITOR.

10:54:15 I'LL END WHERE I BEGAN. WE ARE HERE BECAUSE MR. MUSK

DIDN'T GET HIS WAY AT OPENAI. THAT'S WHAT HAPPENED. HE QUIT, SAYING THEY WOULD FAIL FOR SURE, BUT THEN MY CLIENTS HAD THE NERVE TO GO ON AND SUCCEED WITHOUT HIM.

MR. MUSK MAY NOT LIKE THAT, BUT IT'S NO BASIS FOR A LAWSUIT, MEMBERS OF THE JURY. FOR A LAWSUIT YOU NEED ACTUAL EVIDENCE. AND THE EVIDENCE HERE WILL SHOW THAT WHAT MUSK SAYS HAPPENED DID NOT HAPPEN. IT WILL SHOW THAT OPENAI REMAINS A NONPROFIT. OPENAI HAS A FOR-PROFIT ARM PRECISELY BECAUSE THAT STRUCTURE SERVES THE MISSION.

IT WILL SHOW THAT WITHOUT A FOR-PROFIT ARM, THERE WOULD BE NO OPENAI. IT WILL SHOW THAT MUSK KNEW THAT A FOR-PROFIT ARM WOULD ADVANCE THE MISSION, BUT HE WOULDN'T AGREE TO IT BECAUSE HE INSISTED ON ABSOLUTE CONTROL FOR HIMSELF.

THE EVIDENCE WILL SHOW THAT NEITHER ALTMAN NOR BROCKMAN MISLED MUSK. THEY TOLD HIM WHAT THEY WERE DOING. THEY WANTED TO KEEP HIM ON THE SIDE, BOTH BEFORE AND AFTER HE QUIT. THE EVIDENCE WILL SHOW THAT THE PROMISES MR. MUSK SAYS WERE MADE TO HIM WERE NOT MADE, NOT EVER, NOT IN ANY WAY, LET ALONE IN WRITING.

THE EVIDENCE WILL SHOW THAT THERE HAS BEEN NO BREACH OF ANY CHARITABLE TRUST AND NO UNJUST ENRICHMENT, AND THE EVIDENCE WILL SHOW THAT MR. MUSK KNEW EVERYTHING THAT HE NEEDED TO KNOW TO BRING THIS LAWSUIT MANY YEARS AGO.

I WON'T -- I WON'T TELL YOU WHAT TO WRITE DOWN BECAUSE THAT'S FOR YOU-ALL TO DECIDE, BUT I WOULD ASK YOU TO THINK

10:55:49 ABOUT, AS THE EVIDENCE COMES IN, WHETHER THE PIECES OF THE JIGSAW PUZZLE FIT IN THE WAY THAT MY ADVERSARY SUGGESTED OR WHETHER THE PIECES FIT IN THE WAY THAT I'M SUGGESTING NOW.

10:56:03 WE ARE CONFIDENT THAT THE EVIDENCE WILL SUPPORT THIS VIEW OF THE JIGSAW PUZZLE COVER, AND NOT MR. MUSK'S.

10:56:11 SO AT THE END OF TRIAL, AFTER YOU HAVE HEARD ALL THE EVIDENCE, WE WILL ASK YOU TO FIND THAT MR. ALTMAN AND MR. BROCKMAN AND OPENAI ARE NOT LIABLE ON EVERY CLAIM.

10:56:21 MEMBERS OF THE JURY, I SHOULD SAY I REALLY APPRECIATE YOUR ATTENTION. THANK YOU SO MUCH.

10:56:26 **THE COURT:** OKAY. THANK YOU.

10:56:30 MR. COHEN.

10:56:31 **MR. COHEN:** THANK YOU, YOUR HONOR.

10:56:32 **(COUNSEL FOR DEFENDANT MICROSOFT GAVE THEIR OPENING STATEMENT.)**

10:56:43 **MR. COHEN:** GOOD MORNING.

10:56:44 **JURORS:** GOOD MORNING.

10:56:50 **MR. COHEN:** AFTER ELON MUSK WALKED AWAY, OPENAI CAME TO MICROSOFT BECAUSE IT NEEDED A MASSIVE INVESTMENT TO CONTINUE TO PURSUE ITS RESEARCH.

10:56:58 MICROSOFT SAW AN OPPORTUNITY FOR PARTNERSHIP AND AGREED TO PROVIDE BILLIONS OF DOLLARS IN SUPERCOMPUTERS WHILE LEAVING OPENAI IN CONTROL.

10:57:12 AND THAT PARTNERSHIP HAS BEEN AN EXTRAORDINARY SUCCESS. MICROSOFT'S SUPERCOMPUTERS AND FUNDS HAVE ENABLED OPENAI TO

10:57:23 ADVANCE ITS RESEARCH AND WIDELY DISTRIBUTE ITS TECHNOLOGY,
10:57:26 WHICH IS USED BY HUNDREDS OF MILLIONS OF PEOPLE EVERY DAY.

10:57:30 AND BUILDING ON THAT TECHNOLOGY, MICROSOFT HAS DEVELOPED
10:57:34 SOME OF THE BEST AI TOOLS AND SERVICES THAT ARE USED BY
10:57:38 THOUSANDS OF DEVELOPERS AND MILLIONS OF MICROSOFT CUSTOMERS.

10:57:43 AND, TOGETHER, MICROSOFT AND OPENAI HAVE HELPED FUND ONE
10:57:49 OF THE LARGEST NONPROFIT FOUNDATIONS IN HISTORY.

10:57:53 THE TRUTH IS THAT MICROSOFT HAS HELPED OPENAI PURSUE AND
10:57:58 FURTHER ITS MISSION.

10:58:02 NOW, AT THE CENTER OF THIS LAWSUIT, THERE IS A DISPUTE
10:58:06 BETWEEN MR. MUSK AND MR. ALTMAN AND BROCKMAN OVER THE FUTURE OF
10:58:13 OPENAI, BUT THAT DISPUTE HAS LITTLE TO DO WITH MICROSOFT.

10:58:18 NOW, YOU'VE HEARD FROM OPENAI'S COUNSEL, AND YOU'VE HEARD
10:58:22 FROM MR. MUSK'S COUNSEL ABOUT THE FOUNDING OF OPENAI IN 2015,
10:58:27 AND ABOUT HOW MR. MUSK LEFT WHEN HE COULDN'T GET CONTROL IN
10:58:31 2018, AND HOW AFTER THAT, THE OPENAI NONPROFIT BOARD
10:58:35 ESTABLISHED A FOR-PROFIT SUBSIDIARY SO IT COULD RAISE THE FUNDS
10:58:40 IT NEEDED TO CONTINUE ITS WORK.

10:58:42 ALL OF THAT HAPPENED BEFORE MICROSOFT'S INVESTMENT, AND
10:58:48 WITHOUT ITS INVOLVEMENT.

10:58:52 NOW, AS TO MICROSOFT, MR. MUSK CLAIMS THAT IT KNOWINGLY
10:58:58 HELPED OPENAI VIOLATE SPECIAL CONDITIONS HE SAYS HE HAD ON HIS
10:59:05 DONATIONS TO OPENAI, BUT THIS IS WHAT THE EVIDENCE WILL SHOW:
10:59:11 MICROSOFT WASN'T THERE WHEN MR. MUSK MADE THOSE DONATIONS. AND
10:59:16 BEFORE MICROSOFT ENTERED INTO PARTNERSHIP, IT DID DUE

DILIGENCE. IT ASKED QUESTIONS. IT GATHERED AND REVIEWED DOCUMENTS. IT LOOKED AT EVERYTHING THERE WAS TO LOOK AT, AND NOT A SINGLE PAGE REFERENCED ANY SPECIAL CONDITIONS ON MR. MUSK'S DONATIONS.

HUNDREDS OF PAGES AND NOTHING THAT SAID MICROSOFT COULD NOT INVEST.

AND NOBODY, NOT MR. MUSK, OR ANYONE ELSE, EVER TOLD MICROSOFT THAT THESE CONDITIONS EVEN EXIST.

NOW, OPENAI AND ITS NONPROFIT BOARD THAT KNEW THE MOST ABOUT WHAT OPENAI COULD AND COULD NOT DO, IT AUTHORIZED THE PARTNERSHIP, AND IT TOLD MICROSOFT IN WRITING THAT IT WOULDN'T VIOLATE ANYONE'S RIGHTS.

AND EVEN BEFORE MICROSOFT INVESTED, THAT NONPROFIT BOARD HAD AGREED TO AND ACCEPTED INVESTMENT FROM OTHER INVESTORS.

IN JULY OF 2019, THE OPENAI AND THE MICROSOFT PARTNERSHIP WAS PUBLICLY ANNOUNCED. AND IT WAS BIG NEWS. EVERYBODY KNEW ABOUT IT. YOU HEARD THAT MR. MUSK KNEW ABOUT IT. YOU SAW THAT MR. MUSK TWEETED ABOUT IT.

BUT FOR FIVE YEARS, FROM 2019 TO 2024, HE NEVER SAID A WORD ABOUT IT TO MICROSOFT. HE NEVER TOLD MICROSOFT THAT IT HELPED VIOLATE ANY CONDITIONS ON HIS DONATIONS. IT WAS ONLY AFTER THE SUCCESS OF CHATGPT AND MR. MUSK LAUNCHED HIS OWN FOR-PROFIT AI COMPANY, XAI, THAT SUDDENLY MICROSOFT'S ROLE IN THIS BOARD-APPROVED, PUBLICLY ANNOUNCED PARTNERSHIP WAS SOMEHOW WRONGFUL.

NOW, HERE'S WHAT YOU WILL SEE: THAT MICROSOFT'S PARTNERSHIP, THE BILLIONS OF DOLLARS, THE SUPERCOMPUTERS, EMPLOYEE TIME, THAT HAS HELPED OPENAI, IT HAS HELPED MICROSOFT, AND IT HAS HELPED THE OPENAI NONPROFIT FOUNDATION.

AND MICROSOFT HAS BEEN A RESPONSIBLE PARTNER EVERY STEP OF THE WAY. AND THERE IS NOTHING THAT IT DID TO KNOWINGLY VIOLATE ANY CONDITIONS OF MR. MUSK'S DONATIONS, CONDITIONS THAT YOU HEARD OPENAI SAY DON'T EVEN EXIST.

SO LET ME START BY TELLING YOU SOMETHING ABOUT MICROSOFT. IT WAS FOUNDED JUST OVER 50 YEARS AGO, AND IT HAD A SIMPLE MISSION, PUT A PERSONAL COMPUTER ON EVERY DESK IN EVERY HOME.

NOW, IN THE 1980S AND 1990S, MICROSOFT MET WINDOWS. AND YOU PROBABLY ALL KNOW, WINDOWS IS A COMPUTER OPERATING SYSTEM. ONE OF THE IMPORTANT THINGS THAT A COMPUTER OPERATING SYSTEM DOES IS IT PROVIDES THE TOOLS AND THE CODE THE DEVELOPERS USE TO WRITE THE APPLICATIONS THAT YOU USE EVERY SINGLE DAY.

AND THAT'S IMPORTANT BECAUSE WHAT IT MEANS IS THAT MICROSOFT CAN ONLY SUCCEED WHEN IT HELPS DEVELOPERS SUCCEED. AND THAT WAS MICROSOFT'S MODEL THEN, AND IT IS STILL MICROSOFT'S MODEL TODAY.

SO IN THE 2000'S, MICROSOFT DEVELOPED A CLOUD COMPUTING SERVICE CALLED AZURE, AND AZURE IS AN OPERATING SYSTEM, BUT IT DOESN'T LIVE ON THE COMPANY'S COMPUTERS OR IN THE COMPANY'S BUILDINGS. IT'S ACCESSED REMOTELY THROUGH THE CLOUD, AND THE COMPANY WOULD CONNECT WITH DATA CENTERS THAT MICROSOFT BUILDS

11:03:17 AND RUNS.

11:03:22 AND, TODAY, MICROSOFT SUPPORTS DEVELOPERS OF ARTIFICIAL 11:03:30 INTELLIGENCE APPLICATIONS AND SERVICES THROUGH AZURE. NOW, 11:03:30 AZURE GIVES AI DEVELOPERS THE TOOLS THAT THEY NEED TO BUILD 11:03:34 THEIR MODELS SAFELY AND DISTRIBUTE THEM TO THEIR OWN CUSTOMERS.

11:03:38 AND MICROSOFT HAS A LONG HISTORY OF BUILDING SAFETY AND 11:03:42 SECURITY INTO ITS PRODUCTS, WHICH IS MORE IMPORTANT THAN EVER 11:03:46 WHEN IT COMES TO AI DEVELOPMENT.

11:03:53 AND LET ME BE CLEAR, AS YOU SEE HERE, MICROSOFT IS NOT 11:03:56 JUST ABOUT SUPPORTING OPENAI. MICROSOFT'S CUSTOMERS CAN USE AI 11:04:02 MODELS FROM MANY DIFFERENT DEVELOPERS ON AZURE. SOME YOU MAY 11:04:06 HAVE HEARD OF, LIKE ANTHROPIC OR META, AND THOUSANDS THAT YOU 11:04:10 PROBABLY HAVEN'T HEARD OF, AT LEAST NOT YET.

11:04:17 AND, YES, MR. MUSK HAS MADE AVAILABLE ON MICROSOFT AZURE 11:04:21 CLOUD HIS OWN GROK MODEL, AND HE DID SO AFTER HE FILED THIS 11:04:28 LAWSUIT.

11:04:34 LET ME TELL YOU ABOUT THE KEY PEOPLE AT MICROSOFT WHO HAVE 11:04:37 BEEN INVOLVED WITH THE OPENAI PARTNERSHIP, THE PEOPLE YOU'RE 11:04:40 GOING TO HEAR FROM AT THIS TRIAL.

11:04:45 NOW, SATYA NADELLA HAS BEEN MICROSOFT'S CHIEF EXECUTIVE 11:04:49 OFFICER SINCE 2014. HIS MISSION IS TO EMPOWER EVERY PERSON IN 11:04:55 EVERY ORGANIZATION ON THE PLANET TO ACHIEVE MORE.

11:04:57 MR. NADELLA HAD A VISION FOR HOW A PARTNERSHIP WITH OPENAI 11:05:04 CAN WORK.

11:05:05 KEVIN SCOTT IS MICROSOFT'S CHIEF TECHNOLOGY OFFICER. HE

11:05:08 ASKED IMPORTANT QUESTIONS ABOUT OPENAI AND ABOUT ITS TECHNOLOGY.

AMY HOOD IS MICROSOFT'S CHIEF FINANCIAL OFFICER. SHE IS RESPONSIBLE FOR MAKING SURE THAT MICROSOFT'S FINANCIAL DECISIONS ARE SOUND ONES, AND THAT THEY ARE IN THE INTEREST OF MICROSOFT'S SHAREHOLDERS, WHICH INCLUDES 401(K)'S AND PENSION FUNDS AND MILLIONS OF MILLIONS OF INDIVIDUALS.

AND MIKE WETTER IS A CORPORATE VICE PRESIDENT, ONE OF MICROSOFT'S SENIOR BUSINESSPEOPLE, WHOSE TEAM WAS RESPONSIBLE FOR DOING THE DUE DILIGENCE ON OPENAI AND NEGOTIATING WITH THEM.

THESE ARE MICROSOFT'S MOST SENIOR LEADERS, AND THEY WANTED TO DO A PARTNERSHIP IN THE RIGHT WAY.

NOW, IF YOU REMEMBER BACK JUST A FEW YEARS AGO, THERE WAS NO CHATGPT. AI WASN'T ANYWHERE. OPENAI WAS JUST A RESEARCH ORGANIZATION, AND AS YOU JUST HEARD, MR. MUSK WAS CONVINCED THAT IT WAS GOING TO FAIL. BUT, IN 2016, MICROSOFT BEGAN WORKING WITH OPENAI. AT THAT TIME, MICROSOFT WAS PROVIDING ITS DEEPLY DISCOUNTED COMPUTE, THE COMPUTING RESOURCES, THE SUPERCOMPUTERS. AND MICROSOFT WAS DOING THAT TO HELP OPENAI FURTHER ITS NONPROFIT RESEARCH AND BUILD ITS EARLY MODELS.

SO MICROSOFT KNEW THAT OPENAI WAS A NONPROFIT AND THAT IT HAD A MISSION TO BENEFIT HUMANITY. MICROSOFT SUPPORTED THAT.

SO A FEW -- A FEW YEARS LATER, WHEN OPENAI CAME TO MICROSOFT IN 2018 AND SAID IT WANTED TO EMBARK ON COMMERCIAL

11:07:04 ACTIVITIES, MICROSOFT HAD TO LEARN A LOT MORE. IT HAD QUESTIONS.

11:07:12 SO IN MARCH OF 2018, YOU WILL HEAR FROM MR. SCOTT, THAT MICROSOFT HAD ITS OWN GOAL AT THE TIME. IT WAS SEEKING TO DEVELOP A LEADING AI DEVELOPMENT PLATFORM. AND IT WAS IN COMPETITION WITH OTHER COMPANIES IN DOING THAT, PARTICULARLY GOOGLE.

11:07:29 SO WHEN OPENAI CAME TO MICROSOFT, MICROSOFT NEEDED TO UNDERSTAND, WHAT WAS OPENAI OFFERING? WOULD IT HELP US FURTHER OUR OWN GOALS? COULD THEY EVEN DO THIS?

11:07:40 NOW, I THINK YOU-ALL UNDERSTAND, MICROSOFT IS A FOR-PROFIT COMPANY. IT IS NOT A NONPROFIT. IT HAS OBLIGATIONS TO ITS SHAREHOLDERS AND RESPONSIBILITIES TO ITS EMPLOYEES TO MAKE A PROFIT.

11:07:55 BUT THAT DOESN'T MEAN IT CAN'T SUPPORT DEVELOPERS, AND IT CAN'T SUPPORT WIDELY DISTRIBUTED TECHNOLOGY, AND IT CAN'T SUPPORT ENTERING INTO WIN-WIN PARTNERSHIPS.

11:08:08 SO IN MARCH OF 2018, YOU WILL SEE THAT MR. SCOTT EMAILED TO HIS BOSS, MR. NADELLA, RAISING A QUESTION, "I WONDER IF THE BIG OPENAI DONORS ARE AWARE OF THESE COMMERCIALIZATION PLANS?"

11:08:25 HE DIDN'T KNOW. AND AFTER SOME ADDITIONAL CONVERSATIONS, MR. SCOTT SAID, "I'M GOING TO REACH OUT TO SAM," SAM ALTMAN, "THIS WEEK TO SEE HOW WE COULD BEST GET SOME OF OUR QUESTIONS ANSWERED."

11:08:38 SO YOU WILL SEE THAT MR. SCOTT HAD QUESTIONS, NOT ANSWERS.

AND YOU WILL HEAR FROM MR. SCOTT THAT HE BEGINS TO DO HIS DILIGENCE, TO LEARN MORE ABOUT OPENAI, WHAT IT WAS TRYING TO ACCOMPLISH, AND TO TRY TO GET ANSWERS.

AND SO MR. SCOTT HAD CONVERSATIONS. HE HAD CONVERSATIONS WITH MR. ALTMAN, AND WITH OTHERS. AND IN MID-2008, HE VISITS OPENAI TO GET A DEMONSTRATION OF THEIR TECHNOLOGY AND TO LEARN MORE ABOUT IT.

AND YOU WILL HEAR FROM MR. SCOTT THAT IN NOVEMBER OF 2018, HE STARTS TO LEARN MORE ABOUT OPENAI'S NEW BOARD-APPROVED STRUCTURE, A STRUCTURE THAT WAS CREATED BEFORE MICROSOFT'S INVOLVEMENT.

AND THAT STRUCTURE HAD ALREADY -- AND THAT BOARD HAD ALREADY BEGUN TO RAISE A LOT OF MONEY FROM SOME VERY REPUTABLE INVESTORS. NOW, THAT WAS IMPORTANT BECAUSE IT SHOWED MICROSOFT THAT OPENAI COULD ACTUALLY DO THE THING THAT IT SAID IT COULD DO, AND THAT THESE OTHER INVESTORS HAD VETTED IT, AND THEY WERE COMFORTABLE TO INVEST.

SO YOU WILL SEE THAT MR. SCOTT LEARNED THAT THE NONPROFIT -- THE NONPROFIT HADN'T CHANGED, BUT OPENAI'S NONPROFIT BOARD HAD CREATED THIS FOR-PROFIT SUBSIDIARY, CONTROLLED BY THE NONPROFIT, IN ORDER TO RAISE THE BILLIONS OF DOLLARS THAT IT NEEDED TO CONTINUE ITS WORK.

AND THE OPENAI NONPROFIT BOARD, THE BOARD THAT HAD THE RESPONSIBILITY OF ENSURING THAT OPENAI CONTINUED TO PURSUE ITS MISSION APPROVED THIS STRUCTURE.

BUT IT WASN'T ENOUGH FOR MICROSOFT TO BE TOLD THAT OPENAI COULD DO THIS. MICROSOFT HAD TO VERIFY THAT FOR ITSELF.

SO BEFORE MICROSOFT ENTERS INTO ANY PARTNERSHIP, YOU'LL HEAR FROM MIKE WETTER, THAT MICROSOFT DID ITS OWN DUE DILIGENCE.

NOW, DUE DILIGENCE IS TYPICAL. IT'S SOMETHING THAT COMPANIES DO BEFORE ENTERING INTO IMPORTANT TRANSACTIONS OR ARRANGEMENTS. IT IS THE TRUST BUT VERIFY STEP.

AND MR. WETTER WILL EXPLAIN THAT MICROSOFT DID ITS OWN DETAILED DUE DILIGENCE TO CONFIRM THAT OPENAI COULD DO WHAT IT SAID IT COULD DO.

AND YOU WILL SEE AND HEAR FROM MR. WETTER THAT MICROSOFT AND ITS LAWYERS REVIEWED CORPORATE FORMATION DOCUMENTS AND TAX FILINGS AND CHARTERS AND BYLAWS AND FINANCIAL STATEMENTS AND MANY OTHER DOCUMENTS SO IT COULD CONFIRM FOR ITSELF WHAT OPENAI SAID IT COULD DO.

AND YOU WILL ALSO HEAR FROM MR. WETTER THAT NOT A SINGLE PAGE OF THAT DUE DILIGENCE REFERENCED ANY CONDITIONS ON MR. MUSK'S DONATIONS TO OPENAI. NOT A SINGLE PAGE. AND NOBODY EVER TOLD MICROSOFT DIFFERENTLY.

SO BEFORE PARTNERING, MICROSOFT ASKED QUESTIONS, GOT ANSWERS, TESTED THOSE ANSWERS FOR ITSELF, GOT THEM IN WRITING FROM OPENAI'S NONPROFIT BOARD.

IN JULY OF 2019, MICROSOFT AND OPENAI ANNOUNCE THEIR PARTNERSHIP PUBLICLY. MICROSOFT WOULD INVEST A BILLION DOLLARS

AND BUILD SUPERCOMPUTERS NEEDED FOR OPENAI TO TRAIN AND POWER OPENAI'S ADVANCED AI MODELS.

AND IN RETURN, MICROSOFT WOULD EVENTUALLY GET THE RIGHT TO COMMERCIALIZE, ALONGSIDE OPENAI, THE TECHNOLOGY. BUT OPENAI RETAINED CONTROL OF ITS TECHNOLOGY AND CONTROL OF ITS COMPANY.

AND YOU'RE GOING TO HEAR MR. NADELLA EXPLAIN THAT THIS WAS A WIN/WIN. IT WAS A WIN/WIN BECAUSE OPENAI GOT THE COMPUTING POWER AND CAPITAL TO CONTINUE TO ADVANCE ITS RESEARCH. AND MICROSOFT GOT ACCESS TO GROUNDBREAKING RESEARCH, SO MICROSOFT COULD CONTINUE TO BUILD ITS AI BUSINESS.

AND MICROSOFT BUILT SOME OF THE BEST SUPERCOMPUTERS AND TOOLS, BASED ON THIS PARTNERSHIP WITH OPENAI. AND TOGETHER MICROSOFT AND OPENAI COULD MAKE SAFE AND BENEFICIAL AI TECHNOLOGY WIDELY AVAILABLE THROUGH FREE AND PAID SERVICES.

NOW, AS YOU LISTEN TO THE EVIDENCE, ONE THING SHOULD BE CLEAR, UNLIKE MR. MUSK, MICROSOFT NEVER TRIED TO CONTROL OPENAI. IT SOUGHT AN OPPORTUNITY FOR PARTNERSHIP WITHOUT CONTROL. IT SAW AN OPPORTUNITY FOR A PARTNERSHIP THAT COULD BENEFIT EVERYONE.

SO THIS PUBLICLY-ANNOUNCED PARTNERSHIP BEGINS IN 2019. AND YOU WILL HEAR THAT AS OPENAI'S TECHNOLOGY CONTINUED TO ADVANCE, SO, TOO, DID ITS NEED FOR MORE COMPUTING POWER AND MORE RESOURCES.

SO IN 2021, MICROSOFT COMMITS ANOTHER $2 BILLION IN SUPER COMPUTING AND FUNDING, AND IN 2023, IT COMMITS ANOTHER

11:13:55 $10 BILLION IN SUPER COMPUTING AND FUNDING.

11:14:01 BUT WITH MORE INVESTMENT, THERE WAS EVEN MORE RISK. SO 11:14:04 MICROSOFT TOOK APPROPRIATE STEPS IN ITS AGREEMENTS TO PROTECT 11:14:08 AGAINST THAT RISK, THE KINDS OF PROTECTIONS THAT ANY REASONABLE 11:14:12 COMPANY WOULD TAKE.

11:14:14 AND MICROSOFT ALSO SHARED IN THE BENEFITS, THE TECHNOLOGY, 11:14:20 THE INTELLECTUAL PROPERTY, BECAUSE THAT IS THE POINT OF A 11:14:30 WIN/WIN PARTNERSHIP.

11:14:31 IN EVERY STEP OF THE WAY, OPENAI'S NONPROFIT BOARD, WHICH, 11:14:35 AS YOU HEARD IN 2021 AND 2023, INCLUDING MS. ZILIS HERSELF, 11:14:39 APPROVED THE PARTNERSHIP.

11:14:45 AND YOU'LL SEE NO EVIDENCE THAT OPENAI OR ANYONE EVER TOLD 11:14:49 MICROSOFT THAT IT COULD NOT ENTER INTO OR CONTINUE THE 11:14:53 PARTNERSHIP BECAUSE OF COMMITMENTS TO MR. MUSK, WHO HAD LONG 11:14:56 SINCE LEFT OPENAI.

11:14:57 WHAT YOU WILL SEE IS THE OPPOSITE, THAT OPENAI, THROUGHOUT 11:15:02 THIS PARTNERSHIP, CONFIRMED IN WRITING IN 2019 AND 2021 AND 11:15:07 2023, THAT THE NONPROFIT BOARD HAD APPROVED THE PARTNERSHIP AND 11:15:13 THAT IT WOULD NOT VIOLATE ANYONE'S RIGHTS.

11:15:27 NOW, ALTHOUGH THE PARTNERSHIP WAS WORKING WELL, WE'VE 11:15:32 HEARD ABOUT NOVEMBER 2023, WHEN MR. ALTMAN WAS BRIEFLY FIRED 11:15:35 FROM OPENAI.

11:15:36 YOU HEARD MR. MOLO SAY THAT MICROSOFT WAS PULLING THE 11:15:40 STRINGS, BUT THE EVIDENCE WILL SHOW SOMETHING VERY DIFFERENT 11:15:42 FROM THAT.

11:15:43 YOU'LL HEAR FROM MR. NADELLA, FIRST OF ALL, THAT THIS WAS CHAOTIC FOR MICROSOFT. MICROSOFT KNEW NOTHING ABOUT THIS IN ADVANCE. TO BE CLEAR, NOTHING ABOUT THIS IN ADVANCE.

11:15:58 MICROSOFT WAS FACING A CRISIS, TOO. IT HAD INVESTED $13 BILLION, IT WAS BUILDING CUSTOM SUPERCOMPUTERS FOR OPENAI, IT HAD BUILT PRODUCTS, HAD CUSTOMERS THAT RELIED ON THAT TECHNOLOGY. THIS WAS A CRISIS FOR MICROSOFT, TOO.

11:16:17 IT NEEDED TO REASSURE ITS CUSTOMERS THAT MICROSOFT COULD CONTINUE TO PROVIDE THEM WITH THE TECHNOLOGY THAT THEY NEEDED.

11:16:27 AND YOU'LL HEAR FROM MR. NADELLA ABOUT THAT INTERVIEW THAT MR. MOLO TOLD YOU ABOUT WHERE HE SAID, WE ARE IN THERE, WE ARE BELOW THEM, AND SO ON.

11:16:36 MR. NADELLA WILL EXPLAIN THAT. HE WILL EXPLAIN THAT HE WANTED TO ASSURE MICROSOFT'S CUSTOMERS THAT THEY WOULD BE SUPPORTED EVEN IF OPENAI FELL APART.

11:16:47 NOW, THAT'S NOT WHAT HE WANTED. MICROSOFT'S GOAL WAS TO STABILIZE OPENAI, TO HELP GET IT BACK ON TRACK, AND TO DO SO AS QUICKLY AS POSSIBLE, BUT HE NEEDED TO REASSURE HIS CUSTOMERS.

11:17:00 NOW, MICROSOFT'S OFFERS TO OPENAI EMPLOYEES WAS SIMPLY TO ENSURE THAT THEY DID NOT LEAVE TO GO TO COMPETITORS AND THAT OPENAI FELL APART ENTIRELY.

11:17:13 SO WHEN THE OPENAI BOARD REVERSED ITS COURSE AND REINSTATES SAM ALTMAN, WHAT DOES MICROSOFT DO? IT SUPPORTS IT 100 PERCENT.

11:17:23 ASK YOURSELF THIS: I MEAN, IF MICROSOFT'S GOAL HAD BEEN

TO CONTROL OPENAI, NOVEMBER 2023 WOULD HAVE BEEN THE PERFECT OPPORTUNITY TO DO THAT.

BUT MICROSOFT DIDN'T DO THAT.

THE EVIDENCE WILL SHOW THAT MICROSOFT DID EVERYTHING, EVERYTHING TO SUPPORT OPENAI'S STABILITY, TO SUPPORT THE PARTNERSHIP, AND TO SUPPORT ITS CUSTOMERS.

SO LET ME TURN TO THE LEGAL CLAIMS THAT MR. MUSK HAS BROUGHT AGAINST MICROSOFT AND SOME OF THE QUESTIONS THAT HER HONOR IS GOING TO INSTRUCT YOU ON AT THE END OF THE TRIAL.

SO AS I THINK YOU HEARD, MR. MUSK HAS BROUGHT ONE CLAIM AGAINST MICROSOFT. IT'S AIDING AND ABETTING A BREACH OF CHARITABLE TRUST, WHICH MEANS THAT MICROSOFT HELPED OPENAI BREACH A CHARITABLE TRUST.

BUT TO WIN ON THAT CLAIM, MR. MUSK MUST FIRST PROVE THAT THERE WAS A CHARITABLE TRUST AND THAT IT WAS BREACHED.

AND IF YOU DON'T FIND THAT MR. MUSK CREATED A CHARITABLE TRUST, AND IF YOU DON'T FIND THAT THAT CHARITABLE TRUST WAS BREACHED, THEN THAT'S THE END OF IT FOR MICROSOFT. THERE CAN BE NO LIABILITY FOR AIDING AND ABETTING IF THERE WAS NO CHARITABLE TRUST OR IT WASN'T BREACHED.

NOW, IF YOU FIND THERE WAS A CHARITABLE TRUST AND YOU FIND IT WAS BREACHED, THEN MR. MUSK HAS THE BURDEN, THE PREPONDERANCE OF THE EVIDENCE BURDEN, THAT HER HONOR TALKED ABOUT EARLIER, TO PROVE THAT MICROSOFT KNEW THAT IT HAD KNOWLEDGE ABOUT THE CHARITABLE TRUST IN ITS BREACH AND THAT

MICROSOFT SUBSTANTIALLY ASSISTED.

AND FINALLY, MR. MUSK MUST SHOW THAT HIS CASE WAS FILED ON TIME. YOU HEARD THAT SPOKEN ABOUT TODAY. BECAUSE HE HAS TO SUE WITHIN THREE YEARS UNDER THE LAW. HE CAN'T SIT ON HIS CLAIMS. AND IF YOU FIND THAT HE SAT ON HIS CLAIMS, HE'S TOO LATE.

NOW, THE EVIDENCE WILL SHOW THAT MR. MUSK CAN'T ESTABLISH ANY OF THESE THINGS.

SO LET'S FIRST TALK ABOUT KNOWLEDGE. AT THE END OF THE TRIAL, HER HONOR IS GOING TO ASK YOU TO ANSWER QUESTIONS ABOUT WHAT MICROSOFT KNEW ABOUT DONATION CONDITIONS, WHAT IT KNEW ABOUT THEIR BREACH, CONDITIONS THAT YOU HEARD OPENAI SAY DON'T EVEN EXIST.

MR. MOLO ASKED YOU TO WRITE DOWN A QUESTION, YOU RECALL THAT. BUT THAT'S THE WRONG QUESTION, BECAUSE MICROSOFT KNEW THAT OPENAI WAS A NONPROFIT. I TOLD YOU THAT, AND YOU'RE GOING TO HEAR EVIDENCE OF THAT. THAT'S NOT THE RIGHT QUESTION.

WHAT MATTERS IS WHETHER MICROSOFT KNEW ABOUT MR. MUSK'S FOREVER NONPROFIT CONDITION; A CONDITION YOU HEARD OPENAI SAY DIDN'T EXIST, BUT THAT MICROSOFT KNEW ABOUT THAT.

AND I'VE ALREADY TOLD YOU WHAT THE EVIDENCE IS GOING TO SHOW; THAT MICROSOFT WASN'T THERE WHEN THE DONATIONS WERE MADE; THAT MICROSOFT ASKED QUESTIONS BEFORE ENTERING INTO A PARTNERSHIP; THAT MICROSOFT DID DUE DILIGENCE; THAT IT REVIEWED DOCUMENTS, AND NOT A SINGLE PAGE REFERENCED ANY DONATION

11:20:29 CONDITION; THAT NOBODY EVER TOLD MICROSOFT THAT IT HELPED
11:20:33 VIOLATE ANY SPECIAL DONATION CONDITIONS.

11:20:42 YOU WILL SEE NO EVIDENCE THAT MICROSOFT KNEW ABOUT SPECIAL
11:20:44 DONATION CONDITIONS, ANY CHARITABLE TRUST, BECAUSE THERE WAS
11:20:46 NONE.

11:20:51 NOW, ANOTHER QUESTION THAT HER HONOR WILL ASK YOU TO
11:20:54 ANSWER HAS TO DO WITH WHETHER MICROSOFT SUBSTANTIALLY ASSISTED
11:20:58 OPENAI'S BREACH OF CHARITABLE TRUST, ASSUMING YOU FIND A
11:21:02 BREACH.

11:21:03 AND LET ME BE CLEAR ABOUT WHAT THE EVIDENCE WILL SHOW AND
11:21:06 WHAT IT WON'T SHOW.

11:21:07 FIRST, LET'S LOOK AT WHAT MICROSOFT DID NOT DO; WHAT
11:21:10 MICROSOFT DID NOT DO.

11:21:12 SO THE EVIDENCE WILL SHOW THAT OPENAI'S NONPROFIT BOARD
11:21:19 CREATED A FOR-PROFIT ARM IN SEPTEMBER 19, 2018, AND SET IT UP
11:21:24 TO CARRY OUT OPENAI'S COMMERCIAL VENTURE ON OCTOBER 10TH, 2018.
11:21:29 THAT WAS NINE MONTHS BEFORE MICROSOFT EVER INVESTED.

11:21:36 HOW CAN MICROSOFT SUBSTANTIALLY ASSIST WHAT IT WASN'T EVEN
11:21:40 INVOLVED IN?

11:21:44 SO WHAT IS IT THAT MICROSOFT DID?

11:21:47 WELL, MR. NADELLA WILL EXPLAIN THAT MICROSOFT PROVIDED
11:21:51 COMPUTING RESOURCES AND FUNDING, FUNDING THAT IT WAS TOLD, AND
11:21:55 VERIFIED FOR ITSELF, DID NOT VIOLATE ANY THIRD-PARTY RIGHTS.

11:22:04 WHAT YOU WILL SEE IS THAT THROUGH THIS PARTNERSHIP,
11:22:06 MICROSOFT UNLOCKED, WITH OPENAI, A VIRTUOUS CYCLE.

11:22:14 SO AS YOU SEE HERE, WITH EACH ROUND OF INVESTMENT, MICROSOFT PROVIDED MORE SUPERCOMPUTERS AND MORE COMPUTING POWER, AND MORE RESOURCES, AND THESE COMPUTING RESOURCES PRODUCED BETTER RESEARCH AND BETTER MODELS, WHICH CONTRIBUTED TO MORE INTELLECTUAL PROPERTY FOR BOTH PARTIES, AND MORE INTELLECTUAL PROPERTY JUSTIFIED MORE INVESTMENT, AND SO ON AND SO ON AND SO ON.

11:22:44 MR. MOLO TOLD YOU IT WAS ALL ABOUT A $10 BILLION INVESTMENT IN 2023, BUT HE IGNORES EVERYTHING THAT COMES BEFORE. HE IGNORES THIS VIRTUOUS CYCLE.

11:23:00 NOW, MR. NADELLA WILL EXPLAIN WHY MICROSOFT'S INVESTMENT EXPANDED OVER TIME. IT IS THIS VIRTUOUS CYCLE. AND MR. NADELLA WILL ALSO EXPLAIN WHY MICROSOFT AND OPENAI, TOGETHER, WERE CREATING MORE TECHNOLOGY. IT IS THIS VIRTUOUS CYCLE.

11:23:14 THE EVIDENCE WILL SHOW THAT MICROSOFT WAS NOT SUBSTANTIALLY ASSISTING A BREACH OF CHARITABLE TRUST; IT WAS BUILDING, RESPONSIBLY, A SUCCESSFUL PARTNERSHIP.

11:23:30 NOW, FINALLY, HER HONOR IS GOING TO ASK YOU ABOUT WHETHER MR. MUSK SUED ON TIME AND WITHIN THE THREE-YEAR STATUTE OF LIMITATIONS, OR IF HE WAS TOO LATE.

11:23:41 NOW, THE EVIDENCE WILL SHOW THAT MR. MUSK SUED MICROSOFT FIVE YEARS INTO MICROSOFT'S COLLABORATION WITH OPENAI. FIVE YEARS THAT MICROSOFT SPENT BUILDING AND INVESTING AND APPLYING EMPLOYEE TIME, RELYING ON THAT PARTNERSHIP'S VALIDITY.

11:24:01 AND LET'S BE CLEAR ABOUT ONE THING. MR. MUSK KNEW HOW TO GET IN TOUCH WITH SATYA NADELLA WHEN HE WANTED TO. WHEN MR. MUSK WAS STILL INVOLVED WITH OPENAI, YOU HEARD ABOUT THIS, HE REACHED OUT TO MR. NADELLA IN 2017 TO GET HELP WITH THIS GAMING, THIS DOTA GAMING PROJECT. AND MR. NADELLA HELPED. HE GAVE OPENAI WHAT IT NEEDED, AND IT LED TO THIS BREAKTHROUGH FOR OPENAI.

11:24:34 BUT IN 2019, AFTER MICROSOFT AND OPENAI ANNOUNCE THEIR PARTNERSHIP, MR. NADELLA NEVER HEARD A WORD FROM MR. MUSK. MR. MUSK NEVER PICKED UP THE PHONE TO SAY, YOU CAN'T DO THIS.

11:24:52 NOW, MR. MUSK WILL SAY, I DIDN'T KNOW ENOUGH TO SUE EARLIER. BUT YOU'VE ALREADY SEEN THIS.

11:24:57 IN JULY OF 2019, THIS WAS PUBLICLY ANNOUNCED, AND YOU WILL HEAR THAT HE KNEW ABOUT IT. AND HE LEARNED THAT IN SEPTEMBER OF 2020, MICROSOFT GETS A LICENSE TO ONE OF THE OPENAI MODELS.

11:25:11 AND MR. MUSK WAS PAYING ATTENTION, BECAUSE JUST TWO DAYS LATER HE TWEETED ABOUT IT. YOU SAW THIS TWEET, AND IT'S IMPORTANT. "THIS DOES SEEM LIKE THE OPPOSITE OF OPEN. OPENAI IS ESSENTIALLY CAPTURED BY MICROSOFT."

11:25:29 MR. MUSK NOT ONLY KNEW ABOUT THE PARTNERSHIP, BUT BY SEPTEMBER OF 2020, HE IS TWEETING THAT OPENAI IS CONTROLLED BY MICROSOFT.

11:25:44 AND WHAT WAS IT THAT I HEARD MR. MOLO SAY? THAT ELON MUSK ONLY LEARNED IT WAS NOT OPEN IN 2023.

11:25:51 THAT'S NOT WHAT HIS TWEET SAYS.

11:25:54 NOW, I AM NOT SAYING HE WAS RIGHT ABOUT WHAT HE TWEETED. AND YOU WILL HEAR EVIDENCE ON THAT. BUT WHEN MR. MUSK SAYS TO YOU, I DIDN'T KNOW ENOUGH EARLIER, JUST REMEMBER HIS TWEET.

11:26:11 SO WHEN DID HE SUE MICROSOFT? MORE THAN FOUR YEARS LATER, IN NOVEMBER OF 2024. MR. MUSK HAD FALLEN BEHIND. HE HAD LAUNCHED XAI, AND THEN HE SUED.

11:26:29 BEFORE I SIT DOWN, I WANT TO TELL YOU SOMETHING ABOUT MICROSOFT'S ROLE IN THIS TRIAL. YOU'RE NOT ACTUALLY GOING TO HEAR VERY MUCH FROM ME AND MY COLLEAGUES OVER THE COURSE OF THE NEXT FEW WEEKS, AND I WANT YOU TO UNDERSTAND WHY THAT IS.

11:26:45 SO YOU'VE HEARD ABOUT THE FOUNDING OF OPENAI IN 2015, AND MR. MUSK'S DEPARTURE IN THE FORMATION OF THE FOR-PROFIT. MICROSOFT WASN'T INVOLVED IN ANY OF THAT. AND IN THE COURSE OF THIS TRIAL, YOU'RE NOT GOING TO HEAR FROM MICROSOFT ABOUT ANY OF THOSE EVENTS. AND WE WILL HAVE VERY FEW, IF ANY, QUESTIONS FOR WITNESSES WHO ARE TALKING ABOUT THAT.

11:27:07 NOW, WHEN IT COMES TO THE PARTNERSHIP WITH MICROSOFT, YOU WILL HEAR FROM MICROSOFT: WHY IT WAS INTERESTED IN PARTNERSHIP; WHAT INVESTIGATION IT HAD TO DO BEFORE IT PARTNERED; AND HOW THE PARTNERSHIP HAS BEEN A SUCCESS.

11:27:21 BUT PLEASE WAIT TO HEAR FROM MICROSOFT'S WITNESSES ON THE PARTNERSHIP -- WAIT TO HEAR FROM ALL OF THE WITNESSES -- BUT TO UNDERSTAND MICROSOFT'S PERSPECTIVE ON THAT. AND PLEASE DON'T BE SURPRISED WHEN YOU DON'T SEE US STAND UP AND ASK MANY QUESTIONS TO SO MANY OF THE OTHER WITNESSES IN THIS TRIAL THAT

HAVE NOTHING TO DO WITH THE ISSUES ON WHY WE ARE HERE.

SO I'LL BRING IT BACK TO WHERE I STARTED AS WELL. MICROSOFT SAW AN OPPORTUNITY FOR PARTNERSHIP WHERE IT COULD PROVIDE OPENAI WITH THE RESOURCES IT NEEDED AND HELP MICROSOFT BUILD A SUCCESSFUL AI DEVELOPMENT BUSINESS WHILE LEAVING OPENAI FULLY IN CONTROL OF ITSELF AND ITS TECHNOLOGY.

BUT BEFORE MICROSOFT COULD MOVE FORWARD, IT DID DUE DILIGENCE. IT ASKED QUESTIONS, IT GATHERED DOCUMENTS. AND IT NEVER FOUND ANY SPECIAL CONDITIONS ON MR. MUSK'S DONATIONS BECAUSE THOSE CONDITIONS JUST DON'T EXIST.

AND FOR FIVE YEARS AFTER THE PARTNERSHIP WAS ANNOUNCED, MR. MUSK NEVER TOLD MICROSOFT THAT IT WAS VIOLATING SPECIAL CONDITIONS ON HIS DONATIONS TO OPENAI, AND HE HAD MR. NADELLA'S PHONE NUMBER.

IT WAS ONLY AFTER CHATGPT WAS SO SUCCESSFUL, AND HE LAUNCHED HIS OWN FOR-PROFIT AI COMPANY, XAI, THAT HE SUDDENLY MADE HIS CLAIMS AGAINST MICROSOFT.

NOW, MR. MUSK'S ACCUSATION IS A SERIOUS ONE, THAT MICROSOFT HELPED VIOLATE A CHARITABLE TRUST. AND MICROSOFT DOESN'T TAKE THAT LIGHTLY. AND WE WOULD ASK THAT YOU LISTEN CAREFULLY TO ALL OF THE WITNESSES AND REVIEW ALL THE EVIDENCE FOR YOURSELF.

AND I'M CONFIDENT THAT WHEN YOU DO, YOU WILL SEE THAT MICROSOFT HAS BEEN A RESPONSIBLE PARTNER EVERY STEP OF THE WAY.

AND AT THE END OF THE TRIAL, YOU WILL SEE THAT MR. MUSK

CANNOT COME CLOSE TO MEETING HIS BURDEN OF PROOF, AND I WILL ASK YOU TO DELIVER A VERDICT IN FAVOR OF MICROSOFT.

THANK YOU.

**THE COURT:** ALL RIGHT. THANK YOU, MR. COHEN.

OKAY. WHY DON'T WE GO AHEAD AND WE'LL TAKE OUR BREAK AT THIS POINT. WE'LL STAND IN RECESS FOR 20 MINUTES.

IF EVERYONE WILL RISE FOR THE JURY.

**THE CLERK:** PLEASE RISE FOR THE JURY.

(JURY OUT AT 11:29 A.M.)

THE CLERK: THANK YOU. YOU MAY BE SEATED.

**THE COURT:** OKAY. BEFORE I LET YOU OUT FOR YOUR BREAK, I HAVE A FEW QUESTIONS.

FIRST OF ALL, SO REMINDERS FOR THE PARTIES. YOU SHOULD HAVE MENTIONED TO MR. CUENCO THIS MORNING -- AND I WILL GET THEM, FRANKLY, IN THE AFTERNOON -- WHO THE WITNESSES ARE FOR TODAY. HE HAS NO IDEA.

WHO IS THE FIRST WITNESS?

**MR. MOLO:** MR. MUSK.

**THE COURT:** MR. MUSK IS THE FIRST WITNESS. OKAY. SO WE'LL MAKE SURE TO HAVE THAT DEPOSITION TRANSCRIPT AVAILABLE.

WE NEED TO DO THAT EVERY MORNING. IT'S IN MY STANDING PRETRIAL ORDER NUMBER 1. IT DIDN'T HAPPEN.

NEXT, BY MARCH 20TH, YOU WERE SUPPOSED TO PROVIDE ME WITH A LIST, RIGHT, IN TERMS OF WHERE YOU'RE POSTING YOUR EXHIBITS. WHERE IS IT? AND YOU DID NOT UPDATE THAT ON THE DOCKET.

WHERE IS YOUR WEBSITE GOING TO POST THESE DOCUMENTS?

**MR. KRY:** YOUR HONOR, WE'LL COORDINATE WITH THE OTHER SIDE ON THAT TODAY --

**THE COURT:** I NEED TO KNOW BECAUSE THE PRESS IS ASKING; RIGHT? YOU WERE ORDERED TO HAVE THIS DONE OVER A MONTH AGO. SO YOU HAVE UNTIL -- WE CLOSE EVIDENCE TODAY AT 1:40, AND YOU HAVE UNTIL 1:40 TO GET IT DONE.

**MR. KRY:** THANK YOU.

**THE COURT:** THERE WAS A STIPULATION AT DOCKET 448, THAT'S GRANTED.

I HAVE MORE THINGS FOR YOU TO DO, BUT WE'LL DO IT AFTERWARDS.

WE'LL STAND IN RECESS FOR 20 MINUTES.

**THE CLERK:** THE COURT IS IN RECESS.

(RECESS FROM 11:31 A.M. UNTIL 11:50 A.M.)

(JURY OUT AT 11:50 A.M.)

**THE COURT:** OKAY. I WANT TO TALK ABOUT THIS EXHIBIT 295.

WE'RE BACK ON THE RECORD. THE RECORD WILL REFLECT THAT THE JURY IS NOT HERE.

ALL RIGHT. SO I NOW HAVE THIS BINDER. IN THE FUTURE, GO AHEAD AND PROVIDE ME WITH THREE COPIES OF YOUR WITNESS BINDERS. I UNDERSTAND YOU ARE GOING TO SHARE THOSE BINDERS WITH EACH OTHER, WHAT, RIGHT AT THE BEGINNING OF THE TESTIMONY.

IS THAT THE AGREEMENT?

11:51:14 **MR. KRY:** YES, YOUR HONOR.

11:51:16 **MR. COHEN:** YES, YOUR HONOR.

11:51:17 **MR. SAVITT:** YOUR HONOR, PARDON ME. OUR ANTICIPATION WAS THAT THEY BE SHARED AT THE BEGINNING OF DIRECT OR FRIENDLY EXAMINATIONS, BUT NOT AT THE COMMENCEMENT OF HOSTILE ONES.

11:51:30 **MR. KRY:** THAT'S OUR UNDERSTANDING, TOO, YOUR HONOR.

11:51:31 **THE COURT:** OKAY. THAT'S FINE.

11:51:31 MR. SAVITT: THANK YOU.

11:51:35 THE COURT: SO I'M LOOKING, THOUGH, AT YOUR INDEX, AND IT SAYS -- WHICH IS FINE, YOU KNOW, YOU'VE GOT ALL THESE STIPULATIONS TO -- TO ADMIT ALL THESE EXHIBITS.

11:51:45 AND THAT INCLUDES THIS ONE, 295. NOW, 295 IS A NEWSPAPER ARTICLE, WHICH IS HEARSAY, WHICH IS NOT ADMISSIBLE.

11:51:56 SO WHY WOULD ANYBODY STIPULATE TO ADMIT IT?

11:51:59 **MR. KRY:** YOUR HONOR, THIS WAS THE SUBJECT OF DISCUSSIONS BETWEEN COUNSEL, AND WE'VE ALL AGREED THAT IT CAN COME IN FOR NOTICE. THE ONLY REASON THAT EXHIBIT IS COMING IN IS THAT THIS NEWSPAPER ARTICLE WAS THE ONE THAT MR. MUSK SAW IN 2022 AND THEN SENT A COPY OF TO MR. ALTMAN, AND THAT PRECIPITATED THE EVENTS THAT FOLLOWED. AND SO THIS IS ACTUALLY THE ONE YOUR HONOR HAD MENTIONED THERE WAS ONE EXHIBIT ON WHICH THE PARTIES HAD CONSENTED TO A LIMITING INSTRUCTION. THIS IS THE EXACT ONE THAT WE'RE TALKING ABOUT.

11:52:27 **THE COURT:** OKAY. SO ASSUMING THAT YOU USE ALL OF THESE EXHIBITS, THEN, THE FOLLOWING EXHIBITS ARE ADMITTED: 5,

7, 12, 14, 16, 70, 152, 156, 157, 158, 159, 233, 236, 239, 251, 105, 252, 296, AND 295 FOR A LIMITED PURPOSE.

YOU DO NOT HAVE TO ASK ME. NOW YOU CAN USE THEM. THEY'RE ADMITTED. AGAIN, THIS IS A PROCESS THAT ALLOWS US TO STREAMLINE THESE PROCEEDINGS, AND IT MAKES THINGS GO MUCH MORE SMOOTHLY FOR THE JURY.

IF YOU DO NOT USE THEM, THEY ARE NOT ADMITTED.

DO YOU UNDERSTAND?

(PLAINTIFFS' EXHIBITS 5, 7, 12, 14, 16, 70, 152, 156, 157, 158, 159, 233, 236, 239, 251, 105, 252, 296, AND 295 WERE RECEIVED IN EVIDENCE.)

**MR. KRY:** THANK YOU, YOUR HONOR. THERE WERE A COUPLE ON THE LIST THAT WERE NOT READ. AM I RIGHT, OR --

**THE COURT:** WELL, THERE WAS NO STIPULATION. SO THEY'RE NOT ADMITTED.

**MR. KRY:** SOME OF THESE WERE IN SUBSEQUENT AGREEMENTS. THAT'S WHAT I REPORTED THIS MORNING. SO THERE'S NUMBER 153 IS NOW STIPULATED. AND NUMBER --

**THE COURT:** AGREED?

**MS. EDDY:** WE ARE AGREED SO LONG AS PAUL WAZZAN IS NOT THE SPONSORING WITNESS.

**THE COURT:** WELL, WE HAD -- THESE ARE ONLY FOR MR. MUSK. SO ARE YOU OFFERING THIS THROUGH MR. MUSK?

**MR. KRY:** YES.

**THE COURT:** OKAY.

**MR. KRY:** AND THEN 335, THE PARTIES ALSO REACHED AGREEMENT ON THIS MORNING.

**THE COURT:** AGREED?

**MS. PATEL:** YES, YOUR HONOR, AS TO MICROSOFT.

**MS. EDDY:** YES, TO OPENAI AS WELL.

**THE COURT:** THAT IS ADMITTED AS WELL, THEN.

(PLAINTIFFS' EXHIBITS 153 & 335 WERE RECEIVED IN EVIDENCE.)

**MR. KRY:** AND, YOUR HONOR, 388 AS WELL. THAT ONE -- THAT WAS ALSO AGREED TO BY THE PARTIES THIS MORNING.

**THE COURT:** AGREED?

**MS. PATEL:** YES, AS TO MICROSOFT.

**THE COURT:** THESE ARE PHOTOS?

**MS. EDDY:** YES, YOUR HONOR.

**THE COURT:** THAT'S ADMITTED.

(PLAINTIFFS' EXHIBIT 388 WAS RECEIVED IN EVIDENCE.)

**MR. KRY:** AND, YOUR HONOR, RELATIVE TO THAT, THE PARTIES WOULD ALSO ASK PERMISSION TO HAND UP AN UPDATED EXHIBIT LIST WITH THE UPDATED TOTAL OF EXHIBITS. MAYBE THAT --

**THE COURT:** I DON'T NEED THAT. I NEED OTHER THINGS FROM YOU-ALL, BUT WE'LL TALK ABOUT THEM LATER.

IS OUR 20 MINUTES UP, MR. CUENCO?

**THE CLERK:** YES, YOUR HONOR.

**THE COURT:** ALL RIGHT. LET'S CALL IN THE JURY.

(JURY IN AT 11:54 A.M.)

11:56:04 **THE COURT:** YOU MAY ALL BE SEATED.

11:56:07 WELCOME BACK.

11:56:09 AT THIS POINT, WE ARE GOING TO START --

11:56:21 **THE CLERK:** LET ME CHECK.

11:56:23 **THE COURT:** TEST, TEST.

11:56:24 **THE CLERK:** I'LL REPLACE IT, YOUR HONOR.

11:56:25 **THE COURT:** OKAY. THANK YOU.

11:56:35 TESTING. HELLO, HELLO. YES. CAN YOU HEAR ME NOW?

11:56:42 **JUROR:** YES.

11:56:42 **THE COURT:** GREAT. PERFECT.

11:56:44 WE WILL START THE EVIDENTIARY PORTION OF THE TRIAL NOW.

11:56:46 I DID CONFIRM, HOPEFULLY, THE BAGELS AND FRUIT MADE IT 11:56:50 BACK TO YOU-ALL.

11:56:52 **JUROR:** IT'S GOING IN AND OUT.

11:56:54 **THE COURT:** IT'S GOING IN AND OUT.

11:56:56 OKAY. LET'S GO AHEAD AND TRY ANOTHER ONE.

11:57:15 TEST? YES? NO? TEST, TEST.

11:57:24 ONE THING ABOUT BRINGING YOUR FOOD, TO THE EXTENT YOU HAVE 11:57:28 SPECIFIC THINGS YOU LIKE TO MUNCH ON, DO NOT BRING ANYTHING 11:57:32 TOO, TOO HEAVY.

11:57:33 THE GOOD THING ABOUT HAVING THIS BREAK AS OPPOSED TO BIG 11:57:41 LUNCHES, IS THAT WHEN YOU HAVE A BIG LUNCH --

11:57:43 CAN YOU HEAR ME? CAN YOU HEAR ME? CAN YOU HEAR ME? CAN 11:57:53 YOU HEAR ME? YES.

11:57:55 ALL RIGHT. WE'LL TEST A COUPLE MORE. LET ME JUST --

11:57:57 IF YOU EAT TOO -- LIKE, IF YOU HAVE A BIG LUNCH IN A TRIAL, YOU REALLY WANT TO GO TO SLEEP, AND THAT HAPPENED TO ME AS A BRAND NEW JUDGE IN STATE COURT, AND IN STATE COURT, YOU -- FOR A VARIETY OF UNION REASONS, WE HAVE THESE BIG GAPS. YOU HAVE TO TAKE AN HOUR LUNCH AND THEN 30 MINUTES FOR YOUR HELPERS TO DO THEIR ADMINISTRATIVE, AND SO WE'VE GOT THIS BIG -- AND I HAD A NICE BIG LUNCH.

11:58:27 OH, MY GOSH, IT WAS THE WORST THING. LISTENING TO THESE LAWYERS GOING ON IN THE AFTERNOON, AND I WAS PINCHING MYSELF TO STAY AWAKE. NEVER AGAIN WOULD I EAT A BIG LUNCH IN TRIAL.

11:58:39 DOES THAT HELP? OKAY. ARE WE -- DOES THAT HELP? SOUND GOOD?

11:58:53 **JUROR:** IT'S JUST TOO LOUD.

11:58:56 **THE COURT:** OKAY. NOW IT'S TOO LOUD.

11:58:58 TEST, TEST. YES. AGAIN, DOES THAT HELP?

11:59:05 **JUROR:** YES.

11:59:05 **THE COURT:** OKAY. GOOD. WE ARE TRYING TO GET SOME MORE OF THE DEVICES. THEY'RE ON THEIR LAST LEGS, I THINK.

11:59:16 OKAY. SO WE'LL HAVE OUR FIRST WITNESS.

11:59:19 MR. MOLO.

11:59:21 **MR. MOLO:** YOUR HONOR, THE PLAINTIFF CALLS ELON MUSK.

11:59:24 **THE COURT:** ALL RIGHT. MR. MUSK, COME FORWARD, PLEASE.

11:59:35 AND IF YOU'LL REMAIN STANDING.

11:59:37 MR. CUENCO.

11:59:39 **THE CLERK:** PLEASE RAISE YOUR RIGHT HAND TO BE SWORN.

11:59:46 **(PLAINTIFFS' WITNESS, ELON MUSK, WAS SWORN.)**

11:59:47 **THE WITNESS:** I DO.

11:59:52 **THE CLERK:** PLEASE SAY I DO, OR I AFFIRM.

11:59:56 **THE WITNESS:** I DO.

11:59:57 **THE CLERK:** PLEASE BE SEATED. SPEAK CLEARLY INTO THE MICROPHONE.

12:00:00 PLEASE STATE YOUR FULL NAME AND SPELL OUT YOUR LAST NAME FOR THE RECORD.

12:00:04 **THE WITNESS:** ELON REEVE MUSK, AND M-U-S-K.

12:00:10 **THE CLERK:** THANK YOU.

12:00:10 **THE COURT:** OKAY. GOOD AFTERNOON, SIR.

12:00:14 YOU MAY PROCEED.

12:00:14 **MR. MOLO:** THANK YOU, YOUR HONOR.

12:00:15 **DIRECT EXAMINATION**

12:00:15 **BY MR. MOLO:**

12:00:18 **Q.** ELON, YOU BROUGHT THIS LAWSUIT; RIGHT?

12:00:20 **A.** YES.

12:00:20 **Q.** AT A HIGH LEVEL, CAN YOU JUST DESCRIBE FOR THE JURY WHAT THE LAWSUIT IS ABOUT?

12:00:26 **A.** WELL, FUNDAMENTALLY, I THINK IT -- THEY'RE GOING TO TRY TO MAKE THIS LAWSUIT SEEM VERY COMPLICATED BUT I THINK IT'S ACTUALLY VERY SIMPLE, WHICH IS THAT IT'S NOT OKAY TO STEAL A CHARITY. THAT'S MY VIEW.

12:00:41 AND, MOREOVER, IF THE -- IF THE DEFENDANTS ARE FOUND NOT

12:00:46 GUILTY, IF MICROSOFT, ALTMAN, AND BROCKMAN ARE FOUND NOT
12:00:49 GUILTY, THIS CASE WILL BECOME CASE LAW, IT WILL BECOME
12:00:52 PRECEDENT, AND IT WILL GIVE LICENSE, IN MY OPINION, TO LOSING
12:00:56 EVERY CHARITY IN AMERICA.

12:00:57 SO THE CONSEQUENCES OF THIS CASE GO FAR BEYOND ME OR THE
12:01:02 PARTICULAR PEOPLE HERE, BUT IF IT -- IF IT'S OKAY -- IF THE
12:01:09 VERDICT COMES UP THAT EFFECTIVELY MAKES IT OKAY TO LOOT A
12:01:13 CHARITY, THE ENTIRE FOUNDATION OF CHARITABLE GIVING IN AMERICA
12:01:16 WILL BE DESTROYED. THAT'S MY CONCERN.

12:01:23 **MR. SAVITT:** YOUR HONOR, I WANT TO OBJECT TO THAT
12:01:25 RESPONSE AND MOVE TO STRIKE. IT'S AN INAPPROPRIATE LEGAL
12:01:29 ANALYSIS AND NONRESPONSIVE TO THE QUESTION.

12:01:34 **THE COURT:** WELL, IT WAS RESPONSIVE TO THE QUESTION.
12:01:36 HE IS NOT A LAWYER. IT'S NOT ALLOWED FOR ANY LEGAL VALUE
12:01:40 WHATSOEVER. AND IF THAT'S HIS OPINION, THAT'S HIS OPINION, AND
12:01:45 YOU CAN GIVE IT WHATEVER WEIGHT YOU WANT. OVERRULED.

12:01:48 **THE CLERK:** EXCUSE ME, COUNSEL. THE TABLE
12:01:51 MICROPHONES HAVE BEEN ENABLED. YOU MAY SPEAK WITH YOUR TABLE
12:01:56 MICS.

12:01:56 **THE COURT:** PROCEED.

12:01:57 **BY MR. MOLO:**

12:01:58 **Q.** ELON, I'D LIKE YOU TO TELL THE JURY A BIT ABOUT YOUR
12:02:04 BACKGROUND. WHERE DID YOU GROW UP?

12:02:06 **A.** I WAS BORN AND RAISED IN SOUTH AFRICA. AND SHOULD I GIVE
12:02:10 THE LONG BACKGROUND OR SHORT BACKGROUND?

12:02:12 **Q.** WELL, WE'RE HERE, SO WHY NOT GIVE THE LONG BACKGROUND.

12:02:16 **A.** OKAY. SO, YEAH, I WAS BORN AND RAISED IN SOUTH AFRICA,
12:02:19 AND I LEFT WHEN I WAS 17, JUST BY MYSELF. AND MY MOM IS A
12:02:26 CANADIAN, SO I WENT TO CANADA AND ARRIVED IN MONTREAL WITH
12:02:31 ABOUT $2,500 IN CANADIAN TRAVELERS CHECKS AND ONE BAG OF
12:02:37 CLOTHES AND ONE BAG OF BOOKS, AND TRAVELLED AROUND AND DID A
12:02:41 BUNCH OF ODD JOBS. AND THEN WENT TO COLLEGE IN CANADA FOR A
12:02:44 FEW YEARS.

12:02:45 **Q.** WHY WAS IT THAT -- WHAT WAS IT THAT MADE YOU WANT TO GO TO
12:02:48 CANADA FROM SOUTH AFRICA?

12:02:51 **A.** WELL, I WAS ALWAYS INTERESTED IN TECHNOLOGY, AND I WANTED
12:02:54 TO HAVE SOME IMPACT ON THE WORLD WITH RESPECT TO TECHNOLOGY,
12:02:57 AND IT SEEMED LIKE NORTH AMERICA WAS WHERE IT WAS HAPPENING.

12:03:05 MY GRANDFATHER WAS AMERICAN, BUT I WASN'T ABLE TO GET AN
12:03:09 AMERICA PASSPORT. I WAS ABLE TO GET A CANADIAN PASSPORT
12:03:14 BECAUSE MY MOM WAS BORN IN CANADA. SO I KIND OF GOT AS CLOSE
12:03:17 AS I COULD WITH THE CANADIAN PASSPORT.

12:03:20 **Q.** HOW DID YOU SUPPORT YOURSELF WHEN YOU WENT TO CANADA?

12:03:22 **A.** I WORKED IN A VARIETY OF JOBS. I WAS -- ACTUALLY QUITE A
12:03:26 WIDE VARIETY. I WAS A LUMBERJACK. I WAITED TABLES. I --
12:03:34 YEAH, I WORKED IN A LUMBER MILL. THAT WAS THE TOUGHEST JOB, I
12:03:38 THINK.

12:03:38 I DID SOME PROGRAMMING, SOME CONTRACT PROGRAMMING OF
12:03:45 COMPUTERS. AND THEN I WENT TO QUEENS UNIVERSITY IN CANADA
12:03:53 ON --

12:03:53 **Q.** AND HOW LONG DID YOU STUDY AT QUEENS UNIVERSITY?
12:03:56 **A.** I WAS THERE FOR TWO YEARS.
12:03:57 **Q.** WHAT DID YOU STUDY WHILE YOU WERE THERE?
12:04:00 **A.** A WIDE RANGE OF SUBJECTS, BUT MOSTLY PHYSICS, ECONOMICS,
12:04:03 AND A BUNCH OF HUMANITY SUBJECTS.
12:04:07 **Q.** AND YOU DIDN'T GRADUATE FROM QUEENS UNIVERSITY, DID YOU?
12:04:11 **A.** NO. I GOT A SCHOLARSHIP TO GO TO THE UNIVERSITY OF
12:04:14 PENNSYLVANIA.
12:04:14 **Q.** OKAY.
12:04:15 **A.** WHICH I DID NOT THINK I WOULD BE ABLE TO GO TO BECAUSE THE
12:04:19 TUITION WAS VERY EXPENSIVE, BUT THEY GAVE ME SCHOLARSHIP THAT
12:04:22 ENABLED ME TO GO TO COLLEGE THERE.
12:04:24 **Q.** WHAT DID YOU STUDY AT THE UNIVERSITY OF PENNSYLVANIA?
12:04:26 **A.** PHYSICS AND ECONOMICS.
12:04:28 **Q.** OKAY. WAS THERE A REASON WHY YOU PICKED THOSE TWO
12:04:31 SUBJECTS?
12:04:31 **A.** WELL, I GUESS I'M PRETTY INTERESTED IN PHYSICS, AND HOW
12:04:38 THE ECONOMY WORKS, SO -- IT WASN'T FROM THE STANDPOINT OF
12:04:42 CAREER OR ANYTHING.
12:04:44 I ALREADY KNEW HOW TO PROGRAM COMPUTERS. SO I'VE DONE A
12:04:48 LOT OF PROGRAMMING AS A KID.
12:04:51 I WROTE MY FIRST VIDEO GAME WHEN I WAS 12, WHICH WAS SOLD
12:04:56 FOR LIKE $500 BASICALLY.
12:05:01 AND SO I'M INTERESTED IN TECHNOLOGY AND HOW THE WORLD
12:05:05 WORKS; HENCE THE PHYSICS STUFF.

AND THEN I CAME OUT TO THE BAY AREA TO GO TO GRADUATE SCHOOL AT STANFORD TO WORK ON ENERGY STORAGE TECHNOLOGIES FOR ELECTRIC VEHICLES.

SO I WAS INTERESTED IN ELECTRIC VEHICLES AND SUSTAINABLE ENERGY FOR A LONG TIME. I THOUGHT IT WAS VERY IMPORTANT THAT WE ACCELERATE THE TRANSITION TO A SUSTAINABLE ENERGY ECONOMY.

**Q.** AND DID YOU FINISH THE PH.D. -- THIS WAS A PH.D. PROGRAM AT STANFORD?

**A.** YEAH, YEAH. PRIMARILY THE MATERIALS SCIENCE DEPARTMENT. BUT I PUT THAT ON HOLD TO START AN INTERNET COMPANY, WHICH I THOUGHT WOULD FAIL. I GENERALLY THINK MY COMPANIES ARE GOING TO FAIL UNTIL PROVEN OTHERWISE.

SO, IN FACT, WHEN I TALKED TO BILL NIX, WHO IS THE HEAD OF THE MATERIALS SCIENCE DEPARTMENT AT STANFORD, I SAID, I'LL PROBABLY BE BACK, YOU KNOW, IN A FEW MONTHS AFTER MY COMPANY FAILS.

BUT -- AND HE SAID THIS WAS THE LAST CONVERSATION WE'LL EVER HAVE, BECAUSE I DON'T THINK IT'S GOING TO FAIL, AND HE WAS RIGHT.

**Q.** AND WAS THE COMPANY -- WHO DID YOU START THE COMPANY WITH?

**A.** MY BROTHER, AND GREG CURRY, WHO JUST PASSED AWAY.

**Q.** AND HOW LONG -- DESCRIBE THE COMPANY.

**A.** YEAH. THIS WAS THE EARLY DAYS OF THE INTERNET, SO 1995.

MOST PEOPLE HAD NOT HEARD OF THE INTERNET IN 1995, BUT I THOUGHT IT WAS SOMETHING THAT WOULD PROFOUNDLY CHANGE THE

WORLD, BECAUSE IT WAS LIKE -- THE INTERNET WAS LIKE HUMANITY ACQUIRING A NERVOUS SYSTEM WHERE, IF YOU HAD ACCESS TO ANY PART OF THE INTERNET, YOU WOULD HAVE ACCESS TO ALL KNOWLEDGE, ALL HUMAN KNOWLEDGE.

SO AS WHERE PREVIOUSLY YOU WOULD HAVE TO GO TO A LIBRARY TO LEARN SOMETHING, BY ACCESSING THE INTERNET YOU WOULD GAIN ACCESS TO ALL KNOWLEDGE. YOU COULD LEARN ANYTHING -- ANYTHING YOU WANTED TO.

SO I THOUGHT THE INTERNET WOULD PROFOUNDLY CHANGE HUMANITY. AND I WROTE THE MAPS AND DIRECTION SYSTEM, WHITE PAGES, YELLOW PAGES, I WROTE ALL OF THE INITIAL SOFTWARE MYSELF. I ACTUALLY ONLY HAD ONE COMPUTER, SO THE WEBSITE ONLY WORKED DURING THE DAY, BECAUSE I WOULD PROGRAM AT NIGHT, AND THEN THE WEBSITE WOULD WORK DURING THE DAY WHILE I WAS SLEEPING.

**Q.** AND YOU SOLD THAT COMPANY?

**A.** YES.

**Q.** AND TO WHOM DID YOU SELL IT? AND FOR HOW MUCH MONEY?

**A.** TO COMPAQ COMPUTER, WHICH IS NOW AN ACQUIRED BY HP, AND THAT WAS FOR $300 MILLION.

**Q.** AND WHAT DID YOU DO WITH THE MONEY THAT YOU MADE FROM SELLING -- BY THE WAY, WHAT WAS THE NAME OF THAT COMPANY?

**A.** IT WAS CALLED ZIP2. IT WASN'T THE BEST NAME, TO BE FRANK, BUT IT WAS A SLIGHTLY CONFUSING NAME PERHAPS.

**Q.** AND WHAT DID YOU DO WITH THE MONEY THAT YOU GOT FROM ZIP2?

12:08:03 **A.** WELL, I BELIEVE THAT, YOU KNOW, YOU SHOULDN'T ASK OTHER PEOPLE TO INVEST UNLESS YOU'RE GOING TO PUT YOUR OWN MONEY IN. AT THE BEGINNING OF ZIP2 I DIDN'T HAVE ANY MONEY, SO I COULDN'T DO THAT.

12:08:14 BUT WHEN I STARTED ZIP2, I HAD $100,000 IN STUDENT DEBT AND ONE COMPUTER.

12:08:20 AFTER ZIP2, I OWNED ABOUT, I THINK 7 PERCENT OF THE COMPANY, SO I RECEIVED -- OF THE $300 MILLION, I RECEIVED $20 MILLION.

12:08:30 **Q.** OKAY.

12:08:31 **A.** AND I INVESTED MOST OF THAT INTO X.COM, WHICH BECAME PAYPAL.

12:08:41 **Q.** AND WHAT WAS X.COM?

12:08:43 **A.** IT WAS SORT OF A PAYMENT SYSTEM. BASICALLY, IF YOU'VE USED PAYPAL, THAT'S X.COM. X.COM BECAME PAYPAL. THE COMPANY CHANGED ITS NAME FROM X.COM TO PAYPAL CORPORATION.

12:08:55 **Q.** OKAY. AND HOW LONG WERE YOU PART OF X.COM/PAYPAL?

12:08:59 **A.** WELL, IT WAS -- LET'S SEE. IT WAS LIKE '99, 2000. I GUESS TWO YEARS, SORT OF, FULL TIME, AND THEN MAYBE THREE AND A HALF YEARS ON THE BOARD OF DIRECTORS.

12:09:14 **Q.** OKAY. AND WHAT HAPPENED WITH PAYPAL?

12:09:19 **A.** IT WENT PUBLIC IN 2002, AND THEN WAS ACQUIRED BY EBAY.

12:09:28 **Q.** OKAY. AND HOW MUCH DID EBAY PAY FOR PAYPAL?

12:09:32 **A.** I DON'T RECALL THE EXACT AMOUNT, BUT I THINK IT ENDED UP -- IN TERMS OF EBAY STOCK, BEING OVER A BILLION DOLLARS IN

12:09:39 EBAY STOCK.
12:09:41 **Q.** OKAY. DID YOU USE EXTERNAL FUNDING FROM ANY SOURCES WHEN
12:09:45 YOU WERE FUNDING X.COM?
12:09:48 **A.** YES, WE RECEIVED VENTURE FUNDING, A SERIES A ROUND, B
12:09:53 ROUND, WHATNOT. OUR SERIES A ROUND WAS SEQUOIA CAPITAL.
12:09:59 **Q.** OKAY. AND THEN AFTER PAYPAL WAS MERGED WITH X.COM --
12:10:07 AFTER X.COM MERGED WITH PAYPAL, DID YOU RECEIVE ADDITIONAL --
12:10:14 **A.** WELL, THERE WAS NO COMPANY CALLED PAYPAL. X.COM MERGED
12:10:18 WITH INFINITY, AND THE COMPANY WAS CALLED X.COM AFTER THAT.
12:10:24 THE PRODUCT WAS CALLED PAYPAL, AND THEN WE CHANGED THE
12:10:26 NAME OF THE COMPANY FROM X.COM TO PAYPAL TO AVOID CONFUSION.
12:10:30 **Q.** ALL RIGHT. WHICH I JUST DEMONSTRATED.
12:10:35 DID YOU GET FUNDING FOR PAYPAL AS WELL AS FOR X.COM?
12:10:44 **A.** WELL, YES. I MEAN, THEY'RE THE SAME COMPANY, SO WE --
12:10:48 YEAH, WE HAD VENTURE INVESTORS, AND THEN PUBLIC COMPANY
12:10:52 INVESTORS, AND THEN WE WERE ACQUIRED BY EBAY.
12:10:55 **Q.** WHAT WOULD YOU SAY THE MOST IMPORTANT THINGS YOU DID AS
12:10:59 CEO OF PAYPAL IN TERMS OF YOUR RESPONSIBILITY? WHAT ROLE --
12:11:03 WHAT DOES THE CEO OF A COMPANY LIKE THAT DO?
12:11:06 **A.** WELL, YOU SET THE OVERALL STRATEGY OF THE COMPANY. YOU
12:11:13 RECRUIT THE KEY PEOPLE, AND YOU MANAGE THE COMPANY.
12:11:19 YOU KNOW, I WAS ALSO DRIVING THE CORE TECHNOLOGY AS WELL,
12:11:24 WHICH NOT ALWAYS IS THE CASE BY A CEO.
12:11:27 **Q.** I WANT TO TALK ABOUT SOME OF THE OTHER COMPANIES YOU
12:11:30 FOUNDED.

12:11:31 WOULD IT BE HELPFUL TO YOUR TESTIMONY IF WE PUT UP A GRAPHIC THAT HAD THE LOGOS OF THOSE COMPANIES?
12:11:36 **A.** SURE.
12:11:37 **Q.** OKAY. SO AFTER YOU SOLD PAYPAL --
12:11:43 **THE COURT:** CAN WE PUBLISH THIS, JUST THE DEMONSTRATIVE? I'M ALLOWING IT TO BE PUBLISHED.
12:11:50 **MR. MOLO:** OH, YOU'RE ALLOWING IT. THANK YOU VERY MUCH, YOUR HONOR.
12:11:54 **BY MR. MOLO:**
12:11:54 **Q.** AFTER YOU SOLD PAYPAL, WHAT WAS YOUR NEXT BUSINESS VENTURE?
12:12:00 **A.** AFTER PAYPAL, THERE WAS SPACEX, WHICH WAS -- THE ROLE OF SPACEX IS TO MAKE LIFE MULTI PLANETARY, SO TO EXTEND LIFE BEYOND EARTH. AND ESSENTIALLY TO ENSURE THE LONG-TERM SURVIVAL OF LIFE AND CONSCIOUSNESS AS WE KNOW IT. THAT'S THE GOAL OF SPACEX.
12:12:31 SO THAT'S -- IF WE CAN BE A MULTI PLANET SPECIES AND A MULTI PLANT CIVILIZATION THEN WE'RE MUCH MORE LIKELY TO SLIDE INTO THE FUTURE.
12:12:46 AND SO I THINK SPACEX IS ABOUT LIFE INSURANCE -- IT'S LIFE INSURANCE FOR LIFE AS WE KNOW IT.
12:12:51 AND THEN ALSO I THINK THERE NEEDS TO BE THINGS THAT PEOPLE ARE EXCITED ABOUT THAT MAKE LIFE WORTH LIVING, AND THIS IDEA THAT WE CAN BE OUT THERE AMONG THE STARS IS ONE OF THOSE THINGS THAT INSPIRE AND EXCITE EVERYONE. AND I THINK THAT'S A BIG

DEAL.

LIFE CAN'T JUST BE ABOUT SOLVING ONE MISERABLE PROBLEM AFTER ANOTHER. THERE HAVE TO BE REASONS TO BE EXCITED AND INSPIRED ABOUT THE FUTURE. AND THAT'S WHAT SPACEX IS ABOUT.

AND THEN TESLA IS ABOUT --

**Q.** CAN I ASK YOU A QUESTION THAT IS SPECIFIC?

**A.** SURE.

**Q.** SO IS THERE AN ACTUAL LAUNCHING OF ROCKETS AND SUCH?

**A.** YES. SPACEX IS THE LEADING ROCKET COMPANY IN THE WORLD AT THIS POINT. WE HAD A DIFFICULT TIME IN THE BEGINNING.

SO IN THE BEGINNING OF SPACEX, I WAS UNABLE TO RECRUIT THE CHIEF ENGINEER FOR THE ROCKET COMPANY, BECAUSE ANYONE WHO WAS GOOD WOULDN'T JOIN US, BECAUSE I WAS JUST, LIKE, SOME INTERNET GUY, AND THEY'RE LIKE, WELL, AN INTERNET GUY IS GOING TO FAIL, WHICH ADMITTEDLY IT SOUNDS LIKE AN INTERNET GUY IS GOING TO FAIL AT ROCKETS. I MEAN, YOU KNOW, IT DID SEEM IMPROBABLE, FRANKLY.

BUT I WAS UNABLE TO RECRUIT A CHIEF ENGINEER. SO I ENDED UP BEING THE CHIEF ENGINEER OF SPACEX.

BUT INITIALLY I WOULD SAY NOT A SUCCESSFUL CHIEF ENGINEER. THE FIRST THREE FLIGHTS OF THE ROCKET FAILED. FORTUNATELY, THE FOURTH FLIGHT SUCCEEDED.

IF THE FOURTH FLIGHT HAD NOT SUCCEEDED, SPACEX WOULD HAVE GONE BANKRUPT AND DIED.

BUT TODAY SPACEX IS THE LEADING ROCKET COMPANY IN THE

WORLD.

**Q.** AND DO YOU COLLABORATE AT ALL WITH NASA?

**A.** YES. SPACEX IS THE PRIMARY PROVIDER OF ASTRONAUT TRANSPORT TO NASA. SO ALL OF THE ASTRONAUTS THAT ARE TAKEN TO AND FROM THE SPACE STATION ARE TAKING ON THE SPACEX ROCKETS AND SPACE CRAFTS. AND -- YEAH. AND THEN LAST YEAR WE RESCUED THE ASTRONAUTS FROM THE SPACE STATION.

**Q.** COULD YOU EXPLAIN THAT TO THE JURY.

**A.** YES. SO THERE WAS A -- THE BOEING SPACECRAFT HAD SOME SAFETY ISSUES AND WAS UNABLE TO TAKE THE ASTRONAUTS BACK FROM THE SPACE STATION. SO SPACEX WAS ASKED TO DO SO, AND WE DID SO.

**Q.** THE -- SO WHAT ARE YOUR DUTIES OR PRIMARY RESPONSIBILITIES, I SHOULD SAY, AS THE CEO OF SPACEX?

**A.** WELL, I GUESS I'M THE CEO AND CHIEF ENGINEER. SO I MOSTLY DRIVE THE TECHNOLOGY OF THE COMPANY.

AND THEN GWYNNE SHOTWELL, WHO IS THE PRESIDENT, MANAGES THE BUSINESS SIDE OF THE COMPANY. SHE DOES AN AMAZING JOB.

SO, YEAH, THE TWO OF US PRETTY MUCH RUN THE COMPANY.

**Q.** AND ARE THE RESPONSIBILITIES SIMILAR OR DIFFERENT FROM WHAT YOU HAD AT TESLA -- EXCUSE ME, AT PAYPAL WHEN YOU WERE MENTIONING STRATEGY IMPROVING AND SUCH?

**A.** YES. AND GENERALLY, I DRIVE THE ENGINEERING AT THE COMPANY, SO THAT'S -- MOST OF MY TIME IS SPENT ON TECHNOLOGY.

AS I SAID WITH SPACEX, GWYNNE SHOTWELL IS PRESIDENT, SHE

MANAGES THE BUSINESS SIDE OF THINGS, AND I DRIVE THE TECHNOLOGY.

**Q.** OKAY. AND ABOUT HOW ABOUT EMPLOYEES DO YOU HAVE AT SPACEX NOW?

**A.** ABOUT 15,000.

**Q.** WHAT WAS THE NEXT COMPANY THAT YOU FOUNDED AFTER SPACEX?

**A.** THAT WOULD BE TESLA.

**Q.** OKAY. AND I THINK -- HAD THE COMPANY BEGUN A FEW MONTHS OR SOMETHING BEFORE YOU ACTUALLY BECAME ENGAGED WITH IT OR WERE YOU THERE AT THE VERY BEGINNING?

**A.** WELL, THE INCORPORATION DOCUMENTS HAVE BEEN FILED, BUT THERE WERE NO EMPLOYEES OR INTELLECTUAL PROPERTY AT THE TIME.

SO, YOU KNOW, IT DEPENDS ON PEOPLE'S PERSPECTIVE. BUT ESSENTIALLY THERE WERE FIVE COFOUNDERS OF THE COMPANY, AND I WAS ONE OF THEM, BEFORE THERE WERE ANY EMPLOYEES OR INTELLECTUAL PROPERTY OR ANYTHING LIKE THAT.

**Q.** AND IF SPACEX WAS NOT THAT OLD, WHY DID YOU DECIDE TO FOUND A SECOND COMPANY SO SOON?

**A.** WELL, I THOUGHT IT WAS IMPORTANT TO ACCELERATE THE TRANSITION TO SUSTAINABLE ENERGY. THAT WAS REALLY THE REASON.

AND THE -- GM AND FORD HAD CANCELLED THEIR ELECTRIC CAR PROGRAMS. SO AT THE TIME THERE WAS -- ALL OF THE MAJOR CAR COMPANIES HAD CANCELLED THEIR ELECTRIC VEHICLE PROGRAMS. AND SO UNLESS A STARTUP DID AN ELECTRIC VEHICLE, THERE WOULD BE NO ELECTRIC VEHICLES. AND WE WOULD NOT BE DOING A TRANSITION TO

SUSTAINABLE ENERGY TO ECONOMY, AND I THOUGHT THAT COULD BE PRETTY BAD FOR THE ENVIRONMENT AND FOR, YOU KNOW, JUST HUMANITY AS A WHOLE.

SO WE STARTED TESLA TO SHOW THAT, FIRST, YOU COULD MAKE A GREAT ELECTRIC CAR.

AND SECONDLY, THAT IF YOU MADE AN ELECTRIC CAR, PEOPLE WOULD BUY IT. WHICH MAY SOUND STRANGE TODAY, BECAUSE OBVIOUSLY A LOT OF PEOPLE DO BUY ELECTRIC CARS, BUT THEY SAID THAT EVEN IF YOU DID MAKE A LONG-RANGE ELECTRIC CAR, NOBODY WOULD BUY IT BECAUSE IT WOULD TAKE TOO LONG TO RECHARGE. AND PEOPLE JUST LIKE GASOLINE CARS.

SO WE FIRST HAVE TO MAKE A GOOD ELECTRIC CAR WITH LONG RANGE, AND MAKE THAT COMMERCIALLY VIABLE, AND THEN CONVINCE PEOPLE TO BUY IT, WHICH WE WERE ABLE TO DO. IT WAS A VERY DIFFICULT JOURNEY. BUT, ULTIMATELY, IT'S GOTTEN TO THE POINT WHERE, TODAY, TESLA MAKES ABOUT 2 MILLION CARS A YEAR, 2 MILLION ELECTRIC CAR -- VEHICLES -- 2 MILLION ELECTRIC VEHICLES A YEAR. AND IT'S PROBABLY A FAIR CHARACTERIZATION TO SAY THAT TESLA PLAYED A FUNDAMENTAL ROLE IN ACCELERATING THE ADVENT OF SUSTAINABLE ENERGY.

SO IN TERMS OF -- BASICALLY, ELECTRIC VEHICLES WOULD NOT BE WHERE THEY ARE TODAY WITHOUT TESLA.

**Q.** AND WHAT DO TESLA'S SALES COMPARE TO A COMPANY LIKE FORD IN TERMS OF NUMBER OF VEHICLES THAT ARE MADE?

**A.** WELL, WE'RE SMALLER THAN FORD OR GM. I THINK FORD DOES

ABOUT 5 MILLION CARS A YEAR, AND TESLA DOES 2. BUT WE ARE GROWING, AND I THINK AT SOME POINT THERE WILL BE MORE ELECTRIC VEHICLES THAN GASOLINE VEHICLES.

**Q.** DOES TESLA DO MORE THAN MANUFACTURE CARS?

**A.** YES, TESLA ALSO DOES SOLAR POWER AND BATTERIES, AND SO THESE ARE -- THEY'RE PART OF THE SUSTAINABLE ENERGY SOLUTION, BECAUSE YOU CAN GET ENERGY FROM THE SUN, AND THEN STORE THAT IN BATTERIES, AND THEN YOU CAN CHARGE ELECTRIC VEHICLES. THOSE THREE FORM THE THREE FUNDAMENTAL PILLARS OF THE SUSTAINABLE ENERGY FUTURE.

IF YOU HAVE SOLAR POWER BATTERIES TO STORE SOLAR POWER, FOR -- TO WORK AT NIGHT, AND THEN ELECTRIC VEHICLES, THAT'S -- THAT'S A SUSTAINABLE ENERGY SOLUTION THAT WORKS AS FAR INTO THE FUTURE AS WE CAN IMAGINE, AND WOULD BE VERY GOOD FOR THE WORLD.

**Q.** OKAY. WHAT IS YOUR ROLE AT TESLA?

**A.** I'M THE CEO, AND, I GUESS, CHIEF ENGINEER, OR SOMETHING LIKE THAT.

**Q.** AND WHAT WOULD YOU SAY YOUR PRIMARY RESPONSIBILITIES ARE IN THAT ROLE AT TESLA?

**A.** WELL, THE STRATEGY OF THE COMPANY, RECRUITING KEY PEOPLE. I DO PARTICIPATE IN -- AT A VERY DETAILED LEVEL IN THE ENGINEERING DESIGN OF THE CARS, SOLAR FACTORIES, AND ROBOTS.

**Q.** OKAY. AFTER TESLA, YOU FOUNDED ANOTHER COMPANY. AND CAN YOU TELL US ABOUT THAT, NEURALINK?

**A.** YEAH, SO NEURALINK -- WELL, THERE'S A COUPLE PARTS TO

NEURALINK. THE -- THE LONG-TERM GOAL OF NEURALINK IS -- IS ACTUALLY AI SAFETY IN THE SENSE THAT IF WE CAN CLOSELY TIE HUMAN WORLD TO -- TO AI -- BASICALLY, IF WE CAN ACHIEVE A BETTER AI-HUMAN SYMBIOSIS, THEN WE MOST LIKELY WILL HAVE A FUTURE WITH AI THAT IS GOOD FOR HUMANITY.

IN THE SHORT TERM, THE BENEFIT OF NEURALINK IS THAT IT IS ENABLING PEOPLE WHO ARE -- WHO ARE PARAPLEGIC, TETRAPLEGIC, OR PEOPLE WHO HAVE ALS AND HAVE COMPLETELY LOST THE ABILITY TO SPEAK TO ACTUALLY CONTROL THEIR COMPUTER AND THEIR PHONE AND TO BE ABLE TO SPEAK AGAIN.

SO NEURALINK, I THINK, IS NOW OVER 20 -- APPROACHING NEARLY 30 PEOPLE, AND HAS ENABLED THEM, PEOPLE WHO ARE COMPLETELY PARALYZED, TO USE THEIR COMPUTER, USE THEIR PHONE, AND TO -- TO SPEAK AGAIN.

**Q.** WHAT IS YOUR ROLE AT NEURALINK?

**A.** I, ONCE AGAIN, SORT OF OVERSEE THE COMPANY'S GENERAL STRATEGY. I DO HELP WITH RECRUITING AND GUIDING THE TECHNOLOGIES.

**Q.** AND AFTER NEURALINK, YOU FORMED ANOTHER -- FOUNDED ANOTHER COMPANY, THE BORING COMPANY?

**A.** YEAH.

**Q.** WHAT IS THAT?

**A.** THE BORING COMPANY IS -- IT'S INTENDED TO HELP SOLVE TRAFFIC. I THINK TRAFFIC IS ONE OF THE WORST THINGS THAT PEOPLE EXPERIENCE. PEOPLE WILL SPEND HOURS OF DAY STUCK ON THE

HIGHWAY. THAT'S -- TENDS TO MAKE PEOPLE SAD, AND THAT -- YOU'D PREFER NOT TO BE STUCK IN TRAFFIC.

SO THE BORING COMPANY PLAN PROVIDED THE TRAFFIC TUNNELS FROM ONE PLACE TO ANOTHER IN A CITY AND CAN GREATLY IMPROVE TRAFFIC, SO GET RID OF GRIDLOCK AND ENABLE PEOPLE TO GET TO THEIR DESTINATIONS QUICKLY.

AND THE BORING COMPANY ACTUALLY HAS A LARGE NETWORK OF TUNNELS UNDER LAS VEGAS WHERE PEOPLE CAN GET AROUND VERY QUICKLY. SO IT'S BASICALLY ABOUT SOLVING TRAFFIC, MAKING LIFE BETTER FOR PEOPLE.

**Q.** AND ARE YOU ACTIVELY ENGAGED WITH THE BORING COMPANY AS WELL?

**A.** YEAH, I MEAN, OBVIOUSLY TO A MUCH LESSER DEGREE THAN TESLA OR SPACEX. MOST OF MY DUTIES -- MOST OF MY TIME IS SPACEX AND TESLA.

**Q.** HOW DO YOU MANAGE TO BE INVOLVED IN ALL OF THESE COMPLEX BUSINESSES AT THE SAME TIME?

**A.** WELL, I DO WORK A LOT OF HOURS. SO, I MEAN, I TYPICALLY WORK 80 TO 100 HOURS A WEEK. I DON'T TYPICALLY TAKE VACATIONS. I DON'T HAVE ANY VACATION HOMES, AND I DON'T HAVE YACHTS OR ANYTHING. SO I JUST WORK PRETTY MUCH -- I LIKE WORKING AND SOLVING PROBLEMS THAT MAKE PEOPLE'S LIVES BETTER.

**Q.** IN BUILDING THESE BUSINESSES, YOU MENTIONED THAT YOU'D HAD FUNDING FROM -- FOR PAYPAL. HAVE YOU HAD -- ARE YOU FAMILIAR WITH THE CONCEPT OF VENTURE FUNDING?

**A.** YES. THAT'S --

**Q.** AND WHAT IS THAT? COULD YOU EXPLAIN THAT TO THE JURY?

**A.** SURE. THAT'S -- I MEAN, VENTURE FUNDING, I THINK THE JURY MAY KNOW THIS, BUT IT'S REALLY WHEN VENTURE CAPITAL FIRMS GIVE YOU RISK CAPITAL FOR A COMPANY. SO THEY'LL GIVE YOU, YOU KNOW, HIGH RISK, HIGH RISK CAPITAL.

**Q.** BY "CAPITAL," YOU MEAN MONEY --

**A.** MONEY. THEY'LL GIVE YOU --

**THE COURT:** OKAY. YOU-ALL CANNOT SPEAK OVER EACH OTHER. THIS IS -- IT FEELS LIKE A CONVERSATION, BUT IT'S NOT. I HAVE A COURT REPORTER WHO HAS TO TYPE EVERYTHING THAT IS SAID. WAIT FOR EACH OTHER.

YOU MAY PROCEED.

**BY MR. MOLO:**

**Q.** COULD YOU EXPLAIN WHAT YOU MEAN BY "CAPITAL"?

**A.** YEAH. VENTURE CAPITAL IS JUST ESSENTIALLY A FIRM THAT GIVES YOU MONEY FOR A STARTUP, THAT IS INTENDED FOR. IT'S HIGH RISK, BUT IT'S HIGH RETURN FOR THE VENTURE CAPITALISTS. SO IF THE COMPANY SUCCEEDS, THE VENTURE CAPITALISTS MAKE A LOT OF MONEY; BUT THEY ALSO ACCEPT THE RISK OF FAILURE.

**Q.** AND IS THERE A RELATIONSHIP BETWEEN THE RETURN THAT YOU WOULD GET AS AN EARLY INVESTOR VERSUS SOMEONE WHO INVESTS LATER IN A COMPANY'S HISTORY?

**A.** YES. THE EARLY INVESTORS GENERALLY GET A VERY DISPROPORTIONATE RETURN. SO BECAUSE THE EARLY INVESTORS ARE

TAKING THE MOST AMOUNT OF RISK, THE EARLY INVESTORS WILL GET A VERY DISPROPORTIONATE AMOUNT OF OWNERSHIP AND FINANCIAL RETURN IN EXCHANGE FOR TAKING THE EARLY STAGE RISK FOR THE COMPANY.

AS A COMPANY GETS MORE MATURE AND PROVEN, THE VALUE OF THE COMPANY RISES AND THE RETURN -- THE AMOUNT OF MONEY THAT THE INVESTORS MAKE REDUCES BECAUSE THE RISK OF THE COMPANY IS MUCH LESS WHEN IT'S MATURE AND PROVEN.

**Q.** IN THE EARLY STAGES, DO THE VENTURE CAPITAL FIRMS HAVE GREATER CONTROL OVER THE COMPANY AS OPPOSED TO LATER, AFTER THERE'S MORE INVESTMENT?

**A.** YES. IN THE BEGINNING, IF I TAKE, SAY, ZIP2, MY FIRST COMPANY, THE VENTURE CAPITALISTS HAD 60 PERCENT OWNERSHIP OF THE COMPANY AT THE INITIAL FUNDING. AND THEN OVER TIME, THAT GETS DILUTED DOWN WITH FUTURE FINANCING ROUNDS, BUT THEY STILL WERE THE BIGGEST SHAREHOLDERS IN THE COMPANY.

SO, YEAH, EARLY INVESTORS GENERALLY GET A VERY LARGE SHARE OF THE COMPANY BECAUSE THE RISK IS THE HIGHEST.

**Q.** AND SO YOU AS THE FOUNDER OF ZIP2, THE PERSON WHO CAME UP WITH THE IDEA, YOU DON'T OWN A MAJORITY OF THE COMPANY WHEN YOU ARE TAKING THIS SORT OF FUNDING?

**A.** NO. THE VENTURE CAPITALISTS HAS MAJORITY OF THE COMPANY, TYPICALLY IN A SERIES A ROUND, AND THAT WAS THE CASE FOR MY COMPANY.

SO I THINK THE FOUNDERS HAD -- YEAH, AS I RECALL, THE FOUNDERS GOT 30 PERCENT, BETWEEN ALL OF THEM, AND THEN THE

12:27:42 VENTURE CAPITALISTS HAD 70 PERCENT.
12:27:44 **Q.** IS THAT A TYPICAL STRUCTURE?
12:27:46 **A.** IT IS. IT IS A VERY COMMON STRUCTURE, YEAH.
12:27:50 **Q.** OKAY. I WANT TO TURN TO ARTIFICIAL INTELLIGENCE AND ASK
12:27:55 YOU SOME QUESTIONS ABOUT THAT.
12:27:56 COULD YOU EXPLAIN TO THE JURY -- YOU SEE THIS ON
12:28:01 BILLBOARDS EVERYWHERE -- WHAT IS ARTIFICIAL INTELLIGENCE?
12:28:05 **A.** WELL, IT'S DIGITAL INTELLIGENCE THAT -- I MEAN, IT'S
12:28:12 BASICALLY HOW SMART IS YOUR COMPUTER, ESSENTIALLY.
12:28:16 THE -- OVER TIME, ARTIFICIAL INTELLIGENCE, LIKE THE
12:28:20 SOFTWARE THAT RUNS THE COMPUTERS HAVE GOTTEN SMARTER AND
12:28:24 SMARTER. AND I'M SURE THE JURY HAS EXPERIENCED THIS FIRSTHAND
12:28:27 WHERE YOU HAVE SEEN HOW MUCH SMARTER AI, LIKE CHATBOTS, HAVE
12:28:33 GOTTEN OVER TIME. THEY HAVE GOTTEN TO THE POINT WHERE THEY
12:28:38 APPEAR ALMOST HUMAN.
12:28:44 THEN THERE'S A STAGE, WHAT IS COMMONLY REFERRED TO AS
12:28:46 ARTIFICIAL GENERAL INTELLIGENCE, AND THAT'S -- OR AGI. AND AGI
12:28:52 IS WHEN THE AI BECOMES AS -- AS SMART AS ANY HUMAN. SO,
12:28:58 ARGUABLY, IT'S SMARTER THAN ANY HUMAN.
12:29:01 AND I THINK WE ARE GETTING CLOSE TO THAT POINT. MY GUESS
12:29:04 IS THAT AI WILL BE PROBABLY SMARTER THAN ANY HUMAN AS SOON AS
12:29:09 NEXT YEAR.
12:29:11 **Q.** AND BY "SMARTER," OTHER THAN ANTICIPATING THE NEXT WORD
12:29:19 YOU'RE GOING TO TYPE ON YOUR COMPUTER, WHAT DO YOU MEAN BY
12:29:23 "SMARTER"?

**A.** SMARTER MEANING AI CAN DO ANYTHING THAT A HUMAN CAN DO. SO IF YOU ASK AI, AND ANY OF THE BOT AI'S, TO ANALYZE THIS COURT CASE, FOR EXAMPLE, IT WOULD GIVE YOU REALLY QUITE A GOOD ANALYSIS. YOU NEED TO BE REAL CAREFUL THAT IT DOESN'T HALLUCINATE, BUT LEGAL ANALYSIS OF AI IS VERY, VERY POWERFUL. IT CAN WRITE AN ESSAY. IT CAN ANALYZE A COMPUTER PROGRAM. IT CAN WRITE SOFTWARE FOR YOU. AND IN THE CASE OF TESLA, IT CAN DRIVE THE CAR.

SO IT'S REALLY GETTING TO THE POINT WHERE AI IS GOING TO BE ABLE TO DO ANYTHING THAT A HUMAN CAN DO, AND THEN GET TO THE POINT WHERE AI CAN DO PRETTY MUCH EVERYTHING BETTER THAN A HUMAN CAN DO. THAT DAY IS APPROACHING FAST.

**Q.** OKAY. WHAT ABOUT THE HARD SCIENCES, THINGS LIKE BIOLOGY AND PHYSICS AND CHEMISTRY. IS AI ABLE TO LEARN AND FUNCTION IN THAT AREA -- THOSE AREAS?

**A.** YES, AI IS TO THE POINT WHERE IT CAN GIVE YOU -- IT CAN DO ADVANCED MATHEMATICS, DO ANALYSIS BASED ON PHYSICS AND ENGINEERING.

IT HASN'T YET GOTTEN TO THE POINT WHERE IT CAN INVENT RADICAL NEW TECHNOLOGIES, BUT IT IS -- IT WILL BE THERE, I THINK, PROBABLY NEXT YEAR?

**Q.** WHAT -- WHAT HAPPENS WHEN IT GETS SMARTER THAN HUMANS, OR WHEN THE COMPUTERS GET SMARTER THAN THE HUMANS, THAN HUMANS?

**A.** RIGHT. WELL, THAT'S BEEN MY LONG-STANDING CONCERN ABOUT AI, WHICH IS THAT THERE'S THIS QUESTION OF WHAT HAPPENS WHEN

12:31:17 THE COMPUTERS ARE MUCH SMARTER THAN HUMANS. AND I THINK IT'S MUCH LIKE IF YOU HAD A VERY SMART CHILD, AND JUST IMAGINE THAT CHILD IS GOING TO BE MUCH SMARTER THAN YOU WILL BE. AT THE END OF THE DAY, WHEN THE CHILD GROWS UP, YOU CAN'T REALLY CONTROL THAT CHILD, BUT YOU CAN TRY TO INSTILL THE RIGHT VALUES IN THAT CHILD. YOU CAN INSTILL VALUES OF HONESTY, INTEGRITY, CARING ABOUT HUMANITY; BEING GOOD, ESSENTIALLY.

12:31:48 **Q.** HOW DO YOU DO THAT?

12:31:50 **A.** WELL, THAT'S -- THAT'S IN THE TRAINING OF THE AI ITSELF. SO AS YOU'RE TRAINING AI, AND -- AND WHEN YOU DO SOMETHING CALLED REINFORCEMENT LEARNING, IT'S LIKE WHAT BEHAVIORS DO YOU REINFORCE? AND YOU WANT TO REINFORCE, OBVIOUSLY, GOOD BEHAVIORS THAT ARE BENEFICIAL TO HUMANITY VERSUS BEHAVIORS THAT ARE NOT.

12:32:10 **Q.** DO YOU -- DO YOU HAVE CONCERNS ABOUT AI?

12:32:16 **A.** YES, I HAVE EXTREME CONCERNS ABOUT AI. I'VE HAD CONCERNS ABOUT AI FOR A VERY LONG TIME. AND, IN FACT, THE -- THE REASON THAT OPENAI EXISTS IS BECAUSE I WAS VERY CLOSE FRIENDS WITH LARRY PAGE AT GOOGLE, AND I STAYED AT HIS HOUSE AND WE TALKED FOR MANY HOURS ABOUT AI SAFETY. AND AT SOME POINT, IT BECAME CLEAR TO ME THAT LARRY PAGE WAS NOT BEING SUFFICIENTLY CARING ABOUT THE SAFETY OF AI.

12:32:54 AND I SAID, "WELL, WHAT IF AI WIPES OUT ALL THE HUMANS?" AND HE SAID, "THAT WILL BE FINE AS LONG AS ARTIFICIAL INTELLIGENCE SURVIVES." AND I'M, LIKE, WELL, THAT'S -- THAT'S

INSANE. SO I WAS, LIKE, THAT'S JUST CRAZY. AND THEN HE CALLED ME A SPECIESIST, LIKE -- LIKE AS IN A SPECIESIST FOR BEING PRO HUMAN.

**Q.** OKAY. COULD YOU --

**A.** LIKE, YOU'RE A SPECIESIST, LIKE YOU CARE ABOUT HUMANS MORE THAN OTHER -- HUMANS MORE THAN OTHER -- THAN AI. AND I'M LIKE, "WELL, I DO CARE ABOUT HUMANS MORE THAN AI." AND I'M LIKE, "WELL, WHAT TEAM ARE YOU ON, LARRY?"

WHEN HE CALLED ME A SPECIESIST IN FRONT OF A DOZEN PEOPLE FOR BEING PRO HUMAN, I WAS LIKE THIS IS NUTS. WE BETTER HAVE SOME KIND OF COUNTERPOINT TO GOOGLE, BECAUSE AT THE TIME GOOGLE HAD ALMOST ALL THE AI RESEARCHERS AND, YOU KNOW, TENS OF BILLIONS OF DOLLARS -- I MEAN, THEY HAD ALL THE MONEY, ALL THE COMPUTERS, AND ALL THE TALENT FOR AI. SO THERE WAS NO COUNTERBALANCE TO GOOGLE.

**Q.** DID YOU -- DID YOU HAVE CONCERNS ABOUT AI EVEN BEFORE YOU GOT TO KNOW LARRY PAGE AND HAD THESE DISCUSSIONS?

**A.** YES.

**Q.** AND WHEN DID IT START? IF YOU COULD DESCRIBE THAT, PLEASE.

**A.** WELL, I MEAN, I THOUGHT ABOUT AI ALL OF THE WAY BACK IN THE '90S WHEN I WAS IN COLLEGE AS ONE OF THE THINGS THAT WOULD MOST EFFECT THE FUTURE OF HUMANITY; BUT INITIALLY, NOT SOMETHING THAT I WANTED TO GET INVOLVED IN BECAUSE I WAS CONCERNED THAT AI WOULD BE A DOUBLE-EDGED SWORD. YOU KNOW,

IT'S SOMETHING LIKE, SAY, HELPING ACCELERATE SUSTAINABLE ENERGY, LIKE WITH TESLA, I THINK IS MUCH MORE OF A SINGLE-EDGED SWORD, MEANING THAT IT'S CLEARLY GOING TO BE GOOD TO SOLVE SUSTAINABLE ENERGY.

ON THE OTHER HAND, IF YOU CREATE TOO POWERFUL OF AN AI, IT COULD GO WRONG. I MEAN, IT COULD GO TO A VERY GOOD PLACE, YOU KNOW, AND SOLVE ALL OF THE DISEASES AND MAKE EVERYONE PROSPEROUS, BUT IT COULD ALSO KILL US ALL. YOU KNOW, AND THERE'S -- WE DON'T WANT TO HAVE A TERMINATOR OUTCOME. I THINK WE WANT TO BE IN LIKE A GENE RODDENBERRY MOVIE LIKE "STAR TREK," NOT SO MUCH A JAMES CAMERON MOVIE LIKE "TERMINATOR."

**Q.** LET ME ASK YOU ABOUT THE PERIOD OF 2013, '14, '15, THAT TIME.

WHAT WERE YOU DOING IN CONNECTION WITH YOUR CONCERNS ABOUT AI AT THAT TIME?

**A.** I FUNDED THE FUTURE OF LIFE INSTITUTE.

**Q.** WHAT IS THAT?

**A.** THAT'S AN AI SAFETY ORGANIZATION RUN BY MAX TEGMARK. HE'S A PHYSICS PROFESSOR AT M.I.T.

AND I HAVE GONE TO AN AI SAFETY -- THE FIRST AI SAFETY CONFERENCES, AND I'VE PROVIDED FUNDING FOR AI SAFETY. THIS IS WELL BEFORE THE CREATION OF AI.

**Q.** DO YOU RECALL HOW MUCH YOU PROVIDED FUNDING FOR THESE OTHER ORGANIZATIONS?

**A.** I DON'T RECALL EXACTLY HOW MUCH, BUT I THINK IT MIGHT HAVE

12:36:10 BEEN $10 OR $15 MILLION, WHICH IS A LOT FOR AI SAFETY. YOU CAN GET A LOT OF AI SAFETY RESEARCH PAPERS WITH THAT.

12:36:19 **Q.** DID YOU GO TO CONFERENCES?

12:36:21 **A.** YES.

12:36:21 **Q.** JUST HERE IN THE COUNTRY OR OTHER PLACES?

12:36:32 **A.** WELL, I'VE BEEN TO ONE IN THE UK, ONE IN PUERTO RICO, ONE IN THE BAY AREA.

12:36:37 **Q.** OKAY. AND -- EXCUSE ME.

12:36:42 DID YOU SPEAK TO GOVERNMENT OFFICIALS AROUND THAT TIME ABOUT AI, IF THEY ASKED YOU TO?

12:36:49 **A.** YES, I SPOKE TO PRESIDENT OBAMA. IN FACT, THE ONLY -- I ONLY EVER REALLY HAD ONE OPPORTUNITY TO HAVE A ONE-ON-ONE MEETING WITH PRESIDENT OBAMA, AND I GUESS MAYBE HE THOUGHT I WOULD BE ASKING FOR FAVORS FOR MY COMPANIES. BUT I REALLY JUST WANTED TO WARN HIM ABOUT THE DANGER OF AI. SO I JUST SPENT AN HOUR SAYING WE SHOULD REALLY BE CAREFUL ABOUT AI, IT COULD BE REALLY DANGEROUS.

12:37:16 BUT AT THE TIME AI -- NOBODY REALLY USED AI, SO IT WASN'T OBVIOUS THAT IT WOULD BE SO POWERFUL OR SO DANGEROUS.

12:37:23 **Q.** TO YOUR KNOWLEDGE, DID HE DO ANYTHING IN RESPONSE TO YOUR CONVERSATION?

12:37:26 **A.** I THINK HE ASKED HIS TEAM TO SORT OF LOOK INTO IT AND TRY TO, YOU KNOW, FIGURE OUT WHAT WAS GOING ON.

12:37:35 BUT AT THE TIME AI -- AI WAS NOT GOOD ENOUGH TO SEEM SCARY SMART. WHEREAS, OBVIOUSLY HERE WE ARE IN 2026, AI IS SCARY

SMART.

**Q.** AND ABOUT THAT, AND 2026 WHERE WE ARE, IS THERE ANY CURRENT AGREEMENT TO LIMIT THE DEVELOPMENT OF AI AT THIS POINT IN TIME --

**A.** THERE IS --

**Q.** -- AMONG ANYONE THAT'S IN THE BUSINESS?

**A.** THERE IS NO AGREEMENT TO LIMIT AI. AND SO THERE IS APPARENTLY AN AI ACCELERATION, I WOULD SAY, THAT IS HAPPENING VERY QUICKLY WITH THE NUMBER OF COMPANIES, PRIMARILY IN THE U.S. AND WITH CHINA.

**Q.** OKAY. DO THOSE COMPANIES CONFER AND TRY TO CREATE SAFETY GUIDELINES FOR DEVELOPMENT OF AI?

**A.** THERE HAVE BEEN SOME DISCUSSIONS OF SAFETY. BUT AS FAR AS I CAN TELL, IT'S REALLY, RIGHT NOW, A VERY RAPID EVOLUTION OF AI, AND THERE'S NO -- IT SEEMS TO BE ACCELERATING VERY RAPIDLY.

**Q.** CAN I DIRECT YOUR ATTENTION NOW TO AFTER YOU HAD MET WITH PRESIDENT OBAMA, DID YOU MEET WITH OTHERS IN THE TECH COMMUNITY AND DISCUSS AI?

**A.** YEAH. I HAD ACTUALLY SO MANY DISCUSSIONS OF AI SAFETY AND AI GENERAL, THAT THAT'S -- MY BROTHER AND I AGREED THAT IF WE WERE EVER AT A FRIEND'S PARTY, WE WOULD NOT TALK ABOUT AI, BECAUSE EVERY CONVERSATION WAS ABOUT AI AND AI SAFETY. SO I WAS TELLING ANYONE AND EVERYONE ABOUT AI SAFETY.

**Q.** OKAY. WERE THERE EVER ATTEMPTS BY PEOPLE TO ORGANIZE GROUPS AROUND THIS IN SILICON VALLEY?

**A.** WELL, I MEAN, THERE WERE VARIOUS AI SAFETY MEETINGS AND CONFERENCES, BUT I DON'T THINK THEY ULTIMATELY WENT ANYWHERE.
**Q.** OKAY. I WOULD DIRECT YOUR ATTENTION TO 2015. DID YOU ATTEND ANY DINNERS WITH OTHER PEOPLE WHO WERE CONCERNED ABOUT AI AND AI SAFETY?
**A.** I HAD MANY DINNERS WITH MANY PEOPLE TALKING ABOUT AI SAFETY.
**Q.** OKAY. AND WAS SAM ALTMAN EVER ONE OF THE PEOPLE AT ANY OF THOSE DINNERS?
**A.** I BELIEVE HE WAS AT SOME OF THOSE DINNERS.
**Q.** OKAY. DO YOU RECALL WHEN YOU MET SAM ALTMAN?
**A.** I DON'T RECALL EXACTLY WHEN, EXCEPT THAT HE WAS AT ONE OF THE DINNERS THAT I WAS HOLDING TO DISCUSS AI SAFETY.
**Q.** DO YOU KNOW WHAT HE WAS DOING PROFESSIONALLY AT THAT POINT IN TIME?
**A.** I THINK HE WAS DOING SOMETHING AT Y COMBINATOR.
**Q.** OKAY. WOULD YOU SAY AT THAT POINT IN TIME HE WAS A MAJOR FIGURE IN THE TECH WORLD?
**A.** NO, HE WAS NOT WELL-KNOWN AT THAT TIME.
**Q.** OKAY. WHAT WAS YOUR IMPRESSION OF -- WELL, LET ME ASK YOU THIS: DURING ANY OF THESE MEETINGS OF YOURS, DID MR. ALTMAN EXPRESS HIS VIEWS ABOUT AI AND AI SAFETY?
**A.** AS OUR GOAL, HE AGREED WITH ME REGARDING AI SAFETY AND THAT AI SAFETY WAS VERY IMPORTANT.
**Q.** OKAY. DO YOU SEE MR. ALTMAN IN THE COURTROOM HERE TODAY?

**A.** I'M NOT SURE I DO.

**Q.** SO I WANT TO ASK YOU ABOUT OPENAI AND HOW IT CAME TO BE. ALL RIGHT.

WHAT WERE SORT OF THE FIRST SEEDS THAT WERE PLANTED THAT ULTIMATELY GROW INTO OPENAI?

**A.** WELL, I MEAN, MY PERSPECTIVE ON OPENAI, IN A NUTSHELL, IS IT REALLY -- THE REASON THAT OPENAI EXISTS IS BECAUSE LARRY PAGE CALLED ME A SPECIESIST, THAT'S FUNDAMENTALLY IT. HE -- FOR BEING PRO HUMANITY.

AND THEN SO I WAS, LIKE, WELL, LARRY CLEARLY DOES NOT CARE ENOUGH ABOUT AI SAFETY, SO THERE'S GOT TO BE SOME KIND OF COUNTERBALANCE TO GOOGLE, SOME ORGANIZATION THAT DOES CARE ABOUT AI SAFETY.

AND I THOUGHT WHAT WOULD BE THE, YOU KNOW, OPPOSITE OF GOOGLE, WHICH WOULD BE AN OPEN SOURCE, NONPROFIT WOULD BE THE OPPOSITE OF GOOGLE, WHICH IS A CLOSED SOURCE FOR-PROFIT.

**Q.** WOULD YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY OPEN SOURCE?

**A.** OPEN SOURCE MEANS THAT THE SOFTWARE IS PUBLISHED AND IS AVAILABLE TO ALL. SO IT'S BASICALLY, YOU WRITE SOFTWARE, YOU PUBLISH IT, AND IT'S AVAILABLE TO ANYONE WHO WANTS TO USE IT.

**Q.** WHAT DID YOU SEE THE VALUE IN AI SOFTWARE BEING OPEN SOURCE?

**A.** WELL, IF IT'S OPEN SOURCE, THEN PEOPLE CAN ANALYZE THE AI AND TRY TO DETERMINE IF THERE ARE ANY SAFETY ISSUES WITH IT,

AND IT WOULD BE AI THAT ANYONE CAN USE.

IRONICALLY TODAY, THE LEADERS IN AI OPEN SOURCE ARE THE CHINESE COMPANIES.

**Q.** AND WHY DO YOU THINK THEY'RE DOING THAT?

**A.** I'M NOT SURE. BUT THEY -- APPARENTLY THE BEST OPEN SOURCE AIS ARE MADE BY COMPANIES IN CHINA.

**Q.** OKAY. BACK TO THE FORMATION OF OPENAI, AND UNDERSTANDING WHAT YOUR THOUGHTS WERE, HOW DID IT ACTUALLY ORGANIZE AS AN ORGANIZATION THEN?

**A.** WELL, WE WERE HAVING -- LIKE I SAID, I WAS HAVING ALL OF THESE DINNERS IN SILICON VALLEY, AND I CONCLUDED THAT A COMPANY NEEDED TO BE STARTED TO SERVE AS A COUNTERWEIGHT TO GOOGLE.

**Q.** OKAY.

**A.** TO BE THE OPPOSITE OF GOOGLE, ESSENTIALLY. TO BE OPEN SOURCE. SO SOFTWARE IS AVAILABLE TO EVERYONE FOR FREE.

AND THEN -- AND A NONPROFIT, SO IT'S NOT, YOU KNOW, IT DOESN'T HAVE A PROFIT MOTIVE. IT'S NOT TRYING TO MAXIMIZE THE AMOUNT OF MONEY IT MAKES FROM AI.

**MR. MOLO:** YOUR HONOR, I'D LIKE TO --

**THE WITNESS:** AND THEN --

**MR. MOLO:** I'M SORRY.

**THE WITNESS:** -- I MET SAM ALTMAN AND GREG BROCKMAN IN THE COURSE OF HAVING THESE DINNERS. AND THEN WE DECIDED TO FORM THE COMPANY.

THE -- AND THEN A CRITICAL FOURTH PERSON WAS

ILYA SUTSKEVER WHO WAS AT GOOGLE.

**MR. MOLO:** WE'LL GIVE YOU THE SPELLING.

**BY MR. MOLO:**

**Q.** AND BEFORE WE EVEN GET TO THAT, THOUGH --

**MR. MOLO:** YOUR HONOR, MAY I SHOW THE WITNESS PLAINTIFFS' EXHIBIT 5, WHICH HAS BEEN STIPULATED AND ADMITTED INTO EVIDENCE?

**THE COURT:** IT'S ADMITTED. GO AHEAD. IT'S PUBLISHED.

**BY MR. MOLO:**

**Q.** TAKE A LOOK AT THIS EMAIL, MR. MUSK. THE TOP IS FROM YOU TO MR. ALTMAN DATED JUNE 25, 2015. YOU'RE RESPONDING TO AN EMAIL BELOW THAT DATED JUNE 24, 2015, FROM MR. ALTMAN.

SO HE HAS A NUMBER OF PARAGRAPHS THERE WITH DIFFERENT POINTS. AND THE FIRST ONE SAYS "THE MISSION WOULD BE TO CREATE THE FIRST GENERAL AI AND USE IT FOR INDIVIDUAL EMPOWERMENT, IS THE DISTRIBUTED VERSION OF THE FUTURE THAT SEEMS THE SAFEST. MORE GENERALLY, SAFETY SHOULD BE A FIRST-CLASS REQUIREMENT."

WAS THAT SOMETHING THAT -- YOUR RESPONSE IS, YOU AGREED ON ALL.

BUT DID YOU SPECIFICALLY AGREE ON THAT?

**A.** YEAH. HERE, SAM IS SUMMARIZING THE CONVERSATION WE HAD EARLIER REGARDING CREATING THE COMPANY, AND REFLECTING BACK THE POINTS OF THE DISCUSSION, I THINK PRETTY ACCURATELY HERE.

SO THE GOAL WAS JUST TO CREATE, YEAH, AN AI ORGANIZATION

THAT WOULD BE SAFETY FIRST.

**Q.** OKAY. IF YOU GO TO THE THIRD PARAGRAPH, IT SAYS "I THINK FOR A GOVERNANCE STRUCTURE WE SHOULD START WITH FIVE PEOPLE, AND I'D PROPOSE YOU, BILL GATES, PIERRE OMIDYAR, AND DUSTIN MOSKOVITZ, AND ME."

SO WE KNOW WHO YOU ARE.

BILL GATES WAS --

**A.** FORMERLY THE CEO OF MICROSOFT.

**Q.** OKAY. AND PIERRE OMIDYAR WAS?

**A.** HE WAS THE FOUNDER AND CEO OF EBAY.

**Q.** OKAY. AND THEN DUSTIN MOSKOVITZ?

**A.** I THINK HE WAS ZUCKERBERG'S, LIKE, ROOMMATE OR SOMETHING.

**Q.** AND THEN MR. ALTMAN.

WAS MR. ALTMAN OF THE SAME STATURE IN THE TECH COMMUNITY AS THE OTHERS MENTIONED IN THAT SENTENCE AT THAT TIME?

**A.** NO. AT THAT TIME VERY FEW PEOPLE KNEW WHO SAM ALTMAN WAS.

**Q.** OKAY. SO HE ASKS YOU, IN THE NEXT PARAGRAPH, "WILL YOU BE INVOLVED SOMEHOW IN ADDITION TO JUST GOVERNANCE? I THINK THAT WOULD BE REALLY HELPFUL FOR GETTING THE WORK POINTED IN THE RIGHT DIRECTION, GETTING THE BEST PEOPLE TO BE PART OF IT."

WHAT DID YOU UNDERSTAND HIM TO MEAN BY THAT?

**A.** I'M NOT SURE WHAT HE EXACTLY MEANT -- I MEAN, TO BE CLEAR, I WOULD HAVE CREATED A NONPROFIT OPEN SOURCE FOUNDATION WITH OR WITHOUT -- I WOULD HAVE DONE SO WITH OR WITHOUT SAM ALTMAN OR GREG BROCKMAN. BUT AT THE TIME I WAS GLAD THAT THEY WOULD BE

DOING SO WITH ME.

**Q.** AND THESE COMMENTS THAT HE HAS IN THERE, ONE, TWO, THREE, FOUR, FIVE. ARE THESE IDEAS THAT YOU THINK, DID THEY ORIGINATE WITH YOU? DID THEY ORIGINATE WITH MR. ALTMAN? SOMEONE ELSE?

**A.** THE EMAIL, MOSTLY, IT REFLECTS SAM ALTMAN'S RECOLLECTION OF THE CONVERSATIONS WE HAD BEEN HAVING UP TO THAT POINT. SOME OF IT WOULD BE, YOU KNOW, HIS APPROACH VERSUS MY APPROACH.

**Q.** AND HE SAYS THERE, IN THE THIRD PARAGRAPH, THE THIRD BULLET, "THE TECHNOLOGY WOULD BE OWNED BY THE FOUNDATION AND USED FOR THE GOOD OF THE WORLD."

**A.** YES.

**Q.** OKAY. WHAT DID THAT MEAN TO YOU?

**A.** EXACTLY WHAT IT SAYS, THAT THE TECHNOLOGY WOULD BE OWNED BY THE FOUNDATION, THAT WOULD BE OWNED BY THE CHARITIES.

**Q.** OKAY. AND THEN HE GOES ON TO SAY, "AND IN CASES WHERE IT'S NOT OBVIOUS HOW THAT SHOULD BE APPLIED, THE 5 OF US WOULD DECIDE."

DO YOU KNOW WHAT HE WAS TALKING ABOUT THERE?

**A.** I THINK HE'S REFERRING TO WHAT WOULD BE THE -- WHAT DECISIONS WOULD BE GOOD FOR THE WORLD.

**Q.** OKAY. DID YOU DISCUSS THIS POTENTIAL AI ORGANIZATION WITH OTHERS IN SILICON VALLEY AFTER THIS EMAIL EXCHANGE WITH MR. ALTMAN?

**A.** WELL, AT THE TIME I SPOKE TO EVERYONE, EVERYONE I KNEW ABOUT AI, BUT AS I SAID, IT GOT TO THE POINT WHERE I WAS

TALKING ABOUT AI SO MUCH, MY BROTHER ASKED ME TO PLEASE STOP TALKING ABOUT AI AT PARTIES, BECAUSE IT'S A BUZZ KILL.

SO I WAS BASICALLY TALKING TO EVERYONE ABOUT AI.

**Q.** THAT'S FINE. GO AHEAD.

**A.** YEAH, THAT'S IT REALLY.

**Q.** HOW DID YOU MEET GREG BROCKMAN?

**A.** HE WAS AT ONE OF THE DINNERS WE WERE HAVING TO DISCUSS THE FUTURE OF AI AND AI SAFETY.

**Q.** DID HE KNOW SAM BEFORE YOU, AS FAR AS YOU KNEW?

**A.** I DON'T THINK THEY KNEW EACH OTHER WELL.

**Q.** OKAY. WAS GREG BROCKMAN A PROMINENT FIGURE IN THE TECH WORLD AT THE TIME THAT YOU MET?

**A.** NO. GREG WAS RELATIVELY UNKNOWN.

**Q.** SO WHEN DID YOU SETTLE ON THE NAME OPENAI?

**A.** WELL, THAT CAME AS A RESULT OF DISCUSSIONS WITH GREG, SAM, AND ILYA. I THINK WE BOUNCED AROUND A FEW DIFFERENT NAMES. THE ONE THAT I THOUGHT MADE SENSE WAS OPENAI BECAUSE THE "OPEN" IN OPENAI REPRESENTS OPEN SOURCE. YEAH.

**Q.** AND THEN HOW WAS OPENAI TO BE FUNDED?

**A.** WELL, IT WOULD -- IT WAS TO BE FUNDED AS -- INITIALLY WITH DONATIONS AS A NONPROFIT, AND THEN THEY COULD POTENTIALLY BE SORT OF A PARALLEL FOR-PROFIT, PROVIDED THE PROCEEDS OF THE FOR-PROFIT GO TO CHARITY, THAT YOU COULD HAVE A FOR-PROFIT THAT IS OWNED BY A CHARITY IN ORDER TO FUND THE CHARITY.

**Q.** I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 7.

12:52:25 **MR. MOLO:** YOUR HONOR, THIS IS EXHIBIT 7, WHICH THE PARTIES HAVE STIPULATED CAN BE ADMITTED, AND HAS BEEN ADMITTED.

12:52:31 **THE COURT:** OKAY. IT CAN BE PUBLISHED.

12:52:36 **BY MR. MOLO:**

12:52:36 **Q.** THIS IS AN EMAIL EXCHANGE BETWEEN MR. ALTMAN AND YOU. AND IF YOU GO DOWN ABOUT A THIRD OF THE WAY ON THE PAGE, IT SAYS OCTOBER 18, 2015, SAM ALTMAN SAYS TO YOU "I SEE YOU A COUPLE WEEKS AGO. AS DISCUSSED, I THINK STARTING WITH A $100 MILLION COMMITMENT (AND LEAVING THE TIME UNSPECIFIED) IS THE WAY TO GO."

12:53:20 AND THEN HE SAYS "EVERYONE WE DISCUSSED BUT GATES IS COMMITTED TO DONATING. HOPE TO HAVE HIM LOCKED DOWN. I AM GOING TO SIT DOWN WITH ZUCK, BUT I STILL THINK IT'S PROBABLY TOO PROBLEMATIC GIVEN FACEBOOK AND AI RESEARCH."

12:53:37 AND THEN HE MENTIONS TWO RECRUITS.

12:53:39 BUT THEN HE HAS SPECIFIC ASKS FOR YOU. HE SAYS "CAN YOU DONATE 30 MILLION OVER THE NEXT 5 YEARS?"

12:53:49 "CAN WE CALL YOU AN ADVISOR BUT LEAVE UNSPECIFIED WHAT YOU'LL DO IN DETAIL AND FIGURE IT OUT AS WE GO?"

12:53:56 AND THEN HE SAYS "WILL YOU BE ON THE SAFETY BOARD WITH ME? I'D LIKE IT TO EVENTUALLY BE 5 OF US, INCLUDING THE 3, OVER THE YEAR OR SO. THIS WILL BE THE SECOND KEY FOR RELEASING ANYTHING THAT COULD BE DANGEROUS."

12:54:17 WHAT DID YOU UNDERSTAND HIM TO BE ASKING FOR THERE?

12:54:19 **A.** WELL, JUST THAT THERE WOULD BE A BOARD THAT WOULD DECIDE

WHETHER ANYTHING DANGEROUS WAS GOING TO GET RELEASED AND MAKE SURE THAT NOTHING DANGEROUS GOT RELEASED.

**Q.** AND YOU RESPOND TO HIM, "LET'S DISCUSS GOVERNANCE. THIS IS CRITICAL. I DON'T WANT TO FUND SOMETHING THAT GOES IN WHAT TURNS OUT TO BE THE WRONG DIRECTION."

WHAT DID YOU MEAN BY THAT?

**A.** YEAH, I DIDN'T WANT TO PAVE -- I DIDN'T WANT TO PAVE THE ROAD TO HELL WITH GOOD INTENTIONS. SO THE INTENT WAS TO DO GOOD FOR THE WORLD HERE, AND SO I DIDN'T WANT TO FUND OPENAI TO MAKE SAFE AI AND THEN FIND OUT THAT IT WAS ACTUALLY MAKING UNSAFE AI. SO YOU KNOW.

**Q.** AND BY "GOVERNANCE," WHAT WERE YOU CONCERNED ABOUT, BECAUSE YOU SAY, "LET'S TALK ABOUT GOVERNANCE"? GOVERNANCE, EXCUSE ME.

**A.** YEAH, I MEAN, RELATIVE TO WHO WAS IS IN CHARGE OF AI, AND I FUNDAMENTALLY DO TRUST THEM. I MEAN, THAT'S A REALLY BIG DEAL. WHOEVER IS IN CHARGE OF AI, ARE THEY TRUSTWORTHY? AND IF YOU HAVE SOMEONE WHO IS NOT TRUSTWORTHY IN CHARGE OF AI, I THINK IT'S VERY DANGEROUS TO THE WHOLE -- THE WHOLE WORLD.

**MR. MOLO:** SO, YOUR HONOR, I'D LIKE THE WITNESS -- I'D LIKE TO ASK THE WITNESS SOME QUESTIONS ABOUT PLAINTIFFS' EXHIBIT 12, WHICH HAS BEEN ADMITTED INTO EVIDENCE.

**THE COURT:** PROCEED.

**BY MR. MOLO:**

**Q.** THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND MR. ALTMAN.

IF YOU COULD TAKE JUST A MINUTE TO READ IT TO YOURSELF.

**A.** I CAN'T READ IT BECAUSE THE --

**Q.** BECAUSE OF THE SCREEN?

**THE COURT:** HE SHOULD HAVE A BINDER.

**THE WITNESS:** I CAN READ IT ON THE SCREEN NOW.

**THE COURT:** YOU CAN APPROACH HIM WITH A BINDER.

**MR. MOLO:** THANK YOU.

BY MR. MOLO:

**Q.** I'M GOING TO DIRECT YOUR ATTENTION SPECIFICALLY TO THE SECOND PAGE OF THE EXHIBIT. IF YOU LOOK ABOUT THREE-QUARTERS, TWO-THIRDS, OF THE WAY DOWN, THERE'S AN EMAIL FROM YOU IN WHICH YOU WRITE, "HAD A GREAT CALL WITH GREG. I'M SUPER IMPRESSED WITH EVERYONE SO FAR. THIS IS A GREAT TEAM."

THEN YOU SAY, "DOING THIS AS AN INDEPENDENT, PURE PLAY 501(C)(3), BUT WITH CRYSTAL CLEAR FOCUS ON THE POSITIVE ADVENT OF STRONG AI DISTRIBUTED WIDELY TO HUMANITY DOES SEEM TO MAKE THE MOST SENSE TO ME. PLEASE CORRECT ME IF WE AREN'T ON THE SAME PAGE. THE COMPANY WOULD STILL AIM TO BRING IN REVENUE IN EXCESS OF COSTS AT SOME POINT, BUT POSITIVE NET REVENUE WOULD JUST FLOW TO CASH RESERVES."

WHAT DID YOU MEAN BY THAT?

**A.** I MEAN, IT'S VERY CLEAR THAT OPENAI WOULD BE AN INDEPENDENT 501(C)(3), MEANING A CHARITY FOUNDATION, AND THAT IT WOULD AIM TO BRING IN MORE MONEY THAN IT SPENDS, BUT THOSE MONEY -- BUT THAT MONEY WOULD -- WOULD JUST ACCRUE TO SAVINGS.

12:58:20 SO, IN OTHER WORDS, CASH RESERVES OR SAVINGS.

12:58:30 **THE COURT:** SHE JUST DIDN'T HEAR YOU.

12:58:32 **THE WITNESS:** I UNDERSTAND.

12:58:34 SO THE COMPANY WOULD AIM TO BRING IN REVENUE -- THE
12:58:40 COMPANY WOULD BRING IN MORE MONEY THAN IT SPENDS, AND IN DOING
12:58:44 SO, IF IT BRINGS IN MORE MONEY THAN IT SPENDS, THAT WOULD JUST
12:58:48 BECOME CASH RESERVES OR SAVINGS, BUT IT WOULD REMAIN AN
12:58:52 INDEPENDENT 501(C)(3) CHARITY.

12:58:55 **BY MR. MOLO:**

12:58:56 **Q.** OKAY. MR. ALTMAN RESPONDS TO YOU IN THE EMAIL AT THE VERY
12:58:59 TOP OF THE PAGE, "YES, I THINK AN INDEPENDENT 501(C)(3) IS
12:59:04 CORRECT."

12:59:05 DO YOU SEE THAT?

12:59:05 **A.** YES.

12:59:06 **Q.** AND WHAT DID YOU TAKE THAT TO MEAN?

12:59:08 **A.** THAT HE WAS AGREEING THAT IT SHOULD BE A 501(C)(3), A
12:59:16 CHARITABLE ORGANIZATION.

12:59:16 **Q.** OKAY. AND THEN IF YOU TURN TO THE NEXT PAGE, WHICH IS THE
12:59:19 FIRST PAGE, BUT IT'S A LATER EMAIL, ON NOVEMBER 22ND, 2015, YOU
12:59:25 RESPOND, "GREAT, SOUNDS LIKE WE ARE INDEPENDENTLY FOLLOWING THE
12:59:28 SAME THOUGHT TRACKS."

12:59:30 WHAT DID YOU MEAN BY THAT?

12:59:36 **A.** YEAH, THAT WE'RE IN AGREEMENT THAT OPENAI WOULD BE A
12:59:38 501(C)(3) CHARITY.

12:59:41 **Q.** AND IS THAT THE WAY IT WENT FORWARD?

12:59:42 **A.** THAT'S EXACTLY HOW IT WENT FORWARD.
12:59:44 **Q.** OKAY. DID YOU THEN GO ABOUT FORMING IT WITH CORPORATE DOCUMENTS AND SUCH?
12:59:51 **A.** YES.
12:59:51 **Q.** OKAY. AND YOU INVOLVED LAWYERS AND SUCH TO DO THAT?
12:59:59 **A.** YES. YES. IT WAS -- IT WAS -- THE CORPORATE FOUNDING DOCUMENT SPECIFICALLY STATE THAT THIS IS A CHARITY, AND THAT NO PERSON SHALL BENEFIT FINANCIALLY FROM THIS CHARITY. THAT'S IN THE CORPORATE FOUNDING DOCUMENT.
01:00:14 **Q.** OKAY. SO DO YOU RECALL WHEN IT WAS THAT OPENAI ACTUALLY LAUNCHED?
01:00:23 **A.** YOU MEAN HAD A PUBLIC --
01:00:27 **Q.** YEAH. WAS IT LATER -- WELL, LET ME ASK YOU THIS. DIRECTING YOUR ATTENTION TO SEPTEMBER OF 2015, WAS THERE ANY EFFORT TO ACTUALLY AT THAT TIME TO FORMALLY LAUNCH OPENAI?
01:00:37 **A.** YES, THERE WAS A PRESS RELEASE AND THE WEBSITE WENT LIVE, AND THERE WERE, YEAH, SOME INTERVIEWS.
01:00:45 **Q.** OKAY. HOW INVOLVED WERE YOU IN THE LAUNCH OF OPENAI, THE PUBLIC ANNOUNCEMENT OF THE LAUNCH?
01:00:53 **A.** I WAS -- I WAS FUNDAMENTALLY INVOLVED IN THAT. I REVIEWED AND DRAFTED THE ANNOUNCEMENT, OR PART OF THE ANNOUNCEMENT, AND REVIEWED THE WEB PAGE AND DID MEDIA INTERVIEWS AND WHATNOT.
01:01:09 **Q.** OKAY.
01:01:15 MR. MOLO: YOUR HONOR, I'D LIKE TO ASK THE WITNESS ABOUT PLAINTIFFS' EXHIBIT 14, WHICH HAS BEEN ADMITTED INTO

EVIDENCE.

**THE COURT:** THIS IS ADMITTED. IT CAN BE PUBLISHED.

**BY MR. MOLO:**

**Q.** OKAY. MR. MUSK, IT'S EITHER ON YOUR SCREEN, OR IT'S ALSO IN YOUR BOOK TABBED AT IT SAYS 014.

NOW, THIS IS AN EMAIL FROM MR. ALTMAN TO YOU DATED SEPTEMBER 8TH OF 2015, DISCUSSING A PRESS RELEASE ANNOUNCING OPENAI.

DO YOU RECALL WHO DRAFTED THE PRESS RELEASE?

**A.** I DRAFTED THE PRESS RELEASE ANNOUNCING THE FORMATION OF OPENAI.

**Q.** OKAY. AND HE WRITES YOU, "HOW IS THIS?" AND HE STATES, "OPENAI IS A NONPROFIT ARTIFICIAL INTELLIGENCE RESEARCH COMPANY WITH THE GOAL OF ADVANCING DIGITAL INTELLIGENCE IN A WAY THAT IS MOST LIKELY TO BENEFIT HUMANITY AS A WHOLE, UNENCUMBERED BY AN OBLIGATION TO GENERATE FINANCIAL RETURNS.

"BECAUSE WE DON'T HAVE ANY FINANCIAL OBLIGATIONS, WE CAN FOCUS ON THE MAXIMAL POSITIVE HUMAN IMPACT IN DISSEMINATING AI TECHNOLOGY AS BROADLY AS POSSIBLE."

DID THAT ACCURATELY REFLECT THE VALUES AND STRUCTURE THAT WAS AGREED UPON FOR OPENAI AT THE TIME?

**A.** YES.

**MR. MOLO:** YOUR HONOR, I'M GOING TO ASK THE WITNESS ABOUT PLAINTIFFS' EXHIBIT 16, WHICH THE PARTIES HAVE STIPULATED TO AND THE COURT HAS ADMITTED INTO EVIDENCE.

**THE COURT:** IT CAN BE PUBLISHED. IT'S ADMITTED.

**BY MR. MOLO:**

**Q.** IF YOU COULD TURN TO THE TAB 16, MR. MUSK. IF YOU -- IF YOU WILL LOOK AT THE SECOND PAGE, IF YOU WILL, THE BACK PAGE, IT SAYS CERTIFICATE OF INCORPORATION OF A NON-STOCK CORPORATION.

AND THEN THERE IS "THIRD" THERE. AND IT SAYS, IF YOU GO DOWN TO, THE SPECIFIC PURPOSE" --

MR. MOLO: CAN WE HIGHLIGHT THIS, PLEASE. "THE SPECIFIC PURPOSE..." JUST GO UP. YEAH.

BY MR. MOLO:

**Q.** "THE SPECIFIC PURPOSE OF THE CORPORATION IS TO PROVIDE FUNDING FOR RESEARCH, DEVELOPMENT, AND DISTRIBUTION OF TECHNOLOGY RELATED TO ARTIFICIAL INTELLIGENCE. THE RESULTING TECHNOLOGY WILL BENEFIT THE PUBLIC AND THE CORPORATION WILL SEEK TO OPEN SOURCE TECHNOLOGY FOR THE PUBLIC BENEFIT WHEN APPLICABLE. THE CORPORATION IS NOT ORGANIZED FOR THE PRIVATE GAIN OF ANY PERSON."

**A.** YES, AND EVEN BEFORE THAT IT SAYS "THIS CORPORATION SHALL BE A NONPROFIT CORPORATION ORGANIZED EXCLUSIVELY FOR CHARITABLE OR EDUCATIONAL PURPOSES WITHIN THE MEANING OF SECTION 501(C)(3)."

**Q.** OKAY.

**A.** I'LL REPEAT. "EXCLUSIVELY FOR CHARITABLE PURPOSES" ... FOR THE 501(C)(3).

AND THEN IT EXPLICITLY STATES, "THE CORPORATION IS NOT ORGANIZED FOR THE PRIVATE GAIN OF ANY PERSON." THAT'S THE FOUNDING DOCUMENT OF THE COMPANY FILED WITH THE STATE OF DELAWARE.

**Q.** AND IF YOU GO TO THE -- THE FIRST PAGE OF WHAT I HIGHLIGHTED THERE, IT SAYS "DELAWARE, THE FIRST STATE." AND THE DATE ON THAT IS IN THE THIRD PARAGRAPH. IT SAYS THIS CERTIFICATE IS FILED THE 8TH DAY OF DECEMBER 2015; RIGHT?

**A.** YES.

**Q.** AND DO YOU RECALL THAT'S WHAT HAPPENED AT THAT TIME?

**A.** YEAH, THAT'S AN OFFICIAL DOCUMENT.

**Q.** DID ANYBODY AT OPENAI RAISE ANY ISSUES WHEN THIS SORT OF STATEMENT WAS BEING MADE TO THE -- TO THE GOVERNMENT?

**A.** NOT AT ALL. IN FACT, THE CERTIFICATE OF INCORPORATION STATES THAT IT'S A CHARITY, YOU KNOW, THAT'S NOT FOR THE GAIN OF ANY PERSON.

THE PRESS RELEASE SAID THE SAME THING, AND THE COMPANY'S WEBSITE ALSO SAID THE SAME THING. THEY'RE ALL ONE -- COMPLETELY CONSISTENT IN SAYING THAT THIS IS A CHARITY, IT'S A 501(C)(3) ORGANIZED FOR THE PUBLIC AND NOT FOR THE FINANCIAL BENEFIT OF ANY PERSON.

**Q.** AND ALL OF THOSE WERE IN WRITING?

**A.** ALL IN WRITING. ALL -- YOU CAN LOOK AT THE INTERNET ARCHIVE AND LOOK AT THE WEBSITES. THIS IS NOT A MATTER OF DEBATE, IT'S SIMPLY WHAT HAPPENED.

01:05:51 **Q.** WOULD YOU HAVE DONATED YOUR MONEY AND YOUR TIME AND YOUR ENERGY AND RELATIONSHIPS IN OPENAI IF THIS WERE NOT THE MISSION? BY "THIS" I MEAN WHAT IS SPELLED OUT IN THE DELAWARE CERTIFICATE OF INCORPORATION?

01:06:10 **A.** NO. I SPECIFICALLY -- I MEAN, I CAME UP WITH THE IDEA, THE NAME, RECRUITED THE KEY PEOPLE, TAUGHT THEM EVERYTHING I KNOW, PROVIDED ALL OF THE INITIAL FUNDING. BESIDES THAT, NOTHING.

01:06:25 **Q.** OKAY.

01:06:25 **A.** BUT IT WAS A LOT. AND IT WAS SPECIFICALLY MEANT TO BE FOR A CHARITY THAT DID NOT BENEFIT ANY -- A CHARITY THAT DOES NOT BENEFIT ANY INDIVIDUAL PERSON.

01:06:37 I COULD HAVE STARTED IT AS A FOR-PROFIT, AND I CHOSE NOT TO. I SPECIFICALLY CHOSE TO MAKE IT SOMETHING FOR THE BENEFIT OF ALL HUMANITY.

01:06:46 **Q.** DID -- ONCE THE BUSINESS STARTED, DID YOU MEET WITH OPENAI EMPLOYEES TO DISCUSS STRATEGY AND OPERATIONS?

01:06:57 **A.** YES, MANY TIMES.

01:06:59 **Q.** HOW -- WAS THERE A REGULAR MEETING THAT YOU HAD, OR DID YOU -- DID YOU -- HOW DID IT OCCUR?

01:07:06 **A.** YES. I MEAN, I -- SOME OF THE MEETINGS WERE QUITE LONG. IT TOOK SEVERAL HOURS, OR SOMETIMES THERE WERE MULTIPLE DAYS, BUT, GENERALLY SPEAKING, I HAD A RECURRING WEEKLY MEETING WITH THE TEAM. AND I DON'T SEE A TREMENDOUS AMOUNT IN STARTING COMPANIES -- STARTING TECHNOLOGY COMPANIES IN SILICON VALLEY,

AND SO THE KNOWLEDGE THAT I GAINED FROM THAT WAS EXTREMELY HELPFUL TO OPENAI BEING SUCCESSFUL.

SO -- AND I BELIEVE THE TEAM ALL RECOGNIZED THAT. IN FACT, THEY SENT ME MULTIPLE EMAILS SAYING THAT MY ADVICE WAS INDISPENSABLE AND EXTREMELY RELIABLE.

**Q.** AND DID YOU HAVE OTHER THINGS GOING ON IN YOUR BUSINESS LIFE IN 2016 AND 2017 WITH THESE OTHER COMPANIES THAT YOU TALKED ABOUT EARLIER?

**A.** YES. SPACEX AND TESLA WERE GOING THROUGH TOUGH TIMES. TESLA, ESPECIALLY, WAS ON THE VERGE OF BANKRUPTCY.

**Q.** AND YOU WERE FOUNDING NEURALINK AND THE BORING COMPANY SHORTLY THEREAFTER?

**A.** YEAH.

**THE COURT:** NO LEADING, MR. MOLO.

**MR. MOLO:** I'M SORRY?

**THE COURT:** NO LEADING.

**MR. MOLO:** OH. I'M SORRY.

BY MR. MOLO:

**Q.** WHY DID YOU MAKE THE COMMITMENT TO OPENAI IF YOU HAD ALL OF THESE OTHER THINGS GOING ON?

**A.** WELL, I THOUGHT IT WAS EXTREMELY IMPORTANT TO HAVE A COUNTERBALANCE TO GOOGLE FOR -- FOR AI, THAT THERE NEEDED TO BE SOME COUNTERWEIGHT TO GOOGLE COMPLETELY DOMINATING EVERYTHING IN ARTIFICIAL INTELLIGENCE, GIVEN THAT GOOGLE DID NOT SEEM TO CARE ABOUT AI SAFETY AT THE TIME.

01:08:55 **Q.** DID YOU PLAY A ROLE IN RECRUITING AT OPENAI?
01:08:58 **A.** YES, I WAS INSTRUMENTAL IN RECRUITING ILYA SUTSKEVER, AND MOST OF THE INITIAL TEAM.
01:09:09 **Q.** CAN YOU JUST EXPLAIN WHO SUTSKEVER, WHO HE WAS AT THE TIME YOU RECRUITED HIM?
01:09:13 **A.** ILYA WAS PROBABLY THE NUMBER ONE MOST VALUABLE MEMBER OF GOOGLE'S TEAM IN SILICON VALLEY FOR AI. AND AFTER I RECRUITED ILYA TO OPENAI, LARRY PAGE REFUSED TO SPEAK TO ME EVER AGAIN.
01:09:30 **Q.** HOW -- WHAT WAS LARRY PAGE'S ROLE AT GOOGLE?
01:09:35 **A.** LARRY PAGE WAS THE COFOUNDER AND PRESIDENT OF GOOGLE.
01:09:44 **Q.** HOW MUCH EFFORT DID YOU HAVE TO PUT INTO RECRUITING ILYA?
01:09:47 **A.** AN IMMENSE AMOUNT OF EFFORT. IT WAS EXTREMELY DIFFICULT TO RECRUIT ILYA. AND, IN FACT, ILYA, OVER THE COURSE OF SEVERAL DAYS, SAID HE WOULD JOIN OPENAI, AND THEN LARRY PAGE AND SERGEY AND DEMIS WOULD CONVINCE ILYA TO STAY AT GOOGLE, AND THEN I CONVINCED HIM TO, NO, HE SHOULD JOIN OPENAI. AND THIS WENT BACK AND FORTH FOR, I THINK, FOUR OR FIVE DAYS. HE WENT BACK AND FORTH, HE'S GOING TO JOIN US, HE'S NOT GOING TO JOIN US. SO THIS WAS A -- PROBABLY RECRUITING TOOK, LIKE, FIVE DAYS OF BACK-AND-FORTH.
01:10:26 **Q.** HOW IMPORTANT WAS HE TO OPENAI'S SUCCESS?
01:10:30 **A.** HE WAS CRITICAL TO THE SUCCESS OF THE COMPANY.
01:10:39 **Q.** WERE THERE MANY ENGINEERS OF HIS CALIBER IN THE WORLD, THAT YOU COULD COUNT?
01:10:44 **A.** VERY, VERY FEW. HE WAS ON THE BEST. MAYBE THE TOP THREE

PERHAPS.

**Q.** WERE YOU INVOLVED IN RECRUITING ANY OTHER MEMBERS OF THE FOUNDING TEAM?

**A.** YES. I WAS INVOLVED IN RECRUITING ESSENTIALLY, AT LEAST IN SOME WAY, ALMOST ALL, IF NOT ALL.

**Q.** WERE YOU DOING ANYTHING IN ADDITION TO THE BASIC RECRUITING FOR ANY NON-U.S. RECRUITS?

**A.** YES, I HELPED -- FOR NON-U.S. RECRUITS, I HELPED THEM GET WORK VISAS IN THE U.S. I WROTE LETTERS IN SUPPORT OF THEM GETTING THEIR VISAS, AND USED WHATEVER INFLUENCE I COULD TO GET THEM WORK VISAS IN THE U.S.

**Q.** BEYOND YOUR EFFORTS AT RECRUITING AND DEALING WITH THE STRATEGY, DID YOU EVER LEVERAGE YOUR CONNECTIONS IN THE TECH INDUSTRY ON BEHALF OF OPENAI, TO THE ADVANTAGE OF OPENAI?

**A.** YES, I -- WHEN OPENAI NEEDED COMPUTE, I CALLED SATYA NADELLA, THE CEO OF MICROSOFT.

**Q.** COULD YOU EXPLAIN WHAT COMPUTE IS FOR THE JURY?

**A.** WELL, IT'S JUST LIKE COMPUTERS, OPENAI COMPUTERS.

SO OPENAI NEEDED AI COMPUTERS, AND THE ONLY ONE WHO COULD REALLY CALL SATYA NADELLA AND HAVE HIM ACTUALLY PICK UP AND ANSWER THE PHONE WAS ME. SO I CALLED SATYA NADELLA AND SAID, COULD YOU HELP US WITH COMPUTE? YOU KNOW, WE'RE A NONPROFIT HERE, AND WE'RE TRYING TO DO AI SAFETY, AND IT WOULD BE GREAT IF MICROSOFT COULD CONTRIBUTE SOME COMPUTE TO OPENAI. WHICH EVERY TIME I SEE SATYA NADELLA, HE REMINDS ME OF THAT ACTUALLY.

01:12:41 THE ONLY REASON HE'S IN THIS THING IS BECAUSE OF ME. THOSE ARE HIS WORDS.

01:12:52 **Q.** I'M GOING TO ASK YOU TO TURN TO EXHIBIT 70.

01:12:54 **MR. MOLO:** YOUR HONOR, THIS IS AN EXHIBIT IN EVIDENCE. IT'S AN EMAIL.

01:12:56 **THE COURT:** PROCEED.

01:12:57 **BY MR. MOLO:**

01:12:58 **Q.** THIS IS AN EMAIL FROM YOU TO JENSEN HUANG DATED APRIL 20TH, 2016.

01:13:04 WHO IS JENSEN HUANG?

01:13:05 **A.** JENSEN HUANG IS THE CEO OF NVIDIA. NVIDIA MAKES THE BEST AI COMPUTERS IN THE WORLD.

01:13:14 **Q.** OKAY. AND IN IT, AT THE BOTTOM IS FROM YOU -- FROM BOTTOM TO TOP, YOU SAY --

01:13:20 **THE COURT:** CAN WE PUT THAT OFF FOR JUST A MOMENT?

01:13:23 **MR. MOLO:** I'M SORRY?

01:13:25 **THE COURT:** IS THERE AN ISSUE WITH THE "TO" ON THE EMAIL?

01:13:38 **MR. MOLO:** I DON'T THINK SO.

01:13:39 **THE COURT:** HOLD ON.

01:13:42 **MR. KRY:** PARDON ME.

01:13:43 **THE COURT:** THE PII ON THE TOP OF THAT?

01:13:46 **MR. KRY:** YEAH, SO THE APPROACH THAT OPENAI AND PLAINTIFFS HAVE TAKEN, BOTH AT SUMMARY JUDGMENT AND AT THIS STAGE, IS THAT WE HAVE REDACTED ALL PERSONAL EMAILS AND

PERSONAL PHONE NUMBERS.

WITH RESPECT TO MICROSOFT, THEY SEPARATELY FILED THAT CONTESTED MOTION TO REDACT.

**THE COURT:** THEY ARE THIRD PARTIES, AND THAT'S WHY I'M ASKING THE QUESTION.

**MR. KRY:** I SEE. TO MY KNOWLEDGE, WE DON'T HAVE ANY SPECIFIC --

**THE CLERK:** EXCUSE ME, YOUR HONOR.

**MR. KRY:** YEAH. SO, YOUR HONOR, I DON'T THINK IT'S A RULE 5.2 ISSUE FOR EMAIL ADDRESSES. I DON'T THINK ANY PARTICULAR POSITION WAS ASCERTAINED FROM THE THIRD PARTY. WE CAN REDACT THE THIRD PARTY EMAIL ADDRESS FROM THE PUBLICLY POSTED VERSION OF THAT, IF YOUR HONOR WOULD PREFER.

**THE COURT:** I ISSUED AN ORDER, AND I WAS CONCERNED WHEN I SAW IT.

IS THERE ANY NEED FROM THE DEFENSE SIDE THAT -- OR ARE WE JUST PROCEEDING?

**MR. COHEN:** WE HAVE NO OBJECTION -- WE HAVE NO INTEREST IN OBJECTING TO THIS, YOUR HONOR. WE UNDERSTAND WHAT YOUR ORDER WAS, BUT THIS ISN'T MICROSOFT INFORMATION.

**THE COURT:** OKAY. AND -- ALL RIGHT. GO AHEAD.

**MR. MOLO:** THANK YOU.

**BY MR. MOLO:**

**Q.** SO DIRECTING YOU TO PLAINTIFFS' EXHIBIT 70, AT THE BOTTOM OF THE PAGE, WHICH WOULD BE THE FIRST EMAIL, IT'S FROM YOU TO

JENSEN HUANG.

AND YOU SAY, "CAN OPENAI BUY ONE OF THE EARLY UNITS? THE TEAM IS ASKING ME ABOUT THIS EARLIER TODAY. OPENAI IS UNAFFILIATED WITH TESLA, IS A NONPROFIT COMPANY BY ME AND A FEW OTHERS WITH THE GOAL OF DEVELOPING SAFE AGI (AND HOPEFULLY NOT PAVING THE ROAD TO HELL WITH GOOD INTENTIONS)."

AND THAT WAS WHAT YOU WERE SAYING TO HIM.

WHAT WERE YOU ACTUALLY ASKING HIM FOR THERE?

**A.** I WAS ASKING JENSEN FOR ACCESS TO THE FIRST AI SUPER COMPUTERS THAT THEY WERE MAKING.

**Q.** HOW BIG A DEAL WAS THAT, THAT COMPUTER?

**A.** IT WAS EXTREMELY IMPORTANT TO THE FUTURE OF OPENAI. THIS WAS THE FIRST AI SUPER COMPUTER EVER DEVELOPED, AND IT WOULD MAKE A HUGE DIFFERENCE TO OPENAI, IF WE COULD GET ONE.

**Q.** YOU WEREN'T REQUESTING IT FOR TESLA?

**A.** CORRECT.

**Q.** YOU WERE REQUESTING IT FOR OPENAI?

**A.** YES.

**Q.** AND HE RESPONDS TO YOU --

**A.** I WANT IT TO BE CLEAR -- SORRY. I WANTED IT TO BE CLEAR WITH JENSEN THAT THIS IS NOT -- BECAUSE I'M EMAILING HIM FROM TESLA, MY TESLA EMAIL HERE, THAT THIS IS NOT A TESLA REQUEST. THIS IS JUST -- THIS IS A REQUEST FOR THE NONPROFIT, WHICH I CLEARLY STATE THERE, THAT WE'RE REQUESTING THIS AI SUPER COMPUTER FOR THE NONPROFIT, AND IT'S UNRELATED TO TESLA.

**Q.** OKAY. AND HE RESPONDS TO YOU, "I'VE NOT FORGOTTEN.

"THIS IS THE FIRST SUPER COMPUTER THAT'S SELLING ITSELF OFF THE WEB. DEMAND COMING FROM ALL OVER.

"FIRST SHIPMENT STARTS NEXT MONTH. AND ALREADY TAKING ORDERS FOR DELIVERY IN SEPTEMBER.

"I WILL MAKE SURE OPENAI GETS ONE OF THE FIRST ONES."

AND THEN YOU RESPOND, "MUCH APPRECIATED."

**A.** YES.

**Q.** AND WHAT HAPPENED AFTER THAT?

**A.** JENSEN CAME BY OPENAI AND DELIVERED THE FIRST DGX AI SUPER COMPUTER TO OPENAI, AND I WAS THERE TO RECEIVE IT.

**Q.** I'LL DIRECT YOUR ATTENTION TO THE EXHIBIT AT THE BACK OF YOUR BOOK, 388.

**MR. MOLO:** YOUR HONOR, THIS IS AN EXHIBIT THAT HAS BEEN STIPULATED TO BY THE PARTIES, AND HAS BEEN ADMITTED INTO EVIDENCE.

**THE COURT:** PROCEED.

**BY MR. MOLO:**

**Q.** OKAY. DO YOU RECOGNIZE THIS IMAGE IN THE PHOTOGRAPH?

**A.** YES. THAT'S JENSEN HUANG ON THE LEFT, AND THAT'S THE DGX -- THE AI SUPER COMPUTER THAT HE'S DELIVERING. AND THEN YOU CAN SEE ME AND ILYA, AND -- YEAH.

**Q.** OKAY. SO HE CAME THROUGH?

**A.** YES.

**Q.** ALL RIGHT. NOW, YOU MENTIONED MR. NADELLA AND A COMPUTING

01:18:24 POWER FROM MICROSOFT.
01:18:25 DO YOU REMEMBER MAKING ANY SPECIFIC REQUEST REGARDING A
01:18:32 GAME THAT OPENAI WAS INVOLVED IN?
01:18:38 **A.** YEAH. SO I WAS ACTUALLY PUSHING FOR OPENAI TO SHOW ITS
01:18:48 PROGRESS PUBLICLY BY WINNING AT A COMPUTER GAME THAT NO OTHER
01:18:54 AI HAD EVER WON AT BEFORE.
01:18:56 SO, FRANKLY, I WAS TAKING A PAGE FROM STEVE MINES'S BOOK,
01:19:03 FROM DEMIS HASSABIS, YOU KNOW, BECAUSE THEY MADE AN AI THAT
01:19:10 COULD -- WANTED THE GAME GO.
01:19:13 AND I WAS LIKE, WELL, IF THEY CAN'T MAKE AN AI -- IF
01:19:15 GOOGLE, AT THE TIME, COULD NOT MAKE AN AI THAT COULD WIN AT
01:19:19 "DEFENSE OF THE ANCIENTS," WHICH IS DOTA, IT'S A VIDEO
01:19:21 GAME THAT'S MUCH MORE -- IT'S KIND OF A VERY COMPLICATED VIDEO
01:19:24 GAME.
01:19:25 AND I THOUGHT, WELL, IF WE CAN SHOW THAT WE CAN WIN -- OR
01:19:28 OUR AI CAN WIN AT A VIDEO GAME THAT NO ONE ELSE'S AI COULD WIN
01:19:34 AT, THAT WOULD ESTABLISH A TREMENDOUS AMOUNT OF CREDIBILITY FOR
01:19:38 OPENAI.
01:19:38 **Q.** OKAY. AND SO WHY WERE YOU CALLING MR. NADELLA OR TALKING
01:19:45 TO NADELLA ABOUT THIS?
01:19:46 **A.** WELL, I WAS ASKING HIM IF HE COULD PROVIDE SOME COMPUTE IN
01:19:50 ORDER TO SHOW THAT OPENAI COULD WIN AT THIS COMPLICATED VIDEO
01:19:54 GAME THAT NO ONE ELSE COULD WIN AT. AND THUS, OPENAI COULD
01:19:57 DEMONSTRATE THAT IT HAD SOMETHING SPECIAL THAT NO ONE ELSE HAD.
01:20:01 **Q.** DID YOU HAVE A CONVERSATION WITH HIM ABOUT THIS OVER THE

PHONE?
**A.** I BELIEVE SO.
**Q.** OKAY. DURING THE COURSE OF THAT CONVERSATION, WAS IT EVER MENTIONED THAT OPENAI WAS A NONPROFIT?
**A.** YES.
**Q.** SO WHAT HAPPENED WITH THE CONTEST?
**A.** OPENAI WON THE DOTA CONTEST, AND IT MADE A HUGE DIFFERENCE IN ESTABLISHING THE CREDIBILITY OF OPENAI. BECAUSE IF WE CAN WIN -- IF OPENAI CAN WIN AT A VERY COMPLICATED VIDEO GAME THAT GOOGLE COULD NOT WIN AT, THEN IT ESTABLISHED CREDIBILITY FOR THE COMPANY IN A VERY POWERFUL WAY.
**Q.** HOW MUCH FUNDING -- WE'LL RETURN TO THAT. HOW MUCH FUNDING DID YOU SUPPLY TO OPENAI OVER THE COURSE OF TIME?
**A.** I BELIEVE IT WAS ABOUT $38 MILLION.
**Q.** OKAY. AND WHO WAS THE ORIGINAL SOURCE FOR THE FUNDS THAT EVENTUALLY WENT TO OPENAI FROM YOU?
**A.** I MEAN, I WAS THE SOURCE OF THE FUNDS.
**Q.** OKAY.
**A.** YEAH.
**Q.** DID YOU RELY ON ANYONE TO MANAGE YOUR CONTRIBUTIONS TO OPENAI?
**A.** JARED BIRCHALL DID THE WIRE TRANSFERS.
**Q.** OKAY. AND WHO IS JARED BIRCHALL?
**A.** HE MANAGES MY FAMILY OFFICE.
**Q.** AND YOUR FAMILY OFFICE IS WHAT? EXPLAIN TO THE JURY WHAT

A FAMILY OFFICE IS?
**A.** HE JUST KIND OF MANAGES MY AFFAIRS.
**Q.** OKAY.
**A.** MY FAMILY AFFAIRS.
**Q.** AND HOW WOULD IT WORK WHEN YOU WANTED TO MAKE A CONTRIBUTION THEN? WHAT WAS YOUR ROLE IN THAT?
**A.** I WOULD ASK JARED BIRCHALL TO SEND MONEY TO OPENAI, AND HE WOULD DO SO.
**Q.** OKAY. SO I WANT TO DIRECT YOUR ATTENTION NOW TO THE PERIOD 2017 TO 2018, AND SPECIFICALLY THE SUMMER OF 2017.
HOW WAS OPENAI DOING IN TERMS OF ADVANCING ITS WORK?
**A.** WELL, I MEAN, IT WAS MAKING, I THINK, SOME GOOD PROGRESS. YEAH.
**Q.** AND HOW WAS IT DOING IN TERMS OF FUNDING?
**A.** WELL, I WAS PROVIDING THE FUNDING AT THAT TIME, I BELIEVE.
**Q.** OKAY. WAS THERE EVER A DISCUSSION BETWEEN YOU AND THE OTHER FOUNDERS ABOUT ALTERNATIVE SOURCES OF FUNDING FOR OPENAI?
**A.** WELL, AT VARIOUS TIMES WE DISCUSSED -- WE KIND OF BRAINSTORMED ABOUT DIFFERENT WAYS TO FUND THE CHARITY.
**Q.** OKAY. DO YOU REMEMBER SOME OF THE WAYS THAT -- THINGS THAT WERE DISCUSSED?
**A.** WELL, WE DID TALK ABOUT ESTABLISHING A FOR-PROFIT, OR MAYBE TESLA HAVING PROVIDED SOME OF THE FUNDING. THERE WERE A BUNCH OF SORT OF IDEAS THAT WERE BRAINSTORMED.
**Q.** OKAY.

01:23:07 **A.** AND I WAS NOT OPPOSED TO THERE BEING SORT OF A SMALL FOR-PROFIT THAT WOULD, YOU KNOW, PROVIDE FUNDING TO THE NONPROFIT, AS LONG AS THE, YOU KNOW, THE TAIL DIDN'T WAG THE DOG ESSENTIALLY.
01:23:22 **Q.** OKAY. BEFORE WE GET THERE, WERE THESE LIKE FORMAL MEETINGS IN BOARD ROOMS THAT YOU HAD?
01:23:27 **A.** NO.
01:23:27 **Q.** DESCRIBE THE WAY THESE CONVERSATIONS WENT.
01:23:29 **A.** WELL, WE HAD JUST INFORMAL, VERBAL CONVERSATIONS, AND SOME EMAIL AND TEXT DISCUSSIONS.
01:23:37 **Q.** OKAY. AND WHO WERE PARTIES TO THAT, PRINCIPALLY?
01:23:40 **A.** IT WAS SAM, GREG, ILYA, AND MYSELF.
01:23:54 **Q.** OKAY. DID ANYONE ELSE PLAY A ROLE FROM TIME TO TIME IN THOSE DISCUSSIONS?
01:23:58 **A.** I CAN'T RECALL OFFHAND.
01:23:59 **Q.** OKAY. DO YOU KNOW A COMPANY CALLED CEREBRAS? ARE YOU FAMILIAR WITH THAT?
01:24:10 **A.** YES.
01:24:10 **Q.** WAS THAT EVER MADE PART OF THESE DISCUSSIONS?
01:24:14 **A.** WELL, I MEAN, THERE WAS A LOT OF BRAINSTORMING DISCUSSIONS. I THINK ONE OF THEM INVOLVED SOMEHOW WORKING WITH CEREBRAS.
01:24:25 **Q.** AND WHO WAS PROPOSING THAT?
01:24:27 **A.** I'M NOT SURE WHO PROPOSED THAT.
01:24:29 **Q.** OKAY. DO YOU KNOW, WAS THERE ANYTHING DONE TO EXPLORE A

POTENTIAL TRANSACTION WITH CEREBRAS?
**A.** I DON'T THINK SO.
**Q.** OKAY. DID MR. BROCKMAN OR MR. SUTSKEVER EVER ENDORSE THE IDEA OF DOING A TRANSACTION WITH CEREBRAS?
**A.** THEY MAY HAVE DONE SO.
**Q.** OKAY. DID YOU FAVOR THAT?
**A.** I DON'T THINK SO.
**Q.** WHY NOT?
**A.** IT WASN'T OBVIOUS TO ME HOW SOMEHOW COMBINING WITH A STARTUP COMPUTER COMPANY WOULD BE GOOD FOR OPENAI.
**Q.** OKAY. EXCUSE ME.
WAS THERE EVER A TRANSACTION WITH CEREBRAS?
**A.** NO.
**Q.** NOW, YOU MENTIONED TESLA.
WAS THERE EVER A SPECIFIC PROPOSAL FOR TESLA TO DO SOME SORT OF TRANSACTION WITH OPENAI?
**A.** NOTHING SPECIFIC.
**Q.** WE BRAINSTORMED A NUMBER OF IDEAS, BUT MOST OF THEM DIDN'T SEEM LIKE THEY WOULD WORK.
**Q.** OKAY. WAS THERE DISCUSSION OF VIRTUAL COINS IN THE PROCESS?
**A.** ONE OF THE IDEAS THAT WAS PROPOSED WAS A CRYPTO COIN ISSUANCE, BUT, YEAH, I WAS AGAINST THAT BECAUSE IT SOUNDED KIND OF SCAMMY.
**Q.** OKAY. SO THAT DIDN'T GO FORWARD?

01:26:15 **A.** IT DID NOT.
01:26:16 **Q.** ALL RIGHT. NOW I WANT TO ASK YOU ABOUT THE FORMATION OF THE FOR-PROFIT. EXPLAIN TO THE JURY HOW THIS CAME UP IN THE CONVERSATIONS, PLEASE.
01:26:26 **A.** SURE. SO THERE WAS DISCUSSION OF CREATING A FOR-PROFIT, BUT IT WAS VERY MUCH IN THE VEIN OF IT BEING A SMALL ADJUNCT TO THE NONPROFIT.
01:26:37 SO THE NATURE OF THE FOR-PROFIT WOULD BE THAT IT WOULD BE -- THE PROFIT WOULD BE CAPPED. SO IT WOULD HAVE A MAXIMUM PROFIT LIMIT, AND THAT WHEN ARTIFICIAL GENERAL INTELLIGENCE WAS FIGURED OUT, THAT THE -- THE FOR-PROFIT WOULD DISSOLVE AND CEASE TO EXIST.
01:26:59 BUT NOW THE PROFIT CAP HAS BEEN COMPLETELY REMOVED, AND THE CLAUSE THAT HAS THE FOR-PROFIT DISSOLVING UPON DISCOVERY OF ARTIFICIAL GENERAL INTELLIGENCE HAS ALSO BEEN REMOVED, WHICH IS A VERY BIG DEAL.
01:27:19 **Q.** I DIDN'T -- I'M SORRY. I DIDN'T WANT TO GO THAT FAR YET.
01:27:21 **A.** OKAY.
01:27:21 **Q.** I JUST WANTED TO ASK YOU HOW IT WAS YOU CAME TO CREATE OR WHAT THE DISCUSSION WAS ABOUT CREATING THE FOR-PROFIT AT THAT TIME.
01:27:29 **A.** YEAH. IT WAS ESSENTIALLY AS A SMALL ADJUNCT TO THE NONPROFIT, BUT THE PROFITS FROM THE FOR-PROFIT WOULD FLOW TO THE NONPROFIT.
01:27:38 **Q.** OKAY. COULD EMPLOYEES BE PAID STILL?

01:27:40 **A.** YES.
01:27:41 **Q.** AND MAKE SOME MONEY ALONG THE WAY THEMSELVES?
01:27:43 **A.** YES.
01:27:44 **Q.** DID YOU SEE ANY PROBLEMS WITH HAVING A FOR-PROFIT FUND A NONPROFIT?
01:27:51 **A.** NO. I THINK IT'S PERFECTLY OKAY FOR A FOR-PROFIT TO FUND A NONPROFIT, IT'S JUST NOT OKAY FOR THE FOR-PROFIT TO TAKE THE VAST MAJORITY OF THE VALUE AWAY FROM THE NONPROFIT.
01:28:03 **Q.** WHO WAS GOING TO FUND THE FOR-PROFIT, THE CREATION OF THE FOR-PROFIT ENTITY, INITIALLY?
01:28:11 **A.** WHO WAS GOING TO -- I'M NOT SURE WHO WAS GOING TO FUND IT.
01:28:15 **Q.** WERE YOU INVOLVED IN ANY WAY OF THE FUNDING?
01:28:22 **A.** I WAS NOT INVOLVED IN THE FOR-PROFIT.
01:28:23 **Q.** OKAY. IN THE INITIAL CONVERSATIONS AROUND THE CREATION OF THE FOR-PROFIT, WAS THERE ANY DISCUSSION OF YOU PROVIDING FUNDING? I'M NOT TALKING ABOUT THE ONE THAT WENT FORWARD, I'M TALKING ABOUT THE INITIAL CONVERSATIONS.
01:28:33 **A.** I MEAN, THERE WAS SOME CONVERSATIONS OF ME PARTICIPATING IN THE FOR-PROFIT. BUT, I MEAN, I REALLY WASN'T INTERESTED IN MAKING A PROFIT FOR AI, YOU KNOW, MYSELF, AT LEAST.
01:28:46 **Q.** I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT NUMBER 152, WHICH HAS BEEN ADMITTED INTO EVIDENCE.
01:28:59 MR. MOLO: YOUR HONOR?
01:28:59 **THE COURT:** PROCEED.
01:29:00 **BY MR. MOLO:**

01:29:00 **Q.** THIS IS AN EMAIL FROM YOU TO SHIVON ZILIS COPYING SAM TELLER DATED AUGUST 28TH OF 2017.
01:29:06 WHO IS SHIVON ZILIS?
01:29:08 **A.** SHIVON WAS MY CHIEF OF STAFF AND -- OR, YEAH.
01:29:19 **Q.** OKAY. AT THIS TIME?
01:29:20 **A.** AT THIS TIME.
01:29:20 **Q.** AND WHO IS SAM TELLER?
01:29:22 **A.** WELL, HE WAS ALSO -- I GUESS ALSO CHIEF OF STAFF.
01:29:22 **Q.** OKAY.
01:29:29 **A.** WELL, THEY DIDN'T ACTUALLY HAVE THE TITLE, BUT THEY ARE IN MY EXECUTIVE OFFICE. THEY ARE LIKE BASICALLY SENIOR ADVISORS.
01:29:37 **Q.** SO IT STARTS WITH AN EMAIL FROM -- I'M SORRY. WHEN I SAY IT STARTS -- AT THE BOTTOM IS ACTUALLY AN EMAIL FROM SHIVON ZILIS TO YOU AND SHE WRITES, "6. EQUITY SPLIT."
01:30:00 "GREG STILL INSTINCTUALLY ANCHORED ON EQUITY SPLIT. I PERSONALLY DISAGREE WITH HIM ON THAT INSTINCT, AND HE ASKED FOR AND WAS TO RECEIVE" -- "RECEPTIVE" -- I'M SORRY -- "TO HEARING OTHER THINGS HE COULD NOT USE TO RECALIBRATE HIS MENTAL MODEL."
01:30:22 AND IT SAYS "GREG NOTED THAT ILYA IN SOME WAYS HAS CONTRIBUTED MILLIONS BY LEAVING HIS EARNING POTENTIAL," AND "ONE CONCERN THEY HAD WAS THE PROPOSED EMPLOYEE POOL WAS TOO SMALL."
01:30:40 WHAT IS BEING DISCUSSED THERE?
01:30:41 **A.** I THINK THEY WERE DISCUSSING THE OWNERSHIP OF THE FOR-PROFIT.

01:30:53 **Q.** OKAY. AND WHAT DID -- WHAT DID YOU THINK OF THAT PROPOSAL, IF YOU WILL, FROM BROCKMAN?

01:31:02 **A.** WELL, I MEAN, I GUESS I DISAGREED WITH IT, AND SUGGESTED THAT THEY SHOULD GROW A STOCK -- A FOR-PROFIT COMPANY.

01:31:16 **Q.** SO WHEN IT SAYS "GREG STILL INSTINCTUALLY ANCHORED ON EQUAL SPLIT," WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:31:27 **A.** I ASSUMED IT WOULD MEAN THAT EVERYONE WOULD RECEIVE THE SAME PERCENTAGE, WHICH WOULDN'T MAKE SENSE IF I WAS ALSO PROVIDING ALL -- YOU KNOW, ALL THE SORT OF MONEY AS WELL.

01:31:34 **Q.** SO THIS WAS YOU, SUTSKEVER, BROCKMAN, ALTMAN, THEY WERE PROPOSING THAT IT BE SPLIT FOUR WAYS?

01:31:45 **A.** YEAH. YES.

01:31:49 **Q.** OKAY. AND FROM YOUR EXPERIENCE, IF SOMEONE PROVIDES THE FUNDING FROM -- FOR AN ORGANIZATION, IN THIS CASE IT'S GOING TO BE A FOR-PROFIT SUBSIDIARY, WHAT TYPE OF EQUITY OR OWNERSHIP STATION WOULD THEY BE LOOKING TO ACQUIRE?

01:32:10 **MR. SAVITT:** OBJECTION, FOUNDATION.

01:32:11 **THE COURT:** OVERRULED. GO AHEAD.

01:32:17 ACTUALLY -- GO AHEAD. YOU KNOW WHAT, LAY SOME FOUNDATION. AND YOU HAVE EIGHT MINUTES.

01:32:21 **BY MR. MOLO:**

01:32:21 **Q.** OKAY. BASED UPON YOUR EXPERIENCE IN SILICON VALLEY WORKING WITH VENTURE CAPITAL, AS YOU SAY YOU HAVE, IF SOMEONE IS TO PROVIDE THE MAJORITY OF THE FUNDING, OR ALL THE FUNDING FOR A STARTUP, WHAT PERCENTAGE --

**THE COURT:** THAT'S NOT FOUNDATION.

**MR. MOLO:** OKAY.

**THE COURT:** SO THE POINT OF THE OBJECTION IS, IF YOU WANT HIM TO GIVE AN OPINION, YOU NEED TO KNOW THE FOUNDATION FOR HIS OPINION.

**MR. MOLO:** OKAY. WELL, THAT'S WHAT I THOUGHT HIS EXPERIENCE IN SILICON VALLEY --

**THE COURT:** YOU'RE ASSUMING THE EXPERIENCE.

**MR. MOLO:** HE TESTIFIED TO IT EARLIER.

**THE COURT:** OKAY. SO THAT'S IT, HIS FOUR COMPANIES AND NOTHING ELSE?

**MR. MOLO:** I CAN ASK MORE QUESTIONS ABOUT THAT. OKAY.

BY MR. MOLO:

**Q.** DO YOU HAVE FRIENDS IN VENTURE CAPITAL?

**A.** YES.

**Q.** DO YOU HAVE OTHER BUSINESS ASSOCIATES THAT YOU DEAL WITH IN VENTURE CAPITAL?

**A.** I WOULD SAY THAT I UNDERSTAND VENTURE CAPITALISTS IN SILICON VALLEY. THERE ARE VERY FEW PEOPLE THAT UNDERSTAND VENTURE CAPITALISTS IN SILICON VALLEY BETTER THAN I DO.

**Q.** WHY IS THAT?

**A.** BECAUSE I'VE BEEN INVOLVED IN OVER 100 FINANCING ROUNDS IN SILICON VALLEY.

**Q.** OKAY. SO BASED UPON THAT EXPERIENCE, WHAT PERCENTAGE

WOULD THE PARTY PROVIDING THE MAJORITY OF THE FUNDING EXPECT TO RECEIVE IN A STARTUP?

**A.** RIGHT. IF IT WAS A STARTUP, YOU COULD SAY THAT PERHAPS THE FOUNDERS WOULD HAVE AN EQUAL EQUITY SPLIT, BUT THEN WHOEVER PROVIDED ALMOST ALL OF THE MONEY WOULD ALSO HAVE EQUITY FOR THE INVESTMENT AS WELL. SO IN THIS CASE, IT WOULDN'T MAKE SENSE TO CREATE A COMPANY WHERE EVERYONE HAS AN EQUAL SPLIT IF ONE OF THE FOUNDERS, IN MY CASE -- IN THAT CASE, ME -- IS ALSO PROVIDING ALL OF THE MONEY IN ADDITION.

**Q.** OKAY.

**A.** SO YEAH.

**Q.** SO WHAT WAS YOUR REACTION TO -- TO THAT NEWS?

**A.** I THOUGHT THIS SEEMED UNFAIR AND INAPPROPRIATE, AND THAT THEY SHOULD GO START THEIR OWN COMPANY.

**Q.** OKAY. AND IF YOU GO FURTHER UP THE EMAIL, IT SAYS "DURATION OF CONTROL AND TRANSITION. THE NON-NEGOTIABLE SEEMS TO BE AN IRONCLAD AGREEMENT TO NOT HAVE ANY ONE PERSON HAVE ABSOLUTE CONTROL OF AGI, IF IT'S CREATED. SATISFYING THIS MEANS A SITUATION WHERE, REGARDLESS OF WHAT HAPPENS TO THE THREE OF THEM, IT'S GUARANTEED THAT POWER OVER THE COMPANY IS DISTRIBUTED AFTER THE 2-3 YEAR INITIAL PERIOD."

WHAT DID YOU UNDERSTAND THAT TO MEAN?

**A.** YEAH, IT SEEMS PRETTY LITERAL; THAT NO ONE PERSON SHOULD HAVE ABSOLUTE CONTROL OF AGI, WHICH I AGREE WITH.

**Q.** OKAY. WHAT WAS YOUR REACTION -- WELL, ABOVE THAT, YOU

01:35:25 SAY -- YOU DO RESPOND TO THE EMAIL. YOU SAY, "THIS IS VERY
01:35:29 ANNOYING. PLEASE ENCOURAGE THEM TO GO START A COMPANY. I'VE
01:35:33 HAD ENOUGH."
01:35:34 WHAT DID YOU MEAN BY THAT?
01:35:35 **A.** WELL, THE -- THEIR DEMANDS SEEMS TO BE, WITH REGARD TO THE
01:35:44 EQUITY SPLIT, UNFAIR. I THOUGHT IT JUST DIDN'T MAKE SENSE IF
01:35:47 YOU -- TO HAVE -- IF YOU COFOUND A COMPANY, THAT THERE WOULD BE
01:35:51 AN EQUAL SPLIT IF ONE OF THE PEOPLE IS PROVIDING ALMOST ALL THE
01:35:55 MONEY.
01:35:56 **Q.** OKAY. IS THIS SOMETHING THAT YOU BROUGHT UP AFTER A
01:36:03 SERIES OF NEGOTIATIONS, OR IS THIS SOMETHING THAT YOU ARE
01:36:06 SEEING MORE OR LESS FOR THE FIRST TIME?
01:36:07 **A.** I WOULDN'T SAY THERE WAS A SERIES OF NEGOTIATIONS. THERE
01:36:12 WERE DISCUSSIONS, BUT THE DISCUSSIONS WERE NOT GOING IN A
01:36:15 DIRECTION THAT MADE SENSE.
01:36:17 **Q.** OKAY. WAS IT IMPORTANT FOR YOU TO HAVE CONTROL OF THE
01:36:21 FOR-PROFIT ENTITY INITIALLY?
01:36:23 **A.** ONLY INITIALLY, BUT --
01:36:25 **Q.** WHY?
01:36:26 **A.** I WANTED TO MAKE SURE THAT IT WENT IN THE RIGHT DIRECTION,
01:36:29 BUT I WOULD EXPECT IT TO BE DILUTED DOWN OVER TIME AND HAVE
01:36:32 LESS THAN 50 PERCENT CONTROL AFTER THE INITIAL ROUND.
01:36:38 **Q.** AND WHAT DO YOU MEAN BY GO "IN THE RIGHT DIRECTION"?
01:36:43 **A.** WELL, THAT IT WOULD BE MAKING A SAFE AI, MOSTLY THAT.
01:36:47 **Q.** AND WHAT WOULD HAPPEN TO YOUR CONTROL OVER TIME?

01:36:51 **A.** IT WOULD REDUCE OVER TIME. THAT'S WHAT HAPPENED AT TESLA, FOR EXAMPLE. AND MY INTEREST WITH TESLA NOW IS AROUND 15, 1-5, PERCENT. SO AT THE BEGINNING OF TESLA, I HAD THE MAJORITY OF TESLA; AND THEN OVER TIME, AS YOU GET MORE INVESTORS, THEY OWN A PIECE OF THE COMPANY, AND THEN YOUR OWNERSHIP IS REDUCED OVER TIME. SO MY OWNERSHIP OF TESLA WENT FROM, IN THE BEGINNING, TO BEING PROBABLY AROUND 60 PERCENT OF THE COMPANY, TO OVER TIME NOW BEING AROUND 15, 1-5, PERCENT OF THE COMPANY.

01:37:31 **THE COURT:** WHAT WAS THE PERIOD?

01:37:36 **THE WITNESS:** OH, IT WAS OVER A PERIOD OF -- WELL, THAT WAS FROM 2004 TO LAST YEAR.

01:37:43 **BY MR. MOLO:**

01:37:43 **Q.** HOW QUICKLY DID YOU THINK THAT YOUR MAJORITY INTEREST IN THE OPENAI FOR-PROFIT SUBSIDIARY WOULD DILUTE DOWN SO THAT YOU OWNED LESS THAN 50 PERCENT?

01:37:57 **A.** PROBABLY WITHIN A FEW YEARS. THAT ALSO IS THE CASE AT TESLA. MY OWNERSHIP OF TESLA DROPPED BELOW 50 PERCENT WITHIN TWO YEARS.

01:38:05 **Q.** OKAY. I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 153, WHICH THE COURT HAS ADMITTED INTO EVIDENCE.

01:38:15 **THE COURT:** PROCEED.

01:38:18 WELL, YOU'VE GOT TWO MINUTES.

01:38:20 **MR. MOLO:** I'M SORRY?

01:38:21 **THE COURT:** YOU HAVE TWO MINUTES.

01:38:23 **MR. MOLO:** OKAY. THIS MAY BE -- IT'S UP TO YOU.

01:38:26 THIS COULD BE A CONVENIENT POINT TO STOP. I'M GOING TO ASK HIM ABOUT THIS.

01:38:30 **THE COURT:** I MEAN, IF THAT WORKS.

01:38:31 **MR. MOLO:** THANK YOU.

01:38:33 **THE COURT:** ALL RIGHT. SO, MEMBERS OF THE JURY, LET ME GIVE YOU THIS INSTRUCTION AGAIN.

01:38:46 BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE RECEIVED IN THIS CASE, AND ON MY INSTRUCTIONS AT THE END OF THE CASE, I REMIND YOU THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES, EXCEPT WHEN YOU DISCUSS THE CASE WITH YOUR FELLOW JURORS, BUT ONLY DURING DELIBERATIONS.

01:39:06 SO DO NOT COMMUNICATE WITH ANYONE IN ANY WAY, AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY, ABOUT THE MERITS OF THIS CASE, OR ANYTHING TO DO WITH IT. THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE, OR ELECTRONIC MEANS, VIA EMAIL, VIA TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE, APPLICATION, SOCIAL MEDIA PLATFORM, INCLUDING, BUT NOT LIMITED TO, FACEBOOK, YOUTUBE, X, INSTAGRAM, LINKEDIN, SNAPCHAT, OR ANY OTHER FORM.

01:39:40 THIS APPLIES TO COMMUNICATING WITH YOUR FAMILY, YOUR EMPLOYER, THE MEDIA, THE PRESS, ANY PERSON INVOLVED WITH THIS TRIAL.

01:39:48 IF YOU ARE APPROACHED OR ASKED IN ANY WAY ABOUT THIS CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO RESPOND, AND

PLEASE REPORT THAT CONTACT TO THE COURT.

DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.

DO NOT DO ANY RESEARCH SUCH AS CONSULTING DICTIONARIES, SEARCHING THE INTERNET, USING ANY REFERENCE MATERIALS, INCLUDING AI. NONE OF THAT; RIGHT?

DO NOT MAKE ANY INVESTIGATION ON YOUR OWN OR TRY TO LEARN ABOUT THE CASE OR THE ISSUES.

ALSO, DO NOT DO ANY RESEARCH ABOUT THE LAW, OR THE PEOPLE INVOLVED, INCLUDING THE PARTIES, THE WITNESSES, THE LAWYERS, UNTIL YOU HAVE BEEN EXCUSED AS JURORS.

AGAIN, IF YOU HAPPEN TO HEAR OR READ ANYTHING, OR SEE ANYTHING FROM THE MEDIA, JUST TURN AWAY AND LET ME KNOW.

AGAIN, WHAT WE ARE TRYING TO DO HERE IS HAVE PROCESSES IN PLACE THAT PROTECT THE RIGHTS OF ALL OF THE PARTIES, AND THAT IS IMPORTANT THAT WE ARE ALL ON THE SAME PAGE. WE ALL SEE THE EXACT SAME THING, EXACT SAME WITNESS TESTIMONY, THE EXACT SAME, WE HEAR THE SAME TESTIMONY AND EVIDENCE, ET CETERA.

NOW, YOU'VE BEEN HERE ALL DAY. SO WHAT IS THE NEWS GOING TO TELL YOU? YOU'RE HERE. YOU HAD THE BEST SEAT IN THE HOUSE. THERE'S NO NEED TO LISTEN TO WHAT THEY THINK, BECAUSE ALL THAT YOU CAN CONSIDER IS WHAT YOU'VE HEARD.

OKAY. SOMETHING ELSE. I'VE BEEN WATCHING YOU. MANY OF YOU HAVE BEEN TAKING NOTES. YOU'RE WORKING VERY HARD. IT IS

01:41:44 NOT EASY BEING A JUROR. IT IS NOT EASY TO BE SO FOCUSED ON WHAT THESE PEOPLE ARE TELLING YOU, AND MAYBE YOU DIDN'T KNOW ANYTHING ABOUT THIS AREA. SO YOU MAY BE TIRED. JUST KNOW, YOU MAY BE TIRED.

01:42:02 IF YOU GET CRANKY WITH YOUR FAMILY, JUST KNOW THAT IT'S BECAUSE YOU'RE TIRED. OKAY? CUT THEM SOME SLACK. JUST RELAX. DO WHAT YOU NEED TO DO. TRY TO GET REFRESHED, AND WE'LL START AGAIN TOMORROW. OKAY?

01:42:17 DO ANY OF YOU HAVE ANY QUESTIONS?

01:42:21 **JURORS:** NO.

01:42:22 **THE COURT:** NO? ALL RIGHT. TERRIFIC. WE'LL STAND IN RECESS WITH YOU UNTIL 8:30 TOMORROW MORNING.

01:42:27 **THE CLERK:** PLEASE RISE FOR THE JURY.

01:42:29 (JURY OUT AT 1:42 P.M.)

01:42:50 **THE CLERK:** THANK YOU. YOU MAY BE SEATED.

01:42:52 **THE COURT:** YOU MAY STEP DOWN.

01:42:54 OKAY. WE HAVE JUST A FEW THINGS TO TALK ABOUT NOW THAT THE JURY HAS LEFT THE COURTROOM.

01:43:06 MR. MUSK, YOU CAN SPEAK WITH YOUR LAWYERS TONIGHT. ONCE YOU'RE ON CROSS-EXAMINATION, YOU WILL NOT BE ABLE TO SPEAK TO YOUR LAWYERS DURING THE BREAK.

01:43:16 DO YOU UNDERSTAND?

01:43:17 **THE WITNESS:** YES.

01:43:18 **THE COURT:** ALL RIGHT. THE REST OF THIS IS JUST LOGISTICAL.

SO LET'S GO THROUGH SOME OF THESE TOPICS.

IRENE, DO YOU NEED A BREAK?

THE COURT REPORTER: NO, I'M GOOD. THANK YOU.

**THE COURT:** IF SOMETHING -- AND I DON'T KNOW IF YOU WERE IN HERE, MR. MOLO, WHEN WE DID THIS RIGHT AFTER THE BREAK. I WANT TO ADMIT THESE EXHIBITS DURING -- WHEN THE JURY IS NOT HERE. SO WE'LL DO IT FIRST THING IN THE MORNING. ONCE I ADMIT THEM, YOU CAN USE THEM.

AND IF MY CRD DOESN'T PUBLISH IT, I'LL REMIND HIM THAT IT'S ADMITTED, AND WE JUST MOVE FORWARD.

**MR. MOLO:** SO YOU WANT ME TO SAY THIS HAS BEEN ADMITTED INTO EVIDENCE OR JUST GO?

**THE COURT:** YOU CAN IF YOU WANT. YOU DON'T HAVE TO ON MY ACCOUNT.

**MR. MOLO:** OKAY.

**THE COURT:** I KNOW WHAT I'VE ADMITTED.

**MR. MOLO:** OKAY. THANK YOU.

**THE COURT:** ALL RIGHT. SO THAT'S THAT PIECE.

HOW MUCH TIME DO YOU EACH WANT ME TO RESERVE ON THE TIME SHEET FOR YOUR CLOSINGS?

PLAINTIFFS?

**MR. MOLO:** YES.

**MR. KRY:** NINETY MINUTES FOR CLOSING FOR PLAINTIFFS.

**THE COURT:** NINETY FOR PLAINTIFF.

AND OPENAI?

01:44:51 **MS. EDDY:** NINETY FOR THE OPENAI DEFENDANTS.

01:44:54 **THE COURT:** OKAY. AND THEN MICROSOFT?

01:44:57 **MR. COHEN:** THIRTY, YOUR HONOR.

01:45:07 **THE COURT:** OKAY. WEBSITE FOR EXHIBITS.

01:45:09 **MR. KRY:** YES, YOUR HONOR, THE PARTIES COORDINATED. 01:45:11 AND THANKS TO THE WACHTELL TEAM FOR THEIR ASSISTANCE, WE NOW 01:45:17 HAVE PUBLIC SHARE FILE THAT'S BEEN SENT TO THE COURTROOM 01:45:18 DEPUTY.

01:45:20 **THE COURT:** DOES SOMEONE HAVE THE LINK?

01:45:21 **MR. KRY:** IT WAS EMAILED TO THE COURTROOM DEPUTY. IF 01:45:23 YOUR HONOR WOULD LIKE ANYTHING ELSE DONE WITH IT, WE CAN 01:45:26 ARRANGE THAT, TOO.

01:45:30 **THE COURT:** ALL RIGHT. WE'LL POST IT AS A DOCKET 01:45:32 ENTRY SO THAT PEOPLE HAVE ACCESS TO IT.

01:45:34 **MR. KRY:** THANK YOU.

01:45:42 **THE COURT:** YOU HAD SOME -- LET ME MAKE SURE.

01:45:44 THE PLAINTIFFS, YOU'VE GOT COMPUTERS ON THE RIGHT-HAND 01:45:46 SIDE -- ON THE SIDE FACING THE JURY. DO YOU HAVE PRIVACY 01:45:48 SCREENS ON THERE?

01:45:49 **MR. KRY:** YES, YOUR HONOR.

01:45:49 **THE COURT:** OKAY. PERFECT.

01:45:54 YOU HAD SOME DEPOSITION DISPUTES. I HAVE QUESTIONS AND 01:46:01 ANSWERS.

01:46:36 WITH RESPECT TO -- WE'RE AT DOCKET 501-6, THIS IS THE 01:46:40 CHART.

WITH RESPECT TO MCCAULEY'S DEPOSITION, THE OBJECTION AT PAGE 65 IS SUSTAINED.

THE OBJECTION AT PAGE 73 IS OVERRULED.

MY QUESTION WITH RESPECT TO THE OBJECTION AT PAGE 85 AND 86, I CAN'T SEE -- I DON'T HAVE THE EMAIL THAT'S REFERENCED. SO IT'S HARD FOR ME TO UNDERSTAND THE CONTEXT.

IF SOMEONE WOULD GET ME THE EMAIL FOR THAT PARTICULAR DESIGNATION THAT YOU'RE TALKING ABOUT.

**MR. KRY:** YOUR HONOR, THAT'S A TRIAL EXHIBIT.

**THE COURT:** ALL RIGHT. SOMEONE GET THAT NUMBER FOR ME.

(DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

**MR. KRY:** YOUR HONOR, IT'S PLAINTIFFS' 300.

**THE COURT:** ALL RIGHT. I'LL TAKE A LOOK AT THAT, AND I'LL LET YOU KNOW.

THE BALANCE OF THAT SECTION, THE OBJECTIONS ARE OVERRULED.

THE NEXT ROW, THE OBJECTIONS ARE OVERRULED.

THE NEXT ROW, THE OBJECTIONS ARE OVERRULED.

WITH RESPECT TO HELEN TONER, MOST OF THOSE QUESTIONS ARE LEADING, AND THE OBJECTIONS ARE SUSTAINED. IN FACT, ALL OF THE OBJECTIONS ARE SUSTAINED.

THE LAST OPENAI'S OBJECTIONS.

SO PLAINTIFFS' DESIGNATION, THAT'S THE LAST ROW, THOSE OBJECTIONS ARE OVERRULED.

OKAY. I AM -- WELL, WHO'S ON TAP FOR TOMORROW? IS IT ALL

01:48:54 DAY WITH MR. MUSK? AND IF MR. MUSK FINISHES -- WELL, YOU TELL ME.

01:48:58 **MR. KRY:** YOUR HONOR, CAN WE INQUIRE OF OPENAI WHAT THEIR CURRENT ESTIMATE IS FOR CROSS-EXAMINATION?

01:49:10 **MR. SAVITT:** IT'S A LITTLE DIFFICULT TO SAY, AND IT DEPENDS HOW LONG THE CONTINUE WITH MR. MUSK. BUT PROBABLY A COUPLE HOURS IS WHAT I WOULD SAY.

01:49:16 **MR. KRY:** IF IT'S ONLY TWO HOURS --

01:49:19 **MR. SAVITT:** IT COULD BE TWO TO THREE HOURS.

01:49:21 **MR. KRY:** I THINK BASED ON THAT ESTIMATES, IT'S POSSIBLE WE MAY GET TO OUR SECOND WITNESS, THAT WOULD BE MR. JARED BIRCHALL.

01:49:25 **THE COURT:** OKAY.

01:49:46 THE LAST ISSUE THAT I WANTED TO RAISE WITH OPENAI, I'M NOT EXACTLY SURE WHAT THE EVIDENCE IS ON THIS TOPIC OF THE NAME OF OPENAI THAT WAS REFERENCED IN THEIR OPENING, BUT I WILL TELL YOU THAT WHAT MR. MUSK TESTIFIED TO TODAY, THIS MORNING, OR THIS AFTERNOON, IS CONSISTENT WITH REPRESENTATIONS THAT OPENAI HAS MADE TO ME IN A DIFFERENT CASE WITH RESPECT TO A DISPUTE ON THE NAME AGAINST OPEN SPACE AI.

01:50:30 SO YOU SEEM TO SUGGEST THAT THE NAME OPENAI DID NOT REFER TO OPEN SOURCE, AND I WOULD SUGGEST THAT PERHAPS YOU TALK TO QUINN EMANUEL, AND I SUGGEST THAT PERHAPS YOU LOOK AT THE PROSECUTION HISTORY IN FRONT OF THE PTO WITH RESPECT TO THE NAME, AND YOU DO NOT TAKE INCONSISTENT POSITIONS IN FRONT OF

01:50:58 THEM.

01:50:59 **MR. SAVITT:** THANK YOU, YOUR HONOR.

01:51:00 **THE COURT:** ALL RIGHT. OKAY. ANYTHING ELSE THAT YOU
01:51:05 WANT TO BRING UP?

01:51:06 **MS. PATEL:** YOUR HONOR, WE JUST WANTED TO RAISE ONE
01:51:08 THING. EARLIER TODAY THE ISSUE OF THIRD PARTY PII CAME UP, AND
01:51:13 AFTER THINKING ABOUT IT A LITTLE BIT MORE, I DON'T THINK
01:51:16 MICROSOFT HAS ANY BASIS TO OBJECT BECAUSE IT'S NOT OUR
01:51:21 INFORMATION, AND THESE DOCUMENTS WERE NOT PRODUCED BY
01:51:22 MICROSOFT. BUT I DO THINK IT WOULD BE IMPORTANT TO PUT IN
01:51:26 PLACE SOME PROCEDURES TO PROTECT THE THIRD PARTY INFORMATION TO
01:51:28 THE EXTENT POSSIBLE.

01:51:35 **THE COURT:** SO I DON'T KNOW WHERE THESE DOCUMENTS
01:51:37 CAME FROM. I DON'T KNOW IF PEOPLE WERE PUT ON NOTICE. I DON'T
01:51:51 EVEN KNOW IF THEY'RE CURRENT EMAILS.

01:51:53 SO YOU-ALL MEET AND CONFER, AND SEE IF YOU CAN FIGURE THIS
01:51:56 OUT. ALL RIGHT?

01:51:56 **MS. PATEL:** WE WILL DO THAT. THANK YOU, YOUR HONOR.

01:51:57 **MR. SAVITT:** YES.

01:51:58 **MR. KRY:** YOUR HONOR, DID YOU WANT US TO
01:52:00 PROVISIONALLY, WITH THAT ONE EMAIL THEN --

01:52:03 **THE COURT:** I THINK IT WOULD BE HELPFUL IF IT'S A
01:52:05 CURRENT EMAIL.

01:52:06 **MR. KRY:** I'M NOT SURE, BUT WE CAN DO THAT.

01:52:08 **THE COURT:** OKAY. YOU SHOULD PLAN ON MEETING ON

01:52:15 FRIDAY TO TALK ABOUT JURY INSTRUCTIONS. I WILL HAVE -- I
01:52:19 WORKED ON THOSE INSTRUCTIONS LAST WEEK, AND, FRANKLY, FOR MOST
01:52:24 OF THEM I DIDN'T LIKE EITHER SIDE'S INSTRUCTIONS. IT'S NOT
01:52:29 SURPRISING. LAWYERS ON BOTH SIDES TRY TO GET INSTRUCTIONS THAT
01:52:32 BENEFIT THEIR CLIENTS, AND ARE NOT NECESSARILY NEUTRAL.
01:52:36 SO I HAVE DRAFTED, BASED UPON BOTH OF YOUR SUBMISSIONS AND
01:52:42 READING THE OBJECTIONS ON BOTH SIDES, A DIFFERENT SET THAT I
01:52:46 THINK IS MUCH MORE OBJECTIVE AND NEUTRAL FOR THE JURY. I WILL
01:52:50 SHARE THOSE WITH YOU. I'VE GOT QUESTIONS THAT I -- I DON'T
01:52:58 WANT TO GIVE THIS TO YOU PIECEMEAL, BUT THERE ARE SET OF LEGAL
01:53:03 ISSUES THAT I WOULD LIKE PROBABLY SOME SHORT BRIEFING ON, AND I
01:53:05 HOPE TO HAVE THAT TO YOU BEFORE FRIDAY. OKAY?
01:53:12 ANYTHING ELSE?
01:53:14 **MR. MOLO:** NO.
01:53:14 **THE COURT:** MY COMMENT TO ALL OF YOU IS THE SAME AS
01:53:16 THE JURY. DON'T BE CRANKY WITH EACH OTHER. TRIALS TAKE A LOT
01:53:20 OF TIME. YOU WORK VERY LATE. BUT USUALLY AFTER A COUPLE OF
01:53:25 DAYS, WE ALL SETTLE IN AND THINGS MOVE MORE SMOOTHLY. SO WE'LL
01:53:29 STAND IN RECESS UNTIL 8:00 O'CLOCK TOMORROW. THANK YOU.
01:53:32 **MS. PATEL:** THANK YOU, YOUR HONOR.
01:53:33 **MR. KRY:** THANK YOU, YOUR HONOR.
01:53:34 **THE CLERK:** COURT IS IN RECESS.
01:53:36 (COURT ADJOURNED AT 1:53 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.



IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074

DATED: APRIL 28, 2026