# Tasha McCauley All

## Designation List Report



π PLAINTIFF π

United States District Court
Northern District of California

Case No.  **4:24-CV-04722-YGR**

Case Title **Musk et al. v. Altman et al.**

Exhibit No.  **1703**

Date Entered _____

Mark Busby, Clerk

By: _____ , Deputy Clerk

**Mccauley, Tasha**                                    **2025-09-30**

| | |
|---|---|
| Plaintiff Affirmative | 00:27:43 |
| OAI Counters to Musk Aff | 00:22:37 |
| Musk Counters to OAI Counter | 00:00:23 |
| MSFT Counters to Musk Aff | 00:00:59 |
| **TOTAL RUN TIME** | **00:51:41** |

Documents linked to video:

319



**ID: DL4**

2026-05-07

**DL4 - Tasha McCauley All**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 10:03 - 10:04 | **Mccauley, Tasha 2025-09-30** | 00:00:03 | **DL4.1** |

10:03    Please state your full name for the record.

10:04    THE WITNESS:  My name is Tasha McCauley.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 16:13 - 16:21 | **Mccauley, Tasha 2025-09-30** | 00:00:21 | **DL4.2** |

16:13    Q.  Did you previously work at an organization

16:14    called Effective Ventures?

16:15    A.  I had a board position there.

16:16    Q.  Okay.

16:17    And what does Effective Ventures do?

16:18    A.  It was an organization that oversaw a number of

16:19    other organizations working across a variety of cause

16:20    areas, some of which were AI related, some of which were

16:21    focused on AI.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 18:06 - 18:12 | **Mccauley, Tasha 2025-09-30** | 00:00:18 | **DL4.3** |

18:06    Q.  Other than Effective Ventures, have you ever

18:07    been associated with an organization --

18:08    (Stenographer clarification.)

18:09    Q.  (By Mr. Hawes)  -- that has advocated views on

18:10    AI safety?

18:11    A.  Yes.  The Center for AI Governance is another

18:12    organization that I have a board position on.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 20:13 - 20:15 | **Mccauley, Tasha 2025-09-30** | 00:00:07 | **DL4.4** |

20:13    Q.  (By Mr. Hawes)  Just to back up, when did you

20:14    first join OpenAI?

20:15    A.  I joined in November of 2018.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 42:10 - 42:22 | **Mccauley, Tasha 2025-09-30** | 00:01:06 | **DL4.5** |

42:10    During your time on the board, did OpenAI have

42:11    a conflict of interest policy?

42:12    A.  Yes, I -- there was a -- well, certainly a

42:13    company conflict of interest policy, and there was a

42:14    conflict of interest policy that I -- I want to be

42:15    careful not to speculate here, because I don't remember

42:16    what the requirement of that policy stated in terms of

42:17    kind of, like, frequency of disclosure and stuff like

42:18    that.

42:19    So, but I will say -- I will say I think that I

42:20    was -- I and other independent board members were

42:21    interested in having, like, a more robust process for

42:22    conflict disclosures, yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 46:07 - 46:18 | **Mccauley, Tasha 2025-09-30** | 00:00:35 | **DL4.6** |

Q. And you mentioned that you were trying to implement a more robust process.

A. We were --

Q. Why were you trying to do that?

A. I think -- I think -- well, the fact that we didn't have a comprehensive process in place made us concerned that we might miss important external activities that might have been useful for the board to know about. And I think, in particular, I do remember some conversations with the independent board members where we had those concerns about -- about Sam in particular.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 46:19 - 46:25 | **Mccauley, Tasha 2025-09-30** | 00:00:35 | **DL4.164** |

Q. What were your concerns about Sam in particular?

A. I think it was -- it was unclear to us whether he might have, you know, either -- either investments or activities that he might have been gaining from without the board knowing that -- that could have impacted his -- his consideration as a board member of OpenAI.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 49:11 - 49:11 | **Mccauley, Tasha 2025-09-30** | 00:00:02 | **DL4.7** |

What were those concerns?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 50:16 - 50:22 | **Mccauley, Tasha 2025-09-30** | 00:00:42 | **DL4.8** |

We had some concerns around Sam's ownership of OpenAI fund; and I think, in particular, you know, concern that this wasn't disclosed to the board and concern for what this might mean for, you know, the company, for investors in OpenAI, for -- sorry. OpenAI startup fund -- apologies -- to be specific about what fund.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 53:06 - 53:08 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.10** |

And what was your understanding of the specific concerns that Mr. D'Angelo had regarding Mr. Altman's interests in the OpenAI Startup Fund.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 53:13 - 53:20 | **Mccauley, Tasha 2025-09-30** | 00:00:31 | **DL4.11** |

A. I think the specific concern was that the activity of the fund -- well, for one, that we didn't know that Sam owned the fund was, you know, concerning.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

I think the activities of the fund -- you know,
I want to make sure I'm recalling accurately enough that
I would say that perhaps that, you know, any activities
of the fund were working against the interest of OpenAI
investors.  For example --

| 53:22 - 53:25 | **Mccauley, Tasha 2025-09-30** | 00:00:11 | **DL4.12** |
|---|---|---|---|

THE WITNESS:  -- any employee time that might
have been being spent on the -- the fund; in particular,
if employees were getting, you know, equity from the
fund in addition -- you know, for -- if they were taking

| 54:01 - 54:17 | **Mccauley, Tasha 2025-09-30** | 00:01:09 | **DL4.13** |
|---|---|---|---|

time away from -- from working on OpenAI, there was a
question of whether OpenAI shareholders should -- should
benefit from employee time being -- I believe, you know,
if I'm recalling the discussions correctly, it was
discussions of that nature.
Also corporate opportunity questions of
whether, sort of, products that -- or features that were
being offered to -- to startup fund participants,
startup fund companies, maybe before -- before general
releases that may have given them an advantage that --
I'm -- I apologize.  I'm just trying to remember
accurately what some of the discussions were.
I think it was really just questions of whether
the fund was benefiting Sam, whether the fund was
sufficiently -- it was, you know, taking away from
potential returns for -- for OpenAI investors.  That was
the primary gist of it.

| 56:02 - 56:07 | **Mccauley, Tasha 2025-09-30** | 00:00:25 | **DL4.73** |
|---|---|---|---|

To your knowledge, did OpenAI provide products
to companies in which the OpenAI Startup Fund had
invested on a prioritized basis?
A.  I -- I remember discussion of that concern.  I
do not recall specific -- specifically whether or not
that happened.

| 59:12 - 59:18 | **Mccauley, Tasha 2025-09-30** | 00:00:11 | **DL4.14** |
|---|---|---|---|

Q.  Did the board, in fact, fire Mr. Altman from
his position as board member and CEO of OpenAI, Inc.,?
on November 16th, 2023?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

59:15  A.  Yes.

59:16  Q.  Were you one of the board members who voted to

59:17      remove Mr. Altman?

59:18  A.  I was.

| 65:16 - 65:22 | **Mccauley, Tasha 2025-09-30** | 00:00:23 | **DL4.74** |

Is it accurate that the board had been

deadlocked over which AI safety expert to add?

A.  Yes.  Yeah.

Q.  Which AI safety expert did you favor hiring?

A.  Well, I think I had, you know, positive views

on a couple of them and, you know, there were pros and

cons to each.

| 68:05 - 68:07 | **Mccauley, Tasha 2025-09-30** | 00:00:09 | **DL4.15** |

Q.  Was it your understanding that notwithstanding

the statements he would make, Mr. Altman, in truth,

opposed the AI safety candidates?

| 68:09 - 68:18 | **Mccauley, Tasha 2025-09-30** | 00:00:51 | **DL4.16** |

THE WITNESS:  You know, I -- I think -- I think

a concern that I had was that -- and I think a concern

that was spoken amongst, you know, the independent board

members at the time was that we were worried that Sam

didn't want to lose control of the board.

So I think -- I don't know about whether it was

specifically about an AI safety board member or not.  I

think it was more a question of whoever we brought on,

whether they were going to be favorable to, kind of,

Sam's wishes or -- or not.

| 69:22 - 69:25 | **Mccauley, Tasha 2025-09-30** | 00:00:15 | **DL4.17** |

Q.  Was Mr. Altman's handling of this situation one

of the factors you considered in dismissing him?

A.  Yes.  I would say we were -- we were --

speaking for myself, I was concerned, very concerned,

| 70:01 - 70:04 | **Mccauley, Tasha 2025-09-30** | 00:00:10 | **DL4.78** |

that the premise of the board, we -- that the design of

the structure and the way the board was intended to be

set up was that the board was -- had a majority of

disinterested members.

| 80:01 - 80:11 | **Mccauley, Tasha 2025-09-30** | 00:00:36 | **DL4.20** |

Would the release of unapproved models by

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

80:02 OpenAI present an AI safety risk?

80:03 A. Yes, it potentially could. You know, I think,

80:04 as I said before, we didn't know of any specific --

80:05 specific risks with these particular models, but

80:06 there's absolutely the risk that models can -- can

80:07 contain -- you know, that models can present risks; that

80:08 they can have unintended consequences, so for that

80:09 reason, having these processes in place was -- was very

80:10 crucial in the eyes of, you know, the board; at least

80:11 myself, I'll say.

| 83:21 - 83:24 | **Mccauley, Tasha 2025-09-30** | 00:00:12 | **DL4.22** |
|---|---|---|---|

83:21 Q. And at some point, did you learn that

83:22 Mr. Altman had attributed the statement to you that

83:23 Ms. Toner should obviously leave the board?

83:24 A. Yes.

| 84:10 - 84:20 | **Mccauley, Tasha 2025-09-30** | 00:00:44 | **DL4.23** |
|---|---|---|---|

84:10 Q. How did you react upon hearing about that?

84:11 A. I was very displeased. This was absolutely not

84:12 reflective of something I said or thought in any way. I

84:13 think Helen was a -- a good independent board member. I

84:14 don't think -- I think Sam didn't -- well, I won't

84:15 speculate, but I was very displeased and very concerned.

84:16 I believe I called -- I called some other board

84:17 members. I called Adam, I called Helen, and we

84:18 discussed the fact that there was an untrue thing being

84:19 said, it seemed with the intention of -- of pushing

84:20 Helen off the board.

| 84:21 - 84:23 | **Mccauley, Tasha 2025-09-30** | 00:00:05 | **DL4.24** |
|---|---|---|---|

84:21 Q. And was Mr. Altman's handling of that situation

84:22 one of the factors you considered in dismissing him?

84:23 A. Yes.

| 85:17 - 86:21 | **Mccauley, Tasha 2025-09-30** | 00:01:50 | **DL4.25** |
|---|---|---|---|

85:17 Q. What did Mr. Sutskever's e-mail about

85:18 Mr. Altman contain?

85:19 A. It contained a number of examples of what he

85:20 considered dishonest behavior or problematic behavior; I

85:21 would say some of the concerns we were considering. So

85:22 there were -- maybe I'll just back out to say there was

85:23 a few buckets of concerns.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

There was concern about sort of our ability to oversee -- you know, properly oversee the company and whether there was sort of resistance to oversight. There were -- there were concerns about, you know, lies, honesty, you know. There were concerns about, you know, the senior leaders and what they -- what we were hearing that they were perceiving as kind of a lot of chaos, a lot of what they -- I think what, perhaps, Mira described as kind of repeated crisis events. I think maybe what she said was, like, every few months or something like that, they were kind of having these crisis events and that it was mostly stemming from Sam's behavior. So -- so the e-mail that -- that Ilya sent included a very lengthy -- well, you know, lengthy document -- I don't recall exactly how long it was, but dozens of pages of examples of different chaotic events that had occurred from -- from Sam's behavior or lies he had told.

Q. And the conduct you just described, the problematic behavior, the lies and the crisis events, those were attributed to Mr. Altman's behavior?

A. Yes. Yes.

| 88:02 - 88:05 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.26** |

Q. As an OpenAI board member, was it important to you that models, products like GPT Turbo, be approved by the joint safety board?

A. Yes.

| 88:09 - 88:12 | **Mccauley, Tasha 2025-09-30** | 00:00:11 | **DL4.27** |

Q. Did Mr. Altman's misstatement about whether the company's legal department had told him that GPT-4 Turbo didn't need to go through the joint safety board, did that cause you concerns?

| 88:14 - 88:15 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.28** |

THE WITNESS: It did definitely cause me concerns, yes.

| 89:02 - 89:05 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.29** |

Was your understanding of Mr. Altman's handling of the GPT-4 Turbo situation one of the factors you

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 89:04   considered in dismissing him? | | |
| | 89:05   A.   Yes. | | |
| 89:07 - 89:08 | **Mccauley, Tasha 2025-09-30** | 00:00:05 | **DL4.30** |
| | 89:07   did Mr. Altman engage in any other conduct that | | |
| | 89:08   contributed to your decision to dismiss him? | | |
| 89:12 - 90:11 | **Mccauley, Tasha 2025-09-30** | 00:01:29 | **DL4.32** |
| | 89:12   I think there were, you | | |
| | 89:13   know, in the course of being on the board, you know, | | |
| | 89:14   many -- many smaller interactions that gave me real -- | | |
| | 89:15   real doubt as to whether I could trust what the CEO was | | |
| | 89:16   telling us, and I know that in my discussions with other | | |
| | 89:17   board members, they had the same kind of concerns. | | |
| | 89:18   Employees from inside the company were, over | | |
| | 89:19   the course of, you know, years had surfaced similar | | |
| | 89:20   concerns that -- that Sam's -- that a pattern of | | |
| | 89:21   dishonesty was a very difficult component of -- of Sam's | | |
| | 89:22   leadership. | | |
| | 89:23   And, you know, when I think about some of the | | |
| | 89:24   other things that I was hearing from the senior leaders, | | |
| | 89:25   you know, right in the immediate, you know, weeks | | |
| | 90:01   preceding Sam's firing, you know, descriptions of what | | |
| | 90:02   was, you know, kind of a -- a toxic culture from lying | | |
| | 90:03   and this kind of thing, that was leading to these -- | | |
| | 90:04   these kinds of crisis events. | | |
| | 90:05   Or another concern that I had was -- was, you | | |
| | 90:06   know, because of this pattern of lying, that a lot of | | |
| | 90:07   people in the company, you know -- as was being reported | | |
| | 90:08   to me, people in the company were copying that behavior, | | |
| | 90:09   and there was kind of a culture of lying and a culture | | |
| | 90:10   of, you know, yeah, deceit.  And I think for us, as a | | |
| | 90:11   board, this -- this was just extremely concerning. | | |
| 90:12 - 91:07 | **Mccauley, Tasha 2025-09-30** | 00:01:05 | **DL4.33** |
| | 90:12   I mean, again, I think this is concerning in | | |
| | 90:13   any company, any regular for-profit company; that's just | | |
| | 90:14   extremely concerning behavior.  But in particular for | | |
| | 90:15   this company, because we were a non-profit board and our | | |
| | 90:16   mandate was to be able to effectively oversee the | | |
| | 90:17   company -- a for-profit company that was underneath us, | | |
| | 90:18   and our primary way of doing that was very much being | | |
| | 90:19   called into question, because we weren't -- we did not | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

have a high degree of confidence at all that we would be able to trust that the information being conveyed to us was sufficient to let us make decisions in an informed way and -- and that -- that's, you know, very fundamental to -- to the reasoning we had. I think I had mentioned before, you know, we knew that stakes were going to get a lot higher going forward. Stakes were, as they were at the time, which was, you know, reasonably high as it was, but when we thought about being able to oversee the kinds of complex decisions that would be presented to us years down the line, it became very, very concerning to us that we would be able to.

| 96:13 - 96:15 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.34** |

was the expectation at OpenAI that Mr. Altman was going to receive a significant equity stake in the company?

| 96:18 - 96:22 | **Mccauley, Tasha 2025-09-30** | 00:00:15 | **DL4.35** |

A. There had been -- the time that I was on the board, there were discussions in both directions and discussions that he was not going to take equity and later discussions that he was eventually going to take equity, I think, so --

| 96:23 - 97:11 | **Mccauley, Tasha 2025-09-30** | 00:01:00 | **DL4.36** |

Q. When were the discussions that he was eventually going to take equity?

A. The first such discussion that I recall -- I can't say with certainty when it was, but I want to say -- I'm -- I'm going to broadly say, you know, possibly sometime in 2021 or something. I don't know -- I don't know specifically.

Q. And who was involved in those discussions?

A. I had a discussion with Sam, I think, where I cited a previous conversation we had had where he said that he did not -- that he -- what I recall, that he had said that he wasn't planning to take equity in the company and citing that, he corrected me that he did plan to take equity at some point.

| 97:12 - 97:17 | **Mccauley, Tasha 2025-09-30** | 00:00:19 | **DL4.79** |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 97:12 Q. And so in 2021, Mr. Altman communicated to you | | **DL4.79** |
| | 97:13 that he planned to take equity at some point. What | | |
| | 97:14 specifically did he say? | | |
| | 97:15 A. There weren't specifics provided then. He | | |
| | 97:16 didn't -- he didn't say a specific plan or a specific | | |
| | 97:17 time frame or a specific amount at that time. | | |
| 97:18 - 97:21 | **Mccauley, Tasha 2025-09-30** | 00:00:10 | **DL4.171** |
| | 97:18 Q. Were there any other discussions with | | |
| | 97:19 Mr. Altman where he communicated to you that he planned | | |
| | 97:20 to eventually take equity? | | |
| | 97:21 A. I don't recall. | | |
| 100:03 - 101:04 | **Mccauley, Tasha 2025-09-30** | 00:02:11 | **DL4.37** |
| | 100:03 After the board announced that it was firing | | |
| | 100:04 Mr. Altman on Friday, November 17th, what happened next? | | |
| | 100:05 A. It's hard to summarize the following five days, | | |
| | 100:06 but I'll say what happened next was we immediately began | | |
| | 100:07 working with Mira on the transition. She communicated, | | |
| | 100:08 I think, right away -- actually, I believe, if I recall | | |
| | 100:09 correctly, you know, before the actual moment where we | | |
| | 100:10 told Sam; again, communicating with Microsoft, you know, | | |
| | 100:11 sort of managing the different effects from the | | |
| | 100:12 announcement of the transition. | | |
| | 100:13 Apologies. | | |
| | 100:14 And I -- in the first number of hours following | | |
| | 100:15 the announcement, actually by her reports -- reporting | | |
| | 100:16 to us, things seemed to be going quite well and the | | |
| | 100:17 transition from her perspective, I think, was happening | | |
| | 100:18 in a -- in a pretty smooth way. | | |
| | 100:19 Later, things started to change. Mira got in | | |
| | 100:20 touch with us and said that there was some tension | | |
| | 100:21 happening because -- by her -- by the way she said it to | | |
| | 100:22 us was that Sam and Ilya are calling everybody saying | | |
| | 100:23 that there's been an evil coup by -- or a coup by | | |
| | 100:24 Ilya -- I think later described, maybe, as an evil coup; | | |
| | 100:25 I'm not sure -- and that this sparked a bunch of fear | | |
| | 101:01 and -- and upset in the company, you know, so I think | | |
| | 101:02 the fallout from that was something we had to contend | | |
| | 101:03 with for the next period of time, and that was -- that | | |
| | 101:04 was definitely destabilizing to the process. | | |
| 101:06 - 101:19 | **Mccauley, Tasha 2025-09-30** | 00:00:43 | **DL4.80** |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

101:06 You mentioned that you were communicating with
101:07 Microsoft.  Who were you communicating with at
101:08 Microsoft?
101:09 A. Mira was communicating directly with Microsoft.
101:10 I don't recall offhand who was on the initial call that
101:11 she had that day, but she was, you know, frequently in
101:12 touch with Microsoft and was -- was kind of the
101:13 administrator of that -- of that communication and -- on
101:14 behalf of the board --
101:15 (Stenographer clarification.)
101:16 THE WITNESS:  -- during that process.
101:17 Q. (By Mr. Hawes)  Were you personally
101:18 communicating with anyone from Microsoft?
101:19 A. Not on -- not at that time.  Not on that day.

**DL4.80**

| 101:20 - 101:24 | **Mccauley, Tasha 2025-09-30** | 00:00:10 | **DL4.38** |

101:20 Q. Did you later communicate with anyone from
101:21 Microsoft?
101:22 A. Satya -- Satya spoke with us at a later point.
101:23 Q. And who is Satya?
101:24 A. Satya Nadella, the CEO of Microsoft.

| 102:13 - 102:17 | **Mccauley, Tasha 2025-09-30** | 00:00:25 | **DL4.81** |

102:13 Q. And you mentioned that "He spoke with us."  Who
102:14 are you referring to when you say "us"?
102:15 A. It was, by the best of my recollection,
102:16 myself, Adam, Helen -- Adam D'Angelo, Helen Toner, and
102:17 Ilya Sutskever.

| 102:18 - 103:01 | **Mccauley, Tasha 2025-09-30** | 00:00:30 | **DL4.166** |

102:18 Q. How often did you and those other directors
102:19 speak with Mr. Nadella over the next few days after
102:20 Mr. Altman's firing?
102:21 A. That's the only conversation that I recall
102:22 participating in.  I believe it's -- I don't want to
102:23 speculate.  I think it's possible other directors may
102:24 have spoken to him further, but I didn't that I recall;
102:25 or at least I don't recall having any further
103:01 conversations with Satya.

| 103:02 - 103:13 | **Mccauley, Tasha 2025-09-30** | 00:00:42 | **DL4.39** |

103:02 Q. So in that one conversation that you remember
103:03 on the Sunday following Mr. Altman's dismissal --

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

103:04  A.  Um-hum.

103:05  Q.  -- what do you recall being discussed?

103:06  A.  I recall -- to the best of my recollection, Satya wanted to restore things to as they had been.  I think he was asking if -- if we would consider reinstating Sam.  You know, I don't remember the specific words.  I remember that being kind of the -- the basic objective of the conversation, I think, and we did not agree that that was the right step for us to take.

| 121:24 - 122:01 | **Mccauley, Tasha 2025-09-30** | 00:00:05 | **DL4.84** |

121:24  Q.  (By Mr. Hawes)  Did the board ultimately decide to reinstate Mr. Altman?

122:01  A.  The board did, yeah.

| 122:04 - 122:08 | **Mccauley, Tasha 2025-09-30** | 00:00:13 | **DL4.157** |

122:04  Q.  What was your role in that decision?

122:05  A.  I was one of the board members who was involved in the -- the many, many, many discussions over the course of the following days, the days following the firing.

| 123:04 - 124:22 | **Mccauley, Tasha 2025-09-30** | 00:02:49 | **DL4.86** |

123:04  Q.  (By Mr. Hawes)  After Mr. Altman was reinstated, did you resign from the board?

123:06  A.  I did, yes.

123:07  Q.  Why did you resign?

123:08  A.  Well, a piece of what happened in the aftermath of the firing, I think an important piece, is -- first of all, I think there was confusion about what was -- what was going on; and there was also, you know, a tender offer out to the employees.  So this combination of things, I think, made it very difficult for the employees to -- and also, we -- we felt that we couldn't -- we weren't -- we didn't really have an effective mechanism to accurately convey the set of things that had motivated us as a board for a number of reasons.  And so the -- the employees of the company, I think, had -- didn't have confidence in keeping the board as it was; so we made the decision to restructure the board and, as I said before, keep one of the existing members going forward and bring on a couple of

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

additional members.
I think the decision and -- and some of the
stipulations we had in making that decision were that
Sam would not be on this restructured board; that there
would be a very thorough independent investigation to
look into some of the behaviors and, you know, to -- I
think the whole process, but from our perspective in
particular, some of the behaviors that we were concerned
with.
We also had discussed a few different
governance mechanisms that we thought would be important
to carry forward and discussed those with the board
members that were going to be on the newly composed
board.
So with those different mechanisms, we felt
that we reached an agreeable point where we felt that
there was a chance for a thorough investigation, some
new oversight mechanisms, you know, some board members
who, you know, we had at least, you know, I think,
some -- some hope that -- that they could provide
sufficient corporate governance.
And -- and I think the alternative that we were
seeing where, you know, if there was significant
destabilization or a breaking of the company, we did not
feel would best serve OpenAI's mission.

| 129:17 - 129:25 | **Mccauley, Tasha 2025-09-30** | 00:00:26 | **DL4.44** |

Q. What experience led you to believe that
self-governance cannot reliably withstand the pressure
of profit incentives?
A. The experience we had at OpenAI -- I think part
of the way I described it toward the beginning, which
is -- I think the reason we were optimistic is because
the company was oriented in a very public way around its
mission, and it had created a structure that would allow
the empowerment of that mission, even in the face of

| 130:01 - 130:12 | **Mccauley, Tasha 2025-09-30** | 00:01:08 | **DL4.45** |

extreme pressure from investors, for example.
But the piece that would make that work
correctly was really, you know, the leadership and the
leadership's willingness to allow the board the proper

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

oversight, allow the board to make decisions that were informed. And because we didn't have that piece, we were not able to really make that innovative structure work at OpenAI. That's not to say that it's impossible for a self-governance structure to work. What we were saying here is, it can't reliably -- this can't be the primary mechanism by which AI governance happens.

| 130:14 - 130:25 | **Mccauley, Tasha 2025-09-30** | 00:00:46 | **DL4.46** |
|---|---|---|---|

THE WITNESS: Basically, that we need good regulatory frameworks to support the responsible development of AI, because if we're relying on private companies to consider the interests of the public, they can't be ultimately responsible for doing that because of the potential for these internal misalignments that come from -- the situation I've described, that come from interests that are at odds with one another. And it all comes down to kind of one CEO making those decisions, and we have the public good at stake. That's very sub-optimal, so -- so that's what this was saying.

| 131:16 - 131:25 | **Mccauley, Tasha 2025-09-30** | 00:00:29 | **DL4.47** |
|---|---|---|---|

Q. In your time on the board, what profit incentives did OpenAI experience?

A. Well, the company was developing -- you know, was commercializing a number of products in the time that I was there, so it stood to make money on those products, and those are the profit incentives I'm talking about. I'm also talking about profit incentives for -- for investors who had invested in the company -- well, let me just make sure I see the wording exactly.

| 132:11 - 132:12 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.48** |
|---|---|---|---|

Q. Was OpenAI able to withstand those profit incentives effectively?

| 132:14 - 132:20 | **Mccauley, Tasha 2025-09-30** | 00:00:26 | **DL4.49** |
|---|---|---|---|

THE WITNESS: In my experience -- I mean, this is at the heart of the issue we're talking about. In my experience, we were concerned that, you know, decisions

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

were being made that we didn't see as prioritizing the
mission that the company was oriented around.  And in
our experience, that seemed to have potentially been
motivated by profit interests.

| 133:15 - 133:25 | **Mccauley, Tasha 2025-09-30** | 00:00:35 | **DL4.50** |

What did not work about the for-profit
subsidiary structure?
A.   I think what I described before about -- I do
think the -- the reason I say that we went in cautiously
optimistic about the structure itself -- I mean, the
structure was being conceived of when I joined the
company.  As I said, I joined when it was still a
non-profit, so I was there -- came in kind of like right
before it -- it transitioned.
And I think, structurally, we were optimistic.
I was optimistic upon coming in and Helen, as she said

| 134:01 - 134:13 | **Mccauley, Tasha 2025-09-30** | 00:00:43 | **DL4.51** |

in this article as well, that that structure would lend
itself a good chance of self-governance if we were
achieving the necessary leadership buy-in.
And that's the piece that I think didn't work
about this.  I think the piece that didn't work was that
we did not have confidence that we could properly
oversee as -- as was mandated for us.  Our -- one of
our, you know, primary duties as board members was to
oversee the activities of the non-profit and ensure that
the activities were happening in accordance with the
non-profit's mission.  Since we determined that we
couldn't rely on information we were receiving, we
didn't think we could do that.

| 135:22 - 135:23 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.52** |

Q.   And in your opinion, did OpenAI fail to stick
to its original mission?

| 135:25 - 136:02 | **Mccauley, Tasha 2025-09-30** | 00:00:14 | **DL4.53** |

THE WITNESS:  I -- I think, in my opinion, I
saw a number of instances that I would characterize as
not prioritizing the mission.

| 136:06 - 136:17 | **Mccauley, Tasha 2025-09-30** | 00:00:53 | **DL4.54** |

Q.   -- are you saying that OpenAI failed to stick

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

to its mission?

A. I think the structure that was put in place wasn't sufficient to -- well, I would say the -- the combination of the structure and the behavior of -- of the company's CEO, Sam, resulted in a number of instances that I think I would characterize, as I said before, the mission was not being prioritized. And we had concern that that would continue to happen, and we had very great concern that as stakes got a lot higher, that would be potentially against the interest of -- of the public.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 141:20 - 142:02 | **Mccauley, Tasha 2025-09-30** | 00:00:21 | **DL4.55** |

Q. In your view, was OpenAI facing immense profit incentives?

A. Yes. I think OpenAI had the potential to be extremely profitable in the longer term.

Q. And do you think those profit incentives risk compromising OpenAI's ability to carry out its mission of developing safe AI?

A. I do --

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 142:05 - 142:19 | **Mccauley, Tasha 2025-09-30** | 00:00:51 | **DL4.56** |

THE WITNESS: I think that -- I think that those profit incentives make it necessary that there is -- there are checks and balances on how the decisions are being made. If -- if, you know, the company is going to talk about itself as a mission-oriented company with an independent board over it, if it's presenting itself that way, then -- then, absolutely, it needs to be able to show that it can actually provide the structure needed to -- to work against the profit incentives.

You know, if it were a purely for-profit company, you know, it's kind of a different question. The mandate we had was this particular structure made it so that we needed to be able to make informed decisions, and we didn't feel we could.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 152:01 - 152:05 | **Mccauley, Tasha 2025-09-30** | 00:00:15 | **DL4.88** |

You and counsel spoke a little bit earlier today about the article that Ms. Toner published in connection with her service on OpenAI which was the

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

152:04    source of that controversy.
152:05    Do you recall that discussion with counsel?

| 152:14 - 152:16 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.91** |

152:14  Q.  The article that Ms. Toner published in
152:15    late 2023.
152:16  A.  Oh, the -- the paper.

| 152:18 - 152:18 | **Mccauley, Tasha 2025-09-30** | 00:00:01 | **DL4.167** |

152:18    THE WITNESS:  It's kind of an academic paper.

| 153:13 - 153:24 | **Mccauley, Tasha 2025-09-30** | 00:00:36 | **DL4.92** |

153:13  Q.  Was it your impression that it compared
153:14    Anthropic favorably relative to OpenAI?
153:15  A.  I -- I do remember thinking that it was, you
153:16    know, kind of judging Anthropic's work more favorably
153:17    than OpenAI's.
153:18  Q.  In your various board service, on the six
153:19    boards that you've served on, do you ever recall a
153:20    member of -- of the board, a colleague of yours on the
153:21    board, publishing material that favorably compared a
153:22    competitor of the organization with the organization
153:23    itself?
153:24  A.  I don't.

| 212:20 - 213:01 | **Mccauley, Tasha 2025-09-30** | 00:00:19 | **DL4.95** |

212:20    and -- you and Ms. Toner and Mr. Sutskever and
212:21    Mr. D'Angelo informed Altman via video call that he was
212:22    off the board and fired on November 17th; right?
212:23  A.  Yes.
212:24  Q.  Before that, you had taken legal steps to
212:25    remove him from the board; right?
213:01  A.  Right.

| 214:05 - 214:07 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.96** |

214:05  Q.  And after you had the video call with Altman,
214:06    you had a video call with Brockman.
214:07  A.  That's right.

| 215:15 - 215:18 | **Mccauley, Tasha 2025-09-30** | 00:00:15 | **DL4.97** |

215:15  Q.  (By Mr. Savitt)  All in, the Altman call was
215:16    about how long?
215:17  A.  I want to say relatively brief, under -- on the
215:18    order of ten minutes.  I'm not totally sure.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 215:20 - 216:01 | **Mccauley, Tasha 2025-09-30** | 00:00:12 | **DL4.98** |

And all in, the Brockman call was about how long?
A. Shorter than that, I think.
Q. Shorter?
A. I believe so.
Q. And did they happen one directly after another?
A. Pretty closely, yes.

| 217:04 - 217:06 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.99** |

Q. Altman had been provided no advance notice of this decision.
A. That's right.

| 225:23 - 225:24 | **Mccauley, Tasha 2025-09-30** | 00:00:05 | **DL4.101** |

Other than Ms. Murati and Mr. -- or Dr. Sutskever,...

| 226:01 - 226:14 | **Mccauley, Tasha 2025-09-30** | 00:01:02 | **DL4.159** |

Q. -- does -- did the three independent directors consult with any other OpenAI officers or employees while in the midst of this deliberative process?
A. So there were discussions about concerns that other senior leaders had expressed to -- I believe, to the best of my recollection, you know, Mira and -- and Ilya.
And there was a discussion about whether it would make sense to involve any other people in the leadership team who may have been expressing similar kinds of concerns to the ones that Ilya was expressing, to the ones that Mira was expressing.
But we ultimately determined that the risk of doing that may --

| 226:16 - 226:20 | **Mccauley, Tasha 2025-09-30** | 00:00:19 | **DL4.160** |

THE WITNESS: -- that it might be risky to reach out to other members of the leadership team, because if we were to undertake a decision like this, you know, our concern was that Sam, you know, would -- would very actively counteract it, so --

| 227:07 - 227:08 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.161** |

Q. And did you speak with Jason Kwon?
A. No.

**DL4 - Tasha McCauley All**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 227:12 - 227:18 | Mccauley, Tasha 2025-09-30 | 00:00:22 | **DL4.162** |

227:12  Q.  Did the independent directors during this
227:13      process speak with Brad Lightcap?
227:14  A.  We did not.  We didn't -- we made a decision
227:15      that involving other members of the leadership team in
227:16      particular -- well, that in speaking with other members
227:17      of the leadership team would have greatly increased the
227:18      chance that Sam was going to counteract the decision.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 227:21 - 227:25 | Mccauley, Tasha 2025-09-30 | 00:00:07 | **DL4.163** |

227:21  Q.  And you didn't speak with Mr. Altman, of
227:22      course, for the same reason; correct?
227:23  A.  Correct.
227:24  Q.  And you didn't speak with Brockman.
227:25  A.  Correct.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 230:11 - 230:13 | Mccauley, Tasha 2025-09-30 | 00:00:05 | **DL4.102** |

230:11  Q.  You guys didn't bother to talk to the employees
230:12      either before you made this decision.
230:13  A.  For the same reasons.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 238:25 - 239:04 | Mccauley, Tasha 2025-09-30 | 00:00:11 | **DL4.103** |

238:25      The board didn't give any
239:01      notice to any stakeholder before it terminated Altman;
239:02      correct?
239:03  A.  I did not feel that it could, and it did not.
239:04      Yeah.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 239:08 - 239:09 | Mccauley, Tasha 2025-09-30 | 00:00:04 | **DL4.104** |
| 🔗 319.1 | | | |

239:08  Q.  If I could ask you to look at Exhibit 8.
239:09  A.  Yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 239:20 - 239:25 | Mccauley, Tasha 2025-09-30 | 00:00:26 | **DL4.105** |

239:20  Q.  (By Mr. Savitt)  Did you participate in the
239:21      drafting of this -- of this draft Slack message?
239:22  A.  We had quite a lot of discussion about what to
239:23      say to the company.  We just -- let me just look at
239:24      this, like, exact -- yeah.  I mean, this is very
239:25      consistent with what I remember talking about.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 240:01 - 240:03 | Mccauley, Tasha 2025-09-30 | 00:00:05 | **DL4.172** |

240:01  Q.  I think my question, Ms. McCauley, was whether
240:02      you participated in the preparation of this draft.
240:03  A.  Yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 240:07 - 241:16 | **Mccauley, Tasha 2025-09-30** | 00:01:07 | **DL4.106** |

240:07    Was this message sent, do you know, one way or
240:08    the other?
240:09  A.  As I said before, this is -- this is consistent
240:10    with the -- what we talked about in terms of sharing
240:11    something to the Slack channel.  I wasn't on that public
240:12    Slack channel, and I believe, if I remember correctly,
240:13    Ilya sent it to the Slack channel.
240:14    So a message was sent.  I believe it was this
240:15    one.  I can't confirm for sure.
240:16  Q.  And it was sent on behalf of the --
240:17  A.  The board.
240:18  Q.  -- of the board?
240:19  A.  Yeah.  I mean -- exactly.  Yeah.
240:20  Q.  Let me direct your attention, if I might, to
240:21    the paragraph right before, "Why did the board act this
240:22    way?"
240:23    Do you see that?
240:24    The one beginning -- beginning with the

🔗 319.1.3
240:25    sentence, "We want to be abundantly clear."
241:01  A.  Yes.
241:02  Q.  That paragraph reads, "We want to be abundantly
241:03    clear, we believe in OpenAI, its people, and its
241:04    products."
241:05    Do you see that?
241:06  A.  Yes, I do.
241:07  Q.  And that reflected your and your fellow
241:08    directors' view at the time; correct?
241:09  A.  Um-hum.

🔗 319.1.4
241:10  Q.  Then it goes on to say, "This decision is not
241:11    about product safety or security, the pace of
241:12    development, or OpenAI's -- OpenAI's finances."
241:13    Do you see that?
241:14  A.  I do.
241:15  Q.  And that also reflected you and your fellow
241:16    directors' view at the time; correct?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 241:23 - 242:01 | **Mccauley, Tasha 2025-09-30** | 00:00:09 | **DL4.107** |

🔗 319.1
241:23  Q.  You wouldn't -- you wouldn't have participated
241:24    in a drafting of this and had it sent to the
241:25    organization if it didn't reflect your view; fair

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

242:01    enough?

| 242:03 - 242:20 | **Mccauley, Tasha 2025-09-30** | 00:01:05 | **DL4.108** |

242:03    THE WITNESS:  It reflects -- it reflects a fair
summary.  The one piece that I'll elaborate on is about
product safety.  I think what we were conveying there is
that we weren't concerned that any product had been
unsafely released in particular, as I said earlier.
The -- we did have concerns about processes not
being respected that would have ensured that all
products above a certain threshold were safely released
into the future, but the decision wasn't about the
safety of any of the products that were, you know, being
deployed at the time.

Q.  (By Mr. Savitt)  So -- and I do want to discuss
with you those concerns, but I suppose I want to know
whether you stand behind or -- whether you stand behind
the announcement on the 20th of November that the
decision to fire Altman was not about product safety or
security or the pace of development or OpenAI's
finances?  Yes or no?

✗ Clear

| 242:22 - 243:15 | **Mccauley, Tasha 2025-09-30** | 00:01:04 | **DL4.109** |

242:22    THE WITNESS:  I think, as I -- as I said
before, if -- if the -- what we intended to say with
this was that there wasn't a particular -- there weren't
any products that we felt were unsafe.  We did have
concerns about process around product release and
whether those processes were being respected; and that
was, you know, very much a part of our -- our
consideration.
But if the question is about the safety of a
product, I think this is accurate to say.  I think
because -- especially because there was speculation at
the time that there was a product or something being
considered that was potentially unsafe, and so our
intention was to say it's not that we learned about some
unsafe product and this was a result of -- of learning
about that.
So the nuance I'm providing is to say we did
have concerns about processes for safely deploying
products, but it wasn't about a product being unsafe.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 248:13 - 248:18 | **Mccauley, Tasha 2025-09-30** | 00:00:19 | **DL4.110** |

Q. In your colloquy with my colleague earlier, you said, in discussing the severance package portion of this e-mail, that you had had a conversation with Mr. Altman where he said that he might receive equity. Do you recall that discussion?
A. I do, yeah.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 250:14 - 250:16 | **Mccauley, Tasha 2025-09-30** | 00:00:11 | **DL4.112** |

Let me ask you this: When he said -- when Altman said, "Well, I may get equity," did you say anything in sum and substance like, "Why the change"?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 250:22 - 251:03 | **Mccauley, Tasha 2025-09-30** | 00:00:24 | **DL4.113** |

A. I do recall that there was some conversation that ensued after that about it. Unfortunately, I don't recall -- really remember the specifics of it. This piece of conversation pops out in my mind. I don't recall specifics, and I'm certain we discussed it further after that. I wish I could recall the specifics. I don't.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 252:17 - 252:19 | **Mccauley, Tasha 2025-09-30** | 00:00:07 | **DL4.114** |

Q. Within two days, Dr. Sutskever changed his mind about firing Altman, didn't he?
A. Yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 253:12 - 253:22 | **Mccauley, Tasha 2025-09-30** | 00:00:15 | **DL4.115** |

Q. As far as you know, he never referred to the board's actions as a coup.
A. Not by my recollection. Not with us.
Q. But you do allow that within two days, he changed his mind --
A. I do.
Q. -- and apologized and said he wanted to come back.
A. Yes.
Q. Wanted Altman to come back.
A. Yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 254:01 - 254:05 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.117** |

Q. (By Mr. Savitt) And, ultimately, Altman did come back.
A. That's right.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

Q. And you and the other directors agreed that he should come back.

| 254:07 - 255:01 | **Mccauley, Tasha 2025-09-30** | 00:00:59 | **DL4.118** |

THE WITNESS:  The other directors and I agreed that of the options available to us at the moment -- at the moment of decision, around that, that that was the option that was most consistent with the mission, because we thought if the alternative truly was that OpenAI would disintegrate, that would not best serve the mission.

We also, of course, you know, had our very, you know, clear concerns around Mr. Altman; and a part of the negotiation process was to -- was centered around helping make -- helping make sure that he had the best chance of being governed going forward.

Q. (By Mr. Savitt)  Fair -- fair enough.

But I want to make sure I get this narrow a point.

A. Yeah.

Q. You agree that Altman could not have been reinstated without the approval of the board as it was then constituted, which was you and three others; correct?

| 255:03 - 255:03 | **Mccauley, Tasha 2025-09-30** | 00:00:01 | **DL4.119** |

THE WITNESS:  I -- I agree.

| 255:05 - 255:23 | **Mccauley, Tasha 2025-09-30** | 00:01:16 | **DL4.120** |

And you talked about trying to put a better governance program in place looking ahead; you mentioned that or words to that effect, fair, Ms. McCauley?

A. Yes.

Q. And was part of that getting some interim directors in place that you had confidence in?

A. Yes.  Yes, part of that was getting some interim director -- you know, to answer that question is not straight -- not entirely straightforward, because I think the directors that we chose had some -- had some evidence that they might be able to offer good governance, and I had, you know, also points of concern. So I think of the options that we had of the composition that we were able to agree on, that seemed

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

like the most reasonable option.

Q. You -- you and your fellow directors agreed that Bret -- Bret Taylor and Larry Summers would become directors; correct?

A. Yes.

| 255:25 - 256:05 | **Mccauley, Tasha 2025-09-30** | 00:00:13 | **DL4.121** |

Q. (By Mr. Savitt)  And you also agreed that Mr. D'Angelo would stay on as a director.

A. That's right.

Q. And that those three would comprise the board after Altman was reinstated.

A. That's right.

| 260:25 - 261:05 | **Mccauley, Tasha 2025-09-30** | 00:00:21 | **DL4.122** |

And do you recall talking about the review of GPT-4 Turbo by the DSB?

A. Yes.  Well -- yes.

Q. And you -- do you recall attributing a lack of candor to a statement by Altman regarding the review of the GPT-4 Turbo by the DSB?

| 261:07 - 261:22 | **Mccauley, Tasha 2025-09-30** | 00:01:00 | **DL4.123** |

THE WITNESS:  The issue with the GPT-4 Turbo DSB review was that Sam had, you know, communicated with -- with the CTO, indicating that this particular product might not need to go through the DSB review. So I'm just to clarify your question about lack of candor.  This would have been -- I would have described it as, you know, him communicating with a couple of senior leaders in a way that seemed like he wasn't being truthful with them, and then the board was also unaware of that interaction and unaware that there was potentially an attempt to slide this model past DSB review.

Q. (By Mr. Savitt)  And everything you know about that you learned from Mr. Sutskever through a few screenshots in his document; correct?

A. Yes.

| 261:25 - 262:02 | **Mccauley, Tasha 2025-09-30** | 00:00:06 | **DL4.124** |

Q. (By Mr. Savitt)  And in inquiring about this, the board didn't talk with Kwon or Altman about what had

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 262:02    happened; right? | | |
| 262:04 - 262:07 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.125** |
| | 262:04    THE WITNESS:  Correct.<br>262:05  Q.  (By Mr. Savitt)  And the GPT-4 Turbo was not an<br>262:06    entirely new model, was it?  It was just an extension of<br>262:07    GPT-4; right? | | |
| 262:10 - 262:10 | **Mccauley, Tasha 2025-09-30** | 00:00:06 | **DL4.126** |
| | 262:10  A.  It was a -- yes, it was an extension of -- | | |
| 262:14 - 262:23 | **Mccauley, Tasha 2025-09-30** | 00:00:27 | **DL4.127** |
| | 262:14  Q.  (By Mr. Savitt)  And GPT-4 did go through DSB<br>262:15    review, didn't it?<br>262:16  A.  You know, this was a different implementation<br>262:17    of GPT-4 and --<br>262:18  Q.  My question was whether GPT-4 had gone through<br>262:19    DSB review.<br>262:20  A.  GPT-4 did, although this GPT-4 Turbo was also<br>262:21    required to go through DSB review.  And by this<br>262:22    conversation, I think Sam was trying to indicate that<br>262:23    maybe it didn't need to go through. | | |
| 263:16 - 263:17 | **Mccauley, Tasha 2025-09-30** | 00:00:03 | **DL4.128** |
| | 263:16  Q.  (By Mr. Savitt)  Did you know that GPT-4 Turbo<br>263:17    did go through the DSB review? | | |
| 263:19 - 263:19 | **Mccauley, Tasha 2025-09-30** | 00:00:02 | **DL4.129** |
| | 263:19    THE WITNESS:  It may have -- | | |
| 264:06 - 264:07 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.130** |
| | 264:06  Q.  (By Mr. Savitt)  Do you think the release of<br>264:07    GPT-4 Turbo was a mistake? | | |
| 264:10 - 264:11 | **Mccauley, Tasha 2025-09-30** | 00:00:07 | **DL4.158** |
| | 264:10  A.  I think I don't consider the release of GPT-4<br>264:11    Turbo unsafe. | | |
| 264:12 - 264:19 | **Mccauley, Tasha 2025-09-30** | 00:00:23 | **DL4.156** |
| | 264:12  Q.  Thank you.<br>264:13  A.  And I would like to elaborate that that wasn't<br>264:14    the question at hand.  The question that we were<br>264:15    considering in that was, was the process sufficient to<br>264:16    make sure that we could be ensured that models then and<br>264:17    going forward into the future would be handled and put<br>264:18    through a process of safety review in a way that was | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

264:19    sufficient and -- and acceptable to the board.

| 264:25 - 265:06 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.131** |
|---|---|---|---|

264:25    You mentioned
265:01    an issue regarding GPT-4 in India.
265:02    Do you recall that?
265:03  A.  I do.
265:04  Q.  That involved a limited test of a product.
265:05    Do you remember that?
265:06  A.  Um-hum.

| 265:21 - 265:22 | **Mccauley, Tasha 2025-09-30** | 00:00:03 | **DL4.132** |
|---|---|---|---|

265:21  Q.  (By Mr. Savitt)  And you didn't ask Mr. Altman
265:22    about it, did you?

| 265:24 - 266:01 | **Mccauley, Tasha 2025-09-30** | 00:00:09 | **DL4.133** |
|---|---|---|---|

265:24    THE WITNESS:  There was, you know, in the
265:25    course of that full-day board meeting that we were
266:01    there, it didn't come up until after I left.  And

| 275:16 - 275:18 | **Mccauley, Tasha 2025-09-30** | 00:00:05 | **DL4.135** |
|---|---|---|---|

275:16  Q.  Did you ever approve a transaction as to which
275:17    you believe Altman had a undisclosed conflict of
275:18    interest?

| 275:20 - 275:24 | **Mccauley, Tasha 2025-09-30** | 00:00:13 | **DL4.136** |
|---|---|---|---|

275:20    THE WITNESS:  Did I approve a transaction
275:21    where -- where I thought he might have an undisclosed
275:22    COI pertaining to that transaction?
275:23  Q.  (By Mr. Savitt)  That's right.
275:24  A.  I do not believe so.

| 275:25 - 276:05 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.138** |
|---|---|---|---|

275:25  Q.  You talked about Altman's interest in a startup
276:01    fund.
276:02    Do you remember that?
276:03  A.  I do.
276:04  Q.  Are you aware that Altman ever invested as a
276:05    limited partner?

| 276:07 - 276:11 | **Mccauley, Tasha 2025-09-30** | 00:00:10 | **DL4.139** |
|---|---|---|---|

276:07    THE WITNESS:  I -- I don't feel confident that
276:08    I recall the details specifically enough to say.
276:09  Q.  (By Mr. Savitt)  Are you aware that Altman
276:10    never received a distribution or any economic benefit

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 276:11    from -- | | |
| 276:13 - 276:17 | **Mccauley, Tasha 2025-09-30** | 00:00:07 | **DL4.140** |
| | 276:13    THE WITNESS:  I -- I don't feel confident to | | |
| | 276:14    say. | | |
| | 276:15  Q.  (By Mr. Savitt)  So you certainly don't know | | |
| | 276:16    that he received a distribution or economic benefit | | |
| | 276:17    from it; right? | | |
| 276:19 - 276:19 | **Mccauley, Tasha 2025-09-30** | 00:00:01 | **DL4.141** |
| | 276:19    THE WITNESS:  I don't know that he would. | | |
| 284:02 - 284:05 | **Mccauley, Tasha 2025-09-30** | 00:00:23 | **DL4.148** |
| | 284:02  Q.  (By Ms. Patel) Aside from that concern relating | | |
| | 284:03    to that incident, was -- did Microsoft play any role in | | |
| | 284:04    your decision to vote to fire Mr. Altman? | | |
| | 284:05  A.  No.  I wouldn't characterize it like that. | | |
| 284:07 - 284:09 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.168** |
| | 284:07    Is it correct that during your time on the | | |
| | 284:08    board, you did not have visibility into Microsoft's | | |
| | 284:09    safety-related practices? | | |
| 284:11 - 284:13 | **Mccauley, Tasha 2025-09-30** | 00:00:10 | **DL4.149** |
| | 284:11    THE WITNESS:  Apart from, you know, jointly, | | |
| | 284:12    apart from the DSB, I didn't have knowledge of the | | |
| | 284:13    processes internal to Microsoft. | | |
| 286:04 - 286:08 | **Mccauley, Tasha 2025-09-30** | 00:00:18 | **DL4.152** |
| | 286:04    In the days following Mr. Altman's firing, was | | |
| | 286:05    it your understanding that OpenAI had the final say on | | |
| | 286:06    any decisions about who would be added to the OpenAI | | |
| | 286:07    board? | | |
| | 286:08  A.  Yes. | | |
| 288:09 - 288:11 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.57** |
| | 288:09    You testified earlier about various | | |
| | 288:10    incidents -- | | |
| | 288:11  A.  Yes. | | |
| 288:17 - 289:05 | **Mccauley, Tasha 2025-09-30** | 00:00:47 | **DL4.58** |
| | 288:17  Q.  Was one of those incidents Mr. Altman's | | |
| | 288:18    foot-dragging over adding an AI safety expert to the | | |
| | 288:19    board? | | |
| | 288:20  A.  That -- that was -- you know, I think the fact | | |
| | 288:21    that that process was unable to result in adding | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

288:22    independent members and an AI safety member to the

288:23    board, it exacerbated our concerns, yes.

288:24  Q.  And was another one of those incidents that --

288:25    Mr. Altman's representation that the three enhancements

289:01    to GPT-4 had all been approved by the safety board?

289:02  A.  Yes, that was a factor.

289:03  Q.  Was another one of those incidents Mr. Altman's

289:04    failure to disclose that a GPT-4 test was released in

289:05    India without joint safety board review?

| 289:08 - 289:10 | **Mccauley, Tasha 2025-09-30** | 00:00:04 | **DL4.59** |

289:08  Q.  Could you answer

289:09    whether that was another incident.

289:10  A.  Yes.

| 289:13 - 289:14 | **Mccauley, Tasha 2025-09-30** | 00:00:06 | **DL4.170** |

289:13    Was another incident Mr. Altman's failure to

289:14    inform the board prior to ChatGPT's release?

| 289:16 - 289:20 | **Mccauley, Tasha 2025-09-30** | 00:00:10 | **DL4.60** |

289:16    THE WITNESS:  Yes.

289:17  Q.  (By Mr. Hawes)  And was another incident

289:18    Mr. Altman's misrepresentation about you allegedly

289:19    saying Ms. Toner should obviously leave the board?

289:20  A.  Yes.

| 289:22 - 289:24 | **Mccauley, Tasha 2025-09-30** | 00:00:08 | **DL4.61** |

289:22  Q.  (By Mr. Hawes)  And was another incident

289:23    Mr. Altman's misrepresentation that the legal department

289:24    told him GPT-4 Turbo did not need safety board review?

| 290:01 - 290:05 | **Mccauley, Tasha 2025-09-30** | 00:00:12 | **DL4.62** |

290:01    THE WITNESS:  Yes, that -- that we saw

290:02    screenshots to that effect.

290:03  Q.  (By Mr. Hawes)  And did those six incidents

290:04    cause you concern about Mr. Altman's commitment to AI

290:05    safety?

| 290:07 - 290:12 | **Mccauley, Tasha 2025-09-30** | 00:00:25 | **DL4.63** |

290:07    THE WITNESS:  It caused me concern about our --

290:08    those and -- and I think a broader pattern that we were

290:09    observing, you know, through -- you know, this broad

290:10    pattern caused us concern that we would not

290:11    appropriately be able to oversee the -- the for-profit,

290:12    and that had, you know, implications for safety.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 290:20 - 290:22 | **Mccauley, Tasha 2025-09-30** | 00:00:07 | **DL4.64** |

So did Mr. Altman's handling of those six
incidents impair the board's ability to manage AI safety
risks?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 290:23 - 290:25 | **Mccauley, Tasha 2025-09-30** | 00:00:06 | **DL4.65** |

A.  I do believe it impaired our -- our ability to
do so with respect to -- to OpenAI and OpenAI's
activity.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 291:01 - 291:03 | **Mccauley, Tasha 2025-09-30** | 00:00:09 | **DL4.66** |

Q.  And did those six incidents also cause you to
question whether Mr. Altman was prioritizing commercial
interests over AI's -- OpenAI's mission?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 291:05 - 291:06 | **Mccauley, Tasha 2025-09-30** | 00:00:10 | **DL4.67** |

THE WITNESS:  It did -- they did cause me to
question -- to question that.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 291:21 - 292:09 | **Mccauley, Tasha 2025-09-30** | 00:00:51 | **DL4.143** |

Q.  Notwithstanding those six incidents,
Ms. McCauley, you reached the conclusion that it was
better to reinstate Mr. Altman with the governance
revisions that your and your fellow directors
instituted, as compared to allowing OpenAI to
disintegrate; correct?
A.  Yes.
Q.  And you made the decision to reinstitute
Mr. Altman as CEO, believing it was in the best interest
of OpenAI and its mission; correct?
A.  I guess as compared to the alternative of the
company falling apart.
Q.  And that was the alternative that appeared to
be available; correct?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 292:11 - 292:12 | **Mccauley, Tasha 2025-09-30** | 00:00:03 | **DL4.145** |

THE WITNESS:  That -- that it appeared
possible.

| | |
|---|---|
| Plaintiff Affirmative | 00:27:43 |
| OAI Counters to Musk Aff | 00:22:37 |
| Musk Counters to OAI Counter | 00:00:23 |

30 / 30

| MSFT Counters to Musk Aff | 00:00:59 |
|---|---|
| **TOTAL RUN TIME** | **00:51:41** |

Documents linked to video:
319