MARC TOBEROFF (CA SBN 188547)
MToberoff@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333

STEVEN F. MOLO (*pro hac vice*)
ROBERT K. KRY (*pro hac vice*)
JENNIFER M. SCHUBERT (*pro hac vice*)
WALTER H HAWES IV (*pro hac vice*)
ALEXANDRA C. EYNON (*pro hac vice*)
SARA TOFIGHBAKHSH (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160

*Attorneys for Plaintiffs Elon Musk*
*and X.AI Corp.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ELON MUSK et al., | Case No. 4:24-cv-04722-YGR |
| Plaintiffs, | **PLAINTIFFS' ANSWER AND DEFENSES TO THE OPENAI DEFENDANTS' AMENDED COUNTERCLAIMS** |
| v. | |
| SAMUEL ALTMAN et al., | |
| Defendants. | |

**ANSWER**

Plaintiffs Elon Musk and X.AI Corp. (collectively "Plaintiffs") hereby answer Count I (Unfair Competition Under California Business & Professions Code §§ 17200 *et seq*.) and Count II (Tortious Interference with Prospective Economic Advantage) of the OpenAI Defendants' Amended Counterclaims (Dkt. 229 at 1-26).

**PRELIMINARY STATEMENT**

1.     Since its founding as an AI research lab in December 2015, OpenAI has had one mission: to ensure that artificial intelligence with the ability to outperform humans—artificial general intelligence, or "AGI"—benefits all humanity.

**RESPONSE:** Denied.

2.     Counterclaim Defendant Elon Musk worked with Sam Altman, Greg Brockman, and Ilya Sutskever to help launch OpenAI. He sat on OpenAI's board and pledged $1 billion in donations to the organization, which was set up as a nonprofit.

**RESPONSE:** Plaintiffs admit the allegations in the first sentence of Paragraph 2. Plaintiffs further admit that OpenAI was set up as a nonprofit, that Musk sat on OpenAI's board, and that Musk pledged $1 billion to support OpenAI to the extent other donors failed to provide that amount and the organization remained committed to its charitable mission.

3.     But Musk's involvement with OpenAI was short-lived. In 2017 and 2018, Altman, Brockman, and Sutskever refused to bow to Musk's demands for control of the enterprise or, alternatively, its absorption into Musk's electric car company, Tesla. So Musk quit, declaring that OpenAI would fail without him and that he would focus on AI development at Tesla. The $1 billion commitment he'd made to OpenAI was never satisfied—not even close.

**RESPONSE:** Plaintiffs deny the allegations in the first and second sentences of Paragraph 3. Plaintiffs admit that, after disagreements with Altman, Brockman, and Sutskever regarding OpenAI's governance and organizational structure, Musk stepped down from the OpenAI board in February 2018 to focus on his other commitments, including his role as CEO of Tesla, which was then developing AI technology. Plaintiffs further admit that Musk provided $38,191,066 in financial contributions to OpenAI, in addition to numerous highly valuable non-financial

1

contributions. Plaintiffs otherwise deny the allegations in Paragraph 3.

4. Years later, in 2022, OpenAI launched ChatGPT, an AI chatbot that attracted attention and users on an unprecedented scale. ChatGPT drew a new spotlight onto OpenAI. Musk had nothing to do with it.

**RESPONSE:** Plaintiffs admit that OpenAI launched ChatGPT in 2022. Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the remaining allegations in the first sentence of Paragraph 4 and deny them on that basis. Plaintiffs otherwise deny the allegations in Paragraph 4.

5. In March 2023, GPT-4, OpenAI's then-latest technology, was hailed as a transformative breakthrough on the path to AGI. Again Musk was on the sidelines.

**RESPONSE:** Paragraph 5 purports to characterize public commentary on GPT-4 cited in Paragraph 53 and footnotes 2 and 3, *infra*. Plaintiffs respectfully refer the Court to the sources cited therein for the complete and accurate contents of that commentary. Plaintiffs otherwise lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in the first sentence of Paragraph 5 and deny them on that basis. Plaintiffs admit that, as of March 2023, Musk had no formal role with OpenAI. Plaintiffs otherwise deny the allegations in the second sentence of Paragraph 5.

6. Musk could not tolerate seeing such success for an enterprise he had abandoned and declared doomed. He made it his project to take down OpenAI, and to build a direct competitor that would seize the technological lead—not for humanity but for Elon Musk.

**RESPONSE:** Denied.

7. The ensuing campaign has been relentless. Through press attacks, malicious campaigns broadcast to Musk's more than 200 million followers on the social media platform he controls, a pretextual demand for corporate records, harassing legal claims, and a sham bid for OpenAI's assets, Musk has tried every tool available to harm OpenAI.

**RESPONSE:** Denied.

8. Those efforts have only intensified in recent months, as OpenAI has announced a possible restructuring that would see the existing for-profit entity under the nonprofit OpenAI, Inc.

2

become a public benefit corporation, allowing it to better compete for capital and top talent in service of the mission to develop AGI for the benefit of humanity. Pretending to represent the public, Musk seeks to prevent that restructuring—even though, years ago, he advised that a similar reorganization was needed to salvage OpenAI's mission. Musk peddles the false claim that OpenAI is planning to "convert" from a nonprofit into a for-profit enterprise. He does so knowing the nonprofit not only would continue to exist, but would be one of the best-resourced in history.

**RESPONSE:** Denied.

9.    OpenAI is resilient, and the employees, investors, and partners at the core of its mission recognize that Musk's claims are as meritless as they are self-serving. But Musk's actions have taken a toll. Should his campaign persist, greater harm is threatened—to OpenAI's ability to govern in service of its mission, to the relationships that are essential to furthering that mission, and to the public interest. Investors, partners, and employees saw what happened to Twitter when Musk took it over in 2022: the company's value plummeted, business partners were left hanging, most employees were sent packing, and the business was ultimately absorbed into Musk's AI company. Musk's continued attacks on OpenAI, culminating most recently in the fake takeover bid designed to disrupt OpenAI's future, must cease. Musk should be enjoined from further unlawful and unfair action, and held responsible for the damage he has already caused.

**RESPONSE:** Denied.

## PARTIES

10.    Counterclaim Plaintiff OpenAI, Inc. is a registered nonprofit corporation incorporated under the laws of Delaware on December 8, 2015. OpenAI, Inc. is registered as an out-of-state nonprofit corporation with the California Secretary of State and has its principal place of business at 1455 3rd St., San Francisco, CA 94158.

**RESPONSE:** Plaintiffs admit the allegations in Paragraph 10 and respond that, on information and belief, OpenAI, Inc. changed its name to the OpenAI Foundation on or around October 28, 2025.

11.    Counterclaim Plaintiff OpenAI Global, LLC is a registered limited liability company formed under the laws of Delaware on December 28, 2022. OpenAI Global, LLC is registered as an

3

out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1455 3rd St., San Francisco, CA 94158.

**RESPONSE:** Admitted.

12.     Counterclaim Plaintiff OpenAI OpCo, LLC is a registered limited liability company formed under the laws of Delaware on September 19, 2018 as OpenAI L.P. that was later converted to OpenAI OpCo, LLC on January 23, 2023. OpenAI OpCo, LLC is registered as an out-of-state limited liability company with the California Secretary of State and has its principal place of business at 1455 3rd St., San Francisco, CA 94158.

**RESPONSE:** Admitted.

13.     Counterclaim Defendant Elon Musk is an individual residing in Texas.

**RESPONSE:** Admitted.

14.     Counterclaim Defendant X.AI Corp. ("xAI") is a public benefit corporation formed under the laws of Nevada with its principal place of business at 3180 18th Street, San Francisco, CA 94110.

**RESPONSE:**  Plaintiffs admit that X.AI Corp. ("xAI") was originally formed under the laws of Nevada and was previously registered as a public benefit corporation.  Today, xAI is a wholly owned indirect subsidiary of Space Exploration Technologies Corp. ("SpaceX") and is incorporated under the laws of Nevada with its principal place of business at 800 W. Cesar Chavez St., Austin, Texas 78701.

**JURISDICTION**

15.     The Court has supplemental jurisdiction over Counterclaim Plaintiffs' claims pursuant to 28 U.S.C. § 1367 because the claims form part of the same case or controversy and arise out of the same transaction or occurrence as Counterclaim Defendants' claims under Article III of the United States Constitution.

**RESPONSE:** Admitted.

16.     The Court has personal jurisdiction over Counterclaim Defendant Musk, who has availed himself of this forum by asserting claims in this Court against the OpenAI Defendants.

**RESPONSE:** Admitted.

17.     The Court has personal jurisdiction over Counterclaim Defendant xAI, a corporation headquartered in California that has also availed itself of this forum by asserting claims in this Court against the OpenAI Defendants.

**RESPONSE:** Plaintiffs admit that the Court has personal jurisdiction over xAI and that xAI has asserted claims in this Court against the OpenAI Defendants.  Plaintiffs otherwise deny the allegations in Paragraph 17.

18.     Venue is proper in the Northern District of California because the counterclaims asserted herein are compulsory counterclaims, and venue is proper in the original action, and, under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the counterclaims occurred in this District and this Court has personal jurisdiction over the Counterclaim Defendants.

**RESPONSE:** Admitted.

## FACTUAL ALLEGATIONS

**A.      OpenAI is founded**

19.     In May 2015, Sam Altman proposed to Elon Musk an idea he had discussed with Greg Brockman: the formation of an "AI lab" with the mission of "creat[ing] the first general AI and us[ing] it for individual empowerment."

**RESPONSE:**  Paragraph 19 purports to quote from and characterize a May 25, 2015 email and a June 25, 2015 email, admitted as Trial Exhibits 3 and 5, respectively, to which Plaintiffs respectfully refer the Court for their complete and accurate contents.  Plaintiffs otherwise deny the allegations in Paragraph 19.

20.     Altman and Brockman understood that attaining AGI—highly advanced artificial intelligence systems that are generally smarter than humans and can outperform humans at most economically valuable work—could prove transformative. The technology could exponentially advance scientific and medical knowledge, expand the limits of human ingenuity and creativity, and turbocharge the economy. But the technology presented risks. The new AI lab would therefore be committed to developing AGI in the interests of humanity as a whole.

**RESPONSE:** Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 20 and deny them on that basis.  Plaintiffs

admit that highly advanced artificial intelligence systems can advance scientific and medical knowledge, improve human ingenuity and creativity, and boost the economy, but also present risks. Plaintiffs further admit that OpenAI's mission included a commitment to developing AGI in the interests of humanity as a whole.

21. Musk expressed support for these ideas. In July 2015, he had dinner with Altman, Brockman, and Ilya Sutskever, among others, to explore the project under contemplation. The discussion centered on the feasibility of launching an AGI project that could become and stay competitive with DeepMind, an AI company under the umbrella of Google.

**RESPONSE:** Plaintiffs admit that, as the original source of the idea for OpenAI, Musk supported the ideas underlying the organization's founding and attended a July 2015 dinner with Altman, Brockman, and Ilya Sutskever, among others, to discuss, among other things, the potential founding of OpenAI. Plaintiffs further admit that one of the founding ideas behind OpenAI discussed at the July 2015 dinner was to create a "counterweight" to DeepMind, meaning a company that was the opposite of Google: open source and organized as a nonprofit, with AI safety as a priority. Plaintiffs otherwise deny the allegations in Paragraph 21.

22. Immediately following the July 2015 dinner, Altman and Brockman resolved to move forward with this idea and began recruiting a team. The original plan was to associate the lab with Y Combinator, the startup accelerator where Altman worked. By November 2015, Altman, Brockman, and Sutskever had issued offers to their founding team.

**RESPONSE:** Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in the first and second sentences of Paragraph 21 to the extent they characterize Altman and Brockman's intentions or mental state and deny them on that basis. Plaintiffs admit that, after the July 2015 dinner, Altman and Brockman – along with Musk – were involved in moving the idea of OpenAI forward and recruiting OpenAI's founding team members. Plaintiffs further admit that, by November 2015, certain members of OpenAI's founding team had received offers to join OpenAI. Plaintiffs otherwise deny the allegations in Paragraph 22.

23. After meeting the prospective team members to help persuade them to accept their offers, Musk said he wanted to become more involved in the lab—provided it did not operate under

6

the auspices of Y Combinator. Altman, Brockman, and Sutskever agreed.

**RESPONSE:** Plaintiffs admit that Musk met with prospective OpenAI team members to recruit them to OpenAI, that Musk did not want OpenAI to operate under the auspices of Y Combinator, and that Altman, Brockman, and Sutskever agreed not to operate under Y Combinator. Plaintiffs deny the remaining allegations in Paragraph 23.

24.    In December 2015, Altman, Brockman, Sutskever, and Musk launched OpenAI. The organization—OpenAI, Inc.—took the form of a Delaware nonprofit corporation organized for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code. Musk thought the nonprofit structure not "optimal," and advised it would "[p]robably be better to have a standard C corp with a parallel nonprofit"—*i.e.*, a for-profit corporation with an affiliated nonprofit. But the founders ultimately were satisfied that a nonprofit alone would serve the mission for the time being. Musk became a "member" of the nonprofit and a co-chair of OpenAI, Inc.'s board of directors.

**RESPONSE:**  Plaintiffs admit the allegations in the first and second sentences of Paragraph 24.  Plaintiffs deny the allegations in the third and fourth sentences of Paragraph 24, which purport to quote from and characterize a November 20, 2015 email, admitted as Trial Exhibit 507, to which Plaintiffs respectfully refer the Court for its complete and accurate contents.  Plaintiffs admit the allegations in the fifth sentence of Paragraph 24.

25.    The "specific purpose" of OpenAI, Inc., as reflected in its founding Certificate of Incorporation, was "to provide funding for research, development and distribution of technology related to artificial intelligence." The Certificate stated that the "technology will benefit the public" and "the corporation will seek to open source technology for the public benefit where applicable." These statements comported with discussions Altman, Brockman, Musk, and Sutskever had in the months before and shortly after OpenAI's formation. In June 2015, Musk agreed with Altman to "have an ongoing conversation about what work should be open-sourced and what shouldn't." In January 2016, Sutskever proposed and Musk agreed that "[a]s we get closer to building AI, it will make sense to start being less open. The Open in [O]penAI means that everyone should benefit from the fruits of AI after it[']s built, but it's totally OK to not share science."

7

**RESPONSE:** The first and second sentences of Paragraph 25 purport to quote from and characterize OpenAI's Delaware Certificate of Incorporation, filed December 8, 2015, admitted as Trial Exhibit 16, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs admit that OpenAI's Delaware Certificate of Incorporation comported with conversations Altman, Brockman, Musk, and Sutskever had in the months before and shortly after OpenAI's formation – specifically the agreement that OpenAI would open source its technology except where safety concerns weighed against open-sourcing. Plaintiffs deny the allegations in the fourth and fifth sentences of Paragraph 25, which purport to quote from and characterize a June 25, 2015 email and a January 2, 2016 email, admitted as Trial Exhibits 5 and 516, respectively, to which Plaintiffs respectfully refer the Court for their complete and accurate contents.

26.     OpenAI's mission, as stated in the OpenAI, Inc. Charter, is to "ensure that artificial general intelligence . . . benefits all of humanity." The Charter recognizes that "to be effective at addressing AGI's impact on society, OpenAI must be on the cutting edge of AI capabilities."

**RESPONSE:** Paragraph 26 purports to quote from and characterize the OpenAI, Inc. Charter, admitted as Trial Exhibit 24, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs deny that the portions of the Charter quoted in Paragraph 26 fully represent OpenAI's mission.

27.     OpenAI was, and has remained, committed to its mission.

**RESPONSE:** Denied.

**B.     <u>OpenAI's founders, including Musk, consider a restructuring to facilitate furtherance of the mission</u>**

28.     OpenAI's founders knew the project of developing AGI that benefits humanity would require significant funding. Musk was especially attuned to this reality. When his co-founders proposed raising an initial $100 million, Musk insisted instead they "say that we are starting with a $1B funding commitment." That commitment, Musk assured, would come from him. If others did not come through, he would "cover what anyone else doesn't provide."

**RESPONSE:** Plaintiffs admit the allegations in the first sentence of Paragraph 29. Plaintiffs deny the allegations in the second sentence of Paragraph 28. The third, fourth, and fifth sentences

8

of Paragraph 28 purport to quote from and characterize a November 23, 2015 email, admitted as Trial Exhibit 509, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs admit that Musk pledged $1 billion to support OpenAI to the extent other donors failed to provide that amount and the organization remained committed to its charitable mission, and otherwise deny the allegations in the third, fourth, and fifth sentences of Paragraph 28.

29.     Early research advances by OpenAI and others soon revealed that OpenAI would need much more than even the $1 billion Musk had pledged to advance its mission. The initial insight came from OpenAI's development of technology for a competitive video game, Dota, which showed that more computing power—"compute"—with a general learning algorithm yielded better performance seemingly without limit. Compute was thus identified as a key to progress toward AGI, and its costs would run in the billions of dollars annually.

**RESPONSE:** Plaintiffs admit that, in or around mid-2017, OpenAI identified compute as a key ingredient to developing AGI given the improved performance that came with pairing a general learning algorithm with more computing power. Plaintiffs further admit that, upon that discovery, OpenAI estimated the cost of its compute requirements would increase significantly, ultimately concluding by at least 2018 that it may cost up to billions of dollars annually. Plaintiffs otherwise deny the allegations in Paragraph 29.

30.     To attract the capital needed to advance the mission, OpenAI's founders began considering an organizational change that would allow supporters not just to donate, but to invest. Musk endorsed the change. In mid-2017, he observed that the nonprofit structure "may not be the right one now," and suggested that China's evident intent to "do whatever it takes to obtain what [OpenAI] develop[ed]" favored a determination to "change course." When, in August 2017, OpenAI's technology beat one of the world's best players in Dota 1v1, Musk declared it the "triggering event" signaling it was "[t]ime to make the next step for OpenAI."

**RESPONSE:** Plaintiffs admit the allegations in the first sentence of Paragraph 30. Plaintiffs further admit that Musk supported a potential organizational change to attract outside investment so long as OpenAI remained a nonprofit organization committed to its charitable mission, and otherwise deny the allegations in the second sentence of Paragraph 30. The third and fourth

9

sentences of Paragraph 30 purport to quote from and characterize a July 21, 2017 email and an August 11, 2017 email, admitted as Trial Exhibits 632 and 642, respectively, to which Plaintiffs respectfully refer the Court for their complete and accurate contents.

31.    But Musk wanted more than an organizational change that would better advance OpenAI's mission. He wanted control, for himself.

**RESPONSE:**  Plaintiffs admit that, in considering a potential for-profit entity to support OpenAI as a nonprofit, charitable organization, Musk sought short-term control of the prospective entity, while making it clear that he would "quickly" relinquish that control.  Plaintiffs otherwise deny the allegations in Paragraph 31.

32.    Altman, Brockman, and Sutskever agreed with Musk that it was time to create a for-profit entity. They envisioned a collaborative approach to the new entity.

**RESPONSE:**  Plaintiffs admit that Altman, Brockman, and Sutskever discussed the formation of a potential for-profit entity with Musk in mid-2017, but Plaintiffs otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 and deny them on that basis.

33.    Musk had a different idea. He demanded sole control of the new for-profit, at least in the short term: He would be CEO, own a majority equity stake, and control a majority of the board. He would—in his own words—"unequivocally have initial control of the company." Musk explained to Brockman and Sutskever that he needed the lion's share of the economic interest in the contemplated for-profit enterprise because he required $80 billion to create a self-sustaining colony on Mars.

**RESPONSE:**  Plaintiffs deny the allegations in the first sentence of Paragraph 33.  The allegations in the second and third sentences of Paragraph 33 purport to quote from and characterize a September 13, 2017 email, admitted as Trial Ex. 156, to which Plaintiffs respectfully refer the Court for its complete and accurate contents.   Plaintiffs admit that in the discussions regarding a potential for-profit entity, Musk proposed serving as CEO, owning a majority equity stake, and having initial control of the company, but Musk clarified unequivocally that those were only short-term requirements that would "change quickly" as additional investors and board members joined.

Plaintiffs deny the allegations in the fourth sentence of Paragraph 33.

34.    Musk began implementing his plan. He directed his personal wealth manager, Jared Birchall, to incorporate a Delaware public benefit corporation called "Open Artificial Intelligence Technologies, Inc." The certificate was registered on September 15, 2017.

**RESPONSE:**  Plaintiffs admit that Jared Birchall, at Musk's direction, incorporated a Delaware public benefit corporation called "Open Artificial Intelligence Technologies, Inc.," with a certificate of incorporation dated September 15, 2017.  Plaintiffs otherwise deny the allegations in Paragraph 34.

35.    But Altman, Brockman, and Sutskever refused to accept a venture dominated by Musk. As Sutskever explained to Musk in an email copying Brockman and Altman, an "AGI dictatorship" would be inconsistent with OpenAI's mission: "You stated that you don't want to control the final AGI, but during this negotiation, you've shown to us that absolute control is extremely important to you . . . . The goal of OpenAI is to make the future good and to avoid an AGI dictatorship . . . So it is a bad idea to create a structure where you could become a dictator if you chose to, especially given that we can create some other structure that avoids this possibility."

**RESPONSE:**  Plaintiffs admit no agreement was reached on creating a new for-profit entity associated with OpenAI, Inc., but Plaintiffs otherwise deny the allegations in the first sentence of Paragraph 35.  The remaining allegations in Paragraph 35 purport to quote from and characterize a September 20, 2017 email, admitted as Trial Exhibit 157, to which Plaintiffs respectfully refer the Court for its complete and accurate contents.

36.    Musk was incensed. If he could not control the contemplated for-profit entity, he would not participate in it: "Guys, I've had enough. This is the final straw. Either go do something on your own or continue with OpenAI as a nonprofit. I will no longer fund OpenAI until you have made a firm commitment to stay or I'm just being a fool who is essentially providing free funding for you to create a startup. Discussions are over."

**RESPONSE:** Plaintiffs deny the allegations in the first sentence of Paragraph 36.  The remaining allegations in Paragraph 36 purport to quote from and characterize a September 20, 2017 email, admitted as Trial Exhibit 157, to which Plaintiffs respectfully refer the Court for its complete

and accurate contents.

37.     Discussions were not over—nor were Musk's efforts to dominate OpenAI for his own ends. In late 2017 and again in early 2018, Musk proposed to absorb OpenAI into Tesla. This "for-profit pivot" would allow OpenAI to use "Tesla as its cash cow." In Musk's view, without this move OpenAI was doomed to fail: "OpenAI is on a path of certain failure relative to Google. There obviously needs to be immediate and dramatic action or everyone except for Google will be consigned to irrelevance. . . Either we fix things and my engagement increases a lot or we don't and I will drop to near zero and publicly reduce my association. I will not be in a situation where the perception of my influence and time doesn't match the reality."

**RESPONSE:** Plaintiffs admit that some discussions about OpenAI's future organizational structure and governance continued after September 20, 2017, but Plaintiffs otherwise deny the allegations in the first sentence of Paragraph 37.  Plaintiffs admit that, in the course of those discussions, Musk suggested some form of partnership or association between OpenAI and Tesla, but Plaintiffs deny that the discussions ever advanced to the point of a concrete proposal and otherwise deny the allegations in the second sentence of Paragraph 37.  The remaining allegations in Paragraph 37 purport to quote from and characterize a January 31, 2018 email and a February 1, 2018 email, admitted as Trial Exhibits 164 and 749, respectively, to which Plaintiffs respectfully refer the Court for their complete and accurate contents.

38.     Musk declared: "Tesla is the only path that could even hope to hold a candle to Google."

**RESPONSE:** Paragraph 38 purports to quote from and characterize a February 1, 2018 email, admitted as Trial Exhibit 749, to which Plaintiffs respectfully refer the Court for its complete and accurate contents.

39.     Altman, Brockman, and Sutskever disagreed. Committing AGI's development to a Musk-controlled entity was not, in their view, consistent with OpenAI's mission. So they declined.

**RESPONSE:** Plaintiffs admit that no partnership or association ever formed between Tesla and OpenAI, but Plaintiffs otherwise lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in Paragraph 39 and deny them on that basis.

## C.     Musk parts ways with OpenAI

40.     Musk's withdrawal from OpenAI in February 2018 was noisy but relatively amicable. Musk resigned from OpenAI's board to focus on the only AGI development path he deemed viable: Tesla AI. During the final all-employee meeting he attended, Musk reiterated his view that OpenAI needed to raise billions of dollars a year to be a plausible competitor to DeepMind, and encouraged the organization to pursue that funding however it could.

**RESPONSE:** Plaintiffs admit that Musk stepped down from OpenAI's board in February 2018, in part to focus on his other companies, including SpaceX and Tesla, and that, around that time, Tesla was pursuing AI capabilities. Plaintiffs further admit that, in the final all-employee meeting he attended, Musk reiterated his view that OpenAI needed to compete with Google to stay relevant. Plaintiffs otherwise deny the allegations in Paragraph 40.

41.     Though Musk facilitated a few more contributions to OpenAI, Inc., he never honored the $1 billion pledge he'd made upon OpenAI's launch.

**RESPONSE:** Plaintiffs admit that, although Musk contributed more than $8.5 million to OpenAI after he left the board, bringing his total financial contributions to OpenAI to $38,191,066, he never made $1 billion in financial contributions to OpenAI because he became convinced that OpenAI had strayed from its charitable mission. Plaintiffs otherwise deny the allegations in Paragraph 41.

## D.     OpenAI forms a capped-profit subsidiary to raise needed capital

42.     Musk had declared that without "billions per year immediately," OpenAI would fail in its mission. That pronouncement reflected both the astronomical increases in AI compute demands since OpenAI's founding, and the rising cost of retaining and attracting top talent in an increasingly competitive AI field.

**RESPONSE:** Paragraph 42 purports to quote from and characterize a December 26, 2018 email, admitted as Trial Exhibit 853, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs admit that, at the time, two of the main costs driving the need for additional resources in AI development were increasing AI compute demands and the rising cost of retaining and attracting top talent in an increasingly competitive AI field. Plaintiffs otherwise deny

13

the allegations in Paragraph 42.

43.    OpenAI's generative pre-trained transformer model GPT-1, released in mid-2018, was a tremendous achievement. But its capabilities, and the resources required to train it, would be dwarfed by later models, and its launch marked a new phase of exponential growth in the demand for compute to support and develop emerging AI technology. GPT-3, released in 2020, would require over *17,000 times* the computing power required to develop GPT-1.

**RESPONSE:** Plaintiffs admit that OpenAI's GPT-1 model was released in mid-2018 and OpenAI's GPT-3 model was released in 2020.  Plaintiffs otherwise lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in Paragraph 43 and deny them on that basis.

44.    Demand for scarce top talent in the AI industry had increased exponentially as well, particularly as more well-resourced companies joined the serious pursuit of AGI. Musk recognized this better than anyone. In 2017, Musk caused top AI engineers from OpenAI to be seconded to Tesla so they could impart scarce AI learning to Tesla employees. He even poached one of those OpenAI engineers for Tesla and, as he separated from OpenAI, sought (unsuccessfully) to recruit more.

**RESPONSE:**  Plaintiffs admit that competition for top talent in the AI industry increased at the time, especially as well-resourced companies joined the serious pursuit of AGI.  Plaintiffs further admit that in 2017 Musk asked whether OpenAI employees would be willing to assist the autopilot team at Tesla, and four OpenAI employees agreed, assisting Tesla on and off over the course of several months.  Plaintiffs further admit that, while Musk sat on OpenAI's board, he caused Tesla to hire one OpenAI engineer who was already planning on leaving OpenAI, and that, after Musk left OpenAI's board, he sought to recruit three or four additional OpenAI employees to Tesla.  Plaintiffs otherwise deny the allegations in Paragraph 44.

45.    Through 2018, Altman kept Musk apprised of OpenAI's fundraising efforts, and OpenAI's board considered an organizational change that would attract $10 billion—the amount that Altman, Brockman, and Sutskever estimated would be required to develop AGI—while preserving and protecting the mission.

**RESPONSE:** Plaintiffs admit that, in 2018, OpenAI's board considered an organizational change that would attract outside investment and that Altman provided Musk with highly curated, inaccurate, and misleading information regarding that organizational change. Plaintiffs deny the remaining allegations in Paragraph 45.

46.    The change the board ultimately approved was the creation of a "capped" for-profit entity, OpenAI, L.P. The new for-profit was bound to pursue the nonprofit's mission and subject to the control of the OpenAI, Inc. board, but presented investors and employees with the opportunity to participate in any profits OpenAI's operations might ultimately yield. These participation interests were "capped"—their holders could see returns up to a certain fixed point, with any residual profits flowing to the nonprofit. This capped-profit structure remains in place today.

**RESPONSE:** Plaintiffs admit OpenAI's board ultimately approved a for-profit entity, OpenAI, L.P., which presented investors and employees with the ability to receive theoretically "capped" returns from any profits that OpenAI's operations ultimately generated. Plaintiffs further admit that OpenAI, L.P. was, on paper, structured to pursue OpenAI's nonprofit mission and subject to the control of OpenAI, Inc.'s board. But Plaintiffs deny that OpenAI, L.P., in practice, pursued OpenAI's charitable mission, was effectively controlled by OpenAI's nonprofit board, or was structured to provide investment returns that were realistically "capped." Plaintiffs otherwise deny the allegations in Paragraph 46.

47.    The creation of the capped-profit entity was no secret. Brockman, Sutskever, and OpenAI announced it in a blog post in early March 2019. Musk had advance notice; he was offered, and declined, equity in the new entity. The day the blog post went live, Musk asked Altman to make clear to others that he had "no financial interest in the for-profit arm of OpenAI."

**RESPONSE:** Plaintiffs admit that Altman informed Musk of OpenAI's intention to create a capped-profit entity, although the information sent to Musk describing the capped-profit company, including a draft of the March 2019 blog post, was highly curated, inaccurate, and misleading. Plaintiffs further admit that Musk was offered and declined equity in the capped-profit entity. Plaintiffs further admit that Musk, in an email dated March 11, 2019, instructed Altman to "please be explicit that I have no financial interest in the for-profit arm of OpenAI," and Altman agreed.

Plaintiffs otherwise deny the allegations in Paragraph 47.

48.    Musk raised no objection to the formation of OpenAI, L.P.

**RESPONSE:** Plaintiffs admit that, based on the highly curated, inaccurate, and misleading information Musk received, he raised no objection to the formation of OpenAI, L.P. prior to its public launch in March 2019.

**E.    <u>OpenAI flourishes and advances the mission without Musk</u>**

49.    The same year it was created, OpenAI, L.P. was able to raise $1 billion from Microsoft Corporation, as part of a deal to supply OpenAI with needed compute. From there, OpenAI's technological breakthroughs and public exposure accelerated dramatically.

**RESPONSE:** Plaintiffs admit that Microsoft Corporation committed to investing cash and compute collectively valued at $1 billion in OpenAI, L.P. in mid-2019, less than a year after OpenAI L.P. was created.  Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the remaining allegations in Paragraph 49 and deny them on that basis.

50.    OpenAI's launch of GPT-3 in June 2020 was recognized as an enormous "leap forward" marking a "pivotal moment when the world started acknowledging [the] groundbreaking technology" of generative AI.[1]

**RESPONSE:**  Paragraph 50 purports to quote from and characterize a March 19, 2023 article published in *Forbes*, to which Plaintiffs respectfully refer the Court for its complete and accurate contents.  Plaintiffs otherwise deny the allegations in Paragraph 50.

51.    OpenAI began making its models available to developers and institutional users through an application programming interface, or "API." In August 2021, OpenAI released through the API a revolutionary model called "Codex," which was capable of interpreting simple, natural language commands and executing them in dozens of programming languages. OpenAI's coding model was integrated in GitHub's AI tool, Copilot, making it available to a much broader user base. Copilot—powered by OpenAI technology—prompted praise from Musk, who noted on Twitter,

---

[1] Bernard Marr, *A Short History Of ChatGPT: How We Got To Where We Are Today*, Forbes (Mar. 19, 2023), https://www.forbes.com/sites/bernardmarr/2023/05/19/a-short-history-of-chatgpt-how-we-got-to-where-we-are-today/.

"Nice work by OpenAI[,] [i]t is hard to do useful things."

**RESPONSE:** Plaintiffs admit the allegations in the first sentence of Paragraph 51. The third sentence of Paragraph 51 purports to quote from a June 4, 2022 post on X by Musk, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the remaining allegations in Paragraph 51 and deny them on that basis.

52. In November 2022, OpenAI launched ChatGPT, an updated model with an online chat interface allowing users to interact with the model in a conversational way. ChatGPT introduced the public to the power of generative AI—and OpenAI's models—on an unprecedented scale. Hundreds of millions use ChatGPT for free every week.

**RESPONSE:** Plaintiffs admit the allegations in the first sentence of Paragraph 52. Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the remaining allegations in Paragraph 52 and deny them on that basis.

53. In March 2023, OpenAI released GPT-4, a model hailed as a "stunning" technological advancement that "promise[d] to blow previous iterations [of OpenAI's models] out of the water, potentially changing the way we use the internet to work, play and create."[2] Bill Gates went so far as to describe GPT-4 as "the most important advance in technology since the graphical user interface" was first developed in 1980.[3]

**RESPONSE:** Plaintiffs admit that OpenAI released GPT-4 in March 2023. The remaining allegations in Paragraph 53 purport to quote from and characterize a March 16, 2023 article published by CNN and a March 21, 2023 article published by CNBC, to which Plaintiffs respectfully refer the Court for their full and accurate contents. Plaintiffs otherwise deny the allegations in Paragraph 53.

54. Through these releases of increasingly useful products, OpenAI has defined the now

---

[2] Samantha Murphy Kelly, *5 jaw-dropping things GPT-4 can do that ChatGPT couldn't*, CNN (Mar. 16, 2023), https://www.cnn.com/2023/03/16/tech/gpt-4-use-cases/index.html.

[3] Kif Leswing, *Bill Gates says OpenAI's GPT is the most important advance in technology since 1980*, CNBC (Mar. 21, 2023), https://www.cnbc.com/2023/03/21/bill-gates-openai-gpt-most-important-advance-in-technology-since-1980.html.

industry-standard principle of "iterative deployment," which allows for the gathering of information about AI technology that cannot be gained in the lab alone. Making AI tools available to the public is a crucial means of learning how users interact with AI systems and the practical strengths and weaknesses of those systems. It also facilitates understanding of and adaptation to new AI capabilities.

**RESPONSE:** Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in the first sentence of Paragraph 54 and deny them on that basis. Plaintiffs admit that making AI tools available to the public is one way to learn how users interact with AI systems and the practical strengths and weaknesses of those systems, and admit that it can facilitate understanding of and adaption to new AI capabilities. Plaintiffs otherwise deny the allegations in Paragraph 54.

## F.    Musk begins his attacks on OpenAI while quietly building a competitor

55.    Over and over in OpenAI's early years, Musk predicted that the enterprise would fail unless it bowed to his vision, his plans, and his control. Around the time of his resignation from the OpenAI board, Musk declared OpenAI was "on a path of certain failure relative to Google"; "should assume failure"; and was "on a path to be irrelevant." Musk's "probability assessment of OpenAI being relevant to [competitors] without a dramatic change in execution and resources" was, he announced, "0%." "Not 1%." OpenAI was in Musk's estimation "not a serious counterweight to DeepMind/Google and will only get further behind." All this was "obvious," said Musk.

**RESPONSE:** Plaintiffs deny the allegations in the first sentence of Paragraph 55. The remaining allegations in Paragraph 55 purport to quote from and characterize a January 31, 2018 email and a December 31, 2018 email, admitted as Trial Exhibits 748 and 853, respectively, to which Plaintiffs respectfully refer the Court for their complete and accurate contents.

56.    Yet here was OpenAI, a few years later, pursuing its mission with more success than any other actor in the field, proving Musk wrong.

**RESPONSE:** Denied.

57.    Musk could not abide it.

**RESPONSE:** Denied.

58.     So he set in motion a campaign of harassment, interference, and misinformation designed to take down OpenAI and clear the field for himself.

**RESPONSE:** Denied.

59.     In March 2023, Musk quietly created a new AI development company, Counterclaim Defendant xAI. He incorporated xAI as a for-profit public benefit corporation in Nevada, but made no public announcement of his intentions to launch a competitor at the time. That would come only months later.

**RESPONSE:**  Plaintiffs admit that, in March 2023, Musk founded xAI under Nevada law as a company focused on AI development, and, on April 20, 2023, converted xAI to a public benefit corporation.  Plaintiffs further admit that, while public news reports referenced the incorporation of xAI earlier, Musk did not publicly announce xAI until July 2023.  Plaintiffs otherwise deny the allegations in Paragraph 59.

60.     Meanwhile, days after the clandestine incorporation of his nascent competitor, Musk noisily supported a six-month "moratorium" on development of AI any more advanced than OpenAI's just-released GPT-4—which Musk warned posed "profound risks to society and humanity." The effect of this "moratorium" would have been to stall OpenAI while all others, most notably Musk, caught up.

**RESPONSE:**  Plaintiffs admit only that Musk, along with now more than 33,000 others, signed an open letter titled "Pause Giant AI Experiments," which was published on March 22, 2023. To the extent Paragraph 60 quotes from or characterizes that letter, Plaintiffs respectfully refer the Court to the published version for its complete and accurate contents.  *See* Future of Life Institute, *Pause Giant AI Experiments: An Open Letter* (Mar. 22, 2023), https://futureoflife.org/open-letter/pause-giant-ai-experiments/.  Plaintiffs otherwise deny the allegations in Paragraph 60.

61.     A few weeks later, Musk's personal lawyer contacted OpenAI and demanded access to OpenAI's confidential and commercially sensitive internal documents. Feigning concern as a former donor and director of OpenAI, and without ever disclosing he was building a competitor in secret, Musk framed his request as wanting to ensure OpenAI was not being taken advantage of or corrupted by Microsoft. When OpenAI sought to place customary restrictions on the use of the

information sought, Musk's lawyer threatened that OpenAI would "regret this conversation" because Musk wanted the documents right away.

**RESPONSE:** Plaintiffs admit that, on or around April 30, 2023, an attorney from the law firm Quinn Emanuel Urquhart & Sullivan, LLP, representing Musk, contacted OpenAI requesting certain documents. Plaintiffs admit that, at that time, Musk had not explicitly informed OpenAI about his founding of xAI, although major news sources had already reported on the topic, identifying Musk's new venture as a potential competitor to OpenAI. Plaintiffs admit that Musk told Altman that he was concerned about "the relationship between all the [for-profit OpenAI] companies and the original OpenAI 501c3" and whether Microsoft's rights under its agreements with OpenAI gave it "de facto control of AGI," but deny that these were feigned concerns. Plaintiffs deny that Musk objected to customary restrictions on the use of the information sought and note that, when Altman requested "lawyers eyes only" protections for commercially sensitive documents, Musk agreed that those measures were "probably ok." Plaintiffs otherwise deny the allegations in Paragraph 61.

62. Just two weeks after gaining access to the information he had sought, Musk denigrated OpenAI on national television and insinuated that its partnership with Microsoft was improper.[4]

**RESPONSE:** Paragraph 62 purports to characterize a May 16, 2023 interview of Musk on CNBC, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs otherwise deny the allegations in Paragraph 62.

63. Not until July 12, 2023 did Musk finally announce publicly the formation of xAI. Musk had used the months between quiet incorporation and public announcement to recruit researchers with the promise of creating a rival to OpenAI.

**RESPONSE:** Plaintiffs admit that Musk did not publicly announce the formation of xAI until July 12, 2023, although xAI's formation was previously disclosed and discussed in a public

---

[4] *See Elon Musk on Sam Altman and ChatGPT: I am the reason OpenAI exists*, CNBC (May 15, 2023), https://www.cnbc.com/video/2023/05/16/elon-musk-on-sam-altman-and-chatgpt-i-am-the-reason-openai-exists.html.

media interview with Musk almost two months earlier. Plaintiffs further admit that Musk recruited employees to xAI in the months between when the incorporation paperwork was filed and when Musk publicly announced xAI. Plaintiffs otherwise deny the allegations in Paragraph 63.

64. In November 2023, after Altman was briefly removed and reinstated as OpenAI's CEO, Musk again sought to destabilize the organization. On November 21, 2023, the day the agreement was reached to accomplish Altman's return, Musk posted to his more than 200 million X followers a link to a letter purporting to come from disgruntled OpenAI employees, but widely recognized as a hoax. The letter accused Altman and Brockman of a "disturbing pattern of deceit and manipulation," and of having silenced or sidelined employees. On the basis of the fake letter, Musk added his own commentary, designed to increase his competitor's jeopardy: "These seem like concerns worth investigating."

**RESPONSE:** Plaintiffs deny the allegations in the first sentence of Paragraph 64. Plaintiffs admit that, on November 21, 2023, Musk posted a link to a letter on X, where Musk has more than 200 million followers, which stated that it was authored by former OpenAI employees and addressed issues and concerns they perceived at OpenAI, including that Altman and Brockman silenced or sidelined employees and displayed a "disturbing pattern of deceit and manipulation." Plaintiffs further admit that, in his post, Musk stated: "This letter about OpenAI was just sent to me. These seem like concerns worth investigating." Plaintiffs otherwise deny the allegations in Paragraph 64.

**G.    Musk takes his harassment campaign to courts and regulators**

65. Having failed to impede OpenAI's progress and pursuit of its mission, Musk intensified his attacks—this time using the courts and a parallel, carefully coordinated media campaign.

**RESPONSE:** Denied.

66. On February 29, 2024, Musk sued Altman, Brockman, OpenAI, Inc., OpenAI, L.P., OpenAI, L.L.C., OpenAI GP, L.L.C., OpenAI OpCo, LLC, OpenAI Global, LLC, OAI Corporation, LLC, and OpenAI Holdings, LLC in California Superior Court. In his headline claim, Musk asserted that OpenAI, Inc.'s Certificate of Incorporation, an email exchange he had with Altman in 2015 brainstorming an AI lab, and a blog post together comprised an enforceable written contract—a

21

"Founding Agreement" in which all of the defendants purportedly promised Musk they would conduct their operations in ways that Musk (helming a direct competitor) preferred: open-sourcing all their latest technology and refraining from licensing it to Microsoft. Musk immediately began tweeting about the lawsuit, broadcasting to his enormous audience that "OpenAI is a house of cards."

**RESPONSE:** Plaintiffs admit the allegations in the first sentence of Paragraph 66. The allegations in the second sentence of Paragraph 66 purport to characterize the Complaint filed on February 29, 2024 in *Musk v. Altman*, CGC-24-612746 (Cal. Super. Ct.), to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs further admit that, on March 2, 2024, Musk posted on X, in response to another user's post: "Yeah, this structure is either legal and everyone should do it or it is illegal and OpenAI is a house of cards." Plaintiffs otherwise deny the allegations in Paragraph 66.

67.    Defendants in the Superior Court action filed a demurrer, arguing that none of Musk's claims could stand. With the demurrer fully briefed, argument was set for 10 a.m. PT on June 12, 2024. Rather than defend his claims, Musk, through counsel, informed defendants at 11:40 a.m. PT on June 11, 2024 that he was withdrawing his lawsuit. No explanation was offered.

**RESPONSE:** Plaintiffs admit the allegations in the first and second sentences of Paragraph 67. Plaintiffs further admit that Musk, through counsel, informed defendants at or around 11:40 a.m. PT on June 11, 2024 that he was withdrawing his lawsuit, as he was entitled to do, without elaborating on the reason for that withdrawal.

68.    Two months later, Musk filed this federal action with new counsel. Musk's action—as it has shifted shape in the ensuing months—now includes new plaintiffs xAI and former OpenAI director and Musk associate Shivon Zilis, as well as new defendant Microsoft. And it now asserts a sprawling array of theories: antitrust violations, false advertising, fiduciary breach, fraud, contract and charitable trust breach, and even racketeering. The filing of the federal suit was accompanied by another media blast, this time from Musk's current counsel, who called the withdrawn state-court

action a "Goldfish" that "lacked teeth"[5] but said the new one (based on the same factual narrative) was a "Great White."[6]

**RESPONSE:** Plaintiffs admit that Musk filed this federal action with new counsel on August 5, 2024. To the extent the second and third sentences of Paragraph 68 purport to characterize the allegations and parties in this lawsuit, Plaintiffs respectfully refer the Court to the relevant filings, including the operative Second Amended Complaint, and this Court's decisions related thereto. The allegations in the fourth sentence of Paragraph 68 purport to quote from and characterize an August 5, 2024 article in the *New York Times* and an August 7, 2024 article published by Reuters, to which Plaintiffs respectfully refer the Court for their complete and accurate contents. Plaintiffs otherwise deny the allegations in Paragraph 68.

69. Around the same time he filed this action, Musk demanded that regulators investigate OpenAI. He sent several letters to the Attorneys General of California and Delaware, encouraging them to take action against OpenAI—most explosively, to force OpenAI, Inc., without legal basis, to auction off its assets for the benefit of Musk and his associates.

**RESPONSE:** Plaintiffs admit that Musk's counsel sent letters to the California Attorney General's office in or around November 2024 seeking relator status in this action, consistent with the Attorney General's procedures. Plaintiffs further admit that Musk's counsel sent letters to the Attorneys General of California and Delaware in or around January 2025 seeking information relating to OpenAI's proposed restructuring and potential sale of its assets to its related for-profit entities. Plaintiffs respectfully refer the Court to those letters for their complete and accurate contents and otherwise deny the allegations in Paragraph 69.

**H.     Musk intensifies his attacks on OpenAI and grows xAI**

70. Meanwhile, Musk supercharged his public attacks on OpenAI. Using his social-

---

[5] *See* Cade Metz, *Elon Musk Revives Lawsuit Against OpenAI and Sam Altman*, N.Y. Times (Aug. 5, 2024), https://www.nytimes.com/2024/08/05/technology/elon-musk-openai-lawsuit.html; Mike Scarcella, *Elon Musk Taps Copyright Law Vet Toberoff for OpenAI Lawsuit*, Reuters (Aug. 7, 2024), https://www.reuters.com/legal/litigation/elon-musk-taps-copyright-law-vet-toberoff-openai-lawsuit-2024-08-07/.

[6] *See* Scarcella, *supra* note 5.

PLAINTIFFS' ANSWER TO OPENAI DEFENDANTS' COUNTERCLAIMS
CASE NO.: 4:24-CV-04722-YGR

media platform, X, he unleashed a barrage of invective against the enterprise and its leadership, variously describing OpenAI as a "digital Frankenstein's monster," "a lie," "evil," and a "a total scam."

**RESPONSE:**  Plaintiffs admit that Musk has made certain posts on X that are critical of OpenAI and its leadership, often in response to public critiques that Altman and OpenAI have leveled at Musk and his companies.  Plaintiffs respectfully refer the Court to those posts for their complete and accurate contents, and otherwise deny the allegations in Paragraph 70.

71.    At the same time, Musk has been wielding his ever-growing influence and the web of companies under his control to turn xAI into a major player in a highly competitive industry— one that is raising capital at unprecedented speed and scale.[7] Two weeks ago, xAI announced that its valuation is now $80 billion, and that it had acquired X. The acquisition gives xAI unprecedented direct access to all the user data flowing through the platform formerly known as Twitter—and therefore a major competitive advantage in an industry dependent on such data for model training.

**RESPONSE:**  Plaintiffs admit that, at or around the time it acquired X, xAI was valued at $80 billion and that, as part of that acquisition, xAI had direct access to certain X user data that was potentially relevant to model training.  Plaintiffs otherwise deny the allegations in Paragraph 71.

72.    At Musk's direction, xAI built in three months what is believed to be the world's largest supercomputer, dubbed "Colossus." The project used 100,000 next-generation NVIDIA GPU chips, some of which Musk diverted from Tesla. Musk reportedly plans a "tenfold" expansion of "Colossus" to "incorporate more than 1 [million] graphics processing units . . . to leap ahead of rivals," including OpenAI.[8]

**RESPONSE:**  Plaintiffs admit that xAI built Colossus, which is believed to be the world's largest supercomputer.  Plaintiffs further admit that Colossus initially used 100,000 NVIDIA GPU chips, including some that were originally reserved for Tesla.  Plaintiffs otherwise deny the

---

[7] Meghan Bobrowsky, Berber Jin & Tom Dotan, *Inside Elon Musk's Quest to Beat OpenAI at its Own Game*, The Wall Street Journal (Nov. 27, 2024), https://www.wsj.com/tech/ai/elon-musk-x-open-ai-03ff1ead.

[8] *See* Stephen Morris and Tabby Kinder, *Elon Musk plans to expand Colossus AI super-computer tenfold*, Financial Times (Dec. 4, 2024).

allegations in the first and second sentences of Paragraph 72. The third sentence of Paragraph 72 purports to quote from and characterize a December 4, 2024 article published in the *Financial Times*, to which Plaintiffs respectfully refer the Court for its complete and accurate contents.

## I.      OpenAI considers a restructuring

73.      While Musk was ginning up lawsuits and press campaigns and provoking regulators, OpenAI's board was focused on its mission. As part of that work, it was considering whether the mission might best be served by a further evolution of OpenAI's structure.

**RESPONSE:** Denied.

74.      With companies like Google, Amazon, Meta, and now xAI pouring billions into AI development and competing with OpenAI for scarce compute, OpenAI's capital needs have become more pressing than ever. Training GPT-4, which OpenAI released in 2023, required *67 times* more computing power (measured in petaFLOPS) than GPT-3, released just three years prior, and nearly *1.2 million times* more than GPT-1, released in 2018. The demands and the costs are only rising. So too are the demands for, and costs of, retaining and attracting scarce top talent in the field.

**RESPONSE:** Plaintiffs admit that xAI has invested billions into the development of AI and that the demand for, and cost of, retaining and attracting top talent in the AI field have risen significantly over the past several years. Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the remaining allegations in Paragraph 74 and deny them on that basis.

75.      OpenAI's current structure poses challenges in attracting new investment and retaining and attracting highly skilled personnel. Every one of OpenAI's significant competitors has a familiar corporate structure that allows for offers of conventional equity—an attraction not just for investors contemplating multi-billion-dollar commitments but for current and prospective employees who want a stake in the enterprise they're helping to build. The profit interests in OpenAI's capped-profit are less familiar.

**RESPONSE:** Plaintiffs deny the allegations in the first and third sentences of Paragraph 75 on the basis that OpenAI no longer offers profit interests in a "capped-profit" structure. Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the allegations

in the second sentence of Paragraph 75 and deny them on that basis.

76. The challenges OpenAI faces are reflected in its most recent fundraising rounds, in which investors have insisted on conditions freeing them from certain funding commitments or allowing redemption of invested funds with interest in the event OpenAI fails to simplify its capital structure.

**RESPONSE:** Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in Paragraph 76 and deny them on that basis.

77. Given these challenges, and the threat they pose to the pursuit of the mission, OpenAI's board has for many months been considering *not* a "conversion" of the nonprofit into a for-profit entity—as Musk has falsely and repeatedly claimed—but a structure change in which the nonprofit would continue to exist and pursue its mission of ensuring that AGI benefits all of humanity, while the capped-profit would become a public benefit corporation ("PBC") serving the exact same mission but also having accountability to investors and employees. The nonprofit would exchange its current economic interest in the capped-profit entity for an equity stake in the PBC—thus sharing in the PBC's financial success while pursuing mission-advancing projects.

**RESPONSE:** Plaintiffs admit that, in the transaction completed on or around October 28, 2025, the nonprofit exchanged its then-current economic interest in the capped-profit structure for an equity stake in the newly formed PBC.  Plaintiffs otherwise deny the allegations in Paragraph 77.

78. Any decision to restructure will have been made following extensive deliberation by a well-qualified board. In addition to Altman, the current board comprises the following directors:

    a. Bret Taylor (Chair), who led Twitter's board of directors before and during its acquisition by Musk and is former co-CEO of Salesforce and former Chief Technology Officer of Facebook;

    b. Adam D'Angelo, CEO and co-founder of Quora;

    c. Dr. Sue Desmond-Hellmann, former CEO of the Bill & Melinda Gates Foundation, former Chancellor of the University of California at San Francisco, and current director of Pfizer Corporation;

    d.  Paul Nakasone, a retired U.S. Army General and leading expert in cybersecurity, technology advancement, and global cyber defense who once led the National Security Agency;

    e.  Nicole Seligman, former Executive Vice President and Global General Counsel of Sony Corporation and former President of Sony Entertainment;

    f.  Larry Summers, a former President of Harvard University and former Secretary of the U.S. Treasury;

    g.  Zico Kolter, Director of the Machine Learning Department at Carnegie Mellon University; and

    h.  Adebayo Ogunlesi, Founding Partner, Chairman, and CEO of Global Infrastructure Partners, a leading infrastructure investing platform, and a Senior Managing Director at BlackRock.

**RESPONSE:** Plaintiffs deny the allegations in the first sentence of Paragraph 79, deny the allegations in Paragraph 79(d) to the extent they characterize Mr. Nakasone as a leading expert, deny the allegations in Paragraph 79(f) to the extent they suggest that Larry Summers remains on OpenAI's board, and deny the allegations in Paragraph 79(h) to the extent they characterize Global Infrastructure Partners as a leading infrastructure investing platform. Plaintiffs otherwise admit the allegations in Paragraph 79.

79. If a restructuring designed to serve the advancement of the mission is halted, the mission will be impaired. OpenAI's competitors—entities like Musk's xAI that do not share OpenAI's mission—will benefit.

**RESPONSE:** Denied.

**J.** **Musk seeks to enjoin the possible restructuring and much of OpenAI's business, then makes a sham bid for the nonprofit's assets**

80. The prospect of a possible restructuring became public in or about the fall of 2024. Never one to miss an opportunity, Musk, on November 29, 2024, sought emergency relief to stop it from happening—and, for good measure, to halt large swaths of OpenAI's business activities.

**RESPONSE:** Plaintiffs admit that Musk sought a preliminary injunction on November 29, 2024.  To the extent the allegations in Paragraph 80 characterize the relief sought, Plaintiffs respectfully refer the Court to that filing for its complete and accurate contents.  Plaintiffs otherwise deny the allegations in Paragraph 80.

81.    The supposed predicate for this preliminary injunction motion was long-ago donations of approximately $40 million Musk claims to have made to OpenAI—funding provided before Musk decided to abandon OpenAI and the $1 billion pledge he'd made at the enterprise's founding.

**RESPONSE:**  To the extent Paragraph 81 characterizes the preliminary injunction motion filed on November 29, 2024, Plaintiffs respectfully refer the Court to that filing for its complete and accurate contents.  Plaintiffs otherwise deny the allegations in Paragraph 81.

82.    The Court heard argument on Musk's motion on February 4, 2025 and reserved ruling.[9]

**RESPONSE:** Admitted.

83.    Before the Court could rule, Musk turned immediately to other means. On February 10, 2025, Musk's litigation counsel sent a "Letter of Intent" to OpenAI's board on behalf of a consortium of private investors—including xAI, Baron Capital Group, Inc., Valor Management LLC, Atreides Management, LP, Vy Fund III, L.P., Emanuel Capital Management, LLC, Eight Partners VC, LLC, and others who remain unidentified. The letter purported to offer $97.375 billion for the purchase of OpenAI, Inc.'s assets.

**RESPONSE:** Plaintiffs deny the allegations in the first sentence of Paragraph 83.  Plaintiffs otherwise admit the allegations in Paragraph 83.  Plaintiffs further note that, prior to sending the letter of intent to OpenAI, Musk, through counsel, sought information regarding what, if any, competitive bidding process the California and Delaware Attorneys General would establish for OpenAI's charitable assets.  Musk's counsel sent the letter of intent only after the California and

---

[9] The Court ultimately denied Musk's preliminary injunction motion in its entirety on March 4, 2025, finding Musk had failed to meet his burden of proof in seeking such "extraordinary relief." *See* Order Denying Motion for a Preliminary Injunction, Dkt. 121 at 1 (Mar. 4, 2025).

28

Delaware Attorneys General failed to provide any information regarding the nature, terms, or timing of that process.

84.     Before the letter even reached OpenAI's board, Musk's counsel set about building maximum buzz and maximum disruption for OpenAI. He provided the letter to the *Wall Street Journal* (where the story appeared on the front page), and the "bid" dominated international news for days.

**RESPONSE:** Plaintiffs admit that Musk's counsel provided a copy of the letter to the *Wall Street Journal* and that a story regarding the bid appeared in the *Wall Street Journal*. Plaintiffs otherwise deny the allegations in Paragraph 84.

85.     After studying Musk's stunt, savvy media commentators recognized it as a sham, variously describing Musk's "bid" as "less [ ] a serious effort to take control of OpenAI than as a gambit" to interfere with OpenAI's contemplated corporate reorganization;[10] a "spoiler" aimed at disrupting OpenAI's fundraising and reorganization efforts;[11] and a "wrecking ball against an opponent" and rival.[12]

**RESPONSE:** Paragraph 85 purports to quote from and characterize articles published in *Axios*, *The Economist*, and *The Guardian*, to which Plaintiffs respectfully refer the Court for their complete contents. Plaintiffs otherwise deny the allegations in Paragraph 85.

86.     Among other things, the letter included no evidence of financing to pay the nearly $100 billion purchase price, which the letter described as based on OpenAI's "historical financial results" and "projections." OpenAI has never disclosed financial "projections" publicly or provided them to Musk or any of the other investors named in the letter. None of the investors had conducted any diligence on the business.

---

[10] Scott Rosenberg, *Musk lawyers say he'll drop bid for OpenAI if it gives up for-profit plan*, Axios (Feb. 13, 2025), https://www.axios.com/2025/02/13/musk-altman-openai-nonprofit-filing.

[11] *Elon Musk's $97bn offer is a headache for Sam Altman's OpenAI*, The Economist (Feb. 11, 2025), https://www.economist.com/business/2025/02/11/elon-musks-97bn-offer-is-a-headache-for-sam-altmans-openai.

[12] Chris Stokel-Walker, *Elon Musk owning OpenAI would be a terrible idea. That doesn't mean it won't happen*, The Guardian (Feb. 12, 2025), https://www.theguardian.com/commentisfree/2025/feb/12/elon-musk-owning-openai-trump-ai-sam-altman.

**RESPONSE:** To the extent Paragraph 86 purports to quote from or characterize the letter of intent dated February 10, 2025, admitted as Trial Exhibit 1157, Plaintiffs respectfully refer the Court to that document for its complete and accurate contents. Plaintiffs deny that the letter of intent "included no evidence of financing to pay the nearly $100 billion purchase price," given that the letter identified prominent investors who were publicly known to have adequate resources to fund a $97.375 billion purchase. Plaintiffs admit that OpenAI never disclosed its financial projections to Musk, but deny that the letter of intent stated that it had. Plaintiffs otherwise lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in the second sentence of Paragraph 86 and deny them on that basis. Plaintiffs further note that the letter of intent expressly states that the proposal was conditioned on "customary due diligence investigation of the Company and its Business." Plaintiffs otherwise deny the allegations in Paragraph 86.

87. The investors who backed the purported takeover bid are close confederates of Musk, some with large stakes in Musk-founded companies including Tesla, SpaceX, The Boring Company, X, and Neuralink.

**RESPONSE:** Plaintiffs admit that the investors involved in the bid have invested in Musk's other companies, including Tesla, SpaceX, and X, among others. Plaintiffs otherwise deny the allegations in Paragraph 87.

88. When asked about the bid on *CNBC*, Ron Baron, one of the investors backing Musk and a longtime Musk booster and major investor in Musk's businesses, became flustered. He then admitted he'd done very little work on the project, hadn't been following it closely, and had only committed $5 million (or 0.00513% of the alleged bid price), which he first claimed to have done in his personal capacity—even though the letter was signed on behalf of his fund. Baron went on to suggest that the point of the bid, as pitched to him (plainly by Musk) was not to buy OpenAI's assets, but instead to obtain "discovery" and get "behind the wall" at OpenAI.

**RESPONSE:** Paragraph 88 purports to quote from and characterize a March 11, 2025 Ron Baron interview with *CNBC Squawk Box* and the February 10, 2025 letter of intent regarding the bid for OpenAI's assets, admitted as Trial Exhibit 1157, to which Plaintiffs respectfully refer the Court for their complete and accurate contents. *See* Baron Capitol, *Ron Baron Discusses Tesla and*

*the Market on CNBC Squawk Box* (March 11, 2025), https://www.baroncapitalgroup.com/news-and-press/ron-baron-cnbc-squawk-box-tesla-market-outlook.  Plaintiffs admit that Ron Baron is a major investor in Musk's businesses since approximately 2014 and otherwise deny the remaining allegations in Paragraph 88.

89.    The purchase price noted in the Letter of Intent was a joking reference to 974 Praf, a character in Iain Banks' science fiction series, *Look to Windward*, from which Musk has also drawn names for multiple SpaceX rockets.[13]

**RESPONSE:**  Denied.

90.    Although OpenAI recognized the bid as a feint, its mere existence—and the media firestorm surrounding it—required OpenAI to expend significant resources in responding to it. Following news of Musk's move, OpenAI's board engaged in the formal process of reviewing and assessing the "bid." This entailed convening a discussion of the Letter of Intent and consideration of next steps in the event Musk's attempts to gain control of OpenAI escalated. It further entailed commissioning legal and financial analyses of the bid's purported "terms" and soliciting briefing from high-level OpenAI employees to inform the board's deliberations.

**RESPONSE:** Plaintiffs deny that the bid was a "feint."  Plaintiffs further deny that the bid required OpenAI to expend significant resources to respond, given that OpenAI rejected the bid almost immediately, as evidenced by Altman's February 10, 2025 post on X stating "no thank you but we will buy Twitter for $9.74 billion if you want" and Bret Taylor's February 11, 2025 statement in a *Wall Street Journal* interview that "OpenAI is not for sale."  Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90 and deny them on that basis.

91.    On February 14, 2024, OpenAI's board unanimously rejected Musk's purported overture.

**RESPONSE:**  Denied.  Plaintiffs admit that OpenAI's board unanimously rejected the bid on February 14, 2025.

---

[13] *See* Stokel-Walker, *supra* note 12.

31

**K.    Musk's campaign has already injured OpenAI and poses a threat to its economic relationships**

92.    OpenAI is a resilient organization. It has succeeded where Musk said it could only fail. But the enterprise and its people have suffered harm as a result of Musk's unlawful campaign of harassment, interference, and misinformation. And those actions threaten further, irreparable harm.

**RESPONSE:** Denied.

93.    Every phase of Musk's campaign has been designed to force OpenAI to divert resources, expend money, or both. From countering Musk's false statements and other public attacks; to addressing Musk's pretextual corporate records demand; to defending against harassing, withdrawn-at-the-last-minute legal claims; to countering Musk's repeated lies and mischaracterizations intended to damage OpenAI's reputation; to responding to the sham bid for OpenAI, Inc.'s assets, OpenAI has borne costs, and been harmed, by Musk's abusive tactics and unrelenting efforts to mislead the public for his own benefit and to OpenAI's detriment and the detriment of its mission.

**RESPONSE:** Denied.

94.    Musk's most recent ploy, pretending to try to take over OpenAI, threatens a more serious toll—on OpenAI's ability to govern itself in service of the mission, on its relationships with investors, on its relationships with employees, and ultimately on advancement of the mission to develop AGI for the benefit of all humanity.

**RESPONSE:** Denied.

95.    The February 10, 2025 Letter of Intent did not so much as acknowledge OpenAI's mission; it was a naked effort to disrupt the board's consideration of a potential restructuring and sow confusion among employees and potential investors. An important procedural aspect of a corporate reorganization of OpenAI may be a valuation of OpenAI, Inc.'s interests in the capped-profit entity. With no involvement in OpenAI's valuation process, Musk—through xAI and its consortium of Musk-associated private investors—has now purported to put a price on OpenAI, Inc.'s assets. Musk's counsel even announced that the "investor group is prepared to match or

32

exceed any bids higher than their own."[14] This very public effort to artificially "raise[ ] the floor for the nonprofit's valuation"[15] has already caused confusion, and were it (or something like it) pursued further, the consequence could be a significant impairment of OpenAI's ability to pursue its mission on terms uncorrupted by unlawful harassment and interference.

**RESPONSE:** Plaintiffs admit the February 10, 2025 letter of intent did not explicitly reference OpenAI's mission, and otherwise deny the allegations in the first sentence of Paragraph 95. Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in the second sentence of Paragraph 95 and deny them on that basis. Plaintiffs admit that Musk had no involvement in OpenAI's internal valuation process, but, as reflected in the letter of intent, worked with a consortium of investors to propose a price for OpenAI, Inc.'s assets, subject to due diligence including inspection of OpenAI's financial books and records. Plaintiffs otherwise deny the allegations in the third sentence of Paragraph 95. The fourth sentence in Paragraph 95 purports to quote from and characterize a February 10, 2025 article published in the *Wall Street Journal*, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs deny the allegations in the fifth sentence of Paragraph 95.

96.     Musk's takeover threats could also imperil OpenAI's relationships with investors and have already made maintenance of those business relationships more costly and burdensome. The February 10, 2025 Letter of Intent came at a time when, as Musk knew, OpenAI was engaged in an extremely competitive process to raise funds. Commentators have noted that the specter of a Musk-dominated OpenAI could "frighten[ ] potential investors and increase OpenAI's cost of capital" in an extremely competitive and capital-intensive market.[16] That is precisely what Musk is

---

[14] Jessica Toonkel and Berber Jin, *Elon Musk-Led Group Makes $97.4 Billion Bid for Control of OpenAI*, The Wall Street Journal (Feb. 10, 2025), https://www.wsj.com/tech/elon-musk-openai-bid-4af12827.

[15] Allison Morrow, *What Elon Musk's $100 billion bid for OpenAI is really all about*, CNN (Feb. 12, 2025), https://www.cnn.com/2025/02/12/business/musk-altman-openai-nightcap/index.html.

[16] Stephanie Palazzolo and Rocket Drew, *The Strategy Behind Musk's $97 Billion Bid for OpenAI*, The Information (Feb. 11, 2025), https://www.theinformation.com/articles/the-strategy-behind-musks-97-billion-bid-for-openai.

seeking to achieve: to "derail[ ] efforts" to raise money from existing and new investors.[17]

**RESPONSE:** Plaintiffs lack knowledge or information sufficient to form an opinion regarding the truth of the allegations in the first sentence of Paragraph 96 and deny them on that basis. Plaintiffs deny that Musk knew about the details of OpenAI's fundraising in or around February 2025, and otherwise deny the allegations in the second sentence of Paragraph 96. The third sentence of Paragraph 96 purports to quote from and characterize a February 11, 2025 article published in *The Information*, to which Plaintiffs respectfully refer the Court for its complete and accurate contents. Plaintiffs deny the allegations in the fourth sentence of Paragraph 96.

97.    That motive was on display earlier this year. In January 2025, when OpenAI, Oracle, and Softbank announced their new Stargate venture—which President Trump heralded as an unprecedented investment in "colossal data centers" that will yield hundreds of thousands of jobs and push the frontiers of scientific discovery—Musk immediately sought to cast doubt on the project's viability. In private, trying to strangle the venture in the cradle, Musk encouraged any investor who would listen not to invest in Stargate.

**RESPONSE:** Denied.

98.    Musk has engaged in these efforts to slow OpenAI's progress and impair its ability to compete effectively in an increasingly crowded field, but also to seize and maintain for xAI an unearned edge designed to impair competition more broadly for the sole benefit of Musk's xAI, at the expense of the public interest.

**RESPONSE:** Denied.

99.    Meanwhile, for OpenAI employees all too familiar with the fallout at Twitter/X, the prospect of a Musk takeover means chaos and arbitrary employment action. Within six months of buying Twitter, Musk fired more than 6,000 of its employees, eliminating approximately 80% of the company's workforce, while refusing to pay required severance.

**RESPONSE:** Plaintiffs deny the allegations in the first sentence of Paragraph 99. Plaintiffs admit that, shortly after Musk acquired control of Twitter, he caused the termination of more than

---

[17] *See Elon Musk's $97bn offer is a headache for Sam Altman's OpenAI*, *supra* note 11.

6,000 employees, eliminating approximately 80% of the company's workforce. Plaintiffs otherwise deny the allegations in Paragraph 99.

100. Still worse, the threat of a Musk takeover is a threat to the very mission of building beneficial AGI—the mission to which OpenAI employees are dedicated. Musk's safety, security, and misinformation record is dismal. According to a study that evaluated the "risk-management practices of top AI companies," "the worst offender" in terms of "inadequate safety measures" was "Elon Musk's xAI." xAI received a total score of 0/5 in this study because it has "barely published anything about risk management."[18] xAI's Grok has also become a leading spreader of misinformation and inflammatory political rhetoric. Just recently, Grok was reported to have provided users with "detailed instructions on how to make chemical weapons of mass destruction," complete with "full list[s] of suppliers" and "[d]etailed instructions on how to get the needed materials."[19] Users also discovered that Grok would "consistently say that President Donald Trump and Musk deserve the death penalty"—a phenomenon xAI representatives themselves described as a "really terrible and bad failure."[20]

**RESPONSE:** Plaintiffs deny the allegations in the first and second sentences of Paragraph 100. The third and fourth sentence of Paragraph 100 purport to quote from and characterize a October 2, 2024 article published in *Time* and a study discussed in that article, to which Plaintiffs respectfully refer the Court for their complete and accurate contents. Plaintiffs deny the allegations in the fifth sentence of Paragraph 100. The sixth and seventh sentences of Paragraph 100 purport to quote from and characterize a February 25, 2025 article published in *Futurism* and a February 23, 2025 article published in *TechCrunch*, respectively, to which Plaintiffs respectfully refer the Court for their complete and accurate contents.

---

[18] Andrew R. Chow, *Some Top AI Labs Have 'Very Weak' Risk Management, Study Finds*, Time (Oct. 2, 2024), https://time.com/7026972/saferai-study-xai-meta/.

[19] Noor Al-Sibai, *Elon's Grok 3 AI Provides "Hundreds of Pages of Detailed Instructions" on Creating Chemical Weapons*, Futurism (Feb 25, 2025), https://futurism.com/elon-musk-grok-3-chemical-weapons.

[20] Kyle Wiggers, *Grok 3 appears to have briefly censored unflattering mentions of Trump and Musk*, TechCrunch (Feb. 23, 2025), https://techcrunch.com/2025/02/23/grok-3-appears-to-have-briefly-censored-unflattering-mentions-of-trump-and-musk/.

101.    The risk of future, irreparable harm from Musk's unlawful conduct is acute, and the risk that that conduct continues is high. With every month that has passed, Musk has intensified and expanded the fronts of his campaign against OpenAI, and has proven himself willing to take ever more dramatic steps to seek a competitive advantage for xAI and to harm Altman, whom, in the words of the President of the United States, Musk "hates."[21]

**RESPONSE:** Plaintiffs admit that Musk dislikes Altman due to Altman's extensive track record of dishonest, deceptive, and manipulative behavior.  Plaintiffs otherwise deny the allegations in Paragraph 101.

## FIRST CLAIM FOR RELIEF

## Unfair Competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

## (By OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC against Musk and xAI)

102.    Counterclaim Plaintiffs re-allege and incorporate by reference each of Paragraphs 1 through 101 as though fully set forth herein.

**RESPONSE:** Plaintiffs repeat and incorporate by reference their responses to the allegations in Paragraphs 1 through 101.

103.    Counterclaim Defendants intentionally engaged in unfair and fraudulent business practices by orchestrating a sham bid to purportedly acquire Counterclaim Plaintiff OpenAI, Inc.'s assets.

**RESPONSE:** Denied.

104.    On February 10, 2025, Musk's counsel announced to the media that he had sent a letter on behalf of a group of private investors, led by Musk in his capacity as CEO of xAI, to OpenAI, Inc.'s board of directors. The letter purported to make a bid to purchase Counterclaim Plaintiff OpenAI, Inc.'s assets for $97.375 billion.

**RESPONSE:**  Plaintiffs admit that, on February 10, 2025, Musk's counsel announced to the *Wall Street Journal* that Musk, in his capacity as CEO of xAI, along with a consortium of investors,

---

[21] *See* Max Chafkin, *Musk Can't Help Bringing His Rivalries to the White House*, Bloomberg (Jan. 24, 2025), https://www.bloomberg.com/news/newsletters/2025-01-24/elon-musk-sam-altman-feud-plays-out-in-trump-white-house-over-stargate.

36

sent a letter of intent to OpenAI, Inc.'s board of directors proposing to purchase OpenAI, Inc.'s assets for $97.375 billion.  Plaintiffs respectfully refer the Court to the letter of intent for its complete and accurate contents.

105.    Counterclaim Defendants' bid was a sham designed to disrupt Counterclaim Plaintiffs' operations and to gain an unfair business advantage.

**RESPONSE:** Denied.

106.    Many of the investors who participated in the purported takeover bid are close associates of Musk whose economic fortunes have turned in large part on the success of Musk-founded companies. One of those investors admitted to the lack of valuation analysis supporting the bid. The bid did not evidence any available financing to support the purported purchase price, and the proposed purchase price for Counterclaim Plaintiff OpenAI, Inc.'s assets had no discernible basis other than a comedic reference to Musk's favorite sci-fi series.

**RESPONSE:**  Plaintiffs admit that the investors involved in the bid have invested in Musk's other companies, including Tesla, SpaceX, and X, among others.  Plaintiffs otherwise deny the allegations in Paragraph 106.

107.    The purpose of the bid was to hinder Counterclaim Plaintiffs in their ability to compete by impeding their ability to raise capital; complicating the process for undertaking any corporate reorganization; introducing unwarranted complexity into the process for valuing assets; attempting to interfere with Counterclaim Plaintiffs' relationships with current and prospective investors; and attempting to interfere with Counterclaim Plaintiffs' business relationships with employees and API developers, including by raising the prospect of working and/or partnering with a Musk-affiliated entity with no strong commitment to OpenAI's mission or to AI safety. These concerns are particularly acute in light of the Counterclaim Defendants' stated intent to wage a bidding war for Counterclaim Plaintiff OpenAI, Inc.'s assets, which was intended to cast a pall of uncertainty over Counterclaim Plaintiffs' commercial future.

**RESPONSE:** Denied.

108.    Counterclaim Defendants' intent to undermine OpenAI through this sham bid is further confirmed by the bid's timing; the bid was announced when public reporting indicated that

OpenAI's board was actively, and intensively, deliberating on a potential structure change while in discussions with both the Delaware and California Attorneys General, such that the bid's announcement at that time was evidently intended to be maximally disruptive.

**RESPONSE:** Plaintiffs admit that the bid was announced after public reporting indicated that OpenAI was in discussions with the Delaware and California Attorneys General regarding a potential for-profit restructuring. Plaintiffs further note that, at the time of the bid, OpenAI's for-profit restructuring was already a long-running source of contention for nonprofit organizations and advocates, who had widely critiqued OpenAI's efforts and called on the Attorneys General to take action prior to the bid. Plaintiffs otherwise deny the allegations in Paragraph 108.

109. Counterclaim Defendants' sham bid is an unfair business practice because it was intended to disrupt Counterclaim Plaintiffs' operations for the purpose of impairing Counterclaim Plaintiffs' ability to raise funds and effectively compete in the nascent market to develop AI technologies. The purpose of this unfair business practice was to enhance the position of Counterclaim Defendants in the market by reducing competition from Counterclaim Plaintiffs, thus amounting to an incipient violation of federal and/or California antitrust law and/or a violation of the policy and spirit of those antitrust laws, as the effect of the sham bid was to threaten to reduce lawful competition in the market.

**RESPONSE:** Denied.

110. Counterclaim Defendants' sham bid is a fraudulent business practice because the purpose of the bid was to deceive members of the public that Counterclaim Defendants' true intentions were to acquire Counterclaim Plaintiff OpenAI, Inc.'s assets for $97.375 billion, rather than to disrupt Counterclaim Plaintiffs' operations and interfere with its business relationships.

**RESPONSE:** Denied.

111. As a direct and proximate result of Counterclaim Defendants' sham bid, Counterclaim Plaintiffs were forced to bear substantial costs and have thus suffered injuries in fact and lost money or property, including, without limitation, resources expended in hiring advisors to evaluate and respond to the bid and costs associated with the diversion of Counterclaim Plaintiffs' employees' time to respond to the bid.

**RESPONSE:** Plaintiffs deny the allegations in Paragraph 111 to the extent they characterize the bid for OpenAI's assets as a "sham." Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 111 and deny them on that basis.

112.    There is a substantial probability that Counterclaim Defendants' unfair and fraudulent conduct will recur in the absence of preliminary and permanent injunctive relief, as Counterclaim Defendants' sham bid is only the latest episode in a years-long campaign of harassment against Counterclaim Plaintiffs, which has also involved, among other things, calling for a "moratorium" on the development of advanced AI technology for purposes of stalling Counterclaim Plaintiffs' progress and benefitting Counterclaim Defendants' rival AI company; issuing a pretextual and deceptive records demand for the purpose of gathering and distorting competitively-sensitive information about Counterclaim Plaintiffs; repeatedly disparaging Counterclaim Plaintiffs on false and derogatory grounds, including on Counterclaim Defendants' X platform to an audience of hundreds of millions; and filing and belatedly withdrawing legal claims for purposes of harassing Counterclaim Plaintiffs.

**RESPONSE:** Denied.

113.    Counterclaim Defendants' motivation in conducting this harassment campaign has been to impose costs on Counterclaim Plaintiffs and disrupt their operations for the ultimate purpose of undermining Counterclaim Plaintiffs' ability to compete in the nascent market for AI technologies, and enhancing Counterclaim Defendants' competitive position in that market.

**RESPONSE:** Denied.

114.    Thus, as a direct and proximate consequence of Counterclaim Defendants' conduct, acts, and/or omissions in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Counterclaim Plaintiffs have been and will continue to be harmed and are entitled to restitution, prejudgment interest, and preliminary and permanent injunctive relief from any further unfair or fraudulent business practices as provided in Cal. Bus. & Prof. Code § 17203.

**RESPONSE:** Denied.

**SECOND CLAIM FOR RELIEF**

**Tortious Interference with Prospective Economic Advantage**

**(By OpenAI, Inc., OpenAI OpCo, LLC, and OpenAI Global, LLC against Musk and xAI)**

115.    Counterclaim Plaintiffs re-allege and incorporate by reference each of Paragraphs 1 through 114 as though fully set forth herein.

**RESPONSE:** Plaintiffs repeat and incorporate by reference their responses to the allegations in Paragraphs 1 through 114.

116.    At all times relevant to this action, Counterclaim Plaintiffs have maintained economic relationships with (1) third-party investors, (2) employees, and (3) customers that were or are likely to yield future and continued benefits to Counterclaim Plaintiffs.

**RESPONSE:** Plaintiffs lack sufficient knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116 and deny them on that basis.

117.    Counterclaim Defendants knew of these economic relationships and the probability of continued benefits to Counterclaim Plaintiffs.

**RESPONSE:** Denied.

118.    Counterclaim Defendants intentionally engaged in actions designed to disrupt Counterclaim Plaintiffs' economic relationships and did in fact disrupt those relationships.

**RESPONSE:** Denied.

119.    Specifically, on February 10, 2025, Musk's counsel announced to the media that he had sent a letter on behalf of a group of private investors, led by Musk in his capacity as CEO of xAI, to OpenAI, Inc.'s board of directors. The letter purported to make a bid on behalf of a consortium of named and unnamed private investors to purchase Counterclaim Plaintiff OpenAI, Inc.'s assets for $97.375 billion.

**RESPONSE:** Plaintiffs admit that, on February 10, 2025, Musk's counsel announced to the *Wall Street Journal* that Musk, in his capacity as CEO of xAI, along with a consortium of investors, sent a letter of intent to OpenAI, Inc.'s board of directors proposing to purchase OpenAI, Inc.'s assets for $97.375 billion.  Plaintiffs respectfully refer the Court to the letter of intent for its complete and accurate contents.

40

120.    Counterclaim Defendants' purported bid was a sham designed to disrupt Counterclaim Plaintiffs' economic relationships.

**RESPONSE:** Denied.

121.    The bid was intended to disrupt Counterclaim Plaintiffs' relationships with current and prospective investors and has rendered the performance of those business relationships more costly and burdensome. Without limitation, the bid complicated the process for undertaking any corporate reorganization, and may ultimately raise Counterclaim Plaintiffs' cost of capital.

**RESPONSE:** Plaintiffs deny the allegations in the first sentence of Paragraph 121. Plaintiffs otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 and deny them on that basis.

122.    On information and belief, the bid was intended to, and did in fact, disrupt Counterclaim Plaintiffs' business relationships with their employees and customers and has rendered the performance of those business relationships more costly and burdensome.

**RESPONSE:** Plaintiffs deny the allegations in Paragraph 122 to the extent they characterize the intent of Plaintiffs or any of their agents.  Plaintiffs otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122 and deny them on that basis.

123.    But for the Counterclaim Defendants' sham bid, Counterclaim Plaintiffs likely would have enjoyed the full scope of economic benefits from these business relationships.

**RESPONSE:** Plaintiffs deny the allegations in Paragraph 123 to the extent they characterize the bid as a sham.  Plaintiffs otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 and deny them on that basis.

124.    As a direct and proximate result of Counterclaim Defendants' wrongful conduct, Counterclaim Plaintiffs have suffered damages in an amount to be proven at trial.

**RESPONSE:** Denied.

125.    Counterclaim Defendants' conduct was independently wrongful because it constituted an unfair and fraudulent business practice in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (*see* Claim 1).

**RESPONSE:** Denied.

126.    Counterclaim Defendants engaged in wrongful conduct with malice, oppression, and fraud. Accordingly, Counterclaim Plaintiffs request that punitive damages be awarded in an amount sufficient to sanction this conduct and to deter those who would commit or knowingly seek to profit from similar actions, now or in the future.

**RESPONSE:** Denied.

127.    In addition to recovering damages, a preliminary and permanent injunction of any further interference with Counterclaim Plaintiffs' economic relationships is warranted because there is no adequate remedy at law for Counterclaim Defendants' tortious interference and the risk of future, irreparable harm is acute, in light of Counterclaim Defendants' years-long pattern of abusive conduct, involving, among other things, calling for a "moratorium" on the development of advanced AI technology to stall Counterclaim Plaintiffs' progress; issuing a pretextual and deceptive corporate records request; filing and withdrawing legal claims for purposes of harassing Counterclaim Plaintiffs; and orchestrating a sham bid to purportedly acquire Counterclaim Plaintiff OpenAI, Inc.'s assets (*see* Claim 1).

**RESPONSE:** Denied.

## AFFIRMATIVE DEFENSES

Plaintiffs assert the following defenses based in part and without limitation on the allegations asserted in Paragraphs 1 through 127 and the responses thereto, which are incorporated herein.

### FIRST DEFENSE: UNCLEAN HANDS

Both Counts of the OpenAI Defendants' Amended Counterclaims are barred, in whole or in part, by the OpenAI Defendants' unclean hands.  The OpenAI Defendants engaged in inequitable conduct that violates conscience and good faith, including:

- Since at least November 2022, the OpenAI Defendants worked to convert OpenAI, Inc. (now OpenAI Foundation) from a nonprofit organization focused on a charitable mission to a fully for-profit organization dedicated to maximizing the financial returns of its investors and insiders, including Altman and Brockman.  The OpenAI Defendants used Musk's financial contributions – more than $38 million that accounted for the majority

42

of OpenAI's funding in its first two years – along with Musk's reputation, recruiting ability, business connections, leadership, and strategic insight to ensure OpenAI's success.  But recognizing that Musk's support was strictly conditioned on OpenAI remaining an open-source, nonprofit organization dedicated to its charitable mission, the OpenAI Defendants falsely reassured Musk that OpenAI would stick to its charitable mission and misled him into believing that was the case.

- As part of their efforts to turn OpenAI into an entirely for-profit entity, in 2024 and 2025, the OpenAI Defendants contemplated a for-profit restructuring whereby OpenAI's for-profit affiliates would acquire the nonprofit's assets, eliminating the nonprofit altogether and removing even the façade of pursuing a nonprofit, charitable mission.  On information and belief, OpenAI's insiders – including Altman and Brockman, who stood to make significant individual financial returns through the restructuring – planned to participate on both sides of that conflicted transaction.  On information and belief, the OpenAI Defendants planned to sell OpenAI, Inc.'s assets in that transaction at a below-market price that did not reflect their fair value, violating the charitable trust that those assets were subject to as well as Altman and Brockman's fiduciary duties as officers and directors of the nonprofit organization.

- The OpenAI Defendants engaged in rampant self-dealing.  Altman and Brockman used their influence as officers and directors of OpenAI, Inc. and its for-profit affiliates to cause OpenAI to enter into numerous transactions with entities in which Altman or Brockman held a personal financial interest or through which they would otherwise personally benefit.

- The OpenAI Defendants sought to stifle legitimate competition from Plaintiffs by discouraging investment in xAI.  On information and belief, the OpenAI Defendants went so far as to condition investors' ability to participate in OpenAI's heavily oversubscribed fundraising rounds on the investors' agreement not to invest in OpenAI's competitors, including, specifically, xAI.

The OpenAI Defendants' inequitable conduct relates directly to both Counts of the OpenAI

43

Defendants' Amended Counterclaims.  Those claims are focused on Musk's efforts in or around 2023 through 2025 to investigate the OpenAI Defendants' inequitable conduct and protect OpenAI's assets and charitable mission from that conduct.  As OpenAI's original primary donor, its former co-chair, and someone whose reputation was publicly intertwined with OpenAI's for years, Musk was concerned for OpenAI's nonprofit mission.  He investigated whether OpenAI was complying with its mission and duties as a registered charity and nonprofit organization, or had instead been captured by for-profit interests.  After developing concerns, Musk sued and communicated with the California and Delaware Attorneys General to protect OpenAI's charitable mission and preserve OpenAI's assets.  The OpenAI Defendants' inequitable conduct relates directly to those efforts.

**SECOND DEFENSE: LITIGATION PRIVILEGE UNDER CAL. CIV. CODE § 47(b)**

Both Counts of the OpenAI Defendants' Amended Counterclaims are barred, in whole or in part, by the litigation privilege under California Civil Code § 47(b).  The February 10, 2025 letter of intent, Plaintiffs' communications with the California and Delaware Attorneys General, and Plaintiffs' litigation filings in California state court and this Court constitute communications in the context of or in contemplation of an official proceeding or a proceeding authorized by law within the scope of Civil Code § 47(b).  Plaintiffs, as litigants, potential relators, and interested parties affected by OpenAI's then-ongoing for-profit restructuring were authorized participants under the law when making the complained-of communications.  The communications were sent to achieve the object of the proceeding and were logically related to the object of the proceeding: ensuring the OpenAI nonprofit entity received fair value for its assets, which were subject to a charitable trust.  Plaintiffs' communications are therefore insulated from tort liability under Civil Code § 47(b).  And given that Civil Code § 47(b) specifically permits Plaintiffs' conduct, it qualifies as a statutory safe harbor to liability under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

**THIRD DEFENSE: CONSTITUTIONAL RIGHTS TO FREE SPEECH AND PETITION**

Both Counts of the OpenAI Defendants' Amended Counterclaims are barred, in whole or in part, by Plaintiffs' rights under the United States Constitution and the Constitution of the State of California to freedom of speech and freedom to petition the government.  The alleged conduct at the heart of the OpenAI Defendants' Amended Counterclaims – including Plaintiffs'

44

communications with the OpenAI Defendants, Plaintiffs' communications with the news media, Plaintiffs' communications with the California and Delaware Attorneys General, and Plaintiffs' litigation filings in California state court and this Court – constitutes protected First Amendment activity.  As such, Plaintiffs' conduct is protected by the *Noerr-Pennington* doctrine and constitutionally insulated from liability.

### FOURTH DEFENSE: PRIVILEGE OF FREE COMPETITION

Count II of the OpenAI Defendants' Amended Counterclaims is barred because the complained-of conduct, even if true, is protected as legitimate competition. Even if Plaintiffs intentionally disrupted the OpenAI Defendants' prospective economic relationships, that conduct was not tortious because the OpenAI Defendants are Plaintiffs' competitors; the allegedly injured relationships relate to the area of competition between the OpenAI Defendants and Plaintiffs; Plaintiffs did not employ any wrongful means; Plaintiffs' conduct did not create or continue any unlawful restraint of trade; and Plaintiffs' purpose was at least in part to advance Plaintiffs' interest in competing with the OpenAI Defendants.

### NEGATIVE DEFENSES

### FIFTH DEFENSE: LACK OF STATUTORY STANDING

Count I of the OpenAI Defendants' Amended Counterclaims is barred because the OpenAI Defendants lack standing under Cal. Bus. & Prof. Code § 17204 to assert that claim.

### SIXTH DEFENSE:  LACK OF ARTICLE III STANDING

Both Counts of the OpenAI Defendants' Amended Counterclaims are barred because the OpenAI Defendants lack Article III standing to assert those claims.

### SEVENTH DEFENSE: FAILURE TO STATE A CLAIM

Both Counts of the OpenAI Defendants' Amended Counterclaims fail to state a claim upon which relief may be granted.

### EIGHTH DEFENSE: NO INDEPENDENTLY WRONGFUL ACT

Count II of the OpenAI Defendants' Amended Counterclaims is barred because the OpenAI Defendants fail to plead or prove an independently wrongful act.

**NINTH DEFENSE: NO CAUSATION**

Both Counts of the OpenAI Defendants' Amended Counterclaims are barred because the OpenAI Defendants fail to plead or prove that Plaintiffs' conduct was a but-for or proximate cause of the OpenAI Defendants' purported injury.

**TENTH DEFENSE: NO DAMAGES**

Both Counts of the OpenAI Defendants' Amended Counterclaims are barred because the OpenAI Defendants have not suffered any injury, loss, or damages from the conduct alleged in the Amended Counterclaims.

**ELEVENTH DEFENSE: NO ENHANCED DAMAGES**

The OpenAI Defendants' request for punitive, exemplary, or other enhanced damages is barred because Plaintiffs never acted with oppression, fraud, malice, or willful or wanton negligence and such an award, if granted, would violate Plaintiffs' state and federal rights.

**TWELFTH DEFENSE: NO EQUITABLE RELIEF**

The OpenAI Defendants are not entitled to equitable relief, including but not limited to injunctive relief, because they have an adequate remedy at law and cannot show that they will suffer any irreparable harm, that the balance of the equities tips in their favor, or that the public interest supports relief.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a trial by jury for all issues triable to a jury under Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  August 10, 2026                    MOLOLAMKEN LLP

                                    By:    */s/ Steven F. Molo*
                                           Steven F. Molo (*pro hac vice*)

                                           Marc Toberoff (CA SBN 188547)
                                           MToberoff@toberoffandassociates.com
                                           TOBEROFF & ASSOCIATES, P.C.
                                           23823 Malibu Road, Suite 50-363
                                           Malibu, CA 90265
                                           Telephone: (310) 246-3333

                                           Robert K. Kry (*pro hac vice*)
                                           Jennifer M. Schubert (*pro hac vice*)
                                           Walter H Hawes IV (*pro hac vice*)
                                           Alexandra C. Eynon (*pro hac vice*)
                                           Sara Tofighbakhsh (*pro hac vice*)
                                           MOLOLAMKEN LLP
                                           430 Park Avenue
                                           New York, NY  10022
                                           Telephone: (212) 607-8160

47